H-1794-1 – MITIGATION (P)

Appendix 1-1

**Appendices**

**Appendix 1. Tools for Ensuring the Durability of Compensatory Mitigation Sites**

Durability is the maintenance of the effectiveness of a mitigation measure and/or a compensatory mitigation site for the duration of the impacts from public lands uses (BLM-proposed and externally proposed), including resource, administrative, and financial considerations. Tools to enhance site durability, where it does not already exist, will vary depending on the particular characteristics of a compensatory mitigation site (e.g., land ownership, current management prescriptions).

A. *BLM-Managed Lands*: On BLM-managed lands the most durable compensatory mitigation sites for conducting compensatory mitigation measures are those sites in the National Conservation Lands due to these lands' protected status in law. On other BLM-managed lands, the BLM may be able to offer a degree of durability that may be short of the near full durability provided by lands in the National Conservation Lands.

For compensatory mitigation sites on BLM-managed land, appropriate actions should be taken to ensure that those sites are durable. Some durability actions may include one or a combination of the following:

1. Secretarial withdrawals under the authority of FLPMA § 204 (43 USC 1714) to curtail or limit the operation of some or all of the public land laws (such as a withdrawal from mineral entry under the mining laws) at the site.

   a. The voluntary relinquishment of a mining claim by a mining claimant, or a voluntary agreement from a mining claimant to cease operations or not start operations, could provide additional durability to the site for the duration of the Secretarial withdrawal.

2. The lease or conveyance of public land, under the authority of the Recreation and Public Purposes Act (43 USC 869 et seq.), to a Federal, state, or local government, or non-profit organization, for a public purpose that provides for the durability of the site.

3. Identification of a protective land use plan allocation for the site, including land use restrictions that provide, consistent with applicable law, for the durability of the site (via the authority granted in FLPMA § 202; e.g., exclusion area; no surface occupancy; limitations on the amount of disturbance; established protection measures, such as required Best Management Practices; Area of Critical Environmental Concern; Research Natural Areas).

   a. The use of land use planning to provide a layer of durability is encouraged; however, it is important to recognize that future land use plan amendments (e.g.,

BLM_0026463

H-1794-1 – MITIGATION (P)

project-level land use plan amendments) and/or revisions to the land use plan have the potential to change the durability of compensatory mitigation sites.

4. The issuance of a land use authorization (e.g., leases or easements) to a member of the public for purposes of conservation for the site (via the authority granted in FLPMA Title III and/or Title V).

5. The modification or relinquishment of an existing lease, with the consent of the lessee, to remove this (potential) incompatible uses from the site for the duration of the impact.

*Example (layering of durability tools): To provide for the durability of compensatory mitigation sites associated with residual effects from oil and gas wells and related infrastructure on BLM-managed lands, in an area with a valid existing oil and gas lease, the lessee agrees to a modification or relinquishment of the lease within the compensatory mitigation site. Additionally, the BLM amends its land use plan to exclude other incompatible uses in the area of the compensatory mitigation site (e.g., oil and gas leasing, transmission line rights-of-way, off-road vehicle use, closing the compensatory mitigation site to disposal), and the Secretary withdraws the compensatory mitigation site from mineral entry. The lease modification or relinquishment will reduce or prevent surface disturbance allowable under the lease, the land use plan amendment will restrict the most conflicting public land uses, and the withdrawal will prevent location and entry under the United States mining laws, subject to valid existing rights, and from applications and offers under the mineral leasing law. Together, these three actions ensure the durability of the compensatory mitigation site.*

B. *Private Lands*: For compensatory mitigation sites on private lands, durability tools may include legal conservation easements, other deed restrictions, habitat management agreements, etc. and may only be implemented with the consent of the landowner.

BLM_0026464

**Appendix 2. The BLM's Management of Compensatory Mitigation Funds**

Subject to the requirements described below, the BLM may accept an offer of monies from a public land user to fund specific compensatory mitigation measures, either on or off BLM-managed lands. The BLM may also accept an offer of monies from individual, public land users and may pool those funds towards completion of larger, collective compensatory mitigation measures. This is especially efficient for compensating for the residual effects to similar resources from multiple public land uses, when it is not feasible or efficient to require individual, public land users to manage their own compensatory mitigation measures or sites.

The BLM may use monetary contributions for implementing compensatory mitigation measures and the management of compensatory mitigation sites, including the associated administrative costs, durability, monitoring, adaptive management, and reporting. In order to qualify, the funds collected should be identified for specific types of compensatory mitigation measures (e.g., habitat restoration for a species that would be impacted by the public land use). The decision document should be as specific as possible regarding what types of compensatory mitigation measures will be funded in order to address the residual effects that were determined to warrant compensatory mitigation.

The BLM's process for accepting and managing mitigation contributions is as follows:

A. *On BLM-Managed Lands*: BLM's authority to accept an offer of monies for specific compensatory mitigation measures at compensatory mitigation sites on BLM-managed lands comes from:

1. FLPMA Section 307(b), which provides the authority to enter into contracts and cooperative agreements, and FLPMA Section 307(c), which provides the authority to accept contributions or donations of money for management and protection of the public lands.

2. The Wyden Amendment, 16 U.S.C. 1011, which provides the authority to expend contributed funds on activities limited to those involving the protection, restoration, and enhancement of fish and wildlife habitat and other resources or for the reduction of risk of natural disaster where public safety is threatened that also benefit resources on public lands within the watershed.

B. *On non-BLM-Managed Lands*: Before accepting money intended for expenditure on non-BLM lands (including other Federal, Tribal, State, or private lands, with the consent of the landowner), BLM managers should consult with the Solicitor's Office and the National Operations Center to confirm that they have sufficient authority to accept and expend funds in the proposed manner. The BLM's authority to accept an offer of monies to fund BLM's performance of specific compensatory measures at compensatory mitigation sites on non-BLM-managed lands comes from:

H-1794-1 – MITIGATION (P)

Appendix 2-2

1. The Wyden Amendment, 16 U.S.C. 1011, which provides the authority to expend contributed funds on activities limited to those involving the protection, restoration, and enhancement of fish and wildlife habitat and other resources <u>or</u> for the reduction of risk of natural disaster where public safety is threatened that also benefit resources on <u>public lands</u> within the watershed.

C. For the BLM to accept compensatory mitigation funds, a written agreement must exist between the BLM and the entity contributing the funds (e.g., the public land user). This agreement should be consistent with applicable law and describe the:

1. Authorities to enter into the agreement.

2. Amount of funding that the BLM is accepting.

3. Resource <u>outcomes</u> that will be achieved with the funds.

4. Specific types of compensatory mitigation measure(s) that may be undertaken with the funds, including a discussion of how <u>durability</u> will be ensured.

5. Timelines for expending the funds to implement the compensatory mitigation measure(s).

6. Adequacy of funds for the specific compensatory mitigation measures(s), including a discussion of how <u>additionality</u> will be ensured.

7. Project codes for tracking accepted and expended funds (especially in the case of multiple contributors).

8. Administrative fees.

9. Disposition or refund of excess funds, if any.

10. Reporting requirements.

11. Rules and requirements for agency cooperators.

12. Assent of all parties, including the applicable BLM State Director.

Additional written agreements may be necessary to expend the compensatory mitigation funds, such as with the landowner(s) where the compensatory mitigation measure will occur (if not on BLM-managed lands) or with an applicable regulatory agency (e.g., US Fish and Wildlife Service, State agencies).

D. The BLM must carefully and transparently manage compensatory mitigation funds by:

BLM_0026466

H-1794-1 – MITIGATION (P)

Appendix 2-3

1. Properly recording the acceptance of funds for compensatory mitigation measures on Form 4120-9 ("Proffer of Monetary Contributions") and depositing the funds into the appropriate 7100 account (usually 7122) for expending on the compensatory mitigation measure.

2. Assigning specific project codes to the compensatory mitigation fund accounts to track the contributions and subsequent expenditures.

BLM_0026467

Form 1221-2
(June 1969)



<table>
<tr><td rowspan="3">UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT<br><br>MANUAL TRANSMITTAL SHEET</td></tr>
</table>

|  |  |
|---|---|
| UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT<br><br>MANUAL TRANSMITTAL SHEET | Release<br>1-1780 |
|  | Date<br>12/15/16 |

Subject: BLM Manual 1780 Tribal Relations (P)

1.  <u>Explanation of Material Transmitted</u>:  This release transmits the new Manual (MS) 1780, *Tribal Relations*, which replaces MS 8120, *Tribal Consultation under Cultural Resources*. MS 1780 implements new administration and Departmental policies to provide comprehensive policy direction for all BLM managers and programs.

2.  <u>Reports Required</u>:  None.

3.  <u>Material Superseded</u>:  MS 8120.  Release number 8-74

4.  <u>Filing Instructions</u>:  Remove and replace in accordance with the below instructions.

REMOVE     All of MS 8120                   INSERT    All of MS 1780
           Release 8-74


                              *Neil Kornze*

                              Director
                              Bureau of Land Management

BLM_0026468

MS-1780 – TRIBAL RELATIONS (P)

i

# Table of Contents

**CHAPTER 1. INTRODUCTION** ......................................................................................... **1-1**
   1.1   PURPOSE ..................................................................................................................... 1-1
   1.2   OBJECTIVES ................................................................................................................ 1-2
   1.3   AUTHORITY ................................................................................................................ 1-3
   1.4   RESPONSIBILITY ......................................................................................................... 1-7
   1.5   REFERENCES ............................................................................................................... 1-12
   1.6   POLICY ....................................................................................................................... 1-13
   1.7   FILE AND RECORDS MAINTENANCE .......................................................................... 1-19

**CHAPTER 2. BLM RELATIONSHIP TO TRIBAL GOVERNMENTS,
INDIVIDUALS, AND NON-FEDERALLY RECOGNIZED GROUPS** ............................. **2-1**
   2.1   FEDERALLY RECOGNIZED TRIBES ............................................................................. 2-1
   2.2   INDIAN INDIVIDUALS AND NONGOVERNMENTAL TRIBAL GROUPS ........................... 2-1
   2.3   GROUPS AND COMMUNITIES NOT FEDERALLY RECOGNIZED ....................................... 2-2

**CHAPTER 3. PROGRAM RELATIONSHIPS** ....................................................................... **3-1**
   3.1   TRIBAL RELATIONS INFORM DECISIONMAKING AND PROGRAM MANAGEMENT ............ 3-1
   3.2   TRIBAL CONSULTATION OBLIGATIONS EXTEND TO INTER-AGENCY
        RELATIONSHIPS .......................................................................................................... 3-8
   3.3   RELATIONSHIP TO STATE AND LOCAL GOVERNMENTS ................................................ 3-9

**GLOSSARY OF TERMS** ........................................................................................................ **G-1**

**APPENDICES**
   APPENDIX 1   ACRONYMS AND ABBREVIATIONS ............................................................. A1-1
   APPENDIX 2   JUDGING THE ADEQUACY OF TRIBAL CONSULTATION ................................. A2-1
   APPENDIX 3   BLM TRIBAL LIAISON POSITION DESCRIPTION .......................................... A3-1

BLM MANUAL                                      Rel. No. 1-1780
Supersedes Rel. 8-74                    12/15/16

BLM_0026469

Case No. 1:20-cv-02484-MSK   Document 34-1   filed 04/27/21   USDC Colorado   pg 8 of 470

# Chapter 1.  Introduction

## 1.1   Purpose

A.  The United States has a unique legal relationship with federally recognized Indian tribes established through and confirmed by the Constitution of the United States, treaties, statutes, Executive orders, and judicial decisions.  In accordance with that relationship, the Bureau of Land Management (BLM) is charged with engaging in regular and meaningful consultation and collaboration with federally recognized tribes in the development of Federal policies and decisions that have tribal implications.

B.  This manual defines the policies, roles and responsibilities, and standards for BLM tribal relations and government-to-government tribal consultation within a comprehensive framework of those legal authorities affecting this relationship.  This manual provides a reference source within the BLM Manual system that establishes policy governing BLM tribal relationships, including consultation, coordination, and trust responsibilities.  Its purpose is to strengthen the BLM's tribal relations policies and procedures, including those related to the agency's trust responsibilities toward tribes.  These policies encourage the BLM to establish ongoing relationships with federally recognized tribes (American Indians and Alaska Natives) through engagement in open, continuous, and meaningful consultation.

C.  This manual provides policy direction on the BLM's tribal consultation responsibilities across all BLM program areas.

D.  This manual and its accompanying handbook, H-1780-1, Improving and Sustaining BLM-Tribal Relations, replace policies previously established in MS-8120,  Tribal Consultation Under Cultural Resources (December 2004), and H-8120-1, General Procedural Guidance for Native American Consultation (December 2004).  These updated directives reflect key provisions of those authorities listed below which have been issued since December 2004.

E.  This manual establishes policy direction regarding government-to-government consultation with Indian tribes relating to BLM decisions to ensure that it—

1.   Begins early in the life cycle of a proposed action;

2.   Directly involves the agency official who has delegated authority for disposition of the proposed action;

3.   Recognizes the transparent and deliberative nature of consultation;

4.   Includes a reasonable and sustained effort to invite tribes to consult, which may include several invitations and/or other methods of offering engagement;

BLM_0026470

MS-1780 – TRIBAL RELATIONS (P)

5. Is carried out in the context of an ongoing relationship involving regularly scheduled meetings and other forms of communications;

6. Communicates final decisions with a summary explanation of how tribal concerns were taken into account; and

7. Does not terminate with the decision or authorization itself, but rather continues to engage tribes regarding land and mineral resources, land uses, treatments, all forms of mitigation (including data recovery, interpretation, funding for tribal social/cultural programs, lease stipulations, operating plan conditions-of-approval, etc.), inspections and monitoring, reclamation requirements, and dissemination of reports and information for the lands and resources affected.

## 1.2   Objectives

The objectives of this manual are—

A. To develop and maintain productive government-to-government tribal relationships at the field, district, state, and Washington office levels with federally recognized tribes within the framework of the legal authorities listed at section 1.3.

B. To build long-term partnerships with tribal governments based on common interests in managing and protecting lands and resources important to Indian tribes and the American people.

C. To encourage the exchange of information regarding tribal issues and resources across all BLM programs.

D. To establish tribal consultation as a standard and routine BLM practice.

E. To ensure that BLM tribal consultation is consistent with departmental and national policy goals to—

1. Collect, evaluate, apply, and protect sensitive and confidential information relating to tribal concerns in a consistent manner;

2. Conduct timely, respectful, and meaningful two-way communication and consultation with tribes that—

a. Recognizes the ongoing BLM operational and fiduciary responsibility concerning Indian tribal trust minerals and other resource development on Indian trust lands.

b. Ensures appropriate opportunities for tribal input regarding the management of non-trust assets on public lands managed by the BLM; and

BLM_0026471

MS-1780 – TRIBAL RELATIONS (P)

    3.    Foster positive relationships and trust between the BLM and tribes through collaborative stewardship in management of tribal and public land resources.

F.   To carry out policies and operational guidance designed to meet these goals based on tribal consultation principles expressed in the Department of the Interior's Policy on Consultation with Indian Tribes and the Consultation Committee of the Interagency Working Group on Indian Affairs, as adopted in the Departmental Manual – 512 DM 4 and 5 (November 9, 2015). This manual adopts consultation principles derived from Presidential Memorandum on Tribal Consultation (November 5, 2009) and Executive Order 13175 (November 6, 2000):

    1.    Respect tribal sovereignty;

    2.    Honor the government-to-government relationship;

    3.    Acknowledge trust responsibility;

    4.    Accept tribal self-determination and self-governance; and

    5.    Regard consultation as an ongoing process.

G.   To establish a BLM tribal relations policy that recognizes each tribal government is unique in its views, concerns, and capacities. The BLM will endeavor to establish government-to-government relationships with each tribe that are responsive to the unique nature of each tribal government.

H.   To acknowledge that tribes have different interests and capacities and to commit to working collaboratively with tribes to develop consultation procedures that meet the needs and capabilities of both the BLM and tribes.

## 1.3   Authority

Federal government and Indian tribal relationships reflect the political and historical development of the Nation. The BLM's legal and political government-to-government consultation process is an expression of such fundamental legal principles as trust relationship, reserved rights, plenary powers, and tribal sovereignty. These legal tenets are further delineated in accordance with the following authorities and directives:

A.   *Treaties.* Treaties between tribes and the United States constitute negotiated agreements that served multiple functions, including recognizing a sovereign government, establishing economic relations, acquiring territory by the United States, and establishing reserves where tribal law and customs prevail. Some tribes reserved the right for their members to fish, hunt, and gather foods and medicine on their homelands beyond reserved land boundaries; other treaties were never ratified, however, thus providing an opportunity for those tribes to continue their claim to aboriginal title and inherent rights. The federal trust responsibility confirms that tribes

BLM MANUAL                                Rel. No. 1-1780
Supersedes Rel. 8-74                       12/15/16

BLM_0026472

MS-1780 – TRIBAL RELATIONS (P)

1-4

have a unique status and forms the basis for the relationship between tribes and the United States government.  Under the treaties, tribes ceded significant portions of their aboriginal lands to the United States.  Generally, in return, tribes reserved separate, isolated reservation lands under the treaties and retained certain rights to hunt, fish, graze animals, and gather resources on unoccupied lands ceded to the United States.  These rights are known as "off-reservation treaty rights."

B.  *Laws* that serve as authorities for tribal consultation are—

1.  The Act of April 8, 1864, Survey of Reservations (25 U.S.C. 176);

2.  The Anti-Deficiency Act of 1870 (31 U.S.C. 1341);

3.  Indian General Allotment Act of 1887 (25 U.S.C. 334);

4.  Leases of Allotted Lands for Mining Purposes of 1909 (25 U.S.C. 396);

5.  Mineral Leasing Act of 1920, as amended through Public Law 113-67 (30 U.S.C. 181);

6.  Indian Reorganization Act (IRA) of 1934 (25 U.S.C. 5101, et seq.);

7.  Leases of Unallotted Lands for Mining Purposes of 1938 (25 U.S.C. 396a);

8.  National Historic Preservation Act of 1966 (NHPA) (54 U.S.C. 300101);

9.  National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321);

10.  Alaska Native Claims Settlement Act of 1971 (43 U.S.C. 1601, et seq.);

11.  Indian Self-Determination and Education Assistance Act of 1975 (25 U.S.C. 450);

12.  Federal Land Policy and Management Act of 1976 (FLPMA) (43 U.S.C. 1701);

13.  American Indian Religious Freedom Act of 1978 (AIRFA) (42 U.S.C. 1996);

14.  Archaeological Resources Protection Act of 1979 (ARPA) (16 U.S.C. 470aa);

15.  Alaska National Interest Lands Conservation Act of 1980 (ANILCA) (16 U.S.C. 1602–1784);

16.  Indian Mineral Development Act of 1982 (25 U.S.C. 1601);

17.  Native American Graves Protection and Repatriation Act of 1990 (NAGPRA) (25 U.S.C. 3001);

18.  Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb); and

BLM_0026473

MS-1780 – TRIBAL RELATIONS (P)

19.   Tribal Forest Protection Act of 2004 (25 U.S.C. 3101, et seq.).

C.   *Regulations* governing tribal consultation include—

1.   25 CFR Part 211, Leasing of Tribal Lands for Mineral Development;

2.   25 CFR Part 212, Leasing of Allotted Lands for Mineral Development;

3.   25 CFR Part 216, Surface Exploration, Mining, and Reclamation;

4.   25 CFR Part 224, Tribal Energy Resource Agreements Under the Indian Tribal Energy Development and Self Determination Act;

5.   25 CFR Part 225, Oil and Gas, Geothermal, and Solid Mineral Agreements;

6.   25 CFR Part 900, Contracts Under the Indian Self-Determination and Education Assistance Act;

7.   25 CFR Part 1000, Annual Funding Agreements Under the Tribal Self-Governance Act Amendments to the Indian Self-Determination and Education Act;

8.   36 CFR Part 60, National Register of Historic Places;

9.   36 CFR Part 800, Protection of Historic Properties;

10.   40 CFR Part 1500, Purpose, Policy, and Mandate (of NEPA);

11.   43 CFR Part 7, Protection of Archaeological Resources;

12.   43 CFR Part 10, Native American Graves Protection and Repatriation Regulations;

13.   43 CFR Part 46, Implementation of the National Environmental Policy Act of 1969;

14.   43 CFR Part 1600, Planning, Programming, Budgeting;

15.   43 CFR 2650, Alaska Native Selections under the Alaska Native Claims Settlement Act;

16.   43 CFR Part 3000, Minerals Management: General;

17.   43 CFR Part 3160, Onshore Oil and Gas Operations (i.e., Oil and Gas Order No.1);

18.   43 CFR Part 3260, Geothermal Resources Operations;

BLM_0026474

MS-1780 – TRIBAL RELATIONS (P)

1-6

19.   43 CFR Part 3400, Coal Management: General;

20.   43 CFR Part 3590, Solid Mineral (Other Than Coal) Exploration and Mining Operations;

21.   43 CFR Part 8365, Rules of Conduct; and

22.   43 CFR Part 9180, Cadastral Surveys.

D.   *Executive Orders/Presidential Memoranda* addressing tribal relations include—

1.   Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (59 CFR Part 7629; February 16, 1994);

2.   Presidential Memorandum of April 29, 1994, Government-to-Government Relations with Native American Tribal Governments;

3.   Executive Order 13007, Indian Sacred Sites (61 CFR Part 104; May 24, 1996);

4.   Executive Order 13175, Consultation and Coordination with Indian Tribal Governments (65 CFR Part 67249; November 6, 2000);

5.   Presidential Memorandum of September 23, 2004, Memorandum on Government-to-Government Relationship with Tribal Governments;

6.   Presidential Memorandum of November 5, 2009, Tribal Consultation;

7.   Presidential Memorandum of April 16, 2010, A 21st Century Strategy for America's Great Outdoors; and

8.   Executive Order 13592, Improving American Indian and Alaska Native Educational Opportunities and Strengthening Tribal Colleges and Universities (3 CFR Part 13592; December 2, 2011).

E.   Orders from the Secretary of the Interior include—

1.   Secretarial Order 3087 (as amended), Organizational Restructuring of the Department of the Interior Minerals Management Functions (December 3, 1982);

2.   Secretarial Order 3206, American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act (June 5, 1997);

3.   Secretarial Order 3215, Principles for the Discharge of the Secretary's Trust Responsibility (April 28, 2000);

BLM_0026475

4.   Secretarial Order 3317, Department of the Interior Policy on Consultation with Tribes (December 1, 2011);

5.   Secretarial Order 3323, Establishment of the America's Great Outdoors Program (September 12, 2012);

6.   Secretarial Order 3335, Reaffirmation of the Federal Trust Responsibility to Federally Recognized Indian Tribes and Individual Indian Beneficiaries (August 20, 2014);

7.   Secretarial Order 3336, Rangeland Fire Prevention, Management and Restoration (January 5, 2015);

8.   Secretarial Order 3342, Identifying Opportunities for Cooperative and Collaborative Partnerships with Federally Recognized Indian Tribes in the Management of Federal Lands and Resources (October 21, 2016).

F.   Departmental Manuals include—

1.   512 DM 3, Departmental Responsibilities for Protecting/Accommodating Access to Indian Sacred Sites

2.   512 DM 4, Department of the Interior Policy on Consultation with Indian Tribes and Alaska Native Corporations

3.   512 DM 5, Procedures for Consultation with Indian Tribes

1.4   Responsibility

A.   *Delegation of Authority.*  Part 235 of the Departmental Manual (DM) delegates authorities from the Secretary or Assistant Secretary of Land and Minerals Management to the BLM Director.  BLM state directors are generally authorized to perform in their respective states the functions of the BLM Director.  BLM policy (MS 1203.02) requires that authority for making specific agency decisions related to project approvals or land use allocations be delegated to the level of the organization (field office manager or district manager) most responsive to local communities, issues, and conditions.  Department policy as stated in 512 DM 5 is "the appropriate DOI officials are those individuals who are knowledgeable about the matters at hand, are authorized to speak for a bureau/office, and who exercise delegated authority in the disposition and implementation of a bureau/office action."  The authorized officer carrying out tribal consultation for the BLM under such delegation is doing so on behalf of the Secretary of the Interior.

B.   *The Director and deputy directors* have responsibility for ensuring that BLM program-specific policies and operations are consistent with the policies and principles on tribal relations as expressed in part by Secretarial Order 3335, including government-to-

government consultation, and are followed by state, district, and field office managers. On an annual basis, the Director must report to the Secretary on the results of his/her tribal consultation efforts in accordance with 512 DM 4. In carrying out the reporting requirements of 512 DM 4, the Director may meet with Indian tribal leaders regarding the BLM's management priorities and policies. Reporting is intended to be comprehensive and may include, but is not limited to, the scope of consultation efforts, the cost of these efforts, and the effectiveness of consultation activities.

C. *Assistant directors*, acting through their respective divisions and staffs to the resource programs or administrative processes involved, are jointly responsible for developing the specific program- or process-related guidance, procedures, and directives needed to ensure that tribal consultation is carried out consistently in accordance with this manual among the BLM's various programs and offices.

D. *The tribal liaison officer* is appointed by the Director to carry out the duties prescribed in 512 DM 4. Such responsibilities include but are not limited to: enhancing communications with tribes; promoting cooperation between agencies when a Department of the Interior action with tribal implications arises; coordinating annual reports describing efforts to promote consultation with tribes; supporting/participating in the joint tribal-Federal mission to identify areas for improvements in the Department's consultation practices; and contributing to the development of annual work plans that specify priorities to improve the quality of consultation practices.

E. *State directors and associate state directors* must develop and maintain a government-to-government relationship with tribes. State directors are charged with—

   1. Ensuring that tribal consultation responsibilities are accomplished;

   2. Developing agreements for communication within the framework of the Bureau's government-to-government relationship with tribes;

   3. Ensuring the development and use of sound technical information, policy guidance, and procedures as needed;

   4. Coordinating tribal consultation with other Federal offices at state and regional levels where appropriate;

   5. Developing procedures to facilitate consultation when BLM-tribal consultation includes more than one field office;

   6. Coordinating protocols that facilitate tribal consultation and tribal relations with other BLM state directors, including the establishment of regional tribal liaisons, when the tribes involved consult with multiple BLM states; and

BLM_0026477

MS-1780 – TRIBAL RELATIONS (P)

    7.    Cooperate with other state directors by facilitating regular coordination meetings and developing consistent tribal consultation procedures for tribes whose concerns regarding traditional lands may extend into multiple states.

F.  *District managers and field office managers (line officers)* are expected to establish ongoing government-to-government relationships with elected tribal officials and those members of tribal government authorized by the tribe to engage in government-to-government activities.  Line managers must become familiar with the history of Federal-tribal relationships of the particular tribes with whom they consult.  Such knowledge should include, where applicable, an appreciation for how property rights have been maintained as well as any specific off-reservation treaty rights and how they relate to or affect local tribes' use and access to resources on public lands.  Given the complexity of laws, treaties, and other authorities, line managers must seek legal advice from Department of the Interior solicitors if legal questions arise regarding tribal rights and the management of public lands or resources.  Line officers are directly accountable for carrying out BLM policies and decisions within a geographically designated administrative unit.  They are authorized to speak for the BLM and have delegated project-level decisionmaking authority and responsibility, including—

    1.    Administering lands, cultural heritage, natural, and minerals resources programs in a manner consistent with Indian treaty rights, other applicable legal statutes, and the BLM's responsibility to work in partnership with Indian tribes on a government-to-government basis;

    2.    Developing relationships and agreements to facilitate coordination and consultation when BLM-tribal consultation is limited to that particular field office;

    3.    Seeking opportunities to develop partnerships with tribes under all appropriate BLM authorities;

    4.    Facilitating tribal access to public lands for the purposes of religious use and other traditional uses, such as gathering natural resources, and avoiding unnecessary interference with traditional religious practices;

    5.    Ensuring that Indian tribes are consulted to gather information relating to public land resources of interest to tribes (such as firewood collecting, grazing, water use, and plants and animals of traditional importance) and to ensure that land use planning takes such concerns and interests into account;

    6.    Initiating contact and consulting with tribes pursuant to the requirements of laws, Executive orders, regulations, guidance, and agreements cited in sections 1.3 and 1.5 and personally participating in key milestone meetings;

BLM_0026478

MS-1780 – TRIBAL RELATIONS (P)

7. Ensuring that potentially affected tribes, located inside and outside of field office boundaries, are consulted in order to identify their concerns to allow these concerns to be considered in specific BLM decisions;

8. Ensuring that information on tribal issues receives good faith consideration during BLM decisionmaking;

9. Ensuring that the manner in which tribal concerns are considered and how these concerns are addressed in the decisionmaking process is communicated clearly to the affected tribes;

10. Maintaining a professional staff capable of working cooperatively and effectively with tribal representatives so that proposed land use actions minimize adverse effects to lands or resources of importance to tribes to the extent permitted by law; and

11. Ensuring that tribal mineral records, sensitive and confidential information related to sacred sites as defined in Executive Order 13007, and traditional religious or cultural practices on the public lands are protected from public disclosure to the extent permitted by law.

G. *State, district, and field tribal liaisons* are responsible for providing professionally sound information, recommendations, and advice to line managers regarding coordination of all Bureau programs and activities with programs and interests of tribal governments. BLM tribal liaisons are charged with providing line managers with timely and appropriate information on how best to engage in effective government-to-government consultation and ongoing relationships with tribal entities. Where multiple tribal liaison positions are created within a state, coordination from the State Office will establish and implement uniform policies for tribal consultation so that approaches do not vary significantly across the state. A model position description for such a position can be found in appendix 3. Depending upon their location within the BLM organization, tribal liaison duties may include:

1. Advising line management on possible impacts of proposed agency actions and identifying potential preferred courses of action, where appropriate;

2. Advocating and promoting effective ongoing communication between the BLM and tribes;

3. Communicating issues and concerns raised by tribes during consultation to the project manager or other staff specialists;

4. Assisting BLM specialists and concerned tribal staff to craft solutions to conflicts concerning natural and heritage resources;

BLM_0026479

MS-1780 – TRIBAL RELATIONS (P)

5. Advising managers on conflicting or competing interests of various tribes regarding proposed land uses;

6. Ensuring that tribal issues and concerns are appropriately considered and addressed in the NEPA review process;

7. Documenting ongoing tribal consultation and providing it to the project manager or line officer;

8. Facilitating and providing staff support to all line officers engaged in government-to-government meetings or joint field trips, including providing documentation of discussions;

9. Providing line and project managers with information regarding traditional uses of public lands, tribal practices and beliefs, and locations on public lands that may be associated with such practices and beliefs;

10. Working with tribes to develop and implement projects and programs of mutual interest that enhance opportunities for the education and training of tribal members and the public, including development of curriculum materials; and

11. Informing tribal youth of temporary seasonal employment opportunities, internships, or the Pathways Program for careers in the BLM, as directed by human resources staff and field managers.

H. *Project managers* ensure that line officers invite tribes to be cooperating agencies in preparing resource management plans (RMP) and EISs; as consulting parties under 36 CFR Part 800; or as interested parties for any project review. Project managers support efforts by the appropriate line officer(s) to facilitate tribal consultation for multi-jurisdiction projects such as interstate rights-of-way which may affect tribal use and access to public lands or resources of concern to tribes. Project managers work with tribal liaisons to facilitate government-to-government consultation with Indian tribes by promoting open and ongoing dialogue. They ensure that documentation of tribal consultation is maintained and complete in the administrative record. They provide final decision documents, accompanied by an explanation of why the agency did or did not make changes requested by tribes, to all line officers responsible for consulting with tribal partners.

I. *Applicants* for BLM authorizations (permittees, lessees, licensees, grantees, etc.) cannot be delegated tribal consultation responsibilities. The appropriate use of applicants or their contractors will be determined by the BLM line manager and the tribes, following BLM-tribal consultation. The BLM remains responsible for the government-to-government consultation process. Applicants, their employees, and contractors may not become involved in any aspects of tribal consultation in which BLM decisionmaking constitutes an inherently governmental function. However, applicants may assist the

BLM_0026480

MS-1780 – TRIBAL RELATIONS (P)

BLM in such administrative support activities as gathering and analyzing data, preparing reports, facilitating field trip logistics, managing compilation of data and records as part of project documentation, or other approved activities. (See H-1780-1 Chapter III. B. 3 for a more detailed description of the limited role of applicants in the facilitation of tribal consultation by the BLM).

1.5   References

A. Existing BLM manual guidance is found in—

1.   MS-1203, Delegation of Authority, (including annual updates);

2.   MS-1601, Land Use Planning;

3.   H-1790-1, National Environmental Policy Act;

4.   MS-4100, Grazing Administration—Exclusive of Alaska;

5.   MS-6100, National Conservation Lands Management;

6.   MS-6220, National Monuments, National Conservation Areas, and Similar Designations;

7.   MS-6250, National Scenic and Historic Trail Administration;

8.   MS-6330, Management of BLM Wilderness Study Areas;

9.   MS-6340, Management of Designated Wilderness Areas;

10.   MS-6400, Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, Planning, and Management;

11.   MS-8100, Foundation of the Cultural Heritage Program;

12.   MS-8110, Proactive Management of Heritage Resources;

13.   MS-8120, Heritage Resources in Land Use Planning;

14.   MS-8130, Heritage Resource Stewardship and Protection;

15.   MS-8140, Environmental Review in Heritage Resources;

16.   MS-8150, Permitting Cultural Heritage Program Activities;

17.   MS-8160, Managing Heritage Resource Data;

18.   MS-8170, Managing Cultural Resource Collections; and

BLM_0026481

MS-1780 – TRIBAL RELATIONS (P)

1-13

19. MS-8180, Implementing the Native American Graves Protection and Repatriation Act

B. Agreements pertinent to tribal relations include—

1. Memorandum of Understanding among the U.S. Department of Defense, U.S. Department of the Interior, U.S. Department of Agriculture, U.S. Department of Energy, and the Advisory Council on Historic Preservation Regarding Interagency Coordination and Collaboration for the Protection of Indian Sacred Sites (December 4, 2012);

2. Programmatic Agreement Among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers regarding the Manner in which the BLM Will Meet its Responsibilities under the National Historic Preservation Act (February 9, 2012); and

3. Onshore Federal and Indian Energy and Mineral Lease Management Standard Operating Procedures (SOP) (signed by the DOI Assistant Secretary, PMB, on September 18, 2013, and amended on September 23, 2013).

C. Plans that address tribal relations include—

1. Department of the Interior, Environmental Justice Strategic Plan, 2012–2017.

1.6   Policy

The BLM's policy for tribal relations is based on the recognition of tribal sovereignty and tribal self-governance as reflected in Principle 1 of Secretarial Order 3335. The BLM recognizes each tribal government is unique and that different tribes have varying levels of staffing, expertise, and interests.

The BLM commits to building and sustaining an ongoing relationship with Indian tribes. Such a relationship is founded upon consultation regarding planning and project-specific issues as well as long-term personal and institutional relationships resulting from collaborative and cooperative programs of mutual interest as reflected in Principle 4 of Secretarial Order 3335. Collaborative efforts include BLM education or employment opportunities for tribes and tribal members; joint training courses; management of natural and heritage resources; and exchanges of speakers and programs that increase cultural understanding.

The BLM affirms that government-to-government consultation is the official means for considering and incorporating tribal concerns into the BLM decisionmaking process. The BLM views consultation as a deliberative process that aims to create effective collaboration and informed land use decisions as addressed in Principle 6 of Secretarial Order 3335. Those individuals who are knowledgeable about the matters at hand, who are authorized to speak for

BLM_0026482

MS-1780 – TRIBAL RELATIONS (P)

1-14

the agency, and who exercise delegated authority in the disposition and implementation of an agency action will represent the BLM in government-to-government consultation.  BLM officials who have been delegated the authority to engage in government-to-government consultation include the Director, state directors, and their line officers.

The BLM engages in government-to-government consultation with elected tribal officials. Tribal leaders may assign a tribal staff member or other designee to be their official representative in discussions.  Such a delegation often extends to such positions as Division Directors for Realty or Natural Resources or Tribal Historic Preservation Officers.

The BLM also acknowledges that Federal and tribal officials, staff, tribal elders, various specialists, contractors, and applicants often engage in ongoing interaction and discussion.  Such information sharing or exchanges may contribute much of the information needed to support plan and project decisionmaking.  These informal discussions are necessary to ensure the free flow of information among all parties and to ensure that both tribal officials and Federal managers are well informed about a common set of facts, perspectives, and issues when they engage in formal government-to-government consultation.  Successfully achieving both meaningful consultation and a strong government-to-government relationship often depends upon these informal, staff-to-staff working relationships.

    A.  *General.*  Several general policies are related to all tribal consultation situations:

        1.     The BLM formally engages federally recognized Indian tribes on a government-to-government basis.  These formal interactions are complemented by informal working relationships between BLM managers and tribal officials, and between BLM and tribal staffs.

        2.     The BLM conducts government-to-government consultation with Indian tribes to improve collaborative and informed Federal decisionmaking.  The BLM understands government-to-government consultation to be an ongoing relationship between BLM officials and elected tribal officials that educates both parties and results in the best informed BLM land use decisions.

        3.     The BLM intends government-to-government consultation to be an open and ongoing dialogue between BLM line officers and elected tribal officials regarding both specific projects and general issues related to policy, planning, and other long-term concerns.

        4.     Information, opinions, or recommendations may be provided to the BLM from individual tribal members or traditional tribal religious leaders.  In cases where such comments conflict with positions taken by official tribal representatives, the BLM will defer to the opinions and positions adopted by the tribal government. Should this occur, the comments will be treated as those received from the public. They will be handled accordingly by the BLM and tribal members notified.  Only where specified in particular statutes (e.g., NAGPRA gives legal precedence to

BLM_0026483

MS-1780 – TRIBAL RELATIONS (P)

1-15

lineal descendants) will the BLM consult with and give precedence to individuals other than official tribal government representatives.

5. Only BLM line officers are authorized to speak for the agency and will exercise their delegated authority in the conduct of government-to-government consultation and decision-making.

6. The BLM consults with tribes for all actions where consultation is specifically required by statute, regulation, or policy and for any additional action that will have a substantial direct effect on tribal planning issues, including regulations, rulemaking, policy, guidance, or operational activities.

7. The BLM understands that project-specific consultation between the BLM and tribal technical staff should be established early in the planning cycle and continues during project implementation and afterward during long-term monitoring and reclamation.

8. When amending and revising land use plans the BLM seeks to be consistent with tribal land use and resource allocation plans (including Alaska Native village or regional corporation plans, as applicable) and other tribal resource planning documents to the extent consistent with the laws governing the administration of the public lands per 43 CFR 1610.3-2.

9. The BLM recognizes that it has a broad trust responsibility that in some cases includes a fiduciary duty related to Indian trust assets and property or interests reserved by or granted to Indian tribes or Indian individuals by treaty, statute, and Executive orders. The BLM also recognizes that Indian tribes may have reserved rights granted by treaties or authorized by specific legislation that applies to water, fish, wildlife, or vegetative resources.

10. The BLM recognizes that Indian tribes are knowledgeable sources and experts concerning their own cultures. They can provide unique insight and explanation of tribal history and land uses. When provided with such information, the BLM will take this into account when making decisions related to the identification, evaluation, treatment, and management of natural and heritage resources.

11. The BLM recognizes Indian religious and cultural values as an important, living part of our Nation's heritage. The BLM commits to addressing and, where practicable, minimizing potential disruption of the traditional expression or maintenance of these values that might result from BLM land use decisions.

B. *Compensation to Tribes.* The BLM traditionally contracts for services, including reports or studies, through the BLM acquisition and procurement procedures to obtain data and documentation on resources it manages or that may be affected by its decisions. Such contractual relationships will continue.

BLM_0026484

MS-1780 – TRIBAL RELATIONS (P)

1-16

All contractual obligations to tribes, labor, and financial outlays spent by the BLM to carry out tribal consultation policies and procedures expressed within this manual and H-1780-1 will be governed by provisions of the Anti-Deficiency Act. This Act prevents the incurring of obligations or the making of expenditures in advance or in excess of amounts available in appropriated funds.

Upon issuance of this manual and H-1780-1, Improving and Sustaining BLM-Tribal Relations, the BLM will allow an expansion of compensation to include Native American contributions of information, comments, or input into the BLM's decision-making processes. When it is in the BLM's best interest to do so to facilitate land use decisions, managers may provide, or require that land use applicants provide, financial compensation to Indian tribes to help defray their costs for consulting with the BLM regarding land use planning or authorizations. Such compensation may cover the costs of travel, per diem, time of tribal elders or officials. This comprehensive compensation policy incorporates the following considerations:

1. The BLM acknowledges that tribal information and perspectives may be important for managers to make robust and defensible decisions and that compensation may facilitate the decisionmaking process.

2. The BLM acknowledges that requests to tribes for consultation or information for the large number of land use authorizations processed annually can result in substantial administrative and personnel costs to tribes.

3. The BLM has the authority to implement policies and procedures to pay both for reports or investigations necessary to the decisionmaking process as well as to partially offset reasonable financial costs to tribes for government-to-government consultation. Thus, compensation may be provided for both professional products and for tribal participation in BLM decisionmaking processes.

4. Field offices that request products from tribes must do so using standard procurement instruments such as contracts or assistance agreements.

5. Compensation for government-to-government consultation, which is neither legally prohibited nor required, is at the discretion of the responsible manager, and subject to the availability of appropriated funds.

6. Costs of providing compensation for consultation shall be charged to the benefitting subactivity.

7. Compensation must be approved by the appropriate federal official in advance.

8. Compensation will only be provided to tribal representatives whose consultation expenses are not otherwise provided by their tribe.

BLM_0026485

MS-1780 – TRIBAL RELATIONS (P)

1-17

9.  When a line officer decides to provide compensation for reasonable consultation costs, offices are strongly encouraged to execute agreements with tribe(s) to specify the level of reasonable compensation to be provided, to whom, and for what purpose (see H-1780-1, Improving and Sustaining BLM-Tribal Relations, Appendix 2, Implementation of BLM Policy Regarding Compensation to Native Americans for Products and Their Participation in the BLM's Decision-Making Processes).

10. Tribal compensation policies and procedures will be implemented so as not to unduly burden BLM field offices with administrative details.

11. When the BLM requires a proponent to provide funding for tribal consultation or services, the BLM shall explicitly inform the proponent what information the agency needs and shall specify reasonable limits and restrictions to the expenditures. It remains the BLM's responsibility to consult with tribes to determine how best to obtain that information.

12. In accordance with the appropriate governing sections of FLPMA (e.g., sections 304(b) and 504(g)) or other legal authorities, proponents may be required to provide funding to carry out consultation when it is necessary for the BLM to process the application consistent with existing processing fee and cost recovery allowance guidance. This may include (a) a cost recovery agreement to reimburse BLM staff for their tribal consultation costs; (b) financial arrangements between the proponent and tribes to cover reasonable costs for consultation; and/or (c) compensation to tribal experts for application review or other services that contribute information necessary for the BLM to make a well-informed decision.

13. Offices may proceed with the expectation that interested Indian tribes will respond within a reasonable time period. If an office initiates consultation with a tribe but does not receive a response, the bureau/office should make reasonable and periodic efforts to repeat the invitation and, when feasible, should allow an Indian tribe to join an ongoing consultation.

C.  Reburial of Native American Human Remains and Cultural Items Addressed by NAGPRA on Public Land.   State directors may authorize the reburial of Native American human remains and cultural items, as defined in NAGPRA, on BLM public lands.  Reburial may be authorized only after the NAGPRA process has concluded. When considering reburial requests, managers should comply with relevant NEPA and NHPA requirements as applicable and evaluate available legal and physical protections offered at the proposed location, future Bureau responsibilities, and accessibility for tribal members. Indian tribes may have expectations for future site protection against theft, disturbance, and such indirect impacts as erosion. Although reburial sites would probably not qualify as historic properties under NHPA, they may be considered as sacred sites under Executive Order 13007 and/or "places of special interest" under NEPA.  The remains may also constitute archaeological resources under ARPA.  The

BLM_0026486

MS-1780 – TRIBAL RELATIONS (P)

1-18

BLM's heritage resource specialists will maintain records of reburials as working files or as a layer of information separate and distinct from other heritage resources within site record databases. Such strategies including the securing of related records in locked cabinets will better protect culturally sensitive information.

D. *Conclusion of Consultation.* The BLM line manager must determine that sufficient tribal consultation has occurred in accordance with time frames required to make a decision regarding land use planning or proposed actions on the public lands. Department policy in 512 DM 5.5(D) requires bureaus to prepare a summary of the consultation activities upon completion of consultation for actions. This is usually done through the NEPA record. Tribes that have participated in consultation must be notified of the basis for the BLM decision. The BLM must clearly explain how tribal input affected the final decision. While the BLM prefers that it address tribal concerns or resolve potential effects , however, this is not always possible. Where the BLM was not able to accommodate tribal desires, a clear explanation must be provided explaining why this was not possible. Avenues for protest or appeal of the BLM's final decision must be provided. Correspondence shall make clear that, whether the tribe agrees with the BLM decision or not, the agency views tribal consultation as an open-ended relationship. In that spirit, BLM line managers shall ask tribes at the issuance of a decision if they wish to comment on future updating, monitoring, or reclamation tied to the planning or proposed action.

E. *Performance Measures.* State, district, and field offices will create specific, measurable performance standards to ensure accountability of line officers in carrying out BLM tribal consultation policies. They will be uniform on a district or statewide basis. For all offices managing actions with tribal implications, line officers' annual performance evaluations (i.e., employee performance appraisal plans) must contain at least one critical element, or sub-element, pertaining to BLM-tribal relations.

F. *Staffing.* State directors must ensure that each state's table of organization includes sufficient staff expertise in tribal relations and other resources to effectively carry out timely and responsive tribal consultation. Staff tribal liaisons must provide input to all agency programs whose actions may affect tribal interests. Simply assigning tribal relations duties to onboard staff specialists, such as heritage resource specialists, will often not allow sufficient time or expertise for the accomplishment of tasks and duties listed in section 1.4.G above in a legally defensible manner. On a statewide basis, at least one full-time equivalent tribal liaison position should be staffed by an individual with knowledge and experience related not only to historic preservation but also to consultation policies of tribes, local tribes' primary concerns, including socioeconomic concerns, environmental justice issues, cultural or treaty considerations, mineral trust concerns, and tribal customs and traditions. Tribal liaison positions may be located at the state, district, or field office level depending on where the work can be most effectively performed. Tribal liaison positions must be established for administrative units where tribal relations are pronounced and routinely have a bearing on agency

BLM_0026487

MS-1780 – TRIBAL RELATIONS (P)

1-19

decisionmaking processes.  As discussed in section 1.6 B.11 above, where justifiable, state directors and field office managers shall utilize cost recovery agreements to the maximum extent possible to defray the costs of tribal liaison activities.

G. *Tracking Costs of Consultation and Tribal Relations.*  All BLM employees engaged in tribal consultation must code their time to the appropriate program element in conformance with the BLM's cost management structure, which emphasizes coding to the specific project/activity compelling the consultation, such as a right-of-way application, permit issuance, lease, or specific fire activity.  In instances where no direct cost, output-producing program element is applicable, labor and operations costs tied to consultation or tribal relations must be coded to "AJ" where available.  All costs must be tracked by each BLM employee and accounted for in the appropriate annual reporting so the Director can provide accurate costs of tribal consultation to the Secretary pursuant to 512 DM 4.

1.7   File and Records Maintenance

See sections 1.2.E, 1.4, 1.6.A–D, and 1.9.A–C.  Filing requirements are found in the General Record Schedules (GRS)/BLM Combined Records Schedule (Schedule 4).

BLM_0026488

MS-1780 – TRIBAL RELATIONS (P)

## Chapter 2.   BLM Relationship to Tribal Governments, Individuals, and Non-federally Recognized Groups

2.1    Federally Recognized Tribes

Federally recognized tribes are sovereign nations and the legal representatives ensure that tribal members may exercise rights and privileges held through treaties, Executive orders, and agreements with the United States, both on and off reservations.  The special legal status of tribal governments requires that official relations with the BLM, including consultation pursuant to this manual section, must be conducted on a government-to-government basis.  Authorities and responsibilities of specific tribal governments are defined in the constitutions and bylaws of the individual tribes.

Federally recognized Alaska Native tribes are afforded the same benefits and privileges as federally recognized tribes in the contiguous 48 states.  Alaska tribes, as identified by the Bureau of Indian Affairs (BIA) annually in the *Federal Register*, are acknowledged to have the immunities and privileges available to other federally recognized tribes by virtue of their government-to-government relationship with the United States, as well as the responsibilities, powers, and obligations of such tribes.  An up-to-date tribal listing can be obtained from the designated native liaison in the Alaska State Office or a field office, or from the headquarters office of the BIA.

2.2    Indian Individuals and Nongovernmental Tribal Groups

As a matter of protocol and courtesy, initiation of contacts with tribal members must always be coordinated by BLM line officers through tribal officials.  However, there are instances where individual Indians and Nongovernmental Tribal Groups have rights or privileges.

A.  The religious observances of American Indians, Eskimos, Aleuts, and Native Hawaiians are protected under the AIRFA and Executive Order 13007, regardless of whether they are members of a federally recognized Indian tribe.

B.  Lineal descendants who may or may not be tribal members have rights to claim human remains and cultural items under the NAGPRA.  Disposition, repatriation, and/or reburial of lineal ancestors may be conducted directly with family members.  Tribal NAGPRA coordinators or other tribal officials must be involved, to the maximum extent possible given the wishes of the family, provided all other decision process and notification requirements of NAGPRA are met.

C.  During consultation, tribal groups such as cultural committees or elders may offer information or opinions that differ from those provided by official tribal representatives.  The consultation record maintained within NEPA or NHPA Section 106 documentation should acknowledge that differences of opinion were expressed to

BLM_0026489

MS-1780 – TRIBAL RELATIONS (P)

2-2

the BLM but make clear that the agency is required to defer to the position of the official tribal representatives.

2.3    Groups and Communities Not Federally Recognized

The BLM consults with non-recognized Native groups and communities in limited circumstances.  In accordance with the ARPA regulations (43 CFR 7.7(a)(2)), the BLM may notify and consult with Native American groups that do not meet the definition of an Indian tribe under ARPA.  The agency will consult with such groups in accordance with the terms of the AIRFA and those portions of the NAGPRA affecting lineal descendants and Indian groups that are not federally-recognized.  Non-recognized groups and communities and their individual members can participate in the BLM's decisionmaking as members of the public.  Since only federally recognized tribes qualify as governments under 25 U.S.C. § 5130, a non-federally recognized group may not serve as a cooperating agency in preparation of an EIS or environmental assessment (EA).

BLM_0026490

MS-1780 – TRIBAL RELATIONS (P)

3-1

## Chapter 3.   Program Relationships

3.1    Tribal Relations Inform Decisionmaking and Program Management

A.  *Relationship to Administrative Procedures.*  BLM managers utilize land use planning and environmental review to solicit and consider Indian tribal issues and concerns. Managers and staff must employ appropriate techniques through government-to-government consultation to ensure the early identification and consideration of Indian tribal values potentially affected by BLM land use decisions.  Such processes should be routine during the collection and evaluation of land use and resource information at the very earliest stages of land use plans and environmental document preparation.

1.  *Tribal Consultation and Public Participation.*  Tribal interests are not on an equal footing with the interests of most other groups and individuals.  Tribes are different from other public land constituencies.  They are neither *stakeholders* nor *just another public group* whose interests should be considered.  Their special relationship with the United States Government is rooted in history and defined by law.  Indian tribal issues and concerns must be identified through government-to-government consultation and public participation techniques, including those forms of notification utilized in the NEPA process (e.g., scoping, public notices, and informational mailings).  In addition as noted below in 3.A3, managers shall establish any additional effective means necessary for consulting with Indian tribes regarding any proposed actions which may affect traditional religious or cultural practices or traditional land uses.  For example, BLM offices may need to schedule presentations and discussions at tribal chapter houses in isolated communities where routine public scoping meetings might be unlikely to result in adequate tribal attendance and participation.

2.  *Inventory.*  At the initiation of land use planning and environmental review, government-to-government consultation should be used to define and consider Indian tribal issues and conflicts as they apply to various proposed program actions and decisions.  Interdisciplinary team members will share their knowledge of known sensitive and significant resources based on inventory data, ethnographic or historic literature, or other documentation.

a.  Special techniques may be needed to supplement existing BLM databases to identify resources potentially affected by BLM land use decisions.  These techniques may include—

- Review of natural or heritage resource literature, including credible ethnographic sources;

- Interviews with knowledgeable members of the Native American community, who may or may not be official representatives of the tribal government or ANCSA Corporation; and

BLM_0026491

MS-1780 – TRIBAL RELATIONS (P)

3-2

- Problem-oriented research focusing on Native American land use.

b. Interviews and new ethnographic fieldwork must incorporate appropriate safeguards for collection and use of, and access to, potentially sensitive information acquired through interviews and direct ethnographic techniques. This may include locational information, tribal requirements for ethnographic studies, details concerning sacred sites or properties of traditional religious and cultural importance, cultural uses of plants and animals on the public lands, and the names of interview subjects or other contacts who are not official governmental representatives of affected groups.

3. *Consideration During Decisionmaking.*  Managers must make a reasonable and good faith effort to consider information regarding tribal concerns and issues, but such level of effort should be commensurate with the tribal issue/resource at issue and the potential requirements associated with particular statutory or regulatory direction or policy considerations.

4. *Cooperating Agency Status.*  Federally recognized tribal governments are eligible to serve as cooperating agencies in the preparation of EISs and RMPs.  In accordance with Department's NEPA regulations and BLM planning regulations, managers are expected to make a reasonable effort to identify tribes who have special expertise concerning a proposed RMP or EIS and must extend an invitation to those identified.  The Council on Environmental Quality regulations implementing NEPA also allow Federal agencies to invite tribal governments to serve as cooperating agencies in preparation of environmental documents where effects occur on reservation lands.  A tribe may choose to serve as a cooperating agency or not.  Establishment of cooperating agency status with a particular tribe does not relieve the BLM of its ongoing responsibilities to consult on a government-to-government basis with that tribe regarding proposed decisions or actions.

5. *Consistency Review.*  Whether or not tribes elect to serve as cooperating agencies in the preparation of environmental documents, they will be given advanced notification of proposed projects/plans as is provided for cooperating agencies.  In addition, under section 202(c)(9) of the FLPMA, as implemented by 43 CFR 1610.3, BLM's resource management plans must be consistent with the land use and resource-related plans of affected Indian tribes, to the extent consistent with federal laws and regulations and the purposes, policies, and programs implementing such laws and regulations.

6. *Special Designations.*  Designations of "areas of critical environmental concern" (43 CFR Part 1610) and other appropriate forms of special recognition and protection of lands and resources of interest to tribes provide opportunities to consult with Indian tribes to consider, protect, and provide access to places of importance to them.

MS-1780 – TRIBAL RELATIONS (P)

7.  *Documentation.*  NEPA and NHPA Section 106 documentation serve as the principal administrative record for identification steps taken and consideration given to Indian tribal concerns.  NHPA Section 106 consultation obligations and requirements for tribal consultation may be appropriate even if the BLM's proposed action is covered by a department categorical exclusion that relieves the agency of the need to prepare an EIS or EA.  BLM should also take care to consider that the proposed action covered by the categorical exclusion does not involve "extraordinary circumstances" relating to potential impacts to Native American land uses, access, or cultural or religious values, as articulated in the Department of the Interior's NEPA regulations at 43 CFR 46.215.  If, for any reason, a NEPA document will not be prepared, an appropriate non-NEPA document should be used to substantiate identification and consideration of Native American concerns and places of importance to them.  Such non-NEPA documentation may consist of BLM-tribal consultation logs, inventory reports, data recovery reports, etc.  These documents should be maintained and housed with the administrative record for the project.

8.  *Agreements.*  Written agreements, such as memoranda of understanding, between the BLM and Indian tribes and other groups, are encouraged to define relationships, issues of concern, contacts, and coordination and consultation procedures.

9.  *Protection of Sensitive Tribal Information.*  Tribes must have confidence that the BLM is doing all that is within its power to protect sensitive information from public disclosure.  See H-1780-1 Chapter II. B for a discussion of legal and practical limits for insuring such confidentiality.

B.  *Environmental Justice.*  The Department of the Interior's Environmental Justice Strategic Plan, 2012–2017 provides important policy direction.  The identified goals:

1.  *Outreach.*  "Ensure minority, low-income, and tribal populations are provided with the opportunity to engage in meaningful involvement in the Department's decision making processes."

2.  *Effects analysis and mitigation.*  "The Department will, on its own or in collaboration with partners, identify and address environmental impacts that may result in disproportionately high and adverse human health or environmental effects on minority, low-income, or tribal populations."

3.  *Partnering.*  "Use existing grant programs, training, and educational opportunities, as available, to aid and empower minority, low-income, and tribal populations in their efforts to build and sustain environmentally and economically sound communities."

BLM_0026493

MS-1780 – TRIBAL RELATIONS (P)

3-4

C. *Relationship to Specific BLM Resource Management Programs.* While specific instances of Indian tribal coordination and consultation might focus on particular lands and resources or a single BLM management program or project, Indian tribal concerns generally cross-cut program boundaries and involve several programs simultaneously.

1. *Cadastral Survey.* The BLM is responsible for performing cadastral surveys on all Federal and Indian trust lands. These surveys provide tribal land managers with information necessary for the management of their lands. The program has established strong relationships with the BIA's Real Estate Services program and the Office of Special Trustee for the purpose of providing cadastral services on Indian trust lands. Under the fiduciary trust model approved by the Secretary, cadastral surveys are provided to tribes, individual American Indians, and Alaska Natives. The BLM prioritizes inventory needs on Indian trust lands based on the application to trespass abatement, timber harvest, mineral leasing, and other priorities related to Indian trust assets and the disbursement of funds into individual Indian monetary accounts.

2. *Heritage Resources.* The BLM has an obligation to consult with Indian tribes when making decisions regarding heritage resource inventories and evaluations, use allocations, National Register nominations, public interpretation, public education, protection, and management. The nature, extent, and degree of tribal involvement, including what types of actions, sites, and in what areas the tribes wish to be consulted, will be determined through consultation and specified in 36 CFR Part 800, state protocols, or project-specific Programmatic Agreements. Identification of tribal traditional religious and cultural properties and public land heritage properties associated with those values, and preparation of ethnological/sociological elements in class I inventories provide an opportunity for tribal consultation when tribes request the participation by tribal consultants. Offices should also consider tribal review for accuracy, sufficiency, and data security. Consultation is also necessary as part of compliance with NAGPRA and the agency's responsibilities for completing summaries and inventories of Native American human remains and cultural items in museum collections as well as those discovered on the public lands. Tribal consultation may also be appropriate when issuing ARPA permits.

3. *Fire and Aviation.* The wildland fire, community assistance, fire planning, fuels management, safety, and training components all frequently affect Indian communities. Plans to implement Secretarial Order 3336, Rangeland Fire Prevention, Management and Restoration, include processes for tribal consultation. National fire prevention and education teams work with local Indian residents to reduce human-caused fires and implement fire prevention programs. The BLM sponsors workshops to help people live safely in the wildland-urban interface. The fuels management program treats millions of acres and invests significantly in contracts to local Indian communities for fuels treatments,

BLM_0026494

MS-1780 – TRIBAL RELATIONS (P)

biomass utilization, and contracting.  Employment as firefighters provides a significant economic boost to tribal communities.

4.  *Forestry.*  Proposed resource allocations and use authorizations should be sensitive to Native American requirements for the noncommercial use of renewable forest and woodland products (e.g., firewood, house and sweat lodge logs, food plants, traditional craft plants, medicinal plants, and ritual plants).  Off-reservation treaty rights must be accommodated where applicable in accordance with principles 2 and 5 of Secretarial Order 3335.  Discretionary forest and woodland management activities (e.g., herbicide spraying, commercial pinion nut harvesting) should involve tribal input, as appropriate.  Special authorizations relating to subsistence uses in Alaska will follow policies developed under the authority of the 1980 Alaska National Interest Lands Conservation Act for the Secretary of the Interior through the Federal Subsistence Board.  Restoration of forested lands, including thinning, prescribed fuels treatments, and treatment of insect infestations may be contracted to tribes in accordance with the 2004 Tribal Forest Protection Act.

5.  *Lands and Realty.*  Land actions that would change the ownership or the use of public lands may be of concern to Indian tribes.  Land tenure adjustments must consider how proposed changes in land ownership would affect off-reservation treaty rights since many tribes have the right to hunt, fish, and gather plant materials on unoccupied Federal lands.  Early and meaningful tribal consultation is important to address the impacts of rights-of-way permitted undertakings on resources, public land uses, and Indian religious practices.  The use of trails, traditional gathering areas, and access to sacred sites and other traditional use areas all can be affected by these projects.

6.  *Minerals.*  The BIA serves as the leasing agent for trust minerals on Indian lands when a tribe chooses to develop their mineral resources.  The BIA follows the regulations at 25 CFR Parts 211, 212, and 225, which mandate the development of the mineral resources in a manner that maximizes the economic interests of Indian mineral owners.  The BIA is responsible for addressing any adverse environmental or heritage resource impacts resulting from such development on tribal trust lands.  The BLM trust responsibilities involve mineral evaluations to support the leasing process as well as post-lease activities covered under administrative authorities pursuant to 43 CFR Parts 3160, 3260, 3400, and 3590.  Specific BIA and BLM responsibilities are described in Onshore Federal and Indian Energy and Mineral Lease Management Standard Operating Procedures (SOP) listed in section 1.5.B.3.  The SOP describes the responsibilities and information sharing required among bureaus and offices under the jurisdiction of the Assistant Secretaries for Policy, Management and Budget; Land and Minerals Management; Indian Affairs; and the Office of the Special Trustee for American Indians in carrying out the Department of the Interior's trust responsibilities for

BLM_0026495

MS-1780 – TRIBAL RELATIONS (P)

3-6

Indian mineral lease management and accounting.  As delineated in the SOP, the BLM has the statutory and regulatory responsibility for oversight of coal and other mining operations on Indian land and provides technical assistance to Indian tribes, allottees, and the BIA, including preparing economic, resource, and mining assessments and analyses; approving exploration and mine and reclamation plans; supervising exploration, development, and abandonment of operations; recommending bonds; and conducting inspection, enforcement, and production verification.  The BLM also administers mineral activities for certain allotted and unallotted Indian lands in accordance with authorities in section 1.3 above, as implemented by 25 CFR Parts 211–214 and 216.

7.   *Procurement.*  As authorized by the Indian Self-Determination and Education Assistant Act (Pub. L. 93-638), the BLM awards contracts to federally recognized Indian tribal governments so they can manage programs and services otherwise conducted by the BLM for Indians.  Contracts, grants, and cooperative agreements are authorized.  BLM programs involved are primarily cadastral survey and minerals management.  Potentially, aspects of the cultural heritage, forestry, range, recreation, and wildlife and fisheries programs could participate if they are of specific geographic, historical, or cultural significance to the Indian tribes.

8.   *Rangeland and Plant Conservation.*  Due consideration must be given to Indian tribal rights established by treaties, and to requests by tribes consistent with such rights, in the administration of the grazing management and range improvement programs.  For example, grazing season of use may be adjusted to accommodate traditional use of native plant resources.  Similarly, proposed vegetation treatments such as burning, chaining, spraying, and seeding may need to be weighed in terms of tribal needs for maintenance of traditional plant use areas.  Range improvement projects (such as water developments) may have the potential to affect properties of traditional religious or cultural importance.  Where tribes hold grazing preference on public lands, they generally are required to follow standard permitting application and NEPA processes for permitted actions similar to nontribal entities.  BLM assists tribal nurseries with native plant materials development and partners with tribes that grow local native seed crops for use by BLM in range restoration and rehabilitation.

9.   *Recreation.*  Native American cultural and religious concerns should be considered when collecting recreation inventory information, preparing recreation management plans, developing or maintaining recreation facilities, designating travel routes, establishing use limitations, and processing special recreation use permits.  For example, visual resource management classification should account for landscapes with attributed sacredness; seasonal off-road vehicle limitations might be necessary when traditional uses could be disrupted; and areas used for subsistence or ritual activities might need organized recreation use channeled

BLM_0026496

MS-1780 – TRIBAL RELATIONS (P)

away from them.  Programs and materials for interpreting areas or subjects related to traditional Native American cultures and practices will incorporate the perspectives of the Native Americans as appropriate.

10.  *Renewable Energy.*  Geothermal, solar, and wind energy development proposals on public lands may be of concern to Indian tribes.  The use of trails, traditional gathering, fishing, and hunting areas, access to sacred sites and traditional use areas, including traditional cultural properties, can all be affected by these landscape-scale projects.  Early and meaningful tribal consultation is required to address the impacts of right-of-way permitted undertakings upon resources, public land uses, and Indian religious practices.

11.  *Soil, Water, and Air.*  Any proposed action that could affect water use must provide for Indian tribal water requirements in accordance with established treaty rights, as confirmed by the responsible State water right authority or pertinent legal decisions.  Indian tribal water rights based on reserved water rights are not governed by State law but in many cases have been perfected under State water right adjudications.  Traditional tribal areas related to off-reservation treaty rights may extend well beyond the United States-imposed ceded and reservation boundaries.  Also, a fiduciary trust obligation may exist when the effects of actions on BLM lands reach Indian lands.  Therefore, situations may arise in which actions affecting soil and air resources will be of concern to Indian tribes and be the focus of tribal consultation.

12.  *Wilderness.*  Wilderness study reports and wilderness management plans should recognize areas used historically for Native American traditional activities, such as gathering medicinal plants and conducting religious ceremonies.  The BLM may consider granting access by elders or other traditionalists with limited mobility via motorized transportation if the use of minimum tool can be justified.  Although wilderness designation may protect traditional use areas from incompatible use or development, designation and management as wilderness may also have the unintended effect of disrupting established traditional uses.

13.  *Wildlife and Fisheries.*  Court decisions have affirmed a treaty right to "take fish" includes tribes' access to their usual and accustomed fishing places and stations for the taking of anadromous fish on public lands.  Tribes with reserved rights to usual and accustomed fishing locations retain those rights, including access to those locations even when the lands have passed from Federal ownership, unlike treaty reserved rights to hunting and gathering.  In addition, Title VIII of the Alaska Native Interest Lands Conservation Act created a Federal responsibility to manage fish and wildlife  resources needed for subsistence on Federal public lands for certain Alaska residents, including Native Americans.  As part of the Federal Subsistence Board, the BLM is uniquely responsible for the management of subsistence resources and uses on BLM lands, including fresh waters that run in or are adjacent to BLM lands.  When BLM field offices prepare habitat

BLM_0026497

MS-1780 – TRIBAL RELATIONS (P)

management plans or improvement projects, they must consult with Indian tribes and take care that proposed conservation measures will not hinder usual and accustomed tribal taking of fish or hunting of game on public lands.  Indian tribal concerns should also be taken into account when developing management and recovery plans for species valued for non-subsistence reasons (e.g., eagles).

3.2   Tribal Consultation Obligations Extend to Inter-Agency Relationships

A. *Planning.*  In the review of other Federal agencies' land use plans under section 202(c)(9) of FLPMA and 43 CFR 1610.3- the BLM should give special recognition and consideration of Native American issues and concerns.  Consultation is normally the responsibility of the Surface Managing Agency that is preparing the land use plan.  The BLM will review other agency's plans to ensure they meet BLM needs and, if they do not, will engage with other agencies to conduct joint consultation to ensure agency needs are met.

B. *Environmental Review.*  When the BLM acts as lead agency for the environmental review of a proposed action, the BLM is responsible for identifying Indian tribal concerns and issues for all potentially affected lands, through consultation with tribes and cooperating agencies, through the NEPA scoping process, and through other appropriate information gathering methods.  Examples include EISs for interstate pipeline projects, oil and natural gas development, coal and other mine developments, and interstate transmission line projects.  When the BLM is not the lead agency, the BLM will coordinate government-to-government consultation with the lead agency but will focus its own efforts on those tribes that have interests or concerns regarding the effects of the action upon lands managed by the BLM.

C. *Exchange of Information.*  The BLM and other Federal agencies should routinely share pertinent non-confidential information about Native American concerns and issues.  Sensitive information obtained under promise of confidentiality may not be shared without explicit permission from its source.  Explicit guidance concerning the sharing of minerals information is contained in attachment E of the SOP.

D. *Cooperation.*  The BLM should explore opportunities to cooperate with the BIA or other Federal agencies to improve opportunities for Indian tribes to enter into cooperative agreements/assistance agreements (e.g., education, training, interpretation, museum work/curation, basic data collection, and ethnographic inventory).  Potentially sensitive programs that may involve several agency jurisdictions should be coordinated to the greatest degree possible (e.g., wild and scenic river designations in areas of Native fisheries).  Regional and interagency meetings should be organized when such an approach lessens the burden of consultation for tribes and when such coordination can make the process more efficient or timely.  Such coordinated interagency meetings may supplement but cannot replace the BLM's government-to-government consultation requirements with individual tribes.

BLM_0026498

MS-1780 – TRIBAL RELATIONS (P)

3.3    Relationship to State and Local Governments

    A.  *Consistency.*  In addition, under section 202(c)(9) of the FLPMA, as implemented by 43 CFR 1610.3, BLM's resource management plans must be consistent with the land use and resource-related plans of affected Indian tribes, to the extent consistent with federal laws and regulations and the purposes, policies, and programs implementing such laws and regulations.  Native American cultural and religious issues shall be part of this consistency review.  The BLM should implement its programs, as they relate to Native American concerns, as consistently as practical with State and local laws and ordinances.  However, where Federal lands are concerned, Federal law has precedence over State and local law.

    B.  *Exchange of Information.*  The BLM should share pertinent non-confidential information relating to Native American issues and concerns with State and local governments in the same manner and with the same limitations as outlined in section 1.9.B.3 above.

BLM_0026499

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-1

### Glossary of Terms

#### -C-

*Consultation*: The conduct of mutual, open, and direct two-way communication in good faith to secure meaningful and timely participation in the decisionmaking process, as allowed by law. See government-to-government consultation for the specific form of tribal consultation.

*Coordination*: Communication and dialogue between the BLM and Indian tribes involving leadership or staffs to increase cooperation between the two parties and the effectiveness of their relationship.

#### -D-

*Director:* Director of the Bureau of Land Management.

*Disposition:* Transfer of control over Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony by a museum or Federal agency under NAGPRA for three types of situations: custody for those excavated intentionally from, or discovered inadvertently on, Federal or tribal lands after November 16, 1990; repatriation to lineal descendants and culturally affiliated Indian tribes; and disposition of culturally unidentifiable human remains with, or without associated funerary projects (43 CFR 10.2(g)(5).

#### -E-

*Ethnography*: Structured and systematic analysis of the culture of a community or other distinctive social unit, through fieldwork-based study with members of the community as well as other sources. In the land management context, this usually refers to an in-depth study of cultural patterns and understandings through intensive participation of members of the subject society or community. Ethnographies are holistic studies presented from the point of view of the subjects. They are reflexive and record all observed behavior. These studies emphasize an emic perspective and accept multiple realities.

*Ethnohistory*: Study of a cultural group's past based on various sources, including ethnography, oral tradition, linguistics, ecology, and other relevant disciplines.

#### -F-

*Federally recognized tribes*: A federally recognized tribe is an American Indian or Alaska Native tribal entity that is recognized as having a government-to-government relationship with the United States, with the responsibilities, powers, limitations, and obligations attached to that designation; and is eligible for funding and services from the Bureau of Indian Affairs.

Furthermore, federally recognized tribes are recognized as possessing certain inherent rights of self-government (i.e., tribal sovereignty) and are entitled to receive certain federal benefits,

BLM_0026500

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-2

services, and protections because of their special relationship with the United States. At present, there are 567 federally recognized American Indian and Alaska Native tribes and villages.

-G-

*Government-to-government consultation*: The consultation between BLM officials with decision making authority and elected tribal officials or those tribal representatives specifically delegated by elected tribal officials to engage in such consultation and decisionmaking. It is built upon the government to government exchange of information and aims to create effective collaboration and informed decision-making. Consultation is an accountable process that ensures meaningful and timely input by tribal officials into the development of regulatory policies and agency decisions that have tribal implications.

*Government-to-government relationship*: The unique legal relationship between the United States and tribal governments.

-I-

*Indian allottee*: Any Indian for whom land or interest in land is held in trust by the United States or who holds title subject to Federal restriction against alienation.

*Indian lands*: Any lands title to which is either (1) held in trust by the United States for benefit of any Indian tribe or individual or (2) held by any Indian tribe or individual subject to restrictions by the United States against alienation.

*Indian organization*: This includes (1) those federally recognized, tribally constituted entities designated by their governing body to facilitate BLM communications and consultation activities or (2) any regional or national organizations whose board is composed of federally recognized tribes and elected/appointed tribal leaders. These organizations represent the interests of tribes when authorized by those tribes, such as the National Association of Tribal Historic Preservation Officers.

*Indian tribe*: Any Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a.)

*Indian trust assets*: Lands, natural resources, money, or other assets held by the Federal Government in trust or that are restricted against alienation for Indian tribes and individual Indians. In the case of the BLM, this term usually applies to any trust mineral lease (fluids or solids) for which the BLM has responsibilities on or within the boundaries of defined Indian lands and allotments, although fiduciary trust obligations may exist when the effects of actions on BLM lands reach Indian lands.

*Inherently governmental function*: As defined by the Federal Activities Inventory Reform (FAIR) Act of 1998 and 2003 Office of Management and Budget Circular A-76, these are

BLM_0026501

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-3

functions that, as a matter of Federal law and policy, must be performed by governmental employees and cannot be contracted out.  They are functions so intimately related to the public interest as to require or mandate performance by government personnel.  These activities require the exercise of substantial discretion in applying governmental authority and/or in making decisions for the government.  Inherently governmental functions normally fall within two categories: the exercise of sovereign governmental authority or the establishment of procedures and processes related to the oversight of monetary transactions or entitlements.

-N-

*Native American*: Any individual descended from a native group of the Americas, including Aleuts, Eskimos, and American Indians who may also be members of federally recognized tribes or American Indian and Alaska Native organizations.

*Non-trust asset*: An asset that is not held in trust by the United States for the benefit of an Indian tribe.  Examples include natural and heritage resources not on tribal trust lands including sacred sites, human remains, and cultural items subject to NAGPRA.

-P-

*Policies that have tribal implications*: Regulations, legislative comments, or proposed legislation as well as other policy statements or actions that potentially have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

*Property of traditional religious and cultural importance*: A form of heritage resource referenced within 36 CFR Part 800; a tangible property (district, site, building, structure, or object) that is associated with cultural practices or beliefs of a living community that (1) are rooted in that community's history and (2) are important in maintaining the cultural identity of the community.  The significance of these properties lies in the role that they play in a community's historically rooted beliefs, customs, and practices.  This term may be considered synonymous with traditional cultural property (TCP; see below) and, like TCPs, properties of traditional religious and cultural importance may or may not meet the National Register criteria.

-R-

*Reburial*: An action requested of Federal agencies by lineal descendants or Indian tribes concerning human remains and/or other NAGPRA "cultural items" that (1) have been repatriated from museum collections or (2) for which custody has transferred following an intentional excavation or inadvertent discovery.

*Repatriation*: Transfer of control of human remains, funerary objects, sacred objects, and objects of cultural patrimony by museums or Federal agencies to a lineal descendant or culturally

BLM_0026502

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-4

affiliated Indian tribe or Native Hawaiian organization in accordance with NAGPRA and its regulations at 43 CFR 10.10.

*Reservation*: Unless another definition is required by Federal statute or regulation, the area of land reserved for a tribe or tribes under treaty or other agreement with the United States, executive order, proclamation, Secretarial order, or federal statute.

*Reserved rights*: Those rights not specifically extinguished through a treaty or agreement. Rights may include hunting, fishing, and gathering privileges, or water and other resource use guarantees.

-S-

*Sacred site*: "Any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by practitioners of an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site" (Executive Order 13007, section 1(b)(iii)).

*Secretary*: The Secretary of the Interior.

*Subsistence use*: The customary and traditional use by Native Americans of renewable resources. For Alaska, specific statutory definition of "subsistence uses" comes from section 803 of the Alaska National Interest Lands Conservation Act of 1980 and is paraphrased as "the customary and traditional uses by rural Alaska residents of wild renewable resources for direct personal or family consumption as food, shelter, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade."

-T-

*Tradition*: Longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses that contribute to the shared heritage of a group. Traditions are shared generally within a social and/or cultural group and span generations. They represent a continuity of understanding relative to some activity, way of life, or mode of expression, which guides particular actions and beliefs. Traditions are not static but evolve to reflect changing economic, political, and technological circumstances.

*Traditional*: Conforming to tradition or customary activity.

*Traditional cultural property (TCP)*: A phrase often used in reference to a "property of traditional religious and cultural importance" as defined in the NHPA, which are identified by

BLM_0026503

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-5

Indian tribes.  The property derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community.  It commonly refers to a culturally sensitive area that may qualify for the NRHP if it meets the criteria and criteria of exceptions at 36 CFR 60.4.  See National Register Bulletin 38.

*Tribal government*: The governing body of an Indian tribe as determined by tribal law.

*Tribal land*: Unless another definition is required by Federal statute or regulation, land held in trust by the United States on behalf of an Indian tribe, land held by an Indian tribe in fee subject to Federal restrictions against alienation, or land held by an Indian tribe in fee status.

*Tribal notification*: A one-way form of communication that provides information, data, or reports to Indian tribes by the BLM, leading to tribal consultation if the tribe so requests.

*Tribal officials*: Elected or duly appointed tribal leader or official designated in writing by an Indian tribe to represent the tribe in government-to-government consultations.

*Tribal trust resource*: Resources held in trust by the United States on behalf of Indian tribes.

*Tribe*: See Indian tribe.

*Trust relationship*: The unique relationship between the United States and Indian tribes and individual Indians that is guided by the trust responsibility.

*Trust responsibility*: The highest moral obligations that the United States must meet to ensure the protection of tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights.  This responsibility extends to all Federal agencies.   reg.

BLM_0026504

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A1-1

**Appendix 1 – Acronyms and Abbreviations**

| | |
|---|---|
| AIRFA | American Indian Religious Freedom Act |
| ARPA | Archaeological Resources Protection Act |
| BIA | Bureau of Indian Affairs |
| BLM | Bureau of Land Management |
| CFR | Code of Federal Regulations |
| DM | Departmental Manual |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| Pub. L. | Public Law |
| RMP | Resource Management Plan |
| SOP | (Onshore Energy and Mineral Lease Management Interagency) Standard Operating Procedure |
| Stat. | Statute |
| TCP | Traditional Cultural Property |
| U.S.C. | United States Code |

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-1

**Appendix 2 – Judging the Adequacy of Tribal Consultation**

## A. Introduction

There are few legal standards that define what constitutes adequate tribal consultation. The clearest standard pertains to compliance with the National Historic Preservation Act (NHPA). The NHPA requires federal agencies, as part of the NHPA Section 106 process, to consult with Indian tribes that attach religious and cultural significance to historic properties potentially affected by an undertaking. 54 U.S.C. 302706. The regulations implementing NHPA Section 106 require federal agencies to make a "reasonable and good faith effort" to identify historic properties within the area of potential effect in part through consultation with Indian tribes. 36 CFR 800.4(b). However, this standard only applies to the agency's effort to consult with Indian tribes regarding historic properties of religious and cultural significance in the context of NHPA Section 106 and not the other specific and general authorities that require tribal consultation on a government-to-government basis.

The BLM's tribal consultation efforts are much broader than the identification of historic properties, and thus, it is important to weigh the adequacy of the agency's overall effort to consult with tribes under all applicable authorities listed in section 1.3 of this manual.

## B. Factors Affecting the Amount of Consultation Needed

BLM line managers engaged in tribal consultation should devote enough time and resources to this obligation commensurate with the following factors:

- Scope and complexity of proposed land use action;
- Availability of alternatives that would reduce or eliminate potential harm or disruption;
- Completeness and appropriateness of the list of Indian tribes and individuals with whom consultation has already been documented;
- Nature of issues raised;
- Intensity of concern expressed;
- Legal requirements posed by treaties, if applicable;
- Potential to resolve issues through further discussions; and
- Need for further consultation.

## C. Sufficient Consultation

Recent Federal district and appellate court cases and Interior Board of Land Appeals' decisions related to compliance with tribal consultation under the NHPA shed light on how courts judge the adequacy of agency-tribal consultation efforts. In cases where agency efforts were judged to

BLM_0026506

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-2

be sufficient, consultation and decisionmaking benefitted from—

- A pattern of numerous and repeated efforts to engage in consultation through various means of communication even when the tribe did not respond;

- A pattern of regularly scheduled consultation meetings with tribes;

- Early engagement to allow maximum contribution from tribes, when the agency has the maximum flexibility and before any alternatives have been finalized;

- Communications through a variety of mediums, including face-to-face meetings, telephone conference calls, notices, shared documents, field trips, and site visits;

- Direct involvement of BLM line officers and elected tribal officials in consultation;

- An engagement with tribes that allows for a reasonable opportunity to identify their concerns, provide input on the projects effects, and participate in resolving any adverse effects;

- The opportunity for tribes to conduct on-site inspection of projects and potentially affected resources;

- Documentation that the agency obtained and considered tribal input and that final decisions took that input into account; and

- Continuation of dialogue after initial authorizations and the involvement of tribes in monitoring, mitigation, and reclamation activities

## D.  Failure to Adequately Consult

In judicial rulings critical of agency consultation efforts, these fatal flaws were identified—

- Initiation of consultation with tribes late in the planning/decision process;

- Failure to fully share all relevant information with tribes;

- Meetings and communications that were of an informational nature rather than two-way communication designed to obtain and consider tribal views and recommendations; and

- Consultations restricted to individual tribal members or meetings limited only to BLM and tribal staff, rather than government-to-government consultation between elected tribal representatives and the designated representatives of the United States.

## E.  Conclusion

Developing an ongoing long-term relationship with tribes who have expressed ties to public lands and information relating to them can make the difference between success and failure in government-to-government consultation.  The sufficiency of consultation will be viewed holistically by the courts; it is the sum of the consultation effort that determines its adequacy, not individual steps in the consultation process.  The sheer number and volume of letters, meetings,

BLM_0026507

Case No. 1:20-cv-02484-MSK   Document 34-1   filed 04/27/21   USDC Colorado   pg 46 of 470

or reports provided to tribes are not enough to demonstrate appropriate consultation.  Rather, a good way to gauge whether the BLM's consultation efforts have been defensible is to consider the degree to which an objective review of the decision record would find a good faith effort to identify, notify, respond, and meaningfully involve and include comments received from Indian tribes potentially affected by a proposed decision and by avoiding preventable interference with traditional religious and cultural practices.

BLM_0026508

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A3-1

**Appendix 3 – BLM Tribal Liaison Position Description**

## A. Introduction

This position is the direct outgrowth of Secretarial Orders 3175 and 3317, formalized in 512 DM 5. The orders emphasize the responsibility of each federal agency in fulfilling United States trust responsibilities to sovereign Indian nations. A primary means in fulfilling these responsibilities is through establishment and maintenance of government-to-government relations.

The position is to be located in the BLM XXXX Office and report to the XXXX Manager. Primary responsibility will be to facilitate formal relations between the BLM and the tribal governments of those federally recognized tribes expressing interests in the actions of the BLM unit.

## B. Major Duties and Responsibilities

The tribal liaison officer—

- Assists line officers in performing their tribal consultation responsibilities with particular Indian tribes having interests in the management unit. The incumbent will coordinate the programs of the Bureau with programs of the tribes;

- Advises line management in BLM on the possible impact of alternative courses of action and of the negotiated reasons for a preferred course of action;

- Is responsible for communication with each agency office on policy issues where differing interpretation or policy positions exist among the agencies as to how those decisions impact any Indian tribe;

- Evaluates sensitive problem issues and recommends to the appropriate agency action officer the necessary steps to solve those issues;

- Has primary responsibility for monitoring all BLM programs which affect the Indian communities and communicating potential issues with managers and staff concerning Native American perception of the status of projects and programs;

- Attends tribal meetings where invited and agency presence is appropriate. Due to the need for government-to-government communication, the liaison often must adapt agency guidelines, regulations, and policy to tribal situations while maintaining integrity of congressional and agency purposes;

- Attends events and participates in ceremonies on behalf of the agency when requested;

- Develops and maintains knowledge of Native American cultures, philosophies, and needs as they pertain to analyzing Indian tribal needs and effecting workable solutions to those needs in relation to agency programs;

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A3-2

- Maintains working knowledge of the history of treaties with the Indian tribes and of the current operative laws which affect the government-to-government communication and the Secretary's trust responsibilities; and

- Is aware of the training available from the agency on various programs which might be of benefit to the Native American workforce, maintains communication with agency training, and informs the tribal leaders of appropriate ways to seek training from the agency.

- Attends formal tribal consultation meetings, assisting BLM line managers in ensuring that information on tribal issues receives good faith consideration during BLM decisionmaking and is fully reflected in the administrative record.

## C. Factors

1. The following knowledge is required by the position:

- Incumbent must have detailed practical knowledge of the principles, concepts, and regulations that govern the relation between managers of the public land and Indian tribes.

- Incumbent must be thoroughly familiar with the consultation polices of tribes with which government-to-government consultation will take place.

- Incumbent must have highly sensitive awareness for the interplay between the various Indian tribes and respect that interplay while not attempting to interfere with it.

- Incumbent must have a working knowledge of the minerals trust responsibilities of the Secretary of the Interior as they relate to Indian lands.

- Incumbent must have a working knowledge of laws such as the Native American Graves Protection and Repatriation Act and amendments to the American Indian Self Determination and Education Assistance Act, which is a foundation for understanding the relationships between the United States and various Indian tribes.

- Incumbent must have working experience and knowledge of how to do business with other cultures and people for whom English is not the primary language.

- Incumbent must be able to consult and advise effectively with representatives of private and public organizations and all levels of the agencies.

- Incumbent must have the ability to develop new solutions to problems not readily resolved by accepted methods.

- Incumbents must have well-honed listening skills and be able to understand the appropriate time to listen and the appropriate time to express agency concerns.

- Incumbent will be working in and around the jurisdictions of several BLM managers and other Federal agencies.  The liaison must have the communication skills and knowledge to provide assistance without causing a sense of disruption among the

BLM_0026510

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A3-3

various agency managers.  This requires a keen understanding of the agencies' organizational structure, chain-of-command relationships, and channels for communication.

2.  Supervision

Incumbent will be representing BLM State Director or BLM District Managers (list field offices).  Because the job will be located in the BLM XXXX Office and because administrative support for the position will come from the BLM XXXX Office, the position will report directly to the appropriate Deputy State Director or District Manager of the XXXX Office.  Differences of opinion among the BLM management will be coordinated through the BLM XXXX State Office.

Work will be assigned by XXXX Manager.  Request for incumbent's assistance by the various BLM field offices will coordinated through the XXXX Manager or his designee.

The position will be on the BLM XXXX State Management Team.

3.  Guidelines

Guidelines are broadly stated, such as basic legislation and interpretation of that legislation.  Incumbent must be resourceful in administering and developing new methods of proposed new policies.

4.  Complexity

The work consistently varies in the range of problems and processes which can involve several complex problems of a sensitive nature and which can have national and intergovernmental implications.  The incumbent can be directly involved in matters that can be controversial or sensitive and that can involve other agencies and organizations. Because of the legal ambiguities and overlapping geographic range of interests of various Indian nations, incumbent must exercise extreme tact and ingenuity in obtaining cooperation from all concerned parties.

There must be a demonstrated ability to counsel and evaluate all levels of government through collaborative techniques and through the patience required to demonstrate respect and caring.

5.  Scope and Effect

Decisions require constant effort and awareness of their potential impact on the public, Federal resources, Indian resources, and agency policy.  Decisions must be made in keeping with agency policy and regulations and with legal and legislative mandates of these rights.

BLM_0026511

MS-1780 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A3-4

6. Personal Contacts

Personal contacts are with leaders of the various Indian nations, with the respected spokesmen and women, and with the religious leaders. These include all levels of contact from casual visits to formal meetings. Personal contacts, as coordinated with various agency officials, will include meetings with affected other tribes in the region. Contacts also include the working relationships which build trust with each of the land managers within whose jurisdiction the incumbent is working. Regular and routine contacts by the incumbent will be made with the district and field office managers to keep them informed on the content and progress of issues, concerns, activities, etc. regarding Indian tribes in their areas of responsibility.

7. Purpose of Contacts

The purpose of the contacts is often to negotiate, justify, defend or settle significant matters. Contacts involve meetings, presentations, hearings, etc. Such contacts typically involve different and apparently irreconcilable differences, and require the incumbent to achieve a solution or find acceptable options. Another purpose of contacts will be to serve as a functional model for other applications of these skills and to communicate both successes and failures to interested parties.

8. Physical Demands

The work requires travel, often to remote sites. The work will often require long hours of meetings and distance driving. The work will also require careful documentation of communication.

9. Work Environment

Work is typically performed in offices, meeting rooms, etc. Travel will involve exposure to moderate discomforts.

BLM_0026512

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

MANUAL TRANSMITTAL SHEET

| | |
|---|---|
| Release 1-1781 | |
| Date 12/15/16 | |

Subject: BLM Handbook 1780-1 Improving and Sustaining BLM-Tribal Relations (P)

1. <u>Explanation of Material Transmitted</u>:  This release transmits the new Handbook (H) 1780-1, *Improving and Sustaining BLM-Tribal Relations*, which replaces H-8120-1, *Guidelines for Conducting Tribal Consultation*.  H-1780-1 implements new administration and Departmental policies to provide comprehensive guidance concerning tribal relations for all BLM managers and programs.

2. <u>Reports Required</u>:  None.

3. <u>Material Superseded</u>:  H-8120-1.  Release number 8-75

4. <u>Filing Instructions</u>:  Remove and replace in accordance with the below instructions.

REMOVE     All of H-8120-1
                Release 8-75            INSERT   All of H-1780-1

*Neil Kornze*

Director
Bureau of Land Management

Case No. 1:20-cv-02484-MSK   Document 34-1   filed 04/27/21   USDC Colorado   pg 52 of 470

# Table of Contents

**CHAPTER I. INTRODUCTION** ..................................................................................I-1
  A.  PURPOSE AND ORGANIZATION OF THIS HANDBOOK........................................................I-1
  B.  THIS HANDBOOK'S PLACE IN THE BLM MANUAL SYSTEM ...............................................I-2

**CHAPTER II. BUILDING AND MAINTAINING TRIBAL RELATIONSHIPS**.............II-1
  A.  INTRODUCTION ...................................................................................................II-1
  B.  CONFIDENTIALITY ...............................................................................................II-1
  C.  BUILDING A BROAD-BASED RELATIONSHIP...................................................................II-4
  D.  FINANCIAL SUPPORT FOR TRIBAL PARTICIPATION IN BLM DECISIONMAKING ...............II-14
  E.  ACCOUNTABILITY .............................................................................................II-15

**CHAPTER III. TRIBAL CONSULTATION GENERAL CONSIDERATIONS** .............III-1
  A.  DISTINGUISHING BETWEEN NOTIFICATION, COORDINATION, AND
     CONSULTATION............................................................................................. III-1
  B.  BLM REPRESENTATIVES IN CONSULTATION............................................................. III-3
  C.  IDENTIFYING TRIBES AND OTHER INDIAN PARTIES FOR CONSULTATION.......................... III-4
  D.  WHEN IN THE DECISIONMAKING PROCESS TO START CONSULTATION........................... III-7
  E.  PREPARING AND INITIATING TRIBAL CONSULTATION .................................................... III-8
  F.  CORRESPONDENCE CONTENT.............................................................................. III-9
  G.  GENERAL FEATURES OF CONSULTATION ................................................................ III-11
  H.  USE OF INTERNET TO FACILITATE CONSULTATION ...................................................... III-13
  I.  LACK OF TRIBAL RESPONSE................................................................................. III-14
  J.  APPROACHES TO CONTENTIOUS MEETINGS .............................................................. III-15
  K.  HOW MUCH CONSULTATION TO DO—MEETING THE GOOD FAITH STANDARD ............ III-15
  L.  DOCUMENTATION OF NOTIFICATION, COORDINATION, AND CONSULTATION .............. III-17
  M.  CONCLUSION OF CONSULTATION......................................................................... III-18

**CHAPTER IV. GUIDANCE FOR TRIBAL CONSULTATION IN PLANNING
AND DECISION SUPPORT** ...................................................................................IV-1
  A.  GENERAL AUTHORITIES.....................................................................................IV-1
  B.  ETHNOGRAPHIC STUDIES ................................................................................IV-17
  C.  COORDINATING TRIBAL CONSULTATION OBLIGATIONS UNDER DIFFERENT
     LAWS ........................................................................................................IV-21
  D.  KEY DIFFERENCES BETWEEN VARIOUS AUTHORITIES .................................................IV-22

**CHAPTER V. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE
TO THE NATIONAL CONSERVATION LANDS PROGRAM** ........................................ V-1
  A.  OVERVIEW .................................................................................................. V-1
  B.  COMPONENTS OF THE NATIONAL CONSERVATION LANDS SYSTEM ................................ V-3

**CHAPTER VI. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE
TO THE FIRE MANAGEMENT PROGRAM** ...................................................................VI-1
  A.  INTRODUCTION ..............................................................................................VI-1

BLM HANDBOOK                        Rel. No. 1-1781
Supersedes Rel. 8-75              12/15/16

BLM_0026514

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

ii

B. LEGAL AUTHORITIES FOR TRIBAL CONSULTATION WITHIN THE FIRE
MANAGEMENT PROGRAM ........................................................................................ VI-1
C. IMPORTANCE OF LUP/RMP FOR FIRE PLANNING AND COORDINATION WITH
INDIAN TRIBES ......................................................................................................... VI-2
D. AREAS OF RESPONSIBILITY ...................................................................................... VI-3
E. PROGRAM OPERATION STANDARDS ........................................................................... VI-3
F. COHESIVE STRATEGY ............................................................................................... VI-3
G. PARTNERSHIPS WITH TRIBES .................................................................................... VI-3
H. USE OF 638 COMPACTS OR SELF-GOVERNANCE CONTRACTS IN THE FIRE
PROGRAM ................................................................................................................. VI-3

**CHAPTER VII. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE
TO THE FOREST AND WOODLANDS PROGRAM .................................................... VII-1**
A. OVERVIEW ............................................................................................................. VII-1
B. LEGAL AUTHORITIES .............................................................................................. VII-2
C. TREATIES AND FOREST PRODUCTS ........................................................................... VII-3
D. STEWARDSHIP CONTRACTING ................................................................................... VII-4

**CHAPTER VIII. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE
TO THE RANGELAND MANAGEMENT PROGRAM ................................................ VIII-1**
A. INTRODUCTION ...................................................................................................... VIII-1
B. CONSULTING DURING MONITORING AND EVALUATION PROCESSES ........................... VIII-1
C. CONSULTING DURING GRAZING PERMIT RENEWAL AND OTHER VEGETATION
MANAGEMENT ACTIVITIES ..................................................................................... VIII-1
D. HOW TYPES OF PROJECTS REQUIRING TRIBAL CONSULTATION ARE DEFINED ............ VIII-2

**CHAPTER IX. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE
TO THE FISH AND WILDLIFE PROGRAM ............................................................... IX-1**
A. INTRODUCTION ........................................................................................................ IX-1
B. COLLABORATIVE CONSERVATION APPROACH ............................................................ IX-1
C. SUBSISTENCE MANAGEMENT ................................................................................... IX-2
D. ENDANGERED SPECIES AND MANAGEMENT OF CRITICAL HABITAT ............................. IX-2
E. DISRUPTION AND REMOVAL OF ANIMAL PARTS ........................................................ IX-3
F. CONFIDENTIAL BIOLOGICAL INFORMATION .............................................................. IX-3
G. LAND ACCESS AND CROSS-BOUNDARY FIELD ACTIVITIES ........................................ IX-4
H. LAW ENFORCEMENT ................................................................................................ IX-5

**CHAPTER X. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE
TO THE CULTURAL HERITAGE PROGRAM ........................................................... X-1**
A. INTRODUCTION ......................................................................................................... X-1
B. CONSULTING UNDER HERITAGE RESOURCES AUTHORITIES ......................................... X-1
C. SPECIAL CONSIDERATIONS/ISSUES THAT APPLY TO THE CULTURAL HERITAGE
PROGRAM ................................................................................................................. X-17

BLM_0026515

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

iii

**CHAPTER XI. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE RENEWABLE ENERGY PROGRAM** ................................................................ XI-1
   A.  INTRODUCTION ............................................................................................... XI-1
   B.  NEPA COMPLIANCE FOR UTILITY-SCALE RENEWABLE ENERGY RIGHT-OF-WAY AUTHORIZATIONS ................................................................................. XI-1
   C.  TRIBAL GOVERNMENT-TO-GOVERNMENT CONSULTATION ............................ XI-2
   D.  SOLAR AND WIND ENERGY APPLICATIONS—DUE DILIGENCE ...................... XI-3
   E.  EARLY COORDINATION MEETINGS AND DEVELOPMENT PRIORITIZATION ...................... XI-3
   F.  PROJECT-SPECIFIC CONSULTATION.................................................................. XI-5
   G.  COMPREHENSIVE SOLAR AND WIND ENERGY PROGRAMS ............................ XI-6
   H.  SOLAR AND WIND ENERGY DEVELOPMENT POLICY ...................................... XI-8

**CHAPTER XII. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE FLUID MINERAL PROGRAM (RESERVED)** ................................................. XII-1

**CHAPTER XIII. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE MINERALS PROGRAM** ...................................................................................... XIII-1
   A.  INTRODUCTION .............................................................................................. XIII-1
   B.  ONSHORE ENERGY AND MINERAL LEASE MANAGEMENT INTERAGENCY STANDARD OPERATING PROCEDURES........................................................... XIII-1
   C.  TRIBAL CONSULTATION FOR FEDERAL MINERALS MANAGEMENT GENERALLY .......... XIII-3
   D.  TRIBAL CONSULTATION FOR FEDERAL MINERALS MANAGEMENT IN SPLIT ESTATE SITUATIONS ...................................................................................... XIII-4
   E.  BLM RESPONSIBILITIES FOR INDIAN TRUST MINERALS MANAGEMENT ....................... XIII-5
   F.  INDIAN SELF-DETERMINATION ACT .......................................................... XIII-10

**CHAPTER XIV. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE CADASTRAL SURVEY PROGRAM** .............................................................. XIV-1
   A.  BACKGROUND................................................................................................ XIV-1
   B.  CADASTRAL PROGRAM ROLE IN MANAGING TRUST ASSETS ....................... XIV-1
   C.  BOUNDARY EVIDENCE................................................................................... XIV-2
   D.  SURVEY PROCESS ......................................................................................... XIV-3

**CHAPTER XV. GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE REALTY PROGRAM (RESERVED)** ................................................................ XV-1
   A.  POLICY REGARDING CONTRACTING FOR PRODUCTS ....................................... 2-1
   B.  POLICY COVERING COMPENSATION FOR TRIBAL INPUT INTO BLM DECISIONMAKING PROCESSES ..................................................................... 2-3

**GLOSSARY OF TERMS**.................................................................................................. G-1

**FIGURES**
Figure III-1   With whom to consult depends on the particular legal authority. .................... III-8
Figure IV-1   Provisions of Title II of the Federal Land Policy and Management Act. ......... IIV-2

BLM HANDBOOK                                    Rel. No. 1-1781
Supersedes Rel. 8-75                         12/15/16

BLM_0026516

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

iv

Figure IV-2    Tribal consultation for purposes of Title II of the Federal Land Policy and
               Management Act..................................................................................................IIV-3
Figure IV-3    Provisions of Section 102 of the National Environmental Policy Act.............IIV-7
Figure IV-4    Tribal consultation for purposes of Section 102 of the National
               Environmental Policy Act...................................................................................IIV-8
Figure IV-5    Provisions of the American Indian Religious Freedom Act..........................IIV-13
Figure IV-6    Tribal consultation for purposes of Section 2 of the American Indian
               Religious Freedom Act. .....................................................................................IIV-13
Figure IV-7    Provisions of Executive Order No. 13007 ......................................................IIV-15
Figure IV-8    Tribal consultation for purposes of Executive Order No. 13007, "Indian
               Sacred Sites." ...................................................................................................IIV-16
Figure X-1     Tribal consultation for purposes of Section 106 of the National Historic
               Preservation Act................................................................................................ X-1
Figure X-2     Provisions of Section 101(d)(6) of the National Historic Preservation Act. ...... X-2
Figure X-3     Provisions of Section 4 of the Archaeological Resources Protection Act. ......... X-7
Figure X-4     Tribal consultation for purposes of Section 4(c) of the Archaeological
               Resources Protection Act.................................................................................. X-9
Figure X-5     Provisions of Sections 5, 6, and 7 of the Native American Graves
               Protection and Repatriation Act and Corresponding Regulations. ................... X-12
Figure X-6     Provisions of Section 3(c) and (d) of the Native American Graves
               Protection and Repatriation Act and Corresponding Regulations. ................... X-13
Figure X-7     Quick Reference for New Discoveries and Collections Requirements
               under the Native American Graves Protection and Repatriation Act. .............. X-15
Figure X-8     Appropriate Consulting Parties Associated with Selected Native
               American Graves Protection and Repatriation Act Activities. ......................... X-16
Figure A3-1    Example of a spreadsheet/database to document tribal consultation................ A3-1

**APPENDICES**

APPENDIX 1    ACRONYMS AND ABBREVIATIONS ..................................................................... A1-1
APPENDIX 2    IMPLEMENTATION OF BLM POLICY REGARDING COMPENSATION TO
               NATIVE AMERICANS FOR PRODUCTS AND THEIR PARTICIPATION IN THE
               BLM'S DECISIONMAKING PROCESSES................................................................. A2-1
APPENDIX 3    SPREADSHEET/DATABASE TO DOCUMENT BLM-INDIAN TRIBAL
               CONSULTATION............................................................................................... A3-1
APPENDIX 4    COORDINATION OF NEPA, NHPA 106, AND TRIBAL CONSULTATION ............... A4-1
APPENDIX 5    EXAMPLE OF CONTENTS FOR TRIBAL CONSULTATION STRATEGY ................... A5-1

BLM_0026517

# CHAPTER I.  INTRODUCTION

## A.  Purpose and Organization of this Handbook

Manual Section 1780 (MS-1780) and Handbook 1780-1 (H-1780-1) are being released simultaneously.  H-1780-1, Improving and Sustaining BLM-Tribal Relations, replaces H-8120-1 (Rel. 8-75, 12/03/04).  MS-1780, Tribal Relations, replaces MS-8120 (Rel. 8-74, 12/03/04). MS-8120 and H-8120-1 were specific to implementation of historic preservation authorities only. Therefore, this new guidance is appropriately placed within the Bureau of Land Management (BLM) 1700 series, which addresses relations with other governments, including State, local, and international relations.  Developed in response to the finalization of 512 Departmental Manual (DM) Chapters 4 and 5, H-1780-1 with MS-1780 provides direction for all BLM programs for improving and sustaining tribal relations, including government-to-government consultation. We attempted to be inclusive; however, this handbook does not contain sections for every program area or discipline who should be involved in tribal relations. Updates and additional chapters will be added when they are available.

H-1780-1 addresses a broad range of legal authorities and agency programs of interest to tribes and also highlights BLM responsibilities.  It incorporates current guidance derived from recent case law, new Secretarial orders and policies, Executive orders, and decades of experience working with tribes on a government-to-government basis:

- Chapter I introduces the handbook material and its relationship to the manual.

- Chapter II provides steps the BLM should take to build a positive broad-based relationship with Indian tribes.  Suggestions stress developing partnerships based on common interests, financial support, confidentiality, and accountability.

- Chapter III provides practical guidance on the mechanics of government-to-government consultations applicable to all BLM programs, including: (1) how to conduct and document consultation efforts; (2) identification of tribal leaders or their representatives; (3) developing strategies to achieve success in BLM-tribal relations, communications, meetings and formal government-to-government consultations; and (4) recognizing tribal motivation driving consultation.

- Chapter IV addresses consultation needed in land use planning and decision support.  It summarizes BLM obligations under the Federal Land Policy and Management Act (FLPMA); National Environmental Policy Act (NEPA); Executive Order (E.O.) 13175, Consultation and Coordination with Indian Tribal Governments; the American Indian Religious Freedom Act (AIRFA); and Executive Order 13007, Indian Sacred Sites.  The use of ethnographic studies for planning purposes, how to coordinate tribal consultation obligations under these legal authorities, as well as key differences among the legal mandates are highlighted.

- Chapter V outlines requirements for tribal consultation and opportunities for tribal partnerships within National Conservation Lands.

BLM_0026518

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

I-2

- Beginning with Chapter VII, a series of program-specific chapters can be found. Each chapter highlights legal authorities driving consultation and tribal relations for that program, explains special considerations applicable to that program, and identifies potential partnerships or agreements with Indian tribes.

- Program-specific chapters: Fire Management Program (Chapter VI); Forest and Woodlands Program (Chapter VII); Rangeland (Chapter VIII); Fish and Wildlife Program (Chapter IX); Cultural Heritage Program (Chapter X); Renewable Energy Program (Chapter XI); Fluid Mineral Program (reserved at Chapter XII); Minerals Program (Chapter XIII); Cadastral Survey Program (Chapter XIV); and Realty Program (reserved at Chapter XV). Handbook guidance is not limited to those programs featured within individual chapters. Examples and clarifications are provided throughout the text regarding how the issue under discussion affects a variety of BLM program areas.

## B.  This Handbook's Place in the BLM Manual System

MS-1780 and this handbook, H-1780-1, are housed within the BLM's broad administrative manual series, since they focus on cooperative relations with other governments, including State and international relations. This guidance is intended for line managers exercising their executive duties and other agency decision makers; however, certain chapters and appendices provide technical direction as well. Agency staff and public land users will also find this handbook beneficial to establish familiarity with agency policies and expectations of the decision makers.

BLM_0026519

## CHAPTER II.  BUILDING AND MAINTAINING TRIBAL RELATIONSHIPS

### A.  Introduction

Successful relations with tribes are built upon the establishment of personal and professional relationships characterized by trust, respect, and mutual interest.  Field offices are encouraged to utilize the tools and strategies presented in this chapter to establish deeper and more meaningful agency-tribal relationships.  These relationships must be founded upon policies that encourage stable interactions and that seek out opportunities to interact positively with tribes across many program areas.

Examples of innovative, cooperative programs between BLM offices and individual tribes are presented in the following sections.  Many tribal requests for gaining access to sites, gathering materials for traditional uses, and protecting sacred places can be addressed within the normal scope of multiple use management.  But the BLM's success in addressing tribal issues depends a great deal on how strong its working relationships are with tribes, how trustful those relationships are, and how skillfully the agency has developed a respectful relationship over time.

### B.  Confidentiality

1.  Background Information.  Native Americans may be reluctant to share sensitive information regarding resource locations and community-held values with agency officials for several reasons.  First, historical relations among native people and others have led to a distrust of the Federal Government and the non-Indian public, especially related to the respect for Native American religion.  Second, secrecy is often a central tenet of Native American religious beliefs.  Third, many Native Americans fear that sharing information with outsiders could result in the abuse of sacred sites and the disruption of religious ceremonies.

> Managers and staff carrying out Native American consultation should clearly represent the sort of information they seek, the purposes to which the information will—and will not—be applied, and the limits of the BLM's ability to protect the information from public disclosure.  The extent of that ability must not be misrepresented.  All sensitive data should be carefully maintained and securely stored.  Offices responsible for gathering sensitive information and conducting consultation should have adequate physical and procedural means to ensure secure file maintenance and management.  Each office may wish to develop maps or geospatial layers in accordance with BLM Federal Geographic Data Committee standards showing areas where tribes have identified issues or concerns.  Maps can depict lands historically occupied or utilized and can also locate areas identified as having ongoing traditional religious significance and use.  However, when information of this extremely sensitive nature is included, maps must be treated as confidential working files with limited internal access and kept from public view.  The metadata should indicate its confidentiality.

BLM_0026520

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

2. **Federal Advisory Committee Act (FACA).** The FACA requirements for open meetings and public access do not apply to tribal consultation involving only Federal and Tribal representatives because Congress has exempted intergovernmental consultation from FACA requirements. Please consult the Solicitor's Office on the scope of the exemption when arranging a tribal consultation.

3. **Freedom of Information Act (FOIA).** Native American are sometimes reticence to share information because agencies have been partially hindered from effectively protecting sensitive information. Once in an agency's possession, the information may be subject to disclosure if it is requested under the 1966 Freedom of Information Act (FOIA; 5 U.S.C. 552) or distributed as part of publically available NEPA analysis.

   The extent to which sensitive tribal information can be maintained as confidential depends on the degree to which it fits within one of FOIA's nine exemptions. These exemptions may protect most information about sacred sites. Whether or not all such information can be protected under them should be discussed with the Solicitor's Office. Several exemptions may apply

   Exemption 3 protects from disclosure matters "specifically exempted from disclosure by statute" and exemption 6 exempts "personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Another possibility concerns the "trade secrets" exemption. It applies to trade secrets and commercial or financial information that is also privileged or confidential.

   To the extent permitted by law, if a tribe submits information under a claim of protection, the BLM can assert an applicable privilege for, and seek to protect, that information from public disclosure. While these privileges are initially asserted by the BLM, a challenge to an assertion of privilege may be ultimately resolved by the Federal judiciary when a decision is challenged in court. In this circumstance, a privileged document may be subject to review or possible release by a court, notwithstanding the BLM's good faith assertion of an applicable privilege. Thus, a tribe must assess and be comfortable with any and all submissions it makes to assist the BLM in its land-use planning process, understanding that there is some risk certain documents may, in the end, be publically disclosed.

4. **Archaeological Resources Protection Act (ARPA).** The regulations (43 CFR 7) implementing the Archaeological Resources Protection Act (ARPA; 16 U.S.C. 470aa–470mm) requires protection from public release. However, it is important to note that ARPA's non-disclosure obligation has important limitations. First, the statute mandates protection against publicly releasing information about "archaeological resources," which include "material remains of past human life or activities which are of archaeological interest" and are at least 100 years of age. Second, even if the information involves an archaeological resource, if the State's governor requests the information, the agency must provide it. State statutes governing disclosure or protection of such information would govern its protection from that point forward. Third, ARPA only applies to public

BLM_0026521

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-3

surface.  Thus, information gathered from BLM consultation regarding private or State surface is not protected under this statute.

5. **National Historic Preservation Act (NHPA).**  The National Historic Preservation Act (54 U.S.C. 300101 et seq.) requires the non-disclosure of sensitive information following procedures that agencies must follow at 54 U.S.C. 307103.  Although courts have not yet ruled that NHPA is a withholding statute under FOIA, it appears to be so.  NHPA provides that the head of a Federal agency conducting NHPA consultation shall, after consulting with the Secretary of the Interior, "withhold from disclosure to the public information about the location, character, or ownership of a historic property" if the Secretary and the agency conclude that disclosure would do any of three things: (1) cause a significant invasion of privacy; (2) risk harm to the historic resource, or (3) impede the use of a traditional religious site by practitioners.  The main limitation with using this protection is that in order to withhold sacred site information under the NHPA, the BLM must first determine that the information pertains to historic properties—that is, properties included in or eligible for inclusion on the National Register of Historic Places (National Register or NRHP).  The BLM then can only make a conditional promise to withhold information under the NHPA if there is a sufficient basis to conclude that the site or sites in question are likely to be considered historic properties.

The ACHP has released guidance on the use of 54 U.S.C. 307103 (old Section 304) to protect sensitive information about historic properties.  The federal official determines what information to withhold, prepares redacted documents, develops documentation to support the decision, and initiates consultation with the Keeper of the National Register (NPS).  If the official and the Keeper both agree that disclosure meets the criteria for withholding, then the official withholds the information from disclosure.  NPS reviews the relevant information and after consulting with the official determines who may have access to the information.  The Keeper consults with the ACHP in this process of determining withholding and access when the information at issue was developed in compliance with Section 106 or Section 110(a) of the NHPA.  If the official and the Keeper disagree on whether disclosure of certain information meets the criteria for withholding, then the information will not be withheld under Section 304.  The decision to withhold information requires agreement by the official and the Keeper.  The ACHP's opinion on this matter is advisory only.

6. **Other Strategies.**  State-adopted versions of the 1979 Uniform Trade Secret Act and the 1974 Privacy Act (5 U.S.C. 552a) also may provide limited degrees of protection.

---

**Oregon.  Vale District.**  In April 2009, the Vale District entered into a Trade Secret Agreement with the Confederated Tribes of the Umatilla Indian Reservation.  In this agreement, the tribes agree to conduct an inventory of culturally important plant species and to use this plant list to model potential habitat for these species using geographic information system (GIS) and statistical methods.  The two parties concur that the model

BLM_0026522

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

generated would inextricably involve cultural resources and information uniquely known to the tribes, which is of economic value.  Both the list and the model are, and will be, trade secrets of the tribes in so far as they consist of information that is secret, has economic value due to its secretive nature, and the tribes have made reasonable efforts to keep this and other cultural information and knowledge secret.  Thus, the agreement concludes that this information may not be subject to disclosure under the trade secrets exemption in the Freedom of Information Act.

Another option to consider for protecting sacred site and other sensitive tribal information from public disclosure is to refrain from housing such information within any formal federal government system of records.  Such data might be housed at tribal offices with joint use agreements allowing BLM officials with a need to know access to the files at tribal offices.  Field offices should consult the Solicitor's Office regarding the application of these statutes and strategies to protect from public disclosure sensitive information regarding sacred sites or places of traditional religious or cultural importance versus the requirement to disclose such information if used by the BLM to make decisions.

**C.  Building a Broad-Based Relationship**

1. **Learn About Indian Tribes, Communities, and Leaders**.  Managers and their staffs should take the time to learn about the tribes with which they will be working:

   - What is their history?

   - What is their aboriginal land base?

   - When were they federally recognized?

   - Were their reservation rights (if any) established by treaty or by Executive order?

   - How are they organized?

   - Do they have off-reservation treaty or other reserved rights?

   - Are they related historically or culturally to other tribes in the area?

   - Are there specific cultural customs that may have bearing on interactions and meeting protocols?

   It is a good idea to read the most widely accepted ethnographic histories of the tribe and information produced by the tribe about itself and membership, often available on their website.  Consider subscribing to tribal media and accessing websites or other media to keep informed about what is important to the tribes with an interest in your area, who the tribal leaders are, and what issues are of concern to them.  Be open to receiving information from officials about their tribe, its customs, and history.  Also, be aware that some information may be considered sensitive and should not be widely disseminated.  Meet or contact tribal representatives, such as tribal history or cultural program leaders,

BLM_0026523

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-5

to learn what sources of information about the tribe they recommend.  This context will have a bearing on meetings and consultations with tribes and may affect how successful a BLM office is in its consultation efforts.

2.  **Establish and Maintain Personal Relationships**.  The most successful BLM-tribal working relationships are those built and maintained over a long period of time with the same individuals representing each party.  A good example is the BLM Indian Lands Surveyor (BILS) Program, whereby senior cadastral surveyors are stationed at BIA Regional Offices, consulting on a regular basis with tribal leaders and managers, individual Indians, and Alaska Natives regarding issues affecting BLM-tribal management of land boundaries relations.

The BLM managers are encouraged to visit tribal councils and appropriate tribal leaders on a recurring basis.  Face-to-face meetings help develop relationships, irrespective of specific issues or proposed actions.  Managers are encouraged to take advantage of these meetings to discuss how, when, and with whom follow-up consultation should occur.  Attending economic enterprises, celebrations, dances, cultural festivals, sporting events, or feasts provides positive intercultural experiences that can build more personal, trustful relationships.

The BLM managers should assign tribal coordination duties to a limited number of employees with the goal of encouraging those employees to develop long-term professional relationships with tribes.  These tribal liaisons or other staff play key roles in coordinating with tribal staff and representatives and often attend government-to-government meetings.  These staff support field managers who have been delegated the authority to make binding decisions (see Chapter III. B). Suggested employee performance appraisal plan elements are provided in Chapter II, section E.1.

When BLM managers and/or staff assigned consultation and coordination responsibilities retire, transfer, or have changes in job duties, tribal relationships can be adversely affected.  Therefore, BLM managers should take appropriate actions to help minimize the turnover of personnel responsible for tribal coordination.  Such actions might include assignment of accretion of duties, creation of appropriate career ladders, etc.

Potential disruptions due to staff turnover can be reduced or managed in a number of ways.  New BLM managers and staff should take training on tribal consultation and relations, such as courses provided by the National Training Center (NTC).  Several are available online.  Tribal liaisons should brief managers shortly after they come on board regarding the history of local tribal relations, existing agreements, prominent issues, and resources of concern to the tribe that the BLM knows about.  Tribal liaisons should accompany managers in meetings.  New managers need to visit tribes soon after arrival to become oriented regarding tribal governmental structures and tribal perspectives and to ensure that regularly scheduled government-to-government consultations will not be disrupted.

BLM_0026524

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

Tribal governments hold elections for president or chairperson frequently, sometimes yearly.  All BLM managers should quickly take the opportunity to meet with new tribal officials at the start of their tenure to discuss ongoing land use planning, land use actions, and proactive programs of interest to the two parties.  Relationships between BLM personnel and permanent tribal staff, such as natural resources division directors, NAGPRA coordinators, planning personnel, tribal historic preservation officers, and other program offices can help maintain continuity.  Relationships with other tribal groups, such as the National Congress of American Indians, Alaska Federation of Natives, the Institute for Tribal Environmental Professionals, and other partnership groups can also help the BLM maintain up-to-date information regarding tribal leadership and contacts.

3.  **Build Partnerships**.  Managers and program leaders at all levels of the BLM should seek out opportunities to build partnerships with Indian communities.  Each BLM program is to ensure that the management of public lands benefits from full engagement with the original stewards of those lands through such means as cooperative agreements, interagency agreements, contracts, hires, and volunteers.

4.  **Collaborative Land Management**.

   a.  **Self-Determination Contracts and Self-Governance Funding Agreements**.  The 1975 Indian Self-Determination and Education Assistance Act (ISDEAA; 25 U.S.C. 450) provides for tribes to contract to take over certain federal programs benefiting tribes.  These self-determination act contracts are known as "638" contracts.  Initially, this program only applied to the BIA and Indian Health Service.  However, later amendments the act (Pub. L. 100-472, 1988; Pub. L. 103-413, 1994) expanded self-determination contracting to all DOI agencies.  Federal and tribal representatives negotiated regulations for the ISDEAA, which can be found at 25 CFR 900.  In addition, there is an internal agency procedures handbook, which also resulted from Federal and tribal collaboration.  As amended, Public Law 638 consists of five titles. Those applicable to the BLM include Title I, Indian Self-Determination Act, and Title IV, Tribal Self-Governance.

   Under Title I, BLM must enter into self-determination contracts with tribal organizations to assume programs, functions, services or activities that benefit Indians because of their status as Indians.  Funding must be no less than is currently spent on the program.  Contract proposals must be approved or declined within 90 days of receipt or they are automatically approved.  Proposals can be declined for only one or more of five statutory reasons.  Consult the Solicitor's Office as soon as you receive a self-determination contract proposal under Title I.

   Under Title IV, self-governance tribes negotiate annual funding agreements with BLM to assume programs, functions, services or activities for the benefit of Indians because of their status as Indians.  In the discretion of BLM, a self-governance tribe

BLM_0026525

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

can also negotiate to assume programs of special geographic, historical or cultural significance to that tribe through a self-governance funding agreement.

Contractible BLM programs include Indian minerals and the field survey portion of cadastral surveys.

Field offices are encouraged to identify and publish in the Department's annual Federal Register notice any programs, functions, services and activities that self-governance Tribes can assume.

b. **Fire and Aviation Programs**. The Fire and Aviation Directorate regularly partners with tribes and other agencies to maximize initial fire attack. The Fuels Management Program focuses on protecting communities and natural and heritage resources while providing for local economic opportunities. Hundreds of millions of dollars in recent years have significantly supplemented rural economies. Such contracts focus on the development of community wildfire protection plans, fuels treatments, biomass utilization, and consultations. Fire prevention and education teams consult with local residents to help reduce human-caused fires and to implement fire prevention and education programs (see Chapter VI).

c. **Cadastral Survey**. The BLM Cadastral Survey Program has established strong relationships with the BIA's Real Estate Services and Office of the Special Trustee for American Indians (OST) for the purpose of providing cadastral services on Indian trust lands. Principal components to this fiduciary trust program: (1) developing the Indian Lands Surveyor (BILS) program to install a highly experienced cadastral surveyor into each of the 12 BIA regional offices to expedite cadastral services to Indians; (2) creating a Certified Federal Surveyor (CFedS) Program to assist licensed land surveyors to continue their professional development and to implement a training program to certify hundreds of surveyors to work on Indian or trust lands, including training tribal surveyors; (3) improving the condition of the Public Land Survey System; (4) creating a cadastral Geographic Information System (CGIS) to graphically represent the records that compose land ownership and occupancy of the individual or tribe; (5) establishing cadastral survey project offices on reservations; and (6) providing title and mapping leadership in the Department's buy-back program.

An inventory of survey needs on Indian trust lands developed in collaboration with the BIA and OST prioritizes work based on trespass abatement, timber harvest, mineral leasing, and other priorities related to Indian trust assets and helps guide disbursement of funds into individual Indian monetary accounts (see Chapter XIV).

d. **Heritage Resources Management**. In furtherance of the Inter-Agency Memorandum of Understanding (MOU) on the Protection of Indian Sacred Sites executed in 2012, the BLM should engage with tribal partners to build tribal capacity for the identification, evaluation, and protection of sacred sites. Tribes may be

BLM_0026526

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

interested in entering into agreements to share capability, expertise, and insight into how to foster collaborative stewardship of sacred sites and other properties of traditional religious and cultural importance.  Field offices should also consult with tribes when developing site-specific protection and management plans that pertain to sacred sites or properties of traditional religious and cultural importance.  Following consultation and commitment in agreement documents, tribal expertise and capability regarding stabilization, patrolling, interpretation, stewardship education, or ethnographic insights into site use and significance can strengthen the management of heritage resources on public lands.

5.  **Procurement.**

a.  **Small Disadvantaged Businesses**.  The BLM is committed to increasing contracting opportunities for small business communities.  Section 8(a) of the 1958 Small Business Investment Act (15 U.S.C. 14A) authorized the Small Business Administration to enter into prime contracts with Federal agencies and to subcontract the performance of the contract to small business concerns.  Executive Order 11458, Prescribing Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise (34 CFR 4937), authorized the use of this provision to assist minority businesses and established the 8(a) program, as it is commonly called.

Many tribal businesses may be eligible to take advantage of their status as a Small Disadvantaged Business, an 8(a) participant, or a Historically Underutilized Business (HUB) Zone.  Local procurement offices should contact tribal business offices and the Small Business Administration to encourage Indian tribal firms to bid on upcoming BLM contracts for which they may qualify.  Small disadvantaged businesses must be owned by individuals who are "socially and economically" disadvantaged and meet other conditions as defined by regulations.  (See 13 CFR 124.104.)

The 8(a) program assists in the expansion and development of existing, newly organized, or prospective profit-oriented small disadvantaged firms.  Small businesses may apply for the section 8(a) program if they are owned and controlled by one or more persons who can provide evidence of having been deprived of the opportunity to develop and maintain a competitive position in the economy because of social and economic disadvantages.  In Alaska, the corporations formed by ANCSA were legislatively approved for inclusion in the 8(a) program.

The HUB Zone program stimulates economic development and creates jobs in urban and rural communities by providing Federal contracting preferences to small businesses.  These preferences go to small businesses that obtain this certification by employing staff who live in a HUB Zone and establishing a "principal office" in one of the specifically designated areas.

BLM_0026527

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

b. **1910 Buy Indian Act (25 U.S.C. 47)**.  Under this act, the Secretary of the Interior has broad discretionary authority to promote the purchase of the products of Indian Country.  Though mandatory for the BIA, the act is discretionary for the BLM.  Its regulations were issued in July 2013 (see 48 CFR 1401; 1452; and 1480).  This act provides further authorization for BLM to offer procurement contracts to Indian-owned businesses in their regions.

c. **Indian Tribes Qualify as Not-for-Profit Organizations**.  The Internal Revenue Service has determined that federally recognized tribes qualify as not-for-profit organizations; thus, contributions to them may be tax deductible.  Their status as not-for-profit organizations allows tribes to participate in, or apply for, special grants and awards restricted to such organizations.  Field offices must check with their procurement offices to pursue opportunities to utilize such grants to advance common goals and program interests.

d. **Contracting for Services, Expertise, or Products Needed for Decisionmaking**.  The BLM may require land use applicants to obtain information from tribes needed to fulfill its NEPA or NHPA requirements as a condition of the permit or authorization.  Information may include knowledge about the management of natural resources or cultural properties, such as current or past land use practices, resource utilization, or distribution of natural resources.  In addition, the BLM itself may contract or pay for tribes and Indian individuals to produce reports.  (See Chapter IV on land use planning and Chapter X on cultural resources for more information on NEPA and NHPA requirements for decisionmaking and compliance.)  The BLM's ability to obtain this information may be impossible without assistance of an Indian tribe or tribal representative.  Indian tribes often have occupied lands near or utilized portions of public lands for long periods of time.  Their insights into past land conditions and the impacts of human use and occupation on ecosystems extend back in time for hundreds of years.  Thus, their knowledge of natural and human interactions on the landscapes managed by the BLM might be shared with the BLM through—

- Studies of plant or animal communities and how past land practices affected species diversity and distribution;

- Fire regime studies that consider how frequently landscapes were deliberately burned by Native populations;

- Forestry studies that seek an understanding of pinyon-juniper canopy composition back through time based on ethnographic accounts of pinyon nut harvesting; and

- Ethnographic reports, National Register nominations, or other specific information regarding historic properties, trails, sacred sites, and landscapes.

6. **Human Resources**.

BLM_0026528

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

a. **Introduction**.  Field offices should consult their local servicing personnel office regarding which hiring authorities, tools, and programs may be used to attract underrepresented Native Americans, either directly to the BLM employment rolls or indirectly through a partner entity.  Federal laws, Executive orders, and implementing regulations from the Office of Personal Management and the Equal Employment Opportunity Commission mandate certain programs to ensure equal opportunity in employment and equal treatment of employees.  (See, for example, Executive Order 13592, Improving American Indian and Alaska Native Educational Opportunities and Strengthening Tribal Colleges and Universities (3 CFR 13592; December 2, 2011)).  The Native American Program requires special emphasis in providing employment opportunities for Indian people regarding Federal employment opportunities.  The ISDEAA establishes Indian preference hiring for Federal programs that are designed to benefit Native people.  This mandate is most often applied within the BIA and Indian Health Services but is not limited to these agencies.  It requires that Federal contracts to Indian organizations or for the benefit of Indians give preference and opportunities for training and employment to Indians to the greatest extent feasible.

b. **Employment Opportunities for Native Americans and Alaska Natives**.  The BLM should develop Native American recruitment programs, including the Pathways Program, and participate in career days with tribes and Indian schools.  This assists in attracting qualified personnel to the agency so that its workforce can be more representative of the nation's cultural diversity.  These recruitment efforts should be focused in tribal communities near lands managed by the BLM for which tribes have cultural, economic, or religious interests.

Although the BLM does not utilize Indian preference hiring per se, the agency does allow self-identification for employment statistics.  ANILCA Section 1308 (applicable to land managing agencies in Alaska) authorizes the hiring of individuals with specialized, localized knowledge or expertise.

Internship opportunities for tribal youth as well as challenge cost-share projects in partnership with tribes and the BIA offer additional opportunities to bolster Indian employment while facilitating mutually supported projects.  Several authorities and programs are currently in place that can assist in these efforts, including the Special Emphasis Programs.  All BLM offices should consider the applicability of the following internship programs to boost Native American and Alaska Native hires within the agency:

- The BLM Intern Not-to-Exceed hiring authority allows a current student to be temporarily appointed to Federal service for 1 year or less via competition.

- Schedule D BLM Career Intern hiring authority provides current students with paid opportunities to work in Federal agencies and explore Federal careers while still in school.

BLM_0026529

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-11

- The Schedule D BLM Recent Graduates authority allows the agency to appoint individuals who recently graduated from qualifying institutions or programs to an intense 1-year on-the-job training and developmental program in the qualifying occupational series or career path.

- DOI Secretarial Direct Hire Authority for Resource Assistant Internship (DHA-RAI) Program can be used to attract and recruit underrepresented groups and to fill mission-critical and hard-to-fill occupations. These individuals are often not on the employment rolls of the BLM. These internships are for a minimum of 11 weeks of full-time work.

- Public Land Corps Special Hiring Authority programs provide work and educational opportunities in the areas of natural and cultural resource conservation and/or development. They are geared toward individuals in the 16–25 age range. The Public Land Corps program allows the BLM to partner with organizations to employ economically, physically, or educationally disadvantaged youth, using a contract, financial assistance, or cooperative agreement.

Programs such as these increase the technical knowledge of tribal members and lead to the employment of Indian youth within the BLM. In addition to meeting the agency's affirmative action goals, providing educational opportunities and employment to tribal members is a powerful demonstration of the BLM's sincerity in establishing positive long-term working relations with tribes.

---

A good example of this is Arizona's American Indian Youth Cultural Resource Internship Program. Authorized through a series of cooperative agreements and individual task orders since 2010, this program recruits tribal youth to conduct a variety of historic preservation activities within the Grand Canyon-Parashant National Monument. Southern Paiute, Dakota, and Navajo youth serve as interns and crew chiefs. They camp in the monument conducting inventory, recording sites, processing artifacts, and completing ceramic and clay analyses. Sessions last for 10 weeks. The national monument managers (National Park Service (NPS) and BLM) provide funding, project supervision, and logistical support while the Kaibab Band of Paiute Indians supplies the student interns, crew chiefs, and vehicles. This partnership exposes Indian youth to a variety of professional agency personnel who encourage them to consider land and resource management careers. It enhances Federal agency knowledge of traditional Southern Paiute culture and traditions while preparing Indian youth for higher education opportunities and careers in public land management.

BLM_0026530

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-12

A more traditional internship program operates between the Montana State Office and the Salish-Kootenai College for the purpose of providing internships for students in a tribal college. This Cooperative Agreement funds a nontraditional program for educating natural resources students. It strengthens student and community knowledge about the BLM. It has increased student interest in career opportunities within the BLM and aided agency efforts to diversify its workforce.

7. **Education**. The BLM can propose and negotiate cooperative agreements between the agency and tribes in the fields of education and employment. The BLM should seek out partnerships with Indian educational institutions to assist in the development of curricula or implementing cooperative education programs. *Project Archaeology* enables the BLM and tribes to develop tribally-relevant curricula and lesson plans that can strengthen science competencies and interest Indian youth in careers in resources management. For instance, online and distance learning programs can be developed in partnership with tribes to offer certificates in natural and heritage resource management. Field offices should ensure that Indian schools and children are included in their education outreach programs.

Fully accredited tribal colleges and universities located in the United States are eager to provide practical experiences and opportunities for their students. The BLM and tribal colleges can partner to establish opportunities for students to conduct research and become involved with public land management issues. Whether the project is documenting threatened or endangered plants or animals or conducting ethnographic studies, BLM-tribal college partnerships offer positive and enriching opportunities for the agency and tribes to appreciate the balance between multiple land use management and tribal cultural and economic interests.

Several current BLM-tribal partnerships support educational opportunities for tribal youth. They create more meaningful educational curricula for young Native Americans and strengthen their opportunities for meaningful employment.

Examples include Bridging the Divide: A Natural and Cultural Resource Field Camp for Tribal High School Youth. Partners include the Montana State Office, the Department-BLM Youth Corps Project, the Shoshone-Bannock Tribes, and Chief Dull Knife College. The program seeks to develop outdoor curricula through outdoor experiences and scientific exploration that connect tribal students to their natural and cultural heritage. Curricula and lesson plans provide teachers with educational background and tools to explore various aspects of natural/heritage resources management. The educational materials will be made available on agency and tribal websites for use or adoption by outdoor education programs, educators, and agencies. In Fiscal Year 2014, for example, the focus was on wet meadow ecosystems and traditional uses of blue camas.

BLM_0026531

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-13

8. **Training Opportunities**. The Secretary's policy charges the Department of the Interior University with the responsibility to develop courses to enhance mutual understanding of cultural perspectives and the administrative requirements for tribal consultation. Managers and staff should complete the most recent tribal consultation training available through the Internet from either DOI Learn or other sources. The BLM NTC also developed a learning module on tribal consultation for managers and another on tribal consultation in Alaska. The OST also prepared a course on United States-tribal trust for the NTC. An additional training course, Working Effectively with Tribal Governments, was developed by the Department and the Advisory Council on Historic Preservation (ACHP). Training is also available outside the Federal Government. The BLM should provide tribal governments with the same access to its training programs as it provides to other Government agencies.

Managers and program leaders involved with tribal issues and tribal consultation should complete the most recent training courses on tribal relations offered for Federal Government/DOI/BLM employees and document this within their annual individual development plans. Check websites listing training opportunities maintained by the Department of the Interior University or the BLM National Training Center for current course offerings.

BLM offices should invite tribes to attend and participate in BLM training courses related to NEPA, lands, right-of-way (ROW), cadastral survey, and heritage resources. Holding periodic joint training courses may familiarize BLM staff with tribal cultural and governmental structure and familiarize tribal leaders, staff, and members with BLM's legal authorities, mission, history, and programs. Training courses should be tailored to address issues of local interest to tribes; both BLM and tribes can benefit from a greater understanding of how Federal programs can best coordinate and consult with tribal governments. As funding allows, the BLM may send tribal staff to training at the NTC. Access to online training course should also be made available to tribes. The dialogue and multicultural perspectives that result from such exchanges enhance both the effectiveness of training as well as government-to-government consultation.

A number of tribes offer their own cultural awareness training, and BLM offices should take advantage where they are available. Examples include training offered by the Confederated Tribes of the Warm Springs, Confederated Tribes of the Umatilla Indian Reservation, and Shoshone-Bannock Tribes. Such classes strengthen BLM's staff understanding and appreciation of tribal traditional, cultural, and religious values, as well as treaties and other tribally reserved rights on Federal lands. Managers should encourage BLM staff to attend gatherings sponsored by tribal entities, tribal consortiums, or nonprofits offering specialized knowledge and addressing issues important to local people (such as the Alaska Federation of Natives annual conference).

States are encouraged to co-host workshops with tribes concerning tribal relationships, traditional cultures, and consultation. By including presentations by tribal and BLM leaders and displaying traditional technologies and crafts, a mutual understanding of

BLM_0026532

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-14

traditional use areas, aboriginal homelands, and the full scope of tribal interests can be enhanced.  One example follows.

**Oregon.  Eugene District.**  Interagency-Intertribal Sponsored Awareness Forum.  In coordination with the Willamette National Forest and four tribes, the Eugene District co-hosted an all-day event for 100 Forest and BLM employees to hear about Indian law, local tribal history, and agency/employee responsibilities to tribes.  Tribal chairpersons and members from the Confederated Tribes of Grand Ronde, Confederated Tribes of Siletz Indians, Confederated Tribes of Warm Springs, and Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians participated in a facilitated panel discussion and shared their tribes' histories.  Tribal artists and traditional craft specialists participated by providing presentations and displays.  Attendees were encouraged to engage and ask questions and to consider how their jobs contributed to the stewardship of lands and resources in which tribal members retain an interest.

The BLM offices may extend invitations to tribal political and cultural leaders to address BLM offices.  This interaction could be part of Native American History Month activities, though it should not be limited to those occasions.  These are excellent means to enhance the agency's appreciation of an individual tribe's culture, history, and living traditions.  Opportunities may also exist to partner with other Federal agencies to sponsor tribal awareness forums to learn about Indian law, local tribal history, and agency responsibilities toward tribes.

**D.  Financial Support for Tribal Participation in BLM Decisionmaking**

In a departure from previous manual and handbook direction, the BLM can now provide funding to tribes to facilitate their participation in the NEPA and NHPA processes under several circumstances.  See also MS-1780, section 1.6.B, and H-1780-1, appendix 2.  *It must be emphasized that this new compensation policy allows for compensation but does not mandate it.*  Such compensation for consultation is not legally required; however the BLM has authority to provide it directly under certain circumstances, or require that compensation needed to acquire information necessary for the BLM to make decisions regarding land use applications or authorizations be provided by third parties.

The BLM may utilize its own appropriated funds or cost reimbursable accounts to reimburse tribal members for travel expenses to attend meetings in connection with NEPA, FLPMA, or the NHPA Section 106 processes or time taken to discuss proposed projects, heritage resource site management, or traditional use areas.  (See the ACHP Memorandum, "Fees in the Section 106 Review Process," July 6, 2001, www.achp.gov/feesin106.pdf.)

BLM_0026533

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-15

**E. Accountability**

1. **Employee Performance Appraisal Plan Considerations**.  Line managers and those staff members routinely engaged in actions with tribal implications must be evaluated regarding their efforts to build tribal relations and carry out effective consultation as part of their employee performance appraisal plan (EPAP) evaluations.  Such annual performance reviews should include elements covering affirmative action, joint training, cooperative education and outreach, cooperative management programs, meeting the BLM's trust responsibilities, and consultation, as appropriate.

   Check the most current version of the DOI Strategic Plan to tie in activities and accomplishments to the current identified mission areas of emphasis (e.g., 2014–2018 Strategic Plan, Mission Area 2, Strengthening Tribal Nations and Insular Communities, which includes several goals: Goal 1, Meet our Trust, Treaty, and Other Responsibilities to American Indians and Alaska Natives; Goal 2, Improve the Quality of Life in Tribal and Native Communities; and Goal 3, Empower Insular Communities).  Many activities carried out by managers and staff support these mission area goals through Indian treaty rights, subsistence rights, supporting self-governance and self-determination, creating economic activities, strengthening Indian education, and creating economic opportunities.

   While EPAP strategic goals and individual performance measures must be tailored to fit individual needs and local program emphases, suggested language for managers' EPAPs follows:

   - Seeks opportunities to develop ongoing partnerships with tribes and to ensure that:  land use decisions reflect thorough and well-documented government-to-government consultation; consultation with tribes begins early in the decision process and is ongoing; and resulting decisions are documented to tribes and demonstrate how tribal issues and concerns were taken into account.

   - Facilitates tribal access for tribal religious and traditional uses; maintains a professional staff capable of carrying out timely and effective government-to-government consultation and who seek out and establish educational, training, interpretive, contracting, fire, cadastral, or minerals programs of joint interest and benefit to tribes and the BLM.

   - Takes steps to fully utilize information gathered from tribes regarding traditional uses, access concerns, and resource issues and protects such sensitive information to the extent allowed by law from public disclosure.

   - Personally participates in tribal consultation and establishes professional relations with tribes, tribal governments, and tribal staff which facilitate long-term, positive partnerships involving land management, resource protection, and economic development.

BLM_0026534

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

II-16

- Ensures that quality cadastral products and/or services are maintained for Indian Country. Promotes the benefits of cadastral services to improve the stewardship on Indian trust and restricted lands. Oversees effective technical assistance, training, and support on land survey issues for Indian lands and minerals. Assists the BIA in collecting survey needs and requests from trust and restricted landowners and tribal realty service providers and ensures that the delivered surveys meets the needs of the requesting party.

2. DOI Reporting Requirements on Tribal Consultation. By December 31 of each year, BLM must present to the Department's Tribal Governance Officer a comprehensive report on BLM efforts in the past year to promote consultation with Tribes (512 DM 4.8).

Managers are responsible for ensuring that such reporting encompasses all programs and must coordinate with the BLM's Tribal Liaison Officer regarding exact content and formatting for data submissions. Effectiveness of consultation can be measured in an assessment of the amount and extent of dialogue that took place; the degree to which tribal feedback affected planning or land use decisions; sentiment of tribes regarding final decisions; and ongoing tribal involvement in mitigation, monitoring, or reclamation activities.

BLM_0026535

## CHAPTER III.  TRIBAL CONSULTATION GENERAL CONSIDERATIONS

### A.  Distinguishing Between Notification, Coordination, and Consultation

The BLM involvement with tribes includes three important and distinct forms of interaction.

1.  **Notification**.  Notification is a one-way form of communication that provides information, data, or reports to tribes by the BLM, often leading to tribal consultation if the tribe so requests.  Notification is usually associated with a formal process such as initiation of land use planning or environmental impact statement (EIS) efforts, or is related to the notification requirements of other authorities such as NAGPRA.

    Where legally required notification is delivered through certified mail or delivery service, a return receipt or delivery confirmation is adequate demonstration that BLM has satisfied the notification requirement.  With some tribes and individuals, however, a notice may not be deliverable for a variety of reasons.  A receipt or report showing that delivery was not made does not meet the BLM's requirement.  To avoid false starts and delays, BLM managers and staff should select a notification strategy that has a high expectation of success.

2.  **Coordination**.  Coordination is generally conducted with tribal representatives such as a Tribal Historic Preservation Officer (THPO), environmental professionals (e.g., air program directors and immediate staff), and any other personnel or officials who are defined as representatives by the tribes.  These representatives are frequently contacted in advance of an action or policy, guidance, or rulemaking in which the BLM thinks tribes will have an interest.  The purpose of coordination, among other things, is to: (1) assist BLM in assessing whether a particular action or decision may affect tribal interests; (2) involve tribes early in the action and/or decision development process to ensure meaningful tribal input; and (3) assist BLM in determining where consultation with elected or duly appointed tribal leaders may be appropriate.  Tribal representatives may indicate that an action or decision does not affect tribal concerns or interests and that consultation is not necessary.  This may help to streamline the consultation process.

3.  **Consultation**.  Consultation is designed to ensure meaningful and timely meetings or discussions with elected or duly appointed tribal leaders (or their authorized representatives) and BLM decision makers as they pertain to proposed BLM actions.  Consultation is an opportunity for tribes to discuss the potential effects of planned agency actions on tribal interests and to make recommendations to the agency.

    Fundamental principles reflected in the Department's Tribal Consultation Policy specify that —

    - DOI agencies will demonstrate a meaningful commitment to consultation by identifying and involving tribal representatives in a meaningful way early in the planning process;

BLM_0026536

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-2

- Consultation is a process that aims to create collaboration with Indian tribes and to inform Federal decision makers—an exchange of information which promotes enhanced communication that emphasizes trust, respect, and shared responsibility; such communication will be open and transparent without compromising the rights of Indian tribes or the government-to-government consultation process; and

- DOI agencies will seek to promote cooperation, participation, and efficiencies in the consultation process to ensure that future Federal actions are achievable, comprehensive, long lasting, and reflective of tribal input.

The BLM considers consultation to mean direct two-way communication between the agency and an American Indian or Alaska Native tribal government regarding proposed BLM actions. The purpose of consulting is to obtain substantive tribal input and involvement during the decisionmaking process. Sometimes the consultation process itself, through sharing and discussing cultural and natural resource information, can enrich and reinvigorate tribal knowledge and appreciation for historic properties, resources, and sites located on public lands.

The precise nature of the interaction should be mutually agreed to between individual tribes and the BLM through consultation. It will vary depending on the organization of tribal governments and the scope and complexity of the land management issues being discussed. The BLM offices are encouraged to develop MOUs with individual tribes that establish procedures to ensure that adequate good faith consultation will occur.

The Department Tribal Consultation Policy notes that sending a letter to a Tribe and receiving no response does not constitute a sufficient effort to initiate tribal consultation. (See MS-1780, Tribal Relations, Appendix 2, Judging the Adequacy of Tribal Consultation, for a detailed discussion.)

All land use planning requires tribal consultation but some land use actions may not. Consultation is necessary on land use actions when the BLM manager determines that the nature or location of a proposed land use could affect tribal interests or concerns. This determination should be an informed one, based on previous consultations and agreed-upon arrangements with the tribes involved.

Where Indian trust assets are involved, BLM must consider a complex framework of legal responsibilities and should consult the Solicitor's Office before making a decision.

Consultation regarding BLM decisionmaking always includes these obligations—

- Identifying appropriate tribal governing bodies and individuals from whom to seek input;

- Conferring with appropriate tribal officials and/or individuals and asking for their views regarding land use proposals, changes in rules or regulations, policies and initiatives, or other pending BLM actions that might affect tribal cultural

BLM_0026537

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

practices, economic development, access to valued locations, or other aspects of tribal life;

- Treating tribal information and preferences as a necessary factor in defining the range of acceptable public land management options; and

- Creating and maintaining a permanent record to show how tribal information was obtained and used in the BLM's decisionmaking process.

Appendix 5 provides guidance for the preparation of a tribal consultation strategy. Such a strategy can help ensure that the roles of key players are identified and that the goals, target audiences, key messages, strategies, and tactics are identified. Whether or not a proposed action or land use justifies preparation of a formal consultation strategy, Appendix 5, Example of Contents for Tribal Consultation Strategy, should be reviewed to make sure that consultation efforts take into account all the factors that will condition its success.

## B. BLM Representatives in Consultation

1. **Importance of Federal Official with Decisionmaking Authority.** Government-to-government consultation requires the participation of a Federal official with decisionmaking authority and the tribal chairperson or other representative official designated by the tribal chair or council. The Department Tribal Consultation Policy provides: "The appropriate Departmental officials are those individuals who are knowledgeable about the matters at hand, are authorized to speak for the Department, and exercise delegated authority in the disposition and implementation of an agency action (512 DM 5.5A).

   The BLM line managers, staff, and tribal authorities must understand the role of delegated authority in the consultation process. (See MS-1203, Delegation of Authority.) The Secretary of the Interior has broad powers to delegate authority that derive from 5 U.S.C. 302, Reorganization Plan No. 3 of 1950, etc., and that authority may be delegated through the Department's management hierarchy to the lowest practical level. However, an officer who delegates or re-delegates authority does not divest himself or herself of the power to exercise that authority, nor does the delegation or re-delegation relieve that official of the responsibility for actions taken pursuant to the delegation.

   In most instances, the person with the most detailed knowledge and understanding of local tribal issues will be the local field office manager, who is often the first to contact a tribe on any issue. It may be necessary to explain the legal basis and robust nature of BLM delegations of authority to assure Indian tribes that their engagement with a local BLM officer is time well spent with a decision maker fully authorized to represent higher levels of authority within the agency and department.

   While day-to-day consultation generally takes place at the field office level, state directors and the Director have important consultation responsibilities as well (see

BLM_0026538

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-4

MS-1780, Tribal Relations, Section 1.4, Responsibility).  Participation by State and Washington Office officials may be necessary for complex or highly controversial projects and is at the discretion of the officials involved.

2.  **Role of Staff**.  The BLM program specialists and staff play an invaluable role in gathering information and briefing their managers on issues affecting BLM-tribal relations.  They provide professionally sound information, recommendations, and advice regarding tribes' traditional and ongoing uses of public lands, practices and beliefs, locations and uses of importance on public lands, and other information necessary for consultation.  They interact frequently with their tribal counterparts within tribal governments to facilitate compliance with laws and regulations requiring tribal consultation and input into federal decisionmaking.  Staff often arranges consultation meetings and meets with tribal staff to discuss issues once BLM managers and tribal officials decide it is time to consult on a matter.  They obtain and share data needed for decisionmaking.  They may identify opportunities for cooperative agreements or other proactive relationships in the fields of education, outreach, and research with tribes.  They play key roles in contracting and the management of sensitive information.  BLM staff, however, cannot represent the BLM in government-to-government interactions.

3.  **Role of Third Parties**.  Contractors cannot negotiate, make commitments, or otherwise give the appearance of exercising the BLM's authority in consultations.  Therefore, as a general rule, consulting firms working for land use applicants may be approved by BLM to carry out the following limited and restricted activities to facilitate consultation—

- Gathering and analyzing data,
- Preparing reports,
- Arrange meetings,
- Facilitating field trip logistics, and
- Managing compilation of data and records as part of the administrative record.

While these steps are helpful, the BLM ultimately retains the responsibility to consult with Indian tribes on a government-to-government basis.  It cannot be transferred by the BLM to other entities.

## C.  Identifying Tribes and other Indian Parties for Consultation

1.  **Individual Tribes**.  Specific consultation should focus on tribes known to have concerns about the geographic area under consideration and the particular resources and/or land uses involved.  In addition, nonresident tribes with historic ties should be given the same opportunity as resident tribes to identify their selected contact persons and their issues and concerns regarding the public lands.

BLM_0026539

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-5

2. **Points of Contact within Tribes**.  For each tribe, BLM offices should develop and maintain current lists of—

- Tribal officials (e.g., chairperson, president, council members, etc.),
- Appropriate staff contacts for specific programs and issues (e.g., energy development, natural resources, lands, cadastral survey, economic development, THPO, etc.),
- Traditional cultural or religious leaders, and
- Lineal descendants of deceased Native American individuals whose remains are discovered on public lands or are in Federal possession or control.

a. **Tribal Officials and Staff**.  Initiate government-to-government consultation through the presiding government official of the Indian tribe (e.g., the tribal chair or governor).  If tribal officials inform the BLM that it is acceptable for the agency to correspond directly with their attorneys, the BLM must respect this request and must prepare correspondence to the attorneys with a copy provided to the elected tribal officials.

b. **Traditional Cultural and Religious Leaders**.  Official representatives of the tribe should be the first source for identifying traditional cultural and religious leaders and other individuals with specialized knowledge.  These may change after tribal elections or a change in tribal administration.

c. **Lineal Descendants**.  For purposes of NAGPRA, lineal descendants of named Native American individuals have legal priority for repatriation or transfer of human remains, funerary objects, and sacred objects.  A lineal descendant is an individual tracing his or her ancestry directly and without interruption by means of the traditional kinship system of the appropriate Indian tribe or by the common law system of descent to a known Native American individual whose remains, funerary objects, or sacred objects are being requested.  This standard requires that the earlier person be identified as an individual whose descendants can be traced (see 43 CFR 10.14(b)).  In other words, lineal descendants may be identified only when a personal identity (i.e., name) is known of the Native American human remains, individual buried with the funerary objects, or individual that owned the sacred objects.  The BLM may not readily know the identity of lineal descendants without some research and may make initial contact through the larger unit of which they are members (tribes, communities, etc.) or through genealogical information such as descent records held by the appropriate BIA agency office.

3. **Coordinating Consultation across Administrative and Jurisdictional Boundaries**.  BLM offices should seek partnership opportunities with other Federal agencies to jointly meet with tribes to discuss land management issues relevant to both agencies and multiple tribes.  As an example, the Oklahoma Field Office participates in the annual

BLM_0026540

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-6

U.S. Forest Service "To Bridge a Gap Conference," which provides the BLM with a chance to meet with a wide variety of tribal leaders. Joint interagency funded tribal liaison positions may carry out such consultation at a savings to the Federal agencies.

Interstate pipelines, major infrastructure projects, and regional EISs, such as the Final Programmatic Impact Statement for Solar Energy Development in Six Southwestern States (Solar PEIS), provide opportunities for BLM offices to consolidate and coordinate tribal consultation. Executive Order 13604, Improving Performance of Federal Permitting and Review of Infrastructure Projects (3 CFR 13604; March 22, 2012) requires such coordination to facilitate the review of nationally or regionally significant infrastructure projects. Rather than multiple states contacting tribes, such as the Hopi or Navajo, that frequently have concerns and interests in several states, BLM offices are encouraged to establish a lead BLM office to coordinate all consultation with tribes having interests across an interstate region. Such arrangements should be negotiated and stipulated in formal agreements signed by the tribes and the multiple BLM offices and the State Historic Preservation Officers (SHPO) involved.

4. **Multi-tribal Organizations**. Official tribal consultation takes place as part of government-to-government relations between the BLM and individual federally recognized tribes. However, tribal relations can also be enhanced through the development of positive working relationships with tribal consortiums. Examples of such organizations include Affiliated Tribes of the Northwest Indians, California Association of Tribal Governments, and Intertribal Council of Arizona

Official repatriation or transfer of Native American human remains and/or cultural items subject to NAGPRA can only take place with either lineal descendants or claimant Indian tribes. However, tribes often work together on NAGPRA consultation and claim activities. Therefore, coordination of NAGPRA activities may occur with a multi-tribal organization, although such cannot replace government-to-government consultation.

BLM field offices should maintain working relationships with such organizations and are encouraged to make presentations to them at their meetings. As discussed in the Secretary's 2011 policy governing consultation with Indian tribes, it is appropriate to hold open tribal meetings for groups of tribes to attend to discuss national or regional issues. This can be an efficient means of communicating BLM activities to groups of tribes. Individual government-to-government consultation with individual tribes will still be required; however, attendance by BLM tribal liaisons, staff, and line managers fosters communication with a wider tribal audience than might otherwise be possible.

National tribal partnership groups, which include representatives of tribal governments, can be contacted as well. Their input may be insightful for large planning initiatives or large-scale EISs. Examples of such organizations—

- National Tribal Air Association,

BLM_0026541

- National Tribal Toxics Council,

- National Tribal Water Council,

- Inter-Tribal Council of the Five Civilized Tribes

- United Southeast Tribes,

- National Tribal Operations Council, and

- Regional Tribal Operations Councils.

5. **With Whom to Consult under Heritage Resource and General Authorities (Summary)**.  The following chart indicates the types of Indian tribal officials and/or individuals with whom the BLM is obligated to consult.  Refer to Chapter IV and individual program chapters for more details regarding the BLM's consultation obligations under various authorities.

**D.  When in the Decisionmaking Process to Start Consultation**

When it becomes apparent that the nature and/or the location of an activity could affect Indian tribal issues or concerns, the BLM manager should initiate appropriate consultation with potentially affected Indian tribes, as soon as possible, once the general outlines of the land use plan (LUP) or the proposed project-specific land use decision have been determined.

Although land use planning is the best time to identify landscape-scale issues and other broad tribal concerns, the BLM must address tribal concerns when approving specific land use authorizations and making other decisions, such as revising significant policies, rules, and regulations.

BLM_0026542

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-8

| Whom To Consult | NHPA | ARPA | NAGPRA | FLPMA | NEPA | AIRFA | E.O. 13007 |
|---|---|---|---|---|---|---|---|
| Tribal representative whom the tribal government has designated for this purpose | X | X | $X^2$ | X | X | X | X |
| Lineal descendant of an identified Native American individual | | | $X^1$ | | | | |
| Traditional religious leader | | | $X^3$ | | | $X^3$ | |
| Appropriately authoritative representative of an Indian religion | | | | | | | $X^3$ |

[1] Lineal descendants (who need not be tribal members) have legal precedence for repatriation and custody.
[2] Indian tribes also consulted.
[3] A tribal government may designate a "traditional religious leader" or an "authoritative representative" as the tribe's representative for consultation under AIRFA or Executive Order 13007. Under NAGPRA, a traditional religious leader is a person recognized by tribal members as responsible for performing certain cultural or religious duties or a leader of the tribe or organization's cultural, ceremonial, or religious practices, as defined in 43 CFR 10.2(d)(3).

**Figure III-1    With whom to consult depends on the particular legal authority.**

## E.  Preparing and Initiating Tribal Consultation

The first step to prepare for consultation is to identify a clear purpose for consultation and identify with whom such consultation should take place.  It is critically important to know the tribes and the people with whom you are consulting.

The second step is to review the record of what is known about the relevant concerns of tribes who may wish to consult.  Recorded sources that should be reviewed—

- Cultural history of the tribe up to present (lands, treaties, etc.),
- Governmental organization,
- Primary tribal officials and staff contacts,
- Previous correspondence with tribes,
- Records of previous consultation,
- Public participation records for LUPs,
- Plan protest records,
- Transcripts of public hearings, and
- Minutes of public meetings.

BLM_0026543

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-9

Pay particular attention to land claims; boundary disputes; water rights; hunting, fishing, and gathering concerns; past and current tribal economic development proposals; ethnographic studies; and published and unpublished documentary sources. Such research should be undertaken to identify traditional use areas or tribal development plans that are closely associated with lands or resources which may be affected by BLM actions.

If MOUs have been established with tribes regarding consultation procedures, the BLM will adhere to the procedures, contacts, and information requirements specified in the agreement.

Otherwise, the third step is to directly contact tribal governments. The first contact is by letter to the chief executive of the tribe with follow-up telephone call(s) if field offices suspect that mail service may not be reliable or if there is a potential for tribal concern based on the conclusions of step 2 above. If the tribe has previously designated a representative to serve as a BLM contact, the BLM should send a courtesy copy of the BLM letter to that individual.

Unless constrained by an emergency situation, such as emergency stabilization and rehabilitation necessitated by wildfires, the BLM field offices should allow for tribes to comment at least 30 days after their receipt of documentation about a proposed action. This should be considered a minimum timeframe which should be lengthened where possible, especially if tribal council schedules are unlikely to be able to accommodate BLM scheduling needs.

The fourth step is to follow up with tribal representatives. If tribal representatives have been designated to consult with the BLM, the agency should follow its initial government-to-government contact by communicating with those individuals. Consultation at this level is generally conducted by BLM staff with tribal staff or other tribal members who have been identified as spokespersons to provide information about cultural and religious values or other concerns.

## F.  Correspondence Content

Correspondence sets the stage for successful consultation. A good letter to initiate consultation should be directed to the appropriate designated tribal representative and include—

- Its purpose;

- Sufficient details of the proposed action so that the reader can understand its extent and likely impact on the environment;

- A detailed map of the proposal at an appropriate scale;

- A summary of applicable laws and policies governing the BLM's consultation process and decisionmaking along with a clear explanation of the extent of BLM discretionary decisionmaking under the applicable statutes;

- An explanation of upcoming opportunities for tribal input into BLM decision points and what the BLM needs to know at those points;

BLM_0026544

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-10

- An invitation for tribes to specify how they would like to be engaged in this decisionmaking process;

- A description of the kind of input needed (such as identification of traditional use areas, access needs, or sacred sites);

- An opportunity to schedule a face-to-face meeting;

- A request for the names and addresses of other persons who should be notified or consulted;

- An explanation of the role of any delegated authority and BLM staff responsibility with regard to tribal consultation;

- Identification of a BLM contact person who can provide further information about the project and how to reach him/her; and

- A specific date by which the BLM would like the tribe to respond.

The BLM should ask tribes for information regarding—

- Concerns they have about the proposed action and how to resolve any issues that might affect tribes;

- How to resolve adverse effects on traditional resources, use areas, trails, and natural or heritage resources identified in reviews of existing data for the area;

- Places of traditional religious or cultural importance that might exist but have not been identified in background data reviews for the project:

- Treatment of human remains and cultural items as defined by NAGPRA if discovery, excavation or removal of those remains and items is anticipated: and

- The necessity for the BLM to contact any traditional leaders or religious practitioners.  If the BLM is already aware of such leaders or practitioners, or if the tribe has designated representatives to act as liaisons with Federal agencies, the letter should state that the BLM plans to contact those individuals as well.

Clauses that might be appropriate under certain circumstances—

- Referrals: "If you are not the appropriate individual to receive this request, please advise whom we should contact."

- Flexible meeting proposals: "If this time and location are not appropriate, please contact [_____] within [___] days prior to the scheduled meeting to make alternative meeting arrangements."

- Documentation requests: "Please indicate on the enclosed map, if possible, areas of specific concern," or "Please provide or refer us to any available information that would help us to understand the significance and nature of your concerns in the [area of

BLM_0026545

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-11

proposed action] for the [proposed action] for the [tribe name]," or "Please provide us with tribal historic and current Area of Interest maps, county and state lists, or relevant GIS files if available."

If a letter is returned as undeliverable, include the canceled, unopened letter in the official file and, if appropriate, begin more direct (and documented) attempts to carry out the notification or consultation.

## G. General Features of Consultation

1. **Face-to-Face Meetings**. Neither BLM managers nor tribal officials have the time to meet face-to-face regarding every issue affecting the two parties. However, face-to-face consultation meetings are often the most effective way to achieve the objectives of consultation (seeking, discussing, and considering the views of other participants). Such face-to-face meetings are especially helpful for—

   - Annual briefings provided to tribal councils regarding major ongoing and foreseeable actions and programs;

   - Consultations concerning resource management plans (RMP), EISs, land tenure adjustments, other major undertakings, or in responses to controversies; and

- When tribal feedback is needed to define what they consider to be "Departmental actions with tribal implications" as stated in the Secretary's Policy on Tribal Consultation (512 DM 5).

   If relevant to the meeting agenda, ask tribes to suggest mitigation options. The best mitigation methods to resolve a particular tribal issue may be something the BLM, as outsiders, never considered. Try not to restrict the discussion to standard mitigation approaches the BLM would apply to most land use conflicts. The best way to approach this is to ask tribal representatives to not only identify their concerns but also to suggest potentially effective mitigation strategies to deal with them, including the most effective measures to reduce project effects if complete avoidance is not feasible.

2. **Regularly Scheduled Meetings with Indian Tribes**. The BLM managers should determine tribal preferences for information sharing and consultation. The BLM managers and staff should consider meeting with tribes in their areas after the office's annual work plan has been prepared. Regularly scheduled meetings can accomplish several important things:

   - The BLM can identify and briefly explain actions planned for the coming year, as well as any additional land use proposals that are foreseeable on public lands or lands that may be affected by BLM decisions.

   - The tribe can identify proposed actions or geographical areas that it is concerned about and about which it would like to be consulted at a later date. The tribe

BLM_0026546

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

might also identify actions or geographical areas for which it feels no need to be consulted.

- For some proposed actions, the BLM and the tribe can agree to follow expedited or tailored consultation procedures to resolve scheduling conflicts, meet project timeframes, or accommodate special needs of the people involved.

- The tribe can use the meeting as an opportunity to identify persons it recognizes as traditional leaders or religious practitioners. The tribe can also identify specific proposed actions, kinds of actions, or geographical areas about which these individuals should be consulted.

Information coming out of these meetings may form the basis of consultation agreements or MOUs that can define the manner in which tribes prefer that future consultation take place, areas or actions the tribes wish to discuss in the future, or specific natural or heritage resources tribes wish to be consulted about whenever proposed actions might affect them. Execution of such tribal agreements is encouraged in Section 6.c of the national PA. Regular periodic meetings can be an effective means for maintaining a constructive ongoing intergovernmental relationship.

3. **Make Consultation Meeting Locations Convenient**. For the benefit of both parties, managers are encouraged to strive for the most efficient and effective method of consultation. Whenever possible, avoid scheduling meetings on matters potentially affecting tribes in places where it would be difficult for tribal members to attend. It is hard for tribal elders, in particular, to travel long distances to attend meetings, and these are the people who are usually chosen by the tribe to be spokespersons on issues of traditional land use or religious concern. If a meeting can be scheduled on or near a reservation, tribal members are more likely to attend.

On occasion, onsite visits or other face-to-face meetings may be requested by the tribes or their designated representatives. A reasonable effort should be made to accommodate such requests in as timely a manner as possible.

4. **Meeting Etiquette**. At face-to-face meetings between the BLM and Indian tribes, BLM managers and staff should follow these commonsense guidelines:

- Timing is critical. Be cognizant of the tribal calendar and major events. Plan meetings accordingly.

- Prepare and distribute meeting information for tribes in advance of the meeting.

- The BLM should work with tribes to prepare agendas that address both tribal and agency concerns.

- Ask tribal leadership if they wish to have appropriate tribal staff open and close the meeting. Be respectful of the fact that meetings will often open and close with a prayer.

BLM_0026547

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-13

- Be patient, especially if the meeting with a tribal council includes additional agenda items or follows no fixed schedule.

- If the BLM is hosting, allow a time at the beginning of the meeting to introduce participants and their roles.  Provide a brief overview of the venue to allow for participation comfort.

- Gifts and food may be important parts of cultural exchanges.  Be aware of and sensitive to local customs.  Respectfully accept any offerings and provide food to the extent allowable by BLM ethics guidance.

- Respect local cultural practices.  Details and arrangements for the government-to-government meetings should be carefully managed in advance by the staff and managers to ensure that managers are informed of local protocols.

- Be clear about what the BLM is doing and why, including which laws and regulations govern our actions.  Set realistic expectations for what the BLM can, and cannot, do.

- Be respectful, professional, and polite by (1) using titles, not first names, especially in formal meetings; (2) turning off cell phones and never using smart phones during meetings even if tribal members may be doing so; (3) never interrupting a tribal speaker; and (4) framing questions tactfully in a manner that does not question an elder's knowledge but that seeks clarification or more information.

- Listen actively.  When information is presented through anecdotes or stories, make sure to understand the point being made.  Ask questions.

- Request permission to take photographs.

- Silence is okay and quiet moments for contemplation are often acceptable if not expected.

- Identify that notes are being taken and by what method.  Provide an opportunity for meeting participants to review the notes shortly afterward to make sure their views are accurately represented.

**H.  Use of Internet to Facilitate Consultation**

Carrying out adequate tribal consultation can be challenging for both individual BLM field offices and tribal offices, especially given restricted travel ceilings and the fact that tribal headquarters may be located hundreds of miles away.  Staff at the BLM field offices should discuss with tribes the feasibility and acceptability of utilizing conferencing programs available over the Internet to facilitate consultation.  Where tribes and the BLM operate compatible teleconferencing capabilities, telephone conferences, videoconferencing, webinars, and other software applications can greatly enhance the limited number of face-to-face meetings that can be arranged between top tribal leaders and BLM managers.  Such real-time virtual communication can be utilized in appropriate circumstances to enhance staff-to-staff

BLM_0026548

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-14

communication; to enable consultation on short notice; or to efficiently transmit status reports, although it cannot take precedence over direct face-to-face meetings when such meetings are feasible.

## I.   Lack of Tribal Response

Applicable government-to-government consultation authorities do not require participation by Indian tribes or other specific consultation parties outside the relevant Federal agency.  Nor do those authorities establish specific timetables for when tribes must engage in consultation.

As the Secretary's policy on Indian tribal consultation makes clear, even if the BLM has made an attempt to initiate consultation and has not received a response, the BLM must still make additional reasonable efforts periodically throughout the planning process to repeat invitations to consult.

If a tribe does not respond within a reasonable period of time, such as 60 days following a BLM requests for input, the responsible BLM manager or his/her designee should follow up with emails and/or personal telephone calls to tribal officials.  Tribes should be informed that if they wish to provide feedback or input that they should contact the responsible BLM manager.  This must be done at least for those NEPA actions where there is a public scoping process as part of government-to-government consultation.  Following up letters with emails and/or telephone calls can assure that tribal officials understand the issue and that the BLM wants to consult in good faith.  Varied forms of communication are particularly important where the BLM is trying to engage with a party that the BLM believes may have an interest in, or information about, the effects of an undertaking.

When a tribe is unresponsive to both the letter(s) and phone call(s), the BLM needs to carefully document its efforts to engage with the tribe.  The BLM should note when, how frequently, and by what means it reached out to particular consulting parties.  While there is no perfect solution to non-responsiveness, BLM offices must use a variety of means in an attempt to consult.  Utilize written correspondence, emails, telephone calls, faxes, and face-to-face discussions if possible to demonstrate a wide-ranging and sustained effort to communicate.

There may be a variety of reasons why a tribe was unable to respond beyond those described below.  The lack of response might be due to—

- Sensitivity of the issues involved,

- Reluctance to divulge specific information until later in the process when it might become more certain that areas of concern really will be adversely affected,

- Mislaying or sidelining of BLM correspondence, or

- Delegating response to a tribal staff member who was out of the office.

It is important to know the schedules for tribal council meetings for the tribes with which BLM

BLM HANDBOOK                                          Rel. No. 1-1781
Supersedes Rel. 8-75                                     12/15/16

BLM_0026549

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-15

offices consult.  Some councils meet every month.  Others only convene every few months.  The BLM's comment periods may not coincide with tribal council meetings where responses are often determined by consensus.

## J.  Approaches to Contentious Meetings

Some consultation meetings may be confrontational because of widespread opposition to a particular proposed project or because of political reasons.  In these situations, the BLM official may wish to consider the following strategies:

- Provide detailed draft agendas in advance for input and finalize the topics and issues to discuss that meet both BLM and tribal concerns.  The agenda should explain how topics relate to the analysis of the undertaking's impacts and fit into the process.

- In situations where meeting confrontations are likely to be particularly acute or where the undertaking is complex, consider using facilitation through the Department's Office of Collaborative Action and Dispute Resolution.

- Hire a court reporter to make a transcript.  The presence of a recorder may dampen confrontation since the attendees know their statements are being recorded verbatim.  Transcripts may provide helpful documentation to inform a decision.  They may be called upon to establish key facts if there is subsequent litigation.

## K.  How Much Consultation to Do—Meeting the Good Faith Standard

There is no simple measure of sufficiency of Indian tribal consultation efforts.  The amount of consultation generally can be considered sufficient when the BLM has enough information to make an informed decision and, if that information is not provided by tribes, prepare a documented record of good faith effort before a decision was made.

Unless specified otherwise in a consultation agreement with the tribe, field managers should evaluate the amount of consultation necessary based on—

- Completeness and appropriateness of the list of Indian tribes and individuals consulted;

- Legal requirements posed by treaties (if any),

- Nature of the issues raised,

- A clear understanding of what the BLM needs to know from the tribes to make a robust decision,

- Potential harm or disruption a proposed action could cause,

- Alternatives that would reduce or eliminate potential harm or disruption,

- Intensity of concern expressed,

- Potential to resolve issues through further discussions, and

BLM HANDBOOK                                                    Rel. No. 1-1781
Supersedes Rel. 8-75                                          12/15/16

BLM_0026550

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-16

- Need for further consultation.

All such judgments should be well documented to ensure a complete record of the authorized officer's good faith efforts to identify, contact, and respond to Indian tribal concerns before reaching a decision.  Sufficient information should be developed to demonstrate how decisions were reached and when they could potentially affect Indian tribal values associated with BLM-administered lands and resources.

This basic standard for good faith effort is the same for both land use planning and land use actions.  As was the case at the land use planning stage, a BLM field manager can be confident that he or she has made a good faith effort to meet the requirements for tribal consultation on land use actions if, after sending out the initial letter to the governing authority of each tribe, the BLM manager—

- Follows up the letter with telephone call(s).  If the tribe chooses not to participate or provide comments, the BLM can consider its efforts sufficient and proceed with the decisionmaking;

- Meets with tribal leaders or other tribal officials in person if tribes request it; and

- Informs tribal officials that the BLM intends to directly contact individuals such as traditional cultural leaders or religious practitioners the BLM already knows who might have concerns about the proposed action before actually doing so.

A good way to gauge whether consultation efforts have been sufficient is to consider the degree to which an objective review of the decision record would find a good faith effort to identify, notify, involve, and respond to all Indian tribes potentially affected by a proposed decision.

Several White House documents guide agencies in meeting this *good faith* standard.  Section 2(a) of Executive Order 13007, Indian Sacred Sites, charges land managing agencies to "promptly implement procedures . . . to ensure reasonable notice is provided of proposed actions or land management policies that may restrict future access to or ceremonial use of, or adversely affect the physical integrity of, sacred sites.  In all actions pursuant to this section, agencies shall comply with the Executive Memorandum of April 29, 1994, 'Government-to-Government Relations with Native American Tribal Governments.'"  The referenced 1994 memorandum states: "Each executive department and agency shall consult, to the greatest extent practicable and to the extent permitted by law, with tribal governments prior to taking actions that affect federally recognized tribal governments.  All such consultations are to be open and candid so that all interested parties may evaluate for themselves the potential impact of relevant proposals."  An example of how the courts define "reasonable and good faith effort" when consulting with tribes under NHPA emerged from the Tenth Circuit Court of Appeals' decision in the case of *Pueblo of Sandia* v. *United States*.  In that case, the U.S. Forest Service wrote letters to Sandia Pueblo requesting detailed information about traditional cultural properties (TCP) within an area proposed for development.  The tribe responded with only general information, stating that

BLM_0026551

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-17

spiritual sites were located in the area but did not provide detailed locations or information about them. The Forest Service took this as insufficient information to confirm the presence of National Register-eligible TCPs and it reached the determination that no historic properties would be affected by the proposed action.

The tribe sued and the court opined that the information the tribe provided to the Forest Service, even though of a general nature, should have been enough to alert the agency that TCPs might be affected. The court stated that the agency should have followed up on the tribe's assertions. The take away from this case is that writing letters to tribes asking them to identify places of traditional use, access, or cultural or religious importance may be a good first step, but it is not enough if information provided by a tribe indicates the presence of such places. A reasonable and good faith effort requires that the BLM follow up on this type of information provided and take additional steps to determine the nature of these places of tribal concern, determine whether or not those places qualify for nomination to the NRHP, and determine whether they would be affected by the proposed action.

See also MS-1780, Tribal Relations, Appendix 2, Judging the Adequacy of Tribal Consultation.

## L.  Documentation of Notification, Coordination, and Consultation

The BLM must document consultation efforts carefully through adoption of a consultation data tracking system. Copies of all correspondence, emails, telephone logs, meeting notes, and other records must be maintained in a complete administrative record.

Evidence of notification, coordination, and consultation (or failure despite diligent efforts) is to be included in the official file and provided to the BLM officer in support of a proposed decision. The names of preparers should appear on all notification and consultation materials, which should be signed and dated. The consultation record must show that the decision maker made a good faith effort to obtain and weigh tribal concerns in decisionmaking. If a decision does not conform to the tribe's requests, the consultation record must explain the manager's basis for reaching a different outcome.

BLM officers should accustom themselves to looking for evidence of notification or consultation (whether successful or not as a result of a good faith effort) in the case file before making a decision. If notification or consultation was not done, the staff person preparing the material for the BLM officer should include a note and justification for why it was not carried out.

All attempts to establish telephone communication, and a record of all conversations conducted by telephone, should be documented by a signed and dated note to the files to be included in the permanent record. Copies of relevant emails are to be included as well. Field offices should check with records administrators to determine if certain texts or social media might also need to be preserved as part of the administrative record.

All direct face-to-face meetings must be documented by meeting notes describing dates, attendees, location, subjects covered, and decisions reached. The BLM-prepared meeting notes

BLM_0026552

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

III-18

should be vetted with those who participated before final approval. Such meeting notes should be sent to tribal leaders as well as any tribal staff who attended the meeting. Correspondence transmitting the meeting notes should ask tribal officials to check to make sure that positions expressed by tribal staff at the meeting do in fact reflect the tribe's actual position on the issues discussed. Final copies of meeting notes may be provided to tribes who were invited but did not attend the meeting if the BLM field office anticipates additional opportunities for consultation with those tribes later in the process.

## M. Conclusion of Consultation

In all cases, the tribes that have participated in consultation should be notified of the BLM's decision. This correspondence should be sent via certified mail or delivery service and a copy included in the permanent decision record. This notification should specifically include a discussion of the BLM's basis for its decision, how the final decision was or was not able to accommodate tribal concerns raised during the consultation process, and the avenues available for protest or appeal of the decision.

Following the BLM decision or authorization, opportunities are likely available for ongoing engagement with tribes regarding the implementation of the authorization, monitoring of its effects, and reclamation following the life of the project. Tribes should be made aware of opportunities to stay engaged with the BLM regarding the enforcement of any design guidelines or mitigation requirements to protect resources of concern to tribes.

BLM_0026553

## CHAPTER IV.  GUIDANCE FOR TRIBAL CONSULTATION IN PLANNING AND DECISION SUPPORT

### A.  General Authorities

This chapter gives great weight to the general planning procedures (FLPMA) and related decision support considerations (NEPA) since these processes constitute overarching obligations that affect **ALL** programs.  BLM also must comply with Section 106 of the NHPA for all undertakings, which would apply to any BLM program.  The procedural requirements of Section 106 of the NHPA, including effect determinations and resolution of adverse effects, apply only to historic properties considered to be listed in or eligible for the National Register of Historic Places, as defined in the statute and regulations.  It is for this reason that NHPA is addressed in more detail within the Cultural Heritage Program Chapter X.

BLM's responsibilities for compliance with Section 106 of the NHPA, including tribal consultation, are triggered by a proposed undertaking.  Tribal consultation as part of the Section 106 process is driven by and focused on a specific undertaking.  While BLM must conduct tribal consultation as part of the Section 106 process, this consultation is focused on historic properties only and does not satisfy BLM's obligations to consult with tribes on other issues potentially raised by a proposed action or program.  As discussed in this handbook, the BLM conducts a great deal of tribal consultation outside of the Section 106 context, including periodic consultation meetings with tribes and communication throughout the BLM.

The FLPMA, the NEPA, Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Population and Low Income Populations, and Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, apply broadly to the management of public lands and provide opportunities for tribes to participate in decisionmaking across all BLM program areas and all classifications of public lands.  In addition to the general authorities discussed in this chapter, some individual State or region-specific acts may provide additional mandates and requirements for the management of lands administered by the BLM, such as timberlands in western Oregon subject to the 1937 Oregon and California Revested and Sustained Yield Management Act (O&C Act; 43 U.S.C. 1181(f)).  Unless otherwise specified, the requirements for consulting with tribes and fulfilling trust responsibilities remain consistent with these general authorities.

The FLPMA guides all BLM programs, NEPA pertains to the entire breadth of the human environment, and Executive Orders 12898 and 13175 involve all forms of guidance and policy making.  The planning and environmental review systems supporting FLPMA and NEPA establish the procedural and scheduling framework for tribal consultation.  Traditional religious activities including uses of sacred locations on public lands also should be considered in the management and planning processes of FLPMA and NEPA guided by the AIRFA and Executive Order 13007, Indian Sacred Sites.  Executive Order 12898 requires that each Federal agency consider the impacts of its programs on minority and low-income populations, including tribal communities and reservations.

BLM_0026554

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-2

The BLM's land use planning process under FLPMA and the NEPA analysis that accompanies it provides an early opportunity for tribes to help inform BLM decisions with the potential to affect their interests through both formal consultation and serving as cooperating agencies.  For example, tribal concerns with regard to places of traditional use or environmental justice issues are most effectively identified and considered over the extended period of time afforded by the land use planning process and associated environmental review.  Tribal preservation concerns should be identified in spatial and programmatic terms, to address in general the locales and the types of land use activities that would and would not be of further tribal concern as well as specific locations of cultural sensitivity the tribes wish to identify.  Land use planning provides the BLM with the opportunity to learn about potential conflicts so they may be avoided or their severity reduced.  Criteria and procedures for consulting with tribes about potential future individual land use actions and their role as a possible cooperating agency may be discussed and negotiated at this time.  Similarly, NEPA's project planning process involves many of the same opportunities for identifying tribal issues through government-to-government consultation regarding proposed land development projects.

Given the breadth of tribal interests in many regions, it is advantageous for the BLM and tribes to consult and identify priorities to help mitigate the potentially high workloads for all those concerned.  Through this general consultation, the manager can determine what actions are likely to affect tribal interests.  Such determinations can be the subject of communication protocols in MOUs to help guide all of those involved in future discussions.

1. **Federal Land Policy and Management Act**.  The BLM is obligated in section 202(c)(9) of the FLPMA to coordinate planning on public lands with Indian tribes and to ensure consistency between BLM's and the tribes' LUPs to the extent consistent with federal laws and the purposes of FLPMA.  LUPs include RMPs and management framework plans.  New RMPs, RMP plan revisions, and RMP amendments are planning efforts.  Implementation-level plans are subsequent to the land use planning process.

---

#### Federal Land Policy and Management Act, Title II

- Directs the preparation and continuing maintenance of an inventory of the public lands, their resources, and other values, open to participation of the public and other governments, including tribes.
- Directs that LUPs be developed, maintained, and revised (as needed), open to participation of the public and other governments and in coordination with the policies of approved tribal land resource management programs.
- Provides through planning a means to anticipate conflicts between proposed land uses and tribal issues and concerns, and strive to reduce the number and severity of use conflicts at the implementation stage.
- Provides for continuing coordination with Indian tribes regarding the consistency of LUPs, guidelines, and rules and regulations on public land and tribal land.

---

**Figure IV-1      Provisions of Title II of the Federal Land Policy and Management Act.**

BLM_0026555

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-3

Going into consultation with knowledge about a tribe's historic relationship with the land and resources should enable managers to direct their questions in a sensitive and effective way. After initiating contact, the BLM frequently consults with representatives designated by the tribe for that purpose. These representatives are usually tribal staff, often the tribe's own environmental and planning personnel.

The planning regulations require the BLM to initiate government-to-government consultation with federally recognized Indian tribes.

| Consultation for FLPMA Purposes | |
| --- | --- |
| **BLM consults with—** | **Purpose of consultation is—** |
| Elected tribal officials, or tribal representative(s) whom the tribal government has designated for this purpose | • To solicit input identifying public land places, resources, uses, and values that are important to the tribe and/or tribal members and should be considered in LUPs<br>• To coordinate BLM and tribal land use policies and programs, and to seek consistency between LUPs, guidelines, and rules and regulations affecting public land and tribal land |

**Figure IV-2    Tribal consultation for purposes of Title II of the Federal Land Policy and Management Act.**

Over the course of consultation at the land use planning stage, BLM should emphasize to tribes that with adequate information (strengthened by tribal input), the BLM is better able to consider decisions that may be beneficial to tribes. Administrative and land use allocation actions the BLM can take to protect and accommodate tribal use of culturally important places following consultation during land use planning include the following:

- Protecting sacred places from incompatible uses. Some places are so important to tribes that many land uses at or even near those places may be perceived by religious practitioners as defiling their religious character. If the BLM learns about these places during land use planning before allocation decisions are made, the agency may be better able to protect those locations.

- Avoiding authorization of conflicting activities at sacred places. Many rituals and ceremonies conducted by religious practitioners occur at certain times of the year and for relatively brief periods of time. If the BLM knows where sacred and ceremonial places are located, and when they are likely to be used, the agency can make decisions in LUPs to avoid conflicting activities at those locations at those

BLM_0026556

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

critical times while always guarding against disclosures of any culturally sensitive tribal information without tribal consent.

- Making Off-Highway Vehicle (OHV) designation decisions that can accommodate tribal use and concerns with resource protection. The BLM often conceives OHV restrictions as protecting areas from potential damage. However, closing certain areas to OHV use through land use planning allocation decisions and route designations can inadvertently restrict or prohibit access to sacred places by tribal elders and religious practitioners who are unable to walk long distances. Therefore, tribes must be encouraged to participate in land use planning at the RMP level to identify their preferences for open/limited/closed OHV area allocations for motorized travel. Tribes also must be encouraged to participate and be consulted during the travel and transportation management implementation planning when route designations are determined. This will ensure that they will be able to continue visiting places important to them on the public lands.

- Facilitating traditional gathering of culturally important plants. Administrative actions can be identified in LUPs that will enable the gathering of medicinal plants, basketry materials, and other resources used in tribal cultures. For example, the BLM may specify in plans that collection by Native Americans of noncommercial quantities of herbs, medicines, and other items necessary for traditional cultural or religious purposes would be permitted through a simple letter of authorization issued annually, without charge.

- Making special designations to protect natural or mineral resources, historic properties, sacred sites, and traditional use areas. Areas of Critical Environmental Concern (ACECs) can be designated in whole or in part within RMPs to protect land and resources of traditional cultural or religious importance to tribes. Protective stipulations attached to the management of these areas can help accommodate use and access by Indian people and limit potentially conflicting land uses. (See, for example, the Biscuitroot Cultural ACEC in eastern Oregon, designated to provide priority use for Northern Great Basin and Plateau tribes to continue harvesting biscuitroots and bitterroots in accordance with their cultural traditions.)

- Developing consultation agreements with tribes. These communication protocols help structure and facilitate consultation on planning generally and on subsequent specific land use actions. They establish contacts for both government-to-government consultation and less formal staff communication. The agreement can identify tribal staff contacts and traditional or religious practitioners. Tribes can let the agency know in advance which types of actions they wish to be consulted about and/or areas requiring consultation whenever actions are planned there. Such agreements can be helpful to establish culturally sensitive ways for tribes to inform the BLM of their needs and concerns about places important to them.

BLM_0026557

- Developing comprehensive NAGPRA agreements.  Land use planning offers a good opportunity to develop NAGPRA agreements with Indian tribes that have claimed, or are likely to claim, Native American human remains or other cultural items subject to NAGPRA within the planning area.  Though not mandatory, such agreements are strongly encouraged.  Per 43 CFR 10.5(f), these agreements should address land management activities that could result in the intentional excavation or inadvertent discovery of Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony, and describe the procedures that will be followed to notify and consult with lineal descendants and Indian tribes and for determining custody, treatment, and disposition.  These agreements need to comply with the requirements of 43 CFR 10.5 and 10.6, and may take some effort to establish in the short term.  However, comprehensive agreements are important planning tools.  They provide some predictability for process and reduce the likelihood that land use activities will be delayed if BLM and Indian tribes come to agreement on procedures in advance.

To meet the BLM's responsibilities under FLPMA, as well as responsibilities under many other authorities discussed in this chapter, the BLM line officer needs to inform tribal officials of opportunities to participate in the development of BLM plans, including their potential cooperating agency role.  While tribes may be invited to become cooperating agencies for planning purposes, the BLM does not expect or require tribes to act in this capacity.  It is entirely an individual tribe's choice to become a cooperating agency when they feel that it is in their best interest to do so.  Establishment of cooperating agency status with a particular tribe does not adversely affect that tribe's sovereignty; nor does it relieve the BLM of its ongoing responsibilities to consult fully regarding proposed decisions or actions with that tribe.

The BLM must request tribal reviews and ask which other tribal members should be contacted.  The BLM offices need to make a good faith effort to pursue those contacts and carefully consider all input received.  The BLM can consolidate the consultation effort using the following processes:

- Review what is already known about the interests of the tribe pertaining to the planning area, including ethnographic data or other information provided by the tribe;

- Initiate communication with potentially interested tribes on a government-to-government basis.  The BLM accomplishes this by sending a letter, addressed personally to the chief executive of each tribe, providing a description and map of the planning effort, and inviting the tribe to participate in scoping.  The letter should request comments on—

  o Any issues or concerns the tribe may have regarding the BLM's management of the planning area,

BLM_0026558

Case No. 1:20-cv-02484-MSK   Document 34-1   filed 04/27/21   USDC Colorado   pg 97 of 470

- o Any sacred sites or places of traditional religious or cultural importance to the tribe within the planning area, or needs for access to such places, that the BLM should consider in its planning effort including nomination of potential ACECs through a submittal process provided in the BLM ACEC Manual, and

- o Any traditional religious or cultural practitioners the BLM should contact. If the BLM is already aware of such individuals, the agency letter should state that it will be contacting those persons as well.

- Invite an eligible federally recognized tribe to serve as a cooperating agency as provided in BLM's *A Desk Guide to Cooperating Agency Relationships and Coordination with Intergovernmental Partners* (2012). Tribal officials may use that role as a convenient means to communicate their views or contribute their expertise, supplementing the government-to-government consultation process. A tribe's eligibility is based on their local knowledge of culturally distinctive uses and an understanding of the land and resources involved, which often may be wide-ranging.

Tribes are often reluctant to reveal information about places of religious or cultural importance until they perceive a definite threat to those places. For that reason, tribes may not want to tell the BLM about specific sacred sites and other traditional places at the land use planning level when the agency does not yet know about specific impacts to particular geographical locations. In such cases, BLM managers should coordinate with BLM tribal liaisons or cultural heritage specialists who may be able to share ethnographic information and tribal histories with the planning team.

When engaged in consultation with tribes during land use planning, BLM offices may discuss safeguards the BLM is willing to adopt to protect sensitive information from disclosure. For example, BLM offices may allow tribes to keep primary written documentation at their offices while the BLM maintains references to them only as working files. Arrangements in which data utilized by the BLM during the decisionmaking process are housed at tribal offices must be documented in an MOU.

The BLM should send copies of the draft and proposed RMPs and associated environmental analysis to tribal officials for review and comment. If the tribe has chosen to participate as a cooperating agency, the letter should be part of the review and comment during the administrative (pre-public) review period provided for cooperating agencies. If not, the letter would be part of the draft RMP public review period following publication of the NEPA notification in the *Federal Register*. In addition, tribes will be allowed to comment during the 60-day governor's consistency review and 30-day appeal period in which the Governor may appeal to the Director if not satisfied with the State Director's decisions regarding whether or not to accept the recommendations of the Governor. While there is usually not a formal comment period for proposed RMPs, comments from tribes may be accepted during this time frame. When making decisions

BLM_0026559

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-7

on the plan, managers should consider any comments tribal officials provided and must notify the tribe of final plan decisions, including an explanation for why the plan was or was not able to accommodate particular tribal concerns.

The BLM should carefully document all consultation efforts by including copies of correspondence, a record of telephone conversations, and copies of relevant emails in the administrative record for the planning effort. (See appendix 3 for example of a tribal consultation spreadsheet).

2. **National Environmental Policy Act**. The purposes of tribal consultation under the NEPA, in general, are to identify potential conflicts between proposed actions needing BLM approval and tribal interests and to seek alternatives that would avoid, reduce, or resolve them through the project planning process. The NEPA charges Federal agencies to consider the effects of any action that could significantly affect the quality of the human environment. Section 101(b)(4) of NEPA further notes that it is the "responsibility of the Federal Government to use all practicable means . . . to the end that the Nation may . . . preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice." Clearly, the BLM cannot fulfill this obligation without learning about and considering American Indian and Alaska Native uses of the public lands. These are important parts of the human environment as well as the historic, cultural, and natural aspects of our national heritage. Information from federally recognized tribes can be gained through both consultation and the tribe's cooperating agency involvement during the project planning analysis.

---

**National Environmental Policy Act Section 102(2)(c)**

Directs the responsible Federal official considering a proposed action that could significantly affect the quality of the human environment to prepare a detailed statement on—

- The environmental impact of the proposed action,
- Any adverse environmental effects which cannot be avoided should the proposal be implemented,
- Alternatives to the proposed action,
- The relationship between local short-term uses of the human environment and the maintenance and enhancement of long-term productivity, and
- Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

---

**Figure IV-3     Provisions of Section 102 of the National Environmental Policy Act.**

The Council on Environmental Quality (CEQ) regulations require that agencies consult early with appropriate Indian tribes and invite any affected tribes to participate in scoping. The CEQ regulations also recognize tribal eligibility to serve as cooperating

BLM_0026560

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-8

agencies in the project planning effort when the effects of a proposed action are on reservation lands. Tribes must be consulted whenever other governmental entities or the public are formally involved in BLM's environmental review. In practice, this means that the BLM consults with tribes regarding EISs, environmental assessments (EA) for which there will be a public review and comment period, and other NEPA documentation that entails public involvement or initial discussion with local or State governments. While tribal input for implementation level plans will not require as extensive a review period as compared to RMPs, a minimum of 30 days should be provided for tribal feedback for EAs, especially those that involve sites, historic properties, resources, or landscapes important to Native Americans. Additionally, the departmental manual (DM) requires consultation with Indian tribes when proposed actions might affect an Indian reservation (516 DM 4.16B).

| Consultation for NEPA Purposes | |
|---|---|
| **BLM consults with—** | **Purpose of consultation is—** |
| Elected tribal officials, or tribal representative(s) whom the tribal government has designated for this purpose | • To identify a proposed action's potential to conflict with tribal members' uses of the environment for cultural, religious, and economic purposes<br>• To seek alternatives that would resolve the potential conflicts |

**Figure IV-4    Tribal consultation for purposes of Section 102 of the National Environmental Policy Act.**

How does the BLM comply with NEPA's tribal consultation obligations for project planning? Tribal consultation must take place at key points in the NEPA process. These are some key points—

- Before initial public notice, including when pre-application meetings occur,

- At the formation of BLM's proposed action,

- When alternative actions are formulated,

- When assessment of impacts is projected,

- At the publication of the analysis documents,

- At the Final EIS, when relevant, and

- Before the final decision is rendered.

Tribal consultation, including compliance with NHPA Section 106, may be appropriate even if BLM's proposed action is covered by an applicable categorical exclusion (CX) that relieves that agency of having to prepare an EIS or EA. In these circumstances, the

BLM_0026561

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-9

BLM should take care to consider whether or not the proposed action covered by the CX involves "extraordinary circumstances" relating to impacts to Indian tribal land uses, access, and cultural or religious values, as articulated in the Department of the Interior's NEPA regulations at 43 CFR 46.215. If, for any reason, a NEPA document will not be prepared, an appropriate non-NEPA document should be used to substantiate identification and consideration of Indian tribal concerns and places of importance to them. Such non-NEPA documentation may consist of BLM-tribal consultation logs, inventory reports, data recovery reports, etc. These documents should be maintained and housed with the administrative record for the project.

The NEPA document must fully disclose tribal issues and provide a summary of tribal consultation in order to demonstrate that tribal concerns have been heard and their positions considered. As is fitting for the special Federal-tribal relationship, tribal issues and recommendations should be fully discussed and addressed in relevant sections of the text within the NEPA document, rather than as an appendix to the discussion of cultural, and archaeological resources. Relevant sections where these discussions could occur:

- Scoping and Issues. Include a specific discussion of scoping issues raised by tribes.

- Affected Environment. Include a section that introduces those tribes with interests in the project and identifies resources or issues of significance to them.

- Alternatives. Discuss how tribal issues shaped the alternatives considered.

- Environmental Impacts. Address impacts, including cumulative effects, to tribal concerns and refer to more detailed discussions in other sections, such as impacts to water, biological, or botanical resources of tribal significance.

A number of strategies should be discussed with tribes during consultation associated with the NEPA process to protect resources and access issues of importance to them. Mitigation measures analyzed in the NEPA document may include, but are not limited to, the following:

- Attaching measures to use authorizations to protect resources of importance to tribes and accommodate their use. For example, in certain situations ceremonial places can be screened from view by planting vegetation or installing temporary visual barriers. Intrusive developments can be hidden or painted to blend with the environment.

- Moving competing uses. Conflicting activities and uses can be shifted to other areas or scheduled for other times.

- Removing incompatible facilities. Disturbed ground surfaces and vegetation can be restored. Vehicle use can be restricted. Livestock can be managed. Vandalism can be reduced by law enforcement patrols and site steward monitoring. Tribes can probably also suggest additional measures.

BLM_0026562

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-10

- Including tribes in project planning and utilizing their input to design specifications for access, parking, trails, interpretive signs, and other visitor developments. Tribal consultation in several States has resulted in tribal input into the text and artwork on interpretive signs at rock art sites. Such consultation improves relations with tribes by partnering on the interpretation of a site reflecting their cultural traditions and enhances the interpretive experience of all visitors.

- Consulting with tribal governments to collaboratively identify means of reducing or avoiding impacts. This approach can be effective if a proposed action poses a disproportionate impact, economically or environmentally, on a tribal community or reservation.

- Issuing special use permits to address conflicts. Permits are generally not necessary when Indians wish to visit sacred sites because most Indian religious and ceremonial practices are solitary or involve only a few people for a short period of time. However in specially designated areas, such as where sensitive species exist, or where there is competition for special uses, a tribe may be issued a special use permit to authorize an activity if it is necessary to limit the duration of the event and the number of participants, and restrict simultaneous use by others.

- Negotiating MOU to facilitate access and use. If consultation with a tribe about a proposed activity reveals the potential for recurring conflicts with traditional cultural or religious uses, an MOU with the tribe can address concerns about access and use during certain times.

- Developing management of land boundary plans to compile into one project planning document all the various geographical areas of interest and a risk assessment of potential conflict from inadequate or misrepresented knowledge, location, or markings. If a proposed action may involve areas of high risk, from either on-the-ground location uncertainty or in the authoritative geographical record, a management of land boundary plan should be prepared by cadastral staff. Such plans identify areas of high risk due to uncertainty in the land tenure records. They provide an opportunity for the BLM and the affiliated tribe(s) to work from shared knowledge and to agree on mitigation measures. The BLM should attempt to develop a plan that reflects the tribe's information and knowledge of such locations. A management of land boundary plan is particularly useful at the pre-undertaking stage of project planning, providing a common understanding of the whole landscape.

- Specifying the appropriate treatment of accidental finds resulting from project activities or natural erosion processes such as archaeological sites or human remains. This anticipation can include developing a NAGPRA plan of action to specify the procedures for notifying and consulting with lineal descendants and Indian tribes regarding intentional excavation or inadvertent discovery of Native

BLM_0026563

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-11

American human remains and/or cultural items, and fieldwork and laboratory analysis that will be performed, consistent with ARPA. These plans are addressed in 43 CFR 10.5(3), and at a minimum address the types of objects to be considered as cultural items; information used to determine custody, treatment, care, and handling; recording; analysis; traditional treatments; nature of reports; and planned disposition. Such plans provide an opportunity for the BLM and the affiliated tribe(s) to develop procedures for the excavation, treatment, and disposition of the remains. The Federal agency official must prepare, approve, and sign the written plan of action. A copy must be provided to the lineal descendants and Indian tribes involved, who may sign, but their signatures are not required. See Chapter X, NAGPRA Consultation for Land Use Authorization, section B.3.f for more guidance and the law, regulations, and relevant BLM policy in the 8100 manual series for the requisite authority and procedural requirements for addressing agency responsibilities for compliance with NAGPRA.

Where tribal concerns are appropriately addressed through the NHPA Section 106 process, as in the consideration of historic properties with traditional and religious significance, the NEPA document should reference the outcome of the Section 106 process.

3. **Executive Order 13175**. Federal agencies are directed to develop an "accountable process" for ensuring meaningful and timely input by officials from federally recognized tribes in the development of legislation and regulatory policies that have tribal implications. The Executive order applies to regulations, legislative comments or proposed legislation, and other policies, statements, or actions that have substantial direct effects on one or more tribes, on the relationship between the Federal Government and tribes, or on the distribution of power and responsibilities between the Federal Government and tribes.

The Executive order was issued to strengthen government-to-government relationships and to reduce the imposition of unfunded mandates upon Indian tribes. Agencies may not promulgate any regulations that have tribal implications unless funds necessary to pay the direct costs incurred by Indian tribal governments to comply are provided. The agency must consult with tribal officials early in the process of developing the regulations prior to their promulgation. In a preamble to any final regulations, agencies must provide the Director of the Office of Management and Budget with a tribal summary impact statement consisting of a description of the agency's consultations with tribal officials, a summary of tribal concerns, the agency's position supporting the need for the regulation, and a statement of the extent to which the concerns of tribal officials have been met.

4. **Executive Order 12898**. Executive Order 12898, Federal Actions to Address Environmental Justice and Minority Populations and Low-Income Populations (February

BLM_0026564

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-12

11, 1994), directs Federal agencies to identify and address, "as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations" including federally recognized tribes as expressed in section 6-606. H-1601-1, Land Use Planning Handbook, Appendix D, Social Science Considerations in Land Use Planning Decisions, establishes environmental justice as "a mandatory critical element for consideration in all land use planning and NEPA documents" and describes agency principles and the approach for incorporating environmental justice issues in its RMP/EIS process. The principles include determining when proposed actions may pose adverse and disproportionate impacts on tribal communities and reservations; providing full involvement of tribes in BLM decisions that affect their "lives, livelihoods, and health"; incorporating considerations in land use planning alternatives; and, in consultation with tribes, determining if land disposition proposals may affect real estate values and real income of the tribe. Tribal consultation should consider measures to eliminate or minimize impacts, document the findings, and recommend solutions. In addition to government-to-government consultation, scoping/issue identification meetings should be scheduled on tribal reservations to further encourage tribal participation. Information needs and related analyses should be incorporated in agency work plans for social and economic impact analyses, and the resulting considerations included in the analysis of the management situation, the affected environment chapter of the planning document, and the impact analysis (environmental consequences) chapter. An explanation of how environmental justice issues were considered and possibly mitigated also should be included in the description and rationale of the preferred alternative.

Meeting the requirements for environmental justice review in planning or project decisions does not constitute government-to-government consultation with tribes. Conversely, even if the tribal governments involved in a planning or project decision raise no objections to a proposed action, tribal members as individuals may raise environmental justice concerns, which must be considered.

5. **American Indian Religious Freedom Act**. The AIRFA is primarily a policy statement. It informs Federal officials that under the Establishment Clause of the First Amendment of the U.S. Constitution, the Federal Government should do nothing to prohibit the free exercise of religion. Section 1 reminds Federal agencies that Native Americans enjoy the same constitutional guarantees under the First Amendment as do all other people. Section 2 provides that the President will determine whether agency-specific laws and procedures conflict with the policy and need for congressional action. The President's determination was made in a report to the Congress 1 year after the 1978 enactment of AIRFA.

BLM_0026565

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-13

---

**American Indian Religious Freedom Act**

Resolves that it shall be the policy of the United States to protect and preserve for American Indians their **inherent right of freedom to believe, express, and exercise their traditional religions**, including—

- Access to sacred sites, including cemeteries, required in their religion;
- Use and possession of sacred objects necessary to the exercise of religious rites and ceremonies; and
- Freedom to worship through ceremonials and traditional rites without government intrusion or interference.

---

**Figure IV-5      Provisions of the American Indian Religious Freedom Act.**

Case law has established that AIRFA has an ongoing implementation requirement, obligating agencies to consult with tribal officials and tribal religious leaders when agency actions would abridge the tribe's religious freedom by (1) denying access to sacred sites required in their religion; (2) prohibiting the use and possession of sacred objects necessary to the exercise of religious rites and ceremonies; or (3) intruding upon or interfering with ceremonies.

The AIRFA focuses not just on religious places, but also on religious practices—religious activities—and it directs agencies to consider both places and practices before taking actions that could affect them. The BLM's corresponding policy is to avoid infringing on Native Americans' religious rights. The BLM must examine proposed actions and authorizations, as well as routine management practices that could substantially restrict access or interfere with free exercise of religion.

---

| Consultation for AIRFA Purposes | |
|---|---|
| **BLM consults with—** | **Purpose of consultation is—** |
| Elected officials or tribal representative(s) and/or native traditional religious leaders whom the tribal government has designated or identified for this purpose | • To identify the potential for land management procedures to conflict with Native Americans' religious observances<br>• To seek alternatives that would resolve the potential conflicts |

**Figure IV-6      Tribal consultation for purposes of Section 2 of the American Indian Religious Freedom Act.**

The provisions of AIRFA are not limited to federally-recognized Indian tribes. The constitutionally guaranteed freedom to follow the religion of one's choice extends to all Native Americans—as to others—without qualification.

BLM_0026566

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-14

As a first step in complying with AIRFA's consultation requirements, BLM offices should review existing information to identify previously recorded places and practices of traditional religious importance. Then, the agency contacts all potentially interested federally recognized tribes and other Native American groups by letter and telephone as part of the NEPA scoping process. Although AIRFA is not directed at tribal governments, BLM's normal government-to-government channels are the best starting points for consultation since it is commonly a topic of tribal concern. After that, the BLM should elicit information and views directly from the traditional religious practitioners identified by the tribal government whose interest would be affected. After initiating contact by letter and telephone, the BLM field manager or designated representative should follow up with face-to-face contact if places of religious significance or practices would likely be affected by BLM actions. If the agency learns that proposed plans or actions might disturb traditional religious places or disrupt traditional religious practices, the agency must seek ways to avoid or minimize those impacts to the extent practicable.

6. **Executive Order 13007.** This Executive order directs Federal land managing agencies to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners, and to avoid adversely affecting the physical integrity of such sacred sites to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions. A *sacred site* is defined as any "specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site."

Many tribes would argue that the sacred is embedded in all natural phenomena and that sacred sites are often not confined or precisely delineated. The Executive order does not deny this more all-encompassing view of sacredness. However, its definition of sacred sites clearly focuses on the places that are more important than others for worshipping the sacred or conducting religious ceremonies, and it is those special places that Federal agencies are directed to consider. Sacred landscapes would be the subject of consultation under NEPA.

The order is very explicit about not creating new rights and not limiting duly authorized land uses. It is "not intended to, nor does it, create any right, benefit, trust responsibility, substantive or procedural, enforceable at law or equity by any party against the United States, its agencies, officers, or any person" (section 4). Nothing in it is to be "construed to require a taking of vested property interests [nor] shall this order be construed to impair enforceable rights to use of Federal lands that have been granted to third parties through final agency action" (section 3).

Executive Order 13007 directs Federal agencies to avoid harming sacred sites "to the extent practicable, permitted by law, and not clearly inconsistent with essential agency

BLM_0026567

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-15

functions." This is a reasonably strong standard. It is stronger than the standard for protecting places of traditional religious and cultural importance under NHPA Section 106, which only requires agencies to "take into account" the effects of their actions on such places.

---

### Executive Order 13007, Indian Sacred Sites

- Directs Federal land managers to accommodate Indian religious practitioners' access to and ceremonial use of Indian sacred sites, and to avoid adversely affecting the physical integrity of such sites;
- Directs land managing agencies to implement procedures to carry out these accommodation and protection provisions, including reasonable notice of proposed actions or land use policies that may restrict future access to or ceremonial use of, or adversely affect physical integrity of, Indian sacred sites;
- Cites Executive Memorandum of April 29, 1994, Government-to-Government Relations with Native American Tribal Governments, as the model for communication procedures; and
- Requires a report within 1 year on any statutory or administrative changes needed to meet the order's directions, and on the procedures implemented or proposed to facilitate consultation with appropriate Indian tribes and religious leaders.

---

**Figure IV-7    Provisions of Executive Order No. 13007**

The order required agencies to report to the President within 1 year addressing changes needed to accommodate access and use of Indian sacred sites on Federal lands, or changes needed to avoid adversely affecting the physical integrity of sacred sites. The Order also required agencies to address in their report the procedures implemented or proposed, "to facilitate consultation with appropriate Indian tribes and religious leaders and the expeditious resolution of disputes relating to agency action on Federal lands that may adversely affect access to, ceremonial use of, or the physical integrity of sacred sites."

The BLM reported that no statutory or administrative changes were needed and provided copies of MS-8160 (1990) and Handbook H-8160-1 (1994) as its procedures for facilitating consultation.

Executive Order 13007 reinforces the original intent of AIRFA expressed 18 years earlier with regard to sacred sites. A major purpose of the Executive order is to improve communication between land managing agencies and tribes. The tribal government is the appropriate starting point for initiating an official dialogue. The BLM also generally consults with tribal representatives and Indian religious practitioners designated by the tribe for this purpose. The BLM's initial correspondence should be addressed to the chief executive of the tribe, but communication among BLM staff, tribal staff, and religious practitioners can proceed after the official government-to-government contact.

BLM_0026568

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-16

| Consultation for Executive Order 13007 Purposes | |
|---|---|
| **BLM consults with—** | **Purpose of consultation is—** |
| Elected officials or tribal representative and/or appropriately authoritative representative of an Indian religion whom the tribal government has identified for this purpose | • To determine whether proposed land management actions would—<br>  ○ Accommodate Indian religious practitioners' access to and ceremonial use of Indian sacred sites on Federal lands; and/or<br>  ○ Avoid adversely affecting the physical integrity of Indian sacred sites on Federal lands.<br>• To seek alternatives that would resolve potential conflicts. |

**Figure IV-8      Tribal consultation for purposes of Executive Order No. 13007, "Indian Sacred Sites."**

a. **Identifying sacred sites.**  Aside from a few exceptional cases where well-known physical markers are present, only tribal representatives have the knowledge needed to identify a tribe's sacred sites.  A tribe may name an appropriately authoritative representative of an Indian religion to provide this information.  Federal officials cannot know to accommodate access to and ceremonial use of Indian sacred sites, and to avoid adversely affecting them, unless the tribe identifies them.  Identification can only occur by consultation.  In some cases, a tribe may be reluctant to tell BLM where a site is located, because BLM cannot protect that information or because the site may no longer be sacred if its location is revealed.  In such cases, the Federal officials should ask if there is a broader area that should be protected, within which there may be a sacred site.

b. **Any place can be sacred.**  Sacred sites include a variety of places and landscapes, including but not limited to springs, mountains, caves, rock shelters, rock art sites, archaeological sites, burial locations, and stone and earth structures.  Some sacred sites would not routinely be recorded as archaeological sites by archaeological surveys.  They can only be identified by Indian tribes.  Other sacred sites might well be recorded as a result of archaeological surveys and their sacredness determined later through consultation with tribes.

Age is often irrelevant to sacredness.  A location with little or no antiquity may be vitally important to a tribe as a religious or ceremonial site.  Because some Indian religious practitioners are considered to be in a continual process of revelation, the actual practice of ceremonies and rituals by these individuals establishes and affirms a site's sacredness.  In many cases, there may be no inherent element of a landscape that makes one place sacred and another not.  It may be the practices themselves that

BLM_0026569

took place there that have conferred the element of sacredness to that spot on the landscape.

A place may have traditional religious importance even if not regularly visited by religious practitioners. Some sacred sites may be used only infrequently for special ceremonial purposes. Some highly sacred places may never be visited at all because they are considered too powerful or dangerous for a person to survive physically or spiritually.

Different places can be sacred at different times. The number, nature, and locations of sacred sites are not fixed. Information the BLM obtains at one point in time about such places may not be sufficient to assess the potential effects of undertakings upon that site at a later time. Religious observances are subject to change in form or location and can take on different meaning over time.

The setting is often highly important. The integrity of a site that has traditional religious importance can be adversely affected if damaged directly or indirectly through the introduction of visual intrusions or changes in sounds or air quality.

c. **Distinguishing between sacred sites and other places of cultural importance**. In some cases, it may not be possible to differentiate among sacred sites and properties of traditional religious and cultural importance (sometimes called traditional cultural properties or TCPs) that may be eligible for listing in the NRHP. A sacred site may or may not be eligible for listing. Sacred sites are not addressed in the NHPA and the conclusion that a property fits the definition of a sacred site does not automatically confer significance to it relative to the NRHP.

TCPs differ from sacred sites in several important respects. TCPs are considered under NHPA Section 106 to determine their eligibility to the NRHP. TCPs and sacred sites can also be considered under FLPMA. TCPs can be secular, while sacred sites cannot. TCPs normally must be at least 50 years old for entry in the NRHP, while sacred sites even if more than 50 years old may not be appropriate for NRHP listing. The similarity among these is that tribal identification is necessary as the beginning point for compliance with the intent of the law or executive order.

## B. Ethnographic Studies

1. **Introduction.** Ethnographic studies, or *ethnogeographies*, are particularly useful at the pre-decisional stages of planning when they focus on land- and place-based concerns. Ethnographic studies conducted early in the planning cycle can be an effective tool to address tribal concerns on a broad landscape scale. Ethnographic studies may require interviews with subject matter experts (usually tribal members) and can contribute to a robust decisionmaking process. When considering such studies, tribal governments should be involved at an early stage to identify the key questions or issues to be explored. Ethnographic studies may be phased as a project progresses, and the level of effort should

BLM_0026570

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-18

be proportionate to the decisions being made at any given phase.  Such strategies should be explored during consultation at an early stage.

Overview ethnographies early in project planning, based on existing information, should identify tribes likely to be affected by the project; landscape-scale issues that could affect project designs and siting decisions; known areas and resources likely to be of interest to the affected tribes; the types of resources and areas likely to occur that are of historic and current tribal interest; and the need for and focus of further field surveys, informant interviews, and government-to-government consultation.

As project plans and tribal consultation progress, more in-depth and focused ethnographic information and consultation may be needed to identify and evaluate specific places of traditional and religious importance; to identify tribal values associated with cultural and natural resources; to define more generalized cultural concerns that characterize a tribe's relationship with the land; and to resolve potential impacts to land and resources of concern.

It may be necessary to include a cadastral survey and management of land boundary plan within the ethnographic report.  Management of land boundary plans may be needed when (1) boundaries and legal status of sacred sites, TCPs, and areas of traditional land uses lie close or adjacent to changes in land ownership or (2) the land status of such resources is uncertain or could be disputed.

2.  **Scale.**  Ethnographic studies or inventories, unlike archaeological inventory, seek not to identify things but to accurately profile values and the cultural context of their occurrence on the landscape.  The BLM will not normally require separate ethnographic surveys for individual actions evaluated within EAs.  Such actions are more limited in scope and BLM requests to tribes to identify sacred sites or traditional use areas should not be burdensome.  Another means for addressing such concerns is the earlier identification of resources and important places through landscape-scale studies outside specific planning schedules.  This broader approach can often avert potential disagreements and delays during planning actions and strengthen trust.

   In contrast, for most EISs, the scope, impact, and controversy of the proposed action are far more widespread.  Because the identification of sacred sites and traditional use areas could be burdensome for tribes for the lands affected by these large-scale projects, the BLM may require an applicant to contract for ethnographic studies as part of this environmental review process.  Contract methodologies, objectives, and ethnographer qualifications must all be approved in advance by the BLM in consultation with  the tribe(s) of interest in the study.  The BLM will use the results of these studies, along with other information as appropriate, to complete consultation under a variety of authorities.

3.  **Who Pays.**  When the BLM is engaged in RMP formulation, the agency itself may fund such studies when information pertaining to traditional lifeways, traditional use of plants and animals, trails, and sacred sites is needed to make decisions about land allocations.

BLM_0026571

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-19

Internal BLM-generated undertakings, such as recreation projects or land restoration projects, may also require that the agency commission ethnographic studies (including management of land boundary plans where needed).

Applicants, permittees, or operators (regardless of whether the undertaking is being evaluated through an EA or EIS) are responsible for funding ethnographic studies (including management of land boundary plans where needed) when the anticipated information is required by the BLM to fulfill its project assessment obligations.  These include identifying sacred sites, historic properties, and places of traditional cultural or religious importance within an area of potential effects; determining their significance; and designing treatment programs for significant properties affected.

4. **When Needed.**  Traditional use areas and sacred sites are places that are integral to a community's history, traditional economy, religious expression, or ceremonial activity.  These places are seen by tribes as necessary to maintain the continuing cultural identity or religious practices of the community.  For many tribes, the links to specific places have been maintained, at least in part, but for many others, those links have been broken through centuries of conflict, displacement, assimilation policies, and other cultural disruptions.  Ethnographic studies may be needed to identify specific places known to tribes as well as to capture the memory of them as it may exist in stories and elders' memories.  Ethnographic studies may also be necessary to identify cultural beliefs and practices that could affect or be affected by proposed land uses or proposed land tenure adjustments.

5. **Decision Considerations.**  There are several factors to consider when determining if an ethnographic study is warranted.  As a general rule, before initiating this type of study, the BLM should:

   - Establish the area to be covered by the planning effort or affected by a proposed action.

   - Review the management of land boundary plan, if available.

   - Consult with tribes to determine the nature and extent of tribal concerns that occur in the area.

   - Consider tribal communication protocols for sharing information about properties of traditional religious and cultural importance and sacred sites.  In some cases, tribes will be able to provide information that traditional use areas or sacred sites are present and provide sufficient information to evaluate their importance and determine effects of planning or proposed action through the consultation process itself.  If this is the case, the BLM can utilize this information without conducting an ethnographic study.

   - Document consultation efforts if, after a reasonable and good faith effort to consult, tribes do not provide information regarding or concerns pertaining to

BLM_0026572

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-20

culturally sensitive areas and locations, or areas that may be affected by the action. BLM may continue planning and implementation, including compliance with NEPA and other authorities, such as NHPA.

- Determine what must be done in order to meet the requirements of Executive Order 13007 if a tribe indicates that sacred sites are present, but cannot or will not provide specific location or other information about them. An ethnographic study can help BLM to determine how to (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites.

- Propose the use of an ethnographic study, in consultation with the tribes, to acquire information about traditional use areas. If, after a reasonable and good faith effort to consult, tribes provide information that such areas may be affected by the proposed action, but refuse to, or cannot, provide information necessary for the BLM to determine their importance and whether they could be affected by the planning or proposed authorization, then the BLM should document this situation. In addition to consulting with the tribes, the BLM office should also conduct an archaeological and literature records search for the project area early in the process.

- Consider that a focused ethnographic investigations may be warranted if consultation indicates that tribes may have knowledge of past land use practices (e.g., historic Indian fire practices) and their effects upon land health issues.

- Consider ethnographic fieldwork or targeted informant interviews if issues of environmental justice arise. These may inform the agency on tribal political and economic experiences that shape tribal perspectives on land management practices.

---

In an innovative partnership with the Northern Cheyenne Tribe and Chief Dull Knife College, the Montana State Office initiated ecoregional ethnographic assessments for the Northwestern Plains and Middle Rockies ecoregions. Designed to feed into ongoing rapid ecoregional assessments, these studies will yield a systematic overview of the ethnographic, historic, and archaeological information for the regions. The information will be incorporated into RMPs and will influence oil and gas leasing decisions, lease stipulations, and determinations of renewable energy zones. Tribal benefits include being able to affect the management of important heritage resources on aboriginal lands and creating a GIS database of important heritage resources within their tribal historic preservation office. The tribal college is strengthened through creating a permanent archive of important tribal heritage resources as well as ethnographic and historic information; by providing select students with internship opportunities; and by offering students practical analytical experiences that are incorporated into curriculum materials. Information being collected as a result of archival and literature searches, oral history interviews, site visits by tribal elders, and site recording will be organized to protect proprietary information. The data will be housed to provide access to: (1) tribal

BLM_0026573

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-21

information only; (2) tribal/BLM information only; and (3) tribal/BLM/public information.

## C. Coordinating Tribal Consultation Obligations under Different Laws

Efficiencies can be gained in the environmental review process by coordinating procedures for compliance with NEPA, NHPA Section 106, section 3 of NAGPRA, AIRFA, Executive Order 13007, and the BLM's tribal consultation responsibilities. Coordination will allow the BLM to (1) conserve resources by gathering information that helps to support all of these requirements at the same time; (2) reduce redundancy and avoid unexpected and unnecessary delays by synchronizing the schedules for meeting these requirements; (3) make it easier for the public and tribes to understand when and how to contribute to the BLM decision-making process for various issues; and (4) reduce litigation liability by ensuring that the requirements of these processes are met in a timely manner.

While NHPA Section 106 agreements are not intended to comply with statutes other than NHPA, efficiencies can be gained by coordinating consultation activities. In developing NHPA Section 106 programmatic agreements (PAs), agencies should take into account efforts required by other Federal laws that relate to heritage resources, such as NAGPRA and ARPA. The coordination of the agency's compliance efforts should be recognized in Section 106 PAs and duplication of efforts should be avoided by tailoring the Section 106 process to accommodate their requirements.

Project efficiencies may be gained by agreeing ahead of time how NAGPRA consultation will take place should Native American human remains or other cultural items be discovered. When crafting PAs, offices should reference NAGPRA and the general steps that will take place when discoveries of Native American human remains or other cultural items occur as a standard stipulation, and then reference the plan of action (43 CFR 10.5(e)) or comprehensive agreement (43 CFR 10.5(f)). Either document may be attached to the PA as an appendix for reference, but they must be standalone documents (see Chapter X, section B.3.g).

One of the principal opportunities for coordinating NEPA and NHPA 106 compliance is the public notification and comment process in situations where an EIS is found to be appropriate. For example, rather than carry out a separate procedure for public notification to meet NHPA Section 106 requirements, the BLM may reference both authorities when publishing a notice of intent or notice of availability in the *Federal Register* and/or a notice of a public meeting in the newspaper. Referencing both statutory processes informs the public of their opportunity to bring forward broad environmental concerns as well as Section 106-related information, concerns, and opinions.

Regulations for both NEPA and NHPA require that agencies coordinate their compliance processes to the extent possible. Therefore, BLM offices must incorporate into their NEPA analysis available information on potential impacts to cultural and tribal resources and possible mitigation measures gathered through the NHPA Section 106 and tribal consultation processes.

BLM_0026574

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-22

Offices must complete both the NHPA Section 106 process and tribal consultation prior to making a final decision on a proposed action.

NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 was published in March 2013. This guidance was prepared jointly by the ACHP and the CEQ. It provides advice on implementing provisions added to the Section 106 regulations in 1999 that address both *coordination* of the Section 106 and NEPA reviews and the *substitution* of NEPA reviews for the Section 106 process.

Appendix 4 presents a side-by-side matrix that illustrates the procedural, informational, participation, and documentation requirements of NEPA, NHPA Section 106, and tribal consultation. The right-hand column also shows key recommendations for coordinating the processes and successfully meeting compliance requirements prior to making a decision. (Note that completing a CX for an action may satisfy BLM's NEPA obligations but will not satisfy the BLM's NHPA Section 106 requirements.)

## D. Key Differences between Various Authorities

The BLM's obligation to consult with Indian tribes on a government-to-government basis cannot be fulfilled only by consulting about historic properties significant to the Indian tribes under Section 106 of the NHPA. Each Federal statute with a requirement to either coordinate or consult with Indian tribes carries with it the unique, separate obligation to consult on a government-to-government basis. In practice, government-to-government consultation may cover multiple issues of which Section 106 consultation is likely to play only a part.

NEPA's project planning process and FLPMA's land use planning process can each recognize and consider impacts to heritage resources that do not fit within the scope of the Section 106 process. There are a number of important legal differences when comparing the general authorities of FLPMA and NEPA to NHPA. Important distinctions can be noted in terms of (1) the types of resources to be considered, (2) general consultation procedures, and (3) timing for inventorying and collecting data about heritage resources.

The reach of NHPA is restricted to *historic properties*, and these are understood to be eligible for or listed on the NRHP under specific criteria at 36 CFR 60.4. Neither FLPMA nor NEPA requires this level of qualification in order to be inventoried, identified for management, or considered in the decisionmaking process. FLPMA land use planning only recognizes that historic, cultural, and archaeological resources must be managed regardless of significance unless adopted LUPs specify non-management options, while NEPA's project planning covers important historic and cultural aspects of our national heritage. *Important* is undefined in the law and its regulations.

Thus, it may be possible to consider, manage, and protect certain heritage resources under NEPA that might not qualify for consideration as historic properties under NHPA. Plant gathering areas, traditional landscapes, and some traditional cultural properties may still be evaluated and

BLM_0026575

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IV-23

protected as part of the NEPA project planning process even though it might be difficult to determine them as eligible for listing in the NRHP.

NEPA regulations for project planning only require agencies to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" and to "provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents." The public participation requirement is significant, but it does not obligate the agency to engage in a dialogue with the public or tribes or seek agreement on issues related to the NEPA process. Indeed, the NEPA project planning process does not mandate the type of engagement contemplated by the explicitly defined use of consultation to fulfill an agency's Section 106 obligations.

State and field offices should utilize the internet to facilitate public notification under NHPA through the use and distribution of NEPA Project Logs. Decision documents posted on the web stimulate public involvement and feedback on environmental documents and proposals on public lands. Public comment periods will continue to be initiated through official notifications (direct mailing, local and/or state newspapers, Federal Register notices). However, the interested public should also be encouraged to check these internet-based NEPA logs frequently to ensure adequate time for input on specific projects, especially in the case of projects without a planned formal comment period. BLM contact persons should be identified on the individual logs. (A good example of a field office that utilizes this strategy of public outreach is the Rio Puerco Field Office, Albuquerque District, New Mexico.)

Likewise, FLPMA's land use planning does not make any reference to a process of consultation with the public similar to requirements of NHPA. The BLM cannot simply rely on the proscribed public participation and notification requirements of these other two laws to comply with the Section 106 process of NHPA or with BLM's general trust obligations to consult. As discussed above, coordinating NEPA and NHPA compliance is encouraged. Generally, NEPA project planning procedures cannot substitute for the Section 106 process. However, 36 CFR 800.8 do allow an agency to integrate Section 106 into the NEPA process and utilize the NEPA process for Section 106 purposes provided that the conditions set out in 36 CFR 800.8(c)(1-5) are met.

Slight but important differences are found in the requirements governing the timing and collection of data at different stages of each law's process. The Section 106 process of NHPA allows for a phased identification approach. Agencies are also not required to have conducted a complete inventory of historic properties for all alternatives analyzed in a NEPA document. NEPA requires agencies to identify and assess impacts to heritage resources as part of its documentation; however, it is possible that more complete data regarding historic properties may be identified after release of NEPA documents.

BLM_0026576

## CHAPTER V.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE NATIONAL CONSERVATION LANDS PROGRAM

### A.  Overview

This chapter explains how National Conservation Lands managers and staff carry out tribal consultation and coordination responsibilities in accordance with legal requirements for BLM's National Conservation Lands, which include national monuments, national conservation areas, components of the National Wilderness Preservation System; wilderness study areas (WSAs); components of the National Wild and Scenic Rivers System; national scenic or historic trails designated as components of the National Trails System; any area designated by Congress to be administered for conservation purposes; and the National Conservation Lands Science Program. These lands feature exceptional scientific, cultural, ecological, historical, and recreational values, and differ tremendously in landscape and size.  BLM management of these National Conservation Lands components must comply with specific designating acts of Congress and Presidential proclamations by conserving, protecting, and restoring the resources and values for which they were designated.

While National Conservation Lands units are designated based on a general recognition of their outstanding natural, scientific, scenic, or cultural values, BLM managers are rarely aware of all the values they contain.  Relatively little public land has been carefully inventoried, marked, studied, or been the subject of ethnographic study to identify trails, traditional use areas, and sacred places of value to tribes.  Therefore, tribal consultation and building sustained positive partnerships with Indian tribes is one of the best ways the BLM can understand and document the unique values the BLM is charged with managing and protecting within National Conservation Lands.

The BLM's National Conservation Lands mission is to conserve, protect, and restore nationally significant landscapes and places that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations.  These landscapes, and the natural and heritage resources they contain, create common ground with tribes who also want to conserve or preserve heritage resources, traditional use areas, trails, and sacred sites.

This guidance provides tools for agency land managers to fulfill the National Conservation Lands mission to conserve, protect, and restore the nationally significant landscapes and places that have outstanding cultural, ecological, and scientific values through collaborations with tribes in surrounding areas.  Because individual National Conservation Lands units contain the full gamut of resources and lands of importance to Indian tribes, managers and staff should consult MS-1780, Tribal Relations, and individual chapters within this handbook regarding consultation issues relevant to particular resources and programs.

While many of the directives within MS-1780 and H-1780-1 pertain to National Conservation Lands and tribal relations generally, policies and procedures that can apply specifically to National Conservation Lands and tribal relations opportunities are identified below.  National program policies generally applicable to BLM public lands apply to National Conservation

BLM_0026577

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-2

Lands components to the extent that they are consistent with the designation proclamation or legislation, other applicable law, and BLM policy.

Please note that the full content of all of the completed National Conservation Lands manuals, handbooks, and strategic plans referenced in this chapter can be found on the BLM website and WO 400 National Conservation Lands Share Point Site. These include MS-6100, MS-6220, MS-6250, MS-6280, MS-6330, MS-6340, and MS-6400.

The National Conservation Lands basic authorities derive from the FLPMA and 2009 Omnibus Public Land Management Act of 2009 (Pub. L. 111-11). The FLPMA directs BLM's interdisciplinary course of multiple-use and sustained-yield management "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values."

The Omnibus Act formally codified the National Conservation Lands after years of existence derived from administrative origins. The act provided that, "In order to conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations, there is established in the Bureau of Land Management the National Landscape Conservation System" (Pub. L. 111-11, section 2002 (a)). "The Secretary shall manage the system in accordance with any applicable law (including regulations) relating to any component of the system … and in a manner that protects the values for which the components of the system were designated" (section 2002(c)).

MS-6100 provides general policy to BLM personnel on managing National Conservation Lands. The manual reaffirms that BLM's mission for the National Conservation Lands is to conserve, protect, and restore nationally significant landscapes and places that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations. The BLM's vision for the National Conservation Lands is to be a leader in conservation by protecting landscapes, applying evolving knowledge, and bringing people together to share stewardship of the land.

While all National Conservation Lands components pertain to tribal relations, some goals identify more specific National Conservation Lands and tribal relations opportunities and are identified here.

An overarching and explicit commitment by BLM is to conserve and protect natural and heritage resources that are sacred to Indian tribes. (See MS-6100, National Conservation Lands, Section 1.6 A, General Principles for the Management of National Conservation Lands Units.) Recognizing that the National Conservation Lands represent a relatively small portion of the land managed by the BLM and other Federal, State, tribal, and local government entities, these special conservation areas must be managed within the context of the larger landscape. A collaborative landscape approach to the management of National Conservation Lands provides opportunities to promote healthy landscapes and contribute to the local tribal economies and social fabric of the community. To instill this ethic, the BLM seeks to engage tribes and other interested parties at the earliest opportunity in National Conservation Lands' planning, management, and resource

BLM_0026578

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-3

and geospatial data sharing, consistent with the Federal Advisory Committee Act and the Sunshine in Government provisions in section 313 of the FLPMA using existing collaborative forums, including government-to-government consultation with tribes. This includes working with tribes and others to identify and strive to protect lands that are critical to the long-term ecological sustainability of the landscape. The BLM also seeks to serve as an information resource for grassroots efforts to explore possible designations through legislation pertaining to the National Conservation Lands and ensure a diversity of viewpoints is brought to the table, including tribes. Such a collaborative approach is intended to: (1) cultivate a sense of shared stewardship for the BLM-managed public lands and advance the relevance of conservation lands; (2) connect diverse groups of people, interests, and government organizations by building strong partnerships; (3) attract volunteers; and (4) engage youth through education, interpretation, and outreach. This includes working in collaboration with tribes and other partners on outreach and media materials addressing natural and heritage resources. Tribal perspectives will be sought and incorporated into outreach, educational, and interpretive materials since tribal views on the effects of use of such National Conservation Lands units as scenic or historic trails or wild and scenic rivers often differ significantly from non-tribal views (e.g., immigrant settlers to the American West).

**B. Components of the National Conservation Lands System**

1. **National Monuments, National Conservation Areas, and Similar Designations**. The BLM MS-6220, National Monuments, National Conservation Areas, and Similar Designations, provides the BLM Officer and program staff professionals with general policies for the administration and management of these designations. These designations provide opportunities for collaborative tribal relationships.

---

**Tribal Partnerships and Other Opportunities**

The BLM enjoys a partnership with Pueblo de Cochiti and Sandoval County to provide access, facility development and maintenance, resource protection, research opportunities, public education, and enjoyment in the Kasha-Katuwe Tent Rocks National Monument. Established in 2001, the monument is located on lands with ancestral significance to the Pueblo de Cochiti. The pueblo serves as a gateway community to the monument since it administers 3 miles of access road through tribal lands. The establishing proclamation directs the BLM to manage the lands in close cooperation with the Pueblo de Cochiti. The proclamation further requires that the monument's management plan protect the objects identified in the proclamation and further the purposes of the AIRFA. The Pueblo de Cochiti and the BLM jointly desire to maintain and preserve the natural and heritage resources, regulate visitor access and use, provide visitor information and interpretation, and stimulate the pueblo's economy related to tourism. Cooperative management provides for on-the-ground efforts to maintain and protect natural and cultural values enhanced through stewardship by tribal members.

---

BLM_0026579

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-4

2. **National Wild and Scenic Rivers System**.  The 1968 Wild and Scenic Rivers Act (WSRA; 16 U.S.C. 1271) established a National Wild and Scenic Rivers System that protects the special character of certain rivers, while recognizing the potential for use and development.  Many of these river corridors support habitats critical for culturally sensitive species and long served as focal points for ancient settlements and special use areas.

The WSRA also requires Federal agencies to consider potential wild, scenic, and recreational river areas during their planning processes, and provides the Secretary of the Interior and the Secretary of Agriculture authority to acquire lands within the boundaries of any component of the National Wild and Scenic Rivers System.  Lands owned by an Indian tribe may not be acquired without the consent of the tribe as long as the Indian tribe is following a plan for management and protection of the lands that ensures its use for purposes consistent with the WSRA. (See Section 6(a)(1) of the Wild and Scenic Rivers Act.)

The BLM works in partnership with tribes to coordinate the management of wild and scenic rivers in several States.  In Oregon, for example, the Oregon Omnibus Wild and Scenic Rivers Act of 1988 (16 U.S.C. 1274) designated over 173 miles of the Deschutes River and directed the Secretary of the Interior (BLM) to administer 100 miles of it through a cooperative management agreement between the Confederated Tribes of the Warm Springs Reservation (the Confederation) and the State of Oregon (as provided in section 10(e) of the act).  The same legislation also designated 147 miles of the John Day River and directed the Secretary of the Interior (BLM) to administer the river through a cooperative agreement with the State of Oregon.  The river is managed cooperatively by a number of entities, including the Confederation.  BLM entered into an MOU with the Confederation, BIA, the State of Oregon, and the John Day Coalition of Counties.  The Confederation was involved in developing the management plans for both rivers and participates in their respective day-to-day management.

---

By executing the 2002 cooperative management agreement covering the Lower Deschutes River and the 2007 MOU for the John Day River, the BLM agrees to joint management plans for the rivers supported by all signatory parties.  The agency and the Confederation agree to cooperate and coordinate with each other in implementing the decisions and regulations of the plan.  They meet periodically to discuss implementation issues, tasks, priorities, and duties and to agree upon a schedule for management actions and projects.  They develop annual written work plans.  They consult and seek consensus on key decisions pertaining to plan implementation.  Coordination by technical core team members and consultation by managers and executive board representatives occurs at regular intervals.

---

BLM_0026580

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-5

Alaska wild and scenic rivers have specific provisions through the ANILCA for protecting and providing opportunities for subsistence uses by rural residences, Native and non-Native alike. *Subsistence uses* are defined in ANILCA, Title VIII, Section 803, as the "customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing; and for customary trades." The BLM ensures that rural residents engaged in subsistence uses have reasonable access to subsistence resources on public lands (including within wild and scenic river corridors).

MS-6400, Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, Planning, and Management, provides policy, direction, and guidance for the identification, evaluation, planning, and management of eligible and suitable wild and scenic rivers and the planning and management of designated components of the National Wild and Scenic Rivers System. The Director, state directors and district managers/field managers are responsible for "developing and maintaining relationships with tribal governments, interested in the management of designated rivers or the inventory, evaluation, and management of potential additions to the National System."

BLM must coordinate and consult with tribes concerned with the inventory, evaluation, and management of potential additions to the Wild and Scenic Rivers System. This tribal interaction and public involvement are critical, as rivers, due to their linear nature, often cross jurisdictional boundaries. Managers should involve any affected or concerned party at all stages of the wild and scenic river process. The manual also outlines eligibility criteria for outstandingly remarkable cultural values that can be modified as appropriate to make them more meaningful in the area of comparison.

"The river, or area within the river corridor, contains rare or outstanding examples of historic or prehistoric locations of human activity, occupation, or use, including locations of traditional cultural or religious importance to specified social and/or cultural groups. Likely candidates might include a unique plant procurement site of contemporary significance." (MS 6400 Chapter 3E7)

The wild and scenic river suitability evaluation guidance provides 13 factors to be analyzed including factor 11 that considers how designation may help or impede the goals of tribal governments or other governmental entities.

3. **National Scenic and Historic Trails Program**. The BLM is one of several agencies that share responsibility for management of national scenic and historic trails. The BLM also serves as National Trail Administrator for three national historic trails, two of which are administered jointly with the NPS. Many recognized trails follow ancient routes of importance to tribes and intersect habitats of culturally sensitive plants and heritage resources.

BLM_0026581

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-6

National scenic trails are extended trails that provide outdoor recreation and conserve and enhance the various qualities—scenic, historical, natural, and cultural—of the areas they pass through.

MS-6250, National Scenic and Historic Trail Administration, also addresses specific functions delegated to the BLM from the Secretary of Interior pursuant to the National Trails System Act regarding how to conduct national scenic or historic trail feasibility studies, how to administer a national scenic or historic trail upon designation by Congress, and the responsibilities of national scenic or historic trail administrators.

MS-6280, Management of National Scenic and Historic Trails and Trails Under Study or Recommended as Suitable for Congressional Designation, states that an objective of the BLM is to develop and maintain relationships, and collaborate and coordinate with tribes and other interested parties regarding management of national trails. The BLM Director and district/field managers are to develop and maintain relationships, including collaborating and coordinating with tribes and other interested parties and ensure efforts are made to manage national trail resources on shared trail boundaries in accordance with applicable laws and in a manner compatible with the respective landowners and management entities and in coordination with tribes and other interested parties.

In the management and stewardship of national trails and national trail management corridors, the BLM encourages, assists, and establishes cooperative tribal relationships, partnerships, and stakeholder involvement to increase efficiencies, improve awareness and communication, promote consistency, and expand participation in the management of the national trails.

The BLM must also conduct and maintain a national trail inventory to ensure resource data consistency and information sharing. The national trail inventory is conducted in cooperation with tribes and interested parties in accordance with policy, agreements, and protocol. The BLM manager should coordinate inventory efforts with tribes, other interests, SHPOs, and the ACHP to maximize efficiencies. The BLM may offer technical training and/or limited financial support to tribes and other parties who are interested in participating in national trail inventory and related monitoring.

Tribes are invited to participate in all National Trails System and trail-specific workshops and conferences. Strong partnerships can be developed with tribes to enhance the interpretation and visitor experiences at national historic trails.

**Tribal Partnerships and Other Opportunities**

BLM Montana Field Offices actively consult with the Nez Perce Tribe, the Confederated Tribes of the Colville Reservation, and the Confederated Tribes of the Umatilla Reservation regarding any Federal undertakings that could potentially affect areas along the designated trail route, as well as prior to initiating any interpretive efforts involving

BLM_0026582

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-7

the trail. Revisions of the Comprehensive Trail Management Plan incorporate consultation efforts and proactive working relationships with other Indian tribes whose aboriginal territories are crossed by the designated trail route.

4. **Wilderness Program**

a. **Congressionally Designated Wilderness**.

The Wilderness Act and the Religious Freedom Restoration Act (42 U.S.C. 2000bb–2000bb-4) established the general legal authority for Congress to designate and for agencies to manage wilderness. MS-6340, Management of BLM Wilderness, includes Section 6340.19, Traditional Use by Native Americans, which states:

> "Many wilderness areas are, in whole or in part, also important locations for traditional uses by Native Americans, from areas important for the collection of natural materials, to places for traditional religious practice, and entire landscapes of cultural identity. Traditional uses in wilderness are managed in accordance with the Wilderness Act, the National Historic Preservation Act, the Archaeological Resources Protection Act, the American Indian Religious Freedom Act (AIRFA), the Religious Freedom Restoration Act (RFRA), the Native American Graves Protection and Repatriation Act (NAGPRA), Executive Order 13007—Indian Sacred Sites, the Department of the Interior Tribal Consultation Policy of December 2011, and BLM Manual 8120."

The following are some examples of how Native Americans exercise their rights in wilderness—

- Access to sacred sites important to their religion,
- Use and possession of sacred objects important to the exercise of religious rites and ceremonies, and
- Freedom to worship through ceremonies and traditional rites without government intrusion or interference.

The BLM allows Native American traditional practices that are consistent with preserving wilderness character, as well as uses guaranteed by treaty reserved rights which may impair wilderness character. In addition, the BLM must use the following guidelines in managing traditional uses in wilderness areas:

- Traditional uses and sacred locations can only be identified by Indian tribes or tribal representatives. The BLM must consult with designated representatives of appropriate federally recognized tribes to identify these uses and locations. If affected Indian tribes are reluctant to divulge this information, the BLM assumes that these sites and resources will be adequately protected if the area's wilderness character is preserved.

BLM_0026583

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-8

- Native Americans may have rights guaranteed by treaty to collect natural materials from a wilderness area for religious or subsistence purposes without additional authorization from the BLM.  In addition, under AIRFA and Religious Freedom Restoration Act, Native Americans may be permitted by the BLM to collect for religious purposes natural materials that are not allowed to be collected by other members of the public even though not explicitly guaranteed by treaty.

- In accessing a sacred site or collecting natural materials in wilderness, Native Americans generally may not use motor vehicles, motorized equipment, motorboats, mechanical transport, or land aircraft, unless the use of such prohibited tools is guaranteed by treaty or any special provisions in enabling legislation.  However, they could be authorized if an analysis of the "minimum tool" necessary indicates that the project or activity is necessary to meet the minimum requirements for the administration of the area and the tool or method used results in the least impact to the physical resource or wilderness values.

- In general, the BLM will not close a wilderness or portion of the wilderness for Native American traditional practices.  In rare instances, upon the request of an Indian tribe or Indian religious community, the BLM may temporarily close to the general public use of one or more specific portions of a wilderness area in order to protect the privacy of traditional cultural and religious activities in such areas by Native Americans.  Any such closure must affect the smallest practicable area for the minimum period necessary for such purposes.

b.   **Wilderness Study Areas**.  In addition to formally designated wilderness areas, FLPMA directed the Bureau to inventory and study its roadless areas for wilderness characteristics that often also contain culturally sensitive traditional use areas and sacred sites.  To be designated as a WSA, an area had to have the following characteristics—

- Size—roadless areas of at least 5,000 acres of public lands or of a manageable size;

- Naturalness—generally appears to have been affected primarily by the forces of nature; and

- Opportunities—provides outstanding opportunities for solitude or primitive and unconfined types of recreation.

In addition, WSAs often have special qualities such as ecological, geological, educational, historical, scientific and scenic values.

BLM_0026584

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

V-9

MS-6330, Management of Wilderness Study Areas, states that it is BLM's policy to "develop and maintain relationships with … tribal governments … regarding the stewardship of WSAs."

5.  **National Conservation Lands Science Program**.  The BLM's National Conservation Lands comprise a natural and cultural scientific laboratory that attracts scientists from around the world.  Indeed, several National Conservation Lands components have been designated by Congress or the President because of their varied scientific objects and values of interest.  Many of the scientific research projects in National Conservation Lands are conducted through partnerships with tribes as well as scientists and scientific organizations, including universities, government agencies, special-focus groups, and nongovernmental organizations.  (A copy of the 2007 *National Conservation Lands Science Strategy* can be found on the BLM website.)

BLM_0026585

## CHAPTER VI.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE FIRE MANAGEMENT PROGRAM

### A.  Introduction

BLM involves tribes at the strategic and program planning levels through tribal consultation on LUPs/RMPs and preseason program coordination meetings as well as at the tactical program-implementation level during fuels program implementation planning, community assistance, prevention, and incident management.  BLM uses compatible planning processes, funding mechanisms, training, qualification requirements, operational procedures, and public education programs for all fire management activities with other Federal agencies and tribes to the maximum extent possible.  BLM is committed to standardization of policies and procedures among Federal agencies and tribes.  Consistency of plans and operations provides a platform upon which Federal wildland fire management programs can cooperate across agency and government boundaries.

### B.  Legal Authorities for Tribal Consultation within the Fire Management Program

1.  **Reciprocal Fire Protection Act (1955) (42 U.S.C. 1856, 1856a)**.  Under this act, Federal agencies charged with the duty of providing fire protection for any property of the United States are authorized to enter into a reciprocal agreement with any fire organization maintaining fire protection facilities in the vicinity of such property for mutual aid in furnishing fire protection for such property and for other property for which such organization normally provides fire protection.

2.  **Federal Grant and Cooperative Agreement Act** (1977) (31 U.S.C. 6301–6308), **Economy Act** (1932) (31 U.S.C. 1535), and **Federal Land Policy and Management Act**.  These acts authorize the BLM to enter into contracts, agreements, and award grants.

3.  **Timber Protection Act** (1922) (16 U.S.C. 594).  This act authorizes the Secretary of Interior to "protect and preserve, from fire … timber owned by the United States upon the public lands … Indian reservations, or other lands under the jurisdiction of the Department of Interior."

4.  **Alaska Native Claims Settlement Act** (1971) (43 U.S.C. 1601–1624).  Section 1620(e) states:

    "Real property interests conveyed pursuant to this chapter to a Native individual, Native group, corporation organized under section 1613(h)(3) of this title, or Village or Regional Corporation shall continue to be regarded as public lands. . . . So long as there are no substantial revenues from such lands they shall continue to receive wildland fire protection services from the United States at no cost."

5.  **Departmental Manual 620, Wildland Fire Management, Chapter 2, General Policy and Procedures—Alaska** (620 DM 2).  Section 2.4 states:

BLM_0026586

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VI-2

"BLM will maintain and operate the Department of the Interior wildland fire suppression organization in Alaska with the primary intention of providing cost-effective suppression services and minimizing unnecessary duplication of suppression systems for Department of the Interior agencies.  BLM will also provide consistency in State and Native wildland fire relationships and provide statewide mobility of wildland fire resources.  BLM is authorized to provide safe, cost-effective emergency wildland fire suppression services in support of land, natural and cultural RMPs on Department of the Interior administered land and on those lands that require protection under the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1620(e)), herein after referred to as Native Land.  BLM will execute these services within the framework of approved fire management plans or within the mutually agreed upon standards established by the respective land managers/owners.

"Nothing herein relieves agency administrators in the Interior bureaus of the management responsibility and accountability for activities occurring on their respective lands.

"Wildland fire suppression and other fire management activities provided on Native Lands under the authority of the ANCSA, as amended (43 U.S.C. 1620(e)), will consider Native land managers on an equal basis with Federal land managers.

"Each bureau will continue to use its delegated authority for application of wildland fire management activities such as planning, education and prevention, use of prescribed fire, establishing emergency suppression strategies and setting emergency suppression priorities for the wildland fire suppression organization on respective bureau lands."

6. **Tribal Forest Protection Act** (2004) (25 U.S.C. 3115a).  This law authorizes the Secretary of Interior to give special consideration to tribally proposed stewardship contracting or other projects on BLM land bordering or adjacent to Indian trust land to protect the Indian trust resources from fire, disease, or other threat coming off of BLM land.

## C. Importance of LUP/RMP for Fire Planning and Coordination with Indian Tribes

The LUP (see Chapter IV, Guidance for Consultation in Planning and Decision Support) sets the objectives for the use and desired condition of the various public lands, including fire management objectives and the fire management program in the designated area.  Response to fires is guided by the strategies and objectives outlined in the RMP.

The BLM must consult with tribes during the LUP/RMP process and during development of programmatic emergency stabilization and burned area rehabilitation plans, hazardous fuels treatment projects, and fire management plans that implement decisions beyond those of the LUP/RMP.  BLM should seize the opportunity to consult with tribes early during the NEPA development process to adjust planning decisions to meet tribal needs of access, resource utilization, restoration of vegetation communities containing culturally important plants, and protection of sacred sites.

BLM_0026587

Case No. 1:20-cv-02484-MSK   Document 34-1   filed 04/27/21   USDC Colorado   pg 126 of 470

## D. Areas of Responsibility

The BLM has the legal authority to protect the lands under its management and administration from the adverse effects of wildfire. This can be done by the agency itself or through contracts and agreements with other protection organizations.

## E. Program Operation Standards

During initial action, all agencies (Federal, State, local, and tribal) accept each other's standards. Once jurisdiction is clearly established, then the standards of the agency(s) with jurisdiction prevail. Prior to the fire season, Federal agencies must meet with their State, local, and tribal agency partners to facilitate an understanding of the qualification/certification standards that will apply to the use of local non-Federal firefighters during initial action on fires on lands under the jurisdiction of a Federal agency. The National Wildfire Coordinating Group position standards (as identified in Product Management System (PMS) 310-1, Wildland Fire Qualification System Guide) are considered the industry standard and are essential for safe operations in the wildland fire environment. Failure to meet the standards would prohibit tribal firefighters from participation in off-reservation fire activities beyond initial attack.

## F. Cohesive Strategy

The 2009 Federal Land Assistance, Management and Enhancement (FLAME) Act (43 U.S.C. 1748a) directed the Departments of Agriculture and Interior to develop a cohesive wildland fire management strategy. The cohesive strategy takes a holistic view of fire on the landscape—across jurisdictions in an "all hands all lands" approach to create fire adapted communities, restore and maintain landscapes, and respond to wildfires. This approach supports an inclusive intergovernmental approach to "safely and effectively extinguish fire where allowable; manage our natural resources; and as a Nation, live with wildland fire."

## G. Partnerships with Tribes

Developing and updating agreements with tribes can clarify jurisdictional interrelationships and define roles and responsibilities among BLM and tribal fire protection entities. These agreements may be used to coordinate preparedness needs across the landscape and gain operational efficiencies to meet peak operational demands and achieve economic efficiencies in fuels management, preparedness, and prevention.

## H. Use of 638 Compacts or Self-Governance Contracts in the Fire Program

In the lower 48 States, the BIA, through treaties and Executive orders, has the responsibility to protect tribal lands that are held in trust or restricted status but not on intermingled fee lands (private land owned and intermingled with tribal trust and restricted fee lands) unless the BIA establishes MOU with local protection districts. Protection responsibility also includes allotted lands held by individual tribal members. Protection responsibility includes wildland fire management, wildfire suppression and external structure protection.

BLM_0026588

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VI-4

Because the BIA has responsibility to protect tribal lands in the lower 48 States, the use of 638 compacts or self-governance contracts for fire management by the BLM does not occur. However, for Native lands in Alaska, Secretarial Order 3077 (March 17, 1982) recognized the economic and operational benefits of continuing suppression responsibilities by the BLM for all Native Lands conveyed under ANCSA and DOI-managed lands including Native allotments. Therefore, Indian tribes in Alaska can compact or contract to implement fire program functions for Native lands for which the BLM otherwise would have responsibility.

For Native lands in Alaska there are three basic situations:

- BLM Management: The BLM manages and implements the entire wildfire program using primarily BLM employees.

- Contract Program: An individual tribe may contract for all or part of the program. They can either run the program themselves or contract with the private sector. (This is currently the case in Alaska where the Alaska Fire Service has entered into an annual funding agreement with local tribal entities to provide wildland fire training of emergency fire crews).

- Compact Program: A compact tribe accepts funding from the BLM to take full control of the program. The BLM withdraws its personnel leaving only a single BLM employee (either a superintendent or trust officer). In this case, the tribe only has to follow Federal law, but not necessarily BLM policies. The BIA retains the responsibility to sign delegations of authority to incident management teams.

# CHAPTER VII.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE FOREST AND WOODLANDS PROGRAM

## A. Overview

1. **Oregon and California Grant Lands and the Public Domain Forestry Programs.** The BLM manages almost 67 million acres of forest and woodlands, comprised of Oregon and California grant lands in western Oregon and public domain (PD) forest across the West.  The PD forest land covers over 32 million acres across the 13 Western States and over 33 million acres in Alaska.  The O&C Act directs the BLM to manage the 2.3 million acres of productive commercial timberlands for permanent forest production in conformance with the principle of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, contributing to the economic stability of local communities and industries, and providing recreational opportunities.  The FLPMA directs BLM to apply principles of multiple-use and a sustained yield of resources in the management of PD lands.  Management of the PD lands focuses on restoring forest health and improving wildlife habitat, reducing the risk of catastrophic wildfire, and providing a variety of special forest products including firewood to local communities.

2. **Use of Public Lands Forest Products by Tribes and Pueblos**.  Most traditional tribal lands or aboriginal territories inhabited by the many tribes were ceded to the United States through treaty and are now within public land boundaries.  Within these aboriginal or traditional territories, the tribal members were able to obtain resources needed to support their livelihoods and sustenance.

   A variety of forest products are important to tribes, including firewood for cooking, heating, and ceremonial use as well as nuts, berries, poles, and traditional vegetative materials for subsistence and ceremonial needs.  A number of tribal communities also have forest products businesses and may have an interest in saw timber or commercial firewood from public lands.  Tribal communities in many areas of the west rely on BLM forest products to sustain their traditions and meet their cultural needs.  For many, firewood is the primary source of heat and is used for cooking in many areas where propane, liquefied natural gas or other petroleum fuels are unavailable or cost prohibitive.  In the Eastern Navajo Chapters of New Mexico, for example, firewood is the primary source of heat for 90 percent of tribal members with 60 percent of this firewood being harvested primarily by permit from BLM lands.

   The BLM policy is to accommodate, to the greatest extent practicable, traditional use of public lands by Native Americans and to support traditional gathering of culturally important plants, timber, and forest products.  Additionally, economic development opportunities may exist involving forest products, including merchantable timber and biomass utilization.  For many tribal communities, access to forest products and involvement in forest planning efforts are important to maintaining traditional gathering and ceremonial use of cultural utilized plants, timber, and other forest products.

BLM_0026590

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VII-2

## B. Legal Authorities

1. **Sale of Timber and Vegetative Materials**.  Providing forest products to members of tribal communities is subject to existing statutes and regulations concerning disposal of forest products.  Authority to sell or otherwise dispose of forest and vegetative products, including timber, is found in the 1947 Materials Act (30 U.S.C. 601 et seq.); the current policy for the sale of vegetative resources is found at 43 CFR 5420.0-6.  This policy states that all timber or other vegetative resources to be sold or removed shall be appraised and in no case shall be sold at less than the appraised value.  In addition, 43 CFR 5462.2 prohibits cutting, removing, or otherwise damaging any timber, tree, or other vegetative resource except authorized by a forest product sale, contract, permit, or Federal law or regulation.

2. **Non-sale Disposal and Free Use With Permit**.  Current policies for the issuance of free-use permits for vegetative resources are found at 43 CFR 5500 and 5510, MS-5500, and in 43 CFR 8365.1-5.  The 1955 Multiple Surface Use Act (30 U.S.C. 611) gives the Secretary the ability to dispose of certain minerals and certain vegetative products, timber, and forest products without charge.  The law states that any Federal, State, or Territorial agency, unit, or subdivision, including municipalities, or any association or corporation not organized for profit, may take and remove, without charge, materials and resources subject to this act, for use other than for commercial or industrial purposes or resale.  However, limitations for Non-sale or Free-Use permits are specified by current Federal regulations:

   - Free-use permits must not be issued when the applicant owns or controls an adequate supply of timber or vegetative materials to meet their needs (43 CFR 5511.2-1).

   - Free-use permits must not be issued to individuals, outside of Alaska, except qualified mining claimants, and non-sale disposals must be for the applicants own use and may not be bartered or sold or used for commercial or industrial purposes or resale (43 CFR 5510.0-3(b)).

   - Free-use permits issued to a nonprofit association or corporation may not provide for the disposition of more than $100 worth of timber or other vegetative materials during any one calendar year (43 CFR 5511.307).

3. **Non-sale Disposal and Free Use—No Permit (free or otherwise)**.  No permit is required for the collection of limited amounts of vegetative products by members of the public in accordance with 43 CFR 8365.1-5.  Commonly available renewable resources such as flowers, berries, nuts, seeds, cones, and leaves may be collected for noncommercial uses.  This language could encompass a wide range of vegetative resources of concern to tribes.

BLM_0026591

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VII-3

4. **Tribal Forest Protection Act**.  Passed in response to wildfires crossing onto tribal lands from Federal lands, the act applies to national forest and BLM lands.  The statute allows tribes to submit a request to enter into contracts and agreements with the BLM to conduct projects aimed at reducing threats from Federal lands and protecting tribal forests.  The BLM must respond to a request within 120 days, either supporting and initiating the project, or denying the project with an explanation but offering a schedule of consultation with the Indian tribe for the purpose of developing a strategy for protecting the Indian forest land or rangeland of the Indian tribe and interests of the Indian tribe in Federal land.

Proposed projects under the Tribal Forest Protection Act entail work on Federal land that borders or is adjacent to tribal lands.  Activities include treatments to reduce fire danger and other threats to tribal forests and communities as well as other land restoration activities.  In entering into an agreement or contract under Public Law 108-278, including stewardship contracts, the BLM may give specific consideration in the procurement process to tribally related factors such as historical and cultural affiliation with the land, treaty rights, agency/tribal working relationships, landscape features, and others found in the act (see 25 USC 3115a, section 2(e)(2)A-H).  The Tribal Forest Protection Act is important particularly for BLM lands that abut reservation boundaries.  Developing an agreement or stewardship contract for managing forestlands in these areas is highly encouraged.

## C. Treaties and Forest Products

A variety of treaties exist with tribes located primarily in the northern Rockies and Pacific Northwest that not only established reservations for the exclusive use of the tribes, but also reserved their right to continue traditional activities in aboriginal territories beyond these reserved areas.   Some tribes or their members have retained rights to hunt, fish, and/or gather other resources on ceded lands, even if these lands are no longer within Indian Country.  A number of treaties and the ANILCA contain language reserving the right to hunt, fish, and conduct other traditional activities such as harvesting forest and vegetative products on lands off of the reservations.

Questions arise concerning the issue of whether valid treaty rights in a Senate-ratified statute supersede the Code of Federal Regulations concerning off-reservation lands.  For example, the treaty between the United States and the Bannock and Shoshone of the Fort Hall Reservation from 1900 states that "so long as any of the lands ceded … under this treaty remain part of the public domain, Indians belonging to the above mentioned tribes … shall have the right, without any charge therefore, to cut timber for their own use, but not for resale."  So, under the treaty, tribal members can cut timber, not just collect forest products, without having to pay.  On the one hand, the Federal regulations do not allow for free-use permits to be issued to individuals outside of Alaska.  On the other hand, the treaty is a law and thus carries greater legal weight than the regulations, given Federal Government's trust responsibility to recognize treaties and honor their exercise.  Secretarial Order 3335, *Reaffirmation of the Federal Trust Responsibility*, states that the trust responsibility can often be best achieved "through legislative authorization."  Future

BLM_0026592

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VII-4

legislative authorizations could address issues related to forest products sale and disposal. However, until then, offices and States will have to balance trust responsibility with compliance with applicable Federal regulations.

The Federal regulations guiding BLM decisions regarding the sale or non-sale disposal of forest products establish restrictions on the issuance of free-use permits. BLM state offices have the discretion to establish price guidelines for the sale of vegetative materials and forest products of interest to tribes that are not cost prohibitive. For example, willows used by a number of different tribes for basket weaving cannot be provided free of charge if they will be used for commercial purposes such as selling baskets and do require an appraisal based on market conditions. However, the commercial market may be limited for some products and the appraised value may be low. Another option for non-sale disposal of forest products is to develop stewardship projects with tribal communities. A number of legal instruments exist to allow partnerships with tribal entities such as financial assistance agreements, stewardship contracts, agreements and forest products sales, and service contracts. Executing stewardship contracting with interested tribes provides an alternative solution to the tribal treaty/forest products sale regulation conundrum.

**D. Stewardship Contracting**

Stewardship contracting authority, originally granted under the Appropriations Bill of 1999 (Pub. L. 105-277, section 347), and amended by the Omnibus Appropriations Bill of 2003 (Pub. L. 08-7, section 323), was permanently authorized by Section 8205 of the 2014 Agricultural Act (7 U.S.C. 8702) (i.e., Farm Bill). Using stewardship contracts and agreements can be effective in meeting the forest products needs of tribes and pueblos while developing economic development projects through collaborative forest management. The BLM's primary objective for its stewardship contracting program is to implement projects that increase the health and resiliency of both public lands and local communities. Stewardship often involves exchanging goods for services, where a partner conducts service work for the BLM and in return can acquire forest products for their use. Stewardship contracting provides the authority to utilize the value of forest products to offset the cost of service work within a single contract. If a tribe or pueblo has a forestry program and can provide or develop a forestry crew, stewardship contracting can be an important tool for both engaging tribal communities in public lands forest management as well as for economic development within the community.

Meeting local and rural community needs is a requirement of stewardship contracting and may be identified through collaboration. The level of collaboration should match the size, complexity, duration and level of public interest in the stewardship project. Existing collaborative relationships can be used, thus streamlining the collaborative process. Collaborative processes allow and provide opportunities for diverse interests and stakeholders to play an active and meaningful role in stewardship projects.

BLM_0026593

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VII-5

The primary objective of a stewardship contracting project is to achieve one or more of the land management goals that meet local and rural community needs. These goals as identified in the authorizing legislation, may include, but are not limited to—

- Road and trail maintenance or obliteration for improved water quality;
- Soil productivity, habitat for wildlife and fisheries, or other resource values;
- Setting prescribed fires to improve composition, structure, condition, and health of stands or to improve wildlife habitat;
- Removing vegetation or other activities to promote healthy forest stands, reduce fire hazards or achieve other land management objectives;
- Watershed restoration and maintenance;
- Restoration and maintenance of wildlife and fish habitat; and
- Control of noxious and exotic weeds and reestablishing native plant species.

Additional guidance can be found in End Results, Stewardship Project Guidance, Version 3. Establishment of Consultation Protocols through Agreements, Contracts, and Other Instruments of Collaboration

1. **Build a Relationship with Tribal Foresters and Natural Resource Staff**. Regular or annual meetings or workshops between BLM and tribal forestry staff could potentially be done at a regional level as well as a State or local level. Many tribal communities have tribal forestry programs either as a stand-alone agency or as part of a natural resources department under the tribal government or tribal corporation. Some tribal forestry programs have developed under 638 self-rule authority and may be located under a different department in the tribal organization (i.e., the Ramah Navajo Chapter Forestry Program is located under the chapter school board). With government-to-government consultation between tribal leaders and BLM line officers, ample opportunity exists for staff-to-staff consultation and collaboration between BLM foresters and their tribal counterparts.

2. **Meetings to Discuss Proposed Forest Management Projects.** Opportunities for collaboration can be initiated between BLM foresters and tribal entities staff. If there is sufficient interest or a number of outstanding issues to discuss, quarterly forest management coordination meetings may be scheduled. Make sure to check the cultural calendar with the tribal communities to avoid conflict with feasts, festivals or other cultural events. An MOU may be useful to create a more structured process for consulting on forest management issues.

3. **Agreements**. Although not used to transfer funds or pay for service work, an MOU can describe the process for meeting with tribal forestry officials on a regular basis. For example, the MOU can state the BLM will schedule meetings, transmit a proposed agenda, and circulate resulting meeting notes within certain timeframes. An MOU can

BLM_0026594

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VII-6

also have a list of projects, issues, or ongoing opportunities for consultation, and the list should be regularly updated.  For example, an MOU between the BLM and tribal community could describe a process for setting regular meetings to discuss ongoing issues such as access to forest products, protection for ceremonial use vegetation collection areas, and opportunities for economic development such as developing a stewardship agreement.

Developing an MOU also gives a chance for the BLM staff to work with their tribal counterparts and offers a glimpse into their internal process.  For collaborative forest restoration and management activities, BLM staff may need other instruments that allow for the transfer of funds such as financial assistance agreements, service contracts, or intergovernmental agreements.

BLM_0026595

# CHAPTER VIII.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE RANGELAND MANAGEMENT PROGRAM

## A.  Introduction

This chapter explains how managers and staff carry out tribal consultation and coordination when conducting land health evaluations, developing allotment or grazing management plans, modifying permitted livestock grazing use, and planning range improvements and vegetation treatments.  Consultation is part of program implementation and management and thus supported by appropriate rangeland subactivities.  The BLM must notify relevant tribal contacts when identifying the watersheds, allotment, or permits that are subject to grazing management review.  Appropriate notification is described in Chapter III of this handbook.

## B.  Consulting During Monitoring and Evaluation Processes

Range health monitoring processes can include establishing monitoring sites and identifying data collection methods, both quantitative and qualitative.  Tribes may be interested in collecting or contributing data that informs the evaluation process.  Therefore, BLM should provide opportunities for tribes to be involved in developing a monitoring plan for grazing allotments or watersheds.  Such monitoring plans should include a list of resource objectives, the methods for data collection, the sites where data will be collected, and the responsible parties for collecting the data.  The BLM also should notify relevant tribes of the areas where evaluation reports, including land health evaluations, are planned each year and provide the tribe an opportunity to review, comment, and give input during preparation of particular reports in areas of interest to the tribe.

## C.  Consulting During Grazing Permit Renewal and Other Vegetation Management Activities

The BLM should notify tribal contacts when initiating NEPA processes for range improvements, vegetation treatments, and grazing management.  The BLM should provide tribes an opportunity to participate in the development of allotment management plans (or their equivalent) and other alternatives for analysis in NEPA documents.  Individual tribal members that have a grazing permit or lease should be consulted as a permittee, separately from tribal consultation unless the tribe designates that member to represent them.  The BLM should identify the appropriate tribes at the beginning of each year which areas are expected to be addressed, either through permit renewal or management changes necessary to address grazing management or land health issues.

The BLM should notify tribes when it is planning range improvement structures or vegetation treatments.  Changes in the physical environment as well as timing of the activity involved have potential to affect the properties of religious or cultural sites and activities.  Tribes may also identify seed sources or species that can be planted/seeded to restore cultural uses.

BLM_0026596

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

VIII-2

**D.  How Types of Projects Requiring Tribal Consultation Are Defined**

Individual BLM protocols, authorized under the BLM's national Programmatic Agreement (PA)(see Chapter X), may specify which types of range projects do and do not require tribal consultation under the NHPA.  For example, in Wyoming, no consultation with the SHPO or tribes is required for grazing lease renewals and transfers in which the type and numbers of animals and seasons of use do not change.  In addition, states may not need to consult with tribes or their SHPOs for small range improvements that have minimal potential to affect heritage resources, such as short fence lines, small stock ponds, or the placement of a stock tank.

It may be cumbersome to the tribes and the BLM to consult in all cases, especially where scattered BLM lands and areas with extensive split estate contain numerous, small, and discontinuous grazing leases.  BLM offices should consult with tribes to define which types of projects tribes wish to consult on under NEPA and NHPA.

BLM_0026597

Case No. 1:20-cv-02484-MSK   Document 34-1   filed 04/27/21   USDC Colorado   pg 136 of 470

## CHAPTER IX.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE FISH AND WILDLIFE PROGRAM

### A.  Introduction

The BLM and Indian tribes have a common goal of conserving fish and wildlife species, their habitats, and the ecosystems upon which they depend.  A number of tribes retained off-reservation treaty or other reserved rights which have a large focus on hunting and usual and accustomed fishing locations.  Therefore, the health of habitats on public lands that support culturally sensitive species are critically important.  As a result, tribes often manage and influence some of the most important fish and wildlife habitats both on and off reservations. Subsequently, the Federal Government and the BLM have distinct and unique obligations as well as common interests with tribes to effectively manage and make best decisions toward our shared resources and trust responsibilities.

### B.  Collaborative Conservation Approach

While the major components of this handbook are aimed at cultivating and maintaining effective partnerships between the BLM and Indian tribal governments, a prominent common goal is to effect long-term conservation of fish and wildlife resources.  Tribes and the BLM share a common goal of ensuring responsible and sustainable management of natural resources and ecosystems, maintaining healthy populations of plant and animal species, and protecting sensitive species.  (Commitments to conserve priority habitats for the greater sage-grouse documented within the Records of Decision and approved RMP amendments for both the Great Basin and Rocky Mountain Regions released in September of 2015 are recent examples of successful collaborative conservation between federal agencies, states, and tribes).

Tribes have authority for self-government, including the management of fish and wildlife resources within the boundaries of reservations.  Tribes usually have the most intimate knowledge of species locations, population health, and management requirements for species occurring on tribal lands.  Tribal fish and game departments may also regulate off-reservation treaty rights to hunt by issuing tribal members off-reservation hunting permits (the Shoshone Bannock Tribes for example).  The BLM also recognizes that Tribal management of fish, wildlife, plants, and other natural resources, while in accordance with many of the same principles as Federal management of these resources, is at times guided by different goals and concerns than those of the BLM.  Efforts should be made to obtain and incorporate tribal natural resources development plans into BLM integrated resource management strategies that protect fish and wildlife and other natural resources.

BLM should acknowledge that the tribes will usually be the primary managers of fish and wildlife resources on tribal lands and will maintain and hold records concerning fish and wildlife species and management. BLM should also recognize that tribes may have specific, relevant understanding of natural resources within their purview based on traditional knowledge accumulated over a long period of time. Information collected by a tribe is not subject to Federal Freedom of Information Act requests, provided that the information was collected using tribal

BLM_0026598

funds and is maintained with the tribe.  In cases where tribal proprietary or confidential cultural or religious information is not compromised, BLM should request that tribes share this information with the BLM.  The BLM has a trust responsibility to assist the tribe in caring for fish, wildlife, plants, and their habitats, and the BLM has much expertise in the area of fish and wildlife habitat management.  While tribes may be able to contribute important traditional ecological knowledge to the BLM, the BLM can provide valuable and important technical assistance to tribes who seek means to manage fish and wildlife for conservation and sustainable use.  These can include candidate, proposed, listed, and non-status species.

## C.  Subsistence Management

When BLM field offices prepare habitat management plans or improvement projects, they must consult with Indian tribes and ensure, to the extent possible, that proposed BLM activities and conservation measures will not hinder the gathering of plants or the tribal taking of fish at usual and accustomed locations where specifically reserved by treaty or impede other reserved rights and traditional uses involving wildlife on public lands.  Tribal concerns should also be considered when developing management and recovery plans for species valued for nonsubsistence reasons.

Title VIII of the ANILCA created a Federal responsibility to manage fish and wildlife resources needed for subsistence on Federal public lands for certain rural Alaska residents, including Native Americans.  As part of the Federal Subsistence Board, the BLM is uniquely responsible for the cooperative management of subsistence resources and uses on BLM lands in Alaska, including fresh waters that run in or are adjacent to BLM lands.

## D.  Endangered Species and Management of Critical Habitat

On June 5, 1997, the Secretaries of the Interior and Commerce jointly issued Secretarial Order 3206, American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act.  This order not only addressed consultation requirements specific to the Endangered Species Act, but also provided guidance and direction about the department-wide Federal-tribal relationship and its relationship to tribal reserved rights, and clarified agency trust responsibilities.  The order provided a policy framework for establishing and maintaining effective working relationships and mutual partnerships to promote the conservation of fish and wildlife species and the health of ecosystems on which they depend.  The Secretarial order directs that responsibilities under the Endangered Species Act be carried out in a manner that harmonizes trust responsibilities, tribal limited sovereignty, and statutory missions such that tribes do not bear a disproportionate burden for the conservation of listed species.

Secretarial Order 3206 directed all bureau and agencies within the DOI to:

- Work directly with and seek to establish effective government-to-government working relationships with tribes to promote and protect the health of ecosystems.  Tribes are to be afforded adequate opportunities to participate in data collection, consensus seeking, and associated processes.

BLM_0026599

- Recognize that tribal lands are not subject to the same controls as Federal public lands.

- Take affirmative steps to assist tribes in developing and expanding tribal programs that promote the health of ecosystems upon which sensitive species depend, including cooperative identification of appropriate management measures to address concerns for such species and their habitats.

- Offer and provide scientific and technical assistance and information as may be available for the development of tribal conservation and management plans to promote maintenance, restoration, enhancement, and health of ecosystems.

- Recognize that Indian tribes are appropriate governmental entities to manage their lands and tribal trust resources and give deference to tribal conservation and management plans for tribal trust resources that adequately address BLM's conservation needs for fish and wildlife species. Government-to-government consultations should be conducted to discuss the extent to which BLM and tribal RMPs commonly incorporate actions that address the conservation needs of listed species.

- Be sensitive to Indian culture, religion, and spirituality and adequately take into consideration the impacts of BLM actions and policies regarding tribal use of fish and wildlife species for cultural and religious purposes.

- Recognize the need for and make available information related to tribal fish and wildlife resources, facilitate the mutual exchange of information and strive to protect sensitive tribal information from disclosure. Effort should be made to promptly notify and consult with affected tribes regarding all requests for tribal information.

## E. Disruption and Removal of Animal Parts

The U.S. Fish and Wildlife Service is delegated custodial process responsibility for processing and distributing certain animal parts, such as eagle feathers, for recognized religious, ceremonial, and cultural purposes in accordance with Federal laws. BLM offices must coordinate with the appropriate U.S. Fish and Wildlife Service office regarding animal part availability and the need to conduct required scientific and law enforcement investigations. In addition, fish and wildlife animals or body parts should not be relocated or removed from any Tribal land except by explicit prior written authorization from the tribe. This also includes handling or distributing animal parts from areas where there are found.

## F. Confidential Biological Information

The tribe has authority to manage access to and to safeguard information about tribal lands, resources, and ecosystems, and their associated flora and fauna. Information obtained from tribal governments and information generated by the BLM through technical assistance to tribal governments must not be shared or released without the tribe's consent or as required by law. It is ideal and desirable for both tribes and the BLM to establish a protocol to facilitate sharing of information while ensuring that tribal proprietary, commercial, and other confidential

BLM_0026600

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IX-4

information is protected.  There are several types of confidential biological information, as detailed below.

1.  **Traditional Ecological Knowledge**.  This term is used to describe the knowledge held by indigenous cultures about their immediate environment and the cultural practices that build on that knowledge.  Traditional ecological knowledge can include an intimate and detailed knowledge of plants, animals, and natural phenomena; the development and use of appropriate technologies for hunting, fishing, trapping, agriculture, and forestry; and a holistic knowledge.

2.  **Confidential Tribal Information**.  Confidential Tribal Information means all information that is religious, cultural, ceremonial, proprietary, financial, technical, commercial, privileged, sensitive, or confidential in nature or content or that relates to natural resources, heritage resources, or resource management practices of the tribe. Information can mean any verbal, visual, pictorial, specimen, graphic, electronically stored, printed, recorded, or written material acquired from the tribe or other person or entity or obtained in any other way.  Confidential Tribal information should not be used in any way that is detrimental to or that could result in a competitive disadvantage to the tribe.  The BLM should provide an opportunity for the tribe to review and consult on drafts of any documents (e.g., biological opinions) containing confidential tribal fish and wildlife information prior to its disclosure or completion as a final document.

Examples of potentially confidential biological information—

- Biological reports, summaries, data, maps, photographs;

- Lists of species occurring on tribal lands;

- Habitat or ecosystem conditions on tribal lands;

- Water quality, quantity, and inventories of the tribe's water resources, including surface water and groundwater;

- Commercial activities of the tribe;

- Natural resource management practices or plans of the tribe;

- Location and nature of fish and wildlife sites of cultural significance to the tribe; and

- Biological information gathered on tribal lands.

## G.  Land Access and Cross-Boundary Field Activities

The BLM should access tribal lands to collect biological and habitat information only upon written authorization by the tribe and should be accompanied by an authorized representative designated by the tribe.  The tribes and the BLM should each designate a primary contact person to coordinate any authorized field activities and information requests.

BLM HANDBOOK                                             Rel. No. 1-1781
Supersedes Rel. 8-75                                     12/15/16

BLM_0026601

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

IX-5

## H.  Law Enforcement

A federally recognized Indian tribe has the inherent authority to develop codes and regulations to protect natural resources on its tribal lands.  Tribes also have authority to develop and enter into agreements with other agencies and entities in order to promote, protect, enhance, and pursue effective management of its natural resources.  It may be appropriate for a tribe and the BLM to enter into a memorandum of agreement (MOA) for law enforcement to discuss and enforce enumerated Federal laws that address the protection and conservation of fish, wildlife and natural resources within the respective jurisdiction.

BLM_0026602

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-1

## CHAPTER X.  GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE CULTURAL HERITAGE PROGRAM

### A.  Introduction

This chapter explains how BLM managers and staff can carry out tribal consultation in accordance with legal requirements contained within historic preservation, archaeological resource protection, and related heritage resource authorities.

### B.  Consulting Under Heritage Resources Authorities

Since passage of several bills by Congress protecting selected Native American sites in the American Southwest in the late 19th century, the legislative and executive branches of government have passed or issued a number of laws and Executive and Secretarial orders addressing Native American cultural heritage issues.  They have steadily increased Federal agency responsibilities, including the BLM's, for taking into account Native American concerns in their decision-making processes and management goals.  Several general authorities were addressed in Chapter IV, Guidance for Tribal Consultation in Planning and Decision Support. This chapter describes three statutes and their regulations that more specifically address cultural heritage issues and the interaction of these authorities with those described elsewhere in this handbook.  Line officers with the assistance of heritage resource specialists must give tribal concerns full consideration according to the legal requirements.

1. **National Historic Preservation Act**.  Requirements for tribal consultation come from Sections 106 and 101(d)(6) of this law (54 U.S.C. 306108 and 54 U.S.C. 302706).

| Consultation for NHPA Section 106 Purposes | |
| --- | --- |
| **BLM consults with—** | **Purpose of consultation is—** |
| Elected officials or Tribal representative(s) whom the tribal government has designated for this purpose | • To identify tribally significant religious or cultural properties that may be eligible for the National Register of Historic Places |
| | • To understand tribal concerns sufficiently to take into account the effects that a proposed Federal undertaking might have on National Register eligible properties |

**Figure X-1     Tribal consultation for purposes of Section 106 of the National Historic Preservation Act.**

Generally speaking, the purpose of consulting with tribes under the NHPA during land use and project planning is to call for meaningful tribal participation in BLM's efforts to—

- Identify places of traditional cultural or religious importance and other tribally valued historic resource sites and locations,

BLM_0026603

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-2

- Evaluate the significance of those places in relation to the NRHP criteria,

- Assess potential effects on places of traditional cultural or religious importance from any pending land use planning decision or undertaking, and

- Determine appropriate mitigation measures to avoid or reduce adverse effects of planned special designations, land use allocations, and management prescriptions.

Section 106 of the NHPA requires Federal agencies to identify and consider potential effects that their undertakings might have on significant historic properties.  Specific provisions to consult with Indian tribes during Section 106 compliance were added to the act through amendments in 1992.  The NHPA requires the BLM to identify the area of potential effects associated with a federal undertaking, which in some circumstances may extend beyond federal land.  For example, a transmission right-of-way application that proposes to use public land and non-federal land and the BLM has determined that it has sufficient control and responsibility over the proposal to federalize review of the entire project.  In such circumstances, the BLM's obligation under NHPA to consider the potential effects on historic properties would cover the entire project and would include an obligation to consult with Indian tribes about potential effects on places of traditional or religious importance.  The BLM should contact the Solicitor's Office if there are any questions regarding whether the BLM must review an entire project that occurs on public land and non-public land, or more generally, if there are questions regarding the extent of the BLM's review under the NHPA for a proposed federal undertaking.

---

**54 U.S.C. 302706 of the National Historic Preservation Act**

- Specifies that the traditional or historical importance an Indian tribe attaches to a particular place may make the place eligible* for the National Register of Historic Places (i.e., a "historic property" that is significant for purposes of the act); and

- Directs agencies carrying out Section 106 compliance to consult with any Indian tribe whose tradition or history may contribute to the National Register eligibility* of a potentially affected property.

---

\* National Register eligibility is determined by evaluating a candidate property's characteristics against the National Register criteria at 36 CFR 60.4. See BLM MS-8110.  No property type enjoys categorical eligibility.

**Figure X-2     Provisions of 54 U.S.C. 302706 of the National Historic Preservation Act.**

Tribal consultation under the NHPA must be conducted on a government-to-government, basis, so it should start with the chief executive of the tribe.  In practice, tribes may designate tribal staff members to communicate with BLM for this purpose.  However, the BLM's first contact, usually in the form of a letter, should be addressed to the chief

BLM_0026604

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-3

executive of the tribal government.  Additional tribal staff to be contacted is often determined by formal or informal agreements between the tribe and the BLM.

In some cases, the BLM's proposed or approved actions may occur on or affect historic properties on tribal lands.  When that occurs, consultation must also include the THPO if the tribe has such an official approved by the NPS in accordance with Chapter 3027 of the NHPA, 54 U.S.C. 302702, to carry out Section 106 responsibilities on tribal lands.  In these cases, consultation with tribes regarding determinations of eligibility, effect, and treatment must be carried out as specified at 36 CFR 800, rather than state protocols executed under the BLM's National PA.

a.  **Traditional Cultural Properties and Eligibility**.  The NHPA and its implementing regulations (36 CFR 800) refer to "properties of traditional religious and cultural importance."  These are places that are prominent in a particular group's cultural practices, beliefs, or values, when those practices, beliefs, or values—

- Are widely shared within the group,

- Have been passed down through the generations, and

- Have served a recognized role in maintaining the group's cultural identity for at least 50 years.

The term "traditional cultural property" (TCP) is also used in reference to such valued places, but it is not found in law or regulation.  It is a term introduced in an NPS guidance document, National Register Bulletin 38, Guidelines for Evaluating and Documenting Traditional Cultural Properties.  For tribes, TCPs have come to be widely used as synonymous with the phrase "properties of traditional religious and cultural importance."  For that reason, the two terms may be considered synonymous within this handbook.

Places of traditional religious or cultural importance to tribes may be archaeological sites (such as burials, rock art, eagle catching pits, stone effigies, kivas, shrines, and so on) but often are not.  The traditional importance an Indian tribe ascribes to a place may make that place eligible for the National Register even if the place has no archaeological artifacts or features.

Examples of TCPs that are listed within the NRHP for their association with Native Americans:

*Kuchamaa* (Tecate Peak), California.  A sacred mountain associated with the Kumeyaay Indians.  The peak marks a significant location for the acquisition of knowledge and power by shamans and remains a site of important rituals and rites.

*Bassett Grove Ceremonial* Grounds, Oklahoma.  The grounds are the location of special ceremonies conducted by the Seneca and Cayuga Indians since 1832 and

BLM_0026605

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-4

reflect an intimate association between valued traditional practices and a single distinct location.

The BLM cannot know if a tribe ascribes traditional or cultural importance to a place unless it asks the tribe.  These kinds of values are normally not articulated by archaeologists preparing inventory reports.  Most BLM archaeologists are trained to identify and evaluate the scientific values of cultural properties, but identifying and evaluating the traditional religious or cultural values of a place requires consultation with the people or community who holds those values.

In consulting with tribes, four kinds of places may emerge as TCPs—

- Places that are still used and important to tribes,

- Places that are no longer used but are still remembered and are important to the tribe,

- Places that are lost from memory but are later discovered in the field and identified as important places that are described in the tribes' oral histories, and

- Places that are lost from memory but are later discovered in the field and identified as important to the tribe even though they are not described in the tribes' oral histories.

The third and fourth type of TCPs may be considered problematic since they were not previously known to the tribal community.  In consultations with tribes, do not allow the label of TCP to become a contentious issue.  The regulations at 36 CFR 800.4(c)(1) state that, "The agency official shall acknowledge that Indian tribes...possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them."  Thus, tribal consultation is essential for determining the eligibility of TCPs.  With deference to tribal views regarding these properties, the focus of consultation must be on gathering information to determine the spatial extent of the property to the extent feasible, the character-defining features, and how it can best be managed to avoid or mitigate adverse effects that may result from the proposed undertaking.

Eligibility for the NRHP is a determination based on application of the NRHP criteria (36 CFR 60.4).  Only those places that fulfill one or more of the NRHP criteria may be found eligible through consultation or nomination.  No type of property is automatically, categorically eligible, including TCPs.  All candidate NRHP-eligible properties must be evaluated against the criteria.  Those that do not meet the eligibility standard are not subject to compliance with Section 106 of the NHPA.  The BLM may still need to consider the impacts from the federal action on such resource even though it is ineligible, e.g., under NEPA.

BLM_0026606

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-5

**BLM-Specific Section 106 Compliance Procedures**. In February 2012, the BLM Director, Chairman of the ACHP, and President of the National Conference of State Historic Preservation Officers approved an updated "Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which the BLM Will Meet Its Responsibilities Under the National Historic Preservation Act." See MS 8100, Appendix 2. This PA provides an alternative approach for BLM's compliance with the requirements of the Section 106 process, including reliance on its own cultural heritage program policies and procedures as found in the BLM 8100-series manuals and handbooks.

As part of implementing the PA, individual BLM state directors and SHPOs may execute state-specific protocols that guide how they interact, exchange information, and complement one another's capabilities. These two party protocols are executed in consultation with tribes and other interested parties. Procedures agreed to within individual state BLM-SHPO protocols may streamline and expedite the Section 106 consultation process. (Tribal consultation obligations required by 36 CFR 800 remain in effect unless a BLM state negotiates and executes an agreement with a tribe that tailors tribal consultation procedures in a manner acceptable to both parties). In addition, the PA requires that state directors improve BLM-tribal relations by meeting with tribes to find ways to improve communication, including the opportunity to develop consultation procedures tailored to the needs of the individual BLM field office and specific tribe or tribes.

The principles of the national PA and BLM-SHPO protocols, and the procedural details in the BLM 8100 series manuals and handbooks effectively replace the ACHP's regulations (36 CFR 800) and associated guidance for routine compliance activities, except when they occur on tribal lands. For any decision occurring on tribal land and for more complex cases, the national PA or BLM-SHPO protocol would not apply and instead BLM must follow the provisions of the 36 CFR 800 process or other alternative procedures under 36 CFR 800.14 that may be applicable.

b. **"Indian Tribe" is Specified in the Act**. 54 U.S.C. 302701 states the purpose "to assist Indian tribes in preserving their particular historic properties." 54 U.S.C. 302706 directs agencies to weigh NRHP eligibility for properties important to an Indian tribe, and to consult with the Indian tribe in regard to properties found eligible. BLM is also obligated to consult with tribes regarding heritage resources even when sites or use areas are not found eligible to the NRHP.

"(A) Properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register.

BLM_0026607

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-6

> "(B) In carrying out its responsibilities under section 106 of this Act, a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to properties described in subparagraph (A)."

The NHPA is silent on coordination with non-recognized Indian groups and non-recognized Alaska Native entities regarding properties of religious and cultural importance and Section 106. These groups would be addressed under NEPA and other authorities.

**Consolidating Consultation Efforts.** Under 54 U.S.C. 302706 and 54 U.S.C. 306102, tribal consultation may be appropriate when archaeological data recovery is being considered to mitigate adverse effects on a property's scientific importance, to determine if the property also has ascribed religious and cultural significance. Where appropriate, such consultation opportunities may be used to meet the separate consultation requirements of 43 CFR 7.7 of the 1979 Archaeological Resources Protection Act (16 U.S.C. 470aa–470mm) and NAGPRA Section 3(c) as well as those of 54 U.S.C. 302101-302108; 302301-302304; 302501-302505; 302701-302706; 302902-302909; 306101; and 303902-303903 and 54 U.S.C. 306101-306114.

However, the BLM must be careful to keep the distinct legal purposes of these Acts separate, so as to eliminate any confusion for the various participants and those tracking agency compliance. Losing focus on the requirements of individual laws and their reasons for obtaining the Indian tribal input can result in omissions, mistakes, inappropriate expectations on the part of Indian tribes, and inadvertent noncompliance on the BLM's part.

2. **Archaeological Resources Protection Act.** The ARPA provides for the protection and management of archaeological resources through the approval of permits for their excavation or collection and the imposition of civil and criminal penalties. Tribal consultation requirements under ARPA derive from sections 4(c) and 10. Section 4(c) requires the responsible Federal land manager to notify the appropriate Indian tribe before approving a heritage resource use permit (see MS-8150) for the excavation or collection of archaeological resources (see 43 CFR 7.3), if the Federal land manager determines that a location with cultural or religious importance to the tribe may be harmed or destroyed by the permitted activity.

BLM_0026608

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-7

---

| **Section 4 of the Archaeological Resources Protection Act** |
|---|
| • Requires the Federal land manager, before issuing a permit to excavate or remove archaeological resources from public land, to notify* the affected Indian tribe when a location having cultural or religious importance to the tribe may be harmed or destroyed by the permitted activity. |
| • Requires Federal land managers to include in the permit any terms and conditions deemed necessary to carry out the purposes of the act. Section 10 links ARPA's implementation and the purposes of the American Indian Religious Freedom Act. |
| ------------ |
| * Uniform regulations at 43 CFR 7.7 recognize that notification logically leads to consultation if the tribe so requests, and require that any terms and conditions agreed to through consultation will be included in the permit. |

**Figure X-3      Provisions of Section 4 of the Archaeological Resources Protection Act.**

a.   **Section 4(c)**.  The exact wording of Section 4(c) of ARPA is:

"If a permit issued under this section may result in harm to, or destruction of, *any religious or cultural site,* as determined by the Federal land manager, before issuing such permit, the Federal land manager shall notify any Indian tribe which may consider the *site* as *having religious or cultural importance*.  Such notice shall not be deemed a disclosure to the public for purposes of Section 9" (16 U.S.C. 470cc(c); emphasis added).

The statutory term *site* in the phrase "religious or cultural site" does not mean the same as the word *site* in the discipline of archaeology, and should instead be understood to refer to a *place* or a *location,* whether archaeological in nature or not. The ARPA regulations provide, for example, that a "Federal land manager may enter into agreement with any Indian tribe . . . for determining *locations* for which such tribe . . . wishes to receive notice under this section" 43 CFR 7.7(b)(3), (emphasis added).

Considerations regarding the term *site* within an ARPA context:

(1) A site having religious or cultural importance is probably at least as likely to occur in the absence of archaeological resources as in their presence.  If the Federal land manager were to notify tribes only with respect to archaeological resources, a location's religious or cultural importance could go unheeded, and inadvertent harm or destruction could occur and the BLM's notification requirement would be unfulfilled.

(2) "Having religious or cultural importance" is an AIRFA concept, not an archaeological resource one.  The phrase came into the 1979 ARPA bill after a hearing where testimony was given by advocates for Indian religious freedom and

BLM_0026609

traditional religious practitioners, shortly after the American Indian Religious Freedom Act of 1978 became law. The language in ARPA Section 10(a), requiring the rule makers to consider AIRFA when drafting uniform implementing regulations, was included in the ARPA bill at the same time. It reads, "Such rules and regulations may be promulgated only after consideration of the provisions of the American Indian Religious Freedom Act (92 Stat. 469; 42 U.S.C. 1996)." The purpose of AIRFA is to ensure access to religious sites and freedom to worship through ceremonials and traditional rites, unhindered by Federal infringement, restriction, or intrusion.

(3) When implementing Section 4(c), the focus of notification and consultation should not be just the archaeological resources that are the subject of a permit application. Rather, BLM should consider the location, nature, scale, and timing of permitted activities that would occur under the permit (e.g., presence of work crews, surface disturbance) relative to places on the landscape that members of an Indian tribe are known, through consultation, to regard as important for their traditional cultural and religious observances. Although excavations may normally be considered a CX under NEPA, the BLM must still consult with Indian tribes under ARPA when the field manager concludes that proposed activities might result in harm or destruction to religious or cultural sites or traditional cultural or religious practices that occur there.

(a) **Would permitted activities in the area, at the time proposed, hinder or intrude on legally (AIRFA) protected religious use**? If the Federal land manager is confident, based on previous consultation, that permitted activities would not hinder such use, there would be no reason to notify an Indian tribe before processing an ARPA permit application.

(b) **Would permitted activities in a specific place, including an archaeological site, raise cultural concerns**? For example, a ruin that an applicant has selected for excavation might be recognized in cultural tradition as a venerable ancestral home, or an archaeological site might contain features that are always considered important for cultural or religious reasons. Those kinds of concerns should influence the BLM decision about issuing a permit for excavating and/or removing archaeological resources. When the BLM notifies and consults tribes under ARPA, the focus should not be restricted to the archaeological resources identified in the permit application. The BLM also should consider the: (1) location, (2) nature, (3) scale, and (4) timing of the activities that would occur under the permit.

(c) **Also, a tribe might have concerns about the potential for disturbing human remains and funerary objects**. This would be subject to consultation under NAGPRA. The BLM must take reasonable steps to determine whether a planned activity may result in the excavation of Native American human remains and/or cultural items, and notify and consult with

BLM_0026610

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-9

Indian tribes prior to approving permits for such activities. (See 43 CFR 10.3 regarding consultation for intentional excavations.)

| Consultation for ARPA 4(c) Purposes | |
|---|---|
| **BLM consults with—** | **Purpose of consultation is—** |
| Tribal representative(s) whom the tribal government has designated for this purpose | • To consider tribal religious or cultural locations on public lands, which archaeological activities, if permitted, could harm or destroy |
| | • To consider protective terms and conditions that could be put into a permit to protect tribal religious or cultural locations from harm or destruction |

**Figure X-4**     **Tribal consultation for purposes of Section 4(c) of the Archaeological Resources Protection Act.**

b.  **Consultation Procedures.**  In general, only permits for major testing programs, excavation, or collection require tribal notification and consultation before being issued.  (See ARPA Section 4 and 43 CFR 7.7.)  The Federal land manager determines, based on information obtained from Indian tribes, whether proposed archaeological activities on public lands (such as specific instances of testing or excavation) could harm or destroy places of tribal religious or cultural importance, such as places where members of a tribe conduct cultural activities and religious observances.  Because of their nature, scale, or timing, most inventory and minor testing proposals have little potential to permanently harm or destroy such places and will not warrant notification.

When the responsible BLM manager determines that tribal notification is necessary before processing an ARPA permit application, the BLM should notify the appropriate tribe(s) by mail, with return receipt requested.  The notification letter should—

- Describe the location and nature of the proposed archaeological work,

- Identify the harmful or destructive effects the proposed work might have on known places of religious or cultural importance,

- Offer to consult with the tribe regarding the proposed work,

- State that any request for consultation must be received by the BLM within 30 days from the date the tribe received the notification letter,

- Cite ARPA Section 4(c) and 43 CFR 7.7(a) as the basis for notification, and

BLM_0026611

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

- Cite NAGPRA Section 3(c) if the proposed work would involve intentional excavation of human remains, funerary objects, sacred objects, or objects of cultural patrimony

If the tribe asks to consult after receiving the notification letter, then the consultation should be undertaken expeditiously, consistent with the procedural requirements and timeframes contained in 43 CFR 7.7(a)(3), MS-8150, and Chapter III of this handbook.  When permit-related consultation is taking place, it is appropriate to use the opportunity to consult prospectively with regard to NAGPRA to develop procedures to be followed in case human remains or cultural items are discovered.

c. **Decision and Documentation**.  Based on the results of consultation and in conformance with 305 DM 3 (see below), the BLM must consider whether to modify the proposed work to accommodate the tribe's concerns or even deny the permit altogether.  The Federal land manager must determine the nature, location, and timing of field excavation as well as analysis methods that will be authorized in the permit.  A standard for boundary evidence certificate of land boundary locations and land status must be obtained by cadastral staff when authorized work is contemplated within one-quarter mile of a boundary.  When decisions about field work and laboratory analyses do not conform to the requests of Indian tribes, the manager must document the reasons in the permit file and notify the tribes of the outcome and its basis.

(1) **Conformance with DOI policy on integrity of scientific and scholarly activities**.  On December 16, 2014, the Department issued 305 DM 3 on Integrity of Scientific and Scholarly Activities.  The policy and requirements apply to all DOI employees when they engage in, supervise, manage, or influence scientific activities.  DOI policy states that: "Science and scholarship play a vital role in the Department's mission, providing one of several critical inputs to decisionmaking on conservation and responsible development of natural resources, preservation of heritage resources, and responsibilities to tribal communities."  The manual establishes a number of policy statements, including that the DOI will:

- Support a culture of scientific integrity;

- Recognize the importance of scientific information, science, and scholarship as methods for maintaining and enhancing the effectiveness and establishing credibility and value with all sectors of the public;

- Preserve the integrity of scientific activities it conducts and activities that are conducted on its behalf;

- Facilitate the free flow of scientific information; and

- Document the scientific findings considered in decisionmaking.

BLM_0026612

Responsibilities delegated down to managers and supervisors include the obligation to comply with and implement this chapter as it pertains to their area of management or supervision and to ensure that all contracts and permits covered under the scope of this chapter and under their purview include the requirements of this policy in the performance work statement.

(2) **Non-federally recognized tribes and nontribal groups may be notified**. The uniform regulations implementing ARPA provide that the Federal land manager may also give notice to any other Native American group known to consider potentially affected locations as being of religious or cultural importance (43 CFR 7.7(a)(2)). Input from non-federally recognized and nontribal groups is in the nature of public participation, not government-to-government consultation. Nontribal groups might include environmental organizations interested in protecting archaeological sites or Indian sacred sites.

(3) **Document unsuccessful efforts**. If all efforts to notify and consult with the appropriate Indian tribe(s) prove unsuccessful, the permit application may be processed without further delay. In all cases, documentation of efforts to notify and consult must be included in the permit file. This documentation will serve as evidence of notification and consultation efforts in accord with 43 CFR 7.7.

3. **Native American Graves Protection and Repatriation Act.**

    a. **Introduction**. NAGPRA was enacted in 1990 to address the rights of lineal descendants, Indian tribes, and Native Hawaiian organizations to certain Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony (cultural items). The statute, and its implementing regulations, 43 CFR 10, provide terms, definitions, and procedural requirements for addressing treatment and disposition of Native American human remains and cultural items. Because the BLM does not have lands or programs in Hawaii, the following guidance is limited to lineal descendants and Indian tribes.

    BLM managers are required to consult with tribes under NAGPRA to determine affiliation and disposition of Native American human remains and cultural items. This section addresses tribal notification and consultation requirements under NAGPRA. Refer to the statute, regulations, and BLM-specific policy for the full scope of procedural requirements for NAGPRA compliance, such as documentation of collections and procedures for new discoveries.

    NAGPRA has two distinct parts. Its provisions for collections of Native American human remains and cultural items in the control of the BLM, generally, before NAGPRA was enacted on November 16, 1990, differ from the provisions that apply to Native American human remains and cultural items discovered on public lands after that date. The former are considered to be "existing collections" and the latter are "new discoveries." Items that come into the control of the BLM after 1990, but

BLM_0026613

that did not come from the public lands also represent collections, such as items that are acquired through law enforcement efforts or donations to the BLM.

b.  **Collections**.  The purposes of tribal consultation under the Collections provisions of NAGPRA are to identify Native American human remains, funerary objects, sacred objects and objects of cultural patrimony in agency museum collections and to determine which Indian tribes are culturally affiliated with the human remains and cultural items, and thus may claim them for repatriation.  BLM will also consult on the treatment and disposition of human remains for which no tribe is culturally affiliated and determined to be "culturally unidentifiable."

Often, these collections are housed in non-federal museums and universities (repositories), and BLM, therefore, must coordinate the process with the repository officials to document collections and provide Indian tribes access to collections.

Specific requirements for producing summaries and inventories, tribal and public notice, and steps for responding to claims and repatriating are provided in NAGPRA Sections 6 and 7 and 43 CFR 10.8-11and relevant BLM NAGPRA policy.  The NAGPRA regulations include specific steps and standards for consultation and sharing information.

---

**NAGPRA Sections 5, 6, and 7 and 43 CFR 10 Subpart C**

- Section 5 and 43 CFR 10.9 require Federal agencies and museums to complete an inventory of human remains and associated funerary objects in consultation with Indian tribes and traditional religious leaders.  Inventories have two parts, one of lists human remains that have been determined to be culturally affiliated with Federally recognized Indian tribes; the second lists remains for which affiliation could not be determined, and are considered to be Culturally Unidentifiable.
- Section 6 and 43 CFR 10.8 require Federal agencies and museums provide a summary of unassociated funerary objects, sacred objects, and objects of cultural patrimony to Indian tribes and traditional religious leaders and consult with them.
- Section 7 and 43 CFR 10.10 states that, if pursuant to Sections 5 or 6, cultural affiliation is established/shown and if requested by the tribe or known lineal descendant, the cultural items shall be returned at a place and in a manner of delivery determined through consultation. 43 CFR 10.11 provides for disposition of Culturally Unidentifiable human remains to claimant groups.

---

**Figure X-5        Provisions of Sections 5, 6, and 7 of the Native American Graves Protection and Repatriation Act and Corresponding Regulations.**

c.  **New Discoveries**.  New discoveries under NAGPRA are situations in which Native American human remains and/or cultural items are intentionally excavated or inadvertently discovered on public land after NAGPRA was enacted on November 16, 1990.  Where the Collections sections of NAGPRA are in many ways retrospective, addressing past activities where Native American human remains

BLM_0026614

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-13

and/or cultural items were collected, the New Discoveries section is prospective, addressing new discoveries on the public lands.

Consultation for both planned and unanticipated activities includes obtaining tribal views on treatment and disposition of Native American human remains and/or cultural items discovered on public lands. Consultation informs procedures and provision of information, as well as a written Plan of Action, should the remains or items be excavated or removed, and transfers of custody to claimant tribes. The consultation and documentation requirements for planned excavations and inadvertent discoveries are prescribed in NAGPRA Section 3 and 43 CFR 10.3-6.

---

### NAGPRA Section 3 and 43 CFR 10 Subpart B, "New Discoveries"

- Provide that ownership and control of Native American human remains and/or cultural items discovered on the public lands after 1990 shall be (in priority order) with lineal descendants, Indian tribe on whose lands the remains or items were discovered, culturally affiliated Indian tribes, tribe that is recognized as aboriginally occupying the area in which the remains or objects were discovered  on whose aboriginal land the remains and objects were discovered according to the Indian Claims Commission or US Court of Claims, a tribe with a cultural relationship

- Require the Federal agency to notify potential lineal descendants and potentially claimant tribes when Native American human remains and/or cultural items are discovered on the public lands.

- Require the responsible Federal agency to consult with the affected Indian tribes and developing a Plan of Action before authorizing excavation or removal of Native American human remains, funerary objects, sacred objects and/or objects of cultural patrimony from public land.

- Require the responsible Federal agency to safeguard Native American human remains and/or cultural items discovered during an authorized land use, and to halt the land use for as much as 30 days (43 CFR 10.4(d)(iv)).

- Require the Federal agency to determine lineal descendants or Indian tribes that have rights to the remains and/or items, and upon a valid claim, transfer custody.

**Figure X-6    Provisions of Section 3(c) and (d) of the Native American Graves Protection and Repatriation Act and Corresponding Regulations.**

(1) **Intentional Excavation.** BLM must take reasonable steps to determine whether a planned activity may result in the excavation of Native American human remains and/or cultural items subject to NAGPRA from Federal lands. When an intentional excavation is planned, BLM must follow the procedures found at 43 CFR 10.3 and any applicable requirements of applicable State laws, as specified in statewide BLM-SHPO protocol agreements. In addition, a cultural resource use permit (see MS-8150) or equivalent documentation is required, which ensures that the recovery is conducted in accordance with ARPA, as required by 43 CFR 10.3(b)(1).

BLM_0026615

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-14

BLM managers must notify and consult with Indian tribes before issuing authorizations when it anticipates that an activity may result in the discovery of Native American human remains and/or cultural items. Consultation informs the development of BLM's Plan of Action for the identification, treatment, recording, and disposition of Native American human remains and/or cultural items. Plans of Action have a specific format, which is detailed in the regulations at 43 CFR 10.5(e). The BLM manager signs the Plan of Action. Consulting tribes are provided a copy and may sign, but do not have to sign.

---

**NAGPRA Notification and Land Use Authorizations**. NAGPRA requires that anyone who discovers human remains or other NAGPRA items on public land report them to the BLM manager in writing. All Federal authorizations to carry out land use activities on the public lands, including all leases and permits, must include a requirement for the holder of the authorization to notify the appropriate Federal official immediately upon the discovery of Native American human remains and/or cultural items (**43 CFR 10.4(g)**).

---

Plans of Action address specific projects. On a more programmatic level, a Comprehensive Agreement is encouraged, following 43 CFR 10.5(f). These agreements are developed in consultation with Indian tribes, and the BLM Manager and tribal officials sign.

(2) **Inadvertent Discoveries.** An inadvertent discovery is a discovery of Native American human remains and/or cultural items on the public lands when there is no Plan of Action. When Native American human remains or other NAGPRA cultural items are discovered on public land, BLM offices must handle this in the manner described in the inadvertent discovery procedures found at 43 CFR 10.4 and any applicable requirements of State laws, as specified in statewide BLM-SHPO protocol agreements.

If the discovery occurs, but no Plan of Action is in place, within three working days, the BLM manager must telephone, notify in writing, and initiate tribal consultation. Work must cease at the location of the discovery and the remains must be safeguarded for up to 30 days while the BLM conducts tribal consultation to determine next steps. If the human remains and/or cultural items must be removed, BLM develops a Plan of Action to address the treatment, recording, and disposition, in accordance with 43 CFR 10.5(e).

To minimize chances of a 30-day work stoppage, when there is a reasonable likelihood that a project will result in the discovery of Native American human remains and/or cultural items, BLM offices should consult with Indian tribes and develop plan(s) of action that will be implemented should discoveries occur.

The following table provides a summary reference of the provisions of NAGPRA for both Collections and New Discoveries.

BLM_0026616

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-15

| Quick Reference – New Discoveries and Collections Requirements under NAGPRA | | |
|---|---|---|
| | **Planned Excavation and Inadvertent Discovery on Federal or Tribal Lands** | **Collections Held by Federal Agencies or Museums that Receive Federal Funds** |
| **Authorities:** | 25 USC 3002 (Section 3)<br>43 CFR 10 Subpart B (§10.3-10.7) | 25 USC 3003-3005 (Sections 5-7)<br>43 CFR 10 Subpart C (§10.8-10.13) |
| **Deadlines:** | Effective November 16, 1990 | Summaries: November 16, 1993<br>• 6 months after receipt of a new collection, newly identified collection, or notification of a new Indian tribe<br>• 3 years after receipt of Federal funds<br><br>Inventories: November 16, 1995<br>• 2 years for new collection/tribe<br>• 5 years of first receipt of Federal funds |
| **Documentation and Investigation Requirements:** | • Consultation<br>• Plan of Action<br>• Scientific methods and techniques for removal, recording, and analysis<br>• Descriptive and interpretive report<br>• Curation of unclaimed NAGPRA cultural items | • Consultation<br>• Summaries: general descriptions of collections that may contain unassociated funerary objects, sacred objects, objects of cultural patrimony<br>• Inventories: item-by-item descriptions of human remains and associated funerary objects.<br>• Curation of Culturally Unidentifiable cultural items. |
| **Priority Order of Control:** | 1. Lineal descendant<br>2. Indian tribe land owner<br>3. Culturally affiliated Indian tribe or Native Hawaiian Organization<br>4. Indian tribe with a "stronger cultural relationship"<br>5. Indian tribe that aboriginally occupied the area (as determined by the Indian Claims Commission)<br>6. Unclaimed | 1. Lineal descendant<br><br>2. Culturally affiliated Indian tribe or Native Hawaiian Organization<br><br><br><br>3. Culturally Unidentifiable |
| **Public Notification:**<br><br><br>Publication:<br><br><br><br><br><br><br>Frequency of Publication: | Notice of Intended Disposition<br><br><br>Newspaper of general circulation in the area in which cultural items were found and, if applicable, a newspaper of general circulation in the area(s) in which affiliated Indian tribes now reside.<br><br>At least twice, one week apart | Notice of Inventory Completion *(human remains & associated funerary objects)*<br><br>Notice of Intent to Repatriate *(unassociated funerary objects, sacred objects, objects of cultural patrimony)*<br><br>Federal Register<br><br><br>Publish One Time |
| **Term for Transference of Control:** | "Transfer of Custody" of human remains, funerary objects, sacred objects, objects of cultural patrimony | "Repatriation" for "Culturally Affiliated" human remains, funerary objects, sacred objects, objects of cultural patrimony<br>"Transfer of Control" of culturally unidentifiable human remains funerary objects |

**Figure X-7     Quick Reference for New Discoveries and Collections Requirements under the Native American Graves Protection and Repatriation Act.**

BLM_0026617

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-16

d. **Consulting Parties under NAGPRA**.  BLM managers consult under NAGPRA with lineal descendants, Indian tribes, and traditional religious leaders.  For collections, the BLM Federal officer is the State Director.  For new discoveries, the BLM officer may be the State Director, District Manager, Field Manager or Monument Manager.  Refer to BLM Manual 1203, Delegations of Authority.  As with other consultation, BLM staff may facilitate and coordinate communication in support of consultation efforts.

Finding lineal descendants for NAGPRA consultation will be rare, but BLM must consult with lineal descendants if any are known.  Lineal descendants do not have to be members of federally recognized tribes.

Many Indian tribes have designated NAGPRA representatives to consult with Federal agencies.  In the absence of a designated tribal NAGPRA representative, the BLM officer should consult with the executive officer of the tribe or other representative identified by tribal leadership.

BLM must also consult with individuals who are recognized by members of an Indian tribe as being traditional religious leaders with expertise in identifying cultural items.

| NAGPRA Activity | Consulting Parties |
|---|---|
| Collections: Inventories of human remains and associated funerary objects<br>43 CFR 10.9(b) | Lineal descendants; and<br>Indian tribe officials and traditional religious leaders—<br>• From whose tribal lands the human remains and associated funerary objects originated;<br>• That are, or are likely to be, culturally affiliated with human remains and associated funerary objects; and<br>• From whose aboriginal lands the human remains and associated funerary objects originated |
| Collections: Summaries of unassociated funerary objects, sacred objects and objects of cultural patrimony<br>43 CFR 10.8(d) | Indian tribe officials and traditional religious leaders—<br>• From whose tribal lands unassociated funerary objects, sacred objects, or objects of cultural patrimony originated;<br>• That are, or are likely to be, culturally affiliated with unassociated funerary objects, sacred objects, or objects of cultural patrimony; and<br>• From whose aboriginal lands unassociated funerary objects, sacred objects, or objects of cultural patrimony originated |
| New Discoveries on Federal lands<br>43 CFR 10.5(a) | Lineal descendants; and<br>Indian Tribal officials from:<br>• From Indian tribes on whose aboriginal lands the planned activity will occur or where the inadvertent discovery has been made; and<br>• From Indian tribes that are, or are likely to be, culturally affiliated with the human remains, funerary objects, sacred objects, or objects of cultural patrimony; and<br>• From Indian tribes that have a demonstrated cultural relationship with the human remains, funerary objects, sacred objects, or objects of cultural patrimony. |

**Figure X-8     Appropriate Consulting Parties Associated with Selected Native American Graves Protection and Repatriation Act Activities.**

BLM_0026618

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-17

Refer to the regulations for specific direction on consulting parties when working on different NAGPRA activities, as summarized in the table below.

e. **Access to Information, Collections, and Documentation.** Among other goals, NAGPRA was intended to ensure Tribal representatives access to information about collections associated with their Indian tribes and ancestors. Consultation to determine cultural affiliation and disposition requires an exchange of information.

(1) **Physical Access.** Consultation requirements are prescribed in the regulations and direct that agencies provide certain materials to help tribal officials identify NAGPRA cultural items. BLM may need to make arrangements for tribal officials to travel to the repositories where the collections are housed or to attend meetings to discuss NAGPRA items.

(2) **Access to Documentation.** The consultation standards in NAGPRA require that Federal agencies and museums provide information to lineal descendants and Indian tribes. The regulations also require that Federal agencies and museums request information from descendants and tribes about whom to contact and procedures for the consultation process, as well as the kinds of items considered to be funerary objects, sacred objects and objects of cultural patrimony. See 43 CFR 10.8(d)(3-4) and 43 CFR 10.9(b)(3-4) for requirements for information exchange for NAGPRA collections. See 43 CFR 10.5(c-d) for information exchange for NAGPRA new discoveries.

(3) **Use of Images and Digital Scans.** The use of photographs in NAGPRA activities should be carefully considered. Many tribes are uncomfortable with the creation and distribution of images of human remains or funerary objects. However, this can be one of the most effective consultation tools for sharing information. The distribution of images must be limited to those individuals who need to see them for determinations of affiliation and consultation purposes.

C. **Special Considerations/Issues That Apply to the Cultural Heritage Program**

1. **Reburial of Native American Human Remains and Cultural Items as Defined by NAGPRA.**

a. **Reburial on Public Lands**. Lineal descendants and Indian tribes may ask to rebury Native American human remains and funerary objects on the public lands. While not a component of NAGPRA, reburial is often a requested outcome, and the BLM may consider reburial of Native American human remains and funerary objects once the NAGPRA process has concluded (i.e., human remains and/or cultural items have been repatriated or transferred to claimant descendants or tribes).

The reburial of NAGPRA items on public lands is a discretionary action and authorized on a case-by-case basis. The BLM is not required under NAGPRA, or any

BLM_0026619

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-18

other authority, to rebury repatriated or transferred NAGPRA materials on public lands. BLM retains the discretion to decide whether to authorize reburials and under what conditions reburials will occur. Reburials may be authorized by the state directors with copies of relevant documentation provided to the Washington Division of Cultural and Paleontological Resources and Tribal Consultation (WO-240) as part of annual report submissions.

In evaluating a reburial request, BLM managers should consider the legal and logistical issues associated with reburial, such as:

(1) **Land Status and Selection.** Lands best suited for reburial activities are locations well away from areas or routes frequented by the public and areas withdrawn from multiple uses and mineral entry, such as wilderness areas and WSAs. These are areas where future earth disturbing lands uses are unlikely.

(2) **Coordination with Relevant Authorities.** Reburial actions must also comply with FLPMA, NEPA, NHPA, NAGPRA, ARPA, AIRFA, and Executive Order 13007.

(3) **Legal Protection.** All activities and documentation related to reburial must be kept confidential to the maximum extent authorized by law. As appropriate, sites may be part of historic properties as defined in the NHPA. Civil and criminal penalties may result from vandalism, disturbance, removal, and/or trafficking of items from the burial under ARPA, NAGPRA, and/or other authorities.

(4) **Practical Considerations.** Any applicable State health and safety or cemetery laws must be complied with prior to a reburial. Tribes typically request that reburials be as close to the original interment location as feasible. Lineal descendants and/or claimant tribes must be offered an opportunity to be present and conduct a ceremony at the reburial. Reburied materials must not include materials that could create a future safety hazard. No monuments or memorials may be constructed or left at the site. Protective measures such as screening may be considered.

(5) **Future Bureau Responsibilities.** Identify any future responsibilities, such as providing access to tribes (if requested) and monitoring. The use of fencing or other protective devices that would require ongoing monitoring are discouraged. Consider entering into a reburial agreement (MOU) with the tribes articulating roles and responsibilities.

(6) **Budget Considerations.** Consider the costs to the agency for allowing a reburial. The BLM may facilitate the reburial by providing staff and equipment. For post-1990 excavations or inadvertent discoveries related to a BLM-funded, permitted, or licensed project, costs associated with reburial must be considered part of the

BLM_0026620

project costs of the land use program or land use authorization borne by the applicant.

Once reburial locations have been identified and a reburial plan developed addressing the considerations mentioned above, the BLM manager must send the proposal to their state director for approval.  The BLM's cultural staff will maintain records of such reburials as part of heritage resources site record databases.

b.  **Reburial vs. Stabilization.**

(1)  For museum collections (Sections 5–7 of NAGPRA; 43 CFR 10.8-11), reburial may be authorized on a case-by-case basis for Native American human remains and cultural items repatriated from BLM museum collections to the claimant Indian tribe(s).  BLM may also rebury culturally unidentifiable remains from BLM museum collections following disposition authorized in 43 CFR 10.11(c).

(2)  For new discoveries (Section 3 of NAGPRA; 43 CFR 10.3-7), reburial may be authorized on a case-by-case basis upon completion of a transfer of custody of newly discovered human remains and cultural items (intentional excavations and inadvertent discoveries) excavated or removed from the public lands to claimant Indian tribe(s).  Costs associated with reburial for new discoveries related to projects funded, permitted, or licensed by the BLM, if authorized, may be considered part of project costs.

(3)  For inadvertent discovery situations where burials are eroding out of the ground and individual bones are being lost and destroyed by washing down slope or weathering, or situations where burials are uncovered and individual bones dislodged due to land-disturbing activities, field offices are authorized to take emergency measures to place the bones together as close to the original location as possible and rebury them with the least ground disturbance possible so as not to draw attention to the location.  The BLM manager must still notify Indian tribes pursuant to the New Discovery provisions of NAGPRA at 43 CFR 10.4(d).  These actions represent efforts to stabilize the burial, as opposed to excavation or removal.  Should the location be vulnerable to future natural or human activity, the BLM manager should, after consultation with potentially claimant Indian tribes, consider excavation or removal to a more secure location, following NAGPRA requirements at 43 CFR 10.3, including a Plan of Action.

2.  **Data Security and Confidentiality.**  The BLM is the sole Federal agency responsible for collecting resource information for the lands it manages.  It is also responsible for maintaining that information in a secure environment.  This information is used to evaluate the significance of these resources.  It is also used to develop appropriate protection measures in long-term land-use planning documents and in the environmental documentation supporting multiple use decisions.  Public disclosure of heritage resource information is restricted under several legal authorities, including 43 CFR 7

BLM_0026621

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

implementing ARPA Section 9 and 54 U.S.C.307103.  Section 1 of Executive Order 13007 is an executive policy that supports the non-disclosure of tribal information.

Disclosure of sensitive Native American information may be denied if it—

- Exists only in "working files" (i.e., documents that are not formal products of the agency or official correspondence, such as raw ethnographic data or notes— except for information used in making a decision, which must become part of the official decision record and therefore be subject to disclosure);

- The BLM has gone through the process outlined in 54 U.S.C. 307103 and disclosure would risk harm to the property, cause a significant invasion of privacy, or impede the use of a traditional religious site by practitioners; or

- Pertains to an archaeological resource as defined in 43 CFR 7, and disclosure would risk harm to the resource.

Information pertaining to spiritual, religious, or cultural values or beliefs, when they coincide in space with historic properties (under NHPA) or archaeological resources (under ARPA), could also be protected from disclosure under these authorities.  The confidentiality of information less firmly associated with a historic property or archaeological resource, however, is not resolved.  No blanket FOIA exemption exists for NAGPRA related information.  Thus, potentially sensitive information, such as the specific nature of materials subject to NAGPRA consideration, and the identity of descendants or culturally affiliated Indian tribes, may be subject to FOIA disclosure.  However, if the NAGPRA cultural items are associated with an archaeological resource, the locational information would be subject to the FOIA exemption in ARPA.  Consequently, the BLM state FOIA officer must evaluate any NAGPRA-related FOIA request, case-by-case, in close consultation with the NAGPRA coordinator and the responsible manager.  While BLM managers should make every effort to safeguard sensitive information to the fullest degree possible, information requested under a valid FOIA request may not be withheld unless a FOIA exemption applies. On a case-by-case basis, BLM state offices may negotiate unique solutions with tribes to safeguard sensitive information.  Contracts for ethnographic studies may require submission of summary reports to the BLM.  These should contain no confidential information, maps, or figures and are intended to provide managers and the public an overview of the study, its results, and implications for management decisions.  Final comprehensive reports can contain sensitive information and could be housed at tribal headquarters or tribal historic preservation offices.  BLM and tribes may agree that such comprehensive final reports will be held at tribal offices, and specified BLM staff will be granted access and use of them at those locations.  When data utilized by the BLM during the decisionmaking process will be housed at tribal offices, access and use of the data must be documented in an MOU.

BLM_0026622

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-21

3. **Data Share Agreements.**

a. **Background.** When the BLM shares sensitive heritage resources information with tribes, it documents the specific purpose and retains appropriate safeguards through a data sharing agreement signed by the BLM Federal officer with jurisdiction over the information provided. Site records and survey data are the property of the BLM as entrusted to our management under FLPMA and other authorities. These data do not constitute the "intellectual property" of tribes despite cultural ties to some archaeological, protohistoric, and historic sites by Indian tribes. Such data may be needed by tribes for purposes of input into the NHPA Section 106 process, ARPA permitting, or the identification of places of traditional cultural and/or religious importance.

On a broad level, the BLM must withhold from public disclosure information about historic or archaeological resources under both the NHPA (after going through the process described at 54 U.S.C. 307103) and the Archaeological Resources Protection Act (Section 9(a)). Further, Executive Order 13007 directs Federal agencies to "maintain the confidentiality of sacred sites."

However, these confidentiality provisions refer to "disclosure to the public." Tribes, in contrast, have a standing that must be recognized as separate and distinct from the public. The sharing of sensitive heritage resources data may be undertaken as described below with the understanding that it is BLM policy to consult with tribes regarding decisions that may affect tribal values or interests. This sharing is in accordance with the DOI's Policy of Consultation with Indian tribes, which emphasizes the goals of improving informed BLM decisionmaking and the fostering of a government-to-government exchange of information in the spirit of trust, respect, and shared responsibility.

Overlapping of ancestral, aboriginal, or ceded lands will not affect BLM data sharing decisions. Competing land claims between tribes is also not a factor in BLM data share agreements with individual tribes.

b. **Range of Data Share Agreements.** Data share agreements may be executed in a variety of formats with tribes.

Tribes may execute user agreements through SHPO offices in states where the SHPO controls access to and use of inventory and site data housed in a common repository. In these circumstances, potential users must agree to use the data responsibly and to protect it from unauthorized release. SHPO staff evaluates data requests and enforces the agreements. Such data share agreements may work effectively, although how up-to-date such SHPO databases are varies considerably across different states.

BLM_0026623

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-22

In addition, tribes may negotiate and execute a data share agreement directly with the BLM. All data sharing agreements should provide the following as minimum standards—

- Specific types (formats, media) of confidential-sensitive data to be provided by BLM;

- Purposes for which BLM data is being shared, including expectations for how data sharing will assist consultation on BLM plans/projects;

- How and when data will be shared;

- Procedures for identifying data files as "confidential nonpublic data";

- Reference to relevant legal authorities;

- Identification of tribal staff who will have access to the confidential/sensitive data;

- BLM contact persons;

- Security, protection, and access to confidential-sensitive data;

- A commitment by the tribe to protect the data from release to other parties to the maximum extent provided by tribal authorities; and

- Notification to BLM when the tribe receives a request by others to access the shared data.

Provisions for data sharing between the BLM and a tribe may also be specified within NHPA Section 106 PAs provided that the agreement contains the minimum standards discussed above.

In the absence of a formal data share agreement, the BLM may share cultural information relevant to a BLM-proposed decision with tribes participating in the NHPA Section 106 process. The data provided will be at a level of detail needed to inform consultation, provided that such sharing of information does not put the subject heritage resources at risk from vandalism or theft, or violate a commitment to other tribes regarding the safeguarding of confidential information.

c. **Cancellation of Data Sharing.** A BLM manager may decide to stop further distributions of confidential information to tribes if the BLM manager has reason to believe that confidential information has been or may be inappropriately distributed by the tribe and that BLM's distribution of information to the tribe poses a risk of harm, including actual or potential threats to the integrity or condition of heritage resources. If the BLM manager determines to end distribution, the manager will inform the tribe in writing of the BLM's decision and the basis for its concerns. The BLM should allow the tribe 30 days to initiate consultation to discuss the matter if it wishes to continue to receive confidential information.

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-23

d. **Data That Should Not Be Shared.** BLM heritage resources databases are extensive and they may contain information on particular sites that should not be shared with tribes under any circumstances. The following situations provide examples:

- Records should be pulled from data exchanges if they pertain to sites located on surface estates not managed by the BLM.

- Data related to sacred sites or places of traditional cultural and/or religious importance to a particular tribe provided by traditional religious leaders/practitioners and/or ethnographic informants should not be shared with other tribes, unless expressly approved by tribal representatives. The BLM is obligated under AIRFA and Executive Order 13007 to protect access to and physical integrity of sacred sites.

- BLM managers must take great care to ensure that access to and protection of sites considered sacred by individual tribes/tribal members is not compromised by the release of confidential sensitive heritage resources data to other tribes.

- Data pertaining to human burials or human reburial locations where BLM has determined that a connection exists with lineal descendants and/or culturally affiliated tribe should not be shared unless expressly approved by the lineal descendants or leader of the culturally affiliated tribe.

- Data relating to historic period archaeological/built environment sites associated with European-American settlement and use and lacking evidence of pre-contact or American Indian occupation/use may be excluded when providing data to tribes. (Note that in some cases, tribes may already have access to these data through the SHPO. Their review can reveal Native American affiliations or associations that may not have been previously identified or known).

e. **Format and Costs for Data Sharing.** The BLM may share digital site and survey data if a tribe has the technical capacity to receive, manipulate, and protect the data. Many tribes have established GIS for maintaining their own heritage resources data, which are managed by professionally qualified staff and GIS specialists. In these cases, there is no compelling reason not to share digital data as long as an appropriate data sharing agreement is in place. Labor costs for preparing and transmitting the data dumps will be absorbed by the BLM's information technology and cultural heritage programs. The production, duplication, and distribution of hard copies of inventory and evaluation reports and data recovery plans will generally only occur on a project or undertaking basis. In these cases, costs must be passed on to the applicant or benefitting subactivity.

4. **Development of MOUs with Tribes to Facilitate NHPA Section 106 Consultation.** In the process of reviewing, updating, and rewriting state protocols as required by the

BLM_0026625

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-24

National PA, states must include language that encourages development of MOAs or MOUs with tribes to better define the NHPA Section 106 consultation procedures best adapted to individual tribes. These will be two-party agreements outside of the BLM-SHPO protocols, but the protocols should mention the BLM commitment to pursue them.

Tribal consultation MOUs can define in advance such matters as: (1) the types of undertakings tribes wish to consult on; (2) geographical areas where tribes desire NHPA Section 106 consultation; (3) types of properties tribes wish to consult on regarding determinations of eligibility, effect, or treatment; (4) data sharing procedures; (5) how contacts should be made; (6) when contacts are appropriate; (7) who serves as contact points; and (8) in what manner should communication be made. Many tribes are overwhelmed with Federal Government consultation requests under the various Federal statutes. Consultation MOUs can focus consultation just on those sites, areas, or undertakings about which the tribes are most concerned.

There are a number of excellent examples of agreements that clarify and streamline consultation and coordination and encourage cooperative activities on public lands. BLM offices are encouraged to contact state offices for current examples of such accords. Examples of successful MOUs negotiated in the past—

- Arizona. Memorandum of Understanding between Hualapai Tribe and the United States Department of the Interior's Bureau of Land Management, Colorado River District (2012).

- Idaho. Memorandum of Understanding between the Shoshone-Paiute Tribes of the Duck Valley reservation and the Idaho Bureau of Land Management, United States Department of the Interior (2007).

- California. Consultation Protocol between Big Pine Paiute Tribe and Bureau of Land Management, Bishop Field Office, Ridgecrest Field Office (2003).

5. **Qualifications and Costs for Tribal Monitoring or Participation in Archaeological Survey and Excavation**. Programmatic Agreements or other decision documents may specify the appropriate use of tribal members on archaeological surveys, excavations, or for the monitoring of these activities, or project land disturbance. Costs for inclusion of tribal participants as crew members involved with survey, testing, excavation, or monitoring are normally borne by the land use applicant as part of the Section 106 compliance. The BLM may facilitate arrangements for tribal monitors with the land use applicant but will not be involved in the payment for such services by the land use applicant. Separate archaeological surveys performed by tribes in addition to those archaeological inventories permitted by the BLM and carried out by permittees adhering to the Secretary of the Interior's Standards and Guidelines governing professional qualifications for archaeology and history will not be required. See MS-8150, Permitting Uses of Heritage Resources.

BLM_0026626

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

X-25

a. **Archaeological Survey.**  Indian tribes may request that tribal members be included on archaeological survey crews.  Requirements for the inclusion of tribal members on archaeological inventory crews do not exist; however, inclusion of such crew members may be helpful to document sacred sites or properties of traditional and religious significance.  Any recommendations regarding identification and evaluation of heritage resources encountered will be incorporated into survey reports submitted by the heritage resource permittee.

b. **Archaeological Excavation**.  Indian tribes may request that tribal members be included on archaeological testing or excavations.  Requirements for the inclusion of tribal members on archaeological excavation or testing crews do not exist; however, inclusion of tribal members on testing or excavation crews may be allowed for permits under certain circumstances.

   For instance, the heritage resource permittee may include tribal members as part of excavation crews if their inclusion is needed in order to recognize and identify any cultural items subject to NAGPRA.  Such an arrangement may be authorized if tribal crew members experience, background, or expertise are comparable to the standards the heritage resources permittee requires for its testing or excavation crew members.

c. **Monitoring.**  Tribal monitors may be included on archaeological crews to observe trenching, blading, excavation, or other land disturbing operations the BLM authorizes that can disturb human burials or funerary objects subject to NAGPRA to ensure that disturbances to the heritage remains are minimized.  A separate tribal monitoring agreement should be created that specifies the monitors, describes their duties, timeframes, and details of any documentation or reports they will produce.  It will be included in the NEPA decision or PA/MOA.  While payments for tribal monitors will be agreed to and carried out between the tribe and the proponent, the BLM may be involved in crafting the details agreed to by the tribe, the proponent, the SHPO, and the BLM as part of the NEPA or Section 106 documentation.

BLM_0026627

# CHAPTER XI.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE RENEWABLE ENERGY PROGRAM

## A.  Introduction

This chapter provides background on renewable energy development of the public lands and explains when BLM managers and staff may carry out tribal consultation in accordance with the BLM's policy and regulatory requirements for solar and wind energy development on the public lands.  Due to the scale and scope of solar and wind energy developments, a proposed project's area of potential effects may impact natural resources, landscape features, access, or heritage resources important to tribes.  The primary focus of consultation for this program is through NEPA analysis. Although crucial aspects of consultation are covered in Chapters III and IV, some key aspects are highlighted here to assist the reader.

The BLM authorizes solar and wind energy developments under Title V of the FLPMA and its enabling regulations at 43 CFR 2800.

## B.  NEPA Compliance for Utility-Scale Renewable Energy Right-of-Way Authorizations

In its analysis of utility-scale renewable energy ROW applications, the BLM must always comply with requirements of NEPA, including tribal consultation.  NEPA and tribal consultation may be required when BLM analyzes a renewable energy development after a competitive process has taken place.

Renewable energy applications are externally generated requests for the use of lands administered by the BLM.  As explained below, early coordination between BLM and other Federal Government agencies, identification of the purpose and need, and the development of alternatives are required components for the decision process the BLM engages in when weighing such uses.  Each required component may include tribal consultation and would be discussed in the NEPA document.

Competitive processes are internally generated administrative processes which may be used to determine which among several potential developers may continue BLM analysis and review for a renewable energy development on the public lands.  For example, the BLM may hold a competitive process when there are two or more competing applications for the same system on the public lands.  In some instances, BLM may invite competition in some areas, such as SEZs, as described in the Solar PEIS.  When designating such areas, BLM must consult and coordinate with tribes throughout the land use planning processes (see Chapter IV of this handbook). Further, BLM's proposed rule, when final, would establish an administrative process for handling SEZs and other such designated areas as designated leasing areas (DLAs).

1. **Disclosing Early Coordination in the NEPA Process**.  Field offices must incorporate the early coordination in NEPA documents, such as tribal consultation, and discuss this information in scoping meetings and other public meetings.  These may also be reflected in the alternatives section of the NEPA document.

BLM_0026628

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-2

For renewable energy applications, early coordination may be conducted when land use planning decisions are in place that would establish the application area lands for competitive purposes.  The BLM should incorporate by reference and tier, as appropriate to the current LUP and disclose the tribal consultation and coordination that occurred within the prior NEPA documents.  The NEPA documents must incorporate any PAs or MOU into the scoping and other public meetings sections of the NEPA documents.  In some instances, tribal consultation and coordination may have been completed during the most recent LUP amendment (e.g., landscape-scale NEPA such as the Solar PEIS) and further consultation may not be necessary before BLM issues a NEPA decision for a project.  However, BLM should address such NEPA processes and decisions in their continuing documentation of any consultation and coordination with tribal governments.

In the event that competition occurs on the public lands for a renewable energy projects, such as in an SEZ or a DLA, the BLM may not need to consult further before issuing a NEPA decision for the project.  However, the BLM should include such NEPA processes and decisions in their continuing documentation of any consultation and coordination with tribal governments.  The NEPA documents must incorporate any PAs or MOUs into the scoping and other public meetings sections of the NEPA documents.

2.  **Purpose and Need**.  The purpose and need statement in the NEPA document must also describe the BLM's authorities and management objectives.  Additionally, offices must include a description of the BLM's decision(s) to be made as part of the purpose and need statement to help establish the scope of the NEPA document.

3.  **Alternatives**.  For renewable energy ROWs, the BLM and the applicant consider many different types of alternatives during application activities including those suggested to the BLM by external parties, such as tribes, through scoping and comments on the draft NEPA document.  The BLM must develop a well-supported rationale when deciding if such alternatives are reasonable and whether to analyze them or eliminate them from detailed analysis.

## C.  Tribal Government-to-Government Consultation

Key to improving the permitting and review processes for renewable energy projects is to ensure timely tribal consultation as required by various authorities, such as NEPA and NHPA.  To improve government-to-government consultation processes associated with NHPA Section 106, the BLM in coordination with the ACHP and other agencies developed a "toolkit" of procedures to help guide agencies and project proponents in meaningfully taking into account tribal concerns related to the NHPA.  The procedures were released to BLM field offices and posted on the ACHP website.

On September 24, 2012, the BLM executed a PA establishing general principles governing BLM-tribal consultations and describing opportunities for tribal input into the specific steps in the NHPA Section 106 compliance process for the solar energy program.  Parties to the PA include the BLM, ACHP, and SHPOs from Arizona, California, Colorado, Nevada, New

BLM_0026629

Mexico, and Utah.  The PA establishes procedures the BLM will follow to meet its NHPA Section 106 obligations for all future site-specific solar energy applications where the BLM is the lead Federal agency and the application is for projects on BLM-managed public lands.  (See final Solar PA).

The application of this solar PA to California was amended through the adoption on February 5, 2016 of a Programmatic Agreement among the Bureau of Land Management, California, the California Office of Historic Preservation, and the Advisory Council on Historic Preservation, Regarding Renewable Energy Development on a Portion of Public Lands Administered by the Bureau of Land Management-California.  This more recent PA refines the approach of the Solar PEIS and Solar PA on lands administered by the BLM within the boundaries of the Desert Renewable Energy Conservation Plan (DRECP).  It amends the Solar PEIS through its land use planning process and replaces the Solar PA with this new PA, accommodating all renewable energy projects, including any renewable energy project or transmission line ROW application and any connected actions for solar, wind, geothermal production, and transmission lines that also include appurtenant facilities.  It also provides additional, locally developed management considerations in California.  (See renewable energy development PA in California).

**D.  Solar and Wind Energy Applications—Due Diligence**

The BLM requires a plan of development (POD) for all solar and wind applications consistent with the provisions of 43 CFR 2804.25(b).  The POD must be of sufficient detail to provide the basic information necessary to begin the environmental analysis and make tribal consultation meaningful for all parties.  Such a plan must be submitted in a timely manner, and in the case of wind energy it must be submitted prior to the end of the initial 3-year term of a wind energy site testing authorization, if such an authorization is held.

**E.  Early Coordination Meetings and Development Prioritization**

Early coordination and careful review of proposed renewable energy projects with tribes, as well as Federal, State, and local government agencies, help the BLM identify and prioritize those applications for the public lands that have the fewest resource conflicts and the greatest likelihood of success.  Early coordination meetings inviting tribes and others for consultation activities will be required before an authorization is given for lands that are designated for competitive solar and wind energy purposes.  Subsequent consultation and coordination meetings may be held when reviewing the POD for projects of competitively gained authorizations or in review of project applications.

1. **Early Coordination Meeting Discussions**.  The BLM requires that all applicants schedule and participate in at least two early coordination meetings for proposed developments outside of designated competitive areas.  The purpose of the meetings includes identifying and discussing potential environmental and siting constraints, land availability, timeframes, financial obligations, consultation procedures with Indian tribes, and potential tribal concerns regarding access, resource utilization, and impacts to sacred sites.

BLM_0026630

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-4

Early coordination meetings can identify necessary studies pertaining to environmental, visual, and heritage resources, including the need for ethnographic studies, and allow consideration of potential alternative site locations and project configurations.

Other Federal agencies, State agencies and tribes must be invited to participate to ensure issues and concerns are given full consideration early in the process. BLM state and field offices should establish consultation or coordination agreements with other agencies and Indian tribes to facilitate the process.

Lands designated for solar and wind energy competition have already been coordinated and consulted on with Federal, State, and tribal governments or offices prior to the BLM's decision to designate such an area. Competitively gained authorizations in such areas may not be coordinated or consulted on further, prior to their authorization of the development. However, additional coordination and consultation may occur when evaluating the POD of such projects as part of the BLM's ongoing consultation with tribal governments.

Early coordination activities with tribal governments can be incorporated into an environmental review document as part of the background information for the NEPA document in preparation for government-to-government consultation.

Required early coordination meetings focus on different matters for a potential development. The focus of the first early coordination meeting is to discuss the general project proposal, the status of the BLM land use planning in the area, potential siting constraints, potential environmental issues including anticipated tribal concerns in the area, and BLM ROW processes. The second meeting must initiate and ensure coordination with Federal, State, and local governments, and Indian tribes. This dialogue provides an opportunity to discuss potential environmental and siting constraints and modify the proposed project as appropriate before an application is accepted by the BLM. Follow-up coordination and government-to-government consultation meetings between the BLM and concerned tribe(s) will likely be needed.

2. **Review and Screening of Applications**. Once an application is received and cost recovery agreement established, the BLM will not continue to process a solar or wind energy development ROW application without first holding the early coordination meetings. No application will continue to be processed until an applicant has submitted a complete ROW application with sufficient detail (e.g., acceptable plan of development, studies, and inventories) to initiate the environmental analysis and review process, including tribal consultation, and the applicant has provided cost recovery fees as required by the regulations at 43 CFR 2804.14.

The BLM will prioritize an application by placing it into one of three categories based upon the potential level of conflicts the development may have on the public lands, including resources, access, and landscapes of tribal concern. It may re-categorize the application based on new information received through surveys, public meetings, or other

BLM_0026631

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-5

data collection, or after any changes to the application.  Should a proposed project meet only the criteria of the lowest conflict resources, it would receive priority over other applications that meet the medium and high resource conflict criteria.  Applications that meet one or more medium resource conflict criteria will be prioritized over applications that meet high resource conflict criteria.  Applications that meet one or more high resource conflict criteria may not be feasible to authorize.  Developments within a designated competitive area will generally be prioritized over all application for solar and wind energy developments.

Application screening criteria are specified within the final version of a BLM's proposed rule to amend portions of 43 CFR 2800 and portions of 43 CFR 2880, and develop a revised subpart 2809.  The proposed rule and the final rule when completed may be found at the BLM website.

## F.  Project-Specific Consultation

When the BLM receives an application or is otherwise made aware of a potential solar or wind energy project on the public land, the BLM will initiate project-specific consultation with tribes.  When consulting for a project-specific action, the following steps are identified as requirements for processing an application or opportunities for tribal consultation that will satisfy the BLM's policy and regulatory requirements for solar or wind energy development that are summarized in appendix 4.

1. **Early Coordination**.  The BLM requires that all prospective applicants schedule and participate in two early coordination meetings with the BLM before the BLM will continue to process the ROW application for a solar or wind energy development outside of DLAs.  The purpose of the second coordination meeting is to initiate and ensure early coordination with tribes, as well as Federal, State, and local government agencies.

2. **Pre-NEPA Public Meetings**.  If a public meeting is held by BLM for a proposed project before the acceptance of an application, tribal governments will be notified and invited to participate in the meeting.

3. **Application Status**.  Upon receipt of an application and the POD, the BLM may update the tribal governments with the POD and anticipated processing timeline and milestones of the project.

4. **Begin Protocols in Appendix 4**.  From this point, follow appendix 4 of this handbook which illustrates the procedural, informational, participation, and documentation requirements of NEPA, NHPA Section 106, and tribal consultation.  The right-hand column in this appendix contains recommendations for coordinating the processes and successfully meeting compliance requirements prior to making a decision.

Maintain communication with project manager and stay apprised of changes to the preferred action and its alternatives within the NEPA document, which are articulated

BLM_0026632

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-6

within the POD.  This will assist consultation with the tribal governments using the most current project information.

## G. Comprehensive Solar and Wind Energy Programs

1. **Solar Energy**.  In 2007, the BLM issued Instruction Memorandum (IM) 2011-003, Solar Energy Development Policy, to address increased interest in solar energy development on BLM-administered public lands and to implement goals to construct renewable energy facilities on public lands.  This policy established procedures for processing ROW applications for solar energy development projects in accordance with the FLPMA and the BLM regulations.

   The BLM's practice at that time was to evaluate solar energy ROW applications on a project-by-project basis.  In addition, many of the BLM's LUPs did not specifically address solar energy development; therefore, projects not in conformance with existing LUPs required individual LUP amendments.  Moreover, the BLM did not have a standard set of mitigation measures that could be applied consistently to all solar energy development projects.  The need to develop case-by-case mitigation measures and amend LUPs added to the time needed to process ROW applications for solar energy projects.

   On March 11, 2009, the Secretary of the Interior issued Secretarial Order 3285, which announced a policy goal of identifying and prioritizing specific locations best suited for the large-scale production of solar energy on public lands.  The Secretarial Order required DOI agencies and bureaus to work collaboratively with each other, tribes, Federal agencies, individual states, local governments, and interested stakeholders, including renewable energy generators and transmission and distribution utilities, to : (1) encourage the timely and responsible development of renewable energy and associated transmission, while protecting and enhancing the nation's water, wildlife, and other natural resources; (2) identify appropriate areas for generation and transmission; (3) develop best management practices for renewable energy and transmission projects on public lands to ensure the most environmentally responsible development and delivery of renewable energy; and (4) establish clear policy direction for authorizing the development of solar energy on public lands.  On February 22, 2010, Secretarial Order 3285 was amended to clarify Departmental roles and responsibilities in prioritizing development of renewable energy.  The amended order is referred to as Secretarial Order 3285A1.

   As an agency with a multiple-use mission, to comply with Secretarial Order 3285A1, the BLM must make land use decisions that are environmentally responsible and sustain the health and productivity of the public lands for the use and enjoyment of present and future generations.  The BLM recognized that for solar energy development to be successful, it must be consistent with protection of other important resources and values, including cultural, historic, and paleontological values, units of the National Park System, national wildlife refuges, and other specially designated areas.

BLM_0026633

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-7

To comply with Executive Order 13212 and the Energy Policy Act of 2005, and later with Secretarial Order 3285A1, and to replace elements of the 2007 Solar Energy Development Policy, the BLM began developing a comprehensive solar energy program in much the same way as the BLM had developed the 2006 Wind Energy Policy.  In May 2008, in conjunction with the DOE, the BLM initiated a programmatic environmental impact statement (PEIS) for solar energy development under NEPA.  In December 2010, the BLM and DOE published the Draft Solar PEIS.  During the comment period, the public, as well as many cooperating agencies and key stakeholders, offered suggestions on how the BLM and DOE could increase the utility of the analysis, strengthen elements of the BLM's proposed Solar Energy Program, and increase certainty regarding solar energy development on BLM-administered lands.  On October 28, 2011, the lead agencies published a supplement to the Draft Solar PEIS, in which adjustments were made to elements of the proposed Solar Energy Program and to guidance for facilitating utility-scale solar energy development to better meet BLM and DOE solar energy objectives.  The Final Solar PEIS was published in July 2012; after further deliberation and consultation, the record of decision (ROD) was signed by the Secretary in October 2012 that—

- Created a comprehensive Solar Energy Program to administer the development of utility-scale solar energy resources on BLM-administered public lands in six southwestern states: Arizona, California, Colorado, Nevada, New Mexico, and Utah, including a component that requires continued consultation with tribes at the project-specific level;

- Provided that future project-specific environmental analyses for solar energy development would tier from the analysis in the Solar PEIS/ROD, thereby allowing the project-specific analyses to focus just on critical, site-specific issues of concern; and

- Established land use allocations and incorporated required programmatic and specific design features into 89 BLM LUPs in the 6-state study area.

In addition, the decision: (1) identified areas excluded from utility-scale solar energy ROWs; (2) established 17 SEZs, which are priority areas for utility-scale solar energy development ROWs, and identified a process to establish new SEZs; and (3) identified *variance areas*, areas potentially available for utility-scale solar energy development outside of exclusion areas and SEZs.

2. **Wind Energy**.  In response to Executive Order 13213, issued in 2002, the BLM developed the interim Wind Energy Development Policy (IM 2003-020) to address immediate needs for responding to requests for wind development on public lands.  Because of the need for a permanent policy, the BLM in 2003 began a comprehensive process of reviewing the potential of the public lands to support wind energy development.  Utilizing the Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States (Wind

BLM_0026634

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-8

PEIS), which analyzed alternatives and potential impacts of wind energy development, the BLM in January of 2006 issued a ROD that—

- Established a comprehensive Wind Energy Development Program to administer the development of wind energy resources on BLM-administered public lands in 11 western states (Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming), which includes a component that required continued consultation with Indian tribes at the project-specific level;

- Provided that future project-specific environmental analyses for wind energy development would tier from the analysis in the Wind PEIS/ROD, thereby allowing the project-specific analyses to focus on critical site-specific issues of concern;

- Established policies and best management practices (BMP) for the administration of wind energy development activities;

- Replaced the BLM Interim Wind Energy Policy with a new policy (IM 2009-43) that incorporated the programmatic policies and BMPs evaluated in the PEIS; and

- Amended 52 BLM LUPs in 9 states: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The LUP amendments included the adoption of the Wind Energy Development Program policies and BMPs described in the Wind PEIS, as well as identification of specific areas where wind energy development will be excluded.

## H. Solar and Wind Energy Development Policy

Processing applications for solar and wind energy projects on public lands must be carried out in the following manner:

1. **Inventory and Planning**. The BLM released the Wind PEIS in collaboration with the DOE's National Renewable Energy Laboratory. Appendix B of the Wind PEIS provided an inventory of wind resource maps of the public lands administered by the BLM. Updates to these wind resource maps are available online on BLM's West-wide Wind Mapping Project,   a web-based geospatial data viewer that may be downloaded for further review and use.

   All land use planning efforts must address the renewable energy resource potential, tribal and public concerns, and opportunities for renewable energy development within the land use planning area. Land use plan revisions will address the environmental and tribal/public concerns associated with commercial wind energy development, such as the availability of lands for development applications or the designation of exclusion or competition areas.

BLM_0026635

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-9

2. **Open, Exclusion, and Competitive Lands**.  *Open areas* are lands that the BLM may accept applications for renewable energy development that have not been identified as exclusion or competitive areas.  Open areas may have been previously referred to as avoidance or variance zones that are potentially sensitive to renewable energy development.

*Exclusion areas* are lands for which the BLM will not accept applications for renewable energy development.  BLM has determined that such development of these lands is incompatible with specific resource management goals and objectives, and a decision was made excluding those lands from renewable energy development.  Lands excluded from renewable energy site monitoring and testing and development include designated areas that are part of National Conservation Lands (wilderness areas, WSAs, national monuments, national conservation areas, wild and scenic rivers, and national historic and scenic trails).

*Competitive areas* are lands that BLM has identified as preferred areas for solar and wind energy development.  A competitive process to offer these lands is described in the BLM's regulations (when final) under 43 CFR Subpart 2809.  Competitively designated areas are generally closed to applications for renewable energy development and may only hold competition to determine a successful bidder.  The selected bidder will receive the authorization once all bidding requirements are fulfilled.  These areas would include areas designated through BLM's landscape-scale land use planning process as appropriate for solar or wind development through a competitive offer.

Land use plans may identify ROW avoidance, exclusion or competition areas under BLM land use planning guidelines (see appendix C of H-1601-1, Land Use Planning Handbook).  The identification of open, exclusion, and competitive areas on the public land may be found in BLM's land use planning decisions and program implementation tools under the BLM's renewable energy webpage.

3. **Processing Timeframes, Authorizations, and Due Diligence**.  ROW developments for solar and wind energy must be identified as a priority field office workload and will be processed in as timely a manner as possible.  Application and development due diligence requirements are found within the BLM's development policies and regulations under 43 CFR 2800.  These requirements include those for site and project area testing and monitoring, development, cost recovery, rents and fees and bonding.  Such policies and regulations may be found on the BLM's renewable energy webpage.

4. **Performance and Reclamation Bond**.  The BLM must require a performance and reclamation bond for all solar and wind energy projects to ensure compliance with the terms and conditions of the ROW authorization.  The authorized officer may increase or decrease the bond amount at any time during the term of the ROW authorization, consistent with the BLM regulations and policies.

BLM_0026636

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XI-10

5. **Design Features and Best Management Practices**.  The BLM's Solar PEIS identified the impacts of solar energy development and BMPs in terms of design features that can mitigate or reduce adverse impacts from solar development on the public lands.  The design features include mitigation measures which in turn specify project-specific plans such as heritage resources protection measures and mitigation plans addressing tribal concerns to the maximum extent feasible.  The terms and conditions of each ROW lease or grant must require that these plans be included in a POD and that the holder will fully comply with the terms of the plans.

The BLM's Final Wind PEIS identified the impacts of wind energy development and BMPs that can mitigate or reduce adverse impacts from wind development on the public lands.  The BMPs include mitigation measures which in turn specify project-specific plans that may include heritage resources protection measures and mitigation plans addressing tribal concerns to the maximum extent feasible.  The terms and conditions of each ROW lease or grant must require that these plans be included in a POD and that the holder will fully comply with the terms of the plans.

BLM_0026637

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XII-1

**CHAPTER XII.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE FLUID MINERAL PROGRAM (RESERVED)**

BLM_0026638

# CHAPTER XIII.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE MINERALS PROGRAM

## A.  Introduction

This chapter explains how BLM managers and staff carry out tribal consultation and coordination when managing onshore Federal mineral resources and when assisting the BIA, tribes, and Indian allottees with minerals management under the trust responsibilities of the DOI. (The term Indian allottee means any Indian for whom land or interest in land is held in trust by the United States or who holds title subject to Federal restriction against alienation.)

The DOI's Bureau of Ocean Energy Management is responsible for managing the development of the nation's offshore resources.  Functions include leasing, plan administration, environmental studies, and resource and economic evaluation.  The Bureau of Safety and Environmental Enforcement enforces offshore safety and environmental regulations.

## B.  Onshore Energy and Mineral Lease Management Interagency Standard Operating Procedures

Significant interagency coordination is required when managing both Federal onshore minerals as well as Indian trust mineral resources.  Recently, an interagency working protocol was executed formally specifying these roles and responsibilities, known as Onshore Energy and Mineral Lease Management Interagency Standard Operating Procedures, or Standard Operating Procedures (SOP).  The purpose of the SOPs, effective October 1, 2013, is to establish common standards and methods for creating efficient and effective working relationships to achieve the Departmental goal of accurate energy and minerals accountability for onshore Federal and Indian leases.

The SOPs describe the responsibilities and information sharing required among bureaus and offices under the jurisdiction of the Assistant Secretary, Policy, Management and Budget; Assistant Secretary, Land and Minerals Management; Assistant Secretary, Indian Affairs; and the OST in carrying out the DOI's responsibilities for Federal and Indian onshore lease management and accounting.

The SOPs were developed by a working group of staff from the BLM, BIA, Office of Natural Resources Revenue (ONRR), Office of Surface Mining Reclamation and Enforcement (OSM), OST, and Office of Indian Energy and Economic Development (IEED).  They explain the sole, joint, and final responsibilities assigned to agencies for all activities required for the leasing and development of minerals on Indian trust and Federal onshore lands.  The SOPs replace earlier versions of the Tripartite MOU between the BIA, the BLM, the ONRR (the former Minerals Management Service), and OSM.

While formal lines of communication are established in the SOP between the Federal agencies, especially between the BLM and the BIA, the BLM does retain the responsibility to communicate with allottees regarding mineral development, surface resource protection, and

BLM_0026639

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-2

other issues.  Guidance provided elsewhere in this handbook (especially Chapters II and III) may be utilized to carry out such communications and outreach more effectively.

In cases where Indian tribes have established their own departments for the development of mineral resources, they will be responsible for the diligent development of their own mineral resources within their reservations.  In these cases, the BLM and BIA consultation and coordination actions may vary from what is described within the SOP.

1. **Division of Responsibilities**.  The management activities for onshore Federal and Indian leases which involve BIA, BLM, IEED, ONRR, OSM, and OST responsibilities and information sharing are described in eight attachments to the SOP.  The attachments contain detailed tables showing the responsibilities of each agency for all onshore Federal and Indian mineral development activities.  Key attachments—

   - Attachment A:  Agency responsibilities and information sharing for Indian owned fluid minerals that offers a comprehensive listing of actions discussed within the SOP regarding the information sharing and division of responsibilities, by agency, for managing Indian trust fluid minerals;

   - Attachment B:  Agency responsibilities and information sharing for fluid minerals on Federal onshore lands;

   - Attachment C:  Agency responsibilities and information sharing for Indian-owned solid minerals which, like the section on fluid minerals on Indian lands, sets out detailed agency responsibilities assigned to every step in the process of managing and developing solid minerals on Indian lands;

   - Attachment D:  Agency responsibilities and information sharing for solid minerals on Federal onshore lands;

   - Attachment E:  General operating procedures for information sharing by BIA, BLM, IEED, ONRR, OSM, and OST to the public, including sharing personally identifiable information, and for protecting information that may be proprietary or confidential;

   - Attachment F:  BLM/BIA/ONRR responsibilities and procedures for the Indian Mineral Development Act, including administrative responsibilities for BLM, BIA, IEED, ONRR, OST, and tribes;

   - Attachment G:  Responsibilities and procedures of BIA, BLM, and OSM for coal leasing and mining operations on Indian lands, including the procedures for cooperation and coordination among BIA, BLM, and OSM for the surface and resource management of coal mining and exploration on Indian lands; and

   - Attachment H:  Responsibilities and procedures for renewable energy resource development on Indian lands.

BLM_0026640

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-3

2. **Outreach**. Agencies have responsibilities under the SOPs for outreach, including government-to-government consultation and communication with Indian communities to demonstrate the work they perform and to provide customer support. Agencies agree to share their outreach schedules with each other for each fiscal year (and updates as appropriate) to prevent conflicting information dissemination, to promote efficiencies, and to minimize imposition on the resources and time of tribes and individual Indian mineral owners. Agencies must provide copies of inquiries from tribes and allottees to other affected agencies in a timely manner.

## C. Tribal Consultation for Federal Minerals Management Generally

Federal mineral resource management, as with other resource programs, begins with the RMP process involving consultation with all applicable tribes. Refer to Chapter IV, Guidance for Tribal Consultation in Planning and Decision Support, of this handbook. Consultation must seek to ascertain tribal concerns about areas proposed for mineral leasing or development. These include areas of traditional use, access to sacred sites, and other locations of cultural sensitivity. Off-reservation treaty rights on public lands involving mineral development should also be addressed. BLM should protect treaty-based fishing, hunting, gathering, and similar rights of access and resource use on public lands while considering the leasing and/or sale of Federal mineral resources. BLM is directly involved in the right of access for tribal members as they exercise treaty based rights on lands managed by BLM.

A variety of references may be consulted for guidance regarding the planning and development of fluid and solid minerals on Federal onshore lands managed by the BLM and tribal consultation responsibilities associated with such actions. See MS-1780, Tribal Relations, Chapter 1, Section 1.3, Authority, and Section 1.5, References.

In regard to fluid minerals, Onshore Oil and Gas Order No. 1 governs onshore oil and gas operations, Federal and Indian oil and gas leases, and approval of operations. Updated versions of this order cover procedures for processing applications for permits to drill and the use of BMPs in lease development. H-1624-1, Planning for Fluid Mineral Resources, provides detailed instructions for complying with the fluid minerals supplemental program guidance for resource management planning. It covers procedural directions for analyzing and documenting reasonably foreseeable fluid mineral development and the impact of such development on the human environment.

Concerning the solid mineral program, regulations at 43 CFR 3461, Federal Lands Review: Unsuitability for Mining, reference the central role of land use planning assessments. These regulations primarily implement the general unsuitability criteria listed in Section 522(a) of the 1977 Surface Mining Control and Reclamation Act (30 U.S.C. 1272(a)). During the land use planning process and in response to input received from tribes through its consultation process, the BLM must assess the unsuitability of Federal lands for all or certain stipulated methods of coal mining. Each of the unsuitability criteria is applied to all coal lands with development potential identified in the comprehensive LUP or analysis. Comments must be solicited from the

BLM_0026641

public and Indian tribes by notices published in the *Federal Register* and other means of contact and consultation detailed in Chapters IV and V of this handbook.

Twenty criteria are listed for determining lands unsuitable for all or certain stipulated methods of coal mining.  These are—

- Number 7:  All publically or privately owned places which are included in the NRHP, and

- Number 20:  Federal lands in a State to which is applicable a criterion (i) proposed by the State or Indian tribe located in the planning area, and (ii) adopted by rulemaking by the Secretary.

It is clear that thorough and well-documented consultation must accompany this process and the regulations at 43 CFR 3461.2-2 refer to the necessity of completing such consultation prior to the adoption of a comprehensive LUP.

There are a number of references that may be consulted which provide guidance and policy for the management and protection of heritage resources and associated tribal consultation in the face of minerals development on Federal lands.  The ACHP website lists case studies and agreement documents covering minerals projects and compliance timing, consideration of alternatives for project location and implementation, consultation with Indian tribes and other interested parties, and assessment of impacts on natural and cultural landscapes.  The website links to the CEQ and ACHP handbook on integrating NEPA and NHPA; Federal Oversight and Assistance for Shale Gas Development and Section 106; and other resources for complying with Section 106.  The ACHP also maintain links to a toolkit which provides tips and advice for applicants navigating the NHPA Section 106 process

Under terms of the BLM's National PA with the ACHP and the National Conference of SHPOs (2012) (see copy at WEBSITE), each BLM state executes a protocol agreement with its SHPO.  These stipulate how Section 106 consultation will take place locally.

While protocols cannot alter the tribal consultation process specified within 36 CFR 800, local consultation procedures can be customized if agreed to by tribes in signed agreements.  For example, appendix A of Wyoming's Protocol, commits to consultation and compliance procedures specified in numerous coal, oil and gas, and geophysical project-specific supplemental MOA and PAs.

## D.  Tribal Consultation for Federal Minerals Management in Split Estate Situations

The BLM is also involved in the leasing of Federal minerals in split estate situations where they lie under Indian trust lands.  Appendix A of the SOP addresses procedures for such situations involving mineral development.  Onshore Oil and Gas Order Number 1 describes the requirements for approval of these leases.  The order was amended in 2007 by the Oil and Gas Gold Book.

BLM_0026642

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-5

For both fluid and solid mineral development, the BLM is to pursue tribal consultation on potential effects of the proposed Federal action as normally pursued in BLM decisionmaking processes.  In addition, appendix A of the SOPs requires that the BLM consult with the BIA to obtain conditions of mineral leasing approval through a surface use agreement prior to authorizing the action.  The BIA records the surface use agreement with the Land Title and Records Office within 30 days after its execution.  When mutually agreed to, the BIA may assume BLM responsibilities for the surface use agreement and disbursement of any annual payments required for the use of the Indian trust surface.

Any authorization for disposal of water produced by a minerals action will be in accordance with the terms and conditions of the issued application for permit to drill and with Onshore Order Number 7.  Depending upon the method of disposal, other Federal agencies such as the Environmental Protection Agency may also be involved.  For solid minerals, the BLM will use BIA reclamation standards for evaluating an operator's restoration plan.  Upon acceptance of reclamation actions by the operator, the BLM is to notify the BIA in addition to the operator. Attachment G to the SOP addresses coal leasing procedures for split estate situations involving Federal minerals and Indian trust surface.

For split estate situations involving Federal minerals and nonfederal surface, such as State trust lands and private ownership, the BLM is compelled to satisfy the same procedures as if the surface were Federal in regard to NEPA and the NHPA.  The 2008 brochure, *Split Estate: Cultural Resource Requirements on Private Surface—Federal Minerals for Oil and Gas Development*, describes the common Section 106 process applied to fluid minerals situations, including the identification of locations of traditional cultural or religious importance to Indian tribes. (The brochure can be found via the BLM website.)

In all these split estate situations, the Federal mineral rights are considered the dominant estate, meaning they take precedence over other rights associated with the surface property.  However, the BLM is compelled to show due regard for the nonfederal interests, including tribal, and occupy only those portions of the surface that are reasonably necessary to develop the mineral estate.

## E.  BLM Responsibilities for Indian Trust Minerals Management

Development of mineral leases on tribal lands requires consultation with both the BIA and individual tribes.  In certain circumstances, the BLM may be required to consult directly with Indian mineral owners themselves.  BLM employees working in the minerals program need to have detailed knowledge of the BLM role in managing Indian trust minerals and their part in carrying out these responsibilities.  They should be aware that their action or inaction can directly or indirectly impact Indian trust assets, and that Indian lands are very different from private, public, or acquired Federal lands.  For example, allotted lands and mineral ownership can be highly fractionated due to Indian heirship laws, which can make decisions concerning mineral resource development very complicated.

BLM_0026643

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-6

It is important to emphasize that the BLM does not manage or account for trust funds; it manages lands and mineral resources which generate trust funds. The BLM Indian trust minerals responsibility concerns the management of Indian trust assets, which are defined in 303 DM 2.5, Principles for Managing Indian Trust Assets, as "lands, natural resources, money, or other assets held by the Federal Government in trust or that are restricted against alienation for Indian tribes and individual Indians." Potential impacts to trust assets from public land mineral activities should be considered during the RMP process.

1. **Principles for Managing Indian Trust Minerals.** According to 303 DM 2, the proper discharge of the Secretary's trust responsibilities requires that persons who manage Indian trust assets do the following.

   a. Protect and preserve Indian trust assets from loss, damage, unlawful alienation, waste, and depletion.

   - BLM has direct responsibilities for mineral operations on Indian trust lands, and monitors Indian leases for production verification, inspection and enforcement, diligent development, etc. so that the resource is not wasted or unduly depleted. BLM also watches for mineral trespass.

   - The general goal is to maximize economic gain for tribes and/or allottees.

   b. Assure that any management of Indian trust assets that the Secretary has an obligation to undertake promotes the interest of the mineral owner and, to the extent it is consistent with the Secretary's trust responsibility, supports the owner's intended use of the assets.

   - This requires consultation. Field offices should not assume that economic factors are the only ones to consider in determining "best interest." Consult with the mineral owner and use that information to make decisions, which must be technically and legally correct and reasonable. If it is Indian allotted land, BLM may be consulting with BIA, the fiduciary trust officer, or an allottee association.

   - As trustee, the agency makes the final determination, which may at times go against the wishes of the tribe or individual mineral owner.

   - Document all consultations and explain how BLM arrived at its final decision.

   c. Enforce the terms of all leases or other agreements that provide for the use of trust assets and take appropriate steps to remedy trespass on trust or restricted lands.

   - BLM inspects Indian mineral leases to ensure proper measurement and reporting for royalty purposes, inspection and enforcement, etc.

   - BLM employees should be aware that revenues from minerals might be the only income for an individual Indian beneficiary.

BLM_0026644

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-7

d. Promote tribal control and self-determination over tribal trust lands, resources, or interests.

- Make sure employees have a working knowledge of the ISDEAA Titles I and IV.

- Support employment of tribal members under 638 contracts.

e. Select and oversee persons who manage Indian trust assets.

- BLM is responsible for selecting personnel to manage Indian trust resources and must select personnel with the skills and knowledge to successfully carry out the programs and support activities involving Indian trust resources.

- Employees must have an understanding of the trust responsibility and the role of a fiduciary and be willing to accept that responsibility and work with tribes and individual Indian beneficiaries.

f. Confirm that tribes that manage Indian trust assets pursuant to contracts and compacts authorized by the ISDEAA protect and prudently manage Indian trust assets.

- In carrying out program reviews, BLM conducts oversight of tribes with 638 contracts to ensure resources are protected.

g. Provide oversight and review of the performance of the Secretary's trust responsibility, including Indian trust asset and investment management programs, operational systems, and information systems.

- BLM conducts oversight through periodic reviews [inspections, internal control reviews, department reviews, OST reviews] of trust programs, including records and automated systems containing trust data.

h. Account for and timely identify, collect, deposit, invest, and distribute income due or held on behalf of beneficial owners.

- Although BLM has no direct responsibility for trust monies, BLM might be called upon for supporting documentation at the request of BIA, OST, or ONRR.

i. Establish and maintain a system of records that permits beneficial owners to obtain information regarding their Indian trust assets in a timely manner and protects the privacy of such information in accordance with applicable statutes.

- Such records are verifiable and provide information on how the trust resource was managed.

BLM_0026645

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-8

- Documentation assures information can be provided to beneficial owners upon request, while protecting the privacy of those records per applicable statutes (BLM guidance should provide enough information that employees know whether Indian records/data meet payment card industry (PCI) security standards or are publically available).

j. Communicate with beneficial owners regarding the management and administration of Indian trust assets.

- BLM should be in communication with the beneficial owners of the trust resources regularly.  In most offices with Indian minerals responsibility, BLM meets on a periodic basis with tribal minerals personnel.

For example, representatives from the BLM Arizona State Office organize quarterly coal coordination meetings with the Hopi Tribe and the Navajo Nation.  Representatives from the BIA and OSM attend as well.  Participants discuss on a government-to-government basis coal-related mining and environmental issues involving the DOI's management of the Arizona and New Mexico coal mines located within the Hopi and Navajo reservations.

- BLM minerals personnel must understand that the Indian trust programs are part of BLM's mission, and that BLM is not merely doing BIA's job.  The trust functions were delegated to BLM by the Secretary or were established by law.  This puts BLM in the role of a fiduciary, and BLM has the responsibilities of a fiduciary in managing trust assets and making decisions that may impact trust assets.  Not being aware of this might result in inadvertent damage to trust assets, resulting in liability to the Government.  Employees may be held personally liable where it is determined that their actions were deliberate.

k. Protect treaty-based fishing, hunting, gathering, and similar rights of access and resource use on traditional tribal lands.

- BLM is directly involved in the right of access for tribal members as they exercise treaty-based rights on traditional tribal lands managed by BLM.

2. **The BLM Role—Indian Trust Minerals**.  BLM employees must be aware that the Federal Government has been held liable where it was found to be in breach of trust.  This may involve payments to tribes and/or allottees, or may result in new agency procedures.  Some examples are—

- *Cobell* v. *Salazar*:  $3.4 billion dollar settlement

BLM_0026646

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-9

- Assiniboine-Sioux in Montana:  BLM Indian Oil and Gas Diligent Development Program resulted from court ruling

If there is a question concerning trust management issues, look to statutes, regulations, the Departmental Manual, and if not addressed, then go to the Solicitor for advice or formal opinion.

Being a trustee requires good communication within the agency, with other agencies, and with beneficiaries.  Communication with tribes and/or allottees is unlike communication with the public.  Be cognizant of your obligations as trustee and the requirement to do what is in the best interest of the beneficiary.

Keep in mind that each tribe is unique and that the interests of tribes or individual Indians may be different and may change over time.  Get to know the relationship between allottees and their tribe.  These may be adversarial or there may be a conflict of interest between the tribe and allottees.  Know what authority tribes have over allotted lands, if any, in a particular instance.  Check with BIA regarding these issues.

Become familiar with your local tribe(s) organization—chair, council, executives, traditional religious leaders, and so on.  Some dates or seasons of the year are not appropriate for conducting certain minerals management or development activities. Become acquainted with local tribal protocols.  It is helpful to subscribe to the local tribal paper (if there is one) to keep up politically and socially.  Follow local political developments; however, your take on the implications may be different because you are not part of the tribe.  Staff must become familiar with local Indian land ownership patterns, especially in split estate situations where the minerals may be Federal and the surface owner is a tribe or individual Indian, or vice-versa.

Many allottees may be unaware that BLM can help them.  BLM field offices may need to meet in a smaller group when consulting with allottees or have a separate meeting for allottees so they are not worried about the consequences of speaking out.

BLM has to balance its roles of steward of the public lands and Indian mineral trustee. Employees in lands and planning need to be aware of the responsibilities relating to the potential impact on trust assets from public land activities.  Notify tribes/allottees and BIA of the potential or known impacts of Federal land activities and options for mitigation.  Do not inform tribes of potential impacts to their trust mineral assets late in the planning process.  If competing land uses might impact tribal mineral interests, field offices must consult with tribes early on in the process so that they can become involved in the planning stages.

Staff must keep up to date on what is occurring with trust programs, especially if there are problems, new guidance, budget issues, information technology factors, etc. that can affect Indian trust management.

BLM_0026647

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-10

If BLM lands are in a treaty-rights area, employees need to be aware of treaty-based rights of access on public lands.

Employees must remember that funds used to administer BLM's trust programs (e.g., subactivities where the special project codes "TRST", or tribe codes are used) are not trust funds; they are Federal funds used for trust programs.

3. **BLM Personnel Management—Indian Trust Minerals.**  BLM managers must—

- Ensure that employees have the skills and knowledge necessary to carry out their Indian trust minerals duties.

- Devote the resources (budget, people, and equipment) necessary to carry out the trust responsibility.

- Know which employees are working in trust management and how much of their time is spent on this.

- Emphasize to employees the importance of bringing potential/actual problems or issues that may affect their trust work or the way they do their work to the attention of their immediate supervisors.

- Make sure human resources support is available.  If trust positions become vacant, fill them with qualified people.

- Ensure that employees, especially new ones, know they are working with a trust asset.

- Make sure employees are aware of the government-to-government relationship, and know the office and local tribal protocols for Indian consultation and communication.

## F.  Indian Self-Determination Act

BLM minerals personnel need to be aware of the requirements of Titles I and IV of the Indian Self-Determination Act discussed in detail in Chapter II C.4. Title I requires the Secretary to contract with tribes for programs and services carried out by the Federal Government for the benefit of Indians because of their status as Indians.

---

Contracted programs for the BLM include the inspection and enforcement function for minerals operations on Indian lands.  In New Mexico, the BLM has entered into a cooperative agreement with the Jicarilla Apache tribe for improving and coordinating the oil and gas inspection program on tribal lands.  The agreement improves the coordination in planning and programming of these inspections, increases their frequency, and provides for a more uniform application of regulations and improved communications

BLM HANDBOOK
Supersedes Rel. 8-75

Rel. No. 1-1781
12/15/16

BLM_0026648

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIII-11

between the BLM and the tribe in the performance of their regulatory functions.  In Alaska, there is a long history of contracting for cadastral survey of individual allotments.

- Tribes can ask to contract for non-Indian programs under title IV, section 403(c) based on taking over other activities which are of a special geographic, historical, or cultural significance (called nexus programs).  Agreements under this authority are sometimes called "compacts," and whole programs could be affected.

All employees should know that 638 contracts issued under title I are mandatory while compacts agreed under title IV are discretionary; however, both are extremely time sensitive.  Delays may occur because: (1) the request is misdirected or unknowingly delayed by mailroom or other non-program personnel or (2) the request sits on the desk of person who is on leave or travel.

BLM_0026649

## CHAPTER XIV.  GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE CADASTRAL SURVEY PROGRAM

### A.  Background

The Cadastral Survey Program is a core mission of the BLM responsible for supporting field offices by supplying clearly defined boundaries and other boundary and ownership information for the protection and proper management of public and Indian lands.  Both planning and resource programs involve boundary components that may require early involvement of cadastral survey land tenure subject matter experts in the early stages of the decision making process.  Nearly every program requires accurate land boundary knowledge in order to protect the land and resources from trespass and unauthorized use.  This can be achieved after completing management of land boundary (MLB) plans, which utilize the standards for boundary evidence (SBE) process.  By policy, if projects are planned within one-quarter mile of a boundary held in trust by the federal government, then the SBE process is required prior to final decisions and work on the ground.

BLM either performs the needed cadastral surveys itself or oversees the surveying by others.  BLM administers the Public Land Survey System, which is the official system for storing public land boundary record information.  This system includes about 1.3 million linear miles of boundary lines of Federal and Indian lands on 385 million acres in the western United States, excluding Alaska.

Public lands in the United States have been surveyed into townships and sections since 1785.  In most states, these surveys contribute to a master title plat (MTP) showing the survey or boundary lines.  Since 1864 all surveys of Indian lands held in trust by the Federal Government have been under the direction and control of the BLM and one of its predecessors, the General Land Office.  This delegation was codified at 25 U.S.C. 176.  The Department's trust responsibility includes the improvement and protection of approximately 56 million acres of land and natural resources to improve the quality of life for tribal communities.  Establishing Indian land boundaries follows the guidance in the BLM's Manual of Surveying Instructions for the Survey of the Public Lands of the United States 2009 and the Department's Standards for Indian Trust Lands Boundary Evidence: A Cadastral Business Practice Standard.  The standards were developed jointly by the BIA, the BLM, the OST, and the ANCSA corporation representatives.

### B.  Cadastral Program Role in Managing Trust Assets

The 1994 American Indian Trust Fund Management Reform Act (25 U.S.C. 4001) established a State-licensed land surveyor service, titled Certified Federal Surveyor (CFedS), in partnership with the BLM cadastral program.  It also established other technical roles including a pre-approved BIA agency or tribal official or agent, which is an individual who has successfully completed the certification process to qualify to perform land description reviews, and tribal members and BIA employees who have become proficient in the creation and review of legal descriptions.  These programs have strengthened BLM/BIA capacities for addressing trust asset boundary needs.

BLM_0026650

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIV-2

The Office of Special Trust for American Indians (OST) oversees all the trust reform efforts within the BLM, BIA, and ONRR.  The BLM's Washington Office Chief Cadastral Surveyor provides direction and control over BLM's Cadastral Survey Program and its functions regarding tribal issues.  The program's objective is to better "manage risks and assure proper and efficient discharge of the Secretary's responsibility to trust beneficiaries" by reducing the potential for boundary defects.

Proper management of Indian trust boundaries is complicated by the existence of complex and confusing land descriptions resulting from inaccurate or inadequate boundary descriptions.  The BLM Cadastral Survey Program strives to resolve such ambiguities prior to transactions since resolution after transactions can be very costly and may involve litigation.  The standards for boundary evidence (SBE) process for Indian trust lands is a guide for determining when a cadastral survey is needed and when a less costly alternative is appropriate.

## C.  Boundary Evidence

A major focus of the BLM Cadastral Program is the concern for Indian trust lands boundary evidence under authority of the American Indian Trust Fund Management Reform Act.  Boundary evidence is the authenticated documentation used to describe natural or political separation that delineates and identifies a tract of land sufficiently to ascertain its actual location on the ground.  The act enhanced the Department's management of the Secretary's trust responsibility which specifically relates to Indian trust assets, including land or a natural resource held by the Federal Government in trust or that is restricted against alienation.  The objectives of this guidance are to provide "consistent, timely, efficient and economical assessment of the need for boundary evidence relative to Indian trust assets"; expeditiously process Indian trust asset transactions; facilitate solutions to Indian trust asset boundary issues; and protect assets from boundary conflicts, trespass, unauthorized use, and ambiguous land descriptions.  The Cadastral Survey Program webpage on the national BLM website provides additional information on boundary evidence services.

The American Indian Trust Fund Management Reform Act of 1994 created the OST.  The Act addressed the federal government and the Interior Department's management of Indian trust funds.  It established a collaborative approach between BLM and BIA to engage tribal beneficiaries in the management and use of tribal trust assets.  This approach recognized five major business processes, including cadastral survey.  The act also implemented a standard land status record system that includes Indian lands, an improved Federal surveyor program to certify private land surveyors and tribal surveyors, and a program creating a BLM Indian Lands Surveyor (BILS) at each of the BIA regional offices to focus on Indian trust survey issues and provide on-site assistance at the BIA.

The four possible sources for establishing boundary evidence using the SBE process for tribal trust assets are: (1) cadastral land survey by trained professional surveyors; (2) a land description review; (3) a chain of surveys review; and (4) physical land inspection concerning unrecorded activities.  Often the effort produces a boundary assurance report when an actual survey is not

BLM_0026651

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIV-3

performed.  Other non-survey techniques which can be used involve reviewing land survey and land title records, photography, mapping, and utilizing computer software.

## D.  Survey Process

The cadastral survey process begins when an Indian beneficiary, a tribe, or the BIA identifies a need for survey services and submits an informal request to the BLM.  The BLM must determine that the request pertains to trust lands and that the interested party would benefit from the services.  Normally a tribal manager or the BIA initiates a boundary-related task to resolve a trespass, manage or protect natural resources, determine precise reservation boundaries for law enforcement purposes, or for some other purpose.  The BLM develops a cost estimate for the solution, and the BIA, in consultation with the tribe, determines funding availability.  The BIA will incorporate the specific task into an established priority listing for that region.  Funds are provided by either the BIA headquarters or the appropriate BIA regional office to the BLM under an interagency agreement (IA) negotiated by both agencies.  Occasionally individuals or tribes may provide funds directly to the BLM for the cadastral survey services.

During the performance of a cadastral survey, archaeological and historical sites are not recorded or depicted on maps by cadastral survey crews.  Cadastral land surveys are available to the public online or in BLM public rooms.  Restricting public knowledge of the location of heritage resources is needed to maintain their preservation. Cadastral survey crews should report any findings back to the appropriate BLM cultural heritage specialist for follow-up documentation.

Once the cadastral survey or SBE reports are complete, the BLM must enter the information into official records and submit a written report and digital products or other prepared results to the requesting parties.  The tribal managers or BIA are ultimately responsible for the outcome of their approved land transactions.  The standards for boundary evidence (SBE) process is used for acquisitions, conversions, transfers, partitions, asset management, donations, ROWs, easements, leases, and other land and resource transactions.  The tribe or BIA consults with a BLM cadastral surveyor, a certified federal surveyor (CFedS), or a pre-approved agency or tribal official or agent to determine if boundary evidence is needed and the type of method appropriate for the specific occasion.  The Fiduciary Trust Model has identified training for BIA employees and tribal members in regard to cadastral survey, including training at the BLM NTC.

Generally, the BLM should perform cadastral surveys for all acquisitions and for all conveyances, conversions, transfers, partitions, and management activities where improvements are anticipated, management involves a larger property, new boundaries are being established, boundaries and titles are complex and confusing, litigation is probable, or instances where a survey is specifically required.

The needs for survey include establishing accurate boundaries for transfer of ownership, resolving ownership and land use disputes, and establishing accurate locations of proposed roads, pipelines, or utility lines.  The associated extensive fieldwork in conducting a cadastral survey also can result in discoveries of unauthorized or previously unknown land uses or damages.  Thousands of unauthorized use cases have been discovered by BLM/BIA surveys leading to the

BLM_0026652

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XIV-4

recovery of millions of dollars in revenue for tribes from unauthorized ROWs and unauthorized extraction of oil, gas, and other valuable minerals.  Therefore, priority setting by BIA and BLM and the tribes is important.  High risk situations where significant potential revenues could be collected are of particular interest in addition to land transactions.  The creation of an adequate system to identify high risk lands is still a focus of the agencies and tribes.

Despite the sovereign status of tribes exempting them from recording requirements of State laws and regulations, they should have their land surveys recorded in the appropriate state or county record system so that they are accessible to others; this will facilitate the protection of tribal and trust lands.

All title documents affecting Indian land are recorded in the Indian Land Record of Title.  The BIA's Division of Land Titles and Records and its Land Titles and Records Office are the official Federal offices of record for all documents affecting title to Indian lands and for the determination, maintenance, and certified reporting of land title ownership and encumbrances on Indian trust and restricted lands.

BLM_0026653

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

XV-1

## CHAPTER XV.   GUIDANCE FOR TRIBAL CONSULTATION APPLICABLE TO THE REALTY PROGRAM (RESERVED)

BLM_0026654

### Glossary of Terms

#### -C-

*Consultation*: The conduct of mutual, open, and direct two-way communication in good faith to secure meaningful and timely participation in the decisionmaking process, as allowed by law. See government-to-government consultation for the specific form of tribal consultation.

*Coordination*: Communication and dialogue between the BLM and Indian tribes involving leadership or staffs to increase cooperation between the two parties and the effectiveness of their relationship.

#### -D-

*Director:*  Director of the Bureau of Land Management.

#### -E-

*Ethnography*: Structured and systematic analysis of the culture of a community or other distinctive social unit, through fieldwork-based study with members of the community as well as other sources.

*Ethnohistory*: Study of a cultural group's past based on various sources, including ethnography, oral tradition, linguistics, ecology, and other relevant disciplines.

#### -F-

*Federally recognized tribes*: A federally recognized tribe is an American Indian or Alaska Native tribal entity that is recognized as having a government-to-government relationship with the United States, with the responsibilities, powers, limitations, and obligations attached to that designation, and is eligible for funding and services from the Bureau of Indian Affairs.

Furthermore, federally recognized tribes are recognized as possessing certain inherent rights of self-government (i.e., tribal sovereignty) and are entitled to receive certain federal benefits, services, and protections because of their special relationship with the United States.  At present, there are 567 federally recognized American Indian and Alaska Native tribes and villages.

#### -G-

*Government-to-government consultation*: The consultation between BLM officials with decisionmaking authority and elected tribal officials or those tribal representatives specifically delegated by elected tribal officials to engage in such consultation and decisionmaking.  It is built upon the government to government exchange of information and aims to create effective collaboration and informed decision-making.  Consultation is the process of identifying and seeking input from appropriate tribal governing bodies, considering their issues and documenting the manner in which the input affected the specific management decision(s) at issue. Consultation is an accountable process that ensures meaningful and timely input by tribal

BLM HANDBOOK                                                      Rel. No. 1-1781
Supersedes Rel. 8-75                                           12/15/16

BLM_0026655

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-2

officials into the development of regulatory policies and agency decisions that have tribal implications.

*Government-to-government relationship*: The unique legal relationship between the United States and tribal governments.

-I-

*Indian allottee*: Any Indian for whom land or interest in land is held in trust by the United States or who holds title subject to Federal restriction against alienation.

*Indian lands*: Any lands title to which is either (1) held in trust by the United States for benefit of any Indian tribe or individual or (2) held by any Indian tribe or individual subject to restrictions by the United States against alienation.

*Indian organization*: This includes (1) those federally recognized, tribally constituted entities designated by their governing body to facilitate BLM communications and consultation activities or (2) any regional or national organizations whose board is composed of federally recognized tribes and elected/appointed tribal leaders.  These organizations represent the interests of tribes when authorized by those tribes, such as the National Association of Tribal Historic Preservation Officers.

*Indian tribe*: Any Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994 (Pub. L. 103-454; 108 Stat. 4791; 25 U.S.C. 479a-1.)

*Indian trust assets*: Lands, natural resources, money, or other assets held by the Federal Government in trust or that are restricted against alienation for Indian tribes and individual Indians except by acts of Congress.  In the case of the BLM, this term usually applies to any trust mineral lease (fluids or solids) for which the BLM has responsibilities on or within the boundaries of defined Indian lands and allotments, although fiduciary trust obligations may exist when the effect of actions on BLM lands reach Indian lands.

*Inherently governmental function*: As defined by the Federal Activities Inventory Reform (FAIR) Act of 1998 and 2003 Office of Management and Budget Circular A-76, these are functions that, as a matter of Federal law and policy, must be performed by governmental employees and cannot be contracted out.  They are functions so intimately related to the public interest as to require or mandate performance by government personnel.  These activities require the exercise of substantial discretion in applying governmental authority and/or in making decisions for the government.  Inherently governmental functions normally fall within two categories: the exercise of sovereign governmental authority or the establishment of procedures and processes related to the oversight of monetary transactions or entitlements.

BLM_0026656

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-3

-M-

*Management of land boundary*:  Management of Land Boundary (MLB) Cadastral Program strives to incorporate land tenure specialists into consultation processes and products by early involvement in planning projects.

-N-

*Native American*:  Any individual descended from a native group of the Americas, including Aleuts, Eskimos, and American Indians who may also be members of federally recognized tribes or American Indian and Alaska Native organizations.

*Nontrust asset*: An asset that is not held in trust by the United States for the benefit of an Indian tribe.  Examples include natural and heritage resources not on tribal trust lands such as reservations and allotments, sacred sites, human remains, and cultural items subject to NAGPRA.

-P-

*Policies that have tribal implications*: Regulations, legislative comments, or proposed legislation as well as other policy statements or actions that potentially have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

*Property of traditional religious and cultural importance*: A form of historic property as defined in 36 CFR 800; a tangible property (district, site, building, structure, or object) that is associated with cultural practices or beliefs of a living community that (1) are rooted in that community's history and (2) are important in maintaining the cultural identity of the community.  The significance of these properties lies in the role that they play in a community's historically rooted beliefs, customs, and practices.  This term may be considered synonymous with traditional cultural property (TCP; see below).

*Proposed land use*: Any use of lands or resources, BLM-administered or not, that requires a BLM manager's formal approval, whether proposed by BLM or by an outside applicant.

-R-

*Reburial*: An action requested of Federal agencies by lineal descendants or Indian tribes concerning human remains and/or other NAGPRA "cultural items" that (1) have been repatriated from museum collections or (2) have had their custody transferred following an intentional excavation or inadvertent discovery.

*Repatriation*: Transfer of control of human remains, funerary objects, sacred objects, and objects of cultural patrimony by museums or Federal agencies to a lineal descendant or culturally

BLM_0026657

affiliated Indian tribe or Native Hawaiian organization in accordance with NAGPRA and its regulations at 43 CFR 10.

*Reservation*:  Unless another definition is required by Federal statute or regulation, the area of land reserved for a tribe or tribes under treaty or other agreement with the United States, executive order, proclamation, Secretarial order, or federal statute.

*Reserved rights*:  Those rights not specifically extinguished through a treaty or agreement. Rights may include hunting, fishing, and gathering privileges, or water and other resource use guarantees.

-S-

*Sacred site*: "Any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by practitioners of an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site" (Executive Order 13007, section 1(b)(iii)).

*Secretary*: The Secretary of the Interior.

*Subsistence use*:  The customary and traditional use by Native Americans of renewable resources.  For Alaska, specific statutory definition of "subsistence uses" comes from section 803 of the Alaska National Interest Lands Conservation Act of 1980 and is paraphrased as "the customary and traditional uses by rural Alaska residents of wild renewable resources for direct personal or family consumption as food, shelter, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade."

-T-

*Tradition*: Longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses. Traditions are shared generally within a social and/or cultural group and span generations.  They represent a continuity of understanding relative to some activity, way of life, or mode of expression, which guides particular actions and beliefs.  Traditions are not static but evolve to reflect changing economic, political, and technological circumstances.  This knowledge includes an intimate and detailed understanding of plants, animals, and natural phenomena; the development and use of appropriate technologies for hunting, fishing, trapping, agriculture, and forestry; and a holistic concept or "world view" that parallels the scientific discipline of ecology.

*Traditional*: Conforming to tradition.

BLM_0026658

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

G-5

*Traditional cultural property (TCP)*: A phrase often used in reference to a " property of traditional religious and cultural importance" as defined in the NHPA. The property derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community. It commonly refers to a culturally sensitive area that may qualify for the NRHP if it meets the criteria and criteria exceptions at 36 CFR 60.4. See National Register Bulletin 38.

*Tribal government*: The governing body of an Indian tribe as determined by tribal law.

*Tribal land*: Unless another definition is required by Federal statute (such as NHPA) or regulation, land held in trust by the United States on behalf of an Indian tribe, land held by an Indian tribe in fee subject to Federal restrictions against alienation, or land held by an Indian tribe in fee status.

*Tribal notification*: A one-way form of communication that provides information, data, or reports to Indian tribes by the BLM, leading to tribal consultation if the tribe so requests.

*Tribal officials*: Elected or duly appointed tribal leader or official designated in writing by an Indian tribe to represent the tribe in government-to-government consultations.

*Tribal trust resource*: Resources held in trust by the United States on behalf of Indian tribes.

*Tribe*: See Indian tribe.

*Trust relationship*: The unique relationship between the United States and Indian tribes and individual Indians, that is guided by the trust responsibility.

*Trust responsibility*: The highest moral obligations that the United States must meet to ensure the protection of tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights. This responsibility to extend to all Federal agencies. .

BLM_0026659

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A1-1

## Appendix 1 — Acronyms and Abbreviations

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| ACHP | Advisory Council on Historic Preservation |
| AIRFA | American Indian Religious Freedom Act |
| ANCSA | Alaska Native Claims Settlement Act |
| ANILCA | Alaska National Interest Lands Conservation Act |
| ARPA | Archaeological Resources Protection Act |
| BIA | Bureau of Indian Affairs |
| BILS | BLM-Indian Lands Surveyors |
| BLM | Bureau of Land Management |
| BMP | Best Management Practices |
| CEQ | Council on Environmental Quality |
| CFedS | Certified Federal Surveyor |
| CFR | Code of Federal Regulations |
| CX | Categorical Exclusion |
| DLA | Designated Leasing Area |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DM | Departmental Manual |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| E.O. | Executive Order |
| EPAP | Employee Performance Appraisal Plan |
| FLAME | Federal Lands Assistance Management and Enhancement |
| FLPMA | Federal Land Policy and Management Act |
| FOIA | Freedom of Information Act |
| GIS | Geographic Information System |
| HUB | Historically Underutilized Business |
| IEED | Office of Indian Energy and Economic Development |
| IM | Instruction Memorandum |
| ISDEAA | Indian Self-Determination and Education Assistance Act |
| LUP | Land Use Plan |
| MLB | Management of Land Boundaries |
| MOA | Memorandum of Agreement |
| MOU | Memorandum of Understanding |
| NAGPRA | Native American Graves Protection and Repatriation Act |

BLM_0026660

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A1-2

| | |
|---|---|
| NCL | National Conservation Lands |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| NTC | National Training Center |
| O&C Act | Oregon and California Revested and Sustained Yield Management Act |
| OHV | Off-Highway Vehicle |
| ONRR | Office of Natural Resources Revenue |
| OSM | Office of Surface Mining, Reclamation, and Enforcement |
| OST | Office of the Special Trustee for American Indians |
| PA | Programmatic Agreement |
| PCI | Payment Card Industry |
| PD | Public Domain |
| PEIS | Programmatic Environmental Impact Statement |
| POD | Plan of Development |
| Pub. L. | Public Law |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW | Right-of-Way |
| SEZ | Solar Energy Zone |
| SHPO | State Historic Preservation Officer |
| S.O. | Secretarial Order |
| SOP | (Onshore Energy and Mineral Lease Management Interagency) Standard Operating Procedure |
| Stat. | Statute |
| TCP | Traditional Cultural Property |
| THPO | Tribal Historic Preservation Officer |
| U.S.C. | United States Code |
| WSA | Wilderness Study Area |
| WSRA | Wild and Scenic Rivers Act |

BLM_0026661

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-1

### Appendix 2 — Implementation of BLM Policy Regarding Payment to Native Americans for Products Versus Compensation for Their Participation in the BLM's Decisionmaking Processes

MS-1780, Tribal Relations, Chapter 1, Section 1.6, Policy, Subsection. B, Compensation to Tribes, states:

"The BLM traditionally contracts for services, including reports or studies, through the BLM acquisition and procurement procedures to obtain data and documentation on resources it manages or that may be affected by its decisions.  Such contractual relationships will continue.

Upon issuance of this Manual and H-1780-1, the BLM will allow an expansion of compensation to include Native American contributions of information, comments, or input into the BLM's decisionmaking processes.  When it is in the BLM's best interest to do so and is necessary to obtain information needed for the BLM to make land use decisions, managers may provide, or require that land use applicants provide, financial compensation to Indian tribes to help defray their costs for consulting with the BLM regarding land use planning or authorizations. Such compensation may cover the costs of travel, per diem, time of tribal elders or officials."

The following procedures distinguish between contracting for products delivered by Indian tribes and compensating tribes to help defray the costs of participating and providing input into the BLM decisionmaking processes.

### A.  Policy Regarding Contracting for Products

1. **Consider if Contracting is Appropriate**.  The BLM should first consider whether contracting with tribes and tribal representative is appropriate.  The BLM should consider contracting when obtaining reports or other products. No restrictions exist that prevent the BLM from contracting for the services of qualified Native American individuals, firms, or organizations, through the BLM acquisition and procurement procedures to produce in-depth reports or other products. Such contracting does not constitute *consultation* in accordance with the MS-1780, Tribal Relations.

   When contracting for a product, the BLM manager must fully comply with all Federal procurement rules. Where BLM's contract costs would be reimbursable, any form of payment to Indian tribes should be coordinated with affected project applicants beforehand.  All payment should be directed through the BLM using appropriate Federal procurement procedures.  The following examples illustrate situations where it may be appropriate for the BLM to contract for the information and products described:

   a. **BLM requests information about traditional cultural practices affecting present-day plant and animal distributions**.  An interdisciplinary management plan is being developed for an area. In assessing current conditions, questions are raised about how long the current plant species composition has existed and how past land uses including Native American use of fires may have reduced or increased various species. The BLM decides to gather information to better understand how humans

BLM_0026662

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-2

have changed the environment. Elders of the Indian tribe that historically occupied the area agree to share their knowledge of traditional practices that manipulated and changed the plant and animal communities if compensated

b.  **BLM requests assistance in documenting and evaluating a place used for traditional purposes.**  An Indian tribe has informed BLM of a specific place where its members have conducted traditional ceremonies for generations (i.e., a traditional cultural property (TCP)). From the information provided by the tribe, BLM determines that the property is likely to meet the National Register eligibility criteria but requests assistance in more thoroughly documenting and evaluating the property in the field to meet eligibility documentation requirements as well as meet broader management responsibilities under the Federal Land Policy and Management Act. The tribe offers the expertise of a traditional practitioner **who agrees to accompany BLM personnel to the property and assist in its documentation, but** only if he is paid for his time and travel.

c.  **BLM requests tribal participation in preparing written reports or other products**.  An archaeological site is excavated. During consultations with a local Indian tribe prior to the excavation, BLM learns that the site figures prominently in the tribe's oral histories and determines that the tribe's perspective would be a valuable addition to the excavation report. The tribe is willing to assist in writing or providing information for the report if it is paid for doing so.

d.  **BLM requests tribal documentation of traditional land uses and resource exploitation**.  A large-scale right-of-way application for a solar development will result in the removal of large tracts of native vegetation, including Indian rice grass and mesquite.  Indian tribes have indicated a concern regarding the impacts development will cause to these traditional food sources.  The BLM decides to contract for an ethnographic study of traditional uses of Indian rice grass, mesquite beans, and other native plants on the lands potentially affected.  Researchers want to know how important these resources are to traditional lifeways and current lifestyles; whether or not other nearby plant resources could be substituted; and whether compensatory mitigation programs involving seeding new areas for these culturally important plants is possible.

e.  **BLM requests assistance in analyzing or interpreting cultural materials**.  An archaeological site identified during a field inventory contains artifacts unfamiliar to the archaeologist. The archaeologist shows the artifacts to local Native Americans who recognize them as similar in appearance to objects they use in traditional activities. The Native Americans offer to explain the manner in which they use such objects if they are paid for this information. If BLM requests such information, payment may be appropriate.  Interpretations of artifact use and meaning must be cross-checked with other ethnographic, historic, and archaeological sources.

BLM_0026663

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-3

2. **Consult Other Offices**.  Consult other BLM offices for examples of contracts with tribes for such products as ethnographic studies, identification of sacred places, documentation of the meaning of rock art sites, and traditional land use practices.

### B. Policy Covering Compensation for Tribal Input into BLM Decisionmaking Processes

1. **Strategies to Follow Which Can Minimize the Need to Provide Compensation for Consultation**.  Although the BLM may authorize compensation to Indian tribes for some of their costs associated with consultation, BLM field offices should make every effort to minimize the need for such compensation by adhering to the following strategies.

   a. **Avoid creating attendance difficulties**.  Whenever possible, the BLM should schedule meetings on or near reservations and tribal communities so that tribal members can attend without incurring travel and per diem expenses.

   b. **Utilize technology to minimize travel**.  If acceptable to the tribe(s) involved and technologically feasible for both parties, use Internet conferencing programs to create virtual meetings to minimize the need for travel by either party.  While not every tribe will have such technological capabilities, many tribes are updating their information technology capabilities, making such communications possible.

   c. **Take advantage of government-sponsored overlapping meetings**.  BLM field managers should take advantage and meet with tribal officials and other representatives when tribes will be attending meetings that BLM managers and staff would also be attending.  Examples include Congressional Field Hearings, State legislative sessions, or Secretarial or Congressional field visits.  By coordinating schedules, the BLM and tribes may be able to meet for a portion of a day while their representatives are readily available.  However, do not attempt to attend tribally sponsored meetings unless invited to participate.

2. **Goals in Providing Compensation**.  The goals of the BLM providing, or requiring that proponents provide, compensation for tribal participation in BLM decisionmaking processes are: (a) to obtain information necessary to complete compliance reviews and (b) to facilitate tribal reviews of materials in order to meet project deadlines.

3. **Actions/Undertakings for Which Compensation May Be Provided**.

   a. **Large-scale undertakings initiated by outside parties, requiring an environmental impact statement (EIS)**.  Such projects are frequently established on a cost recovery basis. In these circumstances, the proponent may either make arrangements for payments directly with the tribes for their costs or the BLM may use cost recovery funds to compensate or reimburse the tribe(s) for reasonable expenses incurred. For these cases, the BLM must inform the proponent regarding the requirements for work and services that must be performed and the products

BLM_0026664

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-4

expected.  Compensation would be provided for travel costs and per diem to attend consultation meetings.

If contracts are required for ethnographic studies to provide information and insight on traditional lifeways, resources, TCPs, subsistence resources, traditional hunting, fishing, or gathering concerns, or sacred sites that could be impacted by the proposed project, the proponent must award contracts to obtain BLM's specific information needs.

Cost reimbursable accounts may be used to cover BLM staff time, travel expenses, and per diem required to carry out tribal consultation when processing an application or when inspecting and monitoring the public lands covered by an authorization.

b. **Small-scale undertakings initiated by outside parties, usually analyzed and approved with environmental assessments.**  Such actions/undertakings might include oil and gas, range, and, timber projects, etc.  It is expected that tribal consultation will already have taken place at earlier lease approval stages or the land use planning stage.

Nevertheless, the BLM must add a clause or term to existing permits or lease authorizations that informs operators/licensees/permittees that if tribal consultation issues arise, the operator/licensee/permittee may be required to pay for additional tribal consultation.  The BLM's *retained rights* under the oil and gas leasing process allow it to condition development so as to protect the environment, including heritage resources and those resources subject to tribal consultation.  Rights granted on leases are subject to Secretarial orders, Executive orders, and manuals and handbooks when not inconsistent with lease rights granted.  Both section 6 of leases forms and regulations (43 CFR 3101.1-2) allow reasonable measures to be required to be taken to minimize adverse impacts to the environment and other resources.  MS-3101 also established that under the BLM's reserved authority, it may impose additional mitigation measures beyond lease stipulations to ensure that proposed operations minimize adverse impacts to other resources so long as consistent with lease rights granted.  Interior Board of Land Appeals (IBLA) decisions (*see e.g., Yates Petroleum Corp.*, 176 IBLA 144, 155 (2008)) also recognize the BLM's rights to condition post-lease development pursuant to the 43 CFR 3101 regulations and the unnecessary or undue degradation clause, holding that the BLM can require post-lease conditions of approval that were not addressed in original lease stipulations.

Thus, operators/licensees/permittees may be required to pay for tribal consultation and arrange for such payments through their own contracts or other agreements directly with the tribe(s).  Compensation would be provided for travel costs and per diem to attend consultation meetings.

For these cases, the BLM must inform the proponent regarding the requirements for work and services that must be performed and products expected.  If contracts are

BLM_0026665

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-5

required for ethnographic studies to provide information and insight on traditional lifeways, resources, TCPs, subsistence resources, traditional hunting or fishing concerns, or sacred sites that could be impacted by the proposed project, the proponent must award contracts to obtain BLM's specific information needs.

c. **BLM-initiated projects (new resource management plans (RMP), RMP updates, BLM-instigated developments)**.  In these cases, the BLM itself, through the benefitting subactivity, may pay for tribal compensation.  Subject to approval in advance by the field manager and subject to the availability of funds, the BLM may provide compensation to defray the costs of travel, per diem, time, or the preparation of reports, documentation, and correspondence.  Compensation should be provided from the BLM to tribes in accordance with the terms and conditions of assistance agreements, MOAs, or contracts executed in advance.

4. **Third Party Participation**.  The BLM will not provide compensation to third parties who participate in meetings and discussions between the BLM and Indian tribes.  Compensation may only be considered for Indian tribal participants in the government-to-government consultation process.

5. **Reasonable Limits for Compensation Provided by Outside Parties**.  The BLM will not intervene to arbitrate or settle disputes between applicants and tribes over agreements in which the BLM does not participate.  These agreements may include those for contracted goods and services or compensation for participation in the consultation process.  The BLM may only require that applicants make a reasonable and good faith effort to acquire goods and services necessary or reasonable for the BLM to make its decision in a timely manner.  However, the BLM must document the following and continue with its decisionmaking process if the BLM determines that: tribal demands for compensation exceed prevailing standards and negotiations break down on this issue; specified goods or services were never delivered; or the goods or services fail to meet agreed upon deliverables standards.

6. **Format and Provisions for Agreement Documents Establishing Compensation for BLM-Initiated Projects (New RMPs, RMP Updates, and BLM-Instigated Developments)**.  Agreement documents with tribes in which the BLM helps to defray consultation costs for BLM-initiated projects will consider tribal consultation input as fees for professional services.  Amounts provided may not fully cover tribal expenses but, like honoraria, represent a sign of respect.

If the BLM concludes that consultation costs to a tribe constitute a barrier to effective consultation and that an agreement document is appropriate, a lump sum payment on a per project basis directly to the tribe itself is allowed.  Tribal governments will be responsible to distribute the funds to the individual tribal members who have participated in the consultation effort.  Individual tribal members will make their own travel arrangements.  Federal Government per diem rates do not apply.  No receipts are required

BLM_0026666

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-6

on the part of the BLM.  Tribal representative will make their own travel arrangements and be responsible for their own taxes.

The agreement document should contain the following sections and these suggested provisions.

a. **Objective.**  The scope of the project should clearly be defined here in terms of final outcomes anticipated, the role of the parties, and the specific anticipated uses of funding.

b. **Project management plan.**  Project proposals should be incorporated here.

c. **Term of agreement.**  Agreements should be multiyear, usually valid for up to 5 years.

d. **Financial support.**  Funding sources, carry-over provisions, and any cost sharing provisions must be specified.  The BLM may provide compensation for consultation at the discretion of the manager and in consideration of relevant factors, such as the complexity of the project, travel costs, etc. Guidelines for consideration include the following suggested maximum amounts per project—

   - New RMPs—up to $1,000 per tribe,
   - RMP updates—up to $500 per tribe, and
   - BLM-instigated developments—up to $500 per tribe.

e. **Deliverables and reports.**  Care must be taken to describe in detail the expected deliverables or products to be provided to the BLM.  Such descriptions are necessary for the BLM to judge whether or not useful information that met the specified format and content for products was delivered satisfactorily.  Such deliverables might include detailed written NHPA Section 106 or NEPA comments; participation in meetings; formal Section 106 or NEPA verbal comments; and documentation of traditional uses, resources, access, or presence of sacred sites or TCPs within areas likely to be affected by proposed actions or proposed changes in land use.

---

The Montana State Office transferred funds to the Crow tribe who agreed to host intertribal workshops.  These workshops focused on producing individual, formal tribal consultation protocols/agreements for BLM field offices in Montana, the Dakotas, and Wyoming.  Twenty-two Indian tribes were invited to attend.  The goal is to negotiate consultation protocols that can define more efficient and effective consultation procedures between the BLM and tribal governments and/or their designated representatives.  The Crow tribe used the payments to cover the costs of motel accommodations and meeting room expenses.  As "host", the Crow tribe received funding from the BLM via an Assistance Agreement and then distributed funds to

BLM_0026667

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A2-7

participating tribal representatives to reimburse them for costs of mileage and per diem expenses.  Funds were made available by the Crow tribe to be handed out at the beginning of each meeting for all participants attending the workshops.

BLM_0026668

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A3-1

### Appendix 3 — Spreadsheet/Database to Document BLM-Indian Tribal Consultation

The BLM's administrative record must contain the complete documentation of BLM-tribal consultation for each land use plan and action approved by the line officer. Such documentation must include copies of correspondence, telephone logs, meeting notes, emails, and reports exchanged between the parties. The administrative record of tribal consultation must be assembled separately from the record of other obligations to engage the public more generally.

A summary of the consultation history for each tribe should be captured in a spreadsheet/database format in chronological order. Figure A3-1 provides an example of such documentation. In the example, the "Contacting BLM Office" column should list the individual BLM field office engaged in the consultation along with point of contact information for the BLM individual(s) carrying out the consultation. The "Tribe" column must list the tribe involved along with the mailing address, email, and telephone information for the tribal officials and staff who are being contacted. The "Current Status" column provides space to summarize the most up-to-date issues, upcoming meetings, deliverable dates for reports or interviews, or a brief summary of issues of most interest to tribes. The "Contact History" column must provide dates for email, letters, documents, telephone calls, field trips, etc. The "Tribal Response" column briefly summarizes tribal responses or input to documents, meetings, phone calls, or other forms of communication. BLM staff must keep this spreadsheet up to date.

The spreadsheet is a helpful summary, but the complete consultation record, including all documents must be maintained in folders for each individual tribe. The courts have ruled that grouping tribes together in the administrative record is unhelpful. Indian tribes are not interchangeable. Consultation with one tribe does not relieve the BLM of its obligation to consult with any other tribe.

| Contacting BLM Office | Tribe | Current Status | Contact History | Tribal Response |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Figure A3-1     Example of a spreadsheet/database to document tribal consultation.**

BLM_0026669

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A4-1

## Appendix 4 — Coordination of NEPA, NHPA 106, and Tribal Consultation

| National Environmental Policy Act (NEPA) | National Historic Preservation Act (NHPA) Section 106 | Tribal Consultation | Making It Work |
|---|---|---|---|
| **Project Formulation** | | | |
| ➢ **Identify the purpose and need for action**<br>➢ **Conduct internal scoping**[iv]<br>➢ **Describe the proposed action and preiiminary aiternatives**<br>➢ **Identify preliminary issues for analysis**<br> • **Determine appropriate form of NEPA**[i] **compliance: Categorical Exclusion (CX)**[ii]**, Determination of NEPA Adequacy (DNA), Environmental Assessment (EA)**[iii]**, or Environmental Impact Statement (EIS)**[i]<br>➢ **Develop a plan to involve the public** | **Initiate 106 Process**<br>➢ Establish undertaking and potential to cause effects<br>➢ Identify potentially affected State Historic Preservation Officers (SHPO) and/or Tribal Historic Preservation Officers (THPO), tribes and consulting parties<br>➢ Develop a plan to involve the public<br>➢ Begin Section 106 consultation per established protocols when applicable | ➢ Establish list of Indian tribes potentially affected<br>➢ Develop a plan to consult with affected Indian tribes<br>➢ Notify Indian tribes of opportunity to consult | ➢ Incorporate NHPA Section 106 and tribal consultation into the overall project schedule and tracking system |
| **External Scoping** | | | |
| ➢ **Publish/post notification of scoping (notice of intent, press release, website, etc.)**<br>➢ **Conduct scoping**<br>➢ **Refine issues for analysis**<br>➢ **Define scope of analysis**<br>➢ **Refine alternatives**<br>➢ **Identify data needs** | **Identify Historic Properties**<br>➢ Refine Area of Potential Effects (APE) in consultation with SHPO/THPO<br>➢ Seek information from consulting parties on historic properties in the APE<br>➢ Notify the public and invite their comments<br>➢ Review new and existing information and identify data gaps<br>➢ Develop strategy to complete resource identification | ➢ Initiate staff level and government-to-government consultation with Indian tribes.<br>➢ Gather information from Indian tribes to assist in identifying properties of religious and cultural significance | ➢ Include the project in all staff level and government-to-government consultation meetings<br>➢ Include language in any notification of scoping (including notice of intent) stating it partially fulfills NHPA 106 public notification requirements<br>➢ Ensure all public contacts and scoping meetings include NHPA information |

BLM_0026670

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A4-2

| National Environmental Policy Act (NEPA) | National Historic Preservation Act (NHPA) Section 106 | Tribal Consultation | Making It Work |
|---|---|---|---|
| **External Scoping (continued)** | | | |
| | | | ➢ Use scoping and tribal consultation to identify historic resources and key issues, especially landscape level concerns that could pose challenges<br>➢ Document everything |
| **Prepare Preliminary/Draft NEPA Document** | | | |
| ➢ **Include:**<br>  • **Proposed Action**<br>  • **Alternatives**<br>  • **Affected Environment**<br>  • **Environmental Consequences (direct, indirect, and cumulative effects)**<br>  • **Mitigation** | ➢ Complete resource identification and eligibility determination, make determination of effect or no effect, notify all consulting parties and invite their views<br>➢ Consider views of consulting parties and public on effects<br>**Assess Adverse Effects**<br>➢ Assess and determine whether effects are adverse or not. Invite the Advisory Council on Historic Properties (ACHP) to participate as appropriate and according to the state protocol under the programmatic agreement (PA)<br>**Resolve Adverse Effects**<br>➢ Consult to resolve potential adverse effects; prepare draft memoranda of agreement (MOA) or PA | ➢ Continue consultation with Indian tribes to complete identification of resources and effects of proposed action<br>➢ Resolve potential adverse effects to resources of concern; invite tribes to be a party to the MOA or PA that will conclude the NHPA 106 process | ➢ Include any information obtained from the NHPA Section 106 and tribal consultation in the draft NEPA document sections on affected environment, impacts, and mitigation for public review and comment and to help meet Section 106 documentation requirements<br>➢ Include the draft MOA or PA in the appendix of draft NEPA document, protecting sensitive information from tribes<br>➢ Update the public on the status of NEPA, NHPA Section 106 and tribal consultation on state and field office websites<br>➢ Keep tribes informed by including on the agenda at all regular meetings with tribes |

BLM_0026671

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A4-3

| National Environmental Policy Act (NEPA) | National Historic Preservation Act (NHPA) Section 106 | Tribal Consultation | Making It Work |
|---|---|---|---|
| **Release Preliminary/Draft NEPA Document** | | | |
| ➢ **Publish/post notification of draft (notice of availability (NOA), press release, website, etc.)** <br> ➢ **Receive comments on the draft** | ➢ Send draft MOA/PA and documentation required by NHPA Section 106 to SHPOs, tribes, and consulting parties | ➢ Consult on the proposed MOA/PA that will conclude the Section 106 process and determine whether tribes will be primary signatories or concurring signatories | ➢ State that notices of draft NEPA documents (including NOA) partially fulfills requirements of NHPA Section 106; combine mailing of draft NEPA document with coordination of draft MOA/PA <br> ➢ Review NEPA comments to highlight unresolved cultural, historic, and/or tribal issues |
| **Prepare Final NEPA Document** | | | |
| ➢ **Respond to comments** <br> ➢ **Modify draft NEPA document as necessary** | ➢ Respond to comments <br> ➢ Modify draft MOA/PA as necessary | ➢ Respond to tribal comments and concerns | ➢ Include the draft final MOA or PA in the appendix of the final NEPA document |
| **Release Final NEPA Document** | | | |
| ➢ Publish/post notification of final NEPA document (NOA, press release, website, etc.) | ➢ Sign MOA/PA (prior to the decision record or record of decision). | | |
| **Sign Decision Record** | | | |
| ➢ **Document the decision** | | | ➢ Include NHPA Section 106 mitigation in the decision record |

(i) For the purposes of this side-by-side, the NEPA process has been generalized into stages without consideration for specific type of NEPA documentation.

(ii) Section 106 of the NHPA and tribal consultation provide statutory obligations independent of the requirements of NEPA.  Because CXs and DNAs provide limited opportunities for public and tribal involvement, effective coordination between the NEPA process and Section 106 of the NHPA and tribal consultation may not always be possible.

(iii) Some form of public involvement is required in the preparation of all EAs; the type and extent is up to the discretion of the authorized officer.  Examples include: external scoping, public notification before or during preparation of EA, public meetings, or public review and comment on EA prior to it being finalized.  As a consequence, Section 106 of the NHPA and tribal consultation may require more public involvement and consultation than is afforded by an EA.

(iv) Note that the newly revised Management of Land Boundary Cadastral Program strives to incorporate land tenure specialists into consultation processes and products by early

| | |
|---|---|
| BLM HANDBOOK | Rel. No. 1-1781 |
| Supersedes Rel. 8-75 | 12/15/16 |

BLM_0026672

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A4-4

| National Environmental Policy Act (NEPA) | National Historic Preservation Act (NHPA) Section 106 | Tribal Consultation | Making It Work |
|---|---|---|---|

involvement in planning projects.  These specialists should be incorporated into planning teams whenever there is a need for gathering, interpreting, and presenting spatial and land status data.

BLM_0026673

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A5-1

### Appendix 5 — Example of Contents for Tribal Consultation Strategy

A tribal consultation strategy can facilitate communication among all those engaged in the consultation process. Such strategies may be simple or elaborate depending upon the project, those engaged in the project and the complexity of the process (for example, multiple agencies and many tribes). Strategies should clearly identify the roles and responsibilities of those involved in consultation. The following template and examples may be adopted or adapted as needed.

**Introduction to the Strategy**: Provide background and the reasons for developing a consultation strategy.

For example:

- Introduce the project
- Briefly reference the major authorities for tribal consultation on this project (e.g., National Historic Preservation Act (NHPA), National Environmental Policy Act (NEPA), Federal Land Policy and Management Act (FLPMA), relevant Executive orders, and other applicable authorities).

**Purpose**: What is the purpose of this strategy?

For example:

- The tribal consultation strategy will facilitate internal and external communication and help ensure informed and effective consultation among all parties.

**Goals**: What are the goals of this strategy?

For example:

- Coordinate internal communication so that all agency parties, including relevant staff and managers at every level engaged with the project, are informed as necessary and so that any manager engaged in consultation is fully informed of the issues.
- Establish expectations and roles and responsibilities of those key individuals involved in the project.
- Coordinate external communications among agency and federally recognized tribes so that—
  - o All parties are fully informed about the project and its developments from initial planning through construction;
  - o The agency establishes an understanding of how individual tribes prefer to receive information and updates and how to engage in consultation;

BLM_0026674

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A5-2

- o   Information to tribes is conveyed in a timely and respectful manner;
- o   Tribes are provided ample opportunity to make consultation as meaningful as possible, participate in informal dialog and information sharing as well as formal government-to-government consultation, convey their views and issues, and influence the decisions; and
- o   Agencies meet their obligations to comply with laws, regulations, and policies governing tribal consultation and can demonstrate a reasonable and good faith effort to do so.

- Consider other goals that may be appropriate to the project.

**Target Audiences (Internal and External)**: Who are the key players in tribal consultation process? What are their roles and responsibilities?

For example:

- Identify the potentially interested federally recognized tribes:
  - o   Who are the current tribal leaders for official correspondence and government-to-government consultation and what is their contact information?
  - o   Which tribes have a Tribal Historic Preservation Officer? What is his/her name and contact information?
  - o   Which tribal staff or tribal members are likely to be concerned with the project?
  - o   Does the tribe have a designated point of contact for the project or for specific issues (e.g., lands issues, economic development, etc.)?
  - o   Make sure all correspondence is appropriately addressed to the tribal leader and the designated point of contact, and copied to any other relevant staff.
- Find out if there are potentially interested Native American groups that are not federally recognized:
  - o   Who are they and how should they be approached since government-to-government consultation is neither mandated nor appropriate?
  - o   Contact and coordinate with these groups through the NEPA process and comply with presently established state and local practices.
- Identify the BLM personnel likely to be engaged in the consultation process:
  - o   Who is the authorizing officer, decision maker, or other official with primary government-to-government consultation responsibilities?
  - o   Who are other officials likely to be engaged (e.g., Director, state director, other local offices)? What are their roles?

BLM_0026675

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A5-3

- o Who are the key staff (project manager, tribal liaison or staff lead for tribal consultation; other specialists; other staff at other levels of the organization)? What are their responsibilities?

- Identify the proponent and the third-party contractor for the project:

  - o Who are their key contacts for lands, fisheries, natural resources, cultural or other tribal concerns?

  - o What is their contact information?

  - o What are their roles and responsibilities?

- Determine who or what individuals, agencies, or others should be part of the consultation plan:

  - o When and how should these individuals/entities be involved?

**Key Messages**: What do you want to say to each of your audiences? What do they need to know and understand? Develop key messages for consistency among BLM managers and staff.

For example:

- What are the goals of consultation (to make consultation meaningful; to develop relationships; to improve outcomes for all)?

- What contribution can tribes make to the NEPA, FLPMA, Cadastral Survey, Standards for Boundary Evidence Certificate(s), or Section 106 processes?

- What are the key opportunities for tribes to participate in the project? What are the points in the process where tribal engagement is most valuable? How do these relate to project timelines and decisions?

- What can the BLM do to facilitate tribal participation?

- What is the role of delegated authority in the consultation process? Do the various parties to the process understand that role?

- What decisions are anticipated along the way? When will they be made? And by whom?

- What are the main points about the project that tribes need to know, and what are some of the constraints on the project (consider time, location)?

**How do you intend to accomplish communication goals?**

For example:

- Identify the individual tribes' preferred means of communication and consultation.

BLM HANDBOOK                                              Rel. No. 1781-1
Supersedes Rel. 8-75                                        12/15/16

BLM_0026676

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A5-4

- Develop internal communication protocols and tracking mechanisms to ensure all managers and staff remain current and informed regarding tribal concerns and issues, and are consistent in their communications with tribes.

- Develop benchmarks and timeframes for consultation, coordinate with the NEPA, NHPA Section 106, cadastral survey, standards for boundary evidence certificate(s), or right-of-way application processes.

- Maintain confidentiality of tribally sensitive information to the maximum extent possible.

- Make sure to continue and document your outreach efforts even in the face of non-responsiveness from individual tribes.

**Tactics**: What do you need to do to implement strategies and achieve goals?

For example:

- Determine what official correspondence must be prepared, and when should it go out:
  o Start with a letter inviting consultation and conveying key messages.
  o What are the other points in the process when you need to send letters and invite consultation, including face-to-face meetings?
  o Close with a letter to each tribe thanking the tribe for their participation, identifying their issues, and how these concerns were addressed.

- Develop a system for tracking all communication:
  o Each communication with tribes—letters, meetings, phone calls, field trips, formal meeting and staff—should be documented in a correspondence record form or other appropriate log.

- Ensure timely and appropriate follow-up to tribal letters, calls, requests, and issues raised:
  o Consider using a centralized tracking system that will record all contacts, requests, and follow-up actions needed.
  o Designate a point-of-contact (may be a contractor) to maintain the tracking system and to identify all follow-up actions needed (response letters, materials requested, meetings requested, issues raised); to report regularly to staff and management; and to make sure responses are made in a timely manner.

- Integrate Section 106 invitations to consult with the NEPA outreach process.

- Use all appropriate communication tools to ensure frequent and current information flow among various participants: agency, tribes, proponent, consultants:
  o Include letters, meetings, field trips, telephone, email, web, personal communications.
  o Document all communications.

BLM_0026677

H-1780-1 – IMPROVING AND SUSTAINING BLM-TRIBAL RELATIONS (P)

A5-5

- Provide tribes the opportunity to review agency consultation notes and records to ensure correct understanding of tribal concerns and requests.

- Establish the best possible administrative record documenting all efforts at consultation and interaction.

BLM_0026678

Form 1221-2
(June 1969)



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

**MANUAL TRANSMITTAL SHEET**

| Release |
|---|
| 1-1771 |

| Date |
|---|
| 3/2/2016 |

Subject

1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

1. <u>Explanation of Materials Transmitted</u>:  This release establishes policy for the management of domestic sheep and goats to sustain wild sheep on public lands administered by the Bureau of Land Management (BLM).  This release acknowledges wild sheep habitat as a resource that may require special management considerations in the context of BLM authorized domestic sheep or goat grazing, trailing, or other (e.g., recreational) use within and adjacent to wild sheep habitat.

2. <u>Reports Required</u>:  None.

3. <u>Materials Superseded</u>:  This manual updates and supersedes policy guidance contained in Instruction Memorandum No. 98-140 – Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats.

4. <u>Filing Instructions</u>:  File as directed below.

    REMOVE                    INSERT

    None                         13 Pages

*Steven A. Ellis*
Deputy Director, Operations

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

i

## Table of Contents

| | | |
|---|---|---|
| 1.1 | Purpose | 1 |
| 1.2 | Objectives | 1 |
| 1.3 | Authorities | 1 |
| A. | Statutes | 1 |
| B. | Regulations | 2 |
| C. | Orders | 2 |
| 1.4 | Responsibility | 2 |
| A. | Director | 2 |
| B. | Assistant Director of Resources and Planning | 2 |
| C. | Chief, Division of Fish and Wildlife Conservation | 2 |
| D. | Chief, Division of Forest, Rangeland, Riparian and Plant Conservation | 2 |
| E. | State Directors | 2 |
| F. | District Managers | 3 |
| G. | Field Managers | 3 |
| 1.6 | Policy | 4 |
| 1.7 | File and Record Maintenance | 5 |
| 1.8 | Guide to Management Practices | 5 |
| A. | BLM Management Practices | 6 |
| B. | Permittee/Lessee Management Practices | 8 |
| C. | Optional Agreements to Address Site Specific Issues | 9 |
| 1.9 | Coordination | 10 |
| | Glossary of Terms | G-1 |

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

1

## 1.1   **Purpose**

The purpose of this manual is to provide policy guidance for the coordination and management of domestic sheep and goats to sustain wild sheep on the BLM managed lands (BLM lands). Respiratory disease is one of the most crucial factors influencing the bighorn sheep populations. Domestic sheep and goats are carriers of bacteria that may cause substantial wild sheep mortality as a result of respiratory disease. These carriers are generally not fatal to adult domestic sheep.[1]

Specifically, this manual sets forth policy for the management of BLM lands where the presence of domestic sheep or goats may lead to (1) interaction with wild sheep, and (2) the potential for disease transmission between the species. This manual applies to both grazing authorizations, including trailing, and to other non-permitted (or unregulated) activities, where this guidance is applicable, that may result in the presence of domestic sheep or goats in wild sheep habitat on the BLM lands.

## 1.2   **Objectives**

The objectives of this manual are to (1) support multiple use and sustained yield management of BLM lands; (2) promote sound management of domestic sheep and goats to sustain wild sheep; and (3) provide bureau-wide consistency to reduce the potential for contact between wild sheep and domestic sheep or goats that could result in disease transmission between the species.

## 1.3   **Authorities**

### A. Statutes

1. The Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. §1701, *et seq.*)

2. Public Rangelands Improvement Act of 1978 (43 U.S.C. §1901, *et seq.*)

3. National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. §4321, *et seq.*)

4. Endangered Species Act of 1973 (16 U.S.C. §1531, *et seq.*)

5. Sikes Act of 1960 (16 U.S.C. §670, *et seq.*)

6. Taylor Grazing Act of 1934, as amended (43 U.S.C. §315, *et seq.*)

7. Tribal Forest Protection Act of 2004 (25 U.S.C. §3115a)

---

[1] Miller, M.W.; Knowles, D.P.; Bulgin, M.S.; Clay, B.R.; Cook, W.E.; Srikumaran, S.; Scarfe, A.D.; and Layfield, D. 2008. Pasteurellosis Transmission Risks between Domestic and Wild Sheep. Publications from U.S. Department of Agriculture –Agricultural Research Service, University of Nebraska Faculty Paper Number 285.

Wild Sheep Working Group. 2012. Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat. Western Association of Fish and Wildlife Agencies.

BLM Manual

Rel. No. 1-1771
Dated 3/2/2016

BLM_0026681

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

2

### B. Regulations

1. 43 C.F.R. Part 24 – Department of the Interior Fish and Wildlife Policy:  State-Federal Relationships
2. 43 C.F.R. Subpart 1601 – Planning and Subpart 1610 – Resource Management Planning
3. 43 C.F.R. Subparts 4100 and 4200 (1995) – Grazing Administration

### C. Orders

Secretarial Order 3317 – Department of the Interior Policy on Consultation with Indian Tribes

## 1.4    Responsibility

### A. Director

The Director is responsible for overall leadership to implement this policy on the coordination and management of domestic sheep and goats to sustain wild sheep on BLM lands.

### B. Assistant Director of Resources and Planning

The Assistant Director of Resources and Planning is responsible for ensuring the implementation of this policy on BLM lands.  The Assistant Director also provides policy and program interpretations, direction, and line management to achieve consistency of field implementation of this policy.

### C. Chief, Division of Fish and Wildlife Conservation

The Chief, Division of Fish and Wildlife Conservation, is responsible for initiating and recommending policies, objectives, general procedures, national level coordination (including partner organizations), and priorities relating to implementation of this policy.

### D. Chief, Division of Forest, Rangeland, Riparian and Plant Conservation

The Chief, Division of Forest, Rangeland, Riparian and Plant Conservation is responsible for initiating and recommending policies, objectives, general procedures, national level coordination (including partner organizations), and priorities relating to implementation of this policy.

### E. State Directors

State Directors are responsible for:

1. Establishing policy supplemental to Manual 1730, if necessary, on BLM lands within their state(s) for the management of domestic sheep and goats to sustain wild sheep that is consistent with applicable laws, regulations, and policies.

BLM_0026682

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

3

2. Providing state leadership to ensure the management of domestic sheep and goats to sustain wild sheep is integrated into statewide programs and land use plans (e.g., Resource Management Plans) as appropriate.

3. Coordinating with other federal agencies, states, tribes, local governments, private industry, and the public when planning and implementing this policy.

4. Ensuring government-to-government consultation and collaboration with tribes, as applicable, when planning and implementing this policy.

**F. District Managers**

District Managers are responsible for:

1. Implementing laws, regulations, and policies to ensure the management of domestic sheep and goats to sustain wild sheep is considered in land use plans, implementation-level plans, and land-use authorizations.

2. Coordinating with other BLM offices, other federal agencies, states, tribes, local governments, private livestock industry, and the public when implementing this policy.

**G. Field Managers**

Field Managers are responsible for:

1. Planning and implementing wild sheep and habitat projects, in coordination with the states, tribes, and/or partner organizations, to ensure they are consistent with applicable laws, regulations and policies.  Field Managers also are responsible for planning and implementing domestic sheep and goat management decisions that are consistent with applicable laws, regulations and policies.

2. Coordinating with other BLM offices, other federal agencies, states, tribes, local governments, private livestock industry, permittees/lessees, and the public when implementing this policy.

**1.5    References**

1. BLM Manual 1601 – Land Use Planning.

2. BLM Handbook H-1601 – Land Use Planning Handbook.

3. BLM Manual 1745 – Introduction, Transplant, Augmentation, and Reestablishment of Fish, Wildlife, and Plants.

4. BLM Manual 6500 - Fish and Wildlife Conservation.

5. BLM Manual 4100 - Grazing Administration.

BLM Manual                                                              Rel. No. 1-1771
                                                                       Dated 3/2/2016

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

4

6. BLM Handbook 4110 – Grazing Qualifications and Preference.

7. BLM Handbook 4130 – Grazing Use Authorizations.

8. BLM Handbook 4160 – Decisions, Appeals, and Hearings.

9. Western Association of Fish and Wildlife Agencies. Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat. Prepared by the Wild Sheep Working Group. 2012.

10. U.S. Animal Health Association Joint Working Group Committee of Wildlife Diseases & Committee on Sheep and Goats. Recommendations on best management practices for domestic sheep grazing on public land ranges shared with bighorn sheep. 2009.

## 1.6   Policy

The BLM's policy will be to (1) achieve effective separation of BLM authorized domestic sheep or goats from wild sheep on BLM lands, and (2) to minimize the risk of contact between the species. Effective separation is defined as the spatial or temporal separation between wild sheep and domestic sheep or goats, resulting in minimal risk of contact and subsequent transmission of respiratory disease between animal groups (see glossary). Currently, physical separation of domestic sheep or goats from wild sheep is the only effective means to reduce the potential for pneumonia-type disease transmission. Domestic sheep and goat authorizations and other uses will be implemented to ensure that effective separation results in a high degree of confidence that there will be a low to no risk of contact with wild sheep.

The BLM will execute this policy by including goals and objectives within land use plans, implementation-level plans, and land-use authorizations to support sustainable wild sheep and wild sheep habitat in fulfillment of the BLM's multiple-use and sustained yield mission. Where appropriate, the BLM will consider the potential for disease transmission in NEPA analyses, land use plans, implementation-level planning documents, and land-use authorizations. Wild sheep and domestic sheep and goat management activities will be planned, implemented, monitored, and evaluated in consideration of current and desired conditions and the potential for future changes in landscape and environmental conditions.

The BLM will use the best available science and information and carefully assess the stressors on wild sheep and habitat, including but not limited to the potential for disease transmission from domestic sheep or goats. Stressors will depend on local conditions but may include proximity to domestic sheep on private land, development pressure, degraded habitat and fragmentation, and translocation efforts, among other stressors. The BLM will consider the needs of the public through land use planning efforts so that it can make informed decisions on the management of domestic sheep and goat use and wild sheep and habitat on BLM lands. Further, the BLM will communicate, coordinate, and collaborate with stakeholders of BLM lands to achieve wild sheep and domestic sheep and goat management objectives. See also Coordination Section 1.9.

BLM_0026684

## 1.7     File and Record Maintenance

All records associated with wild sheep and domestic sheep and goat management will be managed according to established records retention and disposal policies.  See BLM Manual Section 1220, Records and Information Management, for disposition policies and procedures.

## 1.8     Guide to Management Practices

Management practices will be considered during NEPA analyses for inclusion as terms and conditions in domestic sheep and goat grazing permits and leases, where applicable, along with additional site-specific or new practices that help to achieve effective separation and minimize the risk of contact, based on the best available science and information.  To reduce the potential for disease transmission, the BLM will consider (1) habitat distribution; (2) connectivity; (3) wild sheep occurrence; (4) wild sheep population numbers; (5) proximity of wild sheep populations to areas authorized for domestic sheep and goat grazing or trailing; (6) risk of inter-species contact; (7) domestic sheep and goat allotment boundaries and season of use; (8) domestic livestock operational needs; and (9) other pertinent parameters affecting the BLM's ability to provide for effective separation when authorizing domestic sheep and goat uses on BLM lands.  The selection of management actions will consider the context of surrounding lands, especially those involving domestic sheep or goats, as well as surrounding wild sheep populations across one or more planning areas.

Coordination is essential when making management decisions and implementing management practices.  This includes early and timely communication with other federal agencies, states, tribes, local governments, permittees, lessees, and partner organizations.  Public involvement occurs primarily through the NEPA and decision-making process.  The BLM will provide outreach to the public through educational efforts and with partner organizations.  See also Section 1.9 – Coordination.

In general, these management practices will apply to (1) BLM grazing allotments with authorized domestic sheep or goat use, including trailing; (2) authorized recreational activities involving domestic sheep or goats; and (3) the use of domestic sheep or goats in vegetation management, including treatment of invasive or undesirable plant species.  Management practices also will apply where use of goats may occur in connection with generally unregulated recreational activities, and for unauthorized livestock grazing actions where there is a potential risk of contact with wild sheep, to the extent feasible.

The BLM will coordinate with Federal, State and local agencies and Tribes to map habitat, connectivity, wild sheep occupied habitats, and movement patterns of wild sheep within and among the states.  Current habitat maps and movement (i.e., telemetry) information are available in many States as well as wild sheep management plans.  These maps and plans will be a source of information to identify wild sheep distribution and use patterns.

The potential risk of wild sheep contact or interaction with domestic sheep or goats will be analyzed using the best available science and information, best available models, and updated

BLM_0026685

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

6

habitat maps.[2]  Specifically, a risk analysis will be conducted when domestic sheep or goat grazing authorizations, including trailing, or other activities, are under consideration when (1) land-use plans are developed, including revisions, relevant amendments, and implementation-level plans; (2) issuing or renewing domestic sheep or goat grazing permits; and (3) when risk has not previously been analyzed or when new/updated science, information, analysis tools, models, or maps could substantially affect the results of a previous risk analysis, as determined by the BLM authorized officer (normally the BLM field manager).  At the outset of planning and identifying the range of alternatives in the NEPA review, the level of analysis should be commensurate with the presumed degree of risk for inter-species contact and potential disease transmission determined with coordination with partner agencies, tribes, and permittees, and lessees.

Once the risk of contact between wild sheep and domestic sheep or goats has been identified for a specific area, and for the range of alternatives in NEPA, the BLM authorized officer will evaluate the identified level or extent of risk and determine if domestic sheep or goat grazing can occur and still achieve effective separation from wild sheep.  The decision will include an assessment of how management practices and geographic features are expected to provide for effective separation as documented in the applicable NEPA analyses and decision documents for proposed activities.  The higher the level of risk, the more likely that management practices will need to be incorporated into decisions to achieve effective separation, including not authorizing domestic sheep or goat grazing or other uses.

The section below outlines (1) BLM management practices; (2) permittee/lessee management practices; and (3) options for developing agreements to address site-specific, time-sensitive, and other state and local level actions to achieve effective separation.  The practices that are applicable to particular planning efforts or land-use authorizations will be considered in the applicable NEPA analyses and range of alternatives.  Not all practices will be feasible or relevant to a particular planning effort or land-use authorization.  However, the BLM authorized officer (i.e., field manager) will include the practices that are expected to provide for effective separation between wild sheep and domestic sheep or goats.  Selected practices will be included as terms and conditions in land-use authorizations, including livestock grazing permits.

### A.  BLM Management Practices

1. The BLM will consult with the state wildlife agencies, tribes, and other experts (e.g., other federal agencies, academic institutions, partner organizations) for the most current techniques, management practices, plans, and local maps to provide effective separation

---

[2] Maps displaying occupied wild sheep habitat and domestic sheep and goat grazing authorizations on BLM lands are available on the BLM's national website under the Wildlife Program at:

http://www.blm.gov/wo/st/en/prog/more/fish__wildlife_and/wildlife3/1.html.

Also, the Bighorn Sheep Risk of Contact Model, is available for BLM decision makers to analyze risk of contact between domestic sheep or goats and wild sheep.  The BLM field staff should contact their state wildlife program lead to access model components, updated user guide, and required software.  The maps and modeling tool are subject to periodic updates.  Refined maps or modeling tools may be available for local areas but should be commensurate with these nationally-available tools.

BLM Manual

Rel. No. 1-1771
Dated 3/2/2016

BLM_0026686

between wild sheep and domestic sheep or goats.  The BLM will consider developing a separation response plan in cooperation with the affected permittee/lessee, state wildlife agency, and other affected entities.

2. Where domestic sheep or goats are authorized (including trailing and for vegetation management), or where recreational sheep or goats use (e.g., pack animals) may occur, and there is a potential for inter-species contact of wild sheep and domestic sheep or goats, land use plans and/or implementation-level plans will prescribe management practices to provide effective separation.  Identify in the land use plan and/or implementation-level plan if opportunities exist for allotment or pasture management changes to help achieve effective separation.

3. The BLM will work with federal land managers, tribes, state agencies and the public to establish attainable goals and objectives for the abundance and distribution of wild sheep within current, historic, and/or other suitable ranges adjacent to BLM lands.

4. The BLM will develop management practices that address the potential for interaction between wild sheep with domestic sheep or goats when developing implementation-level plans for the management of livestock grazing allotments, including permit renewals and terms and conditions, as well as other projects involving domestic sheep or goats on BLM lands.  The outcomes of these implementation-level plans and NEPA-supported decisions will inform subsequent land use planning efforts on BLM lands.

5. In the absence of a specific agreement with the state, tribes, permittees/lessees, and/or other entities, the BLM will identify the process, protocols, and timelines for short-term or emergency management actions and communications when intervention is needed to respond to observed or reported interaction of wild sheep with domestic sheep or goats (i.e., emergency separation response plan).  At a minimum, the BLM will immediately notify (i.e., as soon as feasible) the applicable state wildlife agency of any observed or reported contact, interactions, or close proximity between wild sheep and domestic sheep or goats.

6. Coordinate with the applicable state wildlife agency to determine the wild sheep population and herd priorities or emphasis areas, using state Wildlife Action Plans or other plans (e.g., state Bighorn Sheep Management Plan) and use that information to inform domestic livestock grazing authorization decisions.  Determine occupied and suitable unoccupied wild sheep habitat within the planning unit in coordination with the state wildlife agency.  Encourage early coordination regarding state agency actions to translocate wild sheep to avoid areas where the BLM has authorized domestic sheep and goat grazing or other uses.

7. Develop an approach for identifying, reporting, and quickly recovering stray domestic sheep or goats.  Ensure that any permit terms and conditions are being implemented.  The BLM will track and record the number of stray domestic sheep or goats, and whether stray animals were located and returned to the herd or authorized use area on BLM lands, in cooperation with permittees/lessees.

8. Do not convert the kind of livestock use from cattle to domestic sheep or goats on allotments within, or in proximity to, priority wild sheep populations or emphasis areas (as described in BLM Management Practice #6, above).

BLM Manual

Rel. No. 1-1771
Dated 3/2/2016

BLM_0026687

9. Identify topographic features or natural or man-made barriers (e.g., fencing, interstate highways, extensive areas of dense forest vegetation, lack of suitable habitat) that increase physical separation between wild sheep and domestic sheep or goats.

10. Do not authorize trailing of domestic sheep or goats across areas where wild sheep are present during the time of trailing.  Ensure an advance on-site evaluation to determine if wild sheep are present near the trailing route and proceed according to a separation response plan or other authorization terms and conditions.

11. If effective separation between wild sheep and domestic sheep or goats cannot be reasonably expected, and/or if reporting indicates that contact has occurred in spite of the best efforts to implement management practices to prevent contact, consider relocating the authorized sheep or goats to another allotment(s) where risk of contact is lower.

12. If the allotment/authorization cannot be managed in a manner that will provide effective separation, then seek voluntary non-use from the permittee (in accordance with the provisions in 43 C.F.R. §4110.3-3 – Grazing Qualifications and Preference) while seeking long-term solutions to achieve effective separation.

13. If the permittee/lessee is unwilling to apply for voluntary non-use, issue a final decision effective upon issuance or temporary suspension of domestic sheep or goat use in the allotment (in accordance with the provisions in 43 C.F.R. §4110.3-3 – Grazing Qualifications and Preference) while seeking long-term solutions to achieve effective separation.

14. If effective separation between wild sheep and domestic sheep or goats is not achievable, and relocating the permitted or authorized use is not possible, consider livestock use conversion from domestic sheep or goats.

15. If effective separation between wild sheep and domestic sheep or goats is not achievable, consider cancelling a domestic sheep or goat authorization or closing an allotment to domestic sheep and goat use, particularly when priority wild sheep populations or emphasis areas are in close proximity.  Such actions must comply with NEPA, grazing regulations, and land use planning regulations.

**B. Permittee/Lessee Management Practices**

The practices listed below are actions that could be implemented by grazing permittees/lessees and are intended to assist in achieving effective separation.  These actions may be included as terms and conditions to new, renewed, and modified permits and leases.  Additional practices may be appropriate based on site-specific circumstances and current science.

1. The permittee/lessee will immediately notify the local BLM authorized officer (i.e., field manager), or other primary point of contact designated by the authorized officer, of any observed or reported contact, or close proximity, between wild sheep and the permittee's/lessee's domestic sheep or goats.

2. The permittee/lessee will prevent the turnout of sheep or goats with observed or known respiratory infection or disease (e.g., Mycoplasma or Pasteurella-type pneumonia

BLM_0026688

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

9

bacteria) on grazing allotments or trailing routes, or for use in vegetation management activities, or authorized/recreational activities.

3.  The permittee/lessee will retrieve and remove sick or physically infirmed domestic sheep or goats from the herd as soon as possible.

4.  When trailing domestic sheep through areas where there is a potential for contact with wild sheep, the permittee/lessee will use the appropriate combination of close herding, multiple herders, and well-trained herd dogs to keep the sheep bunched and to minimize the risk of strays.  Any strays will be gathered and moved back with the herd as soon as possible or removed from BLM lands as the trailing occurs.

5.  Permittee/lessee will report their authorized domestic sheep or goat routing and distribution within an allotment, trailing between allotments, strays and recovery efforts, according to the terms and conditions of their authorization(s) or permit(s)/lease(s).

6.  Immediately report (as soon as feasible) to the authorized office (i.e., field manager) any wild sheep sightings in proximity to authorized domestic sheep or goat allotments or trailing routes.

7.  Grazing domestic ewes while in estrus heightens the possibility of contact between wild sheep and domestic sheep or goats.  Decrease inter-species attraction by only turning out ewes and nannies that are known to be pregnant or with lamb(s) during the grazing period in areas of potential for contact with wild sheep.

8.  When trailing in areas where physical separation cannot be assured, use trucking instead of trailing.

**C.  Optional Agreements to Address Site Specific Issues**

1.  Determine if past agreements or documentation exist that addressed site-specific domestic sheep or goat grazing and evaluate the effectiveness, validity, and whether circumstances have changed since the date of the agreement or documentation.  Ensure consistency of agreements with the objectives of this policy.

2.  Determine if state, regional, or local level agreements or similar instruments exist to address site-specific, time-sensitive and other state and local level actions to achieve effective separation and determine the effectiveness and validity of such agreements. Ensure consistency of agreements with the objectives of this policy.

3.  Consider developing new agreements to address state, tribal, regional, and/or local-level management practices.  Examples of such agreements may include emergency and short-term response plans for observed and reported contact or interactions between wild sheep and domestic sheep or goats.

BLM_0026689

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

## 1.9     <u>Coordination</u>

Coordinate with partners including federal, state, and local agencies, grazing permittees/lessees, tribes, tribal organizations, academic institutions, and non-governmental organizations that have an interest in domestic sheep and goats and wild sheep on public lands.  The BLM also is committed to fulfilling its trust responsibilities to tribes including consultation pursuant to Secretarial Order 3317, when applicable.  The BLM will seek partnerships that provide services, technical expertise, and support so that the BLM and partner organizations can accomplish mutually-compatible goals and objectives for the management of domestic sheep and goats to sustain wild sheep on public lands.  The BLM also acknowledges and honors the Memoranda of Understanding between the BLM and other organizations regarding wild sheep and habitat management.

BLM_0026690

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

G-1

## Glossary of Terms

This glossary is provided for the convenience of the reader and the terms are defined for the purpose of this manual only.

-A-

Authorized:  the BLM approved activity (including grazing by domestic sheep or goats)  on BLM lands.

Authorization (regarding domestic sheep or goats):  permit, lease, exchange-of-use, or other permission to graze, trail or otherwise move domestic sheep or goats on lands administered and managed by the Bureau of Land Management.

-D-

Domestic sheep or goats:  Domestic sheep (*Ovis aries*) or goats (*Capra hircus*) refer to all sheep and goats authorized, including recreational activities, and those unpermitted on lands administered and managed by the Bureau of Land Management (BLM lands).

-E-

Effective separation:  Spatial or temporal separation between wild sheep and domestic sheep or goats, resulting in minimal risk of contact and subsequent transmission of respiratory disease between animal groups (WAFWA 2012).

-R-

Risk assessment:  A quantitative and qualitative evaluation of the potential for contact between wild sheep and domestic sheep or goats measured in probability and rate of potential contact.

-S-

Separation response plan:  A plan that includes the process, protocols, and timelines for management actions and communications when intervention is needed to respond to observed or reported interaction of wild sheep with domestic sheep or goats.  Plans should be developed cooperatively between the BLM, permittees/lessees, state wildlife agencies, tribes, and other affected federal agencies.

BLM_0026691

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep (Public)

G-2

<u>Sustainable</u>:  The term is synonymous with the term "sustained yield" as defined by the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. §1701 *et seq.*).  The term means the achievement and maintenance in perpetuity of a high level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.

<u>-W-</u>

<u>Wild sheep</u>:  Wild sheep refers to all wild sheep (<u>*Ovis canadensis*</u> and <u>*Ovis dalli*</u>).

BLM Manual

Rel. No. 1-1771
Dated 3/2/2016

BLM_0026692

# Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan

Volume I, Environmental Impact Statement

DOI-BLM-CO-S050-2013-0022-EIS



**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**
**Phone: (970) 240-5300**





BLM_0026693

BLM_0026694



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT



### Southwest District Office
### 2465 S. Townsend Ave.
### Montrose, CO 81401

In Reply Refer To
1792

July 2016

Dear Reader:

Attached for your review is the Final Environmental Impact Statement (EIS) for the Bull Mountain Master Development Plan (MDP). The United States (US) Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office (UFO), has received a proposed MDP for natural gas exploration and development from SG Interests I, Ltd. for the Bull Mountain Unit. The BLM prepared this document in consultation with cooperating agencies, and in accordance with the National Environmental Policy Act of 1969 (NEPA), as amended, the Federal Land Policy and Management Act of 1976, as amended, implementing regulations, the BLM's NEPA Handbook (H-1790-1), and other applicable law and policy.

The boundaries of the Unit encompass approximately 19,670 acres federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit consists of 440 acres of federal surface underlain by federal mineral estate and administered by the BLM UFO; 12,900 acres of split-estate lands consisting of private surface and federal minerals administered by the BLM; and 6,330 acres of fee land consisting of private surface and private minerals regulated by the Colorado Oil and Gas Conservation Commission (COGCC). The Bull Mountain MDP Final EIS and supporting information is available on the project web site at:
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html.

A MDP provides information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations, and plans for future production; they are typically prepared for a planned cluster of wells and associated facilities in close proximity, or for multiple in-fill wells scattered throughout an oil and gas Unit or field, and include information on associated facilities (roads, pipelines, utility corridors, compressor stations, etc.). If the MDP is approved, this EIS will provide an "umbrella" analysis to which subsequent federal actions proposed within the Unit (e.g.; APDs) would be tiered for additional NEPA compliance.

In developing the Final EIS, the BLM decision maker selected a combination of various management decisions from each of the alternatives analyzed in the Draft EIS to create the Preferred Alternative (Alternative D). The Preferred Alternative proposes a management strategy that best meets the needs of the resources and values in this area under the BLM multiple-use and sustained-yield mandate. Comments on the Bull Mountain MDP Draft EIS helped to formulate the Final EIS and Preferred Alternative.

A limited number of the Bull Mountain MDP Final EIS have been printed. Viewing the document electronically from the project website or from a CD is encouraged. The Bull Mountain MDP Final EIS is available for review at the following locations during regular business hours:

- Bureau of Land Management, Uncompahgre Field Office, 2465 South Townsend Ave., Montrose, CO 81401

- Bureau of Land Management, Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215U.S.
- Forest Service, Paonia Ranger District, North Rio Grande Ave., Paonia, CO 81428
- Paonia Public Library, 2 Third Street, Paonia, CO 81428

The Final EIS is available for a 30-day public review following publication of the Notice of Availability in the *Federal Register*. The 30-day availability period is not a formal public comment period, but any comments received may be addressed in the Record of Decision.

Thank you for your continued interest in the Bull Mountain MDP EIS. We appreciate the information and suggestions you contribute to the planning process. For additional information or clarification regarding this document, please contact Ms. Gina Jones at (970) 240-5381.

Sincerely,

Barbara Sharrow

Barbara Sharrow
Acting Southwest District Manager

1 Attachment:
1- Final EIS

BLM_0026696

**BLM**

# United States Department of the Interior Bureau of Land Management

---

### Environmental Impact Statement

### BLM/CO/PL-16/012

---

### July 2016

## Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan

***Location:*** *Gunnison County, Colorado*

---

### U.S. Department of the Interior
### Bureau of Land Management
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, CO 81401
### Phone: (970) 240-5300



## VOLUME I:
### *Executive Summary; Chapters 1 through 7; Glossary*

BLM_0026697

BLM_0026698

# TABLE OF CONTENTS – VOLUME I

Chapter                                                          Page

**ES. Executive Summary** ............................................................................. **ES-1**

ES.1 Overview ........................................................................................ ES-1
    ES.1.1 Project Setting ................................................................. ES-1
ES.2 Purpose and Need .......................................................................... ES-3
ES.3 Relationship to Laws, Regulations, and Policies ........................... ES-3
ES.4 Decisions to be Made .................................................................... ES-4
ES.5 Scope of Analysis .......................................................................... ES-4
    ES.5.1 Requirements for Future NEPA Analysis ............................ ES-5
ES.6 Summary of the Reasonably Foreseeable Development Scenario ................. ES-5
ES.7 Alternatives ................................................................................... ES-6
    ES.7.1 Alternative A, No Action ..................................................... ES-6
    ES.7.2 Alternative B, Proposed Action ........................................... ES-10
    ES.7.3 Alternative C, Modified Action ........................................... ES-10
    ES.7.4 Alternative D, the BLM's Preferred Alternative ................. ES-11
ES.8 Summary of Environmental Consequences Analysis ..................... ES-11
ES.9 Public Involvement, Consultation, and Coordination .................... ES-12
    ES.9.1 Comments on the Draft EIS ................................................ ES-12
    ES.9.2 Cooperating Agencies ......................................................... ES-13

**1. Introduction** .......................................................................................... **1-1**

1.1 Overview ........................................................................................ 1-1
    1.1.1 Regional Setting .................................................................. 1-2
1.2 Purpose and Need .......................................................................... 1-5
1.3 Decisions to be Made .................................................................... 1-5
1.4 Relationship to BLM Plans and Policies ........................................ 1-6
    1.4.1 BLM National and Statewide Regulations and Policies ....... 1-6
    1.4.2 Conformance with the Current Resource Management Plan .............. 1-7
    1.4.3 Uncompahgre Resource Management Plan Revision .......... 1-7
1.5 Federal, State, and Local Permitting and Approvals ...................... 1-7
1.6 Scope of Analysis .......................................................................... 1-9
    1.6.1 Requirements for Future NEPA Analysis ............................ 1-10
1.7 Public Involvement ........................................................................ 1-11
    1.7.1 Cooperating Agencies ......................................................... 1-12
1.8 Key Issues Addressed in this EIS .................................................. 1-13
    1.8.1 Issues Identified at Environmental Assessment Scoping ..... 1-13
    1.8.2 Additional Issues Considered in this EIS ............................. 1-14
1.9 Changes between the Draft EIS and the Final EIS ......................... 1-15
    1.9.1 Updates to Geographic Information Systems Information ................. 1-16
    1.9.2 Changes to the Alternatives (Chapter 2) ............................. 1-16
    1.9.3 Changes to Other Chapters and Appendices ....................... 1-17

BLM_0026699

**2.     Alternatives** .................................................................................................. **2-1**

  2.1     Introduction ......................................................................................... 2-1
  2.2     Alternatives ........................................................................................ 2-1
          2.2.1   Alternative Development .......................................................... 2-1
          2.2.2   Alternatives Considered for Detailed Analysis ........................ 2-2
          2.2.3   Identifying the Preferred Alternative (Alternative D) .............. 2-3
          2.2.4   Summary of the Alternatives ................................................... 2-3
          2.2.5   Elements Common to All Alternatives ..................................... 2-8
          2.2.6   Alternative A, No Action ........................................................ 2-13
          2.2.7   Alternative B, Proposed Action .............................................. 2-40
          2.2.8   Alternative C, Modified Action .............................................. 2-73
          2.2.9   Alternative D, the BLM's Preferred Alternative .................... 2-86
  2.3     Alternatives Considered but Eliminated from Detailed Analysis ............. 2-102
          2.3.1   Alternatives Considered and Eliminated during EA Development .. 2-102
          2.3.2   Alternatives Considered and Eliminated from EIS Development .... 2-103
  2.4     Summary of Alternatives ................................................................... 2-105
  2.5     Summary of Impacts ......................................................................... 2-116

**3.     Affected Environment** ............................................................................... **3-1**

  3.1     Introduction ......................................................................................... 3-1
  3.2     Resources ............................................................................................ 3-4
          3.2.1   Air Resources ......................................................................... 3-4
          3.2.2   Noise .................................................................................... 3-21
          3.2.3   Soil Resources ...................................................................... 3-23
          3.2.4   Water Resources ................................................................... 3-30
          3.2.5   Geology ................................................................................ 3-48
          3.2.6   Vegetation ............................................................................ 3-57
          3.2.7   Invasive, Nonnative Species .................................................. 3-63
          3.2.8   Fish and Wildlife ................................................................... 3-65
          3.2.9   Migratory Birds ..................................................................... 3-73
          3.2.10  Special Status Species (Threatened, Endangered, Sensitive
                  Species) ............................................................................... 3-81
          3.2.11  Wildland Fire Management .................................................... 3-97
          3.2.12  Cultural Resources ............................................................... 3-98
          3.2.13  Paleontological Resources ................................................... 3-101
          3.2.14  Visual Resources ................................................................ 3-106
  3.3     Resource Uses .................................................................................. 3-109
          3.3.1   Livestock Grazing ............................................................... 3-109
          3.3.2   Minerals (Leasable, Locatable, Salable) .............................. 3-113
          3.3.3   Recreation .......................................................................... 3-119
          3.3.4   Lands and Realty ................................................................. 3-120
          3.3.5   Transportation and Access ................................................... 3-122
  3.4     Social and Economic Conditions ........................................................ 3-125
          3.4.1   Hazardous Materials and Wastes ......................................... 3-125
          3.4.2   Socioeconomics .................................................................. 3-128
          3.4.3   Environmental Justice ......................................................... 3-135

BLM_0026700

**4.**   **Environmental Consequences** .................................................................. **4-1**

4.1   Introduction ............................................................................. 4-1
      4.1.1   General Methodology for Analyzing Impacts ..................... 4-1
      4.1.2   Analytical Assumptions ..................................................... 4-3
      4.1.3   Cumulative Effects ............................................................ 4-4
      4.1.4   Incomplete or Unavailable Information .............................. 4-21
4.2   Resources ............................................................................... 4-22
      4.2.1   Air Quality ........................................................................ 4-22
      4.2.2   Noise ................................................................................. 4-72
      4.2.3   Soil Resources .................................................................. 4-80
      4.2.4   Water Resources ............................................................... 4-91
      4.2.5   Geology ............................................................................. 4-109
      4.2.6   Vegetation and Invasive, Nonnative Species ..................... 4-118
      4.2.7   Fish and Wildlife ............................................................... 4-128
      4.2.8   Migratory Birds ................................................................. 4-152
      4.2.9   Special Status Species ...................................................... 4-158
      4.2.10  Wildland Fire Management ................................................ 4-172
      4.2.11  Cultural Resources ........................................................... 4-174
      4.2.12  Paleontological Resources ................................................ 4-179
      4.2.13  Visual Resources .............................................................. 4-183
4.3   Resource Uses ........................................................................ 4-191
      4.3.1   Livestock Grazing ............................................................. 4-191
      4.3.2   Minerals (Leasable, Locatable, Salable) ........................... 4-194
      4.3.3   Recreation ........................................................................ 4-199
      4.3.4   Lands and Realty ............................................................... 4-202
      4.3.5   Transportation and Access ................................................ 4-207
4.4   Social and Economic Conditions ............................................... 4-214
      4.4.1   Hazardous Materials and Wastes ...................................... 4-214
      4.4.2   Socioeconomics ................................................................ 4-219
      4.4.3   Environmental Justice ....................................................... 4-244
4.5   Irreversible and Irretrievable Commitment of Resources and
      Relationship of Short-term Uses of the Environment to Long-term
      Productivity ............................................................................. 4-245
      4.5.1   Irreversible and Irretrievable Commitment of Resources ..... 4-245
      4.5.2   Relationship of Short-term Uses of the Environment to
              Long-term Productivity ..................................................... 4-246

**5.**   **Consultation and Coordination** ............................................................. **5-1**

5.1   Introduction ............................................................................. 5-1
5.2   Notice of Intent and Public Comments ....................................... 5-1
5.3   Notice of Availability for the Draft EIS and Public Review ........... 5-2
      5.3.1   Public Meetings ................................................................ 5-2
5.4   Summary of Comments Received on the Draft EIS ...................... 5-3
      5.4.1   Process and Methodology .................................................. 5-3
      5.4.2   Public Comments .............................................................. 5-5

BLM_0026701

5.5 Consultation and Coordination with Agencies and Tribal Governments ......... 5-7
  5.5.1 Government-to-Government Consultation with Native American Tribes.................................................................. 5-7
  5.5.2 Colorado State Historic Preservation Officer Consultation.................. 5-8
  5.5.3 US Fish and Wildlife Service Consultation .......................................... 5-8
  5.5.4 US Environmental Protection Agency ................................................. 5-9
5.6 Cooperating Agencies ........................................................................................ 5-9

**6. List of Preparers** ...................................................................................................... **6-1**

**7. References** ................................................................................................................... **7-1**

**Glossary** ............................................................................................................. **Glossary-1**

BLM_0026702

# TABLES

Page

ES-1   Summary of Actions by Alternative ................................................................ ES-7
ES-2   Summary of Design Features and Mitigation Measures per Alternative ................. ES-9
1-1   Federal, State, and Local Permits and Approvals Applicable to the Bull
      Mountain Unit ...................................................................................................... 1-7
2-1   Traffic Estimates for Construction, Drilling, Completion, and Production
      Activities per Well Pad ...................................................................................... 2-10
2-2   Project Feature Assumed Short- and Long-Term Disturbance Estimates ................. 2-12
2-3   Existing Features within the Unit ....................................................................... 2-12
2-4   McIntyre Flowback Pits ..................................................................................... 2-27
2-5   Bull Mountain Unit Annual Production Rates ...................................................... 2-30
2-6   Alternative A Traffic Estimates per Well Pad for Construction, Drilling,
      Completion, and Production Activities ................................................................ 2-37
2-7   Alternative B Traffic Estimates for Construction, Drilling, Completion, and
      Production Activities .......................................................................................... 2-71
2-8   Alternative C Traffic Estimates for Construction, Drilling, Completion, and
      Production Activities .......................................................................................... 2-82
2-9   Alternative D Traffic Estimates for Construction, Drilling, Completion, and
      Production Activities .......................................................................................... 2-98
2-10   Summary of Actions by Alternative ................................................................. 2-105
2-11   Stipulations, Design Features, and Mitigation Measures .................................... 2-107
2-12   Summary of Surface Disturbance Acres by Alternative ...................................... 2-116
2-13   Estimated Total Traffic Round Trips for Drilling, Completion, and
      Production Activities by Alternative[1] .............................................................. 2-117
2-14   Summary of Environmental Consequences by Alternative .................................. 2-118
3-1   Approved Standards for Public Land Health ........................................................ 3-2
3-2   Ambient Air Standards and PSD Increments ($\mu$g/m$^3$) .................................... 3-6
3-3   Near-Field Analysis Background Ambient Air Quality Concentrations ..................... 3-8
3-4   Background Nitrogen and Sulfur Deposition Values (kg/ha-yr) ............................ 3-12
3-5   Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes ............... 3-13
3-6   Mean Monthly Temperature Ranges and Total Precipitation Amounts ................... 3-15
3-7   Wind Direction Frequency Distribution .............................................................. 3-17
3-8   Wind Speed Distribution ................................................................................... 3-17
3-9   Common Sound Levels ...................................................................................... 3-21
3-10   Regulatory Limits for Noise Generated by Natural Gas Facilities ........................ 3-22
3-11   Noise Levels Associated with Typical Construction Equipment (dBA) ................... 3-23
3-12   Classified Soil Types in the Bull Mountain Unit ................................................ 3-25
3-13   Acres of Farmlands in the Bull Mountain Unit .................................................. 3-26
3-14   Acres of Slopes in the Bull Mountain Unit ........................................................ 3-26
3-15   Soil Erosion Ratings for the Bull Mountain Unit ............................................... 3-28
3-16   Erosion Potential of Roads and Trails for the Bull Mountain Unit ....................... 3-28
3-17   Land Health Assessment Results in the Bull Mountain Unit ................................ 3-29
3-18   Typical Monthly Flows for USGS near the Unit (cfs[1]) ...................................... 3-33
3-19   General Water Quality of Springs within the Unit (one sample per station) ............. 3-35
3-20   Stream Classifications and Water Quality Standards .......................................... 3-36

BLM_0026703

3-21    List of Impaired Water Quality Segments ................................................................. 3-36
3-22    General Water Quality of East Muddy/Muddy Creeks on/near the Unit.................... 3-37
3-23    Water Quality Lab Test Results from Produced Water from Existing
        Producing Natural Gas Wells within the Producing Formations in the Unit.............. 3-41
3-24    Summary of Results for Selected Analytes in Samples from 23 Wells Collected
        between July 16, 2002 and June 12, 2013 ................................................................. 3-45
3-25    Summary of Results for Selected Analytes in Samples from 51 Surface Water
        Locations Collected between July 16, 2002 and August 10, 2012 ........................... 3-45
3-26    Existing Vegetation Communities in Bull Mountain Unit ......................................... 3-58
3-27    Land Health Assessment Results in the Bull Mountain Unit ..................................... 3-63
3-28    Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed
        in Bull Mountain Unit ............................................................................................... 3-64
3-29    Birds of Conservation Concern of the Uncompahgre Field Office ............................ 3-75
3-30    Threatened and Endangered Species of the Uncompahgre Field Office .................... 3-82
3-31    Existing Habitats within the Ragged Mountain Lynx Analysis Unit ......................... 3-86
3-32    Existing Habitats within the Crystal West Lynx Analysis Units................................ 3-86
3-33    BLM Sensitive Species of the Uncompahgre Field Office[1] ..................................... 3-90
3-34    Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil
        Resources ................................................................................................................... 3-103
3-35    Ranches and Allotments within the Bull Mountain Unit............................................ 3-110
3-36    Bull Mountain Unit Existing Facilities ..................................................................... 3-114
3-37    Annual Wages by Industry, 2012............................................................................... 3-130
4-1     Summary of Cumulative Actions within the Unit by Alternative ............................... 4-5
4-2     Summary Cumulative Surface Disturbance Acres within the Unit by Alternative ...... 4-8
4-3     Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that
        Comprise the Cumulative Impact Scenario ............................................................... 4-16
4-4     Acute Reference Exposure Levels (1-hour exposure) ............................................... 4-31
4-5     Sensitive Lakes Analyzed in Far-Field Analysis....................................................... 4-33
4-6     Alternative A Year 2 Emissions (TPY) ..................................................................... 4-38
4-7     Alternative A Year 2 GHG Emissions (metric tons per year) .................................... 4-39
4-8     Alternative A - Maximum Modeled Pollutant Concentrations at Class I and
        Sensitive Class II Areas ($\mu g/m^3$)............................................................................ 4-40
4-9     Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II
        Areas .......................................................................................................................... 4-42
4-10    Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I
        and Sensitive Class II Areas ...................................................................................... 4-43
4-11    Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive
        Class II Areas ............................................................................................................. 4-44
4-12    Alternative B Year 5 Emissions (TPY) ..................................................................... 4-45
4-13    Alternative B Year 5 GHG Emissions (metric tons per year) .................................... 4-46
4-14    Alternative B - Criteria Pollutant Modeling Results for Field Development
        Activities.................................................................................................................... 4-46
4-15    Alternative B - Criteria Pollutant Modeling Results for Field Production
        Activities.................................................................................................................... 4-47
4-16    Alternative B - HAP Modeling Results for Field Production Sources ....................... 4-48
4-17    Alternative B - Unit Risk Analyses ........................................................................... 4-49

4-18    Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$) .................................................................................. 4-50

4-19    Alternative B - Maximum Visibility Impacts at Class I and Sensitive Class II Areas .................................................................................................................................... 4-52

4-20    Alternative B - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas ........................................................................................ 4-52

4-21    Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas ............................................................................................................... 4-53

4-22    Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ($\mu g/m^3$) ............................. 4-67

4-23a   Cumulative Visibility Results ($\Delta dv$) for Worst 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources ...................................................... 4-70

4-23b   Cumulative Visibility Results ($\Delta dv$) for Best 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources ...................................................... 4-70

4-24    Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ..................... 4-71

4-25    Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas ........................................ 4-71

4-26    Average Noise Levels Produced during Construction and Operations .................... 4-74

4-27    Acres of Soils on Steep Slopes Potentially Impacted (Alternative A) ..................... 4-83

4-28    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative A) ... 4-83

4-29    Acres of Soils with Erosion Hazard Ratings for Roads (Alternative A) .................. 4-84

4-30    Acres of Soils on Steep Slopes Potentially Impacted (Alternative B) ..................... 4-84

4-31    Acres of Farmlands Potentially Impacted (Alternative B) ........................................ 4-85

4-32    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative B) ... 4-85

4-33    Acres of Soils with Erosion Hazard Ratings for Roads (Alternative B) .................. 4-86

4-34    Acres of Farmlands Potentially Impacted (Alternative C) ........................................ 4-87

4-35    Acres of Soils on Steep Slopes Potentially Impacted (Alternative C) ..................... 4-87

4-36    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C) ... 4-87

4-37    Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative C) ............................................................................................................ 4-88

4-38    Acres of Farmlands Potentially Impacted (Alternative D) ........................................ 4-88

4-39    Acres of Soils on Steep Slopes Potentially Impacted (Alternative D) ..................... 4-89

4-40    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative D) ... 4-89

4-41    Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative D) ............................................................................................................ 4-90

4-42    Estimated Risk of a Reportable Spill from a Producing Gas Well in Colorado 2009 to 2013 ................................................................................................ 4-96

4-43    Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative A) ............................................................................................................ 4-121

4-44    Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative B) ............................................................................................................ 4-122

4-45    Permanent Impacts on Vegetation Communities from Development of Well Pad 12-89-7-1 ................................................................................................... 4-123

BLM_0026705

4-46    Direct Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternative C) ....................................................................................................... 4-124
4-47    Direct Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternative D) ....................................................................................................... 4-125
4-48    Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternatives A and B combined) ......................................................................... 4-126
4-49    Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternatives A and C combined) ......................................................................... 4-126
4-50    Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternatives A and D combined) ......................................................................... 4-127
4-51    Habitat Quality Categories as a Function of Road Density ..................................... 4-132
4-52    Habitat Categories by Alternative ............................................................................ 4-133
4-53    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
        Alternative A ........................................................................................................ 4-134
4-54    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
        Alternative B ......................................................................................................... 4-142
4-55    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
        Alternative C ......................................................................................................... 4-145
4-56    Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under
        Alternative D ......................................................................................................... 4-149
4-57    Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
        (Alternatives A and B combined) ......................................................................... 4-150
4-58    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
        (Alternatives A and C combined) ......................................................................... 4-151
4-59    Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit
        (Alternatives A and D Combined) ........................................................................ 4-151
4-60    Visual Resources Inventory Scenic Quality Evaluation Ratings .............................. 4-184
4-61    Grazing Disturbance on BLM Allotments from Roads and Well Pads ................... 4-192
4-62    Alternative A - Surface Disturbance[1] by Landownership ....................................... 4-204
4-63    Alternative B - Surface Disturbance[1] by Landownership ....................................... 4-205
4-64    Alternative C - Surface Disturbance[1] by Landownership ....................................... 4-206
4-65    Alternative D - Surface Disturbance[1] by Landownership ....................................... 4-206
4-66    Bull Mountain Unit Estimated Annual Direct Labor Requirements and
        Costs - Alternative A ............................................................................................ 4-227
4-67    Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A ....... 4-228
4-68    Impacts on Local Fiscal Conditions—Alternative A ............................................... 4-231
4-69    Bull Mountain Unit Direct Annual Employment and Labor Costs—
        Alternative B ......................................................................................................... 4-234
4-70    Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B ...... 4-235
4-71    Impacts on Local Fiscal Conditions - Alternative B ............................................... 4-237
4-72    Irreversible and Irretrievable Commitment of Resources ........................................ 4-246
4-73    Relationship of Short-term Uses of the Environment to Long-term Productivity .... 4-247
5-1     Number of Unique Submissions and Comments by Affiliation .................................. 5-5
5-2     Number of Comments on the Draft EIS by Category .................................................. 5-6

BLM_0026706

# FIGURES

Page

ES-1   Bull Mountain Unit ................................................................................................ ES-2
1-1   Regional Bull Mountain Unit .................................................................................. 1-3
1-2   Bull Mountain Unit ................................................................................................. 1-4
2-1   Alternative A, No Action ...................................................................................... 2-14
2-2   Alternative B, Proposed Action ............................................................................ 2-41
2-3   Alternative B, C, and D 12-89-7-1 APD ............................................................... 2-43
2-4   Alternative B, Proposed Action Wildlife Habitat Plan ......................................... 2-44
2-5   Alternative C, Modified Action ............................................................................ 2-75
2-6   Alternative C, Constraints .................................................................................... 2-76
2-7   Alternative D, BLM's Preferred Alternative ........................................................ 2-89
2-8   Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan ..................... 2-90
3-1   Air Quality Study Area ........................................................................................... 3-7
3-2   Soils ...................................................................................................................... 3-24
3-3   Farmlands .............................................................................................................. 3-27
3-4   Watersheds ............................................................................................................ 3-31
3-5   Streams and Springs .............................................................................................. 3-34
3-6   Water Quality Monitoring ..................................................................................... 3-44
3-7   Geology Cross Section .......................................................................................... 3-50
3-8   Geology ................................................................................................................. 3-53
3-9   Landslides ............................................................................................................. 3-55
3-10   Vegetation ............................................................................................................. 3-59
3-11   Riparian and Wetland Vegetation ......................................................................... 3-62
3-12   Fish and Aquatic Wildlife Habitat ........................................................................ 3-66
3-13   Mule Deer Habitat ................................................................................................. 3-69
3-14   Elk Habitat ............................................................................................................ 3-70
3-15   Purple Martin Habitat ........................................................................................... 3-79
3-16   Bald Eagle Habitat ................................................................................................ 3-80
3-17   Canada Lynx Habitat ............................................................................................. 3-87
3-18   North Fork Landscape Unit Prehistoric Site Sensitivity Model ......................... 3-100
3-19   Potential Fossil Yield Classification ................................................................... 3-105
3-20   Grazing Allotments ............................................................................................. 3-111
3-21   Existing Infrastructure ........................................................................................ 3-123
4-1   Alternatives A and B Cumulative ........................................................................ 4-12
4-2   Alternatives A and C Cumulative ........................................................................ 4-13
4-3   Alternatives A and D Cumulative ........................................................................ 4-14
4-4   Cumulative Effects Study Area ............................................................................ 4-15
4-5   Near-Field Analysis, Well Pad and Access Road Construction Modeling
        Scenario ................................................................................................................ 4-25
4-6   Near-Field Analysis, Well Production Modeling Scenario ................................... 4-26
4-7   Near-Field Analysis, Well Development Modeling Scenario ................................ 4-27
4-8   Well Production Receptor Grid ............................................................................. 4-28
4-9   Near-Field Analysis, Well Development Receptor Grid ....................................... 4-29
4-10   Far-field Analysis Modeling Scenario .................................................................. 4-34
4-11   Far-field Analysis, Source Layout ........................................................................ 4-35

BLM_0026707

4-12    2008 ozone DVC (top left), 2021 ozone DVF (top right) and 2021 – 2008
         ozone DVF differences calculated using MATS for the CARMMS 2021 High
         Development Scenario. .............................................................................. 4-63
4-13    Fourth highest daily maximum 8-hour ozone concentrations for the 2008 Base
         Case (top left), CARMMS 2021 High Development Scenario (top right),
         2021 minus 2008 differences (bottom). .................................................... 4-65
4-14    Contribution to Fourth Highest Daily Maximum Ozone Concentrations Due to
         Emissions from Federal Oil and Gas within the UFO Planning Area for the
         CARMMS 2021 High Development Scenario. .......................................... 4-66
4-15    Habitat Categories by Alternative. ........................................................... 4-135

BLM_0026708

# APPENDICES – VOLUME II

A    Well Pad Site Suitability Models and Methodology
B    Construction, Drilling, Completion, and Reclamation
C    Design Features, Mitigation Measures, and Conditions of Approval
D    Master Surface Use Plan of Operations
E    Master Drilling Plan
F    Summary of Lease Stipulations
G    Hazardous Materials Management Summary
H    Water Quality Sampling Constituents for the Bull Mountain Unit
I    Noxious Weed Management Plan
J    Air Quality Technical Support Document for the Bull Mountain Unit MDP EIS
K    Economic Impact Analysis Methodology – Technical Report
L    Bainard Augmentation Plan
M    Poly Pipeline Operation Plan
N    Response to Comments on the Draft EIS
O    12-89-7-1 APD Package

BLM_0026709

This page intentionally left blank.

BLM_0026710

## ACRONYMS AND ABBREVIATIONS                                          Full Phrase

| | |
|---|---|
| μeq/l | microequivalents per liter |
| APD | Application for Permit to Drill |
| AUM | Animal Unit Month |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| CAAQS | Colorado Ambient Air Quality Standards |
| CDPHE | State of Colorado Department of Public Health and Environment |
| CDWR | Colorado Division of Water Resources |
| CEQ | Council on Environmental Quality |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| COGCC | Colorado Oil and Gas Conservation Commission |
| COGIS | Colorado Oil and Gas Information System |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| dBA | A-weighted decibel |
| dBC | C-weighted decibel |
| DOI | United States Department of the Interior |
| DOT | Department of Transportation |
| EA | environmental assessment |
| EIS | environmental impact statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| Forest Service | United States Department of Agriculture, Forest Service |
| GIS | geographic information system |
| kg/ha/yr | kilogram per hectare per year |
| lbs | pounds |
| MBTA | Migratory Bird Treaty Act |
| MDP | Master Development Plan |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NSO | no surface occupancy |
| PFYC | potential fossil yield count |
| POD | Plans of Development |
| ppm | parts per million |
| PSD | prevention of significant deterioration |
| RAC | Resource Advisory Council |
| RDFs | Required Design Features |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW | right-of-way |

BLM_0026711

| | |
|---|---|
| SGI | SG Interests I, LTD |
| SPCC | Spill Prevention Control and Countermeasures |
| TDS | total dissolved solids |
| TL | timing limitation |
| UFO | Uncompahgre Field Office |
| the Unit | Bull Mountain Unit |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| VOCs | volatile organic compounds |
| VRI | Visual Resource Inventory |
| VRM | Visual Resource Management |
| WHP | Wildlife Habitat Plan |

BLM_0026712

# Executive Summary

BLM_0026713

BLM_0026714

# TABLE OF CONTENTS

**Chapter**                                                   **Page**

**ES. EXECUTIVE SUMMARY** ............................................................................. **ES-1**

    ES.1 Overview ............................................................................ ES-1
        ES.1.1 Project Setting ...................................................... ES-1
    ES.2 Purpose and Need ............................................................. ES-3
    ES.3 Relationship to Laws, Regulations, and Policies .............. ES-3
    ES.4 Decisions to be Made ........................................................ ES-4
    ES.5 Scope of Analysis .............................................................. ES-4
        ES.5.1 Requirements for Future NEPA Analysis ............. ES-5
    ES.6 Summary of the Reasonably Foreseeable Development Scenario ............... ES-5
    ES.7 Alternatives ....................................................................... ES-6
        ES.7.1 Alternative A, No Action ...................................... ES-6
        ES.7.2 Alternative B, Proposed Action ........................... ES-10
        ES.7.3 Alternative C, Modified Action ........................... ES-10
        ES.7.4 Alternative D, the BLM's Preferred Alternative ........... ES-11
    ES.8 Summary of Environmental Consequences Analysis ........... ES-11
    ES.9 Public Involvement, Consultation, and Coordination ........... ES-12
        ES.9.1 Comments on the Draft EIS ................................. ES-12
        ES.9.2 Cooperating Agencies ......................................... ES-13

# TABLES
                                                    **Page**

ES-1 Summary of Actions by Alternative ........................................... ES-7
ES-2 Summary of Design Features and Mitigation Measures per Alternative ........... ES-9

# FIGURE
                                                    **Page**

ES-1 Bull Mountain Unit ................................................................... ES-2

BLM_0026715

This page intentionally left blank.

BLM_0026716

# EXECUTIVE SUMMARY

## ES.1   OVERVIEW

The United States Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office, has received a proposed Master Development Plan (MDP) for natural gas exploration and development from SG Interests I, Ltd. (SGI) for the Bull Mountain Unit. The Bull Mountain Unit MDP describes the exploration and development of up to 146 natural gas wells, 4 water disposal wells, and associated infrastructure on federal and private mineral leases. An MDP provides information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations, and plans for future production. MDPs are typically prepared for a planned cluster of wells and associated facilities near, or for multiple in-fill wells scattered throughout, an oil and gas unit or field. They have information on associated facilities, such as roads, pipelines, utility corridors, and compressor stations.

In 2003 (and updated in 2008), the BLM approved the agreement for the Bull Mountain Unit (the Unit) to provide for the orderly, planned, and structured development for extraction of the natural gas resources. "The objective of unitization is to proceed with a program that will adequately and timely explore and develop all committed lands within the unit area without regard to internal ownership boundaries.… By effectively eliminating internal property boundaries within the unit area, unitization permits the most efficient and cost effective means of developing the underlying oil and gas resources" (Draft BLM Manual, Section 3180-1 Unitization [Exploratory], p. 2-7).

Under terms of the agreement, SGI is required to diligently develop at least two producing wells per year in order to maintain the Unit designation. This requirement is currently suspended under an approved Suspension of Operations and Production while this EIS is being prepared.

### ES.1.1 Project Setting

The boundaries of the Unit encompass approximately 19,670 acres of federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit consists of 440 acres of federal surface underlain by federal mineral estate and administered by the BLM; 12,900 acres of private surface with federal mineral estate (split-estate) administered by the BLM; and 6,330 acres of private surface with private mineral estate (**Figure ES-1**, Bull Mountain Unit).

BLM_0026717



Executive Summary

**Bull Mountain Unit**

Source: BLM GIS 2014

Figure ES-1

**Legend:**
- Bull Mountain Unit
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals
- Perennial stream

BLM_0026718

The Unit is in the Colorado River basin, approximately 30 miles northeast of the town of Paonia and is bisected by State Highway 133. The elevation is approximately 7,400 feet, consisting of rolling topography in a mountainous region (**Figure ES-1**). The Unit is dominated by sagebrush (*Artemisia tridentata* ssp. *vaseyana*). The second most common vegetation community is oakbrush, which is composed of Gambel's oak (*Quercus gambelii*), Saskatoon and Utah serviceberry (*Amelanchier utahensis* and *A. alnifolia*), and chokecherry (*Padus virginiana*), followed by mixed mountain shrubland. Other vegetation communities are aspen (*Populus tremuloides*) woodlands and irrigated pasturelands.

Cattle graze over most of the area during the snow-free months, typically mid-May through mid-October; sheep graze in spring and fall. In the fall, cattle and sheep gather in portions of the Unit, coming off grazing allotments on the adjacent Grand Mesa, Uncompahgre, and Gunnison National Forest. A few residential sites are within the Unit, generally near the State Highway 133 corridor. Further details for the project's regional setting are described in **Chapter 3**, Affected Environment.

## ES.2   PURPOSE AND NEED

The BLM's purpose is to consider the proponent's request for approval of an MDP to develop federal fluid minerals in the Bull Mountain Unit. The BLM also must consider its multiple-use mission. In addition to managing such activities as fluid mineral development, the mission is to conserve natural, historical, cultural, and other resources on the lands it administers.

The BLM's need arises from its responsibility under the Federal Land Policy and Management Act, the Mineral Leasing Act, and other legislation to respond to the applicant's request. These acts authorize the development of federal onshore natural gas reserves for supply and economic stability. Also, the BLM is considering the proposed MDP, which takes into account field development in total. This is intended to facilitate infrastructure planning and to increase the orderly development of natural gas resources, consistent with the Energy Policy Acts of 2001 and 2005.

## ES.3   RELATIONSHIP TO LAWS, REGULATIONS, AND POLICIES

This environmental impact statement (EIS) is prepared under the authority of and complies with the following:

- National Environmental Policy Act of 1969 (NEPA), as amended

- Council on Environmental Quality regulations for implementing NEPA (40 Code of Federal Regulations [CFR], Parts 1500-1508)

- Department of the Interior NEPA regulations (43 CFR Part 46)

- Endangered Species Act of 1973, as amended

- National Historic Preservation Act of 1966

- Department of the Interior and BLM policies (BLM NEPA Handbook H-1790-1 [BLM 2008a])

BLM_0026719

The BLM regulates environmental aspects of oil and gas exploration, development, and production of deposits from federal and Native American leases (43 CFR Part 3162.5-1, and 25 CFR Part 225.4). Exploration and development of federal oil and gas resources by private industry is under the authority of the following:

- Mineral Leasing Act of 1920

- Mining and Minerals Policy Act of 1970

- National Materials and Minerals Policy, Research, and Development Act of 1980

- Federal Onshore Oil and Gas Leasing Reform Act of 1987

- Various regulations specific to implementing those laws (e.g., 43 CFR 3100)

Onshore Oil and Gas Order Number 1 describes the application requirements for the approval of all proposed oil and gas exploratory, development, or service wells on federal onshore and gas leases. The Order addresses procedures for processing APDs and the use of best management practices in lease development, operations in split-estate situations, and defines MDPs including information on drilling plans, surface use plans of operations, and plans for future production.

## ES.4   DECISIONS TO BE MADE
The BLM must decide to do one of the following:

- Approve the Bull Mountain Unit MDP, including the 12-89-7-1 well pad APD, as proposed

- Approve the plan and APD with modification and mitigation

- Reject the MDP, but still approve the APD with appropriate mitigations

- Reject both the MDP and the APD

Approving the APD as proposed or with mitigation in the Record of Decision (ROD) would grant SGI a permit to begin well pad, road, pipeline, and facility construction and well drilling and completion.

Any decisions made in the ROD would provide a blueprint for future anticipated actions; future ground-disturbing activity and construction would require additional authorizations from the BLM or COGCC or both. Additional applications and approvals would be required and additional NEPA analysis may be required prior to BLM making decisions on the applications (see **Section ES.5.1**, Requirements for Future NEPA Analysis).

## ES.5   SCOPE OF ANALYSIS
The scope of analysis encompasses all phases of natural gas field development: siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation. The technologies described here are representative of those most likely to be deployed over the life of the project.

BLM_0026720

The analysis areas for well pad locations is shown as 40-acre conceptual circles on maps; this was done because the exact locations of future well pads is unknown. Additionally, the roads and pipelines are approximations because no engineering has been done to specifically design road and pipeline alignments or construction requirements. As these elements of the MDP are generalizations, approximations, and conceptual analysis areas, the effects analysis in **Chapter 4**, Environmental Consequences, is generalized to account for all possible scenarios. In this manner, the BLM is able to analyze future potential energy development on the entire Bull Mountain Unit.

To address the specifics of developing the 12-89-7-1 APD, the scope of analysis for affected resources is specific to the location and drilling plan (see **Appendix O** for the complete APD package). The BLM conducted an on-site inspection of the well locations and conducted numerous site-specific studies to define the current condition of resources on location and to determine the possible effects on those resources. Specialty reports included a Class III cultural resources survey, a vegetation and wildlife summary report, and baseline water quality monitoring. All of this information has been incorporated into the EIS and analyzed to ensure adequate NEPA analysis.

The life of any individual well is estimated to be 40 years; this includes the coal bed natural gas, shale gas, and water disposal wells, although the actual production years could vary by individual wells. For purposes of analysis, the BLM therefore assumed that the analysis horizon for the project would be 50 years. The analysis focuses on the direct, indirect, and cumulative impacts that could eventually result from activities associated with development of the Unit. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

### ES.5.1 Requirements for Future NEPA Analysis

The Bull Mountain Unit MDP EIS programmatic analysis relies on approximate information for the well pad locations, road alignments, pipeline routes, and other facilities. The purpose of this is to assess the cumulative resource impacts of SGI's proposed well development in the overall Unit area.

If the MDP is approved, this EIS will provide an "umbrella" analysis; future APDs proposed in the Unit would be analyzed and the resulting document would tier off from this EIS. Approval of these actions would require additional documentation of NEPA compliance, such as a tiered environmental assessment, a documentation of NEPA adequacy, or a categorical exclusion. Categorical exclusions that may apply to some future development activities include those provided in Section 390 of the Energy Policy Act of 2005, 42 USC 15942(b). Approval would be subject to the APD process (described in **Section 1.6.1**, Requirements for Future NEPA Analysis) and would be in accordance with federal and state oil and gas regulations, Washington Office Instruction Memorandum 2008-166, the 1989 Uncompahgre Basin RMP, or the future revised Uncompahgre RMP.

### ES.6   SUMMARY OF THE REASONABLY FORESEEABLE DEVELOPMENT SCENARIO

The BLM developed a reasonably foreseeable development scenario (RFDS) for oil and gas from analyzing past activity, production, and other sources in support of the Uncompahgre RMP revision (BLM 2012). An RFD scenario provides information about the type and level of oil and

BLM_0026721

gas activity and associated disturbance that could occur subsequent to leasing in the
Uncompahgre Field Office planning area. The RFDS is unconstrained by management-imposed
conditions as it is based primarily on geology and historical exploration and development
activity. It provides information necessary to analyze long-term and/or widespread effects that
could result from possible exploration and/or development activities on oil and gas leases. The
RFD is not a decision, and it neither establishes nor implies a "cap" on development. The time
frame used in the Uncompahgre RMP/EIS's RFDS is from 2010 through 2030. For more details
regarding the cumulative development within the region, see Tables 7a, 7b, 8a, and 8b from the
Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field
Office (BLM 2012).

## ES.7   ALTERNATIVES

The goal of developing feasible alternatives is to allow analysis of different combinations of
resource uses and protections to address conflicts among resources and resource uses and meet
the purpose of and need for the project.

The BLM identified a reasonable range of alternatives, including a No Action Alternative (as
required at 40 CFR 1502.14). It also identified the proposed action and a modified action. These
are based on issues, concerns, and opportunities raised in public comments during scoping;
interdisciplinary interaction between resource professionals; and collaboration with cooperating
agencies. Meaningful differences among the three alternatives are described in **Tables ES-1 and
ES-2**.

The eight phases of the project (siting, construction, drilling, completion, interim reclamation,
production and maintenance, final wellbore abandonment, and reclamation) are uniform across
all alternatives; however, the actions differ as to how the phases would be completed and what
additional environmental protections would be required.

As a result of public comments, best science, cooperating agency coordination, and internal
review of the Draft EIS, the BLM developed the Final EIS for the Bull Mountain Unit Master
Development Plan. The BLM selected none of the alternatives from the Draft EIS as its Preferred
Alternative; rather, the BLM selected a combination of locations and actions from Alternative B
(the Proposed Action) and Alternative C (BLM Modified Action). Additionally, the BLM
included amendments to the Proposed Action from SGI (revisions to one compressor station
location, inclusion of a wildlife habitat plan, and the addition of the 12-89-7-1 APD). The
Preferred Alternative (Alternative D) focuses on addressing public comments, while continuing
to meet the BLM's legal and regulatory mandates.

### ES.7.1 Alternative A, No Action

Alternative A, No Action, is the only alternative that does not respond to the purpose of and need
for the proposed action; rather it serves as a comparison to the proposed action's and the
alternatives' environmental effects (including cumulative effects). Under the No Action
Alternative, the Bull Mountain Unit MDP would not be approved; private mineral estate would
continue to be developed through authorizations approved by the Colorado Oil and Gas
Conservation Commission (COGCC), which regulates and approves private mineral estate
development.

BLM_0026722

**Table ES-1**
**Summary of Actions by Alternative[1]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Construction | Well pads | 10 new pads on private mineral estate | 36 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 35 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 33 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD |
| | Access roads | 26 miles upgrades to existing roads 5 miles new road construction | 53 miles upgrades to existing roads 16 miles new road construction | 13 miles upgrades to existing roads 12 miles new road construction | 14 miles upgrades to existing roads 16 miles new road construction |
| | | construction rate: 600-800 yards per day | | | |
| | Pipelines | 4 miles new collocated with roads 8 miles new cross-country | 13 miles new collocated with roads 9 miles new cross-country | 19 miles new collocated with roads 0 miles new cross-country | 14 miles new collocated with roads 10 miles new cross-country |
| | Electrical lines | 1 new overhead electrical line (up to 5 power poles) | 4 new overhead electrical lines (up to 20 power poles) | 4 new buried electrical lines (collocated with roads) | 4 new electrical lines, may be buried or overhead (up to 20 power poles) |
| Drilling | Gas wells | 55 new gas wells | 146 new gas wells, inclusive of the one well to be drilled as part of the 12-89-7-1 APD | | |
| | | Timeframe Coal bed methane natural gas – 60 days Shale and sandstone – 85 days | | | |
| | Water disposal wells | 1 new water disposal well | 4 new water disposal wells | | |
| | | Timeframe: 60 – 120 days | | | |
| | Total wells | 56 wells | 150 wells | | |
| | Drilling rate | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year |
| | Drilling duration | 3 years | 6 years | | |
| Completion | Gas wells | Well completion duration: 8 – 10 days Flow testing duration: 25 – 50 days | | | |
| | Water disposal | Well completion duration: 8 – 10 days | | | |

[1] Under the BLM's Preferred Alternative, Alternative D, the operations and development of private minerals described in Alternative A would continue to be implemented; analysis for the cumulative effects of development under Alternative A and D is discussed in **Table 4-1**, Summary of Cumulative Actions within the Unit by Alternative. Alternatives B, C, and D display development and actions that would occur only on federal mineral estate (which falls within the BLM's decision-making authority).

BLM_0026723

Table ES-1
Summary of Actions by Alternative[1]

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| | wells | | | | |
| Production and Maintenance | Compressor station | 1 new screw compressor station | 3 new screw compressor stations; 1 new multi-engine compressor station | 4 new screw compressor stations | 3 new screw compressor stations; 1 new multi-engine compressor station |
| | Remote telemetry monitoring | No similar action | Included as part of the Wildlife Habitat Plan | No similar action | Included as part of the Wildlife Habitat Plan |
| | Workover estimates | Years 1-6: one workover every two years per well Years 7-40: 67 workovers annually | | | |
| | Produced water management | Production: 500 – 3,000 barrels[2] per day | | | |
| | | Coal bed methane natural gas-produced water injected into water disposal wells, trucked to disposal location, or recycled for use in well completions | | | |
| Water Use and Sources | Drilling | Up to 21.3 acre-feet[3] | 58 acre-feet | | |
| | Completion | Up to 714.3 acre-feet[4] | Up to 2,369.3 acre-feet | | |
| | Dust abatement | Up to 13.2 acre-feet of freshwater | Up to 52.9 acre-feet of freshwater | | |
| | Source for all uses | 30% freshwater and 70% recycled or produced water | | | |
| | Total water usage for drilling and completion[5] (based on source percentages noted above) | Total water: 748.8 acre-feet Freshwater: 220.7 acre-feet Recycled/produced water: 514.9 acre-feet | Total water: 2,480.2 acre-feet Freshwater: 744.1 acre-feet Recycled/produced water: 1736.1 acre-feet | | |

[2] 1 barrel = 42 gallons, standard US oil barrel volume
[3] Combined water disposal and gas wells, based on an average of 3,000 barrels per well. Conversion factor is 7,758 barrels per acre-foot.
[4] Calculated based on assuming 50 percent coal bed natural gas wells and 50 percent shale wells as discussed in the Bull Mountain EA. Water amounts for each type of well were taken from the Master Drilling Plan in Appendix E. Calculations used number of new gas wells per alternative divided in half for each type of well (coal bed methane/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage during completion.
[5] Amounts were calculated based on adding together the drilling, completion, and dust abatement amounts together. The total was multiplied by 30 percent to determine the freshwater amount and 70 percent to determine the amount of recycled/produced water that would be used.

BLM_0026724

**Table ES-2**
**Summary of Design Features and Mitigation Measures per Alternative**

|  | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| *Design Features* | • Operator committed measures | • Operator committed measures<br>• Wildlife Habitat Plan | • Operator committed measures<br>• Appendix C<br>• Air quality/AQRV measures<br>• Pneumatic requirements<br>• Annual construction planning meeting<br>• Order of development plan<br>• Annual reclamation status report<br>• Annual raptor nest surveys<br>• ¼ mile avoidance for raptor nests<br>• Control drainage to avoid wetlands<br>• Control of noxious weeds | • Operator committed measures<br>• Wildlife Habitat Plan<br>• Appendix C<br>• Air quality/AQRV measures<br>• Pneumatic requirements<br>• Annual construction planning meeting<br>• Order of development plan<br>• Annual reclamation status report<br>• Annual raptor nest surveys<br>• ¼ mile avoidance for raptor nests<br>• Control drainage to avoid wetlands<br>• Control of noxious weeds<br>• Geologic hazards measures<br>• Water quality monitoring measures |
| *Mitigation Measures* |  | • App. C measures<br>• Air quality/AQRV measures<br>• Geologic hazards measures | • Geologic hazards measures |  |

BLM_0026725

Rejection of the MDP under the No Action Alternative would not mean that private mineral estate would be the only source of development in the Unit. Existing lease rights granted by the BLM on federal mineral estate would remain in effect; the BLM may consider proposals for individual APDs on federal mineral estate, for access across federal lands for oil and gas development, and for production-related activities in the Unit at any time. These additional individual proposals or applications would be analyzed separately at the time they were received. While development of the federal leases is foreseeable even in the absence of an MDP, the No Action Alternative looks at only private mineral estate development in the direct and indirect analysis. However, because federal mineral estate development is a reasonably foreseeable future action, the combination of private and federal mineral estate development is analyzed in the cumulative effects section of **Chapter 4**, Environmental Consequences.

Based on this, Alternative A is comprised of the following activities:

- Continuation of previously authorized federal authorizations on the existing well pads

- Continued operation of previously authorized private wells targeting private minerals

- Development of new natural gas wells on private surface targeting private minerals that would be built on new and existing well pads approved through the COGCC

## ES.7.2 Alternative B, Proposed Action

Alternative B is largely the same as Alternative A in terms of the phases of development and actions anticipated to complete construction, drilling, completion, production, and reclamation. However, this alternative is specific to BLM-administered mineral estate, considering only the federal mineral estate development within the Unit for purposes of comparison to Alternative A. If Alternative B were approved, the operations and development of private minerals described in Alternative A would also likely be implemented. The combination of federal mineral and private mineral development is analyzed in Chapter 4, Environmental Consequences, under cumulative effects.

## ES.7.3 Alternative C, Modified Action

Alternative C, the Modified Action, is similar to Alternative B in that it considers federal mineral estate development only. It considers the same number of wells (146) but one less well pad (35). It also uses different weighting factors in the site selection model to address issues of development impacts on vegetation resources, water quality, and soil resources, which resulted in different pad locations. When the GIS analysis was rerun to eliminate areas that would be in elk critical winter range, one pad with most of its area in elk critical winter range was also eliminated. The BLM dropped this one pad from consideration to avoid conflicts with development in critical winter range.

Alternative C provides additional mitigation measures and addresses issues regarding development impacts on the same resources noted above, as well as wildlife populations and air quality. Like Alternative B, Alternative C considers only federal mineral estate development, and if it were approved, the private mineral estate development described in Alternative A likely would still be implemented. The cumulative effects of federal and private mineral estate

BLM_0026726

development is analyzed in the cumulative effects section of Chapter 4, Environmental Consequences.

### ES.7.4 Alternative D, the BLM's Preferred Alternative

Alternative D, the BLM's Preferred Alternative, is similar to Alternatives B and C in that it considers development on federal mineral estate only. It considers the same number of wells (146) but slightly fewer well pads (33). Alternative D is based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives in the Draft EIS, cooperating agency input, and public input on the Draft EIS. This resulted in the following additions to Alternative D:

- The BLM selected only those roads and pipelines needed to access the pads, thereby reducing the miles of road and cross-country pipelines constructed. Minimizing cross-country pipelines was achieved by collocating most pipelines with roads; only those pipelines that could not follow roads, such as where the road and pipeline were going in opposite directions, were placed cross country. Roads and pipelines would also be placed to avoid elk habitat as much as possible.

- The standard will be for closed loop systems to be used to eliminate pits on location and the release of VOCs, unless, due to resource considerations, impacts could be demonstrated to be less when using a reserve pit system (no net benefit to using a closed loop system).

- Remote monitoring (remote telemetry) would be applied to locations and facilities to minimize well monitoring trips throughout the Unit.

- The Proposed Action from SGI would incorporate amendments, including the addition of the 12-89-7-1 APD, the revised plans for a compressor station outside the Unit, and the Wildlife Habitat Plan.

- The air quality design features, requirements for baseline water quality monitoring, and geologic hazards measures would be added.

As for Alternatives B and C, if Alternative D were approved, the operations and development of private minerals described in Alternative A would still be implemented. The cumulative effects of the combined private and federal mineral estate development is analyzed in the cumulative effects section of **Chapter 4**, Environmental Consequences.

### ES.8   SUMMARY OF ENVIRONMENTAL CONSEQUENCES ANALYSIS

The purpose of the environmental consequences analysis in this EIS is to determine and disclose the potential for significant impacts of the federal action on the human environment. Council on Environmental Quality regulations for implementing NEPA comprehensively interprets the "human environment" to include the natural and physical environment and the relationship of people with that environment (40 CFR 1508.14). The "federal action" is the BLM's decision whether to approve the Bull Mountain Unit MDP as proposed, to approve the MDP with modification and mitigation including the 12-89-7-1 APD, to reject both the MDP and 12-89-7-1 APD, or to reject the MDP but approve the 12-89-7-1 APD. The environmental consequences

BLM_0026727

provide the decision maker with the information necessary to compare and contrast the predicted effects of the proposed action and alternatives and to make a reasoned and informed decision regarding which alternative or course of action or combination of alternatives should be selected in the ROD.

**Chapter 4** evaluates the likely direct, indirect, and cumulative impacts on the human and natural environment in terms of environmental, social, and economic consequences that are projected to occur from implementing the alternatives. Some types of impacts for resources or resource uses could be confined to BLM-administered lands, such as soil disturbance resulting from construction activities; some actions may have offsite/indirect impacts on resources on other land jurisdictions, such as private or state lands, overlying federal mineral estate. An example of the latter is requirements to protect special status species and cultural resources overlying mineral resources. Some BLM management actions might affect only certain resources and alternatives.

The impact analysis identifies both enhancing and improving effects on a resource from a management action, as well as those that have the potential to diminish resource values. See **Tables 2-11**, **2-12**, and **2-13** for summaries of resource-specific direct and indirect impacts that could or would result from implementing the alternatives.

### ES.9   PUBLIC INVOLVEMENT, CONSULTATION, AND COORDINATION

During the development of this EIS, the BLM consulted and coordinated formally and informally with other federal agencies, state and local governments, Native American tribes, and the interested public, in compliance with 40 CFR 1501.7, 1502.19, and 1503 and Department of Interior regulations 43 CFR 46.435.

The BLM conducted two scoping periods for the Bull Mountain Unit MDP Environmental Assessment: from October 28 to December 12, 2008, and from September 17 to November 13, 2009. The preliminary environmental assessment was available for a 30-day public comment period, from March 23 to April 23, 2012. Comments on the proposed action received during the public scoping period and comments received on the Bull Mountain Unit MDP Preliminary Environmental Assessment are summarized in the Bull Mountain Scoping Report. It is available on the project website at http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html.

A Notice of Intent to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134), as well as provided general information regarding the project and how to participate in scoping through media outlets, postcards, emails, and its website. A project newsletter was issued on May 2, 2013, which provided information on the kickoff of the EIS and future opportunities for public involvement.

### ES.9.1 Comments on the Draft EIS

On January 16, 2015, the BLM and EPA published a Notice of Availability in the *Federal Register*, which marked the beginning of the formal 45-day public comment period. On January 27, 2015, the public comment period was extended for an additional 45 days, ending on April 16, 2015. One open house/listening session was held on February 10, 2015, in Paonia, during the 90-day comment period.

BLM_0026728

The BLM received a total of 565 unique comment letters, forms, and e-mails during the 90-day public comment period; this resulted in 360 substantive comments. In addition to the unique submissions discussed above, 83 form letters were submitted.

The 360 substantive comments were categorized into 67 issue statements. The comments received on the Draft EIS were similar to the issues raised during both the EA and EIS public scoping periods. They focused primarily on water resources (57), air resources (52), wildlife, birds, and special status species (49), socioeconomics (40), the Conservation Alternative (38), general regulatory comments (27), and general NEPA requirements (20). See **Table 5-2** for a complete list of comments by issue category.

All substantive comments, detailed summaries, and responses organized by resource, resource use, or EIS planning regulation can be found in **Appendix N**, Response to Comments on the Draft Environmental Impact Statement. A brief overview of changes to the document is provided in **Chapter 1**, Introduction, **Section 1.9**, Changes between the Draft EIS and Final EIS.

### ES.9.2 Cooperating Agencies

A cooperating agency is any federal, state, or local government agency or Native American tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis or EIS (40 CFR Part 1508.5). Throughout this EIS preparation, the BLM engaged multiple cooperating agencies and tribes for a broader understanding of their issues and concerns regarding the Bull Mountain Unit MDP and EIS. Interactions have included periodic briefings and reviews of preliminary, internal draft EIS text. Cooperating agencies are Region 8 of the US Environmental Protection Agency; the Grand Mesa, Uncompahgre, Gunnison National Forest; the Delta Conservation District; the Colorado Department of Natural Resources (including the Division of Parks and Wildlife); the Colorado Department of Public health and Environment; Gunnison County and Delta County.

Consistent with Section 7(c) of the Endangered Species Act, the BLM consulted with the US Fish and Wildlife Service (USFWS) regarding potential effects of the project on federally listed threatened or endangered species or critical habitat. The BLM prepared and submitted to the USFWS a biological assessment to evaluate the impacts of the preferred alternative on federally listed threatened and endangered species. For each listed species, the BLM provided a determination of whether the implementation of the final EIS would affect, adversely affect, not affect, or have no adverse effect" for the species that were the subject of this consultation. After reviewing the biological assessment, the USFWS responded with a concurrence memorandum, dated October 20, 2015, with a finding of "not likely to adversely affect."

The Draft Bull Mountain Unit MDP EIS was submitted to the Environmental Protection Agency in accordance with 40 CFR 1506.9. The BLM has contacted and consulted with tribal governments of Ute Tribe of the Uintah and Ouray Reservation, the Southern Ute Indian Tribe, and the Ute Mountain Ute Indian Tribe. The BLM remains in contact via phone calls and emails and by responding to individual requests for additional information or meeting presentations.

The BLM began consultations with the Colorado State Historic Preservation Officer on September 10, 2013, in accordance with the Protocol for Managing Cultural Resources on Lands Administered by the Bureau of Land Management in Colorado. The SHPO formally responded

BLM_0026729

to the letter on September 19, 2013, expressing interest but no specific concerns. The SHPO did not submit any formal comments on the Draft EIS.

In addition, the BLM has kept the Southwest Resource Advisory Council informed of the EIS progress throughout its development, but the council has not had any specific comments or input during the NEPA process.

BLM_0026730

# Chapter 1
## Introduction

BLM_0026731

BLM_0026732

# TABLE OF CONTENTS

Chapter                                                                                                  Page

**1.   INTRODUCTION** ................................................................................................................. **1-1**

    1.1    Overview ..................................................................................................... 1-1

            1.1.1  Regional Setting ........................................................................... 1-2

    1.2    Purpose and Need ....................................................................................... 1-5

    1.3    Decisions to be Made ................................................................................. 1-5

    1.4    Relationship to BLM Plans and Policies .................................................... 1-6

            1.4.1  BLM National and Statewide Regulations and Policies ..................... 1-6

            1.4.2  Conformance with the Current Resource Management Plan ............... 1-7

            1.4.3  Uncompahgre Resource Management Plan Revision ........................... 1-7

    1.5    Federal, State, and Local Permitting and Approvals ........................................ 1-7

    1.6    Scope of Analysis ...................................................................................... 1-9

            1.6.1  Requirements for Future NEPA Analysis ......................................... 1-10

    1.7    Public Involvement .................................................................................... 1-11

            1.7.1  Cooperating Agencies ................................................................... 1-12

    1.8    Key Issues Addressed in this EIS .............................................................. 1-13

            1.8.1  Issues Identified at Environmental Assessment Scoping .................... 1-13

            1.8.2  Additional Issues Considered in this EIS ........................................ 1-14

    1.9    Changes between the Draft EIS and the Final EIS ....................................... 1-15

            1.9.1  Updates to Geographic Information Systems Information ................. 1-16

            1.9.2  Changes to the Alternatives (Chapter 2) ........................................ 1-16

            1.9.3  Changes to Other Chapters and Appendices ..................................... 1-17

# TABLES

                                                                               Page

1-1    Federal, State, and Local Permits and Approvals Applicable to the
Bull Mountain Unit ............................................................................................ 1-7

# FIGURES

                                                                               Page

1-1    Regional Bull Mountain Unit ................................................................................ 1-3

1-2    Bull Mountain Unit .............................................................................................. 1-4

BLM_0026733

This page intentionally left blank.

BLM_0026734

# CHAPTER 1
# INTRODUCTION

## 1.1 OVERVIEW

The United States Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office, has received a proposed Master Development Plan (MDP) for natural gas exploration and development from SG Interests, Ltd. (SGI) for the Bull Mountain Unit (the Unit). It includes one application for a permit to drill (APD) for the 12-89-7-1 well pad.[1] The Bull Mountain Unit MDP arises from initial studies of the subsurface fluid mineral reserves and the results of previous natural gas drilling, both of which indicate the potential for economically viable reserves of natural gas in the area. An MDP provides information common to multiple planned wells, including drilling plans, surface use plans of operation, and plans for future production; they are typically prepared for a planned cluster of wells and associated facilities in close proximity, or for multiple in-fill wells scattered throughout an oil and gas Unit or field, and include information on associated facilities (e.g., roads, pipelines, utility corridors, and compressor stations).

The Bull Mountain Unit MDP describes the exploration for and development of up to 146 natural gas wells, 4 water disposal wells, and associated infrastructure on federal and private mineral leases within a federally Unitized area known as the Unit. Under terms of the Unit agreement, SGI is required to diligently develop at least two producing wells per year in order to maintain the administrative structure of the Unit. This requirement is currently suspended under an approved Suspension of Operations and Production while this environmental impact statement (EIS) is being prepared. Instead of structuring the development of federal leases as a series of individual actions, the BLM encourages the use of multi-well development plans to more effectively manage federal lease development (BLM IM 2005-247).

Additionally, federal unitization allows for placement of wells within the Unit in a logical fashion without regard to setbacks from committed lease lines in order to minimize road

---

[1] SGI submitted the 12-89-7-1 well pad APD and the BLM made an on-site inspection on May 16, 2011. The APD has been pending since October 25, 2012. SGI has submitted no other APDs nor has the BLM conducted any on-site inspections for wells, pads, or associated infrastructure in the Unit.

BLM_0026735

development, pipelines, and other surface impacts (BLM 2007c); however, the COGCC rule 318.d(3) setback requirements subject to agreements between COGCC and BLM. The objective of unitization is to proceed with a program that will adequately and timely explore and develop all committed lands within the Unit area without regard to internal ownership boundaries. By effectively eliminating internal property boundaries within the Unit area, unitization permits the most efficient and cost effective means of developing the underlying oil and gas resources (BLM 2013g, pages 2-60).

In 2003, the BLM approved a Unit agreement for the leases within the Bull Mountain area to provide for the orderly, planned, and structured development of extraction for natural gas resources. The boundaries of the Unit encompass approximately 19,670 acres federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit consists of 440 acres of federal surface underlain by BLM-administered mineral estate; 12,900 acres of split-estate lands consisting of private surface and BLM-administered minerals; and 6,330 acres of fee land consisting of private surface and private minerals regulated by the Colorado Oil and Gas Conservation Commission (COGCC; **Figure 1-2**, Bull Mountain Unit).

In split estate situations, the surface rights and subsurface rights (such as the rights to develop minerals) for a piece of land are owned by different parties. See the BLM's website on Split Estate for additional information and details on BLM policies regarding split estate (http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/split_estate.html); see also Legal Responsibilities of BLM for Oil and Gas Leasing and Operations on Split Estate Land.

A memorandum of understanding was signed by the BLM Colorado State Office, the US Department of Agriculture, the Forest Service (Forest Service), the Rocky Mountain Region, and the COGCC dated July 10, 2009. It addresses the application of the COGCC's final amended rules for oil and gas operations to federal lands and minerals (including split-estate lands). The Memorandum of Understanding facilitates cooperation among the agencies to limit the potential for redundancy or conflicting regulations among the permitting authorities. However, it recognizes that each regulatory agency in Colorado must receive permit applications from oil and gas operators that comply with and include responses to their own specific rules and regulatory requirements.

In the memorandum of understanding, the parties agree to advise operators to identify and incorporate applicable standards and practices contained in the COGCC rules into federal APDs, MDPs, or other requested authorizations related to oil and gas operations so long as such state standards or practices are at least as stringent as comparable federal standards or practices, in order to minimize the potential for multiple reviews.

### 1.1.1   Regional Setting

The Unit is located within the Colorado River basin, approximately 30 miles northeast of the Town of Paonia, and is bisected by State Highway 133. The elevation is approximately 7,400 feet and consists of rolling topography in a mountainous region (**Figure 1-1**, Regional Bull Mountain Unit and **Figure 1-2**, Bull Mountain Unit). Snow blankets most of the area from mid-October through mid-May, increasing from an average of a few inches through early December

BLM_0026736



**Regional Bull Mountain Unit**

Source: BLM GIS 2014

Bull Mountain Unit
Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals

Figure 1-1

BLM_0026737

I. Introduction



**Bull Mountain Unit**

Source: BLM GIS 2014

Bull Mountain Unit

Perennial stream

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Figure 1-2

BLM_0026738

to an average high of 5.5 to 6 feet in March (NRCS 2011). South-facing slopes have more winter melting events, and north-facing slopes retain snow longer and accumulate more snow through the course of the winter. East and West Muddy Creek, the two main drainages that collect local surface waters within the Unit, reach their confluence just south and outside of the Unit, where they form Muddy Creek.

Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek basin. Irrigated meadows are also found in the Ault Creek basin at the far western side of the Unit. There are many irrigation diversions off of the larger creeks, especially on the eastern side of the Unit. Stock ponds for domestic cattle and sheep grazing occur frequently on the landscape, and in general retain surface waters throughout the year.

The Unit is dominated by sagebrush (*Artemisia tridentata* subsp. *vaseyana*). Oakbrush communities comprised of Gambel's oak (*Quercus gambelii*), Saskatoon and Utah serviceberry (*Amelanchier utahensis* and *A. alnifolia*), and chokecherry (*Padus virginiana*) are the second most common, followed by mixed mountain shrubland. Other vegetation communities include aspen (*Populus tremuloides*) woodlands and irrigated pasturelands.

Cattle grazing occurs over most of the area during the snow-free months, typically mid-May through mid-October. Some springtime and fall sheep grazing occurs as well. In the fall, portions of the Unit are used for gathering cattle and sheep coming off of grazing allotments on the adjacent Grand Mesa, Uncompahgre, and Gunnison National Forest. A few residential sites are located within the Unit, generally near Gunnison County Road 265 and the State Highway 133 corridor.

## 1.2    PURPOSE AND NEED

The BLM's purpose is to consider the proponent's request for an MDP and the 12-89-7-1 APD to develop federal fluid minerals in the Unit, while also considering the BLM's multiple-use mission which, in addition to managing activities on federal land such as fluid mineral development, includes conserving natural, historical, cultural, and other resources on the BLM-administered lands.

The BLM's need arises from its responsibilities under the Federal Land Policy and Management Act of 1976 (FLPMA), the Mineral Leasing Act, and other legislation to respond to the applicant's request. To increase the orderly development of natural gas resources consistent with the Energy Policy Acts of 2001 and 2005, which emphasize the development of domestic natural gas reserves for supply and economic stability, and to better facilitate the planning of infrastructure, the BLM is considering the proposed MDP. The MDP takes into account field development as a whole rather than as individual actions.

## 1.3    DECISIONS TO BE MADE

The decision to be made by the BLM is whether to approve the Bull Mountain Unit MDP, including approving the 12-89-7-1 well pad APD, as proposed, to approve the plan and APD with modification and mitigation, to reject the MDP, or to approve the APD. Approval of the APD as proposed or with mitigation in the ROD would grant SGI a permit to begin well pad, road, pipeline, and facility construction and well drilling and completion.

BLM_0026739

In the ROD, the BLM decision-maker (i.e., the BLM Southwest District Manager) will determine the following:

- Whether the Proposed Action and alternatives are in conformance with the applicable land use plan and programmatic plans developed under NEPA

- Whether the analysis in this EIS is adequate for the purposes of reaching informed decisions on the Bull Mountain Unit natural gas field development Proposed Action and alternatives

- Whether to approve the Proposed Action, select a different alternative, or select a combination of alternatives

The Authorized Officer will also determine what conditions of approval (COAs) will be attached to the ROD and any individual permits issued after the ROD.

Existing lease rights granted by the BLM on federal mineral estate remain in effect during this EIS process. The BLM may receive and consider proposals for individual APDs and/or associated facilities on federal surface land and mineral estate, access across federal lands for oil and gas development, and production-related activities at any time. These additional individual actions submitted to the BLM will have separate NEPA analyses at the time they are received.

Any decisions made in the ROD will provide a blueprint for future anticipated actions; future ground-disturbing activity and construction would require additional authorizations from the BLM and/or COGCC. **Section 1.6.1**, Requirements for Future NEPA Analysis, provides additional details on the process for reviewing future APDs submitted under the MDP.

## 1.4    RELATIONSHIP TO BLM PLANS AND POLICIES

### 1.4.1    BLM National and Statewide Regulations and Policies

This EIS is consistent with the National Environmental Policy Act of 1969 (NEPA), as amended; the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, outlined in Part 40 of the Code of Federal Regulations (40 Code of Federal Regulations [CFR] Parts 1500-1508) and Department of the Interior NEPA regulations at 43 CFR 46; Department of the Interior and BLM policies and manuals (BLM 2008); the Endangered Species Act of 1973 (ESA); and the National Historic Preservation Act of 1966 (NHPA).

Exploration and development of federal oil and gas resources by private industry is under authority of the Mineral Leasing Act of 1920, as amended; the Mining and Minerals Policy Act of 1970; the National Materials and Minerals Policy, Research and Development Act of 1980; the Federal Onshore Oil and Gas Leasing Reform Act of 1987; and various regulations specific to implementation of those laws (e.g., 43 CFR 3100).

Onshore Oil and Gas Order Number 1 (Order) contains the requirements necessary for the approval of all proposed oil and gas exploratory, development, or service wells on all federal onshore oil and gas leases, including leases where the surface is managed by the Forest Service.

BLM_0026740

In 2007, the Order was revised to reflect passage of the 1987 Onshore Oil and Gas Leasing Reform Act and the Energy Policy Act of 2005. Major changes involve procedures for processing APDs, the use of best management practices (BMPs) in lease development, and procedures for operating in split estate situations, where privately owned surface overlies federally owned minerals. The Order also defines master development plans, noting that they provide information common to multiple planned wells, including drilling plans, surface use plans of operations, and plans for future production.

In 2015, the BLM released the new rule, Oil and Gas: Hydraulic Fracturing on Federal and Indian Lands (to be codified in 43 CFR, Part 3160). If and when the rule takes effect, it will apply to hydraulic fracturing operations on federal minerals. The requirements would not apply to actions conducted exclusively on private mineral estate.

### 1.4.2    Conformance with the Current Resource Management Plan

The BLM land use planning decisions for federal lands and minerals within the Unit are contained in the Uncompahgre Basin RMP (1989). The alternatives are subject to the decisions in the current RMP. The RMP decision relevant to the Bull Mountain Unit MDP states, "Federal oil and gas estate will be open to leasing. Seasonal restrictions are required on crucial deer and elk winter range and on bald eagle hunting habitat to protect crucial deer and elk winter range and bald eagle hunting habitat from disturbance" (BLM 1989, pages 28 and 32).

All of the alternatives in this EIS are in conformance with the Uncompahgre Basin RMP.

### 1.4.3    Uncompahgre Resource Management Plan Revision

The BLM is revising its Land Use Plan for the Uncompahgre Field Office. Existing RMP decisions will remain in effect during the land use plan revision process until the revision is completed and approved (43 United States Code [USC] 1711- 1712, 43 CFR 1600).

Inventory information and baseline reports developed for the Uncompahgre RMP revision, as well as those for the Bull Mountain Unit MDP Environmental Assessment (EA, BLM 2012), were incorporated into this EIS to provide recent and best information available.

### 1.5     FEDERAL, STATE, AND LOCAL PERMITTING AND APPROVALS

The Proposed Action and alternatives would be in compliance with various federal, state, and local laws and regulations, and SGI would procure any required permits or easements (**Table 1-1**, Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit).

**Table 1-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| *Federal Agency* | |
| US Army Corps of Engineers | • Section 404 and 401 permits for compliance with Clean Water Act |
| US Bureau of Land Management | • NEPA<br>• Approval of the APDs<br>• Sundry notices for construction and other changes<br>• Permits to drill, deepen, or plug back on BLM-administered land (APD/Sundry Notice process) |

BLM_0026741

**Table 1-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| US Bureau of Land Management *(continued)* | • Right-of-way (ROW) grants and temporary use permits for pipelines on BLM-administered land outside the Unit<br>• ROW grants for access roads on BLM-administered land outside the Unit<br>• Authorization for flaring and venting of natural gas on BLM-administered land<br>• Plugging and abandonment of a well on BLM-administered land<br>• Modifications of and/or exceptions to lease stipulations<br>• Antiquities, cultural and historic resource permits on BLM-administered land<br>• Paleontological resource use permits<br>• Approval to dispose of produced water on BLM administered land<br>• Pesticide use permits<br>• Noxious Weed Act enforcement<br>• Initiation of Section 7 consultation with US Fish and Wildlife Service (USFWS)<br>• Mineral material sales permits |
| US Department of Justice, Bureau of Alcohol, Tobacco and Firearms | • Explosives user permits |
| US Environmental Protection Agency – Region 8 | • Air quality permits (delegated to Colorado Department of Public Health and Environment)<br>• Review and comment on major federal actions<br>• Spill Prevention, Control, and Countermeasure Plan<br>• Underground Injection Control permits (delegated to COGCC) |
| US Fish and Wildlife Service | • Migratory Bird Treaty Act and Bald Eagle Protection Act consultations<br>• Section 7 consultation for compliance with Endangered Species Act |
| *State Agency* | |
| Colorado Division of Water Resources (Office of the State Engineer) | • Water well permits<br>• Stream alteration permits<br>• Change in nature of use water applications |
| Colorado Parks and Wildlife | • Coordination regarding impacts on wildlife and state sensitive species<br>• Compliance with COGCC Rules and Regulations<br>• Consistency with essential elements of wildlife mitigation strategy |
| Colorado Oil and Gas Conservation Commission | • Coordination on APDs (including Oil and Gas Location Assessment)<br>• Permits to drill, deepen, or re-enter and operate oil and gas or disposal wells<br>• Underground Injection Control Permits (delegated by the Environmental Protection Agency)<br>• Pressure monitoring and well spacing<br>• Disposal facility permits<br>• Permits to flare natural gas<br>• Compliance with safety regulations for oil and gas activities |

BLM_0026742

**Table 1-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| Colorado Department of Public Health and Environment, Division of Water Quality | • Construction Discharge Permit for stormwater discharges during project construction (according to current stormwater management plan) <br> • Coordination with COGCC for Injection Permit Applications <br> • Water Well Permit <br> • Section 401 Clean Water Act water quality certification stream and wetland crossing. <br> • Construction dewatering permits <br> • Stream alteration permits <br> • Solid and hazardous waste control |
| Colorado Department of Public Health and Environment, Division of Air Quality | • Air Quality Permits and Air Pollutant Emissions Notices (including delegations from the Environmental Protection Agency) for stationary and portable sources <br> • Approval orders and permits for compressors and other stationary emissions sources <br> • Air quality permits to construct <br> • New Source Review permits <br> • Fugitive dust control |
| Colorado Department of Transportation | • Access permits for access to and from State Highway 133 <br> • Utility, relocation, and special use permit for work in the highway ROW <br> • Oversize/overweight vehicle permits for use of state highway <br> • Approval of construction and operation of natural gas pipelines <br> • Permits for encroachment and for crossing state roads |
| Colorado Water Court Division 4 | • Water Augmentation Plan |
| *Local Government* | |
| Gunnison County | • Gunnison County Land Use Resolution <br> • Application for an Oil & Gas/land use change permit <br> • Performance/utilization bond <br> • Driveway permits for county road access <br> • Permits for use of County Road 265 for overweight/oversize equipment <br> • County zoning/land use plan consultation <br> • Special use and conditional use permits <br> • Encroachment permits <br> • Road conditional use and opening permits <br> • Solid waste disposal permits <br> • Construction permits and licenses <br> • Colorado Noxious Weed Act enforcement |

Source: BLM 2012; Gunnison County 2013.

## 1.6    SCOPE OF ANALYSIS

The BLM has addressed the requisite resource issues (as defined from internal and external scoping as well as from comments on the Draft EIS) at a programmatic level and on the site-specific level for the proposed 12-89-7-1 APD.

All phases of natural gas field development are included in the scope of the analysis. These are siting, construction, drilling, completion, interim reclamation, production and maintenance, final

BLM_0026743

wellbore abandonment, and reclamation. The technologies described here are representative of those most likely to be deployed over the life of the project.

The analysis areas for well pad locations is shown as 40-acre conceptual circles on maps to account for not knowing the exact locations of future well pads. Additionally, the roads and pipelines are approximations, because no engineering has been done to specifically design road and pipeline alignments or construction requirements. Because these elements of the MDP are generalizations, approximations, and conceptual analysis areas, the effects analysis in Chapter 4, Environmental Consequences is generalized to account for all possible scenarios. In this manner, the BLM is able to analyze future potential energy development on the entire Bull Mountain Unit.

To address the specifics of developing the 12-89-7-1 APD, the scope of analysis for affected resources is specific to the location and drilling plan (see **Appendix O** for the complete APD package). The BLM conducted an on-site inspection of the well location, and numerous site-specific studies were conducted to define the current condition of resources on location and to determine possible effects on those resources. Specialty reports included a Class III cultural resources survey, a vegetation and wildlife summary report, and baseline water quality monitoring. All of this information has been incorporated into the EIS and analyzed to ensure adequate NEPA compliance.

For the purposes of analysis, the life of any individual well is estimated to be 40 years and the analysis horizon for the project would be 50 years. This includes all oil and gas wells and water disposal wells, although the actual production years may vary for individual wells. The analysis focuses on the direct, indirect, and cumulative impacts that could eventually result from activities resulting from the actions presented in the alternatives. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

Information provided within the environmental consequences section provides the decision-maker with the information necessary to compare and contrast the predicted effects of the Proposed Action and alternatives and make a reasoned and informed decision regarding which alternative or combination of actions should be selected in the ROD.

### 1.6.1   Requirements for Future NEPA Analysis

If the BLM decides to approve SGI's proposed Bull Mountain Unit MDP or a modified alternative to it, the exact locations of wells, roads, pipelines, and other facilities would be determined when those wells or facilities are proposed for drilling or construction as part of an APD. The BLM would be required to review and act on the APD, which includes the surface use plans of operation (SUPOs) and site-specific subsurface drilling plan (see **Appendix O** for a complete APD package). Submission and approval of such applications are required before the surface is disturbed. Siting of these locations would be subject to the APD process described below and the design features and conditions of approval (COAs) adopted in the ROD for this EIS, plus any BMPs the BLM determines are necessary to reduce adverse effects.

An operator can initiate the APD process either by filing an APD or a notice of staking (NOS). The NOS consists of an overview of the operator's proposal, including a location map and a

BLM_0026744

sketched site plan. The detailed information required to be submitted for each APD is identified in Onshore Oil and Gas Order No. 1 and 43 CFR 3162.3.

The BLM is responsible for approving a project proponent's APD, including both the SUPO and subsurface drilling plan, and for applying appropriate mitigation measures, or COAs, for affected resources on BLM-administered lands or minerals.

Before approving an APD, the BLM must comply with NEPA and consider the environmental effects of the Proposed Action. The environmental review includes an on-site inspection of the proposed well, access road, and pipeline locations, as well as other areas of proposed surface use. The purpose of the on-site inspection is to identify site-specific environmental impacts and to identify avoidance techniques or other mitigation measures. The on-site inspection could, for example, include site-specific surveys for cultural and paleontological resources or threatened or endangered species if the potential for these resources exists on or near the proposed disturbance.

After the on-site inspection, the project proponent would submit the APD or would revise it to address changes requested during the inspection. Additional mitigation measures may be added as design features by proponents as part of their revisions, or BLM may add them as COAs after NEPA analysis. Examples of these additional measures are adjusting the proposed locations of well sites, roads, and pipelines to avoid a sensitive resource, identifying specific construction methods to be employed, and identifying reclamation standards.

After drilling, routine well operations would not require approval; however, the BLM would have approval authority for operational activities that may alter the specifications of an approved APD, certain subsequent well operations, disposal of water produced from federal leases, and new surface disturbances (e.g., workover pits). The BLM also retains the authority to approve well plugging and abandonment, gas venting, gas flaring, and certain measures for handling production. Other permits, approvals, authorizing actions, and consultations required by federal, state and local agencies are discussed in **Section 1.5**.

If the MDP is approved, this EIS will provide an "umbrella" analysis to which analysis of future APDs proposed within the Unit would be tiered. Approval of these actions would require additional documentation of NEPA compliance, such as a tiered environmental assessment, a Documentation of NEPA Adequacy, or a categorical exclusion. Categorical exclusions that may apply to some future development activities include those provided in Section 390 of the Energy Policy Act of 2005, 42 USC 15942(b). Approval would be subject to the APD process described above. They would be in accordance with federal and state oil and gas regulations, Washington Office Instruction Memorandum 2008-166, and the 1989 Uncompahgre Basin RMP or the future revised Uncompahgre RMP.

Because the APD for the 12-89-7-1 well pad is included in this EIS, no further NEPA analysis would be required to approve it. Should it be approved as part of the Bull Mountain Unit MDP ROD, well pad work and drilling could begin at any time.

## 1.7   PUBLIC INVOLVEMENT

Public involvement is a vital component of the EIS processes (43 CFR 1506.6). Scoping was an early and open process for determining the scope of issues to be addressed and identifying the

BLM_0026745

significant issues related to a Proposed Action. Information collected during scoping may also be used to develop the alternatives to be addressed in a NEPA document. Public involvement was conducted in the following phases for the Bull Mountain Unit MDP environmental review process:

- Public scoping prior to NEPA analysis to determine the scope of issues and alternatives to be addressed

- Public outreach, news releases, and newspaper advertisements

- Public review and input on the Bull Mountain Unit MDP EA

- Collaboration with federal, state, local, and tribal governments; the BLM Colorado Southwest Resource Advisory Council (RAC); and cooperating agencies

- A Notice of Intent (NOI) to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134, April 3, 2013)

- A Notice of Availability (NOA) of the Draft EIS was published in the *Federal Register* on January 16, 2015 (80 *Federal Register* 2438-2439, January 16, 2015). The Draft EIS was available for public review and comment for 90 days.

The scoping summary report documents the results of the public involvement process beginning with public scoping and including the comments received on the EA, and provides information about the ongoing collaboration process; a copy of the report is available on the Bull Mountain EIS project website: http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html. **Appendix N** documents the substantive comments, summary of issues, and responses to comments from public review of the Draft EIS.

Detailed information regarding the public comment process for the Draft EIS is found **Chapter 5**, Consultation and Coordination.

### 1.7.1  Cooperating Agencies

The BLM engaged multiple cooperating agencies and tribes for a broader understanding on their issues and concerns regarding the Bull Mountain Unit Master Development Plan and EIS. Cooperating agencies are state or federal agencies, or local or tribal governments that enter into a formal relationship with the BLM to help develop EISs (40 CFR 1508.5). A cooperating agency's involvement can include participating in issue identification, collecting inventory data, contributing to alternative formulation, and estimating effects of alternatives (40 CFR 1501.6). The cooperating agencies on the Bull Mountain Unit MDP EIS are the following:

- Environmental Protection Agency, Region 8

- Grand Mesa, Uncompahgre, Gunnison National Forest

- Delta Conservation District

- Colorado Department of Natural Resources, including the Division of Parks and Wildlife

BLM_0026746

- Colorado Department of Public Health and Environment

- Delta County

- Gunnison County

The BLM initiated consultation with the Colorado State Historic Preservation Officer in August 2013 in accordance with the Protocol for Managing Cultural Resources on Lands Administered by the Bureau of Land Management in Colorado. Consultations will continue through the course of the EIS process to ensure compliance with the NHPA and NEPA.

The BLM has also contacted and consulted with Native American tribal governments including the Ute Tribe of the Uintah and Ouray Reservation, Southern Ute Indian Tribe, and Ute Mountain Ute Indian Tribe. Formal letters were sent to the three tribes in January 2014. The BLM continues to remain in contact via phone calls and emails, and by responding to individual requests for additional information or meeting presentations.

Finally, the Southwest RAC has been kept informed of the EIS progress throughout the document's development. For full details on the coordination and consultation conducted for the EIS, see **Chapter 5**, Consultation and Coordination.

## 1.8 KEY ISSUES ADDRESSED IN THIS EIS

An issue is a point of disagreement or dispute with the Proposed Action based on some anticipated environmental effect (BLM 2008a, page 40). The BLM has used the issues and other information collected in the scoping and EA comment phases to help formulate a reasonable range of alternative management strategies that are analyzed in this Final EIS.

The NOI invited further comments and the project has been discussed internally and externally during the interim. The issue statements below include those from the scoping period for the EA, as well as public comments received on the EA after its publication in March 2012. The process of developing this EIS afforded opportunities for collaboration with local, state, federal, and tribal governments; land-management agencies; public interest groups; and public land users. As a result, these issues and concerns have been modified to reflect public comments and concerns. The overarching issues the EIS addresses are listed below.

### 1.8.1 Issues Identified at Environmental Assessment Scoping

Information accepted during project scoping conducted in 2008 and 2009 was compiled to develop issue statements. The following issues of key environmental, social, and economic concern were identified:

Air Quality. How will harmful emissions and dust from construction and operations be monitored and controlled?

Water Quality and Supply. How will hydraulic fracturing and reinjection of produced water affect the short-term and long-term quality and supply of water for agricultural and residential use? What are the potential hazards from surface spills and various substances used during

BLM_0026747

drilling and production? An inventory and performance monitoring program should be instituted to establish a baseline and provide regular reporting for the life of the project.

Threatened, Endangered, and Sensitive Wildlife Species. What are the potential impacts on species identified as threatened, endangered, or of concern to state and federal agencies, including Canada Lynx and Gunnison sage-grouse?

Wildlife and Wildlife Habitat. The area is used by a wide variety of species, including a large population of elk, and the potential impacts, duration, and density of development in this relatively undeveloped area is a concern. How will construction and ongoing use of access roads affect wildlife habitat utilization and connectivity within and adjacent to the Bull Mountain Unit?

Recreation and Visual Resources. The Bull Mountain Unit is adjacent to important recreation areas for camping, hunting, and sightseeing and includes a segment of the West Elk Scenic Byway. How will the project affect access to and quality of recreation and visual resources?

Socio-economics. How will development and operation of additional roads and infrastructure affect the rural character, lifestyle, and property values in the area, as well as tourism that relies on existing recreational and scenic values? What are the positive and negative economic impacts of developing the mineral resource?

Transportation. How will increased traffic and resulting impacts on road conditions, maintenance, and safety be addressed? How will new pipeline and access road corridors be minimized?

## 1.8.2   Additional Issues Considered in this EIS

Based on the comments received on the EA, many of the issues are similar to those identified from scoping; however, some additional concerns and key issues have been identified as noted below.

Climate Change. How will the BLM address climate change and greenhouse gas emissions that result from the project and other projects in the area in the EIS?

Cumulative Impacts. What area projects will the BLM include when considering cumulative impacts; will the BLM include projects such as the North Fork Valley Leasing and other leasing actions? Will the BLM address impacts from the project activities on the surrounding National Park Service Units, National Forest System lands, and the broader county socioeconomics?

Range of Alternatives. Will the BLM consider additional alternatives in the EIS, such as different water disposal systems or access points to the Bull Mountain Unit? Will the BLM consider additional required design features as part of the alternatives?

National Environmental Policy Act. How will the BLM coordinate the EIS development with the on-going Uncompahgre RMP revision? What is the appropriate level of analysis for the EIS – high-level programmatic analysis or site-specific analysis? Will there be additional NEPA analysis required for individual drilling permits? Since this is an EIS effort, will the BLM coordinate with cooperating agencies and other stakeholders?

BLM_0026748

<u>Noise</u>. What are the impacts from increased noise in the project area? Will noise diminish the quality of life and recreational experiences people currently enjoy?

<u>Geologic Resources</u>. What are the impacts on the geologic resources from water injection and hydraulic fracturing? Could there be increased risk for induced seismicity and geologic hazards (e.g., landslides and slope instability)?

<u>Visual Resources, Vegetation, Soil Resources, Recreation</u>. How will the BLM address impacts on these resources from the project's actions? What mitigation measures will the BLM include, such as design features, BMPs, or other required mitigation to address these impacts?

<u>Health and Safety</u>. What are the impacts on human health and safety that could result from the project actions? How will the BLM address project-related trash and reduce the risk for hazardous spills, traffic related safety issues, and release of toxic emissions?

## 1.9   CHANGES BETWEEN THE DRAFT EIS AND THE FINAL EIS

As a result of public comments, best science, cooperating agency coordination, and internal review of the Draft EIS, the BLM developed the Final EIS for the Bull Mountain Unit Master Development Plan. None of the alternatives from the Draft EIS were selected as the BLM's Preferred Alternative. Rather, the BLM selected a combination of locations and actions from Alternative B (the Proposed Action) and Alternative C (BLM Modified Action). Additionally, the BLM included amendments to the Proposed Action from SGI (revisions to one compressor station location, inclusion of a wildlife habitat plan, and the addition of the 12-89-7-1 APD). The Preferred Alternative (Alternative D) focused on addressing public comments while continuing to meet the BLM's legal and regulatory mandates.

Throughout the development of the Final EIS, editorial changes were made to improve clarity, and technical changes were made to correct errors. New information on resources or resource uses was added. New program policies were recognized.

The BLM has determined that the Preferred Alternative is a minor variation of the Draft EIS alternatives and that its impacts would not affect the human environment in a substantial manner or to a significant extent not already considered in the Draft EIS. The impacts disclosed in the Final EIS are similar or identical to those described in the Draft EIS, and all differences have been accounted for in the analysis. Because they are not substantial or significant changes, supplementation to the Draft EIS is not necessary.

NEPA requires agencies to prepare a supplement to a Draft EIS under the following circumstances:

- The agency makes substantial changes in the Proposed Action that are relevant to environmental concerns

- If there are significant new circumstances or information relevant to environmental concerns and bearing on the Proposed Action or its impacts

BLM_0026749

A supplement is not necessary if a newly formulated alternative is a minor variation of one of the alternatives and is qualitatively within the spectrum of alternatives analyzed in the Draft EIS.

The Preferred Alternative includes components of the alternatives analyzed in the Draft EIS. Taken together, these components present a suite of management decisions that present a minor variation of alternatives identified in the Draft EIS and are qualitatively within the spectrum of alternatives analyzed.

### 1.9.1   Updates to Geographic Information Systems Information
GIS information (e.g., acreage figures and associated quantifications) was updated as follows:

- Some datasets, including the roads layer, were corrected due to inaccurate datasets, unknown sources, or outdated information.

### 1.9.2   Changes to the Alternatives (Chapter 2)
Management actions in Chapter 2 were updated. The following are the management actions that underwent the changes between the Draft EIS and the Final EIS.

- Existing infrastructure was updated based on information provided by SGI to account for continuing development permitted through the COGCC on private mineral estate.

- Alternative A, No Action, was revised to clarify that it represents those actions that would be anticipated should the BLM reject the MDP. Rejection of the MDP would result in continued development of the gas resources, but without the benefit of an umbrella development strategy and without any assurance on how long the approval process would take. The BLM would continue to review and process each individual APD submitted on a first-come/first-served basis. As these additional BLM permitted activities would occur in the future, but without an assumed time frame for submission and approval, the BLM considers them reasonably foreseeable actions. The BLM has accounted for all 146 federal gas wells in the cumulative effects analysis for Alternative A.

- SGI added to its Proposed Action (Alternative B) the 12-89-7-1 APD and a wildlife habitat plan and replaced the size and number of compressor engines at the station outside the Unit boundary to the northwest (see **Figure 2-2**, Alternative B, Proposed Action). The new arrangement consists of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station. The affected environment and environmental consequences chapters were revised to reflect these changes in Alternative B.

- Alternative D, the BLM's Preferred Alternative

  - Well Pad Locations, Roads, and Pipelines. The BLM selected 33 well pad locations that present environmentally responsible development of the gas resource. Thirty-one pads were selected from Alternative B and two pads from Alternative C. Additionally, the BLM selected only those roads and pipelines needed to access the pads, resulting in a reduction of miles of road constructed

BLM_0026750

and cross-country pipelines. Minimization of cross-country pipelines was achieved through colocation of most pipelines into road routes; only those pipelines that could not follow roads (i.e., the road and pipeline were going in opposite directions) were placed cross-country. Roads and pipelines would also be placed to avoid elk habitat as much as possible.

o   The standard will be for closed loop systems to be used to eliminate pits on location and release of VOCs, unless due to resource considerations impacts can be demonstrated to be less when using a reserve pit system (no net benefit to using a closed loop system).

o   All EPA and COGCC requirements for use of green completion technologies will be considered when reviewing submitted APDs.

o   Remote monitoring (remote telemetry) will be applied to locations and facilities to minimize well monitoring trips throughout the Unit.

o   Incorporation of amendments to the Proposed Action from SGI: the 12-89-7-1 APD, the revised plans for a compressor station located outside the Unit, and the Wildlife Habitat Plan.

o   Air Quality design features. The air quality mitigation measures identified in Alternative B of the Draft EIS were incorporated in the Preferred Alternative (Alternative D).

o   Baseline Water Quality Monitoring. Commenters requested a baseline water quality monitoring program as part of the Master Development Plan. SGI conducts water quality sampling and monitoring as part of their State of Colorado requirements. This program will continue and the Preferred Alternative includes additional requirements to monitor for additional compounds. The BLM and SGI will also hold annual meetings to report findings from water quality monitoring.

o   Mitigation measures that were presented in **Section 4.2.5**, Geology, impact analysis are incorporated into the Preferred Alternative and they are analyzed as such in the impact analysis under Alternative D.

### 1.9.3   Changes to Other Chapters and Appendices

•   **Appendix C**, Conditions of Approval, was refined to include only those actions that are pertinent to the Master Development Plan. Certain actions were eliminated from the appendix because they were redundant with other actions, represented requirements that the BLM and SGI must follow as a matter of law, or were stipulations on the existing leases.

•   Additional literature provided by the public was reviewed and, when relevant, added to the baseline information in **Chapter** 3, Affected Environment.

BLM_0026751

- **Chapter 3**, Affected Environment, and **Chapter 4**, Environmental Consequences, were updated to reflect the new EPA ozone NAAQS of 70 ppb (released to the public October 1, 2015). The BLM's air quality technical specialists reviewed the analysis in Chapter 4 to ensure that the analysis was adequate when discussing ozone. The impacts discussion in the Final EIS is similar to what was described in the Draft EIS. Because the current analysis changes are not substantial or significant, supplementation to the Draft EIS resulting from the ozone standard change is not necessary.

    Note that the ozone contributions from the project have not changed and the project area and areas surrounding it are in attainment for the previous ozone NAAQS from 2008 (75 ppb). The EPA expects to issue detailed guidance on the designation process for the new NAAQS in early 2016; however, it has indicated that attainment designations for the 2015 NAAQS will be based on 2014-2016 data. State recommendations for designations of attainment and nonattainment areas are due to the EPA by October 1, 2016, and the EPA will finalize designations by October 1, 2017. Therefore, at the time of writing of this document, the attainment status of the project area and surrounding counties in western Colorado under the 2015 NAAQS is not yet known and the designations under the 2008 NAAQS remain in place. The nonattainment decisions are the purview of the EPA and the State of Colorado and therefore are beyond the scope of this document.

- The site-specific studies conducted for the 12-89-7-1 APD (Class III Cultural Resources Survey Report, Vegetation and Biological Report, and baseline water well water quality monitoring data) were incorporated into the affected environment and analyzed in the environmental consequences. See **Chapter 3**, Affected Environment, **Sections 3.2.4**, Water Resources, **3.2.6**, Vegetation, **3.2.8**, Fish and Wildlife, **3.2.10**, Special Status Species, and **3.2.12**, Cultural Resources.

- **Chapter 4**, Environmental Consequences, was updated with analysis related to the Preferred Alternative and was revised for consistency with **Chapter 3**, Affected Environment, including the new information related to the 12-89-7-1 APD.

- **Table 4-3** in Chapter 4, Cumulative Effects, was revised to provide a more comprehensive list of cumulative projects, past and future, and was used to support a more detailed analysis of cumulative impacts. Cumulative impacts were reviewed for consistency with the rest of the Final EIS.

- Additions were made to **Chapter 5**, Consultation and Coordination, to describe the public comment process on the Draft EIS and the results of the US Fish and Wildlife Survey's review of the biological assessment for the Bull Mountain MDP.

- **Appendix N**, Response to Comments on the Draft EIS, was added. It documents the substantive public comments received, summaries of the issues resulting from public input, and responses to public comments.

- In various chapters and appendices, clarifications were made on specific topics commenters found confusing or deficiently described, including implementation-level decisions.

BLM_0026752

- All comments citing editorial changes to the document were reviewed and incorporated as appropriate. The Final EIS was edited and revised to correct typographic errors, missing references, definitions, acronyms, calculations, and other inconsistencies.

This page intentionally left blank.

BLM_0026754

# Chapter 2
## Alternatives

BLM_0026755

BLM_0026756

# TABLE OF CONTENTS

Chapter                                                                                          Page

**2.    ALTERNATIVES** ...................................................................................................... 2-1
   2.1    Introduction ................................................................................................ 2-1
   2.2    Alternatives ................................................................................................ 2-1
        2.2.1   Alternative Development ................................................................ 2-1
        2.2.2   Alternatives Considered for Detailed Analysis .................................. 2-2
        2.2.3   Identifying the Preferred Alternative (Alternative D) .......................... 2-3
        2.2.4   Summary of the Alternatives ........................................................... 2-3
        2.2.5   Elements Common to All Alternatives ............................................. 2-8
        2.2.6   Alternative A, No Action ............................................................... 2-13
        2.2.7   Alternative B, Proposed Action ....................................................... 2-40
        2.2.8   Alternative C, Modified Action ....................................................... 2-73
        2.2.9   Alternative D, the BLM's Preferred Alternative ............................... 2-86
   2.3    Alternatives Considered but Eliminated from Detailed Analysis ................. 2-102
        2.3.1   Alternatives Considered and Eliminated during EA Development .. 2-102
        2.3.2   Alternatives Considered and Eliminated from EIS Development .... 2-103
   2.4    Summary of Alternatives ............................................................................ 2-105
   2.5    Summary of Impacts .................................................................................. 2-116

# TABLES

                                                                                      Page

2-1     Traffic Estimates for Construction, Drilling, Completion, and Production
        Activities per Well Pad ............................................................................... 2-10
2-2     Project Feature Assumed Short- and Long-Term Disturbance Estimates ................. 2-12
2-3     Existing Features within the Unit ............................................................... 2-12
2-4     McIntyre Flowback Pits .............................................................................. 2-27
2-5     Bull Mountain Unit Annual Production Rates ............................................. 2-30
2-6     Alternative A Traffic Estimates per Well Pad for Construction, Drilling,
        Completion, and Production Activities ....................................................... 2-37
2-7     Alternative B Traffic Estimates for Construction, Drilling, Completion, and
        Production Activities ................................................................................... 2-71
2-8     Alternative C Traffic Estimates for Construction, Drilling, Completion, and
        Production Activities ................................................................................... 2-82
2-9     Alternative D Traffic Estimates for Construction, Drilling, Completion, and
        Production Activities ................................................................................... 2-98
2-10    Summary of Actions by Alternative ............................................................ 2-105
2-11    Stipulations, Design Features, and Mitigation Measures............................. 2-107
2-12    Summary of Surface Disturbance Acres by Alternative................................ 2-116
2-13    Estimated Total Traffic Round Trips for Drilling, Completion, and Production
        Activities by Alternative[1] ....................................................................... 2-117
2-14    Summary of Environmental Consequences by Alternative........................... 2-118

BLM_0026757

# FIGURES
Page

2-1     Alternative A, No Action ............................................................................................ 2-14
2-2     Alternative B, Proposed Action .................................................................................. 2-41
2-3     Alternative B, C, and D 12-89-7-1 APD .................................................................... 2-43
2-4     Alternative B, Proposed Action Wildlife Habitat Plan .............................................. 2-44
2-5     Alternative C, Modified Action .................................................................................. 2-75
2-6     Alternative C, Constraints .......................................................................................... 2-76
2-7     Alternative D, BLM's Preferred Alternative ............................................................. 2-89
2-8     Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan .......................... 2-90

BLM_0026758

# CHAPTER 2
# ALTERNATIVES

## 2.1   INTRODUCTION

This chapter details Alternatives A through C and the Preferred Alternative (Alternative D) for the Bull Mountain Unit MDP Final Environmental Impact Statement (Final EIS). The BLM identified a range of alternatives, including the No Action Alternative, the Proposed Action, the Modified Action, and the Preferred Alternative. The Proposed Action, Modified Action, and Preferred Alternative are based on the actions proposed by SGI, issues, concerns, and opportunities raised in public comments during scoping and comments on the Preliminary EA; interdisciplinary interaction between resource professionals; and collaboration with cooperating agencies.

The BLM NEPA Handbook (H-1790-1) also calls for expression of the BLM's preferred alternative in the Draft EIS if one exists (BLM 2008c). The BLM did not identify a preferred alternative for the Bull Mountain Unit Master Development Plan project at the Draft EIS stage, pending the review and analysis of public comments on the Draft EIS. Based on the review of public and internal BLM comments, the BLM has identified the Preferred Alternative in this Final EIS. A summary of the Preferred Alternative and how the BLM selected it is detailed below in **Section 2.2.3**, The Preferred Alternative (Alternative D).

Although the development activities anticipated in the alternatives would take place on federal and private mineral estate, the BLM's decisions are limited to federal lands and minerals. Those activities on BLM-administered mineral estate for the BLM's decision for the Bull Mountain Unit MDP must conform to the Uncompahgre Basin RMP (BLM 1989). See **Chapter 1**, Introduction, for further details regarding BLM authority.

## 2.2   ALTERNATIVES

### 2.2.1   Alternative Development

The CEQ regulations require an agency to consider significant issues when developing the range of alternatives to be considered in an EIS (43 CFR 1500.1, 1501.7, and 1502.1). As defined in the BLM's NEPA Handbook (H-1790-1, page 40), an issue is a point of disagreement, debate, or

BLM_0026759

dispute with a Proposed Action based on some anticipated environmental effect; an issue has elements that distinguish it from a position statement including:

- Has a cause and effect relationship with the Proposed Action or alternatives

- Is within the scope of analysis

- Has not been decided by law, regulation, or previous decision

- Is amenable to scientific analysis rather than conjecture

Issues point to environmental effects, and may lead to the identification of **design features** that are incorporated into the Proposed Action or an alternative, or to **mitigation measures**.

Issues relevant to the Bull Mountain Unit MDP EIS were identified during internal and external scoping for this EIS, as well as public comments submitted on the Bull Mountain Unit MDP EA, and are presented in **Section 1.8**, Key Issues Addressed in this EIS.

> *Design Features:* Specific means, measures, or practices that make up the Proposed Action and alternatives. They include construction activities, operating procedures, stipulations, and measures that reduce or avoid adverse environmental impacts.
>
> *Mitigation Measures:* Specific means, measures, or practices that would reduce or eliminate the effects of the Proposed Action or alternatives. They may be used to reduce or avoid adverse impacts, whether or not impacts are significant. A measure or practice is termed "mitigation measure" only if it has not been incorporated into the Proposed Action or alternatives. (See 40 CFR 1508.20 and BLM NEPA Handbook, H-1790-1, pages 44-45 and 61.)

### 2.2.2   Alternatives Considered for Detailed Analysis

The two action alternatives (Alternative B, the Proposed Action, and Alternative C, the Modified Action) and the Preferred Alternative (Alternative D) offer a range of possible management approaches for responding to the issues presented in **Section 1.8**, Key Issues Addressed in this EIS.

Meaningful differences among the alternatives are described in **Table 2-10**, Summary of Actions by Alternative. Figures following the description of each alternative provide a visual representation of differences between alternatives. GIS has been used to perform acreage calculations and to generate these figures. Calculations are dependent upon the quality and availability of data, and most calculations in this EIS are rounded to the nearest 10 acres or 0.1 mile. Given the general scale of the analysis and the compatibility constraints between datasets, all calculations are approximate and serve for comparison and analytic purposes only. Likewise, the figures are provided for illustrative purposes and subject to the limitations discussed above. The BLM may receive additional or updated data; therefore, acreages may be recalculated and revised during the analysis of future decisions.

Well pad and well locations, road alignments, pipeline routes, and other facility placements discussed in the Bull Mountain Unit MDP EIS alternatives are conceptually illustrated for the purposes of assessing the cumulative resource impacts of proposed development in the Unit. However, during development of the Final EIS, the BLM agreed to consider the 12-89-7-1 APD. As noted in **Section 1.3**, Decisions to be Made, this APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012. By considering it in the Final EIS, it is now possible for the BLM to approve or reject the APD as

BLM_0026760

part of the ROD. (See **Section 1.3**, Decisions to be Made, and **Section 1.6.1**, Requirements for Future NEPA Analysis, for further details.)

### 2.2.3   Identifying the Preferred Alternative (Alternative D)

The BLM's NEPA handbook (H-1790-1) requires the BLM to identify a Preferred Alternative in the Final EIS. Formulated by the management and interdisciplinary team, the Preferred Alternative represents those goals, objectives, and actions determined to be most effective at resolving the issues, while allowing environmentally responsible development. While collaboration is critical in developing and evaluating alternatives, the final designation of the Preferred Alternative remains the exclusive responsibility of the BLM. The BLM has selected Alternative D as the Preferred Alternative, based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives, cooperating agency input, and public input on the Draft EIS.

Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping and Draft EIS commenting efforts enabled the BLM to identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternatives development process, as well as during the EIS process in general.

All of the action alternatives were developed to meet the purpose of and need for the project, while minimizing or mitigating environmental impacts. These objectives would be accomplished in Alternative D by incorporating the following key elements of Alternatives B and C:

- Including air quality and air quality related values COAs that limit emissions in order to keep levels below national standards

- Including actions and COAs that would reduce soil, vegetation, and water impacts (see **Appendix C**)

- Selecting well pad analysis areas that would impact wildlife habitat the least

- Implementing a wildlife habitat plan (see **Appendix C** for plan specifics)

These components of the Preferred Alternative are discussed more in **Section 2.2.8**, Alternative D, BLM's Preferred Alternative. The air measures and wildlife habitat plan in the Preferred Alternative have been voluntarily agreed to by SGI since the publication of the DEIS and in light of public comments received on the DEIS. Some of these measures may go beyond those required by the approved Uncompahgre RMP, regulations, statutes, or the terms of SGI's valid and existing leases; however, the company has voluntarily agreed to these components of the alternative and BLM will include them as COAs in the ROD.

### 2.2.4   Summary of the Alternatives

A brief, narrative introduction to each of the four alternatives is provided below. The phases of construction, drilling, completion, reclamation, and final abandonment are the same under all alternatives.

BLM_0026761

### Alternative A, No Action

Under the No Action Alternative, the Bull Mountain Unit MDP would be denied, and the BLM would not approve the 12-89-7-1 APD.

If the BLM were to select Alternative A, it would mean that SGI could continue to submit APDs to COGCC for authorization to develop on private lands with private mineral estate and to submit individual APDs to the BLM in the future. Regarding COGCC submissions, the BLM does not approve or control development on these lands. For analysis purposes, the No Action Alternative addresses the development of private mineral estate only in recognition of the fact that federal mineral development would still occur with SGI submitting individual APDs to the BLM on a case-by-case basis. Up to 146 wells could be fully developed, but they would be spaced over an unknown time frame due to such factors as availability of drilling equipment, federal permit processing time, and the need for future NEPA analysis. This combination of federal mineral and private mineral development that would occur is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

The components described for Alternative A (e.g., development, construction, and drilling) are assumptions only. The BLM's analysis of the No Action Alternative assumes that previously authorized activities and activities on private mineral estate would continue and that federal mineral estate would be developed ad hoc without an MDP. Private mineral estate activities would occur as authorized by the COGCC.

**Figure 2-1**, Alternative A, No Action, presents the conceptual locations of potential well pads over areas currently thought to be most productive for natural gas development.

### Alternative B, SGI's Proposed Action

Alternative B is specific to BLM-administered mineral estate, the BLM's authority, and the actions the BLM would approve under a master development plan. Alternative B describes the development that would occur on federal mineral estate in the Unit. As private mineral development would continue to occur outside the scope of a federally approved MDP and APD, the combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

After the Draft EIS was released, SGI modified its Proposed Action, as follows:

- Inclusion of the 12-89-7-1 well pad APD—This APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012. The specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix O**. This site-specific information is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.7**, Alternative B. For example, while **Section 2.2.5** describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD drilling plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

BLM_0026762

- New developments under the Proposed Action would be subject to the Bull Mountain Unit Wildlife Habitat Plan (WHP) submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**; the provisions found in it are included in the text descriptions below.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length and route of the pipeline has been updated to reflect this change.

**Table 2-11**, Stipulations, Design Features, and Mitigation Measures, lists plans and strategy documents that would apply to federal APDs, including a master surface use plan of operations and a master drilling plan (see **Appendix D** and **E**, respectively). These plans would be revised to reflect the specifics of an APD, design features, and current lease stipulations.

When the analysis in **Chapter 4**, Environmental Consequences, indicated the need for mitigation to address adverse impacts, BLM analyzed the COAs listed in **Appendix C** or suggested additional measures to evaluate the effectiveness of the measures in reducing or eliminating effects. These include the following additional mitigation measures that may be included as COAs on the 12-89-7-1 APD and any future APD:

- The COAs listed in **Appendix C**

- Geologic hazard measures, the same as those noted above for Alternative A, No Action

- Air quality and AQRV control measures

**Figure 2-2**, Alternative B, Proposed Action, presents the conceptual locations of potential well pads over areas currently thought to be most productive for natural gas development.

If Alternative B is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. All actions would be in compliance with all laws, regulations, and BLM policies. These include the BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989).

### *Alternative C, the BLM's Modified Action*

Alternative C was developed by modifying the GIS model to minimize surface disturbance by putting greater emphasis on soil types and proximity to existing roads and collocating roads and pipelines. This in turn would reduce the miles of roads and pipelines needed to service the pad

BLM_0026763

sites (see **Appendix A** for additional details). The phases of development, development methods, and actions anticipated during construction, drilling, completion, production, and reclamation of Alternative C are similar to Alternative A. However, like Alternative B, this alternative is specific to BLM-administered mineral and surface estate, the BLM's authority, and the actions it would approve under an MDP.

Alternative C provides additional features and changes to actions in order to consider options for addressing the impacts of gas development on wildlife populations, vegetation resources, water quality, air quality, and soil resources. It includes the following as design features:

- Seasonal winter timing limitations or a progressive development approach, which would limit drilling and construction over private and federal minerals to no more than one-quarter of the Unit in any given period (December 1 to April 30)

- The COAs listed in **Appendix C**

- Geologic hazard measures the same as those noted above for Alternative A

- Air quality and AQRV control measures, including a requirement to apply dust abatement to unpaved roads to achieve at least 50 percent control during all construction and development phases and the use and operation of pneumatic devices, tanks, and dehydrators in accordance with CDPHE and EPA Oil and Gas Regulations

- A requirement for an annual meeting to plan and discuss an annual construction and operational activities plan, the order for development phasing around the Unit to avoid widespread impacts on wintering big game species, and the reclamation monitoring status report

- Annual raptor nesting surveys to identify raptor nests within 0.25 mile of surface-disturbing activities from April 15 to July 15 or until young of the year have fledged and avoidance of occupied nests from April 15 to July 15

- A requirement to prevent accumulated water on pads from draining into wetlands or riparian areas

- Control of noxious weeds

Like Alternative B, if Alternative C is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

### *Alternative D, the BLM's Preferred Alternative*

Alternative D is based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives, cooperating agency input, and public input on the Draft EIS. Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping and Draft

BLM_0026764

EIS commenting enabled the BLM to identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternatives development process and the EIS process in general.

Additional design features of Alternative D resulting from public input on the Draft EIS are the following:

- The measures identified in SGI's Wildlife Habitat Plan (**Appendix C**)

- All of the air quality and AQRV control and monitoring measures, noxious weeds measures, and other measures noted in Alternative C

- Baseline water quality monitoring measures

The amendments proposed by SGI in the Proposed Actions also apply to Alternative D as noted here:

- Inclusion of the 12-89-7-1 well pad APD—This APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012. The specific surface use plan of operation and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix P**. The site-specific information is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.7**, Alternative B. For example, while **Section 2.2.5** describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD Drilling Plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

- New developments under the Preferred Alternative would be subject to the Bull Mountain Unit WHP submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest; see **Figure 2-2**) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length of the pipeline has been updated to reflect this change.

Similar to Alternatives B and C, if Alternative D were approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The

BLM_0026765

combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

### 2.2.5   Elements Common to All Alternatives

The following alternatives describe the range of possible actions that the BLM is considering in the EIS. There are several phases of the project and assumptions that would be the same across all alternatives. To eliminate redundancy and streamline presentation, those elements common to all alternatives are presented first, followed by the elements unique to each individual alternative. The actions are also summarized in **Table 2-10**, Summary of Actions by Alternative, and **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, at the end of the chapter.

The life cycle of an individual well and its associated facilities and required infrastructure (e.g., roads, pipelines, and compressor stations) is composed of eight primary phases: siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation. A siting design and constraints analysis for well pad placement was conducted as part the Bull Mountain EA and has been carried forward to determine approximate siting for the EIS. The siting design and constraints analysis was used as a baseline for all alternatives and is described below. Additionally, due to uncertainties for site-specific locational information, several assumptions have been made for all alternatives and are provided in the section titled *Assumptions Common to All Alternatives*. Specific details of the remaining seven phases are described in each alternative.

### *Siting*

As explained in detail in **Appendix A**, Well Pad Site Suitability Models and Methodology, GIS was utilized to find sites with respect to a number of environmental resource constraints. The GIS analysis was used by SGI to propose locations of well pads, roads, pipelines, and other infrastructure and utilized in all alternatives. GIS was also used to modify locations in Alternative C (see additional details in **Section 2.2.6**, Alternative C, Modified Action).

It is important to note that the locations of proposed well pads, access roads, pipelines, compressor stations, and other surface facilities for each alternative illustrated on **Figures 2-1** to **2-3** are conceptual in nature and may be modified at a later stage (e.g., during consideration of an APD), as noted above. Field verification of proposed locations is described in **Appendix A**. Drilling proposals would conform to the COGCC regulations and policies and to the objectives of the site selection model as described in **Appendix A**. On BLM-administered surface or mineral estate, where reasonably practicable, the on-site determinations would conform with the objectives of the site selection model and as described in the BLM Instruction Memorandum No. 2004-194: Integration of Best Management Practices into Application for Permit to Drill Approvals and Associated Rights of Way, IM 2013-033: Reducing Preventable Causes of Direct Wildlife Mortality Associated with Fluid Mineral Facilities Authorized by the BLM, and the BLM/Forest Service publication Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book (The Gold Book [DOI and USDA 2007]).

### *Assumptions Common to All Alternatives*

Several assumptions have been made for all alternatives and are provided below.

BLM_0026766

- Rate of development: SGI anticipates using three drilling rigs to drill multiple wells per rig per year. It is assumed that SGI would drill up to 27 wells each year. The full-field development time frame will differ based on the number of wells proposed under each alternative, as well as additional delay time for permitting.

- Wells would be drilled to develop productive formations in the Unit including the Cameo, South Canyon, and Coal Ridge coal formations, the Cozzette and Corcoran sandstone formations, and the Mancos shale formations.

- The extent of such development and prospective nature of the resources is based on geologic information, data derived from wells drilled to date, and economic factors. The resource is expected to be productive over the entire Unit; however, it is possible for some areas to have more favorable economics than other areas due to varying reservoir qualities. It is possible that areas currently identified for development may not be economically viable; as a result, some of the proposed well pads and wells may not be constructed and drilled.

- The well-head density needed to develop the resources is expected to vary depending on the formation being developed. The geologic characteristics of the individual formations in the Unit would dictate this density. The ultimate well-head density per well pad would be defined through future drilling, and resource and formation analysis. Again, these well-head densities refer to downhole/bottomhole wellbore densities. SGI would use directional drilling and multiple well pad drilling and completion techniques to develop these resources that would minimize the number of well pads or surface locations.

  The number of wells per well pad would vary depending on the required downhole well density and how many directional wells can be drilled from the location, whether or not both shallow and deep horizons are being developed, and topographic considerations. For the purposes of analysis, the assumption is that, on average, there could be four to five wells on any individual well pad; however, depending on the factors noted above, an individual well pad could have one well or up to twelve wells per pad. Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone gas wells, and shale gas wells on each pad is not known at this time but would be determined at the APD stage.

  Wellbores on multi-well pads would be offset in a line 15 to 20 feet from the previous wellbore. If more than approximately 6 wells are to be drilled from a well pad, parallel lines of wells spaced up to 15 to 20 feet apart may be employed.

- Across all alternatives, the life of any individual well is estimated to be 40 years based on use of current technologies and production methods, although the actual productive life of a single well may vary. This includes all oil, gas, and water disposal wells, although the actual production years may vary for individual wells. It is assumed for the purposes of analysis that the life of the project would be 50 years, but future technological advances and increased production efficiency may extend the life of the project beyond 50 years.

BLM_0026767

- The number of employees working in the Unit during the construction, drilling, and completion phases would depend on the number of drilling rigs operating at any one time. In addition to the workforce associated with well pad construction, and drilling and completion operations, personnel and contractors could be in the Unit during the construction or improvement of roads, installation of pipelines, and construction of new compressor stations or other surface facilities. These employment numbers would also vary depending on the amount of infrastructure proposed and the pace and level of development. Estimates are presented under each phase in each alternative.

  Employment for production operations and well service would depend on the number of producing wells at any one time. The number of operations and service personnel would grow over time as the number of producing wells increased, but employment for production operations and well force would amount to a small percentage of the total workforce.

  If the current employment patterns are maintained, the workforce and contractors associated with the project would be stationed in the areas of Grand Junction, Montrose, Delta, Paonia, Hotchkiss, Glenwood Springs, and Gunnison, Colorado.

- Reserve pit fences would be constructed and maintained according to the permitting agency requirements.

- All alternatives assume a standard traffic rate per well pad that will be used for calculations. **Table 2-1**, Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad, presents the traffic that could occur for each individual well pad. Actual traffic volumes would vary depending on the level of drilling activity, the specific operations that might be underway at a well pad and the maturity of the project at any particular time. Actual and specific volumes will be determined in future APDs and disclosed in associated NEPA documents, as appropriate.

**Table 2-1**
**Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 160 |
| Semi trucks | 37,000 | 4 |
| Pickup trucks | 6,000 | 40 |
| Motor grader on semi-trailer | 40,000 | 1 |
| Dozer (2) on semi-trailer | 19,000 | 2 |
| Track hoe on semi-trailer | 43,000 | 1 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 2 |
| Bulldozer on lowboy trailer with truck | 120,000 | 2 |
| 80-barrel water trucks for dust control | 54,000 loaded | 20 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 2-4 |
| Track hoe on lowboy trailer with truck | 91,000 | 2 |

BLM_0026768

**Table 2-1**
**Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Welding trucks | 9,500 | 2 |
| Crew cab pickups | 5,200 | 40 |
| Bending machine/trailer | 48,000 | 2 |
| Side booms on lowboy trailer with truck | 63,000 | 2 |
| X-ray truck | 5,200 | 4 |
| Testing truck | 6,000 | 2 |
| Pipe trucks | 120,000 loaded | 1 |
| | 36,000 unloaded | 1 |
| Utility tractor and truck with lowboy trailer | 40,000 | 2 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 1 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 25 |
| Rig-up trucks empty | 36,500 | 4-6 |
| 80-barrel water trucks loaded | 54,000 | 40 |
| 80-barrel water trucks empty | 25,000 | 40 |
| Crew-cab pickups | 6,000 | 40 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 2 |
| Drilling/completion rig | 120,000 | 2 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 25 |
| Rig-up trucks empty | 36,500 | 4-6 |
| 80-barrel water trucks loaded | 54,000 | 45 |
| 80-barrel water trucks empty | 25,000 | 45 |
| Pickup trucks | 6,000 | 40 |
| Vehicles for well production | | |
| Pickup trucks for workovers | 6,000 | 16 rountrips per well workover |
| Workover rig | 120,000 | 1 roundtrip per well workover |
| Haul trucks | 120,000 | 6 |

- All alternatives assume a standard area of disturbance that will be used for calculations. Due to the unknown number of wells per pad and actual alignments for roads and pipelines, the disturbance areas used are estimates only and were developed based on the assumption that the disturbance area would need to be large enough to reasonably accommodate future permitted construction or realignments. Additionally, an adequately sized well pad would accommodate the drilling equipment while providing a safe offset from other existing wellbore(s). **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates, presents the assumed short- and long-term estimates. Actual and specific well pad size, pipeline width or road width will be determined in future APDs and analyzed in subsequent NEPA actions.

BLM_0026769

**Table 2-2**
**Project Feature Assumed Short- and Long-Term Disturbance Estimates**

| Project Feature | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
|---|---|---|
| Well pads | | |
| New well pads | 5 acres | 2 acres |
| Existing well pads | 2 acres | 2 acres |
| Access roads (width) | | |
| Existing improved roads | 0 feet | 16 feet |
| Upgrades to existing 2-track roads | 25 feet | 16 feet |
| New road construction | 25 feet | 16 feet |
| Pipelines (analysis area) | | |
| Collocated with roads | 100 feet | 16 feet |
| Not collocated with roads (cross country) | 50 feet | 0 feet |
| Facilities | | |
| Compressor station | 5 acres per station | 2 acres per station |

Note: Estimated acreages according to the assumed short- and long-term disturbance are for analysis purposes. The permitted rights-of-way for construction would cover fewer acres.

### Existing Facilities

There are already existing well pads, wells, roads, pipelines, and other facilities within the Unit to which any alternative (including No Action) would add developments. Listed below in **Table 2-3**, Existing Features within the Unit, are the current number of productive/active pads, wells, facilities, and miles of roads that would remain consistent across all alternatives.

**Table 2-3**
**Existing Features within the Unit**

| Feature | Number of Features or Miles of Road |
|---|---|
| Well pads | 18 |
| Natural gas wells | 17 |
| Water disposal wells | 1 |
| Access roads currently suitable for use | 23 miles |
| Pipelines collocated with roads | 6 miles |
| Pipelines cross-country | 13 miles |
| Overhead electrical lines (to water disposal well) | 1 |
| Flowback pits | 4 |
| Existing storage yard outside the Unit | 1 |
| Existing storage yard inside the Unit | 1 |

As noted above in the table, SGI would use an existing equipment storage yard located on private land at the Forest Service boundary outside of the Unit, as well as existing well pads to temporarily house construction equipment, vehicles, pipe and pipe welding materials, hydraulic fracturing tanks, production equipment, and other standard gas field equipment. The existing storage area would be used continuously throughout the project development phase. Storage of sensitive or hazardous materials would be handled in compliance with all applicable federal and State of Colorado regulations. Temporary use of existing pads for equipment storage would occur with appropriate permitting and notice to agencies and landowners at the APD stage of development. These locations would be chosen to accommodate nearby construction, drilling, and completion activities. Upon completion of the development phase of the project, or when

BLM_0026770

storage areas are no longer needed, all remaining equipment would be removed and the storage areas would be reclaimed according to standards of the appropriate surface management agency.

A complete listing of producing, active, inactive, closed, abandoned, dry, and plugged features are listed in **Section 3.3.2**, Minerals.

## 2.2.6   Alternative A, No Action

NEPA regulations require that the EIS alternatives analysis "include the alternative of no action" (40 CFR 1502.14(d)). The No Action Alternative does not respond to the purpose and need for the Proposed Action. Rather, it serves as a baseline for comparing the Proposed Action's and alternatives' environmental effects (including cumulative effects) and it illustrates the consequences of not meeting the stated purpose and need. Under the No Action Alternative, the Bull Mountain Unit MDP would be denied, but the BLM could approve the 12-89-7-1 APD.

If the BLM were to reject an MDP, SGI could continue to submit APDs to COGCC for authorization to develop on private lands with private mineral estate and could submit individual APDs to the BLM in the future. Regarding COGCC submissions, the BLM does not approve or control development on these lands. For analysis purposes, the No Action Alternative addresses the development of private mineral estate only. In recognition of the fact that federal mineral development would likely still occur with SGI submitting individual APDs on a case-by-case basis, this combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

As noted in **Section 2.1.1**, Elements Common to All Alternatives, the eight phases of the project (siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation) are uniform across all alternatives; however, the actions differ as to how the phases are completed and what additional environmental protections would be required. The BLM's analysis of the No Action alternative assumes that previously authorized activities and activities on private mineral estate would continue and that federal mineral estate would be developed ad hoc without an MDP. Private mineral estate development would occur as authorized by the COGCC.

**Figure 2-1**, Alternative A, No Action, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

### New Developments
Alternative A comprises up to 55 new natural gas wells on privately owned surface lands targeting private minerals. The 55 wells would be built on existing well pads and as many as 10 new well pads. There would be one new water disposal well, construction of new pipelines and some new roads, and upgrades to existing roads. Based on these numbers, a total of 56 new wells drilled, and the assumed drilling rate noted in the common assumptions, the BLM estimates that drilling activities would occur for approximately 3 years.

The average number of wells per pad would be the same as that described above in **Section 2.2.4**, Elements Common to All Alternatives. One of the new well pads would be constructed specifically to drill and maintain a new water disposal well. Some of the new gas wells would be

BLM_0026771

2. Alternatives



**Alternative A, No Action**

The No Action alternative is specific to previously authorized activities and activities on private (fee) lands/private (fee) mineral estate.

Alternative A, No Action
- Proposed well pad analysis area
- Proposed screw compressor
- Proposed pipeline
- Proposed new road construction

Existing road requires upgrade for use

Existing Infrastructure
- Existing storage yard
- Existing road currently suitable for use
- Existing pipeline

- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

Source: SG Interests GIS 2013 and BLM GIS 2014

Figure 2-1

BLM_0026772

drilled on the existing water disposal well pad; however, the quantity and combination of conventional sandstone, coal bed methane natural gas, and shale gas wells on each pad is not known at this time and would be determined at the permitting stage.

***Construction***
Implementation of any alternative would require the construction of roads, well pads, pipelines, and ancillary facilities.

*Access Road Construction*
The primary access roads within the Unit are State Highway 133 and County Road 265. In addition to these primary access roads, gas development of the Bull Mountain Unit would require the construction and improvement of multiple access roads some of which would cross private lands overlying federal mineral estate. Site-specific plans for road construction and upgrades would be included as part of individual future State APDs and would be subject to approval from the County and/or landowners.

New road construction and improvements of existing roads would typically require the use of motor graders, crawler tractors, 10-yard end dump trucks, and water trucks. The standard methodology for building new roads involves the use of a bulldozer or track hoe to segregate and windrow the vegetation to one side of the route, remove topsoil to the opposing side of the route, and rough-in the roadway. As access roads would be constructed using standard crown-and-ditch specifications, a grader or bulldozer would establish barrow ditches and crown the road surface. Roads would be constructed with appropriate drainage and erosion-control features/structures (e.g., cut-and-fill slope and drainage-ditch stabilization, relief and drainage culverts, water bars, wing ditches, and rip-rap). On roads with grades between 3 and 15 percent, rolling dips could be used rather than culverts. Where culverts are required, a track hoe or backhoe would trench the road and install the culverts. Some hand labor would be required when installing and armoring culverts.

The new roads and improved existing road surfaces would be composed of an appropriate volume of road base compacted using a roller and freshwater as necessary. Approximately 6 to 8 inches of road base would be used in road construction and reconstruction. Road base or gravel needed would be hauled in and a grader used to smooth the running surface. Rock, road base, and gravel materials for all uses would be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado. Specifics on where the source materials would be obtained from would be identified on the individual APD when submitted. Upgrade and graveling of these roads would occur as necessary to maintain the post-construction surface quality.

Freshwater would be used in initial road construction and rock/gravel surfacing to improve the workability of the soil and the rock and gravel, and for dust abatement. Freshwater needed for access road construction would be obtained from nearby sources (per agreements with landowners), or would be under the guidance of SGI's water augmentation plan (see **Appendix L**, Bainard Augmentation Plan). Freshwater application to roads for dust abatement would be applied to the road more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater may be used each day to control fugitive dust per mile during dry months (for example in a typical June). Approximately 2,000 to

BLM_0026773

5,000 gallons of freshwater may be used to control fugitive dust per mile of road during wet months (for example during a typical August).

On average, SGI estimates that roads would be constructed at a rate of approximately 600 to 800 yards per day. Spur roads to individual well pads would be constructed immediately prior to well pad construction. Each spur road workforce would include an average of five personnel to operate the equipment. For trunk roads (i.e., those providing access through the Unit or to multiple well pads), several crews could operate simultaneously on different roads or different portions of the same road. Total personnel working on trunk road construction or improvements could range in size from 6 to12 individuals.

*Well Pad Construction (Gas and Water Disposal Wells)*
Prior to individual well pad construction, SGI would obtain approval of an APD by the COGCC. Each application would contain site-specific details related to well pad size, construction and well operations, and mitigation measures; possible mitigation measures that could be applied as COAs for the drilling permit are noted in **Appendix B**, Construction, Drilling, Completion, and Reclamation. COGCC would apply its own measures to mitigate potential environmental impacts, but it could adopt the measures identified in **Appendix C**, Design Features, Mitigation Measures, and Conditions of Approval, based on the analysis contained in this EIS. COGCC would consult with CPW, CDPHE, the local government designee, and the landowner before applying its own measures to mitigate potential environmental impacts.

Construction of a typical well pad would entail the use of bulldozers, motor graders, Class 125 or larger track hoes, backhoes, compacters, and 10- to 20-yard dump trucks. Well pad construction equipment needs would vary depending on site-specific conditions; however, methods for construction would be the same for all types of natural gas well pads and water disposal well pads proposed.

Within the approved well pad location, a leveled area would be graded by a bulldozer after or simultaneously with upgrade/construction of an access road to the well site. Standard cut-and-fill construction techniques and machinery (bulldozer or grader) would be used; stockpile, cut, and fill locations within the well pad construction area would be specified on the APD. Vegetation would be cleared and all available topsoil to a depth of 8 to 12 inches would be stockpiled and segregated from subsoils over the entire disturbed surface to create the well pad area. The well pad would be surfaced using "pit run," or equivalent material, which generally consists of rock less than 6 inches in diameter. The area within the anchor bolt pattern and around tank batteries or facilities would also be surfaced with a top dressing of 3-inch road base. Pit run and road base would both be trucked in to the site from local gravel pits near Carbondale, Delta, Paonia, or other local areas. If the well location requires only minimal grading, 8 inches of topsoil would be salvaged from the entire disturbed surface and stockpiled in contiguous berms or stockpiles at the edges of the well pad to facilitate future reclamation. Stockpiled topsoil would be protected against wind and water erosion and seeded with approved seed mix concurrent with cessation of well pad construction and earth-moving operations. Native seed mixes would be required for reclamation.

On average, five personnel, mostly equipment operators, would work on the construction of an individual well pad. Construction of an individual well pad could take from 1 to 3 weeks

BLM_0026774

depending on the features of each particular site. Under Alternative A, SGI has a range of possible drilling methods that could be used, including a system that utilizes a reserve pit or one that does not use a pit (referred to as "closed-loop"). If SGI utilized a drilling system with a reserve pit to hold drill cuttings and fluids, a lined reserve pit system would be constructed on the well pad. The reserve pit sizes vary with well type and site conditions, but would typically be approximately 50 feet by 150 feet and lined with an impermeable minimum 24-mil plastic liner so as not to leak, break, or allow discharge. The reserve pit would be fenced on three sides during drilling and on the fourth side immediately after the removal of the drilling rig. The well pad itself may also be fenced. Bird netting would be installed over the pit within 24 hours and silt fencing would be installed around the base of the fences. Two feet of freeboard is required at all times. Any reserve pits, which are left open over the winter months, would be fenced to keep big game and wildlife off of the pits. Pits would have a 2-foot unlined berm in addition to the minimum 2 feet of freeboard around them to prevent snowmelt on the pad from flowing into pits.

Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad. Use of erosion control measures, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips would be employed by SGI as necessary and appropriate to minimize erosion and surface runoff during well pad construction and operation.

*Pipeline Construction*
Pipelines would be necessary to transport gas from producing wells to the existing sales gas pipeline and to transport produced water to proposed water disposal wells or flowback pits. The following sections describe the various pipeline construction phases, which are typical for this type of development.

Clearing and Grading
At the start of pipeline construction, the route would be cleared of vegetation to remove any obstacles or debris. Grading would follow to remove the topsoil and surface rock, and stockpile it within the edge of the route for redistribution following construction. All brush and other materials that are cleared would be windrowed within the route or in temporary use areas. If the pipeline is not collocated with a road, then these materials may be dispersed over the route to impede future access along it following construction. Trees and rocks would be strategically placed on the pipeline corridor to impede future access as stipulated by individual permit conditions or surface landowner agreements.

Trenching
Construction methods used to excavate a trench would vary depending on soil, terrain, and related factors. Rotary trenching machines would be used where possible. In situations such as steep slopes, unstable soils, high water tables, or deep or wide trench requirements, conventional tracked backhoes (track hoes) would generally be used. Highway crossing methods and construction requirements would be according to the Colorado Department of Transportation (CDOT) permit stipulations and general conditions as necessary.

Measures would be taken during construction to ensure that access is provided for property owners, tenants, or ROW holders to move vehicles, equipment, and livestock across the trench where necessary. Adequate precautions would also be taken to ensure that livestock are not

BLM_0026775

prevented from reaching water sources because of the open trench. These would include contacting livestock operators, providing adequate crossing facilities, fencing, or other measures as needed.

If a pipeline should be routed to cross a road or wetland, SGI could utilize a pipeline bore for the crossing. If boring were utilized, the bore operations would be set up outside of the wetland or road right-of-way, and designed to minimize impacts on these features. Temporary use areas before and after the feature to be bored may be needed, and would vary in size depending on the terrain and the size of the feature to be bored. Specific route determinations, siting design, and boring methods would be determined at the permitting stage.

Pipe Installation

Gas gathering and subsurface water pipelines would be constructed of steel. Pipe installation would include stringing, bending for horizontal or vertical angles in the alignment, welding the pipe segments together, x-ray inspection, coating the joint areas to prevent corrosion, and then lowering-in and padding.

- Stringing. Line pipe would be trucked directly from the manufacturer or a contractor storage yard to the corridor. Each individual joint of pipe would be unloaded, and strung parallel to the trench. Sufficient pipe for road or stream crossings and steep slopes would be stockpiled at staging areas near the crossings or slope. Stringing operations would be coordinated with trenching and installation activities to properly manage the construction time at a particular tract of land. Gaps would be left at access points across the trench to allow crossing of the corridor.

- Bending. After the joints of pipe are strung along the trench but before the joints are welded together, individual joints of the pipe would be bent if necessary to accommodate horizontal and vertical changes in direction. Field bends would be made utilizing a hydraulically operated bending machine. Where the deflection of a bend exceeds the allowable limits for a field-bent pipe, factory (induction) bends would be installed.

- Welding. After the pipe joints are bent, the pipe would be lined up end-to-end and clamped into position. The pipe would then be welded in conformance with 49 CFR Part 192, Subpart E. "Welding of Steel Pipelines" and API 1104, "Standard for Welding Pipelines and Related Facilities," latest edition.

- X-Ray Inspection. Welds would be visually inspected by a qualified inspector using non-destructive radiographic methods according to CDOT requirements. A specialized contractor, certified to perform radiographic inspection, would be employed to perform this work. Any defects would be repaired or cut out as required under the specified regulations and standards.

- Coating. To prevent corrosion, the pipe would be externally coated with fusion-bonded epoxy coating prior to delivery. Power Crete-coated pipe would be installed in all bore locations unless the pipe is cased. After welding, field joints would be sandblasted, flocked, and coated with a synergy coating. Before the pipe is lowered into the trench, the

BLM_0026776

pipeline coating would be visually inspected and tested with an electronic detector, and any faults or scratches would be repaired.

- Lowering-In and Padding. Once the welding, inspection, and joint coating has been completed, a section of the pipe would be lowered into the trench. Side boom tractors would be used to lift the pipe, position it over the trench, and lower it into place. Inspection would be conducted to verify that minimum cover is provided, the trench bottom is free of rocks or other debris, external pipe coating is not damaged, and the pipe is properly fitted and installed into the trench. Specialized machines would be used to sift soil fines from the excavated subsoils to provide rock-free pipeline padding and bedding. In rocky areas, padding material or a rock shield would be used to protect the pipe.

- Backfilling. Backfilling would begin after a section of the pipe has been successfully placed in the trench and final inspection has been completed. Backfill would be conducted using a track hoe, rotary auger backfilled, padding machine, or other suitable equipment. Backfilling of the trench would generally use the subsoil previously excavated from the trench, except in rocky areas where imported select fill material may be needed. Backfill would be graded and compacted by tamping or walking-in with a wheeled or tracked vehicle. Compaction would be performed to 95 percent maximum density as determined by AASHTO T-99 at all county road crossings. Backfill of trenches would not be performed where the soil is frozen to the extent that large consolidated masses have formed that would not "break down." The contractor would then re-spread the previously segregated topsoil to return the surface to its original grade. Any excavated materials or materials unfit for backfill would be utilized or properly disposed of in conformance with applicable laws or regulations. The construction contractor would place a mound over the trench approximately 6 inches high to account for subsidence. The entire construction zone would be seeded in the first appropriate season after disturbance.

- Pressure Testing. The entire pipeline would be tested in compliance with USDOT regulations (49 CFR Part 192). Prior to filling the pipeline for a pressure test, each section of the pipeline would be cleaned by passing reinforced poly pigs through the interior of the line. Incremental segments of the pipeline would then be filled with compressed water, air, or natural gas to the desired maximum pressure (up to 720 pounds per square inch), and held for the duration of the test (8 hours minimum if USDOT regulations apply). The compressed air would be discharged into the atmosphere following the completion of the test. Notification to all nearby residents as well as the Gunnison County Dispatch Center would be made prior to the pressure test and blow down. Water discharge, if necessary, would occur into upland areas, on gentle slopes, and would be conducted in accordance to the conditions and stipulations in CDPHE's Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. These conditions and stipulations require permit-specific sampling, testing, filtering or mitigation, reporting, and a plan to prevent soil erosion or impacts on surface waters.

BLM_0026777

Gathering pipelines for individual well pads would consist of 6- to 8-inch outer diameter pipeline, and be designed for 720 pounds per square inch. Each gathering line would tie into a larger trunk line with a 12- to 16-inch outer diameter, which would eventually transport the gas to the Bull Mountain Pipeline; carsonite pipeline markers would be installed on the surface and tracer wire would be installed for all buried pipelines. The dimensions of the pipe used would be dependent on the number of wells served and production estimates.

Between 10 and 25 construction and supply-related personnel would be needed to install new sections of pipeline gathering system. All gas pipelines would be constructed to applicable American Petroleum Institute/industry standards.

*Overhead Electrical Line Construction for Water Disposal Wells*
For Alternative A, the new water disposal well would require construction of one new overhead electrical line (up to 5 power poles) to supply power to the water disposal wellhead. Electrical line construction would take place following successful completion of the new water disposal well. Electrical power would be used for long-term operation of lights, water heaters, and ancillary needs at the water disposal facility. In most, but not all cases, well pumps would not use electricity, and would be run by natural gas-powered pumps.

The new line would be installed following the most practical route from existing lines to the new water disposal well site; two options would be to follow existing two-track roads or run the line cross-country. The average ROW width for power lines is 30 feet. Final routes would be subject to surface owner approval. If the line followed existing two-track roads construction vehicles would stay on existing disturbance areas. If the line ran cross-country, then appropriate access and vehicle routes would be approved as part of the project design. If the terrain allows for it, access could be overland along the route. Wooden power poles would be erected and typical equipment includes pickups, auger/drilling rigs, bucket trucks and stringing equipment. Some Gambel's oak, aspen, and other taller shrubs may need to be pruned back for construction, and each power pole hole would disturb approximately 8 square feet of vegetation during excavation of the hole and setting of the power poles. There would be no prescriptive clearing of the corridor for electrical lines. Electrical line would run to the new water disposal well location.

**Drilling**
Drilling operations would be conducted in compliance with the APD issued by the State and any relevant Federal Regulations (i.e., USFWS and EPA regulations). Specific techniques for drilling wells would differ depending on whether SGI drilled a gas well or a water disposal well; the specific techniques for natural gas well and water well drilling are presented below. Trucks would be used to transport drilling components to the work site. Rig components are designed for portability and are easily loaded and unloaded and mostly self-contained on the mobile drill rig. Auxiliary equipment for the supply of electricity, compressed air, and freshwater would be trucked in for drilling operations. Drill pipe, drill bits, cement, freshwater, wire rope, and other supplies would be trucked to the well pad and stored temporarily until used. Traffic would consist of support equipment, contractor vehicles, construction personnel, and material delivery. Well pad activity would involve backhoes, front-end loaders, boom and winch trucks, delivery trucks, welding machinery, and personal conveyance vehicles.

BLM_0026778

*Gas Well Drilling*
Drilling gas wells can use a number of different wellbore directions, types of drilling technologies, target different formations, and utilize different drilling lubricants (commonly referred to as drilling fluids or drilling muds).

In its broadest definition, a wellbore is a hole that is drilled to aid in the exploration and recovery of natural resources including oil, gas or water. A wellbore is the actual hole that forms the well. A wellbore can be drilled vertically or directionally. A vertical wellbore is a wellbore drilled straight down below the drilling rig. A directional wellbore may start out vertically, but is then turned to move out at an angle, in an S-shape, or turned horizontally. Wellbores could be any of the mentioned varieties (vertical or directional), and would be encased by materials such as steel and cement. As applications to the COGCC are similar to Federal applications, illustrations of the different types of wellbores for Federal applications are provided in **Appendix E**, Master Drilling Plan.

As noted under the section describing the well pad construction techniques, drilling methods could fall within two broad categories – those drilling systems that utilize a reserve pit on the well pad or a pit-less system, generally called a "closed-loop system." Under Alternative A, SGI proposes to use either system: drilling with a reserve pit or closed-loop. Which system is utilized would depend on the type of well to be drilled, what drilling equipment may be available at the time, and/or economic factors such as a closed-loop system becoming cost-prohibitive. The type of drilling system would be determined when the drilling application is submitted to the COGCC.

In drilling with a reserve pit system, a small amount of fluid is retained in the cuttings and the cuttings are placed in the reserve pit. The reserve pit would also hold fresh and/or recycled water used in drilling and any excess drilling mud; the reserve pit is not used to store flowback water during the completion phase nor used to store produced water during the production phase. Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe). Drilling mud would flow through a series of equipment and tanks in order to recondition it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit. Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules, then transported to a permitted disposal/waste management facility.

Each reserve pit would be constructed with an impermeable liner so as to prevent releases. Reserve pit fences would be constructed and maintained according to the COGCC requirements, including fencing and netting to prevent harm to wildlife resources. Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules.

A closed loop system is defined simply as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids. Equipment to separate out solids (e.g., screen shakers, hydrocyclones, or centrifuges) and collection

BLM_0026779

equipment (e.g., vacuum trucks) minimize the amount of drilling waste muds and cuttings that require disposal, and maximize the amount of drilling fluid recycled and reused in the drilling process. The recovered drilling fluid can be stored in 500-barrel tanks and re-used in active mud systems; consequently, drilling fluid is moved from well-to-well and reconditioned by the dewatering equipment and mud products. The solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

Following well pad and access road construction, a Tier-2 or Tier-3 type drilling rig would be transported to the well pad along with other necessary equipment. A conventional drilling rig used for vertical wellbores would require construction as described above in the well pad construction section. The rig would operate 24 hours per day. If the well were proposed as a directional wellbore (e.g., horizontal or s-shaped), then directional drilling equipment would be used and would operate 24 hours per day. Additional equipment and materials needed for directional drilling operations would be trucked in to the well site.

Drilling would begin by digging a circular pit, called a cellar, and lining the pit with metal, where the wellbore would be drilled. The cellar would provide space for the casing head spools and blowout preventers that would be installed under the rig. Drilling operations normally include keeping a sharp bit on the bottom drilling as efficiently as possible, adding a new joint of pipe as the hole deepens, tripping the drill string out of the hole to put on a new bit as needed and running it back to the bottom, and installing steel casing and cementing the casing in the hole.

Drilling fluids are used to aid the drilling of boreholes regardless of the type of well being drilled. The main functions of drilling fluids include providing hydrostatic pressure to prevent formation fluids from entering into the wellbore, keeping the drill bit cool and clean during drilling, carrying out drill cuttings (i.e., pulverized rock generated from drilling), and suspending the drill cuttings while drilling is paused and when the drilling assembly is brought in and out of the hole.

Drilling fluid is a mixture of a fluid (either water or an oil-based product such as mineral oil) and "mud." For Alternative A, SGI plans to use freshwater-based drilling fluid but may also use oil-based drilling fluids in production formations where borehole stability requires it or for directionally drilled wells. Alternative A does not present a preference for one type of drilling fluid over another; specifics on which type of drilling fluid used would be included on the individual drilling application.

A water-based drilling fluid uses fresh or recycled[1] water or a combination of both mixed with the mud; SGI would use a fresh-water mud system. Up to approximately 3,000 barrels of water would be used for drilling a particular well. For Alternative A, that would result in up to 165,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to 55 new wells drilled). In production level formations, where the borehole stability requires it, or for directionally drilled wells, an oil-based drilling fluid, using products such as mineral oil, may

---

[1] Recycled water is water that has been used in other phases of the well development process. It could be water that has been removed from drilling mud, water used during completion that flows back after the well has been pressured and fractured, or water that has been produced as a by-product of gas production (known as produced water).

BLM_0026780

be used. The mud portion of a drilling fluid is composed of clays, minerals, and additives, such as bentonite, barite, soda ash, lime, polymer, lignite, and lost circulation material.

The drilling fluid used for a particular job is selected to avoid formation damage and to limit corrosion. For example, where borehole stability requires it, a mud typically consisting of potassium chloride substitute and commercial clay stabilizer (such as Di-Ammonium phosphate) would be used to drill the production hole section. This mud formulation inhibits potentially reactive shales to prevent shale swelling and hole sloughing. Drilling fluids and mud additives would be recirculated during drilling, and could be transported to another drilling location for reuse or treated and removed from the location.

Casing and cementing plans are designed by engineers and included in an APD and associated Drilling Plan. The casing and cementing program would be conducted as approved to protect and isolate all usable water zones, potentially productive zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Placement of steel casing would entail the connection and insertion of continuous sections of steel pipe into the drill hole. The casing would extend from the bottom of the hole to the surface except when drilling or production liner is used. Casing would be set in the hole, one joint at a time, threading one piece into a collar on the next. The wells would be lined with conductor casing to a depth of at least 80 feet; with surface casing to at least 400 feet; with intermediate casing to approximately 3,000 to 5,500 feet; then with production casing to the target well depth. Casing programs are dependent on the target depth and individual well casing plan.

The casing would be cemented into place in stages by pumping a slurry of dry cement and water into the casing head, down through the casing string to the bottom of a string stage, and then up through the spacing between the casing and the wellbore (annulus) back up to the surface except when a production string is used. Surface casing cement is calculated to return to the surface (100 percent excess volume). After the cement is pumped into the casing, a 1-inch pipe is run on the outside of the casing and approximately 50 sacks of cement are used to top off the annulus. If the cement does not circulate back to the surface, a temperature log is run to find the top of cement. At this point, corrective measures are taken if necessary.

A plug would be pushed to the bottom of the wellbore to remove any residual cement from the inside walls of the casing. If adequate cement coverage and quality were not attained, remedial actions would be taken based on site-specific situations. Calculated volumes of cement would be pumped into the annulus to fill the space, where it would be allowed to harden. A cement bond log would be run on the wellbore to ensure that no voids remain in the annulus. Cementing the annulus around the casing pipe restores the original formation isolation by posing a barrier to the vertical migration of fluids or gasses between rock formations within the annulus of the borehole, protects the well by preventing formation pressures from damaging the casing, and retards corrosion by minimizing contact between the casing and naturally occurring corrosive formation fluids. Each well may have multiple strings, and each string is cemented independently.

All drilling operations and other well site activities would be conducted in compliance with COGCC rules and regulations. Pressure tests are required before drilling out from under all casing strings set and cemented in place. Blowout preventer controls must be installed prior to

BLM_0026781

drilling out the surface shoe and prior to starting workover or completion operations. Blowout preventers would be inspected and tested at regular intervals to insure good mechanical working order.

Site-specific descriptions of drilling procedures would be included in each APD submitted to the COGCC for each proposed well.

Drilling activities on individual wells would typically occur 24 hours per day, 7 days per week, and would require approximately 16 workers.

Coal bed methane natural gas wells would typically be drilled vertically, but some would be drilled directionally including horizontally, depending on the specific needs at that location, which are dictated by terrain in the surrounding areas, distance to the Unit boundary, and other site-specific factors. There could also be multiple wells on one well pad. Development of coal bed methane natural gas wells on new well pads, including construction, drilling, stimulation, and completion, would require an average of 60 days.

Shale and sandstone gas wells could be drilled vertically, directionally, or with multiple horizontal wells from a single pad, where feasible, to minimize the number of well pads required to drain the resource. Directionally drilled wells, both shallow and deep, could take approximately 46 to 60 days per well to drill. Development of shale gas wells on new well pads would require an average of 85 days.

*Water Disposal Well Drilling*

For Alternative A, SGI proposes drilling one new water disposal well. For each water disposal well, a 24-inch-diameter hole would be drilled for the first 40 feet, and then gradually reduced with decreasing diameters of casing strings until the hole reaches its target depth, estimated at 10,000 feet. Once the casing strings are set and the outside annulus is cemented in place for each string of casing, the wells would be completed (see *Water Disposal Well Completion* below).

Tubing with a diameter of 2.875 to 3.5 inches would be run down the casing to the top of the target disposal zones. The tubing would be landed in a set packer approximately 100 feet above the uppermost-completed injection zone. A packer set has rubberized rings, which when activated seal off the bottom of the casing, preventing disposal waters from migrating up the insides of the casing. Above the packer set, the annulus between the tubing and inner casing walls would be filled with packer fluid. Pressure would be monitored at the surface to detect any loss of packer fluid into surrounding formations and to detect migration of injected water upward into non-target annulus zones, as well as to insure tubing, packer, and casing integrity.

The disposal well may be completed in the Entrada or Maroon Formations; the primary injection target zone is the Entrada formation at 8,900 feet, with the Maroon in the secondary injection zone at 9,000 to 9,500 feet. The maximum daily injection rate for the Maroon formation is 4,000 barrels per day, while the maximum daily injection rate for the Entrada formation is 2,000 barrels per day. If these formations are not useable, the Dakota and Morrison Formations may also be evaluated. A water-based mud system would be used for drilling of the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production hole sections of the water disposal well.

BLM_0026782

Drilling water disposal wells would require 60 to 120 days. Up to approximately 3,000 barrels of water would be used for drilling a particular water disposal well. For Alternative A, that would result in up to 3,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to one new water disposal well drilled).

### Completion

#### Gas Well Completion

After drilling and casing of the well, a completion program would be initiated to stimulate production of natural gas and to determine gas and water production characteristics. A mobile completion rig (also called a workover rig) similar to the drill rig may be used to complete each well. The well completion process, lasting 8 to 10 days, includes perforating the well's steel casing and cement, hydraulically fracturing the producing formation(s), and installing a series of valves and fittings on the wellhead. Hydraulic fracturing does not always require the presence of a workover rig.

Wells are often treated during completion to improve resource recovery by increasing the rate and volume of hydrocarbons moving from the natural gas reservoir into the wellbore. These processes are known as well-stimulation treatments and include hydraulic fracturing, acidizing, and other mechanical and chemical treatments, often used in combination.

Hydraulic fracturing is a 60-year-old process used to maximize the extraction of underground resources by allowing natural gas to move more freely from the rock pores to production wells that bring the gas to the surface. Fluids, commonly made up of water and chemical additives (e.g. recycled or freshwater, liquid carbon dioxide, sand, and chemical additives), are pumped into a geologic formation at high pressure during hydraulic fracturing. When the pressure exceeds the rock strength, the fluids open or enlarge fractures. After the fractures are created, a propping agent is pumped into the fractures to keep them from closing when the pumping pressure is released. After fracturing is completed, approximately 60 to 80 percent of the injected fracturing fluid returns to the wellbore (EPA 2004). The specific type and components of the fracturing fluid chemical vary based on geologic formation and by company, but may include constituents such as hydrochloric acid, anti-bacterial agents, corrosion inhibitors, and surfactants (BLM 2013a). Per COGCC Order No. 1R-114, operators are required to post their disclosure of chemicals intentionally added to hydraulic fracturing fluids on FracFocus per COGCC Order No. 1R-114.

Hydraulic fracturing is now being used more commonly due to advances in technology. Groundwater is protected during the fracturing process by a combination of the casing and cement that is installed when the well is drilled and by the depth of the rock between fracture zone and any fresh-water bearing zones or aquifers (EPA 2004). As state requirements for applications are similar to federal applications, illustrations of the different wellbores requirements are presented in **Appendix E**, Master Drilling Plan. Additionally, specific casing information would be included on the drilling applications. The casing and cementing techniques described in the drilling plan would provide redundant protection of all usable aquifers above the target zones by cementing both the surface and intermediate casing strings from the base of pipe back to the surface.

BLM_0026783

Water used during completion operations would be recycled, fresh, or a combination of both, and quantities used would vary in accordance with the formations the wells are completed in. Specifics for how much water each well type would require for completion is provided in **Appendix D**, Master Surface Use Plan of Operations. As each well type requires vastly different amounts of water, calculations for estimated water usage were based on assuming 50 percent CBNG wells and 50 percent shale wells as discussed in the Bull Mountain EA. Calculations used number of new wells per alternative divided in half for each type of well (CBNG/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage. The results showed that there could be up to 5,542,000 barrels (or 538 acre-feet) of water used for well completions during the 3 year development time frame. If fewer shale wells were drilled and completed, the water use estimate could be lower. Recycled water could also be used for well completions when water conditions allow (see *Flowback Pits* discussion below).

Test gas could be flared (released to the atmosphere) or environmentally friendly green completion technology may be used. What makes the well completion "green" is that the gas is separated from the water and placed in a pipeline instead of being released to the atmosphere. Green completions take place during the flowback stage of the completion, during which natural gas is produced with the water. Green completion technologies capture the gas at the well head immediately after well completion instead of releasing it into the atmosphere or flaring it off, resulting in reducing volatile organic compound (VOC) emissions from wells. In green completions, gas and hydrocarbon liquids are physically separated from other fluids and delivered directly into equipment that holds or transports the hydrocarbons for productive use. There is no venting or flaring. See also COGCC regulation 800-4 for further details on green completion technologies.

If a well is flared, the flares are designed to be directed straight upward and are located in an area on pad to prevent damage to the environment or a safety hazard. In the event it becomes necessary to flare a well, a deflector and/or directional orifice would be designed and installed to safeguard both personnel and adjacent lands. The flowback involves removing the water that was used to stimulate the well.

Following the hydraulic fracturing of the well, a percentage of the fluid, consisting primarily of produced water, may be returned to the surface. This percentage of return varies between wells. Even though the produced water and gas can flow into the casing after it is perforated, a small-diameter pipe, called tubing, is placed in the well to serve as a way for the produced water to be brought to the surface. Typically, the start of the tubing is placed below the perforated interval to allow any fluids collecting at the bottom of the well to be pumped up through the tubing to the surface. The tubing in the well is suspended from the wellhead, so as the well production flows up, the production from the well can be controlled by opening and closing valves on the wellhead. Excess produced water would be stored on the pad in containers, piped to the McIntyre Flowback Pits (see *Flowback Pits*, below), or sent to a water disposal well for reinjection.

Typical equipment and vehicles used during completion activities include propane and carbon dioxide tanker trucks; hydraulic fracturing trucks; sand transport trucks; water trucks; oil service

BLM_0026784

trucks used to transport pumps and equipment for hydraulic fracturing; flat beds and gin trucks to move water tanks, rigs, tubing, and hydraulic fracturing chemicals; logging trucks (cased hole wireline trucks); and pickup trucks to haul personnel and miscellaneous small materials.

Completion activities on individual wells would occur 24 hours per day, 7 days per week, and would require approximately 25 workers. Completion of an individual well would generally take approximately 7 days, depending on conditions at the individual well. Flow testing follows completion and takes 25 to 50 days. Only 2 workers are employed 24 hours per day for testing.

*Flowback Pits*
In order to minimize the consumptive use of water for completion operations, SGI has constructed four pits on private surface lands to temporarily store a mixture of freshwater, produced water, and recycled water prior to and after completion operations, per the regulatory guidance and permitting of COGCC. Water estimates for hydraulic fracturing operations by well type are presented in **Appendix D**. The flowback pits would reduce the amount of water transportation trucking traffic, on-site storage of water on pads in hydraulic fracturing tanks, and subsequent removal of waters between hydraulic fracturing operations. At this time the flowback pits are permitted as follows: two pits on Rock Creek Ranch (T11N R90W Section 24) immediately north of SGI's existing federal 11-90-24-2 water disposal well, and two additional pits on Rock Creek Ranch lands in T11N R90 Section 26. Since all four flowback pits would be located on lands previously owned by the McIntyre Ranch, they are referenced as follows (**Table 2-4**, McIntyre Flowback Pits):

**Table 2-4**
**McIntyre Flowback Pits**

| Pit Name | Dimensions | Fluid Volume Capacity (barrels) |
|---|---|---|
| McIntyre Flowback Pit 1 | 130 feet by 200 feet by 12 feet deep (10 feet fluid depth) | 31,463 |
| McIntyre Flowback Pit 2 | 110 feet by 230 feet by 12 feet deep (10 feet fluid depth) | 29,720 |
| McIntyre Flowback Pit 3 | 150 feet by 600 feet by 12 feet deep (10 feet fluid depth) | 144,247 |
| McIntyre Flowback Pit 4 | 150 feet by 600 feet by 13 feet deep (11 feet fluid depth) | 144,247 |

Fresh, production, and recycled water would be delivered to the McIntyre pits through surface polyethylene (HDPE, referred to here as poly) pipe and existing buried steel water pipelines for temporary storage prior to hydraulic fracturing operations. Temporary water pumps would draw water from the McIntyre pits into the temporary surface pipes and existing water pipelines (in order to reduce truck-based fluid hauling). Water would be mixed with sands and chemicals on a target pad site prior to injection into a wellbore (see the *Drilling* and *Hazardous Material and Solid Waste* sections below for details on chemicals used).

As noted above, SGI plans to temporarily lay down poly pipelines in order to transport the fresh or recycled water used for completions from the McIntyre Pits to storage tanks and then to the wellhead (see **Appendix M**, Poly Pipeline Operation Plan). Generally, the pipe strings would follow roads. The length of time the pipe is on the surface depends on where and when a well is to be completed; it is moved from one location to another when a new well is ready for completion. Temporary poly may be left in place for several months in some cases. Pipe

BLM_0026785

diameter is dependent on the volume and pressure of water needed for the completion. SGI anticipates that 12-inch internal diameter would be the largest pipe required, but could also use a smaller interior diameter pipe if needed (e.g., 8-inch or 6-inch).

After hydraulic fracturing operations for a well are complete, used fluids would be flowed back out of a wellbore, filtered on the pad site, temporarily stored in tanks, and then pumped into transportation trucks (to be trucked to a McIntyre flowback pit) or pumped into an existing water pipeline or temporary surface poly pipe for delivery to a McIntyre flowback pit for temporary storage. These used fluids could then be re-used for additional hydraulic fracturing operations during the same season if water condition allows. The highest total dissolved solids (TDS) anticipated in the water contained within the pits would be 60,000 to 70,000 parts per million (ppm), with an average TDS of 40,000 ppm in the pits. Produced water TDS in the field is approximately 15,000 ppm.

Construction of the McIntyre pits involved the salvaging of topsoils, the excavation of the pit itself, and compaction of the pit interior. Pits have been engineered with a triple liner system that includes surface and groundwater sites and monitoring of the four groundwater monitoring wells as required by the COGCC permits issued for the pits. There is a 1-foot berm surrounding the pit over which the liners are pulled and anchored in on the opposite side. At least 2 feet of freeboard is maintained in the pits at all times. Bird deterrent netting is stretched over the pits to keep birds out. Additionally, year-round wildlife and silt fencing has been placed around the pits to prevent terrestrial wildlife entry into a full or empty pit.

*Water Disposal Well Completion*
The additional water disposal well would also require completion. Similar to traditional wells, a workover rig would be used to complete the well. This process includes perforating the well's steel casing, and may include hydraulic fracturing of the formation to improve its ability to accept injected water. This supplemental hydraulic fracturing could also recur later in the life of the well. Drilling and hydraulic fracturing would follow standard industry and regulatory procedures, and be permitted as under producing wells with the additional process of converting it to a disposal well. Multiple disposal zones would be perforated in order to allow produced water to flow into any of the available receiving formations, and allow for redundancy in receiving formations.

**Interim Reclamation**
The goal of interim reclamation is to maintain soil productivity during the production phase. All surfaces not needed for long-term operations would be recontoured and seeded as per the requirements set by the COGCC. Seed availability may vary, so not all species may be available at the time they are needed. However, major species are generally available. If availability were a concern, SGI would request the use of COGCC's approved alternate seed mixture.

If the well(s) on a pad are not productive, the pad would be abandoned and reclaimed in accordance with applicable agency requirements stipulated in the permit for the well, and according to the reclamation portion of the information submitted with the APD. Reclamation areas would include, but not be limited to, fill slopes, trenches, wing ditches, edges of disturbance, temporary-use areas no longer needed, and embankments. Reclamation would involve recontouring the well pad to blend with the natural topography, even redistribution of

BLM_0026786

segregated topsoil, seeding, and monitoring to ensure revegetation is successful. Reclamation efforts would continue until all related requirements were met. Removal or burial of any surfacing material used to complete the well pad would be according to the authorizing agency's standards.

Upon well completion, the well location and surrounding area would be cleared of all unused tubing, materials, trash, and debris. SGI would perform interim reclamation efforts on as much of the disturbed area as practicable after drilling and conducting subsequent operations. This process entails returning areas not needed for production operations or for subsequent drilling operations to near-original condition or to the land use designated by the surface landowner. SGI would minimize dust and erosion during the interim reclamation process. SGI would initiate interim reclamation within three months for projects on croplands and within 6 months for projects on non-crop lands after finishing drilling and subsequent operations, unless an exception was granted. Areas needed for production and subsequent drilling operations (those planned within 12 months) would be stabilized to minimize fugitive dust and erosion. Stockpiled topsoil, as well as remnant vegetation (e.g., uprooted sagebrush and oak brush) would be spread over interim reclamation areas, and then seeded with an approved seed mix per the landowner agreement. Any remaining stockpiled topsoil not needed for final interim reclamation would also be stabilized and reseeded. Prior to reseeding, all reclaimed areas would be scarified and left with as rough and uneven a surface as is practicable. The appropriate amount of seed would be applied across the reclaimed areas as prescribed in the permit.

If a reserve pit is utilized, it would be cleaned out, the liner removed and properly disposed of, backfilled, and reclaimed within 6 months from the date of well completion, weather permitting. Prior to any dirt work associated with reserve pit restoration, the reserve pits would be as dry as possible. Cuttings within the pit would be sampled and laboratory tested according to COGCC 900 Series Rules. Results of cuttings pit testing on federal well sites would be made available to the COGCC. Cuttings would then be trucked to an approved and permitted disposal facility (depending on the concentrations of potential soil contaminants listed in COGCC Table 910-1 and analyzed by an EPA-approved laboratory); fencing surrounding the pits would also be removed.

It is estimated that well pads would be reduced in size to an average of 2 acres after interim reclamation is complete. However, the number of wells and associated production equipment needs on each pad would primarily dictate the size of an individual production pad.

Revegetation efforts would be considered satisfactory when soil erosion resulting from the operation has been stabilized, and a vegetation cover equal to 70 percent of pre-existing or seeded-in vegetation is reestablished (both cover and diversity of species) as evidenced by pre- and post-construction photo-point monitoring and vegetation plots and transects. SGI would monitor interim and final reclamation progress at 1-, 3-, and 5-year intervals. Reseeding would be required if satisfactory interim reclamation progress is not being made at year 2 or year 3 monitoring intervals, or if final reclamation is not achieved by year 5.

Interim reclamation would also include repair of range management facilities and improvements that had been altered by project-related activities, for example, the installation of cattle guards where new access roads crossed fences.

BLM_0026787

### *Production and Maintenance*

#### *Production*

If a well were determined to be commercially productive, production facilities would be installed on the well pad. Typically, up to eight (8) 200- to 400-barrel storage tanks would be installed per well for produced water and 1 storage tank for condensate (if needed). The produced water would be piped or trucked to the McIntyre pits, storage tanks, or water disposal wells (described below in the *Produced Water Management* section). Condensate, if produced, would be transferred to trucks as necessary and transported for sale or to an approved disposal site. Typically, a heated three-phase separator, rated at 0.125 mmBtu/day, would be necessary to separate fluids associated with each wellbore. Protective barriers would be installed around the production facilities, including tanks. Regardless of the alternative selected, the appropriate location of facilities would be determined during the APD process.

Dehydration facilities to separate water from natural gas would be centralized at compression facilities.

Where applicable, wells would be fitted with cavity pumps that would require generators to power them. Currently, there is 1 188-horsepower generator to run 2 existing cavity pumps, but smaller, more efficient turbine generators could also be used. These pump and generator systems could be used on any type of well, whether coal bed methane natural gas or shale, if needed. The prime mover for pump jacks would be small (50 horsepower or less) natural gas-fired internal combustion engines.

All site security guidelines would be followed as identified in the authorizing agency's statutes, regulations, and policy.

Existing wells in the Unit have seen increases in production since initial production year of 2010. **Table 2-5**, Bull Mountain Unit Annual Production Rates, illustrates the amounts of gas and water produced each year.

<table>
<tr><td colspan="5" align="center">Table 2-5<br>**Bull Mountain Unit Annual Production Rates**</td></tr>
<tr><th>Year</th><th>Average No. of Prod. Wells</th><th>Average No. of Prod. Days</th><th>Gas Production (MCF)[2]</th><th>Water Production (barrels)</th></tr>
<tr><td>2010</td><td>12</td><td>30</td><td>133,455</td><td>10,911</td></tr>
<tr><td>2011</td><td>11</td><td>99</td><td>132,678</td><td>224,476</td></tr>
<tr><td>2012</td><td>9</td><td>110</td><td>95,299</td><td>254,944</td></tr>
<tr><td>2013</td><td>9</td><td>56</td><td>116,780[3]</td><td>107,342</td></tr>
<tr><td>2014</td><td>9</td><td>100</td><td>923,948[3]</td><td>268,155</td></tr>
<tr><td>2015[1]</td><td>9</td><td>126</td><td>928,815[3]</td><td>216,037</td></tr>
</table>

Source: COGCC 2013
Colorado Oil and Gas Conservation Commission's Colorado Oil and Gas Information System Production Data Inquiry website: http://cogcc.state.co.us/cogis/ProductionSearch.asp..
[1] Production through July 2015
[2] Production amounts are from SGI, August 7, 2013, unless otherwise noted.
[3] Production amounts are from the COGCC website.

BLM_0026788

In addition to the daily site inspections at each well pad location, SGI would remotely monitor specific aspects of well production. This remote monitoring is proposed as a way to provide monitoring between the daily site inspections by SGI personnel. This proposed remote monitoring would be conducted at all fee and federal well pad locations, as proposed in SGI's Proposed Action and Alternative A. SGI will monitor the following aspects of well production using remote telemetry:

- Tubing pressure

- Casing pressure

- Gathering system line pressure

- Wellhead differential pressure

- Wellhead gas temperature

- Wellhead gas rate

- Production tank level alarms

SGI will implement this proposed remote monitoring under the following time limits:

- Wells existing in the Bull Mountain Unit on the effective date of this WHP must be retrofitted and become compliant with the seven monitored aspects of well production listed above within 24 months of the effective date of this WHP.

Wells not yet existing in the BMU on the effective date of this WHP must be compliant with the seven monitored aspects of the well production listed above within six months of such a well being placed in production.

*Surface Facilities*
Installed surface facilities for each gas well would include the wellhead, and may include artificial lift, separators, water transfer, pumps, tank batteries, wellhead compression, and gas-metering facilities. If artificial lift is used, the driver may be natural gas powered. Facilities would occupy less than 1 acre on the site. All long-term facility structures would be painted in accordance with the authorizing agency's standards. Separated, produced water from each well would be transported or pumped through in-ground water lines to an approved disposal well. Disposal of produced water would be in accordance with a plan approved by the COGCC.

All permanent structures would be painted a flat, non-reflective standard environmental color as specified by the authorizing agency or private landowner. Facilities would be painted within 6 months of being located on site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations (i.e., some parts of equipment would retain its safety coloration such that it does not blend with the surroundings).

Surface facilities for water disposal wells would include the wellhead, water injection pump and housing, filter skid and gas filter skid, and approximately 6 to 8 400-barrel holding tanks and 1

BLM_0026789

90-barrel facility drain tank. Water storage tanks would be heated during the winter months to prevent ice formation in the tanks and lines. The injection pumps for the water disposal well would be powered by electricity supplied by overhead or buried electrical lines or by natural gas engine. Facilities would occupy less than 1 acre on the well pad, which would be 1.4 acres following interim reclamation. All long-term facility structures would be painted in accordance with the authorizing agency's standards.

SGI would use a second existing storage yard sized approximately 250 feet by 400 feet, and it would be located on their property to store materials and equipment (T11S R90W Section 14).

*Compressor Stations*
Compression in the field may be necessary as wells come online. Under Alternative A, SGI proposes one new screw compressor located on previously disturbed land (T11S R90W Section 24 and adjacent to the Federal 24-1 and Federal 24-1a well pads, see **Figure 2-1**).

SGI is proposing to use natural gas-fired internal combustion engines to power the compressor. Emissions from natural gas-fired compressor at the compressor facility would typically be less than 2 grams per horsepower/hour of carbon monoxide (CO) and nitrous oxides ($NO_x$), and less than 1 gram per horsepower/hour of VOCs. The compressor would use hospital grade mufflers (an industry standard within the oil and gas industry) and would be housed in buildings or portable structures in an effort to abate noise from the compressor engine.

Up to 20 personnel may be involved in compressor station construction, with an average of 5 personnel on site at any one time.

*Produced Water Management*
Water to be injected into the water disposal wells would first be piped or delivered by truck into the holding tanks to allow sediments to settle out. The water would then pass through a series of filters to remove solids larger than 10 microns in diameter. Accumulated solids from the settling and filtration process would be periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water would reduce scaling or deposition of minerals in the receiving formation, which would otherwise shorten the life of the disposal zones. Chemicals used for treatment would likely include acids, which would keep any minerals in suspension, retard scaling, and act as a biocide. Disposal of produced water would be in accordance with a plan approved by the COGCC rules and regulations.

SGI estimates that between 500 and 3,000 barrels per day of produced water would be injected into the water disposal well. Produced water could also be trucked to an approved disposal site.

Water disposal wells would be drilled to non-producing, non-useable water bearing, formations capable of accepting water. These formations do not produce gas, contain no useable water, and are capable of accepting large quantities of injected water. Conceptual locations for water disposal wells have been illustrated on each alternative map (**Figures 2-1** to **2-3**). In some cases, non-producing gas wells may also be converted for water disposal use. All water disposal wells would be permitted through the appropriate authority. Water disposal facilities would include natural gas-fired internal combustion engines to drive injection pumps directly or via a generator powering an electric motor.

BLM_0026790

*Workovers*

Periodic workovers would be required to correct downhole problems in a producing well, pump maintenance, and to return the well to production. Workovers are undertaken on an as-needed basis to increase or maintain production from downhole producing zones or to re-complete a well in a new zone.

A well would require a workover for any of several typical reasons including:

- Refracturing the producing formation(s) using advanced techniques designed to stimulate additional production

- Cleaning out the wellbore and perforations to stimulate/facilitate production

- Re-completing in another potentially productive zone that was not originally completed at the time the well was drilled

- Repairing casing and other downhole equipment

A workover would generally require three to five workers for four days. Workover activities would typically be implemented during daylight hours only.

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit.  The exact scheduling and particular wells selected for workover is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new Fee/Fee wells per year in Alternative A and continued operations of the existing wells in the Unit, the following estimates for workover operations may occur.

After completion of the drilling phase of this alternative, annually, up to 36 workovers are anticipated to occur upon the 55 Fee/Fee new wells amongst 10 new well pads and the existing 20 wells amongst 17 existing pads (14 Fee/Fee wells, 11 pads, one WDW-one pad, and five federal wells, five pads).  Based on the initial drilling schedule the workover rig and support crew could move between approximately 15-16 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should additional workovers are scheduled to occur consecutively, the support crew would be travelling in and out of the Unit with up to four light trucks on a daily basis. As an individual well workover is estimated to take approximately four days, the resulting round trips in and out of the Unit by light truck per individual four-day workover is estimated to be 16, which results in approximately 576 light truck round trips per year should all 36 calculated workovers be completed annually. It is also assumed that if workover scheduling permits (e.g., minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

SGI could conduct workover operations at any period during the calendar year on the Fee/Fee wells of Alternative A and those which already exist.

BLM_0026791

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well operations.

*Maintenance*

During the normal life of the wells, routine production and maintenance operations would be conducted throughout the year to ensure that equipment is functioning properly. A well operations technician (referred to in the industry as a pumper) visits well pads in a pickup truck to monitor various operating conditions such as gas and water production rates, pipeline pressure, and separator pressure, to determine if abnormal conditions exist and make or schedule necessary repairs. Maintenance of the well pad would also include monitoring the establishment of desirable vegetation, repair of any erosion occurring on the location, and control of noxious or invasive weeds. Additionally, road maintenance would include dust abatement procedures such as application of magnesium chloride. In the case of the water disposal wells, routine maintenance ensures that the well can continue to accept injections of produced water efficiently.

All project roads would require routine year-round maintenance to provide year-round access. SGI would be required to prepare and implement a road maintenance plan for all roads used for project-related purposes. Maintenance would include inspections, reduction of ruts and holes, maintenance to keep water off the road, replacement of surfacing materials, and clearing of sediment blocking ditches and culverts. Should snow removal be necessary, roads would be cleared with a motor grader or snowplow, and where possible snow would be stored along the down gradient side to prohibit runoff onto the road. Road maintenance agreements and requirements would vary depending on the owner of a given road in the Unit. SGI has committed to adhere to county road maintenance and encroachment ordinance requirements. Aggregate would be used as necessary to maintain a solid running surface and minimize dust generation.

**Final Reclamation and Abandonment**

When a well is to be plugged and abandoned, SGI or subsequent operators would reclaim and revegetate the well pads. Site-specific reclamation plans would be included with the submitted drilling applications to the COGCC. Development of a site-specific reclamation plan would include consultation between the surface owner and the operator. The following minimum standards would be applied:

- All surface equipment would be removed

- Removal or burial of surfacing material would comply with the authorizing agency's standards

Wells would be plugged using COGCC standards and comply with all state regulations.

Revegetation efforts would be considered satisfactory when soil erosion resulting from the operation has been stabilized, and a vegetation cover equal to 70 percent (both cover and diversity of species) of pre-existing or seeded-in vegetation is reestablished as evidenced by pre- and post-construction photo-point monitoring and vegetation plots and transects. SGI would

BLM_0026792

monitor interim and final reclamation progress at 1-, 3-, and 5-year intervals. Reseeding would be required if satisfactory interim reclamation progress is not being made at year 2 or year 3 monitoring intervals, or if final reclamation is not achieved by year 5.

***Water Use and Water Sources***
Specific volumes of water usage needed for any given phase of development are presented within that phase description.

Over the life of the project (approximately 50 years), an estimated 30 percent of project water would be obtained from freshwater sources. The remaining 70 percent of water needs could be supplied by various sources, and may include recycled or produced water (see **Appendix D** and **Appendix E**).

Water is needed for a variety of activities associated with development of the Unit, including dust abatement on roads, moistening of soils and gravels for compaction of well pad surfaces, production of drilling muds (to help lubricate the bore hole and circulate drill-bit cuttings), cementing the casing, and hydraulic fracturing and well stimulation. Water is also sometimes used to hydraulically test pipeline integrity (see "pressure testing" section in the pipe installation section). Water for drilling and cementing would be pumped to the well site and stored for operations or would be trucked in. After use, the water used for drilling/completion must be injected into a disposal well or, hauled off-site to an approved disposal facility or stored for reuse in the flowback pits. SGI plans to re-use water where possible. Flowback fluids to be used during the same drilling season may be stored in the McIntyre Flowback Pits (see above).

Use of surface water would be contingent upon the proper authorizations and permissions by the State of Colorado and water right holders (see **Appendix L**). Specific water withdrawal points would be identified in each future drilling application. However, as specific water withdrawal points have not yet been identified by SGI, it is assumed for the purposes of analysis and Section 7 Consultation that the entire depletion associated with this project would be a new depletion from the Colorado River, and thus would be subject to recovery fees as appropriate.

Water from all of these sources would be distributed by truck, buried pipeline, or surface poly pipe to the point of use. Re-use of produced water and water from drilling and completion of other wells would be conducted to the maximum extent practical, estimated at 70 percent of total water needs.

Freshwater application to roads for dust abatement would be applied to the road more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater may be used each day to control fugitive dust per mile during dry months (for example in a typical June). Approximately 2,000 to 5,000 gallons of freshwater may be used to control fugitive dust per mile of road during wet months (for example during a typical August). If dust palliatives were used, the County would determine which ones would be best suited to the situation on county roads. Options for palliatives are magnesium chloride and potassium chloride.

BLM_0026793

*Hazardous Materials and Solid Waste*

Natural gas development employs a variety of chemicals including solvents, lubricants, paints, and additives. A list of chemicals used during drilling, completion, and production is included in **Appendix G**, Hazardous Materials Management Summary. The listing identifies the chemical, its common application, and potentially hazardous components.

Drilling by-products produced include solid pieces of waste rock combined with fluids and/or lubricants used to maintain smooth drilling operations; the by-products are produced by the drill bit cutting through the various formations at intervals beginning 3 to 4 feet from the surface and ending at the bottom of the hole. After drilling is complete, closure of the reserve pit would be completed according to the appropriate regulatory requirements (see pit closure section below).

Emptied steel and plastic drums for materials such as caustic soda, citric acid, lubricating oil, methanol, and drilling additives would require disposal. Empty metal or plastic drums would be returned to the supplier of the product. Any waste lubricating oil would be disposed of properly by a third-party contractor.

SGI has prepared and implemented an Integrated Spill Prevention, Control, and Countermeasures Plan and Emergency Response Plan for containment and control of oil and chemicals used in the Unit, as well as fire prevention and protection and emergency reporting. Procedures outlined in the Plans are applicable to all SGI personnel and contractors. In accordance with the plans, SGI personnel are trained to conduct routine inspections of the containment areas and to promptly contain and clean up any accidental spills. SGI's plans can be provided upon request to BLM at their Montrose office.

Chemicals on the EPA's Consolidated List of Chemicals Subject to Reporting Under Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III) may be used or stored in quantities over reportable quantities. In the course of drilling, SGI could potentially store and use diesel fuel, sand (silica), hydrochloric acid, and $CO_2$ gas, all described as hazardous substances in 40 CFR Part 302, Section 302.4. In addition, natural gas condensate and crude oil, described as hazardous substances in 40 CFR Part 302, Section 302.4, may be stored or used in reportable quantities. During production operations, tri-ethylene glycol, ethylene glycol mix (50 percent), and methanol, all described as hazardous substances in 40 CFR Part 302, Section 302.4, may be stored or used on site. Small quantities of retail products (paint/spray paint, solvents [e.g., WD-40], and lubrication oil) containing non-reportable volumes of hazardous substances may be stored and used on site at any time. No extremely hazardous substances, as defined in 40 CFR Part 355, would be used, produced, stored, transported, or disposed of under any of the alternatives. Hazardous substances would be reported as required by Title III and COGCC chemical inventory programs.

Any surface spills or releases of oil, condensate, produced or flowback water, drilling fluids or other potentially harmful substances would be contained and immediately removed according to SGI's spill plan. The spilled or released fluids, along with any contaminated soils would be disposed of at an approved disposal site.

BLM_0026794

Tanks containing hazardous materials, including drilling fluids and/or muds, completion fluids, fuels, lubricants, produced liquid hydrocarbons, condensates, and produced water, would be surrounded by a secondary containment berm of sufficient capacity to contain the entire capacity of the largest single container and sufficient freeboard to contain precipitation as required in the authorizing agency's standards. For instance, EPA requires containment of 150 percent of the volume of the largest container. All loading lines and valves would be placed inside the berm surrounding the tank or would utilize catchment basins to contain spills. The tanks would be emptied as necessary, and the liquids transported to market via trucks.

Portable toilets and bear-resistant trash containers would be located on active construction sites. A commercial supplier would install and maintain portable toilets and equipment and would be responsible for removing sanitary waste. Sanitary waste facilities (i.e., toilet holding tanks) would be regularly pumped and their contents disposed of at approved sewage disposal facilities in Delta, Montrose, Garfield, or Gunnison Counties, in accordance with applicable rules and regulations regarding sewage treatment and disposal. Accumulated trash and nonflammable waste materials would be hauled to an approved landfill once a week or as often as necessary. All debris and waste materials not contained in the trash containers would be cleaned up, removed from the construction ROW or well pad, and disposed of at an approved landfill. Trash would be cleaned up every day.

Sanitary waste equipment and trash bins would be removed from the Unit upon completion of access road or pipeline construction, following drilling and completion operations at an individual well pad, or as required.

### Access and Traffic

Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative A are presented below in **Table 2-6** and are based on 10 new well pads.

**Table 2-6**
**Alternative A Traffic Estimates per Well Pad for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 1,600 |
| Semi-trailer trucks | 37,000 | 40 |
| Pickup trucks | 6,000 | 400 |
| Motor grader on semi-trailer | 40,000 | 10 |
| Dozer (2) on semi-trailer | 19,000 | 20 |
| Track hoe on semi-trailer | 43,000 | 10 |
| Pipeline construction | | |
| Motor grader on lowboy Trailer with truck | 50,800 | 20 |
| Bulldozer on lowboy trailer with Truck | 120,000 | 20 |
| 80-barrel water trucks for dust control | 54,000 loaded | 200 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 20-40 |
| Track hoe on lowboy trailer with truck | 91,000 | 20 |
| Welding trucks | 9,500 | 20 |

BLM_0026795

**Table 2-6**
**Alternative A Traffic Estimates per Well Pad for Construction, Drilling,**
**Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Crew cab pickups | 5,200 | 400 |
| Bending machine/trailer | 48,000 | 20 |
| Side booms on lowboy trailer with truck | 63,000 | 20 |
| X-ray truck | 5,200 | 40 |
| Testing truck | 6,000 | 20 |
| Pipe trucks | 120,000 loaded 36,000 unloaded | 10 |
| Utility tractor and truck with lowboy trailer | 40,000 | 20 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 10 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 250 |
| Rig-up trucks empty | 36,500 | 40-60 |
| 80-barrel water trucks loaded | 54,000 | 400 |
| 80-barrel water trucks empty | 25,000 | 400 |
| Crew-cab pickups | 6,000 | 400 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 20 |
| Drilling/completion rig | 120,000 | 20 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 250 |
| Rig-up trucks empty | 36,500 | 40-60 |
| 80-barrel water trucks loaded | 54,000 | 450 |
| 80-barrel water trucks empty | 25,000 | 450 |
| Crew cab pickups | 6,000 | 400 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 576 |
| Workover rig (rig roundtrips per year) | 120,000 | 36 |
| Haul trucks | 120,000 | 60 |

Typical pumper traffic would be pickup trucks estimated to have an average vehicle weight of 6,000 to 10,000 pounds for approximately 1 round trip per well per day; typical water disposal well traffic would be approximately 2 round trips per well per day. Typical water truck traffic for dust suppression activities is estimated at 2 round trips per well per day. Workover traffic is difficult to predict because there is no schedule for when equipment will break down, nor can downhole problems be reliably predicted, however an estimate has been provided. The field's general age also is a factor in how many workovers may occur in a given year or on a given well. Younger wells tend to have fewer issues than older wells; as equipment and facilities age, the trend is for more repairs and replacement. Additionally, the Unit is still in the exploratory phase, so factors that would contribute to predicting when a well may need maintenance are unknown, such as type of downhole environment. All other traffic estimates would be the same as described in **Table 2-1**.

BLM_0026796

### Surface Disturbance

Short-term surface disturbance (expressed as acres) would occur during and immediately after the construction, drilling, completion, and testing activities. Those portions of the well pads, access road ROWs, pipeline ROWs, and other facilities not needed for production operations or additional well drilling on the same pad would be reclaimed as conditions allow within one to two growing seasons following completion of the respective well, access road, or pipeline. What remains after interim reclamation and prior to final reclamation is considered long-term disturbance.

The No Action alternative would construct up to 10 new well pads that would result in approximately 50 acres of short-term disturbance and 20 acres of long-term disturbance, and require 5 miles of new road construction and 26 miles of improvements to existing roads for access (totaling 109 acres of short-term disturbance and 58 acres of long-term disturbance).[2] SGI also proposes 12 miles of new pipelines that would total 101 acres short-term disturbance and 9 acres long-term disturbance (cross-country pipelines would be fully reclaimed resulting in zero acres long-term disturbance). Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreage area of disturbance are shown in **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, which includes both short-term (during immediate construction and development) and long-term (after interim reclamation) disturbance.

### Best Management Practices

Best management practices are practices or a combination of practices that are determined to provide the most effective, environmentally sound, and economically feasible means of managing an activity; they are state-of-the-art industry and agency recognized mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are selectively applied to projects to aid in achieving desired outcomes for safe, environmentally responsible development by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. BMPs can also be proposed by SGI for activities. BMPs not incorporated into the permit application by the applicant may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or ROW stipulations.

SGI has also provided a Master Surface Use Plan of Operations (see **Appendix D**) and a Master Drilling Plan (**Appendix E**) that provide measures for application under Alternative A. These generalized plans would be revised to include site-specific information for future drilling permits, and reviewed for adequacy by the COGCC prior to approval. Upon review of the individual drilling application, the COGCC may request additional mitigation measures.

---

[2] Calculations of possible disturbance areas are based on the assumptions presented in **Section 2.2.5**, Elements Common to All Alternatives, and **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates; the estimates below should be considered upper threshold limits for the purposes of summarizing the extent of possible disturbance under Alternative A, No Action.

BLM_0026797

### 2.2.7  Alternative B, Proposed Action

Alternative B is specific to BLM-administered mineral estate, the BLM's authority, and the actions they would approve under a Master Development Plan, including consideration of the 12-89-7-1 APD. As noted in **Section 1.3**, Decisions to be Made, this APD was submitted to the BLM, which inspected it on May 16, 2011. The APD has been pending since October 25, 2012. By considering it in the Final EIS, it is now possible for the BLM to approve or reject the APD as part of the ROD.

If Alternative B is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. Alternative B describes the development that would occur on federal mineral estate within the Unit for purposes of comparison with Alternative A conditions. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

**Figure 2-2**, Alternative B, Proposed Action, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

All actions described below, including those that occur on split-estate lands, would be in compliance with all laws, regulations, and BLM policies, including BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), the BLM Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Design features, mitigation measures, and the COAs listed in **Appendix C** would apply (see **Table 2-11**, Stipulations, Design Features, and Mitigation Measures). In addition, several strategy and planning documents would apply, including the Hazardous Materials Management Summary (**Appendix G**), the Noxious Weed Management Plan (**Appendix I**), Bainard Augmentation Plan (**Appendix L**), and Poly Pipeline Operations Plan (**Appendix M**). The Master Surface Use Plan of Operations and a Master Drilling Plan (see **Appendices D** and **E**, respectively) would also apply, and a revised version of the plans specific to a development must be submitted with an APD.

*New Developments*

Alternative B includes up to 36 new well pads, up to 146 new natural gas wells, and up to 4 new water disposal wells to develop federal mineral estate. The average number of wells per pad would be the same as described above in **Section 2.2.4**, Elements Common to All Alternatives. Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone gas wells, and shale gas wells on each pad is not known at this time and would also be determined at the APD stage.

Additionally, it is estimated that approximately 16 miles of new road construction and 53 miles of improvements to existing roads for access, 21 miles of new pipeline construction, and up to 4 new compressor stations would be constructed.

After release of the Draft EIS, SGI amended its Proposed Action with the following modifications:

BLM_0026798

2. Alternatives



**Alternative B, Proposed Action**

Alternative B is specific to BLM-administered federal mineral estate and surface and development would occur under a Master Development Plan.

Source: SG Interests GIS 2013 and BLM GIS 2014

Alternative B, Proposed Action

- 🔴 Proposed well pad analysis area
- ⬠ Proposed screw compressor
- •—•—• Proposed pipeline

〰 Proposed new road construction

—— Existing road requires upgrade for use

Existing Infrastructure

—— Existing road currently suitable for use

•——• Existing pipeline

▣ Existing storage yard

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Figure 2-2

BLM_0026799

- Inclusion of the 12-89-7-1 well pad APD—The Specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix O**. The site-specific information described below and in detail in **Appendix O** is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.7**, Alternative B. For example, while the alternatives describe many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD Drilling Plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well (see **Figure 2-3**, Alternative B, C, and D 12-89-7-1 APD).

- New developments under the Proposed Action would be subject to SGI's Bull Mountain Unit WHP (see **Figure 2-4**, Alternative B, Proposed Action Wildlife Habitat Plan). The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**. The provisions found in the WHP are included in the text descriptions below.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest; see **Figure 2-2**, Alternative B, Proposed Action) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length of the pipeline has been updated to reflect this change.

Based on these numbers, and the assumed drilling rate noted in the common assumptions, it is estimated that drilling activities would occur for approximately 6 years.

*APD for Federal 12-89-7-1*

On November 6, 2014, the COGCC approved an APD submitted by SGI to drill 12-89-7-1, which was SGI had re-filed on June 19, 2014. The well would be drilled to a total depth of 4,700 feet, and would target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well would have a 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet; a 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet (the depth was extended in the current permit from its original depth); and a 6-inch-diameter casing in a 8.5-inch-diameter borehole to the final depth of 4,700 feet.

As described in the Surface Use Plan of Operations, the well pad would cover about three acres. A total of up to five wells are planned for this well pad. The wells would target both coal bed methane and sandstone and shale gas-producing formations.

BLM_0026800



**Alternatives B, C, and D, 12-89-7-1 APD**

During development of the Final EIS, BLM agreed to consider the 12-89-7-1 well pad APD. This APD was submitted and had an on-site inspection by the BLM on May 16, 2011. The APD has been pending since October 25, 2012. By considering it the Final EIS in alternatives B, C, and D, it is now possible for BLM to approve or reject the APD as part of the Record of Decision.

Figure 2-3

Legend:
- Short-term surface disturbance for proposed well pad 12-89-7-1
- Proposed pipeline
- Existing road currently suitable for use
- Bull Mountain Unit
- Federal surface, federal minerals
- Private surface, federal minerals

Source: SG Interests GIS 2013 and BLM GIS 2014

BLM_0026801

2. Alternatives



The WHP covers 12,500 acres of the MDP. Of the alternative B estimated 600 acres of short term disturbance*, 353 would be covered under the WHP, and of the estimated 215 acres of long-term disturbance, 123 would be covered under the WHP. *The total short- and long-term disturbance acreages are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted.

Source: SG Interests GIS 2013 and BLM GIS 2014

**Alternative B, Proposed Action**

| Alternative B, Proposed Action | | Existing road requires upgrade for use |
| --- | --- | --- |
| ● | Proposed well pad analysis area | WHP winter closure |
| ◉ | Proposed screw compressor | Federal surface, federal minerals |
| ✛✛ | Proposed pipeline | Private surface, federal minerals |
| 〰 | Proposed new road construction | Private surface, private minerals |

**Alternative B, Proposed Action Wildlife Habitat Plan**

New developments under the Proposed Action would be subject to the Bull Mountain Unit Wildlife Habitat Plan (WHP) submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities.

Figure 2-4

BLM_0026802

Although the proposed well pad is about one-half mile west of Highway 133 and East Muddy Creek, the topography to the east of the site is steep. Site access would be from an existing road designed to accommodate heavy vehicle traffic that runs southeast from an existing well pad, the Gunnison Energy Corporation's Hotchkiss 12-90 #1-34 well, located a little more than one mile northwest of the proposed well pad. This approximately one-mile road segment would require realignment, and about 23 acres of surface area would be disturbed in the process.

Just west of the proposed pad is the Narrows Gathering Pipeline, with a buried 12- to 16-inch-diameter gas line and an 8-inch-diameter water line for transporting gas and produced water from the production wells. The right-of-way of the Narrows Gathering Pipeline is 50 feet wide. About 2.75 acres will be disturbed for tie-in lines from the proposed well to the Narrows Gathering Pipeline.

*Construction*

In accordance with the WHP, SGI would do the following:

- Conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling—SGI will conduct these surveys between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM NOS. The intent of the surveys is to implement avoidance strategies where possible and minimize potential impacts on nesting raptors and migratory birds. These surveys may modify facility design, make minor site location adjustments, and promote operational awareness to reduce direct and indirect impacts when a habitat of concern is identified. Where active raptor nests are identified, SGI will apply CPW's raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors 2008). When other migratory bird nests are located, SGI will avoid disturbing them and will flag and avoid nestlings during the nesting season. Stream crossing in active streams would be conducted outside the spawning season identified by CPW for applicable aquatic species.

- Meet annually with the BLM by December 31 to summarize its development and mitigation activities for the previous 12 months and to forecast with best available information the next year's development and mitigation activities as they relate to the WHP.

- Observe the restricted surface occupancy (RSO) buffer restrictions in COGCC Rules—If SGI cannot comply with the RSO buffer restrictions for a particular facility, it agrees to enter into an individual consultation with CPW on that facility, under Rule 306.c, to evaluate options for avoidance, minimization, and mitigation.

- Avoid the verified elk winter concentration areas where practicable in re-siting the well pad—The primary constraint in avoiding these areas will be the 40-acre analysis area, within which the well pad can be relocated under the MDP EIS analysis. Other resources, such as slope, soil, and wetlands, will also factor into any re-siting analysis. Where this conflict occurs and cannot be resolved, site-specific mitigations will be addressed during any future required site-specific NEPA analysis.

BLM_0026803

*Access Road Construction*

The primary access roads would be State Highway 133 and County Road 265, and new road construction and improvements would only occur on an as-needed basis to facilitate access to well pads and other facilities. Site-specific plans for road construction and up-grades would be included as part of individual future APDs and would be subject to approval from the BLM.

New road construction and improvements to existing roads would typically require the use of motor graders, crawler tractors, 10-yard-end dump trucks, and water trucks. The standard method for building new roads involves the use of a bulldozer or track hoe to segregate the vegetation to one side of the route in windrows, remove topsoil to the opposing side of the route, and rough-in the roadway. As access roads would be constructed using standard crown-and-ditch specifications, a grader or bulldozer would establish barrow ditches and crown the road surface. Roads would be constructed with appropriate drainage and erosion control features and structures (e.g., cut-and-fill slope and drainage-ditch stabilization, relief and drainage culverts, water bars, wing ditches, and riprap). On roads with grades between 3 and 15 percent, rolling dips could be used rather than culverts. Where culverts are required, a track hoe or backhoe would be used to trench the road and install the culverts. Some hand labor would be required when installing and armoring culverts.

The new roads and improved existing road surfaces would be composed of an appropriate volume of road base compacted using a roller and freshwater as necessary. Approximately 6 to 8 inches of road base would be used in road construction and reconstruction. Road base or gravel would be hauled in and a grader would be used to smooth the running surface. Rock, road base, and gravel materials for all uses would be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado. Specifics on where the source materials would be obtained from would be identified on the individual APD when it is submitted. These roads would be upgraded and covered with gravel as necessary to maintain the post-construction surface quality.

Freshwater would be used in initial road construction and rock/gravel surfacing to improve the workability of the soil, rock, and gravel and for dust abatement. Freshwater needed for access road construction would be obtained from nearby sources, in accordance with agreements with landowners, or would be under the guidance of SGI's water augmentation plan (see **Appendix L**, Bainard Augmentation Plan). Freshwater for dust abatement would be applied to the road more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater may be used per day per mile to control fugitive dust during dry months (for example in a typical June). Approximately 2,000 to 5,000 gallons of freshwater may be used per day per mile to control fugitive dust during wet months (for example during a typical August).

On average, SGI estimates that roads would be constructed at a rate of approximately 600 to 800 yards per day. Spur roads to individual well pads would be constructed just before well pad construction. Each spur road workforce would include an average of five workers to operate the equipment. For trunk roads (those providing access through the Unit or to multiple well pads), several crews could operate simultaneously on different roads or different portions of the same

BLM_0026804

road. The total number of workers on trunk road construction and improvements could range from 6 to12.

*Well Pad Construction (Gas and Water Disposal Wells)*
Before individual well pad construction, SGI would obtain approval of an APD by the BLM. Each APD would contain site-specific details related to well pad size, construction and well operations, and mitigation measures (see **Appendix C** for a list of COAs). The BLM may consult with CPW, CDPHE, the local government designee, and the landowner before applying its own measures to mitigate potential environmental impacts, or it could adopt the measures identified in **Appendix C**.

SGI will use multiple-well pad sites to reduce surface disturbance and overall habitat fragmentation. This could reduce heavy equipment traffic due to fewer rig mobilizations and de-mobilizations.

Construction of a typical well pad would entail the use of bulldozers, motor graders, Class 125 or larger track hoes, backhoes, compacters, and 10- to 20-yard dump trucks. Well pad construction equipment needs would vary depending on site-specific conditions; however, methods for construction would be the same for all types of natural gas well pads and water disposal well pads proposed.

Within the approved well pad location, a leveled area would be graded by a bulldozer after or simultaneously with upgrade/construction of an access road. Standard cut-and-fill construction techniques and machinery (bulldozer or grader) would be used; stockpile, cut, and fill locations in the well pad construction area would be specified on the APD. Vegetation would be cleared, and all available topsoil to a depth of 8 to 12 inches would be stockpiled and segregated from subsoils over the entire disturbed surface to create the well pad area. The well pad would be surfaced using "pit run," or equivalent material, which generally consists of rock less than 6 inches in diameter. The area within the anchor bolt pattern and around tank batteries or facilities would also be surfaced with a top dressing of 3-inch road base. Pit run and road base would both be trucked to the site from gravel pits near Carbondale, Delta, Paonia, or other local areas. If the well location requires only minimal grading, 8 inches of topsoil would be salvaged from the entire disturbed surface and stockpiled in contiguous berms or stockpiles at the edges of the well pad to facilitate future reclamation. Stockpiled topsoil would be protected against wind and water erosion and would be seeded with an approved seed mix concurrent with cessation of well pad construction and earth-moving operations. Native seed mixes would be required for reclamation.

On average, five workers, mostly equipment operators, would work on the construction of an individual well pad. This could take from one to three weeks, depending on the features of each particular site.

The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time, the same as described in Alternative A. Additionally, as part of individual APDs, SGI would identify the specific pipeline routes needed in order to transport the gas and water from the well head.

BLM_0026805

Under Alternative B, SGI could propose a reserve pit or pitless closed-loop drilling system, which would determine the size and construction needs of the well pad. If SGI used a drilling system with a reserve pit to hold drill cuttings and fluids, it would construct a lined reserve pit system on the well pad. The reserve pit sizes vary with well type and site conditions, but they would typically be approximately 50 feet by 150 feet and lined with an impermeable, minimum 24-mil plastic liner so as not to leak, break, or allow discharge. The reserve pit would be fenced on three sides during drilling and on the fourth side immediately after the drilling rig is removed. The well pad itself may also be fenced. Bird netting would be installed over the pit within 24 hours, and silt fencing would be installed around the base of the fences. Two feet of freeboard is required at all times. Any reserve pits left open over the winter would be fenced to keep out big game and wildlife. Pits would have a 2-foot unlined berm in addition to the minimum 2 feet of freeboard around them to prevent snowmelt on the pad from flowing into the pits.

Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad. As necessary, SGI would use erosion control measures, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips. These materials and structures would be used to minimize erosion and surface runoff during well pad construction and operation.

The requirements for a closed loop drilling system are described under *Gas Well Drilling*, below.

In addition to installing standard stormwater erosion controls to protect water quality, as required by the CDPHE, SGI would comply with CPW- and COGCC-recommended buffers for aquatic habitats in the BMU. SGI would implement the following best management practices from the wildlife habitat plan in the BMU:

- Except as outlined on Figure 2 in the WHP and activities outlined in the bullets below, no surface disturbance would be allowed within 300 feet of a designated cutthroat trout stream.

- In other watersheds, well pads and facilities would not be sited, to the extent practicable, within 150 feet of any natural lake, wetland, or perennial or seasonally flowing stream or river.

- Roads crossing CPW mapped cutthroat trout streams would be bridged or appropriately sized culverts would be used to prevent stream bed damage and the transfer of disease organisms. Pipelines that cross cutthroat trout streams should be bored if practicable.

- Stream disturbances in or upstream of CPW-mapped cutthroat trout habitat would be avoided between June 1 and August 31 to prevent impacts on spawning cutthroat trout.

- All stream crossing and culverts on perennial and intermittent streams would be designed to allow aquatic species passage.

- Minimum right-of-way widths would be used where pipelines cross riparian areas and streams, and crossing would be constructed at right angles to the stream channel.

BLM_0026806

- Native riparian canopy cover and stream bank vegetation would be left intact to the extent practicable.

- Chemical dust suppression would be avoided within 300 feet of the ordinary high water mark of any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river, unless required by the surface owner or by county or state requirements.

- Water suction hoses would be screened to exclude fish and amphibians.

- SGI would disinfect heavy equipment, hand tools, boots, and any other equipment that was previously used in a river, stream, lake, pond, or wetland in a different watershed before moving the equipment to another water body. The disinfection practice applies field wide and follows the procedure outlined in COGCC's Rule 1204.a.2.

*Pipeline Construction*

SGI would collocate pipelines and other utilities next to road rights-of-way where practicable. The methods of construction are described below and are the same as described in Alternative A, No Action.

Pipelines would be necessary to transport gas from producing wells to the existing gas pipeline and to transport produced water to proposed water disposal wells or flowback pits.

The following sections describe the various pipeline construction phases, which are typical for this type of development.

Clearing and Grading

At the start of pipeline construction, the route would be cleared of vegetation to remove any obstacles or debris. Grading would follow to remove the topsoil and surface rock and stockpile it at the edge of the route for redistribution following construction. All brush and other materials that are cleared would be placed in windrows in the route or in temporary use areas. If the pipeline is not collocated with a road, then these materials may be dispersed over the route to impede access following construction. Trees and rocks would be strategically placed on the pipeline corridor to impede access, as stipulated by individual permit conditions or surface landowner agreements.

Trenching

Construction methods used to excavate a trench would vary, depending on soil, terrain, and related factors. Rotary trenching machines would be used where possible. In situations where there are steep slopes, unstable soils, high water tables, or deep or wide trench requirements, conventional tracked backhoes (track hoes) would generally be used. Highway crossing methods and construction requirements would be according to CDOT permit stipulations and general conditions as necessary.

SGI would take measures during construction to ensure that access is provided for property owners, tenants, and ROW holders to move vehicles, equipment, and livestock across the trench where necessary. Adequate precautions would also be taken to ensure that livestock are not prevented from reaching water sources because of the open trench. These would include

BLM_0026807

contacting livestock operators, providing adequate crossing facilities and fencing, or other measures as needed.

If a pipeline should be routed across a road or wetland, SGI could use a pipeline bore for the crossing. If so, the bore operations would be set up outside of the wetland or road right-of-way and would be designed to minimize impacts on these features. Temporary use areas before and after the feature to be bored may be needed and would vary in size depending on the terrain and the size of the feature to be bored. Specific route determinations, siting design, and boring methods would be determined at the permitting stage.

Pipe Installation

Gas gathering and subsurface water pipelines would be constructed of steel. Pipe installation would include stringing, bending for horizontal or vertical angles in the alignment, welding the pipe segments together, making x-ray inspection, coating the joint areas to prevent corrosion, and then lowering-in and padding.

- Stringing—Line pipe would be trucked directly from the manufacturer or a contractor storage yard to the corridor. Each individual joint of pipe would be unloaded and strung parallel to the trench. Sufficient pipe for road or stream crossings and steep slopes would be stockpiled near the crossings or slope. Stringing operations would be coordinated with trenching and installation to properly manage the construction time at a particular tract of land. Gaps would be left at access points across the trench to allow crossing corridor.

- Bending—After the joints of pipe are strung along the trench but before the joints are welded together, individual joints of the pipe would be bent if necessary to accommodate horizontal and vertical changes in direction. Field bends would be made using a hydraulically operated bending machine. Where the deflection of a bend exceeds the allowable limits for a field-bent pipe, factory (induction) bends would be installed.

- Welding—After the pipe joints are bent, the pipes would be lined up end-to-end and clamped into position. The pipes would then be welded in conformance with 49 CFR, Part 192, Subpart E, "Welding of Steel Pipelines," and API 1104, "Standard for Welding Pipelines and Related Facilities," latest edition.

- X-ray inspection—Welds would be inspected by a qualified inspector using nondestructive radiographic methods and according to CDOT requirements. A specialized contractor, certified to perform radiographic inspection, would be employed to perform this work. Any defects would be repaired or cut out, as required under the specified regulations and standards.

- Coating—To prevent corrosion, the exterior of the pipes would be coated with fusion-bonded epoxy coating before delivery. Power Crete-coated pipe would be installed in all bore locations unless the pipe is cased. After welding, field joints would be sandblasted, flocked, and coated with a synergy coating. Before the pipe is lowered into the trench, the pipeline coating would be inspected and tested with an electronic detector, and any faults or scratches would be repaired.

BLM_0026808

- Lowering-in and padding—Once the welding, inspection, and joint coating has been completed, a section of the pipe would be lowered into the trench. Side boom tractors would be used to lift the pipe, position it over the trench, and lower it into place. An inspection would verify that minimum cover is provided, the trench bottom is free of rocks or other debris, external pipe coating is not damaged, and the pipe is properly fitted and installed into the trench. Specialized machines would be used to sift soil fines from the excavated subsoils to provide rock-free pipeline padding and bedding. In rocky areas, padding material or a rock shield would be used to protect the pipe.

- Backfilling—This would begin after a section of the pipe has been successfully placed in the trench and final inspection has been completed. Backfilling would be conducted using a track hoe, rotary auger back filler, padding machine, or other suitable equipment. Backfilling of the trench would generally use the subsoil previously excavated from the trench, except in rocky areas where imported select fill material may be needed. Backfill would be graded and compacted by tamping or walking-in with a wheeled or tracked vehicle. Compaction would be performed to 95 percent maximum density, as determined by AASHTO T-99, at all county road crossings. Trenches would not be backfilled where the soil is frozen to the extent that large consolidated masses have formed that would not break down. The contractor would then re-spread the previously segregated topsoil to return the surface to its original grade. Any excavated materials or those unfit for backfill would be used or properly disposed of, in conformance with applicable laws or regulations. The construction contractor would place an approximately 6-inch-high mound over the trench to account for subsidence. The entire construction zone would be seeded in the first appropriate season after disturbance.

- Pressure testing—The entire pipeline would be tested in compliance with USDOT regulations (49 CFR, Part 192). Before the pipeline is filled for a pressure test, each section would be cleaned by passing reinforced poly pigs through the interior. Incremental segments of the pipeline would then be filled with compressed water, air, or natural gas to the desired maximum pressure (up to 720 pounds per square inch) and held for the duration of the test (8 hours minimum, if USDOT regulations apply). The compressed air would be discharged into the atmosphere following the completion of the test. All nearby residents and the Gunnison County Dispatch Center would be notified before the pressure test and blow down. If necessary, water would be discharged into upland areas on gentle slopes. This would be conducted in accordance with the conditions and stipulations in CDPHE's Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. These conditions and stipulations require permit-specific sampling, testing, filtering or mitigation, reporting, and a plan to prevent soil erosion or impacts on surface waters.

Gathering pipelines for individual well pads would consist of 6- to 8-inch outer diameter pipeline and would be designed for 720 pounds per square inch. Each gathering line would tie into a larger trunk line with a 12- to 16-inch outer diameter, which would eventually transport the gas to the Bull Mountain pipeline; carsonite pipeline markers would be installed on the surface, and tracer wire would be installed for all buried pipelines. The dimensions of the pipe used would depend on the number of wells served and the production estimates.

BLM_0026809

Between 10 and 25 construction- and supply-related workers would be needed to install new sections of the pipeline gathering system. All gas pipelines would be constructed to applicable American Petroleum Institute and industry standards.

*Overhead Electrical Line Construction for Water Disposal Wells*
Under Alternative B, SGI proposes up to four new water disposal wells that would require construction of four new overhead electrical lines (up to 20 power poles) to supply power to the water disposal well heads. SGI would collocate pipelines and other utilities next to road rights-of-way where practicable.

The methods for constructing the electrical lines are described below and are the same as described in Alternative A, No Action.

Electrical lines would be constructed following successful completion of the new water disposal wells. Electrical power would be used for long-term operation of lights, water heaters, and ancillary needs at the water disposal facilities. In most but not all cases, well pumps would not use electricity and would be run by natural gas-powered pumps.

The average ROW width for power lines is 30 feet; final routes would be subject to surface owner approval. If a line followed existing two-track roads, then construction vehicles would stay on existing disturbance areas. If the line ran cross-country, then appropriate access and vehicle routes would be approved as part of the project design. If the terrain allows for it, access could be overland along the route.

Wooden power poles would be erected, and typical equipment includes pickups, auger/drilling rigs, bucket trucks, and stringing equipment. Some Gambel's oak, aspen, and other taller shrubs may need to be pruned back for construction, and each power pole hole would disturb approximately 8 square feet of vegetation during excavation of the hole and setting of the power poles. There would be no prescriptive clearing of the corridor for electrical lines, which would run to the new water disposal well location.

**Drilling**
Drilling operations would be conducted in compliance with all applicable and relevant state and federal regulations. In accordance with the WHP, SGI would limit the number of drilling rigs in the BMU when wintering big game could be most impacted. SGI would operate up to three drilling rigs between April 15 and December 1 of each year. Only one drilling rig would operate from December 1 through April 15 each year.

To address potential direct and indirect impacts on wintering big game, SGI would voluntarily limit winter activities in portions of the BMU that CPW has identified as the most critical to wintering big game. See **Figure 1**, Winter Closure Areas, in **Appendix C**, the Wildlife Habitat Plan.

SGI agrees that the activities listed below would not be allowed in the voluntary big game winter closure areas between December 1 and April 15 each year:

- Drilling of new wells

BLM_0026810

- Well work-over and completion activity intended to increase the production of a well

- Reclamation activities and existing road maintenance activities that can be delayed until after April 15 each year

- New surface-disturbing activities, including pipeline construction and installation, road and pad construction, and other general construction and facility installation

The BLM would not unreasonably withhold individual waivers allowing for such continuing activity under the following circumstances:

- Where activities prohibited in the winter closure areas between December 1 and April 15 of each year would begin in a timely fashion

- Where the date of completion is expected to be December 1

- Where operational or regulatory restraints require continuing operations after December 1

SGI would limit activities to the following between December 1 and April 15 each year:

- Well production and routine maintenance activities. In this context, well production and routine maintenance activities are

    o Emergency work-overs or other emergency actions necessary to remedy equipment failures or unanticipated declines in production, or as required by local, state, or federal regulatory agencies

    o Non-routine pipeline facility maintenance necessary to remedy unanticipated production problems, to address safety issues, or as required by local, state, and federal regulatory agencies

    o Normal daily production activities including pumping of wells, generally requiring up to two vehicle trips per day or less to a well pad

Normal daily production activities require snow plowing and the minimum amount of road maintenance necessary to access the well. Daily access to each well pad is necessary for safe and environmentally responsible operations. For example, formation water produced from wells in the BMU and stored temporarily in tanks on each location requires daily site visits to ensure prudent and environmentally responsible operations. The combination of large volumes of stored water and extreme low temperatures can result in mechanical failures that can be effectively monitored only by daily site visits. Roads to each location must be plowed to ensure minimal response times for necessary equipment to address any issue that could result in damage to environmental resources. Remote telemetry monitoring cannot provide the same level of assurance and environmental protection that human daily site visits can.

SGI would install gates and signs to limit access, to the extent permitted by the landowners, at all entry points to the Voluntary Big Game Closure Areas (see **Figure 1**, Winter Closure Areas, in **Appendix C**, the Wildlife Habitat Plan).

BLM_0026811

Specific techniques for drilling wells would differ depending on whether SGI drilled a gas well or a water disposal well; the specific techniques for natural gas well and water well drilling are presented below. Trucks would transport drilling components to the work site. Rig components are designed for portability and are easily loaded and unloaded and mostly are self-contained on the mobile drill rig. Auxiliary equipment for the supply of electricity, compressed air, and freshwater would be trucked in for drilling operations. Drill pipe, drill bits, cement, freshwater, wire rope, and other supplies would be trucked to the well pad and stored until used. Traffic would consist of support equipment, contractor vehicles, construction personnel, and material delivery. Well pad activity would involve backhoes, front-end loaders, boom and winch trucks, delivery trucks, welding machinery, and personal vehicles.

*Gas Well Drilling*

Gas well drilling could use any of the different wellbore directions, types of drilling technologies (reserve pit and/or closed loop systems), target formations, and drilling lubricants. Alternative B, Proposed Action, does not present a preference for one type of technology or methodology over another. Under Alternative B, the type of wellbore, drilling system, target formation, and drilling lubricant would be specified in the APD when submitted to the BLM. All drilling operations and other well site activities would be conducted in compliance with BLM policies, and regulations, and with the Master Surface Use Plan of Operations and Master Drilling Plan (see **Appendix D** and **E**, respectively). The possible range of methods for drilling are described below.

In its broadest definition, a wellbore is a hole that is drilled to aid in the exploration and recovery of natural resources, including oil, gas, or water. A wellbore is the actual hole that forms the well and can be drilled vertically or directionally. A vertical wellbore is drilled straight down below the drilling rig. A directional wellbore may start out vertically but is then turned to move out at an angle, in an S-shape, or turned horizontally. Wellbores could be any of the mentioned varieties (vertical or directional) and would be encased by such materials as steel and cement. Because applications to the COGCC are similar to federal applications, illustrations of the different types of wellbores for federal applications are provided in **Appendix E**, Master Drilling Plan.

As noted under the section describing the well pad construction techniques, drilling methods could fall within two broad categories: those drilling systems that use a reserve pit on the well pad or a pitless system, generally called a closed-loop system. Under Alternative A, SGI proposes either to drill with a reserve pit or a closed-loop. Which system it uses would depend on the type of well to be drilled, what drilling equipment may be available at the time, and economic factors, such as a closed-loop system becoming cost-prohibitive. The type of drilling system would be determined when the drilling application is submitted to the BLM.

In drilling with a reserve pit system, a small amount of fluid is retained in the cuttings, which are placed in the reserve pit. The reserve pit would also hold freshwater or recycled water used in drilling and any excess drilling mud; the reserve pit would not be used to store flowback water during the completion phase nor to store produced water during the production phase.

Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe). Drilling mud would flow through a series of equipment and tanks in order to recondition

BLM_0026812

it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit. Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules then transported to a permitted disposal/waste management facility.

Each reserve pit would be constructed with an impermeable liner so as to prevent releases. Reserve pit fences would be constructed and maintained according to the BLM requirements, including using fencing and netting to prevent harm to wildlife. Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules.

A closed-loop system is defined simply as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids. Equipment such as screen shakers, hydrocyclones, or centrifuges to separate solids and collection equipment, such as vacuum trucks, minimize the amount of drilling waste muds and cuttings that require disposal and maximize the amount of drilling fluid recycled and reused in the drilling process.

The recovered drilling fluid can be stored in 500-barrel tanks and reused in active mud systems; consequently, drilling fluid is moved from well to well and is reconditioned by the dewatering equipment and mud products. The solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

Following well pad and access road construction, a tier-2 or tier-3 type drilling rig would be transported to the well pad, along with other necessary equipment; SGI would determine which rig is finally chosen at the APD stage, depending on availability or BLM COAs. A conventional drilling rig used for vertical wellbores would require construction, as described above in the well pad construction section. The rig would operate 24 hours a day. If the well were proposed as a directional wellbore (e.g., horizontal or s-shaped), then directional drilling equipment would be used and would operate 24 hours a day. Additional equipment and materials needed for directional drilling operations would be trucked to the well site.

Drilling would begin by digging a circular pit, called a cellar, and lining the pit with metal, where the wellbore would be drilled. The cellar would provide space for the casing head spools and blowout preventers that would be installed under the rig. Drilling operations normally include the following:

- Keeping a sharp bit on the bottom drilling as efficiently as possible

- Adding a new joint of pipe as the hole deepens

- Tripping the drill string out of the hole to put on a new bit as needed and running it back to the bottom

- Installing steel casing and cementing it in the hole

BLM_0026813

Drilling fluids are used to aid the drilling of boreholes regardless of the type of well being drilled. The main functions of drilling fluids are as follows:

- To provide hydrostatic pressure to prevent formation fluids from entering the wellbore

- To keep the drill bit cool and clean during drilling

- To carry out drill cuttings (i.e., pulverized rock generated from drilling)

- To suspend the cuttings while drilling is paused and when the drilling assembly is brought in and out of the hole

Drilling fluid is a mixture of either water or an oil-based product, such as mineral oil, and mud. For Alternative B, SGI would use both water-based and oil-based drilling fluids, depending on the target formations. Specifics on which type of drilling fluid used would be included on the individual APD.

A water-based drilling fluid uses freshwater or recycled water[3] or a combination of both mixed with the mud; SGI would use a freshwater mud system. Up to approximately 3,000 barrels of water would be used for drilling a particular well. For Alternative B, that would result in up to 438,000 barrels of water for drilling (up to 3,000 barrels per well multiplied by up to 146 new wells drilled). In production level formations, where borehole stability requires it or for directionally drilled wells, an oil-based drilling fluid, made from products such as mineral oil, may be used. The mud portion of a drilling fluid is composed of clays, minerals, and additives, such as bentonite, barite, soda ash, lime, polymer, lignite, and lost circulation material.

The drilling fluid used for a particular job is selected to avoid formation damage and to limit corrosion. For example, where borehole stability requires it, a mud typically consisting of potassium chloride substitute and commercial clay stabilizer (such as di-ammonium phosphate) would be used to drill the production hole section. This mud formulation inhibits potentially reactive shales to prevent shale swelling and hole sloughing. Drilling fluids and mud additives would be recirculated during drilling and could be transported to another drilling location for reuse or treated and removed from the location.

Casing and cementing plans are designed by engineers and are included in an APD and associated drilling plan. The casing and cementing program would be conducted as approved to protect and isolate all usable water zones, potentially productive zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Placement of steel casing would entail the connection and insertion of continuous sections of steel pipe into the drill hole. The casing would extend from the bottom of the hole to the surface, except when a drilling or production liner is used. Casing would be set in the hole, one joint at a time, threading one piece into a collar on the next. The wells would be lined with conductor casing to a depth of

---

[3] Recycled water has been used in other phases of the well development process. It could be water that has been removed from drilling mud, water used during completion that flows back after the well has been pressured and fractured, or water that has been produced as a by-product of gas production (known as produced water).

BLM_0026814

at least 80 feet, with surface casing to at least 400 feet, with intermediate casing to approximately 3,000 to 5,500 feet, then with production casing to the target well depth. Casing programs are dependent on the target depth and individual well casing plan.

The casing would be cemented into place in stages by pumping a slurry of dry cement and water into the casing head, down through the casing string to the bottom of a string stage, and then up through the spacing between the casing and the wellbore (annulus), back up to the surface, except when a production string is used. Surface casing cement is calculated to return to the surface (100 percent excess volume). After the cement is pumped into the casing, a 1-inch-diameter pipe is run on the outside of the casing and approximately 50 sacks of cement are used to top off the annulus. If the cement does not circulate back to the surface, a temperature log is run to find the top of cement. At this point, corrective measures are taken, if necessary.

A plug would be pushed to the bottom of the wellbore to remove any residual cement from the inside walls of the casing. If adequate cement coverage and quality were not attained, remedial actions would be taken, based on site-specific situations. Calculated volumes of cement would be pumped into the annulus to fill the space, where it would be allowed to harden. A cement bond log would be run on the wellbore to ensure that no voids remain in the annulus. Cementing the annulus around the casing pipe accomplishes the following:

- Restores the original formation isolation by posing a barrier to the vertical migration of fluids or gasses between rock formations in the annulus of the borehole

- Protects the well by preventing formation pressures from damaging the casing

- Retards corrosion by minimizing contact between the casing and naturally occurring corrosive formation fluids

Each well may have multiple strings, and each string is cemented independently.

All drilling operations and other well site activities would be conducted in compliance with BLM rules and regulations. Pressure tests are required before drilling out from under all casing strings set and cemented in place. Blowout preventer controls must be installed before drilling out the surface shoe and before starting workover or completion operations. Blowout preventers would be inspected and tested at regular intervals to ensure good mechanical working order.

Site-specific descriptions of drilling procedures would be included in each APD submitted to the BLM for each proposed well.

Drilling activities on individual wells would typically occur 24 hours a day, 7 days a week, and would require approximately 16 workers.

Coal bed methane natural gas wells would typically be drilled vertically, but some would be drilled directionally, including horizontally, depending on the specific needs at that location. These are dictated by terrain in the surrounding areas, distance to the Unit boundary, and other site-specific factors. There could also be multiple wells on one well pad. Development of coal

BLM_0026815

bed methane natural gas wells on new well pads, including construction, drilling, stimulation, and completion, would require an average of 60 days.

Shale and sandstone gas wells could be drilled vertically or directionally or with multiple horizontal wells from a single pad, where feasible, to minimize the number of well pads required to drain the resource. Directionally drilled wells, both shallow and deep, could take approximately 46 to 60 days per well to drill. Development of shale gas wells on new well pads would require an average of 85 days.

In accordance with the WHP, SGI would manage pits necessary for production activities to minimize the likelihood of wildlife mortalities. SGI would install wildlife fencing around pits and netting over open pits to exclude birds, bats, and terrestrial wildlife. For reserve pits, the netting would be applied within 24 hours after drilling has begun. The netting would be retained and maintained for as long as there are liquids in the reserve pit, but it may be removed once the pits are dried. For dry pits, SGI would provide escape ramps or other means to allow terrestrial wildlife to escape from open pits. SGI may implement closed-loop pitless drilling systems at its discretion to avoid the need to fence and net reserve pits.

*Water Disposal Well Drilling*
For Alternative B, SGI proposes drilling up to four new water disposal wells.

For each water disposal well, a 24-inch-diameter hole would be drilled for the first 40 feet and then gradually reduced with decreasing diameters of casing strings until the hole reaches its target depth, estimated at 10,000 feet. Once the casing strings are set and the outside annulus is cemented in place for each string of casing, the wells would be completed (see *Water Disposal Well Completion* below).

Tubing with a diameter of 2.875 to 3.5 inches would be run down the casing to the top of the target disposal zones. The tubing would be landed in a set packer approximately 100 feet above the uppermost completed injection zone. A packer set has rubberized rings, which when activated seal off the bottom of the casing, preventing disposal waters from migrating up the insides of the casing. Above the packer set, the annulus between the tubing and inner casing walls would be filled with packer fluid. Pressure would be monitored at the surface to detect any loss of packer fluid into surrounding formations and to detect migration of injected water upward into nontarget annulus zones, as well as to ensure tubing, packer, and casing integrity.

The disposal wells may be completed in the Entrada or Maroon Formations; the primary injection target zone is the Entrada Formation at 8,900 feet, with the Maroon Formation in the secondary injection zone at 9,000 to 9,500 feet. The maximum daily injection rate for the Maroon Formation is 4,000 barrels a day, while the maximum daily injection rate for the Entrada Formation is 2,000 barrels a day. If these formations are not usable, the Dakota and Morrison Formations may be evaluated. A water-based mud system would be used for drilling the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production hole sections of the water disposal well.

Drilling water disposal wells would require 60 to 120 days to complete. Up to 3,000 barrels of water would be used for drilling a particular water disposal well. For Alternative B, that would

BLM_0026816

result in up to 12,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to four new water disposal wells drilled).

Water disposal wells would be permitted by the BLM as APDs if the wells are on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the well prior to using the well for water disposal.

### Completion

#### Gas Well Completion

After well drilling and casing, a completion program would be initiated to stimulate production of natural gas and to determine gas and water production characteristics. A mobile completion rig (also called a workover rig) similar to the drill rig may be used to complete each well. The well completion process, lasting 8 to 10 days, includes perforating the well's steel casing and cement, hydraulically fracturing the producing formations, and installing a series of valves and fittings on the wellhead. Hydraulic fracturing does not always require the presence of a workover rig.

Wells are often treated during completion to improve resource recovery by increasing the rate and volume of hydrocarbons moving from the natural gas reservoir into the wellbore. These processes are known as well-stimulation treatments and include hydraulic fracturing, acidizing, and other mechanical and chemical treatments, often used in combination.

Hydraulic fracturing is a 60-year-old process used to maximize the extraction of underground resources by allowing natural gas to move more freely from the rock pores to production wells that bring the gas to the surface. Fluids, commonly made up of water and chemical additives (e.g., recycled or freshwater, liquid carbon dioxide, sand, and chemical additives), are pumped into a geologic formation at high pressure. When the pressure exceeds the rock strength, the fluids open or enlarge fractures. After the fractures are created, a propping agent is pumped in to keep them from closing when the pumping pressure is released. After fracturing is completed, approximately 60 to 80 percent of the injected fracturing fluid returns to the wellbore (EPA 2004). The specific type and components of the fracturing fluid chemical vary based on geologic formation and by company, but they may include constituents such as hydrochloric acid, anti-bacterial agents, corrosion inhibitors, and surfactants (BLM 2013a). In accordance with COGCC Order No. 1R-114, operators are required to disclose chemicals intentionally added to hydraulic fracturing fluids on FracFocus.

Hydraulic fracturing is now being used more commonly due to advances in technology. Groundwater is protected during the fracturing process by a combination of the casing and cement that is installed when the well is drilled and by the depth of the rock between fracture zone and any freshwater-bearing zones or aquifers (EPA 2004). Illustrations of the different wellbore requirements are in **Appendix E**, Master Drilling Plan. Additionally, specific casing information would be included on the drilling applications. The casing and cementing techniques described in the drilling plan would provide redundant protection of all usable aquifers above the target zones by cementing both the surface and intermediate casing strings from the base of pipe back to the surface.

BLM_0026817

Water used during completion operations would be recycled, freshwater, or a combination of both, and quantities used would vary in accordance with the formations the wells are completed in. Specifics for how much water each well type would require for completion is provided in **Appendix E**. As each well type requires vastly different volumes of water, calculations for estimated water use were based on assuming 50 percent CBNG wells and 50 percent shale wells, as discussed in the Bull Mountain EA. Calculations used the number of new wells per alternative and divided in half for each type of well (CBNG/shale). To estimate the volume of water use per well type, the number of wells was multiplied by the highest volume of water use for that well type. Water use totals were added to get a total maximum amount of water use. The results showed that there could be up to 18,132,000 barrels (or 1,759 acre-feet) of water used for well completions during the six-year development time frame. If fewer shale wells were drilled and completed, the water use estimate would be lower.

Test gas could be flared (released to the atmosphere), or environmentally friendly green completion technology may be used, and must meet additional federal requirements such as federal regulations and Onshore Orders. Recycled water could also be used for well completions when water conditions allow (see *Flowback Pits* discussion below). What makes the well completion "green" is that the gas is separated from the water and placed in a pipeline instead of being released to the atmosphere. Green completions take place during the flowback stage of the completion, during which natural gas is produced with the water. Green completion technologies capture the gas at the well head immediately after well completion instead of releasing it into the atmosphere or flaring it off, reducing volatile organic compound (VOC) emissions from wells. In green completions, gas and hydrocarbon liquids are physically separated from other fluids and delivered directly into equipment that holds or transports the hydrocarbons for productive use. There is no venting or flaring when green completion techniques are employed. (See COGCC regulation 800-4 for further details on green completion technologies.)

If a well is flared, the flares are designed to be directed straight upward and are on a pad to prevent damage to the environment or a safety hazard. If it becomes necessary to flare a well, a deflector or directional orifice would be designed and installed to safeguard both personnel and adjacent lands. The flowback involves removing the water that was used to stimulate the well.

Following the hydraulic fracturing of the well, a percentage of the fluid, consisting primarily of produced water, may be returned to the surface. This percentage of return varies between wells. Even though the produced water and gas can flow to the casing after it is perforated, a small-diameter pipe, called tubing, is placed in the well as a way for the produced water to be brought to the surface. Typically, the start of the tubing is placed below the perforated interval to allow any fluids collecting at the bottom of the well to be pumped up through the tubing to the surface. The tubing in the well is suspended from the wellhead, so as the well production flows up, the production from the well can be controlled by opening and closing valves on the wellhead. Excess produced water would be stored on the pad in containers, piped to the McIntyre Flowback Pits (see *Flowback Pits*, below), or sent to a water disposal well for reinjection.

Typical equipment and vehicles used during completion activities are as follows:

- Propane and carbon dioxide tanker trucks

BLM_0026818

- Hydraulic fracturing trucks

- Sand transport trucks and water trucks

- Oil service trucks used to transport pumps and equipment for hydraulic fracturing

- Flatbeds and gin trucks to move water tanks, rigs, tubing, and hydraulic fracturing chemicals

- Logging trucks (cased hole wireline trucks)

- Pickup trucks to haul personnel and miscellaneous small materials

Individual wells would be completed 24 hours a day, 7 days a week, and would require approximately 25 workers. Completion of an individual well would generally take approximately seven days, depending on conditions. Flow testing follows completion and takes 25 to 50 days. Only two workers are used 24 hours per day for testing.

*Flowback Pits*
At full build out, the four McIntyre Flowback Pits would be used for the Proposed Action.

In order to minimize water consumption for completion operations, SGI has constructed four pits on private surface lands to temporarily store a mixture of freshwater, produced water, and recycled water before and after completion operations, in accordance with the regulatory guidance and permitting of COGCC. Water estimates for hydraulic fracturing operations by well type are presented in **Appendix D**. The flowback pits would reduce the number of trucks transporting water, on-site storage of water on pads in hydraulic fracturing tanks, and subsequent removal of water between hydraulic fracturing operations. At this time the flowback pits are permitted as follows: two pits on Rock Creek Ranch (T11N R90W Section 24) immediately north of SGI's existing federal 11-90-24-2 water disposal well, and two additional pits on Rock Creek Ranch lands in T11N R90 Section 26. (See **Table 2-4**, McIntyre Flowback Pits, for further details on the pits.)

Fresh, production, and recycled water would be delivered to the McIntyre pits through surface polyethylene (HDPE, referred to here as poly) pipe and existing buried steel water pipelines for temporary storage prior to hydraulic fracturing operations. Temporary water pumps would draw water from the McIntyre pits into the temporary surface pipes and existing water pipelines, in order to reduce the number of trucks hauling fluid. Water would be mixed with sands and chemicals on a target pad site before being injected into a wellbore (see the *Drilling* and *Hazardous Material and Solid Waste* sections below for details on chemicals used).

SGI plans to temporarily lay down poly pipelines in order to transport the freshwater or recycled water used for completions from the McIntyre pits to storage tanks and then to the wellhead (see **Appendix M**, Poly Pipeline Operation Plan). Generally, the pipe strings would follow roads. The length of time the pipe is on the surface depends on where and when a well is to be completed; it is moved from one location to another when a new well is ready for completion. Temporary poly may be left in place for several months in some cases. Pipe diameter depends on the volume and

BLM_0026819

pressure of water needed for the completion. SGI anticipates that 12-inch internal diameter pipe would be the largest required, but the company could use an 8-inch- or 6-inch-diameter pipe if needed.

After hydraulic fracturing operations for a well are complete, used fluids would flow back out of a wellbore and would be filtered on the pad site, temporarily stored in tanks, and then trucked to a McIntyre flowback pit or pumped into an existing water pipeline or temporary surface poly pipe for delivery to a McIntyre flowback pit for temporary storage. These used fluids could then be reused for additional hydraulic fracturing operations during the same season if water condition allows. The highest total dissolved solids (TDS) anticipated in the water contained in the pits would be 60,000 to 70,000 parts per million (ppm), with an average TDS of 40,000 ppm in the pits. Produced water TDS in the field is approximately 15,000 ppm.

Construction of the McIntyre pits involved salvaging topsoil, excavating the pit itself, and compacting the pit interior. Pits have been engineered with a triple liner system that includes surface and groundwater sites and monitoring of the four groundwater monitoring wells, as required by the COGCC permits issued for the pits. There is a 1-foot berm surrounding the pit over which the liners are pulled and anchored on the opposite side. At least 2 feet of freeboard is maintained in the pits at all times. Netting is stretched over the pits to keep birds out. Additionally, year-round wildlife and silt fencing has been placed around the pits to prevent terrestrial wildlife from entering a full or empty pit.

*Water Disposal Well Completion*
The additional water disposal wells would also require completion. Similar to traditional wells, a workover rig would be used to complete a water disposal well. This process includes perforating the well's steel casing and may include hydraulic fracturing of the formation to improve its ability to accept injected water. This supplemental hydraulic fracturing could also recur later in the life of the well. Drilling and hydraulic fracturing would follow standard industry and regulatory procedures and would be permitted as under producing wells, with the additional process of converting it to a disposal well. Multiple disposal zones would be perforated in order to allow produced water to flow into any of the available receiving formations and to allow for redundancy in receiving formations.

**Interim Reclamation**
The goal of interim reclamation is to maintain soil productivity during the production phase. If the wells on a pad are not productive, the pad would be abandoned and reclaimed, in accordance with BLM and landowner requirements stipulated in the permit for the well and according to the reclamation portion of the surface-use plan submitted with the APD. Reclamation areas would include fill slopes, trenches, wing ditches, edges of disturbance, temporary-use areas no longer needed, and embankments. Reclamation would involve recontouring the well pad to blend with the natural topography, evenly redistributing segregated topsoil, seeding, and monitoring to ensure revegetation is successful. Reclamation would continue until all related requirements were met. Removal or burial of any surfacing material used to complete the well pad would be according to the BLM's standards.

Upon well completion, the well location and surrounding area would be cleared of all unused tubing, materials, trash, and debris. SGI would perform interim reclamation on as much of the

BLM_0026820

disturbed area as practicable after drilling and conducting subsequent operations. This process entails returning areas not needed for production operations or for subsequent drilling operations to near-original condition or to the land use designated by the surface landowner. SGI would minimize dust and erosion during the interim reclamation process. It would initiate interim reclamation within three months for projects on croplands and within six months for projects on non-crop lands after finishing drilling and subsequent operations, unless an exception were granted. Areas needed for production and subsequent drilling operations (those planned within 12 months) would be stabilized to minimize fugitive dust and erosion. Stockpiled topsoil and remnant vegetation (e.g., uprooted sagebrush and oak brush) would be spread over interim reclamation areas.

Following well completion, portions of the well pad not needed for production would be reseeded and reclaimed. On private surface, the landowner has the choice to use a BLM-approved seed mix or their own, as outlined in the agreement with SGI. SGI will use a CPW-recommended, wildlife-friendly seed mix for interim and final reclamation where approved by the surface owner. The CPW-recommended seed mixes for the BMU are found in Appendix A of the Wildlife Habitat Plan (**Appendix C**; see also **Appendix D** for reclamation details). Any remaining stockpiled topsoil not needed for final interim reclamation would also be stabilized and reseeded. Prior to reseeding, all reclaimed areas would be scarified and left with as rough and uneven a surface as is practicable.

If a reserve pit is used, it would be cleaned out and the liner would be removed and properly disposed of. The pit would be backfilled and reclaimed within six months from the date of well completion, weather permitting. Before any work associated with reserve pit restoration, the reserve pits would be as dry as possible. Cuttings within the pit would be sampled and laboratory tested according to COGCC 900 Series Rules. Results of cuttings pit testing on federal well sites would be made available to the COGCC. Cuttings would then be trucked to an approved and permitted disposal facility (depending on the concentrations of potential soil contaminants listed in COGCC Table 910-1 and analyzed by an EPA-approved laboratory); fencing surrounding the pits would also be removed.

Well pads would be reduced in size to an estimated average of 2 acres after interim reclamation is complete. However, the number of wells and associated production equipment needs on each pad would primarily dictate the size of an individual production pad.

Revegetation would be considered satisfactory when soil erosion resulting from the operation has been stabilized and a vegetation cover equal to 70 percent of preexisting or seeded-in vegetation has been reestablished (both cover and diversity of species), as evidenced by pre- and post-construction photo monitoring and vegetation plots and transects. SGI would monitor interim and final reclamation progress at intervals of one, three, and five years. Reseeding would be required if satisfactory interim reclamation progress is not being made at year two or year three, or if final reclamation is not achieved by year five.

Interim reclamation would also include repairing range management facilities and improvements that had been altered by project-related activities, such as the installation of cattle guards where new access roads cross fences.

BLM_0026821

***Production and Maintenance***

*Production*

Regardless of the alternative selected, the actual location of facilities would be determined during the APD stage. All site security guidelines (Onshore Order #3) would be followed as identified in the BLM's statutes, regulations, and policy.

If a well were determined to be commercially productive, production facilities would be installed on the well pad. Typically, up to eight 200- to 400-barrel storage tanks would be installed per well for produced water and one storage tank for condensate (if needed). The produced water would be piped or trucked to the McIntyre pits, storage tanks, or water disposal wells (described below in the *Produced Water Management* section). Condensate, if produced, would be transferred to trucks as necessary and transported for sale or to an approved disposal site. Typically, a heated three-phase separator, rated at 0.125 mmBtu/day, would be necessary to separate fluids associated with each wellbore. Protective barriers would be installed around the production facilities, including the tanks. Regardless of the alternative selected, the appropriate location of facilities would be determined during the APD process.

Dehydration facilities to separate water from natural gas would be centralized at compression facilities.

Where applicable, wells would be fitted with cavity pumps that would require generators to power them. Currently, there is one 188-horsepower generator to run two cavity pumps, but smaller, more efficient turbine generators could also be used. These pump and generator systems could be used on any type of well, whether coal bed methane natural gas or shale, if needed. The prime mover for pump jacks would be 50-horsepower or smaller natural gas-fired internal combustion engines.

All site security guidelines would be followed as identified in the authorizing agency's statutes, regulations, and policy.

As noted in the WHP and in addition to the daily site inspections at each well pad location, SGI would remotely monitor specific aspects of well production. This remote monitoring is proposed as a way to provide monitoring between the daily site inspections by SGI personnel. Additionally, this proposed remote monitoring would be conducted at all fee and federal well pad locations, as proposed in SGI's Proposed Action and Alternatives A and B. SGI would monitor the following aspects of well production using remote telemetry:

- Tubing pressure

- Casing pressure

- Gathering system line pressure

- Wellhead differential pressure

- Wellhead gas temperature

BLM_0026822

- Wellhead gas rate

- Production tank level alarms

SGI would implement this proposed remote monitoring under the following time limits:

- Wells existing in the BMU on the effective date of the WHP would be retrofitted to comply with the seven monitored aspects of well production listed above within 24 months of the effective date of the WHP.

- Wells not yet existing in the BMU on the effective date of the WHP would comply with the seven monitored aspects of the well production listed above within six months of such a well being placed in production.

*Surface Facilities*

Surface facilities installation and regulatory requirements would be in accordance with BLM standards, policies, and regulations.

Installed surface facilities for each gas well would include the wellhead and may include artificial lifts, separators, water transfer, pumps, tank batteries, wellhead compression, and gas-metering facilities. If an artificial lift is used, the driver may be powered by natural gas. Facilities would occupy less than an acre on the site. Separated produced water from each well would be transported or pumped through in-ground water lines to an approved disposal well.

All long-term facility and permanent structures would be painted a flat, nonreflective standard environmental color, as specified by the BLM or private landowner. Facilities would be painted within six months of being on-site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations; that is, some parts of equipment would retain their safety coloration so they do not blend with the surroundings.

Surface facilities for water disposal wells would include the wellhead, water injection pump and housing, filter skid and gas filter skid, and approximately six to eight 400-barrel holding tanks and a 90-barrel facility drain tank. Water storage tanks would be heated during the winter to prevent ice formation in the tanks and lines. The injection pumps for the water disposal well would be powered by electricity supplied by overhead or buried electrical lines or by a natural gas engine. Facilities would occupy less than an acre on the well pad, which would be 1.4 acres following interim reclamation.

SGI would use a second existing storage yard of approximately 250 feet by 400 feet on SGI's property to store materials and equipment (T11S R90W Section 14).

*Compressor Stations*

Compression in the field may be necessary as wells come online. Under Alternative B, SGI proposes four new screw compressor stations (see **Figure 2-2**, Alternative B, Proposed Action). Three of the stations consist of one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest) would consist of three 3,550-horsepower engines housed in a larger muffled building.

BLM_0026823

The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

Emissions from natural the gas-fired compressor at the compressor facilities would typically be less than 2 grams per horsepower per hour of carbon monoxide (CO) and nitrous oxides ($NO_x$), and less than 1 gram per horsepower per hour of VOCs. The compressor would use hospital grade mufflers (an oil and gas industry standard) and would be housed in buildings or portable structures so as to abate noise from the compressor engine.

Up to 20 personnel may be involved in constructing all of the compressor stations, with an average of 5 personnel on a site at any one time.

*Produced Water Management*

Disposal of produced water would be in accordance with a plan approved by the BLM as provided for in Onshore Oil and Gas Order No. 7, Produced Ground Water.

Water to be injected into the water disposal wells would first be piped or delivered by truck into the holding tanks to allow sediments to settle. The water would then pass through a series of filters to remove solids larger than 10 microns in diameter. Accumulated solids from the settling and filtration process would be periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water would reduce mineral scaling or deposition in the receiving formation, which would otherwise shorten the life of the disposal zones. Chemicals used for treatment would likely include acids, which would keep any minerals in suspension, retard scaling, and act as a biocide. Disposal of produced water would be in accordance with a plan approved by the COGCC rules and regulations.

SGI estimates that between 500 and 3,000 barrels per day of produced water would be injected into the water disposal well. Produced water could also be trucked to an approved disposal site.

Water disposal wells would be drilled to nonproducing, unusable water-bearing formations capable of accepting water. These formations do not produce gas, contain no usable water, and are capable of accepting large quantities of injected water. In some cases, nonproducing gas wells may also be converted for water disposal use; if this were proposed, it would be detailed in the specific APD when it is submitted to the BLM. Water disposal facilities would include natural gas-fired internal combustion engines to drive injection pumps directly or a generator powering an electric motor.

Where applicable, each new facility would be tied in to a field-wide produced water gathering system for water disposal. This water gathering system, when used in conjunction with temporary surface poly lines, significantly reduces truck traffic and consolidates water handling facilities.

SGI estimates that between 500 and 3,000 barrels per day of produced water would be injected into each of the water disposal wells at full build-out of the Unit. In the interim, produced water would be reinjected into the existing water disposal well within the Unit or trucked to an approved disposal site.

*Workovers*

Periodic workovers would be required to correct downhole problems in a producing well, to maintain pumps, and to return the well to production. Workovers are undertaken as needed to increase or maintain production from downhole producing zones or to re-complete a well in a new zone.

A well would require a workover for any of the following reasons:

- Refracturing the producing formations using advanced techniques designed to stimulate additional production

- Cleaning out the wellbore and perforations to stimulate and facilitate production

- Re-completing in another potentially productive zone that was not originally completed at the time the well was drilled

- Repairing casing and other downhole equipment

A workover would generally require three to five workers for four days. Workover activities would typically be implemented during daylight only.

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit. The exact scheduling and particular wells selected for WO is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new federal wells per year in Alternative B the following estimates for workover operations may occur.

After completion of the drilling phase of Alternative B, annually, approximately 67 workovers are anticipated to occur upon the proposed 150 federal wells amongst 40 new pads. Based on the initial drilling schedule the workover rig and support crew could move between approximately 20 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should multiple workovers be scheduled to occur consecutively, the support crew would be travelling in and out of the Unit daily with up to four light trucks. Individual well workovers are anticipated to take approximately four days each resulting in up to 16 light truck round trips in and out of the Unit per individual workover. Also resulting in approximately 1,072 light truck round trips per year should all 67 workovers occur. It is also likely that if workover scheduling permits (i.e. minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

During the initial period of development of Alternative B (years one through six), SGI's WHP applies a timing restriction on workovers throughout the unit from Dec. 1 - April 15. However the Winter Closure Areas as identified in the WHP only include up to 84 wells amongst 21 well pads. If no commitments were made throughout the rest of the Unit, there would otherwise be no timing constraints applicable to workovers on the other proposed 66 wells amongst 19 (15 multi-well pads and four individual WDW) well pads located outside the Winter Closure Areas.

BLM_0026825

After full development of the Federal wells in Alternative B has occurred (150 wells), the timing restrictions on workovers from the WHP would no longer be applicable to the federal wells within the Winter Closure Areas.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well operations.

*Maintenance*

During the normal life of the wells, routine production and maintenance operations would be conducted throughout the year to ensure that equipment is functioning properly. A well operations technician (referred to in the industry as a pumper) visits well pads in a pickup truck to monitor various operating conditions, such as gas and water production rates, pipeline pressure, and separator pressure, to determine if abnormal conditions exist and to make or schedule necessary repairs. Well maintenance also would include monitoring the establishment of desirable vegetation, repairing any erosion, and controlling noxious or invasive weeds. Additionally, road maintenance would include dust abatement procedures, such as applying magnesium chloride. In the case of the water disposal wells, routine maintenance ensures that the well can continue to accept injections of produced water efficiently.

All project roads would require routine year-round maintenance to provide year-round access. SGI would be required to prepare and implement a road maintenance plan for all roads used for project-related purposes. Maintenance would include inspections, reduction of ruts and holes, maintenance to keep water off the road, replacement of surfacing materials, and clearing of sediment blocking ditches and culverts. Should snow removal be necessary, roads would be cleared with a motor grader or snowplow, and where possible snow would be stored along the downgradient side to prohibit runoff onto the road. Road maintenance agreements and requirements would vary depending on the owner of a given road in the Unit. SGI has committed to adhere to county road maintenance and encroachment ordinance requirements. Aggregate would be used as necessary to maintain a solid running surface and to minimize dust generation.

**Final Reclamation and Abandonment**

Development of a site-specific reclamation plan, based on information provided in **Appendix D** would include consultation between the BLM, the surface owner, and SGI. Site-specific reclamation plans would be submitted to the BLM.

Wells would be plugged in compliance with all BLM standards and all federal regulations. All surface equipment would be removed. Removal or burial of surfacing material would comply with the authorizing agency's standards. Wells would be plugged in compliance with all BLM standards and all federal regulations.

Revegetation would be considered satisfactory when soil erosion resulting from the operation has been stabilized and a vegetation cover equal to 70 percent (both cover and diversity of species) of pre-existing or seeded-in vegetation is reestablished, as evidenced by pre- and post-construction photo monitoring and vegetation plots and transects. SGI would monitor interim

BLM_0026826

and final reclamation progress at intervals of one, two, and three years. Reseeding would be required if satisfactory interim reclamation progress is not being made at year two or year three monitoring intervals, or if final reclamation is not achieved by year five.

### Water Use and Sources
Specific volumes of water usage needed for any given phase of development are presented within that phase description.

Over the life of the project, an estimated 30 percent of project water would be obtained from freshwater sources. The remaining 70 percent could be supplied by various sources and may include recycled or produced water (see **Appendices D** and **E**).

Water is needed for a variety of activities associated with development of the Unit, including dust abatement on roads, moistening of soils and gravels for compaction of well pad surfaces, production of drilling muds (to help lubricate the bore hole and circulate drill-bit cuttings), cementing the casing, and hydraulic fracturing and well stimulation. Water is also sometimes used to hydraulically test pipeline integrity (see *Pressure Testing* under *Pipe Installation*). Water for drilling and cementing would be pumped to the well site and stored for operations or would be trucked in. After use, the water for drilling and completion must be injected into a disposal well, hauled off-site to an approved disposal facility, or stored for reuse in the flowback pits. SGI plans to reuse water where possible. Flowback fluids to be used during the same drilling season may be stored in the McIntyre flowback pits (see above).

Use of surface water would be contingent on the proper authorizations and permissions by the State of Colorado and water rights holders (see **Appendix L**). Specific water withdrawal points would be identified in each future drilling application. However, SGI has not yet identified specific water withdrawal points; thus, for the purposes of analysis and Section 7 Consultation, the assumption is that the entire depletion associated with this project would be a new depletion from the Colorado River and thus would be subject to recovery fees.

Water from all of these sources would be distributed by truck, buried pipeline, or surface poly pipe to the point of use. Produced water and water from drilling and completion of other wells would be reused to the maximum extent practical, estimated at 70 percent of total water needs.

Freshwater for dust abatement would be applied to roads more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater per mile may be used each day to control fugitive dust during dry months (for example in a typical June). Approximately 2,000 to 5,000 gallons per mile of freshwater may be used to control fugitive dust during wet months (for example during a typical August). If dust palliatives were used, the County would determine which ones would be best suited to the situation on county roads. Options include magnesium chloride and potassium chloride.

### Hazardous Materials and Solid Waste
Natural gas development employs a variety of chemicals, including solvents, lubricants, paints, and additives. A list of chemicals used during drilling, completion, and production is in **Appendix G**, Hazardous Materials Management Summary. The listing identifies the chemical, its common application, and potentially hazardous components.

BLM_0026827

Drilling by-products produced include solid pieces of waste rock combined with fluids and lubricants used to maintain smooth drilling operations; the by-products are produced by the drill bit cutting through the various formations, at intervals beginning 3 to 4 feet from the surface and ending at the bottom of the hole. After drilling is complete, the reserve pit would be closed according to the appropriate regulatory requirements (see *Pit Closure* below).

Emptied steel and plastic drums for such materials as caustic soda, citric acid, lubricating oil, methanol, and drilling additives would require disposal. Empty metal or plastic drums would be returned to the supplier of the product. Any waste lubricating oil would be disposed of properly by a third-party contractor.

SGI has prepared and implemented an integrated spill prevention, control, and countermeasures plan and emergency response plan for containment and control of oil and chemicals used in the Unit, as well as fire prevention and protection and emergency reporting. Procedures outlined in the plans are applicable to all SGI personnel and contractors. In accordance with the plans, SGI personnel are trained to conduct routine inspections of the containment areas and to promptly contain and clean up any accidental spills. SGI can provide its plans on request to the BLM at its Montrose office.

Chemicals on the EPA's Consolidated List of Chemicals Subject to Reporting Under Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III) may be used or stored in quantities over reportable quantities. In the course of drilling, SGI could store and use diesel fuel, sand (silica), hydrochloric acid, and $CO_2$ gas, all described as hazardous substances in 40 CFR, Part 302, Section 302.4. In addition, natural gas condensate and crude oil, described as hazardous substances in 40 CFR, Part 302, Section 302.4, may be stored or used in reportable quantities. During production operations, tri-ethylene glycol, ethylene glycol mix (50 percent), and methanol, all described as hazardous substances in 40 CFR, Part 302, Section 302.4, may be stored or used on-site. Small quantities of retail products (paint, solvents [e.g., WD-40], and lubrication oil) containing volumes of hazardous substances that do not need to be reported may be stored and used on-site at any time. No extremely hazardous substances, as defined in 40 CFR, Part 355, would be used, produced, stored, transported, or disposed of under any of the alternatives. Hazardous substances would be reported as required by Title III and COGCC chemical inventory programs.

Any surface spills or releases of oil, condensate, produced or flowback water, drilling fluids, or other potentially harmful substances would be contained and immediately removed according to SGI's spill plan. The spilled or released fluids, along with any contaminated soils, would be disposed of at an approved disposal site.

Tanks containing hazardous materials, including drilling fluids or muds, completion fluids, fuels, lubricants, produced liquid hydrocarbons, condensates, and produced water, would be surrounded by a secondary containment berm of sufficient capacity to contain the entire capacity of the largest single container and sufficient freeboard to contain precipitation, as required in the authorizing agency's standards. For instance, the EPA requires containment of 150 percent of the volume of the largest container. All loading lines and valves would be placed inside the berm surrounding the tank, or catchment basins would be used to contain spills. The tanks would be emptied as necessary, and the liquids would be trucked to market.

BLM_0026828

Portable toilets and bear-resistant trash containers would be located on active construction sites. A commercial supplier would install and maintain portable toilets and equipment and would be responsible for removing sanitary waste. Toilet holding tanks would be regularly pumped and their contents disposed of at approved sewage disposal facilities in Delta, Montrose, Garfield, or Gunnison Counties, in accordance with applicable rules and regulations. Accumulated trash and nonflammable waste would be hauled to an approved landfill once a week or as often as necessary. All debris and waste materials not contained in the trash containers would be cleaned up, removed from the construction ROW or well pad, and disposed of at an approved landfill. Trash would be cleaned up every day.

Sanitary waste equipment and trash bins would be removed from the Unit upon completion of access road or pipeline construction, following drilling and completion operations at an individual well pad, or as required.

*Access and Traffic*
Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative B are presented below in **Table 2-7**, Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities, based on 36 new well pads.

**Table 2-7**
**Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 5,760 |
| Semi-trailer trucks | 37,000 | 144 |
| Pickup trucks | 6,000 | 1440 |
| Motor grader on semi-trailer | 40,000 | 36 |
| Dozer (2) on semi-trailer | 19,000 | 72 |
| Track hoe on semi-trailer | 43,000 | 36 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 72 |
| Bulldozer on lowboy trailer with truck | 120,000 | 72 |
| 80-barrel water trucks for dust control | 54,000 loaded | 720 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 72-144 |
| Track hoe on lowboy trailer with truck | 91,000 | 72 |
| Welding trucks | 9,500 | 72 |
| Crew-cab pickups | 5,200 | 1,440 |
| Bending machine/trailer | 48,000 | 72 |
| Side booms on lowboy trailer with truck | 63,000 | 72 |
| X-ray truck | 5,200 | 144 |
| Testing truck | 6,000 | 72 |
| Pipe trucks | 120,000 loaded 36,000 unloaded | 36 |
| Utility tractor and truck with lowboy trailer | 40,000 | 72 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 36 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 900 |

BLM_0026829

**Table 2-7**
**Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Rig-up trucks empty | 36,500 | 144-216 |
| 80-barrel water trucks loaded | 54,000 | 1,440 |
| 80-barrel water trucks empty | 25,000 | 1,440 |
| Crew-cab pickups | 6,000 | 1,440 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 72 |
| Drilling/completion rig | 120,000 | 72 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 900 |
| Rig-up trucks empty | 36,500 | 144-216 |
| 80-barrel water trucks loaded | 54,000 | 1,620 |
| 80-barrel water trucks empty | 25,000 | 1,620 |
| Crew-cab pickups | 6,000 | 1,440 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 1,072 |
| Workover rig (rig roundtrips per year) | 120,000 | 67 |
| Haul trucks | 120,000 | 216 |

Typical pumper traffic would be pickup trucks estimated to have an average vehicle weight of 6,000 to 10,000 pounds for approximately one round trip per well per day; typical water disposal well traffic would be approximately two round trips per well per day. Typical water truck traffic for dust suppression activities is estimated at two round trips per well per day.

Workover traffic is difficult to predict because there is no schedule for when equipment will breakdown, nor can downhole problems be reliably predicted. The field's general age also plays a factor in how many workovers may occur in a given year or on a given well. Younger wells tend to have fewer issues than older wells; as equipment and facilities age, the trend is for more repairs and replacement. Additionally, the Bull Mountain Unit is still in the exploratory phase, so factors that would contribute to predicting when a well may need maintenance are unknown, such as type of downhole environment. Only with time and experience will a routine schedule of workovers be determined.

*Surface Disturbance*

Alternative B would construct up to 36 new well pads to develop federal mineral estate that would result in approximately 180 acres of short-term disturbance and 72 acres of long-term disturbance, and would require 16 miles of new road construction and 53 miles of improvements to existing roads for access (totaling 243 acres of short-term disturbance and 129 acres of long-term disturbance).[4] SGI also proposes 21 miles of new pipelines that would total 206 acres short-term disturbance and 25 acres long-term disturbance (cross-country pipelines would be fully

---

[4] Calculations of possible disturbance areas are based on the assumptions presented in **Section 2.2.5**, Elements Common to All Alternatives, and **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates.

BLM_0026830

reclaimed resulting in zero acres of long-term disturbance[5]). Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreages for areas of disturbance are shown in **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, which includes both short-term (immediate construction) and long-term (interim reclamation) disturbance amounts.

Following well completions, portions of the federal well pad not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 36 new well pads would be reduced to 72 acres following successful interim reclamation.

### 2.2.8   Alternative C, Modified Action

Alternative C was developed by modifying the GIS model to minimize surface disturbance by putting greater emphasis on soil types and collocating roads and pipelines, which in turn would reduce the miles of road and pipeline needed to service the pad sites (see **Appendix A** for additional details). Like Alternative B, this alternative is specific to BLM-administered mineral and surface estate, the BLM's authority, and the actions they would approve under a MDP. If Alternative C were approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

Alternative C provides additional features and changes to actions in order to consider options for addressing the impacts of gas development on wildlife populations, vegetation resources, water quality, air quality, and soil resources. In order to highlight the substantive differences in Alternative C, the modified actions are described in detail; actions that are the same as those described in Alternative B are noted as such and the reader is referred back to the previous discussion.

As noted in **Section 1.8**, Key Issues Addressed in the EIS, wildlife and habitat impacts are an issue to be addressed in the EIS. Federal minerals within the Unit are generally subject to a winter seasonal timing limitation (December 1 to April 30) to protect crucial deer and elk winter ranges from development activities (e.g., construction and drilling). Therefore, Alternative C includes the option to use seasonal winter timing limitations or a progressive development approach. SGI's desire to conduct winter construction and drilling activities over federal minerals could be accommodated while minimizing impacts on wintering big game through winter timing limitations within the Negotiated Reduced Winter Activity Areas identified in **Figure 2-6**, Alternative C, Constraints.

Impacts on big game could be mitigated by creating a progressive movement of winter construction and drilling activities. SGI would voluntarily confine drilling and construction activities over private and federal minerals to no more than one-quarter of the Unit in any given winter period (December 1 to April 30). The portion or area of the Unit where winter activity may occur would be mutually negotiated annually between SGI, the BLM, and CPW no later than August 1. Under this scenario, the BLM would consider exceptions to winter seasonal timing limitations within the agreed-upon area to allow ongoing winter drilling activity.

---

[5] While the assumption is for pipeline rights-of-way to be fully reclaimed, they may not be returned to pre-construction productivity because the proposed seed mixes do not include forbs or shrubs.

BLM_0026831

If Alternative C is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

All actions described below, including those that occur on split-estate lands, would be in compliance with all laws, regulations, and BLM policies, including BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), the BLM Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Design features, mitigation measures, and the COAs listed in **Appendix C** would apply (see **Table 2-11**, Stipulations, Design Features, and Mitigation Measures). In addition, several strategy and planning documents would apply, including the Hazardous Materials Management Summary (**Appendix G**), Noxious Weed Management Plan (**Appendix I**), Bainard Augmentation Plan (**Appendix L**), and Poly Pipeline Operations Plan (**Appendix M**). The Master Surface Use Plan of Operations and a Master Drilling Plan (see **Appendices D** and **E**, respectively) would also apply, and a revised version of the plans specific to a development must be submitted with an APD.

*New Developments*
The techniques and methodologies described for construction, drilling, completion, reclamation, production, maintenance, water uses and sources, and other elements in **Section 2.2.5**, Elements Common to All Alternatives, are applicable to Alternative C. The information provided below is unique to Alternative C, Modified Action.

As noted above, Alternative C modified the weighting factors in the site selection model to minimize surface disturbance by putting greater emphasis on soil types and collocating roads and pipelines, resulting in moving many of the well pad locations as illustrated on **Figure 2-5**, Alternative C, Modified Action. Additionally, well pads and roads would avoid identified elk winter concentration areas as illustrated on **Figure 2-6**, Alternative C, Constraints, unless avoiding such habitats would equate to greater net surface disturbance or is determined to be a detriment to other resource values.

With these constraints, SGI would construct up to 35 new well pads to develop Federal mineral estate, up to 146 new natural gas wells and up to 4 new water disposal wells. The average number of wells per pad would be the same as described above in **Section 2.2.4**, Elements Common to All Alternatives. Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad is not known at this time and would also be determined at the APD stage. Additionally, at the APD stage, the exact locations of well pads would be sited in ecological sites within the 40-acre analysis areas best suited to achieve maximum reclamation success. Under Alternative C, new water disposal wells would be sited on existing pads.

Additionally, it is estimated that approximately 12 miles of new road construction and 13 miles of improvements to existing roads for access, 19 miles of new pipeline construction collocated with roads, and up to 4 new compressor stations would be constructed.

BLM_0026832

2. Alternatives



Alternative C is specific to BLM-administered federal mineral estate and surface and development would occur under a Master Development Plan. Alternative C provides additional design features including siting to avoid identified elk winter concentration areas and includes a voluntary winter timing limitation within the Negotiated Reduced Winter Activity Areas.

Source: SG Interests GIS 2013, BLM GIS 2014, CPW 2012, Petterson 2012

**Alternative C, Modified Action**

Proposed well pad analysis area

Proposed well pad analysis area- must site pad outside areas of overlapping identified elk winter concentration areas

Proposed screw compressor

Proposed pipeline (co-located with roads)

Proposed new road construction

Existing road requires upgrade for use

Area eliminated from consideration for proposed pad (identified elk winter concentration area)

Existing Infrastructure

Existing storage yard

Existing pipeline

Existing road currently suitable for use

**Alternative C, Modified Action**

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Figure 2-5

BLM_0026833

2. Alternatives



**Alternative C, Constraints**



Negotiated Reduced
Winter Activity Area

Area eliminated from
consideration for
proposed pad
(identified elk winter
concentration area)

Federal surface,
federal minerals

Private surface,
federal minerals

Private surface,
private minerals

Figure 2-6

BLM_0026834

Based on these numbers, and the assumed drilling rate noted in the common assumptions, it is estimated that drilling activities would occur for approximately 6 years.

***Construction***

Pre-construction nesting surveys for migratory birds, including raptors, would be conducted prior to any surface disturbing construction activities scheduled between April 15 and July 15 each year to identify active migratory bird nest sites. Active nests would be avoided during construction activities using applicable species-specific CPW construction buffers to avoid disruption of migratory bird breeding activities. Stream crossing in active streams would be conducted outside the spawning season identified by CPW for applicable aquatic species.

*Access Road Construction*

As under Alternative B, the primary access roads would be State Highway 133 and County Road 265, and new road construction and improvements would only occur on an as-needed basis to facilitate access to well pads and other facilities. Site-specific plans for road construction and up-grades would be included as part of individual future APDs and would be subject to approval from the BLM (see **Appendix D**).

The new roads and improved existing road surfaces would be composed of an appropriate volume of road base compacted using a roller and freshwater as necessary. Approximately 6 to 8 inches of road base would be used in road construction and reconstruction. Road base or gravel would be hauled in and a grader would be used to smooth the running surface. Rock, road base, and gravel materials for all uses would be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado. Specifics on where the source materials would be obtained from would be identified on the individual APD when it is submitted. These roads would be upgraded and covered with gravel as necessary to maintain the post-construction surface quality.

*Well Pad Construction (Gas and Water Disposal Wells)*

As under Alternative B, prior to individual well pad construction, SGI would obtain approval of an APD by the BLM. Each APD would contain site-specific details related to well pad size, construction and well operations, and mitigation measures. Pit run and road base would both be trucked to the site from gravel pits near Carbondale, Delta, Paonia, or other local areas.

Under Alternative C, the BLM is including additional design features to address issues raised during scoping and public comments on the EA (see Appendix C). One such design feature requires SGI to use a closed loop drilling system, which would determine the size and construction needs of the well pad. Similar to Alternatives A and B, the quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time.

*Pipeline Construction*

No new cross country pipeline construction would be approved; the entire pipeline network would be required to be collocated with current and proposed road network development consistent with Gold Book recommendations unless deemed a detriment to resources. Where feasible, trunk lines shall be buried in the roadbed or within the borrow ditch to further reduce surface disturbance. No more than a 30-foot-wide disturbance route in addition to the average

BLM_0026835

16-foot road surface would be approved for collocated pipelines. All other construction methods would be the same as described in Alternative B.

*Overhead Electrical Line Construction for Water Disposal Wells*
Under Alternative C, up to four new water disposal wells that would require construction of four new electrical lines to supply power to the water disposal wellheads. Under Alternative C the new electrical lines would be buried adjacent to the roads to minimize overhead disturbance to wildlife resources. All other construction methods would be the same as described in Alternative B.

**Drilling**
Drilling operations would be conducted in compliance with all applicable and relevant state and federal regulations, and would be the same as described in Alternative B above except for the differences noted below. However, under Alternative C, only closed loop drilling systems would be approved for federal wells. The BLM would review industry standards and procedures (BMPs) at the time of application and consider operator input when determining feasibility. See **Appendix E** for additional information.

*Gas Well Drilling*
Gas well drilling could use any of the different wellbore directions, target formations, and drilling lubricants noted in Alternative B. Under Alternative C, the type of wellbore, target formation, and drilling lubricant would be specified in the APD when submitted to the BLM. More environmentally friendly additives (e.g., mineral oil) would be considered for use. Required use would be based on such factors as economic feasibility and availability. All drilling operations and other well site activities would be conducted in compliance with BLM laws, policies, and regulations.

Under Alternative C, a Tier-2 drilling rig engine or cleaner would be required; this determination would be made by SGI at the APD stage and subject to BLM stipulations and COAs. All descriptions relating to drilling rig time frames, equipment, and materials are the same as described under Alternative B.

Similar to Alternative B, approximately 3,000 barrels of water would be used for drilling in any particular well on average. For Alternative C, that would result in up to 438,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to 146 new gas wells drilled).

*Water Disposal Well Drilling*
As under Alternative B, SGI proposes drilling up to four new water disposal wells and the methods and technologies used for water disposal well drilling are the same as described there. As described under New Developments for Alternative C, new water disposal wells would be sited on existing pads.

Like Alternative B, the disposal wells may be completed in the Dakota, Morrison, Entrada, or Maroon Formations. A water-based mud system would be used for drilling of the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production

BLM_0026836

hole sections of the water disposal well. Water usage for each water disposal well would be the same as described in Alternative B.

Water disposal wells would be permitted by the BLM as APDs if the wells are on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the well prior to using the well for water disposal.

### *Completion*

#### *Gas Well Completion*
Gas well completions would largely be the same as described under Alternative B, including the water used during completion operations.

For Alternative C, SGI would be required to employ green completion technologies following EPA NSPS OOOO Regulations. Recycled water could also be used for well completions when water conditions allow (see *Flowback Pits* discussion below).

#### *Flowback Pits*
The four McIntyre Flowback Pits would be used for the Proposed Action in the same manner as described in Alternative B.

#### *Water Disposal Well Completion*
The methods, equipment and process used for water disposal well completions would be the same as described in Alternative B.

### *Interim Reclamation*
Following well completions, portions of the well pad not needed for production would be reseeded and reclaimed according to specifications of the approved Federal APD. Interim reclamation would be designed to develop a suitable plant community capable of competitively excluding invasive species while also providing for wildlife and livestock objectives and would include appropriate composition of grasses, forbs, and shrubs for the ecological site. Long-term well pad disturbance from the 35 new well pads would be reduced to 70 acres following successful interim reclamation (see **Appendix D**).

### *Production and Maintenance*

#### *Production*
Specifications and methodologies for production would be the same as described in Alternative B. Regardless of the alternative selected, the actual location of facilities would be determined during the APD stage. All site security guidelines as identified in the BLM's statutes, regulations, and policy would be followed.

#### *Surface Facilities*
How and where surface facilities would be installed are the same as described in Alternative B, although their installation and regulatory requirements would be in accordance with BLM standards, policies, and regulations, and the modifications unique to Alternative C as described below.

BLM_0026837

All permanent structures would be painted a flat, non-reflective standard environmental color as specified in the authorized Federal APD. Facilities would be painted within 6 months of being located on site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations (i.e., some parts of equipment would retain its safety coloration such that it does not blend with the surroundings).

Specifications for water disposal wells' surface facilities would be the same as described in Alternative B. Any long-term water disposal well structures would also be painted in accordance with the BLM's standards.

Centralized production facilities would be established outside of the Negotiated Reduced Winter Activity Areas shown in **Figure 2-6** to significantly reduce year round truck traffic to the individual wells located within these areas to enhance their utility as winter refugia for wildlife. Centralized production facilities would ideally be situated on existing pads down gradient and would serve to further maximize interim reclamation as the outlying pads would not necessarily need traditional production facilities. The centralized production facilities may result in larger pad sizes at centralized production facilities or the development of additional pads to accommodate such facilities. Successful implementation of the centralized production facilities concept could result in a substantial reduction in the number of annual truck miles driven within the Unit and result in corresponding reduced disturbance to wildlife.

Once a well is put into production, SGI would use remote telemetry or equivalent technology at all Unit wells and flowback pits to minimize well monitoring trips throughout the Unit, unless another proven method would create less environmental impact. Locked gates would be established at the access points for well pad roads that occur within the Negotiated Reduced Winter Activity Areas (see **Figure 2-6**) and only emergency related trips would occur within these areas from Dec. 1 - April 30 annually between the hours of 9 A.M. and 3 P.M. For Alternative C, emergency is defined as:

- Non-routine pipeline facility maintenance to remedy unanticipated production or safety problems, and

- Emergency workovers to remedy equipment failures, loss of well integrity, unanticipated rapid declines in production, or threats to life, property, or resources.

The BLM Authorized Officer would be promptly notified of any emergency work commencing. The minimal amount of seasonal road maintenance required to pump the well or conduct emergency activities would be conducted by SGI.

*Compressor Stations*
Compression in the field may be necessary as wells come online, and the four new compressor stations are the same as described under Alternative B (see **Figure 2-5**).

*Produced Water*
Methodologies for treating produced water would be the same as described in Alternative B; however, disposal of produced water would be in accordance with a plan approved by the BLM as provided for in Onshore Oil and Gas Order No. 7, Disposal of Produced Water.

BLM_0026838

SGI estimates that between 500 and 3,000 barrels per day of produced water from the coal bed methane natural gas wells would be injected into each of the water disposal wells at full build-out of the Unit. In the interim, produced water would be reinjected into the existing water disposal well within the Unit or trucked to an approved disposal site.

Water disposal wells would be drilled to non-producing, non-useable water bearing, formations capable of accepting water. These formations do not produce gas, contain no useable water, and are capable of accepting large quantities of injected water. In some cases, non-producing gas wells may also be converted for water disposal use; if this were proposed, it would be described in detail in the specific APD at the time of submission to the BLM. Water disposal facilities would include natural gas-fired internal combustion engines to drive injection pumps directly or via a generator powering an electric motor.

*Workover and Maintenance*

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit. The exact scheduling and particular wells selected for workover is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new federal wells per year in Alternative C the following estimates for workover operations may occur.

After completion of the drilling phase of Alternative C, annually, approximately 67 workovers are anticipated to occur upon the proposed 150 federal wells amongst 36 new well pads. Based on the initial drilling schedule the workover rig and support crew could move between approximately 18 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should multiple workovers be scheduled to occur consecutively, the support crew would be travelling in and out of the Unit daily with up to four light trucks. Individual well workovers are anticipated to take approximately four days each resulting in up to 16 light truck round trips in and out of the Unit per individual workover. Also resulting in approximately 1,072 light truck round trips per year should all 67 workovers occur. It is also assumed that if WO scheduling permits (e.g., minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

Workovers on wells which are proposed in areas identified within Negotiated Reduced Winter Activity Areas would be avoided (excepting emergencies) by such operations from Dec. 1 – April 30 annually for the life of the well. This results in avoidance (excepting emergency) of routine workovers on approximately 43 wells amongst 10 well pads for the productive life of the wells during these months.

Otherwise there are no timing constraints applicable to workovers on the remaining proposed 107 wells amongst 25 well pads located outside the Negotiated Reduced Winter Activity Areas.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well

BLM_0026839

operations. Additionally, all workover related traffic would be limited to travelling to and from location after 9 a.m. and before 3 p.m. SGI shall minimize trips between the hours of 9 a.m. and 3 p.m. as much as possible.

### Final Reclamation and Abandonment

Standards and methodologies would be generally the same as described in Alternative B. Development of a site-specific reclamation plan, based on information provided in **Appendix D** would include consultation between the BLM, the surface owner, and SGI. Site-specific reclamation plans would be submitted to the BLM. Wells would be plugged in compliance with all BLM standards and all federal regulations.

- All surface equipment would be removed

- Removal or burial of surfacing material would comply with the authorizing agency's standards

Wells would be plugged in compliance with all BLM standards and all federal regulations.

### Water Use and Sources

Specific volumes of water usage needed for any given phase of development are presented within that phase description. Otherwise, the rest of the water usage information is the same as presented in Alternative B.

### Hazardous Materials and Solid Waste

The hazardous materials actions for Alternative C are generally the same as those described under Alternative B.

### Access and Traffic

Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative C are presented below in **Table 2-8**, Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities, based on 35 new well pads.

**Table 2-8**
**Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 5,600 |
| Semi-trailer trucks | 37,000 | 140 |
| Pickup trucks | 6,000 | 1,400 |
| Motor grader on semi-trailer | 40,000 | 35 |
| Dozer (2) on semi-trailer | 19,000 | 70 |
| Track hoe on semi-trailer | 43,000 | 35 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 70 |
| Bulldozer on lowboy trailer with truck | 120,000 | 70 |

BLM_0026840

**Table 2-8**
**Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| 80-barrel water trucks for dust control | 54,000 loaded | 700 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 70-140 |
| Track hoe on lowboy trailer with truck | 91,000 | 70 |
| Welding trucks | 9,500 | 70 |
| Crew-cab pickups | 5,200 | 1,400 |
| Bending machine/trailer | 48,000 | 70 |
| Side booms on lowboy trailer with truck | 63,000 | 70 |
| X-ray truck | 5,200 | 140 |
| Testing truck | 6,000 | 70 |
| Pipe trucks | 120000 loaded 36000 unloaded | 35 |
| Utility tractor and truck with lowboy trailer | 40,000 | 70 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 35 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 875 |
| Rig-up trucks empty | 36,500 | 140-210 |
| 80-barrel water trucks loaded | 54,000 | 1,400 |
| 80-barrel water trucks empty | 25,000 | 1,400 |
| Crew-cab pickups | 6,000 | 1,400 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 70 |
| Drilling/completion rig | 120,000 | 70 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 875 |
| Rig-up trucks empty | 36,500 | 140-210 |
| 80-barrel water trucks loaded | 54,000 | 1,575 |
| 80-barrel water trucks empty | 25,000 | 1,575 |
| Crew-cab pickups | 6,000 | 1,400 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 1,072 |
| Workover rig (rig roundtrips per year) | 120,000 | 67 |
| Haul trucks | 120,000 | 210 |

Traffic estimates are the same as those described for Alternative B.

*Surface Disturbance*

Alternative C would construct up to 35 new well pads that would result in approximately 175 acres of short-term disturbance and 70 acres of long-term disturbance, and require 12 miles of new road construction and 13 miles of improvements to existing roads for access (totaling 91 acres of short-term disturbance and 48 acres of long-term disturbance). Under this alternative, there would also be 19 miles of new pipelines collocated with roads that would total 231 acres short-term disturbance and 37 acres long-term disturbance (there are no cross-country pipelines as part of this alternative). Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreage area of disturbance are shown in **Table 2-12**, Summary of

BLM_0026841

Surface Disturbance Acres by Alternative, which includes both short-term (immediate construction) and long-term (interim reclamation) disturbance amounts.

Following the cessation of disturbance operations necessary to facilitate drilling the first well on the pad, portions of the well pad and access road not needed for drilling would be reseeded and stabilized according to BLM specifications. Following well completions or the 6th year of development anticipated as the final season necessary for full build-out of this alternative, all portions of existing well pads not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 35 new well pads would be reduced to 70 acres following successful interim reclamation.

**Figure 2-5**, Alternative C, Modified Action, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

*Design Features*
Alternative C includes additional design features to address air quality, wildlife, and water issues:

- Air quality measures:

    o The BLM would place a COA on each permit, requiring SGI to apply continuous watering to keep the surface moist during access road and well-pad construction, and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining no visible dust plume operations.

    o The BLM would place a COA on each permit, requiring SGI to emit 5 tons per year (TPY) or less of NOx at each well pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 tons per year may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before it authorizes activities.

    o The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to use to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000-

BLM_0026842

horsepower[6] at any one time during the development phase could trigger the need for additional impacts analysis. It could also warrant a COA for Tier 3-4 engines. The goal of the requirement is for drilling-, completion-, and fracturing-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate could be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

o   The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx.[7] The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).

- SGI would be required to utilize and operate pneumatic devices, tanks and dehydrators in accordance with CDPHE and EPA Oil and Gas Regulations.

- SGI would have a yearly meeting with the BLM to present an annual construction and operational activities plan of operations prior to the construction season.

- With an annual agreement by SGI as part of the annual Operations Plan, SGI would present the order for development phasing around the Unit to avoid widespread impacts on wintering big game species during a winter period.

- SGI would provide an annual reclamation monitoring status report that would present reclamation status, maps of reclamation areas, and identifying appropriate native seed mixes and their proper application.

- SGI would conduct annual raptor nesting surveys in the Unit to ensure compliance with the Migratory Bird Treaty Act. The surveys would occur within 0.25 mile of surface disturbing activities from April 15 to July 15 or until young of the year have fledged Activities would be avoided around occupied nests from April 15 to July 15; exceptions would be discussed with the authorized officer on a case-by-case basis.

- SGI would ensure that water accumulation on pads is not allowed to drain into wetlands or riparian areas down-gradient from the Unit.

- SGI would control noxious weeds within the Unit, including on or within wells pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other

---

[6] This total horsepower was analyzed for the EIS-specific $NO_2$ 1-hour impacts analysis.
[7] The annual NOx emissions level limit required to provide project-level nitrogen deposition impacts at the DAT threshold [0.005 kg/ha-yr]; it is determined from the nitrogen deposition modeling analyses for Alternatives A and B.

BLM_0026843

area associated with natural gas development. The measures identified in **Appendix I**, Noxious Weed Management Plan, would be followed.

## 2.2.9   Alternative D, the BLM's Preferred Alternative

Alternative D is based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives, cooperating agency input, and public input on the Draft EIS. Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping and Draft EIS commenting efforts enabled the BLM to identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternative development process, as well as the EIS process in general.

Additional features included with Alternative D resulting from SGI's amendments to the Proposed Action and public input on the Draft EIS are the following:

- Inclusion of the 12-89-7-1 well pad APD—This APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012 (see **Figure 2-3**, Alternative B, C, and D 12-89-7-1 APD). The specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix O**. The site-specific information described below and in detail in **Appendix O** is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.9**, Alternative D. For example, while **Section 2.2.5** describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD drilling plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

- New developments under the Preferred Alternative would be subject to the Bull WHP submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**; its provisions are included in the text descriptions below.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest; see **Figure 2-7**, Alternative D, BLM's Preferred Alternative) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length of the pipeline has been updated to reflect this change.

BLM_0026844

- Air quality and AQRV control and monitoring measures

  o The BLM would place a COA on each permit, requiring SGI to apply continuous watering to keep the surface moist during access road and well-pad construction activities and during heavy traffic periods, including drilling and completion phases of well development and for production and operational phase during dry conditions. SGI would be required to limit off-site transport by maintaining "no visible dust plume" operations.

  o The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well-pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before it authorizes activities.

  o The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to use to develop project-specific emissions inventories. Operating engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and could warrant a COA for Tier 3-4 engines. The goal of the requirement is for drill-, completion-, and fracturing-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

  o The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx. The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary that provides information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).

- Noxious weeds measures (COAs #45-48)

- An annual reclamation and monitoring status report (COA #51)

BLM_0026845

- Geological hazard measures (COAs #52-55)

- Baseline water quality monitoring requirement (COAs #56-59)

Those techniques and methods for construction, drilling, completion, reclamation, production, maintenance, water uses and sources, and other elements in **Section 2.2.5**, Elements Common to All Alternatives, and the actions anticipated to complete construction, drilling, completion, production, and reclamation. Alternative D is specific to BLM-administered mineral estate, the BLM's authority, and the actions it would approve under a master development plan. Regardless of whether Alternative D is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

**Figure 2-7**, Alternative D, BLM's Preferred Alternative, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

All actions described below, including those that occur on split-estate lands, would comply with all laws, regulations, and BLM policies. These include the BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), the BLM Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Design features, mitigation measures, and the COAs listed in **Appendix C** would apply (see **Table 2-11**, Stipulations, Design Features, and Mitigation Measures). In addition, several strategy and planning documents would apply, including the Hazardous Materials Management Summary (**Appendix G**), Noxious Weed Management Plan (**Appendix I**), Bairand Augmentation Plan (**Appendix L**), and Poly Pipeline Operations Plan (**Appendix M**). The Master Surface Use Plan of Operations and a Master Drilling Plan (see **Appendices D** and **E**, respectively) would also apply, and a revised version of the plans specific to a development must be submitted with an APD.

*New Developments*
The information provided below is unique to Alternative D, the BLM's Preferred Alternative.

New developments under the Preferred Alternative would be subject to the Bull Mountain Unit WHP that SGI submitted. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production, maintenance, or reclamation phase activities. **Figure 2-8**, Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan, illustrates where restrictions apply; the WHP text and additional maps are found in Appendix C, Design Features, Mitigation Measures, and Conditions of Approval.

SGI would construct up to 33 new well pads to develop federal mineral estate, up to 146 new natural gas wells, and up to 4 new water disposal wells. The average number of wells per pad would be the same as described above in **Section 2.2.4**, Elements Common to All Alternatives. The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad is not known at this time but would also be determined at the APD stage. Additionally,

BLM_0026846

2. Alternatives



Alternative D, Preferred

○ Proposed well pad analysis area

⬠ Proposed screw compressor

Proposed pipeline

Proposed new road construction

Existing road requires upgrades for use

Existing Infrastructure

⊡ Existing storage yard

Existing road currently suitable for use

Existing pipeline

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Source: SG Interests GIS 2013 and BLM GIS 2014

**Alternative D, BLM's Preferred Alternative**

Alternative D is specific to BLM-administered mineral estate, the BLM's authority, and development would occur under a master development plan.

Figure 2-7

BLM_0026847

2. Alternatives



The WHP covers 12,500 acres of the MDP. Of the alternative D estimated 455 acres of short term disturbance*, 245 would be covered under the WHP, and of the estimated 133 acres of long-term disturbance, 67 would be covered under the WHP. *The total short- and long-term disturbance acreages are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted.

**Alternative D, Preferred**

- ○ Proposed well pad analysis area
- ⬡ Proposed screw compressor
- ·—·— Proposed pipeline
- —— Proposed new road construction

- —— Existing road requires upgrades for use
- ▨ WHP winter closure
- ▨ Federal surface, federal minerals
- ▨ Private surface, federal minerals
- ▨ Private surface, private minerals

## Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan

New developments under the Preferred Alternative would be subject to the Bull Mountain Unit WHP that SGI submits. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production, maintenance, or reclamation phase activities.

Figure 2-8

BLM_0026848

at the APD stage, the exact locations of well pads would be in ecological sites within the 40-acre analysis areas best suited to achieve maximum reclamation success. These locations would be determined in consultation with BLM, COGCC, CPW, CDPHE, the local government designee, and the landowner. Under Alternative D, new water disposal wells would be sited on existing pads.

Additionally, SGI would construct approximately 16 miles of new road construction and 14 miles of improvements to existing roads for access, 14 miles of new pipeline construction collocated with roads, 10 miles of new cross-country pipeline construction, and up to 4 new compressor stations. Three of the stations would have one 637-horsepower screw compressor engine in an appropriately sized and muffled building. The fourth station (located outside the Unit boundary to the northwest; see **Figure 2-7**, Alternative D, BLM's Preferred Alternative) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

Based on these numbers and the assumed drilling rate noted in the common assumptions, drilling activities would occur for approximately 6 years.

*APD for Federal 12-89-7-1*
On November 6, 2014, the COGCC approved an APD submitted by SGI to drill Federal 12-89-7-1, which SGI had re-filed on June 19, 2014. The well would be drilled to a total depth of 4,700 feet, and would target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well would have a 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet; a 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet (the depth was extended in the current permit from its original depth); and a 6-inch-diameter casing in a 8.5-inch-diameter borehole to the final depth of 4,700 feet.

As described in the surface use plan of operations, the well pad would cover about three acres. A total of up to five wells are planned for this well pad. The wells would target both coal bed methane and sandstone and shale gas producing formations.

Although the proposed well pad is about one-half mile west of Highway 133 and East Muddy Creek, the topography to the east of the site is steep, and access would be from a road designed to accommodate heavy vehicle traffic that runs southeast from Gunnison Energy Corporation's Hotchkiss 12-90 #1-34 well, located a little more than one mile northwest of the proposed well pad. This approximately one-mile road segment would require realignment, and about 23 acres of surface area would be disturbed in the process.

Just west of the proposed pad is the Narrows Gathering Pipeline, with a buried 12- to 16-inch-diameter gas line and an 8-inch-diameter water line, for transporting gas and produced water from the production wells. The right-of-way of the Narrows Gathering Pipeline is 50 feet wide. About 2.75 acres would be disturbed for tie-in lines from the proposed well to the Narrows Gathering Pipeline.

**Construction**
SGI will conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling activities. SG will conduct these surveys

BLM_0026849

between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM Notice of Staking. The intent of the surveys is to implement avoidance strategies where possible and minimize potential impacts to nesting raptors and migratory birds. These surveys may result in modifications to facility design, minor site location adjustments, and operational awareness that reduce direct and indirect impacts when a habitat of concern is identified. Where active raptor nests are identified, SGI will apply CPWs raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors, 2008). When other migratory bird nests are located, SGI will avoid disturbance of nests, nestling birds are flagged when located and avoided during the nesting season.

*Access Road Construction*
Alternative D access road construction would be the same as under Alternative B. The primary access roads would be State Highway 133 and County Road 265, and roads would be constructed or improved only as needed to facilitate access to well pads and other facilities. Site-specific plans for road construction and upgrades would be included as part of individual future APDs. They would be subject to approval from the COGCC, landowners, or the BLM (see **Appendix D**).

*Well Pad Construction (Gas and Water Disposal Wells)*
Alternative D well pad construction would be the same as Alternative B. Before individual well pad construction, SGI would obtain the BLM's approval for an APD. Each APD would contain site-specific details on well pad size, construction and well operations, and mitigation measures.

Under Alternative D, the BLM's standard would be for closed loop systems to be used to eliminate pits on location and the release of VOCs, unless impacts could be demonstrated to be less when a reserve pit system is used. (There would be no net benefit to using a closed loop system.) The type of drilling system would be determined when the drilling application is submitted.

The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time, the same as described in Alternative B.

*Pipeline Construction*
This would be the same as Alternative B; however, pipelines and roads would be sited to avoid identified elk winter concentration areas, unless avoiding such habitats would result in greater net surface disturbance or if it were determined to be a detriment to other resource values. Where feasible, trunk lines would be buried in the roadbed or in the borrow ditch to further reduce surface disturbance. No more than a 30-foot-wide disturbance route in addition to the average 16-foot-wide road would be approved for collocated pipelines.

*Overhead Electrical Line Construction for Water Disposal Wells*
Under Alternative D, SGI proposes up to four new water disposal wells that would require constructing new overhead electrical lines to each water disposal well to supply power to the wellhead (up to five power poles for each line). The methods for installing the overhead power lines would be the same as described in Alternative B. The new lines would be installed following the most practical route from existing lines to the new water disposal well site via two options: following existing two-track roads or running the line cross-country.

BLM_0026850

### Drilling

Drilling would be conducted in compliance with all applicable and relevant state and federal regulations; it would be the same as described in Alternative B, except for the differences noted below.

#### Gas Well Drilling

Gas well drilling could use any of the different wellbore directions, types of drilling technologies (reserve pit or closed loop systems), target formations, and drilling lubricants noted in Alternative B. Under Alternative D, the type of wellbore, target formation, and drilling lubricant would be specified in the APD when submitted to the BLM. All drilling operations and other well site activities would be conducted in compliance with BLM policies and regulations and with the Master Surface Use Plan of Operations and Master Drilling Plan (see **Appendices D** and **E**). The standard drilling system would be a closed loop system in order to eliminate pits on location and the release of VOCs, unless analysis indicates that resource impacts would be reduced by using a reserve pit system (i.e., there would be no net benefit to using a closed loop system). The type of drilling system would be determined when the drilling application is submitted.

A closed loop system is defined as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. During use, the following would apply:

- The reserve pit would be replaced with a series of storage tanks that separate liquids and solids.

- Equipment to separate solids (e.g., screen shakers, hydrocyclones, or centrifuges) and collection equipment (e.g., vacuum trucks) would minimize the volume of drilling waste muds and cuttings that require disposal and would maximize the volume of drilling fluid recycled and reused in the drilling process.

- The recovered drilling fluid would be stored in 500-barrel tanks and reused in active mud systems.

- Drilling fluid would be moved from well-to-well and reconditioned by the dewatering equipment and mud products.

- Solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

If a reserve pit system were used, the following would apply:

- A conventional drilling rig would be used.

- A reserve pit would hold drilling cuttings and a small amount of fluid, freshwater, or recycled water used in drilling and any excess drilling mud.

- The reserve pit would not be used to store flowback water during the completion phase nor used to store produced water during the production phase.

BLM_0026851

- Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe).

- Drilling mud would flow through a series of equipment and tanks in order to recondition it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit.

- Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules then transported to a permitted disposal/waste management facility.

- Reserve pit fences would be constructed and maintained according to the permitting agency's requirements.

- Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules or federal regulations.

- The pit would be lined with an impermeable minimum 24-mil plastic liner so as not to leak, break, or allow discharge.

- Reserve pit sizes vary with well type and site conditions but would typically be approximately 50 feet by 150 feet and lined.

- Fencing:

  o Reserve pits would be fenced on three sides during drilling and on the fourth side immediately after the drilling rig is removed in order to keep big game and wildlife out of the pits.

  o Silt fencing would be installed around the base of the fences.

- Bird netting would be installed over the pit within 24 hours after drilling has begun.

- Two feet of freeboard would be required at all times.

- Pits would have a two-foot unlined berm in addition to the minimum two feet of freeboard around them to prevent snowmelt on the pad from flowing into the pits.

- Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad.

- Erosion control measures would be used, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips, as necessary and appropriate to minimize erosion and surface runoff during well pad construction and operation.

BLM_0026852

A Tier 2 or cleaner drilling rig would be transported to the well pad, along with other necessary equipment. All descriptions relating to drilling rig time frames, equipment, and materials are the same as described under Alternative B.

SGI would use freshwater-based drilling fluids for most drilling activities. However, a small percentage of mineral oil additive may be used, depending on the formation that will be encountered. Mineral oil drilling fluids are preferred in production formations where borehole stability requires it or for directionally drilled wells. Specifics on which type of drilling fluid used would be identified at the APD stage and included on the individual drilling application. Similar to Alternative B, on average, approximately 3,000 barrels of water would be used for drilling in any particular well. For Alternative D, that would result in up to 438,000 barrels of water for drilling (up to 3,000 barrels per well multiplied by up to 146 new wells drilled).

*Water Disposal Well Drilling*
As under Alternative B, SGI proposes drilling up to four new water disposal wells, and the methods and technologies used for water disposal well drilling are the same as described there.

Like Alternative B, the disposal wells may be completed in the Dakota, Morrison, Entrada, or Maroon Formations. A water-based mud system would be used for drilling the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production hole sections of the water disposal well. Up to approximately 3,000 barrels of water would be used for drilling a particular water disposal well. For Alternative D, that would result in up to 12,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to four new water disposal wells drilled).

The BLM would permit water disposal wells APDs if the wells are on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the well before using it for water disposal.

**Completion**

*Gas Well Completion*
Gas well completions would largely be the same as described in Alternative B, except for the differences described below. As under Alternative B, **Appendix E** and **Appendix D** are incorporated by reference for drilling and surface use descriptions.

Test gas could be flared (i.e., released to the atmosphere) or captured for sale or use, which would prevent its escape to the atmosphere. The operator would follow the EPA NSPS OOOO regulations regarding use of green completions. See also COGCC regulation 2 CCR 805.b(3) for further details on green completion technologies.

*Flowback Pits*
At full build out, the four McIntyre flowback pits would be used in the same manner as described in Alternative B.

BLM_0026853

*Water Disposal Well Completion*
The methods, equipment, and process used for water disposal well completions would be the same as described in Alternative B.

**Interim Reclamation**
Following well completions, portions of the well pad not needed for production would be reseeded and reclaimed according to the specifications outlined in the Wildlife Habitat Plan (see Appendix C). Long-term well pad disturbance from the 33 new well pads would be reduced to 66 acres following successful interim reclamation.

**Production and Maintenance**

*Production*
Production specifications and methods would be the same as described in Alternative B, with the following change:

- Centralized production facilities may be used should it be determined that doing so would provide a net benefit to the impacted resources. Whether centralized production facilities are required or developed as part of a project's design features would be determined at the permitting stage.

As under other alternatives, the actual location of facilities would be determined during the APD stage. All site security guidelines (Onshore Order #3) would be followed as identified in the BLM's statutes, regulations, and policy.

*Surface Facilities*
Surface facilities would be installed the same as described in Alternative B, with the following changes:

- The BLM Authorized Officer would be promptly notified of any emergency work commencing.

- SGI would conduct the minimal amount of seasonal road maintenance required to pump the well or conduct emergency activities.

*Compressor Stations*
Compression in the field would be necessary as wells come online. As noted under *New Developments* above, Alternative D has four new screw compressor stations. Three of the stations would have one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station (see **Figure 2-5**).

*Produced Water Management*
Methods for treating produced water would be the same as described in Alternative B.

BLM_0026854

*Workover and Maintenance*
A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit.  The exact scheduling and particular wells selected for workover is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new federal wells per year in Alternative D the following estimates for workover operations may occur.

After completion of the drilling phase of Alternative D, annually, approximately 67 workovers are anticipated to occur upon the proposed 150 federal wells amongst 33 new well pads. Based on the initial drilling schedule the workover rig and support crew could move between approximately 17 well pads each year to workover wells.  Although the single workover rig would likely remain within the Unit should multiple workovers be scheduled to occur consecutively, the support crew would be travelling in and out of the Unit daily with up to four light trucks. Individual well workovers are anticipated to take approximately four days each resulting in up to 16 light truck round trips in and out of the Unit per individual workover. Also resulting in approximately 1,072 light truck round trips per year should all 67 workovers occur. It is also assumed that if workover scheduling permits (i.e. minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

During the initial period of development of Alternative D (years one through six), SGI's WHP applies a timing restriction on workovers throughout the Unit from Dec. 1 - April 15.  However the Winter Closure Areas as identified in the WHP only include up to 77 wells amongst 17 well pads.   If no commitments were made throughout the rest of the Unit, there would otherwise be no timing constraints applicable to workovers on the other proposed 73 wells amongst 19 well pads located outside the Winter Closure Areas.

After full development of the Federal wells in Alternative D has occurred (150 wells), the timing restrictions on workovers from the WHP would no longer be applicable to the federal wells within the Winter Closure Areas.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2.  These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well operations.

**Final Reclamation and Abandonment**
Standards and methods would be generally the same as described in Alternative B.

**Water Use and Sources**
Water use and sources is the same as described in Alternative B.

**Hazardous Materials and Solid Waste**
Hazardous materials and solid waste actions are the same as those described in Alternative B.

BLM_0026855

*Access and Traffic*

Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative D are presented below in **Table 2-9**, Alternative D Traffic Estimates for Construction, Drilling, Completion, and Production Activities, based on 33 new well pads.

**Table 2-9**
**Alternative D Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 5,280 |
| Semi-trailer trucks | 37,000 | 132 |
| Pickup trucks | 6,000 | 1,320 |
| Motor grader on semi-trailer | 40,000 | 33 |
| Dozer (2) on semi-trailer | 19,000 | 66 |
| Track hoe on semi-trailer | 43,000 | 33 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 66 |
| Bulldozer on lowboy trailer with truck | 120,000 | 66 |
| 80-barrel water trucks for dust control | 54,000 loaded | 660 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 66-132 |
| Track hoe on lowboy trailer with truck | 91,000 | 66 |
| Welding trucks | 9,500 | 66 |
| Crew-cab pickups | 5,200 | 1,320 |
| Bending machine/trailer | 48,000 | 66 |
| Side booms on lowboy trailer with truck | 63,000 | 66 |
| X-ray truck | 5,200 | 132 |
| Testing truck | 6,000 | 66 |
| Pipe trucks | 120,000 loaded | 33 |
| | 36,000 unloaded | |
| Utility tractor and truck with lowboy trailer | 40,000 | 33 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 33 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 825 |
| Rig-up trucks empty | 36,500 | 132-198 |
| 80-barrel water trucks loaded | 54,000 | 1,320 |
| 80-barrel water trucks empty | 25,000 | 1,320 |
| Crew-cab pickups | 6,000 | 1,320 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 66 |
| Drilling/completion rig | 120,000 | 66 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 825 |
| Rig-up trucks empty | 36,500 | 132-198 |
| 80-barrel water trucks loaded | 54,000 | 1,485 |
| 80-barrel water trucks empty | 25,000 | 1,485 |
| Crew-cab pickups | 6,000 | 40 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 1,072 |
| Workover rig (rig roundtrips per year) | 120,000 | 67 |
| Haul trucks | 120,000 | 198 |

BLM_0026856

Traffic estimates for Alternative D are the same as those described in Alternative B.

### Surface Disturbance

Alternative D would construct up to 33 new well pads to develop federal mineral estate. This would result in approximately 165 acres of short-term disturbance and 66 acres of long-term disturbance. It would require 16 miles of new road construction and 14 miles of improvements to existing roads for access (totaling 106 acres of short-term disturbance and 57 acres of long-term disturbance).[8] SGI also proposes 24 miles of new pipelines that would total 231 acres of short-term disturbance and 27 acres of long-term disturbance (cross-country pipelines would be fully reclaimed, resulting in zero acres of long-term disturbance).

Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreages for areas of disturbance are shown in **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, which includes both short-term (immediate construction) and long-term (interim reclamation) disturbance amounts.

Following well completions, portions of the federal well pad not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 33 new well pads would be reduced to 66 acres following successful interim reclamation.

### Design Features

Alternative D includes additional design features to address air quality, wildlife, geologic hazards, and water issues, as follows:

- The following air quality measures:

  - The BLM would place a COA on each permit, requiring SGI to apply continuous watering during access road and well-pad construction and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining no visible dust plume operations.

  - The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well-pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before authorizing activities.

---

[8] Calculations of possible disturbance areas are based on the assumptions presented in **Section 2.2.5**, Elements Common to All Alternatives, and **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates.

BLM_0026857

    o   The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion activities. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3-4 engines. The goal of the requirement is for drill-, completion-, and fracturing-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

    o   The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx. The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).

- SGI would be required to use and operate pneumatic devices, tanks, and dehydrators, in accordance with CDPHE and EPA oil and gas regulations.

- SGI agrees to meet annually with BLM by December 31 each year to summarize its development and mitigation activities for the previous 12-months and to forecast with best available information the next year's development and mitigation activities

- SGI meet annually with the BLM to present a construction and operational activities plan prior to the construction season.

- With an annual agreement by SGI as part of the annual operations plan, SGI would present the order for development phasing around the Unit to avoid widespread impacts on wintering big game species.

- SGI would provide an annual reclamation monitoring status report that would present maps of reclamation areas and identify appropriate native seed mixes and their proper application.

- SGI would conduct annual raptor nesting surveys in the Unit to ensure compliance with the Migratory Bird Treaty Act. The surveys would occur within 0.25 mile of surface-disturbing activities from April 15 to July 15 or until young of the year have fledged. Activities would be avoided around occupied nests from April 15 to July 15; exceptions would be discussed with the BLM Authorized Officer on a case-by-case basis.

- SGI would ensure that water accumulation on pads is not allowed to drain into wetlands or riparian areas downgradient of the Unit.

BLM_0026858

- SGI would control noxious weeds in the Unit, including on or in wells pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other area associated with natural gas development. SGI would follow the measures identified in **Appendix I**, Noxious Weed Management Plan.

- The following Geologic Hazards measures:

  o Avoidance of areas with geologic hazards—Project-specific conditions would be evaluated during the site permitting process, and avoiding disturbance in areas with higher risks in the proposed sites would minimize hazards.

  o Engineering controls—If geologic hazards could not be avoided, drainage systems would be designed to reduce soil saturation and prevent erosion in areas with steep slopes and to stabilize the toes of slopes. The design would be based on site-specific geotechnical site evaluations.

  o Monitoring of landslides—If landslide-prone areas could not be avoided, such as east of Highway 133, mass movement of the landslide deposits could be monitored, such as by installing tensiometers or alarm systems to enable automated shutoff of gas pipelines in the event of slope failure.

  o Monitoring and maintenance of acceptable injection pressure—Monitoring of deep well injection pressures and of changes in the transmissivity[9] during injection could determine whether deep injection pressures are fracturing the reservoir rock, and injection rates and pressures could be adjusted to reduce the potential for these effects.

  o Monitoring of seismicity—Seismic activity could be monitored with sensitive seismometers as a follow-up to the injection pressure monitoring measure above to determine whether earthquakes are triggered at the depth of injection. This would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures in the targeted injection zone.

- The following Water Quality monitoring measures:

  o In addition to the State of Colorado water baseline monitoring requirements, the following will be added to the existing baseline monitoring program conducted by SGI

    ▪ Increase sampling radius to 1 mile from well pad location for water wells

    ▪ Include all surface water sources and spring sources within 1 mile of well pad location. Surface water and springs would be sampled twice a year, at high flow and at low flow, to meet the baseline monitoring requirements.

---

[9] A measure of how much fluid can flow horizontally through an aquifer

BLM_0026859

Water would be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX, TPH, dissolved organic carbon (DOC), and nutrients and for field properties, including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling would include one replicate and one blank during each sampling trip. The replicate and blank would be analyzed for the same constituents as the environmental sample.

o   Surface water and groundwater baseline samples should include stable isotopes of methane (carbon and deuterium) to determine the origin of the methane (biogenic or thermogenic).

o   Sample collection for surface water and groundwater should follow the National Field Manual for collecting water quality data. SGI should submit instrument logs, well characteristics, and other QC/QA collection methods to the BLM.

o   SGI should summarize data provide it to the BLM annually. The BLM would determine if further analysis of data may be required by a third party, such as the US Geological Survey. Any additional expenses incurred for third-party reviews required by BLM would be the responsibility of SGI.

## 2.3   ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS

There were several elements of alternatives considered by the BLM during the development of the EA and the EIS. The elements considered during EA development came during the initial scoping period on the EA; those considered during EIS development came from public comments on the EA or were received after publication of the Notice of Intent. No individual or group submitted a complete alternative that included all elements of the project (well pads, well drilling, and pipelines). The elements and the reasons for eliminating them are described below.

### 2.3.1   Alternatives Considered and Eliminated during EA Development

#### 500-foot Development Setback

During initial EA scoping, the Gunnison County Temporary Regulations for Oil and Gas Operations were discussed, and implementation of a required 500-foot development setback from waterways and riparian areas was considered. This setback requirement has since been changed to be a 300-foot requirement.

SGI and the BLM ran a modified GIS modeling program to incorporate this 500-foot setback from waterways and riparian areas. The resulting well site locations would have required an additional 5.6 miles of access roads and an additional 8.3 acres of long-term surface disturbance. This alternative also placed development higher on ridges and side-slopes. Therefore, the alternative was considered but eliminated from further analysis due to increased surface impacts associated with increased development and development on ridges and side slopes.

#### Proximity to Road Networks

Another alternative considered but not carried forward during EA development raised the issue of the overall length of roads and the amount of surface disturbance under the Proposed Action

BLM_0026860

as an environmental concern. The BLM developed a set of weights and values for the GIS model criteria that would minimize road lengths and, therefore, surface disturbance, emphasizing proximity to existing road networks while reducing the weights on surface water and surrounding buffer zones. The well pad locations produced from the modified model were not uniformly distributed throughout the Unit and occurred in high-density groups in close proximity to existing roads, and many pad sites were within 300 feet of waterways. As a result, large portions of the Unit were excluded from development and only about half of the Unit's natural gas resource would have been drained. This alternative was considered but eliminated from further analysis because it did not meet the purpose and need for the proposal, and it was not consistent with the existing Unit agreement to efficiently develop the federal mineral resources.

### 2.3.2   Alternatives Considered and Eliminated from EIS Development

The alternatives considered but not carried forward in the earlier Draft EA and the public comments on the Draft EA were considered in the alternatives development for the EIS. Issues and comments are summarized in the Scoping Summary Report (BLM 2013b). Several commenters suggested additional mitigation measures for consideration in the alternatives. The comments were provided to the resource authors for consideration and included in the Final EIS as appropriate. Specific actions or alternatives that were not carried forward are addressed below.

*Alternative Water Treatment Facilities*

Comments suggested that the BLM consider an alternative form of produced water management such as the potential for on-site produced water treatment to meet NPDES discharge permit requirements and reuse water rather than deep well injection. Under the alternatives, during the development phase water would be managed and reused for operations (e.g., completion) as practicable. Large evaporation pond(s) and smaller on-site treatment (e.g., reverse osmosis units) were considered for dealing with produced water after the drilling and development and during the production and maintenance phase. Evaporation rates at higher altitudes and cooler temperatures hinder the ability to evaporate large volumes of water from ponds. Potential mitigation measures and/or processes such as smaller on-site units to address this issue at the APD stage are identified in Chapter 4, Environmental Consequences. Consequently a separate alternative was eliminated from further analysis.

*New Access Route Entry Points to the Unit*

Several commenters on the EA suggested that the BLM consider different access routes to well pads that would remove new roads or eliminate upgrades to roads, including highlighting specific sections of the Unit to avoid such as the Bull Mountain Ranch. Siting of access routes into the Unit was considered early on in the Proposed Action design process by the siting study (see **Appendix A**) that was specifically intended to take advantage of existing access routes and minimize the need for new roads and upgrades. In addition, other existing roads that could possibly provide access to the analysis area are shown on the maps. The MDP would not foreclose consideration of alternate access routes in the future, and other routes may be considered during site-specific analysis at the APD stage. Therefore, Alternatives A, B, and C provide an appropriate range of alternatives for analysis at this time.

BLM_0026861

***Extending Development to a Longer or Shorter Time Period***

Commenters suggested considering additional phasing time frames to extend the drilling horizon past the 6 years estimated in the Proposed Action. Other commenters suggested the BLM consider requiring all of the development to occur at once and to be completed within 1 year. Drilling all 146 gas wells and 4 water disposal wells in one construction season is unviable due to insufficient rig and labor availability and limits the ability to incorporate the results of recent drilling into future drilling plans. The 6-year period is an aggressive estimate.

***Additional Mitigation Measures***

Several commenters suggested that additional mitigation measures should be considered in the alternatives, including greenhouse gas and criteria pollutants emission mitigation measures, and well pad berming and lining measures. Several of these suggestions are already addressed under existing regulations such as New Source Performance Standards Subparts W and OOOO (40 CFR Part 60). Additionally, SGI includes emission reducing mitigations in their Greenhouse Gas Strategy and adopted as standard operating procedures for projects. Measures that were not covered under existing regulations or included as operator committed design measures were included for consideration in one or more alternative.

BLM_0026862

## 2.4   SUMMARY OF ALTERNATIVES

**Table 2-10**
**Summary of Actions by Alternative[10]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Construction | Well pads | 10 new pads on private mineral estate | 36 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 35 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 33 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD |
| | Access roads | 26 miles upgrades to existing roads<br>5 miles new road construction | 53 miles upgrades to existing roads<br>16 miles new road construction | 13 miles upgrades to existing roads<br>12 miles new road construction | 14 miles upgrades to existing roads<br>16 miles new road construction |
| | | construction rate: 600-800 yards per day | | | |
| | Pipelines | 4 miles new collocated with roads<br>8 miles new cross-country | 13 miles new collocated with roads<br>9 miles new cross-country | 19 miles new collocated with roads<br>0 miles new cross-country | 14 miles new collocated with roads<br>10 miles new cross-country |
| | Electrical lines | 1 new overhead electrical line<br>(up to 5 power poles) | 4 new overhead electrical lines<br>(up to 20 power poles) | 4 new buried electrical lines (collocated with roads) | 4 new electrical lines, may be buried or overhead (up to 20 power poles) |
| Drilling | Gas wells | 55 new gas wells | 146 new gas wells, inclusive of the one well to be drilled as part of the 12-89-7-1 APD | | |
| | | Time frame<br>Coal bed methane natural gas – 60 days<br>Shale and sandstone – 85 days | | | |
| | Water disposal wells | 1 new water disposal well | 4 new water disposal wells | | |
| | | Time frame: 60 – 120 days | | | |
| | Total wells | 56 wells | 150 wells | | |
| | Drilling rate | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year |
| | Drilling duration | 3 years | 6 years | | |

[10] Under Alternatives B, C, and D, the operations and development of private minerals described in Alternative A would continue to be implemented; analysis for the cumulative effects of development under Alternative A plus the action alternatives is discussed in **Table 4-1**, Summary of Cumulative Actions within the Unit by Alternative. Alternatives B, C, and D display development and actions that would occur only on federal mineral estate (which falls within the BLM's decision-making authority).

BLM_0026863

**Table 2-10**
**Summary of Actions by Alternative[10]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Completion | Gas wells | Well completion duration: 8 – 10 days Flow testing duration: 25 – 50 days | | | |
| | Water disposal wells | Well completion duration: 8 – 10 days | | | |
| Production and Maintenance | Compressor station | 1 new screw compressor station | 3 new screw compressor stations; 1 new multi-engine compressor station | 4 new screw compressor stations | 3 new screw compressor stations; 1 new multi-engine compressor station |
| | Remote telemetry monitoring | No similar action | Included as part of the WHP | No similar action | Included as part of the WHP |
| | Workover estimates | Years 1-6: one workover every two years per well Years 7-40: 67 workovers annually | | | |
| | Produced water management | Production: 500 – 3,000 barrels[11] per day | | | |
| | | Coal bed methane natural gas-produced water injected into water disposal wells, trucked to disposal location, or recycled for use in well completions | | | |
| Water Use and Sources | Drilling | Up to 21.3 acre-feet[12] | 58 acre-feet | | |
| | Completion | Up to 714.3 acre-feet[13] | Up to 2,369.3 acre-feet | | |
| | Dust abatement | Up to 13.2 acre-feet of freshwater | Up to 52.9 acre-feet of freshwater | | |
| | Source for all uses | 30% freshwater and 70% recycled or produced water | | | |
| | Total water usage for drilling and completion[14] (based on source percentages noted above) | Total water: 748.8 acre-feet Freshwater: 220.7 acre-feet Recycled/produced water: 514.9 acre-feet | Total water: 2,480.2 acre-feet Freshwater: 744.1 acre-feet Recycled/produced water: 1736.1 acre-feet | | |

[11] 1 barrel = 42 gallons, standard US oil barrel volume

[12] Combined water disposal and gas wells, based on an average of 3,000 barrels per well. Conversion factor is 7,758 barrels per acre-foot.

[13] Calculated based on assuming 50 percent coal bed natural gas wells and 50 percent shale wells as discussed in the Bull Mountain EA. Water amounts for each type of well were taken from the Master Drilling Plan in Appendix E. Calculations used number of new gas wells per alternative divided in half for each type of well (coal bed methane/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage during completion.

[14] Amounts were calculated based on adding together the drilling, completion, and dust abatement amounts together. The total was multiplied by 30 percent to determine the freshwater amount and 70 percent to determine the amount of recycled/produced water that would be used.

BLM_0026864

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| Lease stipulations | Standard stipulations as listed on individual leases apply. Additional lease stipulations that apply within the Unit: • Timing limitation stipulation: To protect crucial deer and elk winter ranges. No surface use is allowed from December 1 through April 30. This stipulation does not apply to operation and maintenance of production facilities. • All lands of the following leases are subject to Colorado lease notice exhibit CO-34, Lease Notice: To alert lessee of potential habitat for threatened endangered, candidate, or other special status plant or animal. Bull Mountain Unit Agreement stipulations: • The terms, conditions, and provisions of all leases, subleases, and other contracts relating to exploration, drilling, development or operation for oil or gas on lands committed to this agreement are hereby expressly modified and amended to the extent necessary to make the same conform to the provisions hereof, but otherwise to remain in full force and effect. | | | |
| Plans and strategy documents | Master Surface Use Plan of Operations (Appendix D) | | | |
| | Master Drilling Plan (Appendix E) | | | |
| | Hazardous Materials Management Summary (Appendix G) | | | |
| | Noxious Weed Management Plan (Appendix 1) | | | |
| | Bainard Augmentation Plan (Appendix L) | | | |
| | Poly Pipeline Operations Plan (Appendix M) | | | |
| Site Suitability Modeling | No similar action | SGI's Wildlife Habitat Plan | No similar action | SGI's Wildlife Habitat Plan |
| | Site selection weighted factors: • Slope – 30% • Sensitivity to visual impacts from Highway 133 and County Road 265 travel routes – 30% • Proximity to existing road networks – 15% • Proximity to existing gathering pipeline system – 10% • Proximity to delineated wetlands and wetland buffer zones, stream networks, and stream buffer zones – 10% • Proximity to known streams containing Colorado River | Same as Alternative A | Site selection weighted factors: • Slope – 20% • Sensitivity to visual impacts from Highway 133 and County Road 265 travel routes – 10% • Proximity to existing road networks – 35% • Proximity to existing gathering pipeline system – 15% • Proximity to delineated wetlands and wetland buffer zones, stream networks, and stream buffer zones – 5% • Proximity to known streams containing Colorado River | Individual well pad locations were selected from Alternatives B and C. This resulted in selecting the following well pad locations: • 31 pads from Alternative B • 2 pads from Alternative C • 3 pads dropped from consideration See **Figure 2-5**, BLM's Preferred Alternative (Alternative D). |

BLM_0026865

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | cutthroat trout – 0% <br> • Soil erosion factors – 4% <br> • Vegetated areas and open meadows – 1% | | cutthroat trout – 0% <br> • Soil erosion factors – 15% <br> • Vegetated areas and open meadows – 0% <br><br> Additional factor considered: <br> • Verified elk winter concentration areas | |
| Design Features | Operator actions and measures as described in Section 2.2.5, Elements Common to All Alternatives and Section 2.2.6, Alternative A, No Action. | Operator actions and measures described in Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.7, Alternative B, Proposed Action | Operator actions and measures described in Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.8, Alternative C, Modified Action <br><br> Appendix C, Design Features, Mitigation Measures, and Conditions of Approval <br><br> Air Quality and AQRV measures <br><br> SGI would be required to utilize and operate pneumatic devices, tanks and dehydrators in accordance with CDPHE and EPA Oil and Gas Regulations. <br><br> SGI would have a yearly meeting with the BLM to present an annual construction and operational activities plan prior to the construction season. <br><br> With an annual agreement by | Operator actions and measures described in Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.9, Alternative D, Preferred Alternative <br><br> All of the design features identified under Alternative C <br><br> Geologic hazards measures (noted under Alternative B Mitigation Measures) <br><br> Water Quality monitoring: In addition to the State of Colorado water baseline monitoring requirements, the following will be added to the existing baseline monitoring program conducted by the operator. <br> • Increase sampling radius to 1 mile from well pad |

BLM_0026866

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | | SGI as part of the annual Operations Plan, SGI would present the order for development phasing around the Unit to avoid widespread impacts on wintering big game species during a winter period.<br><br>SGI would provide an annual reclamation monitoring status report that would present reclamation status, maps of reclamation areas, and identifying appropriate native seed mixes and their proper application.<br><br>SGI would conduct annual raptor nesting surveys in the Unit to ensure compliance with the Migratory Bird Treaty Act. The surveys would occur within 0.25 mile of surface disturbing activities from April 15 to July 15 or until young of the year have fledged Activities would be avoided around occupied nests from April 15 to July 15; exceptions would be discussed with the authorized officer on a case-by-case basis.<br><br>SGI would ensure that water accumulation on pads is not allowed to drain into wetlands | location for water wells.<br>• Include all surface water sources and spring sources within 1 mile from well pad location. Surface water and springs will be sampled two times a year, at high flow and at low flow to meet the baseline monitoring requirements. Water will be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX, TPH, dissolved organic carbon (DOC), nutrients, and field properties including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling will include one replicate and one blank during each sampling trip. The replicate and blank will be analyzed for the same constituents as the environmental sample.<br>• Surface water and groundwater baseline samples should include stable isotopes of |

BLM_0026867

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | | or riparian areas down-gradient from the Unit.<br><br>SGI would control noxious weeds within the Unit, including on or within wells pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other area associated with natural gas development. The measures identified in Appendix I, Noxious Weed Management Plan, would be followed. | methane (carbon and deuterium) to determine the origin of the methane (biogenic and/or thermogenic).<br>• Sample collection for surface water and groundwater should follow the National field manual for the collection of water-quality data. Instrument logs, well characteristics, and other QA/QA collection methods should be submitted to the BLM.<br>• Data should be summarized and provided to the BLM annually for review. BLM will determine if further analysis of data may be required by a third party such as the U.S. Geological Survey. Any additional expenses incurred for third party reviews as required by BLM, will be the responsibility of the operator |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| Mitigation measures | | Appendix C, Design Features, Mitigation Measures, and Conditions of Approval which includes the following:<br><br>Air Quality measures:<br>• SGI would apply dust abatement to unpaved roads to achieve at least 50% control during all construction and development phases. SGI would also apply dust abatement (greater than or equal to 50%) to unpaved roads during the production phase when expected traffic rates exceed two trips to each well pad within the Unit per day.<br>• The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well-pad production emissions inventory for each APD or details for the well-pad production equipment and operations (including refined emissions factors) to | Geologic Hazards mitigation measures same as Alternative B. | None |

BLM_0026869

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before authorizing activities.<br>• The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling/ fracturing/completion activities. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3-4 engines. The goal of the requirement is for | | |

*Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan*

BLM_0026870

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | development-(drill/completion/ fracturing) related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.<br>• The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory for BLM review that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx. The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).<br><br>Geologic Hazards mitigation measures to include: | | |

BLM_0026871

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | • Mitigation 1, Avoidance of Areas with Geologic Hazards. The most effective mitigation to reduce effects of slope failure is to avoid areas with higher risks. Project-specific conditions would be evaluated during the site permitting process, and disturbance would be avoided in areas with higher risks in the proposed sites to minimize hazards.<br>• Mitigation 2, Engineering Controls. If geologic hazards cannot be avoided, such mitigation measures as designing drainage systems to reduce soil saturation and prevent erosion in areas with steep slopes and to stabilize the toes of slopes could be implemented, based on recommendations following site-specific geotechnical site evaluations.<br>• Mitigation 3, Monitoring of Landslides. If landslide-prone areas could not be avoided, such as east of Highway 133, mass movement of the landslide deposits could be monitored by installing tensiometers to monitor the rate of differential horizontal movement so that corrective | | |

BLM_0026872

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | action can be taken. Alarm systems can be installed to enable automated shutoff of gas pipelines at critical points in the event of slope failure.<br>• Mitigation 4, Monitoring and Maintenance of Acceptable Injection Pressure. Monitoring of deep well injection pressures and of changes in the transmissivity during injection can determine whether deep injection pressures are causing fracturing of the reservoir rock and injection rates, and pressures can be adjusted to reduce the potential for these effects.<br>• Mitigation 5, Monitoring of Seismicity. Seismic activity could be monitored with sensitive seismometers as a follow-up measure to Mitigation 1, to determine whether earthquakes are triggered at the depth of injection. This would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures in the targeted injection zone. | | |

BLM_0026873

## 2.5   SUMMARY OF IMPACTS

**Table 2-12**
**Summary of Surface Disturbance Acres by Alternative**

| Project Feature | Alternative A, No Action | | Alternative B, Proposed Action | | Alternative C, Modified Action | | Alternative D, the BLM's Preferred Alternative | |
|---|---|---|---|---|---|---|---|---|
| | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
| New well pads | 55 acres | 22 acres | 180 acres | 72 acres | 175 acres | 70 acres | 165 acres | 66 acres |
| Access roads | | | | | | | | |
| Upgrades to existing | 92 acres | 49 acres | 183 acres | 97 acres | 47 acres | 25 acres | 51 acres | 27 acres |
| New road construction | 17 acres | 9 acres | 60 acres | 32 acres | 44 acres | 23 acres | 56 acres | 30 acres |
| Pipelines | | | | | | | | |
| New collocated with roads | 54 acres | 9 acres | 161 acres | 25 acres | 231 acres | 37 acres | 171 acres | 27 acres |
| New cross-country | 47 acres | 0 acres | 56 acres | 0 acres | 0 acres | 0 acres | 61 acres | 0 acres |
| Facilities | | | | | | | | |
| New compressor stations | 5 acres | 2 acres | 20 acres | 8 acres | 20 acres | 8 acres | 20 acres | 8 acres |
| storage yard | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres |
| **Total Acres[15]** | **260 acres** | **88 acres** | **600 acres** | **215 acres** | **441 acres** | **126 acres** | **455 acres** | **133 acres** |
| **Total Acres within WHP** | **NA** | **NA** | **353 acres** | **123 acres** | **NA** | **NA** | **245 acres** | **133 acres** |

---

[15] Acreage amounts presented under each type of disturbance (roads, pipelines, etc.) are not summed to give the total estimated short- and long-term disturbance acreages. The total short- and long-term disturbance acreages are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted. Cumulative impacts are discussed in Chapter 4.

**Table 2-13**
**Estimated Total Traffic Round Trips for Drilling, Completion, and Production Activities by Alternative[1]**

| Vehicle Type | Alternative A, No Action (10 Well Pads) | Alternative B, Proposed Action (36 Well Pads) | Alternative C, Modified Action (35 Well Pads) | Alternative D, BLM's Preferred Alternative (33 Well Pads) |
|---|---|---|---|---|
| **Vehicles for pad and access road construction** | | | | |
| Gravel trucks | 1,600 | 5,760 | 5,600 | 5,280 |
| Semi trucks | 40 | 144 | 140 | 132 |
| Pickup trucks | 400 | 1,440 | 1,400 | 1,320 |
| Motor grader | 10 | 36 | 35 | 33 |
| Dozer (2) | 20 | 72 | 70 | 66 |
| Track hoe | 10 | 36 | 35 | 33 |
| **Pipeline construction** | | | | |
| Motor grader on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| Bulldozer on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| 80-barrel water trucks for dust control | 200 | 720 | 700 | 660 |
| 80-barrel water trucks for hydrostatic testing | 20-40 | 72-144 | 70-140 | 66-132 |
| Track hoe on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| Welding trucks | 20 | 72 | 70 | 66 |
| Crew-cab pickups | 400 | 1,440 | 1,400 | 1,320 |
| Bending machine/trailer | 20 | 72 | 70 | 66 |
| Side booms on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| X-ray truck | 40 | 144 | 140 | 132 |
| Testing truck | 20 | 72 | 70 | 66 |
| Pipe trucks | 10 | 36 | 35 | 33 |
| Utility tractor and truck with lowboy trailer | 20 | 72 | 70 | 33 |
| **Vehicles for drilling/completing first well on the pad** | | | | |
| Drilling/completion rig | 10 | 36 | 35 | 33 |
| Rig-up trucks loaded | 250 | 900 | 875 | 825 |
| Rig-up trucks empty | 40-60 | 144-216 | 140-210 | 132-198 |
| 80-barrel water trucks loaded | 400 | 1,440 | 1,400 | 1,320 |
| 80-barrel water trucks empty | 400 | 1,440 | 1,400 | 1,320 |
| Crew-cab pickups | 400 | 1,440 | 1,400 | 1,320 |
| **Vehicles for drilling/completing subsequent wells on the same pad** | | | | |
| Motor grader | 20 | 72 | 70 | 66 |
| Drilling/completion rig | 20 | 72 | 70 | 66 |
| Rig-up trucks loaded | 250 | 900 | 875 | 825 |
| Rig-up trucks empty | 40-60 | 144-216 | 140-210 | 132-198 |
| 80-barrel water trucks loaded | 450 | 1,620 | 1,575 | 1,485 |

BLM_0026875

**Table 2-13**
**Estimated Total Traffic Round Trips for Drilling, Completion, and Production Activities by Alternative[1]**

| Vehicle Type | Alternative A, No Action (10 Well Pads) | Alternative B, Proposed Action (36 Well Pads) | Alternative C, Modified Action (35 Well Pads) | Alternative D, BLM's Preferred Alternative (33 Well Pads) |
|---|---|---|---|---|
| 80-barrel water trucks empty | 450 | 1,620 | 1,575 | 1,485 |
| Crew-cab pickups | 400 | 1,440 | 1,400 | 40 |
| Vehicles for well production | | | | |
| Haul trucks | 60 | 216 | 210 | 198 |
| Pickup trucks (roundtrips per well) | 4 round trips per day for WDWs | 8 round trips per day for WDWs | 8 round trips per day for WDWs | 8 round trips per day for WDWs |
| | 71 round trips per day for gas wells | 162 round trips per day for gas wells | 162 round trips per day for gas wells | 162 round trips per day for gas wells |
| Vehicles for workovers | | | | |
| Workover rig (1 roundtrip per well) | 36 | 67 | 67 | 67 |
| Pickup trucks (roundtrips per well) | 576 | 1,072 | 1,072 | 1,072 |

[1] Number of trips per well pad are found in **Table 2-1**, Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad

**Table 2-14**, Summary of Environmental Consequences by Alternative, provides a brief summary comparison of resource-specific direct and indirect impacts that could or would result from implementation of the alternatives. Detailed discussions (including quantitative and cumulative) on impacts or environmental consequences are addressed within Chapter 4 of this EIS.

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| Air Resources | ▪ Near-field pollutant impacts would below the NAAQS or CAAQS. In addition impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations that could exceed the annual increment value.<br>▪ Direct modeled | ▪ Total ambient air concentrations are less than the applicable NAAQS and CAAQS.<br>▪ Direct modeled concentrations are below the applicable PSD Class II increments, with the exception of the modeled annual $NO_2$ concentration which is above the annual | ▪ Near-field pollutant impacts for Alternative C would be similar to those presented for Alternative B. Impacts from Alternative C sources would below the NAAQS or CAAQS. In addition impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations which | ▪ Near-field pollutant impacts for Alternative D would be similar to those presented for Alternative B.<br>▪ The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be similar to the impacts for the Alternative B.<br>▪ Pollutant impacts would be |

BLM_0026876

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class sensitive Class II areas and I are well below the PSD Class I and Class II increments.<br>■ Visibility analysis indicated that there are zero days predicted above the 0.5 delta-decivie threshold at any of the Class I and sensitive Class II areas<br>■ For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC values greater than 25 µeq/l, and a 1.0 µeq/l change in ANC for lakes with background ANC values equal to or less than 25 µeq/l<br>■ The degree to which any observable changes to climate can, or would, be attributable to Alternative A cannot be reasonably predicted at this time | increment value.<br>■ HAP impacts are below the applicable short-term RELs and the long-term non-carcinogenic RfCs, with the exception of the maximum modeled formaldehyde concentration from compression emissions which at 81.6 µg/m³ is above the short-term REL threshold of 55 µg/m³.<br>■ Direct modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas are well below the PSD Class I and Class II increments.<br>■ The visibility analysis indicated that there are zero days predicted above the 0.5-delta-deciview threshold at any of the Class I and sensitive Class II areas.<br>■ The maximum predicted visibility impact was 0.45 delta-deciview occurring at the Maroon Bells - Snowmass Wilderness Area<br>■ For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC | could exceed the annual increment value.<br>■ HAP impacts from well site production would be similar to the impacts for the Alternative B<br>■ Pollutant impacts would be similar to those presented in for Alternative B<br>■ Visibility impacts estimated resulting from Alternative C emissions would be similar to those presented for Alternative B<br>■ Nitrogen deposition impacts under Alternative C would be less than the impacts for Alternative B and greater than the impacts for Alternative A. Sulfur deposition impacts would be below the DAT.<br>■ The degree to which any observable climate changes can, or would, be attributable to Alternative C cannot be reasonably predicted at this time<br>■ Additional mitigation measures as described under Alternative B would also apply and would result in similar impacts. | similar to those presented in for Alternative B.<br>■ Visibility impacts estimated resulting from Alternative D emissions would be similar to those presented for Alternative B.<br>■ Nitrogen deposition impacts under Alternative D would be less than the impacts for Alternative B and greater than the impacts for Alternative A. Sulfur deposition impacts would be below the DAT. The maximum greenhouse gas emissions resulting from Alternative D sources would be comparable to the emissions estimated for Alternative B.<br>■ The contribution to regional ozone from Bull Mountain project sources would likely be less than the maximum ozone contribution from the UFO planning area oil and gas sources.<br>■ The maximum future year emissions from the Bull Mountain project area emissions, including existing sources, Alternative A sources (on private lands) and Alternative D sources (on BLM-administered lands), |

BLM_0026877

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | values greater than 25 µeq/l, and a 1.0 µeq/l change in ANC for lakes with background ANC values equal to or less than 25 µeq/l.<br>■ The degree to which any observable climate changes can, or would, be attributable to Alternative B cannot be reasonably predicted at this time<br>■ Additional mitigation measures would reduce impacts on near-field particulate matter (PM) impacts from construction and traffic, near-field $NO_2$ 1-hour impacts, and far-field nitrogen deposition at nearby Forest Service sensitive areas.<br>  o  The BLM would place a COA on each permit, requiring SGI to continuously keep the surface moist by watering during access road and well-pad construction and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining "no visible | | are: 311.1 TPY $NO_x$, 124.5 TPY VOC, 206.5 TPY CO, 0.8 TPY $SO_2$, 65.6 TPY $PM_{10}$ and 46.0 TPY $PM_{2.5}$.<br>■ All AQRVs would be below required standards.<br>■ Additional mitigation measures as noted under Alternative B would be included as design features to keep emissions below acceptable levels. |

BLM_0026878

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | dust plume" operations.<br>o  The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well-pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the NO$_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI could demonstrate compliance with the NO$_2$ 1-hour NAAQS for the APD. The BLM would approve any additional | | |

BLM_0026879

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | impacts analyses before authorizing activities.<br>o The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion activities. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3-4 engines. The goal of the requirement is for development-related (e.g., drill, completion, | | |

BLM_0026880

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | and fracturing) engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate could be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS<br>o    The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan and projection for Unit-wide federal wells production phase NOx emissions at or below 143 tons per year of NOx. The BLM would place a COA on each APD, requiring SGI to submit a NOx emissions accounting analysis summary that provides information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx | | |

BLM_0026881

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | emissions budget (approximately143 tons per year of NOx). | | |
| Noise | <ul><li>Short-term, localized, and intermittent daytime noise impacts during approximately 60 days of construction. Localized impacts 24 hours per day during well drilling; potentially greater at night.</li><li>Construction-related traffic would produce intermittent noise impacts, with greater impacts occurring on more heavily used routes such as SH 133. Construction traffic would generally not occur during nighttime hours; therefore, would not affect the more sensitive nighttime ambient noise levels.</li><li>Potential for increased noise levels related to well drilling, pumping, and operations at:<ul><li>1 residence (T11S R90W Section 13)</li></ul>However, well pad construction, drilling, and operations are estimated to be within the maximum permissible noise levels allowed under COGCC</li></ul> | <ul><li>Impacts on noise from construction activities and construction traffic would be similar to Alternative A, but would be elevated given the increased duration (6 years) of development.</li><li>Potential for increased noise levels related to well drilling, pumping, and operations at 12 residences.</li><li>Potential for increased noise levels related to pipeline construction at 15 residences.</li><li>Potential for increased noise levels related to new access road at 6 residences.</li><li>Similar to Alternative A, noise levels are estimated to be within the maximum permissible levels allowed under COGCC rules.</li><li>Similar to Alternative A, projected noise level from 4 new compressor stations would be below 26 dBA. Like Alternative A, there would be potential low frequency sounds.<ul><li>nearest residence located approximately 3,000 feet east of the proposed</li></ul></li></ul> | <ul><li>Impacts on noise from construction activities would be similar to Alternative B, but the same number of wells would be concentrated in fewer areas, resulting in potential increased localized noise impacts during construction.</li><li>Potential for increased noise levels related well drilling, pumping, and operations at 8 residences.</li><li>Potential for increased noise levels related to pipeline construction at 8 residences.</li><li>Potential for increased noise levels related to new access road at 7 residences.</li><li>Like Alternative A, well pad construction, pipeline and access road construction, and well drilling and operations are estimated to be within the maximum permissible noise levels allowed under COGCC rules.</li><li>Compressor station-related noise impacts and mitigation would be the same as described under Alternative</li></ul> | <ul><li>Impacts under Alternative D would be less than those described under Alternative B because there would be fewer sensitive receptors within 1,000 feet of proposed well pad analysis areas and new proposed access roads or road upgrades.</li><li>Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.</li></ul> |

BLM_0026882

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | rules.<br>• Projected noise level from 1 new compressor station would be below 26 dBA at locations farther than 2,500 feet. However, there would be potential low frequency sounds.<br> • Nearest residence located approximately 3,000 feet east of the proposed site<br>• Mitigation measures (such as siting to avoid impacts and requiring mufflers and other sound reducing-measures) would be determined during permitting and subsequent environmental review to ensure that construction and operational activities comply with COGCC maximum permissible noise levels. | compressor station in T11S R90W Section 24<br> • nearest residents are 0.5 to 1 mile away from the other three compressor site locations<br>• Implementing mitigation measures would ensure compliance with COGCC maximum permissible noise levels and minimize potential noise impacts.<br>• Application of mitigation measure #28 and other noise dampening measures would likely be needed to comply with regulatory limits for noise generated by natural gas facilities associated with the 12-89-7-1 APD. | B.<br>• Impacts from implementing mitigation measures would be the same as Alternative B.<br>• Impacts from APD 12-89-7-1 would be the same as those described under Alternative B. | |
| Soil Resources | • Impacts include compaction from overland travel and land grading, vegetation clearing, increased erosion, runoff and sedimentation. | • Impacts on soils would be similar to Alternative A, but on a larger scale.<br>• Mitigation measures for erosion and sediment control reduce the likelihood for long-term soil impacts.<br>• The 12-89-7-1 APD would result in short-term disturbance on 35.8 acres and | • Impacts on soils would be similar to Alternative B but covering a slightly smaller area because of the clustered footprint in this alternative.<br>• Mitigation measures for erosion and sediment control reduce the likelihood for long-term soil impacts.<br>• Impacts from APD 12-89-7- | • Impacts on soils would be similar to Alternative B but covering a slightly smaller area.<br>• Design features for erosion and sediment control would reduce the likelihood for long-term soil impacts.<br>• Impacts from APD 12-89-7-1 would be the same as those |

BLM_0026883

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | long-term disturbance on 32.8 acres. Impacts would be minimized via COAs to mitigate erosion. | 1 would be the same as those described under Alternative B. | described under Alternative B. |
| Water Resources | ▪ Water quantity:<br>  ▪ 32 acre-feet required from Muddy Creek (minor percent of total flow).<br>▪ Water quality:<br>  ▪ Least amount of impacts on surface water quality from spills or chemical releases.<br>  ▪ Potential impacts on groundwater quality from spills or releases from HPDE pipes.<br>▪ Groundwater:<br>  ▪ Least amount of impacts from drilling.<br>  ▪ Least amount of impacts from hydraulic fracturing.<br>▪ Wastewater:<br>  ▪ Lowest volume of water to be disposed in the injection wells. | ▪ Water quantity:<br>  ▪ Same augmentation requirements as Alternative A but for a longer time.<br>▪ Water quality:<br>  ▪ More development over a larger area could result in greater impacts on surface water quality from spills and release of chemicals.<br>  ▪ Increased risk of impacts on groundwater quality resulting from the increased number of facilities than Alternative A.<br>▪ Groundwater:<br>  ▪ Drilling impacts similar to Alternative A, but would occur over a longer duration.<br>  ▪ Impacts from hydraulic fracturing would be minor and similar to Alternative A, but would occur over a longer duration. No impacts on potable groundwater expected. | ▪ Water quantity:<br>  ▪ Impacts would be nearly identical to those under Alternative B, except slightly less water consumption for dust control.<br>▪ Water quality:<br>  ▪ Impacts on surface water and groundwater quality from spills and chemical releases would be slightly less than Alternative B due to fewer well pads and miles of roads.<br>▪ Groundwater:<br>  ▪ Impacts from drilling and hydraulic fracturing activities would be the same as under Alternative B.<br>▪ Wastewater:<br>  ▪ Impacts would be the same as Alternative B.<br>▪ COAs would reduce potential impacts. | ▪ Water quantity:<br>  ▪ Impacts would be similar to Alternatives B and C.<br>▪ Water quality:<br>  ▪ Impacts on surface water and groundwater quality from spills would be less than under Alternative B, due to construction of fewer well pads.<br>  ▪ The well pads eliminated from Alternative D relative to Alternative B are those with more difficult access or higher vulnerability to spills, which would also result in lower level of risk in the event that a spill were to occur.<br>▪ Groundwater:<br>  ▪ Impacts would be the same as Alternative B.<br>▪ Design features would reduce potential impacts. |

BLM_0026884

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | ▪ Wastewater: <br>  ▪ Impacts of disposal of production wastewater are expected to be minor. <br> ▪ COAs would reduce potential impacts. | | |
| Geology | ▪ Slope stability: <br>  ▪ Potential impacts on well pads east of SH 133 from slope failure less likely; however, creep may occur. <br>  ▪ Potential impacts on well pads west of SH 133 would likely be avoided. <br>  ▪ Roads would not likely contribute to slope failure. <br> ▪ Earthquake potential: <br>  ▪ Low potential for inducing surface earthquakes. | ▪ Slope stability: <br>  ▪ Impacts would be similar to Alternative A, except risk is increased by a larger area of pads and more miles of roads and pipelines. <br> ▪ COAs would reduce potential impacts. <br> ▪ Earthquake potential: <br>  ▪ Increased risk of inducing strong earthquakes due to increased volume of waste fluid disposal; however, degree of increased risk cannot be easily predicted. Overall risk considered low. | ▪ Slope stability: <br>  ▪ Impacts would be greater than under Alternative A, but would be minimized by avoidance of steep slopes to the extent possible, and by implementation of COAs. <br> ▪ Earthquake potential: <br>  ▪ Impacts similar to Alternative B. | ▪ Slope stability: <br>  ▪ Impacts would be less than Alternative B, as there are four fewer well pads and infrastructure located east of SH 133. <br>  ▪ Effects associated with slope instability under Alternative D would be similar to those under Alternative B, except that risk would be reduced by the smaller number of pads and fewer miles of roads and pipelines. <br> ▪ Earthquake potential: <br>  ▪ Impacts similar to Alternative B. |
| Vegetation | ▪ Impacts include increased fragmentation of vegetation communities; decreased productivity due to increased erosion, sediment deposition, and fugitive dust; increased potential for wildfires; and increased potential for the spread of | ▪ Impacts similar to Alternative A, but would occur over a larger area. <br> ▪ COAs would be applied to minimize impacts on vegetation. <br> ▪ Mandatory noxious and invasive weed controls would reduce likelihood of weed | ▪ Impacts would be the same as Alternative B, but would occur over a smaller area. <br> ▪ Interim reclamation would go further in restoring a native plant community compared to Alternatives A. <br> ▪ There would be short-term impacts on 439 acres and | ▪ Impacts would be similar to Alternative B, but would occur over a smaller area. <br> ▪ Design features would be applied to minimize impacts on vegetation. <br> ▪ Mandatory noxious and invasive weed controls would reduce the likelihood of weed |

BLM_0026885

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | invasive and noxious plants.<br>■ There would be short-term impacts on 258 acres and long-term impacts on 85 acres. | spread.<br>■ There would be short-term impacts on 586 acres and long-term impacts on 212 acres. | long-term impacts on 124 acres. | spread.<br>■ There would be short-term impacts on 454 acres and long-term impacts on 133 acres. |
| Fish and Wildlife | ■ Terrestrial wildlife:<br>■ Impacts include increased fragmentation in disturbed areas; reduced habitat value or use by wildlife; temporary habitat loss due to changes in vegetation structure; avoidance of habitat or temporary displacement from habitat caused by increased human activity, traffic, noise, and lighting, which could increase physical distress, energy expenditure, competition for resources, and decrease nutritional condition and reproductive success; displacement from crucial winter habitats due to winter drilling; increased potential for disruption | ■ Terrestrial wildlife:<br>■ Short- and long-term impacts would be the greatest of any alternative because they would occur over the largest area.<br>■ Timing limitations may reduce impacts on deer and elk crucial winter range.<br>■ COAs would be applied to minimize impacts on wildlife.<br>■ Aquatic wildlife:<br>■ Potential impacts on fish from boring pipelines greater than Alternative A.<br>■ General:<br>■ The WHP would reduce impacts on big game, aquatic resources, and nesting birds, relative to current conditions or Alternative C.<br>■ 12-89-7-1 APD<br>■ Direct impacts on deer and elk could include | ■ Terrestrial wildlife:<br>■ Impacts similar to Alternative A, but would occur over a larger area.<br>■ The progressive development plan would directly increase habitat protection for deer and elk winter habitat and indirectly increase habitat protection for other wildlife species which may inhabit those areas.<br>■ COAs would be applied to minimize impacts on wildlife.<br>■ Aquatic wildlife:<br>■ Potential impacts on fish from boring pipelines greater than Alternative A.<br>■ Aquatic wildlife and their habitat would be impacted more than Alternative A as a result of increased water depletions; however, | ■ Terrestrial wildlife:<br>■ Impacts would be similar to Alternative A but would occur over a larger area.<br>■ Timing limitations may reduce impacts on deer and elk crucial winter range.<br>■ Design features would be applied to minimize impacts on wildlife.<br>■ Aquatic wildlife:<br>■ Measures to protect water quality and aquatic resources in the WHP wildlife mitigation plan would reduce impacts on fish compared to Alternative C.<br>■ General:<br>■ The WHP would reduce impacts on big game, aquatic resources, and nesting birds, relative to current conditions or Alternative C.<br>■ 12-89-7-1 APD |

BLM_0026886

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | of migration routes and prevention of access to sufficient foraging and water resources; and increased potential for collisions with vehicles.<br>■ Timing limitations may reduce impacts on deer and elk crucial winter range.<br>■ Aquatic wildlife:<br>■ Potential impacts on fish from boring pipelines.<br>■ In the short term and long term, water depletions would threaten the quantity of aquatic habitat for fish and other aquatic species known to inhabit the Unit. | mortality from traffic on access roads, but the levels of mortality would likely be low and not have population-level impact. Short- and long-term indirect impacts would likely include habitat avoidance due to disturbance, noise, and light. | water use would be less than the water withdrawals proposed under Alternative B.<br>■ 12-89-7-1 APD<br>■ Same as Alternative B. | ■ Same as Alternative B. |
| Migratory Birds | ■ Neotropical species:<br>■ Reduced habitat availability in the short and long term for sagebrush obligate species.<br>■ Reduced irrigated meadow habitat could possibly impact American bittern, although habitat is limited within the | ■ Neotropical species:<br>■ Sagebrush vegetation would be most impacted under this alternative in both the short term and long term; therefore, sagebrush obligate species would have decreased habitat.<br>■ Oakbrush and some aspen habitat would be disturbed in the short and | ■ Neotropical species:<br>■ Impacts would be similar to Alternative B, but would occur over a smaller area.<br>■ Raptors:<br>■ Impacts would be similar to Alternative B but would occur over a smaller area.<br>■ Like Alternative B, migratory bird impacts | ■ Neotropical species:<br>■ Impacts would be similar to Alternative B but would occur over a smaller area.<br>■ Raptors:<br>■ Impacts would be similar to Alternative B but would occur over a smaller area.<br>■ The effects of applying the WHP and design features |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | Unit.<br>• Raptors:<br>  ▪ Surface disturbance within irrigated meadow and sagebrush vegetation would reduce habitat and hunting grounds for golden eagles and prairie falcons in the short and long term. | long term. This would reduce the available habitat for multiple species.<br>▪ Impacts on American bittern would be similar to Alternative A, but would occur over a larger area.<br>• Raptors:<br>  ▪ Impacts on golden eagles and prairie falcons from surface disturbance would be similar to Alternative A, but would occur over a larger area.<br>▪ Migratory bird impacts would be mitigated by implementing measures in the WHP and applying COAs, including nesting surveys.<br>▪ Prohibiting surface-disturbing activities from May 15 to July 15 would protect breeding migratory birds.<br>▪ 12-89-7-1 APD:<br>  ▪ Negligible impacts on migratory birds. | would be mitigated by applying COAs and performing nesting surveys.<br>• Burying new electrical lines would minimize potential overhead disturbance for migratory bird species.<br>▪ 12-89-7-1 APD<br>  ▪ Same as Alternative B. | would be similar to those under Alternative B and would provide greater benefits than under Alternative C.<br>▪ 12-89-7-1 APD<br>  ▪ Same as Alternative B. |
| Special Status Species | ▪ Impacts on special status wildlife includes increased fragmentation in disturbed areas; reduced habitat value or use by wildlife; temporary habitat loss due to changes in vegetation | ▪ Impacts on special status wildlife are similar to Alternative A, but would be the greater due to occurring over a larger area. Adherence to applicable COAs, and attaching site-specific COAs | ▪ Impacts on special status wildlife are similar to Alternative A, but would occur over a larger area. Adherence to applicable COAs, and attaching site-specific COAs and APDs | ▪ Impacts on special status wildlife are similar to Alternative A but would be greater as they would occur over a larger area. Adhering to applicable COAs and attaching site-specific COAs |

BLM_0026888

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | structure; avoidance of habitat or temporary displacement from habitat caused by increased human activity, traffic, noise, and lighting, which could increase physical distress, energy expenditure, competition for resources, and decrease nutritional condition and reproductive success; displacement from crucial winter habitats due to winter drilling; increased potential for disruption of migration routes and prevention of access to sufficient foraging and water resources; and increased potential for collisions with vehicles.<br>▪ Implementing SGI's Well Pad Site Suitability Models and Methodologies would likely result in no water quality impacts on the four endangered Colorado River fish species. Impacts of additional water depletions could be mitigated by SGI.<br>▪ No effect on species.<br>▪ May affect but is not likely to adversely affect Canada lynx.<br>▪ May affect, and is likely to | and APDs would minimize the potential for impacts on Threatened, Endangered, and Candidate species. COAs and BLM adopted mitigation would make activities compliant with the 1999 Programmatic BO and Recovery Agreement and ensure continued recovery of those listed fish species.<br>▪ Implementing SGI's water augmentation plan would require much less water depletions within the Unit, reducing impacts on endangered Colorado and Gunnison River Fish.<br>▪ No effect on greenback cutthroat trout.<br>▪ May affect but is not likely to adversely affect Canada lynx and bald eagle.<br>▪ May affect, and is likely to adversely affect no species.<br>▪ Not likely to jeopardize the continued existence Colorado pikeminnow, razorback sucker, humpback chub, bonytail chub.<br>▪ May adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of | would minimize the potential for impacts on Threatened, Endangered, and Candidate species.<br>▪ Similar to Alternative B, implementing SGI's water augmentation plan would require much less water depletions within the Unit, reducing impacts on endangered Colorado and Gunnison River Fish.<br>▪ No effect on greenback cutthroat trout.<br>▪ May affect but is not likely to adversely affect Canada lynx and bald eagle.<br>▪ May affect, and is likely to adversely affect no species.<br>▪ Not likely to jeopardize the continued existence Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub.<br>▪ May adversely impact individuals, but is not likely to result in a loss of viability on the Unit, or cause a trend to federal listing nor a loss of species viability range-wide northern goshawk, Brewer's sparrow, and leopard frog.<br>▪ No adverse impacts on these species, and would not | and APDs would minimize the potential for impacts on threatened, endangered, and candidate species. COAs and BLM-adopted mitigation would ensure continued recovery of those listed fish species.<br>▪ No effect on greenback cutthroat trout.<br>▪ May affect but is not likely to adversely affect Canada lynx and bald eagle.<br>▪ May affect and is likely to adversely affect no species.<br>▪ Not likely to jeopardize the continued existence of Colorado pikeminnow, razorback sucker, humpback chub, bonytail chub.<br>▪ May adversely impact individuals but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide on northern goshawk, Brewer's sparrow, and leopard frog.<br>▪ No adverse impacts and would not result in a loss of |

BLM_0026889

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | *adversely affect* Colorado pikeminnow, razor back sucker, humpback chub, and bonytail chub.<br>• *May affect, and is not likely to adversely affect* greenback cutthroat trout.<br>• *May adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide* northern goshawk, bald eagle, Brewer's sparrow, and leopard frog.<br>• *No impacts on these species, and would not result in a loss of viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide* on the BLM listed bat species. | *species viability range-wide* northern goshawk, Brewer's sparrow, and leopard frog.<br>• *No adverse impacts on these species, and would not result in a loss of viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide* on the BLM listed bat species.<br>• Development of APD 12-89-7-1 may result in bald eagles temporarily avoiding scavenging habitat near the access road or well pad during the winter. The APD would not result in population-level effects on the northern leopard frog. There would be no impact on other special status species. | *result in a loss of viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide* on the BLM listed bat species.<br>• Impacts from APD 12-89-7-1 would be the same as under Alternative B. | *viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide* on the BLM-listed bat species.<br>• Impacts from APD 12-89-7-1 would be the same as under Alternative B. |
| Wildland Fire Management | • Natural gas well development may increase the risk of wildfires by introducing new ignition sources, increasing human activity, and increasing invasive weeds.<br>• Natural gas well development may pose a hazard to firefighters from | • Impacts would be similar to Alternative A; however, the risk of human caused ignition from construction and firefighter hazards would be increased due to increased level of development. | • Impacts would be similar to Alternative B; however, fewer new well pads would be constructed, therefore the likelihood of ignition and hazards would be decreased.<br>• Additional design features to protect other resources, burying four overhead lines, and an annual reclamation | • Impacts under Alternative D would be similar to those described under Alternative B, except there would be slightly less vehicle traffic, thereby reducing the potential for unplanned ignition. |

BLM_0026890

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | toxins, fighting fires and evacuating personnel, and risks from overhead power lines.<br>• New and improved access roads may improve access for wildland fire suppression activities.<br>• Proposed development may also create fuel breaks that could prevent the spread of wildland fires. | | monitoring status report may also provide indirect reduction of wildfire risk. | |
| Cultural Resources | • Specific numbers of impacted cultural resources under Alternative A are unavailable, though previous work in the Unit indicates that the resources are sparsely distributed (Millward 2013). Impacts on cultural resources would be assessed on a case-by-case or APD-specific basis.<br>• Potential effects, including direct and indirect impacts from surface-disturbing activities and soil erosion, on cultural resources eligible for listing on the NRHP would be avoided or mitigated. If previously undiscovered resources were identified during an undertaking, work would be suspended while the | • Under Alternative B, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). Under Alternative B, impacts on cultural resources would be assessed on a case-by-case or APD-specific basis.<br>• COAs for APDs would be applied to minimize impacts on cultural resources. | • Same as Alternative B. | • Same as Alternative B. |

BLM_0026891

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | resource is evaluated and mitigated to avoid any further effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects would be possible. | | | |
| Paleontological Resources | ▪ There would be few protections provided to paleontological resources that may occur within the Unit. Paleontological resources would be indirectly protected via stipulations or actions that would protect other resources, such as those for wildlife and cultural resources.<br>▪ If individual APDs are submitted to BLM for consideration (not under a Master Development Plan), then paleontological resources could be directly protected via a paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are | ▪ If APDs are submitted to BLM for consideration (not under a Master Development Plan), paleontological resources could be directly protected via the paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are authorized in Class 4 and 5 Paleontological Areas. | ▪ Same as Alternative B. | ▪ Same as Alternative B. |

BLM_0026892

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | authorized in Class 4 and 5 Paleontological Areas. | | | |
| Visual Resources | ▪ Increase in long-term surface disturbance and permanent structures could diminish scenic quality evaluation ratings for vegetation, color, and cultural modifications enough to lower the scenic quality ratings of the Scenic Quality Rating Units from Class A to a Class B or Class C, thereby potentially changing the VRI to Class III or IV.<br>▪ Majority of visual impacts would be away from the West Elk Loop Scenic Byway. | ▪ Greater increase in long-term surface disturbance and permanent structures could diminish scenic quality evaluation ratings and more likely change the VRI to Class III or IV.<br>▪ Greatest potential for changing the VRI and having the most impacts near the West Elk Loop Scenic Byway.<br>▪ COAs would be applied to reduce impacts on visual resources.<br>▪ Overall, changes to existing landform, vegetation, and structures from 12-89-7-I APD activities would result in a weak to moderate degree of contrast in form, line, texture, and color. | ▪ Long-term surface disturbance and permanent structures similar to Alternative B would result in similar scenic quality impacts and VRI changes to Class III or IV.<br>▪ Greater potential for visual impacts near the West Elk Loop Scenic Byway.<br>▪ COAs would be applied to reduce impacts on visual resources.<br>▪ Impacts from APD I2-89-7-I would be the same as under Alternative B. | ▪ Similar to those described under Alternative B, except that there would be three fewer well pads, resulting in slightly fewer changes to vegetation, color, and cultural modifications.<br>▪ Impacts from APD I2-89-7-I would be the same as under Alternative B. |
| Livestock Grazing | ▪ Construction-related disturbance would reduce available grazing acreage and forage for sheep and cattle in the short term. Installation of access roads, well pads and utility lines to access private mineral reserves would reduce forage and acreage in long term. | ▪ Impacts from construction-related disturbance and the installation of access roads, well pads and utility lines to access mineral reserves would be similar to Alternative A, but would occur over a larger area.<br>▪ Potential long-term loss of 23 acres of vegetation on BLM allotments would be less than | ▪ Impacts from construction-related disturbance and the installation of access roads, well pads and utility lines to access mineral reserves would be similar to Alternative A, but would occur over a larger area.<br>▪ Potential long-term loss of 16 acres of vegetation on BLM allotments. | ▪ Impacts would be similar to those described under Alternative B, except there would be the potential long-term loss of 13 acres of vegetation on BLM allotments.<br>▪ Impacts from APD I2-89-7-I would be the same as under Alternative B. |

BLM_0026893

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | • Potential long-term loss of vegetation on 14 acres of BLM allotments. Additional acreage lost on private lands.<br>• Potential for additional sources of income to ranches through lease fees or surface use agreements. Replacement of old fence lines could help with long-term costs of maintaining infrastructure. | significant because only approximately 5% of acres on BLM land would be impacted and design features would be applied to minimize indirect impacts.<br>• Potential impacts from additional sources of income and replacement of old fence lines would be similar to Alternative A.<br>• APD 12-89-7-1 would disturb approximately 5 acres of private ranchland and has the potential to impact livestock productivity on this private ranch. Impacts would be minimized due to the limited acres disturbed and the fact that livestock are not currently grazed on the ranch in the winter and spring. | • Additional COAs to reduce impacts on vegetation, and reclamation of pipeline corridors would ultimately increase forage. With this mitigation in place, impacts on livestock grazing would be less than significant.<br>• Potential impacts from additional sources of income and replacement of old fence lines would be similar to Alternative A.<br>• Impacts from APD 12-89-7-1 would be the same as under Alternative B. | |
| Minerals | • Possible that SGI would not pursue much near-term development of federal gas resources in the project area; therefore, development of federal gas resources would be reduced.<br>• Federal leases in the project area would continue to be subject to lease stipulations including the standard stipulations, and a timing | • SGI would pursue development of federal gas resources in the project area; therefore, development of federal gas resources would be increased.<br>• Impacts on federal leases from lease stipulations, site suitability, and various management plans would be similar to Alternative A; but the effects would be increased due to more | • Similar to Alternative B, SGI would pursue development of federal gas resources in the project area; therefore, development of federal gas resources would be increased.<br>• Impacts on federal leases from lease stipulations, site suitability, and various management plans would be similar to Alternative B. The additional constraints to | • As under Alternatives B and C, development of federal resources would be increased compared to Alternative A.<br>• Impacts on federal leases from lease stipulations, site suitability, and various management plans would be similar to Alternative B.<br>• Impacts from design features would be similar to Alternative B. |

BLM_0026894

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | limitation. Timing limitation stipulation could reduce development of federal gas resources.<br>▪ Factors and constraints for site suitability could reduce the total amount of development of federal gas resources.<br>▪ Implementing various management plans (i.e., noxious weeds, surface use, etc.) would restrict development of federal gas resources. | development.<br>▪ Federal gas leases in the project area would be subject to the COAs; however, overall development of federal gas resources in the project area would increase despite the added restrictions. | protect wildlife would not be likely to reduce the total amount of development of federal gas resources in the project area.<br>▪ Impacts from COAs would be similar to Alternative B. | |
| Recreation | ▪ Fewer potential adverse impacts on hunting opportunities because less big game habitat fragmented.<br>▪ Fewer potential adverse impacts on scenic viewing and other recreational activities that occur along West Elk Loop Scenic Byway and CR 265. | ▪ Greatest disturbance of, and decrease in, big game would result in most potential adverse impacts on hunting opportunities, especially during construction activities. Long-term impacts would be less noticeable, but hunters could choose to go elsewhere.<br>▪ Noise, congestion, and safety concerns resulting from increased traffic on the West Elk Loop Scenic Byway and CR 265 would adversely impact scenic viewing and other recreational activities. | ▪ Impacts on hunting opportunities would be similar to Alternative B; however, comprehensive wildlife management actions would likely limit disturbance of and decrease in big game. Like Alternative B, hunters could choose to go elsewhere.<br>▪ Scenic viewing and other recreational activity impacts on the West Elk Loop Scenic Byway and CR 265 similar to Alternative B. | ▪ Impacts would be similar to those described under Alternative B because there would be similar wildlife mitigation measures, traffic levels, disturbance to the landscape, and resultant potential for conflict with recreational activities and opportunities. |
| Lands and Realty | ▪ Approximately 88 acres long-term disturbance<br>  ▪ Federal surface – 4 acres | ▪ Approximately 215 acres long-term disturbance<br>  ▪ Federal surface – 4 acres<br>  ▪ Federal minerals – 164 | ▪ Approximately 126 acres long-term disturbance<br>  ▪ Federal surface – 6 acres | ▪ Land use impacts would be similar to but fewer than those described in Alternative B. |

BLM_0026895

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | ▪ Federal minerals – 25 acres<br>▪ Private surface – 60 acres<br>▪ Approximately 259 acres short-term disturbance<br>  ▪ Federal surface – 7 acres<br>  ▪ Federal minerals – 74 acres<br>  ▪ Private surface – 178 acres<br>▪ Implementation would lead to adjustments in existing land uses on BLM-administered and private lands and authorization of additional ROWs.<br>▪ Extent of land uses displaced would be mostly on private lands, including residential areas along State Highway 133. | ▪ Private surface – 47 acres<br>▪ Approximately 598 acres short-term disturbance<br>  ▪ Federal surface – 10 acres<br>  ▪ Federal minerals – 462 acres<br>  ▪ Private surface – 126 acres<br>▪ Impacts from additional ROW authorizations similar to Alternative A.<br>▪ Impacts on Federal surface lands would be similar to Alternative A. Increased development on private surface lands would be greater than under Alternative A, resulting in potential greater increase in impacts on land use on these lands.<br>▪ APD 12-89-7-1 could result in greater increases in intrusive impacts and loss of forage, irrigated hay meadows, and hunting opportunities than under Alternative A. | ▪ Federal minerals-109 acres<br>▪ Private surface – 12 acres<br>▪ Approximately 441 acres short-term disturbance<br>  ▪ Federal surface – 16 acres<br>  ▪ Federal minerals – 369 acres<br>  ▪ Private surface – 56 acres<br>▪ Impacts from additional ROW authorizations similar to Alternative A.<br>▪ Extent of Federal and private surface land uses displaced would be less than under Alternatives A and B. During winter months, private landowners and public land users would not be as severely affected due to comprehensive wildlife management actions.<br>▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. | ▪ Approximately 133 acres long-term disturbance<br>  ▪ Federal surface – 1 acre<br>  ▪ Federal minerals – 120<br>  ▪ Private surface – 12 acres<br>▪ Approximately 455 acres short-term disturbance<br>  ▪ Federal surface – 5 acres<br>  ▪ Federal minerals – 382 acres<br>  ▪ Private surface – 68 acres<br>▪ Impacts from applying COAs would be the same as under Alternatives B and C.<br>▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. |
| Transportation and Access | ▪ Temporary decrease in access for property owners and leaseholders during construction activities; however, long-term improvements to existing | ▪ Temporary and long-term impacts on access would be similar to Alternative A, but would apply to a larger area within the Unit.<br>▪ Increased average annual | ▪ Temporary and long-term impacts on access similar to Alternative A, but would apply to a larger area.<br>▪ Increased average annual daily traffic on Highway 133 | ▪ Temporary and long-term impacts on access would be similar to Alternative A but would apply to a larger area in the Unit.<br>▪ Increased average annual |

BLM_0026896

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
|  | routes would promote greater access within the Unit.<br>■ Increased average annual daily traffic on Highway 133 (in Gunnison County) by less than 1% over a 3-year time frame. Average annual daily trips associated with trucks could increase by up to 11%.<br>■ Increased vehicle trips would affect long-term traffic movement on routes in Unit, especially on Highway 133. Short-term spikes in traffic volumes on CR 265 and access roads during construction.<br>■ Safety on Highway 133 and other routes in the Unit decreased because of higher traffic volumes.<br>■ Potential for road surface deterioration over time, including Highway 133 and CR 265; however, implementing a road maintenance plan may reduce deterioration. | daily traffic on Highway 133 (in Gunnison County) by 1.35% over a 6-year time frame. Average annual daily trips associated with trucks could increase by up to 21%.<br>■ Increased vehicle trips would affect long-term traffic movement on routes in Unit, especially on Highway 133 and CR 265. Similar to Alternative A, short-term spikes in traffic volumes on CR 265 and access roads.<br>■ Effects on safety from increased vehicle volume similar to Alternative A.<br>■ Potential for road surface deterioration greater than Alternative A. Similar to Alternative A, implementing a road maintenance plan may reduce deterioration. | (in Gunnison County) by 1% over a 6-year time frame. Average annual daily trips associated with trucks could increase by up to 16%.<br>■ Increased vehicle trips would affect traffic movement on routes in Unit, especially on Highway 133. Similar to Alternative A, short-term spikes in traffic volumes on CR 265 and access roads.<br>■ Effects on safety from increased vehicle volume similar to Alternative A.<br>■ Potential for road surface deterioration similar to Alternative B. | daily traffic on Highway 133 (in Gunnison County) by 1.35% over a 6-year time frame. Average annual daily trips associated with trucks could increase by up to 21%.<br>■ Effects on long-term traffic movement on Highway 133 and CR 265 would be similar to Alternative B. Short-term spikes in traffic volumes on CR 265 and access roads would be similar to Alternative B.<br>■ Effects on safety from increased vehicle volume would be similar to Alternative A.<br>■ Potential for road surface deterioration would be similar to Alternatives B and C. |
| Hazardous and Solid Wastes | ■ Alternative A would result in the least risk over time, because it involves the fewest wells. | ■ Potential impacts similar to Alternative A, but of greater magnitude based on the increase in proposed | ■ Potential impacts on human health and safety would be similar to Alternative B; however, SGI would | ■ The impacts from hazardous substances and waste generation under Alternative D would be less than those |

BLM_0026897

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | • Potential impacts include human or animal contact to hazardous substances, contamination of water bodies and aquifers, and effects on air quality from natural gas and drilling operations.<br>• No development on BLM-administered lands would likely result in fewer impacts from hazardous and solid wastes on lands overlaying BLM-administered mineral estate, including potential contamination of groundwater. Development continuing on private land could impact the surrounding community.<br>• If a closed-loop system were implemented, there would be fewer impacts on health and safety from drilling waste and cuttings than if a reserve pit system is used. | development.<br>• Because there would be more development on BLM-administered mineral estate, there are likely to be more impacts from hazardous and solid wastes on these lands, including potential contamination of groundwater. Impacts on surrounding community would be similar to Alternative A.<br>• Similar to Alternative A, a closed loop system that could reduce potential impacts on health and safety.<br>• COAs in Appendix C address hazardous substances and would reduce the risk of hazardous spills. | propose to use a closed loop system, which would reduce potential impacts on health and safety.<br>• COAs in Appendix C address hazardous substances and would reduce the risk of hazardous spills. | under Alternative B, since Alternative D would construct fewer pads.<br>• Risks would be reduced through avoidance of risky locations and implementation of site-specific design features.<br>• Design features from Appendix C would reduce the risk of hazardous material spills. |
| Socioeconomics | • Employment would be approximately 80 percent from within the Rocky-Mountain region; however, a smaller portion would be from the immediate project area. | • Employment would be approximately 80 percent from within the Rocky-Mountain region; however, a smaller portion would be from the immediate project area. | • Employment would be approximately 80 percent from within the Rocky-Mountain region; however, a smaller portion would be from the immediate project area. | • Employment would be approximately 80 percent from within the Rocky Mountain region; however, a smaller portion would be from the immediate project area. |

BLM_0026898

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | ▪ Direct employment estimates are 285 people during the drilling phase; 34 people during the production. <br> ▪ Development likely to result in increases to severance and ad valorem taxes <br> ▪ Development is likely to result in an increase in Non-residential property, particular oil and gas property as well as ad-valorem tax on oil and gas production. <br> ▪ Changes in residential property values may be mixed. <br> ▪ Sales tax revenues would be increased <br> ▪ Lodging tax revenues may be increased. <br> ▪ Impacts on public services are likely to be restricted to the drilling phase and would be limited in nature. <br> ▪ Increased heavy vehicle traffic would likely result in the need to increase road maintenance. <br> ▪ Even if project activities do not directly result in significant changes in air or water quality, residents and | ▪ Direct employment estimates are 285 people during the drilling phase; 94 people during the production. <br> ▪ Development likely to result in higher increases to severance and ad valorem taxes than under Alternative A. <br> ▪ Development is likely to result in larger increases in Non-residential property than under Alternative A. <br> ▪ Changes in residential property values would be the same as Alternative A; all 44 properties in the Unit would likely be affected. <br> ▪ Sales tax and lodging tax revenues would be increased more than under Alternative A. <br> ▪ Alternative B is likely to have more extensive impacts on public services than Alternative A. <br> ▪ Road maintenance costs are expected to be higher than Alternative A due to higher levels of heavy vehicle traffic. <br> ▪ Even if project activities do not directly result in significant changes in air or water quality, residents' | ▪ Direct employment estimates are the same as under Alternative B. <br> ▪ Increases to severance and ad valorem taxes would be the same as Alternative B. <br> ▪ Increase in Non-residential property revenue would be the same as Alternative B. <br> ▪ Changes in residential property values would be the same as Alternatives A and B. <br> ▪ Sales tax and lodging tax revenues would be the same as Alternative B. <br> ▪ Impacts on public services are likely to be the same as Alternative B. <br> ▪ Road maintenance costs would be the same as Alternative B. <br> ▪ Quality of life concerns would be same as Alternative B. <br> ▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. | ▪ Direct employment estimates are the same as Alternative B. <br> ▪ Development would likely result in higher increases to severance and ad valorem taxes than under Alternative A. <br> ▪ Development would likely result in larger increases in non-residential property than under Alternative A. <br> ▪ Impacts on residential property values would be slightly fewer than Alternative A. <br> ▪ Sales tax and lodging tax revenues would be increased more than under Alternative A. <br> ▪ Alternative B is likely to have more extensive impacts on public services than Alternative A. <br> ▪ Road maintenance costs would be similar to Alternative A. <br> ▪ Residents' concerns about impacts on quality of life would be similar to Alternative B. <br> ▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. |

BLM_0026899

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | visitors perception of the air and water quality may be influenced by the presence of development activities.<br>■ Changes to residential property values may occur but are likely to have impacts only on those properties immediately adjacent to the proposed development. | concerns about impacts on quality of life would be highest under Alternative B due to the higher degree of development.<br>■ APD 12-89-7-1 could increase employment needs, while reducing hunting opportunities, potentially decreasing property values and affecting quality of life. | | |
| Environmental Justice | ■ The actions are not likely to have disproportionate adverse effects on low income or minority populations. | ■ Same as Alternative A | ■ Same as Alternative A | ■ Same as Alternative A. |

BLM_0026900

# Chapter 3
## Affected Environment

BLM_0026902

# TABLE OF CONTENTS

Chapter                                                                        Page

**3. AFFECTED ENVIRONMENT** ............................................................................. **3-1**

    3.1    Introduction ...................................................................................... 3-1
    3.2    Resources ......................................................................................... 3-4
            3.2.1   Air Resources ......................................................................... 3-4
            3.2.2   Noise ...................................................................................... 3-21
            3.2.3   Soil Resources ....................................................................... 3-23
            3.2.4   Water Resources .................................................................... 3-30
            3.2.5   Geology .................................................................................. 3-48
            3.2.6   Vegetation ............................................................................. 3-57
            3.2.7   Invasive, Nonnative Species ................................................ 3-63
            3.2.8   Fish and Wildlife .................................................................. 3-65
            3.2.9   Migratory Birds .................................................................... 3-73
            3.2.10 Special Status Species (Threatened, Endangered, Sensitive
                      Species) ................................................................................ 3-81
            3.2.11 Wildland Fire Management ................................................. 3-97
            3.2.12 Cultural Resources ............................................................... 3-98
            3.2.13 Paleontological Resources ................................................. 3-101
            3.2.14 Visual Resources ............................................................... 3-106
    3.3    Resource Uses ............................................................................. 3-109
            3.3.1   Livestock Grazing .............................................................. 3-109
            3.3.2   Minerals (Leasable, Locatable, Salable) ........................... 3-113
            3.3.3   Recreation .......................................................................... 3-119
            3.3.4   Lands and Realty ................................................................ 3-120
            3.3.5   Transportation and Access ................................................. 3-122
    3.4    Social and Economic Conditions ................................................ 3-125
            3.4.1   Hazardous Materials and Wastes ....................................... 3-125
            3.4.2   Socioeconomics ................................................................. 3-128
            3.4.3   Environmental Justice ........................................................ 3-135

BLM_0026903

# TABLES

Page

| | | |
|---|---|---|
| 3-1 | Approved Standards for Public Land Health | 3-2 |
| 3-2 | Ambient Air Standards and PSD Increments ($\mu g/m^3$) | 3-6 |
| 3-3 | Near-Field Analysis Background Ambient Air Quality Concentrations | 3-8 |
| 3-4 | Background Nitrogen and Sulfur Deposition Values (kg/ha-yr) | 3-12 |
| 3-5 | Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes | 3-13 |
| 3-6 | Mean Monthly Temperature Ranges and Total Precipitation Amounts | 3-15 |
| 3-7 | Wind Direction Frequency Distribution | 3-17 |
| 3-8 | Wind Speed Distribution | 3-17 |
| 3-9 | Common Sound Levels | 3-21 |
| 3-10 | Regulatory Limits for Noise Generated by Natural Gas Facilities | 3-22 |
| 3-11 | Noise Levels Associated with Typical Construction Equipment (dBA) | 3-23 |
| 3-12 | Classified Soil Types in the Bull Mountain Unit | 3-25 |
| 3-13 | Acres of Farmlands in the Bull Mountain Unit | 3-26 |
| 3-14 | Acres of Slopes in the Bull Mountain Unit | 3-26 |
| 3-15 | Soil Erosion Ratings for the Bull Mountain Unit | 3-28 |
| 3-16 | Erosion Potential of Roads and Trails for the Bull Mountain Unit | 3-28 |
| 3-17 | Land Health Assessment Results in the Bull Mountain Unit | 3-29 |
| 3-18 | Typical Monthly Flows for USGS near the Unit (cfs[1]) | 3-33 |
| 3-19 | General Water Quality of Springs within the Unit (one sample per station) | 3-35 |
| 3-20 | Stream Classifications and Water Quality Standards | 3-36 |
| 3-21 | List of Impaired Water Quality Segments | 3-36 |
| 3-22 | General Water Quality of East Muddy/Muddy Creeks on/near the Unit | 3-37 |
| 3-23 | Water Quality Lab Test Results from Produced Water from Existing Producing Natural Gas Wells within the Producing Formations in the Unit | 3-41 |
| 3-24 | Summary of Results for Selected Analytes in Samples from 23 Wells Collected between July 16, 2002 and June 12, 2013 | 3-45 |
| 3-25 | Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012 | 3-45 |
| 3-26 | Existing Vegetation Communities in Bull Mountain Unit | 3-58 |
| 3-27 | Land Health Assessment Results in the Bull Mountain Unit | 3-63 |
| 3-28 | Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed in Bull Mountain Unit | 3-64 |
| 3-29 | Birds of Conservation Concern of the Uncompahgre Field Office | 3-75 |
| 3-30 | Threatened and Endangered Species of the Uncompahgre Field Office | 3-82 |
| 3-31 | Existing Habitats within the Ragged Mountain Lynx Analysis Unit | 3-86 |
| 3-32 | Existing Habitats within the Crystal West Lynx Analysis Units | 3-86 |
| 3-33 | BLM Sensitive Species of the Uncompahgre Field Office[1] | 3-90 |
| 3-34 | Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources | 3-103 |
| 3-35 | Ranches and Allotments within the Bull Mountain Unit | 3-110 |
| 3-36 | Bull Mountain Unit Existing Facilities | 3-114 |
| 3-37 | Annual Wages by Industry, 2012 | 3-130 |

# FIGURES

Page

3-1   Air Quality Study Area ................................................................................................. 3-7
3-2   Soils ............................................................................................................................. 3-24
3-3   Farmlands .................................................................................................................... 3-27
3-4   Watersheds .................................................................................................................. 3-31
3-5   Streams and Springs .................................................................................................... 3-34
3-6   Water Quality Monitoring ........................................................................................... 3-44
3-7   Geology Cross Section ................................................................................................ 3-50
3-8   Geology ....................................................................................................................... 3-53
3-9   Landslides .................................................................................................................... 3-55
3-10  Vegetation ................................................................................................................... 3-59
3-11  Riparian and Wetland Vegetation ............................................................................... 3-62
3-12  Fish and Aquatic Wildlife Habitat .............................................................................. 3-66
3-13  Mule Deer Habitat ....................................................................................................... 3-69
3-14  Elk Habitat .................................................................................................................. 3-70
3-15  Purple Martin Habitat .................................................................................................. 3-79
3-16  Bald Eagle Habitat ...................................................................................................... 3-80
3-17  Canada Lynx Habitat ................................................................................................... 3-87
3-18  North Fork Landscape Unit Prehistoric Site Sensitivity Model ............................... 3-100
3-19  Potential Fossil Yield Classification ......................................................................... 3-105
3-20  Grazing Allotments ................................................................................................... 3-111
3-21  Existing Infrastructure .............................................................................................. 3-123

BLM_0026905

This page intentionally left blank.

BLM_0026906

# CHAPTER 3
# AFFECTED ENVIRONMENT

## 3.1   INTRODUCTION

The purpose of this chapter is to describe the existing biological, physical, and socioeconomic characteristics of the Bull Mountain Unit MDP project area, including human uses that could be affected by implementing the alternatives described in **Chapter 2**, Alternatives. This chapter includes a discussion of resources, resource uses, and social and economic conditions. Each topic area includes an introduction, followed by a description of current conditions and trends.

Information from the ongoing Uncompahgre RMP revision, scoping comments, the Preliminary Bull Mountain EA and public comments received on the environmental assessment, and other updated sources were used to help set the context for the project area. The level of information presented in this chapter is commensurate with and sufficient to assess potential effects discussed in **Chapter 4**, Environmental Consequences, based on the alternatives presented in **Chapter 2**.

Acreage figures and other numbers used are approximate projections. Readers should not infer that they reflect exact measurements or precise calculations. Acreages were calculated using GIS technology, and there may be slight variations in total acres between resources.

The project area is the geographic area within which the BLM will make decisions and includes all lands, regardless of jurisdiction, within the project area boundaries. However, the BLM makes decisions on only those lands and federal mineral estates that it administers (the decision area). Private mineral estate development is not included in Alternatives B or C; decisions in either of those alternatives may have impacts on private surface overlying private mineral leases (i.e., to accommodate access, or construct a stretch of pipeline both inside and directly adjacent to the Unit if the only reason impacts were to occur were due to the approval of a federal APD). The analysis area includes any lands, regardless of jurisdiction, for which the BLM synthesizes, analyzes, and interprets data and information that relates to the project area. The analysis areas can be any size, can vary according to resource, and can be located anywhere within, around, partially outside, or completely outside the project or decision areas. For example, air quality and socio-economics necessitate a broader analysis area in order to better disclose the extent and magnitude of the anticipated impacts. The analysis areas for resources and resource uses are defined in **Chapter 4**, Environmental Consequences.

BLM_0026907

### Standards for Public Land Health

In January 1997, Colorado BLM approved the Standards for Public Land Health. Standards describe conditions needed to sustain public land health and relate to all uses of the public lands. The approved standards presented in **Table 3-1**, Approved Standards for Public Land Health, are applicable to resources within the Unit and the current resource conformance to these standards is proved in **Section 3.2**, Resources.

Table 3-1
**Approved Standards for Public Land Health**

| Standard | Definition/Statement |
|---|---|
| #1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allow for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff. |
| #2 Riparian Systems | Riparian systems associated with both running and standing water, function properly and have the ability to recover from major surface disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and biodiversity. Water quality is improved or maintained. Stable soils store and release water slowly. |
| #3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| #4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities. |
| #5 Water Quality | The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM-administered lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 Code of Colorado Regulations 1002-8), as required by Section 303(c) of the Clean Water Act. |

Source: BLM 1997

### Resources and Uses Not Addressed

Certain types of resources that may be present in the Uncompahgre Field Office (UFO) are not addressed in this EIS because issues relating to these resources were not identified during scoping by the public or the BLM determined they do not occur within the analysis area. The noted resources below are not addressed in this chapter.

Areas of Critical Environmental Concern and Wild and Scenic Rivers do not occur in or within analysis area of the Unit, and will not be affected by the actions being considered in **Chapter 2**, Alternatives; therefore, they are not discussed.

Coal resources within the Unit are within the Piceance Deep coal field, located in the Uinta coal region. The coal development potential area identified in the 1989 Uncompahgre Basin RMP is based on a maximum development depth of about 2,000 feet; however, coal resources in the Unit

BLM_0026908

have an overburden of more than 3,500 feet. Therefore, coal resources in the Unit are not considered to have economic or scientific interest and are not further discussed in this chapter.

Although locatable minerals such as uranium, vanadium, gypsum, and placer gold are known to exist throughout portions of the region, there has been no history of exploration, development, or production of any kind within or near (within 50 miles) the Unit. For this reason, locatable minerals are not further discussed in this chapter. Similarly, there are no mineral material operations and no free use permits in or near the Unit. While potential for mineral materials within the Unit may exist, lack of interest in and surrounding this area in developing mineral materials is an indication that development in this area is not likely to occur. For this reason, mineral materials are not discussed further in this chapter.

According to the Renewable Energy Potential Report (2010), the Unit has 19,670 acres (100 percent) with geothermal potential. This is shown in **Figure 2-2** of the Renewable Energy Potential Report (BLM 2010a). There are no hot springs, geothermal facilities, pending applications for geothermal facilities, leases, or lease nominations in or near the Unit. For this reason, geothermal resources are not further discussed in this chapter.

No congressionally designated Wilderness Areas, Wilderness Study Areas, or lands with wilderness characteristics have been identified within the project area (defined as the boundaries of the Unit). The nearby Raggeds Wilderness in the White River and Gunnison National Forests and the West Elk Wilderness Area in the Gunnison National Forest are managed by the US Department of Agriculture, Forest Service (Forest Service). Because they do not fall within the defined project area, these areas will not be analyzed as discrete units in the EIS. However, Raggeds Wilderness and West Elk Wilderness Area do fall within the defined analysis area for air resources. Therefore, these areas are discussed in the context of the air resources affected environment and impact analysis.

BLM-administered lands within the UFO were inventoried for wilderness characteristics between 2010 and 2011[1]. No lands possessing wilderness characteristics were found on BLM-administered lands occurring in or within the analysis area of the Unit and will not be affected by the actions being considered in **Chapter 2**, Alternatives; therefore, they are not discussed further.

Based on the current cultural resources surveys completed as part of the Bull Mountain Unit MDP EIS, there has been limited archaeological evidence of the historic presence of Native Americans within the Unit. However, only consultation with tribes that use resources in the Unit or live in the surrounding area will confirm whether there are sensitive heritage areas or religious concerns within the Unit. Consultation with the tribes is on-going and is described in **Chapter 5**, Consultation and Coordination.

---

[1] For additional details and information, please see the Uncompahgre Field Office's Lands With Wilderness Characteristics report which can be found on-line at
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/lwc_inventory.html

BLM_0026909

## 3.2     RESOURCES

This section contains a description of the biological and physical resources of the project area and follows the order of topics addressed in Chapter 2, as follows:

- Air resources

- Noise

- Soil resources

- Water resources

- Geology

- Vegetation

- Invasive, nonnative species

- Fish and wildlife

- Migratory birds

- Special status species (threatened, endangered, sensitive species)

- Wildland fire management

- Cultural resources

- Paleontological resources

- Visual resources

### 3.2.1   Air Resources

*Current Conditions*

The project area is in Gunnison County, in the Central Mountains Region for air quality planning (CDPHE 2014). This region includes counties that generally are on or near the Continental Divide. Air quality concerns in this region are primarily impacts related to particulate pollution from wood burning and road sanding activities. Air quality for any area is generally influenced by the amount of pollutants that are released within the vicinity and up wind of that area, and can be highly dependent upon the contaminants chemical and physical properties. Additionally, an area's topography or terrain (such as mountains and valleys) and weather (such as wind, temperature, air turbulence, air pressure, rainfall, and cloud cover) will have a direct bearing on how pollutants accumulate or disperse.

*Overview of Regulatory Environment*

Air quality impacts from pollutant emissions are limited by regulations, standards, and implementation plans established under the Clean Air Act (CAA), as administered by the

BLM_0026910

Colorado Department of Public Health and Environment (CDPHE) Air Pollution Control Division (APCD) under authorization of the EPA. The operator will comply with all applicable federal, state, and local air laws, regulations, and policies.

The APCD is the primary air quality regulatory agency responsible for determining potential impacts once detailed industrial development plans have been made, and those development plans are subject to applicable air quality laws, regulations, standards, control measures, and management practices. Unlike the conceptual "reasonable, but conservative" engineering designs used in NEPA analyses, any APCD air quality preconstruction permitting demonstrations required would be based on very site-specific, detailed engineering values, which would be assessed in the permit application review. Any proposed facility which meets the requirements set forth under division permit regulations is subject to the Colorado permitting and compliance processes.

Regulations and standards which limit permissible levels of air pollutant concentrations and air emissions and are relevant to the Project air impact analysis include:

- National Ambient Air Quality Standards (NAAQS) and Colorado Ambient Air Quality Standards (CAAQS)

- Prevention of Significant Deterioration

- New Source Performance Standards

- National Emission Standards for Hazardous Air Pollutants

- Non-Road Engine Tier Standards

- Colorado Oil and Gas Permitting Guidance

Each of these regulations is further described in the following sections.

*Ambient Air Quality Standards*

The NAAQS and CAAQS are health-based criteria for the maximum acceptable concentrations of air pollutants at all locations to which the public has access. Although specific air quality monitoring has not been conducted in the project area, the CDPHE (2014) has designated all of Gunnison County as "attainment" for all criteria pollutants. Criteria pollutants under CAAQS and NAAQS are carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter less than 10 microns in effective diameter ($PM_{10}$), particulate matter less than 2.5 microns in effective diameter ($PM_{2.5}$), sulfur dioxide ($SO_2$), and lead (Pb). Lead emissions from project sources are negligible and therefore, the lead NAAQS is not addressed in this analysis. States typically adopt the NAAQS but may also develop state-specific ambient air quality standards for certain pollutants. The NAAQS and CAAQS are summarized in **Table 3-2**, Ambient Air Standards and PSD Increments ($\mu g/m^3$). PSD Class I and Class II increments are also included in **Table 3-2**, and a discussion of PSD increments is provided later in this section.

BLM_0026911

**Table 3-2**
**Ambient Air Standards and PSD Increments (μg/m³)**

| Pollutant | Averaging Time | Colorado and National Ambient Air Quality Standards | Incremental Increase Above Legal Baseline | |
|---|---|---|---|---|
| | | | PSD Class I[1] | PSD Class II[1] |
| Carbon Monoxide (CO) | 1-hour[2] | 40,000 | --[3] | --[3] |
| | 8-hour[2] | 10,000 | -- | -- |
| Nitrogen Dioxide (NO₂) | Annual[4] | 100 | 2.5 | 25 |
| | 1-hour[5] | 188 | N/A | N/A |
| Ozone (O₃) | 8-hour[6] | 137 (NAAQS)[7] 147 (CAAQS) | N/A | N/A |
| Particulate matter (PM₁₀) | 24-hour[2] | 150 | 8 | 30 |
| | Annual[4] | --[8] | 4 | 17 |
| Particulate matter (PM₂.₅) | 24-hour[9] | 35 | N/A | N/A |
| | Annual[4] | 12 | N/A | N/A |
| Sulfur Dioxide (SO₂) | 1-hour[10] | 196 | N/A | N/A |
| | 3-hour[2] | 1,300 (NAAQS) 700 (CAAQS) | 25 | 512 |
| | 24-hour[2,11] | 365 | 5 | 91 |
| | Annual[4,11] | 80 | 2 | 20 |

CAAQS (CDPHE 2014), NAAQS (EPA 2014), PSD Increments (EPA 2010a)

[1] The PSD demonstrations serve information purposes only and do not constitute a regulatory PSD increment consumption analysis.

[2] No more than one exceedance per year.

[3] No PSD increments have been established for this pollutant.

[4] Annual arithmetic mean.

[5] An area is in compliance with the standard if the 98th percentile of daily maximum 1-hour nitrogen dioxide concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.

[6] An area is in compliance with the standard if the fourth-highest daily maximum 8-hour ozone concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.

[7] On October 1, 2015, the EPA revised the NAAQS for 8-hour ozone concentrations from 75 ppb (147 μg/m³) to 70 ppb (137 μg/m³). The effective date of the revised NAAQS is 60 days after publication in the *Federal Register* (EPA 2015b). The 75 ppb NAAQS was established in 2008, and under the Clean Air Act, the EPA is required to review the NAAQS periodically.

[8] The NAAQS and CAAQS for this averaging time for this pollutant has been revoked by EPA and the CDPHE.

[9] An area is in compliance with the standard if the highest 24-hour PM₂.₅ concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.

[10] An area is in compliance with the standard if the 99th percentile of daily maximum 1-hour sulfur dioxide concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.

[11] In accordance with 40 CFR §50.4 *National Primary Ambient Air Quality Standards for Sulfur Oxides*, the SO₂ 24-hour and annual NAAQS remains in effect until 1 year after the effective date of the designation of that area, pursuant to section 107 of the Clean Air Act, for the SO₂ NAAQS set forth in §50. 17 (SO₂ 1-hour standard). Designations for the 1-hour SO₂ NAAQS in Colorado have not occurred.

*Air Pollutant Concentrations*

Monitoring of air pollutant concentrations has been conducted within the region, shown in **Figure 3-1**, Air Quality Study Area. These monitoring sites are part of several monitoring networks overseen by state and federal agencies, including: CDPHE (State of Colorado), Clean Air Status and Trends Network (CASTNET), Interagency Monitoring of Protected Visual Environments (IMPROVE), and National Acid Deposition Program National Trends Network (NADP/NTN).

BLM_0026912

3. Affected Environment



**Air Quality Study Area**
Source: Carter Lake Consulting GIS 2014

Figure 3-1

BLM_0026913

Air pollutants monitored at these sites include carbon monoxide, nitrogen dioxide, ozone, particulate matter, and sulfur dioxide. Background concentrations of these pollutants define ambient air concentrations in the region and establish existing compliance with ambient air quality standards. The most representative monitored regional background concentrations of carbon monoxide, nitrogen dioxide, particulate matter, and sulfur dioxide, as identified by the CDPHE Air Pollution Control Division (2013), are shown in **Table 3-3**, Near-Field Analysis Background Ambient Air Quality Concentrations. This table also provides a representative background ozone concentration from the CASTNET Gothic monitoring site in Gunnison National Forest (EPA 2015c).

**Table 3-3**
**Near-Field Analysis Background Ambient Air Quality Concentrations**

| Pollutant | Averaging Period | Measured Background Concentration ($\mu g/m3$) |
|---|---|---|
| Carbon monoxide (CO)[1] | 1-hour | 1150 |
| | 8-hour | 1150 |
| Nitrogen dioxide (NO$_2$)[1] | Annual | 1.9 |
| | 1-hour | 21 |
| Ozone (O$_3$)[2] | 8-hour | 126 |
| Particulate matter (PM$_{10}$)[3] | 24-hour | 36 |
| | Annual | 15 |
| Particulate matter (PM$_{2.5}$)[1] | 24-hour | 14 |
| | Annual | 3 |
| Sulfur dioxide (SO$_2$)[4] | 1-hour | 3 |
| | 3-hour | 3 |
| | 24-hour | 3 |
| | Annual | 3 |

Sources: CDPHE 2013b; EPA 2015c

[1] Data collected at Williams Willow Creek during 2012
[2] Data collected from Gothic monitoring site from 2012 to 2014
[3] Data from S. Ute, collected 1 mile NE of Ignacio from 2003 to 2005
[4] Data from Greasewood Hub, collected from 2009 to 2010

*Ozone*
Ozone is an important component of photochemical smog. Ozone is not emitted directly into the atmosphere, but is formed from photochemical reactions of precursor species in the presence of sunlight. The most important precursors are oxides of nitrogen (NO$_x$) and volatile organic compounds (VOCs). High ozone episodes occur most typically in urban areas during the summer during periods with high temperatures and abundant sunlight. However, high ozone episodes during the winter have been recently been recorded in Wyoming's Upper Green River basin and in Utah's Uinta Basin during periods with fresh snow cover, cold temperatures, and sunlight.

*Hazardous Air Pollutants*
Toxic air pollutants, also known as hazardous air pollutants, are those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. No ambient air quality standards exist for hazardous air pollutants; instead emissions of these pollutants are regulated by a variety of regulations that

BLM_0026914

target the specific source class and industrial sectors for stationary, mobile, and product use/formulations. Sources of hazardous air pollutants from project operations include well-site production emissions (benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde), and compressor station and gas plant combustion emissions (formaldehyde).

*Prevention of Significant Deterioration*

The PSD Program is designed to limit the incremental increase of specific air pollutant concentrations above a legally defined baseline level. All areas of the country are assigned a classification which describes the degree of degradation to the existing air quality that is allowed to occur within the area under the PSD permitting rules. PSD Class I areas are areas of special national or regional natural, scenic, recreational, or historic value, and very little degradation in air quality is allowed by strictly limiting industrial growth. Class I areas are protected by Federal Land Managers (FLMs) through management of air quality related values such as visibility, aquatic ecosystems, flora, and fauna (See section *Air Quality Related Values*, below). PSD Class II areas allow for reasonable industrial/economic expansion.

The FLMs can designate specific PSD Class II areas that they manage as "sensitive" Class II areas, based on their own criteria, and request that PSD Class I level air quality analyses are included for these areas.

The project area and surrounding areas are classified as PSD Class II. The PSD Class I area located closest to the Unit is the Maroon Bells – Snowmass Wilderness Area, which is approximately 5.6 miles to the east. Other PSD Class I and sensitive Class II areas located within 124 miles (200 kilometers) of the project area are shown in **Figure 3-1**, Air Quality Study Area, and include:

- Arches National Park, Utah (Class I)

- Black Canyon of the Gunnison National Park, Colorado (Class I)

- Colorado National Monument, Colorado, (Class II)

- Dinosaur National Monument, Colorado-Utah (Federal Class II, Colorado Class I (SO$_2$ only)

- Eagles Nest Wilderness Area, Colorado (Class I)

- Flat Tops Wilderness Area, Colorado (Class I)

- La Garita Wilderness Area, Colorado (Class I)

- Maroon Bells – Snowmass Wilderness Area, Colorado (Class I)

- Mount Zirkel Wilderness Area, Colorado (Class I)

- Rocky Mountain National Park, Colorado (Class I)

- Weminuche Wilderness Area , Colorado (Class I)

BLM_0026915

- West Elk Wilderness Area, Colorado (Class I)

All NEPA analysis comparisons with PSD Class I and II increments are intended to evaluate a threshold of concern and do not represent a regulatory PSD increment consumption analysis. The determination of PSD increment consumption is an air quality regulatory agency responsibility and only applies to major sources of air pollution. Such an analysis is not likely to be required for this project because the field is not considered a major source of air pollution.

*Air Quality Related Values*
An air quality related value represents atmospheric effects on the landscape that may adversely impact sensitive resources. Landscape level resources may include visibility or a specific scenic, cultural, physical, biological, ecological, or recreational resource. The air quality related values of visibility, atmospheric deposition, and the change in water chemistry associated with atmospheric deposition at acid-sensitive lakes have been identified as a concern at several Class I and sensitive Class II areas within the study area. A discussion of the applicable background data and analysis thresholds is provided below.

*Visibility*
Visibility conditions can be measured as standard visual range, the farthest distance at which an observer can just see a black object viewed against the horizon sky; the larger the standard visual range, the cleaner the air. Visibility for the region is considered to be very good. Continuous visibility-related optical background data representative of the project area have been collected in the PSD Class II White River Wilderness (located approximately 30 miles east of the project area), as part of the Interagency Monitoring of Protected Visual Environments program. The average standard visual range at the White River Wilderness is over 125 miles (VIEWS 2013).

Another measure of visibility includes the concept of extinction (i.e., the absorption or scattering of light). Change in atmospheric light extinction relative to background conditions is used to measure regional haze. Analysis thresholds for atmospheric light extinction are set forth in The Federal Land Managers' Air Quality Related Values Work Group (FLAG) Report (FLAG 2010), with the results reported in percent change in light extinction and change in deciviews. A 5-percent change in light extinction (approximately equal to 0.5 deciview) is the threshold recommended in the 2010 FLAG Report and is considered to contribute to regional haze visibility impairment. A 10-percent change in light extinction (approximately equal to 1 deciview) is considered to represent a noticeable change in visibility when compared with background conditions.

Estimated visibility degradation at the Class I areas and sensitive Class II areas of concern are presented in terms of the number of days that exceed a threshold percent change in extinction, or deciview relative to background conditions. Although procedures and thresholds have not been established for sensitive Class II areas, the BLM is including these areas in its visibility analysis.

*Atmospheric Deposition and Lake Chemistry*
Atmospheric deposition refers to the processes by which air pollutants are removed from the atmosphere and deposited on terrestrial and aquatic ecosystems, and it is reported as the mass of material deposited on an area per year. Air pollutants are deposited by wet deposition (precipitation) and dry deposition (gravitational settling of pollutants). The chemical components

BLM_0026916

of wet deposition include sulfate ($SO_4$), nitrate ($NO_3$), and ammonium ($NH_4$); the chemical components of dry deposition include sulfate, sulfur dioxide, nitrogen oxides, nitrate, ammonium, and nitric acid ($HNO_3$).

The effects of atmospheric deposition of nitrogen and sulfur compounds on terrestrial and aquatic ecosystems are well documented and have been shown to cause leaching of nutrients from soils, acidification of surface waters, injury to high-elevation vegetation, and changes in nutrient cycling and species composition. The 2010 FLAG Report recommends that applicable sources assess impacts of nitrogen and sulfur deposition at Class I areas.

This guidance recognizes the importance of establishing critical deposition loading values ("critical loads") for each specific Class I area as these critical loads are completely dependent on local atmospheric, aquatic, and terrestrial conditions and chemistry. Critical load thresholds are essentially a level of atmospheric pollutant deposition below which negative ecosystem effects are not likely to occur. The 2010 FLAG Report does not include any critical load levels for specific Class I areas and refers to site-specific critical load information on federal land management websites for each area of concern. This guidance does, however, recommend the use of deposition analysis thresholds developed by the National Park Service and the USFWS. The deposition analysis thresholds represent screening-level values for nitrogen and sulfur deposition from project emission sources below which estimated impacts are considered negligible. The deposition analysis threshold established for both nitrogen and sulfur in western Class I areas is 0.005 kilograms per hectare per year (kg/ha/yr).

In addition to the screening level analysis, project-specific and cumulative modeled results are compared to critical load thresholds established for the Rocky Mountain region to assess total deposition impacts. The BLM has compiled currently available research data on critical load values for Class I areas in the vicinity of the project area. Critical load thresholds published by Fox et al. (1989) established pollutant loadings for total nitrogen of 3 to 5 kg/ha/yr) and for total sulfur of 5 kg/ha/yr for Bob Marshall Wilderness Area in Montana and Bridger Wilderness Area in Wyoming. However, the National Park Service has recently stated that these pollutant loadings are not protective of sensitive resources and in its Technical Guidance on Assessing Impacts on Air Quality in NEPA and Planning Documents (NPS 2011) suggests that critical load values above 3 kg/ha/yr may result in moderate impacts. Research conducted by Jill Baron (Baron 2006) using hindcasting of diatom communities suggests 1.5 kg/ha/yr as a critical loading value for wet nitrogen deposition for high-elevation lakes in Rocky Mountain National Park, Colorado. Recent research conducted by Saros et al. (2010) using fossil diatom assemblages suggest that a critical load value of 1.4 kg/ha/yr for wet nitrogen is applicable to the eastern Sierra Nevada and Greater Yellowstone ecosystems. For the Bull Mountain MDP, both project-specific and cumulative nitrogen and sulfur deposition impacts are compared to the following critical load values: 1.5 kg/ha/yr as a surrogate for total nitrogen deposition and 3 kg/ha/yr for total sulfur deposition for the Class I and sensitive Class II areas evaluated.

The National Acid Deposition Program and the National Trends Network station monitors wet atmospheric deposition and the Clean Air Status and Trends Network station monitors dry atmospheric deposition at the Gothic site, located east of the project area, shown in **Figure 3-1**.

BLM_0026917

The total annual deposition (wet and dry) reported as total nitrogen and total sulfur deposition for year 2010 is shown in **Table 3-4**, Background Nitrogen and Sulfur Deposition Values (kg/ha-yr).

**Table 3-4**
**Background Nitrogen and Sulfur Deposition Values (kg/ha-yr)**

| Site Location | Nitrogen Disposition | | | Sulfur Deposition | | | Year of Monitoring |
|---|---|---|---|---|---|---|---|
| | Wet | Dry | Total | Wet | Dry | Total | |
| Gothic | 1.77 | 0.23 | 2.00 | 0.89 | 0.09 | 0.98 | 2010 |

Source: EPA 2013

Analyses to assess the change in water chemistry associated with atmospheric deposition are performed following the procedures developed by the Forest Service Rocky Mountain Region (Forest Service 2000). The analysis assesses the change in the acid neutralizing capacity of the sensitive lakes within the study area (**Figure 3-1**). Predicted changes in acid neutralizing capacity are compared with the applicable threshold for each identified lake: 10-percent change in acid neutralizing capacity for lakes with background acid neutralizing capacity values greater than 25 microequivalents per liter, and less than a 1 microequivalents per liter change in acid neutralizing capacity for lakes with background acid neutralizing capacity values equal to or less than 25 microequivalents per liter.

**Table 3-5**, Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes, presents a list of 28 lakes in the Eagles Nest, Flat Tops, La Garita, Maroon Bells-Snowmass, Raggeds, Weminuche and West Elk Wilderness Areas that have been identified as acid sensitive. Analyses for potential changes to lake acidity from atmospheric deposition are based on the acid neutralizing capacity for the lake. The most recent lake chemistry background acid neutralizing capacity data are also shown in **Table 3-5**. The acid neutralizing capacity values shown are the 10th percentile lowest acid neutralizing capacity values which were calculated for each lake following procedures provided from the Forest Service. The years of monitoring data that were currently available, and the number of samples used in the calculation of the 10th percentile lowest acid neutralizing capacity values, are provided.

Of the 28 lakes listed in **Table 3-5**, 6 are considered by the Forest Service as extremely sensitive to atmospheric deposition since the background acid neutralizing capacity values are less than 25 microequivalents per liter ($\mu$eq/l), including four in the Weminuche Wilderness Area (White Dome Lake, Little Eldorado Lake, Ute Lake and Big Eldorado Lake), one in the Raggeds Wilderness (Deep Creek Lake), and one in the Flat Tops Wilderness Area (Upper Ned Wilson).

*New Source Performance Standards*
Under Section 111 of the Clean Air Act, the EPA has promulgated technology-based emissions standards which apply to specific categories of stationary sources. These standards are referred to as New Source Performance Standards (40 CFR Part 60). The New Source Performance Standards potentially applicable to the Project include the following subparts of 40 CFR 60.

BLM_0026918

**Table 3-5**
**Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes**

| Wilderness Area | Lake | Latitude (Degrees) | Longitude (Degrees) | 10th Percentile Lowest Value (μeq/L)[1] | Number of Samples | Monitoring Period |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 39.6983 | -106.3044 | 86.8 | 49 | 1993-2010 |
| Eagles Nest | Upper Willow Lake | 39.6470 | -106.1735 | 133.9 | 50 | 1990-2010 |
| Flat Tops | Ned Wilson Lake | 39.9614 | -107.3239 | 39.0 | 191 | 1981-2007 |
| Flat Tops | Upper Ned Wilson Lake | 39.9628 | -107.3236 | 12.9 | 143 | 1983-2007 |
| Flat Tops | Lower Packtrail Pothole | 39.9682 | -107.3241 | 29.7 | 96 | 1987-2007 |
| Flat Tops | Upper Packtrail Pothole | 39.9656 | -107.3238 | 48.7 | 96 | 1987-2007 |
| La Garita | Small Lake Above U-Shaped Lake | 37.9436 | -106.8648 | 59.9 | 24 | 1992-2009 |
| La Garita | U-Shaped Lake | 37.9429 | -106.8618 | 81.4 | 23 | 1992-2009 |
| Maroon Bells | Avalanche Lake | 39.1439 | -107.0998 | 163.3 | 52 | 1991-2009 |
| Maroon Bells | Capitol Lake | 39.1630 | -107.0820 | 167.6 | 54 | 1991-2009 |
| Maroon Bells | Moon Lake | 39.1644 | -107.0589 | 52.2 | 51 | 1991-2009 |
| Mount Zirkel | Lake Elbert | 40.6342 | -106.7069 | 53.6 | 67 | 1985-2007 |
| Mount Zirkel | Seven Lakes (LG East) | 40.8958 | -106.6819 | 36.2 | 67.0 | 1985-2007 |
| Mount Zirkel | Summit Lake | 40.5453 | -106.6819 | 48.3 | 124 | 1985-2007 |
| Raggeds | Deep Creek Lake | 39.0089 | -107.2400 | 20.6 | 24 | 1995-2009 |
| Weminuche | Big Eldorado Lake | 37.7133 | -107.5433 | 7.8 | 55 | 1985-2007 |
| Weminuche | Four Mile Pothole | 37.4684 | -107.0525 | 123.4 | 19 | 2000-2009 |
| Weminuche | Lake Due South of Ute Lake | 37.6361 | -107.4428 | 13.2 | 24 | 1992-2009 |
| Weminuche | Little Eldorado | 37.7133 | -107.5458 | -3.3 | 54 | 1985-2007 |
| Weminuche | Little Granite Lake | 37.6205 | -107.3317 | 80.7 | 20 | 2000-2009 |
| Weminuche | Lower Sunlight Lake | 37.6331 | -107.5830 | 80.9 | 52 | 1985-2007 |
| Weminuche | Middle Ute Lake | 37.6483 | -107.4752 | 42.8 | 29 | 1985-2009 |
| Weminuche | Small Pond Above Trout Lake | 37.6519 | -107.1564 | 25.5 | 27 | 1992-2009 |
| Weminuche | Upper Grizzly Lake | 37.6200 | -107.5836 | 29.9 | 45 | 1985-2007 |
| Weminuche | Upper Sunlight Lake | 37.6278 | -107.5797 | 28.0 | 51 | 1985-2007 |
| Weminuche | West Snowdon Lake | 37.7103 | -107.6935 | 39.4 | 26 | 2000-2009 |
| Weminuche | White Dome Lake | 37.7089 | -107.5525 | 1.7 | 49 | 1985-2007 |
| West Elk | South Golden Lake | 38.7776 | -107.1828 | 111.4 | 25 | 1995-2008 |

Source: VIEWS, January 2014
[1] 10th Percentile Lowest Acid Neutralizing Capacity Values Reported

- Subpart A—General Provisions. Provisions of Subpart A apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the date of publication in this part of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that

BLM_0026919

facility. Provisions of Subpart A could apply to proposed sources that are affected by New Source Performance Standards.

- Subpart Kb—Standards of Performance for Volatile Organic Storage Vessels. Subpart Kb applies to storage vessels with a capacity greater than or equal to 75 cubic meters (m3) that are used to store volatile organic liquids for which construction, reconstruction, or modification is commenced after July 23, 1984. This subpart potentially would be applicable to storage tanks for natural gas liquids.

- Subpart JJJJ—Standards of Performance for Stationary Spark-Ignition Internal Combustion Engines. This subpart establishes emission standards and compliance schedules for the control of emissions from stationary combustion turbines that commenced construction, modification, or reconstruction after February 18, 2005. The pollutants regulated by this subpart are nitrogen oxides and sulfur dioxide. Subpart JJJJ applies to manufacturers, owners, and operators as well as new, modified, and reconstructed stationary spark-ignited internal combustion engines such as generators, pumps, and compressors. The applicable emissions standards are based on engine type, fuel type, and manufacturing date.

- Subpart OOOO—Standards of Performance for Crude Oil and Natural Gas Production. Subpart OOOO regulates volatile organic compound emissions from well completions, centrifugal compressors, reciprocating compressors, pneumatic controllers, storage vessels and leaking components in the natural gas production industry, as well as sulfur dioxide emissions from onshore natural gas processing plants.

*National Emission Standards for Hazardous Air Pollutants*
National emission standards for hazardous air pollutants from oil and natural gas production facilities (40 CFR, Part 63, Subpart HH) are applicable to the project. Subpart HH establishes emissions standards for hazardous air pollutants from glycol dehydrator process vents and flash emissions from storage vessels, and sets requirements for equipment leaks at oil and natural gas production facilities.

*Non-Road Engine Tier Standards*
The EPA sets emissions standards for non-road diesel engines for hydrocarbons, nitrogen oxides, carbon monoxide, and particulate matter. The emissions standards are implemented in tiers by year, with different standards and start years for various engine power ratings. The new standards do not apply to existing non-road equipment. Only equipment built after the start date for an engine category (1999-2006, depending on the category) is affected by the rule. Over the life of the project, the fleet of non-road equipment will turn over and higher-emitting engines will be replaced with lower-emitting engines.

*Colorado Oil and Gas Permitting Guidance*
Colorado Department of Public Health and Environment Air Quality Control Commission regulations that are applicable to the project are as follows:

- Regulation 3 emissions reporting requirements

BLM_0026920

- Regulation 6, which fully adopts the EPA's Standards of Performance for Crude Oil and Natural Gas Production, Transmission, and Distribution found in 40 CFR, Part 60, Subpart OOOO ("NSPS OOOO")

- Regulation 7, which includes extensive VOC reductions and regulates methane emissions from the oil and gas industry

*Climate*

The nearest precipitation and temperature measurements were collected at Redstone, Colorado, (1979-1994), approximately 2.5 miles northeast of the project area at an elevation of 8,070 feet above mean sea level (WRCC 2013).

The annual average total precipitation at Redstone, Colorado, is 27.7 inches, with annual totals ranging from 20.2 inches in 1987 to 40.4 inches in 1985. Precipitation is greatest in the spring and fall. Snowfall occurs from fall though spring with the greatest amount in March. The average annual snowfall is 169.4 inches.

The region has cool temperatures, with average daily temperature (in degrees Fahrenheit [°F]) ranging between 8°F and 33°F in January to between 44°F and 76°F in July. Extreme temperatures have ranged from negative 29°F in 1985 to 93°F in 1991. **Table 3-6**, Mean Monthly Temperature Ranges and Total Precipitation Amounts, shows the mean monthly temperature ranges and total precipitation amounts.

**Table 3-6**
**Mean Monthly Temperature Ranges and Total Precipitation Amounts**

| Month | Average Temperature Range (°F) | Total Precipitation (inches) | Total Snowfall (inches) |
|---|---|---|---|
| January | 8-33 | 1.8 | 26.0 |
| February | 12-36 | 2.4 | 29.9 |
| March | 17-43 | 3.1 | 32.4 |
| April | 25-51 | 2.0 | 12.1 |
| May | 32-61 | 2.3 | 5.3 |
| June | 39-72 | 1.5 | 0.5 |
| July | 44-76 | 2.2 | 0.0 |
| August | 44-75 | 1.7 | 0.0 |
| September | 37-67 | 3.0 | 0.5 |
| October | 28-55 | 3.0 | 6.9 |
| November | 18-39 | 2.6 | 26.4 |
| December | 9-32 | 2.0 | 29.5 |
| ANNUAL | 39.6 (mean) | 27.7 | 169.4 |

Source: WRCC 2013

Due to the absence of any available representative monitored meteorology data for the Bull Mountain project area, the 2008 Weather Research and Forecasting (WRF) meteorological model output produced as part of the Western Regional Air Partnership's (WRAP) West-wide

BLM_0026921

Jump Start Air Quality Modeling Study (WestJumpAQMS; ENVIRON et al. 2012) was used to characterize current meteorological conditions in the project area. Two WRF model 4-kilometer (2.4-mile) grid cells are within the project area boundary, a north site and a south site. The north site represents mountain top conditions, and the south site characterizes channeling in the project area valley. Wind roses showing a diagram of the frequency of each wind direction for the north and south sites are shown on the next page. Wind direction is the direction from which the wind is blowing. For example, if the wind is blowing from the north to the south 1.8 percent of the time, the wind direction is north.



Table 3-7, Wind Direction Frequency Distribution, and Table 3-8, Wind Speed Distribution, below display the 2008 WRF model data in tabular format for wind direction frequency and speed distributions at the north and south project area sites. The annual mean wind speed at the north site is 4.2 miles per hour (mph), and 5.0 mph at the south site.

*Greenhouse Gases and Climate Change*

<u>Greenhouse Gases</u>
Greenhouse gases (GHGs) in Earth's atmosphere absorb outgoing thermal radiation and radiate some of that heat back to Earth. This causes temperatures in the lower atmosphere and on the surface to be higher than they would be without atmospheric GHGs. Higher concentrations of

BLM_0026922

**Table 3-7**
**Wind Direction Frequency Distribution**

| North Site | | South Site | |
|---|---|---|---|
| **Wind Direction** | **Frequency (%)** | **Wind Direction** | **Frequency (%)** |
| North | 10.6 | South | 5.0 |
| North- Northeast | 12.0 | South Southwest | 2.2 |
| Northeast | 11.0 | Southwest | 1.1 |
| East Northeast | 6.3 | West Southwest | 0.8 |
| East | 3.2 | West | 0.8 |
| East Southeast | 1.8 | West Northwest | 1.0 |
| Southeast | 1.9 | Northwest | 2.9 |
| South Southeast | 4.5 | South Southeast | 12.7 |
| South | 5.5 | South | 21.6 |
| South Southwest | 8.8 | South Southwest | 15.3 |
| Southwest | 9.8 | Southwest | 12.4 |
| West Southwest | 4.2 | West Southwest | 5.3 |
| West | 2.9 | West | 3.2 |
| West Northwest | 2.6 | West Northwest | 3.1 |
| Northwest | 5.0 | Northwest | 4.2 |
| North Northwest | 9.9 | North Northwest | 8.7 |

Source: ENVIRON et al. 2012

**Table 3-8**
**Wind Speed Distribution**

| North Site | | South Site | |
|---|---|---|---|
| **Wind Speed (mph)** | **Frequency (%)** | **Wind Speed (mph)** | **Frequency (%)** |
| 0-4.0 | 61.7 | 0-4.0 | 52.1 |
| 4.0-7.5 | 22.8 | 4.0-7.5 | 23.9 |
| 7.5-12.1 | 12.2 | 7.5-12.1 | 18.6 |
| 12.1-19.0 | 3.1 | 12.1-19.0 | 5.0 |
| 19.0-24.7 | 0.2 | 19.0-24.7 | 0.3 |
| Greater than 24.7 | 0 | Greater than 24.7 | 0.02 |

Source: ENVIRON et al. 2012

GHGs amplify the heat-trapping effect, resulting in higher surface temperatures. Some GHGs, such as water vapor, occur naturally in the atmosphere. Others, such as carbon dioxide and methane, occur naturally in the atmosphere and are also emitted into the atmosphere by human activities. The human-caused GHGs of primary concern are carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and fluorinated gases. GHGs projected to be emitted by Bull Mountain project sources are $CO_2$, $CH_4$, and $N_2O$. The atmospheric lifetimes for these gases are on the order of decades. Emitted GHGs become well mixed throughout the atmosphere and contribute to the global atmospheric burden. Therefore, it is not possible to attribute a particular climate impact in any given region to GHG emissions from a particular source.

In 2007, the US Supreme Court ruled in *Massachusetts v. EPA* that the EPA has the authority to regulate greenhouse gases such as methane and carbon dioxide as air pollutants under the Clean

BLM_0026923

Air Act. The ruling did not, however, require the EPA to create any emission control standards or ambient air quality standards for greenhouse gases. At present, there are no ambient air quality standards for greenhouse gases, and there are no emissions limits on greenhouse gases that would apply to the sources developed under the Proposed Action and the action alternatives. There are, however, applicable reporting requirements under the EPA's Greenhouse Gas Reporting Program. These greenhouse gas emission reporting requirements, finalized in 2010 under 40 CFR Part 98 (EPA 2010), require facility operators to develop and report annual methane and carbon dioxide emissions from equipment leaks and venting, and emissions of carbon dioxide, methane, and nitrous oxide from flaring, onshore production stationary and portable combustion emissions, and combustion emissions from stationary equipment. At present, there are no rules related to greenhouse gas emissions or impacts that would affect development of the Proposed Action or the action alternatives besides these greenhouse gas reporting requirements.

Climate Change

Climate change is a statistically significant and long-term change in climate patterns. The terms climate change and global warming are often used interchangeably, although they are not the same thing.

Climate change is any deviation from the average climate, whether warming or cooling, and can result from both natural and human (anthropogenic) sources. Natural contributors to climate change include fluctuations in solar radiation, volcanic eruptions, and plate tectonics.

Global warming refers to the apparent warming of climate observed since the early twentieth century and is primarily attributed to human activities, such as fossil fuel combustion, industrial processes, and land use changes.

The natural greenhouse effect is critical to the discussion of climate change. It refers to the process by which natural GHGs in the atmosphere absorb heat energy radiated by Earth's surface and reflect some of that heat back toward Earth, causing temperatures in the lower atmosphere and on the surface to be higher than they would be otherwise. These GHGs trap heat that would otherwise be radiated into space, causing Earth's atmosphere to warm and making temperatures suitable for life. Without the natural greenhouse effect, the average surface temperature of Earth would be about 0°F.

Higher concentrations of GHGs amplify the heat-trapping effect, resulting in higher surface temperatures. Water vapor is the most abundant GHG, followed by carbon dioxide, methane, nitrous oxide, and several trace gases. Water vapor, which occurs naturally in the atmosphere, is often excluded from the discussion of GHGs and climate change since its atmospheric concentration depends largely on temperature rather than specific source emissions. Other GHGs, such as carbon dioxide and methane, occur naturally in the atmosphere, but they are also emitted by human activities.

Atmospheric concentrations of naturally emitted GHGs have varied for millennia, and Earth's climate has fluctuated accordingly. However, since the beginning of the Industrial Revolution around 1750, human activities have significantly increased GHG concentrations and introduced human-made compounds that act as GHGs in the atmosphere. The atmospheric concentrations of

BLM_0026924

carbon dioxide, methane, and nitrous oxide have increased to levels unprecedented in at least the last 800,000 years. From pre-industrial times until today, the global average concentrations of carbon dioxide, methane, and nitrous oxide in the atmosphere have increased by around 40 percent, 150 percent, and 20 percent, respectively (IPCC [Intergovernmental Panel on Climate Change] 2013).

Human activities emit billions of tons of carbon dioxide every year, primarily from fossil fuel combustion, but there are a variety of other industrial sources. Methane is emitted from oil and natural gas systems, landfills, mining, agricultural waste, and other industrial processes. Nitrous oxide is emitted from anthropogenic activities in the agricultural, energy-related, waste, and industrial sectors. Refrigerant and semiconductor manufacturing, electrical transmission, and metal production emit a variety of trace GHGs, including hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. These trace gases have no natural sources and come entirely from human activities.

Our current understanding of the climate system comes from the cumulative results of observations, experimental research, theoretical studies, and model simulations. The IPCC Fifth Assessment Report (AR5; IPCC 2013) uses terms to indicate the assessed likelihood of an outcome ranging from *exceptionally unlikely* (0 to 1 percent probability) to *virtually certain* (99 to 100 percent probability), and a level of confidence ranging from *very low* to *very high*. The findings presented in AR5 indicate that climate system warming is unequivocal, and many of the observed changes are unprecedented over decades to millennia. It is *certain* that the global mean surface temperature has increased since the late nineteenth century and *virtually certain* that maximum and minimum temperatures over land have increased on a global scale since 1950. The globally averaged combined land and ocean surface temperature data show a warming of 1.5 °F.

Human influence has been detected in the warming of the atmosphere and the ocean, in changes in the global water cycle, in reductions in snow and ice, in global mean sea level rise, and in changes in some climate extremes. It is *extremely likely* (95 to 100 percent probability) that human influence has been the dominant cause of the observed warming since the mid-twentieth century (IPCC 2013). Findings from AR5 and reported by other organizations (NASA Goddard Institute for Space Studies 2013; NOAA National Climate Data Center 2013) also indicate that changes in the climate system are not uniform and that regional differences are apparent.

*National Assessment of Climate Change*
The US Global Change Research Program released the third US National Climate Assessment in May 2014. The assessment summarizes the current state of knowledge on climate change and its impacts throughout the United States. It was written by climate scientists and draws from a large body of peer-reviewed scientific research, technical reports, and other publicly available sources. The assessment documents current climate change impacts and those that are anticipated to occur throughout this century. It also provides region-specific impact assessments for key sectors, such as energy, water, and human health.

The assessment summarizes the authors' conclusions in a number of key messages (NCA 2014a), several of which are excerpted here:

BLM_0026925

Global climate is changing and this change is apparent across a wide range of observations. The global warming of the past 50 years is primarily due to human activities.

Global climate is projected to continue to change over this century and beyond. The magnitude of climate change beyond the next few decades depends primarily on the amount of heat-trapping gases emitted globally, and how sensitive the Earth's climate is to those emissions.

U.S. average temperature has increased by 1.3°F to 1.9°F since record keeping began in 1895; most of this increase has occurred since about 1970. The most recent decade was the nation's warmest on record. Temperatures in the United States are expected to continue to rise. Because human-induced warming is superimposed on a naturally varying climate, the temperature rise has not been, and will not be, uniform or smooth across the country or over time.

Average U.S. precipitation has increased since 1900, but some areas have had increases greater than the national average, and some areas have had decreases. More winter and spring precipitation is projected for the northern United States, and less for the Southwest, over this century.

Global sea level has risen by about 8 inches since reliable record keeping began in 1880. It is projected to rise another 1 to 4 feet by 2100.

The oceans are currently absorbing about a quarter of the carbon dioxide emitted to the atmosphere annually and are becoming more acidic as a result, leading to concerns about intensifying impacts on marine ecosystems.

The assessment provided an analysis of projected climate change by region, and the Bull Mountain project is part of the Southwest region. The key messages for this region (NCA 2014b) are as follows:

Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts on people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

Flooding and erosion in coastal areas are already occurring even at existing sea levels and damaging some California coastal areas during storms and extreme high tides. Sea level

BLM_0026926

rise is projected to increase as Earth continues to warm, resulting in major damage as wind-driven waves ride upon higher seas and reach farther inland.

Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems.

## 3.2.2   Noise

### Current Conditions

Noise is defined as unwanted sound and can be intermittent or continuous, steady or impulsive. Human response to noise is extremely diverse and varies according to the type of noise source, the sensitivity and expectations of the receptor, the time of day, and the distance between the noise source and the receptor.

The decibel (dB) is the accepted unit of measurement for noise. Because human hearing is not equally sensitive to all sound frequencies, various frequency weighting schemes have been developed to approximate the way people hear sound. The A-weighted decibel scale (dBA) is normally used to approximate human hearing response to sound. Example sound noise levels are shown in **Table 3-9**, Common Sound Levels.

**Table 3-9**
**Common Sound Levels**

| Characterization | dBA | Example Noise Condition Or Event |
|---|---|---|
| Threshold of pain | 130 | Surface detonation, 30 pounds of TNT at 1,000 feet |
| | 125 | F/A-18 aircraft takeoff with afterburner at 470 feet |
| Possible building damage | 120 | Mach 1.1 sonic boom under aircraft at 12,000 feet |
| | 115 | F/A-18 aircraft takeoff with afterburner at 1,600 feet |
| | 110 | Peak crowd noise at a professional football game in an open stadium |
| | 105 | Emergency vehicle siren at 50 feet |
| | 100 | F/A-18 aircraft departure climb-out at 2,400 feet |
| Extremely noisy | 95 | Locomotive horn at 100 feet |
| 8-hour workplace limit | 90 | Heavy truck, 35 mph at 20 feet; leaf blower at 5 feet |
| Very noisy | 85 | Power lawn mower at 5 feet; city bus at 30 feet |
| | 80 | 2-Axle commercial truck, 35 mph at 20 feet |
| Noisy | 75 | Street sweeper at 30 feet; Idling locomotive, 50 feet |
| | 70 | Auto, 35 mph at 20 feet; 300 feet from busy 6-lane freeway |
| Moderately noisy | 65 | Typical daytime busy downtown background conditions |
| | 60 | Typical daytime urban mixed use area conditions |
| | 55 | Typical urban residential area away from major streets |
| | 50 | Typical daytime suburban background conditions |
| Quiet | 45 | Typical rural area daytime background conditions |
| | 40 | Quiet suburban area at night |
| Very quiet | 30 | Quiet rural area, winter night, no wind |
| | 20 | Empty recording studio |
| Barely audible | 10 | Audiometric testing booth |
| Threshold of Hearing | 0 | --- |

Source: Beranek 1988

BLM_0026927

In general, sound waves travel away from the noise source as an expanding spherical surface. The energy contained in a sound wave is spread over an increasing area as it travels away from the source. This results in a decrease in loudness at greater distances from the noise source. A doubling of distance results in an approximately 6-decibel reduction in sound pressure level for single point sources of noise and a 3-decibel reduction in sound pressure level for multiple point sources moving in a straight line such as a highway (Hedge 2011).

*Regulatory Considerations*

The Department of the Interior and the USDA have published surface operating standards and guidelines for oil and gas exploration and development, commonly referred to as The Gold Book (DOI and USDA 2007). This Gold Book contains noise control guidelines for well drilling and production operations. These guidelines state:

> Noise that has the potential to disturb wildlife, livestock, and private surface owners or neighbors should be controlled to reduce sound levels. Suitable mufflers should be installed on all internal combustion engines and certain compressor components. Other noise reduction techniques to consider include siting wells, production facilities, compressors, roads to take advantage of topography and distance, and constructing engineered sound barriers or sound-insulated buildings. The placement of tank batteries and other facilities offsite and the use of remote well monitoring systems can reduce vehicle traffic in the field and the associated noise.

The COGCC has established noise abatement regulations for oil and gas operations (COGCC 2009). These regulations follow Colorado Noise Statute 25-12-103, Maximum Permissible Noise Levels. The COGCC guidelines state that the goal of the rule is to identify noise sources related to oil and gas operations that impact surrounding landowners and to implement cost-effective and technically feasible mitigation measures to bring oil and gas facilities into compliance with maximum permissible noise levels detailed in **Table 3-10**, Regulatory Limits for Noise Generated by Natural Gas Facilities, below.

The Gunnison County Board of County Commissioners passed Resolution No. 2012-25, A Resolution Amending the Gunnison County, Colorado Temporary Regulations for Oil and Gas Operations on August 28, 2012. These regulations do not contain specific standards for noise.

**Table 3-10**
**Regulatory Limits for Noise Generated by Natural Gas Facilities**

| Zone Area[1] | 7 AM to 7 PM[2] | 7 PM to 7 AM |
|---|---|---|
| Residential/Agricultural/Rural | 55 dBA | 50 dBA |
| Commercial | 60 dBA | 55 dBA |
| Light industrial | 70 dBA | 65 dBA |
| Industrial | 80 dBA | 75 dBA |

Source: COGCC 2009, Section 802(c)
[1] In remote areas with no nearby occupied structures, the light industrial standard may be applied.
[2] In the hours between 7:00 a.m. and the next 7:00 p.m., the noise levels permitted below may be increased 10 dBA for a period not to exceed 15 minutes in any 1 hour period. The allowable noise level for periodic, impulsive or shrill noises is reduced by 5 dBA from the levels shown.
[3] Sound levels shall be measured at a distance of 350 feet from the noise source. If an oil and gas well site, production facility, or gas facility is installed closer than 350 feet from an existing occupied structure, sound levels shall be measured at a point 25 feet from the structure towards the noise source.

BLM_0026928

*Existing Noise Environment*
The Unit is within a rural agricultural area that includes a mix of farming and ranching properties, with dwellings located primarily along State Route 133 and county and private roads in the plan Unit. Noise levels from human activity are mostly mechanical, consisting mainly of existing natural gas development, new exploration activities, ranching/farming activities, and travel on local roadways. Ambient levels are estimated to range from 35 to 40 dBA, increasing up to 60 dBA with traffic from local roads. The varied terrain and vegetation within the Unit provide barriers and buffers for noise.

Noise from existing natural gas development within the Unit comes from a number of sources, including truck traffic, drilling and completion activities, and well pumps. No compressor stations are present in the Unit. **Table 3-11**, Noise Levels Associated with Typical Construction Equipment (dBA), summarizes noise levels of typical construction equipment.

**Table 3-11**
**Noise Levels Associated with Typical Construction Equipment (dBA)**

| Equipment | 50 feet | 500 feet | 1,000 feet |
|-----------|---------|----------|------------|
| Tractor | 80 | 60 | 54 |
| Bulldozer | 89 | 69 | 63 |
| Motor grader | 85 | 65 | 59 |
| Mechanic truck | 88 | 68 | 62 |
| Backhoe | 85 | 65 | 59 |
| Crane | 88 | 68 | 62 |
| Air compressor | 82 | 62 | 56 |
| Dump truck | 88 | 68 | 62 |
| Average, nearest dBA | 86 | 66 | 60 |

Source: La Plata County 2002

*Sensitive Resources*
Sensitive receptors include known residences, schools, churches, hospitals, libraries, camping areas, and parks. Any known cultural or sensitive wildlife area is also considered a sensitive noise receptor. Sensitive receptors in the project area include the residences discussed above, recreational users, and wildlife.

**Trends**
Noise level trends in the project area are expected to resemble baseline levels, with localized noise level increases as more natural gas wells are developed on private and potentially public lands.

### 3.2.3   Soil Resources

**Current Conditions**

*Soil Composition*
Soils are the product of weathering of rocks. They may reflect the mineral composition of the parent rock materials, but they are also highly dependent on vegetation, climate, and slope. There are 10 classified soil types with significant acreage (greater than 15 acres) found within the Unit per the USDA Natural Resource Conservation Service, as seen in **Figure 3-2**, Soils. Some of the

BLM_0026929

3. Affected Environment



**Soils**

Source: NRCS 2013

| | | |
|---|---|---|
| ☐ Bull Mountain Unit | ■ Cochetopa stony loam | ■ Fughes loam |
| ■ Breece loam | ■ Cryoborolls, very stony | ■ Torriorthents-Rock outcrop, |
| ■ Bulkley clay loam | ■ Curecanti loam | sandstone, complex |
| | Fluvents, flooded | |

Figure 3-2

BLM_0026930

soil series are differentiated based on percent of slope in the Unit as found in **Table 3-12**, Classified Soil Types in the Bull Mountain Unit. Many have similar characteristics, and the majority are within the Fughes Series, which has 10,880 acres (55 percent) of soils in the project area and Bulkley Series, which has 3,600 (18 percent) of soils in the project area. Soils in the Fughes series are derived principally from sedimentary rocks, mainly shale and interbedded sandstone, and typically form deep, well-drained soil deposits on alluvial fans, terraces, valley side-slopes, draws, and drainage ways (NRCS 2013). Their texture is heavy clay loam with 36 to 50 percent clay. The Bulkley soil series is derived from fine-textured alluvium eroded from shale and are found on alluvium fans and hills (NRCS 2013). Their texture is clay or silty clay loam with weathered shale, typically found at depths of approximately 3 to 6 feet.

**Table 3-12**
**Classified Soil Types in the Bull Mountain Unit**

| Classified Soil Type | Acres |
|---|---|
| Herm-Fughes-Kolob family complex, 25 to 40 percent slopes | 10 |
| Wetopa-Wesdy complex, 5 to 65 percent slopes | 10 |
| Breece loam, 1 to 6 percent slopes | 280 |
| Bulkley clay loam, 12 to 25 percent slopes | 980 |
| Bulkley clay loam, 25 to 65 percent slopes | 2,620 |
| Cochetopa stony loam, 10 to 40 percent slopes | 850 |
| Cryoborolls, very stony | 1,540 |
| Curecanti loam, 3 to 15 percent slopes | 290 |
| Curecanti stony loam, 3 to 30 percent slopes | 300 |
| Fluvents, flooded | 560 |
| Fughes loam, 5 to 15 percent slopes | 1,240 |
| Fughes loam, 15 to 25 percent slopes | 3,700 |
| Fughes loam, 25 to 65 percent slopes | 4,180 |
| Fughes stony loam, 3 to 30 percent slopes | 880 |
| Fughes-Curecanti stony loams, 10 to 40 percent slopes | 880 |
| Torriorthents-Rock outcrop, sandstone, complex | 1,370 |

Source: NRCS 2013

Approximately 9 percent of the soils are within the Cryoborolls sub-order, and 7 percent of the soils are within the Torriorthents series. Cryoborolls are a sub-order of Mollisols, and are currently classified as Cryolls. Cryolls have similar soil characteristics as Mollisols, and are considered to be Mollisols in cold climates. Torriorthent soils are generally shallow silty clay or silty clay loam and are typically found in moderately steep to very steep areas with bedrock outcrops of sandstone, shale, and interbedded shale and sandstone. The remaining 11 percent of soils are within the Cochetopa series (4 percent), the Curecanti series (3 percent), the Fluvents series (3 percent), and the Breece series (1 percent). These soils are well drained and formed in colluvium and alluvium on mountain sides and slopes, from basalts, rhyolitic tuffs, or granitic outcrops and glacial outwash (NRCS 2013).

*Prime and Unique Farmlands*
Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) prime farmlands, (2) unique farmlands, (3) farmlands of statewide importance, and (4) farmlands of local importance. The state makes designations of land that would be considered prime farmland if irrigated. Impacts from federal actions on BLM-administered lands on farmlands identified as prime or unique are required to be analyzed and disclosed to the

BLM_0026931

public during development of an EIS. The USDA delineates important farmlands as those having soils that support the crops necessary for the preservation of the nation's domestic food and other supplies, specifically the capacity to preserve high yields of food, seed, forage, fiber, and oilseed with minimal agricultural amendment of the soil, adequate water, and a sufficient growing season. As seen in **Table 3-13**, Acres of Farmlands in the Bull Mountain Unit, and **Figure 3-3**, Farmlands, there are 1,240 acres of farmlands of statewide importance, and 280 acres of land that would be considered prime farmland if irrigated in the Unit. There are 18,150 acres in the Unit that do not have a farmland designation. Of these designations, 2,160 acres are irrigated, as shown in **Table 3-13**. There are 170 irrigated acres of prime farmland if irrigated, indicating that there are 170 acres of prime farmland within the Unit.

**Table 3-13**
**Acres of Farmlands in the Bull Mountain Unit**

| Farmland Classification | Acres |
|---|---|
| Farmlands of statewide importance | 1,240 |
| Irrigated farmlands of statewide importance | 770 |
| Prime farmland if irrigated | 280 |
| Irrigated prime farmland if irrigated | 170 |
| Not prime farmland | 18,150 |
| Irrigated not prime farmland | 1,220 |

Source: NRCS 2013 and CDSS 2013

*Fragile Soils*
Fragile soils in the Unit consist of soils with a high wind and water erosion hazard and soils located on steep slopes. The Unit does contain soils high in sodium, selenium, soils affected by drought, or soils with a high potential to support biological soil crusts.

The NRCS has categorized slopes into five groups of steepness with overlapping lower and upper slope grade limit percentages. Moderately steep slopes have angles between 4 and 10 degrees, steep slopes have angles between 8 and 30 degrees, and very steep slopes have angles greater than 40 degrees. Soils located on steep slopes are generally subjected to high drainage densities, high relief, and high ruggedness, which results in increased erosion rates. Within the Unit, there are 1,730 acres of moderately steep slopes, 1,370 acres of steep slopes, and 8,340 acres of very steep slopes, as shown in **Table 3-14**, Acres of Slopes in the Bull Mountain Unit.

**Table 3-14**
**Acres of Slopes in the Bull Mountain Unit**

| Slope Classification | Acres |
|---|---|
| Gently sloping 1-10% | 2,360 |
| Strongly sloping 11-20% | 5,860 |
| Moderately steep 21-30% | 1,730 |
| Steep 31-40% | 1,370 |
| Very steep >40% | 8,340 |

Source: NRCS 2013

BLM_0026932