

3. Affected Environment

**Farmlands**

Bull Mountain Unit
Irrigated land
Farmland of statewide importance
Prime farmland if irrigated
Not prime farmland

Source: CDSS 2013, NRCS 2013

Figure 3-3

BLM_0026933

The erodibility of a soil, known as the K factor in soil surveys, represents both the susceptibility of soil to wind erosion, and water erosion through the rate of run-off. The Natural Resource Conservation Service surveys soils for their potential rate of erosion, or soil erosion hazard on a scale of slight to very severe. The conditions of eroded soil are based on a comparison of the suitability for use and the management needs of the eroded soil with those of the uneroded soil of the same type or series (NRCS 2012).

The Natural Resource Conservation Service has classified soils in the project area based on their potential for erosion after disturbance in off-road and off-trail areas. The ratings in this interpretation indicate the hazard of soil loss from off-road and off-trail areas after disturbance activities that expose the soil surface. The ratings are based on slope and soil erosion factor K. The soil loss is caused by sheet or rill erosion in off-road or off-trail areas where 50 to 75 percent of the surface has been exposed by logging, grazing, mining, or other kinds of disturbance. **Table 3-15**, Soil Erosion Ratings for the Bull Mountain Unit, shows acres of each soil hazard rating for the Unit.

**Table 3-15**
**Soil Erosion Ratings for the Bull Mountain Unit**

| Rating | Total Acres | Percent of the Unit |
|---|---|---|
| Slight | 2,360 | 12% |
| Moderate | 8,970 | 45% |
| Severe | 6,800 | 35% |
| Very Severe | 1,540 | 8% |
| Total | 19,670 | 100% |

Source: NRCS 2013

Soil erosion is also categorized into an erosion soil hazard for roads and trails, which is based on the soil erosion factor, K, slope, and content of rock fragments. This data has 3 categories (slight, moderate, and severe) and a numerical rating ranging from 0.01 to 1.00 which designates the soils as suitable or not suitable for road building, as seen in **Table 3-16**, Erosion Potential of Roads and Trails for the Bull Mountain Unit. A rating of slight indicates that little or no erosion is likely. A rating of moderate indicates that some erosion is likely and the road or trail may require additional maintenance and erosion-control measures. A rating of severe indicates that significant erosion is expected and the road or trail would require frequent maintenance and costly erosion control measures (NRCS 2012).

**Table 3-16**
**Erosion Potential of Roads and Trails for the Bull Mountain Unit**

| Rating | Total Acres | Percent of the Unit |
|---|---|---|
| Slight | 280 | 1% |
| Moderate | 2,010 | 10% |
| Severe | 17,370 | 89% |
| Total | 19,660 | 100% |

Source: BLM GIS 2014

BLM_0026934

*Trends*

Soil erodibility and low strength, combined with steep slopes and variable rates of runoff can lead to undesirable effects. Erosion is a natural process but human activities can speed up or increase the potential magnitude of these effects. Erosion rates may increase significantly when soil is disturbed. Undercutting slopes can activate or reactivate slides. Some of these effects have been observed in the site area. For example, construction of State Highway 133 may have directly undercut slopes, including landslide deposits, or constrained the natural ability of Muddy Creek to establish an optimal gradient, leaving some reaches vulnerable to erosion. Muddy Creek normally carries a high sediment load, and has resulted in significant loss of storage capacity in Paonia Reservoir since 1962 when the dam was constructed. There is some evidence that sedimentation rates have accelerated over the years. A major landslide following heavy rainfall in 1986 carried massive quantities of sediment to the channel and banks of East Muddy Creek (Appel and Butler 1991). Efforts to maintain the outlet works of the reservoir by keeping its level low to flush sediment through were initially successful; however, it may have had the unintended effect of increasing sediment deposition rates in the dead pool area of the reservoir (Collins and Kimbrel 2015).

A land health assessment was conducted on federal surface lands within the Unit in 2006-2007 as part of the North Fork Land Health Assessment. This assessment rates soil resources into 1 of 3 categories based upon BLM Colorado Public Land Health Standard: 1) meeting the standard, 2) meeting the standard with problems, or 3) not meeting the standard. Areas were classified as "unknown" if they were considered too small or minor to evaluate. Soils meeting the land health standard are healthy with respect to water absorption, erosion, organic matter, and groundcover. The BLM applies these standards to public lands on a landscape scale to help describe a landscape's potential, various uses, and the conditions needed to sustain land health. The soil rating for soil resources within the Unit is shown in **Table 3-17**, Land Health Assessment Results in the Bull Mountain Unit (BLM 2007).

**Table 3-17**
**Land Health Assessment Results in the Bull Mountain Unit**

| Land Health Assessment Rating | Federal Surface (acres) |
|---|---|
| Meeting Land Health Standard 1 | 310 (70%) |
| Not Meeting Land Health Standards 1 | 0 |
| Unknown or Data Not Available | 130 (30%) |
| Total | 440 |

Source: BLM 2007

Recently, natural gas exploration and development activities have been creating surface disturbances which can lead to an increased rate of run off and erosion of soils. Over the last decade exploratory and development activities in and surrounding the Unit have focused on exploring for shale gas resources and developing coal bed natural gas resources, and these activities are expected to continue over the next 20 years (BLM 2012). Mineral and energy exploration and development activities have BMPs in place to minimize soil surface disturbance, but the projected increases in natural gas extraction indicate that there is potential for additional soil disturbance and accelerated rates of erosion.

BLM_0026935

### 3.2.4   Water Resources

*Current Conditions*

*Surface Water*
The Unit is in the North Fork Gunnison River drainage basin, US Geological Survey (USGS) Hydrologic Unit Code 14020004, and is part of the upper Colorado River Basin. The climate in the Unit is semi-arid and the North Fork Gunnison River basin has a drainage area of approximately 969 square miles. Hydrologic Unit Code numbers identify the hierarchical relationships of sub-watersheds. Hydrologic Unit Code 14, which represents the upper Colorado River basin, is 1 of 21 hydrologic regions in the United States. The 10-digit Hydrologic Unit Codes 1402000409 and 1402000455 identify the watersheds of East Muddy Creek and West Muddy Creek, respectively. These are the two principal streams draining the Unit. As shown on **Figure 3-4**, Watersheds, the watersheds of both streams extend far beyond the Unit. The Unit is entirely contained within these two watersheds, though the two streams converge a little more than a mile south of the Unit.

On the east side of the Unit, the tributary streams to East Muddy Creek form a radial pattern from peaks that rise to more than 12,000 feet above mean sea level. The peaks are rocky outcrops, composed of the exposed remnants of igneous intrusions that once erupted lava onto the surface. Thousands of feet of overlying deposits have been eroded away, but the process still continues. Many of the lower slopes are landslide deposits which are continuously sliding into East Muddy Creek. East Muddy Creek flows along the toe of these deposits, sweeping them downstream as they are delivered by the radial stream channels and by episodic landslide activity. Lee Creek, which is a tributary to East Muddy Creek, extends north along the toe of the slope of Chair Mountain beyond the Unit, but the watershed of Lee Creek is much smaller than the watershed of East Muddy Creek, and more runoff is carried by East Muddy Creek than by Lee Creek. The channel of West Muddy Creek is similarly constrained by the north-facing slope of Buck Mesa, as it carries runoff from the upper watershed across the southwest corner of the Unit.

The lowest elevation within the Unit is approximately 6,500 feet above mean sea level at the southern boundary of the Unit just below the convergences of East Muddy Creek and Spring Creek. The elevation of East Muddy Creek where it enters the northeast corner of the Unit, near the convergence with Henderson Creek, is approximately 7,240 feet above mean sea level. This represents a fall of about 740 feet over a distance of about 10 miles, or an average stream gradient of about 75 feet per mile, or less than 1.5 percent. The gradient is relatively uniform over the entire reach and during normal flow conditions, the stream meanders through a relatively broad flood plain. The channel of West Muddy Creek is about twice as steep, with a drop of about 720 feet over a distance of about 5 miles within the Unit. Both streams have alluvial channels through the Unit. The tributaries to East Muddy Creek and West Muddy Creek are steeper and narrower.

BLM_0026936

3. Affected Environment



**Watersheds**

Source: BLM GIS 2014, NHD 2013

- ⬜ Bull Mountain Unit
- 🟢 Watershed: level 5 hydrologic unit code
- 〜 Perennial stream or other stream
- 🔵 Lake or reservoir
- 🔵 Other water body
- 🟦 Town

Figure 3-4

BLM_0026937

The highest elevation within the Unit is on the northeast boundary, where the elevation reaches about 8,400 feet above mean sea level on the western slope of the Raggeds. On the western side of the Unit, the landscape is dominated by the relatively uniform regional uplift of the Colorado Plateau. The summit of Bull Mountain, near the center of the Unit, is 8,185 feet above mean sea level, but most of the ridges and promontories on the west side of the Unit rise to elevations in the range of approximately 7,000 to 7,500 feet above mean sea level. The tributaries to East and West Muddy Creek tend to drain small, rectangular watersheds, many of which contain broad terraces suitable for agriculture.

Due to the high elevation of the area, snow covers the ground from about November through March. Peak runoff within the area is a result of spring snowmelt (April through June) that originates from the higher peaks to the north and east of the Unit (**Table 3-18**, Typical Monthly Flows for USGS near the Unit (cfs[1])). The gages on East and West Muddy Creek were only in use for limited periods of time, but provide an indication of the distribution of runoff during the year. The station descriptions are summarized below:

- **USGS Station 09131200, West Muddy Creek near Somerset, Colorado**. This site was maintained from 1961 through 1973 and was located on West Muddy Creek upstream of the confluence of West and East Muddy creeks, approximately 4 miles west of the Unit. The drainage area upstream of the gage is approximately 50 square miles. The mean monthly discharge rates for the entire data record at this location ranged from 5 cubic feet per second (cfs; January) to 167 cfs (May). The mean annual discharge rates recorded at this location ranged from 11.0 cfs (1963) to 59.1 cfs (1962). Instantaneous peak discharge rates recorded at this site ranged from 120 cfs (1972) to 1,190 cfs (1973).

- **USGS Station 09130500, East Muddy Creek near Bardine, Colorado**. This site was maintained from October 1934 through September 1953 and was located on East Muddy Creek just south of the Unit. The drainage area upstream of the gage is 133 square miles. The mean monthly discharge rates for the entire data record at this location range from 14 cfs (January) to 475 cfs (May). The mean annual discharge rates recorded at this location ranged from 53.7 cfs (1940) to 135.0 cfs (1938). Instantaneous peak discharge rates recorded at this site ranged from 480 cfs (1951) to 2,190 cfs (1941).

- **USGS Station 09131500, Muddy Creek at Bardine, Colorado**. This site was maintained from October 1949 through September 1955 and was located on Muddy Creek below Paonia Reservoir, approximately 5 miles south of the Unit. The drainage area upstream of the gage is 257 square miles. The mean monthly discharge rates for the entire data record at this location ranged from 21 cfs (December and January) to 642 cfs (May). The mean annual discharge rates recorded at this location ranged from 48.9 cfs (1954) to 242.9 cfs (1952). Instantaneous peak discharge rates recorded at this site ranged from 382 cfs (1954) to 3,400 cfs (1952).

Muddy Creek is the principal source of inflow to Paonia Reservoir, which is operated by the Bureau of Reclamation for irrigation and flood control. As the name implies, Muddy Creek carries a high sediment load, especially during the period of peak annual runoff, which occurs in June, following the spring thaw. Paonia reservoir was designed with the expectation that it would

BLM_0026938

**Table 3-18**
**Typical Monthly Flows for USGS near the Unit (cfs[1])**

| USGS Gage | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09131200 West Muddy Creek Near Somerset, Colorado | 5.0 | 5.1 | 9.9 | 64.7 | 166.8 | 74.7 | 14.5 | 6.3 | 8.7 | 8.5 | 7.4 | 5.7 |
| 09130500 East Muddy Creek Near Bardine, Colorado | 13.7 | 14.8 | 26.1 | 172.8 | 474.9 | 209.3 | 46.6 | 27.1 | 18.9 | 18.5 | 18.4 | 15.0 |
| 09131500 Muddy Creek at Bardine, Colorado | 21.0 | 22.4 | 29.9 | 302.3 | 642.1 | 268.7 | 48.7 | 36.0 | 22.4 | 24.0 | 24.0 | 21.0 |

Source: USGS 2013. National Water Information System (http://waterdata.usgs.gov/co/nwis/ )
[1] cubic feet per second

receive about 100 acre-feet of sediment per year, but it has sometimes received much more, such as in 1986 when landslides activated by runoff on the west-facing slopes of Chair Mountain and the Raggeds delivered more than 600 acre-feet of sediment to Muddy Creek, which deposited it in the reservoir (Latousek 1995). The dam was built in 1962, but about one-quarter of its storage capacity had been lost to siltation by 2010 (NFRIA 2010). The outlet works became plugged, and sediment had to be excavated to clear them following heavy spring runoff in 2014 (NFRIA 2010; Collins and Kimbrell 2015). The source of much of the sediment appears to be material being shed from the landslide terrane on the western slope of the Raggeds, east of Highway 133.

The area within the Unit receives relatively little precipitation during the summer despite the high runoff Snowmelt, overland flow after rainfall events, and perched groundwater likely contribute to the high runoff observed in the Unit. Surface water is the primary source of irrigation for the area, due to lack of a significant groundwater aquifer, and water storage has historically been a concern.

One hundred twelve (112) ponds and small reservoirs exist within the Unit, based on review of the Bull Mountain and Chair Mountain 7.5-minute topographic quadrangle maps (USGS 2001a, 2001b). Records indicate that 19 of these are permitted through the Colorado Division of Water Resources (CDWR). The permitted reservoirs are used for recreation, fishery, augmentation, fire, stock watering, wildlife, and other uses (CDWR 2010). Permitted reservoirs are discussed further in the Water Resources Technical Report (WWC 2011).

Six developed springs are listed in the National Water Information System database and 13 are recorded with surface water rights in the Colorado Division of Water Resources database, including two that were also in the USGS database (USGS 2010b). The spring water is evaluated as good quality with a moderate mineral content reflected in the specific conductance values. The approximate locations of the listed springs are shown on **Figure 3-5**, Streams and Springs. Available water quality data for the six springs listed in the database are resented in **Table 3-19**, General Water Quality of Springs within the Unit (one sample per station).

BLM_0026939

3. Affected Environment



**Streams and Springs**

Source: BLM GIS 2014, NHD 2013

**Legend**

- ▢ Bull Mountain Unit
- ᨼ Perennial stream
- ᨼ Intermittent stream
- ◣ Lake or reservoir
- ⊰ Spring
- ⌒ 100 foot contour

Figure 3-5

BLM_0026940

**Table 3-19**
**General Water Quality of Springs within the Unit (one sample per station)**

| Gauging Station | Parameters | | |
|---|---|---|---|
| | Temperature (°F) | Specific Conductance (µmohs/cm)[1] | pH (standard units) |
| USGS 390210107202001 SC01208909ABB1 | 57 | 70 | 6.9 |
| USGS 390340107213801 SC01108932BAD1 | 50 | 205 | 8.2 |
| USGS 390435107253801 SC01109027AAC1 | 82 | 285 | 7.5 |
| USGS 390611107235601 SC01109013BDB1 | 68 | 320 | 7.2 |
| USGS 390625107231701 SC01109013AAA1 | 61 | 270 | 7.0 |
| USGS 390659107240801 SC01109012BCA1 | 46 | 370 | 6.7 |

Source: USGS 2013. National Water Information System – Water Quality Samples for Colorado.

http://nwis.waterdata.usgs.gov/co/nwis/
[1] µmohs/cm = micro mohs per centimeter

Colorado has adopted basic standards and antidegradation rules for surface waters. The CDPHE regulations governing the North Fork Gunnison River are contained within Water Quality Control Commission Regulation No. 35, which establishes classifications and numeric standards for the Gunnison and Lower Delores River Basins (CDPHE 2010a). Under these rules, the beneficial uses of all tributaries to the North Fork Gunnison River (including all lakes, reservoirs, and wetlands) are classified under five separate categories. The designated beneficial uses for surface water are Aquatic Life; Recreation; Domestic Water Supply; Wetlands; and Agriculture (CDPHE 2009a).

Stream segment descriptions and water quality classifications within and downstream of the Unit, including the North Fork Gunnison River, are listed in **Table 3-20**, Stream Classifications and Water Quality Standards. A complete listing of numeric standards for physical, biological, inorganic, and metal constituents for Colorado surface water can be found in Basic Standards for Surface Water (CDPHE 2009a).

Regulation No. 93 establishes Colorado's Section 303(d) list of water quality-limited segments requiring total maximum daily loads (TMDLs; CDPHE 2012b). The list, which also established Colorado's Monitoring and Evaluation List, must be submitted to the EPA, while the Monitoring and Evaluation List is a state-only document. It identifies water bodies not on the 303(d) list in which water quality problems are suspected but where further evaluation is necessary to confirm the problem.

The 2012 303(d) list was the one most recently submitted to the EPA, which has not yet approved it. The reach of East Muddy Creek, from Little Muddy Creek to West Muddy Creek, is listed on the 303(d) list or the Monitoring and Evaluation List, as summarized in **Table 3-21**.

BLM_0026941

**Table 3-20**
**Stream Classifications and Water Quality Standards**

| Stream Segment Description | Classification |
|---|---|
| All tributaries to North Fork of the Gunnison River including all lakes, reservoirs, and wetlands within the West Elk and Raggeds Wilderness Areas. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| All tributaries to the North Fork of the Gunnison River including all lakes, reservoirs, and wetlands from the source of Muddy Creek to a point immediately below the confluence with Coal Creek; all tributaries to the North Fork of the Gunnison including all lakes, reservoirs, and wetlands, including the Grand Mesa Lakes which are on National Forest System lands, except for the specific listing in Segments 1 and 7. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| All tributaries to the North Fork of the Gunnison River including all lakes, reservoirs, and wetlands which are not on National Forest System lands, except for the specific listings in Segments 4, 5, 6b, and 7. | Aquatic Life Warm 2 Recreation P Agriculture |
| Paonia Reservoir. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |

Source: CDPHE 2010a

**Table 3-21**
**List of Impaired Water Quality Segments**

| Water Body Identification Number (WBID) | Segment Description | Portion | Monitoring and Evaluation Parameters | 303(d) Impairment |
|---|---|---|---|---|
| COGUNF04 | All tributaries to the North Fork Gunnison River | E. Muddy Creek | Lead, selenium, *E. coli* (May–October) | Iron (total recoverable) |

Lead, selenium, and *E. coli* bacteria are included on the Monitoring and Evaluation List, due to the uncertainty in the measured data that form the basis for listing; total recoverable iron is listed as an impairment requiring development of a TMDL. Total recoverable metals (also called total metals) are determined by digestion of an unfiltered sample. If the sample were to have sediment containing the targeted metal, the metal would be included in the result. In waters with high suspended sediment loads, such as Muddy Creek, a significant percentage of the iron detected in the sample may originate from sediment entrained in the sample.

One USGS surface water quality sampling station (390620107241900) is located within the Unit, and four other sampling stations (09129800, 390000107212700, 385918107205200, and 385903107210800) are located either above or below the Unit that provide relevant long-term water quality data, including temperature, specific conductance, pH, hardness, sodium absorption ratio, total dissolved solids, total suspended sediment, and sediment yield.

The USGS has collected water quality samples of various constituents at differing time intervals. Data are summarized in **Table 3-22**, General Water Quality of East Muddy/Muddy Creeks on/near the Unit. The data are not definitive since they were collected over a limited period of time and at only a few locations, but they indicate that the stream water quality is generally good.

BLM_0026942

**Table 3-22**
**General Water Quality of East Muddy/Muddy Creeks on/near the Unit**

| Parameter | No. of Samples | Range | Mean | Median |
|---|---|---|---|---|
| **USGS 385918107205200 Muddy Creek Above Paonia Res Site No 1 (1977 – 1978)** | | | | |
| Temperature (°C) | 2 | 6.5-20 | 0.2 | 0.2 |
| Specific Conductance (µmohs/cm) | 2 | 120-305 | 302.5 | 302.5 |
| pH (field - standard units) | 2 | 7.6-8.7 | 8.3 | 8.3 |
| Total Hardness (mg/L as CaCO$_3$) | - | - | - | - |
| Sodium Absorption Ratio (unitless) | 2 | 7.3-8.5 | 140.0 | 140.0 |
| Total Dissolved Solids at 180 °C (mg/L) | 2 | 60-140 | 0.4 | 0.4 |
| Total Suspended Solids (mg/L) | - | - | - | - |
| Sediment Yield (tons/day) | - | - | - | - |
| **USGS 385903107210800 Muddy Creek Above Paonia Reservoir, Colorado (1982 – 1983)** | | | | |
| Temperature (°C) | 15 | 6.5-20 | 13.5 | 13.0 |
| Specific Conductance (µmohs/cm) | 15 | 120-305 | 191.5 | 180.0 |
| pH (field - standard units) | 15 | 7.6-8.7 | 8.2 | 8.2 |
| Total Hardness (mg/L as CaCO$_3$) | 15 | 60-140 | 90.1 | 79.0 |
| Sodium Absorption Ratio (unitless) | 15 | 0.2-0.4 | 0.3 | 0.3 |
| Total Dissolved Solids at 180°C (mg/L) | 14 | 84-182 | 124.4 | 117.5 |
| Total Suspended Solids (mg/L) | 10 | 58-3,660 | 862.3 | 450.5 |
| Sediment Yield (tons/day) | 10 | 9.4-3,710 | 1395.1 | 905.0 |
| **USGS 385918107205200 Muddy Creek Above Paonia Res Site No 1 (1977 – 1978)** | | | | |
| Total Dissolved Solids at 180°C (mg/L) | 2 | 60-140 | 0.4 | 0.4 |
| Total Suspended Solids (mg/L) | - | - | - | - |
| Sediment Yield (tons/day) | - | - | - | - |
| **USGS 390000107212700 Lower West Muddy Creek Near Paonia Reservoir, Colorado (1982 – 1983)** | | | | |
| Sodium Absorption Ratio (unitless) | 12 | 0.2-0.4 | 0.3 | 0.3 |
| Total Dissolved Solids at 180°C (mg/L) | 12 | 96-210 | 152.8 | 155.5 |
| Total Suspended Solids (mg/L) | 11 | 10-271 | 96.6 | 48.0 |
| Sediment Yield (tons/day) | 11 | 0.15-653 | 110.5 | 6.4 |

Source: USGS 2010b
°C = degrees Celsius
µmohs/cm = µmohs per centimeter
mg/L = milligrams per liter

Given the geology of the region, it seems likely that most of the base flow in the perennial streams through the Unit is contributed by perched ground water, possibly within the alluvium near the stream channels, and by overland flow during periods of rainfall and runoff from snowmelt. No hydrologic studies have been performed to confirm the importance of perched groundwater, but most groundwater wells in the area are shallow wells located close to the channel of East Muddy Creek.

The North Fork Gunnison River is recognized as a major contributor of salt to the Colorado River System (NFRIA 2010). Salinity has become a major concern within the Colorado River drainage basin. The 1972 Clean Water Act required the establishment of numeric criteria for salinity for the Colorado River and in 1973, seven Colorado River Basin states created the Colorado River Basin Salinity Control Forum. The Forum developed water quality standards for salinity including numeric criteria and a basin-wide plan of implementation. The plan consists of a number of control measures to be implemented by State and Federal agencies. In 1974, Congress enacted the Colorado River Basin Salinity Control Act. The Act was amended in 1984, requiring the Secretary of the Interior to develop a comprehensive program to minimize

BLM_0026943

contributions from BLM-administered. Salinity in Muddy Creek upstream of Paonia Reservoir is low, as demonstrated by the low total dissolved solids concentrations shown in **Table 3-22**.

*Regional Groundwater Occurrence*

An understanding of the regional aquifer system provides clues to the occurrence of groundwater within the Unit. However, conditions within the Unit may differ in important ways, due to the fact that the Unit is located on the margin of the Piceance Basin and is likely affected by several unusual features of that location, including the presence of volcanic intrusive rocks, proximity to the upwarped edge of Mesaverde strata, and because of the unusual juxtaposition of a source of recharge (East Muddy Creek) over this same area. Much remains to be discovered about the subsurface conditions in the vicinity of the Unit.

According to Ackerman and Brooks (1986), alluvial aquifers in the region are thickest in valley bottoms (usually less than 100 feet thick) and are likely connected hydraulically with adjacent bedrock aquifers. This suggests that groundwater is probably able to flow from the alluvial aquifer into the underlying bedrock formation, although the direction and quantity of this flow would depend on the permeability of the underlying bedrock unit.

The primary bedrock aquifers in the North Fork Gunnison River Basin are the Dakota Sandstone and the Burro Canyon Formation of Early and Late Cretaceous age (Ackerman and Brooks 1986). The Dakota Sandstone varies from 30 to 150 feet in thickness and the Burro Canyon Formation varies from 50 to 180 feet thick (BLM 2010b). Wells completed in these formations typically yield more than 10 gallons per minute, although the depth and quality of water in these formations at the Unit is expected to make them unsuitable as a potable aquifer (Ackerman and Brooks 1986).

The Upper Cretaceous Mesaverde aquifer is regionally more extensive than the other bedrock aquifers in the area because none of the major river systems (i.e., the North Fork of the Gunnison, Colorado, or White Rivers) have eroded into it. Within the North Fork Gunnison River Basin, the Mesaverde aquifer includes the Lance Formation, the Fox Hills Sandstone (where it is present), the Lewis Shale, and the Mesaverde Group, which is composed of the Williams Fork Formation, the Trout Creek Sandstone Member, and the Iles Formation (Freethey 1991). The lithologic composition of the Mesaverde aquifer is highly variable from formation to formation and from location to location due to the complex nature in which the strata were deposited. Within the Piceance Basin, the Mesaverde aquifer is predominantly composed of sandstone with interbedded shale and coal beds. Within the North Fork of the Gunnison River Basin, the thickness of the Mesaverde aquifer varies between approximately 4,000 feet to 5,000 feet. Wells completed in the Mesaverde Formation have yields that are typically less than 10 gallons per minute, especially where the formation contains relatively little secondary permeability from joints and fractures (Ackerman and Brooks 1986).

Underlying the Mesaverde aquifer is the Mancos shale. Within the Unit, the Mancos Shale is approximately 4,500 feet thick. The Mancos Shale is primarily marine shale, mudstone, and claystone; therefore, permeability is very low. Because of the low permeability within the Mancos Shale, it is considered a major confining layer that essentially stops all groundwater flow (Ackerman and Brooks 1986).

BLM_0026944

*Local Groundwater Occurrence*

Alluvial deposits within the Unit primarily consist of sand, silt, and gravel of Quaternary age adjacent to the East Muddy Creek valley. Portions of the alluvial aquifer extends into the tributary valleys. Thin alluvial and eolian deposits are present on mesas near the site but none appear to be actually within the Unit (Ackerman and Brooks 1986). Wells completed in the alluvium have yields that can range from 1 to 150 gallons per minute but generally average about 20 gallons per minute (Ackerman and Brooks 1986).

Most domestic water wells in the Unit are completed in the Wasatch Formation or in alluvium near stream channels. In the Piceance Basin, alluvial aquifers are generally the most productive, but within the Unit, alluvial deposits are thin, except within the floodplains of the major streams, the water table is generally below the elevation of the alluvium.

Groundwater in the bedrock aquifers is expected to flow in the direction of the geologic dip, which is approximately 4 degrees from horizontal and in a northeastward direction (BLM 2007a). However, near the margins of the Piceance Basin, where outcrops of Mesaverde rocks have been folded upward and crop out at the surface or are found at shallow depth, runoff or rainwater can work its way down through fractures and may yield good quality water to wells in these margin areas (EPA 2004).

The situation is further complicated by the presence of the igneous intrusive rocks, such as the Raggeds, in the southeastern portion of the basin. Flow within joints and fractures is sometimes significant in intrusive igneous rocks; these are not deposited in horizontal layers and have strata of varying permeability, as sedimentary rocks tend to be. The path of groundwater flow through joints and fractures in igneous intrusive rocks, as well as in other crystalline rocks, can be unpredictable, and the fractures might be capable of conducting freshwater vertically or in unexpected directions. It is also possible that some freshwater recharge occurs through the alluvial channels of the principal streams, especially where the streams are near the upturned Mesaverde Formation, such as along the south-trending reach of East Muddy Creek (Lazear 2009).

*Groundwater Quality*

Federal Safe Drinking Water Act regulations (40 CFR 144.3) define an Underground Source of Drinking Water as:

> an aquifer or portion thereof: (a)(1) which supplies any public water system; or (2) which contains a sufficient quantity of ground water to supply a public water system; and (i) currently supplies drinking water for human consumption; or (ii) contains fewer than 10,000 mg/L total dissolved solids; and (b) which is not an exempted aquifer.

Under 40 CFR 146.04, a Underground Source of Drinking Water can be exempted if it does not currently serve as a source of drinking water, and cannot now and will not in the future serve as a source of drinking water for one of four reasons:

- It is mineral, hydrocarbon, or geothermal energy producing, or can be demonstrated by a permit applicant as part of a permit application for a Class II or III operation to contain

BLM_0026945

minerals or hydrocarbons that considering their quantity and location are expected to be commercially producible.

- It is situated at a depth or location that makes recovery of water for drinking water purposes economically or technologically impractical.

- It is so contaminated that it would be economically or technologically impractical to render that water fit for human consumption.

- It is located over a Class III well mining area subject to subsidence or catastrophic collapse; or the total dissolved solids content of the ground water is more than 3,000 and less than 10,000 milligrams/liter, and it is not reasonably expected to supply a public water system.

The EPA secondary drinking water standard for total dissolved solids (TDS) is 500 mg/L. Above a TDS of 500 mg/L, water has a noticeable salty taste, and at higher concentrations may have excessive hardness, or may contain harmful constituents. Secondary drinking water standards are guidelines rather than enforceable standards, though, and water with a high TDS can be blended with higher quality water to achieve acceptable TDS concentrations in the blended water.

A USGS investigation of groundwater resources in the North Fork watershed found that alluvial aquifers yield water with dissolved solids concentrations ranging from 110 to 2,300 mg/L. The higher cost of drilling deeper wells is usually not rewarded by higher yields or better quality water. The Mesaverde Group contains rocks that generally have low permeability and poor water quality. TDS concentrations of water samples from the Mesaverde Group, the Dakota Sandstone, and Burro Canyon Formation that were evaluated by the USGS ranged from 56 to 3,200 mg/L.

According to the North Fork River Watershed Plan, groundwater from bedrock aquifers in the upper watershed is generally of the sodium bicarbonate type that is neutral to alkaline (pH 7 to 9), with low metals content and a high methane content (NFRIA 2010). This suggests that methane continues to be generated in the underlying rocks, and that there may be a steady flux of methane into the overlying formations.

Below the depths normally explored for domestic water supplies, water quality tends to diminish. Most potable wells are less than 200 feet deep, though occasionally they extend deeper. But the deeper portions of the Piceance Basin, particularly in the central basin areas, contain evaporites (salts concentrated in sands of Lake Uinta, for example, which once covered portions of the Piceance Basin) that raise the TDS concentrations above levels that are normally acceptable for drinking water.

TDS concentrations of water samples from the Mancos Shale ranged from 1,800 to 8,200 mg/L in the USGS study (Ackerman and Brooks 1986); but the Mancos Shale has very low primary permeability associated with an aquitard rather than an aquifer. TDS in the overlying Rollins Sandstone reportedly ranges from 3,000 to 9,000 mg/L (NFRIA 2010). While poor in quality, the Rollins Sandstone would qualify as a Underground Source of Drinking Water.

BLM_0026946

Throughout the central parts of the Piceance Basin, coal-bearing strata are generally found at depths of more than 4,000 feet. Within the Unit, the depth to the base of the coal-bearing Cameo Group ranges from greater than 4,000 feet in the northwest to less than 2,000 feet along the east. These depths are generally too deep for economic drilling and pumping of groundwater, even if the groundwater were potable.

Knowledge about groundwater conditions at depths greater than several thousand feet comes almost entirely from wells drilled for gas production. The deepest permeable formations are commonly used for deep injection of production wastewater. SGI's existing disposal well (Federal 24-2 WDW) is a Class II disposal well located on fee lands in the NWSW Section 24, T11S, R90W and is used to dispose of produced water from current natural gas production in the area. The geological horizons for the primary disposal zones for the one existing and four proposed disposal wells are the sandstone formations below the Mancos Shale, including the Dakota Sandstone, Morrison Formation, Entrada Sandstone, and Maroon Formation at depths between 9,300 and 9,500 feet. The total dissolved solids concentration measured in the existing injection well, completed in the Unit in the Permian to Pennsylvanian age Maroon Formation, is 18,962 mg/L, which is about half the salinity of sea water. Produced-water quality sample lab test results from samples collected in 2007 from existing producing wells within the Unit are included in **Table 3-23**, Water Quality Lab Test Results from Produced Water from Existing Producing Natural Gas Wells within the Producing Formations in the Unit. Some of the waters encountered at these depths also contain dissolved petroleum hydrocarbons, including the volatile constituents benzene, toluene, ethylbenzene, and xylenes, which are found in light crude oil.

**Table 3-23**
**Water Quality Lab Test Results from Produced Water from Existing Producing Natural Gas Wells within the Producing Formations in the Unit**

| Parameter[1] | McIntyre 11-90-14-4 | Falcon Seaboard 11-90-12-1 | Henderson R1 | Federal 26-1 |
|---|---|---|---|---|
| pH (field) | 5.5 | 7.1 | 5.6 | 9.6 |
| Total Dissolved Solids | 10,557 | 8,775 | 18,445 | 4,495 |
| Potassium | 94 | 431 | 312 | 110 |
| Sodium | 2,961 | 2,531 | 5,462 | 1,493 |
| Calcium | 664 | 260 | 736 | 60 |
| Magnesium | 252 | 140 | 572 | 60 |
| Bicarbonate | 280 | 636 | 132 | 260 |
| Chloride | 6,400 | 4,800 | 11,600 | 2,400 |
| Sulfate | 0 | 4 | 4 | 19 |
| Total Iron | 0.9 | 5.4 | 1.6 | 0.1 |

[1] All units in mg/L except pH, which is in standard pH units

Water to be injected into the deep formations in which the disposal wells are completed is first piped into holding tanks to allow sediments to settle out by gravity. The water then passes through a series of filters to remove solids larger than 10 microns in diameter so that these sediments will not clog the pores of the sandstone aquifer in which they are injected.

Accumulated solids from the settling and filtration process are periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water

reduces scaling or deposition of minerals in the receiving formation, which, if unabated, could reduce the porosity in the recovery formation and otherwise shorten the life of the disposal wells.

*Current Water Quality Monitoring Program*

In compliance with Gunnison County and COGCC regulations (Gunnison County Board of County Commissioners 2003, COGCC 2009), and in anticipation of potential new development, SGI initiated baseline water quality monitoring of surface water monitoring locations near existing and proposed production wells within the Unit. Sites have been established to sample surface water along streams, ponds, and other water bodies to establish baseline conditions.

The requirements have changed during recent years, but as part of its current permitting requirements, COGCC Rules 608 (which covers coal bed methane wells) and 609 (which addresses all other oil and gas wells) require baseline monitoring of groundwater, and SGI has collected samples from available sources of groundwater within a 0.25 to 1-mile radius of proposed natural gas wells as part of its compliance with these rules.

Under Rule 609, the permittee is required to sample up to four sources of groundwater, including wells or springs (with preference given to well-maintained domestic wells), within a 0.5 mile radius of a new well pad. Initial sampling must be conducted within 12 months prior to setting conductor pipe in the first well of a multi-well site, or before commencement of drilling an injection well. Subsequent monitoring is required at the same locations between 6 and 12 months, and then again between 5 and 6 years after completion of the well. The testing program must include pH, specific conductance, TDS, dissolved gases (methane, ethane propane), alkalinity (total bicarbonate and carbonate as $CaCO_3$), major anions (bromide, chloride, fluoride, sulfate, nitrate and nitrite as N, phosphorus), major cations calcium, iron, magnesium, manganese, potassium, sodium), other elements barium, boron, selenium and strontium, presence of bacteria (iron related, sulfate reducing, slime forming), total petroleum hydrocarbons TPH), and BTEX compounds benzene, toluene, ethylbenzene and xylenes). Field observations of odor, color, sediment, bubbles, and effervescence must also be documented.

Rule 608 imposes additional requirements for monitoring in the vicinity of coal bed methane wells. The operator must perform a records search for plugged and abandoned wells within 0.25 mile of the proposed coal bed methane well, and must assess the risk that the plugged and abandoned wells may act as a conduit for gas or water leakage. Within 1 year, and then every 3 years after production from the coal bed methane well, SGI must perform a soil gas survey at all plugged and abandoned wells, and submit the result of the surveys to COGCC. In addition, SGI must sample existing water wells within a certain distance from the proposed coal bed methane well as part of a baseline sampling program. The method of selecting the wells to be sampled is specified in the rule, but generally requires sampling 2 wells within 0.25 mile of the coal bed methane well if they exist, or 1 well within 0.5 mile if closer wells do not exist. The initial testing program differs from Rule 609. Testing must include major cations and anions, TDS, iron, manganese, selenium, nitrates and nitrites, dissolved methane, field pH, sodium adsorption ratio, presence of bacteria (iron related, sulfate reducing, slime, and coliform), and specific conductance. Hydrogen sulfide must be measured in the field, and field observations of odor, color, sediment, bubbles, and effervescence must also be included.

BLM_0026948

The network of sampling points that has been monitored by SGI currently includes 23 wells, 1 cistern, and 51 surface water locations within the Unit. Additional sampling has also been conducted at locations outside the Unit. **Figure 3-6**, Water Quality Monitoring, shows the locations where baseline monitoring has been performed. Some of the available data were collected prior to 2010, including 6 wells and 8 surface water locations that were sampled between 2002 and 2008 but have not been sampled since; 8 wells that were sampled prior to 2010 and have been sampled again since 2010. Excluding the locations for which there are only pre-2010 data, there are currently 16 wells, 1 cistern, and 40 surface water locations in the water quality monitoring network within the Unit.

Baseline samples provide an indication of conditions prior to the initiation of oil and gas development activities. They can also provide an indication of the geographic variability of water quality throughout the Unit. Examination of baseline data could potentially reveal underlying geographic and temporal trends in water quality associated with natural conditions or with pre-oil and gas activities. More importantly, re-sampling over time and comparison to the baseline data can be used to identify changes in water quality, to monitor the effectiveness of controls designed to protect water resources, and to determine the need for corrective action.

The baseline monitoring program has evolved somewhat over the years since it was initiated, resulting in variations in the chemical and physical parameters measured at different locations and times. At most locations, water samples have been analyzed for presence of petroleum hydrocarbons, a class of compounds called polynuclear aromatic hydrocarbons, selected metals, general water quality indicators (such as pH, dissolved and suspended solids, nutrients, common anions and cations, and others), and methane. Since water quality can be affected by many factors other than project activities, data from multiple monitoring locations in the vicinity of existing and proposed production/exploration well platforms, preferably collected over time are needed to evaluate the causes of changes in water quality. The baseline monitoring results have indicated that existing surface and groundwater quality is generally good and typically meets regulatory standards to support the existing beneficial uses of the water. **Table 3-24**, Summary of Results for Selected Analytes in Samples from 23 Wells Collected between July 16, 2002 and June 12, 2013, and **Table 3-25**, Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012, show the ranges of concentrations of selected analytes from monitoring of water wells and surface water sites within the Unit between 2007 and 2013. The results are from 59 samples analyzed from a network of 23 wells, and 84 samples analyzed from 51 surface water locations. (Note that not all analytical data are represented in the tables; not all wells or surface water samples were analyzed for the same compounds each time; and some wells and surface water locations have been sampled multiple times.) The similarity between the surface water and the well sample results in **Table 3-24** and **Table 3-25** probably reflects the fact that many of the wells included in the monitoring network are completed at shallow depths, within the alluvial aquifer, and near stream channels.

BLM_0026949

3. Affected Environment



**Water Quality Monitoring**

Source: BLM GIS 2014,
SG Interests 2013

Legend:
- Bull Mountain Unit
- ▲ Surface water
- ● Well water
- ● Shallow ground water
- ■ Water cistern

Figure 3-6

BLM_0026950

**Table 3-24**
**Summary of Results for Selected Analytes in Samples from 23 Wells Collected between**
**July 16, 2002 and June 12, 2013**

| Analyte | No. of Samples | Number of Non-detects | Average Detected Concentration | Minimum Detected | Maximum Detected |
|---|---|---|---|---|---|
| pH | 23 | 0 | 8.2 | 8 | 8.6 |
| Temperature | 23 | 0 | 21.4 | 19 | 23 |
| conductivity @25°C | 23 | 0 | 355 | 138 | 725 |
| Residue, filterable (TDS) @180°C | 25 | 0 | 208 | 90 | 430 |
| Calcium (dissolved) | 12 | 0 | 48.6 | 28.6 | 93.8 |
| Sodium (dissolved) | 3 | 0 | 8.9 | 6.8 | 10.4 |
| Potassium (dissolved) | 11 | 0 | 1.16 | 0.6 | 2.2 |
| Silica (dissolved) | 9 | 0 | 13.7 | 6.2 | 19.1 |
| Total alkalinity | 25 | 0 | 164 | 60 | 304 |
| Bicarbonate as $CaCO_3$ | 25 | 0 | 163 | 59 | 304 |
| Ortho phosphorus (dissolved) | 8 | 0 | 0.019 | 0.01 | 0.04 |
| Bromide | 4 | 0 | 0.10 | 0.03 | 0.25 |
| Chloride | 24 | 0 | 9.8 | 1 | 70 |
| Fluoride | 17 | 0 | 0.32 | 0.1 | 0.8 |
| Nitrate as nitrogen (dissolved) | 6 | 1 | 0.31 | 0.1 | 0.47 |
| Sulfate | 19 | 1 | 8.8 | 3 | 31 |
| Boron (dissolved) | 9 | 4 | 0.014 | 0.01 | 0.02 |
| Selenium (total) | 10 | 0 | 0.0011 | 0.00010 | 0.0036 |
| Strontium (dissolved) | 9 | 0 | 0.53 | 0.2 | 0.9 |
| Uranium (dissolved) | 10 | 3 | 0.0019 | 0.0003 | 0.005 |
| Methane | 6 | 4 | 4.995 | 0.39 | 9.6 |
| Benzene | 2 | 2 | ND | ND | ND |
| Ethylbenzene | 2 | 1 | 0.4 | 0.2 | 0.6 |
| Toluene | 3 | 0 | 0.23 | 0.2 | 0.3 |
| m,p-xylenes | 1 | 0 | 0.4 | 0.4 | 0.4 |
| TPH C10 to C28 | 22 | 20 | 0.35 | 0.2 | 0.5 |

**Table 3-25**
**Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected**
**between July 16, 2002 and August 10, 2012**

| Analyte | Units | No. of Samples | Number of Non-detects | Average Detected Concentration | Minimum | Maximum |
|---|---|---|---|---|---|---|
| pH | std units | 42 | 0 | 8.4 | 7.8 | 9.7 |
| Temperature | deg C | 42 | 0 | 20.8 | 19 | 23 |
| Conductivity @25°C | umhos/cm$^2$ | 42 | 0 | 362 | 70 | 602 |
| Residue, filterable (TDS) @180°C | mg/L | 45 | 0 | 223 | 40 | 370 |
| Calcium (dissolved) | mg/L | 5 | 0 | 60.22 | 46.3 | 70.1 |
| Sodium (dissolved) | mg/L | 3 | 0 | 21.6 | 12.5 | 38.9 |
| Potassium (dissolved) | mg/L | 5 | 0 | 1.9 | 1.2 | 2.5 |
| Silica (dissolved) | mg/L | 2 | 0 | 8.5 | 6.7 | 10.3 |
| Total alkalinity | mg/L | 45 | 0 | 183 | 33 | 325 |
| Bicarbonate as $CaCO_3$ | mg/L | 45 | 0 | 172 | 33 | 305 |

BLM_0026951

**Table 3-25**
**Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012**

| Analyte | Units | No. of Samples | Number of Non-detects | Average Detected Concentration | Mini-mum | Maxi-mum |
|---|---|---|---|---|---|---|
| Ortho phosphorus (dissolved) | mg/L | 2 | 0 | 0.03 | 0.02 | 0.04 |
| Bromide | mg/L | 2 | 0 | 0.045 | 0.03 | 0.06 |
| Chloride | mg/L | 41 | 0 | 6.5 | 1 | 23 |
| Fluoride | mg/L | 37 | 0 | 0.24 | 0.1 | 0.5 |
| Nitrate as nitrogen (dissoloved) | mg/L | 0 | NA | NA | NA | NA |
| Sulfate | mg/L | 35 | 0 | 6.9 | 1 | 39 |
| Boron (dissolved) | mg/L | 2 | 0 | 0.015 | 0.01 | 0.02 |
| Selenium (total) | mg/L | 36 | 0 | 0.00031 | 0.0001 | 0.0008 |
| Strontium (dissolved) | mg/L | 2 | 0 | 0.7 | 0.55 | 0.85 |
| Uranium (dissolved) | mg/L | 2 | 0 | 0.0012 | 0.0009 | 0.0014 |
| Methane | mg/L | 2 | 1 | 0.17 | 0.17 | 0.17 |
| Benzene | µg/L | NA | NA | NA | NA | NA |
| Ethylbenzene | µg/L | 1 | 0 | 0.2 | 0.2 | 0.2 |
| Toluene | µg/L | 6 | 0 | 0.33 | 0.2 | 0.7 |
| m,p-xylenes | µg/L | 2 | 0 | 0.65 | 0.5 | 0.8 |
| TPH C10 to C28 | mg/L | 42 | 33 | 0.24 | 0.1 | 0.6 |

*Hydrology and Water Rights*
There are a number of irrigation diversions from the larger creeks, especially on the eastern side of the Unit (BLM 2010a). Stock ponds are abundant in the area and, in general, contain water throughout the year.

Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek drainage. Irrigated meadows are also found in the Ault Creek drainage at the far western side of the Unit (BLM 2010a). Natural flows of streams are likely affected by diversions for irrigation and there are numerous water rights for both reservoirs and irrigation diversions on North Fork Gunnison River (NFRIA 2010). Based on USGS estimates, approximately 3,000 acres of irrigated lands occur upstream of USGS gauging station 09132500 (North Fork Gunnison River near Somerset, Colorado; USGS 2010a). Irrigation diversions affect the intensity, quantity, and timing of streamflows within the North Fork Gunnison River, and may have a similar effect in the Unit. For example, in June when runoff is highest, irrigation diversions attenuate peak flows by diverting some of the flow onto irrigated lands. Irrigation withdrawals sometimes reduce discharge in the North Fork Gunnison River to low volumes. During drought years, surface flow sometimes disappears entirely from segments of the channel (NFRIA 2010).

According to the Colorado Division of Water Resources, there are 35 ditch-type water rights within the Unit. All but three of these ditches list Muddy Creek as the source. Permitted surface water rights on the Unit are summarized in the Water Resources Technical Report (WWC 2011).

<u>Surface Water Rights.</u> Based on a review of the Colorado Division of Water Resources' surface water rights database, there are 75 permitted surface water rights within the Unit. The majority of the water rights (33) have a designated use that is (or includes) irrigation. Other uses include

BLM_0026952

stock (19), fishery (18), domestic (14), recreation (12), wildlife (5), fire (5), federal reserve (4), storage (2), other (2), industrial (1), and augmentation (1). The sum of water rights uses is greater than 75 as some of the individual rights list multiple uses. Sources for these surface water rights within the Unit are as follows: Muddy Creek is the water source for 71, North Fork Gunnison River is the source for 3, and Gunnison River is the source for 1. Existing surface water rights within the Unit are tabulated in the Water Resources Technical Report.

Groundwater Rights. A CDWR records review revealed 66 current groundwater permits within the Unit. All of these groundwater permits are filed on water wells apportioned as follows: 20 domestic use; 15 domestic/stock use; 12 other use; 11 household use only; and 8 industrial use. Of the 66 permitted wells, 50 wells are developed, no records of completion are available for 14 wells, and 2 permits were extended. Of the 66 permitted wells, 48 report positive yields. Details on the permitted wells within the Unit are tabulated in Water Resources Technical Report (WWC 2011).

*Trends*
Several trends related to water resources are important in the region and may affect the Unit.

The Unit provides very favorable conditions for agriculture in terms of climate and soils. However, a reliable water supply has long been a limiting factor for agricultural development of the area. Most of the water use in the area is from surface water or from shallow groundwater that is probably in direct connection to surface water. Surface storage is limited, and groundwater storage capacity is inadequate to meet most needs. Any reduction in surface water availability is likely to impact agriculture. Similarly, water quality is critical to the viability of agriculture and, with limited supplies of potable surface water and groundwater to meet demand, any reduction in water quality could have severe impacts on landowners.

Development of the gas resources in the southeastern margin of the Piceance Basin is in its early stages. The economic viability of gas production in this portion of the basin remains to be tested. The exploration and initial development phase will likely bring significant changes to the region, including additional demands on water resources. There is strong demand for development of domestic gas resources throughout the country that could also contribute to lower prices as the demand is filled, and to reduced economic feasibility in marginally productive areas. In the event that the gas resources in the Unit do not prove as economically viable as initially hoped, it would be important to ensure that the region is not abandoned in such a way that agriculture activity could continue with minimal long-term impact.

The rate of erosion from the vicinity of the Unit, and particularly the west slope of the Raggeds, has an important effect on the rate of sedimentation of the Paonia Reservoir, and therefore its effective life. The project, along with other potential consequent development of the area could lead to increased erosion rates and faster sedimentation of the reservoir. This would have an indirect effect on irrigation and on agriculture that is dependent on water storage in the reservoir.

The 2006-2007 land health assessment of federal lands within the Unit included a water quality assessment (standard 5) on nearly 60 miles of streams. This standard was met for a majority of streams (74 percent) in the Unit and the watersheds they drain into. The remaining waters assessed within the Unit were meeting standard 5 with problem areas (23 percent) or were not

BLM_0026953

---

meeting the water quality standard (3 percent). Stream segments that were not meeting standard 5 in the Unit were attributed to soil erosion, exposed soil, and poor vegetation cover in the surrounding watersheds. These watersheds are more susceptible to erosion and subsequent sedimentation within adjacent streams.

### APD for Federal 12-89-7-1

The domestic water well nearest to the 12-89-7-1 pad site is well 12-89-8 #2 (the Fransen well), about 2,000 feet east of the site. It is at an elevation of about 6,700 feet amsl, or about 700 feet below the elevation of the site (the proposed pad is about 7,388 feet amsl). The Fransen well is a shallow well screened from 35 to 45 feet below the surface in the alluvial sediment along the channel of East Muddy Creek. The Fransen well is included in SGI's baseline monitoring program, in accordance with COGCC Rule 609. The well is reportedly used for watering domestic animals and for lawn and garden irrigation. The water is impacted by iron-related bacteria; it reportedly has a rotten egg odor and effervesces slightly. The resident has complained of skin irritation caused by exposure to the water. Testing has indicated the presence of methane gas at a concentration of 9.6 mg/L in the water, which is the highest concentration of methane reported to date in the baseline sampling program for the project area.[2] Isotopic analysis indicates that the methane falls within a range that is slightly more characteristic of a thermogenic origin (meaning that it may be generated from hydrocarbon deposits in the deep subsurface) than of a biogenic origin (such as from microbial degradation of organic matter near the surface).

### 3.2.5   Geology

#### Current Conditions

##### Physiography

Physiography refers to the physical appearance of the surface of the earth, which reflects its geologic and tectonic history. The Unit is located on the boundary between the Western Section of the Southern Rocky Mountains physiographic province, and the Uinta Basin Section of the Colorado Plateau physiographic province (Lobeck 1975; Fenneman 1946; CGS 2011). It lies west of the Sawatch Range, the White River Uplift, and the Continental Divide which belong to the Southern Rocky Mountains; and east of the Uncompahgre uplift, on the southeastern margin of the Piceance Basin, which are part of the eastern edge of the Colorado Plateau. State Highway 133 roughly marks the boundary between the 2 provinces. Streams west of the Continental Divide drain to the west, toward the Colorado River, but follow a circuitous route to get there: first the tributaries of Muddy Creek flow to the southeast across the Unit and converge near the southeast corner of the Unit. Then Muddy Creek turns south and flows along State Highway 133 to Paonia Reservoir on the North Fork of the Gunnison River. The North Fork Gunnison flows southwest and then turns northwest to join the Colorado River at Grand Junction. Streams on the east side of State Highway 133 drain to the west, to Muddy Creek.

---

[2] Methane is an odorless gas and would not explain the rotten egg odor, which is characteristic of hydrogen sulfide; however, hydrogen sulfide was not reported in the analytical results from the well.

BLM_0026954

As indicated on the USGS 7.5 minute topographic quadrangles that depict the site area, topographic relief ranges widely in the nearby region of the Unit (USGS 2001a, 2001b, 2001c, 2011). Chair Mountain, about 3 miles east of the Unit, rises to 12,723 feet, and nearby Ragged Peak is 12,641 feet. There is about 1,500 feet of relief within the Unit. The lowest point is in the channel of East Muddy Creek near the confluence of Spring Creek, where the elevation is about 6,690 feet. At 8,185 feet, Bull Mountain is the highest point within the Unit.

The stream drainage pattern on the west side of the Unit, west of State Highway 133, is rectangular, with small straight stream segments generally oriented perpendicular to the principal drainages, West Muddy Creek, and East Muddy Creek. The trunk streams are moderately incised, with relatively wide channels and steep side slopes, which have the appearance of being antecedent to the terrain. Meanders have developed within the channels of East and West Muddy Creeks. Some of the side slopes are relatively flat, while others are very steep. The stream channel gradients of the trunk streams are relatively gradual. For example, the slope of the channel of East Muddy Creek is about 3 feet per 1,000 feet. The drainage pattern on the east side of State Highway 133 is radial, with streams issuing in every direction out from peaks such as Chair Peak.

The Unit is at the southeastern margin of the Piceance Basin, a large structural basin covering approximately 1,000 square miles, which extends northwest to the area near Rangely, Colorado. It is bounded by the Uinta uplift to the north, the White River uplift and the Grand Hogback on the northeast, and the Uncompahgre uplift on the southwest. To the southeast, it butts up against Chair Mountain and the Raggeds. It is separated from the Uinta Basin, which extends westward into Utah, by the Douglas Creek Arch, a topographic rise that roughly parallels the western border of Colorado. The Piceance Basin is cut approximately in half by the Colorado River, which enters the Piceance Basin near Rifle Creek at the south end of the White River uplift, and exits the Piceance Basin at Grand Junction. Water drains from the each end of the Basin toward the Colorado River. The Piceance Basin lies almost entirely within the Colorado Plateau physiographic province.

North of the Colorado River, the Piceance Basin contains abundant oil shale deposits (up to 2,000 feet thick, some of it very near the surface) in the Middle Tertiary Green River formation (Taylor 1987). Coal and gas are found below the depth of the oil shale, at depths of 6,000 to 10,000 feet, in the Mesaverde formation. The southern portion of the basin contains mainly coal and gas. In the southern portion of the basin, there is no structural or stratigraphic trap for the gas deposits. The gas is trapped in the primary porosity of the low permeability rocks. The low permeability of these rocks presents the primary challenge for exploiting these abundant gas deposits. The most effective way of releasing and extracting the gas is to increase the secondary porosity of the reservoir rock using a technique called hydraulic fracturing. See **Figure 3-7**, Geology Cross Section.

*Geologic History*
The Piceance Basin formed during the Laramide orogeny, a period of mountain building that began in the late Cretaceous Period (more than 65 million years ago) and continued for more than 30 million years, extending into the Oligocene Period. Before the Laramide, the area that

BLM_0026955

3. Affected Environment



Geology Cross Section

BLM_0026956

was to become the Piceance Basin was part of a broad, shallow inland sea, the western shoreline of which lay along the edge of the Sevier thrust belt, a north-trending mountain range created as the oceanic plate was pushed up against the continent by plate tectonic forces. This westward compressional movement deformed the crust inland, creating large folds in the sedimentary rocks that had been deposited in the continental interior. Sediments eroded from the eastern slopes of the Sevier thrust belt were deposited in the sea that covered the Piceance Basin, gradually filling it and causing the shoreline to migrate eastward. It was these sediments, deposited during the late Cretaceous Period, which became the Mesaverde formation. The fact that the same rocks lie deep under the Piceance Basin and form the principal gas reservoir in the south part of the basin, and also crop out along its margins, forming the steep cliffs of the Grand Hogback, is proof of the intense forces that deformed the landscape during the Laramide orogeny. The exposed Mesaverde rocks also act as a conduit to conduct groundwater to great depths within the basin.

The Laramide orogeny, which was powered by subduction of oceanic crust deep under the continent formed vast quantities of molten rock (magma) that, along with the compressional forces associated with plate subduction, intruded under and pushed up the sedimentary rocks that had once filled the inland sea, creating the Rocky Mountains. But rocks that are above sea level tend to erode and are transported to lower areas by water. The period of the later Cretaceous to the middle Paleocene is missing from the geologic record of the Piceance Basin because the area was gradually elevated above sea level during this time. However, by the middle of the Paleocene, the Piceance Basin was subsiding, and filled with thousands of feet of sediments eroded from the adjacent uplifted mountains.

Heat from the subducting crust helped to "cook" the organic matter that was contained in the shallow marine sediments that had been deposited in the inland basins and subsequently buried by basin filling sediments during the Laramide. The combination of heat from the pressure of burial, and the heat from the underlying magma, transformed the organic matter over time into oil, coal, and methane gas, depending on the combination of temperature and pressure and the abundance of the organic matter prevailing in each part of the basin. In some areas, such as to the area southeast of the Unit, magma rose nearer to the surface, and even erupted onto the surface during the middle Oligocene to early Miocene Periods.

The primary gas source rocks in the southern Piceance Basin are the Mancos Shale and certain members of the Mesaverde Group. The Mesaverde Group is also considered to be a gas reservoir, largely because of its low permeability. The stratigraphic and structural context of these formations is discussed below.

*Hydrocarbon Source Rocks*
The Mancos Shale formed from the deposition of fine-grained silts and clays in the shallow inland sea that prevailed at the beginning of the late Cretaceous Period a little more than 90 million years ago. The Mancos Shale, in addition to carbonaceous strata in the overlying Mesaverde Group, is considered a likely source of some of the methane gas now present in the Mesaverde Group (Johnson 1988). Methane is generated when oil or coal is sufficiently heated, and in some areas the Mancos Shale is known to contain up to 4 percent organic carbon, and it may have been a significant source of gas due to its great thickness. The top of the Mancos Shale

BLM_0026957

is reported to be about 4,500 feet below the surface at the southern end of the Unit, and may be several thousand feet thick (Hettinger and Kirshbaum 2002). The Mancos Shale rests on the Cretaceous Dakota Sandstone. Below these are additional Mesozoic rocks, which may lie unconformably on pre-Cambrian crystalline rocks. Tweto (1983) indicates that in one cross-sections that happens to pass through the Unit the pre-Cambrian basement is about 9,000 feet below the surface at the southern boundary of the Unit.

The relatively steady conditions that accompanied the deposition of the Mancos Shale were gradually superseded about 65 to 70 million years ago by a period of more rapid deposition and regional uplift. Sediments eroded from the Sevier Thrust Belt to the west were deposited during a period of changing sea depths, so that shale deposits (away from the shore) alternated with sandstones (near the shore). The Upper Cretaceous Mesaverde Group, which is exposed on nearly all of the margins of the Piceance Basin, including along the eastern side of the Unit, is important as both a source and a reservoir for natural gas throughout the region (Tweto 1979). The Mesaverde Group (labeled Kmv on **Figure 3-8**, Geology) includes several formations or members, among which are two highly carbonaceous sequences: the Corcoran and Cozzette Members. These are the deepest significant coal-bearing strata in the basin. Towards the end of the Cretaceous, uplift and shallowing of the depositional environment caused by an eastward migrating shoreline resulted in deposition of coarser sediments. Although the sediments of the Mesaverde Formation are generally coarser, the pores between the grains have been filled with various precipitated minerals, including clay minerals that tend to swell when moisture is present, and these fillings reduce the porosity and permeability of the formation. Most of the natural porosity in the gas-bearing formations results from subsequent dissolution of the precipitated material filling the pores, though most of the pores are not well connected to each other (Pitman et al 1988). Hence, although gas is stored within the porosity of the formation, it is difficult to recover it. Throughout the basin, gas production has had to be enhanced by hydraulic fracturing (Johnson 1988).

According to Johnson (1988), most of the gas produced from the southern part of the Piceance Basin has been from the Corcoran and Cozzette Members of the Mesaverde Group, or from stratigraphic units that contain coarser grained sediments, and most has been from depths of less than 5,000 feet. The Unit lies at approximately the southern limit of occurrence of the Cozzette Member, and therefore the Cozzette is relatively thin in this area (Johnson 1988). It was at the base of the Mesaverde Group, and near the top of the Mancos Shale. The top of the Mesaverde Group is reportedly found at a depth of about 800 feet below the surface at the southern end of the Unit, making the Mesaverde Group more than 3,000 feet thick in this area. Thin coal beds are reportedly present in the Bowie Shale Member, a member of the Williams Fork Formation, which is found in the lower half of the Mesaverde Group (Hettinger and Kirshbaum 2002). The top of the Mesaverde Group dips toward the center of the Piceance Basin, more steeply along the margins of the basin, such as in the vicinity of the Unit (Tweto 1983). Mesaverde Group rocks are exposed along Muddy Creek according to mapping by Ellis and Freeman (1984), and are prominently exposed in the Grand Hogback north of the Unit. This exposure at the surface demonstrates that, if gas were not trapped in the tight porosity of the formation, it would have leaked to the surface.

BLM_0026958

3. Affected Environment



COLORADO

Bull Mountain
Uncompahgre
Field Office

Uncompahgre
Field Office

Bull Mountain

Paonia

Hotchkiss

**Geology**

Source: Tweto et al. 1978

| | | |
|---|---|---|
| Bull Mountain Unit | Miocene (12-26 Ma) | |
| Quaternary Deposits (<3 Ma) | Miocene Intrusives; Basalt dikes and plugs (3-12 Ma) | |
| Landslide or colluvial deposits | Eocene (38-54 Ma) | |
| Alluvial Terraces | Wasatch Frm | |

Figure 3-8

BLM_0026959

Similarly, the exposed, shallow portions of the Mesaverde Group provide a potential conduit for surface and groundwater to enter the Mesaverde rocks. Indeed, seepage of groundwater from above may be one of the factors that prevents gas from escaping from the porosity of the Mesaverde rocks. Drill stem tests have reportedly indicated that gas within the porosity of the formation is under higher pressure than expected due to formation pressure alone. It has been suggested that water-filled porosity under hydrostatic pressure may be a significant factor in sealing the formation and trapping the gas under pressure. Understanding the dynamic forces involved may provide insights regarding the effects of the use of hydraulic fracturing to extract gas from the formation.

The Wasatch Formation is the principal formation exposed at the surface throughout the Piceance Basin, and on most of the western half of the Unit (Tweto 1979). The Wasatch Formation (and underlying Ohio Creek Formation) was deposited on the erosional surface of the Mesaverde Group at the end of the Cretaceous and beginning of the Paleocene Period. In some parts of the basin, the Wasatch Formation contains significant gas deposits. Wasatch Formation deposits (labeled Tw on **Figure 3-8**) is exposed across most of the western side of the Unit, and is covered by various types of Quaternary deposits on the eastern side of the Unit. These include landslide deposits (Ql), alluvium (Qa), colluvium (Qc), gravel (Qg), and glacial deposits (Qr). The Wasatch Formation consists of consolidated materials eroded from the slopes of the young Rocky Mountains and includes claystone, mudstone, shale, sandstone, and conglomerate. When exposed to weathering at the ground surface, these rocks tend to break down to their component sediments. They contain a high percentage of fine grained materials that are highly erodible. The Ohio Creek Formation (Toc) has been mapped along the valley walls and bottoms of East Muddy Creek. It forms steep canyons in areas of stream erosion and is known as a source of landslide hazards. Sandstone outcrops of the Ohio Creek Formation are visible along the valley of East Muddy Creek (Godwin 1968). Erosion of the soils that develop on the exposed Wasatch and Ohio Creek Formations is a source of sediment that is transported downstream by Muddy Creek (Stover 1986). The sediment load carried by Muddy Creek is the primary cause of rapid sedimentation and loss of storage capacity in Paonia Reservoir (Appel and Butler 1991; Latousek 1995).

*Geologic Hazards*
Potential geological hazards within the Unit include (Trautner 2011):

- Avalanches—A few limited areas within the Unit have slopes steeper than 30 degrees, generally considered the minimum angle for avalanche initiation in Colorado's snow climate. Avalanches may occur during periods of intensive snowfall (greater than 1 inch of snow per hour for 12 hours or more); however, the area has not historically had significant avalanche hazards.

- Landslides—Existing landslide areas within the Unit comprise 1,163 acres, primarily on the east side of State Highway 133 in the southeast corner of the Unit. **Figure 3-9**, Landslides, illustrates the distribution of landslide deposits, based on mapping conducted by various workers and compiled by the Colorado Geological Survey (CGS 2012). The data shown on **Figure 3-9** have various degrees of accuracy and do not include some

BLM_0026960

3. Affected Environment



**Landslides**

◻ Bull Mountain Unit

▨ Landslide, digitized at a scale of 1:250,000

▨ Landslide, digitized at a scale of 1:24,000

Source: Godwin 1968 (1:24,000 scale data),
USGS 1976 (1:250,00 scale data),
both accessed via Colorado Geological Survey
GIS 2013

Figure 3-9

BLM_0026961

recent data. A landslide area near Spring Creek was active in 1986, during a period of above-average precipitation and rapid snowmelt (Appel and Butler 1991). Stover (1986) prepared a detailed map of the recent landslide deposits. Evidence of recent landslide movement was found along the proposed pipeline route leading from State Highway 133 to the proposed FED 12-89-9 #1, with scarps ranging from 2 to 5 feet high (Trautner 2011).

- Rockfall—Most rockfall hazards within the Unit occur along the west side of the State Highway 133 corridor. Colorado Department of Transportation has conducted extensive mitigation in the form of rockfall fences and scaling of existing hazards. Some small areas occur near the top of slopes with slopes greater than 30 percent. One such area, which has a small outcrop of sandstone, is located north of the proposed access road and pipeline to the proposed FED 11-90-35 #1.

- Mudflows and debris fans—Mud or debris flows occur when soils become saturated, usually during an intense rain event, and begin to flow down-slope, often carrying rocks or boulders and building up sediment channels. A debris fan is created when the mud or debris flow spreads into a fan-like shape at the bottom of a gully. The landslides that occurred on the east and west sides of East Muddy Creek were a combination of rotation landslides and debris flows.

- Seismic activity—Landslides can be triggered by earthquakes under some circumstances. The site is in an area that has very low seismic activity, where only very low magnitude earthquakes are likely (USGS 2008). State of Colorado/USGS database shows one minor earthquake recorded in the area of the Unit in 1988, which does not appear to have triggered any landslide events. There are no significant active faults in the region of the site (Morgan 2008).

### Trends

Exploration and extraction of gas and other hydrocarbons from tight formations are receiving increased interest as more easily extractable resources are depleted and technological improvements combined with increased demand for fuel make extraction from tight formations more economically feasible.

The Unit is located in an area of active erosion and many unstable slopes. These conditions present a continuing concern in the area because of the economic and safety challenges they present. Global climate changes may lead to more extreme ranges in rainfall and runoff and reducing the reliability of past records as predictors of future hazards.

### APD for Federal 12-89-7-1

On November 6, 2014, the COGCC approved an APD submitted by SGI to drill Federal 12-89-7-1, which SGI had re-filed on June 19, 2014. The bedrock exposed at the surface of the proposed site belongs to the Wasatch Formation. The well would be drilled to a total depth of 4,700 feet and would target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well would have the following characteristics:

- 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet

BLM_0026962

- 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet (the depth was extended in the current permit from its original depth)

- 6-inch-diameter casing in a 8.5 inch-diameter borehole to the final depth of 4,700 feet

By comparison, the published boring log summary of the Hotchkiss Federal Well 12-89-17-11, about 2,300 feet southeast of the proposed well and at about the same surface elevation, reportedly encountered the following:

- Cameo Coal at a depth of about 3,004 feet

- Rollins Formation at a depth of 3,093 feet

- Cozzette Formation at a depth of 3,970 feet

- Corcoran Formation at 4,104 feet

- Mancos Shale at a depth of 4,126 feet

- Dakota Formation at a depth of 7,906 feet

Surface casing was run to a depth of 800 feet.

The boring log of Hotchkiss Federal Well 12-89-17-13, located about 2,000 feet south of Well 12-89-17-11, encountered the following:

- Ohio Creek Formation at a depth of 328 feet

- Mesaverde Formation at a depth of 1,283 feet

- Cameo Coal at a depth of 2,304 feet

- Rollins Formation at a depth of 3,070 feet

- Cozzette Formation from 3,490 to 3,525 feet

Surface casing was run to a depth of 632 feet.

The proposed well pad is on relatively level terrain, with steep slopes to the east of the site. Access would be from existing roads northwest of the site.

### 3.2.6   Vegetation
Information in this section is based on the Biological Evaluation (Petterson 2012) conducted for the Bull Mountain Unit EA, interpretation of high resolution aerial photography, and site visits conducted in 2009 to ground-truth the vegetation community types.

*Current Conditions*
The Unit is within the Southern Rockies EPA Level III ecoregion (EPA 2011d). This ecoregion is composed of steep, rugged mountains with high elevations. Although coniferous forests cover

BLM_0026963

much of the region, as in most of the mountainous regions in the western United States, vegetation, as well as soil and land use, follows a pattern of elevational banding. The lowest elevations are generally grass or shrub-covered. Low to middle elevations are also grazed and covered by a variety of vegetation types including Douglas-fir, ponderosa pine, aspen, and juniper-oak woodlands. Middle to high elevations are largely covered by coniferous forests. The highest elevations have alpine characteristics (EPA 2010).

Vegetation communities found within the Unit are listed in **Table 3-26**, Existing Vegetation Communities in Bull Mountain Unit, and shown on **Figure 3-10**, Vegetation.

**Table 3-26**
**Existing Vegetation Communities in Bull Mountain Unit**

| Vegetation Type | Federal Surface/Federal Minerals (acres) | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) |
|---|---|---|---|
| Aspen | 0 | 829 | 292 |
| Aspen/Conifer | 0 | 3 | 9 |
| Aspen/Oak | 95 | 486 | 188 |
| Disturbed Area | 4 | 78 | 93 |
| Irrigated Meadow | 3 | 297 | 1,681 |
| Mixed Conifer | 0 | 5 | 58 |
| Mixed Mountain Shrub | 50 | 1,048 | 655 |
| Oakbrush | 162 | 3,156 | 667 |
| Pinyon/Juniper | 6 | 80 | 43 |
| Riparian Woodland | 3 | 28 | 56 |
| Rocky Outcrop | 0 | 1 | 0 |
| Sagebrush | 81 | 6,337 | 1,838 |
| Wetland/Riparian Area | 28 | 213 | 431 |
| Willow | 0 | 15 | 1 |
| Open Water | 9 | 33 | 47 |
| Total | 440 | 12,609 | 6,485 |

Source: Petterson 2012; BLM GIS 2014

The following are descriptions of the major community types:

Sagebrush. Vegetation is dominated by mountain sagebrush (*Artemisia tridentata* var. *vaseyana*), with Douglas rabbitbrush (*Chrysothamnus viscidiflorus*) and snowberry (*Symphorocarpos rotundifolius*) also present. Dominant grasses include Kentucky bluegrass (*Poa pratensis*) and Thurber's fescue (*Festuca thurberi*), with western yarrow (*Achillea lanulosa*), lupine (*Lupinus argenteus*), and sandwort (*Arenaria kingii*) as the dominant forb species. There are a few invasive and noxious plant species in the area, including musk thistle (*Carduus nutans*) and Japanese brome (*Bromus japonicus*).

Oakbrush (Gambel's Oak Shrubland). This diverse community type is found at middle elevations of the project area. The amount of Gambel's oak (*Quercus gambelii*; also called oakbrush) varies, depending primarily on elevation and aspect. In some areas, the type consists almost entirely of dense, tall oakbrush with few associated shrubs and a sparse herbaceous understory due to extreme shading by the oak canopy and competition for light, moisture, and space. In areas of elevated soil moisture, another tall shrub, chokecherry (*Prunus virginiana*), is

BLM_0026964

3. Affected Environment



| Vegetation |
| --- |
| Bull Mountain Unit |
| Sagebrush |
| Oakbrush |
| Irrigated meadow |
| Mixed mountain shrub |
| Aspen |
| Aspen/oak |
| Wetland/riparian |
| Meadow |
| Disturbed |
| Pinyon/juniper |
| Open water |
| Other |

Source: Petterson 2012, BLM GIS 2014

Figure 3-10

BLM_0026965

sometimes present and locally co-dominant. On slightly drier exposures, the oakbrush shares dominance with Saskatoon serviceberry (*Amelanchier alnifolia*). More open stands may include snowberry in the understory, occasionally accompanied by wax currant (*Ribes cereum*).

Irrigated meadow. A major community type in the Unit is irrigated hay meadows. These pasturelands occur mostly towards the northern end of the Unit. Dominant vegetation includes timothy (*Phleum pratense*), orchardgrass (*Dactylis glomerata*), red clover (*Trifolium pratense*), Kentucky bluegrass, and smooth brome (*Bromus inermus*). The noxious weed Canada thistle (*Cirsium arvense*) is common in wetter areas and in ditches. Some native wetland graminoids, including beaked sedge (*Carex utriculata*) and meadow sedge (*C. praegracilis*), are found in the irrigation ditch laterals. Almost the entire irrigated meadow community is dominated by nonnative vegetation.

Mixed Mountain Shrubland. On drier slopes at lower elevations or on sunnier aspects, the habitat is dominated by Utah serviceberry (*Amelanchier utahensis*) and some Saskatoon serviceberry and varying amounts of chokecherry, sagebrush, snowberry, and Gambel's oak. Because of the more open canopies of these shrubs, the herbaceous layer is denser and more diverse. Associated forbs vary with elevation, site moisture, and shrub density but commonly include tailcup lupine (*Lupinus caudatus*), Rocky Mountain penstemon (*Penstemon strictus*), Watson's penstemon (*Penstemon watsonii*), aspen daisy (*Erigeron speciosus*), running fleabane (*Erigeron flagellaris*), Drummond's rockcress (*Boechera drummondii*), Nuttall's larkspur (*Delphinium nuttallianum*), small-leaf pussytoes (*Antennaria parviflora*), lambs-tongue groundsel (*Senecio integerrimus*), longleaf phlox (*Phlox longifolia*), sticky false starwort (*Pseudostellaria jamesii*), and narrowleaf mountain trumpet (*Collomia linearis*). Native perennial graminoids include elk sedge (*Carex geyeri*) and a variety of grasses such as slender wheatgrass (*Elymus trachycaulus*) and junegrass (*Koeleria macrantha*).

Grasses. Common grasses include Indian ricegrass (*Achnatherum hymenoides*), slender wheatgrass, western wheatgrass (*Pascopyrum smithii*), bottlebrush squirreltail (*Elymus elymoides*), junegrass, and muttongrass (*Poa fendleriana*). Common forbs include tapertip onion (*Allium acuminatum*), running fleabane, lobeleaf groundsel (*Packera multilobata*), tailcup lupine, death camas (*Toxicoscordion venenosum*), coppermallow (*Sphaeralcea coccinea*), balsamroot (*Balsamorhiza sagittata*), and Indian paintbrush (*Castilleja* sp.).

Aspen Forest. At the higher elevations in the Unit, and on north facing slopes at mid-elevations stands of quaking aspen (*Populus tremuloides*) occur. In the lower elevation aspen stands, understory vegetation is dominated by chokecherry and Saskatoon serviceberry. The understory in this system can also include low-growing shrubs such as common juniper (*Juniperus communis*), Woods' rose (*Rosa woodsii*), and snowberry as well as a diverse grass/forb understory. Perennial grasses in the herbaceous layer include the native mountain brome (*Bromopsis marginatus*) as well as the nonnative smooth brome. Many dead and dying aspen trees were observed, likely from sudden aspen decline or possibly old age.

Pinyon/Juniper Woodland. Stands of pinyon pine (*Pinus edulis*) and Utah juniper (*Juniperus osteosperma*)—generally consisting almost entirely of the latter—occur at lower elevations of the project area, often interspersed within sagebrush shrublands or drier types of mixed mountain shrubland. This habitat type is best developed at the southern end of the Unit on south and west

BLM_0026966

facing slopes. Associated shrubs include bitterbrush (*Purshia tridentata*), Utah serviceberry, broom snakeweed (*Gutierrezia sarothrae*), and skunkbrush (three-leaf sumac) (*Rhus trilobata*). In general, the sparse herbaceous layer consists of graminoids such as cheatgrass (*Bromus tectorum*), western wheatgrass, Indian ricegrass, bottlebrush squirreltail, muttongrass, and Sandberg bluegrass (*Poa secunda*). Forbs are a minor component.

*Wetlands and Riparian Zones*
Wetlands, some of which are hydrologically connected to Waters of the United States, are found throughout the Unit (**Figure 3-11**, Riparian and Wetland Vegetation). Major drainages include Lee Creek and East and West Muddy Creeks. Wetlands in the Unit are dominated by beaked sedge, woolly sedge (*Carex lanuginosa*), meadow sedge, swordleaf rush (*Juncus ensifolius*), Baltic rush (*Juncus balticus*) and other graminoids. Rocky Mountain willow (*Salix monticola*), Bebb's willow (*S. bebbiana*), and Drummonds willow (*S. drummondiana*) occur in these wetlands. Most wetlands retain moisture well into the summer, and the widespread irrigation at the northern end of the Unit has expanded the surface area of wetlands. Subsequently, many irrigation ditches and laterals move waters across the private ranches, utilizing waters from Lee, Henderson, Spring, Drift, Little Henderson, Grouse, Buck, East and West Muddy, and Ault creeks.

No fens (peat-forming wetlands fed by groundwater; EPA 2014c) have been identified within the Unit.

Within the broad category of riparian vegetation are many distinct, interwoven plant communities. Among the most widespread are communities dominated by narrowleaf cottonwood (*Populus angustifolia*) and distinguished by various associated shrubs and trees including thinleaf alder (*Alnus tenuifolia*), blue spruce (*Picea pungens*), Douglas-fir (*Pseudotsuga menziesii*), river hawthorn (*Crataegus rivularis*), box elder maple (*Acer negundo*), sandbar willow (*Salix exigua*), skunkbrush, and red osier dogwood (*Cornus sericea*). Some willow dominated communities may also be present, with sandbar willow occurring alone or in combination with strapleaf willow (*Salix ligulifolia*) or Pacific willow (*Salix lucida*). Tamarisk (*Tamarix chinensis*; BLM 2007a) occurs in ephemeral and lower elevation drainages.

**Trends**
Sagebrush. Most of the sagebrush communities within the Unit generally support very good understory grass and forb diversity, despite evidence of high grazing pressure and mechanical damage to plants. Thousands of acres of sagebrush on the Hotchkiss Ranch were mowed in the mid-2000s to reduce sagebrush cover and increase grass production for livestock grazing. In these areas, sagebrush is beginning to recover.

Meadow. There is persistent and heavy grazing on the majority of the meadow communities, likely favoring the persistence and cover of species more tolerant to grazing, such as Kentucky bluegrass and tarweed.

Wetlands and Riparian Zones. Widespread summertime cattle and sheep grazing has impacted the wetlands in the Unit; hoof action on soft soils is evident and extensive grazing of wetland vegetation was observed during 2008 to 2011 site visits. Hedging of willows was also evident.

BLM_0026967

3. Affected Environment



**Riparian and Wetland Vegetation**

Source: Peterson 2012, BLM GIS 2014, NHD 2013

Legend:
- Bull Mountain Unit
- Open water
- Wetland/riparian
- Riparian woodland
- ~~~ Perennial stream
- ~~ Intermittent stream
- Ephermal stream
- ~~ Ditch/other

June 27, 2014
BullMtn_AE_riparian_V04.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data for
individual use or aggregate use with other data.

0  2,000  4,000
Feet

Figure 3-11

BLM_0026968

<u>Aspen Forest</u>. Aspen trees have been impacted by sudden aspen decline. Aging stands and many dead aspen trees are observable at mid- and high elevations in the Unit.

<u>Conifers</u>. Spruce and pine trees in coniferous forests have suffered from bark beetle infestations.

Trends for the other vegetation communities within the Unit are unknown.

A land health assessment was conducted on federal surface lands within the Unit in 2006-2007 as part of the North Fork Land Health Assessment. Most lands were found to be meeting Land Health Standard 3 (healthy vegetation communities; **Table 3-27**, Land Health Assessment Results in the Bull Mountain Unit). Areas were classified as "unknown" if they were considered too small or minor to evaluate (BLM 2007a).

**Table 3-27**
**Land Health Assessment Results in the Bull Mountain Unit**

| Land Health Assessment Rating | Federal Surface (acres and percentage) |
|---|---|
| Meeting Land Health Standards 3 | 315 (72%) |
| Not Meeting Land Health Standards 3 | 0 |
| Unknown or Data Not Available | 125 (28%) |
| Total | 440 |

Source: BLM 2007

***APD for Federal 12-89-7-1***
The well pad location for Federal 12-89-7-1 is composed of 1.79 acres of mixed mountain shrub and 0.21 acre of aspen vegetation. The area along the proposed pipeline associated with Federal 12-89-7-1 is composed of 5.272 acres of sagebrush, 0.182 acre of oakbrush, 0.058 acre of mixed mountain shrub, and 0.001 acre of wetland vegetation.

### 3.2.7   Invasive, Nonnative Species

***Regulatory Background***

*Federal Noxious Weed Act of 1974*
This law provides for the control and management of nonindigenous weeds that injure or have the potential to injure the interests of agriculture and commerce, wildlife resources, or the public health. The Federal Noxious Weed Act prohibits importing or moving any noxious weeds identified by the regulation and allows for inspection and quarantine to prevent the spread of noxious weeds.

*Executive Order 13112, Invasive Species*
Signed in 1999, this Executive Order directs federal agencies to prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause. To do this, the Executive Order established the National Invasive Species Council; there are currently 13 departments and agencies on the Council.

BLM_0026969

*Colorado Noxious Weed Act*
Passed in 1996, the Colorado Noxious Weed Act ensures protection for all Colorado lands from noxious weeds and creates a duty to control these plants on the part of all landowners, both public and private. It characterizes noxious weeds into three lists: A, B, and C. List A species require mandatory eradication by local governing agencies; List B species are mandated for eradication in some parts of the state, and recommended for suppression or containment in other areas depending on distribution and densities around the state; and List C species are widespread and established.

**Current Conditions**
Noxious and invasive weeds compete with native vegetation for water, space, and nutrients. Invasive plants include those species that are not native to the United States, and the BLM considers plants invasive if they have been introduced into an environment where they did not evolve. As a result, they usually have no natural enemies to limit their reproduction and spread (Westbrooks 1998).

Noxious weeds are a subset of invasive plants that are state or federally listed as harmful to public health, agriculture, recreation, wildlife and any private or public property. These weeds are regulated by the Animal and Plant Health Inspection Service and/or the Colorado Department of Agriculture. The Colorado state noxious weeds that occur within Gunnison County are presented in **Table 3-28**, Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed in Bull Mountain Unit.

**Table 3-28**
**Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed in Bull Mountain Unit**

| Common Name | Scientific Name | Colorado Weed List | Observed in Bull Mountain Unit |
|---|---|---|---|
| Absinth wormwood | *Artemisia absinthium* | B | |
| Black henbane | *Hyoscyamus niger* | B | |
| Canada thistle | *Cirsium arvense* | B | X |
| Cheatgrass | *Bromus tectorum* | C | X |
| Dalmatian toadflax | *Linaria dalmatica* | B | |
| Dame's rocket | *Hesperis matronalis* | B | |
| Diffuse knapweed | *Centaurea diffusa* | B | X |
| Field bindweed | *Convolvulus arvensis* | C | |
| Hoary cress | *Cardaria draba* | A | |
| Houndstongue | *Cynoglossum officinale* | B | X |
| Leafy spurge | *Euphorbia esula* | B | |
| Musk thistle | *Carduus nutans* | B | X |
| Orange hawkweed | *Hieracium aurantiacum* | A | |
| Oxeye daisy | *Chrysanthemum luecanthemum* | B | X |
| Plumeless thistle | *Carduus acanthoides* | B | |
| Purple loosestrife | *Lythrum salicaria* | A | |
| Russian knapweed | *Acroptilon repens* | B | |
| Saltcedar | *Tamarix* spp. | B | |
| Scentless chamomile | *Matricaria perforate* | B | X |
| Scotch thistle | *Onopordum acanthium* or *O. tauricum* | B | |
| Spotted knapweed | *Centaurea maculosa* | B | X |
| Yellow toadflax | *Linaria vulgaris* | B | X |
| Whitetop | *Cardaria draba* | B | X |

Source: Colorado State University Extension 2013; Petterson 2012

Musk thistle is widely scattered across the Unit and becomes quite noticeable on private property at the southwestern side of the Unit. Scattered Japanese brome (invasive, but not noxious) and houndstongue (*Cynoglossum officinale*) are also common. Canada thistle occurs in more mesic (moist) sites. Other noxious weeds in the vicinity of the project area and potentially becoming problematic in areas of surface disturbance include the nonnative annual cheatgrass and limited patches of the nonnative biennial forbs spotted knapweed (*Centaurea stoebe* ssp. *micranthos*) and diffuse knapweed (*Centaurea diffusa*), which currently infests the Colorado Department of Transportation yard at the junction of County Road 265 and State Highway 133. Other noxious weeds minimally occurring in the general area include oxeye daisy (*Chrysanthemum leucanthemum*), scentless chamomile (*Matricaria perforata*), whitetop (*Cardaria draba*), and yellow toadflax (*Linaria vulgaris*). Vegetative cover by noxious weeds in the general area is estimated at less than 1 percent of the total plant cover. For the past 8 years, SGI has annually treated noxious weeds on their pads, access roads, and pipeline corridors. Noxious weeds in these areas are relatively infrequent.

### *Trends*

The Unit is covered by a mixed mountain shrubland community type that has seen various agricultural uses and surface disturbances over the last 100 years. Recently, natural gas exploration and development activities have also been creating surface disturbances, which remove native vegetation and increase the potential for noxious or invasive weed introduction and spread. For most of the landscape, noxious weeds are not yet a dominant part of the plant community. However, although few infestations are present in undisturbed lands, infestations tend to be distributed frequently enough across the landscape to pose a threat to undisturbed lands, especially with some of the more invasive species (BLM 2007a).

### 3.2.8   Fish and Wildlife

### *Current Conditions*

#### *Aquatic Wildlife*

The Unit contains a number of fish-bearing streams, including Henderson, Roberts, Drift, Lee, East and West Muddy, and Ault Creeks (**Figure 3-12**, Fish and Aquatic Wildlife Habitat). However, East Muddy Creek can only support fish during the late summer and fall, the rest of the year it is too silty and is likely ineffective for any significant fish use (Petterson 2012). A multitude of smaller tributaries contribute perennial and ephemeral flows to these creeks.

In terms of aquatic life, all of these streams are limited primarily by flows, which are flashy and seasonally very low, and by heavy sediment loads in East Muddy Creek. Other limiting factors include the type of substrate and the presence, density, and width of riparian plant communities. For more information regarding riparian conditions within the Unit refer to **Section 3.2.6**, Vegetation. These streams are sourced both directly and indirectly from snowpack at higher elevations on the flanks of Huntsman Ridge, the Ragged Mountains, and Spruce Mountain to the north of the Unit, but some of these creeks are sourced by lower-elevation hills, and these creeks (mainly on the western side of the Unit) tend to be ephemeral. Much of the recharge from snowpack enters the streams as groundwater inflow from colluvium and shallow bedrock. Refer to **Section 3.2.4**, Water Resources, for flow and water quality descriptions within the Unit.

BLM_0026971



**Fish and Aquatic Wildlife Habitat**

Source: BLM GIS 2014

Bull Mountain Unit

Cutthroat conservation complete barrier

Cutthroat conservation partial barrier

Occupied cutthroat stream

Perennial stream

Intermittent stream

Watershed

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Figure 3-12

BLM_0026972

Substrates vary longitudinally along the streams and include reaches dominated by cobbles and finer sediments.

Fish surveys by CPW have documented the presence of greenback cutthroat trout (*Onchorhynchus clarkia stomias*) lineage fish, a federally listed threatened subspecies, in upper reaches of Roberts and Henderson Creeks located north of the Unit (**Figure 3-12**). Other creeks in the Unit may have suitable greenback cutthroat trout habitat, including Lee Creek, Drift Creek, and Ault Creek; however, no greenback cutthroat trout have been identified within the Unit. Further discussion of greenback cutthroat trout is provided in **Section 3.2.10**, Special Status Species (Threatened, Endangered, and Sensitive Species).

Nonnative brook trout is a sport fish that occupies lower reaches of Lee Creek. This eastern North American trout has been widely introduced in mountainous areas of Colorado because of its ability to tolerate slightly warmer waters than the cutthroat trout and its ability to reproduce successfully in streams with very low flows. Brook trout may also occur in other creeks within the Unit. Brook trout can competitively displace cutthroat trout.

Aquatic macroinvertebrates inhabit perennial streams such as Lee Creek during a portion of their lifecycles. These species include larvae of stoneflies, mayflies, and some caddisflies in fast-flowing reaches with rocky or detrital substrates. The aquatic larvae and winged adults of stoneflies, mayflies, and caddisflies are probably the main prey for trout in Lee, Roberts, and Henderson Creeks, and other creeks with low-sediment loading. Other terrestrial invertebrates that land or fall onto the surface or are carried into the stream in runoff from adjacent uplands can also be prey for trout. In slow-flowing portions of area wetlands with fine substrates, and in East and West Muddy Creeks, aquatic macroinvertebrates probably include the larvae of midges, mosquitoes, and some caddisflies. These species are able to tolerate relatively warm, turbid, and poorly oxygenated waters, and their more abbreviated larval stages allow them to reproduce in intermittent streams and in seasonally inundated overbank areas.

*Terrestrial Wildlife*
General Wildlife. General wildlife species of interest that have habitat on or adjacent to the project area include mammals, birds, and herptiles. A detailed description of wildlife species observed within the Unit is provided in the Biological Evaluation for the Bull Mountain Unit (Petterson 2012). Big game species that inhabit the Unit include mule deer, elk, black bear, and moose. Refer to **Section 3.2.9**, Migratory Birds, and **Section 3.2.10**, Special Status Species (Threatened, Endangered, and Sensitive Species), for additional information on other specific species. For a complete description of the various habitat types within the Unit refer to **Section 3.2.6**, Vegetation, which provides acres of habitat that could be impacted under the alternatives.

CPW was consulted regarding the development of the Unit through the scoping process. CPW raised concerns over direct and indirect impacts on deer and elk habitats and habitat connectivity. Per their request, CPW was provided a copy of the Biological Evaluation.

Big game species were chosen for impacts analysis because of the high biological importance and public interest of these species, for economic value, and for regulatory concern. Individual wildlife species and groups not specifically mentioned in this assessment are not insignificant;

BLM_0026973

rather, they are not presently at issue because the limited extent of the proposed project would avoid or minimally impact these species and their habitats.

Mule Deer (*Odocoileus hemionus*). Throughout the State of Colorado, mule deer are abundant and browse on shrubs and trees. Mule deer breed in mid- to late fall (October to December; CPW 2012a). The Unit is located at the northern end of a larger area of mule deer Winter Range, Severe Winter Range and a Winter Concentration Area as mapped by CPW Natural Diversity Information Source data (**Figure 3-13**, Mule Deer Habitat). The northern and western portions of the Unit, as well as larger areas to the west, north, and east outside of the Unit, do not provide mule deer limiting habitats. The CPW manage mule deer in the Bull Mountain area under game management units 52 and 521, south Grand Mesa. Deer use of the Unit occurs throughout the summer, and the entire Unit is shown as Mule Deer Summer Range by CPW Natural Diversity Information Source mapping. Fawning occurs in the general area, given the suitable aspen and mixed mountain shrubland habitats (which provide good cover), and abundant water sources from frequent stock tanks and creeks (which is important for nursing does). During the winter, deer mainly use pinyon-juniper habitats towards the southern end of the Unit in lower elevations and on south facing slopes, but some winter use may still occur in the northern areas of the Unit during mild winters. The southern and western facing slopes are very important for deer during the winter months due to shallower snow depths and more frequent melting, and northern and eastern slopes are less utilized due to deep and persistent snows. Deer will mobilize throughout the winter to find more desirable foraging areas, and habitat connectivity is important throughout the winter. CPW maps approximately 4,616 acres of mule deer Winter Range, 196 acres of mule deer Severe Winter Range, and 207 acres of mule deer Winter Concentration Areas within the Unit.

During the fall and during hunting seasons, deer congregate in the Unit and likely use some of the area as a "hunting refuge" as the Unit is mostly private land. Management of deer herd sizes by CPW is difficult when deer utilize sizable hunting refuges. However, during the fall hunters are known to be legally guided and permitted to hunt on the Falcon Seaboard, Jacobs, Aspen Leaf, Rock Creek, Buck Creek, Hughes, Hotchkiss, and other ranches within the Unit. Continued hunting of the area will be important to keep deer herds from congregating and will help with managing deer herd sizes. At this time, mule deer continue to pass through the greater area but are likely modifying their movement patterns to avoid human activity and traffic around the more active wells and roads.

Elk (*Cervus elaphus*). Elk mostly graze on grasses in summer and they will also consume twigs from trees and shrubs during the winter (CPW 2012b).The Unit is located at the northern end of a larger area of elk Winter Range, Severe Winter Range, and Winter Concentration Area as mapped by CPW (**Figure 3-14**). The Unit itself contains elk Winter Range, Severe Winter Range, Winter Concentration Area, and Summer Range by CPW (**Figure 3-14**, Elk Habitat), and is located in Data Analysis Unit E-14. The data analysis unit covers 2,477 square miles. Most of the Unit is on private lands, BLM- administered lands, and the Grand Mesa Uncompahgre and Gunnison National Forest and White River National Forests.

3. Affected Environment



The entire Bull Mountain Unit is within mule deer summer range.

**Mule Deer Habitat**
Source: NDIS 2010

| | |
|---|---|
| ☐ | Bull Mountain Unit |
| ☐ | Mule deer winter concentration |
| ▨ | Mule deer severe winter range |
| ░ | Mule deer critical winter range |
| ☐ | Mule deer winter range |

Figure 3-13

BLM_0026975

3. Affected Environment



The entire Bull Mountain Unit is within elk summer and winter range.

**Elk Habitat**

Bull Mountain Unit

Elk highway crossings: where elk movements traditionally cross roads, presenting potential conflicts between elk and motorists.

Elk severe winter range: where 90% of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten.

Elk winter concentration: verified by Petterson 2012

Elk winter concentration: where densities are 200% greater than the surrounding winter range density during the average five winters out of ten from the first heavy snowfall to spring green-up.

Source: NDIS 2010, Petterson 2012

Figure 3-14

July 03, 2014
BullMtn_AE_elk_V04.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

BLM_0026976

Elk can be found in the Unit year-round, but most significant elk use of the Unit occurs generally during the spring, fall, and winter, with some low-density summertime use. Suitable habitat for elk in spring, summer, and fall occurs in the aspen stands at the upper elevations outside of the Unit, and along both the extreme eastern and western sides of the Unit. Hunting pressure in the area is likely light to moderate. Most, if not all, of the larger ranches within the Unit provide

access for hunting, as this helps keep elk from congregating on private property, but also provides an important supplemental source of income for these ranches and helps with herd size management.

Most observed elk use of the Unit area begins in late October and becomes more localized as winter range occupancy in small but important yards where elk tend to linger through the deepest snow months. As the snows melt in late winter and early spring elk are more widespread. During the most severe of winters (such as in 2008-2009), elk may be forced toward the more southern end of the Unit and along the Muddy Creek corridor, commonly lingering and utilizing hay spread for wintering cattle.

Elk activities through the winter vary depending on snowfall depths and subsequent melting events. Elk scat on lower-elevation, steep, south-facing slopes in the Unit are observed to be very common, and browsing levels of brush are indicative of heavy winter utilization. However, the north-facing slopes and more level terrain do not see intense wintertime utilization. Some of the elk yards on south- and west-facing slopes are very small but are likely critical habitats for wintering elk.

CPW maps the entire Unit as Winter Range; lower elevations of the Unit are also considered Severe Winter Range totaling approximately 5,000 acres, and Winter Concentration Areas totaling nearly 12,000 acres within the Unit. There are approximately 77 acres of elk highway crossings in the Unit. There are no mapped elk calving grounds, but some elk do calve in the Unit, especially during cool, wet springs. Most cows and calves move to higher elevations outside of the Unit as summer progresses.

Black Bear (*Ursus americanus*). Colorado Black bears tend to live near open areas of chokecherry and serviceberry brush in stands of Gamble's oak and aspen. Black bears within the Unit are managed by CPW as Grand Mesa Data Analysis Unit B-17 in west-central Colorado. Bear densities are considered high within the Grand Mesa Data Analysis Unit. Their natural diet consists of berries, nuts, and insects (CPW 2012c). Bears commonly supplement their diets by raiding garbage cans, breaking into homes, and becoming a hazard and a nuisance. Habitat in the Unit is suitable for bear use.

Moose (*Alces alces*). Moose were introduced by CPW onto the Grand Mesa from Utah between 2005 and 2007 and are managed by CPW Data Analysis Unit M-5. Since that time, moose have expanded their range towards areas around the Unit. Moose in general utilize coniferous habitats and wetland complexes, but can also heavily utilize oakbrush and mixed mountain shrubland habitats in the area. During the winter moose browse mainly on willows; in summer they graze on grasses and forbs. Additionally, moose wade into lakes and streams to feed on aquatic vegetation (CPW 2013a). CPW has mapped the Unit as Overall Range, which covers most of the Grand Mesa and Muddy Creek basin.

BLM_0026977

*Trends*

In the 2006-2007 North Fork Land Health Assessment, which included federal lands within the Unit, found that most of the Land Health Standards were being met for standard 1 (soils), standard 3 (plant and animal communities), and standard 4 (threatened and endangered species).

Nearly 90 percent of the stream miles included in the 2006-2007 North Fork Land Health Assessment were meeting standards 2 (riparian systems) and 5 (water quality).

Current population data are lacking for fish, amphibians, and other aquatic species; therefore current trends are largely unknown. Other non-game populations, including furbearers, small mammals, and reptiles, are expected to be stable. Those wildlife species or populations thought to be at risk or declining are monitored and tracked as special status species (**Section 3.2.10**, Special Status Species [Threatened, Endangered, Sensitive Species]).

Mule Deer. The mule deer herds which occur within the Unit are managed by CPW under Data Analysis Unit D-51, South Grand Mesa and consist of game management units 411, 52, and 521. The D-51 herd management plan from 2007 is outdated but reports that the mule deer populations exceeded population objectives from the early 1980s with a peak in 1982 of nearly 20,000 deer. Since the population peak, mule deer in D-51 have declined to at or below the population objective of 12,500 deer , possibly due to such factors as limited winter range habitat availability and human development on transition and winter ranges (CPW 2007). The post-hunt 2012 population estimate was approximately 9,200 animals, with a 3-year average sex ratio of 27:100; the D-51 population is essentially stable (B. Diamond, CPW pers. comm. June 21, 2013).

Elk. Computer modeling data as well as other information, including harvest and aerial surveys, show that the Data Analysis Unit E-14 elk herd has increased significantly since the 1950s (CPW 2009; Giezentanner 2008). The overall population of this herd increased from approximately 2,500 animals in the early 1950s to an estimated high of over 21,000 in 1990 and 1991. The 10-year average from 1998 to 2007 is approximately 16,000. In 2008, the post-hunt population was estimated at approximately 18,600 individuals, within the population objective range of 15,000 to 19,000 (CPW 2010).

Black Bear. Current black bear numbers in Data Analysis Unit B-17 are considered stable. In 2011, population models estimated the presumptive post-hunt population at 1,600 individual black bears in Data Analysis Unit B-17 (CPW 2013b). Total mortality objectives for population suppression have been set at 15 to 20 percent (240 to 320 bears) annually; this plan was approved by the CPW Commission in January 2013.

Moose. In 2008, CPW estimated that approximately 125 moose inhabit Data Analysis Unit M-5 consisting of approximately 60 bulls: 100 cows. The current herd management objectives include increasing the population size to 200-300 moose (CPW 2009).

*APD for Federal 12-89-7-1*

Existing habitats for wildlife in the APD area are described in **Section 3.2.6**, Vegetation. The APD area is within mule deer winter range and is at the edge of a winter concentration area. Some fawning likely occurs in the general area, given the habitat with suitable cover and

BLM_0026978

abundant water sources from stock ponds and ephemeral creeks (Rocky Mountain Ecological Services, Inc. 2012).

The APD area is also within elk winter range and severe winter range. Elk begin to use the area in early November, both north- and south-facing slopes. As winter progresses and snows become deeper, elk congregate on south-facing slopes.

As the pad site and pipeline corridor are next to existing roads and increased human activity, the suitability and use of these areas by terrestrial wildlife is likely low.

There are no perennial aquatic habitats in the APD area to provide habitat for aquatic species.

### 3.2.9   Migratory Birds

*Current Conditions*
The Migratory Bird Treaty Act, established in 1918, made it unlawful to pursue, hunt, kill, capture, possess, sell, purchase, or barter any migratory bird, including the feathers or other parts, nests, eggs, or migratory bird products. In addition, Executive Order 13186 set forth the responsibilities of federal agencies to implement further the provisions of the Act by integrating bird conservation principles and practices into agency activities and by ensuring that federal actions evaluate the effects of actions and agency plans on migratory birds.

As used in the Act, "migratory birds" include native resident species that remain in an area throughout the year as well as migrant species that move from northern to southern latitudes and from higher to lower elevations to avoid winter conditions and a seasonal shortage of suitable food.

For most migrant and native resident species, nesting habitat is of special importance because it is critical for supporting reproduction in terms of both nesting sites and food. Also, because birds are generally territorial during the nesting season, their ability to access and utilize sufficient food is limited by the quality of the territory occupied. During non-breeding seasons, birds are generally non-territorial and able to feed across a larger area and wider range of habitats.

Among the wide variety of species protected by the Act, special concern is usually given to the following groups:

- Species that migrate across long distances

- Birds of prey, which require large areas of suitable habitat for finding sufficient prey

- Species that have narrow habitat tolerances and hence are vulnerable to extirpation from an area as a result of a relatively minor habitat loss

- Species that nest colonially and hence are vulnerable to extirpation from an area as a result of minor habitat loss

BLM Instruction Memorandum No. 2008-050 provides guidance toward meeting the agency's responsibilities under the Migratory Bird Treaty Act. This guidance directs field offices to

BLM_0026979

promote the maintenance and improvement of habitat quantity and quality for migratory birds of conservation concern to avoid, reduce, or mitigate adverse impacts on their habitats to the extent feasible and in a manner consistent with regional or statewide bird conservation priorities. Because of the many species of migratory birds potentially present within field office boundaries, the BLM has focused its protection on species listed by the USFWS as Birds of Conservation Concern. This listing resulted from the 1988 amendment to the Fish and Wildlife Conservation Act, which mandates USFWS to "identify species, subspecies, and populations of all migratory nongame birds that, without additional conservation actions, are likely to become candidates for listing under the Endangered Species Act of 1973." **Table 3-29**, Birds of Conservation Concern of the Uncompahgre Field Office, lists those species that occur or have a potential to occur within the field office.

*Neotropical Species*
The Unit is dominated by sagebrush communities, with nearby Gambel's oak and mixed shrubs. A variety of migratory birds fulfill nesting requirements within these vegetation communities from late May to mid-July and/or during spring and fall migrations.

Approximately 42 percent of the Unit is dominated by sagebrush shrublands, and provides potential habitat for Brewer's sparrow, See **Section 3.2.10**, Special Status Species (Threatened, Endangered, Sensitive Species) for a discussion on impacts on this species. Other species associated with sagebrush shrublands that occur, but are not Birds of Conservation Concern species, include the western meadowlark (*Sturnella neglecta*), vesper sparrow (*Pooecetes gramineus*), and lark sparrow (*Chondestes grammacus*).

None of the Birds of Conservation Concern species in the UFO area are commonly associated with mixed mountain shrub and oakbrush habitats in the Unit. Migratory birds commonly associated with these habitat types but not included on the Birds of Conservation Concern list include migrants such as the Cordilleran flycatcher (*Empidonax occidentalis*), western scrub-jay (*Aphelocoma californica*), blue-gray gnatcatcher (*Polioptila caerulea*), Virginia's warbler (*Vermivora virginiae*), MacGillivray's warbler (*Oporornis tolmiei*), lesser goldfinch (*Carduelis psaltria*), black-headed grosbeak (*Pheucticus melanocephalus*), spotted towhee (*Pipilo maculatus*), and green-tailed towhee (*P. chlorurus*).

Areas of quaking aspen or other deciduous trees (including along drainages), occupy approximately 6 percent of the project area, and provide potential habitat for the house wren (*Troglodytes aedon*) and warbling vireo (*Vireo gilvus*). Also, migrants may use these habitats periodically such as the cordilleran flycatcher, western wood-pewee (*Contopus sordidulus*), tree swallow (*Tachycineta bicolor*), and violet-green swallow (*Tachycineta thalassina*). A Birds of Conservation Concern species of riparian habitats, the willow flycatcher, is an obligate in lower-elevation riparian shrublands dominated by tall willows or structurally similar species.

The small area of mixed conifer forests on north-facing slopes in some of the deeper drainages supports limited numbers of coniferous forest species, including Cassin's finch. The area is generally below the elevational range of Cassin's finch for nesting, but use during winter is possible when individuals or flocks move to lower areas in search of food. Other species potentially nesting in the scattered coniferous forest stands include migrants such as Hammond's

BLM_0026980

**Table 3-29**
**Birds of Conservation Concern of the Uncompahgre Field Office**

| Common Name | Scientific Name | Habitat Description | Range/Status | Potential and/or Occurrence in Project Area |
|---|---|---|---|---|
| American bittern | *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/summer resident, breeding confirmed in the region but not within the UFO | Suitable habitat is limited, not likely occurring |
| Bald eagle[1] | *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident, no confirmed breeding | See assessment under Sensitive Species |
| Bendire's thrasher | *Toxostoma bendirei* | Desert, especially areas of tall vegetation, cholla cactus, creosote bush and yucca, and in juniper woodland | UFO is outside known range | No |
| Black rosy-finch | *Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds and nests in alpine areas near rock piles and cliffs | Winter resident, non-breeding | No |
| Brewer's sparrow | *Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident, breeding | Summer resident, breeding, see Sensitive Species assessment |
| Brown-capped rosy-finch | *Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer residents, breeding | No |
| Burrowing owl | *Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Summer/fall resident, breeding | No, see assessment under Sensitive Species Section |
| Cassin's finch | *Haemorhous cassinii* | Open montane coniferous forests; breeds and nests in coniferous forests | Year-round resident, breeding | Yes |
| Chestnut-collared longspur | *Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant, non-breeding | No |
| Ferruginous hawk | *Buteo regalis* | Open, rolling, and rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/winter resident, non-breeding | Possible migrant through area. See assessment under Sensitive Species Section |

BLM_0026981

**Table 3-29**
**Birds of Conservation Concern of the Uncompahgre Field Office**

| Common Name | Scientific Name | Habitat Description | Range/Status | Potential and/or Occurrence in Project Area |
|---|---|---|---|---|
| Flammulated owl | *Otus flammeolus* | Montane forest, usually open and mature conifer forests; prefers ponderosa pine and Jeffrey pine | Summer resident, breeding | Yes |
| Golden eagle | *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident, breeding | Common in Unit, unknown nest site |
| Grace's warbler | *Dendroica graciae* | Mature coniferous forests | Summer resident, breeding | No |
| Grasshopper sparrow | *Ammodramus savannarum* | Open grasslands and cultivated fields | UFO is outside known range | No |
| Gray vireo | *Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident, breeding | Possibly at southern end of Unit |
| Gunnison sage grouse | *Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | Year-round resident, breeding. | No, see assessment under Sensitive Species Section |
| Juniper titmouse | *Baeolophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident, breeding | Possibly at southern end of Unit |
| Lewis's woodpecker | *Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa), riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident, breeding | No |
| Long-billed curlew | *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | Spring/fall migrant, non-breeding | Unlikely migrant through area. See assessment under Sensitive Species Section |

*Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan*

BLM_0026982

**Table 3-29**
**Birds of Conservation Concern of the Uncompahgre Field Office**

| Common Name | Scientific Name | Habitat Description | Range/Status | Potential and/or Occurrence in Project Area |
|---|---|---|---|---|
| Mountain plover | *Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies; short vegetation | Spring/fall migrant, non-breeding | No |
| Peregrine falcon[1] | *Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident, breeding | Possibly foraging during summer. See assessment under Sensitive Species Section |
| Pinyon jay | *Gymnorhinus cyanocephalus* | Pinyon-juniper woodland | Year-round resident, breeding | Possibly at southern end of Unit |
| Prairie falcon | *Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident, breeding | Observed as migrant through area |
| Snowy plover [2] | *Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Spring migrant, non-breeding | No |
| Veery | *Catharus fuscescens* | Deciduous forests, riparian, shrubs | Possible summer resident, observed recently in Gunnison County, possible breeding | No |
| Willow flycatcher [2] | *Empidonax traillii* | Riparian and moist, shrubby areas; winters in shrubby openings with short vegetation | Summer resident, breeding | No |
| Yellow-billed cuckoo[3] | *Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident, breeding | No, see assessment under Sensitive Species Section |

Source: USFWS 2008; Cornell Lab of Ornithology 2009; San Juan Institute of Natural and Cultural Resources 2009; Petterson 2012
[1] Endangered Species Act delisted species.
[2] Non-listed subspecies/population
[3] Endangered Species Act candidate species

BLM_0026983

flycatcher (*Empidonax hammondii*), western tanager (*Piranga ludoviciana*), plumbeous vireo (*Vireo plumbeus*), yellow-rumped warbler (*Dendroica coronata*), chipping sparrow (*Spizella passerina*), darkeyed junco (*Junco hyemalis*), and pine siskin (*Carduelis pinus*).

Stands or scattered individuals of pinyon pine and Utah juniper provide some habitat for three pinyon-juniper obligates on the Birds of Conservation Concern list: the pinyon jay, juniper titmouse, and gray vireo. The gray vireo is unlikely to occur because the location of the project area is outside the known nesting range, which is located farther to the west. Other migrants occurring in the limited pinyon-juniper include migrants such as the gray flycatcher (*Empidonax wrightii*), Say's phoebe (*Sayornis saya*), mountain bluebird (*Sialia sialis*), blue-gray gnatcatcher, and black-throated gray warbler (*Dendroica nigrescens*).

During winter, three additional species—Clark's nutcracker (*Nucifraga Columbiana*), Townsend's solitaire (*Myadestes townsendi*), and the cedar waxwing (*Bombycilla cedrorum*)— may congregate in pinyon-juniper habitats in search of pine nuts (the nutcracker) or juniper berries (the solitaire and waxwing).

The purple martin (*Progne subis*), although not a Bird of Conservation Concern, is a migratory bird that winters in South America and arrives in Colorado in early June then departs the area by late August (CPIF 2013). This swallow is recognized as a Forest Service sensitive species and is a Management Indicator Species in the Rocky Mountain Region (Region 2). Additionally, this species is listed as a Priority Species by the Colorado Partners in Flight plan (Wiggins 2005). The purple martin is an obligate secondary cavity nester and in Colorado it prefers to breed in stands of old growth aspen nesting in cavities excavated by woodpeckers or flickers (CPIF 2013). Due to the presence of suitable habitat and sightings of purple martin within and adjacent to the Unit (**Figure 3-15**, Purple Martin Habitat), as well as current management considerations of this species, effects of the Proposed Action on the purple martin will be addressed.

*Raptor Species*
Suitable bald eagle winter habitat occurs in the south central region of the Unit along East Muddy Creek (**Figure 3-16**, Bald Eagle Habitat). The golden eagle (*Aquila chrysaetos*) and prairie falcon (*Falco mexicanus*) are more likely to hunt across sagebrush areas than in the other habitat types in the Unit, all of which contain taller and denser woody vegetation. The irrigated meadows occupying 10 percent of the Unit provide potential habitat for the golden eagle and potentially for prairie falcon, when this species migrates through the project area.

Also, stands of quaking aspen and other deciduous trees provide suitable habitat for the flammulated owl. Intact stands of aspen within the Unit that are not affected by sudden aspen decline may also provide suitable nesting habitat for raptors and could require further surveys to address potential impacts on nesting raptors in the Unit. The north-facing slopes of mixed conifer forests in some of the drainages have the potential to support the flammulated owl.

*Trends*
Habitat throughout the UFO supports a diversity of migratory bird species, including neotropical migrants. Recent studies and monitoring suggest that some of these populations are declining, due in part to land use and management practices and habitat loss and degradation (USFWS 2008). With the limited wildlife data available, most raptor populations appear to be stable.

BLM_0026984



**Purple Martin Habitat**
Source: USFS 2008, GAP 2013

Bull Mountain Unit
Purple martin colony
Purple martin habitat

Figure 3-15

BLM_0026985

3. Affected Environment



**Bald Eagle Habitat**

Source: NDIS 2010

☐ Bull Mountain Unit

▨ Bald eagle winter forage: frequented by wintering bald eagles between November 15 and March 15.

■ Bald eagle winter range: bald eagles have been observed between November 15 and April 1.

Figure 3-16

BLM_0026986

### 3.2.10  Special Status Species (Threatened, Endangered, Sensitive Species)

*Current Conditions*
Listed or candidate wildlife, fish, and plant species that were considered and evaluated for this assessment include those identified by the UFO and the USFWS as potentially occurring in Gunnison County (accessed December 2011).

The following habitats dominate the project area: sagebrush, mixed shrublands, oakbrush, riparian/emergent wetlands, aspen, irrigated hay meadows, and upland grass meadows. While all species were considered, only species which occur in the area, have suitable habitat, or for which the Unit is within the range of the species were selected for additional evaluation due to direct, indirect, and/or cumulative impacts. No critical habitat occurs in the Unit.

Information on species status, distribution, and ecology was derived from USFWS recovery plans, Colorado Natural Heritage Program database maps and reports, CPW habitat mapping (CPW 2011), personal knowledge of the consultant and reviewing BLM biologists, various scientific studies and reports, and correspondence with USFWS biologists.

Habitat surveys were conducted in the fall of 2007 through spring of 2011 (Petterson 2012).

*Federally Listed, Proposed, or Candidate Threatened or Endangered Animal Species*
**Table 3-30**, Threatened and Endangered Species of the Uncompahgre Field Office, is a complete list of federally protected listed, proposed, or candidate threatened or endangered animal species considered and evaluated.

Canada Lynx (*Lynx canadensis*), Federally Threatened Species: In Colorado, Canada lynx occupy high elevation coniferous forests characterized by cold, snowy winters and an adequate prey base (Ruggiero et al. 1999). The preferred prey of Canada lynx throughout their range is the snowshoe hare (*Lepus americanus*). In the western United States, lynx are associated with mesic forests of lodgepole pine, subalpine fir, Engelmann spruce, and quaking aspen in the upper montane and subalpine zones, generally between 8,000 and 12,000 feet in elevation. Although snowshoe hares are the preferred prey, lynx also feed on other species such as pine squirrel (*Tamiasciurus hudsonicus*), and blue (dusky) grouse (*Dendragapus obscurus*).

The Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000, revised 2003) was developed to provide a consistent and effective approach to conserve Canada lynx on federal lands in the conterminous United States. The Lynx Conservation Assessment and Strategy indicates that project planning should evaluate the effects on lynx habitat within designated Lynx Analysis Units that are generally greater than 25,000 acres in the southern Rocky Mountain Geographic Area. Lynx Analysis Units do not represent actual lynx home ranges, but their scale should approximate the size of an area used by an individual lynx. A major transportation route to the Unit is State Highway 133, which passes through the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Area. As such, the USFWS (Broderdorp 2011) has suggested that indirect effects from development of the Unit be investigated for potential effects on Canada lynx.

BLM_0026987

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| **Fish** | | | | | | | | | |
| Bonytail *Gila elegans* | E | Warm-waters of the Colorado River main stem and tributaries, some reservoirs; flooded bottomlands for nurseries; pools and eddies over rocky substrates with silt-boulder mixtures for spawning | N | N | Y | N | | | X |
| Humpback chub *Gila cypha* | E | Warm-water, canyon-bound reaches of Colorado River main stem and larger tributaries; turbid waters with fluctuating hydrology; young require low-velocity, shoreline habitats such as eddies and backwaters | N | N | N | N | | | X |
| Razorback sucker *Xyrauchen texanus* | E | Warm-water reaches of the Colorado River main stem and larger tributaries; some reservoirs; low velocity, deep runs, eddies, backwaters, side canyons, pools, eddies; cobble, gravel, and sand bars for spawning; tributaries, backwaters, floodplain for nurseries | N | N | N | N | | | X |
| Colorado pikeminnow *Ptychocheilus lucius* | E | Warm-waters of the Colorado River main stem and tributaries; deep, low velocity eddies, pools, runs, and nearshore features; uninterrupted streams for spawning migration and young dispersal; also floodplains, tributary mouths, and side canyons; highly complex systems | N | N | N | N | | | X |

*Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan*

BLM_0026988

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | T | Cold water streams and lakes with adequate spawning habitat (riffles), often with shading cover; young shelter in shallow backwaters | N | Y | Y | N | X | | |
| **Mammals** | | | | | | | | | |
| Black-footed ferret[7] *Mustela nigripes* | E | Prairie dog colonies for shelter and food; greater than 200 acres of habitat with at least 8 burrows per acre | N | N | N | N | X | | |
| Canada lynx *Lynx canadensis* | T | Spruce-fir, lodgepole pine, willow carrs, and adjacent aspen and mountain shrub communities that support snowshoe hare and other prey | N | N | Y | Y | | X | |
| North American Wolverine *Gulo gulo luscus* | C | Alpine and arctic tundra, boreal and mountain forests (primarily coniferous); limited to mountains in the south, especially large wilderness areas. | N | N | N | N | X | | |
| Gunnison's prairie dog *Cynomys gunnisoni* | C | Level to gently sloping grasslands, semi-desert shrublands, and montane shrublands, from 6,000 to 12,000 feet in elevation | N | N | N | N | X | | |
| **Birds** | | | | | | | | | |
| Mexican spotted owl[8] *Strix occidentalis* | T | Mixed-conifer forests and steep-walled canyons with minimal human disturbance | N | N | Y | N | X | | |

BLM_0026989

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| Southwestern willow flycatcher[8] *Empidonax traillii extimus* | E | For breeding, riparian tree and shrub communities along rivers, wetlands, and lakes; for wintering, brushy grasslands, shrubby clearings or pastures, and woodlands near water | N | N | N | N | X | | |
| Gunnison sage grouse *Centrocercus minimus* | C | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | N | N | N | Y | X | | |
| Western yellow-billed cuckoo *Coccyzus americanus* | C | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | N | N | Y | N | X | | |
| **Plants** | | | | | | | | | |
| Clay-loving wild buckwheat *Eriogonum pelinophilum* | E | Mancos shale badlands in salt desert shrub communities, often with shadscale, black sagebrush, and mat saltbush; 5,200 to 6,400 feet in elevation | N | N | N | N | X | | |
| Colorado hookless cactus *Sclerocactus glaucus* | T | Salt-desert shrub communities in clay soils on alluvial benches and breaks, toe slopes, and deposits often with cobbled, rocky, or graveled surfaces; 4,500 to 6,000 feet in elevation | N | N | N | N | X | | |

BLM_0026990

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| **Invertebrates** | | | | | | | | | |
| Uncompahgre fritillary butterfly[8] *Boloria acrocnema* | E | Restricted to moist, alpine slopes above 12,000 feet in elevation with extensive snow willow patches; restricted to San Juan Mountains | N | N | N | N | X | | |

Source: USFWS 2009; Van Reyper 2006
[1] Potential and/or known occurrences in Project Area? Assessment based on UFO files and GIS data, partner data, and local knowledge.
[2] Project area is within the current known range of the species?
[3] Project area contains suitable habitat for the species?
[4] Project activities will have "No Effect" to the species or its habitat
[5] Project activities "May Effect, Not Likely to Adversely Affect" to the species or its habitat
[6] Project activities "May Effect, Likely to Adversely Affect" to the species or its habitat
[7] Black-footed ferret are believed to be extirpated from this portion of its range.
[8] Species not known to occur within UFO boundaries, but known to occur in close proximity.

BLM_0026991

The Ragged Mountain Lynx Analysis Unit comprises 20,174.5 acres or 31.5 square miles (Forest Service 2008a). Mapped lynx habitat in Lynx Analysis Unit statistics only includes lands in federal ownership (Error! Not a valid bookmark self-reference., Canada Lynx Habitat). Environmental baseline statistics of lynx habitat in the Ragged Mountain Lynx Analysis Unit are summarized in **Table 3-31**, Existing Habitats within the Ragged Mountain Lynx Analysis Unit, and **Table 3-32**, Existing Habitats within the Crystal West Lynx Analysis Units.

**Table 3-31**
**Existing Habitats within the Ragged Mountain Lynx Analysis Unit**

| Habitat Type | Acres | Percent of the Unit |
|---|---|---|
| Primary Suitable | 8,638 | 43% |
| Secondary Suitable | 3,166 | 16% |
| Unclassified | 8,370 | 41% |
| Total | 20,174 | 100% |

Source: Forest Service 2008

**Table 3-32**
**Existing Habitats within the Crystal West Lynx Analysis Units**

| Habitat Type | Acres | Percent of the Unit |
|---|---|---|
| Winter Foraging | 20,790 | 21% |
| Denning | 14,603 | 15% |
| Other | 10,884 | 11% |
| Non-Habitat | 40,294 | 41% |
| Private | 10,963 | 11% |
| Total | 97,534 | 100% |

Source: Forest Service 2008

The Ragged Mountain Lynx Analysis Unit overlaps a small portion of the 27,034-acre McClure Pass Lynx Linkage Area at the northern end of the Lynx Analysis Unit, linking the Huntsman Ridge area with habitats in the Crystal West, Crystal East, and Huntsman Mountain Lynx Analysis Units on the White River and Grand Mesa Uncompahgre and Gunnison National Forests. The McClure Pass Lynx Linkage Area links suitable lynx habitats in the Elk Mountains to potential habitats on Huntsman Ridge and the Grand Mesa. State Highway 133 is within the McClure Pass Lynx Linkage Area.

The Crystal West Lynx Analysis Unit is a relatively large Lynx Analysis Unit at 97,534 acres, and is located on the White River National Forest. At this time the White River National Forest still utilizes habitat definitions previously described under the Lynx Conservation Assessment and Strategy. The Lynx Conservation Assessment and Strategy provides guidelines for the management of lynx habitat within Lynx Analysis Units, and recommends that at least 10 percent of a Lynx Analysis Unit be suitable Denning habitat, and the Crystal West Lynx Analysis Unit is at 15 percent Denning habitat. The Lynx Conservation Assessment and Strategy also recommends that at least 6,500 acres of primary lynx habitat (Denning and Winter Foraging habitats) be available for lynx use; the Crystal West Lynx Analysis Unit is at 35,393 acres.

BLM_0026992

3. Affected Environment



COLORADO

Bull Mountain

Uncompahgre Field Office

Uncompahgre Field Office

Bull Mountain

Paonia

Hotchkiss

Crystal East

**Canada Lynx**

Source: USFS 2003

Bull Mountain Unit

Canada lynx linkage: travel corridors between large blocks of potential habitat used for dispersal or summer movements

Canada lynx habitat: denning, winter and other (seasonal) habitat

Canada lynx analysis unit: management boundaries for locations with enough potential habitat to support a female lynx, state or private lands not incorporated

Figure 3-17

BLM_0026993

Case No. 1:20-cv-02484-MSK   Document 34-2   filed 04/27/21   USDC Colorado   pg 62 of 397

Major existing land uses that may influence lynx habitat use within the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Area is generally limited to widespread livestock grazing, dispersed camping and infrequent trail use, relatively active fall big game hunting, and some limited winter-time snowmobile activities.

Colorado River Endangered Fish, Federally Endangered Species. The USFWS lists the humpback chub (*Gila cypha*), bonytail chub (*G. elegans*), Colorado pikeminnow (*Ptychocheilus lucius*), and razorback sucker (*Xyrauchen texanus*) as occurring in downstream waters in the Colorado River. Colorado pikeminnow and razorback sucker also occur in lower reaches of the Gunnison River, near the City of Delta down to the confluence with the Colorado River.

The Unit is approximately 60 river miles upstream of the nearest designated critical habitat for the Colorado pikeminnow and razorback sucker and even further away for designated critical habitats for the humpback chub and bonytail in the main stem of the Colorado River.

Water depletions in the Colorado River Basin and the potential effects on federally listed Colorado River fish as a result of fluid mineral development were addressed in the Programmatic Biological Assessment for the BLM's Fluid Minerals Program in Western Colorado (May 2008). In response to BLM's Programmatic Biological Assessment, the USFWS issued a Programmatic Biological Opinion (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions associated with BLM approved projects in the Colorado River Basin are not likely to jeopardize the continued existence the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub. Likewise, the project is also not likely to destroy or adversely modify designated critical habitats for these endangered fish along the Green, Yampa, White, Colorado, and Gunnison Rivers. Water depletions analyzed under the Programmatic Biological Opinion include water used for dust abatement, hydrostatic testing, well drilling and completion, and water associated with federal actions. The Programmatic Biological Opinion requires the BLM and SGI to report the entire quantity of freshwater actually used to develop a federal well in that year to update water use estimates. Water depletion reports will be submitted to the USFWS on October 31 of each year. These reports will be used to track compliance with the threshold depletion amount.

Greenback cutthroat trout (*Onchorhynchus clarkii stomias*), Federally Threatened Species. Currently, populations of green lineage cutthroat occur in Roberts Creek and Henderson Creek in the northwest portion of the Unit. Genetic testing has shown that the Roberts Creek population is 96 percent genetically pure greenback cutthroat trout and the Dyke Creek population is 98 percent genetically pure. Any population that shows at least 80 percent genetic purity would be subject to the requirements of the Endangered Species Act (Speas 2010; USFWS 2010). Fish sampling in Ault Creek revealed that there are no cutthroat trout within that creek (Petterson 2012). Cutthroat trout populations in Henderson Creek have not undergone the amplified fragment length polymorphism genetic testing process, but mitochondrial DNA testing has shown those trout to have greenback cutthroat trout lineage. Greenback cutthroat trout occur in clear, cold, high-gradient streams and creeks. They are extremely vulnerable to competition by nonnative trout (e.g., brook trout [*Salvelinus fontinalis*]), which were accidentally released in the Clear Fork. Trout are also vulnerable to water depletions.

BLM_0026994

*Federally Listed, Proposed, or Candidate Threatened or Endangered Plant Species*
Habitat necessary for life requirements of federally listed, proposed, or candidate threatened or endangered plant species are not found within the Unit.

*BLM Sensitive Species*
**Table 3-33**, BLM Sensitive Species of the Uncompahgre Field Office[1], lists the species considered and evaluated. Of the 31 UFO-listed sensitive animal species known or likely to occur in or adjacent to the Unit, most do not occur in the area on a regular basis and are listed as unlikely based on project location and habitat types. However, eight species are considered to possibly occur, indicating a greater likelihood of occurrence, or present, in that they are known to occur. These species are addressed below.

Northern Goshawk (*Accipiter gentilis*). This raptor nests in subalpine spruce-fir, Ponderosa pine, aspen forests, and infrequently in mature pinyon-juniper woodlands, but may move to lower-elevation woodlands during winter in search of prey. The Unit provides suitable nesting and foraging habitat for this species.

Bald Eagle (*Haliaeetus leucocephalus*). Removed from the federal list of threatened or endangered species in August 2007, this large raptor is now considered a sensitive species and remains protected by the Bald and Golden Eagle Protection Act as well as the Migratory Bird Treaty Act. Bald eagles roost during the winter along Muddy Creek at the southern end of the Unit, but may scavenge on winter-killed big game species in upland areas in the Unit. Bald eagle winter forage areas and winter range are mapped on approximately 2,976 acres of the Unit. Bald eagles are not known to occur in the area during the summer.

Brewer's Sparrow (*Spizella breweri*). This migrant is essentially a sagebrush obligate, although it may occasionally nest in other semi-desert shrublands. Sagebrush is a significant component of the habitat in the Unit, and this species is known to nest in the project area (Petterson 2012). This species does not occur in the area during the winter (see **Section 3.2.9**, Migratory Birds).

Bat Species. Bats potentially found in the Unit include Townsend's big-eared bat (*Corynorhinus townsendii pallescens*), spotted bat (*Euderma maculatum*), and fringed myotis (*Myotis thysanodes*). All of these bat species may forage over shrublands typified by the sagebrush and pinyon-juniper woodlands occurring within the lower elevations and south-facing slopes in the Unit. However, these bat species require nearby rock outcrops, caves or mines (abandoned or active) for shelter; for fringed myotis and spotted bat, old buildings and larger trees with cavities will suffice. Rock outcrops occur at the southern end of the Unit, near the West Muddy Creek and East Muddy Creek canyons, but no direct or indirect impacts on these outcrops would occur.

Leopard Frog (*Lithobates pipiens*). This species occurs in the Unit in irrigated meadows, riparian areas and creeks, and prefers sunny, grassy wetlands. It requires abundant aquatic vegetation for breeding and adjacent semi-aquatic vegetation for cover when adults disperse short distances to feed. Leopard frogs feed primarily on emergent adults of aquatic insects or on terrestrial insects attracted to the water.

BLM_0026995

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| **Fish** | | | | | | | |
| Roundtail chub *Gila robusta* | Warm-water rocky runs, rapids, and pools of creeks and small to large rivers; also large reservoirs in the upper Colorado River system; generally prefers cobble-rubble, sand-cobble, or sand-gravel substrate | None | N | N | | X | |
| Bluehead sucker *Catostomus discobolus* | Large rivers and mountain streams, rarely in lakes; variable, from cold, clear mountain streams to warm, turbid streams; moderate to fast flowing water above rubble-rock substrate; young prefer quiet shallow areas near shoreline | None | N | N | | X | |
| Flannelmouth sucker *Catostomus latipinnis* | Warm moderate- to large-sized rivers, seldom in small creeks, absent from impoundments; pools and deeper runs often near tributary mouths; also riffles and backwaters; young usually in shallower water than are adults | None | N | N | | X | |
| Colorado River cutthroat trout *Oncorhynchus clarki pleuriticus* | Cool, clear streams or lakes with well-vegetated streambanks for shading cover and bank stability; deep pools, boulders, and logs; thrives at high elevations | None | Y | N | X | | |
| **Mammals** | | | | | | | |
| Desert bighorn sheep *Ovis canadensis nelsoni* | Steep, mountainous or hilly terrain dominated by grass, low shrubs, rock cover, and areas near open escape and cliff retreats; in the resource area, concentrated along major river corridors and canyons | None | N | N | X | | |
| White-tailed prairie dog [7] *Cynomys leucurus* | Level to gently sloping grasslands and semi-desert grasslands from 5,000 to 10,000 feet in elevation | None | N | N | X | | |
| Kit fox *Vulpes macrotis* | Semi-desert shrublands of saltbrush, shadscale and greasewood often in association with prairie dog towns | None | N | N | X | | |

BLM_0026996

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| Allen's (Mexican) big-eared bat *Idionycteris phyllotis* | Ponderosa pine, pinyon-juniper woodland, oak brush, riparian woodland (cottonwood); typically found near rocky outcrops, cliffs, and boulders; often forages near streams and ponds. Thought to be in the West End of Montrose County. | None | Y | N | X | | |
| Big free-tailed bat *Nyctinomops macrotis* | Rocky areas and rugged terrain in desert and woodland habitats; roosts in rock crevices in cliffs and in buildings caves, and occasionally tree holes | None | Y | Y | | X | |
| Spotted bat *Euderma maculatum* | Desert shrub, ponderosa pine, pinyon-juniper woodland, canyon bottoms, open pasture, and hayfields; roost in crevices in cliffs with surface water nearby | None | Y | Y | | X | |
| Townsend's big-eared bat *Corynorhinus townsendii* | Mesic habitats including coniferous forests, deciduous forests, sagebrush steppe, juniper woodlands, and mountain; maternity roosts and hibernation in caves and mines; does not use crevices or cracks; caves, buildings, and tree cavities for night roosts | None | Y | Y | | X | |
| Fringed myotis *Myotis thysanodes* | Desert, grassland, and woodland habitats including ponderosa pine, pinyon/juniper, greasewood, saltbush, and scrub oak; roosts in caves, mines, rock crevices, and buildings | None | Y | Y | | X | |
| **Birds** | | | | | | | |
| Bald eagle[5] *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | None | Y | Y | | X | |
| American peregrine falcon[5] *Falco peregrines anatum* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | None | Y | N | X | | |

BLM_0026997

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| Northern goshawk *Accipiter gentilis* | Nests in a variety of forest types including deciduous, coniferous, and mixed forests including ponderosa pine, lodgepole pine, or in mixed-forests with fir and spruce; also nest in aspen or willow forests; migrants and wintering individuals can be observed in all coniferous forest types | None | Y | Y | | X | |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops; winter migrant. | None | Y | N | X | | |
| Burrowing owl[8] *Athene cunicularia* | Level to gently sloping grasslands and semi-desert grasslands; Prairie dog colonies for shelter and food | None | Y | N | X | | |
| Columbian sharp-tailed grouse *Tympanuchus phasianellus columbian* | Native bunchgrass and shrub-steppe communities for nesting; mountain shrubs including serviceberry are critical for winter food and escape cover; thought to be extirpated from UFO. | None | N | Y | X | | |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities; rare occurrence | None | Rare | N | X | | |
| White-faced ibis *Plegadis chihi* | Marshes, swamps, ponds and rivers | None | Y | N | X | | |
| American white pelican *Pelecanus erythrorhynchos* | Typically large reservoirs but also observed on smaller water bodies including ponds; nests on islands | None | Y | N | X | | |
| Brewer's sparrow *Spizella breweri* | Breeds primarily in sagebrush shrublands, but also in other shrublands such as mountain mahogany or rabbitbrush; migrants seen in wooded, brushy, and weedy riparian, agricultural, and urban areas; occasionally observed in pinyon-juniper | None | Y | Y | | Y | |
| Black swift[8] *Cypseloides niger* | Nests on precipitous cliffs near or behind high waterfalls; forages from montane to adjacent lowland habitats; rare | None | Y | N | X | | |

BLM_0026998

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| **Reptiles and Amphibians** | | | | | | | |
| Longnose leopard lizard *Gambelia wislizenii* | Desert and semidesert areas with scattered shrubs or other low plants; e.g., sagebrush; areas with abundant rodent burrows, typically below 5,000 feet in elevation | None | N | N | X | | |
| Midget faded rattlesnake[9] *Crotalus oreganus concolor* | Rocky outcrops for refuge and hibernacula, often near riparian; upper limit of 7,500 to 9,500 feet in elevation | None | Y | N | X | | |
| Milk snake *Lampropeltis triangulum taylori* | Variable types including shrubby hillsides, canyons, open ponderosa pine stands and pinyon-juniper woodlands, arid river valleys and canyons, animal burrows, and abandoned mines; hibernates in rock crevices | None | Y | N | N | | |
| Northern leopard frog[7] *Lithobates pipiens* | Springs, slow-moving streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes; in summer, commonly inhabits wet meadows and fields; may forage along water's edge or in nearby meadows or fields | Yes | Y | Y | | X | |
| Canyon treefrog *Hyla arenicolor* | Rocky canyon bottoms along intermittent or perennial streams in temporary or permanent pools or arroyos ; semi-arid grassland, pinyon-juniper, pine-oak woodland, scrubland, and montane zones; elevation 1,000 to 10,000 feet | None | Y | N | X | | |
| Boreal toad *Anaxyrus boreas boreas* | Mountain lakes, ponds, meadows, and wetlands in subalpine forest (e.g., spruce, fir, lodgepole pine, and aspen); feed in meadows and forest openings near water but sometimes in drier forest habitats | None | N | N | X | | |
| **Plants** | | | | | | | |
| Debeque milkvetch *Astragalus debequaeus* | Varicolored, fine-textured, seleniferous, saline soils of the Wasatch Formation-Atwell Gulch Member; elevation 5,100 to 6,400 feet | None | N | N | X | | |

BLM_0026999

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| Grand Junction milkvetch *Astragalus linifolius* | Sparsely vegetated habitats in pinyon-juniper and sagebrush communities, often within Chinle and Morrison Formation and selenium-bearing soils; elevation 4,800 to 6,200 feet | None | Y | N | X | | |
| Naturita milkvetch *Astragalus naturitensis* | Cracks and ledges of sandstone cliffs and flat bedrock area typically with shallow soils, within pinyon-juniper woodland; elevation 5,400 to 6,700 feet | None | Y | N | X | | |
| San Rafael milkvetch *Astragalus rafaelensis* | Banks of sandy clay gulches and hills, at the foot of sandstone outcrops, or among boulders along dry watercourses in seleniferous soils derived from shale or sandstone formations; elevation 4,500 to 5,300 feet | None | Y | N | X | | |
| Sandstone milkvetch *Astragalus sesquiflorus* | Sandstone rock ledges (Entrada formation), domed slickrock fissures, talus under cliffs, sometimes in sandy washes; elevation 5,000 to 5,500 feet | None | N | N | X | | |
| Gypsum Valley cateye *Cryptantha gypsophila* | Confined to scattered gypsum outcrop and grayish-white, often lichen-covered, soils of the Paradox Member of the Hermosa Formation; often the dominant plant at these sites; elevation 5,200 to 6,500 feet | None | N | N | X | | |
| Fragile (slender) rockbrake *Cryptogramma stelleri* | Cool, moist, sheltered calcareous cliff crevices and rock ledges | None | Y | N | X | | |
| Kachina daisy (fleabane)[8] *Erigeron kachinensis* | Saline soils in alcoves and seeps in canyon walls; elevation 4,800 feet 5,600 feet | None | N | N | X | | |
| Montrose (Uncompahgre) bladderpod *Lesquerella vicina* | Sandy-gravel soil mostly of sandstone fragments over Mancos Shale (heavy clays) mainly in pinyon-juniper woodlands or in the ecotone between it and salt desert scrub; also in sandy soils derived from Jurassic sandstones and in sagebrush steppe communities; elevation 5,800 to 7,500 feet | None | N | N | X | | |

BLM_0027007

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| Colorado (Adobe) desert parsley *Lomatium concinnum* | Adobe hills and plains on rocky soils derived from Mancos Formation shale; shrub communities dominated by sagebrush, shadscale, greasewood, or scrub oak; elevation 5,500 to 7,000 feet | None | N | N | X | | |
| Paradox Valley (Payson's) lupine *Lupinus crassus* | Pinyon-juniper woodlands, or clay barrens derived from Chinle or Mancos Formation shales, often in draws and washes with sparse vegetation; elevation 5,000 to 5,800 feet | None | Y | N | X | | |
| Dolores skeleton plant[8] *Lygodesmia doloresenis* | Reddish purple, sandy alluvium and colluviums of the Cutler Formation between the canyon walls and the river in juniper, shadscale, and sagebrush communities; elevation 4,000 to 5,500 feet | None | N | N | X | | |
| Eastwood's monkey-flower *Mimulus eastwoodiae* | Shallow caves and seeps on steep canyon walls; elevation 4,700 to 5,800 feet | None | Y | N | X | | |
| Paradox (Aromatic Indian) breadroot *Pediomelum aromaticum* | Open pinyon-juniper woodlands in sandy soils or adobe hills; elevation 4,800 to 5,700 feet | None | Y | N | X | | |
| **Invertebrates** | | | | | | | |
| Great Basin silverspot butterfly *Speyeria nokomis nokomis* | Found in streamside meadows and open seepage areas with an abundance of violets | None | N | | X | | |

Sources: BLM 2011; Van Reyper 2006; Spackman et al. 1997

[1] Potential and/or known occurrences in Project Area? Assessment based on UFO files and GIS data, partner data, and local knowledge.
[2] Project area is within the current known range of the species?
[3] Project area contains suitable habitat for the species?
[4] Project activities will have no effect on the species or its habitat
[5] Project activities may affect individuals of the species or its habitat, but not likely to result in a trend toward federal listing
[6] Project activities are likely to result in a trend toward federal listing for the species
[7] Species was petitioned for listing and is currently under status review by USFWS, and a 12-month finding is pending; i.e., listing of the species throughout all or a significant portion of its range may be warranted.
[8] Species not on BLM Colorado State Director's Sensitive List; included at the Field Office level to account for recent sightings, proximate occurrences, and/or potential habitat
[9] Validity of subspecies designation is in question by taxonomists.

BLM_0027001

*BLM Sensitive Plant Species*
During field surveys for special status plant species, no sensitive plants species were observed, nor was suitable habitat present in the project area for any of these species.

***Trends***
By definition, the populations, and often habitats, of all special status wildlife species have historically suffered downward trends. However, due to protection and recovery efforts, some populations, such as peregrine falcon and bald eagle, are stabilizing. Management efforts by USFWS, CPW, the BLM, and others have reversed the downward trend for a number of these populations. Nevertheless, none of the populations are thought to be near their historic levels, and most remain biologically insecure, regardless of their legal status.

Current and future threats include habitat loss and fragmentation, poaching, predation, disease, invasive species, and others. Habitat degradation and loss are caused by, or exacerbated by, historic overgrazing, oil and gas development, mining, water diversions, recreation, agriculture, residential development, and other human activities. Natural processes such as fire, drought, vegetation type conversions, and climate change may also contribute to landscape changes over time. It is not known which species will be able to adapt to these changes and persist over time. Pinyon-juniper, riparian, sagebrush, and salt-desert shrub have been determined to be at-risk habitats and harbor many of our special status and rare species.

Beginning in 1997, the Colorado Division of Wildlife (now CPW) initiated a Canada lynx reintroduction program to establish a self-sustaining population in suitable habitat throughout Colorado (CPW 2010). All of the benchmarks established by CPW used in measuring the success of the reintroduction program for Canada lynx were met as of 2010. Observations of lynx reproduction in Colorado first documented litters in the spring of 2003; as of 2010, reintroduced lynx that have established territories also produced litters (CPW 2010). At present, the Canada lynx population is estimated at 200 to 300 throughout Colorado and the reintroduction program is considered a success by the USFWS (USFWS 2013).

The greenback cutthroat trout recovery plan (USFWS 1998) identified hybridization and resource competition with other trout species as key limiting factors that affect greenback cutthroat trout success. Colorado greenback cutthroat trout populations were believed to be exceeding population recovery goals set in the USFWS recovery plan (USFWS 1998, 2009). Intensive data collection efforts within the Grand Mesa Uncompahgre and Gunnison National Forest have not produced rigorous trend data for greenback cutthroat trout near the Unit due to a lack of standardized sampling methods. Despite the lack of population trend data, the USFWS concluded that populations within the Grand Mesa Uncompahgre and Gunnison National Forest including Dyke and Roberts Creeks have increased between 2002 and 2010 (Dare et al. 2011). However, recent genetic studies have concluded that the only true greenback cutthroat trout population exists in Bear Creek, a tributary of the Arkansas River west of Colorado Springs (USFWS 2012). These recent findings will require the USFWS to reevaluate the taxonomy and status of the species.

The goals of the Upper Colorado River Endangered Fish Recovery Program is to downlist the Colorado pikeminnow from endangered to threatened by 2018, and to downlist the humpback chub, razorback sucker, and bonytail from endangered to threatened by 2020 (Upper Colorado

BLM_0027002

River Endangered Fish Recovery Program 2013). Current estimates for Colorado pikeminnow indicate that the Colorado River populations are stable and the program is meeting or exceeding stocking goals for bonytail and razorback sucker (Upper Colorado River Endangered Fish Recovery Program 2013). Upper Colorado River humpback chub populations below the confluence of the Gunnison River near Black Rocks, Colorado, have remained stable since a decline 13 years ago (Upper Colorado River Endangered Fish Recovery Program 2013).

### APD for Federal 12-89-7-1

The APD area does not provide suitable habitat for Canada lynx or special status fish, birds, or bats. Bald eagles may be attracted to the area during winter for foraging or scavenging, though the species is not in the area during the spring, summer and fall.

The pipeline associated with Federal 12-89-7-1 would cross suitable and likely occupied northern leopard frog habitats. The pad location is within upland habitats, which do not provide suitable habitat for the species.

### 3.2.11 Wildland Fire Management

Wildland fire management on public lands is governed by the Federal Wildland Fire Management Policy was developed by the secretaries of the Department of the Interior and the USDA. The 2001 Federal Wildland Fire Management Policy provides guiding principles, policy statements, and implementation actions. Under the plan, every unit within a federal land management agency, such as a BLM field office, that has vegetation capable of sustaining wildland fire is required to prepare a fire management plan, a strategic plan that outlines a program for managing wildland and prescriptive vegetation treatments. Fire management plans are dynamic documents that are reviewed annually and updated whenever better information is available. The plan is supplemented by operational plans, such as preparedness plans, dispatch plans, prescribed fire plans, and prevention plans.

The UFO Fire Management Plan (FMP) was originally written and approved in 1998, and has undergone three revisions in order to incorporate national policy changes, as well as minor changes gained through experience. In the next few years, an effort will be made to integrate the UFO FMP and other local agencies' fire management plans.

### Current Conditions

The Unit is located within the Ragged Mountain Fire Protection District. It is geographically located within Management Unit 16 as defined in the RMP (BLM 1989). The RMP calls for intensive suppression of fire on federally managed lands within this Unit. Surface fuels in the Unit are dominated by generally continuous sagebrush fuels, with patches of decadent Gambel's oak and mixed-shrub fuel types. Should they occur, fires within these fuel types would be generally difficult to stop with hand-crews and Type 6 brush trucks, unless natural and man-made fuel breaks (e.g., roads and irrigated meadows) were utilized. Wildfire risk assessment mapping from 2012 quantifies potential fire intensity in the project area as moderate to high (Colorado State Forest Service 2012).

Gunnison County regulations state that natural gas operations "shall not cause a significant risk of wildfire hazard." As a result, measures are put in place to minimize risk on natural gas operations and other energy development in the project area and surrounding area.

BLM_0027003

*Trends*

Large fires have been uncommon in the area. Within 10 miles of the Bull Mountain Management Unit, only two large fires have been documented since 1960, the most recent of which occurred in 1981 (BLM 2013a).

Changes to vegetation, climate, as well as development in the wild land-urban interface zone could all impact fire risk in and around the project area. Changes to these factors are difficult to quantify, but it is likely that fire risk will remain static or slightly increase over the life of the plan.

## 3.2.12 Cultural Resources

Cultural resources are defined as fragile and nonrenewable remains of prehistoric and historic human activity, occupation, or endeavor as reflected in districts, sites, structures, buildings, objects, artifacts, ruins, works of art, architecture, and natural features that were important to human history. Cultural resources comprise the physical remains themselves, the areas where significant human events occurred even if evidence of the event no longer remains, and the environment surrounding the actual resource.

Significant cultural resources are defined as those listed in, or eligible for listing in, the National Register of Historic Places. Significant cultural resources are generally at least 50 years old and meet one or more of the criteria presented in 36 CFR Part 60, which specifies that the quality of significance in American history, architecture, archaeology, and culture is present in districts, sites, buildings, structures, and objects of national, state and local importance that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and that are associated with events that have made a significant contribution to the broad patterns of our history; are associated with the lives of persons significant in our past; embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or have yielded, or may be likely to yield, information important in prehistory or history.

*Current Conditions*

The area has been inhabited by humans for approximately 10,000 to 12,000 years. Early inhabitants are characterized as Paleo-Indian hunters of big game, followed by small-game hunters and gatherers, Ute, and eventually Euro-American settlement. Detailed summaries of the Units prehistoric and historic past can be found in the UFO Class I Cultural Resource Overview (Greubel et al. 2010), the Northern Colorado River Basin regional prehistoric archaeological context (Reed and Metcalf 1999), and the Colorado historical archaeology context (Church et al. 2007). Current land uses within the Unit include cattle and sheep grazing, oil and gas exploration, and residential development.

As of May 14, 2013, 25 cultural resource investigations have been conducted within the Unit covering 600 acres (less than 1 percent) of the Unit. Of these, 20 were related to the oil and gas development in the area, 4 were related to federal management or exchange, and 1 was related to Natural Resource Conservation Service funding. These inventories resulted in the identification of five archaeological sites and five isolated artifacts. The archeological sites include a historic ranch, three historic roads, and one historic trash dump with a prehistoric lithic scatter. Of these,

BLM_0027004

only the ranch and one historic road are considered significant resources. Although very few previous surveys have been conducted in the Unit, those inventories show that cultural resources are limited.

As part of a larger UFO RMP, a cultural resource sensitivity model of the North Forth Land Unit of the UFO Management area was developed (**Figure 3-18**, North Fork Landscape Unit Prehistoric Site Sensitivity Model; Greubel et al. 2010). The model used existing environmental and cultural data across the UFO management area to extrapolate the potentiality of cultural resources in areas not yet inventoried. The Unit is within this model area, and the analysis can be used to characterize the likely cultural resources within the Unit as a whole. Based on mathematical probabilities used in the model, 88 percent of the Unit has very low to low potential for prehistoric cultural sites. None of the Unit has a medium or high likelihood of prehistoric cultural resources, but 12 percent of the Unit is characterized as Low-Medium sensitivity.

In order to gain further insight into prehistoric site distributions and densities within the Unit more specifically, a Class II cultural resource inventory was conducted by Alpine Archaeological Consultants, Inc. in the spring of 2013 (Millward 2013). Of the 840 acres inventoried, roughly half were in Low-Medium sensitivity areas, with the remainder in Low and Very Low areas. The sample-oriented inventory resulted in the recordation of one new site and three isolated finds, all found within the Low-Medium areas. This inventory validated the model expectations; few to no prehistoric sites are expected to exist in the vast majority of the Unit. It is likely that travel in the area was restricted by the geographic features and thick vegetation, thus limiting prehistoric human use to ephemeral activities and resulting in fewer artifacts and features than might typically be expected.

Historic use of the area appears to be more common and includes roads and small ranch settings. Historic research shows that the Unit was homesteaded from 1916 to 1936, with stock raising as a clear focus. There is most certainly evidence of small, historic homesteading efforts in the Unit; based on available records, there were likely approximately 50 residential areas with structures within the entire Unit in the 1920s and 1930s. A few of those homesteads grew and consolidated into larger ranches, with some complexes still occupied today. Most were isolated structures that were abandoned and lie in ruins. Although historic homestead and ranch activities are likely still evident on the landscape, the relative frequency of homesteads, transportation corridors, ditches, and trash dumps are low.

Although the Unit has been occupied for more than 10,000 years, the evidence of those occupations occurs at a very low frequency. The relatively ephemeral occupations coupled with dense vegetation and rugged terrain result in very few cultural resources in the Unit.

### Trends
Factors influencing cultural resource trends include the presence and condition of cultural sites, which are very difficult to evaluate. In general, downward trends in cultural resources directly relate to impacts, which alter the integrity and physical condition of the resource, while upward trends relate to the identification or creation of new sites.

BLM_0027005

Bull Mountain Unit
Low-medium
Low
Very low

**North Fork Landscape Unit**
**Prehistoric Sensitivity Model**

Source: Alpine Archaeological Consultants, Inc. 2013

Figure 3-18

In general, site conditions are considered to be declining due to natural erosional processes, increased casual use, increased development, and a general lack of protection. Exposed sites and associated artifacts, features, and structures are easily disturbed by natural elements such as wind and water erosion, deterioration, decay, animal and human intrusion, and development and maintenance activities. Vandalism of sites and cultural artifacts, such as illicit surface collecting, unauthorized digging, and pot hunting, is also a factor. Archaeological and historic sites are also known to be deteriorating from a variety of causes.

As time passes, additional cultural resources are being discovered, which appears as a positive trend. As development increases, more Section 106 studies are required. The results of those studies are the likely discovery of previously unknown sites. However, these new discoveries do not constitute newly created resources, merely newly discovered ones. The discoveries add to the knowledge base but are not truly additions to the body of resources in existence.

Cultural resources are defined as objects or locations more than 50 years old. As long as the definition remains based on the age of the items, as time passes the trend is toward increasing numbers of (relatively recent) cultural resources.

### APD for Federal 12-89-7-1
A Class III cultural resources inventory was performed for the well pad location, and the access road in November 2010. The area is known to have few archaeological resources, so there were expected to be few or no significant properties within the project boundaries. The field survey was conducted using accepted agency standards and resulted in no isolated finds or sites being located. The report preparers noted that the project area and immediate surroundings have limited potential in terms of available resources; large-scale projects in the region have had very limited results, and this inventory had similar findings. Although there are areas where soils are fairly deep, the preparers concluded that the subsurface potential is quite low (Cater and Larsen 2010).

### 3.2.13 Paleontological Resources
Paleontology is the study of prehistoric life, its evolution, and its interaction with the environment (paleoecology). The term paleontological resources, as used by the BLM, includes any fossilized remains or traces of organisms that are preserved in or on Earth's crust, are of scientific interest, and provide information about the history of life. Paleontological resources, whether invertebrate, plant, trace, or vertebrate fossils, constitute a fragile and nonrenewable record of the history of life on our planet. The BLM's policy is to manage paleontological resources for scientific, educational, and recreational values (e.g., hobby collecting of invertebrate fossils and petrified wood) and to protect these resources from adverse impacts. To accomplish this goal, paleontological resources must be professionally identified and evaluated, and paleontological data should be considered as early as possible any decision-making process.

Paleontological resources are integrally associated with the geologic rock units (formations, members, or beds) in which they are preserved, and the probability for finding paleontological resources can be broadly predicted from the geologic units present at or near the surface. Therefore, geologic mapping paired with the BLM's Potential Fossil Yield Classification (PFYC) system can be used for assessing the occurrence potential of paleontological resources.

BLM_0027007

Paleontological resources are managed according to the BLM Manual Section 8270, Paleontological Resource Management, BLM Handbook H-8270-1, General Procedural Guidance for Paleontological Resource Management, and applicable BLM instructional memoranda and bulletins. It should be noted that additional protection measures have now been enacted under the Omnibus Public Lands Act of 2009 (123 Stat. 1174 Public Law 111–11, Subtitle D), giving paleontological resources protection under law. The BLM is currently developing regulations to implement the requirements of this law.

Recent BLM guidance (Instruction Memorandum 2008-009, PFYC system for Paleontological Resources on Public Lands [BLM 2007b]) defines a new classification system for the classification of paleontological resources, the PFYC system. This system is intended to provide a uniform tool to assess potential occurrences of paleontological resources and to allow evaluation of potential impacts on these resources. It is intended to be applied in broad approach for programmatic efforts and as an intermediate step in evaluating specific projects.

### *Potential Fossil Yield Classification System*
The potential for paleontological resources is currently identified using two indicators: The BLM Fossil Class Condition system, and the newer PFYC system. While the older BLM Fossil Class Condition system has been used extensively in the past, recent BLM guidelines encourage use of the more precise PFYC system.

In the PFYC system, geologic units are classified from 1 (no potential for significant fossils) to 5 (very high occurrence of significant fossils) based on the relative abundance of vertebrate fossils or significant invertebrate or plant fossils and their sensitivity to adverse impacts.[3] This classification is applied to the geologic formation, member, or other distinguishable unit, preferably at the most detailed mappable level. It is not applicable to specific paleontological localities or small areas within units. While widely scattered fossils or localities may occur within a geologic unit, the relative abundance of significant localities determines the class assignment. The BLM in Colorado has classified rock units both statewide and by BLM region (Trujillo 2010).

The PFYC system is meant to provide baseline guidance for predicting, assessing, and mitigating paleontological resources. The classification should be considered at an intermediate point in the analysis, and should be used to assist in determining the need for further assessment and/or mitigation actions. Descriptions of the PFYC classes can be found in BLM Instruction Memorandum 2008-009 (BLM 2007b).

---

[3] PFYC 1 – very low potential for recognizable fossil remains; PFYC 2 – low potential for vertebrate fossils or scientifically significant non-vertebrate fossils; PFYC 3 – moderate potential where fossil content varies in significance, abundance, and predictable occurrence, or unknown fossil potential; PFYC 4 – high occurrence of significant fossils; PFYC 5 – very high occurrence that consistently and predictably produce fossils. Source: BLM WO Instruction Memorandum 2008-009 (http://www.blm.gov/wo/st/en/prog/more/CRM/paleontology/paleontological_regulations.html)

BLM_0027008

*Current Conditions*

**Table 3-34**, Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources, lists the potentially fossil-bearing rock units in the project area in stratigraphic order (from oldest at bottom to youngest at top), their PFYC category, and the known fossil resources from each unit in general and specifically in the project area. The distribution of PFYC categories across the project area is displayed in **Figure 3-19**, Potential Fossil Yield Classification. There are no rocks at the surface or near the surface older than the Ohio Creek Formation within the boundaries of the Bull Mountain Unit; **Figure 3-19** shows the Wasatch Formation and other recent deposits. Additionally, there are few areas of exposed rock outcrops or strata and no known localities within the project area.

**Table 3-34**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Project Area |
|---|---|---|---|---|---|---|
| Quaternary | | unconsolidated sediments | | 3 | Pleistocene mammals | Mammoth teeth, camel, horse, rodents |
| Eocene | | Uinta Formation | | 3 | mammals | none known |
| Eocene | | Green River Formation | Parachute Creek Member | 3 | fish, bats, birds, mammals | none known |
| Paleocene-Eocene | | Wasatch Formation | | 3 | mammals, reptiles, invertebrates | none known |
| Upper Cretaceous | Mesa Verde | Hunter Canyon Formation Mt. Garfield Formation Sego Sandstone | | 3 | dinosaurs, mammals, reptiles, fish | none known |
| Upper Cretaceous | | Mancos Shelf | | 3 | marine reptiles, invertebrates, shark teeth, wood | mosasaur, invertebrates, wood |
| Lower Cretaceous | | Dakota Formation | | 3 | invertebrates, plants, tracks, mammals | none known |
| Lower Cretaceous | | Burro Canyon Formation | | 3 | dinosaurs, tracks, plants | theropod dinosaur, fish scales, plants, invertebrates |
| Upper Jurassic | | Morrison Formation | Brushy Basin Member | 4-5 | dinosaurs, mammals, pterosaurs, lizards, amphibians, sphenodonts, crocodiles, turtles, fish, invertebrates | dinosaurs, mammals, pterosaurs, lizards, amphibians, crocodiles, turtles, fish, invertebrates |

BLM_0027009

**Table 3-34**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Project Area |
|---|---|---|---|---|---|---|
| Middle Jurassic | San Rafael | Wanakah Formation | | 4-5 | fish, plants, trace fossils, invertebrates | Hadrodon (bivalve) |
| | | | Salt Wash Member | 4-5 | dinosaurs, crocodiles, turtles, invertebrates | dinosaurs, crocodiles, turtles, invertebrates |
| | | Entrada Sandstone | | 3 | dinosaur tracks | none known |
| Lower Jurassic | Glen Canyon | Navajo Sandstone | | 3 | dinosaur tracks, rare dinosaur skeleton | none known |
| | | Kayenta Formation | | 3 | dinosaurs, dinosaur tracks | none known |
| | | Wingate Sandstone | | 3 | dinosaur tracks | theropod tracks |
| Lower Triassic | | Chinle Formation | | 5 | Phytosaurs, aetosaurs, dinosaurs, lizards, lungfish, invertebrates | none known |
| Lower Triassic | | Moenkopi Formation | | 3 | tracks, invertebrates | plants |
| Pennsylvanian-Permian | | Cutler Formation | | 3-4-5 | amphibians, synapsids, reptiles, invertebrates | Fish, large amphibians, microsaurian amphibians, various reptiles, plants |
| Pennsylvanian | | Hermosa Formation | | | none known | none known |

Sources: Trujillo 2010; Batten and Stokes 1986; Breithaupt 1985; Foster 2007; Irmis 2005; Kass 1999; Kurten and Anderson 1980; Lillegraven and McKenna 1986; Lockley and Hunt 1995; Merewether et al. 2006; O'Sullivan et al. 2006; Roehler 1992; Schoch 1986; Sertich and Loewen 2010; Turner and Peterson 1999; Untermann and Untermann 1964; Vaughn 1962, 1964; Weiscampel 1990

The surface geology of the Bull Mountain Unit is unlikely to yield significant fossils for two primary reasons, as follows:

1. The Wasatch Formation is made up of fluvial sandstone that has been transported some distance, as evidenced by large-scale cross bedding and gravel lags seen in the outcrops. The interbedded shales exposed are orange and red, indicating an aerobic environment as expected to be associated with fluvial sand deposition. Fossil preservation is not likely in this type of deposition. This environment is the reason that **Table 3-34** lists "none known" under "Known Fossil Resources in Project Area" for the Wasatch Formation. The other rock types shown on the map would be recent deposits and have similar characteristics.

BLM_0027010



Bull Mountain Unit

PFYC 5 very high fossil occurrence that consistently and predictably produce fossils

PFYC 4 high occurrence of significant fossils (none)

PFYC 3 moderate potential where fossil content varies in significance, abundance, and predictable occurrence, or unknown fossil potential

**Potential Fossil Yield Classification**

Source: BLM GIS 2014

PFYC 2 low potential for vertebrate fossils or scientifically significant nonvertebrate fossils (none)

PFYC 1 very low potential for recognizable fossil remains (none)

Figure 3-19

2. Limited outcrops are found in the Bull Mountain Unit. The best rock exposures are found on the cutbanks of West and East Muddy Creeks. The broad Wasatch Formation shown on the surface geology map (**Figure 3-19**) is the top of the layer and is covered with a shallow soil or thin gravels. Construction and associated disturbance would be very limited next to the creeks where fossils might be found.

*Trends*

Qualitative observation indicates that the condition has remained stable for paleontological resources protected or mitigated through the permitting process and other standard operating procedures, such as pre-disturbance clearance, associated with federal management actions. In these cases, the trend has been toward conservation. For resources not associated with direct management actions, the trend has been slightly downward. The primary contributors to this trend include unauthorized collection of fossils, limited law enforcement resources, and ground disturbance associated with recreational activities.

**3.2.14 Visual Resources**

Visual resources refer to the visible features (e.g., land, water, vegetation, animals, and structures) on a landscape. These features contribute to the scenic or visual quality and appeal of the landscape. Visual impact is the creation of an intrusion or perceptible contrast that affects the scenic quality of a landscape. A visual impact can be perceived by an individual or group as either positive or negative, depending on a variety of factors or conditions (e.g., personal experience, time of day, and weather or seasonal conditions; BLM 1984).

*Visual Resource Management System*

The BLM Visual Resource Management (VRM) system is a way to identify and evaluate these scenic values in order to determine appropriate levels of management. VRM is a tool to identify and map essential landscape settings to meet public preferences and recreational experiences today and into the future. The VRM system helps to ensure that actions taken on BLM-administered lands today will benefit the visual qualities associated with the landscapes, while protecting these visual resources for years to come.

*Visual Resource Inventory*

Visual resource inventory (VRI) involves identifying the visual resources of an area and assigning them to inventory classes using the BLM's resource inventory process. The process involves rating the visual appeal of a tract of land (Scenic Quality Evaluation), measuring public concern for scenic quality (Sensitivity Level Analysis), and determining whether the tract of land is visible from travel routes or observation points (Delineation of Distance Zones). Based on these three inventory components, lands are placed into one of four VRI classes. These class assignments are informational and provide the basis for considering visual values during the RMP process. They do not establish management direction and are not used as a basis for constraining or limiting surface-disturbing activities but are considered a baseline for existing conditions. This process is described in detail in BLM Handbook H-8410-1, Visual Resource Inventory (BLM 1986a).

*Visual Resource Management*

The assignment of VRM classes is ultimately based on management decisions made during the RMP process, which must take into consideration the value of visual resources. During the

BLM_0027012

process, inventory class boundaries can be adjusted as necessary to reflect these resource allocation decisions. The goal of VRM is to minimize the visual impacts of all surface-disturbing activities, regardless of the class to which an area is assigned. Objectives for each of the four Visual Resource Classes are as follows:

<u>Class I.</u> The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.

<u>Class II.</u> The objective of this class is to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

<u>Class III.</u> The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

<u>Class IV.</u> The objective of this class is to provide for management activities that require major modification of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

The analysis of a visual contrast rating process is used to resolve visual impacts. The process of a visual contrast rating, which involves comparing the project features with the existing landscape features using basic elements of form, line, color, and texture, is described in detail in BLM Handbook H-8431-1, Visual Resource Contrast Rating (BLM 1986b).

***Current Conditions***
The project area encompasses the rolling foothills to the northwest of the Ragged Mountain range, which holds a highly diverse landscape with a high amount of visual variety. Vertical relief is present, with high, rolling hills and fairly steep slopes. It is substantially natural in character, with few human intrusions creating a visual imprint on the land. The vegetation is vibrant and healthy, displaying as much or more diversity than seen in comparable areas in the west, resulting in brilliant seasonal color variation. Numerous shrub species thrive with open meadows weaving in between large stands of woodlands comprised of aspen, juniper, and oak, along with a few groups of coniferous trees. The viewshed is mostly open and exposed as the traveler comes down McClure Pass, moving west along State Highway 133. As the highway begins to drop, the viewshed begins to narrow and is limited by the valley walls of Muddy Creek and the North Fork of the Gunnison River.

State Highway 133 and County Road 265 serve as the two primary travel routes in the project area. The West Elk Loop Scenic Byway passes through the project area on State Highway 133

BLM_0027013

and connects the towns of Carbondale, Hotchkiss, Crawford, Gunnison, Crested Butte, among others. This route also provides access to the White River and Gunnison National Forests, the Black Canyon of the Gunnison National Park, Gunnison Gorge National Conservation Area, Curecanti National Recreation Area, and Crawford and Paonia State Parks. County Road 265 has less traffic and is primarily used for local use with some regional access. This road follows a drainage, which limits its viewshed to the immediate foreground due to the topography.

The proposed facilities in the project area occur on a mixture of private surface/private minerals, private surface/federal minerals (split-estate), and federal surface/federal minerals. While VRM objectives do not apply to non-BLM-administered lands, visual concerns may be addressed on split-estate where federal minerals occur.

A VRI of the UFO was completed in September 2009 according to guidelines in BLM Manual Handbook H-8410-1, Visual Resource Inventory (BLM 1986a) and the project area was included as part of that inventory. While not yet incorporated into the current RMP, this data is the most recent and comprehensive data available for visual resources within the project area.

Information for each of the three VRI components, as they pertain to the project area, is as follows:

Scenic Quality Evaluation: The project area is within the Bull Mountain, Paonia Reservoir, and Deep Creek Scenic Quality Rating Units of the VRI. Landform, water, vegetation, and structures were reviewed and described in the context of form, line, color, and texture as part of the VRI. In addition, landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications were rated. The three Scenic Quality Rating Units received a Class A scenic quality rating, indicating a high and unique scenery value. The Scenic Quality Rating Units were given this rating due to the variety and seasonal color variation of vegetation, the adjacent scenery provided by the Ragged Mountain Range as well as the presence of flowing water. The rating documentation also notes that these Scenic Quality Rating Units provide a very diverse and vibrant vegetative community, considerable visual variety in terms of color, and that it is a very scenic landscape.

Sensitivity Level Analysis: The project area is within the Bull Mountain, Paonia Reservoir, and Deep Creek Sensitivity Level Rating Units. Although the Deep Creek Sensitivity Level Rating Unit received a rating of medium for sensitivity, the Bull Mountain and Paonia Reservoir Sensitivity Level Rating Units (97 percent of the project area) received a rating of high for sensitivity. During the VRI, it was noted that a high sensitivity rating involved a high public sensitivity to preserving the rural character and open space of the area, as well as the presence of the West Elk Loop Scenic Byway, and the volume of tourist traffic and visitor use. The area attracts the notice of conservation groups concerned about energy development.

Delineation of Distance Zones: The project area is all within the foreground/middle ground distance zone (0 to 5 miles), which means the landscape can readily be seen and experienced from a major travel route or point. The primary travel routes are State Highway 133 and County Road 265.

BLM_0027014

The scenic quality evaluation, sensitivity level analysis, and distance zone delineation combine to rate the project area as VRI Class II. Under the RMP, however, all BLM-administered land within the project area is rated as VRM Class III.

*State and Local Plans*

The Delta County Master Plan. This plan notes the presence of the West Elk Loop Scenic Byway and the protection and interpretation of the cultural heritage and natural resources in the area. The Delta County Master Plan states the following goal:

> The preservation of the rural lifestyle and landscape, which includes the natural environment and unique physical characteristics of Delta County. Natural resources associated with the rural landscape include open space and scenic viewsheds, and includes a desired strategy to map the significant physical features and environmental characteristics of the County, such as important scenic viewsheds.

The Town of Paonia State Highway 133 Corridor Master Plan. This plan states as a goal that, "The open scenic character of the West Elk Scenic Byway shall be protected." It states that new development should not detract from the rural qualities of the highway corridor and Paonia's small-town character.

*Trends*

The landscape in the Unit is experiencing a high degree of human modification due to energy development occurring on private lands. This type of development includes strips of land lacking vegetation for access roads, artificial structures associated with energy development and transmission infrastructure, and commotion from operating and maintaining energy development sites.

## 3.3   RESOURCE USES

This section contains a description of the human uses of resources in the project area and follows the order of topics addressed in **Chapter 2**:

- Livestock grazing

- Minerals (leasable, locatable, salable)

- Recreation

- Lands and realty

- Transportation and access

### 3.3.1   Livestock Grazing

*Regulatory Environment*

The BLM manages grazing under the authority of the Taylor Grazing Act of 1934, the FLPMA, and the Public Rangelands Improvement Act of 1978. Under this management, ranchers may

BLM_0027015

obtain permits for an allotment of public land on which a specified number of livestock may graze. The number of permitted livestock on a particular allotment is determined by how many animal unit months that land will support.

The BLM operates a program to stabilize or improve the ecological condition of the allotments in compliance with the Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management. Standards are expressions of physical and biological condition or the degree of function required for healthy land, and they define minimum resource conditions that must be achieved or maintained.

### Current Conditions

Until recently, this area sustained very high levels of both sheep and cattle grazing. Larger ranches within the Unit still host both cattle and sheep grazing, but sheep grazing is mostly limited to ranches at the northern end of the Unit (**Figure 3-20**, Grazing Allotments). **Table 3-35**, Ranches and Allotments within the Bull Mountain Unit, below lists private landholdings and BLM grazing allotments within the Unit.

**Table 3-35**
**Ranches and Allotments within the Bull Mountain Unit**

| Name | Acreage (if available) | AUMs | Class of Livestock | Season of Use |
|------|------------------------|------|--------------------|---------------|
| **BLM Allotments** | | | | |
| Stock Driveway | 340 | 32 | Cattle | Summer |
| Downing | 280 | 27 | Cattle | Summer |
| Rock Creek Ranch I, Ltd. | N/A | 200 | Sheep | Spring/Fall |
| **Private Ranches** | | | | |
| Sperry | N/A | 200 | Sheep | Spring/Fall |
| Rock Creek Ranch I, Ltd. | N/A | 315 | Cattle | Summer/Fall |
| Jacobs Ranch | 2,000 | 225 | Cattle | Summer/Fall |
| Falcon Seaboard Ranch | N/A | N/A | Cattle | Summer |
| Aspen Leaf | N/A | N/A | Sheep and Cattle | Spring/Summer/Fall |
| Hotchkiss | N/A | N/A | Sheep and Cattle | Spring/Summer/Fall |

Source: BLM GIS 2014, needs source for AUMs
AUM = animal unit month
N/A = not available

Federal landholdings are limited in the Unit and only two grazing allotments are present in the southeast corner of the Unit, Stock Driveway and Downing. These allotments are partially on BLM-administered and partially on private land (BLM 2007 - North Fork Land Health Assessment). The allotment portions on BLM-administered land are generally meeting land health standards (BLM 2007).

The Rock Creek Ranch I, Ltd. once ran 20 bands of sheep (a band is 1,000 sheep) in this area. Currently, Rock Creek Ranch runs one band, and another rancher (Sperry) runs one band northeast of this area. In addition, cattle graze seasonally in this area, and a grazing permit is leased back to Rock Creek Ranch I, Ltd. for grazing. On the Rock Creek Ranch, Rock Creek Ranch I, Ltd. runs 173 cow-calf pairs in one area and 134 pairs in another, plus 10 heifers.

BLM_0027016

3. Affected Environment



**Grazing Allotments**

Source: BLM GIS 2014

☐ Bull Mountain Unit

🟩 Grazing allotment

Figure 3-20

BLM_0027017

The Jacobs Ranch is located at the eastern side of the Unit and is a working cattle ranch. This ranch supports a cow-calf operation, with grazing occurring from May 15th through December. A maximum of 225 cow-calf pairs graze on 2,000 acres of pasture. Cattle start the early season on south-facing slopes north of State Highway 133, and in mid-July are moved south of State Highway 133. No cattle are grazed during the winter and spring on the ranch. Irrigation starts around the end April or early May, and ends in late August to early September. Meadows are hayed for grass-hay production.

The Falcon Seaboard Ranch was consolidated from several smaller ranches in 1990 and was purchased by Falcon Seaboard in its current configuration in 1996. Prior to 1996 the ranch was used for both cattle and sheep grazing, but currently only sees cattle grazing. The ranch supports both a cow/calf and yearling calf operation. Yearlings are brought on (via stock trucks) in early May and grazed through the summer to early September. Cows and nursing calves are trucked to the ranch in early June and come off in early October. No cattle are grazed during the winter and spring on the ranch. Irrigation of meadows starts around the end of April or early May, and ends in late August to early September. Meadows are hayed for grass-hay production.

Other large ranches in the Unit include the Sperry, Aspen Leaf, and Hotchkiss ranches, all of which support cow/calf and yearling calf operations as well as sheep grazing. Sheep generally graze the ranches in the spring, and are moved onto summertime allotments on National Forest System lands on the Grand Mesa Uncompahgre and Gunnison and White River National Forests. They are trailed back down onto the ranches in the late fall, where they graze on upland meadows, and on irrigated hay fields post-haying. All sheep are generally trucked out of the Muddy Creek basin by early November for market. On the Hotchkiss Ranch, a small herd of sheep (around 30) persists through the summer on the ranch. The location of the 12-89-7-1 APD well pad is on private lands with active sheep and cattle grazing on Hotchkiss Ranch.

Along the State Highway 133 corridor, from the intersection of State Road 265 and south, there is a lack of widespread large ranches, but cattle are often wintered on the lower-elevation meadows near Muddy Creek. Subdivisions and smaller lot sizes have decreased the connectivity of larger ranches, and less cattle grazing occurs. Further, the steeper topography and drier climate reduce grazing opportunities at the southern end of the Unit.

Despite the extremely high grazing pressure in the past, the area has a very good distribution of grasses and forbs in the understory of the sagebrush and Gambel's oak habitat types. Within the general area, aspen stands and various increaser species of plants indicate high long-term grazing pressure. These increasers include skunk cabbage (*Veratrum tenuipetalum*), tall larkspur (*Delphinium barbeyi*), tarweed (*Madia glomerata*), and sneezeweed (*Helenium autumnale*). Notable evidence of habitat degradation from past and current grazing was not apparent during a site visit. The dense stands of Gambel's oak are too thick to be greatly utilized by livestock.

Substantial elk wintering activity can also occur on ranches with elk winter ranges (e.g., lower-elevation, south- and west-facing slopes), such as the Jacobs Ranch. Some mule deer wintering range is also present in the project area.

BLM_0027018

*Trends*

Past livestock grazing on the Unit was heavier than currently practiced, with use levels up to 20 times higher than current use maintained in the area. Currently, 7 private ranches and 2 BLM grazing allotments operate in the Unit at a capacity of approximately 1,000 animal unit months. Livestock grazing trends in the project area appear stable at the present time, though with increasing human population and associated development, grazing may experience some decline in the near future.

### 3.3.2   Minerals (Leasable, Locatable, Salable)

Except for gas and coal resources, no fluid or solid leasable minerals or locatable minerals are known to exist within the Unit. As discussed under Section 3.2.5, Geology, coal can be found at depths of 6,000 to 10,000 feet. In the Uncompahgre RMP (1989), coal potential is based on a maximum development depth of about 2,000 feet, and the revised RMP (ROD expected in 2015) is proposing to expand that depth to 3,000 feet. As such, coal resources are not considered a viable resource in the Unit and no impact on coal is expected from the proposed project. There is potential for minor occurrences of mineral materials; however, there are no operations and no county free use permits within the Unit. No impact on mineral materials is expected from the proposed project.

*Fluid Leasable Minerals—Gas*

In the Unit, the Mesa Verde Group in the Piceance Basin has gas potential for conventional gas in sandstone units, coal bed methane gas within its coal seams, and shale gas resources in sedimentary strata associated with the Mancos Shale. The hydrocarbon production in this area has been natural gas with very little condensate[4] and no associated oil. For this reason, only natural gas production will be discussed in the remainder of this section.

As of 2010, wells in the North Fork area had produced over 3 billion cubic feet of gas. The bulk of the gas production in this area is from upper Cretaceous sandstone reservoirs in the Mesa Verde Group within the greater Piceance Basin. Primary targets for drilling in the Mesa Verde group include the Cozzette and Corcoran Sandstone members found within the Mount Garfield (or Iles) Formation.

In addition, a high potential exists for the occurrence of coal bed natural gas in the Mesa Verde Group. The South Canyon Coal and Cameo Coal units within the Williams Fork Formation are targets within this group. Producers are also exploring potential sources of shale gas within the Mancos shale (BLM 2012).

Additional formations within the Cenozoic zone contain natural gas production potential but have not yet been productive (BLM 2012). According to Colorado State historic records, 116 gas wells have been drilled in the North Fork area on federally managed oil and gas leases, including split-estate lands. Of these wells, 15 are currently producing, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged (BLM 2011).

---

[4] Of SGI's 13 producing wells, 6 made condensate. Of these 6 wells, 2 produce salable quantities and the remaining 4 produce between 0 and 6 barrels per month. The 2 wells that produce condensate have had average sales of 98 and 20 barrels of condensate per month.

BLM_0027019

*Current Conditions*
Oil and gas leasing in the Unit is guided by the Uncompahgre RMP (1989), which is currently
being revised (ROD expected in 2015). According to the RFD prepared in support of the ongoing
RMP revision, the Unit is located in an area identified as having High occurrence potential (BLM
2012). Mineral production within the Unit is limited to natural gas wells developed by SGI and one
natural gas well developed by Gunnison Energy Corporation. SGI owns and operates 11
private/private and 5 federal mineral/private surface natural gas wells on 13 well pads, and one
additional well pad housing a water-disposal well. Gunnison Energy Corporation owns and
operates one private/private natural gas well within the Unit project area. **Table 2-5**, Bull Mountain
Unit Annual Production Rates, provides annual gas and water production data. Additionally, **Table
3-36**, Bull Mountain Unit Existing Facilities, presents the existing facilities in the Unit.

Table 3-36
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Well | McIntyre 11-90-11 #3 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, NWSW |
| Location | McIntyre-11S90W 11NWSW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, NWSW |
| Well | McIntyre 11-90-11 I | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, SENW |
| Location | McIntyre 11-90-1I-SENW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, SENW |
| Location | Falcon Seaboard 11-90-11SESE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, SESE |
| Well | Falcon Seaboard 11-90-11 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 11, SESE |
| Well | Falcon Seaboard 11-90-12 2 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, NWNE |
| Location | Falcon Seaboard 11-90-12NWNE | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, NWNE |
| Location | Falcon Seaboard 11-90-12SWNW | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Location | Falcon Seaboard -11S90W 12SWNW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Well | Falcon Seaboard 11-90-12 #1A | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Well | Falcon Seaboard 11-90-12 1 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, SWNW |

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Well | Falcon Seaboard 11-90-12 4 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Lease | Falcon Seaboard 11-90-12 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Well | McIntyre 11-90-14 1 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 14, NWSW |
| Location | McIntyre 11-90-14-NWSW | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 14, NWSW |
| Pit | McIntyre Flowback Pits 2 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 23, NESE |
| Location | McIntyre Flowback Pits 1 & 2 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 23, NESW |
| Well | RC Fed 11-90-23 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 23, SESW |
| Location | Rock Creek 11-90-23 1 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 23, SESW |
| Well | Rock Creek 11-90-23 1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 23, SESW |
| Location | Federal 11-90-24 #3 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 24, Lot 4 |
| Well | Federal 11-90-24 3 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, Lot 4 |
| Location | Federal 11-90-24-11S90W 24NWSE | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 24, NWSE |
| Well | Federal 11-90-24 1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, NWSE |
| UIC Disposal | Federal 24-2 WDW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 24, NWSW |
| Well | Federal 24-2 WDW | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, NWSW |
| Location | Federal -611S90W 24NWSW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 24, NWSW |

BLM_0027021

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Location | Federal 24SWNE | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, SWNE |
| Well | Federal 11-90-24 #1A | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, SWNE |
| Pit | McIntyre Flowback 1 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 24, SWNW |
| Centralized EP Waste Management Facility | McIntyre Flowback Pits #1 and #2 421065 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 24, SWNW |
| Well | Hughes 11-90-26 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 26, Lot 6 |
| Location | Hughes 11-90-26 2 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 26, Lot 6 |
| Well | Federal 11-90-26 #1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 26, NENE |
| Location | Federal 26NENE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 26, NENE |
| Location | McIntyre Flowback Pits 3 & 4 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Centralized EP Waste Management Facility | McIntyre Flowback Pits #3 and #4 421066 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Pit | McIntyre Flowback 4 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Pit | McIntyre Flowback 3 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Well | Pasco Spadafora 3 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Well | Pasco Spadafora 2 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Location | Pasco Spadafora #2 413893 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Location | Pasco (Spadafora)-611S90W 27NENE | Delhi Taylor Oil Corp 23430 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |

BLM_0027022

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Well | Pasco (Spadafora) 1 | Delhi Taylor Oil Corp 23430 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Well | Federal 11-90-35#1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W35, SWNE |
| Location | Federal -611S90W 35SWNE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 35, SWNE |
| Location | Falcon Seaboard 11-89-7- 611S89W 7SESE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 7, SESE |
| Well | Falcon Seaboard 11-89-7 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 7, SESE |
| Well | Federal 11-89-17 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Well | Muddy Creek Federal 10-17- 11-89 | Tamarack Energy Inc. 85545 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Location | Federal 11-89-17-11S89W 17SWNE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Location | Muddy Creek Federal- 611S89W17SWNE | Tamarack Energy Inc. 85545 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Well | Cow Skull 11-89-18 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 18, NESW |
| Location | Cow Skull 11-89-18 #1 414132 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 18, NESW |
| Well | Cow Skull 11-89-18 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 89W, 18, NESW |
| Location | HL 11-89-19 #1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W,19, SENW |
| Well | HL 11-89-19 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W,19, SENW |
| Pit | Jacobs 29-1 | Loch Exploration Inc. 51058 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 29 |
| Well | Jacobs 29-1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 89W, 29, NWNW |

BLM_0027023

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Location | Jacobs-611S89W 29NWNW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 29, NWNW |
| Location | Borich 11-89-32 #1 | SGI 77330 | | Gunnison Co. T.11S, R. 89W, 32, NWSE |
| Well | Borich 11-89-32 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 32, NWSE |
| Location | Buck Creek 12-89-5 1 | SGI 77330 | | Gunnison Co. T.12S, R. 89W, 5, SWNE |
| Well | Medved 12-89-5 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.12S, R. 89W, 5, SWNE |
| Location | Federal 12-89-7 #1 | SGI 77330 | | Gunnison Co. T.12S, R. 89W, 7, NESE |
| Well | Federal 12-89-7 #1 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 89W, 7, NESE |
| Location | Eck 12-90-1 428197 | SGI 77330 | | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Eck WDW 2 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Eck 12-90-1 #3 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Eck 12-90-1 1 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Hotchkiss 12-90 1-34 | Gunnison Energy Corp. 100122 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, SWSE |
| Pit | Hotchkiss 1290 1-34 | Gunnison Energy Corp. 100122 | Wildcat 99999 | Gunnison Co. T.12S, R. 90W, 1, SWSE |
| Location | Hotchkiss 12-90-612S90W 1SWSE | Gunnison Energy Corp. 100122 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, SWSE |
| Well | Hotchkiss Ranch 3-11 | Petro-Lewis Corp. 68900 | Wildcat 99999 | Gunnison Co. T.12S, R. 90W, 11, NENW |
| Location | Hotchkiss Ranch -12S90W 11NENW | Petro-Lewis Corp. 68900 | Wildcat 99999 | Gunnison Co. T.12S, R. 90W, 11, NENW |

BLM_0027024

*Trends*

The US oil and gas industry is drilling fewer dry holes and recovering more oil and gas reserves per well due to innovative drilling and completion techniques. The Energy Information Administration estimates that over the next 20 years successfully drilled US energy wells will increase 0.2 percent per year through 2030. According to the Annual Energy Outlook 2011, shale gas production is expected to steadily increase, growing almost fourfold from 2009 to 2034; natural gas in power generation will grow due to low natural gas prices and the relatively low capital costs for new natural gas plants that make it more attractive than coal; and reliance on petroleum imports as a share of total liquids consumption is expected to decrease (EIA 2011; BLM 2012).

Over the last decade, exploratory and development activities in and surrounding the Unit have focused on exploring for and developing coal bed natural gas resources and other Cretaceous aged sediments. Although the risk of failure is higher for these types of exploratory activities (in comparison to drilling for tight sands gas and shale gas types of reservoirs), the BLM expects that exploratory and development activities in this area will continue over the next 20 years (BLM 2012).

Increases in future natural gas production to accommodate projected increased demand is anticipated to come partly from the Rocky Mountain area, in particular shale gas resources. It is difficult to predict how much new gas production is expected to come from reservoirs in and surrounding the Unit.

### 3.3.3   Recreation

*Current Conditions*

The Unit is accessed from State Highway 133, along the West Elk Loop Scenic Byway, and County Road 265. The West Elk Loop Scenic Byway passes through the proposed project area on State Highway 133 and connects the town of Carbondale, Hotchkiss, Crawford, Gunnison, Crested Butte, and other towns. In addition to attracting tourists, State Highway 133 provides access to hiking, mountain biking, dispersed camping, viewing of seasonal colors, cross-country skiing, and snowmobiling. The byway is known for its history, showcasing towns of varied lifestyles, and natural beauty. This route also provides access to the White River and Gunnison National Forests, the Black Canyon of the Gunnison National Park, Gunnison Gorge National Conservation Area, Curecanti National Recreation Area, and Crawford and Paonia State Parks.

County Road 265 provides access to the Grand Mesa, Uncompahgre, and Gunnison National Forest, which is extensively utilized for fall big game hunting, summer camping, viewing of seasonal colors, and snowmobiling.

Paonia State Park is located in close proximity to State Highway 133 and provides developed campsites, picnic sites, and a boat ramp surrounding Paonia Reservoir. McClure Pass is also in the vicinity and provides access to hiking, horseback riding, fishing, viewing of seasonal colors and scenic viewing, skiing, and snowshoeing and is a popular area with locals seeking nearby recreation opportunities.

BLM_0027025

The project area consists primarily of private surface that has historically been used for agriculture and grazing, with seasonal hunting. Hunting on private lands is permitted through local outfitter-guide services located in Crested Butte, Paonia, and Hotchkiss as well as with landowner permission requested by individual hunters. Most of the larger private ranches in the Unit allow hunting with a ranch-approved guide or through the payment of a fee to the landowner. Surface use agreements between SGI and individual surface owners dictate any timing restrictions applicable to specific locations. This is in addition to the federal timing limitations associated with federal leases or COAs. SGI has negotiated amendments to such agreements where drilling or completion operations have taken place during restricted times, as stated in the agreement.

*Trends*
Recreation near the project area is expected to continue to increase as the local population increases. Recreation in the project area itself is likely to stay at current levels if private landowners continue to limit the number of hunters allowed on their property.

### 3.3.4   Lands and Realty

*Current Conditions*
The analysis area includes all land ownerships in the project area. The boundaries of the Unit encompass federal and private oil and gas mineral estate which covers approximately 19,670 acres located in Gunnison County, Colorado. As shown in **Figure 1-1**, Bull Mountain Unit, the majority of the surface lands in the project area are privately owned. Over 90 percent of the subsurface minerals, both federal and private within the geographic area of the Unit, are committed to the Unit at this time. The total project area consists of 440 surface acres of federal surface underlain by federal mineral estate administered by the BLM; 6,330 acres of private lands consisting of private surface and private minerals regulated by the COGCC; and 12,900 acres of split-estate land, consisting of private surface and federal minerals administered by the BLM.

The primary land uses within and adjacent to the project area include oil and gas development, livestock grazing, and seasonal hunting. See **Sections 3.3.1**, Livestock Grazing; **3.3.2**, Minerals; and **3.3.3**, Recreation, for details on these specific land uses. Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek basin. Irrigated meadows are also found in the Ault Creek basin at the far western side of the Unit. A few residential subdivisions are located within the Unit, generally near the State Highway 133 corridor.

SGI began leasing minerals in the Unit in 2000 and has periodically purchased additional mineral interests within the Unit. The company currently owns and operates 11 private/private and 5 federal natural gas wells on 18 well pads and 1 water-disposal well occupying approximately 36 acres in the Unit. The wells were developed at an average of 2 per year for the past 6 years. To date, SGI and Gunnison Energy Corporation (the other existing operator within the Unit boundary) have developed 19.0 miles of gathering pipelines (6.3 miles collocated with roads, and 12.7 miles cross-country). Approximately 22.9 miles of roads within the Unit are currently suitable for use, many of which SGI has improved for access roads (not including Gunnison County Road 265, which has also been improved by Gunnison County Road and Bridge and by

BLM_0027026

SGI according to various road use agreements). Natural gas is currently delivered to the Bull Mountain Pipeline and the Ragged Mountain Pipeline north of the Unit for delivery to local and national markets.

*Relevant Regulations and Guidelines*

Land use regulations applicable to this project include federal, state, and local. The primary entities responsible for land use planning within the study area are the BLM and Gunnison County. The proposed project is located mainly in rural areas. The nearest communities are Paonia and Marble. Paonia is approximately 30 miles southwest of the Unit and Marble is approximately 20 miles east of the Unit. Land use plans for these communities will not inform the land use and realty analysis. These locations are provided for reference only.

Overarching policy and procedural guidance is found in the FLPMA, Mineral Leasing Act, and the BLM NEPA Handbook (H-1790-1). These documents direct BLM activities related to ROW authorizations and preparation of environmental impact documentation. The BLM does not require the Unit Operator to obtain an authorization in circumstances where actions are tied to leases that are part of a unit. For example, SGI is not required to obtain a BLM ROW authorization, provided the facility (e.g., road or pipeline) is contained within the Unit and its use is specific to the Unit. If the facility also serves off-Unit use, then a ROW authorization would be required. For example a pipeline carrying off-Unit gas from development outside of the Unit.

The proposed project is located partially on surface lands and entirely on federal mineral estate administered by the UFO. The UFO RMP guides the management of lands and resources on BLM-administered land in the project area. County-level land use planning criteria applicable to this project are found within the Gunnison County Regulations for Oil & Gas Operations. The Gunnison County, Colorado Regulations for Oil and Gas Operations were adopted by the Gunnison County Board of County Commissioners on August 28, 2012, via Resolution #2012-25. The purpose of these Regulations is to establish "processes" that provide reasonable limitations and safeguards for the exploration and production of oil and gas resources in the County. Where valid and applicable, all oil and gas operations in the unincorporated areas on private land within the County shall comply with these regulations.

*Land Use Authorizations*

BLM-administered lands throughout the project area are generally made available for land use authorizations, which are analyzed and issued on a case-by-case basis. A ROW is an authorization to use a specific parcel of BLM-administered land for a specific project, such as roads, pipelines, and power lines. A ROW authorizes nonexclusive rights and privileges for a specific use of the land for a designated time. A ROW is granted for a term appropriate to the life of a project. A ROW authorizes the holder to construct, operate, maintain, and terminate a facility over, under, upon, or through BLM-administered lands. Such authorizations are issued for commercial and non-commercial purposes such as roads and utilities, and may be for energy or non-energy-related uses. Land use authorizations are also issued to other federal, state, and local agencies and governments.

Existing land use authorizations within the Unit include ROWs for State Highway 133, Delta-Montrose Electric Association power lines, a Delta County Tele-Com telephone line, the Volk Ditch, and private access ROWs.

BLM_0027027

*Trends*

Demand for land use authorizations in the project area is anticipated to increase in correlation with future residential and commercial development, increasing population, and energy demand. Based on review of LR 2000 database, there has only been one new ROW authorized (access road to a private property) since the Draft Environmental Assessment was released in 2012.

### 3.3.5   Transportation and Access

*Current Conditions*

Travel and access are central to many activities on BLM-administered lands. Comprehensive Travel and Transportation Management, which is the BLM's program for managing transportation, takes into consideration motorized (e.g. cars, trucks, and motorcycles) and non-motorized (e.g. bicycles, foot, and horseback) access for resource management, recreation, and other resource uses such as energy and mineral development. The primary goal of Comprehensive Travel and Transportation Management is to provide a network of routes for which access is available to designated uses. Executive Order 11644 and CFR (43 CFR Part 8340) both require the BLM to designate all BLM-administered lands as open, closed, or limited to off-highway vehicle use. Further, Colorado Instruction Memorandum 2007-20 restricts off-highway vehicle use within limited areas to designated routes. Accordingly, motorized vehicle access on the 440 acres of BLM-administered surface estate in the Unit is limited to existing routes until further route planning can be conducted for the area.

*Access*

Within the project area, State Highway 133 is the only paved roadway; it bisects the eastern portion of the Unit from north to south for approximately 6.4 miles. There are 23 miles of roads currently suitable for use, some of which SGI upgraded as access roads to well pads. Gunnison County Road 265, which is an upgraded unpaved public road, crosses the project area for approximately 4.8 miles. There are additional numerous miles of unimproved two-track routes throughout the project area. Primary access to the Unit is from State Highway 133 and Gunnison County Road 265 (**Figure 3-21**, Existing Infrastructure).

State Highway 133 is an undivided 2-lane road with a typical lane width of 12 feet and overall paved width, including shoulders, of between 30 and 40 feet, depending on location in the Unit. State Highway 133 provides an arterial connection for regional car and truck travel between Hotchkiss and Paonia in Delta County through Gunnison County to the town of Carbondale in Garfield County. In Gunnison County, County Roads 265 and 77 intersect State Highway 133 as well as several private roads. Where these roads intersect State Highway 133, the intersecting roadway is typically paved for the first 100 to 200 feet before becoming gravel or dirt. The posted speed limit for the segment of State Highway 133 within the project area ranges from 45 to 50 mph. Paved and unpaved emergency and slow vehicle turnouts are located intermittently along the route.

County Road 265 intersects with State Highway 133 approximately 2 miles south of the point where State Highway 133 enters the Unit from the northeast. The road is graveled except for a paved 120-foot segment where the road intersects with State Highway 133. The road runs

BLM_0027028

3. Affected Environment





| Symbol | Description | Symbol | Description |
|---|---|---|---|
| Bull Mountain Unit | | 133 Existing paved road | |
| Existing well pad | | 265 Existing upgraded public road | |
| Existing pipeline | | Existing road currently suitable for use | |
| Gunnison Energy LLC existing pipeline | | Existing road requires upgrades for use | |

**Existing Infrastructure**

Source: BLM GIS 2014,
Gunnison County 2012,
SG Interests GIS 2013,
US Census 2012

Figure 3-21

BLM_0027029

northwest through the Unit providing access to private homes and ranches, as well as National Forest System lands. Private roads used for oil and gas development and other private residential, agricultural, and industrial uses also intersect County Road 265 periodically throughout the roadway length in the project area. The roadway width varies depending on location, but is typically between 15 and 30 feet with periodic turnouts. Within the Unit, County Road 265 crosses two small streams. The bridge width for each stream crossing is approximately 28 feet. Gunnison County provides limited plow service on this road during the winter (Gunnison County 2013).Two additional gravel-surfaced county roads, County Road 849 and County Road 77, provide access in the northwestern and southeastern portions of the Unit, respectively. County Road 849 intersects with County Road 265 and provides access to private agricultural and industrial uses. Each road has similar design characteristics as County Road 265. Other routes within the Unit are single lane gravel-surfaced roads and two-track routes used for private access to ranches, agricultural lands, and existing well sites. Several of the private access roads are gated with access limited to administrative uses only.

*Transportation*
Existing regional traffic on State Highway 133 consists primarily of local residents, regional travelers, and commercial vehicles, including light and heavy trucks from nearby mineral extraction activities. Based on 2012 data from the Colorado Department of Transportation, the annual average daily traffic, which is a measurement of total traffic volume for a full year for a given location, as counted by a traffic counter, divided by 365 days, is 1,400 for a 22.3 mile segment of State Highway 133 between the intersection with County Road 12 approximately 6.75 miles south of the project area boundary and the intersection with County Road 3 north of the Gunnison County line in Pitkin County approximately 6 miles north of the project area boundary. The peak truck traffic for this segment is 6.3 percent of the total recorded volume. On an average day, there are 30 single trucks and 60 combined trucks traveling on this segment of State Highway 133 (CDOT 2012a).

Between 2008 and 2010 (the years for which data is available), there were three traffic-related fatalities on State Highway 133 in Gunnison County. Two of the fatalities involved motorcycle riders, while the other involved the driver of a passenger vehicle (CDOT 2012b).

Traffic on the 4.8 mile segment of County Road 265 within the Unit consists primarily of local residents, farmers and ranchers, and commercial vehicles, including light and heavy trucks from the mineral extraction industries. The county road is also used to access recreation and hunting opportunities on adjacent National Forest System Lands. For the period July 31 through October 15, 2007 (the latest period for which data are available), the average daily traffic count for the entire roadway was 205 vehicles (102 northbound and 103 southbound).

SGI executed Gunnison County Road Improvement Agreement on September 13, 2005, and the First Amendment to Road Improvement Agreement on July 11, 2006, for improvements to County Road 265. Gunnison County holds Performance/Utilization Bond No. RLB0004678 in the amount of $10,000 to warrant against road damage to County Road 265. On November 5, 2010, SGI and Gunnison Energy entered an agreement with Gunnison County (Gunnison County 2010) under which SGI and Gunnison Energy agreed to purchase magnesium chloride so that the Gunnison County Public Works Department can apply it to County Road 265 for dust

BLM_0027030

suppression twice each year through 2015. In accordance with the agreement, both of the annual applications would be for the entire length of County Road 265, while an additional and discretionary application would be applied only at residential driveway entrances next to County Road 265. Gunnison County would grade County Road 265 each year in preparation for the magnesium chloride application and would have full responsibility for the product's application.

### *Trends*

On the 22.3 mile segment of State Highway 133 between the intersection with County Road 12 and the intersection with County Road 3, Colorado Department of Transportation projects an increase in annual average daily traffic from a current level of 1,400 to 2,500 by 2033. Over the next 20 years, the number of single trucks traveling on this segment on an average day is expected to increase from 30 to 54, while the daily number of combined trucks is expected to increase from 60 to 107 (CDOT 2012c).

While no quantitative forecast is available for County Road 265, annual average daily traffic on this road would increase only if the local population increases or non-residential uses in the Unit, such as access to adjacent National Forest System Lands for recreation and hunting, create additional vehicle trips.

## 3.4    SOCIAL AND ECONOMIC CONDITIONS

This section is a description of the support conditions in the project area and follows the order of topics addressed in **Chapter 2**:

- Hazardous and solid waste

- Socioeconomics

- Environmental Justice

### 3.4.1    Hazardous Materials and Wastes

The affected environment for hazardous materials is air, water, soil, and biological resources that could be affected by an accidental release of hazardous materials during storage, use in construction, drilling, and operations, and transportation to and from the Unit. Additionally, hazardous wastes from abandoned mines or other past activities in the project area could affect air, water, soil, and biological resources. Sensitive areas for hazardous materials releases are those next to water bodies, those above potable groundwater aquifers, and those in areas where humans or sensitive environmental receptors would be directly impacted.

The most pertinent of the federal laws dealing with hazardous materials contamination are as follows:

- The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, Public Law 96-510 of 1980) provides for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment. It also provides national, regional, and local contingency plans. Applicable emergency operations plans in place include the National Contingency Plan (40 CFR 300, required by Section 105 of CERCLA), the Region VIII Regional Contingency Plan, and the

BLM_0027031

Gunnison County Emergency Operations Plan (developed by the Gunnison County Office of Emergency Management).

- The Resource Conservation and Recovery Act (Public Law 94-580, October 21, 1976) regulates the use of hazardous substances and strictly regulates the management and disposal of hazardous as well as ordinary solid wastes. Oil and gas lessees are exempt from certain parts of the Act, including Subtitle C (hazardous waste regulations); however, they are not exempt from Subtitle D (solid waste regulations).

In general, a spill prevention, control, and countermeasures (SPCC) plan must be developed in compliance with 40 CFR, Part 112, for facilities with an aggregate aboveground oil storage capacity of 1,320 gallons or more. The SPCC plan is intended to prevent the release of oils, such as diesel fuel, gasoline, crude oil, or condensate, into the Waters of the United States. The plan must provide response actions to be taken and notifications to be made in the event of a release.

According to 29 CFR 1910.1200(g), SGI is required to maintain a file containing Material Safety Data Sheets for all chemicals, compounds, and/or substances utilized during the course of construction, drilling, completion, and production operations of the project. This file is to be available at all times when employees are present at the site. The BLM Instruction Memoranda numbers WO-93-344 and CO-97-023 require that all NEPA documents list and describe any hazardous and extremely hazardous materials that would be produced, used, stored, transported, or disposed of as a result of a proposed project.

On December 13, 2011, the State of Colorado enacted Code of Colorado Regulations 404-1:205A, a new rule requiring vendors and providers of hydraulic fracturing services to provide the operator of a natural gas well with the identity of each additive and each chemical intentionally added to the hydraulic fracturing fluid, within 30 days following the conclusion of the hydraulic fracturing treatment (Nettles et al. 2012 CCR 404-01:205A). The operator must then complete a chemical disclosure registry form and post the form to a national public website, fracfocus.org, within 60 to 120 days. The operator must disclose the concentration of the chemical or additive but is not required to disclose the brand name of the product or additive to which the disclosed chemical or chemical concentration is a component. A vendor, service provider, or operator may claim that the specific identity and concentration of a chemical is entitled to trade secret protection and may withhold disclosure of this information on that basis. However, the identity and amount of any chemicals claimed to be a trade secret must be identified to any health professional who requests such information in writing (and who agrees to keep the information confidential) for the purpose of diagnosing or treating an individual who may have been exposed to such chemicals. Likewise, this information must be provided to the COGCC upon receipt of a letter stating that such information is necessary to respond to a spill or release, or a complaint from a person who may have been directly and "adversely affected or aggrieved" by a spill or release.

The EPA conducted a study in 2004 and concluded hydraulic fracturing presents little or no threat to underground sources of drinking water (EPA 2004). However, this study was highly criticized as politically motivated and scientifically unsound by former EPA scientists and others (Wilson 2004). In 2010, Congress mandated the EPA conduct a new study on the impacts of hydraulic fracturing on drinking water. This study is scheduled to be released by the EPA in

BLM_0027032

2014, though it is rumored that its release may be delayed until 2016 (EPA 2013g). In the meantime, many citizen groups, environmentalists, and scientists believe hydraulic fracturing poses a great threat to air and water quality. Concerns are typically about the use of toxic chemicals and diesel fuel in fracturing fluid and the detrimental impacts on the environment and on human health that would result if these chemicals were to contaminate underground drinking water sources (EPA 2004).

Typical hazardous materials present or likely to be present in the project area during development and production are listed in **Appendix G**, Hazardous Materials Management Summary, and are as follows:

- Drilling mud and cementing products, including caustic materials

- Flammable or combustible materials, including petroleum products

- Well stimulation additives, such as acids and gels (corrosives)

- Hydraulic oil

- Ethylene glycol (antifreeze), which is also used in dehydration units

- sanitary wastes

Use of any substances classified as Extremely Hazardous by the Superfund Amendments and Reauthorization Act of 1986 would be limited to treating chemicals, should they be necessary. Materials generated during drilling include drill cuttings, combined with drilling fluids and additives used to maintain circulation and reduce borehole caving and accomplish cementing of the borehole annulus. These fluids are normally confined to the borehole, reserve pit, and/or storage tanks.

### General Project Area
A search of EPA records indicates no presence of present or past hazardous waste generation or management facilities in the area, nor any accidents, spills, leaks, or improper disposal of hazardous materials resulting in brownfields (EPA 2013a). As of 2011 there were no Superfund sites in the area, nor any indication in the EPA Hazardous Waste Report of any past or present hazardous waste treatment, storage, or disposal facilities (EPA 2013b).

The interactive EPA database *EnviroMapper for Envirofacts* identified two points of interest for hazards to human health within the project area. The Gunnison Energy Corp 1-34 Well Site was identified in the Air Facility System as a stationary source of volatile organic compound emissions, and the Aspen Leaf Lateral Pipeline was identified in the EPA Integrated Compliance System for having been issued a permit to discharge waste water into rivers (EPA 2013c, 2013d) Both facilities are operating in compliance with procedure (EPA 2013c, 2013e).

Other nearby points of interest include the Gunnison Energy Corporation and three Gunnison Energy Corp well sites, all of which lie just south of the project area and are operating in compliance with procedure (EPA 2013a, 2013f).

BLM_0027033

*Trends*

Over the last decade exploratory and development activities in and surrounding the Unit have focused on exploring for and developing coal bed natural gas resources, and these activities are expected to continue over the next 20 years (BLM 2012b). As these activities continue and potentially increase in the future, the risk of an accidental release of hazardous materials increases. Increased gas operations would likely result in increased transportation, storage, and use of hazardous material in construction, drilling, and operations, which would increase the risk of air, water, soil, and biological resources being affected by hazardous materials.

## 3.4.2   Socioeconomics

*Current Conditions and Trends*

Local and regional demographic characteristics, economic factors, and social structure have the potential to be affected by management decisions in the Bull Mountain Unit MDP EIS planning area. Economic and demographic statistics are primarily reported by county. While the project is located within Gunnison County, it is likely that the local workforce may be drawn from Delta, and project construction and operation has the potential to impact Delta County, in particular North Fork Valley. For these reasons, demographic, economic, and social data are presented for Gunnison and Delta Counties. A state context is provided for comparison where appropriate. It should be noted that much of the population of Gunnison County is located in the Gunnison and Crested Butte area, which is not likely to be impacted by the proposed project and has little influence on the current conditions of the planning area. A summary of current social and economic conditions for the area is included below, additional information, including complete data tables, is available in the Bull Mountain MDP EIS Socioeconomic Baseline Report (BLM 2013b).

*Demographics and Economic Conditions*

Population: As of 2010, total population in Delta and Gunnison Counties was 30,952 and 15,324 respectively. Total population in the two-county region has increased since 1980, but at a slower rate than that of the State. From 1980 to 1990, population declined in both Delta and Gunnison Counties. In the 1990s, growth for both Counties was slightly higher than the state average (30.6 percent) at 32.7 percent for Delta County and 35.9 percent for Gunnison County. Since 2000, population growth has slowed and was lower than the state average of 16.9 percent (11.2 percent for Delta County and 9.8 percent for Gunnison County) (US Census Bureau 2010, Headwaters Economic 2013). It should be noted that, despite growth, total population density remains low in the study area.

Population growth in the area is expected to continue over the next few decades with approximately 14 percent increase by 2020 and 62 percent increase by 2040 for the two-county study area (Colorado Division of Local Government, State Demography Office 2012). In-migration of people from other Colorado regions and throughout the West is the likely source of much of the anticipated population growth. For Delta, and in particular, Gunnison County, a growing percentage of the population is originally from other states, with 44.9 percent and 56.5 percent respectively born in other states based on 2010 data (US Census Bureau 2010).

BLM_0027034

<u>Income and Employment:</u> Median household incomes for Delta County ($41,856) and Gunnison County ($50,073) remained below the state average of $52,762 in 2010. Per capita income in Delta County ($23,495) was lower than the state average of $27,915, while the per capita income in Gunnison County ($28,862) was slightly higher than the state average (US Census Bureau 2010).

Income is derived from two major sources: (1) labor earnings or income from the workplace; and (2) non-labor income including dividends, interest, and rent and transfer payments (payments from governments to individuals; age-related, including Medicare, disability insurance payments, and retirements). Labor income is the main source of income in Delta and Gunnison County, however non labor income contributes an important source of income; from 1970 to 2011, non-labor income in Delta County grew from $50 million to $187 million, an increase of 275 percent (Headwater Economics 2013). Percent of personal income contributed by non-labor income in Delta County (44.6 percent) and Gunnison County (40.8 percent) are well above the state average of 29.8 percent (Headwater Economics 2013). Based on input from the community assessment and economic workshops, the large level of non-labor income is likely related to high numbers of retirees in the area (BLM 2009, 2010).

As of 2011 data, key industries in Delta County include retail trade (11 percent of total employment), health care and social assistance (9 percent), farm employment (9.3 percent), construction (7 percent), and government (16 percent). In Gunnison County, retail trade (9.1 percent), construction (8.7 percent), arts entertainment and recreation (8.2 percent) and accommodation and food services (11.7 percent), and government (16.9 percent) employed the most people (US Department of Commerce, Bureau of Economic Analysis 2012). Mining data is non-disclosed for Gunnison County and for certain mining sectors in Delta County, however, estimates from the Headwaters Economics' Economic Profile System indicate that mining represents an important industry in the area, with approximately 7.9 percent of employment in Delta County and 10.4 percent in Gunnison County related to mining (Headwaters Economics 2013). It should be noted that data from the US Department of Commerce, Bureau of Economic Analysis are not directly comparable with the data from Headwaters Economics due to different sources of data and different industry coverage.

A significant portion of the tourism base economy in Gunnison County is located in the towns of Gunnison and Crested Butte. The Bull Mountain area's economic conditions are, therefore, not comparable with the rest of Gunnison County. Specifically, agriculture and natural resource development are more dominant in the project area than tourism. Fall big game hunting is also a popular activity in this area. Delta County's economy is similar to the project area, but also features a significant healthcare and nursing home industry in and around the town of Delta.

It should be noted that for some industries average annual wages are higher than others. Highest average annual wages are typically seen in the government sector and natural resources extraction, particularly in mining. Average wage per job numbers are typically lower in the hospitality sector and in agriculture. The average annual wage for the natural resources and mining sector was significantly higher than average annual wage for both Gunnison and Delta Counties (116 percent and 63 percent higher than average wage) (Headwater Economics 2013). see **Table 3-37**, Annual Wages by Industry, 2012.

BLM_0027035

**Table 3-37**
**Annual Wages by Industry, 2012**

|  | Avg. Annual Wages | | % Above or Below Avg. | |
|---|---|---|---|---|
|  | Delta | Gunnison | Delta | Gunnison |
| **Total** | $33,870 | $36,202 |  |  |
| **Private** | $32,231 | $35,342 | -4.8% | -2.4% |
| **Non-Services Related** | $47,354 | $58,853 | 39.8% | 62.6% |
| Natural Resources and Mining | $55,410 | $78,183 | 63.6% | 116.0% |
| Agriculture, forestry, fishing & hunting | $28,202 | N/A | -16.7% | N/A |
| Mining (incl. fossil fuels) | $69,873 | N/A | 106.3% | N/A |
| Construction | $37,210 | $36,393 | 9.9% | 0.5% |
| Manufacturing (Incl. forest products) | $35,312 | $21,806 | 4.3% | -39.8% |
| **Services Related** | $25,619 | $27,781 | -24.4% | -23.3% |
| Trade, Transportation, and Utilities | 28,270 | $27,329 | -16.5% | -24.5% |
| Information | $28,515 | $35,688 | -15.8% | -1.4% |
| Financial Activities | $33,642 | $37,726 | -0.7% | 4.2% |
| Professional and Business Services | $34,538 | $60,954 | 2.0% | 68.4% |
| Education and Health Services | $24,378 | $34,314 | -28.0% | -5.2% |
| Leisure and Hospitality | $12,961 | $17,041 | -61.7% | -52.9% |
| Other Services | $29,350 | $22,942 | -13.3% | -36.6% |
| Unclassified | $6,246 | $56,047 | -81.6% | 54.8% |
| **Government** | $38,217 | $38,970 | 12.8% | 7.6% |
| Federal Government | $61,600 | $52,914 | 81.9% | 46.2% |
| State Government | $50,796 | $44,794 | 50.0% | 23.7% |
| Local Government | $35,087 | $34,801 | 3.6% | -3.9% |

Source: Headwaters Economics 2013. Based on BLS 2012 data.

Unemployment levels in the two-county area are decreasing from peaks in 2010 and remain lower in Gunnison County than Delta County. Estimated annual unemployment rates were 5.9 percent and 7.5 percent in Delta and Gunnison County respectively in 2013, compared to the Colorado annual unemployment rate of 6.8 percent (US Department of Commerce, Bureau of Labor Statistics 2014).

Housing Resources: As of 2010, approximately 14,572 and 11,412 housing units were available in Delta and Gunnison counties respectively (US Census Bureau 2010). The number of housing units in the two-county area increased since 2000, with the rate of increase higher than the state average in Gunnison County (20.0 percent) and lower than the average in Delta County (15 percent). Housing vacancy rates in the study area are notably high in Gunnison County (42.9 percent), with the majority of the vacant housing units second homes used for seasonal, recreational, or occasional use.

Temporary housing availability in the area includes 2 RV parks and 16 hotels with in a 25 mile radius of Delta, the largest town in the vicinity of the project area (tripadvisor.com 2014). Glenwood Springs is approximately 50 miles and contains approximately 24 hotels. The regional hub of Grand Junction is approximately 100 miles away contains over 25 hotels.

Median home value has increased since 2000, with a 32 percent increase in Delta County (a median value of $198,000) and a 37 percent increase in Gunnison County (a median value of $338,100), based on 2007-2011 data (US Census Bureau 2000, 2011). Both Counties had higher rates of change than the Colorado average of 9 percent. Based on 2007-2011 data, median

BLM_0027036

monthly rental rates were $721 and $858 in 2011 for Delta and Gunnison Counties, respectively (US Census Bureau 2000, 2011). Median rental rates increased at a lower rate than housing prices, at 10 percent for Delta County and 11 percent for Gunnison County, but at a higher rate than the Colorado average of 1 percent.

*Fiscal Conditions*

Property Taxes: Property taxes are determined by multiplying the assessed (taxable) value of the property by the tax rate. The tax rates are set by local government entities and vary by location. Assessed values are derived by multiplying the actual value of the property by 7.96 percent for residential property and by 29 percent for other property, including improvements for oil and gas production. Ad-valorem property taxes are also applied to oil and gas production in Colorado based on prior year production. The assessed value is either 87.5 percent or 75 percent depending on whether the production is classified as primary or secondary.

Approximately half of property tax revenues go towards County school districts with the remainder distributed to other Gunnison County entities. Gunnison County's total taxable assessed value for 2012 was $689,286,200, with oil and gas property representing $4,264,210 (0.62 percent) of total County-assessed value. Gunnison County reported $35,413,810 in property tax revenue for 2012 (Gunnison County 2012). Property taxes in Delta County would not be directly affected by project activities but could be impacted by any related change in property values.

Severance Taxes: Tax revenue related to natural gas production comes from two main sources: the Colorado state severance tax and the state's share of federal mineral lease royalties. Colorado Severance Tax is a tax imposed upon nonrenewable natural resources that are removed from the earth. The severance tax is graduated, ranging from 2 percent for income under $25,000 to 5 percent for income of $300,000 and over. Very small operations are exempt. Producers may also deduct ad- valorum property taxes paid from severance taxes. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources to fund water conservation, wildlife, and environmental programs and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects and 30 percent is directly distributed to local communities. The direct payments from Department of Local Affairs to Colorado communities are often used to offset the impacts of drilling on roads, schools and public services. Gunnison County received $833,006 in severance taxes in 2012.

Federal Mineral Royalties: Additional revenue is collected for bonus, rent and royalties on federal mineral leases. Federal royalty rates are generally 12.5 percent of production value. Approximately 50 percent of revenues go to the US Treasury and 49 percent of these revenues are transferred to the Colorado State Treasurer. This portion, in turn, is distributed to counties, cities, and school districts based on senate bill 08-218. In 2012 approximately $2.5 million was distributed to Delta County, Gunnison county, and area communities (Colorado Division of Local Government 2012).

Other Taxes: Additional taxes on oil and gas activities include contributions to the Oil & Gas Conservation Fund Levy (approximately 12 percent of net revenue) and the Oil & Gas Environmental Response Fund (approximately 2 percent of net revenue).

BLM_0027037

Contributions also occur from corporate income tax (4.63 percent), sales tax would be paid on supplies purchased in state ( average rate for Colorado is 4.3 percent).

Lodging taxes in Delta county provide additional revenue for local communities, approximately $80,000 in Delta County in 2011 (Delta County 2012). County lodging tax is 1.9 percent, but may vary by municipality (Colorado Department of Revenue 2014). Gunnison County has no county imposed lodging tax.

*Social Services*

Law Enforcement and Emergency Response: Law enforcement services in the Bull Mountain area are provided by the Gunnison County Sheriff's Office. Sheriff's deputies provide routine patrol services, First Responder medical care, and 24-hour on-call coverage for the area. The Sheriff's Office provides dispatch services for all emergency service agencies in the county. Emergency management is also provided under the jurisdiction of the Sheriff's Office through the County's emergency manager.. Delta County Hospital in Delta offers ambulance service with advanced life support and is a certified Level IV trauma center. Montrose Memorial Hospital is a Level III trauma center. Fire-suppression services are provided by the Ragged Mountain Fire District.

Schools: The project area is located within Delta County Joint District. The average teacher/student ratio is 1:17.8. The district has four high schools, three middle schools, five elementary schools, one K-8 school, and three K-12 schools (Delta County 2013).

Domestic Water and Wastewater Treatment: The incorporated areas of Delta County and Gunnison counties, including much of the two-county region, are not served by domestic water suppliers or municipal waste water treatment plants and generally utilize wells for potable water and private septic systems. Scarcity of domestic water as well as water quality has historically been important issues in the region. The town of Paonia is in the process of upgrading the existing water treatment facility to 2 million gallons in order to provide additional finished water storage and the ability to divert the Old Original Town Spring and the Upper Reynolds Creek Spring to the Lamborn Plant, therefore added flexibility in operations and redundancy in the water system. Federal and state funding is being sought to support this effort. Recent water rate increases also occurred in in anticipation of the State of Colorado requiring upgrades and the need for additional water capacity (Delta County Independent 2012).

*Local Economic Activity Affected By Project Area Land Uses*

Local economies are directly and indirectly impacted by expenditures and revenues generated by a variety of activities in planning area. Activities that tend to have the greatest economic influence in the area include recreation, mining and energy resource development, and livestock grazing, as discussed in detail below.

Hunting and Recreational Use: Recreational activity has important economic value both in terms of the satisfaction it provides local residents and the economic activity it generates for the regional economy. In terms of economic activity, recreation generates additional spending in the local economy that supports jobs and income. Recreational use contributes to the local economy through expenditures of visitors and employment of local residents in the service sectors. A 2008 study by Colorado Parks and Wildlife found that hunters and anglers spent an estimated $1

BLM_0027038

billion on trip expenses and sporting equipment in Colorado in 2007 (CPW 2008). Expenditures per visitor for multiple activities can also be estimated by applying the average visitor spending levels developed by the US Forest Service for its National Visitor Use Monitoring Reports, which were $57.15 for the average overnight visitor and $19.02 for the average day-use visitor (USDA Forest Service 2008). In the planning area recreational activity includes hunting on private lands through local outfitter-guide services as well as hiking, biking and other recreational activities along the State Highway 133 corridor as described in **Section 3.3.3**, Recreation.

Agriculture and Livestock Grazing: Agriculture is a traditional use of lands in the project region and continues to be important today. There were 1,494 farms totaling 441,004 acres in the two-county region in 2012 (USDA NASS 2014). The North Fork Valley has become known for its rural character and organic farms; approximately 40 farms in Delta County were certified organic or transitioning to organic in 2012; Delta County has the largest concentration of organic farms and orchards of any Colorado County (USDA NASS 2014). The area has become a premier agri-tourism destination in the Rocky Mountains for visitors to organic farms and vineyards; based on the 2012 agricultural census, approximately 21 farms had established agri-tourism opportunities in Delta County, generating $293,000, and 17 farms in Gunnison County generated $243,000 through agri-tourism (USDA NASS 2014). Livestock grazing of cattle and sheep is also a traditional use on public and private lands in the area as discussed in **Section 3.3.1**, Livestock Grazing.

Tourism: Tourism in the North Fork Valley Area includes those seeking recreational experiences and agri-tourism, as discussed above. Employment in tourism is not considered a separate industry category; therefore, data on jobs generated are estimates only. In 2011, travel and tourism-related jobs accounted for approximately 11.8 percent of the jobs in Delta County and 48.5 percent of jobs in Gunnison County compared the state average of 17.5 percent of jobs (Headwater Economics 2013). As previously noted, the majority of the tourism in Gunnison County is located outside of the project area in the towns of Gunnison and Crested Butte. Travel spending has been classified by county in Colorado in a recent report. In 2011, it is estimated that travel spending in Delta County resulted in an estimated 33.8 million dollars, brought in 9.5 million in earnings, resulted in 530 jobs, and generated nearly 1 million in local taxes (Colorado Tourism Office 2011).

Mineral and Energy Resources: Leasable minerals play an important economic role in both Delta and Gunnison Counties. As discussed in **Section 3.3.2**, Minerals, while the potential for development may exist, locatable minerals, mineral materials, and renewable energy have not been developed in notable amounts in the project area and are unlikely to be developed over the life of the MDP and therefore do not significantly contribute to the local area economy or social structure.

Coal mining is a historical industry in the area and is primarily related to three mines in the North Fork Valley near Paonia in an area known as the Somerset coal field. Production varies based on market conditions, but in 2012, approximately 13.4 million tons were produced overall for the three mines combined and employment totaled 948 miners (Colorado Division of Reclamation Mining and Safety 2013). However, Elk Creek Mine was closed in late 2013 after

BLM_0027039

an underground fire closed off much of the coal-mining operation, resulting in a 257-person reduction in workforce in 2013 (Denver Post 2013). Coal resources within the Unit are not considered economically feasible for extraction. Therefore, while coal mining is a traditional land use in the area, coal resources in the Unit are not considered to have economic interest and do not likely contribute a significant economic contribution or influence on social values.

In the past 10 years, oil, and in particular and natural gas development, has increased steadily in Gunnison County, as described in detail in **Section 3.3.2**, Minerals. As of 2010, wells on private and federal minerals in the North Fork area had produced over 3 billion cubic feet of gas. Similarly, within the Unit, existing wells have seen steady increases in production since initial production year of 2010, with approximately 359,165 mcf sold in 2012, including all producing wells (see **Table 2-5**, Bull Mountain Unit Annual Production Rates).

County employment figures for oil, gas, and coal extraction are included within the mining and mining and mining related industries category of BLS and contributes approximately 7.9 percent of county employment in Delta County in 2011, and an estimated 10.4 percent in Gunnison County (Headwater Economics 2013). Additional jobs for this industry are also reflected in construction numbers and other fields that are connected to the exploration and development of resources. It should be noted, however, that these figures include portions of the Counties located outside of the planning area and include estimates for non-disclosed data.

Estimates can be made for economic contributions from natural gas based on the production levels reported. At an average well-head price of $2.66 per mcf and 1,944,599 mcf sold, total gas sales from all wells in the two-county area would have been approximately $5.17 million in 2012 (EIA 2013; Colorado Oil and Gas Conservation Commission 2013). As previously noted, this figure includes all production in Delta and Gunnison Counties, including lands outside of the planning area. Using the same average well-head price and the estimated 359,165 mcf sold from all existing Unit wells (private and BLM minerals) in 2012, it can be estimated that sales from the Unit totaled $955 thousand in 2012.

*Quality of Life and Non-Market Values*
The planning area an surrounding North Fork Valley region consist of a largely rural setting with small towns. Meetings were held with local community leaders in advance of the UFO RMP revision which collected information about local residents' values and desired conditions for community in the planning area. In meetings held for a Community Assessment in November-December of 2008 and in economic workshops in March of 2010, local residents sited small community feeling, slower pace of life, and outdoor lifestyle as important factors in local communities, particularly in Hotchkiss and Paonia. Local community leaders also stressed the importance of health lands and environment as well as municipal watershed protection as important factors. Some representatives, particularly from Delta County, also recognized the importance of mining jobs for the local economy. All communities desired moderate controlled growth (BLM 2009 and BLM 2010) .

Many of the quality of life components brought forward in community meetings can be discussed in terms of non-market values. Non-market values are the benefits derived by society from the uses or experiences that are not dispensed through markets and do not require payment. Non-market values can be broken down into two categories, use and non-use values. The use-

BLM_0027040

value of a non-market good is the value to society from the direct use of the asset; through recreational activities such as hiking, bird watching and OHV use. The use of non-market goods often requires consumption of associated market goods, such as lodging and gas. Non-use, or passive use, values of a non-market good reflect the value of an asset beyond its current use, due to willingness to preserve a resource for potential future use and for the benefit of preserving an asset for future generations to enjoy. This can include values such as scenic views and preservation of plant and animal habitat that are not currently providing economic benefits . Non-use values are typically measures in surveys of individual's willingness to pay for preservation of a resource.

Open space in the region has an important non-market function in the use category through area recreational activities, including fishing and hunting. These uses provide opportunities for recreation local residents and may also attract area visitors. Undeveloped open space in the area may also play a role in the non-use category by preserving the visual landscape as well as the historic pastoral setting for future generations' enjoyment. Ranchlands and farmlands themselves may be important for heritage value, both culturally and naturally (Rosenberger and Walsh 1997).

Some of the value of undeveloped areas can also be determined by examining ecosystem services, including clean air and water. BLM Instruction Memorandum (IM 2013-131) explains that "Ecosystem goods and services include a range of human benefits resulting from appropriate ecosystem structure and function, such as flood control from intact wetlands and carbon sequestration from healthy forests. Some involve commodities sold in markets, for example, natural gas. Others, such as wetlands protection and carbon sequestration, do not commonly involve markets, and thus reflect nonmarket values" (BLM 2013c).

Both use and non-use non-market values of open space can play a role in attracting new residents who in turn bring new sources of income to the area. Communities adjacent to public lands offer a high level of natural amenities that often attract retirees and others with non-labor sources of income, as well as sole proprietors and telecommuters who bring income from other regions into the local economy (Haefele et al. 2007). Undeveloped open space may also influence property value of local homes (Fausold and Lilieholm 1996, Western Governors' Association 1998, Crompton 2000).

### 3.4.3   Environmental Justice

*Current Conditions*

A summary of low income populations and racial and ethnic minorities in the socioeconomic planning areas is provided below. Additional information, including complete data tables, is available in the Bull Mountain MDP EIS Socioeconomic Baseline Report (BLM 2013b).

Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations, requires that federal agencies identify and address any disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority and low-income populations. Environmental justice refers to the fair treatment and meaningful involvement of people of all races, cultures, and incomes with respect to the development, implementation, and enforcement of environmental laws, regulations, programs, and policies. It focuses on environmental hazards and human health to

BLM_0027041

avoid disproportionately high and adverse human health or environmental effects on minority and low-income populations. Low-income populations are defined as persons living below the poverty level based on total income of $11,484 for an individual and $22,811 for a family household of four for 2011 data (US Census Bureau 2010b). Black/African American, Hispanic, Asian and Pacific Islander, American Indian, Eskimo, Aleut, and other non-White persons are defined as minority populations. For environmental justice compliance, the relevant minority population is defined as the total of all persons of a minority racial identity plus persons of Hispanic-origin ethnic identity (Council on Environmental Quality 1997).

Populations are identified for further analysis of environmental justice impacts when one of two factors is present: (1) the minority and/or low income population of the affected area exceeds 50 percent or (2) the minority and/or population percentage of the affected area is "meaningfully greater" than the minority population percentage in the general population or other appropriate unit of geographic analysis, identified here as 20 percentage points or greater difference from the state level.

*Low-income Populations*
Based on 2007-2011 data, Delta County had a low-income population of 14.1 percent, near the state poverty rate of 14.3, while Gunnison County was estimated to be slightly lower than the state rate at 13.8 percent of persons below poverty. The census tracts encompassing the proposed project area (Gunnison Valley tract 9639) and those in the North Fork Valley south of the project area along State Highway 133 (Delta County tracts 9646 and 9650) were also examined. Poverty rate for these geographic areas ranged from 7.0 in Gunnison County in the regions surrounding the project area, and 16.9 and 9.5 percent for the 2 relevant census tracts in Delta County. All areas had an increase in poverty compared to 2000 data due to the 2008 economic downturn (US Census Bureau 2011).

*Minority Populations*
Based on 2007-2011 data, approximately 71 percent of Colorado's population was identified as White and not of Hispanic or Latino origin. The remaining 29 percent identified as an ethnic and/or racial minorities. People of Hispanic or Latino descent (of any race) were the largest minority group and accounted for 20.7 percent of the total state population (US Census Bureau 2011).

The project area and the two-county region examined are less diverse than that of the state. In Delta County, approximately 83 percent of the total population was identified as White of non-Hispanic/Latino origin in 2010 and the remaining 17 percent as ethnic and/or racial minority, while in Gunnison County approximately 89 percent were identified as White of non-Hispanic/Latino origin and the remaining 11 percent identifying as an ethnic and/or racial minority. The largest minority groups in both counties included those of Hispanic/Latino descent. The racial and ethnic background of the census tract containing the project area (Gunnison County tract 9639) as well as those along State Highway 133 in the North Fork Valley south of the project area (Delta County tracts 9646 and 9650) were also examined. For these census tracts, the percentage of the population who identified themselves as being of Hispanic/Latino origin or from a minority racial group were 1.8, 6.1 and 7.8 percent receptivity, while the remainder of the population classified themselves as White of non-Hispanic/Latino origin (US Census Bureau 2011).

BLM_0027042

# Chapter 4
## Environmental Consequences

BLM_0027043

BLM_0027044

# TABLE OF CONTENTS

Chapter                                                                        Page

**4.**     **ENVIRONMENTAL CONSEQUENCES** ............................................................................ **4-1**

    4.1    Introduction .................................................................................. 4-1
        4.1.1  General Methodology for Analyzing Impacts ................. 4-1
        4.1.2  Analytical Assumptions ...................................................... 4-3
        4.1.3  Cumulative Effects ............................................................ 4-4
        4.1.4  Incomplete or Unavailable Information ........................... 4-21
    4.2    Resources ................................................................................... 4-22
        4.2.1  Air Quality ......................................................................... 4-22
        4.2.2  Noise .................................................................................. 4-72
        4.2.3  Soil Resources ................................................................... 4-80
        4.2.4  Water Resources ............................................................... 4-91
        4.2.5  Geology ............................................................................ 4-109
        4.2.6  Vegetation and Invasive, Nonnative Species ................... 4-118
        4.2.7  Fish and Wildlife ............................................................. 4-128
        4.2.8  Migratory Birds ............................................................... 4-152
        4.2.9  Special Status Species ...................................................... 4-158
        4.2.10 Wildland Fire Management ............................................. 4-172
        4.2.11 Cultural Resources ........................................................... 4-174
        4.2.12 Paleontological Resources ............................................... 4-179
        4.2.13 Visual Resources .............................................................. 4-183
    4.3    Resource Uses ............................................................................ 4-191
        4.3.1  Livestock Grazing ............................................................ 4-191
        4.3.2  Minerals (Leasable, Locatable, Salable) .......................... 4-194
        4.3.3  Recreation ........................................................................ 4-199
        4.3.4  Lands and Realty .............................................................. 4-202
        4.3.5  Transportation and Access ............................................... 4-207
    4.4    Social and Economic Conditions ............................................... 4-214
        4.4.1  Hazardous Materials and Wastes ..................................... 4-214
        4.4.2  Socioeconomics ............................................................... 4-219
        4.4.3  Environmental Justice ...................................................... 4-244
    4.5    Irreversible and Irretrievable Commitment of Resources and
        Relationship of Short-term Uses of the Environment to Long-term
        Productivity ................................................................................ 4-245
        4.5.1  Irreversible and Irretrievable Commitment of Resources .......... 4-245
        4.5.2  Relationship of Short-term Uses of the Environment to
              Long-term Productivity .................................................... 4-246

BLM_0027045

# TABLES
Page

4-1    Summary of Cumulative Actions within the Unit by Alternative ............................... 4-5
4-2    Summary Cumulative Surface Disturbance Acres within the Unit by Alternative ...... 4-8
4-3    Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that
       Comprise the Cumulative Impact Scenario ................................................. 4-16
4-4    Acute Reference Exposure Levels (1-hour exposure) ................................................ 4-31
4-5    Sensitive Lakes Analyzed in Far-Field Analysis ...................................................... 4-33
4-6    Alternative A Year 2 Emissions (TPY) .................................................................... 4-38
4-7    Alternative A Year 2 GHG Emissions (metric tons per year) ................................... 4-39
4-8    Alternative A - Maximum Modeled Pollutant Concentrations at Class I and
       Sensitive Class II Areas ($\mu$g/m$^3$) ................................................................. 4-40
4-9    Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II
       Areas ....................................................................................................... 4-42
4-10   Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I
       and Sensitive Class II Areas ...................................................................... 4-43
4-11   Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive
       Class II Areas ............................................................................................ 4-44
4-12   Alternative B Year 5 Emissions (TPY) ..................................................................... 4-45
4-13   Alternative B Year 5 GHG Emissions (metric tons per year) ................................... 4-46
4-14   Alternative B - Criteria Pollutant Modeling Results for Field Development
       Activities .................................................................................................. 4-46
4-15   Alternative B - Criteria Pollutant Modeling Results for Field Production
       Activities .................................................................................................. 4-47
4-16   Alternative B - HAP Modeling Results for Field Production Sources ...................... 4-48
4-17   Alternative B - Unit Risk Analyses ........................................................................ 4-49
4-18   Alternative B - Maximum Modeled Pollutant Concentrations at Class I and
       Sensitive Class II Areas ($\mu$g/m$^3$) ................................................................. 4-50
4-19   Alternative B - Maximum Visibility Impacts at Class I and Sensitive Class II
       Areas ....................................................................................................... 4-52
4-20   Alternative B - Maximum Nitrogen and Sulfur Deposition Impacts at Class I
       and Sensitive Class II Areas ...................................................................... 4-52
4-21   Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive
       Class II Areas ............................................................................................ 4-53
4-22   Cumulative Pollutant Concentrations (CARMMS 2021 High Development
       Scenario) at Class I and Sensitive Class II Areas ($\mu$g/m$^3$) ............................ 4-67
4-23a  Cumulative Visibility Results ($\Delta$dv) for Worst 20% Visibility Days at Class I
       Areas for Current Year (2008) and 2021 High Development Scenario all
       Emissions and Contributions from RFD Sources ........................................ 4-70
4-23b  Cumulative Visibility Results ($\Delta$dv) for Best 20% Visibility Days at Class I
       Areas for Current Year (2008) and 2021 High Development Scenario all
       Emissions and Contributions from RFD Sources ........................................ 4-70
4-24   Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021
       High Development Scenario) at Class I and Sensitive Class II Areas ......................... 4-71
4-25   Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development
       Scenario) within the Class I and Sensitive Class II Areas ......................................... 4-71

BLM_0027046

4-26    Average Noise Levels Produced during Construction and Operations ...................... 4-74
4-27    Acres of Soils on Steep Slopes Potentially Impacted (Alternative A)....................... 4-83
4-28    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative A)... 4-83
4-29    Acres of Soils with Erosion Hazard Ratings for Roads (Alternative A) ................... 4-84
4-30    Acres of Soils on Steep Slopes Potentially Impacted (Alternative B)....................... 4-84
4-31    Acres of Farmlands Potentially Impacted (Alternative B) ........................................ 4-85
4-32    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative B)... 4-85
4-33    Acres of Soils with Erosion Hazard Ratings for Roads (Alternative B)..................... 4-86
4-34    Acres of Farmlands Potentially Impacted (Alternative C) ........................................ 4-87
4-35    Acres of Soils on Steep Slopes Potentially Impacted (Alternative C)....................... 4-87
4-36    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C)... 4-87
4-37    Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted
        (Alternative C) ......................................................................................................... 4-88
4-38    Acres of Farmlands Potentially Impacted (Alternative D) ........................................ 4-88
4-39    Acres of Soils on Steep Slopes Potentially Impacted (Alternative D)....................... 4-89
4-40    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative D)... 4-89
4-41    Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted
        (Alternative D) ......................................................................................................... 4-90
4-42    Estimated Risk of a Reportable Spill from a Producing Gas Well in
        Colorado 2009 to 2013 ............................................................................................. 4-96
4-43    Direct Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternative A) ....................................................................................................... 4-121
4-44    Direct Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternative B) ....................................................................................................... 4-122
4-45    Permanent Impacts on Vegetation Communities from Development of
        Well Pad 12-89-7-1 ................................................................................................. 4-123
4-46    Direct Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternative C) ....................................................................................................... 4-124
4-47    Direct Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternative D) ....................................................................................................... 4-125
4-48    Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternatives A and B combined) ........................................................................... 4-126
4-49    Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternatives A and C combined) ........................................................................... 4-126
4-50    Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
        (Alternatives A and D combined) ........................................................................... 4-127
4-51    Habitat Quality Categories as a Function of Road Density ...................................... 4-132
4-52    Habitat Categories by Alternative............................................................................ 4-133
4-53    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
        Alternative A........................................................................................................... 4-134
4-54    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
        Alternative B ........................................................................................................... 4-142
4-55    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
        Alternative C ........................................................................................................... 4-145
4-56    Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under
        Alternative D........................................................................................................... 4-149

BLM_0027047

4-57    Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
        (Alternatives A and B combined) ................................................................... 4-150
4-58    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
        (Alternatives A and C combined) ................................................................... 4-151
4-59    Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit
        (Alternatives A and D Combined) .................................................................. 4-151
4-60    Visual Resources Inventory Scenic Quality Evaluation Ratings ............................ 4-184
4-61    Grazing Disturbance on BLM Allotments from Roads and Well Pads .................... 4-192
4-62    Alternative A - Surface Disturbance[1] by Landownership ..................................... 4-204
4-63    Alternative B - Surface Disturbance[1] by Landownership ..................................... 4-205
4-64    Alternative C - Surface Disturbance[1] by Landownership ..................................... 4-206
4-65    Alternative D - Surface Disturbance[1] by Landownership ..................................... 4-206
4-66    Bull Mountain Unit Estimated Annual Direct Labor Requirements and
        Costs - Alternative A .................................................................................... 4-227
4-67    Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A ....... 4-228
4-68    Impacts on Local Fiscal Conditions—Alternative A .......................................... 4-231
4-69    Bull Mountain Unit Direct Annual Employment and Labor Costs—Alternative B ... 4-234
4-70    Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B ...... 4-235
4-71    Impacts on Local Fiscal Conditions - Alternative B ........................................... 4-237
4-72    Irreversible and Irretrievable Commitment of Resources ..................................... 4-246
4-73    Relationship of Short-term Uses of the Environment to Long-term Productivity .... 4-247

# FIGURES                                                                                 Page

4-1     Alternatives A and B Cumulative .................................................................... 4-12
4-2     Alternatives A and C Cumulative .................................................................... 4-13
4-3     Alternatives A and D Cumulative .................................................................... 4-14
4-4     Cumulative Effects Study Area ....................................................................... 4-15
4-5     Near-Field Analysis, Well Pad and Access Road Construction Modeling
        Scenario ..................................................................................................... 4-25
4-6     Near-Field Analysis, Well Production Modeling Scenario .................................... 4-26
4-7     Near-Field Analysis, Well Development Modeling Scenario ................................. 4-27
4-8     Well Production Receptor Grid ....................................................................... 4-28
4-9     Near-Field Analysis, Well Development Receptor Grid ....................................... 4-29
4-10    Far-field Analysis Modeling Scenario .............................................................. 4-34
4-11    Far-field Analysis, Source Layout .................................................................. 4-35
4-12    2008 ozone DVC (top left), 2021 ozone DVF (top right) and 2021 – 2008
        ozone DVF differences calculated using MATS for the CARMMS 2021 High
        Development Scenario ................................................................................... 4-63
4-13    Fourth highest daily maximum 8-hour ozone concentrations for the 2008 Base
        Case (top left), CARMMS 2021 High Development Scenario (top right),
        2021 minus 2008 differences (bottom) .............................................................. 4-65
4-14    Contribution to Fourth Highest Daily Maximum Ozone Concentrations Due
        to Emissions from Federal Oil and Gas within the UFO Planning Area for
        the CARMMS 2021 High Development Scenario ................................................ 4-66
4-15    Habitat Categories by Alternative ................................................................... 4-135

BLM_0027048

# CHAPTER 4
# ENVIRONMENTAL CONSEQUENCES

## 4.1   INTRODUCTION

This chapter presents the likely direct, indirect, and cumulative environmental impacts that could result from implementing the alternatives presented in **Chapter 2**, Alternatives. This chapter is organized by topic, similar to **Chapter 3**, Affected Environment. Each topic area includes a method of analysis section that identifies indicators of impacts, methods, and assumptions; a summary of effects common to all alternatives; and an analysis of impacts for each of the alternatives.

This impact analysis identifies impacts that may result in some level of change to the resource, regardless of whether that change is beneficial or adverse. The impact analysis does not include a subjective qualifier (beneficial or adverse) to the impact; instead, it states the nature, magnitude, and context for the change (see **Section 4.1.1**, General Methodology for Analyzing Impacts, for more detail). The evaluations presented in this section are confined to the actions that have more prominent, immediate, or direct effects. Some of the proposed management actions and potential future development may affect only certain resources and alternatives. If an activity or action is not addressed in a given section, no impacts are expected, or the impact is expected to be negligible.

Impact analysis is a cause-and-effect inquiry. The detailed impact analyses and conclusions are based on the interdisciplinary team's knowledge of resources and the project area, reviews of existing literature, and information provided by experts in the BLM and other agencies. The baseline used for the impact analysis is the current condition or situation, as described in **Chapter 3**, Affected Environment. Impacts on resources and resource uses are analyzed and discussed in detail commensurate with resources issues and concerns identified throughout the process. At times, impacts are described using ranges of potential impacts or in qualitative terms.

### 4.1.1   General Methodology for Analyzing Impacts

Potential impacts or effects are described in terms of type, context, duration, and intensity, which are generally defined as follows:

- Type of Impact – Because types of impacts can be interpreted differently by different people, this chapter does not differentiate between beneficial and adverse impacts (except

BLM_0027049

in cases where such characterization is required by law, regulation, or policy). The presentation of impacts for key programmatic issues is intended to provide the BLM decision-maker and reader with an understanding of the multiple-use tradeoffs associated with each alternative.

- Context – Context describes the area or location (site-specific, local, Unit-wide, or regional) in which the impact would occur. Site-specific impacts would occur at the location of the action, local impacts would occur within the general vicinity of the action area, Unit-wide impacts would affect a greater portion of the state, and regional impacts would extend beyond the Unit (state) boundaries.

- Duration – Duration describes the length of time an effect would occur, either short term or long term. Short term is defined as anticipated to begin and end within the first 5 years after the action is implemented. Long term is defined as lasting beyond 5 years to the end of or beyond a 50-year project horizon.

- Intensity – This analysis discusses impacts using quantitative data wherever possible. If quantitative analysis is not possible, qualitative statements are used.

- Direct and Indirect Impacts – Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place. Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

- Cumulative Impacts – Cumulative impacts are described at the end of each resource section. Cumulative impacts are the direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action (40 CFR Part 1508.7). The list of actions used for cumulative impact analysis is provided in **Section 4.1.3**, Cumulative Effects, Past, Present, and Reasonably Foreseeable Future Actions.

Analysis shown under an alternative may be referenced in the other alternatives with such statements as "impacts would be the same as, or similar to, Alternative A" or "impacts would be the same as Alternative B, except for…" as applicable.

Irreversible and irretrievable commitment of resources, unavoidable adverse impacts, and the relationship of short-term uses of the environment to long-term productivity are discussed in **Section 4.5**, Irreversible and Irretrievable Commitment of Resources and Relationship of Short-term Uses of the Environment to Long-term Productivity. Each of these impacts discussions is required by the regulations at 40 CFR 1502.16 and summarizes information for resources and resources uses that may be affected.

The scope of the analysis focuses on impacts on resources and uses on BLM-administered lands or mineral estate, as the decisions being made by the BLM apply only to BLM-administered resources and uses. However, the type of impacts anticipated from energy development may be useful to other agencies and/or private landowners in understanding project development.

## 4.1.2   Analytical Assumptions

Several assumptions were made to facilitate the analysis of the projected impacts. These assumptions set guidelines and provide reasonably foreseeable projected levels of development that would occur within the project area and time frame. These assumptions should not be interpreted as constraining or redefining the management objectives and actions proposed for each alternative, as described in **Chapter 2**, Alternatives. The following general assumptions apply to all resource categories. Any specific resource assumptions are provided in the methods of analysis section for that resource.

- Sufficient funding and personnel would be available for implementing the final decision.

- Implementing actions from any of the alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements such as state, county, and local government regulations.

- Additional site-specific NEPA documentation would be completed on PODs or individual APDs as appropriate.

- Appropriate maintenance would be carried out to maintain the functional capability of all developments.

- The discussion of impacts is based on the best available data. Knowledge of the Unit and professional judgment, based on observation and analysis of conditions and responses in similar areas, are used to infer environmental impacts where data are limited.

- Temporal and spatial boundaries used in the direct and indirect effects analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline date for the cumulative impacts analysis is 2013. The short-term scope of analysis is 0-5 years and the long-term scope of analysis is 6+ years unless otherwise noted under the specific resource heading. The spatial boundary for the scope of analysis is the Unit boundary, unless otherwise noted under the specific resource heading.

- Acreage figures and other numbers used in the analyses are approximate projections for comparison and analytic purposes only. Readers should not infer that they reflect exact measurements or precise calculations. Acreage calculations are rounded to the nearest 10 acres. All alternatives assume a standard area of disturbance that would be used for calculations. Due to the uncertainty of the number of wells per pad and alignments for roads and pipelines, the disturbance areas used are estimates only and were developed based on the assumption that the disturbance area would need to be large enough to reasonably accommodate future permitted construction or realignments. Actual and specific well pad size, pipeline width or road width would be determined in future APDs and/or PODs and analyzed in subsequent NEPA actions.

- Cumulative actions in in the Unit are all those of Alternative A plus all those of Alternatives B, C, and D. For example, the cumulative actions under Alternative A includes all of the private wells and well pads as described in Alternative A, plus all of

BLM_0027051

the federal wells and well pads as described in Alternative B. These numbers are the same as for cumulative Actions under Alternative B. For Alternatives C and D, the cumulative effects include all of Alternative A actions plus all actions accounted for in Alternative C or Alternative D, respectively. **Table 4-1**, Summary of Cumulative Actions within the Unit by Alternative, and **Table 4-2**, Summary Cumulative Surface Disturbance Acres within the Unit by Alternative, below present action quantities in terms of well and well pad numbers as well as miles of roads and acreage of disturbance.

## 4.1.3   Cumulative Effects

Cumulative impacts are effects on the environment that result from the impact of implementing any one of the alternatives in combination with other actions outside the scope of this plan, either within the Unit or adjacent to it. Cumulative impact analysis is required by CEQ regulations because environmental conditions result from many different factors that act together. The total effect of any single action cannot be determined by considering it in isolation. Total effect must be determined by considering the likely result of that action in conjunction with many others. Evaluation of potential impacts considers incremental impacts that could occur from the proposed project, as well as impacts from past, present, and reasonably foreseeable future actions. Management actions could be influenced by activities and conditions on adjacent public and non-public lands beyond the Unit boundary; therefore, assessment data and information could span multiple scales, landownerships, and jurisdictions. These assessments involve determinations that often are complex and, to some degree, subjective.

*Cumulative Analysis Methodology*

The cumulative impacts discussion that follows considers the alternatives in the context of the broader human environment – specifically, actions that occur outside the scope and geographic area covered by the Unit. Resources not discussed in detail include Areas of Critical Environmental Concern and Wild and Scenic Rivers, coal resources, locatable minerals, mineral materials, geothermal resources, Wilderness Study Areas, or lands with wilderness characteristics (see Chapter 3, Resources and Uses Not Addressed for more information). Wilderness areas are only discussed in the context of potential air quality and visibility impacts on wilderness in **Section 4.2.1**, Air Quality.

Because of the programmatic nature of the Bull Mountain Unit MDP EIS and cumulative assessment, the analysis tends to be broad and generalized to address potential effects that could occur from a reasonably foreseeable management scenario combined with other reasonably foreseeable activities or projects. Consequently, this assessment is primarily qualitative for most resources because of lack of detailed information that would result from site-specific decisions and other activities or projects. Quantitative information is used whenever available and as appropriate to portray the magnitude of an impact. The analysis assesses the magnitude of cumulative impacts by comparing the environment in its baseline condition with the expected impacts of the alternatives and other actions in the same geographic area. The magnitude of an impact is determined through a comparison of anticipated conditions against the naturally occurring baseline as depicted in the affected environment (see **Chapter 3**, Affected Environment) or the long-term sustainability of a resource or social system.

BLM_0027052

**Table 4-1**
**Summary of Cumulative Actions within the Unit by Alternative**

| Phase | Action | Alternative A, No Action | Alternative B Proposed Action | Alternative C Modified Action | Alternative D BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Construction | Well pads | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>36 new pads on federal mineral estate | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>36 new pads on federal mineral estate | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>35 new pads on federal mineral estate | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>33 new pads on federal mineral estate |
| | Access roads | 23 miles existing suitable roads<br>79 miles upgrades to existing roads<br>21 miles new road construction | 23 miles existing suitable roads<br>79 miles upgrades to existing roads<br>21 miles new road construction | 23 miles existing suitable roads<br>39 miles upgrades to existing roads<br>16 miles new road construction | 23 miles existing suitable roads<br>40 miles upgrades to existing roads<br>20 miles new road construction |
| | | Construction Rate: 600-800 yards per day | | | |
| | Pipelines | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>18 miles new collocated with roads<br>17 miles new cross-country | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>18 miles new collocated with roads<br>17 miles new cross-country | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>24 miles new collocated with roads<br>8 miles new cross-country | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>19 miles new collocated with roads<br>18 miles new cross-country |
| | Electrical lines | 5 new overhead electrical lines (20 power poles) + 1 existing overhead electrical line | | 5 new buried electrical lines + 1 existing overhead electrical line | 1 new overhead electrical line (5 power poles) + 1 existing overhead electrical line |

BLM_0027053

**Table 4-1**
**Summary of Cumulative Actions within the Unit by Alternative**

| Phase | Action | Alternative A, No Action | Alternative B Proposed Action | Alternative C Modified Action | Alternative D BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Drilling | Gas wells | 18 existing gas wells<br>201 new gas wells (146 federal wells, 55 private wells) | | | |
| | | Time frame<br>Coal bed methane natural gas—60 days<br>Shale and sandstone—85 days | | | |
| | Water disposal wells | 1 existing water disposal well<br>5 new water disposal wells | | | |
| | | Time frame: 60 to 120 days | | | |
| | Drilling rate | 3 Tier-2 or cleaner rigs drilling 27 wells per year | | | |
| | Drilling duration | 10 years | 6 years | | |
| Completion | Gas wells | Well completion duration: 8 to 10 days<br>Flow testing duration: 25 to 50 days | | | |
| | Water disposal wells | Well completion duration: 8 to 10 days | | | |
| Production and maintenance | Compressor station | 4 compressor stations | | | |
| | Produced water management | Production: 500 to 3,000 barrels per day | | | |
| | | Coal bed Methane Natural Gas-produced water is used in completions, recycled, and then injected into water disposal wells or trucked to disposal location | | | |

BLM_0027054

**Table 4-1**
**Summary of Cumulative Actions within the Unit by Alternative**

| Phase | Action | Alternative A, No Action | Alternative B Proposed Action | Alternative C Modified Action | Alternative D BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Water use and sources | Drilling | 618,000 barrels for all wells | | | |
| | Completion | Up to 27,446,200 barrels[1] or 2,662 acre-feet for all new wells (109 coal bed methane)(1,800 barrels) = 196,200 (109 shale)(250,000 barrels) = 27,250,000 | | | |
| | Dust abatement | 100 to 400 barrels per day | | | |
| | Source for all uses | 30% freshwater and 70% recycled or produced water | | | |
| | Total water usage for drilling and completion[2] (based on source percentages noted above) | 8,419,260 barrels, or 817 acre-feet freshwater 19,644,940 barrels, or 1,905 acre-feet recycled/produced water | | | |

[1]Calculated based on assuming 50 percent CBNG wells and 50 percent shale wells as discussed in the Bull Mountain EA. Water amounts for each type of well were taken from the general SUPO in Appendix D. Calculations used number of new wells per alternative divided in half for each type of well (coal bed methane/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage.

[2]Amounts were calculated based on adding together the Drilling barrels and Completion barrels. The total was multiplied by 30 percent to determine the freshwater amount and 70 percent to determine the amount of recycled/produced water that would be used.

BLM_0027055

**Table 4-2**
**Summary Cumulative Surface Disturbance Acres within the Unit by Alternative[3]**

| Project Feature | Alternative A | | Alternative B | | Alternative C | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
| **Well Pads** | | | | | | | | |
| Existing Well Pads | N/A | 36 acres | N/A | 36 acres | N/A | 36 acres | N/A | 36 acres |
| New Well Pads | 230 acres | 92 acres | 230 acres | 92 acres | 225 acres | 90 acres | 215 acres | 86 acres |
| **Roads** | | | | | | | | |
| Existing suitable roads | N/A | 41 acres | N/A | 41 acres | N/A | 41 acres | N/A | 41 acres |
| Upgrades to existing | 275 acres | 146 acres | 275 acres | 146 acres | 139 acres | 74 acres | 143 acres | 76 acres |
| New road construction | 77 acres | 41 acres | 77 acres | 41 acres | 60 acres | 32 acres | 72 acres | 38 acres |
| **Pipelines** | | | | | | | | |
| Existing, collocated with roads | N/A | 11 acres | N/A | 11 acres | N/A | 11 acres | N/A | 11 acres |
| Existing cross-country | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| New, collocated with roads | 215 acres | 34 acres | 215 acres | 34 acres | 285 acres | 45 acres | 225 acres | 35 acres |
| New cross-country | 103 acres | 0 acres | 103 acres | 0 acres | 47 acres | 0 acres | 108 acres | 0 acres |

[3]Calculated by adding Alternative A short- and long-term disturbances with Alternative B short- and long-term disturbances (A+B = Alternative A cumulative, A+B= Alternative B cumulative) and Alternative C (A+C=Alternative C cumulative) and Alternative D (A+D=Alternative D cumulative). Total acres are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted.

*Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan*

BLM_0027056

**Table 4-2**
**Summary Cumulative Surface Disturbance Acres within the Unit by Alternative[3]**

| Project Feature | Alternative A | | Alternative B | | Alternative C | | Alternative D | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
| Facilities | | | | | | | | |
| Existing Flowback Pits | N/A | 5 acres | N/A | 5 acres | N/A | 5 acres | N/A | 5 acres |
| New Compressor Stations | 20 acres | 8 acres | 20 acres | 8 acres | 20 acres | 8 acres | 20 acres | 8 acres |
| New Storage Yard | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres |
| Total acres | 860 acres | 303 acres | 860 acres | 303 acres | 701 acres | 214 acres | 715 acres | 221 acres |

BLM_0027057

The following factors were considered in this cumulative impact assessment:

- Federal, state, and private actions

- Potential for synergistic effects or synergistic interaction among or between effects

- Potential for effects across political and administrative boundaries

- Other spatial and temporal characteristics of each affected resource

- Comparative scale of cumulative impacts across alternatives

Temporal and spatial boundaries used in the cumulative analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline date for the cumulative impacts analysis is 2013. The temporal scope of this analysis is a 50-year planning horizon.

General cumulative analysis spatial boundaries were developed to facilitate the analysis; the cumulative effects analysis area is the Bull Mountain Unit boundary plus a 10-mile radius. Spatial and temporal boundaries can vary and can be contained within the Unit boundaries. If a resource requires a different analysis area than these, the specifics are included under the appropriate resource section heading.

***Past, Present, and Reasonably Foreseeable Future Actions***
Past, present, and reasonably foreseeable future actions are considered in the analysis to identify whether and to what extent the environment has been degraded or enhanced, whether ongoing activities are causing impacts, and trends for activities in and impacts on the area. Projects and activities are evaluated on the basis of proximity, connection to the same environmental systems, potential for subsequent impacts or activity, similar impacts, the likelihood a project would occur, and whether the project is reasonably foreseeable.

The general cumulative impacts analysis area was defined as the Bull Mountain Unit plus a 10-mile buffer around the Unit; however, each resource topic defines the area based on the specific issues and resources being addressed. For example, the air resources cumulative impacts analysis provides for an airshed cumulative analysis area which extends well beyond the general cumulative analysis area. For those projects that fall within the general cumulative analysis area, projects and activities considered in the cumulative analysis were identified by cooperators and BLM employees with local knowledge of the area. Each was asked to provide information on the most influential past, present, or reasonably foreseeable future actions. Additional information was obtained through discussions with agency officials and review of publicly available materials and websites.

BLM_0027058

Effects of past actions and activities are manifested in the current condition of the resources, as described in the affected environment (see **Chapter 3**, Affected Environment). Reasonably foreseeable future actions are actions that have been committed to or known proposals that would take place within a 50-year planning period. **Table 4-1**; **Table 4-2**; **Figure 4-1**, Alternatives A and B Cumulative, **Figure 4-2**, Alternatives A and C Cumulative, **Figure 4-3**, Alternatives A and D Cumulative, and **Figure 4-4**, Cumulative Effects Study Area, present summaries of the existing and current actions within the Bull Mountain Unit as a starting point for cumulative effects analysis.

Reasonably foreseeable future action scenarios are projections made to predict future impacts – they are not actual planning decisions or resource commitments. Projections, which have been developed for analytical purposes only, are based on current conditions and trends and represent a best professional estimate. Unforeseen changes in factors such as economics, demand, and federal, state, and local laws and policies could result in different outcomes than those projected in this analysis.

The BLM has considered other potential future actions that have been eliminated from further analysis because of the small likelihood these actions would be pursued and implemented within the life of the plan or because so little is known about the potential action that formulating an analysis of impacts is premature. In addition, potential future actions protective of the environment (such as new potential threatened or endangered species listings or regulations related to fugitive dust emissions) have less likelihood of creating major environmental consequences alone, or in combination with this programmatic effort. Federal actions such as species listing may cause the BLM to reconsider decisions created from this action because the consultations and relative impacts might no longer be appropriate. These potential future actions may have greater capacity to affect resource uses within the Unit; however, until more information is developed, no reasonable estimation of impacts could be developed.

Data on the precise locations and overall extent of resources within the Unit are considerable, although the information varies according to resource type and locale. Furthermore, understanding of the impacts on and the interplay among these resources is evolving. As knowledge improves, management measures (adaptive or otherwise) would be considered to reduce potential cumulative impacts in accordance with law, regulations, and BLM RMPs.

Projects and activities identified as having the greatest likelihood to generate potential cumulative impacts when added to the Bull Mountain Unit MDP alternatives are displayed in **Table 4-3**, Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario.

BLM_0027059

4. Environmental Consequences



**Alternatives A and B Cumulative**

Figure 4-1

BLM_0027060

4. Environmental Consequences



Alternative A proposed well pad analysis area

Alternative C proposed well pad analysis area

Alternative C proposed well pad analysis area- must site pad outside of areas overlapping identified elk winter concentration areas

Alternative A proposed pipeline

Alternative C proposed pipeline

Alternative A proposed new road construction

Alternative C proposed new road construction

Alternatives A and C existing road requires upgrade for use

Alternatives A and C proposed screw compressor

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

**Alternatives A and C Cumulative**

Existing Infrastructure

Existing road currently suitable for use

Existing pipeline

Existing flowback pit

Existing well pad

Existing storage yard

Source: SG Interests GIS 2013 and BLM GIS 2014

Figure 4-2

BLM_0027061

4. Environmental Consequences



Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

**Alternatives A and D Cumulative**

Alternative A proposed well pad analysis area

Alternative D proposed well pad analysis area

Alternative A proposed pipeline

Alternative D proposed pipeline

Alternative A proposed new road construction

Alternative D proposed new road construction

Alternatives A and D existing road requires upgrade for use

Alternatives A and D proposed screw compressor

Existing Infrastructure

Existing road currently suitable for use

Existing pipeline

Existing flowback pit

Existing well pad

Existing storage yard

Figure 4-3

Source: SG Interests GIS 2013 and BLM GIS 2014

BLM_0027062

4. Environmental Consequences



**Cumulative Effects Study Area**

Source: BLM GIS 2014

Legend:
- Bull Mountain Unit
- Cumulative Effects Study Area
- Forest Service Wilderness
- Watershed: level 5 hydrologic unit code
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

Figure 4-4

BLM_0027063

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Energy and minerals development | Summary. Most oil and gas development on BLM-administered lands within the cumulative analysis area has been in the North Fork of the Gunnison River area. Numerous mining claims exist. Most coal mining occurs in the North Fork of the Gunnison area. Oil and gas development has been focused on the North Fork area and to the south of the valley. |
|---|---|
| | Coal. There are two active underground coal mines on federal mineral estate in the cumulative impacts analysis area. The following table contains recent production data for the three coal mines in the North Fork Valley. |

| Raw Coal Production in the North Fork Valley Year Averages (Tons) | | | | |
|---|---|---|---|---|
| Average Based on[1] | Bowie No. 2 Mine | Elk Creek Mine | West Elk Mine | Total |
| 5 year | 2,935,892 | 2,051,704 | 6,090,157 | 11,077,753 |
| 1 year | 3,000,000 | -- | 6,000,000 | 9,000,000 |

Source: BLM UFO Coal program

[1]5-year period ended December 31, 2014; 1-year period ends Dec. 31, 2015

Notes: Each of these mining operations control coal reserves with a mix of federal and fee coal; however, 90 percent or more of local production is federal. As mining progresses, only federal coal would be available in the reserve base.

Bowie No. 2 Mine was opened in 1997 as a room-and-pillar mine but was converted to a longwall system in late 1999. It is northeast of Paonia, Colorado, and is operated by Bowie Resources, LLC, with a loadout northeast of Paonia. There are 14,540 acres permitted in the combined Bowie No. 1 and No. 2 Mines, accessed by the Bowie No. 2 Mine.

The Elk Creek Mine is a longwall operation north of Somerset, Colorado, operated by Oxbow Mining, LLC, with a loadout immediately north of Somerset. There are 13,430 acres permitted.

The West Elk Mine is a longwall operation south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There are 17,160 acres permitted. The mine is approximately the seventh largest underground longwall coal mine in the United States.

Oxbow has completed exploration drilling to confirm the quality, quantity, and extent of the coal in this area. The Oak Mesa Project encompassed about 13,873 acres north of Hotchkiss in Delta County. The coal exploration license expired under its own terms in September 2014. There has been no interest expressed in leasing the coal reserves.

Oil and Gas Leasing. The BLM routinely offers land parcels for competitive oil and gas leasing to allow exploration and development of oil and gas resources for public sale. Continued leasing is necessary for oil and gas companies to seek new areas for oil and gas production, or to develop previously inaccessible/uneconomical reserves.

Twenty-five percent (224,950 acres) of the federal fluid mineral estate in the UFO (916,030) is already leased. This includes 160,510 acres (24 percent) of BLM surface and 64,440 acres (27 percent) of split-estate lands (private, state, and local surface with federal fluid mineral subsurface). Total fluid minerals acres leased annually by the BLM over the past 12 years are as follows:

BLM_0027064

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Year | Average Lease Acreages | Total Leased Acres* | Total Number of Leases |
|------|------|------|------|
| 2000 | 745 | 16,130 | 21 |
| 2001 | 545 | 40,070 | 71 |
| 2002 | 490 | 2,240 | 5 |
| 2003 | 460 | 14,070 | 32 |
| 2004 | 635 | 4,250 | 7 |
| 2005 | 900 | 54,710 | 52 |
| 2006 | 510 | 15,850 | 29 |
| 2007 | 500 | 31,560 | 48 |
| 2008 | 490 | 23,540 | 37 |
| 2009 | 80 | 390 | 5 |
| 2010 | N/A | 0 | 0 |
| 2011 | 40 | 40 | 1 |
| 2012** | 800 | 800 | 1 |

Source: BLM 2012a
*Includes all leased BLM surface acres, plus all federal fluid mineral subsurface under private, local, and State surface. Values are limited to active leases and do not include pending leases.
**As of August 2012.

The BLM developed a reasonably foreseeable development scenario (RFDS) for oil and gas by analyzing past activity, production, and other sources in support of the Uncompahgre RMP revision (BLM 2012b). An RFD scenario provides information about the type and level of oil and gas activity and associated disturbance that could occur after leasing in the Uncompahgre Field Office planning area. The RFDS is unconstrained by management-imposed conditions because it is based primarily on geology and historical exploration and development. It provides information necessary to analyze long-term or widespread effects that could result from possible exploration or development on oil and gas leases. The RFD is not a decision, and it neither establishes nor implies a cap on development. NFS lands, other federal agency lands, and state and private lands are included in the baseline projection for those lands assessed in the RFD. The time frame used in the Uncompahgre RMP/EIS's RFDS is from 2010 through 2030. For more details on cumulative development in the region, see Tables 7a, 7b, 8a, and 8b from the Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office.

According to the RFD the project area is identified as having high occurrence potential (BLM 2012b). Mineral production in the area is limited to existing natural gas wells operated by Gunnison Energy and SGII.

Gunnison Energy is the sole oil and gas operator in Delta County. Since 2005 the company has drilled approximately 10 wells and installed a gathering line for the Spaulding Peak Unit, which is north and east of Cedaredge, Colorado.

Gunnison Energy permitted 16 wells on 9 pads (Hotchkiss Federal BLM-DOI-UFO-2008-035 EA) in Gunnison County; to date, five pads have been constructed and nine wells have been drilled.

There is a combined federal and private mineral development of 28 abandoned natural gas wells, 54 producible wells, and 10 approved wells that have not been constructed.

Vessels Coal Mine Methane Capture Project Methane Drainage System, situated above Oxbow Mining LLC's Elk Creek Mine near Somerset, Colorado: Capture of low-level coal mine methane emissions produced at the mine as a result of coal extraction and combusted on-site for either electrical generation, with excess flared rather than venting directly to atmosphere.

BLM_0027065

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

|  |  |
|---|---|
|  | Petrox 2-APDs in Somerset Unit: Two APDs from Petrox Resources are proposed for development in the Federal Somerset Unit, a 6,400-acre project area that largely overlies the Pilot Knob Roadless Area north of Somerset. Petrox has submitted an MDP to the Forest Service; however, the proposal does not contain complete or current data and relies on the development of the two submitted APDs for revision. While operations may be considered reasonably foreseeable, specific details of the MDP are unavailable for analysis. |
|  | Spadafora Waste Disposal Pits: The Gunnison County Planning Commission approved the Spadafora Water Storage Facility on March 6, 2015. Three water storage pits, each with a pump station and a volume of about 9,240,000 gallons, would sit on roughly 19 acres and would store and recycle produced water for drilling and gas well operations. This facility is in the project area and next to the Spadafora well pad for APDs GE 11-90-20-21 H1 and H2. |
|  | Huntsman Unit Proposal: SGI has proposed drilling in the Huntsman Unit (COC 74403X), which includes three SGI leases (COC 63886, 63888, and 63889). SGI has proposed one APD there for well 10-89-31 #1 inside lease COC 63886. |
|  | Deadman Gulch APD: SGI has proposed an APD (12-89-30#1) inside the Gunnison Energy Deadman Gulch Unit and next to the Petrox Somerset Federal Unit in the Pilot Knob CRA on lease COC 64169. |
|  | The Gunnison Energy/SGI duel proposal for 25 federal natural gas wells and associated infrastructure on 5 multi-well pads, approximately 5 miles west of the Bull Mountain Unit. The development would be on an existing well pad (Aspen Leaf), four new multi-well pads would be constructed (11-90-9, Allen, Henderson, and Spadafora), along with associated gas gathering lines, subsurface water lines, temporary surface poly pipelines, and up to 25 total gas wells, which may be drilled within the next 5 years. |
|  | On private lands within Delta and Gunnison Counties, COGIS records as of November 2011 show a total of 43 natural gas wells; 19 wells are producing, 16 are shut-in and capable of producing; 2 are waiting on completion; and the remaining 6 were drilled, abandoned, and plugged. |
| Vegetation Management | Forestry. Past, current, and foreseeable forestry uses in the cumulative analysis area include personal and commercial harvest of pinyon and juniper fuel wood, poles and posts for fence building, wildings (live trees and shrubs), and Christmas trees. |
|  | Vegetation treatments. Prescribed fire and mechanical treatments of vegetation (e.g., chaining, rollerchops, Dixie-harrow, drill seeding, hydro-axing, and brush mowing) were very common in the past on public and private rangelands in the cumulative analysis area. These treatments and maintenance of these vegetation treatments are still fairly common and would likely continue (except chaining). In addition, manual and mechanical treatments of large woody invasive species such as tamarisk have occurred in the riparian areas of rivers and streams; this type of restoration work would likely continue in the foreseeable future. |
|  | Hazardous fuels reduction. Fuels treatments, including prescribed fires, chemical and mechanical treatment, and seeding, would likely continue and potentially increase in the future. |
|  | Sage-grouse habitat. Implementation of conservation plans for sage-grouse within the cumulative impacts analysis area includes active management techniques to improve habitat quality for sage-grouse, maintain or increase suitable habitat within population areas, and maintain or increase sage-grouse numbers. Plans include the San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009), Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005), Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), and Colorado Sagebrush: A Conservation Assessment and Strategy (Boyle and Reeder 2005). |

BLM_0027066

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Livestock grazing | The UFO manages 240 grazing allotments with 165 grazing permittees. Historically, several areas throughout the Unit sustained high levels of both sheep and cattle grazing. Seasonal cattle grazing still occurs, to a lesser degree, from approximately June through September. The Forest Service conducted an Environmental Assessment in 2005 for the Muddy Creek basin (also known as Muddy country). On National Forest System lands surrounding the Unit, there are 11 allotments with multiple permittees managing approximately 12,480 ewe/lamb pairs, 1,048 cow/calf pairs, and 30 horses. These allotments are managed intensely with multi-pasture rotations of relatively short duration.

This resource is primarily affected by surface disturbance of forage habitat for the livestock. With the coal mines and increasing oil and gas development, there continues to be a loss of grass/forb vegetation communities, which have become a limiting factor for grazing. On the Forest, some shut-in wells had not been reclaimed, which continues to affect the amount of forage available to livestock. |
| Recreation and visitor use | Colorado's population has grown significantly in the past 10 years, and an increasing number of people are living near or seeking local BLM-administered lands for a diversity of recreational opportunities characterized by the mountain resort or outdoor lifestyle. The primary recreational activities in the UFO are motorized vehicle touring, all-terrain vehicle use, motorcycling, mountain biking, big and small game hunting, fishing, hiking, backpacking, horseback riding, sight-seeing, target shooting, dog-walking, and river boating. Recreation-based visitor use in the UFO has increased in most areas in recent years and is expected to continue to increase on BLM and non-BLM lands.

Unauthorized travel. Travel off designated or existing routes as well as the creation of social trails has occurred and would likely continue to occur within the cumulative analysis area. |
| Lands and realty | Designation of Energy Corridors on Federal Lands in the 11 Western States Programmatic EIS (DOE and BLM 2009). This multi-federal agency Programmatic EIS analyzes the environmental impacts of designating federal energy corridors on federal lands in 11 western states and incorporating those designations into relevant land use and resource management plans.

Natural gas pipelines. Bull Mountain Gathering line, Ragged Mountain Gathering, Sheep Gas Gathering System, Henderson Lateral pipeline, Aspen Leaf trunk pipeline, Hotchkiss Ranches Gas Gathering System, Vessels Oxbow facility connection line from Bore hole 1, local utility service pipelines.

Sheep-Bull connector natural gas pipeline. A pipeline in which GE will convey produced gas from the Sheep Gas Gathering System to the SGI Bull Mountain Gathering line. It will connect on private land at the existing Sheep Gas pipeline yard in T11S, R90W, Section 8, NENE, traverse NFS lands to the NE cross country but parallel to NFSR 851 and tie into Bull Mountain pipeline on NFS lands in T11S, R90W, Section 3, SW/SW.

Colorado Department of Transportation: 2011 activities on State Highway 133 include snow maintenance and emergency response actions. CDOT is working on highway improvement projects on Highway 92 from Hotchkiss to Delta and Highway 50 in the Blue Mesa Lake area; both of these projects are likely to continue for the next several years

Delta County Master Plan (Delta County 1996). Countywide land use and growth plan for Delta County.

Several gravel pits have also been approved in the past 5 years; however, most are within just a few miles of the city of Delta itself.

Residential developments in the area around the communities of Paonia, Hotchkiss, Crawford, and Delta have been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State Highway 133. |

BLM_0027067

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| | Gunnison County: Lands in the Bull Mountain Unit area are designated almost exclusively agricultural and that the current land use is primarily ranching with interspersed residences. The area is nearly surrounded by National Forest System lands. There is a small mixed use area south and southeast of County Road 849; however, there are no commercial or industrial uses occurring in this area. The East Bull Mountain subdivision is in the general area; it consists of 6 35-acre lots of which only one has been developed. |
| Roadway development | Road construction has occurred in association with timber harvesting, historic vegetation treatments, energy development, and mining on BLM-administered lands, private lands, State of Colorado lands, and National Forest System lands. The bulk of new road building is occurring for community expansion and energy development. Road construction is expected to continue at the current rate on BLM and National Forest System lands; the future rate is unknown on private and State of Colorado lands. |
| Water diversions | The UFO has been and will continue to be affected by irrigation and drinking water diversions. Reservoir operations have affected water supply, aquatic conditions, and timing. Irrigation rights are expected to continue being bought and sold in the future, with some new property owners informally changing how the right was historically used. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses. Future oil shale development in the region could also result in water diversions. |
| Water | The Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system. |
| | The Town of Paonia plans to replace its current 2-million-gallon water treatment plant, add an additional 2 million gallons of treated water storage, and incorporate hydropower components on the water lines in an effort to reduce plant costs with sustainable energy. Estimated completion 2015. |
| Spread of noxious/invasive weeds | Noxious weeds, including tamarisk, have invaded and will continue to invade many locations in the cumulative analysis area. Noxious weeds are carried by wind, humans, machinery, and animals. The BLM UFO currently manages weed infestations through integrated weed management, including biological, chemical, mechanical, manual, and educational methods. The 1991 and 2007 Records of Decision for Vegetation Treatment on BLM Lands in Thirteen Western States (BLM 2007a), and the 2007 Programmatic Environmental Report (BLM 2007g), guide the management of noxious weeds in western states. The BLM UFO finalized a noxious weed management strategy in 2013 (BLM 2013) that guides the treatment of weeds in the field office. Noxious and invasive weeds are expected to continue to spread on all lands. Due to their ability to tolerate certain conditions, some species are expected to remain a serious long-term challenge in the cumulative analysis area. |
| | Delta County Noxious Weed Management Plan (Delta County 2010). |
| Wildland fires | Fires within the cumulative analysis area are both naturally occurring and used as a management tool. Naturally occurring fires have been widely distributed in terms of frequency and severity. Increasing recurrence and severity of drought conditions have been predicted for this area as a result of climate change. This could, in turn, increase the occurrence and severity of wildfires on BLM-administered land. |
| Spread of forest insects and diseases | Several years of drought in western states have resulted in severe stress on pine trees. This stress has made the trees less able to fend off attacks by insects such as mountain pine beetles. Mountain pine beetle infestation has been occurring in Colorado since 1996, and some pinyon pine stands in the cumulative analysis area have experienced ips beetle kill. Sudden Aspen Decline is also impacting parts of the cumulative analysis area. |

BLM_0027068

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the**
**Cumulative Impact Scenario**

| | |
|---|---|
| Drought | For much of the last decade, most of the western US has experienced drought. Inflows to Lake Powell (indicative of the Upper Colorado Basin) have been below average since 2000, and Colorado regularly goes through periods of drought that may be statewide, region-wide, or within a more localized area. Agriculture, drinking water supplies, and wildland fires are all impacted by drought. |
| Climate change | Increased concern over greenhouse gas emissions and global warming issues may lead to future federal and state regulations limiting the emission of associated pollutants. |
| Air Quality | The area near Telluride is in the Telluride $PM_{10}$ maintenance area. The area is currently in compliance with all applicable National Ambient Air Quality Standards. For as long as the area remains in maintenance, the BLM will analyze any authorized activities in accordance with the provisions of the General Conformity Rule and document any findings in the applicable authorizing NEPA document. |
| Other | Forest Service Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado; Final Rule (77 *Federal Register* 39576-39612, 3 July 2012). The Colorado Roadless Rule provides management direction for conserving and managing approximately 4.2 million acres of Colorado Roadless Areas on National Forest System lands. |

## 4.1.4   Incomplete or Unavailable Information

The CEQ established implementing regulations for NEPA requiring that a federal agency identify relevant information that may be incomplete or unavailable for an evaluation of reasonably foreseeable significant adverse effects in an EIS (40 CFR 1502.22). If the information is essential to a reasoned choice among alternatives, it must be included or addressed in an EIS. Knowledge and information is, and will always be, incomplete, particularly with complex ecosystems considered at various scales.

The best available information pertinent to the decisions to be made has been used in developing this EIS. Considerable effort has been taken to acquire and convert resource data from both the BLM and outside sources into digital format for use in the EIS.

Certain information was unavailable for use in developing this plan because inventories have either not been conducted or are not complete. Some of the major types of data that are incomplete or unavailable include the following:

- Class III cultural resources inventory for the entire Unit

- Field surveys for paleontological resources

- General fish and wildlife surveys focused on migratory bird and raptor surveys for the entire Unit

For these resources, estimates were made concerning the number, type, and significance of these resources based on previous surveys and existing knowledge. In addition, some impacts cannot be quantified given the proposed management actions. Where this gap occurs, impacts are projected in qualitative terms or, in some instances, are described as unknown. Subsequent project-level analysis will provide the opportunity to collect and examine site-specific inventory data required to determine appropriate application of the land use plan-level guidance. In

BLM_0027069

addition, ongoing inventory efforts by the BLM and other agencies in the Unit are updating and refining information for the project area.

## 4.2   RESOURCES

### 4.2.1   Air Quality

*Methods of Analysis*

Air quality modeling analyses were performed to assess the potential impacts on ambient air quality and air quality related values (AQRVs) from potential air emissions resulting from Bull Mountain Unit MDP alternatives. Emissions inventories were developed for Alternative A and Alternative B, and both near-field and far-field air quality analyses were performed to assess the potential impacts from these alternatives. Potential ambient air quality impacts were quantified and compared to applicable state and federal ambient air quality standards (AAQS), Prevention of Significant Deterioration (PSD) increments, and hazardous air pollutant (HAP) thresholds. Potential AQRV impacts (impacts on visibility, atmospheric deposition, and potential increases in acidification to acid-sensitive lakes) were determined and compared with applicable thresholds. The information for this section is pulled directly from the air quality analysis provided in the Bull Mountain Project Air Quality Technical Support Document (AQTSD; Carter Lake 2014).The project-specific air quality impact analyses as described in the AQTSD shows that there are several key air quality related impacts of concern due to predicted air quality impact levels being close to acceptable impact thresholds (AAQS, DAT, etc.). A primary objective of this section is to summarize the overall air quality analysis as described in the AQTSD and provide discussions for the following impacts of concern: near-field particulate matter (p.m.) impacts from construction and traffic activities, near-field NO2 1-hour and HAPs impacts, far-field nitrogen deposition at nearby Forest Service sensitive areas and regional ozone.

*Emission Inventory Development*

Air pollutant emissions would occur as part of field construction and well production activities. Sources of emissions during construction include vehicle traffic, well pad and road construction, pipeline construction, and well drilling and completion. The primary pollutants emitted during construction would be $PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, volatile organic compounds (VOCs), and HAPs including benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde. These activities would temporarily elevate pollutant levels, but impacts would be localized and would occur only for the short-term duration of the activities. Fugitive dust emissions ($PM_{10}$ and $PM_{2.5}$) would result from work crews commuting to and from the work site and from the transportation and operation of equipment during construction. Wind-blown fugitive dust emissions would also occur from open and disturbed land during construction.

Emissions were quantified using accepted methodologies, including manufacturer's emission factors, EPA emission factors and standards (emissions standards described in Chapter 3), and engineering estimates. Drill rig and completion engines emissions estimated assuming Non-Road Engine Tier-2 Standards emissions compliant.

During field production air pollutant emissions would occur from compressor station operation, well site pumping unit engines, water transfer pump engines, well site heaters, valve/flanges

BLM_0027070

(fugitives), vehicle traffic on roads during routine field operations and maintenance, and work-over activities. The primary pollutants emitted would be $PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, VOCs, and HAPs (benzene, toluene, ethyl benzene, xylene, n-hexane and formaldehyde). These emissions would impact air quality in the project area over the life of the project. Production equipment is subject to current and future CDPHE Best Available Control Technology (BACT) and Reasonably Achievable Control Technology (RACT) guidance and applicable portions of 40 CFR Part 63 Subpart OOOO, Standards of Performance for Crude Oil and Natural Gas Production.

Greenhouse Gases

As part of the development of the project emission inventories, inventories of $CO_2$, $CH_4$, and $N_2O$ emissions from field development and production activities were prepared. Modeling GHG impacts is not within the scope of either the near-field or far-field impact analyses, but the GHG inventories are presented herein for informational purposes and compared to other GHG emission inventories in order to provide context for the project GHG emissions.

In the emission inventory, emissions of the greenhouse gases $CO_2$, $CH_4$, and $N_2O$ from new and existing sources are quantified in terms of $CO_2$ equivalents ($CO_2e$). Measuring emissions in terms of $CO_2e$ allows for the comparison of emissions from different greenhouse gases based on their Global Warming Potential (GWP). GWP is defined as the cumulative radiative forcing of a gas over a specified time horizon relative to a reference gas resulting from the emission of a unit mass of gas. The reference gas is taken to be $CO_2$. The $CO_2e$ emissions for a greenhouse gas are derived by multiplying the emissions of the gas by the associated GWP. The GWPs for the inventoried greenhouse gases are $CO_2$:1, $CH_4$:21, $N_2O$:310 (EPA 2011).

Near-Field Modeling

A near-field ambient air quality impact assessment was performed to evaluate potential maximum pollutant impacts within and near the project area resulting from project alternative construction and operation activities. EPA's Guideline (EPA 2005) model, AERMOD (version 13350), was used to assess these near-field impacts. The near-field modeling analyses performed provide an estimate of the potential impacts resulting from Alternative A and Alternative B source emissions.

Due to the absence of any available representative monitored meteorology data for the Unit, the 2008 Weather Research and Forecasting (WRF) meteorological model output produced as part of the Western Regional Air Partnership's (WRAP) West-wide Jump Start Air Quality Modeling Study (WestJumpAQMS; ENVIRON et al. 2012) was used to develop meteorological datasets for the AERMOD modeling. To generate appropriate meteorology for input into AERMOD, the Mesoscale Model Interface Program (MMIF) Version 3.0 (ENVIRON 2013) was used in conjunction with 2008 WRF model output. There are 2 WRF model (4-kilometer/2.5-mile) grid cells within the project area, a north site and a south site. MMIF was used to extract the WRF meteorology data for these two sites and both these meteorological data sets were used to assess impacts from emissions for each alternative. Impacts reported herein represent the maximum modeled impacts from either of the two meteorological data sets.

The near-field criteria pollutant impact assessment was performed to estimate maximum potential impacts of CO, $NO_2$, $SO_2$, and $PM_{10}$ and $PM_{2.5}$ from field development and field production emissions sources. Near-field HAP emissions were evaluated for purposes of

BLM_0027071

assessing impacts in the immediate vicinity of the project area for both short-term exposure assessment and for calculation of long-term human health risk. Potential impacts on regional ozone formation from this project are discussed below in the cumulative impacts summary section.

For well pad and access road construction during field development, near-field modeling assessed $PM_{10}$ and $PM_{2.5}$ impacts. The entire Unit layout for the proposed development shows that the minimum distance separating new wells pads is approximately 600 meters and therefore, fugitive dust and vehicle tailpipe particulate emissions from one representative well pad and road segment under construction were analyzed. Wind erosion emissions were included in the modeling. Road and pad vehicle activities were idealized as volume sources and wind erosion emissions were idealized as area sources. Model receptors were placed at 25-meter increments along a boundary 100 meters from the well pad and accessed road, and then defined on 100-meter intervals extending outward approximately 1.5 kilometers. Flat terrain receptors were used. The source and receptor layout for this modeling scenario is shown in **Figure 4-5**, Near-Field Analysis, Well Pad and Access Road Construction Modeling Scenario.

For well production and drilling, modeling scenarios were developed for a concentrated area of development proposed in the Unit, shown in **Figure 4-6**, Near-Field Analysis, Well Production Modeling Scenario, and **Figure 4-7**, Near-Field Analysis, Well Development Modeling Scenario. The modeling scenario for well production included 10 new well pads, 4 existing well pads, and 3 proposed compressor stations. New well pads included three pumping units, and associated activities (well site heaters, traffic, and fugitive emissions) for 4 wells in production. Existing well pads included two pumping units and related activities for two wells in production. A 100-meter pad size (approximately 2 acres) was used for well production and compressor station pads. The modeling scenario developed for analyzing drilling included seven new well pads and four existing well pads under production, three compressor stations, and three Tier-2 drilling rigs operating (one year-round and two operating from April through November). Drill rig emissions were based on a maximum hourly load conditions. New well pads included three pumping units, and associated activities for four wells in production. Existing well pads included two pumping units and related activities for two wells in production. A 100-meter pad size was used for well and compressor station pads. For the 3 well pads with drilling, a 150-meter (approximately 5 acres) pad size was used.

Both analyses utilized receptor grids that extended outward approximately 1.5 kilometer from the edge of any well pad. Discrete modeling receptors were defined on a 25-meter interval along boundaries, and then defined on 100-meter intervals throughout the modeling domain. **Figure 4-8**, Well Production Receptor Grid, and **Figure 4-9**, Near-Field Analysis, Well Development Receptor Grid, illustrate the receptor grids used for analyzing well production and well construction, respectively. Where applicable, terrain elevations for each receptor were developed using the AERMAP (Version 11103) processor along with available digital elevation model data.

Point sources were used for modeling emissions from compressors, heaters, pumping units, and drilling rigs. Volume sources were used for modeling well-site fugitive emissions and road travel. Volume source parameters were also used for modeling one pumping unit at each well given that these units could have a horizontal stack release.

BLM_0027072



**Figure 4-5. Near-Field Analysis, Well Pad and Access Road Construction Modeling Scenario**

BLM_0027073



**Figure 4-6. Near-Field Analysis, Well Production Modeling Scenario**

BLM_0027074



**Figure 4-7. Near-Field Analysis, Well Development Modeling Scenario**

BLM_0027075



**Figure 4-8. Well Production Receptor Grid**

BLM_0027076



**Figure 4-9. Near-Field Analysis, Well Development Receptor Grid**

BLM_0027077

The AERMOD near-field modeling utilized default regulatory model switch settings, with the exception of the non-default Ozone Limiting Method (OLM) option, which was used for modeling $NO_2$ concentration estimates. Modeling analyses for $NO_2$ concentration estimates utilized seasonal diurnal ozone concentration profiles developed using the years 2011-2013 data collected at the Clean Air Status and Trends Network (CASTNET) Gothic ozone site located in Gunnison County, Colorado. A value of 20 percent was used for all source in-stack $NO_2$ concentration estimates. This value is a conservative estimate supported by data from EPA's $NO_2/NO_x$ In-Stack Ratio (ISR) Database (EPA 2013) and from data provided from oil and gas operators.

For 1-hour $NO_2$ NAAQS compliance demonstrations, where the 1-hour NAAQS is defined as the 3-year average of the 98th percentile of the yearly distribution of 1-hour daily maximum concentrations, all modeled impacts presented represent the 3-year average of the eighth-highest daily maximum 1-hour concentrations. For scenarios where drilling operations were modeled, drilling operations were assumed to occur for a maximum of 1 year during the 3-year averaging period. Since drill rigs move to different locations during field development, it is unlikely that drilling would occur for 3 consecutive years in the same location.

Hazardous Air Pollutants
Short-term and long-term near-field modeling analyses were conducted for HAPs. Short-term, 1-hour (acute) HAP concentrations were compared with acute reference exposure level (REL) thresholds. Long-term (annual) HAP concentrations were compared with non-carcinogenic reference concentrations for chronic inhalation thresholds (RfCs).

Modeling analyses estimated the potential cancer risk from emissions of suspected carcinogens benzene, ethyl benzene and formaldehyde. Impacts were evaluated based on estimates of the increased latent cancer risk over a 70-year lifetime. This analysis presents the potential incremental risk from formaldehyde and does not represent a total risk analysis. The cancer risks were calculated using the maximum predicted annual concentrations and EPA's chronic inhalation unit risk factors (URF) for carcinogenic constituents (EPA 2012b). Two estimates of cancer risk are presented: 1) a most likely exposure (MLE) scenario; and 2) a maximum exposed individual (MEI) scenario. The estimated cancer risks are adjusted to account for duration of exposure and time spent at home.

The adjustment for the MLE scenario is assumed to be 9 years, which corresponds to the mean duration that a family remains at a residence (EPA 1993). This duration corresponds to an adjustment factor of 9/70 = 0.13. The duration of exposure for the MEI scenario is assumed to be 50 years (i.e., the life of the project), corresponding to an adjustment factor of 50/70 = 0.71. A second adjustment is made for time spent at home versus time spent elsewhere. For the MLE scenario, the at-home time fraction is 0.64 (EPA 1993), and it is assumed that the individual would remain in an area where annual air toxics concentrations would be one-quarter as large as the maximum annual average concentration during the rest of the day. Therefore, the final MLE adjustment factor is (0.13) x [(0.64 x 1.0) + (0.36 x 0.25)] = 0.094. The MEI scenario assumes that the individual is at home 100 percent of the time, for a final MEI adjustment factor of (0.71 x 1.0) = 0.71.

BLM_0027078

For the air analysis short-term (1-hour) hazardous air pollutant concentrations are compared to acute reference exposure levels (EPA 2011) shown in **Table 4-4**, Acute Reference Exposure Levels (1-hour exposure). Reference exposure levels are defined as concentrations at or below which no adverse health effects are expected. No reference exposure levels are available for ethyl benzene and n-hexane; instead, the available Immediately Dangerous to Life or Health values divided by 10 are used. These values were determined by the National Institute for Occupational Safety and Health and were obtained from EPA's Air Toxics Database (EPA 2011). These values are approximately comparable to mild effects levels for 1-hour exposures.

**Table 4-4**
**Acute Reference Exposure Levels (1-hour exposure)**

| Hazardous Air Pollutant | REL ($\mu g/m^3$) |
|---|---|
| Benzene | 1,300 |
| Toluene | 37,000 |
| Ethyl Benzene | 350,000[1] |
| Xylene | 22,000 |
| n-Hexane | 390,000[1] |
| Formaldehyde | 55 |

Source: EPA 2011
[1] No reference exposure levels available for these hazardous air pollutants.

Long-term exposure to hazardous air pollutants are compared to reference concentrations for chronic inhalation. A reference concentration for chronic inhalation is defined by EPA as the daily inhalation concentration at which no long-term adverse health effects are expected. Reference concentrations for chronic inhalation exist for both non-carcinogenic and carcinogenic effects on human health (EPA 2012). Annual modeled hazardous air pollutant concentrations for all hazardous air pollutants emitted were compared directly to the non-carcinogenic reference concentrations for chronic inhalation shown in **Table 3-7**, Non-Carcinogenic Hazardous Air Pollutant Reference Concentrations for Chronic Inhalation (Annual Average). Long-term exposures to emissions of suspected carcinogens (benzene, ethyl benzene, and formaldehyde) are also evaluated based on estimates of the increased latent cancer risk over a 70-year lifetime.

Far-Field Modeling
The CALPUFF model was used to assess potential far-field impacts on ambient air pollutant concentrations and AQRVs (visibility and atmospheric deposition) from air pollutant emissions of $NO_x$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ from project alternative sources. Concentration and AQRV impacts were assessed at the following Class I and sensitive Class II areas within 200 kilometers of the project area (exceptions noted):

- Arches National Park, Utah (Class I)

- Black Canyon of the Gunnison National Park, Colorado (Class I)

- Colorado National Monument, Colorado, (Class II)

BLM_0027079

- Dinosaur National Monument, Colorado-Utah (Federal Class II, Colorado Class I ($SO_2$ only)

- Eagles Nest Wilderness Area, Colorado (Class I)

- Flat Tops Wilderness Area, Colorado (Class I)

- La Garita Wilderness Area, Colorado (Class I)

- Maroon Bells – Snowmass Wilderness Area, Colorado (Class I)

- Mount Zirkel Wilderness Area, Colorado (Class I)

- Ragged Wilderness Area, Colorado (Class II) (deposition analysis only)

- Rocky Mountain National Park, Colorado (Class I)

- Weminuche Wilderness Area , Colorado (Class I)

- West Elk Wilderness Area, Colorado (Class I)

Twenty-eight lakes within the Class I and sensitive Class II areas identified as being sensitive to atmospheric deposition were assessed for potential increases in lake acidification from atmospheric deposition impacts. These lakes are listed below in **Table 4-5**, Sensitive Lakes Analyzed in Far-Field Analysis.

The far-field analyses used the EPA-approved version of the CALPUFF modeling system (Version 5.8.4) along with a windfield developed for year 2008 using the MMIF (Version 3.0) program and the 2008 WRF meteorological model output that was produced as part of the WRAP WestJumpAQMS. The modeling domain and the Class I and sensitive Class II areas are shown in **Figure 4-10**, Far-field Analysis Modeling Scenario.

The far-field assessment assumed maximum field-wide emissions scenarios with well development and production activities occurring simultaneously throughout the project area. Three drilling rigs operating continuously (one year-round and two operating from April through November), and one completion rig operating year-round were included in the modeling analysis for each project alternative. Compression and well site production emissions (including heaters, pumping units, and traffic emissions) were included in the modeling analysis. Drilling rigs, completion rigs, and four compressor stations were idealized as point sources, and well site activities were idealized as volume sources. The source layout analyzed for the far-field analysis is shown in **Figure 4-11**, Far-field Analysis, Source Layout.

**Table 4-5**
**Sensitive Lakes Analyzed in Far-Field Analysis**

| Wilderness Area | Lake |
|---|---|
| Eagles Nest Wilderness Area | Booth Lake |
| Eagles Nest Wilderness Area | Upper Willow Lake |
| Flat Tops Wilderness Area | Ned Wilson Lake |
| Flat Tops Wilderness Area | Upper Ned Wilson Lake |
| Flat Tops Wilderness Area | Lower Packtrail Pothole |
| Flat Tops Wilderness Area | Upper Packtrail Pothole |
| La Garita Wilderness Area | Small Lake Above U-Shaped Lake |
| La Garita Wilderness Area | U-Shaped Lake |
| Maroon Bells Wilderness Area | Avalanche Lake |
| Maroon Bells Wilderness Area | Capitol Lake |
| Maroon Bells Wilderness Area | Moon Lake |
| Mount Zirkel Wilderness Area | Lake Elbert |
| Mount Zirkel Wilderness Area | Seven Lakes (LG East) |
| Mount Zirkel Wilderness Area | Summit Lake |
| Raggeds Wilderness Area | Deep Creek Lake |
| Weminuche Wilderness Area | Big Eldorado Lake |
| Weminuche Wilderness Area | Four Mile Pothole |
| Weminuche Wilderness Area | Lake Due South of Ute Lake |
| Weminuche Wilderness Area | Little Eldorado Lake |
| Weminuche Wilderness Area | Little Granite Lake |
| Weminuche Wilderness Area | Lower Sunlight Lake |
| Weminuche Wilderness Area | Middle Ute Lake |
| Weminuche Wilderness Area | Small Pond Above Trout Lake |
| Weminuche Wilderness Area | Upper Grizzly Lake |
| Weminuche Wilderness Area | Upper Sunlight Lake |
| Weminuche Wilderness Area | West Snowdon Lake |
| Weminuche Wilderness Area | White Dome Lake |
| West Elk Wilderness Area | South Golden Lake |

BLM_0027081



**Figure 4-10. Far-field Analysis Modeling Scenario**

BLM_0027082



**Figure 4-11. Far-field Analysis, Source Layout**

BLM_0027083

### Nature and Type of Effects

#### Air Quality and Air Quality Related Values

Air quality impacts from pollutant emissions are limited by regulations, standards and implementation plans established under the Federal Clean Air Act, as administered by the CDPHE-APCD under authorization of the EPA. The operator will conform to all applicable local, state, tribal or federal air quality laws, statutes, regulations, standards or implementation plans. As such, significant impacts on air quality from project-related activities would result if it is demonstrated that:

- NAAQS or CAAQS likely would be exceeded

- AQRVs likely would be impacted beyond acceptable levels

Short-term, 1-hour (acute) HAP concentrations are compared with the acute RELs. RELs are defined as concentrations at or below which no adverse health effects are expected. Long-term (annual) HAP concentrations are compared with non-carcinogenic RfCs. An RfC is defined by EPA as the daily inhalation concentration at which no long-term adverse health effects are expected. Analyses for cancer risk are based on a 1-in-1 million cancer risk factor. An acceptable exposure level (AEL) is generally a concentration level that represents lifetime cancer risk to an individual of between 1 in 10,000 and 1 in 1,000,000 (EPA 2014b).

#### Greenhouse Gas Emissions and Climate Change

The US Supreme Court ruled in 2007 that the EPA has the authority to regulate greenhouse gases (GHGs), such as $CH_4$ and $CO_2$, as air pollutants under the Clean Air Act; however, there are currently no ambient air quality standards for GHGs, nor are there any emissions limits on GHGs that would apply to sources developed under the Proposed Action and alternatives. There are, however, applicable reporting requirements under the EPA's Greenhouse Gas Reporting Program. These GHG emission reporting requirements, finalized in 2010 under 40 CFR, Part 98, require industrial sources that emit 25,000 metric tons or more of $CO_2e$ per year to report GHG emissions annually. At present, there are no rules related to GHG emissions or impacts that could affect development of project alternatives, besides these GHG reporting requirements.

The Council on Environmental Quality (CEQ) in 2014 released draft guidance for federal agencies on consideration of GHGs and the effects of climate change in NEPA documents. While the guidance provides federal agencies with significant discretion on how to consider the effects of GHG emissions and climate change in their evaluation of proposals for federal actions, it also provides an expectation of what should be considered and disclosed. Agencies are directed to consider two separate issues when addressing climate change: the effects of a Proposed Action on climate change as indicated by its GHG emissions and the implications of climate change for the environmental effect of a Proposed Action. Agencies should consider the climate change effects of a proposal by comparing the GHG emissions of the Proposed Action and the reasonable alternatives. The effects of climate change on the Proposed Action and alternatives should be considered during the analysis of the affected environment. Land managers should consult the CEQ guidance for information on direct, indirect, and cumulative impact analyses, among other topics.

BLM_0027084

Renewable and nonrenewable resource management actions have the potential to impact climate change due to GHG emissions and other human-caused effects. However, the assessment of GHG emissions and climate change is extremely complex because of the inherent interrelationships among its sources, causation, mechanisms of action, and impacts.

Emitted GHGs become well-mixed throughout the atmosphere and contribute to the global atmospheric burden of GHGs. Given the global and complex nature of climate change, it is not possible to attribute a particular climate impact in any given region to GHG emissions from a particular source. The uncertainty in applying results from global climate models to the regional or local scale (a process known as downscaling) limits the ability to quantify potential future impacts from GHGs emissions at this scale. When further information on the impacts of local emissions to climate change is known, such information would be incorporated into the BLM's planning and NEPA documents.

The environmental impacts of GHG emissions from oil and gas refining and from consumption, such as from vehicle operations, are not effects of BLM actions related to oil and gas development, as defined by the CEQ. This is because they do not occur at the same time and place as the action. Thus, GHG emissions from refining and consumption oil and gas do not constitute a direct effect that is analyzed under NEPA. Nor are refining and consumption an indirect effect of oil and gas production because production is not an indirect cause of GHG emissions resulting from refining and consumption. However, emissions from refining and consumption and other activities may be accounted for in the cumulative effects analysis (BLM 2014a).

### Effects Common to All Alternatives

#### Near-field Impacts
Near-field pollutant impacts resulting from well development and well production would be below the NAAQS and CAAQS. In addition, pollutant impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ impacts, which could exceed the annual increment value. The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions which could exceed the short-term REL threshold.

#### Far-Field Impacts

Pollutant Impacts
Far-field pollutant impacts from project sources would be below PSD increments at all Class I and sensitive Class II areas.

Visibility Impacts
Impacts on visibility from project sources would be below the 0.5 delta-deciview ($\Delta$dv) threshold at all Class I and sensitive Class II areas.

BLM_0027085

Deposition Impacts

Sulfur deposition impacts from project sources would be below the DAT at all Class I and sensitive Class II areas.

Potential nitrogen and sulfur deposition impacts from project sources would not contribute to ANC changes that exceed threshold values at any of the analyzed sensitive lakes.

### Alternative A

Alternative A includes the construction and operation of 55 natural gas wells, 12 well pads, 1 water disposal well, and associated roads and production facilities, including 1 compression station. The 55 new natural gas wells would be built on privately owned surface lands targeting private minerals.

### Alternative A Emissions

Maximum annual field-wide criteria pollutant ($PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, and VOC), HAP and GHG emissions were calculated for the first 10 years of the life of the project (LOP). The maximum field-wide emissions are expected to occur during project year 2, the last year with drilling occurring at a rate of 27 wells per year. The criteria pollutant and HAP emissions for well development and production activities in project year 2 are shown in **Table 4-6**, Alternative A Year 2 Emissions (TPY). Total HAP emissions for project year 2 are also provided in this table, including benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde emissions of 1.38, 2.06, 0.11, 0.92, 0.75, and 1.84 tons per year (TPY), respectively. Maximum total GHG emissions from construction and production activities are also expected to occur in project year 2 and are shown in **Table 4-7**, Alternative A Year 2 GHG Emissions (metric tons per year).

**Table 4-6**
**Alternative A Year 2 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Construction Emissions | | | | | | | |
| Well Pad and Road Construction | 1.67 | 0.17 | -- | -- | -- | -- | -- |
| Well Pad and Road Construction Traffic | 2.78 | 0.30 | 0.47 | 0.45 | 0.002 | 0.05 | -- |
| Well Pad and Road Construction Heavy Equipment | 0.13 | 0.13 | 2.37 | 2.20 | 0.11 | 0.17 | -- |
| Pipeline Construction | 0.94 | 0.09 | -- | -- | -- | -- | -- |
| Pipeline Construction Traffic | 0.85 | 0.09 | 0.09 | 0.15 | 0.0004 | 0.01 | -- |
| Pipeline Construction Heavy Equipment | 0.06 | 0.06 | 1.79 | 1.03 | 0.05 | 0.16 | -- |
| Drill Rig Engines | 1.16 | 1.16 | 34.71 | 20.06 | 0.11 | 2.31 | 0.03 |
| Drilling Traffic | 15.25 | 15.25 | 2.44 | 2.49 | 0.01 | 0.28 | -- |
| Drilling Heavy Equipment | 0.006 | 0.006 | 0.18 | 0.10 | 0.005 | 0.25 | -- |
| Fracturing Engines | 0.31 | 0.31 | 9.43 | 5.45 | 0.11 | 0.63 | 0.009 |
| Completion Rig Engines | 0.09 | 0.09 | 2.68 | 1.55 | 0.003 | 0.18 | 0.003 |
| Completion Traffic | 0.62 | 0.07 | 0.13 | 0.10 | 0.001 | 0.01 | 0.00 |
| Completion Flaring | 0.10 | 0.10 | 0.91 | 4.97 | 0.00 | 0.37 | 0.09 |

BLM_0027086

**Table 4-6**
**Alternative A Year 2 Emissions (TPY)**

| Activity | PM$_{10}$ | PM$_{2.5}$ | NO$_x$ | CO | SO$_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Production Emissions | | | | | | | |
| | | | | | | | |
| Workover Rig Engines | 0.06 | 0.06 | 1.72 | 0.99 | 0.002 | 0.11 | 0.002 |
| Production Traffic | 1.36 | 0.14 | 0.09 | 0.17 | 0.0004 | 0.02 | 0.00 |
| Separator Heaters | 0.11 | 0.11 | 1.45 | 0.72 | -- | 0.46 | 0.06 |
| Tank Heaters | 0.15 | 0.15 | 1.93 | 0.97 | -- | 0.61 | 0.09 |
| Production Fugitives | -- | -- | -- | -- | -- | 20.58 | 4.87 |
| Screw Compressors | 0.26 | 0.26 | 6.15 | 13.16 | -- | 2.52 | 1.44 |
| C.S. Separators | 0.004 | 0.004 | 0.05 | 0.03 | -- | 0.02 | 0.002 |
| Water Transfer Pumps | 0.51 | 0.51 | 18.00 | 3.71 | -- | 1.26 | 0.13 |
| Pumping Units | 1.16 | 1.16 | 41.24 | 8.50 | -- | 2.89 | 0.31 |
| | | | | | | | |
| Total Construction Emissions | 23.96 | 17.82 | 55.19 | 38.55 | 0.40 | 4.43 | 0.14 |
| | | | | | | | |
| Total Production Emissions | 3.61 | 2.39 | 70.64 | 28.26 | 0.002 | 28.47 | 6.91 |
| | | | | | | | |
| Total Emissions | 27.57 | 20.21 | 125.83 | 66.80 | 0.40 | 32.90 | 7.05 |

**Table 4-7**
**Alternative A Year 2 GHG Emissions (metric tons per year)**

| Pollutant | Construction | Production | Total |
|---|---|---|---|
| CO$_2$e | 7,107 | 13,071 | 20,178 |

*Near-Field Impacts*
Near-field pollutant impacts for Alternative A would be similar to those presented below for Alternative B. Impacts from Alternative A sources would be below the NAAQS and CAAQS. In addition, impacts would not exceed the PSD Class II increments, with the exception of annual NO$_2$ concentrations, which could exceed the annual increment value.

The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be similar to the impacts for the Alternative B. HAP impacts under Alternative A would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions which could exceed the short-term REL threshold.

For the suspected carcinogens (benzene, ethyl benzene, and formaldehyde), the cancer risk level for production activities for either the MLE or the MEI analysis would be similar to Alternative B levels.

*Far-Field Impacts*
The far-field assessment assumed a field-wide maximum emissions scenario with well drilling/completion and production activities occurring simultaneously throughout the project area. The field-wide scenario included 41 wells in production, 3 drilling rigs operating continuously (one year-round and two operating from April through November), and one completion rig operating year-round.

BLM_0027087

<u>Pollutant Impacts</u>

The direct modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas are provided in **Table 4-8**, Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$), for comparison to applicable PSD Class I and Class II increments. As shown in **Table 4-8**, these values are well below the PSD Class I and Class II increments.

**Table 4-8**
**Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Arches National Park | $NO_2$ | Annual | 5.91E-06 | 2.5 |
| | $SO_2$ | 3-hour | 4.54E-04 | 25 |
| | | 24-hour | 1.35E-04 | 5 |
| | | Annual | 1.54E-06 | 2 |
| | $PM_{10}$ | 24-hour | 7.08E-04 | 8 |
| | | Annual | 1.03E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.04E-04 | 2 |
| | | Annual | 8.27E-06 | 1 |
| Black Canyon of the Gunnison National Park | $NO_2$ | Annual | 3.58E-04 | 2.5 |
| | $SO_2$ | 3-hour | 3.24E-03 | 25 |
| | | 24-hour | 1.03E-03 | 5 |
| | | Annual | 3.17E-05 | 2 |
| | $PM_{10}$ | 24-hour | 8.35E-03 | 8 |
| | | Annual | 2.25E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.21E-03 | 2 |
| | | Annual | 1.91E-04 | 1 |
| Colorado National Monument | $NO_2$ | Annual | 4.60E-05 | 2.5 |
| | $SO_2$ | 3-hour | 5.67E-04 | 25 |
| | | 24-hour | 1.36E-04 | 5 |
| | | Annual | 6.73E-06 | 2 |
| | $PM_{10}$ | 24-hour | 1.35E-03 | 8 |
| | | Annual | 4.00E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.11E-03 | 2 |
| | | Annual | 3.26E-05 | 1 |
| Dinosaur National Monument | $NO_2$ | Annual | 6.42E-06 | 25 |
| | $SO_2$ | 3-hour | 2.72E-04 | 512 |
| | | 24-hour | 4.77E-05 | 91 |
| | | Annual | 1.33E-06 | 20 |
| | $PM_{10}$ | 24-hour | 5.12E-04 | 30 |
| | | Annual | 1.17E-05 | 17 |
| | $PM_{2.5}$ | 24-hour | 4.99E-04 | 9 |
| | | Annual | 9.42E-06 | 4 |

BLM_0027088

**Table 4-8**
**Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas**
**($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Eagles Nest Wilderness Area | $NO_2$ | Annual | 3.62E-04 | 2.5 |
| | $SO_2$ | 3-hour | 1.79E-03 | 25 |
| | | 24-hour | 3.42E-04 | 5 |
| | | Annual | 4.16E-05 | 2 |
| | $PM_{10}$ | 24-hour | 7.69E-03 | 8 |
| | | Annual | 3.70E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.20E-03 | 2 |
| | | Annual | 2.88E-04 | 1 |
| Flat Tops Wilderness Area | $NO_2$ | Annual | 2.04E-04 | 2.5 |
| | $SO_2$ | 3-hour | 1.67E-03 | 25 |
| | | 24-hour | 4.03E-04 | 5 |
| | | Annual | 2.15E-05 | 2 |
| | $PM_{10}$ | 24-hour | 8.16E-03 | 8 |
| | | Annual | 2.17E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.97E-03 | 2 |
| | | Annual | 1.80E-04 | 1 |
| La Garita Wilderness Area | $NO_2$ | Annual | 1.05E-04 | 2.5 |
| | $SO_2$ | 3-hour | 2.95E-03 | 25 |
| | | 24-hour | 5.29E-04 | 5 |
| | | Annual | 1.53E-05 | 2 |
| | $PM_{10}$ | 24-hour | 1.05E-02 | 8 |
| | | Annual | 1.47E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.11E-02 | 2 |
| | | Annual | 1.21E-04 | 1 |
| Maroon Bells/Snowmass Wilderness Area | $NO_2$ | Annual | 7.78E-03 | 2.5 |
| | $SO_2$ | 3-hour | 2.83E-02 | 25 |
| | | 24-hour | 6.91E-03 | 5 |
| | | Annual | 6.70E-04 | 2 |
| | $PM_{10}$ | 24-hour | 5.49E-02 | 8 |
| | | Annual | 2.96E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 3.86E-02 | 2 |
| | | Annual | 1.94E-03 | 1 |
| Mount Zirkel Wilderness Area | $NO_2$ | Annual | 4.87E-05 | 2.5 |
| | $SO_2$ | 3-hour | 5.41E-04 | 25 |
| | | 24-hour | 2.14E-04 | 5 |
| | | Annual | 7.42E-06 | 2 |
| | $PM_{10}$ | 24-hour | 2.96E-03 | 8 |
| | | Annual | 7.01E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.49E-03 | 2 |
| | | Annual | 5.79E-05 | 1 |

BLM_0027089

**Table 4-8**
**Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Rocky Mountain National Park | $NO_2$ | Annual | 1.37E-04 | 25 |
| | $SO_2$ | 3-hour | 1.09E-03 | 25 |
| | | 24-hour | 3.48E-04 | 5 |
| | | Annual | 1.97E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.96E-03 | 8 |
| | | Annual | 1.98E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.31E-03 | 2 |
| | | Annual | 1.60E-04 | 1 |
| Weminuche Wilderness Area | $NO_2$ | Annual | 6.02E-05 | 2.5 |
| | $SO_2$ | 3-hour | 1.20E-03 | 25 |
| | | 24-hour | 2.61E-04 | 5 |
| | | Annual | 9.78E-06 | 2 |
| | $PM_{10}$ | 24-hour | 6.84E-03 | 8 |
| | | Annual | 9.29E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 6.85E-03 | 2 |
| | | Annual | 7.94E-05 | 1 |
| West Elk Wilderness Area | $NO_2$ | Annual | 2.73E-03 | 2.5 |
| | $SO_2$ | 3-hour | 7.43E-03 | 25 |
| | | 24-hour | 2.82E-03 | 5 |
| | | Annual | 2.05E-04 | 2 |
| | $PM_{10}$ | 24-hour | 2.34E-02 | 8 |
| | | Annual | 1.21E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.08E-02 | 2 |
| | | Annual | 8.79E-04 | 1 |

Visibility Impacts
Visibility impacts were calculated following FLAG 2010 (FLAG, 2010), at Class I and sensitive Class II areas and the results are shown in **Table 4-9**, Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas. The visibility analysis indicated that there are zero days predicted above the 0.5 delta-deciview ($\Delta dv$) threshold at any of the Class I and sensitive Class II areas.

**Table 4-9**
**Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum Impact ($\Delta dv$) |
|---|---|
| Arches National Park | 0.003 |
| Black Canyon of the Gunnison National Park | 0.028 |
| Colorado National Monument | 0.004 |
| Dinosaur National Monument | 0.002 |
| Eagles Nest Wilderness Area | 0.033 |
| Flat Tops Wilderness Area | 0.037 |
| La Garita Wilderness Area | 0.045 |
| Maroon Bells/Snowmass Wilderness Area | 0.170 |

**Table 4-9**
**Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum Impact (Δdv) |
|---|---|
| Mount Zirkel Wilderness Area | 0.011 |
| Rocky Mountain National Park | 0.009 |
| Weminuche Wilderness Area | 0.031 |
| West Elk Wilderness Area | 0.086 |

Deposition Impacts

Potential direct atmospheric deposition impacts within Class I and sensitive Class II areas were calculated for Alternative A sources and are shown in **Table 4-10**, Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas. The maximum direct total (wet and dry) N and S deposition are predicted to be below the DAT of 0.005 kg/ha-yr at all Class I and sensitive Class II areas.

In addition, potential changes in ANC, resulting from potential N and S deposition from Alternative A source emissions, were calculated for 28 sensitive lakes within the Class I and sensitive Class II Wilderness areas. The baseline ANC values for calculating changes were based on approximately 15-20 years of lake chemistry data ending year 2010 for most lakes included in the analysis. The estimated change in ANC for each lake is shown in **Table 4-11**, Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas. For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC values greater than 25 μeq/l, and a 1.0 μeq/l change in ANC for lakes with background ANC values equal to or less than 25 μeq/l.

**Table 4-10**
**Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum N Deposition (kg/ha/yr) | Maximum S Deposition (kg/ha/yr) |
|---|---|---|
| Arches National Park | 0.00001 | 0.000001 |
| Black Canyon of the Gunnison National Park | 0.00030 | 0.00004 |
| Colorado National Monument | 0.00003 | 0.00001 |
| Dinosaur National Monument | 0.00001 | 0.00000 |
| Eagles Nest Wilderness Area | 0.00047 | 0.00006 |
| Flat Tops Wilderness Area | 0.00030 | 0.00004 |
| La Garita Wilderness Area | 0.00025 | 0.00004 |
| Maroon Bells/Snowmass Wilderness Area | 0.00427 | 0.00071 |
| Mount Zirkel Wilderness Area | 0.00011 | 0.00001 |
| Ragged Wilderness Area (Deep Creek Lake) | 0.00273 | 0.00042 |
| Rocky Mountain National Park | 0.00026 | 0.00003 |
| Weminuche Wilderness Area | 0.00015 | 0.00002 |
| West Elk Wilderness Area | 0.00134 | 0.00018 |

BLM_0027091

**Table 4-11**
**Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas**

| Wilderness Area | Sensitive Lake | 10th Percentile Lowest ANC Value (µeq/L) | N Deposition (kg/ha/yr) | S Deposition (kg/ha/yr) | ANC Relative Change (%) | ANC Absolute Change (µeq/L) |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 86.8 | 0.00040 | 0.00005 | 0.005 | n/a |
| Eagles Nest | Upper Willow Lake | 134.1 | 0.00042 | 0.00005 | 0.004 | n/a |
| Flat Tops | Ned Wilson Lake | 39.0 | 0.00019 | 0.00002 | 0.005 | n/a |
| Flat Tops | Upper Ned Wilson Lake | 12.9 | 0.00019 | 0.00002 | 0.015 | 0.002 |
| Flat Tops | Lower Packtrail Pothole | 29.7 | 0.00019 | 0.00002 | 0.007 | n/a |
| Flat Tops | Upper Packtrail Pothole | 48.7 | 0.00019 | 0.00002 | 0.004 | n/a |
| La Garita | Small Lake Above U-Shaped Lake | 59.9 | 0.00021 | 0.00003 | 0.005 | n/a |
| La Garita | U-Shaped Lake | 81.4 | 0.00021 | 0.00003 | 0.004 | n/a |
| Maroon Bells | Avalanche Lake | 158.8 | 0.00209 | 0.00031 | 0.010 | n/a |
| Maroon Bells | Capitol Lake | 154.4 | 0.00208 | 0.00031 | 0.011 | n/a |
| Maroon Bells | Moon Lake | 53.0 | 0.00207 | 0.00031 | 0.039 | n/a |
| Mount Zirkel | Lake Elbert | 56.6 | 0.00010 | 0.00001 | 0.001 | n/a |
| Mount Zirkel | Seven Lakes (LG East) | 36.2 | 0.00008 | 0.00001 | 0.002 | n/a |
| Mount Zirkel | Summit Lake | 48.0 | 0.00011 | 0.00001 | 0.002 | n/a |
| Raggeds | Deep Creek Lake | 20.6 | 0.00273 | 0.00042 | 0.156 | 0.032 |
| Weminuche | Big Eldorado Lake | 19.6 | 0.00008 | 0.00001 | 0.004 | 0.001 |
| Weminuche | Four Mile Pothole | 123.4 | 0.00009 | 0.00001 | 0.001 | n/a |
| Weminuche | Lake Due South of Ute Lake | 13.2 | 0.00008 | 0.00001 | 0.006 | 0.001 |
| Weminuche | Little Eldorado | -3.3 | 0.00008 | 0.00001 | 0.027 | 0.001 |
| Weminuche | Little Granite Lake | 80.7 | 0.00008 | 0.00001 | 0.002 | n/a |
| Weminuche | Lower Sunlight Lake | 80.9 | 0.00007 | 0.00001 | 0.001 | n/a |
| Weminuche | Middle Ute Lake | 42.8 | 0.00008 | 0.00001 | 0.002 | n/a |
| Weminuche | Small Pond Above Trout Lake | 25.5 | 0.00009 | 0.00001 | 0.005 | n/a |
| Weminuche | Upper Grizzly Lake | 29.9 | 0.00007 | 0.00001 | 0.002 | n/a |
| Weminuche | Upper Sunlight Lake | 28.0 | 0.00007 | 0.00001 | 0.003 | n/a |
| Weminuche | West Snowdon Lake | 39.4 | 0.00008 | 0.00001 | 0.002 | n/a |
| Weminuche | White Dome Lake | 2.1 | 0.00008 | 0.00001 | 0.042 | 0.09 |
| West Elk | South Golden Lake | 111.4 | 0.00091 | 0.00012 | 0.009 | n/a |

*Regional Climate Change and Greenhouse Gas Emissions*

The maximum GHG emissions resulting from Alternative A are estimated at 20,178 metric tons per year (0.02 terragrams [tg]/yr) of $CO_2$e). To place the project GHG emissions in context, those from the top five emitting coal-fired power plants in Colorado range from 2.6 to 9.0 tg/year (EPA 2014b). At this time, it is not possible to predict the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change. As such, the controversy is to what extent GHG emissions resulting from continued oil and gas development may contribute to global climate change, as well as the accompanying changes to natural systems cannot be quantified or predicted. The degree to which any observable changes can, or would, be attributable to Alternative A cannot be reasonably predicted at this time.

BLM_0027092

*Alternative B*
Alternative B includes the construction and operation of up to 146 natural gas wells, 36 well pads, 4 water disposal wells, and associated roads and production facilities, including 4 compression stations. These activities are specific to BLM-administered estate.

*Alternative B Emissions*
Maximum annual field-wide criteria pollutant ($PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, and VOC), HAP and GHG emissions were calculated for the first 10 years of the life of the project (LOP). The maximum field-wide emissions are expected to occur during project year 5, the last year with drilling occurring at a rate of 27 wells per year. The criteria pollutant and HAP emissions for well development and production activities in project year 5 are shown in **Table 4-12**, Alternative B Year 5 Emissions (TPY). Total VOC and HAP emissions for project year 5 are also provided in this table. Project year 6 is expected to have slightly higher VOC emissions (82.95 TPY) and HAP emissions (20.65 TPY); including benzene (3.65 TPY), toluene (5.50 TPY), ethyl benzene (0.30 TPY), xylene (2.44 TPY), n-hexane (1.98 TPY), and formaldehyde emissions (6.78 TPY). Maximum total GHG emissions from construction and production activities are also expected to occur in project year 5 and are shown in **Table 4-13**, Alternative B Year 5 GHG Emissions (metric tons per year).

**Table 4-12**
**Alternative B Year 5 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Construction Emissions | | | | | | | |
| Well Pad and Road Construction | 1.67 | 0.17 | -- | -- | -- | -- | -- |
| Well Pad and Road Construction Traffic | 2.78 | 0.30 | 0.47 | 0.45 | 0.002 | 0.05 | -- |
| Well Pad and Road Construction Heavy Equipment | 0.13 | 0.13 | 2.37 | 2.20 | 0.11 | 0.17 | -- |
| Pipeline Construction | 0.94 | 0.09 | -- | -- | -- | -- | -- |
| Pipeline Construction Traffic | 0.85 | 0.09 | 0.09 | 0.15 | 0.0004 | 0.01 | -- |
| Pipeline Construction Heavy Equipment | 0.06 | 0.06 | 1.79 | 1.03 | 0.05 | 0.16 | -- |
| Drill Rig Engines | 1.16 | 1.16 | 34.71 | 20.06 | 0.11 | 2.31 | 0.03 |
| Drilling Traffic | 15.25 | 15.25 | 2.44 | 2.49 | 0.01 | 0.28 | -- |
| Drilling Heavy Equipment | 0.006 | 0.006 | 0.18 | 0.10 | 0.01 | 0.25 | -- |
| Fracturing Engines | 0.31 | 0.31 | 9.43 | 5.45 | 0.11 | 0.63 | 0.01 |
| Completion Rig Engines | 0.09 | 0.09 | 2.68 | 1.55 | 0.003 | 0.18 | 0.003 |
| Completion Traffic | 0.62 | 0.07 | 0.13 | 0.10 | 0.001 | 0.01 | 0.00 |
| Completion Flaring | 0.10 | 0.10 | 0.91 | 4.97 | 0.00 | 0.37 | 0.09 |
| Production Emissions | | | | | | | |
| Workover Rig Engines | 0.14 | 0.14 | 4.33 | 2.50 | 0.005 | 0.29 | 0.004 |
| Production Traffic | 3.65 | 0.37 | 0.23 | 0.46 | 0.001 | 0.04 | 0.00 |
| Separator Heaters | 0.28 | 0.28 | 3.64 | 1.82 | -- | 1.15 | 0.16 |
| Tank Heaters | 0.37 | 0.37 | 4.86 | 2.43 | -- | 1.54 | 0.22 |
| Production Fugitives | -- | -- | -- | -- | -- | 51.73 | 12.25 |
| Screw Compressors | 0.98 | 0.98 | 24.60 | 52.65 | -- | 10.09 | 5.77 |
| C.S. Separators | 0.02 | 0.02 | 0.21 | 0.11 | -- | 0.07 | 0.01 |
| Water Transfer Pumps | 1.42 | 1.42 | 50.22 | 10.35 | -- | 3.52 | 0.38 |
| Pumping Units | 2.87 | 2.87 | 101.84 | 20.99 | -- | 7.14 | 0.76 |

BLM_0027093

**Table 4-12**
**Alternative B Year 5 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Total Construction Emissions | 23.96 | 17.82 | 55.19 | 38.55 | 0.40 | 4.43 | 0.14 |
| Total Production Emissions | 9.72 | 6.44 | 189.94 | 91.32 | 0.01 | 75.57 | 19.65 |
| Total Emissions | 33.68 | 24.26 | 245.13 | 129.87 | 0.40 | 79.99 | 19.69 |

**Table 4-13**
**Alternative B Year 5 GHG Emissions (metric tons per year)**

| Pollutant | Construction | Production | Total |
|---|---|---|---|
| $CO_2e$ | 7,107 | 37,282 | 44,389 |

*Near-Field Impacts*

Air pollutant dispersion modeling was performed to quantify maximum potential $PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, and HAP impacts from construction and production. AERMOD was used to model the maximum potential emissions of $PM_{10}$, $PM_{2.5}$, $NO_x$, CO and $SO_2$ that could occur from Alternative B well pad/road construction, drilling/completion and production sources. **Table 4-14**, Alternative B - Criteria Pollutant Modeling Results for Field Development Activities, presents the maximum modeled air pollutant concentrations that could occur from well development activities. **Table 4-15**, Alternative B - Criteria Pollutant Modeling Results for Field Production Activities, presents maximum concentrations that could occur from well production activities. When maximum modeled concentrations from the modeled scenarios are added to representative background concentrations, total ambient air concentrations are less than the applicable NAAQS and CAAQS. In addition, direct modeled concentrations are below the applicable PSD Class II increments, with the exception of the modeled annual $NO_2$ concentration which is above the annual increment value.

Note that the emissions from field development activities would be temporary and would not consume PSD increment and, as a result, are excluded from increment comparisons.

**Table 4-14**
**Alternative B - Criteria Pollutant Modeling Results for Field Development Activities**

| | Averaging Time | Maximum Concentration ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total Concentration ($\mu g/m^3$) | NAAQS/CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|
| CO | 1-Hour | 775.1 | 1150 | 1,925.1 | 40,000 |
| | 8-Hour | 480.9 | 1150 | 1,630.9 | 10,000 |
| $NO_2$ | 1-Hour | 159.4 | 21 | 180.4 | 188 |
| | Annual | 37.3 | 1.9 | 39.2 | 100 |
| $SO_2$ | 1-Hour | 4.0 | 3 | 7.0 | 196 |
| | 3-Hour | 3.0 | 3 | 6.0 | 1,300/700 |
| | 24-Hour | 0.8 | 3 | 3.8 | 365/-- |
| | Annual | 0.09 | 3 | 3.1 | 80/-- |
| $PM_{10}$ | 24-Hour | 84.7 | 36 | 120.7 | 150 |
| | Annual | 8.1 | 15 | 23.1 | 50 |

BLM_0027094

**Table 4-14**
**Alternative B - Criteria Pollutant Modeling Results for Field Development Activities**

|  | Averaging Time | Maximum Concentration ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total Concentration ($\mu g/m^3$) | NAAQS/CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|
| $PM_{2.5}$ | 24-Hour | 12.6 | 14 | 26.6 | 35 |
|  | Annual | 1.2 | 3 | 4.2 | 12 |

Notes:
Maximum modeled CO, $NO_2$ and $SO_2$ impacts occur during drilling operations, and maximum $PM_{10}$ and $PM_{2.5}$ impacts occur during well pad and access road construction.
Modeled highest second-high values shown for all short term averaging times
$NO_2$ 1-hour value calculated as the 3-year average of the 8th highest daily maximum 1-hour concentrations
$SO_2$ 1-hour value is the maximum 1-hour concentration
$PM_{2.5}$ 24-hour value is the eighth-highest value
24-hour and annual $SO_2$ NAAQS remain in effect until 1 year after the area is designated for the 2010 (1-hour) standard.
Designations for the 1-hr $SO_2$ NAAQS in CO have not occurred.

**Table 4-15**
**Alternative B - Criteria Pollutant Modeling Results for Field Production Activities**

|  | Averaging Time | Maximum Concentration ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total Concentration ($\mu g/m^3$) | NAAQS/CAAQS ($\mu g/m^3$) | PSD Class II Increment ($\mu g/m^3$) |
|---|---|---|---|---|---|---|
| CO | 1-Hour | 775.4 | 1150 | 1,925.4 | 40,000 | -- |
|  | 8-Hour | 481.1 | 1150 | 1,631.1 | 10,000 | -- |
| $NO_2$ | 1-Hour | 159.1 | 21 | 180.1 | 188 | -- |
|  | Annual | 38.6 | 1.9 | 40.5 | 100 | 25 |
| $SO_2$ | 1-Hour | 0.002 | 3 | 3.0 | 196 | -- |
|  | 3-Hour | 0.001 | 3 | 3.0 | 1,300/700 | 512 |
|  | 24-Hour | 0.001 | 3 | 3.0 | 365/-- | 91 |
|  | Annual | 0.0003 | 3 | 3.0 | 80/-- | 20 |
| $PM_{10}$ | 24-Hour | 0.007 | 36 | 36.0 | 150 | 30 |
|  | Annual | 0.002 | 15 | 15.0 | 50 | 17 |
| $PM_{2.5}$ | 24-Hour | 0.007 | 14 | 14.0 | 35 | 9 |
|  | Annual | 0.002 | 3 | 3.0 | 12 | 4 |

Notes:
Modeled highest second-high values shown for all short term averaging times
$NO_2$ 1-hour value calculated as the 3-year average of the 8th highest daily maximum 1-hour concentrations
$SO_2$ 1-hour value is the maximum 1-hour concentration
24-hour and annual $SO_2$ NAAQS remain in effect until 1 year after the area is designated for the 2010 (1-hour) standard.
Designations for the 1-hr $SO_2$ NAAQS in CO have not occurred.

As described in the footnote for **Table 4-14**, the maximum $PM_{10}$ and $PM_{2.5}$ impacts (primarily dust) occur during access road and well pad construction activities. For construction phase near-field modeling, impacts are below applicable AAQS at receptors starting 100 meters from the emissions sources (see Figure 4-3 for construction scenario near-field modeling layout). Emissions calculations for the construction phase p.m. near-field modeling analysis assume dust control applied routinely to disturbed unpaved surfaces. To ensure that dust impacts are acceptable at receptors near well pad and access road construction/development phase activities (< 100 meters of source), additional dust mitigation would be required (see Mitigation Section for more details).

BLM_0027095

As previously described in this section as well as the in-depth discussion in the AQTSD, $NO_2$ 1-hour 98th percentile daily maximum 3-year average impacts for the Field Development (**Table 4-14**) activities modeling scenario are calculated assuming 1 year of drilling and 2 years of production related activities at each well pad. Three years of production related activities at each well pad are assumed for calculating $NO_2$ 1-hour 98th percentile daily maximum 3-year average impacts for the production modeling scenario (**Table 4-15**). The near-field modeling scenarios were based on the best available information from the Project proponent at the time of conducting the analysis. $NO_x$ emissions rates totals for new well pad development are primarily made up of large engine (drilling/fracturing/completion) emissions. $NO_x$ emissions rates totals for the new well pad production level equipment configuration are primarily driven by the pumping units and were developed for modeling to support compliance with the applicable AAQS. The number of pumping units designated for new well pads for the modeling analysis to support compliance is reasonable for the average number of wells per pad. Well pad level $NO_x$ emissions rate limits (one for development and production phases) would be required for each new well pad to ensure that near-field $NO_2$ impacts are acceptable. (See Mitigation Section for more information).

Modeling was performed to estimate the maximum impacts that could occur from HAP emissions from field production sources as well as an analysis for long-term (annual) HAP concentrations was performed for benzene, toluene, ethyl benzene, n-hexane, and formaldehyde emission resulting from field production activities. Potential maximum acute (short-term; 1-hour) HAP concentrations compared with the acute RELs and potential annual HAP concentrations compared with non-carcinogenic RfCs are shown in **Table 4-16**, Alternative B - HAP Modeling Results for Field Production Sources. RELs are defined as concentrations at or below which no adverse health effects are expected. As shown in **Table 4-16**, all HAP impacts are below the applicable short-term RELs and the long-term non-carcinogenic RfCs, with the exception of the maximum modeled formaldehyde concentration from compression emissions which at 81.6 $\mu g/m^3$ is above the short-term REL threshold of 55 $\mu g/m^3$.

**Table 4-16**
**Alternative B - HAP Modeling Results for Field Production Sources**

| | Maximum 1-hour Concentration ($\mu g/m^3$) | REL ($\mu g/m^3$) | Annual Concentration ($\mu g/m^3$) | RFC($\mu g/m^3$) |
|---|---|---|---|---|
| Formaldehyde | 81.6 | 55 | 3.89 | 9.8 |
| n-Hexane | 8.0 | 390000[1] | 1.33 | 700 |
| Benzene | 14.8 | 1,300 | 2.47 | 30 |
| Toluene | 23.6 | 37,000 | 3.92 | 5,000 |
| Ethyl Benzene | 1.3 | 350000[1] | 0.21 | 1,000 |
| Xylene | 10.4 | 22,000 | 1.74 | 100 |

[1] No REL available for these air toxics. Values shown are from Immediately Dangerous to Life or Health (IDLH/10), EPA Air Toxics Database, Table 2 (EPA 2011).

Modeling estimated the potential cancer risk resulting from suspected carcinogens (benzene ethyl benzene and formaldehyde) emissions. Impacts were evaluated based on estimates of the increased latent cancer risk over a 70-year lifetime. This analysis presents the potential incremental risk from formaldehyde and does not represent a total risk analysis. The cancer risks were calculated using the maximum predicted annual concentrations and EPA's chronic inhalation unit risk factors (URF) for carcinogenic constituents. Two estimates of cancer risk are

BLM_0027096

presented: 1) a most likely exposure (MLE) scenario; and 2) a maximum exposed individual (MEI) scenario. The estimated cancer risks are adjusted to account for duration of exposure and time spent at home.

The modeled long-term risk from project emissions is shown in **Table 4-17**, Alternative B - Unit Risk Analyses. Under both the MLE and MEI scenarios, the estimated cancer risk associated with long-term exposure to benzene and formaldehyde is greater than a 1 in 1 million, but within AEL concentration levels (EPA 2014b). While reviewing these results, it is important to recognize that these maximum impacts occur along the edge of the well pad (50 meters) for benzene and within 150 meters of a compressor station for formaldehyde. Maximum emissions are assumed to occur continuously for a 50-year life of project, and that the MEI risk level assumes a person would have to live within close proximity to a well pad and/or a compressor station for 50 years.

**Table 4-17**
**Alternative B - Unit Risk Analyses**

| | Analysis | HAP | Modeled Concentration ($\mu g/m3$) | Unit Risk Factor $1/(\mu g/m3)$ | Exposure Adjustment Factor | Cancer Risk |
|---|---|---|---|---|---|---|
| Field Production | MLE | Benzene | 2.47 | 7.8E-06 | 0.0949 | 1.8E-06 |
| | | Ethylbenzene | 0.21 | 2.5E-06 | 0.0949 | 5.0E-08 |
| | | Formaldehyde | 3.89 | 1.3E-05 | 0.0949 | 4.8E-06 |
| Total Combined | | | | | | 6.7E-06 |
| Field Production | MEI | Benzene | 2.47 | 7.8E-06 | 0.71 | 1.4E-05 |
| | | Ethylbenzene | 0.21 | 2.5E-06 | 0.71 | 3.7E-07 |
| | | Formaldehyde | 3.89 | 1.3E-05 | 0.71 | 3.6E-05 |
| Total Combined | | | | | | 5.0E-05 |

Refined air quality analyses for compressor stations would be required for CDPHE permitting at a later stage when detailed information for the compressor station layout and equipment (i.e. emissions sources) configuration will be known. It is anticipated that the CDPHE would analyze and address potential formaldehyde impacts at the compressor station permitting stage.

*Far-Field Impacts*
The far-field assessment assumed a field-wide maximum emissions scenario with well drilling/completion and production activities occurring simultaneously throughout the project area. The field-wide scenario included 135 wells in production, 3 drilling rigs operating continuously (one year-round and two operating from April-November), and one completion rig operating year-round.

Pollutant Impacts
The direct modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas are provided in **Table 4-18**, Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$), for comparison to applicable PSD Class I and Class II increments. These values are well below the PSD Class I and Class II increments.

BLM_0027097

**Table 4-18**
**Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas**
**($\mu$g/m$^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Arches National Park | NO$_2$ | Annual | 1.3E-05 | 2.5 |
| | SO$_2$ | 3-hour | 5.2E-04 | 25 |
| | | 24-hour | 1.6E-04 | 5 |
| | | Annual | 1.9E-06 | 2 |
| | PM$_{10}$ | 24-hour | 1.8E-03 | 8 |
| | | Annual | 2.7E-05 | 4 |
| | PM$_{2.5}$ | 24-hour | 1.8E-03 | 2 |
| | | Annual | 2.0E-05 | 1 |
| Black Canyon of the Gunnison National Park | NO$_2$ | Annual | 8.7E-04 | 2.5 |
| | SO$_2$ | 3-hour | 4.3E-03 | 25 |
| | | 24-hour | 1.2E-03 | 5 |
| | | Annual | 4.0E-05 | 2 |
| | PM$_{10}$ | 24-hour | 2.4E-02 | 8 |
| | | Annual | 5.9E-04 | 4 |
| | PM$_{2.5}$ | 24-hour | 2.0E-02 | 2 |
| | | Annual | 4.8E-04 | 1 |
| Colorado National Monument | NO$_2$ | Annual | 1.0E-04 | 2.5 |
| | SO$_2$ | 3-hour | 6.7E-04 | 25 |
| | | 24-hour | 1.5E-04 | 5 |
| | | Annual | 7.9E-06 | 2 |
| | PM$_{10}$ | 24-hour | 3.3E-03 | 8 |
| | | Annual | 1.0E-04 | 4 |
| | PM$_{2.5}$ | 24-hour | 2.5E-03 | 2 |
| | | Annual | 7.6E-05 | 1 |
| Dinosaur National Monument | NO$_2$ | Annual | 1.4E-05 | 25 |
| | SO$_2$ | 3-hour | 3.1E-04 | 512 |
| | | 24-hour | 5.5E-05 | 91 |
| | | Annual | 1.6E-06 | 20 |
| | PM$_{10}$ | 24-hour | 1.4E-03 | 30 |
| | | Annual | 3.0E-05 | 17 |
| | PM$_{2.5}$ | 24-hour | 1.4E-03 | 9 |
| | | Annual | 2.3E-05 | 4 |
| Eagles Nest Wilderness Area | NO$_2$ | Annual | 8.7E-04 | 2.5 |
| | SO$_2$ | 3-hour | 3.0E-03 | 25 |
| | | 24-hour | 5.2E-04 | 5 |
| | | Annual | 5.3E-05 | 2 |
| | PM$_{10}$ | 24-hour | 2.4E-02 | 8 |
| | | Annual | 9.7E-04 | 4 |
| | PM$_{2.5}$ | 24-hour | 2.2E-02 | 2 |
| | | Annual | 7.0E-04 | 1 |
| Flat Tops Wilderness Area | NO$_2$ | Annual | 4.9E-04 | 2.5 |
| | SO$_2$ | 3-hour | 3.0E-03 | 25 |
| | | 24-hour | 5.9E-04 | 5 |
| | | Annual | 2.8E-05 | 2 |
| | PM$_{10}$ | 24-hour | 2.5E-02 | 8 |
| | | Annual | 5.7E-04 | 4 |
| | PM$_{2.5}$ | 24-hour | 2.5E-02 | 2 |
| | | Annual | 4.5E-04 | 1 |

BLM_0027098

**Table 4-18**
**Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas**
**($\mu$g/m$^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| La Garita Wilderness Area | $NO_2$ | Annual | 2.8E-04 | 2.5 |
| | $SO_2$ | 3-hour | 7.0E-03 | 25 |
| | | 24-hour | 1.2E-03 | 5 |
| | | Annual | 2.0E-05 | 2 |
| | $PM_{10}$ | 24-hour | 3.3E-02 | 8 |
| | | Annual | 3.9E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 3.5E-02 | 2 |
| | | Annual | 3.0E-04 | 1 |
| Maroon Bells/Snowmass Wilderness Area | $NO_2$ | Annual | 1.8E-02 | 2.5 |
| | $SO_2$ | 3-hour | 3.3E-02 | 25 |
| | | 24-hour | 8.3E-03 | 5 |
| | | Annual | 8.4E-04 | 2 |
| | $PM_{10}$ | 24-hour | 1.6E-01 | 8 |
| | | Annual | 8.1E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.0E-01 | 2 |
| | | Annual | 4.7E-03 | 1 |
| Mount Zirkel Wilderness Area | $NO_2$ | Annual | 1.1E-04 | 2.5 |
| | $SO_2$ | 3-hour | 7.7E-04 | 25 |
| | | 24-hour | 2.6E-04 | 5 |
| | | Annual | 9.2E-06 | 2 |
| | $PM_{10}$ | 24-hour | 7.1E-03 | 8 |
| | | Annual | 1.8E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 5.5E-03 | 2 |
| | | Annual | 1.4E-04 | 1 |
| Rocky Mountain National Park | $NO_2$ | Annual | 3.3E-04 | 25 |
| | $SO_2$ | 3-hour | 1.9E-03 | 25 |
| | | 24-hour | 4.4E-04 | 5 |
| | | Annual | 2.5E-05 | 2 |
| | $PM_{10}$ | 24-hour | 8.5E-03 | 8 |
| | | Annual | 5.1E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 6.4E-03 | 2 |
| | | Annual | 3.8E-04 | 1 |
| Weminuche Wilderness Area | $NO_2$ | Annual | 1.5E-04 | 2.5 |
| | $SO_2$ | 3-hour | 3.6E-03 | 25 |
| | | 24-hour | 6.8E-04 | 5 |
| | | Annual | 1.3E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.2E-02 | 8 |
| | | Annual | 2.4E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.2E-02 | 2 |
| | | Annual | 1.9E-04 | 1 |
| West Elk Wilderness Area | $NO_2$ | Annual | 6.7E-03 | 2.5 |
| | $SO_2$ | 3-hour | 1.2E-02 | 25 |
| | | 24-hour | 3.3E-03 | 5 |
| | | Annual | 2.6E-04 | 2 |
| | $PM_{10}$ | 24-hour | 6.7E-02 | 8 |
| | | Annual | 3.3E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 6.3E-02 | 2 |
| | | Annual | 2.2E-03 | 1 |

BLM_0027099

Visibility Impacts
Visibility impacts were calculated following FLAG 2010 (FLAG, 2010), at Class I and sensitive
Class II areas. The results are shown in **Table 4-19**, Alternative B - Maximum Visibility Impacts
at Class I and Sensitive Class II Areas. The visibility analysis indicated that there are zero days
predicted above the 0.5-Δdv threshold at any of the Class I and sensitive Class II areas. The
maximum predicted visibility impact was 0.45 Δdv, occurring at the Maroon Bells - Snowmass
Wilderness Area.

**Table 4-19**
**Alternative B - Maximum Visibility Impacts at Class I and Sensitive
Class II Areas**

| Location | Maximum Impact (Δdv) |
|---|---|
| Arches National Park | 0.01 |
| Black Canyon of the Gunnison National Park | 0.08 |
| Colorado National Monument | 0.01 |
| Dinosaur National Monument | 0.01 |
| Eagles Nest Wilderness Area | 0.10 |
| Flat Tops Wilderness Area | 0.12 |
| La Garita Wilderness Area | 0.14 |
| Maroon Bells/Snowmass Wilderness Area | 0.45 |
| Mount Zirkel Wilderness Area | 0.02 |
| Rocky Mountain National Park | 0.03 |
| Weminuche Wilderness Area | 0.10 |
| West Elk Wilderness Area | 0.26 |

Deposition Impacts
As shown in **Table 4-20**, modeled nitrogen and sulfur deposition impacts for Alternative B are
below the DAT at all Class I and sensitive Class II areas. The exception is the Maroon
Bell/Snowmass and Raggeds wilderness areas, where nitrogen deposition impacts are above the
DAT. Modeling for Alternatives A and B used the same source locations and parameters,
although Alternative B was modeled with more emissions from these source locations.

**Table 4-20**
**Alternative B - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II
Areas**

| Location | Maximum N Deposition (kg/ha/yr) | Maximum S Deposition (kg/ha/yr) |
|---|---|---|
| Arches National Park | 0.00002 | 0.000001 |
| Black Canyon of the Gunnison National Park | 0.00070 | 0.000054 |
| Colorado National Monument | 0.00008 | 0.000006 |
| Dinosaur National Monument | 0.00002 | 0.000002 |
| Eagles Nest Wilderness Area | 0.00110 | 0.000075 |
| Flat Tops Wilderness Area | 0.00069 | 0.000045 |
| La Garita Wilderness Area | 0.00057 | 0.000043 |
| Maroon Bells/Snowmass Wilderness Area | 0.00953 | 0.000874 |
| Mount Zirkel Wilderness Area | 0.00025 | 0.000017 |
| Ragged Wilderness Area (Deep Creek Lake) | 0.00623 | 0.000521 |
| Rocky Mountain National Park | 0.00061 | 0.000039 |
| Weminuche Wilderness Area | 0.00034 | 0.000026 |
| West Elk Wilderness Area | 0.00319 | 0.000221 |

Given that Alternative A deposition impacts are below the DAT at all Class I and sensitive Class II areas, the emissions levels close to those under Alternative A would be required to reduce Alternative B nitrogen deposition impacts to near the DAT. In order to achieve this, additional mitigation measures are included, as described below in *Additional Mitigation Measures.*

In addition, potential changes in ANC, resulting from potential N and S deposition from Alternative B source emissions, were calculated for 28 sensitive lakes within the Class I and sensitive Class II Wilderness areas. The estimated change in ANC for each lake is shown in **Table 4-21**, Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas. For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC values greater than 25 µeq/l, and a 1.0 µeq/l change in ANC for lakes with background ANC values equal to or less than 25 µeq/l.

**Table 4-21**
**Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas**

| Wilderness Area | Sensitive Lake | 10th Percentile Lowest ANC Value (µeq/L) | N Deposition (kg/ha/yr) | S Deposition (kg/ha/yr) | ANC Relative Change (%) | ANC Absolute Change (µeq/L) |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 86.8 | 0.00093 | 0.00006 | 0.011 | n/a |
| Eagles Nest | Upper Willow Lake | 134.1 | 0.00098 | 0.00007 | 0.009 | n/a |
| Flat Tops | Ned Wilson Lake | 39.0 | 0.00042 | 0.00003 | 0.011 | n/a |
| Flat Tops | Upper Ned Wilson Lake | 12.9 | 0.00042 | 0.00003 | 0.032 | 0.004 |
| Flat Tops | Lower Packtrail Pothole | 29.7 | 0.00042 | 0.00003 | 0.014 | n/a |
| Flat Tops | Upper Packtrail Pothole | 48.7 | 0.00042 | 0.00003 | 0.009 | n/a |
| La Garita | Small Lake Above U-Shaped Lake | 59.9 | 0.00049 | 0.00004 | 0.012 | n/a |
| La Garita | U-Shaped Lake | 81.4 | 0.00049 | 0.00004 | 0.009 | n/a |
| Maroon Bells | Avalanche Lake | 158.8 | 0.00471 | 0.00038 | 0.021 | n/a |
| Maroon Bells | Capitol Lake | 154.4 | 0.00467 | 0.00038 | 0.024 | n/a |
| Maroon Bells | Moon Lake | 53.0 | 0.00465 | 0.00039 | 0.083 | n/a |
| Mount Zirkel | Lake Elbert | 56.6 | 0.00022 | 0.00002 | 0.003 | n/a |
| Mount Zirkel | Seven Lakes (LG East) | 36.2 | 0.00018 | 0.00001 | 0.004 | n/a |
| Mount Zirkel | Summit Lake | 48.0 | 0.00025 | 0.00002 | 0.004 | n/a |
| Raggeds | Deep Creek Lake | 20.6 | 0.00623 | 0.00052 | 0.335 | 0.069 |
| Weminuche | Big Eldorado Lake | 19.6 | 0.00018 | 0.00002 | 0.010 | 0.002 |
| Weminuche | Four Mile Pothole | 123.4 | 0.00021 | 0.00002 | 0.001 | n/a |
| Weminuche | Lake Due South of Ute Lake | 13.2 | 0.00018 | 0.00001 | 0.014 | 0.002 |
| Weminuche | Little Eldorado | -3.3 | 0.00018 | 0.00002 | 0.057 | 0.002 |
| Weminuche | Little Granite Lake | 80.7 | 0.00019 | 0.00002 | 0.004 | n/a |
| Weminuche | Lower Sunlight Lake | 80.9 | 0.00017 | 0.00001 | 0.002 | n/a |
| Weminuche | Middle Ute Lake | 42.8 | 0.00018 | 0.00001 | 0.005 | n/a |
| Weminuche | Small Pond Above Trout Lake | 25.5 | 0.00022 | 0.00002 | 0.011 | n/a |
| Weminuche | Upper Grizzly Lake | 29.9 | 0.00016 | 0.00001 | 0.005 | n/a |
| Weminuche | Upper Sunlight Lake | 28.0 | 0.00017 | 0.00001 | 0.006 | n/a |
| Weminuche | West Snowdon Lake | 39.4 | 0.00017 | 0.00002 | 0.004 | n/a |
| Weminuche | White Dome Lake | 2.1 | 0.00018 | 0.00002 | 0.089 | 0.19 |
| West Elk | South Golden Lake | 111.4 | 0.00215 | 0.00015 | 0.019 | n/a |

*Regional Climate Change and Greenhouse Gas Emissions*
The maximum GHG emissions resulting from Alternative B are estimated at 39,689 metric tons per year (0.04 tg/yr) of $CO_2$e. To place the project GHG emissions in context, the GHG emissions from the top 5 emitting coal-fired power plants in Colorado range from 2.6 to 9.0 tg/year (EPA 2014c).

Predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time primarily because climate change is a cumulative phenomenon that requires global scale emissions inventory/budget and many resources (computational power, etc.) to determine the sensitivity of climate with respect to changing global conditions. As such, the controversy is to what extent GHG emissions resulting from continued oil and gas development may contribute to global climate change, as well as the accompanying changes to natural systems cannot be quantified or predicted. The degree to which any observable changes can or would be attributable to Alternative B cannot be reasonably predicted at this time.

**Amended Proposed Action Air Quality Impacts Analysis**
Between publication of the Draft EIS and development of the Final EIS, SGI submitted a change to the type, size, and number of compressor engines at the Bull Mountain Compressor Station (BMCS) site. This change resulted in an amended Proposed Action and required a review and update of the analysis. The new compressor station includes the installation of a set of three 3,550-horsepower natural gas-fired compressor engines.

The BMCS is outside the Bull Mountain Unit project area, approximately 0.5 mile (approximately 800 meters) to the west of the northwest corner of the project area. The DEIS air quality analysis analyzed one 637-horsepower natural gas-fired compressor engine at this location and three 637-horsepower compressor engines in the project area; these latter engines remain included in the revised Proposed Action.

The BLM obtained a construction permit recently from the CDPHE that provides detailed permitted air pollutant emissions rates and operations information for the new BMCS. The BLM Colorado State Office used the details of this permit to conduct a refined air quality impacts analysis for the amended Proposed Action. The near-field air quality impacts analysis for the DEIS and the CDPHE-issued permit showed that $NO_x$ and formaldehyde emissions and impacts are the primary concerns for compressor engine operation. The remainder of this amended Proposed Action analysis is focused on air quality impacts from these pollutants.

The air quality impacts analysis for the DEIS presented above had three primary components: a cumulative CARMMS analysis, a project-specific far-field CALPUFF analysis, and a project-specific near-field AERMOD impacts analysis.

The following provides information for each air quality impacts analysis component, with respect to new information for the amended Proposed Action:

- CARMMS cumulative impacts analysis—The CARMMS cumulative year 2021 emissions inventory for UFO and the Bull Mountain project area accounted for substantial new future federal and non-federal oil and gas development. The CARMMS

BLM_0027102

high oil and gas development, year 2021, $NO_x$ annual emissions estimates for 37 4-kilometer grid points were centered approximately on the amended Proposed Action BMCS. They were compared to an April 2015 CDPHE permitted $NO_x$ emissions inventory for the same size domain. This was done to determine the projected increase and growth in $NO_x$ emissions in the project area. The current CDPHE emissions inventory shows approximately 139 TPY of $NO_x$ for all permitted emissions sources in the project area. The CARMMS high scenario accounted for approximately 1,441 TPY of $NO_x$ in the same project area. (Approximately 75 percent of the CARMMS year 2021 $NO_x$ emissions estimate is associated with oil and gas.) This substantial growth in oil and gas-related $NO_x$ emissions in the project area for the CARMMS high oil and gas development scenario accounts for the Bull Mountain Unit Proposed Action and multiple nearby potential future oil and gas projects. The CARMMS high scenario inventory allowed for plenty of oil and gas growth in the project area for the amended Proposed Action. For this reason, it is adequate to assume that the CARMMS projected year 2021 high oil and gas development scenario cumulative modeling results sufficiently account for the amended Proposed Action.

- Project-specific far-field CALPUFF analysis—As described in the CALPUFF modeling subsection and the previous mitigation subsection of this EIS, a Unit-wide $NO_x$ emissions limit (approximately 143 TPY of $NO_x$ for the post-development phase/full production and operational phase) was determined using project-specific CALPUFF modeling results for Alternatives A and B. It is reasonable to assume that project-specific CALPUFF modeling results would be different for the amended Proposed Action; however, that would not change the acceptable annual $NO_x$ limit that was established based on the CALPUFF modeling for the two alternatives. Additional project-specific CALPUFF modeling was not performed for the amended Proposed Action; this is because the $NO_x$ emissions limit had already been determined, based on previous project alternative CALPUFF modeling, and it would still apply regardless of the size and extent of the amended Proposed Action.

- Project-specific near-field AERMOD impacts analysis—As previously described, the amended Proposed Action includes installation of a new compressor station that would be substantially larger than any that were originally analyzed in the project-specific near-field analysis for the DEIS (10,650 horsepower versus 637 horsepower). For this reason, the BLM Colorado completed a refined AERMOD near-field $NO_2$ (1-hour) and formaldehyde (1-hour and annual) impacts analysis for the amended Proposed Action, the details of which are as follows:

  o Using ArcGIS and aerial images, the closest ambient air receptors are two nearby residences approximately .5 mile (approximately 800 meters) to the northeast and northwest of the BMCS.

  o The two annual year 2008 meteorological datasets that were used for the original project-specific near-field analysis were used for this refined AERMOD near-field impacts analysis. Also, the annual ozone dataset used for the previous near-field $NO_2$ modeling analyses was used for the AERMOD ozone limiting method

BLM_0027103

(OLM) $NO_x$ to $NO_2$ conversion for this refined amended Proposed Action analysis (see the AQTSD for more information on near-field modeling meteorology and ozone dataset).

o   For the amended Proposed Action BMCS, maximum short-term $NO_x$ and formaldehyde emissions at CDPHE permitted emissions levels were modeled for estimating maximum 1-hour average $NO_2$ and formaldehyde concentrations. Annual permitted formaldehyde emissions levels were modeled for estimating formaldehyde concentrations that were used in the annual/long-term formaldehyde exposure analysis. The modeling analysis for the amended Proposed Action also included the emissions from proposed oil and gas sources related to a nearby project in western Gunnison County, the Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-Well Pads (BLM and US Forest Service 2015). $NO_x$ and formaldehyde emissions associated with full development (drilling and completion) of a well pad near the BMCS (approximately 2,100 meters west of BMCS) were included in the AERMOD runs for the $NO_2$ and formaldehyde short-term/1-hour impacts analysis. The post-construction/development phase formaldehyde emissions were modeled for the long-term/annual formaldehyde exposure analysis.

o   For future background concentrations for the project area to account for impacts not modeled explicitly using AERMOD, the CARMMS year 2021 projected $NO_2$ concentrations for the 37 grid cells (see discussion above for CARMMS cumulative analysis for the amended Proposed Action) were processed. The results would determine a future $NO_2$ 1-hour background concentration that would account for the projected oil and gas growth in the project area. The background $NO_2$ 1-hour concentration that was used for the refined analysis (approximately 31 $\mu g/m^3$) is the overall maximum (of all grid cells) 1st high, daily 1-hour value for all CARMMS grid cells processed. The formaldehyde background concentrations that were used to account for all sources not explicitly modeled in AERMOD are from a Garfield County monitor located in an area of substantial oil and gas operations. CARMMS year 2021 $NO_2$ and Garfield County-monitored formaldehyde concentrations were added to AERMOD modeled concentrations for developing total concentration estimates for comparison to ambient air impact thresholds.

The refined near-field impacts analysis maximum modeled results for the amended Proposed Action are well below the impacts thresholds for all pollutants and averaging times. The maximum modeled 1st-highest daily maximum 1-hour $NO_2$ value, when added to the maximum modeled CARMMS daily maximum 1-hour $NO_2$ concentration for the project area, is well below the $NO_2$ 1-hour NAAQS. The amended Proposed Action BMCS maximum modeled 1st-highest daily maximum $NO_2$ value alone (impact from just the BMCS) is approximately a sixth of the $NO_2$ 1-hour NAAQS. Maximum modeled short-term and long-term formaldehyde concentrations (including background concentrations) are well below acceptable formaldehyde exposure thresholds (REL and RfC) and within the acceptable long-term exposure risk range.

BLM_0027104

The information provided above indicates that the air quality impacts for the amended Proposed Action would be in compliance with ambient air quality standards and below applicable threshold values.

To summarize, the CARMMS high scenario cumulative analysis accounted for substantial oil and gas growth in the project area and therefore includes emissions and impacts associated with the amended Proposed Action; the DEIS project-specific CALPUFF analysis for Alternatives A and B were used to establish the Bull Mountain Unit field-wide operational phase (post-construction) annual NOx emissions limit. This limit still applies for the amended Proposed Action, so no additional project-specific CALPUFF modeling is needed. The maximum modeled results for the refined near-field impacts analysis for the amended Proposed Action BMCS are predicted to be below acceptable impact thresholds or within acceptable impact ranges at nearby ambient receptors.

### Additional Mitigation Measures

As described in the *Methods of Analysis* description at the beginning of the this section, there are several key air quality-related impacts of concern identified in the AQTSD due to predicted air quality impact levels being close to acceptable impact thresholds. Specifically, additional mitigation is needed for the following impacts of concern: near-field particulate matter (p.m.) impacts from construction and traffic activities, near-field $NO_2$ 1-hour impacts, and far-field nitrogen deposition at nearby Forest Service sensitive areas.

As described previously in this section and in the AQTSD, maximum modeled p.m. impacts are associated with the resource road and well pad construction activities modeling scenario. That scenario includes routine water/dust control application achieving approximately 50 percent dust control. Near-field impacts are acceptable for the construction scenario at receptors 100 meters of more from the emissions sources, assuming this level of emissions control. It is not technically practicable to exclude p.m. impacts at all locations within 100 meters of the emissions source , such as well pad and road construction activities; for that reason, additional emissions control would be needed to reduce dust emissions.

The $NO_2$ 1-hour modeling production scenario was based on a configuration of well pad production equipment (i.e. pumping units, heaters, etc.) that resulted in acceptable $NO_2$ 1-hour modeled impacts. The well pad production equipment configuration (i.e., the emissions levels) is reasonable for the average number of wells per pad based on operator input. To ensure that $NO_2$ 1-hour concentrations are acceptable near well pads for any number of new wells (approximately 4 to 12) per pad, there would be a $NO_x$ well pad emissions limit requirement so that well pad production $NO_x$ emissions are at or below the levels modeled for the near-field analysis described in the AQTSD. In addition, the $NO_2$ 1-hour modeling development scenario assumed Tier 2 development engines at 2,000 horsepower total operating at any one time for a single year at each well pad. It further assumed that there would be an engine operation or NOx emissions limit requirement for well development-related engines.

Modeled nitrogen deposition for the No Action Alternative (Alternative A) are below the DAT for all Class I and sensitive Class II areas; however, nitrogen deposition for the Proposed Action (Alternative B) are above the DAT for a nearby Class I and sensitive Class II area. Modeling for Alternatives A and B used the same number of sources, locations, and source parameters; the

BLM_0027105

main difference for the two scenarios is that Alternative B was modeled with more emissions from the project-related emissions sources. Using information determined from the modeling analyses, a Unit-wide emissions control plan would be required so that production level emissions for all action alternatives would be at or below the levels modeled for Alternative A (nitrogen deposition impacts at acceptable levels).

The following provides details for the additional emissions control requirements, as identified by the modeling analyses performed for this EIS:

- The BLM would place a COA on each permit, requiring SGI to continuously keep the surface moist with water during access road and well pad construction and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining no visible dust plume operations.

- The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of $NO_x$ at each well pad for production operations (post- construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to develop project-specific emissions inventories. An annual $NO_x$ emissions rate greater than 5 TYP may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before authorizing activities.

- The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase[4] could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3 or 4 engines. The goal of the requirement is for drill-, completion-, and fracturing-related engines to emit no more than 1 gram per second of $NO_x$ total at any one time (total of all engines operating concurrently), unless another $NO_x$ emissions rate can be demonstrated to comply with the $NO_2$ 1-hour NAAQS.

- The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory . It would show a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx[5]. The BLM would place a COA on each permit (APD), requiring

---

[4]  This total horsepower was analyzed for the EIS-specific $NO_2$ 1-hour impacts analysis.
[5]  The annual $NO_x$ emissions level limit required to provide project-level nitrogen deposition impacts at the DAT threshold (0.005 kg/ha-yr); it is determined from the nitrogen deposition modeling analyses for Alternatives A and B.

BLM_0027106

SGI to submit a $NO_x$ emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) $NO_x$ emissions budget (approximately 143 TPY of $NO_x$).

### Alternative C

Alternative C includes activities specific to BLM-administered estate for the construction and operation of up to 146 natural gas wells, 35 well pads, 1 water disposal well, and associated roads and production facilities, including 4 compression stations. This alternative would include as design features the use of drilling rig engines with Tier 3 or Tier 4 level emissions, as well as the air resources additional mitigation measures noted under Alternative B. Therefore, the following analysis describes the effects with the measures applied.

### Near-field Impacts

Near-field pollutant impacts for Alternative C would be similar to those presented above for Alternative B. However, with the implementation of additional mitigation measures (described above under *Additional Mitigation Measures*), the impacts would be below the NAAQS or CAAQS. In addition impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations which could exceed the annual increment value.

The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be similar to the impacts for the Alternative B. HAP impacts under Alternative C would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions which could exceed the short-term REL threshold. For the suspected carcinogens (benzene, ethyl benzene, and formaldehyde) the cancer risk level for production activities for either the MLE or the MEI analysis would be similar to Alternative B.

### Far-Field Impacts

Pollutant Impacts

Pollutant impacts would be similar to those presented in for Alternative B. Pollutant impacts would be below PSD increments at all Class I and sensitive Class II areas.

Visibility Impacts

Visibility impacts estimated resulting from Alternative C emissions would be similar to those presented for Alternative B, which indicated that there would be zero days predicted above the 0.5 Δdv threshold at any of the Class I and sensitive Class II areas.

Deposition Impacts

Nitrogen deposition impacts under Alternative C would be less than the impacts for Alternative B and greater than the impacts for Alternative A. Sulfur deposition impacts would be below the DAT.

Potential sensitive lake acidification resulted from nitrogen and sulfur deposition impacts under Alternative C would be similar to the impacts for Alternative B, where modeling results

BLM_0027107

indicated that there would be no ANC changes at any of the analyzed lakes that exceeded threshold values.

*Regional Climate Change and Greenhouse Gas Emissions*
The maximum greenhouse gas emissions resulting from Alternative C sources would be comparable to the emissions estimated for Alternative B. See discussion for Alternative B.

The additional mitigation measures described under Alternative B would be applied in Alternative C resulting in a reduction of the noted impacts to be the same as described in Alternative B.

### Alternative D
Alternative D includes activities specific to BLM-administered estate for the construction and operation of up to 146 natural gas wells, 4 water disposal wells, and associated roads and production facilities, including 4 compression stations. In developing the Preferred Alternative (Alternative D), the BLM included as design features the air resources mitigation measures noted under Alternative B. Therefore, the following analysis describes the effects with the measures applied.

*Near-Field Impacts*
Near-field pollutant impacts for Alternative D would be similar to those presented above for Alternative B. Impacts from Alternative D sources would be below the NAAQS and CAAQS. In addition impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations, which could exceed the annual increment value.

The maximum predicted acute and long-term HAP impacts from well site production would be similar to the impacts under Alternative B. HAP impacts under Alternative D would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions, which could exceed the short-term REL threshold. For the suspected carcinogens benzene, ethyl benzene, and formaldehyde, the cancer risk level for production activities for either the MLE or the MEI analysis would be similar to that under Alternative B.

*Far-Field Impacts*

Pollutant Impacts
Pollutant impacts would be similar to those for Alternative B and would be below PSD increments at all Class I and sensitive Class II areas.

Visibility Impacts
Estimated visibility impacts from Alternative D emissions would be similar to those presented for Alternative B; they indicated that there would be zero days predicted above the 0.5 Δdv threshold at any of the Class I and sensitive Class II areas.

Deposition Impacts
Nitrogen deposition impacts under Alternative D would be less than the impacts for Alternative B and greater than those for Alternative A. Sulfur deposition impacts would be below the DAT.

BLM_0027108

Under Alternative D, potential sensitive lake acidification that results from nitrogen and sulfur deposition impacts would be similar to that described for Alternative B. Under that alternative, modeling results indicated that there would be no ANC changes at any of the analyzed lakes that exceeded threshold values.

*Regional Climate Change and Greenhouse Gas Emissions*
The maximum GHG emissions from Alternative D sources would be comparable to the emissions estimated for Alternative B. See discussion for Alternative B.

*Regional Ozone and Cumulative Air Quality and AQRV analyses*
As part of the adaptive management strategy for managing air resources within the BLM GJFO and UFO planning areas, the BLM conducted a regional air modeling study to evaluate potential impacts on air quality from future mineral development in western Colorado. The Colorado Air Resources Management Modeling Study (CARMMS) (BLM 2014b) assesses predicted impacts on air quality and air quality related values (AQRVs) from projected increases in oil and gas development. The CARMMS includes potential impacts using projections of oil and gas development up to a maximum of 10 years in the future to reflect realistic estimations of development projections and technology improvements.

The CARMMS includes cumulative air quality and AQRV impact assessments from future year (year 2021) oil and gas development on federal and non-federal lands within 13 separate Colorado BLM planning areas as well as mining within the 13 Colorado BLM planning areas. CARMMS also includes emissions from other regional sources including oil and gas emissions throughout the modeling domain which encompasses all of Colorado, western Arizona, western Utah and north-central New Mexico and extends into southern Wyoming, western Nebraska, western Kansas and northwest Texas.

The CARMMS includes use of the Comprehensive Air-quality Model with extensions (CAMx) photochemical grid model (PGM) model to estimate air quality and AQRV impacts for both a base case year (2008) and future year 2021. Emissions from all sources types (anthropogenic and natural) are included in the CAMx modeling.

As part of CARMMS future year 2021 emissions estimates were developed for 3 development scenarios for the 13 Colorado planning areas. These include year 2021 high, medium and low oil and gas development scenarios. Modeling results for the CARMMS 2021 high oil and gas development scenario are applicable for use in estimating potential ozone formation from regional emissions and Bull Mountain project emissions, and for determining the maximum contribution of Bull Mountain sources to regional ozone formation (BLM 2014b). The CARMMS results are also applicable for Bull Mountain project cumulative air quality and AQRV analyses.

The CARMMS 2021 high oil and gas development scenario modeling analysis included BLM UFO planning area oil and gas emissions on BLM-administered lands of 612 TPY $NO_x$, 620 TPY VOC, 788 TPY CO, 1 TPY $SO_2$, 144 TPY $PM_{10}$ and 37 TPY $PM_{2.5}$. The maximum future year emissions from Bull Mountain project area emissions, including existing sources, Alternative A sources (on private lands), and Alternative D sources (on BLM-administered

lands), are 311.1 TPY NO$_x$, 124.5 TPY VOC, 206.5 TPY CO, 0.8 TPY SO$_2$, 65.6 TPY PM$_{10}$ and
46.0 TPY PM$_{2.5}$.

*Regional Ozone Impacts*

The CARMMS included estimates of future year regional ozone impacts using two analysis
methods. One method uses the change in the PGM modeled concentrations between base case or
current year (DVC) (year 2008) and future year (DVF) (year 2021) simulations to scale observed
ozone concentrations from monitoring sites to obtain projected future year ozone concentrations.
This method utilized EPA's Modeled Attainment Test Software (MATS; Abt 2012) projection
tool with the CAMx 2008 Base Case and 2021 High Development Scenario ozone
concentrations to estimate ozone impacts. The second method uses the absolute modeling results
from the CAMx model to estimate ozone impacts.

The ozone analyses included in the CARMMS study (BLM 2014b) presented CAMx modeled
ozone concentrations compared to the 8-hour ozone NAAQS of 75 ppb that has been in effect
since 2008.  On October 1, 2015, the EPA revised the level of the 8-hour ozone NAAQS to 70
ppb (EPA 2015b). The CAMx modeled ozone concentration data prepared for the CARMMS
2014 study will be reprocessed. A revised CARMMS report that presents predicted future year
ozone concentrations relative to the new ozone NAAQS will be completed during 2016.
However the information presented herein, from the 2014 CARMMS study, is applicable for
estimating Bull Mountain project-level ozone impacts. This information also will be used for
comparing future year regional ozone impacts in the vicinity of the Bull Mountain project area to
the level of the revised ozone NAAQS.

**Figure 4-12** presents the CAMx predicted ozone concentrations using MATS. The current year
DVCs indicate areas of ozone exceedances of the NAAQS (70 ppb) in Colorado, eastern Utah,
southern Wyoming, northeast Arizona, and northern New Mexico with the maximum
concentrations near Denver and Salt Lake City. The maximum DVC of 81.5 ppb is estimated just
northwest of Denver (**Figure 4-12**, top left). The current year DVCs also indicate that there are
areas near the Bull Mountain project area in Gunnison County that are above the 70 ppb
NAAQS, in the range of 71 to 73 ppb. For the 2021 High Development Scenario, the area of
2021 ozone DVF exceedances is slightly reduced from the base year, with a peak DVF of 79.3
ppb still northwest of Denver (**Figure 4-12**, top right). The High Development Scenario indicates
that the range of future year concentrations nearby the Bull Mountain project area are
approximately the same as the base year. The 2021 DVF-2008 DVC difference plot
(**Figure 4-12**, bottom) shows mainly ozone reductions, the largest of which is in the Denver and
Salt Lake City areas; however, it shows ozone increases in the Piceance Basin (Garfield County,
Colorado). In the vicinity of the project area, there are small areas with ozone reductions up to
1.0 ppb and ozone increases up to 1.0 ppb.

BLM_0027110



**Figure 4-12.** 2008 ozone DVC (top left), 2021 ozone DVF (top right) and 2021 – 2008 ozone DVF differences calculated using MATS for the CARMMS 2021 High Development Scenario.

BLM_0027111

The CAMx absolute modeling results are presented in **Figure 4-13**. The ozone NAAQS is defined as the three-year average of the 4th highest daily maximum 8-hour ozone concentrations. Since CARMMS only has one year of modeling results, the 2021 fourth highest daily maximum 8-hour ozone concentrations are used for the NAAQS comparison metric.

**Figure 4-13** displays the fourth highest ozone concentrations for the 2008 Base Case and the 2021 High Development Scenario and their differences. For the 2008 Base Case, there are ozone exceedance areas in Colorado, eastern Utah, southern Wyoming, northeast Arizona, and northern New Mexico. The maximum ozone concentrations are estimated near Denver, Salt Lake City and northern New Mexico, and on the border of Utah and Arizona (**Figure 4-13**, top left).

The 2008 Base Case also indicates that there are areas near the Bull Mountain project area in Gunnison County that are above the 70 ppb NAAQS, in the range of 70-76 ppb. In the 2021 High Development Scenario, the area of ozone exceedances is slightly reduced, although there are increases in ozone concentrations estimated in the Uinta Basin (**Figure 4-13**, top right). The 2021 High Development Scenario also indicates a slight increase in the areas near the project area that are above the 70 ppb NAAQS in the range of 70-76 ppb.

The 2021-2008 ozone differences (**Figure 4-13**, bottom) show more decreases than increases. The areas of ozone increases tend to occur in oil and gas development areas, for example, the D-J, Piceance, and Uinta Basins. In the vicinity of the Bull Mountain project area, there are small areas with ozone reductions up to 3.0 ppb and ozone increases up to 3.0 ppb.

**Figure 4-14** presents the maximum ozone contributions due to federal oil and gas emissions in the UFO planning area from the CAMx absolute model results. The maximum ozone contribution from the UFO planning area oil and gas sources is 0.8 ppb. Given that the UFO planning area oil and gas emissions include 612 TPY $NO_x$ and 620 TPY VOC and that the maximum future year emissions from Bull Mountain project sources show 311.1 TPY $NO_x$ and 124.5 TPY VOC, the contribution to regional ozone from Bull Mountain project sources would likely be less.

Cumulative Air Quality and AQRV Impacts

The CARMMS 2021 high oil and gas development modeling analysis presented a scenario which included future year 2021 projected federal and non- federal oil and gas emissions throughout the 4-kilometer grid CARMMS domain plus mining on BLM-administered lands in Colorado. This scenario which includes future year oil and gas emissions from the 13 Colorado BLM planning area plus the Mancos Shale area in Northern New Mexico, and emissions from the Piceance Basin (CO) and Uinta Basin (UT), is presented herein to describe cumulative impacts for the Bull Mountain project. For the Bull Mountain project cumulative analysis these cumulative oil and gas emissions and mining emissions are considered reasonably foreseeable development (RFD) emissions.

The CARMMS included impact assessments at 55 PSD Class I and sensitive Class II areas, and at 58 lakes throughout the CARMMS modeling domain, which included each of the Class I and Class II areas and lakes that have been included in the Bull Mountain project CALPUFF impacts analyses. For the Bull Mountain project cumulative assessment, the CARMMS impacts are presented for the PSD Class I and sensitive Class II areas and lakes that were included in the CALPUFF analyses.



**Figure 4-13.** Fourth highest daily maximum 8-hour ozone concentrations for the 2008 Base Case (top left), CARMMS 2021 High Development Scenario (top right), 2021 minus 2008 differences (bottom).



**Figure 4-14.** Contribution to Fourth Highest Daily Maximum Ozone Concentrations Due to Emissions from Federal Oil and Gas within the UFO Planning Area for the CARMMS 2021 High Development Scenario.

Air Quality Impacts

The modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas resulting from cumulative RFD source emissions are provided in **Table 4-22**, Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ($\mu g/m^3$), for comparison to applicable PSD Class I and Class II increments. All values are well below the PSD Class I and Class II increments.

BLM_0027114

**Table 4-22**
**Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (µg/m$^3$)**

| Location | Pollutant | Averaging Time | Modeled Concentration | PSD Increment |
|---|---|---|---|---|
| Arches National Park | NO$_2$ | Annual | 0.357 | 2.5 |
| | SO$_2$ | 3-hour | 0.107 | 25 |
| | | 24-hour | 0.046 | 5 |
| | | Annual | 0.006 | 2 |
| | PM$_{10}$ | 24-hour | 0.577 | 8 |
| | | Annual | 0.096 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.430 | 2 |
| | | Annual | 0.080 | 1 |
| Black Canyon of the Gunnison National Park | NO$_2$ | Annual | 0.481 | 2.5 |
| | SO$_2$ | 3-hour | 0.086 | 25 |
| | | 24-hour | 0.052 | 5 |
| | | Annual | 0.006 | 2 |
| | PM$_{10}$ | 24-hour | 0.763 | 8 |
| | | Annual | 0.199 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.617 | 2 |
| | | Annual | 0.104 | 1 |
| Colorado National Monument | NO$_2$ | Annual | 0.600 | 2.5 |
| | SO$_2$ | 3-hour | 0.190 | 25 |
| | | 24-hour | 0.080 | 5 |
| | | Annual | 0.012 | 2 |
| | PM$_{10}$ | 24-hour | 1.233 | 8 |
| | | Annual | 0.194 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.890 | 2 |
| | | Annual | 0.155 | 1 |
| Dinosaur National Monument | NO$_2$ | Annual | 1.444 | 25 |
| | SO$_2$ | 3-hour | 1.495 | 512 |
| | | 24-hour | 0.487 | 91 |
| | | Annual | 0.108 | 20 |
| | PM$_{10}$ | 24-hour | 3.539 | 30 |
| | | Annual | 0.551 | 17 |
| | PM$_{2.5}$ | 24-hour | 3.535 | 9 |
| | | Annual | 0.546 | 4 |
| Eagles Nest Wilderness Area | NO$_2$ | Annual | 0.246 | 2.5 |
| | SO$_2$ | 3-hour | 0.093 | 25 |
| | | 24-hour | 0.029 | 5 |
| | | Annual | 0.005 | 2 |
| | PM$_{10}$ | 24-hour | 0.566 | 8 |
| | | Annual | 0.131 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.485 | 2 |
| | | Annual | 0.099 | 1 |
| Flat Tops Wilderness Area | NO$_2$ | Annual | 0.515 | 2.5 |
| | SO$_2$ | 3-hour | 0.422 | 25 |
| | | 24-hour | 0.157 | 5 |
| | | Annual | 0.017 | 2 |
| | PM$_{10}$ | 24-hour | 1.093 | 8 |
| | | Annual | 0.241 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.882 | 2 |
| | | Annual | 0.189 | 1 |

BLM_0027115

**Table 4-22**
**Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (µg/m$^3$)**

| Location | Pollutant | Averaging Time | Modeled Concentration | PSD Increment |
|---|---|---|---|---|
| La Garita Wilderness Area | NO$_2$ | Annual | 0.135 | 2.5 |
| | SO$_2$ | 3-hour | 0.074 | 25 |
| | | 24-hour | 0.024 | 5 |
| | | Annual | 0.004 | 2 |
| | PM$_{10}$ | 24-hour | 0.341 | 8 |
| | | Annual | 0.059 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.293 | 2 |
| | | Annual | 0.045 | 1 |
| Maroon Bells/Snowmass Wilderness Area | NO$_2$ | Annual | 0.447 | 2.5 |
| | SO$_2$ | 3-hour | 0.114 | 25 |
| | | 24-hour | 0.036 | 5 |
| | | Annual | 0.007 | 2 |
| | PM$_{10}$ | 24-hour | 0.824 | 8 |
| | | Annual | 0.241 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.587 | 2 |
| | | Annual | 0.167 | 1 |
| Mount Zirkel Wilderness Area | NO$_2$ | Annual | 0.228 | 2.5 |
| | SO$_2$ | 3-hour | 0.179 | 25 |
| | | 24-hour | 0.065 | 5 |
| | | Annual | 0.010 | 2 |
| | PM$_{10}$ | 24-hour | 0.893 | 8 |
| | | Annual | 0.240 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.822 | 2 |
| | | Annual | 0.219 | 1 |
| Raggeds Wilderness Area | NO$_2$ | Annual | 0.579 | 25 |
| | SO$_2$ | 3-hour | 0.114 | 25 |
| | | 24-hour | 0.035 | 5 |
| | | Annual | 0.007 | 2 |
| | PM$_{10}$ | 24-hour | 1.407 | 8 |
| | | Annual | 0.332 | 4 |
| | PM$_{2.5}$ | 24-hour | 1.209 | 2 |
| | | Annual | 0.247 | 1 |
| Rocky Mountain National Park | NO$_2$ | Annual | 0.240 | 25 |
| | SO$_2$ | 3-hour | 0.087 | 25 |
| | | 24-hour | 0.021 | 5 |
| | | Annual | 0.005 | 2 |
| | PM$_{10}$ | 24-hour | 1.882 | 8 |
| | | Annual | 0.207 | 4 |
| | PM$_{2.5}$ | 24-hour | 1.164 | 2 |
| | | Annual | 0.116 | 1 |
| Weminuche Wilderness Area | NO$_2$ | Annual | 0.446 | 2.5 |
| | SO$_2$ | 3-hour | 0.171 | 25 |
| | | 24-hour | 0.046 | 5 |
| | | Annual | 0.006 | 2 |
| | PM$_{10}$ | 24-hour | 0.494 | 8 |
| | | Annual | 0.097 | 4 |
| | PM$_{2.5}$ | 24-hour | 0.459 | 2 |
| | | Annual | 0.062 | 1 |

BLM_0027116

**Table 4-22**
**Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (µg/m³)**

| Location | Pollutant | Averaging Time | Modeled Concentration | PSD Increment |
|---|---|---|---|---|
| West Elk Wilderness Area | $NO_2$ | Annual | 0.289 | 2.5 |
| | $SO_2$ | 3-hour | 0.095 | 25 |
| | | 24-hour | 0.037 | 5 |
| | | Annual | 0.005 | 2 |
| | $PM_{10}$ | 24-hour | 0.790 | 8 |
| | | Annual | 0.238 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.706 | 2 |
| | | Annual | 0.193 | 1 |

*Visibility Impacts*

The visibility impacts due to RFD oil and gas emissions and mining emissions were examined following the procedures provided by the USFWS and NPS (USFWS and NPS, 2012). These procedures use EPA's Modeled Attainment Test Software (MATS) to project current year observed visibility impairment for the best 20 percent (B20%) and worst 20 percent (W20%) days to the future year using the 2008 Base Case and 2021 High Development Scenario modeling results [which include contributions from all sources categories (anthropogenic and natural)] with and without emissions from RFD sources.

**Table 4-23a** and **Table 4-23b** display the cumulative visibility results for the 2021 High Development Scenario and RFD sources for W20% and B20% days, respectively. Note that since MATS was used and MATS only includes observed data for Class I areas, cumulative visibility results are presented for just the Class I areas.

As is indicated in **Table 4-23a**, from the 2008 current year to the 2021 High Development Scenario future year, the W20% visibility metric is estimated to improve at each of the Class I areas. The biggest improvement is a reduction of 0.89 dv that occurs at Rocky Mountain National Park and goes from 12.04 dv in 2008 to 11.15 dv in 2021. RFD emissions are estimated to contribute a maximum of 0.26 dv to the 2021 W20% days visibility at Black Canyon in Gunnison National Park.

Cumulative visibility results at Class I areas for the B20% days are provided in **Table 4-23b**. From the 2008 to 2021, the B20% days visibility is estimated to degrade in two and improve in eight Class I areas. The largest B20% visibility degradation is a 0.18 dv increase from 2.25 to 2.43 dv at the Weminuche Wilderness Area. The largest B20% visibility improvement is a 0.16 dv decrease at the Maroon Bells-Snowmass Wilderness Area, from 0.69 to 0.53 dv. The maximum contribution from RFD sources to 2021 B20% visibility metrics is 0.17 dv at the Flat Tops Wilderness Area.

BLM_0027117

**Table 4-23a**

**Cumulative Visibility Results (Δdv) for Worst 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources**

| Class I Area | State | IMPROVE Site | 2008 Base | 2021 High | 2021 High Improvement from 2008 | Contribution from RFD |
|---|---|---|---|---|---|---|
| Arches NP | UT | CANY1 | 11.02 | 10.37 | 0.65 | 0.18 |
| Black Canyon of the Gunnison NP | CO | WEMI1 | 9.95 | 9.31 | 0.64 | 0.26 |
| Eagles Nest Wilderness | CO | WHRI1 | 8.68 | 7.87 | 0.81 | 0.17 |
| Flat Tops Wilderness | CO | WHRI1 | 8.68 | 8.07 | 0.61 | 0.22 |
| La Garita Wilderness | CO | WEMI1 | 9.95 | 9.36 | 0.59 | 0.05 |
| Maroon Bells-Snowmass Wilderness | CO | WHRI1 | 8.68 | 7.91 | 0.77 | 0.11 |
| Mount Zirkel Wilderness | CO | MOZI1 | 9.36 | 8.54 | 0.82 | 0.12 |
| Rocky Mountain NP | CO | ROMO1 | 12.04 | 11.15 | 0.89 | 0.12 |
| Weminuche Wilderness | CO | WEMI1 | 9.95 | 9.49 | 0.46 | 0.07 |
| West Elk Wilderness | CO | WHRI1 | 8.68 | 8.08 | 0.60 | 0.11 |

**Table 4-23b**

**Cumulative Visibility Results (Δdv) for Best 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources**

| Class I Area | State | IMPROVE Site | 2008 Base | 2021 High | 2021 High Improvement from 2008 | Contribution from RFD |
|---|---|---|---|---|---|---|
| Arches NP | UT | CANY1 | 2.86 | 2.86 | 0.00 | 0.08 |
| Black Canyon of the Gunnison NP | CO | WEMI1 | 2.25 | 2.18 | 0.07 | 0.14 |
| Eagles Nest Wilderness | CO | WHRI1 | 0.69 | 0.55 | 0.14 | 0.07 |
| Flat Tops Wilderness | CO | WHRI1 | 0.69 | 0.55 | 0.14 | 0.17 |
| La Garita Wilderness | CO | WEMI1 | 2.25 | 2.29 | -0.04 | 0.07 |
| Maroon Bells-Snowmass Wilderness | CO | WHRI1 | 0.69 | 0.53 | 0.16 | 0.06 |
| Mount Zirkel Wilderness | CO | MOZI1 | 0.95 | 0.84 | 0.11 | 0.16 |
| Rocky Mountain NP | CO | ROMO1 | 1.91 | 1.87 | 0.04 | 0.07 |
| Weminuche Wilderness | CO | WEMI1 | 2.25 | 2.43 | -0.18 | 0.08 |
| West Elk Wilderness | CO | WHRI1 | 0.69 | 0.57 | 0.12 | 0.05 |

*Deposition Impacts*

Potential atmospheric deposition impacts within Class I and sensitive Class II areas were calculated for cumulative RFD sources and are shown in **Table 4-24**, Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas. The maximum direct total (wet and dry) N and S deposition are predicted to be well below the cumulative analysis thresholds of 1.5 ky/ha/yr for nitrogen and 3 kg/ha/yr for sulfur at all Class I and sensitive Class II areas. The maximum total nitrogen and sulfur deposition rates are approximately 50 percent and 1 percent of the cumulative analysis thresholds, occurring at Dinosaur National Monument and the Mount Zirkel Wilderness Area, respectively.

Potential changes in ANC from baseline conditions resulting from potential N and S deposition from cumulative RFD source emissions were calculated for 28 sensitive lakes within the Class I and sensitive Class II Wilderness areas. The estimated change in ANC for each lake is shown in **Table 4-25**, Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas. The estimated changes in ANC are all predicted

BLM_0027118

**Table 4-24**
**Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas**

| Location | Maximum N Deposition (kg/ha/yr) | Maximum S Deposition (kg/ha/yr) |
|---|---|---|
| Arches National Park | 0.257 | 0.003 |
| Black Canyon of the Gunnison National Park | 0.303 | 0.006 |
| Colorado National Monument | 0.400 | 0.006 |
| Dinosaur National Monument | 0.745 | 0.030 |
| Eagles Nest Wilderness Area | 0.414 | 0.015 |
| Flat Tops Wilderness Area | 0.557 | 0.033 |
| La Garita Wilderness Area | 0.257 | 0.007 |
| Maroon Bells/Snowmass Wilderness Area | 0.439 | 0.019 |
| Mount Zirkel Wilderness Area | 0.472 | 0.041 |
| Ragged Wilderness Area | 0.410 | 0.018 |
| Rocky Mountain National Park | 0.456 | 0.019 |
| Weminuche Wilderness Area | 0.505 | 0.013 |
| West Elk Wilderness Area | 0.324 | 0.011 |

**Table 4-25**
**Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas**

| Wilderness Area | Sensitive Lake | 10th Percentile Lowest ANC Value (μeq/L) | N Deposition (kg/ha/yr) | S Deposition (kg/ha/yr) | ANC Relative Change (%) | ANC Absolute Change (μeq/L) |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 86.8 | 0.012 | 0.342 | 5.1 | n/a |
| Eagles Nest | Upper Willow Lake | 134.1 | 0.009 | 0.251 | 2.8 | n/a |
| Flat Tops | Ned Wilson Lake | 39.0 | 0.027 | 0.434 | 10.9 | n/a |
| Flat Tops | Upper Ned Wilson Lake | 12.9 | 0.027 | 0.434 | n/a | 4.3 |
| Flat Tops | Lower Packtrail Pothole | 29.7 | 0.027 | 0.434 | 14.4 | n/a |
| Flat Tops | Upper Packtrail Pothole | 48.7 | 0.027 | 0.434 | 8.8 | n/a |
| La Garita | Small Lake Above U-Shaped Lake | 59.9 | 0.006 | 0.228 | 4.5 | n/a |
| La Garita | U-Shaped Lake | 81.4 | 0.006 | 0.228 | 3.3 | n/a |
| Maroon Bells | Avalanche Lake | 158.8 | 0.019 | 0.412 | 2.2 | n/a |
| Maroon Bells | Capitol Lake | 154.4 | 0.019 | 0.405 | 2.6 | n/a |
| Maroon Bells | Moon Lake | 53.0 | 0.019 | 0.405 | 7.6 | n/a |
| Mount Zirkel | Lake Elbert | 56.6 | 0.038 | 0.472 | 5.5 | n/a |
| Mount Zirkel | Seven Lakes (LG East) | 36.2 | 0.028 | 0.388 | 7.8 | n/a |
| Mount Zirkel | Summit Lake | 48.0 | 0.041 | 0.466 | 7.7 | n/a |
| Raggeds | Deep Creek Lake | 20.6 | 0.014 | 0.336 | n/a | 4.2 |
| Weminuche | Big Eldorado Lake | 19.6 | 0.007 | 0.246 | n/a | 2.4 |
| Weminuche | Four Mile Pothole | 123.4 | 0.011 | 0.471 | 3.5 | n/a |
| Weminuche | Lake Due South of Ute Lake | 13.2 | 0.008 | 0.277 | n/a | 2.8 |
| Weminuche | Little Eldorado | -3.3 | 0.007 | 0.246 | n/a | 2.4 |
| Weminuche | Little Granite Lake | 80.7 | 0.008 | 0.333 | 5.4 | n/a |
| Weminuche | Lower Sunlight Lake | 80.9 | 0.009 | 0.307 | 3.5 | n/a |
| Weminuche | Middle Ute Lake | 42.8 | 0.007 | 0.253 | 6.1 | n/a |
| Weminuche | Small Pond Above Trout Lake | 25.5 | 0.008 | 0.337 | 13.2 | n/a |
| Weminuche | Upper Grizzly Lake | 29.9 | 0.011 | 0.328 | 10.2 | n/a |
| Weminuche | Upper Sunlight Lake | 28.0 | 0.011 | 0.328 | 10.9 | n/a |
| Weminuche | West Snowdon Lake | 39.4 | 0.006 | 0.228 | 6.5 | n/a |
| Weminuche | White Dome Lake | 2.1 | 0.007 | 0.246 | n/a | 2.4 |
| West Elk | South Golden Lake | 111.4 | 0.008 | 0.285 | 2.8 | n/a |

BLM_0027119

to be above the applicable significance thresholds (less than a 10 percent change in ANC for lakes with ANC values greater than 25 µeq/l, and a 1.0 µeq/l change in ANC for lakes with background ANC values equal to or less than 25 µeq/l); at Ned Wilson and Upper Ned Wilson Lakes and Lower Packtrail Pothole in the Flat Tops Wilderness Area; at Deep Creek Lake in the Raggeds Wilderness Area; and at Big and Little Eldorado lakes, the Lake Due South of Ute Lake, the Small Pond Above Trout Lake, and Upper Grizzly, Upper Sunlight, and White Dome lakes in the Weminuche Wilderness Area. The greatest percent change for lakes with ANC values greater than 25 µeq/l is 14.4 percent at Lower Packtrail Pothole. The greatest ANC change for lakes with background ANC values equal to or less than 25 µeq/l is 4.3 µeq/l at Upper Ned Wilson Lake.

### Amended Proposed Action Air Quality Impacts Analysis

Alternative D changes to the Bull Mountain Compressor Station engine size, type, and number are the same as those described under Alternative B; therefore, the resulting effects are the same as those described above under Alternative B.

## 4.2.2   Noise

### Methods of Analysis

Noise from the development and operation of gas wells and construction of associated infrastructure has the potential to impact sensitive land uses and users in the Unit. For this analysis, potential sensitive receptor locations within the Unit were identified, and the distances to potential well pads, compressor stations, pipelines, electrical lines, and access roads were assessed. The nature and types of noise sources associated with construction and operation and approximate noise levels by distance were then described. Actual noise levels at sensitive receptor locations would depend upon the exact locations of wells and related infrastructure, the amount of development activity occurring, and the local topography and would be assessed in tiered analysis as described in **Section 1.6.1**, Requirements for Future NEPA Analysis. This analysis assumes that measures for noise abatement would be applied to meet DOI and USDA Gold Book guidelines (DOI and USDA 2007) and COGCC and CDPHE maximum permissible noise levels described in **Section 3.2.2**, Noise, and in **Appendix C,** Conditions of Approval, Requirement 28.

### Nature and Type of Effects

Sources of noise include construction activities (earth-moving equipment for road, well pad, compressor station, electrical line, and pipeline construction); vehicle traffic; well drilling, completion, and production; and compressor station operations. Noise levels that typically result from these activities are described under Effects Common to All Alternatives, below.

Noise resulting from each alternative has the potential to affect sensitive receptors in the project area, primarily residents, recreational users, and wildlife. Potential noise impacts on wildlife are addressed separately in **Section 4.2.7**, Fish and Wildlife. The magnitude of the effect would depend upon the distance between the receptor and the noise source, the duration and frequency of the noise, and the time at which the noise occurred (noise is viewed as more disruptive when it occurs at night). In addition, individuals react differently to changes in ambient noise levels and to various types of sound; therefore, the perceived level of impact may vary by receptor. Noise

BLM_0027120

levels that meet maximum permissible noise levels may still be perceived as a noise impact for some sensitive receptors.

***Effects Common to All Alternatives***
Noise under all alternatives would occur from construction activities and from operational activities. Construction would produce short-term, localized, and intermittent increases in ambient noise levels, while operations may produce long-term increases in ambient noise levels over the life of the project.

Construction-related Actions. Construction activities would include well pad development, access road improvement and development, pipeline and electrical line development, and compressor station development. These activities would require the use of earth-moving equipment (e.g., bulldozers, graders, and backhoes), heavy trucks (e.g., dump trucks and water trucks), generators, and air compressors at the construction site. In addition, heavy truck traffic and personal vehicle traffic would increase along area roadways to bring personnel and supplies to the staging and construction site locations. Noise from these activities would be short term and intermittent. For access roads, electrical lines, and pipelines, the construction equipment would not remain in one location for a long period of time given the linear nature of this type of development. Construction of these features would occur during working hours and would not affect nighttime ambient noise levels. In general, well pads would each take 1 to 3 weeks to construct, and access roads would be constructed at a rate of 600 to 800 yards per day.

Well drilling and completion would also be a short-term source of noise but would occur 24 hours per day, 7 days per week for an average of 60 days per natural gas well and 60 to 120 days per water disposal well. Drilling would take an average of 60 days for coal bed methane wells and 85 days for shale and sandstone. Completions would take an additional 8 to 10 days for all types of wells. The primary noise sources associated with drilling include large diesel engines that power the rotary rig and pumps and the large diesel-driven air compressors. In addition, heavy truck traffic and personal vehicle traffic would increase along area roadways to bring personnel and supplies to the well site.

Operation-Related Actions. The primary sources of noise during operation include natural gas well pumps at each well, natural gas-fired internal combustion engines to power the compressors at each compressor station, and intermittent traffic related to operations and maintenance. In addition, periodic workovers would be needed to correct problems with producing wells, and road maintenance would occur to replace surface materials and apply dust abatement.

Noise from oil and gas development has been studied at federal, state, and local levels. Within Colorado, the COGCC conducted surveys of noise generated by various types of equipment used for drilling and production of natural gas (COGCC 2006), while La Plata County published a county impact report that included noise analysis from oil and gas operations (La Plata County 2002). **Table 4-26**, Average Noise Levels Produced during Construction and Operations, shows noise levels contained within those reports. The noise level reported was extrapolated to other distances; noise levels generally decrease by 6 dBA with a doubling of distance.

BLM_0027121

**Table 4-26**
**Average Noise Levels Produced during Construction and Operations**

| Activity | Duration of Noise | Noise Level at 50 Feet (dBA) | Noise Level at 500 Feet (dBA) | Noise Level at 1,000 Feet (dBA) | Noise Level at 2,500 Feet (dBA) |
|---|---|---|---|---|---|
| Well Pad, Access Road, Pipeline Construction Equipment[1] | Short-term, daytime | 86 | 66 | 60 | 52 |
| Well Drilling[1] | Short-term, 24 hours/day | 86 | 66 | 60 | 52 |
| Three-Axle On-Road Vehicle, 35 mph[1] | Short-term, daytime | 88 | 68 | 62 | 54 |
| Two-Axle On-Road Vehicle, 35 mph[1] | Short-term, daytime | 72 | 52 | 46 | 28 |
| Well Pump Units (Natural Gas)[1] | Long-term, 24 hours/day | 67 | 47 | 41 | 33 |
| Compressor Station (muffled and shielded)[1] | Long-term, 24 hours/day | 60 | 48 | 42 | 26 |

Source: [1]La Plata County 2002, [2]COGCC 2006

Actual noise levels at a given location depend upon the topography of the area, atmospheric conditions (e.g., temperature, wind speed and direction, and humidity), vegetative conditions (which can absorb sound), and the presence of structures between a noise source and a noise receptor.

*Alternative A*
Alternative A would include new developments on private lands and private minerals. Activities on these lands would be subject to COGCC and CDPHE maximum permissible noise levels described in **Section 3.2.2**, Noise.

Construction-Related Impacts. Construction related to well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts as facilities are constructed. These actions would not occur during nighttime hours. Well drilling would have localized impacts within the vicinity of the well drilling activities that would last approximately 60 days per well. These activities would occur 24 hours per day and would thus have greater impacts, especially during nighttime hours, if drilling occurred in the vicinity of sensitive receptors such as residences. Construction-related traffic would produce intermittent noise impacts during the construction period, with greater impacts occurring on more heavily used routes such as State Route 133.

Under Alternative A, no proposed well pad analysis areas or new pipelines would be within 1,000 feet of existing residences except for the well pad that would be located within T11S R90W Section 13 (see **Figure 2-1**, Alternative A), as measured from the edge of the well pad analysis area (actual well pad and well placement likely would be greater than 1,000 feet from residences within this area). Well pad construction and drilling are estimated to be within the maximum permissible noise levels allowed under COGCC and CDPHE rules for gas facility installation based on average noise levels presented in **Table 4-26**. Under COGCC rules, well pad development, pipeline development, well drilling, workover, and completion are subject to the noise standards for light industrial or industrial land uses. For construction-related actions,

BLM_0027122

the standards are 70 dBA (light industrial) or 80 dbA (industrial) from 7 a.m. to 7 p.m. and 65 dbA or 70 dBA from 7 p.m. to 7 a.m.. At 1,000 feet, the construction activities are within these levels for all phases of construction. Activities may exceed this level for short periods of time if blasting or flaring is required, as allowed for by COGCC rules.

Under Alternative A, there are residences along roads that require upgrade for use and roads that do not require upgrade but that would be utilized over the 3-year construction period for construction-related traffic. These residences would experience intermittent and short-term noise level increases from road improvement as well as noise level increases from construction-related traffic. Construction traffic is not subject to COGCC maximum permissible noise levels, and noise levels at sensitive receptor locations would depend upon setback of the residence from the road as well as volume, speed, and type of traffic. Construction traffic would generally not occur during nighttime hours and would not affect the nighttime ambient noise levels.

Construction would have the potential to affect recreational users of the areas. Because noise related to construction could affect game movements within the Unit, hunters would be particularly impacted.

Operation-Related Noise Impacts. The primary operation-related noise sources would be natural gas-fired production well pumps and the compressor station. As described above, there are generally no well pad analysis areas within 1,000 feet of residences. Well pump operations are projected to be 41 dBA at 1,000 feet, which is below the COGCC standards of 55 dBA from 7 a.m. to 7 p.m. and 50 dBA from 7 p.m. to 7 a.m. for residential/agricultural/rural uses. Well pads containing multiple wells may result in higher cumulative noise levels than those described for discrete wells but would be subject to the same maximum permissible noise levels.

Under Alternative A, the nearest residence is approximately 3,000 feet east of the proposed compressor station site. While the projected noise level would be below 26 dBA at locations farther than 2,500 feet based on **Table 4-26**, compressor stations also have the potential to produce low frequency sounds (measured as dBC) that are less likely to attenuate with distance or at downwind locations. COGCC rules address low frequency noise by requiring noise readings at the request of a landowner and mitigation for noise levels over 65 dBC within 25 feet of a residence or occupied structure (COGCC Rule 802d).

Siting to avoid impacts, requiring mufflers, and other sound reducing-measures would be determined during permitting and subsequent environmental review to ensure that construction and operational activities comply with COGCC maximum permissible noise levels.

*Alternative B*

Construction-Related Impacts. Construction related to well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts as facilities are constructed. These actions would not occur during nighttime hours. Well drilling would have localized impacts within the vicinity of the well drilling activities that would last approximately 60 days per well. These activities would occur 24 hours per day and would thus have greater impacts, especially during nighttime hours, if drilling occurred in the vicinity of sensitive receptors such as residences. Construction-related traffic would produce intermittent noise impacts during the

BLM_0027123

construction period, with greater impacts occurring on more heavily used routes. Construction would occur over 6 years, resulting in a longer duration of elevated construction noise levels when compared with Alternative A.

Under Alternative B, one proposed well pad analysis area would be within 1,000 feet of an existing residence (T11S R90W Section 36) and many would be more than 1 mile from existing residences, with the exceptions of 1 house within T11S R90W Section 11, 1 house within T11S R89W Section 29, a cluster of 3 houses within T11S R90W Section 27, a cluster of 6 houses within T12S R89W Sections 4 and 9, and a single house within Section 9 (see **Figure 2-2**, Alternative B), as measured from the edge of the well pad analysis area. Actual well pad and well placement could be greater than 1,000 feet from residences within these areas. In addition, the same residences within T12S R89W Sections 4 and 9, as well as residences within T11S R89W Section 31, could be within 1,000 feet of proposed pipeline construction. Residences within T12S R89W Sections 4 and 9 could also be within 1,000 feet of a new proposed access road or road upgrades.

If the BLM were to apply mitigation measure #28, operators would be required to comply with CDPHE and COGCC regulations related to noise control. However, this would not further reduce noise impacts because compliance with CDPHE and COGCC regulations is mandatory. Well pad construction, pipeline and access road construction, and well drilling are estimated to be within the maximum permissible noise levels allowed under COGCC and CDPHE rules for gas facility installation. Activities may exceed this level for short periods of time if blasting or flaring is required, as allowed for by COGCC rules.

Under Alternative B, there are residences along roads that require upgrade for use throughout the Unit, as well as roads that do not require upgrade but that would be utilized over the 6-year construction period for construction-related traffic. These residences would experience intermittent and short-term noise level increases from road improvement as well as noise level increases from construction-related traffic. Noise levels at sensitive receptor locations would depend upon setback of the residence from the road as well as volume, speed, and type of traffic. Construction traffic would generally not occur during nighttime hours and would not affect the nighttime ambient noise levels.

Construction would have the potential to affect recreational users of the areas. Because noise related to construction could affect game movements within the Unit, hunters would be particularly impacted.

There are two residences within one-half mile of the APD 12-89-7-1 well site; the nearer of the two is approximately 1,700 feet from the well site. A third residence is slightly more than one-half mile away. The maximum average sound level at the nearest residence during construction and operation would be approximately 57 dBA. This would be from three-axle vehicles traveling to and from the well site and would be a short-term daytime impact. Average noise levels from well drilling would be approximately 55 dBA; this impact would occur over the short term but for 24-hours a day. Regulatory limits for noise generated by natural gas facilities are 55 dBA from 7 a.m. to 7 p.m. and 50 dBA from 7 p.m. to 7 a.m. (see **Section 3.2.2**, Noise). To meet these regulatory requirements and to comply with mitigation measure #28 in **Appendix C**, noise

BLM_0027124

dampening measures would likely be needed.[6] If the BLM were to apply mitigation measure #28 in **Appendix C**, then impacts would be less than significant.

Operation-Related Noise Impacts. The primary operation-related noise sources would be natural gas-fired production well pumps, the three new screw compressor stations, and the one new multi-engine compressor station. Well pump operations are projected to be 41 dBA at 1,000 feet, which is below the COGCC standards. Well pads containing multiple wells would result in higher noise levels than those described for discrete wells depending upon the location and number of wells.

Under Alternative B, the nearest residences are approximately 3,000 feet east of the 2 proposed compressor stations in T11S R90W Section 24 and northeast of the proposed compressor station in T11S R90W Section 10, while the nearest residents are approximately 1 mile away from the proposed compressor station in T12S R90W Section 1. While the projected noise level would be below 26 dBA at locations farther than 2,500 feet based on **Table 4-26**, compressor stations have the potential to produce low frequency sounds (measured as dBC) that are less likely to attenuate with distance or at downwind locations. COGCC rules address low frequency noise by requiring noise readings at the request of a landowner and mitigation for noise levels over 65 dBC within 25 feet of a residence or occupied structure (COGCC Rule 802d).

Operation impacts related to APD 12-89-7-1 are the same as those described for construction, above (**Appendix O**).

*Alternative C*
Alternative C has additional facility location constraints designed to move development closer to existing roads and pipelines and away from sensitive erosive soils. This has modified the number and placement of potential well pads, roads, and pipelines. While Alternative C would have fewer well pads, the same number of wells would be concentrated in fewer areas, resulting in the potential for increased localized noise impacts during construction and operation.

Construction-Related Impacts. Construction-related noise impacts associated with well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts as facilities are constructed. These actions would not occur during nighttime hours. Well drilling would have localized impacts within the vicinity of the well drilling activities that would last approximately 60 days per well. These activities would occur 24 hours per day and would thus have greater impacts, especially during nighttime hours, if drilling occurred in the vicinity of sensitive receptors such as residences. Construction-related traffic would produce intermittent noise impacts during the construction period, with greater impacts occurring on more heavily used routes. Construction would occur over 6 years, resulting in a longer duration of elevated construction noise levels when compared with Alternative A.

---

[6] Actual noise levels at a given location depend upon the topography of the area, atmospheric conditions, vegetative conditions, and the presence of structures between a noise source and a noise receptor.

BLM_0027125

Like Alternative B, no proposed well pad analysis areas would be within 1,000 feet of existing residences and many would be more than 1 mile from existing residences, with the exceptions of one residence within T11S R90W Section 11, a cluster of 6 residences within T12S R89W Sections 4 and 9, and a single residence within Section 9 (see **Figure 2-3**, Alternative C), as measured from the edge of the well pad analysis area. Actual well pad and well placement could be greater than 1,000 feet from residences within these areas. In addition, the same residences within T12S R89W Sections 4 and 9, as well as 1 residence within T11S R89W Section 31, could be within 1,000 feet of proposed pipeline construction. Residences within T12S R89W Sections 4 and 9 could also be within 1,000 feet of a new proposed access road or road upgrades.

As shown in **Appendix C**, a required design feature mandates compliance with CDPHE and COGCC regulations related to noise control. Impacts would be the same as those described under Alternative B. Well pad construction, pipeline and access road construction, and well drilling are estimated to be within the maximum permissible noise levels allowed under COGCC rules for gas facility installation. Activities may exceed this level for short periods of time if blasting or flaring is required, as allowed for by COGCC rules.

Under Alternative C, there are residences along roads that require upgrade for use throughout the Unit, as well as roads that do not require upgrade but that would be utilized over the 6-year construction period for construction-related traffic. These residences would experience intermittent and short-term noise level increases from road improvement as well as noise level increases from construction-related traffic. Noise levels at sensitive receptor locations would depend upon setback of the residence from the road as well as volume, speed, and type of traffic. Construction traffic would generally not occur during nighttime hours and would not affect the nighttime ambient noise levels.

Construction would have the potential to affect recreational users of the areas, primarily hunters, because noise related to construction could affect game movements within the Unit.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

Operation-Related Noise Impacts. The primary operation-related noise sources would be natural gas-fired production well pumps and the four compressor stations. Well pump operations are projected to be 41 dBA at 1,000 feet, which is below the COGCC standards. Well pads containing multiple wells would result in higher noise levels than those described for discrete wells depending upon the location and number of wells. Noise levels at well pads near residences likely would be higher under Alternative C compared with Alternative B if a greater number of wells were developed on these pads.

Compressor station-related noise impacts would be the same as described under Alternative B.

Specific best management practices would be determined during permitting and subsequent environmental review to ensure that construction and operational activities comply with CDPHE and COGCC maximum permissible noise levels and minimize potential noise impacts on sensitive receptors within the project area.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

BLM_0027126

***Alternative D, the Preferred Alternative***
The types of impacts under Alternative D would be similar to those described under Alternative B, except that there would be fewer sensitive receptors within one mile of the proposed well pad analysis areas.

Construction-Related Impacts
Construction related to well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts similar to those described under Alternative B. As under Alternative B, there would be one proposed well pad analysis area within 1,000 feet of an existing residence (T11S R90W Section 36). Compared to Alternative B, there would be three fewer homes within one mile of a well pad analysis area. The following homes would be within one mile of a well pad analysis area: 1 house within T11S R90W Section 11, 1 house within T11S R89W Section 29, a cluster of 6 houses within T12S R89W Sections 4 and 9, and a single house within Section 9 (see **Figure 2-4**, Alternative D), as measured from the edge of the well pad analysis area. Actual well pad and well placement could be greater than 1,000 feet from residences within these areas.

As under other alternatives, noise impacts would be reduced because well pad, pipeline, and access road construction and well drilling would be required to be within the maximum permissible noise levels allowed under COGCC and CDPHE rules for gas facility installation. Activities may exceed this level for short periods if blasting or flaring is required, as allowed for by COGCC rules.

Impacts from road upgrades and construction traffic on residences would be similar to, but slightly less than, those under Alternative B. This is because there would be fewer miles of upgraded roads and similar numbers and types of vehicles.

Impacts on recreation, including hunting, would be similar to those described under Alternative B. This is because the overall level of development and associated disturbance on recreation is similar.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

Operation-Related Noise Impacts
Impacts would be similar to those under Alternative B because similar types and numbers of equipment would be used.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

***Cumulative***
The cumulative impacts assessment area for noise is the Unit boundary. Development of combined natural gas production facilities from Alternative A and any of the action alternatives (see **Table 4-1** and **Table 4-2**) would result in the addition of noise sources to those that already exist within the Unit. Existing noise sources include existing traffic and equipment noise from natural gas development and well maintenance, agricultural activities, and recreational and tourist traffic on State Highway 133 and County Route 265.

BLM_0027127

Natural gas development actions under all alternatives, in combination with the 18 existing wells and the 55 wells and 1 compressor station that would be developed under Alternative A, would contribute to increases in ambient noise levels in the short term during construction and over the long term as wells go into production and operate for the life of the field (estimated to be 40 years). The types of noise impacts from implementing Alternatives B, C, or D would be similar to those described under Effects Common to All Alternatives but would occur for a longer duration and over a wider area. Cumulative noise impacts would be similar across alternatives because there would be similar noise sources, types, and durations under each alternative. Cumulative projects under Alternative B would create new long-term sources of noise throughout the Unit, while cumulative projects under Alternative C would concentrate the same amount of development within fewer areas. Cumulative projects under Alternative D would be similar to those under Alternative B. However, there would be three fewer well pads within the Unit and therefore three fewer stationary sources of noise (and associated traffic to and from those three well pads).

In some areas, the density of development could be considered by some individuals to be noisy. The continuous noise from production wells and compressor stations may be disruptive or objectionable to some residents as well as recreationists, hunters, and livestock operators and may result in displacement of such activities. The combined effect would be greater than the sum of their parts.

Ambient noise levels at buildout would be expected to increase in some areas within the Unit as a result of implementing any of the alternatives in combination with past, present, and reasonably foreseeable future actions.

### 4.2.3   Soil Resources
This section discusses impacts on soil resources from proposed management actions under each alternative. Existing conditions concerning soil resources are described in **Section 3.2.3**, Soil Resources. Soils, especially in fragile soil areas, are susceptible to impacts from surface disturbance, which can lead to compaction, accelerated erosion, soil loss, and reduced productivity

***Methods of Analysis***
Each 5-acre well pad may be placed within a 40-acre area as identified in **Figures 2-1**, **2-2**, and **2-3**. Due to the uncertainty of final well pad placement, a total sediment production based on well pad placement is not available. Every soil type within the Unit (see **Table 3-14**) may be impacted by wellhead placement and other features of the proposed projects. Soils within the Unit have soil erosion hazard ratings from slight to very severe, an erosion potential of roads and trails ranging from slight to severe and slope classification ranging from gently sloping to very steep. Erosion hazard ratings for roads and trails are broken out into three categories. A rating of *slight* indicates that little or no erosion is likely; *moderate* indicates that some erosion is likely, that the roads or trails may require occasional maintenance, and that simple erosion-control measures are needed; and *severe* indicates that significant erosion is expected, that the roads or trails require frequent maintenance, and that costly erosion-control measures are needed. Slope classification has a scale connotation that refers to the ground surface configuration for scales

BLM_0027128

that exceed about 10 meters of range upward to the landscape as a whole, and includes gradient, complexity, length, and aspect (NRCS 1993).

Overall, soils with moderate erosion ratings and gently sloping slopes are less likely to produce sediment, whereas soils with severe or very severe erosion ratings and steep slopes are more likely to produce sediment. Soil erosion and slope steepness are correlated. That is, the steeper the slope that the soil is found on, the more erosion that is likely to happen. Due to the varying nature of slope, soil type, and soil erosion ratings, the absolute amount of erosion based on erosion ratings is not specified (NRCS 1993).

Impacts were determined by assessing number of acres planned for modification under each alternative. This assessment was completed for soils within the Unit and sensitive soils. For the purpose of this analysis, sensitive soils are defined as soils suitable for farmland as classified by the USDA under the Farmland Protection Act, soils on steep slopes, soils susceptible to natural erosion, and soils susceptible to erosion in reference to road and trail maintenance.

*Indicators*
Indicators of impacts on soil resources are based on proposed changes in the level of surface-disturbing activities from construction and development of roads, pipelines, well pads, and other facility placements. Management actions involving ground-disturbing activities, reduced vegetation cover, trampling, and vehicle and heavy machinery use contribute to soil impacts through compaction and increased erosion rates.

The following indicators were used to evaluate effects on soils resources from the Proposed Action:

- Acres proposed for disturbance

- Acres of farmlands and sensitive soils proposed for disturbance

- Acres proposed for long term and short term disturbance (as shown in **Table 2-2**)

*Assumptions*
The analysis of soil resources has the following assumptions:

- Soil resources would be managed to meet Standard 1 of the Colorado Standards for Public Land Health.

- Fragile soils would be managed to minimize erosion and maintain soil productivity.

- Applicable COAs and other mitigation measures as outlined under approved ROWs, APDs, and lease stipulations would apply under all alternatives.

***Nature and Type of Effects***
Direct effects are as follows:

- Compaction from overland travel and land grading, resulting in decreased vegetation cover and more exposure of the soil surface to erosion (Burton et al. 2008).

BLM_0027129

- Clearing areas for construction of well pads, roads, pipelines, and ancillary facilities leads to increased erosion, runoff and sedimentation, and fragmentation of soil features due to the loss of surface vegetation.

- Removing soil surface from facility sites and stockpiling it for later reclamation could result in soil horizon mixing and changes to initial soil properties of individual sites during reclamation.

Direct impacts on acres with farmland designation would be surface disturbance resulting in the long-term or short-term loss of farmland characteristics. If development were to convert important farmland to non-farm use, then a land evaluation and site assessment system form (Form AD-1006 or Form CPA-106) to establish a farmland conversion impact rating score on impacted lands would need to be submitted to the appropriate US Department of Agriculture's Natural Resources Conservation Service (NRCS) office. This score is used as an indicator to consider alternative sites if the potential adverse impacts on the farmland were to exceed the recommended allowable level.

Indirect effects of the actions on soil resources may include introducing invasive weeds to the project area through additional overland travel. This results in decreased soil stability and increased soil erosion. If chemical spills were to occur, remediation could require removing soil layers for proper disposal at appropriate designated facilities, resulting in a local permanent loss of soil horizons. Indirect effects on soils with farmland characteristics would be the same as those on other vegetation types, assuming crops are growing on the farmlands.

### Effects Common to All Alternatives
Under all alternatives, interim reclamation of areas with the processes and seed mixtures described in **Section 2.2.3** would reduce the effects from extended exposure of bare ground. This is because these measures are expected to replace the vegetation and hold the soil in place. However, weed infestation of the reclaimed areas is still a possibility and would need to be addressed with monitoring or additional mitigation measures.

An integrated spill prevention, control and countermeasures plan and emergency response plan, required by both COGCC and BLM, outlines the actions and procedures needed to reduce the possibilities for spills and measures to control and respond to emergency spills. The measures provide effective, environmentally sound, and economically feasible means of managing spills. They would be applied on an as-needed, site-specific basis to avoid, minimize, reduce, and rectify impacts from spills. As such, a plan is anticipated to reduce the likelihood of hazardous material spills and subsequent permanent removal and disposal of soil.

### Alternative A
**Table 2-10** provides acreage amounts for the direct short-term and long-term impacts on soil resources under Alternative A.

BLM_0027130

Table 4-27, Table 4-28, and Table 4-29 provide the acreage amounts of disturbance on farmlands and sensitive soil resources. As noted above, when construction exposes bare ground, interim reclamation measures are applied to reduce wind and water erosion and the resultant loss of soils. Under Alternative A, the interim reclamation procedures agreed to via landowner agreements and the COGCC would help to reduce the possibility and severity of soil loss. Reclamation plans would be submitted for each new well. Reseeding and interim reclamation areas with approved seed mixes would reduce the likelihood for noxious weed invasion, erosion, and dust by restoring plant cover. Monitoring would help to ensure that revegetation is deemed successful.

**Table 4-27**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative A)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long Term | | | | | |
| 1-10 | 2 | 0 | 4 | 11 | 12 |
| 11-20 | 3 | 0 | 2 | 16 | 8 |
| 21-30 | 0 | 0 | 0 | 4 | 1 |
| 31-40 | 0 | 0 | 0 | 2 | 0 |
| 41+ | 2 | 0 | 3 | 18 | 1 |
| Total | 8 | 0 | 9 | 49 | 22 |
| Short Term | | | | | |
| 1-10 | 15 | 13 | 7 | 21 | 28 |
| 11-20 | 21 | 22 | 4 | 29 | 21 |
| 21-30 | 2 | 0 | 1 | 8 | 1 |
| 31-40 | 2 | 0 | 0 | 11 | 0 |
| 41+ | 14 | 11 | 5 | 33 | 5 |
| Total | 54 | 46 | 17 | 92 | 55 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-28**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative A)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long Term | | | | | |
| Slight | 2 | 0 | 4 | 11 | 12 |
| Moderate | 4 | 0 | 2 | 21 | 9 |
| Severe | 2 | 0 | 1 | 10 | 0 |
| Very Severe | 0 | 0 | 1 | 7 | 1 |
| Total | 8 | 0 | 9 | 49 | 22 |
| Short term | | | | | |
| Slight | 15 | 13 | 7 | 21 | 28 |
| Moderate | 24 | 23 | 4 | 38 | 22 |
| Severe | 13 | 4 | 3 | 19 | 1 |
| Very Severe | 2 | 7 | 2 | 14 | 4 |
| Total | 54 | 46 | 17 | 92 | 55 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

BLM_0027131

**Table 4-29**
**Acres of Soils with Erosion Hazard Ratings for Roads (Alternative A)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 1 | 0 | 0 | 1 | 0 |
| Moderate | 0 | 0 | 2 | 2 | 3 |
| Severe | 7 | 0 | 7 | 47 | 18 |
| Total | 9 | 0 | 9 | 49 | 22 |
| Short term | | | | | |
| Slight | 5 | 2 | 0 | 1 | 0 |
| Moderate | 2 | 4 | 3 | 3 | 8 |
| Severe | 46 | 44 | 14 | 87 | 47 |
| Total | 54 | 46 | 17 | 92 | 55 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

### Alternative B

Impacts from the phases of development would be similar to those described under *Nature and Type of Effects*, *Effects Common to All Alternatives*, and Alternative A. BLM land health in developed areas would likely be reduced under this alternative.

The acreage of impacts would increase under Alternative B compared to Alternative A, as shown in **Table 2-10**, due to the additional facilities and areas considered under this alternative. **Table 4-30**, **Table 4-31**, **Table 4-32**, and **Table 4-33** provide acreage amounts that would be disturbed on farmlands and sensitive soil resources as a result of construction.

Under Alternative B, the BLM has the suite of conditions of approval actions that would be applied to approved APDs (**Appendix C**) and that would help mitigate impacts on sensitive soil resources. If the BLM were to apply mitigation measures in **Appendix C**, then the impacts on soil and sensitive soil resources would temporarily increase erosion rates and soil instability. Once mitigation measures were applied, soils would be restabilized. COA #7 (measure for stockpiling soils and addressing disturbed areas) and COA #10 (measure for recontouring and replacing vegetation materials) would reduce the level of soil loss from wind and water erosion. They also would reduce the risk of soil horizons mixing and soil property changes.

**Table 4-30**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative B)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| 1-10 | 1 | 0 | 2 | 17 | 4 |
| 11-20 | 15 | 0 | 18 | 36 | 40 |
| 21-30 | 1 | 0 | 1 | 7 | 2 |
| 31-40 | 0 | 0 | 1 | 2 | 2 |
| 41+ | 8 | 0 | 11 | 35 | 22 |
| Total | 25 | 0 | 32 | 97 | 71 |

BLM_0027132

**Table 4-30**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative B)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Short term | | | | | |
| 1-10 | 3 | 3 | 4 | 32 | 10 |
| 11-20 | 96 | 24 | 33 | 67 | 102 |
| 21-30 | 6 | 8 | 1 | 13 | 5 |
| 31-40 | 1 | 4 | 1 | 5 | 6 |
| 41+ | 54 | 7 | 21 | 66 | 60 |
| Total | 161 | 47 | 60 | 182 | 182 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-31**
**Acres of Farmlands Potentially Impacted (Alternative B)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-country | Roads: New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term disturbance | | | | | |
| Farmland of statewide importance | 0 | 0 | 1 | 11 | 2 |
| Prime farmland if irrigated | 0 | 0 | 0 | 2 | 0 |
| Short term disturbance | | | | | |
| Farmland of statewide importance | 2 | 2 | 2 | 21 | 5 |
| Prime farmland if irrigated | 0 | 0 | 1 | 3 | 0 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-32**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative B)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 1 | 0 | 2 | 17 | 4 |
| Moderate | 16 | 0 | 19 | 46 | 45 |
| Severe | 8 | 0 | 9 | 26 | 21 |
| Very Severe | 0 | 0 | 2 | 9 | 1 |
| Total | 25 | 0 | 32 | 97 | 71 |
| Short term | | | | | |
| Slight | 3 | 3 | 4 | 32 | 10 |
| Moderate | 104 | 36 | 36 | 85 | 112 |
| Severe | 51 | 7 | 16 | 49 | 57 |
| Very Severe | 1 | 0 | 4 | 17 | 3 |
| Total | 161 | 47 | 60 | 182 | 182 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

BLM_0027133

**Table 4-33**
**Acres of Soils with Erosion Hazard Ratings for Roads (Alternative B)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 0 | 0 | 0 | 2 | 0 |
| Moderate | 1 | 0 | 1 | 9 | 5 |
| Severe | 23 | 0 | 30 | 87 | 66 |
| Total | 25 | 0 | 31 | 97 | 71 |
| Short term | | | | | |
| Slight | 0 | 0 | 1 | 3 | 0 |
| Moderate | 10 | 6 | 2 | 17 | 12 |
| Severe | 151 | 41 | 57 | 162 | 169 |
| Total | 161 | 47 | 60 | 182 | 182 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

Other measures are COA #5 (maximizing interim reclamation), COA #6 (stockpiling top soil), and COAs #50 through #52 (reclamation). These would all provide guidelines for vegetation reestablishment, in addition to the measures noted above; COA #8 (weed-free seed mixes) and COAs #45 through #48 would help limit the spread of weeds; COA #12 (dust abatement), and COA #17 (avoiding steep slopes) would limit water and wind erosion and would help reduce erosion from wind.

Under Alternative B, the 12-89-7-1 APD would be approved. The APD would include the authorization to disturb 3 acres for the construction of the well pad, an additional 25.3 acres for associated pipeline construction, and 7.5 acres to upgrade the access road to the well pad site. This disturbance would occur on soils identified as Bulkley clay loam with 12 to 25 percent slopes. Slopes between 11 and 25 percent are considered strongly sloping and may be more susceptible to erosion when disturbed. After construction, interim reclamation would reduce the disturbance associated with the authorization of the APD by about 3 acres. These acres would be reseeded with approved weed-free mix, which would further reduce the long-term potential for erosion.

*Alternative C*
**Table 2-10** shows the direct and short-term and long-term impacts on soil resources under all alternatives. **Table 4-34**, **Table 4-35**, **Table 4-36**, and **Table 4-37** show the direct short-term and long-term impacts on farmlands and sensitive soil resources. Application of the COAs provided in Alternative C would help mitigate impacts in the same manner as described in Alternative B. The 12-89-7-1 APD would be approved and would result in the same level of disturbance as discussed under Alternative B.

Under Alternative C additional measures would provide a monitoring protocol to ensure that reclamation is meeting requirements and standards. These additional measures require an annual reclamation monitoring status report to help identify areas for improvement and identify appropriate native seed mixes and their proper application. Interim reclamation would ultimately increase soil health and stability through replanting an appropriate composition of grasses, forbs, and shrubs for the ecological site. This would reduce the overall potential for soil loss through erosion.

**Table 4-34**
**Acres of Farmlands Potentially Impacted (Alternative C)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-country | Roads: New Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Long term disturbance | | | | | | | |
| Farmland of statewide importance | 1 | 0 | 1 | 0 | 0 | 0 | 3 |
| Prime farmland if irrigated | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Short term disturbance | | | | | | | |
| Farmland of statewide importance | 8 | 0 | 2 | 0 | 0 | 0 | 8 |
| Prime farmland if irrigated | 0 | 0 | 1 | 0 | 0 | 0 | 0 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-35**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative C)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Long term | | | | | | | |
| 1-10 | 3 | 0 | 3 | 1 | 1 | 0 | 4 |
| 11-20 | 18 | 0 | 12 | 12 | 1 | 6 | 35 |
| 21-30 | 4 | 0 | 2 | 4 | 0 | 0 | 5 |
| 31-40 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| 41+ | 12 | 0 | 0 | 7 | 0 | 0 | 23 |
| Total | 37 | 0 | 23 | 25 | 2 | 6 | 69 |
| Short term | | | | | | | |
| 1-10 | 21 | 0 | 6 | 15 | 3 | 0 | 10 |
| 11-20 | 110 | 0 | 23 | 30 | 2 | 13 | 89 |
| 21-30 | 25 | 0 | 4 | 5 | 0 | 0 | 15 |
| 31-40 | 0 | 0 | 0 | 2 | 0 | 0 | 3 |
| 41+ | 74 | 0 | 11 | 27 | 0 | 2 | 61 |
| Total | 230 | 0 | 44 | 78 | 5 | 15 | 177 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-36**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Long term | | | | | | | |
| Slight | 3 | 0 | 3 | 1 | 1 | 0 | 4 |
| Moderate | 22 | 0 | 14 | 17 | 1 | 6 | 42 |
| Severe | 9 | 0 | 4 | 6 | 0 | 0 | 22 |
| Very Severe | 3 | 0 | 2 | 1 | 0 | 0 | 0 |
| Total | 37 | 0 | 23 | 25 | 2 | 6 | 69 |

BLM_0027135

**Table 4-36**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Short term | | | | | | | |
| Slight | 21 | 0 | 6 | 2 | 3 | 0 | 10 |
| Moderate | 135 | 0 | 27 | 32 | 2 | 13 | 106 |
| Severe | 57 | 0 | 7 | 11 | 0 | 2 | 59 |
| Very Severe | 18 | 0 | 4 | 2 | 0 | 0 | 2 |
| Total | 231 | 0 | 44 | 47 | 5 | 15 | 177 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-37**
**Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative C)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 0 | 0 | 0 | 0 | 0 |
| Moderate | 6 | 0 | 5 | 2 | 8 |
| Severe | 31 | 0 | 18 | 23 | 61 |
| Total | 37 | 0 | 23 | 25 | 69 |
| Short term | | | | | |
| Slight | 0 | 0 | 1 | 0 | 0 |
| Moderate | 36 | 0 | 9 | 3 | 20 |
| Severe | 194 | 0 | 34 | 44 | 157 |
| Very Severe | 0 | 0 | 0 | | |
| Total | 231 | 0 | 44 | 47 | 177 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

***Alternative D, the Preferred Alternative***
**Table 2-10** shows the direct short-term and long-term impacts on soil resources under all alternatives. **Table 4-38**, **Table 4-39**, **Table 4-40**, and **Table 4-41** show the direct short-term and long-term impacts on farmlands and sensitive soil resources. The 12-89-7-1 APD would be approved and would result in the same level of disturbance as discussed under Alternative B.

**Table 4-38**
**Acres of Farmlands Potentially Impacted (Alternative D)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-Country | Roads: New Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Long-term disturbance | | | | | | |
| Farmland of statewide importance | 0 | 0 | 1 | 0 | 0 | 2 |
| Prime farmland if irrigated | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 4-38**
**Acres of Farmlands Potentially Impacted (Alternative D)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-Country | Roads: New Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Short-term disturbance | | | | | | |
| Farmland of statewide importance | 2 | 3 | 2 | 0 | 0 | 5 |
| Prime farmland if irrigated | 0 | 0 | 1 | 0 | 0 | 0 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

**Table 4-39**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative D)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-Country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Long-term | | | | | | |
| 1-10 | 0 | 0 | 2 | 1 | 0 | 4 |
| 11-20 | 15 | 0 | 17 | 15 | 6 | 39 |
| 21-30 | 1 | 0 | 1 | 2 | 0 | 2 |
| 31-40 | 0 | 0 | 0 | 0 | 0 | 1 |
| 41+ | 10 | 0 | 9 | 9 | 0 | 18 |
| Total | 27 | 0 | 30 | 27 | 6 | 65 |
| Short-term | | | | | | |
| 1-10 | 3 | 7 | 4 | 1 | 0 | 10 |
| 11-20 | 96 | 35 | 31 | 27 | 13 | 99 |
| 21-30 | 9 | 5 | 2 | 4 | 0 | 5 |
| 31-40 | 1 | 0 | 11 | 1 | 0 | 3 |
| 41+ | 62 | 13 | 18 | 18 | 2 | 50 |
| Total | 171 | 60 | 56 | 51 | 15 | 166 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

**Table 4-40**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative D)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-Country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Long-term | | | | | | |
| Slight | 0 | 0 | 2 | 1 | 0 | 4 |
| Moderate | 17 | 0 | 18 | 17 | 6 | 43 |
| Severe | 9 | 0 | 7 | 9 | 0 | 17 |
| Very Severe | 0 | 0 | 2 | 0 | 0 | 1 |
| Total | 27 | 0 | 30 | 27 | 6 | 65 |
| Short-term | | | | | | |
| Slight | 3 | 7 | 4 | 1 | 0 | 10 |
| Moderate | 106 | 40 | 34 | 32 | 13 | 107 |
| Severe | 60 | 8 | 14 | 17 | 2 | 47 |
| Very Severe | 2 | 5 | 4 | 0 | 0 | 3 |
| Total | 171 | 60 | 56 | 51 | 15 | 166 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

BLM_0027137

**Table 4-41**
**Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative D)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-Country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long-term | | | | | |
|   Slight | 0 | 0 | 0 | 0 | 0 |
|   Moderate | 1 | 0 | 1 | 2 | 6 |
|   Severe | 26 | 0 | 28 | 25 | 60 |
|   Total | 27 | 0 | 30 | 27 | 65 |
| Short-term | | | | | |
|   Slight | 0 | 0 | 1 | 0 | 0 |
|   Moderate | 7 | 0 | 3 | 4 | 12 |
|   Severe | 164 | 0 | 52 | 47 | 154 |
|   Very Severe | 0 | 0 | 0 | | |
|   Total | 171 | 60 | 56 | 51 | 166 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

Alternative D has a suite of COAs from Appendix C that would be applied to approved APDs and would help mitigate impacts on sensitive soil resources. Application of COAs #7 (for stockpiling soils and addressing disturbed areas) and #10 (for recontouring and replacing vegetation materials) would reduce the level of soil loss from wind and water erosion. They also would reduce the risk of soil horizons mixing and soil property changes.

Other measures are COA #5 (maximizing interim reclamation), COA #6 (stockpiling top soil), and COAs #50 through #52 (reclamation), which would provide guidelines for vegetation reestablishment. COA #8 (weed-free seed mixes) and COAs #45 through #48 would help limit the spread of weeds. COA #12 (dust abatement) and COA #17 (avoiding steep slopes) would limit water and wind erosion and would help reduce erosion from wind.

As noted in the Preferred Alternative, SGI would monitor interim and final reclamation progress at one-, three-, and five-year intervals. The company would reseed if satisfactory interim reclamation progress is not being made at year two or year three monitoring intervals, or if final reclamation is not achieved by year five. These measures would help ensure that reclamation is successful and would prevent the continuation of the impacts noted above.

*Cumulative*
The cumulative analysis takes into account the combined effects of the No Action Alternative and any one of the action alternatives with other past, present, and reasonably foreseeable future actions. Of the actions noted in **Table 4-3**, grazing, mining, oil and gas, travel management, forestry and vegetation management, when combined with the actions from Alternative A and any of the action alternatives, would disturb soils in the region due to trampling, construction of project facilities, transmission lines, access roads, and overland travel. Currently there are 620 acres of livestock grazing, 23 acres of mineral materials, and 23 miles of existing access roads suitable for use, and there are 20.5 miles of pipeline. Depending on the alternative chosen, an additional 260 to 600 acres of temporary disturbance and 88 to 260 acres of soils would be permanently disturbed due to oil and gas development.

BLM_0027138

If Alternatives B through D were constructed simultaneously with other projects, cumulative construction and operation impacts on soil resources would increase. Actions taken under a Bull Mountain Unit MDP on federal mineral estate would be subject to the lease stipulations, project design features and COAs (see **Appendix C**) which would help ensure that soil resources were not unnecessarily degraded during activities, and require reclamation procedures. Application of these measures would reduce the additive effects of Alternatives B through D on the overall level of disturbance within the 10-mile radius of the analysis area.

## 4.2.4   Water Resources

*Methods of Analysis*

Existing surface and groundwater quality data, including results of baseline sampling, were compiled and evaluated to identify existing and baseline conditions. The water rights database maintained by the Colorado Division of Water Resources (CDWR) was queried to identify existing water rights holders within the Unit, to evaluate the distribution and general magnitude of existing allocations, and the sources of water within the Unit. The Colorado Oil and Gas Information System (COGIS) was searched for records of oil and gas wells located in the Unit and surrounding area.

Sources of, and mechanisms for, potential impacts of proposed activities on water resources were gleaned from scientific literature, environmental documentation of similar projects, scoping comments, experience from other gas and oil development sites, and from a range of sources, including regulatory agency, industry, research, and advocacy group sources. For example, much public controversy surrounds the use of hydraulic fracturing as a means of extracting oil and gas from tight formations that would not have been considered economically recoverable a few years ago. Although the technique is not new, the amount of data available about applications of the technology in a wide range of environments has grown rapidly in recent years along with the number of oil and gas wells where it has been used. Success in reducing the cost of extraction and expansion of the use of hydraulic fracturing has resulted in many innovations in the technology, and greater regulatory involvement, and it is likely that these changes would continue in coming years.

Estimates of the level of significance of program-specific and location-specific effects in this impact analysis have been made based on evaluation of the hydrologic and geologic context of the project, relying on documented descriptions of effects in similar environments, opinions of experts consulted during preparation, and on engineering judgment of the analyst.

Some potential impacts are expected to be reduced as a result of compliance with existing regulatory requirements and agency policies, COAs and design features (see **Appendix C**). In general, compliance with regulatory requirements is assumed as an inherent component of the project, and theoretical impacts would be avoided by this compliance. Specific siting details, and specific project details, such as the particular well drilling methods, waste containment or disposal methods, well completion methods, and number of wells, would be evaluated in project-specific plans, and specific mitigation measures that would be developed as part of the planning process for the specific project sites.

BLM_0027139

*Nature and Type of Effects*

Effects on water resources can be divided between water quantity effects and water quality effects. Water quantity effects relate to the quantity of water that would be required to accomplish the project objectives of drilling and maximizing the recovery of gas while minimizing the costs of production and the environmental effects associated with production.

Water quality effects include effects on both surface water and groundwater resources. Groundwater resources include both potable and non-potable resources. Most of the beneficial uses of water in the project area are derived from surface water resources. However, surface water and groundwater are connected, in that groundwater is recharged by surface water, and groundwater in turn discharges to streams and springs.

Effects can be either direct and indirect, or cumulative. Direct effects are those in which there is a direct cause and effect relationship between the project action and the effect. Indirect effects tend to be less obvious than direct effects and are less predictable, since they may be contingent on a sequence of triggering actions. Direct *water quantity* effects would include effects such as reduction in streamflow or decline in groundwater levels as a result of water withdrawals from streams or wells, respectively. Indirect *water quantity* effects might include effects such as a depletion of regional groundwater supplies as a result of consumptive use of surface water. Direct *water quality* effects include the effects that would result from a waste spill that discharged to a surface water body, or from migration of saline wastewater into a freshwater aquifer because of a failure of containment. Indirect *water quality* effects might include effects such as impairment of water quality in a freshwater aquifer because of a decline in water levels in the aquifer that induces lower quality water to flow into the aquifer.

Effects can also be divided among short-term and long-term effects. Short-term effects are mainly associated with construction. They tend to occur early in the project and typically have a short duration relative to long-term impacts. Construction activities of the project include earth moving activities such as pad construction and road and pipeline construction, and also well construction. Some of these activities, especially well construction, would be initiated at different individual sites within the project area over a relatively long period, though at any particular location they would be short in duration. Short-term effects could occur at many locations simultaneously with long-term effects. Long-term effects are usually associated with operation and maintenance activities. Not only are they more likely to occur over periods of years rather than months, but their timing is also generally less predictable.

The nature and magnitude of some types of potential effects would depend on options that have not yet been specified at the programmatic level of analysis. As discussed in Chapter 2, more specific and detailed analysis of effects would be evaluated in future project-specific plans required during permitting or to meet other environmental requirements. In this analysis, where more than one option is available (such as use of recovery pits versus closed loop systems during drilling), the range of effects is discussed in an attempt to bracket the potential effects.

*Effects Common to All Alternatives*

Most of the effects of the project would occur under any of the alternatives, and only the magnitude of the effects would vary. Even under Alternative A, most of the same impacts would occur as under the action alternatives. Since these effects are common to all of the alternatives,

BLM_0027140

they are discussed in detail below, and the differences in magnitude of these common effects are discussed for each of the alternatives.

*Short-Term Effects*

Short-term effects are associated with construction activities, such as construction of roads, pipelines, well pads and associated infrastructure, and wells.

**Water Quantity.** As discussed in Chapter 2, SGI anticipates drilling new wells at a rate of up to 27 wells per year under all of the alternatives. Each alternative includes installation of wells over multiple years, but the maximum water requirements in a given year would be the same for each alternative until the maximum number of wells for the alternative is reached. Water is required for drilling and development of each new well, and for dust suppression during construction of roads, pipelines, and well pads.

Freshwater needed for drilling, pad construction, completion, and dust suppression would be obtained from nearby sources (per agreements with landowners) and in accordance with SGI's water augmentation plan (see **Appendix L**). Under the augmentation plan, SGI would store water in Bainard Reservoir No. 1 to augment stream diversion amounts of up to 50.64 acre-feet per year, based on the following estimated consumptive uses:

- Construction of up to 8 wells per year (at 1.69 acre-feet per year per well);

- Construction of an estimated 8 well pads per year (0.77 acre-feet per site);

- Dust suppression to maintain approximately 15 miles of roads (500,000 gallons, or about 1.5 acre-feet per mile);

- Transit losses of 7.96 acre-feet per year from the reservoir outlet to the point of replacement at the confluence of Muddy Creek and West Muddy Creek.

In addition, the Augmentation Plan estimates evaporative losses of 33.1 acre-feet per year from Bainard Reservoir No. 1 where the augmentation water would be stored.

These quantities represent a maximum amount estimate, since augmentation is only necessary when senior water rights holders downstream place a call on the water.

Closed loop drilling systems (that do not rely on a reserve pit for managing drilling fluids) would be used unless SGI can demonstrate the benefit or need for using a pit. Closed loop systems reduce the potential for emissions of volatile compounds and tend to reduce the volume of waste generated. Pitless systems may help minimize the volume of water consumed in drilling, though comparably low water consumption can be obtained with retention pit systems if they are operated to conserve water.

In addition to the water needed for drilling and dust suppression, additional water is needed for well completions, involving hydraulic fracturing of the gas-containing formations. The quantity of water required for hydraulic fracturing would vary with the geology encountered in the reservoir rock, the type of well (vertical or horizontal/direction and the length(s) of the

BLM_0027141

perforated interval(s), and would also depend on the amount of waste fluid that can be recycled for subsequent fracturing stages.

The water requirements for hydraulic fracturing would not be known until the wells are drilled and logged, but coal bed methane deposits are expected to require the least water per length of well (because of the water that can be produced from these deposits, and the low fracture resistance), sandstone somewhat more, and shale would require the most, because of its low porosity and high fracture resistance.

Nor is it certain that water would be used exclusively as the base fluid for hydraulic fracturing. While the use of waterless fracturing techniques could greatly reduce the quantity of water required for construction off wells, it is a technology that has not always been successful. For purposes of this analysis, the conservative maximum estimate of the average water requirements per well used for evaluation purposes in this report is 124,000 barrels of water, about 16 acre-feet per well, although this would significantly overestimate the consumptive use if the water is recycled.

Other water sources, besides freshwater, could be used, including the water produced from a well during drilling, which notably would include the water produced from coal bed methane wells. It is expected that about 80 percent of the volume injected for hydraulic fracturing would be returned during completion, and this water can potentially be recycled. Assuming that the water can be recycled and that about 30 percent is lost to the formation or to evaporation or other losses, a more realistic estimate is that 70 percent of water entered into the system could be recovered and used as recycled water for the next well. The remaining 30 percent of water would need to be replenished with freshwater sources.

Rules establishing the procedures for a determination of whether produced waters are non-tributary are codified in 2 CCR 402-17 (Produced Nontributary Groundwater Rules). The rules establish certain areas and formations as nontributary waters without requiring further evaluation. According to these rules, groundwater in the Mesaverde Formation, Cameo and South Canyon Coal Groups within the boundaries of the Bull Mountain Unit are delineated as nontributary waters. Since this includes the target formations for gas development in the Unit, augmentation is not expected to be required for water produced from these formations in the Unit. However, an augmentation plan would be needed to off-set water usage for drilling the freshwater portion of the wells, as discussed at the top of this section.

**Impacts on Surface Water Quality.** The quality of surface waters in the Unit, including streams and reservoirs, is generally high, and is suitable for most beneficial uses. Water quality could be degraded by accidental spills or releases of substances stored or used at the project sites, such as hydraulic oil and fuel used in heavy equipment, chemical additives used in well stimulation, or waste fluids stored in tanks or pits, transported by truck, or conveyed in pipelines.

Engineering controls (such as spill containment structures) and use of COAs can provide a high level of protection against spill reaching surface water bodies. In the event than unanticipated uncontrolled spills occur, setbacks from surface water bodies of chemical storage facilities, impoundments, pipelines, and other improvements, or of ground disturbing activities, can

BLM_0027142

provide additional protection by allowing more time and opportunity to detect and remediate spills before they reach surface water resources.

As described in Chapter 2, fresh, production, and recycled water may be transferred overland via portable polyethylene (HDPE) pipe, and via existing buried steel pipelines, to the four McIntyre flowback pits located on private lands on the west-central portion of the Unit. Two of the pits have capacities of about 30,000 barrels. Two larger pits each have about five times the capacities of the smaller pits. The pits must conform to requirements in COGCC 900 Series Rules. Pipelines are also addressed in the 900 Series Rules. However, use of portable pipelines is not specifically addressed. The use of pipelines to convey stimulation fluids to a central water storage facility has a number of advantages over hauling the water in trucks, or even transporting it in permanent steel pipelines, such as reducing land disturbance, dust and wear on roads, and encouraging recycling of the fluids. However, portable pipelines may be vulnerable to breakage or sabotage, and it may be difficult to monitor the integrity of the pipelines during use, or to shut off the pipelines in the event a failure is detected. Under a worst case scenario, a large volume of brine could be discharged near a stream crossing when the stream is flowing, causing a sudden change in salinity capable of impacting riparian habitat and biota downstream of the release. The effects would depend on the concentrations in the fluid and the quantity and rate of the release.

Surface water could also be degraded by sediment eroded from areas of soil disturbance such as pipeline trenches, roads, or well pads. Mitigation measures would be applied during construction and as part of the site design. These could include drainage controls at the disturbed site, grading to help maintain internal drainage and low slopes, runoff containment, directing runoff to retention/infiltration areas and away from surface water features, revegetation to establish ground cover, and installing silt fences around the perimeter of erodible areas. All of these measures are addressed in the Storm Water Construction Permit required by the CDPHE.

The Storm Water Construction Permit is required for new construction involving disturbance of more than 1 acre of land, including access roads and feeder pipelines. The state requirement applies to oil and gas facilities until the site is finally stabilized, which for oil and gas sites is defined by the COGCC as the stage of interim reclamation. Multiple oil and gas sites within a field can be covered under a single Field permit certification.

The purpose of the Storm Water Construction Permit is to prevent non-storm water discharges from entering Waters of the State. The permit must identify and implement best management practices. The Permit requires a minimum inspection schedule and specifies that the stormwater management system of each individual site under active construction must be inspected at least once every 14 calendar days, and within 24 hours after the end of any precipitation or snowfall event that causes surface erosion (except during periods of winter snow cover), to ensure that the best management practices are effective in preventing non-storm water discharges.

If spill prevention control and countermeasures (SPCC) plans are required for the site (combined aboveground oil storage capacity of more than 1,320 gallons), the SPCC plans can be incorporated into the storm water construction plan to comply with the best management practices requirements applicable to bulk storage at the site. The storm water construction plan also describes site stabilization methods at each portion of the sites, in accordance with COGCC standards.

BLM_0027143

Compliance with the requirements for the Storm Water Construction Permit is expected to ensure that the potential for impacts on surface water quality from spills or releases during construction are reduced to less than significant levels, but some idea of the risk of a spill occurring can be obtained from past spill records maintained by the COGCC (2014).

According to the US Energy Information Agency (US EIA 2013), the number of producing gas and gas condensate wells in Colorado grew from about 5,125 in 1989, to about 32,000 in 2012. **Table 4-42**, Estimated Risk of a Reportable Spill from a Producing Gas Well in Colorado 2009 to 2013, shows the number of combined oil and gas spills reported to COGCC from 2009 to 2013, and as a percentage of the number of producing gas wells. The table overestimates the risk of a spill related to gas wells only, since the spill data includes spills from oil wells. There were approximately 50,000 active oil and gas wells in Colorado in 2013, so the risk of a spill as a percentage of active oil and gas wells combined was closer to 1 percent (1 in 100) in 2013.

COGCC records indicate that, from 2006 to present, 9 spill incidents were reported at oil and gas wells in Gunnison County (no spills are recorded in Gunnison County prior to 2006), which is a rate of about 1 incident per year in an area with about 44 active wells. The higher rate of incidents per well in this area compared to the state average probably reflects a higher risk of spills during well construction. None of the spills impacted surface water, and most spills are contained within a berm or are cleaned up before they threaten surface water.

**Table 4-42**
**Estimated Risk of a Reportable Spill from a Producing Gas Well in Colorado 2009 to 2013**

| Year | Number of Producing Gas and Gas Condensate Wells[1] | Number of Reported Oil and Gas Spills[2,3] | Percent Spills per Well |
|---|---|---|---|
| 2009 | 27,021 | 384 | 1.4% |
| 2010 | 28,813 | 497 | 1.7% |
| 2011 | 30,101 | 526 | 1.7% |
| 2012 | 32,000 | 402 | 1.3% |
| 2013 | 34,000 (estimated) | 534 | 1.7% |

1 - US EIA 2013; 2 -EnergyWire, May 4, 2013;
Source: COGCC 2014

One such spill occurred in 2012 at well Jacobs 29-1 on the Jacobs Ranch property just east of Highway 133 and about 300 feet east of Muddy Creek. The spill involved a release of 158 barrels (6,636 gallons) of produced water caused by pump failure during transfer of the water to containment vessels, and was contained within the berm surrounding the containment vessels. An estimated 95 barrels (3,990 gallons) of the spilled fluid was recovered.

In its most recent annual report (2014), COGCC reported only three releases of exploration and production waste fluids in Northwestern Colorado (which includes the Piceance Basin) that impacted either surface water or dry drainages leading to surface water (COGCC 2014).

**Impacts on Groundwater Quality from Surface Spills.** Groundwater quality can be impacted by surface spills of the same sort that might impact surface water quality. Instead of running off or being transported by storm water, the spill infiltrates the vadose zone (the unsaturated area between the ground surface and water table) to the water table. The rate of migration is

BLM_0027144

dependent on the nature of the materials; infiltration is slower through clays than through sands. Spills and releases at the ground surface would be prevented or mitigated through compliance with existing regulatory requirements and policies, including regulations under state and federal laws and adherence to BLM lease stipulations (see Section 3.2.4).

The BLM's protection of groundwater resources begins during the resource management planning process with the development of stipulations or lease notices to be applied to oil and gas leases.

BLM standard practice includes performing a site-specific analysis of groundwater occurrence and vulnerability during BLM's review of an APD. A BLM geologist and/or hydrologist would perform an independent review of each APD utilizing Colorado Geological Survey (CGS) and US Geological Survey (USGS) geologic and hydrologic data and maps to identify usable groundwater resources that require protection.

**Groundwater Impacts from Drilling.** For federal lands and mineral estate, a BLM petroleum engineer would review the drilling plan to ensure that the casing and cementing program is protective of freshwater aquifer zones identified in the geologic report. A natural resource specialist would review the surface use plan and determine the adequacy of reserve pit design. COAs would be attached to the APD as necessary.

Freshwater tends to occur at relatively shallow depths below the ground surface, on the order of hundreds of feet deep, rather than thousands of feet. Freshwater is low in dissolved salts. The federal secondary drinking water standard for dissolved salts (called total dissolved solids, or TDS) is 1,000 milligram per liter (mg/L), which is approximately equivalent to 1,000 parts per million (ppm) by weight. By contrast, seawater has a TDS concentration of about 30,000 to 40,000 ppm. Water with higher concentrations is called brine. Groundwater at the depths at which the gas-containing formations are found (thousands of feet), is brackish, with TDS concentrations in the range of about 7,000 ppm up to about 15,000 ppm.

Before an oil or gas well is drilled, a plan must be submitted to the COGCC (and to the BLM where the wells target the federal mineral estate) for approval, specifying the groundwater zones and geologic units the well would encounter, and how the well would be constructed to protect groundwater resources. To protect freshwater aquifers, COGCC requires that a *surface casing* be installed to a depth of at least 50 feet below the depth of the deepest water well or below the depth of the bottom of the aquifer, whichever is greater. The surface casing must be terminated in an impermeable formation below the aquifer. If multiple freshwater aquifers are present, each may need to be isolated from the others. (In some instances, the COGCC may require a larger diameter *conductor casing* that extends a short distance below the surface and provides greater protection against migration of contaminants at the surface to the aquifer during drilling, but in most locations, the surface casing alone is sufficient.) BLM requirements are similar.

After the surface casing is installed, the borehole is continued through the surface casing and a smaller diameter casing is installed. In many wells, an *intermediate casing* is installed below the surface casing, to a depth above the formation containing the targeted hydrocarbon deposits. The intermediate casing is sealed and cemented, and then the production casing string is installed to

BLM_0027145

the depth of the target formation. In some wells the production casing is installed with no intermediate casing.

**Groundwater Impacts from Hydraulic Fracturing (Well Stimulation).** Some geologic materials (clays, cemented sandstones, shale) act as barriers to the vertical flow of water and fluids, due to their low porosity and low permeability, while other geologic units (loose sands, gravels) are highly conductive and allow fluids to migrate easily. The presence of accumulations of fluid hydrocarbons in the subsurface is evidence that the hydrocarbons have been isolated and trapped, since otherwise the hydrocarbons would escape to the earth's surface. In the case of shale gas, the gas is trapped in the fine porosity of the shale and within the matrix of the shale formation.

Hydraulic fracturing creates or widens fractures in the fine, impermeable deposits and creates interconnected pathways that allow the hydrocarbon fluids to escape or be pumped from the formation. The process of hydraulic fracturing involves directing hydraulic fracturing fluids into a small region within a tight formation that has been penetrated by a well. The well may be either a vertical well or a horizontal well created by directional drilling. The pressure is applied through a perforated segment of production casing enclosed above and below by packers inside casing and by cement applied in the annular space between the casing and the borehole. The packers limit the distance within which the pressure is applied to the adjacent formation, and the cement outside the casing prevents the pressure from being directed into the annular space of the well bore. The segments of the well in which the hydraulic fracturing pressure is directed are selected based on the presence of the targeted deposits, and an assessment of the geologic structure, based on information from logs made during drilling.

If not properly cemented and sealed, the annular space around a well casing (the space between the borehole and the steel casing of the well) could act as a conduit for the brackish or saline fluids to move from one depth to another in response to hydraulic fracturing pressures.

As water is recycled in the hydraulic fracturing process, salt concentrations in the fluids increase because more salts are removed from the formation each time water is circulated and recovered. Brines with concentrations of up to 70,000 ppm TDS may be generated in the process of drilling and hydraulic fracturing the wells, and would be stored at the surface for reuse or disposal.

In addition to the natural salts that are present in the formations at depth, the fluids used in hydraulic fracturing can contain a variety of additives designed to accomplish various objectives, including improving the permeability of porous materials, increasing secondary porosity (fracture diameter), maintaining pumps and equipment, preventing biofouling, and adjusting viscosity. Proppants, an industry term for sand or human-made ceramics that lodge in the fractures, holding them open, are added to the hydraulic fracturing fluid to hold open the newly created or widened fractures. COGCC regulations (Rule 205) require operators to identify and report the additives used in the hydraulic fracturing fluids and their quantities within 30 days of completion of a well. Since April 2012, this information, with the exception of certain trade secret information, must be made available to the public on a publicly available website, FracFocus (http://www.fracfocusdata.org). Prior to promulgation of Rule 205, some information about the nature and quantities of chemicals used in a well were reported in the Colorado Oil and Gas Information System (COGIS) online database, with varying degrees of completeness.

BLM_0027146

The constituents of the hydraulic fracturing fluid vary. Hydraulic fracturing involves the use of water as the base injection fluid. According to COGCC, water and proppants (primarily sand, which may be supplemented by synthetic materials), account for more than 99 percent of the mass of hydraulic fluid. A variety of additives comprise the remaining less than 1 percent of the hydraulic fracturing fluid, including gels to increase fluid viscosity to suspend the proppants, biocides to eliminate bacteria, scale inhibitors to maintain piping, surfactants, iron controlling agents, and crosslinking agents that maintain viscosity with temperature increase, friction reducers to promote entry and distribution of the proppants into fractures. Most of the additives used in the industry are non-toxic and highly dilute in the fluid, so that they would present very little threat to water quality even if the cement seals in the wells were to fail, or the fractures themselves were to become conduits (COGCC 2011).

A technique called waterless fracturing has been explored as a way of reducing water use but has met with limited success and is not yet considered a proven technology. Waterless fracturing substitutes a non-aqueous fluid for some or all of the water that would ordinarily be used. Waterless fracturing was recently used in one well in the Unit (Federal 11-89-17 #1, located just west of Highway 133 and southwest of Chair Creek, and completed to a depth of 8,510 feet). The well had been drilled in 2009, but did not produce until it was hydraulically fractured in 2012. The base fluid utilized in fracturing this well was a mixture of 50 percent butane and 50 percent propane, which together comprised about 82 percent of the hydraulic fracturing fluid by weight. Proppants constituted about 13 percent, and other additives, including gelling agents, comprised the remaining approximately 3 percent (FracFocus 2012).

Most of the hydraulic fracturing fluid (often up to about 80 percent or more) is recovered in flowback from the well during completion and prior to production, and most of the rest of the residual hydraulic fracturing fluid is recovered during production, along with some water already present in the formation. Maximum recovery of gas requires that the formation be as free of water as possible. This means that the pressure gradients that force fluids into the formation away from the well during hydraulic fracturing are temporary, and reverse toward the well when production begins. COGCC requirements governing the hydraulic fracturing process include Rule 341, which requires monitoring of the pressures applied during well stimulation, and Rules 903 and 904 which include the requirements for containing hydraulic fracturing fluids. In addition, special requirements apply to Coal Bed Methane (coal bed methane) wells (Rule 608).

The water and chemical additives used in hydraulic fracturing must be stored and mixed at the wellhead during well construction, and chemicals must be stored at certain central storage points in the project area. Chemical storage and handling during construction are governed by the spill prevention requirements under the Clean Water Act, and more specifically by Construction Storm Management Plans, and SPCC Plans, where applicable, as described above. If a spill were to occur, COGCC Rule 906 requires notification of the COGCC, the Colorado Department of Public Health and Environment (CDPHE), and the landowner of any spill incident that could impact Waters of the State.

**Impacts Associated with Disposal of Production Wastewater.** It is likely that much of the water injected for hydraulic fracturing would be recycled and used in subsequent hydraulic fracturing operations of other wells, until the fluid becomes too saline for reuse. The quantity of

BLM_0027147

waste water that would need to be disposed is therefore dependent not only on the amount recovered, but on the amount that can be recycled. Additional water (not only some of the water injected during hydraulic fracturing, but also the saline water naturally present in the formation) is produced during production of gas, and must be recycled or disposed.

Currently, SGI operates one deep injection well (Federal 24-2 WDW, which is centrally located in the Unit in Section 24 of Township 11S/Range 90W). No other injection wells are currently active within more than 1 mile of the Unit. Federal 24-2 WDW was drilled to a depth of nearly 10,000 feet, and is designed to inject production water into the Maroon Formation, which lies deep below the Mancos Shale. (See also the discussion of deep injection, seismic effects, and mitigation measures in **Section 2.4.5**, Geologic Resources.)

The deep groundwater is not potable. The water that would initially be produced from the formation is brackish, with TDS concentrations generally less than 15,000 ppm. As the water is recycled, the salt concentration increases, because more salts are removed from the formation. Brines with concentrations of up to 70,000 ppm TDS may be generated in the process of hydraulic fracturing.

Other methods of handling produced water besides deep injection may be considered in individual APDs. A number of innovative options are available, but they tend to be more costly than standard disposal methods, and their feasibility depends on the composition of the produced water, the re-use objectives of the treated water, disposal options and costs of the residual waste, and the scale of treatment required. Although large-scale plants may be more efficient, they must be centrally located and produced water must be transported to the treatment site. Small-scale treatment systems are desirable because they can be placed close to the well site and can avoid the need for transport of waste fluids. The two best developed technologies applicable to treatment of produced water are membrane filtration (specifically reverse osmosis, but it also includes microfiltration, ultrafiltration, and nanofiltration) and electrocoagulation. Other technologies that may be considered alone or as part of a treatment chain include: thermal treatment (which uses heat for distillation); hydrocyclones (for particulate separation, possibly as a pretreatment in combination with other technologies); gas floatation (to remove particulates and organic matter, as a pre-treatment technology); filtration; ion exchange; chemical oxidation; electrodialysis/electrodialysis reversal; freeze thaw evaporation; Dewvaporation; and macro-porous polymer extraction (Igunnu and Chen 2013). Each of these technologies has disadvantages, ranging from high cost to limited effectiveness, to lack of data to demonstrate reliability. Each would require further evaluation of cost and feasibility.

*Long-Term Effects*
**Water Quantity.** The long-term effects on water quantity would be similar to the short-term effects, but would be lower in magnitude as construction tapers off and the focus turns to long-term operation and maintenance, which would demand less water.

**Water Quality.** The long-term effects on water quality would be similar to the short-term effects, but would probably be lower in magnitude as construction tapers off and the focus turns to long-term operation and maintenance.

BLM_0027148

### Alternative A

**Water Quantity.** Alternative A involves development primarily on private lands and, therefore, does not require management by the BLM. For comparison purposes, Alternative A assumes that up to 27 new wells per year may be constructed. If augmentation water in Bainard Reservoir No. 1 is estimated to be sufficient for all dust suppression and pad construction as well as the drilling of 8 wells per year, and assuming that construction of each well consumes approximately 1.7 acre-feet, the remaining 19 new wells would require approximately 32 acre-feet of water per year to be purchased from willing sellers. This is approximately the amount of annual evaporative loss from Bainard Reservoir. Hydraulic fracturing would require about 536 acre-feet per year and a total of about 552 acre-feet for all purposes combined. Assuming that the water is obtained between April and July, when average historical daily flows in Muddy Creek have ranged from about 200 cubic feet per second (cfs) to over 500 cfs, this 468 acre-feet could be obtained from diverting approximately 2.6 cfs during this 4-month period, which would represent less than 1 percent of the streamflow during this period.

Water requirements could be reduced by using closed loop drilling and by recycling produced water and hydraulic fracturing fluids. Assuming that 30 percent of the required water comes from freshwater sources and 70 percent comes from other sources, such as produced and recycled water, the wells would require 140 acre-feet total of freshwater, which would be equivalent to diversion of about 0.8 cfs during a 4-month period. The diversion rate would be less if it was spread over a longer period. For example, if spread over the year, the diversion rate would only be about 0.25 cfs. If this water requirement were obtained by purchase from existing holders of water rights, then no impacts on water resources would be expected.

Overall water quantity under Alternative A was estimated based on known water quantities, anticipated drilling rates, and number of wells. For drilling, it is estimated that up to 3,000 barrels of water would be needed per well and this amount is assumed for both water disposal and gas wells. Based on this and the 56 wells proposed under Alternative A, up to 168,000 barrels of water would be needed to drill all wells. Using a standard conversion factor of 7,758 barrels per acre-foot of water, drilling would require up to 21.3 acre-feet.

For completion, the calculations assumed a 50/50 split of coal bed methane to shale wells. The water amounts for each type of well are provided in **Appendix D**. Assuming the highest water amount for each type of well would be used, this amount was multiplied by the total number of gas wells (23 coal bed methane wells and 22 shale wells), it is estimated that up to 5,541,200 barrels or 714.3 acre-feet of water would be needed for completion of all wells.

Dust abatement water usage estimates required understanding the time frame as well as the stages when water would be applied to suppress dust. Calculations estimated that there would be up to 190 barrels of freshwater used per day for dust suppression. Assuming that water usage would be higher in the drier months than in the wetter months, calculations assumed that this maximum rate of application would occur for six months out of the year, with each month estimated at 30 days. As Alternative A estimates 3 years for drilling and construction, up to 102,600 barrels or 13.2 acre-feet of water would be needed for dust abatement.

BLM_0027149

When all of these estimates are totaled, up to 748.8 acre-feet of water (220.7 acre-feet freshwater and 514.9 acre-feet of recycled/produced water) would be needed to meet anticipated water demands.

**Impacts on Surface Water Quality.** Impacts on surface water quality are generally expected to be lowest under Alternative A because it involves the least new construction and the least change from existing conditions. Under Alternative A, new construction would primarily be located in the northern and eastern areas of the Unit. The proposed well pads in the northern portion of the Unit are generally closer to perennial streams (Muddy Creek, and others). Most of the slopes at the proposed sites are relatively flat, and there are more and better established roads in the northern area, than in the southern portion of the site, which helps to minimize the potential for erosion.

The area east of Highway 133 is probably more likely to have large landslides and debris flows that could cause severe damage to the surface completions of wells, or could damage storage tanks or pipelines, which could increase the risk of spills and releases compared to existing conditions.

**Impacts on Groundwater Quality from Surface Spills.** The northern and eastern portions of the site, where most of the private lands are located comprise the majority of the cultivated and irrigated lands. These are probably located over or near more abundant fresh groundwater supplies than in the south, which is steeper and contains thinner soils and generally narrower valleys. The new well pad sites on private lands under Alternative A are relatively far from the McIntyre Flowback Pits. It may not be feasible to run portable aboveground piping to the flowback pits from east of Highway 133, or across East Muddy Creek. This would reduce the cost and logistical advantages of using the flowback pits to recycle hydraulic fracturing fluids and would thereby reduce the potential for spills or releases due to breaches of the HPDE overland water pipes.

**Groundwater Impacts from Drilling.** The potential impacts from drilling would be greater than under current conditions, but would be least for Alternative A from among the alternatives, since Alternative A involves construction of the fewest new wells.

**Groundwater Impacts from Hydraulic Fracturing (Well Stimulation).** As with the impacts from drilling, the impacts on groundwater from hydraulic fracturing would also be lowest under Alternative A.

To the extent that the well sites in Alternative A are generally far from the McIntyre Flowback Pits, more hydraulic fracturing water might need to be stored on the proposed well pads before and after hydraulic fracturing, increasing the risk of a spill at each well pad somewhat.

**Impacts Associated with Disposal of Production Wastewater.** A new injection well is expected under Alternative A. The effects would be as described above, but since Alternative A involves the fewest new wells, it would likely generate the lowest volume of water to be disposed in the injection wells.

BLM_0027150

*Alternative B*
**Water Quantity.** Alternative B involves development on federal mineral estate lands and
therefore would involve active management and oversight by BLM. Alternative B assumes that
up to 146 new wells would be constructed over a period of 6 years. Since the rate of construction
is the same for Alternatives A, B and C, augmentation requirements would be the same for all
three alternatives, except that the augmentation would continue for a longer time under
Alternative B than under Alternative A.

Overall water quantity would be higher under Alternative B due to more wells and a longer time
frame for development. For drilling, the BLM estimates that up to 3,000 barrels of water would
be needed per well and this amount is assumed for both water disposal and gas wells. Based on
this and the 150 wells proposed under Alternative B, up to 450,000 barrels of water would be
needed to drill all wells. Using a standard conversion factor of 7,758 barrels per acre-foot of
water, drilling would require up to 58 acre-feet.

For completion, the calculations assumed a 50/50 split of coal bed methane to shale wells. The
water amounts for each type of well are provided in **Appendix D**. Assuming the highest water
amount for each type of well would be used, this amount was multiplied by the total number of
gas wells (73 coal bed methane wells and 73 shale wells), the BLM estimates estimated that up to
18,381,400 barrels or 2,369.3 acre-feet of water would be needed for completion of all wells.

Dust abatement water usage estimates required understanding the time frame as well as the
stages when water would be applied to suppress dust. Calculations estimated that there would be
up to 380 barrels of freshwater used per day for dust suppression. Assuming that water usage
would be higher in the drier months than in the wetter months, calculations assumed that this
maximum rate of application would occur for 6 months out of the year, with each month
estimated at 30 days. As Alternative B estimates 6 years for drilling and construction, up to
410,400 barrels or 52.9 acre-feet of water would be needed for dust abatement.

When all of these estimates are totaled, up to 2,480 acre-feet of water (744 acre-feet freshwater
and 1,736 acre-feet of recycled/produced water) would be needed to meet anticipated water
demands.

**Impacts on Surface Water Quality.** As discussed above under Effects Common to All
Alternatives, effects on surface water quality would result mainly from either spills or releases of
chemicals, or from soil erosion caused by ground disturbed by construction activities such as
well pad construction, pit construction, and road and pipeline construction. Alternative B would
involve construction of more than 3 times as many well pads (36 instead of 11), and about 4
times as many miles of new roads (16 miles instead of 5 miles) compared to Alternative A.
However, the rate of development would be about the same as under Alternative A, meaning that
construction activities would extend over a longer period than under Alternative A. Not only
would there be increased construction activity under Alternative B, but the construction activity
would be spread throughout a larger area, and would be located on different sites (belonging to
the federal mineral estate) than under Alternative A. Compliance with existing regulatory
requirements, including implementation of best management practices for storm water
management, and SPCC plans, would greatly reduce the potential for spills and releases.

BLM_0027151

As discussed earlier in this chapter, the use of portable HDPE piping to convey wastewater from well stimulation activities, and production water to the centrally-located flowback pits for recycling could increase the risk of releases and are less secure than underground pipes, depending on how many of these systems are operating at one time. The risks of a spill associated with a pipe failure could be reduced by development of a contingency plan as part of the existing SPCC plan.

The broader distribution of well pad sites under Alternative B includes areas with different soils, different vegetation cover, and in some cases steeper slopes than Alternative A. Most of the land with privately-held mineral rights is located in areas suitable for agriculture, near surface water sources, and with deeper alluvial deposits, while most of the increase in well pad sites under Alternative B are in the area west of Highway 133 and between East Muddy Creek and West Muddy Creek, on the flanks of Bull Mountain. There are fewer level sites in this area, and road and pipeline routes are more likely to cross difficult terrain.

Alternative B also would allow a higher density of well pads in the area east of Highway 133, and along the east-facing slopes west of Lee Creek, than under Alternative A (13 new pads under Alternative B versus only 3 pads under Alternative A). This area contains extensive landslide deposits derived from rocks on the slopes of Chair Mountain, and these deposits are not only potentially vulnerable to reactivation by infiltration of surface water, but also have relatively low cohesiveness and are susceptible to rapid erosion.

Although ground-disturbing activities are likely to result in increased erosion, the streams draining the project area normally carry a high sediment load. Additional sediment loading rates could be greatly reduced by implementation of best management practices, as required for compliance with Construction Stormwater Planning and permitting requirements.

Impacts on surface water quality would be reduced by adhering to site-specific COAs, as follows:

- COA #1 would reduce the potential impacts on surface water quality from erosion, the risk of spills, or from other threats identified during review of the NOS/APD. It would accomplish this by enabling the BLM to require re-siting a well pad within a 745-foot radius of the proposed location.

- COA #3 would reduce the potential for erosion or spills and releases associated with slope failure by requiring site-specific slope-stability studies to be conducted in areas of potential geologic hazards.

- COA #4 would indirectly reduce impacts on surface water quality by scaling loose rock that presents a safety hazard and could also damage containment structures.

- COAs #5 and #6 would indirectly reduce impacts on surface water quality by improving the effectiveness of interim and long-term reclamation of the well pad, which would reduce the potential for erosion.

BLM_0027152

- COAs #14 and #15 would reduce impacts on surface water quality by reducing the potential for erosion associated with road construction.

- COA #20 would reduce impacts on surface water by requiring that fluids be stored in tanks or pits with approved liners, with a preference for storage in tanks, since closed loop systems would be adopted as the standard method of managing drilling fluids.

- COA #22 would reduce the potential for spills by maintaining freeboard in pits (if present) during winter.

- COA #24 would reduce the potential for spills by requiring hydrostatic testing of pipelines and storage vessels.

- COA #49 through #51 would reduce the potential for soil erosion by requiring recontouring and revegetation of disturbed slopes as so as practicable, and the submittal of reclamation status reports to ensure that the effectiveness of reclamation is tracked.

**Impacts on Groundwater Quality from Surface Spills.** The same types of spills and releases that affect surface water could also affect groundwater. Therefore, there would be an increased risk of spills and releases resulting from the increased number of facilities under Alternative B than Alternative A, but no new types of impacts are expected.

As described for surface water quality, COAs that reduce the potential for spills and releases would also protect groundwater quality. These are COAs #1, #3, #4, #20, and #22.

**Groundwater Impacts from Drilling.** Alternative B includes 146 new wells, compared to the 55 new wells expected under Alternative A. The wells would be drilled and completed at the same assumed rate under both alternatives. The main difference between the alternatives, besides location of the wells, would be the duration of the well construction activities (6 years instead of just 3 years under Alternative A). During drilling, either closed loop or pit methods may be used. The BLM encourages the use of the closed loop drilling method, but does not require it. Due to the higher cost of closed loop drilling, it is likely that pits would be used more frequently. Pits would be lined to prevent releases. The constituents of the drilling fluid additives would be non-toxic, with the exception of fluids returned from the formation, which may contain petroleum hydrocarbons and heavy metals. Drilling wastes would be properly disposed. Compliance with COGCC and BLM requirements for management of drilling wastes would reduce the potential for impacts on groundwater to negligible levels.

**Groundwater Impacts from Hydraulic Fracturing (Well Stimulation).** The impacts on groundwater from drilling and completion are expected to be the same or similar regardless of location, since potable groundwater occurs at relatively shallow depths relative to the thousands of feet depth of the target gas formations. Therefore, the impacts from Alternative B are expected to be similar in nature to those under Alternative A, and are expected to be minor. The fractures created by hydraulic fracturing would extend to limited distances and are expected to be confined to the target formations. Surface and intermediate casings would be cemented throughout their length, and would be subject to inspection and documentation by performing cement bond logs, if necessary. The effects of hydraulic fracturing under Alternative B would be the same as under

BLM_0027153

Alternative A, but would occur over a longer period (6 years instead of 3 years). In some areas coal bed methane deposits may be encountered, involving production of more water than would be expected from shale. However, both types of deposits are well isolated from potable groundwater by depth, and so hydraulic fracturing is not expected to impact potable groundwater resources.

**Impacts Associated with Disposal of Production Wastewater.** The construction and operation of deep disposal wells are governed by state and federal regulations. Direct impacts of disposal of production wastewater are expected to be minor, since injection of the production water would be at depths on the order of 10,000 feet, and because casings would be properly cemented to avoid contamination migration through the well annulus. Compliance with regulatory requirements is expected to reduce the potential direct impacts to non-significant levels.

Potential for indirect impacts from disposal of production wastewater, such as increased potential for spills or releases of production wastewater from the conveyance systems between the wells and the injection well, potential for a release from one of the flowback pits used to store production wastewater, or potential for impacts associated with the construction of four new deep injection wells, represent a subset of the impacts of spills and releases of chemicals and fluids discussed above. Compliance with regulatory requirements would reduce these impacts to less than significant levels.

*APD for Federal 12-89-7-1*
The wells proposed for Well Pad 12-89-7-1 would be typical in that they are expected to be a mixture of coal bed methane and shale or sandstone wells. SGI has previously estimated in its surface plan of operations (SUPO) for Well Pad 12-89-7-1 that about 5,000 barrels of freshwater would be needed to complete shale and sandstone wells, while about 10,000 barrels would be needed to complete coal bed methane wells. The estimate depends on the number of completion stages and whether the wells are vertical or horizontal, with a smaller estimate for vertical wells. The water quantity estimated for Well 12-89-7-1 is lower than the average for Bull Mountain wells, so the impacts would fall within the range discussed above for the overall project. Similarly, no new roads and relatively little surface disturbance would be required to prepare the pad and gas/water transmission facilities at this pad, so water for dust suppression would be lower than average.

Surface drainage from the proposed pad location is toward the southeast into an unnamed small stream that is a tributary of East Muddy Creek just north of Spring Creek. Potential impacts on surface water and groundwater quality would be similar to those discussed for the project in general and would be mitigated in the same ways. Since the proposed pads are in the upper watershed, relatively little surface runoff accumulates near the site, and this affords more time to respond to a spill and prevent it from reaching surface water.

*Alternative C*
**Water Quantity.** The potential impacts of Alternative C on water quantity would be nearly identical to those under Alternative B, except that Alternative C would consume slightly less water for dust control on fewer miles of new and upgraded roads, and fewer miles of pipelines collocated with the new roads. These impacts are expected to be less than significant.

BLM_0027154

**Impacts on Surface Water and Groundwater Quality.** The impacts on surface water and groundwater quality from spills would be less than under Alternative B, due to construction of fewer well pads (35 new pads under Alternative C versus 36 new pads under Alternative B), and slightly few miles of new roads. Under Alternative C, six of the well pads proposed under Alternative B along the Highway 133 corridor, and eight well pads proposed under Alternative B in the somewhat steeper terrain on the slopes of Bull Mountain between East Muddy Creek and West Muddy Creek, would not be constructed. Since these locations are likely to have somewhat higher risks of spills associated with landslides and the conveyance of materials, wastes, and equipment over difficult terrain, the potential for water quality impacts is expected to be lower than under Alternative B. Because the well pads eliminated under Alternative C along the Highway 133 corridor, and at the south end of the Unit would have been relatively close to these perennial streams, and their elimination reduces the overall risk that a surface spill would reach one of these streams, or the shallow groundwater associated with the valley bottoms. It is assumed that these streams are gaining streams most of the year and that groundwater contributes to their flow.

Implementing COAs identified above to mitigate impacts of Alternative B also apply to Alternative C.

### APD for Federal 12-89-7-1
The impacts on water resources from development of the pad and facilities at well pad 12-89-7-1 under Alternative C would be the same as under Alternative B.

**Groundwater Impacts from Drilling, Hydraulic Fracturing, and Disposal of Production Wastewater.** The impacts of Alternative C on groundwater quality from drilling and hydraulic fracturing activities would be the same as under Alternative B, because the same number of wells would be installed under both alternatives.

### Alternative D, the Preferred Alternative
**Water Quantity.** The potential impacts of Alternative D on water quantity would be similar to those under Alternatives B and C. This is because the same number of wells would be constructed overall, and at the same rate per year. The impacts on water quantity are expected to be less than significant.

**Impacts on Surface Water and Groundwater Quality.** The impacts on surface water and groundwater quality from spills would be less than under Alternative B. This would be because fewer well pads would be constructed (33 new pads under Alternative D versus 36 new pads under Alternative B), and there would be slightly fewer miles of new roads. Fewer well pads with the same number of wells overall would increase the number of wells per pad, with an average of approximately one additional well per two well pads. Increasing the number of wells per pad would slightly increase the potential for spills at any particular pad; however, this would also help to improve some operational efficiencies, which might translate to a lower overall risk of spills. Furthermore, the four pads eliminated from Alternative D relative to Alternative B are more difficult to access or have a higher vulnerability to spills, which would also result in lower level of risk in the event of a spill.

BLM_0027155

Implementing COAs identified above to mitigate the impacts of Alternative B also apply to Alternative D.

**Groundwater Impacts from Drilling, Hydraulic Fracturing, and Disposal of Production Wastewater.** The impacts of Alternative D on groundwater quality from drilling and hydraulic fracturing would be the same as under Alternative B. This is because the same number of wells would be installed under both alternatives.

### *APD for Federal 12-89-7-1*
The impacts on water resources from development of the pad and facilities at well pad 12-89-7-1 under Alternative D would be the same as under Alternative C.

### *Cumulative*
Alternative A has been defined with specific numbers of additional well pads and associated roads, pipelines and other ancillary facilities to support a particular level of gas exploration and extraction activity, as a way of fixing the baseline for comparison the alternative in time. It has further been assumed, for purposes of comparison that Alternative A would not proceed under either of the project alternatives. In practice, however, the future actions described under Alternative A are independent of the project alternatives and could be implemented concurrently or at any time, in addition to the project alternatives. For this reason, the combined Alternative A and Alternative B must be evaluated with regard to the cumulative impacts of both actions.

Other gas extraction projects on both public and privately held lands, and inside and outside of the Unit boundaries, would also continue to be carried forward by various entities, subject to assessment of the economic and mineral resource potential. Based on COGIS records of oil and gas well permits, a total of 46 wells have been completed since 1960 within the approximately 140 square mile area containing the UNIT and bounded by Townships 11S and 12S, and Ranges 89W and 90W. Of these, approximately half (27 wells) were completed in the 9 years since 2005, or an average of 3 wells per year. All of these recent wells were constructed by either SGI, or by Gunnison Energy Corporation. If the project results in completion of 27 wells per year, it would represent an increase in the rate of well construction in the area well above the current and past trends.

Beyond the Unit during this period, SGI completed four wells and GEC completed one well inside the Unit. A total of 16 wells were completed within the Unit during this time, and 11 were completed outside the Unit, mainly south of West Muddy Creek and near the southern boundary of the Unit (about 1 well per year outside the boundary, and 2 wells per year inside). The reasonably foreseeable development scenario for oil and gas developed by the UFO (BLM 2012b) projects development of up to 1,271 new oil and gas wells in the UFO between 2010 and 2030. Some of these wells would be drilled horizontally, some directionally, and some vertically. The proposed new wells analyzed in this EIS are included in the UFO's projection. Because the total number of wells drilled under each alternative in this EIS does not change, the alternatives are not expected to alter the projected number of new wells in the UFO RFD.

However, assuming that drilling outside the Unit boundary continues at the same pace noted above, very little additional drilling activity is expected except for the proposed project and Alternative A. If both of those were completed, it would result in a total of 64 well pads and 218

BLM_0027156

gas wells inside the Unit in 6 years, and 5 deep injection wells. If the rate of well drilling outside the Unit continues at the same pace, there would be about 17 completed wells outside the Unit in 6 years, including 1 deep injection well. This would represent a significant increase in the amount of surface disturbance, deep injection activity, and gas production, compared to previous years.

**Water Quantity.** Since the rate of well construction is assumed to be steady, and capped at about 27 new wells per year, the demand for water will remain relatively steady for about 10 years. As explained above, the annual demand of drilling for water will not be significant at these levels, so the cumulative impact on water quantity is not expected to be significant but the expanded demand would continue for a longer time than under either of the alternatives alone. Based on calculations, the total cumulative water demands over the course of the development is estimated at 8,419,260 barrels or 817 acre-feet freshwater and 19,644,940 barrels or 1,905 acre-feet recycled/produced water.

**Impacts on Surface and Groundwater Quality.** The cumulative impacts on surface and groundwater quality from spills and releases during construction would be similar to those under Alternative B except that the period of higher risk associated with construction activities would extend further into the future than under the Proposed Alternative. If the rate of well construction increases so that the expected number of wells is completed in 6 years instead of 8 years, the cumulative rate of water consumption per year would be approximately 25 percent higher than assumed under each of the alternatives alone. However, assuming that the source of this additional water use is in exchange for existing water uses, no significant impacts are expected.

**Groundwater Impacts from Drilling, Hydraulic Fracturing, and Disposal of Production Wastewater**. As with the risk of spills, the rate of development of the gas resources would not increase, but the impacts would be extended further into the future. Since the impacts of drilling and hydraulic fracturing are expected to be minimal for any given well, due to the regulatory protections currently in place, and ability to monitor conditions in the well, the cumulative impacts are not expected to be significant. Direct and indirect impacts of disposal of production wastewater would also be much the same as under Alternative B, since the rate of disposal would not change; therefore, the cumulative effects are expected to be less than significant.

## 4.2.5   Geology

*Methods of Analysis*
Areas of proposed activities, such as construction of well pads, roads, and pipelines, were identified on maps and compared with areas with potential geologic hazards, such as steep slopes, landslides, or active (Quaternary) faults. Engineering judgment was used to identify the types of effects and general magnitude of the effects that could occur. Some potential impacts are expected to be reduced as a result of compliance with existing regulatory requirements and agency policies as well as through the implementation of COAs and design features.

*Nature and Type of Effects*
Implementation of the alternatives would affect geologic resources or be affected by geologic hazards if it exposes people, structures, or the environment to potential substantial adverse

BLM_0027157

effects, including the risk of loss, injury or death from proximity to geologic hazards, such as earthquakes, subsidence, or landslides, or if it results in damage to unique geologic features.

### Effects Common to All Alternatives

**Construction-related effects.** Each of the alternatives includes construction of new well pads and wells, pipelines, roads, electrical transmission lines, and ancillary structures and facilities. During well drilling and completion, tanks or pits would be constructed on well pads and drilling fluids and various hazardous and non-hazardous materials would be stored on the pads or in associated storage areas. During the production and maintenance phase of operations, highly flammable gas would be produced and conveyed in pipelines and stored under pressure in tanks. Throughout the period of development of gas resources in the Unit both construction-related, and production and maintenance-related activities would be occurring simultaneously, sometimes at the same locations, and sometimes at different locations.

**Slope Failure.** The area east of Highway 133 (western slopes of Ragged Mountain to Muddy Creek) contains unstable slopes with high potential for landslide activity. The underlying geology and mechanisms for downslope movement are different on the eastern side of the Unit from the west side. In general, on the eastern side, there are larger areas containing landslide deposits, the deposits are thicker, and large areas are prone to steady and continuous downslope movement (creep). North of Jacobs Ranch and East Muddy Creek, the area between Lee Creek and Drift Creek on the west side of Highway 133 also contains thick alluvial, colluvial, and landslide deposits (Ellis and Freeman 1984), but this area is probably not as prone to new landslides because the watershed above the area is smaller, and therefore it is less likely for groundwater to accumulate within the deposits. The rate of movement can be enhanced by heavy precipitation as it infiltrates the unconsolidated deposits of previous landslides. In 1986, following major storm events, a swath of saturated soil and debris moved more than 200 feet downslope and engulfed the channel of Muddy Creek in the East Muddy Creek Slide in the southeastern portion of the Unit. Wells that penetrate landslide-prone deposits could be deformed by creep, or ruptured by rapid movement of slide deposits relative to the underlying rock. Surface equipment including tanks and pipelines could be damaged in a landslide, potentially resulting in releases or safety hazards. West of Highway 133 there are many areas with greater than 15 percent slopes and some areas, particularly bordering West Muddy Creek, and along the larger streams, where slopes exceed 30 percent. Steep slopes are susceptible to rock slides and debris flows, and slope stability can be reduced by construction activity if material at the toe of a slope is removed or destabilized, such as for road cuts or leveling of well pads.

Slope failure would be a significant impact.

The mitigation measures listed below could reduce the severity or probability for these impacts.

> **Mitigation 1—Avoidance of Areas with Geologic Hazards**. The most effective mitigation to reduce effects of slope failure is to avoid areas with higher risks. Project-specific conditions would be evaluated during the site permitting process, and avoiding disturbance in areas with higher risks within the proposed sites would minimize hazards.

> **Mitigation 2—Engineering Controls**. If geologic hazards cannot be avoided, mitigation measures such as designing drainage systems to reduce soil saturation and prevent

BLM_0027158

erosion in areas with steep slopes, and to stabilize the toes of slopes, could be implemented, based on recommendations following site-specific geotechnical site evaluations.

**Mitigation 3—Monitoring of Landslides**. If landslide-prone areas cannot be avoided, such as east of Highway 133, mass movement of the landslide deposits can be monitored, such as by installation of tensiometers to monitor the rate of differential horizontal movement so that corrective action can be taken. Alarm systems can be installed to enable automated shutoff of gas pipelines at critical points in the event of slope failure.

The BLM could apply these measures as COAs or could require them as design features on a submitted APD. Their application would avoid areas with geologic hazards, would prevent erosion and destabilization of slopes resulting from soil saturation, and would provide a monitoring protocol to track slope stability in areas prone to landslides.

**Existing Seismic Hazards.** Strong earthquakes have the potential to damage containment structures or trigger landslides or slope failure, resulting in damage to containment structures or pipelines, with potential for releases of liquids or gas to the environment. Rupture of gas lines or pressurized storage tanks could have the potential to lead to fire or explosion hazards. There are no known active faults within the Unit and the region of the site has a low potential for strong seismic shaking.

**Potential for Triggering Earthquakes during Deep Well Injection.** Disposal of waste fluids is an indirect result of drilling and well stimulation. The volume of fluids that require disposal is highly dependent on the selection of fluid management techniques; whether pits or closed loop drilling systems are used. Significantly more waste fluids would be generated where pit systems are used, but either method is allowable under each of the alternatives, and the choice of methods would be determined based on a variety of location-specific factors.

It has long been known that injection of fluids at depth can trigger earthquakes. Fluid injection has even been suggested as a way, under controlled circumstances, to gradually release the stored energy within locked segments of an earthquake fault zone to reduce the potential for a large earthquake, but the method has not been proven. However, fluid injection has been implicated as the unintended cause of earthquakes along active faults in several instances in the past (Nicholson and Wesson 1990). Deep injection for disposal of waste fluids was responsible, for example, for earthquakes up to magnitude (M) 3.6 near Ashtabula, Ohio in 1987, and for 3 M5 to M5.5 earthquakes at the Rocky Mountain Arsenal in 1967 (the largest fluid injection-related earthquakes to date). A detailed inventory of earthquakes attributed to fluid injection prior to 1990 is presented in the US Geological Survey report authored by Nicholson and Wesson (1990).

Since 2001, the number of earthquakes in the midcontinent area of the United States with magnitude greater than M3.0 has increased sharply, from a relatively steady annual rate of about 21 events per year, to a high of 188 in 2011 (Ellsworth 2013). During 2010 and 2011, more than 90 small earthquakes (up to M4.7) occurred along the Guy-Greenbrier Fault Zone in Arkansas shortly after the start of injection of waste fluids in 2 wells (Ausbrooks and Horton 2011).

BLM_0027159

Deep injection of wastewater induced a sequence of earthquakes up to M3.6 in the Horn River Basin in British Columbia in 2009. In 2010, an M4.1 earthquake occurred in a previously quiet region where injection wells had been operating for 18 years. This was followed by an M5.0 and an M5.7 earthquake in the following year. The epicenter was about 1 mile from the injection wells (Ellsworth 2013).

In Paradox Valley, in southwestern Colorado, deep injection was used as a method of disposing of shallow saline groundwater to protect water supplies, and the experience provided an opportunity to study the effects of adjusting injection pressures over time. Hundreds of small earthquakes were induced when the injection tests were conducted between 1991 and 1995. The injection pressures needed to accommodate the volume of waste water was greater than the pressure needed to fracture the rock, so the small earthquakes were expected. Over the following years of operation, several earthquakes greater than M3.0 were induced, and the zone of seismic activity expanded to beyond 7.5 miles.

These and many other events suggest that deep injection of waste fluids is capable of producing large earthquakes in areas with requisite tectonic stress conditions, that the affected zone can continue to expand with continued injection, and that it is difficult to control or reverse the process, once seismicity is initiated (Ellsworth 2013).

The primary mechanism by which fluid injection is thought to trigger earthquakes is by overcoming the shear strength and the coefficient of friction along a fault by increasing the pore pressure in the rock. The potential for movement along a fault, and the magnitude of that movement, however, depend on the tectonic stress conditions in the fault zone preceding fluid injection. Thus fluid injection facilitates fault rupture in areas where stress has built up along a fault, but does not cause faulting or create strong earthquakes in the absence of existing stress.

Injection wells for waste disposal typically target permeable formations, where the formation has capacity to accommodate the fluids with least injection pressure. Unlike hydraulic fracturing, deep well injection pressures need not exceed the strength of the rock. The most reliable method for estimating the existing stress conditions in the earth's crust is from measurements taken during hydraulic fracturing, and a large body of data from hydraulic fracturing records across the United States has made it possible to predict the general orientation and magnitudes of the principal stresses at many sites. In the Rocky Mountains province where the site is located, the principal stresses are extensional along an east-west axis, and normal faulting predominates (Nicholson and Wesson 1990). The magnitude of an earthquake is largely a function of the dimensions of the fault. Not only is the region of the Unit seismically quiet, but the few faults in the surrounding region are relatively small.

The lack of seismicity and of active faults in the region of the Unit leads to a probable low level of risk that deep injection of waste fluids would trigger an earthquake capable of causing damage at the ground surface in the Unit. However, knowledge of the stress field and of the existence or dimensions of faults at depth is imperfect. Monitoring of seismicity during operation of the deep injection wells is recommended to mitigate the potential for inducing earthquakes by injection of fluids over time.

BLM_0027160

Some mitigation measures that could reduce the severity or probability for these impacts are listed below.

**Mitigation 4—Monitoring and Maintenance of Acceptable Injection Pressure**. Monitoring of deep well injection pressures and of changes in the transmissivity (a measure of how much fluid can flow horizontally through an aquifer) during injection, can provide a means of determining whether deep injection pressures are causing fracturing of the reservoir rock and injection rates and pressures can adjusted to reduce the potential for these effects.

**Mitigation 5—Monitoring of Seismicity**. Monitoring of seismic activity with sensitive seismometers could be implemented as a follow-up measure to Mitigation 1, to determine whether earthquakes are triggered at the depth of injection, since this would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures within the targeted injection zone.

Because the state regulates injection wells, both of these mitigation measures would fall under the State of Colorado's jurisdiction. If adopted by SGI or the BLM, SGI would follow all state mandates, regulations, and policies. The BLM could adopt these measures as COAs or could require them as design features on a submitted APD. Their application would provide additional monitoring mechanisms for the possibility of injection well-induced seismicity.

**Potential for Inducing Earthquakes by Well Stimulation (Hydraulic Fracturing).** Unlike deep injection of waste fluids, the purpose of hydraulic fracturing is to overcome the strength of the rock and to open fractures by increasing the pore pressure in the rock. During well stimulation activities associated with some or all well completions, fluids would be injected at high pressure into the targeted geologic formations. Hydraulic fracturing normally produces many micro-earthquakes, but it is unlikely to trigger earthquakes that can be felt at the surface.

Hydraulic fracturing differs from waste injection because injected fluids are removed after hydraulic fracturing, so that the pore pressure increase from hydraulic fracturing is temporary and the affected zone is relatively localized around the well. According to Ellsworth (2013) more than 100,000 wells have been hydraulically fractured in recent years, and no earthquakes larger than M3.6 have been attributed to hydraulic fracturing.

Extensive data collected from hydraulic fracturing events in shale formations suggest that the magnitudes of the micro-earthquakes associated with hydraulic fracturing are mainly in the range of M4 to M1, which cannot be felt (Warpinski 2013). The possibility exists that fractures created by hydraulic fracturing might intercept an existing active fault and trigger it to move, but the probability is low.

Revqust et al. (2013) performed modeling studies to evaluate the effects of hydraulic fracturing and concluded that "the possibility of hydraulically induced fractures at great depth (thousands of meters) causing activation of faults and creation of a new flow path that can reach shallow groundwater resources (or even the surface) is remote." Based on these observations, the direct effects of hydraulic fracturing as a trigger for damaging earthquakes are expected to be less than significant.

BLM_0027161

**Potential for Breaching Geologic Confining Formations during Hydraulic Fracturing.**
Warpinski (2013) compiled data from hydraulic fracturing projects throughout the US, supporting the limited vertical extent of fractures above and below the point of injection. Monitoring of the micro-earthquakes that occur during hydraulic fracturing provides a way of assessing the effectiveness of hydraulic fracturing and determining the length of the fractures. Fractures propagated from hydraulic fracturing tend to be longer in the horizontal direction than the vertical, because of bedding orientation. According to Warpinski, most fractures propagated by hydraulic fracturing of shale are limited to a zone about 1,000 feet above and below the injection point, with almost no fractures extending more than 2,000 feet. Gas-containing formations targeted for hydraulic fracturing are usually much too deep below the depths of freshwater to be intercepted by fractures generated during hydraulic fracturing.

**Potential for Breaching Geologic Confining Formations during Deep Well Injection.** One of the objectives of deep injection of fluids is to isolate the fluids within the targeted geologic formation and prevent vertical migration. Due to the depth of the injection wells, fluids can be injected at pressures that could allow the fluids to rise vertically above the targeted formation. The higher the injection pressure the higher the rate of injection that can be achieved, but too high an injection pressure could enable fluids to migrate vertically if the confining pressure of the overlying formation is overcome. If the injection pressure is high enough, the rock confining the target fluid disposal reservoir may be fractured, allowing pathways for fluids to migrate vertically into overlying geologic units. The depth of the target reservoir formation relative to the fresh groundwater aquifer near the land surface makes it unlikely that injected fluids would be able to rise high enough to impact the relatively shallow freshwater aquifer (Geologic Society of America 2015). The operator is required to monitor injection pressure and to maintain hydrostatic pressures well below the elevation of the freshwater aquifer. Compliance with existing requirements is expected to adequately mitigate against significant intrusion of waste fluids into adjacent formations and would prevent cross-contamination of shallow fresh-water aquifers.

*Alternative A*
**Slope Stability.** As described in Chapter 2, three new well pads (Jacobs 11-98-32 #1; Borich 11-89-32 #1; and Medved 12-89-5 #1) are proposed east of Highway 133, on the west slope of Chair Mountain and the Raggeds, which have a recent history of landslides in the southern portion of the Unit. Detailed mapping of landslide deposits has not been performed north of Spring Creek, although available mapping suggests that landslide deposits are not as extensive north of Spring Creek as they are south of Spring Creek. The proposed well pads are on the lower slopes where sudden slope failure is less likely although creep may occur. These areas could be in the path of landslides originating upslope.

The most southeastern of the proposed well pad sites (Volk 12-88-9 #2) is south of Spring Creek, and upslope (east) of Ragged Mountain Ranch Road, in an area that is underlain by older (Pleistocene age) landslide deposits (Stover 1986). Because of their age these deposits are probably more stable than the more recently active deposits further to the west, but the thickness of the deposits is not known. It should also be noted that recent landslides have occurred as a result of failure of the older landslide deposits.

BLM_0027162

On the west side of Highway 133, the pads proposed under Alternative A would be located in relatively level areas. Most are north of East Muddy Creek, where most of the farmed lands are located. Typically, the proposed pads would be located near the margins of farmed lands, which in some cases allows for the possibility of placing them near the edges of ravines, but there is ample room within the proposed siting areas to avoid steep slopes. One proposed pad (McIntyre 11-90-23 #1) is in an area of gently sloping land near the existing McIntyre Flowback Pits #3 and #4.

The proposed roads under Alternative A tend to follow existing tracks and generally would not require significant cutting or filling of slopes, and therefore it is not likely that the roads would contribute to slope failure. A limited geotechnical study of selected slopes conducted by Trautner Geotech (2010), mostly in the area south of East Muddy Creek, concluded that the threshold for slope instability in the areas evaluated was 35 percent (20 degrees), based on the standard safety factor used for roadway stability. The report recommended avoidance of routes where slopes are greater than 35 percent, and noted that if the soil becomes saturated the safety factor decreases, so proper drainage design is important where slopes approach the recommended threshold.

**Potential for Triggering Earthquakes during Deep Well Injection.** Alternative A includes one existing deep waste injection well and one new waste injection to handle the fluids generated from new gas wells on the 10 proposed pads. The potential for inducing large earthquakes is expected to be low, but no data are available to evaluate the existing stress field, and the existing network of seismographs is not designed to accurately detect micro-earthquakes.

*Alternative B*
**Slope Stability.** Under Alternative B, six of the proposed pads would be constructed east of Highway 133, where some of the underlying deposits are former landslide deposits. While not all of the area has been mapped to identify landslide deposits in detail, but the landscape east of Highway 133 is characterized by hummocky ground, lobate fan features, deflected stream channels, sparse vegetation, and other features common to landslide terrain. The hazards of constructing the pads on these lands includes the potential for creep as well as rapid mass failure of the underlying surficial materials, particularly reactivation of existing landslide deposits, and potential for landslides originating from an upslope source to move across the site.

The effects associated with slope instability under Alternative B would be similar to those under Alternative A, except that risk is increased by more acreage of pads and more miles of roads and pipelines.

If the BLM were to apply mitigation measures under Appendix C, then impacts from geologic hazards would be reduced. Specific measures applicable to geologic hazard mitigation are the following:

- COA #1 would authorize the BLM to require SGI to re-site proposed well pads within a 745-foot radius of the proposed location, based on a review of SGI's NOS/APD and results of the site-specific slope-stability analysis.

- COA #3 would require site-specific slope-stability studies to be conducted in areas of potential geologic hazard, as identified in the MDP analysis prior to design and

BLM_0027163

construction. It also would require that appropriate site-specific mitigation measures be identified to address the threats.

- COA #4 would require scaling loose rock in the vicinity of a well pad to reduce safety hazards.

Implementing these COAs would reduce but not eliminate potential hazards. Additionally, if the BLM were to incorporate the additional mitigation measures described under *Effects Common to All Alternatives*, it would further reduce the probability of impacts and monitor for changes that could result in damage or failure.

**Potential for Triggering Earthquakes during Deep Well Injection.** The effects of Alternative B would be similar to those described under Alternative A, except that Alternative B includes development of four new deep waste injection wells in the Unit, in addition to the existing deep injection well. The locations of the new wells would be determined later. The need for four additional injection wells under Alternative B reflects the increase in waste fluid that would be generated by the higher number of gas wells to be developed under Alternative B, as well as the need to have proposed wells located closer to the points of generation. The increased volume of waste fluid disposal would likely increase the risk of inducing strong earthquakes relative to Alternative A, but the degree of increased risk cannot be easily predicted since it depends on many factors, including the transmissivity of the reservoir formations, the rate of injection, the tectonic stress conditions that exist within the region, and the presence or absence of any incipient active faults at depth that could be within the radius of influence of the injection wells. In general, based on the lack of earthquake activity and lack of any known active faults in the region, the increased risk of inducing earthquakes under Alternative B is considered low.

*APD for Federal 12-89-7-1*
Geologic hazards at the proposed site are expected to be low. The relatively flat terrain at the proposed site would require relatively little alteration. Since existing roads would be used, there would be relatively little new disturbance for roadwork. The terrain to the east of the proposed site is steep, but the proposed improvements would be located on the portions of the site that are naturally level, so the adjacent steep slopes could be avoided. Mitigation measures discussed for the general project would apply to activities at well pad 12-89-7-1. No additional impacts are expected, and no other mitigation measures would be required.

*Alternative C*
**Slope Stability.** Alternative C would include construction of 35 new well pads on split estate lands, instead of the 10 new pads on private lands as described under Alternative A. Alternative C includes four well pads east of Highway 133; two located north of Jacobs Ranch, and two located in the southeast area just north of Spring Creek, which contains landslide terrain of the western slope of the Raggeds (Ellis and Freeman 1984). Overall, the potential impacts associated with slope stability would be about the same as Alternative B and higher under Alternative C than under Alternative A. Avoiding disturbance on steep slopes to the extent possible, and implementing COAs #1, #3, #4, #17, and #53 would minimize impacts, as well as designing site drainage to direct runoff away from the site and to reduce infiltration and water saturation of the underlying deposits. Additionally, as noted under Alternative B, if the BLM were to incorporate the additional mitigation measures described under *Effects Common to All Alternatives*, it would

BLM_0027164

further reduce the probability of impacts and monitor for changes that could result in damage or failure.

**Potential for Triggering Earthquakes during Deep Well Injection.** Alternative C includes development of four deep waste injection wells in the Unit, as described for Alternative B, and proposes the same number of gas wells as under Alternative B, except that the gas wells would be concentrated at one fewer well pads than under Alternative B. The effects of Alternative C would be the same as those described under Alternative B.

*APD for Federal 12-89-7-1*
Under Alternative C, the geological resource impacts from developing the pad and facilities at well pad 12-89-7-1 would be the same as under Alternative B.

*Alternative D, the Preferred Alternative*
**Slope Stability.** Alternative D is similar to Alternative B; however, it would be lessened as there are four fewer well pads and infrastructure located east of Highway 133. As described for Alternative B, the hazards of constructing the pads on landslide-prone lands east of Highway 133 are the potential for creep and rapid mass failure of the underlying surficial materials, particularly reactivation of existing landslide deposits. There is also the potential for landslides originating from an upslope source to move across the site.

The effects of slope instability under Alternative D would be similar to those under Alternative B, except that the risk would be reduced by the smaller number of pads and fewer miles of roads and pipelines. Additionally, Alternative D includes the noted measures for slope stability under *Effects Common to All Alternatives* as design features (see **Appendix C**). Because of this there would be a reduced risk from the impacts described under that heading. This, combined with the application of the COAs noted in Alternative B, would provide a suite of measures to effectively mitigate slope instability.

**Potential for Triggering Earthquakes during Deep Well Injection.** The effects of Alternative D would be similar to those described under Alternative B. Micro-earthquakes may be induced by deep injection; however, as described for Alternative B, due to the lack of earthquake activity and lack of any known active faults in the region, the risk of inducing significant earthquakes under Alternative D is considered low. Additionally, Alternative D includes the noted design features for monitoring seismicity, noted under *Effects Common to All Alternatives* as design features to be included on future APDs (see **Appendix C**). For this reason, there would be a reduced risk from the impacts described under that heading.

*APD for Federal 12-89-7-1*
Under Alternative D, the geological resource impacts from developing the pad and facilities at well pad 12-89-7-1 would be the same as under Alternative C.

*Cumulative*
The combined actions of the No Action Alternative with any of the action alternatives (B, C, or D) are shown in **Table 4-1** and **Table 4-2**. The combination of these actions with those listed in **Table 4-3** create the effects described below.

BLM_0027165

**Slope Failure.** The cumulative effects of the actions identified under Alternative A and any one of the action alternatives would increase in proportion to the amount of drilling and construction activity. Most of the increased activity that would occur on private lands would probably be related to increased drilling from the existing and proposed well pads, using the existing and proposed infrastructure (e.g. roads, pipelines, and transmission lines) and is therefore not expected to significantly increase the potential for slope failure.

**Potential for Triggering Earthquakes during Deep Well Injection.** If drilling and gas production continues to increase on private lands, the amount of waste requiring disposal would also increase, requiring more fluid injection and potentially requiring more injection wells. Logically, the potential for inducing earthquakes would increase proportionally with the increase in disposal, but the significance of any increase would depend on a number of factors that are not well known, including the tectonic stress field in the region of the site, and the presence or absence of hidden faults. Overall, increased fluid injection of wastes generated on private lands is expected to result in an incremental cumulative increase in the potential impacts relative to the action alternatives.

### 4.2.6   Vegetation and Invasive, Nonnative Species

*Methods of Analysis*
Impacts were determined by assessing which actions, if any, would change the upland vegetation, riparian and wetland vegetation, and weed indicators described below. Some impacts are direct, while others are indirect and affect vegetation through a change in another resource. Direct impacts on vegetation include disrupting, damaging, or removing vegetation, thereby reducing area, amount, or condition of native vegetation. Included among these are actions that reduce total numbers of plant species and actions that reduce or cause the loss of diversity, vigor, or structure of vegetation, or that degrade its function for wildlife habitat.

Indirect impacts are those that cannot be absolutely linked to one action, such as decreased plant vigor or health from dust or reduced water quality. Other indirect impacts include loss of habitat suitable for vegetation colonization due to surface disturbance; introduction of weeds that compete with desirable, native vegetation; conditions that enhance the spread of weeds; and general loss of habitat due to surface occupancy or soil compaction.

*Indicators*
Indicators for upland vegetation communities are based on the BLM Colorado Public Land Health Standards 2 and 3 (BLM 1997) and include:

- Condition of native vegetation communities and individual native plant species

- Connectivity

- Age class distribution

BLM_0027166

Indicators for riparian and wetland vegetation include:

- Condition of riparian vegetation community and individual riparian plant species

- Hydrologic functionality

Indicators for invasive and noxious weeds include:

- Level of spread of noxious weeds and other undesirable species in the overall plant community

***Nature and Type of Effects***
Direct effects include vegetation loss, conversion, and fragmentation (both short-term and long-term), which would result from land grading and clearing, and the construction of well pads, roads, pipelines, and ancillary facilities. Human presence and activity on-site could trample vegetation, causing damage or death. Vegetation removal or trampling would reduce the condition of native vegetation communities and individual native plant species, alter age class distribution, reduce connectivity, and encourage the spread of invasive species. Fragmentation could cause the loss of genetic interchange among vegetation communities and thus reduce fitness of some plant populations.

Reclamation could also affect individual plant species through introduction of new genetic materials into local populations by way of seedings or plantings. As a result, the local genetic make-up of populations could be degraded, resulting in reduced fitness.

Indirect effects include spread of weeds. Invasive weeds alter plant community structure and composition, productivity, nutrient cycling, and hydrology and may cause declines in native plant populations through competitive exclusion, niche displacement and other mechanisms. Invasive plants reduce and may eliminate vegetation that provides cover for wildlife and forage for livestock, and may also increase fire risk. Impacts on wetland or riparian systems could involve damage to vegetation, loss of hydrologic function, increased erosion, reduced water retention, and loss of wildlife habitat. Riparian impacts would be avoided under all alternatives.

In addition, activities that would disturb soils could cause erosion, topsoil and biological soil crust loss, and soil compaction. This could affect vegetation's ability to regenerate and could facilitate weed introduction and spread. Soil compaction results in decreased vegetation cover and more exposure of the soil surface to erosion (Burton et al. 2008). Soil compaction may also affect the size and abundance of plants by reducing moisture availability and precluding adequate taproot penetration to deeper horizons (Ouren et al. 2007). Furthermore, construction and maintenance activities could increase dust, which could cover existing vegetation and impair plant photosynthesis and respiration. Resulting impacts could include lowered plant vigor and growth rate, altered or disrupted pollination, and increased susceptibility to disease, drought, or insect attack. As a result, surface-disturbing activities could affect the density, composition, and frequency of species in an area, thus affecting native vegetation condition.

Overall, direct and indirect effects from gas development would likely reduce land health in the Bull Mountain Unit.

BLM_0027167

### Effects Common to All Alternatives

Under all alternatives, interim reclamation of areas not needed for long-term operations would reduce short-term direct effects from vegetation removal. Reclamation areas would be reseeded 3 to 6 months after construction. Wetlands and riparian vegetation would be avoided when possible by site selection and when they cannot be avoided through approval from the BLM. Distance from streams and wetlands was included as a siting and weighting factor in well pad site selection, see **Appendix A**. Surface-disturbing activities shall avoid riparian/wetland habitat unless otherwise approved by the BLM, see **Appendix C**, Conditions of Approval.

In addition, an Integrated Spill Prevention, Control and Countermeasures Plan and Emergency Response Plan would reduce the likelihood for hazardous material spills and subsequent toxicity to vegetation.

### Alternative A

Under Alternative A, impacts from gas development would continue on non-federal mineral estate, and existing lease rights on federal mineral estate would remain in effect. However, the BLM may receive and consider proposals for individual APDs, access, and/or other production-related activities at any time on federal surface and/or federal mineral estate.

There would be no change to BLM land health with respect to vegetation under Alternative A.

**Table 4-43**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative A), shows the direct, short-term and long-term impacts on vegetation communities under Alternative A. This table is based on the conceptual siting of project components and estimated project footprint, and exact acreages could change during site-specific design and permitting. Sagebrush and irrigated meadow communities would have the greatest acreage affected, largely on private surface/private mineral and private surface/federal mineral estates. Given the conceptual nature of project siting, indirect impacts are not quantified. However, indirect effects include the effects from spread of weeds, dust, increased accessibility for grazing, and trampling from nearby humans.

To the extent practicable, interim reclamation areas would be reseeded with mixes that would comply with CPW and Gunnison County goals and objectives; this would reduce the likelihood for noxious weed invasion, erosion, and dust through restoration of plant cover. However, seed mixes would not have any forb or shrub species and would be a mix of grasses. This would limit diversity and restoration of initial conditions. Monitoring would help to ensure that vegetation is deemed successful and reclamation plans would be submitted for each new well.

Mandatory noxious and invasive weed measures would be applied, as discussed in **Appendix I** (**Sections I.2.2, I.2.3, I.3.1, I.3.2**, and **I.3.3**), thereby reducing the likelihood for the introduction and spread of noxious and invasive weeds. Further, these species would be controlled to prevent their spread.

BLM_0027168

**Table 4-43**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative A)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (acres)[2] | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) | Total (acres)[3] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | 0 | 1 | 3 | 4 |
| Aspen/Oak | 1 | 2 | 3 | 6 |
| Disturbed Area | 0 | 6 | 17 | 23 |
| Irrigated Meadow | 0 | 2 | 56 | 58 |
| Meadow | 0 | 2 | 18 | 20 |
| Mixed Mountain Shrub | 1 | 3 | 10 | 14 |
| Oakbrush | 3 | 3 | 4 | 10 |
| Sagebrush | 2 | 52 | 60 | 114 |
| Wetland/Riparian Area | 0 | 3 | 6 | 9 |
| **TOTAL** | 7 | 74 | 177 | 258 |
| *Long-Term Impacts* | | | | |
| Aspen | 0 | 0 | 1 | 1 |
| Aspen/Oak | 0 | 0 | 1 | 1 |
| Disturbed Area | 0 | 3 | 11 | 14 |
| Irrigated Meadow | 0 | 0 | 16 | 16 |
| Meadow | 0 | 1 | 8 | 9 |
| Mixed Mountain Shrub | 0 | 0 | 2 | 2 |
| Oakbrush | 1 | 1 | 1 | 3 |
| Sagebrush | 1 | 17 | 18 | 36 |
| Wetland/Riparian Area[4] | 0 | 1 | 2 | 3 |
| **TOTAL** | 2 | 23 | 60 | 85 |

Source: SGI GIS 2013, BLM GIS 2014, Petterson 2012

[1] No short or long term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2] Disturbance acreage for federal lands is due to construction needed to upgrade roads to access private pads.
[3] In some cases, discrepancies in totals occur due to rounding of acres
[4] Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based upon 5 acre and 2 acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

### Alternative B

Impacts from the phases of development would be similar to those described for Alternative A, but under Alternative B, impacts would occur on federal lands/federal mineral estate. BLM land health with respect to vegetation would likely be reduced in developed areas under this alternative. However, since most lands were found to be meeting Land Health Standard 3 in the most recent North Fork Land Health Assessment, it is unknown whether they would still meet this standard or would be found to be not meeting as a result of this alternative.

**Table 4-44**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative B), shows the direct, short and long term impacts on vegetation communities under Alternative B. Although the acres of impacts are estimates, the overall acreage of impacts would increase under Alternative B compared to Alternative A, as additional facilities would be constructed. Sagebrush and oakbrush communities would have the greatest acreage affected, with increased impacts on private surface/federal mineral estates compared with Alternative A.

BLM_0027169

**Table 4-44**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative B)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (acres) | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) | Total (acres)[2] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | 0 | 19 | 3 | 22 |
| Aspen/Oak | 4 | 4 | 4 | 12 |
| Disturbed Area | 1 | 10 | 18 | 29 |
| Irrigated Meadow | 1 | 24 | 13 | 38 |
| Meadow | 0 | 13 | 8 | 21 |
| Mixed Mountain Shrub | 1 | 11 | 9 | 21 |
| Oakbrush | 6 | 56 | 9 | 71 |
| Sagebrush | 4 | 316 | 42 | 362 |
| Wetland/Riparian Area | 1 | 6 | 3 | 10 |
| **TOTAL** | **18** | **459** | **109** | **586** |
| *Long-Term Impacts* | | | | |
| Aspen | 0 | 5 | 1 | 6 |
| Aspen/Oak | 1 | 2 | 1 | 4 |
| Disturbed Area | 0 | 7 | 13 | 20 |
| Irrigated Meadow | 0 | 8 | 5 | 13 |
| Meadow | 0 | 6 | 4 | 10 |
| Mixed Mountain Shrub | 0 | 3 | 3 | 6 |
| Oakbrush | 1 | 17 | 3 | 21 |
| Sagebrush | 1 | 113 | 15 | 129 |
| Wetland/Riparian Area | 0 | 2 | 1 | 3 |
| **TOTAL** | **3** | **163** | **46** | **212** |

Source: SGI GIS 2013, BLM GIS 2014, Petterson 2012
[1] No short or long term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2] In some cases, discrepancies in totals occur due to rounding of acres

Development of well pad 12-89-7-1 and the associated pipelines would cause permanent impacts on vegetation, as shown in **Table 4-45**. Temporary impacts may extend into the areas around the well pad and pipelines but would be reclaimed following construction. Short- and long-term impacts would occur, as described under *Nature and Type of Effects*. The mixed mountain shrub community would have the greatest acreage affected.

Mandatory noxious and invasive weed measures (**Appendix I**) would be applied, having impacts as described for Alternative A.

If the BLM were to apply the mitigation measures in **Appendix C** as COAs, residual impacts would be reduced. Mitigation (COAs #6 through #9, #11 through #13, #15 through #18, and #48 through #50) includes measures for erosion control and dust abatement, to minimize vegetation removal, and to provide guidelines for vegetation reestablishment. These would be applied where appropriate to reduce the likelihood for fragmentation, vegetation condition and hydrologic functionality degradation, and age class distribution changes. COAs #45 through #48 would further reduce the likelihood for weed introduction and spread and would include additional control and monitoring measures. Together, these mitigation measures would reduce impacts on upland, riparian, and wetland vegetation and would reduce the likelihood of weed spread.

BLM_0027170

**Table 4-45**
**Permanent Impacts on Vegetation**
**Communities from Development of Well Pad**
**12-89-7-1**

| Vegetation Community | Disturbance Area (Acres) |
|---|---|
| *Proposed ROW* | |
| Mixed mountain shrub | 0.058 |
| Oakbrush | 0.182 |
| Sagebrush | 5.272 |
| Wetland/riparian | 0.001 |
| **Total for ROW** | **5.513** |
| *Pad Site* | |
| Aspen | 0.21 |
| Mixed mountain shrub | 1.79 |
| **Total for Pad Site** | **2.01** |
| *Proposed ROW and Pad Site* | |
| Aspen | 0.21 |
| Mixed mountain shrub | 1.848 |
| Oakbrush | 0.182 |
| Sagebrush | 5.272 |
| Wetland/Riparian | 0.001 |
| **Total for ROW and Pad Site** | **7.523** |

Source: Rocky Mountain Ecological Services 2012

However, the short-term and long-term impacts on vegetation communities displayed in **Table 4-44** would remain as residual impacts.

*Alternative C*
**Table 4-46**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative C), shows the direct, short-term, and long-term impacts on vegetation communities under Alternative C. Although the acres of impacts are estimates, the overall acreage of impacts would be less than those for Alternative B, but more than Alternative A, as additional facilities would be constructed. Impacts on land health would likely be similar to Alternative B, given the application of design features and COAs (see **Appendix C**) under both alternatives. As under Alternative B, sagebrush and oakbrush would be the most impacted vegetation communities under Alternative C.

Under Alternative C, mitigation measures described for Alternative B (**Appendix C**) would be applied as design features, where appropriate, with a similar reduction in the likelihood for impacts on vegetation. Alternative C also includes design features (shown in **Appendix C**) to reduce impacts on vegetation, such as increased dust abatement measures and requiring an annual reclamation monitoring status report, which would help identify areas for improvement. Interim reclamation would include the appropriate composition of grasses, forbs, and shrubs for the ecological site, which would go further in restoring a native plant community compared to Alternatives A and B. Mandatory noxious and invasive weed design features would be applied, having impacts as described for Alternative A. Together, these design features would reduce impacts on upland, riparian, and wetland vegetation and reduce the likelihood of weed spread

BLM_0027171

**Table 4-46**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative C)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (acres) | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) | Total (acres)[2] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | 0 | 15 | 0 | 15 |
| Aspen/Oak | 8 | 10 | 2 | 20 |
| Disturbed Area | 0 | 9 | 5 | 14 |
| Irrigated Meadow | 1 | 26 | 5 | 32 |
| Meadow | 0 | 7 | 3 | 10 |
| Mixed Mountain Shrub | 1 | 7 | 3 | 11 |
| Oakbrush | 3 | 34 | 5 | 41 |
| Sagebrush | 4 | 253 | 31 | 288 |
| Wetland/Riparian Area | 0 | 5 | 2 | 7 |
| **TOTAL** | **17** | **366** | **56** | **439** |
| *Long-Term Impacts* | | | | |
| Aspen | 0 | 4 | 0 | 4 |
| Aspen/Oak | 2 | 2 | 0 | 4 |
| Disturbed Area | 0 | 3 | 4 | 7 |
| Irrigated Meadow | 0 | 8 | 1 | 9 |
| Meadow | 0 | 3 | 1 | 4 |
| Mixed Mountain Shrub | 0 | 1 | 0 | 1 |
| Oakbrush | 1 | 9 | 0 | 10 |
| Sagebrush | 1 | 78 | 5 | 84 |
| Wetland/Riparian Area | 0 | 1 | 0 | 1 |
| **TOTAL** | **4** | **109** | **11** | **124** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres

more than Alternatives A and B. However, the short-term and long-term impacts on vegetation communities displayed in **Table 4-46** would remain as residual impacts. Residual impacts would be more than under Alternative A but less than under Alternative B. Further, impacts could still occur from erosion, dust, trampling, or ineffective re-establishment, despite the implementation of design features.

### *Alternative D, the Preferred Alternative*

**Table 4-47**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative D), shows the direct, and short-term, and long-term impacts on vegetation communities under Alternative D. Although the acres of impacts are estimates, the overall acreage of impacts would be less than those for Alternative B but more than Alternative A. This is because additional facilities would be constructed. Impacts on land health would likely be similar to Alternative B, though they would likely be less under Alternative C. As under Alternative B, sagebrush and oakbrush would be the most impacted vegetation communities under Alternative D.

As under Alternative C, the same design features from **Appendix C** would be applied where appropriate, with a similar reduction in the likelihood for impacts on vegetation. Mandatory noxious and invasive weed design features would be applied, having impacts as described for

BLM_0027172

**Table 4-47**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative D)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | 0 | 14 | 2 | 16 |
| Aspen/Oak | 2 | 3 | 3 | 8 |
| Disturbed Area | 0 | 6 | 4 | 10 |
| Irrigated Meadow | 1 | 22 | 7 | 29 |
| Meadow | 0 | 10 | 2 | 13 |
| Mixed Mountain Shrub | 0 | 11 | 5 | 16 |
| Riparian Woodland | 0 | 1 | 0 | 1 |
| Oakbrush | 0 | 38 | 5 | 44 |
| Sagebrush | 1 | 271 | 38 | 311 |
| Wetland/Riparian Area | 0 | 5 | 2 | 7 |
| **TOTAL** | **5** | **382** | **68** | **454** |
| *Long-Term Impacts* | | | | |
| Aspen | 1 | 4 | 0 | 4 |
| Aspen/Oak | 0 | 1 | 0 | 1 |
| Disturbed Area | 0 | 3 | 3 | 7 |
| Irrigated Meadow | 0 | 6 | 0 | 7 |
| Meadow | 0 | 5 | 1 | 5 |
| Mixed Mountain Shrub | 0 | 3 | 1 | 3 |
| Riparian Woodland | 0 | 0 | 0 | 0 |
| Oakbrush | 0 | 10 | 0 | 11 |
| Sagebrush | 0 | 87 | 6 | 93 |
| Wetland/Riparian Area | 0 | 1 | 0 | 2 |
| **TOTAL** | **1** | **120** | **12** | **133** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts are anticipated on aspen/conifer, mixed conifer, pinyon/juniper, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres

Alternative A. Together, these design features would reduce impacts on upland, riparian, and wetland vegetation and would reduce the likelihood of weed spread more than Alternative A. However, the short-term and long-term impacts on vegetation communities displayed in **Table 4-47** would remain as residual impacts. Further, impacts could still occur from erosion, dust, trampling, or ineffective reestablishment, despite the implementation of design features.

*Cumulative*
Cumulative impacts would represent the combination of Alternatives A and B, Alternatives A and C, or Alternatives A and D. Combined with other past, present, and reasonably foreseeable future actions, either combination of Alternatives A, B, C, and D would contribute to vegetation disturbance and removal and a reduction of land health in the region both temporarily and permanently (see **Table 4-48**, **Table 4-49**, and **Table 4-50**). Past, present, and future activities would continue to disturb and remove vegetation in the region due to trampling and constructing project facilities, transmission lines, and access roads. These activities are sheep and cattle grazing on BLM and National Forest System lands; coal mining in the North Fork Valley; oil and gas development; fuel and fence pole wood harvesting; and forage consumption.

BLM_0027173

**Table 4-48**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit**
**(Alternatives A and B combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | 0 | 20 | 6 | **26** |
| Aspen/Oak | 5 | 6 | 7 | **18** |
| Disturbed Area | 1 | 16 | 35 | **52** |
| Irrigated Meadow | 1 | 26 | 69 | **96** |
| Meadow | 0 | 15 | 26 | **41** |
| Mixed Mountain Shrub | 2 | 14 | 19 | **35** |
| Oakbrush | 9 | 59 | 13 | **81** |
| Sagebrush | 6 | 368 | 102 | **476** |
| Wetland/Riparian Area | 1 | 9 | 9 | **19** |
| **TOTAL** | **25** | **533** | **286** | **844** |
| *Long-Term Impacts* | | | | |
| Aspen | 0 | 5 | 2 | **7** |
| Aspen/Oak | 1 | 2 | 2 | **5** |
| Disturbed Area | 0 | 10 | 24 | **34** |
| Irrigated Meadow | 0 | 8 | 21 | **29** |
| Meadow | 0 | 7 | 12 | **19** |
| Mixed Mountain Shrub | 0 | 3 | 5 | **8** |
| Oakbrush | 2 | 18 | 4 | **24** |
| Sagebrush | 2 | 130 | 33 | **165** |
| Wetland/Riparian Area[3] | 0 | 3 | 3 | **6** |
| **TOTAL** | **5** | **186** | **106** | **297** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres
[3]Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based upon 5 acre and 2 acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

**Table 4-49**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit**
**(Alternatives A and C combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | 0 | 16 | 3 | **19** |
| Aspen/Oak | 9 | 12 | 5 | **26** |
| Disturbed Area | 0 | 15 | 22 | **37** |
| Irrigated Meadow | 1 | 28 | 61 | **90** |
| Meadow | 0 | 9 | 21 | **30** |
| Mixed Mountain Shrub | 2 | 10 | 13 | **25** |
| Oakbrush | 6 | 37 | 9 | **52** |
| Sagebrush | 6 | 305 | 91 | **402** |
| Wetland/Riparian Area | 0 | 8 | 8 | **16** |
| **TOTAL** | **24** | **440** | **233** | **697** |

BLM_0027174

**Table 4-49**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit**
**(Alternatives A and C combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| *Long-Term Impacts* | | | | |
| Aspen | 0 | 4 | 1 | **5** |
| Aspen/Oak | 2 | 2 | 1 | **5** |
| Disturbed Area | 0 | 6 | 15 | **21** |
| Irrigated Meadow | 0 | 8 | 17 | **25** |
| Meadow | 0 | 4 | 9 | **13** |
| Mixed Mountain Shrub | 0 | 1 | 2 | **3** |
| Oakbrush | 2 | 10 | 1 | **13** |
| Sagebrush | 2 | 95 | 23 | **120** |
| Wetland/Riparian Area[3] | 0 | 2 | 2 | **4** |
| **TOTAL** | 6 | 132 | 71 | **209** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres
[3]Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based upon 5 acre and 2 acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

**Table 4-50**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit**
**(Alternatives A and D combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| *Short-Term Impacts* | | | | |
| Aspen | - | 15 | 5 | 20 |
| Aspen/Oak | 3 | 5 | 6 | 14 |
| Disturbed Area | 1 | 12 | 21 | 34 |
| Irrigated Meadow | 1 | 24 | 63 | 87 |
| Meadow | 0 | 12 | 21 | 33 |
| Mixed Mountain Shrub | 1 | 13 | 15 | 29 |
| Oakbrush | 3 | 42 | 9 | 54 |
| Riparian Woodland | - | 1 | 0 | 1 |
| Sagebrush | 3 | 323 | 97 | 424 |
| Wetland/Riparian Area | 0 | 8 | 8 | 16 |
| **TOTAL** | - | 15 | 5 | 20 |
| *Long-Term Impacts* | **11** | **455** | **246** | **713** |
| Aspen | - | 4 | 1 | 5 |
| Aspen/Oak | 1 | 1 | 1 | 3 |
| Disturbed Area | 1 | 6 | 14 | 21 |
| Irrigated Meadow | 0 | 6 | 17 | 23 |
| Meadow | 0 | 5 | 8 | 13 |
| Mixed Mountain Shrub | 0 | 3 | 3 | 7 |
| Oakbrush | 1 | 11 | 2 | 14 |
| Riparian Woodland | - | 0 | 0 | 0 |

BLM_0027175

**Table 4-50**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit**
**(Alternatives A and D combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| Sagebrush | 1 | 105 | 24 | 130 |
| Wetland/Riparian Area[3] | - | 2 | 2 | 4 |
| **TOTAL** | **1** | **145** | **72** | **221** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts are anticipated on aspen/conifer, mixed conifer, pinyon/juniper, rocky outcrop, willow, or open water communities.
[2]In some cases, discrepancies in totals occur due to rounding of acres.
[3]Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based on 5-acre and 2-acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

Increasing recreation pressure, including OHVs on the 440 acres of the Bull Mountain Unit on federal surface estate, would continue to disturb native vegetation and spread weeds. Forest insects and diseases would continue to spread, and wildfires would continue to occur, both damaging and sometimes destroying native vegetation. If Alternatives A and B, Alternatives A and C, or Alternatives A and D were constructed simultaneously with other projects, cumulative construction and operation impacts on native vegetation could increase. If projects in the region were not successfully revegetated, native vegetation communities could be lost, or permanently converted to communities dominated by invasive, nonnative species, leading to an incremental reduction in land health.

Revegetation efforts with non-local genotypes could marginally reduce the fitness of native populations of the reclamation species within vegetation communities. Alternately, current efforts to protect vegetation in the region, including land use planning efforts could help prioritize areas for protection, particularly native plant communities, and would improve adaptive management for forest diseases. Implementation of COAs in **Appendix C** (COAs #6 through #9, #11 through #13, #15 through #18, and #44 through #46) would minimize cumulative impacts caused by Alternatives A, B, C, or D, and no additional mitigation measures are recommended.

### 4.2.7   Fish and Wildlife

This section discusses impacts on fish and wildlife habitat from proposed management actions of other resources and resource uses. Habitat types are described in **Section 3.2.6**, Vegetation. Existing conditions concerning fish and wildlife and descriptions of habitat requirements for various species are described in **Section 3.2.8**, Fish and Wildlife.

*Methods of Analysis*

*Terrestrial Wildlife*
Impacts on wildlife and their habitats include the following:

BLM_0027176

- Disturbance and/or loss of plant communities, food supplies, cover, breeding sites, and other habitat components necessary for population maintenance used by any species to a degree that would lead to substantial population declines

- Disturbance and/or loss of seasonally important habitat (e.g., critical for overwintering or successful breeding) to a degree that would lead to substantial population declines

- Interference with a species' movement pattern that decreases the ability of a species to breed or overwinter successfully to a degree that would lead to substantial population declines

- Loss of habitat functionality

*Aquatic Wildlife*
Impacts on aquatic species and their habitats include the following:

- Sediment and Turbidity – Increased sediment loading in waters containing sediment-intolerant fish species, loss of recruitment, stress, habitat alteration, and habitat loss

- Habitat Alteration – Changes that render habitat nonfunctional for select species or more conducive to competitive species

- Loss or Reduction of Streamside Vegetation/Cover – Increased temperatures, stress, reduced productivity, and impacts on food webs

- Water Quality Alteration – Actions that alter important water quality parameters, including pH, dissolved oxygen, temperature, hardness, alkalinity/salinity, and turbidity

- Water Depletions – Loss of physical habitat, changes in water quality, sediment accumulation, habitat alteration, loss of habitat complexity, or food source reduction

- Potential direct mortalities to aquatic wildlife from motorized travel

*Indicators*
Indicators of impacts on fish and wildlife are as follows:

- Amount and condition of available habitat

- Likelihood of mortality, injury, or direct disturbance

- Likelihood of habitat disturbance

*Assumptions*
The analysis includes the following assumptions:

- Activities associated with the construction, operation, and development of oil and gas resources in the Unit are expected to have the greatest impacts on big game species.

BLM_0027177

Small mammals and reptiles may be less influenced by oil and gas development as habitat use may occur over a smaller spatial extent.

- The actual locations of oil and gas well pads and associated infrastructure including pipelines and access roads is subject to change as a result of the APDs.

- Short-term effects are defined as those that would occur over a time frame of 5 years or less, and long-term effects would occur over longer than 5 years.

### Nature and Type of Effects

Mineral exploration and development, and associated ROW use would result in both short-term and long-term impacts on fish and status wildlife species on BLM-administered lands and federal mineral estate in the Unit under all alternatives. Effects are directly linked to vegetation conditions and water quality and quantity (**Section 4.2.6**, Vegetation, and **Section 4.2.4**, Water Resources). Displacement of species could increase competition for resources in adjacent habitats. Over the long term, these activities would remove and fragment habitats due to road development and use, facility construction and placement, creation of well pads, natural gas wells, water disposal wells, and pipelines, and construction within ROWs. Species are likely to avoid developed areas over the long term. Seasonal closures of ROWs, if implemented in critical limiting habitats, could reduce impacts on targeted wildlife species and limit the effects of habitat fragmentation.

Indirect impacts may include the following:

- An increase in predators or predation pressure

- Decreased survival or reproduction of the species

- Decreased habitat effectiveness

- Interference with habitat function, movement patterns, behavior, or displacement

- Introduction of invasive vegetation that competes with desirable native vegetation and could result in changed habitat or altered fire cycles

### Effects Common to All Alternatives

Under all alternatives, oil and gas development actions would continue to use existing infrastructure including well pads, access roads, pipelines, one overhead electrical line (4 power poles), and others. See **Table 2-10**, Summary of Actions by Alternative, for a summary of existing actions in the Unit. Some existing roads would be upgraded and new roads would be built. Therefore, impacts on fish and wildlife populations from oil and gas development activities would continue, irrespective of the proposed alternatives. These activities along with those associated with casual use, permitted activities, and habitat changes, as described in the Nature and Types of Effects section above, would continue to impact fish and wildlife throughout the Unit. Threats specific to aquatic wildlife as a result of oil and gas development within the Unit would be attributed to water depletions as well as road and pipeline crossings of streams, wetlands, and other water bodies.

BLM_0027178

Areas affected by short-term construction disturbance may have a longer duration of impacts on wildlife than expected. This is because these areas would not be reclaimed to pre-disturbance conditions for many years, given the slow rate of shrub re-establishment and time required to return to functional habitat conditions for many shrub-dependent species, such as mule deer and elk.

Under all alternatives, pipeline crossings of wetlands as well as roads, would be bored (not trenched) outside of road ROWs and wetland boundaries. Impacts from boring activities during construction phases could include a "frac-out," which is caused when excessive pressure builds up forcing drilling mud to the surface (DFO 2007) A frac-out would result in short-term displacement of terrestrial and aquatic wildlife or habitat avoidance as a result of excessive mud (terrestrial) or increased sediment and turbidity as well as reduced water quality (aquatic). Activities associated with stream borings could also result in bank destabilization in the short term. In the long term, fish and wildlife species and their habitat would be at risk of hazardous materials contamination in the event of a pipeline rupture under all alternatives. Aquatic wildlife, particularly habitat for Colorado River fish species would continue to be reduced as a result of continued water depletions for ongoing drilling, completion, and dust abatement activities.

*Habitat Quality*
There is a large body of evidence documenting the effects of roads and travel routes on habitat quality for a wide variety of big game species (Foreman et al. 2003; Hebarrelewhite 2008; Nietvelt 2002; Sawyer et al. 2006, 2009). While many studies quantify the effects of roads and road densities on wildlife and habitat quality, few distinguish between road classifications, traffic volumes, or specific road types and their corresponding effects on wildlife. Road density appears to be the most studied parameter related to roads and their effects on wildlife (Foreman et al. 2003; Hebarrelewhite 2008; Nietvelt 2002). For this reason, the BLM has chosen to use route density as a means to characterize habitat quality and describe and assess impacts within the Unit, which is mapped as crucial winter range for big game. Doherty et al. (2008), Hebarrelewhite (2008), Sawyer et al. (2009), Wilbert et al. (2008), and others have used spatial models to characterize the effects of route density on overall habitat quality within a given geographic area.

The response to routes for individual big game species varies. In many cases responses have been documented as displacement distances or avoidance buffers for individual species. When the average documented displacement distance or avoidance buffer for a given species exceeds the distance to the nearest road across available habitats, the habitat quality for that species has decreased substantially and may result in population-level adverse effects (Hebarrelewhite 2008; Doherty et al. 2008; Ingelfinger and Anderson 2004; Sawyer et al. 2006, 2009).

According to a recent literature review of ungulate response to route development, substantial impacts on ungulate populations begin to manifest themselves when route densities reach 0.5 to 1 mile of road per square mile. Similar route density threshold has been implicated for maintaining sustainable populations of sage-grouse, large carnivores, and bears (Doherty et al. 2008; Van Dyke et al. 1986; Clevenger et al. 1997).

BLM_0027179

Big game habitat quality within the geographic boundary of the Bull Mountain Unit (Unit) can be characterized as described in **Table 4-51**, Habitat Quality Categories as a Function of Road Density, based on route densities analyzed across the alternatives. Route densities were calculated based on the Kernel Density tool provided in ArcGIS with a search radius of 1000 meters based on the average route avoidance distance for ungulates described in Rost and Bailey 1979 and Freddy et al. 1986.

**Table 4-51**
**Habitat Quality Categories as a Function of Road Density**

| Habitat Quality | Existing Route Density and Fragmentation |
|---|---|
| Category 1 | 0.0 - 0.5 road miles/sq. mile |
| Category 2 | 0.6 - 2.0 road miles/sq. mile |
| Category 3 | 2.1 - 4.0 road miles/sq. mile |
| Category 4 | > 4.0 road miles/sq. mile |

Source: CPW 2011

*Alternative A*

Effects on fish and wildlife from access road use and pipeline development would be as described under the Nature and Types of Effects for casual use and permitted use. Surface disturbance from current oil and gas development would continue. New access roads would not be purposefully sited to reduce impacts on key big game habitat such as winter habitats. Within the Unit, crucial winter range is of greatest importance for deer and elk. Seasonal restrictions to human activities may reduce impacts on crucial winter range. Under Alternative A, impacts from road development and use would have the least direct effect on wildlife and their habitat as Alternative A would result in the fewest number of well pads, miles of roads, and pipelines.

Because the WHP is an agreement with the BLM for operations on federally permitted actions, the assumption is that its provisions would not be applied under Alternative A for this analysis. If SGI were to voluntarily work under the provisions or the COGCC were to adopt them for state permits, the seasonal closures, monitoring, and design features would avoid or minimize impacts on big game winter habitat, would protect water quality and aquatic resources, would collocate wells, and would provide for pre-construction nest surveys. Additionally, installing netting over open pits would reduce the likelihood of death or injury to wildlife from entrapment or exposure to oil. Measures to protect water quality and aquatic resources would limit surface-disturbing activities near lakes, wetlands, and perennial or seasonal flowing waterways providing fish habitat. Implementing the WHP would likely reduce but not eliminate impacts on wildlife, such as habitat loss and fragmentation, injury, or death.

Additionally, reducing the number of pipeline and road crossings of streams and other water bodies as well as decreasing the amount of surface water used within the Unit would reduce impacts on aquatic species and their habitat. Actions proposed under Alternative A would result in the least amount of water depletions since Alternative A proposes to develop the fewest number of well pads which would require the least amount of project water for oil and gas development (see **Table 2-10**, Summary of Actions by Alternative, for water quantities). Therefore, aquatic habitat would be least affected by surface water use under Alternative A.

BLM_0027180

*Terrestrial Wildlife*
Under Alternative A, proposed well pads, roads, pipelines and other supporting infrastructure would result in the short-term disturbance of over 260 acres in the Unit; in the long term over 88 acres would be disturbed. Estimates of impacts on wildlife resources were determined quantitatively in GIS to analyze potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-43** for a description of direct impacts on habitat vegetation types under Alternative A.

The road density analysis indicates that Alternative A would result in 4,440 acres of Category 1 habitat and 15,230 acres (sum of habitat Categories 2, 3, and 4) with road densities greater than 0.5 road miles per square mile (**Table 4-52**, Habitat Categories by Alternative; **Figure 4-15**, Habitat Categories by Alternative). Scattered throughout the Unit are islands of Category 1 habitat, some of which overlap severe winter range for elk and deer. Road densities are greatest (Category 4) along Highway 133 in the eastern portion of the Unit where human disturbance is greatest. Travel activities associated with other road uses in the Unit would also contribute to human disturbances that could cause wildlife displacement or avoidance. Under Alternative A, federal minerals within the Unit would continue to be subject to a winter seasonal timing limitation from December 1 through April 30 to protect deer and elk winter ranges from development activities.

Mule Deer – Mule deer have shown considerable ability to acclimate to human activities within the area, and rarely flee very far from vehicular use of roads. However, it is well-documented that deer stress levels, and thus overall fitness, are compromised when mule deer use habitats near and within areas of major natural gas development. Wilbert et al. (2008) provided observations of wildlife responses to indicators including distance to nearest roads and well pads. Mule deer in shrub habitat avoid roads within 328 feet and the minimum distance from active oil and gas development that mule deer are likely to occur in range between 1.6 and 2.3 miles from well pads. Restricting surface-disturbing activities from mineral development through management actions would, therefore, reduce impacts on wildlife species and their habitat, generally for species within the Unit.

Table 4-52
Habitat Categories by Alternative

| Habitat Category | Alt. A (No Action) Acres | % Δ | Alt. B (Proposed Action) Acres | % Δ | Alt. B Proposed Action) Wildlife Habitat Plan Acres | %Δ | Alt. C (Modified Action) Acres | Δ | Alt. C (Reduced Winter Activity) Acres | % Δ | Alt. D (Preferred Alternative) Acres | % Δ | Alt. D (Preferred Alternative) Wildlife Habitat Plan Acres | % Δ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 4,440 | -- | 1,180 | -73 | 5,950 | 25 | 4,310 | -3 | 5,750 | 30 | 3,260 | -27 | 6,480 | 31 |
| 2 | 6,160 | -- | 4,100 | -33 | 5,300 | -14 | 7,300 | 19 | 7,100 | 15 | 7,280 | -15 | 6,780 | 9 |
| 3 | 7,430 | -- | 9,230 | 24 | 6,520 | -12 | 7,010 | -6 | 5,960 | -20 | 7,450 | 0 | 5,570 | -25 |
| 4 | 1,640 | -- | 5,170 | 69 | 1,900 | 14 | 1,060 | -35 | 870 | -47 | 1,690 | -3 | 850 | -48 |

Source: BLM GIS 2014, CPW 2011

BLM_0027181

The BLM will be modifying the lease stipulations for winter timing restrictions in areas outside of the SGI committed winter big game closure areas. These lease modifications will allow a landscape-level approach to effective winter range management and maintenance of effective winter range conditions, which would otherwise not be realized. At this time, the level of natural gas development in the Unit is not considered to be major, and while there is likely some change in mule deer behavior in the area around producing wells and some of the more heavily used roads, detectable impacts on deer population levels in the area are unlikely.

Direct impacts (i.e., mortality) to mule deer are unlikely in the project area given that all roads within the Unit are dirt roads (with the exception of Highway 133), and road speeds are generally below 30 mph. Within the Unit, the slow road speeds and mobility of deer would limit traffic-related deer mortality. The level of traffic on Highway 133 from development of Alternative A would increase by less than 1 percent over the next 6 years (**Section 4.3.5**, Transportation and Access), which would likely have additive but nominal direct mortality impacts on mule deer wintering in lower elevations along Highway 133. This would likely impact individual deer, but no population level impacts would be expected.

Netting around pits would avoid the chance that deer could become stuck in a pit, or ingest waters on pit surfaces.

See the Vegetation section for a detailed description of the acres of impact on specific vegetation communities. **Table 4-53**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative A, shows the quantitative impacts on mule deer and elk habitats that would result from Alternative A. These direct impacts on habitats would be relatively small in scale.

**Table 4-53**
**Impacts on Mule Deer and Elk Habitat in**
**Bull Mountain Unit under Alternative A**

| Impacts | Total (acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 41 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 72 |
| Elk winter concentration area | 196 |
| *Long-Term Impacts* | |
| Mule deer winter range | 12 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 21 |
| Elk winter concentration area | 65 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

BLM_0027182

## Habitat Categories by Alternative







Figure 4-15

BLM_0027183

This page intentionally left blank.

BLM_0027184

In summary, long-term impacts on habitat would decrease after major activities associated with development are complete, and thus traffic levels and heavy construction activities would also decrease. However, compared to current conditions, the area would see a long-term increase in human activity, which would diminish the utility of the area for mule deer. Avoidance of winter habitat under the WHP would reduce these impacts. Mule deer densities within the Unit may decrease over time with full development of the Unit due to increased human activities, but the relatively small footprint of the project would allow for adequate forage for mule deer throughout the area.

The long-term indirect impacts on deer would be largely dependent on the amount of traffic and human activities in the Unit. With automation of facilities and reduced traffic, disturbance would be reduced, but the facilities would still be maintained year-round. It is conceivable that deer may continue to utilize much of the Unit. However, if wells are checked daily or roads see regular traffic, deer densities and use of the Unit would likely remain lower than current levels. Overall deer populations would not be expected to decrease, but deer densities in the Unit would be lower.

Avoidance of winter big game habitat during the drilling and construction phases would protect the deer population in the winter. During the summer and fall, deer seem to be more sensitive to human disturbances (which would coincide with the construction season and fall hunting seasons), while wintering mule deer seem more accepting of human activities (which coincides with reduced human activity in the Unit). Given the low levels of human activity anticipated in the winter, deer may maintain traditional use patterns. However, year-round maintenance during the production phase would involve traffic and human disturbance and may result in deer avoiding habitat. Indirect impacts on deer would be realized through lower fawn weights and possibly higher fawn deaths. Deaths could increase due to does and fawns needing to travel more to avoid habitats near roads, pads, pits, and other areas of human activity, which could therefore limit their use of preferred habitats and refugia and increase their metabolic outputs.

Elk – Direct impacts (e.g., mortality) to elk are unlikely in the project area given that all roads within the Unit are dirt (with the exception of Highway 133), and road speeds are generally below 30 mph. It is possible that some elk may be struck while attempting to cross a road, but this is relatively unlikely given the road speeds (which are even slower during the winter) and agility of elk. Mortality to elk along Highway 133 is currently occurring due to existing traffic patterns, and development of the Unit would contribute to additional traffic on Highway 133. The level of traffic on Highway 133 from Alternative A would increase by less than 1 percent, depending on the time of year and level of development (see **Section 4.3.5**, Transportation and Access, for more information regarding traffic impacts). Traffic increases would likely have additive but nominal direct mortality impacts on elk wintering in lower elevations along Highway 133. This would likely impact individual elk, but no population-level impacts would be expected, especially when considering that elk would be wintering near Highway 133 when development-related traffic volumes are lower.

Wildlife fencing around cutting pits would avoid the chance that elk could become stuck in a pit or ingest waters on pit surfaces. The odor of cuttings pits, tarps covering pits, and the presence of livestock fencing around pads would further deter elk from these areas.

BLM_0027185

**Table 4-53** shows the quantitative impacts on mule deer and elk habitats that would result from Alternative A. See the Vegetation section for a detailed description of the acres of impacts on specific vegetation communities. These direct impacts on habitats are very small in scale. Areas affected by short-term construction disturbance may have a longer duration of impacts on elk than expected. This is because these areas would not be reclaimed to pre-disturbance conditions for many years given the slow rate of shrub re-establishment and time required to return to functional habitat conditions for elk.

There may be a 2- to 3-year period when pipeline corridors provide lower elk grazing opportunities throughout the Unit. It is assumed that over 3 years or so, most of the cleared pipeline corridors and other temporary use areas would be revegetated and would once again provide elk with more suitable foraging. However, in some circumstances where landowners or other agencies require the planting of more aggressive nonnative grasses and forbs, the recovery of native forbs and shrubs into these short-term disturbance acres may take much longer due to the competitive exclusion of desirable native plants.

Elk would avoid otherwise suitable habitats near access roads, construction areas, and active drilling sites during the construction process due to human activities, traffic, loud noises, and other perceived threats by elk as described under the Nature and Types of Effects. For instance, Wilbert et al. (2008) found that elk habitat effectiveness is eliminated in non-forested habitats when road densities exceed 1 mile/square mile. It is reasonable to assume that decreased utilization would occur near areas of higher human activity, noise, and traffic. Indirect impacts which may occur during the summer construction, drilling, and completion seasons are tempered by the fact that during the summer most elk have migrated to higher terrain outside of the Unit. Construction, road use, and drilling activities occurring during the calving period (late May through late June) which occur near aspen stands and oakbrush stands may displace some individual calving elk, or disturb some calving activities. As most cows would have left the Unit by this time of year, widespread impacts are not anticipated. Avoidance of winter habitat under the WHP would reduce potential impacts on wintering elk; however, year-round maintenance activities would occur and could result in elk avoiding habitat.

The Muddy Creek elk winter concentration area is geographically isolated, covering approximately 25,000 acres (39 square miles), approximately 1.5 percent of the entire unit. Typical winter snow depths prevent elk from using the northern slopes and confine their distribution to southern aspects. Thus, only a subset of the 25,000 acres in the Muddy Creek winter concentration area provides high functioning winter foraging habitat for elk. Despite being geographically isolated and small, aerial count data gathered since the 1980s from the Muddy Creek Area indicate that up to 10 percent of the elk in the area winter there. This geographic isolation limits the ability of big game to shift their distribution to respond to disturbances from oil and gas development and production in the winter. The disturbance to elk in this isolated winter concentration area, with its significantly higher densities of wintering animals than general winter range, could result in population decline. This could happen even after COAs, best management practices, and the voluntary timing limitation. This is because elk have no contiguous habitat to relocate to.

BLM_0027186

In summary, the development of the Unit under Alternative A would create a direct loss of less than 1 percent of the potentially available habitats under any of the proposed activities. This loss of habitat would have an insignificant impact on elk. However, traffic and human activities in the Unit would have a larger indirect impact footprint, especially during the construction and drilling phases, possibly resulting in a larger range of areas with reduced habitat effectiveness for elk. Since drilling would occur year-round on private lands/private mineral estate which are relatively evenly distributed across the Unit, impacts on elk would likely occur, causing widespread impacts. It is expected, however, that most construction, drilling, and development would likely occur during the summer, reducing the likelihood for impacts on elk when they are most common in the Unit (winter). Year-round maintenance activities would impact wintering elk, particularly in isolated winter concentration areas, such as Muddy Creek.

Elk would continue to use, migrate through, and may even be seen very close to the facilities and roads within the Unit, but scientific literature indicates that elk utilization of habitats near roads decreases with increasing traffic levels (Wilbert et al. 2008), and new roads reduce habitat effectiveness for elk (see Petterson 2012). Given the size of the project, its location, and surrounding habitats, this project could have moderate impacts on elk densities and distribution within the Unit. However, it is unlikely that elk populations within the greater Muddy Creek basin would decrease, but elk densities across the Unit would likely be lower, or at least elk would be redistributed in some areas, with elk seeking habitats away from facilities and high-use roads. This may place elk in suboptimal habitats. Some areas would likely support similar elk densities as currently occurring due to low levels of development, but some areas proposed for development are located very close to or within critical winter habitats and impacts on elk in these areas would have disproportionately large impacts.

Black bear – Alternative A would have negligible impacts on bear populations or bear habitat. Bear-proof trash containers should be used on-site at all times to minimize visitation by bears but would not be required.

Moose – The development of the Unit would likely preclude moose lingering or utilizing habitats within the modeled indirect impact areas (see previous discussions). After construction, the low human activity levels around individual well pads would likely cause moose to leave if humans entered the area. Depending on the distance from the pad site, however, some moose may linger, or would not flee from human activities on pads and roads. This is not to say that moose stress levels would not rise or changes in behavior would not be noticed.

Increased traffic on local roads would also reduce moose use of habitats near roads. Increased mortality from vehicle strikes is not likely within the project area, as road speeds are fairly low, but moose vehicle strikes have been documented on Highway 133 on the east side of McClure pass near Placita. In summary, while this project may have minor localized impacts on the ability for moose to continue to fully utilize habitats in the Unit, the Unit is not optimal moose habitat, and moose use of this area would already likely be relatively infrequent. Therefore, Alternative A would have negligible impacts on moose or moose habitat.

*Aquatic Wildlife*
Under Alternative A, 4 miles of new pipeline collocated with roads and 8 miles of new cross country would be used to transport gas from producing wells and to transport water to proposed

BLM_0027187

water disposal wells. Impacts on aquatic wildlife would occur where pipeline construction phases require a pipeline bore at fish-bearing stream crossings. See **Section 3.2.8**, Fish and Wildlife, for a description of fish-bearing streams in the Unit. Surface water withdrawals would be required for nearly all phases of oil and gas development especially during construction, drilling, and dust abatement activities; 30 percent of project water would be gathered from freshwater sources and the remaining 70 percent would come from a variety of recycled and/or produced sources. Specific water withdrawal points have not yet been identified by SGI; however, it is assumed for the purposes of this analysis that the entire freshwater depletion associated with this project would be a new depletion from the Colorado River. In the short and long term, water depletions would threaten the quantity of aquatic habitat for fish and other aquatic species known to inhabit the Unit. See **Section 3.2.8**, Fish and Wildlife and **Section 3.2.10**, Special Status Species, for a list of aquatic wildlife in the Unit. Water volumes required for the activities under Alternative A would be minimal compared with the expected discharge in Muddy Creek (see **Section 4.2.4**, Water Resources) and would not substantially reduce water for aquatic wildlife. Measures to protect water quality and aquatic resources in the WHP would further reduce impacts on fish.

***Alternative B***
Impacts on fish and wildlife from access road use, pipeline development, and water use would be as described under the Nature and Types of Effects for casual use and permitted use. Surface disturbance from current and proposed oil and gas development would be greatest under Alternative B. The WHP would be implemented as a design feature to reduce impacts on big game winter habitat, protect water quality and aquatic resources, collocate wells, and provide for pre-construction nest surveys. Under Alternative B, impacts from road development and use would have a greater direct effect on wildlife and their habitat than Alternative A as Alternative B would result in the greatest number of well pads, miles of roads, and pipelines. However, implementing the WHP would reduce impacts on big game, aquatic resources, and nesting birds, relative to current conditions or Alternative C. This is as a result of surface disturbance activities and the lack of effective timing limitations on a landscape scale to reduce impacts on big game within crucial winter activity areas.

Actions proposed under Alternative B would result in greater water depletions as a result of developing the greatest number of well pads which would require the greatest amount of water during construction, drilling, and dust abatement phases of the proposed project (see **Table 2-10**, Summary of Actions by Alternative, for water quantities). Therefore, aquatic habitat would be more affected by surface water depletions under Alternative B than Alternative A, but measures in the WHP, such as setbacks from streams, would protect water quality.

***Terrestrial Wildlife***
Management actions proposed under Alternative B would result in greater of surface disturbance relative to Alternative A. Upgrades to existing roads would total 53 miles, with 16 miles of new construction. The road density analysis within the Unit identified 1,180 acres of Category 1 habitat, an approximate decrease of 72 percent compared to Alternative A. Direct impacts on terrestrial wildlife species where road densities are greater than 0.5 road miles per square mile would be most pronounced on 18,500 acres (sum of Categories 2, 3, and 4), a 21 percent increase compared to Alternative A (**Table 4-52**). Besides the direct loss of habitat and resulting habitat

BLM_0027188

fragmentation, this increase in roads could result in habitat avoidance and an increased likelihood for injury or mortality due to collisions of wildlife with vehicles (See *Habitat Quality*, above). However, seasonal closures under the WHP would reduce the direct road impact area to 13,720 acres, a reduction of 10 percent compared to Alternative A (see **Table 4-52**).

Under Alternative B, federal minerals within the Unit would continue to be subject to a winter seasonal timing limitation from December 1 through April 30 to protect deer and elk winter ranges from development activities. In addition, deer and elk would be protected under the WHP's seasonal closures to limit activity in important wintering habitat and design features to locate wells in areas that would minimize habitat fragmentation.

Quantitative estimates of impacts on wildlife resources were determined for potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-44** for a description of direct impacts on habitat vegetation types under Alternative B.

In addition, under Alternative B, SGI proposes to construct up to 4 new water disposal wells powered by overhead electrical lines requiring 20 new power poles. The addition of power lines and poles pose a threat of disturbance as described under permitted activities in the Nature and Types of Effects section. Power lines and poles may also serve as perches for birds of prey, which may indirectly increase predation on small mammals and other prey items (APLIC/USFWS 2005). Further discussion regarding impacts on birds is provided in **Sections 4.2.8**, Migratory Birds and **4.2.9**, Special Status Species.

Mule Deer and Elk – Under Alternative B, surface disturbance activities from oil and gas development would result in greater impacts on mule deer habitat throughout the Unit compared to Alternative A (**Table 4-53**). The type of impacts would be as described in the Nature and Types of Effects section above.

The reduction in habitats, as shown in **Table 4-54**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative B, and habitat quality, described in the road density analysis above, would likely result in increased impacts on mule deer and elk fitness in individuals and would lower mule deer and elk densities in the Unit during the winter compared to Alternative A.

Development of well pad 12-89-7-1 and the associated pipelines would cause impacts on wildlife species around the well pad and pipelines. Approximately 2 acres of sagebrush shrubland habitat would be lost to pad construction; approximately 5.5 acres of previously undisturbed vegetation and 8.6 acres of previously disturbed vegetation would be impacted temporarily by pipeline construction.

The project is in mule deer winter range, near a winter concentration area. The site is also in elk winter range, and activities there would add additional traffic and human activity and would be expected to result in elk avoiding the habitat.

BLM_0027189

**Table 4-54**
**Impacts on Mule Deer and Elk Habitat in**
**Bull Mountain Unit under Alternative B**

| Impacts | Total (acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 153 |
| Mule deer winter concentration area | 3 |
| Elk highway crossing | 1 |
| Elk severe winter range | 135 |
| Elk winter concentration area | 404 |
| *Long-Term Impacts* | |
| Mule deer winter range | 51 |
| Mule deer winter concentration area | 1 |
| Elk highway crossing | 1 |
| Elk severe winter range | 49 |
| Elk winter concentration area | 146 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

Direct impacts on deer and elk could include mortality from traffic on access roads, but the levels of mortality would likely be low and not have population-level impact. Short- and long-term indirect impacts would likely include habitat avoidance due to disturbance, noise, and light. It is not possible to quantify the impacts on the deer and elk populations at this time. Because of the small size of the project, prime winter range would not be impacted by pad development, but it could be impacted by habitat avoidance in areas adjacent to access roads. Following construction, automation of well pad activities would minimize disturbance to wintering and migrating elk, but year-round maintenance would still occur (Rocky Mountain Ecological Services 2012).

Black bear – Under Alternative B, the increase in surface disturbance activities within the Unit from proposed oil and gas development would result in slightly reduced black bear habitat and more frequent encounters with humans as a result of increased activities. However, bear-resistant dumpsters and trash receptacles would be installed at all facilities as required under the COA design feature in **Appendix C** (COA #41). Thus, impacts on black bears and their habitat under Alternative B would be negligible.

Impacts on black bear from development of well pad 12-89-7-1 and the associated pipelines would be minor. This is because bears in the area are habituated to human disturbance (Rocky Mountain Ecological Services 2012).

Moose – Moose habitat would be slightly reduced and human encounters would increase as a result of actions proposed under Alternative B. Impacts on moose and their habitat would be negligible under Alternative B.

Adhering to COAs from **Appendix C** (COAs #39 through #45 for protection of wildlife) and design features in **Appendix C** would minimize the potential for impacts on wildlife. Because of the amount of surface disturbance associated with Alternative B, residual disturbance and harm to wildlife habitat would still occur after implementation of design features and COAs. In

BLM_0027190

addition, the BLM may include additional site-specific COAs to the APDs for increased protection of wildlife and their habitat.

*Aquatic Wildlife*
Given the increased miles of pipeline infrastructure, Alternative B would require more pipeline bores at stream crossings and would, therefore, result in greater impacts on aquatic wildlife compared to Alternative A. The annual rate of oil and gas construction in the Unit would be the same under Alternative B compared to Alternative A, but it would continue for a longer time period. Therefore, under Alternative B, construction and drilling phases would require more water use from local sources over the life of the project but annual withdrawals would be minimal as described in Alternative A. Based on the water estimates in **Section 4.2.4**, Water Resources, approximately 124 acre-feet of freshwater would be required to meet water demands, which is less than the annual depletion amount of 379 acre-feet per year for all oil and gas activities on the western slope per the BLM/USFWS programmatic agreement.

Development of well pad 12-89-7-1 and the associated pipelines is sufficiently distanced from the Gunnison and Colorado Rivers and occupied habitats. Because of this, incidental sediment delivery to local streams would be adequately diluted with background waters so that sediment would have no measurable impacts on the fish in these rivers (Rocky Mountain Ecological Services 2012).

**Alternative C**
Impacts on fish and wildlife under Alternative C would be as described under the *Nature and Types of Effects* for casual use and permitted use. Surface disturbance from current oil and gas development would continue; however, new access roads would be located in a manner that reduces impacts on big game species and their habitat. Additionally, wildlife design features would implement timing limitations to restrict oil and gas activities in critical elk and deer winter habitat; however, the WHP would not be implemented under Alternative C. Aquatic wildlife and their habitat would be impacted more under Alternative C than Alternative A as a result of increased water depletions; however, water use under Alternative C would be less than the water withdrawals proposed under Alternative B.

*Terrestrial Wildlife*
In general, actions proposed under Alternative C contain elements that are similar to Alternatives A and B in terms of the phases of development and associated actions from construction through reclamation. Alternative C however, would adhere to the COAs and additional design features to address the impacts of oil and gas development on wildlife and their habitat. For example, centralized production facilities would be established outside of the Reduced Winter Activity Areas shown in **Figure 2-3** to reduce year round truck traffic to the individual wells located within these areas to enhance their utility as winter refugia for wildlife. Remote telemetry would be used to reduce well monitoring trips once a well is put into production. This could result in a substantial reduction in the number of annual truck miles driven within the Unit and a corresponding reduction in disturbance to wildlife.

Under Alternative C, proposed well pads, roads, pipelines and other supporting infrastructure would result in the short-term disturbance of over 441 acres in the Unit; in the long term, 126 acres would be disturbed. The collocation of all pipelines with roads would maintain habitat

BLM_0027191

patch size and late seral communities as well as reduce the likelihood for weed introduction and spread. However, the short-term impacts from collocation would be greater due to the larger work area required. The road density analysis within the Unit indicates that road development under Alternative C would result in 4,310 acres of Category 1 habitat and big game impacts would be most pronounced on 15,370 acres where road densities are greater than 0.5 road mile per square mile (**Table 4-52**). In Alternative A, Category 1 habitat would be about the same as Alternative A. As a result, the potential habitat avoidance and conflict with vehicles would be greater than Alternative A, but less than Alternative B.

Quantitative estimates of impacts on wildlife resources were determined for potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-46** for a description of direct impacts on habitat vegetation types under Alternative C.

Under Alternative C, federal minerals within the Unit would continue to be subject to a winter seasonal timing limitation from December 1 through April 30 (COA #39) to protect deer and elk winter ranges from development activities. Exceptions or modifications would not be considered within these areas except for emergency work. In addition to the general TLs already imposed on federal mineral development, Alternative C proposes to use voluntary seasonal winter timing limitations or a progressive development approach to further reduce the potential for impacting critical winter habitat for deer and elk within the Unit (see Additional Mitigation Measures, below).

The voluntary winter timing limitations or a progressive development approach could mitigate for impacts on big game during construction or resource development activities in sensitive winter habitats on federal and private lands. Under this alternative, the BLM would waive winter TLs within agreed-upon areas to allow winter development activities. See **Section 2.2.6**, Alternative C, Modified Action, for information regarding the voluntary seasonal winter timing limitations within the Unit. The voluntary seasonal winter timing limitations would result in an additional 5,750 acres of Category 1 habitat quality during the season of highest occupation by big game populations in the Unit, a 30 percent increase from Alternative A, and would reduce Category 2, 3, and 4 habitats by 1,300 acres compared to Alternative A. The TL would also focus activities in a smaller area, providing a refuge for animals elsewhere in the Unit. This TL as well as the centralized gathering facilities and remote telemetry would result in a landscape reduction of human presence and disturbance during the winter and likely maintenance of big game herd size at or near Alternative A levels given the increase in habitat quality and reduced activity areas. Other wildlife species that may inhabit the seasonal winter TL areas would also receive added protection.

Additional wildlife mitigation elements under Alternative C would include pre-construction nesting surveys for migratory birds and raptors would be conducted in advance of proposed surface-disturbing activities between April 1 and June 30. Also, the proposed construction of four new water disposal wells would bury electrical lines adjacent to roadways. Though burying electrical lines causes short-term habitat disturbance, in the long term it reduces potential harm to birds and other wildlife from providing perches to predators. For more discussion regarding impacts on birds see **Sections 4.2.8**, Migratory Birds and **4.2.9**, Special Status Species.

BLM_0027192

Mule Deer and Elk—Under Alternative C, surface disturbance activities from oil and gas development would result in overall lesser impacts on mule deer and elk habitat throughout the Unit compared to Alternatives A and B (**Table 4-52**), though roads would cross through elk winter range. The type of impacts would be as described in the Nature and Types of Effects section above. Additional voluntary winter TLs, described above, would further protect critical winter range for mule deer in the Unit. The reduction in habitats, as shown in **Table 4-55**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative C, and habitat quality, as described in the road density analysis above, would likely result in increased impacts on mule deer and elk fitness in individuals and would lower mule deer and elk densities in the Unit during the winter compared to Alternative A.

**Table 4-55**
**Impacts on Mule Deer and Elk Habitat in**
**Bull Mountain Unit under Alternative C**

| Impacts | Total (acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 114 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 0 |
| Elk severe winter range | 105 |
| Elk winter concentration area | 277 |
| *Long-Term Impacts* | |
| Mule deer winter range | 33 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 0 |
| Elk severe winter range | 29 |
| Elk winter concentration area | 74 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Black bear—Under Alternative C, the increase in surface disturbance activities within the Unit from proposed oil and gas development would result in slightly reduced black bear habitat and more frequent encounters with humans as a result of increased activities. However, impacts on black bears and their habitat under Alternative C would be less than impacts expected as a result of Alternatives A and B. Bear-resistant dumpsters and trash receptacles would be installed at all facilities as required under the COAs described in **Appendix C** (COA #40) Impacts on bear habitat under Alternative C would be negligible.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Moose—Moose habitat would be slightly reduced and human encounters would increase as a result of actions proposed under Alternative C. However, impacts on moose and their habitat under Alternative C would be less than impacts expected as a result of Alternatives A and B. Impacts on moose and their habitat would be negligible under Alternative C.

BLM_0027193

Adhering to COAs described in **Appendix C** (COAs #39 through #45 for protection of wildlife; additional measures to protect habitat are included in the vegetation section) and design features in **Appendix C** would minimize the potential for impacts on wildlife. Because of the surface disturbance associated with development, residual disturbance and harm to wildlife habitat would still occur after implementation of design features and COAs, but less than under Alternative B, which incorporates fewer protective measures. In addition, the BLM may include site-specific COAs to the APDs for increased protection of wildlife and their habitat. Further, the acceptance and participation in the voluntary winter TLs would directly increase habitat protection for deer and elk winter habitat and indirectly increase habitat protection for other wildlife species that may inhabit those areas. Changes in route density would increase indirect impacts on elk and deer winter range. They are likely to lead to changes in habitat utilization, decreased habitat quality, habitat avoidance by big game, and reduced effectiveness of habitat. This would be despite the additions of site-specific COAs and the voluntary timing limitation.

*Aquatic Wildlife*
Given the increased miles of pipeline infrastructure, it is anticipated that Alternative C would require more pipeline bores at stream crossings and would, therefore, result in greater impacts on aquatic wildlife than Alternative A, but less than Alternative B. The annual rate of oil and gas construction in the Unit would be the same under Alternative C compared Alternative B but would require less water use for dust abatement. Based on the water estimates in **Section 4.2.4**, Water Resources, approximately 124 acre-feet of freshwater would be required to meet water demands which is less than the annual depletion amount of 379 acre-feet per year for all oil and gas activities on the western slope per the BLM/USFWS programmatic agreement. Therefore, under Alternative C, annual water withdrawals from local sources in the Unit would be minimal as described in Alternative A above. Under Alternative C, aquatic wildlife within the Unit would have slightly less available water compared to Alternative A and slightly more than Alternative B.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Additional Mitigation Measures
Under Alternative C, centralized production facilities would be established outside of the Reduced Winter Activity Areas (**Figure 2-3**) to reduce year-round truck traffic to the individual wells located within these areas to enhance their utility as winter refugia for wildlife.

Remote telemetry would be used to reduce well monitoring trips once a well is put into production, resulting in a substantial reduction in the number of annual truck miles driven within the Unit and a corresponding reduction in disturbance to wildlife.

Under Alternative C, collocation of all pipelines with roads would maintain habitat patch size and late seral communities as well as reduce the likelihood for weed introduction and spread over the long term.

Alternative C proposes to use voluntary seasonal winter timing limitations or a progressive development approach to further reduce the potential for impacting critical winter habitat for deer and elk within the Unit.

BLM_0027194

Voluntary winter timing limitations under Alternative C could mitigate for impacts on big game during construction or resource development activities in sensitive winter habitats. Under this alternative, the BLM would waive winter TLs within agreed-upon areas to allow winter development activities. The voluntary seasonal winter timing limitations would increase Category 1 wildlife habitat while decreasing lower quality habitat. The TL would also focus activities in a smaller area, resulting in reduced human presence on winter range.

Under Alternative C, pre-construction nesting surveys for migratory birds and raptors would occur between April 1 and June 30 (an increase from May 15 through July 15, as described in **Appendix C**. Also, four new water disposal wells would bury electrical lines adjacent to roadways to reduce potential impacts on birds and other wildlife.

### *Alternative D, the Preferred Alternative*
Impacts on fish and wildlife under Alternative D would be as described under *Nature and Types of Effects* for casual use and permitted use. Surface disturbance from current oil and gas development would continue; however, new access roads would be located in a manner that reduces impacts on big game species and their habitat. Additionally, the wildlife design features described in the WHP would include timing limitations to restrict oil and gas activities in critical elk and deer winter habitat. Aquatic wildlife and their habitat would be impacted more under Alternative D than Alternative A as a result of increased water depletions; however, water use under Alternative D would be the same as water withdrawals proposed under Alternatives B and C.

### *Terrestrial Wildlife*
Quantitative estimates of impacts on wildlife resources were determined for potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-47** for a description of direct impacts on habitat vegetation types under Alternative D. Expanding the project footprint relative to Alternative A would increase habitat loss and fragmentation for big game species.

All roads in the Unit are dirt (with the exception of Highway 133) and road speeds are generally below 30 mph. Because of this, traffic-related deaths of deer and elk would be limited, and no population level impacts would be expected. Netting around pits is a component of the WHP and would avoid the chance that deer or elk could become stuck in a pit or ingest waters on pit surfaces. The road density analysis in the Unit indicates that road development under Alternative D would result in 3,260 acres of Category 1 habitat; big game impacts would be most pronounced on 16,420 acres where road densities are greater than half a road mile per square mile (**Table 4-52**). However, seasonal closures under the WHP would reduce the direct road impact area to 13,200 acres, a reduction of 13 percent compared to Alternative A (see **Table 4-52**).

In addition, under Alternative D, SGI proposes to construct up to four new water disposal wells, powered by overhead electrical lines requiring 20 new power poles. The addition of power lines and poles pose a threat of disturbance, as described in the *Nature and Types of Effects* section. Power lines and poles may also serve as perches for birds of prey, which may indirectly increase predation on small mammals and other prey (APLIC/USFWS 2005). Burying power lines would reduce these impacts. Further discussion regarding impacts on birds is provided in **Section 4.2.8**,

BLM_0027195

Migratory Birds, and **Section 4.2.9**, Special Status Species. The effects of applying the COAs in **Appendix C** would be similar to those effects described under Alternatives C and B.

Long-term direct impacts on wildlife habitat would decrease after major activities associated with development are complete; traffic levels and heavy construction activities would also decrease. However, compared to current conditions, the area would see long-term increased indirect impacts from an increase in human activity, which would diminish the utility of the area for big game. Compared to Alternative A there would be an 8% decrease in high quality wildlife habitat (habitat category 1&2 having less <2 miles/sq. mile of industry roads, **Table 4-52**) where impacts to habitat quality will be most pronounced. Compared to Alternative A there would be a relatively small increase in poor wildlife habitat (category 3&4) with an expected 3% increase. With the application of the WHP in the winter period 12/1-4/15 SG proposes to limit their activities in winter concentration areas ("Winter Closure Areas") on both fee/fee and split estate lands resulting in a landscape approach to maintaining more effective winter habitat suitability for big game. During the winter these reduced activity areas would result in a 40% increase in higher quality wildlife habitat over Alternative A which may result in better habitat suitability for wintering big game (**Figure 4-15**). However, even with the application of the WHP SG proposes to do daily well checks requiring up to two vehicle trips per day per well pad, conduct emergency work-overs of wells, additionally these actions would require SG to also plow snow as needed. These activities will result in in some level of residual impact that will diminish wintering big game habitat quality compared to current conditions. As a result it is likely that the Bull MOuntian Unit may winter less big game than it currently does. Those impacts are expected to be greatly diminished compared to a scenario where the WHP would not be implemented as there would be no required reduction in winter activity including drilling and completions on fee/fee lands. Additionally, most work-overs and routine maintenance are not subject to standard BLM winter timing limitations on split estate lands.

SG has committed to applying the WHP through the development phase of the project meaning that once the last wells are drilled and the Bull Mountain Unit is put in to the production phase the WHP would no longer be implemented. Impacts to wintering big game are expected to be considerably greater for this portion of the project. As equipment and wells age it is conceivable that more maintenance activity and well work-overs may be necessary. Without commitments to implement the WHP after the development stage it is realistic that more activity will occur during the winter period in the "Winter Closure Areas" during the 30+ year production phase. With increased winter activity in these areas it is reasonable to assume that impacts to wintering big game may be greatest during the production phase as higher quality winter habitat would be reduced by 40 percent. Over the long term the production phase may result in fewer wintering big game within the Bull Mountain Unit that what may persist during the development phase of the project.

As noted in **Table 4-56**, Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under Alternative D, the effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

BLM_0027196

**Table 4-56**
**Impacts on Mule Deer and Elk Habitat in the**
**Bull Mountain Unit under Alternative D**

| Impacts | Total (Acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 115 |
| Mule deer winter concentration area | 2 |
| Elk highway crossing | 0 |
| Elk severe winter range | 98 |
| Elk winter concentration area | 306 |
| *Long-Term Impacts* | |
| Mule deer winter range | 30 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 0 |
| Elk severe winter range | 28 |
| Elk winter concentration area | 89 |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012

*Aquatic Wildlife*
Impacts on aquatic wildlife would occur where pipeline construction phases require a pipeline bore at fish-bearing stream crossings. (See **Section 3.2.8**, Fish and Wildlife, for a description of fish-bearing streams in the Unit.) Measures to protect water quality and aquatic resources in the WHP would further reduce impacts on fish.

Surface water withdrawals would be required for nearly all phases of oil and gas development especially during construction, drilling, and dust abatement activities; 30 percent of project water would be gathered from freshwater sources, and the remaining 70 percent would come from a variety of recycled or produced sources under all alternatives. In the short term and long term, water depletions would threaten the quantity of aquatic habitat for fish and other aquatic species known to inhabit the Unit. (See **Section 3.2.8**, Fish and Wildlife and **Section 3.2.10**, Special Status Species, for a list of aquatic wildlife species in the Unit.) Water volumes required for drilling would be minimal compared with the expected discharge in Muddy Creek (see **Section 4.2.4**, Water Resources) and would not substantially reduce water for aquatic wildlife. Measures to protect water quality and aquatic resources in the WHP would reduce impacts on fish compared to Alternative C.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

*Cumulative*
Many past and present actions and current conditions within the cumulative impact analysis area have affected and would likely continue to affect fish and wildlife species. The proposed activities may also result in direct impacts on individuals from development or vehicular collisions or indirect impacts from noise. Vegetation restoration projects and travel management-related route closures throughout the Forest Service lands would have some cumulative impacts that might counteract some of the development-related impacts by increasing habitat availability. In addition, reasonably foreseeable future actions that may affect fish and wildlife in the future

BLM_0027197

are described in **Table 4-3**. Recent and planned habitat restoration projects within the region include vegetation treatments to improve habitat and reduce fire threats. These improvement efforts would expand the extent and increase the quality of habitat for many fish and wildlife species that inhabit the surrounding region. However, impacts resulting from energy development, especially from oil and gas resources in the North Fork of the Gunnison River areas, would continue, as less than 25 percent of the Uncompahgre Field Office mineral estate has been leased. As such, access roads would continue to be developed on federal, state, and private lands in the region in support of energy development. These actions would reduce the availability of habitat and forage as well as increase habitat fragmentation. Additionally, continued and future actions resulting in water depletions or impacts on water quality within the region would reduce the quantity and quality of habitat for fish and other aquatic species.

Under all of the alternatives, impacts on fish and wildlife as a result of increased oil and gas development within the Unit would contribute to the impacts from past, present, and reasonably foreseeable actions described in **Table 4-3** (**Table 4-57**, Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit [Alternatives A and B combined], and **Table 4-58**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit [Alternatives A and C combined] and **Table 4-59**). Alternative A would result in the fewest number of well pads and would therefore result in the least amount of impacts on terrestrial and aquatic wildlife. The WHP under Alternatives B and D would protect big game winter habitat with seasonal closures and would provide for nesting surveys prior to construction and apply provisions to protect water quality for aquatic wildlife. The winter closures in the WHP would more than double the area in the Bull Mountain Unit containing lease stipulations protecting big game. Actions proposed under Alternative B would result in the greatest direct impacts on fish and wildlife habitat while applying additional COAs described in **Appendix C** (COAs #39 through #45 for protection of wildlife). The WHP would also apply under Alternative B. Under Alternative C, oil and gas development activities would result in more disturbance of fish and wildlife habitat compared to Alternative A but less than Alternative B. Although the WHP would not apply, Alternative C would implement COAs and voluntary seasonal timing limitations and other measures described under *Additional Mitigation Measures* above. This would be to reduce impacts on sensitive winter big game habitat by avoiding drilling activity while these species are using the habitat. Alternative D, the Preferred Alternative, would have comparable disturbance levels as Alternatives B and C but would apply the WHP measures, collocating roads and drilling sites, and minimizing cumulative impacts compared to the other action alternatives.

### Table 4-57
### Cumulative Impacts on Mule Deer and Elk
### Habitat in Bull Mountain Unit
### (Alternatives A and B combined)

| Impacts | Total (acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 192 |
| Mule deer winter concentration area | 3 |
| Elk highway crossing | 2 |
| Elk severe winter range | 218 |
| Elk winter concentration area | 585 |

BLM_0027198

**Table 4-57**

**Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit (Alternatives A and B combined)**

| Impacts | Total (acres) |
|---|---|
| *Long-Term Impacts* | |
| Mule deer winter range | 63 |
| Mule deer winter concentration area | 1 |
| Elk highway crossing | 2 |
| Elk severe winter range | 70 |
| Elk winter concentration area | 210 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

**Table 4-58**

**Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit (Alternatives A and C combined)**

| Impacts | Total (acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 165 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 177 |
| Elk winter concentration area | 473 |
| *Long-Term Impacts* | |
| Mule deer winter range | 45 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 50 |
| Elk winter concentration area | 139 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

**Table 4-59**

**Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit (Alternatives A and D Combined)**

| Impacts | Total (Acres) |
|---|---|
| *Short-Term Impacts* | |
| Mule deer winter range | 165 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 177 |
| Elk winter concentration area | 473 |
| *Long-Term Impacts* | |
| Mule deer winter range | 45 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 50 |
| Elk winter concentration area | 139 |

Sources: SGI 2013; BLM GIS 2014; Petterson 2012

BLM_0027199

## 4.2.8   Migratory Birds

Impacts on bird species protected under the Migratory Bird Treaty Act (MBTA) of 1918 as a result of proposed management actions within the Bull Mountain Unit are discussed in this section. Detailed descriptions of habitat types within the Unit are provided in **Section 3.2.6**, Vegetation. See **Section 3.2.9**, Migratory Birds for a list of bird species that are known or have the potential to inhabit the Unit.

### *Methods of Analysis*

Impacts on migratory birds and their habitat are similar to those described for terrestrial wildlife in **Section 4.2.7**, Fish and Wildlife.

#### *Indicators*

Indicators of impacts on migratory birds are as follows:

- Amount and condition of available habitat

- Likelihood of mortality, injury, or direct disturbance

- Likelihood of habitat disturbance

#### *Assumptions*

The analysis includes the following assumptions:

- Impacts on migratory birds analyzed in this section focus on those species identified in Chapter 3, Migratory Birds, which are known to inhabit the Unit.

- The actual locations of oil and gas well pads and associated infrastructure including pipelines and access roads is subject to change as a result of the APDs.

- Short-term effects are defined as those that would occur over a time frame of 5 years or less, and long-term effects would occur over longer than 5 years.

### *Nature and Type of Effects*

Migratory bird habitats on BLM-administered lands in the Unit would be affected under all alternatives. Changes to bird habitats would be caused by the following three types of disturbances: 1) disturbance and disruption from casual use; 2) disturbance and disruption from permitted activities; and 3) changes to habitat conditions. These potential causes of disturbance are directly linked to vegetation conditions and water quality and quantity (**Section 4.2.6**, Vegetation, and **Section 4.2.4**, Water Resources). See **Section 4.2.7**, Fish and Wildlife, for a complete description of the three types of disturbances that could affect migratory birds.

### *Effects Common to All Alternatives*

Within the Unit, oil and gas development activities would continue under all alternatives. Direct and indirect impacts on migratory birds would be as described under Nature and Type of Effects for permitted activities. In addition, activities associate with casual use and habitat changes described in the Nature and Type of Effects section would continue to impact migratory birds and their habitat.

BLM_0027200

*Alternative A*
For a complete description of activities and disturbances associated with Alternative A, see
**Section 4.2.7**, Fish and Wildlife. Increased human activity as a result of ongoing oil and gas
development activities and recreation in the Unit could result in impacts on raptor species (as
described in the Nature and Type of Effects section) from disturbance from casual use and
permitted activities. Direct impacts on migratory bird species would primarily be a result of
injury or mortality from vehicle collisions or from striking oil and gas infrastructure. Indirect
impacts on migratory birds would be from the loss of habitat or habitat fragmentation as a result
of resource development activities. See **Section 4.2.6**, Vegetation, for a list of impacts on
vegetation types under Alternative A.

Neotropical Species
Under Alternative A, sagebrush and irrigated meadows vegetation are expected to be most
impacted as a result of continued oil and gas development (e.g., well pads, pipelines, and roads).
These activities would therefore result in reduced habitat availability in the short term and long
term for sagebrush obligate species including Brewer's sparrow, western meadowlark, vesper
sparrow, and lark sparrow. Reduced irrigated meadow habitat could possibly impact American
bittern, although marsh and meadow habitat for the bittern is limited within the Unit. Purple
martin habitat, which includes old growth aspen stands, is not expected to be impacted by
activities associated with Alternative A.

Raptors
Several raptor species occur or have the potential to occur in the Unit including bald and golden
eagles, ferruginous hawks, falcons (peregrine and prairie), as well as flammulated owls. Under
Alternative A, surface disturbance within irrigated meadow and sagebrush vegetation would
reduce foraging habitat for golden eagles and prairie falcons in the short term and long term.

*Alternative B*
Impacts on vegetation within the Unit from well pads, pipelines, and roads would reduce habitat
availability for migratory birds compared to Alternative A. For a complete description of
activities and disturbances associated with Alternative B, see **Section 4.2.7**, Fish and Wildlife.
Increased human activity as a result of ongoing and proposed oil and gas development activities
in the Unit could result in impacts on raptor species as described in the Nature and Type of
Effects under disturbance from casual use and permitted activities. See **Section 4.2.6**,
Vegetation, for a list of impacts on vegetation types under Alternative B. Migratory bird impacts
would be mitigated by applying additional COAs described in **Appendix C** (COAs #21, #25,
#39, #41, and #42) as mitigation measures. Installing netting over oil pits (COA #21) would
reduce the likelihood of bird deaths or injury from entrapment or exposure to oil. Applying COA
#25 would reduce but not eliminate the risk of raptor death or injury due to electrocution.
Additional pre-construction measures include nesting surveys described in the WHP and **Table
2-11**, Stipulations, Design Features, and Mitigation Measures. These would identify occupied
nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby
reducing the likelihood of nest abandonment. Restrictions on surface-disturbing activities during
the breeding season (COA #39 for early-nesting species, such as raptors) would protect breeding
migratory birds. Such restrictions could have long-term implications, such as ensuring successful

BLM_0027201

nesting and reproduction for some individuals would maintain the size and diversity of local populations, though they may be reduced in size from pre-development levels.

A V would be implemented under Alternative B as a design feature, which would include measures intended to avoid and minimize impacts on wildlife, including migratory birds. Pre-construction raptor and migratory bird nest surveys would be conducted to identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. Additionally, installing netting over open pits would reduce the likelihood of bird deaths or injury from entrapment or exposure to oil. Measures to protect water quality and aquatic resources would likely also benefit migratory birds by limiting surface-disturbing activities near lakes, wetlands, or perennial or seasonal flowing waterways, which serve as important breeding and foraging habitats. Implementing the V would likely reduce but not eliminate impacts on migratory birds, such as habitat disturbance and injury or death. Alternative B may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide.

The effects of developing well pad 12-89-7-1 and the associated pipelines would have negligible impacts on migratory birds; however, they would cumulatively add to other human activities in the vicinity and could change how migratory birds use the area (Rocky Mountain Ecological Services 2012).

Neotropical Species
Under Alternative B, sagebrush vegetation is expected to be most impacted by the actions proposed under this alternative in both the short term and long term. Sagebrush obligate species described above under Alternative A would have decreased habitat as a result of Alternative B. Additionally, oakbrush and some aspen habitat would be disturbed in the short term and long term. This would reduce the available habitat for purple martin, woodpeckers, flickers, house wren, warbling vireo, cordilleran flycatcher, western wood-pewee, tree swallow, and violet-green swallow. Irrigated meadow habitat is expected to be disturbed in the short term, resulting in less available habitat for American bittern (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

Raptors
Surface disturbance within irrigated meadow (short-term) and sagebrush (short- and long-term) vegetation would reduce foraging habitat for golden eagles and prairie falcons. Flammulated owl oakbrush and aspen habitat would be decreased in the short term and long term under Alternative B (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

*Alternative C*
Under Alternative C, impacts on vegetation within the Unit from well pads, pipelines, and roads would reduce habitat availability for migratory birds. Refer to **Section 4.2.7**, Fish and Wildlife, for activities and disturbances associated with Alternative C. Impacts as described in Section 4.2.7, such as burial of electrical lines, road development, and habitat loss, would also apply to migratory birds. Increased human activity as a result of ongoing and proposed oil and gas development activities in the Unit could result in impacts on raptor species as described in the Nature and Type of Effects under disturbance from casual use and permitted activities. See **Section 4.2.6**, Vegetation, for a list of impacts on vegetation types under Alternative C.

BLM_0027202

Migratory bird impacts would be mitigated by applying COAs provided in **Appendix C** (COAs #21, #25, #39, #41, and #42) as design features. In addition, under Alternative C, pre-construction nesting surveys for migratory birds and raptors (as described in **Section 2.2.6**) would be implemented to identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. Additionally, new electrical lines to power the four proposed water disposal wells would be buried along roads to minimize potential overhead disturbance to birds and other wildlife (APLIC/USFWS 2005).

In general, impacts on migratory birds from actions proposed by Alternative C would be similar to those described under Alternative B; however, less habitat within the Unit would be impacted in the short term and long term, and more nests would be protected from disturbance. Alternative C may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Neotropical Species
In both the short term and long term, sagebrush vegetation is expected to be most impacted of all habitat types by the actions proposed under Alternative C. Sagebrush-obligate species described above under Alternative A would have decreased habitat as a result of Alternative C; however, sagebrush habitat would not be reduced as much as under Alternative B. Oakbrush and some aspen habitat would be disturbed in the short term and long term. This would reduce the available habitat for purple martin, woodpeckers, flickers, house wren, warbling vireo, cordilleran flycatcher, western wood-pewee, tree swallow, and violet-green swallow. Irrigated meadow habitat is expected to be disturbed in the short term. resulting in less available habitat for American bittern (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

Raptors
Surface disturbance within irrigated meadow (short-term) and sagebrush (short- and long-term) vegetation would reduce foraging habitat for golden eagles and prairie falcons. Flammulated owl oakbrush and aspen habitat would be decreased in the short term and long term under Alternative C (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

Additional Mitigation Measures
Under Alternative C, collocation of all pipelines with roads would maintain habitat patch size and late seral communities as well as reduce the likelihood for weed introduction and spread over the long term.

 *Alternative D, the Preferred Alternative*
Under Alternative D, impacts on vegetation in the Unit from well pads, pipelines, and roads would reduce habitat availability for migratory birds. Increased human activity as a result of ongoing and proposed oil and gas development in the Unit could impact raptor species, as described in the *Nature and Type of Effects* under disturbance from casual use and permitted activities. (See **Section 4.2.6**, Vegetation and Invasive, and Nonnative Species, for a list of impacts on vegetation types under Alternative D.)

BLM_0027203

Migratory bird impacts would be mitigated by applying COAs provided in **Appendix C** (COAs #21, #25, #39, #41, and #42) as design features. The effects of applying these COAs would be similar to those effects described under Alternatives C and B. Installing netting over oil pits (COA #21) would reduce the likelihood of bird deaths or injury from entrapment or exposure to oil. Application of COA #25 would reduce but not eliminate the risk of raptor death or injury due to electrocution.

Pre-construction nesting surveys for migratory birds and raptors (as described in **Section 2.2.6** and the WHP) would be implemented to identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. The effects of applying the Wildlife Habitat Plan  would be similar to those effects described under Alternative B. Implementing the COAs and WHP as design features under Alternative D would likely reduce but not eliminate impacts on migratory birds.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Neotropical Species
In both the short term and long term, sagebrush vegetation is expected to be most impacted by the actions proposed under Alternative D. Sagebrush obligate species described under Alternative A above would have decreased habitat as a result of Alternative D; sagebrush habitat would not be reduced as much as described under Alternative B. Oakbrush and some aspen habitat would be disturbed in the short term and long term. This would reduce the available habitat for purple martin, woodpeckers, flickers, house wren, warbling vireo, cordilleran flycatcher, western wood-pewee, tree swallow, and violet-green swallow.

Irrigated meadow habitat is expected to be disturbed in the short term, resulting in less available habitat for the American bittern (see **Section 4.2.6**, Vegetation, for quantitative impacts on habitat).

Raptors
Surface disturbance within irrigated meadow (short-term) and sagebrush (short-term and long-term) vegetation would reduce foraging habitat for golden eagles and prairie falcons. Flammulated owl oakbrush and aspen habitat would be decreased in the short term and long term under Alternative D (see **Section 4.2.6**, Vegetation, for quantitative impacts on habitat).

***Cumulative***
Migratory bird habitat would continue to be affected through several past and present actions as well as current conditions within the cumulative impact analysis area. In addition, reasonably foreseeable future actions that may affect migratory birds in the future are described in **Table 4-3**. Recent and planned vegetation improvement efforts would expand the extent and increase the quality of habitat for many migratory bird species that inhabit the surrounding region. Specifically, sagebrush restoration efforts aimed at improving habitat for sage-grouse would result in an increase in habitat for other sagebrush obligate bird species including Brewer's sparrow and meadowlark. Also, projects within the region to treat aspen affected by Sudden Aspen Decline as well as aspen stands impacted by insects and disease would reduce habitat for cavity nesters like the purple martin in the short term but improve aspen health in the long term.

BLM_0027204

Impacts resulting from energy development, especially of oil and gas resources in the North Fork of the Gunnison River areas, would continue as less than 25 percent of the Uncompahgre Field Office mineral estate has been leased. As such, access roads would continue to be developed on federal, state, and private lands in the region in support of energy development. These actions would reduce the availability of migratory bird habitat as well as increase the risk of direct mortality, habitat fragmentation, and habitat avoidance.

The proposed activities may also result in direct impacts on nests or individuals from development from vehicular collisions or indirect impacts from noise. Vegetation restoration projects and travel management-related route closures throughout the Forest Service lands would have some cumulative impacts; these might counteract some of the development-related impacts by increasing habitat availability for migratory birds and raptors. Oil and gas development within the Unit proposed under all alternatives would contribute to the impacts from past, present, and reasonably foreseeable actions described in **Table 4-3**. Permitted or casual activities resulting in vegetation removal or disturbance, in combination with climate change, fires, drought, and spread of weeds and forest diseases, could affect migratory bird breeding and foraging habitat in the region, regardless of landownership. Alternative A would result in the fewest number of well pads and would therefore result in the least amount of cumulative impacts on migratory bird habitat. There are no COAs outlined in **Appendix C** that would contribute to the cumulative loss of migratory bird habitat in the region.

Actions proposed under Alternative B would result in the greatest cumulative impacts on available migratory bird habitat. Implementing COAs specific to migratory birds (COAs #21, #25, #39, #41, and #42 and the WHP) would reduce but not eliminate the likelihood of injury, death, and nest abandonment; however, Alternative B would contribute to the cumulative loss of migratory bird breeding habitat in the region, when combined with other past, present, and reasonably foreseeable projects that are expected to result in vegetation removal.

Under Alternative C, oil and gas development activities would result in more surface disturbance of migratory bird habitat compared to Alternative A, but slightly less than Alternative B. In addition, Alternative C would implement COAs as design features, as well as voluntary seasonal timing limitations to reduce impacts on sensitive winter big game habitat (see Alternative C in Fish and Wildlife section above). The additional measures proposed under Alternative C (see *Additional Mitigation Measures*, above) would reduce the risk of bird injury, death, and nest abandonment; however, Alternative C would contribute to the cumulative loss of migratory bird breeding habitat in the region, when combined with other past, present, and reasonably foreseeable projects that are expected to result in vegetation removal.

Under Alternative D, oil and gas development would result in less surface disturbance compared to Alternatives B and C. Implementing COAs specific to migratory birds (COAs #21, #25, #39, #41, and #42) and the WHP, applied as design features would reduce but not eliminate the likelihood of injury, death, and nest abandonment. However, Alternative D would contribute to the cumulative loss of migratory bird breeding habitat in the region, when combined with other past, present, and reasonably foreseeable projects that are expected to result in vegetation removal.

BLM_0027205

Impacts on migratory birds and their habitat from the Proposed Action would be limited to up to 32 acres of habitat removal, and noise and other human-related disturbance associated with development and long-term production. This comprises a <0.01 percent addition to the total past, present, and reasonably foreseeable future surface disturbance identified. These impacts would be further localized and minimized by implementing environmental protection measures and mitigation measures proposed by SGI or required by the BLM (e.g., migratory bird nest surveys and protective COAs). In addition, the Proposed Action would be at least partially temporally removed from some or all of the reasonably foreseeable future actions; thus, the overall cumulative impact on migratory birds and raptors would be reduced in terms of total cumulative acres of disturbance at one time.

### 4.2.9   Special Status Species
This section discussed impacts on special status species, including federally listed species and BLM sensitive species from proposed management actions of other resources and resource uses. Exiting conditions are described in **Section 3.2.10**, Special Status Species.

***Methods of Analysis***
Impacts on special status species would primarily result from unmitigated surface disturbance such as wildfires, wildfire-suppression activities, erosion, and trampling. Direct and indirect impacts on special status species result from any surface-disturbing activity or alteration to occupied habitats. All federal actions would comply with ESA consultation requirements, and all implementation actions would be subject to further special status species review before site-specific projects are authorized or implemented. Federal regulations and BLM policy protecting threatened, endangered, and sensitive species were considered methods for reducing the potential impacts from permitted activities as described in **Section 3.2.8**, Special Status Species. If adverse impacts are identified, mitigation measures, including avoidance, would be implemented to minimize or eliminate the impacts.

***Indicators***
Indicators of impacts on special status species are as follows:

- Amount and condition of available habitat
- Likelihood of mortality, injury, or direct disturbance
- Likelihood of habitat disturbance

***Assumptions***
The analysis includes the following assumptions:

- In general, special status species would be more sensitive to habitat fragmentation, development, or changes in habitat conditions, as populations are often already highly fragmented, require specific microhabitats, and are especially sensitive to disturbance and human presence.
- The actual locations of oil and gas well pads and associated infrastructure including pipelines and access roads is subject to change as a result of the APDs.

BLM_0027206

- Impacts on special status species would be more significant than impacts on common species because population viability is already uncertain for special status species and certain species, such as special status plants, tend to be poor competitors.

- Short-term effects are defined as those that would occur over a time frame of 5 years or less, and long-term effects would occur over longer than 5 years.

- USFWS would be consulted on any action that could potentially affect any listed plant or animal species or their habitat.

- No special status plant species inhabit the Unit.

***Nature and Type of Effects***

Special status fish and wildlife habitats on BLM-administered lands in the Unit would be affected under all alternatives. Changes to habitats would be caused by the following three types of disturbances: 1) disturbance and disruption from casual use; 2) disturbance and disruption from permitted activities; and 3) changes to habitat conditions. These potential causes of disturbance are directly linked to vegetation conditions and water quality and quantity (**Section 4.2.6**, Vegetation, and **Section 4.2.4**, Water Resources). See **Section 4.2.7**, Fish and Wildlife for a complete description of the three types of disturbances that could affect special status species.

***Effects Common to All Alternatives***

Under all alternatives, oil and gas development actions would continue to use existing infrastructure including well pads, access roads, pipelines, one overhead electrical line (4 power poles), and others. See **Table 2-10**, Summary of Actions by Alternative, for a summary of existing actions in the Unit. Some existing roads would be upgraded and new roads would be built. Therefore, impacts on special status fish and wildlife populations from oil and gas development activities would continue irrespective of the proposed alternatives. These activities along with those associated with casual use, permitted activities, and habitat changes, as described in the Nature and Types of Effects section above, would continue to impact special status species throughout the Unit. Threats specific to special status aquatic wildlife as a result of oil and gas development within the Unit would be attributed to water depletions as well as road and pipeline crossings of streams, wetlands, and other water bodies.

Under all alternatives, pipeline crossings of wetlands as well as roads, would be bored (not trenched) outside of road rights-of-way and wetland boundaries. Impacts from boring activities during construction phases could include a frac-out, which is caused when excessive pressure builds up forcing drilling mud to the surface (DFO 2007). A frac-out would result in short-term displacement of special status wildlife or habitat avoidance as a result of excessive mud (terrestrial) or increased sediment and turbidity (aquatic). Activities associated with stream borings could also result in bank destabilization in the short term. In the long term, special status species and their habitat would be at risk of hazardous materials contamination in the event of a pipeline rupture under all alternatives. Aquatic wildlife, particularly habitat for Colorado River fish species would continue to be reduced as a result of continued water depletions for ongoing drilling, completion, and dust abatement activities.

BLM_0027207

### Alternative A

### Federally Listed, Proposed, or Candidate Species

<u>Canada Lynx</u>
Under Alternative A, direct impacts on suitable Canada lynx habitat are not expected. Lynx primary prey source, snowshoe hare, has very limited habitat in the Unit and it is unlikely that impacts from Alternative A would affect lynx. Some habitat for secondary prey sources does occur in the Unit but impacts from Alternative A would not affect the availability of these prey items for lynx (Petterson 2012). Highway 133 passes through the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Area. Traffic would increase along State Highway 133 as it is the primary access road to the Unit.

Under Alternative A, well pads and access road construction phases would result in an estimated 6,032 round trips on Highway 133 and an estimated 2,407 round trips during the pipeline development phase although not all traffic associated with accessing the Unit would go over McClure Pass. Alternative A would result in an estimated increase in the overall average annual daily traffic on Highway 133 near the Unit by less than 1 percent over a 3-year time frame; average annual daily trips by trucks could increase by up to 11 percent compared to existing truck-related traffic levels. (See **Section 4.3.5**, Transportation and Access, for additional traffic impacts in the Unit.)

While an increase in vehicle traffic traveling State Highway 133 does increase the potential for vehicle collision with lynx potentially crossing the highway, the project is not anticipated to cause an increase above the 2,000-vehicle-per-day threshold at which it is believed that lynx are impeded from moving across the highway. Lynx should therefore still be able to cross State Highway 133 unimpeded (Petterson 2012). Further, indirect impacts from habitat fragmentation are not likely to be substantial since the lynx habitat in the area is considered to be poor. The activities under Alternative A may affect but is not likely to adversely affect lynx populations.

<u>Endangered Colorado and Gunnison River Fish</u>
Construction and maintenance activities under Alternative A are unlikely to result in water quality impacts on the four endangered Colorado River fish species by continuing to implement Colorado Department of Public Health and Environment and Clean Water Act requirements as well as SGI's Well Pad Site Suitability Models and Methodologies (**Appendix A**). Water quality impacts from sediment releases or hazardous chemical spills in the Unit would likely be reduced because the Paonia Reservoir would capture these potential contaminants before reaching the North Fork of the Gunnison River.

Surface water use under Alternative A, as described in **Section 4.2.7**, Fish and Wildlife, would result in water depletions that have the potential to impact fish populations. As the Unit would be developed over three years, the total freshwater acre-feet depletions would be roughly spread out during this time period, resulting in freshwater annual consumptive depletions of approximately 74 acre-feet for Alternative A. If development of the Unit were to take longer than three years, then the annual water depletion amount would decrease accordingly. Based on data from the US Geological Survey gauging station (#09130500), the mean annual discharge rate of East Muddy Creek near Bardine (1935-1953) varied from a low of 53.7 cfs (39,066 acre-feet per year) in

BLM_0027208

1940 to a high of 135.0 cfs (97,504 acre-feet per year) in 1938 (see the hydrology assessment for the MDP [Berry 2011]). Therefore, under Alternative A, if this water were removed directly from East Muddy Creek, the maximum water depletion for East Muddy Creek would be about 0.2 percent of the average annual discharge during a dry year to 0.07 percent of the discharge during a wet year. SGI has secured previously appropriated water for this project; as such, no new water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project. For more information regarding water use in the Unit proposed under the alternatives refer to **Section 4.2.4**, Water Resources.

Net water depletions are expected to be lower given SGI's water augmentation plan (see **Appendix L**). However, the USFWS considers any net water depletion that could decrease instream flows to have direct and/or indirect impact on the four Colorado River endangered fish species. Therefore Alternative A may affect, and is likely to adversely affect the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub. In May 2008, the BLM prepared a Programmatic Biological Assessment (PBA) that addresses water-depleting activities associated with the BLM's fluid minerals program in the Colorado River Basin in Colorado. In response to the BLM's PBA, the USFWS issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions from the Colorado River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, or razorback sucker, and that BLM water depletions are not likely to destroy or adversely modify designated critical habitat for any of these fish.

A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin was initiated in January 1988. The Recovery Program serves as the reasonable and prudent alternative to avoid jeopardy and provide recovery to the endangered fishes by depletions from the Colorado River Basin. The PBO addresses water depletions associated with fluid minerals development on BLM-administered lands, including water used for well drilling, hydrostatic testing of pipelines, and dust abatement on roads. The PBO includes reasonable and prudent alternatives developed by the USFWS that allow BLM to authorize oil and gas wells that result in water depletion while avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification of their critical habitat. As a reasonable and prudent alternative in the PBO, USFWS authorized the BLM to solicit a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) in the amount equal to the average annual acre-feet depleted by fluid minerals activities on BLM-administered lands.

Upon final approval of individual APDs, this project would be entered into the Uncompahgre Field Office fluid minerals water depletion log, which would be submitted, to the Colorado State Office at the end of each fiscal year. SGI is already a signatory to the Endangered Fish Recovery Agreement (USFWS 1999), which is considered to be appropriate compensatory mitigation for likely foreseeable impacts, and because of this as well as possible USFWS-coordinated timed releases from augmenting water sources for the maintenance of instream flows (e.g., additional waters released from the Aspinall Unit), the impacts of additional water depletions could be mitigated by SGI and the BLM, which would therefore make their activities compliant with the PBO and Recovery Agreement and ensure continued recovery of these listed fish species.

BLM_0027209

Greenback Cutthroat Trout
Greenback cutthroat trout lineage fish occur nearby in Roberts, Henderson, and other tributaries to East Muddy Creek. The construction and operation activities under Alternative A may affect, and are not likely to adversely affect greenback cutthroat trout lineage fish due to a pipeline crossing of the GB lineage occupied Roberts Creek. These impacts would be very short in duration, and would require implementation of construction-related proactive impact minimization measures. Under Alternative A, SGI would continue to implement its Well Pad Site Suitability Models and Methodologies (**Appendix A**) which accounts for proximity to stream networks and stream buffer zones into the site suitability assessment, thereby minimizing the likelihood for impacts on greenback cutthroat trout habitat.

*BLM Sensitive Species*

Northern Goshawk
Proposed development activities would have periods that involve loud noises with high levels of activity, but generally lasting for a few months in any given area. Alternative A would have short-term development impacts directly impacting 12 acres, and permanently impact 4 acres of aspen and aspen/oak habitats, but would not impact mixed conifer habitats. Short-term indirect impacts through noise, human activities, and pipeline construction in suitable goshawk habitats would extend beyond the direct habitat impacts described above. Long-term lower-intensity indirect impacts would decrease over time but would likely keep goshawk from nesting within this area, and may also diminish habitat effectiveness for foraging, but would not entirely preclude use in these areas. While some components of Alternative A would occur near isolated and smaller aspen stands, these stands are not large enough to support goshawk nesting activities and would not likely support foraging either, given the dominance of shrublands and agricultural fields within the Unit (Petterson 2012).

The habitats directly and indirectly impacted are relatively poor quality for goshawk nesting, and moderate quality for foraging. With suitable prey-bases and widespread forested habitat types beyond the Unit area, goshawk could still likely forage within the Unit. Outside of the summer reproduction and nesting season, northern goshawk could still encounter low levels of human activity during the winter, which would have negligible impacts on goshawk given the small footprint of activities proposed and widespread foraging habitats available during the winter.

Alternative A may impact individuals, but is not likely to result in a loss of viability on the Unit, or cause a trend towards federal listing or a loss of species viability range-wide, but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Under Alternative A, the short-term construction phase would cause approximately 12 acres of surface impacts (0.1 percent of available habitat) on CPW-mapped bald eagle winter range and winter forage areas within the Unit. Long-term, there would be approximately 4 acres of surface impacts (less than 0.1 percent of available habitat). One pipeline would cross East Muddy Creek within winter ranges. Since drilling would occur year-round on private lands/private mineral estate which are relatively evenly distributed across the Unit, impacts on wintering bald eagles would likely occur, causing widespread impacts. Aside from one pipeline crossing, these

BLM_0027210

activities would occur well away from large cottonwoods and suitable roost trees near East Muddy Creek. The pipeline crossing would be bored in any season. If a pipeline bore occurs during the low-flow period of early winter it is possible that roosting bald eagles in the area would be disturbed and vacate the area during construction (short-term). Boring operations during higher flow periods in the summer would occur outside of winter nesting months. The main impact of development on bald eagles under Alternative A could result from a re-distribution of wintering elk and deer in the area and therefore potential scavenging opportunities for eagles. While this may indeed occur near pads and roads, deer and elk would still likely be in the general area, perhaps even closer to East Muddy Creek. The high mobility of bald eagles would still allow them to easily find and feed on any carrion in the general area, and no reduction in winter foraging habitat would be expected.

Because of the potential disturbance to roosting bald eagles during the pipeline bore of East Muddy Creek (for about 5 days if the creek is crossed during the winter), and the potential for disturbance to wintering bald eagles, Alternative A may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Brewer's Sparrow

Alternative A would create short-term construction related impacts on 114 acres and direct long-term production impact on 36 acres of sagebrush habitats. It is assumed that in the long term, most of the cleared pipeline corridors and other temporary-use areas in sagebrush-dominated habitats would begin to support smaller sagebrush plants. However, in some circumstances where landowners choose to plant nonnative grasses and forbs, the recovery of sagebrush plants in these short-term disturbance acres may take much longer due to competitive exclusion of sagebrush. Most areas cleared of sagebrush would recover with the use of native graminoid and forb seed mixes, though selection of seed mixes is at the discretion of the landowner (Petterson 2012).

Some construction activities would occur when sparrows are in various stages of reproduction. Adult sparrows would easily be able to avoid any clearing of sagebrush plants, and therefore there would be no anticipated direct impacts on adult birds (i.e., mortality). However, sagebrush clearing activities occurring during the nesting period (late May through early July) may result in the take of nests (i.e., eggs or nestlings). Indirect impacts on Brewer's sparrow would result from avoidance of nesting in sagebrush habitats near the access roads, construction areas, and active drilling sites during the construction process; however, they may still forage near roads and other active areas. While habitat fragmentation is cited as a cause for population declines, this is mostly tied to widespread community change types; since Alternative A is relatively small in scale and complexity, no detectable impacts on Brewer's sparrow population numbers are expected (Petterson 2012). As a result, Alternative A may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide. As Brewer's sparrows are not in the area during the winter, wintertime operations would have no impact on this species.

BLM_0027211

4. Environmental Consequences

Bat Species

The Unit provides suitable foraging habitat for listed sensitive bat species, and while there would be some loss of foraging habitat, the project's impact on potential foraging areas would be very minor given the range of these species and their preference for lower elevation habitats. The project would have negligible impacts on shrubby habitats on the landscape scale, thus those habitats would continue to support the bats' primary prey species (flying and crawling insects). Therefore, there should be no impact on the bats' abilities to procure prey within the Unit (Petterson 2012). As bats require free water on a daily basis, bats would likely use any un-netted cuttings pits, flowback pits, or other available fluid storage areas for drinking. If these pits contain substances toxic to bats and are not netted during the summer (when bats are active), it is highly likely that bats would drink from these fluid storage areas, resulting in likely adverse effects. With the application of COA #21 that require netting of pits within 24 hours after drilling activities have begun, the likelihood of such impacts is low. As a result, Alternative A would likely result in no impacts on these species, and would not result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Leopard Frog

Alternative A would have multiple well pad sites and associated facilities located within irrigated pastures, and would also result in direct construction related short term impacts on 67 acres of wetlands and irrigated meadow habitats. Loss of wetlands would require mitigation per USACE permitting. Long-term production impacts would occur on 19 acres of potential frog habitats. The potential take of individual frogs could result from trampling or direct mortality during summer construction and development periods, as well as from substances hazardous to aquatic resources and frogs washing off pad sites or roads and into suitable aquatic habitats. Some temporary diminished habitat effectiveness would occur in wetlands crossed by pipeline corridors. Stormwater sedimentation from roads would result in indirect impacts on wetlands and frog habitat. Water depletions from area ponds and reservoirs would also occur during construction and well development/completion periods, possibly impacting eggs, larvae, and foraging habitats for adults. As northern leopard frogs are hibernating during the winter, wintertime activities on roads and pads would have no impact. Alternative A may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

***Alternative B***

*All Species*

Under Alternative B, SGI would apply the WHP (**Appendix C**) as a design feature. This plan, developed in coordination with BLM and CPW, would mitigate potential impacts on wildlife. Although the focus of the plan is to reduce impacts on big game species, its avoidance and mitigation actions would likely benefit all special status species as well, due to habitat overlap with these species. For example, the plan includes pre-construction raptor and migratory bird nest surveys and avoidance, pit management to exclude birds, bats, and other wildlife, and management of activities in riparian zones to protect water quality and aquatic resources. Additional measures are field-wide operating practices to reduce impacts on terrestrial species, seasonal closures, and remote monitoring.

4-164            *Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan*            July 2016

BLM_0027212

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx
Under Alternative B, traffic volume into the Unit would increase during all well development phases, which would last for approximately 3 years. New traffic would result in a 1.35 percent average increase during the six-year development time frame. The average annual daily trips associated with trucks could increase by up to 21 percent compared to existing truck-related traffic levels, and 10 percent more than Alternative A (see **Section 4.3.5**, Transportation and Access for more details). Subsequently, it is reasonable to assume an increase in traffic on Highway 133 through the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Unit compared to Alternative A, thereby increasing the likelihood for a vehicle collision with lynx. However, as discussed under Alternative A above, increased traffic over McClure Pass is not expected to impact lynx populations or their habitat due to a general lack of suitable habitat. Therefore, actions proposed under Alternative B may affect but is not likely to adversely affect lynx populations. Development of well pad 12-89-7-1 and the associated pipelines would have no effect on Canada lynx, because there is no potential habitat in this area (Rocky Mountain Ecological Services 2012).

Endangered Colorado and Gunnison River Fish
Capturing potential contaminants at Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases as described under Alternative A above. Actions proposed under Alternative B would result in larger annual water depletions of approximately 124 acre-feet compared to Alternative A (see **Section 4.2.4**, Water Resources). However, impacts are anticipated to be similar to Alternative A, since SGI has secured previously appropriated water for this project. As such, no new water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project. Therefore, actions under Alternative B are not likely to jeopardize the continued existence of Colorado pikeminnow, razorback sucker, humpback chub, or bonytail chub and are not likely to destroy or adversely modify designated critical habitat for any of these fish. Development of well pad 12-89-7-1 and the associated pipelines is sufficiently distanced from the Gunnison and Colorado Rivers and occupied habitats. Because of this, incidental sediment delivery to local streams would be adequately diluted with background waters so that no sediment would have any measurable impacts on the fish in these rivers (Rocky Mountain Ecological Services 2012).

Greenback Cutthroat Trout
Under Alternative B, there would be no activities within the Henderson or Roberts Creek drainages. Water depletions from the Ault Creek drainage and from Bainard Reservoir would have no impact on known GB lineage fish or known occupied habitats (Petterson 2012). As a result, oil and gas development in the Unit (including development of well pad 12-89-7-1 and the associated pipelines) would have no effect on greenback cutthroat trout lineage fish.

*BLM Sensitive Species*

Northern Goshawk
Under Alternative B, 34 acres of aspen and aspen/oak habitat would be impacted in the short term, and 10 acres would be impacted in the long term. Effects from oil and gas development in

BLM_0027213

the Unit under this alternative would result in impacts on northern goshawk habitat as described under Alternative A but with a two-fold increase in short- and long-term impacts compared to Alternative A. Given the low quality habitat for northern goshawk and moderate foraging quality in the Unit, impacts on this raptor under Alternative B may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide, but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Actions proposed under Alternative B would result in 134 acres of short term surface impacts (4 percent of available habitat) on mapped bald eagle winter range and winter forage areas from oil and gas activities in the Unit. In the long term, Alternative B would impact 47 acres of these habitats (2 percent of available habitat) in the Unit. Impacts on bald eagle winter range in the long term would be three times greater than Alternative A and nearly two times greater in the short term. Under Alternative B, a proposed pipeline would be bored under Spring Creek in the southeastern corner of the Unit near mapped bald eagle winter range. Together, these activities may affect, but are not likely to adversely affect bald eagles.

Alternative B could cause re-distribution of wintering elk and deer in the area near pads and roads. Deer and elk would likely remain in the general area, however. Given the high mobility of bald eagles, they are expected to easily continue to find and feed on any winter-kill in the general area and no reduction in available carrion would be expected (Petterson 2012). As described in **Appendix C**, COA #39 would be applied as a mitigation measure under Alternative B. If the BLM were to apply this mitigation measure, there would be a reduced likelihood of impacts on nesting bald eagles.

Development of well pad 12-89-7-1 and the associated pipelines may result in temporary avoidance of scavenging habitat near the access road or well pad during the winter; however, daily well checks and incidental activity would have no impact on eagles' ability to scavenge winter-killed big game or livestock or road kill (Rocky Mountain Ecological Services 2012).

Brewer's Sparrow
Under Alternative B, 362 acres of sagebrush would be impacted in the short term, and 129 acres in the long term. Impacts on Brewer's sparrow would be similar to those described under Alternative A but with increased impacts on sagebrush in the short term and long term. Therefore, Alternative B may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Bat Species
Impacts on sensitive bat habitat under Alternative B would be similar to those described under Alternative A. Alternative B would likely result in no adverse impacts on these species, and would not result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Development of well pad 12-89-7-1 and the associated pipelines would not occur near any caves or mines, and potential impacts would likely be minor, given the limitations presented by the

high elevation of the site and a lack of widespread roosts (Rocky Mountain Ecological Services 2012).

Northern Leopard Frog

Actions proposed under Alternative B would impact 48 acres of wetlands and irrigated meadows combined in the short term and 16 acres in the long term. These impacts would affect northern leopard frogs as described under Alternative A and may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Development of the pipeline associated with well pad 12-89-7-1 would cross suitable and likely occupied leopard frog habitats. However, the impacts would affect less than 0.06 acre of wetlands, and wetlands would be reclaimed, replanted, and reseeded with local native species similar in composition to existing conditions. Crossing occupied wetlands would likely destroy individual frogs; however, this would not occur at a large enough scale to affect frog populations or the long-term suitability of the area for frogs at the project level.

If the BLM were to apply the mitigation measures in **Appendix C**, the likelihood for injury, death, or direct disturbance would be reduced. Mitigation Measures (COAs #21, #25, #38 through #44, and #49 through #51 ) would minimize the potential for impacts on Threatened, Endangered, and Candidate species by preserving the amount and condition of wildlife habitat to the extent possible. This would reduce the likelihood of direct disturbance to species and their habitats. In addition, BLM may attach site-specific COAs to the APDs.

*Alternative C*

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx

Under Alternative C, traffic volume into the Unit would increase during all well development phases, which would last for approximately 3 years. New traffic would result in a 1 percent average increase during the six-year development time frame. The average annual daily trips associated with trucks could increase by up to 16 percent compared to existing truck-related traffic levels, and 7 percent more than Alternative A (see **Section 4.3.5**, Transportation and Access for more details). As discussed under Alternative A, not all of the increased traffic on Highway 133 would go over McClure Pass so the potential impacts estimated under Alternative C would likely be much less than calculated in this analysis. Considering the poor quality of suitable lynx habitat in the Unit actions proposed under Alternative C may affect but is not likely to adversely affect lynx populations. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Endangered Colorado and Gunnison River Fish

Capturing potential contaminants at Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases, as described under Alternative A above. Actions proposed under Alternative C would result in water depletions similar to those expected for Alternative B (see **Section 4.2.4**, Water Resources). Therefore, actions under Alternative C not likely to jeopardize the continued existence of endangered Colorado and

BLM_0027215

Gunnison River fishes and are not likely to destroy or adversely modify designated critical habitat for any of these fish. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Greenback Cutthroat Trout
Under Alternative C, a proposed collocated cross country pipeline would be bored under Grouse Creek in the eastern side of the Unit which is not a recognized GB lineage occupied stream as described under Alternative A. Therefore, actions proposed under Alternative C would likely result in no effect on greenback cutthroat trout lineage fish.

*BLM Sensitive Species*

Northern Goshawk
Under Alternative C, 35 acres of aspen and aspen/oak habitat would be impacted in the short term and 8 acres would be impacted in the long term. Effects from oil and gas development in the Unit under this alternative would result in short- and long-term impacts on northern goshawk habitat as described under Alternative A and would impact nearly the same amount of aspen and aspen/oak habitat as Alternative B. Given the low quality habitat for northern goshawk and moderate foraging quality in the Unit, impacts on this raptor under Alternative C may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide, but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Actions proposed under Alternative C would result in 98 acres of short-term surface impacts (3 percent of available habitat) on mapped bald eagle winter range and winter forage areas from oil and gas activities in the Unit. In the long term, Alternative C would impact 28 acres of these habitats (1 percent of available habitat) in the Unit. Impacts on bald eagle winter range in the long term would be two times greater than Alternative A and eight acres more in the short term. Under Alternative C, a proposed pipeline would be collocated at Grouse Creek outside of mapped bald eagle winter range. As described under **Appendix C**, COA #39 would be applied as a design feature under Alternative C. As such, there would be a reduced likelihood of impacts on nesting bald eagles. Impacts on bald eagles as a result of surface-disturbing activities proposed under Alternative C may affect, but is not likely to adversely affect bald eagles. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Brewer's Sparrow
Under Alternative C, 287 acres of sagebrush would be impacted in the short term and 84 acres in the long term. Impacts on Brewer's sparrow would be similar to those described under Alternative A but with less acres of impacted sagebrush in the short term and long term compared to Alternative B. Therefore, the management actions proposed under Alternative C may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

BLM_0027216

Bat Species
Impacts on sensitive bat habitat under Alternative C would be similar to those described under Alternative A. Alternative C would likely result in no impacts on these species, and would not result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Northern Leopard Frog
Actions proposed under Alternative C would impact 39 acres of wetlands and irrigated meadows combined in the short term and 10 acres in the long term. These impacts would affect northern leopard frogs as described under Alternative A and may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide. Reduction to irrigated meadow/wetlands habitat would be similar in acres as Alternative B and would likely result in the same impacts on northern leopard frogs.

Adhering to applicable COAs as described for Alternative B would minimize the potential for impacts on threatened, endangered, and candidate species, as described above. In addition, the BLM may attach site-specific COAs to the APDs. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

***Alternative D, the Preferred Alternative***

*All Species*
Under Alternative D, SGI would apply the WHP (**Appendix C**) as a design feature, which would have impacts as described for Alternative B.

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx
Under Alternative D, traffic volume into the Unit would increase during all well development phases, which would last for approximately three years. Alternative D would add an estimated total of 8,439 round trips to the Unit over the six-year development period, equivalent to an average annual daily traffic amount of 10 trips. Truck-related traffic could increase by up to 11 percent compared to current conditions (see **Section 4.3.5**, Transportation and Access, for more details).

SH 133 would experience the greatest increase in average annual daily traffic. However, not all of the increased traffic on SH 133 would travel over McClure Pass to access the Unit. SGI estimates that approximately 20 percent of traffic generated by the Proposed Action would travel to the Unit from the north, traversing McClure Pass and the MPLLA. This would equate to an additional 1,688 trips over McClure Pass over current conditions. Most of this increase in traffic would occur during the summer, coinciding with construction, drilling, and well completion in the Unit. Most vehicle trips would occur during daylight hours.

While an increase in vehicle traffic traveling through the MPLLA does increase the potential for vehicle collision with lynx crossing the highway, the Proposed Action is not anticipated to cause an increase above the 2,000 vehicle-per-day threshold that would impede lynx dispersal. Given

BLM_0027217

the lack of lynx population centers and large blocks of primary lynx habitat in or near the MPLLA, the likelihood that lynx would frequently disperse through the MPLLA is small (Petterson 2012). Considering this, along with the poor quality of suitable lynx habitat in the Unit, actions proposed under Alternative D may affect but are not likely to adversely affect lynx populations.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Endangered Colorado and Gunnison River Fish
Capturing potential contaminants at Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases, as described under Alternative A above. Actions proposed under Alternative D would result in water depletions similar to those expected for Alternative B (see **Section 4.2.4**, Water Resources). Therefore, actions under Alternative D are not likely to jeopardize the continued existence of endangered Colorado and Gunnison River fishes and are not likely to destroy or adversely modify designated critical habitat for any of these fish. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Greenback Cutthroat Trout
Under Alternative D, there would be no activities in the Henderson or Roberts Creek drainages. Water depletions from the Ault Creek drainage and from Bainard Reservoir would have no impact on known greenback lineage fish or known occupied habitats (Petterson 2012). As a result, oil and gas development in the Unit would have no effect on greenback cutthroat trout lineage fish. Any impacts would be very short in duration and would require implementing construction-related proactive impact minimization measures. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

*BLM Sensitive Species*

Northern Goshawk
Under Alternative D, 24 acres of aspen and aspen/oak habitat would be impacted in the short term and 5 acres would be impacted in the long term. Effects from oil and gas development in the Unit under this alternative would result in short- and long-term impacts on northern goshawk habitat as described under Alternative A and would impact fewer acres of aspen and aspen/oak habitat as Alternatives B or C. Given the low quality habitat for northern goshawk and moderate foraging quality in the Unit, impacts on this raptor under Alternative D may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend toward federal listing or a loss of species viability range-wide. Nevertheless, nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Actions proposed under Alternative D would result in 94 acres of short-term surface impacts (3 percent of available habitat) on mapped bald eagle winter range and winter forage areas from oil and gas activities in the Unit. In the long term, Alternative D would impact 27 acres of these habitats (1 percent of available habitat) in the Unit. Impacts on bald eagle winter range in the long term would be two times greater than Alternative A and eight acres more in the short term.

BLM_0027218

As described under **Appendix C**, COA #39 would be applied as a design feature under Alternative D. As such, there would be a reduced likelihood of impacts on nesting bald eagles. Impacts on bald eagles as a result of surface-disturbing activities proposed under Alternative D may affect but are not likely to adversely affect bald eagles. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Brewer's Sparrow
Under Alternative D, 310 acres of sagebrush would be impacted in the short term and 93 acres in the long term. Impacts on Brewer's sparrow would be similar to those described under Alternative A but with fewer acres of impacted sagebrush in the short term and long term compared to Alternative B. Therefore, the management actions proposed under Alternative D may impact individuals but are not likely to result in a loss of viability on the Unit nor cause a trend toward federal listing or a loss of species viability range-wide. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Bat Species
Impacts on sensitive bat habitat under Alternative D would be similar to those described under Alternative A. Alternative D would likely result in no impacts on these species and would not result in a loss of viability on the Unit nor cause a trend toward federal listing or a loss of species viability range-wide. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Northern Leopard Frog
Actions proposed under Alternative D would impact 36 acres of wetlands and irrigated meadows combined in the short term and 8 acres in the long term. These impacts would affect northern leopard frogs, as described under Alternative A, and may impact individuals but are not likely to result in a loss of viability on the Unit nor cause a trend toward federal listing or a loss of species viability range-wide. Impacts on irrigated meadows and wetlands would be similar in acres as Alternative C and would likely result in the same impacts on northern leopard frogs.

The COAs described under Alternative B would be applied as design features under Alternative D, which would minimize the potential for impacts on the threatened, endangered, and candidate species described above. In addition, the BLM may attach site-specific COAs to the APDs. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

*Cumulative*
Past and present actions as well as current conditions within the cumulative impact analysis area have affected and would likely continue to affect special status species. In addition, reasonably foreseeable future actions that may affect special status species in the future are described in **Table 4-3**. Habitat restoration projects within the region include vegetation treatments to improve habitat and reduce fire threats. These improvement efforts would expand the extent and increase the quality of habitat for many special status fish and wildlife species that inhabit the surrounding region. However, oil and gas development in the North Fork of the Gunnison River area, would continue to affect special status species within the region as less than 25 percent of the Uncompahgre Field Office mineral estate has been leased. Access roads would continue to be

BLM_0027219

developed on federal, state, and private lands in the region in support of energy development. These actions would reduce the availability of habitat and forage as well as increase habitat fragmentation for special status species. Additionally, continued and future actions resulting in water depletions or impacts on water quality within the region would reduce the quantity and quality of habitat for special status fish and other aquatic species. Any proposed project with the potential to impact ESA-listed species would require consultation with the USFWS to determine the potential impacts on federally protected species and to develop mitigation actions.

Under all of the alternatives, impacts on special status species as a result of increased oil and gas development within the Unit would contribute to the impacts from past, present, and reasonably foreseeable actions described in **Table 4-3**. Alternative A would result in the fewest number of well pads and would therefore result in the least amount of impacts on special status fish and wildlife species. However, mitigation measures including COAs, RDFs, and voluntary seasonal winter timing limitations would not be imposed under Alternative A. Actions proposed under Alternative B would result in the greatest direct impacts on special status species habitat while imposing COAs described in **Appendix C**; no voluntary seasonal timing limitations have been proposed under Alternative B. Under Alternatives C and D, oil and gas development activities would result in more surface disturbance of special status species habitat compared to Alternative A but less than Alternative B. In addition, all action alternatives would implement COAs #21, #25, #38 through #44, and #49 through #51 to reduce impacts. The WHP under Alternatives B and D would reduce impacts on special status species and their habitats. Current and future water depletions would continue to threaten Colorado River endangered fish species. The implementation of a water augmentation program as proposed by SGI (**Appendix L**) would minimize water depletions; other such water augmentation plans are recommended in the region to reduce the amount of water used for oil and gas development. Increased road and pipeline crossings within the area would contribute to potential habitat impacts for GB lineage occupied streams.

## 4.2.10  Wildland Fire Management

### Methods of Analysis
Impacts on fire and fuels management generally result from activities that affect firefighter and public safety or fire intensity, frequency, and suppression efforts. Indicators of impacts on wildland fire management resources are the following:

- A change in the likelihood of human caused wildfire in the Unit

- A change in the size, extent, or occurrence of wildfire in the Unit

- A change in the ability to conduct wildfire suppression efforts

### Nature and Type of Effects
The development of natural gas wells may increase the risk of wildfires by introducing new ignition sources and increasing human activity in the Units. Potential sources of ignition during the construction period include but are not limited to construction equipment, vehicles on access roads, and construction personnel. Operation and maintenance of wells would represent a reduced level of risk of ignition s compared to the construction phase due to decreased vehicle

BLM_0027220

traffic and equipment use. Risks of ignition still exist during production, including those from well workover operations. While the potential for ignition of wildfire from natural gas emitted from wells during drilling and production does exist, best management practices and standard operating procedures generally lower these risks to a minimal level. Operators also reduce risk by shutting down during wildfire events near active wells.

Indirect sources of wildfire risk from natural gas development include the potential for an increase in invasive weeds in disturbed areas. Spread of cheatgrass (*Bromus tectorum*) is widely recognized as modifying fire behavior, resulting in reduced fire intervals and increased intensity of burning (Menakis et al. 2003). Proper reclamation techniques and use of native seed mixes can reduce incidence of cheat grass and associated fire risk.

Energy development may also pose a hazard to firefighters, including unknown toxins, facility protection, industry personnel evacuation, and overhead power line danger. Fire programs could incur additional costs to train firefighting personnel for emergency situations associated with energy development.

New and improved access roads may improve access for wildland fire suppression activities. Proposed development may also create fuel breaks (e.g., areas where there is no vegetation) that could be effective in preventing the spread of wildland fires.

### Effects Common to All Alternatives

Under all Alternatives fires would be managed with intensive suppression as a priority based on the management prescriptions for the Fire Management Unit laid out in the UFO RMP.

Human-caused wildfires resulting from unsafe well control practices would be averted by complying with regulatory requirements and standard measures, which are discussed in **Appendix C**. In general, well pads would be kept free of vegetation and trash in order to minimize the potential of wildfires.

Storage of sensitive or hazardous materials would be handled in compliance with all applicable federal and state regulations, minimizing risk of firefighter exposures to chemicals during suppression efforts.

### Alternative A

Under Alternative **A**, the risk of wild fire ignition, as described under *Nature and Type of Impacts*, would continue from operating existing federal and state authorizations and developing the new wells, pads, and associated infrastructure. Under Alternative A, COGCC requirements (rule 606A) would be applied, which could reduce wildland fire risk.

### Alternative B

Impacts would be similar to those described in Alternative **A** and in Nature and Type of Impacts. Due to the increased amount of development under Alternative B, however, the risk of human caused ignition from construction related vehicles and equipment would be increased.

BLM_0027221

*Alternative C*
Impacts under Alternative C would be similar to those described under Alternative B. However, under this Alternative, fewer new well pads would be constructed on federal mineral estate; therefore reducing the likelihood of ignition.

In addition, design features imposed to protect wildlife, water, air and other resources, may also provide indirect reduction of wildfire risk. Four new electrical lines would be buried in this alternative, reducing risk of ignition from as compared to overhead lines. Preparation of an annual reclamation monitoring status report may decrease incidence and spread of invasive species and associated risk of wildfire.

*Alternative D, the Preferred Alternative*
Impacts under Alternative D would be similar to those described under Alternative B. However, under this alternative, fewer new well pads would be constructed, and there would be slightly less vehicle traffic, thereby reducing the potential for unplanned ignition.

*Cumulative*
Past and present management actions and natural events in the cumulative impact analysis area have altered the condition of vegetation and natural fire regimes across the landscape. Examples include fire suppression, energy development, grazing, noxious and invasive weed spread, and drought. Continued development in the wildland-urban interface zone may increase fire risk and result in the need for additional resources including federal, state, and local agency resources for fire suppression. Proposed ROW developments, road and trail construction, as well as oil and gas leasing and development on federal and private lands are activities would represent additional wildfire risks in the region. As discussed in **Section 3.2.11**, Wildland Fire Management, large fires in the Unit have been uncommon, and the focus on intense suppression efforts is likely to continue this trend. The Proposed Action and alternatives would, however, add to the cumulative wildfire risk in the area, potentially resulting in increased suppression costs for the UFO as well as a strain on resources in the fire protection district. The degree of added ignition risk would vary based on the alternative selected, with cumulative fire risk related to the level of development as discussed under impacts by Alternative, above.

## 4.2.11  Cultural Resources

*Methods of Analysis*
Cultural resources are past and present expressions of human culture and history in the physical environment. The term cultural resource can refer to archaeological, historical, and architectural sites, structures, or places with important public and scientific uses and can include locations (sites, natural features, resource gathering areas, or places) of traditional cultural or religious importance to specific social or cultural groups.

This section discusses impacts on cultural resources from the proposed goals, objectives, management actions, and allocation actions noted in **Chapter 2**, Alternatives. Existing conditions concerning cultural resources are described in **Section 3.2.12**, Cultural Resources.

Cultural resource baseline information in **Section 3.2.12**, Cultural Resources, was reviewed for current understanding of known resources and to determine the condition of the resources. All

BLM_0027222

laws pertinent to determining effects on cultural resources (i.e., NHPA) were considered and included in criteria for determining impacts. This known information was overlain with the actions found under each alternative in **Chapter 2**, Alternatives, and conclusions were drawn based on an understanding of how these types of actions could affect known and potentially discoverable resources.

*Indicators*

Cultural resources are impacted when a property is damaged, its physical integrity is lost, or the setting of a resource is damaged. Under NEPA, impacts on cultural resources are assessed by applying the criteria of adverse effect, as defined in the implementing regulations for Section 106 of the NHPA (36 CFR Part 800). For this analysis, indicators for determining effects on cultural resources include asking if the action would result in any of the following:

- Destroy, damage, or alter all or part of the physical nature of a cultural resource

- Change the character of the property's use or physical features within its setting that contribute to its historic significance (e.g., isolating the property from its setting)

- Introduce visual, atmospheric, or audible elements that diminish the integrity of the property's significant historic features

- Disturb any human remains, including those interred outside of formal cemeteries

- Contribute to an adverse effect (under the NHPA) to a cultural resource if it is listed in or eligible for listing in the National Register or if it is an area of importance to a Native American or other traditional community. If a site is determined to be eligible for listing in or is listed in the National Register, any physical disturbance would also constitute a significant impact under NEPA. If a site is determined to be ineligible for listing, then any disturbance could be considered substantial, but it would not be significant under NEPA or adverse under NHPA.

*Assumptions*

This analysis assumes the following:

- Impacts on cultural resources are assessed by applying the criteria of adverse effect, as defined in 36 CFR Part 800.5a: An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association…. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative.

- Human occupation of North America over the last 10,000 years has left its mark on all landforms, and sites could be manifest on the surface or deeply buried. There could be areas of importance to contemporary Native Americans that are not readily identifiable outside of those communities.

BLM_0027223

292 of 397

- The information on cultural resources in the Unit is based on the results of industry and BLM inventory projects for cultural resource sites in the Unit (Greubel et al. 2010, Millward 2013). However, because these data are biased toward past, project-oriented undertakings, they cannot accurately predict where or how many resources may exist in unsurveyed areas.

- This analysis does not attempt to quantify affected resources. Rather, the relative number of sites that could be affected by actions correlates with the degree, nature, depth, and quantity of surface-disturbing activities in the Unit where the more surface that is disturbed, the more cultural resources may be affected.

- Each of the 40-acre analysis areas used herein represent an area of possible placement for a single 5-acre well pad.

- This analysis does not include resource-specific, protection measures. Cultural resource protection and mitigation measures would be applied at the project design and implementation phases after appropriate Section 106 consultation requirements are met. Mitigation can include project cancellation, redesign, avoidance, or data recovery.

### *Nature and Type of Effects*

There would be no immediate impacts from the actions noted in the alternatives of the Bull Mountain Unit MDP, though there could be indirect impacts (impacts that occur later in time or farther removed in distance, as well as cumulative impacts) associated with future development.

Any activities that would involve surface-disturbing activities could have direct and indirect impacts on cultural resources, including damaging, destroying, or displacing artifacts and features and constructing modern features out of character with a historic setting. Damaging, displacing, or destroying cultural resources could include removing artifacts from their situational context, breaking artifacts, or shifting, obliterating, or excavating features without appropriate scientific recording.

Indirect impacts on cultural resources include changing the character of a property's use or physical features within a property's setting that contribute to its historic significance (e.g., isolating the property from its setting) and introducing visual, atmospheric, or audible elements that diminish the integrity of the property's historic features. Construction activities could result in placing modern features onto a landscape that did not have them previously. Additionally, any action that would result in increased human and worker presence (e.g., more people visiting a recreation area or workers brought in for construction operations) would risk illicit collecting of surface artifacts, resulting in a loss of scientific information.

The potential for undiscovered buried cultural resources and human remains exists despite previous archaeological surveys and investigations, suggesting a very low likelihood for such discoveries. Surface-disturbing activities could directly impact undiscovered cultural resources and human remains by exposing buried material, resulting in inadvertent artifact destruction or loss of scientific context. Indirect impacts could result from the increased human presence, leading to possible illicit collecting of newly exposed materials.

BLM_0027224

Any actions that would result in reclaiming landscapes to predisturbance conditions would eliminate the indirect viewshed or setting impacts for cultural resources. Reclamation would likely restore the natural landscape setting but may not result in restoring the historic setting. However, direct impacts on cultural resources or any unanticipated discoveries made would remain as they were, permanently destroyed or damaged by surface-disturbing actions. Reclamation impacts on undiscovered buried cultural materials or human remains would be similar to those noted above, namely that activities could expose buried materials, resulting in inadvertent artifact destruction or loss of scientific context.

***Effects Common to All Alternatives***

Cultural resource compliance actions would continue under all alternatives. Laws, regulations, and policies for both BLM-administered mineral estate and COGCC-administered mineral estate that supersede Bull Mountain Unit MDP decisions would apply. All actions would continue maintaining the integrity or characteristics of historic properties under legal guidelines for protection, preservation, investigation, and public use (i.e., development and interpretation) on a case-by-case basis.

Any action that disturbs or diminishes the integrity of a historic property's location, design, setting, materials, workmanship, feeling, or association, as defined in 36 CFR Part 800, is an adverse effect. Potential effects from subsequent undertakings for all resources, resource uses, and special designations would be addressed at the project design and implementation phase. Required separate compliance with Section 106 would result in the continued identification, evaluation, mitigation, and nominations to the National Register. Effects on cultural resources eligible for listing on the National Register would be avoided or mitigated. If previously undiscovered resources were identified during an undertaking, work would be suspended while the resource is evaluated and mitigated to avoid any further effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects, as defined by 36 CFR Part 800, would be possible.

All alternatives include surface-disturbing actions that would directly and indirectly impact cultural resources. Surface-disturbing activities include the construction of well pads, access roads, pipelines, electrical lines, and storage areas or the recontouring and reseeding that occurs during reclamation. Drilling or other activities that do not alter the extent of surface disturbances are not likely to directly impact cultural resources. Direct effects on cultural resources would be evaluated for individual undertakings, and protections and mitigations would be applied at project design and implementation phases.

Erosion of soils that are a result of surface disturbance is an indirect impact from construction activities. Many cultural resources are susceptible to erosion damage, including modifying spatial relationships of artifacts and destroying features and stratified deposits; all of which are important to understanding past culture. Nondestructive measures to protect soils could be included as conditions on permits to reduce impacts.

All alternatives include indirect impacts on cultural resources. Any action that increases access can lead to inadvertent damage, unauthorized collection, or vandalism of cultural resources. Additionally, infrastructure construction modifies the visual or audible character of the setting of

BLM_0027225

Case No. 1:20-cv-02484-MSK   Document 34-2   filed 04/27/21   USDC Colorado   pg 294 of 397

a cultural resource. Indirect effects on cultural resources would be evaluated on a case-by-case or APD-specific basis.

*Alternative A*

All of the actions in Alternative A have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, the exact nature of the direct and indirect impacts is not known because the location of all cultural resources within the Bull Mountain Unit is not known. Specific numbers of impacted cultural resources for the different nature and types of effects under Alternative A are unavailable, though previous work in the Bull Mountain Unit indicates that the resources are sparsely distributed (Millward 2013). Under Alternative A, impacts on cultural resources would be assessed on a case-by-case basis, and mitigation measures for possible disturbance would follow applicable COGCC requirements.

*Alternative B*

All of the actions in Alternative B have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, because the location of all cultural resources within the Bull Mountain Unit is not known, the exact nature of the direct and indirect impacts is not known. Although the specific numbers of impacted resources under Alternative B are unavailable, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). Under Alternative B, impacts on cultural resources would be assessed on a case-by-case or APD-specific basis. Impacts can typically be mitigated by implementing the measures identified in **Appendix C**, such as archaeological and cultural resources protection (see COA #34), and soil preservation (COA #7); they would be included on a case-by-case basis at project design and implementation phases.

*Alternative C*

All of the actions in Alternative C have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, because the location of all cultural resources within the Unit is not known, the exact nature of the direct and indirect impacts is not known. Although the specific numbers of impacted resources under Alternative C are unavailable, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). As with the previous alternatives, under Alternative C, impacts on cultural resources would be assessed on a case-by-case or APD-specific basis. Impacts can typically be mitigated by implementing the measures identified in **Appendix C**, such as archaeological and cultural resources protection (see COA #34), and soil preservation (COA #7); they would be included on a case-by-case basis at project design and implementation phases.

*Alternative D, the Preferred Alternative*

Similar to previous alternatives, all of the actions in Alternative D have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, because the location of all cultural resources in the Unit is not known, the exact nature of the direct and indirect impacts also is not known. Although the specific numbers of impacted resources under Alternative D are unavailable, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). Impacts on cultural resources would be assessed on a case-by-case or APD-specific basis. Impacts can typically be mitigated by

BLM_0027226

implementing the measures identified in **Appendix C**, such as archaeological and cultural resources protection (see COA #34) and soil preservation (COA #7); they would be included on a case-by-case basis at project design and implementation phases.

### Cumulative

Decisions within the Unit could have impacts that, when combined with past, present, and reasonably foreseeable future actions, would produce cumulative effects on cultural resources. Cumulative effects would result from the destruction and loss of known and unrecorded resources and unanticipated discoveries from many projects, creating an additive effect of scientific information loss. Such activities include changes to federal land use plans; increases in mining, fluid mineral leasing, and renewable energy development; vegetation and habitat management; livestock grazing; increases in recreation and visitor use; road construction; urban encroachment, shifts in water management; invasive plant and animal species; and wildland fire (**Table 4-3**). These impacts would continue to affect cultural resources, through loss or disturbance to the integrity and setting of cultural resources.

Actions related to recreation, grazing, vegetation treatment, wildland fire, mineral development, and energy development have had past effects and are expected to continue to affect cultural resources. Increased frequency of wildland fire due to shifting environmental parameters, such as drought, climate change, and forest health, could lead to additional direct loss of cultural resources.

Cultural resources next to areas of growth and development would be most susceptible to future effects. The construction of buildings, roads, and associated structures increases ground disturbance, causing effects on cultural resources and their settings. Development near public lands also increases pressure from recreation. Designating travel corridors can protect cultural resources located off the routes, but restrictions are difficult to enforce, especially as population and recreational use grows and other areas are closed. Increased use of the Internet and GPS devices to disseminate the location of cultural resources and encourage visitation to sites can facilitate vandalism and unauthorized collecting.

All undertakings that could affect cultural resources on federal land or actions that are funded, licensed, or permitted by the federal government are subject to the Section 106 process of the NHPA and other applicable laws and regulations. Consideration of the future cumulative effects of undertakings on protected cultural resources would be required, and adverse effects would be resolved on a site-by-site or project-by-project basis. Adherence to appropriate predevelopment, development, and post-development protective measures would reduce most cumulative effects to an insignificant level. Implementation of the proposed MDP is not anticipated to contribute to cumulative effects.

### 4.2.12  Paleontological Resources

### Methods of Analysis

Based on a reasonable prediction of possible future types of development, but not their timing or location, the following impact analysis provides a general description of common impacts on paleontological resources.

*Indicators*
The primary overall indicator for paleontological resources is whether the characteristics that make a fossil locality or feature important for scientific use have been lost or diminished. Natural weathering, decay, erosion, improper collection, and vandalism can remove or damage those characteristics that make a paleontological resource scientifically important. Specific indicators used to assess the condition of in situ paleontological resources are the extent of erosion, rock fall and other natural processes, and human-caused disturbances. Resource condition is assessed through field observations, paleontological reports associated with paleontological use permits and construction activities, commercial site reports, and project reviews.

*Assumptions*
In addition to the assumptions in **Section 4.1.2**, the analysis assumes the following:

- Occurrences of paleontological resources are closely tied to the geologic units (e.g., formations, members, or beds) that contain them. The probability for finding paleontological resources can be broadly predicted from the geologic units at or near the surface.

- Geologic mapping can be used for assessing the potential for paleontological resources using the BLM's Potential Fossil Yield Classification (PFYC) system.

- For assessing impacts, only those objectives and actions potentially affecting vertebrate and scientifically important paleontological resources are considered.

- Scientifically important fossils may continue to be discovered throughout the Unit. Discoveries are most likely in geologic units classified as high-potential PFYC Class 4 or 5.

- Inventories conducted before surface disturbance or construction monitoring in high-probability areas could result in the identification and evaluation of previously undiscovered resources, which the BLM would mitigate for accordingly.

- Potential for impacts on both surface and subsurface paleontological resources is directly proportional to the amount of surface disturbance associated with a Proposed Action.

- At the programmatic level of analysis, it is not possible to identify and evaluate areas of higher paleontological sensitivity with respect to locations of proposed surface disturbance. Therefore, potential impacts on paleontological resources under each alternative can only be generally estimated, and they correlate directly to the amount of anticipated surface disturbance proposed under each alternative.

### Nature and Type of Effects
Exposed fossils can be damaged by natural weathering and erosion from wind and water, and this damage can be exacerbated by concentration of human use and activity. Other sources of human-caused damage are ground-disturbing activity, vandalism, unauthorized collection, and over-collection of localities. Surface disturbance and excavations could impact fossils that could occur on or underneath the surface in areas containing paleontologically sensitive geologic units.

BLM_0027228

If formations with high potential for yielding fossil vertebrates, such as the Upper Jurassic Morrison Formation noted in **Section 3.2.14,** crop out in the Unit, there is a high probability for impacting fossils during surface-disturbing activities in these areas.

Types of impacts include permanent loss of the paleontological resource and the scientific data it could provide through damage or destruction caused by surface-disturbing activities. Without removing some rock surrounding fossils, they would remain largely undetected; therefore, management actions that result in erosion do not necessarily result in damage to paleontological resources. Excessive erosion, especially from other surface disturbance on exposed localities, could damage fossils at the surface.

Impacts can typically be mitigated to below a level of significance by implementing paleontological mitigation measures. Pedestrian surveys would typically be necessary before any surface-disturbing activities were authorized in areas with a high potential for yielding fossil vertebrates (e.g., the Morrison formation), and if the risk were high enough, on-site monitoring could be required during construction. If data recovery were the prescribed mitigation, this could also result in fossils being salvaged that may never have been unearthed as the result of natural processes. These newly exposed fossils would become available for scientific research, education, display, and preservation into perpetuity at a public museum. Unmitigated surface-disturbing activities could dislodge or damage paleontological resources and features that were not visible before surface disturbance.

An increase in visitors to, workers in, or access to paleontological localities or sensitive areas could result in an increased potential for loss of paleontological resources by vandalism and poaching (Eagles et al. 2002). For fossils to have significant scientific value, they must be found in place; transporting fossils degrades the scientific value due to unknown source material and general erosion of the surface, resulting in the fossil being unrecognizable in some cases. The best fossil preservation occurs when the fossil is buried in place. These impacts are difficult to mitigate to below the level of significance, but they can be greatly reduced by increasing public awareness about the scientific importance of paleontological resources through education, community partnerships, and interpretive displays, and by informing the public about penalties for unlawfully destroying or poaching these resources from BLM-administered lands.

***Effects Common to All Alternatives***
Any action that disturbs or diminishes the scientific integrity of a scientifically important locality would be considered an adverse effect. Potential effects from subsequent exploration and development actions would be addressed at the APD and/or POD stage. Effects on scientifically important paleontological resources would be avoided or mitigated. If previously undiscovered resources were identified during project development, work would be suspended while the resource is evaluated and mitigated to avoid any further effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects would be possible.

All alternatives include surface-disturbing actions that, if fossils were present, could directly and indirectly impact paleontological resources and could result in the nature and types of effects described above.

BLM_0027229

Erosion of soils that are a result of surface disturbance is an indirect impact from construction activities. Paleontological resources are susceptible to erosion damage, including destroying individual fossils and stratified deposits; all of which are important to understanding past environments. Laws, regulations, and policies for both BLM-administered mineral estate and COGCC-administered mineral estate that supersede Bull Mountain Unit MDP decisions would apply.

All alternatives could result in indirect impacts on paleontological resources. Any action that increases access can lead to inadvertent damage, unauthorized collection, or vandalism of fossil resources. Indirect effects on fossil resources would be evaluated on a case-by-case or APD-specific basis.

### Alternative A
As Alternative A would be continuation of state managed actions, there would be few protections against the loss or diminishment of paleontological resources that may occur within the Unit, and effects could be of the nature and type described above. Paleontological resources are also indirectly protected via stipulations or actions that would protect other resources, such as those for wildlife or cultural resources.

As noted above in *Nature and Type of Effects*, there are instances when human actions can inadvertently lead to damage or destruction of these resources.

### Alternative B
As Alternative B includes actions under a Master Development Plan, paleontological resources could be directly protected via the paleontological resources lease notification or by COAs on individual APDs or PODs submitted under the Master Development Plan.

Due to the BLM's mandate to protect scientifically important paleontological resources, there are few instances when a locality or fossil would be deliberately destroyed. However, as noted above in Nature and Type of Effects, there are instances when human actions can inadvertently lead to damage or destruction of these resources.

### Alternative C
Alternative C would have the same nature and types of effects as described above in Nature and Type of Effects, Effects Common to All Alternatives, and Alternative B sections.

### Alternative D, the Preferred Alternative
Alternative D would have the same nature and types of effects as described above in *Nature and Type of Effects*, *Effects Common to All Alternatives*, and Alternative B sections.

### Cumulative
The cumulative impact analysis area used to analyze cumulative impacts on paleontological resources is a 50-mile radius around the Bull Mountain Unit. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and would likely continue to affect paleontological resources are mineral exploration and development, unauthorized travel, forestry, livestock grazing, recreation, road construction, ROWs, water diversions, weed invasion and spread, weed control, prescribed and wildland fires,

BLM_0027230

land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Types of impacts from past, present, and reasonably foreseeable future actions that affect paleontological resources are the same as those discussed under Nature and Type of Effects. They include destruction or damage of resources without the benefit of scientific study or interpretation due to construction, recreation, theft, vandalism, and the effects of natural processes without the benefit of recovery, scientific study, or interpretation.

Current and future trends are energy and minerals development, including fluid mineral leasing and development and mineral materials sales; population growth; urbanization; increase in recreational demand; and ROW projects, including pipeline and transmission line construction, road construction, and erosion. For actions on BLM-administered land and mineral estate, impacts would be minimized through existing laws, regulations, and stipulations addressing surface-disturbing activities in PFYC Class 4 and 5 areas and other sensitive areas. Other ground-disturbing activities, such as road construction and utility infrastructure, could be reviewed by other federal, state, or local agencies for the presence and scientific value of paleontological resources, and steps could be taken to recover or avoid significant finds. Actions on private land could result in the inadvertent destruction of paleontological resources or the removal of fossils without any scientific study. Increasing recreation demand could result from unauthorized removal, vandalism, incremental damage of surface resources, and subsequent erosion.

Beyond authorized ground disturbance, cumulative impacts could occur from intensive travel, dispersed recreation, wildfire suppression, erosion, unauthorized collection, and vandalism. These could result in the unmitigated loss of scientific information and could reduce the educational and interpretative potential of the resource. Protections provided by other resource measures (such as those for cultural resources) would reduce the intensity of these effects. Adherence to appropriate protective measures before, during, and after development would reduce most impacts to a minimal level.

### 4.2.13  Visual Resources
This section discusses impacts on visual resources from the alternatives. The area of analysis for visual resources is the proposed project area.

***Methods of Analysis***
The visual resource inventory (VRI) classes form the basis for analysis in this section. Although VRI classes use the same numerical scale (i.e., Class I through IV) as VRM classes, they are defined differently. Visual resource inventory classes are the categories the BLM uses to classify the current visual character of the landscape and are a way to communicate the degree of visual quality in the area. Generally, VRI Class I indicates high visual quality, and VRI Class IV indicates lower visual quality. The project area is VRI Class II. The VRI is on file at the UFO.

This section identifies impacts on visual resources on BLM-administered and non-BLM-administered lands. Impacts on visual resources are assessed by comparing the Proposed Actions for each alternative to the VRI class of the project area. Because the sensitivity level is expected to remain high and medium for most of the Unit, the analysis does not consider changes to sensitivity levels. Furthermore, the landscape is entirely within the foreground/middle ground distance zone (zero to 5 miles). This is not expected to change from actions under any of the

BLM_0027231

alternatives, so the analysis does not further consider changes to distance zones. As such, the following impact analysis by alternative focuses on the potential for change in VRI classification due to a change in scenic quality. Under no alternative would the scenic quality be anticipated to improve.

When assessing scenic quality, seven factors are considered: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. Of these factors, actions under the alternatives have the highest potential to change vegetation, color, or cultural modifications. Where cultural modifications would be allowed, there could be a change in the variety of vegetation forms, patterns, or texture from such activities as construction, vegetation removal, and soil composition changes. Furthermore, where cultural modifications would be allowed to the extent that the basic components of the landscape (e.g., vegetation, soil, and rock) changed drastically, the variety, contrast, and harmony of color could change as well. The VRI scenic quality evaluation ratings for vegetation, color, and cultural modifications are provided in **Table 4-60**, Visual Resources Inventory Scenic Quality Evaluation Ratings.

**Table 4-60**
**Visual Resources Inventory Scenic Quality Evaluation Ratings**

| Scenic Quality Rating Unit | Scenic Quality Evaluation Rating Criteria | | | | |
|---|---|---|---|---|---|
| | Vegetation (1 to 5 points) | Color (1 to 5 points) | Cultural Modification (-4 to 2 points) | Total Score* (points) | Scenic Quality Rating (A to C) |
| Bull Mountain | 3.5 | 4 | 0 | 19.5 | A |
| Paonia Reservoir | 5 | 4 | -0.5 | 19 | A |
| Deep Creek | 5 | 4 | 0 | 20.5 | A |

Source: Otak 2009
Notes: Total scenic quality rating score: A = 19 point or more; B = 12-18 points; C = 11 points or less.
*Table does not include ratings for the rating criteria landform, water, adjacent scenery, and scarcity.

*Indicators*
The indicator of impacts on visual resources is the following: Proposed actions would allow changes to the landscape that could alter its character enough that future visual resource inventories would result in a VRI class reclassification due to changes in vegetation, color, and cultural modifications (such as structures and artificial elements not found in nature). For example, the area is currently assigned to VRM Class III and VRI Class II. The level of change allowed by VRM Class III could alter the landscape to the point that future visual resource inventories could result in reclassifying the area to VRI Class III or IV.

Impacts on visual resources are assessed by comparing the actions for each alternative to the VRI class of the project area. Generally, VRI Class II areas are more susceptible to impacts from changes to the landscape because of the high-value visual resources in these areas.

*Assumptions*
The analysis of visual resources has the following assumptions:

- The scenic vistas within the project area would become more sensitive to visual change; in other words, they would increase in value over time.

BLM_0027232

- Scenic resources would become increasingly important to residents of and visitors to the area.

- Visitors to BLM-administered lands or residents living near BLM-administered lands are sensitive to changes in visual quality.

- Activities that cause the most contrast and are the most noticeable to the viewer and the public are considered to have the greatest effect on scenic quality.

- The severity of a visual effect depends on a variety of factors, including the size of a project (i.e., area disturbed and physical size of structures), the location and design of access roads, and the overall visibility of disturbed areas.

- VRM class objectives would be adhered to through project design, avoidance, or mitigation.

- Visual resource and reclamation COAs (in **Appendix C**, COAs #36 and #50 through #52) and design features (in **Appendix C**) for Alternatives B and C would be implemented to reduce harmful impacts.

- Visual contrast ratings would be required for all future site-specific activities. The visual contrast rating system would be used as a guide to analyze site-specific impacts from activities as well as design and placement. Activities would be designed to minimize their visual impacts in order to conform to the area's VRM class objective. This would allow the BLM to reduce impacts on a site-specific basis to ensure compliance with the assigned VRM class.

- Private lands are assigned to the same VRI classes as BLM-administered lands in order to provide a consistent approach for analyzing impacts on visual resources across all lands.

- State Highway 133 and County Road 265 serve as the two primary travel routes in the project area. The West Elk Loop Scenic Byway passes through the project area on State Highway 133. These travel routes would become more sensitive to visual change; in other words, they would increase in value over time.

Views of the project area would be afforded to individuals conducting livestock grazing, operating and maintaining access roads and energy developments (primarily oil and gas), driving vehicles along local travel routes (primarily State Highway 133 and County Road 265), and recreating (such as hunting, hiking, mountain biking, dispersed camping, viewing of seasonal colors, cross-country skiing, and snowmobiling).

*Nature and Type of Effects*
In order to accurately and comprehensively analyze and quantify impacts, future site-specific plans need to be provided detailing the location of project features and the amount of cut-and-fill. This information will be used to conduct a future analysis of impacts on visual resources according to the BLM VRM system analysis stage. The process of conducting a visual resource contrast rating, which involves comparing the project features with the existing landscape

BLM_0027233

features using basic elements of form, line, color, and texture, is described in detail in BLM Handbook H-8431-1, Visual Resource Contrast Rating (BLM 1986b). The goal of VRM is to minimize the visual impacts of all surface-disturbing activities, regardless of the class to which an area is assigned. The project area is VRM Class III. The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape. Completing the BLM VRM system analysis stage will identify if a proposed site-specific development would meet the VRM class objective for an area.

*Temporary Effects*
Temporary direct effects on visual resources would occur from construction and ground-disturbing activities at well pads, access roads, pipelines, electrical lines, and facilities, such as storage areas, flowback pits, and compressor stations. To the extent practicable and feasible, activities would be located within the right-of-way. During the construction period, crews may be working concurrently at various locations. Therefore, the temporary effects on visual resources described below may occur at the same time in multiple locations. The effects would occur for a short period of time (weeks or months). After construction is completed, all equipment would be removed, and staging, storage, and construction areas would be reclaimed to a pre-disturbance condition. Impacts from construction would not change the VRI classification.

Ground Disturbance and Dust
Construction activities would disturb the ground surface and require removing vegetation, which would affect visual resources by creating land barren of vegetation when compared to adjacent land. Also, ground disturbances would affect visual resources by creating exposed soil with a different texture and color than undisturbed soil. Depending on growing conditions, trees and shrubs may not regenerate quickly, which would affect the timeline for reclaiming disturbed areas.

Ground-disturbing activities would also generate dust from vehicle movement, excavation, and wind blowing across exposed soil. Fugitive dust would affect visual resources by diminishing atmospheric clarity. This effect would persist until the dust settles or is blown elsewhere.

Implementation of COA #36 would reduce effects on visual resources by limiting light pollution that could cause changes to cultural modifications. Implementing COAs #50 through #52 would reduce effects on visual resources by instituting reclamation practices that limit the duration and scope of changes to the physical landscape.

Construction Lighting
Lights would be used during construction only when necessary for safety, and lighting would be kept to a minimum. This would reduce nighttime darkness by adding light to areas lacking sources of artificial light. Nighttime effects on surrounding areas would be limited because nighttime construction work is not proposed.

BLM_0027234

Glare
Reflective surfaces on construction equipment and vehicles create glare. The intensity and amount of glare would vary depending on the intensity of sunlight and the time of day. This would affect visual resources by adding artificial points of illumination not found naturally in the landscape where construction equipment and vehicles are present.

Cluttered Views
During construction, views of the project area would be cluttered with construction equipment, construction materials, and temporary support infrastructure, such as pipes, pits, fences, flagging, and stream crossings. The color and geometric, boxy forms of construction materials and equipment would contrast with the rolling form of the terrain and the vegetation. The rigid vertical elements would create various focal points on a mostly open landscape and would not mimic other landscape elements, which are mostly vegetation. The color of construction equipment and vehicles would not resemble the muted tans and greens of the terrain and vegetation.

*Permanent Effects*
Permanent direct effects on visual resources would occur from operating and maintaining sites and facilities. The effects on visual resources would be permanent, unless a site was abandoned and reclaimed. The life of the project is estimated at 50 years.

Roads
New roads would add artificial elements to undeveloped areas. Improving roads typically enhances the contrast of the road with the adjacent landscape. Roads lack vegetation and create an abrupt vegetation edge along the roadside. Smooth roads would stand out against the moderately coarse texture of the terrain. This would affect visual resources by dividing the landscape with areas that lack vegetation, altering the natural topography, and altering the texture and color of the land surface. The visibility of the new and improved roads would vary, depending on viewer distance and location, topography, and screening vegetation.

Pipelines and Electrical Lines
New pipelines and electrical lines would add artificial elements to undeveloped areas. The form, line, and texture of these structures would not resemble nearby structures, unless they are collocated with similar existing structures. In particular, pipelines would divide the landscape with strips of land lacking vegetation and electrical lines would introduce prominent vertical elements. The visibility of the new pipelines and electrical lines would vary, depending on viewer distance and location, topography, color and composition of pipelines and electrical line poles, and screening vegetation.

Well Pads and Facilities
Well pads and facilities, such as flowback pits and compressor stations, would add artificial elements to undeveloped areas. These areas would be cleared of vegetation, thereby leaving a clearing that contrasts with the surrounding landscape. The form, line, color, and texture of these facilities would not resemble nearby structures, unless they are collocated with similar existing industrial facilities. Also, the well pads and facilities would be sources of activity and commotion that are not typically found in undeveloped areas. The visibility of the facilities

BLM_0027235

would vary, depending on viewer distance and location, topography, color and composition of facilities, and screening vegetation.

Lights would be installed for safety and to illuminate work areas, such as drilling rigs, at night. This would reduce nighttime darkness by adding light to areas lacking sources of artificial light. As a result, this would diminish opportunities for viewing visual resources between dusk and dawn. In particular, this would affect stargazing opportunities.

### Effects Common to All Alternatives

The Nature and Types of Effects described above would occur under all alternatives. The intensity of the effects would vary by alternative and is described below for each alternative. The temporary direct effects on visual resources would only last during construction and all equipment would be removed, and staging, storage, and construction areas would be reclaimed to a pre-disturbance condition. Therefore, the impact on visual resources described below focuses on the permanent direct effects. **Table 2-10**, Summary of Actions by Alternative and **Table 2-12**, Summary Surface Disturbance Acres by Alternative identify the total number of permanent structures and total acres of long-term surface disturbance.

### Alternative A

Activities under Alternative A would result in long-term surface disturbance and associated permanent structures that would change vegetation, color, and cultural modifications on the landscape. These changes could result in the 0.5 to 2.0 point drop in scenic quality evaluation ratings for the Bull Mountain, Paonia Reservoir, and Deep Creek Units; this would trigger reclassification as a Scenic Quality B rating. As a result, the VRI Class could be changed to Class III or IV. There would be no impact on VRM management because development would be on private lands. The viewshed along the West Elk Loop Scenic Byway would be less affected than under other alternatives because there would be less development. The actual extent of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Because the BLM would not approve the 12-89-7-1 APD under Alternative A, this well would not be drilled. This would result in the continuation of the current land and resource uses at this well site. As a result, there would be no impacts on visual resources from drilling this particular well.

### Alternative B

Alternative B would result in more acres of long-term surface disturbance and associated structures than Alternative A. If the BLM were to apply mitigation measures #30 and #44 through #46 in **Appendix C**, they would reduce effects on visual resources by instituting reclamation practices that limit the duration and scope of changes to the physical landscape and by limiting light pollution that could cause changes to cultural modifications. As under Alternative A, Alternative B would likely result in reclassification of the area to VRI Class III or IV due to changes in vegetation, color, and cultural modifications. The proposed development on BLM-administered land would be consistent with VRM Class III management, which allows a moderate level of change to the landscape. Overall, Alternative B would have the greatest potential for changing the VRI Class and the greatest impacts near the West Elk Loop Scenic Byway due to the scope and location of proposed development. The actual extent of change to

BLM_0027236

the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Approving the 12-89-7-1 APD would result in changes to landform, vegetation, and structures at the well site and along the proposed pipeline route. These changes would occur on private land in an area with several existing natural gas facilities, including producing gas wells, a water injection well, and a centralized water storage facility. The proposed drill rig derricks and nighttime lighting on the derricks would be visible during well drilling because of the low height of surrounding vegetation. The completed well pads and their associated storage tanks would be visible from various local points along private roads and from surrounding private lands. Taller equipment would also be at least partly visible from State Highway 133. In addition to the measures in **Chapter 2** (e.g., flat nonreflective standard environmental paint colors), if the BLM were to apply mitigation measures #26, #36, #51, and #52, it would make the well pad facilities blend into the surrounding colors and forms fairly well. As such, the facilities would not tend to dominate the view for the casual observer.

Overall, changes to existing landform, vegetation, and structures from 12-89-7-1 APD activities would result in a weak to moderate degree of contrast in form, line, texture, and color.

*Alternative C*
As under the other alternatives, Alternative C would likely cause the VRI class to change to Class III or IV by introducing a moderate level of change to the landscape. Impacts would be reduced by implementing required design features for reclamation and light pollution. As under Alternative B, the proposed development on BLM-administered land would be consistent with VRM Class III management. Due to the number and proximity of proposed well pad locations, Alternative C would have a greater impact on visual resources along the West Elk Loop Scenic Byway than Alternative A. The actual extent of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Impacts from approving the 12-89-7-1 APD would be the same as those described under Alternative B.

*Alternative D, the Preferred Alternative*
Impacts under Alternative D would be similar to those described under Alternative B, except that there would be three fewer well pads, resulting in slightly fewer changes to vegetation, color, and cultural modifications. Similar to Alternative B, locating well pads away from the SH 133 viewshed would minimize degradation of views from the scenic highway. However, because the Bull Mountain, Paonia, and Deep Creek Scenic Quality Rating Units require only a 0.5 to 2.0 point deduction before being reclassified as B-rated units, the scope and nature of development would likely result in a reduction in their evaluation ratings. The actual extent of change to the scenic quality rating depends on viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Impacts from approving the 12-89-7-1 APD would be the same as those described under Alternative B.

BLM_0027237

*Cumulative*

The cumulative analysis area for visual resources is the proposed project area and adjacent areas. The analysis involves the same process as described above under Methods of Analysis. However, in addition to focusing on vegetation, color, or cultural modifications, adjacent scenery is also addressed in order to capture impacts on scenic quality from nearby cumulative projects.

Several past, present, and reasonably foreseeable future projects have altered or will alter the visual character and quality of the landscape. For example, oil and gas extraction in the cumulative analysis area has impacted and will continue to impact visual resources on public and private lands. Other primary sources of cumulative impacts on visual resources are vegetation treatments, prescribed fires, and expanded residential development. These actions would occur under all alternatives. Coal development is also common in the cumulative analysis area, though the use of underground mining techniques limits the number and size of surface facilities and alteration of the visual landscape. Together, these projects have altered the area's visual character and quality by introducing cultural modifications and altering the vegetation and color of the landscape. These past, present, and reasonably foreseeable future actions would occur under any alternative.

The incremental effect of adding Alternatives A, B, C, or D to the past, present, and reasonably foreseeable future actions would be to further degrade the cumulative analysis area's visual character and quality. Development of non-federal mineral estate under Alternative A would add to the cumulative effects by introducing additional surface disturbance. It is assumed to occur regardless of whether a different alternative is approved.

Similar to the construction activities and process described under the alternatives, construction for many of the cumulative projects listed in **Table 4-3** would likely be limited to a short period of time, involve reclaiming construction areas to a pre-disturbance condition, and employ visual resource design techniques and COAs. Not all projects and their associated construction activities would occur simultaneously. Given their short-term nature and assuming implementation of design features and COAs, construction associated with reasonably foreseeable future projects would not change the VRI classification of the cumulative analysis area.

Operation and maintenance of the cumulative projects would result in cumulative impacts on scenic quality similar to the permanent effects described for each alternative above. Additionally, events, such as spread of forest insects and diseases and wildland fires, would also have long-term effects on scenic quality.

The actual extent of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation. However, the natural landscape has a finite number of changes that it can accommodate before cumulative impacts on scenic quality become readily apparent. Therefore, as the quantity and density of development and change increases, so does the potential for scenic quality degradation. Alternative A would result in the least development in the cumulative analysis area and, as a result, the lowest degree of change affecting visual resources.

BLM_0027238

By contrast, Alternative B would result in the greatest development and degree of change affecting visual resources. Alternatives C and D would result in a greater degree of change in the cumulative analysis area when compared to Alternative A; however, cumulative impacts would be less than under Alternative B because there would be less development on the landscape.

Under Alternatives B, C, and D, implementing COAs would reduce harmful impacts (see **Appendix C**, Design Features, Mitigation Measures, and Conditions of Approval, COAs #36 and #50 through #52). Given the increase in total acres of long-term surface disturbance and associated permanent structures by previously authorized activities in the cumulative analysis area, residual impacts could change the VRI class to Class III or IV. However, implementing COAs would reduce the likelihood of a change in VRI Class. The actual amount of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation. These would be determined and analyzed in future site-specific analyses.

## 4.3   RESOURCE USES

### 4.3.1   Livestock Grazing

*Methods of Analysis*
Impacts were determined by assessing which actions, if any, would change the livestock grazing indicators described below. Some impacts are direct, including loss of grazing acreage or reduction in AUMs. Indirect impacts affect grazing through a change in another resource, such as decreased forage from dust or reduced water quality for vegetation. Other indirect impacts include increased costs for ranchers due to fencing and difficulties in moving livestock, or loss of forage quality from introduction of unpalatable weeds.

The indicator used for impacts on livestock grazing is the number of acres of grazing habitat that would be lost.

*Nature and Type of Effects*
Direct effects include loss and fragmentation of grazing land resulting from land grading and clearing and construction of well pads, roads, pipelines, and facilities. Human presence and vehicle traffic on-site could disturb livestock and trample vegetation providing forage. Vegetation removal or trampling would reduce the amount and quality of available forage.

Indirect effects on livestock and rangeland include the possibility of injury to livestock from vehicle and equipment traffic on-site. Traffic facilitates spread of weeds, resulting in reduced forage palatability. Vehicles and equipment could also cause erosion and soil compaction, affecting the growth of forage and potentially facilitating weed spread. Furthermore, construction and maintenance activities could increase dust, which could cover vegetation, reduce palatability of forage, and increase tooth wear.

In addition, increased fencing would be required to isolate drilling facilities from livestock grazing areas. Pad sites would be fenced to keep livestock away from reclaimed areas to allow for soil and vegetation recovery, adding to lost grazing potential. Cattle guards and gates would be placed in roadways, which may impede the movement of livestock across the range and

BLM_0027239

require additional time and effort for livestock management, increasing costs for ranchers. Livestock may also be lost if gates are not properly closed on access roads. However, given that approximately 5 percent of acres on BLM-administered land would be impacted, the impacts on ranchers from decreased forage production would be less than significant.

*Effects Common to All Alternatives*
Livestock grazing would continue during development and operation of the Unit. Construction-related disturbance would reduce available grazing acreage and forage for sheep and cattle, and the installation of access roads, well pads and utility lines to access private mineral reserves would reduce forage and acreage in the long term.

On BLM allotments, 14 acres or more would be lost to grazing under all alternatives (**Table 4-61**, Grazing Disturbance on BLM Allotments from Roads and Well Pads), with additional acreage lost from private ranchlands. The acreage would be converted to roads, pipelines and other long-term surface uses. This calculation assumes that all vegetation in these areas provides potential livestock grazing, though vegetation types such as sagebrush are not palatable for cattle, so the actual amount may be less. Also, the acreage is concentrated in the far southeastern corner of the Unit, which is where the BLM-managed grazing allotments are found.

Potential impacts include additional sources of income to ranches through lease fees or surface use agreements. Replacement of old fence lines could help with long-term costs of maintaining infrastructure.

Table 4-61
**Grazing Disturbance on BLM Allotments from Roads and Well Pads**

|  | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| **Federal surface, federal minerals** | **4** | **11** | **8** | **5** |
| Downing (280 acres) | 4 | 8 | 6 | 5 |
| Stock Driveway (340 acres) | 0 | 3 | 2 | 0 |
| **Private surface, private minerals** | **10** | **8** | **8** | **8** |
| Downing | 10 | 8 | 8 | 8 |
| **TOTAL** | **14** | **19** | **16** | **13** |

Source: BLM GIS 2014
Grazing allotments are in the southeastern part of Unit. As pipelines are collocated with a north-south running road in Alternative C, they do not go through the BLM land in that allotment.

*Alternative A*
Under Alternative A, existing lease rights granted by the BLM on federal lands and/or federal mineral estate would remain in effect. New wells would continue to be developed on private lands in the Unit.

Under Alternative A, based on assumptions discussed in Chapter 2, no new development on federal lands or of federal mineral estate would occur, which would limit impacts on grazing lands. However, existing lease rights on federal mineral estate would remain in effect and direct and indirect impacts from energy development would continue on non-federal mineral estate, requiring construction of access roads and pipelines on federal lands.

BLM_0027240

BLM grazing allotments under Alternative A are shown in **Table 4-61**. The table is based on the conceptual siting of project components and estimated project footprint; the exact acreages could change during design and site permitting. The table includes only BLM allotments on BLM-administered surface, because the locations of ranches on private lands are not available. Additional impacts on ranchlands on private lands overlaying federal mineral estate would occur under each alternative.

### Alternative B

Under Alternative B, impacts described under Alternative A would occur, and impacts would also occur from mineral development on federal lands. The acreage of impacts would increase under Alternative B compared to Alternative A, as shown in **Table 4-61**, as additional facilities would be constructed. In addition to the acreage shown in the table, impacts would occur to private grazing allotments overlaying federal mineral estate. These acres of impacts were not calculated for the MDP because the locations of private ranches were not available.

Grazing acreage would be lost and forage quality would be reduced under this alternative in areas being developed. Specific mitigation measures in **Appendix C** could minimize these impacts if applied as COAs. For example, dust abatement measures (COA #12) would reduce the likelihood that forage palatability on adjacent lands would be impacted. COAs #7, #9, and #10 for erosion control and limiting removal of vegetation and requiring replanting vegetation (COAs #18 and #49 through #51) would reduce the likelihood for impacts on forage quality in the long term. Only approximately 13 acres (3 percent of acres of grazing allotments) of BLM-administered land would be impacted. Assuming COAs in **Appendix C** would be applied to minimize indirect impacts as described, the alternative's effects would be less than significant.

Approval of the 12-89-7-1 APD under Alternative B and all action alternatives has the potential for site-specific impacts on livestock grazing. Land surrounding the site is a privately owned working sheep and cattle ranch. The disturbance of approximately 5 acres of this ranchland, as well as indirect disturbance of livestock as discussed under *Nature and Type of Effects*, could impact livestock productivity on this private ranch. Impacts would be minimized due to the limited number of acres disturbed and the fact that livestock are not currently grazed on the ranch in the winter and spring.

### Alternative C

Alternative C is a modified action alternative, with fewer overall well pads, access roads and other facilities planned. The acreage of impacts on BLM surface grazing allotments would be slightly reduced compared to Alternative B (**Table 4-61**); therefore, direct impacts would be similar to Alternative B but slightly reduced. Indirect impacts on grazing lands, forage, and livestock would be similar to Alternative B, though slightly reduced, due to the smaller scale of the projected development. Alternative C would also incorporate all measures in **Appendix C** as design features and include additional measures to reduce impacts on vegetation, such as dust abatement measures. Reclamation of pipeline corridors would ultimately increase forage through replanting of grasses and forbs. With these measures in place, impacts on livestock grazing would be less than significant.

BLM_0027241

*Alternative D, the Preferred Alternative*
As the locations and types of development under Alternative D are similar to those described for Alternative B, the impacts on livestock grazing under Alternative D would be the same as those described above.

*Cumulative*
Cumulative impacts would include the combined implementation of the No Action Alternative plus the federal development described under any of the action alternatives and combined with other reasonably foreseeable future actions in the vicinity. A total of 13 acres, or 3 percent of BLM grazing allotments on BLM-administered lands, would be lost to development under the combination of No Action and Alternative D. Additional acreage would be lost from private ranches overlaying federal mineral estate that would be developed under Alternative D; the acreage of private grazing land lost is not included in **Table 4-61** because the locations of private ranches are not available.

The Unit and larger UFO historically sustained high levels of grazing. Sheep and cattle grazing still occurs, primarily in the spring and summer. BLM-administered lands in the Unit, 60 AUMs are active, while private lands sustain over 1,000 AUMs. On National Forest System lands surrounding the Unit, approximately 2,500 sheep AUMs, 1,000 cattle AUMs, and 30 horses.

With increasing oil and gas development, as well as coal mining, grass/forb vegetation communities continue to be lost, reducing grazing potential. Combined with other past, present, and reasonably foreseeable future actions, Alternative D would contribute to the gradual decline of grazing in the vicinity of the proposed project. Implementing the COAs in **Appendix C**, as discussed under direct and indirect impacts, would minimize the cumulative impacts caused by Alternative D, and no additional mitigation measures are recommended.

## 4.3.2   Minerals (Leasable, Locatable, Salable)

*Methods of Analysis*
Impacts on leasable minerals, locatable minerals, and salable minerals could result from requirements to protect other resources in the project area. Because natural gas development is the only mineral activity occurring in the project area, only gas development is discussed in terms of impacts from this federal action.

Indicators for impacts on federal natural gas resources in the project area from this federal action are as follows:

- Approval or denial of the Bull Mountain Unit master development plan (MDP)

- Application of factors and constraints for pad, road and facility siting to protect other resources

- Application of conditions of approval to be applied to protect other resources

BLM_0027242

## Nature and Type of Effects

Approval of the Bull Mountain Unit MDP would result in more orderly development of federal resources in the project area. SGI would develop its existing federal gas leases in the project area with vertical, directional, and horizontal wells. Federal gas resources would be extracted through conventional methods as well.

Denial of the Bull Mountain Unit MDP would result in a shift of near-term development focus from federal minerals in the project area to private minerals in the project area. Therefore, the amount of near-term development of federal minerals in the project area would be reduced.

Application of timing limitation stipulations may be required if impacts of fluid mineral development on other resources cannot be mitigated within the standard 60-day suspension of operation period afforded by regulation. Portions of the project area where timing limitation stipulations are applied would be temporarily closed to drilling operations and all subsequent well operations except routine non-surface-disturbing activities. Excepted activities that would be allowed at all times include routine fracturing or acidizing jobs, recompletion in the same interval, well cleanout work, routine well maintenance, and bottom hole pressure surveys (43 CFR Part 3162.3-2). Most activities that would be subject to timing limitation stipulations (drilling operations) can be initiated and completed outside of the restricted dates specified in the stipulation. Application of timing limitation stipulations may also limit the types of wells that can be used to extract federal mineral resources in the project area. Because horizontal wells take up to 30 days longer to drill than vertical wells, drilling horizontal wells in areas subject to timing limitations may not be practicable. However, variances may be granted on a case-by-case basis subject to the terms of the timing limitation.

Application of factors and constraints to determine site suitability for fluid mineral activities limits the location of fluid mineral development. Examples of factors and constraints considered in siting include steep slopes and proximity to known streams containing Colorado River Cutthroat Trout. If either of these factors were present in a given area, roads or other facilities may not be sited in that area, and gas development in that area would be less likely. As a result, application of these factors and constraints could reduce the total amount of development of federal gas resources in the project area.

Application of conditions of approval listed in **Appendix C** would impact federal fluid mineral development by restricting the extraction of gas resources in the project area. These restrictions may limit the siting of extraction facilities, increase the cost of extraction, or add steps that must be taken in the extraction and reclamation process. Examples of COAs that may be applied include standards such as slope stability study requirements (COA #3), minimizing construction of new staging areas (COA #14), avoiding NRHP-eligible sites (COA #34), and interim reclamation requirements (COAs #50 through #52). COAs would be applied to gas development activities on a site-specific basis as appropriate.

Application of SGI's proposed WHP would impact federal fluid mineral development and would restrict gas extraction in the project area in a manner similar to that described for the COAs listed in **Appendix C**. For example, the WHP would restrict gas extraction by prohibiting drilling, surface-disturbing activities, and workovers and completions designed to increase production in

BLM_0027243

big game winter closure areas. Surface facilities would also be sited to avoid verified elk winter concentration areas.

***Effects Common to All Alternatives***

Under all alternatives, gas development activities on SGI federal leases in the project area would continue to be subject to lease stipulations including the standard stipulations applicable to all oil and gas leases in Colorado and a timing limitation stipulation to protect crucial deer and elk winter ranges. Application of the timing limitation stipulation could reduce development of federal gas resources in the project area and limit the type of wells used as described under *Nature and Type of Effects.*

Factors and constraints for site suitability, including slope, sensitivity to visual impacts, proximity to roads and pipelines, and proximity to sensitive natural resources, would be applied to fluid mineral siting under all alternatives. Application of these factors and constraints could reduce the total amount of development of federal gas resources in the project area as described under *Nature and Type of Effects.*

Under all alternatives, various management plans would be applied to gas development activities in the project area. Example plans include a noxious weed management plan and surface use plan of operations. Application of these plans would restrict development of federal gas resources in the project area as described under *Nature and Type of Effects.*

***Alternative A***

Under Alternative A, the MDP and APD would not be approved; it is possible that SGI would shift development focus to private minerals but would also submit APDs on a case-by-case basis. If SGI did not pursue much near-term development of federal gas resources in the project area under this alternative, development of federal gas resources would be reduced in the near term but would eventually be developed as described under *Nature and Type of Effects*; see also the description of cumulative effects below for the combination of private and federal mineral estate development.

One proposed well pad would be developed and 10 significant road upgrades would occur in verified elk concentration areas under this alternative. Total new road construction would cover 5 miles. Intensive activities associated with these facilities would be impacted by timing limitation stipulations as described under *Nature and Type of Effects.*

Near-term development under Alternative A would occur on private minerals, and no COAs are applicable to development on private minerals. Some near-term development, such as upgrades to existing roads needed to access well pads on private minerals under Alternative A, would occur on lands overlying federal minerals. COAs would not impact fluid minerals on private minerals under this alternative.

***Alternative B***

Under Alternative B, the MDP and APD would be approved, and SGI's development of federal gas leases in the project area would be guided by this MDP going forward.

Under Alternative B, in verified elk concentration areas, SGI would construct 19 new well pads and 3 new roads as well as completing 10 significant road upgrades. Total new road construction would cover 16 miles. Intensive activities associated with these facilities would be impacted by timing limitation stipulations as described under *Nature and Type of Effects*. Because more well pads and roads would be constructed under Alternative B, the impacts of timing limitation stipulations on federal mineral development would increase.

Under Alternative B, development of SGI's federal gas leases in the project area would be subject to a requirement for avoidance of identified occupied raptor nests. Development of SGI's federal gas leases in the project area would also be subject to the SGI proposed wildlife mitigation plan. Impacts of the plan on federal fluid mineral development are described under *Nature and Type of Effects*. If the BLM also applied the COAs described in **Appendix C**, impacts on federal fluid minerals would be similar to those described under *Nature and Type of Effects*. The portion of the Unit where all operations would be allowed throughout the year (including winter) would be reduced compared with Alternative A. Because little near-term development of federal gas resources in the project area would have occurred under Alternative A, overall near-term development of federal gas resources in the project area would increase under Alternative B despite the added restrictions of the wildlife mitigation plan and COAs. Additionally, the total amount of federal gas resources extracted may increase compared with Alternative A due to efficiencies in extraction made possible by the more comprehensive development planning in the MDP.

### Alternative C

Like Alternative B, under Alternative C, the MDP and APD would be approved, and SGI's development of federal gas leases in the project area would be guided by this MDP going forward. However, additional restrictions to protect big game would limit development in the project area under Alternative C compared with Alternative B. Under Alternative C, SGI would develop 35 new well pads over federal mineral estate and drill 146 new gas wells in the project area. Because no new wells would be constructed over federal mineral estate in the near-term under Alternative A, Alternative C would result in a large increase in near-term development of federal gas resources in the project area (see *Nature and Type of Effects*). Construction of new wells under Alternative C would be the same as that under Alternative B.

Under Alternative C, additional siting and operational constraints would be applied beyond those described under *Effects Common to All Alternatives*. The impacts of timing limitations on gas extraction activities (described under *Nature and Type of Effects*) would increase. This is because voluntary timing limitations and the progressive development plan would limit operations such as workovers and recompletions (emergency situations excepted) during the winter, in addition to drilling and construction. The portion of the Unit where all operations would be allowed throughout the year (including winter) would be the smallest under this alternative.

Conversely, much less activity would occur in the remainder of the Unit during the winter, providing elk a place to go with relatively less disturbance. However, total miles of new road construction would actually increase by 7 miles compared to Alternative A to 12 miles total, as would development of new well pads and wells on federal mineral estate in the near-term. Construction of these roads and well pads would facilitate development of federal gas resources

BLM_0027245

in the project area. Additional operational constraints would include requirements such as closed loop drilling, continuous watering for dust suppression, green completions, and the use of remote telemetry to minimize well monitoring trips (see **Section 2.2.6**, Alternative C, Modified Action). As illustrated by the projected drilling of 146 new federal gas wells under both Alternatives B and C, the siting and operational constraints applied under Alternative C are not likely to reduce the total amount of development of federal gas resources in the project area compared to Alternative B, even though they would reduce total surface disturbance from gas development facilities.

### Alternative D, the Preferred Alternative
Impacts on fluid mineral development under Alternative D would be the same as those under Alternative B if the COAs under Alternative B were applied, even though the siting of surface facilities would differ. While a maximum of only 33 well pads would be developed under Alternative D, 146 new wells would be drilled. Therefore, the siting and operational constraints applied under Alternative D are not likely to reduce the total amount of development of federal gas resources in the project area compared to Alternative B. This is despite the fact that they would reduce total surface disturbance from gas development facilities. Because little near-term development of federal gas resources in the project area would have occurred under Alternative A, overall near-term development of federal gas resources in the project area would increase under Alternative D, despite the added restrictions of conditions of approval and the wildlife mitigation plan. Additionally, the total amount of federal gas resources extracted may increase compared with Alternative A due to efficiencies in extraction made possible by the more comprehensive development planning in the MDP.

### Cumulative
The cumulative impact analysis area for the proposed MDP and APD is the federal and private mineral estate in the project area in addition to the UFO. The UFO has already leased 25 percent of the federal fluid mineral estate in the project area for fluid mineral development, including all of the parcels that would be developed by SGI under this MDP and APD.

Under Alternative A, the MDP and APD would not be approved, and development of federal gas resources in the project area would continue to occur on an APD-by-APD basis. As such, near-term development of federal gas resources in the project area would be difficult to determine as it would be dependent on SGI's drilling schedule; however, as noted in **Table 4-1** and **Table 4-2**, all 201 gas wells and five water disposal wells would be built, eventually resulting in full development of federal gas resources in the project area. Therefore, in the long term, the amount of development of federal gas resources in the project area is expected to be similar under all alternatives. Conversely, extraction of gas resources from private mineral estate would occur sooner under Alternative A than under Alternatives B and C due to the shift in near-term focus to private minerals under Alternative A. The primary difference under Alternative A, aside from the timing of the development of private vs. federal resources, is that the federal gas development in the project area would occur on a piecemeal basis under Alternative A instead of according to a plan under Alternatives B and C. As a result, cumulative development of federal gas resources in the project area could be less efficient under Alternative A.

BLM_0027246

Because gas development in the project area would occur according to the MDP and APD under Alternatives B and C, federal gas resources in the project area would be extracted more quickly and potentially more efficiently than under Alternative A. Development of private gas resources in the project area would likely be delayed under these alternatives because SGI would be focusing on federal mineral estate in the near term.

The reasonably foreseeable development scenario for oil and gas developed by the UFO (BLM 2012b) anticipates the development of up to 1,271 new oil and gas wells in the UFO between 2010 and 2030. Some of these wells would be drilled horizontally, some directionally, and some vertically. The proposed new wells analyzed in this EIS are included in the UFO's projection. Because the total number of wells drilled under each alternative in this EIS does not change, the alternatives are not expected to alter the projected number of new wells in the UFO RFD.

## 4.3.3   Recreation

This section discusses impacts on recreation from proposed management actions in each alternative. Existing conditions concerning recreation are described in **Section 3.3.3**, Recreation. Existing conditions concerning travel and access are discussed in **Section 3.3.5**, Comprehensive Transportation and Access; however, because the two resource uses are closely related and often interdependent, some references to transportation and access have been made in this section.

*Methods of Analysis*

Indicators of impacts on recreation include changes to recreational opportunities within the project area and along primary transportation routes used during construction and operation.

The analysis includes the following assumptions:

- The primary recreational activity occurring in the project area is big game hunting (e.g., mule deer and elk).

- Big game hunting participation in the project area is dependent upon the number of hunters allowed by private landowners.

- Recreational use in the surrounding region will continue to increase as the population increases.

- There are no developed recreation facilities in the project area.

- Development would occur under every alternative, including development on private and state lands with non-federal minerals under Alternative A.

*Nature and Type of Effects*

Recreation is vulnerable to any action that would alter the activities and opportunities in a particular area. These actions could result in changes to recreational access or the amount and quality of a recreational activity.

BLM_0027247

As described in **Section 3.3.3**, Recreation, primary recreational activities in the project area and major access routes include big game hunting and scenic viewing. In addition, nearby routes provide access for year-round recreational activities.

The quality of hunting opportunities is primarily influenced by access and habitat conditions. Alternatives where access and habitat are enhanced would provide improved hunting opportunities. Likewise, a reduction in access and habitat conditions would diminish hunting opportunities. The timing of project activities would also impact hunting opportunities. Mule deer and elk hunting seasons are in the fall, overlapping portions of September, October, November, and December. A decrease in project activities during this time would lessen adverse impacts on hunting activities.

Scenic viewing is primarily influenced by road conditions (including traffic) and the condition of the viewshed. Impacts on visual quality, described in **Section 4.2.11**, Visual Resources, would also result in impacts on recreation. Alternatives that introduce additional traffic or degrade visual resources would have an adverse impact on scenic viewing. A reduction in traffic or an improvement in visual resources would be beneficial to recreation.

Other recreational opportunities near the project area are dependent upon access provided by the West Elk Loop Scenic Byway and County Road (CR) 265. Impacts on travel and access are discussed in **Section 4.3.5**, Comprehensive Transportation and Access. Alternatives that reduce access would have an adverse impact on the ability to engage in recreational activities along these routes. Likewise, improvements in access would have a beneficial impact on recreation.

***Effects Common to All Alternatives***
Assuming some development occurs under Alternative A, the resulting traffic, habitat fragmentation, and visual degradation would result in adverse impacts on hunting and other recreational opportunities under all alternatives.

***Alternative A***
Development occurring on state lands with non-federal minerals would result in the same types of impacts described under Alternatives B and C, but they would occur over a smaller area. Thus, adverse impacts on hunting opportunities may be less pronounced because there would be less big game habitat fragmentation. Likewise, fewer construction and operation vehicles using the West Elk Loop Scenic Byway and County Road 265 would result in less disruption to driving for pleasure and other recreation along those routes.

***Alternative B***
Actions under Alternative B would have the most pronounced disturbances on big game over the short term and long term (see **Section 4.2.7**, Fish and Wildlife, for analysis of impacts on big game). A decrease in the presence of big game in the project area would mean that hunters could expect less success. This may cause hunters to choose to hunt elsewhere, resulting in a loss of this recreational opportunity. (The economic impacts of a loss in hunting opportunities are described in **Section 4.4.2**, Socioeconomics.) Impacts would be most pronounced over the short term, when construction activities are anticipated to result in the greatest disturbance of big game. Long-term impacts would be less noticeable, but given the many high-quality choices for

BLM_0027248

hunting in the region, the impact of project operations on habitat conditions could cause hunters to go elsewhere.

The creation of project-related road construction access points directly adjacent to West Elk Loop Scenic Byway and County Road 265 is not expected to provide recreational value because of potential conflicts with project-related truck traffic and the developed setting of the project area.

Noise, congestion, and safety concerns resulting from increased traffic on the West Elk Loop Scenic Byway and County Road 265 would adversely impact scenic viewing. Recreational opportunities near these roads may also be diminished if the activities are sensitive to the intrusion of increased truck noise. An approximately 21 percent increase in truck traffic (compared to existing conditions) would adversely affect recreational access to nearby designations as a result of lengthened travel times and safety concerns; impacts on access are described in **Section 4.3.5**, Transportation and Access.

### Alternative C
Actions under Alternative C would disturb big game habitat over the short term and long term (see **Section 4.2.7**, Fish and Wildlife), but a more comprehensive approach to wildlife management would likely limit these disturbances. However, given the many high-quality choices for hunting in the region, the impact of project operations on habitat conditions could cause hunters to go elsewhere.

Impacts from additional access points next to the West Elk Loop Scenic Byway and County Road 265 would be similar to those under Alternative B, but there would be less project-related traffic and potential for degradation of recreation and access.

Impacts from project-related truck traffic on the West Elk Loop Scenic Byway and County Road 265 would be slightly less than under Alternative B because there would be a 5 percent smaller increase in truck traffic .

### Alternative D, the Preferred Alternative
Impacts would be similar to those described under Alternative B because there would be similar wildlife mitigation measures, traffic levels, disturbance to the landscape, and resultant potential for conflict with recreational activities and opportunities.

### Cumulative
The spatial boundary for cumulative impacts on recreation includes the project area boundary and the West Elk Loop Scenic Byway and County Road 265 corridors.

The cumulative impact analysis area for recreation is relatively undeveloped and is a popular area for big-game hunting. Although there are few existing or proposed oil and gas developments, residential development and the resulting loss of habitat and access pose a threat to hunting. However, the scale of residential development (and the amount of public lands where such development is prohibited) is such that hunting opportunities would remain plentiful throughout the life of the project. As a result, cumulative impacts on hunting would be minor; it

BLM_0027249

is expected that hunters could find success on nearby land away from the disturbances caused by Alternative B.

Past, present, and reasonably foreseeable future actions are expected to have minor cumulative impacts on scenic viewing because the relative lack of existing and proposed development in the cumulative impact analysis area means that scenic viewing opportunities would remain intact in many places. Adverse impacts would be localized and most noticeable along the West Elk Loop Scenic Byway and County Road 265 for the life of the project.

Impacts on recreational access in the cumulative impact analysis area would be similar to those for scenic driving. An increase in traffic would lengthen travel times and may present safety concerns. Traffic is expected to increase in conjunction with the region's population and popularity as a tourism destination. In the context of these two larger trends, the alternatives would have a relatively minor impact on recreational access. However, other proposed projects in the area would result in similar adverse additive impacts. These impacts would be especially noticeable along the West Elk Loop Scenic Byway and County Road 265 and may contribute to less recreational use of these roads and nearby lands.

## 4.3.4   Lands and Realty

### *Methods of Analysis*
Land status baseline information in **Section 3.3.4**, Lands and Realty, was reviewed for an understanding of current lands and realty program goals, management practices, and ownership breakdown in the Unit. This known information was overlain with the actions found under each alternative in Chapter 2, and conclusions were drawn based on an understanding of how these types of actions may affect the lands and realty program, and adjacent landowners.

Indicators of impacts on lands and realty are conflicts with the following:

- Existing or adjacent land uses

- Existing federal and local land uses, plans, and policies

- Existing BLM land use authorizations

This analysis assumes the following:

- Existing ROWs would be managed to protect valid existing rights

### *Nature and Type of Effects*

#### *Public Lands*
An increase in natural gas development would lead to adjustments in the existing land uses in the Unit. Existing land uses would be displaced by surface-disturbing activity during both the construction and operation phases of the project. Land users would be affected by intrusive impacts. Examples of intrusive impacts include increases in traffic, noise, dust, and human activity, as well as changes in the visual landscape. These impacts could be a source of potential

BLM_0027250

conflict with recreational users, such as seasonal hunters, and ranchers that would be impacted by temporary forage losses on BLM-administered grazing allotments. Impacts on individual land uses are analyzed in other resource sections of this chapter. Impacts would occur for the life of the project, as well as after the project, since it is possible that some areas would not be fully reclaimed to original condition.

*Private Lands*
Impacts on private lands would occur from the sights and sounds of resource development on all land jurisdictions in the Unit. These impacts could include increased traffic, fugitive dust, noise, the loss of privacy that results from increased human activity (e.g., crews and equipment), and visual or aesthetic impacts that could devalue private property. In general, implementation of the project and the construction of gas facilities would change the character of the landscape from a rural to a more industrialized setting. Impacts would occur for the life of the project as well as after the project, since some areas would not be fully reclaimed to original condition.

As discussed in **Section 3.3.4**, most private lands within and adjacent to the Unit include oil and gas development, livestock grazing, and seasonal hunting. Development on private land in the Unit would lead to adjustments in existing land uses including loss of private rangeland and irrigated hay meadows. The severity of the impacts would vary depending on surface and mineral ownership at specific locations. Landowners who own mineral rights for the property are able to decide whether to allow development on their land. Land use conflicts are most likely to occur where wells are located on split-estate properties that have private surface ownership without mineral-estate ownership. The specific locations of facilities would be negotiated with landowners on split-estate lands. As discussed in **Section 3.3.4**, approximately 6,300 acres of leased lands in the Unit are private surface/private mineral estate and 12,900 acres are held in split estate. Section 1835 of the 2005 Energy Policy Act requires the BLM to review current policies and practices with respect to management of split-estate lands.

*Land Use Authorizations*
As discussed in **Section 3.3.4**, there are several authorized ROWs within the Unit, including State Highway 133, power and telephone lines, and private accesses. During the development phase, the integrity of existing ROWs could be impacted by construction activities. In order to avoid conflicts with existing ROWs, they would be avoided to the extent possible. If they cannot be avoided, caution would be taken to ensure no impacts on facilities or disruption of use occurs.

SGI would not be required to obtain a BLM ROW, provided that the facility (e.g., road, pipeline) is contained within the Unit and its use is specific to the Unit. If the facility also serves off-unit use, then a ROW would be required. For example, a pipeline ROW would be required to transport off-unit gas from development south of unit, across the Unit on the BLM surface in Sections 8 & 9, T12S, R89W. (See proposed pipeline in **Figures 2-2 & 2-3** that enters the Unit southern boundary in Section 9.) Potential impacts on current land uses resulting from the authorization of additional ROWs across BLM-administered land include losses of livestock forage due to surface disturbance; losses of wildlife habitat and displacement of wildlife due to surface disturbance and habitat fragmentation; and visual impacts on recreational users.

**Effects Common to All Alternatives**
There are no effects common to all alternatives.

BLM_0027251

*Alternative A*

Impacts under Alternative A would be similar to those described under *Nature and Type of Effects*. However, the extent of land uses displaced by oil and gas facilities would be mostly on private lands. In particular, there could be intrusive impacts on the residential areas along SH 133. However, compliance with the COGCC and Gunnison County regulations for oil and gas operations would mitigate potential impacts on landowners and users by providing reasonable limitations and safeguards for gas development on private lands/private mineral estate.

Because the BLM would not approve the 12-89-7-1 APD under Alternative A, the density of oil and gas wells on the 2,000-acre property associated with the APD would not immediately increase. The requested 5 acres of disturbance would not be approved. APDs on the parcel could be submitted and approved in the future on a case-by-case basis, with impacts similar to those described under *Nature and Type of Effects*.

Approximately four percent of the long-term and three percent of the short-term surface disturbance under Alternative A would occur on BLM-administered lands, including from the construction of new roads and improvements to existing roads for access, new pipeline construction, and up to one new compressor station. The remaining surface disturbance, approximately 96 and 97 percent, would occur on private surface. The disturbance on private surface would be caused by new and upgraded roads, well pads, and pipelines. **Table 4-62**, Alternative A - Surface Disturbance[1] by Landownership, summarizes surface disturbance by landownership. The factors and constraints for site suitability constraints modeling (see **Appendix A**) would limit the total amount of surface disturbance.

**Table 4-62**
**Alternative A - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 7 | 4 |
| Private | | |
|     Federal minerals | 74 | 25 |
|     Private minerals | 178 | 60 |
| Total | 259 | 88 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

Reclaiming portions of the well pads and access road and pipeline ROWs that are not needed for production would reduce long-term or residual disturbance under Alternative A to approximately 88 acres. This is approximately 66 percent less than the short-term disturbance.

Potential impacts on current land uses resulting from the authorization of additional ROWs across public land include losses of livestock forage due to surface disturbance; losses of wildlife habitat and displacement of wildlife due to surface disturbance and habitat fragmentation; and visual impacts on recreation users.

*Alternative B*

Impacts would be similar to those described under *Nature and Type of Effects* but would extend onto BLM-administered lands. In addition, increased development on private surface lands,

BLM_0027252

including 12-89-7-1 APD, could result in greater increases in intrusive impacts and loss of forage, irrigated hay meadows, and hunting opportunities than under Alternative A. Similar to Alternative A, compliance with the COGCC and Gunnison County regulations for oil and gas operations would mitigate potential impacts on landowners and users by providing reasonable limitations and safeguards for gas development on private lands/private mineral estate.

Applying the WHP would likely limit surface disturbance and reduce impacts of gas development on wildlife populations. The mitigation efforts in the WHP could also reduce the intensity of traffic, fugitive dust, noise, and human activity in the Unit project area. Consequently, private landowners and public land users would not be as severely affected by these intrusive impacts during that period.

Approximately 2 percent of the long-term and 3 percent of the short-term surface disturbance under Alternative B would occur on BLM-administered lands. There would be more short-term disturbance and associated impacts on federal lands than under Alternative A. **Table 4-63** summarizes surface disturbance by landownership. The factors and constraints taken into account during the site suitability modeling (see **Appendix A**) would limit the total amount of surface disturbance and associated impacts.

Reclamation requirements in COAs #50 through #52 would reduce the long-term or residual disturbance to approximately 215 acres. This is approximately 56 percent more than the short-term disturbance.

**Table 4-63**
**Alternative B - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 10 | 4 |
| Private | | |
| Federal minerals | 462 | 164 |
| Private minerals | 126 | 47 |
| Total | 598 | 215 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

*Alternative C*
Land use impacts would be similar to those described in Alternative B, with the following exceptions. An additional design feature (e.g., verified elk winter concentration areas factor and constraint for site suitability) and changes to actions would limit the total amount of surface disturbance and associated impacts. Long-term surface disturbance and associated impacts would be less than under Alternative A but more than under Alternative B. As such, the extent of land uses displaced would be less than under Alternative A. Voluntary construction restrictions could also reduce the intensity of traffic, fugitive dust, noise, and human activity in the Unit project area during the winter. Consequently, private landowners and public land users would not be as severely affected by these intrusive impacts during that period.

The WHP would not be implemented and there would be no possible reduction in surface disturbance and associated impacts resulting from its application.

BLM_0027253

Approximately five percent of the long-term and four percent of the short-term surface disturbance under Alternative C would occur on BLM-administered lands; impacts would be similar to those under Alternative B. **Table 4-64** summarizes surface disturbance by landownership. The factors and constraints for site suitability constraints modeling (see **Appendix A**) would limit the total amount of surface disturbance.

**Table 4-64**
**Alternative C - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 16 | 6 |
| Private | | |
| Federal minerals | 369 | 109 |
| Private minerals | 56 | 12 |
| Total | 441 | 126 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

Impacts from applying COAs would be the same as under Alternative B. Their application would result in approximately 126 acres of long-term or residual disturbance, or approximately 71 percent less than the short-term disturbance.

### *Alternative D, the Preferred Alternative*
Land use impacts would be similar to those described in Alternative B, with the following exceptions. Long-term surface disturbance would likely be less than Alternative B. As such, the extent of land uses displaced would be less than under Alternative B.

Less than one percent of the long-term and one percent of the short-term surface disturbance under Alternative D would occur on BLM-administered lands. Disturbance on federal surface would be caused by upgrades to existing roads and constructing pipelines. The remaining surface disturbance, approximately 99 percent long term and 99 percent short term, would occur on private lands, including the 12-89-7-1 APD. New and upgraded roads, well pads, and pipelines would result in disturbance on private surface.

**Table 4-65** summarizes surface disturbance by landownership. The factors and constraints for site suitability constraints modeling (see **Appendix A**) would limit the total amount of surface disturbance.

**Table 4-65**
**Alternative D - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 5 | 1 |
| Private | | |
| Federal minerals | 382 | 120 |
| Private minerals | 68 | 12 |
| Total | 455 | 133 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

BLM_0027254

Impacts from applying COAs would be the same as under Alternatives B and C. Their application would result in approximately 133 acres of long-term or residual disturbance, or approximately 71 percent less than the short-term disturbance.

### Cumulative

The cumulative impact analysis area for lands and realty includes the Unit project area. Lands in the Unit are designated almost exclusively agricultural by Gunnison County and the current land use is primarily ranching with interspersed residences. The Unit is nearly surrounded by National Forest System lands. With the exception of existing oil and gas development, there are no commercial or industrial uses occurring in the area.

Oil and gas leasing in the Unit is guided by the Uncompahgre RMP (1989), which is currently being revised (ROD expected in 2017). According to the RFD prepared in support of the ongoing RMP revision, the Unit is located in an area identified as having High occurrence potential (BLM 2012b). Mineral production within the Unit is limited to natural gas wells developed by SGI and one natural gas well developed by Gunnison Energy Corporation. Additional surface disturbance on BLM-administered and private lands caused by future oil and gas development would lead to adjustments in the existing land uses in the Unit. Land users would be impacted by the development activities throughout the Unit. Examples of intrusive effects include increases in traffic, noise, dust, and human activity, as well as changes in the visual landscape. As lands in the Unit become more industrialized, individuals that currently own private lands that are next to BLM-administered or National Forest System lands could be adversely impacted by the shifting character of the landscape.

The cumulative impact of identified actions on the BLM's lands and realty program would result from activities that affect the BLM's ability to authorize land use authorizations (including ROWs) in the Unit. Alternative B proposed the greatest possible increase, compared to Alternatives A, C, and D, in land use authorizations from oil and gas development.

The collective effects on lands and realty for Alternatives A, B, C, and D are interrelated with various energy-related economic growth activities. The need for minor ROWs (such as distribution lines and roads) and new or expanded facilities to accommodate energy growth, such as coal mining and natural gas production, are also affected by the increased demand for energy and minerals, as well as potential increased population growth and development on private lands. Most development of utility and transportation corridors has occurred in the eastern portion of the Unit, along State Highway 133. In the future, energy and minerals-related economic development activities and population growth in Gunnison County would likely drive the location and types of ROWs authorized by the BLM.

### 4.3.5   Transportation and Access

### Methods of Analysis

Impacts on transportation and access would occur as a result of an increase in traffic volume or change in the availability or quality of transportation routes. The following indicators are used to evaluate effects on transportation and access from the Proposed Action:

- Change in the number, acreage, and total miles of access roads;

BLM_0027255

- Change in the average annual daily traffic volume for Highway 133;

- Change in the quality of existing arterial roadways and access roads that would affect the roadway's ability to safely and efficiently accommodate vehicle movement.

### Nature and Type of Effects

For the purposes of this analysis, transportation describes the movement of vehicles on routes within the project area. Any new oil and gas development activity within the Unit would generate additional traffic entering and exiting the Unit via Highway 133, County Road (CR) 265 and the network of access roads. The nature and type of vehicle trips would vary depending on the phase of well development. During the well pad and pipeline construction phases, vehicles entering and leaving the Unit would include gravel trucks, semi-trucks, water trucks, pick-up trucks, and a series of flatbed trucks hauling construction equipment. Subsequent well drilling and well production phases would also result in an increase in vehicles entering and leaving the Unit. Vehicle traffic associated with the drilling and production phases would include drilling/completion rigs, water trucks, pick-up trucks, workover rigs, and haul trucks. Trip origins for vehicles during all phases would be from areas outside the Unit. Accordingly, traffic volumes would increase on Highway 133, County Road 265 and well site access roads. Effects of increased vehicle traffic volumes on Highway 133 would include congestion and associated longer travel times for other transportation route users and increased probability of traffic-related incidents, including fatalities.

Heavy vehicles (i.e. those 55,000 pounds or heavier) accelerate the rate of road wear. The longevity of road surface conditions depends on several factors, such as surface type, weather conditions, sub-base characteristics, and the nature and type of vehicle traffic. Interaction of pavement condition and vehicles takes into account vehicle weight, frequency, axle spacing, vehicle speed, number of tires per axle, suspension, and tire pressure. In general, a twofold increase in vehicle weight can increase road surface deterioration by 800 to 1,600 percent (FHWA 2000). More frequent maintenance would be required to offset the effects of heavy vehicle use.

Indirect effects of higher traffic volumes would include more frequent road construction, the need for additional patrolling by public safety personnel, and deterioration of the highway's scenic attributes. On County Road 265, increased heavy vehicle traffic would deteriorate the gravel road surface requiring more frequent road maintenance. However, improvements to County Road 265 as part of any agreement between the county and a developer would improve the quality and safety of the road surface in the near-term. On-going maintenance would be necessary for long-term transportation quality.

Whereas transportation describes the movement of vehicle traffic, access considers the physical availability of transportation routes. In general, the construction of new roads would improve access within the transportation network. Similarly, improvements to routes that increase the ability of route users to safely reach certain locations would promote greater access. Within the Unit, well pad development requiring new access roads would result in an overall increase in access. However, new access roads typically provide specific localized ingress and egress to and from a single or cluster of well pads and would therefore provide limited accessibility benefits throughout the broader Unit. Access to locations within the Unit would temporarily decrease

BLM_0027256

during construction activities that require the partial or full closure of existing route segments. In the long term, improvements to existing routes such as more stable surface materials, increased road widths or added lanes, additional slow vehicle turnouts, and longer sight distances would promote greater access to destinations within the Unit.

Route designation as part of a future travel management planning process would also impact transportation and access. Any seasonal or permanent closure of routes within the Unit (e.g., to motorized travel) would decrease or eliminate vehicle trips on those routes and concurrently reduce the level of accessibility to certain locations.

### Effects Common to All Alternatives

Under all the alternatives, existing drilling operations would continue with associated effects on transportation and access. There would continue to be approximately 96 miles of paved and unpaved routes in the Unit, including a 6.4 mile segment of Highway 133, a 4.8 mile segment of County Road 265, 20 miles of gravel access roads, and 49 miles of 2-track routes. Highway 133 would continue to provide the primary access to the Unit from surrounding areas, while County Road 265 would provide localized access in the northern half of the Unit. Truck traffic and associated transportation impacts as described in the Nature and Type of Effects would be greatest during well pad and pipeline construction activities. During drilling and production phases, transportation impacts would be comparatively less.

For all alternatives, road improvements carried out prior to or in conjunction with well pad construction that strengthen road surfaces, would extend the longevity of roadways. However, the need for more frequent road maintenance activity would result in periodic delays, particularly during the summer, on the routes where maintenance activities are occurring.

### Alternative A

Alternative A proposes an estimated 10 new well pads, which would require the construction of 5 miles of new 16-foot wide access roads and the improvement of 26 miles of existing roadways. During road construction, measures would be taken to ensure continued access to existing property owners and leaseholders within the Unit. Impacts on access would mostly occur during well pad construction or during construction of individual pipelines or transmission lines directly adjacent to roadways.

Alternative A would increase the average annual daily traffic volume on the existing transportation network within the Unit, including the number of heavy trucks. Most vehicles would enter and exit the Unit via Highway 133 from points south of the Unit. Delta, Hotchkiss, Paonia, Crested Butte, and Gunnison are the region's primary population centers, the local distribution centers for construction materials such as gravel, and the regional disposal locations for drilling fluids and other waste from the well development process. A lesser number of vehicles would enter and exit via Highway 133 to the north; adverse impacts on traffic and access would be less in that area.

Traffic volume would increase most during the well pad, access road, and pipeline construction phases. During construction phases, Alternative A would add an estimated total of 8,439 round trips to the Unit, 55 percent of which would be from gravel trucks. Another 28 percent of the trips would be associated with crew cab pick-up trucks. Over a 6-year period, the number of

BLM_0027257

average annual daily trips for all phases of development would be 22,751, equivalent to an average annual daily traffic amount of 10 trips. Alternative A would increase the overall average daily traffic on the segment of Highway 133 in Gunnison County by less than 1 percent over a 6-year time frame. The average annual daily trips associated with trucks could increase by up to 11 percent compared to existing truck-related traffic levels. The increase in truck trips is expected to be noticeable to most motorists and may result in periodic delays.

Annual traffic increases would be greatest during the well pad construction and drilling due to more frequent trips by gravel trucks (4,640 total trips), water trucks (2,320 total trips), and rig-up trucks (2,610 total). The number of new trips for large trucks would be the least during well production (218 total); however, there would be an ongoing average of 71 round trips per well per year of employee pick-up trucks. Construction of individual well pads would take from 1 to 3 weeks. Other routes would experience substantially fewer average annual daily trips compared to Highway 133, but would experience localized, short-term spikes in traffic volumes during construction of nearby wells.

Increased vehicle trips, especially associated with slower moving vehicles such as loaded gravel and water trucks, drill rigs, and lowboy trucks with construction equipment would affect the movement of traffic on Highway 133, and to a lesser extent on County Road 265 and local access roads. Because well pad construction and drilling activities would occur 24 hours per day, 7 days per week, daily vehicle trips would be spaced across a longer time period. However, an overall increase in truck traffic would increase travel times for motorists on Highway 133, especially during already congested periods such as weekends. An increase in vehicle volume would also increase the potential for collisions, disabled vehicles, and other incidents thereby reducing vehicle mobility and driver safety on Highway 133 and other routes in the Unit.

Alternative A would also result in road surface deterioration over time. Gravel trucks, water trucks, and other heavy vehicles used during the well construction and drilling processes would steadily degrade road surfaces requiring more frequent road repairs. At an average loaded weight of 110,000 pounds, gravel trucks would result in the most road surface impacts during the well pad and access road construction phase. The total number of loaded gravel trucks entering the Unit under Alternative A would be 2,320. The same number would leave the Unit, but with a substantially lighter (less than 50,000 pounds) payload.

During pipeline construction and drilling/completing, drilling completion rigs, pipe trucks, and lowboy flatbed trucks carrying bulldozers, tractors, motor graders and other machinery would enter and leave the Unit approximately 5,742 times. On half of these trips (2,871) the trucks would be loaded with an average weight of 120,000 pounds. For the other half, most trucks would be empty with an average weight of 36,000 pounds or less. Because Highway 133 is a key access route into the Unit and to proposed development under Alternative A, there would be the potential for surface conditions on that roadway to degrade overtime. Impacts would include pavement cracking, rutting, and the formation of potholes. Impacts on unpaved routes, such as County Road 265, would primarily be rutting and erosion of the road surface.

For Highway 133, increased traffic volume, reduced mobility, and poorer road surfaces could incrementally decrease motorists' enjoyment of the route as a scenic byway, particularly during the well pad construction phase. Exhaust from additional truck traffic could detract from the

BLM_0027258

roadway's scenic qualities. See **Section 4.2.13**, Visual Resources and **Section 4.3.3**, Recreation, for further analysis related to the Highway 133/West Elk Scenic and Historic Byway.

### *Alternative B*

Alternative B proposes an additional 36 well pads than Alternative A. To provide access to the additional well pads, developers would construct an estimated 16 new miles of access roads, 4 times more than Alternative A. The effects of the new access roads would be similar to those described in the Nature and Types of Effects and under Alternative A, above, but would apply to a larger and more widespread area within the Unit.

Under Alternative B, traffic volume would increase during all well development phases, which would last for approximately 6 years. For all development phases, Alternative B would add an estimated total of 41,658 round trips to the Unit, equivalent to an average annual daily traffic amount of 19 trips. As the primary ingress point to the Unit, Highway 133 would experience the greatest increase in average annual daily traffic, particularly with traffic entering the Unit from the south. Based on an existing average annual daily number of trips of 1,400 on Highway 133 through Gunnison County, new traffic proposed under Alternative B would result in a 1.35 percent average increase during the 6-year development time frame. The average annual daily trips associated with trucks could increase by up to 21 percent compared to existing truck-related traffic levels, and 10 percent more than Alternative A. The types of impacts would be similar to those under Alternative A but more widespread due to increased traffic levels.

Like Alternative A, daily traffic would increase the most during well construction and drilling, access road construction, and pipeline placement. These activities would require frequent trips by gravel trucks (8,480 total trips), water trucks (4,240 total trips), and rig-up trucks (4,770 total). The number of new trips associated with large trucks would be the least during well production (477 total); however, there would be an ongoing average of 162 round trips per well per year of employee pick-up trucks. Construction of individual well pads would take from 1 to 3 weeks. Since trip destinations would be disbursed throughout the Unit, other routes would experience substantially fewer average annual daily trips compared to Highway 133, with localized, short-term spikes in traffic volumes during construction of nearby wells.

Under Alternative B, 20 percent of all new trips would be from gravel trucks. Increased vehicle trips associated with these slower moving vehicles would affect the movement of traffic on Highway 133 and County Road 265. Because well pad construction and drilling activities would occur 24 hours per day, 7 days per week, daily vehicle trips would be spaced across a longer time period. However, an overall increase in truck traffic would increase travel times for motorists on Highway 133, especially during already congested periods such as weekends. An increase in vehicle volume would also increase the potential for collisions, disabled vehicles, and other incidents thereby reducing vehicle mobility and driver safety on Highway 133 and other routes in the Unit.

Similar to Alternative A, Alternative B would also result in road surface deterioration over time. Gravel trucks would result in the most road surface impacts during the well pad and access road construction phase. Other vehicles with average weights of 120,000 pounds, such as drilling completion rigs, rig up trucks, low boys with bulldozers and other construction equipment, work over rigs, and haul trucks, would impact road surfaces throughout well development due to their

BLM_0027259

heavy weights. Because Highway 133 is a key access route into the Unit and to proposed development sites under Alternative B, surface conditions on that roadway would degrade overtime. Compared to Alternative A, Alternative B would result in a greater likelihood for pavement cracking, rutting, and the formation of potholes. Impacts on unpaved routes, such as County Road 265, would include rutting and erosion of the road surface. Because County Road 265 would provide access to more well locations under Alternative B compared to Alternative A, the potential for surface deterioration on County Road 265 would be greater than Alternative A.

Applying COAs #15 and #17 through #19 (see Appendix C) would mitigate impacts on road conditions by requiring year-round maintenance and cleanup and restricting travel on natural surface roads when wet or susceptible to rutting or other damage. By maintaining better road conditions, the COAs would also improve access. However, restricting the location of new roads, parking areas, and pullouts (COAs #14, #16, and #17) could confine traffic flow and impede access if reasonable alternatives do not exist. Road construction and maintenance COAs would also minimize impacts on soil resources, as described in **Section 4.2.3**.

For Highway 133, increased traffic volume, reduced mobility, and poorer road surfaces could incrementally decrease motorists' enjoyment of the route as a scenic byway, particularly when heavy vehicle traffic entering and leaving well sites would be greatest. Vehicle exhaust could also detract from the roadway's scenic qualities. See **Section 4.2.13**, Visual Resources, and **Section 4.3.3**, Recreation, for further analysis related to the Highway 133/West Elk Scenic and Historic Byway.

### Alternative C
Under Alternative C, the BLM would approve 35 well pads in addition to those proposed under Alternative A. Added measures to protect wildlife and reduce surface disturbance (e.g., new access roads would be constructed only as-needed) would confine traffic to fewer miles of roads. Therefore, impacts would be more localized than under the other alternatives.

Placing new piping in existing roadways would disrupt the movement of traffic on those roadways during construction activities resulting in road closures, detours, and localized travel delays.

Traffic volume would increase during all well development phases under Alternative C. For all development phases, which would last approximately 6 years, Alternative C would add an estimated total of 30,654 round trips to the Unit, equivalent to an average annual daily traffic amount of 14 trips. Highway 133 would experience the greatest increase in average annual daily traffic, particularly with traffic entering the Unit from the south. The increase for all vehicle types would be equivalent to 1 percent of the existing average annual daily traffic for the segment of Highway 133 through Gunnison County. Truck-related traffic under Alternative C could increase by up to 16 percent compared to existing conditions, which is 7 percent more than Alternative A.

Like Alternatives A and B, daily traffic increases would be greatest during the well pad construction phase due to more frequent trips by gravel trucks (6,240 total) and the least during well production (351 total). During production, the use of remote telemetry technology would reduce the need for site visits, thereby minimizing new vehicle trips during production. There

BLM_0027260

would however, be an ongoing average of 162 total round trips per year of employee pick-up trucks during well production. Other routes would experience substantially fewer average annual daily trips compared to Highway 133 due to the distributed nature of well sites in the Unit. Similar to Alternatives A and B, there would be localized, short-term spikes in traffic volumes on County Road 265 and access roads during construction of nearby wells.

The proportion of vehicle trips associated with heavy construction equipment such as gravel trucks would be the same as Alternative B. Impacts on County Road 265 and other access roads in the Unit would vary depending on individual well location.

Similar to Alternatives A and B, Alternative C would result in road surface deterioration over time. Because of vehicle weight and frequency of trips, gravel trucks would result in the most road surface impacts during the well pad and access road construction phase. Drilling completion rigs, rig up trucks, low boys with bulldozers and other construction equipment, work over rigs, and haul trucks would impact road surfaces during other well development phases due to their heavy weights (120,000 pounds). Alternative C would result in a greater likelihood for pavement cracking, rutting, and the formation of potholes compared to Alternative A, but less than Alternative B. Impacts on unpaved routes, such as County Road 265, would include more rutting and erosion of the road surface compared to Alternative A, but less than Alternative B. Because Alternative C proposes new well sites to be accessed via County Road 265, the potential for surface deterioration on County Road 265 would be greater than Alternative A and similar to Alternative B.

Impacts from applying road construction and maintenance COAs would be the same as under Alternative B.

Increased traffic volume, reduced mobility, and poorer road surfaces would affect motorists' enjoyment of Highway 133 as a scenic byway more than Alternative A, but less than Alternative B. See **Section 4.2.13**, Visual Resources and **Section 4.3.3**, Recreation, for further analysis related to the Highway 133/West Elk Scenic and Historic Byway.

### *Alternative D, the Preferred Alternative*
Alternative D, the Preferred Alternative, proposes an additional 33 well pads than Alternative A, requiring the construction of an estimated 16 new miles of access roads. The effects of the new roads would be similar to those described in the *Nature and Types of Effects* and under Alternatives B and C, above.

Effects from burying new pipelines beneath roadbeds would be the same as those described under Alternative C above.

Traffic estimates for Alternative D would be approximately five percent less than for Alternative C over the course of the six-year development period, with similar but slightly fewer and less intense impacts. As discussed under the other alternatives, Highway 133, particularly south of the Unit, would experience the greatest increase in average annual daily traffic.

Similar to the other alternatives, impacts from increased annual gravel truck traffic would be greatest during the well pad construction phase, with an estimated 5,280 round trips, 3,680 (230

BLM_0027261

percent) more trips than Alternative A. During well production under Alternative D, there would be an ongoing average of approximately 1,337 round trips per year of workover light trucks, workover rigs, and haul trucks, which would be four times more trips than under Alternative A. Trip increases and subsequent traffic would be most apparent on Highway 133, while County Road 265 and smaller access roads throughout the Unit would experience localized, short-term increases in traffic volume.

As would be the case under all alternatives, Alternative D would result in a gradual deterioration of road surfaces over time, with gravel trucks used during construction resulting in the most road surface impacts. Alternative D would result in a similar degree of impacts on local and regional road surfaces and associated drivability as is described under Alternatives B and C.

Impacts from applying the road construction and maintenance COAs would be the same as under Alternatives B and C.

***Cumulative***
West-central Colorado will continue to be a popular destination for outdoor recreation activities, including motorcycling and pleasure driving on the region's many scenic mountain roadways. Accordingly, the use of Highway 133/West Elk Scenic and Historic Byway for pleasure driving and motorcycling is expected to steadily increase over time. Highway 133 serves as the primary arterial route between population centers in Delta and major destinations along the western front of the Rocky Mountains (e.g. Snowmass and Aspen). As urban populations in nearby municipalities such as Delta, Paonia, Hotchkiss, and Crawford grow, traffic volume on Highway 133 is expected to increase.

Each of the proposed alternatives would increase the average annual daily traffic volume on Highway 133 through the Unit. Alternative A would add an average of 10 trips per day to the Unit, while Alternatives B and C would add an average of 19 and 14, respectively. Alternative D, the preferred alternative, would add 15 trips per day. Because many of these trips would be by large trucks carrying heavy loads, drivers on Highway 133 could experience longer travel times for the segment within the Unit, and when travelling between eastern Delta County and the Unit.

An increase in truck volume coupled with more frequent passenger car trips would steadily degrade the Highway 133 road surface. Lane closures to repair cracked pavement and potholes would occur at more frequent intervals resulting in delays to motorists, well operators, and others travelling on Highway 133 within or adjacent to the Unit.

## 4.4    SOCIAL AND ECONOMIC CONDITIONS

### 4.4.1   Hazardous Materials and Wastes
This section describes potential impacts on humans or the environment from use or generation of hazardous substances during construction and operation and maintenance. The nature and quantities of hazardous and solid wastes are described in **Section 3.4.1**, Hazardous Materials and Wastes.

BLM_0027262

### Methods of Analysis

Indicators of the potential for, and the severity of, impacts on human health and the environment of storing and handling hazardous substances and solid waste are the following:

- Quantity of hazardous material produced as influenced by the number of wells and methods of drilling employed

- Distance of wells from sensitive features including but not limited to steep slopes and streams

- Likelihood of accidents associated with transport over roads and via pipelines as influenced by well density and distance from disposal wells and from centralized storage facilities

- Frequency of occurrence of spills and releases of hazardous substances

- Severity of spills and releases, including effectiveness and timeliness of spill response measures

The analysis includes the following assumptions:

- Occupational Safety and Health Administration health and safety guidelines would be followed by all workers during all construction, operation, and decommissioning phases of the projects.

- Access to construction areas and areas where hazardous materials are stored, or where there is a potential for exposure to hazardous substances, would be controlled, such as by fences and gates or by other security measures, to exclude unauthorized entry.

- The COAs and design features identified in **Appendix C** would be implemented during all stages of the project as appropriate.

### Nature and Type of Effects

Some chemicals used in hydraulic fracturing are considered hazardous under 40 CFR, Part 302, Section 302.4, as discussed under **Section 2.2.4**, Alternative A, No Action, sub-section Hazardous Materials and Solid Waste. There could be impacts on humans or the environment as a result of spills and releases or improper handling of hazardous substances (for example, from not wearing or using appropriate protective equipment or not having appropriate training to perform required duties).

Health and safety could be impacted if an exposure pathway is completed between a hazardous substance and a human or environmental receptor. A receptor is a road term that includes workers, the public, and non-human species, such as fish and wildlife, and even plant species. Exposure pathways primarily include direct contact, inhalation, and ingestion.

One of the strategies for avoiding exposure is to focus on preventing the completion of these exposure pathways, for example by containing hazardous substances or by using clothing and

BLM_0027263

equipment designed to provide a barrier to exposure. Use of such specialized clothing and equipment requires special training.

Spills and releases increase the potential for exposure pathways to be completed. Therefore, avoiding spills and releases through appropriate planning and preparation is one of the most effective strategies for preventing exposures. However, if spills or releases do occur, then contingency planning and training to respond to the spill or release can minimize or eliminate adverse effects.

Based on the actions described in the alternatives, the following are examples of possible impacts that could affect human health and safety:

- Vehicular accidents resulting in spills or leaks of petroleum products or hazardous substances, including drilling fluids, produced water, wastewater generated in drilling operations, and other substances

- Spills during fueling operations

- Spills while handling drilling or well stimulation fluids during drilling and hydraulic fracturing operations

- Introduction of methane, drilling fluids, or other contaminants into potable aquifers or otherwise causing degradation and loss of beneficial use of subsurface resources through failure of seals or other systems designed to protect those resources

- Fires or explosions of flammable or explosive materials stored or used at the site or mixing of incompatible materials

Gas field development activities involve the use of chemicals and the generation of materials that can have adverse effects on human health and the environment. Accidents from equipment failure or human error are inevitable and some are likely to result in releases. Environment and Energy Publishing analyzed state records and found that the 15 states with the highest number of onshore oil and gas activity reported 7,662 spills, blowouts, and leaks in 2013 (E&E 2014). Though many of these incidents were small spills, the combined volume of the spills was more than 26 million gallons of oil, fracturing fluid, produced water, and other substances (E&E 2014). In Colorado, reported spills increased by 33 percent, with 402 spills reported in 2012 and 534 reported in 2013 (E&E 2014).

This increase does not necessarily imply negligence, but it may be attributable to a number of factors, including improved spill reporting or an increase in development activities. However, these data show that spills occur with some frequency, and it is therefore necessary to minimize the risk of occurrence and to design measures to effectively respond to spills and minimize any subsequent effects.

Mitigation measures as required by state and federal regualtions and implementedd by SG fall into two broad categories: regulatory engineering controls and administrative controls.

BLM_0027264

Engineering controls are physical design features that address potential hazards and causes of failure. Examples of engineering controls are as follows:

- Pit liners to prevent the release of fluids from the containment structure

- Secondary containment to control migration of fluids if the primary container, such as a storage tank, fails

- Cement seals to prevent migration of fluids through the annulus of a borehole

Administrative controls are plans and policies that restrict some activities and require others. They include the following:

- Training requirements so that workers recognize the hazards associated with the tasks they are required to perform

- Monitoring requirements to evaluate the effectiveness of mitigation measures and the need to take corrective action in case the mitigation measures are not effective

- Seasonal use restrictions to avoid conditions where accidents may be more likely to occur, response would be slower, or the effects could be more severe

State and federal regulatory requirements and site-specific COAs aim to reduce the risk of impacts on human health and the environment. The COAs are based on the BLM's review of SGI's NOS/APD submittal and its evaluation of the site-specific features at the development site.

### Effects Common to All Alternatives

Under all alternatives, existing drilling operations would continue, with potential effects on human health and the environment that would be similar to those described under *Nature and Types of Effects*, above. Impacts from additional future development would be the same as those described under *Nature and Types of Effects* and would result under all alternatives.

The types of impacts from hazardous storage and use of hazardous substances would be the same under all alternatives. The impacts may vary in degree, based on the number of wells drilled, the amount of wastewater produced, location, and site-specific conditions.

Under all alternatives oil and gas development could continue on private lands with non-federal minerals. This would result in the same kinds of human health and environmental impacts as those discussed under *Nature and Types of Effects*.

### Alternative A

Under Alternative A, the Bull Mountain Unit MDP would not be approved. Fifty-five new natural gas wells and one new water disposal well would be developed on private lands within the non-federal mineral estate.

Under this alternative either a closed loop or reserve pit system would be used. Preference would be given to closed loop systems unless pit systems are necessary or would involve demonstrable benefits relative to closed loop systems. A closed loop system would reduce the risk of impacts

BLM_0027265

on human health and the environment compared to a reserve pit system for several reasons. A closed loop system would probably generate less drilling waste and drilling cuttings, requiring less management and necessity for less material to be transported, stored, and disposed of. SGI would specify the type of drilling system to be used when submitting the APD to the COGCC.

In general, since the impacts associated with management of hazardous substances would be similar in character under each alternative, the primary difference among the alternatives is the quantity of hazardous materials that must be managed. Alternative A would result in the least risk, because it involves the fewest wells over time. However, in a given year, the alternatives are expected to be similar, since the number of wells drilled in a year would be the same. That said, the alternatives also differ in the locations of the wells and site-specific issues, such as the following:

- Accessibility

- Distance from disposal wells and from centralized storage facilities

- Slope stability

- Proximity to streams

- Length of haul routes

Other location-specific factors would also influence the potential magnitude of the impacts.

The types of impacts that would occur under Alternative A are those described under *Nature and Types of Effects*.

### Alternative B
Under Alternative B, as many as 146 new natural gas wells and 4 new water disposal wells would be developed on federal mineral estate only. This is a larger number of new natural gas and water disposal wells than would be developed in the decision area under Alternative A. Since the same number of wells would be constructed per year under each alternative, Alternative B differs from Alternative A, primarily in the duration of the effects and the increasing density of wells that would be operated and maintained over time. Most of the potential impacts from spills and releases or from accidents involving stored materials are expected to result from construction of the wells. Operation and maintenance involves fewer materials. Nevertheless, as well density increases, the likelihood of accidents associated with transport over roads and via pipelines would increase. Therefore, the magnitude of the impacts from Alternative B are expected to be greater than under Alternative A.

### Alternative C
The impacts from hazardous substances and waste generation under Alternative C would be similar to those under Alternative B, except that there would be more pads and wells located in steeper, less stable terrane and more remote locations. This could increase the potential for spills or releases. The risks would be reduced by avoiding these steep, unstable areas locations and implementing site-specific COAs in **Appendix C** (see COAs #37 and #52 through #55).

BLM_0027266

*Alternative D, the Preferred Alternative*
The impacts from hazardous substances and waste generation under Alternative D would be less than those under Alternative B because Alternative D involves constructing fewer pads. The risks would be reduced by avoiding risky locations and implementing site-specific COAs (in **Appendix C**) to reduce the risk of hazardous material spills.

*Cumulative*
As discussed under the alternatives above, impacts from storage and use of hazardous substances would increase with the density of wells and well pads. The same generally applies on the wider regional scale. The Bull Mountain Unit is relatively undeveloped compared to some of the adjacent areas in the Piceance Basin; but over time, if the development of gas resources turns out to be economically feasible, the density of wells and pads would increase, approaching the density in other more developed areas of the basin. This may result in increased probability of significant spills and greater potential for impacts on human health and the environment over time.

The assumption is that the annual rate of well construction would remain constant. Nevertheless, the cumulative effects of the combined implementation of Alternative A and the preferred alternative would increase the density of wells and the intensity of road use over time in the Bull Mountain Unit. This would increase the potential for spills and releases and greater potential for impacts on human health and the environment. The longer duration of construction would also increase the probability of spills and releases. There would be a higher probability that a significant release or exposure incident would eventually occur over the lifetime of the project.

## 4.4.2   Socioeconomics

*Methods of Analysis*
Social and economic analysis is focused on the two-county study area (Gunnison and Delta Counties) as defined in **Chapter 3**. Although impacts may occur in surrounding counties and throughout the state, it was determined that the majority of impacts would occur within Delta and Gunnison Counties due to the location of the Unit and current population base.

Direct impacts on employment during drilling and production phases, as well as estimated costs of drilling and production are provided based on estimates from SGI. Estimates of production and related tax and royalty revenue based on full build-out were also supplied from SGI.

Revenues from minerals royalties, severance taxes, and property use taxes were calculated based on estimated production and estimated well head price, as described in **Section 3.4.2**, Socioeconomics. The analysis of potential changes in tax revenues is based on the federal mineral royalty of 12.5 percent of sales value and 5 percent of taxable value for state severance taxes (Colorado severance tax rates depend on production value but are 5 percent for production valued over $300,000).

Impacts on other land uses are discussed quantitatively and qualitatively where applicable. Economic impacts from recreation are discussed in terms of expenditures of residents from outside the local area only. This is was based on the assumption that expenditures of residents of the primary study area would occur in the region regardless of the BLM's actions that impact

BLM_0027267

recreational opportunities; however, changes in nonresident recreation patterns would alter the amount of money entering the primary study area. Information on the origin of visitors to recreational areas is typically not available.

Secondary project spending was analyzed using the IMPLAN input-output modeling economic impact analysis software and data (2010). All model estimates are presented in 2014 dollars, and data from SGI for labor and employment costs are based on 2014 dollars. The model represents the area where local direct economic effects would occur and where all the local secondary effects would develop (i.e., Gunnison and Delta Counties). All IMPLAN data displayed are in terms of the estimated impacts within the two-county study area. Effects of the project are also likely to occur in other counties in Colorado and the region. It should be noted that actual economic impacts and jobs created would vary based on the production schedule, technology employed, market conditions, and other factors. Modeling is intended to provide a comparison of impacts by alternatives rather than represent a precise forecast of actual economic impacts.

In addition to the assumptions included in **Chapter 2**, the following assumptions are applied for socioeconomic impact analysis

- For all alternatives, a maximum of 27 wells per year development has been estimated. This rate of drilling does not represent an average drilling year for the life of the project, but rather represents an average year at the peak drilling period, after ramp up of development, including compressor stations and supporting infrastructure construction. This level of development may not occur in any given year due to market conditions for oil and gas or other factors.

- Wells completed during the planning period would produce throughout the planning period.

- Average well head price for natural gas in 2012 was is $2.66/MCF (thousand cubic feet; EIA 2013b). Estimates from SGI predict natural gas prices of $4.50/MCF until 2017 and $5.50/MCF thereafter. Natural gas prices are volatile and actual average price is likely to change. Data are provided for comparative purposes only.

- Production estimates for drilled holes are based on SGI model numbers for composite coal bed methane and sandstone wells and Mancos wells models from 2015 to 2036.

- All data are displayed in 2014 dollar values. Data was converted to 2010 model year dollars for input into IMPLAN model using Bureau of Labor Statistics CPI deflator values

- Percent of spending in the local economy dictated by IMPLAN- model regional percentage of local spending by sector.

- Assumes current rate of severance taxes and royalty charges and distribution.

- Unless otherwise stated it is assumed that the distribution of well type for a typically well pad with five wells is one sandstone, one coal, and three Mancos shale.

Indicators of impacts on socioeconomics are the following:

- Local area employment levels

- County and local area population

- Local government fiscal conditions

- Local area property values

- Changes to other area land uses including but not limited to hunting, agriculture, and livestock grazing

- Quality of life factors including but not limited to air, water quality, traffic, crime, and social environment

***Nature and Type of Effects***

*Employment, Population and Income*
Components of the Proposed Action that are likely to affect the local economy include those that result in changes to level of employment in the area and related population levels, and those that impact spending on local materials and supplies.

The aspects that are most likely to affect project-related employment, labor, and related project spending are the number of wells drilled, technology employed in drilling, the number of producing wells, and production levels. The primary differences between the alternatives are the length, pace, and intensity and timing of the development phase, and the intensity of the production phase, which is mainly determined by the total number of wells and restrictions applied to the timing of production.

The effect of project spending on the socioeconomic study area would depend on whether project employment and spending occurs locally or over a wider geographical area. For the Unit, SGI estimates that employment would be stationed in Grand Junction, Montrose, Delta, Paonia, Hotchkiss, Glenwood Springs, and Gunnison, Colorado. The specific employment needs and project spending would change over time depending on the development phase and would affect the overall distribution of project spending; highest spending and highest levels of economic contributions are generally within the drilling phase.

Population levels would be impacted directly by project activities when temporary or permanent population increases occur in the project area as a result of labor for project work. Further indirect increases can occur when project spending and employment results in additional employment needs in service and support industries. In Pennsylvania, a 1 percent increase in total employment directly linked to the oil and gas energy sector is associated with a 0.5 percent increase in county population (Farren et al. 2013). There is potential for housing and rental prices to be indirectly impacted by gas drilling should a housing shortage result in increased demand for a limited number of homes and increased prices. In Williston, North Dakota, where the national shale boom is most pronounced, the flood of workers into the small and remote region

BLM_0027269

has placed a strain on housing availability and cost. One report states that the rental price for a two bedroom apartment rose from $350 to $2,000 (Oldham 2012). However, a recent review of housing impacts in Pennsylvania from 2007 to 2011 indicates that shale development is generally not associated with significant adverse effects on housing affordability and availability (Farren et al. 2013). There is some indication that temporary workers favor long-term hotels and may drive the construction of these facilities in areas with sustained drilling activity. Counties can also rely on the housing stock of neighboring counties to make up for any lack in housing availability when commuting is feasible

*Specific Economic Sectors*
Potential impacts on other land uses in the area include impacts on ranching/livestock grazing, recreation and hunting, and agriculture.

Level of grazing on BLM-administered lands and on private lands in the project area may decrease should proposed areas of disturbance include areas within current BLM-administered grazing allotments and private ranches. Any reduction of permitted or billed levels of AUMs would result in economic impacts on individual permittees, ranchers, and local businesses supporting ranching and livestock operations; however, as very little of the development would occur on the BLM-administered allotments, this would likely be a neglige amount. Based on IM 2003-131, SGI would be required to work with any other surface owners to mitigate or compensate for damages from the proposed operations. Operations on private lands are dependent on the annual decisions made by individual ranchers and are unknown and unpredictable for this document; therefore, reliable conclusions regarding the socioeconomic impacts from the gas developments are not possible. Impacts on particular allotments are discussed in **Section 4.3.1**, Livestock Grazing.

Estimates in 2007 dollars indicate that big game hunting in Colorado resulted in expenditures of $106 per day for in-state hunters and $216 per day for out-of-state hunters (CDOW 2008). Expenditures primarily included food, lodging and transportation. In addition, the area's hunting and fishing opportunities supported approximately 912 jobs in Delta and Gunnison counties. In general, visitation to the socioeconomic project area is anticipated to increase over the next 20 years, following trends in population growth, therefore increases in contributions from hunting and other recreational activities on project area lands would be likely (approximately 2.5 and 4.5 percent per year for the UFO as a whole utilizing Colorado State Demography Office population projects). However, should project activities exclude hunting from the area, reduce the availability of game, reduce the quality of habitat in the project area for large-game, or degrade the hunting experience for those hunting in the area, then hunting trips in the area could be reduced causing the economic contribution of this activity to the area to also be reduced.

In general, impacts of BLM management activities are likely to occur should changes in visitation by hunters or other recreational visitors from outside the area occur. The reasoning is that if local recreational visitors reduce visits to the project area, they are likely to visit other local recreational areas within the socioeconomic study area, and no overall loss in income to the local economy would occur. In contrast, loss of visitors from outside the region would reduce overall contributions to the local economy.

BLM_0027270

Impacts are also possible from changes in visitation to the West Elk Loop Scenic. Economic impacts from scenic byway travel are difficult to determine, but one 2001 Colorado study estimated an approximant $50 - $188 Visitor group spending per day and $32,500 annual visitor spending per mile (Petraglia and Weisbrod 2001). Should project activities such as increased truck traffic, dust or changes to the visual setting impact the level of visitor use of the West Elk Scenic Byway (State Highway 133) contributions to local communities would be decreased. Approximately 6.4 miles of the Byway cross the Bull Mountain Unit.

Potential impacts on agriculture and agricultural tourism consist of two main components, 1) impacts due to changes to water quality or quantity, soil quality or other factors that resulting in a decrease in quantity or quality of the product produced and, 2) impacts due to a perceived degradation of the area's quality of product that resulted in decreased sales and/or visitation.

Rumbach (2010) analyzed the potential impact of shale gas drilling on the New York tourism industry. He questioned whether drilling would permanently damage the brand of a region as a pristine and picturesque destination as well as the brand image for agricultural products from a shale drilling area. While quantitative analysis is lacking in Rumbach's paper and other literature, there is some indication that increased truck traffic and visual impacts of drilling rigs may impact visitor experience. Local organic farmers and wineries express similar concerns as noted in recent new articles (for example, Taylor 2013; Jaffee 2012). In a letter submit to the BLM related to leasing of North Fork parcels for oil and gas development, the Paonia Chamber of commerce stated, "Many of our farmers are very concerned that the mere perception of polluted air, soil, and water will drive away agricultural customers in search of other quality vendors… Our hospitality industry and community at large is concerned about the potential impacts on our growing agro-tourism economy and the West Elk Scenic and Historic Byway Tourism Loop, of which we have just received recognition and funds to promote as a healthy community travel destination."

While this letter was written specifically addressing leasing for the North Fork project 30 miles from the Bull Mountain planning area, it reflects concerns of some residents in Paonia related to oil and gas development in the area.

*Public Revenues*
Fiscal effects on local governments are extrapolated from the economic impacts, from projections of the value of the gas that is produced and from value of oil and gas property.

Federal mineral royalties are collected at a rate of 12.5 percent of total sales value of the production from federal-owned mineral estate, as described in Section 3.4.2, Socioeconomics. Approximately 50 percent of royalties' revenue is transferred to the Colorado State Treasurer. This portion, in turn, is distributed to counties, cities, and school districts based on senate bill 08-218. Increased production would therefore result in increased contributions to local communities and counties.

Taxes collected on production include severance tax, as well as less significant contributions to the Oil & Gas Conservation Fund Levy and the Oil & Gas Environmental Response Fund (taxed at a maximum of $0.0017 of market value at wellhead). Colorado state severance taxes on natural gas extraction are graduated, ranging from 2 percent for gross income under $25,000 to 5

BLM_0027271

percent for income of $300,000 and over. Some deductions apply for, example for ad valorem taxes paid. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources to fund water conservation, wildlife, and environmental programs and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects and 30 percent is directly distributed to local communities.

Property taxes are also assessed on both residential and business property as well as machinery and equipment. Assessed values are derived by multiplying the actual value of the property by 7.96 percent for residential property and by 29 percent for other property times the local tax rate. Property taxes also include ad-valorem taxes, paid by the producer on the value of oil and gas production. Gunnison County ad-valorem taxes for primary production are determined based on appraisal value of 87.5 percent of prior year sales. Property taxes collected would benefit Gunnison County, local communities and school districts in Gunnison County, but would not directly impact Delta County. Changes in both residential and non-residential property value as a result of project activities would impact local community funds available, by increasing or decreasing assessed value and taxes paid. Sales tax would be generated based on current tax rate in local Counties and municipalities as discussed in Chapter 3. Increased supplies purchase in the local area directly or indirectly in support of drilling and production would also increase local tax revenue.

Short-term rental properties, such as hotels, are a source of income to local communities should employees for the proposed project require short-term lodging. The Delta County lodging tax is 1.9 percent as of 2011, but it may vary by municipality (Colorado Department of Revenue 2014).

*Public Services*
Potential impacts on public services include increased demand for community social services, such as police and fire departments, first responders, and local hospitals and associated costs. Such cost increases resulting from gas drilling have been documented in the Rocky Mountains and the east coast (Haefele and Morton 2009; Kelsey and Ward 2010). Impacts are generally dependent on the number of temporary workers required to relocate to the local area during drilling operations, with the higher the level of workers relocating, the greater the strain on services.

Impacts on roads may also occur due to increased traffic that occurs as a result of drilling, particularly that involving large trucks. In a 2014 study, the estimated road-reconstruction costs associated with a single horizontal well range from $13,000 to $23,000, or $5,000-$10,000 per well if state roads with the lowest traffic volumes are excluded (Abramzon et al. 2014). In Rio Blanco County Colorado, a $17,700 per well fee was suggested to off-set the costs of road infrastructure maintenance (RPI 2008). Increased taxes (severance and property) could mitigate these cost pressures for public roads.

*Community Social Conditions*
As discussed in Chapter 3, survey of residents in the project area as well as comments received during scoping and on the draft EA demonstrate that area residents have varying viewpoints on the most important values for local communities and the desired conditions for these communities (BLM 2009 and 2010). Some participants and commenters note importance of jobs

BLM_0027272

that the energy industry brings to the area, stating that decent paying jobs in Delta and Montrose are important. In other communities, particularly in the North Fork Valley, residents noted that local area is economically and socially dependent on healthy lands and noted clean air, water, as well as small town atmosphere, as key values (BLM 2009 and 2010). These residents are concerned that development would result in changes to these characteristics, reduce the quality of life for current residents, and result in reduction of retirees and other with non-labor income choosing to live in the area. In all areas surveyed, sustained growth was noted as an important in maintaining communities' social setting, therefore any should project activities result in unchecked growth could change local community character. Recent surveys of area residents conducted by the North Fork Heart and Soul Project (North Fork Heart and Soul 2014), a group of local citizens, generally support these findings. Values that were seen as most important for the community based on a survey of 1,600 residents are summarized as follows:

- Rural and natural environment that has an abundance of resources and opportunities for healthy living, quality food, work, recreation, and connection to the land

- Small town feel and sense of community

- Steady economy with work opportunities and the ability to grow traditional and emerging economic sectors

- Freedom to live the way we choose, our independence and our personal responsibility to our communities

- Honoring traditions and heritage while looking to the future

It is important to note that the BLM did not commission or review the North Fork Heart and Soul Project surveys, and they may not represent the full spectrum of public opinion.

*Property Value*
The impact on property values from oil drilling is uncertain. On the one hand, increased property valuations of large tracts may be expected due to potential income from gas drilling, and an influx of transient workers would probably increase the demand for and value of rental properties (Bennet 2013). In contrast, real or perceived concerns about local water quality, air quality and/or visual setting may decrease residential property values or impact ability to sell properties.

Two common methods used to estimate economic values for ecosystem or environmental services that directly affect real estate prices are hedonic pricing studies and contingent valuation studies. Hedonic pricing is a revealed preference technique that uses transaction data. It estimates the price of a home both by internal characteristics of the house and the external factors affecting it (i.e. surrounding location, local air and water quality, and nearby amenities). Contingent valuation, a survey-based stated preference technique, examines how much money people would be willing to pay or willing to accept to maintain the existence of or be compensated for the loss of an environmental feature.

Hedonic pricing studies and contingent valuation studies have examined the impact of wells in close proximity to residential properties. For example, contingent valuation surveys in Texas and

BLM_0027273

Florida found a 5 to 15 percent reduction in stated bid value for homes within 1 mile of theoretical hydraulic fracturing scenarios, with the exact reduction dependent on the petroleum-friendliness of the venue and proximity to the drilling site (Throupe et al. 2013). Similarly, a 2010 study found a 3 to 14 percent decrease in values, with impacts dissipating at around 2,000 meters from the well-head (Integra Realty Resources 2010). Muehlenbachs, Spiller, and Timmins (2012) hedonic price study demonstrated that the risk of groundwater contamination from natural gas extraction leads to a significant reduction in house prices—a 26 percent reduction for housing on well water compared with an increase in property value for those properties on public water supply. They further found that "these reductions offset any gains to the owners of groundwater-dependent properties from lease payments or improved local economic conditions, and may even lead to a net drop in prices."

Overall, these studies indicate that there may be some impact on values for residential properties next to drilling sites. The exact level is variable and dissipates with distance from the drilling site. Based on literature reviewed, the greatest level of impacts may occur within .5 mile of active wells, but some impacts have been seen within 1 mile of active wells. Property values details are provided in **Appendix K**, Economic Impact Analysis Methodology – Technical Report.

*Non-Market Effects*
In addition to the impacts discussed above, project activities may impact factors such as open spaces and clean air and water that have value in terms of the preservation for future generations, or in their value as providing ecosystem services as discussed in Chapter 3. Conducting willingness to pay surveys for non-use values or determining values for ecosystem services was not within the scope of this project; therefore, discussion of non-market impacts is qualitative in nature.

**Effects Common to All Alternatives**
Development would occur to some extent under all alternatives. Additional labor requirements and associated impacts on population and income, as well as indirect impacts on property values and social setting could occur under all alternatives, the intensity of impacts for the drilling phase would be dictated by the pace and scale of development and for the production phase, by the rate of production.

*Alternative A*
Alternative A includes the construction and operation of 55 natural gas wells, 10 well pads, 1 water disposal well, and associated roads and production facilities, including 1 compression station. Under Alternative A the 2-89-7-1 well pad APD would not be approved. This scenario assumes that new development would only occur on private surface with private minerals, as detailed in **Section 2.2.5,** Alternative A, No Action.

*Employment, Income and Population*
Average number of direct employment for different project phases, based on estimates provided by SGI, are included in **Table 4-66**, Bull Mountain Unit Estimated Annual Direct Labor Requirements and Costs - Alternative A. It should be noted that numbers for the development phase represent estimated annual maximums; employment in any one year may vary based on

BLM_0027274

**Table 4-66**
**Bull Mountain Unit Estimated Annual Direct Labor Requirements and Costs - Alternative A**

| Project Phase | SGI Employees | Direct Labor Costs | Contract Employees | Direct Labor Costs | Vendors* |
|---|---|---|---|---|---|
| Drilling | 15 | $1,996,800 | 6 | $399,360 | 264 |
| Production | 6 | $798,720 | 3 | $199,680 | 25 |

Sources: SGI 2014; IMPLAN 2014
Assumes a maximum of 27 wells drilled per year per common assumptions in Chapter 2. Production estimates based on a total of 55 wells. All employment number in average annual monthly jobs, rounded to whole numbers.
*Note that vendors are not directly employed by SGI and represent estimates based on SGI vendor costs.

exact rate of drilling. The drilling period for direct and indirect impacts is expected to last up to three years. In addition to employees directly employed by SGI and as SGI contractors, additional companies would be hired to supply workers (vendors) to construct locations, roads, and pipelines as well as for drilling and completing the wells. Vendors would also perform surveys (civil and resource); stormwater BMP installation, maintenance, and inspections; and well site maintenance. No immediate development and related employment impacts would occur under Alternative A because all drilling would require additional APD approval. Peak period of employment in the Bull Mountain Unit under Alternative A would likely occur about 1 year after initiation, after some wells are online and drilling continues on others. While total number of well pads constructed and well pads drilled varies by alternative, the maximum pace of development is estimated to be the same for all alternatives (up to 27 wells drilled per year). As a result, the number of employees for a given year of drilling would be similar across alternatives.

SGI predicts that employment would be approximately 80 percent from within the Rocky-Mountain region, including areas with recent oil and gas development such as Grand Junction and Denver, Colorado, as well as Farmington, New Mexico. The amount of employees drawn from within the socioeconomic study area would be smaller and determined by the skill set of available workers. The outflow of labor earnings due to jobs held by non-residents would be especially high during the development phase. It should also be noted that job numbers represent new hires; however, an increase in new hires does not directly equate to an increase in the total employment count in an area. The new hires count is simply an indication of hiring activity in an industry.

Total production employment would be reduced as compared to employment for the drilling phase. With the exception of workers needed for construction of compression stations and periodic work-overs, employment for the production phase would be more stable and consistent. Production phase employees are more likely to represent local employees, given the long-term nature of the employment. As a result, the outflow of labor earning would be reduced during the production phase.

In addition to direct employment, project activities would result in additional secondary employment. Secondary employment is the multiplier effect resulting from additional employment created by purchases of goods and services, additional employment of suppliers (indirect employment), and household spending due to project-related income (induced employment).

BLM_0027275

Total employment estimates are summarized in **Table 4-67**, Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A. In addition, some development is likely to start while drilling is ongoing, however, the numbers in the table below do not account for this small amount of additional labor. In a given year of drilling, up to approximately 280 direct workers and 471 total jobs in the two-county study area would be supported by the proposed drilling operations, including SGI direct employees, contract employees and vendor employees. Additional jobs outside of the socioeconomic project area would also be supported. It should be noted that all employment values are estimates only and are provided for the purposes of comparison with the Proposed Action and amended Proposed Action. As discussed in the *Nature and Type of Effects* section above, actual level of employment for the project overall and at any given time would depend on the rate of production, type of technology employed in drilling wells, the number of wells drilled per pad, and other factors.

**Table 4-67**
**Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A**

| Project Phase | Direct Employment including Vendors | Total Employment | Direct Contributions | Total Contributions |
|---|---|---|---|---|
| Drilling | 285 | 471 | $89,775,488 | $101,797,900 |
| Production | 34 | 49 | $3,687,102 | $5,082,004 |

Sources: SGI 2014; IMPLAN 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year. Includes estimate SGI, contract and vendor employment. Based on 2014 vendor costs. Total employment and contributions include direct, indirect and induced value added. All employment numbers reported in average annual monthly jobs

Due to the presence of natural gas drilling and skilled workers in the region, it is likely that much of the labor required can be drawn from the available workers in the region and would not require permanent relocation to the two-county study area. Based on the number of workers required during drilling under Alternative A, it is unlikely that the labor required for this alternative would result in significant population increases; local employment change represents a less than 1 percent population change.

The level of anticipated labor required would likely be filled by those currently unemployed, local residents in the oil and gas industry and experts in the field from within and outside the region. A percentage of those employed would not permanently reside in the two-county study area due to variety of reasons, such as the following:

- The industry's requirement for rotational and transient crews

- Housing availability (scarcity of appropriate type or price)

- Lifestyle preferences (invested elsewhere)

- Economic expectations (job permanence or job mobility)

Out-of-town workers would reduce the amount of household goods and services consumed and housing investment spent locally.

BLM_0027276

Impacts would likely be limited to the drilling phase as short-term employment would lead to temporary residency by job-holders instead of permanent immigration. Workers that cannot locate accommodation may be able to find temporary housing in towns in surrounding counties. For example, Montrose is located a little more than an hour driving distance from the Unit. As discussed in Chapter 3, within a 25-mile radius surrounding Delta, there are two RV parks and 16 hotels and over 50 additional hotels and other short-term lodging in population centers within a 100-mile radius of the Unit (tripadvisor.com 2014).

Rental vacancy rate for apartments or homes as of 2012 was approximately 4.5 percent in Delta County and 16 percent in Gunnison County (US Census Bureau 2012). As previously stated, SGI estimates that employment would be stationed not only locally in Delta, Paonia, Hotchkiss, but also in Montrose, Grand Junction, Glenwood Springs, and Gunnison. Based on vacancy rates and availability of hotel rooms as compared with the number of anticipated workers, area rental vacancies and hotels should be able to accommodate needs.

Average income for the natural resources and mining sector in 2012 was $77,012 and $54,586 for Gunnison and Delta Counties respectively. This average income was significantly higher than average annual wage for both Gunnison and Delta Counties (116 percent and 63 percent higher than average wage, respectively; Headwater Economics 2013).

Based on estimates provided by SGI, the direct labor costs from SGI and contract employees in the two-county study area under Alternative A would average approximately $133,120 annually per job including overhead costs for SGI employees and $66,560 for contractors during drilling and approximately $116,688 per job, including overhead costs for SGI employees and $62,233 for contractors during the production phase. Note that the high estimates per job would not be typical of earnings for all jobs. Higher income for workers in the gas industry raise the average income per job; however, the overall distribution of income would likely be concentrated on the lower end of the income spectrum due to work at lower-paid industry jobs and jobs at local trade and service establishments resulting from secondary employment. Also note that vendor labor income is not included here.

*Specific Economic Sectors*
Impacts on private land utilized for livestock grazing cannot be quantified but may result in increased time or costs for ranchers if lands are made unavailable for grazing, additional fencing is required, increased herding is required, fences are left open resulting in unwanted disbursement. See section in **Section 4.3.1**, Livestock Grazing for additional details.

Within the two-county study area, recreation, including hunting, may be impacted by ongoing development due to disturbance of big game habitat. Because the exact number of recreation visitor days in baseline conditions or under Alternative A is not available for the project area, impacts on recreation cannot be quantified. Under Alterative A, as discussed **Section 5.3.3**, Recreation, visitor experience of those hunting and recreating may be impacted by ongoing drilling operations on private lands, both in terms of visual impacts and experience. However, due to development being limited to private minerals, fragmentation of habitat for large game would be minimized under Alternative A, and economic impacts on hunting would be the lowest under this alternative.

BLM_0027277

As discussed in **Section 4.3.5**, Transportation and Access, Alternative A would result in a less than 1 percent increase in traffic; however, truck traffic may increase by up to 11 percent, which may result in decreased motorists' enjoyment of State Highway 133 as a scenic byway, particularly during the well pad construction phase. Reduction of visitor use would decrease this contribution to the local economy as discussed under *Nature and Type of Effects* with impacts most likely to occur during the drilling phase on the 6.4 miles of the West Elk Loop Scenic Byway within Bull Mountain Unit. For example, if a 5 percent reduction in visitor use or spending occurred, this could relate to loss of $10,400 annually based on a per mile base rate of $32,000 spending per mile and 6.4 miles in the project area as discussed in *Nature and Type of Effects*. Impacts would likely be lowest under this alternative due to lower level of proposed development.

Agriculture and agricultural tourism may be impacted by changes to water quality (refer to **Section 4.2.4**, Water Resources for details of impacts on water quality). Due to minimal change to water quantity and quality anticipated, direct impacts on agricultural operations are likely to be limited. As noted in the *Nature and Type of Effects* section, increased drilling may relate to a change to visitors experience of the area as well as the perceived quality of agricultural products from the area, but literature and data are lacking to verify this impact or quantitatively analyze potential impacts. Comments were submitted during public scoping and on the draft EA that provide some indication of the potential impacts on local companies. Owners of the Desert Weyr Farm near Paonia stated that they have seen a 10 percent decrease in revenues, which they attribute to concerns about the quality of the visitor experience to the farm or the quality of products due to ongoing oil and gas development and potential for expanded development. Due to the lack of development of federal lands or federal minerals under this Alternative, impacts would be limited to development of private minerals and private lands, where the BLM has no role in the decisions relate to scale and nature of development.

*Public Revenues*

As described under the *Nature and Type of Effects* section, public revenues would be influenced by anticipated production increases under Alternative A.

Existing wells in the Unit have seen steady increases in production since the initial production year of 2010. **Table 2-3**, Bull Mountain Unit Annual Production Rates, illustrates the past amounts of gas produced each year in the Unit. Average rate of gas production is estimated based on SGI models by well type. As a point of reference, total production for Gunnison County in 2012 was 2,072,000 MCF (Colorado Oil and Gas Conservation Commission 2013). Average rate of gas production is estimated for future years based on SGI models by well type. Tax estimates based on multipliers of net estimated revenue as described in **Appendix K**. Note that production and well head prices are model estimates only and actual production and price would vary depending on the resource and market conditions under all alternatives. Well head price in this analysis is estimated at $4.50/MCF for the first 3 project years and $5.50/MCF thereafter. Annual averages for well head prices have historically been volatile, ranging from a high of $7.97/MCF to a low of $0.19/MCF over the past 40 years (EIA 2013b). Production data and tax revenues should be viewed as estimates and used for the purpose of comparing alternatives only.

BLM_0027278

Estimated impacts from Alternative A on local fiscal conditions are included in **Table 4-68**, Impacts on Local Fiscal Conditions—Alternative A.

**Table 4-68**
**Impacts on Local Fiscal Conditions—Alternative A**

| Year | Severance Tax (Million $) | Ad Valorem Tax (Million $) |
|---|---|---|
| 2015 | $1.9 | $1.1 |
| 2016 | $3.7 | $2.2 |
| 2017 | $6,.2 | $3.8 |
| 2018-2036 | $113.6 | $69.6 |
| Total | $125.4 | $76.7 |

Source: SGI 2014
Severance tax includes the Oil & Gas Conservation Fund Levy and the Oil & Gas Environmental Response Fund.

Assumes maximum build-out and an average of 27 wells drilled per year. Tax estimates based on multipliers of net estimated revenue. Note that amounts represent taxes collected not taxes distributed.

Severance tax—As detailed in *Nature and Type of Effects*, Colorado state severance tax is graduated, ranging from 2 percent for income under $25,000 to 5 percent for income of $300,000 and over. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects, and 30 percent is directly distributed to local communities. Based on projected production and well head price, severance tax collected under Alternative A is displayed in **Table 4-68**.

Federal mineral royalties—As discussed in **Section 3.4.2**, Socioeconomics, and *Nature and Type of Effects*, production from federal mineral estate would result in collection of royalty revenues, a portion of which would be distributed back to local area counties and communities. Under Alternative A, royalty revenue would be limited to ongoing drilling on federal leases, with the majority of drilling likely occurring on private lands, at least in the near term, due to lack of the MDP.

Property tax—Under all Alternatives, development is likely to result in an increase in Non-residential property, particular oil and gas property as well as ad-valorem tax on oil and gas production. Changes in residential property values may be mixed, and are discussed in further detail below. Property taxes in Delta County would not be directly affected by project activities but could be impacted by any related change in property values. Based on projected production and ad-valorem tax collected under Alternative A is displayed in **Table 4-68.**

Other taxes—Sales tax revenues under Alternative A would be increased, with level of impacts dependent on the quantity and cost of local materials purchased for project construction and operations. It is likely that much of the specialized equipment would not be locally available and would not contribute to local taxes.

BLM_0027279

Lodging tax revenues may be increased as a result of temporary workers residing in the area; the exact amount would depend on the county and city in which workers stayed. Length of stay and exact number of employees requiring temporary housing cannot be determined at the planning level.

*Public Services*
As noted in *Nature and Type of Effects*, population increase can strain public services. Impacts could occur on the following:

- Law enforcement

- Emergency Response

- Public schools

- Domestic Water and Wastewater Treatment

However, due to the population change of less than 1 percent in the project area, impacts are likely to be restricted to the drilling phase and would be limited in nature under Alternative A. Impacts are most likely to occur in short term increases in emergency services due to construction work.

As discussed in **Section 4.3.5**, increased heavy vehicle traffic would likely result in the need to increase road maintenance. Alternative A would increase the overall average annual daily traffic on the segment of Highway 133 by less than 1 percent over a 6-year time frame. The average annual daily trips associated with trucks could, however, increase by up to 11 percent compared to existing truck-related traffic levels. SGI would implement a road maintenance plan for all public roads used for project-related purposes. Maintenance would include inspections, reduction of ruts and holes, and replacement of surfacing materials as needed.

Estimated costs for road maintenance associated with the development of 55 wells range from $275,000 to over $1.27 million based on previous studies as discussed under *Nature and Type of Effects*. SGI's road maintenance plan and taxes collected from oil and gas operations are intended offset the costs of maintenance.

*Community Social Conditions*
Delta and Gunnison County combined are anticipated to increase in population by over 30,000 by 2040, an increase of 62 percent (Colorado Division of Local Government, State Demography Office 2012). The proposed project would have negligible contributions to population increases, therefore changes to social setting due to population increases would not be realized. The nature and type of impacts on social conditions would be as discussed under *Nature and Type of Effects* above. Due to the lack of approval of an MDP under this alternative, the scale and pace of development are difficult to determine and would be largely impacted by the market for natural gas. Development under Alternative A is limited to development of private land with private minerals, and the BLM has no role in the decisions relate to scale and nature of development.

BLM_0027280

Studies of impacts of project activities were conducted to model both near-field and far-field impacts on air quality. As discussed in **Section 4.2.1**, Air Quality, near-field pollutant impacts would be below the NAAQS or CAAQS, and would not exceed the PSD Class II increments with the exception of annual $NO_2$ impacts, which could exceed the annual increment value.

As a result, local residents' health and quality of life related to air quality are not likely to be significantly impacted by project activities for any alternative.

As discussed in **Section 4.2.4**, Water Resources, the amount of water required for project construction activities is small compared with the discharge in Muddy Creek. Water requirements could be greatly reduced by implementing closed-loop drilling methods, recycling fracturing water, and by using waterless fracturing methods. The potential impacts from drilling on water quality would be least among the alternatives, since Alternative A involves construction of the fewest new wells. In terms of water quality, the quality of water could be degraded by accidental spills or releases of hazardous substances stored or used at the project sites, such as hydraulic oil and fuel used in heavy equipment, chemical additives used in well stimulation, or waste fluids stored in tanks or pits, transported by truck, or conveyed in pipelines. Following Colorado Department of Public Health and Environment (CDPHE) guidelines, and applying standard lease stipulations, described under **Table 2-11**, would reduce risk of contamination of water resources under all alternatives. Approval of drilling plans would provide protection measure to minimize impacts on water quality, which is of concern for area residents using well water who would be particularly affected by impacts on ground and drinking water. All wells would have a surface casing to prevent contaminates migration to the aquifer.

It should be recognized that even if project activities do not directly result in significant changes in air or water quality, residents and visitors perception of the air and water quality may be influenced by the presence of development activities. A national study in 2010 found that among Americans who are very or somewhat aware of hydraulic fracturing, more than 69 percent are very or somewhat concerned about related water quality issues (Civil Society Institute 2010). In comments received during on the draft EA, commenters expressed ongoing concerns about risks to irrigation water due to accidental contamination, particularly for irrigation water in the Muddy River; such concerns are likely to be present with any level of development. Additionally, public comments received from local business owners involved in natural homes and alternative energy noted they have already experienced a decrease in business related to uncertainly about development and related impacts on the social setting. The exact level of impacts on area business due to perceptions about development cannot be quantified due to lack of certainty. Note that comments received may not be indicative of all area businesses experience.

*Property Values*

Changes to residential property values may occur but are likely to have impacts only on those properties immediately adjacent to the proposed development as discussed under *Nature and Type of Effects*. In the project area, 37 of 44 residents are within 1 mile of existing and proposed well pads where the 40 acre analysis area is utilized, the majority of these are within 0.5 miles of proposed well sites. The greatest potential for impacts would likely occur on these 37 residential properties, although impacts may occur on a wider scale in the region. As described in the *Nature and Type of Effects* section, the literature on property values demonstrates both increases

BLM_0027281

and decreases in value, depending on water supply source, exact proximity to wells, siting and other factors, therefore the exact impacts on values cannot be determined and would vary based on site-specific location and water source.

*Non-Market Effects*
Due to the assumption under Alternative A that development is limited to private lands and private minerals, while some changes may occur to open space and associate non-market values, impacts are likely to be lowest under this Alternative.

***Alternative B***
In addition to the existing developments, Alternative B would construct up to 36 new well pads on federal mineral estate, up to 146 new natural gas wells and up to 4 new water disposal wells. The quantity and combination of CBNG and shale gas wells on each pad is not known at this time and would also be determined at the APD stage. It is estimated that drilling activities for federal wells would occur for approximately 6 years. Additionally, it is estimated that approximately 16 miles of new road construction, 53 miles of improvements to existing roads for access, 21 miles of new pipeline construction, and up to 4 new compressor stations would be constructed. Under Alternative B and all action alternatives, the BLM would also approve the 2-89-7-1 well pad APD.

*Employment, Population, and Income*
Based on estimates provided by SGI, employment directly by SGI and by contract employees for the drilling phase is estimated to be 15 SGI employees and 6 contractors and to last up to 6 years. Approval of the 2-89-7-1 well pad APD could result in an increase in immediate needs for employment, as compared to Alternative A, although the maximum level of development is still estimated at 27 wells drilled per year, as discussed under Alternative A. Employment for the production phase is estimated to be 23 SGI employees and 10 contractors. As under Alternative A, it should be noted that a substantial portion of the project workforce (approximately 264 for drilling phase and 61 for the production phase) would be from vendor's employees. SGI and vendor employment estimates are included in **Table 4-69**, Bull Mountain Unit Direct Annual Employment and Labor Costs—Alternative B.

**Table 4-69**
**Bull Mountain Unit Direct Annual Employment and Labor Costs—Alternative B**

| Project Phase | Direct Employment (SGI) | Direct Labor Costs | Direct Employment (Contract) | Direct Labor Costs | Direct Employment (Vendor)* |
|---|---|---|---|---|---|
| Drilling | 15 | $1,996,800 | 6 | $399,360 | 264 |
| Production | 23 | $2,496,000 | 10 | $665,600 | 61 |

Sources: SGI 2014; IMPLAN 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year. All employment numbers reported in average annual monthly employees.
*Note that vendors are not directly employed by SGI and represent estimates based on SGI vendor costs.

These numbers do not include additional material costs for construction of compressor stations as well as roads, estimated at $2,025,250 direct costs. A portion of materials would be sourced from local retailers or supplies while a portion would be purchased in other locations and

brought to the site location. Road materials for example, are likely to be obtained from local quarry sites and therefore the costs of these materials contributing to the local economy (See **Table 4-70**, Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B).

In total, minimal population increases from employment from drilling would be as discussed under Alternative A, but would occur for a longer period of time. As under Alternative A, it is estimated that the project would result in a less than 1 percent temporary increase in population in the area.

**Table 4-70**
**Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B**

| Project Phase | Direct Employment including Vendors | Total Employment | Direct Contributions | Total Contributions |
|---|---|---|---|---|
| Drilling | 285 | 471 | $89,775,488 | $101,797,900 |
| Production | 94 | 136 | $10,024,831 | $13,804,839 |

Sources: SGI 2014; IMPLAN 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year. All employment number in reported in average annual monthly employees. Includes estimated SGI and contract and vendor costs. Based on 2014 vendor costs.

*Specific Economic Sectors*
Type of impacts on range, hunting, agriculture and tourism would be similar to those described under *Nature and Type of Effects* and under Alternative A. Under Alternative B, the increase in proposed development would result in an increased level of impacts on these land uses.

For recreation including hunting, the reduction in visitation to the area has not been quantified; therefore the specific economic impacts cannot be determined. With increased development compared to Alternative A, Hunters could expect less success, which could result decreased visits and a resultant loss of income for local area outfitters, retailers, and service providers. As discussed under the *Nature and Type of Effects*, hunters' spending includes lodging, food, and fuel.

Impacts would be most pronounced over the short term, when construction activities are anticipated to result in the greatest disturbance of big game. Long-term impacts on the local economy could occur should hunters decide to hunt on other area lands in long-term. The level of impact would depend on if hunters and other visitors chose to hunt elsewhere in the two-county area or chose to travel to another county for recreation. Specifically, for the 2-89-7-1 well pad APD site, there could be short-term impacts on hunting opportunities. The project site is located in winter range for elk, and, as discussed in the site wildlife and vegetation assessment, elk may move to other undisturbed sites as a result of project activities. Economic impacts are likely to be limited overall, because the site is on private lands and hunting is restricted to outfitters authorized by the landowners.

Applying a WHP as a design feature to address the impacts of development on wildlife populations could reduce the level of impacts on local big game herds. Elements of the plan would at least partially mitigate the impact on quality and wildlife habitat and the related

BLM_0027283

economic impacts from loss of hunting opportunities. Examples of these elements are avoiding elk winter concentration areas and limiting the number of drilling rigs operating during those times when wintering big game could be most impacted.

Similarly, impacts on the visitation level and visitor experience for West Elk Loop Scenic Byway is highest under Alternative B due to higher level of proposed development. For example, if a 10 percent reduction in visitor use or spending occurred, this could relate to loss of $20,500 annually based on a per mile rate of $32,000 spending per mile and 6.4 miles in the planning area as discussed in *Nature and Type of Effects*.

As discussed in **Section 4.3.1**, Livestock Grazing, approximately 3 percent (13 acres) of federal lands available for grazing on BLM allotments would be reduced. Due to the limited acres impacted and the scattered nature of federal surface lands in the area, the impacted acres and related economic impacts are negligible. Additional acres of privately owned grazing land may become unavailable, but the acres impacted and the related economic impacts cannot be quantified for the MDP level. For the 2-89-7-1 well pad APD, as discussed in **Section 4.3.1**, Livestock Grazing, approximately 5 acres of private grazing land could be disturbed. Due to the limited number of acres impacted and the lack of grazing on the land during the winter and spring, economic impacts are likely to be minimal.

Impacts on agriculture would occur if the project resulted to changes in water quality or quantity. However, as discussed in **Section 4.2.4**, Water Resources, the amount of water required for project construction activities is small compared to the discharge in Muddy Creek and water quantify should not be impacted. While the risk of spills or erosion is increased under this alternative, the mitigation measures in **Appendix C** would likely limit the likelihood of water contamination if applied. Specifically, these features are measures to limit impacts from surface disturbance and control erosion (COAs #7, #8, #48, and #52), to identify potentially hazardous substances (COA #38), to control use of tanks, pits (COAs #20 through #23) and pipelines (COA #24), and to define reclamation requirements (COAs #50 through #52).

Overall impacts on the organic farming industry and related agri-tourism cannot be quantified. However, if the increased development in the Unit results in a real or perceived impact on the environmental quality or crops grown in the area, the sales and tourism from local farms would be impacted.

In addition, the visual impacts of a greater number of gas wells alongside Highway 133 and other areas road, increased truck traffic are likely to impact the quality of the visitor experience for those seeking a quiet, pastoral, small town setting.

*Public Revenues*
Alternative B would result in increased contributions to local, state and public revenues, as described in detail below. Impacts would be similar in nature to that described under Alternative A, but increased due to the drilling of additional wells, and anticipated higher levels of production in the long term. Revenue for any given year may be lower than the projected maximum levels described below. The addition of WHP design features limiting winter drilling may have some well pad-specific impacts on production levels and related revenue.

BLM_0027284

Severance tax: Assuming a maximum build out and based on a natural gas price of $4.50/1,000 MCF until 2017 and $5.50/1,000 MCF thereafter, the Proposed Action would generate an estimated $313 million in severance taxes from 2015-2036 (SGI 2014). Estimated severance taxes collected are displayed in **Table 4-71**, Impacts on Local Fiscal Conditions - Alternative B.

**Table 4-71**
**Impacts on Local Fiscal Conditions - Alternative B**

| Year | Severance Tax (Million $) | Ad-Valorem Tax (Million $) | Federal Mineral Royalties (Million $) |
|------|---------------------------|----------------------------|----------------------------------------|
| 2015 | $1.9 | $1.1 | $5.9 |
| 2016 | $3.6 | $2.2 | $11.5 |
| 2017 | $8.2 | $4.9 | $25.7 |
| 2018 | $13.1 | $7.8 | $40.8 |
| 2019 | $16.8 | $10.0 | $52.5 |
| 2020-2036 | $275.6 | $157.2 | 837.7 |
| TOTAL | $313.3 | $188.0 | $973.3 |

Source: SGI 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year.
Severance tax includes the Oil & Gas Conservation Fund Levy and the Oil & Gas Environmental Response Fund.
Tax estimates are based on multipliers of net estimated revenue. Note that amounts represent taxes collected not taxes distributed.

Federal Mineral Royalties: Under Alterative B, drilling and production of federal minerals would occur as detailed in Chapter 3. The proposed Action would generate an estimated $973 million in royalties from 2015-2036 (SGI 2014). See **Table 4-71**.

Property Tax: As discussed under Alternative A, development is likely to result in an increase in Non-residential property, particular oil and gas property as well as ad-valorem tax on oil and gas production. Changes in residential property values may be mixed, and are discussed in further detail below. Property taxes in Delta County would not be directly affected by project activities but could be impacted by any related change in property values. Based on modeled production rates and natural gas prices as stated under severance taxes, ad-valorem taxes are estimated at $188 million from 2015 to 2036. See **Table 4-71**.

*Other Taxes*
As discussed under Alternative A, sales tax and lodging tax revenue are likely to increase under Alternative B, exact level of increase would be determined by quantity and cost of local materials purchased for project construction and operations and exact number of employees requiring temporary housing, location of this housing and the length of stay. Revenue increases are likely to be largest under Alternative B due to the increased number of wells drilled and the longer length of the drilling period.

*Public Services*
A strain on local services may occur as discussed under *Nature and Type of Effects* and Alternative A. Due to the longer length that temporary workers would be required for drilling required under this Alternative, the level of strain on resources is likely to be increased under Alternative B. However, total population increase in the project area would remain under 1

BLM_0027285

percent, therefore all impacts would be minimized. In addition, impacts are likely to be limited to the 6-year drilling phase, as workers would not permanently relocate to the project area. Impacts are most likely to occur in short term increases in emergency services due to construction work and increased traffic.

As discussed in section 4.3.5, Transportation and Access, average annual daily trips associated with trucks could increase by up to 21 percent compared to existing truck-related traffic levels, and 10 percent more than Alternative A. Taxes collected from oil and gas operations are intended offset the costs of maintenance, but may not fully compensate for costs. Estimated costs for road maintenance from development of 146 new well could range from $130,000-$3.36 million based on previous studies as discussed under *Nature and Type of Effects*.

Across all jurisdictions, Alternative B may stimulate demand for services and impose costs to deliver before generating the offsetting revenues As ad-valorem taxes are collected on prior year sales, monies for road repair or increased emergency responders for example, may not be immediately available, Even if revenues would eventually exceed the costs of service, some local governments and service providers may experience short-term adverse fiscal impacts due to the project.

*Community Social Conditions*
As discussed under *Nature and Type of Effects* and Alternative A, influx of temporary workers can change the character of rural towns, particularly if a large number of these workers are from outside of the area. The same maximum rate of development is proposed for all alternatives; therefore, the level of workers required and anticipated temporary population increase would be the same as discussed under Alternative A. Under Alternative B, however, the drilling phase would continue for a longer period of time (6 as opposed to 3 years) therefore the temporary workers would remain in the areas longer, and more may relocate.

The exact level of impact would be affected by the rate of development and the percentage of workers from outside the region, both of which are difficult to determine at the MDP analysis level. Anticipated population increases for all phases are less than 1 percent, substantially below that observed by Smith et al. (2001) to result in boomtown impacts that dramatically altered the character of an area, therefore changes to local community setting due to population increases are likely to be minimal.

As described in **Section 4.2.1**, Air Quality, there is potential for impacts from $PM_{10}$ and $PM_{2.5}$ at receptors less than 328 feet from the source of development activities. However, additional dust control measures would be adopted to minimize these impacts; therefore, air quality should not be impacted, and local residents' health and quality of life related to air quality are not likely to be significantly impacted by project activities.

In terms of water quality and quantity changes that may impact local communities, impacts are not anticipated, but may occur under any alternative. The rate of construction is the same for Alternatives A, B, and C, water augmentation requirements would be the same for all three alternatives, except that the augmentation would continue for a longer time under Alternative B than under Alternative A. Construction would occur at the same rates as under Alternative A and over a larger area, increasing the chance of spills and release of chemicals as well as erosion.

BLM_0027286

Compliance with existing regulatory requirements (including implementing COA #38 in **Appendix C** as a mitigation measure for hazardous substances and SPCC plans) would greatly reduce the potential for spills and releases. Overall, hydraulic fracturing is not anticipated to impact potable groundwater resources under any alternative.

As discussed under Alternative A, even if air and water quality are not significantly impacted by project activities, local residents or visitors may still have concerns over perceived impacts from development. Impacts would be as described under Alternative A and *Nature of Type of Impacts*, but due to the increased level of development under B, likelihood of increased concern for area visitors and residents, and related impacts on quality of life would be highest under this Alternative.

*Property Values*
As under Alternative A, changes to residential property values may occur and are increased with increased drilling activity due to more residences being in proximity to drilling activity. Impacts are may occur to residences within 1 mile of existing and proposed wells as discussed under *Nature and Type of Effects*. This alternative includes all 44 residential properties in the Unit. Approval of the 2-89-7-1 well pad APD could impact three residential properties; the closest structure is approximately 1,700 feet from the well site. As discussed under Alternative A, there is uncertainty in the literature about the degree to which drilling impacts property values; therefore, the exact level of impacts is uncertain.

*Non-Market Effects*
The greatest potential for impacts on non-market values occurs under Alternative B due to the highest proposed level of development. Impacts on quality of life are discussed under *Community Social Conditions*, above. Under this alternative, up 925 acres would be disturbed in the short term and over 315 acres in the long term in the Unit. Approval of the 2-89-7-1 well pad APD could specifically impact five acres, as identified in Alternative B. Lands would eventually be restored, minimizing long-term impacts. However, the perception of these areas as no longer pristine would impact the benefit of undeveloped lands for future use or enjoyment.

Based on analysis in **Section 4.2.4**, Water Resources, and **4.2.1**, Air Quality, air or water quality impacts would be minimized, assuming that the COAs described in **Appendix C** are applied as mitigation measures, particularly measures limiting surface-disturbing activities and associated dust and erosion (COAs #7, #8, #48, and #52) as well as measures for road construction and maintenance (COAs #14 through #19), and for hazardous substances (COA #38).

While impacts on air and water would be limited, and significant impacts are not anticipated, the potential for contamination of air or water from a leak or spill is present under any alternative where development occurs. It should be noted that if degradation to air, water or land quality did occur, additional loss of ecosystem service benefits would occur, the cost to replace these services provided or mitigate for the loss should be recognized.

**Alternative C**
Impacts on socioeconomics under Alternative C would be similar to those described under Alternative B. However, Alternative C would implement measures in **Appendices C** and **O** as design features. They include additional measures to reduce impacts of gas development on

BLM_0027287

vegetation, water quality, air quality, and soil. For example, as described in **Table 2-11**, Alternative C requires that only closed loop drilling operations be used, includes requirements for an annual Operations Plan, including development phasing to avoid impacts on wintering big game species. In addition, Alternative C concentrates roads and development activities to a greater extent to minimize surface disturbance. Impacts of additional measures on drilling and gas production cannot be quantified here, but it can be assumed that such measures could increase the time required for drilling operations and decrease average production levels as compared with Alternative B.

*Employment, Population, and Income*
Due to the identical number of maximum wells as under Alternative B, the same number of SGI and contract laborers would likely be required for drilling and well completion. Labor required for production would be similarly reduced. The exact level of labor needs would depend on the rate and intensity of development which cannot be determined here.

*Specific Economic Sectors*
Type of impacts on range, hunting, agriculture and tourism would be similar to those described under the *Nature and Type of Effects* and under Alternatives A and B. Under Alternative C, measures in **Appendices C** and **O** would be included as design features, as discussed in **Table 2-11**. This would result in increased certainty and consistency in application of measures and resulting decrease in impacts on other land uses. The application of additional mitigation measures for air quality could minimize the impacts on air quality that could affect visitors' experiences in the area. Although the WHP would not be applied under Alternative C, potential timing restrictions for big game wintering habitat and other measures to protect wildlife would be applied, reducing the extent of impacts to some degree.

The reduction in recreation visitation, including hunting, as a result of development activity, has not been quantified; therefore, the specific economic impacts cannot be determined. As under Alternative B, the timing restriction for wildlife would reduce the level of impacts on local big game herds, thereby at least partially mitigating the impact on quality and wildlife habitat and the related economic impacts from loss of hunting opportunities.

Impacts on livestock grazing, agriculture, and tourism including the scenic byway use would be as described under Alternative B; however, the intensity of impacts would be reduced due to the reduction in anticipated infrastructure, more clustered development, and additional mitigation measures.

*Public Expenditures and Revenues*
Under Alternative C, Gunnison County government and the School Districts would experience an increase in tax and royalty revenues as discussed under Alternative B; however, the amount realized would be proportionately less due to additional mitigation measures, discussed in **Table 2-11**, that are likely to reduce overall production.

*Public Services*
A strain on local services may occur, as discussed under *Nature and Type of Effects* and Alternative B. Impacts are likely to be limited to the 6-year drilling phase.

BLM_0027288

*Community Social Conditions*
Impacts on social conditions would be similar to those described under Alternative B. All design features and additional mitigation measures for air quality, as described in **Appendices C** and **O**, have the potential to reduce impacts on air quality thereby reducing the overall effect that the project may have on the quality of life for local area residents. Minimizing surface disturbance under this alternative could also reduce overall impacts on quality of life, due to reduced impacts on soil disturbance, visual impacts, and other resources.

*Property Values*
Approximately 41 of 44 homes are located within 1 mile of a well pad; therefore, impacts could occur as discussed under Alternative B, but at a slightly reduced scale.

*Non-Market Effects*
Impacts would be as discussed under Alternative B. Level of potential impacts would be somewhat reduced due to the concentration of development.

***Alternative D, the Preferred Alternative***
Impacts on socioeconomics under Alternative D would be similar to those described under Alternative B. Alternative D includes all measures from **Appendix C**, as well as additional measures for air quality, geologic hazards, and baseline water quality monitoring and the WHP as design features. These measures are likely to mitigate impacts of gas development on air and water quality and soil resources, which may mitigate any impacts on the local environment and community.

*Employment, Population, and Income*
Because the maximum number of wells under Alternative D is identical to those under Alternative B, the same number of SGI and contract laborers would likely be required for drilling and well completion. The exact level of labor needs would depend on the rate and intensity of development, which cannot be determined here.

*Specific Economic Sectors*
The impacts on range, hunting, agriculture, and tourism would be similar to those described under the *Nature and Type of Effects* and under Alternative A. Under Alternative D, as described for Alternatives B and C, the increase in proposed development would also increase the levels of impacts on these land uses.

Impacts on recreation, livestock grazing, agriculture, and tourism, including the scenic byway use, would be as described under Alternative B. Including additional design features to mitigate impacts on air quality and geologic hazards and to require baseline water quality monitoring, as described in **Appendices C** and **O**, could minimize the impacts of project activities on air and water quality and any related impacts on visitor experience or visitation levels.

*Public Expenditures and Revenues*
Under Alternative D, Gunnison County government and the school districts would experience an increase in tax and royalty revenues from that seen in Alternative A due to increased development, as discussed under Alternatives B.

BLM_0027289

*Public Services*
Local services may be strained, as discussed under *Nature and Type of Effects* and Alternative B. Impacts are likely to be limited to the six-year drilling phase.

*Community Social Conditions*
Impacts on social conditions would be similar to those described under Alternative B. Including additional design features, as described in **Appendices C** and **O**, could reduce overall impacts on quality of life for area residents. Design features in place for water quality monitoring could reduce the potential for impacts on water quality from project activities. Design features could also reduce concerns voiced by area residents that water quality impacts may occur but not be detected. As discussed under Alternative C, measures to protect air quality could minimize air quality-related impacts.

*Property Values*
Approximately 42 of 44 homes are within 1 mile of a well pad; therefore, impacts could occur, as discussed under Alternative B, but at a slightly reduced scale.

*Non-Market Effects*
Impacts would be similar to those discussed under *Nature and Type of Effects* and Alternative B.

Under this alternative, up to 455 acres in the Unit would be disturbed in the short term and over 133 acres in the long term. The level of surface disturbance from well pads and related impacts would be slightly reduced due to the concentration of development on fewer well pads.

As under Alternatives B and C, applying the relevant COAs would minimize air and water quality impacts and increase related ecosystem benefits. Additional measures for water monitoring would further reduce the likelihood that water quality would be impacted in the long term.

**Cumulative**
The cumulative impact analysis area used to analyze cumulative impacts on socioeconomics and environmental justice is the two-county study area. Trends discussed in **Chapter 3** are likely to continue with similar impacts; energy development in the two-county study area currently including oil and gas development and coal mining, primarily on the North Fork of the Gunnison river area. Out of approximately 124,100 currently leased acres in the North Fork Valley, 45 active wells exist. Of these, approximately half (27 wells) were completed in the 10 years since 2005, or an average of 3 wells per year within the Unit. A lease sale EA was completed in 2012 for an additional 22 parcels consisting of 29,891 acres of federal land and approximately 860 acres of split-estate land; it is unclear how many of these leases will be developed. There are currently 17 APDs pending in the area. The North Fork Valley also has coal leases of nearly 40,000 acres, of which 1,600 acres are disturbed. On private lands within Delta and Gunnison Counties, COGIS records as of November 2011 show a total of 43 natural gas wells; 19 wells are producing, 16 are shut-in and capable of producing, 2 are waiting on completion, and the remaining 6 were drilled, abandoned, and plugged. Of particular note for proposed developments is the Gunnison Energy/SGI duel proposal for 25 federal natural gas wells and associated infrastructure, located approximately 5 miles west of the Bull Mountain Unit.

BLM_0027290

The BLM UFO Reasonable Foreseeable Development Scenario for Oil and Gas (BLM 2012b) indicates that Oil and Gas development in the UFO is likely to increase over the next 20 years. It is important to note that 25 percent of the federal fluid mineral estate in the UFO is already leased for fluid mineral development, including all of the parcels that would be developed by SGI under this MDP. The level of drilling outside of the Unit boundary cannot be determined and would be influenced by the market price of oil and gas and other factors. For the purpose of this analysis, the assumption is that drilling outside the Unit boundary would continue at a similar pace to current development. Cumulative analysis focuses on the contributions from the proposed development with a qualitative discussion of potential impacts from other future development in the region.

As discussed under Alternative A, Direct and Indirect Impacts, Alternative A has been defined with specific numbers of well pads and associated roads, pipelines, and other ancillary facilities to support a particular level of gas exploration and extraction activity on private lands as a way of fixing a comparison to the action alternatives. In practice, however, the future actions described under Alternative A are independent of the project alternatives and would likely be implemented concurrently or at any time, in addition to the action alternatives. For this reason, the combined Alternative A and Action Alternatives B, C, and D must be evaluated with regard to the cumulative impacts. As described in **Table 4-1**, up to 201 new gas wells (including federal and private mineral estate) may be developed under all alternatives. Drilling rate under all alternatives is assumed to remain at a maximum of 27 wells per year, as discussed under direct and indirect impacts. SGI has provided this maximum based on infrastructure and capital limitations. The level of drilling is not likely to peak until all drilling-related infrastructure has been developed. Similarly, at the end of the estimated production time frame, drilling-related construction is likely to be reduced as production ramps up. The total development time frame may impact the exact number of wells per year and the number of temporary workers require at any given point in time, as described below; however, the number of workers required at any given time should not exceed the maximum estimate. Total production impacts and overall impacts on other land uses and social structure would be greater than that defined for Alternatives A or B, C, or D alone, as discussed in detail below.

Under Alternatives B, C, or D, the total time frame for development of all federal and fee wells may be up to 10 years (**Table 4-1**). Total employees supported for a given year of drilling would be the same as stated under Alternative B: a maximum of 285 direct employees and a total of 471 (direct, indirect, and induced) employees.

Related population increases would likely remain less than 1 percent for the area. However, extending the need for temporary employees in the area for drilling operations beyond that discussed for direct and indirect impacts could result in impacts on area temporary housing, services, and social values. Conversely, the presence of drilling operations in the area for an extended time frame could represent employment opportunities for residents in the region; 80 percent are anticipated to be drawn from within the Rocky Mountain region (SGI 2014).

The cumulative impact of employment for the proposed project and other projects under development would depend on the exact timing of development as well as the location of residences for these employees. Increased pressure on temporary housing, services, or social

BLM_0027291

values would be most likely to occur if the construction period for proposed projects overlaps the construction period for the Bull Mountain MDP. Overlap may occur with the 36 drilling and 35 completion workers that Gunnison Energy estimates would need temporary housing for the 25 natural gas well development five miles from the Bull Mountain Unit, as construction is anticipated to begin within the next five years.

Contributions of the Bull Mountain project to cumulative impacts during the production phase would consist of up to 128 direct and indirect employees (including vendors) and 185 total employees (including direct, indirect and induced jobs) annually under all alternatives. However, the production time frame for individual wells would vary and total production numbers in a given year would likewise be variable. Total population changes would remain low, and long-term impacts on housing and services are not anticipated. Due to the low level of employees required for the production phase, no substantial cumulative changes to area population or impacts on public services are anticipated.

As discussed under direct and indirect impacts, potential impacts on other land uses including livestock grazing, hunting, recreation, and agriculture may occur. When both private and federal mineral estate are taken into account and the potential for additional impacts in the area from other development is examined, the impacts on these other land uses is increased. Adopting mitigation measures, including COAs and design features as specified by alternative under the direct and indirect impacts, could reduce the impacts of development on other land uses from the proposed project, particularly for federal lands. The exact cumulative impacts on area land uses would be determined by where other Proposed Actions are sited, relative to current land uses as well as mitigation measures employed.

Overall, while the alternative selected may impact the pace and timing of development as well as the priority of developing federal or private mineral estate, development would continue under all alternatives. In the long term, the amount of development of federal gas resources in the Unit is expected to be similar under all alternatives. Level of development proposed under all alternatives would represent a significant increase in the drilling activity and potentially gas production, compared to previous years, with the exact rate of development dependent on market prices. While the exact level of labor required at any given time cannot be forecasted, increased energy development can increase the impacts of changes in social structure, population, and housing availability in local communities, particularly if simultaneous drilling periods occur requiring high levels of temporary labor in area communities. Development of the Proposed Action and other proposed activities in the two-county region could also add to the changes in the scenic values, air, and water quality and other non-market commodities. The intensity of development in the oil and gas sector is determined by pace and timing, which, to a large degree, is determined by public policy and also market forces, including national and international energy demand.

### 4.4.3   Environmental Justice

*Methods of Analysis*
As described in **Section 3.4.3**, Environmental Justice, low income and minority populations for the purpose of environmental justice analysis are defined as 1) the aggregate minority population

BLM_0027292

or low income population of the affected area exceeding 50 percent or 2) the aggregate minority or low income population percentage of the affected area being meaningfully greater than the minority population percentage in than comparable identified here as 20 percentage points or greater difference from the state level.

Indicators of impacts on environmental justice are as follows:

- Reduced income or employment in low-income and minority populations

- Impediments to economic development in low-income or minority communities

- Disproportionate potential for human health and safety impacts on low-income or minority communities

### Effects Common to All Alternatives
As detailed in Section 3.4.2, no county or census tract level populations in the project area meet CEQ definitions for low income or minority populations. As such, the Proposed Action and alternatives are not likely to have disproportionate adverse effects on low income or minority populations. Public outreach for this EIS has included efforts to involve members of the community from all socioeconomic classes, and all relevant ethnic and racial backgrounds.

### Cumulative
The cumulative impact analysis area is discussed in the Cumulative section of socioeconomic impacts, above. No significant cumulative impacts on environmental justice would occur under any alternative because there are no minority or low income populations in the project area per CEQ guidelines.

## 4.5 IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES AND RELATIONSHIP OF SHORT-TERM USES OF THE ENVIRONMENT TO LONG-TERM PRODUCTIVITY
This section includes a summary table of the irreversible and irretrievable commitments of resources and the relationship between short-term uses of the environment and long-term productivity as required in 40 CFR 1502.16.

### 4.5.1 Irreversible and Irretrievable Commitment of Resources
A resource commitment is considered irreversible when direct and indirect impacts from its use limit future use options. Irreversible commitments apply primarily to nonrenewable resources, such as cultural resources, and to those resources that are renewable only over long periods of time, such as soil productivity. A resource commitment is considered irretrievable when the use or consumption of the resource is neither renewable nor recoverable for future use. Irretrievable commitment applies to the loss of production, harvest, or natural resources. **Table 4-72**, Irreversible and Irretrievable Commitment of Resources, summarizes the findings. The management actions, COAs, and additional mitigation measures described above would be implemented to ensure that all natural resources are conserved to the maximum extent practicable.

BLM_0027293

**Table 4-72**
**Irreversible and Irretrievable Commitment of Resources**

| Resource | Irreversible and Irretrievable Commitment of Resources |
|---|---|
| Cultural Resources | Cultural resources are nonrenewable and, once damaged or destroyed, are not recoverable. Therefore, if a cultural resource is damaged or destroyed during energy development, that particular cultural location, resource, or object would be irretrievable. |
| Energy and Minerals | Gas development would result in the consumption of natural gas, condensate, and water, as well as salable minerals such as sand and gravel used in road construction. |
| Paleontological Resources | Paleontological resources are nonrenewable and, once damaged or destroyed, cannot be recovered. Therefore, if a paleontological resource (specimen, assemblage, or site) is damaged or destroyed during development, this scientific resource would become irretrievable. |
| Soils | Grading, construction, maintenance, and other surface-disturbing activities on sensitive, protective soil surface layers such as biotic crusts and desert pavement, which take very long periods to form, are effectively irretrievable. Increases in erosion due to disturbance of these surfaces would persist for lengthy, unknown periods. Implementation of COAs and best management practices would reduce erosion in these and other areas, assuming that channel head-cutting or other severe erosion does not become established. |
| Vegetation | Most energy development projects would cause the irreversible loss of vegetation that would otherwise have been available for wildlife to use. While every effort would be made to recover native vegetation and habitat, full restoration of preexisting conditions is not assured. |
| Visual Resources | The introduction of any new manmade line, form, color, or texture into an existing landscape would cause a change, however slight or great, in the existing visual resource inventory conditions (even if the VRM objectives are met), and for the most part, is generally irreversible because few manmade footprints upon the landscape that result from the spread of a growing civilization are ultimately removed completely. |

## 4.5.2   Relationship of Short-term Uses of the Environment to Long-term Productivity

This section compares the potential temporary effects of the actions analyzed in this EIS on the environment with the potential effects on its long-term productivity. The BLM must consider the degree to which the Proposed Action or alternatives would sacrifice a resource value that might benefit the environment in the long term, for some temporary value to a project proponent or the public. **Table 4-73**, Relationship of Short-term Uses of the Environment to Long-term Productivity, summarizes the findings.

Environmental protection measures described in the management actions, COAs, and additional mitigation measures would be employed to reduce disturbances and reclaim or improve vegetation cover, soil, and wildlife habitat on these lands. While the degree of reclamation is unknown, to the extent that disturbances can be reclaimed, other productive use of these lands would not be precluded in the long term.

BLM_0027294

**Table 4-73**
**Relationship of Short-term Uses of the Environment to Long-term Productivity**

| Resource | Relationship of Short-term Uses of the Environment to Long-term Productivity |
|---|---|
| Air Quality and Greenhouse Gases | Short-term construction activities would impact air quality; long term production and continued development activities would contribute to the regional impacts on air quality. |
| Fish and Wildlife | There may be some loss of existing vegetation, soil, and habitat available for wildlife, but mitigation measures are intended to avoid most high quality wildlife habitat. Full recovery of these lands and restoration of any lost habitat or associated wildlife is not assured. |
| Livestock Grazing | Where undeveloped land is used for facilities, some grazing uses could continue within a project site. A project's use of the environment has very little adverse impact on the maintenance and enhancement of long-term productivity as construction areas would be reclaimed. |
| Soils | The alternatives would cause removal of vegetation and disturbance of soil resources. While every effort would be made to restore soil conditions, full restoration of preexisting conditions is not assured and would take many years. In particular, grading, construction, maintenance, and other surface-disturbing activities on sensitive, protective soil surface layers such as biotic crusts, which take very long periods to form, are effectively irretrievable. Increases in erosion due to disturbance of these surfaces would persist for lengthy, unknown periods. Implementing mitigation measures and COAs would reduce erosion in these and other areas, assuming that channel head-cutting or other severe erosion does not become established. |
| Special Status Species | There would be some loss of habitat under the alternatives, but at least Alternatives B and C have been designed to avoid habitat important to special status species; therefore, the project should not significantly contribute to the population decline in special status species, lead to federal listing of species, or lead to species extinction. |
| Vegetation | There would be some loss of existing vegetation, but most of the Unit has vegetation cover that is common to the region, so a project would not result in the loss of rare resources. |

BLM_0027295



This page intentionally left blank.

BLM_0027296

# Chapter 5
## Consultation and Coordination

BLM_0027297

BLM_0027298

# TABLE OF CONTENTS

Chapter                                                                                                    Page

5.      CONSULTATION AND COORDINATION........................................................................ 5-1
        5.1      Introduction............................................................................................... 5-1
        5.2      Notice of Intent and Public Comments......................................................... 5-1
        5.3      Notice of Availability for the Draft EIS and Public Review ........................... 5-2
                 5.3.1   Public Meetings ............................................................................. 5-2
        5.4      Summary of Comments Received on the Draft EIS ....................................... 5-3
                 5.4.1   Process and Methodology................................................................ 5-3
                 5.4.2   Public Comments ........................................................................... 5-5
        5.5      Consultation and Coordination with Agencies and Tribal Governments ......... 5-7
                 5.5.1   Government-to-Government Consultation with Native
                         American Tribes........................................................................... 5-7
                 5.5.2   Colorado State Historic Preservation Officer Consultation................. 5-8
                 5.5.3   US Fish and Wildlife Service Consultation ......................................... 5-8
                 5.5.4   US Environmental Protection Agency................................................ 5-9
        5.6      Cooperating Agencies.................................................................................. 5-9

# TABLES

                                                                                                           Page

5-1     Number of Unique Submissions and Comments by Affiliation ................................... 5-5
5-2     Number of Comments on the Draft EIS by Category................................................... 5-6

BLM_0027299

This page intentionally left blank.

BLM_0027300

# CHAPTER 5
# CONSULTATION AND COORDINATION

## 5.1   INTRODUCTION

During the NEPA process for this EIS, the BLM formally and informally consulted and coordinated with other federal agencies, state and local governments, Indian tribes, and the interested public.

The following sections of this chapter describe the public involvement, consultation, and coordination process, including key consultation and coordination activities undertaken to ensure the BLM's compliance with, in both the spirit and intent, 40 CFR, Parts 1501.7, 1502.19, and 1503.

## 5.2   NOTICE OF INTENT AND PUBLIC COMMENTS

Throughout the public involvement process for this EIS, the BLM has sought information from individuals and organizations with knowledge of or concern for resources in the Bull Mountain Unit MDP. The process included a thorough and ongoing public participation process.

Two scoping periods were conducted for the Bull Mountain Unit MDP EA. The first was conducted from October 28, 2008, to December 12, 2008; and the second was conducted from September 17, 2009, to November 13, 2009. The preliminary EA was available for a 30-day public comment period from March 23 to April 23, 2012.

A Notice of Intent (NOI) to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134, April 3, 2013). It notified the public of the BLM's intent to prepare an EIS, provided information on the EA previously completed for the project, and included an overview of the proposed action and a list of BLM-identified preliminary issues.

The preliminary issues were as follows: air quality; water quality and supply; threatened, endangered, and sensitive wildlife species; wildlife and wildlife habitat; recreation and visual resources; socioeconomics; and transportation.

BLM_0027301

In addition, the BLM notified the public of the public involvement through media outlets, postcards, emails, and the BLM's website. A project newsletter issued on May 2, 2013, provided information on the kickoff of the EIS and future opportunities for public involvement.

Comments received during the initial EIS comment period largely fell into several key categories: environmental, socioeconomic, stakeholder involvement, cumulative impact analyses, impact mitigation, alternatives to be analyzed, and coordination with ongoing regional and state planning (see list in Section 1.8, Key Issues Addressed in this EIS). The scoping summary report and copies of all written comments submitted by mail, email, or in person are available from the BLM Uncompahgre Field Office.

Public participation will be ongoing throughout the remainder of the Bull Mountain Unit MDP EIS process. One substantial part is the opportunity for members of the public to comment on this Draft EIS during the comment period. In the Final EIS, the BLM will respond to all substantive comments received during the 45-day comment period. It will issue a ROD after the release of the Final EIS.

## 5.3   NOTICE OF AVAILABILITY FOR THE DRAFT EIS AND PUBLIC REVIEW

On January 16, 2015, the BLM and EPA published a Notice of Availability in the *Federal Register* which marked the beginning of the formal 45-day public comment period. On January 27, 2015 the public comment period was extended for an additional 45 days. The formal public comment period ended on April 16, 2015.

The BLM provided copies of the Draft RMP/EIS directly to cooperating agencies, and other federal, state, and local agencies. Paper copies were also available at community libraries in Paonia, Hotchkiss, Delta, and Gunnison, and the Paonia US Forest Service office.

### 5.3.1   Public Meetings

One open house/listening session was held on February 10, 2015 in Paonia, CO during the 90-day comment period for the Draft EIS. The location, date, and time of the open house was announced via email and in the RMP newsletter that was emailed and mailed to the mailing list as well as posted to the project's website.

The open house/listening session provided information to the public on the content of the Draft EIS, guidance on how, where, and when to comment on the document, and provided a question and answer session for the public to voice their thoughts and concerns. Prior to a project presentation by the BLM, the attendees were encouraged to visit with BLM representatives and managers regarding questions or concerns about the Draft EIS. Following the open house period, the BLM gave a presentation on an overview of the project, the range of alternatives considered, and the issues addressed in the analysis. Following the presentation, the public was provided an opportunity to voice questions and concerns regarding the project or aspects of the analysis. Throughout the meeting, the public had an opportunity to submit written comments to the BLM.

BLM_0027302

## 5.4   SUMMARY OF COMMENTS RECEIVED ON THE DRAFT EIS

### 5.4.1   Process and Methodology

According to NEPA, the BLM is required to identify and formally respond to all substantive public comments. The BLM developed a systematic process to ensure all substantive comments were tracked and considered. On receipt, each comment letter was assigned an identification number and logged into CommentWorks, an Internet database that allowed the BLM to organize, categorize, and respond to comments. Substantive comments from each letter were coded to appropriate categories, based on the content of the comment, and the link to the commenter was retained. The categories generally follow the sections presented in the Draft EIS, though some relate to the NEPA process or editorial concerns.

Comments similar to each other were grouped under a topic heading, and the BLM drafted a statement summarizing the ideas and themes contained in the comments. The responses were crafted to respond to the comments and indicates whether the commenters' points resulted in a change in the document. As a result of public comments, changes were made to the Draft EIS and reflect the consideration given to public comments. A summary of major changes between the Draft EIS and the Final EIS can be found in **Section 1.9**.

Although each comment letter was diligently considered, the comment analysis process involved determining whether a comment was substantive or nonsubstantive. In performing this analysis, the BLM and Forest Service relied on the CEQ's regulations to determine what constituted a substantive comment. A substantive comment does one or more of the following:

- Questions, with a reasonable basis, the accuracy of the information or analysis in the EIS

- Questions, with a reasonable basis, the adequacy of the information or analysis in the EIS

- Presents reasonable alternatives other than those presented in the Draft EIS that meet the purpose and need of the Proposed Action and addresses significant issues

- Questions, with a reasonable basis, the merits of an alternative or alternatives

- Causes changes in or revisions to the Proposed Action

- Questions, with a reasonable basis, the adequacy of the planning process itself

Additionally, the BLM's NEPA Handbook identifies the following types of substantive comments:

- Comments on the adequacy of the analysis—Comments that express a professional disagreement with the conclusions of the analysis or assert that the analysis is inadequate are substantive but may or may not lead to changes in the Final EIS. Interpretations of analyses should be based on professional expertise. Where there is disagreement within a professional discipline, a careful review of the various interpretations is warranted. In some cases, public comments may necessitate a reevaluation of analytical conclusions. If, after reevaluation, the manager responsible for preparing the EIS (the BLM Authorized

BLM_0027303

Officer) does not think that a change is warranted, his or her response should provide the rationale for that conclusion.

- Comments that identify new impacts, alternatives, or mitigation measures—Public comments on a Draft EIS that identify impacts, alternatives, or mitigation measures that were not addressed in the draft are substantive. This type of comment requires the Authorized Officer to determine whether it warrants further consideration; if so, the BLM Authorized Officer must determine whether the new impacts, new alternatives, or new mitigation measures should be analyzed in the Final EIS, a supplement to the Draft EIS, or a completely revised and recirculated Draft EIS.

- Disagreements with Significance Determinations—Comments that directly or indirectly question, with a reasonable basis, determinations regarding the significance or severity of impacts are substantive. A reevaluation of these determinations may be warranted and may lead to changes in the Final EIS. If, after reevaluation, the BLM Authorized Officer does not think that a change is warranted, his or her response should provide the rationale for that conclusion.

Some submissions received contained substantive comments but were out of the scope of this project. These were comments on subjects not related to this project, other oil and gas development or leasing projects, or BLM laws, rules, regulations, or policy. These comments were reviewed and sent along to the appropriate party as needed, but they were not included in the comment report.

Comments that failed to meet the above descriptions were considered nonsubstantive. Many comments received throughout the process were from those who expressed personal opinions or preferences, those whose comments had little relevance to the adequacy or accuracy of the Draft EIS, or those who represented commentary on resource management without any real connection to the document being reviewed. These commenters did not provide specific information to assist the interdisciplinary team in making a change to the preferred alternative, did not suggest other alternatives, and did not take issue with methods used in the Draft EIS. Those comments are not addressed further in this document.

Examples of some of these comments are the following:

- The best of the alternatives is Alternative A (or B or C).

- The BLM has yet to show land stewardship above its current level.

- The MDP does not reflect balanced land management.

- You cannot let the project proceed.

- You should not allow leasing in this area.

Opinions, feelings, and preferences for one element or one alternative over another and comments of a personal or philosophical nature were all read, analyzed, and considered;

BLM_0027304

however, because such comments were not substantive, the BLM did not respond to them. It is also important to note that while all comments were reviewed and considered, comments were not counted as "votes." The NEPA public comment period is neither considered an election nor does it result in a representative sampling of the population. Therefore, public comments are not appropriate to be used as a democratic decision-making tool or as a scientific sampling mechanism.

Comments citing editorial changes to the document were reviewed and incorporated. The Final EIS has been extensively technically edited and revised to fix typos, missing references, definitions, and acronyms, and other clarifications as needed.

## 5.4.2   Public Comments

A total of 565 unique comment letters, forms, and e-mails were received during the 90-day public comment period. These documents resulted in 360 substantive comments. The breakdown of unique submissions and comments by affiliation are provided in **Table 5-1** below. None of the anonymous submissions contained substantive comments.

**Table 5-1**
**Number of Unique Submissions and Comments by Affiliation**

| Group | Number of Submissions | Number of Comments |
|---|---|---|
| Private individuals | 515 | 66 |
| Organizations (including businesses and environmental and wildlife protection groups) | 22 | 273 |
| Federal agencies (EPA, USFWS, Forest Service, NPS) | 4 | 11 |
| State agencies (CDPHE, Colorado State Legislature) | 2 | 2 |
| Local government (county commissions and departments) | 6 | 8 |
| Educational institutions (Western State Colorado University) | 9 | 0 |
| **Total** | **565** | **360** |

In addition to the unique submissions discussed above, 83 form letters were submitted during the public comment period. Form letters are exact or very close copies of a letter that are submitted multiple times by different individuals; individuals may add additional language to the letter, but this usually does not substantially change its content. Often, form letters are created by an organization and sent to their members, who in turn submit them during the public comment period.

For the Bull Mountain Unit MDP EIS, there was only one type of form letter master submitted. While all content in the letter was identical or nearly so with additional text, there was no indication as to which group generated the master content. One copy of the letter was included in the comment analysis process as a master form letter, and it was reviewed for substantive content. All substantive comments were included in the comment analysis process. For the form letters that contained additional unique content, the comments were reviewed for substance, and when found, the comments were parsed and analyzed.

The 360 substantive comments were categorized into 67 issue statements. The comments received on the Draft EIS were similar to the issues raised during both the EA and EIS public scoping periods; they focused primarily on the following issues:

BLM_0027305

- Water resources (57 comments)

- Air resources (52 comments)

- Wildlife, birds, and special status species (49 comments)

- Socioeconomics (40 comments)

- The Conservation Alternative (38 comments)

- General regulatory comments (27 comments)

- General NEPA requirements (20 comments)

See **Table 5-2** for a complete list of comments by issue category.

**Table 5-2**
**Number of Comments on the Draft EIS by Category**

| Topic | Number of Comments* |
|---|---|
| Water resources | 57 |
| Air resources | 52 |
| Wildlife, birds, special status species | 49 |
| Socioeconomic, environmental justice | 40 |
| Conservation alternative | 38 |
| Plans, policies, laws, regulations | 27 |
| NEPA (range of alternatives, general impacts analysis, general cumulative impacts analysis, general assumptions) | 20 |
| Project components (construction, drilling, interim reclamation, production/maintenance, final reclamation) | 16 |
| Bonding | 14 |
| Mitigation measures (general) | 13 |
| Traffic, access | 11 |
| Geology | 10 |
| Soil | 8 |
| Noise | 9 |
| Hydraulic fracturing | 8 |
| Hazardous materials | 7 |
| Vegetation | 7 |
| Alternatives assumptions | 7 |
| Visual resources | 6 |
| Siting model | 5 |
| GIS data and analysis | 4 |
| Impacts on grazing | 4 |
| Cultural resources | 3 |
| Paleontology | 1 |

*Some comments were coded to multiple categories. For example, a comment on landslide risk and the need for an alternative to address this would be coded to Geology and NEPA.

In many cases, commenters expressed a desire for a specific outcome, namely for drilling and development within the Unit to be shut down and not allowed to proceed. As described in

BLM_0027306

**Chapters 1** and **2**, the intent of the project was to consider acceptance, rejection, or modification of the applicant's proposed Master Development Plan. As the area is already under lease, stopping drilling and development is beyond the scope of this EIS.

All substantive comments, detailed summaries, and responses organized by resource, resource use, or EIS planning regulation can be found in **Appendix N**; an overview of changes to the document is provided in **Chapter 1**, Introduction, **Section 1.10**, Changes between the Draft EIS and Final EIS.

**5.5    CONSULTATION AND COORDINATION WITH AGENCIES AND TRIBAL GOVERNMENTS**
Various federal laws require the BLM to consult with American Indian tribes, the State Historic Preservation Office (SHPO), the USFWS, and the EPA during the NEPA decision making process. This section documents the specific consultation and coordination undertaken through development of the Final EIS.

**5.5.1   Government-to-Government Consultation with Native American Tribes**
The federal government works on a government-to-government basis with Native American tribes. This relationship was formally recognized on November 6, 2000, with Executive Order 13175 (*Federal Register*, Volume 65, page 67249). As a matter of practice, the BLM coordinates with all tribal governments, associated native communities, native organizations, and tribal individuals whose interests might be directly and substantially affected by activities on public lands. In addition, Section 106 of the NHPA requires federal agencies to consult with Indian tribes for undertakings on tribal lands and for historic properties of significance to the tribes that may be affected by an undertaking (36 CFR, Part 800.2[c][2]). BLM Manual 8120 (BLM 2004a) and BLM Handbook H-8120-1 (BLM 2004b) provide guidance for Native American consultations.

The BLM has given substantial consideration to the proper government-to-government consultations for this project in order to provide for multiple opportunities for tribal consultation. It has provided tribes with multiple ongoing opportunities to comment and receive information on and participate in the Bull Mountain Unit MDP EIS.

Executive Order 13175 stipulates that, during the NEPA process, federal agencies consult tribes identified as "directly and substantially affected." The BLM contacted the following tribal governments early in the EIS process:

- Southern Ute Indian Tribe

- Ute Mountain Ute Tribe

- Ute Tribe of the Uintah and Ouray Reservation

The Tribal governments were informally consulted during the earlier EA process and have been kept abreast of the project status during regular coordination meetings. In February 2014, the BLM sent formal letters to the tribes inviting them to serve as cooperating agencies for the EIS and initiating formal consultation, in accordance with the NHPA and other legal authorities. Although no tribes requested formal status as cooperating agencies, some tribal governments

BLM_0027307

responded with a request to be kept informed of the EIS's progress. The tribes are on the EIS's mailing list to receive updates and notification of the availability of the Draft and Final EIS.

Government-to-government consultation for the Bull Mountain Unit MDP EIS has continued via phone and email to keep all tribal entities informed about the NEPA process for the EIS. In addition, the BLM will continue to implement government-to-government consultation on a case-by-case basis for site-specific energy development projects on BLM-administered lands and mineral estate within the project area.

### 5.5.2   Colorado State Historic Preservation Officer Consultation

In accordance with the requirements of Section 106 of the NHPA, the BLM coordinated with and solicited input from the Colorado SHPO. The BLM and the SHPO followed the coordination protocols in the Colorado Protocol relating to EISs; the protocol provides for a phased consultation process related to historic, traditional, and cultural resources for an EIS and subsequent activities that could tier from a ROD. In accordance with these procedures, the BLM wrote to the SHPO on September 10, 2013. The letter introduced the Bull Mountain Unit MDP EIS and specified the need to consult on information about potential development actions. The SHPO formally responded to the letter on September 19, 2013, expressing interest but no specific concerns.

The SHPO did not submit any formal comments on the Draft EIS.

### 5.5.3   US Fish and Wildlife Service Consultation

Consultation with the USFWS is required under Section 7(c) of the ESA before the BLM begins any project that may affect federally listed or endangered species or its habitat. This proposed action is considered to be a major project; the Draft EIS described potential impacts on threatened and endangered species as a result of management actions proposed in the alternatives. The BLM has been in consultation with the USFWS regarding water depletion concerns and potential lynx habitat near the project area.

As part of the Final EIS, the BLM determined their preferred alternative and prepared a Biological Assessment evaluating the impacts of the activities on federally listed threatened and endangered species. The BLM submitted the Biological Assessment to the USFWS for review on September 22, 2015. For each listed species, the BLM determined if the implementation of the Preferred Alternative may affect the species that was the subject of the consultation. The USFWS responded on October 20, 2015 with a memorandum concurring with the BLM's analysis that project "may affect, is not likely to adversely affect" the threatened Greenback cutthroat trout and threatened Canada lynx and "may affect, is likely to adversely affect" the four endangered Colorado River fishes. The finding on the Colorado River fishes falls under BLM Colorado's Programmatic Biological Assessment (PBA) for water depleting activities associated with BLM's fluid minerals program in the Colorado River Basin in Colorado. U.S. Fish and Wildlife Service (FWS) issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-C0-08-F-0006) on December 19, 2008, which concurred with BLM's determination that water depletions are "Likely to Adversely Affect" the Colorado pikeminnow, Humpback chub, Bonytail, and Razorback sucker.

BLM_0027308

### 5.5.4   US Environmental Protection Agency

NEPA regulations require that EISs be filed with the EPA (40 CFR, Part 1506.9). The Final Bull Mountain Unit MDP EIS was submitted to the EPA, as required by CEQ regulations.

## 5.6   COOPERATING AGENCIES

A cooperating agency is any federal, state, or local government agency or Native American tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. Cooperating agencies and tribes "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks."

The benefits of enhanced collaboration among agencies in preparing NEPA analyses are as follows:

- Disclosing relevant information early in the analytical process

- Applying available technical expertise and staff support

- Avoiding duplication with other federal, state, tribal, and local procedures

- Establishing a mechanism for addressing intergovernmental issues

Seven agencies are working with the BLM as cooperating agencies and are listed below:

- US EPA, Region 8

- GMUG National Forest

- Gunnison County

- Delta County

- Delta Conservation District

- Colorado Department of Natural Resources (including the Division of Parks and Wildlife)

- Colorado Department of Public Health and Environment

Interactions with the cooperating agencies have included periodic briefings and reviews of preliminary, internal draft sections of text. The BLM will continue to engage these cooperating agencies throughout the preparation of the EIS.

BLM_0027309

This page intentionally left blank.

BLM_0027310

# Chapter 6
## List of Preparers

BLM_0027312

# CHAPTER 6
# LIST OF PREPARERS

This EIS was prepared by an interdisciplinary team of staff from the BLM, Environmental Management and Planning Solutions, Inc. (EMPSi), with their supporting subcontractors Carter Lake Consulting and Alpine Archaeology. The following is a list of people that prepared or contributed to the development of the EIS.

| **BUREAU OF LAND MANAGEMENT** | |
|---|---|
| **Name** | **Role/Responsibility** |
| **Colorado State Office Interdisciplinary Team Members** | |
| Forrest Cook | Air Quality |
| Jessica Montag, Wyoming State Office | Socioeconomics, Environmental Justice |
| Martin Hensley, Colorado State Office | Socioeconomics, Environmental Justice |
| Joshua Sidon, National Operations Center | Socioeconomics, Environmental Justice |
| **Uncompahgre Field Office Interdisciplinary Team Members** | |
| Jerry Jones | Project Coordinator |
| Bruce Krickbaum | NEPA, ACEC |
| Barbara Sharrow | Field Manager |
| Thane Stranathan | Fluid Minerals |
| Edd Franz | Wilderness, Wild & Scenic Rivers |
| Glade Hadden | Cultural, Native American Concerns, Paleontology |
| Jedd Sondergard | Soils, Farmlands, Water Quality/Rights |
| Amanda Clements | Vegetation, Wetlands/Riparian |
| Lynae Rogers | Invasive/Nonnative Species, Range |
| Ken Holsinger | T&E Species, Wildlife, Migratory Birds |
| Julie Jackson | Transportation, Recreation, Visual |
| Linda Reed | Access, Realty |
| Kelly Homstad | Fire, Forestry |

BLM_0027313

| BUREAU OF LAND MANAGEMENT | |
|---|---|
| **Name** | **Role/Responsibility** |
| Pamela Leschak | Fluids Geologist |
| Rob Ernst | Geology, Minerals |
| John Pecor | Petroleum Engineer |
| Teresa Pfifer | Supervisor Land and Minerals Staff |
| Alan Kraus | Hazardous Materials, Wastes |
| Dave Sinton | GIS |

| CONSULTANTS | | |
|---|---|---|
| **Name** | **Role/Responsibility** | **Education** |
| **Environmental Management and Planning Solutions, Inc.** *www.empsi.com* | | |
| **Jordon Adams** | GIS; Soil Resources; Geology | BS, Environmental Sciences |
| **David Batts** | Principal, Quality Assurance/Quality Control | MS, Natural Resource Planning BS, International Development |
| **Amy Cordle** | Air Quality; Climate Change; Noise | BS, Civil Engineering |
| **Annie Daly** | Air Quality; Visual Resources | BA, Environmental Studies |
| **Carol-Anne Garrison** | Project Manager; Cultural Resources, Paleontology, Tribal Interests and Consultation | Master's Certificate, Project Management MA, Anthropology BA, Anthropology |
| **Andrew Gentile** | Health and Safety | MS, Environmental Management BS, Biochemistry |
| **Zoe Ghali** | Soils; Socioeconomics and Environmental Justice Livestock Grazing | MS, Environmental Physiology Interdisciplinary Masters Certificate, Environmental Policy BS, Biology |
| **Brandon Jensen** | Fish and Wildlife; Migratory Birds; Special Status Species | MS, Environmental Science BS, Biology |
| **Jenna Jonker** | GIS | BA, Geography |
| **Matthew Kluvo** | Climate Change | MS, Environmental Science BS, Ecology and Evolutionary Biology |
| **Laura Long** | Technical Editing; Formatting | MA, Media and Communications BA, English Literature |
| **Katie Patterson** | Leasable Minerals | JD, Environmental Law BA, Public Policy |
| **Marcia Rickey** | Deputy Project Manager, GIS Manager | MS, Conservation Biology BS, Biology |
| **Chad Ricklefs, AICP** | Land Use and Realty | MURP, Environmental Planning BA, Political Science and Environmental Conservation |

BLM_0027314

| CONSULTANTS | | |
|---|---|---|
| **Name** | **Role/Responsibility** | **Education** |
| **Drew Vankat** | Recreation; Travel Management | MS, Environmental Policy and Planning<br>BPhil, Environmental and Urban Planning |
| **Jennifer Whitaker** | Special Designations; Minerals | MS, Project Management<br>BS, Public Affairs |
| **Tom Whitehead** | Water Resources and Geology | MS, Hydrology<br>BS, Geology<br>BA, Anthropology |
| **Liza Wozniak** | Fish and Wildlife; Migratory Birds; Special Status Species, Livestock Grazing | MS, Ecology<br>MPH, Environmental Toxicology<br>BS, Biology |
| **Meredith Zaccherio** | Vegetation; Fish and Wildlife | MA, Biology<br>BS, Biology and Environmental Science |
| **Lauren Zielinski** | Water Resources, Document Support | BS, Earth and Environmental Engineering |
| **Carter Lake Consulting** | | |
| **Jim Zapert** | Air Quality | MS, Atmospheric Sciences<br>BS, Meteorology |
| **Alpine Archaeology** | | |
| **Matthew J. Landt** | Cultural/Historic Resources and Native American Interests | MA, Anthropology<br>BS, Anthropology |
| **Kimberly L. Redman** | Cultural/Historic Resources and Native American Interests | MA, Anthropology<br>BS, Anthropology |

BLM_0027315

This page intentionally left blank.

BLM_0027316

# Chapter 7
## References

BLM_0027318

# CHAPTER 7
# REFERENCES

Abramzon, S., C. Samaras, A. Curtright, A. Litovitz, and N. Burger. 2014. Estimating the Consumptive Use Costs of Shale Natural Gas Extraction on Pennsylvania Roadways. Journal of Infrastructure Systems, 10.1061/(ASCE)IS.1943-555X.0000203. 06014001.

Abt Associates. 2012. Modeled Attainment Software, User's Manual. Abt Associates Inc., Bethesda, MD. October. (http://www.epa.gov/ttn/scram/guidance/guide/MATS-2-5-1_manual.pdf).

Ackerman, D. J. and Brooks. 1986. Reconnaissance of Ground Water Resources in the North Fork Gunnison River Basin, Southwest Colorado. USGS Water Resources Investigation Report 85-4230.

American Speech and Hearing Association (ASHA). 2008. Noise Levels. Available at Internet Web site: http://www.asha.org/public/hearing/disorders/noise.htm.

Appel, Cynthia L. and David L. Butler. 1991. Effects of a Landslide Complex on Sediment Discharges and Loads in the Muddy Creek Drainage Basin and Deposition into Paonia Reservoir, West-Central Colorado, 1986-87. U.S. Geological Survey Water-Resources Investigations Report 90-4173.

Ausbrooks, S. M. and S. Horton. 2012. Disposal of Hydrofracking-Waste Fluid by Injection into Subsurface Aquifers Triggers Earthquake Swarm in Central Arkansas with Potential for Damaging Earthquakes. PowerPoint Slide Presentation. Arkansas Geological Survey and the University of Memphis Center for Earthquake Research and Information.

Avian Power Line Interaction Committee (APLIC) and United States Fish and Wildlife Service (USFWS). 2005. Avian Protection Plan Guidelines. http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Apr2005.pdf

Bamberger, M. and R. E. Oswald. 2012. *Impacts of Gas Drilling on Human and Animal Health.* New Solutions, Vol. 22(1) 51-77.

BLM_0027319

Barber, J. R., K. M. Fristrup, C. L. Brown, A. R. Hardy, L. M. Angeloni, and K. R. Crooks. 2009a. The costs of chronic noise exposure for terrestrial organisms. Trends in Ecology and Evolution 25 (3): 180-189.

_____. 2009b. Conserving the wild life therein – Protecting park fauna from anthropogenic noise. Park Science 26 (3), Winter 2009-2010.

Baron, J. S. 2006. Hindcasting Nitrogen Deposition to Determine and Ecological Critical Load. Ecological Applications, 16(2), 2006, pp 433-439.

Bennet, A. 2013. The Impact of Hydraulic Fracturing On Housing Values In Weld County, Colorado: A Hedonic Analysis. Thesis in Fulfilment of Degree of Master of Science Colorado State University Fort Collins, Colorado. Summer 2013

Beranek, L. L., editor. 1988. Noise and vibration control (revised edition). Institute of Noise Control Engineering, Washington, DC.

Berry, J. 2011. Hydrology and Surface Water Report for Bull Mountain Unit Master Development Plan. WWC Engineering. Sheridan WY.

Broderdorp, K. 2006-2011. Personal communication. Wildlife Biologist. US Fish and Wildlife Service, Western Colorado Field Office. Grand Junction, Colorado (reference from the EA).

Bureau of Land Management (BLM). 1984. Manual 8400—Visual Resource Management. Rel. 8-24, April 5, 1984. BLM, Washington, DC.

_____. 1985. BLM Manual 9113

_____. 1986a. Handbook H-8410-1- Visual Resource Inventory. Rel. 8-28, January 17, 1986. BLM, Washington, DC.

_____. 1986b. Handbook H-8431-1, Visual Resource Contrast Rating. Rel. 8-30, January 17, 1986. BLM, Washington, DC.

_____. 1989. Uncompahgre Basin Resource Management Plan and Record of Decision. BLM, Montrose District, Uncompahgre Basin Resource Area, CO. July 1989. Available at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. Last accessed, February 12, 2014.

_____. 1997. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. BLM, Colorado State Office, Lakewood, CO. February 3, 1997.

_____. 2005. Washington Office Instruction Memorandum 2005-247, "National Environmental Policy Act (NEPA) Compliance for Oil, Gas, and Geothermal Development". Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/ national_instruction.html. Last accessed, February 12, 2014.

BLM_0027320

_____. 2007a. North Fork Land Health Assessment 2006-2007. Uncompahgre Field Office, BLM.BLM. 2013. Soil Survey Staff, Natural Resources Conservation Service, United States Department of Agriculture. Soil Survey Geographic (SSURGO) Database for Paonia County, CO. Available online at http://soildatamart.nrcs.usda.gov. Accessed June 2013.

_____. 2007b. Environmental Assessment Piceance Development Project CO-110-2005-219-EA. Online at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/ white_river_field/completed_2007_documents.Par.71869.File.dat/co11005219ea.pdf. Accessed September 2010.

_____. 2007c. BLM Onshore Oil and Gas Order #1: Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations. Available at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/Onshore_Order_no1.html. Last accessed, February 12, 2014.

_____. 2008a. BLM NEPA Handbook, H-1790-1. Available at http://www.blm.gov/wo/st/en/ info/regulations/Instruction_Memos_and_Bulletins/blm_handbooks.html. Last accessed February 12, 2014.

_____. 2008b. Instruction Memorandum 2008-166—Technical Correction to the Bureau of Land Management's (BLM) National Environmental Policy Act (NEPA) Handbook, August 1, 2008. BLM, Washington, DC.

_____. 2009. Community Assessment of the Uncompahgre Planning Area. BLM, Uncompahgre Field Office, Montrose, CO. 224 pp

_____. 2010a. Renewable Energy Potential Report. BLM, Uncompahgre Field Office, Montrose, CO. May 2010

_____. 2010b. Analysis of the Management Situation for the BLM Uncompahgre Planning Area. Online at: http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/ uncompahgre_field/rmp/rmp_docs.Par.60566.File.dat/AMS%20Final%20Web%20071210.pdf. Accessed September 2010.

_____. 2010c. Socioeconomic Baseline report prepared for the Uncompahgre Resource Management Plan. BLM, Uncompahgre Field Office, Montrose. CO. October 2010.

_____. 2011a. Meteorological observations collected at Pine Ridge Colorado Site, Remote Automated Weather Station, US Bureau of Land Management, Online at http://www.raws.dri.edu.

_____. 2011b. PowerPoint Presentation, "Coal and Fluid Minerals Potential Presentation." Presented for the Cooperating Agencies on June 23, 2011 by Rob Ernst.

_____. 2011c. BLM Recreation Management Information System for fiscal years 2007-2011 Uncompahgre Field Office.

_____. 2012a. Bull Mountain Unit Master Development Plan, Preliminary Environmental Assessment. DOI-CO-150-2009-0005 EA. Available at http://www.blm.gov/co/st/en/ BLM_Information/nepa/ufo/Bull_Mountain_EIS.html. Last accessed February 12, 2014.

_____. 2012b. Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado. Prepared by BLM Wyoming State Office, Reservoir Management Group for BLM, Uncompahgre Field Office, Montrose, CO. February 2012.

_____. 2013a. 2013. Hydraulic Fracturing White Paper. BLM Wyoming State Office. July 5, 2013.

_____. 2013b. Bull Mountain Unit MDP Scoping Summary Report. Available at http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html. Last accessed February 12, 2014.

_____. 2013c. Programmatic Environmental Analysis for Integrated Weed Management Treatments. Environmental Assessment. DOI-BLM-S050-2012-0029 EA. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/fy 2013_nepa_docs.Par.78980.File.dat/12-29%20EA%20Programmatic%20Intregrated%20Weed%20Treatments%20Final.pdf. Last accessed May 8, 2014.

_____. 2013d. BLM GIS of historical fire data. Accessed by Kelly Homstad, May 2013.

_____. 2013e. Socioeconomic Baseline report prepared for the Bull Mountain Unit Master Development Plan EIS. BLM, Uncompahgre Field Office, Montrose, CO. August 2013.

_____. 2013f. Instruction Memorandum No. 2013-131. Guidance on Estimating Nonmarket Environmental Values. September 12, 2013.

_____. 2013g. Draft BLM Manual 3180-1, Unitization [Exploratory]. Available from BLM Uncompahgre Field Office, Montrose, CO.

_____. 2014a. Air Resources Technical Report for Oil and Gas Development, New Mexico, Oklahoma, Texas, and Kansas. Bureau of Land Management, New Mexico State Office. February 2014.

_____. 2014b. Colorado Air Resource Management Modeling Study (CARMMS), 2021 Modeling Results for the High, Low and Medium Oil and Gas Development Scenarios (Draft Final), Bureau of Land Management, Colorado State Office, Lakewood, Colorado. December.

BLM_0027322

Bureau of Land Management Geographic Information System (BLM GIS). 2014. GIS data used in conjunction with SG Interests data to form the alternatives, and GIS data on file with BLM's eGIS server, including Bull Mountain Unit, VRM and VRI, existing roads, OHV designations, Colorado HUC 5 watersheds and others. Department of the Interior, BLM, Colorado Uncompahgre Field Office. Data was edited from June 2013 – June 2014 for DEIS and updated May –September 2015 for FEIS.

Bureau of Land Management and U.S. Forest Service. 2015. Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-well Pads, Environmental Assessment DOI-BLM-CO-S050-2015-0029-EA, BLM Uncompahgre Field Office, Montrose, CO and U.S. Forest Service Paonia Ranger District, Paonia, CO, June 2015.

Burton, T. A., E. R. Cowley, and S. J. Smith. 2008. Monitoring Stream Channels and Riparian Vegetation – Multiple Indicators. Version 5.0. US Department of the Interior. Bureau of Land Management. Idaho State Office. Boise, Idaho.

Cater, John and Andrew Larsen. 2010. A Cultural Resource Inventory of the SG Interests Federal 12-89-7 Unit 1 Well Pad in Gunnison County, Colorado. Prepared for the Bureau of Land Management, Uncompahgre Field Office by Aztec Archaeological Consultants, LLC.

Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carrillo, Jonathon C. Horn, Carl Späth, David R. Guilfoyle, and E. Steve Cassells. 2007. Colorado History:  A Context for Historical Archaeology. Colorado Council of Professional Archaeologists, Denver.

Civil Society Institute. 2010. Fracking and Clean waters: A Survey of Americans. Conducted for the Civil Society Institute by infogroup ORC. December 21, 2010.

Clevenger, A.P., Purroy, F.J., and M.A. Campos. 1997. Habitat assessment of a relict brown bear *Ursus arctos* population in northern Spain. Biological Conservation 80:17-22.

Colorado Department of Public Health and Environment (CDPHE). 2009a. Regulation 31- The Basic Standards and Methodologies for Surface Water (amended 10/13/09, effective 11/30/09). Online at http://www.cdphe.state.co.us/regulations/wqccregs/. Accessed September 2010.

_____. 2009b. Regulation 41 - The Basic Standards for Ground Water (amended 10/13/09, effective 11/30/09). Online at http://www.cdphe.state.co.us/regulations/wqccregs/. Accessed September 2010.

_____. 2010a Regulation 35 - Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins (amended 2/8/10, effective 6/30/10). Online at http://www.cdphe.state.co.us/regulations/wqccregs/. Accessed March 2014.

BLM_0027323

_____. 2010b. Regulation 93 - Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List (amended 3/9/10, effective 4/30/10). Online at: http://www.cdphe.state.co.us/regulations/wqccregs/ . Accessed September 2010.

_____. 2013a. Colorado Department of Public Health and Environment, Air Quality Control Commission, Air Quality Standards, Designations and Emission Budgets, 5 CCR 1001-14 (Effective 02/15/13). Online at: https://www.colorado.gov/pacific/sites/default/files/5-CCR-1001-14.pdf

_____. 2013b. Colorado Department of Public Health and Environment, Air Pollution Control Division, Letter from Nancy Chick to Susan Connell, Carter Lake Consulting, Summary of background concentration estimates for the Bull Mountain Unit area, June 12 2013.

_____. 2014. Colorado 2013 Air Quality Data Report. Air Pollution Control Division, Colorado Department of Public Health and Environment, November 2014.

Colorado Department of Revenue. 2014. Colorado Sales and Use Tax by County. DR 1002. March 12, 2014.

Colorado Department of Transportation. 2012a. Online Transportation Information System. Traffic Data Explorer. Internet Website: http://dtdapps.coloradodot.info/Otis/ HighwayData#/ui/2/0/criteria/133A/15.359/42.956. Accessed on June 17, 2013.

_____. 2012b. Statistics. http://www.coloradodot.info/library/statistics/2011%20Fatals.pdf/view & http://www.coloradodot.info/library/statistics/08-09-fatality-data.xls/view. Accessed on June 17, 2013.

_____. 2012c. Online Transportation Information System. Traffic Data Explorer. Internet Website: http://dtdapps.coloradodot.info/Otis/TrafficData#ui/1/2/0/criteria/133A/0/ 68.821/true/true/. Accessed on June 17, 2013.

Colorado Division of Local Government 2012. Federal Mineral Lease and State Severance Tax Direct Distribution. Internet Web site: http://dola.colorado.gov/dlg/fa/dd/ history.html#data. Accessed June 20, 2013.

Colorado Division of Local Government, State Demography Office. 2012. State Demography Office Home Page. Internet Web site: http://www.dola.state.co.us/demog/index.html. Accessed June 21, 2013.

Colorado Division of Reclamation Mining and Safety. 2013. County Operator Mining Data. 2012. Monthly Coal Summary Reports. Internet Web site: http://mining.state.co.us/Coal%20Reports.htm. Accessed June 25, 2013.

Colorado Division of Water Resources (CDWR). 2010. Revised Memorandum: Submittals to the Division of Water Resources for approval of substitute water supply plans and well permits for oil and gas wells that produce ground water while producing oil or gas. From Kevin G. Rein, Assistant State Engineer. March 24.

BLM_0027324

_____. 2010. Colorado Decision Support System. Online at: http://cdss.state.co.us/DNN/default.aspx. Accessed September 2010.

Colorado Division of Wildlife (CDOW), now Colorado Parks and Wildlife. 2008. The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado. Prepared for CDOW by BBC Research Consulting, Denver, CO. September 26, 2008.

Colorado Geological Survey (CGS). 2011. Map of Physiologic Provinces of Colorado, Modified from Fennemand and Johnson. 1:3,000,000. Online at: http://geosurvey.state.co.us/geology/topography/Pages/Physiographic.aspx.

Colorado Oil and Gas Conservation Commission (COGCC). 2006. Results of Noise Survey. Revised 09/19/2006.

_____. 2009. Section 800 Series: Aesthetic and Noise Control Regulations. Available at Internet Web site: http://cogcc.state.co.us/. April 1, 2009.

_____. 2013a. Colorado Oil and Gas Conservation Commission's Colorado Oil and Gas Information System Production Data Inquiry web site: http://cogcc.state.co.us/cogis/ ProductionSearch.asp Last accessed June 19, 2013

_____. 2013b. Colorado Oil and Gas information System. Internet Web site: http://cogcc.state.co.us/cogis/. Accessed June, 2013.

Colorado Partners in Flight (CPIF). 2013. Physiographic Region 62: Southern Rocky Mountains Purple Martin (*Progne subis*). Available online. http://www.rmbo.org/pif/bcp/phy62/ aspen/puma.htm

Colorado Parks and Wildlife (CPW). 2007. Data Analysis Unit D-51 South Grand Mesa Mule Deer Management Plan: Game Management Units 411, 52, and 521. December 2007.

_____. 2009. Moose Management Plan: Data Analysis Unit M-5. Colorado Parks and Wildlife. April 2009. Available online: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/ Hunting/BigGame/DAU/Moose/FinalM-5DAUPlan4-15-09.pdf.

_____. 2010. Success of the Colorado Division of Wildlife's Lynx Reintroduction Program. Available online: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Research/ Mammals/ColoradoLynxReintroductionAssessment_090710.pdf

_____. 2011. Compensatory Mitigation and Mitigation Banking Implementation Strategy for Oil and Gas White Paper. Durango, CO. August 2011.

_____. 2012a. Deer: Genus *Odocoileus*. Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/Deer.aspx. Accessed on June 17, 2013.

BLM_0027325

_____. 2012b. Elk: *Cervus elaphus.* Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/Elk.aspx. Accessed on June 17, 2013.

_____. 2012c. Black Bear: *Ursus americanus.* Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/BlackBear.aspx. Accessed on June 17, 2013.

_____. 2013a. Moose: *Alces alces.* Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/Moose.aspx. Accessed on June 17, 2013.

_____. 2013b. Black Bear Data Analysis Unit Management Plan Grand Mesa DAU B-17. Colorado Parks and Wildlife. January 2013. Available online: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Hunting/BigGame/DAU/Bear/B17DAUplan-GrandMesa.pdf.

Colorado State Forest Service. 2012. Colorado Wildfire Risk Assessment Portal. Internet web site: http://www.coloradowildfirerisk.com/home/risk. Accessed June 7, 2013.

Colorado State University Extension (CSUE). 2013. Gunnison County Noxious Weeds. Internet Web site: http://www.gunnison.colostate.edu/agri/weeds/absinthwormwood.shtml. Accessed June 17, 2013.

Colorado Tourism Office. 2011. The Economic Impact of Travel on Colorado. 1996–2011, Prepared for Colorado Tourism Office, Office of Economic Development and International Trade Denver, Colorado. Prepared by Dean Runyan Associates. November 2012.

Cornell Lab of Ornithology. 2009. All about birds: bird guide. Internet web site: http://www.allaboutbirds.org/guide/. Accessed May 15, 2009.

Council on Environmental Quality. 1997. Environmental Justice - Guidance Under the National Environmental Policy Act. December 10, 1997.

_____. 2014. Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews. 40 CFR Parts 1500, 1501, 1502, 1505, 1506, 1507, and 1508. January 2014.

Crompton, J.L. 2000. The Impact of Parks and Open Space on Property Values and the Property Tax Base. National Recreation and Park Association, Ashburn, VA.

Dare, M., M. Carrillo, and C. Speas. 2011. Cutthroat trout (*Oncorhynchus clarkii*) Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Grand Mesa, Uncompahgre, and Gunnison National Forests, Delta, Colorado.

Delta County. 2012. Lodging Tax Revenue. 2012.

BLM_0027326

_____. 2013. Delta County Joint Education District 50 data. Accessed June 26, 2013.

Delta County Independent. 2012. June 12, 2012 article

Denver Post. 2013. Elk Creek Mine in Somerset will go idle. Aldo Svaldi. December 2, 2013.

Department of Fisheries and Oceans (DFO). 2007. Directional Drilling. Online at http://www.dfo-mpo.gc.ca/oceans-habitat/habitat/modernizing-moderniser/epmp-pmpe/qc/pdf/drill_e.pdf. Accessed December 2013.

Department of Interior and United States Department of Agriculture (DOI and USDA). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp. Available at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/gold_book.html. Last accessed, February 12, 2014.

Digiuio, D. C., R. T. Wilkin, C. Miller, and G. Oberley. 2011. Investigation of Ground Water Contamination near Pavillion, Wyoming. Draft. US EPA Office of Research and Development. EPA 600/R-00/000. December.

Doherty K. E., D. E. Naugle, B. L. Walker, and J. M. Graham. 2008. Greater Sage-Grouse Winter Habitat Selection and Energy Development. Journal of Wildlife Management 72(1): 187-195.

Ellis, M. S. and V. L Freeman. 1984. Geologic Map and Cross Sections of the Carbondale 30' x 60' Quadrangle West-Central Colorado. US Geological Survey Coal Investigations Map C-97-A. 1:100,000.

Ellsworth, W. L. 2013. Injection-Induced Earthquakes. Science 341, 1225942. DOI: 10.1126/science.1225942

Energy Information Administration (EIA). 2011. Annual Energy Outlook 2011. Available at http://www.eia.gov/forecasts/archive/aeo11/index.cfm. Last accessed August 5, 2014.

ENVIRON, Alpine Geophysics and University of North Carolina. 2012. Western Regional Air Partnership (WRAP) West-wide Jump Start Air Quality Modeling Study (WestJumpAQMS) WRF Application/Evaluation. Prepared for Tom Moore WRAP. January 20, 2012.

ENVIRON. 2013. The Mesoscale Model Interface Program (MMIF) Version 3.0, Draft Users Manual. Prepared for Environmental Protection Agency Office of Air Quality Planning and Standards, Air Quality Assessment Division, Air Quality Modeling Group, Research Triangle Park, North Carolina. September 30, 2013.

Environment and Energy (journalist Mike Soraghan). 2014. Oil and Gas: Spills up 17 percent in U.S. in 2013. Available online: http://www.eenews.net/energywire/stories/1059999364. Accessed May 23, 2014.

BLM_0027327

Environmental Protection Agency (EPA). 1993. Superfund's Standard Default Exposure Factors for the Central Tendency and Reasonable Maximum Exposure. Preliminary Review Draft.

_____. 2004. Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs. US EPA, Office of Ground Water and Drinking Water, Drinking Water Protection Division, Prevention Branch, Washington, DC.

_____. 2005. Guideline on Air Quality Models. Updated 2005. Environmental Protection Agency Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina. Published in Federal Register, Vol. 70, No. 216, November 9, 2005.

_____. 2010 Primary Distinguishing Characteristics of Level III Ecoregions of the Continental United States, revised July 2010. Internet Web site: http://www.epa.gov/wed/pages/ecoregions/level_iii_iv.htm. Accessed on June 17, 2013.

_____. 2011a. 40 CFR Part 98, Mandatory Reporting of Greenhouse Gases, Final Rule. Published in Federal Register Vol. 75, No. 242, Friday, December 17, 2010. (air resources)

_____. 2011b. Draft Investigation of Ground Water Contamination near Pavillion, Wyoming. EPA 600/R-00/000. December. Available online at http://www2.epa.gov/region8/ pavillion (water)

_____. 2011c. Air Toxics Database, Table 2, Acute Dose-Response Values for Screening Risk Assessments (12/19/2011). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. (http://www.epa.gov/ttn/atw/ toxsource/Table2.pdf). (air resources)

_____. 2011d. EPA Ecoregions. Last updated on June 20, 2011. Internet Web site: http://www.epa.gov/wed/pages/ecoregions.htm. Accessed on June 17, 2013. (vegetation)

_____. 2012a. Air Toxics Database, Table 1, Prioritized Chronic Dose-Response Values (5/7/2012). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. (http://www.epa.gov/ttn/atw/toxsource/ Table1.pdf). (air resources)

_____. 2012b. Air Toxics Database, Table 1, Prioritized Chronic Dose-Response Values (5/7/2012). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. (http://www.epa.gov/ttn/atw/toxsource/ Table1.pdf).

_____. 2012c. Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews; Final Rule, Fed Reg, Vol. 77, No. 159, Thursday, August 16, 2012, pp. 49490- 49600

BLM_0027328

_____. 2013a. Envirofacts -Multisystem Search. Internet web site: http://www.epa.gov/enviro/facts/multisystem.html. Accessed June 21, 2013.

_____. 2013b. Envirofacts- List of Facilities Reporting to BR in Envirofacts. Internet web site: http://iaspub.epa.gov/enviro/brs_query_v2.brs_main?fac_search=0&fac_value=&fac_search_type=1&postal_code=&location_address=&add_search_type=1&city_name=&county_name=gunnison&state_code=co&naic_code_desc=&naic_code=&yvalue=2011&mopt=0&mmopt=&wst_search=0&keyword1=&keyword2=&keyword3=&RValue1=&RValue2=&RValue3=&CValue1=&CValue2=&CValue3=&page=1&total_rows_found=&last_fac_name=

_____. 2013c. Plant Information, Gunnison Energy Corp – 1-34 Well Site. Internet web site: http://oaspub.epa.gov/enviro/afs_reports.detail_plt_view?p_state_county_compliance_src=0805100068&p_plant_id=. Accessed June 21, 2013.

_____. 2013d. Topic Searches. Internet web site: http://www.epa.gov/enviro/facts/topicsearch.html#water. Accessed on June 21, 2013.

_____. 2013e. Facility Detail Report; Aspen Leaf Lateral Pipeline. Internet web site: http://iaspub.epa.gov/enviro/fii_query_dtl.disp_program_facility?p_registry_id=110040434009. Accessed June 21, 2013.

_____. 2013f. Envirofacts, Search Results. Interactive internet web site: http://www.epa.gov/emefdata/em4ef.html?ve=8,38.66682052612305,-107.03172302246094&pText=Gunnison. Accessed June 21, 2013.

_____. 2013g. EPA's Study of Hydraulic Fracturing and Its Potential Impact on Drinking Water Resources. Internet web site: http://www2.epa.gov/hfstudy. Accessed on August 6, 2013.

_____. 2013h. Clean Air Status and Trends Network (CASTNET). Accessed online: http://java.epa.gov/castnet/viewsiteinfo.do. Accessed June.

_____. 2013i. NO2/NOx In-Stack Ratio (ISR) Database (8/26/2013). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network, Support Center for Regulatory Atmospheric Modeling Website. (http://www.epa.gov/ttn/scram).

_____. 2014a. Fens. Internet Web site: http://water.epa.gov/type/wetlands/fen.cfm. Accessed on July 16, 2014.

_____. 2014b. Superfund Network. Accessed online: http://www.epa.gov/superfund/community/pdfs/toolkit/risk_communication-attachment6.pdf. Accessed March 2014.

_____. 2014c. Greenhouse Gas Reporting Program. Accessed online: http://www.epa.gov/climatechange/ghgemissions/usinventoryreport.html. March.

BLM_0027329