_____. 2015a. National Ambient Air Quality Standards, Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Website. (http://www.epa.gov/ttn/naaqs).

_____. 2015b. 40 CFR Parts 50, 51, 52, 53, and 58, National Ambient Air Quality Standards for Ozone: Final Rule by the Environmental Protection Agency on 10/01/2015. Online at http://www3.epa.gov/airquality/ozonepollution/pdfs/20151001fr.pdf

_____. 2015c. Clean Air Status and Trends Network (CASTNET). Accessed online from EPA's Air Quality System (AQS) Data Mart at: http://www3.epa.gov/airdata/ad_rep_mon.html. Accessed October.

Farren, M., A. Weinstein, M. Partridge, and M. Betz. 2013. Too Many Heads and Not Enough Beds:Will Shale Development Cause a Housing Shortage? Ohio State University. Swank Program in Rural-Urban Policy Summary and Report. June 2013

Fausold, C. J. and R. J. Lilieholm. 1996. The economic value of open space. Land Lines 8(5):1–4. September 1996.

Federal Highways Administration (FHWA). 2000. Comprehensive Truck Size and Weight Study to Congress

_____. 2011. Noise Effect on Wildlife. Internet Web site: http://www.fhwa.dot.gov/environment/noise/noise_effect_on_wildlife/effects/wild01.cfm #content. Accessed May 29, 2013.

Federal Land Managers Air Quality Related Values Workgroup (FLAG) 2010. Federal Land Managers' Air Quality Related Values Workgroup (FLAG) Phase I Report – Revised (2010). U.S. Forest Service-Air Quality Program, National Park Service-Air Resources Division, U.S. Fish and Wildlife Service-Air Quality Branch. October 2010.

Fenneman, N. M., and D.W. Johnson. 1946.  Physiographic Divisions of the Conterminous U.S. U.S. Geological Survey (USGS), Washington, D.C., GIS version after Fenneman's is available http://water.usgs.gov/GIS/dsdl/physio.gz.

Foreman T. T., D. Sperling, J. A. Bissonette, A. P. Clevenger, C. D. Cutshall, V. H. Dale, L. Fahrig, R. France, C.R. Goldman, K. Heanue, J. A. Jones, F. J. Swanson, T. Turrentine, and T. C. Winter. 2003. Road Ecology. Island Press, Washington, D.C. 481 pp.

Forest Service 2000. Screening Methodology for Calculating ANC Change to High Elevation Lakes, User's Guide. U.S. Department of Agriculture (USDA) Forest Service, Rocky Mountain Region. January 2000.

_____. 2003. GIS purple martin colony data. Data received from BLM Kenneth Holsinger June 20th 2013.

_____. 2008a. GIS database for lynx habitat in Colorado. Regional Office, Lakewood, CO.

BLM_0027330

_____. 2008b. National Visitor Use Monitoring Results, National Summary Report. Last updated October 2008.

_____. 2010. Lake water chemistry provided by the USDA Forest Service, April 2010. Available online: www.fs.fed.us/armdata.

Fox, D., A. M. Bartuska, J. G. Byrne, E. Cowling, R. Fisher, G. E. Likens, S. E. Lindberg, R. A. Linthurst, J. Messer, and D. S. Nichols. 1989. A Screening Procedure to Evaluate Air Pollution Effects on Class I Wilderness Areas. General Technical Report RM-168. U.S.D.A. Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado. 36 pp.

FracFocus. 2012. Hydraulic Fracturing Fluid Product Component Information Disclosure, Federal 11-89-17 1, Gunnison County, Colorado.  Job Date: June 9, 2012.  Available online at:  http://www.fracfocusdata.org/DisclosureSearch/StandardSearch.aspx. Accessed on January 10, 2014.

Freddy, D. J., W. M. Bronaugh, and M. C. Fowler. 1986. Responses of mule deer to disturbance by persons afoot and snowmobiles. Wildlife Society Bulletin 14:63–68.

Freethey, G. W., and G. E. Cordy, 1991, Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin.

Geologic Society of America. 2015. "Water Quality." GSA Critical Issue: Hydraulic Fracturing. http://www.geosociety.org/criticalissues/hydraulicFracturing/waterQuality.asp. Last accessed November 23, 2015.

Giezentanner, K. I. 2008. Final Environmental Assessment, Management Indicator Species (MIS) Forest Plan Amendment, to the 2002 Land and Resource Management Plan- 2002 Amendment for the White River National Forest. White River National Forest, Glenwood Springs, CO.

Godwin, L. H. 1968.  Geologic map of the Chair Mountain quadrangle, Gunnison and Pitkin Counties, Colorado, and GIS data for landslides 24K scale. USGS Geologic Quadrangle: GQ-704. Digitized by Colorado Geological Survey, http://geosurvey.state.co.us/hazards/Landslides/Pages/CGSlandslide_inventory.aspx Downloaded June 24, 2013.

Greubel, Rand A., Jaclyn Mullen, Matthew J. Landt, Jonathon C. Horn, and Alan D. Reed. 2010. Class I Cultural Resource Overview of the Bureau of Land Management's Uncompahgre Field Office, Western Colorado. Prepared by Alpine Archaeological Consultants, Inc., Montrose, Colorado. Submitted to Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado.

Gunnison County.  2012 Financial Report. December 31, 2012.

BLM_0027331

_____. 2013. Gunnison County Land Use Resolution. Available at www.gunnisoncounty.org/documentcenter/view/1829. Last accessed, February 12, 2014.

Gunnison County Board of County Commissioners. 2003. Temporary Regulations for Oil and Gas Operations (Amended May 2004). Online at http://www.gunnisoncounty.org/planning_pdf/TEMP%20OIL%20AND%20GAS%20RE GS%20Amended%20May%2018,%202004.pdf?download=TEMP%20OIL%20AND%2 0GAS%20REGS%20Amended%20May%2018,%202004.pdf.  Accessed September 2010.

Gunnison County Public Works Department. 2013. Numerical List of County Maintained/Plowed Roads. http://www.gunnisoncounty.org/public_pdf/Numer-CntyMantainedRoads.pdf?download=Numer-CntyMantainedRoads.pdf. Accessed on June 17, 2013.

Haefele, M., P. Morton, and N. Culver. 2007. Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. Washington, D.C. The Wilderness Society.

Headwaters Economics. 2013. Economic Profile System Human Dimensions Toolkit - Socioeconomic Profiles produced for Delta and Gunnison Counties. Internet Web site: http://www.headwaterseconomics.org/eps/. Data for Economic Profile System accessed June, 20 2013 and March 12, 2014..

Hebblewhite, M. 2008. A literature review of the effects of energy development on ungulates: Implications for central and eastern Montana. Report prepared for Montana Fish, Wildlife and Parks, Miles City, MT. 125 pp.

Hedge, Allen. 2011. Acoustic Environment. DEA3500. Cornell University. January 2011.

Hettinger, R. D., and M. A. Kirshbaum.  2002.  Stratigraphy of the Upper Cretaceous Mancos Shale (Upper Part) and Mesaverde Group in the Southern Part of the Uinta and Piceance Basins.

Holzman, D. C. 2011. *Methane Found in Well Water Near Fracking Sites.* Environmental Health Perspectives, Vol. 119, No. 7, p. A289.

IMPLAN. 2014. MIG, Inc., IMPLAN System (data and software 2010), 502 2nd Street, Suite 301, Hudson, WI 54016.

Ingelfinger, F. and F. Anderson. 2004. Passerine Response to Roads Associated with Natural Gas extraction in a Sagebrush Steppe Habitat. Western North American Naturalist. 64:385-395.

BLM_0027332

Intergovernmental Panel on Climate Change (IPCC). 2013. Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. [Stocker, T. F., D. Qin, G. K. Plattner, M. Tignor, S. K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex, and P. M. Midgley (eds.)] Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA. 1,535 pp.

Jaffee, Mark. 2012. Denver Post. Colorado North Fork Valley residents, businesses fighting prospect of fuel leases. Posted March 18, 2012.

Johnson, R.C. 1989.  Geologic History and Hydrocarbon Potential of the Late Cretaceous-Age, Low Permeability Reservoirs, Piceance Basin, Western Colorado., in Evolution of Sedimentary Basins - Uinta and Piceance Basins.  U.S. Geological Survey Bulletin 1787: E

Kassotis C. D., D. E. Tillitt, J. W. Davis, A. M. Hormann, and S. C. Nagel. 2013. *Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region.* The Endocrine Society.

Kelsey T. W. and M. W. Ward. 2010. Natural Gas Drilling Effects on Municipal Governments throughout Pennsylvania's Marcellus Shale Region, 2010, Penn State Cooperative Extension, 2011.

Kowalski, D. 2010. CPW, Aquatic Research Scientist. Personal communication regarding greenback cutthroat trout.

La Plata County. 2002. Final La Plata County Impact Report. La Plata County, Colorado. October 2002.

Latousek, T.  1995.  Paonia Reservoir.  Online at: http://www.usbr.gov/projects//ImageServer?imgName=Doc_1305126167556.pdf. Accessed on June 17, 2013.

Lazear, G.D. 2009.  Fractures, convection and under pressure: hydrogeology on the southern margin of the Piceance basin, west-central Colorado, USA.  Hydrogeology Journal 17:641-664.

Lobeck, A. K.  1975.  Physiographic Diagram of North America.  The Geographical Press, N.J.

McKenzie, L. M., R. Z. Witter, L. S. Newman, and J. L. Adgate. 2012.  *Human health risk assessment of air emissions from development of unconventional natural gas resources.* Science of the Total Environment. May 1, 2012. Volume 424: 79-87.

Menakis, J. P., D. Osborne, and M. Miller. 2003. Mapping the cheatgrass-caused departure from historical natural fire regimes in the Great Basin, USA. USDA Forest Service Proceedings RMRS-P-29. p. 281-288.

BLM_0027333

Millward, Sara. 2013.  Class II Cultural Resources Inventory of the Bull Mountain Unit Study Area, Gunnison County, Colorado. Prepared by Alpine Archaeological Consultants, Inc., Montrose, Colorado. Prepared for EMPSi, Boulder, Colorado. Submitted to the Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado.

Morgan, M. L. 2008.  Colorado's Earthquake and Fault Map, Showing Locations of Historical Earthquakes and Known or Suspected Geologically Young Faults.  Colorado Geological Survey.  1:1,150,000.  Online at:  http://geosurvey.state.co.us/hazards/Earthquakes/ Documents/Earthquake_Map_2008.pdf.

Muehlenbachs, L., E. Spiller, and C. Timmins. 2012. Shale Gas Development and Property Values: Differences Across Drinking Water Sources. National Bureau of Economic Research. Working Paper 18390. http://www.nber.org/papers/w18390.

National Climate Assessment (NCA). 2014a. Melillo, Jerry M., Terese (T. C.) Richmond, and Gary W. Yohe, eds. *2014: Climate Change Impacts in the United States: The Third National Climate Assessment.*  U.S. Global Change Research Program, 841 pp. doi: 10.7930/J0Z31WJ2.

_____. 2014b. Garfin, G., G. Franco, H. Blanco, A. Comrie, P. Gonzalez, T. Piechota, R. Smyth, and R. Waskom, 2014: Ch. 20: Southwest. *Climate Change Impacts in the United States: The Third National Climate Assessment*, J. M. Melillo, Terese (T.C.) Richmond, and G. W. Yohe, Eds., U.S. Global Change Research Program, 462–486. doi:10.7930/J08G8HMN. Online at <http://nca2014.globalchange.gov/report/regions/southwest>.

National Cooperative Soil Survey. 2013. Last updated on April 15, 2013. Internet Web site: http://soils.usda.gov/partnerships/ncss/Accessed on June 17, 2013.

National GAP Analysis Program (GAP). 2013. GIS species data portal range data for purple martin. Internet Web Site: gapanalysis.usgs.gov/species/data/download Accessed on June 20th, 2013.

National Hydrography Dataset (NHD). 2013. GIS data for streams. Received via email from BLM UFO Ken Holsinger May 10th, 2013.

Natural Diversity Information Source (NDIS). 2010. GIS data for bald eagle, mule deer, elk. Colorado Parks and Wildlife, biologists, district managers and researchers. A division of the Colorado Department of Natural Resources. Accessed via the BLM's eGIS server June 2013.

Natural Resources Conservation Service (NRCS). 1993. Soil Survey Division Staff. 1993. Soil survey manual. Soil Conservation Service. U.S. Department of Agriculture Handbook 18.Accessed on December2013. http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/ survey/?cid=nrcs142p2_054262

_____. 2011. SNOTEL data, Booth station, Gunnison County, 2010-2011 Water Years.

BLM_0027334

_____. 2012. National soil survey handbook, title 430-VI. Available online at http://soils.usda.gov/technical/handbook/. Accessed on June 17, 2013.

_____. 2013a. United States Department of Agriculture. Soil Survey Geographic (SSURGO) Database for Paonia County, CO. Available online at http://soildatamart.nrcs.usda.gov. Accessed June 2013.

_____. 2013b. GIS data for soil survey co679, with farmland, erosion, and representative slope attributes added using the NRCS Soil Data Viewer. US Department of Agriculture. Data available at www.soildatamart.nrcs.usda.gov. Last accessed June 11, 2013.

Nicholson, C., and R. L. Wesson.  1990.  Earthquake Hazard Associated with Deep Well Injection – A Report to the U.S. Environmental Protection Agency.  U.S Geological Survey Bulletin 1951.

Nietvelt, C. G. 2002. The effects of roads on wildlife: bibliography. Report prepared for U.S. Forest Service Bridger-Teton National Forest, Jackson, Wyoming. 73 pp.

North Fork Heart and Soul Project 2014. What Matters Most to the Future of the North Fork Valley- A White Paper. February 2014.

North Fork River Improvement Association (NFRIA). 2010. North Fork of the Gunnison River Watershed Plan Update. Online at: http://npscolorado.com/NFRIAWatershed_Action_Plan.pdf.  Accessed on June 17, 2013.

Office of Governor Matt Mead.  2013.  Wyoming to Lead Further Investigation of Water Quality Concerns Outside of Pavillion with Support of EPA.  Press Release June 20, 2013. Available online at: http://governor.wy.gov/media/pressReleases/Pages/WyomingtoLead FurtherInvestigationofWaterQualityConcernsOutsideofPavillionwithSupportofEPA.aspx

Oldham, J. 2012. North Dakota oil boom brings blight with growth as costs soar. Bloomberg News. Internet website: http://www.bloomberg.com/news/2012-01-25/north-dakota-oil-boom-brings-blight-with-growth-as-costs-soar.html.Accessed January 6, 2014.

Otak, Inc. 2009. Visual Resource Inventory. Prepared for the U.S. Department of the Interior. Bureau of Land Management. Uncompahgre Field Office. Montrose, Colorado. September 2009.

Ouren, D. S., C. Haas, C. P. Melcher, S. C. Stewart, P. D. Ponds, N. R. Sexton, L. Burris, T. Fancher, and Z. H. Bowen. 2007. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources. US Department of the Interior, US Geological Survey, Open-File Report 2007-1353. 225 p.

Petraglia and Weisbrod 2001. A Review of Impact Studies Related to Scenic Byway Designation. Prepared by Economic Development Research Group, Inc for the National Scenic Byways Resource Center. March 2001.

BLM_0027335

Petterson, E. S. 2012. Biological Opinion. Wildlife and Aquatic Resources Report for the Bull Mountain Unit Master Development Plan. *Prepared for*: Bureau of Land Management, Uncompahgre Field Office *and* SG Interests, I LTD. Rocky Mountain Ecological Services, Inc. Glenwood Springs, CO. 195pp.

Pitman, J. K., C. W. Spencer, and R. M. Pollastro. 1988. Petrograhy Mineralogy, and Reservoir Characteristics of the Upper Cretaceous Mesaverde Group in the East-Central Piceance Basin, Colorado. in Evolution of Sedimentary Basins - Uinta and Piceance Basins. U.S. Geological Survey Bulletin 1787: G.

Radle, A. L. 2007. The effect of noise on wildlife: a literature review. Accessed online at the World Forum for Acoustic Ecology Online Reader. Internet web site: http://interact.uoregon.edu/MediaLit/wfae/library/articles/radle_effect_noise_wildlife.pdf.

Reed, Alan D., and Michael D. Metcalf. 1999. Colorado Prehistory: A Context for the Northern Colorado River Basin. Colorado Council of Professional Archaeologists, Denver.

Rocky Mountain Ecological Services. 2012. Wildlife and Vegetation Assessment Report, Federal 12-89-7 Natural Gas Project. February 2012.

Rosenberger, R. S., and R. G. Walsh. 1997. "Nonmarket Value of Western Valley Ranch Land Using Contingent Valuation." Journal of Agricultural and Resource Economics 22(2): 296–309

Rost, G. and J. Bailey. 1979. Distribution of mule deer and elk in relation to roads. The Journal of Wildlife Management 43(3): 634-641.

RPI Consulting. 2008 Road & Bridge Department Impact Fee Support Study. Prepared for Rio Blanco County, Colorado. April 2008.

Ruediger, B., J. Claar, S. Gnidek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinalki, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000 (updated 2003). Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT. 142p.

Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey and J. R. Squires, eds. 1999. Ecology and conservation of lynx in the United States. Univ. Colorado Press and USDA Rocky Mtn. Res. Stn., USDA Gen. Tech. Rep. RMS-GTR-30WWW. 480 pp.

Rumbach, A. 2010. "Natural Gas Drilling in the Marcellus Shale: Potential Impacts on the Tourism Economy of the Southern Tier." Prepared for the Southern Tier Central Planning Board (Corning, New York)

BLM_0027336

Rutqvist, J., A. P. Rinaldi, F. Cappa, and G. J. Moridis. 2013. Modeling of Fault Reactivation and Induced Seismicity During Hydraulic Fracturing of Shale-Gas Reservoirs. Journal of Petroleum Science and Engineering. April 28. Online at: http://www2.epa.gov/sites/production/files/2013-12/documents/fault-reactivation.pdf

San Juan Institute of Natural and Cultural Resources. 2009. Colorado Breeding Bird Atlas. Fort Lewis College, Durango, Colorado. Internet web site: http://www.cobreedingbirdatlasii.org/. Accessed: May 15, 2009.

Saros, J. E., D. W. Clow, T. Blett, and A. P. Wolfe. 2010. "Critical nitrogen deposition loads in high- elevation lakes of the western U.S. inferred from paleolimnological records". Water, Air & Soil Pollution, DOI 10.1007/s11270-010-0526-6.

Sawyer, H., Kauffman M. J., and R. M. Nielson. 2009. Influence of well pad activity on winter habitat selection patterns of mule deer. Journal of Wildlife Management 73:1052-1061.

Sawyer, H., Nielson, R., Lindzey, F., and L. Mcdonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70(2), 396-403. 2006

Schmidt, C. W. 2011. *Blind Rush?: Shale Gas Boom Proceeds amid Human Health Questions.* Environmental Health Perspectives, Vol. 119, No. 8, pp. A348-A353.

SG Interests. 2013. GIS data describing the alternatives. SG Interests, Houston, TX. Data layers developed received April 2013 – December 2013, updated for existing infrastructure May – June 2015.

_____. 2014. Project labor, cost, production and tax revenue estimates provided on January 24, 2014. Updated information provided May 23, 2014.

Smith, M. D., R. S. Krannich, and L. M. Hunter. Growth, Decline, Stability, and Disruption: A Longitudinal Analysis of Social Well-Being in Four Western Rural Communities. Rural Sociology, 66: 425–450. doi: 10.1111/j.1549-0831.2001.tb00075.x

Spackman, S. B., J. C. Jennings, C. Dawson, M. Minton, A. Kratz, and C. Spurrier. 1997. Colorado rare plant field guide. Prepared for the BLM, USFS, and USFWS by the Colorado Natural Heritage Program.

Speas, C. 2010. US Forest Service, Wildlife, Fisheries, and Rare Plants Program Manager. Personal communication regarding greenback cutthroat trout. January 26, 2010.

Stover, B. K., 1986, Surficial-Geologic Map of the Muddy Creek Landslide Complex, Gunnison County, Colorado, April 15, 1986. Colorado Geological Survey, Open-File Report 86-5.

Taylor, O. J. 1987. Hydrologic System of Piceance Basin. Oil Shale, Water Resources, and Valuable Minerals of the Piceance Basin, Colorado: The Challenge and Choices of Development. U.S. Department of Interior U.S. Geological Survey Professional Paper 1310. U.S. Government Printing Office. Washington D.C. 1987.

BLM_0027337

Taylor, Phil. 2013. Rising wineries, organic farms clash with BLM over leasing in energy-rich western Colorado. EE News. January 28, 2013.

Throupe, R., R.A. Simons, and X. Mao. 2013. A review of hydro ''fracking'' and its potential effects on real estate. Journal of Real Estate Literature. Volume 21, Number 2, 2013

Trautner Geotech LLC.  2011.  Geologic Hazard Assessment of the Bull Mountain Geographical Area Plan Environmental Assessment Project Site.  Prepared for SG Interests, Ltd.

Tripadvisor.com. 2014. Hotel rooms in Delta, Glenwood Springs and Grand Junction. Internet website: http://www.tripadvisor.com/Hotels. Accessed May 19, 2014.

Tweto, O. 1979. Geologic Map of Colorado.  Colorado Geological Survey Miscellaneous Investigations MI-16.  1:500,000.

_____. 1983. Geologic Sections Across Colorado (Section C-C').  Colorado Geological Survey Miscellaneous Investigations MI-1416.  1:500,000.

United States Bureau of Labor Statistics. 2014. Local Areas annual unemployment rates. Internet web site:  http://data.bls.gov/cgi-bin/dbdown. Accessed May 12, 2014.

United States Census Bureau. 2000. 2000 Census Summary Data (SF1, SF2). Internet Web site: http://www.census.gov/prod/cen2000. Accessed on June 20, 2013

_____.2010a.  2010 Census Summary Data (SF1, SF2). Internet Web site: http://www.census.gov/prod/cen2010. Accessed on June 20, 2013.

_____. 2010b. Poverty Thresholds for 2011. Internet Web Site: http://www.census.gov/hhes/www/poverty/threshld/thresh08.html. Accessed June 25, 2013.

_____. 2011. American Community Survey Data for 2007-2011, Internet Web Site: http://www.census.gov/acs/www/. Accessed June 20, 2013.

_____. 2012. Gunnison and Delta Counties. American Community Survey Housing data 2008-2012. Internet Web site:http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk. Accessed May 19, 2014.

United States Department of Agriculture, National Agricultural Statistical Service (USDA NASS). 2007. 2007 Agricultural Census County Summary Highlights – Colorado. Last updated December 2009. Internet Web site: http://www.agcensus.usda.gov/Publications/2007/Full_Report/Volume_1,_Chapter_2_County_Level/Colorado/st08_2_001_001.pdf. Accessed on June 19, 2013.

_____. 2014. 2012 Agricultural Census- Colorado State and County Data. Released May 2014.

BLM_0027338

United States Department of Commerce, Bureau of Economic Analysis (BEA) 2012. Regional Economic Information System Data from tables Ca25N, Ca30, Ca1-3, and Ca05N. Updated 2012. Internet Web site: http://www.bea.gov/regional/index.htm#state. Accessed June 20, 2013.

United States Energy Information Administration (EIA). 2013a . Colorado Energy Profile. Internet Web Site: http://tonto.eia.doe.gov/state/state_energy_profiles.cfm?sid=CO. Accessed June 25, 2013.

_____. 2013b. U.S. Natural Gas Wellhead Price (Dollars per Thousand Cubic Feet). Internet Web Site: http://www.eia.gov/dnav/ng/hist/n9190us3A.htm. Accessed December 30, 2013.

United States Fish and Wildlife Service (USFWS). 1998. Greenback Cutthroat Trout Recovery Plan. Region 6 US Fish and Wildlife Service Denver, CO. March 1998. Available online: http://warnercnr.colostate.edu/~kurtf/400web/Field%20trip%20assignment/Native%20cutthroat/GBNRecoveryPlan.pdf.

_____. 1999. Final programmatic biological opinion for Bureau of Reclamation's operations and depletions, other depletions, and funding and recovery program actions in the upper Colorado River above the confluence with the Gunnison River. USFWS, Grand Jct. CO. July 1999.

_____. 2008. Birds of Conservation Concern. US Fish and Wildlife Service Division of Migratory Bird Management. Arlington, Virginia. December 2008.

_____. 2009. Greenback Cutthroat Trout (*Oncorhnychus clarki stomias*) 5-Year Review: Summary and Evaluation. USFWS Colorado Field Office. Lakewood, CO. May 2009. Available online: http://ecos.fws.gov/docs/five_year_review/doc2414.pdf.

_____. 2010. Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List Astragalus microcymbus and Astralagus schmolliae as Endangered or Threatened. Federal Register / Vol. 75, No. 240 / Wednesday, December 15, 2010 / Proposed Rules.

_____. 2012. Greenback Cutthroat Trout Recovery Team: Study Reveals Secrets of Colorado's Cutthroats. Available online: http://www.fws.gov/mountain-prairie/pressrel/2012/09242012_GBCT.pdf.

_____. 2013. Rocky Mountain Success Story: Canada Lynx Returns. Available online: http://www.fws.gov/news/blog/index.cfm/2013/2/1/Rocky-Mountain-Success-Story-Canada-Lynx-Returns.

United States Geological Survey (USGS). N.d. Professional Paper 1411-C.

BLM_0027339

_____. 1976. GIS data for landslides, 250 K scale, Colorado Landslide Inventory, complied by Colorado Geological Survey and USGS from multiple sources. http://geosurvey.state.co.us/hazards/Landslides/Pages/CGSlandslide_inventory.aspx Downloaded June 24, 2013.

_____. 2001a. Bull Mountain, Colorado, 7.5-minute topographic quadrangle map (water).

_____. 2001b. Chair Mountain, Colorado, 7.5-minute topographic quadrangle map (water).

_____. 2001c. Somerset, Colorado, 7.5-minute topographic quadrangle map (water).

_____. 2008. Seismic Hazard Map of Western U.S., showing Peak Ground Acceleration (PGA) with 2% probability of exceedence in 50 years.  Online at: http://earthquake.usgs.gov/hazards/products/conterminous/2008/update_201001/maps/2008.WUS.0p00.1150.2475.pdf.

_____. 2010. National Water Information System – Water Quality Samples for Colorado. Online at http://nwis.waterdata.usgs.gov/co/nwis/qwdata?search_criteria=search_site_no& submitted_for m=introduction. Accessed September 2010. (water)

_____. 2011. Paonia Reservoir, Colorado, 7.5-minute topographic quadrangle map.

_____. 2013. need reference, from ch 3 water; National Water Information System (http://waterdata.usgs.gov/co/nwis/).

_____. 2014. Record Number of Oklahoma Tremors Raises Possibility of Damaging Earthquakes. 2014. Available online: http://earthquake.usgs.gov/regional/ceus/products/ newsrelease_05022014.php. Accessed May 23, 2014.

Upper Colorado River Endangered Fish Recovery Program 2013 2012-2013 Highlights. Available online: http://www.coloradoriverrecovery.org/general-information/general-publications/briefingbook/2012-2013Highlights.pdf.

Van Dyke, F. B., R. H. Brocke, H. G. Shaw, B. B. Ackerman, T. P. Hemker, and F. G. Lindzey. 1986. Reactions of mountain lions to logging and human activity. The Journal of Wildlife Management 50:95-102.

Van Reyper, G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office, Montrose, CO, updated 2009/ 2010. Unpublished document.

Visibility Information Exchange Web System (VIEWS). 2013. Regional Haze Summary Data. Means for Best, Middle, and Worst 20% Visibility Days. Accessed online: http://views.cira.colostate.edu/web/Trends/. Accessed June.

Warpinski, M. 2013. Understanding Hydraulic Fracture Growth, Effectiveness, and Safety Through Microseismic Monitoring.  http://dx.doi.org/10.5772/55974 . Accessed on January 13, 2014.

BLM_0027340

Weinhold, B. 2012. Energy Development Linked with Earthquakes. Environmental Health Perspectives Vol. 120, No. 10. October 2012.

Westbrooks, R. 1998. Invasive plants, changing the landscape of America: Fact book.  Federal Interagency Committee for the Management of Noxious and Exotic Weeds (FICMNEW). Washington, DC.

Western Governors' Association, 1998. WGA Open Land Initiative. Economic Benefits of Open Space: April 1998.  http://www.westgov.org/wga/intiatives/tpl/ecogen.htm

Western Regional Climate Center (WRCC). 2013. Historical climate data for Redstone 4 W, Colorado.  Online at http://www.wrcc.dri.edu.  Accessed June 2013.

Wiggins, D. 2005. Purple Martin (*Progne subis*): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. Available online: http://www.fs.fed.us/r2/projects/scp/assessments/purplemartin.pdf.

Wilbert, M., J. Thomas, and N. W. Culver. 2008. Analysis of Habitat Fragmentation from Oil and Gas Development and its Impacts on Wildlife: A Framework for Public Land Management Planning. The Wilderness Society, Ecology and Economics Research Department. May 20, 2008.

Wilson, Weston. 2004. Letter to Senators Allard and Campbell and Representative DeGette, Colorado Representatives, regarding errors in EPA hydraulic fracturing study. October 8, 2004.

Wright Water Engineers, Inc. 2003. Characterization and Assessment of Water Resources on the Southeastern Flank of the Grand Mesa, Delta, Gunnison and Mesa Counties, Colorado. January.

WWC Engineering (WWC) 2011. Water Resources Technical Report. Sheridan, Wyoming. June 2011. (water)

BLM_0027341

Case No. 1:20-cv-02484-MSK   Document 34-3   filed 04/27/21   USDC Colorado   pg 13 of 201

This page intentionally left blank.

BLM_0027342

# Glossary

BLM_0027343

BLM_0027344

# GLOSSARY

**100-year floodplain.** The area inundated by a flood event with a one percent chance of occurring in any given year.

**Abandoned nest.** A nest that was occupied by breeding birds earlier in the breeding season but was abandoned at some point during breeding (e.g., failed eggs, death of young).

**Active nest site.** A raptor nest site that is currently occupied by a pair of breeding raptors.

**Actual use.** The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by periodic field checks by the BLM.

**Adaptive management.** A type of natural resource management in which decisions are made as part of an ongoing science-based process. Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society. Results are used to modify management policy, strategies, and practices.

**Administrative access.** Administrative access pertains to travel on routes that are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation.

**Air basin.** A land area with generally similar meteorological and geographic conditions throughout. To the extent possible, air basin boundaries are defined along political boundary lines and include both the source and receptor areas.

**Air pollution.** Degradation of air quality resulting from unwanted chemicals or other materials occurring in the air.

BLM_0027345

**Air quality classes.** Classifications established under the Prevention of Significant Deterioration portion of the Clean Air Act, which limits the amount of air pollution considered significant within an area. Class I applies to areas where almost any change in air quality would be significant; Class II applies to areas where the deterioration normally accompanying moderate well-controlled growth would be insignificant; and Class III applies to areas where industrial deterioration would generally be insignificant.

**Airshed.** A subset of air basin, the term denotes a geographical area that shares the same air because of topography, meteorology and climate.

**Allotment.** An area of land in which one or more livestock operators graze their livestock. Allotments generally consist of BLM lands but may include other federally managed, state-owned, and private lands. An allotment may include or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment management plan.** A concisely written program of livestock grazing management, including supportive measures if required, designed to attain specific, multiple-use management goals in a grazing allotment. An AMP is prepared in consultation with the permittee(s), lessee(s), and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife. An AMP establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**All-terrain vehicle.** A motorized vehicle that is less than 50 inches in width and is capable of operating on roads, trails, or designed areas that are not maintained. A wheeled vehicle, other than a snowmobile, that has a wheelbase and chassis of 50 inches in width or less, generally has a dry weight of 800 to 1200 pounds or less, and travels on three or more low-pressure tires.

**Alluvial soil.** A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

**Alluvium.** Clay, silt, sand, gravel, or other rock materials transported by moving water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in rivers, floodplains, lakes, and shores, and in fans at the base of mountain slopes.

**Alternate nest (inactive nest) site.** A raptor nest site that has been used in the past by and within the territory of a breeding pair of raptors. The nest site still maintains the characteristics of a nest structure and habitat features of a nest site but is not currently in use.

**Ambient air quality.** The state of the atmosphere at ground level as defined by the range of measured and/or predicted ambient concentrations of all significant pollutants for all averaging periods of interest.

**Ambient noise.** The all-encompassing noise level associated with a given environment, being a composite of sounds from all sources.

BLM_0027346

**Animal unit month (AUM).** The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

**Aquatic**. Living or growing in or on the water.

**Assets.** Term utilized to describe roads, primitive roads, and trails that comprise the transportation system. Also the general term utilized to describe all BLM constructed "Assets" contained within the Facility Asset Management System.

**Atmospheric deposition.** Air pollution produced when acid chemicals are incorporated into rain, snow, fog, or mist and fall to the earth. Sometimes referred to as "acid rain" and comes from sulfur oxides and nitrogen oxides, products of burning coal and other fuels and from certain industrial processes. If the acid chemicals in the air are blown into the area where the weather is wet, the acids can fall to earth in the rain, snow, fog, or mist. In areas where the weather is dry, the acid chemicals may become incorporated into dust or smoke.

**Attainment area.** A geographic area in which levels of a criteria air pollutant meet the health-based National Ambient Air Quality Standard for that specific pollutant.

**Attenuation.** The reduction of sound intensity and energy as a function of distance traveled.

**Avoidance area.** See "right-of-way avoidance area" definition.

**Backcountry.** Lands that is remote from development and typically difficult to access.

**Bank-full stage.** The water surface elevation that just fills the active channel to the top of its banks and at a point where the water begins to overflow onto a floodplain.

**Best management practice (BMP).** A method, process, or activity, or usually a combination of these, that are determined by a State or a designated planning agency to be the most effective and practicable means (including technological, economic, and institutional considerations) of managing or controlling particular conditions or circumstances. BMPs are a suite of voluntary, accepted measures that may or may not be applied to or enforced for any given project.

**Big game.** Indigenous, ungulate (hoofed) wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biodiversity (biological diversity).** The variety of life and its processes, and the interrelationships within and among various levels of ecological organization. Conservation, protection, and restoration of biological species and genetic diversity are needed to sustain the health of existing biological systems. Federal resource management agencies must examine the implications of management actions and development decisions on regional and local biodiversity.

**Biological Opinion.** A document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

**Biological soil crust.** A complex association between soil particles and cyanobacteria, algae, microfungi, lichens, and bryophytes that live within or atop the uppermost millimeters of soil.

**BLM Sensitive Species.** Those species that are not federally listed as endangered, threatened, or proposed under the ESA, but that are designated by the BLM State Director under 16 USC 1536(a)(2) for special management consideration. By national policy, federally listed candidate species are automatically included as sensitive species. Sensitive species are managed so they will not need to be listed as proposed, threatened, or endangered under the ESA.

**Candidate species.** Taxa for which the USFWS has sufficient information on their status and threats to propose the species for listing as endangered or threatened under the ESA, but for which issuance of a proposed rule is currently precluded by higher priority listing actions. Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the Federal Register (BLM Manual 6840, Special Status Species Manual).

**Categorical Exclusion.** A category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an environmental impact statement is required (40 CFR 1508.4), but a limited form of NEPA analysis is performed.

**Centralized production facilities.** Consolidation of basic processes, facilities, equipment, and personnel related to oil and/or gas development in one area or on one pad rather than spread out across multiple well pads or in several different locations. Examples of consolidation include drilling multiple wells (from a few to a few dozen) from a single pad, placing roads, pipes, and transmission lines sited in common corridors, and remotely storing materials and/or staging development activities, including hydraulic fracturing and other well completions materials.

**Chemical vegetation treatment.** Application of herbicides to control invasive species/noxious weeds and/or unwanted vegetation. To meet resource objectives the preponderance of chemical treatments would be used in areas where cheatgrass or noxious weeds have invaded sagebrush steppe.

**Classified surface water supply segment.** A "public water system," as defined by the State of Colorado, beginning at the surface water point of intake and extending 5 miles upstream.

**Clean Air Act of 1963 (as amended).** Federal legislation governing air pollution control.

**Climate change.** Any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:

- Natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun

- Natural processes within the climate system (e.g., changes in ocean circulation)

BLM_0027348

- Human activities that change the atmosphere's composition (e.g., driving automobiles) and the land surface (e.g., deforestation, reforestation, urbanization, and desertification).

**Closed loop system:** a mechanical and chemical system which allows an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids, some of which are re-used and some of which are disposed of. The recovered drilling fluid is stored in 500-barrel tanks and re-used in active mud systems; consequently, drilling fluid is moved from well-to-well and reconditioned by the dewatering equipment and mud products. The solid wastes are transferred off-site for disposal at oilfield waste disposal facilities.

**Collaboration.** A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration may take place with any interested parties, whether or not they are a cooperating agency.

**Collaborative partnerships.** Refers to people working together, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks.

**Common use area.** Areas designated to sell various mineral materials (e.g., gravel or moss rock) to the public through purchase of a permit from the BLM Field Office.

**Condition of approval.** Condition or provision (requirement) under which an application for a permit to drill or sundry notice is approved.

**Conformance.** A proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation agreement.** A formal signed agreement between the USFWS or National Oceanographic and Atmospheric Administration-Fisheries and other parties that implement specific actions, activities, or programs designed to eliminate or reduce threats to, or otherwise improve the status of, a species. Conservation agreements can be developed at a state, regional, or national level and generally include multiple agencies at both the state and federal level, as well as tribes. Depending on the types of commitments the BLM makes in a conservation agreement and the level of signatory authority, plan revisions or amendments may be required before the conservation agreement is signed or subsequently in order to implement the conservation agreement.

**Conservation strategy.** A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM sensitive species or that have been determined by the USFWS or National Oceanographic and Atmospheric Administration-Fisheries to be federal candidates under the ESA.

BLM_0027349

**Controlled surface use (CSU).** CSU is a category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values and is applicable to fluid mineral leasing and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads). CSU areas are open to fluid mineral leasing but the stipulation allows the BLM to require special operational constraints, or the activity can be shifted more than 200 meters (656 feet) to protect the specified resource or value.

**Cooperating Agency.** Assists the lead federal agency in developing an environmental assessment or environmental impact statement. These can be any agency with jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any tribe or Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor.** A strip of land that aids in the movement of species between disconnected core areas of their natural habitat.

**Criteria pollutant.** The US EPA uses six "criteria pollutants" as indicators of air quality, and has established for each of them a maximum concentration above which adverse effects on human health may occur. These threshold concentrations are called National Ambient Air Quality Standards. The criteria pollutants are ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, particulate matter and lead.

**Critical habitat.** An area: A) designated by the USFWS that is occupied by a threatened or endangered species "on which are found those physical and biological features (1) essential to the conservation of the species, and (2) which may require special management considerations or protection;" or B) on which are found those physical and biological features essential to the conservation of a species that may require special management consideration or protection.

**Crucial habitat types.** The environment essential to plant or animal biodiversity and conservation at the landscape level. Crucial habitats include, but are not limited to, ecological emphasis areas, severe winter range, winter concentration areas, reproduction areas, and movement corridors.

**Crucial winter range.** That part of the overall range where 90 percent of the individuals are located during the average five winters out of 10 from the first heavy snowfall to spring green-up, or during a site-specific period of winter as defined for each Colorado Parks and Wildlife Data Analysis Unit.

**Cultural resources.** Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social and/or cultural groups.

**Cultural resources inventory.** An inventory to assess the potential presence of cultural resources. There are three classes of surveys:

BLM_0027350

**Class III.** An intensive field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites in an area. Upon its completion, no further cultural resources inventory work is normally needed.

**Cumulative effects.** The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**Cyanobacteria.** A blue-green algae or bacteria that obtain its energy through photosynthesis.

**Decision Area.** Lands and federal mineral estate within the planning area that are administered by the BLM.

**Degraded vegetation.** Areas where the plant community is not complete or is under threat. Examples include missing components such as perennial forbs or cool season grasses, weed infestations, or lack of regeneration of key species such as sagebrush or cottonwoods trees.

**Design feature(s).** Specific means, measures or practices that make up the proposed action and alternatives. They include construction activities, operating procedures, and stipulations, as well as measures that reduce or avoid adverse environmental impacts. See BLM NEPA Handbook, H-1790-1, pages 44-45 and 61.

**Designated roads and trails.** Specific roads and trails identified by the BLM (or other agency) where some type of motorized/nonmotorized use is appropriate and allowed, either seasonally or year-long (H-1601-1, BLM Land Use Planning Handbook).

**Direct impacts.** Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place.

**Directional drilling.** A drilling technique whereby a well is deliberately deviated from the vertical in order to reach a particular part of the oil- or gas-bearing reservoir. Directional drilling technology enables the driller to steer the drill stem and bit to a desired bottom hole location. Directional wells initially are drilled straight down to a predetermined depth and then gradually curved at one or more different points to penetrate one or more given target reservoirs. This specialized drilling usually is accomplished with the use of a fluid-driven downhole motor, which turns the drill bit. Directional drilling also allows multiple production and injection wells to be drilled from a single surface location such as a gravel pad, thus minimizing cost and the surface impact of oil and gas drilling, production, and transportation facilities. It can be used to reach a target located beneath an environmentally sensitive area (Alaska Department of Natural Resources, Division of Oil and Gas 2009).

**Disruptive activities.** Human-caused disturbances that induce stress on a population, community, or ecosystem and cause potential loss of species fitness (survival, reproduction, and recruitment) within crucial habitats or other sensitive areas during specified time periods; may or may not entail surface disturbance. This does not include regular background levels of activity, such as hiking, cross country skiing or livestock grazing, that individuals would be accustomed to. Examples of disruptive activities include:

BLM_0027351

- Commercial recreation activities, especially large groups

- Abnormally loud or sustained noise

- Road maintenance

**Diversity.** The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Domestic well.** A well serving up to three single-family dwellings, irrigating one acre or less of lawn and garden, and providing water for the individual's domestic animals and livestock.

**Easement.** A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Ecologic functionality.** These levels include successional processes that are in place, energy and nutrients that are being cycled effectively, and soil that is being appropriately stabilized. An area can be functioning at a basic level of ecologic functionality without meeting land health standards.

**Ecosystem diversity.** The variety of habitats, living communities, and ecological processes in the living world. Ecosystem diversity refers to the diversity of a place at the level of ecosystem. Inherent in ecosystem diversity are both biotic (living) and abiotic (non-living) components. The term differs from biodiversity, which refers to variation in species rather than ecosystems.

**Emergency stabilization.** Planned actions to stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize threats to life or property resulting from the effects of a fire, or to repair/replace/construct physical improvements necessary to prevent degradation of land or resources. Emergency stabilization actions must be taken within one year following containment of a wildfire.

**Endangered species.** Any species that is in danger of extinction throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Manual). Under the ESA in the US, "endangered" is the more-protected of the two categories. Designation as endangered (or threatened) is determined by USFWS as directed by the ESA.

**Endangered Species Act of 1973 (ESA) (as amended).** Designed to protect critically imperiled species from extinction as a consequence of economic growth and development untempered by adequate concern and conservation. The Act is administered by two federal agencies, USFWS and the National Oceanic and Atmospheric Administration. The purpose of the Act is to protect species and also the ecosystems upon which they depend (16 USC 1531-1544).

**Enhance.** Increase or improve in value, quality or desirability.

**Environmental assessment.** A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives

BLM_0027352

considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental impact statement (EIS).** A detailed statement prepared by the responsible official in which a major federal action that significantly affects the quality of the human environment is described, alternatives to the proposed action are provided, and effects are analyzed (BLM National Management Strategy for OHV Use on Public Lands).

**Exclusion area.** *See "right-of-way exclusion area" definition.*

**Exemplary (vegetation).** An area of vegetation that does not show signs of degradation and which may serve as a comparison to illustrate what the vegetation potential is for a given type of environment. Exemplary vegetation meets A-ranked viability criteria as described by the Colorado Natural Heritage Program.

**Existing routes.** The roads, trails, or ways that are used by motorized vehicles (e.g., jeeps, all-terrain vehicles, and motorized dirt bikes), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders) and are, to the best of BLM's knowledge, in existence at the time of RMP/EIS publication.

**Extremely rare vegetation communities.** Unique combinations of plant species as identified by terminology and a classification system from the Colorado Natural Heritage Program. These are identified as Potential Conservation Areas with moderate or better Biodiversity Significance and fair or better Viability.

**Federal Land Policy and Management Act of 1976 (FLPMA).** Public Law 94-579, October 21, 1976, often referred to as the BLM's "Organic Act," which provides most of the BLM's legislated authority, direction policy, and basic management guidance.

**Federal mineral estate.** Subsurface mineral estate owned by the US and administered by the BLM.

**Fire frequency.** A general term referring to the recurrence of fire in a given area over time.

**Fire Regime Condition Classification System.** Measures the extent to which vegetation departs from reference conditions, or how the current vegetation differs from a particular reference condition.

**Fire severity.** Degree to which a site has been altered or disrupted by fire; loosely, a product of fire intensity and residence time.

**Fire suppression.** All work and activities connected with control and fire-extinguishing operations, beginning with discovery and continuing until the fire is completely extinguished.

**Flowback pit.** Surface pits to hold the recycled water for use during completion.

**Fluid minerals.** Oil, gas, coal bed natural gas, and geothermal resources.

BLM_0027353

**Fluvial.** Of or pertaining to rivers or produced by the action of rivers or streams.

**Forage.** All browse and herbaceous foods that are available to grazing animals.

**Forage base.** The amount of vegetation available for wildlife and livestock use.

**Four-wheel drive vehicle.** A passenger vehicle or truck having power available to all wheels. Any motorized vehicle that has generally higher clearance than a passenger car and has traction on all four wheels.

**Fragile soils.** Soils having a shallow depth to bedrock, minimal surface layer of organic material, textures that are more easily detached and eroded, or are on slopes over 35 percent.

**Fugitive dust.** Significant atmospheric dust arises from the mechanical disturbance of granular material exposed to the air. Dust generated from these open sources is termed "fugitive" because it is not discharged to the atmosphere in a confined flow stream. Common sources of fugitive dust include unpaved roads, agricultural tilling operations, aggregate storage piles, and heavy construction operations.

**Functional/structural group.** A group of species that perform similar roles or functions in the ecosystem and are grouped together on an ecological site basis because of factors such as similar shoot or root structure, rooting depth, woody or non-woody stems, plant height, photosynthetic pathways, nitrogen fixing ability, and life cycle.

**Functioning at risk.** Riparian-wetland areas that are in functional condition, but that have an existing soil, water, or vegetation attribute that makes them susceptible to degradation.

**Geographic Information System (GIS).** A system of computer hardware, software, data, people, and applications that capture, store, edit, analyze, and display a potentially wide array of geospatial information.

**Geomorphic balance.** Stream channel size, sinuosity, slope, and substrate are appropriate for its landscape setting and geology.

**Geophysical exploration.** Efforts to locate deposits of oil and gas resources and to better define the subsurface.

**Green completion.** Methods that minimize the amount of natural gas and oil vapors that are released to the environment when a well is being flowed during the completion phase of a well.

**Groundwater.** Water held underground in soil or permeable rock, often feeding springs and wells.

**Guzzler.** General term covering guzzler, wildlife drinker, or tenaja. A natural or artificially constructed structure or device to capture and hold rain water, and make it accessible to small and/or large animals. Most guzzlers involve above or below ground piping, storage tanks, and valves. Tenajas are natural depressions in rock, which trap and hold water. To some guzzlers, steps or ladders are sometimes added to improve access and reduce mortality from drowning.

BLM_0027354

**Habitat.** An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for part or all of their life cycle.

**Habitat management plan.** A written and approved activity plan for a geographical area which identifies habitat management activities to be implemented in achieving specific objectives of planning decisions.

**Hazardous material.** A substance, pollutant, or contaminant that, due to its quantity, concentration, or physical or chemical characteristics, poses a potential hazard to human health and safety or to the environment if released into the workplace or the environment.

**Healthy aquatic community.** Varies by species and numbers of target species present, and channel type, and is characterized by: proper amounts of sediment/silt; a diversity of instream habitat complexity; the development/maintenance of undercut bank habitats'; adequate canopy cover; appropriate holding habitat (pools/minimum pools depth) commensurate with the identified Rosgen channel type; reduced diurnal water temperature fluctuations; appropriate width to depth ratios; and represented by a healthy biological community (fish and macroinvertebrate diversity and abundance reflect water quality attaining a biological minimum).

**High-power communication site.** Sites that include broadcast types of uses (e.g., television, AM/FM radio, cable television, broadcast translator).

**High wind event.** The period of time and location covered by National Weather Service high wind warning; or when there are sustained surface winds greater than 40 miles per hour lasting more than an hour or winds over 58 miles per hour that are occurring for an unspecified period of time.

**Historic resources.** Any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places.

**Horizontal drilling.** A more-specialized type of directional drilling that allows a single well bore at the surface to penetrate oil- or gas-bearing reservoir strata at angles that parallel or nearly parallel the dip of the strata. The well bore is then open and in communication with the reservoir over much longer distances. In development wells, this can greatly increase production rates of oil and gas or volumes of injected fluids. Horizontal drilling may involve underbalanced drilling, coiled tubing, bit steering, continuous logging, multilateral horizontals, and horizontal completions. Lateral step-outs are directional wells that branch off a main borehole to access more of the subsurface. Conditions for successful horizontal wells include adequate pre-spud planning, reservoir descriptions, drillable strata that will not collapse, and careful cost control (Alaska Department of Natural Resources, Division of Oil and Gas 2009).

**Impact.** The effect, influence, alteration, or imprint caused by an action.

**Impairment.** The degree to which a distance of clear visibility is degraded by man-made pollutants.

BLM_0027355

**Inactive nest site.** *See "alternate nest (inactive nest) site" definition.*

**Indicators.** Factors that describe resource condition and change and can help the BLM determine trends over time.

**Indirect impacts.** Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

**Intermittent stream.** An intermittent stream is a stream that flows only at certain times of the year when it receives water from springs or from some surface sources such as melting snow in mountainous areas. During the dry season and throughout minor drought periods, these streams will not exhibit flow. Geomorphological characteristics are not well defined and are often inconspicuous. In the absence of external limiting factors, such as pollution and thermal modifications, species are scarce and adapted to the wet and dry conditions of the fluctuating water level.

**Invertebrate.** An animal lacking a backbone or spinal column, such as insects, snails, and worms. The group includes 97 percent of all animal species.

**K factor.** A soil erodibility factor used in the universal soil loss equation that is a measure of the susceptibility of soil particles to detachment and transport by rainfall and runoff. Estimation of the factor takes several soil parameters into account, including soil texture, percent of sand greater than 0.10 millimeter, soil organic matter content, soil structure, soil permeability, clay mineralogy, and coarse fragments. K factor values range from .02 to .64, the greater values indicating the highest susceptibilities to erosion.

**Key wildlife habitat.** Specific areas within the geographic area occupied by a species in which are found those physical and biological features 1) essential to the conservation of the species, and 2) which may require special management considerations or protection.

**Lacustrine.** Pertaining to, produced by, or inhabiting a lake environment.

**Land health condition.** A classification for land health which includes these categories: "Meeting Land Health Standard(s)" and "Not Meeting Land Health Standard(s)".

- **Meeting Land Health Standard(s):** Lands for which health indicators are currently in acceptable condition such that basic levels of ecological processes and functions are in place. This rating includes the following subcategories:

- **Fully Meeting Standard(s):** Lands for which there are no substantive concerns with health indicators

- **Exceeding Standard(s):** Lands for which health indicators are in substantially better conditions than acceptable levels.

- **Meeting Standard(s) with Problems:** Lands which have one or more concerns with health indicators to the degree that they are categorized as meeting the Land Health Standards, but have some issues which make them at risk of becoming "not meeting."

BLM_0027356

- **Not Meeting Land Health Standard(s):** Lands for which one or more health indicators are in unacceptable conditions such that basic levels of ecological processes and functions are no longer in place.

- **Land health trend** is used to describe these classes further. It includes these categories: upward, static, and downward.

- **Upward Trend:** lands which have shown improving indicator conditions over time.

- **Static Trend:** lands which have shown no clear improvement or decline in indicator conditions over time.

- **Downward Trend:** lands which have shown declining indicator conditions over time.

**Land health improvement projects.** Activities that are directed at increasing the levels and/or vigor of desirable species within the plant community so that it reaches a higher level of functioning. Activities include restoration or revegetation of areas of degraded vegetation; removal of weeds, and repair or retirement and rehabilitation of developments which are contributing to vegetation degradation.

**Landscape scale.** An approach that examines or considers issues at an extensive scale rather than the individual site scale. The term landscape refers to the scale of the approach (landscape as an area), rather than as a topic of interest.

**Land treatment.** All methods of artificial range improvement arid soil stabilization such as reseeding, brush control (chemical and mechanical), pitting, furrowing, and water spreading.

**Land use plan.** A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land use plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and management framework plans (H-1601-1, BLM Land Use Planning Handbook).

**Land use plan decision.** Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Late season.** Late summer or fall grazing.

**Leasable minerals.** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. These include energy-related mineral resources such as oil, natural gas, coal, and geothermal, and some non-energy minerals, such as phosphate, sodium, potassium, and sulfur. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

**Lease.** Section 302 of the Federal Land Policy and Management Act of 1976 provides the BLM's authority to issue leases for the use, occupancy, and development of public lands. Leases are issued for purposes such as a commercial filming, advertising displays, commercial or

BLM_0027357

noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, native or introduced species harvesting, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy if the residential structures are not incidental to the mining operation, and water pipelines and well pumps related to irrigation and nonirrigation facilities. The regulations establishing procedures for processing these leases and permits are found in 43 CFR 2920.

**Lease notice.** Provides more-detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. A lease notice also addresses special items that lessees should consider when planning operations but does not impose additional restrictions. Lease notices are not an RMP-level decision, and new lease notices may be added to fluid mineral leases at the time of sale. Lease notices apply only to leasable minerals (e.g., oil, gas, geothermal) and not to other types of leases, such as livestock grazing.

**Lease stipulation.** A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lentic.** Pertaining to standing water such as lakes and ponds.

**Limited area.** An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions (43 CFR 8340.0-5).

**Locatable minerals.** Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Long-term effect.** The effect could occur for an extended period after implementation of the alternative. The effect could last several years or more.

**Low-power communication site.** Sites that include to non-broadcast uses (e.g., commercial or private mobile radio service, cellular telephone, microwave, local exchange network, passive reflector).

**Management decision.** A decision made by the BLM to manage public lands. Management decisions include both land use plan decisions and implementation decisions.

**Master development plan.** Information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations, and plans for future production.

**Mechanical transport.** Any vehicle, device, or contrivance for moving people or material in or over land, water, snow, or air that has moving parts.

BLM_0027358

**Mechanical vegetation treatment.** Includes mowing, chaining, chopping, drill seeding, and cutting vegetation to meet resource objective. Mechanical treatments generally occur in areas where fuel loads or invasive species need to be reduced prior to prescribed fire application; when fire risk to resources is too great to use naturally started wildland fires or prescribed fires; or where opportunities exist for biomass utilization or timber harvest. Mechanical treatments may also be utilized to improve wildlife habitat conditions.

**Mechanized uses.** Equipment that is mechanized, including but not limited to mountain bikes, wheelbarrows, and game carts.

**Mexican spotted owl suitable breeding habitat.** Vegetation characteristics described in the current Mexican spotted owl recovery plan in areas where Mexican spotted owl breeding has been confirmed.

**Mineral.** Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained usually from the ground. Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral entry.** The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral estate.** The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineralize.** The process where a substance is converted from an organic substance to an inorganic substance.

**Mineral materials (salable minerals, salable mineral materials).** Common varieties of mineral materials such as soil, sand and gravel, stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Materials Act of 1947, as amended.

**Mineral patent.** A claim on which title has passed from the federal government to the mining claimant under the Mining Law of 1872.

**Minimum impact suppression tactics.** The use of fire management tactics commensurate with the fire's potential or existing behavior while producing the least impact on the resource being protected.

**Mining claim.** A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, millsite, and tunnel site.

BLM_0027359

**Mining Law of 1872.** Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the "General Mining Laws" or "Mining Laws."

**Mitigation.** Alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures or adequate scientific study. Mitigation may be achieved by avoidance, minimization, rectification, reduction, and compensation.

**Mitigation measure(s).** Mitigation includes specific means, measures or practices that would reduce or eliminate effects of the proposed action or alternatives. Mitigation may be used to reduce or avoid adverse impacts, whether or not they are significant in nature. Measures or practices are only termed mitigation measures if they have <u>not</u> been incorporated into the proposed action or alternatives. If mitigation measures are incorporated into the proposed action or alternatives, they are called design features. See **Design feature(s)** definition above. BLM NEPA Handbook, H-1790-1, and 40 CFR 1508.20.

**Modification.** A change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Motorized vehicles or uses.** Vehicles that are motorized, including but not limited to jeeps, all-terrain vehicles (all-terrain vehicles, such as four-wheelers and three-wheelers), trail motorcycles or dirt bikes, and aircrafts.

**Multiple-use.** The management of the public lands and their various resource values so that they are used in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (FLPMA) (BLM Manual 6840, Special Status Species Manual).

**Municipal watershed.** A watershed area that provides water for use by a municipality as defined by the community and accepted by the State.

**National Environmental Policy Act of 1969 (NEPA).** Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**National Register of Historic Places.** A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of, 1966 and maintained by the National Park Service.

BLM_0027360

**Native cutthroat trout.** Native populations include what current science and genetics tell us are Colorado River cutthroat or greenback cutthroat trout.

**Native vegetation.** Plant species that were found here prior to European settlement, and consequently are in balance with these ecosystems because they have well developed parasites, predators, and pollinators.

**Naturalness.** Consistent with what would occur without human intervention. For vegetation structure, naturalness implies a pattern similar to what fire and climate would produce across the landscape.

**Natural processes.** Fire, drought, insect and disease outbreaks, flooding, and other events that existed prior to European settlement, and shaped vegetation composition and structure.

**Non-energy leasable minerals.** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. Non-energy minerals include resources such as phosphate, sodium, potassium, and sulfur.

**Nonfunctional condition.** Riparian-wetland areas that clearly are not providing adequate vegetation, landform, or woody debris to dissipate energies associated with flow events, and thus are not reducing erosion, improving water quality.

**No surface occupancy (NSO).** A major constraint where use or occupancy of the land surface for fluid mineral exploration or development and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads) are prohibited to protect identified resource values. Areas identified as NSO are open to fluid mineral leasing, but surface occupancy or surface-disturbing activities associated with fluid mineral leasing cannot be conducted on the surface of the land. Access to fluid mineral deposits would require horizontal drilling from outside the boundaries of the NSO area.

**Noxious weeds.** A plant species designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the US.

**Off-highway vehicle (OHV) (off-road vehicle).** Any motorized vehicle capable of, or designated for travel on or immediately over land, water or other natural terrain, excluding: (1) any non-amphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense emergencies (43 CFR 8340.0-5).

**Off-highway vehicle area designations.** BLM-administered lands in the CFO are designated as Open, Limited, or Closed for OHV use.

BLM_0027361

- **Limited.** An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions (43 CFR 8340.0-5).

- **Closed.** An area where off-road vehicle use is prohibited. Use of off-road vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer (43 CFR 8340.0-5).

- **Open.** Generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 defines the specific meaning of "open" as it relates to OHV use.

**Open area.** *See "Off-highway vehicle area designations – Open" definition.*

**Ordinary high water mark.** That line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

**Outstandingly remarkable value (ORV).** Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act of 1968: "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values..." Other similar values that may be considered include ecological, biological, or botanical.

**Overstory.** That portion of a plant community consisting of the taller plants on the site; the forest or woodland canopy.

**Ozone.** A faint blue gas produced in the atmosphere from chemical reactions of burning coal, gasoline, and other fuels and chemicals found in products such as solvents, paints, and hairsprays.

**Paleontological resources.** The physical remains or other physical evidence of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for correlating and dating rock strata and for understanding past environments, environmental change, and the evolution of life.

**Particulate matter (PM).** One of the six "criteria" pollutants for which the US EPA established National Ambient Air Quality Standards. Particulate matter is defined as two categories, fine particulates, with an aerodynamic diameter of 10 micrometers ($PM_{10}$) or less, and fine particulates with an aerodynamic diameter of 2.5 micrometers or less ($PM_{2.5}$).

**Passenger vehicle.** Two-wheel-drive, low-clearance vehicles.

BLM_0027362

**Perennial stream.** A stream that flows continuously. Perennial streams are generally associated with a water table in the localities through which they flow.

**Permitted access.** *See "administrative access" definition.*

**Permitted use.** The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and expressed in AUMs (43 CFR 4100.0-5) (from H-4180-1, BLM Rangeland Health Standards Manual).

**Permittee.** A person or company permitted to graze livestock on public land.

**Project Area.** The geographical area for which EISs are developed. The Bull Mountain MDP EIS area boundary defines the area assessed in this EIS, and encompasses approximately 19,700 acres in Delta County in southwestern Colorado.

**Issues.** Concerns, conflicts, and problems with the existing management of public lands. Frequently, issues are based on how land uses affect resources. Some issues are concerned with how land uses can affect other land uses, or how the protection of resources affects land uses.

**Potential Fossil Yield Classification (PFYC) system.** A system used by the BLM to classify geologic units based on the relative abundance of vertebrate fossils or scientifically significant invertebrate or plant fossils and their sensitivity to adverse impacts, with a higher class number indicating a higher potential.

**Potential vegetation group.** Potential vegetation types grouped on the basis of a similar general moisture or temperature environment.

**Prehistoric resources.** Any material remains, structures, and items used or modified by people before Euro-Americans established a presence in the region.

**Prescribed fire.** A wildland fire originating from a planned ignition to meet specific objectives identified in a written, approved, prescribed fire plan for which NEPA requirements (where applicable) have been met prior to ignition.

**Prevention of significant deterioration.** An air pollution permitting program intended to ensure that air quality does not diminish in attainment areas.

**Proper functioning condition.** A term describing stream health that is based on the presence of adequate vegetation, landform and debris to dissipate energy, reduce erosion and improve water quality.

**Proper functioning condition for lentic areas.** A riparian-wetland areas are functioning properly when adequate vegetation, landform, or debris is present to: dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality; filter sediment and aid floodplain development; improve flood-water retention and ground-water recharge; develop root masses that stabilize islands and shoreline features against cutting action; restrict water percolation; develop diverse ponding characteristics to provide the habitat and the water depth, duration, and temperature

BLM_0027363

necessary for fish production, waterbird breeding, and other uses; and support greater biodiversity.

**Proper functioning condition for lotic areas.** A riparian-wetland area is considered to be in proper functioning condition when adequate vegetation, landform, or large woody debris is present to:

- Dissipate stream energy associated with high waterflow, thereby reducing erosion and improving water quality

- Filter sediment, capture bedload, and aid floodplain development

- Improve flood-water retention and ground-water recharge

- Develop root masses that stabilize streambanks against cutting action

- Develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses

- Support greater biodiversity

**Proposed critical habitat.** Those areas officially proposed for designations as critical habitat by the Secretary of Interior or Commerce.

**Proposed species.** A species for which a proposed rule to add the species to the federal list of threatened and endangered species has been published in the Federal Register.

**Public land.** Land or interest in land owned by the US and administered by the Secretary of the Interior through the BLM without regard to how the US acquired ownership, except lands located on the Outer Continental Shelf and land held for the benefit of Indians, Aleuts, and Eskimos (H-1601-1, BLM Land Use Planning Handbook).

**Public water supply.** As defined by the state of Colorado, a "public water system" is a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has a least fifteen service connections or regularly serves an average of at least 25 individuals daily at least 60 days out of the year.

**Range improvement project.** An authorized physical modification or treatment which is designed to improve production of forage; change vegetation composition; control patterns of use; provide water; stabilize soil and water conditions; restore, protect and improve the condition of rangeland ecosystems to benefit livestock, wild horses and burros, and fish and wildlife. This definition includes, but is not limited to: structures, treatment projects and use of mechanical devices, or modifications achieved through mechanical means.

**Raptor.** Bird of prey with sharp talons and strongly curved beaks, such as hawks, owls, falcons, and eagles.

BLM_0027364

**Rare vegetation.** Unique combinations of plant species as identified by terminology and a classification system from the Colorado Natural Heritage Program (CNHP). These are defined using CNHP's Global Rarity Ranks denoting scarcity on a global level and include the rankings of G1 and G2.

**Reasonable foreseeable development scenario.** The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Recharge areas.** Headwaters of perennial streams, contributing watersheds to springs and/or seeps, floodplains, all stream channels, municipal watersheds, and source water protection areas.

**Reclamation.** Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

**Recreation experiences.** Psychological outcomes realized either by recreation-tourism participants as a direct result of their on-site leisure engagements and recreation-tourism activity participation or by nonparticipating community residents as a result of their interaction with visitors and guests within their community or interaction with the BLM and other public and private recreation-tourism providers and their actions.

**Recreation management zones.** Subunits within an SRMA managed for distinctly different recreation products. Recreation products are composed of recreation opportunities, the natural resource and community settings within which they occur, and the administrative and service environment created by all affecting recreation-tourism providers, within which recreation participation occurs.

**Recreation opportunities.** Favorable circumstances enabling visitors' engagement in a leisure activity to realize immediate psychological experiences and attain more lasting, value-added beneficial outcomes.

**Recreation setting character conditions.** The distinguishing recreational qualities of any landscape, objectively defined along a continuum, ranging from primitive to urban landscapes, expressed in terms of the nature of the component parts of its physical, social, and administrative attributes. These recreational qualities can be both classified and mapped. This classification and mapping process should be based on variation that either exists (for example, setting descriptions) or is desired (for example, setting prescriptions) among component parts of the various physical, social, and administrative attributes of any landscape. The recreation opportunity spectrum is one of the tools for doing this.

**Recreation settings.** The collective distinguishing attributes of landscapes that influence and sometimes actually determine what kinds of recreation opportunities are produced.

**Rehabilitate.** Returning disturbed lands as near to its predisturbed condition as is reasonably practical or as specified in approved permits.

BLM_0027365

**Required Design Features.** Specific means, measures or practices that make up the proposed action and alternatives and would be required as part of future project designs. Design features could be identified as the impact analysis is being conducted, especially those that would reduce or eliminate adverse effects after the initial formulation of alternatives. In this situation, design features may be added to the proposed action or alternatives. Standard operating procedures, stipulations, and best management practices are usually considered design features. If any means, measures, or practices are not incorporated into the proposed action or alternatives, they are considered mitigation measures.

**Reserve pit:** A pit dug on a well pad used for temporary storage for waste fluids during oil and gas drilling and completion. Reserve pits are backfilled when the well is put into production and reclaimed.

**Resource Advisory Council.** A council established by the Secretary of the Interior to provide advice or recommendations to BLM management. The Southwest Colorado RAC covers issues within the UFO.

**Resource management plan (RMP).** A land use plan as prescribed by the Federal Land Policy and Management Act that establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Restore/restoration.** The process of returning disturbed areas to a natural array of native plant and animal associations.

**Retard.** Measurably slow attainment of any identified objective level that is worse than the objective standard. Degradation of the physical/biological process or conditions that determine objective standards would be considered to retard attainment of specific objective standard.

**Revegetate/revegetation.** The process of putting vegetation back in an area where vegetation previously existed, which may or may not simulate natural conditions.

**Right-of-way (ROW).** BLM-administered lands authorized to be used or occupied for specific purposes pursuant to a right-of-way grant, which are in the public interest and which require ROWs over, on, under, or through such lands.

**Right-of-way avoidance area.** An area identified through resource management planning to be avoided but may be available for ROW location with special stipulations. A ROW avoidance area is comparable to the SSR restriction applied to other resources.

**Right-of-way exclusion area.** An area identified through resource management planning that is not available for ROW location under any conditions. A ROW exclusion area is comparable to the NGD stipulation applied to other resources.

**Riparian/aquatic system.** Interacting system between aquatic and terrestrial situations. Identified by a stream channel and distinctive vegetation that requires or tolerates free or unbound water.

BLM_0027366

**Riparian area.** A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian zone.** An area one-quarter mile wide encompassing riparian and adjacent vegetation.

**Road.** A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Roadless.** The absence of roads that have been constructed and maintained by mechanical means to ensure regular and continuous use.

**Routes.** Multiple roads, trails and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system. Generically, components of the transportation system are described as "routes."

**Salinity.** Refers to the solids such as sodium chloride (table salt) and alkali metals that are dissolved in water.

**Saturated soils.** Occur when the infiltration capacity of the soil is exceeded from above due to rainfall or snowmelt runoff. Soils can also become saturated from groundwater inputs.

**Scoping process.** An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**Season of use.** The time during which livestock grazing is permitted on a given range area, as specified in the grazing lease.

**Seeding.** Seeding is a vegetation treatment that includes the application of grass, forb, or shrub seed, either aerially or from the ground. In areas of gentle terrain, ground applications of seed are often accomplished with a rangeland drill. Seeding allows the establishment of native species or placeholder species and restoration of disturbed areas to a perennial-dominated cover type, thereby decreasing the risk of subsequent invasion by exotic plant species. Seeding would be used primarily as a follow-up treatment in areas where disturbance or the previously described treatments have removed exotic plant species and their residue.

**Setting character.** The condition of any recreation system, objectively defined along a continuum, ranging from primitive to urban in terms of variation of its component physical, social, and administrative attributes.

**Severe winter range.** That part of the overall range where 90 percent of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten. Severe winter range is defined for each Colorado Division of Wildlife Data Analysis Unit.

BLM_0027367

**Short-term effect.** The effect occurs only during or immediately after implementation of the alternative.

**Sole-source aquifer.** Defined by the US EPA as an aquifer supplying at least 50 percent of the drinking water consumed in the area overlying the aquifer, where the surrounding area has no alternative drinking water source(s) that could physically, legally, and economically supply all those who depend upon the aquifer for drinking water.

**Source water protection area.** The area delineated by a state for a public water supply or including numerous suppliers, whether the source is ground water or surface water or both.

**Special status species.** BLM special status species are: (1) species listed, candidate, or proposed for listing under the ESA; and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the ESA that are designated as BLM sensitive by the BLM State Director(s). All federally listed candidate species, proposed species, and delisted species in the five years following delisting are conserved as BLM sensitive species.

**Split estate.** Lands on which the mineral estate is owned by someone other than the surface estate owner. For example, the surface is in private ownership and the mineral resources are publicly held and managed by the federal government.

**Stabilize.** The process of stopping further damage from occurring.

**Standard.** A description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards). To be expressed as a desired outcome (goal).

**Standard lease terms and conditions.** Areas may be open to leasing with no specific management decisions defined in a Resource Management Plan; however, these areas are subject to lease terms and conditions as defined on the lease form (Form 3100-11, Offer to Lease and Lease for Oil and Gas; and Form 3200-24, Offer to Lease and Lease for Geothermal Resources).

**State-listed noxious weed species.** Noxious weed species listed by the State of Colorado:

- **List A** species are designated by the Commissioner for eradication.

- **List B** weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, develops and implements state noxious weed management plans designed to stop the continued spread of these species.

- **List C** weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, will develop and implement state noxious weed management plans designed to support the efforts of local governing bodies to facilitate more effective integrated weed management on private and public lands. The goal of such plans will not be to stop the

continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species.

**State implementation plan.** A detailed description of the programs a state will use to carry out its responsibilities under the Clean Air Act. State implementation plans are collections of the regulations used by a state to reduce air pollution.

**Stationary source.** Refers to a stationary source of emissions. Prevention of Significant Deterioration permits are required for major new stationary sources of emissions that emit 100 tons or more per year of carbon monoxide, sulphur dioxide, nitrogen dioxide, ozone, or particulate matter.

**Stipulation (general).** A term or condition in an agreement or contract.

**Stipulation (oil and gas).** A provision that modifies standard oil and gas lease terms and conditions in order to protect other resource values or land uses and is attached to and made a part of the lease. Typical lease stipulations include No Surface Occupancy (NSO), Timing Limitations (TL), and Controlled Surface Use (CSU). Lease stipulations are developed through the land use planning (RMP) process.

**Streamside management zone.** Land adjacent to a waterbody where activities on land are likely to affect water quality.

**Surface-disturbing activities.** Surface-disturbing activities are those that normally result in more than negligible (immeasurable, not readily noticeable) disturbance to vegetation and soils on public lands and accelerate the natural erosive process. Surface disturbances could require reclamation and normally involve use and/or occupancy of the surface, causing disturbance to soils and vegetation. They include, but are not limited to: the use of mechanized earth-moving equipment; truck-mounted drilling, stationary drill rigs in unison, and geophysical exploration equipment off designated routes; off-road vehicle travel in areas designated as limited or closed to off-road vehicle use; construction of facilities such as range facilities and/or improvements, power lines, pipelines, oil and gas wells and/or pads; recreation sites; new road and trail construction; and use of pyrotechnics and explosives. Surface disturbance is not normally caused by casual-use activities. Activities that are not considered surface-disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, dispersed camping, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the land by wildlife.

**Sustained yield.** The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple uses.

**Terrestrial.** Living or growing in or on the land.

**Threatened species.** Any species that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (BLM Manual 6840, Special Status

BLM_0027369

Species Management). Under the ESA in the US, "threatened" is the lesser-protected of the two categories. Designation as threatened (or endangered) is determined by USFWS as directed by the ESA.

**Tier 1-4 Emission Standards.** The first federal standards (Tier 1) for new nonroad (or off-road) diesel engines were adopted in 1994 for engines over 37 kW (50 hp), to be phased-in from 1996 to 2000. On August 27, 1998, the EPA signed the final rule that introduced Tier 1 standards for equipment under 37 kW (50 hp) and increasingly more stringent Tier 2 and Tier 3 standards for all equipment with phase-in schedules from 2000 to 2008. The Tier 1-3 standards are met through advanced engine design, with no or only limited use of exhaust gas aftertreatment (oxidation catalysts). On May 11, 2004, EPA signed the final rule introducing Tier 4 emission standards, which are phased-in over the period of 2008-2015. The Tier 4 standards require that emissions of particulate matter and NOx be further reduced by about 90%. Such emission reductions can be achieved through the use of control technologies—including advanced exhaust gas aftertreatment—similar to those required by the 2007-2010 standards for highway engines. For complete tables of Tier 1 – 4 emission standards, see the EPA website: http://www.epa.gov/otaq/nonroad-diesel.htm (last accessed 10/13/2014).

**Timing Limitation (TL).** The TL stipulation, a moderate constraint, is applicable to fluid mineral leasing, all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads), and other surface-disturbing activities (i.e., those not related to fluid mineral leasing). Areas identified for TL are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. TLs can overlap spatially with NSO, NGD, CSU, SSR, as well as with areas that have no other restrictions. Administrative activities are allowed at the discretion of the Authorized Officer.

**Total dissolved solids.** Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

**Total maximum daily load.** An estimate of the total quantity of pollutants (from all sources: point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Traditional cultural properties.** A property that derives significance from traditional values associated with it by a social or cultural group, such as an Indian tribe or local community. A traditional cultural property may qualify for the National Register of Historic Places if it meets the criteria and criteria exceptions at 36 CFR 60.4 (see National Register Bulletin 38).

**Traditional use.** Longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses. Traditions are shared generally within a social and/or cultural group and span

BLM_0027370

generations. Usually traditional uses are reserved rights resulting from treaty and/or agreements with Native American groups.

**Trail.** A linear route managed for human-power (e.g., hiking or bicycling), stock (e.g., equestrian), or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Transmission.** The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to consumers, or is delivered to other electric systems. Transmission is considered to end when the energy is transformed for distribution to the consumer.

**Transportation system.** The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

**Trespass.** Any unauthorized use of public land.

**Tribal interests.** Native American or Native Alaskan economic rights such as Indian trust assets, resource uses and access guaranteed by treaty rights, and subsistence uses.

**Understory.** That portion of a plant community growing underneath the taller plants on the site.

**Upland game birds.** Non-waterfowl game birds usually hunted with pointing breed, flushing spaniels, and retrievers. Upland game birds include grouse, chukar, quail, snipe, doves, pigeons, ptarmigan, and wild turkey.

**Utility corridor.** Tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**Valid existing rights.** Documented, legal rights or interests in the land that allow a person or entity to use said land for a specific purpose and that are still in effect. Such rights include but are not limited to fee title ownership, mineral rights, rights-of-way, easements, permits, and licenses. Such rights may have been reserved, acquired, leased, granted, permitted, or otherwise authorized over time.

**Vegetation manipulation.** Planned alteration of vegetation communities through use of mechanical, chemical, seeding, and/or prescribed fire or managed fire to achieve desired resource objectives.

**Vegetation structure.** The stage of plant community development, encompassing age of stand, height of vegetation, and spatial distribution of plants.

**Vegetation treatments.** Management practices which change the vegetation structure to a different stage of development. Vegetation treatment methods include managed fire, prescribed fire, chemical, mechanical, and seeding.

BLM_0027371

**Vegetation type.** A plant community with immediately distinguishable characteristics based upon and named after the apparent dominant plant species.

**Vertebrate.** An animal having a backbone or spinal column. Includes jawless fishes, bony fishes, sharks and rays, amphibians, reptiles, mammals, and birds.

**Viewshed.** The panorama from a given viewpoint that encompasses the visual landscape, including everything visible within a 360-degree radius.

**Visibility (air quality).** A measure of the ability to see and identify objects at different distances.

**Visual resource management (VRM).** The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives.

**Visual resource management classes.** Define the degree of acceptable visual change within a characteristic landscape. A class is based on the physical and sociological characteristics of any given homogeneous area and serves as a management objective. Categories assigned to public lands are based on scenic quality, sensitivity level, and distance zones. Each class has an objective that prescribes the amount of change allowed in the characteristic landscape (from H-1601-1, BLM Land Use Planning Handbook).

The four classes are described below:

- **Class I** provides for natural ecological changes only. This class includes primitive areas, some natural areas, some wild and scenic rivers, and other similar areas where landscape modification activities should be restricted.

- **Class II** areas are those areas where changes in any of the basic elements (form, line, color, or texture) caused by management activity should not be evident in the characteristic landscape.

- **Class III** includes areas where changes in the basic elements (form, line, color, or texture) caused by a management activity may be evident in the characteristic landscape. However, the changes should remain subordinate to the visual strength of the existing character.

- **Class IV** applies to areas where changes may subordinate the original composition and character; however, they should reflect what could be a natural occurrence within the characteristic landscape.

**Visual resources.** The visible physical features on a landscape, (topography, water, vegetation, animals, structures, and other features) that comprise die scenery of the area.

**Visual sensitivity.** Visual sensitivity levels are a measure of public concern for scenic quality and existing or proposed visual change.

BLM_0027372

**Volatile organic compounds.** Chemicals that produce vapors readily at room temperature and at normal atmospheric pressure. Volatile organic compounds include gasoline, industrial chemicals such as benzene, solvents such as toluene and xylene, and tetrachloroethylene (perchloroethylene, the principal dry cleaning solvent).

**Waiver.** A permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Watershed.** Topographical region or area delineated by water draining to a particular watercourse or body of water.

**Watershed condition indicators.** An integrated suite of aquatic, riparian, and hydrologic condition measures that is intended to be used at the watershed scale.

**Wilderness.** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation, that is protected and managed to preserve its natural conditions and that (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practical its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value. The definition is contained in Section 2(c) of the Wilderness Act of 1964 (78 Stat. 891).

**Wilderness characteristics.** Wilderness characteristics attributes include the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include supplemental values. Lands with wilderness characteristics are those lands that have been inventoried and determined by the BLM to contain wilderness characteristics as defined in section 2(c) of the Wilderness Act.

**Wilderness Study Area (WSA).** A designation made through the land use planning process of a roadless area found to have wilderness characteristics, as described in Section 2(c) of the Wilderness Act of 1964.

**Wildland fire.** Wildland fire is a general term describing any non-structure fire that occurs in the wildland. Wildland fires are categorized into two distinct types:

- **Wildfires:** Unplanned ignitions or prescribed fires that are declared wildfires

- **Prescribed fires:** Planned ignitions

**Wildland-urban interface (WUI):** The line, area or zone where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuels.

**Winter concentration area:** That part of winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter

BLM_0027373

range in the average five winters out of ten. Winter concentration areas are defined for each Colorado Division of Wildlife Data Analysis Unit.

**Xeroriparian area.** An area or vegetative community that exists in arid environments and is characterized by dry washes exposed to only intermittent flows of water (ephemeral streams) associated with discrete precipitation events.

BLM_0027374

BLM





**U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

# GUNNISON SAGE-GROUSE RANGEWIDE

## Draft Resource Management Plan Amendment
## Draft Environmental Impact Statement



# AUGUST 2016

**BLM COLORADO STATE OFFICE**
Lakewood, Colorado
Ruth Welch, State Director

**BLM UTAH STATE OFFICE**
Salt Lake City, Utah
Jenna Whitlock, Acting State Director

**BLM MISSION**

It is the mission of the Bureau of Land Management to sustain
the health, diversity, and productivity of the public lands for the
use and enjoyment of present and future generations.

BLM/CO/PL-16/008

BLM_0027376

**BUREAU OF LAND MANAGEMENT**

# Gunnison Sage-Grouse Rangewide
*Draft Resource Management Plan Amendment*
*and Draft Environmental Impact Statement*

U.S. Department of the Interior
Bureau of Land Management

Ruth Welch, State Director
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215

Jenna Whitlock, Acting State Director
Bureau of Land Management
Utah State Office
440 West 200 South
Salt Lake City, Utah 84101

**Access the Draft Resource Management Plan**
**and Draft Environmental Impact Statement**
**online through the project website at:**
**http://1.usa.gov/1Uusw8C**

**Cover Photos (left to right) by:**
Top Row: Bob Gress; Cameron Aldridge
Middle Row: Brad Wilson
Bottom Row: Bob Gress; John Furka; Helen Richardson

BLM_0027377

This page intentionally left blank.

BLM_0027378

ABSTRACT

# ABSTRACT

**Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment/**
**Draft Environmental Impact Statement**

Responsible Agency: United States Department of the Interior, Bureau of Land Management
Type of Action: Administrative
Document Status:  Draft

This draft resource management plan amendment and environmental impact statement has been prepared by the Bureau of Land Management (BLM) with assistance from 21 cooperating agencies.  It describes and analyzes four alternatives for managing approximately 741,700 acres of BLM-administered land and nearly 1.35 million acres of BLM-administered subsurface federal mineral estate that may lie beneath other surface ownership.  Surface estate and federal mineral estate is managed by seven BLM field offices (Grand Junction, Gunnison, San Luis Valley, Tres Rios and Uncompahgre in Colorado and Moab and Monticello in Utah), three national conservation areas (Dominguez-Escalante, Gunnison Gorge and McInnis Canyons) and Canyons of the Ancients National Monument.  The analysis area spans portions of 12 counties: Chaffee, Delta, Dolores, Gunnison, Hinsdale Mesa, Montrose, Ouray, Saguache, and San Miguel in Colorado and Grand and San Juan in Utah.

The alternatives present a range of management actions to achieve the goal of Gunnison Sage-Grouse conservation for BLM Colorado and Utah.  Major planning issues addressed include land and realty actions, energy and minerals, recreation and travel management and livestock grazing.  Alternative A is a continuation of current management (No Action Alternative); use of public lands and resources would continue to be managed under the current BLM RMPs, as amended.  Alternative B manages land primarily for the benefit of GUSG and its habitat.  Alternative C minimizes or compensates for impacts from resource uses and other actions to varying degrees.  Alternative D represents the agency's preliminary preference for a combination of decisions to effectively achieve BLM goals and policies, meet the purpose and need, address the key planning issues, and respond to the recommendations of cooperating agencies and BLM specialists.

Review Period: Comments on the Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment/Environmental Impact Statement will be accepted for 90 calendar days following publication of the United States Environmental Protection Agency's Notice of Availability in the Federal Register.

For further information, contact:
    Bridget Clayton, BLM Colorado Sage Grouse Coordinator
    2815 H Road, Grand Junction, CO 81506
    (970) 244-3045
    Project Website:  http://1.usa.gov/1Uusw8C

BLM_0027379

This page intentionally left blank.

BLM_0027380

DEAR READER LETTER



## United States Department of the Interior
BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215-7210
www.co.blm.gov



In Reply Refer To:
1610 (CO-910)

**JUL 2 6 2016**

Dear Reader:

Enclosed for your review and comment is the Gunnison Sage-Grouse (GUSG) Rangewide Draft
Resource Management Plan (RMP) Amendment/Draft Environmental Impact Statement (EIS).
The Bureau of Land Management (BLM) prepared this Draft RMP Amendment/Draft EIS in
consultation with 21 cooperating agencies and in accordance with the National Environmental
Policy Act of 1969 (as amended), Federal Land Policy and Management Act of 1976 (as
amended), BLM Land Use Planning Handbook (H-1601-1), and other applicable laws, policies,
and implementing regulations.

The planning area for the Draft RMP Amendment/Draft EIS consists of approximately 2.1
million acres of federal, state, city, county and private lands in Colorado and Utah (including just
over 740,000 acres of BLM-administered lands), along with an estimated 1.3 million acres of
BLM-administered federal mineral estate. BLM lands and federal mineral estate in the planning
area are managed by seven BLM field offices (Grand Junction, Gunnison, San Luis Valley, Tres
Rios and Uncompahgre in Colorado; Moab and Monticello in Utah) spanning portions of 10
Colorado counties (Chaffee, Delta, Dolores, Hinsdale, Gunnison, Mesa, Montrose, Ouray,
Saguache and San Miguel) and two Utah counties (Grand and San Juan). If approved, the plan
could amend up to 11 existing BLM RMPs (including one national monument RMP and three
national conservation area RMPs) in order to provide current guidance for managing and
conserving GUSG habitat on BLM-administered lands and federal mineral estate.

The BLM encourages the public to provide information and comments pertaining to the analysis
presented in the Draft RMP Amendment/Draft EIS. We are particularly interested in feedback
concerning the adequacy and accuracy of the proposed alternatives, the analysis of their
respective management decisions, and any new information that would help the BLM as we
develop the plan. As a member of the public, your timely comments will help us formulate the
Proposed RMP Amendment/Final EIS. Comments will be accepted for ninety (90) calendar days
following the Environmental Protection Agency's (EPA) publication of its Notice of Availability
in the Federal Register. The BLM can best utilize your comments and resource information
submissions if received within the review period.

Your review and comments on the content of this document are critical to the success of this
planning effort. If you wish to submit comments on the Draft RMP Amendment/Draft EIS, we
request that you make your comments as specific as possible. Comments will be more helpful if
they include suggested changes, sources, or methodologies, and reference a section or page

BLM_0027381

number. Comments containing only opinion or preferences will be considered and included as part of the decision making process, but they will not receive a formal response from the BLM.

Comments may be submitted electronically through the project website: http://1.usa.gov/1Uusw8C. Submissions will also be accepted by email to: GUSG_amend@blm.gov; facsimile to: (303) 239-3699; or mail to: Gunnison Sage-Grouse EIS, BLM Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215. Please avoid duplicate comments by submitting them only once and in one format.

Before including your address, phone number, email address or other personally identifiable information, be advised that your entire comment—including personally identifiable information—may be made publicly available at any time. While you can request to have your personally identifiable information withheld from public review, the BLM cannot guarantee that we will be able to do so.

Public meetings to provide an overview of the document, respond to questions, and take public comments will be announced by local media, website, and/or public mailings at least 15 days in advance.

Copies of the Draft RMP/Draft EIS have been sent to affected Federal, state and local government agencies. Interested parties can view the Draft RMP Amendment/Draft EIS electronically through the project website, http://1.usa.gov/1Uusw8C. The BLM has printed a limited number of paper copies as well. Paper copies are available for public review at the following BLM locations:

- Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215
- Colorado Southwest District Office, 2465 South Townsend Avenue, Montrose, CO 81401
- Grand Junction Field Office, 2815 H Road, Grand Junction, CO 81506
- Gunnison Field Office, 210 West Spencer Avenue, Gunnison, CO 81230
- San Luis Valley Field Office, 1313 E. Highway 160, Monte Vista, CO 81144
- Tres Rios Field Office, 29211 Highway 184, Dolores, CO 81323
- Utah State Office, 440 West 200 South, Suite 500, Salt Lake City, UT 84101
- Utah Canyon County District Office, 82 East Dogwood, Moab, UT 84532
- Monticello Field Office, 365 North Main, Monticello, UT 84535

Thank you for your continued interest in and contributions to this important planning effort. For additional information or clarification regarding this document or the planning process, please contact BLM Colorado Sage Grouse Coordinator Bridget Clayton at (970) 244-3045.

Sincerely,

Ruth Welch
State Director

BLM_0027382

# EXECUTIVE SUMMARY

## INTRODUCTION

The Gunnison Sage-Grouse (GUSG) *(Centrocercus minimus)* is a ground-dwelling bird species with a current range limited to seven scattered populations in southwest Colorado and southeast Utah—approximately 7% (FWS 2010a) of its recognized historical range in southwest Colorado, southeast Utah, northeast Arizona, and northern New Mexico (RCP 2005 and FWS 2014b, c). The GUSG is designated as a sensitive species by the State of Utah and labeled as a species of special concern by the State of Colorado.

In January 2013, the U.S. Fish and Wildlife Service (FWS) proposed to list the GUSG as endangered under the Endangered Species Act (ESA) (FWS 2013a) and to designate critical habitat for the species (FWS 2013b). On November 20, 2014, the FWS published a final rule in the Federal Register listing the GUSG as a threatened species (FWS 2014b) and designating critical habitat (FWS 2014c). The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah. The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision. In response to the listing decision, the United States (U.S.) Department of the Interior, Bureau of Land Management (BLM) has prepared this Draft Resource Management Plan (RMP) Amendment to analyze the addition of GUSG conservation measures to their existing RMPs.

The Federal Land Policy and Management Act of 1976 (FLPMA) directs the BLM to develop and periodically revise or amend its RMPs, which guide management of BLM-administered lands. The FWS has identified conservation measures in land use plans as the principal regulatory mechanism for protecting GUSG on BLM-administered lands. Based on the FWS-identified threats to the GUSG, the BLM needs to incorporate objectives and adequate conservation measures into RMPs to contribute to the conservation and assist with the recovery of the GUSG. The conservation measures could include restrictions on resource uses and programs that affect GUSG, as well as measures to reduce the impacts resulting from BLM programs and authorized uses.

An Environmental Impact Statement (EIS) has been prepared in association with the RMP Amendment. An EIS is a document required by the National Environmental Policy Act (NEPA) for federal government agency actions "significantly affecting the quality of the human environment." A tool for decision-making, an EIS discloses the environmental effects of a proposed agency action and evaluates a range of alternative actions.

BLM_0027383

Management direction and actions outlined in this RMP Amendment apply only to BLM-administered lands within the planning area, as well as to the federal mineral estate beneath other surface-owned lands—this constitutes the decision area. These areas are located in Chaffee, Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel counties in southwestern Colorado and Grand and San Juan counties in Southeastern Utah.

The decision area includes approximately 620,000 acres of BLM-administered public land, as well as approximately 1,000,000 acres of subsurface federal mineral estate (as shown in Figure 1.1 and described in Table 1.1 and Table 1.2).

The decision area is defined as BLM-administered lands and federal mineral estate within three categories of GUSG habitat:

## Occupied Habitat

Occupied critical habitat, as designated by the FWS under the ESA, forms the core, but not the entirety of what is defined as Occupied Habitat in this Draft RMP Amendment. Occupied Habitat supplements occupied critical habitat as necessary to meet the purpose and need of this action and comply with the multiple use and sustained yield mandate of the BLM. Occupied Habitat supplements occupied critical habitat as follows:

- Occupied Habitat includes an area of vacant/unknown and a small area of occupied, as defined and delineated by the CPW, not included in FWS-designated critical occupied habitat.
- Occupied Habitat includes the Poncha Pass area. The FWS did not include the Poncha Pass area in their final occupied critical habitat designation because they concluded that the "Poncha Pass area, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet primary constituent element (PCE) 1." However, the Poncha Pass area does currently support GUSG and the BLM will treat it as such unless and until it no longer meets the criteria.
- Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the FWS excluded from the critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not. Removing these properties from Occupied Habitat would exclude the subsurface mineral estate from the management actions contained in this RMP Amendment.

## Unoccupied Habitat

Unoccupied critical habitat, as designated by the FWS under the ESA, forms the extent of Unoccupied Habitat. Unoccupied critical habitat consists of specific areas

BLM_0027384

EXECUTIVE SUMMARY

outside of those occupied by GUSG at the time of the listing that are determined to be essential for the conservation of the species (16 USC § 1532 (5), (A), (ii)).

**Non-Habitat Areas within Four Miles of a Lek**
Disruptive activities outside of Occupied or Unoccupied Habitat can affect GUSG and GUSG habitat. As a result, disruptive activities occurring within four miles of a lek in Non-Habitat Areas adjacent to Occupied and/or Unoccupied Habitat will be considered.

# PURPOSE AND NEED FOR THE RESOURCE MANAGEMENT PLAN AMENDMENT

## PURPOSE

This RMP Amendment provides a framework for conserving and assisting with the recovery of the GUSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird. The ESA requires agencies to ensure that their actions are not likely to jeopardize the continued existence of a listed species or result in the adverse modification or destruction of critical habitat for a listed species. In meeting this requirement, the BLM will strive to integrate management objectives and actions that promote recovery of the GUSG with the agency's responsibility to allow for appropriate public land uses that enhance the economic stability of local communities in accordance with the multiple use and sustained yield direction set forth in the FLPMA.

## NEED

ESA Section 7(a)(1) requires the BLM to use its authority to further the purposes of the ESA by implementing programs for the conservation of federally listed species and the ecosystems upon which they depend. The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs "shall be revised as necessary based on ..., new data, new or revised policy ..." (43 Code of Federal Regulations [CFR] 1610.5-6). These evaluations concluded that a RMP Amendment is necessary in order to address the changed circumstances and new information resulting from the 2014 FWS listing of the GUSG as "threatened" under the ESA.

# THE SCOPING PROCESS

Scoping is an early and open process for determining the scope, or range, of issues to be addressed and for identifying the significant issues to consider in the planning

BLM_0027385

process. Scoping is designed to meet the public involvement requirements of FLPMA and NEPA. Scoping helps the BLM to identify the concerns of the agency and affected public and define the relevant issues and alternatives that will be examined in detail in the RMP Amendment. A planning issue is defined as a major controversy or dispute regarding management or uses on BLM-administered lands that can be addressed through a range of alternatives.

A 60-day public scoping period began on July 18, 2014, with the publication in the Federal Register of a Notice of Intent to begin planning and ended on August 18, 2014.

This cooperative process included soliciting input from interested state and local governments, tribal governments, other federal agencies and organizations, and individuals to identify the scope of issues to be addressed in the RMP Amendment and to assist in formulating reasonable alternatives. The scoping process is a method for opening dialogue between the BLM and the public about managing for the GUSG and GUSG habitat on BLM-administered lands. The process also identifies the concerns of those who have an interest in this subject. As part of the scoping process, the BLM requested that the public submit nominations for potential areas of critical environmental concern (ACECs) for the GUSG and its habitat.

Scoping included four open-house meetings in Golden, Gunnison, Montrose, and Dove Creek Colorado in early August 2014. In addition, news releases notified the public of the scoping period and invited them to provide written comments. Public comments were used to define the relevant issues that would be addressed by a reasonable range of alternatives in the RMP Amendment and associated EIS.

The Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment/EIS Scoping Summary Report (BLM 2014) is available on the project website. The discussion below provides an overview of the scoping results.

## ISSUES

During the scoping process, the public and agencies identified issues to be addressed in the GUSG RMP Amendment/EIS. Issues outlined in the Scoping Summary Report, as well as resource and use issues from the BLM Land Use Planning Handbook and Manual (H-1610-1; BLM 2005), were considered in developing the alternatives brought forward for analysis. The scope of issues included GUSG habitat, energy and mineral development, livestock grazing, vegetation and riparian management, lands and realty and recreation and travel management.

BLM_0027386

## MANAGEMENT ALTERNATIVES

Alternatives development is guided by established planning criteria (as outlined in 43 CFR Section 1610). The basic goal of alternative development is to produce distinct potential management scenarios that:

- Address the identified major planning issues
- Explore opportunities to enhance management of resources and resource uses
- Meet the purpose and need for the RMP Amendment
- Are feasible

Between September 2014 and March 2016, the BLM project team met to develop management goals and identify objectives and actions. Various groups, along with cooperating agencies, met a number of times to refine their work. Through this process, the planning team developed one no action alternative (A), required by CEQ, and three action alternatives (B, C, and D). The action alternatives were designed to address the planning issues, to fulfill the purpose of and need for the RMP Amendment, and to meet the multiple use mandates of FLPMA (43 US Code, Section 1716).

The three resulting action alternatives offer a range of possible management approaches. Their purpose is to respond to planning issues and concerns identified through public scoping, to maintain or increase GUSG abundance and distribution in the planning area, and to provide adequate regulatory mechanisms for GUSG.

While the goal is the same across alternatives, each alternative contains a discrete set of objectives, allowable uses, and management actions constituting a separate RMP Amendment. The goal is through varying approaches, with the potential for different long-range outcomes and conditions. Land use allocations and conservation measures in the alternatives are focused on mapped GUSG habitat (Occupied, Unoccupied and Non-Habitat), depending on the alternative's objective.

The relative emphasis given to particular resources and resource uses differs as well, including allowable uses, restoration measures, and specific direction pertaining to individual resource programs. When resources or resource uses are mandated by law or are not tied to planning issues, there are typically few or no distinctions between alternatives.

The alternatives are also directed toward responding to FWS-identified issues and threats to GUSG and their habitat. All of the action alternatives were developed to employ resource programs to address the FWS-identified threats. A complete description of all decisions proposed for each alternative is in Chapter 2, Alternatives. A summary of each of the alternatives is presented below.

BLM_0027387

## NO ACTION ALTERNATIVE A

Alternative A meets the CEQ requirement that a no action alternative be considered. This alternative would continue current management direction and prevailing conditions derived from the existing planning documents of each field office. Goals and objectives for resources and resource uses are based on the most recent RMP decisions, along with associated amendments, activity and implementation level plans, and other management decision documents. Laws, regulations, and BLM policies that supersede RMP decisions would apply.

Goals and objectives for BLM-administered lands and mineral estate would not change. Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, construction of utility corridors, and livestock grazing would also remain the same. The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

## ALTERNATIVE B

GUSG conservation measures and threats outlined in the FWS listing decision published in the Federal Register in November 2014 and conservation measures identified in the Gunnison Sage-grouse Rangewide Conservation Plan (RCP) (2005) were used to formulate BLM management direction under Alternative B. Management actions implemented by the BLM, in concert with local, state and other federal agencies and private landowners, play a critical role in the future trends of GUSG populations. Alternative B would achieve the purpose of and need for the RMP Amendment by avoiding negative impacts from resource uses and other actions in Occupied Habitat and Unoccupied Habitat and enhancing recovery opportunities.

## ALTERNATIVE C

Alternative C would achieve the purpose of and need for the RMP Amendment by minimizing or compensating for impacts from resource uses and other actions to varying degrees in Occupied Habitat and Unoccupied Habitat. Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or through compensatory mitigation. Impacts that occur would be rectified by repairing, rehabilitating, or restoring the affected environment and/or by reducing or eliminating the impact over time through preservation and maintenance operations during the life of the action. Negative impacts that cannot be minimized would be compensated for by replacing or providing substitute resources or environments, often off-site.

BLM_0027388

## ALTERNATIVE D (AGENCY PREFERRED)

Alternative D (consisting of sub-alternatives D1 and D2) is the agency-preferred alternative and seeks to allocate resources among land uses and conserve natural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. Public scoping efforts and language included in the FWS decision to list the species as threatened under the ESA enabled the BLM to identify and shape significant issues pertaining to GUSG Habitat, energy development, livestock grazing, potential ACECs, public land access, and other program areas to provide a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Conservation measures under Alternative D are focused on both Occupied and Unoccupied Habitat.

As Alternative D was being developed, it became apparent that, while some management actions should be consistent rangewide, there were more that should be specific to the Gunnison Basin Population or to the satellite (non-Gunnison Basin) populations due to distinct differences in bird numbers, amount of contiguous habitat (BLM and non-BLM), extent, scale, and intensity of threats, and other considerations among and between the populations. For this reason, the preferred alternative was divided into two sub-alternatives labeled $D_1$ and $D_2$.

### Sub-Alternative $D_1$

Sub-Alternative $D_1$ is the agency-preferred alternative for the Gunnison Basin Population of GUSG. The Gunnison Basin Population contains the largest numbers of birds and habitat across the range of the species. The extent, scale, and nature of the threats to this population are generally different than those affecting the satellite populations. While critical to the long-term success and recovery of the species, the management actions necessary for this population are different from those necessary for the satellite populations. Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or through compensatory mitigation.

### Sub-Alternative $D_2$

Sub-Alternative $D_2$ is the BLM preferred alternative for the satellite (non-Gunnison Basin) populations of GUSG. The low numbers of birds, and range of habitat threats separate from those present in the Gunnison Basin, were identified as critical factors in the FWS decision to list the GUSG as threatened under the ESA. As a result, these population areas are key to species recovery and require different combinations of protection than needed within the Gunnison Basin. Sub-Alternative $D_2$ would achieve the purpose of and need for the RMP Amendment by balancing resources and resource use among competing human interests, land uses, and the

BLM_0027389

conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the population, including plant and wildlife habitat.

## ENVIRONMENTAL CONSEQUENCES

The purpose of the environmental consequences analysis in this RMP Amendment/EIS is to determine the potential for significant impacts of the federal action on the human environment. CEQ regulations for implementing NEPA state that the human environment is interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment (40 CFR, Part 1508.14). The federal action is the BLM's selection of an RMP Amendment that will provide a consistent framework for its management of the GUSG and its habitat on BLM-administered lands. This would be in concert with its allocation of resources, in accordance with the multiple-use and sustained yield mandates of FLPMA.

Management actions proposed in Chapter 2, Alternatives are primarily planning-level decisions and typically would not result in direct on-the-ground changes. However, by planning for uses on BLM-administered surface estate and federal mineral estate during the planning horizon, this impact analysis focuses on impacts that could eventually result in on-the-ground changes. Impacts for some resources or resource uses, such as livestock grazing and off-highway vehicle use, could be confined to the BLM-administered surface estate.

Other impacts, such as energy and minerals and requirements to protect GUSG from such activity, could apply to all BLM-administered federal mineral estate (including split-estate). Some BLM management actions may affect only certain resources under certain alternatives. This impact analysis in Chapter 4, Environmental Consequences, identifies impacts that may enhance or improve a resource as a result of management actions, as well as those impacts that have the potential to impair a resource.

BLM_0027390

# TABLE OF CONTENTS

ABSTRACT
DEAR READER LETTER
EXECUTIVE SUMMARY                                                                        i
FIGURES                                                                               xvii
TABLES                                                                                 xix
ABBREVIATIONS AND ACRONYMS                                                           xxiii

## 1. INTRODUCTION                                                                    1-1

1.1.    BACKGROUND                                                                     1-2
1.1.1.  Gunnison Sage-Grouse                                                           1-2
1.1.2.  BLM Land Use Planning Requirement                                             1-2
        Plan Amendments                                                               1-2
1.1.3.  Purpose and Need                                                              1-3
        Purpose                                                                       1-3
        Need                                                                          1-3
1.2.    THE PLANNING AREA                                                             1-5
1.2.1.  GUSG RMP Amendment Planning Area                                              1-5
1.2.2.  GUSG RMP Amendment Decision Areas                                             1-6
        Occupied Habitat                                                              1-6
        Unoccupied Habitat                                                            1-7
        Non-Habitat Areas within Four Miles of a Lek                                  1-7
1.2.3.  Planning Area by GUSG Population                                              1-8
1.2.4.  BLM RMPs Potentially Amended by this Action                                  1-12
        BLM Colorado Plans                                                           1-12
        BLM Utah Plans                                                               1-14
1.2.5.  Issues and Resources Identified and Considered but Not Carried Forward       1-15
1.3.    PLANNING CRITERIA                                                            1-22
1.3.1.  About BLM Planning Criteria                                                  1-22
1.3.2.  Criteria for the GUSG RMP Amendment                                          1-22
1.4.    THE PLANNING PROCESS                                                         1-25
1.4.1.  BLM Land Use Planning Process                                                1-25
        Plan Maintenance                                                             1-26
        Relationship To Other Policies and Plans                                     1-26

## 2. ALTERNATIVES                                                                    2-1

BLM_0027391

TABLE OF CONTENTS

2.1.    INTRODUCTION TO ALTERNATIVES                                                    2-2

2.1.1.  Components of Alternatives                                                          2-2

2.1.2.  Purpose of Alternatives Development                                                 2-3

2.1.3.  Developing Alternatives                                                            2-3

        Alternatives Development Process                                                   2-3

        Developing a Reasonable Range of Alternatives                                      2-4

2.1.4.  Resulting Range of Alternatives                                                    2-5

        Alternatives Considered but Not Analyzed in Detail                                 2-8

        Area of Critical Environmental Concern Proposals                                   2-9

2.2.    ALTERNATIVES                                                                       2-11

2.2.1.  Summary of Alternatives                                                            2-11

        Alternative A - No Action                                                          2-13

        Alternative B                                                                      2-13

        Alternative C                                                                      2-13

        Alternative D - Agency Preferred                                                   2-14

        *Sub-Alternative D₁ - Gunnison Basin Preferred*                                    *2-15*

        *Sub-Alternative D₂ - Satellite Populations Preferred*                             *2-15*

        Management Common to All Alternatives                                              2-15

        Agency-Preferred Alternative                                                       2-16

2.2.2.  Tables of Alternatives                                                             2-17

        How to Read Tables 2.6 and 2.7                                                     2-17

        Table 2.6 - No Action Alternative A                                                2-18

        Table 2.7 - Action Alternatives: B, C, and Sub-Alternatives D₁/D₂                  2-137

        Table 2.8 - Summary Comparison of Environmental Consequences                       2-191

2.3.    MONITORING, EVALUATION, ADAPTIVE MANAGEMENT, & MITIGATION 2-205

2.3.1.  Evaluation                                                                         2-205

2.3.2.  Monitoring                                                                         2-205

2.3.3.  Adaptive Management                                                                2-206

        Adaptive Management                                                                2-206

        Adaptive Management and Monitoring                                                 2-207

        Adaptive Management Plan                                                           2-207

        Adaptive Management Triggers                                                        2-207

        GUSG Habitat                                                                       2-208

        Poncha Pass Management Absent GUSG                                                 2-208

        Incorporation of a FWS Recovery Plan or an Updated RCP                             2-209

        Incorporation of a Change to the ESA Status of the GUSG                            2-209

2.3.4.  Mitigation                                                                         2-209

BLM_0027392

TABLE OF CONTENTS

Mitigation Plan                                                                 2-210

## 3.  AFFECTED ENVIRONMENT                                              3-1

3.1.    SPECIAL STATUS SPECIES                                                 3-2
3.1.1.  Gunnison Sage-Grouse (Centrocercus minimus) and Habitat               3-2

3.2.    FISH & WILDLIFE                                                        3-34
3.2.1.  Elk (Cervus canadensis)                                               3-35
        Colorado Elk Units                                                    3-36
        Utah Elk Units                                                        3-48
3.2.2.  Mule Deer (Odocoileus hemionus)                                       3-50
        Colorado Data Analysis Units                                          3-50
        Utah Mule Deer Units                                                  3-62
3.2.3.  Common Raven (Corvus corax)                                           3-64

3.3.    SOIL RESOURCES                                                        3-66
3.3.1.  Conditions within Occupied and Unoccupied Habitat                     3-66

3.4.    TERRESTRIAL VEGETATION (INCLUDING WOODLANDS)                          3-70
3.4.1.  Conditions within Occupied and Unoccupied Habitat                     3-70

3.5.    RIPARIAN AREAS & WETLANDS                                             3-79
3.5.1.  Conditions within Occupied and Unoccupied Habitat                     3-79

3.6.    NOXIOUS WEEDS & INVASIVE SPECIES                                      3-85
3.6.1.  Conditions within Occupied and Unoccupied Habitat                     3-85

3.7.    WILDLAND FIRE ECOLOGY & MANAGEMENT                                    3-91
3.7.1.  Conditions within Occupied and Unoccupied Habitat                     3-91

3.8.    LIVESTOCK GRAZING                                                     3-95
3.8.1.  Conditions within Occupied and Unoccupied Habitat                     3-95

3.9.    RECREATION                                                            3-102
3.9.1.  Conditions within the Planning Area                                   3-102
3.9.2.  Conditions on BLM-Administered Lands                                  3-103
        Recreation Policy                                                     3-103
        Recreation Participation                                              3-104
        Recreation Priorities                                                 3-105
        Recreation Management Areas                                           3-105
        Special Recreation Permits                                            3-114
        Tourism                                                               3-116
        Developed Recreation Facilities                                       3-116

BLM_0027393

TABLE OF CONTENTS

| | | |
|---|---|---|
| | *Community-Based Recreation* | *3-119* |
| | *Recreation Participation* | *3-119* |
| | *Recreation Priorities* | *3-121* |
| **3.10.** | **TRAVEL & TRANSPORTATION MANAGEMENT** | **3-123** |
| 3.10.1. | Conditions within the Decision Area | 3-123 |
| 3.10.2. | Conditions on BLM-Administered Lands | 3-138 |
| | OHV Designations | 3-138 |
| | Travel Management Planning | 3-142 |
| **3.11.** | **MINERALS** | **3-144** |
| 3.11.1. | Leasable Minerals | 3-154 |
| | Oil & Gas | 3-154 |
| | Split Estate | 3-159 |
| | Geothermal Resources | 3-164 |
| | DOE Uranium Lease Tracts | 3-167 |
| | Other Solid Leasable Minerals | 3-169 |
| 3.11.2. | Locatable Minerals | 3-173 |
| 3.11.3. | Salable Minerals | 3-188 |
| **3.12.** | **LANDS & REALTY** | **3-195** |
| 3.12.1. | Land Use Authorizations & Utility Corridors | 3-195 |
| 3.12.2. | Withdrawals | 3-208 |
| **3.13.** | **AREAS OF CRITICAL ENVIRONMENTAL CONCERN** | **3-210** |
| 3.13.1. | Conditions within Occupied and Unoccupied Habitat | 3-210 |
| **3.14.** | **SOCIAL & ECONOMIC CONDITIONS** | **3-212** |
| 3.14.1. | Demographic and Economic Conditions | 3-213 |
| 3.14.2. | Environmental Justice | 3-223 |
| 3.14.3. | Economic Contribution Analysis | 3-225 |
| **4.** | **ENVIRONMENTAL CONSEQUENCES** | **4-1** |
| **4.1.** | **INTRODUCTION** | **4-1** |
| 4.1.1. | Purpose and Format | 4-1 |
| 4.1.2. | Analytical Assumptions | 4-3 |
| 4.1.3. | General Methodology for Analyzing Impacts | 4-4 |
| 4.1.4. | Cumulative Analysis Methodology | 4-5 |
| 4.1.5. | Incomplete or Unavailable Information | 4-8 |
| **4.2.** | **SPECIAL STATUS SPECIES** | **4-10** |

BLM_0027394

TABLE OF CONTENTS

| | Gunnison Sage-Grouse & Habitat | 4-10 |
|---|---|---|
| 4.2.1. | Methodology | 4-10 |
| 4.2.2. | Impacts Common to All Alternatives | 4-10 |
| 4.2.3. | Impacts by Alternative | 4-19 |
| 4.2.4. | Cumulative Effects | 4-40 |
| 4.3. | FISH & WILDLIFE | 4-46 |
| | Big Game | 4-46 |
| 4.3.1. | Methodology | 4-46 |
| 4.3.2. | Impacts Common to All Alternatives | 4-46 |
| 4.3.3. | Impacts by Alternative | 4-49 |
| 4.3.4. | Cumulative Impacts | 4-54 |
| | Common Raven | 4-54 |
| 4.3.5. | Methodology | 4-54 |
| 4.3.6. | Impacts Common to All Alternatives | 4-55 |
| 4.3.7. | Impacts by Alternative | 4-56 |
| 4.3.8. | Cumulative Effects | 4-59 |
| 4.4. | SOIL RESOURCES | 4-60 |
| 4.4.1. | Methodology | 4-60 |
| 4.4.2. | Impacts Common to All Alternatives | 4-62 |
| 4.4.3. | Impacts by Alternative | 4-62 |
| 4.4.4. | Cumulative Impacts | 4-66 |
| 4.5. | TERRESTRIAL VEGETATION (INCLUDING WOODLANDS) | 4-68 |
| 4.5.1. | Methodology | 4-68 |
| 4.5.2. | Impacts Common to All Alternatives | 4-72 |
| 4.5.3. | Impacts by Alternative | 4-73 |
| 4.5.4. | Cumulative Impacts | 4-79 |
| 4.6. | RIPARIAN AREAS & WETLANDS | 4-81 |
| 4.6.1. | Methodology | 4-81 |
| 4.6.2. | Impacts Common to All Alternatives | 4-84 |
| 4.6.3. | Impacts by Alternative | 4-84 |
| 4.6.4. | Cumulative Impacts | 4-91 |
| 4.7. | INVASIVE SPECIES | 4-93 |
| 4.7.1. | Methodology | 4-93 |
| 4.7.2. | Impacts Common to All Alternatives | 4-94 |
| 4.7.3. | Impacts by Alternative | 4-95 |

BLM_0027395

TABLE OF CONTENTS

| 4.7.4. | Cumulative Impacts | 4-99 |
|---|---|---|
| **4.8.** | **WILDLAND FIRE ECOLOGY & MANAGEMENT** | **4-100** |
| 4.8.1. | Methodology | 4-100 |
| 4.8.2. | Impacts Common to All Alternatives | 4-103 |
| 4.8.3. | Impacts by Alternative | 4-103 |
| 4.8.4. | Cumulative Impacts | 4-109 |
| **4.9.** | **LIVESTOCK GRAZING** | **4-111** |
| 4.9.1. | Methodology | 4-111 |
| 4.9.2. | Impacts Common to All Alternatives | 4-115 |
| 4.9.3. | Impacts by Alternative | 4-115 |
| 4.9.4. | Cumulative Impacts | 4-124 |
| **4.10.** | **RECREATION** | **4-126** |
| 4.10.1. | Methodology | 4-126 |
| 4.10.2. | Impacts Common to All Alternatives | 4-128 |
| 4.10.3. | Impacts by Alternative | 4-129 |
| 4.10.4. | Cumulative Impacts | 4-135 |
| **4.11.** | **TRAVEL MANAGEMENT** | **4-137** |
| 4.11.1. | Methodology | 4-137 |
| 4.11.2. | Impacts Common to All Alternatives | 4-139 |
| 4.11.3. | Impacts by Alternative | 4-139 |
| 4.11.4. | Cumulative Impacts | 4-144 |
| **4.12.** | **LEASABLE FLUID MINERALS** | **4-146** |
| | Oil and Gas | 4-146 |
| 4.12.1. | Methodology | 4-146 |
| 4.12.2. | General Impacts | 4-147 |
| 4.12.3. | Impacts by Alternative | 4-148 |
| | Geothermal | 4-152 |
| **4.13.** | **LEASABLE SOLID MINERALS** | **4-153** |
| 4.13.1. | Methodology | 4-153 |
| 4.13.2. | General Impacts | 4-154 |
| 4.13.3. | Impacts by Alternative | 4-155 |
| **4.14.** | **LOCATABLE MINERALS** | **4-158** |
| 4.14.1. | Methodology | 4-158 |
| 4.14.2. | Impacts by Alternative | 4-159 |

BLM_0027396

TABLE OF CONTENTS

| | | |
|---|---|---|
| 4.15. | SALABLE MINERALS | 4-162 |
| 4.15.1. | Methodology | 4-162 |
| 4.15.2. | General Impacts | 4-163 |
| 4.15.3. | Impacts by Alternative | 4-163 |
| 4.15.4. | Cumulative Impacts | 4-165 |
| 4.16. | LANDS & REALTY | 4-168 |
| | Land Use Authorizations and Utility Corridors | 4-168 |
| 4.16.1. | Methodology | 4-168 |
| 4.16.2. | Impacts by Alternative | 4-169 |
| 4.16.3. | Cumulative Impacts | 4-173 |
| 4.17. | AREAS OF CRITICAL ENVIRONMENTAL CONCERN | 4-174 |
| 4.17.1. | Methodology | 4-174 |
| 4.17.2. | Impacts by Alternative | 4-175 |
| 4.18. | SOCIO-ECONOMICS | 4-177 |
| 4.18.1. | Methodology | 4-177 |
| 4.18.2. | Socio-Economic Impacts | 4-181 |
| | Grazing Allotments | 4-181 |
| | Recreation | 4-185 |
| | Oil, Natural Gas, and $CO_2$ Leases | 4-186 |
| | Other Minerals | 4-189 |
| | Lands & Realty | 4-192 |
| | Non-Market Values | 4-193 |
| | Environmental Justice | 4-194 |
| 4.18.3. | Cumulative Impacts | 4-197 |
| **5.** | **CONSULTATION & COORDINATION** | **5-1** |
| 5.1. | COLLABORATION | 5-1 |
| 5.1.1. | Native American Tribal Consultation | 5-2 |
| 5.1.2. | Colorado State and Utah State Historic Preservation Officers Consultation | 5-3 |
| 5.1.3. | U.S. Fish and Wildlife Service Consultation | 5-3 |
| 5.1.4. | Cooperating Agencies | 5-3 |
| 5.1.5. | Resource Advisory Councils | 5-6 |
| 5.2. | COORDINATION & CONSISTENCY | 5-7 |
| 5.2.1. | Rangewide and Local Working Group Plans | 5-7 |
| 5.2.2. | County Plans and Policies | 5-8 |

TABLE OF CONTENTS

5.2.3.    State Policies and Plans                                                                    5-8

5.2.4.    BLM Policies and Plans                                                                    5-9

5.2.5.    Other Federal Agency Policies and Plans                                            5-9

5.2.6.    Memoranda of Understanding                                                          5-10

5.2.7.    Public Involvement                                                                      5-10

5.3.      SCOPING & ISSUES                                                                      5-12

5.3.1.    Public Scoping                                                                            5-12
          Scoping Meetings                                                                          5-12
          Other Outreach Methods                                                                5-13

5.3.2.    Scoping Comments                                                                      5-14

5.3.3.    Key Issues Identified through Scoping                                            5-15
          Future Public Involvement                                                              5-15

5.4.      LIST OF PREPARERS                                                                    5-17

**6.  APPENDICES                                                                                  6-1**

          APPENDIX A:  GUSG Population Maps                                                6-2
          APPENDIX B:  BLM Washington Office IM 2014-100                            6-18
          APPENDIX C:  GUSG Candidate Conservation Agreement, Gunnison Basin Population 6-30
          APPENDIX D:  GUSG Rangewide Conservation Plan Structural Habitat Guidelines   6-144
          APPENDIX E:  BLM Standards for Public Land Health and Guidelines for Livestock Grazing
          Management in Colorado and Utah                                                6-151
          APPENDIX F:  GUSG Draft Socio-Economic Data                                6-160
          APPENDIX G:  Areas of Critical Environmental Concern - Relevance and Importance
          Analysis and Determination Rationale                                            6-171
          APPENDIX H:  Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use
          Authorizations                                                                        6-181
          APPENDIX I:  Draft GUSG Best Management Practices                        6-198
          APPENDIX J:  GUSG Rangewide Mitigation Strategy                          6-210

**7.  GLOSSARY                                                                                    7-1**

**8.  REFERENCES                                                                                  8-1**

BLM_0027398

FIGURES AND TABLES

# FIGURES

Figure 1.1 - Decision Area for the GUSG Rangewide RMP Amendment/EIS.................................................. 1-4
Figure 3.2 - Gunnison Basin GUSG Population, 1996–2014......................................................................... 3-8
Figure 3.3 - Surface Disturbance in the Gunnison Basin Population Area................................................... 3-10
Figure 3.4 - Cerro Summit-Cimarron-Sims Mesa GUSG Population, 1998–2014........................................ 3-11
Figure 3.5 - Surface Disturbance in the Cerro Summit-Cimarron-Sims Mesa Population Area............. 3-13
Figure 3.6 - Crawford GUSG Population, 1996–2014.................................................................................. 3-14
Figure 3.7 - Surface Disturbance in the Crawford Population Area ............................................................ 3-16
Figure 3.8 - Monticello GUSG Sub-Population, 1996–2014....................................................................... 3-18
Figure 3.9 - Dove Creek GUSG Sub-Population, 1996–2014..................................................................... 3-19
Figure 3.10 - Surface Disturbance in the Monticello-Dove Creek Population Area................................. 3-21
Figure 3.11 - Piñon Mesa GUSG Population, 1996–2014 .......................................................................... 3-22
Figure 3.12 - Surface Disturbance in the Piñon Mesa Population Area...................................................... 3-24
Figure 3.13  - Poncha Pass GUSG Population, 1998–2014.......................................................................... 3-26
Figure 3.14 - Surface Disturbance in the Poncha Pass Population Area..................................................... 3-28
Figure 3.15 - San Miguel Basin GUSG Population, 1996–2014................................................................... 3-30
Figure 3.16 - Surface Disturbance in the San Miguel Basin Population Area.............................................. 3-32
Figure 3.17 - Sand Dunes Elk Unit (E-11) Post-Hunt Population Estimate, 1988–2014............................ 3-37
Figure 3.18 - Piñon Mesa Elk Unit (E-19) Post-Hunt Population Estimate................................................ 3-38
Figure 3.19 - Uncompahgre Elk Unit (E-20) Post-Hunt Population Estimate, 1980–2014........................ 3-39
Figure 3.20 - Disappointment Elk Unit (E-24) Post-Hunt Population Estimate, 1987–2013 .................... 3-40
Figure 3.21 - Powderhorn Elk Unit (E-25) Post-Hunt Population Estimate, 1980–2014 ......................... 3-41
Figure 3.22 - Saguache Elk Unit (E-26) Post-Hunt Population Estimate, 1987–2013................................ 3-43
Figure 3.23 - Cimarron Elk Unit (E-35) Post-Hunt Population Estimate, 1980–2014............................... 3-44
Figure 3.24 - Sapinero Elk Unit (E-41) Post-Hunt Population Estimate...................................................... 3-45
Figure 3.25 - Fossil Ridge Elk Unit (E-43) Post-Hunt Population Estimate, 1980–2014........................... 3-47
Figure 3.26 - Coal Creek/Fruitland Mesa Elk Unit (E-52) Post-Hunt Population Estimate, 1980–2014. 3-48
Figure 3.27 - Utah La Sal Elk Unit Population Estimate, 2003–2013 .......................................................... 3-49
Figure 3.28 - Utah San Juan Elk Unit Population Estimate, 2003–2013 ..................................................... 3-49
Figure 3.29 - Piñon Mesa Mule Deer Unit (D-18) Post-Hunt Population Estimate.................................... 3-51
Figure 3.30 - Uncompahgre Mule Deer Unit (D-19) Post-Hunt Population Estimate, 1980–2014......... 3-52
Figure 3.31 - West Elk Mule Deer Unit (D-21) Post-Hunt Population Estimate, 1980–2014.................. 3-54
Figure 3.32 - Taylor Park Mule Deer Unit (D-22) Post-Hunt Population Estimate, 1980–2014.............. 3-55
Figure 3.33 - Groundhog Mule Deer Unit (D-24) Post-Hunt Population Estimate, 1982–2014.............. 3-56
Figure 3.34 - Powderhorn Mule Deer Unit (D-25) Post-Hunt Population Estimate, 1980–2014........... 3-57
Figure 3.35 - Saguache Mule Deer Unit Post-Hunt Population Estimate, 1988–2014............................... 3-58
Figure 3.36 - Mesa Verde Mule Deer Unit (D-29) Post-Hunt Population Estimate, 1987–2016 ............. 3-59
Figure 3.37 - Villa Grove Mule Deer Unit (D-37) Post-Hunt Population Estimate, 1986–2014............... 3-60
Figure 3.38 - Fruitland Mesa Mule Deer Unit (D-39) Post-Hunt Population Estimate, 1980–2014......... 3-61
Figure 3.39 - Cimarron Mule Deer Unit (D-40) Post-Hunt Population Estimate, 1980–2014................. 3-62
Figure 3.40 - Utah La Sal Mule Deer Unit Population Estimate .................................................................. 3-63
Figure 3.41 - Utah San Juan Mule Deer Unit Population Estimate.............................................................. 3-64

BLM_0027399

FIGURES AND TABLES

Figure 3.42 - BLM Special Recreation Management Areas in the Decision Area........................................3-108
Figure 3.43 - BLM Extensive Recreation Management Areas in the Decision Area...............................3-111
Figure 3.44 - BLM Lands with GUSG Habitat Not Designated as Recreation Management Areas.......3-113
Figure 3.45 - BLM Recreation Sites in or Adjacent to the Planning Area.......................................................3-118
Figure 3.46 - Roads within GUSG Habitat: Cerro Summit-Cimarron-Sims Mesa Population...............3-129
Figure 3.47 - Roads within GUSG Habitat: Crawford Population...................................................................3-130
Figure 3.48 - Roads within GUSG Habitat: Gunnison Basin Population...........................................................3-131
Figure 3.49 - Roads within GUSG Habitat: Monticello-Dove Creek Population..........................................3-132
Figure 3.50 - Roads within GUSG Habitat: Piñon Mesa Population.................................................................3-133
Figure 3.51 - Roads within GUSG Habitat: Poncha Pass Population.................................................................3-134
Figure 3.52 - Roads within GUSG Habitat: San Miguel Basin Population.........................................................3-135
Figure 3.53 - Off-Highway Vehicle Designations within the Decision Area....................................................3-141
Figure 3.54 - Mineral Ownership in Cerro Summit-Cimarron-Sims Mesa Population Area...................3-147
Figure 3.55 - Mineral Ownership in the Crawford Population Area.................................................................3-148
Figure 3.56 - Mineral Ownership in the Gunnison Basin Population Area.......................................................3-149
Figure 3.57 - Mineral Ownership in the Monticello-Dove Creek Population Area.................................3-150
Figure 3.58 - Mineral Ownership in the Piñon Mesa Population Area.............................................................3-151
Figure 3.59 - Mineral Ownership in the Poncha Pass Population Area............................................................3-152
Figure 3.60 - Mineral Ownership in the San Miguel Basin Population Area.....................................................3-153
Figure 3.61 - DOE Uranium Lease Tracts within the Decision Area..............................................................3-168
Figure 3.62 - Withdrawals and Active Claims in Cerro Summit-Cimarron-Sims Mesa Population Area...3-177
Figure 3.63 - Withdrawals and Active Mining Claims in the Crawford Population Area........................3-178
Figure 3.64 - Withdrawals and Active Mining Claims in the Gunnison Basin Population Area..............3-179
Figure 3.65 - Withdrawals and Active Mining Claims in Monticello-Dove Creek Population Area......3-180
Figure 3.66 - Withdrawals and Active Mining Claims in the Piñon Mesa Population Area....................3-181
Figure 3.67 - Withdrawals and Active Mining Claims in the Poncha Pass Population Area...................3-182
Figure 3.68 - Withdrawals and Active Mining Claims in the San Miguel Basin Population Area...........3-183
Figure 3.69 - ROWs and ROW Corridors in Cerro Summit-Cimarron-Sims Mesa Population Area.3-200
Figure 3.70 - ROWs and ROW Corridors in the Crawford Population Area...........................................3-201
Figure 3.71 - ROWs and ROW Corridors in the Gunnison Basin Population Area................................3-202
Figure 3.72 - ROWs and ROW Corridors in the Monticello-Dove Creek Population Area.................3-203
Figure 3.73 - ROWs and ROW Corridors in the Piñon Mesa Population Area........................................3-204
Figure 3.74 - ROWs and ROW Corridors in the Poncha Pass Population Area.....................................3-205
Figure 3.75 - ROWs and ROW Corridors in the San Miguel Basin Population Area.............................3-206
Figure 3.76 - Unemployment Trends, Area 1.......................................................................................................3-217
Figure 3.77 - Unemployment Trends, Area 2.......................................................................................................3-219
Figure 3.78 - Unemployment Trends, Area 3.......................................................................................................3-223
Figure 4.79 - Potential of Leks in the Decision Area to Be Impacted by Roads........................................4-28
Figure A.80 - Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population...............................6-4
Figure A.81 - Decision Area for the Crawford Population.................................................................................6-5
Figure A.82 - Decision Area for the Gunnison Basin Population.......................................................................6-6
Figure A.83 - Decision Area for the Monticello-Dove Creek Population.......................................................6-7
Figure A.84 - Decision Area for the Piñon Mesa Population.............................................................................6-8

BLM_0027400

FIGURES AND TABLES

Figure A.85 - Decision Area for the Poncha Pass Population............................................................................ 6-9
Figure A.86 - Decision Area for the San Miguel Basin Population.................................................................. 6-10
Figure A.87 - Sub-Surface Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population....... 6-11
Figure A.88 - Sub-Surface Decision Area for the Crawford Population ....................................................... 6-12
Figure A.89 - Sub-Surface Decision Area for the Gunnison Basin Population.............................................. 6-13
Figure A.90 - Sub-Surface Decision Area for the Monticello-Dove Creek Population............................. 6-14
Figure A.91 - Sub-Surface Decision Area for the Piñon Mesa Population .................................................... 6-15
Figure A.92 - Sub-Surface Decision Area for the Poncha Pass Population................................................... 6-16
Figure A.93 - Sub-Surface Decision Area for the San Miguel Basin Population........................................... 6-17

## TABLES

Table 1.1 - Surface Ownership/Administration by GUSG Population Area.................................................... 1-9
Table 1.2 - Acres of Federal Subsurface Minerals by Population Area.......................................................... 1-11
Table 1.3 - Acreage of GUSG Habitat on BLM Lands by Affected RMP....................................................... 1-14
Table 2.4 - Applicable BLM Programs and Decisions to Address Issues and FWS Threats....................... 2-6
Table 2.5 - Summary of Impacted Acres by Resource Use for Each Alternative......................................... 2-12
Table 2.6 - Alternative A: No Action ................................................................................................................. 2-18
Table 2.7 - Action Alternatives B, C, and D (consisting of Sub-Alternatives D₁ and D₂)....................... 2-137
Table 2.8 - Summary Comparison of Environmental Consequences............................................................2-191
Table 3.9 - GUSG Population, Three-year Average 1998–2005 (CPW 2014)............................................... 3-3
Table 3.10 - GUSG Population, Three-year Average 2006–2014 (CPW 2014)............................................. 3-3
Table 3.11 - Surface Disturbance within GUSG Habitat by Land Status........................................................ 3-4
Table 3.12 - LANDFIRE Habitat Types in the Planning Area Capable of Supporting GUSG..................... 3-5
Table 3.13 - Surface Ownership in the Satellite Population Areas.................................................................... 3-5
Table 3.14 - Surface Ownership within the Four-Mile Non-Habitat Areas ................................................... 3-6
Table 3.15 - Gunnison Basin GUSG Habitat based on LANDFIRE Data........................................................ 3-8
Table 3.16 - Land Status for the Gunnison Basin Population Area ................................................................. 3-9
Table 3.17 - Surface Disturbance in the Gunnison Basin Population Area..................................................... 3-9
Table 3.18 - Cerro Summit-Cimarron-Sims Mesa GUSG Habitat based on LANDFIRE Data................. 3-12
Table 3.19 - Land Status for the Cerro Summit-Cimarron-Sims Mesa Population Area........................... 3-12
Table 3.20 - Surface Disturbance in the Cerro Summit-Cimarron-Sims Mesa Population Area ............ 3-12
Table 3.21 - Crawford GUSG Habitat based on LANDFIRE Data................................................................. 3-15
Table 3.22 - Land Status for the Crawford Population Area .......................................................................... 3-15
Table 3.23 - Surface Disturbance in the Crawford Population Area ............................................................ 3-16
Table 3.24 - Monticello-Dove Creek GUSG Habitat based on LANDFIRE Data....................................... 3-19
Table 3.25 - Surface Ownership in the Monticello-Dove Creek Population Area...................................... 3-20
Table 3.26 - Surface Disturbance in the Monticello-Dove Creek Population Area.................................... 3-20
Table 3.27 - Piñon Mesa GUSG Habitat based on LANDFIRE Data.............................................................. 3-23
Table 3.28 - Surface Ownership in the Piñon Mesa Population Area............................................................. 3-23
Table 3.29 - Surface Disturbance in the Piñon Mesa Population Area.......................................................... 3-24
Table 3.30 - Poncha Pass Sage-Grouse Habitat based on LANDFIRE Data................................................. 3-26

BLM_0027401

FIGURES AND TABLES

Table 3.31 - Surface Ownership in the Poncha Pass Population Area..................................................3-27
Table 3.32 - Surface Disturbance in the Poncha Pass Population Area..............................................3-28
Table 3.33 - San Miguel Basin GUSG Habitat based on LANDFIRE Data .......................................3-31
Table 3.34 - Surface Ownership in the San Miguel Population Area ..................................................3-31
Table 3.35 - Surface Disturbance in the San Miguel Population Area................................................3-31
Table 3.36 - Fish and Wildlife Species of Primary Interest in the Decision Area ..........................3-34
Table 3.37 - Soil Indicators on BLM Lands across GUSG Habitat.......................................................3-68
Table 3.38 - Soil Indicators on BLM Lands within Non-Habitat Areas.............................................3-68
Table 3.39 - Vegetation Types on BLM Lands in Occupied and Unoccupied Habitat ...............3-73
Table 3.40 - Vegetation Types on BLM Lands within Non-Habitat Areas.......................................3-74
Table 3.41 - Vegetation Conditions on BLM Lands in Occupied and Unoccupied Habitat.......3-75
Table 3.42 - Vegetation Conditions on BLM Lands within Non-Habitat Areas.............................3-76
Table 3.43 - Riparian and Wetland Areas on BLM Lands in Occupied and Unoccupied Habitat...........3-80
Table 3.44 - Riparian and Wetland Areas on BLM Lands within Non-Habitat Areas..................3-81
Table 3.45 - Riparian Conditions on BLM Lands in Occupied and Unoccupied Habitat............3-82
Table 3.46 - Riparian Conditions on BLM Lands within Non-Habitat Areas ..................................3-83
Table 3.47 - Noxious and Invasive Species Indicators on BLM Lands within GUSG Habitat...................3-89
Table 3.48 - Noxious and Invasive Species Indicators on BLM Lands within Non-Habitat Areas...........3-90
Table 3.49 - Wildland Fire Management Indicators on BLM Lands in GUSG Habitat...............3-93
Table 3.50 - Wildland Fire Management Indicators on BLM Lands within Non-Habitat Areas ..............3-94
Table 3.51 - Livestock Grazing Allotments, AUMs and Concerns within BLM GUSG Habitat...............3-98
Table 3.52 - Livestock Grazing Allotments, AUMs, and Concerns in BLM Non-Habitat Areas ............3-99
Table 3.53 - Livestock Grazing Management Indicators on BLM Lands in GUSG Habitat....................3-100
Table 3.54 - Acreage of BLM Special Recreation Management Areas by Population .............................3-107
Table 3.55 - BLM Extensive Recreation Management Areas by Population..................................................3-109
Table 3.56 - BLM Lands with GUSG Habitat Not Designated as Recreation Management Areas........3-112
Table 3.57 - Special Recreation Permits in the Decision Area.........................................................................3-115
Table 3.58 - BLM Recreation Sites in the Decision Area...................................................................................3-117
Table 3.59 - Miles of Road on BLM-Administered Lands within GUSG Habitat by Population.............3-125
Table 3.60 - Acres of Road on BLM-Administered Lands within GUSG Habitat by Population...........3-127
Table 3.61 - Miles of Trail on BLM-Administered Lands by GUSG Population Area .............................3-136
Table 3.62 - Acres of Trail on BLM-Administered Lands by GUSG Population Area............................3-137
Table 3.63 - OHV Travel Designations in the Decision Area by GUSG Population.............................3-139
Table 3.64 - Mineral Estate in GUSG Habitat and Non-Habitat by Population Area ..........................3-145
Table 3.65 - Oil and Gas Development Potential in the Decision Area .....................................................3-155
Table 3.66 - Federal Fluid Mineral Acreage Closed, Open, and Leased for Oil and Gas........................3-157
Table 3.67 - Oil and Gas Leasing Allocation Decisions and Current Leases by GUSG Population ......3-160
Table 3.68 - Federal Mineral Estate Closed and Open to Leasing and Leased for Solid Minerals.........3-170
Table 3.69 - Status of Locatable Minerals in the Decision Area ...................................................................3-175
Table 3.70 - Salable Minerals Status in the Decision Area................................................................................3-190
Table 3.71 - ROWs and Other Land Use Authorizations in the Decision Area ......................................3-197
Table 3.72 - ROW Exclusion and Avoidance Areas in the Decision Area.................................................3-198
Table 3.73 - Land Use Authorizations in the Decision Area ...........................................................................3-207
Table 3.74 - Area 1 Population Change, 2000–2012 .........................................................................................3-214

BLM_0027402

Table 3.75 - Area 1 Land Ownership ...................................................................................................3-214
Table 3.76 - Area 1 Median Household Income ..................................................................................3-216
Table 3.77 - Population Change in Area 2, 2000–2012......................................................................3-218
Table 3.78 - Area 2 Land Ownership ...................................................................................................3-218
Table 3.79 - Area 2 Median Household Income ..................................................................................3-219
Table 3.80 - Population Change in Area 3, 2000–2012......................................................................3-220
Table 3.81 - Area 3 Land Ownership ...................................................................................................3-221
Table 3.82 - Area 3 Median Household Income ..................................................................................3-222
Table 3.83 - Race and Ethnicity in the Planning Area by County.....................................................3-224
Table 3.84 - Percentage of People with Income below the Poverty Level.......................................3-225
Table 3.85 - Area 1 Federal Mineral Production, Fiscal Year 2013...................................................3-227
Table 3.86 - Countywide Oil and Gas Production, Area 1, 2012–2014 ...........................................3-227
Table 3.87 - Area 2 Federal Mineral Production, Fiscal Year 2013...................................................3-228
Table 3.88 - Countywide Oil and Gas Production, Area 2, 2012–2014 ...........................................3-228
Table 3.89 - Area 3 Federal Mineral Production, Fiscal Year 2013...................................................3-228
Table 3.90 - Countywide Oil and Gas Production, Area 3 .................................................................3-229
Table 3.91 - Average Number of Billed AUMs within GUSG Habitat in Area 1, 2012–2014...............3-231
Table 3.92 - Average Number of Billed AUMs within GUSG Habitat in Area 2, 2012–2014...............3-231
Table 3.93  - Average Number of Billed AUMs within GUSG Habitat in Area 3, 2012–2014...............3-232
Table 3.94 - Area 1 Recreation Visits...................................................................................................3-233
Table 3.95 - Area 2 Recreation Visits...................................................................................................3-233
Table 3.96 - Area 3 Recreation Visits...................................................................................................3-234
Table 4.97 - Reasonably Foreseeable Actions .......................................................................................... 4-7
Table 4.98 - FWS Listing Factors and Threat Potential on BLM Lands in the Decision Area ................. 4-11
Table 4.99 - Acres of BLM Surface by BLM Unit ..................................................................................... 4-20
Table 4.100 - Sagebrush Decline from 1958 to 1993 ............................................................................... 4-21
Table 4.101 - GUSG Habitat Characteristics in Non-Habitat ................................................................... 4-26
Table 4.102 - Supportable Deer Density Estimates .................................................................................. 4-48
Table 4.103 - Supportable Elk Density Estimates ..................................................................................... 4-48
Table 4.104 - Oil and Gas Leasing by Population Area ...........................................................................4-149
Table 4.105 - Solid Mineral Leasing on Federal Mineral Estate in Decision Area......................................4-155
Table 4.106 - Status of Locatable Minerals in the Decision Area .........................................................4-160
Table 4.107 - Mineral Estate in GUSG Occupied and Unoccupied Habitat............................................4-164
Table 5.108 - Agencies and Tribes Invited to Participate as Cooperating Agencies ...................................... 5-4
Table 5.109 - Public Scoping Meetings...................................................................................................5-12
Table 5.110 - Comments by Resource or Planning Issue .......................................................................5-15
Table 5.111 - Contributors to the Draft RMP Amendment/Draft EIS ..................................................5-17
Table A.112 - Data Sources for the Draft RMP Amendment/Draft EIS...................................................... 6-2
Table F.113 - Delta County, Colorado Employment by Industry.........................................................6-160
Table F.114 - Dolores County, Colorado Employment by Industry....................................................6-161
Table F.115 - Gunnison County, Colorado Employment by Industry .................................................6-162
Table F.116 - Hinsdale County, Colorado Employment by Industry...................................................6-163
Table F.117 - Mesa County, Colorado Employment by Industry.........................................................6-164
Table F.118 - Montrose County, Colorado Employment by Industry..................................................6-165

BLM_0027403

FIGURES AND TABLES

Table F.119 - Ouray County, Colorado Employment by Industry ................................................................. 6-166
Table F.120 - Saguache County, Colorado Employment by Industry .......................................................... 6-167
Table F.121 - San Miguel County, Colorado Employment by Industry ....................................................... 6-168
Table F.122 - Grand County, Utah Employment by Industry ...................................................................... 6-169
Table F.123 - San Juan County, Utah Employment by Industry.................................................................. 6-170

BLM_0027404

## ABBREVIATIONS AND ACRONYMS

The following abbreviations and acronyms are used throughout this document.

| COMMON ABBREVIATIONS/ ACRONYMS | COMPLETE PHRASE |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AMP | Allotment Management Plan |
| APD | Application for Permit to Drill |
| ATV | all-terrain vehicle |
| AUM | animal unit month |
| BA | Biological Assessment |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| BO | Biological Opinion |
| BOR | Bureau of Reclamation |
| BRCW | Black Ridge Canyons Wilderness (designated Wilderness within McInnis Canyons NCA) |
| CCA | Candidate Conservation Agreement |
| CCAA | Candidate Conservation Agreement with Assurances |
| CCNCA | Colorado Canyons NCA (former title for McInnis Canyons NCA) |
| CCR | Colorado Code of Regulations |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| COA | Conditions of Approval |
| CPW | Colorado Parks and Wildlife (previously Colorado Division of Wildlife) |
| CSU | Controlled Surface Use |
| dBA | A-Weighted Decibel |
| DEIS | Draft Environmental Impact Statement |
| DOE | U.S. Department of Energy |
| DOI | U.S. Department of the Interior |
| DRMP Amendment | Draft Resource Management Plan Amendment |

ABBREVIATIONS AND ACRONYMS

| COMMON ABBREVIATIONS/ ACRONYMS | COMPLETE PHRASE |
| --- | --- |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| ERMA | Extensive Recreation Management Area |
| ESA | Endangered Species Act of 1973 |
| FAR | Functional at Risk |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FO | Field Office |
| FRCC | Fire Regime Condition Class |
| FRN | Federal Register Notice |
| FWS | U.S. Fish and Wildlife Service |
| GIS | Geographic Information Systems |
| GUSG | Gunnison Sage-Grouse |
| IM | Instruction Memorandum |
| LN | Lease Notice |
| LUP | land use plan |
| MOU | Memorandum of Understanding |
| MS | BLM Manual Section |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NF | Non Functional |
| NM | National Monument |
| NPS | U.S. National Park Service |
| NRCS | National Resources Conservation Service |
| NSO | No Surface Occupancy |
| OHV | Off-Highway Vehicle |
| PCE | Primary Constituent Element |
| PFC | proper functioning condition |
| RAC | Resource Advisory Council |
| RCP | Rangewide Conservation Plan |

**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

BLM_0027406

ABBREVIATIONS AND ACRONYMS

| COMMON ABBREVIATIONS/ ACRONYMS | COMPLETE PHRASE |
|---|---|
| RMP | Resource Management Plan |
| RMP Amendment | Resource Management Plan Amendment |
| ROD | Record of Decision |
| ROW | right-of-way |
| SRMA | Special Recreation Management Area |
| SRP | Special Recreation Permit |
| SSR | Site-Specific Relocation |
| SSS | Special Status Species |
| TL | timing limitation |
| TMP | travel management plan |
| UDWR | Utah Division of Wildlife Resources |
| U.S. | United States |
| USC | United States Code |
| USFS | U.S. Forest Service |
| VCC | vegetation condition class |
| WEM | waiver, exception, or modification |
| WO | Washington Office |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic Rivers |

BLM_0027408

# I. INTRODUCTION

The United States (U.S.) Department of the Interior (DOI) Bureau of Land Management (BLM) has prepared this Draft Resource Management Plan (RMP) Amendment and Draft Environmental Impact Statement (EIS) in order to analyze alternative approaches to contribute to the conservation of, and implement actions to assist with the recovery of, the Gunnison Sage-Grouse (GUSG) *(Centrocercus minimus)* and its habitat.  The BLM proposes to incorporate goals, objectives, and management actions for the benefit of the GUSG and its habitat into approved resource management plans (RMPs) across the range of the species. This amendment will govern the allocation and administration (including use, protection, and enhancement) of resources, resource uses, and special management areas relevant to the GUSG and GUSG habitat, potentially amending land use plan decisions in up to eleven BLM RMPs currently in use.

A Draft EIS has been prepared in association with the Draft RMP Amendment and incorporated into this document.  The EIS is a tool for decision-making required for any federal agency action significantly affecting the quality of the human environment.  The EIS analyzes and describes the positive and negative environmental effects of the alternative approaches to conservation of the GUSG.

Draft decisions in this document apply only to BLM-administered public surface lands and subsurface mineral estate.  Lands within the planning area administered by other Federal agencies (including the U.S. Forest Service [USFS], U.S. Fish and Wildlife Service [FWS], and National Park Service [NPS]) and state agencies (such as the Colorado and Utah state land boards), along with actions that are the administrative responsibility of other agencies (such as county roads), are not the subject of this planning effort.  In addition, planning decisions in this RMP Amendment do not pertain to private lands, with the exception of federal minerals that lie beneath private surface (known as split estate).

BLM_0027409

CHAPTER I - INTRODUCTION

# 1.1. BACKGROUND

## 1.1.1. GUNNISON SAGE-GROUSE

The GUSG *(Centrocercus minimus)* is a ground-dwelling bird species with a current range limited to seven scattered populations in southwest Colorado and southeast Utah—approximately 7% (FWS 2010a) of its recognized historical range in southwest Colorado, southeast Utah, northeast Arizona, and northern New Mexico (RCP 2005 and FWS 2014b, c).  The GUSG is designated as a sensitive species by the State of Utah and labeled as a species of special concern by the State of Colorado.

In January 2013, the U.S. Fish and Wildlife Service (FWS) proposed to list the GUSG as endangered under the Endangered Species Act (ESA) (FWS 2013a) and to designate critical habitat for the species (FWS 2013b).  On November 20, 2014, the FWS published a final rule in the Federal Register listing the GUSG as a threatened species (FWS 2014b), as well as a final rule designating critical habitat for the bird (FWS 2014c).  The FWS determined that the most substantial threats to the GUSG currently and in the future include habitat decline due to human disturbance, small population size and structure, drought, climate change, and disease.

## 1.1.2. BLM LAND USE PLANNING REQUIREMENT

### PLAN AMENDMENTS

The Federal Land Policy and Management Act of 1976 (FLPMA) directs the BLM to develop and periodically revise or amend its RMPs to ensure that goals and actions reflect current policies and conditions.  Per 43 Code of Federal Regulations (CFR) 1610.5-5, RMP amendments change one or more of the terms, conditions, or decisions of an approved land use plan, including decisions related to desired outcomes and measures to achieve desired outcomes.  RMP amendments are most often prompted by the need to:

- Consider a proposal or action that does not conform to the plan;
- Implement new or revised policy that changes land use plan decisions, such as an approved conservation agreement between the BLM and the FWS;
- Respond to new, intensified, or changed uses on public land; or
- Consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

BLM_0027410

BLM regulations in 43 CFR 1600 and CEQ NEPA regulations in 40 CFR 1500 guide the preparation of plan amendments. RMPs requiring amendment may be grouped geographically or by type of decision in the same amendment process. Similarly, one amendment process may amend the same or related decisions in more than one land use plan. When preparing an associated EIS, the amending process follows the same procedure required for the preparation and approval of the plan, but consideration shall be limited to that portion of the plan being considered for amendment. If several plans are being amended simultaneously, a single EIS may be prepared to cover all amendments.

### 1.1.3.   PURPOSE AND NEED

## PURPOSE

This land use plan amendment provides a framework for conserving and assisting with the recovery of the Gunnison Sage-Grouse and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird. The Endangered Species Act requires agencies to ensure that their actions are not likely to jeopardize the continued existence of a listed species or result in the adverse modification or destruction of critical habitat for a listed species. In meeting this requirement, the BLM will strive to integrate management objectives and actions that promote recovery of the Gunnison Sage-Grouse with the agency's responsibility to allow for appropriate public land uses that enhance the economic stability of local communities in accordance with the multiple use and sustained yield direction set forth in the Federal Land Policy and Management Act of 1976.

## NEED

ESA Section 7(a)(1) requires the BLM to use its authorities to further the purposes of the ESA by implementing programs for the conservation of federally listed species and the ecosystems upon which they depend. The BLM conducted plan evaluations in accordance with its planning regulations, which require that RMPs "shall be revised as necessary based on ..., new data, new or revised policy ..." (43 CFR 1610.5-6). These evaluations concluded that a plan amendment is necessary to address the changed circumstances and new information resulting from the 2014 FWS listing of the GUSG as "threatened" under the Endangered Species Act.

BLM_0027411

CHAPTER 1 - INTRODUCTION

**Figure 1.1 - Decision Area for the GUSG Rangewide RMP Amendment/EIS**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016**

BLM_0027412

CHAPTER 1 - INTRODUCTION

## 1.2. THE PLANNING AREA

### 1.2.1. GUSG RMP AMENDMENT PLANNING AREA

As stated in the BLM Land Use Planning Handbook H-1601-1 (2010), the planning area is the geographic boundary within which the BLM makes decisions during a planning effort. When appropriate, BLM State Directors may establish regional planning areas that encompass several field offices and/or states. A planning area boundary includes all lands regardless of jurisdiction. However, the BLM will only make decisions on lands that fall under the BLM's jurisdiction (as detailed in the description of decision areas below). Lands within the planning area administered by other state and federal agencies or under private ownership are not the subject of this planning effort, with the exception of federal minerals beneath public and private surface lands.

The planning area for the GUSG Rangewide Draft RMP Amendment/Draft EIS consists of lands within the boundaries of the following BLM Colorado and Utah field offices, national monuments, and national conservation areas, and the decisions made through this RMP Amendment/EIS have the potential to affect the associated RMPs for these units:

**BLM Colorado**

- Canyons of the Ancients NM (Canyons of the Ancients NM RMP)
- Dominguez-Escalante NCA (Dominguez-Escalante NCA RMP)
- Grand Junction FO (Grand Junction FO RMP)
- Gunnison Gorge NCA (Gunnison Gorge NCA RMP)
- Gunnison FO (Gunnison Resource Area RMP)
- McInnis Canyons NCA (McInnis Canyons NCA RMP)
- San Luis Valley FO (San Luis Resource Area RMP)
- Tres Rios FO (Tres Rios FO RMP)
- Uncompahgre FO (San Juan/San Miguel RMP and Uncompahgre Basin RMP)

**BLM Utah**

- Moab FO (Moab FO RMP)
- Monticello FO (Monticello FO RMP).

The planning area includes BLM-administered lands not allocated as GUSG habitat. This RMP Amendment does not establish any additional management for these lands, and each would continue to be managed in accordance with the existing underlying BLM land use plan for that area.

BLM_0027413

## 1.2.2.   GUSG RMP AMENDMENT DECISION AREAS

The decision area is the geographic boundary within which a BLM planning decision will apply, and the specific lands within that boundary to which the decision applies. Decisions in this amendment apply only to lands for which the BLM has authority (jurisdiction) to make land use and management decisions (shown in Figure 1.1). As a general rule, the BLM has jurisdiction over public lands, including federal surface lands and subsurface mineral estate, administered by the BLM for the Secretary of the Interior (see the glossary definition of Public Lands). In split estate situations (where the surface land is owned by a non-federal entity, such as a state trust or private owner, and the federal subsurface mineral estate is administered by the BLM), jurisdiction pertains only to the federal subsurface mineral estate. Decision areas are limited in geographic scope to encompass only the area relevant to the analysis and do not extend beyond the planning area.

The decision areas in this amendment consist of specified GUSG Occupied Habitat, GUSG Unoccupied Habitat, and Non-Habitat Areas. A decision may apply to more than one decision area. Surface and subsurface maps depicting Occupied Habitat, Unoccupied Habitat, and Non-Habitat Areas for each GUSG population are included in the map section in Appendix A.

### OCCUPIED HABITAT

Occupied Habitat, as defined in this Draft RMP Amendment, consists primarily, but not exclusively, of occupied critical habitat designated by the FWS under the ESA. Occupied Habitat supplements occupied critical habitat as necessary to meet the purpose and need of this action and comply with the multiple use and sustained yield mandate of the BLM. In the Draft RMP Amendment, BLM Occupied Habitat supplements FWS-designated occupied critical habitat as follows:

- Occupied Habitat includes a small area of occupied habitat (as defined and delineated by Colorado Parks and Wildlife [CPW]) and an area of vacant/unknown habitat on BLM lands supporting the Crawford Population of GUSG that are not included in FWS-designated critical occupied habitat.
- The Poncha Pass population area is included as Occupied Habitat in the Draft RMP Amendment. Although included in their proposed designation of occupied critical habitat and identified as containing "the physical and biological features essential to the conservation of the Gunnison sagegrouse" (FWS 2013a), the FWS did not include the Poncha Pass Unit in their final designation, as they concluded that the "Poncha Pass area, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet primary constituent element (PCE)

BLM_0027414

1."  However, the Poncha Pass area is currently occupied by GUSG and the BLM will treat it as Occupied Habitat until a recovery plan identifying FWS goals for the Poncha Pass Population have been completed.

- Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the FWS excluded from the critical habitat designation.  While private lands with conservation easements were removed from critical habitat, conservation easements do not apply to the federal mineral estate.  These areas are included in the RMP Amendment in order to identify and prescribe management for the federal mineral estate.

For purposes of this Draft RMP Amendment, Occupied Habitat includes only BLM-administered surface lands and subsurface minerals.  Lands occupied by GUSG but not administered by the BLM are not included within the definition of Occupied Habitat and are not subject to the decisions adopted in this Draft RMP Amendment, but are considered in the analysis of alternatives, as appropriate.

## UNOCCUPIED HABITAT

Unoccupied critical habitat, as designated by the FWS under the ESA, forms the extent of Unoccupied Habitat.  Unoccupied critical habitat consists of specific areas outside of those occupied by GUSG at the time of the listing that are determined to be essential for the conservation of the species (16 USC § 1532 (5), (A), (ii)).

For purposes of this Draft RMP Amendment, Unoccupied Habitat includes only BLM-administered surface lands and subsurface minerals.  BLM decisions do not apply to Unoccupied Habitat on private land or on lands managed by other government organizations.  When conducting an analysis, all Unoccupied Habitat is included.

## NON-HABITAT AREAS WITHIN FOUR MILES OF A LEK

Disruptive activities occurring outside of Occupied or Unoccupied Habitat have the potential to affect GUSG or GUSG habitat.  As outlined in Table 2.7, Alternative B identifies management prescriptions to address potential disruptive activities occurring within four miles of a lek in Non-Habitat Areas adjacent to Occupied and/or Unoccupied Habitat.

Physical (natural) and human-constructed features and vegetative characteristics on the landscape can prevent otherwise disruptive activities from affecting GUSG or its habitat.  In order to assess these situations, a matrix would be developed at the implementation level by the FWS in cooperation with the BLM, state fish and game agencies, and other cooperating agencies to assist the BLM in determining whether a

BLM_0027415

proposed action could disrupt GUSG or GUSG habitat or if potential disruptive activities could be prevented due to site-specific conditions. If project analysis establishes that an activity would be disruptive or does not determine with certainty whether disruption could be effectively prevented, then the appropriate management prescriptions (outlined in Table 2.7) would apply. If it is clearly established that no disruption would result, then the specific management prescriptions would not be applicable. When a clear determination cannot be made, the parties would revise the matrix as necessary to provide greater clarity.

The management prescriptions for Non-Habitat Areas would pertain only to disruptive activities on BLM-administered surface lands and sub-surface minerals within four miles of a lek and adjacent to Occupied and/or Unoccupied Habitat.

## 1.2.3.  PLANNING AREA BY GUSG POPULATION

GUSG habitat is predominantly non-contiguous—separated by natural geographic barriers and human development. Because of the disconnected nature of the habitat, the GUSG is described as occurring within seven distinct populations (with five of these primarily located within Colorado and two extending into Utah):

- Cerro Summit-Cimarron-Sims Mesa
- Crawford
- Gunnison Basin
- Monticello-Dove Creek
- Piñon Mesa
- Poncha Pass
- San Miguel Basin

Delineating the GUSG by population enables the BLM to better analyze variations in habitat, threats, and impacts throughout the decision area, and identify appropriate responses to these different populations and habitat issues. The population approach also provides a natural starting point from which to evaluate issues related to habitat fragmentation.

Table 1.1 provides acreages and percentages of BLM, state, local, private, and other federal lands within each of the seven GUSG population areas, while Table 1.2 provides the acreages of federal subsurface minerals within each of the population areas.

BLM_0027416

CHAPTER 1 - INTRODUCTION

**Table 1.1 - Surface Ownership/Administration by GUSG Population Area**

| GUSG POPULATION AREA | BLM Acres | BLM % | LOCAL Acres | LOCAL % | NPS Acres | NPS % | OTHER Acres | OTHER % | PRIVATE Acres | PRIVATE % | STATE Acres | STATE % | USFS Acres | USFS % | TOTAL Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **20,815** | **16%** | **7,032** | **5%** | **4,500** | **4%** | **0** | **0%** | **95,750** | **75%** | **0** | **0%** | **369** | **0%** | **128,466** |
| Occupied | 4,380 | 12% | 4,336 | 12% | 362 | 1% | 0 | 0% | 28,064 | 76% | 0 | 0% | 0 | 0% | 37,142 |
| Unoccupied | 5,011 | 26% | | 0% | 6 | 0% | 0 | 0% | 14,353 | 74% | 0 | 0% | 0 | 0% | 19,370 |
| Non-Habitat | 11,425 | 16% | 2,696 | 4% | 4,132 | 6% | 0 | 0% | 53,333 | 74% | 0 | 0% | 369 | 1% | 71,955 |
| **Crawford** | **33,955** | **28%** | **0** | **0%** | **17,331** | **14%** | **0** | **0%** | **69,562** | **57%** | **0** | **0%** | **2,190** | **2%** | **123,039** |
| Occupied | 22,150 | 63% | 0 | 0% | 4,402 | 13% | 0 | 0% | 8,444 | 24% | 0 | 0% | 0 | 0% | 34,996 |
| Unoccupied | 10,324 | 13% | 0 | 0% | 7,023 | 9% | 0 | 0% | 60,738 | 76% | 0 | 0% | 2,190 | 3% | 80,274 |
| Non-Habitat | 1,481 | 19% | 0 | 0% | 5,907 | 76% | 0 | 0% | 380 | 5% | 0 | 0% | 0 | 0% | 7,768 |
| **Gunnison Basin** | **378,003** | **46%** | **12,524** | **2%** | **20,509** | **2%** | **0** | **0%** | **264,048** | **32%** | **4,366** | **1%** | **143,491** | **17%** | **822,942** |
| Occupied | 302,024 | 50% | 9,880 | 2% | 9,430 | 2% | 0 | 0% | 187,761 | 31% | 3,205 | 1% | 92,724 | 15% | 605,026 |
| Unoccupied | 63,972 | 47% | 0 | 0% | 7,407 | 5% | 0 | 0% | 53,034 | 39% | 414 | 0% | 12,181 | 9% | 137,009 |
| Non-Habitat | 12,007 | 15% | 2,643 | 3% | 3,671 | 5% | 0 | 0% | 23,252 | 29% | 747 | 1% | 38,586 | 48% | 80,907 |
| **Monticello-Dove Creek** | **69,788** | **17%** | **5** | **0%** | **0** | **0%** | **4** | **0%** | **335,021** | **82%** | **1,156** | **0%** | **944** | **0%** | **406,919** |
| Occupied | 8,483 | 8% | 0 | 0% | 0 | 0% | 0 | 0% | 102,864 | 92% | 922 | 0% | 0 | 0% | 112,269 |
| Unoccupied | 35,904 | 15% | 5 | 0% | 0 | 0% | 0 | 0% | 199,918 | 85% | 0 | 0% | 48 | 0% | 235,877 |
| Non-Habitat | 25,400 | 43% | 0 | 0% | 0 | 0% | 4 | 0% | 32,239 | 55% | 235 | 0% | 896 | 2% | 58,774 |
| **Piñon Mesa** | **137,111** | **45%** | **0** | **0%** | **0** | **0%** | **25** | **0%** | **111,526** | **37%** | **916** | **0%** | **55,021** | **18%** | **304,598** |
| Occupied | 12,686 | 29% | 0 | 0% | 0 | 0% | 0 | 0% | 30,689 | 70% | 0 | 0% | 729 | 2% | 44,104 |
| Unoccupied | 97,795 | 49% | 0 | 0% | 0 | 0% | 25 | 0% | 60,845 | 30% | 0 | 0% | 42,698 | 21% | 201,363 |

BLM_0027417

CHAPTER 1 - INTRODUCTION

| GUSG POPULATION AREA | BLM | | LOCAL | | NPS | | OTHER | | PRIVATE | | STATE | | USFS | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Non-Habitat | 26,629 | 45% | 0 | 0% | 0 | 0% | 0 | 0% | 19,992 | 34% | 916 | 2% | 11,594 | 20% | 59,131 |
| **Poncha Pass** | **25,500** | **39%** | **0** | **0%** | **0** | **0%** | **0** | **0%** | **16,642** | **26%** | **2,083** | **3%** | **20,347** | **32%** | **64,571** |
| Occupied | 9,860 | 48% | 0 | 0% | 0 | 0% | 0 | 0% | 4,875 | 24% | 478 | 2% | 5,214 | 26% | 20,428 |
| Unoccupied | 14,877 | 53% | 0 | 0% | 0 | 0% | 0 | 0% | 11,225 | 40% | 1,605 | 6% | 187 | 1% | 27,894 |
| Non-Habitat | 763 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 541 | 3% | 0 | 0% | 14,945 | 92% | 16,249 |
| **San Miguel Basin** | **76,568** | **29%** | **8,686** | **3%** | **0** | **0%** | **0** | **0%** | **140,304** | **52%** | **6,956** | **3%** | **35,328** | **13%** | **267,842** |
| Occupied | 35,879 | 35% | 8,357 | 8% | 0 | 0% | 0 | 0% | 52,458 | 52% | 3,437 | 3% | 1,466 | 1% | 101,597 |
| Unoccupied | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 29,094 | 70% | 0 | 0% | 12,393 | 30% | 41,488 |
| Non-Habitat | 40,689 | 33% | 329 | 0% | 0 | 0% | 0 | 0% | 58,752 | 47% | 3,519 | 3% | 21,469 | 17% | 124,757 |
| **Total Acres** | **741,740** | **35%** | **28,247** | **1%** | **42,340** | **2%** | **29** | **0%** | **1,032,853** | **49%** | **15,477** | **1%** | **257,691** | **12%** | **2,118,377** |

BLM_0027418

CHAPTER I - INTRODUCTION

## Table 1.2 - Acres of Federal Subsurface Minerals by Population Area

| GUSG POPULATION AREA | ALL MINERALS | COAL ONLY | OIL AND GAS ONLY | OIL, GAS AND COAL ONLY | OTHER | TOTAL |
|---|---|---|---|---|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **59,277** | **11,264** | **643** | **177** | **0** | **71,361** |
| Occupied | 15,110 | 3,136 | 171 | 137 | 0 | 18,554 |
| Unoccupied | 11,261 | 0 | 127 | 0 | 0 | 11,388 |
| Non-Habitat | 32,906 | 8,128 | 346 | 39 | 0 | 41,419 |
| **Crawford** | **72,657** | **0** | **128** | **36** | **167** | **72,989** |
| Occupied | 31,781 | 0 | 0 | 0 | 0 | 31,781 |
| Unoccupied | 33,277 | 0 | 128 | 36 | 0 | 33,442 |
| Non-Habitat | 7,598 | 0 | 0 | 0 | 167 | 7,765 |
| **Gunnison Basin** | **633,509** | **894** | **684** | **0** | **6,287** | **641,375** |
| Occupied | 454,701 | 569 | 684 | 0 | 4,103 | 460,057 |
| Unoccupied | 110,485 | 0 | 0 | 0 | 2,127 | 112,612 |
| Non-Habitat | 68,323 | 326 | 0 | 0 | 56 | 68,705 |
| **Monticello-Dove Creek** | **76,922** | **509** | **33,548** | **0** | **8,286** | **119,265** |
| Occupied | 8,782 | 309 | 10,175 | 0 | 4,217 | 23,174 |
| Unoccupied | 40,015 | 0 | 20,916 | 0 | 2,509 | 63,741 |
| Non-Habitat | 28,125 | 200 | 2,457 | 0 | 1,569 | 32,350 |
| **Piñon Mesa** | **230,301** | **0** | **445** | **0** | **44** | **230,790** |
| Occupied | 25,769 | 0 | 41 | 0 | 0 | 25,810 |
| Unoccupied | 158,442 | 0 | 143 | 0 | 44 | 158,629 |
| Non-Habitat | 46,090 | 0 | 261 | 0 | 0 | 46,351 |
| **Poncha Pass** | **47,660** | **0** | **0** | **0** | **306** | **47,966** |
| Occupied | 16,382 | 0 | 0 | 0 | 85 | 16,468 |
| Unoccupied | 15,800 | 0 | 0 | 0 | 0 | 15,800 |
| Non-Habitat | 15,478 | 0 | 0 | 0 | 220 | 15,698 |
| **San Miguel Basin** | **156,394** | **0** | **2,386** | **0** | **6,511** | **165,290** |
| Occupied | 65,082 | 0 | 1,325 | 0 | 364 | 66,771 |
| Unoccupied | 8,320 | 0 | 0 | 0 | 5,297 | 13,617 |
| Non-Habitat | 82,991 | 0 | 1,061 | 0 | 850 | 84,902 |
| **Total Acreage** | **1,276,720** | **12,667** | **37,835** | **213** | **21,600** | **1,349,036** |

BLM_0027419

## 1.2.4. BLM RMPs POTENTIALLY AMENDED BY THIS ACTION

The following BLM RMPs currently in use within the planning area have the potential to be amended by this RMP Amendment:

## BLM COLORADO PLANS

### Canyons of the Ancients NM RMP

The Canyons of the Ancients NM RMP was issued in June 2010. Canyons of the Ancients NM operates under this plan and contains Unoccupied Habitat supporting the Monticello-Dove Creek GUSG Population.

### Dominguez-Escalante NCA RMP

The draft Dominguez-Escalante NCA RMP was released in April 2013 and the final plan is expected to be issued in 2016. Dominguez-Escalante NCA is co-administered by the Grand Junction FO under the Grand Junction FO RMP and the Uncompahgre FO under the Uncompahgre Basin RMP and contains Unoccupied Habitat in the Piñon Mesa GUSG Population.

### Grand Junction FO RMP

The approved Grand Junction RMP revision was signed in August of 2015. The Grand Junction FO operates under this plan and it contains habitat supporting the Piñon Mesa GUSG Population.

### Gunnison Gorge NCA RMP

The Gunnison Gorge NCA Approved RMP and ROD was issued in November 2004. Gunnison Gorge NCA is administered by the Uncompahgre FO under this plan and contains habitat supporting the Crawford GUSG Population.

### Gunnison Resource Area RMP

The Gunnison Resource Area RMP was issued in February 1993. The Gunnison FO operates under this plan and provides habitat for two GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population and the Gunnison Basin Population.

### McInnis Canyons NCA RMP

The McInnis Canyons (formerly Colorado Canyons) NCA and Black Ridge Canyons Wilderness RMP and ROD was issued in September 2004. McInnis Canyons NCA is administered by the Grand Junction FO under this plan and contains habitat supporting the Piñon Mesa GUSG Population.

BLM_0027420

### San Juan/San Miguel RMP

The San Juan/San Miguel RMP was issued in 1985. A portion of the Uncompahgre FO operates under this plan and contains habitat supporting the San Miguel Basin GUSG Population. This portion of BLM-administered land is included in the planning area for the Uncompahgre RMP, and the approved RMP is expected to be issued in late 2017.

### San Luis Resource Area RMP

The San Luis Resource Area ROD and Approved RMP was issued in December 1991. The San Luis Valley FO contains habitat supporting the Poncha Pass GUSG Population. In addition, the FO manages habitat supporting the Poncha Pass Population within the Royal Gorge FO.

### Tres Rios FO RMP

The Tres Rios FO RMP was issued in February 2015. The Tres Rios FO provides habitat for two GUSG populations: the Monticello-Dove Creek Population (with the Dove Creek sub-population predominantly within the Tres Rios FO) and the San Miguel Basin Population.

### Tres Rios FO Areas of Critical Environmental Concern (ACEC) RMP Amendment

The BLM is preparing an RMP Amendment and associated Environmental Assessment (EA) for the Tres Rios FO (DOI-BLM-CO-S010-2016-0018-EA). The EA will evaluate and consider management prescriptions for eighteen potential ACECs. Two of the proposed ACECs (Dry Creek Basin and Northdale) meet the relevance and importance criteria for GUSG conservation.

The proposed range of alternatives and management prescriptions prepared for the Tres Rios FO RMP ACEC Amendment would be consistent with the GUSG planning effort. Protection of identified relevance and importance values will be considered during project-level analysis of any management actions or project proposals.

Additionally, Alternative B in this document analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat, which overlaps the Dry Creek Basin and Northdale ACECs proposed in the Tres Rios FO RMP ACEC Amendment.

### Uncompahgre Basin RMP

The Uncompahgre Basin RMP and ROD was issued in July 1989. A significant portion of the Uncompahgre FO operates under this plan and provides habitat for four GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population (with the Sims Mesa sub-population entirely within the Uncompahgre FO), the Crawford Population, the Gunnison Basin Population, and the Piñon Mesa Population. This

BLM_0027421

CHAPTER 1 - INTRODUCTION

portion of the field office is included in the planning area for the Uncompahgre RMP. The Draft Uncompahgre RMP was issued in May 2016, and the approved RMP is expected to be issued in late 2017.

If the GUSG RMP Amendment is issued prior to the revised Uncompahgre RMP, then it would amend the existing Uncompahgre Basin RMP (as well as the San Juan/San Miguel RMP) for lands in the Uncompahgre RMP planning area.  Analysis from the GUSG EIS would be incorporated by reference into the Uncompahgre Proposed RMP/Final EIS, and decisions made in the GUSG Approved RMP Amendment/ROD would be carried forward to the Uncompahgre Approved RMP/Record of Decision.  However, if the revised Uncompahgre RMP is issued first, then the GUSG RMP Amendment could require amendment of the Uncompahgre RMP.

## BLM UTAH PLANS

### Moab FO RMP

The Moab FO ROD and Approved RMP was issued in October 2008.  The Moab FO operates under this plan and contains habitat supporting the Piñon Mesa GUSG Population.

### Monticello FO RMP

The Monticello FO ROD and Approved RMP was issued in November 2008.  The Monticello FO operates under this plan and contains habitat supporting the Monticello-Dove Creek GUSG Population (with the Monticello sub-population predominantly within the Monticello FO).

Table 1.3 provides the acreages of Occupied Habitat, Unoccupied Habitat, and Non-Habitat Areas within Four Miles of a Lek for each of the potentially affected RMPs.

**Table 1.3 - Acreage of GUSG Habitat on BLM Lands by Affected RMP**

| AFFECTED RMP | SURFACE ACRES | | | SUB-SURFACE ACRES | | |
|---|---|---|---|---|---|---|
| | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas |
| Canyons of the Ancients NM RMP | — | 4,042 | — | — | 4,079 | — |
| Dominguez-Escalante NCA RMP | — | — | — | — | — | — |
| Grand Junction FO RMP | 12,335 | 71,889 | 12,676 | 25,460 | 128,339 | 32,892 |
| Gunnison Gorge NCA RMP | 22,148 | 5,491 | 1,481 | 27,383 | 12,263 | 1,861 |
| Gunnison Resource Area RMP | 302,349 | 65,000 | 13,391 | 461,052 | 108,748 | 73,983 |
| McInnis Canyons NCA RMP | 351 | 21,575 | 181 | 350 | 20,475 | 181 |
| Moab FO RMP | — | 4,338 | 13,772 | — | 4,265 | 13,277 |

BLM_0027422

CHAPTER 1 - INTRODUCTION

| | SURFACE ACRES | | | SUB-SURFACE ACRES | | |
|---|---|---|---|---|---|---|
| **AFFECTED RMP** | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas |
| Monticello FO RMP | 3,234 | 1,745 | 13,540 | 10,619 | 8,238 | 20,006 |
| San Juan/San Miguel RMP | 825 | – | 20,280 | 11,745 | 12,550 | 46,511 |
| San Luis Resource Area RMP | 9,742 | 14,877 | 763 | 15,750 | 15,800 | 14,970 |
| Tres Rios FO RMP | 40,308 | 30,106 | 32,269 | 67,270 | 51,416 | 44,868 |
| Uncompahgre Basin RMP | 4,057 | 8,816 | 10,041 | 21,958 | 28,957 | 41,532 |

## 1.2.5. ISSUES AND RESOURCES IDENTIFIED AND CONSIDERED BUT NOT CARRIED FORWARD

The following issues identified during public scoping are not being carried forward in this RMP Amendment/EIS for reasons that include lack of significant impacts and topics beyond the scope of the RMP Amendment:

Air Quality - Management of air quality was not identified as a key issue driving the formulation of alternatives for this RMP Amendment. While no significant changes in air quality are anticipated as a result of efforts to conserve and restore GUSG, management actions with the potential to impact air quality are addressed in this EIS.

Coal - As part of BLM land use planning, RMPs identify lands with potentially developable coal resources. There are four specific land use screening steps that are unique to developing land use planning decisions for federal coal lands. These are:
- Identification of coal with potential for development
- Determination if the lands are unsuitable for coal development
- Consideration of multiple use conflicts
- Surface owner consultation

The purpose of the coal screening portion of the land use planning process (43 CFR 3420.1-4) is to identify those federal lands that are acceptable for further consideration for coal leasing and development. Only those areas that have development potential may be identified as acceptable for further consideration for leasing. The suitability of those lands for coal leasing is then determined based upon twenty criteria listed in Section 522 of the Surface Mining Control and Reclamation Act and in 43 CFR 3461.5. Lands found suitable for coal leasing are evaluated in relation to potential multiple-use conflicts and protective measures identified in the RMP to determine whether or not coal leasing would be acceptable. No federal minerals subject to BLM administration have been identified as suitable for further consideration for coal leasing within the analysis area in the Grand Junction, draft

BLM_0027423

CHAPTER 1 - INTRODUCTION

Uncompahgre, and Tres Rios RMPs.  Coal leasing is not mentioned in the Gunnison or San Luis RMPs.

In the Moab and Monticello FOs and their respective RMPs, no expressions of interest for coal leasing have been received and the development potential for coal resources is low.  If an interest in coal leasing were expressed, the respective RMP would be amended as appropriate and mining unsuitability criteria (43 CFR 3461) would be applied by the field office, as applicable, before any coal leases would be issued.  If issued, a coal lease would be subject to special conditions developed in the RMP and unsuitability assessment that could restrict all or certain types of mining techniques.  Before any coal could be removed, the field office would have to approve the mining permit application package, incorporating stipulations developed in the RMP.  McInnis Canyons, Dominguez-Escalante, and Gunnison Gorge NCAs and Canyon of the Ancients NM are withdrawn from coal leasing as stipulated in the enabling legislation for each area.

<u>Cultural Resources</u> - Management of cultural resources was not identified as a key issue driving the formulation of alternatives for this RMP Amendment.  Additionally, no significant changes to cultural resources are anticipated as a result of management actions and alternatives.  Many beneficial effects potentially accrue to cultural resources from the conservation of GUSG habitat.  There is also potential for negative impacts resulting from habitat improvement activity, vegetation management, restrictions on mitigation options (e.g. fence exclosures for protection), and the movement of development into other areas of cultural resource sensitivity (e.g. pinyon juniper vegetation zone).

Quantification of potential impacts requires knowledge of the extent of cultural resources, or at least a reasonable predictive capability.  Such knowledge or reasonable prediction capability is unavailable beyond the basic premise that cultural resources are more likely to be found in pinyon juniper vegetation (Haas, Personal Communication, 2015).  Quantification also requires the ability to estimate the proposed extent of potentially impactful management actions in quantifiable terms such as acres or percent.  The management actions and objectives relevant to cultural resources do not contain such quantitative metrics.  The combination of this lack of quantification of both the resource and the potential impacts renders quantitative analysis, and therefore estimation of significance of effects, inappropriate for this RMP Amendment.  Finally, cultural resources are protected from significant impacts as a general matter by the laws and regulations that govern impacts to them.

<u>ESA Listing Decisions</u> - Decisions directly associated with the listing of the GUSG under the ESA are the purview of the FWS and are not addressed in this RMP Amendment.

BLM_0027424

CHAPTER 1 - INTRODUCTION

<u>Fish and Wildlife</u> - While the GUSG is addressed in the *Special Status Species* resource sections of this EIS and three wildlife species are addressed in the *Fish and Wildlife* sections, general fish and wildlife management was not identified as a key issue to be addressed through this RMP Amendment.

<u>Hunting of GUSG</u> - The hunting of GUSG is not allowed in either Colorado or Utah.  Comments related to state-regulated actions are outside the scope of this RMP Amendment.

<u>Land Tenure</u> - Land tenure is an action that has been addressed in the existing RMPs, in accordance with FLPMA.  Land tenure refers to public land ownership, both disposal and acquisition.  Changes in land tenure can be accomplished through direct sales, land exchanges, land purchases, and/or land donations.  The existing RMPs identify specific parcels or criteria for parcels that are available for disposal. Public lands within Wilderness Areas, Wilderness Study Areas, the Canyons of the Ancients NM, and the Dominguez-Escalante, McInnis Canyons, and Gunnison Gorge NCAs are withdrawn from disposal under the public land laws.

Any land tenure actions, including disposals identified in an RMP, are subject to site-specific environmental analysis under NEPA.  Land tenure adjustments must be determined to be in the public interest (FLPMA sec. 102(a)(1), 203(a), 205(b), and 206(a)) and to be in conformance with relevant laws, regulations, and policies. These include the policy as stated in BLM Manual 6840, Special Status Species Management: "the BLM shall retain in Federal ownership those habitats essential for the conservation of any listed species, particularly those that are part of a broader, logical public land ownership management unit.  The BLM may dispose of lands providing habitat for listed species, including critical habitat, only following consultation with the FWS and upon a determination that such action is consistent with relevant law."

<u>Lands with Wilderness Characteristics</u> - Section 201 of FLPMA requires the BLM to maintain an inventory of all public lands and their resources and other values, including wilderness characteristics.  FLPMA further provides that the preparation and maintenance of the inventory shall not, in and of itself, change or prevent change of the management or use of public lands.  BLM lands identified as possessing wilderness characteristics must possess sufficient size, naturalness, and outstanding opportunities for either solitude or primitive and unconfined recreation, and may also possess supplemental values.  The purpose of and need for this RMP Amendment is limited to making land use planning decisions specific to the conservation of GUSG habitat.  As no decisions related to the management of lands with wilderness characteristics will be made as part of this planning effort, any discussion of lands with wilderness characteristics will be limited to the analysis of potential impacts from the management action alternatives.

BLM_0027425

CHAPTER 1 - INTRODUCTION

The BLM will conduct wilderness characteristics inventories as a part of the NEPA analysis for any site-specific projects, such as vegetation treatments, that have the potential to impact this resource. At that time, alternatives will be considered to avoid or minimize the impacts to wilderness characteristics where possible, while still meeting the purpose and need for the project.

National Heritage Areas - No National Heritage Areas are located within the planning area.

National Historic Landmarks - No National Historic Landmarks are located on BLM-managed lands within the planning area.

National Historic Trails - National Historic Trails (NHTs) closely follow historic trails or routes of travel of national significance. Branches of the Old Spanish NHT occur throughout the planning area in both Colorado and Utah. The Old Spanish NHT was an important pack trail (and a later emigration route) connecting Santa Fe and Los Angeles from 1829 to 1848. Because the trail consisted of a multitude of general corridors on which the pack strings were driven, evidence of the actual routes that define the trail are extremely rare. Management actions for the conservation of the GUSG are not expected to impact the values of the Old Spanish NHT.

National Recreation Areas (NRA) - No NRAs occur on BLM-managed lands within the planning area. Curecanti NRA, located on the Gunnison River within the planning area, is managed by the National Park Service.

National Scenic Trails - National Scenic Trails (NST) are only authorized and designated through an Act of Congress. NSTs provide maximum outdoor recreation potential and for the conservation and enjoyment of the various qualities—scenic, historical, natural, and cultural—of the areas through which they pass. In the Gunnison Basin, the BLM manages approximately one mile of the Continental Divide NST within the planning area. On BLM lands, the Continental Divide NST is located on the extreme southern edge of GUSG habitat, and management actions taken for the conservation of the GUSG are not expected to impact its values.

Oil Shale and Tar Sands - The BLM completed the Approved Land Use Plan Amendments/ROD for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming and Final EIS in 2013. The Oil Shale/Tar Sands EIS analyzed the most geologically prospective oil shale areas in Colorado, Utah, and Wyoming. The ROD amended three RMPs in Colorado and four in Utah, only two of which—the 1988 Grand Junction RMP (as amended by the 2006 Roan Plateau RMP Amendment) and the 2008 Monticello

BLM_0027426

RMP—overlap with the planning area. No federal oil shale or tar sands resources were made available for application for leasing in the planning area.

Paleontological Resources - The management of paleontological resources was not identified as a key issue driving the development of alternatives for this RMP Amendment. While no significant changes to paleontological resources in the planning area are anticipated as a result of efforts to conserve and restore GUSG, management actions with the potential to impact paleontological resources are addressed in this EIS.

Prime and Unique Farmlands - None of the actions proposed in this RMP Amendment were determined to have the potential to impact prime and unique farmlands (as defined by the CEQ and mapped by the Natural Resources Conservation Service) or farmlands of statewide or local importance (as mapped by state or local agencies). Irrigation is necessary for land to be classified as Prime and Unique Farmlands and BLM lands are not irrigated.

Renewable Energy Land Use Authorizations - Renewable energy includes geothermal, solar power, wind, and hydropower resources. Geothermal resources are managed as a leasable fluid mineral and are discussed in the Leasable Minerals sections of this EIS. Solar, wind, and hydropower resources are managed by the lands and realty program. The BLM completed programmatic environmental analyses and subsequent decisions for both wind energy and solar energy development. In the Programmatic EIS on Wind Energy Development (BLM 2005), none of the decision area was identified as having potential for future wind energy development. There are currently no wind energy development proposals in the planning area.

In the Approved Resource Management Plan Amendments/ROD for Solar Energy Development in Six Southwestern States (BLM 2012), the entire planning area is excluded from utility-scale solar development (projects generating 20 megawatts or greater), either through designation as an exclusion area or by being subject to exclusion criteria. There are currently no utility-scale solar energy development proposals or authorizations on public lands in the planning area.

Small-scale wind, solar, and hydropower projects would be managed by the lands and realty programs and are discussed in the Lands and Realty sections of this EIS.

Scenic, Historic, and Backcountry Byways - Several national and state scenic and/or historic byways exist within the planning area. The West Elk Loop Scenic Byway crosses three population areas: Crawford, Cerro Summit-Cimarron-Sims Mesa, and Gunnison Basin. The San Juan Skyway touches the outer southwest edge of the San Miguel Basin Population, while the Unaweep/Tabeguache Scenic Byway brushes the edges of two sub-units on the east side of the Piñon Mesa Population. The Silver Thread Scenic Byway also intersects GUSG Habitat., but is located on state

BLM_0027427

highways.  Conservation of the GUSG is not expected to alter the experience of America's or Colorado/Utah designated byways and designation of additional byways is beyond the scope of this planning effort; therefore, byways are not analyzed in detail in this planning effort.

Special Status Plants - The Draft RMP Amendment does not propose the removal of any protections for listed or sensitive plant species.  BLM Manual 6840 on Special Status Species Management provides instruction on survey and protection of sensitive and listed plants.  In accordance with this manual, surveys and avoidance of special status plants would be required where GUSG conservation measures such as habitat improvements have the potential to affect them.  This standard practice, in combination with the conservation nature of this RMP Amendment, precludes the need to analyze listed and sensitive plants further in this document.

In no scenario under the Draft RMP Amendment would disturbance to a special status plant species increase; the opposite will be the case.  Under the RMP Amendment, special status plant species would receive additional protection where their range overlaps with GUSG.  Requiring no surface disturbance in order to protect GUSG and their habitat would also benefit other special status species.  Habitat treatments would focus on pinyon and juniper encroachment into sagebrush and on sagebrush restoration.  Stand type conversion of pinyon-juniper stands are not included in this amendment.

Taylor Grazing Act/National Grazing Policy - Both elimination and reduction of livestock (i.e., permitted grazing use) within GUSG habitat in the planning area are considered in different alternatives.  This is consistent with Instruction Memorandum (IM) 2012-169, RMP Alternative Development for Livestock Grazing.

Visual Resources - The management of visual resources was not identified as a key issue driving the development of alternatives for this RMP Amendment.  While no significant changes to visual resources are anticipated as a result of efforts to conserve and restore GUSG, management actions with the potential to impact visual resources are addressed in this EIS.

Water Quality - The management of water quality was not identified as a key issue driving alternatives design for this RMP Amendment.  Additionally, consideration and initial analysis of water quality did not identify reasonably foreseeable significant impacts occurring due to any of the alternatives.  Therefore, water quality was not analyzed in detail.

Wild Horse and Burro Management - No wild horses and burros or wild horse and burro herd management areas occur within the decision area.

Wild and Scenic Rivers - While no stream segments within the planning area have been designated as Wild and Scenic Rivers (WSR), both the Tres Rios and

BLM_0027428

CHAPTER 1 - INTRODUCTION

Uncompahgre FOs contain stream segments partially intersecting the planning area that have been identified as eligible or suitable for WSR designation. The RMPs for the respective offices include land use prescriptions that provide for interim protective management of river-related values. All of the alternatives under consideration in this planning effort contain land use restrictions that would be as restrictive as or more restrictive than land use prescriptions presently in effect for the stream segments. Because of the additional protections provided for river-related values along eligible and suitable stream segments under any of the alternatives and the small amount of intersection between the planning area and eligible and suitable stream segments, WSR issues are not analyzed in detail in this planning effort.

The BLM will not consider any management actions or allocations through this planning effort that would prevent the agency from managing eligible and suitable WSRs in a manner that would protect river values and ensure a decision on suitability could be made for eligible rivers, and in the case of suitable rivers, until Congress designates the segment or releases it for other uses.

<u>Wilderness/Wilderness Study Areas</u> - Four of the GUSG populations—Crawford, Gunnison Basin, Monticello-Dove Creek, and Piñon Mesa—either intersect or abut wilderness areas or wilderness study areas. Management for the conservation of GUSG in designated wilderness areas or wilderness study areas is not expected to result in measurable impacts or impair existing wilderness character. It is beyond the current authority of the BLM and the scope of this planning effort to designate new wilderness areas or wilderness study areas. The BLM will not consider any management actions or allocations through this planning effort that would prevent the agency from managing recommended wilderness areas in a manner that would preserve and protect wilderness characteristics or preclude Congress from designating wilderness areas in the future.

# 1.3. PLANNING CRITERIA

## 1.3.1. ABOUT BLM PLANNING CRITERIA

Planning criteria are standards and rules used as a framework to resolve issues and develop alternatives and to ensure that decision making is tailored to the issues and the BLM avoids unnecessary data collection and analysis. Planning criteria are based on appropriate laws, regulations, and BLM manuals, handbooks, and policy directives, as well as on public participation and coordination with cooperating agencies (consisting of state, local, and other federal agencies and government entities) and Native American tribes.

## 1.3.2. CRITERIA FOR THE GUSG RMP AMENDMENT

Preliminary planning criteria were established at the start of public scoping in order to guide initial input, and have been modified as a result of feedback and new information.

The current planning criteria state that:

- The planning effort will be limited to making land use planning decisions specific to the conservation of the GUSG and its habitat. For the purposes of this planning effort, GUSG habitat may include areas in addition to those designated as critical habitat by the FWS in the final listing decision.
- Lands addressed in the RMP Amendment will consist of GUSG Occupied and Unoccupied Habitat and Non-Habitat Areas administered by the BLM. Decisions in the RMP Amendment will apply only to federal public lands and minerals administered by the BLM.
- The BLM will consider land use allocations and/or prescriptive standards to conserve GUSG habitat, as well as objectives and management actions to restore, enhance, and improve GUSG habitat.
- The BLM will use a collaborative and multi-jurisdictional approach, where appropriate, to determine the goals and objectives of public lands for the conservation of the GUSG and its habitat.
- As described by law and policy, the BLM will strive to ensure that conservation measures are as consistent as possible with other planning jurisdictions within the planning area boundary.
- The BLM will consider a reasonable range of alternatives, including appropriate management prescriptions that focus on the relative values of

BLM_0027430

resources while contributing to the conservation of the GUSG and its habitat.

- The BLM will consider GUSG conservation measures developed by or in conjunction with cooperating agencies, including county and state governments and the FWS, among others.
- The RMP Amendment will consider management actions that have been previously demonstrated as successful for GUSG conservation on private, local, state, other federal, or BLM-administered lands.
- The BLM will use the Gunnison Sage-Grouse Rangewide Conservation Plan (Rangewide Steering Committee 2005) and other appropriate resources to identify GUSG habitat requirements and best management practices (BMPs).
- The planning effort will comply with FLPMA, NEPA, CEQ regulations at 40 CFR parts 1500–1508, DOI regulations at 43 CFR part 46 and 43 CFR part 1600, BLM H-1601 Land Use Planning Handbook Appendix C: Program-Specific and Resource-Specific Decision Guidance Requirements for affected resource programs; BLM NEPA Handbook H-1790-1 (2008); and all other applicable BLM policies and guidance.
- The planning effort will recognize valid existing rights.
- The BLM will address socioeconomic impacts of the alternatives developed. Socioeconomic analyses will use an accepted input/output quantitative model such as the Impact Analysis for Planning or the Regional Input-Output Modeling System.
- The BLM will use current scientific information, research, technologies, and results of inventory, monitoring, and coordination to determine appropriate local and regional management strategies that will enhance or restore GUSG habitat.
- All activities and uses for BLM-administered lands within GUSG habitat will follow existing land health standards.  Standards and guidelines for livestock grazing and other applicable programs will be applicable to all alternatives for BLM lands.
- Resources and resource programs that do not contain specific management direction for GUSG and that may be indirectly affected by the proposed management actions will be identified and discussed only to the degree required to fully understand the range of effects of the proposed management actions.
- The BLM will consult with Native American tribes to identify sites, areas, and objectives important to their cultural and religious heritage within GUSG habitat.
- The BLM will coordinate and communicate with state, local, and tribal governments to ensure that the BLM considers provisions of pertinent plans, will seek to resolve inconsistencies between state, local, and tribal plans, and

BLM_0027431

will provide ample opportunities for state, local and tribal governments to comment during development of the RMP Amendment.

- The planning effort will be based on adaptive management principles.
- The BLM will use the most current approved BLM corporate spatial data supported by current metadata to ascertain the extent and quality of GUSG habitat. Data will be consistent with the principles of the Information Quality Act of 2001.
- The BLM will make use of data and expertise pertaining to the GUSG provided by the FWS and state wildlife agencies to the fullest extent practicable in making management determinations on federal lands. The BLM recognizes the jurisdiction of state wildlife agencies as the primary management agencies for species not managed under the Endangered Species Act.
- The BLM will adhere to the principles of multiple use and sustained yield.
- The BLM will use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences.

BLM_0027432

CHAPTER 1 - INTRODUCTION

## 1.4. THE PLANNING PROCESS

### 1.4.1. BLM LAND USE PLANNING PROCESS

FLPMA requires that the BLM develop and maintain RMPs as management tools by which "present and future use is projected" (43 United States Code [USC] 1701[a][2]). The implementing regulations of FLPMA for planning (43 CFR Part 1600) state that RMPs are a preliminary step in the overall process of managing BLM-administered lands and are "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses" (43 CFR Part 1601.0-2). Public participation and input are important components of land use planning.

Under BLM regulations, approval of an EIS-level RMP revision or amendment is considered a major federal action that could significantly affect the quality of the human environment and therefore requires disclosure and documentation of environmental effects as described in NEPA. Thus, this EIS accompanies the amendment of the existing RMPs.

The EIS follows the format outlined in the BLM Land Use Planning Handbook H-1601-1, planning regulations at 43 CFR 1610, NEPA Handbook H-1790-1, CEQ regulations at 40 CFR 1500–1508, and DOI NEPA regulations at 43 CFR 46. The RMP Amendment and EIS are being developed in full compliance with NEPA and the planning process is being conducted in compliance with legal and policy requirements regarding public notices, required elements, distribution of draft and final documents, and specific laws.

The BLM uses a nine-step planning process to develop or revise RMPs outlined in 43 CFR Part 1600 and the BLM Land Use Planning Handbook H-1601-1 (BLM 2005d). This EIS analyzes the impacts of four alternatives for the GUSG Rangewide RMP Amendment/EIS, including a No Action Alternative. In accordance with the BLM planning handbook, portions of separate alternatives analyzed in the Draft RMP Amendment may be combined in order to formulate a comprehensive alternative for the final RMP Amendment.

Through a rangewide plan amendment effort the BLM will incorporate objectives and management actions into approved RMPs. The BLM will evaluate and adapt a suite of conservation measures based on the RCP, local GUSG conservation initiatives, current peer-reviewed research, and conservation summaries developed in conjunction with FWS and state fish and wildlife agencies.

BLM_0027433

This planning effort is limited to actions that support conservation or recovery of the GUSG and its habitat and will be structured to incorporate adaptive management practices where appropriate in order to achieve habitat conservation, restoration, and enhancement goals.

A Scoping Report was completed prior to formulating the alternatives and preparing the Draft RMP Amendment/EIS. Public comments on the Draft RMP Amendment/EIS will be analyzed following a 90-day review period. The BLM will consider all comments prior to publishing a Proposed RMP Amendment/Final EIS. Prior to issuing a Record of Decision (ROD), the public will have an opportunity to protest the Proposed RMP Amendment and the states of Colorado and Utah will conduct Governor's Consistency Reviews.

## PLAN MAINTENANCE

Over the life of a plan, the BLM expects that new information gathered from field inventories and assessments, other agency studies, and other sources will update geographic information system (GIS) and other data (to include best management practices). To the extent that new information or actions address issues covered in the RMP Amendment, the BLM will integrate the data through plan maintenance. BLM regulations in 43 CFR 1610.5-4 provide that plan decisions and supporting actions can be maintained to reflect minor changes in data. Maintenance is limited to further refining, documenting, or clarifying a previously approved decision incorporated in the RMP Amendment. Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved RMP Amendment.

## RELATIONSHIP TO OTHER POLICIES AND PLANS

This planning effort recognizes the many ongoing efforts to conserve the GUSG through policies and plans implemented throughout the planning area by other land managers and government agencies. The BLM will seek to be consistent with or complement other management actions in accordance with FLPMA and regulations.

BLM_0027434

# 2.  ALTERNATIVES

Chapter Two details alternatives A through D (including sub-alternatives $D_1$ and $D_2$) for the GUSG Rangewide RMP Amendment/EIS, identifying management actions and where those actions would be applicable.  The draft alternatives were formulated in response to issues and concerns identified through public scoping and threats to the GUSG identified in the FWS final listing decision and in an effort to maintain or increase GUSG abundance and distribution by conserving, enhancing, or restoring the sagebrush ecosystem upon which the species depends, as well as implement actions that will lead to recovery of the species.  Decisions resulting from this RMP Amendment would apply to federal surface lands and federal subsurface mineral estate administered by the BLM in the decision area (described in Section 1.2.2).

CHAPTER 2 - ALTERNATIVES

# 2.1. INTRODUCTION TO ALTERNATIVES

The GUSG RMP Amendment/EIS was drafted in compliance with NEPA, which directs the BLM to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources..." (NEPA Section 102[2][e]).  At the heart of the alternative development process is the requirement that the range of alternatives is reasonable.  The purpose of and need for the action provide the parameters for determining the reasonableness of the range of alternatives.

The BLM recognizes that social, economic, and environmental issues extend across land ownership boundaries and that extensive cooperation is necessary in order to actively address issues of mutual concern.  To the extent possible, these alternatives reflect input provided during public scoping and from cooperating agencies.

RMP decisions consist of identifying and clearly defining goals and objectives (desired outcomes) for resources and resource uses.  After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

## 2.1.1.  COMPONENTS OF ALTERNATIVES

Goals are broad statements of desired outcomes that usually are not quantifiable. Objectives identify specific desired outcomes for resources.  Goals typically pertain to all of the alternatives, while objectives may be consistent across alternatives or vary by alternative.  An RMP can include some objectives that vary by alternative and other objectives that are consistent across alternatives.  And while goals typically apply to the entire decision area, objectives, allowable uses, and management actions may apply to the decision area as a whole or to a specific geographic area(s).

RMPs identify resource uses or allocations that are allowable, restricted, or prohibited on public lands and federal mineral estate.  These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including restrictions necessary to meet goals and objectives.  Land use plans also identify lands where specific uses are excluded in order to protect resource values.  At the land use plan level, it is important to identify reasonable development scenarios for allowable uses to enable the orderly implementation of future actions.  These scenarios provide a context for RMP decisions and an analytical base for NEPA analysis.  The BLM may also establish criteria in a land use plan to guide the identification of site-specific use levels for activities during plan implementation.

BLM_0027436

Land use plans must identify the management actions anticipated to achieve outcomes, including actions to maintain, restore, or improve land health.  These actions include proactive measures (such as measures to enhance function and condition), as well as measures or criteria guiding day-to-day activities occurring on public lands.

## 2.1.2.  PURPOSE OF ALTERNATIVES DEVELOPMENT

Land use planning and NEPA regulations require the BLM to formulate a reasonable range of alternatives.  Alternative development is guided by established planning criteria (as outlined in 43 CFR Section 1610).

The basic goal of alternative development is to produce distinct potential management scenarios that:

- Address the identified major planning issues
- Explore opportunities to enhance management of resources and resource uses
- Meet the purpose and need for the RMP Amendment
- Are feasible.

Pursuit of this goal provides the BLM and the public with an appreciation for the diverse ways in which conflicts regarding resources and resource uses might be resolved, and offers the BLM State Director(s) a reasonable range of alternatives from which to make an informed decision.  The components and broad aim of each alternative considered for the GUSG Range-wide RMP Amendment/EIS are discussed below.

## 2.1.3.  DEVELOPING ALTERNATIVES

### ALTERNATIVES DEVELOPMENT PROCESS

The planning team adhered to the BLM planning process in developing a reasonable range of alternatives for the RMP Amendment/EIS.  Planning was conducted in compliance with NEPA and White House Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR 1500), including seeking public input and analyzing a reasonable range of alternatives.  In order to meet the planning criteria and respond to scoping issues and FWS-identified threats, the alternatives include management options that could modify or amend decisions in field office, national conservation area, and national monument RMPs across the planning area.  Because the RMP Amendment/EIS is specific to

BLM_0027437

GUSG conservation, numerous decisions in existing RMPs remain valid. In these instances, no alternative management prescriptions were required.

Public input received during the scoping process was considered to ensure that all issues and concerns would be addressed, as appropriate, when developing the alternatives. The planning team identified the issues to be addressed in the RMP Amendment/EIS based on broad concerns or controversies related to conditions, trends, needs, and existing and potential uses of planning area lands and resources.

## DEVELOPING A REASONABLE RANGE OF ALTERNATIVES

The BLM project team identified planning issues, developed management goals, and drafted objectives and actions to address the goals based on scoping and collaboration efforts. Cooperating agencies reviewed, discussed, and provided comments on the drafts. Reasonable alternatives meet the purpose and need of the project and can be feasibly carried out based on estimated cost, logistics, technology, and social and environmental factors.

Using a two-step process, the planning team:

- Developed preliminary action alternatives B and C. The action alternatives were designed to:
  o Address the planning issues by offering a range of management responses;
  o Fulfill the purpose and need for the RMP Amendment (outlined in Chapter 1, Section 1.1, Purpose and Need);
  o Meet the multiple use mandates of FLPMA (43 USC 1716).
- Blended goals, objectives, and actions from the action alternatives to formulate a third action alternative (Alternative D) that strives for balance among competing interests and has the greatest potential to effectively address the purpose and need in the Gunnison Basin and each of the satellite populations. This quest for balance was further refined by splitting Alternative D into two sub-alternatives. Sub-alternative $D_1$ focuses on issues associated with the more stable Gunnison Basin Population, while $D_2$ focuses on issues associated with the smaller satellite populations.

The action alternatives (B and C and sub-alternatives $D_1/D_2$) respond to issues and concerns raised during the public scoping period, as well as planning criteria and guidance applicable to management of resources and resource uses with the potential to affect GUSG or GUSG Habitat.

BLM_0027438

## 2.1.4.   RESULTING RANGE OF ALTERNATIVES

The No Action Alternative (A) outlines existing management direction, including current decisions set forth in field office RMPs and reasonable, foreseeable, management scenarios. CEQ requires a No Action Alternative in order to provide a baseline for comparison of the other alternatives (CEQ 1981). While reflecting current management, management actions from Alternative A can also be selected for the final RMP Amendment/EIS.

The action alternatives (B and C and sub-alternatives $D_1$ and $D_2$) offer a range of possible management approaches for responding to planning issues and concerns to conserve and restore GUSG and habitat in the decision area. While the goal is the same across alternatives, objectives can differ by alternative, and each of the alternatives contains a discrete set of management actions with the potential for different long-range outcomes and conditions to meet the purpose and need for the amendments.

The relative emphasis given to particular resources and resource uses differs as well, including allowable uses, restoration measures, and specific direction pertaining to individual resource programs. When resources or resource uses are mandated by law or are not tied to planning issues, there are typically few or no distinctions between alternatives.

Differences among the alternatives are described in Table 2.5 - Summary of Impacted Acres by Resource Use. Table 2.7 details the proposed goals, objectives, management actions, and allowable uses by resource for each of the action alternatives B and C and sub-alternatives $D_1$ and $D_2$. No Action Alternative A is outlined in a separate table (Table 2.6) that precedes the action alternatives table.

A complete description of the stipulations developed for implementation of the management actions can be found in Appendix H, Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations. A complete description of the Best Management Practices (BMPs) for implementation of the management actions described in the alternatives is available in Appendix I, Best Management Practices.

Geographic information system (GIS) data has been used in developing acreage calculations and for generating many of the figures. Calculations in this EIS are rounded and are dependent upon the quality and availability of data. Data were collected from a variety of sources, including the BLM, collaborative partners, stakeholders, and cooperating agencies, among others. Given the scale of the analysis, the compatibility constraints between datasets, and the lack of data for some resources, all calculations are approximate and serve for comparison and analytic purposes only. Because the BLM may receive additional GIS data, the acreages are likely to be recalculated and revised.

BLM_0027439

CHAPTER 2 - ALTERNATIVES

The action alternatives (B and C and sub-alternatives $D_1/D_2$) may modify planning decisions in the three NCAs and or the National Monument, but only as consistent with their designations.

The action alternatives were designed to respond to threats to the GUSG and GUSG habitat identified by the FWS, as well as issues identified by the public and cooperating agencies during scoping.  Table 2.4 identifies these threats and issues, as well as the applicable BLM resource programs and management decisions being analyzed in this EIS to address the threats and issues.

**Table 2.4 - Applicable BLM Programs and Decisions to Address Issues and FWS Threats**

| FWS THREAT* | SCOPING ISSUE | APPLICABLE BLM RESOURCE PROGRAM FOR ADDRESSING THREAT | |
|---|---|---|---|
| RANGEWIDE - MOST SUBSTANTIAL THREAT | | | |
| Habitat Decline Due to Human Disturbance | Energy and Minerals | Program: | Minerals |
| | | Decisions: | Identify areas open and closed to fluid mineral leasing. |
| | | | Identify No Surface Occupancy (NSO), Controlled Surface Use (CSU), and/or Timing Limitation (TL) stipulations for open areas. |
| | | | Identify areas to petition for withdrawal from mineral development. |
| | | | Establish terms, conditions, or special considerations. |
| | | | Identify areas open and closed to mineral materials disposal. |
| | | | Establish BMPs. |
| | Lands and Realty | Program: | Lands and Realty |
| | | Decision: | Identify stipulations for ROW grants and utility corridors. |
| | | | Identify ROW avoidance or exclusion areas. |
| | Recreation | Program: | Recreation |
| | | Decision: | Identify terms, conditions and stipulations for SRPs. |
| | Range Management | Program: | Range Management |
| | | Decision: | Identify appropriate grazing management practices and suitability for range facilities/improvements. |
| | Travel Management | Program: | Travel and Transportation Management - Roads |
| | | Decision: | Identify areas open, limited, or closed to travel and modes of access and travel. |
| Small Population Size and Structure | Lands and Realty | Program: | Lands and Realty |
| | | Decision: | Identify criteria for areas for retention, disposal, or acquisition. |
| Climate Change | Climate Change | Although no individual resource program addresses this threat to the GUSG or GUSG Habitat, the threat has been considered as part of individual resource concerns and monitored trends. | |
| Disease | No similar issue identified. | Program: | Range Management, Special Status Species |
| | | Decision: | Identify actions to minimize potential of spread of West Nile Virus. |
| Drought | Drought | Although no individual resource program addresses this threat to the GUSG or GUSG Habitat, the threat has been considered as part of individual resource concerns and monitored trends. | |
| LOCALIZED - LESS SUBSTANTIAL THREAT | | | |

BLM_0027440

CHAPTER 2 - ALTERNATIVES

| FWS THREAT* | SCOPING ISSUE | APPLICABLE BLM RESOURCE PROGRAM FOR ADDRESSING THREAT | |
|---|---|---|---|
| Grazing Practices Inconsistent with Local Ecological Conditions | Livestock Grazing Vegetation Management | Program: | Range Management |
| | | Decisions: | Identify areas open and closed to grazing. Establish animal unit months (AUMs). Identify appropriate grazing management practices and suitability for range facilities/improvements. |
| | | Program: | Wildlife |
| | | Decisions: | Identify habitat management. |
| | | Program: | Special Status Species |
| | | Decision: | Identify habitat management. |
| Fences | Range Improvements | Program: | Range Management |
| | | Decision: | Identify appropriate grazing management practices and suitability for fences. |
| Invasive Species | Weeds | Program: | Vegetation Management, Range Management, Wildland Fire Management, and Recreation |
| | | Decisions: | Control, suppress, or eradicate weeds. Identify BMPs for allowable uses. Actively manage or treat weeds. |
| Fire | Fire Management Vegetation Management | Program: | Wildfire Management |
| | | Decisions: | Consider changes to fire management strategies. Identify areas suitable/unsuitable for managing wildfire to meet resource objectives. Identify priority areas for suppression. |
| Mineral Development | Energy and Mineral Development | Program: | Fluid Minerals |
| | | Decisions: | Identify areas open and closed to fluid mineral leasing. Identify NSO, CSU, and TL stipulations for open areas. |
| | | Program: | Lands and Realty |
| | | Decisions: | Identify stipulations for ROW grants and utility corridors. Identify ROW avoidance or exclusion areas. |
| | | Program: | Locatable Minerals |
| | | Decisions: | Identify areas to petition for withdrawal from mineral development. Establish terms, conditions, or special considerations. |
| | | Program: | Salable Mineral Materials |
| | | Decisions: | Identify areas open and closed to mineral materials disposal. Establish terms, conditions, or special considerations. |
| | | Program: | Non-energy Leasable Minerals |
| | | Decisions: | Identify areas open and closed to non-energy leasable minerals. Establish terms, conditions, or special considerations. |
| Conifer Invasion (including pinyon and juniper) | Vegetation Management | Program: | Vegetation |
| | | Decisions: | Identify habitat management. |
| | | Program: | Wildfire Management |
| | | Decisions: | Consider changes to fire management strategies. Identify areas suitable/unsuitable for managing wildfire to meet resource objectives. Identify priority areas for suppression. |

| FWS THREAT* | SCOPING ISSUE | APPLICABLE BLM RESOURCE PROGRAM FOR ADDRESSING THREAT | |
|---|---|---|---|
| Large-Scale Water Development | No similar issue identified. | Program: | Lands and Realty |
| | | Decision: | Identify stipulations for development. |
| Predation | Predation | Program: | Lands and Realty, Minerals, Recreation, Range Management |
| | | Decision: | Establish design features and BMPs. |
| Recreation | Recreation and Travel Management | Program: | Recreation |
| | | Decision: | Establish design features and BMPs to apply to SRPs. |
| | | Program: | Travel and Transportation Management |
| | | Decision: | Identify areas open, limited, or closed to travel and modes of access and travel. |
| No similar threat identified. | Special Management Areas | Program: | Special Designations |
| | | Decisions: | Identify special management areas. |
| No similar threat identified. | Social, Economic, and Environmental Justice | Although no individual resource program addresses this threat to the GUSG or GUSG Habitat, the threat has been considered as part of individual resource concerns and monitored trends. | |

*As identified in the FWS final listing decision (FR Vol. 79, No. 224)

## ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL

### Alternative Focused on Management Actions for Occupied Habitat

As part of internal scoping, a recommendation was made for an alternative focused solely on Occupied Habitat. As the majority of acres included under the umbrella of "Unoccupied Habitat" includes lands designated as critical habitat by the FWS, this alternative would not meet the purpose and need of this effort or meet BLM's responsibilities under Section 7(a)(2) of the Endangered Species Act, and therefore, was not carried forward for analysis. Specifically, nearly one third of GUSG critical habitat on BLM surface lands is classified as Unoccupied Habitat. Although currently not in use by GUSG, the lands are designated as critical habitat and considered to be essential for conservation of the species.

### Alternative Emphasizing Full Resource Development

This alternative would not meet the purpose and need of this effort to address threats to the species or meet BLM responsibilities under Section 7(a)(2) of the Endangered Species Act, as the majority of acreage in the planning area includes land designated as critical habitat by the FWS. The No Action Alternative represents the fullest development scenario within the range of alternatives analyzed. As stated in the Purpose and Need, the "Endangered Species Act requires agencies to ensure that their actions are not likely to jeopardize the continued existence of a listed species or result in the adverse modification or destruction of critical habitat for a

BLM_0027442

listed species." Full development of resources and infrastructure on lands designated as critical habitat would likely result in habitat degradation and fragmentation, which would hinder conservation of the GUSG. Therefore, this alternative was not carried forward for analysis.

## Alternative Closing Areas to Entry or Activities to Protect Populations

A recommendation was made to provide increased protection of Gunnison sage-grouse, particularly the satellite populations. Among the protections would be to provide the ability of BLM to exclude or prohibit all human entry or activities that may conflict with the conservation of Gunnison sage-grouse. Such an alternative would be counter to 43 CFR 2310.3-4, which states that "All orders withdrawing 5,000 or more acres shall be subject to the Congressional Review Provision of section 204(c) of the Act (43 U.S.C. 1714(c)." Moreover, the potential to implement such withdrawals would not be considered to be within a reasonable range of alternatives. Alternative B, other protections considered in this document, and the adaptive management provisions will help protect the species. Therefore, this suggested alternative was not carried forward for analysis.

## AREA OF CRITICAL ENVIRONMENTAL CONCERN PROPOSALS

Areas of Critical Environmental Concern (ACECs) differ from other special designations, such as Wilderness Study Areas, in that designation by itself does not automatically prohibit or restrict other uses in the area.

Multiple public proposals recommending designation of new ACECs were submitted to the BLM during the public scoping period, including the following:

- Establish a system of conservation areas to anchor restoration efforts by conserving the highest quality habitats:
  - o Areas of high ecological value for GUSG and other sagebrush dependent species
  - o Designate sagebrush reserves that encompass centers of GUSG abundance large enough to achieve the goals of biological representation and ecological redundancy and resiliency.
- Consider all GUSG Habitat on BLM lands, including both Occupied Habitat and critical habitat as delineated by the FWS, for ACEC designation in at least one alternative.
- Consider designation of all proposed critical habitat on public lands in a conservation alternative.
- Consider the following specific areas for designation as ACECs:

BLM_0027443

- o All habitat on BLM land currently occupied by populations of GUSG outside of the Gunnison Basin, with a buffer large enough to ensure that activities authorized adjacent to the ACEC will not result in functional loss or fragmentation of currently Occupied Habitat
  - o Priority habitat on BLM lands in the Gunnison Basin, as identified by the CCA, with improvements
  - o Areas outside of priority habitat in the Gunnison Basin with high potential for restoration and re-establishment of populations
  - o Any ACECs or special management designations in GUSG Habitat that have been included in current public or internal draft BLM RMPs (e.g. Tres Rios, Uncompahgre, etc.)
- Designate all GUSG Habitat on federal lands.
- Designate priority habitat.
- Designate large blocks of core habitat.
- Manage potential critical habitat as ACECs for vegetation composition and structure consistent with ecological site potential and within the reference state to achieve GUSG seasonal habitat objectives.

In consideration of these public proposals, the BLM proposes to designate all Occupied and Unoccupied habitat as an ACEC under Alternative B.  Occupied Habitat and Unoccupied Habitat were separately evaluated by a team of BLM biologists and determined to meet the relevance and importance criteria.  See Appendix G, Areas of Critical Environmental Concern, Relevance and Importance Rationale, for details of the analysis."

BLM_0027444

## 2.2. ALTERNATIVES

### 2.2.1. SUMMARY OF ALTERNATIVES

This section summarizes and compares the four alternatives (A through D) considered in the EIS. To reduce the length and avoid confusion, only select meaningful differences among alternatives (with the most potential to affect resources) are summarized in this section. Combined with the appendices and Table 2.4 - Applicable BLM Resource Programs and Management Decisions for Addressing Scoping Issues and FWS-identified Threats, Table 2.6 - Alternative A: No Action, and Table 2.7 - Draft Action Alternatives B and C and Sub-Alternatives $D_1/D_2$ highlight meaningful differences among the alternatives regarding what they establish and where they occur.

Table 2.5 summarizes the acreage that would be allocated or restricted for each resource or resource use, based on the management actions for each of the alternatives. Please note that there is overlap between acreages of resources and resource uses as currently managed (under No Action Alternative A) and as potentially managed (under the action alternatives B and C and sub-alternatives $D_1/D_2$).

Decisions made through this RMP Amendment are anticipated to be subsequently implemented. Restrictions on resource uses (such as closures to leasing) made through this amendment apply for the life of an RMP unless otherwise amended or revised.

BLM_0027445

CHAPTER 2 - ALTERNATIVES

**Table 2.5 - Summary of Impacted Acres by Resource Use for Each Alternative**

| RESOURCE USE | NO ACTION ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | SUB-ALTERNATIVE D₁ | SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| COMPREHENSIVE TRAVEL & TRANSPORTATION MANAGEMENT | | | | | |
| Open to Cross-Country Motorized Travel | 56,072 | 0 | 0 | 2 | 0 |
| Closed to Motorized Travel | 34,550 | 623,346 | 34,550 | 4,541 | 30,009 |
| LANDS & REALTY | | | | | |
| ROW Exclusion Areas - Occupied Habitat | 3,786 | 395,463 | 3,786 | 3,277 | BLM lands within 0.6 mile of a lek |
| ROW Avoidance Areas - Occupied Habitat | 24,425 | 0 | 391,677 | 298,747 | BLM lands outside 0.6 mile of a lek |
| ROW Exclusion Areas - Unoccupied Habitat | 10,843 | 227,883 | 10,843 | 4,614 | 6,229 |
| ROW Avoidance Areas - Unoccupied Habitat | 89,141 | 0 | 217,000 | 59,358 | 157,681 |
| Recommended for Withdrawal from Federal Mineral Development | N/A | 855,766 | TBD | TBD | TBD |
| FLUID MINERAL LEASING (also applies to Geothermal Leasing) | | | | | |
| Closed to Fluid Mineral Leasing | 206,950 | 851,752 | 126,133 | 9,148 | 197,802 |
| Open to Leasing Subject to NSO | 370,466 | N/A | 498,584 | 381,330 | 276,926 |
| LOCATABLE MINERALS, MINERAL MATERIALS, & NON-ENERGY SOLID LEASABLE MINERALS | | | | | |
| Closed to Mineral Material Sales | 65,946 | 611,710 - plus 169 riparian miles in Unoccupied Habitat | 65,946 | 8,446 | 57,500 |
| Closed to Non-Energy Mineral Leasing | 206,950 | 851,752 | 126,133 | 9,148 | 197,802 |
| LIVESTOCK GRAZING | | | | | |
| Not Permitted for Livestock Grazing | 46,147 | 623,346 | 46,147 | 26,375 | 19,772 |

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

BLM_0027446

## ALTERNATIVE A - NO ACTION

The No Action Alternative A would continue current management direction and prevailing conditions derived from the existing planning documents of each field office.  Goals and objectives for resources and resource uses are based on the most recent RMP decisions, along with associated amendments, activity and implementation level plans, and other management decision documents.  Laws, regulations, and BLM policies that supersede RMP decisions would apply.

Goals and objectives for BLM-administered lands and mineral estate would not change.  Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, construction of utility corridors, and livestock grazing would also remain the same.  The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

## ALTERNATIVE B

Alternative B would manage lands in the decision area predominately for GUSG and its habitat.  GUSG conservation measures and threats outlined in the FWS listing decision published in the *Federal Register* in November 2014 and conservation measures identified in the RCP (2005) were used to formulate BLM management direction under Alternative B.  Management actions implemented by the BLM, in concert with local, state and other federal agencies and private landowners, play a critical role in the future trends of GUSG populations.  Alternative B would achieve the purpose of and need for the RMP Amendment by avoiding negative impacts from resource uses and other actions in Occupied Habitat and Unoccupied Habitat and enhancing recovery opportunities.

## ALTERNATIVE C

Alternative C would achieve the purpose of and need for the RMP Amendment by minimizing or compensating for impacts from resource uses and other actions to varying degrees in Occupied Habitat and Unoccupied Habitat.  Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or mitigated through compensatory mitigation.  Impacts that occur would be rectified by repairing, rehabilitating, or restoring the affected environment and/or by reducing or eliminating the impact over time through preservation and maintenance operations during the life of the action.  Residual impacts are impacts to the resource that remain after avoidance and minimization measures have been implemented.  Residual impacts would be

BLM_0027447

compensated for by replacing or providing substitute resources or environments, as identified in the GUSG Mitigation Plan.

## ALTERNATIVE D - AGENCY PREFERRED

Alternative D (consisting of sub-alternatives $D_1$ and $D_2$) is the agency-preferred alternative and seeks to allocate resources among land uses and conserve natural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. Public scoping efforts and language included in the FWS decision to list the species as threatened under the ESA enabled the BLM to identify and shape significant issues pertaining to GUSG Habitat, energy development, livestock grazing, public land access, and other program areas to provide a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Conservation measures under Alternative D are focused on both Occupied and Unoccupied Habitat.

As Alternative D was being developed, it became apparent that, while some management actions should be consistent rangewide, there were more that should be specific to either the Gunnison Basin Population or the satellite (non-Gunnison Basin) populations, due to distinct differences in bird numbers, amount of contiguous habitat (BLM and non-BLM), extent, scale, and intensity of threats, and other considerations among and between the populations. The Gunnison Basin Population is the only population large enough to have a very high probability of surviving random demographic stochastic events over a 50-year timeframe (RCP, pg. 202) and has been relatively stable based on the last 19 years of lek counts (as discussed in the FWS 2014 listing decision). It is also the only population large enough in and of itself to maintain a reasonably large degree of genetic variation over time (RCP, p. 202). Additionally, the Gunnison Basin is not currently undergoing significant pinyon-juniper encroachment (Boyle and Reeder 2005).

Declining trends in the abundance of GUSG outside of the Gunnison Basin indicate that currently Occupied Habitat for the satellite populations may be less than the minimum amount of habitat necessary for their long-term viability (FWS 2014 listing decision) and has some degree of documented pinyon-juniper encroachment. Limits on available habitat in the satellite populations suggest local extinctions may occur without intervention. The satellite populations are likely small enough to induce inbreeding depression, and could be losing adaptive potential (FWS 2014 listing decision). For this reason, the preferred alternative was divided into two sub-alternatives labeled $D_1$ and $D_2$.

BLM_0027448

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ is the agency-preferred alternative for the Gunnison Basin Population of GUSG. The Gunnison Basin Population contains the largest numbers of birds and habitat across the range of the species. The extent, scale, and nature of the threats to this population are generally different than those affecting the satellite populations. While critical to the long-term success and recovery of the species, the management actions necessary for this population are different from those necessary for the satellite populations. Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or through compensatory mitigation.

## SUB-ALTERNATIVE D₂ - SATELLITE POPULATIONS PREFERRED

Sub-Alternative $D_2$ is the BLM preferred alternative for the satellite (non-Gunnison Basin) populations of GUSG. The low numbers of birds, and range of habitat threats separate from those present in the Gunnison Basin, were identified as critical factors in the FWS decision to list the GUSG as threatened under the ESA. As a result, these population areas are key to species recovery and require different combinations of protection than needed within the Gunnison Basin. Sub-alternative $D_2$ would achieve the purpose of and need for the RMP Amendment by balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the population, including plant and wildlife habitat.

## MANAGEMENT COMMON TO ALL ALTERNATIVES

Allowable uses and management actions from existing RMPs that remain valid and do not require revision have been carried forward to all of the proposed alternatives. Other decisions are common only to the action alternatives (B, C, and $D_1/D_2$).

Although each alternative emphasizes a slightly different mix of resources and resource uses, all alternatives contain the following:

- Conserve, enhance and restore the sagebrush ecosystem upon which GUSG populations depend in cooperation with other conservation partners.
- Comply with state and federal laws, regulations, policies, and standards, including FLPMA multiple use mandates.
- Implement actions originating from laws, regulations, and policies and conform to day-to-day management, monitoring, and administrative functions not specifically addressed.

BLM_0027449

- Preserve valid existing rights, which include any leases, claims, or other use authorizations established before a new or modified authorization, change in land designation, or new or modified regulation is approved.  Existing fluid mineral leases are managed through the stipulations attached to the existing lease and, where supported by site specific analysis, conditions of approval (COAs) to an approved permit.
- Collaborate with adjacent landowners, federal and state agencies, local governments, tribes, communities, other agencies, and other individuals and organizations, as needed to monitor and implement decisions to achieve desired resource conditions.
- Provide protection for human safety and property from wildfire.

## AGENCY-PREFERRED ALTERNATIVE

The proposed alternatives offer a range of discrete strategies for resolving potential deficiencies in existing management, exploring opportunities for enhanced management, and addressing issues identified through internal assessment and public scoping related to maintaining or increasing GUSG abundance and distribution on BLM-administered lands.

Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration.  Public scoping efforts enabled the BLM to identify and shape significant issues pertaining to GUSG Habitat, energy development, livestock grazing, potential ACECs, public land access, recreation, rights of way, and other program areas.  Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternative development process, as well as the EIS process in general.

The BLM NEPA handbook (H-1790-1) and BLM Planning handbook (H-1610-4.7) require the BLM to identify a preferred alternative in the Draft RMP Amendment/EIS.  Formulated by the planning team, the preferred alternative represents those goals, objectives, and actions determined to be most effective at resolving planning issues and balancing resource use at this stage of the process.  While collaboration is critical in developing and evaluating alternatives, the final designation of a preferred alternative remains the exclusive responsibility of the BLM.

Alternative D (consisting of sub-alternatives $D_1$ and $D_2$) represents the BLM preferred alternative.

BLM_0027450

## 2.2.2.  TABLES OF ALTERNATIVES

### HOW TO READ TABLES 2.6 AND 2.7

Table 2.6 details the No Action Alternative A.  Management actions outlined in Alternative A were extracted from planning documents currently in use by the BLM administrative units across the planning area (including RMPs, travel management plans (TMP), and programmatic EISs), and reflect current management direction.

Table 2.7 details the action alternatives B and C and sub-alternatives $D_1$ (Gunnison Basin Preferred) and $D_2$ (Satellite Populations Preferred).

When multiple alternatives include the same management action for a resource or resource use, the action is described in the first column, followed by a notation in the subsequent column(s) (i.e., "Same as Alternative B.").

Both alternatives tables are arranged in the same order by resource or resource use, followed by applicable RMP Amendment goals, objectives, and management actions.

BLM_0027451

CHAPTER 2 - ALTERNATIVES

## TABLE 2.6 - NO ACTION ALTERNATIVE A

**Table 2.6 - Alternative A: No Action**

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| **TRAVEL AND TRANSPORTATION** | | |
| **Travel Management Planning** | | |
| 1 | Travel | **GRAND JUNCTION RMP 2015**<br>SSS-SGR-MA-03:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>SSS-SGR-MA-06:  To reduce disturbance to Gunnison or Greater Sage-grouse, close duplicative or redundant routes within Sage-grouse habitat and/within 4 miles of a lek.<br><br>**MCINNIS CANYONS NCA 2004**<br>Special emphasis will be given to proper placement of roads and trails, along with rehabilitation and stabilization of existing roads and trails.<br><br>**MOAB FO RMP 2008**<br>Travel Management Decision 3 (TRV-3):  Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis (p. 126).<br>Travel Management Decision 10 (TRV-10):  OHV Designations:<br>• About 339,298 acres will be closed to OHV travel.<br>• About 1,481,334 acres will be limited to designated routes.<br>• Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30) (p. 127)<br>Travel Management Decision 10 (TRV-10):  Designated Routes – Motorized:<br>• Designate 3,693 miles of motorized routes.<br>• Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track).<br>• Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9.0 miles of single-track designated above and 22.0 miles of inventoried Grand County roads (p. 127). |

BLM_0027452

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MONTICELLO FO RMP 2008**<br>TM-2:  Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories.  Adjustments of these categories will be made based on recreational demand and potential conflict.  All non-motorized travel is allowed on designated routes unless otherwise prohibited (page 141).<br>TM-6:  Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network (page 141).<br><br>**TRES RIOS FO RMP 2015**<br>No cross country motorized travel allowed in sage grouse habitat (limited to existing, in process to limited to designated). |
| 2 | Travel | **GRAND JUNCTION RMP 2015**<br>SSS-SGR-MA-03:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>SSS-SGR-MA-06:  To reduce disturbance to Gunnison or Greater Sage-grouse, close duplicative or redundant routes within Sage-grouse habitat and/within 4 miles of a lek.<br><br>**MCINNIS CANYONS NCA 2004**<br>Special emphasis will be given to proper placement of roads and trails, along with rehabilitation and stabilization of existing roads and trails.<br><br>**MOAB FO RMP 2008**<br>Travel Management Decision 3 (TRV-3):  Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis (p. 126).<br>Travel Management Decision 10 (TRV-10):  OHV Designations:<br>• About 339,298 acres will be closed to OHV travel.<br>• About 1,481,334 acres will be limited to designated routes.<br>• Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30) (p. 127)<br>• Travel Management Decision 10 (TRV-10):  Designated Routes – Motorized:<br>• Designate 3,693 miles of motorized routes. |

BLM_0027453

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track). <br> • Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9.0 miles of single-track designated above and 22.0 miles of inventoried Grand County roads (p. 127). <br><br> **MONTICELLO FO RMP 2008** <br> TM-2:  Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories.  Adjustments of these categories will be made based on recreational demand and potential conflict.  All non-motorized travel is allowed on designated routes unless otherwise prohibited (page 141). <br> TM-6:  Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network (page 141). <br><br> **TRES RIOS FO RMP 2015** <br> No cross country motorized travel allowed in sage grouse habitat (limited to existing, in process to limited to designated). |
| 3 | Travel | **GRAND JUNCTION RMP 2015** <br> SSS-SGR-MA-03:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks. <br> SSS-SGR-MA-06:  To reduce disturbance to Gunnison or Greater Sage-grouse, close duplicative or redundant routes within Sage-grouse habitat and/within 4 miles of a lek. <br><br> **MCINNIS CANYONS NCA 2004** <br> Special emphasis will be given to proper placement of roads and trails, along with rehabilitation and stabilization of existing roads and trails. <br><br> **MOAB FO RMP 2008** <br> Travel Management Decision 3 (TRV-3):  Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis (p. 126). <br> Travel Management Decision 10 (TRV-10):  OHV Designations: <br> • About 339,298 acres will be closed to OHV travel. <br> • About 1,481,334 acres will be limited to designated routes. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30) (p. 127) Travel Management Decision 10 (TRV-10):  Designated Routes – Motorized: <br> • Designate 3,693 miles of motorized routes. <br> • Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track). <br> • Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9.0 miles of single-track designated above and 22.0 miles of inventoried Grand County roads (p. 127). <br><br> **MONTICELLO FO RMP 2008** <br> TM-2:  Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories.  Adjustments of these categories will be made based on recreational demand and potential conflict.  All non-motorized travel is allowed on designated routes unless otherwise prohibited (page 141). <br> TM-6:  Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network (page 141). <br><br> **TRES RIOS FO RMP 2015** <br> No cross country motorized travel allowed in sage grouse habitat (limited to existing, in process to limited to designated). |
| 4 | Travel | **CANYONS OF THE ANCIENTS NM RMP 2010** <br> Prohibit cross-country motorized and mechanized (such as mountain bike) travel.  Limit motorized and mechanized vehicle use to designated routes. <br><br> **GRAND JUNCTION FO RMP 2015** <br> Manage 126,400 acres as closed to mechanized travel: <br> • WSAs <br> • ACECs: Atwell Gulch, Juanita Arch, Mt. Garfield, Pyramid Rock, A portion of Rough Canyon (600 acres), and Unaweep Seep <br> • Wildlife Emphasis Areas:  Timber Ridge (deer/elk/sagegrouse), A portion of Rapid Creek (1,700 acres), and Bangs (RMZ 3 and 4). <br> • Lands managed for wilderness characteristics:  Bangs, A portion of Maverick (1,600 acres), and Unaweep. <br><br> **GUNNISON RMP 1993** |

BLM_0027455

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Gunnison Field Office Existing Conditions:  222 Miles of Road 0.6 Mile from Leks; 539 Miles of Road 2 Miles from Leks 719 Miles of Road 4.0 Miles from Leks

**GUNNISON GORGE NCA RMP 2004**
REC-C-3:  The OHV designations in the planning area will include 2,579 acres in the open category, where cross-country, off-route motorized and non-motorized, mechanical vehicular travel will be permitted; 51,727 acres of lands where motorized and non-motorized mechanized use will be limited to designated routes year round; 22,200 acres of public lands where motorized and non-motorized mechanized travel will generally be limited to designated routes from May 1 to November 14 annually, and for the remainder of the year, these lands will be closed to these uses; and 19,274 acres of public lands closed to motorized and mechanized use yearlong, including the Gunnison Gorge Wilderness.

**MOAB FO RMP 2008**
Travel Management Decision 4 (TRV-4):  Limit travel by motorized vehicle on all lands administered by the Moab Field Office to designated routes, except for Managed Open Areas, and for areas that are closed to motorized travel (see Map 30; see Appendix N for Travel Plan development) (p. 126)
Motorized travel is limited to designated routes within Occupied Habitat.  There are no Managed Open Areas within GUSG Occupied Habitat, not areas closed to motorized travel.

**MONTICELLO FO RMP 2008**
MCA-2:  OHV use is either limited to designated routes or closed to cross-country travel.  All ACECs will have travel limited to designated routes unless otherwise noted. (p. 55).  There are no exceptions that allow for cross-country travel for game retrieval or antler gathering in areas designated as limited or closed.  OHV use for game retrieval will adhere to all OHV classifications.

**SAN JUAN/SAN MIGUEL RMP 1985**
Provide administrative access to public land to enhance management of the range resource.  Provide maintenance of roads in the BLM transportation plan to minimum standards for user safety.

**SAN LUIS VALLEY TMP 2009/2014**
Evaluate and manage snowmobile trails/use areas.
Eliminate 'OSV open play area' on east side of U.S. Highway 285 from Saguache County Road LL57 (Hayden Pass Rd.), north to Raspberry Creek for the protection of the GUSG.  Proposed by GUSG Working Group.  Not yet officially part of the SLVFO TMP (SLVFO TMP, as amended - 2014 (NOT FINAL)). |

BLM_0027456

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 5 | Travel | **MOAB FO RMP 2008**<br>SSS-3: As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (pg. 117).<br><br>**MONTICELLO FO RMP 2008**<br>• Prohibit construction of roads year-round.<br>• Prohibit construction of wind power turbines year-round.<br>• Avoid all permitted activities from March 20 to May 15. If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning. Prohibit construction of roads year-round.<br>SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (pg. 137).<br><br>**SAN LUIS RMP 1991**<br>Limited OHV designations in riparian zones. |
| 6 | Travel | **MOAB FO RMP 2008**<br>Travel Management Decision 3 (TRV-3): Specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis. These identified routes will be available regardless of other management actions. These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level. These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes. Site-specific NEPA documentation will be required for changes to the route designation system. (p. 126)<br><br>**MONTICELLO FO RMP 2008**<br>Year-round habitat (within 4.0 miles of active strutting ground):<br>Avoid the construction of power lines, wind power turbines, or other aboveground structures |
| 7 | Travel | No similar action. |
| 8 | Travel | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Prohibit the construction of new routes in existing, un-fragmented sagebrush shrublands 60 acres or larger. Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met: |

BLM_0027457

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere.<br>• New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation. Reroutes would be placed to avoid encompassing more than half of the perimeter of the patch. Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks. Prioritize the largest patches in sage-grouse critical habitat. Minimize travel routes in and crossing riparian and wetland areas.<br>When routes are contributing to continued decline, do one or more of the following:<br>• Close and rehabilitate<br>• Relocate the routes<br>• Re-engineer these routes. Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.). Locate new routes outside of riparian and wetland areas. Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or protect crossings at necessary crossing locations.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation. Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas.<br><br>**GUNNISON BASIN TMP 2010**<br>Possible New Routes, It is my decision that before a new route can be approved to be built (ground disturbance), further environmental analysis and public involvement, pursuant to NEPA must be completed prior to a decision to authorize the action. The analysis would also address compliance with other laws and regulations relating to endangered species and cultural resources. Future possible routes not listed in the FEIS may be considered for addition to the BLM Travel Management System if these routes are consistent with criteria identified in the FEIS.<br><br>**MOAB FO RMP 2008**<br>SSS -24: All surface-disturbing activities will be prohibited within 0.6 mile of a lek. Implement GUSG RCP (2005) pp. 122: Minimize negative impacts of roads.<br>SSS- 12: As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats. (p. 119). |

BLM_0027458

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Travel Management decision 3 (TRV-3): See also specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis. These identified routes will be available regardless of other management actions. These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level. These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes. Site-specific NEPA documentation will be required for changes to the route designation system (p. 126).<br><br>**MONTICELLO FO RMP 2008**<br>SSP-23: Lek habitat (within 0.6 mile of active strutting ground):<br>Prohibit construction of roads year-round (p. 139).<br>SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (pg. 136).<br><br>**SAN LUIS VALLEY TMP 2009**<br>Reduce route density. |
| 9 | Travel | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Prohibit the construction of new routes in existing, un-fragmented sagebrush shrublands 60 acres or larger. Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met:<br>• Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere.<br>• New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation. Reroutes would be placed to avoid encompassing more than half of the perimeter of the patch. Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks. Prioritize the largest patches in sage-grouse critical habitat. Minimize travel routes in and crossing riparian and wetland areas.<br>When routes are contributing to continued decline, do one or more of the following:<br>• Close and rehabilitate<br>• Relocate the routes<br>• Re-engineer these routes. Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.). Locate new routes outside of riparian and wetland areas. Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or |

BLM_0027459

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | protect crossings at necessary crossing locations. |
| | | **GRAND JUNCTION FO RMP 2015** Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation. Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas. |
| | | **GUNNISON BASIN TMP 2010** Possible New Routes, It is my decision that before a new route can be approved to be built (ground disturbance), further environmental analysis and public involvement, pursuant to NEPA must be completed prior to a decision to authorize the action. The analysis would also address compliance with other laws and regulations relating to endangered species and cultural resources. Future possible routes not listed in the FEIS may be considered for addition to the BLM Travel Management System if these routes are consistent with criteria identified in the FEIS. |
| | | **MOAB FO RMP 2008** SSS-24: All surface-disturbing activities will be prohibited within 0.6 mile of a lek. Implement GUSG RCP (2005) pp. 122: Minimize negative impacts of roads. SSS-12: As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats (p. 119). Travel Management decision 3 (TRV-3): See also specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis. These identified routes will be available regardless of other management actions. These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level. These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes. Site-specific NEPA documentation will be required for changes to the route designation system (p. 126). |
| | | **MONTICELLO FO RMP 2008** SSP-23: Lek habitat (within 0.6 mile of active strutting ground): Prohibit construction of roads year-round (p. 139). SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act. (p. 136) |
| | | **SAN LUIS VALLEY TMP 2009** |

BLM_0027460

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
|  |  | Reduce route density. |
| 10 | Travel | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Prohibit the construction of new routes in existing, un-fragmented sagebrush shrublands 60 acres or larger.  Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met:<br>• Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere.<br>• New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation.  Reroutes would be placed to avoid encompassing more than half of the perimeter of the patch. Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks.  Prioritize the largest patches in sage-grouse critical habitat.  Minimize travel routes in and crossing riparian and wetland areas.<br>When routes are contributing to continued decline, do one or more of the following:<br>• Close and rehabilitate<br>• Relocate the routes<br>• Re-engineer these routes.  Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.).  Locate new routes outside of riparian and wetland areas.  Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or protect crossings at necessary crossing locations.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation.  Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas.<br><br>**GUNNISON BASIN TMP 2010**<br>Possible New Routes, It is my decision that before a new route can be approved to be built (ground disturbance), further environmental analysis and public involvement, pursuant to NEPA must be completed prior to a decision to authorize the action.  The analysis would also address compliance with other laws and regulations relating to endangered species and cultural resources.  Future possible routes not listed in the FEIS may be considered for addition to the BLM Travel Management System if these routes are consistent with criteria identified in the FEIS.<br><br>**MOAB FO RMP 2008** |

BLM_0027461

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | SSS -24:  All surface-disturbing activities will be prohibited within 0.6 mile of a lek.  Implement GUSG RCP (2005) p. 122: Minimize negative impacts of roads. Travel Management decision 3 (TRV-3):  See also specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis.  These identified routes will be available regardless of other management actions.  These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level.  These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes.  Site-specific NEPA documentation will be required for changes to the route designation system (p. 126). |
| 11 | Travel | No Similar Action. |
| 12 | Travel | **DOMINGUEZ-ESCALANTE DRAFT RMP 2013** TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks. TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek. <br><br>**GRAND JUNCTION FO** TRV-MA-62:  Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes, and trails on listed species and in designated critical habitat for threatened and endangered plants.  Identify mitigation where open routes are negatively effecting listed species and/or designated critical habitat, and ensure that Land Health Standard 4 is being achieved or progress is being made towards meeting this Standard. TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks. TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek. <br><br>**MOAB FO RMP 2008** SSS-24:  Implement RCP 2005 pp. 226 -228:  Minimize negative impacts of roads. (Travel Management Decision 9 (TRV-9):  Any routes that are not baseline routes will be signed "Closed" on the ground.  Such routes will be considered as impacts to the area's natural character, and use of such routes will be considered cross country use and not allowed.  Non-inventoried routes should be rehabilitated (p. 127). |

BLM_0027462

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
|  |  | TRV-8:  Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified as to these closures and restrictions (p. 127). |
|  |  | **MONTICELLO FO RMP 2008**<br>TM-8:  Where the authorized officer determines that OHVs are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified.  The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes.<br>SSP-18:  Any nonessential routes developed for a project located in special status species habitat will be closed and rehabilitated when the project is complete. |
|  |  | **TRES RIOS FO RMP 2015**<br>ACTION:  Conduct restoration of roads, primitive roads, and trails not designated in travel management plans.  This also includes primitive route/roads that were not designated in wilderness study areas and within lands managed for wilderness characteristics that have been selected for protection. |
| 13 | Travel | **DOMINGUEZ-ESCALANTE DRAFT RMP 2013**<br>TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek.<br><br>**GRAND JUNCTION FO**<br>TRV-MA-62:  Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes, and trails on listed species and in designated critical habitat for threatened and endangered plants.  Identify mitigation where open routes are negatively effecting listed species and/or designated critical habitat, and ensure that Land Health Standard 4 is being achieved or progress is being made towards meeting this Standard.<br>TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek. |

BLM_0027463

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MOAB FO RMP 2008**<br>SSS-24:  Implement RCP 2005 pp. 226 -228:  Minimize negative impacts of roads.<br>(Travel Management Decision 9 (TRV-9):  Any routes that are not baseline routes will be signed "Closed" on the ground.  Such routes will be considered as impacts to the area's natural character, and use of such routes will be considered cross country use and not allowed.  Non-inventoried routes should be rehabilitated (p. 127).<br>TRV-8:  Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas. The public will be notified as to these closures and restrictions (p. 127).<br><br>**MONTICELLO FO RMP 2008**<br>TM-8:  Where the authorized officer determines that OHVs are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified.  The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes.<br>SSP-18:  Any nonessential routes developed for a project located in special status species habitat will be closed and rehabilitated when the project is complete.<br><br>**TRES RIOS FO RMP 2015**<br>ACTION:  Conduct restoration of roads, primitive roads, and trails not designated in travel management plans.  This also includes primitive route/roads that were not designated in wilderness study areas and within lands managed for wilderness characteristics that have been selected for protection. |
| 14 | Travel | **GUNNISON GORGE NCA RMP 2004**<br>ACTION:  From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks.  The routes shown are preliminary and may not be all inclusive.<br>ACTION:  Roads managed by BLM will be closed seasonally or otherwise under the appropriate regulations or laws for protection of resources, for prevention of vandalism or trespass, or for other reasons that warrant such restrictions in order to better manage resources or values on public lands.  These options will be implemented as a result of findings during monitoring of resources and programs as part of adaptive management.<br>ACTION:  The management unit will be closed to motorized and mechanical vehicular use and travel from |

BLM_0027464

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | November 15 through April 30 annually to prevent disturbance to wintering big game or breeding/strutting sage-grouse.  Closure could be extended an additional 30 days if warranted by circumstances.<br>ACTION:  Motorized and mechanical vehicle travel on public lands in this management unit will be limited to the designated routes as shown on Figure 2-4 from May 1 through November 14, unless necessary to extend closure another 30 days.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, public health and safety concerns, or road and trail damage as necessary.<br><br>**GUNNISON BASIN TMP 2010**<br>ACTION:  I have decided to apply seasonal closures to motorized travel, for sage-grouse habitat conservation, to specific areas of key sage-grouse habitat rather than simply closing specific routes.  This proposed area closure is expected to help protect sage-grouse breeding and early nesting habitat and encompasses about 191,000 acres around Gunnison.  This area would be closed to all motorized travel, except to access private in-holdings with proper authorization and some administrative access, from March 15 to May 15 each year.<br><br>**HARTMAN ROCKS RAMP 2014**<br>ACTION:  Roads and trails south of the power line road would be closed to motorized and mechanized vehicles from March 15 to May 15 each year for GUSG conservation.<br>ACTION:  The 2006 RAMP designated system roads and trails.  It also designated types of use on those trails.  It instituted seasonal closures to help with GUSG conservation.  Off route travel with motorized and mechanized vehicles is not allowed under this alternative.<br>ACTION:  No cross country travel.  Currently, the Public Lands managed by BLM within the planning area are open to over-snow winter travel.  The proposed action alternative would amend the RMP to limit over-snow travel by tracked vehicles (e.g. snowmobiles) to specific designated routes within the planning area.  Tracked vehicles would be allowed to travel over snow on system roads that are groomed for cross-country skiing.  Using tracked vehicles on ungroomed routes would not be allowed at Hartman Rocks Recreation Area.<br><br>**MOAB FO RMP 2008**<br>SSS -24:  Implement RCP 2005 p. 246:  Minimize negative impacts of recreational activities.<br>TRV-5:  BLM could impose limitation to types of vehicles if monitoring indicates a type of vehicle is causing disturbances to the soil, wildlife, wildlife habitat, cultural and vegetative resources...<br>TRV-8:  Where the authorized officer determines ORV are causing or will cause considerable adverse impacts, the |

BLM_0027465

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | AO shall close or restrict such areas. |
| | | **MONTICELLO FO RMP 2008**<br>TM-8:  Where the authorized Officer determines that OHVs are causing or will cause adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified.  The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes (p. 142). |
| | | **SAN LUIS VALLEY TMP 2013**<br>Apply seasonal road closures to all motorized routes from Poncha Pass (east side of U.S. Highway 285) to Saguache County Road LL57 (Hayden Pass), with the exception of the Glider Road (BLM Road 5342) from March 1st to May 15th for the protection of the GUSG. |
| 15 | Travel | **GUNNISON GORGE NCA RMP 2004**<br>ACTION:  From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks.  The routes shown are preliminary and may not be all inclusive.<br>ACTION:  Roads managed by BLM will be closed seasonally or otherwise under the appropriate regulations or laws for protection of resources, for prevention of vandalism or trespass, or for other reasons that warrant such restrictions in order to better manage resources or values on public lands.  These options will be implemented as a result of findings during monitoring of resources and programs as part of adaptive management.<br>ACTION:  The management unit will be closed to motorized and mechanical vehicular use and travel from November 15 through April 30 annually to prevent disturbance to wintering big game or breeding/strutting sage-grouse.  Closure could be extended an additional 30 days if warranted by circumstances.<br>ACTION:  Motorized and mechanical vehicle travel on public lands in this management unit will be limited to the designated routes as shown on Figure 2-4 from May 1 through November 14, unless necessary to extend closure another 30 days.<br>**GRAND JUNCTION FO RMP 2015**<br>Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, public health and safety concerns, or road and trail damage as necessary. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON BASIN TMP 2010**<br>ACTION:  I have decided to apply seasonal closures to motorized travel, for sage-grouse habitat conservation, to specific areas of key sage-grouse habitat rather than simply closing specific routes.  This proposed area closure is expected to help protect sage-grouse breeding and early nesting habitat and encompasses about 191,000 acres around Gunnison.  This area would be closed to all motorized travel, except to access private in-holdings with proper authorization and some administrative access, from March 15 to May 15 each year.<br><br>**HARTMAN ROCKS RAMP 2014**<br>ACTION:  Roads and trails south of the power line road would be closed to motorized and mechanized vehicles from March 15 to May 15 each year for GUSG conservation.<br>ACTION:  The 2006 RAMP designated system roads and trails.  It also designated types of use on those trails.  It instituted seasonal closures to help with GUSG conservation.  Off route travel with motorized and mechanized vehicles is not allowed under this alternative.<br><br>**MOAB FO RMP 2008**<br>SSS -24 - Implement RCP 2005 p. 246:  Minimize negative impacts of recreational activities.<br>TRV-5:  BLM could impose limitations on types of vehicle allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated roads (p. 126).<br><br>**SAN LUIS RMP 1991**<br>Seasonal road closures will be applied to the GUSG lek and nesting habitat area, and includes all motorized routes from Poncha Pass (east of U.S. Highway 285) to the Hayden Pass Road (Saguache County Road LL57), with the exception of the Glider Road (BLM Road 5342 accessed through CR-LL57), which is outside of GUSG Habitat.  Dates for seasonal road closures are from March 1st to May 15th. |
| 16 | Travel | **GUNNISON GORGE NCA RMP 2004**<br>ACTION:  From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks.  The routes shown are preliminary and may not be all inclusive.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, |

BLM_0027467

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | public health and safety concerns, or road and trail damage as necessary. **MOAB FO RMP 2008** SSS -24:  Implement 2005 GUSG RCP p. 246:  Minimize negative impacts of recreational activities. **MONTICELLO RMP 2008** SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). |
| **RECREATION** | | |
| 17 | Recreation | **MONTICELLO FO RMP 2008** REC-2:  Consider and, where appropriate, implement management methods to protect natural and cultural resources and while giving consideration to community and economic impacts, implement management methods to maintain or enhance recreation opportunities.  Management methods may include limitation of visitor numbers, camping and travel controls, implementation of fees, alteration of when use takes place, and other similar actions as they are approved through normal BLM procedures (p. 88). REC-141:  ERMA lands are managed to provide an undeveloped setting where visitors can disperse and recreate in a generally unregulated manner, as long as the use is consistent with other resource values (p. 111). REC-143:  Any portions of an ERMA subject to other management prescriptions (i.e., ACEC, WSA, etc.) will be managed according to those prescriptions (p. 111). REC-144:  Monitor the ERMA to determine if more intensive recreational management is required to protect resource values and preserve the recreational experience (p. 111). REC-145:  Encourage "Leave No Trace" and "Tread Lightly" principles throughout the ERMA (p. 111). REC-149:  Within the ERMA, dispersed vehicle camping is allowed only in previously disturbed areas within 150 feet of designated routes (on each side of a centerline).  If use is such that undue environmental impacts are taking place, BLM will close and rehabilitate damaged areas.  This use will not include areas within WSAs (389,444 acres) or non-WSA areas with wilderness characteristics (88,871 acres), WSR corridors, ACECs, or T&E/special status species habitats.  Where monitoring identifies resource impacts, future implementation level plans could consider designation of specific camp sites (p. 112). |
| 18 | Recreation | **CANYONS OF THE ANCIENTS NM RMP 2010** Mitigate (vegetation damage) by restoration and reclamation for disturbance on a project-level basis. |

BLM_0027468

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON GORGE NCA RMP 2004**<br>Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas.<br><br>**MOAB FO RMP 2008**<br>If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek.<br>Purpose:  To protect occupied lek sites within GUSG Habitat.<br>Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if:<br>(1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM.<br>Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. |
| 19 | Recreation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Mitigate (vegetation damage) by restoration and reclamation for disturbance on a project-level basis.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas.<br><br>**MOAB FO RMP 2008**<br>If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek.<br>Purpose:  To protect occupied lek sites within GUSG Habitat. |

BLM_0027469

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. Modification:  The Field Manager may modify the boundaries of the stipulation area if: (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM. Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. **TRES RIOS FO RMP 2015** Structures in sage grouse habitat should be constructed to limit risk of collision and predation. |
| **Special Recreation Permits (SRPs)** | | |
| 20 | Recreation | **GRAND JUNCTION FO RMP 2015** ACTION:  Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs would be applied where appropriate.  All new SRP proposals would be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits. ACTION:  All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns. **GUNNISON GORGE NCA RMP 2004** Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas. **MCINNIS CANYONS NCA RMP 2004** Special Recreation Permits are issued at the discretion of the Field Manager, who may at any time and without prior notice, choose not to issue permits for certain activities or use areas. Such decisions could be based on a variety of factors such as planning decisions, potential resource impacts, existing outfitters in the same area, overcrowding, |

BLM_0027470

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | past poor performance, and other concerns. All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I). Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met. **MOAB FO RMP 2008** REC-46:  Special Recreation Permits (SRPs):  SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs will be applied where appropriate (p. 97). REC-48:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 98). REC-50:  Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources.  Organized group permits required for groups with 25 or more vehicles (one driver/vehicle) (p. 98). SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (p. 117). **MONTICELLO FO RMP 2008** REC-17:  SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors (p. 91). REC-18:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K of RMP) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 91). SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). **TRES RIOS FO RMP 2015** Only allow special recreation permits that have neutral or beneficial effects to priority habitat areas. |
| 21 | Recreation | **GRAND JUNCTION FO RMP 2015** |

BLM_0027471

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | ACTION:  Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs would be applied where appropriate.  All new SRP proposals would be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits.<br>ACTION:  All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas.<br><br>**MCINNIS CANYONS NCA RMP 2004**<br>Special Recreation Permits are issued at the discretion of the Field Manager, who may at any time and without prior notice, choose not to issue permits for certain activities or use areas.  Such decisions could be based on a variety of factors such as planning decisions, potential resource impacts, existing outfitters in the same area, overcrowding, past poor performance, and other concerns.<br>All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I). Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met.<br><br>**MOAB FO RMP 2008**<br>REC-46:  Special Recreation Permits (SRPs):  SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs will be applied where appropriate (p. 97).<br>REC-48:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 98).<br>REC-50:  Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational |

BLM_0027472

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources. Organized group permits required for groups with 25 or more vehicles (one driver/vehicle) (p. 98). SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (p. 117). **MONTICELLO FO RMP 2008** REC-17:  SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors (p. 91). REC-18:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K of RMP) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 91). SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). **TRES RIOS FO RMP 2015** Only allow special recreation permits that have neutral or beneficial effects to priority habitat areas. |
| 22 | Recreation | **GRAND JUNCTION FO RMP 2015** ACTION:  Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs would be applied where appropriate.  All new SRP proposals would be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits. ACTION:  All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns. **GUNNISON GORGE NCA RMP 2004** Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow |

BLM_0027473

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | camping, firewood gathering, etc., only in designated areas in critical habitat areas.

**MCINNIS CANYONS NCA RMP 2004**
Special Recreation Permits are issued at the discretion of the Field Manager, who may at any time and without prior notice, choose not to issue permits for certain activities or use areas.  Such decisions could be based on a variety of factors such as planning decisions, potential resource impacts, existing outfitters in the same area, overcrowding, past poor performance, and other concerns.
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I).
Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met.

**MOAB FO RMP 2008**
REC-46:  Special Recreation Permits (SRPs):  SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs will be applied where appropriate (p. 97).
REC-48:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 98).
REC-50:  Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources.  Organized group permits required for groups with 25 or more vehicles (one driver/vehicle) (p. 98).
SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (p. 117).

**MONTICELLO FO RMP 2008**
REC-17:  SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors (p. 91).
REC-18:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K of RMP) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 91).
SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). **TRES RIOS FO RMP 2015** Only allow special recreation permits that have neutral or beneficial effects to priority habitat areas. |
| 23 | Recreation | No similar action. |
| **LANDS AND REALTY MANAGEMENT** | | |
| **Rights-of-Way (ROWs)** | | |
| 24 | Lands & Realty– Exclusion and Avoidance Areas | **CANYONS OF THE ANCIENTS NM RMP 2010** • Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land. • Allow land actions to occur only when they will result in minimal adverse impact(s), when they will be beneficial to cultural resource management, or when there is a clear and significant public need. • Limit ROWs for development of resources to a 16-foot running surface (road) width. **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2–14d), except to allow for: • Reasonable access and utilities to non-federal property and existing ROW facilities. • Upgrades or modifications to existing facilities • Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA. **GUNNISON RMP 1993** ROW Exclusion Areas: • MU 3 (Cochetopa Canyon SRMA): ROWs. Public land in the unit will be classified an exclusion area for above-ground utility ROWs. Underground utility ROWs and development will be limited to previously disturbed areas associated with existing roads. • MU 9 (Dillon Pinnacles ACEC): ROWs. Public lands in the unit will be classified an exclusion area for ROWs. • ROW Avoidance Areas: • MU 1 (Part of Alpine Triangle SRMA): ROWs. Public lands north of the south line of Sections 16 and 17, T.47N.R.3W. NMPM, approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other ROWs. |

BLM_0027475

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • MU 1 (Part of Alpine Triangle SRMA):  ROWs.  With the exception of public lands in the ROWs corridor, the entire unit will be closed to the development of above-ground utilities (91,510 acres). |

**GUNNISON GORGE NCA RMP 2004**
• MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG.
• MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet.  Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes.  Mitigation will be required in all applications to meet the objectives of this management unit.  Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives.

**GRAND JUNCTION FO RMP 2015**
Allowable Use (LR-AU1):  ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development):  Manage 210,000 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-27, Appendix A):
Within a 0.4-mile radius of Sage-Grouse leks
WSAs (allow for ROWs to existing leases without an NSO stipulation issued under the 1987 RMP)
Allowable Use (LR-AU2):  ROW Avoidance Areas:  Manage 779,400 acres as ROW avoidance areas (Figure 2-27, Appendix A) (see Appendix B):
Sage-Grouse:  Occupied Habitat
Sage-Grouse:  Within a 4.0-mile radius of leks
Streams/springs possessing lotic/lentic riparian characteristics
Wetlands, springs, seeps, and riparian areas...
Allowable Use (LR-AU9):  Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback.

BLM_0027476

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
|  |  | **MCINNIS CANYONS NCA RMP 2004**<br>All roads administered by the BLM will be maintained in their current condition, and no improvement will be permitted through ROW authorizations.  Any new roads that could be authorized will be constructed to minimal widths and standards similar to nearby existing "jeep roads."  Any such new roads could also be gated to prevent, or limit, public vehicle access.<br><br>**MOAB FO RMP 2008**<br>Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat.  There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:<br>• All surface-disturbing activities will be prohibited within 0.6 mile of GUSG leks on a year-round basis.  Within the 0.6 mile buffer, allow no permanent aboveground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.<br>• Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches.  Where fences are necessary, increase their visibility.  Modify or remove fences to minimize sage-grouse mortality.<br>• As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats.<br>• ROW avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>ROW Avoidance Areas:  riparian areas and springs.<br><br>**MONTICELLO FO RMP 2008**<br>ROW avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land.  Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas.  NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no |

BLM_0027477

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | feasible alternatives.<br>**SAN LUIS RMP 1991**<br>Protection measures (for riparian/wetland areas) will include, but are not limited to, 1) mitigation of impacts from ROWs and utility corridors adjacent to or that cross riparian areas.<br>San Luis Area #1; 1-16: Any impacts from ROWs adjacent to or that cross riparian areas will be mitigated.<br>Amended the San Luis RMP: Programmatic policies and BMPs in the Wind Energy Development Program will be adopted.<br>Policy: The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.<br>POD BMPs: Site Monitoring and Testing. Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present. Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.<br>**SOLAR PEIS 2012**<br>Solar Energy Program ROW Exclusion Areas:<br>1. All designated and proposed critical habitat areas for species protected under the ESA of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1<br>2. Sage-grouse core areas, nesting habitat, and winter habitat;<br>3. All ROW exclusion areas identified in applicable land use plans.<br>4. All ROW avoidance areas identified in applicable land use plans. (p. 38)<br>Grand Junction FO: All lands would be excluded.<br>Gunnison FO: Approximately 3,162 acres in variance areas.<br>Gunnison Gorge NCA: All lands would be excluded.<br>McInnis Canyons NCA: All lands would be excluded.<br>Moab FO: Approximately 587 acres in variance areas.<br>Monticello FO: Approximately 4,120 acres in variance areas.<br>San Juan/San Miguel: Approximately 12,105 acres in variance areas.<br>San Luis Valley FO: Approximately 50,384 acres in variance areas. Four Solar Energy Zones designated (total of 16,308 acres) [none of which are within or adjacent to GUSG Occupied Habitat].<br>Uncompahgre Basin: All lands would be excluded. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 25 | Lands & Realty-Road ROWs | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Make every reasonable effort to provide primary access to private landowners when such access will not result in significant adverse impacts to other resources.<br>Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Allow for reasonable access to non-Federal property with the following limitations:<br>• All ROWs on existing roads administered by the BLM will be maintained in their current condition unless an upgrade in condition would better protect natural and cultural resources<br>• Any new roads would be authorized and constructed in a way that minimizes impacts to natural and cultural resources<br>• Any new roads will be gated as needed to prevent or limit public vehicle access<br>• Utilities to non-Federal property must be co-located within a 50 foot buffer of the access road to the property, unless an exception would reduce impacts to natural and cultural resources.<br>Grant no additional ROWs when reasonable access already exists, unless there is a compelling public need. Authorize only 1 access route to private parcels, unless public safety or local ordinances warrant additional routes. (NOTE: Additional routes will be considered at the discretion of the Monument Manager. The ROW width will be commensurate with the development needs of the individual private parcel.) Work with private landowners to coordinate development of access routes across public lands in order to prevent proliferation of routes (see Appendix L).<br><br>**GUNNISON GORGE NCA RMP 2004**<br>On public lands in the planning area outside the Wilderness, the BLM will cooperate with the US Department of the Interior, Bureau of Reclamation (BOR) to acknowledge and document the agency's existing facilities and access needs for maintenance and operation of these facilities under the appropriate authority, e.g., withdrawals and ROWs. BLM will request adequate information to process for the appropriate documentation, analysis, and authorizations for the facilities. See decisions in Management Unit 6 regarding public lands withdrawn to BOR and OHV uses.<br>On public lands in the planning area outside the Wilderness, the BLM will acknowledge and document the Uncompahgre Valley Water Users Association and BOR's existing facilities and access needs for maintenance and operation of these facilities on public lands, under the appropriate authority, such as withdrawals and ROWs, when the BLM receives adequate mapping and other information to process the appropriate authorizations for the facilities. |

BLM_0027479

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA RMP 2004**<br>In response to potential development on private inholdings, the BLM may request Mesa County consideration of land use permitting restrictions on private inholdings for protecting the overall landscape and land use character. Requested restrictions could include limiting land uses or subdivision of property, limiting any development to a portion of the private land, locating and designing developments to minimize adverse impacts to the landscape, limiting use of exterior lights, or providing for limited public access.<br><br>**TRES RIOS FO RMP 2015**<br>Road access to private land is granted only where no other reasonable alternative exists and where it meets the appropriate road design and maintenance standards necessary for resource protection and public safety. |
| 26 | Lands & Realty-Power and Phone Lines | **GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>MU 4 (GUSG ACEC/IBA):  Approximately one mile of the public lands in the management unit parallel to Red Canyon Creek will be located within a recommended ROW utility corridor for future growth in the North Fork Valley area.  Part of this corridor is also located in Management Unit 6.  See Figure 2-2 (at the end of this chapter) for the location and Table 2-3 (see end of this chapter) for information on all recommended corridors in the planning area.<br>Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.  MU 6:  Corridors (cont'd) Map Key 4, Table 2-3 (at end of this chapter)   Along the south side of Red Canyon Creek.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  Part of this corridor will be located in Management Unit 4.<br>MU 6:  Corridors (cont'd) Map Key 5, Table 2-3 (at end of this chapter)   Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit |

BLM_0027480

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | will be restricted during crucial periods for wintering deer and elk.  This corridor will be located adjacent to Unit 4. |
| | | **MONTICELLO FO RMP 2008** |
| | | This RMP will adopt the existing designated ROW corridors from the 1991 San Juan RMP including the Western Utility Group (WUG) updates to the Western Regional Corridor Study (Map 5), Section 368 Energy Policy Act of 2005, Westwide Energy Corridor PEIS.  Designate additional corridors as needed subject to physical barriers and sensitive resource values.  Designated transportation and utility corridors include existing groupings of ROWs for electric transmission facilities, pipelines 16 inches and larger, communication lines, federal and state highways, and major county road systems. |
| | | **TRES RIOS FO RMP 2015** |
| | | Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| | | **ENERGY CORRIDOR DESIGNATION PEIS 2009** |
| | | • Grand Junction RMP Amendment:  Corridors 132-133, 132-276 |
| | | • Gunnison RMP Amendment:  Corridor 87-277 |
| | | • San Juan/San Miguel RMP Amendment:  Corridors 130-131, 130-274 |
| | | • Uncompahgre Basin RMP Amendment:  Corridors 132-136, 134-136, 134-139, 136-139, 139-277, 136-277. The following corridors were identified as "corridors of concern" in the Settlement Agreement, with additional Sage-Grouse habitat concerns to be addressed in the event of ROW pre-application discussion and/or ROW applications: 82-277, 130-274, 130-274 (E). |
| | | • San Luis Valley FO RMP Amendment:  San Luis Area #1; I-15:  Utility corridor routes, identified by the Western Utility Group and included in the Rio Grande Forest Plan, are adopted with three exceptions: |
| | | No utility corridor from the Poncha Pass corridor west to Middle Creek (near Saguache) to Del Norte.  This area has many acres of crucial winter wildlife habitat, is highly scenic, and is an important dispersed recreation area. Any expansion of utility use in the Poncha Pass corridor will be analyzed thoroughly under the NEPA process. |
| 27 | Lands & Realty-Communication Sites | **GRAND JUNCTION FO RMP 2015** |
| | | Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values. |
| | | **GUNNISON RMP 1993** |

BLM_0027481

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | ROW Corridors:  Public lands within one-half mile on each side of the centerline of Western Area Power Administrations' (WAPA) Curecanti to Salida 230 Kv electrical transmission line, and Tri-State Generation and Transmission Association's Blue Mesa to Lake City 115 Kv electrical transmission line will be designated as ROWs corridors.  The WAPA line crosses Management Units 8, 11, 12, 13, 14, and 16.  A ROW window 1,000 feet in width, or 500 feet either side of the centerline, will be designated where the WAPA line crosses Management Unit 8.  The Tri-State corridor crosses Management Units 1, 13, and 16.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>• MU 4 (GUSG ACEC/IBA):  Approximately one mile of the public lands in the management unit parallel to Red Canyon Creek will be located within a recommended ROW utility corridor for future growth in the North Fork Valley area.  Part of this corridor is also located in Management Unit 6.  See Figure 2-2 (at the end of this chapter) for the location and Table 2-3 (see end of this chapter) for information on all recommended corridors in the planning area.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.<br>• MU 6:  Corridors (cont'd) Map Key 4, Table 2-3 (at end of this chapter).   Along the south side of Red Canyon Creek.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  Part of this corridor will be located in Management Unit 4.<br>• MU 6:  Corridors (cont'd) Map Key 5, Table 2-3 (at end of this chapter).   Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  This corridor will be located adjacent to Unit 4.<br><br>**MONTICELLO FO RMP 2008**<br>This RMP will adopt the existing designated ROW corridors from the 1991 San Juan RMP including the Western Utility Group (WUG) updates to the Western Regional Corridor Study (Map 5), Section 368 Energy Policy Act of 2005, Westwide Energy Corridor PEIS.  Designate additional corridors as needed subject to physical barriers and sensitive resource values.  Designated transportation and utility corridors include existing groupings of ROWs for electric transmission facilities, pipelines 16 inches and larger, communication lines, federal and state highways, and |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | major county road systems. |
| | | **TRES RIOS FO RMP 2015** Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| | | **ENERGY CORRIDOR DESIGNATION PEIS 2009** • Grand Junction RMP Amendment:  Corridors 132-133, 132-276 • Gunnison RMP Amendment:  Corridor 87-277 • San Juan/San Miguel RMP Amendment:  Corridors 130-131, 130-274 • Uncompahgre Basin RMP Amendment:  Corridors 132-136, 134-136, 134-139, 136-139, 139-277, 136-277.  The following corridors were identified as "corridors of concern" in the Settlement Agreement, with additional Sage-Grouse habitat concerns to be addressed in the event of ROW pre-application discussion and/or ROW applications:  82-277, 130-274, 130-274 (E). • San Luis Valley FO RMP Amendment:  San Luis Area #1; I-15:  Utility corridor routes, identified by the Western Utility Group and included in the Rio Grande Forest Plan, are adopted with three exceptions: ○ No utility corridor from the Poncha Pass corridor west to Middle Creek (near Saguache) to Del Norte.  This area has many acres of crucial winter wildlife habitat, is highly scenic, and is an important dispersed recreation area. Any expansion of utility use in the Poncha Pass corridor will be analyzed thoroughly under the NEPA process. |
| 28 | Lands & Realty | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** Utilities to non-Federal property must be co-located within a 50 foot buffer of the access road to the property, unless an exception would reduce impacts to natural and cultural resources. |
| | | **GUNNISON GORGE NCA RMP 2004** • MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG. • MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear |

BLM_0027483

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet. Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes. Mitigation will be required in all applications to meet the objectives of this management unit. Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives. |
| 29 | Lands & Realty- Exclusion and Avoidance Areas | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>• Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land.<br>• Allow land actions to occur only when they will result in minimal adverse impact(s), when they will be beneficial to cultural resource management, or when there is a clear and significant public need.<br>• Include all surface-use stipulations (including NGD/NSO, TL, and protective considerations for cultural resources) on new ROWs.<br>• Limit ROWs for development of resources to a 16-foot running surface (road) width.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2–14d), except to allow for:<br>• Reasonable access and utilities to non-federal property and existing ROW facilities.<br>• Upgrades or modifications to existing facilities<br>• Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA.<br><br>**GUNNISON RMP 1993**<br>ROW Exclusion Areas:<br>• MU 3 (Cochetopa Canyon SRMA):  ROWs.  Public land in the unit will be classified an exclusion area for above-ground utility ROWs.  Underground utility ROWs and development will be limited to previously disturbed areas associated with existing roads.<br>• MU 9 (Dillon Pinnacles ACEC):  ROWs.  Public lands in the unit will be classified an exclusion area for ROWs.<br>ROW Avoidance Areas:<br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs. Public lands north of the south line of Sections 16 and 17, T.47N.R.3W. NMPM, approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other ROWs.<br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs.  With the exception of public lands in the ROWs corridor, the entire unit will be closed to the development of above-ground utilities (91,510 acres). |

BLM_0027484

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON GORGE NCA RMP 2004**<br>• MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG.<br>• MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet.  Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes.  Mitigation will be required in all applications to meet the objectives of this management unit.  Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU1):  ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development):  Manage 221,600 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-27, Appendix A):<br>• Within a 0.4-mile radius of Sage-Grouse leks.<br>Allowable Use (LR-AU2):  ROW Avoidance Areas:  Manage 779,800 acres as ROW avoidance areas (Figure 2-27, Appendix A) (see Appendix B):<br>• Sage-Grouse:  Occupied Habitat<br>• Sage-Grouse:  Within a 4.0-mile radius of leks<br>• Streams/springs possessing lotic/lentic riparian characteristics<br>• Wetlands, springs, seeps, and riparian areas.<br>Allowable Use (LR-AU9):  Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback.<br>ACTION:  Identify the following as ROW exclusion areas:<br>Within a 0.6-mile radius of Sage-Grouse leks<br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values. |

BLM_0027485

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA RMP 2004** <br> All roads administered by the BLM will be maintained in their current condition, and no improvement will be permitted through ROW authorizations.  Any new roads that could be authorized will be constructed to minimal widths and standards similar to nearby existing "jeep roads."  Any such new roads could also be gated to prevent, or limit, public vehicle access. <br><br> **MOAB FO RMP 2008** <br> Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat. There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply: <br> • All surface-disturbing activities will be prohibited within 0.6 mile of GUSG leks on a year-round basis. Within the 0.6 mile buffer, allow no permanent aboveground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences. <br> • Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility. Modify or remove fences to minimize sage-grouse mortality. <br> As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats. <br> ROW avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values. <br> ROW Avoidance Areas:  riparian areas and springs. <br><br> **MONTICELLO FO RMP 2008** <br> ROW avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values. <br> Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land.  Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas.  NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no |

BLM_0027486

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | feasible alternatives. |

feasible alternatives.

**SAN LUIS RMP 1991**
Protection measures (for riparian/wetland areas) will include, but are not limited to, 1) mitigation of impacts from ROWs and utility corridors adjacent to or that cross riparian areas.
San Luis Area #1; 1-16:  Any impacts from ROWs adjacent to or that cross riparian areas will be mitigated.
Amended the San Luis RMP:  Programmatic policies and BMPs in the Wind Energy Development Program will be adopted.
Policy:  The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.
POD BMPs:  Site Monitoring and Testing.  Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present.  Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.

**SOLAR PEIS 2012**
Solar Energy Program ROW Exclusion Areas:
1. All designated and proposed critical habitat areas for species protected under the ESA of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1
2. Sage-grouse core areas, nesting habitat, and winter habitat;
3. Greater sage-grouse habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in California, Nevada, and Utah, and GUSG Habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in Utah.
4. All areas designated as NSO in applicable land use plans.
5. All ROW exclusion areas identified in applicable land use plans.
6. All ROW avoidance areas identified in applicable land use plans (p. 38).
Grand Junction FO:  All lands would be excluded.
Gunnison FO:  Approximately 3,162 acres in variance areas.
Gunnison Gorge NCA:  All lands would be excluded.
McInnis Canyons NCA:  All lands would be excluded.
Moab FO:  Approximately 587 acres in variance areas.
Monticello FO:  Approximately 4,120 acres in variance areas.
San Juan/San Miguel:  Approximately 12,105 acres in variance areas.

BLM_0027487

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|-------|-------------|------------------------|
| | | San Luis Valley FO:  Approximately 50,384 acres in variance areas.  Four Solar Energy Zones designated (total of 16,308 acres) [none of which are within or adjacent to GUSG Occupied Habitat]. Uncompahgre Basin:  All lands would be excluded. |
| 30 | Lands & Realty | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>• Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land.<br>• Allow land actions to occur only when they will result in minimal adverse impact(s), when they will be beneficial to cultural resource management, or when there is a clear and significant public need.<br>• Include all surface-use stipulations (including NGD/NSO, TL, and protective considerations for cultural resources) on new ROWs.<br>• Limit ROWs for development of resources to a 16-foot running surface (road) width.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2–14d), except to allow for:<br>• Reasonable access and utilities to non-federal property and existing ROW facilities.<br>• Upgrades or modifications to existing facilities.<br>Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA.<br><br>**GUNNISON RMP 1993**<br>ROW Exclusion Areas:<br>• MU 3 (Cochetopa Canyon SRMA):  ROWs.  Public land in the unit will be classified an exclusion area for above-ground utility ROWs.  Underground utility ROWs and development will be limited to previously disturbed areas associated with existing roads.<br>• MU 9 (Dillon Pinnacles ACEC):  ROWs.  Public lands in the unit will be classified an exclusion area for ROWs.<br>ROW Avoidance Areas:<br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs.  Public lands north of the south line of Sections 16 and 17, T.47N.R.3W. NMPM, approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other ROWs.<br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs.  With the exception of public lands in the ROWs corridor, the entire unit will be closed to the development of above-ground utilities (91,510 acres).<br><br>**GUNNISON GORGE NCA RMP 2004** |

BLM_0027488

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG.<br>• MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet.  Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes.  Mitigation will be required in all applications to meet the objectives of this management unit.  Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU1):  ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development):  Manage 221,600 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-27, Appendix A):<br>• Within a 0.4-mile radius of Sage-Grouse leks.<br>Allowable Use (LR-AU2):  ROW Avoidance Areas:  Manage 779,800 acres as ROW avoidance areas (Figure 2-27, Appendix A) (see Appendix B):<br>• Sage-Grouse:  Occupied Habitat<br>• Sage-Grouse:  Within a 4.0-mile radius of leks<br>• Streams/springs possessing lotic/lentic riparian characteristics<br>• Wetlands, springs, seeps, and riparian areas...<br>Allowable Use (LR-AU9):  Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback.<br>ACTION:  Identify the following as ROW exclusion areas:<br>Within a 0.6-mile radius of Sage-Grouse leks<br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values.<br><br>**MCINNIS CANYONS NCA RMP 2004** |

BLM_0027489

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | All roads administered by the BLM will be maintained in their current condition, and no improvement will be permitted through ROW authorizations.  Any new roads that could be authorized will be constructed to minimal widths and standards similar to nearby existing "jeep roads."  Any such new roads could also be gated to prevent, or limit, public vehicle access.<br><br>**MOAB FO RMP 2008**<br>Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat. There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:<br>• All surface-disturbing activities will be prohibited within 0.6 mile of GUSG leks on a year-round basis.  Within the 0.6 mile buffer, allow no permanent aboveground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.<br>• Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility. Modify or remove fences to minimize sage-grouse mortality.<br>As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats.<br>ROW avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>ROW Avoidance Areas:  riparian areas and springs.<br><br>**MONTICELLO FO RMP 2008**<br>ROW avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land.  Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas.  NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no feasible alternatives. |

BLM_0027490

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **SAN LUIS RMP 1991**<br>Protection measures (for riparian/wetland areas) will include, but are not limited to, 1) mitigation of impacts from ROWs and utility corridors adjacent to or that cross riparian areas.<br>San Luis Area #1; 1-16: Any impacts from ROWs adjacent to or that cross riparian areas will be mitigated.<br>Amended the San Luis RMP: Programmatic policies and BMPs in the Wind Energy Development Program will be adopted.<br>Policy: The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.<br>POD BMPs: Site Monitoring and Testing. Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present. Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.<br><br>**SOLAR PEIS 2012**<br>Solar Energy Program ROW Exclusion Areas:<br>1. All designated and proposed critical habitat areas for species protected under the ESA of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1<br>2. Sage-grouse core areas, nesting habitat, and winter habitat;<br>3. Greater sage-grouse habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in California, Nevada, and Utah, and GUSG Habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in Utah.<br>4. All areas designated as NSO in applicable land use plans.<br>5. All ROW exclusion areas identified in applicable land use plans.<br>6. All ROW avoidance areas identified in applicable land use plans (p. 38).<br>• Grand Junction FO: All lands would be excluded.<br>• Gunnison FO: Approximately 3,162 acres in variance areas.<br>• Gunnison Gorge NCA: All lands would be excluded.<br>• McInnis Canyons NCA: All lands would be excluded.<br>• Moab FO: Approximately 587 acres in variance areas.<br>• Monticello FO: Approximately 4,120 acres in variance areas.<br>• San Juan/San Miguel: Approximately 12,105 acres in variance areas. |

BLM_0027491

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • San Luis Valley FO:  Approximately 50,384 acres in variance areas.  Four Solar Energy Zones designated (total of 16,308 acres) [none of which are within or adjacent to GUSG Occupied Habitat].<br>• Uncompahgre Basin:  All lands would be excluded. |
| 31 | Lands & Realty | No similar action. |
| 32 | Lands & Realty | No similar action. |
| 33 | Lands & Realty | **GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values.<br>**TRES RIOS FO RMP 2015**<br>Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| 34 | Lands & Realty | **GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values.<br>**TRES RIOS FO RMP 2015**<br>Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| 35 | Lands & Realty | **GUNNISON RMP 1993**<br>MU 14 (riparian areas containing important sage grouse brood-rearing areas):  ROWs.  Mitigating measures will be included in ROW authorizations to prevent disturbance within this unit to brooding sage grouse from June 15 through July 31 and from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk.<br>MU 15 (important fishery streams):  ROWs.  No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period.  Mitigating measures will be included in ROW authorizations in these areas of this unit to prevent disturbance to brooding sage grouse. |

BLM_0027492

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 36 | Lands & Realty | **GUNNISON GORGE NCA RMP 2004**<br>Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.<br>• MU 6: Corridors (cont'd) Map Key 4, Table 2-3 (at end of this chapter)   Along the south side of Red Canyon Creek.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  Part of this corridor will be located in Management Unit 4.<br>• MU 6: Corridors (cont'd) Map Key 5, Table 2-3 (at end of this chapter)   Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  This corridor will be located adjacent to Unit 4. |
| 37 | Lands & Realty | **GUNNISON RMP 1993**<br>• MU 14 (riparian areas containing important sage grouse brood-rearing areas):  ROWs.  Mitigating measures will be included in ROW authorizations to prevent disturbance within this unit to brooding sage grouse from June 15 through July 31 and from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk.<br>• MU 15 (important fishery streams):  ROWs.  No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period.  Mitigating measures will be included in ROW authorizations in these areas of this unit to prevent disturbance to brooding sage grouse. |
| **RANGELAND MANAGEMENT** | | |
| 38 | Range Management | **TRES RIOS FO RMP 2015**<br>Guideline 2.4.65:  Within occupied Gunnison sage-grouse critical habitat the RCP grazing guidelines should be incorporated when appropriate. |
| 39 | Range | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** |

BLM_0027493

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | Management | Livestock grazing permits will include seasonal utilization limits for palatable forage that reflect best management practices and are consistent with meeting land health standards or other biological objectives.  Lower limits will be established for grazing allotments with land health problems where grazing is contributing to those problems. |
| | | **GRAND JUNCTION FO RMP 2015** |
| | | ACTION (A10):  Identify appropriate utilization levels based on allotment or site-specific management practices, such as season-of-use, grazing intensity and duration, and utilization patterns, as well as vegetative conditions, riparian conditions, the presence or absence of range improvements, and resource issues or concerns. |
| | | ACTION (A11):  Implement changes in livestock use through allotment management plans, grazing use agreements, and terms and conditions on grazing permits for priority allotments based on the current prioritization process and/or land health issues. |
| | | **TRES RIOS FO RMP 2015** |
| | | Guideline 2.4.65:  Within occupied Gunnison sage-grouse critical habitat the RCP grazing guidelines should be incorporated when appropriate. |
| | | Guideline 2.4.66:  Within Occupied Habitat, grazing in treatment areas should be deferred for 2 growing season after treatment, unless needed for seedbed preparation or desired understory and over-story are established. |
| 40 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010** |
| | | Administer 23 allotments.  Remove 5 grazing allotments from Availability: the East and West Sand Canyon, Rock Creek, Goodman Gulch, and Trail Canyon allotments.  Remove the Rock Creek allotment at the time the current grazing.  Permittee is no longer able to run a livestock operation.  Pursue establishing common reserve allotments, as allotments become available, in order to allow for periodic rest and deferment in other allotments.  Make one of the following determinations in the event a grazing permit is relinquished or cancelled: |
| | | 1. Reissue a term grazing permit. |
| | | 2. Close, either temporarily or permanently, the allotment to grazing where any of the following exists and is attributable to livestock grazing: |
| | | ○ damage to cultural resources; |
| | | ○ fragile soil/biological crusts essential for soil and water resource protection; |
| | | ○ low forage production (less than 200 pounds/acre); inadequate facilities to manage livestock grazing (such as fencing, water, or forage availability); and/or |
| | | ○ degraded riparian and/or upland conditions. |
| | | 3. Create, temporarily or permanently, a reserve forage allotment. (NOTE: Permits for reserve forage allotments |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | will not be held by specific grazing operators.)  Require grazing to meet the goals described for the area in the RMP and, if applicable, in an allotment management plan.  Grant temporary, nonrenewable use to Federal permit holders when there is a demonstrated need to rest a permittee's allotment.  [NOTE: "Need" for rest will include, but not be limited to, the following reasons: to improve resource condition of other allotments prior to prescribed burns or necessary fence construction; and during/after rehabilitation projects (such as wildland fire, drought, flood, insect damage, and/or disease).]  **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**  Close the following areas to livestock use (361 acres, Map 2–4p): ● Bean Allotment (361 acres, due to conflicts with adjoining private lands).  Unallocated areas would be managed according to the following (Map 2–4p): Area open to livestock grazing (acreage also included in line 506 as available to grazing): 994 acres Area where active movement would be the only livestock use allowed: 572 acres Area closed to livestock use: 3,489 acres New (un-allotted) land acquisitions would be evaluated and closed or allotted to neighboring permittees on a case-by-case basis considering topography and resource objectives.  Based on biological resource objectives, evaluate and allocate vacated or relinquished allotments, or un-allotted areas for:  • combining with active allotments to provide for additional management options.  • establishing grass banks  • closure to grazing.  Changes (increases or decreases) in forage allocation for livestock grazing could be made where such changes would allow for progress toward the achievement of biological objectives.  **GRAND JUNCTION FO RMP 2015**  Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat.  Action (A4): Make 66,600 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land.  The purpose includes steep slopes, conflict with BLM recreation sites, or avoidance of sensitive resources such as those described in the Areas of Critical Environmental Concern section.  Refer to Appendix J, Livestock Grazing Allotments.  Action (A5): Close the following allotments to livestock use (see Appendix J):  • Same as Alternative A plus the following: o Baldridge Mesa; o Bevan;  o Boulder Canyon; o Browns Place; o Brush Creek; o Charlesworth; o Clifton; o Clover Gulch; o Coon Creek; o Dead Horse; o Dry Kimball; o Eby Point;  o Erven; o Etcheverry; o Fetters; o Heely; o Hight; o Horizon; o Hunter; o Logan Wash; o Parkes Place; o Plateau |

BLM_0027495

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Creek; o Red Mountain; Webber; o Webb Isolated Tracts; and o Whitewater Hill. Action (A6):  In open allotments, close the following areas to livestock use: • Ant Research Area; • Badger Wash un-grazed paired plots or designated no grazing areas as defined in the study objectives; • Miracle Rock picnic area; • Mud Springs picnic area; • North Fruita Desert developed campground; • Pyramid Rock ACEC; • Study area exclosures; and • West Creek picnic area. • Palisade municipal watershed. Action (A8):  Periodically evaluate whether to close other allotments or portions of allotments to livestock grazing, and implement with project level  analysis, based on the following criteria: <br>• Areas identified as BLM disposal tracts; <br>• Lack of administrative access to public land; <br>• Small percentage of forage in allotment is contributed by BLM lands in allotment (less than 15 percent); <br>• Areas not accessible to livestock grazing (e.g., steep slopes); <br>• "C" category allotments that are relinquished and determined to be impractical for the administration of livestock grazing by the Authorized Officer; <br>• Major impact to sensitive resources such as wildlife or threatened and endangered species (e.g., competition for forage, winter range, Sage- Grouse habitat), or sensitive fish habitat, as determined by data analysis; <br>• Public health and safety; <br>• High intensity recreation areas/facilities; <br>• Resource objectives for municipal watersheds; <br>• Impacts to cultural resources; and <br>• Conflicts with adjoining private lands (development). Action (A23):  Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat. Action (A24):  Pursue the opportunity to establish grass banks from un-allotted grazing allotments to provide management options on other allotments (e.g., fire, drought, vegetation treatments, and allotments not meeting land health). <br><br>**GUNNISON GORGE NCA RMP 2004** <br>Forage for livestock will not be permanently allocated on newly acquired lands.  Cattle will not be permitted to use forage on these newly acquired lands.  On newly acquired lands in the planning area BLM will prepare, with input from permittees, a grazing allotment and grazing strategy that will permit the lands to be used by any existing sheep grazing permittee when permittee's allotment(s) are not usable, such as if grazing is restricted on allotments because of drought/fire, a vegetation treatment (e.g., vegetation manipulation and follow-up seeding) is being conducted on an |

BLM_0027496

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | allotment that requires a deferment from grazing, or if their allotment requires a deferment from grazing to allow plants to recover from previous grazing (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands.  Not authorizing new permanent allocations of forage for domestic sheep grazing within occupied bighorn sheep habitat or associated nine mile buffer zones, will move bighorn sheep management in the NCA slightly closer to the guidelines contained in BLM's Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats ([BLM 1998f]).  Suitable public lands will be available for livestock grazing use.  Grazing allotments that become unallocated will be considered for: 1) using occasionally as a grazing bank to alleviate grazing pressure on other allotments in the region; or 2) adding to an existing, contiguous allotment to increase grazing flexibility. **MCINNIS CANYONS NCA RMP 2004** Any grazing permit that is relinquished or canceled will be evaluated for future allocation and level of use. **SAN JUAN/SAN MIGUEL RMP 1985** Un-allotted tracts generally will remain available for future livestock grazing, as provided for in the BLM grazing regulations (43 CFR 4110 and 43 CFR 4130).  However, certain tracts not currently authorized for grazing use will remain un-allotted. **SAN LUIS RMP 1991** 1-7:  Consider allocating 1,500 AUMs for livestock grazing in the presently un-allotted acres (approximately 30,000 acres) that are suitable for grazing. **TRES RIOS FO RMP 2015** If grazing privileges are relinquished or cancelled on Tres Rios FO lands where fragile soils, low forage production, low livestock water availability, and/or conflicts with other resources make livestock grazing undesirable, the privileges should not be re-allocated.  Prior to allocating grazing privileges for a new grazing permittee on unallocated grazing allotments, the needs of existing rangeland management, as well as ecological diversity and species viability, should be considered.  The designation of grazing allotments to be used as forage reserves should be considered when grazing privileges terminate, if such designations would improve land management as well as livestock management opportunities.  The BLM should consider closing custodial allotments when term grazing permits expire where public lands cannot be properly managed due to the subdividing of surrounding base property, or due to insufficient or livestock water availability, access, management flexibility, and/or lack of capable rangeland. |
| 41 | Range | **CANYONS OF THE ANCIENTS NM RMP 2010** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | Management | Administer 23 allotments.  Remove 5 grazing allotments from Availability: the East and West Sand Canyon, Rock Creek, Goodman Gulch, and Trail Canyon allotments. Remove the Rock Creek allotment at the time the current grazing. Permittee is no longer able to run a livestock operation.  Pursue establishing common reserve allotments, as allotments become available, in order to allow for periodic rest and deferment in other allotments.  Make one of the following determinations in the event a grazing permit is relinquished or cancelled: <br> 3. Reissue a term grazing permit. <br> 4. Close, either temporarily or permanently, the allotment to grazing where any of the following exists and is attributable to livestock grazing: <br> ○ damage to cultural resources; <br> ○ fragile soil/biological crusts essential for soil and water resource protection; <br> ○ low forage production (less than 200 pounds/acre); inadequate facilities to manage livestock grazing (such as fencing, water, or forage availability); and/or <br> ○ degraded riparian and/or upland conditions. <br> 5. Create, temporarily or permanently, a reserve forage allotment. (NOTE: Permits for reserve forage allotments will not be held by specific grazing operators.)  Require grazing to meet the goals described for the area in the RMP and, if applicable, in an allotment management plan.  Grant temporary, nonrenewable use to Federal permit holders when there is a demonstrated need to rest a permittee's allotment.  [NOTE: "Need" for rest will include, but not be limited to, the following reasons: to improve resource condition of other allotments prior to prescribed burns or necessary fence construction; and during/after rehabilitation projects (such as wildland fire, drought, flood, insect damage, and/or disease).] <br><br> **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** <br> Close the following areas to livestock use (361 acres, Map 2–4p): ● Bean Allotment (361 acres, due to conflicts with adjoining private lands). Unallocated areas would be managed according to the following (Map 2–4p): Area open to livestock grazing (acreage also included in line 506 as available to grazing): 994 acres Area where active movement would be the only livestock use allowed: 572 acres Area closed to livestock use: 3,489 acres New (un-allotted) land acquisitions would be evaluated and closed or allotted to neighboring permittees on a case-by-case basis considering topography and resource objectives.  Based on biological resource objectives, evaluate and allocate vacated or relinquished allotments, or un-allotted areas for: ● combining with active allotments to provide for additional management options. ● establishing grass banks ● closure to grazing. <br><br> **GRAND JUNCTION FO RMP 2015** <br> Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non- |

BLM_0027498

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | use warrants to rest other allotments that include important Sage-Grouse habitat. Action (A4): Make 66,600 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land. The purpose includes steep slopes, conflict with BLM recreation sites, or avoidance of sensitive resources such as those described in the Areas of Critical Environmental Concern section. Refer to Appendix J, Livestock Grazing Allotments. Action (A5): Close the following allotments to livestock use (see Appendix J): <br>• Same as Alternative A plus the following: o Baldridge Mesa; o Bevan;  o Boulder Canyon; o Browns Place; o Brush Creek; o Charlesworth; o Clifton; o Clover Gulch; o Coon Creek; o Dead Horse; o Dry Kimball; o Eby Point;  o Erven; o Etcheverry; o Fetters; o Heely; o Hight; o Horizon; o Hunter; o Logan Wash; o Parkes Place; o Plateau Creek; o Red Mountain; Webber;  o Webb Isolated Tracts; and o Whitewater Hill. <br>Action (A6):  In open allotments, close the following areas to livestock use: • Ant Research Area; • Badger Wash un-grazed paired plots or designated no grazing areas as defined in the study objectives; • Miracle Rock picnic area; • Mud Springs picnic area; • North Fruita Desert developed campground; • Pyramid Rock ACEC; • Study area exclosures; and • West Creek picnic area. • Palisade municipal watershed. <br>Action (A8):  Periodically evaluate whether to close other allotments or portions of allotments to livestock grazing, and implement with project level  analysis, based on the following criteria: <br>• Areas identified as BLM disposal tracts; <br>• Lack of administrative access to public land; <br>• Small percentage of forage in allotment is contributed by BLM lands in allotment (less than 15 percent); <br>• Areas not accessible to livestock grazing (e.g., steep slopes); <br>• "C" category allotments that are relinquished and determined to be impractical for the administration of livestock grazing by the Authorized Officer; <br>• Major impact to sensitive resources such as wildlife or threatened and endangered species (e.g., competition for forage, winter range, Sage-Grouse habitat), or sensitive fish habitat, as determined by data analysis; <br>• Public health and safety; <br>• High intensity recreation areas/facilities; <br>• Resource objectives for municipal watersheds; <br>• Impacts to cultural resources; and <br>• Conflicts with adjoining private lands (development). <br>Action (A23):  Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat. |

BLM_0027499

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Action (A24):  Pursue the opportunity to establish grass banks from un-allotted grazing allotments to provide management options on other allotments (e.g., fire, drought, vegetation treatments, and allotments not meeting land health).

**GUNNISON GORGE NCA RMP 2004**
Forage for livestock will not be permanently allocated on newly acquired lands.  Cattle will not be permitted to use forage on these newly acquired lands.  On newly acquired lands in the planning area BLM will prepare, with input from permittees, a grazing allotment and grazing strategy that will permit the lands to be used by any existing sheep grazing permittee when permittee's allotment(s) are not usable, such as if grazing is restricted on allotments because of drought/fire, a vegetation treatment (e.g., vegetation manipulation and follow-up seeding) is being conducted on an allotment that requires a deferment from grazing, or if their allotment requires a deferment from grazing to allow plants to recover from previous grazing (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands.  Not authorizing new permanent allocations of forage for domestic sheep grazing within occupied bighorn sheep habitat or associated nine mile buffer zones, will move bighorn sheep management in the NCA slightly closer to the guidelines contained in BLM's Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats ([BLM 1998f]).  Suitable public lands will be available for livestock grazing use.  Grazing allotments that become unallocated will be considered for: 1) using occasionally as a grazing bank to alleviate grazing pressure on other allotments in the region; or 2) adding to an existing, contiguous allotment to increase grazing flexibility.

**MCINNIS CANYONS NCA RMP 2004**
Any grazing permit that is relinquished or canceled will be evaluated for future allocation and level of use.

**SAN JUAN/SAN MIGUEL RMP 1985**
Un-allotted tracts generally will remain available for future livestock grazing, as provided for in the BLM grazing regulations (43 CFR 4110 and 43 CFR 4130).  However, certain tracts not currently authorized for grazing use will remain un-allotted.

**SAN LUIS RMP 1991**
1-7:  Consider allocating 1,500 AUMs for livestock grazing in the presently un-allotted acres (approximately 30,000 acres) that are suitable for grazing.

**TRES RIOS FO RMP 2015**
If grazing privileges are relinquished or cancelled on Tres Rios FO lands where fragile soils, low forage production, low livestock water availability, and/or conflicts with other resources make livestock grazing undesirable, the |

BLM_0027500

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | privileges should not be re-allocated.  Prior to allocating grazing privileges for a new grazing permittee on unallocated grazing allotments, the needs of existing rangeland management, as well as ecological diversity and species viability, should be considered.  The designation of grazing allotments to be used as forage reserves should be considered when grazing privileges terminate, if such designations would improve land management as well as livestock management opportunities.  The BLM should consider closing custodial allotments when term grazing permits expire where public lands cannot be properly managed due to the subdividing of surrounding base property, or due to insufficient or livestock water availability, access, management flexibility, and/or lack of capable rangeland. |
| 42 | Range Management | No similar action. |
| **Range Improvements** | | |
| 43 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Implement specific projects (such as cross-fencing of riparian areas, development of water sources outside of riparian areas, and use of seedlings) in a manner that facilitates effective management and promotes recovery and maintenance of riparian/alluvial habitat.  Consider allowing temporary range improvement structures, on a case-by-case basis, where risk of damage to other resource values is low.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Construct new livestock facilities (e.g., water developments, fences, corrals) as needed to achieve biological resources objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to Sage-Grouse objectives.  Structural range improvements, in this context, include but are not limited to: cattle guards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments.<br>Action (VR-A4):  Consider the following management actions for improvement or protection of riparian values: riparian grazing pastures, exclosures, land acquisitions, adjustments to grazing management, stream structures, and plantings.<br>Action (A13):  Construct range improvement projects on allotments to implement changes in grazing management to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Action (A20):  Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to Sage-Grouse objectives.  Structural range improvements, in this context, include but are not limited to: cattle guards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks structures used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments. Action (A22):  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat. **GUNNISON RMP 1993** Structural and non-structural range improvements such as fences, water developments, bums, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.  However, any range improvements identified in the Management Framework Plan ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits.  Cooperative agreements will be the preferred method to authorize range improvements.  These agreements will be used to authorize all structural and nonstructural, multiple-use range improvements (removable and non-removable).  Range improvement permits will be used to authorize single use, removable range improvements required for livestock operations.  These range improvements will be paid for and constructed by the permittee, or other non-federal entities.  Maintenance will be assigned and contributions defined in both cooperative agreements and range improvement permits.  All range improvement permits and cooperative agreements will comply with 43 CFR 4120.3-2. **MCINNIS CANYONS NCA RMP 2004** Additional range improvements will be utilized to improve grazing management in accordance with grazing management plans. **SAN LUIS RMP 1991** New range improvements will be constructed if needed to achieve allotment management plan objectives and/or implement the grazing management programs prescribed in the allotment management plans.  Manipulation of vegetation can be used if needed to meet management objectives. San Luis I-7:  Construct new range improvements, if needed, to achieve allotment management plan objectives and/or implement the grazing programs prescribed in the allotment management plans.  Manipulation of vegetation will be used, if needed, to meet management objectives. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **TRES RIOS FO RMP 2015**<br>Wildlife needs should be considered in the design of structural and non-structural range improvements. |
| 44 | Range Management | No similar action. |
| 45 | Range Management | No similar action. |
| 46 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Encourage range, fuels and fire, and vegetation management activities that will protect and/or enhance riparian/aquatic resource conditions. Manage riparian areas in a manner that moves them toward achieving Proper Functioning Condition. (NOTE: Projects designed for enhancement or improvement of riparian and alluvial sites will not be allowed within 100 feet of active channel edges without appropriate mitigation.) Design spring developments that maintain water flow in riparian channels and that, at the same time, provide livestock water outside of the channel and spring source area. Fence springs (and associated cultural resource sites) in livestock use areas. Fence streams and riparian areas where reduced livestock numbers, or season of use adjustments, do not result in achieving PFC and/or in meeting Public Land Health Standards and Guidelines.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Apply SSR (see Appendix B, Map 2-2e) within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone of naturally occurring seeps and springs (lentic riparian areas). Also apply SSR to the spring/seep recharge zone where it is determined to extend more than 100 meters from the riparian zone. For all new water developments, inspect and characterize all springs and seeps located inside the affected watershed, down gradient and within one mile of proposed development.<br>Allow for new water developments when: a. Surface disturbing actions would not directly impact the source area, and; b. characterization of the spring/seep, indicates recharge potential would not be significantly altered, and; c. Development would be limited to instances where needed to achieve biological resources objectives.<br>Apply SSR within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank–full stage) of ephemeral streams (see Appendix B, Maps 2-2d and 2-2e).<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (VR-AU3): STIPULATION NSO-4: Lentic Riparian Areas (including springs, seeps, and fens).<br>(Alternative B: All Programs Except Fluid Minerals. Alternative C: All Surface-disturbing Activities) Prohibit surface |

BLM_0027503

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. (Refer to Appendix B.) See Figures 2-43 (Alternative B) and 2-44 (Alternative C) in Appendix A. Standard exceptions apply; see Appendix B. NSO-2 (ROWA) Streams/Springs Possessing Lotic Riparian Characteristics (except oil and gas). NSO-4 (ROWA) Lentic Riparian Areas (including springs, seeps, and fens) (except oil and gas). ACTION (A13):  Construct range improvement projects on allotments to implement changes in grazing management to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users. ACTION (A19):  Authorize new water developments for diversions from spring or seep source only when priority Sage-Grouse habitat would benefit on both upland and riparian habitat from the development or there are no negative impacts to sage grouse. This includes developing new water sources for livestock as part of an allotment management plan/ conservation plan to improve sage-grouse habitat. ACTION (A22):  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat.<br><br>**GUNNISON RMP 1993**<br>New water sources will be developed with concern for the protection of riparian areas.  Structural and non-structural range improvements such as fences, water developments, bums, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.  However, any range improvements identified in the Management Framework Plan ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits. Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be  safe for livestock and wildlife needs.  Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be safe for livestock and wildlife needs. Existing water source developments within riparian areas will be modified, or relocated, if inventories and studies indicate the hydrologic condition is being negatively impacted from use of the development.  Water developments that are range improvements will be modified or relocated in accordance with 43 CFR 4120.<br><br>**MOAB FO RMP 2008**<br>GRA-20 Grazing in Riparian Areas:  Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing will |

BLM_0027504

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | improve riparian functioning condition. |
| 47 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Encourage range, fuels and fire, and vegetation management activities that will protect and/or enhance riparian/aquatic resource conditions.  Manage riparian areas in a manner that moves them toward achieving Proper Functioning Condition. (NOTE:  Projects designed for enhancement or improvement of riparian and alluvial sites will not be allowed within 100 feet of active channel edges without appropriate mitigation.)  Design spring developments that maintain water flow in riparian channels and that, at the same time, provide livestock water outside of the channel and spring source area.  Fence springs (and associated cultural resource sites) in livestock use areas. Fence streams and riparian areas where reduced livestock numbers, or season of use adjustments, do not result in achieving PFC and/or in meeting Public Land Health Standards and Guidelines.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Apply SSR (see Appendix B, Map 2-2e) within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone of naturally occurring seeps and springs (lentic riparian areas).  Also apply SSR to the spring/seep recharge zone where it is determined to extend more than 100 meters from the riparian zone.  For all new water developments, inspect and characterize all springs and seeps located inside the affected watershed, down gradient and within one mile of proposed development.<br>Allow for new water developments when: a. Surface disturbing actions would not directly impact the source area, and; b. characterization of the spring/seep, indicates recharge potential would not be significantly altered, and; c. Development would be limited to instances where needed to achieve biological resources objectives.<br>Apply SSR within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank–full stage) of ephemeral streams (see Appendix B, Maps 2-2d and 2-2e).<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (VR-AU3): STIPULATION NSO-4: Lentic Riparian Areas (including springs, seeps, and fens).  (Alternative B: All Programs Except Fluid Minerals.  Alternative C: All Surface-disturbing Activities) Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. (Refer to Appendix B.) See Figures 2-43 (Alternative B) and 2-44 (Alternative C) in Appendix A.  Standard exceptions apply; see Appendix B.<br>NSO-2 (ROWA) Streams/Springs Possessing Lotic Riparian Characteristics (except oil and gas).<br>NSO-4 (ROWA) Lentic Riparian Areas (including springs, seeps, and fens) (except oil and gas).<br>ACTION (A13):  Construct range improvement projects on allotments to implement changes in grazing management |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users. ACTION (A19):  Authorize new water developments for diversions from spring or seep source only when priority Sage-Grouse habitat would benefit on both upland and riparian habitat from the development or there are no negative impacts to sage grouse. This includes developing new water sources for livestock as part of an allotment management plan/ conservation plan to improve sage-grouse habitat. ACTION (A22):  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat. **GUNNISON RMP 1993** New water sources will be developed with concern for the protection of riparian areas.  Structural and non-structural range improvements such as fences, water developments, bums, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.  However, any range improvements identified in the Management Framework Plan ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits. Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be  safe for livestock and wildlife needs.  Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be safe for livestock and wildlife needs. Existing water source developments within riparian areas will be modified, or relocated, if inventories and studies indicate the hydrologic condition is being negatively impacted from use of the development.  Water developments that are range improvements will be modified or relocated in accordance with 43 CFR 4120. **MOAB FO RMP 2008** GRA-20 Grazing in Riparian Areas:  Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing will improve riparian functioning condition. |
| 48 | Range Management | No similar action. |
| 49 | Range Management | **GRAND JUNCTION FO RMP 2015** SSS-SGR-MA-10:  To reduce Sage-Grouse strikes and mortality, remove, modify, or mark fences in high risk areas. |

BLM_0027506

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | When fences are necessary, require a Sage- Grouse-safe design. SSS-SGR-MA-04: Improve brood-rearing habitat by implementing the following action: restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting mosquito breeding habitat at elevations below 8,000 feet. SSS-SGR-MA-09: Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to sage-grouse objectives. Structural range improvements , in this context, include but are not limited to: cattleguards, fences, enclosures, corrals, or other livestock handling structures; pipelines troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments.<br><br>**GUNNISON RMP 1993**<br>Fences will be installed according to spacing, height, and other specifications described in the BLM Manual, Section 1740 and Handbook H-1741-1, for the control of livestock as well as the protection of wildlife.  An example will be spacing the bottom wire of a 3-wire fence at 16 inches above the ground in pronghorn antelope ranges.  Variances from these standards require approval of the authorized officer after consultation with affected parties.<br><br>**MOAB FO RMP 2008**<br>SSS-24: Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the GUSG RCP (2005 as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore GUSG populations and habitat.  About 175,727 acres of potential habitat has been identified within the Moab planning area.  There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:<br>• All surface-disturbing activities will be prohibited within 0.6 miles of GUSG leks on a year-round basis. Within the 0.6 mile buffer, allow no permanent aboveground facilities or power-lines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.<br>• Within 4.0 miles of a lek, avoid fence construction, overhead power-line construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility. Modify or remove fences to minimize sage-grouse mortality.<br>SSS-3: As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E.<br><br>**MONTICELLO FO RMP 2008** |

BLM_0027507

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act.<br>SSP-23: Lek habitat (within 0.6 miles of active strutting ground): Prohibit year-round construction of fences. Retrofit visual devices on existing fences to prevent collisions. Where opportunity exists, remove existing fences and Avoid all permitted activities from March 20 to May 15. If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning.<br>SSP-24 Year-round habitat (within 4 miles of active strutting ground): Avoid construction of new fences. If impracticable, increase the visibility of the fences (flagging, white-tipped T-posts, etc.) and monitor effectiveness of visual devices and modify or remove fences if necessary to minimize sage-grouse mortality.<br>RIP-4:The BLM will follow Utah's Standards for Rangeland Health and Guidelines for Grazing and Recreation Management (BLM 1997) to achieve riparian PFC.<br>RIP-16 Develop seasonal restrictions, closures, and/or forage utilization limits on grazing in riparian areas considered Functioning at Risk.<br>SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act.<br>Within 4.0 miles of a lek, avoid fence construction, overhead power-line construction and aboveground structures that provide raptor hunting perches.  Where fences are necessary, increase their visibility.  Modify or remove fences to minimize sage-grouse mortality.  All surface-disturbing activities will be prohibited within 0.6 miles of GUSG leks on a year-round basis.  Within the 0.6 mile buffer, allow not permanent aboveground facilities; prohibit or limit year-round construction of fences and where there is opportunity to remove them.<br><br>**TRES RIOS FO RMP 2015**<br>Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat.<br>Guideline 2.4.59:  Structures in sage-grouse habitat should be constructed to limit risk of collision and predation.<br>2.3.70 Structures in sage-grouse habitat should be constructed to limit risk of collision and predation. |
| 50 | Range Management | **GRAND JUNCTION FO RMP 2015**<br>SSS-SGR-MA-04:  Improve brood-rearing habitats by implementing the following action:<br>• Restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting mosquito breeding habitat at elevations below 8,000 feet.<br><br>**MONTICELLO FO RMP 2008** |

BLM_0027508

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | MCA-4:  The BLM will coordinate actions with affected parties where natural resources may be impacted by fire, drought, insects and diseases, or natural disasters. |
| | | **TRES RIOS FO RMP 2015** Guideline 2.4.67:  When developing or modifying water developments, BMPs (Appendix N) should be used to mitigate potential impacts from West Nile virus on sage-grouse within Occupied Habitat. |
| 51 | Range Management | **GRAND JUNCTION FO RMP 2015** SSS-SGR-MA-04:  Improve brood-rearing habitats by implementing the following action: • Restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting mosquito breeding habitat at elevations below 8,000 feet. |
| | | **MONTICELLO FO RMP 2008** MCA-4:  The BLM will coordinate actions with affected parties where natural resources may be impacted by fire, drought, insects and diseases, or natural disasters. |
| | | **TRES RIOS FO RMP 2015** Guideline 2.4.67:  When developing or modifying water developments, BMPs (Appendix N) should be used to mitigate potential impacts from West Nile virus on sage-grouse within Occupied Habitat. |
| **FLUID MINERALS** | | |
| **Unleased Fluid Minerals** | | |
| 52 | Fluid Minerals | No similar action. |
| 53 | Fluid Minerals | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all Federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: 1) all forms of entry, appropriation, or disposal under the public land laws; 2) location, entry, and patent under the mining laws; and 3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws. **GUNNISON GORGE NCA RMP 2004** |

BLM_0027509

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Oil and gas stipulation:  Gunnison Gorge NCA-1 (Colorado BLM Exhibit CO-02) NSO stipulation.  To protect grouse strutting/dancing grounds (including sage and mountain sharp-tailed grouse and lesser and greater prairie chickens) within a two-mile (three-kilometer) radius from the site (potentially affects MU 4). Oil and gas stipulation:  Gunnison Gorge NCA-12 NSO stipulation.  To protect GUSG brood rearing habitat in certain riparian areas (potentially affects MU 3, 4, 6). Oil and gas stipulation:  Gunnison Gorge NCA-14 CSUS:  Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond 500 feet of the riparian vegetation zone on the lands described below (for clarification, the 500-foot restriction starts at the point between riparian vegetation and upland vegetation).  To protect perennial water impoundments and streams, and/or riparian/wetland vegetation zone, important GUSG brood-rearing habitat, and fish use, water quality, and other related resource values. **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2): No Leasing: BLM surface/federal minerals.  Manage 295,600 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes] GUSG Critical Habitat; Allowable Use (FM-AU3):  No Leasing: Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39 in Appendix A: [includes] GUSG Critical Habitat (16,500 acres) **GUNNISON RMP 1993** CO-2, Sage Grouse Lek/Courtship sites; CO-2: No surface occupancy or use is allowed within a one-quarter mile radius of sage grouse lek sites/courtship sites. NOTE:  The 1993 Gunnison RMP specifies a NSO buffer for sage-grouse leks within a 0.25-mile radius of leks.  The 2005 Gunnison Sage Grouse RCP specifies a NSO buffer within a 0.6-mile radius of active leks.  Per BLM policy to implement the RCP, the 1997 Public Land Health Standards Amendment to the RMP, and BLM policy regarding sage-grouse management, the 0.6-mile sage-grouse active lek buffer would be implemented. GUSG lek sites NSO stipulation (G-10) (within a 0.6 mile radius of GUSG leks of inactive, historic, and unknown status). (Geothermal Amendment) CSU, CO-28, Riparian/Wetland vegetation in Sage Grouse Brood Rearing Habitat -- Lease STIPULATION CSU GUSG mapped summer-fall habitat CSU stipulation (G-25) |

BLM_0027510

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1. all forms of entry, appropriation, or disposal under the public land laws;<br>2. location, entry, and patent under the mining laws; and<br>3. the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto.<br><br>**MOAB FO RMP 2008**<br>If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek.<br>Purpose:  To protect occupied lek sites within GUSG Habitat.<br>Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM.<br>Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM.<br><br>**MONTICELLO FO RMP 2008**<br>CSU STIPULATION:  Avoid surface-disturbing activities within year round habitat (between 0.6 and 4.0 miles of active [GUSG lek].  If activities cannot be avoided, then an operating plan which incorporates the applicable conservation measures outlined in the GUSG RCP (2005 as amended) must be approved by the BLM prior to surface-disturbing activities.<br>Conservation measures from this plan include, but are not limited to: Fences would be fitted with visual devices to minimize grouse collisions; Road length and width would be minimized and vehicles not exceed 35 mph; Bury power lines or place raptor perching deterrents on power poles; Any necessary equipment would produce minimal noise, including compressors, vehicles, and other sources of noise by using mufflers or noise suppression devices.<br>Exception:  The Field Manager may grant an exception after an analysis the authorized officer determines that the animals are not present in the project area.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. |

BLM_0027511

| R O W | PROGRAM AREA | NO ACTION<br>ALTERNATIVE A |
|---|---|---|
| | | Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse.<br>CSU STIPULATION:  No surface-disturbing activities are allowed within 0.6 miles of an active GUSG strutting ground [lek].<br>No surface-disturbing activities are allowed within 0.6 mile of an active strutting ground.<br>Exception:  The Field Manager may grant an exception if, after an analysis, the authorized officer determines that the animals are not present in the project area or the activity can be completed so as to not adversely affect the animals.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat.<br>Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse.<br>Purpose:  To protect and conserve GUSG and their habitat.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>NSO: [Stip. Code: CO-2] Grouse (includes sage grouse, mountain sharp-tailed, lesser and greater prairie chickens).<br>NSO within one-quarter mile radius of a lek site (courtship area). (p. 17)<br><br>**SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>NSO on all Occupied Habitat within 4.0 miles of lek sites and extending to include the top of Poncha Pass on all BLM-managed mineral estate north of the 4.0-mile buffer on both sides of Highway 285.<br><br>**TRES RIOS FO RMP 2015**<br>NSO:  No surface occupancy is allowed on the lands described below: as mapped for occupied Gunnison sage-grouse habitat.  For the purpose of: Protecting priority habitat such as lek sites and nesting habitat for Gunnison sage-grouse. (3.4.2)<br>Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. (2.4.61) |
| 54 | Fluid Minerals | **GUNNISON GEOTHERMAL LEASING RMP AMENDMENT 2011**<br>GUSG mapped summer-fall habitat CSU stipulation (G-25).<br><br>**MONTICELLO FO RMP 2008**<br>Leasing will be available with CSU stipulations for oil and gas development.  Follow Suggested Management Practices, where applicable, for oil and gas development listed in the GUSG RCP (2005 as amended).<br>CSU Stipulation:  No surface-disturbing activities allowed within 0.6 miles of an active Gunnison Sage-grouse strutting ground [lek]. |

BLM_0027512

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | CSU Stipulation:  Avoid surface-disturbing activities within year round habitat (between 0.6 and 4.0 miles of active [GUSG lek].  If activities cannot be avoided, then an operating plan that incorporates the applicable conservation measures outlined in the RCP must be approved by the BLM prior to surface-disturbing activities. |
| | | **TRES RIOS FO RMP 2015** CSU - Unoccupied Habitat:  In unoccupied Gunnison sage-grouse habitat, NSO would be allowed within a 0.6-mile radius of a newly identified lek site.  A TL may be applied to lease activities if surface occupancy is allowed. A TL may apply to construction, drilling, and workovers within 4.0 miles of an identified lek site from March 1 through June 30, dependent on the distribution of suitable nesting habitat and line of sight from the activity to the lek (potential habitat as identified in the Gunnison Sage Grouse Rangewide Plan, 2005). (3.4.3) |
| 55 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** No WEMs. |
| 56 | Fluid Minerals | No similar action. |
| 57 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes]<br>Occupied GUSG Habitat (12,700 acres). |
| 58 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced.<br>Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present.  Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment.<br>Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing).<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-38 in Appendix A: [includes]<br>Occupied GUSG Habitat<br>Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes]<br>Occupied GUSG Habitat (12,700 acres). |
| 59 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced.<br>Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present.  Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. |

BLM_0027514

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing).<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes]<br>Occupied GUSG Habitat<br>Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes]<br>Occupied GUSG Habitat (12,700 acres). |
| 60 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015**<br>Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.<br><br>**SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.  This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |

BLM_0027515

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 61 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015**<br>Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.<br><br>**SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.  This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |
| 62 | Fluid Minerals | **GUNNISON GORGE NCA RMP 2004**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands outside the NCA and Wilderness boundaries will be open to leasing with standard lease terms, except as noted in management unit prescriptions... Other special stipulations and conditions for leasing of federal mineral estate, such as NSO stipulation and timing limitation stipulation (TLS), will be recommended in some management unit prescriptions; these special stipulations and conditions will also apply to federal surface and split-estate lands adjacent to the management unit in which the stipulations in Appendix E will apply.<br><br>**GUNNISON RMP 1993**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands, that is, private or other non-federal surface estate overlying federal mineral estate, will be open to leasing with standard lease terms.  Other special stipulations and conditions for leasing such as no surface occupancy and seasonal restrictions are assigned or specified in each management unit prescription and as deemed necessary; these special stipulations and conditions will also apply to federal surface and split-estate lands. |

BLM_0027516

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MOAB FO RMP 2008**<br>On 20,061 acres of split-estate lands, the BLM will apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM will close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix A). Mitigation measures to protect other resource values will be developed during the appropriate site-specific environmental analysis and will be attached as conditions of approval to permits in consultation with the surface owner or SMA. |
| | | **MONTICELLO FO RMP 2008**<br>On split-estate lands, lease stipulations will consist of those necessary to comply with non-discretionary federal laws, such as the Endangered Species Act. The one exception to this will be the stipulations developed for GUSG as identified in Appendix B. Mitigation measures will also be applied to protect other resource values such as VRM class, recreation, and non-federally protected fish and wildlife species consistent with Section 6 of the standard lease terms. These mitigation measures will be developed during site-specific environmental analysis and will be attached as COAs in consultation with the surface owner or surface management agency. |
| | | **UNCOMPAHGRE BASIN**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms: Other conditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands. Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities. |
| 63 | Fluid Minerals | **TRES RIOS FO RMP 2015**<br>Guideline 2.4.61: Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 64 | Fluid Minerals | No similar action. |
| **Leased Fluid Minerals** | | |
| 65 | Fluid Minerals | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all Federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: |

BLM_0027517

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | 1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Oil and gas stipulation:  Gunnison Gorge NCA-1 (Colorado BLM Exhibit CO-02) NSO stipulation.  To protect grouse strutting/dancing grounds (including sage and mountain sharp-tailed grouse and lesser and greater prairie chickens) within a two-mile (three-kilometer) radius from the site (potentially affects MU 4).<br>Oil and gas stipulation:  Gunnison Gorge NCA-12 NSO stipulation.  To protect GUSG brood rearing habitat in certain riparian areas (potentially affects MU 3, 4, 6).<br>Oil and gas stipulation:  Gunnison Gorge NCA-14 CSUS:  Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond 500 feet of the riparian vegetation zone on the lands described below (for clarification, the 500-foot restriction starts at the point between riparian vegetation and upland vegetation).  To protect perennial water impoundments and streams, and/or riparian/wetland vegetation zone, important GUSG brood-rearing habitat, and fish use, water quality, and other related resource values.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (FM-AU2):  No Leasing: BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes]<br>Occupied GUSG Habitat;<br>Allowable Use (FM-AU3):  No Leasing: Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39 in Appendix A: [includes]<br>Occupied GUSG Habitat (12,700 acres)<br><br>**GUNNISON RMP 1993**<br>CO-2, Sage Grouse Lek/Courtship sites; CO-2: No surface occupancy or use is allowed within a one-quarter mile radius of sage grouse lek sites/courtship sites.<br>NOTE:  The 1993 Gunnison RMP specifies a NSO buffer for sage-grouse leks within a 0.25-mile radius of leks.  The 2005 Gunnison Sage Grouse RCP specifies a NSO buffer within a 0.6-mile radius of active leks.  Per BLM policy to implement the RCP, the 1997 Public Land Health Standards Amendment to the RMP, and BLM policy regarding sage-grouse management, the 0.6-mile sage-grouse active lek buffer would be implemented. |

BLM_0027518

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | GUSG lek sites NSO stipulation (G-10) (within a 0.6 mile radius of GUSG leks of inactive, historic, and unknown status). (Geothermal Amendment) CSU, CO-28, Riparian/Wetland vegetation in Sage Grouse Brood Rearing Habitat -- Lease STIPULATION CSU GUSG mapped summer-fall habitat CSU stipulation (G-25) **MCINNIS CANYONS NCA PROCLAMATION 2000** As specified in the enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: 1. all forms of entry, appropriation, or disposal under the public land laws; 2. location, entry, and patent under the mining laws; and 3. the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto. **MOAB FO RMP 2008** If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek. Purpose:  To protect occupied lek sites within GUSG Habitat. Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. Modification:  The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM. Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. **MONTICELLO FO RMP 2008** CSU STIPULATION:  Avoid surface-disturbing activities within year round habitat (between 0.6 and 4.0 miles of active [GUSG lek].  If activities cannot be avoided, then an operating plan which incorporates the applicable conservation measures outlined in the GUSG RCP (2005 as amended) must be approved by the BLM prior to surface-disturbing activities. Conservation measures from this plan include, but are not limited to: Fences would be fitted with visual devices to minimize grouse collisions; Road length and width would be minimized and vehicles not exceed 35 mph; Bury power lines or place raptor perching deterrents on power poles; Any necessary equipment would produce minimal noise, including compressors, vehicles, and other sources of noise by using mufflers or noise suppression devices. |

BLM_0027519

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Exception:  The Field Manager may grant an exception after an analysis the authorized officer determines that the animals are not present in the project area. Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse. CSU STIPULATION:  No surface-disturbing activities are allowed within 0.6 miles of an active GUSG strutting ground [lek]. No surface-disturbing activities are allowed within 0.6 mile of an active strutting ground. Exception:  The Field Manager may grant an exception if, after an analysis, the authorized officer determines that the animals are not present in the project area or the activity can be completed so as to not adversely affect the animals. Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse. Purpose:  To protect and conserve GUSG and their habitat. **SAN JUAN/SAN MIGUEL RMP 1985** NSO: [Stip. Code: CO-2] Grouse (includes sage grouse, mountain sharp-tailed, lesser and greater prairie chickens). NSO within one-quarter mile radius of a lek site (courtship area). (p. 17) **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** NSO on all Occupied Habitat within 4.0 miles of lek sites and extending to include the top of Poncha Pass on all BLM-managed mineral estate north of the 4.0-mile buffer on both sides of Highway 285. **TRES RIOS FO RMP 2015** NSO:  No surface occupancy is allowed on the lands described below: as mapped for occupied Gunnison sage-grouse habitat.  For the purpose of: Protecting priority habitat such as lek sites and nesting habitat for Gunnison sage-grouse. (3.4.2) Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. (2.4.61) |
| 66 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all |

BLM_0027520

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 67 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) |

BLM_0027521

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3): No Leasing: Split-estate. Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 68 | Fluid Minerals | No similar action. |
| 69 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015** Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. |
| | | **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.  This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |
| 70 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015** Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The |

BLM_0027522

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. |
| | | **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |
| 71 | Fluid Minerals | **GUNNISON GORGE NCA RMP 2004**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands outside the NCA and Wilderness boundaries will be open to leasing with standard lease terms, except as noted in management unit prescriptions... Other special stipulations and conditions for leasing of federal mineral estate, such as NSO stipulation and timing limitation stipulation (TLS), will be recommended in some management unit prescriptions; these special stipulations and conditions will also apply to federal surface and split-estate lands adjacent to the management unit in which the stipulations in Appendix E will apply.<br><br>**GUNNISON RMP 1993**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands, that is, private or other non-federal surface estate overlying federal mineral estate, will be open to leasing with standard lease terms. Other special stipulations and conditions for leasing such as no surface occupancy and seasonal restrictions are assigned or specified in each management unit prescription and as deemed necessary; these special stipulations and conditions will also apply to federal surface and split-estate lands.<br><br>**MOAB FO RMP 2008**<br>On 20,061 acres of split-estate lands, the BLM will apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM will close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix A). Mitigation measures to protect other resource values will be developed during the appropriate site-specific environmental analysis and will be attached as conditions of approval to permits in consultation with the surface owner or SMA. |

BLM_0027523

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MONTICELLO FO RMP 2008**<br>On split-estate lands, lease stipulations will consist of those necessary to comply with non-discretionary federal laws, such as the Endangered Species Act.  The one exception to this will be the stipulations developed for GUSG as identified in Appendix B.  Mitigation measures will also be applied to protect other resource values such as VRM class, recreation, and non-federally protected fish and wildlife species consistent with Section 6 of the standard lease terms.  These mitigation measures will be developed during site-specific environmental analysis and will be attached as COAs in consultation with the surface owner or surface management agency.<br><br>**UNCOMPAHGRE BASIN**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms:  Other conditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands.  Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities. |
| 72 | Fluid Minerals | No similar action. |
| 73 | Fluid Minerals | **GUNNISON GORGE NCA RMP 2004**<br>Oil and gas stipulation:  Gunnison Gorge NCA-15 (Colorado BLM Exhibit CO-30) Information Notice or Lease Notice:  A potential closure period from March 1 through June 30, and special mitigation measures to protect nesting GUSG from surface-disturbing activities. Information Notice or Lease Notice:  The lessee is hereby notified of potential closure period (March 1 through June 30) and special mitigation to protect nesting GUSG from surface-disturbing activities.  GUSG nesting habitat is described as sagebrush stands with plants between 30 and 100 centimeters in height and 15 to 40 percent mean canopy cover.<br>Oil and gas stipulation:  Gunnison Gorge NCA-8 TLS:  No surface use is allowed December 16 through March 15 [Nov.15 – March 30 specified in RMP]. Protecting crucial GUSG wintering range (potentially affects MU 4, 6).<br>**GUNNISON GEOTHERMAL LEASING RMP AMENDMENT 2011**<br>GUSG Timing Limitation stipulations (G-20):  Construction or drilling activities will not be allowed in Occupied Habitat between March 15 and May 15.<br>GUSG Timing Limitation stipulations (G-21):   Routine operations, maintenance, and other activities in Occupied Habitat will be allowed between 9:00 a.m. and 4:00 p.m. during the period between March 15 and May 15.  This restriction applies to human activity, and not to continuing operation of equipment and facilities, such as well pumps, power plant, and cooling equipment. |

BLM_0027524

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|-------|--------------|-------------------------|
| | | **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>BRCW (applicable on BLM-managed and split-estate lands) No human encroachment in mapped Occupied Habitat March 1 – August 15.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Stipulation Code CO-30: In order to protect nesting grouse species, surface-disturbing activities proposed during the period between March 1 and June 30 will be relocated, consistent with lease rights granted and section 6 of standard lease terms, out of grouse nesting habitat. Sage-grouse nesting habitat is described as sage stands with sagebrush plants between 30 and 1000 centimeters in height and a mean canopy cover between 15 and 40 percent.<br>TL: To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only from May 16 to March 14 on sage grouse strutting grounds. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.<br>Stipulation Code CO-15: Grouse (includes sage-grouse, mountain sharp-tailed, and lesser and greater prairie chickens) Sage-grouse crucial winter habitat -- December 16 to March 15.<br><br>**TRES RIOS FO RMP 2015**<br>2.3.71: New noise sources resulting from management activities should not contribute to noise levels that negatively impact sage-grouse leks during the active lek season (March 1 to June 30) based on best available science.<br>3.4.5 Controlled Surface Use – Noise Restriction Occupied and Unoccupied Habitat<br>Surface occupancy or use is subject to the following special operating constraints: New noise sources resulting from management activities must not contribute to noise levels exceeding 34 A-weighted decibels (dBA) (10 dBA above ambient measures, typically 20 to 24 dBA) from 6 p.m. until 9 a.m. at the perimeter of a lek during active lek season. In Occupied Habitat the BLM would not authorize vehicular traffic between the hours of 6 p.m. and 9 a.m. within 1.9 miles of a lek from March 15 through May 15 annually. This stipulation applies to vehicles that may create noise levels that exceed recommended guidance.<br>2.3.70: Structures in sage-grouse habitat should be constructed to limit risk of collision and predation. (See Structure Design in General Management.)<br>Guideline 2.4.62: Remote methodologies for monitoring, transporting fluids to centralized collection tanks, etc., should be utilized to minimize human disturbance in Gunnison sage-grouse habitat. |
| | **SOLID MINERALS** | |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| **Locatable Minerals** | | |
| 74 | Solid Minerals | No similar action. |
| **Locatable Minerals** | | |
| 75 | Locatable Minerals | **CANYONS OF THE ANCIENTS NM PROCLAMATION 2000**<br>From the Proclamation: All Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral leasing, other than by exchange that furthers the protective purposes of the monument, and except for oil and gas leasing as prescribed herein. ... The establishment of this monument is subject to valid existing rights.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the CCNCA enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the CCNCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto.<br><br>**MOAB FO RMP 2008**<br>Where public lands are sold or exchanged under 43 U.S.C. 682(B) (Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S.C. 1718 (Sales) or 43 U.S.C. 1716 (Exchanges), the minerals reserved to the United States will continue to be removed from the operation of the mining laws unless a subsequent land-use planning |

BLM_0027526

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | decision expressly recommends restoring the land to mineral entry. |
| 76 | Locatable Minerals | **CANYONS OF THE ANCIENTS NM PROCLAMATION 2000**<br>From the Proclamation:  All Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral leasing, other than by exchange that furthers the protective purposes of the monument, and except for oil and gas leasing as prescribed herein. ... The establishment of this monument is subject to valid existing rights.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the CCNCA enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the CCNCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto.<br><br>**MOAB FO RMP 2008**<br>Where public lands are sold or exchanged under 43 U.S.C. 682(B) (Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S.C. 1718 (Sales) or 43 U.S.C. 1716 (Exchanges), the minerals reserved to the United States will continue to be removed from the operation of the mining laws unless a subsequent land-use planning decision expressly recommends restoring the land to mineral entry. |
| 77 | Locatable Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Locate no new mining claims and undertake no new prospecting or exploration activities designed to identify new |

BLM_0027527

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | locatable hardrock minerals or to establish the discovery of valuable mineral deposits.  Approve no operating plans for mining operations, unless the USDOI has made a final determination regarding the validity of the mining claims and mill sites covered by the plan. |
| | | **GUNNISON GORGE NCA RMP 2004** BLM will conduct validity examinations on all mining claims located within the NCA or on any lands withdrawn from mineral entry. |
| 78 | Locatable Minerals | **GUNNISON GORGE NCA RMP 2004** Plans of operation will be required for proposed locatable mineral activity authorized by BLM's surface management regulations on the following lands: 1) lands closed to OHV travel and 2) lands within designated ACECs. MU 4 (GUSG ACEC/IBA):  A plan of operation will be required in this ACEC, for locatable mineral activities that will result in surface disturbance. |
| | | **MOAB FO RMP 2008** To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).  These stipulations are found in Appendix A.  Locatable minerals include gold, copper, and uranium. |
| | | **TRES RIOS FO RMP 2015** See Timing Limitations and No Ground Disturbance in General Management section. 2.3.73 Applicable BMPs should be applied to all mineral proposals as COAs within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 79 | Locatable Minerals | **TRES RIOS FO RMP 2015** See Timing Limitations and No Ground Disturbance in General Management section. 2.3.73 Applicable BMPs should be applied to all mineral proposals as COAs within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| **Salable Minerals** | | |
| 80 | Salable Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** See 43 CFR 3600 which prohibits mineral materials disposal in National Monuments. |
| | | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** |

BLM_0027528

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: <br> 1.  all forms of entry, appropriation, or disposal under the public land laws; <br> 2.  location, entry, and patent under the mining laws; and <br> 3.  the operation of the mineral leasing, mineral materials, and geothermal leasing laws. <br><br> **GUNNISON GORGE NCA RMP 2004** <br> Disposal of saleable mineral material on federal mineral estate will not be permitted in the NCA and Wilderness. Disposal of mineral materials from specific areas outside the NCA and Wilderness will be permitted unless prohibited in a management unit prescription.  Disposal of mineral materials where not prohibited will be discretionary with the authorizing official and will be determined on a case-by-case basis.  Disposal of mineral materials within power site reserves or within other agency withdrawn lands will require approval of the agency reserving the withdrawal. <br><br> **GUNNISON RMP 1993** <br> Disposal of mineral material on federal mineral estate will be permitted.  Disposal of mineral materials from specific areas is discretionary with the authorizing official and will be determined on a case-by-basis.  Disposal of mineral materials within power site reserves or within other agency withdrawn lands will require approval of the agency reserving the withdrawal. <br> **MCINNIS CANYONS NCA PROCLAMATION 2000** <br> As specified in the CCNCA enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the CCNCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: <br> 1.  all forms of entry, appropriation, or disposal under the public land laws; <br> 2.  location, entry, and patent under the mining laws; and <br> 3.  the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto. <br><br> **MOAB FO RMP 2008** <br> To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).  These stipulations are found in Appendix A.  Salable minerals include sand and gravel, clay, and building stone. <br><br> **MONTICELLO FO RMP 2008** |

BLM_0027529

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Management conditions for disposal of mineral materials under each category correspond respectively to the oil and gas leasing stipulations developed in the RMP, as follows: Standard lease terms TL and CSU NSO and closed. **SAN LUIS RMP 1991** San Luis Area #1; I-4:  Federal mineral estate will be open on 486,240 acres (99 percent) and will be available for disposal of mineral materials except in riparian zones. **TRES RIOS FO RMP 2015** See Timing Limitations and No Ground Disturbance in General Management section. 2.3.73:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 81 | Salable Minerals | **GUNNISON RMP 1993** MU 7 (West Antelope Creek ACEC) MU 11 (grouse high production areas) MU 12 (elk and deer crucial winter range) MU 14 (riparian areas containing important sage grouse brood-rearing areas) MU 16 (general resource lands): Disposal of mineral materials will not be permitted on federal mineral estate within 1/4 mile of all leks in the unit from April 1 through May 31 in order to prevent disturbance to strutting sage grouse. |
| 82 | Salable Minerals | **GUNNISON RMP 1993** MU 7 (West Antelope Creek ACEC) MU 11 (grouse high production areas) MU 12 (elk and deer crucial winter range) MU 14 (riparian areas containing important sage grouse brood-rearing areas) MU 16 (general resource lands): Disposal of mineral materials will not be permitted on federal mineral estate within 1/4 mile of all leks in the unit from April 1 through May 31 in order to prevent disturbance to strutting sage grouse. **MOAB FO RMP 2008** |

BLM_0027530