CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.61 - DOE Uranium Lease Tracts within the Decision Area**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

BLM_0027812

# OTHER SOLID LEASABLE MINERALS

Other solid leasable minerals include most chlorides, sulfates, carbonates, borates, silicates, or nitrates of sodium or potassium (potash) and related products, phosphate and related minerals, and gilsonite (including all vein-type solid hydrocarbons).  Rarely, hard rock minerals that would otherwise be locatable (such as gold, silver, copper, and uranium, etc.) may also be subject to leasing on certain lands acquired by the federal government (rather than typical public domain lands). These typically locatable minerals are discussed in the Locatable Minerals section. Solid leasable minerals are extracted by a broad array of methods, including surface, underground, and solution mining methods.

While classified as solid leasable minerals, coal and oil shale and tar sands are not discussed here as they are considered beyond the scope of this RMP Amendment. (See Section 1.2.5.)

## INDICATORS

The following indicators are used to describe the existing condition related to solid minerals leasing and to analyze the impacts of the preferred alternative and other alternatives on the availability of and access to federal solid mineral resources:

- Acres of federal minerals leased for solid minerals
- Acres of federal minerals closed to solid minerals leasing
- Acres of federal minerals open to solid minerals leasing
- Acres subject to NSO stipulation
- Acres subject to CSU, TL, and/or standard stipulations
- Acres of ROW exclusion and avoidance areas (described in 3.12 Lands and Realty).

## EXISTING CONDITIONS

There are solid leasable minerals activities authorized in the Monticello-Dove Creek population area.  The other population areas have no current activity and no identified potential for solid minerals.

BLM_0027813

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.68 - Federal Mineral Estate Closed and Open to Leasing and Leased for Solid Minerals**

| HABITAT TYPE | ACRES CLOSED TO LEASING[1] | ACRES OPEN TO LEASING | ACRES UNDER PROSPECTING PERMITS | ACRES LEASED |
|---|---|---|---|---|
| Total Decision Area - Federal Minerals | 238,500 | 764,400 | 19,000 | 0 |
| Occupied Habitat | 81,900 | 432,200 | 6,000 | 0 |
| Unoccupied Habitat | 125,100 | 178,700 | 13,000 | 0 |
| Non-Habitat | 31,500 | 153,500 | 0 | 0 |

[1]Includes areas administratively unavailable for leasing, such as Wilderness Areas, Wilderness Study Areas, and certain withdrawn lands.

In addition, there are approximately 281,500 acres of federal minerals located within four miles of GUSG leks, but outside of Occupied and Unoccupied Habitat in the decision area.  Similar to the decision area, there are eight pending potash prospecting permits that overlap a portion of the Non-Habitat in proximity to the Monticello-Dove Creek Population.  There is no current activity and no identified potential for solid minerals in proximity to the other population areas.  Approximately 10% of the Non-Habitat Areas are located in areas closed to leasing, primarily within Wilderness, WSAs, NCAs, or the Canyons of the Ancients NM.

## Gunnison Basin Population

### Gunnison FO

No areas within the Gunnison FO have been identified as having development potential for leasable solid minerals and there is no mention of leasable solid minerals in the Gunnison RMP.  Solid minerals leases would be managed under the same stipulations as those applicable to fluid mineral leases.  Those stipulations are discussed in the Fluid Minerals section of this chapter.

### Uncompahgre FO

No areas in the Uncompahgre FO portion of the Gunnison Basin population area have been identified as having development potential for leasable solid minerals.

Under the current Uncompahgre Basin RMP (1989), there are no lease stipulations prescribed for protection of GUSG or GUSG habitat.

## Cerro Summit-Cimarron-Sims Mesa Population

### Uncompahgre and Gunnison FOs

The mineral potential and RMP guidance for BLM lands supporting the Cerro Summit-Cimarron-Sims Mesa GUSG Population are the same as that for the Gunnison Basin Population.

BLM_0027814

## Crawford Population

### Gunnison Gorge NCA

The Gunnison Gorge NCA and the Gunnison Gorge Wilderness are withdrawn from mineral leasing. While there is no specific mention of leasable solid minerals management in the Gunnison Gorge RMP, solid mineral leases outside of the NCA and Wilderness would be managed under the same stipulations as those applicable to fluid mineral leases. Those stipulations are discussed in the Fluid Minerals section of this chapter.

### Uncompahgre FO

No areas in the Uncompahgre FO portion of the Gunnison Basin population area have been identified as having potential for leasable solid minerals.

Under the current Uncompahgre Basin RMP (1989), there are no special stipulations prescribed for protection of GUSG or GUSG habitat.

## Monticello-Dove Creek Population

### Canyons of the Ancients NM

All federal lands and interests in lands are withdrawn from solid mineral leasing.

### Tres Rios FO

There is high potential for the occurrence of a variety of solid leasable minerals, primarily sodium and potash (BLM 2013c). In 2013, the Tres Rios FO prepared an EA in which six of 19 potash prospecting permit applications were analyzed. Five of the applications were authorized, four of which were in Unoccupied Habitat. The sixth application, located in Occupied Habitat, was deferred. There are 13 additional prospecting permit applications, which include 2,579 acres in Occupied Habitat and 10,298 acres in Unoccupied Habitat.

Under the Tres Rios RMP, the same or similar surface use restrictions may be applied to solid leasable minerals as those applied to fluid leasable minerals (BLM 2015b). Those stipulations are discussed in the Fluid Minerals section of this chapter.

### Monticello FO

Within the Monticello FO, no areas with solid mineral potential have been identified in the decision area. Neither of the two Known Potash Leasing Areas are within GUSG habitat. The Moab and Monticello FOs are developing a Master Leasing Plan for oil and gas and potash leasing. The analysis area for the Master Leasing Plan is generally west of the GUSG decision area and does not include any GUSG habitat.

BLM_0027815

There are six pending prospecting permit applications, which include 2,513 acres in Occupied Habitat.

## Piñon Mesa Population

### Dominguez-Escalante NCA and McInnis Canyons NCA

As specified in the enabling legislation, both NCAs are withdrawn from mineral leasing.

### Grand Junction FO

Under the Grand Junction RMP (2015), Occupied Habitat and Unoccupied Habitat are closed to leasing. Although there is moderate occurrence potential for potash within the population area, no interest in exploration activities has been expressed (BLM 2015c).

### Uncompahgre FO

Within the Uncompahgre FO, no lands supporting the Piñon Mesa Population have been identified as having potential for leasable solid minerals (BLM 2010a).

Under the existing Uncompahgre Basin RMP, no lease stipulations are prescribed for protection of GUSG or GUSG habitat.

### Moab FO

Under the Moab RMP, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable) to the extent possible. Leasable solid minerals include coal and potash (BLM 2008e). Although three areas within the Moab FO fall within known potash leasing areas, none of the areas overlap with GUSG habitat.

## San Miguel Basin Population

### Tres Rios FO

The decision area holds potential for a variety of solid leasable minerals subject to lease under the Mineral Leasing Act of 1920, as amended. The same or similar surface use restrictions would apply to solid leasable minerals as those for fluid leasable minerals (BLM 2015b).

### Uncompahgre FO

Within the Uncompahgre FO, no lands supporting the San Miguel Basin Population have been identified as having potential for leasable solid minerals.

BLM_0027816

CHAPTER 3 - AFFECTED ENVIRONMENT

Under the current Uncompahgre Basin RMP (1989), there are no special stipulations prescribed for protection of GUSG or GUSG habitat.

### Poncha Pass Population

#### San Luis Valley FO

There is no mention of leasable solid minerals in the San Luis RMP.  As with direction in the other RMPs, any leases for solid minerals would be managed under the same stipulations as those applicable to fluid mineral leases.

## TRENDS

Along with other natural resources, potash and soda ash have experienced a rise in commodity prices to historic levels.  With high demand for sodium and potassium deposits expected to continue, soda ash and potash exploration activity in the planning area is projected to increase over the next ten to fifteen years (BLM 2008c).

The U.S. is the largest consumer of potash and imports about 80 percent of the potash used mainly from Canada.  About 85 percent of U.S. potash sales are to the fertilizer industry and the principal use of potash worldwide is as an agricultural fertilizer.  A growing world population and corresponding increased need for food will require continued growth in both potash production and consumption (BLM 2014f).

Growing demand for potash in association with the sharp rise in potash prices in 2008 ($900 per ton) and continuing high prices through 2012 ($470 per ton) have sparked a renewed interest in the potash resources of the Paradox Basin in both Colorado and Utah.  Though the price of potash dropped to $470 per ton in 2012 and has slowly declined and hovered near $387 per ton, the interest in potash resources within the Paradox Basin has remained high.  The Paradox Basin contains over 25 percent of the known potash resources in the United States (BLM 2014f).  Presently only exploration and prospecting has been proposed for potash.  However, if viable deposits are proved up by exploration, leasing and development could occur in the future.

## 3.11.2.  LOCATABLE MINERALS

The right to explore or develop locatable minerals on federal lands is established by the location (or staking) of lode, placer, tunnel, or millsite mining claims and is authorized under the General Mining Law of 1872, as amended.  Locatable minerals include metallic minerals such as gold, silver, copper, lead, zinc, molybdenum,

BLM_0027817

uranium, and non-metallic minerals such as fluorspar, asbestos, talc, and mica. Within a mining claim, the surface lands remain open to the public for other uses.

The BLM may recommend closures to mineral entry (a land use planning decision) by petitioning the Secretary of the Interior to withdraw areas from further location of mining claims or sites. BLM lands subject to existing mineral withdrawals are summarized in Table 3.69.

Areas not withdrawn are open to location and are subject to surface management regulations (43 CFR 3809). The regulations are nondiscretionary and require the claimant to prevent unnecessary or undue degradation of the land. For operations other than casual use, the claimant is required to submit a notice or a plan of operations. Casual use means activities ordinarily resulting in no or negligible disturbance of the public lands or resources. BLM surface management regulations at 43 CFR 3809.11(c)(6) require that in GUSG habitat (areas with federally listed threatened species or their designated critical habitat), an operator must submit a plan of operations regardless of whether the proposed activities would otherwise be subject to a notice.

The plan would be reviewed, including an environmental analysis under NEPA, to be sure that the required performance standards (43 CFR 3809.420) would be met. Performance standards include such things as land use plan compliance, actions to protect public lands, (such as, to prevent adverse impacts to threatened or endangered species and their habitat which may be affected by operations), concurrent reclamation, and full reclamation requirements. In addition, the BLM would require a bond or financial guarantee that would cover the estimated costs of reclamation.

## INDICATORS

The following indicators are used to describe the existing condition related to the exploration and development of locatable minerals. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal locatable mineral resources, particularly in the context of the potential for such mineral resources:

- Acres of current mining claims
- Acres of federal minerals withdrawn from mineral entry
- Acres of federal minerals proposed for withdrawal from mineral entry.

BLM_0027818

CHAPTER 3 - AFFECTED ENVIRONMENT

## EXISTING CONDITIONS

Within the decision area, there are some areas with moderate to high locatable mineral potential (primarily for uranium and vanadium). These areas are in the Monticello-Dove Creek population area. The existing conditions for locatable mineral claims and withdrawals across the decision area are summarized in Table 3.69 and are depicted in Figures 3.62–3.68. Note that the acres of active claims in Table 3.69 are actual acres reported in BLM Land & Mineral Legacy Rehost 2000 System (LR2000) records. However, the active claims shown on the maps are mapped to the nearest quarter-section (usually about 160 acres) and so illustrate the distribution of active claims rather than actual acres. The conditions related to locatable mineral claims vary between BLM field offices and between GUSG populations, and are described in detail later in this section.

In addition, there are approximately 284,400 acres of federal minerals located within four miles of GUSG leks, but outside of Occupied Habitat and Unoccupied Habitat in the decision area. Similar to the decision area, only the Non-Habitat Areas in proximity to the Monticello-Dove Creek Population (less than 10% of Non-Habitat) have been identified as having moderate to high potential for uranium and vanadium. There are about 22 active mining claims within Non-Habitat Areas in proximity to the San Miguel Basin Population, 1 in proximity to the Piñon Mesa Population, and 5 in proximity to the Monticello-Dove Creek Population.

**Table 3.69 - Status of Locatable Minerals in the Decision Area**

| POPULATION | HABITAT TYPE | ACRES WITHDRAWN[1] | ACRES OPEN TO LOCATION | ACTIVE CLAIMS (AC) |
|---|---|---|---|---|
| Gunnison Basin | Occupied | 17,750 | 449,100 | 3,190 |
| | Unoccupied | 9,420 | 100,200 | 7,830 |
| | Non-Habitat | 0 | 68,380 | 230 |
| Cimarron/Cerro/Sims Mesa | Occupied | 70 | 14,700 | 0 |
| | Unoccupied | 940 | 10,300 | 0 |
| Crawford | Occupied | 6,860 | 26,100 | 0 |
| | Unoccupied | 1,540 | 31,700 | 0 |
| | Non-Habitat | 1,310 | 0 | 0 |
| Monticello-Dove Creek | Occupied | 0 | 23,170 | 0 |
| | Unoccupied | 5,930 | 57,770 | 2,090 |
| | Non-Habitat | 0 | 32,550 | 60 |
| Piñon Mesa | Occupied | 380 | 25,800 | 0 |
| | Unoccupied | 36,800 | 133,500 | 21 |
| | Non-Habitat | 310 | 45,780 | 0 |
| San Miguel Basin | Occupied | 380 | 65,500 | 520 |

BLM_0027819

CHAPTER 3 - AFFECTED ENVIRONMENT

| POPULATION | HABITAT TYPE | ACRES WITHDRAWN[1] | ACRES OPEN TO LOCATION | ACTIVE CLAIMS (AC) |
|---|---|---|---|---|
| | Unoccupied | 0 | 13,600 | 0 |
| | Non-Habitat | 0 | 83,800 | 770 |
| Poncho Pass | Occupied | 220 | 16,500 | 0 |
| | Unoccupied | 130 | 15,800 | 0 |
| | Non-Habitat | 310 | 45,780 | 0 |
| TOTAL | Occupied | 25,640 | 614,900 | 3,710 |
| | Unoccupied | 54,820 | 337,700 | 9,940 |
| | Non-Habitat | 1,620 | 282,800 | 1,060 |

[1] Includes Wilderness Canyons of the Ancients NM, NCAs, and other withdrawn lands.
BLM 2015, queried July 16, 2015.

BLM_0027820

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.62 - Withdrawals and Active Claims in Cerro Summit-Cimarron-Sims Mesa Population Area**



BLM_0027821

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.63 - Withdrawals and Active Mining Claims in the Crawford Population Area**



BLM_0027822

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.64 - Withdrawals and Active Mining Claims in the Gunnison Basin Population Area**



BLM_0027823

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.65 - Withdrawals and Active Mining Claims in Monticello-Dove Creek Population Area**



BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
**AUGUST 2016**

BLM_0027824

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.66 - Withdrawals and Active Mining Claims in the Piñon Mesa Population Area**



BLM_0027825

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS

AUGUST 2016

Figure 3.67 - Withdrawals and Active Mining Claims in the Poncha Pass Population Area

CHAPTER 3 - AFFECTED ENVIRONMENT



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.68 - Withdrawals and Active Mining Claims in the San Miguel Basin Population Area**



BLM_0027827

CHAPTER 3 - AFFECTED ENVIRONMENT

## Gunnison Basin Population

Within the Gunnison Basin population area, 27,200 acres are withdrawn from location of mining claims, along with an additional 19,610 acres withdrawn from location of claims for nonmetallic minerals only. The remainder of the area is open to locating claims. There are 540 mining claims in this population area, which account for 11,027 acres (1.9 % of the area) (BLM 2015a). An additional 358 claims not fully within the decision area includes up to 7,373 acres.

Of the active claims in the decision area, only 309 acres are under a pending plan of operations, meaning that a plan has been submitted to, but has not yet been approved by, the BLM.

### Gunnison FO

Historically within the Gunnison FO, metallic mineral resources have been produced from the Gunnison Gold Belt, which lies within the Colorado Mineral Belt. The Iron Hill area near Powderhorn contains mineral deposits with a good potential for production of rare earth metals, such as titanium (BLM 1991b). The White Earth Mining District of the Iron Hill Carbonatite Complex near Powderhorn contains a massive carbonatite stock that forms the core of the Iron Hill carbonatite complex. The carbonatite stock is enriched in rare earth elements, niobium, and thorium, while the adjacent pyroxenite unit is enriched in these same elements, as well as substantial amounts of titanium (Long et al 2010).

### Uncompahgre FO

No potential for locatable minerals has been identified in the portion of the Uncompahgre FO supporting the Gunnison Basin Population (BLM 2010a).

## Cerro Summit-Cimarron-Sims Mesa Population

### Uncompahgre FO and Gunnison FO

There are 1,020 acres withdrawn from location of mining claims in the Cerro Summit-Cimarron-Sims Mesa population area, including 40 acres withdrawn from location of claims for nonmetallic minerals only. The rest of the area is open to locating claims.

No potential for locatable minerals has been identified (BLM 1991b, BLM 2010a) and no mining claims occur within the population area (BLM 2015a).

## Crawford Population

Within the Crawford population area, 7,240 acres are withdrawn from location of mining claims, while an additional 1,310 acres are withdrawn in Non-Habitat areas.

BLM_0027828

The rest of the area is open to locating claims. There are no mining claims in this population area (BLM 2015a).

### Gunnison Gorge NCA

There is little development related to locatable minerals in the NCA area. Federal mineral estate in areas outside of the NCA and Wilderness and not under withdrawal is open to entry and location under the general mining laws, including recreational panning. Plans of operation will be required for proposed locatable mineral activity authorized by the BLM's surface management regulations on the following lands: 1) lands closed to OHV travel and 2) lands within designated ACECs. Within the Gunnison Sage-Grouse ACEC (MU 4), a plan of operation will be required for locatable mineral activities that would result in surface disturbance.

### Uncompahgre FO

No potential for locatable minerals has been identified in this part of the Uncompahgre FO (BLM 2010a).

## Monticello-Dove Creek Population

Within the Monticello-Dove Creek population area, 5,970 acres are withdrawn from location of mining claims, including about 1,710 acres withdrawn as lease tracts to the Department of Energy Uranium Leasing Program. (See Figure 3.70.) An additional 280 acres are withdrawn from location of claims for nonmetallic minerals only. The rest of the area is open to locating claims. There are 101 mining claims totaling 2,087 acres (3.8 % of the population area) (BLM 2015a). An additional 258 claims that includes up to 5,351 acres are not fully within the decision area.

### Tres Rios FO

There is a high potential for the occurrence of uranium and vanadium, as well as some potential for copper, along the Colorado-Utah border in the Uravan Mineral Belt (BLM 2013c).

### Monticello FO

The primary locatable minerals with potential for development are uranium and vanadium, often located along with copper. There is a high potential for the occurrence of uranium and vanadium deposits in historic mining areas. Where the Chinle and Morrison formations are present outside of these areas, there is a moderate potential for occurrence and a low to moderate potential for occurrence of copper. The copper deposits throughout the Monticello FO are low-grade and sparse, making development unlikely (BLM 2005d).

BLM_0027829

### Canyons of the Ancients NM

When Canyons of the Ancients NM was established, the law specified that all federal lands and interests in lands within the boundaries of the monument were appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws.  The establishment of the Monument, and concurrent withdrawal, were subject to valid existing rights.  There are two existing unpatented uranium mining claims located in the Monument (BLM 2009).

## Piñon Mesa Population

There is moderate potential for the occurrence of uranium and vanadium in the Piñon Mesa population area (BLM 2015a).  There are 37,200 acres withdrawn from location of mining claims in this population area, including 6,180 acres withdrawn from location of claims for nonmetallic minerals only.  An additional 310 acres are withdrawn in Non-Habitat areas.  The rest of the population area is open to locating claims.  There is one mining claim within the area that accounts for 21 acres (less than 0.1% of the area) (BLM 2015a).  Another two claims consisting of up to 41 acres are not fully within the decision area.

### McInnis Canyons NCA

As specified in the McInnis Canyons NCA enabling legislation (Public Law 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA, and all land and interests in land acquired for the NCA or associated Wilderness Area by the U.S. are withdrawn from location, entry, and patent under the mining laws.

### Grand Junction FO

There are no approved mining operations in this area, but the public has been collecting gemstones from a few abandoned underground mines along Highway 141 southwest of Whitewater.  There is no other discussion of any potential for locatable minerals in the Piñon Mesa population area in the Grand Junction FO (BLM 2015c).

### Uncompahgre FO

There is no discussion of any potential for locatable minerals in the Piñon Mesa population area in the Uncompahgre FO (BLM 2010a).

### Dominguez-Escalante NCA

As specified in the Dominguez-Escalante NCA enabling legislation (Omnibus Public Lands Management Act of 2009), subject to valid existing rights, all federal land within the NCA and associated Wilderness Area and all land and interests in land

BLM_0027830

acquired by the U.S. within the NCA or associated Wilderness Area are withdrawn from location, entry, and patent under the mining laws.

## Moab FO

The primary locatable minerals in the decision area include copper, uranium and vanadium. While no mining activity has occurred within GUSG habitat in the Moab FO, most of the lands are open for location. To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).

# Poncha Pass Population

## San Luis Valley FO

The portion of the decision area in the San Luis Valley FO was identified as having low to moderate potential for locatable minerals.

In the Poncha Pass population area, 350 acres are withdrawn from location of claims for nonmetallic minerals only. The rest of the area is open to locating claims. There are currently no mining claims in this population area (BLM 2015a).

# San Miguel Basin Population

## Tres Rios FO and Uncompahgre FO

There is a high potential for the occurrence of uranium and vanadium in the Uravan Mineral Belt along the Colorado-Utah border, as well as some potential for copper (BLM 2013c).

In the San Miguel population area, 360 acres are withdrawn from location of claims for nonmetallic minerals only, while the rest of the area is open to locating claims. There are currently 25 mining claims totaling 517 acres (0.6 % of the population area) (BLM 2015a). There are another 119 claims totaling up to 2,413 acres that are not fully within the decision area.

Of the active claims, only 41 acres in the Uncompahgre FO are under an authorized plan of operations (for uranium mining).

## TRENDS

The demand for mineral resources is driven by price, which, in turn, is governed by improvements in technology of exploration, production, refining, transportation, manufacture, and use; changes in lifestyle; changes in regulation and availability of land and access; changes in patterns of supply and demand (both domestically and

BLM_0027831

internationally); and changes in national policy areas (including military conflict, security, and strategic reserves). The planning area has reserves of precious metals used for industrial, cosmetic, and investment purposes, as well as base metals (copper, lead, zinc, molybdenum, tin, tungsten, bismuth, and tellurium) used for a variety of industrial purposes. Exploration drilling of these deposits is a distinct possibility.

The planning area contains uranium resources used for domestic power generation, medicine, and weapons, as well as vanadium used in steel production and batteries. Currently, important locatable mineral interests within the decision area are limited to uranium and vanadium (in the Monticello-Dove Creek area). The increasing interest in nuclear power generation, as well as the need for vanadium (a byproduct of uranium development), for modern energy, air, space, power, and weapons technology could rapidly increase the demand for uranium exploration, development, and processing.

Although higher gold prices have increased the number of mining claims in the area, no substantial gold mining or exploration projects on public lands have come to fruition in the recent past, but continued high prices would likely translate into increased exploration and development in the near future. Demand for limestone for use as a chemical scrubber for coal-fired power plants could also increase.

## 3.11.3. SALABLE MINERALS

Salable minerals (also referred to as mineral materials) include common varieties of construction materials and aggregates, such as, sand, gravel, limestone aggregate, building stone, cinders (clinker), moss-covered rock (moss rock), roadbed, decorative rock, clay, and ballast material. Mineral materials are sold or permitted under the Mineral Materials Sale Act of 1947, as amended and regulated under 43 CFR 3600. The sale of mineral materials is discretionary.

Sand and gravel, as construction aggregate, is an extremely important resource. The extraction of the resource varies directly with the amount of development nearby—road building and maintenance, and urban development—as sand and gravel is necessary for that infrastructure development. The proximity of both transportation and markets are key elements in the development of a deposit.

Mineral materials are sold at a fair market value or made available through free use permits to governmental agencies. Local government agencies and nonprofit organizations may obtain these materials free of cost for community purposes. The BLM can make mineral materials available to the public through small sales contracts and may designate areas called "community pits" or "common use areas" for these small sales.

BLM_0027832

CHAPTER 3 - AFFECTED ENVIRONMENT

## INDICATORS

The following indicators are used to describe the existing condition related to the development of salable minerals.  These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal salable mineral resources:

- Acres of currently permitted salable mineral sites
- Acres of federal minerals open to salable mineral development
- Acres of federal minerals closed to salable mineral development
- Acres of federal minerals proposed for withdrawal from mineral disposal.

## EXISTING CONDITIONS

Unlike most locatable minerals, deposits of common variety mineral materials occur everywhere, by default.  Common sites for natural concentrations of small to large amounts of such materials are canyon walls, stream channels, talus slopes, landslides, ancient river terraces, glacial moraines, and floodplains.  Road cuts, quarries, and pits increase the amount of material available for extraction.  Areas with known resources, or areas that are favorable for resources of sand and gravel, may contain materials that are ready for use or that are suitable for screening, washing, or crushing in order to meet size or fine-material requirements.

The existing conditions for salable minerals across the decision area are summarized in the following tables.  The conditions related to salable minerals vary between BLM field offices and between GUSG populations, and are described in detail later in this section.

Approximately 281,500 acres of federal minerals are located within four miles of GUSG leks, but are outside of Occupied or Unoccupied Habitat in the decision area.  No mineral material sites within the Non-Habitat Areas overlap with the decision area.  Approximately 10% of the Non-Habitat Areas are in locations closed to mineral material sales, primarily within wilderness areas, WSAs, NCAs, or Canyons of the Ancients NM.

BLM_0027833

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.70 - Salable Minerals Status in the Decision Area**

| POPULATION AREA | ACRES CLOSED TO MINERAL MATERIAL SALES | ACTIVE AND PENDING MINERAL MATERIAL SALES/FREE USE PERMITS[1] (ACRES) | |
| --- | --- | --- | --- |
| | | Sand and Gravel | Stone |
| Gunnison Basin | 13,300 | 134 | 173 |
| Cerro Summit-Cimarron-Sims Mesa | 0 | 0 | 0 |
| Crawford | 13,620 | 10 | 0 |
| Monticello-Dove Creek | 4,080 | 0 | 0 |
| Piñon Mesa | 41,080 | 0 | 0 |
| Poncha Pass | 520 | 0 | 0 |
| San Miguel Basin | 0 | 0 | 33 |
| **TOTAL ACRES** | **72,600** | **144** | **206** |

[1] Free Use Permits are issued for federal, state, and local government uses.

## Gunnison Basin Population

There are 5,100 acres currently authorized for free use permits and/or mineral material sales in this population area. Of that, 5,030 acres are in Occupied Habitat. Within Non-Habitat Areas, 110 acres are closed to mineral material sales.

### Gunnison FO

Mineral materials disposal is subject to the following additional restrictions:

- No surface-disturbing activities will be permitted within 0.6 mile of all sage grouse leks during the strutting season to prevent disturbance to mating sage grouse.
- MU 8 (South Beaver Creek ACEC): Disposal of mineral materials on 4,540 acres of federal mineral estate within the unit will not be authorized in order to protect populations of skiff milkvetch.
- MU 9 (Dillon Pinnacles ACEC): Disposal of mineral materials on 530 acres of the federal mineral estate in the unit will not be permitted in order to prevent potential deterioration of scenic, recreation, and other natural values.
- MU 14 (riparian areas containing important sage grouse brood-rearing areas): Disposal of mineral materials on about 2,440 acres of federal mineral estate in the unit will not be authorized, from June 15 through July 31 to prevent disturbance to sage grouse during the brooding period.

BLM_0027834

CHAPTER 3 - AFFECTED ENVIRONMENT

### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the field office is open to mineral material disposal.

## Cerro Summit-Cimarron-Sims Mesa Population

### Uncompahgre FO and Gunnison FO

There are currently no authorized free use permits and/or mineral material sales in this population area.  The management situation for salable minerals in this population area is the same as for the Gunnison Basin population area, with the exception that Gunnison RMP management guidance related to MU 8 and 9 do not apply in this population area.

## Crawford Population

There are 41 acres currently authorized for a free use permit in Occupied Habitat in the Crawford population area.  Within Non-Habitat Areas, 6,700 acres are closed to mineral material sales.

### Gunnison Gorge NCA

Public lands in Flat Top-Peach Valley OHV Recreation Area (MU2) and in the Gunnison and North Fork Rivers SRMA (MU3) outside of the NCA are not available for mineral material sales.

### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the field office is open to mineral material disposal.

## Monticello-Dove Creek Population

No free use permits and/or mineral material sales are currently authorized in the Monticello-Dove Creek population area.

### Tres Rios FO

The following standards specific to protection of GUSG and GUSG habitat apply to mineral material disposals in the decision area:

- Management activities must not occur from March 1 to June 30 within Occupied Habitat suitable for nesting to allow for breeding and December 1 to March 15 for known winter habitat.

- New structural improvements or surface disturbance must not occur within known winter concentration area or within a 0.6-mile radius of known GUSG leks.

The following guidelines specific to protection of GUSG and GUSG habitat apply to mineral material disposals:

- New noise sources resulting from management activities should not contribute to noise levels that negatively impact sage-grouse leks during the active lek season (March 1 to June 30) based on best available science.
- Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations. Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible.

Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within Occupied Habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat.

## Monticello FO

Management conditions for disposal of mineral materials correspond respectively to the oil and gas leasing stipulations developed in the Monticello RMP. Areas with standard lease terms are available for disposal of mineral materials subject to standard conditions. Areas with a TL and/or CSU stipulation are available subject to special conditions. Areas designated as NSO are unavailable for disposal of mineral material, but there are no such areas in the decision area.

### Canyon of the Ancients NM

Mineral materials disposal is prohibited in national monuments.

## Piñon Mesa Population

No free use permits and/or mineral material sales are currently authorized in the Piñon Mesa population area. In Non-Habitat Areas, 14,870 acres are closed to mineral material sales.

### Dominguez-Escalante and McInnis Canyons NCAs

Both NCAs are closed to mineral material disposal.

BLM_0027836

CHAPTER 3 - AFFECTED ENVIRONMENT

### Grand Junction FO

Public lands not otherwise closed are open for consideration for mineral material disposal on a case-by-case basis (BLM 2015c).

### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the Uncompahgre FO is open to mineral material disposal.

### Moab FO

To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable) in the Moab FO.

## Poncha Pass Population

### San Luis Valley FO

There are currently no authorized free use permits and/or mineral material sales in this population area.  In Non-Habitat Areas, 4,840 acres are closed to mineral material sales.

Federal minerals in the entire planning area are open to mineral materials disposal, except for within riparian areas. The area was identified as having low to moderate potential for sand and gravel (BLM 1989).

## San Miguel Basin Population

There are 160 acres currently authorized for free use permits and/or mineral material sales in this population area.

### Tres Rios FO

The management situation for mineral material disposal in this population area is the same as that for the Monticello-Dove Creek Population.

### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the field office is open to mineral material disposal.

## TRENDS

With the continued increase in the human population in the planning area, the need for additional sand and gravel resources for road improvements and other construction related activities will likely increase.  Increasing construction in all area communities will likely create a growing demand for aggregate and fill materials, as

BLM_0027837

CHAPTER 3 - AFFECTED ENVIRONMENT

well as for decorative and landscaping stone. The building of new roads and the maintenance and improvement of existing roads may create increasing demand for aggregate for asphalt and cement and gravel for road surfaces. The competition for gravel and aggregate, may likely result in more development of quarries and pits within the decision area, on public lands as well as on adjacent private lands.

BLM_0027838

CHAPTER 3 - AFFECTED ENVIRONMENT

# 3.12. LANDS & REALTY

## 3.12.1. LAND USE AUTHORIZATIONS & UTILITY CORRIDORS

Land use authorizations include granting right-of-ways (ROWs), permits, and leases. A ROW grant is an authorization to use a specific piece of public land for a certain project, such as roads, pipelines, transmission lines, and communication sites. A ROW grant authorizes rights and privileges for a specific use of the land for a specific period of time. Generally, a BLM ROW is granted for a term appropriate for the life of the project and typically for a maximum of a 30-year term.

Broad policy concerning the granting of ROWs for roads and trails across public land is to provide access to applicants who do not have access to their private property, cannot gain access across nonfederal land, and cannot exercise existing rights of access across nonfederal land. ROW grants are authorized for uses such as oil and gas development, water pipelines, electric transmission and distribution lines, roads, and communication lines such as telephone or cable. An ROW authorizes the holder to construct, operate, maintain, and/or terminate a new or existing facility over, under, upon, or through public lands. The majority of ROWs granted are authorized under Title V of the FLPMA and under the Mineral Leasing Act.

Leases and permits are issued for purposes such as commercial filming, advertising displays, apiaries, livestock holding or feeding areas not related to grazing permits and leases, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, or oil rig stacking sites. The regulations for the processing of leases and permits are found at 43 CFR 2920. Permits are short term (generally not to exceed three years) revocable authorizations to use the lands for specified purposes. Leases are usually long-term authorizations requiring a significant capital investment.

In RMPs, areas identified as unsuitable for surface disturbance or occupancy are generally identified as avoidance or exclusion areas for ROWs. Restrictions and mitigation measures could be modified on a case-by-case basis for avoidance areas, depending on impacts on resources, while exclusion areas are strictly prohibited from ROW development.

Utility corridors, developed to concentrate the effects of utility lines in manageable locations on public lands, often provide suitable locations for utility transmission lines. The corridors may contain power lines, transcontinental fiber-optic

BLM_0027839

communication cables, and trans-state gas pipelines. Identifying corridors does not necessarily mandate that transportation and transmission facilities would be located within the corridor, especially if they are not compatible with other resource uses, values, and objectives in and near the corridors, or if the corridors are already at maximum capacity with existing structures.

## INDICATORS

The following indicators are used to describe the existing condition related to land use authorizations, as well as to analyze the impacts of the preferred alternative and other alternatives on the availability of BLM-administered lands for ROWs. The term "ROW" is generally used to refer to all land use authorizations, including ROWs, land use permits, leases, and communication use leases, unless otherwise specified in the discussion. This includes authorizations for solar and wind energy developments:

- Acres of ROW exclusion areas
- Acres of ROW avoidance areas
- Acres of designated utility corridors
- Acres of BLM ROWs
- Powerlines/Phone Lines
  - o Overhead
  - o Buried
- Roads
- Pipelines
- Acres of communication site leases/ROWs
- Acres of other leases and permits

## EXISTING CONDITIONS

In current RMPs, the BLM has allocation decisions in place designating which areas are:

- ROW exclusion areas not available for location of ROWs under any condition
- ROW avoidance areas to be avoided but potentially available for location of ROWs with additional stipulations
- Areas open to ROWs and under what conditions.

In addition, the current RMPs indicate designated ROW corridors, which are specific areas identified as preferred locations for existing and future ROW facilities.

BLM_0027840

CHAPTER 3 - AFFECTED ENVIRONMENT

Table 3.71 provides acreages of ROW exclusion areas, avoidance areas, and open areas, ROW corridors, and currently authorized ROWs (including ROWs, leases, permits, and communication sites) in the decision area.

