The use of prescribed fire is specifically permitted in the following management plans: Canyons of the Ancients, Dominguez-Escalante NCA, Grand Junction, Gunnison Gorge NCA, Gunnison, San Luis Valley, Tres Rios, Moab, Monticello and Uncompahgre. Prescribed fire contributed to a higher likelihood of human caused ignitions in these areas. While the prescribed fire data has not been fully analyzed for the area, if there were any past escapes over the past 30 years, they would have been included as a component of the current burned area acreage. This contributing factor to burned acreage is expected to continue in a similar pattern over the short and long term.

Fuels management activities are encouraged in the following RMP: Canyons of the Ancients NM, Dominguez-Escalante NCA, Grand Junction, Moab, Monticello, and Tres Rios. However, other management units have been carrying out fuels treatment projects without specific management plan direction. These actions have contributed to the current distribution of fuels across the BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas, which has factored into the amount of acres burned. This pattern is projected to continue over the short and long term.

Current fire management direction varies across the management units. Canyons of the Ancients NM, Gunnison Gorge NCA, Gunnison, San Luis, and Uncompahgre Basin RMPs place substantial constraints upon or emphasize suppression of natural fire, at least in portions of the area covered under each plan. Grand Junction, Dominguez-Escalante NCA, Moab, Monticello, and Tres Rios RMPs allow for management of natural fire to achieve resource benefits. Fire management plans have added further detail to this direction, and provided for more use of naturally occurring fire for resource benefit. Firefighter access to implement suppression or other fire management has been facilitated by the current route network. This complex of management approaches and firefighter access has also contributed to current burned area acreage. Little change is anticipated in the future under this alternative within the BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas.

## Fuels Condition

VCC 2 is the dominant class across the BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas, with the remainder approximately evenly split between classes 1 and 3. Fuels treatments, as discussed in the preceding section, have contributed to the current VCC distribution. Prescribed fire also discussed above, has been used to reduce fuels in many of the management units. Finally, fire management as outlined above has been a factor in the current VCC status.

As discussed in the vegetation section, successional rates appear to be proceeding more quickly than the rate of wildfire, prescribed fire, fuels and other vegetation

BLM_0027984

treatments.  While it is likely that the distribution of VCCs would remain static over the short term, over the long term, a decrease in VCC1 and increases in VCC 2 and VCC 3 would be expected, as percent departure from historic reference conditions increases on BLM surface in both Occupied and Unoccupied Habitat and Non-Habitat Areas.

## ALTERNATIVE B

Alternative B would reduce fire frequency but could increase acreage burned by wildfire in comparison to Alternative A on both the BLM surface in Occupied and Unoccupied Habitat and the four-mile Non-Habitat Areas.  Wildfire suppression cost would probably be greater than Alternative A because of access difficulties, and the greater cost associated with suppressing large fires.

### Amount of Land Burned by Wildfires and Fire Frequency

Alternative B places substantial restrictions on new surface disturbing activities which would limit human activity.  These restrictions would cover more of the BLM surface in Occupied and Unoccupied Habitat and the four-mile Non-Habitat Areas than Alternative A.  This alternative also requires route density reductions during travel management planning which would further limit human access and activity. In addition, prescribed fire would be prohibited under this alternative in this area. Together, these restrictions would reduce the opportunities for human ignition across the BLM surface in Occupied and Unoccupied Habitat, as well as Non-Habitat Areas, in comparison with Alternative A.  Associated reductions to fire frequency and burned acreage from these factors are anticipated.

Alternative B prohibits fuels treatments in the BLM surface in Occupied and Unoccupied Habitat with the exception of areas not exhibiting the characteristics of GUSG habitat.  It also prioritizes suppression of all fire on BLM surface in Occupied and Unoccupied Habitat to protect GUSG habitat, immediately after protection of life and property. However, firefighter access to implement fire suppression would be more difficult under a reduced route network with reclaimed routes—also mandated under Alternative B.  The outcome of this combination of management actions is most likely longer Initial Attack times, and more situations where fires become difficult to control.  This would result in increased acreage burned by wildfire in this area—particularly from natural ignitions—as compared with Alternative A.  Within Non-Habitat Areas, management of fire to increase connectivity would also increase the area burned by wildfire as compared with Alternative A.

BLM_0027985

### Fuels Condition

Under Alternative B, fuel treatments on BLM surface in Occupied and Unoccupied Habitat would be prohibited and prescribed fire would not be allowed. In addition, aggressive fire suppression would be pursued, although other management actions would reduce its effectiveness. These factors would combine across this area to increase the percent departure from historic reference conditions in comparison to Alternative A, resulting in more acres in VCC 2 and VCC 3. Within Non-Habitat Areas, management of fire to increase connectivity would reduce acreage in VCC 2 and VCC 3 as compared with Alternative A.

## ALTERNATIVE C

Alternative C would reduce fire frequency in comparison with Alternative A, but could increase acreage burned by wildfire in comparison to Alternative A. Wildfire suppression cost would probably be greater than Alternative A because of more access difficulties, and the greater cost associated with managing more wildfires for resource benefit. However costs are projected to be less than Alternative B which would have substantially less access, no fuels reduction projects, and more opportunities for wildfire to reach large and costly sizes.

### Amount of Land Burned by Wildfires and Fire Frequency

Alternative C limits surface disturbance, and associated human activities on more of the BLM surface in Occupied and Unoccupied Habitat than Alternative A, but less than Alternative B. Alternative C also specifies consideration of route density reductions during travel management planning. These actions could result in reduced human access and associated opportunities for accidental ignition in comparison with Alternative A, resulting in associated reductions in burned area acreage and fire frequency. However, surface disturbance restrictions and route density reduction would be to a lesser extent than Alternative B, resulting in greater ignition opportunities, and more associated fire. This alternative places more restrictions on the use of prescribed fire than Alternative A, with reduced likelihood of escape and a lesser increase in burned area and fire frequency.

Alternative C allows fuels treatments with some design restriction to benefit GUSG across the BLM surface in Occupied and Unoccupied Habitat. It also encourages wildfire management for benefit of GUSG. However, firefighter access to implement fire management activities would be more difficult under a reduced route network with reclaimed routes, which is also included as part of Alternative C. The outcome of this combination of management actions could be longer fire size-up and planning times than Alternative A, and more acreage burned by wildfire. More acreage is projected to be burned under this alternative than under Alternative B as well. The increase in acreage would primarily result from more fuels treatments

BLM_0027986

which would increase wildfire manageability, and allow for more wildfire incidents to be used to achieve GUSG benefits.

Impacts to acreage burned and fire frequency within Non-Habitat Areas would be similar to Alternative A.

### Fuels Condition

Under Alternative C, fuel treatments would be allowed with some restrictions across the BLM surface in Occupied and Unoccupied Habitat, and prescribed fire would also be allowed. In addition, wildfire would be used to achieve GUSG habitat objectives in some vegetation types. These factors would combine to reduce VCC class over both the short and long term as compared with Alternative A and B. More acres would fall into VCC 1 and fewer acres would be in VCC2 and VCC 3 as a result.

Impacts to fuel loading within Non-Habitat Areas would be similar to Alternative A.

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ would reduce fire frequency in comparison with Alternative A but could increase acreage burned by wildfire in comparison to Alternative A. Wildfire suppression cost would probably be greater than Alternative A because of more access difficulties, and the greater cost associated with managing more wildfires for resource benefit. Costs are projected to be generally similar but less than Alternative C because of similar access, fuels treatment, and wildfire use for resource benefit with the exception of wildfire management in Occupied Habitat.

### Amount of Land Burned by Wildfires and Fire Frequency

Sub-Alternative $D_1$ allows for surface disturbance under 0.25 acre within the Gunnison Basin population area. This represents a decrease in areas at higher risk of ignition and associated increase in fire due to human activities, as compared with Alternative A. Sub-Alternative $D_1$ would leave more area than alternatives B and C open to surface disturbance, human activities, and associated impacts to fire. Sub-Alternative $D_1$ proposes no route reduction measures with similar impacts as Alternative A to human access and associated fire. This alternative treats prescribed fire the same as Alternative C with the same expected results to acreage burned by wildfire and fire frequency.

Sub-Alternative $D_1$ provides the same management actions as Alternative C for fuels treatment and wildfire management within Unoccupied Habitat for the Gunnison Basin population area, with the same anticipated impacts to acreage burned by wildfire. However, it treats wildfire management in Occupied Habitat similar to Alternative B. Higher route densities, fewer reclaimed routes and the presence of

BLM_0027987

fuels treatments under this alternative would improve firefighter access and fire manageability for more effective suppression than Alternative B, resulting in less acres of Occupied Habitat burned by wildfire. Because wildfire would not be used to achieve resource objectives in Occupied Habitat, Sub-Alternative $D_1$ would most likely result in fewer acres burned by wildfire than Alternative A within Occupied Habitat.

Impacts to acreage burned and fire frequency within Non-Habitat Areas would be similar to Alternative A.

### Fuels Condition

Sub-Alternative $D_1$ contains the same fuels treatment and prescribed fire measures as Alternative C. While it also has similar measures for use of wildland fire to achieve GUSG habitat objectives in Unoccupied Habitat, it calls for fire suppression within Occupied Habitat. These factors would combine to produce similar results as Alternative C for VCC status in Unoccupied Habitat, but would result in less reduction of VCC in Occupied Habitat. Because of the additional restrictions placed on prescribed fire use and fuels treatments, VCC would be reduced less than under Alternative A. However, it would be reduced more than under Alternative B which prohibits prescribed fire and fuels treatments in habitat areas.

Impacts to fuel loading within the Non-Habitat Areas would be similar to Alternative A.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Sub-Alternative $D_2$ would reduce fire frequency in comparison with Alternative A but could increase acreage burned by wildfire. Wildfire suppression cost would probably be greater than Alternative A because of more access difficulties, and the greater cost associated with managing more wildfires for resource benefit. Costs are projected to be generally similar but less than Alternative C because of similar access, fuels treatment, and wildfire use for resource benefit with the exception of wildfire management in Occupied Habitat.

### Amount of Land Burned by Wildfires and Fire Frequency

Sub-Alternative $D_2$ places similar surface disturbance constraints and route reduction actions on satellite population areas as Alternative C, and similar measures for prescribed burns in Unoccupied Habitat. The identical impacts to human access and activity, acreage burned by wildfire and fire frequency would be expected in Unoccupied Habitat. Limitations on prescribed fire within Occupied Habitat under Sub-Alternative $D_2$ are not expected to change the escape fire

BLM_0027988

possibility at a detectable level, so acreage burned by wildfire and fire frequency in this alternative would also be similar to Alternative C.

Sub-Alternative $D_2$ provides the same management actions as Alternative C for fuels treatment and wildfire management within Unoccupied Habitat for the satellite population areas, with the same anticipated impacts to acreage burned by wildfire. However it treats wildfire management in Occupied Habitat similar to Alternative B. Higher route densities, fewer reclaimed routes and the presence of fuels treatments under this alternative would improve firefighter access and fire manageability for more effective suppression than Alternative B, resulting in less acres of Occupied Habitat burned by wildfire. Because wildfire would not be used to achieve resource objectives in Occupied Habitat, Sub-Alternative $D_2$ would most likely result in fewer acres burned by wildfire than Alternative A within Occupied Habitat.

Impacts to acreage burned and fire frequency within the Non-Habitat Areas would be similar to Alternative A.

### Fuels Condition

Sub-Alternative $D_2$ contains the same fuels treatment, fire management and prescribed burning measures as Alternative C in Unoccupied Habitat, but restricts the use of wildfire for resource benefit and prescribed fire is limited to the burning of slash piles in Occupied Habitat. These factors would combine to produce similar results for VCC status as Alternative C in the satellite population area in Unoccupied Habitat. However in Occupied Habitat the management actions would result in less reduction of VCC. Because of the additional restrictions placed on prescribed fire use and fuels treatments, VCC would be reduced less than under Alternative A. However, it would be reduced more than under Alternative B, which prohibits prescribed fire and fuels treatments in habitat areas.

Impacts to fuel loading within Non-Habitat Areas would be similar to Alternative A.

## 4.8.4.   CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely to continue to affect wildland fire ecology and management are the creation of wildland-urban interface areas, creation of recreation areas, fuels treatments, habitat treatments, and livestock grazing.

Past and present management actions and natural events within the cumulative impact analysis area have altered the condition of vegetation and natural fire regimes across the landscape. These include fire suppression, vegetation treatments, grazing,

BLM_0027989

noxious and invasive weed spread, drought, and insect and disease outbreaks. In some cases, areas have become more prone to large intense fires.

Urban development and recreational activities in the cumulative impact analysis area are expected to increase over the life of the plan amendment, creating additional potential ignition sources and the probability of wildfire occurrence. Of these two factors, urbanization, especially the expansion of residential areas, is expected to be the larger contributor on cumulative wildland fire impacts. Additional wildland-urban interface would increase the need for hazardous fuels projects to reduce the risk of wildfires burning from BLM-administered land into residential areas. Increased wildland-urban interface can also increase costs associated with suppression and is more dangerous to firefighters and the public. Additional fire suppression resources could be needed, including federal, state, and local agency resources.

Changing land use patterns and increased recreation and visitation would also result in the modification of vegetation communities; both trends present new vectors for the introduction of noxious weeds and nonnative vegetation species lacking adequate vegetative cover. These introduced species could eventually alter the fire regime of certain areas and potentially increase the frequency, size, and intensity of wildfires.

Prioritization of fuels treatments and suppression in GUSG Habitat could cumulatively affect areas inside and outside of the cumulative impacts analysis area by placing a lower priority on non-GUSG habitat areas. This prioritization could cause more fires in areas outside of Occupied Habitat and Unoccupied Habitat due to fewer fuels treatments and suppression efforts.

Cumulative impacts on wildland fire ecology and management are expected to be the greatest under Alternative B, because the BLM would place the most restrictions on fire management in the most areas. Management under Alternative A would result in the fewest cumulative impacts on fire management because it would place the fewest restrictions on that program in the fewest areas. Under Alternative C and sub-alternatives $D_1$ and $D_2$, the BLM would place more restrictions on fire management across a larger area than Alternative A, but fewer than under Alternative B.

BLM_0027990

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.9. LIVESTOCK GRAZING

## 4.9.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Active permitted forage (expressed as Animal Unit Months or AUMs)
- Acres within active livestock grazing allotments
- Acres of BLM lands achieving Land Health Ecological Fundamental, and acres not achieving this fundamental  with livestock grazing a significant factor
- Acres of area where there are prohibitions on or limitations to the construction or maintenance of structural and nonstructural range improvements.

### ASSUMPTIONS

The BLM will continue to bring grazing allotments and their management into compliance with BLM Colorado and Utah Public Land Health Standards.

Many range improvements (e.g., water wells, troughs, catchments, and reservoirs) result in a localized loss of vegetation cover due to livestock concentrating around them.

Range improvements generally lead to improved livestock distribution and vegetation management, which in turn could support long-term vegetation objectives without changes to permitted AUMs or season of use.  Loss of the ability to develop, maintain, and use range improvements would result in loss of livestock distribution capabilities, which could decrease the ability to manage the rangelands

Implementation of particular livestock grazing management actions may affect permittees by increasing their operational cost through more intensive livestock management, season-of-use changes, class of livestock changes, modified grazing systems, or decreased AUMs.

All classes of livestock depend on the herbaceous component of a shrub/grass plant community.  Some livestock also utilize shrubs, which can be an important forage component during some seasons.

Increases in shrubs or pinyon and juniper are generally adverse to forage production; increases in perennial grasses and forbs are generally beneficial to forage production.

BLM_0027991

Vegetation treatments, such as prescribed burns or weed control, can enhance the plant community composition and forage availability.

Overutilization can adversely affect plant composition and ground cover.

Water can improve livestock distribution, and areas without available water will have less use than areas with water.  Areas very close to water will often have over use.

Fences are an important tool used to control areas, timing, and intensity of livestock use, and are generally needed to confine grazing to within allotments, particularly where cattle and horses are grazed.

Rates of suburban and rural development will continue, reducing private ranchland and BLM grazing allotments in some cases.

## METHODS AND DATA

### Permitted Forage

Active permitted Animal Unit Months (AUMs) are estimated for BLM surface in Occupied and Unoccupied Habitat.  These estimates are based on the BLM's Range Administration Database and an updated GIS layer of allotment boundaries, supplemented with information from the range staff of BLM field offices in the planning area.

This analysis compares permitted AUM availability between the different alternatives because of its importance to livestock grazers.  Management actions closing areas to grazing would directly eliminate AUMs.  Actions reducing AUMs or constraining their availability through permit terms and conditions would directly reduce permitted AUMs.

Other management actions also influence forage availability, but with indirect impacts to permitted AUMs.  Alternatives encouraging vegetation treatments or providing for the use of wildfire in shrub or tree-dominated vegetation, including follow-up grazing management, are projected to improve range condition and increase forage production and available AUMs (DeBano 1989).  Alternatives preventing treatments or suppressing wildfire will be considered to reduce forage availability.  Because range improvements can improve livestock distribution and result in better forage utilization, alternatives which prohibit or limit their construction will be considered to indirectly reduce AUMs over both the short and long term.

Designation or development of BLM surface for other land uses could reduce forage availability and permitted AUMs.  Management actions designating Special Recreation

BLM_0027992

Management Areas or allowing for surface occupancy for mineral development are projected to reduce permitted AUMs.

## Acres within Active Livestock Grazing Allotments

The alternatives are also analyzed for impacts to the total area permitted for livestock grazing. Management actions with impacts to this indicator are limited to those which close allotments, remove entire allotments or remove portions of allotments from grazing use.

## Land Health Ecological Fundamental Status

The Land Health Ecological Fundamental is used here as an indicator of native range condition. Lands not achieving the Ecological Fundamental are considered to be in poor native range condition. This indicator is less effective for indicating condition on ranges with nonnative seedings, but these make up less than 12% of the decision area.

This analysis also considers areas that are not achieving the Ecological Fundamental with livestock grazing a significant factor. BLM requires that grazing management be adjusted within a year to improve conditions on lands in this category. To this end, the BLM has developed livestock grazing guidelines that are consistent with achieving the Land Health Fundamentals (BLM 2008, 2011e). These include generalized guidelines for appropriate utilization levels, rest, recovery, and completion of lifecycle stages for palatable plants. While current management is subject to this requirement, not all grazing permits and allotment management plans have incorporated these guidelines yet. Therefore, in this analysis, current management is projected to maintain poor range condition where livestock grazing is a significant factor over the short term, and improve it over the long term. Alternatives that incorporate the livestock grazing guidelines or similar range management guidance into grazing permits and grazing management plans will be considered consistent with improving range condition where livestock grazing is a significant factor. This would apply over both the short and long term. Alternatives that remove or close lands in this category to grazing are projected to have the same effect on range condition.

Livestock operators who graze on BLM typically have private land pastures or hayfields as well. In many cases, these private lands also provide GUSG habitat. Over the course of a year, they must balance their livestock forage needs across these different sources. If forage from one source is reduced, other sources must make up the difference in order to maintain their herd. This could be done through increasing stocking rates on non-BLM pastures, which could reduce range condition in these pastures in some cases (Holechek 1989). Based on this, alternatives which reduce or eliminate permitted AUMs from BLM land will be interpreted as

BLM_0027993

potentially indirectly reducing range condition on non-BLM pastures. Alternatives which do not reduce AUMs will be considered neutral to non-BLM pasture condition.

## Constraints on Range Improvements

This analysis is based on acres of area where there are land use plan-level prohibitions on or limitations to the construction or maintenance of structural range improvements. The indicator is used to address cost and complexity of range management. This information is based on the existing land use plans supplemented by a survey of BLM field offices range staff.

Uneven livestock distribution—which is a major challenge in the mountain and desert west—can reduce range condition in some areas, and fail to utilize forage in other areas of an allotment. Well-distributed water sources and fences are important tools to achieve more uniform livestock distribution (Holechek 1989). Therefore, limitations on construction of fences, water sources, and other structural range improvements can increase the cost and complexity of achieving full use of the allotment and its permitted AUMs. Alternatives which prohibit or limit construction of range improvements will be considered to reduce livestock management options more than alternatives which place lesser constraints on their construction. Furthermore, because infrastructure and its maintenance can be costly, alternatives which require redesign, increased maintenance or upgrading of range improvements will be considered to increase the cost and complexity of range management more than alternatives that do not include such constraints.

## Grazing Systems

This indicator is also used to evaluate impacts to the cost and complexity of range management, and is based on the acreage of different types of grazing systems on BLM lands. This information has been provided by BLM field offices range staff.

Grazing systems are used to improve livestock distribution and the condition of important forage species (Holechek 1989). As discussed in Chapter 3 and in the Range Improvements section above, higher management systems are likely to be more costly and complex to administer than lower management systems. As a result, alternatives which require implementation of higher management grazing systems will be considered to make range management more costly and complex than alternatives that do not have similar requirements.

BLM_0027994

## 4.9.2.   IMPACTS COMMON TO ALL ALTERNATIVES

### Permitted Forage

Wildlife would continue to graze and browse, reducing the available AUMs across the BLM surface in Occupied and Unoccupied Habitat. Fires, drought, insect outbreaks and similar natural phenomena would also affect the availability of AUMs. Natural vegetation succession would move the vegetation in many areas toward dominance by woody species and reduced forage production. This would reduce AUMs, particularly over the long term.

### Land Health Ecological Fundamental Status

Wildlife impacts, fires, drought, insect outbreaks and similar natural phenomena would affect land health indicators and could impact the Ecological Fundamental Status.

## 4.9.3.   IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

#### Permitted Forage

Permitted forage currently exceeds 36,000 AUMs across the BLM surface in Occupied and Unoccupied Habitat and is expected to continue near these levels over the short term.  Over the long term, permitted AUMs are likely to decline as management units reduce stocking rates on some allotments to bring them into compliance with Land Health Standards, both on Occupied and Unoccupied Habitat and in the Non-Habitat Areas.

This alternative would place few restrictions on vegetation treatments.  The following RMPs encourage vegetation treatments in order to meet habitat objectives: Canyons of the Ancients NM, Dominguez-Escalante NCA, Grand Junction, Gunnison Gorge NCA, Gunnison, McInnis Canyons NCA, Monticello, Moab, San Luis, and Tres Rios.  None of the land use plans explicitly prevent vegetation treatments.  Treated areas are anticipated to continue to accumulate at current rates approximating 1-3% of the BLM surface in Occupied and Unoccupied Habitat per decade and at a slower rate in Non-Habitat Areas over the short and long term.  Forage availability is projected to increase across these areas as a result.

About 12% of BLM surface in Occupied Habitat and 34% in Unoccupied Habitat is currently under some type of planning-level constraint that prevents or complicates development of range infrastructure.  This acreage is expected to remain unchanged under Alternative A.  The remainder of BLM surface in Occupied and Unoccupied

BLM_0027995

Habitat currently has fewer restrictions. In these areas, it would be easier to achieve improved livestock distribution and more uniform forage utilization, and therefore indirectly increase forage availability.

Special recreation management areas are expected to increase in number as land use plans are issued or revised. Available forage in these areas is projected to decrease as a result of conflicts between livestock and recreation. Surface protection stipulations currently prevent large-scale development of energy projects across 61% of BLM surface in Occupied and Unoccupied Habitat. If substantial mineral or energy project development were to occur on the remaining 39% open to surface development, then forage availability would be reduced. The amount of land protected from surface disturbance is expected to increase with new and revised land use plans for BLM surface in Occupied and Unoccupied Habitat and the Non-Habitat Areas.

## Acres within Active Livestock Grazing Allotments

Nearly 580,000 acres of BLM surface in Occupied and Unoccupied Habitat and 67,000 acres within the Non-Habitat Areas fall within active livestock grazing allotments. This acreage is expected to decline over the short term as new and revised RMPs eliminate some allotments. Similar long-term declines are anticipated as continued population growth and development cause additional allotments to become impractical to graze.

## Land Health Ecological Fundamental Status

As previously discussed in the vegetation section, Alternative A constrains surface disturbance on 61% of BLM surface in Occupied and Unoccupied Habitat and 42% within the Non-Habitat Areas, with no anticipated impacts to the current Ecological Fundamental status in these areas. On the remaining 41% of unprotected surface and 60% of the Non-Habitat Areas, existing status is expected to be maintained over the short term. But over the long term, lands not achieving the Ecological Fundamental are projected to increase within the unconstrained area.

Livestock grazing is anticipated to continue on over 90% of BLM surface in Occupied and Unoccupied Habitat and within 56% of the Non-Habitat Areas. It is not expected to influence existing Land Health status for the short term. Over the long term, ratings are expected to improve on acreages currently not achieving the Ecological Fundamental where livestock grazing is a significant factor, and in some areas where significant factors have not been identified yet. Conditions are expected to improve on between 37,000 and 258,000 acres on BLM surface in Occupied and Unoccupied Habitat and between 13,000 and 23,000 acres within the Non-Habitat Areas.

BLM_0027996

Current conditions on non-BLM pastures would be expected to continue over the short term. Over the long term, conditions could decline if ranchers were to increase stocking rates to adjust for stocking rate reductions on BLM lands. Such reductions are projected to occur in some allotments not achieving the Ecological Fundamental with livestock grazing a significant factor.

### Constraints on Range Improvements

About 12% of BLM surface in Occupied Habitat and 34% of Unoccupied Habitat is currently under some type of planning-level constraint which prevents or complicates development of range infrastructure, increasing the cost and complexity of range management. This acreage would be expected to remain unchanged under Alternative A. The remaining BLM surface in Occupied and Unoccupied Habitat currently has fewer restrictions.

Maintenance of existing range developments is subject to general timing constraints to protect wildlife or soils in most land use plans. The extent and scope of these constraints would be expected to increase over the short term as new land use plans and RMP revisions are issued. These constraints would add to the cost and complexity of range management for BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas.

### Grazing Systems

Grazing systems would be expected to continue approximately as they are currently—with the majority of allotments and acreage on BLM surface in Occupied and Unoccupied Habitat in some type of higher level management system. This higher level of management is associated with greater cost and complexity than lower levels of management. The cost and complexity would be amplified as range project maintenance is increasingly constrained.

## ALTERNATIVE B

### Permitted Forage

Under Alternative B, all BLM surface in GUSG habitat would be closed to livestock grazing. In contrast to Alternative A, there would be no permitted AUMs over the short or long term as a result. Indirect impacts to forage availability from vegetation treatments, development of range infrastructure, and conflicts with recreation or mineral development would be irrelevant for livestock grazing. Forage reductions from surface-disturbing activities in the Non-Habitat Areas would be less than under Alternative A.

BLM_0027997

### Acres within Active Livestock Grazing Allotments

With the closure of BLM surface in Occupied and Unoccupied Habitat to livestock grazing, there would no longer be any active allotments, as compared with Alternative A. Impacts to allotted acreage in Non-Habitat Areas would be similar to Alternative A.

### Land Health Ecological Fundamental Status

With the elimination of livestock grazing, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor would improve over the short and long term. This acreage would be expected to be between 37,000 and 258,000 acres. Alternative B would achieve the same results more quickly than Alternative A.

Range conditions on non-BLM pastures would be expected to decline over the short and long term as a result of ranchers either increasing stocking rates to adjust for loss of grazing on BLM lands, or converting private lands to more impactful land uses that result in reduced range conditions.

Impacts to land health in Non-Habitat Areas would be similar to those under Alternative A.

### Constraints on Range Improvements

Under Alternative B, range improvements would not be needed or allowed in Occupied and Unoccupied Habitat. Within the Non-Habitat Areas, requirements for water developments to comply with West Nile virus minimization measures would add additional costs and complexity to livestock management on BLM lands compared with Alternative A.

### Grazing Systems

With closure to livestock, systems for managing grazing would no longer be needed on BLM lands in Occupied and Unoccupied Habitat. Within the Non-Habitat Areas, impacts to grazing systems would be similar to those under Alternative A.

## ALTERNATIVE C

### Permitted Forage

Alternative C would maintain livestock grazing across much of BLM surface in Occupied and Unoccupied Habitat, but could reduce AUMs in allotments not meeting RCP guidelines or where livestock disrupt GUSG. In addition, the alternative includes an objective that would prioritize expedient action to improve these areas, requiring a short-term reduction of AUMs in contrast to Alternative A. The objective specifies the inclusion of RCP habitat indicators into grazing

BLM_0027998

management adjustments that would likely result in more of a reduction over the long term than Alternative A. Under Alternative C, grazing permits would be subject to consistent, specific evaluation for GUSG habitat indicators, which is not the case under Alternative A. Forage reductions would be less than under Alternative B.

Vegetation treatments would be emphasized under Alternative C. While not possible to predict the amount of increase over current levels, over 3% of BLM surface in Occupied and Unoccupied Habitat per decade would have more available forage, an increase over forage levels under alternatives A or B.

Alternative C would place constraints on development of new range infrastructure in Occupied and Unoccupied Habitat. New developments would be required to conserve, enhance, or restore Occupied Habitat, and would not be allowed to degrade Unoccupied Habitat. Available forage could increase where such developments are constructed. Because of the constraints, fewer developments and a greater increase in forage availability would be expected in comparison to Alternative A.

Under this alternative, special recreation management areas not in conflict with GUSG would be allowed within Occupied Habitat and would be allowed without restriction within Unoccupied Habitat. Forage availability could be reduced as a result of recreation and livestock conflicts, though the reduction would be less than under Alternative A.

Because of proposed ROW avoidance and mineral leasing NSO stipulations, Alternative C would place a portion of BLM surface in Occupied and Unoccupied Habitat under surface disturbance restrictions, more than under Alternative A, but less than under Alternative B. This alternative would prevent loss of forage to large-scale mining or energy development across more area than Alternative A over both the short and long term.

Within the Non-Habitat Areas, impacts to permitted forage would be similar to those under Alternative A.

## Acres within Active Livestock Grazing Allotments

Because Alternative C allows for the potential closure of voluntarily relinquished allotments, the acreage of allotments is projected to be less than under Alternative A, but greater than under Alternative B. Within Non-Habitat Areas, the impacts to allotted acreage would be similar to Alternative A.

## Land Health Ecological Fundamental Status

Because of proposed ROW avoidance and mineral leasing NSO stipulations, Alternative C would constrain surface-disturbing activities on a portion of BLM

BLM_0027999

surface in Occupied and Unoccupied Habitat to a greater extent than Alternative A, but less than Alternative B. Similar to alternatives A and B, conditions over the short term would probably not change as a result of surface disturbance. However, over the long term, conditions under Alternative C would be subject to decline from accumulating surface disturbance across portions of BLM surface in Occupied and Unoccupied Habitat.

Alternative C maintains livestock grazing across BLM surface in Occupied and Unoccupied Habitat using appropriate grazing practices to meet GUSG RCP habitat requirements. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to Alternative B. This acreage is expected to be between 37,000 and 258,000 acres. The improvement in Land Health status would occur more rapidly than under Alternative A, and would be sustained into the future.

Under Alternative C, conditions on non-BLM pastures could decline over the short and long term if ranchers were to increase stocking rates on private pastures to adjust for stocking rate reductions on BLM lands. Such reductions could occur in BLM allotments not achieving the Ecological Fundamental with livestock grazing as a significant factor. The decline would be greater than under Alternative A, but less than under Alternative B.

Within Non-Habitat Areas, impacts to range conditions and land health would be similar to those under Alternative A.

### Constraints on Range Improvements

Alternative C would place constraints on the development of new range infrastructure in Occupied and Unoccupied Habitat. New developments would be required to conserve, enhance, or restore Occupied Habitat, and would not be allowed to degrade Unoccupied Habitat, increasing the cost and complexity of range management. Furthermore, Alternative C includes maintenance requirements that would add additional cost over both the short and long term. These constraints are greater than under Alternative A, but less than under Alternative B (which prevents grazing altogether). Within Non-Habitat Areas, constraints on range project development and maintenance would be similar to those under Alternative A.

### Grazing Systems

Alternative C requires managing allotments through livestock distribution, stocking rates, and seasonal use considerations when RCP habitat guidelines are not being met or when livestock disrupt GUSG. This would likely require switching to higher management level grazing systems in some instances. Such a switch would represent an increase over Alternative A. Because range project development and maintenance is more heavily constrained under Alternative C, the overall cost and

BLM_0028000

complexity of implementing  higher management level grazing systems would exceed alternatives A and B.  Within Non-Habitat Areas, grazing systems would be managed similar to Alternative A, with the same level of associated cost and complexity.