**Table 3.71 - ROWs and Other Land Use Authorizations in the Decision Area**

| HABITAT TYPE | ROW EXCLUSION AREAS (ACRES) | ROW AVOIDANCE AREAS (ACRES) | OPEN TO ROWS (ACRES) | ROW CORRIDORS (ACRES) | AUTHORIZED ROWS (ACRES[1]) |
|---|---|---|---|---|---|
| **Total Decision Area** | | | | | |
| **Occupied Habitat** | **5,800** | **15,900** | **389,700** | **93,100** | **15,400** |
| **Unoccupied Habitat** | **44,900** | **28,700** | **183,000** | **31,000** | **6,400** |
| **Non-Habitat** | **32,200** | **8,400** | **86,200** | **0** | **0** |
| **Gunnison Basin Population Area** | | | | | |
| Occupied Habitat | 3,300 | 300 | 298,700 | 54,000 | 11,900 |
| Unoccupied Habitat | 4,600 | 2,400 | 59,400 | 5,600 | 3,100 |
| **Cerro Summit-Cimarron-Sims Mesa Population Area** | | | | | |
| Occupied Habitat | 0 | 0 | 4,400 | 6,000 | 700 |
| Unoccupied Habitat | 0 | 0 | 5,000 | 7,000 | 400 |
| **Crawford Population Area** | | | | | |
| Occupied Habitat | 200 | 0 | 22,000 | 1,000 | 700 |
| Unoccupied Habitat | 200 | 40 | 10,200 | 7,500 | 700 |
| Non-Habitat | 1,300 | 0 | 0 | 0 | 0 |
| **Monticello-Dove Creek Population Area** | | | | | |
| Occupied Habitat | 0 | 0 | 10,200 | 22,500 | 200 |
| Unoccupied Habitat | 2,000 | 0 | 32,200 | 100 | 900 |
| **Piñon Mesa Population Area** | | | | | |
| Occupied Habitat | 100 | 24,100 | 12,600 | 0 | 0 |
| Unoccupied Habitat | 4,000 | 86,700 | 93,800 | 100 | 700 |
| Non-Habitat | 18,500 | 5,900 | 8,100 | 0 | 0 |
| **Poncha Pass Population Area** | | | | | |
| Occupied Habitat | 0 | 0 | 9,900 | 7,100 | 300 |
| Unoccupied Habitat | 0 | 0 | 14,900 | 10,500 | 600 |
| **San Miguel Basin Population Area** | | | | | |
| Occupied Habitat | 200 | 0 | 35,700 | 2,500 | 1,600 |
| Unoccupied Habitat | 0 | 0 | 0 | 200 | 0 |
| Non-Habitat | 13,000 | 0 | 27,700 | 0 | 0 |

[1]Includes total acres encumbered by one or more **ROWs**; there may be overlapping **ROWs**, e.g. a phone line within a road **ROW**.

BLM_0027841

CHAPTER 3 - AFFECTED ENVIRONMENT

Table 3.72 provides a summary of the designated ROW exclusion and avoidance areas within the decision area.  Timing limitations that apply to all ground disturbances, apply in areas otherwise open to ROWs and other land use authorizations.

There are about 118,400 acres of BLM lands in Non-Habitat Areas, of which approximately 28% are within ROW exclusion areas and 5% within ROW avoidance areas.

Wilderness Areas are administered to preserve wilderness character and so are generally ROW exclusion areas with some specific allowances for access to inholdings and for valid existing rights, as described in BLM Manual 6340. Wilderness Study Areas are managed so as not to impair the suitability of such areas for preservation as wilderness, and so are also generally ROW exclusion areas, with some specific allowances as described in BLM Manual 6330.

**Table 3.72 - ROW Exclusion and Avoidance Areas in the Decision Area**

| RMP | ROW EXCLUSION[1] | ROW AVOIDANCE |
|---|---|---|
| Canyons of the Ancients NM | Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land. | Include all surface-use stipulations (including NGD/NSO, TL, and protective considerations for cultural resources) on new ROWs. |
| Draft Dominguez-Escalante NCA | ROW exclusion area, except to allow for: <br> • Reasonable access and utilities to non-federal property and existing ROW facilities. <br> • Upgrades or modifications to existing facilities. | N/A |
| Grand Junction | Within 0.6-mile of a lek. | Occupied Habitat; areas within 4-mile radius of a lek. |
| Gunnison | MU9 (Dillon Pinnacles ACEC) | No above-ground utilities in MU1 (Alpine Triangle SRMA) and MU3 (Cochetopa Canyon SRMA). <br> In MU1, public lands north of the south line of Sections 16 and 17, T47N, R3W, NMPM, avoidance area for all other ROWs. |
| Gunnison Gorge NCA | N/A | MU3 (Gunnison and North Fork Rivers SRMA) |
| McInnis Canyons NCA | N/A | N/A |
| Moab | N/A | NSO areas: within 0.6-mile of a lek |
| Monticello | N/A | NSO areas: within 0.6-mile of a lek |
| San Luis | N/A | N/A |
| Tres Rios | N/A | N/A |
| Uncompahgre Basin | N/A | N/A |

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

BLM_0027842

CHAPTER 3 - AFFECTED ENVIRONMENT

| RMP | ROW EXCLUSION[1] | ROW AVOIDANCE |
| --- | --- | --- |

[1] In addition to wilderness areas and wilderness study areas.

It is a BLM objective to grant ROWs to any qualified individual, business, or government entity and to control and direct the use of ROWs on public land so as to:

- Protect the natural resources associated with public lands and adjacent lands;
- Prevent unnecessary or undue environmental damage to the lands and resources;
- Promote the use of rights-of-way in common considering engineering and technological compatibility, national security, and land use plans; and,
- Coordinate, to the fullest extent possible, with state and local governments and interested parties (43 CFR 2801.2 and 2881.2).

ROW corridors are designated in accordance with FLPMA, which requires that the use of ROWs in common shall be required to the extent practical in order to minimize adverse environmental impacts and the proliferation of separate ROWs. Corridors may be suitable to accommodate more than one type of ROW use or facility. Designated corridors are often already occupied by at least one existing facility.

In addition to field office-specific corridors, the BLM in January 2009 issued the Approved RMP Amendment/ROD for Designation of Energy Corridors on Bureau of Land Management Administered Land in the 11 Western States (West Wide Energy Corridors) in accordance with the Energy Policy Act of 2005. The ROD amended four RMPs in the GUSG planning area to designate ROW corridors specific to energy, such as pipelines and transmission lines. As a result of subsequent litigation and a settlement agreement, 36 of the 119 corridors were designated as Corridors of Concern, with additional review requirements. Applications for a new ROW in a utility corridor must still undergo site-specific NEPA analysis before a ROW can be granted.

BLM_0027843

**Figure 3.69 - ROWs and ROW Corridors in Cerro Summit-Cimarron-Sims Mesa Population Area**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

BLM_0027844

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.70 - ROWs and ROW Corridors in the Crawford Population Area**



BLM_0027845

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.71 - ROWs and ROW Corridors in the Gunnison Basin Population Area**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

BLM_0027846

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.72 - ROWs and ROW Corridors in the Monticello-Dove Creek Population Area**



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.73 - ROWs and ROW Corridors in the Piñon Mesa Population Area**



BLM_0027848

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.74 - ROWs and ROW Corridors in the Poncha Pass Population Area**



BLM_0027849

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.75 - ROWs and ROW Corridors in the San Miguel Basin Population Area**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

BLM_0027850

CHAPTER 3 - AFFECTED ENVIRONMENT

The BLM authorizes a wide range of uses and facilities through ROWs, leases, and permits, from interstate electric transmission lines to local electric distribution lines; from major highways to two-track dirt roads accessing private property parcels and/or energy facilities; and various facilities related to energy development that are not authorized as part of mineral lease development.  Table 3.73 summarizes the current land use authorizations in the decision area.

**Table 3.73 - Land Use Authorizations in the Decision Area**

| HABITAT TYPE | POWER AND PHONE LINES | | | ROADS AND HIGHWAYS | PIPELINES | COMMUNI-CATION SITES | WATER-RELATED AND OTHER[1] |
| | Overhead | Buried | Unknown | | | | |
|---|---|---|---|---|---|---|---|
| Occupied Habitat | 6,900 | 260 | 1,800 | 6,200 | 1,500 | 800 | 1,300 |
| Unoccupied Habitat | 2,000 | 100 | 600 | 3,600 | 600 | 100 | 640 |
| **Total Decision Area** | **8,900** | **400** | **2,400** | **9,700** | **2,000** | **900** | **2,000** |
| GUNNISON BASIN POPULATION AREA | | | | | | | |
| Occupied Habitat | 6,700 | 200 | 1,300 | 5,100 | 20 | 500 | 300 |
| Unoccupied Habitat | 600 | 10 | 200 | 2,400 | 0 | 10 | 50 |
| CERRO SUMMIT-CIMARRON-SIMS MESA POPULATION AREA | | | | | | | |
| Occupied Habitat | 0 | 0 | 200 | 800 | 100 | 0 | 180 |
| Unoccupied Habitat | 400 | 0 | 30 | 40 | 0 | 0 | 40 |
| CRAWFORD POPULATION AREA | | | | | | | |
| Occupied Habitat | 0 | 0 | 100 | 0 | 0 | 300 | 600 |
| Unoccupied Habitat | 0 | 0 | 200 | 300 | 100 | 100 | 400 |
| MONTICELLO-DOVE CREEK POPULATION AREA | | | | | | | |
| Occupied Habitat | 10 | 20 | 0 | 200 | 40 | 0 | 10 |
| Unoccupied Habitat | 100 | 0 | 0 | 400 | 500 | 0 | 100 |
| PIÑON MESA POPULATION AREA | | | | | | | |
| Occupied Habitat | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unoccupied Habitat | 400 | 30 | 0 | 300 | 0 | 0 | 100 |
| PONCHA PASS POPULATION AREA | | | | | | | |
| Occupied Habitat | 200 | 40 | 0 | 20 | 0 | 0 | 0 |
| Unoccupied Habitat | 500 | 100 | 0 | 20 | 0 | 0 | 0 |
| SAN MIGUEL BASIN POPULATION AREA | | | | | | | |
| Occupied Habitat | 10 | 0 | 200 | 200 | 1,300 | 10 | 200 |
| Unoccupied Habitat | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] "Water-Related and Other" includes ditches, irrigation facilities, water facilities, water plants, and other

BLM_0027851

## TRENDS

Within the planning area, the demand for ROWs will continue to increase. About 10% of the existing acres occupied by ROWs are for ROWs that were granted in the past ten years. Recent demand has included all types of ROWs, including access roads, electric and phone lines, pipelines, and communication sites. The rate of the increased demand is tied to the rate of population growth and associated private land development, access needs, and utilities development. Demand for ROWs is also tied to minerals development and associated infrastructure development and access needs.

## 3.12.2. WITHDRAWALS

## EXISTING CONDITIONS

Withdrawals are formal lands actions that set aside, withhold, or reserve federal land by statute or administrative public land order for public purposes. Withdrawn lands are specific areas of federal land reserved and set aside from disposal, location, or entry under some or all of the general land laws. These lands are established for the purpose of limiting activities under the laws in order to maintain other public values or to reserve the area for a particular public purpose or program. The segregative effects of withdrawals can vary depending upon the particular resource being protected, and a withdrawal can be modified or eliminated through revocation.

Withdrawals are established for a wide variety of purposes such as Federal Energy Regulatory Commission power site reserves; Department of Defense military reservations; administrative sites; recreation sites; national parks; national forests; Bureau of Reclamation projects such as reservoirs; wild and scenic rivers; and wilderness areas. Withdrawals are most often used to preserve sensitive environmental values and major federal investments in facilities or other improvements, to support national security, or to provide for public health and safety. Withdrawals can be designated by Congress through a public land order or statute, or be processed administratively by the BLM through FLPMA and 43 CFR 2300.

In the decision area, 82,060 acres (including 1,610 acres in Non-Habitat) are currently withdrawn from mineral entry and there are no pending withdrawals. The existing withdrawals include wilderness areas, WSAs, NCAs, Canyons of the Ancients NM, various water power and storage withdrawals, and various administrative withdrawals. Refer to the Locatable Minerals section for a further

BLM_0027852

CHAPTER 3 - AFFECTED ENVIRONMENT

discussion of withdrawals and to Table 3.69 in that section, which summarizes the current withdrawals in the decision area.

BLM_0027853

CHAPTER 3 - AFFECTED ENVIRONMENT

# 3.13. AREAS OF CRITICAL ENVIRONMENTAL CONCERN

Areas of Critical Environmental Concern (ACEC) are the only special designation category brought forward for analysis in this amendment. (See Section 1.2.5 for a complete list of issues identified and considered but not further analyzed.) The BLM uses the ACEC designation to highlight areas where special management attention is necessary to protect and prevent irreparable damage to important historic, cultural, and scenic values; fish or wildlife resources; or other natural systems or processes [43 CFR 1610.7-2(b)]. ACEC designation may also be used to protect human life and safety from natural hazards.

## INDICATORS

- The presence or absence of an ACEC is indicated by a designation within a BLM RMP.

## EXISTING CONDITIONS

### 3.13.1. CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

One ACEC in the decision area has been designated expressly for the purpose of protecting GUSG habitat. The 22,000-acre Gunnison Sage Grouse ACEC/Important Bird Area is located within the Gunnison Gorge NCA decision area. These lands contain a population of GUSG that is managed under the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado (Crawford Sage-Grouse Partnership 1998). At the time of designation, the ACEC was believed to include 100 percent of the Occupied Habitat in the NCA planning area.

The Gunnison Gorge NCA RMP (2004) sets forth management of the ACEC as follows:

Public lands in the Management Unit 4 (22,200 acres) are designated and managed as the Gunnison Sage Grouse ACEC/Important Bird Area. Management and protection of the GUSG and its habitat will be emphasized in this management unit.

For 22,000 acres within the Gunnison Sage-Grouse ACEC, the following lease stipulations for GUSG and GUSG habitat protection apply:

BLM_0027854

CHAPTER 3 - AFFECTED ENVIRONMENT

- NSO within 2 miles of GUSG leks
- NSO stipulation within riparian areas
- TL within GUSG winter range, November 15 through April 30
- CSU stipulation for other GUSG habitat.

A lease notice could be attached to oil and gas leases containing GUSG nest sites that would prohibit surface-disturbing activities or require other special mitigation on leases from March 1 through June 30 to prevent disturbance to nesting GUSG.

## TRENDS

ACECs are an administrative designation analyzed solely through the RMP process. ACEC designation is determined by the planning schedule and does not exhibit an identifiable future trend beyond that.

CHAPTER 3 - AFFECTED ENVIRONMENT

# 3.14. SOCIAL & ECONOMIC CONDITIONS

This section evaluates existing demographic and economic conditions in and around GUSG Habitat and assesses the economic role of activities that rely on BLM-managed resources in the region.  Additional species conservation measures may affect these activities and, therefore, socioeconomic conditions.  These consequences are addressed in Chapter 4.

The GUSG populations are spread across nine Colorado counties and two Utah counties:  Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel counties in Colorado and Grand and San Juan counties in Utah.  Most of the demographic and economic data are presented at the county level, with reference to statewide conditions and trends for context.  While county-level data often masks variation within counties, community-level data, particularly in rural areas, is scarce and typically contains large margins of error. Therefore, county-level data is considered the best available for analysis.

The economic contribution analysis relies on functional economic areas—defined by labor market linkages—rather than the political boundaries of a county.  The economic analysis groups the 11 counties into three areas.  Area One includes Delta, Gunnison, Hinsdale, Montrose, Ouray, and Saguache counties in Colorado, Area Two includes Mesa County, Colorado, and Area Three includes Dolores, and San Miguel counties in Colorado and Grand and San Juan counties in Utah.  Although Mesa County, Colorado and Grand County, Utah share one of the critical habitat units, the economic linkages between these counties are weak.  Therefore, these counties are addressed separately in the socioeconomic analysis.

## INDICATORS

The following are indicators of socioeconomic effects resulting from management actions related to the protection of Gunnison Sage-Grouse within the decision area:

- Employment, labor income, and output associated with economic activities affected by management alternatives
- Number of jobs
- Dollar value of output and labor income
- Qualitative assessment of additional costs to the use of public lands and resources
- Grazing allotment infrastructure and management costs

BLM_0027856

- Restrictions on mineral development and extraction, including fluid mineral leasing stipulations (e.g., NSO) and ROW exclusion and avoidance designations
- Recreation site access
- Interest groups and communities of place
- Qualitative assessment of effects to quality of life
- Qualitative assessment of non-market values
- Environmental Justice
- Qualitative assessment of disproportionately high and adverse human health and environmental impacts

## 3.14.1. DEMOGRAPHIC AND ECONOMIC CONDITIONS

### Area 1

The Gunnison Basin contains the largest population of GUSG (approximately 4,000 birds or 80% of the total population). The occupied portions of this Gunnison Basin area extend across portions of Gunnison and Saguache counties. Other habitat areas include the Cerro Summit-Cimarron-Sims Mesa area (mostly in Montrose County), the Crawford area (Delta, Gunnison, and Montrose counties) and the Poncha Pass area (mostly in Saguache County).

As indicated in Table 3.74, most of the counties in Area 1 grew more slowly than the State of Colorado between 2000 and 2012. Montrose County, which is also the most populous county, and Ouray County slightly exceeded Colorado's population growth rate over this period. All other counties in this area experienced population growth rates that were substantially slower than statewide population growth.

BLM_0027857

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.74 - Area 1 Population Change, 2000–2012**

| COLORADO COUNTY | 2000 POPULATION | 2012 POPULATION | POPULATION GROWTH 2000-2012 |
|---|---|---|---|
| Delta County | 27,824 | 30,432 | 9.4% |
| Gunnison County | 14,000 | 15,475 | 10.5% |
| Hinsdale County | 792 | 810 | 2.3% |
| Montrose County | 33,438 | 40,725 | 21.8% |
| Ouray County | 3,747 | 4,530 | 20.9% |
| Saguache County | 5,904 | 6,304 | 6.8% |
| State of Colorado | 4,302,086 | 5,187,582 | 20.6% |
| **Source: U.S. Census Bureau 2000 and 2012b** | | | |

Population growth can put pressure on existing housing stock and drive new residential development when vacancy rates are low.  New residential development in these counties may result in habitat loss and fragmentation (IEc 2013).  However, the counties with the largest shares of habitat (Gunnison and Saguache counties) have some of the lowest population growth rates in the area.  This decreases the likelihood of conflict between population growth and GUSG habitat.

In all counties except Ouray, a minority of land is privately owned.  Public land provides natural amenities, open space, recreation opportunities, and other benefits to nearby residents.  High levels of public land ownership can also constrain development.  Throughout the West, high shares of public lands increase the potential for land management actions to influence local economic conditions.  Table 3.75 shows the large share of BLM-managed public lands in Delta, Gunnison, Hinsdale, Montrose, and Saguache counties.  The high percentage of BLM lands underscores the potential for changes in BLM GUSG conservation measures to affect social and economic activity.

**Table 3.75 - Area 1 Land Ownership**

| COLORADO COUNTY | PRIVATE LAND | BLM |
|---|---|---|
| Delta County | 43.2% | 30.1% |
| Gunnison County | 18.5% | 17.3% |
| Hinsdale County | 4.5% | 17.5% |
| Montrose County | 31.0% | 42.7% |
| Ouray County | 52.9% | 7.5% |
| Saguache County | 26.0% | 16.9% |

BLM_0027858

CHAPTER 3 - AFFECTED ENVIRONMENT

| COLORADO COUNTY | PRIVATE LAND | BLM |
|---|---|---|
| State of Colorado | 56.7% | 12.6% |
| Source: USGS 2012 | | |

Industry composition may influence the relationship between habitat conservation and regional economic activity. Several counties in this area have large shares of employment in the agricultural sector (see Appendix E). Livestock grazing in critical habitat areas may require modification to prevent conflict with the GUSG. In Delta County, cattle ranching and farming is the largest agricultural sector in the county, with 464 jobs (approximately 3 percent of all employment in the county). Montrose County also has a large share of employment in cattle ranching and farming, with 483 jobs (2 percent of total employment in the county). More than one-third of employment in Saguache County is in the agricultural sector. Seventy jobs in the county are in cattle ranching and farming subsector, which is approximately 3 percent of all employment in the county (IMPLAN 2012). While BLM allotments often provide a small portion permittees' forage, public land forage complements ranching operations that also occur on adjacent National Forest System lands and private lands.

Mineral and energy development activities may be affected by GUSG conservation measures. Delta, Gunnison, and Montrose counties have large shares of employment in the mining sector (7.9%, 7.4%, and 4.7%, respectively; see Appendix E). Restrictions on surface occupancy and disturbance, for example, could affect the prevalence of mining activity in the region.

Habitat conservation measures may also affect outdoor recreation opportunities on public lands. More than twenty percent of employment in Gunnison County is in tourism-related sectors (arts, entertainment, and recreation and accommodation and food services), which reflects the importance of outdoor recreation to local economic activity in the county (IMPLAN 2012). Appendix E provides details on sector-level employment for all counties in the planning area. The economic analysis discusses the economic role of grazing, recreation, mineral extraction, and energy development on BLM-managed public lands in the area.

Table 3.76 displays median household income for each of the Area 1 counties.

BLM_0027859

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.76 - Area 1 Median Household Income**

| COLORADO COUNTY | MEDIAN HOUSEHOLD INCOME |
|---|---|
| Chaffee County | $45,713 |
| Delta County | $42,786 |
| Gunnison County | $50,091 |
| Hinsdale County | $54,844 |
| Montrose County | $47,139 |
| Ouray County | $66,474 |
| Saguache County | $32,429 |
| State of Colorado | $58,244 |
| **Source: U.S. Census Bureau 2012a** | |

Most counties in the area are less affluent than the state as a whole. Only Ouray County has higher median household income than the state. Saguache County has the lowest median household income in the area. Low household income can increase vulnerability to social and economic change, as people have access to fewer resources. In addition to having the lowest household income in the area, Saguache County also has the highest unemployment rate.

Figure 3.76 displays the 10-year trend for unemployment in Area 1. While unemployment spiked throughout the area during the recession, only Saguache County continues to experience unemployment above 10 percent. Montrose County also has a high unemployment rate compared to the state. Montrose County experienced the most severe unemployment during the recession. All other counties in the area have unemployment rates similar to, or below, the unemployment rate in the state.

BLM_0027860

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.76 - Unemployment Trends, Area 1**



Source: BLS 2014

Discussions with county officials in this area indicated that residents value open space, outdoor recreation opportunities, and recognition of their historical – and in some cases continued – reliance on resource-based industries for employment. Communities in this area offer a wealth of natural amenities, which make communities appealing places to live that positively contribute to quality of life. In some communities in this area, natural amenities also drive second-home ownership (Gunnison County 2014). Out-of-county property owners bring outside money into counties, which can create jobs and improve local services. Second-home ownership can also increase housing costs, which make it more difficult for low-wage workers to live near their place of work (Gunnison County 2014). County officials also noted the importance of multiple use management on public lands in the area to local economic activity.

## Area 2

The majority of the Piñon Mesa GUSG Population inhabits areas to the southwest of Grand Junction and Fruita in Mesa County, Colorado. Grand Junction is the largest city in Mesa County and the largest city between Denver and Salt Lake City. As a regional economic center, the county is economically diverse. Other communities in the county rely on agriculture and oil and gas extraction for local employment and income. Public land amenities, including recreational opportunities and open space, attract residents to the area. Mesa County has grown substantially over the past 50 years, but has also experienced a number of boom and bust cycles. BLM-managed

BLM_0027861

CHAPTER 3 - AFFECTED ENVIRONMENT

public lands in the county contribute to local employment and income through energy development, recreation, and livestock grazing (BLM 2012).

As shown in Table 3.77, Mesa County added more than 30,000 residents between 2000 and 2012.  The population growth rate in the county exceeds the statewide population growth rate. Population growth can strain infrastructure, housing supply, and community relations. New residential development may lead to habitat loss and fragmentation (IEc 2013). Therefore, population growth may also complicate the conservation of GUSG critical habitat.

**Table 3.77 - Population Change in Area 2, 2000–2012**

| COLORADO COUNTY | 2000 POPULATION | 2012 POPULATION | POPULATION GROWTH, 2000-2012 |
|---|---|---|---|
| Mesa County | 116,939 | 147,848 | 26.4% |
| State of Colorado | 4,302,086 | 5,187,582 | 20.6% |
| **Source: U.S. Census Bureau 2000 and 2012b** | | | |

As shown in Table 3.78, nearly half of the land in Mesa County is managed by the BLM.  As a result, BLM management actions have the potential to meaningfully influence social and economic conditions in the county. Federal land management decisions may affect water quality, recreation opportunities, and resource extraction. The social and economic influence of public land management decisions increases where the majority of land is publicly owned.

**Table 3.78 - Area 2 Land Ownership**

| COLORADO COUNTY | PRIVATE LAND | BLM LANDS |
|---|---|---|
| Mesa County | 25.9% | 46.6% |
| State of Colorado | 56.7% | 12.6% |
| **Source:  USGS 2012** | | |

Habitat conservation measures may affect livestock grazing, outdoor recreation opportunities, and mineral activities on public lands.  Mesa County has a large share of employment (5.1%) in the mining sector compared to Colorado overall (1.8%). The relative economic specialization in the mining sector suggests that GUSG conservation measures could affect economic activity on BLM-managed lands in the county. Appendix E provides further details on sector-level employment for the county.

BLM_0027862

CHAPTER 3 - AFFECTED ENVIRONMENT

Table 3.79 displays median household income in Mesa County and the State of Colorado.

**Table 3.79 - Area 2 Median Household Income**

| COLORADO COUNTY | MEDIAN HOUSEHOLD INCOME |
|---|---|
| Mesa County | $51,029 |
| State of Colorado | $58,244 |
| Source: U.S. Census Bureau 2012a | |

Household income in Mesa County is lower than median household income in the state, although it is higher than many counties in Area 1. Additionally, Figure 3.86 shows that the unemployment rate in Mesa County has exceeded the statewide unemployment rate since 2009. While the unemployment rates have tracked closely over much of the past decade, the unemployment rate in the county is currently about 1 percentage point higher than Colorado's unemployment rate.

**Figure 3.77 - Unemployment Trends, Area 2**



Source: BLS 2014

## Area 3

Most of the GUSG habitat in this area is near the communities of Dove Creek in Dolores County, Colorado and Monticello in San Juan County, Utah. This  habitat area also covers a large portion of San Miguel County, Colorado.

BLM_0027863

CHAPTER 3 - AFFECTED ENVIRONMENT

Discussions with county officials in the area indicate that much of the area in proximity to the critical habitat remains reliant on agriculture, mineral extraction, and other natural resource-based economic activities.  In Dolores County, for instance, 64% of tax revenue was generated from oil and gas activities (Julie Kibel, personal communication, September 25, 2014).  The counties in this area also attract many recreation visitors and other tourists. Natural amenities in the area encourage public land recreation and contribute to residents' quality of life. Balancing economic development with the preservation of natural amenities is a key interest of county officials (Dolores County 2014).

As shown in Table 3.80, all of the counties in Area 3 grew more slowly than other counties in each state between 2000 and 2012.  Relatively slow population growth suggests that these counties are not attracting significant numbers of new residents from other states and counties. The counties are also predominantly rural. The most densely populated county in the area—San Miguel (CO)—has fewer than 6 people per square mile, compared to approximately 50 people per square mile in the State of Colorado (U.S. Census Bureau 2012b).  Slower population growth may reduce incentives for new residential development, which may limit potential conflict between private land development and GUSG habitat.

**Table 3.80 - Population Change in Area 3, 2000–2012**

| COUNTY/STATE | 2000 POPULATION | 2012 POPULATION | POPULATION GROWTH 2000-2012 |
|---|---|---|---|
| Dolores County, CO | 1,844 | 1,994 | 8.1% |
| San Miguel County, CO | 6,593 | 7,580 | 15.0% |
| Grand County, UT | 8,407 | 9,328 | 11.0% |
| San Juan County, UT | 14,389 | 14,965 | 4.0% |
| State of Colorado | 4,302,086 | 5,187,582 | 20.6% |
| State of Utah | 2,233,183 | 2,855,287 | 27.9% |

Source: U.S. Census Bureau 2000 and 2012b

In all counties, a minority of land is in private ownership.  As indicated in Table 3.81, all of the Area 3 counties have lower rates of private land ownership than their respective states.  The BLM manages a particularly large share of lands in San Miguel (CO), Grand (UT), and San Juan (UT) counties.  Due to large shares of public land ownership, BLM management actions related to habitat conservation may affect social and economic conditions in these counties.

BLM_0027864

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.81 - Area 3 Land Ownership**

| COUNTY/STATE | PRIVATE LAND | BLM LANDS |
|---|---|---|
| Dolores County, CO | 33.6% | 14.8% |
| San Miguel County, CO | 35.9% | 38.9% |
| Grand County, UT | 4.3% | 66.0% |
| San Juan County, UT | 8.2% | 41.3% |
| State of Colorado | 56.7% | 12.6% |
| State of Utah | 23.5 | 42.2% |

Source: USGS 2012

Habitat conservation measures may affect livestock grazing, outdoor recreation, and mineral activities on BLM-managed lands. Dolores County, Colorado and San Juan County, Utah have relatively large shares of employment in the agricultural sector. Appendix E provides details on sector-level employment for all counties in the planning area.  In Dolores County, cattle ranching and farming is the largest agricultural sector in the county, with 64 jobs (approximately 6 percent of all employment in the county).  San Juan County also has a large share of employment in cattle ranching and farming, with 155 jobs (2.5 percent of all employment in the county) (IMPLAN 2012).

In comparison, just 0.5% of jobs in Colorado and 0.1% of jobs in Utah are in the cattle ranching and farming sector (IMPLAN 2012). Therefore, a resident of San Juan County, Utah is 25 times more likely to work in cattle ranching and farming than a resident of their state overall. A resident of Dolores County, Colorado is 12 times more likely to work in this sector.  This indicates that Area 3 is specialized in cattle ranching and farming relative to the regional economy.

San Juan County also has a large mining sector, accounting for 7.8% of jobs in the county.  Mining-related employment only accounts for 1% of employment statewide in Utah; therefore, San Juan County is also specialized in mining relative to the broader economy (IMPLAN 2012).

Tourism-related sectors (arts, entertainment, and recreation and accommodation and food services) are among the largest sectors in San Miguel County, Colorado and Grand County, Utah.  More than one-third of employment in San Miguel County and approximately 30% of employment in Grand County is in tourism-related sectors (IMPLAN 2012).  In Colorado, tourism-related sectors account for about 10% of employment. In Utah, those sectors account for 9% of employment (IMPLAN 2012).  Therefore, San Miguel (CO) and Grand (UT) counties are specialized in tourism-related sectors relative to the regional economy.  However, Telluride in eastern San Miguel County (CO) is responsible for driving much of the

BLM_0027865

CHAPTER 3 - AFFECTED ENVIRONMENT

tourism-related employment in the county.  Telluride is physically separate from the decision area and will not be affected by proposed habitat conservation measures.

Table 3.82 displays the median household income in the area.  All counties except San Miguel County, Colorado have lower household incomes than their respective states. Low household income can indicate socioeconomic vulnerability.  Vulnerable individuals and communities may be less resilient to social and economic change.

**Table 3.82 - Area 3 Median Household Income**

| COUNTY/STATE | MEDIAN HOUSEHOLD INCOME |
|---|---|
| Dolores County, Colorado | $43,098 |
| San Miguel County, Colorado | $63,766 |
| Grand County, Utah | $42,208 |
| San Juan County, Utah | $40,186 |
| State of Colorado | $58,244 |
| State of Utah | $58,164 |
| Source: U.S. Census Bureau 2012a | |

In addition to having lower median household incomes, most counties in this area have higher unemployment rates than Colorado and Utah overall. Unemployment in Dolores County, Colorado spiked during the recession, but is again in line with other counties in the region. San Juan (UT), Dolores (CO), and Grand (UT) counties have higher unemployment rates than Colorado and Utah.

BLM_0027866

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.78 - Unemployment Trends, Area 3**



Source: BLS 2014

## 3.14.2. ENVIRONMENTAL JUSTICE

In 1994, President Clinton issued Executive Order 12898 mandating that all federal agencies analyze the potential for their actions to affect minority and low-income populations disproportionately. The Council on Environmental Quality (CEQ) issued supplemental guidance to assist agencies' compliance (CEQ 1997). The CEQ suggests the following criteria for identifying potential environmental justice populations:

- "Minority population: Minority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis..."
- "Low-income population: Low-income populations in an affected area should be identified with the annual statistical poverty thresholds from the Bureau of the Census' Current Population Reports, Series P-60 on Income and Poverty. In identifying low-income populations, agencies may consider as a community either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group experiences common conditions of environmental exposure or effect."

BLM_0027867

CHAPTER 3 - AFFECTED ENVIRONMENT

The emphasis of environmental justice is on health effects and the benefits of a healthy environment.  The CEQ has interpreted health effects with a broad definition: "*Such effects may include ecological, cultural, human health, economic or social impacts on minority communities, low-income communities or Indian Tribes …when those impacts are interrelated to impacts on the natural or physical environment*" (CEQ 1997).

Table 3.83 displays the share of minority populations in each planning area county and their respective states.  Table 3.84 lists the poverty rate in the counties and states.  These conditions are used to evaluate the presence of environmental justice populations in the decision area.

**Table 3.83 - Race and Ethnicity in the Planning Area by County**

| COUNTY/STATE | WHITE ALONE | BLACK OR AFRICAN AMERICAN ALONE | AMERICAN INDIAN OR ALASKA NATIVE ALONE | ASIAN ALONE | NATIVE HAWAIIAN OR OTHER PACIFIC ISLANDER ALONE | SOME OTHER RACE | TWO OR MORE RACES | HISPANIC OR LATINO* |
|---|---|---|---|---|---|---|---|---|
| **State of Colorado** | **84.2%** | **4.0%** | **1.0%** | **2.7%** | **0.1%** | **4.7%** | **3.3%** | **20.6%** |
| Delta County | 94.4% | 1.0% | 0.6% | 0.6% | 0.0% | 2.1% | 1.3% | 14.0% |
| Dolores County | 96.6% | 0.0% | 1.1% | 0.2% | 0.1% | 0.0% | 2.0% | 3.8% |
| Gunnison County | 95.3% | 0.8% | 0.4% | 0.7% | 0.0% | 1.5% | 1.3% | 8.3% |
| Hinsdale County | 99.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.9% | 2.4% |
| Mesa County | 90.2% | 0.7% | 1.1% | 0.7% | 0.1% | 4.6% | 2.7% | 13.3% |
| Montrose County | 91.0% | 0.6% | 0.8% | 0.6% | 0.1% | 3.8% | 3.1% | 19.6% |
| Ouray County | 97.7% | 0.0% | 0.3% | 0.6% | 0.0% | 0.0% | 1.4% | 2.0% |
| Saguache County | 81.0% | 0.5% | 1.5% | 0.2% | 0.1% | 10.4% | 6.4% | 41.3% |
| San Miguel County | 96.6% | 0.2% | 0.4% | 1.6% | 0.0% | 0.2% | 1.0% | 8.9% |
| **State of Utah** | **89.1%** | **1.1%** | **1.1%** | **2.0%** | **0.9%** | **3.4%** | **2.3%** | **12.9%** |
| Grand County | 93.2% | 0.4% | 4.7% | 0.5% | 0.2% | 0.2% | 0.8% | 9.4% |
| San Juan County | 48.2% | 0.1% | 48.7% | 0.5% | 0.4% | 0.4% | 1.7% | 4.9% |

*Hispanic or Latino is an ethnicity and Hispanic/Latino individuals can be of any race.
Source:  U.S. Census Bureau 2012a

San Juan County, Utah has a large share of Native American residents.  Nearly half of county residents identify as Native American. Saguache County (CO) also has a large share of minority residents, with more than 40 percent of people reporting Hispanic or Latino heritage.  Saguache County is the only county that has a larger share of Hispanic/Latino residents than the state overall.

BLM_0027868

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.84 - Percentage of People with Income below the Poverty Level**

| COUNTY/STATE | POVERTY RATE |
|---|---|
| **State of Colorado** | **12.9%** |
| Delta County, Colorado | 14.9% |
| Dolores County, Colorado | 13.9% |
| Gunnison County, Colorado | 16.3% |
| Hinsdale County, Colorado | 5.1% |
| Mesa County, Colorado | 13.4% |
| Montrose County, Colorado | 13.8% |
| Ouray County, Colorado | 6.0% |
| Saguache County, Colorado | 24.8% |
| San Miguel County, Colorado | 7.3% |
| **State of Utah** | **12.1%** |
| Grand County, Utah | 13.6% |
| San Juan County, Utah | 27.9% |
| Source: U.S. Census Bureau 2012a | |

Delta, Dolores, Gunnison, Mesa, Montrose, and Saguache counties in Colorado and Grand and San Juan counties in Utah have poverty rates above the rates in their respective states. Saguache and San Juan counties have the highest poverty rates in the decision area, with approximately one-quarter of residents living in poverty.

San Juan and Saguache counties have large shares of minority residents. These counties also have the highest poverty rates in the decision area. These conditions increase the likelihood that individuals in these counties may experience disproportionately adverse consequences from economic changes. The environmental consequences analysis will evaluate if GUSG conservation measures disproportionately affect the environmental justice populations identified here.