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

### Permitted Forage

Sub-Alternative $D_1$ is similar to Alternative C in that it maintains livestock grazing across much of the Gunnison Basin population area, and could reduce AUMs in allotments which do not meet RCP guidelines.  While slightly less strict than Alternative C in terms of timing and approach, the short and long term outcomes to permitted AUMs would be similar.

Sub-Alternative $D_1$ proposes the same vegetation treatment approach as Alternative C, with the same outcome to forage availability.  This alternative places constraints on development of new range infrastructure across the BLM surface in the Gunnison Basin population area, but to a lesser degree than Alternative C, with associated increases in available forage

Special Recreation Management Areas have been identified for future development under this alternative, which is more than would likely occur under Alternative C. These SRMAs could reduce forage availability as a result of recreation and livestock conflicts.  This reduction in available forage would be less than under Alternative A, but more than Alternative C.

Sub-Alternative $D_1$ places restrictions on some types of surface-disturbing activities, but allows others to occur with mitigation to protect GUSG and their habitat.  A portion of the BLM surface within the Gunnison Basin Population is covered by these partial restrictions.  This portion would be greater than in Alternative A, but less than Alternatives B and C.  As a result, this alternative would prevent loss of forage to large scale mining or energy development across more area than Alternative A, but less than Alternative C.

Within Non-Habitat Areas, impacts to permitted forage would be similar to Alternative A.

### Acres within Active Livestock Grazing Allotments

Sub-Alternative $D_1$ is similar to Alternative C and would have the same impacts to acreage of active grazing allotments.  Within Non-Habitat Areas, impacts to allotted acreage would be similar to Alternative A.

BLM_0028001

## Land Health Ecological Fundamental Status

Sub-Alternative $D_1$ constrains surface disturbing activities on a portion of the Gunnison Basin Population, an increase in comparison to Alternative A, but a decrease compared with alternatives B and C. Over the short term, land health and conditions would probably not change as a result of surface disturbance, similar to alternatives A, B, and C. However, over the long term, conditions under Sub-Alternative $D_1$ would be subject to decline from accumulating surface disturbance across a portion of the Gunnison Basin population area.

Sub-Alternative $D_1$ maintains livestock grazing across the Gunnison Basin population area using a strategy designed to achieve RCP guidelines. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to alternatives B and C. Because causal determinations for land health status have not yet been documented within the Gunnison Basin, this acreage could be anywhere between 0 and 211,000 acres. Similar to alternatives B and C, this improvement in Land Health status would occur more rapidly than under Alternative A and would be sustained into the future.

Conditions on non-BLM pastures would be expected to be similar to those under Alternative C, since both alternatives could reduce stocking rates in some allotments on BLM lands.

Within the Non-Habitat Areas, impacts to range condition and land health would be similar to those under Alternative A.

## Constraints on Range Improvements

Sub-Alternative $D_1$ places constraints on development of new range infrastructure across the BLM land in the Gunnison Basin population area, but to a lesser degree than Alternative C. While the cost and complexity of range management is expected to be greater than under Alternative A, it would not rise as much as under Alternative C. Within the Non-Habitat Areas, constraints on range project development and maintenance would be similar to Alternative A.

## Grazing Systems

This alternative requires similar grazing management measures as Alternative C, but to a lesser extent. As a result, fewer allotments would require switching to higher management level grazing systems. While this switch represents an increase in range management cost and complexity over Alternative A, it is less than Alternative C. Similarly, this alternative contains constraints on range project development and maintenance that are more restrictive than Alternative A, but less than Alternative C. While this would further increase the cost and complexity of implementing higher management level grazing systems in comparison to Alternative A, the

BLM_0028002

increases would be less than under Alternative C. Within Non-Habitat Areas, grazing systems would be managed similar to Alternative A, with the same level of associated cost and complexity.

# SUB-ALTERNATIVE D$_2$ - SATELLITE PREFERRED

## Permitted Forage

Sub-Alternative D$_2$ is similar to Alternative C and would result in the same level of AUM reduction as Alternative C. This alternative proposes the same vegetation treatment approach as Alternative C, with the same outcome to forage availability. Sub-Alternative D$_2$ places the same constraints on development of new range as Alternative C, with associated increases in available forage. Alternative C also contains the same SRMA and surface disturbance restrictions, with the same outcomes for forage availability.

Within the Non-Habitat Areas, impacts to permitted forage would be similar to Alternative A.

## Acres within Active Livestock Grazing Allotments

This alternative is identical to Alternative C and would have the same impacts to acreage of active grazing allotments. Within the Non-Habitat Areas, impacts to allotted acreage would be similar to Alternative A.

## Land Health Ecological Fundamental Status

Sub-Alternative D$_2$ shares the same constraints as Alternative C across the satellite populations. Over the short term, land health conditions across this area would probably not change as a result of surface disturbance, similar to alternatives A, B and C. Over the long term, conditions under Sub-Alternative D$_2$ would be subject to decline from accumulating surface disturbance across a portion of the satellite populations.

Sub-Alternative D$_2$ maintains livestock grazing across the satellite populations area using a strategy designed to achieve RCP guidelines. Similar results for the land health Ecological Fundamental are expected for this area as described under Alternative C. Because causal determinations for land health status have not yet been documented within some of the satellite population areas, this acreage could be anywhere between 37,000 and 46,000 acres. Similar to alternatives B and C, the improvement in Land Health status would occur more rapidly than under Alternative A and would also be sustained into the future.

Conditions on non-BLM pastures are expected to be the same as under Alternative C.

BLM_0028003

Within the Non-Habitat Areas, impacts to range condition and land health would be similar to Alternative A.

### Constraints on Range Improvements

Sub-Alternative $D_2$ places the same constraints on development of new range infrastructure and on range project maintenance as Alternative C with the same impacts to the cost and complexity of range management. Within the Non-Habitat Areas, constraints on range project development and maintenance would be similar to Alternative A.

### Grazing Systems

Sub-Alternative $D_2$ requires the same grazing management, range development and maintenance measures as Alternative C, and would have the same impacts to grazing systems and the cost and complexity of range management. Within the Non-Habitat Areas, grazing systems would be managed similar to Alternative A, with the same level of associated cost and complexity.

## 4.9.4.   CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect range management are wildfires, surface-disturbing activities, the presence and abundance of grazing wildlife, increased recreational demands, and protections for sensitive resources.

Past actions that have affected livestock grazing include human-caused surface disturbances (mineral development, recreation, prescribed burning, mechanical vegetation treatments, WSAs and historic grazing practices) and wildland fires that have contributed to current ecological conditions.

Cumulative projects that increase human disturbance in grazing areas could also indirectly impact grazing by increasing weeds and invasive species. Weed invasion can reduce preferred livestock and wildlife forage and increase the chance of weeds being dispersed by roaming livestock. Cumulative projects that increase human disturbance in grazing areas could directly impact grazing by displacing, injuring, or killing animals.

Present actions affecting livestock grazing are mainly those that reduce available grazing acreage, restrict management actions or the level of forage production in those areas. Key examples include wildland fires, motorized vehicle use, recreation, habitat restoration, fuels reduction, and special designations that restrict grazing. Future actions affecting livestock grazing would be similar to present actions, except

BLM_0028004

under Alternative B, under which the BLM would close BLM surface across the BLM surface in Occupied and Unoccupied Habitat to livestock grazing.

The cumulative impacts under each alternative would parallel the impacts of the alternatives in the general impact analysis, above.  In general, management actions in every alternative would result in short- and/or long-term changes in availability of forage due to treatment activities, other surface-disturbing and disruptive activities, human disturbance, special designations, and the presence of grazing wildlife, threatened, or endangered species.  Although forage would increase over the long term under Alternative B if grazing were removed, Alternative B would also have the greatest impact on livestock grazing. Under alternatives A and C and sub-alternatives $D_1$ and $D_2$, forage would be utilized annually at various levels relative to the protections provided in the four alternatives.  Management under Alternative A would contribute the most cumulative effects to range management by allowing the most surface disturbance, which would cumulatively decrease forage availability.

BLM_0028005

# 4.10. RECREATION

## 4.10.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

Indicators of impacts to recreation are as follows:

- Changes in the number of acres where recreationists are unable to achieve targeted beneficial outcomes (specific to SRMAs), and for the BLM to achieve and maintain supporting setting characteristics (specific to SRMAs and some ERMAs).
- Changes in the number of acres where unstructured recreational opportunities and experiences are reduced or eliminated.
- Changes to the number or types of SRPs allowed in GUSG habitat.

### ASSUMPTIONS

The analysis uses the following assumptions:

- Recreation would be managed to achieve the objectives of individual Field Offices.
- Recreation objectives would vary based on the age of a Field Office's Land Use Plan.
- Traditional recreation uses within the decision area would continue, and are anticipated to increase as local populations grow.
- Improved facilities, especially recreation trails, are expected to result in increased use.
- Outside of areas where recreation is the management focus, BLM will mostly manage for dispersed recreation activities, where users participate in activities individually or in small groups.
- Conflicts between motorized users and non-motorized recreationists would increase with increasing use, especially in areas that area open to both.
- Outdoor recreation will continue to be an increasingly important component of local economies.
- Demand for recreation permits will remain steady or gradually increase, but will continue to be issued on a discretionary basis.
- Management actions to preserve GUSG habitat would affect a variety of resources and uses, which would improve some recreation opportunities and

    **BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

BLM_0028006

experiences, and potentially degrade other recreation opportunities and experiences.

Impacts on recreation can be direct, indirect, or cumulative.  Management actions that alter or prohibit a user's opportunities to access recreation areas or participate in recreation activities would result in a direct impact.  Indirect impacts are those that change the physical, social, or administrative settings within which recreation activities take place.  In areas where management prescriptions are in place to achieve or maintain desired settings, a change to the setting or availability of recreation opportunities would result in an impact.

Physical, social, and administrative settings are not specifically managed for in areas not identified as recreation management areas, although these areas do still provide intrinsic recreation values and opportunities. The indicator typically used to describe the impact on these areas is the availability of opportunities as described by either acreage restrictions or specific activity prohibitions.

For areas managed as Special Recreation Management Areas (SRMAs), both availability of recreation opportunities (activities and desired outcomes) and changes to physical, social, and administrative settings are used as indicators of impacts.  This discussion analyzes the impacts that proposed management decisions would have on managing recreation settings and the targeted outcomes. For areas managed as Extensive Recreation Management Areas (ERMAs), both availability of activity opportunities and changes to the qualities and conditions (settings) are used as indicators of impacts.  This discussion also analyzes the impacts that proposed management decisions would have on managing recreation and the prescribed setting character.  Since visitor use patterns are difficult to estimate and depend on many factors beyond the scope of management (e.g., recreation trends and economy), qualitative language (such as "increase" or "decrease") is generally used unless quantitative visitor use data is available to describe anticipated impacts.

## METHODS AND DATA

Literature reviews were conducted relative to individual resource areas, to include studies from a variety of sources and a review of relevant BLM laws, regulations, and policies.  Interviews with local field office subject matter experts were also conducted relative to land status, recreation management area classification, permitted uses, etc. for both Occupied Habitat and Unoccupied Habitat.  Finally, geospatial data from the BLM and other authorities was used to help analyze conditions and land use allocations within the decision area, including the presence of SRMAs, ERMAs, and non-RMAs.

## 4.10.2.  IMPACTS COMMON TO ALL ALTERNATIVES

**Number of acres where recreationists are unable to achieve targeted beneficial outcomes (specific to SRMAs), and for BLM to achieve and maintain supporting setting characteristics (specific to SRMAs and some ERMAs)**

All alternatives involve controlling major ground disturbances and disruption to GUSG and their habitat.  For RMAs in GUSG habitat, this could result in a loss of recreational opportunities for people desiring more robust infrastructure and management to achieve their recreational pursuits.  However, RMAs (or their Recreation Management Zones (RMZs)) that have objectives related to 'solitude' or 'backcountry' that are essentially undeveloped, would continue to be compatible with GUSG conservation measures.

**Number of acres where unstructured recreational opportunities and experiences are reduced or eliminated**

Recreation would continue to occur in the unstructured (or dispersed) environment.  All alternatives involve controlling human disruption, new ground disturbances, and reclamation of existing ground disturbance for the benefit of GUSG and their habitat.  Timing limitations, seasonal closures, and other management actions implemented to protect GUSG and their habitat are not expected to result in significant impacts to recreational opportunities in the unstructured environment.

**Number or Types of SRPs Allowed in GUSG Habitat**

Recreation permits, where allowed, are administered in a manner that is consistent with management objectives determined in RMPs, Recreation Area Management Plans, or in their absence, through recreation management objectives resulting from analysis of resources and visitor use in each area.  SRPs will continue to be issued only at the discretion of local offices and will remain subject to the terms, conditions, and stipulations of the permit, which can be changed at any time to meet resource objectives.  SRPs under all alternatives would be managed to reduce or eliminate conflicts from SRP activities to GUSG or their habitat.

This could potentially result in a long-term shift in the way that SRPs are managed in the decision area.  SRPs most likely to be affected are those that depend on a primitive or backcountry setting, such as for hunting, outdoor education, equestrian-related activities, wilderness therapy, organized motor vehicle events, etc.  It also includes other activities that occur during spring and summer, when they would need to avoid GUSG lekking, nesting and brood-rearing periods.  Fall Big Game Hunting outfitters may be less affected because there are fewer sensitive concerns

for GUSG during the fall hunting season than for other types of hunting seasons, such as Mountain Lion, Turkey, and Small Game.

## 4.10.3. IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

#### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Alternative A would have the least impact to structured, outcomes-focused recreation management related to RMAs within the decision area. Under Alternative A, the BLM would continue to manage recreation uses in RMAs as identified in the existing RMPs. The BLM would not be restricted in establishing new RMAs under appropriate conditions, and current recreational opportunities in the decision area would continue. There would be no new impacts on recreation under Alternative A.

#### Number of Acres with Unstructured Recreational Opportunities and Experiences

Alternative A would have the least impact to unstructured recreational opportunities and experiences, with no change in current management. Under Alternative A, the BLM would continue to manage recreation uses as identified in the existing RMPs. Current recreational opportunities in the decision area would continue over the long term, and there would be no new impacts on recreation under Alternative A.

#### Number or Type of SRPs Allowed within GUSG Habitat

Alternative A would have the least impact to recreation and visitor services related to SRPs, with no change in current management. Under Alternative A, the BLM would continue to manage recreation uses as identified in the existing RMPs. The BLM would continue to review and approve recreation permits on a case-by-case basis. Current recreational opportunities in the decision area would continue, and there would be no new impacts on recreation under Alternative A.

### ALTERNATIVE B

#### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Alternative B, the most restrictive alternative, would have the greatest impact to structured recreation and visitor services. Under Alternative B, the BLM would not

BLM_0028009

allow new Recreation Management Areas (RMAs) in either Occupied Habitat or Unoccupied Habitat, but would allow recreation uses and activities to occur in both Occupied Habitat and Unoccupied Habitat that do not conflict with the protection and recovery of GUSG and GUSG habitat.

In addition to denying future RMAs, Alternative B would result in a loss of new opportunities for structured, outcomes-focused recreation management (and the benefits associated with targeted recreation opportunities, settings and experiences), and would potentially degrade beneficial outcomes in existing RMAs currently located within GUSG habitat if restrictions were applied to recreation for the benefit of GUSG recovery.  There are 66,010 acres of SRMAs in the decision area that could potentially be eliminated under Alternative B, if they were determined to be in conflict with GUSG conservation.

## Number of Acres with Unstructured Recreational Opportunities and Experiences

BLM management under Alternative B would contain the most restrictions on unstructured recreational activities, such as for timing and season of use, ground disturbance limitations, and requires the most reclamation of existing disturbance. Alternative B would not allow for new recreation site development and could potentially require the removal of existing recreation sites and infrastructure, if it was determined to negatively impact GUSG and their habitat.  There are currently 14 recreation sites in GUSG habitat from trailheads to campgrounds and other recreation sites.  Under Alternative B, BLM would seasonally prohibit motorized and non-motorized recreation from March 15 to May 15 in Occupied Habitat, or in Non-Habitat.  This would result in temporary reductions in recreational opportunities and would decrease the area available for recreational opportunities such as camping, mountain biking, hiking, and antler shed hunting.  Big Game hunting would largely be unaffected because the restrictions (especially seasonal and timing) would not overlap with big game hunting seasons, however some hunting seasons that do overlap with seasonal closures under Alternative B, such as for Mountain Lion and Wild Turkey, would be impacted in some locations.  Specific to GUSG, lek viewing sites would not be established and lek viewing would not be promoted.

In addition to restrictions for recreation resources, Alternative B contains the greatest restrictions on all other resource uses as well, such as lands and realty actions, energy development, livestock grazing, etc.  Restrictions on these other resource uses could have a beneficial impact to unstructured recreation by reducing the potential for conflict with recreational access and degradation of physical setting characteristics.  On the other hand, human entry closures and other area restrictions would deny recreation access and opportunities for part of the year.

BLM_0028010

### Number or Types of SRPs Allowed within GUSG Habitat

Alternative B, would have the greatest and longest-lasting impact to recreation and visitor services related to SRPs, with an emphasis on avoiding new SRPs and eliminating current SRPs in GUSG habitat over time. Under Alternative B, the BLM would not allow new SRPs in either Occupied Habitat or Unoccupied Habitat, and would also deny existing permits from being renewed in both Occupied Habitat and Unoccupied Habitat. In addition to denying future recreational activities and events that are required to be permitted, Alternative B would result in a loss of new opportunities, and also existing opportunities to continue engaging in current permitted activities and events, which would be eliminated in GUSG habitat over time. There are currently 126 SRPs in the decision area, of which 13 are Mountain Lion hunters that could overlap with critical life function periods of GUSG in March, and 9 other permittees in the Gunnison Field Office and 3 other permittees in the Tres Rios Field Office that could potentially overlap critical time periods of GUSG from March to May, based on their permits being year-round (see Table 4.6).

### Non-Habitat

Alternative B also provides management actions for Non-Habitat that would further restrict surface-disturbing activities outside of GUSG habitat, and would affect the types of recreational activities and opportunities available within the Non-Habitat Areas. Impacts to SRPs within the Non-Habitat would be similar to those in Occupied and Unoccupied Habitat, with an emphasis on avoiding or eliminating permitted uses that do not have neutral or beneficial effects to GUSG or their habitat.

## ALTERNATIVE C

### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

BLM management under Alternative C would contain less restriction than Alternative B on structured recreation and visitor services associated with SRMAs and ERMAs, if recreation is compatible with GUSG and their habitat. Recreation in GUSG habitat would not be emphasized if it was determined to be incompatible with GUSG management objectives, and new RMAs would not be designated in either Occupied Habitat or Unoccupied Habitat where a conflict between recreation and GUSG has been identified.

In addition to the possibility of denying future RMAs, Alternative C would result in a loss of new opportunities for structured, outcomes-focused recreation management (and the benefits associated with targeted recreation opportunities, settings and experiences), and would potentially degrade beneficial outcomes in existing RMAs

BLM_0028011

currently located within GUSG habitat if restrictions were applied to benefit GUSG recovery that would change the fundamental character of an RMA.

## Number of Acres with Unstructured Recreational Opportunities and Experiences

BLM management under Alternative C would contain less restriction on unstructured recreational activities than Alternative B, allowing for some development if mitigations can be applied and the development is located in areas outside of habitat that possesses the Primary Constituent Elements of effective GUSG habitat. Seasonal restrictions, such as road closures from March 15 through May 15, would apply if a conflict between recreational activities and GUSG was identified. Spatial restrictions within 0.6 mile of an active lek would also apply to prevent disturbance to GUSG during critical times of the year for them. Restrictions designed to mitigate disturbance to GUSG and their habitat would be predictable and temporary, resulting in minimal impacts to unstructured recreation opportunities throughout the decision area. Specific to GUSG, lek viewing and lek viewing sites would be coordinated with state agencies as needed.

## Number or Types of SRPs Allowed in GUSG Habitat

Impacts on recreation and visitor services under Alternative C would only allow for new or renewed SRPs in Occupied Habitat that could adhere to the criteria for minimizing impacts to GUSG. New or renewed SRPs would only be allowed in Unoccupied Habitat that would have minimal effects on that portion of habitat that currently exhibits, or has the potential to exhibit the Primary Constituent Elements (PCEs) of GUSG habitat. Under Alternative C, for both Occupied Habitat and Unoccupied Habitat, BLM would attempt to transfer currently permitted uses to other areas outside of GUSG habitat, where possible and when and where it would benefit GUSG conservation most. Similar to Alternative B, restrictions on future recreational activities and events that are required to be permitted, under Alternative C would result in a loss of opportunities to continue engaging in current activities and events if they are found to have adverse effects on GUSG habitat.

Implementing conservation measures, establishing seasonal restrictions, and relocating activities subject to SRPs, and other measures designed to reduce seasonal disturbances to GUSG and their habitat, would likely result in limited impacts on recreation because activities would not be prohibited, due in large part to the type and season of current SRPs in the decision area. However, if mitigations aimed at protecting GUSG and their habitat were ineffective, the BLM may implement seasonal closures of roads and areas, which would limit recreation opportunities in a more general way.

BLM_0028012

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Under Sub-Alternative D₁, the Preferred Alternative for Gunnison Basin Occupied Habitat, management actions related to GUSG habitat would default to the interagency Candidate Conservation Agreement (CCA) to protect and enhance the recovery of the GUSG in its core range and habitat. Numerous considerations related to the goal of protecting and enhancing GUSG and their habitat have already been extensively analyzed for the Gunnison Basin, including the protocol for managing existing RMAs or establishing new RMAs.

In Occupied Habitat in the Gunnison Basin, three Urban Interface Recreation Areas have been identified in the CCA, Appendix B (Hartman Rocks, Signal Peak, and Van Tuyl Ranch). The intent of that section is to outline the preferred locations for current, concentrated recreation at the urban interface, and to outline long-term planning for recreation expansion to balance the needs of a growing population and the need to maintain GUSG habitat. A guiding strategy of the CCA Recreation Team has been to balance GUSG and recreation via the concentration of use in preferred areas.

The three areas are generally in close proximity to the City of Gunnison and, especially in the case of Hartman Rocks, capture the vast majority of recreationists in GUSG habitat in the Basin. Although GUSG conservation measures will still be observed in each of these areas, such as seasonal closures to minimize disturbance to leks, the off-site mitigation standards outlined in sections 4.3, 4.4, 5.2, and 5.3 of the CCA would not be required in these areas to compensate for new route and facility development. For efficiency, route reclamation efforts would be best-suited to areas at a greater distance from the urban interface. For each of the areas, a minimum set of GUSG conservation measures is outlined.

### Number of Acres with Unstructured Recreational Opportunities and Experiences

Under Sub-Alternative D₁, management actions related to Occupied Habitat would default to the CCA regarding the conditions under which small-scale recreational infrastructure may be developed, and whether or not lek-viewing sites may need to be established through coordination with state agencies, and other factors. (See Chapter 2, Recreation, Alternative D, for specifics pertaining to the CCA.) Similar to aspects of alternatives A through C, in the Gunnison Basin, current recreational opportunities in the decision area would continue, and there would be no new or significant impacts on recreation under Sub-Alternative D₁.

BLM_0028013

### Number or Types of SRPs Allowed within GUSG Habitat

Under Sub-Alternative D$_1$, management actions related to GUSG Occupied Habitat would default to the CCA's protocol for issuing, denying, or modifying SRPs for the benefit of the GUSG (reflected in Chapter 2, Recreation, Alternative D). Similar to Alternative A, in the Gunnison Basin, current recreational opportunities in the decision area would continue, and there would be no new or significant impacts on recreation under Sub-Alternative D$_1$.

## SUB-ALTERNATIVE D$_2$ - SATELLITE PREFERRED

### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Same as Alternative C.

### Number of Acres with Unstructured Recreational Opportunities and Experiences

Under Sub-Alternative D$_2$, the Preferred Alternative for the GUSG satellite populations and the Gunnison Basin Unoccupied Habitat, BLM management would contain similar restrictions on unstructured recreational activities as elements of alternatives B and C and Sub-Alternative D$_1$, such as for: timing and season of use, ground disturbance limitations, and reclamation of existing disturbance. Sub-Alternative D$_2$ acknowledges that decisions related to GUSG and their habitat in satellite populations are potentially more impacting because of their smaller populations, smaller areas of habitat, and decreased linkage to the main Gunnison Basin Population.

### Number or Types of SRPs Allowed within GUSG Habitat

Under Sub-Alternative D$_2$, BLM would only allow SRPs that have minimal effects in Occupied Habitat and Unoccupied Habitat. Similar to Alternative C, BLM would continue to review and approve recreation permits on a case-by-case basis accepting only those uses determined to be neutral or beneficial to GUSG and their habitat, (and when and where it would benefit GUSG conservation most), transferring permits that may cause adverse impacts to the recovery of the GUSG to other areas outside of GUSG habitat. Sub-Alternative D$_2$ could potentially result in a loss of opportunities to continue engaging in current permitted activities and events, however, that impact to SRPs is expected to be minor.

BLM_0028014

## 4.10.4. CUMULATIVE IMPACTS

The area used to analyze cumulative impacts on recreation resources is the planning area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected, and will likely continue to affect, recreation are increased visitation (especially from residents within the planning area and those from the surrounding region), urbanization of communities in the planning area, advances in outdoor recreation equipment, management in existing Recreation Management Areas, and energy development.

At the broadest level, the physical, social, and operational recreation setting character of BLM-administered lands are quickly changing from natural to more developed, from less crowded to more contacts with others, and from less restrictive to more rules and regulations. These changes are expected to impact the activity opportunities that can be offered and the recreation experience and benefit opportunities that can be produced.

There is a strong correlation between population growth, visitation, and recreation, in large part because many new residents have moved to the area specifically because of easy access to recreation opportunities on BLM and other public lands. The expanding suburban development footprint has also placed many new neighborhoods directly adjacent to BLM boundaries, resulting in increased trespass onto private property and resource impacts from private property owners accessing public lands from adjoining private land (e.g., social trailing, etc.). Advances in technology are at least partly responsible for increased recreation across the planning area, as motorized and mechanized vehicles are more capable of accessing previously remote areas.

Reasonably foreseeable trends that would result in cumulative impacts on recreation include continued growth patterns in demand for all recreation experiences, increased demand for close-to-home recreation opportunities for local residents, continued and increased visitation from a growing regional population, and increased popularity of adjacent public lands. However, restrictions on development of public lands to protect GUSG and their habitat could cumulatively result in a benefit for GUSG from managed recreation.

Management of recreation-focused areas (SRMAs and ERMAs), unstructured or dispersed recreational opportunities, and the issuance of SRPs would continue as they are currently managed under Alternative A. Under Alternative B, the BLM would place the most restrictions on recreation, resulting in the greatest number of cumulative impacts, such as the potential elimination of RMAs or elimination of new or reissued SRPs. Under Alternative C, BLM would have more flexibility to provide for continued or new recreational opportunities if it could be demonstrated that

BLM_0028015

GUSG and their habitat would not be negatively impacted. However, the BLM would place some restrictions on recreation, which could cumulatively add to a decrease in this resource use. Under Sub-Alternative $D_1$, the BLM would manage recreation resources in accordance with the CCA developed for the protection and recovery of the GUSG within its core range and habitat. Under Sub-Alternative $D_2$, the BLM would manage recreation in the smaller, more vulnerable GUSG satellite populations, using the full suite of management actions available for the protection and recovery of GUSG. Sub-Alternative $D_2$ would not be less restrictive than Alternative C, but could be more restrictive, if necessary. Under Sub-Alternative $D_2$, the BLM could place some restrictions on recreation that would result in a cumulative decrease in this resource use.

BLM_0028016

# 4.11. TRAVEL MANAGEMENT

## 4.11.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

Indicators of impacts to travel management are as follows:

- Change in the types of allowable uses occurring on transportation routes in GUSG habitat.
- Change in the number of motorized acres designated as Open (to cross-country motorized travel), Limited (to existing or designated routes for motorized travel), or Closed (to motorized travel altogether).
- Change in the number of acres where new route development would be allowed.

### ASSUMPTIONS

The analysis uses the following assumptions:

- Travel management would be managed to achieve the objectives of individual Field Offices and would vary based on the age of a BLM unit's RMP.
- Travel systems are dynamic and will be changed through subsequent implementation level planning efforts in order to respond to the needs of the BLM multiple-use mission. The designation of individual routes as open, closed, or limited for motorized use is an implementation-level process and not considered as part of a RMP (planning-level) process.
- The demand for access to travel routes would continue to increase over the life of the RMPs.
- Traditional travel management uses within the decision area would continue, and are anticipated to increase as local populations grow. Motorized and non-motorized use will continue to increase. The potential for resource and user conflict increases as OHV use increases and becomes more concentrated.
- Implementation of a travel management plan includes: increased public education, notification by use of signs, enforcement, resource monitoring in regard to travel management, and the designation of transportation routes (linear features - roads and trails of varying allowable uses).
- Improved facilities, especially trails, are expected to result in increased use.

BLM_0028017

- Travel Management will continue to be an increasingly important component of local economies.

## METHODS AND DATA

This section discusses impacts on travel and transportation management from proposed BLM management actions. Existing conditions concerning travel and transportation management are described in the Comprehensive Travel and Transportation Management (CTTM) section in Chapter 3. Travel and transportation management supports and helps achieve the objectives of other resource programs. Consequently, travel designations would adhere to the management prescriptions included under each alternative, while following the theme of each alternative.

At the resource management planning level, impacts on CTTM are those that restrict travel, such as managing areas as closed or limited to motorized travel and limiting seasonal travel. New travel and transportation management actions in response to GUSG habitat protection strategies would impact the number of acres where motorized and some non-motorized travel is allowed.

Travel management decisions impact other resources and uses, such as closing routes or limiting travel to protect sensitive resources. As such, impacts of travel management actions on other resources and uses are discussed in the respective resource sections of this chapter. Impacts on CTTM from other program areas do occur and are considered a part of implementation level transportation management planning.

Literature reviews were conducted relative to individual resource areas, to include: studies from a variety of sources (see References for Travel Management-related studies), and a review of BLM's relevant laws, regulations, and policies. Interviews with local field office subject matter experts were also conducted relative to land status, Travel Management Area classification, permitted uses, etc. for both Occupied Habitat and Unoccupied Habitat. Finally, geo-spatial data from BLM and other authorities was used to help analyze conditions and land-use allocations within the decision area, including: the presence of open, limited, and closed Travel Management Areas and the location of roads and trails within GUSG habitat.

BLM_0028018

## 4.11.2. IMPACTS COMMON TO ALL ALTERNATIVES

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Applying restrictions to allowable uses for transportation routes in the decision area to protect GUSG, especially during time periods associated with critical life functions, in most cases would only seasonally limit access in certain parts of the decision area. Because the restrictions would mostly be localized and temporary, long-term impacts on allowable uses of the transportation system within the decision area are not expected to be significant.

### Number of Acres Open, Limited, or Closed to Motorized Travel

A shift in OHV designations in GUSG habitat under all alternatives would reduce cross-country motorized travel opportunities in the decision area. Nationally, however, BLM is currently in the process of moving away from an 'open system' of travel management in favor of a Comprehensive Travel and Transportation Management (CTTM) system. While some short-term impacts can be expected, long-term impacts for cross-country transportation use are not expected.

### Number of Acres Where New Route Development Would Be Allowed

Under all alternatives, travel would be limited to designated routes. Under the action Alternatives B through E, an emphasis would be placed on reducing route densities, especially in Occupied Habitat. Timing limitations and seasonal closures from March 15 to May 15 would also be applied to GUSG habitat.

## 4.11.3. IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

#### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Compared to the action alternatives, Alternative A would provide for the greatest diversity of allowable uses on existing or designated transportation routes within the decision area, and field office TMPs and RMPs would provide the basis for allowable uses on roads and trails. Under Alternative A, the BLM would continue to manage allowable uses on roads and trails as identified in the existing RMPs, and current Travel Management designations for individual routes would continue over the long term. There would be no new impacts on Travel Management under Alternative A.