## 3.14.3. ECONOMIC CONTRIBUTION ANALYSIS

Public land uses, including recreation, energy and mineral development, and livestock grazing contribute to economic activity across the twelve counties. The economic contribution analysis estimates the number of jobs and amount of labor income attributable to activities on BLM-managed lands in the study area. GUSG conservation measures are expected to affect energy and mineral development, recreation, and livestock grazing on BLM-managed lands in the decision area. While

BLM_0027869

public land management contributes to economic activity in other ways—e.g., through payments-in-lieu-of-taxes—other contributions are not expected to be measurably affected by GUSG conservation measures.

The economic contribution analysis uses IMPLAN Professional version 3.0, with 2012 data. IMPLAN is an input-output model that estimates the economic consequences of changes in an industry, event, or policy. IMPLAN captures direct, indirect, and induced economic contributions. Direct contributions occur in the immediately affected industry. For example, public land forage directly contributes to employment, income, and output in the cattle ranching sector. Indirect contributions result from directly affected individuals and firms buying goods and services to support their business. Ranchers buying hardware to repair a fence is an example of an indirect contribution. Induced contributions result from employees of the directly and indirectly affected sectors spending household income in the regional economy (e.g., on housing).

Appendix F details the assumptions and methodology used in the economic contribution analysis.

## Oil and Gas

While federal oil and gas production occurs in all three socioeconomic areas, there is limited overlap with GUSG habitat. BLM-managed oil and gas wells exist in the Crawford (Area 1), Monticello-Dove Creek (Area 3), and San Miguel Basin (Area 3) population areas. Because the producing wells that overlap with GUSG habitat are in the Monticello-Dove Creek and San Miguel Basin population areas, the economic contribution of BLM-managed oil and gas is analyzed only for Area 3. For context, countywide oil and gas production from all ownership is disclosed for the three socioeconomic areas.

Energy price volatility complicates the economic contribution analysis. The latest IMPLAN data available for this analysis is from 2012, a year when a barrel of crude oil sold for approximately $100. As of this writing (August 2015), a barrel of crude oil is approximately $45 (USEIA 2015). The dramatic reduction in oil prices likely means that the employment, income, and output data contained in IMPLAN likely differ from current conditions. Natural gas prices have not followed the same downward trend. In 2012, the wellhead price for a Mcf of natural gas was $2.66, which is similar to current prices (EIA 2014).

Area 1 has the lowest levels of oil and gas production among the three socioeconomic areas. Table 3.85 and Table 3.86 display production of federal minerals and production of oil and gas from all ownerships, respectively. Only Delta and Gunnison counties produced oil and gas in 2012 and 2013. Federal minerals accounted for approximately half of natural gas production and 5% of oil production in Area 1.

BLM_0027870

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.85 - Area 1 Federal Mineral Production, Fiscal Year 2013**

| COLORADO COUNTY | OIL (BBL[1]) | GAS (MCF[2]) |
|---|---|---|
| Chaffee County | – | – |
| Delta County | 70 | – |
| Gunnison County | 65 | 1,041,628 |
| Hinsdale County | – | – |
| Montrose County | – | – |
| Ouray County | – | – |
| Saguache County | – | – |
| [1] bbl = barrels of oil | | [2] Mcf = thousand cubic feet |

Source: ONRR 2014

**Table 3.86 - Countywide Oil and Gas Production, Area 1, 2012–2014**

| COLORADO COUNTY | 2012 PRODUCTION | | 2013 PRODUCTION | | 2014 PRODUCTION | |
|---|---|---|---|---|---|---|
| | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) |
| Delta County | 113 | 61,468 | 3,044 | 152,834 | 1,149 | 300,803 |
| Gunnison County | 986 | 1,974,284 | 231 | 1,476,566 | 1,608 | 3,610,345 |
| Hinsdale County | – | – | – | – | – | – |
| Montrose County | – | – | – | – | – | – |
| Ouray County | – | – | – | – | – | – |
| Saguache County | – | – | – | – | – | – |

Source: COGCC 2014

Between 2012 and 2014, Area 1 counties produced an average of 2,377 barrels of oil and 2.5 million Mcf of natural gas annually. No oil and gas was produced from BLM-managed wells in GUSG habitat zones in Area 1. Therefore, an oil and gas economic contribution analysis is not conducted for Area 1.

Area 2 has higher oil and gas production than Area 1, with approximately $1.9 million worth of oil and $58.2 million worth of natural gas extracted from federal sources in fiscal year 2013. Between 2012 and 2014, Area 2 produced an average of 64,180 barrels of oil and 40 million Mcf of natural gas annually. However, like Area 1, Area 2 has no BLM-managed wells in GUSG habitat zones. Therefore, an oil and gas economic contribution analysis is not conducted for Area 2.

BLM_0027871

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.87 - Area 2 Federal Mineral Production, Fiscal Year 2013**

| COLORADO COUNTY | OIL (BBL) | GAS (MCF) |
|---|---|---|
| Mesa County | 20,528 | 21,890,286 |
| [1] bbl = barrels of oil | [2] Mcf = thousand cubic feet | |
| Source: ONRR 2014 | | |

Table 3.88 shows annual production of oil and gas across all mineral ownerships in Mesa County. This data reveals that approximately one-third of oil production and one-half of natural gas production in Mesa County comes from federal minerals.

**Table 3.88 - Countywide Oil and Gas Production, Area 2, 2012–2014**

| COLORADO COUNTY | 2012 PRODUCTION | | 2013 PRODUCTION | | 2014 PRODUCTION | |
|---|---|---|---|---|---|---|
| | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) |
| Mesa County | 72,330 | 46,587,232 | 54,399 | 37,111,263 | 65,811 | 36,311,889 |
| Source: COGCC 2014 | | | | | | |

Area 3 has the highest production of oil and gas in the decision area. Each county in the area reported production of oil and gas. Total federal production in Area 3 accounts for $113.5 million in oil output and $18.7 million in natural gas output. Between 2012 and 2014, Area 3 produced an average of 5.5 million barrels of oil and 51 million Mcf of natural gas annually. Area 3 is the only socioeconomic area in the decision area that has BLM-managed oil and gas producing wells in GUSG habitat zones.

**Table 3.89 - Area 3 Federal Mineral Production, Fiscal Year 2013**

| COUNTY | OIL (BBL) | GAS (MCF) |
|---|---|---|
| Dolores County, Colorado | 18,810 | 264,816 |
| San Miguel County, Colorado | 5,498 | 2,331,571 |
| Grand County, Utah | 768,057 | 2,807,041 |
| San Juan County, Utah | 414,861 | 1,612,013 |
| [1] bbl = barrels of oil | [2] Mcf = thousand cubic feet | |
| Source: ONRR 2014 | | |

BLM_0027872

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.90 - Countywide Oil and Gas Production, Area 3**

| COUNTY | 2012 PRODUCTION | | 2013 PRODUCTION | | 2014 PRODUCTION | |
|---|---|---|---|---|---|---|
| | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) |
| Dolores County, CO | 26,193 | 23,272,905 | 17,472 | 24,114,726 | 14,572 | 48,461,693 |
| San Miguel County, CO | 15,272 | 5,776,642 | 5,917 | 4,382,700 | 2,374 | 4,437,271 |
| Grand County, UT | 363,559 | 4,148,601 | 1,094,061 | 4,341,425 | 1,341,440 | 4,469,215 |
| San Juan County, UT | 4,403,628 | 9,491,182 | 4,571,904 | 9,781,535 | 4,575,257 | 10,650,457 |
| Source: COGCC 2014 and UTDNR 2014 | | | | | | |

Federal minerals account for a relatively small share of total production in Area 3. Table 3.90 displays the annual production of oil and gas across all mineral ownerships in each county. San Juan County, Utah has the highest levels of oil production and Dolores County, Colorado has the highest levels of natural gas production. These are also the counties with the largest share of GUSG Habitat in Area 3. Extraction of BLM-managed oil and gas in the Monticello-Dove Creek population area averaged 6,177 barrels of oil and 275,588 Mcf of gas during the same period. In the San Miguel Basin population area, these figures were 2,166 barrels of oil and 643,693 Mcf of gas. Therefore, BLM-managed resources within GUSG Habitat account for 0.15% of countywide oil production and 1.8% of countywide gas production.

Extraction of BLM-managed oil and gas in the Monticello-Dove Creek and San Miguel Basin population areas support approximately two jobs, $95,000 of labor income, and $630,000 of output on an average annual basis. The economic contribution of oil and gas production may be affected by changes in market conditions. Appendix F describes the assumptions and methodology used to estimate oil and gas economic contributions.

Federal data sources report a varying range of employment in the oil and gas extraction sector. IMPLAN employment estimates, which are derived from several federal sources, exceed the employment numbers reported by the U.S. Census Bureau's County Business Patterns (CBP). In Area 1, IMPLAN reports 859.0 jobs in the extraction of oil and gas, while CBP reports only 4 jobs in 2012. In Area 2, IMPLAN reports 549.7 jobs and CBP reports 99 jobs in 2012. In Area 3, IMPLAN reports 242.7 jobs and CBP reports 90 jobs in 2012 (IMPLAN 2012 and U.S. Census Bureau 2014).

These divergent and conflicting data sets make precise and accurate economic contribution analysis impossible. To reconcile the difference between data sets, the BLM consulted the Colorado State Demography Office and researched the U.S. Census Bureau's County Business Patterns' methodology documents. From this

BLM_0027873

research, it is likely that CBP data underreports employment due to a number of factors, including under representation of sole proprietors, privacy precautions, and CBP's March acquisition of employment data that occurs when a number oil and gas operations are not active. Accordingly, the BLM utilized IMPLAN employment data, which is aggregated from numerous federal economic and demographic data sources.

## Potash

Approximately 19,000 acres of Occupied and Unoccupied Habitat overlap with existing or pending potash prospecting permits. Prior BLM mineral reports have indicated thicknesses of three specific potash seams within this acreage ranging from 14 feet up to 28 feet. Potential potash tonnages within this acreage could be substantial. However, prospecting is needed to determine whether a valuable deposit of potash exists within the lands covered by the prospecting permit applications, and whether these lands are chiefly valuable for potash. Therefore, an estimate of potential production is not possible as of the publication of this document.

In 2014, the market price of potash has been stable near $300 per metric ton, which is near the five-year low (World Bank 2014). Over the past five years, the market price has fluctuated between $287 and $500. Since no potash production is occurring, economic contribution analysis cannot be conducted. However, GUSG conservation measures may affect the potential for future potash mining.

## Carbon Dioxide

Enhanced oil recovery may increase the quantity of oil extracted from a reservoir. Enhanced oil recovery injects carbon dioxide ($CO_2$) to push residual oil to a production well. $CO_2$ injection has the potential to increase production relative to conventional extraction techniques. The price of $CO_2$ is tied to oil prices (Cook 2012). In late 2015, the price of a barrel of oil was approximately $36, which is low relative to recent price trends. Between 2012 and 2014, a barrel of oil was approximately $100 (EIA 2015). The price of third-party supplied $CO_2$ is approximately 2.5 percent of the oil price plus $0.50 per Mcf for transportation costs (van 't Veld and Phillips 2009). At current (late 2015) oil prices, that implies a $CO_2$ price of $1.40 per Mcf.

In periods of low oil prices, private investment in $CO_2$ infrastructure and activities is less likely. There are no current $CO_2$ developments within Gunnison Sage-Grouse habitat. Although seismic testing for $CO_2$ has been completed in the Doe Canyon area, which is within GUSG habitat, no proposals have been received for drilling. Since no $CO_2$ development is occurring, economic contribution analysis cannot be conducted. However, GUSG conservation measures may affect the potential for future $CO_2$ development in the planning area.

BLM_0027874

CHAPTER 3 - AFFECTED ENVIRONMENT

## Livestock Grazing

A number of county representatives indicated that livestock grazing is both economically and culturally important to area residents. BLM-managed public lands in the decision area provide forage for livestock. The following analysis describes the economic contribution of livestock grazing in GUSG habitat. GUSG conservation measures may affect livestock grazing in these areas. The analysis is broken out by GUSG population for each of the three socioeconomic areas.

Table 3.91 shows the number of billed animal unit months (AUMs) that overlap with GUSG Habitat in Area 1, including Poncha Pass.

**Table 3.91 - Average Number of Billed AUMs within GUSG Habitat in Area 1, 2012–2014**

| AUM BILLED | CERRO SUMMIT-CIMARRON-SIMS MESA | CRAWFORD | GUNNISON BASIN | PONCHA PASS |
|---|---|---|---|---|
| Billed Cattle AUMs | 368 | 1,213 | 11,701 | 1,319 |
| Billed Horse AUMs | 0 | 0 | 7 | 0 |
| Billed Sheep AUMs | 710 | 1,098 | 1,573 | 0 |
| Billed Yearling Cattle AUMs | 0 | 0 | 2,275 | 0 |
| Source: BLM 2015 | | | | |

Livestock grazing in Occupied Habitat in Area 1 supports approximately 41 jobs and $744,000 in labor income annually. Livestock grazing in both Occupied and Unoccupied Habitat supports approximately 50 jobs and $924,000 in labor income annually.

Table 3.92 shows the number of billed AUMs that overlap with GUSG Habitat in Area 2.

**Table 3.92 - Average Number of Billed AUMs within GUSG Habitat in Area 2, 2012–2014**

| AUM BILLED | PIÑON MESA |
|---|---|
| Billed Cattle AUMs | 6,916 |
| Billed Horse AUMs | 26 |
| Billed Sheep AUMs | 0 |
| Billed Yearling Cattle AUMs | 248 |
| Source: BLM 2015 | |

Livestock grazing in Occupied Habitat in Area 2 supports approximately 2 jobs and $38,000 in labor income annually. Livestock grazing in both Occupied and

BLM_0027875

CHAPTER 3 - AFFECTED ENVIRONMENT

Unoccupied Habitat supports approximately 15 jobs and $270,000 in labor income annually.

Table 3.93 shows the number of billed AUMs that overlap with GUSG Habitat in Area 3. Livestock grazing within GUSG Habitat in Area 3 supports approximately 21 jobs, $270,000 of labor income, and $1.7 million of output annually.

**Table 3.93 - Average Number of Billed AUMs within GUSG Habitat in Area 3, 2012–2014**

| AUM BILLED | MONTICELLO-DOVE CREEK | SAN MIGUEL BASIN |
|---|---|---|
| Billed Cattle AUMs | 5,728 | 3,719 |
| Billed Horse AUMs | 5 | 3 |
| Billed Sheep AUMs | 0 | 0 |
| Billed Yearling Cattle AUMs | 128 | 0 |
| Source: BLM 2015 | | |

## Recreation

Public lands in the decision area are valued for a variety of recreational opportunities. Public land recreation opportunities improve quality of life and make communities attractive places to live. Additionally, recreation on BLM-managed public lands attracts visitors from outside the local area. When recreation users spend money in the local economy—on food and lodging, for example—they contribute to employment and income in the area. GUSG conservation measures may affect the quantity and distribution of recreation visits across the decision area. This section assesses the economic contribution of recreation on BLM-managed public lands. Recreation visit estimates are only available by BLM field office and not by county.

Table 3.94, Table 3.95, and Table 3.96 display the number of annual recreation visits in fiscal years (FY) 2013 and 2014 for each field office in the decision area. They also show the share of each field office within Occupied Habitat and Unoccupied Habitat. A detailed description of recreation data and economic contribution methods is available in Appendix F.

The Gunnison FO, San Luis Valley FO, and Gunnison Gorge NCA are primarily within Area 1. Recreation opportunities are most likely to be affected in Area 1 due to the large share of the Gunnison FO and Gunnison Gorge NCA with GUSG Habitat.

BLM_0027876

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.94 - Area 1 Recreation Visits**

| BLM UNIT | VISITS (FY13) | VISITS (FY14) | % OF UNIT WITHIN OCCUPIED HABITAT | % OF UNIT WITHIN UNOCCUPIED HABITAT |
|---|---|---|---|---|
| Gunnison FO | 510,028 | 501,926 | 50.8% | 11.5% |
| San Luis Valley FO | 461,471 | 475,972 | 2.0% | 3.0% |
| Gunnison Gorge NCA | 172,688 | 182,575 | 23.0% | 5.7% |
| Source: BLM 2014 | | | | |

The average number of visits in FY13 and FY14 are multiplied by the share of each BLM unit within GUSG Habitat in order to estimate the number of visits that could be affected by GUSG conservation measures. The economic contribution analysis relies on this number to estimate the employment and labor income supported by public land recreation in habitat zones.

Table 3.94 shows Area 1 recreation visits for FY13 and FY14. Non-local recreation visits within GUSG Habitat in Area 1 are estimated to support approximately 90 jobs, $2.4 million of labor income, and $6.5 million of output annually. Local recreation visits support an additional 31 jobs, $890,000 of labor income, and $2.3 million of output annually, equivalent to approximately 0.22% of total employment, 0.17% of labor income, and 0.13% of total output in Area 1.

The Grand Junction FO, Moab FO, and McInnis Canyons NCA are primarily within Area 2. Because only a small share of these BLM units is within GUSG Habitat, GUSG conservation measures will be less likely to affect the quantity and distribution of public land recreation in Area 2.

**Table 3.95 - Area 2 Recreation Visits**

| BLM UNIT | VISITS (FY13) | VISITS (FY14) | % OF UNIT WITHIN OCCUPIED HABITAT | % OF UNIT WITHIN UNOCCUPIED HABITAT |
|---|---|---|---|---|
| Moab FO | 1,996,520 | 1,951,315 | 0.0% | 0.2% |
| Grand Junction FO | 817,869 | 812,896 | 1.2% | 5.1% |
| McInnis Canyons NCA | 295,491 | 283,063 | 0.3% | 17.5% |
| Source: BLM 2014 | | | | |

Table 3.95 shows the percentage of recreation visits occurring within GUSG habit in Area 2 in fiscal years 2013 and 2014. In Area 2, non-local recreation visits in GUSG Habitat are estimated to support approximately 34 jobs, $992,000 in labor income,

BLM_0027877

CHAPTER 3 - AFFECTED ENVIRONMENT

and $2.7 million in output annually.  Local recreation visits support an additional 11 jobs, $376,000 of labor income, and $1 million of output annually, equivalent to approximately 0.05% of total employment, 0.04% of total labor income, and 0.03% of output in Area 2.

The Monticello FO, Uncompahgre FO, Tres Rios FO, Canyons of the Ancients NM, and Dominguez-Escalante NCA are primarily within Area 3.  Similar to Area 2, a relatively small share of each BLM unit is within GUSG Habitat.

**Table 3.96 - Area 3 Recreation Visits**

| BLM UNIT | VISITS (FY13) | VISITS (FY14) | % OF UNIT WITHIN OCCUPIED HABITAT | % OF UNIT WITHIN UNOCCUPIED HABITAT |
|---|---|---|---|---|
| Monticello FO | 245,094 | 255,807 | 0.3% | 0.0% |
| Uncompahgre FO | 467,803 | 524,639 | 0.8% | 1.4% |
| Tres Rios FO | 760,569 | 853,919 | 8.0% | 6.0% |
| Dominguez-Escalante NCA | 98,705 | 92,567 | 0.0% | 8.5% |
| Canyons of the Ancients NM | 76,252 | 68,497 | 0.0% | 2.4% |
| Source: BLM 2014 | | | | |

Table 3.96 shows the percentage of recreation visits occurring within GUSG Habitat in Area 3 in fiscal years 2013 and 2014.  Non-local recreation visits within GUSG Habitat are estimated to support approximately 40 jobs, $1.1 million of labor income, and $2.9 million of output annually.  Local recreation visits support an additional 13 jobs, $400,000 of labor income, and $1 million of output annually.  This is equivalent to approximately 0.24% of total employment, 0.2% of total labor income, and 0.17% of output in Area 3.

## Nonmarket Values

The economic analysis above captures the contributions of public land uses to local economic activity.  An economic contribution analysis considers how the money spent on public land uses cycles through an economy to support local employment and labor income.  This type of analysis informs our understanding of the role of BLM management actions in supporting economic activity and contributing to local employment and income.  However, an economic contribution analysis does not provide complete information relevant to understanding the economic importance of public lands.

Public land has both market and non-market values.  Market values include commodity uses of public land resources, such as mineral extraction.  The discussion of oil and gas, above, describes the market value and oil and natural gas

BLM_0027878

extracted from each county in the decision area. Oil and natural gas are traded in markets and their prices are known. However, not all public land resources are traded in markets. These types of values are called non-market. Non-market values may arise from direct use of the resources (e.g., hunting for personal use and subsistence gathering) or from passive use (sometimes called non-use). Passive use captures the value of knowing that the resource(s) exist, whether or not future direct use is intended. Public lands provide numerous values that are often of direct use to humans, even if they are not recognized in economic analyses. Drinking water, clean air, and the research and educational opportunities that unique ecosystems afford are a few of the many ecosystem goods and services whose values are not addressed in many economic analyses.

Many individuals—in the planning area and throughout the nation—value wildlife. More than half of visitors to national forests participate in a wildlife-related activity, with the majority of these visitors engaged in wildlife viewing (White et al 2013). Comparable statistics are not available for the BLM, but it is reasonable to assume that visitor characteristics and preferences are similar across agencies. Furthermore, individuals may value the protection of wildlife even if they have no intention to visit public lands to view wildlife or participate in other wildlife-related activities (such as hunting and fishing). Approximately 15 million Americans are members of environmental and wildlife conservation non-profit organizations, which is one measure of the population holding wildlife-related values (Straughan and Pollak 2008, World Values Survey 2014). The protection of GUSG in the planning area may advance non-market values related to wildlife.

GUSG conservation measures could entail tradeoffs with other non-market values. Many recreation users value the opportunities on public land beyond what they pay traveling to sites. The difference between what recreation users pay (in travel costs and site fees) and what they are willing to pay is called consumer surplus. Motorized recreation use on public lands may conflict with GUSG conservation measures. Deisenroth et al (2009) find that motorized recreation users have a mean consumer surplus of approximately $89 per person per day (converted from 2007 USD to 2014 USD using BLS 2014a). A reduction in motorized recreation use, therefore, would have both market (loss of economic activity) and non-market (consumer surplus) implications.

Consistent with direction provided in BLM IM 2013-131, the subsequent analysis of environmental consequences will consider non-market goods and services primarily in qualitative terms (BLM 2013). Where appropriate, discussion of how the alternatives may affect non-market values will be presented. However, due to the qualitative nature of these discussions, direct comparisons between changes in market and non-market values are generally not possible. Furthermore, the

BLM_0027879

CHAPTER 3 - AFFECTED ENVIRONMENT

economic impact of each alternative should not be conflated with the economic value of that alternative.  These are two distinct economic measures.

BLM_0027880

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4. ENVIRONMENTAL CONSEQUENCES

## 4.1. INTRODUCTION

### 4.1.1. PURPOSE AND FORMAT

This chapter presents the direct, indirect, and cumulative impacts on the human and natural environment anticipated to occur from implementing the alternatives presented in Chapter 2, Alternatives. The purpose of this chapter is to describe to the decision maker and the public how the environment could change if any of the alternatives in Chapter 2 were to be implemented. It is meant to aid in the decision of which Resource Management Plan Amendment (RMP Amendment) alternative, if any, to adopt.

This chapter is organized by topic, similar to Chapter 3, Affected Environment. Each topic area includes the following:

- A method of analysis section that identifies indicators and assumptions
- An analysis of impacts for each of the four alternatives (in some sections, the analysis has been broken down by alternative; in other sections, if the impacts are expected to be similar, the analyses have been combined)
- A summary comparison of the alternatives.

This impact analysis identifies impacts that may benefit, enhance, or improve a resource or resource use as a result of management actions, as well as those impacts that have the potential to impair a resource or resource use. Some BLM management actions may affect only certain resources, uses, and alternatives. If an activity or action is not addressed in a given section, either no impacts are expected or the impact is expected to be negligible.

Many management actions proposed in Chapter 2 are planning-level decisions that do not result in direct on-the-ground changes. However, by planning for land use on surface estate and federal mineral estate administered by the BLM over the life of the plan, the analysis focuses on the reasonably foreseeable impacts that may result or impacts that could eventually result in-on the ground changes.

BLM_0027881

Some BLM and management actions may affect only certain resources and alternatives. This impact analysis identifies impacts that may benefit, enhance, or improve a resource as a result of management actions, as well as negative impacts. If an activity or action is not addressed in a given section, either no impacts are expected or the impact is negligible, based on BLM analysis.

The BLM manages public lands for multiple use and sustained yield in accordance with the Federal Land Policy and Management Act (FLPMA).  FLPMA states:

> …the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use; and that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands by encouraging collaboration and public participation throughout the planning process.

These decisions can result in trade-offs which are disclosed in this chapter.  The projected impacts on land use activities and the associated environmental impacts of land uses are characterized and evaluated for each of the alternatives.

Impact analysis is a cause-and-effect process.  The detailed impact analyses and conclusions are based on science and professional applied scientific knowledge and natural resource management knowledge from sources including the following:

- The BLM planning team's professional scientific and resource management knowledge of resources and the project area
- Reviews of existing scientific and resource management and planning literature
- Science and professional resource management and planning information provided by experts in the BLM, other agencies, cooperating agencies, interest groups, and concerned citizens.

The baseline used for the impact analysis is the current condition or situation, as described in Chapter 3.  Impacts on resources and resource uses are analyzed and discussed in detail, commensurate with resource issues and concerns identified through the process.  At times, impacts are described using ranges of potential impacts or in qualitative terms.

BLM_0027882

Analysis is based on the Uncompahgre Basin RMP, San Juan/San Miguel RMP, and Draft Dominguez-Escalante NCA RMP for the Uncompahgre FO, and on approved RMPs for the rest of the units: Canyons of the Ancients NM RMP, Dominguez-Escalante NCA RMP, Grand Junction FO RMP, Gunnison Gorge NCA RMP, Gunnison Resource Area RMP, McInnis Canyons NCA RMP, San Luis Resource Area RMP, San Juan/San Miguel RMP, Tres Rios FO RMP, Uncompahgre Basin RMP, and Moab FO RMP and Monticello FO RMP for the Moab FO.

## 4.1.2.   ANALYTICAL ASSUMPTIONS

Several overarching assumptions have been made in order to facilitate the analysis of the project impacts.  These assumptions set guidelines and provide reasonably foreseeable projected levels of development that would occur in the decision area during the planning period.  These assumptions should not be interpreted as constraining or redefining the management objectives and actions proposed for each alternative, as described in Chapter 2.

The following general assumptions apply to all resource categories.  Specific resource assumptions are provided in the methods of analysis section for that resource.

- Sufficient funding and personnel would be available for implementing the final decision.
- Implementing actions from any of the RMP Amendment alternatives would be in compliance with all federal regulations, bureau policies, and other requirements and would respect valid existing rights unless otherwise stated.
- Implementation-level actions necessary to execute land use plan-level decisions in this RMP Amendment would be subject to further environmental review, including that under NEPA, Section 7 of the ESA, Section 106 of the NHPA, and others as appropriate.
- The discussion of impacts is based on best available data.  Knowledge of the planning area and decision area and professional judgment, based on observation and analysis of conditions and responses in similar areas, are used for environmental impacts where data are limited.
- Restrictions (such as siting, design, and mitigation measures) would apply, where appropriate, to surface-disturbing activities associated with land use authorizations and permits issued on BLM-administered lands and federal mineral estate.  There are approximately 638,000 acres of BLM-administered lands and approximately one million acres of federal mineral estate in the decision area.
- Data from GIS has been used in developing acreage calculations and to generate the figures.  Calculations depend on the quality and availability of

BLM_0027883

data.  Acreage figures and other numbers are approximate projections for comparison and analytic purposes only.  Readers should not infer that they reflect exact measurements or precise calculations.  Where quantitative data was unavailable, the BLM relied on its resource specialists' judgment to provide qualitative analyses.  Impacts were sometimes described using ranges of potential impacts or qualitatively, when appropriate.

### 4.1.3. GENERAL METHODOLOGY FOR ANALYZING IMPACTS

Potential impacts are described in terms of type, context, duration and intensity, which are generally defined below.

- Types of Impact - Impacts are characterized using the indicators described at the beginning of each resource impact section.  The presentation of impacts for key planning issues is intended to provide the BLM decision maker and reader with an understanding of the multiple use trade-offs associated with each alternative.
- Context - This describes the area or location (site-specific, local, planning area-wide, or regional) in which the impact would occur.  Site-specific impacts would occur at the location of the action; local impacts would occur within the general vicinity of the action area; planning area-wide impacts would affect a greater portion of decision area lands in Colorado and Utah; and regional impacts would extend beyond the planning area boundary.
- Duration - This describes the duration of an effect, either short term or long term.  Unless otherwise noted, short term is defined as anticipated to begin and end within the first five years after the action is implemented; long term is defined as lasting beyond five years to the end of or beyond the life of this RMP Amendment.
- Intensity - This analysis discusses impacts using quantitative data wherever possible, but to add context, or when quantitative information is lacking, the analysis will use qualitative inferences or comparisons among alternatives.
- Direct and Indirect Impacts - Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place; indirect impacts result from implementing an action or alternative, but typically occur later in time or are removed in distance and are reasonably certain to occur.
- Cumulative Impacts - Cumulative impacts result from the incremental direct and indirect impacts of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts

BLM_0027884

can result from individually minor but collectively significant actions taking place over a period of time. Cumulative impacts are effects on the environment that result from the impact of implementing any one of the alternatives (Chapter 2) in combination with other actions outside the scope of this plan, either within the planning area or adjacent to it. Cumulative impact analysis is required by Council on Environmental Quality (CEQ) regulations because environmental conditions result from many different factors that act together. The total effect of any single action cannot be determined by considering it in isolation, but must be determined by considering the likely result of that action in conjunction with many other factors. Evaluation of potential impacts considers incremental impacts that could occur from the proposed project, as well as impacts from past, present, and reasonably foreseeable future actions. Management actions could be influenced by activities and conditions on adjacent public and nonpublic lands beyond the planning area boundary; therefore, assessment data and information could span multiple scales, land ownerships, and jurisdictions. These assessments involve determinations that often are complex and, to some degree, subjective.

For ease of reading, the impacts of the management actions for a particular alternative on a specific resource are generally described in comparison to the status quo or baseline for that resource.  In order to properly and meaningfully evaluate the impacts under each alternative, the impacts expected under that alternative should be measured against the impacts projected to occur under Alternative A. Because it represents what would be anticipated to occur should no RMP Amendment be implemented, Alternative A serves as a reasonable baseline for comparison of the alternatives.

Irreversible commitments of resources result from actions in which resources are considered permanently changed; irretrievable commitments of resources result from actions in which resources are considered permanently lost.

## 4.1.4.   CUMULATIVE ANALYSIS METHODOLOGY

The cumulative impacts discussions that follow consider the alternatives in the context of the broader human environment.  Because of the programmatic nature of the RMP Amendment and cumulative assessment, the analysis tends to be broad and generalized to address potential impacts that could occur from a reasonably foreseeable management scenario combined with other reasonably foreseeable activities or projects. Consequently, this assessment is primarily qualitative for most resources because of lack of detailed information that would result from project-level decisions and other activities or projects. Quantitative information is used

BLM_0027885

whenever available and as appropriate to portray the magnitude of an impact. The analysis assesses the magnitude of cumulative impacts by comparing the environment in its baseline condition with the expected impacts of the alternatives and other actions in the same geographic area. The magnitude of an impact is determined through a comparison of anticipated conditions against the naturally occurring baseline as depicted in the affected environment (see Chapter 3, Affected Environment) or the long-term sustainability of a resource or social system.

The following factors were considered in this cumulative impact assessment:

- Federal, nonfederal, and private actions
- Potential for synergistic impacts or synergistic interaction among or between impacts
- Potential for impacts across political and administrative boundaries
- Other spatial and temporal characteristics of each affected resource
- Comparative scale of cumulative impacts across alternatives.

The geographic scope for the cumulative impact analysis varies by resource and is described within each resource section.  Each resource specific cumulative effects analysis is conducted over an analysis area (geographic scope) that allows for analysis of past, present, and reasonably foreseeable future actions relevant to that resource and its interactions with other resources.  These analysis areas may be larger or smaller than the planning area, and sometimes smaller than the decision area.  This targeted analysis approach meets the NEPA goal of efficiency and avoids the dilution which could occur if a single cumulative effects analysis area where employed.

## Past, Present, and Reasonably Foreseeable Future Actions

Past, present, and reasonably foreseeable future actions are considered in the analysis to identify whether and to what extent the environment has been degraded or enhanced, whether ongoing activities are causing impacts, and trends for activities in and impacts on the area. Projects and activities are evaluated on the basis of proximity, connection to the same environmental systems, potential for subsequent impacts or activity, similar impacts, the likelihood a project will occur, and whether the project is reasonably foreseeable.

Impacts of past actions and activities are manifested in the current condition of the resources, as described in the affected environment (see Chapter 3, Affected Environment). Reasonably foreseeable future actions are actions that have been committed to or known proposals that would take place within a 10-year planning period.

Reasonably foreseeable future action scenarios are projections made to predict future impacts – they are not actual planning decisions or resource commitments. Projections, which have been developed for analytical purposes only, are based on

BLM_0027886

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

current conditions and trends and represent a best professional estimate. Unforeseen changes in factors such as economics, demand, and federal, state, and local laws and policies could result in different outcomes than those projected in this analysis.

Other potential future actions have been considered and eliminated from further analysis because there is a small likelihood these actions would be pursued and implemented within the life of the plan or because so little is known about the potential action that formulating an analysis of impacts is premature.  These potential future actions may have greater capacity to affect resource uses within the planning area; however, until more information is developed, no reasonable estimation of impacts could be developed.

Data on the precise locations and overall extent of resources within the planning area are considerable, although the information varies according to resource type and locale. Furthermore, understanding of the impacts on and the interplay among these resources is evolving. As knowledge improves, management measures (adaptive or otherwise) would be considered to reduce potential cumulative impacts in accordance with law, regulations, and the existing RMPs for the areas included in the analysis.

### Relevant Cumulative Actions

This cumulative effects analysis considers the incremental impact of the GUSG Proposed RMP Amendment and alternatives in combination with other past, present, and reasonably foreseeable future federal and nonfederal actions on all lands in the decision area.  Where these actions occur within with GUSG habitat, they would cumulatively add to the impacts of BLM authorized activities set forth in the GUSG Proposed RMP Amendment.  Relevant cumulative actions occurring in the decision area may occur on federal, state, private, or mixed land ownership.

Table 4.97 identifies reasonably foreseeable future actions within the range of GUSG that, when added to the Proposed RMP Amendment and alternatives, could cumulatively affect GUSG.  These actions (including CXs, DNAs, EAs, and EISs) were retrieved from BLM field office online NEPA logs and identified as actions within the decision area with the potential to affect the GUSG or its habitat.

**Table 4.97 - Reasonably Foreseeable Actions**

| TYPE OF ACTION | ADMINISTRATIVE UNIT | POPULATION |
|---|---|---|
| Grazing Permit Renewal | Grand Junction FO Monticello FO Uncompahgre FO Gunnison FO | Piñon Mesa Monticello-Dove Creek Crawford and Cerro Summit-Cimarron-Sims Mesa Gunnison Basin |

BLM_0027887

| TYPE OF ACTION | ADMINISTRATIVE UNIT | POPULATION |
|---|---|---|
| Trailing Permits | Uncompahgre FO<br>San Luis Valley FO<br>Moab FO | Crawford Poncha Pass Piñon Mesa |
| Fuels Treatment | Grand Junction FO | Piñon Mesa |
| Habitat Treatment | Grand Junction FO/Moab FO<br>Uncompahgre FO<br>Tres Rios FO | Piñon Mesa Crawford San Miguel |
| Oil/Gas Development | Tres Rios FO | San Miguel<br>Monticello-Dove Creek |
| Powerline ROW Construction/ Reconstruction | Uncompahgre FO<br>Gunnison FO<br>San Luis Valley FO | Cimarron-Cerro Summit-Sims Mesa and San Miguel Gunnison Basin Poncha Pass |
| Travel and Trails | San Luis Valley FO | Poncha Pass |
| Lands/ROWs | Gunnison FO | Gunnison Basin |
| Recreation | Gunnison FO<br>San Luis Valley | Gunnison Basin Poncha Pass |
| Abandoned Minelands | Gunnison FO<br>Tres Rios | Gunnison Basin<br>San Miguel |
| Weed Control | Moab | Piñon Mesa |
| Fire Management Plan | NPS - Black Canyon National Park/ Curecanti National Recreation Area | |

## 4.1.5.  INCOMPLETE OR UNAVAILABLE INFORMATION

The CEQ established implementing regulations for NEPA, requiring that a federal agency identify relevant information that may be incomplete or unavailable for evaluating reasonably foreseeable significant adverse impacts in an EIS (40 CFR, Part 1502.22). If the information is essential to a reasoned choice among alternatives, it must be included or addressed in an EIS, unless the cost of obtaining such information is exorbitant.  Knowledge and information is, and would always be, incomplete, particularly with infinitely complex ecosystems considered at various scales.