BLM_0028019

### Number of Acres Open, Limited, or Closed to Motorized Travel

Compared to the action alternatives, Alternative A would have the least impact to current Travel Management designations. The BLM would continue to manage Travel Management designations as identified in the existing RMPs, and current travel opportunities in the decision area would be maintained over the long term.

Under Alternative A, approximately 53,565 acres (9,317 in Occupied Habitat and 44,248 acres in Unoccupied Habitat) in the decision area would remain open to unrestricted cross-country motorized travel; approximately 543,422 acres (386,025 in Occupied Habitat and 157,397 acres in Unoccupied Habitat) would remain limited to existing routes; and approximately 38,114 acres (10,266 in Occupied Habitat and 27,848 acres in Unoccupied Habitat) would remain closed to motorized use. There would be no new impacts on Travel Management.

### Number of Acres Where New Route Development Would Be Allowed

Compared to the action alternatives, Alternative A would have the least impact to potential new route development within the decision area. The BLM would continue to evaluate the need for additional routes, including ROW applications, proposals for new trails, etc. BLM field office TMPs and RMPs would inform the conditions under which new routes may be authorized, and NEPA analysis would be conducted to evaluate the effects of implementation-level decisions on resources, such as GUSG.

## ALTERNATIVE B

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Under Alternative B, greater restrictions on the allowable uses of transportation routes would be applied through a range of management actions for the protection and recovery of the GUSG and its habitat. Some uses, such as motorized or mechanized travel could be eliminated from roads or trails that negatively impact GUSG. Timing limitations, seasons of use, and temporary closures could also be used to protect GUSG, especially during critical times of the year, such as for breeding, nesting, and brood-rearing. Under Alternative B, upgrades to routes in both Occupied Habitat and Unoccupied Habitat would also not be allowed.

Alternative B would also provide for a 4-mile buffer distance from leks outside of habitat, which would further restrict the transportation system within the Non-Habitat Areas, including those routes not in GUSG habitat. Impacts to the transportation system within the Non-Habitat Areas would be similar to those in

BLM_0028020

Occupied and Unoccupied Habitat, with an emphasis on avoiding or eliminating allowable uses that have negative effects to GUSG or their habitat.

Impacts to the transportation system as a whole are not expected to be significant, however, more significant impacts to transportation and access within GUSG habitat would be expected under Alternative B, with the likely side-effect that transportation use would transfer to other, less restrictive places in the decision area causing greater impacts and user conflict in localized areas within the overall transportation system. Prior to closing routes or access in GUSG habitat, the BLM could elect to employ Section 106 of the National Historic Preservation Act in order to consider new impacts to cultural resources as a result of displaced or increased transportation use to other areas.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Under Alternative B, the designation of acres open, closed, or limited to motorized travel would be the most restrictive of any alternative, and would have the greatest impact to public access and CTTM. Under Alternative B, the BLM would conduct travel management planning as part of this RMP Amendment analysis and completely close Occupied Habitat to motorized travel.

Under such a scenario, access would be more restrictive than No Action Alternative A due to the closure of 597,006 acres to motorized travel. Additionally, there would be no opportunities for cross-country travel in the decision area.

### Number of Acres Where New Route Development Would Be Allowed

Under Alternative B, the BLM would reduce route densities and would not allow new route development within GUSG habitat. Within Non-Habitat Areas, the BLM would only allow new routes or upgrades to existing routes that are determined to not adversely impact GUSG or their habitat. Seasonal closures in Occupied Habitat would occur from March 15 through May 15 in order to protect GUSG during critical life function time periods. General Management Standards would also apply for timing limitations, ground disturbance and vegetation removal, predation control, climate change, invasive species and disease control, and reclamation procedures.

## ALTERNATIVE C

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

BLM management under Alternative C would be less restrictive on allowable use designations for roads or trails than Alternative B, provided that the designations are determined to be compatible with GUSG and their habitat. Under Alternative

BLM_0028021

C, the BLM would have the flexibility to adapt allowable uses on a transportation route to specific conditions or changes over time, if the route is designated as Limited in a current Travel Management Plan. If necessary, restrictions such as timing limitations, season of use, stipulations or limitations for permitted users, and reduction in route densities could be applied for the benefit of GUSG and their habitat. In Occupied Habitat, seasonal closures could be implemented from March 15 through May 15 for all travel management or specific uses if a conflict is identified, either in general or from a particular mode of travel.

In both Occupied Habitat and Unoccupied Habitat, routes would not be upgraded to change the route category or capacity unless that upgrade was necessary for public safety or prevented the construction of a new route. Impacts to the transportation system as a whole would not be significant, but might transfer increased use to other areas causing greater impacts and user conflict in localized areas within the overall transportation system, if restrictions were applied. Most impacts would be beneficial for GUSG and their habitat, and only minor or temporary negative impacts to users of the transportation system.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Under Alternative C, BLM management would contain fewer restrictions on travel management designations than Alternative B, if those designations are determined to be compatible with GUSG and GUSG habitat. In both Occupied Habitat and Unoccupied Habitat, areas currently designated as closed to motorized travel would remain so, and generally motorized travel would be limited to existing or designated routes. New cross-country motorized and mechanized travel would be discouraged. Motorized cross-country travel would be allowed to continue in areas previously open to such travel where it has been demonstrated not to have a negative impact to GUSG or their habitat. Travel management planning would be deferred to a later date and conducted by local subject-matter experts, with implementation completed as quickly as time, personnel, and resources allow.

Under Alternative C, there would be no change from No Action Alternative A in the number of acres closed to motorized travel or limited to existing or designated routes for field offices that have conducted travel management planning. Field offices that have not conducted travel management planning would have reduced acreage for cross-country motorized travel when routes in Occupied Habitat are limited to existing routes under Alternative C.

### Number of Acres Where New Route Development Would Be Allowed

Alternative C would contain fewer restrictions on new routes determined to be compatible with GUSG and GUSG habitat than Alternative B. For both Occupied

BLM_0028022

Habitat and Unoccupied Habitat, new routes would primarily be limited to realignments of existing designated routes, especially if the realignments eliminate the need to construct a new route, or are necessary for public safety. Any new route would require mitigation in accordance with the mitigation strategy in order to decrease fragmentation of GUSG habitat. Under Alternative C, there would generally be no significant change to public access and CTTM within the decision area, and localized impacts to transportation routes would likely be beneficial to all resource areas.

## SUB-ALTERNATIVE D$_1$ - GUNNISON BASIN PREFERRED

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Under Sub-Alternative D$_1$, management actions related to allowable uses of transportation routes in Occupied Habitat would default to the 2010 Gunnison Basin Federal Land TMP. No new impacts to the Gunnison Basin transportation system are anticipated.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Same as Alternative A.

### Number of Acres Where New Route Development Would Be Allowed

Under Sub-Alternative D$_1$, management actions related to Occupied Habitat would default to the 2010 Gunnison Basin TMP. Numerous considerations related to the goal of protecting and enhancing GUSG and GUSG habitat in the Gunnison Basin have already been explored, including conditions under which new routes (roads and trails) could occur. Current travel management opportunities in the Gunnison Basin would continue, with no new or significant impacts expected under Sub-Alternative D$_1$.

## SUB-ALTERNATIVE D$_2$ - SATELLITE PREFERRED

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Under Sub-Alternative D$_2$, BLM management would vary based on current field office TMPs. If existing allowable uses for transportation routes in a particular field office are compatible with GUSG conservation measures as determined by that field office, then No Action Alternative A would apply. If not, then those TMPs would be amended to agree with the standards defined above in Alternative C.

BLM_0028023

**Number of Acres Open, Limited, or Closed to Motorized Travel**

Under Sub-Alternative D$_2$, BLM management would vary based on current field office TMPs. If existing travel management for a particular field office is compatible with GUSG conservation measures, as determined by the field office, then No Action Alternative A would apply. If not, then those TMPs would be amended to agree with the standards defined above in Alternative C.

**Number of Acres Where New Route Development Would Be Allowed**

Same as Alternative C.

## 4.11.4. CUMULATIVE IMPACTS

The area used to analyze cumulative impacts on travel management is the planning area and extends along major roads and trails where management inside the decision area could impact use outside it. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected, and will likely continue to affect travel management are increased use of the travel system and any new actions that introduce additional traffic or reduce or expand the travel system.

RMPs for BLM-administered lands have areas and routes closed to motorized recreation, causing users to move to other BLM-administered lands (and other public lands) in the planning area. Increasing urban and suburban populations proximate to, and within the planning area, have greatly increased the level of recreational and route use on BLM-administered lands. The combination of the region's growing population and the bounty of desirable recreation settings have combined to greatly increase transportation use in the planning area.

For all alternatives, cumulative impacts on travel management would occur primarily from actions that facilitate, limit, or preclude motorized access, including the closure of areas to certain types of travel or through the designation of routes as part of a future travel management planning process. Cumulative impacts on travel management as a result of these reductions could include congestion on the existing travel route network within, and adjacent to, the decision area, particularly where routes provide access to multiple resource uses. Congestion would impact access and require more active management (including enforcement, signage, and education) by the BLM. Overall, these actions are not expected to influence cumulative impacts because of the large remote character in much of the cumulative impact analysis area. Impacts would be localized, occurring in the vicinity of these new actions and near population centers.

BLM_0028024

Management of travel management designations for open, limited, and closed OHV areas; allowable uses for existing or designated routes; and the presence of existing seasonal closures, timing limitations, or other current restrictions would be maintained, and the existing travel network would continue as it is currently managed under No Action Alternative A.

Under Alternative B, the BLM would place the most restrictions on travel management, resulting in the greatest number of cumulative impacts. Eliminating all motorized travel in Occupied Habitat would result in a cumulative loss of travel opportunities. Some users would go elsewhere, but other travel systems might be less capable of accommodating extensive new use; the multijurisdictional travel system encompassing the analysis area might be unable to accommodate demand and would likely mean increased impacts from travel and transportation to GUSG habitat outside of BLM lands.

Under Alternative C, the BLM would have greater flexibility to provide for continued or new travel management opportunities, if it could be demonstrated that GUSG and their habitat would not be negatively impacted. However, the BLM would place some restrictions on the transportation system, which could cumulatively add to a decrease in this resource use and public access.

Under Sub-Alternative $D_1$, the BLM would manage travel and transportation resources in accordance with the 2010 Gunnison Basin Federal Land Travel Management Plan (TMP) and the CCA, developed for the protection and recovery of the GUSG within its core range and habitat. Under Sub-Alternative $D_2$, the BLM would manage travel management in the smaller, more vulnerable, GUSG satellite populations, using the full suite of management actions available for the protection and recovery of GUSG. Sub-Alternative $D_2$ would not be less restrictive than Alternative C, but could be more restrictive, if necessary. Since the BLM could place some restrictions on travel management under Sub-Alternative $D_2$, there could be a cumulative decrease in this resource use and public access.

BLM_0028025

# 4.12. LEASABLE FLUID MINERALS

## OIL AND GAS

### 4.12.1. METHODOLOGY

## ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal oil and gas resources:

- Acres of federal minerals leased for oil and gas
- Acres of federal minerals closed to oil and gas leasing
- Acres of federal minerals open to oil and gas leasing
  - o Acres subject to NSO stipulation
  - o Acres subject to CSU and/or TL stipulations
- Acres of ROW exclusion and avoidance areas

## ASSUMPTIONS

The analysis of impacts on oil and gas exploration and development is based on the following assumptions:

- New stipulations proposed under this RMP Amendment would apply only to new leases.
- Existing stipulations in the RMPs within the planning area would continue to apply. Those stipulations provide for other resource protections, such as riparian areas, that are not specific just to GUSG and habitat.
- Existing fluid mineral leases would be managed to protect valid existing rights and would not be affected by any closures proposed under the preferred alternative or other alternatives.
- Valid existing leases would be managed under the stipulations in effect when the leases were issued. However, new development on existing leases must also comply with the current RMP management direction. This direction is consistent with Interior Board of Land Appeals decisions (*Yates Petroleum Corp.,* 176 IBLA 144 (2008) and *William P. Maycock*, 180 IBLA 1 (2010)) findings that BLM has discretion to modify surface operations to add specific mitigation measures supported by site-specific NEPA analysis undertaken during the development phase on existing leases. Any additional mitigation

BLM_0028026

measures would need to be justifiable, still provide for lease development and would be incorporated in a site-specific document.

- Fluid mineral operations on existing federal leases, regardless of surface ownership, would be subject to COAs by the BLM Authorized Officer at the time of APD approval. The BLM can deny surface occupancy on portions of leases with COAs to avoid or minimize resource conflicts if this action does not eliminate reasonable opportunities to develop the lease. Existing leases would be developed consistent with applicable laws and valid existing rights, using as many of the surface use limitations and conservation measures as possible while still allowing reasonable access.

- Under all alternatives, reclamation bonds are required, pursuant to 43 CFR 3104, in an amount sufficient to ensure full restoration of lands to the condition in which they were found. In addition, APDs, including drilling plans and surface use plans of operations, would be required under all alternatives in accordance with 43 CFR 3162.

- If an area is leased, it could be developed; however, not all leases would be developed within the life of this plan amendment.

- As the demand for energy increases, so will the demand for extracting energy resources in areas with potential. However, oil and gas operations are sensitive to costs, especially when prices are depressed.

- Technological advancements, such as directional drilling, could lead to changes in levels of fluid mineral development potential throughout the decision area as additional resources become more easily accessible.

- Stipulations apply to fluid mineral leasing on all surface lands overlying federal mineral estate, which includes federal mineral estate underlying BLM-administered and non-BLM-administered surface.

## METHODS AND DATA

Where possible, BLM spatial data (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## 4.12.2. GENERAL IMPACTS

The primary planning decisions that could impact the availability of oil and gas resources include: fluid mineral leasing allocations; required fluid mineral leasing stipulations (NSO, TL, and CSU); and, ROW exclusion and avoidance designations.

Allocations of areas open or closed to fluid minerals leasing directly impacts the availability of federal minerals for lease. For areas designated as open to leasing, NSO leasing stipulations would also impact the availability of federal minerals for lease, particularly if lands where wells could be located are too far away to reach the oil and gas resource. Required TL and CSU leasing stipulations could also reduce APDs due to increased costs and decreased efficiency of development from required limitations, such as seasonal restrictions on drilling and other surface-disturbing activities. Indirect impacts include reduced production of oil and gas for the public use and for the generation of lease sale revenues, federal royalties from production, and tax revenues.

Designations of ROW exclusion and avoidance areas could impact the ability to site off-lease ROWs on public land and could increase costs and decrease efficiency of development due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur.

Until specific lease sales are analyzed, offered, and sold and the BLM receives and adjudicates APDs or other authorizations that includes specific information about a particular project, impacts of actual development that might follow lease issuance are speculative. The location, scope, scale, and timing of potential development, the location of existing roads and utility corridors, proximity to GUSG Occupied and/or Unoccupied Habitat, and proximity to other resources and other seasonally critical habitats that facilities would be required to avoid, and the particular downhole geology of a specific lease (which is important in relation to the potential number of wells reachable from a single well pad) are all factors that would determine the magnitude of impacts.

Refer to Section 4.18 for information regarding expected socioeconomic effects from management actions within each alternative.

## 4.12.3. IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

No Action Alternative A would provide the largest amount of federal minerals available for fluid mineral leasing in GUSG habitat. Approximately 206,950 acres are designated as closed to leasing, and 644,800 acres are designated as open to leasing. Of the areas open to leasing, 1,589,722 acres are open to leasing with additional stipulations (NSO, CSU, and/or TL), which includes 370,500 acres leased with a NSO stipulation. Due to overlapping stipulations (meaning that acres could be

BLM_0028028

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

accounted for in NSO, CSU, and/or TL), there are more acres with stipulations than there are acres to be leased.

The Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness and Wilderness Study Areas, are withdrawn from mineral leasing. Mineral development throughout much of the decision area is limited for GUSG protections. All Occupied Habitat is closed to mineral leasing under the Grand Junction RMP, and is open to mineral leasing with a NSO stipulation under the Canyons of the Ancients NM and Tres Rios RMPs. The NSO stipulation is applied to areas within 2.0 miles of a lek for the Gunnison Gorge NCA RMP area (outside of the proclaimed NCA), while the rest of the decision area that is open to leasing is subject to a NSO stipulation for areas within 0.6 mile of a lek.

Currently, there are 36,260 acres of federal minerals leased in the decision area. Approximately 20,630 acres of those leases are held by production. The existing leases are located primarily within the Monticello-Dove Creek and San Miguel Basin population areas. The leases held by production are primarily within the Tres Rios FO and Canyons of the Ancients NM. The undeveloped leases are located primarily with the Tres Rios FO (with 92% of the lease acres), followed by the Monticello FO (with 8%), and the Uncompahgre FO and Canyons of the Ancients NM (together totaling less than 1%).

**Table 4.104 - Oil and Gas Leasing by Population Area**

| POPULATION AREA | FEDERAL MINERAL ACRES | | | |
|---|---|---|---|---|
| | CLOSED TO LEASING | OPEN TO LEASING | LEASED | HELD BY PRODUCTION |
| Gunnison Basin | 9,100 | 556,800 | 0 | 0 |
| Cerro Summit-Cimarron-Sims Mesa | 0 | 11,100 | 0 | 0 |
| Crawford | 41,800 | 23,400 | 20 | 0 |
| Monticello-Dove Creek | 4,300 | 75,600 | 29,700 | 15,600 |
| Piñon Mesa | 123,000 | 61,400 | 0 | 0 |
| San Miguel Basin | 13,000 | 61,700 | 6,500 | 5,000 |
| Poncha Pass | 0 | 32,200 | 0 | 0 |

Within the Monticello-Dove Creek and San Miguel Basin population areas, there are few acres subject to ROW exclusion (2,000 acres in Monticello-Dove Creek and 200 in San Miguel Basin) and none designated as ROW avoidance. Therefore, there are few limitations on siting off-lease ROWs for access roads and utilities.

BLM_0028029

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## ALTERNATIVE B

Under Alternative B, Occupied and Unoccupied Habitat in the decision area would be closed to fluid minerals leasing. Existing leases would be allowed to expire. No new leases would be issued and unleased federal minerals would no longer be available for oil and gas leasing.

There are currently 36,260 acres of federal minerals leased for oil and gas resources in the decision area. Approximately 20,630 acres of those leases are held by production. As leases expire, any potential future production from those leases would not be realized. Leases expire at the end of the primary term, which is usually 10 years. However, leases may continue if: 1) qualifying drilling operations are in progress; 2) the lease contains a well capable of producing in paying quantities; or, 3) the lease is entitled to receive an allocation of production from an off-lease well. If a lease does not have a producible well, or a producible well attributed to it, it will automatically terminate if annual rental is not paid in full and on time. Leases may also be given up, in part or in total, if the lessee files a written relinquishment.

There would be little to no impact to oil and gas development in the Gunnison Basin, Cerro Summit-Cimarron-Sims Mesa, Piñon Mesa, and Poncha Pass population areas. There is low to no development potential for oil and gas in those areas and no authorized leases.

In the Crawford population area, federal minerals account for approximately 57% of the mineral estate. The projected development of one to ten APDs, with an estimated total of from 10 to 30 acres of surface disturbance, would not occur. Currently, there is one authorized federal lease which includes 24 acres (<0.1 % of the population area) (BLM 2015a).

The Monticello-Dove Creek population area has a moderate to high development potential. Federal minerals account for approximately 25% of the mineral estate in the population area. There are 112 authorized federal leases (BLM 2015a) which include 29,700 acres (8.5 % of the population area). The remaining 57,200 acres of unleased federal minerals would no longer be available for leasing. However, approximately 41,350 unleased acres (72% of the unleased federal minerals and 48% of the total federal minerals) are already subject to leasing with a NSO stipulation.

Federal minerals within the Monticello-Dove Creek Population decision area account for about 2% of the mineral estate in the larger Monticello-Dove Creek Population planning area with high development potential (BLM 2015a). In the high development potential areas, it is projected that within the Monticello FO, approximately 1 to 6 wells per year would be drilled within the entire Paradox Fold and Fault Belt (BLM 2008b). Within the Tres Rios FO, it is projected that about 25

BLM_0028030

wells per year would be drilled, primarily within the Gothic Shale Gas Play in the Paradox Basin (BLM 2013).

The San Miguel Basin population area has a low to high development potential, with most of the Occupied Habitat rated as moderate to high development potential, and the Unoccupied Habitat as low to moderate. Federal minerals account for approximately 56% of the mineral estate in the population area. There are 29 authorized federal leases (BLM 2015a) which includes 6,500 acres (4.6 % of the population area). The remaining 73,900 acres of unleased federal minerals would no longer be available for leasing. However, approximately 60,250 unleased acres (68% of the federal minerals) are already subject to leasing with a NSO stipulation (BLM 2015b).

Under Alternative B, a total of approximately 78,100 acres of federal minerals in moderate to high development potential areas would be closed to leasing. Under the No Action Alternative, none of the federal minerals in moderate to high development potential areas are closed to leasing, but 54,550 acres are only open to leasing with a NSO stipulation.

Under this alternative, the entire decision area would be designated as a ROW exclusion area with some exceptions. The exceptions would be designated ROW corridors and areas within 100 feet of the centerline (or if not feasible, within 100 feet of the edge of the ROW) of county roads and highways. Therefore, siting of off-lease ROWs for access roads and utilities would be limited to those exceptions. This would result in increased costs and/or decreased ability to locate such ROWs, which would in turn, potentially further decrease oil and gas leasing.

The Non-Habitat Areas would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat. Timing limitations would be applied as COAs, where applicable. Non-Habitat Areas would be designated as ROW avoidance areas with guidance on how and where ROWs could be granted. Master Development Plans would be required for any new leases and for any undeveloped leases, rather than APD-by-APD analyses. These lease and ROW restrictions would result in increased costs and potentially decreased oil and gas leasing. Less than 40% of the Non-Habitat Areas are within areas with moderate to high development potential. Approximately 10% of the Non-Habitat Areas are located in areas closed to leasing, primarily within Wilderness, WSAs, NCAs, or the Canyons of the Ancients NM.

## ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation and all Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat. Wilderness areas, Wilderness

BLM_0028031

Study Areas, and existing mineral withdrawals would still be closed to leasing. There would be 80,820 more acres of federal minerals available for leasing than under No Action Alternative A. However, the additional acres are all in the Piñon Mesa population area, which has no to low development potential. Approximately 128,120 more acres of the federal minerals open to leasing would be subject to NSO stipulation than under No Action Alternative A. Under this alternative, a total of approximately 139,160 acres of federal minerals in moderate to high development potential areas would be open to leasing, of which 87,530 acres would have a NSO stipulation, while the remaining acreage would have a CSU stipulation.

Under Alternative C, the entire decision area would be designated as a ROW avoidance area with guidance on where and how ROWs would be granted. The guidance includes not granting ROWs when there is other reasonable access, requiring timing limitations and applicable BMPs, as well as requiring mitigation measures. Therefore, siting of off-lease ROWs for preferred locations of access roads and utilities would be somewhat limited. In addition, minimization and mitigation measures result in increased costs and/or decreased ability to locate such ROWs, which would in turn, potentially further decrease oil and gas leasing.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Sub-alternatives $D_1$ and $D_2$ include the same management actions, so the impacts would be the same across the Gunnison Basin and satellite population areas. The actions are the same as those under Alternative C, except that the Piñon Mesa population area would be closed to leasing within the Grand Junction FO, as it is in the No Action Alternative. The impacts are essentially the same as under Alternative C.

## GEOTHERMAL

The analysis of effects of the various alternatives on geothermal leasing is the same as that under oil and gas, except for portions of the No Action Alternative.

Under the No Action Alternative, within the San Luis Valley FO, which includes all of the Poncha Pass population area, Occupied Habitat is open to geothermal leasing with a NSO stipulation.

The Waunita/Tomichi Dome area of the Gunnison FO, within the Gunnison Basin population area, is subject to the Gunnison Geothermal RMP Amendment. The amendment provides that the area is open to geothermal leasing with a CSU stipulation to protect summer-fall habitat, in addition to the existing NSO stipulation within 0.6-mile of a lek and TL stipulations for lekking season (March 15–May 15).

BLM_0028032

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.13. LEASABLE SOLID MINERALS

## 4.13.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal solid mineral resources (other than coal):

- Acres of federal minerals leased for solid minerals
- Acres of federal minerals closed to solid minerals leasing
- Acres of federal minerals open to solid minerals leasing
  - Acres subject to NSO surface use limitation
  - Acres subject to CSU and/or TL surface use limitations
- Acres of ROW exclusion and avoidance areas.

### ASSUMPTIONS

The analysis of impacts on solid minerals exploration and development is based on the following assumptions:

- Existing solid mineral leases would be managed to protect valid existing rights and would not be affected by any closures proposed under the preferred alternative or other alternatives.
- Valid existing leases would be managed under the special stipulations in effect when the leases were issued; new mitigations proposed under this RMP Amendment would apply on new leases and any readjusted leases.
- In addition, prospecting permits or exploration licenses, including exploration plans, would be required under all alternatives in accordance with 43 CFR 3505 and 43 CFR 3506.
- Under all alternatives, reclamation bonds are required, pursuant to 43 CFR 3404.50, in an amount sufficient to ensure full restoration of lands to the condition in which they were found.
- Surface disturbing activities will be mitigated with special stipulations applied to site specific proposals in accordance with 43 CFR 3501.16.
- Surface use limitations apply to solid mineral leasing on all surface operations overlying federal mineral estate, which includes federal mineral estate underlying BLM-administered and non-BLM-administered surface.

BLM_0028033

## METHODS AND DATA

Where possible, BLM spatial (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## 4.13.2. GENERAL IMPACTS

The primary planning decisions that could impact the availability of solid minerals include: solid mineral leasing allocations; solid mineral leasing surface use limitations (NSO, TL, and CSU); and, ROW exclusion and avoidance designations. The management actions under each action alternative are essentially the same as those for fluid minerals leasing. However, surface use limitations are applied as stipulations to fluid mineral leases and as terms, conditions, and/or special stipulations to site-specific solid mineral authorizations, including permit, licenses, and leases.

Allocations of areas open or closed to solid minerals leasing directly impacts the availability of federal minerals for lease. For areas designated as open to leasing, NSO surface use limitations would also impact the availability of federal minerals for lease. Required TL and CSU leasing surface use limitations could also increase costs and decrease efficiency of development from required limitations, such as seasonal restrictions on surface-disturbing activities. Indirect impacts include reduced production of minerals for the public use and for the generation of lease sale revenues, federal royalties from production, and tax revenues.

Designations of ROW exclusion and avoidance areas could impact the ability to site off-lease ROWs on public land and could increase costs and decrease efficiency of development due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur. The magnitude of those impacts cannot be assessed without project-specific information on where an affected lease is located, its size, and its spatial relationship to other leases.

Until specific permits and leases are analyzed based on information about a particular project, impacts of actual development that might follow lease issuance are speculative. The location, scope, scale, and timing of potential development and the location of existing utility corridors are factors that would determine the magnitude of impacts.

BLM_0028034

## 4.13.3.  IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

Under No Action Alternative A, approximately 206,950 acres would continue to be designated as closed to leasing and 610,920 acres open to leasing.  Of the areas open to leasing, 1,470,750 acres are open to leasing with additional surface use limitations, including 362,450 acres leased with a NSO surface use limitation.  Due to overlapping limitations, there are more acres with surface use limitations than there are to be leased (meaning that acres may be accounted for in NSO, CSU, and/or TL).

The Canyons of the Ancients NM, Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness and Wilderness Study Areas, are withdrawn from mineral leasing.  Mineral development throughout much of the decision area is limited for GUSG protections.  All Occupied and Unoccupied Habitat is closed to mineral leasing under the Grand Junction RMP.  The rest of the decision area that is open to leasing is subject to a NSO surface use limitation for areas within 0.6 mile of a lek.  The Gunnison RMP, Uncompahgre Basin RMP, San Juan/San Miguel RMP, and San Luis RMP do not specifically address solid minerals leasing as there is no known development potential for solid minerals.  However, the same surface use limitations that apply to fluid mineral leasing would apply to any solid mineral leases.

Currently, there are no federal minerals leased in the decision area.  However, there are five approved potash prospecting permits in the Monticello-Dove Creek population area.  There are 13 pending potash prospecting permit applications.

**Table 4.105 - Solid Mineral Leasing on Federal Mineral Estate in Decision Area**

| HABITAT TYPE | ACRES CLOSED TO LEASING[1] | ACRES OPEN TO LEASING | ACRES UNDER PROSPECTING PERMITS | ACRES LEASED |
|---|---|---|---|---|
| Total Decision Area — Federal Minerals | 206,950 | 610,920 | 2,600 | 0 |
| Occupied Habitat | 81,900 | 432,200 | 0 | 0 |
| Unoccupied Habitat | 125,100 | 178,700 | 2,600 | 0 |
| Non-Habitat | 31,500 | 153,500 | 0 | 0 |

[1]**Includes areas administratively unavailable for leasing, such as Wilderness Areas, Wilderness Study Areas, and certain withdrawn lands.**

BLM_0028035

## ALTERNATIVE B

Under Alternative B, Occupied and Unoccupied Habitat in the decision area would be closed to solid minerals leasing. Existing leases would be allowed to expire. No new leases, prospecting permits, or exploration licenses would be issued.

There are currently no federal minerals leased for solid mineral resources in the decision area.

There would be little to no impact to solid minerals development in the Gunnison Basin, Cerro Summit-Cimarron-Sims Mesa, Crawford, Piñon Mesa, and Poncha Pass population areas. There is low to no development potential for solid minerals in those areas and no authorized leases.

The Monticello-Dove Creek population area has some development potential. Federal minerals account for approximately 25% of the mineral estate in the population area. There are no authorized federal leases (BLM 2015a). The five authorized potash prospecting permits, which include 2,631 acres, would continue as valid existing rights. The remaining 48,600 acres of unleased federal minerals would no longer be available for leasing.

The San Miguel Basin population area also has some development potential. Federal minerals account for approximately 56% of the mineral estate in the population area. There are no authorized federal leases and no prospecting permits (BLM 2015a). The 73,400 acres of unleased federal minerals in Occupied and Unoccupied Habitat would no longer be available for leasing. However, approximately 65,100 acres (89% of the federal minerals) are already subject to leasing with a NSO surface use limitation (BLM 2015b).

Currently, the potential for development of leasable solid minerals is identified as none to low or is unknown. Under this alternative, no further exploration or prospecting would be allowed, so the development potential would remain unknown. Given the overall lack of potential, this alternative would likely have minimal impact on production of leasable solid minerals compared to the No Action Alternative.

Non-Habitat Areas would be open to leasing with a determination of whether or not disturbance to GUSG and/or habitat would require management restrictions. Increased costs and/or reduced development of solid minerals would be minimal due to the overall lack of potential in the area. There are eight pending potash prospecting permits that overlap some of the Non-Habitat Areas in proximity to the Monticello-Dove Creek Population, and no authorized permits or leases.

BLM_0028036

## ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO surface use limitation.  All Unoccupied Habitat would be open to leasing with a CSU surface use limitation to protect sagebrush and riparian habitat.  Wilderness areas, Wilderness Study Areas, and existing mineral withdrawals would still be closed to leasing.

There would be 80,820 more acres of federal minerals available for leasing than under No Action Alternative A.  However, the additional acres are all in the Piñon Mesa population area, which has no to low development potential.  Approximately 128,120 more acres of the federal minerals open to leasing would be subject to NSO surface use limitation than under No Action Alternative A.

Under this alternative, a total of approximately 84,300 acres of federal minerals in the Monticello-Dove Creek population area (the only area with identified solid leasable mineral development potential) would be open to leasing, of which 13,000 acres of the surface would have a NSO limitation and the remaining acreage would have a CSU limitation.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Because sub-alternatives $D_1$ and $D_2$ include the same management actions, the impacts would be the same across the Gunnison Basin and satellite population areas. The actions are the same as those under Alternative C.  The impacts would be essentially the same as those under Alternative C.