The best available information pertinent to the decisions to be made was used in developing the RMP Amendment.  The BLM made a considerable effort to acquire and convert resource data into digital format for use in the RMP Amendment, both from the BLM and from outside sources.

Under FLPMA, the inventory of public land resources is ongoing and continuously updated.  However, certain information was unavailable for use in developing the

BLM_0027888

RMP Amendment because inventories were not available or complete. Some of the major types of data that are incomplete or unavailable are the following:

- Comprehensive planning area-wide inventory of wildlife and special status species occurrence and condition
- Site-specific surveys of cultural and paleontological resources.

For these resources, estimates were made concerning the number, type, and significance of these resources based on previous surveys and existing knowledge. In addition, some impacts cannot be quantified, given the proposed management actions. Where this gap occurs, impacts are projected in qualitative terms or, in some instances, are described as unknown. Subsequent site-specific project-level analysis for particular implementation decisions will provide site-specific data and analyses to ensure the implementation decision is consistent with this RMP Amendment. In addition, the BLM and other agencies in the planning area continue to update and refine information used to implement this plan.

BLM_0027889

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.2.  SPECIAL STATUS SPECIES

## GUNNISON SAGE-GROUSE & HABITAT

### 4.2.1.  METHODOLOGY

#### ATTRIBUTES AND INDICATORS

- Acres of sagebrush habitat
- Direct and indirect disturbance to GUSG

### 4.2.2.  IMPACTS COMMON TO ALL ALTERNATIVES

Of the 135 GUSG leks identified within the decision area, 82 are categorized as active, 17 as inactive, 5 as of unknown status, and 31 as historic.  Although for purposes of this Draft RMP Amendment, Unoccupied Habitat is defined as including all FWS critical habitat that is not Occupied Habitat, LANDFIRE vegetation identifies only 35% of Unoccupied Habitat as containing characteristics of GUSG habitat, with the balance consisting of 16% agricultural land and 49% other habitat types.  Assessment and analysis of all Unoccupied Habitat would be required in order to determine its potential for restoration to suitable GUSG habitat.

In its final rule published in the Federal Register on November 20, 2014, the FWS identifies 24 threats to the GUSG (listed in Table 4.98).  Of these, 17 threats are identified as occurring on public lands managed by the BLM or for which the BLM has regulatory influence.  For 7 of the threats (invasive plants, pinyon-juniper encroachment, lek viewing, disease, recreation, pesticides and herbicides, and contaminants), there is no data indicating that their occurrence on BLM-administered lands is widespread.  Where they do occur, the impacts are likely to be localized.

Five FWS-identified threats are known to occur on BLM-administered lands: power lines, domestic grazing and wild ungulate herbivory, predation, renewable energy development, and non-renewable energy development.  The extent of each of these threats can vary substantially across the decision area.

Roads, fences, and fire are identified as threats with the potential to be widespread on public lands managed by the BLM.  No data is currently available on traffic volumes for BLM roads across the decision area.  Existing scientific data suggests that impacts from roads are likely to be localized and related to traffic volume.

BLM_0027890

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

While fences are a documented source of mortality for Greater Sage-grouse (Stevens et al 2012), current data suggests that fence collisions are a much less significant threat to GUSG. Current data does not indicate a significant impact to GUSG habitat from fire. The few fires occurring on BLM land in the decision area have burned approximately 1.7% of Occupied and Unoccupied Habitat.

Climate change and drought are identified in the FWS ruling as substantial threats to GUSG. Although neither is managed as a separate resource program area, the BLM is given regulatory authority to manage resources and activities with potential influence on and from both climate change and drought. In particular, 43 CFR 4100 authorizes the BLM to manage grazing allotments during times of drought, as well as to address changing climate conditions.

**Table 4.98 - FWS Listing Factors and Threat Potential on BLM Lands in the Decision Area**

| Listing Factor | Threat | Present on BLM Lands or BLM has Regulatory Authority | Threat Classification on BLM Lands |
|---|---|---|---|
| Present or threatened destruction, modification, or curtailment of its habitat or range | Residential Development | N/A | — |
| | Roads | present | potential |
| | Power lines | present | yes |
| | Domestic Grazing and Wild Ungulate Herbivory | present | yes |
| | Fences | present | potential |
| | Invasive Plants | present | DSNWT |
| | Fire | present | potential |
| | Climate Change | present | RMIP |
| | Renewable Energy Development | present | localized |
| | Nonrenewable Energy Development | present | localized |
| | Pinyon-juniper encroachment | present | DSNWT |
| | Conversion to agriculture | N/A | — |
| | Water development—mainly reservoirs | N/A | — |
| Overutilization for commercial, recreational, scientific, or educational purposes | Hunting | N/A | — |
| | Lek Viewing | present | DSNWT |
| | Scientific research | N/A | — |
| Disease and Predation | Disease | present | DSNWT |
| | Predation | N/A | Yes |
| Inadequacy of existing regulatory mechanisms | Local laws and regulations | N/A | — |
| | State laws and regulations | N/A | — |
| | Federal laws and regulations | present | RMIP |

BLM_0027891

| Listing Factor | Threat | Present on BLM Lands or BLM has Regulatory Authority | Threat Classification on BLM Lands |
|---|---|---|---|
| Other natural or manmade factors affecting its continued existence | Conservation easements | N/A | — |
| | Genetics and small population size | N/A | — |
| | Drought | present | RMIP |
| | Recreation | present | DSNWT |
| | Pesticides and herbicides | present | DSNWT |
| | Contaminants | present | DSNWT |

**DSNWT = Data Suggest No Widespread Threat; RMIP = Regulatory Mechanisms In Place**

## Roads

Sage-grouse exhibit a clear avoidance of paved high volume traffic roads (Carpenter et al 2010; Aldridge et al 2012) and avoid unpaved roads with high traffic levels (Holloran 2005; Tack 2009; Walker 2007).  Road use might be a better predictor of sage-grouse occurrence than road density (Tack 2009).  Walker et al (2007) found that roads not associated with oil and gas development received little or no support for their sage-grouse models and hypothesized that it might have been due to limited amounts of traffic.

## Recreation

Impacts from recreation vary depending on the activity.  Impacts from OHVs are analyzed in the travel management section.

## Lands & Realty

Transmission lines fragment the habitat and can attract avian predators.  Sage-grouse have been documented to avoid anthropogenic features and select habitat to avoid avian predators (Dinkins et al 2012).  Lesser and greater prairie-chickens have been documented to avoid transmission lines by over 3,330 feet for nesting (Pruett et al 2009).  While not in the same genus as sage-grouse, lesser and greater prairie-chickens share similar life histories with respect to lekking behavior and predator-prey interactions, and select similar habitat types.

Dinkins et al (2014) found that Greater Sage-Grouse hen survival was negatively associated with power line density.  Pruett et al (2009) studied the impacts of power lines and roads on lesser and greater prairie-chickens.  Prairie-chickens were found to cross roads more frequently than power lines.  While no set avoidance distance was identified for prairie-chickens, 85% of nests were more than 6,600 feet from transmission lines.  The closest nest was 663 feet from a power line.  Pitman et al (2005) seldom found lesser prairie-chickens within 1,320 feet of transmission lines.  The mean nesting distance from transmission lines in Pitman's study was 4,353 feet.

BLM_0027892

Greater Sage-Grouse have been documented to avoid areas with high levels of avian predator activity (Dinkins et al 2012). Breeding season survival of Greater Sage-Grouse has been shown to be negatively associated with power line density (Dinkins et al 2014).

Common ravens are a common nest predator of Greater Sage-Grouse. Coates and Delehanty (2010) found an increase in common raven density of one raven per 3.86 square miles increased the odds of nest predation by 26%. In a study by Manzer and Hannon (2005) on sharp-tailed grouse in Canada, they found that the odds of a hen having a successful nest was eight times greater in landscapes with less than three corvids per 0.386 square miles when compared with areas with greater than three corvids per 0.386 square miles. Increasing the density of ravens increases the risk of nest predation.

Common ravens have been documented to seek out anthropogenic features for nesting (Coates et al 2014; Howe et al 2014; Bui 2009). Howe found that the odds of raven nesting decreased with every 3,330-foot increase in distance from a transmission line. Increased edge was also found to increase the odds for raven nesting. Breeding ravens hunt live prey an average of 2,333 feet from their nests. Home range sizes vary from 297 acres to 2,323 acres. AS common ravens seek out power lines for nesting and hunting then the risk of predation to sage-grouse nests and broods will be higher the closer they are to power lines.

### Range Management

The Taylor Grazing Act of 1934 (named after Representative Edward Taylor of Colorado) led to the creation of grazing districts in which grazing use was apportioned and regulated (BLM 2015). Grazing management was initially designed to increase productivity and reduce soil erosion by controlling grazing through both fencing and water projects and by conducting forage surveys to balance forage demands with the land's productivity ("carrying capacity"). But by the 1960s and 1970s, appreciation for public lands and expectations for their management rose to a new level, as made clear by congressional passage of such laws as the National Environmental Policy Act of 1969, the Endangered Species Act of 1973, and the Federal Land Policy and Management Act of 1976. Consequently, the BLM moved from managing grazing in general to better management or protection of specific rangeland resources, such as riparian areas, threatened and endangered species, sensitive plant species, and cultural or historical objects (BLM 2015f).

Over time, there has been a gradual decrease in the amount of grazing that takes place on BLM-managed land, and that trend continues today. Grazing use on public lands has declined from 18.2 million AUMs in 1954 to 8.5 million AUMs in 2013 (BLM 2015f). While not pristine, range conditions on public lands managed by the BLM have shown steady improvement since the 1950s, mostly as a result of

BLM_0027893

improved range management practices.  Improper grazing may be detrimental to habitat condition where it occurs.  As areas of improper livestock grazing are identified through LHA, site visits or compliance checks and it is determined that land health standards are not being met, the BLM is required  by regulation to make appropriate changes in grazing management by the next grazing season.

Sage-grouse nest success is correlated with grass height and percentage of cover (Holloran et al 2005), primarily due to loss of nests through predation.  Livestock grazing can be a tool to achieve a desired result.  Grazing can be used to meet ecological requirements for species such as GUSG that require variability in habitat types (Budd and Thorpe 2009).  With respect to nesting habitat quality, indirect impacts include a temporary reduction of herbaceous understory, which could affect food availability and hiding cover.  Without sufficient hiding cover, nest success may be compromised.  Sage-grouse exhibit high nest site fidelity, with hens often returning to nest in the same general area each year.  With reductions in herbaceous cover that fall below RCP habitat guidelines for nesting habitat, nest sites lose concealment and could be more susceptible to predation.

Wild ungulates, particularly elk, have the potential to impact sage-grouse habitat to the point where habitat conditions do not meet RCP guidelines. In areas where elk concentrate in the winter, or areas where large numbers of elk migrate, elk grazing could remove residual cover that sage-grouse use when selecting nest locations.  This may limit the ability of the site to meet RCP guidelines for sage-grouse nesting cover.

Properly managed grazing should not reduce the capability of critical habitat to satisfy requirements essential to GUSG.  There could be localized, temporary reductions of herbaceous cover that result in isolated areas (such as water and salt locations) falling below the minimum coverage recommended in the RCP.  However, sage-grouse have been documented to select for sheep bedding locations and salt locations for establishment of new lek sites (Beck & Mitchell 2000).  It is a common misconception that all areas within sage-grouse home ranges must be managed for nesting habitat.  Habitat management must be responsive to all stages of GUSG life history.

Sage-grouse require a variety of habitat conditions throughout their home ranges to meet critical life functions.  Habitat needs for late brood-rearing habitat would not meet habitat guidelines for nesting GUSG.  In late brood-rearing habitat, sage-grouse selected for grazed meadows rather than long-term ungrazed exclosures (Cagney et al 2010).  Sage-grouse use of grazed meadows was significantly greater than use of ungrazed meadows in late July and throughout August (Evans 1986).  When considering the impacts of grazing on habitat, a management approach that focuses

BLM_0027894

on the availability of all habitat components is more critical than one that focuses on a single life cycle.

Residual tall grass cover and sagebrush cover are components selected by nesting sage-grouse that have been shown to influence nest success.  Incorporating RCP habitat guidelines for herbaceous heights as permit terms and conditions would minimize the extent and occurrence of herbaceous cover being grazed below RCP guidelines to isolated livestock concentration areas.  With the implementation of habitat guidelines at the landscape scale, grazed Occupied Habitat would be more likely to meet seasonal habitat guidelines described in the RCP over the long term.  Monitoring would serve to ensure compliance with permit terms and conditions.

Grazing can also impact habitat quality via compacted soil, erosion, and the increased probability of the presence and spread of exotic plant species.  Each of these impacts would be expected to continue, while not exceeding the current conditions.  Positive influences of controlled grazing by domestic animals on rangelands include:  loosening of the soil surface during dry periods, incorporation of mulch into the soil profile, recycling of nutrients, trampling of seeds into the ground, maintenance of an optimal leaf area index of plant tissue, and reduction in excessive accumulations of standing dead vegetation and mulch that could chemically and physical inhibit new growth (Holechek 1981).

While some available data identifies nest trampling by livestock, no study has documented the percentage of sage-grouse nests that might be lost due to livestock trampling.  In a study of the trampling of nesting grassland passerines in low, moderate, and high stocking rates, Johnson et al (2012) found a daily probability of nest trampling of 0.001 for savannah sparrows and 0.003 for horned larks at moderate livestock grazing rates..  The nesting density of passerines in native grassland is significantly higher than for GUSG.  Based on data from Johnson et al (2012) nesting densities for Savannah Sparrows and Horned Larks combined was 0.04348 nests per acre.  The Gunnison Basin CCA estimates nesting densities of GUSG as 0.00602 grouse per acre for the Gunnison Basin.   Based on trampling probabilities for nesting passerines and density estimates for GUSG, four to twelve of every one-thousand GUSG nests could be trampled over a 28-day incubation period.  This most likely overestimates the probability of nest trampling due to the differences in the nesting substrate.  As GUSG nesting typically occurs under sagebrush rather than in open grasslands, nests are less likely to be trampled.

Fences have the potential to impact GUSG directly through collisions and indirectly by serving as perches for predators.  The collision probability for sage-grouse is influenced by terrain and fence density on the broad scale and by fence construction and distance to leks at the site scale (Stevens et al 2012).  This data should be

BLM_0027895

interpreted with caution as Greater Sage-Grouse habitat is generally flatter and current research on fence collisions suggests that terrain is a factor.

## Minerals

### Fluid Minerals

Surface-disturbing and disruptive activities could have negative impacts on GUSG and GUSG habitat. Multiple studies have identified the avoidance of oil and gas fields by sage-grouse (Aldridge and Boyce 2007, Carpenter et al 2010, Doherty et al 2006, Dzialak et al 2012, Holloran et al 2010, Holloran and Kaiser 2007) and other studies have identified declines in sage-grouse lek attendance as a result of energy development (Gregory and Beck 2014, Harju et al 2010, Hess and Beck 2012, Holloran 2005, Walker et al 2007).

Wells and other infrastructure located within sagebrush communities result in direct habitat loss. Sage-grouse avoidance of these facilities produces even greater indirect habitat loss. Development exceeding one oil and gas well pad for every 699 acres appeared to negatively influence male lek attendance. Similarly, development within 1.86 to 3.0 miles of a Greater Sage-Grouse lek led to declines in peak male attendance, as well as lek inactivity within three to five years (Holloran 2005). Fluid mineral development is most likely to occur in the Dry Creek Basin of the San Miguel population and in the eastern portion of the Monticello-Dove Creek population area.

Adult female sage-grouse will continue to nest in the same nest areas regardless of the level of development in those areas (Holloran 2005). However, nesting yearling greater sage-grouse were documented to avoid oil and gas development by 0.59 miles (Holloran et al 2010), meaning that one well pad could result in the functional loss of 699 acres of nesting habitat. In addition to the loss of nesting habitat, sage-grouse experience decreased survival, increased predation, and lower fecundity. These factors all lead to observed lek abandonment in natural gas fields (Holloran et al 2007). Walker et al found that leks within coalbed natural gas field development declined 35% per year, as opposed to leks outside of development, which declined at a rate of 3% per year. The time lag between development around a lek and lek disappearance was approximately four years. Walker's overall conclusion was that "…development appeared to have substantial negative effects on sage-grouse breeding populations."

Holloran (2005) noted that as development increased within 3.1 miles of a lek, declines in lek attendance approached 100%. Hess and Beck (2012) observed that the odds of lek abandonment increased by 34% with each additional well pad in a 3,330-foot radius. In the Big Horn Basin of Wyoming, greater sage-grouse lek persistence dropped below 50% when oil and gas well densities in a 3,330-foot radius were greater than two wells per 0.386 $mi^2$ (Hess and Beck 2012). Holloran

BLM_0027896

(2005) determined that drilling had no impact on leks at a distance of 3.9 miles and producing wells had no influence on lek attendance at a distance of 2.9 miles. Gregory and Beck (2014) found that, to avoid measurable impacts, no more than one well pad should occur within 1.2 miles of a lek, and that, to avoid delayed impacts, fewer than six well pads should be located within 6.2 miles.

Because GUSG are a sagebrush-obligate species, development occurring in winter habitat could be detrimental to populations. Doherty et al (2006) found that the sage-grouse in their study selected winter habitat based on sagebrush cover and coalbed natural gas development. Sage-grouse use increased in areas with a higher percentage of sagebrush cover, unless coalbed natural gas development was present. Sage-grouse were 1.3 times more likely to use suitable habitat if coalbed natural gas development was not present. In Alberta, Canada, sage-grouse were documented to avoid all anthropogenic edges and had no selection within 3,960 feet of a well and limited use between 3,960 feet and 6,270 feet (Carpenter et al 2010). Because suitable nesting habitat is typically associated with suitable winter habitat, the loss of winter habitat would be expected to be similar to the potential loss of nesting habitat.

### Solid Leasable and Salable Minerals

Although no studies were found that analyze the effects of geothermal, uranium, potash, or salable mineral development (gravel pits) on sage-grouse, impacts from development of these minerals would be expected to be similar to impacts from oil and gas development and largely based on disturbance footprint, activities on the landscape, and human activity levels. With the exception of geothermal and salable mineral development, the only moderate and high potential for leasable mineral development is in the Tres Rios FO.

All existing RMPs in the planning area contain a NSO stipulation for oil and gas development within 0.6 mile of a lek.

## Wildlife and Sensitive Species

GUSG would benefit from management of public lands by the BLM under all alternatives. All plans in the no action have management actions designed to protect sage-grouse from development and disruptive activities. The BLM's management of anthropogenic features would continue under all alternatives.

Predation by common ravens could be one of the greatest limiting factors for GUSG. Multiple studies have documented common ravens as the most common nest predator of sage-grouse nests (Lockyer et al 2013, Bui et al 2010, Bui 2009, Coates and Delehanty 2010, Coates et al 2008) and sage-grouse broods are highly susceptible to predation(Bui et al 2010). Ravens use anthropogenic features for nesting and can use increased fragmentation to move into areas not previously

BLM_0027897

occupied (Coates et al 2014, Howe et al 2014, Bui 2009, Bui et al 2010).  Raven densities are highest near population centers, but ravens can move into fragmented landscapes and establish territories (Bui et al 2010).  Even in areas where raven densities are not high, territorial ravens may have a substantial impact on nest and brood success (Bui et al 2010), predating multiple nests per nest pair (Howe et al 2015).

Although sage-grouse habitat in the 1950s was in worse condition than today, based on existing information it is possible that sage-grouse populations were some of the highest estimated.  Sage-grouse populations increased in the 1940s and 1950s and started to decline in the 1960s and 1970s, in part, due to the loss of sagebrush (Connelly and Braun 1997).  In the range of GUSG, sagebrush was reduced by 20% between 1958 and 1993 (Oyler-McCance et al 2001), with the majority of loss in the Monticello-Dove Creek population area (Table 3.24 and Figure 3.10).

Sage-grouse populations may have experienced artificially high numbers in the 1950s due to extensive predator control throughout the west, as well as the impact of DDT on raptor populations.  This could help explain high grouse population numbers at a time when habitat conditions were relatively poor.  There is evidence that GUSG populations not experiencing impacts from anthropogenic activities could be declining as a result of a developing equilibrium between predator and prey populations.

Common raven numbers in the United States have quadrupled over the last four decades (Sauer et al 2011).  Batterson and Morse (1948) found a 3% sage-grouse nest success rate in an area with common ravens and a 35% nest success rate in an area where common ravens were removed (reference to Batterson and Morse in Schroeder and Baydack 2001).  This idea is supported by work conducted by Manzer and Hannon (2005) on work with Sharp-tailed Grouse in Canada, in which they found that the odds of nest success increased by eight times in landscapes with less than three corvids per square kilometer.  Coates and Delehanty (2010) determined that an increase in density of one raven per ten square kilometers increased the odds of nest predation by 7.4%.  Howe et al (2014) suggests that common ravens can impact small sage-grouse populations in fragmented habitats, leading to hyper-predation even under the best habitat conditions.

None of the alternatives address the direct control of common ravens as a management action.  Objective B in BLM Manual 6830, Animal Damage Control (ADC) seeks to ensure that ADC is carried out in a systematic manner which responds to resource protection, human health, and livestock protection needs while protecting public safety, domestic animals, and non-target wildlife.

Schroeder and Baydack (2001) identified predator management as a consistent theme in European management plans for grouse.  Schroeder and Baydack (2001)

BLM_0027898

cite four studies in which predator controls have been shown to increase nest success, juvenile survival, and population size. Management actions that address predation could reduce fragmentation, limit anthropogenic features on the landscape and improve habitat conditions. While not a long-term solution to GUSG recovery, predator control could provide the relief necessary to establish robust populations capable of absorbing the loss of individuals to predation.

### Wildland Fire, Fuels Management, and Fire Rehabilitation

Sagebrush recovery from wildland fire varies by sagebrush species. In mountain big sagebrush ecosystems, recovery is estimated to take 35–100 years, while Wyoming big sagebrush recovery is estimated to take 50–120 years (Baker 2006). Fire in sagebrush habitat has the potential for increasing perennial grasses, along with an initial increase in forbs (Beck et al 2009). Undesirable shrubs could increase under wild and prescribed fires, while forbs might have no long-term benefits (Beck et al 2009).

## 4.2.3.   IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

#### General

Five RMPs restrict surface-disturbing activities within 0.6 mile or more of a lek. The Grand Junction RMP places a No Surface Occupancy (NSO) restriction within 4.0 miles of a lek. The Gunnison Gorge NCA places surface disturbance restrictions in GUSG habitat, Moab has a 0.6-mile NSO, and the Tres Rios RMP uses a 0.6-mile buffer around leks to prohibit surface occupancy and disturbance and identifies all winter concentration areas as NSO. The Gunnison FO currently uses the CCA.

Canyons of the Ancients NM RMP does not have restrictions for GUSG leks, other than for oil and gas development. While there are only limited restrictions within Canyons of the Ancients NM, there is no Occupied Habitat and the majority of Unoccupied Habitat does not contain primary constituent elements as identified by the FWS.

BLM_0027899

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

**Table 4.99 - Acres of BLM Surface by BLM Unit**

| BLM UNIT | ACRES WITHIN 0.6 MILE OF A LEK | PROHIBITS SURFACE OCCUPANCY FOR ALL ACTIVITIES IN NON-HABITAT |
|---|---|---|
| Grand Junction FO | 851 | — |
| Gunnison Gorge NCA | 4,276 | — |
| Moab FO | 0 | 0.6 mile |
| Monticello FO | 362 | — |
| San Luis Valley FO | 687 | — |
| Canyons of the Ancients NM | 0 | — |
| Gunnison FO | 44,343 | 0.6 mile |
| Tres Rios FO | 1,714 | 0.6 mile |
| Uncompahgre FO | 0 | 0.6 mile |
| San Juan FO | 21 | — |
| Dominguez-Escalante NCA | 0 | — |
| McInnis Canyons NCA | 0 | — |

**Data based on CPW 0.6-mile lek buffer available from COGCC website and UDWR lek data.**

Despite the absence of management direction pertaining to GUSG and GUSG habitat in some RMPs, the present extent of development is extremely low across the range of GUSG.  Energy and mining density has impacted 0.07% of Occupied Habitat in the Gunnison Basin, 0.01% of Occupied Habitat in the Cerro Summit-Cimarron-Sims Mesa, 0.03% of Occupied Habitat in Monticello-Dove Creek, and 0.15% of Occupied Habitat in the San Miguel Basin.  No energy or mining development has occurred in Occupied Habitat for any of the other populations. (See surface disturbance levels in Table 3.11.)  Similarly, the threat of large-scale sagebrush conversion has also appeared to slow, if not stop altogether.  Across the GUSG range, sagebrush was reduced by 20% between 1958 and 1993 (Oyler-McCance et al 2001), with most of the loss occurring in the Monticello-Dove Creek population area. (See Table 3.26 and Figure 3.10.)

BLM_0027900

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

**Table 4.100 - Sagebrush Decline from 1958 to 1993**

| STRATUM | SAGEBRUSH AVAILABLE IN 1958 (ACRES) | SAGEBRUSH AVAILABLE IN 1993 (ACRES) | SAGEBRUSH LOST (ACRES / PERCENT CHANGE) |
|---|---|---|---|
| Gunnison Basin | 947,951 | 843,179 | 104,414 / ¯11% |
| All Others | 994,481 | 714,714 | 279,752 / ¯28% |
| Overall | 1,942,435 | 1,557,891 | 384,512 / ¯20% |

**Table adapted from Oyler-McCance 2001**

Oyler-McCance et al (2001) did not attempt to map sagebrush or surface disturbance, but developed a stratified random sample to estimate habitat loss in the range of GUSG.  In order to quantify surface disturbances in the decision area surface disturbances were mapped for the RMP Amendment.  Surface disturbance mapping identified a 16% loss of habitat through loss of sagebrush availability or habitat degradation (as shown in Table 4.100).  This corresponds with the loss estimated by Oyler-McCance.  Based on the Oyler-McCance data from 1993 and data from the GUSG disturbance mapping, little or no habitat has been lost since 1993.

Management actions that limit surface disturbances around leks vary across the decision area.  Some plans require a 0.6-mile no surface-disturbing activity buffer around lek locations, while others extend out from two to four miles.  A 0.6-mile buffer encompasses 723.5 acres, whereas a two-mile buffer covers 8,038 acres. Across the decision area, 42,127 acres totaling approximately 7% of BLM-administered public lands are covered by a prohibition on surface-disturbing activities.  Timing limitations for disruptive activities during the lek/nesting seasons could be applied on 317,676 acres across the decision area in Occupied and Unoccupied Habitat.  This represents 50% of public lands managed by the BLM in the decision area.  Winter timing restrictions under No Action Alternative A cover 26,502 acres of BLM-administered public land totaling 4% of the decision area.

## Roads

Under all of the action alternatives, motorized vehicles are limited to designated or existing routes.  During the lek season, the Gunnison Basin has closures to motorized vehicles for certain areas on BLM and county roads.  The Gunnison Gorge NCA and the San Luis Valley have area closures during the lekking season. The Gunnison Gorge NCA has a winter closure for big game that also acts as a winter closure to protect GUSG.  The Grand Junction RMP and Moab RMP provide direction to close redundant or duplicative routes.

BLM_0027901

Avoidance of roads by GUSG is likely to relate to the level of use. Areas with higher levels of use likely have more of an impact on sage-grouse avoidance than roads that see lower levels. No Action Alternative A leaves 53,565 acres open to unrestricted cross country travel, or 9% of Occupied and Unoccupied Habitat on public lands managed by the BLM. 17% of areas open to cross-country travel are in Occupied Habitat. Unrestricted cross-country motorized travel has the potential to cause direct loss of nests if the activity was to occur during the nesting season. Under No Action Alternative A, direct disturbance to GUSG could occur on 9% of public lands managed by the BLM. Indirect disturbances could occur on these lands where high volume roads decrease habitat effectiveness through avoidance.

Impacts from cross country travel are likely to differ from road closures. In areas where cross country travel is open direct take of a nest could occur if a nest were to be run over by an off-road vehicle. This is highly unlikely since sage-grouse nest under taller sagebrush and these areas are not typically preferred areas for off road vehicle use.

In the decision area, 85% of public lands are designated as limited to existing routes. Any road through a lek is likely to result in direct disturbance to GUSG during the lek season. Direct disturbance would be proportional to the level of traffic.

## Recreation

Under No Action Alternative A, recreation would occur in the same manner as currently being authorized or managed. Special Recreation Permits would continue to be issued. BLM authority to place conditions of approval on a special recreation permit is not limited to decisions made in land use plans. Special Recreation Permits issued in Occupied Habitat or Unoccupied Habitat would be required to conform to the Endangered Species Act and comply with Section 7 of the Act.

## Lands & Realty

Under No Action Alternative A, five RMPs contain management actions that encourage the placement of new ROWs in existing corridors. Only the Grand Junction RMP designates the area within 0.6 mile of a lek as a ROW exclusion area. However, other plans have general management actions that prohibit surface disturbance and occupancy within 0.6 mile of an active lek. The Grand Junction RMP places all lands within 4.0 miles of a lek as an avoidance area for ROWs. Management direction in the Monticello and Moab RMPs require avoidance of power lines within 4.0 miles of a lek.

In the Gunnison Basin, lands in Occupied Habitat are included in the Candidate Conservation Agreement (CCA 2013). The CCA does not make land use plan allocation decisions or direct management actions, but provides a tool to screen

BLM_0027902

project activities in Tier 1 and Tier 2 Habitat (as defined in the CCA) on federal lands for coverage under streamlined consultation.

Under No Action Alternative A, 5,783 acres of public lands managed by the BLM are exclusion areas for ROWs, or roughly 1% of Occupied Habitat. In Unoccupied Habitat 44,921 acres or 19% of public lands managed by the BLM are exclusion areas for ROWs. Under this alternative, 73,182 acres are designated as utility corridors, approximately 11% of public lands managed by the BLM.

## Range Management

Grazing is managed by the BLM and the BLM has the authority to make changes to permits if range conditions are not meeting rangeland health standards. Terms and conditions do not need to be specifically identified in land use plans in order to be applied to grazing permits and leases. In the Gunnison Basin, range management in Occupied Habitat would continue to follow the CCA and resulting FWS biological opinions.

Under No Action Alternative A, impacts to GUSG would be the same as described in the impacts common to all alternatives. Grazing in the decision area would continue on 90% of BLM-administered public lands.

## Minerals

Under No Action Alternative A, levels of oil and gas development would remain relatively constant and surface-disturbing activities related to oil and gas development would only occur on existing leases and in Unoccupied Habitat, except in the Monticello portion of the Monticello-Dove Creek Population. There are four existing leases in the Monticello area, none of which is held by production. In the Monticello decision area, 9.4% of the area is federal fluid mineral estate. Within the Grand Junction RMP decision area, Piñon Mesa would remain closed to leasing under No Action Alternative A. In the Moab RMP decision area, most of Piñon Mesa is open for leasing, although development potential is very low.

Minerals have been withdrawn from leasing in the Dominguez-Escalante and McInnis Canyons RMP decision areas, and the Gunnison Gorge NCA. The Tres Rios FO RMP leases with an NSO restriction in Occupied Habitat. In Tres Rios FO, leasing would be open with stipulations if Unoccupied Habitat were to become occupied.

Leasing in the Monticello RMP decision area would remain open, with a 0.6-mile NSO around leks and a timing restriction for nesting habitat within 4 miles of a lek. The impacts from closing to leasing and leasing with NSO would be essentially the same, since under each action no development would occur on the lease. Waivers, exceptions, and modifications may be granted consistent with the requirements of 43 CFR 3101.1-4. However, this is extremely rare. In the last ten years, no

modifications or waivers have been authorized. Exceptions have been granted on approximately 7% of APDs, primarily for big game winter range restrictions. (See the minerals analysis in Chapter 3.) There is potential for development to occur from outside of Occupied and Unoccupied Habitat as technology advances and allows drilling from greater distances.

Under No Action Alternative A, 9% of the federal oil and gas mineral estate would continue to be closed to fluid mineral leasing. In the decision area, 44% of the federal oil and gas mineral estate could be leased with NSO restrictions. In the decision area, 4% of the federal mineral estate would remain closed to mineral material sales and 9% to non-energy mineral leasing. Under this alternative, almost half of Occupied and Unoccupied Habitat could not be developed for fluid minerals due to NSO restrictions.

### Fuels Management

Under No Action Alternative A, fuels management would continue to occur in Occupied and Unoccupied Habitat. All fuels treatments would be required to comply with Section 7 of the ESA. Prescribed fire would continue to be allowed in all Occupied and Unoccupied Habitat following consultation with the FWS. The impacts to GUSG habitat from prescribed fire would be the same as identified in the impacts common to all alternatives.

### Wildfire

BLM policy is to immediately suppress wildland fires in sage-grouse habitat. The Grand Junction, Moab, Monticello, and Dominguez-Escalante NCA RMPs have provisions to use wildland fire to enhance or protect resources.

### Emergency Stabilization & Rehabilitation

Under No Action Alternative A, emergency stabilization and rehabilitation would continue to be handled following the normal emergency stabilization and rehabilitation process. Under the emergency stabilization and rehabilitation program, priority is given to restoration of fires in habitat for listed species and critical habitat.

### Wildlife and Sensitive Species

Management actions for sensitive species focus on treating pinyon and juniper that encroach on rangelands. Almost all RMPs provide some direction to use vegetation management treatments to meet sagebrush or resource objectives. Under No Action Alternative A, vegetation treatments would continue to be prioritized by each field office.

BLM_0027904

### Forest and Woodland Products

Under all planning area RMPs, the collection of forest and woodland products is allowed. The BLM has the regulatory mechanisms to control the timing of collection if the collection requires a permit. Issuing firewood and Christmas tree permits could occur in forest and woodland habitats. Seed collection could occur in Occupied Habitat; however, collection for most species would occur outside of the nesting season once seed has set.

### Weeds

Under No Action Alternative A, weeds would continue to be treated on public lands managed by the BLM. Currently the BLM prioritizes the treatment of noxious weeds and invasive species. Treatments focus on roadways, other disturbances, and identified infestations. In areas where treatment could occur in nesting habitat, GUSG could be temporarily disturbed by the activity of spraying during the nesting season. Some weed treatments must occur during the spring. Under the ESA, consultation would be required for any treatments in GUSG habitat.

## ALTERNATIVE B

### General

General guidance for surface-disturbing and disruptive activities under this alternative would prohibit surface-disturbing activities within 4 miles of a lek. This area encompasses approximately 58% (372,117 acres) of BLM surface. Alternative B would place a timing limitation for disruptive activities during the lek/nesting season on 56% (361,482 acres) of BLM-administered lands, while winter timing restrictions would occur on 39% (252,012 acres) of BLM-administered lands.

Under Alternative B, there would be a 14% increase in BLM surface with nesting timing restrictions over Alternative A. Alternative B would increase winter timing restrictions by 851% over Alternative A. Prohibitions on surface-disturbing activities would increase by 690% over Alternative A.

In Occupied Habitat, there are 87 active/unknown, 17 inactive, and 31 historic leks within 4 miles of the edge of Occupied Habitat. The Non-Habitat Areas that extend four miles beyond Occupied and Unoccupied Habitat largely do not contain habitat characteristics for GUSG. Extending management actions beyond the mapped Occupied and Unoccupied Habitat would not benefit GUSG, except to provide protection from potential impacts resulting from projects on the edge of Occupied Habitat of large enough scale to impact GUSG behavior, or in areas where there is habitat to support GUSG and grouse use the areas.