BLM_0028037

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.14. LOCATABLE MINERALS

## 4.14.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal locatable mineral resources:

- Acres of current mining claims
- Acres of federal minerals withdrawn from mineral entry
- Acres of federal minerals proposed for withdrawal from mineral entry
- Restrictions, such as surface use limitations and conservation measures, that can be placed on locatable mineral development activities to prevent unnecessary or undue degradation in GUSG habitat as the law allows
- Acres of ROW exclusion and avoidance areas.

### ASSUMPTIONS

The analysis of impacts on locatable minerals exploration and development is based on the following assumptions:

- Existing claims would be managed to protect valid existing rights and would not be affected by any withdrawal recommendations proposed under the preferred alternative or other alternatives.
- Valid existing claims and existing approved surface management operations would be managed under the conditions in effect when the Plan of Operations was approved; new restrictions proposed under this RMP Amendment would apply only to new Plans of Operation.
- A plan of operations would be required for new proposed operations, greater than casual use, unless currently under an approved notice, in the decision area in accordance with 43 CFR 3809. Existing active notices would not be extended and a Plan of Operations would be required.

### METHODS AND DATA

Where possible, BLM spatial data (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for

BLM_0028038

comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## GENERAL IMPACTS

The primary planning decisions that could impact the availability of locatable minerals include: withdrawals and withdrawal recommendations; and, required conservation measures, such as surface disturbing restrictions and timing limitations.

Areas withdrawn from locating mining claims have an obvious direct impact on the availability of locatable minerals. Areas recommended for withdrawal may eventually have the same direct impact if approved by the Secretary or by Congress. Required surface use limitations, such as timing limitations, could result in increased costs and decreased efficiency of development. Indirect impacts include reduced production of minerals for the public use.

Although access and utilities are typically included in a plan of operations, designations of ROW exclusion and avoidance areas could impact the ability to site access and utility ROWs in locations preferred by a claimant. This in turn, could increase costs and decrease efficiency of mining operations due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur. The magnitude of those impacts cannot be assessed without project-specific information on where mining claims are staked and any details of associated plans of operations.

## 4.14.2. IMPACTS BY ALTERNATIVE

## ALTERNATIVE A - NO ACTION

The Canyons of the Ancients NM, Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness Areas, are withdrawn from mineral entry. There are additional acres withdrawn from mineral entry throughout the analysis area, as shown below.

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

### Table 4.106 - Status of Locatable Minerals in the Decision Area

| POPULATION AREA | FEDERAL MINERAL ACREAGE IN OCCUPIED HABITAT AND UNOCCUPIED HABITAT | | |
| --- | --- | --- | --- |
| | ACRES WITHDRAWN[1] | ACRES OPEN TO STAKING | ACRES IN ACTIVE MINING CLAIMS |
| Gunnison Basin | 22,100 | 549,300 | 11,000 |
| Cerro Summit-Cimarron-Sims Mesa | 1,400 | 25,000 | 0 |
| Crawford | 7,200 | 57,800 | 0 |
| Monticello-Dove Creek | 5,700 | 49,800 | 2,100 |
| Piñon Mesa | 25,000 | 159,300 | 20 |
| San Miguel Basin | 0 | 79,100 | 500 |
| Poncha Pass | 0 | 32,300 | 0 |

[1] Does not include acres withdrawn for nonmetallic locatables.

## ALTERNATIVE B

Under Alternative B, all Occupied and Unoccupied Habitat would be recommended for withdrawal from location and entry under the Mining Law of 1872. This recommendation could result in the publication of a notice of proposed withdrawal in the Federal Register. Once such a notice is published, under 43 U.S.C. 1714(b)(1) the lands would be temporarily segregated from location and entry for up to two years while the Secretary considers the proposed withdrawal.

If the lands are ultimately withdrawn, then no new mining claims could be located for the duration of the withdrawal. During the segregation and withdrawal periods, mining-related activities would be governed by 43 CFR 3809.100. Existing claims could be subject to validity exams, and possible contest. Existing claims could potentially be validated, invalidated, or cancelled. Any claims determined to be valid would be managed according to 43 CFR 3809. Pursuant to FLPMA, the Secretary must notify Congress of any withdrawal exceeding 5,000 acres. Approximately 13,650 acres within the decision area are covered by existing mining claims.

In the absence of segregation or an approved withdrawal, the following would apply:

- All mining operations, beyond casual use activities, would require an authorized plan of operations. The plan would be reviewed, including an environmental analysis under NEPA, to be sure that the required performance standards (43 CFR 3809.420) would be met. Performance standards include such things as land use plan compliance, actions to protect public lands, (such as, to prevent adverse impacts to threatened or endangered species and their habitat which may be affected by operations), concurrent reclamation, and full reclamation requirements. In addition, BLM

BLM_0028040

would require a bond or financial guarantee that would cover the estimated costs of reclamation.

- Apply seasonal restrictions if deemed necessary to prevent unnecessary or undue degradation.

In the Non-Habitat Areas, noise disturbance limitations would be applied, as appropriate, in authorized plans of operation. Approximately 182,400 acres of federal minerals are in Non-Habitat Areas.

These actions would result in impacts on the locatable minerals program through reduced access and increased costs due to requirements for mitigation. Alternative B would have greater impacts on locatable minerals than Alternative A.

## ALTERNATIVE C

Under Alternative C, withdrawals would be considered for recommendation based on an analysis of: 1) risk to GUSG and its habitat from conflicting locatable mineral potential and development in Occupied and Unoccupied Habitat; and, 2) on development risk and subsequent risk to the sage-grouse from conflicting locatable mineral potential and development. Any such recommendation(s) would be subject to the procedures described under Alternative B.

These actions would result in impacts on the locatable minerals program through increased costs due to requirements for mitigation. Alternative C would have greater impacts on locatable minerals than Alternative A, but less than under Alternative B.

## SUB-ALTERNATIVES D$_1$/D$_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Because sub-alternatives D$_1$ and D$_2$ include the same management actions, the impacts would be the same across the Gunnison Basin and satellite population areas. The actions are the same as those under Alternative C, except that no withdrawals would be recommended in Unoccupied Habitat. The impacts would be essentially the same as those under Alternative C.

Sub-alternatives D$_1$ and D$_2$ would have greater impacts on locatable minerals in the Gunnison Basin than Alternative A, but less than under alternatives B or C.

BLM_0028041

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.15. SALABLE MINERALS

## 4.15.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal salable mineral resources:

- Acres of currently permitted salable mineral sites
- Acres of federal minerals open to salable mineral development
- Acres of federal minerals closed to salable mineral development
- Acres of federal minerals proposed for withdrawal from mineral disposal
- Acres of ROW exclusion and avoidance areas.

### ASSUMPTIONS

The analysis of impacts on salable minerals development is based on the following assumptions:

- Existing mineral material operations on federal mineral estate, regardless of surface ownership, could be subject to additional mitigation measures by the BLM Authorized Officer. Under these circumstances, permit and contract modifications would be developed consistent with applicable laws and valid existing rights, using as many of the BMPs and conservation measures as possible while still allowing reasonable access.
- Management actions apply to mineral material activity on surface lands overlying federal mineral estate, which includes all federal mineral estate underlying BLM-administered and non-BLM-administered surface.
- Future demand for mineral materials will vary depending upon market conditions, which differ according to economic conditions and construction activity. Construction projects within approximately 50 miles of mineral materials deposits may lead to development of these deposits. It is expected that mineral materials activity and demand will continue to increase for the life of the RMP Amendment.

BLM_0028042

## METHODS AND DATA

Where possible, BLM spatial data (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## 4.15.2. GENERAL IMPACTS

The primary planning decisions that could impact the availability of salable minerals include: closure of areas to mineral sales; required conservation measures, such as surface disturbing restrictions and timing limitations; and ROW exclusion and avoidance designations.

Areas closed to mineral sales have an obvious direct impact on the availability of mineral materials. Required surface use limitations, such as timing limitations, could result in increased costs and decreased efficiency of development. Indirect impacts include reduced production of minerals for the public use and for the generation of mineral sales revenues.

Designations of ROW exclusion and avoidance areas could impact the ability to site access and utility ROWs on public land and could increase costs and decrease efficiency of development due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur. The magnitude of those impacts cannot be assessed without project-specific information on where mineral material sites would be located and any details of associated plans of operation.

## 4.15.3. IMPACTS BY ALTERNATIVE

## ALTERNATIVE A - NO ACTION

The Canyons of the Ancients NM, Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness and Wilderness Study Areas, are closed to mineral material sales. There are additional acres closed to mineral entry throughout the analysis area, as shown in Table 4.107.

BLM_0028043

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

**Table 4.107 - Mineral Estate in GUSG Occupied and Unoccupied Habitat**

| SURFACE OWNERSHIP/ MANAGEMENT | TOTAL ACRES | ACRES IN OCCUPIED HABITAT | ACRES IN UNOCCUPIED HABITAT | ACRES IN NON-HABITAT AREAS |
|---|---|---|---|---|
| FEDERAL MINERALS[1] | | | | |
| BLM | 720,900 | 378,800 | 224,900 | 117,200 |
| Private | 264,300 | 116,500 | 78,900 | 63,000 |
| State and Local Governments | 17,700 | 12,900 | 0 | 4,800 |
| Other Federal (USFS, NPS) | 295,500 | 112,300 | 83,800 | 99,400 |
| Total Federal Minerals (64%) | 1,298,300 | 626,400 | 387,600 | 284,400 |
| NON-FEDERAL MINERALS | | | | |
| BLM | 20,800 | 16,600 | 3,000 | 1,200 |
| Non-BLM | 748,500 | 296,300 | 331,100 | 121,100 |
| Total Non-Federal Minerals (36%) | 769,300 | 312,900 | 334,000 | 122,400 |
| TOTAL MINERALS | 2,118,400 | 955,600 | 743,300 | 419,600 |

[1]May not include all minerals; occasionally only oil and gas and/or coal are reserved as federal minerals.

## ALTERNATIVE B

Under Alternative B, all Occupied Habitat and sagebrush and riparian habitat in Unoccupied Habitat would be closed to mineral material disposals. Applicable timing limitation and vegetative removal standards in General Management Section would be applied to mineral material disposals allowed in Unoccupied Habitat.

In Non-Habitat Areas, noise disturbance limitations would be applied as appropriate.

These actions would result in impacts on the salable minerals program through reduced access and increased costs due to requirements for mitigation. Indirect impacts include potentially pushing development of salable minerals to non-federal lands. In addition, costs for salable minerals could potentially increase as distances to markets and transportation costs increase. Alternative B would have greater impacts on salable minerals than Alternative A.

## ALTERNATIVE C

Under Alternative C, mineral material sales would be allowed in the entire analysis area, subject to the provisions of the mitigation framework. Applicable timing limitation, surface disturbance limitation, noise, and mitigation standards in the General Management Section would be applied to mineral material sales.

BLM_0028044

These actions would result in impacts on the salable minerals program through reduced access and increased costs due to requirements for mitigation.  Alternative C would have greater impacts on locatable minerals than Alternative A, but less than under Alternative B.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Under sub-alternatives $D_1$ and $D_2$, impacts in the Gunnison Basin and satellite population areas would be the same as under Alternative C.

## 4.15.4.  CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect leasable, locatable, salable, and non-energy leasable minerals are: market fluctuations, pipeline capacity, available markets for distribution, regulatory constraints, new technologies, and reservoir/reserve depletion.

The cumulative impact analysis area for leasable, locatable, salable, and non-energy leasable minerals is the planning area, regardless of land ownership. Impacts on the ability to develop and extract mineral resources could cumulatively reduce exploration and production of commodities from BLM-administered lands.

Impacts on mineral resources that are individually minor may cumulatively reduce exploration and production of commodities from BLM-administered lands.  The BLM has no control over many of the factors that affect mineral extraction and prospecting.  These factors include regulatory policy, public perception and concerns, transportation costs and availability, well spacing, low commodity prices, taxes, and housing and other necessities for workers.

Levels of domestic oil and gas exploration and development follow the swings in oil and gas prices.  As price increases, the development of existing leases and the demand for new leases increases, even in areas with less development potential.  Restrictions on oil and gas leasing would have a cumulative effect on the ability to develop these resources.  Under Alternative A, oil and gas exploration and development is expected to continue as correlated with mineral commodity prices.  Under all of the action alternatives (alternatives B and C and sub-alternatives $D_1$ and $D_2$), oil and gas production would decrease due to restrictions placed on development.  Decreases in production would be greatest under Alternative B, under which the BLM would close all GUSG habitat to fluid mineral leasing.

There is a relatively small amount of moderate to high development potential in the decision area (about 17% or 148,218 acres of federal minerals).  Much of that area is

BLM_0028045

already subject to a NSO stipulation (about 48% of federal minerals in the Monticello-Dove Creek population area and 68% of federal minerals in the San Miguel Basin population area).  In comparison to the rest of Colorado and Utah, oil and gas production in counties overlapping the planning area is relatively small.  Given those factors, the cumulative impacts of reduced oil and gas production in the planning area would be relatively minor on a statewide or national scale.

Non-energy leasable mineral development is also an ongoing activity in the cumulative impact analysis area and is expected to continue as such under Alternative A.  Under all of the action alternatives (alternatives B and C and sub-alternatives $D_1$ and $D_2$), non-energy leasable mineral development would decrease due to restrictions placed on development. Decreases in production would be greatest under Alternative B, under which the BLM would close all GUSG habitat to non-energy leasable mineral development.  There are currently no authorized leases in the decision area.  However, there is demonstrated interest in prospecting for potash resources, with four BLM-authorized potash prospecting permits in the analysis area, one BLM-authorized potash prospecting permit adjacent to the decision area, and at least another 13 pending applications in the decision area.

Locatable mineral development is an ongoing activity in the cumulative impact analysis area and is expected to continue under Alternative A.  The level of exploration and development of locatable minerals, particularly gold and uranium, follow the swings in mineral commodity prices.  Under all of the action alternatives (alternatives B and C and sub-alternatives $D_1$ and $D_2$), locatable mineral development may decrease due to restrictions placed on development. Decreases in production would be greatest under Alternative B, under which the BLM would recommend that all GUSG habitat be withdrawn from mineral entry.

Salable mineral extraction and use is expected to increase, in conjunction with increasing private property and commercial development.  As the amount of BLM-administered land available for disposition of salable materials is reduced, it is expected that demand for salable minerals would increase in other areas adjacent to the cumulative impact analysis area.  The demand for salable minerals includes the demand for relatively short transportation distances.  A reduction of availability on BLM-administered lands would likely push development of salable minerals to nearby non-federal lands.  Due to their proximity to the decision area, these lands would likely be within or adjacent to GUSG habitat.

Mineral exploration and development would continue to occur under all alternatives.  However, acreages open to exploration and development would vary by alternative.  Overall, management under Alternative B would be the most restrictive to mineral development and could result in the greatest amount of cumulative impacts on mineral exploration and development in the cumulative

BLM_0028046

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

impact analysis area. A reduction of availability of mineral resources on BLM-administered lands would likely push development of minerals to nearby non-federal lands with development potential.  Due to the proximity to the decision area, these lands would likely be within or adjacent to GUSG habitat.

BLM_0028047

# 4.16. LANDS & REALTY

## LAND USE AUTHORIZATIONS AND UTILITY CORRIDORS

### 4.16.1. METHODOLOGY

#### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of BLM lands for land use authorizations, including ROWs, permits, leases, and communication site leases:

- Acres of ROW exclusion areas
- Acres of ROW avoidance areas
- Acres of designated utility corridors
- Acres of BLM ROWs
- Powerlines/Phone Lines
  - o Overhead
  - o Buried
- Roads
- Pipelines
- Acres of communication site leases/ROWs
- Acres of other leases and permits.

#### ASSUMPTIONS

The analysis of impacts on lands and realty is based on the following assumptions:

- Existing ROWs would be managed to protect valid existing rights.
- Upon renewal, assignment, or amendment of existing ROWs, additional stipulations could be included.
- The demand for ROWs, communication facilities, and other land uses would increase over the life of the plan.
- Maintaining and upgrading existing ROWs and communication facilities is preferred before constructing new facilities.

#### METHODS AND DATA

The term "ROW" is generally used to refer to all land use authorizations, including ROWs, land use permits, leases, and communications use leases, unless otherwise

BLM_0028048

specified in the discussion. This includes authorizations for small-scale solar energy developments and wind energy developments. As discussed in Chapter 3, the decision area is excluded from utility scale (20 megawatt or greater) development proposals. Any proposals for small-scale development would be subject to the same limitations as other ROW proposals.

Where possible, BLM spatial data (GIS) and other data (such as LR2000) were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

The primary planning decisions that could impact the lands and realty program include: ROW exclusion and avoidance designations; timing limitation and other surface use limitation standards and guidelines; travel management limitations; utility corridor designations; withdrawal recommendations; and, allowable mineral development.

Designations of ROW exclusion and avoidance areas could impact the ability to site ROWs on public land and could require additional mitigation and project criteria. Seasonal restrictions on travel, construction, and surface-disturbing maintenance could impact site accessibility, the ability to construct and maintain ROWs, and project costs. Limits on upgrades to existing routes, new route construction, and realignments of existing routes could impact the ability to site ROWs in an applicant's preferred location. Designations of utility corridors could direct future ROWs to preferred locations, while undesignating corridors could impact the ability to site future ROWs. Limitations on mineral development could reduce demand for ROWs for new infrastructure, such as roads and utilities.

## 4.16.2. IMPACTS BY ALTERNATIVE

### ALTERNATIVE A - NO ACTION

Under No Action Alternative A, approximately 47,400 acres are designated as ROW exclusion areas and 119,500 acres as ROW avoidance areas, including 32,800 acres of exclusion and 5,900 acres of avoidance in Non-Habitat Areas. The remainder of the analysis area is open to ROWs with various resource protections applied as stipulations.

The more recently adopted plans (Grand Junction, Moab, Monticello, and Tres Rios RMPs) provide for NSO, no surface disturbance, and/or ROW exclusion within 0.6 mile of a lek. All of the plans (except for the McInnis Canyons NCA RMP, in which

BLM_0028049

the entire NCA is a ROW exclusion area) include timing limitations to protect GUSG during breeding and/or nesting. The Gunnison Gorge NCA RMP, Tres Rios RMP, and Draft Dominguez-Escalante NCA RMP also include timing limitations for wintering GUSG protection.

There are 248,110 acres in the analysis area designated as utility corridors.

There are no approved or recommended withdrawals specific to protection of GUSG in the analysis area. The Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness Areas, are withdrawn from mineral entry and mineral leasing. Wilderness Study Areas are withdrawn from mineral leasing.

Mineral development throughout much of the decision area is limited for GUSG protections. All Occupied Habitat is closed to mineral leasing under the Grand Junction RMP, and is open to mineral leasing with a NSO stipulation under the Canyons of the Ancients NM and Tres Rios RMPs, and the San Luis Valley Geothermal RMP Amendment. The rest of the decision area that is open to leasing is subject to a NSO stipulation for areas within 0.6 mile of a lek, with NSO within 2 miles of a lek for the Gunnison Gorge NCA RMP decision area outside of the proclaimed NCA. There are similar protections for mineral sales throughout the decision area. New mineral development in open areas would continue to require new ROWs for related infrastructure.

## ALTERNATIVE B

Under Alternative B, Occupied and Unoccupied Habitat in the decision area would be designated as a ROW exclusion area, with some exceptions allowed. Areas subject to the specified exceptions would be managed as ROW avoidance areas. The exceptions would limit any new ROWs to being located within designated utility corridors or within 100 feet of the centerline of highways and county roads (or up to 100 feet from the edge of the ROW if not feasible), or to providing access and utilities to valid existing rights.

Timing limitations, ground disturbance limitations, and mitigation requirements would apply to any new, amended, or renewed authorizations.

Non-Habitat Areas where activities could be disruptive to GUSG would be designated as ROW avoidance areas, and the same guidelines for resource protection would be applied as those described under Alternative C. Noise disturbance limitations would be applied, as appropriate. In addition, whenever feasible new facilities and/or upgrades to existing facilities would be located within designated corridors or other areas with existing facilities.

BLM_0028050

In Occupied and Unoccupied Habitat, designated utility corridors not containing an authorized ROW would be undesignated. No new corridors would be designated in the decision area.

Withdrawal of the decision area would be recommended. This would require preparation of withdrawal packages to be submitted to the Secretary of Interior.

Occupied and Unoccupied Habitat would be closed to mineral leasing and mineral sales. No new leases would be issued when existing leases expire or terminate and so demand for ROWs would decrease.

All of the actions under Alternative B would lead to a decrease in the demand for and the number of new ROWs granted. It would be more difficult for BLM to accommodate new ROWs, and they would be subject to timing, disturbance, and siting limitations and mitigation requirements that could increase construction costs. New ROWs that could not be accommodated within the exception criteria would likely be diverted to adjacent nonfederal lands or prevented entirely.

## ALTERNATIVE C

Under Alternative C, Occupied and Unoccupied Habitat would be designated as a ROW avoidance area, and guidelines for resource protection would be applied if locating a new ROW in Occupied and Unoccupied Habitat could not be avoided. Generally, existing routes subject to a ROW would be required to be maintained in their current condition (width, surface, etc.). Electric and phone lines would be required to be buried, if possible, or if not, then collocated with existing infrastructure where feasible. Perch deterrents would be required for any overhead lines. New communication infrastructure would be collocated with existing infrastructure where possible.

Timing limitations, ground disturbance limitations, and mitigation requirements would apply to any new, amended, or renewed authorization.

No new corridors would be designated in Occupied Habitat. Designated utility corridors in Occupied Habitat that do not contain an authorized ROW would be undesignated.

Withdrawals would be considered for recommendation based on risk to GUSG and its habitat from conflicting locatable mineral potential and development. For areas not withdrawn, seasonal restrictions and other mitigation measures would be applied to mining plans of operation.

Occupied Habitat in the decision area would be open to mineral leasing with a NSO stipulation. Unoccupied Habitat in the decision area would be open to mineral

leasing with a CSU stipulation to protect sagebrush and riparian habitat quality and connectivity. Mineral material sales would be allowed in accordance with the general management action limitations.

The actions under Alternative C would lead to a decrease in the number of new ROWs, but to a lesser degree than under Alternative B. Limitations to mineral development would reduce the demand for new ROWs. It would be more difficult for BLM to accommodate new ROWs, and ROWs would be subject to timing, disturbance, and siting limitations and mitigation requirements that could increase construction costs. There would be fewer new overhead electric and phone lines than would be authorized under the No Action Alternative, due to the requirements to collocate and/or bury new lines where feasible.

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ would: 1) implement the CCA for specific actions in Occupied Habitat; 2) would include the same actions as Sub-Alternative $D_2$ for Unoccupied Habitat and for activities not covered by the CCA and not related to minerals; and, 3) would include the same actions related to minerals development as under Alternative C.

ROWs for new facilities that would not be covered by the CCA guidance include proposals for more than 5.0 acres of permitted area, or more than 25 feet of utility ROW permitted area width, or more than 0.5 mile of aboveground infrastructure (not including buried utilities and pipelines). The CCA generally would apply more limitations on development within Tier 1 habitat than within Tier 2 habitat. The additional limitations include offsite mitigation requirements and a prohibition on new infrastructure, outside of existing development footprints, within 0.6 mile of a lek.

The impacts under Sub-Alternative $D_1$ are similar to those described for Alternative C. However, actions that would require additional offsite mitigation would further increase project costs for proposed ROWs.

## SUB-ALTERNATIVE D₂ - SATELLITE PREFERRED

The actions under Sub-Alternative $D_2$ would be similar to those under Alternative C, with the following differences:

The bulk of the decision area would be designated as a ROW avoidance area. However, areas within 0.6 mile of a lek would be designated as ROW exclusion areas. The same exceptions to ROW exclusion area as allowed under Alternative B

BLM_0028052

would be applied.  Areas subject to the specified exceptions would then be managed as ROW avoidance areas.

The impacts under Sub-Alternative $D_2$ would be similar to those under Alternative C.

## 4.16.3. CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect the lands and realty program include the demand for new and existing ROWs for projects such as access roads, pipelines, electric and phone lines, and communication sites, related to minerals and renewable energy developments and to development of private lands.

The cumulative impact analysis area used to analyze cumulative impacts on the uses administered by the lands and realty program is composed of the planning area.

Population growth, and the associated increased private land development, access needs, and utilities development, as well as increased minerals development and associated infrastructure development and access needs, is expected to continue placing a greater demand on lands and realty actions. Restrictions on ROWs outlined in the alternatives, combined with restrictions from other management plans in the area, would have a cumulative effect by reducing routing options and possibly increasing project construction or implementation costs.

No additional restrictions were placed on utility-scale wind and solar energy development in the alternatives.  None of the decision area has been identified as having potential for future wind energy development.  However, there are some proposals for wind farms on private lands in the planning area in San Juan County, Utah. The decision area is already excluded from utility scale solar development. There are currently no wind energy or solar energy ROWs authorized on public lands in the decision area.

Cumulative impacts on lands and realty are expected to be the greatest under Alternative B, since it would place the most restrictions on development.  In contrast, management under Alternative A would place the fewest restrictions on the lands and realty program and would therefore be expected to contribute the fewest cumulative impacts on lands and realty.  Management under Alternative C and sub-alternatives $D_1$ and $D_2$ would also place restrictions on development, but to a lesser extent than under Alternative B.

BLM_0028053

# 4.17. AREAS OF CRITICAL ENVIRONMENTAL CONCERN

## 4.17.1. METHODOLOGY

### INDICATORS

- The presence of absence of an ACEC is indicated by a designation within a BLM RMP.

### ASSUMPTIONS

- The relevant and important values for which an ACEC is designated are not necessarily uniformly distributed across the entire ACEC.
- Management actions designed to protect GUSG habitat by reducing surface disturbance would benefit those relevant and important values that also occur within sagebrush communities.
- Not all relevant and important values within an ACEC have the same level of protection due to variation in specific management decisions.  Management actions designed to protect GUSG habitat by reducing surface disturbance may result in impacts on relevant and important values that occur outside sagebrush communities.
- The designation of an ACEC does not prevent appropriate land uses so long as they are not detrimental to the relevant and important values.
- Proposed management decisions would not replace existing decisions that are more restrictive.
- Designation of an ACEC would not replace existing ACEC designations; GUSG habitat would be added to existing ACECs as another reason for designation and special management attention.

### METHODS AND DATA

The analysis of impacts on ACECs is necessarily an analysis of impacts on the relevant and important values that are given special management attention through the designation of ACECs. A complete evaluation of impacts on these values is incorporated into the appropriate impact analysis sections addressing Fish and Wildlife, Special Status Species, Vegetation Management, Soil and Water Resources, Visual Resources, Cultural Resources, and Paleontological Resources.  This analysis

BLM_0028054

will not duplicate those sections. Instead, this analysis will center on a comparison of alternatives based on the inclusion of an ACEC in Alternative B and any additional protections provided as a consequence.

## 4.17.2. IMPACTS BY ALTERNATIVE

### ALTERNATIVE A

All currently designated ACECs would continue without modification. The assumption is that proposed management decisions would not replace existing decisions that are more restrictive. No new ACECs would be designated.

### ALTERNATIVE B

Under Alternative B, all Occupied and Unoccupied Habitat would be designated as an ACEC. The special area designation would serve as a reminder to public land users and the BLM that GUSG habitat, both Occupied and Unoccupied, has significant values and resources requiring management with greater restrictions than public lands outside the boundaries of the ACEC.

#### Recreation and Travel Management

Management actions resulting from ACEC designation would limit travel to existing roads and trails, prohibit designation of new RMAs (SRMAs or ERMAs) and only allow Special Recreation Permits that have neutral or beneficial effects to GUSG and their habitat.

#### Minerals and Land Use Authorizations

The ACEC would be designated a ROW exclusion area, with exceptions for designated ROW corridors. The ACEC would be closed to fluid mineral leasing and recommended for withdrawal from locatable mineral entry. Designation could trigger additional requirements for avoidance of unnecessary and undue degradation under the general mining laws (43 CFR 3809). Potential solid mineral operators would be required to submit a plan of operations and obtain BLM approval prior to beginning operations that could cause surface disturbance greater than casual use.

### ALTERNATIVE C

No new ACECs would be designated. Impacts would be the same as under Alternative A.

BLM_0028055

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

No new ACECs would be designated.  Impacts would be the same as under Alternative A.

BLM_0028056

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

# 4.18. SOCIO-ECONOMICS

## 4.18.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following are indicators of socioeconomic effects resulting from management actions related to the protection of GUSG within the decision area:

- Employment, labor income, and output associated with economic activities affected by management alternatives
  - o Number of jobs
  - o Dollar value of output and labor income
- Qualitative assessment of additional costs to the use of public lands and resources
  - o Grazing allotment infrastructure and management costs
  - o Restrictions on mineral development and extraction, including fluid mineral leasing stipulations (e.g., NSO) and right-of-way exclusion and avoidance designations
  - o Recreation site access
- Interest groups and communities of place
  - o Qualitative assessment of effects to quality of life
  - o Qualitative assessment of non-market values
- Environmental Justice
  - o Qualitative assessment of disproportionately high and adverse human health and environmental impacts.

### ASSUMPTIONS

Following are the basic assumptions related to social and economic impact assessment of the alternatives:

- The analysis of economic impacts of management alternatives on grazing assumes billed AUMs represent actual use based on the latest available data. Billed AUMs measure the amount of forage the BLM bills for annually. Billed AUMs may fluctuate year-to-year, but future changes cannot be predicted.
- Recreational expenditures incurred by local visitors to federal lands for recreational purposes are expected to continue to be spent locally if recreational resources on federal lands are no longer available. Expenditures by non-local visitors to federal lands are assumed to no longer be spent in

BLM_0028057

the planning area if federal lands are no longer available for recreation. Economic impacts are assumed to derive from recreation from non-local visitors.

- The analysis of impacts of management alternatives affecting oil and gas development on federal lands assumes that operators who are unable to drill on federal lands would not access the same oil and gas from nearby private or state lands. To the degree that a shift to private or state lands would occur, the impact estimates would be lower for restrictions on drilling and production on federal lands.

- The economic analysis of fluid mineral leasing for action alternatives B and C and sub-alternatives $D_1$ and $D_2$) relies on a qualitative description of added costs due to lease stipulations and access restrictions.

As a landscape level planning effort, none of the alternatives prescribe project-level or site-specific activities on BLM-managed public lands. Furthermore, the agency's selection of an alternative does not authorize funding to any specific project or activity nor does it directly tie into agency budgets as appropriated annually through the federal budget process. As a consequence, agency costs and differences in program costs across alternatives have not been quantified. Information has been presented in several resource impact sections on the types of costs that might be associated with various GUSG conservation measures.

## METHODS AND DATA

For the analysis of economic consequences, quantitative estimates are provided where sufficient data or estimates are available on the potential changes in authorized uses of federal lands under each alternative. When quantitative estimates of economic consequences are not possible, a qualitative discussion of the potential economic effects of management actions associated with specific authorized uses is presented. Therefore, the overall economic consequences are a combination of quantitative estimates and qualitative discussion.

The economic contribution analysis uses IMPLAN Professional Version 3.0 with 2012 data. IMPLAN is an input-output model that uses linkages in a regional economy to estimate the economic impact of projects, programs, policies, and economic changes on a region. The economic contribution analysis also uses FEAST, a USFS tool that serves as an interface with IMPLAN. FEAST translates resource inputs (such as AUMs and recreation visits) into economically-meaningful units for use in IMPLAN.

For quantitative estimates, IMPLAN was used to estimate impacts on employment, labor income, and output in the decision area. Direct economic impacts are generated by the activity itself, such as livestock grazing on public lands. Indirect

BLM_0028058

impacts occur when the directly affected sector purchases supplies and services from other industries. Induced impacts are generated as a result of spending new household income generated by direct and indirect employment. The employment estimated is defined as any part-time, seasonal, or full-time job. In the economic impact tables, direct, indirect and induced contributions are included in the estimated impacts.

The IMPLAN database describes the economy in 440 sectors using federal data from 2012. However, the IMPLAN model is a static model, and it does not capture changes in the industrial composition of a region over time, nor does it capture dynamic effects that may be associated with processes of growth or decline, such as changes in technology or labor productivity. There is, therefore, a degree of uncertainty in the estimates of impacts obtained through the IMPLAN model.