BLM_0027905

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

While numerous studies have identified the impacts of development extending miles from a sage-grouse lek (Walker et al 2007, Carpenter et al 2010, Holloran 2005, Dzialak et al 2013, Gregory and Beck 2014, Harju et al 2010, Hess and Beck 2012, Holloran et al 2010, Holloran et al 2007, Johnson et al 2011), these developments occurred within sage-grouse habitat and in areas likely to have been used by individual grouse from an impacted lek; otherwise there would be no impacts to leks miles away.  Only 22% of the Non-Habitat Areas are capable of supporting GUSG, and those areas are spread throughout the Gunnison Basin and satellite population areas.

**Table 4.101 - GUSG Habitat Characteristics in Non-Habitat**

| POPULATION | Acres of Habitat Capable of Supporting GUSG (% of Non-Habitat) | | |
|---|---|---|---|
| | YES | NO | AGRICULTURAL |
| Cerro-Summit-Cimarron-Sims Mesa | 22,508 (31%) | 41,190 (57%) | 8,257 (11%) |
| Crawford | 1,937 (25%) | 5,831 (75%) | — (0%) |
| Gunnison Basin | 12,526 (15%) | 68,236 (84%) | 145 (0%) |
| Monticello-Dove Creek | 13,935 (24%) | 36,822 (63%) | 7,976 (14%) |
| Piñon Mesa | 18,743 (32%) | 40,279 (68%) | 109 (0%) |
| Poncha Pass | 860 (6%) | 14,683 (94%) | — (0%) |
| San Miguel Basin | 23,034 (18%) | 101,482 (81%) | — (0%) |
| Total | 93,542 (22%) | 308,523 (74%) | 16,728 (4%) |

Public lands managed by the BLM remain largely undeveloped.  Management through the use of a no surface disturbance within four miles of a lek in GUSG habitat would prohibit activity on 62% of the decision area.  Alternative B would place more protections on GUSG habitat than Alternative C or sub-alternatives $D_1/D_2$.  Under Alternative B, direct disturbance to GUSG and loss of sagebrush from development would not occur on 62% of the decision area.

## Roads

Under Alternative B, routes would be closed in Occupied Habitat.  Route closures would be limited to BLM routes in the decision area.  County roads and state highways would remain open.  The primary use time for BLM routes is during hunting season from September through November.  Upgrades to existing BLM routes would not be allowed in Occupied Habitat.  A seasonal closure of motorized and mechanized routes would be implemented from March 15 through May 15 in Occupied Habitat.

BLM_0027906

As all motorized routes would be closed under this alternative, a timing restriction on motorized routes would provide no additional benefit to GUSG. While the closure of mechanized routes would reduce disturbance to GUSG nesting along the route, such a closure would not be likely to have a measurable effect on GUSG. New disruptive activities that could influence the use of an area by GUSG would not be permitted during the lek season.

As a result of the decrease in human activity, it can be expected that elk and mule deer would concentrate in the closure areas to a higher level than under current conditions. This may increase the stress on habitat conditions and result in further habitat degradation due to the loss of vegetation.

Outside of Occupied and Unoccupied Habitat, upgrades to any roads would not be allowed if the upgrade would create an impermeable barrier between populations or sub-populations. Outside of Occupied and Unoccupied Habitat, new route construction would only be allowed if the proposed upgrade would not create an impermeable barrier between populations or sub-populations.

Construction or upgrades of new routes in Non-Habitat Areas would most likely have no effect on GUSG or their habitat based on best available science and the lack of documented use by GUSG outside of Occupied and Unoccupied Habitat. The vast majority of the Non-Habitat Areas outside of Occupied and Unoccupied Habitat do not contain GUSG habitat characteristics.

In order for motor vehicles to impact leks, the noise would have to travel from the road to the lek and be of sufficient decibels to impact the lek location. Not factoring in the effects of vegetation and topography on noise attenuation, a project that produces 80 decibels at 50 feet would attenuate to 39 decibels within 1 mile (www.sengpielaudio.com). To determine the potential impact on GUSG leks, areas within 0.6 miles of a lek and within 1 mile of the edge of Occupied Habitat were identified and mapped (as shown in Figure 4.79).

BLM_0027907

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

**Figure 4.79 - Potential of Leks in the Decision Area to Be Impacted by Roads**



BLM_0027908

There are approximately 19,611 acres of a 0.6-mile lek buffer within 1 mile of the edge of Occupied or Unoccupied Habitat. These areas could potentially be impacted by noise from projects if noise were to reach the edge of the lek (see figure above). This does not take into account to noise impacts already occurring on those leks. Leks within 1 mile of a project that produces 80 dba at 50 feet (i.e., a busy highway) would already be impacted and since noise is not additive, these leks would only experience additional impact if the decibel level from the project was to exceed the existing decibel levels.

Alternative B protects 23,287 acres more than Alternative A of habitat capable of supporting sage-grouse on public lands managed by the BLM outside of Occupied and Unoccupied Habitat. Under Alternative B, project management outside the Occupied and Unoccupied Habitat would focus on projects that are disruptive to GUSG. Under Alternative B, activities disruptive to GUSG from projects outside Occupied and Unoccupied Habitat would not occur. While Alternative B provides more protection, under Alternative A it is extremely unlikely those impacts would occur based on current development and the lack of use of the area by GUSG.

Alternative B implements a 1,563% increase in acres closed to motorized traffic compared to Alternative A. County roads and highways that cross public lands managed by the BLM would remain open and access would to BLM lands would occur in those areas. Under Alternative B, there would be a 100% decrease in areas open to cross country travel. No GUSG or nests would be disturbed by cross country motorized travel.

### Recreation

Four developed recreation sites would be removed in Occupied Habitat and eleven developed recreation sites would be removed in Unoccupied Habitat. (See Table 3.58 - BLM Recreation Sites in the Decision Area.) The impact to GUSG of closing the recreation sites would largely depend on access to the sites. Under Alternative B, access to public lands managed by the BLM would be limited to county roads and highways, and would also vary on the type of recreation site. The benefit to GUSG would depend on the habitat at the recreation site, recreation use levels, and the type of use. In general, sites with more recreational activity would have a larger impact than sites will less activity.

No SRPs would be renewed in Occupied Habitat. SRPs make up a small fraction of recreation use on public lands managed by the BLM. Under this alternative all roads would be closed in Occupied Habitat and recreational use would be limited to foot traffic or horseback.

Outside of Occupied and Unoccupied Habitat but in Non-Habitat no SRPs with the potential to adversely affect GUSG or that act as an impermeable barrier between

BLM_0027909

populations or sub-populations would be allowed.  GUSG movements would only be impacted in those areas where habitat is suitable for sage-grouse, mostly in sagebrush patches large enough to support migrating GUSG, and the project development is such that it acts as a barrier to migration.  Based on existing SRPs in the decision area, there are no SRPs that would act as a barrier to migration. Disruptive impacts from recreational activities would be limited to areas where GUSG occur, there is no science to suggest recreational impacts reach beyond where the activity occurs.  If areas outside of Occupied and Unoccupied Habitat were to be used by GUSG, then Alternative B would limit those recreation permits on 23,287 acres of public lands managed by the BLM or 18% of BLM lands in Non-Habitat.  Alternative B protects 23,287 more acres outside of Occupied and Unoccupied Habitat than Alternative A.

Under Alternative B, disturbances to GUSG from permitted recreational activities would not occur in the decision area.  Under this alternative, there would be more protection than in Alternative A.

## Lands & Realty

Under Alternative B, all Occupied and Unoccupied Habitat would be managed as a ROW exclusion area.  Existing RMP designated corridors would be undesignated. Undesignating a corridor does not imply that existing infrastructure would be relocated, just that the area designation would be removed, and any future utilities would be less likely to be placed within Occupied Habitat.  While ROWs would be allowed within 100 feet of a county road or highway, if the area is within the 4 mile no surface disturbance buffer, then the project would not be allowed.

ROWs in Non-Habitat Areas would be avoided if the project were to be disruptive to GUSG.  If GUSG were found to be using the area, the impacts from ROWs would be the same as those described in impacts common to all alternatives.  Based on best available science, GUSG are not using the areas outside of Occupied and Unoccupied Habitat.

Under Alternative B, activities that would be disruptive to GUSG would be avoided on 23,287 acres habitat capable of supporting sage-grouse on public lands managed by the BLM in Non-Habitat.  Development would be avoided in habitat not capable of supporting GUSG on 100,300 acres if those impacts would be disruptive.  It is highly unlikely that any ROW project would be disruptive to GUSG if the activity occurred in habitat that does not support GUSG, such as forests or woodlands. Only projects in habitat that does not support GUSG (i.e., woodlands and forests) that are immediately adjacent to habitat being used by GUSG has the potential to be disruptive to GUSG.  In rare instances, noise from permitted ROW activities could be disruptive to GUSG on lek sites. (See roads analysis for Non-Habitat Areas.)

BLM_0027910

There is no research that has documented noise impacts to GUSG other than impacts on leks.

This is more that Alternative A that does not require restrictions outside of Occupied and Unoccupied Habitat. Under Alternative B, project management outside the Occupied and Unoccupied Habitat would focus on projects that are disruptive to GUSG. Under Alternative B, ROW activities disruptive to GUSG from projects outside Occupied and Unoccupied Habitat would not occur. Under Alternative A, it is extremely unlikely those impacts would occur based on current development.

Under Alternative B, ROW exclusion areas increase by 6,938% in Occupied Habitat and increase by 417% in Unoccupied Habitat. No new ROWs would be allowed and further fragmentation of GUSG habitat would not occur.

## Range Management

Under Alternative B, livestock grazing would not be permitted. Under this alternative, allotments not meeting range land health standards with livestock grazing determined to be a causal factor would likely improve over time. This action could result in improvement of between 37,000 and 258,000 acres (see analysis in CH 4 Livestock Grazing), representing between 6% and 40% of BLM-administered lands in the planning area. The amount of improvement and the time it would take to improve would be dependent upon the current state of the range in a particular area. In some instances, removing grazing might not improve if habitat has transitioned to a state where introducing some form of disturbance is required to reset the system. Other factors, such as increased grazing by wild ungulates, could delay or even offset recovery from the removal of livestock grazing.

Under Alternative B, all BLM-administered public lands would be closed to grazing, a 100% increase over Alternative A. No nests would be trampled as a result of livestock grazing. Modeling created to estimate nest trampling estimated nest trampling under moderate stocking densities at 1.16 nests out of 100.

## Minerals

Under Alternative B, Occupied Habitat and Unoccupied Habitat would be closed to fluid mineral leasing. Piñon Mesa is closed to leasing under the No Action Alternative. In the Tres Rios FO RMP, Occupied Habitat is open to leasing with NSO restrictions, while Unoccupied Habitat is open to leasing. However, as there are currently no GUSG in Unoccupied Habitat, impacts to GUSG from closing to leasing and leasing with a NSO restriction would be essentially the same. Tres Rios and Monticello are the only field offices with moderate to high fluid mineral development potential. Closing to leasing would have no measurable impacts, since

BLM_0027911

Occupied Habitat in the Tres Rios FO is designated as NSO, and under Alternative B, no exceptions, waivers, or modifications would be allowed.

Under Alternative B, Unoccupied Habitat would be closed to leasing and no oil and gas development would be permitted. Unoccupied Habitat with the highest mineral potential is primarily in the Monticello-Dove Creek population area. Habitat in this area is largely agricultural or pinyon-juniper woodlands, with little sagebrush. Precluding development would protect GUSG in sagebrush habitats. In Unoccupied Habitat under Alternative B, no development would occur.

Exploration for and potential development of potash would not continue since the area would be closed to leasing. Uranium lease tracts are present in the decision area would continue to have the potential for development. Current mining of uranium is underground and mining could occur under Occupied Habitat. New ancillary facilities would have to be placed outside of Occupied Habitat.

Under Alternative B, 1,051,846 acres would not be available for leasing, this is a 1,001% increase from Alternative A. However, protections are not proportional to development potential. Across the decision area there are 91,684 acres in Occupied Habitat of federal fluid mineral estate with moderate to high oil and gas potential, and 47,478 acres in Unoccupied Habitat with moderate to high oil and gas development potential. This represents 13% of the federal mineral estate in the decision area. Under Alternative A, 44% (461,614 acres) of the decision area have NSO stipulations. Factoring in NSO stipulations under Alternative A, then Alternative B increases protection by 89% over Alternative A, however under Alternative A, exceptions, waivers, and modifications to lease stipulations are allowed when supported by site-specific NEPA. The 89% increase does not factor in development potential. The vast majority of Occupied Habitat with high or moderate development potential already has NSO stipulations for the entire lease. In Unoccupied Habitat in the Tres Rios FO, a CSU is applied to all leases in Unoccupied Habitat that prohibits development within 0.6 mile of leks and requires timing restrictions for drilling and construction.

In Non-Habitat, a CSU stipulation would be applied to unleased lands for fluid minerals and non-energy leasable minerals to protect sagebrush and riparian areas. In Non-Habitat 71% is oil and gas mineral estate. Approximately 11% of the federal fluid mineral estate is currently leased for oil and gas development. There are only two populations where there are any existing leases in Non-Habitat. In the Monticello-Dove Creek Population 44% of the federal oil and gas estate is currently leased making up approximately 23% of the Non-Habitat. In the San Miguel Basin 22% of the federal oil and gas estate is currently leased making up approximately 15% of the Non-Habitat. Impacts to GUSG from oil and gas development would be the same as described in the section impacts common to all alternatives if

BLM_0027912

development were to occur in habitat capable of supporting sage-grouse and sage-grouse are using the area. Best available science does not indicate that GUSG are currently using areas outside of Occupied and Unoccupied Habitat. Noise from oil and gas activities could impact GUSG if the noise were to reach lek locations during the lek season. Management actions for salable and locatable mineral development would be limited in Non-Habitat. Management actions that address noise would be implemented for salable and locatable minerals. Noise impacts to GUSG would be the same as those already analyzed.

Management actions would be applied to geophysical exploration and all other mineral activity in Non-Habitat Areas if activities were identified to be disruptive to GUSG. This would apply to 23,287 acres of habitat capable of supporting GUSG on public lands managed by the BLM. Restrictions would only apply if activities were to disrupt GUSG, which would require that sage-grouse be using habitat in the area or if noise from the project were to impact leks during the lek season. Alternative B would protect 23,287 acres of habitat capable of supporting GUSG outside of Occupied and Unoccupied Habitat. Alternative A does not implement any project restrictions outside of Occupied and Unoccupied Habitat. However the BLM is required to comply with the Endangered Species Act and evaluate all projects for impacts to listed species.

The prohibition on siting of line compressors in Non-Habitat is not likely to provide any measurable benefit to GUSG since best available science does not document any use by sage-grouse. The only benefit would be if a proposed compressor is on the edge in continuous sage-grouse habitat. However, this situation is not likely to occur since only 18% of the Non-Habitat could contains GUSG habitat characteristics in the San Miguel Population and only 24% in the Monticello-Dove creek Population. Any compressors placed in the Non-Habitat would have vegetative screening that would substantially buffer any noise. Noise is subject to a restriction to limit noise levels to no more than 10 decibels above ambient at the edge of a lek under Alternative B.

For impacts from compressors to impact leks the noise would have to travel from the compressor to the lek and be of sufficient volume to impact the lek location. Not factoring in the effects of vegetation and topography on noise attenuation, a compressor station that produces 89 decibels at 50 feet would attenuate to 48 decibels within 1 mile (http://www.sengpielaudio.com/calculator-distance.htm).

There are approximately 19,611 acres of the 0.6 mile lek that is within 1 mile of the edge of Occupied or Unoccupied Habitat. These areas could potentially be impacted by noise if projects were to reach the edge of the lek. (See Figure 4.79.) This does not take into account to noise impacts already occurring on those leks.

BLM_0027913

Leks already impacted by noise would only experience additional impact of the decibel level from the project was to exceed the existing levels.

## Fuels Management

Under Alternative B, no fuels treatments or mechanical or prescribed fire would occur in GUSG habitat. Fuels would be treated adjacent to Occupied Habitat and Unoccupied Habitat. Pinyon-juniper encroachment would continue in Occupied and Unoccupied Habitat. Impacts to GUSG would vary depending on funding and treatment costs. Although Alternative B would close 100% of the decision area to fuels treatments, the actual impact would occur on no more than 2% of public lands managed by the BLM.

Within Non-Habitat areas, fuels treatments would be designed to meet RCP guidelines. Prescribed fire would be allowed if the proposed treatments are designed to restore habitat to meet RCP guidelines.

## Wildfire

Under Alternative B, impacts would be the same as other alternatives and as described in impacts common to all alternatives. Within Non-Habitat areas, wildland fires would be managed to help meet connectivity of GUSG habitat.

## Emergency Stabilization and Rehabilitation

Under Alternative B, impacts would be the same as those under other alternatives and as described in impacts common to all alternatives.

## Wildlife and Sensitive Species

Under Alternative B, there would potentially be fewer opportunities for ravens to expand their range through the use of anthropogenic features. Alternative B would increase areas closed to surface disturbances by 690% and increase ROW exclusion areas in Occupied Habitat by 6,938% over No Action Alternative A. Limiting the increase in anthropogenic features would benefit GUSG in areas where new anthropogenic features contribute to the expansion of sage-grouse predators, especially common ravens. BLM management actions would be limited to horse and foot traffic. Common ravens could take advantage of pinyon-juniper encroachment for nesting. Under this alternative, treatments for pinyon-juniper encroachment would not be allowed on 639,079 acres of BLM-administered lands. Impacts to GUSG would vary depending on funding and treatment costs. Although Alternative B would close 100% of the decision area to fuels treatments, the actual impact would occur on no more than 2% of BLM-administered lands.

BLM_0027914

### Forest and Woodland Products

Under Alternative B, no vegetative materials would be collected. Native seeds adapted for the area would not be collected and grown, and would therefore not be available for habitat restoration. Alternative B closes 639,079 acres of public lands managed by the BLM to the collection of vegetative materials, which is 639,079 acres more than Alternative A. Disruptions to GUSG from the collection of forest and woodland products would not occur under this alternative. It is not likely that there would be any measurable benefit to sage-grouse due to the limited amount of vegetative materials being collected.

### Weeds

Under Alternative B, impacts would be the same as other alternatives and as described in impacts common to all alternatives.

## ALTERNATIVE C

### General

Under Alternative C, surface-disturbing activity would be prohibited for 1 mile around GUSG leks. Under Alternative C, surface-disturbing activities would be prohibited on 100,034 acres of public lands managed by the BLM. This is a 112% increase over No Action Alternative A.

Under Alternative C, a timing limitation for disruptive activities during the lek/nesting season would be placed on 361,482 acres (56%) of BLM-administered public lands. Winter timing restrictions would occur on 252,012 acres (39%) of BLM lands.

Under Alternative C, there would be a 14% increase in BLM surface with timing restrictions during nesting periods over No Action Alternative A. Alternative B would increase winter timing restrictions by 851% over No Action Alternative A.

Alternative C would provide additional direction for avoidance areas around lek locations. Under Alternative C, oil and gas well development direction would require avoidance of well pads within 1.2 miles of a lek over approximately 180,725 acres (17% of the federal mineral estate). Under No Action Alternative A, no direction for limiting well pad development around leks is provided. However, because lands would be leased with a NSO stipulation under Alternative C, this management direction would apply only to existing leases, subject to valid existing rights. Existing leases within 1.2 miles of a lek cover about 4,415 acres (0.4% of the federal mineral estate).

Under Alternative C, linear features would be avoided within 1 mile of a lek over approximately 100,034 acres (16%) of BLM-administered land. This would be a

BLM_0027915

112% increase over No Action Alternative A, which prohibits surface disturbance on 47,127 acres around leks.

Under Alternative C, tall structures would be avoided within 1.4 miles of a lek. This covers 153,796 acres of public lands managed by the BLM or 24% of BLM surface. This is a 226% increase over No Action Alternative A, which prohibits surface disturbance on 47,127 acres around leks.

Impacts from noise would be managed under this alternative through direct restrictions on noise levels and indirectly through other management actions. Only the Tres Rios RMP (shown in No Action Alternative A) has management direction for noise to address impacts from noise on GUSG. Timing restrictions in GUSG nesting and winter habitat eliminate noise during the nesting and lekking season.

For long term noise associated with maintenance and operations, noise levels would be required to not have any negative impacts to GUSG. For construction activities and other permitted activities noise is mitigated with timing restrictions.

It should be noted that very little development has occurred on public lands managed by the BLM and little would be expected in the future. In the absence of development, impacts to GUSG under Alternative C would not be measurably different from those under No Action Alternative A.

## Roads

Under Alternative C, motorized vehicles would be limited to existing routes where travel management has not been completed and limited to designated routes where travel management planning has been completed. No upgrades would be allowed in Occupied Habitat, except where needed to address safety concerns. Mitigation of impacts in accordance with the mitigation plan would be required for any upgrades. Reclamation of routes would be prioritized. In the sub-population areas, seasonal closures would be implemented where a conflict has been identified and where the BLM has regulatory authority, as recommended by an interagency team of biologists.

Alternative C retains the same closures to motorized traffic as No Action Alternative A. Under Alternative C, there would be a 100% decrease in areas open to cross-country travel. No GUSG or nests would be disturbed by cross-country motorized travel. Under Alternative C, motorized travel on 639,079 acres would be limited to existing roads and trails, which represents an 18% increase over No Action Alternative A.

## Recreation

Under Alternative C, new developed recreational sites would be allowed if it minimizes impacts to GUSG from recreation and are mitigated in accordance with the mitigation plan. Special recreation permits would be required to contain criteria

BLM_0027916

that minimize impacts to GUSG. Minimization techniques could include, but are not limited to, timing restrictions, avoidance of certain areas, limits on the size or duration of an activity, and vehicle washing to prevent the spread of weeds.

## Lands & Realty

Under Alternative C, ROWs would be limited due to the designation of Occupied Habitat and Unoccupied Habitat as avoidance areas. Habitat would not be further fragmented by ROWs and any ROWs would be collocated with existing disturbances and mitigated under the mitigation plan.

Under Alternative C, ROW exclusion areas would not increase over No Action Alternative A. Alternative C would designate Occupied and Unoccupied Habitat as avoidance areas. Under Alternative C, 360,882 acres of public lands managed by the BLM in Occupied Habitat would be designated as avoidance areas, which represent a 2,272% increase over No Action Alternative A. In Unoccupied Habitat, 232,044 acres of public lands managed by the BLM would be designated as avoidance areas for ROWs, a 710% increase over No Action Alternative A. GUSG would benefit from the limitation of new anthropogenic features on the landscape.

## Range Management

Direct and indirect impacts to sage-grouse from range management activities are described in the impacts common to all alternatives. Under Alternative C, in the sub-populations and Unoccupied Habitat rangewide, the BLM would manage grazing to meet RCP guidelines. Specific grazing permit terms and conditions for managing grazing leases and permits are identified under this alternative. Management would be consistent rangewide for grazing administration. High priority would be given to evaluating range improvements and making modifications based on risks to GUSG. The increased attention to improved range management would be expected to result in improved habitat conditions for GUSG under Alternative C. Improving habitat conditions—specifically grass cover—in areas not meeting requirements for GUSG could increase nest and brood success in those areas.

## Minerals

Because of limited mineral development potential and existing protections, impacts under Alternative C would be primarily the same as those under No Action Alternative A, except that mitigation would be required for any activity in Occupied Habitat or Unoccupied Habitat.

Under Alternative C, 95,564 acres would not be available for leasing, which is the same as under No Action Alternative A. Within Occupied Habitat, Alternative C would place NSO restrictions on 650,854 acres of federal fluid mineral estate and increase NSO stipulations for oil and gas development by 41% over No Action

BLM_0027917

Alternative A.  However, the protections are not proportional to development potential.  Within Occupied Habitat across the decision area, there are 91,684 acres of federal fluid mineral estate with moderate to high oil and gas potential, totaling approximately 14% of federal mineral estate in Occupied Habitat.  However, the only areas with high to moderate oil and gas development potential are within the Monticello FO and Tres Rios FO.  All Occupied Habitat not already leased in the Tres Rios FO has a NSO restriction.  In the Monticello FO, there is a 0.6-mile NSO for existing leks.  The majority of mineral estate in the Monticello decision area is private.  The vast majority of Occupied Habitat with high or moderate development potential already has NSO stipulations for the entire lease.

A one-mile NSO stipulation would be applied to all historic leks in Unoccupied Habitat and wherever a lek buffer overlaps from Occupied Habitat.  No part of a one-mile lek buffer intersects Unoccupied Habitat within the San Miguel Basin population area, while approximately 2 acres overlap within the Monticello-Dove Creek population area.  A one-mile NSO encompasses 1,286 more acres than a 0.6-mile buffer, an increase of 177% per lek over No Action Alternative A.  Alternative C would require a CSU stipulation for sagebrush in Unoccupied Habitat.

In Unoccupied Habitat in the Tres Rios FO, a CSU prohibiting development within 0.6 mile of a lek and requiring timing restrictions for drilling and construction would be applied to all leases within Unoccupied Habitat.

## Fuels Management

Under Alternative C, fuels treatments would be designed to benefit GUSG, which is not currently required under No Action Alternative A.

## Wildfire

Wildfires would be managed to minimize damage to sagebrush.

## Wildlife and Sensitive Species

Impacts to Wildlife and Sensitive Species under Alternative C would be the same as those analyzed under impacts common to all alternatives.  Under Alternative C, sagebrush treatments would be limited to treating those stands not meeting RCP guidelines.  As BLM sagebrush management no longer focuses solely on increasing forage production for livestock, there would likely be no benefit to GUSG.  It is highly unlikely that under No Action Alternative A, sagebrush treatments would occur in sagebrush stands meeting RCP guidelines.

## Forest and Woodland Products

Impacts under Alternative C would be the same as under the No Action Alternative and as described in impacts common to all alternatives.

BLM_0027918

## SUB-ALTERNATIVE D$_1$ - GUNNISON BASIN PREFERRED

### General

Impact from general management actions are the same for Sub-Alternative D$_1$ as described in Alternative C with the exception of the buffer for the prohibition on surface disturbing activities. Under Sub-Alternative D$_1$, a 0.6 mile surface disturbance prohibition covers 78,691 acres. This is no change from Alternative A. Under Alternative C, 148,717 acres are covered by a 1 mile surface disturbance prohibition around sage-grouse leks. This is an 88% increase over Alternative A and Sub-Alternative D$_1$.

### Travel and Transportation Management

Under Sub-Alternative D$_1$, upgrades to existing roads would only be allowed if the upgrade would not have an adverse effect on GUSG populations or habitat. This alternative provides more protection than under the No Action Alternative. Under the no action alternative, any upgrade would be allowed if it is covered by the CCA. Upgrades not covered by the CCA would still be allowed after completion of NEPA and Section 7 consultation under the ESA. The CCA requires mitigation for any road at a rate greater than a 1:1 ratio. This requirement would remain in place for any projects that fall under the CCA. Projects outside the CCA would require greater than a 1:1 ratio.

### Range Management

Actions under Sub-Alternative D$_1$ would be the same as those described for Alternative C.

### Minerals

Impacts under Sub-Alternative D$_1$ would be the same as those described in Alternative C.

### Wildland Fire, Fuels Management, and Fire Rehabilitation

Impacts under Sub-Alternative D$_1$ would be the same as those described in Alternative C.

### Special Status Species

Impacts under Sub-Alternative D$_1$ would be the same as those described in Alternative C.

### Wildlife

Impacts under Sub-Alternative D$_1$ would be the same as those described in Alternative C.

BLM_0027919

### ACECs

Impacts under Sub-Alternative $D_1$ would be the same as those described in Alternative C.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Impacts under Sub-Alternative $D_2$ would be the same as under Alternative C, with the exception of special status species, roads, lands & realty, and fuels management.

### Special Status Species

Under Sub-Alternative $D_2$, no surface disturbance would be permitted within 0.6 mile of a lek on BLM-administered lands supporting the satellite populations of GUSG.  A 0.6-mile buffer would encompass approximately 7,292 acres within Occupied Habitat and 941 acres within Unoccupied Habitat.

### Roads

Under Sub-Alternative $D_2$, road upgrades would be allowed if there would be no adverse effect to GUSG and if impacts were mitigated in accordance with the mitigation plan.

### Lands & Realty

Under Sub-Alternative $D_2$, all lands within 0.6 mile of a lek would become a ROW exclusion area, a 100% increase over No Action Alternative A.

### Fuels

Under Sub-Alternative $D_2$, prescribed fire would not be allowed on BLM lands supporting the GUSG satellite populations, with the exception of pile burning.  The requirement for fuels treatments to meet GUSG habitat objectives would have no impact on the risk of wildland fire.  Fuels treatments have focused on pinyon-juniper encroachment and other woodland habitats within the range of GUSG.  Sagebrush has not been treated in order to reduce the risk of wildland fire.

## 4.2.4.    CUMULATIVE EFFECTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely to continue to affect GUSG are mineral exploration and development, residential and industrial development (including power lines and other ROWs), grazing, recreation, road construction, weed invasion and spread, prescribed and wildland fires, predation, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought.

BLM_0027920

Many of the activities described above can change habitat conditions, which then cause or favor other habitat changes. For example, wildland fire removes habitat, and affected areas are more susceptible to weed invasion, soil erosion, and sedimentation of waterways, all of which degrade habitats. In general, resource use activities have cumulatively caused habitat removal, fragmentation, noise, increased human presence, and weed spread. Land planning efforts and vegetation, habitat, and weed treatments have offset some of these effects by improving habitat connectivity, productivity, diversity, and health.

Climate change could cause an increase or decrease in temperatures and precipitation, which would affect soil conditions, vegetative health, and water flows and temperature. Such changes would alter habitat conditions, potentially creating conditions that could favor certain species or communities, weeds, or pests.

Under all of the action alternatives, impacts to GUSG would be lessened through restrictions, stipulations, closures to mineral exploration and development, recreation, and motorized travel, conditions of approval, and by concentrating development in previously disturbed areas.

This cumulative effects analysis discloses the long-term effects on GUSG from implementing each RMP/EIS alternative in conjunction with other past, present, and reasonably foreseeable future actions.  In accordance with Council of Environmental Quality guidance, cumulative effects need to be analyzed in terms of the specific resource and ecosystem being affected (Council of Environmental Quality 1997).  As discussed in Chapter 1, the purpose for the proposed federal action is to identify and incorporate appropriate conservation measures to conserve, enhance, and restore GUSG habitat by reducing, eliminating, or minimizing threats to GUSG habitat. The RCP delineates six GUSG sub-populations.  Therefore, the cumulative effects analysis study area for the GUSG is Occupied and Unoccupied Habitat in the planning area.

This analysis includes past, present and reasonably foreseeable future actions in the range of GUSG, and evaluates the impacts of the GUSG RMP Amendment, by alternative, when added to those actions.

## METHODS

The cumulative effects analysis uses the following methods:

- FWS final rule Threatened Status for the GUSG was reviewed to identify the primary threats facing GUSG in each population.
- Predation was included as a threat due to concerns identified in the final listing.  The FWS states that "…effects [of predation] may be more

BLM_0027921

substantial and of greater concern for smaller, declining populations, such as the six satellite populations of Gunnison sage-grouse."

- The numbers in this cumulative analysis display the number of acres across the entire range and the percentage of those acres are located within the decision area.

## ASSUMPTIONS

The cumulative analysis uses the same assumptions and indicators as those established for the analysis of direct and indirect effects on GUSG as discussed in Chapter 4. In addition, the following assumptions have been made:

- The timeframe for this analysis is 20 years.
- The cumulative effects analysis area extends beyond public lands managed by the BLM and the federal mineral estate and encompasses the range of GUSG.
- The magnitude of each threat would vary geographically and may have more or less impact on GUSG in some parts for the range, depending on such factors as climate, land use patterns, and topography.
- A management action or alternative would result in a net conservation gain to GUSG if there is an actual benefit or gain above baseline conditions. Baseline conditions are defined as the pre-existing conditions of a defined area and/or resources that can be quantified by an appropriate metric(s). For purposes of a NEPA analysis, the baseline is considered the affected environment that exists at the time NEPA analysis is initiated, and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.
- The cumulative effects analysis quantitatively analyzes impacts on GUSG and their habitat in the range. Impacts on habitat are likely to correspond to impacts on populations, because reductions or alterations in habitat could affect reproductive success through reductions in available forage or nest sites. Human activity could cause disturbance to the birds preventing them from mating or successfully rearing offspring. Human activities also could increase opportunities for predation, disease, or other stressors.

### Regional Efforts to Manage Threats to GUSG

Regional Efforts include past, present, and reasonably foreseeable actions conducted by or in cooperation with agencies, organizations, landowners, or other groups in the range of GUSG. The Range of GUSG encompasses portions of Colorado and Utah.

BLM_0027922

### Colorado Statewide Efforts

- Gunnison Sage-Grouse Candidate Conservation Agreement with Assurances - Gunnison Basin
- Candidate Conservation Agreement - Gunnison Sage-Grouse Conservation Plan: Dove Creek, Colorado
- Gunnison Sage-Grouse Rangewide Conservation Plan 2005
- Gunnison Sage-grouse Rangewide Steering Committee.
- San Miguel Basin Local Working Group
- Gunnison Basin Sage-grouse Strategic Committee
- Crawford Area Local Working Group
- Dove Creek Local Working Group
- Piñon Mesa Gunnison Sage-grouse Partnership
- Poncha Pass Gunnison Sage-grouse Working Group

### Utah Statewide Efforts

- Gunnison Sage-Grouse Rangewide Conservation Plan 2005
- Strategic Management Plan for Sage-Grouse 2002
- San Juan County Gunnison Sage-Grouse Working Group Conservation Plan
- Monticello-Dove Creek Local Working Group
- San Juan County Local Working Group

### Natural Resource Conservation Service Sage-Grouse Initiative

With 844,330 acres of GUSG habitat in private ownership in the decision area, a unique opportunity exists for the Natural Resources Conservation Service to benefit GUSG and to ensure the persistence of large and intact rangelands by implementing long-term contracts and conservation easements.

While participation in the Sage-Grouse Initiative (SGI) program is voluntary, willing participants enter into binding contracts to ensure that conservation practices that enhance GUSG habitat, such as fence marking, protecting riparian areas, and maintaining vegetation in nesting areas, are implemented.  Participating landowners are bound by a contract (usually 3 to 5 years) to implement, in consultation with Natural Resources Conservation Service staff, conservation practices if they wish to receive the financial incentives offered by the SGI.  These financial incentives generally take the form of payments to offset costs of implementing conservation practices and easements or rental payments for long-term conservation.

While potentially effective at conserving GUSG populations and habitat on private lands, incentive-based conservation programs that fund the SGI generally require reauthorization from Congress under subsequent farm bills, meaning future funding is not guaranteed.

BLM_0027923

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## ANALYSIS

The cumulative impact analysis area used to analyze cumulative impacts includes the entire decision area.  The cumulative effects analysis focuses on the most substantial threats to GUSG habitats rangewide; conversion of sagebrush (agricultural and urban development), mineral development, ROWs, and predation.  The analysis presents an overview of populations susceptible to these threats throughout the range of GUSG.

Rangewide, 47% of Occupied Habitat is privately owned and 39% is public lands managed by the BLM.  Unoccupied Habitat is 53% private surface and 35% public lands managed by the BLM.  In the satellite populations, private surface will play a more substantial role in the conservation and recovery of GUSG, 71% of Occupied Habitat is private surface compared to 22% public lands managed by the BLM.  In Unoccupied Habitat, private surface is 57% of the area and public lands managed by the BLM make up 31%.

Conversion of sagebrush to agricultural lands or for urban development may continue, however at a lower rate than has been seen historically.  Agriculture makes up 90% of all disturbances in Occupied Habitat rangewide and 91% of all disturbances in Unoccupied Habitat.

The conversion of sagebrush from urban development will largely be managed by the counties.  In 2013, eleven counties within the range of GUSG and the governors of Colorado and Utah entered into a Memorandum of Understanding for the management of GUSG and their habitat with the goal of increasing the current abundance, viability and vitality of GUSG and their habitats.