The social analysis considers how proposed management actions may affect quality of life. This analysis incorporates non-market values—goods and services not traded in markets that contribute to human well-being. Due to data limitations, the assessment of non-market values is primarily qualitative. Additionally, the social analysis evaluates the potential for disproportionate effects to minority and low-income populations (Environmental Justice).

## Grazing

Economic contributions of public land grazing follow the methodology developed and used by the BLM as part of the annual Department of the Interior economic report. See DOI (2014) for additional information.

## Recreation

The recreation section of the economic contribution analysis uses visit estimates from the Recreation Management Information System (RMIS). RMIS is the BLM's official repository for data relating to the recreational use of public lands and waters. Annually, state and field office outdoor recreation planners enter and verify data on the number of recreation visits to each field office. The data contained in RMIS are the best available information on recreational use of BLM-managed public lands. The economic contribution analysis uses the average number of visits to each field office in FY13 and FY14. The average number of visits is multiplied by the share of the field office within GUSG habitat. The resulting number is used as a proxy for the number of visits that occur within the habitat.

The BLM does not collect information on the distribution of recreation visits among local and non-local users and day and overnight use. Therefore, this analysis uses the national recreation visitor segment shares from the Forest Service's National Visitor Use Monitoring (NVUM) program (White et al 2013). Local visitors are

defined as people residing within 50 miles of the recreation site. The NVUM visitor distribution is:

- Local day visitors: 49%
- Local overnight visitors, lodging on public land: 4%
- Local overnight visitors, lodging off public land: 1%
- Non-local day visitors: 10%
- Non-local overnight visitors, lodging on public land: 9%
- Non-local overnight visitors, lodging off public: 14%
- Non-primary visitors: 13%

Non-primary visitors are individuals whose trip purpose is something other than recreation on the public land. In the economic contribution analysis these visits are added to the local day visits category, since this market segment has the lowest expenditures. Therefore, non-primary visits are captured without assuming substantial visitor spending.

These segment shares are applied to the BLM visitation numbers to estimate the distribution of visitor types for each field office. The segment shares are necessary for the economic contribution analysis because visitor spending varies between local and non-local visitors as well as between day and overnight use. Since BLM does not collect national visitor expenditure data, the average Forest Service visitor expenditure estimates are applied to the BLM data (White et al 2013).

Average visitor spending (per trip) in 2014 dollars is:

- Local day visitors: $36.54
- Local overnight visitors, lodging on public land: $179.82
- Local overnight visitors, lodging off public land: $235.72
- Non-local day visitors: $69.34
- Non-local overnight visitors, lodging on public land: $258.35
- Non-local overnight visitors, lodging off public: $569.08

Dollar values were converted from their original 2009 dollars to 2014 dollars using the Bureau of Labor Statistics' consumer price index calculator (BLS 2014a).

## Minerals

Federal data sources report a wide range of employment in the extraction of oil and gas sector. IMPLAN employment estimates, which are derived from several federal sources, exceed the employment reported by the U.S. Census Bureau's County Business Patterns (CBP). In Area 1, IMPLAN reports 859.0 jobs in the extraction of oil and gas, while CBP reports only 4 jobs in 2012. In Area 2, IMPLAN reports 549.7 jobs and CBP reports 99 jobs in 2012. In Area 3, IMPLAN reports 242.7 jobs and CBP reports 90 jobs in 2012 (IMPLAN 2012 and U.S. Census Bureau 2014).

BLM_0028060

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

Discussions with state officials, BLM minerals specialists, and BLM economists suggest that the IMPLAN data is the most accurate available information. Therefore, IMPLAN is used for this analysis.

Since only Area 3 has production from BLM-managed wells in GUSG habitat, the economic contribution analysis is conducted only for this area. The following calculations were made to estimate direct jobs associated with production from BLM-managed wells within habitat:

1) Multiply countywide barrels of oil produced by the 2012 price (5,477,216*94.05)
2) Multiply countywide Mcf of natural gas produced by the 2012 price (51,109,451*2.66)
3) Divide the total number of jobs in the extraction of oil and gas sector by the sum of (1) and (2), which yields 242.7/(515,132,164.8+135,951,139.66) = 242.7/651,083,304.46 = 0.000000373
4) Multiply barrels of oil produced from BLM-managed wells within GUSG habitat by the 2012 price (8,283*94.05) = 779,016.15
5) Multiply Mcf of natural gas produced from BLM-managed wells within GUSG habitat by the 2012 price (919,281*2.66) = 2,445,287.46
6) Multiply the sum of (4) and (5) by the result of (3), which yields 3,224,303.61 * 0.000000373 = **1.2 direct jobs**

The number of direct jobs are then entered into the IMPLAN model to estimate the indirect and induced effects of oil and gas production from BLM-managed wells within GUSG habitat. IMPLAN modeling reveals that in addition to the 1.2 direct jobs, extraction of oil and gas from BLM-managed wells within GUSG habitat supports an additional 0.7 indirect jobs and 0.3 induced jobs. The total labor income associated with the direct, indirect, and induced jobs is $95,000 and total output is $630,000 (IMPLAN 2012).

## 4.18.2. SOCIO-ECONOMIC IMPACTS

### GRAZING ALLOTMENTS

The potential impacts of management alternatives affecting grazing closures on overall employment, earnings, and output were estimated quantitatively only for alternatives A and B. Alternative C and sub-alternatives $D_1$ and $D_2$ would maintain GUSG habitat open for grazing, but these alternatives would impose restrictions on livestock grazing in GUSG habitat. The extent to which management actions under these alternatives would actually reduce the amount of billed AUMs is unclear. For purposes of the quantitative comparison of alternatives, the mid-point between Alternatives A and B is presented as an estimate of the economic impact of

BLM_0028061

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

Alternative C and sub-alternatives D₁ and D₂. This estimate is presented to allow addition to the impacts of other resource areas on output, employment, and labor income for comparison of alternatives, but should be understood as representing the range of potential impacts.

In addition to economic impacts linked to closing federal lands to livestock grazing, the estimates are intended to illustrate other costs on livestock operators, mainly under Alternative C and sub-alternatives D₁ and D₂. These include, among others:

- Various measures could affect the efficiency of livestock operations such as restrictions in GUSG habitat on vegetation treatments, structural improvements, movement of cattle, or on supplemental winter feeding.
- To the extent determined necessary in land health assessments, some allotments may be required to change livestock rotation or season of grazing, which could also affect the efficiency of ranch operations.
- For Alternative C and sub-alternatives D₁ and D₂ in areas where disturbance caps are exceeded, there is potential for restrictions on new disturbance (such as roads) that could increase operation costs for livestock operators.

Details about impacts under each alternative are provided below.

## ALTERNATIVE A - NO ACTION

Under No Action Alternative A, federal lands with GUSG habitat would remain open for grazing.

### Area 1

Area 1 contains approximately 14,600 billed AUMs for cattle, 7 billed AUMs for horses, 3,381 AUMs for sheep, and 2,275 AUMs for yearling cattle. The majority of AUMs are within GUSG habitat. Livestock grazing in Area 1 supports 45 jobs, $720,000 in labor income, and $4.5 million in output. None of these are expected to change as a result of management actions under No Action Alternative A.

### Area 2

Area 2 contains approximately 6,916 billed AUMs for cattle, 26 billed AUMs for horses, and 248 AUMs for yearling cattle. Livestock grazing in Area 2 supports 15 jobs, $275,000 in labor income, and $1.8 million in output. None of these are expected to change as a result of management actions under No Action Alternative A.

### Area 3

Area 3 contains approximately 9,446 billed AUMs for cattle, 8 billed AUMs for horses, and 128 AUMs for yearling cattle. Livestock grazing in Area 3 supports 21

BLM_0028062

jobs, $270,000 in labor income, and $1.7 million in output. None of these are expected to change as a result of management actions under No Action Alternative A.

## ALTERNATIVE B

Under Alternative B, GUSG habitat would be closed to livestock grazing. Livestock grazing on federal lands in the decision area would be restricted to those with no GUSG habitat. Alternative B would also implement management actions in Non-Habitat Areas. Range management actions in the Non-Habitat Areas would apply only to BLM managed-lands. However, grazing would continue to be authorized.

### Area 1

In Area 1, the impact of Alternative B is reflected in the estimated loss of approximately $783,000 of the output, 9 jobs, and $132,000 labor income compared to current conditions. The impact of Alternative B may also be greater than estimated, if the closure of federal lands makes some grazing operations no longer viable. In addition, permittees may incur fencing costs to prevent livestock from entering public lands in GUSG habitat. Compliance with water development best management practices may increase costs to permittees with allotments in Non-Habitat Areas.

### Area 2

In Area 2, the impact of Alternative B is reflected in the estimated loss of approximately $1 million of the output, 8 jobs, and $153,000 labor income compared to current conditions. The impact of Alternative B may also be greater than estimated, if the closure of federal lands makes some grazing operations no longer viable. In addition, permittees may incur fencing costs to prevent livestock from entering public lands in GUSG habitat. Compliance with water development best management practices may increase costs to permittees with allotments in Non-Habitat Areas.

### Area 3

In Area 3, the impact of Alternative B is reflected in the estimated loss of approximately $1.3 million of the output, 16 jobs, and $208,000 labor income compared to current conditions. The impact of Alternative B may also be greater than estimated, if the closure of federal lands makes some grazing operations no longer viable. In addition, permittees may incur fencing costs to prevent livestock from entering public lands in GUSG habitat. Compliance with water development best management practices may increase costs to permittees with allotments in Non-Habitat Areas.

BLM_0028063

## ALTERNATIVE C

Under Alternative C, grazing on federal lands with GUSG habitat is likely to be similar to Alternative A because all GUSG habitat would be kept open for grazing. However, under Alternative C, decisions on livestock movement, range improvements, and vegetation treatments may be subject to the conservation, enhancement, or restoration of GUSG habitat, potentially reducing forage available because permittees would be required to move livestock off-range if necessary to protect GUSG. Seasonal restrictions could also be imposed, requiring that permittees move their livestock elsewhere, with added costs to their operations.

### Area 1

The estimated employment, labor income, and output consequences of Alternative C are presented as the mid-point between alternatives A and B. In Area 1, this translates to 41 jobs, $652,000 of labor income, and $4.1 million of output. This estimate is provided to allow addition to the impacts of other resource areas on output, employment, and earnings for comparison of alternatives, but should be understood as representing the range of potential impacts (between those of A and B).

### Area 2

The estimated employment, labor income, and output consequences of Alternative C are presented as the mid-point between alternatives A and B. In Area 2, this translates to 11 jobs, $199,000 of labor income, and $1.3 million in output. This estimate is provided to allow addition to the impacts of other resource areas on output, employment, and earnings for comparison of alternatives, but should be understood as representing the range of potential impacts (between those of A and B).

### Area 3

The estimated employment, labor income, and output consequences of Alternative C are presented as the mid-point between alternatives A and B. In Area 3, this translates to 13 jobs, $166,000 of labor income, and $1.1 million of output. This estimate is provided to allow addition to the impacts of other resource areas on output, employment, and earnings for comparison of alternatives, but should be understood as representing the range of potential impacts (between those of A and B).

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

The economic consequences of management under Sub-Alternative $D_1$ are expected to be similar to the economic consequences described under Alternative C.

BLM_0028064

## SUB-ALTERNATIVE D₂ - SATELLITE PREFERRED

The economic consequences of management under Sub-Alternative $D_2$ are expected
to be similar to the economic consequences described under Alternative C and Sub-
Alternative $D_1$.

# RECREATION

## ALTERNATIVE A - NO ACTION

No Action Alternative A would be the least likely to affect recreational
opportunities in the decision area. Total recreation visits, activity participation, and
the location of visits would not change as a result of management under this
alternative.

### Area 1

Non-local recreation visits in Area 1 support 90 jobs, $2.4 million in labor income,
and $6.5 million in output. None of these are expected to change as a result of
management actions under Alternative A.

### Area 2

Non-local recreation visits in Area 2 support 34 jobs, $992,000 in labor income, and
$2.7 million in output. None of these are expected to change as a result of
management actions under Alternative A.

### Area 3

Non-local recreation visits in Area 3 support 40 jobs, $1.1 million in labor income,
and $2.9 million in output. None of these are expected to change as a result of
management actions under Alternative A.

## ALTERNATIVE B

Alternative B would adopt the most restrictive management of recreation use
among the considered alternatives, including limiting route construction and the
issuance of SRPs in Non-Habitat Areas. Total recreation visits are not expected to
change, however, some users may be displaced to other sites in the affected
counties. As a result, economic activity associated with BLM-managed public land
recreation would not change. However, social values related to recreation may be
affected as activities are displaced to less preferred sites. Data on site-specific
management actions is unavailable; therefore, estimating differentiated effects among
the three socioeconomic areas is not possible.

BLM_0028065

## ALTERNATIVE C

Alternative C would implement some recreation restrictions to avoid adverse effects to GUSG and their habitat. Similar to Alternative B, total recreation visits and their associated economic activity are not expected to change. However, some recreation users may be displaced to other sites. The amount of displacement would be lower under Alternative C compared to Alternative B. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ would implement recreation restrictions for consistency with the CCA to protect and enhance the recovery of GUSG. Similar to alternatives B and C, total recreation visits and their associated economic activity are not expected to change. However, some recreation users may be displaced to other sites. The amount of displacement would be lower under Sub-Alternative $D_1$ compared to Alternative B. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Sub-Alternative $D_2$ would implement some recreation restrictions to avoid adverse effects to GUSG and their habitat. Similar to alternatives B and C and Sub-Alternative $D_1$, total recreation visits and their associated economic activity are not expected to change. However, some recreation users may be displaced to other sites. The amount of displacement would be lower under Sub-Alternative $D_2$ compared to Alternative B. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

# OIL, NATURAL GAS, AND $CO_2$ LEASES

## ALTERNATIVE A - NO ACTION

Alternative A would continue current management of oil, natural gas, and carbon dioxide ($CO_2$) leases in the planning area. The existing resource management plans incorporate restrictions on oil, natural gas, and $CO_2$ activity to protect GUSG habitat. The selection of Alternative A would not affect employment, labor income, or output relative to existing conditions. Oil, natural gas, and $CO_2$ lessees are not

expected to face additional costs to their operations as a result of management actions under this alternative.

Future fluid mineral leasing would have the greatest potential under Alternative A. Within the planning area, 96,564 acres would be designated as closed to leasing and 941,991 acres would be designated as open to leasing. The potential for future economic activity related to oil, natural gas, and $CO_2$ development in the planning area would be highest under this alternative.

### Area 1

There are no federal wells with oil or gas production in Area 1.

### Area 2

There are no federal wells with oil or gas production in Area 2.

### Area 3

All existing oil and gas leases are located within the Monticello-Dove Creek and San Miguel Basin population areas. There are 31 wells with production in the Monticello-Dove Creek population area and 37 wells with production in the San Miguel Basin population area. All of the Monticello-Dove Creek wells with production are in Unoccupied Habitat. In the San Miguel Basin population area, all of the wells with production are in Occupied Habitat.

Annual federal oil production in the Monticello-Dove Creek population area averaged approximately 6,200 barrels (bbl) between 2012 and 2014. Over the same period, federal oil production in the San Miguel Basin population area was approximately 2,200 bbl. Annual federal natural gas production in the Monticello-Dove Creek population area averaged approximately 276,000 Mcf between 2012 and 2014. Over the same period, annual federal oil production in the San Miguel Basin Population Area was approximately 644,000 Mcf. Chapter 3 displays the countywide oil and gas production in the Monticello-Dove Creek and San Miguel Basin population areas. Federal oil and gas production in both Occupied and Unoccupied Habitat accounts for a small share of total oil and gas production in the counties (approximately 0.2 percent of oil production and 2 percent of gas production).

Federal mineral production within GUSG habitat in Area 3 would be expected to continue to support 2 jobs, $95,000 in labor income, and $630,000 in output.

## ALTERNATIVE B

Under Alternative B, the entire planning area would be closed to fluid minerals leasing. Existing leases would be allowed to expire. No expressions of interest

BLM_0028067

would be accepted for new or expired leases and unleased federal minerals would no longer be available for oil, natural gas, and $CO_2$ leasing. Alternative B would be expected to reduce employment, labor income, and output related to the development and extraction of oil, natural gas, and $CO_2$ in the planning area. The economic impact of closing the planning area to fluid mineral leasing would vary across the planning area; effects by socioeconomic area are described in more detail below.

Some operators might be able to obtain leases on private land, which could offset some of the economic consequences of this alternative. However, the extent to which these opportunities would exist is uncertain. Specific impacts on leasing and development of currently unleased minerals cannot be estimated without project-specific information on the size and configuration of such leases in relation to adjacent federal or private lands and existing or feasible new access routes. Data on site-specific management actions would not be available until specific lease sales are proposed.

Alternative B would also implement a controlled surface use (CSU) stipulation on BLM-managed lands and federal mineral resources in the Non-Habitat Areas. The CSU stipulation may increase the costs of fluid mineral development and extraction in Non-Habitat, which could deter fluid mineral activities in those areas. Because on site-specific management actions is unavailable, estimating differentiated effects of the CSU stipulation in Non-Habitat among the three socioeconomic areas is not possible.

The economic impact of closing the decision area to fluid mineral leasing would vary across the decision area.

## Area 1

In most of Area 1 (Gunnison Basin, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass population areas), there is low to no development potential for oil, natural gas, and $CO_2$. In the Crawford population area, between one and ten applications for permit to drill (APDs) are projected, which would not occur under Alternative B. Therefore, Alternative B could affect future employment, labor income, and output related to oil and gas development in the Crawford population area.

## Area 2

There is low to no development potential for oil, natural gas, and $CO_2$ in Area 2 (Piñon Mesa). Therefore, fluid mineral leasing restrictions under Alternative B based on current resource knowledge and technologies is not expected to affect future economic activity in Area 2.

BLM_0028068

### Area 3

Area 3 has both existing fluid mineral leases and the potential for future development. Therefore, Alternative B may affect both current and future economic activity related to oil and gas production in Area 3. The designation of the decision area as a ROW exclusion area (with some exceptions) would increase costs for access roads and utilities, which may further affect the financial feasibility of oil, natural gas, and $CO_2$ operations in the area.

## ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation. All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat. The impact of management under this alternative would depend on the extent to which horizontal drilling could be used to reach the same oil reserves. If operators are able to access oil reserves using horizontal drilling, impacts would resemble those from Alternative A. If operators are unable to reach oil reserves using horizontal drilling, the economic impacts of Alternative C would resemble those of Alternative B.

To assess the extent to which federal minerals would remain accessible in the decision area under an NSO stipulation would require project-specific knowledge, including the location and size of leases and their spatial relationship to other leases, intersection of any new utility and road corridors with existing ones and the location of GUSG leks and habitats that facilities would be required to avoid, as well as the potential downhole geology of a specific lease in relation to the potential number of wells reachable from a single well pad. Even if accessible, development of federal minerals may be no longer viable depending on the extent to which the NSO stipulation adds costs to their development. Because data on site-specific management actions is unavailable, estimating differentiated effects among the three socioeconomic areas is not possible.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Under sub-alternatives $D_1$ and $D_2$, the impacts are essentially the same as under Alternative C.

## OTHER MINERALS

As described in Chapter 3, approximately 19,000 acres of GUSG habitat (Occupied and Unoccupied) overlaps with existing or pending potash prospecting permits. GUSG habitat conservation measures may restrict the development of potash in the decision area. These restrictions could affect the economic feasibility of mineral

BLM_0028069

extraction and, as a result, the employment, income, and output associated with mineral development. There is not enough information on the potential for mineral production throughout the primary study area to quantify the potential economic impacts of restrictions imposed by management alternatives.

## ALTERNATIVE A - NO ACTION

Under No Action Alternative A, approximately 95,564 acres are designated as closed to leasing and 899,645 acres are designated as open to leasing.

### Area 1

As there is no known development potential for solid minerals in Area 1, no economic effects are anticipated.

### Area 2

As there is no known development potential for solid minerals in Area 2, no economic effects are anticipated.

### Area 3

Although there are no solid minerals currently leased in the decision area, there are five approved potash prospecting permits in the Monticello-Dove Creek Population Area. Because No Action Alternative A has the highest potential to enable solid mineral development in the decision area, this alternative is the most likely among the alternatives to support employment, income, and output related to solid mineral development in the decision area.

## ALTERNATIVE B

Under Alternative B, the entire decision area would be closed to solid minerals leasing. Existing leases would be allowed to expire. No new leases, prospecting permits, or exploration licenses would be issued.

Alternative B would also implement a controlled surface use (CSU) stipulation on BLM-managed lands and federal mineral resources in Non-Habitat. The CSU stipulation could increase costs associated with potash prospecting and development in Non-Habitat Areas, which could make those activities economically infeasible.

### Area 1

There is no known development potential for solid minerals in Area 1. Therefore, no economic effects are anticipated.

BLM_0028070

### Area 2

There is no known development potential for solid minerals in Area 2. Therefore, no economic effects are anticipated.

### Area 3

Five authorized potash prospecting permits in the Monticello-Dove Creek population area would continue as valid existing rights. The San Miguel Basin population area also has potash development potential. However, since there are no authorized federal leases or prospecting permits, there would be no production in the San Miguel Basin population area. Therefore, Alternative B may reduce the potential for potash prospecting and development to contribute to employment, income, and output in Area 3.

## ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation. All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat.

### Area 1

There is no known development potential for solid minerals in Area 1. Therefore, no economic effects are anticipated.

### Area 2

There is no known development potential for solid minerals in Area 2. Therefore, no economic effects are anticipated.

### Area 3

The consequences of Alternative C are expected to be similar to No Action Alternative A. However, the NSO and CSU stipulations may increase the cost of mining operations. In particular, NSO stipulations are expected to make potash prospecting and development economically infeasible. CSU stipulations would increase the costs of mining operations and may also make potash prospecting and development economically infeasible. Therefore, Alternative C could support lower levels of potash-related employment, income, and output than No Action Alternative A.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

The impacts under sub-alternatives $D_1$ and $D_2$ are essentially the same as under Alternative C.

BLM_0028071

## LANDS & REALTY

ROWs on BLM-managed lands are used for roads, pipelines, utility corridors, communication sites, and other infrastructure.  Management actions that restrict development of infrastructure could increase the cost of new investments or make them no longer economically viable.

## ALTERNATIVE A - NO ACTION

No Action Alternative A places the fewest restrictions on ROW development and route construction and has the largest area open to travel.  Under Alternative A, approximately 305,306 acres are designated as ROW exclusion areas and 89,028 acres are designated as ROW avoidance areas.  The remainder of the analysis area is open to ROWs.  Site-specific management actions and the need for future ROWs is uncertain.  Therefore, the effects cannot be differentiated among the socioeconomic analysis areas.

## ALTERNATIVE B

Under Alternative B, the entire decision area would be designated as a ROW exclusion area, with some exceptions allowed.  General management requirements, including timing limitations and reclamation requirements, would apply to any new, amended, or renewed authorization.  Alternative B would impose greater limitations and added costs to future economic investments in the decision area compared to No Action Alternative A.

Alternative B would also implement management actions in the Non-Habitat Areas.  BLM-managed lands in Non-Habitat Areas would be designated as ROW avoidance areas.  General management requirements, including timing limitations and reclamation requirements, would apply to any new, amended, or renewed authorization. The proposed ROW restrictions in Non-Habitat could increase the costs of infrastructure development adjacent to the decision area.  ROW avoidance area designation could affect the economically viability of infrastructure development in Non-Habitat Areas.

## ALTERNATIVE C

Under Alternative C, the entire decision area would be designated as a ROW avoidance area, and guidelines for resource protection would be applied if locating a new ROW in the decision area could not be avoided.  General management requirements, including timing limitations and reclamation requirements, would apply to any new, amended, or renewed authorization.  Alternative C would have

BLM_0028072

similar economic consequences to Alternative B. However, the added costs to infrastructure development under Alternative C are expected to be lower. Therefore, some projects may be more economically viable under Alternative C compared to Alternative B.

## SUB-ALTERNATIVES D$_1$/D$_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

The impacts under sub-alternatives D$_1$/D$_2$ are similar to those described for Alternative C. However, some infrastructure development under Sub-Alternative D$_1$ would require additional offsite mitigation, which would further increase project costs for proposed ROWs. The added costs could result in some projects no longer being economically viable.

# NON-MARKET VALUES

As described in Chapter 3, non-market values are goods and services that are not traded in markets. Many individuals hold wildlife-related values and the protection of GUSG in the decision area may advance those values. However, other non-market values, particularly recreation-related consumer surplus and livestock grazing heritage values may entail tradeoffs with habitat conservation measures.

## ALTERNATIVE A - NO ACTION

The continuation of surface-disturbing activities under No Action Alternative A would be less likely to support non-market values related to wildlife protection, water and soil quality. However, Alternative A would offer the most access and opportunities for people who value livestock grazing and recreation.

## ALTERNATIVE B

Alternative B is expected to decrease soil erosion and restore damaged streams and wetlands, which will benefit people who value healthy ecosystems. However, Alternative B is also expected to increase the number of acres affected by wildfire and make firefighting more difficult due to limited access. These consequences could adversely affect nearby residents due to smoke emissions and the risk of wildfire in the wildland-urban interface.

Although Alternative B would reduce human surface-disturbing activities in the decision area, the effect on GUSG habitat is not straightforwardly positive. As described in the wildlife section, reduced human activities may cause elk and mule deer to concentrate in closure areas, which may degrade GUSG habitat. The removal of domestic livestock grazing may be offset by increased grazing of wild

ungulates. While these effects may still support wildlife-related non-market values, they may not support the values of those who are particularly interested in the protection of GUSG.

## ALTERNATIVE C

Alternative C would allow for ecosystem restoration activities, which may benefit people who value healthy ecosystems. However, continued livestock grazing would affect soil erosion and riparian health.

Alternative C would reduce wildfire risk in the future due to habitat and fuel treatments. Reduced wildfire risk would benefit nearby residents, who may be affected by smoke emissions and the spread of fire in the wildland-urban interface.

Like No Action Alternative A, Alternative C would continue to support heritage-related livestock grazing values and recreation-related consumer surplus.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Effects to non-market values under sub-alternatives $D_1$ and $D_2$ would be similar to those under Alternative C.

## ENVIRONMENTAL JUSTICE

Chapter 3 finds that San Juan, Utah and Saguache, Colorado counties have large shares of minority residents. These counties also have the highest poverty rates in the decision area. These conditions increase the likelihood that individuals in these counties may experience disproportionately adverse consequences from economic changes. Saguache County is in socioeconomic Area 1, while San Juan County is in socioeconomic Area 3. Therefore, environmental justice consequences are assessed for these two areas.

Saguache County is dominated by agriculture, which accounts for more than one-third (34%) of jobs in the county. This makes agriculture the largest economic sector, by a large margin, in the county. Therefore, GUSG habitat conservation measures that affect livestock grazing could disproportionately and adversely affect residents of Saguache County.

San Juan County has a large share of employment in both agriculture (11.4%) and mining (7.8%) relative to the size of these sectors in Utah overall. The potential for GUSG habitat conservation measures to reduce opportunities for livestock grazing and mineral development could, therefore, disproportionately and adversely affect residents of San Juan County, Utah.

BLM_0028074

## ALTERNATIVE A - NO ACTION

### Area 1 (Saguache County, Colorado)

No Action Alternative A would not affect forage availability or allotment management costs of public land grazing permittees. Therefore, management under Alternative A would not disproportionately and adversely affect environmental justice populations in Area 1.

### Area 3 (San Juan County, Utah)

No Action Alternative A would not affect forage availability or allotment management costs of public land grazing permittees. Additionally, Alternative A would not affect the economic feasibility of mining operations in Area 3. Therefore, management under Alternative A would not affect the quality of life or livelihoods of residents in Area 3.

## ALTERNATIVE B

### Area 1 (Saguache County, Colorado)

Under Alternative B, livestock grazing would be eliminated within Occupied and Unoccupied Habitat. Saguache County includes portions of the Gunnison Basin and Poncha Pass GUSG populations. In both the Gunnison Basin and Poncha Pass populations, approximately 85% of AUMs overlap with GUSG habitat. Therefore, the expected effect of Alternative B in Saguache County is to reduce public land livestock grazing opportunities by 85%. The overlap of agriculture-sector dependence, high poverty rates, and large minority populations indicates that changes to livestock grazing management under Alternative B could adversely and disproportionately affect the environmental justice population in Area 1.

### Area 3 (San Juan County, Utah)

Alternative B would eliminate livestock grazing within GUSG habitat. San Juan County includes a portion of the Monticello-Dove Creek Population. Approximately one-quarter (26%) of AUMs overlap with GUSG habitat. The effects of livestock grazing management under Alternative B would be lower in Area 3 than in Area 1; however, the effect would still be expected to have environmental justice consequences, given the economic specialization in agriculture, high poverty rates, and large minority populations in Area 3.

Alternative B would close the decision area to mineral leasing. Federal oil and gas is extracted from wells in the Monticello-Dove Creek population area, although its contribution to countywide production of oil and gas is small (approximately 0.2% of oil and 2% of gas, as described in chapter 3). In addition to fluid mineral leasing, the Monticello-Dove Creek population area contains the only authorized potash

BLM_0028075

prospecting permits in the decision area. Although these five authorized prospecting permits would continue as valid existing rights under Alternative B, the potential for future economic activity related to potash would be curtailed. These management actions could adversely affect livelihoods in San Juan County.

## ALTERNATIVE C

### Area 1 (Saguache County, Colorado)
Alternative C would continue to authorize public land grazing in GUSG habitat, however, increased measures to protect GUSG relative to Alternative A could increase some costs to the permittee. Although the potential environmental justice consequences would be muted relative to Alternative B, increased livestock operating costs would be more difficult to bear in the area due to high poverty rates.

### Area 3 (San Juan County, Utah)
Alternative C would continue to authorize public land grazing in GUSG habitat, however, increased measures to protect GUSG relative to Alternative A could increase some costs to the permittee. Although the potential environmental justice consequences would be muted relative to Alternative B, increased livestock operating costs would be more difficult to bear in the area due to high poverty rates.

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation. All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat. The effect of these management actions on livelihoods in Area 3 is uncertain, but they are expected to increase operating costs. If increased costs cause some mining operations to cease activities, employment and income in Area 3 could decline.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

### Area 1 (Saguache County, Colorado)
Environmental justice impacts in Saguache County under sub-alternative $D_1$ and $D_2$ would be essentially the same as under Alternative C.

### Area 3 (San Juan County, Utah)
Environmental justice impacts in San Juan County under sub-alternatives $D_1$ and $D_2$ would be essentially the same as under Alternative C.

BLM_0028076

## 4.18.3. CUMULATIVE IMPACTS

The cumulative effects analysis addresses how past, present, and reasonably foreseeable future actions contribute to the socioeconomic consequences of GUSG conservation measures. Cumulative effects analysis considers activities on both federal and non-federal lands in the decision area and vicinity. Because five BLM RMPs (Grand Junction, Gunnison Gorge NCA, Moab, Uncompahgre, and Tres Rios) already restrict surface-disturbing activities within 0.6 mile of a lek or more, GUSG conservation measures are already integrated into BLM management in much of the decision area.

Activities on state, private, and other federal lands (such as USFS lands) in the 11-county socioeconomic analysis area could interact with proposed BLM management actions to either amplify or attenuate the socioeconomic effects described above.

The socioeconomic consequences related to minerals could be affected by both private and public forces. Market fluctuations, such as the recent decline in oil prices, could affect private interest in developing federal mineral resources. Regulatory constraints, including decisions related to pipelines and other infrastructure that depends on public lands, could affect the feasibility of developing both federal and private mineral resources. Actions and events that cause mineral prices to fall would decrease the interest in mineral exploration and development in the decision area, while actions and events that cause mineral prices to rise would increase the interest in mineral exploration and development in the decision area.