Agricultural conversion from sagebrush to cropland is likely to decline relative to previous rates of development.  Rangewide, agricultural conversion accounts for approximately 90% of all surface disturbances.  Subsidies from the USDA NRCS Sage-grouse Initiative provide incentives for maintaining and restoring sage-grouse habitat.  Areas that were highly desirable for cultivation were most likely converted many decades ago.  No sagebrush conversion or urban development would occur on public lands managed by the BLM in the decision area for the duration of the life of the RMP Amendment.

In Occupied Habitat, 96% of all surface disturbances are on private surface.

While mineral development will continue, due to listing and designation of critical habitat, development will most likely occur at a much slower rate.  Fluid mineral development will be limited to existing leases and fee/fee mineral estates in Occupied Habitat.  Due to the lack of fluid mineral development activity in the last ten years, it is not likely that any measurable impacts from fluid mineral development

BLM_0027924

will occur in Occupied Habitat under any of the alternatives. Cumulative impacts from new mineral development should not have any measurable variation among the alternatives. Primarily due to existing management in Occupied Habitat that places NSO leasing restrictions in the Tres Rios FO, where the most potential for oil and gas development to occur. There is one existing proposal for a gas well outside of GUSG habitat with access through Occupied Habitat in Dry Creek Basin. The project proponent proposes to connect oil and gas roads in the southwest portion of Dry Creek Basin. This action would remove oil and gas traffic from the middle of Dry Creek Basin and route all traffic to the far edge in the pinyon-juniper/sagebrush interface. Rerouting traffic would substantially reduce impacts to sage-grouse from oil and gas production activities. Salable minerals operations are present throughout the range of GUSG and existing authorizations would be expected to continue.

ROWs will continue to be processed under all alternatives. Occupied Habitat is an avoidance area and could limit the number of ROW approvals. Upgrading of a Tri-State transmission line is being processed and one alternative is to co-locate the power line along the highway in Dry Creek Basin. This action would decrease impacts from the ROW and improve habitat for GUSG in the Basin. The Poncha Pass Electric Transmission Line could impact GUSG in the Poncha Pass and increase habitat fragmentation.

Predation is a natural process and will continue under all alternatives. It is likely that predation rates could decrease on public lands managed by the BLM, through the management of anthropogenic features under all of the action alternatives. Under the No Action Alternative, facility and infrastructure management would not focus on removing nesting and perching opportunities for avian predators. Objective B in the BLM Manual 6830 Animal Damage Control (ADC) is to "Ensure that ADC is carried out in a systematic manner which responds to resource protection, human health, and livestock protection needs while protecting public safety, domestic animals, and non-target wildlife." While no alternative addresses the direct control of predators, the BLM annually addresses predator control through a MOU with APHIS.

BLM_0027925

## 4.3. FISH & WILDLIFE

**BIG GAME**

### 4.3.1. METHODOLOGY

#### ATTRIBUTES AND INDICATORS

- Elk population estimates
- Number of elk per square mile
- Mule deer population estimates
- Number of mule deer per square mile
- Surface disruptive activities on the landscape

#### ASSUMPTIONS

- Assume an even distribution of big game across the landscape in the planning area.

#### METHODS AND DATA

- BLM surface acreage within the decision area within big game critical winter range
- BLM surface acreage that is not restricted under an ROW exclusion, fluid and solid mineral NSO stipulations, or closed to such leases, or protected within Wilderness or Wilderness Study Areas.
- UDWR and CPW 2014 Elk and Deer Population Estimates.

### 4.3.2. IMPACTS COMMON TO ALL ALTERNATIVES

#### Elk and Mule Deer

Under all alternatives, big game would continue to react to surface disturbing and disruptive activities in a similar fashion. Direct response of mule deer to development is generally through avoidance of habitat and decreased use of an area. Indirect impacts to mule deer could occur on the population level. Studies have documented declines in mule deer numbers as a result of full field oil and gas development. Population declines associated with large-scale oil and gas development are largely thought to be a result of big game being displaced to

BLM_0027926

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

suboptimal habitats. No study has documented a complete abandonment of a developed area. Mule deer would still use lands within and around oil and gas development; however the amount of use would change. Mule deer have been documented to alter their behavior as a response to disturbance; generally this is a non-linear response in habitat use. Reducing traffic from seven or eight vehicles passing per day to three was sufficient for mule deer to perceive less risk and alter their behavior (Sawyer et al 2009).

Deer use areas around development less frequently than areas with no development. Therefore the further an area is from development, the more use it will receive by big game. Sawyer et al (2009) identified that mule deer were not only responding to the loss of habitat through development of well pads, but behavior was influenced by the amount of activity. Mule deer avoided areas with the highest traffic levels by the greatest distance. Mule deer were found closer to areas with the lowest traffic levels (Sawyer 2009). Van Dyke and Klein (1996) found similar results with looking at the response of elk to well drilling and production. Elk avoided human activity twice the distance compared to when there was no activity at the well site. In the winter, elk were selecting landscapes with moderate slopes and away from human activity (Sawyer et al 2007). The impacts of human activity in non-forested environments may be larger than in non-forested environments due the lack of security cover (Sawyer et al 2007).

Human activity levels may have substantial influence on elk distribution in the decision area. Removing or decreasing human activity levels in the decision area could result in an increase in the number of elk winter on public lands managed by the BLM in the decision area. Reducing human activity levels could increase big game use of critical winter range in the decision area based on the decrease in human activity.

There are three potential threats of deer and elk overlapping with GUSG. The first is that they consume herbaceous material that grouse would use as nesting cover, potentially reducing the hiding cover necessary for successful grouse nesting. The second is direct competition for sagebrush, a critical component of grouse diets in the winter. The third is disturbance to nests and nesting hens; since deer and elk have largely migrated away from grouse habitat in May and June, this threat is probably extremely rare. In order to evaluate the first potential threat, the time deer and elk spend in nesting area must be estimated, as well as the biomass of grasses, forbs, and shrubs consumed. These may vary annually, temporally, and by location. The second threat can be addressed by examining food habits of deer and elk and consumption rates within the larger area of deer or elk range overlap with Occupied Habitat.

BLM_0027927

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

Multiple studies have estimated elk and mule deer forage requirements.  CPW estimates forage requirements for one elk as 0.667 AUMs or 533.6 pounds of forage per month.  CPW estimates mule deer monthly forage requirements as 0.2 AUMs or 160 pounds of forage per month (CPW 2015 personal communication).

Based on ecological site descriptions for sagebrush in the decision area, sagebrush habitats can produce a wide range of forage per acre annually.  Estimates (provided in Table 4.102 and Table 4.103) of the number of deer and elk that sagebrush can support are based on utilization levels, rangeland productivity, and forage consumption.  Estimates were calculated based on a big game winter date range of December 1 through April 30, which corresponds to CPW winter timing restrictions for big game winter concentration areas.

**Table 4.102 - Supportable Deer Density Estimates**

| UTILIZATION | RANGE PRODUCTIVITY 250 POUNDS/ACRE | RANGE PRODUCTIVITY 500 POUNDS/ACRE | RANGE PRODUCTIVITY 750 POUNDS/ACRE |
|---|---|---|---|
| 15% | 30.42 | 60.83 | 91.25 |
| 20% | 40.56 | 81.11 | 121.67 |
| 25% | 50.69 | 101.39 | 152.08 |
| 30% | 60.83 | 121.67 | 182.5 |
| 40% | 81.11 | 162.22 | 243.33 |
| 50% | 101.39 | 202.78 | 304.17 |

Above table based on mule deer forage requirement of 160 pounds per month and average weight of 200 pounds.  Density is reported as deer per square mile.

**Table 4.103 - Supportable Elk Density Estimates**

| UTILIZATION | RANGE PRODUCTIVITY 250 POUNDS/ACRE | RANGE PRODUCTIVITY 500 POUNDS/ACRE | RANGE PRODUCTIVITY 750 POUNDS/ACRE |
|---|---|---|---|
| 15% | 9.13 | 18.26 | 27.39 |
| 20% | 12.17 | 24.35 | 36.52 |
| 25% | 15.22 | 30.44 | 45.65 |
| 30% | 18.26 | 36.52 | 54.78 |
| 40% | 24.35 | 48.7 | 73.05 |
| 50% | 30.44 | 60.87 | 91.31 |

Above table based on elk monthly forage requirement of 533 lbs. and average weight of 450 lbs.  Density is reported as elk per square mile.

BLM_0027928

Depending on forage production levels sagebrush communities in the decision area can support densities of winter concentrations of elk ranging from 9 to 27 elk per square mile December 1 through April 30 at 15% utilization.

Depending on forage production levels sagebrush in the decision area can support densities of winter concentrations of deer ranging from 30 to 91 deer per square mile December 1 through April 30 at 15% utilization.

Holechek (1988) recommends that utilization levels within sagebrush communities not exceed 30% in order to maintain rangeland productivity. Many herbivores share the range with GUSG. Utilization needs to account for all herbivores, domestic, state managed wild ungulates, and other wildlife. Rabbits can have a substantial impact on vegetation as shown by Ranglack (2015).

All big game management actions in all plans will remain in place for all alternatives. If a particular plan has a timing limitation for big game critical habitat that timing restriction would remain. The impacts to big game are primarily through the level of activity that will be authorized by BLM management actions. Big game will also benefit by sage-grouse timing restrictions that may extend beyond big game restrictions already in place in existing plans. The BLM will collaborate with state Wildlife Agencies to mitigate wild ungulate impact to GUSG Occupied Habitat.

### 4.3.3.   IMPACTS BY ALTERNATIVE

General management actions impose various restrictions across the landscape. These restrictions vary by alternative and may range from area management direction to timing limitations.

## ALTERNATIVE A - NO ACTION

### Roads

Under No Action Alternative A, there would be no change in impacts to big game from roads. Within Occupied and Unoccupied Habitat, 53,565 acres (9%) of BLM-administered public lands would be open to unrestricted cross-country travel with the potential to result in direct disturbance to big game.

Motorized vehicles would continue to be limited to existing roads and trails on 85% of public lands managed by the BLM in the decision area.

### Recreation

Under No Action Alternative A, recreation sites could continue to be developed anywhere in Occupied Habitat or Unoccupied Habitat, provided that no

BLM_0027929

development occur within 0.6 mile of an active GUSG lek. Outfitter and guide permits would continue to be issued for big game and trophy game animals. Special recreation permits issued by the BLM would be required to enter into Section 7 ESA consultation if the activity would have any effect on GUSG or GUSG habitat.

## Lands & Realty

Under No Action Alternative A, anthropogenic features on the landscape would increase at the same rate as predicted in existing land use plans EISs, primarily resulting from a potential increase in ROWs. Under this alternative, no areas are designated as ROW exclusion areas with the exception of a few RMPs that identify areas within 0.6 mile of a lek as an exclusion area. Because they are not biologically tied to GUSG lek locations, this mitigation measure would have no beneficial effects to big game.

The Grand Junction RMP identifies any area within 4 miles of a lek as a ROW avoidance area. In this plan, the impact to big game would be similar to that under the preferred alternative. The Monticello RMP requires avoidance of the construction of new power lines, wind power turbines, or other aboveground structures within 4 miles of a lek. In all other land use plans, big game habitat could be further fragmented by ROWs, more so than under the preferred alternative. Under No Action Alternative A, 5,783 acres in Occupied Habitat and 44,921 acres in Unoccupied Habitat would be a ROW exclusion area on BLM -administered lands. ROWs would be avoided on 15,855 acres in Occupied Habitat and on 28,651 acres of Unoccupied Habitat. Big game would benefit overall all by the co-location of utilities and reduction in habitat fragmentation on the landscape.

## Range Management

Under No Action Alternative A, the BLM would continue to make changes to grazing permits if range conditions are not meeting rangeland health standards. Terms and conditions do not need to be specifically identified in a land use plan in order to be applied to grazing permits and leases. BLM 4180 regulations provide the regulatory authority to make changes to grazing permits and leases based on monitoring or rangeland health data. In the Gunnison Basin, range management in Occupied Habitat would continue to follow the CCA and resulting biological opinions from the FWS.

## Minerals

Fluid mineral development under No Action Alternative A would not vary from what has already been analyzed under the no action when factoring in development potential. Since 1985, no federal oil or gas wells have been drilled in Occupied Habitat or Unoccupied Habitat outside of the Tres Rios FO. Current management

BLM_0027930

direction in Occupied Habitat in the Tres Rios RMP is to lease with a NSO restriction.

Under No Action Alternative A, 9% of the federal oil and gas mineral estate would continue to be closed to fluid mineral leasing. In the decision area, 44% of the federal oil and gas mineral estate could be leased with NSO restrictions, 4% of the federal mineral estate is closed to mineral material sales, and 9% is closed to non-energy mineral leasing. Under this alternative, fluid mineral development could not occur within almost one-half of Occupied and Unoccupied Habitat due to NSO restrictions. Big game would respond to mineral development as described in the section on impacts common to all alternatives.

## ALTERNATIVE B

Under Alternative B, general guidance for surface-disturbing activities would prohibit surface-disturbing activities within 4 miles of a lek, which is approximately 372,117 acres (58%) of BLM surface in the decision area. Alternative B would place a timing limitation for disruptive activities during the lek/nesting season on 361,482 acres (56%) of BLM-administered lands. Winter timing restrictions for GUSG would occur on 252,012 acres (39%) of public lands managed by the BLM.

These restrictions would benefit big game in the decision area by limiting disruptive activities during critical life functions. GUSG nesting and brood-rearing timing restrictions could benefit elk and mule deer when calving/fawning. Winter timing restrictions for GUSG would benefit big game by removing stresses associated with anthropomorphic activity.

Under Alternative B, there would be a 14% increase in BLM surface with nesting timing restrictions over Alterative A. Winter timing restrictions would increase by 851% and prohibitions on surface-disturbing activities would increase by 690% over No Action Alternative A.

### Roads

The effects of roads on big game would be the same as those described for GUSG under Alternative B in Section 4.3.3. Under this alternative, 633,942 acres would be closed to motorized travel—a 1,563% increase over No Action Alternative A, which closes 6% of the decision area to motorized travel. Alternative B would result in an area free from vehicle disturbances to big game. Most of the decision area is winter habitat for elk and mule deer. Removing disturbances, especially during hard winters when animals are physically stressed, could increase overwinter survival and possibly lead to increased populations.

BLM_0027931

## Recreation

Under Alternative B, no outfitter and guide permits would be issued in Occupied Habitat or Unoccupied Habitat. Although hunting would continue to be allowed, the number of hunters could decrease due to a potential lack of access from the closing of BLM roads. Guiding services would no longer be available for hunting in remote areas where pack animals might be necessary. In the absence of activity, big game could concentrate in Occupied Habitat and Unoccupied Habitat at greater densities. Under Alternative B, 633,942 acres in the decision area would be closed to motorized travel, limiting hunter access to BLM-administered lands and reducing disruptive activity in the area. The removal of developed recreation sites could result in increased use by big game. As elk and mule deer concentrate in these areas, more stress could be placed on GUSG habitat.

## Lands & Realty

Under Alternative B, Occupied Habitat and Unoccupied Habitat would be designated as exclusion areas for new ROWs. Under this alternative, ROW exclusion areas would increase by 6,938% in Occupied Habitat and by 417% in Unoccupied Habitat. No new ROWs would be allowed and further fragmentation of big game habitat would not occur. Benefits to big game in the form of increased population numbers is not expected to be proportional to the increase in protections from ROWs. In many areas, ROW exclusions might not result in any benefit if the potential for ROW development is low. Big game numbers could increase in areas where ROW development is high, including winter range and winter concentration areas.

## Range Management

Under Alternative B, all BLM-administered lands would be closed to domestic livestock grazing, in sharp contrast to No Action Alternative where no lands are closed to grazing. Forage formerly used by livestock would be available to wild ungulates. Big game would no longer compete with livestock for resources. If competition for resources had been a limiting factor on big game in an area, then herd numbers in that area would be expected to increase. In areas where big game concentrate and degrade habitat conditions, continued degradation would be expected, especially if animal concentrations increase due to the lack of human activity in an area.

## Minerals

Under Alternative B, no anthropogenic features would be approved, with the exception of valid and existing rights. Occupied Habitat and Unoccupied Habitat would be closed to fluid mineral leasing under this alternative. Tres Rios and Monticello are the only field offices with moderate to high mineral development

BLM_0027932

potential, primarily for oil and gas, as well as for sodium and potash. Closing Occupied Habitat to leasing under Alternative B would have no measurable impacts over No Action Alternative A since unleased Occupied Habitat in the Tres Rios FO would already have a NSO stipulation.

Under this alternative, Unoccupied Habitat would be closed to leasing and no oil and gas development would occur in Unoccupied Habitat. Unoccupied Habitat with the highest mineral potential is primarily located in the Monticello-Dove Creek population area. Alternative B would close 1,001% more federal mineral estate to leasing than No Action Alternative A, although this does not factor in development potential. In Monticello and Tres Rios FOs, big game could benefit if areas where development might have occurred was critical range or if development would have occurred on a landscape scale.

### Fences

Under Alternative B, no new fences would be constructed and fences within 0.6 mile of a lek would be removed. Big game could benefit from the removal of fences in areas where they had been barriers to migratory and other normal movements.

## ALTERNATIVE C

Under Alternative C, surface-disturbing activity is prohibited on 100,034 acres of public lands managed by the BLM, a 112% increase over No Action Alternative A. Winter timing restrictions cover 252,012 acres from December 1 through March 14 and breeding/nesting timing restrictions on 361,482 acres from March 15 through June 30. Big game using these habitats would benefit from timing restrictions for disruptive activities, as well as from winter timing restrictions for GUSG. Winter protections under Alternative C would increase by 52,928 acres over No Action Alternative A.

Under Alternative C, linear surface disturbances would be prohibited on 100,034 acres (16%) of BLM-administered lands, a 112% increase over No Action Alternative A. Impacts to big game by surface-disturbing activities are described under impacts common to all alternatives.

Under Alternative C, Occupied Habitat would be designated as a ROW avoidance area. New anthropogenic features would be co-located with existing disturbance.

Land use planning decisions would limit anthropogenic activities and benefit big game. Areas outside big game critical winter range will have GUSG winter timing restrictions. These areas comprise approximately 13% of public lands managed by the BLM in Occupied Habitat and could offer additional protection for big game in the winter on 52,928 acres.

BLM_0027933

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

Impacts to big game under Sub-Alternative $D_1$ would be the same as those analyzed in Alternative C.

## SUB-ALTERNATIVE D₂ - SATELLITE PREFERRED

Impacts to big game under Sub-Alternative $D_2$ would be the same as those analyzed in Alternative C.

## 4.3.4. CUMULATIVE IMPACTS

The cumulative impact analysis area used to analyze cumulative impacts includes the entire decision area. Wild ungulate populations are managed by state wildlife agencies and the BLM manages habitat for all species that occur on public lands managed by the BLM. Under all action alternatives, the BLM will work in coordination with state wildlife agencies to identify areas where wild ungulates may be limiting the habitat's potential to meet RCP guidelines. Under No Action Alternative A, no formal management action would guide the agencies development of an MOU with state wildlife agencies, however BLM Manual 6521 State Agencies, provides basic procedures for cooperative programs with state fish and wildlife agencies. The objective is to obtain maximum cooperation with state agencies whose activities affect fish and wildlife habitat management either directly or indirectly on public lands and waters administered by the BLM. Section 12 Inventories, Studies, Surveys, and Plans states that "where both wildlife and livestock use the same areas, conflicts on vegetation allocations may occur. BLM is responsible for reconciling such conflicts."

## COMMON RAVEN

## 4.3.5. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Anthropogenic features on the landscape.

### ASSUMPTIONS

- Juvenile raven densities are highest within 3.0 kilometers of a population center.

BLM_0027934

- Increased anthropogenic features on the landscape increase nesting opportunities.

## METHODS AND DATA

- BLM surface acreage that is not restricted under Right of Way Exclusion, fluid and solid mineral NSO stipulations, or closed to such leases, or protected within Wilderness or Wilderness Study Areas.

## 4.3.6.   IMPACTS COMMON TO ALL ALTERNATIVES

Common raven populations have more than quadrupled in the United States in the last 40 years (Sauer et al 2014). Anthropogenic resources have contributed to increased raven abundance and juvenile survival (Webb et al 2009). Raven densities have been documented to be highest in cities and decrease sharply beyond 1.86 miles (Bui et al 2010). In the decision area 44,744 acres are within 1.86 miles of a population center. Webb et al (2009) found that 69% of dispersal locations for juveniles occurred at a communal point source subsidy, such as a landfill; and anthropogenic food and water sources correspond with juvenile raven movements.

Breeding or territorial ravens use man-made features for nesting (Coates et al 2014, Howe et al 2014, Bui 2009, Slater & Smith 2010, Prather and Messmer 2009) and may act as a conduit for raven movement. Howe et al (2014) noted that the odds of raven nesting decreased the further away one was from a transmission line and the increased edge (fragmentation) in vegetation types increased the odds of raven nesting. Ravens also tend to avoid dense pinyon-juniper habitat, and use more edge habitat (Howe et al 2014, Dunk et al1997).

New anthropogenic features are the most influential predictor of common raven occurrence on public lands managed by the BLM. Anthropogenic features in the decision area would primarily occur in the form of Rights-of-Way authorizations, mineral development, or recreational sites.

Portions of highways can contribute to raven population growth when acting as a point source subsidy due to the availability of road kill animals. Landfills are a substantial point source subsidy for common ravens, however no landfills are anticipated on public lands managed by the BLM in any of the alternatives. No new highways are anticipated and therefore no new point source subsidies would be created for common ravens.

Fluid mineral development would be the same under all alternatives. Currently the Monticello/ Dove Creek Population has potential for oil and gas development.

Future development in Occupied Habitat would be limited to existing leases in all alternatives. Under all alternatives, areas within Occupied Habitat not leased are either closed to leasing or leased with a NSO stipulation.

## 4.3.7. IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

#### General

Management actions that limit surface disturbances vary across the decision area. Under Alternative A surface disturbances are prohibited on 47,127 acres or 7% of public lands managed by the BLM. Timing limitations for sage-grouse should not impact common ravens since ravens are highly tolerable to disturbances.

#### Roads

Under No Action Alternative A, 53,565 acres within the decision area would remain open to unrestricted cross country travel, while 85% of BLM lands would continue to be designated as limited to existing routes.

#### Recreation

Under this alternative, recreation sites could be developed anywhere in Occupied Habitat or Unoccupied Habitat, provided that no development occurs within 0.6 mile of an active GUSG lek. Developed recreation sites could attract common ravens due to waste generated at these sites acting as a food subsidy.

#### Lands and Realty

Under No Action Alternative A, 5,783 acres of public lands managed by the BLM in Occupied Habitat are exclusion areas for ROW, or roughly 1% of Occupied Habitat. In Unoccupied Habitat 44,921 acres or 19% of public lands managed by the BLM are exclusion areas for ROWs. Under Alternative A, 73,182 acres are designated as utility corridors and cover approximately 11% of public lands managed by the BLM. As discussed in impacts common to all alternatives, common ravens can use anthropogenic features to expand their range, particularly linear ROWs.

Under this alternative, anthropogenic features on the landscape would increase at the same rate as stated in current BLM RMPs, primarily through a potential for increases in ROWs. No areas are designated as ROW exclusion areas. The primary driver for raven occupation on BLM-administered lands would be through the approval of new overhead power lines.

BLM_0027936

### Minerals

Under No Action Alternative A, 9% of the federal oil and gas mineral estate is closed to fluid mineral leasing. In the decision area, 44% of the federal oil and gas mineral estate could be leased with NSO restrictions, while 4% of the federal mineral estate is closed to mineral material sales, and 9% is closed to non-energy mineral leasing. Under this alternative, almost half of Occupied Habitat and Unoccupied Habitat could not be developed due to NSO restrictions. The expansion of common ravens could be limited or slowed in areas where development is not allowed or is heavily restricted. Bui et al (2010) found that common raven densities in oil and gas fields were higher than in sagebrush.

## ALTERNATIVE B

### General

Under Alternative B, surface disturbance would be prohibited on 372,117 acres (58%) of BLM surface, a 690% increase over No Action Alternative A. The prohibition of surface-disturbing activities would help to ensure that anthropogenic activities permitted by the BLM would not contribute to the expansion of common ravens on BLM-administered lands.

### Roads

Under Alternative B, roads within Occupied and Unoccupied Habitat would be closed. Road closures would be limited to BLM roads in the decision areas. Alternative B would increase areas closed to motorized traffic by 1,563%, decreasing the potential for road-killed animals to act as a subsidy for common ravens.

### Recreation

Four developed recreation sites in Occupied Habitat and eleven developed recreation sites in Unoccupied Habitat would be removed under Alternative B. In contrast, no sites would be closed under No Action Alternative A. Sites that might serve as a subsidy for common ravens would be eliminated, causing ravens in the area to seek out other sources of prey or new territories.

### Lands and Realty

Under Alternative B, Occupied and Unoccupied Habitat would be managed as a ROW exclusion area. ROWs would be allowed if within 100 feet of a county road or highway, and outside the four-mile no surface disturbance buffer. Under Alternative B, ROW exclusion areas would increase by 6,938% in Occupied Habitat and 417% in Unoccupied Habitat. The potential for ravens to use new ROWs to expand their range would be extremely limited.

BLM_0027937

### Minerals

Under Alternative B, Occupied and Unoccupied Habitat would be closed to fluid mineral leasing. Under Alternative B, 1,051,846 acres would not be available for leasing, a 1,001% increase over No Action Alternative A. However, only 13% of the federal fluid mineral estate has moderate or high development potential. The potential for mineral development to contribute to the expansion of common ravens is only slightly larger than under No Action Alternative A. (See the Minerals analysis under Alternative B for GUSG and Habitat in Section 4.2.3.)

With the exception of valid and existing rights, no anthropogenic features would be approved under Alternative B. Occupied and Unoccupied Habitat would be designated as an exclusion area for new ROWs and would be closed to mineral leasing. The potential for common raven expansion through the use of anthropogenic features would be lower than under No Action Alternative A.

## ALTERNATIVE C

### General

Under Alternative C, surface disturbance would be prohibited on 100,034 acres of BLM-administered lands, a 112% increase over No Action Alternative A. Alternative C would provide additional direction regarding avoidance areas for tall structures. Tall structures would be avoided on 153,796 acres (24%) of BLM-administered land in the decision area, a 226% increase over No Action Alternative A.

### Roads

Under Alternative C, areas closed to motorized traffic would be the same as under No Action Alternative A. Motorized travel would be limited to existing roads and trails on 639,079 acres, an 18% increase over No Action Alternative A.

### Recreation

Recreation impacts would be the same as those under No Action Alternative A.

### Minerals

Under Alternative C, 95,564 acres would not be available for leasing, a continuation of current management under No Action Alternative A. Alternative C would place NSO restrictions on 650,854 acres of federal fluid mineral estate in Occupied Habitat and would increase NSO stipulations for oil and gas development in Occupied Habitat by 41% over No Action Alternative A. However, these protections would not be proportional to development potential. While across the decision area, 91,684 acres (14%) of federal fluid mineral estate in Occupied Habitat is identified as having moderate to high oil and gas potential, these areas are located

BLM_0027938

entirely within the Monticello and Tres Rios FOs. The potential for mineral development to contribute to the expansion of common ravens would be only slightly greater than under No Action Alternative A. (See the Minerals analysis under Alternative C for GUSG and Habitat in Section 4.2.3.)

Under Alternative C, Occupied Habitat would be designated as a ROW avoidance area. New anthropogenic features would be co-located with existing disturbance and the potential for raven expansion would be only along existing anthropogenic features.

## SUB-ALTERNATIVES D₁/D₂ - GUNNISON BASIN AND SATELLITE PREFERRED

Impacts under sub-alternatives $D_1$ and $D_2$ would be the same as those identified for Alternative C.

## 4.3.8.   CUMULATIVE EFFECTS

The cumulative impact analysis area used to analyze cumulative impacts includes the entire decision area. Cumulative effects to common raven would primarily be changes in available nesting and perching sites. Under No Action Alternative A, facility and infrastructure management would continue to provide nesting and perching opportunities for avian predators. All action alternatives focus on the management of infrastructure to remove and minimize perching and nesting opportunities for common ravens. Common raven populations will likely continue to increase in GUSG habitat regardless of alternative, primarily due to the incredible adaptability of this species to changing environments.

BLM_0027939

# 4.4.  SOIL RESOURCES

## 4.4.1.  METHODOLOGY

### ATTRIBUTES AND INDICATORS

Soil stability expressed in terms of:

- Areas of disturbance
- Areas of mechanical vegetation treatments
- Areas open to surface disturbing activities
- Active livestock grazing allotments.

### ASSUMPTIONS

The erosion potential associated with any one disturbance or series of disturbances would be influenced by several factors, including soil fragility, location in the watershed, the type, time, and degree of disturbance, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

Implementation and effectiveness of management actions on soils are directly related to funding, political constraints, workloads, enforcement, compliance, staffing levels, litigation, conflicting priorities and regulations, climate change, and other factors.

Hotter and drier conditions associated with climate change would increase fire frequency (Gordon 2015).

Short-term effects on upland soils would occur over a timeframe of up to ten years and long-term effects could occur from anywhere over 10 years and possibly exceeding several decades.

Soil resources would be managed to meet the Land Health Upland Fundamental (Land Health Upland Fundamental (BLM 2008, 2011e).

### METHODS AND DATA

In sagebrush and other plant communities of semi-arid environments, vegetation cover, biological soil crust, and a network of filamentous fungi maintain soil stability and resistance to erosion.  Vegetation removal can lead to decreased soil stability and erosion resulting from exposure to raindrop impact, wind, and loss of plant crowns (Weltz 1998).  Research indicates that biological soil crust could play an

BLM_0027940

even larger role in soil stability than vegetation and fungi (Chaudhary 2009). When crust is disturbed or eliminated, underlying soils are exposed to wind and water erosion, causing the soil to lose much of its ability to fix nitrogen, store carbon, capture dust and airborne nutrients, and retain moisture (Bryce 2012, Miller et al 2011). Soil crust populations are damaged or reduced when surface disturbances (such as vehicular traffic, vegetation clearing, or trampling) disturb the soil surface (Belnap 2001).

The potential for soil disturbance is used as an indicator and analyzed between alternatives due to its relationship to soil stability. The analysis contrasts the levels of protection from surface-disturbing activities, which are defined as those activities which modify the soil surface, with the exception of very small scale soil surface modifications such as trampling. Surface-disturbing activities include the development and construction of roads and trails, recreational facilities, minerals, pipelines, and many types of ROWs, as well as the development and maintenance of some types of range improvements. In addition, many types of habitat or vegetation treatments disturb the soil surface. While revegetation of a disturbed site begins the reestablishment of soil stability over the short term, the redevelopment of soil crusts—potentially the greatest source of soil stability—may not occur for decades (Belnap 1993). In this analysis, surface disturbance is considered to reduce short and long term soil stability, and alternatives that prohibit or limit surface disturbing activities are expected to protect soil stability more than alternatives that do not limit these activities.

Vegetation treatments utilize a variety of techniques which range from no disturbance of the soil surface through scraping, breaking up or imprinting the topsoil. However, the levels of revegetation and litter following a vegetation treatment—particularly those that minimize soil surface disturbance—can exceed levels prior to treatment. As a result, the overall short and long-term impacts to groundcover, infiltration rates, runoff and soil erosion after the initial disturbance can be neutral or even beneficial (Brockway 2002, Stednick 2010). Based on this information, the analysis will consider vegetation treatments as neutral to soil stability over both the short and long term.

Since vegetation cover is one factor that influences soil stability, activities that reduce or remove it are also compared between alternatives. Both wildlife and livestock grazing influence the amount and arrangement of vegetation cover (Gifford 1978, Weltz 1998). Livestock trampling has also been shown to degrade Biological Soil Crusts, although some of the studies which report this incorporate data from historic high stocking rates which are no longer the practice on BLM lands. (Anderson 1982, Neff 2005, Warren 2001). Based on the availability of data and the evidence that livestock can impact these important components of soil stability, the acreage of actively grazed allotments is used as another indicator for potentially

BLM_0027941

decreased soil stability.  However, it is important to recognize that this indicator overestimates impacted acres because many allotments contain areas that are not accessible or used by livestock, or are only used very lightly.  Alternatives that reduce the amount of land being grazed by domestic livestock would reduce this source of vegetation removal and disruption to Biological Soil Crust along with the associated soil stability impacts.

Wildfires and prescribed fires remove vegetation and surface litter, thereby affecting soil stability (Stednick 2010).  They can also reduce biological soil crusts to varying degrees.  While recovery can begin within 2-5 years, complete recovery can take as long as 200 years (Callison 1985, Hilty 2004, Johansen 2001).  Therefore, alternatives which result in more acreage burned are considered to reduce soil stability more than alternatives with fewer burned acres over the short term, and be neutral to soil stability over the long term as revegetation progresses.

## 4.4.2.   IMPACTS COMMON TO ALL ALTERNATIVES

Wildlife would graze and trample soils throughout the BLM surface in Occupied and Unoccupied Habitat and reduce vegetation cover, thereby reducing soil stability. Wildfires would continue to ignite and burn across this same area—decreasing soil stability within the burned patch for both the short and long term.  As the climate warms and successional vegetation changes continue to build up fuels, more acreage is likely to burn and remain in an unvegetated state for a longer duration, reducing overall soil stability across the BLM surface in Occupied and Unoccupied Habitat over the long term.

## 4.4.3.   IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

#### Soil Stability

Alternative A is expected to result in short and long term soil stability conditions similar to those described in Chapter 3.  Large-scale surface disturbance would be expected to remain about 1% of BLM surface across the BLM surface in Occupied and Unoccupied Habitat as well as on BLM lands in the four-mile Non-Habitat Areas. These figures are based on past levels of development and current levels of surface disturbance restrictions. These surface disturbance restrictions would remain in place affecting about 60% of the BLM surface in Occupied and Unoccupied Habitat, and 39% of the Non-Habitat.  These levels could increase as RMP revisions are completed.  If this occurs, soil stability would be protected across more acreage.

BLM_0027942

Livestock grazing would be expected to continue at roughly the current level of activity across 93% of the BLM surface in Occupied and Unoccupied Habitat and 56% of the four-mile Non-Habitat Areas, over the short term, resulting in little change to soil stability. Over the long term, urbanization of private agricultural lands and associated changes to the livestock industry may reduce the amount of actively grazed lands in this area, which could contribute to increased soil stability on the ungrazed lands.

Wildfires documented over the past several decades have burned 1% of Occupied Habitat on BLM and 7% of Unoccupied Habitat on the BLM surface in Occupied and Unoccupied Habitat, while burning 9% of the Non-Habitat Areas. Only small additions are expected over the short term, but these would accelerate over the long term with anticipated rising temperatures. The additional wildfires and burns would reduce short term soil stability across a growing proportion of these areas. However, data from past burns suggests that only a small proportion of the areas would be impacted, even over the long term.

About 10% of the BLM surface in Occupied and Unoccupied Habitat and 2% of the Non-Habitat Areas has been affected by vegetation treatments. This amount will increase as new treatments are carried out, but with projected neutral impacts to soil stability.

## ALTERNATIVE B

### Soil Stability

Alternative B places large portions of the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas under surface disturbance restrictions, which would protect soil stability from development and construction disturbance. This represents an increase in protected area as compared to Alternative A. Furthermore, as vegetation reestablishes in past disturbances, and closed routes are actively reclaimed, soil stability is expected to increase over current levels in these protected areas. This would occur across the BLM surface in Occupied and Unoccupied Habitat, as well as in the Non-Habitat Areas.

Alternative B also eliminates livestock grazing from the BLM surface in Occupied and Unoccupied Habitat, although wildlife grazing would continue. This represents an increase in acreage protected from livestock grazing and associated vegetation removal and trampling impacts to soil stability as compared with Alternative A.

Vegetation treatments would not be allowed under Alternative B within the BLM surface in Occupied and Unoccupied Habitat, but could occur in Non-Habitat Areas. This would result in similar impacts to soil stability as Alternative A because of their neutral short and long term direct effects. However, over the long term, an indirect

BLM_0027943

outcome is anticipated in the form of increased acreage burned by wildfire on BLM surface in Occupied and Unoccupied Habitat in comparison to Alternative A. This increase is anticipated as fuels build up without any mitigating fuels treatments, climate change increases fire frequency, and travel management restrictions reduce access and efficacy of firefighting. An increase in acreage burned by wildfire would reduce short and long term soil stability in the burned areas as compared to Alternative A.