Mineral price changes could interact with management actions to produce cumulative effects. Under No Action Alternative A, a rise in prices would increase mineral exploration and development relative to existing conditions. A decline in mineral prices would reduce activity under Alternative A, despite relatively permissive management. Under Alternatives B, firms would have fewer opportunities to react to price changes due to management restrictions. Therefore, a rise in prices would increase the cost of foregone economic opportunities. A decline in prices would decrease the cost of foregone mining-related economic opportunities. Under Alternative C and sub-alternatives $D_1$ and $D_2$, a rise in mineral prices could improve the economic feasibility of exploration and development activities in areas subject to NSO and CSU stipulations, while a decline in mineral prices would result in fewer economically feasible exploration and development opportunities.

The socioeconomic consequences related to public land grazing could be affected by the price of private forage, the conversion of ranch land to residential land, and management actions on adjacent public lands (such as USFS lands).

BLM_0028077

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

The socioeconomic consequences related to recreation could be affected by changes in motorized and non-motorized opportunities on adjacent lands and decisions by adjacent landowners regarding access.

BLM_0028078

CHAPTER 5 - CONSULTATION & COORDINATION

# 5. CONSULTATION & COORDINATION

This chapter describes the public outreach and participation opportunities made available through the development of this RMP Amendment/EIS, and consultation and coordination efforts with tribes, government agencies, and other stakeholders.

BLM land use planning activities are conducted in accordance with requirements of NEPA, as well as CEQ regulations and BLM policies and procedures implementing NEPA. NEPA and associated laws, regulations, and policies require the BLM to seek public involvement early in and throughout the planning process to develop a reasonable range of alternatives to proposed actions and to prepare environmental documents that disclose the potential impacts of proposed actions and alternatives. Public involvement and agency consultation and coordination, which have been at the heart of the planning process leading to this Draft RMP Amendment/EIS, were achieved through Federal Register notices, public and informal meetings, individual contacts, media releases, and the GUSG planning project website: http://1.usa.gov/1Uusw8C (formerly www.bit.ly/gunnison_sage-grouse).

## 5.1. COLLABORATION

Federal laws require that the BLM consult with certain federal and state agencies and entities and Native American tribes (40 CFR 1502.25) during the NEPA decision-making process. The BLM is also directed to integrate NEPA requirements with other environmental review and consultation requirements to reduce paperwork and delays (40 CFR 1500.4-5).

In addition to formal scoping (outlined in Chapter 5, Section 5.3), as summarized below, the BLM has implemented an extensive collaborative outreach and public involvement process that has included coordinating with cooperating agencies and holding public scoping meetings. The BLM will continue to meet with interested agencies and organizations throughout the planning process, as appropriate, and will continue coordinating closely with cooperating partners.

BLM_0028079

## 5.1.1.  NATIVE AMERICAN TRIBAL CONSULTATION

The BLM began tribal consultation for cultural resources for the planning process through a consultation initiation letter that was sent to the following tribes on July 9, 2014:

- The Hopi Tribe
- Jicarilla Apache Nation
- Kewa Pueblo (formerly the Pueblo of Santo Domingo)
- Navajo Nation
- Ohkay Owingeh (Pueblo of San Juan)
- Pueblo of Acoma
- Pueblo de Cochiti
- Pueblo of Isleta
- Pueblo of Jemez
- Pueblo of Laguna
- Pueblo of Nambe
- Pueblo of Picuris
- Pueblo of Pojoaque
- Pueblo of San Felipe
- Pueblo of San Ildefonso
- Pueblo of Sandia
- Pueblo of Santa Ana
- Pueblo of Santa Clara
- Pueblo of Taos
- Pueblo of Tesuque
- Pueblo of Zia
- Southern Ute Indian Tribe
- The Paiute Tribe
- Ute Indian Tribe (Uintah & Ouray Reservation)
- Ute Mountain Ute Tribe
- White Mesa Ute Council
- Ysleta del Sur Pueblo
- Zuni Tribe of the Zuni Reservation

None of the 27 tribes contacted expressed an interest in participating in a formal capacity throughout the planning process.  While the BLM received three letters from tribal agencies (Navajo Nation, The Hopi Tribe, and the Pueblo of San Felipe) in response to the consultation notice and scoping period notice, none identified immediate concerns beyond encouraging the BLM to follow the Section 106 consultation process.  Government-to-government consultation will continue

BLM_0028080

throughout the RMP Amendment process to ensure that the concerns of tribal groups are considered. The Draft RMP Amendment/Draft EIS will be provided to the tribes concurrently with its release to the public.

## 5.1.2.  COLORADO STATE AND UTAH STATE HISTORIC PRESERVATION OFFICERS CONSULTATION

The Draft RMP Amendment/Draft EIS will be provided to the Colorado State Historic Preservation Office and Utah State Historic Preservation Office concurrently with its release to the public.

## 5.1.3.  U.S. FISH AND WILDLIFE SERVICE CONSULTATION

To comply with Section 7(c) of the Endangered Species Act, the BLM consulted with the FWS early in the planning process. The FWS provided input on planning issues, data collection and review, and alternatives development in their role as a cooperating agency. The BLM will consult with the FWS as appropriate.

## 5.1.4.  COOPERATING AGENCIES

A cooperating agency is any federal, state, or local government agency or Native American tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1).

On July 9, 2014, the BLM wrote to numerous local, state, federal, and tribal representatives (as shown in Table 5.108), inviting them to participate as cooperating agencies for the Gunnison Sage-Grouse Rangewide RMP Amendment/EIS. Twenty-one agencies signed MOUs with the BLM to participate as cooperating agencies in the preparation of the EIS.

BLM_0028081

CHAPTER 5 - CONSULTATION & COORDINATION

**Table 5.108 - Agencies and Tribes Invited to Participate as Cooperating Agencies**

| AGENCIES AND TRIBAL GOVERNMENTS |
| --- |
| PARTICIPATING AGENCIES |
| **Counties** |
| Delta County, Colorado |
| Dolores County, Colorado |
| Grand County, Utah |
| Gunnison County, Colorado |
| Mesa County, Colorado |
| Montrose County, Colorado |
| Ouray County, Colorado |
| Saguache County, Colorado |
| San Juan County, Utah |
| San Miguel County, Colorado |
| **State Agencies** |
| Colorado Department of Natural Resources |
| Colorado Department of Transportation |
| Colorado Parks and Wildlife |
| State of Utah Public Lands Policy Coordination Office |
| **Federal Agencies** |
| Bureau of Reclamation, Upper Colorado Region |
| National Park Service, Intermountain Region |
| Natural Resources Conservation Service, Colorado State Office |
| Office of Surface Mining Reclamation and Enforcement, Western Region |
| U.S. Department of Energy, Western Area Power Administration |
| U.S. Fish and Wildlife Service, Mountain-Prairie Region |
| U.S. Forest Service - Region 2 |
| OTHERS CONTACTED |
| **Counties** |
| Chaffee County, Colorado |
| Hinsdale County, Colorado |
| **State Agencies** |
| Colorado State Historic Preservation Officer |

BLM_0028082

CHAPTER 5 - CONSULTATION & COORDINATION

| AGENCIES AND TRIBAL GOVERNMENTS |
| --- |
| Colorado Public Utilities Commission |
| Colorado Department of Public Health and Environment |
| Colorado Division of Agriculture |
| Shavano Conservation District |
| Mesa Conservation District |
| San Miguel Basin Conservation District |
| Gunnison Conservation District |
| Delta Conservation District |
| Dove Creek Conservation District |
| Center Conservation District |
| **Federal Agencies** |
| Environmental Protection Agency - Region 8 |
| Natural Resources Conservation Service - Utah State Office |
| U.S. Geological Survey Science Center |
| U.S. Fish and Wildlife Service - Utah Field Office |
| U.S. Army Corps of Engineers - Sacramento District |
| **Tribal Governments** |
| The Hopi Tribe |
| Jicarilla Apache Nation |
| Kewa Pueblo (formerly the Pueblo of Santo Domingo) |
| Navajo Nation |
| Ohkay Owingeh (Pueblo of San Juan) |
| Pueblo of Acoma |
| Pueblo de Cochiti |
| Pueblo of Isleta |
| Pueblo of Jemez |
| Pueblo of Laguna |
| Pueblo of Nambe |
| Pueblo of Picuris |
| Pueblo of Pojoaque |
| Pueblo of San Felipe |
| Pueblo of San Ildefonso |

BLM_0028083

| AGENCIES AND TRIBAL GOVERNMENTS |
| --- |
| Pueblo of Sandia |
| Pueblo of Santa Ana |
| Pueblo of Santa Clara |
| Pueblo of Taos |
| Pueblo of Tesuque |
| Pueblo of Zia |
| Southern Ute Indian Tribe |
| Ute Indian Tribe (Uintah & Ouray Reservation) |
| Ute Mountain Ute Tribe |
| White Mesa Ute Council |
| Ysleta del Sur Pueblo |
| Zuni Tribe of the Zuni Reservation |

Since the planning process began in August, 2014, the BLM has typically conducted two meetings/conference calls a month with cooperating agencies.  Potential cooperating agencies were also encouraged to attend the scoping public meetings and provide comments during the scoping period (discussed in Chapter 5, Section 5.3.1).

## 5.1.5.   RESOURCE ADVISORY COUNCILS

Resource Advisory Councils (RACs) are composed of ten to fifteen members appointed by the Secretary of the Interior to represent a variety of interests across their state.  The RACs meet two to four times annually to develop recommendations for the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources and to provide representative citizen counsel and advice to the Secretary of the Interior concerning the planning and management of public land resources.

A coordinated effort to involve the RACs early on and throughout a planning effort ensures that the BLM will obtain and incorporate local input and advice at every stage.  The three Colorado RACs (Front Range, Northwest, and Southwest) and the Utah RAC have been engaged throughout the Draft RMP Amendment/Draft EIS process as available and appropriate.

BLM_0028084

## 5.2.  COORDINATION & CONSISTENCY

BLM planning regulations (43 CFR 1610) require that BLM RMPs be consistent with officially approved or adopted resource-related plans of other federal, state, local, and tribal governments, to the extent that those plans are consistent with federal laws and regulations applicable to public lands.  Plans formulated by federal, state, local, and tribal governments that relate to federal lands and resources have been reviewed and considered as the RMP Amendment/EIS has been developed.  These plans are listed in Chapter 5, Sections 5.2.1 through 5.2.6.

The BLM is aware that there are specific state laws and local plans relevant to aspects of public land management that are discrete from, and independent of, federal law.  However, the BLM is bound by federal law.  As such, there may be inconsistencies that cannot be reconciled.  FLPMA and its implementing regulations require that the BLM's land use plans be consistent with officially approved state and local plans only if those plans are consistent with the purposes, policies, and programs of federal laws and regulations applicable to public lands.

Where officially approved state and local plans or policies and programs conflict with the purposes, policies and programs of federal law applicable to public lands, there will be an inconsistency that cannot be resolved.  With respect to officially approved state and local policies and programs (as opposed to plans), this consistency provision only applies to the maximum extent practical.  While county and state planning processes, under FLPMA, are required to be as integrated and consistent as practical, the federal agency planning process is not bound by or subject to state or county plans, planning processes, policies, or planning stipulations.

Related policies and plans to be considered during the GUSG RMP Amendment planning effort include:

### 5.2.1.  RANGEWIDE AND LOCAL WORKING GROUP PLANS

- Gunnison Sage-Grouse Rangewide Conservation Plan (2005)
- Crawford Area Gunnison Sage-Grouse Conservation Plan (2011)
- Gunnison Sage-Grouse Conservation Plan Crawford Area, Colorado (1998)
- Gunnison Sage-Grouse Conservation Plan Dove Creek, Colorado (1998)
- Gunnison Sage-Grouse Conservation Plan Gunnison Basin, Colorado (1997)
- Gunnison Sage-Grouse Conservation Plan Piñon Mesa, Colorado (2000)

BLM_0028085

- Gunnison Sage Grouse Conservation Plan San Juan County, Utah
- Gunnison Sage-grouse Conservation Plan Update San Juan County, Utah (2003)
- Gunnison Sage-Grouse Conservation Plan San Miguel Basin Colorado (1998)
- Poncha Pass Gunnison Sage-Grouse Conservation Plan (2000)

## 5.2.2.  COUNTY PLANS AND POLICIES

- Delta County Master Plan (1996)
- Dolores County Planning Process and Master Plan
- Grand County Non-Motorized Trails Master Plan (2011)
- Gunnison County Sage-Grouse Conservation Action Plan (2009)
- Mesa County Master Plan (2000)
- Montrose County Master Plan as amended (2010)
- Ouray County Master Plan (1999)
- Saguache County Master Plan (2010)
- San Juan County Master Plan (2008)
- San Miguel County Master Plan (as amended) (1978)
- Dolores County Development and Land Use Regulations (as amended 2012)
- Gunnison County Resolution No. 2007-09 – Temporary Closure of Certain Roads for Protection of Gunnison Sage Grouse (2007)
- Gunnison County Resolution No. 2007-17 – Amends Gunnison County Land Use Resolution Section 11-106: Protection of Wildlife Habitat Areas (amended 2013)
- Montrose County Resolution No. 39-2013 – Adoption of 1041 Regulations for the Protection of Gunnison Sage Grouse Occupied Habitat

## 5.2.3.  STATE POLICIES AND PLANS

- Candidate Conservation Agreement with Assurances for Gunnison Sage-grouse (*Centrocercus minimus*) between the Colorado Division of Wildlife and the U.S. Fish and Wildlife Service (2006)
- Utah Code, Title 23 – Wildlife Resources

BLM_0028086

## 5.2.4.   BLM POLICIES AND PLANS

### PROGRAMMATIC REGIONAL & NATIONAL-LEVEL PLAN AMENDMENTS/EIS

- Vegetation Treatment on BLM Lands in Thirteen Western States (BLM 1991) (common to the proposed plan and draft alternatives)
- Final Vegetation Treatments on BLM Lands in 17 Western States Programmatic EIS and Associated Record of Decision (ROD) (FES 07-21) (BLM 2007)
- Approved RMP Amendments/ROD for Designation of Energy Corridors on BLM-administered Lands in the 11 Western States (U.S. Department of Energy, USFS, and BLM 2009)

### ACTIVITY-LEVEL PLANS

- Candidate Conservation Agreement for the Gunnison sage-grouse, *Centrocercus minimus* Gunnison Basin Population (2013) (See Appendix C.)
- Bangs Canyon Travel Management Plan (2005)
- Billings Canyon Jeep Trails Plan (2003)
- Burn Canyon Travel Management Plan, Uncompahgre FO (2014)
- Dry Creek Travel Management Plan, Uncompahgre FO (2011)
- Gunnison Field Office Travel Management Plan (2010)
- Ridgway Comprehensive Travel Management Plan, Uncompahgre FO (2013)
- San Luis Valley Public Lands Center Travel Management Plan (2009)
- BLM Grand Junction Field Office [and] NPS Colorado National Monument Fire Management Plan (2008)
- Gunnison Field Office Fire Management Plan (2004)
- Canyon Country Fire Zone Fire Management Plan (2013 maintenance update)
- North Fruita Desert Travel Management Plan (2004)
- San Juan Public Lands Center Fire Management Plan (2014)
- San Luis Valley Bureau of Land Management Fire Management Plan (2004)
- Uncompahgre Field Office Fire Management Plan (2008)
- Utah Land Use Plan Amendment for Fire and Fuels Management (2005)

## 5.2.5.   OTHER FEDERAL AGENCY POLICIES AND PLANS

- Black Canyon of the Gunnison National Monument and Curecanti National Recreational Area General Management Plan (1997, as amended)
- Endangered Species Act of 1973, as amended (16 USC 1531 et sequens)

BLM_0028087

- Grand Mesa, Uncompahgre and Gunnison National Forests Land and Resource Management Plan (1983, as amended)
- Pike and San Isabel National Forests and Comanche and Cimarron National Grasslands Land and Resource Management Plan (1984)
- Rio Grande National Forest Revised Land and Resource Management Plan (1996)
- San Juan National Forest Revised Land and Resource Management Plan (2013)

## 5.2.6.   MEMORANDA OF UNDERSTANDING

- MOU between the BLM and the DOE to identify the individual and shared roles and responsibilities of the DOE and BLM with respect to the DOE Uranium Leasing Program. (April 2010)

## 5.2.7.   PUBLIC INVOLVEMENT

Public Involvement is a vital and legal component of both the RMP Amendment and EIS processes.  Public involvement vests the public in the decision-making process and allows for full environmental disclosure.  Guidance for implementing public involvement under NEPA is codified in 40 CFR Section 1506.6, thereby ensuring that federal agencies make a diligent effort to involve the public in the NEPA process. FLPMA Section 202 directs the Secretary of the Interior to establish procedures for public involvement during land use planning actions on public lands.  These procedures can be found in the BLM Land Use Planning Handbook (H-1601-1). Public involvement for the GUSG RMP Amendment/EIS involves the following four phases:

- Public scoping before NEPA analysis begins to determine the scope of issues and alternatives to be addressed in the RMP Amendment/EIS
- Public outreach via news releases
- Collaboration with federal, state, local, and tribal governments and cooperating agencies
- Public review of and comment on the Draft RMP Amendment/EIS, which analyzes likely environmental effects and identifies the BLMs preferred alternative.

While the public scoping phase of the process has been completed, public outreach and collaboration are ongoing throughout the RMP Amendment/EIS process. Information about the process can be obtained by the public at any time on the BLM GUSG project website (http://1.usa.gov/1Uusw8C).  This website contains

BLM_0028088

CHAPTER 5 - CONSULTATION & COORDINATION

background information about the project, a public involvement timeline and
calendar, maps, and photos of the planning area, and copies of public information
documents released throughout the RMP Amendment/EIS process.

BLM_0028089

CHAPTER 5 - CONSULTATION & COORDINATION

# 5.3. SCOPING & ISSUES

When developing or amending an RMP, the BLM follows a process outlined in the BLM Land Use Planning Handbook H-1601-1 (BLM 2005), beginning with the identification of issues. Planning issues are concerns or controversies about existing and potential land and resource allocations, levels of resource use, production, and related management practices that can be addressed through a range of alternatives. These issues can stem from new information or changed circumstances that cause federal land managers to reassess current situations on federal lands. Issues can be identified either internally by resource specialists and other agency staff or externally by public stakeholders during a public scoping period.

## 5.3.1. PUBLIC SCOPING

The public scoping period for this planning effort was initiated on July 18, 2014 with the publication of a Notice of Intent (79 2014-16819) in the *Federal Register* and ran through August 22, 2014. The process included soliciting input from interested individuals and organizations, state, local, and tribal governments, and other federal agencies in an effort to identify the scope of issues to be addressed in the RMP Amendment and assist in formulating reasonable alternatives.

### SCOPING MEETINGS

The BLM hosted four public scoping meetings in Golden, Gunnison, Montrose, and Dove Creek, Colorado to provide the public with opportunities to learn more about the project and interact with and ask questions of BLM resource specialists and other staff. In addition, scoping comment forms were available for the public to fill out and hand deliver at the meetings. A combined total of 170–200 individuals attended one or more of the public scoping meetings.

**Table 5.109 - Public Scoping Meetings**

| VENUE | LOCATION | DATE | TIME |
|---|---|---|---|
| Marriott - Denver West | Golden, CO | August 4, 2014 | 6-8 pm |
| Western Complex | Gunnison, CO | August 5, 2014 | 6-8 pm |
| Holiday Inn Express | Montrose, CO | August 6, 2014 | 6-8 pm |
| Dove Creek High School | Dove Creek, CO | August 7, 2014 | 6-8 pm |
| **Total Attendees** | | | **170-200** |

BLM_0028090

The scoping meetings were divided into three segments: (1) an open house, (2) a PowerPoint presentation, and (3) a question and answer session.

### Open House

During the open house portion, the public was able to review poster-sized maps depicting various land designations (including surface, split estate, oil and gas leases, grazing allotments, travel routes, and specially designated land status) across the range of the GUSG. BLM resource specialists stationed near the maps provided the public with opportunities for face-to-face interaction.

### PowerPoint Presentation

Following the open house, the GUSG Project Manager delivered a PowerPoint presentation on the BLM GUSG planning effort, which included an overview of FWS proposals to list and designate critical habitat for the GUSG, the goals of public scoping, the BLM planning process, background information on the GUSG and its range, a summary of existing agreements and policies to protect the GUSG, potentially affected RMPs and resource and program areas, a draft project schedule, and acceptable methods for submitting comments.

### Question and Answer Session

A contract employee facilitated a question and answer session that enabled the public to ask questions of the GUSG Project Manager and other BLM staff.  The public was reminded that the verbal questions posed did not constitute a formal public scoping comment and that they would still need to submit their comments and issues in writing.

## OTHER OUTREACH METHODS

In addition, the BLM issued a news release announcing the planning effort and meetings, mailed notifications to an initial list of potentially interested organizations and individuals, established a project website, and made presentations to each of the active BLM resource advisory councils (RAC) within the range of the species.  All of these methods were used to notify the public regarding the scoping period and planning process and to invite the public to provide written comments.  Comments obtained from the public during the scoping period were used to help identify the relevant issues to be addressed through a reasonable range of alternatives.

Public scoping provided the public with an opportunity to identify considerations for managing GUSG habitat.  As part of the scoping process, the BLM also requested that the public consider and submit nominations for potential Areas of Critical Environmental Concern (ACECs) for GUSG and GUSG habitat to be designated in

order to protect the significant wildlife resources, natural processes, or systems within.

### Project Website

The BLM developed a project website at www.bit.ly/gunnison_sage-grouse to provide the public with current information about the RMP Amendment/EIS process (including background information, a public involvement timeline and calendar, maps of the planning area, copies of public information documents such as the Notice of Intent and press releases, a list of cooperating agencies, and project updates).

In addition, project information, documents, and public comment opportunities are posted to the BLM ePlanning site at http://1.usa.gov/1Uusw8C.

### Mailing List

The BLM compiled a mailing list of several hundred individuals, agencies, and organizations that had participated in past BLM projects in southwest Colorado and or southeast Utah. Attendees at the scoping public meetings were added to the mailing list if they chose to receive or continue to receive project information. In addition, all individuals or organizations who submitted scoping comments were added to the mailing list. Requests to be added to or to remain on the official RMP Amendment distribution list will continue to be accepted throughout the planning process.

## 5.3.2. Scoping Comments

All written public comments received on or before August 22, 2014 were evaluated and documented in the Scoping Report (available online at www.bit.ly/gunnison_sage-grouse and through BLM ePlanning at http://1.usa.gov/1Uusw8C).

A total of 63 unique written submissions were received. A number of the submissions contained multiple comments, which resulted in a total of 526 unique comments. These comments were assigned to one of four response categories:

- An issue to be resolved in the RMP Amendment.
- An issue to be resolved through policy or administrative action.
- An issue beyond the scope of the RMP Amendment.
- An issue that has already been addressed but should be better communicated to the issue holder.

Of the 526 comments received, 500 were identified as issues for resolution through the RMP Amendment, 5 were determined to be issues to be resolved through policy or administrative action, and 21 comments were determined to be beyond the

CHAPTER 5 - CONSULTATION & COORDINATION

scope of the plan amendment effort to resolve.  No comments were categorized as issues that had already been addressed but required improved communications between the BLM and the commenter.

### 5.3.3.  KEY ISSUES IDENTIFIED THROUGH SCOPING

**Table 5.110 - Comments by Resource or Planning Issue**

| RESOURCE OR PLANNING ISSUE | NUMBER OF INDIVIDUAL COMMENTS |
|---|---|
| Planning Process and Alternatives | 114 |
| Data/Best Available Science | 54 |
| Energy and Mineral Development | 50 |
| Livestock Grazing | 47 |
| Fish and Wildlife | 42 |
| Recreation and Travel Management | 40 |
| Partnerships/Collaboration | 37 |
| Social, Economic, and Environmental Justice | 30 |
| Lands, Realty, and Rights-of-Way | 28 |
| Special Management Areas | 20 |
| Vegetation Management | 15 |
| Drought Management and Climate Change | 10 |
| Water, Soil, and Riparian Areas | 8 |
| Invasive Species | 5 |
| **TOTAL** | **500** |

## FUTURE PUBLIC INVOLVEMENT

Public participation opportunities will continue to be offered throughout the GUSG RMP Amendment planning process.  A substantial contribution to this effort is the opportunity for members of the public to review and comment on this Draft RMP Amendment/Draft EIS during a 90-day comment period.  The BLM will consider and address substantive comments within the Proposed RMP Amendment/Final EIS.  The release of the Proposed RMP Amendment/Final EIS will be followed by a 30-day protest period, as well as consistency reviews by the governors of Colorado and Utah.  The resolution of legitimate protests and issues raised through the

BLM_0028093

CHAPTER 5 - CONSULTATION & COORDINATION

consistency reviews will culminate in the issuance of a Record of Decision (ROD) and Approved RMP Amendment by the BLM.

BLM_0028094

CHAPTER 5 - CONSULTATION & COORDINATION

## 5.4. LIST OF PREPARERS

BLM resource specialists and staff members from across Colorado and Utah served on an interdisciplinary team in the preparation of this Draft RMP Amendment/Draft EIS. In addition, a USFS Enterprise team contributed the socio-economic analysis, while numerous BLM employees provided valuable input and assistance to the project team members and reviewed and commented on draft documents. Core team members and key contributors are identified in Table 5.111.

**Table 5.111 - Contributors to the Draft RMP Amendment/Draft EIS**

| MEMBER | OFFICE | RESPONSIBILITY |
|---|---|---|
| **CORE TEAM** | | |
| Bridget Clayton | BLM Grand Junction Field Office | Sage Grouse Coordinator (July 2016 – present) |
| Lori A. Armstrong | BLM Colorado Southwest District | Project Manager (July 2015 – June 2016) |
| Leigh D. Espy | BLM Colorado State Office | Project Manager (Project Initiation – July 2015) |
| Roger Sayre | BLM Colorado State Office | NEPA; Planning (December 2015 – present) |
| Travis Haby | BLM National Operations Center | NEPA; Planning (June 2014 – December 2015) |
| Russ Japuntich | BLM Gunnison Field Office | Wildlife Biology - Gunnison Basin Population |
| Nathaniel West | BLM Tres Rios Field Office | Wildlife Biology - Satellite Populations |
| Amanda Clements | BLM Uncompahgre Field Office | Vegetation Management; Grazing; Fire |
| Sean Noonan | BLM San Luis Valley Field Office | Recreation; Travel; Special Designation Areas |
| Marnie Medina | BLM Gunnison Field Office | Minerals; Land Tenure; Contracting Officer's Representative |
| D. Maggie Magee | BLM Colorado Southwest District | Technical Writer-Editor; Web and ePlanning |
| Natalie Dovgan | BLM Colorado State Office | GIS Coordination and Data Analysis |
| **KEY CONTRIBUTORS** | | |
| Ruth Welch | BLM Colorado State Office | State Director |
| Brian St. George | BLM Colorado State Office | Deputy State Director |
| Rebecca Doolittle | BLM Utah Canyon Country District | BLM Utah Point of Contact |
| Leah Baker | BLM Washington Office | Planning Point of Contact |
| Courtney Whiteman | BLM Colorado State Office | Communications Specialist |
| Shannon Borders | BLM Colorado Southwest District | Public Affairs Officer |
| Martin Hensley | BLM Colorado State Office | Socio-Economics Point of Contact |
| Delilah Jaworski | USFS Enterprise Team | Socio-Economics Analysis |
| Kymm Gresset | BLM Colorado State Office | Administrative Record |
| Sara Lura Matthews | BLM Colorado State Office | Facilitation; Administration (pre-draft) |
| David Baker | BLM National Operations Center | Recreation; Travel Management (pre-draft) |
| Sean Hudak, GIS Intern | Colorado Youth Core Association | GIS Analysis |
| Cara Arpino, GIS Intern | Colorado Youth Core Association | GIS Data Digitization |
| Bradley Porter, GIS Intern | Colorado Youth Core Association | GIS Data Digitization |
| Caroline Mardock | Colorado Youth Core Association | GIS Data Digitization |
| Josh Ryan | Colorado Youth Core Association | GIS Data Digitization |

BLM_0028095

BLM_0028096

CHAPTER 6 - APPENDICES

# 6. APPENDICES

- **APPENDIX A:** GUSG Population Maps

- **APPENDIX B:** BLM Washington Office IM 2014-100

- **APPENDIX C:** GUSG Candidate Conservation Agreement, Gunnison Basin Population

- **APPENDIX D:** GUSG Rangewide Conservation Plan Structural Habitat Guidelines

- **APPENDIX E:** BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado and Utah

- **APPENDIX F:** GUSG Draft Socio-Economic Data

- **APPENDIX G:** Areas of Critical Environmental Concern - Relevance and Importance Analysis and Determination Rationale

- **APPENDIX H:** Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

- **APPENDIX I:** Draft GUSG Best Management Practices

- **APPENDIX J:** GUSG Rangewide Mitigation Strategy

BLM_0028097

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

## APPENDIX A:  GUSG POPULATION MAPS

Spatial data for the GUSG Draft RMP Amendment/Draft EIS was primarily generated internally by combining feature classes from BLM field offices covered within the planning area.  Several feature classes were created by pulling legal land descriptions from the BLM LR2000 database, based on pertinent case types.  The remaining feature classes were gathered from external sources such as FWS, USGS, and state and local government data.  Each feature class is listed below by name and general data source for that feature class.

**Table A.112 - Data Sources for the Draft RMP Amendment/Draft EIS**

| DATA SET NAME | DATA SOURCE |
|---|---|
| Existing Vegetation Type | LANDFIRE LF1.2.0 |
| Vegetation Condition Class | LANDFIRE LF1.1.0 |
| Streams | USGS NHD v220 |
| Oil and Gas Wells | Colorado Oil and Gas Commission, Utah Department of Natural Resources |
| Roads | ESRI ArcGIS Online Major Roads, Delta County Roads, Gunnison County Roads, Mesa County Roads, Montrose County Roads, San Miguel County Roads, Grand County Roads, BLM GTLF |
| Uranium Lease Tracts | DOE Uranium Lease Tracts file Y0010500-02 |
| Fire Occurrence History Points | USGS Federal Fire Occurrence |
| GUSG Habitat | USFWS Final GUSG Critical Habitat |
| Lek Buffers | Colorado Parks and Wildlife |
| Wetlands | USFWS Wetlands Inventory |
| Fire Perimeters | Internal combined BLM Colorado and Utah Field office data |
| Land Use Planning Units | Internal combined BLM Colorado and Utah Field office data |
| Surface Restrictions | Internal combined BLM Colorado and Utah Field office data |
| Rights-of-Way (Lines) | Digitized from internal BLM case files and LR2000 attributes |
| Rights-of-Way (Polygon) | Buffered internal digitized ROW lines |
| Rights-of-Way (Polygon) | Generated from internal LR2000 database |
| Rights-of-Way Restrictions | Internal combined BLM Colorado and Utah Field office data |
| Utility Corridors | Internal combined BLM Colorado and Utah Field office data |
| Surface Management Agency | Internal combined BLM Colorado and Utah State office data |
| Coal Occurrence | Internal combined BLM Colorado and Utah Mineral Potential Reports where available |
| Oil and Gas Development Potential | Internal combined BLM Colorado and Utah State office data |
| Uranium Vanadium Occurrence Development Potential | Internal combined BLM Colorado and Utah Mineral Potential Reports where available |
| Mineral Materials Sites | Internal BLM data generated from LR2000 |
| Notice of Surface Management Exploration Operations | Internal BLM data generated from LR2000 |

BLM_0028098

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

| DATA SET NAME | DATA SOURCE |
| --- | --- |
| Solid Non-energy Leasables | Internal BLM data generated from LR2000 |
| Federal Subsurface Estate | Internal combined BLM Colorado and Utah State office data |
| ACEC | Internal combined BLM Colorado and Utah Field office data |
| Lands with Wilderness Characteristics | Internal combined BLM Colorado and Utah Field office data |
| NLCS National Monument and National Conservation Areas | Internal combined BLM Colorado and Utah State office data |
| NLCS National Scenic and Historic Trails | Internal combined BLM Colorado and Utah State office data |
| NLCS Wild and Scenic Rivers | Internal combined BLM Colorado and Utah State office data |
| NLCS Wilderness Areas | Internal combined BLM Colorado and Utah State office data |
| NLCS Wilderness Study Areas | Internal combined BLM Colorado and Utah State office data |
| Oil and Gas Leases | Internal BLM data generated from LR2000 |
| Oil and Gas Stipulations | Internal combined BLM Colorado and Utah State office data |
| Closed to Oil and Gas Lease | Internal combined BLM Colorado and Utah State office data |
| Closed to Solid Minerals | Internal combined BLM Colorado and Utah State office data |
| OHV Areas | Internal combined BLM Colorado and Utah Field office data |
| Proper Functioning Condition | Internal combined BLM Colorado and Utah Field office data |
| Extensive Recreation Management Areas | Internal combined BLM Colorado and Utah Field office data |
| Special Recreation Management Areas | Internal combined BLM Colorado and Utah Field office data |
| Land Health Reporting | Internal combined BLM Colorado and Utah Field office data |
| Vegetation Materials Restrictions | Internal combined BLM Colorado and Utah Field office data |
| Vegetation Treatments | Internal combined BLM Colorado and Utah Field office data |
| Weed Priority Areas | Internal combined BLM Colorado and Utah Field office data |
| Withdrawals | Digitized from internal BLM master title plats and LR2000 generated polygons and attributes |
| Allotments | Internal combined BLM Colorado and Utah Field office data with added attributes from RIPS and field offices |
| Recreation Sites | Internal BLM FAMS database data |
| GUSG Decision Area | USFWS Critical Habitat combined with CPW habitat polygons and lek buffers |



Figure A.80 - Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources



**Figure A.8l - Decision Area for the Crawford Population**

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Gunnison Sage-Grouse Decision Area**
**Crawford Population**

Date: 11/10/2015

- Non-Habitat
- Occupied Habitat
- Unoccupied Habitat
- BLM Field Office Boundary
- BLM National Monuments and National Conservation Areas
- Bureau of Land Management
- National Park Service
- Other Federal
- Private
- State, County, City Areas
- US Forest Service

NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.