Based on past wildfire size and frequency, the acreage where soil stability is reduced by wildfire would probably be less than the acreage where soil stability is improved through the elimination of livestock grazing and authorized surface disturbances. The resulting outcome would be a net gain in soil stability across the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas as compared to Alternative A. This benefit to soil stability would extend through both the short and long terms.

## ALTERNATIVE C

### Soil Stability

Alternative C places a portion of the BLM surface in Occupied and Unoccupied Habitat under surface disturbance restrictions, which is more than Alternative A, but less than Alternative B. This alternative would result in similar types of impacts to soil stability as listed under Alternative B, but to a lesser extent. Impacts in the Non-Habitat Areas would be the same as Alternative A.

Alternative C maintains livestock grazing across the BLM surface in Occupied and Unoccupied Habitat using appropriate grazing practices to meet GUSG RCP habitat requirements. This would likely result in similar short term impacts to soil stability as Alternative A. Over the long term, this alternative may result in more allotments being closed to livestock grazing because of voluntary relinquishment of grazing preference. In closed allotments, the types of impacts to soil stability would be similar to those under Alternative B; however closed allotments would occupy a smaller proportion of the area.

Vegetation treatments on BLM surface in Occupied and Unoccupied Habitat would be emphasized under Alternative C, with generally similar direct impacts to soil stability as Alternatives A and B. However, increased use of prescribed fire would decrease short term soil stability in the burned area footprint. The vegetation treatments are expected to indirectly increase long term soil stability in contrast to Alternatives A and B because of the anticipated reduction in acreage burned by wildfire. This outcome is anticipated due to reduced fuels from vegetation treatments, and adequate access for effective firefighting.

BLM_0027944

Over the short and long term, soil stability on BLM surface in Occupied and Unoccupied Habitat is expected to be improved under this alternative relative to Alternative A, but to a lesser degree than under Alternative B. While levels of burned and treated acreage are difficult to predict under this alternative, the scale of past treatments and burns suggests that less acres would be affected by fuels mitigation and wildfire under this alternative than the scale of surface use restrictions and closures to grazing proposed in Alternative B.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

### Soil Stability

Sub-Alternative $D_1$ places restrictions on some types of surface-disturbing activities, but allows others to occur with mitigation to protect GUSG and their habitat. A portion of the BLM surface in Occupied and Unoccupied Habitat within the Gunnison Basin Population is covered by these partial restrictions. This portion would be greater than in Alternative A, but less than Alternatives B and C.

Livestock grazing under this alternative is comparable to Alternative C and would have similar soil stability outcomes.

Sub-Alternative $D_1$ has the same types of vegetation treatment measures as Alternative C, resulting in comparable direct short and long term impacts, as well as similar indirect impacts on acres burned by wildfire.

Under Sub-Alternative $D_1$, overall soil stability is anticipated to be greater than under Alternative A, but less than Alternatives B and C due to the fewer protections from soil disturbances. Soil stability in the four-mile Non-Habitat Areas is expected to be the same as under Alternative A.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Soil Stability

Sub-Alternative $D_2$ protects soil stability from surface disturbances across a similar area within the satellite populations as Alternative C, but it includes a greater level of protection than C. For example, fewer Rights of Way and recreation infrastructure developments would be allowed

This alternative also contains range management measures identical to Alternative C, with similar impacts to soil stability.

Although Sub-Alternative $D_2$ includes similar vegetation treatment measures as Alternative C, it prevents the use of prescribed fire in GUSG Occupied Habitat. This would reduce the direct soil stability impacts from the prescribed fire footprint

BLM_0027945

along with the risk of escaped fire as compared with Alternative C, resulting in higher soil stability.

Under this alternative, overall soil stability is expected to be greater than Alternative A, but less than Alternative B for the satellite population portion of BLM surface in Occupied and Unoccupied Habitat. It is also expected to be greater than under Alternative C. This would result because of the increased protections to soil stability from more stringent surface disturbance restrictions and reduced risk of wildfire. Soil stability in Non-Habitat Areas would be similar to Alternative A for the satellite population area.

## 4.4.4.   CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect soil and water resources are mineral development, livestock grazing, infrastructure development, vegetation treatments, wildfires, recreation, and travel and transportation activities.

The cumulative impact analysis area used to analyze cumulative impacts on soils includes the entire Occupied and Unoccupied Habitat together with the Non-Habitat Areas. Combined with the proposed management actions, cumulative impacts on soil resources could present challenges to meeting the BLM Land Health Upland Fundamental. Impacts on soil resources would not be as substantial under alternatives B, C, $D_1$, or $D_2$ when compared with Alternative A. Management under Alternative B would provide the greatest protection of soil resources, followed by Sub-Alternative $D_2$, Alternative C, and Sub-Alternative $D_1$.

Mineral development, including oil and gas, coal, and other minerals, could cause localized impacts on soils. Intensive mechanical vegetation treatments likely have and would continue to impact soil resources locally, but they could increase vegetation cover and thus soil health, over the long term. Past livestock grazing has impacted soil resources. Improved management of grazing allotments has led to improvements in soil health over time in the cumulative impacts analysis area.

An important trend in the region is rapidly increasing recreational use. This growth in recreation on public lands is due to local population growth, as well as the area's reputation as a national and international recreation destination. All forms of recreational activities can increase potential for erosion, sedimentation, gully creation, biologic soil crust damage, and riparian and upland vegetation damage. However, the significance of such impacts varies with the nature and degree of disturbance as well as site specific environmental conditions. Typically larger disturbances represent greater potential to damage soils and vegetation, degrade

BLM_0027946

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

water quality, and impair overall watershed function and condition than smaller disturbances.

BLM_0027947

# 4.5. TERRESTRIAL VEGETATION (INCLUDING WOODLANDS)

## 4.5.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Vegetation types and distribution
- Vegetation conditions

### ASSUMPTIONS

Vegetation would be managed to achieve the Land Health Ecological Fundamental, with implementation rates dependent on available budgets and resources.

Methods and projects that help restore watersheds, desirable vegetation communities, or wildlife habitats (including surface disturbance associated with these efforts) would be neutral to or benefit upland vegetation resources over the long term, with the exception of increasing disturbance-related species, including invasive exotic plants.

Increased levels of roads, ROWs, and other development would negatively affect vegetation condition.

The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors, including location in the watershed, the type, time, and degree of disturbance, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

Noxious and invasive weeds would continue to be introduced and spread by vehicle traffic, recreation, wildlife and livestock movements, and activities which disturb the soil surface.

Hotter and drier conditions predicted from climate change models are projected to cause plant stress, and associated plant death, changes in plant species to more drought-tolerant species, and trigger plant community changes (Bryce 2012).

Short-term effects on upland vegetation would occur over a timeframe of up to ten years and long-term effects would occur over longer than ten years.

Fire suppression activities will be effective and keep burned acreage to a minimum level.

BLM_0027948

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## METHODS AND DATA

### Vegetation Types

Vegetation types are indicated by acreages of the major plant communities on BLM surface in Occupied and Unoccupied Habitat. Anticipated increases or decreases of different vegetation types are described under each alternative. The analysis uses LANDFIRE Existing Vegetation Type data (LANDFIRE 2015).

The analysis of direct impacts is based on those activities which affect vegetation types through damage or removal of some or all of the plant species. Vegetation damage or removal often changes the vegetation type on the disturbed area after an initial unvegetated stage. Within sagebrush or pinyon-juniper vegetation types, recovery of the sagebrush, pinyon and juniper can take many years and result in different vegetation types before the original community returns (Barney 1974, Boyd 2011, Romme 2009). For example, in one study Wyoming big sagebrush shrubs required more than ten years to reestablish and reach preceding canopy cover levels following vegetation clearing (Watts 1996). Prior to recovery, grass-forb vegetation typically dominates once the disturbance has stopped (Barney 1974, Bryce 2012, FEIS 2005). On the other hand, the main species in the mountain shrub vegetation type—Gambel's oakbrush, birchleaf mountain mahogany and Utah serviceberry—have the ability to resprout after top removal, and often quickly regain dominance following disturbance (FEIS 2005).

Surface disturbing activities damage or remove vegetation. These include development and construction of roads and trails, recreational facilities, minerals, pipelines, and many types of ROWs, as well as the development and maintenance of some types of range improvements. Although not considered surface-disturbing, wildfire usually removes most or all of the above-ground vegetation. As a result, surface-disturbing activities and many wildfires—particularly the hot fires—directly reduce existing vegetation types and increase unvegetated ground for the short term. Vegetation treatments such as habitat improvements, some prescribed fires or mechanical fuels reduction—which only remove a portion of the vegetation—directly reduce the levels of woodland types and create shrubland or grass-forb vegetation types from them (Brockway 2002, Stevens 2004). In some cases, they convert shrubland to grass-forb vegetation.

The analysis of indirect impacts considers how management activities influence vegetation drivers. The natural drivers for mid-elevation vegetation communities on the Colorado Plateau include climatic factors, herbivory, and infrequent to very rare mixed severity and stand-replacement fires (Bryce 2012, FEIS 2005). Additional drivers are the successional processes whereby slower-growing, usually woody species establish and out-compete shorter-lived species. This analysis extends these drivers to the remainder of the GUSG range, but with the understanding that rates

BLM_0027949

and outcomes of the processes are probably modified by the ecoregion and individual ecological sites (Fowler 1986). This analysis focuses on alteration of the natural fire regime and the ongoing process of succession as key factors which create indirect impacts to the amounts and distribution of vegetation types.

The process of succession interacts with management actions to cause indirect impacts to vegetation types by shifting one type to another over time. Actions which directly create unvegetated ground, grass-forb vegetation, or shrub-dominated types could indirectly create more grass-forb, shrub and woodland types respectively over time as succession proceeds, depending on the ecological site potential. Rates of succession-driven transition from one vegetation type to another have been estimated for the purposes of this analysis. Estimation parameters used in this analysis are derived from studies on sagebrush, pinyon-juniper and mountain shrub recovery following disturbance (Boyd 2011, Bryce 2012, Erdman 1970, Wambolt 2001, Watts 1996).

Fire suppression influences the fire regime, indirectly affecting vegetation types. In the absence of fire or other disturbance, succession can proceed within the limits of the ecological site. On some ecological sites, pinyon and juniper trees are able to eventually dominate sagebrush and mountain shrub communities, while on other sites sagebrush or mountain shrubs maintain dominance over the long term (Bryce 2012, Burkhardt 1976, FEIS 2005, Koniak 1985).

Vegetation treatments and the spread of invasive annuals also affect the fire regime and indirectly affect the vegetation type. Vegetation and fuels treatments can reduce fire size and occurrence, particularly over the short term through enhancing fire suppression effectiveness. This would reduce the acres burned and indirectly decrease the amount of grass-forb vegetation. However, vegetation and fuels treatments may not affect burned acreage a detectable amount over the long term, since most acres burned across the West occur during extreme weather events which influence fire behavior more so than fuels (Reinhart 2008).

The spread of invasive annuals including cheat grass has been linked with increased fire frequency in the Great Basin, with a resulting conversion of shrub and tree vegetation to grass dominance (Bryce 2012, Knapp 1996). Close to 3% of the vegetation on BLM surface in Occupied and Unoccupied Habitat has undergone a vegetation type-change to dominance by invasive species (Bryce 2012). The indirect effects of this are likely to be continued dominance by these species over the short and long term, in part due to their influence on the fire regime.

Based on the preceding discussion, alternatives which allow for surface disturbing activities, or encourage the use of wildfire to accomplish habitat goals, or which result in more wildfire across the landscape will be considered to directly increase unvegetated area. This increase will accompany a reduction in grass-forb, sagebrush,

BLM_0027950

mountain shrub and pinyon-juniper vegetation types. Short and long-term indirect impacts would be increased amounts of grass-forb and mountain shrub types, along with decreased amounts of sagebrush and pinyon-juniper vegetation. Alternatives that restrict surface disturbance and reduce wildfire on BLM surface in Occupied and Unoccupied Habitat would produce the opposite effects for unvegetated, mountain shrub, grass-forb, sagebrush and pinyon-juniper vegetation types.

Alternatives which encourage vegetation treatments including prescribed fire will be expected to directly increase the acreage of grass-forb, sagebrush and mountain shrub vegetation types within the treatment footprint over the short and long term. A reduction in pinyon-juniper vegetation would also result. Short-term reductions in grass-forb types along with increases in pinyon-juniper and sagebrush vegetation would be expected outside of the treatment footprint due to reduced fire size, but these effects would not be expected to continue through the long term.

### Vegetation Condition

Analysis of vegetation conditions is based on lands achieving or not achieving the Land Health Ecological Fundamental. This analysis uses Land Health data generated by the BLM management units. It contrasts how management activities under the different alternatives are expected to improve or deteriorate conditions and cause changes to the Ecological Fundamental's rating. Condition indicators include diversity and composition of native species and plant functional groups, amounts of invasive species, plant productivity and plant vigor (BLM 2008, BLM 2011e). The difference between achieving and not achieving the Land Health Ecological Fundamental can be substantial, and it may take many years to move from one category to another. To address this, the BLM has developed subcategories to describe transitional stages, current management, cause of Land Health problems, and trends of the indicators (BLM 2012b).

Surface disturbance directly removes vegetation which can change native species and functional group composition, plant vigor and productivity. Surface disturbance also creates gaps in the existing vegetation and increases available nutrient, moisture and light levels. Invasive plants are able to exploit these resources, and then produce seed to infest the adjacent areas (Huenneke 1990, Burke 1996, Theoharides 2007). On BLM surface, most disturbances associated with construction and development occur on a small footprint, but many small disturbances across a larger area can affect land health indicators within that larger area and alter the land health rating.

Vegetation treatments, prescribed burns and wildfire also affect vegetation condition. While they all tend to increase levels of invasive species, they can also improve some components of vegetation composition and vigor over the long term (Stevens 2004, Barney 1974, Roundy 2014). Rehabilitation of burned areas can

BLM_0027951

either increase or reduce the likelihood of invasive plant dominance (Getz 2008, Peppin 2010).

Many types of vegetation are adapted to some level of grazing. However, intense or prolonged grazing by livestock and wildlife can lead to changes in functional group composition, plant vigor and production (Holechek 1989, FWS 2010). This can cause a decline of palatable plants and plant groups within a vegetation type along with increases in unpalatable species, affecting several of the Ecological Fundamental indicators (BLM 2008, 2011e). As a result, the presence or absence of livestock grazing and its management can lead to improvements or declines for the indicators and the Land Health rating.

The relationships between vegetation condition and management activities will shape how the alternatives are analyzed. Alternatives that eliminate, limit, or otherwise constrain surface disturbance are projected to maintain the existing Land Health status. Similarly, alternatives with minimal constraints on surface disturbance at the RMP level are expected to maintain present status over the short term, but increase lands not meeting the Ecological Fundamental over the long term as small areas of degraded vegetation accumulate. Because treatments, wildfire, and wildfire rehabilitation have mixed results with respect to the land health indicators, they are expected to be neutral to the land health rating and not affect current status.

Land Health Standards include livestock grazing management guidelines which outline basic criteria to achieve Land Health. Standards and Guidelines have been incorporated into existing RMPs for more than 15 years. Therefore, current management is expected to maintain existing Land Health condition for the short term, and improve it over the long term where the Ecological Fundamental is not being achieved and livestock grazing is a significant factor. Alternatives that remove livestock grazing are projected to improve short and long term Land Health status on these lands, with more rapid improvement resulting from removal of the significant factor. Alternatives which prescribe best management practices for grazing where GUSG habitat requirements are not being met are also projected to improve short and long term Land Health status. Impacts to wildlife grazing from BLM management activities, would be very difficult to predict, so will not be contrasted between the alternatives.

## 4.5.2.   IMPACTS COMMON TO ALL ALTERNATIVES

### Vegetation Types

Successional processes would continue within vegetation communities, leading to increasing dominance by woody species over the long term across more of the

BLM_0027952

landscape.  The amount of forested vegetation type would continue at current levels unless reduced by warming temperatures.

### Vegetation Condition

Wildlife herbivory would continue and cause declines in some areas for the Land Health Ecological Fundamental indicators.  Wildlife use and movement through BLM surface in Occupied and Unoccupied Habitat would also continue to introduce and spread invasive plants.

## 4.5.3.   IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

### Vegetation Types

The anticipated consequences of the No Action Alternative are small increases in unvegetated area as well as sagebrush and pinyon-juniper vegetation types.  The pinyon-juniper type is expected to increase in all but the Gunnison Basin and Poncha Pass population areas based on patterns observed in the Colorado Plateau ecoregion.  These increases would be associated with decreases in grass-forb, and mountain shrub vegetation types.

Surface disturbance protections are already in place across 61% of the BLM surface in Occupied and Unoccupied Habitat, leaving only 39% of this area subject to impacts from localized vegetation removal or damage, and 61% of the four-mile Non-Habitat Areas subject to these impacts.  On the unprotected lands, surface disturbance is projected to increase unvegetated area and decrease sagebrush and pinyon-juniper vegetation.  Associated indirect impacts could be increases in grass-forb and mountain shrub vegetation as a result of successional processes.  Since existing large-scale surface disturbance is estimated to be around 1% of BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas, it is likely that additional vegetation type changes due to surface disturbance would continue to around 1% of these areas.

Vegetation successional rates, vegetation treatments and wildfires are expected to continue at rates similar to the past 30 years.  BLM fire and treatment records indicate that past rates have averaged roughly 0.7% of the BLM surface in Occupied and Unoccupied Habitat per year, with treatments and prescribed fires responsible for 75% and wildfires making up 25% of the total.  Over a ten-year period, the combined effects of treatments, wildfire, and natural succession are projected by this analysis to reduce grass-forb vegetation from 7 to 48% of existing levels.  Sagebrush vegetation could stay at current levels or increase by up to 9% over this same time

BLM_0027953

period, while mountain shrub could decrease from between 1 and 5%. Pinyon-juniper vegetation is projected to increase anywhere between 1 and 10% of existing levels, mainly in the western GUSG population areas. Long term impacts to vegetation are projected to continue along these same trajectories. Similar impacts are expected to occur in the Non-Habitat Areas.

### Vegetation Condition

Alternative A constrains surface disturbance on 61% of the BLM surface in Occupied and Unoccupied Habitat and 39% of the four-mile Non-Habitat Areas, so no impacts to the current Land Health status would be expected in the protected areas from surface-disturbing activities. On the remaining 39% of unprotected BLM surface in Occupied and Unoccupied Habitat and 61% in the Non-Habitat Areas, existing Land Health status is expected to be maintained over the short term. Over the long term, lands not achieving the Ecological Fundamental are projected to increase within the unconstrained area.

Livestock grazing is anticipated to continue on over 90% of the BLM surface in Occupied and Unoccupied Habitat, and over 55% of Non-Habitat Areas. It is not expected to influence existing Land Health status for the short term. Over the long term, ratings are expected to improve on acreages currently not achieving the Ecological Fundamental where livestock grazing is a significant factor, and in some areas where significant factors have not been identified yet. Conditions are expected to improve on between 37,000 and 258,000 acres within the BLM surface in Occupied and Unoccupied Habitat and between 13,000 and 23,000 acres within the Non-Habitat Areas.

## ALTERNATIVE B

### Vegetation Types

Alternative B is likely to result in generally similar impacts to vegetation types as Alternative A. Alternative B would nearly eliminate surface disturbance across the BLM surface in Occupied and Unoccupied Habitat, and reduce it across the four-mile Non-Habitat Areas. This represents an increase in lands protected from surface disturbance as compared with Alternative A. As a result, surface disturbance would not influence vegetation types on these lands. However, at the large scale little change from Alternative A would be detectable, as less than 1% of BLM in Occupied and Unoccupied Habitat or Non-Habitat Areas would be affected under either alternative.

Treatments that manipulate the vegetation type would not be allowed under this alternative, and wildfires would be suppressed, with the exception of those within the Non-Habitat Areas. As a result, succession would be the main influence on the

BLM_0027954

acreages of each vegetation type on BLM surface in Occupied and Unoccupied
Habitat, depending on the ecological site potential.  Estimation parameters for
successional rates used in this analysis are derived from studies on sagebrush,
pinyon-juniper and mountain shrub recovery following disturbance (Boyd 2011,
Bryce 2012, Erdman 1970, Wambolt 2001, Watts 1996).  While estimates of
vegetation shifts include losses of between 17 and 53% of the existing grass-forb
vegetation and gains to pinyon-juniper of 6 to 12%, these ranges largely overlap the
projected ranges under Alternative A.  The projected ranges for sagebrush and
mountain shrub vegetation are nearly identical between alternatives A and B.
Within the Non-Habitat Areas, greater fire use would probably occur than under
Alternative A, resulting in more grass-forb and, mountain shrub vegetation and less
pinyon-juniper woodland in this area.

### Vegetation Condition

Alternative B is expected to more rapidly improve vegetation conditions relative to
Alternative A, and prevent long term degradation across a broader area.

Alternative B would reduce the presence of localized damage to the vegetation
indicators and invasive plants by eliminating nearly all surface-disturbing activities
across the BLM surface in Occupied and Unoccupied Habitat, which represents an
increase as compared with Alternative A.  This would occur across Occupied and
Unoccupied Habitat, and to a lesser degree in Non-Habitat Areas.  Over the short
term, no change to land health status would be expected.  However, over the long
term, this alternative would prevent degradation of Land Health status from
development and construction activities.

Livestock grazing would be eliminated on BLM surface in Occupied and Unoccupied
Habitat, an increase relative to Alternative A.  As a result, the status of lands not
achieving the Ecological Fundamental where livestock grazing is a significant factor is
expected to improve within ten years. This acreage is anticipated to be between
37,000 and 258,000 acres.  The improvement in Land Health status would be
sustained into the future as well.  Alternative B achieves the same results as
Alternative A, but more quickly.  Alternative B would have the same vegetation
condition impacts from livestock grazing in the Non-Habitat Areas as Alternative A.

## ALTERNATIVE C

### Vegetation Types

Alternative C would result in more grass-forb, sagebrush, and mountain shrub
vegetation, and less pinyon-juniper vegetation than alternatives A and B on BLM
surface in Occupied and Unoccupied Habitat over both the short and long term.

BLM_0027955

Impacts to vegetation types in the four-mile Non-Habitat Areas would be the same as under Alternative A.

Alternative C places more area under surface disturbance restrictions than Alternative A, but less area than Alternative B. This would limit the creation of localized unvegetated patches and associated herbaceous vegetation. At the landscape scale, there would be similar impacts to vegetation types as Alternative A because less than 1% of BLM in the planning would be affected under either alternative.

Vegetation treatments and use of fire to improve GUSG habitat are emphasized under this alternative. However, it is not possible to predict the amount of increase that would occur. Nevertheless the expected declines in grass-forb vegetation resulting from succession could drop below 7%, and sagebrush vegetation could increase beyond the possible 9% level in Alternative A. These changes would be associated with declines in pinyon-juniper that could result in a net reduction of this type across the BLM surface in Occupied and Unoccupied Habitat, despite ongoing vegetation succession. Under this alternative, a net gain in mountain shrub across this same area could take place in contrast with the anticipated losses under alternatives A and B.

## Vegetation Condition

Alternative C would constrain surface disturbing activities on a portion of the BLM surface in Occupied and Unoccupied Habitat—an increase in comparison to Alternative A, but a decrease as compared with Alternative B. Over the short term, land health conditions across this area would probably not change as a result of surface disturbance, similar to alternatives A and B. However, long term conditions under Alternative C would be subject to decline from accumulating surface disturbance across less of the area than Alternative A, but more than Alternative B.

Alternative C maintains livestock grazing across the BLM surface in Occupied and Unoccupied Habitat using appropriate grazing practices to meet GUSG RCP habitat requirements. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to Alternative B. This acreage is expected to be between 37,000 and 258,000 acres. Because this alternative institutes specific conservation grazing measures for suitable habitats not meeting RCP guidelines—which is a stricter requirement than Alternative A's requirement to change grazing management on lands not meeting standards—the improvement in Land Health status is projected to occur more rapidly than under Alternative A, and be sustained into the future as well. Impacts to vegetation condition in the four-mile Non-Habitat Areas would be the same as under Alternative A, due to similar surface protections and grazing practices.

BLM_0027956

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

### Vegetation Types

Sub-Alternative D₁ would be expected to result in little overall change to vegetation types as a result of surface-disturbing activities in comparison to alternatives A, B, and C. This alternative places restrictions on some types of surface-disturbing activities, but allows others to occur with mitigation to protect GUSG and their habitat. A portion of BLM surface in Occupied and Unoccupied Habitat within the Gunnison Basin population area is covered by these partial restrictions. This is more area than Alternative A, but less than alternatives B and C. Over the long term, the acreage of small patches of herbaceous vegetation following development-related disturbance is expected to be less than under Alternative A, but greater than alternatives B and C, though probably not detectable at the plan area scale.

Sub-Alternative D₁ contains vegetation treatment, fuels management, and prescribed burn measures comparable to Alternative C, but wildfire in Occupied Habitat would be managed similar to Alternative B and prioritized for suppression. While it is not possible to accurately predict the acreage affected by future treatments and fire management, a range of possible changes in vegetation types can be projected. In the Gunnison Basin population area, this alternative would reduce the loss of grassland below the 27-91% range of loss that is projected under Alternative A. Under Sub-Alternative D₁, sagebrush would be expected to increase beyond the 3-12% increase under Alternative A, Mountain shrub would be expected to increase beyond the less than 1% increase under Alternative A, while pinyon-juniper woodland would be expected to decline below the 1-3% loss under Alternative A.

Impacts to vegetation types in Non-Habitat Areas would be the same as under Alternative A.

### Vegetation Condition

Sub-Alternative D₁ would constrain surface-disturbing activities in a portion of the Gunnison Basin population area—an increase in comparison to Alternative A, but a decrease compared with alternatives B and C. Over the short term, land health conditions would probably not change as a result of surface disturbance, similar to alternatives A, B, and C. However, over the long term, conditions under Sub-Alternative D₁ would be subject to decline from accumulating surface disturbance across a portion of the Gunnison Basin population area.

Sub-Alternative D₁ would maintain livestock grazing across the Gunnison Basin population area using a strategy designed to achieve RCP guidelines. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to Alternative B. Because all causal determinations for land health status are not currently available

BLM_0027957

within the Gunnison Basin, this acreage could be anywhere between 0 and 211,000 acres. Similar to alternatives B and C, this improvement in land health status would occur more rapidly than under Alternative A, and would be sustained into the future.

Impacts to vegetation condition in the Non-Habitat Areas would be the same as under Alternative A, due to similar surface protections and grazing practices.

## SUB-ALTERNATIVE D$_2$ - SATELLITE PREFERRED

### Vegetation Types

Sub-Alternative D$_2$ would place similar constraints on satellite population areas as Alternative C, with identical effects to vegetation types. At the scale of the plan area, little overall difference in vegetation types would occur between alternatives A, B, C, and D$_1$ as a result of surface-disturbing activities.

This alternative contains vegetation treatment and fuels management measures comparable to Alternative C for the satellite populations, but wildfire and prescribed burning in Occupied Habitat would be managed similar to Alternative B. While it is not possible to accurately predict the acreage affected by future treatments and fire management, general percentage changes in vegetation types can be projected. In the satellite populations area, this alternative could increase the loss of grassland below the 7% maximum loss that is projected under Alternative A. Changes in sagebrush are expected to be similar to Alternative A, with between a 2% loss and a 7% gain projected over a ten-year timeframe. In addition, changes in mountain shrub acreage are anticipated to be similar to Alternative A, with between a 2% loss and a 6% gain predicted within the satellite population area. Pinyon-juniper woodland is also expected to experience little change from Alternative A, with a predicted 2-8% decline from current levels.

Impacts to vegetation types in Non-Habitat Areas would be the same as under Alternative A.

### Vegetation Condition

Alternative D$_2$ shares the same constraints as Alternative C across the satellite populations. Over the short term, land health conditions across this area would probably not change as a result of surface disturbance, similar to Alternatives A, B, and C. Over the long term, conditions under Alternative D$_2$ would be subject to decline from accumulating surface disturbance across a portion of the satellite populations.

Alternative D$_2$ maintains livestock grazing across the satellite population areas using a strategy designed to achieve RCP guidelines. Similar results for the land health

BLM_0027958

Ecological Fundamental are expected for this area as described under Alternative C. Because not all causal determinations for land health status are readily available for some of the satellite population areas, this acreage could be anywhere between 37,000 and 46,000 acres. Similar to alternatives B and C, the improvement in land health status would occur more rapidly than under Alternative A, and would be sustained into the future.

Impacts to vegetation condition in Non-Habitat Areas would be the same as under Alternative A, due to similar surface protections and grazing practices.

## 4.5.4.   CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect vegetation are mineral exploration and development, livestock grazing, recreation, road construction, ROWs (including large transmission lines or pipelines), weed invasion and spread, prescribed fire and wildfires, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Many of these create conditions that cause or favor other vegetation changes. For example, wildfire causes vegetation removal, which makes affected areas more susceptible to weed invasion and soil erosion, and also triggers changes in vegetation type.

Drought conditions reduce vegetative health, which makes vegetation prone to insect infestation or disease. In general, resource use activities have cumulatively caused vegetation removal, fragmentation, weed spread, soil compaction, and erosion, whereas land planning efforts and vegetation and weed treatments have countered these effects by improving vegetative connectivity, productivity, diversity, and health.

Climate change within the cumulative impact analysis area is predicted to cause an increase in temperatures contributing to drier conditions, which would affect, vegetative health, and water availability (Bryce 2012). Such changes would alter the conditions to which vegetative communities are adapted, potentially creating conditions that could favor certain species or communities, weeds, or pests.

Under the alternatives, impacts on vegetation would be minimized to the extent practical and feasible through restrictions; stipulations; closures to mineral exploration and development, recreation, and motorized travel; and by concentrating development in previously disturbed areas. Vegetative conditions would be improved through restrictions on development, treatments, weed prevention and control, habitat improvements, use of prescribed and wildfire, and grazing practices ranging from no grazing to appropriately managed grazing.

BLM_0027959

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

In general, management under each alternative would work toward achieving land health but would differ in the time and methods used to reach that goal. Since Alternative A generally includes more resource use and development, impacts on vegetation are more likely to occur under this alternative. As a result, management under Alternative A could significantly contribute to cumulative impacts on vegetation. In contrast, under alternatives B and C and sub-alternatives $D_1/D_2$, BLM management actions are expected to contribute to positive cumulative impacts on vegetation by placing restrictions on development and implementing restoration and other management actions to improve GUSG habitat quality.

BLM_0027960

# 4.6. RIPARIAN AREAS & WETLANDS

## 4.6.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Mileage of riparian areas on BLM surface
- Acreage of wetlands on BLM surface
- Mileage of streams and riparian habitat on BLM surface in riparian Proper Functioning Condition, Functioning at Risk, and Not Functional categories.

### ASSUMPTIONS

Riparian and wetland resources would be managed to meet BLM Land health Riparian Fundamental.

Methods and projects that help restore watersheds, desirable vegetation communities, or wildlife habitats (including surface disturbance associated with these efforts) would benefit riparian vegetation resources over the long term, with the exception of increasing disturbance-related species, including invasive plants.

The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors: proximity to drainages and wetlands, location within the watershed, time and degree of disturbance, reclamation potential of the affected area, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

Noxious and invasive weeds would continue to be introduced and spread by vehicle traffic, recreation, wildlife and livestock movements, and vegetation and surface-disturbing activities.

The analysis was conducted assuming hotter and generally drier conditions, greater evaporation earlier snowmelt and earlier spring runoff. This would lead to more plant stress and shorter duration stream flows (Bryce 2012, Cayan 2001, Seager 2007.)

Short-term effects on riparian and wetland vegetation would occur over a timeframe of two years or less and long-term effects would occur over longer than two years.

BLM_0027961

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## METHODS AND DATA

### Riparian and Wetland Presence and Distribution

Impacts to riparian area presence and distribution are evaluated in terms of stream and riparian mileage on BLM surface in Occupied and Unoccupied Habitat. Anticipated increases or decreases in stream mileages are described under the different alternatives. This analysis uses the U.S. Geological Survey National Hydrologic Dataset, version 2.2.

Impacts to lentic wetland presence and distribution are evaluated using acreage of lentic wetlands across the BLM surface in Occupied and Unoccupied Habitat. Expected increases or decreases in wetland size or abundance are described across the different alternatives. The USFWS National Wetland Inventory is used for this analysis.

Within the Colorado Plateau Ecoregion, drivers that shape riparian and wetland systems have been identified which likely apply across the entire GUSG Habitat and four-mile Non-Habitat Areas. Those that are directly impacted by land management include: groundwater, channel geomorphology, stream hydrology, and animal herbivory (Bryce 2012). Groundwater, channel geomorphology, and stream hydrology can be affected by human activities such as water management, diversion, development of facilities and roads. When these actions alter the amount of water or change the timing and intensity of flows, the degradation and even loss of riparian and wetland systems can result (Bryce 2012, Poff 2011). Even activities, such as development or road construction, that modify hydrology in the uplands can have an influence on the stream hydrology (Poff 2011). Heavy animal herbivory in the form of livestock and native wildlife grazing can also result in streambank alteration, compaction, and degraded riparian vegetation through trampling and consumption. (Belsky 1999, Kauffman 1988, Poff 2011). In some cases, damage can lead to vegetation shifts from wetland to upland species and streambank alteration, reducing the extent and riparian characteristics of the site.

This analysis evaluates the management activities that could cause the reduction or addition of miles of stream and associated riparian habitat, along with acres of wetlands not associated with streams. Activities that improve watershed cover, increase water infiltration, reduce erosion and concentrated flow, and restore spring and stream hydrology would be compatible with increasing the mileage of riparian areas and acreage of wetlands (DeBano 1989).

Grazing and wildlife management practices that avoid overgrazing within a watershed leave abundant stubble and groundcover on the range. Such practices result in higher watershed cover compared with grazing practices that remove too much vegetation or trample and compact sensitive areas (Kauffman 1988, Poff 2011).

BLM_0027962

Removal of grazing has been shown to result in recovery of streambanks and riparian vegetation (Batchelor 2015), while managed grazing can be a compatible use in riparian areas (Kinch 1989). Alternatives that manage grazing to maintain low utilization levels in uplands and riparian areas or that remove grazing from riparian areas and wetlands altogether will be considered compatible with increasing stream and wetland areas.

Vegetation and watershed treatments—both in uplands and along the riparian zone and with appropriate follow up grazing management—can capture sediment and slow runoff, potentially contributing to improved and expanded riparian and wetland areas (DeBano 1989, Zeedyk 2014). The rehabilitation of closed routes that restores the natural hydrology could also contribute to increases in riparian and wetland areas (Trombulak 2000). Therefore, alternatives that encourage route reclamation and habitat treatments with constraints on post-treatment grazing will be considered compatible with increasing stream and wetland areas.

Manipulation of streams and springs for water developments can alter the hydrology and lead to loss of riparian habitat (Husby 2007). Such damage could be mitigated with appropriate design constraints to minimize the loss of wetland area. It is also likely that reestablishing the original hydrology could restore the lost riparian or wetland habitat, although little literature is available on the subject. Alternatives that remove damaging water developments and restore original hydrology will be considered compatible with increasing stream and wetland areas, while alternatives that allow water developments but require that flow be maintained in-channel would be consistent with maintaining current levels of streams and wetlands. Alternatives without such constraints could reduce riparian and wetland area.

## Stream and Riparian Condition

Impacts to stream and riparian conditions are analyzed using BLM stream Proper Functioning Condition data. Because information on wetland condition is largely incomplete, wetlands are not included in this discussion, but parallels exist between stream and wetland condition and management impacts. Anticipated changes in stream mileage in the Proper Functioning (PFC), Functional at Risk (FAR) and Nonfunctioning (NF) categories are described for each of the alternatives.

As previously discussed, riparian condition can be degraded by activities such as development and road building within a watershed, particularly on side slopes above streams (Bryce 2012, Poff 2011). Heavy animal herbivory can also result in reduced riparian condition through streambank alteration, soil compaction, increased sedimentation, and diminished riparian vegetation (Belsky 1999, Kauffman 1988). Habitat improvements and road closure and rehabilitation practices that capture sediment and slow runoff can improve riparian conditions (DeBano 1989, Zeedyk 2014).