0  0.75  1.5      3 Miles

BLM_0028101

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.82 - Decision Area for the Gunnison Basin Population**



BLM_0028102

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.83 - Decision Area for the Monticello-Dove Creek Population**



BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



**Figure A.84 - Decision Area for the Piñon Mesa Population**

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.85 - Decision Area for the Poncha Pass Population**



BLM_0028105

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.86 - Decision Area for the San Miguel Basin Population**



BLM_0028106

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.87 - Sub-Surface Decision Area for the Cerro Summit-Cimarron-Sims Mesa
Population**



BLM_0028107

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.88 - Sub-Surface Decision Area for the Crawford Population**



BLM_0028108

**Figure A.89 - Sub-Surface Decision Area for the Gunnison Basin Population**



CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.90 - Sub-Surface Decision Area for the Monticello-Dove Creek Population**



BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

BLM_0028110

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.91 - Sub-Surface Decision Area for the Piñon Mesa Population**



BLM_0028111

**Figure A.92 - Sub-Surface Decision Area for the Poncha Pass Population**



BLM_0028112

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.93 - Sub-Surface Decision Area for the San Miguel Basin Population**



BLM_0028113

# APPENDIX B:  BLM WASHINGTON OFFICE IM 2014-100

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

May 30, 2014

In Reply Refer To:
6500 (170/200/300/400) P

EMS TRANSMISSION 06/16/2014
Instruction Memorandum No.  2014-100
Expires:  09/30/2015

To:     State Directors, Colorado and Utah

From:      Assistant Director, Resources and Planning

Subject:      Gunnison Sage-grouse Habitat Management Policy on Bureau of Land
Management-Administered Lands in Colorado and Utah

**Program Area**:  All Programs.

**Purpose**:  The intent of this Instruction Memorandum (IM) is to provide interim guidance for protecting important habitat across the range of the Gunnison Sage-Grouse (GUSG). The Bureau of Land Management (BLM) will continue to apply conservation measures to manage and conserve GUSG and their habitat and consider the U.S. Fish and Wildlife Service (FWS) advisory recommendations for minimizing or avoiding adverse effects to GUSG or their proposed critical habitat. Habitat protection is crucial for the conservation and protection of this species. The BLM will focus any type of development in non-habitat areas. Disturbance will be focused outside of a 4-mile buffer around leks.  The BLM intends that little or no disturbance occur within the 4-mile buffer, except for valid existing rights, and except where benefits to the GUSG are greater compared to other available alternatives. This guidance:

- Recognizes the FWS Proposed Listing of the GUSG as endangered (78 FR 2486) under the Endangered Species Act (ESA) (January 11, 2013) posted at http://www.fws.gov/policy/library/2013/2012-31667.pdf
- Provides updated direction regarding management and ongoing planning actions in GUSG occupied habitat.
- Recognizes that the BLM proposes to incorporate objectives and conservation measures for the protection of GUSG and its habitat into relevant Resource Management Plans (RMP) through a GUSG range-wide plan amendment process.
- Ensures continued coordination with the FWS, State fish and wildlife agencies, and other partners regarding implementation, updates and project prioritization for GUSG conservation and strategies identified in the Range-wide GUSG Conservation Plan (RCP) and local GUSG population conservation plans posted at: http://wildlife.state.co.us/WildlifeSpecies/RecoveryConservationPlans/Pages/RecoveryConservationPlans.aspx

BLM_0028114

- Does not preclude developing or using additional conservation measures or strategies deemed necessary to maintain or enhance local GUSG habitat and populations.

Should the final FWS determination be to list GUSG under the ESA, the BLM will review the implementation of this policy in accordance with any Recovery Planning schedules to determine the effectiveness of the guidance and make changes as necessary.

**Policy/Action:** The BLM will continue to apply conservation measures to manage and conserve GUSG and its habitat and consider the FWS advisory recommendations for minimizing or avoiding adverse effects to GUSG or its proposed critical habitat. The BLM's policy is to manage GUSG seasonal habitats and maintain habitat connectivity to support sustainable GUSG populations and/or GUSG population objectives as determined in coordination with the FWS and State fish and wildlife agencies.  This policy is consistent with strategies outlined in the GUSG RCP.  This policy is consistent with the BLM National Sage-grouse Habitat Conservation Strategy (USDI BLM 2004a), CO IM 2010-028 (GUSG & Greater Sage-grouse [GRSG] habitat management), WO IM 2010-071 (energy), WO IM 2010-022 (structures), WO IM 2013-128 (fire), WO IM 2010-117 (oil and gas leasing reform), CO IM 2005-038 (GUSG RCP), and CO IM 2013-033 (GUSG habitat management).  This policy is structured to incorporate adaptive management processes to achieve habitat conservation, restoration and enhancement goals.  This policy will be reviewed and updated, as necessary, following the final FWS listing decision.

Unless otherwise stated, BLM management actions and conservation measures in this IM apply to occupied habitat. Occupied habitat is defined in this IM as the FWS "proposed occupied critical habitat" (hereafter referred to as occupied) for GUSG in Colorado and Utah. Within the Gunnison Basin, occupied habitat is further delineated as Tier 1 or Tier 2 habitats using a habitat prioritization tool, developed locally in conjunction with Gunnison County, FWS, Colorado Parks and Wildlife (CPW), and other agencies. This policy applies to all activities and programs authorized and/or occurring on BLM-administered lands, including federal mineral estate. The direction in this IM is time-limited: the conservation policies and procedures described in this IM will be applied until the BLM makes GUSG conservation and resource management decisions through the land use planning process.

The BLM will work with FWS, and the State fish and wildlife agencies in identifying the best available science for implementation of this IM.

**GUSG Habitat Mapping**

As part of the proposed listing decision, the FWS proposed critical habitat for GUSG (78 FR 2540) posted at http://www.fws.gov/policy/library/2013/2012-31666.pdf. The proposed critical habitat map includes occupied GUSG habitat (as previously mapped by CPW and the Utah Division of Wildlife Resources (UDWR), 2004, as updated), and proposed unoccupied habitat. The FWS compiled proposed unoccupied critical habitat using mapping from the RCP (*potentially suitable habitat* – defined as in need of restoration, but capable of supporting sagebrush communities, and *vacant/unknown habitat* – defined as suitable habitat with no documentation of occupancy) and additional areas thought necessary for GUSG conservation based on 1) proximity to occupied habitat, 2) ability to provide connectivity, and 3) size of area, where sagebrush is a primary plant community (78 FR 2552). The final decision on whether to designate critical habitat for GUSG is expected around the same time as the final listing decision (anticipated November 12, 2014).

The BLM will continue to work with State fish and wildlife agencies and other partners to collect site-specific GUSG habitat data.  GUSG habitat data includes seasonal habitat mapping (nesting, brood rearing and winter), and/or GUSG habitat condition assessments as documented in Land

BLM_0028115

Health Assessments (LHA). Habitat condition assessments reflect progress towards meeting GUSG habitat objectives set forth in the RCP or local conservation plans, as determined through the Habitat Assessment Framework (HAF) indicators or other BLM-approved habitat monitoring methods. [1]

If the species is listed and the FWS develops a range-wide Recovery Plan, the BLM will cooperate in the development and implementation of the Recovery Plan on public lands consistent with the policies in BLM's Special Status Species Management Manual 6840. This participation includes, but is not limited to, representation on the Range-wide Steering Committee (RSC) and local GUSG population working groups.

**Land Use Planning**

The BLM proposes to incorporate objectives and conservation measures for the protection of GUSG and its habitat into approved Resource Management Plans (RMP) through a GUSG range-wide plan amendment process.

As part of this GUSG range-wide planning process, the BLM will consider alternative(s) that:

- Close fluid mineral (oil and gas or geothermal) leasing, and consider land allocations following expiration of oil and gas and geothermal leases with a full range of alternatives, including a scenario where the lands will not be re-offered for lease in occupied GUSG areas;
- Exclude new energy development and rights-of-way (ROW);
- Reduce or make lands unavailable to livestock grazing (consistent with WO-IM-2012-169) in GUSG occupied habitat;
- Include consideration of regional mitigation strategies and appropriate mitigation measures (avoid, minimize, and/or compensate) to reduce or eliminate impacts to GUSG populations;
- Address other factors that may pose a threat to GUSG populations, including recreation management, vegetation treatments, and invasive plant management; and
- Consider citizen-based alternatives, as appropriate.

BLM_0028116

Through this range-wide plan amendment process, BLM Colorado and Utah FOs should consider and evaluate GUSG habitat conservation measures related to timing restrictions, buffer distances, percentages of allowable surface-disturbing activities, noise and desired density levels or other development constraints consistent with the GUSG RCP (including subsequent updates), current peer reviewed sage-grouse research, conservation summaries based on research or as developed in conjunction with State fish and wildlife agencies and the FWS to meet local population objectives. At a minimum, FOs will analyze and implement conservation measures that prohibit or limit energy and discretionary mineral development within four miles of active leks, and minimize surface disturbance and disruptive activities in all occupied habitat, where appropriate.

**Gunnison Basin Candidate Conservation Agreement**

The Gunnison FO, in conjunction with the FWS, CPW, National Park Service (NPS), U.S. Forest Service (USFS), Natural Resources Conservation Service (NRCS) and multiple stakeholders, developed a Candidate Conservation Agreement (CCA) to guide management of GUSG on public lands in the Gunnison Basin. The CCA focuses on managing key threats on federal lands identified by FWS for this population: grazing, recreation, roads, and transmission lines. Actions that fall under the purview of the CCA will follow CCA direction in the Basin. The range-wide planning effort will incorporate measures found in the CCA. All other actions will consider conservation measures identified in the RCP and this IM as the primary guidance for management.

**All Program Areas**

BLM FOs will:

- Work within multiple programs including recreation, hazardous fuels, fire management, Public Domain forestry, range management, and wildlife to accomplish GUSG habitat conservation.  When permitting or authorizing activities, FOs will consider, analyze and incorporate appropriate GUSG management strategies, best management practices (BMPs), and mitigation actions (avoid, minimize, and compensate) through NEPA analysis or other regulatory processes.  FOs will continue to implement appropriate BMPs through the permitting process in all program areas.  BMPs could include those identified at the local, state or national level for oil and gas development in GUSG habitat (see also RCP (Appendix L), fire (WO-IM 2013-128), and grazing guidelines (RCP 2005)).

- Continue coordination with the FWS and State fish and wildlife agencies on appropriate site-specific habitat or population-level management strategies (RCP 2005).  This will include, but is not limited to, considering, prioritizing and implementing management prescriptions and strategies outlined in the RCP and local GUSG conservation plans, as well as all subsequent updates as appropriate. The BLM will work with FWS and State fish and wildlife agencies to determine the best available science for implementation of this IM and, if appropriate, will revise the IM accordingly.

- Implement a 0.6-mile no surface disturbance/no surface occupancy buffer radius (RCP 2005) around all active leks for project-level implementation such as fences or sagebrush habitat treatments. Any sagebrush removal or treatment should be prohibited within this buffer, unless implemented to maintain or enhance the lek (RCP, Appendix I).

- Per the RCP (Appendix I), the BLM should manage all sagebrush habitat within a 4-mile radius of an active lek as GUSG breeding habitat (lekking, nesting, early brood rearing). To complement protections within the 0.6-mile buffer (described above), breeding habitat should be managed to minimize disturbance to GUSG during critical seasonal time periods and minimize the footprint of any project, habitat fragmentation across the landscape, and

BLM_0028117

cumulative effects on the associated population (see RCP, Appendix L).  The following specific disturbance guidelines (see RCP, Appendix I) should be analyzed and applied to all ongoing program authorizations where appropriate:

o   Prohibit surface disturbing activities and disruptive activities within four miles of active leks from March 1 through June 30 (RCP 2005), subject to valid existing rights and emergency repairs of ROWs.
o   Avoid surface disturbance within mapped winter habitat for GUSG (if not mapped, within four miles of active leks); if surface disturbance cannot be avoided, prohibit said activity from December 1 through March 15 (RCP 2005).

- Include requirements to new Special Recreation Permits (SRP) to avoid disturbing leks during the breeding season. SRPs for hunting (other wildlife species), bird watching, and other activities should include appropriate timing restrictions to minimize disturbance to GUSG during critical seasonal periods such as the breeding, late brood rearing and winter-use periods.

- Evaluate the need, and implement where appropriate, seasonal or permanent road or trail closures in occupied habitat through travel management planning and associated NEPA analysis for BLM authorized routes.  Avoid construction of new roads or ROWs within four miles of active leks.

- Analyze the impacts to GUSG when renewable energy (e.g., wind, solar, biomass) development and associated infrastructure (e.g., transmission lines) is proposed in or adjacent to sagebrush habitat, and avoid occupied habitat where warranted.  Manage areas within four miles of active leks as ROW avoidance areas.

- Avoid routing above-ground transmission or distribution lines within occupied habitat.

- In response to a Plan of Operations, evaluate the impacts of non-discretionary activities managed under 43 CFR 3809 (those actions authorized under the 1872 mining law) on local GUSG populations, and clearly describe those effects that cannot be mitigated through the regulatory process.  Through the NEPA process, analyze potential impacts of discretionary mining activities and mitigation approved under 43 CFR 3400 (such as coal management), 43 CFR 3500 (non-energy leasable materials), and exploration or extraction of other solid minerals wherever possible.

- Incorporate adequate reclamation standards designed to re-establish suitable GUSG seasonal habitats (RCP 2005, Appendix H) for all surface-disturbing activities within occupied GUSG habitat.  Incorporate native seed mixtures in restoration efforts.  Wherever possible, native seed mixtures should include a minimum of three native grasses, two native forbs and one native sagebrush species.  Use desired non-persistent, non-native vegetation in rehabilitation only where other options have been proven unsuccessful.

- Monitor all restoration activities for success in meeting short- and long-term vegetation objectives and reclamation standards, including potential weed infestations following the principles outlined in the BLM Assessment, Inventory and Monitoring Strategy.  Conduct follow-up treatments to eliminate weeds as identified through monitoring.  If vegetation objectives are not being met, adjust restoration actions accordingly to improve success of achieving desired GUSG habitat objectives.

BLM_0028118

**Proper Livestock Grazing**

Continue to evaluate and implement livestock grazing management practices consistent with achieving GUSG seasonal habitat objectives during allotment permit renewals and associated NEPA analysis, or as identified through LHAs.  Consistent with the best available science compiled in accordance with the Policy section above, GUSG habitat objectives identified in the RCP (Appendix H) should be considered the range-wide standards for managing GUSG seasonal habitats.  Habitat objectives may be adjusted if more localized habitat structural data are available in coordination with State fish and wildlife agencies and the FWS on a population-by-population basis.  GUSG habitat objectives should always be managed with consideration to ecological site potential.

Use the BLM-approved monitoring techniques described in the HAF to assess and monitor long-term GUSG habitat conditions and trend in conjunction with authorized grazing management.

Where current livestock grazing management has been identified as a causal factor in not meeting Land Health Standards (43 CFR 4180), use the process in WO-IM-2009-007, Process for Evaluating Status of Land Health and Making Determinations of Causal Factors When Land Health Standards Are Not Achieved, to identify appropriate actions. Evaluate progress towards meeting standards that may affect GUSG or its habitat prior to authorizing grazing on an allotment that was not achieving land health standards in the last renewal cycle, and livestock was a significant causal factor.  Where available, use current monitoring data to identify any trends (e.g., progress) toward meeting the standards.  Where monitoring data are not available or inadequate to determine whether progress is being made toward achieving Land Health Standards, an interdisciplinary team should be deployed as practicable to conduct a new land health assessment.  The NEPA analysis for the permit/lease renewal must address a range of reasonable alternatives including alternatives that improve GUSG habitat.

**Wildland Fire and Fuels Management**

While GUSG protection and habitat enhancement is a high priority for the fire management program, firefighter and public safety is the first priority on every fire and takes precedence over natural resource protection. Local agency administrators and resource advisors will convey resource protection priorities to incident commanders. Incident Commanders will then develop and establish incident objectives, strategies, and operational tactics that ensure firefighter and public safety.[2]

The strategy for all unplanned ignitions in GUSG habitat will be "fire suppression." Fire suppression strategies and tactics used on an incident will comply with RMP and Fire Management Plan (FMP) direction. Unplanned ignitions in GUSG occupied habitat will not be managed to meet resource objectives until a final FWS listing decision is made and a programmatic consultation can be completed, if warranted.

Discretionary actions under the fire and fuels management program include:  unplanned ignitions managed to meet resource objectives; planned ignitions (i.e., prescribed fires); and mechanical, biological and chemical vegetation treatments to reduce hazardous fuels. When these discretionary actions are expected to occur in occupied or unoccupied critical habitat, they must occur under conditions analyzed to be acceptable to meet GUSG resource objectives. The NEPA analysis for FMPs and project plans for these discretionary actions address achieving GUSG habitat objectives and must undergo appropriate consultation with the FWS following the final GUSG listing decision under ESA should the FWS make a final determination to list GUSG. These decisions must be documented in the Wildland Fire Decision Support System.

**Climate Change/Rapid Eco-regional Assessments (REA)**

BLM_0028119

The proposed GUSG listing package acknowledges the potential for climate change to alter the distribution of native vegetation, increase the potential for invasive species introduction and increase fire frequencies and intensities, all of which may have long-term impacts to key GUSG seasonal habitats across the landscape.

- The BLM Colorado State Office (COSO) will continue to develop a statewide Climate Change Adaptation Strategy, which will include a vulnerability assessment of GUSG.

- FOs in Colorado will implement climate change adaptation strategies developed through the statewide effort. The strategies will be informed by data provided by REAs or other assessment documents, as appropriate.

- BLM Colorado and Utah will incorporate landscape-level data and adaptive management strategies using information identified through the REAs or other assessments to conserve and restore sagebrush habitats.

## Processing Fluid Mineral Leases in GUSG Habitat

### New Nominated Leases
In accordance with WO IM 2010-117, Change 1, "the State Directors have discretion to temporarily defer leasing on specific tracts of land based on information under review during planning." Since the RCP (2005) was signed, the BLM Colorado's policy has been to defer leasing of occupied GUSG habitat until new FO land use planning has been completed, as these documents detail significant new information on GUSG not addressed in current plans. The BLM will continue to defer leasing in occupied habitat to avoid affecting decisions related to future management decisions.

### Existing Leases
For authorization of any development actions (for individual APDs or where an operator proposes a Master Development Plan) where there are valid existing rights, FOs must coordinate with the FWS (consistent with requirements under ESA), CPW (consistent with COGCC MOU – Attachment 1), UDWR, and industry on management actions designed to minimize impacts to GUSG or their habitat, including Conditions of Approval (COA) that will be applied to future APDs. The BLM must ensure that any proposed COAs or mitigation measures are consistent with the RMP, are adequately supported by site-specific NEPA analysis and do not violate any lease rights (see Yates Petroleum Corp., 176 IBLA 144 [2008]).

In accordance with standard lease terms and conditions, existing leases are subject to applicable laws, including ESA, and therefore, may be required to adopt conditions of approval that would reduce adverse impacts to the species consistent with site-specific environmental analysis and ESA conference or consultation.

BLM offices are encouraged to work with the FWS, State fish and wildlife agencies, and industry in advance of planning to develop potential strategies in a particular geographic area. This pre-planning may include conservation strategies such as siting a project in lower quality habitat, clustering activities to minimize fragmentation of existing habitat patches, or noise mitigation.

This policy does not preclude developing and immediately implementing new mitigation or conservation measures necessary to reduce activity/project impacts to GUSG or their habitats, provided this mitigation is in accordance with existing RMPs and lease rights granted. Any new measures applied for GUSG will be coordinated with the FWS and State fish and wildlife agencies. FOs will work with project proponents, the State, the FWS, and private landowners when

BLM_0028120

appropriate to implement direct avoidance and minimization measures (e.g. relocating disturbance, timing restrictions, etc.) and use COAs.  FOs must ensure any recommended COAs or operator-negotiated stipulations are supported by appropriate analysis through NEPA during the APD, plan of development, or use-authorization approval process.  Biologists are encouraged to reference existing analyses or accepted recommendations from national, range-wide, or local conservation plans; existing or new peer reviewed research studies; or other scientific reports within the NEPA analysis, rather than restate those analyses.

In accordance with Fluid Mineral Resources Handbook (H-1624-1, 2013), the federal government retains certain rights when issuing an oil and gas lease. While the BLM may not unilaterally add a new stipulation to an existing lease that it has already issued, the BLM can subject development of existing leases to reasonable conditions, as necessary, through the application of COAs at the time of permitting. The new constraints must be consistent with the applicable land use plan and not in conflict with rights granted to the holder under the lease.

If the existing lease is in occupied GUSG habitat, and the land use plan does not contain mitigation, FOs should request the operator to modify existing stipulations or add an additional stipulation to mitigate the impacts to GUSG habitat.  When applicable under 43 CFR 3101.1-4, if, after the lease is issued, the authorized officer determines that a modification of a lease term or stipulations involve an issue of major concern for the public, the modification shall be subject to public review for at least 30 days.  43 CFR 3101.1-4. If the operator refuses to sign a stipulation modification or to add a new stipulation, the BLM will need to carefully evaluate whether the project can proceed based on the level of impacts identified in the site-specific NEPA analysis and the BLM's obligation to prevent unnecessary or undue degradation [43 USC 1732(b).]. Any development pursuant to valid existing rights will be approved in the location and in a manner that best minimizes impacts to GUSG.

Where authorized in the applicable RMP, exceptions to lease stipulations or COAs in sagebrush habitats will be considered on a case-by-case basis and coordinated with the FWS and State fish and wildlife agencies before approval.  Any exception authorized in occupied habitat will require District Manager review.

The BLM will defer fluid mineral lease nominations in GUSG occupied habitat until management prescriptions and strategies outlined in the RCP, local GUSG population conservation plans, and/or potential impacts to local GUSG populations as summarized in recent/existing research studies or conservation summaries, have been considered and evaluated through the range-wide plan amendment effort and associated NEPA analysis. Such analyses must consider the cumulative impact of decisions and mitigation measures.

Development constraints may vary by FO when those constraints are based on locally-collected scientific data or local habitat conditions and are supported with clear rationale in the range-wide amendment NEPA analysis. Prescriptive measures carried forward through the selection of the preferred alternative in the range-wide plan amendment will be incorporated into all new leases within occupied or other GUSG habitats, as outlined in the planning document.

Lands determined to be available for lease and development within occupied GUSG habitat, and under what constraints, will be described in the proposed range-wide plan amendment. The BLM will ensure that the GUSG range-wide plan amendment contains language consistent with recent Interior Board of Land Appeals (IBLA) decisions (Yates Petroleum Corp., 176 IBLA 144 [2008] and William P. Maycock, 177 IBLA 1 [2009]).[3] These decisions allow the BLM discretion to modify surface operations to add specific mitigation measures supported by site-specific National Environmental Policy Act of 1969 (NEPA) analysis undertaken during the development phase on existing leases. The IBLA has made it clear when making a decision regarding discrete surface-

BLM_0028121

disturbing oil and gas development activities following site-specific environmental review, the BLM has the authority to impose reasonable protective measures not otherwise provided for in lease stipulations to minimize adverse impacts on other resource values.

## Drainage

It is the responsibility of the BLM to protect the interests of the United States where it is determined that the oil and gas resource is subject to drainage. The BLM has many tools at its disposal to do so, such as forced pooling, communization agreements, issuing leases, and drilling protective wells. Where it is determined that drainage is occurring, the BLM will analyze and employ the least disruptive method necessary to protect the interests of the United States. If disturbance is necessary, the BLM protect GUSG habitat by applying the conservation concepts outlined in this IM, as well as other best management practices, as appropriate.

**Processing Proposed Solid Mineral Leases (Coal) in GUSG Habitat** (i.e., a lease has not been issued and, therefore, no valid existing rights have been established)

The BLM will defer leasing in occupied habitat to avoid affecting decisions related to future management until new FO land use planning has been completed.

## Sagebrush Habitat Improvement/Restoration Projects

All GUSG habitat improvement projects should clearly articulate and document the need for the project to achieve desired habitat objectives (RCP 2005, Appendix H).  Documentation should include current habitat condition assessments and specific treatment objectives as they relate to GUSG habitat.

All vegetation treatments in sagebrush habitat should consider and incorporate seasonal GUSG habitat needs into project design, analysis and approval when those projects are completed to meet other program area objectives.  Recommendations for sagebrush removal or treatment projects within seasonal habitats are located in the RCP, Appendix I (pg. 6-7). (See guidance under "All Program Areas" for more information.)

All habitat treatments and management prescriptions in GUSG habitat should incorporate appropriate effectiveness monitoring to determine whether one or more of the following goals are being achieved:

1) Meeting site-specific GUSG habitat objectives consistent with best available science compiled in accordance with the Policy section above;
2) Enhancing the long-term sustainability of local GUSG populations;
3) Promoting the maintenance of large intact sagebrush communities;
4) Limiting the expansion or dominance of invasive species;
5) Maintaining or improving soil site stability, hydrologic function, and biological integrity;
6) Enhancing the native plant community, including the native shrub reference state in the *State and Transition Model*, with appropriate shrub, grass, and forb composition identified in the applicable ESD where available; and
7) Meeting specific project or management objectives as they relate to GUSG or their habitat.

BLM_0028122

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

Monitoring objectives will be coordinated and/or conducted in conjunction with State fish and wildlife agencies, and will use BLM-approved inventory or monitoring methods.

Livestock grazing will be deferred for all GUSG habitat improvement or restoration treatments for a minimum of two growing seasons to ensure establishment and persistence of desired vegetation, unless analysis or management objectives recommend otherwise.

The BLM will prioritize all GUSG restoration efforts in Proposed Unoccupied Critical Habitat in conjunction with the FWS and State fish and wildlife agencies. Priorities will reflect ground-truthing of site capability, likelihood of success, planning and design, monitoring needs, and prioritization by population status and need.

BLM Colorado and Utah will continue to support, coordinate with, and participate in GUSG conservation activities that are led or initiated by the FWS, State fish and wildlife agencies, and local workgroups or other partnerships.  Such activities may include, but are not limited to, ongoing GUSG research studies, habitat mapping and modeling efforts, conservation planning and project implementation, and population monitoring.

**Conference and Consultation with FWS**

The ESA requires the BLM to conference on all management actions that may result in a Jeopardy determination of a proposed species. Since the BLM is generally not in a position to determine Jeopardy, BLM policy (Manual Section 6840) is to conference on all discretionary actions that May Affect, or are Likely to Adversely Affect (LAA). Per the FWS Guidance for Conferencing (Attachment 2), the FWS has agreed to continue ongoing discussions and/or conferencing for all land use planning efforts and for the Gunnison Basin CCA. The BLM has shared a list of ongoing planning efforts with FWS to help plan their interim workload with the BLM.

The FWS will not be conferencing on individual projects that may have adverse effects to the species or proposed critical habitat, but are not likely to reach the level of Jeopardy to the species. Assessment of project-level impacts should be documented in the associated NEPA analysis.

Individual projects with an LAA determination will be coordinated through the appropriate state office to support continuing ongoing actions. This will include providing feedback to the field on appropriate conservation measures and levels of impacts.

FOs will work with the appropriate state office to prioritize and streamline future consultation needs if the species is listed and help develop a schedule for submitting priority projects/activities/programmatic Biological Assessments (BA) to the FWS for consultation to manage reasonable workloads for both agencies. This will include assisting the FOs in identifying and grouping similar actions (existing and future) that may be assembled and analyzed in programmatic consultation documents or covered by project screens for one or more GUSG populations.

**Adaptive Management**

For purposes of this IM, adaptive management is used in two broad contexts:
1.  Incorporating applicable new research or guidance into GUSG management.

2.  Adjusting management to achieve specific GUSG resource objectives as determined through monitoring (DOI Technical Guide for Adaptive Management, Williams et.al 2007).[4]

BLM_0028123

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

As new research, national or state management guidance, population or habitat data, or other pertinent GUSG information becomes available, recommended management of GUSG should be adjusted accordingly.  All recommended management applications will continue to be implemented via NEPA analysis.  The success in implementation and effectiveness of this management direction will be reviewed to determine if GUSG resource objectives are being met. This review will be in coordination with the FWS, State fish and wildlife agencies, and other agencies through the GUSG RSC.  As RMPs are amended or revised in the future with sufficient local population guidance, those conservation measures and management constraints will be reviewed for effectiveness as described above.

Alternatively, where specific GUSG population or habitat objectives have been set, the BLM will use monitoring data to determine the effectiveness of existing management actions in meeting those objectives.  If not deemed effective, management prescriptions should be adjusted to meet identified resource objectives.

**Timeframe**:  This IM is effective immediately.

**Budget Impact**:  This IM will result in additional operational costs for coordination, NEPA review and monitoring of all activities in GUSG habitats in Colorado and Utah.  In addition, full implementation of this IM including initiating a GUSG range-wide Plan Amendment, restoration efforts, response to climate change indicators, and adaptive management may require significant funding.

**Background:**  Since 1999, the GUSG has been petitioned and reviewed for listing under ESA several times.  The FWS issued a 12-month finding on September 27, 2010, (75 FR 59804), and determined that GUSG warranted protection under the ESA, but that proposing the species for protection would be delayed while the FWS addressed the needs of other higher priority species. On January 11, 2013, the FWS proposed GUSG as endangered, and concurrently proposed the designation of approximately 1.7 million acres of critical habitat, under ESA, as amended (78 FR 2486; 78 FR 2540).

GUSG occur in seven isolated populations, one of which is connected to a GUSG population in Utah.  It is important to maintain existing populations and/or current distribution throughout both Colorado and Utah, where more than 90 percent of the estimated range-wide population of GUSG occurs within Colorado.  Local GUSG workgroups have been established for six of the seven populations and are engaged in management of the species to varying degrees depending on land ownership and local involvement.  Threats to these species vary by population in both Colorado and Utah, and are articulated in their respective Conservation Plans (RCP 2005).
As a land manager of GUSG habitat, it is imperative that the BLM conserve sagebrush communities to support sustainable GUSG populations and maintain or improve connectivity of habitat within and between existing populations, where appropriate.  However, successful management of GUSG will require cooperation from private, state and federal land owners and managers to address the wide range of land uses that intersect with GUSG habitat.  For instance, while the BLM is a primary land manager of GUSG habitat in Colorado, between 80-90 percent of all oil and gas drilling activity statewide occurs on private, county, or state lands, with no federal nexus.  Only by finding ways to work across landscapes that transcend ownership boundaries will federal, state, and private land owners and managers achieve substantial and measurable conservation of sagebrush communities and sustainable GUSG populations.