BLM_0027963

Analysis of management activities that affect stream hydrology, streambank soils, and riparian vegetation are used to contrast impacts between the different alternatives. Alternatives that place restrictions on new surface disturbance such as mineral development, ROWs, and routes near streams will be considered consistent with sustaining current stream and riparian conditions. Alternatives that do not restrict such developments could contribute to declines in conditions over the long term. Alternatives that eliminate or reduce livestock congregating in riparian areas such that streambank trampling is minimized and low utilization levels are achieved will be considered as maintaining good riparian conditions, and consistent with improving degraded conditions. Alternatives that encourage habitat improvements or road closures and rehabilitation with appropriate follow-up grazing management are expected to improve riparian conditions over the short and long term.

## 4.6.2.   IMPACTS COMMON TO ALL ALTERNATIVES

### Riparian and Wetland Area Presence and Distribution

Over the long term, expected warmer and drier climate patterns with earlier snowmelt are likely to reduce stream flows and associated water tables along some channels, reducing the total riparian mileage (Bryce 2012). This is also likely to happen to some wetlands, with associated loss of wetland acreage.

### Stream and Riparian Condition

Warming climate conditions (Bryce 2012) are expected to cause declines in riparian plant vigor and abundance, reducing mileage of streams rated as PFC, while increasing mileage of streams in NF and FAR status. Heavy wildlife herbivory would continue in some areas with its associated impacts to riparian plant productivity, vigor and composition. Wildlife use would also continue to introduce, and spread invasive plants. This would be consistent with maintaining NF or FAR condition ratings in these areas.

## 4.6.3.   IMPACTS BY ALTERNATIVE

## ALTERNATIVE A - NO ACTION

### Riparian and Wetland Area Presence and Distribution

Alternative A would continue current management, which in some areas requires low utilization levels that maintain riparian and watershed cover and function. The following land use plans, which cover over 70% of the BLM surface in Occupied and Unoccupied Habitat, already contain such measures: Canyons of the Ancients NM RMP, Tres Rios RMP, Dominguez-Escalante NCA RMP, and Gunnison RMP.

BLM_0027964

Livestock grazing practices would be consistent with maintaining existing stream mileage and wetland acreage in this area and the four-mile Non-Habitat Areas over the short and long term. Current land use plans from the other management units on the remaining BLM surface in Occupied and Unoccupied Habitat do not contain such direction, and livestock grazing could contribute to reductions from the existing 373 miles of riparian area and 2,489 acres of wetlands in these areas over the long term. Reductions from the current 130 miles and 523 acres of wetlands in the Non-Habitat Areas are also projected to occur.

All current management plans under this alternative allow for vegetation treatment. However, the Dominguez-Escalante NCA, Grand Junction, Gunnison, and Tres Rios RMPs, which cover over 80% of the BLM surface in Occupied and Unoccupied Habitat, specify follow-up grazing practices consistent with maintaining the associated watershed improvements. Treatments in these areas could contribute to improving and expanding riparian and wetland areas over the long term. Treatments in the remaining areas are not projected to contribute to increases. Most existing plans under this alternative do not specify measures to close and rehabilitate routes. As a result, no changes to current stream and wetland areas are anticipated for BLM surface in Occupied and Unoccupied Habitat or the Non-Habitat Areas.

While the development of springs is currently allowed across all of the management units, only Canyons of the Ancients NM—representing a fraction of BLM surface in Occupied and Unoccupied Habitat—requires that water flow be maintained in riparian channels. Within this fraction, spring development practices are expected to sustain current riparian and wetland areas. In the remaining BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas, spring development could contribute to long-term reductions in riparian and wetland areas.

### Stream and Riparian Condition

Several land use plans already contain some surface disturbance protections on lands buffering riparian areas. These include RMPs for the Gunnison FO, Grand Junction FO, Moab FO, Monticello FO, San Luis Valley FO, Gunnison Gorge NCA, and Canyons of the Ancients NM, which represent a portion of the BLM surface in Occupied and Unoccupied Habitat. Activities on these lands are more likely to be consistent with maintaining current riparian conditions for the long term, while surface-disturbing activities are more likely to contribute to declining conditions in the remainder of habitat and Non-Habitat Areas.

Current land use plan direction on a portion of the BLM surface in Occupied and Unoccupied Habitat prescribes specific grazing management to protect riparian condition. Each existing RMP has also been amended to include Public Land Health Standards and Guidelines for Livestock Grazing, with suggested grazing measures to

BLM_0027965

attain riparian PFC. These measures have been in place for more than 15 years, and resulted in current riparian conditions, with 47% of stream miles in Proper Functioning Condition, 36% Functioning at Risk, and 17% Non-Functional on BLM surface in Occupied and Unoccupied Habitat. Current conditions in the Non-Habitat Areas include 77% of miles in Proper Functioning Condition, 19% Functioning at Risk, and 3% Non-Functional. Alternative A is projected to sustain these current riparian conditions over the short term, but contribute to improved conditions over the long term as the required grazing changes take effect. These changes are expected to occur on lands where livestock grazing has been identified as a significant factor. These effects are expected to occur on BLM surface in Occupied and Unoccupied Habitat and the Non-Habitat Areas.

As discussed above, a portion of the BLM surface in Occupied and Unoccupied Habitat and the Non-Habitat Areas is currently covered by land use plans that specify follow-up grazing practices to protect vegetation treatment effectiveness. Across this area, these practices are expected to contribute to improved riparian conditions. Outside of these areas, the lack of consistent land use plan direction for follow-up grazing management could lead to riparian conditions that do not benefit from vegetation treatments and road and route management.

## ALTERNATIVE B

### Riparian and Wetland Area Presence and Distribution

Alternative B would eliminate the streambank and vegetation removal impacts associated with domestic livestock grazing on a portion of the BLM surface in Occupied and Unoccupied Habitat, which would contribute to increasing stream and wetland area. This represents an increase over similarly affected lands in Alternative A.

Habitat treatments and their associated contributions to riparian and wetland area would not be allowed on the BLM surface in Occupied and Unoccupied Habitat under this alternative, but could occur in the four-mile Non-Habitat Areas. Additionally, all closed routes would be actively reclaimed across the BLM surface in Occupied and Unoccupied Habitat. In contrast to Alternative A, this would be a reduction in areas where vegetation treatments with appropriate follow up management could benefit riparian and wetland area. However, active reclamation of all closed routes across the BLM surface in Occupied and Unoccupied Habitat would contribute to increased riparian and wetland area under Alternative B, but these activities would not take place under Alternative A.

This alternative also prohibits new water developments and restores natural hydrology where existing water developments have damaged the stream or wetland. This would contribute to increased riparian and wetland area across the entire BLM

BLM_0027966

surface in Occupied and Unoccupied Habitat in contrast to Alternative A in which water developments could decrease riparian and wetland area across a portion of the BLM surface in Occupied and Unoccupied Habitat. Impacts to riparian miles and wetland acreage in Non-Habitat Areas would be similar to Alternative A.

## Stream and Riparian Condition

Alternative B largely eliminates surface disturbance and associated erosion and altered hydrology across the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas. While Alternative A would perpetuate the current level of surface disturbance restrictions around streams, Alternative B includes more comprehensive restrictions across a larger area. As a result these restrictions would help sustain the current riparian and wetland conditions across more of the BLM surface in Occupied and Unoccupied Habitat than Alternative A. Similar results would be expected in Non-Habitat Areas, but to a lesser degree because the surface protections are less comprehensive.

Alternative B would eliminate livestock grazing across the BLM surface in Occupied and Unoccupied Habitat. This would contribute to sustaining PFC conditions, and improving stream conditions that are currently in FAR or NF status where livestock grazing is a significant factor. Removal of the significant factor—livestock—would likely bring about condition improvements in both the short and long term. While the amount of land affected would not differ from Alternative A, improvements would probably occur more rapidly. Alternative B would result in similar grazing impacts as Alternative A in Non-Habitat Areas.

Alternative B prohibits vegetation treatments but requires active reclamation of all closed routes. Similar results are expected as discussed under the preceding section, whereby active reclamation of all closed routes across the BLM surface in Occupied and Unoccupied Habitat would contribute to improved riparian and wetland condition. In this area however, as compared with Alternative A there would be a reduction in areas where vegetation treatments with appropriate follow up management could benefit riparian and wetland conditions. In the four-mile Non-Habitat Areas, a similar outcome as Alternative A is predicted.

## ALTERNATIVE C

### Riparian and Wetland Area Presence and Distribution

Alternative C requires grazing practices which are consistent with meeting GUSG RCP habitat requirements. These practices would limit the streambank and vegetation removal impacts associated with domestic livestock grazing across the BLM surface in Occupied and Unoccupied Habitat, which could contribute to

BLM_0027967

increasing stream and wetland area. This represents an increase over similarly affected lands in Alternative A, and would have the same results as Alternative B.

Habitat treatments and their associated contributions to riparian and wetland area would be encouraged under this alternative, and appropriate follow-up livestock management required. Some closed routes would be actively reclaimed throughout the BLM surface in Occupied and Unoccupied Habitat, depending on GUSG needs. In contrast to Alternative A, this would be an increase in land where vegetation treatments with appropriate follow up management could benefit riparian and wetland area. In addition, active reclamation of some closed routes across this area would contribute to increased riparian and wetland area, an increase over Alternative A which does not require these activities, but reclamation would occur on fewer roads than Alternative B.

This alternative allows new water developments when GUSG habitat would benefit, or would not be damaged, but would minimize changes to in-channel water flow. The alternative also provides for removal or redesign of existing water developments that are exhibiting seep, spring or riparian area damage due to livestock use. These measures would contribute to sustaining and potentially increasing current area of wetlands and riparian habitat throughout the BLM surface in Occupied and Unoccupied Habitat. This approach represents an improvement over the amount of land similarly protected under Alternative A, and management of water developments would result in lesser gains to riparian and wetland area than Alternative B, which requires removal of all water developments which are damaging to riparian and wetland areas.

In Non-Habitat Areas, similar impacts to Alternative A are predicted for riparian miles and wetland acreage.

## Stream and Riparian Condition

Alternative C limits surface disturbance, and associated impacts to riparian condition on a portion of the BLM surface in Occupied and Unoccupied Habitat. This represents an increase over Alternative A. In contrast to Alternative B, this alternative would protect stream conditions from surface disturbance impacts on less of the BLM surface in Occupied and Unoccupied Habitat.

Alternative C requires grazing practices which are consistent with meeting GUSG RCP habitat requirements. These practices would contribute toward improving riparian conditions on FAR and NF streams where livestock are a significant factor, and maintaining conditions on PFC streams. While the amount of land affected would not differ from Alternative A, improvements would probably occur more rapidly, but probably not as rapidly, as under Alternative B. More rapid improvement for NF and FAR streams where livestock grazing is a significant factor

BLM_0027968

would be expected because of the prompt removal of livestock under Alternative B. Alternative C encourages vegetation treatments, requires follow-up grazing management and specifies active reclamation of closed routes where it is important for GUSG. In contrast to Alternative A, this would be an increase in land where vegetation treatments with appropriate follow up management could benefit riparian conditions. In addition, active reclamation of some closed routes across the BLM surface in Occupied and Unoccupied Habitat would contribute to improved riparian conditions, an increase over Alternative A which does not require these activities. However, reclamation would occur on fewer roads than Alternative B, reducing associated improvements to riparian condition.

In the four-mile Non-Habitat Areas, impacts similar to Alternative A are predicted for stream and riparian condition.

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

### Riparian and Wetland Area Presence and Distribution

This alternative requires grazing practices which are consistent with meeting GUSG RCP habitat requirements. These practices would limit the streambank and vegetation removal impacts associated with domestic livestock grazing across the Gunnison Basin population area, which could contribute to increasing stream and wetland area. Within the Gunnison Basin population area, this represents an increase over similarly affected lands in Alternative A, and would have the same results as alternatives B and C.

Alternative D₁ proposes the same habitat treatments with follow-up livestock management for the Gunnison Basin Population as Alternative C. It also proposes similar measures for reclamation of closed routes where needed to improve priority GUSG habitat. These actions would have the same impacts to riparian and wetland area presence and distribution as Alternative C.

This alternative contains the same measures as Alternative C for new water developments within the Gunnison Basin population area, but does not contain similar requirements to minimize livestock impacts from existing water developments. Sub-Alternative D₁ would be less compatible with sustaining current area of wetlands and riparian habitat throughout the BLM surface in Occupied and Unoccupied Habitat than Alternative C. This alternative represents an improvement over the amount of land similarly protected under Alternative A. However, management of water developments would not contribute to increasing riparian and wetland area as would occur under alternatives B and C within the Gunnison Basin population area.

BLM_0027969

In the four-mile Non-Habitat Areas, impacts similar to Alternative A are predicted for riparian miles and wetland acreage.

### Stream and Riparian Condition

Sub-Alternative $D_1$ allows for surface disturbance under 0.25 acre within the Gunnison Basin population area, with associated hydrologic and erosion impacts to riparian condition. This represents an increase in areas with surface disturbance limitations for the Gunnison Basin population area over Alternative A. Within the Gunnison Basin population area, this alternative would provide lower levels of surface protection across less area than alternatives B and C.

This alternative requires grazing practices which are consistent with meeting GUSG RCP habitat requirements in the Gunnison Basin population area. These practices would result in the same impacts as Alternative C. While the amount of land affected would not differ from Alternative A, improvements would probably occur more rapidly, but not as rapidly as, under Alternative B which would remove the significant factor for NF and FAR streams.

Sub-Alternative $D_1$ proposes the same habitat treatments with follow-up livestock management for the Gunnison Basin Population as Alternative C. It also proposes similar measures for reclamation of closed routes where needed to improve priority GUSG habitat. These actions would have the same impacts to riparian condition as Alternative C.

In Non-Habitat Areas, impacts similar to Alternative A are predicted for stream and riparian condition.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Riparian and Wetland Area Presence and Distribution

Sub-Alternative $D_2$ contains similar grazing measures across the satellite populations as Alternative C with similar scope and type of effects to riparian and wetland area.

This alternative has the same measures for vegetation treatments, follow-up livestock grazing management, and route reclamation as Alternative C. The same impacts to riparian and wetlands are anticipated for the satellite populations are as with Alternative C.

Sub-Alternative $D_2$ has nearly identical measures for water developments as Alternative C. Within the satellite populations the same impacts to riparian and wetlands are anticipated.

In the Non-Habitat Areas, impacts similar to Alternative A are predicted for riparian miles and wetland acreage.

BLM_0027970

### Stream and Riparian Condition

Sub-Alternative D$_2$ places similar surface disturbance constraints on satellite population areas as Alternative C, with identical impacts to riparian condition.

Sub-Alternative D$_2$ contains similar grazing measures across the satellite populations as Alternative C with similar scope and type of effects to riparian condition.

This alternative contains the same measures for vegetation treatments, follow-up livestock grazing management, and route reclamation as Alternative C. The same impacts to riparian and wetlands are projected for the satellite populations as with Alternative C.

In Non-Habitat Areas, impacts similar to Alternative A are predicted for stream and riparian condition.

## 4.6.4. CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area include further water diversion and development, surface-disturbing actions, improper grazing practices, conversion of native rangelands to irrigated agricultural lands or residential development, improper maintenance of transportation facilities, and recreational use. These activities either reduce the amount of water for riparian areas and wetlands, or cause surface disturbance by removing vegetation cover, displacing and compacting soils, and altering soil structure. The result is exposed surfaces that increase the potential for runoff and erosion, and that could have negative effects on stream or wetland function.

Ex-urban growth and development in the region is anticipated to have impacts to riparian and wetland areas. The demand for water is anticipated to increase with development and population growth. Additionally, demand and use of water flowing to BLM lands is expected to continue to rise. Impacts on water quantity would affect riparian areas and wetlands.

Unavoidable water quantity impacts would include water withdrawals for livestock use, oil and gas and other mineral resource exploration, development and production, and watering of roads for dust mitigation. Dust on snow resulting from fugitive dust production outside of the region would continue to impact the timing of melt out and the quantity of water available for downstream users.

Under all alternatives, water resources would be protected due to management in accordance with the Clean Water Act, the Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration, and other applicable state and

federal water quality standards.  Site-specific mitigation would further reduce impacts on water resources.  Adherence to these standards would reduce many of the impacts from future actions.

Alternative actions that allow the least amount of soil disturbance, loss of vegetation, energy and minerals development, recreational use, and roadway and transportation facilities development would be the least impactful on water resources.  Alternative B would cause the fewest cumulative impacts on riparian areas and wetlands, followed by Sub-Alternative $D_2$, Alternative C, Sub-Alternative $D_1$, and Alternative A.  Management under Alternative A allows the most surface disturbance, least restrictions on livestock grazing and is expected to contribute the most cumulative effects on soil and water resources.

BLM_0027972

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.7. INVASIVE SPECIES

## 4.7.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Vegetation treatment acreage as an indicator of large scale surface disturbance and seeding, since these are often tied with weed introduction and spread
- Risk of invasive species introduction and spread due to presence or absence of surface disturbance restrictions
- Risk of invasive species introduction and spread due to presence or absence of permitted livestock grazing.

### ASSUMPTIONS

Noxious and invasive weeds would continue to be introduced and spread by vehicle traffic, recreational activities, wildland fire, wildlife and livestock movements, and vegetation and surface-disturbing activities.

Weeds and pests would be controlled in coordination with the appropriate county weed and pest control districts and with owners of adjacent property in an effort to comply with state plans for weed eradication and control.

Short-term effects on invasive species and their management would occur over a timeframe of ten years or less and long-term effects would occur over longer than ten years.

### METHODS AND DATA

#### Vegetation Treatments

Vegetation treatment acreage is used to indicate the most widespread and best documented source of large scale surface disturbance across the BLM surface in Occupied and Unoccupied Habitat. As discussed in Chapter 3, it is reasonable to assume that the treated acres are more likely to contain invasive species at higher levels than the untreated areas. This is due to soil disturbance, reduced competition from native species, increased resource availability for weed growth, and introduction of weed seed from equipment and as contaminants in seed mixes (Davies 2011, Davis 1990, Dodson 2006, Harrod 2001, Hobbs 1992).

BLM_0027973

This analysis considers vegetation treatment to increase the opportunities for weed introduction, establishment and spread across large treated areas. Alternatives which encourage vegetation treatment are projected to increase treatment-associated weed invasion. Alternatives which prohibit vegetation treatment are projected to maintain current levels of treatment-associated weed invasion, while alternatives which restrict treatment would result in intermediate levels of invasion.

Weed treatments are also considered under this indicator. Alternatives which specify greater range of target species will be considered to reduce weeds more than alternatives with fewer target species. Alternatives which do not provide weed management direction or targeted species will be considered to result in the least weed reduction.

### Risk of Weed Introduction and Spread

The risk of weed introduction or spread is also associated with smaller scale disturbances which disrupt soils and vegetation (Hobbs 1992, Huenneke 1990, Burke 1996, Theoharides 2007).)  Alternatives which restrict surface disturbance will be considered to reduce the risk for weed invasion.  Alternatives which do not restrict surface disturbance are anticipated to increase the risk of weed invasion.

As discussed in Chapter 3, livestock and wildlife grazing is another source of weed introduction, movement and spread (Harrod 2001.) While grazing can also reduce expression of weeds in a plant community by consuming weed seed and biomass or reducing litter production, the introduction and spread risks for weed species that are new to an area remains. Because the alternatives do not present wildlife management actions, this part of the analysis will be based on livestock grazing management. Alternatives which eliminate livestock grazing will be considered to have reduced risk of weed invasion with the removal of this source of weed introduction and transport, compared with alternatives which allow livestock grazing.

## 4.7.2.   IMPACTS COMMON TO ALL ALTERNATIVES

### Vegetation Treatments

Areas that have already been treated are predicted to maintain higher levels of weeds than areas that have not received vegetation treatment, over both the short and long term. Weed management would continue to be directed by strategic plans that direct limited resources for maximum benefit, and rely heavily on treating new species and infestations as directed by the Early Detection Rapid Response approach.

BLM_0027974

### Risk of Weed Introduction and Spread

Wildlife will continue to introduce, spread, and favor expansion of invasive plants. Casual uses that occur on BLM lands will incidentally disturb soils and potentially introduce weeds. As public land uses increase, weed introductions and invasions will as well.

## 4.7.3.   IMPACTS BY ALTERNATIVE

## ALTERNATIVE A - NO ACTION

### Vegetation Treatments

This alternative places few restrictions on vegetation treatments. The following Land Use Plans encourage vegetation treatments to meet habitat objectives: Dominguez-Escalante, Grand Junction, Monticello, Moab, Canyons of the Ancients, Gunnison Gorge, Gunnison, McInnis Canyons, San Luis, and Tres Rios.  No land use plans explicitly prevent vegetation treatments.  Treated areas are anticipated to continue to accumulate at current rates approximating 1-3% of the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas per decade over the short and long term.  Total treated area is projected to be nearly 14% of the BLM surface in Occupied and Unoccupied Habitat and over 2% of Non-Habitat Areas in 10 years. These acreages are more likely to have higher levels of weeds as compared with untreated areas.

Most of the current RMPs call for coordinated weed management. The Canyons of the Ancients NM, Dominguez-Escalante NCA, Grand Junction, Moab, McInnis Canyons NCA, Gunnison, and Gunnison Gorge NCA RMPs specify weed control or prevention as a management action.  However, all units are engaged in weed management.  Under Alternative A, the existing level of weed control would continue across the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas.

### Risk of Weed Introduction and Spread

Most land use plans already contain some surface disturbance protections for BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas, associated with wilderness area or wilderness study area status or tied to realty or mineral development.  The restrictions cover 61% of the BLM surface in Occupied and Unoccupied Habitat and 39% of the Non-Habitat Areas under Alternative A.  Lands under these restrictions are projected to be at lower risk from vegetation and soil disturbance than lands not under these protections.

BLM_0027975

Livestock grazing is anticipated to continue on over 90% of BLM surface in Occupied and Unoccupied Habitat, and over 55% of the Non-Habitat Areas. The risk for weed invasion from livestock grazing is projected to stay at current levels in grazing allotments, both over the short and long term.

## ALTERNATIVE B

### Vegetation Treatments

Under Alternative B, vegetation treatments would not be allowed on BLM surface in Occupied and Unoccupied Habitat. This would cap the total acreage of treatments that could be associated with weed invasions at 10% of BLM surface in Occupied and Unoccupied Habitat. While weeds would continue to be introduced from other sources, within ten years, this would represent a 23% reduction in areas subject to treatment-associated weed invasion compared to Alternative A. In Non-Habitat Areas, there would be little difference in treatment-associated weeds between the two alternatives.

Under Alternative B, all weeds that threaten sagebrush and riparian habitat quality could be treated. This direction is more specific than under Alternative A, and would likely result in more intensive weed control and lower levels of invasive plants across BLM surface in Occupied and Unoccupied Habitat compared to Alternative A. There would be little difference in weed management in the Non-Habitat Areas between the two alternatives.

### Risk of Weed Introduction and Spread

Alternative B places substantial restrictions on new surface-disturbing activities, which are an important source of weed introduction and spread. These include No Leasing and NSO and ROW exclusion stipulations. As a result, the risk of weed introduction and spread would be reduced in the protected areas. These restrictions would cover a larger portion of the BLM surface in Occupied and Unoccupied Habitat than Alternative A, and also extend into Non-Habitat Areas. As a result, weed infestations associated with surface disturbance are predicted to be lower than under Alternative A.

Alternative B would not allow grazing of domestic livestock on BLM surface in Occupied and Unoccupied Habitat, reflecting a reduction in area compared to Alternative A. With the exception of trespass livestock, the risk of weed introduction and spread associated with livestock grazing would be eliminated. In the Non-Habitat Areas, Alternative B is expected to have the same results for grazing-associated weeds as Alternative A.

BLM_0027976

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## ALTERNATIVE C

### Vegetation Treatments

Under Alternative C, vegetation treatments would be emphasized.  While difficult to accurately predict, it is projected that over 14% of BLM surface in Occupied and Unoccupied Habitat would be subject to treatment-associated weed invasion after 10 years, an increase over alternatives A and B.

Alternative C would require a greater level of weed control than Alternative A. This alternative would likely reduce the level of weeds on BLM surface in Occupied and Unoccupied Habitat over the short and long term in comparison to Alternative A.  However, Alternative C would only require management of state-listed noxious weeds that threaten GUSG habitat, which is fewer species than would be controlled under Alternative B.  As a result, there could be more weed invasions associated with Alternative C than Alternative B across this area.

Weeds associated with vegetation treatments are expected to be similar to Alternative A for the Non-Habitat Areas.

### Risk of Weed Introduction and Spread

Alternative C places more area under surface disturbance restrictions than Alternative A, but less area than Alternative B.  These restrictions would limit some of the primary sources of new weed introductions, infestations, and spread in contrast to Alternative A, but would expand them in comparison to Alternative B.

Alternative C would maintain livestock grazing across BLM surface in Occupied and Unoccupied Habitat, using appropriate grazing practices to meet GUSG RCP habitat requirements.  This would produce results similar to Alternative A, with similar acreages affected and at risk of weed introduction from livestock grazing.

The risk of weed introduction and spread in Non-Habitat Areas is projected to be similar to Alternative A.

## SUB-ALTERNATIVE D$_1$ - GUNNISON BASIN PREFERRED

### Vegetation Treatment

Sub-Alternative D$_1$ would provide the same habitat treatments with follow-up livestock management as Alternative C.  Within the Gunnison Basin population area, this would result in the same amount of land subject to treatment-associated weed invasion.  This alternative proposes the same weed treatment measures as Alternative B.  Therefore, the same impacts as under Alternative B are anticipated within the Gunnison Basin population area.  Weeds associated with vegetation treatments are expected to be similar to Alternative A for the Non-Habitat Areas.

BLM_0027977

**Risk of Weed Introduction and Spread**

Sub-Alternative $D_1$ would allow for surface disturbance under 0.25 acre, with an associated risk of weed introduction and spread. Within the Gunnison Basin population area, this would result in a decrease in areas at higher risk of weeds resulting from surface disturbance in comparison to Alternative A. Sub-Alternative $D_1$ would leave more area vulnerable to weeds resulting from surface disturbance than alternatives B or C.

This alternative requires grazing practices that are consistent with meeting GUSG RCP habitat requirements. These practices would result in a similar level of risk of weed introduction and spread from livestock grazing as alternatives A and C.

The risk of weed introduction and spread in Non-Habitat Areas is projected to be similar to Alternative A.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Vegetation Treatment

Sub-Alternative $D_2$ has the same measures for vegetation treatments and follow-up livestock grazing management as Alternative C. Within the satellite populations, the land area subject to treatment-associated weed invasion would be the same as under Alternative C. Sub-Alternative $D_2$ would provide the same weed treatment measures and would result in the same impacts within the satellite population areas as Alternative B. Weeds associated with vegetation treatments would be expected to be similar to Alternative A for the Non-Habitat Areas.

### Risk of Weed Introduction and Spread

Sub-Alternative $D_2$ would place similar constraints over surface disturbance as Alternative C, with identical levels of risk for weed introduction and spread in satellite population areas.

This alternative requires grazing practices that are consistent with meeting GUSG RCP habitat requirements. Within the satellite population areas, these practices would result in the same level of risk for weed introduction and spread as alternatives A and C.

The risk of weed introduction and spread in Non-Habitat Areas is projected to be similar to Alternative A.

BLM_0027978

## 4.7.4.   CUMULATIVE IMPACTS

Within the cumulative impact analysis area, past, present, and reasonably foreseeable future actions and conditions that have affected and will likely continue to affect noxious and invasive weeds are mineral exploration and development, livestock grazing, recreation, road construction, ROWs (including large transmission lines or pipelines), prescribed and wild fires, land use planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought.  Many of these create conditions that cause or favor weed invasion.

In general, resource use activities have cumulatively caused vegetation removal and fragmentation, and resulting weed spread.  Climate change within the cumulative impact analysis area could cause an increase in temperatures and variations in precipitation that could affect soil conditions, vegetative health, and water availability.  Such changes would alter the conditions to which vegetative communities are adapted, potentially creating conditions that favor weeds.

In general, management under each alternative would work toward achieving land health, but would differ in the time and methods used to reach that goal.  Since existing management under Alternative A emphasizes greater resource use and development, increases in weeds are more likely to occur under this alternative.  As a result, management under Alternative A could significantly contribute to cumulative impacts on vegetation.  In contrast, BLM management actions under alternatives B and C and sub-alternatives $D_1$ and $D_2$ (such as placing restrictions on development and prioritizing weed treatments) would be expected to contribute to positive cumulative impacts on weeds.

BLM_0027979

# 4.8. WILDLAND FIRE ECOLOGY & MANAGEMENT

## 4.8.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Amount of land burned by wildfires
- Frequency of wildfire occurrence
- Fuels condition as indicated by Vegetation Condition Class (VCC).

### ASSUMPTIONS

Some VCCs will increase in departure if vegetation treatment actions are not taken and wildfires continue to be aggressively suppressed.

Some types of vegetation treatments would reduce the VCC or maintain it at the desired level.

There will be a growing demand on suppression resources for managing wildfires in the region.

Fire is an important natural disturbance in many of the ecological systems found in the region.

A direct relationship exists between fuel characteristics and potential fire intensity and severity and size in some cases.

Barriers to wildland fire management (such as limited access) will decrease suppression effectiveness, potentially increasing fire size.

Climate change is expected to bring hotter, drier conditions, leading to a longer fire season and more frequent and intense fire over the long term (Archer 2008).

Short-term effects on upland vegetation, fuels and fire would occur over a timeframe of up to ten years and long-term effects would occur over longer than ten years.

### METHODS AND DATA

#### Amount of Land Burned by Wildfires and Fire Frequency

The amount of land burned by wildfire is assessed in terms of acreages and percentages of burned BLM surface in Occupied and Unoccupied Habitat.

BLM_0027980

Frequency of wildfire is evaluated based on the average annual numbers of wildfires with their points of origin on BLM surface across this area. This analysis is based on how each alternative is projected to affect opportunities for ignition, vegetation and fuel distribution as well as fire management.

Management actions which increase opportunities for ignition are expected to result in increased fire frequency and burned acreage. Literature suggests that fire size and numbers are positively correlated with increasing human access and activity (Cardille 2001, Main 1974, Harrington 1978). This analysis assumes that management actions which increase the numbers and distribution of developments and people across the landscape will increase the opportunities for ignition. Consistent with this assumption, alternatives that close routes and restrict surface disturbance will be considered to reduce opportunities for ignition. Prescribed fire defined as any fire intentionally ignited by management actions in accordance with applicable laws, policies, and regulations to meet specific objectives is another source of human-caused fire across the landscape. Approximately 1% of the prescribed fires before 2005 in the U.S. resulted in near misses or escapes (Dether 2005), so while it is rare, prescribed fire can lead to increased acres burned through wildfire. Consequently, alternatives that restrict prescribed fire will be expected to reduce opportunities for ignition, and the associated burned acreage, although to a small degree.

Vegetation and fuel distribution influences burned acreage. Fuel breaks and vegetation treatments which thin or change the type of vegetation are used to modify fire behavior and help reinforce defensible locations. These treatments are used to facilitate indirect firefighting tactics such as backfiring, and ultimately reduce fire size (Finney 2001). Accordingly, alternatives that encourage fuel treatments will be considered to reduce burned acreage over the short term. However, because most acres across the West have burned during extreme weather events (which influences fire behavior more so than fuel distribution), fuels treatments might not affect burned acreage over the long term (Reinhart 2008).

Extensive reviews of plant species, fire, and flammability show that some types of vegetation are more likely to ignite and carry a wildfire than other types (FEIS 2015). Flammable annual vegetation—particularly cheatgrass—can increase fire frequency and acreage burned (Zouhar, Bryce 2012; Knapp 1996). While just 3% of the vegetation on BLM surface in Occupied and Unoccupied Habitat is currently mapped as dominated by cheatgrass, activities that contribute to the introduction and spread of cheatgrass in other vegetation types will be considered to indirectly contribute to increased burned acreage, particularly over the long term. As discussed in the Invasive Plants section, alternatives that restrict surface disturbance will be considered to reduce the risk for weed invasion and long-term burned acreage, while alternatives that do not restrict surface disturbance are anticipated to result in

BLM_0027981

the opposite outcome. Because rehabilitation of burned areas can either increase or reduce the likelihood of invasive plant dominance (Getz 2008; Peppin 2010), rehabilitation actions will not be factored into the analysis of burned acreage or fire frequency.

The amount of land burned by wildfires is further influenced by the BLM fire management capability and strategy. Acreage burned is directly linked to fire management strategy, and a policy of suppressing all fires results in fewer acres burned than a policy aimed at managing fires to achieve habitat objectives, particularly over the short term. While long-term impacts associated with suppression leading to increased fuel loading resulting in an increase in the acreage burned by wildfire, when this would occur cannot be predicted. Firefighter access to fire starts and the presence of fire breaks assist with fire suppression and management. The tie between acreage burned and difficulty of access is supported by at least one study showing an increase in fire size in inaccessible areas (Cardille 2001). Based on this information, alternatives which close and rehabilitate routes, and those which restrict fuels projects are considered to contribute to increased burned acreage. Alternatives that manage to suppress all fires are considered to result in fewer burned acres than alternatives that manage fires to achieve resource objectives over the short term.

## Fuels Condition

Fuel loading throughout the BLM surface in Occupied and Unoccupied Habitat will be evaluated based on acreage of BLM surface in Vegetation Condition Classes (VCC) 2 and 3. VCC indicates the amount that current vegetation has departed from the simulated historical vegetation reference conditions. VCC is calculated based on changes to species composition, structural stage, and canopy closure. Three condition classes describe low departure (VCC 1), moderate departure (VCC 2), and high departure (VCC 3). This information is interpreted here as an indicator of potential areas where vegetation communities have not burned at their natural rates or severities. However, it only represents an approximate picture of fuel conditions and imbalances because some vegetation types included in VCC2 and VCC3 do not have excessive fuel loading Altered VCCs typically indicate increased likelihood of more intense or frequent fires, with associated impacts to BLM fire management resources (LANDFIRE 2009). Vegetation management actions have been recommended by some researchers to reduce VCCs toward baseline conditions (Hood 2007, Hann 2003). These could include fuels treatments, the use of prescribed fire, and some habitat treatments. Fire—both prescribed and wildfire—has the effect of reducing fuels and lowering the VCC as a result. Based on this information, alternatives which encourage fuels treatments, and allow the use of prescribed fire will be interpreted as reducing the VCC over the short and long term. Alternatives that restrict these activities would have the opposite effect.

BLM_0027982

Alternatives that manage wildfires for resource benefit will be considered to reduce the VCC, while those that call for full suppression will be considered to maintain current VCC in the short term but contribute toward advancing VCC over the long term.

## 4.8.2.   IMPACTS COMMON TO ALL ALTERNATIVES

### Amount of Land Burned by Wildfires and Fire Frequency

Over the long term, as climate warms and vegetation successional changes continue to build up fuels, more acreage is likely to burn.  Fire frequency is also expected to increase over current conditions.

### Fuels Condition

Fuels would be decreased in areas that burn.  Vegetation would continue along successional trajectories, increasing in age, woody species dominance and fuel loading until old growth status or a disturbance occurs.  The successional process would continue to advance Vegetation Condition Class.

## 4.8.3.   IMPACTS BY ALTERNATIVE

## ALTERNATIVE A - NO ACTION

Alternative A would continue a similar pattern of fire frequency and acreage burned by wildfire as has occurred over the past several decades.  Wildland fire suppression cost would continue at current levels adjusting for inflation.

### Amount of Land Burned by Wildfires and Fire Frequency

Approximately 4% of the BLM surface in Occupied and Unoccupied Habitat has burned over the past 30 years, and 9% of the four-mile Non-Habitat Areas.  This acreage has occurred under management prescribed by existing and past RMPs. Current plans contain some surface disturbance protections which limit human activity and associated opportunities for ignition.  These restrictions cover 61% of the BLM surface in Occupied and Unoccupied Habitat, and 39% of the Non-Habitat Areas.  On the other hand, most existing plans do not specify measures to reduce route density, which would limit human access and ignition opportunity.  This management setting has resulted in a level of human activity on the landscape such that human caused ignitions have increased the number of fire starts on the landscape.  It has also contributed to the current levels of burned area and fire frequency.  These levels are anticipated to continue over the short and long term.

BLM_0027983