**Directives Affected**:  A BLM Colorado/Utah Handbook Supplement will incorporate the new policy and guidance.

BLM_0028124

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Coordination:** This IM was coordinated with BLM Utah State Office; Colorado State Office; the Washington Office (WO) Resources and Planning Directorate; WO Energy, Minerals, and Realty Management Directorate; and the WO National Landscape Conservation System and Community Programs Directorate.

**Contact:** Robin Sell, Conservation Biologist, at (303) 239-3723, or Leigh Espy, Project Manager, at (303) 239-3801.

Signed by:                                       Authenticated by:
Edwin L. Roberson                                Robert M. Williams
Assistant Director                               Division of IRM Governance,WO-860
Resources and Planning

2 Attachments
   1 - COGCC MOU (9 pp)
   2 - FWS Guidance for Endangered Species Act Conferencing for GUSG (1 p)

---

[1] The HAF is available at
http://sagemap.wr.usgs.gov/docs/rs/SG%20HABITAT%20ASESSMENT%202010.pdf
[2] More information available at: https://www.nifc.gov/policies/policies_documents/GIFWFMP.pdf
[3] Available at: http://www.oha.doi.gov:8080/index.html
[4] Available at: http://www.doi.gov/initiatives/AdaptiveManagement/TechGuide/openingpgs.pdf

BLM_0028125

APPENDIX C:  GUSG CANDIDATE CONSERVATION AGREEMENT, GUNNISON BASIN POPULATION

# Candidate Conservation Agreement
## For the Gunnison sage-grouse, *Centrocercus minimus* Gunnison Basin Population

Developed cooperatively between:
Colorado Parks & Wildlife
Gunnison County
Saguache County
U.S. Bureau of Land Management
U.S. Fish and Wildlife Service
U.S. Forest Service
U.S. National Park Service
U.S. Natural Resources Conservation Service

BLM_0028126

# EXECUTIVE SUMMARY

Beginning in January 2010, federal land management agencies and the Gunnison Basin Sage-Grouse Strategic Committee developed the following Candidate Conservation Agreement (CCA) to promote conservation of the Gunnison Basin population of Gunnison sage-grouse. The CCA addresses three categories of threats to sage-grouse habitat on federal public lands in the Gunnison Basin, as identified in the 2010 FWS status review: development, recreation, and grazing. The CCA will apply to such actions on the approximately 395,000 federal acres of occupied habitat, or roughly two-thirds of the total 590,000 acres of occupied Gunnison sage-grouse habitat in the Basin. As noted in the USFWS 2010 status review, the Gunnison Basin population constitutes 87% of the overall population of Gunnison sage-grouse.

Federal signatories will seek a conference opinion from the U.S. Fish and Wildlife Service (USFWS) in accordance with section 7 of the Endangered Species Act (ESA) regarding the CCA and its covered actions, and this process is expected to be completed by mid – 2013. With the conference opinion, so long as the federal agencies design and manage these specified activities to meet the conservation criteria outlined in the CCA, the federal agencies will have met their ESA conference requirements for those activities. If the Gunnison sage-grouse is subsequently listed under the ESA, the federal signatories will request that the USFWS confirm the conference opinion as the biological opinion, such that the federal agencies will have met their ESA consultation requirements for those covered activities.

Because the nonfederal signatories manage activities and uses on and through federal lands, such as road maintenance and big game, they too serve a role in implementing the CCA. Fortunately, the Gunnison Basin has a long history of government-to-government cooperation to conserve the species and habitat. Nonfederal actions or actions without a federal nexus are not intended to be included in the conference opinion, however.

Although the CCA delineates overarching habitat conservation objectives on federal lands, conservation measures in the CCA are not intended to address all threats to the species and habitat. Rather, the CCA and associated conference opinion covers a wide range of activities on federal lands including development, recreation, and grazing.

Further, neither the CCA nor the conference opinion is a land-use plan, nor is it intended to supersede federal or nonfederal land use planning authority. Section 7 coverage does not absolve federal agencies of NEPA obligations, nor does it absolve nonfederal permittees of compliance with permit terms and conditions. For federal agencies, the CCA is a tool to screen activities on federal lands for coverage under the streamlined, programmatic conference opinion. For nonfederal signatories, this document is intended to be a statement by the federal agencies that, so long as the nonfederal signatories implement the identified conservation measures for an action with a federal nexus , then no further consultation is necessary, and such covered actions are "screened out" of any further consultation requirements. For nonfederal nonsignatories who obtain permits and authorizations for activities on federal lands, including such broad stakeholder groups as right-of way/easement permit holders, recreationists, and Stockgrowers, so long as the federal agency administering such permits implements the identified, associated conservation measures, then no further consultation on the permit is necessary.

BLM_0028127

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

The Strategic Committee is the Gunnison and Saguache County-appointed local working group comprised of agency officials, elected officials, commercial stakeholders, conservation organizations and members of the public. The CCA effort was facilitated by the Bureau of Land Management (BLM), coordinated with the USFWS, and included approximately 35 individuals representing federal and state agencies, two counties, and stakeholder groups.

Signatories include *(See Section 0, Responsibilities of Signatories)*:

- USDA Forest Service: Gunnison Ranger District of the Grand Mesa, Uncompahgre and Gunnison National Forest
- USDI National Park Service: Black Canyon of the Gunnison National Park and Curecanti National Recreation Area
- USDI Bureau of Land Management: Gunnison Field Office
- USDI Fish & Wildlife Service: Western Colorado Field Office
- USDA Natural Resources Conservation Service, Colorado
- State of Colorado – Department of Natural Resources, Colorado Parks & Wildlife: Gunnison Service Center.
- Board of County Commissioners of Gunnison County
- Board of County Commissioners of Saguache County

BLM_0028128

## ACKNOWLEDGMENTS

The Gunnison Basin Gunnison sage-grouse Candidate Conservation Agreement is the result of the collective effort of many, many agency staff and public partners and the persistent dedication of a few. Although singular signatures may represent partners' commitment to implement the CCA, success depends upon a host of staff and public partners to fulfill and evolve the agreement in the years to come. Many thanks to those past and future contributors.

# INTRODUCTION & FRAMEWORK

## 1.1.    Background

For almost two decades, Gunnison sage-grouse conservation in the Gunnison Basin has been driven by local stakeholders, local government, and state and federal Authorized Officers and staff located in the Gunnison Basin, periodically spurred by U.S. Fish & Wildlife Service (USFWS) decisions regarding the species' status. The Gunnison Basin sage-grouse working group completed the first local conservation plan for Gunnison sage-grouse in June 1997, and Basin-wide sage-grouse conservation continues in large part via the Gunnison County and Saguache County-appointed Gunnison Basin Sage-grouse Strategic Committee. Formed in 2005, the Strategic Committee is comprised of agency officials, elected officials, commercial stakeholders, conservation organizations and members of the public.  Meanwhile, the USFWS first designated the grouse as a candidate species in 2000, identifying it as warranted for listing as endangered or threatened under the Endangered Species Act (ESA). The candidate designation means that immediate proposed listing of the species is precluded by higher priority listing actions; the species was again designated as warranted but precluded in 2010. Most recently, in September 2011 the U.S. District Court for the District of Columbia, in *WildEarth Guardians v. Salazar,* approved a settlement agreement between USFWS and Wild Earth Guardians addressing the status of candidate species, including the Gunnison sage-grouse. Under this agreement and a subsequently court-revised timeline,, the USFWS proposed the species as endangered in December 2012, and simultaneously proposed critical habitat.

Because of long-standing local commitment to the identification and implementation of sage-grouse conservation measures, and in anticipation of eventual listing under the ESA, agencies and stakeholders began to seek more formalized recognition of their efforts. Colorado Parks & Wildlife (CPW; then Colorado Division of Wildlife) completed a Candidate Conservation Agreement with Assurances (CCAA) with USFWS in 2006. Via voluntary participation in the CCAA, private landowners throughout the range of the Gunnison sage-grouse (GUSG) have enrolled their properties and obtained assurances that no further conservation measures would be required in the event that the sage-grouse is listed, provided they carry out the conservation measures and land management activities as identified in their Certificates of Inclusion.

Given the popularity of the CCAAs and the emerging regional awareness of these types of voluntary but formalized conservation mechanisms, in 2010 the Gunnison Basin Sage-grouse Strategic Committee took on the task of preparing a Candidate Conservation Agreement (CCA) with the USFWS to both a) address threats to sage-grouse from activities on federal lands, and b) participate in laying the foundation for how such activities could continue subsequent to a listing decision for the grouse.

## 1.2.    CCAs: Policy, Practice

By policy, a Candidate Conservation Agreement is "an agreement signed by [the USFWS] and other Federal or State agencies, local governments, Tribes, businesses, organizations, or non-federal citizens,

BLM_0028130

that identifies specific conservation measures that the participants will voluntarily undertake to conserve the covered species" (64 FR 32705 1999). Although the USFWS issued a final policy for Candidate Conservation Agreements with Assurances in 1999, no comparable policy exists for CCAs.  USFWS issued an informal memo to describe how a CCA/CCAAs could be jointly applied, and the memo detailed recommended components to include in such joint agreements (USFWSa). Yet for stand-alone CCAs, "the degree of detail …can vary widely, and there are no specific permits or assurances associated with them" (USFWS 2011).

By practice, most stand-alone CCAs to-date generally describe the known and anticipated threats to the species and its habitat, coupled with the specific conservation measures that signatories will implement to address the identified threats. For the Gunnison sage-grouse, just such a plan was developed in 2005 via an extensive, multi-agency effort that produced the Gunnison sage-grouse Rangewide Conservation Plan (RCP; GSRSC 2005). The RCP was the first up-to-date and rigorous assessment of rangewide population and habitat data for Gunnison sage-grouse, and still serves as a blueprint for GUSG management across the range. Nonetheless, five years subsequent to varying levels of implementation of the conservation strategies outlined in the Rangewide Conservation Plan, the 2010 status review confirmed that the present and future threats to the species were such that the species continues to be warranted for listing, with an increased priority ranking.

### 1.3.    Goals & Objectives of this CCA

With a wide degree of latitude to develop a CCA, and the impetus to define the next step in management post-Rangewide Conservation Plan, the GUSG CCA participants outlined overarching process- and outcome-oriented goals:

- ***Engage key stakeholders in the Gunnison Basin community in a collaborative planning and review process to support sage-grouse conservation***

   Building on the trajectory of collaborative, bottom-up grouse management by the Strategic Committee and larger Gunnison Basin community, the CCA process was designed such that public partners worked alongside Authorized Officers to build the key components and conservation measures.

- ***Ease the transition to living and working with a species that may be federally listed in the near future***

   By outlining clear design criteria in the CCA for any proposed or renewed activities on federal lands in grouse habitat, signatories and partners plan ahead to identify and implement necessary conservation measures.

   By then conducting a formal, programmatic conference with USFWS for those activities prior to a final listing determination, federal agencies frontload compliance with their ESA Section 7 obligations in the event of listing. In sum, the GUSG CCA was designed to primarily function as a

BLM_0028131

project screening tool to streamline future consultation with USFWS under Section 7.[1]  This regulatory framework is further elaborated in Section 2.

- *Build upon the Rangewide Conservation Plan to make conservation measures actionable*

   Participating federal agencies and public partners have a clear and direct incentive to incorporate delineated conservation measures as design criteria for project proposals and renewed activities in grouse habitat due to a) efficiency gains from streamlined consultation under ESA Section 7 and

   b) greater upfront certainty over the conservation measures required.

   The GUSG CCA advances several of the conservation objectives outlined in the RCP by breaking objectives into specific, implementable steps that can reasonably be achieved by the implementing agencies.

- *Stratify occupied habitat to prioritize conservation measures*

   With approximately 395,000 acres of federally managed occupied Gunnison sage-grouse habitat in the Gunnison Basin, land managers and planners sought a way to stratify the landscape and prioritize conservation measures.[2]  The development of the Habitat Prioritization Tool, and the subsequent delineation of tiered habitat, is outlined in Section 3.3 and Appendix F.

   **Tier 1 Habitat:** Roughly 60% of occupied grouse habitat is proposed to be managed as Tier 1 habitat. These areas are identified by the Habitat Prioritization Tool, and they are generally characterized by two or more overlapping seasonal habitats and minimal existing permanent development.

---

[1] For comparable example, see *Programmatic Consultation Agreement between Bureau of Land Management and US Fish and Wildlife Service for Canada Lynx in Colorado.* USFWS & BLM. 2010.

[2] The Habitat Prioritization Tool was developed for the entirety of occupied habitat in the Gunnison Basin, irrespective of land ownership. The CCA applies the stratification to federal acres only.

**Tier 2 Habitat:** Roughly 40% of occupied grouse habitat is proposed to be managed as Tier 2 habitat. These areas are identified by the Habitat Prioritization Tool, and they generally represent the more fragmented areas on the landscape.

### *Account for cumulative impacts of habitat fragmentation*

Fragmentation as used throughout the CCA is defined as the reduction of continuity and/or quality of habitat, including both direct habitat conversion and indirect/functional impacts.[3] A fundamental goal of the CCA is to account for the cumulative impacts of habitat fragmentation, which is identified as the overriding threat to the species. As such, two habitat objectives frame the conservation measures to address both existing impacts and impacts from future, additional development and activities in occupied habitat on federal lands:

*Tier 1 habitat objective: Reduce existing net fragmentation.*

Section 5, Conservation Measures to Address Existing Development & Activities, outlines measures the agencies and their partners will take to reduce the scope and extent of existing fragmentation over the lifetime of the CCA. For example, Tier 1 habitat will be prioritized for route reclamation.

Section 4, Conservation Measures to Address Future Development & Activities, sets up a framework to reduce net fragmentation – while enabling participating agencies to fulfill mission-priority work and uses – via the use of offsite mitigation[4] for specified types of future infrastructure. For example, new trails can be constructed, but they will have to be offset by a *greater* amount of reclaimed trails. To the extent possible, offsite mitigation should lead to an increase in the size of intact, unfragmented Tier 1 habitat patches.

*Tier 2 habitat objective: Avoid additional net fragmentation.*

Section 4, Conservation Measures to Address Future Development & Activities, sets up a framework to avoid additional net fragmentation – while enabling participating agencies to fulfill mission-priority work and uses — via the use of offsite mitigation for specified types of future infrastructure. For example, new trails that meet the design criteria to minimize impacts to sage-grouse habitat may be constructed, but they will have to be offset at a minimum by an *equal* amount of reclaimed roads and trails.

---

[3] The use of the term fragmentation throughout the CCA is not intended to imply that sage-grouse within the Gunnison Basin population are genetically isolated as a result of habitat fragmentation, and no data exist to indicate genetic isolation is occurring within the Basin.

[4] Offsite mitigation consists of compensating for resource impacts by replacing or providing substitute resources or habitat at a different location than the project area.

*Disturbance Caps*

In the future, new research, agency policy, or signatories to the CCA may identify caps or thresholds of allowable disturbance in occupied grouse habitat in the Basin. At that time, parties to this CCA would consider modifying Tier 1 and Tier 2 habitat objectives to be consistent with identified disturbance caps, thereby ensuring the GUSG CCA remains a viable and relevant instrument *(See Section 9)*.

## 1.4.   Scope

From the onset, CCA participants focused the scope of the agreement on three threats in the Gunnison Basin that contributed to the candidate status of the species: development, grazing, and recreation. While other threats to the species exist, the CCA is a targeted conservation agreement that covers development, recreation, and grazing actions that are:

- discretionary actions occurring on and through federal lands that are likely to have insignificant or discountable effects to the species or habitat
- discretionary actions occurring on and through federal lands that can be closely managed to avoid, minimize, and/or mitigate negative effects to the species or habitat

**Actions covered by this CCA are further defined as:**

- **Development**: New roads, power lines, phone lines, communication sites and meteorological towers, pipelines, fences, culverts, gates, cattle guards, exclosures, rights-of-way and easements that result in small-scale development projects on federal lands. The maintenance and reconstruction of such existing infrastructure is also covered in the CCA, as is the access and maintenance to existing water developments.

- **Recreation**: New recreation roads and trails, modification and reclamation of existing recreation roads and trails, recreation infrastructure (signs, kiosks, vault toilets, vehicle barriers, concentrated parking areas), seasonal restrictions, and special recreation permits, including events and outfitters on federal lands.

- **Grazing:** With respect to grazing, the CCA primarily concerns livestock grazing permits on federal lands. Yet because of the landscape scale of grazing and grouse habitat, additional grazing conservation measures are identified in this CCA to share the conservation responsibility amongst key partners. These measures – including coordinated allotment management planning across private, state, and federal boundaries, upkeep of data analysis unit plans for big game— will not be addressed in the conference opinion, but are necessary components of a range management system that ensures sage-grouse conservation. Other activities relative to livestock management, such as fences, small-scale water developments, are included in the development category.

BLM_0028134

Certain activities on federal lands have impacts of such a scale, magnitude, and project-specific nature as to warrant additional consideration and may thus require additional consultation with USFWS under ESA Section 7, outside of what will occur in connection with the CCA. Such activities and actions on federal lands within the Gunnison Basin are **not** covered by the CCA, including but not limited to:

- Energy and minerals development
- ROWs and easements > 5 acres permitted area
- Utility ROWs and easements > 25 feet permitted area width
- ROWs and easements >.5 mile aboveground infrastructure (not including buried utilities, buried pipelines) OR
- Agency-implemented actions > 1 acre permanent ground disturbance

# 2 REGULATORY FRAMEWORK

## 2.1. CCA Relationship to Section 7 of the ESA

Other species-specific CCAs have been developed and implemented with sufficient time for the USFWS to evaluate their effectiveness at reducing or eliminating threats to candidate species, with the result that some CCAs have contributed to making listing unnecessary for the covered species. Due to the anticipated proposed listing determination by December 31, 2012, beneficial effects of this CCA on the GUSG and GUSG habitat will postdate any such proposal.

*Federal Signatories*
Any federal agency has the option of conducting an ESA Section 7(a)(4) conference for candidate species and species proposed for listing to ensure that the actions they authorize, fund, permit, or carry out are not likely to jeopardize the existence of those species. Because the GUSG CCA is intended in part to serve as a programmatic agreement to streamline the ESA Section 7 consultation process, the participating federal agencies will prepare a Programmatic Biological Assessment of the effects of the CCA's covered actions and their associated conservation measures. Subsequently, the federal agencies will request that USFWS conduct a Section 7 conference, resulting in a conference opinion, pursuant to section 7(a)(4) of the ESA and 50 C.F.R. § 402.10(d).

Should the USFWS list the GUSG as threatened or endangered, the federal agencies will request, pursuant to 50 C.F.R. § 402.10(d), that the USFWS review the CCA conference opinion and adopt it as a biological opinion issued through formal consultation for the actions covered by the CCA that are in compliance with its conservation measures. If the USFWS determines as a result of this review that there have been no significant changes in the information used during the conference or in the CCA, the USFWS would confirm the original Conference Opinion as the Biological Opinion and no further section 7 consultation will be necessary with respect to these actions. Ultimately, this CCA and accompanying Biological Assessment are intended to demonstrate that adequate conservation measures, sufficient adaptive management, and monitoring obligations to allow the conference opinion to be converted into a biological opinion on the effective date of any decision to list GUSG.

*Nonfederal Signatories*

BLM_0028135

The Section 7 process does not apply to non-federal actions or actions that are not authorized, funded, or carried out, in whole or in part, by a federal agency in the United States. Therefore, for non-federal signatories – such as Colorado Parks & Wildlife and Gunnison and Saguache counties – the Biological Assessment and subsequent conference opinion will only address actions with a federal nexus.

## 2.2.   CCA Relationship to CCAAs

Many private landowners in the Gunnison Basin are enrolled in or have made application to be included in a Candidate Conservation Agreement with Assurances (CCAA) between the USFWS and CPW. Unanticipated conflicts may arise during the course of implementing both agreements. For example, one of the strategies in this CCA encourages cross-boundary flexibility for livestock management.  Adjusted grazing prescriptions on the federal portion of an allotment may result in adjusted grazing on the private portion of an allotment, which could conflict with a private landowner's Certificate of Inclusion under his existing CCAA. Any unforeseen conflict between the GUSG CCA and any Certificate of Inclusion issued pursuant to the CCAA will be addressed by the participating agencies and enrolled landowners with close coordination to maximize benefit to grouse habitat. Ultimately, however, nothing in the CCA will alter, impair or negate any obligation or benefit provided to a private landowner under his Certificate of Inclusion in the GUSG CCAA.

## 2.3.   CCA Relationship to Land-Use Plans

***Federal Signatories***
- The GUSG CCA is consistent with the 1992 BLM Gunnison Field Office Resource Management Plan; USFS Land and Resource Management Plan for the Grand Mesa, Uncompahgre and Gunnison National Forests; and 1997 General Management Plan, Black Canyon of the Gunnison National Monument and Curecanti National Recreation Area (*see Section 11, Authorities).*
- The GUSG CCA is not a decision document, and as such, does not replace any need for site-specific NEPA analysis for new and ongoing land-use authorizations.

***Nonfederal Signatories***
- Nothing in the CCA shall, or shall be construed to, limit applicable local government land-use or environmental regulatory authority.

# 3  SPECIES BACKGROUND, HABITAT & THREATS

## 3.1.   Species Background

Currently there are 7 separate populations of Gunnison sage-grouse located in Colorado and Utah with the vast majority of the birds being in the Gunnison Basin.  Loss of sagebrush habitat along with fragmentation has altered much of the historic range of the species.  With limited population size and

BLM_0028136

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

existing threats to the bird, there are currently no strongholds for population persistence, including the
Gunnison Basin (Wisdom et al. 2011). The Gunnison population has remained relatively stable over the
last decade, and the RCP Population Viability Analysis indicated that the population has less than 1%
chance of extinction next 50 years, modeled on a population target of 3000 individuals (GSRSC 2005).
The 2012 population estimate is 3,327, and the three-year average is 3,119 (CPW 2012). However,
several primary threats still exist, including landscape fragmentation, habitat loss, and the potential for
increased habitat disturbance in the future.

As noted in Section 1.1, the USFWS first determined Gunnison sage-grouse to be a candidate species
under the ESA in 2000. On April 11, 2006, USFWS determined that listing under the ESA was not
warranted. In late 2006, a lawsuit was filed alleging the 12-month finding of "not warranted" violated
the ESA. A settlement agreement was reached in 2009 for the USFWS to reissue a 12-month finding.
On September 28, 2010, the USFWS published the 12-month finding which determined that listing
under the ESA was warranted, but precluded by higher priority actions. Most recently, in the fall of
2011 the USFWS and Wild Earth Guardians reached a settlement agreement addressing the status of
many candidate species, including the Gunnison sage-grouse. Under that court-approved settlement
agreement as recently amended, the USFWS is required to issue a proposed rule to list the species, or a
not-warranted determination, no later than December 30, 2012. If the USFWS proposes to list the
species, the settlement agreement requires FWS to finalize its listing determination on or before
September 30, 2013.

## 3.2.   Habitat

There are approximately 593,000 total acres of occupied sage-grouse habitat in the Gunnison Basin.
Elevation within occupied habitat ranges from 7,500 to over 9,500 feet. Precipitation levels range from 7
to 16 inches depending on geographic area and elevation. The majority of sage-grouse habitat within
the Basin receives less than 12 inches of precipitation a year. Typical sagebrush types include mountain
big sagebrush, Wyoming big sagebrush, and black sage. Mountain big sagebrush occurs at higher
elevations and at lower elevations containing moist sites. Wyoming big sagebrush is typically found at
lower elevations and on drier sites. There is a hybrid of Wyoming and mountain in transition areas
between the two. Black sage is also found on the dry gravel soils in lower elevations. Aspect is also an
important factor influencing soil moisture content and the distribution of big sagebrush, with mountain
big sagebrush often occurring on more northerly slopes and Wyoming big sagebrush occurring on more
southerly slopes. There are many perennial and ephemeral streams within the sagebrush-steppe habitat
that provide important brood rearing habitat throughout the Basin. Many of these streams have
sagebrush encroachment as a result of downcutting and entrenchment of the stream channel, leading to
contraction of the riparian zone.

### *Habitat Stratification*

As noted in Section 1.3, a fundamental purpose of the CCA is to stratify the approximately 395,000
federal acres of grouse habitat in the Gunnison Basin and to prioritize conservation measures
accordingly. Via a year-long, collaborative, multi-agency process, members of the Strategic Committee
developed a Habitat Prioritization Tool *(HPT; See Appendix F)*. In January 2012, the Strategic
Committee completed the Habitat Prioritization Tool, and the Committee defined the threshold for what

BLM_0028137

constitutes high-priority grouse management areas for the purposes of the CCA. For now and throughout this document, the highest-value habitat is referred to as Tier 1 habitat, and the remainder of occupied grouse habitat is referred to as Tier 2 habitat. *(See Figure 1)*

*Adaptive Element:*

The Strategic Committee will continue to refine and update the HPT, including but not limited to annual CPW updates regarding the status and high male counts of leks. The HPT will be updated when new, spatially explicit sage-grouse habitat models are created and validated for the Gunnison Basin.

Although thorough review of data inputs to the HPT was conducted, the accuracy of inputs is no doubt limited, with the effect that some existing permanent infrastructure may have been omitted in the current HPT and HPT-derived maps of Tier 1 and Tier 2 habitat. In the course of CCA implementation, future land use authorizations will be ground-truthed to determine presence/absence of existing permanent infrastructure. Subsequent design criteria and conservation measures should be consistent with the actual habitat status as Tier 1 or Tier 2.

BLM_0028138

*Affected Area*

The CCA applies to approximately 395,000 acres, the entirety of occupied sage-grouse habitat on federal lands in the Gunnison Basin. Table 1 details acreage breakdown per agency.



| Table 114. Federal Gunnison sage-grouse occupied habitat acreage. | | | |
|---|---|---|---|
| | *Tier 1* | *Tier 2* | *Tier 1 & Tier 2* |
| **BLM** | 212,554 | 89,300 | 301,854 |
| **USFS** | 33,033 | 50,993 | 84,026 |
| **NPS** | 4,959 | 4,619 | 9,578 |
| **Totals (acres)** | 250,546 | 144,912 | 395,458 |

Figure 94. Tier 1 & Tier 2 habitat on federal lands.

BLM_0028139

## 3.3.   Threats

Section 4 of the Endangered Species Act sets forth procedures for adding species to the
Threatened or Endangered list based on information for five listing factors.  The five listing
factors are:

A.  The present or threatened destruction, modification, or curtailment of the species'
    habitat or range;
B.  Overutilization for commercial, recreational, scientific, or educational purposes
C.  Disease or predation
D.  Inadequacy of existing regulatory mechanisms
E.  Other natural or man-made factors affecting the species' continued existence

The USFWS looks at not only the species' exposure to each of these factors, but also to whether
the species may  respond to a factor in a way that causes actual, negative impacts to the species.
If there is exposure to a factor and resulting negative effects, then the factor may be a threat to
the species.  If the threat drives or contributes to the risk of extinction of the species, leading to
the need for protection under the ESA, the USFWS considers the threat to be significant.

In the 2010 Status Review and 12-month Finding, 75 Fed. Reg. 59,804 (Sept. 28, 2010), USFWS
identified several threats to the grouse within the Gunnison Basin.  As identified in Section 1.4,
the CCA focuses on the threats to federal occupied habitat in the following categories:
development, recreation, and grazing. The following is a summary of USFWS 2010 findings
relating to these threats:

### *Factor A: The present or threatened destruction, modification, or curtailment of its habitat or range*

- ### *Historic Modification of Habitat*

  Current occupied habitat in the Gunnison Basin totals 593,000 acres (GSRSC, 2005).
  Although USFWS notes that approximately 7% of the species potential historic range is
  currently occupied throughout the range of the species, they cite Boyle and Reeder to
  note that the rate of loss of sagebrush in the Basin was lower than other areas of
  sagebrush distribution in Colorado (75 FR 187, 59813).  It appears that 60-70% of
  potential historic habitat remains occupied in the Gunnison Basin, considerably more than
  the USFWS' estimated 7% of potential historic habitat currently occupied rangewide
  (59813).

### *Roads*

  Currently there are 1,274 miles of roads within 4 miles of grouse leks in the Gunnison
  Basin.  One USFWS analysis finds that all occupied habitat in the basin is indirectly

affected by roads, with the conclusion that "increased road use and increased road construction associated with residential development will continue at least through 2050, and likely longer. The resulting habitat loss, degradation, and fragmentation from roads are a significant threat to Gunnison sage-grouse now and in the foreseeable future" (75 FR 187, 59817-8).

*Overall threat: High*

### Powerlines

USFWS analysis indicates that "68 percent of the Gunnison Basin population area is within 4.3 miles of an electrical transmission line and is potentially influenced by avian predators utilizing the additional perches...These results suggest that potential increased predation resulting from transmission lines have the potential to affect a substantial portion of the Gunnison Basin population" (75 FR 187, p. 59819). Citing current demographic and economic trends, USFWS expects that impacts from existing powerlines and distribution of new powerlines associated with residential development will continue at least through 2050, and likely longer (59819).

*Overall threat: Moderate +*

### Invasive Plants

USFWS anticipates cheatgrass and other noxious/invasive weeds will increase in the Gunnison Basin in the future because of potential exacerbation from climate change and the limited success of broad-scale control efforts. Impacts will likely be in the form of habitat degradation via loss of native plants and an altered fire regime (75 FR 187, 59821-2).

*Overall threat: Moderate +*

### Fences

Approximately 960 miles of fence are located on BLM lands alone within the Gunnison Basin, and are thus widely distributed throughout GUSG habitat. Fence posts create perches for avian predators; USFWS anticipates the effect on sage-grouse populations by such facilitated predation is comparable to the effect of powerlines (75 FR 187, 59816-7). Although fences pose a collision hazard that has resulted in a notable level of direct strike mortality rates in the Greater sage-grouse population, mortality risk is dependent in part upon topography. In more rugged terrain, researchers have documented a markedly lesser risk, hypothesized to be a product of consequent higher flying patterns by the grouse (Stevens 2011). The varied terrain of the Gunnison Basin, and anecdotally reported

BLM_0028141

higher-flying patterns of Gunnison sage-grouse, may limit population-level effects of any direct collisions.

*Overall threat: Moderate +*

### Domestic Grazing & Wild Ungulate Herbivory

Domestic livestock grazing occurs throughout most of the occupied habitat in the Gunnison Basin and is expected to continue in the future. USFWS acknowledges that not all livestock grazing results in habitat degradation, and noted that "no studies have documented (positively or negatively) the actual impacts of grazing at the population level" (75 FR 187, 59823). They conclude that "habitat degradation that can result from improper grazing is a significant threat to GUSG now and in the foreseeable future" (59827).

*Overall threat: Moderate (when considered with Wild Ungulate Herbivory)*

### Wild Ungulate Herbivory

Any negative effects of livestock grazing are furthermore "likely being exacerbated by intense browsing of woody species by wild ungulates in portions of the Gunnison Basin" (75 FR 187, 59826-7).

*Overall threat: Moderate (when considered with Wild Ungulate Herbivory)*

### Factor E:  Other natural or manmade factors affecting its continued existence

### Recreation

USFWS notes that recreational activities, a significant use on federal lands, can result in direct and indirect effects on sage-grouse and habitat. Citing the RCP, the USFWS notes that direct disturbance during critical biological periods, including lekking, nesting, and early brood-rearing grouse, "can result in abandonment of lekking activities and nest sites, energy expenditure reducing survival, and greater exposure to predators" (75 FR 187, 59846). Early studies of the indirect effects of widespread motorized recreational access on wildlife habitat indicates that high-frequency human activity along established corridors can affect wildlife through habitat loss and fragmentation, including facilitating the spread of predators and invasive plants (Knick et al 2011). Furthermore, domestic dogs on recreation trails are anticipated to be an additional stressor when within vicinity of sage-grouse, although dogs alone are not currently identified as a population-level threat. In general, USFWS notes that recreational activities do not pose a singular threat

BLM_0028142