CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

**2. A fish and wildlife resource**; (including but not limited to habitat for endangered, sensitive, or threatened species, or habitat essential for maintaining species diversity).

In Scope

**3. A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).

In Scope

**4.** Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process.

Out of scope:  An analysis of areas for presence of natural hazards for the purpose of determining relevance is beyond the scope of this plan amendment.  The purpose and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

## IMPORTANCE

The value, resource, system, process, or hazard described above must have substantial significance and values in order to satisfy the "importance" criteria.  This generally means that the value, resource, system, process, or hazard is characterized by one or more of the following:

**1.** Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

In Scope

**2.** Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

In Scope

**3.** Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of FLPMA.

In Scope

**4.** Has qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare.

BLM_0028268

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

Out of scope:  An analysis of areas for presence of qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare for the purpose of determining importance is beyond the scope of this plan amendment.  The purpose and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

**5.** Poses a significant threat to human life and safety or to property.

Out of scope:  An analysis of areas for presence of a significant threat to human life and safety or to property for the purpose of determining importance is beyond the scope of this plan amendment. The purpose and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

BLM_0028269

# APPENDIX G: ANALYSIS OF ACEC PROPOSALS FOR RELEVANCE AND IMPORTANCE

## 1a. All GUSG Critical Habitat (Occupied and Unoccupied) for Satellite Populations

Meets criteria for both relevance and importance.

| # | Relevance Criterion Description | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species and the USFWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| # | Importance Criterion Description | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| 1 | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species".[ii] |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

BLM_0028270

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated.  Critical habitat is designated as such because the FWS determines that it is "essential for the conservation of the species". |

### 1b. All GUSG Critical Habitat (Occupied and Unoccupied) for the Gunnison Basin

Does not meet criteria for both relevance and importance.

| Relevance Criterion | | Meets Criterion? Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | GUSG are a federally threatened wildlife resource for which the FWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated.  Critical habitat is designated as such because the FWS determines that it is "essential for the conservation of the species". |

BLM_0028271

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

## 2a. All GUSG Occupied Critical Habitat for Satellite Populations

Meets criteria for both relevance and importance.

| Relevance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species and the FWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

BLM_0028272

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species".iii |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

BLM_0028273

## 2b. All GUSG Occupied Critical Habitat for the Gunnison Basin

Meets criteria for both relevance and importance.

| Relevance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species and the FWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| I | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species".[iv] |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical |

BLM_0028274

| # | Importance Criterion<br>Description | Meets Criterion?<br>Yes/No | Rationale for Determination |
|---|---|---|---|
| | mandates of FLPMA. | | habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

## 3. All GUSG Habitat (Occupied and Unoccupied)

| # | Relevance Criterion<br>Description | Meets Criterion?<br>Yes/No | Rationale for Determination |
|---|---|---|---|
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Occupied habitat consists of numerous natural processes and systems. However, occupied habitat itself is not a discrete process or system, and none of the component processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| # | Importance Criterion<br>Description | Meets Criterion?<br>Yes/No | Rationale for Determination |
|---|---|---|---|
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | |
| 3 | Has been recognized as warranting | Yes | |

BLM_0028275

| | | |
|---|---|---|
| protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | | |

## 4. All GUSG Occupied Habitat

| Relevance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Occupied habitat consists of numerous natural processes and systems. However, occupied habitat itself is not a discrete process or system, and none of the component processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | |

BLM_0028276

## APPENDIX H:  DRAFT STIPULATIONS APPLICABLE TO FLUID MINERAL LEASING AND LAND USE AUTHORIZATIONS

### Appendix H - Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

This appendix lists the stipulations for fluid mineral leasing (e.g., oil, gas, and geothermal) referred to throughout this Draft RMP Amendment/Draft EIS.  These stipulations will also apply, where appropriate, to all surface-disturbing activities (and occupancy) associated with land use authorizations, permits, and leases issued on BLM lands.  The stipulations will not apply to activities and uses where they are contrary to laws, regulations, or specific program guidance.  The intent of these stipulations is to consistently mitigate impacts by applying the same stipulation to all land use authorizations across the board.  It is the BLM's intent to incorporate the same level of restrictions, to the extent practicable, on agency proposed projects.

Stipulations outlined in this appendix also apply to fluid mineral leasing on lands overlying federal mineral estate, which includes federal mineral estate underlying privately owned lands, and state-owned lands.  The BLM will coordinate with the surface owner when applying stipulations on split estate at the leasing phase.

Surface-disturbing activities are those that normally result in more than negligible (i.e., immeasurable, not readily noticeable) disturbance to vegetation and soils on public lands and accelerate the natural erosive process.  Surface disturbances could require reclamation and normally involve use and/or occupancy of the surface, causing disturbance to soils and vegetation.  They include, but are not limited to: the use of mechanized earth-moving equipment; construction of facilities such as oil and gas wells and/or pads; major recreation sites; new trail construction.  Surface disturbance is not normally caused by casual-use activities.  Activities that are not normally considered surface disturbing include, but are not limited to: livestock grazing, cross country hiking, minimum impact filming, vehicular travel on designated routes.  Even where stipulations prohibit surface-disturbing activities, some surface-disturbing activities may be allowed under exceptions from stipulations.

Upon completion of the Proposed RMP Amendment/Final EIS, the list of stipulations that are included in the decision would supersede the relevant stipulations attached to the existing land use plans.  Those program areas/stipulations that are not considered in the Proposed RMP Amendment/Final EIS (not directly relevant only to GUSG and GUSG habitat) would continue in full force and effect where they apply (within individual BLM field offices).

### DESCRIPTION OF STIPULATIONS

Three types of stipulations could be applied to leasing authorizations and would also be applied as terms and conditions for land use authorizations: 1) No Surface Occupancy (NSO); 2) Controlled Surface Use (CSU); and 3) Timing Limitations (TL).  Lease Notices (LNs) are also described below.

### No Surface Occupancy (NSO)

BLM_0028277

Use or occupancy of the land surface for fluid mineral exploration or development is prohibited to protect GUSG and GUSG habitat.  In areas open to fluid mineral leasing with NSO stipulations, fluid mineral leasing activities are permitted, but surface-disturbing activities cannot be conducted on the surface of the land unless an exception, modification, or waiver is granted.  Access to fluid mineral deposits would require drilling from outside the boundaries of the NSO stipulation.  An NSO/No Surface-Disturbing Activities stipulation does not apply to existing facilities and the maintenance of existing facilities, such as, but not limited to, range improvements, oil and gas wells and/or pads, and major recreation sites.

## Controlled Surface Use (CSU)

A CSU stipulation is a category of moderate constraint that allows some use and occupancy of public land while protecting identified resources or values.  A CSU stipulation allows the BLM to require additional conditions be met to protect a specified resource or value in addition to standard lease terms and conditions.

## Timing Limitations (TL)

Areas identified for TLs, a moderate constraint, are closed to fluid mineral exploration and development during identified time frames.  This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified.  Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted.  Administrative activities are allowed at the discretion of the BLM Authorized Officer.

## Lease Notice (LN)

A Lease Notice provides more detailed information concerning limitations that already exist in law, lease terms, regulations or operational orders.  An LN also addresses special items that the lessee should consider when planning operations but does not impose additional restrictions.  Lease Notices apply only to leasable minerals (e.g., oil, gas, and geothermal) and not to other types of leases, such as livestock grazing.

## Condition of Approval (COA)

Conditions of Approval are enforceable conditions or provisions under which an Application for Permit to Drill (APD) is approved.

## EXCEPTIONS, MODIFICATIONS, AND WAIVERS

An exception exempts the holder of the lease from the stipulation on a one-time basis.  A modification changes the language or provisions of a stipulation due to changed conditions or new information either temporarily or for the term of the lease.  A modification may or may not apply to all other sites within the leasehold.  A waiver permanently exempts the surface stipulation for a specific lease, planning area, or resource based on absence of need, such as a determination that protection of winter use is unnecessary for maintenance or recovery of a species.

BLM_0028278

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

**Exception, Modification, or Waiver Process**

An exception, modification, or waiver may be granted at the discretion of the BLM Authorized Officer if the specific criteria described below are met.  In order to implement an action that would not normally be allowed because of a stipulation, the proponent must submit a written request for an exception, modification, or waiver and provide the data necessary to demonstrate that specific criteria have been met.  Any such requests would be subject to appropriate consultation and/or coordination with the applicable state and/or federal wildlife agency(ies).  Prior to any modification or waiver of a lease stipulation, a 30-day public notice and comment period could also be required.

## STIPULATIONS APPLICABLE TO LAND USE AUTHORIZATIONS

Restrictions on land use authorizations (including ROWs, permits, and leases) are administered through the identification of exclusion and avoidance areas.  Exclusion areas are unavailable for location of ROWs under any conditions, unless specific exceptions and special stipulations are identified.  Avoidance areas are to be avoided when practicable due to identified resource values but may be available with special stipulations.  Those ROW terms and conditions that would be attached to authorizations sited in areas identified as avoidance areas are described in the draft action alternatives Table 2.7.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE ESA LISTED SPECIES NSO CO/UT

## NO SURFACE OCCUPANCY

## [Alternative C and Sub-Alternatives D₁/D₂]

**Stipulation:**  No surface occupancy or use is allowed within Occupied Habitat for the Gunnison Sage-Grouse as mapped in the Resource Management Plan, BLM's GIS database, or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM:

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To maintain the integrity of habitat for the Gunnison Sage-Grouse and promote recovery of the species.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see Bureau of Land Management Manuals 1624 and 3101 or Forest Service Manuals 1950 and 2820.)**

**Exception:**  An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis.  The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:**  A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease.  Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently.  The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

BLM_0028280

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

BLM_0028281

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE ESA LISTED SPECIES CSU CO/UT

## CONTROLLED SURFACE USE

### [Alternative B]

**Stipulation:** Surface occupancy or use may be restricted or prohibited in Non-Habitat Areas within Four Miles of a Gunnison Sage-Grouse Lek, as mapped in the Resource Management Plan Amendment, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM.

Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet) and/or prohibition on surface-disturbing operations for a period of more than 60 days may be required.

The lease area may now or hereafter contain Non-Habitat Areas within Four Miles of a Gunnison Sage-Grouse Lek adjacent to habitat for wildlife listed as threatened or endangered or identified as candidates for listing under the Endangered Species Act. An assessment of the potential to cause disruption to Gunnison Sage-Grouse may be required before drilling and construction may commence. The operator may be required to submit a plan of development that demonstrates how the proposed activities will avoid or minimize disruption of threatened and endangered species by siting or prioritizing vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, utility installation).

The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species, result in the destruction or adverse modification of designated or proposed critical habitat, or contribute to a need to list a proposed or candidate threatened and endangered species. The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until the agency completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. §1531 et seq., including completion of any required procedure for conference or consultation.

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose**: To protect federally listed, proposed, or candidate threatened or endangered wildlife species and promote recovery of the species.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

BLM_0028282

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP Amendment; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:** A waiver is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

BLM_0028283

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE ESA LISTED SPECIES CSU CO/UT
## CONTROLLED SURFACE USE
### [Alternative C and Sub-Alternatives D₁/D₂]

**Stipulation:**  Surface occupancy or use may be restricted or prohibited within Unoccupied Habitat for the Gunnison Sage-Grouse, as mapped in the Resource Management Plan Amendment, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM.

Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required.

The lease area may now or hereafter contain habitat for wildlife listed as threatened or endangered or identified as candidates for listing under the Endangered Species Act.  An inventory of habitat may be required before drilling and construction may commence.  The operator may be required to submit a plan of development that demonstrates how the proposed activities will avoid or minimize disruption of threatened and endangered species by siting or prioritizing vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, utility installation).

The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species, result in the destruction or adverse modification of designated or proposed critical habitat, or contribute to a need to list a proposed or candidate threatened and endangered species.  The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. §1531 et seq., including completion of any required procedure for conference or consultation.

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose**:  To maintain the integrity of habitat for federally listed, proposed, or candidate, threatened or endangered wildlife species and promote recovery of the species.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:**  An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis.  The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require

BLM_0028284

additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:**  A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease.  Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently.  The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

BLM_0028285

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE TL CO/UT

## TIMING LIMITATION

**Stipulation:** No surface use is allowed within habitat for Gunnison Sage-Grouse during the following time period:

March 1 to May 15 [Alternative B]

March 15 to May 15 [Alternative C and Sub-Alternatives $D_1/D_2$]

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To minimize disruption of Gunnison Sage-Grouse lekking/breeding activities.

This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see Bureau of Land Management manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development,

BLM_0028286

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:** A waiver is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

BLM_0028287

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE TL CO/UT

## TIMING LIMITATION

**Stipulation:** No surface use is allowed within habitat for Gunnison Sage-Grouse during the following time period:

> April 15 to July 15 [Alternative B]
>
> April 15 to June 30 [Alternative C and Sub-Alternatives $D_1/D_2$]

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To minimize disruption of Gunnison Sage-Grouse nesting/early brood-rearing activities.

This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other

BLM_0028288

government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

BLM_0028289

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE TL CO2/UT

## TIMING LIMITATION

**Stipulation:** No surface use is allowed in Gunnison Sage-Grouse winter range, as mapped in the Resource Management Plan Amendment, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period:

October 1 to February 28 [Alternative B]

December 1 to March 14 [Alternative C and Sub-Alternatives $D_1/D_2$]

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To prevent disruption of Gunnison Sage-Grouse during the winter period.

This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development,

BLM_0028290

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

BLM_0028291

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE NSO CO/UT

## NO SURFACE OCCUPANCY/NO SURFACE DISTURBANCE

**Stipulation:** No surface occupancy or use is allowed within a

4-mile [Alternative B]

1-mile [Alternative C]

0.6-mile [Sub-Alternatives $D_1/D_2$]

radius of Gunnison Sage-Grouse leks, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM

**On the following lands:**
<LEGAL_DESCRIPTION>

**Purpose:** To maintain integrity of Occupied and Unoccupied Habitat surrounding Gunnison Sage-Grouse leks.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see Bureau of Land Management Manuals 1624 and 3101 or Forest Service Manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer

BLM_0028292

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30 day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30 day period.

BLM_0028293

## APPENDIX I:  DRAFT GUSG BEST MANAGEMENT PRACTICES

### DRAFT GUNNISON SAGE-GROUSE BEST MANAGEMENT PRACTICES

**Adapted from the *2011 BLM Technical Report:*
*A Report on National Greater Sage-grouse Conservation Measures***

### Travel and Transportation

- Conduct restoration of roads, primitive roads and trails not designated in travel management plans.  This also includes primitive route/roads that were not designated in Wilderness Study Areas and within lands with wilderness characteristics that have been selected for protection.
- When reseeding roads, primitive roads and trails, use appropriate seed mixes and consider the use of transplanted sagebrush.
- Utilize minimum constructions and maintenance standards appropriate for the operation
- Sign roads to prevent off road travel
- Place speed bumps, dips, etc. to slow traffic as needed.

### Recreation

- Only allow special recreation permits (SRPs) that have neutral or beneficial affects to Gunnison Sage-grouse (GUSG) Occupied Habitat.

### Lands and Realty

- Evaluate and take advantage of opportunities to remove, bury, or modify existing power lines within GUSG habitat areas.  Sage-grouse may avoid powerlines because of increased predation risk (Steenhof et al 1993, Lammers and Collopy 2007).  Powerlines effectively influence (direct physical area plus estimated area of effect due to predator movements) at least 39% of the sage-grouse range (Knick et al 2011).  Deaths resulting from collisions with powerlines were an important source of mortality for sage-grouse in southeastern Idaho (Beck et al 2006, 75 FR 13910)
- Where existing leases or ROWs have had some level of development (road, fence, well, etc.) and are no longer in use, reclaim the site by removing these features and restoring the habitat.

#### Land Tenure Adjustments

- Retain public ownership of GUSG Occupied Habitat.  Consider exceptions where:

BLM_0028294

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- o There is mixed ownership, and land exchanges would allow for additional or more contiguous federal ownership patterns within the sage-grouse habitat area.
- o In occupied sage-grouse habitat areas with minority federal ownership, include an additional, effective mitigation agreement for any disposal of federal land.  As a final preservation measure consideration should be given to pursuing a permanent conservation easement.
- Where suitable conservation actions cannot be achieved, seek to acquire state and private lands with intact subsurface mineral estate by donation, purchase or exchange in order to best conserve, enhance or restore GUSG habitat.
- Identify areas where acquisitions (including subsurface mineral rights) or conservation easements, would benefit sage-grouse habitat.

***Proposed Land Withdrawals***

- Do not approve withdrawal proposals not associated with mineral activity unless the land management is consistent with GUSG conservation measures. (For example; in a proposed withdrawal for a military training range buffer area, manage the buffer area with GUSG conservation measures.)

## Range Management

- Work cooperatively on integrated ranch planning within GUSG habitat so that operations with deeded/BLM allotments can be planned as single units.
- Develop specific objectives for sage-grouse habitat based on ESDs and assessments (including within wetlands and riparian areas). If an effective grazing system that meets GUSG habitat requirements is not already in place, analyze at least one alternative that meets GUSG habitat requirements in the NEPA document prepared for the permit renewal (Doherty et al 2011b, Williams et al 2011).
- Manage for vegetation composition and structure consistent with ecological site potential and within the reference state to achieve GUSG seasonal habitat objectives.
- Analyze springs, seeps and associated pipelines to determine if modifications are necessary to maintain the continuity of the predevelopment riparian area within GUSG habitat.  Make modifications where necessary, considering impacts to other water uses when such considerations are neutral or beneficial to GUSG.
- Only allow treatments that conserve, enhance, or restore GUSG habitat (including treatments that benefit livestock as part of an Allotment Management Plan/Conservation Plan to improve GUSG habitat).

BLM_0028295

- Evaluate the role of existing seedings that are currently composed of primarily introduced perennial grasses in and adjacent to GUSG habitat to determine whether they should be restored to sagebrush or habitat of higher quality for GUSG. If these seedings are part of an AMP/Conservation Plan or if they provide value in conserving or enhancing the rest of the habitats, then no restoration would be necessary. Assess the compatibility of these seedings for GUSG habitat or as a component of a grazing system during the land health assessments (Davies et al 2011).

- Design any new structural range improvements and location of supplements (salt or protein blocks) to conserve, enhance, or restore GUSG habitat through an improved grazing management system relative to sage-grouse objectives.  Structural range improvements, in this context, include but are not limited to: cattle guards, fences, exclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments. Potential for invasive species establishment or increase following construction must be considered in the project planning process and monitored and treated post-construction.

- Evaluate existing structural range improvements and location of supplements (salt or protein blocks) to make sure they conserve, enhance or restore GUSG habitat.

  o To reduce outright GUSG strikes and mortality, remove, modify, or mark fences in high-risk areas within GUSG habitat based on proximity to lek, lek size, and topography (Christiansen 2009, Stevens 2011).

  o Monitor for and treat invasive species associated with existing range improvements (Gelbard and Belnap 2003 and Bergquist et al 2007).

  o General wildlife standards for fences should follow Wendy Hanophy's *Fencing with Wildlife in Mind* (CPW 2009).

  o Include the use of the NRCS fence collision risk tool (NRCS 2012) to identify low-risk areas for construction of new fences and to evaluate collision risk for existing fences.

  o When possible, develop alternative livestock water sources outside of naturally occurring riparian areas.

  o Place salt, minerals and supplements at least 0.25-mile away from riparian areas, to the extent feasible within existing pasture boundaries

  o Avoid placing salt, minerals or supplements within 0.50-mile of leks.

### Riparian Areas

- Where riparian areas and wet meadows meet proper functioning condition, strive to attain reference state vegetation relative to the ecological site description.

BLM_0028296

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

## Habitat Restoration

- Prioritize implementation of restoration projects based on environmental variables that improve chances for project success in areas most likely to benefit GUSG (Meinke et al 2009).
- Include sage-grouse habitat parameters as defined in the RCP and appropriate local information in habitat restoration objectives. Make meeting these objectives within occupied sage-grouse habitat areas the highest restoration priority.
- Require use of native seeds for restoration based on availability, adaptation (ecological site potential), and probability of success (Richards et al 1998). Where probability of success or adapted seed availability is low, non-native seeds may be used as long as they support GUSG habitat objectives (Pyke 2011).
- Design post restoration management to ensure long term persistence. This could include changes in livestock grazing management and travel management, etc., to achieve and maintain the desired condition of the restoration effort that benefits GUSG (Eiswerth and Shonkwiler 2006).
- Restore native (or desirable) plants and create landscape patterns which most benefit GUSG.
- Make re-establishment of sagebrush cover and desirable understory plants (relative to ecological site potential) the highest priority for restoration efforts.
- In fire prone areas where sagebrush seed is required for GUSG habitat restoration, consider establishing seed harvest areas that are managed for seed production (Armstrong 2007) and are a priority for protection from outside disturbances.

## West Nile Virus Transmission via Ponds (from Doherty 2007)

The following are seven distinct site modifications that if adhered to, would minimize exploitation of ponds by the Culex tarsalis mosquito:

1. Increase the size of ponds to accommodate a greater volume of water than is discharged. This will result in unvegetated and muddy shorelines that breeding Culex tarsalis avoid (De Szalay and Resh 2000). This modification may reduce Culex tarsalis habitat, but could create larval habitat for Culicoides onorensis, a vector of blue tongue disease, and should be used sparingly (Schmidtmann et al 2000). Steep shorelines should be used in combination with this technique whenever possible (Knight et al 2003).
2. Build steep shorelines to reduce shallow water and aquatic vegetation around the perimeter of impoundments (Knight et al 2003). Construction of steep shorelines also will create more permanent ponds that are a deterrent to colonizing mosquito

BLM_0028297

species like Culex tarsalis which prefer newly flooded sites with high primary productivity (Knight et al 2003).

3. Maintain the water level below that of rooted vegetation for a muddy shoreline that is unfavorable habitat for mosquito larvae. Rooted vegetation includes both aquatic and upland vegetative types. Avoid flooding terrestrial vegetation in flat terrain or low lying areas. Aquatic habitats with a vegetated inflow and outflow separated by open water produce 5-10 fold fewer Culex mosquitoes than completely vegetated wetlands (Walton and Workman 1998). Wetlands with open water also had significantly fewer stage III and IV instars which may be attributed to increased predator abundances in open water habitats (Walton and Workman 1998).

4. Construct dams or impoundments that restrict downslope seepage or overflow by digging ponds in flat areas rather than damming natural draws for effluent water storage, or lining constructed ponds in areas where seepage is anticipated (Knight et al 2003).

5. Line the channel where discharge water flows into the pond with crushed rock, or use a horizontal pipe to discharge inflow directly into existing open water, thus precluding shallow surface inflow and accumulation of sediment that promotes aquatic vegetation.

6. Line the overflow spillway with crushed rock, and construct the spillway with steep sides to preclude the accumulation of shallow water and vegetation.

7. Fence pond site to restrict access by livestock and other wild ungulates that trample and disturb shorelines, enrich sediments with manure and create hoof print pockets of water that are  attractive to breeding mosquitoes.

## Fluid Mineral Development

GUSG Occupied Habitat - BMPs are continuously improving as new science and technology become available and therefore are subject to change. Include from the following BMPs those that are appropriate to mitigate effects from the approved action.

### Roads

- Design roads to an appropriate standard no higher than necessary to accommodate their intended purpose.
- Locate roads to avoid important areas and habitats.
- Coordinate road construction and use among ROW holders.
- Construct road crossing at right angles to ephemeral drainages and stream crossings.
- Establish speed limits on BLM system roads to reduce vehicle/wildlife collisions or design roads to be driven at slower speeds.
- Establish trip restrictions (Lyon and Anderson 2003) or minimization through use of telemetry and remote well control (e.g., Supervisory Control and Data Acquisition).

BLM_0028298

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- Do not issue ROWs to counties on newly constructed energy development roads, unless for a temporary use consistent with all other terms and conditions included in this document.
- Restrict vehicle traffic to only authorized users on newly constructed routes (use signing, gates, etc.)
- Use dust abatement practices on roads and pads.
- Use gravel, chip seal, soil, sand or other types of imported road and fill material only from sites with no weed infestations.
- Should grade or mow roads only when necessary for resource protection, safety, or function.
- Close and rehabilitate duplicate roads.
- Minimize operation of equipment when mud can accumulate on equipment.
- Clean all heavy equipment and mobilizing equipment before entering each project area.

### Operations

- Cluster disturbances, operations (fracture stimulation, liquids gathering, etc.), and facilities.
- Use directional and horizontal drilling to reduce surface disturbance.
- Place infrastructure in already disturbed locations where the habitat has not been restored.
- Consider using oak (or other material) mats for drilling activities to reduce vegetation disturbance and for roads between closely spaced wells to reduce soil compaction and maintain soil structure to increase likelihood of vegetation reestablishment following drilling.
- Apply a phased development approach with concurrent reclamation.
- Place liquid gathering facilities outside of habitat areas. Have no tanks at well locations within habitat areas (minimizes perching and nesting opportunities for ravens and raptors and truck traffic). Pipelines must be under or immediately adjacent to the road (Bui et al 2010).
- Restrict the construction of tall facilities and fences to the minimum number and amount needed.
- Site and/or minimize linear ROWs to reduce disturbance to sagebrush habitats.
- Place new utility developments (power lines, pipelines, etc.) and transportation routes in existing utility or transportation corridors.
- Bury distribution power lines.
- Corridor power, flow, and small pipelines under or immediately adjacent to roads.
- Bore pipeline crossings under perennial streams rather than trenching.

BLM_0028299

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- Design or site permanent structures which create movement (e.g. a pump jack) to minimize impacts to sage-grouse.
- Cover (with fine mesh netting or other effective techniques) all drilling and production pits and tanks regardless of size to reduce sage-grouse mortality.
- Encourage use of water tanks instead of open pits.
- Use low profile storage tanks.
- Paint wells to camouflage in background.
- Equip tanks and other above ground facilities with structures or devices that discourage nesting of raptors and corvids.
- Control the spread and effects of non-native plant species (e.g., by washing vehicles and equipment) (Evangelista et al 2011).
- Locate and use weed-free project staging areas.
- Avoid acquiring water for road dust abatement where access to the water is through weed-infested sites.
- Use only closed-loop systems for drilling operations and no reserve pits.
- Restrict pit and impoundment construction to reduce or eliminate threats from West Nile virus (Doherty 2007).
- Remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat:
  - Overbuild size of ponds for muddy and non-vegetated shorelines.
  - Build steep shorelines to decrease vegetation and increase wave actions.
  - Avoid flooding terrestrial vegetation in flat terrain or low lying areas.
  - Construct dams or impoundments that restrict down slope seepage or overflow.
  - Line the channel where discharge water flows into the pond with crushed rock.
  - Construct spillway with steep sides and line it with crushed rock.
  - Treat waters with larvicides to reduce mosquito production where water occurs on the surface.
- Require noise shields when drilling during the lek, nesting, brood rearing, or wintering season.
- Fit transmission towers with anti-perch devices (Lammers and Collopy 2007).
- Require sage-grouse-safe fences.
- Locate new compressor stations outside habitats and design them to reduce noise that may be directed towards habitat.
- Clean up refuse (Bui et al 2011).
- Locate man camps outside of habitats.

BLM_0028300

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

### Reclamation

- Include objectives for ensuring habitat restoration to meet GUSG habitat needs in reclamation practices/sites (Pyke 2011). Address post-reclamation management in reclamation plans such that goals and objectives are designed to protect and improve GUSG habitat needs.
- Maximize the area of interim reclamation on long-term access roads and well pads including reshaping, topsoiling and revegetating cut and fill slopes.
- Restore disturbed areas at final reclamation to the pre-disturbance landforms and desired plant community.
- Irrigate interim reclamation if necessary for establishing seedlings more quickly.
- Utilize mulching techniques to expedite reclamation and to protect soils.

## Locatable Mineral Development

BMPs are continuously improving as new science and technology become available and therefore are subject to change. Include from the following BMPs those that are appropriate to mitigate effects from the approved action.

### Roads

- Design roads to an appropriate standard no higher than necessary to accommodate their intended purpose.
- Locate roads to avoid important areas and habitats.
- Coordinate road construction and use among ROW holders.
- Construct road crossing at right angles to ephemeral drainages and stream crossings.
- Establish speed limits on BLM system roads to reduce vehicle/wildlife collisions or design roads to be driven at slower speeds.
- Place speed bumps, dips, etc. to slow traffic as needed.
- Do not issue ROWs to counties on mining development roads, unless for a temporary use consistent with all other terms and conditions included in this document.
- Restrict vehicle traffic to only authorized users on newly constructed routes (e. g., use signing, gates, etc.)
- Use dust abatement practices on roads and pads.
- Close and reclaim duplicate roads, by restoring original landform and establishing desired vegetation.

### Operations

- Cluster disturbances associated with operations and facilities as close as possible.

BLM_0028301

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- Place infrastructure in already disturbed locations where the habitat has not been restored.
- Restrict the construction of tall facilities and fences to the minimum number and amount needed.
- Site and/or minimize linear ROWs to reduce disturbance to GUSG habitat.
- Place new utility developments (power lines, pipelines, etc.) and transportation routes in existing utility or transportation corridors.
- Bury power lines.
- Cover (e.g., fine mesh netting or use other effective techniques) all pits and tanks regardless of size to reduce sage-grouse mortality.
- Equip tanks and other above ground facilities with structures or devices that discourage nesting of raptors and corvids.
- Control the spread and effects of non-native plant species (Gelbard and Belnap 2003, Bergquist et al 2007).
- Minimize operations of equipment during conditions when mud can accumulate on equipment.
- Clean all heavy equipment and mobilizing equipment before entering project area.
- Restrict pit and impoundment construction to reduce or eliminate threats from West Nile virus (Doherty 2007).
- Remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat:
  o Overbuild size of ponds for muddy and non-vegetated shorelines.
  o Build steep shorelines to decrease vegetation and increase wave actions.
  o Avoid flooding terrestrial vegetation in flat terrain or low lying areas.
  o Construct dams or impoundments that restrict down slope seepage or overflow.
  o Line the channel where discharge water flows into the pond with crushed rock.
  o Construct spillway with steep sides and line it with crushed rock.
  o Treat waters with larvicides to reduce mosquito production where water occurs on the surface.
- Require sage-grouse-safe fences around sumps.
- Clean up refuse (Bui et al 2010).
- Locate man camps outside of GUSG habitat.

*Reclamation*
- Include restoration objectives to meet sage-grouse habitat needs in reclamation practices/sites.

BLM_0028302

- Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs.
- Maximize the area of interim reclamation on long-term access roads and well pads including reshaping, topsoiling and revegetating cut and fill slopes.
- Restore disturbed areas at final reclamation to pre-disturbance landform and desired plant community.
- Irrigate interim reclamation as necessary during dry periods.
- Utilize mulching techniques to expedite reclamation.

## Salable Mineral Materials

- Restore saleable mineral pits no longer in use to meet GUSG habitat conservation objectives.

## Fire & Fuels (WO IM 2013-128)

### Fuels Management

- Design fuels management projects in sage-grouse habitat to strategically and effectively reduce wildfire threats in the greatest area. This may require fuels treatments implemented in a more linear versus block design (Launchbaugh et al 2007).
- Prioritize native seed allocation for use in GUSG habitat in years when preferred native seed is in short supply. This may require reallocation of native seed from ES&R projects outside of sage-grouse habitat to those inside it. Use of native plant seeds for ES&R seedings is required based on availability, adaptation (site potential), and probability of success Richards et al 1998). Where probability of success or native seed availability is low, non-native seeds may be used as long as they meet GUSG habitat conservation objectives (Pyke 2011). Reestablishment of appropriate sagebrush species/subspecies and important understory plants, relative to site potential, shall be the highest priority for rehabilitation efforts.
- Design post ES&R management to ensure long term persistence of seeded or pre-burn native plants. This may require temporary or long-term changes in livestock grazing, and travel management, etc., to achieve and maintain the desired condition of ES&R projects to benefit sage-grouse (Eiswerth and Shonkwiler 2006).
- Provide training to fuels treatment personnel on GUSG biology, habitat requirements, and identification of areas utilized locally.
- Use fire prescriptions that minimize undesirable effects on vegetation or soils (e.g., minimize mortality of desirable perennial plant species and reduce risk of hydrophobicity).

BLM_0028303

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- Ensure proposed sagebrush treatments are planned with interdisciplinary input from BLM and /or state wildlife agency biologist and that treatment acreage is conservative in the context of surrounding sagegrouse seasonal habitats and landscape.
- Where appropriate, ensure that treatments are configured in a manner (e.g., strips) that promotes use by GUSG (See Connelly et al, 2000*)
- Where applicable, incorporate roads and natural fuel breaks into fuel break design.
- Power-wash all vehicles and equipment involved in fuels management activities prior to entering the area to minimize the introduction of undesirable and/or invasive plant species.
- Design vegetation treatment in areas of high frequency to facilitate firefighting safety, reduce the risk of extreme fire behavior; and to reduce the risk and rate of fire spread to key and restoration habitats.
- As funding and logistics permit, restore annual grasslands to a species composition characterized by perennial grasses, forbs, and shrubs.
- Emphasize the use of native plant species, recognizing that non-native species may be necessary depending on the availability of native seed and prevailing site conditions.
- Remove standing and encroaching trees within at least 100 meters of occupied GUSG leks and other habitats (e.g., nesting, wintering, and brood rearing) to reduce the availability of perch sites for avian predators, as appropriate, and resources permit.
- Protect wildland areas from wildfire originating on private lands, infrastructure corridors, and recreational areas.
- Reduce the risk of vehicle or human-caused wildfires and the spread of invasive species by planting perennial vegetation (e.g., green-strips) paralleling road rights-of-way.
- Strategically place and maintain pre-treated strips/areas (e.g., mowing, herbicide application, and strictly managed grazed strips) to aid in controlling wildfire should wildfire occur near key habitats or important restoration areas (such as where investments in restoration have already been made).

*Fire Management*
- Develop specific GUSG toolboxes containing maps, a list of resource advisors, contact information, local guidance, and other relevant information.
- Provide localized maps to dispatch offices and extended attack incident commanders for use in prioritizing wildfire suppression resources and designing suppression tactics.
- Assign a GUSG resource advisor to all extended attack fires in or near key GUSG habitat areas.  Prior to the start of fire season, provide training to

BLM_0028304

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

GUSG advisors on wildfire suppression organization, objectives, tactics, and procedures to develop a cadre of qualified individuals.

- On critical fire weather days, pre-position additional fire suppression resources to optimize a quick and efficient response in GUSG habitat.
- During periods of multiple fires, ensure line officers are involved in setting priorities.
- To the extent possible, locate wildfire suppression facilities (i.e., base camps, spike camps, drop points, staging areas, and heli-bases) in areas where physical disturbance to GUSG habitat can be minimized, including disturbed areas, grasslands, near roads/trails or in other areas where there is existing disturbance or minimal sagebrush cover.
- Power-wash all firefighting vehicles, to the extent possible, including engines, water tenders, personnel vehicles, and ATVs prior to deploying in or near sage-grouse habitat areas to minimize noxious weed spread.
- Minimize unnecessary cross-country vehicle travel during fire operations in GUSG habitat.
- Minimize burnout operations in key GUSG habitat areas by constructing direct fireline whenever safe and practical to do so.
- Utilize retardant and mechanized equipment to minimize burned acreage during initial attack.
- As safety allows, conduct mop-up where the black adjoins unburned islands, dog legs, or other habitat features to minimize sagebrush loss.

BLM_0028305

## APPENDIX J: GUSG RANGEWIDE MITIGATION STRATEGY

## INTRODUCTION

The BLM will develop a GUSG Rangewide Mitigation Strategy (Mitigation Strategy) for inclusion in the Final EIS and Proposed GUSG Rangewide RMP Amendment. The Mitigation Strategy will be based on the BLM Mitigation Handbook H-1794-1, Department of the Interior Departmental Manual Chapter 6: *Implementing Mitigation at the Landscape-scale*, and the November 3, 2015 Presidential Memorandum: *Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment*.

The purpose of the Mitigation Strategy will be to identify mitigation needs and measures across the range of the GUSG at relevant and appropriate scales that, when implemented, will result in a net conservation gain to and assist with recovery (if the ESA listing remains in effect) and/or ongoing conservation (if the ESA listing is no longer in effect) of the species. The goal will be to help increase the effectiveness, consistency, and transparency of mitigation efforts that assist with the recovery and/or ongoing conservation of the GUSG.

The Mitigation Strategy will incorporate guidance outlined in the BLM Mitigation Handbook. Many components are already present in the overall NEPA analysis associated with this planning effort. As a result, the strategy will build on this existing work rather than attempt to duplicate it. Examples of these components include descriptions of the uses of public land in the planning area, resource objectives, baseline conditions and trends, mitigation measures (including those referenced in the proposed amendment), and potential residual impacts. It will also address whether there is a potential need for compensatory mitigation to address these residual impacts.

The Mitigation Strategy will provide a framework for managers to use in determining necessary and appropriate mitigation for project proposals within GUSG habitat. By employing several key building blocks, the Mitigation Strategy will: 1) incorporate mitigation measures included in the alternatives and best management practices considered in this Draft EIS analysis, 2) incorporate comments received during the public review of this Draft EIS, 3) be based on the best available science, 4) be resource based (i.e., focused on GUSG habitat), 5) consider reasonably foreseeable impacts to GUSG habitat from all of the foreseeable public land uses within the planning area, and 6) be developed using a transparent and meaningful engagement process with cooperating agencies.

The intent of the Mitigation Strategy is to achieve a net conservation gain and assist with the recovery and ongoing conservation of GUSG habitat. To achieve a net gain

BLM_0028306

goal, compensatory mitigation will be required for all residual impacts to GUSG habitat—and not just to those impacts determined to be "significant" as defined under NEPA. To do so, the BLM will undertake management actions identified in the RMP Amendment that are consistent with valid existing rights and applicable law, minimize actions that result in habitat loss, and include an accounting of uncertainty associated with the effectiveness of such mitigation.

The Mitigation Strategy will employ a full mitigation hierarchy. CEQ regulations describe the mitigation hierarchy as:

a) Avoiding the impact altogether by not taking a certain action or parts of an action.
b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.
d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
e) Compensating for the impact by replacing or providing substitute resources or environments.

The Mitigation Strategy should include guidance on avoidance, minimization, and compensation, as follows:

*Avoidance* is defined as those measures that result in a potential impact not occurring from the outset by not taking a certain action or parts of an action. The RMP Amendment alternatives identify a range of potential avoidance measures. Examples of avoidance measures include No Surface Occupancy, Controlled Surface Use, withdrawn areas, closures, and exclusion areas.

*Minimization* occurs through limiting the degree or magnitude of the action and its implementation. The RMP Amendment alternatives identify multiple potential minimization options for a variety of projects and land uses. The alternatives also identify multiple best management practices (Appendix I), design features (Table 2.4), and various stipulations that can be applied to projects as appropriate. Examples of minimization include facility placement, timing of activities, facility design, and interim reclamation.

*Rectification* is the repairing, rehabilitating, or restoring of the affected environment. This approach is more action specific. An example might be the reclamation of an abandoned mine location. Reduction of impacts involves preservation and maintenance operations during the life of the proposed project to be mitigated. This approach is more design specific. An example might be a phased development and reclamation project design or a similar approach to a related impact on the landscape.

BLM_0028307

*Compensation* can occur if, after applying avoidance and minimization techniques, residual impacts remain. *Residual impacts* are defined in the BLM Mitigation Handbook as any reasonably foreseeable impacts from a proposed project that are expected to remain after implementing the avoidance, minimization, rectification, and reduction elements of the mitigation hierarchy. These impacts include those that will continue until the benefits of the mitigation measure are fully realized on the ground. Compensation could include the discussion of impact valuation, compensatory mitigation options, siting, compensatory project types and costs, monitoring, reporting, and funds administration.

The RMP Amendment prioritizes the avoidance of impacts, followed by minimization techniques. If after applying avoidance and minimization techniques, any residual impacts remain, then compensatory mechanisms may be used to address those impacts. Compensatory mechanisms could take the form of a mitigation or conservation bank, habitat exchange, in lieu fee program, proponent mitigation, or other options that might be developed or suggested. Numerous methodologies or tools may be developed, to determine and quantify the nature and extent of the compensatory mitigation required under a given mitigation mechanism. These tested methodologies are used to quantify the nature and extent of the impact from a public land use and nature and extent of the compensatory mitigation measure.

The strategy, with input from cooperating agencies, will identify which methodology(ies) would be most appropriate for use in compensatory mitigation for the GUSG habitat within the scope of this RMP Amendment. The strategy will also identify the criteria for determining what compensatory mitigation mechanisms, and under what conditions, may be available to address residual impacts. This will include a methodology to cross-walk between various methodologies to ensure equivalent benefits are realized. The strategy will identify criteria for selection of locations, to prioritize for compensatory mitigation activities.

In addition, it is expected that the mitigation strategy should ensure that mitigation measures are implemented and monitored for effectiveness using approved methodologies such as the BLM Assessment, Inventory, and Monitoring (AIM) Strategy. It should describe how to remedy failed mitigation efforts, and incorporate adaptive management principles in the design and implementation of compensatory mitigation mechanisms.

## References

BLM 2016: Draft Mitigation Handbook H-1794-1

Department of the Interior's mitigation policy 600 DM 6

Presidential Memorandum - Mitigating Impacts on Natural Resources from Development

BLM_0028308

# 7. GLOSSARY

**Active Livestock Grazing Allotment** - An allotment that is being regularly grazed by livestock. This does not include allotments in a non-use status, e.g., through a voluntary non-use agreement, or in conservation use, allotments that are being removed from the grazing base through an RMP revision or amendment, or vacant allotments.

**Actual use** - The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by periodic field checks by the BLM.

**Adaptive Management** - A type of natural resource management in which decisions are made as part of an ongoing science-based process.  Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society.  Results are used to notify management policy, strategies and practices.

**Allotment** - An area of land in which one or more livestock operators graze their livestock. Allotments generally consist of BLM lands, but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Management Plan (AMP)** - A concisely written program of livestock grazing management, including supportive measures, if required, designed to attain specific management goals in a grazing allotment.  An AMP is prepared in consultation with the permittees, lessees, and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife.  An AMP establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**Amendment** - The process for considering or making changes in the terms, conditions, and decisions of approved Resource Management Plans or management framework plans.  Usually only one or two issues are considered that involve only a portion of the planning area.

**Animal Unit Month (AUM)** - The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

**Application for Permit to Drill (APD)** - An application for oil and gas drilling which includes 1) a drilling plan, 2) a surface use plan of operations, 3) evidence of bond coverage as required by DOI regulations, and 4) such other information as may be required by applicable orders and notices.

**Area of Critical Environmental Concern (ACEC)** - Areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

BLM_0028309

CHAPTER 7 - GLOSSARY

**Authorized Use** - This is an activity (i.e. resource use) occurring on the public lands that is either explicitly or implicitly recognized and legalized by law or regulations.  This term may refer to those activities occurring on the public lands for which the BLM or other appropriate authority has issued a formal authorization document (e.g. livestock grazing; lease/permit; right-of-way; oil and gas permit to drill; etc.).  Formally authorized uses typically involve some type of commercial activity, facility placement, or event.  Unless constrained or bounded by statute, regulation, or an approved land use plan decision, legal activities involving public enjoyment and use of the public lands (e.g. hiking, camping, etc.) require no formal BLM authorization.

**Avoid** - To stay away from when practicable due to identified resource values, but may be available with special stipulations or mitigation.  Establishes that the management priority is to not authorize an activity or parts of an activity in an area, but recognizes that an absolute prohibition is not available or reasonable.

**Avoidance/Avoidance area** - These areas usually address mitigation of some activity (i.e. resource use).  Paraphrasing the CEQ Regulations (40 CFR 1508.20), avoidance means to circumvent, or bypass, an impact altogether by not taking a certain action, or parts of an action.  Therefore the term "avoidance" does not necessarily prohibit a proposed activity, but it may require the relocation of an action, or the total redesign of an action to eliminate any potential impacts resulting from it.  Also see "*right-of-way avoidance areas*" definition.

**Best Management Practices** - A suite of techniques that guide or may be applied to management actions to aide in achieving desired outcomes.  BMPs are often developed in conjunction with land use plans, but they are not considered a planning decision unless the plans specify that they are mandatory.

**Big Game** - Indigenous ungulate wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biological Assessment** - Information prepared by, or under the direction of, a federal agency to determine whether a proposed action is likely to: (1) adversely affect listed species or designated critical habitat; (2) jeopardize the continued existence of species that are proposed for listing; or (3) adversely modify proposed critical habitat.

**Biological Opinion (BO)** - Document which includes: (1) the opinion of the Fish and Wildlife Service...as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat.

**Carrying Capacity** - The stocking rate (for livestock) that is sustainable over time per unit of land area.

**Casual use** - Activities involving practices that do not ordinarily cause appreciable disturbance or damage to the public lands, resources or improvements and, therefore, do not require a right-of-way grant or temporary use permit (43 CFR 2800).  Any short term noncommercial activity which does not cause appreciable damage or disturbance to public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities (43 CFR 2920).  Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Clean Air Act of 1963 and Amendments** - Federal legislation governing air pollution control.

BLM_0028310

CHAPTER 7 - GLOSSARY

**Clean Water Act of 1972 and Amendments** - Federal legislation governing water pollution control.

**Climate change** - Any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from natural factors, natural processes or human activities.

**Closed** - Generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 sets forth the specific meaning of "closed" as it relates to off-highway vehicle use, and 43 CFR 8364 defines "closed" as it relates to closure and restriction orders (from H-1601-1, BLM Land Use Planning Handbook).

**Collaboration** - A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration may take place with any interested parties, whether or not they are a cooperating agency.

**Compensatory mitigation** - Compensating for the residual impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

**Comprehensive Travel and Transportation Management (CTTM)** - The proactive interdisciplinary planning on-the-ground management and administration of ravel networks (both motorized and non-motorized) to ensure public access, natural resources, and regulatory needs are considered. It consists of inventory, easement acquisition, mapping and signing, and other measures necessary to provide access to public lands for a wide variety of uses including uses for recreational, traditional, casual, agricultural, commercials, educational, landing strips, and other purposes).

**Condition Class (Fire Regimes)** - Fire Regime Condition Classes are a measure describing the degree of departure from historical fire regimes, possibly resulting in alterations of key ecosystem components such as species composition, structural stage, stand age, canopy closure, and fuel loadings. One or more of the following activities may have caused this departure: fire suppression, timber harvesting, livestock grazing, introduction and establishment of exotic plant species, introduced insects or disease, or other management activities.

**Conditions of Approval** - Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

**Conformance** - A proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation measures** - Measures to conserve, enhance, and/or restore Gunnison Sage-Grouse habitat by reducing, eliminating, or minimizing threats to that habitat.

**Conservation plan** - The recorded decisions of a landowner or operator, cooperating with a conservation district, on how the landowner or operator plans, within practical limits, to use his/her land according to its capability and to treat it according to its needs for maintenance or improvement of the soil, water, animal, plant, and air resources.

**Conservation strategy** - A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are

BLM_0028311

designated as BLM sensitive species or that have been determined by the US Fish and Wildlife Service to be federal candidates under the ESA.

**Controlled surface use (CSU)** - CSU is a category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values and is applicable to fluid mineral construction and drilling activities (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads). CSU areas are open to fluid mineral leasing but the stipulation allows the BLM to require special operational constraints, or the activity can be shifted more than 200 meters (656 feet) to protect the specified resource or value.

**Communication site** - Sites that include broadcast types of uses (e.g., television, AM/FM radio, cable television, broadcast translator) and non-broadcast uses (e.g., commercial or private mobile radio service, cellular telephone, microwave, local exchange network, passive reflector).

**Cooperating agency** - Assists the lead federal agency in developing an environmental assessment or environmental impact statement. These can be any agency with jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any tribe or federal, state, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Council on Environmental Quality** - An advisory council to the President of the U.S. established by the National Environmental Policy Act of 1969. The council reviews federal programs to analyze and interpret environmental trends and information.

**Critical habitat** - For listed species consists of: (1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the Act, on which are found those physical or biological features (constituent elements) (a) essential to the conservation of the species and (b) which may require special management considerations or protection; and (2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of the Act, upon a determination by the Secretary that such areas are essential for the conservation of the species.

**Crucial wildlife habitat** - The environment essential to plant or animal biodiversity and conservation at the landscape level. Crucial habitats include, but are not limited to, biological core areas, severe winter range, winter concentration areas, reproduction areas, and movement corridors.

**Cultural resources** - Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social and/or cultural groups.

**Cumulative effects** - The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**dBA (A-weighted decibels)** - The commonly used frequency weighting for environmental sounds.

**Decision area** - Public lands and mineral estate managed by the BLM that are within the planning area and are encompassed by all designated habitat.

**Deferred/deferred use** - To set aside, or postpone, a particular resource use(s) or activity(ies) on the public lands to a later time. Generally when this term is used, the period of the deferral is specified.

BLM_0028312

Deferments sometimes follow the sequence timeframe of associated serial actions (e.g., action B will be deferred until action A is completed, etc.).

**Designated roads and trails** - Specific roads and trails identified by the BLM (or other agencies) where some type of motorized vehicle use is appropriate and allowed either seasonally or year-round.

**Desired future condition** - For rangeland vegetation, the condition of rangeland resources on a landscape scale that meet management objectives. It is based on ecological, social, and economic considerations during the land planning process. It is usually expressed as ecological status or management status of vegetation (species composition, habitat diversity, and age and size class of species) and desired soil qualities (soil cover, erosion, and compaction). In a general context, desired future condition is a portrayal of the land or resource conditions that are expected to result if goals and objectives are fully achieved.

**Desired outcomes** - A type of land use plan decision expressed as a goal or objective.

**Direct impacts** - Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place.

**Disposal** - Transfer of public land out of federal ownership to another party through sale, exchange, Recreation and Public Purposes Act, Desert Land Entry or other land law statutes.

**Disruptive Activity** - Public Land resource uses/activities that are likely to alter the behavior, displace, or cause excessive stress to existing GUSG populations occurring at a specific location and/or time. In this context, disruptive activity(ies) refer to those actions that alter behavior or cause the displacement of individuals such that reproductive success is negatively affected, or an individual's physiological ability to cope with environmental stress is compromised. This term does not apply to the physical disturbance of the land surface, vegetation, or features. Examples of disruptive activities may include noise, vehicle traffic, or other human presence regardless of the activity. The term is commonly used in conjunction with protecting wildlife during crucial life stages (e.g., breeding, nesting, birthing, etc.). The use of this term is not intended to prohibit all activity or authorized uses.

**Diversity** - The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Easement** - A right afforded a person or agency to make limited use of another's real property for other purposes.

**Ecological Site** - A distinctive kind of land with specific physical characteristics that differs from other kinds of land in its ability to produce a distinctive kind and amount of vegetation.

**Emergency stabilization** - Planned actions to stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize threats to life or property resulting from the effects of a fire, or to repair/replace/construct physical improvements necessary to prevent degradation of land or resources. Emergency stabilization actions must be taken within one year following containment of a wildfire.

**Endangered species** - Any species that is in danger of extinction throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Manual). Under the Endangered Species Act in the US, "endangered" is the more-protected of the two categories. Designation as endangered (or threatened) is determined by the FWS as directed by the Endangered Species Act.

BLM_0028313

**Endangered Species Act of 1973 (as amended)** - Designed to protect critically imperiled species from extinction as a consequence of economic growth and development untampered by adequate concern and conservation. The Act is administered by two federal agencies, the FWS and the National Oceanic and Atmospheric Administration. The purpose of the Act is to protect species and the ecosystems upon which they depend (16 US Code 1531-1544).

**Endemic species** - A plant or animal restricted to a defined geographic location.

**Enhance** - The improvement of habitat by increasing missing or modifying unsatisfactory components and/or attributes of the plant community to meet sage-grouse objectives.

**Environmental assessment** - A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental Impact Statement (EIS)** - A detailed statement prepared by the responsible official in which a major federal action which significantly affects the quality of the human environment is described, alternatives to the proposed action provided, and effects analyzed (from BLM National Management Strategy for OHV Use on Public Lands).

**Evaluation (plan evaluation)** - The process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and National Environmental Policy Act of 1969 analysis are still valid and whether the plan is being implemented.

**Exchange** - A transaction whereby the federal government receives land or interests in land in exchange for other land or interests in land.

**Exclusion Areas** - An area on the public lands where a certain activity(ies) is prohibited to insure protection of other resource values present on the site. The term is frequently used in reference to lands/realty actions and proposals (e.g., rights-of-way, etc.), but is not unique to lands and realty program activities. This restriction is functionally analogous to the phrase "no surface occupancy" used by the oil and gas program, and is applied as an absolute condition to those affected activities. The less restrictive analogous term is avoidance area. Also see definition for "right-of-way exclusion area."

**Existing routes** - The roads, trails, or ways that are used by motorized vehicles (jeeps, all-terrain vehicles, motorized dirt bikes, etc.), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders) and are, to the best of BLM's knowledge, in existence at the time of RMP/EIS publication.

**Exploration** - Active drilling and geophysical operations to:
      1. Determine the presence of the mineral resource; or
      2. Determine the extent of the reservoir or mineral deposit.

**Extensive Recreation Management Area (ERMA)** - Administrative units that require specific management consideration in order to address recreation use, demand, or Recreation and Visitor Services program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. ERMA management is commensurate and considered in context with the management of other resources and resource uses.

BLM_0028314

CHAPTER 7 - GLOSSARY

**Federal Land Policy and Management Act of 1976 (FLPMA)** - Public Law 94-579, October 21, 1976, often referred to as the BLM's "Organic Act," which provides the majority of the BLM's legislated authority, direction policy, and basic management guidance.

**Federal mineral estate** - Subsurface mineral estate owned by the US and administered by the BLM. Federal mineral estate under BLM jurisdiction is composed of mineral estate underlying BLM lands, privately owned lands, and state-owned lands.

**Fire management plan (FMP)** - A plan that identifies and integrates all wildland fire management and related activities within the context of approved land/resource management plans. It defines a program to manage wildland fires (wildfire, prescribed fire, and wildland fire use). The plan is supplemented by operational plans including, but not limited to, preparedness plans, preplanned dispatch plans, and prevention plans. Fire Management Plans assure that wildland fire management goals and components are coordinated.

**Fire suppression** - All work activities connected with fire extinguishing operations, beginning with discovery of a fire and continuing until the fire is completely extinguished.

**Fluid minerals** - Oil, gas, coal bed natural gas, and geothermal resources.

**Forested lands** - Lands primarily vegetated with trees that include one or more of the following types: aspen, ponderosa pine, lodgepole pine, limber pine, spruce and fir.

**Formal Consultation** - When a federal agency determines, through a biological assessment or other review, that an action is likely to adversely affect a listed species, the agency submits a request to the FWS for formal consultation.  During formal consultation, the FWS and the agency share information about the proposed project and the species likely to be affected.  Formal consultation may last up to 90 days, after which the FWS will prepare a biological opinion on whether the proposed activity is likely to jeopardize the continued existence of a listed species.

**Functional Groups** - The life form of a plant. Examples include trees, shrubs, vines, grasses, forbs.

**Functioning at Risk** - Condition in which vegetation and soil are susceptible to losing their ability to sustain naturally functioning biotic communities.  In uplands or riparian-wetland areas, conditions currently function properly, but a soil, water, or vegetation attribute makes them susceptible to degradation and lessens their ability to sustain natural biotic communities.  Human activities, past or present, may increase the risks.

**Geographic Information System (GIS)** - A system of computer hardware, software, data, people, and applications that capture, store, edit, analyze, and display a potentially wide array of geospatial information.

**Geophysical exploration** - Efforts to locate deposits of oil and gas resources and to better define the subsurface.

**Geothermal energy** - Natural heat from within the Earth captured for production of electric power, space heating, or industrial steam.

**Goal** - A broad statement of a desired outcome; usually not quantifiable and may not have established timeframes for achievement.

**Grazing preference** - Grazing preference or preference means a superior or priority position against others for the purpose of receiving a grazing permit or lease. This priority is attached to base property owned or controlled by the permittee or lessee (43 CFR 4100.0-5).

BLM_0028315

**Grazing system** - Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation. Include, but are not limited to, developing pastures, utilization levels, grazing rotations, timing and duration of use periods, and necessary range improvements.

**Habitat** - An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for all or part their life cycle.

Breeding Habitat:  Sagebrush communities known or suspected to be used by Gunnison Sage-Grouse for nesting and early brood rearing where sagebrush canopy cover is between 10 and 25%, and in a configuration such that it meets the habitat requirements for sage-grouse; to include cleared areas void of sagebrush used a strutting grounds.

Table 1 – Gunnison sage-grouse Structural Guidelines for Breeding Habitat[1]

| Vegetation Variable* | Amount of occurrence in the habitat |
|---|---|
| Sagebrush Canopy Cover* | 10-25% |
| Non-sagebrush Canopy Cover* | 5-15% |
| Total Shrub Canopy Cover* | 15-40% |
| Sagebrush Height* | 25-50 cm (9.8-19.7 in.) |
| Grass Cover* | 10-40% |
| Forb Cover* | 5-40% |
| Grass Height* | 10-15 cm (3.9-5.9 in.) |
| Forb Height* | 5-15 cm (2 – 6 in.) |

[1]These guidelines incorporate the vegetation variable range for arid and mesic sites identified in the RCP.
*These habitat structure values are average values over a given area.

Summer- Fall Habitat:  Vegetation communities known or suspected to be used by Gunnison Sage-grouse, including sagebrush, agricultural field, and wet meadows.

Table 2 – Gunnison sage-grouse Structural Guidelines for Summer-Late Fall Habitat[1]

| Vegetation Variable* | Amount of occurrence in the habitat |
|---|---|
| Sagebrush Canopy Cover* | 5-20% |
| Non-sagebrush Canopy Cover* | 5-15% |
| Total Shrub Canopy Cover* | 10-35% |

BLM_0028316

CHAPTER 7 - GLOSSARY

Table 2 — Gunnison sage-grouse Structural Guidelines for Summer-Late Fall Habitat[1]

| Vegetation Variable* | Amount of occurrence in the habitat |
|---|---|
| Sagebrush Height* | 25-50 CM (9.8 — 19.7 in.) |
| Grass Cover* | 10-35% |
| Forb Cover* | 5-35% |
| Grass Height* | 10-15 cm (3.9-5.9 in.) |
| Forb Height* | 3-10 cm (1.2-3.9 in.) |

[1]These guidelines incorporate the vegetation variable range for arid and mesic sites identified in the RCP.
*These habitat structure values are average values over a given area.

Winter habitat:  Sagebrush areas known or suspected to be used by Gunnison Sage-grouse that area available (i.e., not covered by snow) to sage-grouse in average winters.

Table 3 — Gunnison sage-grouse Structural Guidelines for Winter Habitat[1]

| Vegetation Variable | Amount of occurrence in the habitat |
|---|---|
| Sagebrush Canopy Cover* | 30-40%, or areas of exposed sagebrush in a configuration capable of supporting sage-grouse |
| Sagebrush height* | 40-55 cm (15.8 — 21.7 in.), or where shrub height is above snow cover |

[1]These guidelines incorporate the vegetation variable range for arid and mesic sites identified in the RCP.
*These habitat structure values are average values over a given area.

**Habitat Prioritization Tool** - A spatial model used to evaluate GUSG habitat within the Gunnison Basin. (See Tier 1 Habitat and Tier 2 Habitat.)

**Harvest coefficient** - The percentage of total forage produced that is assigned to grazing animals for consumption.

**Heavy metal** - Occurs naturally in the ecosystem, with large variations in concentration.  In modern times, anthropogenic sources of heavy metals (pollution) have been introduced to the ecosystem. Motivations for controlling heavy metal concentrations in gas streams are diverse.  Some heavy metals are dangerous to health or to the environment, some may cause corrosion, and some are harmful in other ways.

**Impact** - The effect, influence, alteration, or imprint caused by an action.

BLM_0028317

**Impairment** - The degree to which a distance of clear visibility is degraded by human-caused pollutants.

**Implementation decisions** - Decisions that take action to implement land use planning; generally appealable to Interior Board of Land Appeals under 43 CFR 4.410.

**Implementation plan** - An area or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans.

**Incidental Take** - The unintentional harming (including killing) or harassing of a listed species resulting from a Federal action, which may occur when authorized by the FWS through an incidental take statement that identifies the amount or extent of the take, as well as reasonable and prudent measures to minimize the take and terms and conditions that must be observed when implementing those measures.

**Indirect impacts** - Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

**Informal Consultation** - The requirement under Section 7 of the ESA for federal agencies to consult with the FWS when any action the agency carries out, funds, or authorizes (such as through a permit) has the potential to affect a listed endangered or threatened species. The process usually begins as informal consultation and if, after discussions with and concurrence from the FWS, the agency determines that the proposed action is not likely to affect any listed species in the project area, consultation is complete and the proposed project can proceed. If it appears that the agency's action might affect a listed species, the agency can prepare a biological assessment to assist in its determination of the project's effect on a species.

**Integrated Pest Management** - The use of all appropriate weed control measures, including fire, as well as mechanical, chemical, biological, and cultural techniques, in an organized and coordinated manner on a site-specific basis.

**Late season** - Fall or late summer grazing.

**Land classification** - When, under criteria of 43 CFR 2400, a tract of land has potential for either retention for multiple use management or for some form of disposal, or for more than one form of disposal, the relative scarcity of the values involved and the availability of alternative means and sites for realization of those values will be considered. Long-term public benefits will be weighed against more immediate or local benefits. The tract will then be classified in a manner that would best promote the public interest.

**Land Health Fundamental(s)** - Overarching principles of rangeland health listed at 43 CFR 4180.1 which establish the Department of Interior's policy of managing for healthy rangelands. State or regional standards must provide for conformance with the fundamentals for rangeland health.

**Land tenure adjustments** - Ownership or jurisdictional changes to improve the manageability of BLM lands and their usefulness to the public. The BLM has numerous authorities for repositioning lands into a more consolidated pattern, disposing of lands, and entering into cooperative management agreements. These land pattern improvements are completed primarily through the use of land exchanges, but also through land sales, jurisdictional transfers to other agencies, and through the use of cooperative management agreements and leases.

**Land use allocation** - The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions. (from H-1601-1, BLM Land Use Planning Handbook).

BLM_0028318

CHAPTER 7 - GLOSSARY

**Land use plan** - A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and MFPs.

**Land use plan decision** - Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**LANDFIRE** - A partnership program between the DOI, USFS, and Nature Conservancy begun in 2001 that produces geo-spatial products and databases covering the U.S. for the purpose of creating a nationally complete, comprehensive, and consistent set of products that support fire and natural resource management organizations and applications; also known as "Landscape Fire and Resource Management Planning Tools."

**Large transmission lines** - The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to customers, or is delivered to other electrical systems.  Transmission is considered to end when the energy is transformed for distribution to the customer.  For purposes of this EIS, large transmission lines are considered to be 230 kilovolts or higher.  230-kilovolt lines generally require a larger disturbance footprint to accommodate larger infrastructure.

**Late brood-rearing area** - Habitat includes mesic sagebrush and mixed shrub communities, wet meadows, and riparian habitats as well as some agricultural lands (e.g. alfalfa fields, etc.).

**Leasable minerals** - Those minerals or materials subject to lease by the federal government under the Mineral Leasing Act of 1920.  They include coal, phosphate, asphalt, sulphur, potassium, sodium minerals, oil and gas, as well as geothermal resources.

**Lease** - Section 302 of FLPMA provides the BLM with authority to issue leases for the use, occupancy, and development of public lands.  Leases are issued for purposes such as a commercial filming, advertising displays, commercial or noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, harvesting of native or introduced species, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy if the residential structures are not incidental to the mining operation, and water pipelines and well pumps related to irrigation and non-irrigation facilities.  The regulations establishing procedures for the processing of these leases and permits are found in 43 CFR 2920.

**Lease stipulation** - A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lek** - An area where certain bird species (such as sage-grouse) assemble to carry on display and courtship behavior.

Active Lek:  An open area that has been attended by ≥ 2 male sage-grouse in ≥ 2 of the previous 5 years.  For the smaller GUSG populations outside the Gunnison Basin, an active lek is defined as an open area where one or more sage-grouse have been observed on more than one occasion, engaging in courtship or breeding behavior.  An area used by displaying males in the last 5 years is considered an active lek. (RCP)

Historic lek: A formerly active lek that has not been utilized for display or breeding within the last 10 years.

Inactive Lek: To be considered inactive for a given season, a lek must have zero males in attendance for at least two count periods. For the official status of a lek to be considered Inactive, a lek needs to be seasonally In active for five consecutive years.

**Limited** - Designated areas and trails where the use of off-road vehicles is subject to restrictions, such as limiting the number or types of vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year (from BLM National Management Strategy for OHV Use on Public Lands).

**Locatable minerals** - Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Maintenance action** - A minor adjustment to a land use plan that does not require an amendment.

**Management decision** - A decision made by the BLM to manage public lands. Management decisions include both land use plan decisions and implementation decisions.

**Management unit** - A BLM field office, national monument, or national conservation area.

**Master Development Plans** - A plan addressing two or more APDs that share a common drilling plan, surface use plans of operations, and plans for future development and production.

**Mineral** - Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained for human use, usually from the ground. Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral entry** - The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral estate** - The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral materials** - Materials such as sand and gravel and common varieties of stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws. but that can be acquired under the Materials Act of 1947, as amended.

**Minimization mitigation** - Minimizing impacts by limiting the degree or magnitude of the action and its implementation (40 CFR 1508.20 (b)).

**Mining claim** - A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, mill site, and tunnel site.

**Mitigation** - Includes specific means, measures, or practices that could reduce, avoid, or eliminate adverse impacts. Mitigation can include:

BLM_0028320

(a) Avoiding an impact altogether by not taking a certain action or parts of an action.
(b) Minimizing an impact by limiting the degree or magnitude of the action and its implementation.
(c) Rectifying an impact by repairing, rehabilitating, or restoring the affected environment.
(d) Reducing or eliminating an impact over time by preservation and maintenance operations during the life of the action.
(e) Compensating for an impact by replacing or providing substitute resources or environments.

**Modification** - A change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Monitoring (plan monitoring)** - The process of tracking the implementation of land use plan decisions and collecting and assessing data necessary to evaluate the effectiveness of land use planning decisions.

**Motorized vehicles or uses** - Vehicles that are motorized, including but not limited to jeeps, all-terrain vehicles (all-terrain vehicles, such as four-wheelers and three-wheelers), trail motorcycles or dirt bikes, and aircrafts.

**Multiple use** - Managing public lands and their various resource values so that they are utilized in a combination that will best meet the present and future needs of the American people. Making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

**National Environmental Policy Act of 1969 (NEPA)** - Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**National Register of Historic Places** - A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of, 1966 and maintained by the National Park Service.

**National Wild and Scenic Rivers System** - A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three types of streams: (1) **recreational:** rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) **scenic:** rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) **wild:** rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**No Surface Occupancy (NSO)** - A major constraint where use or occupancy of the land surface for fluid mineral exploration or development and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of

BLM_0028321

wells and/or pads) are prohibited to protect identified resource values. Areas identified as NSO are open to fluid mineral leasing, but surface occupancy or surface-disturbing activities associated with fluid mineral leasing cannot be conducted on the surface of the land. Access to fluid mineral deposits would require horizontal drilling from outside the boundaries of the NSO area.

**Non-energy leasable minerals** - Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. Non-energy minerals include resources such as phosphate, sodium, potassium, and sulfur.

**Nonfunctioning Condition** - Condition in which vegetation and ground cover are unable to sustain natural biotic communities. In riparian-wetland areas, conditions do not provide adequate vegetation, landform, or large woody debris to dissipate stream energy associated with high flows and thus are unable to reduce erosion, improve water quality, or other normal characteristics of riparian areas.

**Notice of Intent to Conduct Oil and Gas Geophysical Exploration Operations** - Notice to the BLM to conduct oil and gas exploration proposals.

**Notice of Staking** - Notice to the BLM that staking has been or will be completed for well locations on Federal leases and serves as a request to schedule an onsite inspection.

**Noxious weeds** - A plant species designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the US.

**Objective** - A description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established timeframes for achievement.

**Off-highway vehicle (OHV) (off-road vehicle)** - Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any non-amphibious registered motorboat: (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Open** - Designated areas and trails where off-road vehicles may be operated, subject to operating regulations and vehicle standards set forth in BLM Manuals 8341 and 8343, or an area where all types of vehicle use is permitted at all times, subject to the standards in BLM Manuals 8341 and 8343.

**Outstandingly Remarkable Values** - Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act: "scenic, recreational, geological, fish and wildlife, historic, cultural, or other similar values..." Other similar values which may be considered include ecological, biological or botanical, paleontological, hydrological, scientific or research values.

**Perennial stream** - Perennial streams carry flowing water continuously throughout the year, regardless of weather conditions. It exhibits well-defined geomorphologic characteristics and in the absence of pollution, thermal modifications, or other man-made disturbances has the ability to support aquatic life. During hydrological drought conditions, the flow may be impaired.

**Permitted Use** - The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease, and expressed in Animal Unit Months.

**Permittee** - A person or company permitted to graze livestock on public land.

BLM_0028322

CHAPTER 7 - GLOSSARY

**Planning area** - A geographic area for which land use and resource management plans are developed and maintained.

**Planning criteria** - The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamlines and simplifies the resource management planning actions.

**Policy** - A statement of guiding principles, or procedures, designed and intended to influence planning decisions, operating actions, or other affairs of the BLM. Policies are established interpretations of legislation, executive orders, regulations, or other presidential, secretarial, or management directives.

**Potential Habitat** - Unoccupied habitats that could be suitable for occupation of sage grouse if practical restoration were applied.

**Prescribed fire** - Any fire intentionally ignited by management actions in accordance with applicable laws, policies and regulations to meet specific objectives.

**Primary Constituent Element (PCE)** - A physical or biological feature essential to the conservation of a species and upon which designated or proposed critical habitat is based, such as space for individual and population growth and normal behavior such as food, water, air, light, minerals, or other nutritional or physiological requirements, cover or shelter, sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal, and habitats that are protected from disturbance or are representative of historic geographic and ecological distribution for the species.

**Primitive route** - Any transportation linear feature located within areas that have been identified as having wilderness characteristics and not meeting the wilderness inventory road definition (BLM Manual 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands).

**Prohibit/Closed/Exclusion** - prevented, precluded or not available under any conditions for a particular use or uses to insure protection of other resource values present.

**Properly Functioning Condition** - (1) An element of the Fundamental of Rangeland Health for watersheds, and therefore a required element of state or regional standards and guidelines under 43 CFR § 4180.2(b). (2) Condition in which vegetation and groundcover maintain soil conditions necessary to sustain natural biotic communities. Riparian wetland areas are functioning properly when adequate vegetation, landform, or large woody debris is present to dissipate stream energy associated with high water flows, thereby reducing erosion and improving water quality; filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks against cutting action; develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and support greater biodiversity. The functioning condition of riparian-wetland areas is influenced by geomorphic features, soil, water, and vegetation. (4) Uplands function properly when the existing vegetation and groundcover maintain soil conditions capable of sustaining natural biotic communities. The functioning condition of uplands is influenced by geomorphic features, soil, water, and vegetation.

**Public land** - Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired ownership, except lands located on the Outer Continental Shelf, and lands held for the benefit of Indians, Aleuts, and Eskimos.

**Rangeland health** - The degree to which the integrity of the soil and ecological processes of rangeland ecosystems are sustained.

BLM_0028323

**Range Improvement -** An authorized physical modification or treatment designed to improve production of forage, change vegetation composition, control patterns of use, provide water, stabilize soil and water conditions, restore, protect, and improve the condition of rangeland ecosystems to benefit livestock, wild horses and burros, and fish and wildlife, including, but is not limited to, structures, treatment projects, and use of mechanical devices or modifications achieved through mechanical means.

**Reasonable Foreseeable Development (RFD) Scenario -** The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Recreation and Public Purposes Act (of 1926) -** The Recreation and Public Purposes Act provided for the lease and sale of public lands determined valuable for public purposes. The objective of the Recreation and Public Purposes Act is to meet the needs of state and local government agencies and nonprofit organizations by leasing or conveying public land required for recreation and public purpose uses. Examples of uses made of Recreation and Public Purposes lands are parks and greenbelts, sanitary landfills, schools, religious facilities, and camps for youth groups. The act provides substantial cost-benefits for land acquisition and provides for recreation facilities or historical monuments at no cost.

**Recreation management area -** Includes special recreation management areas (SRMAs) and extensive recreation management areas (ERMAs); see SRMA and ERMA definitions.

**Recreation Opportunity Spectrum -** A continuum used to characterize recreation opportunities in terms of setting, activity and experience opportunities. The spectrum covers a range of recreation opportunities from primitive to urban. With respective to river management planning, the Recreation Opportunity Spectrum represents one possible method for delineating management units or zones.

**Rehabilitate -** Returning disturbed lands as near to its pre-disturbed condition as is reasonably practical or as specified in approved permits.

**Renewable Energy -** Energy resources that constantly renew themselves or that are regarded as practically inexhaustible. These include solar, wind, geothermal, hydro, and biomass. Although particular geothermal formations can be depleted, the natural heat in the Earth is a virtually inexhaustible reserve of potential energy.

**Resource Advisory Council (RAC) -** Provides advice to the BLM on various resource issues. A coordinated effort to involve RACs early on and throughout the process ensure that the BLM obtains and incorporates local input and advice throughout this project.

**Resource Management Plan (RMP) -** A land use plan as prescribed by the Federal Land Policy and Management Act that establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Restore/restoration -** Implementation of a set of actions that promotes plant community diversity and structure that allows plant communities to be more resilient to disturbance and invasive species over the long term. The long-term goal is to create functional, high quality habitat that is occupied by sage-grouse. Short-term goal may be to restore the landform, soils and hydrology and increase the percentage of preferred vegetation, seeding of desired species, or treatment of undesired species.

**Restriction/restricted use -** A limitation or constraint on public land uses and operations. Restrictions can be of any kind, but most commonly apply to certain types of vehicle use, temporal and/or spatial constraints, or certain authorizations.

BLM_0028324

CHAPTER 7 - GLOSSARY

**Revegetate/revegetation -** The process of putting vegetation back in an area where vegetation previously existed, which may or may not simulate natural conditions.

**Revision -** The process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

**Right-of-Way (ROW) -** Means the public lands authorized to be used or occupied for specific purposes pursuant to a right-of-way grant, which are in the public interest and which require rights-of-way over, upon, under, or through such lands.

**Right-of-way avoidance area -** An area identified through resource management planning to be avoided but may be available for ROW location with special stipulations.

**Right-of-way exclusion area -** An area identified through resource management planning that is not available for ROW location under any conditions.

**Riparian area -** A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Road -** A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Rock art -** Petroglyphs (carvings) or pictographs (paintings) created on natural rock surfaces by native people and depicting their history and culture.

**Rotation -** Regular change in grazing between pastures in an allotment for a permitted period.

**Routes -** Multiple roads, trails and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system. Generically, components of the transportation system are described as "routes."

**Sagebrush habitat -** Areas of vegetation composed primarily of sagebrush plant communities - at least 25 percent of the land is dominated by sagebrush cover within a 0.9-mile [1.5-km] radius of any given location, of sufficient size and configuration to encompass all seasonal habitats for a give population of Gunnison Sage-grouse, and facilitate movement within and among populations (FWS 2014 primary constituent element 1).

**Salable minerals -** Common mineral varieties such as sand and gravel found on public lands and used mainly for construction. Salable minerals are disposed of by sales to the public or free-use permits to government agencies or nonprofit organizations.

**Sale (public land) -** A method of land disposal pursuant to Section 203 of FLPMA, whereby the US receives a fair-market payment for the transfer of land from federal ownership. Public lands determined suitable for sale are offered on the initiative of the BLM. Lands suitable for sale must be identified in the RMP. Any lands to be disposed of by sale that are not identified in the current RMP, or that meet the disposal criteria identified in the RMP, require a plan amendment before a sale can occur.

**Scenic byway -** Highway route with a roadside or corridor of special aesthetic, cultural, or historic value. An essential part of the highway is its scenic corridor. The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

BLM_0028325

CHAPTER 7 - GLOSSARY

**Scoping process -** An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**Season of Use -** The time during which livestock grazing is permitted on a given range area, as specified in a grazing lease.

**Sensitive species -** Species designated as sensitive by the BLM State Director, including species that are under status review, have small or declining populations, live in unique habitats, or require special management. BLM Manual 6840 provides policy and guidance for managing special status species.

**Site Specific Relocation (SSR) -** Allows some use and occupancy of public land while protecting identified resources or values. SSR areas are potentially open to surface-disturbing activities but the restriction allows the BLM to require special constraints, or the activity can be shifted (spatially or temporally) to protect the specified resource or value. Activities that are not considered surface disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the area by wildlife.

**Special Recreation Management Area (SRMA) -** A public land area identified in a land use plan to which recreation funding and personnel are committed in order to provide specific, structured recreation opportunities (including activities, experiences, and benefits).

**Special recreation permit (SRP) -** Authorization that allows for recreational uses of public lands and related waters. Issued as a means to control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Commercial SRPs are also issued as a mechanism to provide a fair return for the commercial use of public lands.

**Special status species -** BLM special status species are: (1) species listed, candidate, or proposed for listing under the Endangered Species Act; and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the Endangered Species Act that are designated as BLM sensitive by the BLM State Director(s). All federally listed candidate species, proposed species, and delisted species in the five years following delisting are conserved as BLM sensitive species.

**Split estate -** This is the circumstance where the surface of a particular parcel of land is owned by a different party than the minerals underlying the surface. Split estates can have any combination of surface and subsurface owners (federal/state; federal/private; state/private) or percentages of ownership. When referring to the split estate ownership on a particular parcel of land, it is generally necessary to describe the surface/subsurface ownership pattern of the parcel.

**Standard lease terms and conditions -** Areas may be open to leasing with no specific management decisions defined in a Resource Management Plan; however, these areas are subject to lease terms and conditions as defined on the lease form (Form 3100-11, Offer to Lease and Lease for Oil and Gas; and Form 3200-24, Offer to Lease and Lease for Geothermal Resources).

**State Implementation Plan -** A detailed description of the programs a state will use to carry out its responsibilities under the Clean Air Act. State implementation plans are a collection of regulations used by a state to reduce air pollution.

**Stipulation (general) -** A term or condition in an agreement or contract.

**Stipulation (oil and gas) -** A provision that applies to construction and drilling which modifies standard oil and gas lease terms and conditions in order to protect other resource values or land uses and is attached to and made a part of the lease. Typical lease stipulations include No Surface Occupancy

BLM_0028326

CHAPTER 7 - GLOSSARY

(NSO), Timing Limitations (TL), and Controlled Surface Use (CSU). Lease stipulations are developed through the land use planning (RMP) process.

**Stocking rate -** the number of animals on a given amount of land over a certain period of time. Stocking rate is generally expressed as animal units per unit of land area.

**Structural range improvements –** Constructed developments such as fences, corrals, cattle guards, windmills, and other facilities that help with the distribution and control of livestock.

**Succession -** the observed process of change in the species structure of an ecological community over time.

**Surface access agreement -** A voluntary, private contract between the private surface owner and the Federal mineral lessee or operator to conduct applicable resource surveys and oil and gas operations necessary to develop the Federal mineral lease.  The Surface Access Agreement may include terms or conditions of use, be a waiver, or an agreement for compensation..

**Surface-disturbing activities (or surface disturbance) -** The physical disturbance and movement or removal of land surface and vegetation. These activities range from excavation and development activities associated with use of heavy equipment for road, pipeline, power line and other types of construction; blasting; strip, pit, and underground mining and related activities, including ancillary facility construction; oil and gas well drilling and field construction or development and related activities; range improvement project construction; and recreation site construction.  Surface disturbances normally involve use of surface lands resulting in disturbance to soils and vegetation that could require reclamation.  Surface disturbance is not normally caused by casual-use activities.  Activities not considered surface-disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, prescribed fire, some fuels and vegetation treatments, dispersed camping, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the land by wildlife.

**Surface use(s) -** These are all the various activities that may be present on the surface or near-surface (e.g., pipelines), of the public lands. It does not refer to those subterranean activities (e.g., underground mining, etc.) occurring on the public lands or federal mineral estate. When administered as a use restriction (e.g., *No Surface Use [NSU]*), this phrase prohibits all but specified resource uses and activities in a certain area to protect particular sensitive resource values and property. This designation typically applies to small acreage sensitive resource sites (e.g., plant community study exclosure, etc.), and/or administrative sites (e.g., government ware-yard, etc.) where only authorized, agency personnel are admitted.

**Tall Structures -** Infrastructure that is at least twice as tall as the surrounding vegetation, including poles and towers for lighting, communications, meteorology, telephone and electrical distribution, and high-tension transmission.

**Temporary/temporary use -** A relative term that must be considered in the context of the resource values affected and the nature of the resource use(s)/activity(ies) taking place. Generally, a temporary activity is considered to be one that is not fixed in place and is of short duration.

**Threatened species -** Any species that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Management). Under the Endangered Species Act in the US, "threatened" is the lesser-protected of the two categories. Designation as threatened (or endangered) is determined by USFWS as directed by the Endangered Species Act.

BLM_0028327

**Tier I Habitat -** Roughly 60% of GUSG Occupied Habitat in the Gunnison Basin population area is proposed to be managed as Tier I habitat. These areas were identified in the CCA using the habitat prioritization tool and are generally characterized by overlapping seasonal habitats and minimal existing permanent development.

**Tier 2 Habitat -** Roughly 40% of GUSG Occupied Habitat in the Gunnison Basin population area is proposed to be managed as Tier 2 habitat. These areas were identified in the CCA using the habitat prioritization tool and generally represent the more fragmented areas on the landscape.

**Timing Limitation (TL) -** The TL stipulation, a moderate constraint, is applicable to fluid mineral construction and drilling activities (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads), and other surface-disturbing activities (i.e., those not related to fluid mineral leasing). Areas identified for TL are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. TLs can overlap spatially with NSO and CSU, as well as with areas that have no other restrictions.

**Total Maximum Daily Load -** An estimate of the total quantity of pollutants (from point, nonpoint, and natural sources) allowed into waters without exceeding applicable water quality criteria.

**Traditional Cultural Property -** A property that derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community. A traditional cultural property may qualify for the National Register if it meets the criteria and criteria exceptions in 36 CFR 60.4.

**Trail -** A linear route managed for human power (e.g., hiking or bicycling), stock (e.g., equestrian), or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Transmission -** The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to consumers, or is delivered to other electric systems. Transmission is considered to end when the energy is transformed for distribution to the consumer.

**Transmission line (large) -** An electrical utility line with a capacity greater than or equal to 100 kilovolts or a natural gas, hydrogen, or water pipeline greater than or equal to 24 inches in diameter.

**Transportation system -** The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

**Travel management areas -** Polygons or delineated areas where a rational approach has been taken to classify areas open, closed or limited, and have identified and/or designated a network of roads, trails, ways, landing strips, and other routes that provide for public access and travel across the planning area. All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations (BLM Handbook H-1601-1, Land Use Planning Handbook).

**Trespass -** Any unauthorized use of public land.

BLM_0028328

CHAPTER 7 - GLOSSARY

**Tribal interests -** Native American or Native Alaskan economic rights such as Indian trust assets, resource uses and access guaranteed by treaty rights, and subsistence uses.

**Utility corridor -** Tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**Vacant or Unknown Habitat -** Suitable habitat for sage-grouse that is separated (not contiguous) from occupied habitat that either (1) has not been adequately inventoried, or (2) has not had documentation of grouse presence in the past 10 years.

**Valid existing rights -** Documented, legal rights or interests in the land that allow a person or entity to use said land for a specific purpose and that are still in effect. Such rights include but are not limited to fee title ownership, mineral rights, rights-of-way, easements, permits, and licenses. Such rights may have been reserved, acquired, leased, granted, permitted, or otherwise authorized over time.

**Vegetation treatments -** Management practices which change the vegetation structure to a different stage of development. Vegetation treatment methods include managed fire, prescribed fire, chemical, mechanical, and seeding.

**Visitor day -** Twelve visitor hours that may be aggregated by one or more persons in single or multiple visits.

**Visitor use -** Visitor use of a resource for inspiration, stimulation, solitude, relaxation, education, pleasure, or satisfaction.

**Visual Resource Management (VRM) classes -** Visual resource management classes define the degree of acceptable visual change within a characteristic landscape.  A class is based on the physical and sociological characteristics of any given homogeneous area and serves as a management objective. Categories assigned to public lands based on scenic quality, sensitivity level, and distance zones. Each class has an objective which prescribes the amount of change allowed in the characteristic landscape.

**Watershed -** Topographical region or area delineated by water draining to a particular watercourse or body of water.

**West Nile virus -** A virus that is found in temperate and tropical regions of the world and most commonly transmitted by mosquitos. West Nile virus can cause flu-like symptoms in humans and can be lethal to birds, including sage-grouse.

**Wildcat well -** An exploratory oil well drilled in land not known to be an oil field.

**Wilderness -** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements and generally appear to have been affected primarily by the forces of nature.

**Wilderness characteristics -** Wilderness characteristics attributes include the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include supplemental values. Lands with wilderness characteristics are those lands that have been inventoried and determined by the BLM to contain wilderness characteristics as defined in section 2(c) of the Wilderness Act.

BLM_0028329

CHAPTER 7 - GLOSSARY

**Wilderness Study Area** - The Federal Land Policy and Management Act of 1976 directed the Bureau to inventory and study its roadless areas for wilderness characteristics. To be designated as a Wilderness Study Area, an area had to have the following characteristics:

- Size - roadless areas of at least 5,000 acres of public lands or of a manageable size;
- Naturalness - generally appears to have been affected primarily by the forces of nature;
- Opportunities - provides outstanding opportunities for solitude or primitive and unconfined types of recreation.

**Wildland fire -** Any fire, regardless of ignition source, that is burning outside of a prescribed fire and any fire burning on public lands or threatening public land resources, where no fire prescription standards have been prepared.

**Wildland-Urban Interface (WUI) -** An area within or adjacent to an at risk community that has been identified by a community in its wildfire protection plan or, for areas that do not have such a plan, an area: 1) extending one half mile from the boundary of an at risk community; 2) extending 1½ miles when other criteria are met (such as a sustained steep slope or a geographic feature aiding in creating an effective fire break) or comprised of Condition Class III land; or 3) adjacent to an evacuation route.

**Withdrawal -** An action that restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other federal agencies.

**Woodland –** lands vegetated primarily by juniper and pinyon-pine trees.

BLM_0028330

# 8. REFERENCES

Aldridge, C. L. and M. S. Boyce. 2007. Linking occurrence and fitness to persistence: habitat-based approach for endangered greater sage-grouse. *Ecological Applications* 17:508-526.

Aldridge, C. L., S. E. Nielsen, H. L. Beyer, M. S. Boyce, J. W. Connelly, S. T. Knick, and M. A. Schroeder. 2008. Range-wide patterns of greater sage-grouse persistence. *Diversity and Distributions* 17:983-994.

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial nesting habitat for Gunnison sage-grouse: a spatially explicit hierarchical approach. *Journal of Wildlife Management* 76(2):391-406.

Anderson, D. C., K. T. Harper, and S. R. Rushforth. 1982. Recovery of cryptogamic soil crusts from grazing on Utah winter ranges. *Journal of Range Management* 35(3).

Archer, S. A. and K. I. Predick. 2008. Climate change and ecosystems of the Southwestern United States. *Rangelands* 30(3): 23-38.

Armour, C. L., D. A. Duff, and W. Elmore. 1991. The effects of livestock grazing on riparian and stream ecosystems. *Fisheries* 16(1): 7-11.

Baker, W. L. 2006. Fire and restoration of sagebrush ecosystems. *Wildlife Society Bulletin* 34:177-185.

Balch, J. K., B. A. Bradley, C. M. D'Antonio, and J. Gomez-Dans. 2012. Introduced annual grass increases regional fire activity across the arid western USA (1980–2009). *Global Change Biology* vol. 19 (1) pp. 173-183.

Barney, M. A. and N. C. Frischeknecht. 1974. Vegetation changes following fire in the pinyon-juniper type of west-central Utah. *Journal of Range Management,* Volume 27, No. 2.

Batchelor, J. L., W. J. Ripple, T. M. Wilson, L. E. Painter. 2015. Restoration of riparian areas following the removal of cattle in the northwestern Great Basin. *Environmental Management* (2015) 55:930-942.

Beck, J. L., J. W. Connelly, and K. P. Reese. 2009. Recovery of greater sage-grouse habitat features in Wyoming big sagebrush following prescribed fire. *Restoration Ecology* 17:393-403.

Beck, J. L. and D. L. Mitchell. 2000. Influences of livestock grazing on sage grouse habitat. *Wildlife Society Bulletin* 28:993-1002.

Beck, J. L., K. P. Reese, J. W. Connelly, and M. B. Lucia (Beck et al). 2006. Movements and survival of juvenile greater sage-grouse in southeastern Idaho. *Wildlife Society Bulletin* 34:1070-1078.

Belnap, J. 1993. Recovery rates of cryptobiotic soil crusts: assessment of artificial inoculant and methods of evaluation. *Great Basin Naturalist* 53, 89-95.

BLM_0028331

CHAPTER 8 - REFERENCES

Belnap, J., J. H. Kaltenecker, R. Rosentreter, J. Williams, S. Leonard, and D. Eldridge (Belnap et al). 2001. Biological soil crusts: ecology and management. Bureau of Land Management. National Science and Technology Center Technical reference 1730-2.

Belnap, J., R. Prasse, and K. T. Harper (Belnap, Prasse, and Harper). 2001. Influences of biological soil crusts on soil environments and vascular plants. *Biological Studies*, Vol 150: 281-300.

Belsky, A. J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States. *Journal of Soil and Water Conservation* 54: 419-431.

BLM. (See U.S. Department of the Interior, Bureau of Land Management.)

Boyd, C. S. and T. J. Svejcar. 2011. The influence of plant removal on succession in Wyoming big sagebrush. *Journal of Arid Environments* Volume 75, Issue 8.

Boyle, S. A. and D. R. Reeder. 2005. Colorado sagebrush: a conservation assessment and strategy. Grand Junction: Colorado Division of Wildlife.

Braun, C. E. 1998. Sage-grouse Declines in Western North America: What are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies 78:139-56.

Brockway, D. G., R. G. Gatewood, and R. B. Paris. 2002. Restoring grassland savannas from degraded pinyon-juniper woodlands: effects of mechanical overstory reduction and slash treatment alternatives. *Journal of Environmental Management* Volume 64, Issue 2, February 2002.

Brown, J. K. 1982. Fuel and fire behavior prediction in big sagebrush. U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. Research Paper INT-290. Ogden, UT.

Bryce, S. A., J. R. Strittholt, B. C. Ward, and D. M. Bachelet. 2012. Colorado Plateau Rapid Ecoregional Assessment Report. Prepared for the U.S. Department of the Interior, BLM, Denver.

Budd, B. and J. Thorpe. 2009. Benefits of managed grazing: a manager's perspective. *Society for Range Management* October 2009.

Bui, Thuy-Vy, J. M. Marzluff, and B. Bedrosian. 2010. Common raven activity in relation to land use in western Wyoming: implications for greater sage-grouse reproductive success. *The Condor* 112(1):65-78.

Bui, Thuy-Vy. 2009. The Effects of Nest and Brood Predation by Common Ravens (Corvus corax) on Greater Sage-grouse (Centrocercus urohasianus) in Relation to Land Use in Western Wyoming. Thesis. University of Washington.

Bureau of Land Management. (See U.S. Department of the Interior, Bureau of Land Management.)

Burke, M. J. W. and J. P. Grime. 1996. An experimental study of plant community invasibility. *Ecology* 77: 776-790.

Burkhardt, J. W. and E. W. Tisdale. 1976. Causes of juniper invasion in southwestern Idaho. *Ecology* 57(3):472-484.

BLM_0028332

CHAPTER 8 - REFERENCES

Cagney, J., E. Bainter, B. Budd, T. Christiansen, V. Herren, M. Holloran, B. Rashford, M. Smith, and J. Williams (Cagney et al). 2010. Grazing influence, objective development, and management in Wyoming's greater sage-grouse habitat with emphasis on nesting and early brood rearing. *Cooperative Extension Service Bulletin* B-1203, University of Wyoming: Laramie.

Callison, J., J. D. Brotherson, and J. E. Brown. 1985. The effects of fire on the blackbrush (Coleogyne ramisissima) community of southwestern Utah. *Journal of Range Management* 38:535-538.

Candidate Conservation Agreement for the Gunnison Sage-Grouse, *Centrocercus minim*us Gunnison Basin Population (CCA). 2013. Colorado Parks & Wildlife, Gunnison County, Saguache County, U.S. Bureau of Land Management, U.S. Fish and Wildlife Service, U.S. Forest Service, U.S. National Park Service, and U.S. Natural Resources Conservation Service.

Canfield, R. H. 1941. Application of the line interception method in sampling range vegetation. *Journal of Forestry* 39:388-394.

Cardille, J., S. J. Ventura and M. G. Turner. 2001. Environmental and social factors influencing wildfires in the upper Midwest, United States. *Ecological Applications* 11(1), 2001, pp. 111-127.

Carlisle, D. M., D. M. Wolock, and M. R. Meador. 2011. Alteration of streamflow magnitudes and potential ecological consequences: a multiregional assessment. *Frontiers in Ecology and the Environment* 9:264-270.

Carpenter, J., C. Aldridge, and M. S. Boyce. 2010. Sage-grouse habitat selection during winter in Alberta. *Journal of Wildlife Management* 74(8):1806-1814.

Carsey, K., G. Kittel, K. Decker, D. J. Cooper, and D. Culver. 2003. Field Guide to the Wetland and Riparian Plant Associations of Colorado. Colorado Natural Heritage Program: Fort Collins.

Cayan D. R., S. A. Kammerdiener, M. D. Dettinger, J. M. Caprio, and D. H. Peterson. 2001. Changes in the onset of spring in the western United States. *Bulletin of the American Meteorological Society* 82:399-415.

CBS News. Top 10 Fastest Growing States. New York, NY. http://www.cbsnews.com/ media/top-10-fastest-growing-states/ (accessed July 20, 2015).

Centers for Disease Control. 2012. West Nile Virus. http://www.cdc.gov/ncidod/ dvbid/westnile/birds&mammals.htm.

Chambers, J. C., B. A. Roundy, R. R. Blank, S. E. Meyer, and A. Whittaker. 2007. What makes Great Basin sagebrush ecosystems invasible by *Bromus tectorum?*

Chaudhary, V. B., M. A. Bowker, T. E. O'Dell, J. B. Grace, A. E. Redman, M. C. Rillig, and N. C. Johnson. 2009. Untangling the biological contributions to soil stability in semiarid shrublands. *Ecological Applications* 19(1):110-122.

Clark, L. J. Hall, R. McLean, M. Dunbar, K. Klenk, R. Bowen, and C. A. Smeraski. 2006. Susceptibility of greater sage-grouse to experimental infection with West Nile Virus. *Journal of Wildlife Diseases* 42:14-22.

BLM_0028333

CHAPTER 8 - REFERENCES

Clary, W. P. and W. C. Leininger. 2000. Stubble height as a tool for management of riparian areas. *Journal of Range Management* 53:562-573.

Coates, P. S. 2007. Greater Sage-Grouse (Centrocercus urophasianus) nest predation and incubation behavior. Idaho State University: Boise.

Coates, P. S. and D. J. Delehanty (Coates and Delehanty).

2010. Nest predation of greater sage-grouse in relation to microhabitat factors and predators. *Journal of Wildlife Management* 74(2):240-248.

2008. Effects of environmental factors on incubation patterns of greater sage-grouse. *The Condor* 110(4):627-638.

Coates, P. S., J. W. Connelly, and D. J. Delehanty. 2008. Predators of greater sage-grouse nests identified by video monitoring. *Journal of Field Ornithology* 79(4):421-428.

Coates, P. S., K. B. Howe, M. L. Casazza, and D. J. Delehanty (Coates et al).

2014a. Common raven occurrence in relation to energy transmission line corridors transiting human-altered sagebrush steppe. *Journal of Arid Environments* V.111, pp.68-78.

2014b. Landscape alterations influence differential habitat use of nesting buteos and ravens within sagebrush ecosystem: Implications for transmission line development. *The Condor* 116(3):341-356.

Colorado Off-Highway Vehicle Coalition. 2009. Economic Contribution of Off-Highway Vehicle Recreation in Colorado. Lakewood.

Colorado Office of Economic Development and International Trade. 2015. Gov. Hickenlooper Establishes Colorado Outdoor Recreation Industry Office; Appoints Luis Benitez as Director. Denver.

Colorado Oil and Gas Conservation Commission (COGCC).

2015. Production and Sales by County Monthly. http://cogcc.state.co.us/ COGCCReports (accessed July 2, 2015).

2014. Colorado Oil and Gas Information System, Production. https://cogcc.state.co.us/ (accessed November 5, 2014).

Colorado Parks and Wildlife (CPW).

2015. 2015 Strategic Plan: Existing Conditions, Trends, and Projections. Denver.

2014a. Colorado Statewide Comprehensive Outdoor Recreation Plan. Denver.

2014b. Data Analysis Unit D-29, Deer Management Plan, Game Management Units 72 and 73.

2014c. Data Analysis Unit D-24, Deer Management Plan, Game Management Units 70, 71, & 711.

2014d. Geographic Information Systems data. Unpublished data. Colorado Department of Natural Resources, Parks and Wildlife, Denver.

2013a. Data Analysis Unit D-21, Deer Management Plan, Game Management Unit 54.

BLM_0028334

CHAPTER 8 - REFERENCES

2013b. Data Analysis Unit D-22, Deer Management Plan, Game Management Units 55 & 551.

2013c. Data Analysis Unit D-25, Deer Management Plan, Game Management Units 66 & 67.

2012. 2012 Gunnison Basin Gunnison sage-grouse Lek Count Summary and Population Estimate. Colorado Parks & Wildlife, Gunnison Basin, Colorado, USA.

2010a. Data Analysis Unit E-11, Elk Management Plan, Game Management Unit 82.

2010b. Data Analysis Unit D-18, Deer Management Plan.

2010c. Data Analysis Unit D-37, Deer Management Plan, Game Management Unit 82.

2008a. Data Analysis Unit E-26, Elk Management Plan, Game Management Units 68 & 681.

2008b. Data Analysis Unit D-26, Deer Management Plan, Game Management Units 68, 681, & 682.

2005. Data Analysis Unit E-52, Elk Management Plan, Game Management Units 53 & 63.

2001a. Data Analysis Unit E-43, Elk Management Plan, Game Management Units 55 & 551.

2001b. Data Analysis Unit E-54, Elk Management Plan, Game Management Unit 54.

2001c. Data Analysis Unit E-25, Elk Management Plan, Game Management Units 66 & 67.

Colorado Parks and Wildlife, Gunnison County, Saguache County, U.S. Bureau of Land Management, U.S. Fish and Wildlife Service, U.S. Forest Service, U.S. National Park Service, and U.S. Natural Resources Conservation Service (CCA). 2013. Candidate Conservation Agreement for the Gunnison Sage-Grouse, *Centrocercus minimus* Gunnison Basin Population (CCA).

Colorado Rangeland Monitoring Guide. 2011.

Colorado State Demography Office. 2014. Population Totals for Colorado and Sub-State Regions. Final Estimates – years (1985 to 2013). https://dola.colorado.gov/ demog_webapps/psParameters.jsf (accessed February 7, 2015).

Colorado State Department of Local Affairs. 2012. Population Forecasts. Denver, CO.

Colorado Weed Management Association. 2012. Noxious Weed Information. http://www.cwma.org/noxweeds.html (accessed April 23, 2015).

Commission for Environmental Cooperation (CEC). 2012. Invasive Species. The Northern American Mosaic: An Overview of Key Environmental Issues. Commission for Environmental Cooperation document. p. 1-4.

Connelly, J. W. and C. E. Braun. 1997. Long-term changes in sage-grouse *Centrocercus urophasianus* populations in western North America. *Wildlife Biology* 3:229-234.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation Assessment of Greater Sage-Grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to manage sage grouse populations and their habitats. *Wildlife Society Bulletin* 28:967-985.

BLM_0028335

CHAPTER 8 - REFERENCES

Connelly, J. W., C. A. Hagen, and M. A. Schroeder. 2011a. Characteristics and dynamics of greater sage-grouse populations. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*, pp. 53-67, S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology Volume 38, University of California Press: Berkeley.

Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. *Station Bulletin* 80, University of Idaho: Moscow.

Connelly, J. W., E. T. Rinkes, and C. E. Braun. 2011b. Characteristics of Greater Sage-Grouse habitats: a landscape species at micro- and macroscales, pp. 69-83 in S.T. Knick and J.W. Connelly (editors). *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*. Studies in Avian Biology (vol. 38), University of California Press: Berkeley.

Cook, B. 2012. The Economic Contribution of CO2 Enhanced Oil Recovery in Wyoming's Economy. Enhanced Oil Recovery Institute: Laramie, WY. 43 p.

Cordell, Ken H., et al 2008. Off-Highway Vehicle Recreation in the United States and its Regions and States: An Update National Report from the National Survey on Recreation and the Environment (NSRE). www.fs.fed.us/recreation/programs/ ohv/IrisRec1rpt.pdf (accessed June 30, 2015).

Council on Environmental Quality (CEQ).

   1997. Environmental Justice, Guidance Under the National Environmental Policy Act. Washington, DC. December 10, 1997. 40 p. http://ceq.hss.doe.gov/nepa/regs/ej/ej.pdf.

   1981. Forty Most Asked Questions Concerning CEQ's NEPA Regulations. March 23, 1981.

Cronk, Q. and J. Fuller. 1995. Plant Invaders: The threat to natural ecosystems. Chapman & Hall. New York.

Daubenmire, Rexford. 1959. A canopy-coverage method of vegetation analysis. Northwest Science 33:43-64.

Davies, L. W., J. D. Bates and A. M. Nafus. 2011. Are there benefits to mowing Wyoming big sagebrush plant communities? An evaluation in southeastern Oregon. *Environmental Management* 48: 539-546.

Davis, J. N. and K. T. Harper. 1990. Weedy Annuals and Establishment of Seeded Species on a Chained Juniper-Pinyon Woodland in Central Utah. Proceedings-Symposium on Cheatgrass Invasion, Shrub Die-off, and Other Aspects of Shrub Biology and Management. United States Department of Agriculture, Forest Service, Intermountain Research Station General Technical Report INT-276.

DeBano, L. F. and L. J. Schmidt. 1989. Improving southwestern riparian areas through watershed management. General Technical Report RM 182-182. USDA Forest Service Rocky Mountain Forest and Range Experiment Station. Fort Collins, CO. 33 pp.

Deisenroth, D., J. Loomis, and C. Bond. 2009. Non-Market Valuation of Off-Highway Vehicle Recreation in Larimer County, Colorado: implications of trail closures. *Journal of Environmental Management* 90(11): 3490-3497.

BLM_0028336

CHAPTER 8 - REFERENCES

Deseret News. 2015. Utah Growth Rate Soaring. Salt Lake City. http://www.deseretnews.com/article/600128008/Utah-growth-rate-soaring.html?pg=all (accessed July 28, 2015).

Dether, D. 2005.  Prescribed Fire Lessons Learned. Escape prescribed fire reviews and near miss incidents. Report prepared for Wildland Fire Lessons Learned Center. http://training.nwcg.gov/pre-courses/rx301/Rx_Fire_LL_Escapes_Review.pdf (accessed July 30, 2015).

Dinkins, Jonathan B., M. R. Conover, C. P. Kirol, J. L. Beck, and S. N. Frey. 2014. Greater Sage-grouse (Centrocercus Urophasianus) hen survival: Effects of raptors, anthropogenic and landscape features, and hen behavior. Canadian Journal of Zoology 92:319–330.

Dinkins, Jonathan B., M. R. Conover, C. P. Kirol and J. L. Beck. 2012. Greater Sage-grouse (Centrocercus urophasianus) Select Nest Sites and Brood Sites Away from Avian Predators. *The Auk* 129(4)600-610.

Dodson, E. K. and C. E. Fiedler. 2006. Impacts of restoration treatments on alien plant invasion in Pinus ponderosa forests, Montana. *Journal of Applied Ecology* Vol. 43 Issue 5.

Doherty, K. E., D. E. Naugle, and B. L. Walker. 2010. Greater sage-grouse nesting habitat: the importance of managing at multiple scales. *Journal of Wildlife Management* 74:1544-1553.

Doherty, K. E., D. E. Naugle, B. L. Walker, and J. M. Graham. 2006. Greater sage-grouse winter habitat selection and energy development. *Journal of Wildlife Management* 72(1): 187-195.

Doherty, K. E., D. E. Naugle, and J. S. Evans. 2010. A currency for offsetting energy development impacts: horse-trading sage-grouse on the open market. PLoS ONE 5(4): e10339. doi:10.1371/journal.pone.0010339

Dolores County. 2014. Social and Economic Considerations. Board of County Commissioners: Dove Creek, CO. 7 p.

Driver, B. L., (Ed.). 2008. Managing to Optimize the Beneficial Outcomes of Recreation. State College, PA: Venture.

Dunk, Jeffery R., R. N. Smith and S. L. Cain. 1997. Nest-site selection and reproductive success in common ravens. *The Auk* 114(1): 116-120.

Dzialak, M. R., C. V. Olson, S. M. Harju, S. L. Webb, and J. B. Winstead. 2012. Temporal and hierarchical spatial components of animal occurrence: conserving seasonal habitat for greater sage-grouse. *Ecosphere* 3(4):30. http://dx.doi.org/10.1890/ES11-00315.1

Eiswerth, M. E. and J. S. Shonkwiler. 2006. Examining post-wildfire reseeding on arid rangeland: a multivariate tobit modeling approach. Ecological Modeling 192:286-298.

Ellis, K. L. 1984. Behavior of lekking sage-grouse in response to a perched golden eagle. *Western Birds* 15:37-38.

Ellis, K. L. 1985. Effects of a new transmission line on distribution and aerial predation of breeding male sage grouse. 28 pp. Final Report for Deseret Generation and Transmission Cooperative. Sandy, UT.

BLM_0028337

CHAPTER 8 - REFERENCES

Endangered and Threatened Wildlife and Plants; Determination for the Gunnison sage-grouse as a Threatened or Endangered Species; Notice of the results of the status review. 75 Federal Register 187 (28 September 2010) pp. 59804-59863.

Enz, John W. 2003. North Dakota Topographic, Climatic, and Agricultural Overview. January 2003.

Erdman, J. A. 1970. Pinyon-juniper succession after natural fires on residual soils of Mesa Verde, Colorado. *Brigham Young University Science Bulletin*, Biological Series Volume 11, No. 2. June, 1970.

Evans, C. C. 1986. The relationship of cattle grazing to sage-grouse use of meadow habitat on the Sheldon National Wildlife Refuge. Thesis, University of Nevada: Reno.

Federal Interagency Council on Outdoor Recreation. 2015. Outdoor Recreation: Jobs and Income. Washington, DC. http://www.fs.fed.us/research/docs/outdoor-recreation/recreation-economy.pdf (accessed May 12, 2015).

Federal Register Notices. (See originating agency.)

Finney, M. A. 2001. Design of regular landscape fuel treatment patterns for modifying fire growth and behavior. *Forest Science* 47 (2) 2001.

Fire Effects Information System (FEIS).

> 2015. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory (Producer). http://www.fs.fed.us/database/feis/ (accessed July 30, 2015).

> 2005. Potential Natural Vegetation Groups. Final Document 9-30-2005. http://www.fs.fed.us/database/feis/pdfs/PNVGs/Southwest/R3PJJUff.pdf (accessed June 18, 2015).

Fish and Wildlife Service.  (See U.S. Department of the Interior, Fish and Wildlife Service.)

Forman R. T. T. and L. E. Alexander. 1998. Roads and their major ecological effects. *Annual Review of Ecology and Systematics* 29, pp. 207-231.

Fowler, N. 1986. The role of competition in plant communities in arid and semi-arid regions. *Annual Review of Ecology and Systematics* 1986 17:89-110. Annual Reviews Inc.

Fuhlendorf, S. D. and D. M. Engle. 2001. Restoring heterogeneity on rangelands: ecosystem management based on evolutionary grazing patterns. *BioScience* 51(8): 625-632.

Gartner, W.C., and Lime, D.W. (Eds.). (2000). Trends in Outdoor Recreation, Leisure and Tourism. St. Paul, MN: CABI.

Garton, E. O., J. W. Connelly, J. S. Horne, C. A. Hagen, A. Moser, and M. Schroder. 2011. Greater sage-grouse population dynamics and probability of persistence. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*, pp. 293-382. S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology 38. University of California Press: Berkeley.

Getz, H. L.  and W. L. Baker. 2008. Initial invasion of cheatgrass (Bromus tectorum) into burned pinyon-juniper woodlands in western Colorado. *American Midland Naturalist* Vol. 159, No. 2 (April 2008) pp. 489-497.

BLM_0028338

CHAPTER 8 - REFERENCES

Gibbons P. and D. B. Lindenmayer. 2007. Offsets for land clearing: no net loss or the tail wagging the dog? *Ecological Management and Restoration* 8: 26-31.

Gifford, G. F. and R. H. Hawkins. 1978. Hydrologic impact of grazing on infiltration: a critical review. *Water Resources Research* 12(2):305-313.

Golden Valley County. 2012. Golden Valley County Comprehensive Plan Update: 2012.

Gordon, E. and D. Ojima, eds. 2015. Colorado Climate Change Vulnerability Study. A report submitted to the Colorado Energy Office. Western Water Assessment and Colorado State University.

Grahame, J. D. and T. D. Sisk, editors. 1999-2002. Canyons, cultures and environmental change: An introduction to the land-use history of the Colorado Plateau. Center for Environmental Sciences and Education, Northern Arizona University, Flagstaff. http://www.cpluhna.nau.edu/Biota/wildfire.htm (accessed April 23, 2015).

Gregory, A. J. and J. L. Beck. 2014. Spatial Heterogeneity in Response of Male Greater Sage-grouse Lek Attendance to Energy Development. PLoS ONE 9(6): e97132.

Gunnison County. 2014. Gunnison County Economic Indicators Report, August 2014 Working Draft. Community Development Department: Gunnison, CO.

Gunnison Sage-grouse Rangewide Steering Committee (GUSGRSC). 2005. Gunnison Sage-grouse Rangewide Conservation Plan. Colorado Division of Wildlife: Denver.

Hagen, C. A., J. W. Connelly, and M. A. Schroeder. 2007. A meta-analysis for greater sage-grouse nesting and brood rearing habitats. *Wildlife Biology* 13 Supplement 1:42-50.

Hagen, C. A. 2010. Impacts of energy development on prairie grouse ecology: a research synthesis. Transactions of North American Wildlife and Natural Resource Conference 75:96-103.

Hann, W. J. and D. L. Bunnell. 2001. Fire and land management planning and implementation across multiple scales. *International Journal of Wildland Fire* 10:389-403.

Hann, W. J. and D. J. Strohm. 2003. Fire regime condition class and associated data for fire and fuels planning: methods and applications. *Fire, Fuel Treatments, and Ecological Restoration: Conference Proceedings.* U.S. Forest Service Proceedings RMRS-P-29.

Hann, W., A. Shlisky, D. Havlina, K. Schon, S. Barrett, T. DeMeo, K. Pohl, J. Menakis, D. Hamilton, J. Jones, and M. Levesque. 2008. Interagency Fire Regime Condition Class Guidebook. Version 1.3.0. http://www.frcc.gov.

Hanophy, W. 2009. Fencing with Wildlife in Mind. Colorado Division of Wildlife: Denver. 36 pp.

Harju, S. M., M. R. Dzialak, R. C. Taylor, L. D. Hayden-Wing, and J. B. Winstead. 2010. Thresholds and time lags in effects of energy development on greater sage-grouse populations. *Journal of Wildlife Management* 74(3):437-448.

Harrington, J. B. and R. E. Donnelly. 1978. Fire probabilities in Ontario's boreal forest. American Meteorological Society and the Society of American Foresters, pp. 1-4. Proceedings of the fifth

BLM_0028339

joint conference on fire and forest meteorology. Atlantic City, New Jersey 14-16 March 1978. American Meteorological Society: Boston.

Harrod, R. J. 2001. The effect of invasive and noxious plants on land management in eastern Oregon and Washington. *Northwest Science* 75, 85-89.

Herman-Brunson K. 2007. Nesting and Brood Rearing Habitat Selection of Greater Sage-Grouse and Associated Survival of Hens and Broods at the Edge of their Historic Distribution. Master's thesis, South Dakota State University. http://pubstorage.sdstate.edu/wfs/thesis/Herman-Brunson-Katie-M-M-S-2007.pdf.

Hess, J. E. and J. L. Beck. 2012. Disturbance factors influencing greater sage-grouse lek abandonment in north-central Wyoming. *Journal of Wildlife Management* 76(8):1625-1634.

High Country News.

2015a. Special Outdoor Recreation Issue. Paonia, CO.

2015b. Wilderness as therapist. Paonia, CO. https://www.hcn.org/issues/47.3/ wilderness-as-therapist (accessed July 12, 2015).

Hilty, J., D. J. Eldridge, R. Rosentreter, M. C. Wicklow-Howard, and M. Pellant. 2004. Recovery of biological soil crusts following wildfire in Idaho. *Journal of Range Management* 57: 89–96 January 2004.

Hobbs, R. J. and L. F. Huenneke. 1992. Disturbance, diversity, and invasion: implications for conservation. *Conservation Biology* 6, 324-337.

Holechek, J. L.

1988. An approach for setting the stocking rate. *Rangelands* 10(1):10-14.

1981. Livestock grazing impacts on public lands: a viewpoint. *Journal of Range Management* 34(3): 251-254.

Holechek, J. L., R. D. Pieper, and C. H. Herbel. 1989. Range Management Principles and Practices. Prentice-Hall, Inc. Englewood Cliffs, New Jersey. 501 pp.

Holloran, M. J. 2005. Greater Sage-Grouse (Centrocercus urophasianus) Population Response to Natural Gas Field Development in Western Wyoming. Dissertation, Department of Zoology and Physiology, University of Wyoming: Laramie.

Holloran, M. J., R. C. Kaiser, and W. A. Hubert.

2010. Yearling greater sage-grouse response to energy development in Wyoming. *Journal of Wildlife Management* 74(1): 65-72.

2007. Population response of Yearling Greater sage-grouse to the infrastructure of Natural Gas Fields in Southwestern Wyoming. Completion Report USGS, Wyoming Game and Fish Cooperative Fish and Wildlife Research Unit: Laramie.

BLM_0028340

CHAPTER 8 - REFERENCES

Hood, S. M., D. Long, M. Miller and K. C. Ryan. 2007. Introduction in: Fire ecology and management of the major ecosystems of southern Utah. Gen. Tech. Rep. RMRS-GTR-202, S. M. Hood and M. Miller, editors. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 1-5.

Howe, K. B. and P. S. Coates. 2015. Observations of territorial breeding common ravens caching eggs of greater sage-grouse. *Journal of Fish and Wildlife Management* 5(2).

Howe, K. B., P. S. Coates, and D. J. Delehanty. 2014. Selection of anthropogenic features and vegetation characteristics by nesting Common Ravens in sagebrush ecosystem. *The Condor* 116(1):35-49.

Huenneke L. F., S. P. Hamburg, R. Koide, H. A. Mooney and P. M. Vitousek. 1990. Effects of soil resources on plant invasion and community structure in Californian serpentine grassland. *Ecology* 71:478-491.

Hughes, R.M., Kaufmann, P.R., and M.H. Weber. 2011. Strahler order versus stream size. Journal of the North American Benthological Society 30:103-121.

Husby, P. 2007. Livestock Spring Developments and Wetland Policy. USDA Natural Resources Conservation Service. Conservation Planning Technical Note No. MT-13 (rev. 1) May 2007.

IMPLAN. 2012. IMPLAN Professional Version 3.0, 2012 Data.

IMPROVE. 2011. Spatial and Seasonal Patterns and Temporal Variability of Haze and its Constituents in the United States: Report V. Interagency Monitoring of Protected Visual Environments (IMPROVE). June 2011.

Industrial Economics, Incorporated (IEc). 2013. Draft Economic Analysis of Critical Habitat Designation for the Gunnison Sage-Grouse. Prepared for U.S. Fish and Wildlife Service: Arlington, VA. 204 pp.

Intergovernmental Panel on Climate Change (IPCC). 2007. Climate Change 2007: The Physical Science Basis: Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. Solomon, S. D. et al, editors. Cambridge University Press: New York. 996 pp. http://www.ipcc.ch/

International Mountain Bicycling Association (IMBA). 2015. Demographics of Mountain Biking. https://www.imba.com/resources/research/demographics-mountain-biking (accessed August 7, 2015).

Johansen, J. R. 2001. Impacts of fire on biological soil crusts. pp. 385–400. In: J. Belnap and O. Lange (eds.) Biological soil crusts: structure, management and function. Ecological studies 150. Springer-Verlag, Berlin.

Johnson, D. H., M. J. Holloran, J. W. Connelly, S. E. Hanser, C. L. Amundson, and S. T. Knick. 2011. Influences of environmental and anthropogenic features on Greater Sage-Grouse populations, 1997-2007. Pp. 407-450 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

BLM_0028341

CHAPTER 8 - REFERENCES

Johnson, T. N., P. L. Kennedy and M. A. Etterson. 2012. Nest success and cause-specific nest failure of grassland passerines breeding in prairie grazed by livestock. *The Journal of Wildlife Management* 76(8):1607–1616.

Jones, J. and D. Termenstein. 2013. Fire Regime Condition Class Mapping Tool User's Guide. Version 3.1.0 Wildland Fire Management R, D and A.

Kauffman, J. B. 1988. The status of riparian habitats in Pacific northwest forests, pp. 45–55. *Streamside Management: Riparian Wildlife and Forestry Interactions*. Institute of Forest Resources Contribution 59, K. J. Raedeke, editor. University of Washington: Seattle.

Kazcor, N. 2008. Nesting and Brood-rearing Success and Resource Selection of Greater Sage-grouse in Northwestern South Dakota. Master's thesis, South Dakota State University. http://pubstorage.sdstate.edu/wfs/thesis/Kaczor-Nicholas-W-M-S-2008.pdf.

Kelly, J. P., K. L. Etienne, and J. E. Roth. 2005. Factors influencing the nest predatory behaviors of common ravens in heronries. *The Condor* 107: 402–415.

Kiesecker et al 2010. Energy by design: making mitigation work for conservation and development, pp. 159–181. *Energy Development and Wildlife Conservation in Western North America*, D. E. Naugle, editor. Island Press: Washington, DC.

Kinch, G. 1989. Riparian Area Management: Grazing management in riparian areas. USDI BLM Technical Reference TR 1737-4.

Knapp, P. A. 1996. Cheatgrass (Bromus tectorum L.) dominance in the Great Basin Desert: history, persistence and influences to human activities. *Global Environmental Change* Vol. 6, Issue 1. April 1996.

Knick, S. T. 2011. Historical development, principal federal legislation and current management of sagebrush habitats: implications for conservation, pp. 13–31. Greater Sage-Grouse: Ecology of a Landscape Species and Its Habitats, S. T. Knick and J. W. Connelly, editors. Cooper Ornithological Union, University of California Press: Berkeley.

Knick, S. T. and J. W. Connelly, editors. 2011. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. *Studies in Avian Biology* 38. University of California Press: Berkeley.

Knick, S. T. and J. W. Connelly. 2011. Greater sage-grouse and sagebrush: an introduction to the landscape, pp. 1-9. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*, S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology (vol. 38), University of California Press: Berkeley.

Knick, S. T. and S. E. Hanser. 2011. Connecting pattern and process in greater sage-grouse populations and sagebrush landscapes, pp. 383-405. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*. S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology (vol. 38), University of California Press: Berkeley.

Knight, R. L. and M. W. Call. 1980. The Common Raven. BLM Technical Note 344.

Koniak, S. 1985. Succession in pinyon-juniper woodlands following wildfire in the Great Basin. *The Great Basin Naturalist* Vol. 45, No. 3.

BLM_0028342

CHAPTER 8 - REFERENCES

Kruse, R., E. Bend, and P. Bierzychudek. 2004. Native plant regeneration and introduction of non-natives following post-fire rehabilitation with straw mulch and barley seeding.

LANDFIRE.

2015. Miller, M. E., R. T. Belote, M. A. Bowker, and S. L. Garman. 2011. Alternative states of a semiarid grassland ecosystem: Implications for ecosystem services. *Ecosphere* 2(5):1-18 http://www.landfire.gov/index.php (accessed March 5, 2015).

2010. US_110VCC Metadata. http://landfire.cr.usgs.gov/distmeta/servlet/ gov.usgs.edc.MetaBuilder?TYPE=HTML&DATASET=F4T (accessed June 10, 2015).

2009. http://landfire.gov/NationalProductDescriptions10.php (accessed June 8, 2015).

LeBeau, C. W. 2012. Evaluation of greater sage-grouse reproductive habitat and response to wind energy development in south-central Wyoming. Master's Thesis. University of Wyoming: Laramie.

Lockyer, Z. B., P. S. Coates, M. L. Casazza, S. Espinosa, and D. J. Delehanty. 2013. Greater sage-grouse nest predators in the Virginia mountains of northwestern Nevada. *Journal of Fish and Wildlife Management* 4(2):242–254.

Long, et. al. 2010. The Principal Rare Earth Element Deposits of the United States—A Summary of Domestic Deposits and a Global Perspective.

Lyon, L. A. and S. H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. *Wildlife Society Bulletin* 31:486–491.

Lyons, J. E., et al 2008. Monitoring in the context of structured decision-making and adaptive management. *Journal of Wildlife Management* 72(8):1683–1692.

Main, W. A. and D. A. Haines. 1974. The causes of fires on northeastern national forests. U.S. Forest Service Research Paper NC-102.

Manier, D. J., D. J. A. Wood, Z. H. Bowen, R. M. Donovan, M. J. Holloran, L. M. Juliusson, K. S. Mayne,, S. J. Oyler-McCance, F. R. Quamen, D. J. Saher, and A. J. Titolo. 2013. Summary of Science, Activities, Programs and Policies that Influence the Rangewide Conservation of Greater Sage-Grouse (Centrocercus urophasianus). U.S. Geological Survey Open-File Report 2013-1098. Fort Collins, Colorado.

Manzer, D. L. and S. J. Hannon. 2005. Relating grouse nest success and corvid density to habitat: a multi-scale approach. *Journal of Wildlife Management* 69(1):110–123.

McKenney, B. 2005. Environmental Offset Policies, Principles, and Methods: A Review of Selected Legislative Frameworks. Amherst, NH: Biodiversity Neutral Initiative.

Meinke, C. W., S. T. Knick, and D. A. Pyke. 2009. A spatial model to prioritize sagebrush landscapes in the intermountain west (USA) for restoration. *Restoration Ecology* 17:652-659.

Milchunas, D. G., O. E. Sala, and W. K. Lauenroth. 1988. A generalized model of the effects of grazing by large herbivores on grassland community structure. *The American Naturalist* 132(1):87-106.

BLM_0028343

CHAPTER 8 - REFERENCES

Miller, M. E., R. T. Belote, M. A. Bowker, and S. L. Garman. 2011. Alternative states of a semiarid grassland ecosystem: Implications for ecosystem services. *Ecosphere* 2(5):1–18. http://www.landfire.gov/index.php (accessed March 5, 2015).

Miller, R. F. and L. L. Eddleman. 2001. Spatial and Temporal Changes of Sage Grouse Habitat in the Sagebrush Biome. Oregon State University Agricultural Experiment Station. Technical Bulletin 151. Corvallis, OR. 39 pp.  http://greatbasin.wr.usgs.gov/ LWG/Floristic_Provinces.asp.

Monsen, S. B., R. Stevens, and N. L. Shaw. 2004. Restoring Western Ranges and Wildlands General Technical Report RMRS-GTR-136. Vol. 1. 294 pp.

National Atmospheric Deposition Program/National Trends Network. 2012. NTN Site ND00 interactive trend plots. http://nadp.sws.uiuc.edu/sites/ntn/ NTNtrends.html?siteID=ND00 (accessed January 16, 2013).

National Audubon Society. 2010. The Christmas Bird Count Historical Results. http://www.christmasbirdcount.org [20150618]

National Park Service (NPS). 2009. Air Resources Division. Air quality in national parks: 2008 annual performance and progress report. Natural Resource Report NPS/NRPC/ARD/NRR—2009/151. National Park Service: Denver.

National Renewable Energy Laboratory.

2012a. Classes of Wind Power Density at 10m and 50m. http://rredc.nrel.gov/ wind/pubs/atlas/tables/1-1T.html (accessed December 2012).

2012b. Fuel from the Sky: Solar Power's Potential for Western Energy Supply. http://www.nrel.gov/csp/pdfs/32160.pdf (accessed December 2012).

2011. Estimates of Windy Land Area and Wind Energy Potential, by State, for Areas >=30% Capacity at 80m. Updated April 13, 2011. http://www.windpoweringamerica.gov/filter_detail.asp?itemid=2542 (accessed May 3, 2013).

National Research Council (NRC).

2010. Climate Stabilization Targets: Emissions, Concentrations, and Impacts over Decades to Millennia. NRC of the National Academies, p. 180. Prepublication version released July 16. http://www.nap.edu/catalog.php?record_id=12877

2002. Riparian areas: functions and strategies for management. National Academy of Science. Washington, DC.

Natural Resources Conservation Service (NRCS). 2012. Applying the Sage-Grouse Fence Collision Risk Tool to Reduce Bird Strikes. November 2012. http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1049415.pdf

Nature Conservancy, The.

2015. http://www.nature.org/ourinitiatives/regions/northamerica/unitedstates/ colorado/colorado-simple-structures-help-wildlife.xml (accessed June 5, 2015).

BLM_0028344

CHAPTER 8 - REFERENCES

2011. Gunnison Basin Climate Change Vulnerability Assessment for the Gunnison Climate Working Group.

NatureServe. 2014. NatureServe Explorer. http://explorer.natureserve.org/ (accessed January 21, 2015).

Naugle D. E., K. E. Doherty, B. L. Walker, M. J. Holloran, and H. E. Copeland. 2011. Energy development and greater sage-grouse, pp. 489-504. *Greater Sage-Grouse: Ecology of a Landscape Species and Its Habitats*, S. T. Knick and C. J. W., editors. Cooper Ornithological Union, University of California Press: Berkeley.

Neff, J. C., R. L. Reynolds, J. Belnap, and P. Lamothe. 2005. Multi-decadal impacts of grazing on soil physical and biogeochemical properties in southeast Utah. *Ecological Application* 15(1) 2005.

Obama, B. H. 2010. America's Great Outdoors [Presidential Memorandum]. Washington, DC.

Office of Natural Resources Revenue (ONRR). 2014. County-level Leasable Sales Volume, Value, and Royalties. Department of the Interior: Washington, DC.

Our Public Lands. 2015. Colorado. http://www.ourpubliclands.org/public-lands-report-co (accessed July 12, 2015).

Outdoor Foundation. 2014. Outdoor Participation Report. Washington, DC.

Outdoor Industry Association. 2012. The Outdoor Recreation Economy. Boulder, CO. https://outdoorindustry.org/pdf/OIA_OutdoorRecEconomyReport2012.pdf (accessed July 8, 2015).

Oyler-McCance, S. J., K. P. Burnham, and C. E. Braun. 2001. Influence of changes in sagebrush on Gunnison sage-grouse in southwestern Colorado. *The Southwestern Naturalist* 46(3):323-331.

Painter, T. H., A. P. Barrett, C. C. Landry, J. C. Neff, M. P. Cassidy, C. R. Lawrence, K. E. McBride, and G. L. Farmer. 2007. Impact of disturbed desert soils on duration of mountain snow cover. *Geophysical Research Letters* Vol. 34, L12502, doi:10.1029/2007GL030284, 2007.

Pellant, M., P. Shaver, D. Pyke, and J. Herrick. 2005. Interpreting indicators of rangeland health Version 4. *BLM Technical Reference* 1734-6.

Peppin, D., P. Z. Fulé, C. H. Sieg, J. L. Beyers, and M. E. Hunter. 2010. Post-wildfire seeding in forests of the western United States: an evidence-based review. *Forest Ecology and Management* 260.

Pitman, J. C., C. A. Hagen, R. J. Robel, T. M. Loughin, and R. D. Applegate. 2005. Location and success of lesser prairie-chicken nests in relation to vegetation and human disturbance. *Journal of Wildlife Management* 68(3):1259-1269.

Poff, B., K. A. Koestner, D. G. Neary, and V. J. Henderson. 2011. Threats to riparian ecosystems in western North America: an analysis of existing literature. *Journal of the American Water Resources Association* 1-14.

Prather, P. R. and T. A. Messmer. 2009. Raptor and corvid response to power distribution line perch deterrents in Utah. *Journal of Wildlife Management* 74(4):796-800.

BLM_0028345

Pruett, C. L., Patten, M. A., and D. H. Wolfe. 2009. Avoidance behavior by prairie grouse: implications for development of wind energy. *Conservation Biology* 23(5):1253-1259.

Radle, A. L. 2007. The effect of noise on wildlife: a literature review. World Forum for Acoustic Ecology Online Reader. http://interact.uoregon.edu/MediaLit/wfae/library/articles/radle_effect_noise_wildlife.pdf

Ranglack, D. H., S. Durham, and J. T. du Toit. 2015. Competition on the range: science vs. perception in a bison-cattle conflict in the western USA. *Journal of Applied Ecology* 52:467-474.

Reinhart, E. D., R. E. Keane, D. E. Calkin and J. D. Cohen. 2008. Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States. *Forest Ecology and Management* 256.

Romme, W. H., C. D. Allen, J. D. Bailey, W. L Baker, B. T. Bestelmeyer, P. M. Brown, K. S. Eisenhart, M. L. Floyd, D. W. Huffman, B. F. Jacobs, R. F. Miller, E. H. Muldavin, T. W. Swetnam, R. J. Tausch and P. J. Weisberg. 2009. Historical and modern disturbance regimes, stand structures, and landscape dynamics in pinyon-juniper vegetation of the western United States. *Rangeland Ecology and Management* 62(3).

Rosgen, D. L. 1996. A Geomorphological Approach to Restoration of Incised Rivers. Proceedings of the Conference on Management of Landscapes Disturbed by Channel Incision, 1997.

Roth, J. E., J. P. Kelly, W. J. Sydeman, and M. A. Colwell. 2004. Sex differences in space use of breeding common ravens in western Marin County, California. *The Condor* 106(3):529-539.

Roundy, B. A., R. F. Miller, R. J. Tausch, K. Young, A. Hulet, B. Jessop, J. Chambers, and D. Effett. 2014. Understory cover responses to pinyon-juniper treatments across tree dominance gradients in the Great Basin. *Rangeland Ecology and Management* Vol. 67, No. 5.

Safe Harbor Agreements and Candidate Conservation Agreements with Assurances; Final Policy. 64 Federal Register 116 (17 June 1999) pp. 32705-32716.

Sage-Grouse National Technical Team (NTT). 2011. A Report on National Greater Sage-Grouse Conservation Measures. December 2011.

Sauer, J. R., J. E. Hines, J. E. Fallon, K. L. Pardieck, D. J. Ziolkowski, Jr., and W. A. Link. 2014. The North American Breeding Bird Survey, Results and Analysis 1966–2012. Version 02.19.2014 USGS Patuxent Wildlife Research Center, Laurel, MD.

Sawyer, H., M. J. Kauffman, and R. M. Nielson. 2009. Influence of well pad activity on winter habitat selection patterns of mule deer. *Journal of Wildlife Management* 73:1052-1061.

Sawyer, H., R. M. Nielson, F. G. Lindzey, L. Keith, J. H. Powell, and A. A. Abraham. 2007. Habitat selection of Rocky Mountain elk in a nonforested environment. *Journal of Wildlife Management* 71(3): 868-874.

Schroeder, M. A. and R. K. Baydack. 2001. Predation and the management of prairie grouse. *Wildlife Society Bulletin* 29(1): 24-32.

BLM_0028346

CHAPTER 8 - REFERENCES

Schroeder, M. A., C. L. Aldridge, A. D. Apa, J. R. Bohne, C. E. Braun, S. D. Bunnell, J. W. Connelly, P. Diebert, S. C. Gardner, M. A. Hilliard, G. D. Kobriger, S. M. McAdam, C. W. McCarthy, J. J. McCarthy, D. L. Mitchell, E. V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. *The Condor* 106:363-376.

Seager R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetmaa, N. Lau, C. Li, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. *Science* 316: 1181-1184.

Shlisky, A., J. Waugh, P. Gonzalez, M. Gonzalez, M. Manta, H. Santoso, E. Alvarado, A. Ainuddin Nuruddin, D. Arturo Rodriguez-Trejo, R. Swaty, D. Schmidt, M. Kaufmann, R. Myers, A. Alencar, F. Kearns, D. Johnson, J. Smith, and D. Zollner. 2007. Fire, ecosystems and people: threats and strategies for global biodiversity conservation. *The Nature Conservancy Global Fire Initiative Technical Report* 2007-2.

Singletracks. 2012. U.S. Mountain Bike Trail Stats: The West and States with Mountains Rule. http://www.singletracks.com/blog/mtb-trails/us-mountain-bike-trail-stats-the-west-and-states-with-mountains-rule/ (accessed August 7, 2015).

Sisk-A-Dee. 2015. Gunnison Sage Grouse Conservation. Gunnison, CO. https://www.siskadee.org/index.html (accessed July 17, 2015).

Slater, S. J. and J. P. Smith. 2010. Effectiveness of raptor perch deterrents on an electrical transmission line in southwestern Wyoming. *Journal of Wildlife Management* 74(5):1080-1088

Stednick, J. 2010. Cumulative Watershed Effects of Fuel Management in the Western United States. USDA Forest Service RMRS-GTR-231. 2010.

Steenhof, K., M. N. Kochert, and J. A. Roppe. 1993. Nesting by raptors and common ravens on electrical transmission line towers. *Journal of Wildlife Management* 57:271-281.

Stevens, B. S., J. W. Connelly, and K. P. Reese. 2012. Multi-scale assessment of greater sage-grouse fence collision as a function of site and broad scale factors. *Journal of Wildlife Management* 76(7):1370-1380.

Stevens, B. S. 2011. Impacts of fences on Greater sage-grouse in Idaho: collision, mitigation, and spatial ecology. M.S. Thesis, University of Idaho, Moscow, Idaho, USA.

Stevens, R. and S. B. Monsen. 2004. Guidelines for restoration and rehabilitation of principal plant communities. In Restoring Western Ranges and Wildlands. USDA Forest Service. General Technical Report RMRS-GTR-136.

Stiver, S. J., A. D. Apa, J. R. Bohne, S. D. Bunnell, P. A. Deibert, S. C. Gardner, M. A. Hilliard, C. W. McCarthy, and M. A. Schroeder. 2006. Greater Sage-Grouse Comprehensive Conservation Strategy. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming.

Stiver, S. J., E. T. Rinkes, D. E. Naugle, P. D. Makela, D. A. Nance, and J. W. Karl, eds. 2015. Sage-Grouse Habitat Assessment Framework: A Multiscale Assessment Tool. Technical Reference 6710-1. Bureau of Land Management and Western Association of Fish and Wildlife Agencies, Denver.

BLM_0028347

CHAPTER 8 - REFERENCES

Stoddard, J. L., D. V. Peck, S. G. Paulsen, J. Van Sickle, C. P. Hawkins, A. T. Herlihy, R. M. Hughes, P. R. Kaufmann, D. P. Larsen, G. Lomnicky, A. R. Olsen, S. A. Peterson, P. L. Ringold, and T. R. Whittier. 2005. An ecological assessment of western streams and rivers. EPA 620/R-05/005, U.S. Environmental Protection Agency, Washington, DC.

Straughan, B. and T. Pollak. 2008. The Broader Movement: nonprofit environmental and conservation organizations, 1989–2005. The Urban Institute: Washington, DC. 50 p.

Swanson, C. 2009. Ecology of Greater Sage-Grouse in the Dakotas. PhD dissertation. Wildlife and Fisheries Science, South Dakota State University. http://pubstorage.sdstate.edu/wfs/ thesis/Swanson-Christopher-C-Ph-D-2009.pdf.

Szalavitz, M. 2010. Obesity in America 2010: Where does your state rank when it comes to obesity? MSN Health and Fitness.

Tack, J. 2009. Sage-grouse and the human footprint: Implication for conservation of small and declining populations. Thesis, University of Montana, Missoula.

Taylor R. L., B. L. Walker, D. E. Naugle, L. S. Mills. 2012. Managing multiple vital rates to maximize greater sage-grouse population growth. *Journal of Wildlife Management* 76: 336-347.

Theoharides, K. A. and J. S. Dukes. 2007. Plant invasion across space and time: factors affecting nonindigenous species success during four stages of invasion. Tansley Review, *The New Phytologist* Volume 176, Issue 2.

Torell, L. A., J. A. Tanaka, N. Rimbey, T. Darden, L. Van Tassell and A. Harp. 2002. Ranch-level impacts of changing grazing policies on BLM land to protect the Greater Sage-Grouse: Evidence from Idaho, Nevada and Oregon. Policy Analysis Center for Western Public Lands, policy paper SG-01-02, Caldwell, ID.

Trombulak, S. C. and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. *Conservation Biology*. pp. 18–30. Volume 14 No. 1, February 2000.

Utah Department of Natural Resources (UDNR). 2014. Division of Oil, Gas, and Mining – Statistics. http://oilgas.ogm.utah.gov/Statistics/Statistics.cfm (accessed November 5, 2014).

Utah Division of State Parks and Recreation. 2013. 2014 Utah State Comprehensive Outdoor Recreation Plan. Salt Lake City.

Utah Division of Wildlife Resources (UDWR).

2012. Deer Herd Unit Management Plan, Deer Herd Unit #14.

2005. Utah Comprehensive Wildlife Conservation Strategy. Salt Lake City. http://wildlife.utah.gov/cwcs/11-03-09_utah_cwcs_strategy.pdf (accessed July 20, 2015).

n.d. Utah Mule Deer Statewide Management Plan. http://wildlife.utah.gov/hunting/ biggame/pdf/mule_deer_plan.pdf (accessed June 2015).

n.d. Utah Elk Statewide Management Plan. http://wildlife.utah.gov/hunting/biggame/ pdf/elk_plan.pdf (accessed June 2015).

BLM_0028348

CHAPTER 8 - REFERENCES

U.S. Bureau of Labor Statistics.

2014a. Consumer Price Index Calculator. http://www.bls.gov/data/inflation_calculator.htm (accessed November 20, 2014).

2014b. Local Area Unemployment Statistics. http://www.bls.gov/lau (accessed September 26, 2014).

2011. Local Area Unemployment Statistics. http://www.bls.gov/lau/#tables Unemployment Rates for States http://www.bls.gov/lau/lastrk10.htm.

U.S. Census Bureau (Census Bureau).

2015. Projections of the Size and Composition of the U.S. Population: 2014 to 2060.  Washington, DC. https://www.census.gov/content/dam/Census/library/ publications/2015/demo/p25-1143.pdf (accessed June 30, 2015).

2014. County Business Patterns. http://www.headwaterseconomics.org/tools/eps-hdt (accessed November 24, 2014).

2012a. American Community Survey, 2008-2012 5-year Estimates. http://factfinder2.census.gov (accessed September 16, 2014).

2012b. Population Estimates Program, Current Estimates. http://www.census.gov/popest/data/index.html (accessed September 24, 2014).

2000. Population Estimates Program, Historical Data. http://www.census.gov/popest/ data/historical/index.html (accessed September 24, 2014).

U.S. Climate Change Science Program. 2008. The Effects of Climate Change on Agriculture, Land Resources, Water Resources, and Biodiversity in the United States. May 2008.

U.S. Department of Agriculture, Forest Service (USFS).

2011. R2 Supplement 2600-2004-1 2011, Section 2631.1, Sage-Grouse and Sagebrush Habitats.

2009. Continental Divide Comprehensive Plan (CDNST) Plan Amendment. http://www.fs.fed.us/cdt/main/cdnst_comprehensive_plan_final_092809.pdf

2000. Coarse-Scale Potential Natural Vegetation Groups. v2000. http://www.firelab.org/science-applications/fire-fuel/181-pnvg (accessed August 28, 2012).

U.S. Department of Agriculture, National Agricultural Statistical Service. 2012. Statistics by State. http://www.nass.usda.gov/Statistics_by_State/North_Dakota/Publications/ County_Estimates/index.asp.

U.S. Department of Agriculture. National Resources Conservation Service (NRCS). 2003. National Range and Pasture Handbook. Revision 1, December 2003.

U.S. Department of Agriculture, Soil Conservation Service. 1975. Soil Survey of Gunnison Area, Colorado. Parts of Gunnison, Hinsdale and Saguache Counties.

U.S. Department of Agriculture and U.S. Department of the Interior. 2009. Guidance for Implementation of Federal Wildland Fire Management Policy. Wildland Fire Leadership Council. February 2009.

BLM_0028349

CHAPTER 8 - REFERENCES

U.S. Department of Commerce.

2012a. Census Bureau, American Community Survey Office. Washington, DC.

2012b. Bureau of Economic Analysis, Regional Economic Information System, Washington, D.C. Table CA30.

2010, 2005, and 2000. Decennial census data Historic data. http://www.census.gov/population/cencounts/nd190090.

2007. Census of Governments Survey of State and Local Government Finances. Washington, DC (obtained from EPS-HDT Federal Payments report) p.4.

U.S Department of Energy (DOE). 2014. Final Uranium Leasing Program Programmatic Environmental Impact Statement.

U.S. Department of the Interior (DOI).

2014. U.S. Department of the Interior Economic Report FY13. http://www.doi.gov/ppa/economic_analysis/fy-2013-economic-report.cfm (accessed January 8, 2015).

2004. Bureau of Land Management National Sage-Grouse Habitat Conservation Strategy.

1979. Code of Federal Regulations 8340, Off-Road Vehicles. Washington, D.C.

U.S. Department of the Interior, Bureau of Land Management (BLM).

n.d. Rapid Ecoregional Assessment. BLM Fact Sheet: Level III Ecoregions of the Western U.S. map. Desert Managers Group. http://www.dmg.gov/documents/BR_Rapid_Ecoregional_Assessment_BLM_102809.pdf (accessed January 7, 2015).

2016. National Scenic and Historic Trails Strategy and Work Plan, U.S. Department of the Interior Bureau of Land Management. National Landscape Conservation System, National Scenic and Historic Trails Program, Washington, D.C. BLM-WO-GI-06-020-6250.

2015a. GIS analysis products.

2015b. Livestock Grazing. http://www.blm.gov/wo/st/en/prog/grazing.html (accessed July 14, 2015).

2015c. Proposed Resource Management Plan and Final Environmental Impact Statement for the Grand Junction Field Office, Colorado.

2015d. Rangeland Administration System (accessed June 10, 2015).

2015e. Rapid Ecoregional Assessments. BLM. http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas.html  (accessed January 6, 2015).

2015f. Record of Decision for the Approved Resource Management Plan for Public Lands Administered by the Tres Rios Field Office, Dolores, Colorado.

2015g. Tourism and Community Services Program. Washington, DC. http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/ tourism___community.html. (accessed February 2, 2015).

BLM_0028350

CHAPTER 8 - REFERENCES

2015h. Sage-Grouse Habitat Assessment Framework: A Multiscale Assessment Tool. Stiver, S. J., E. T. Rinkes, D. E. Naugle, P. D. Makela, D. A. Nance, and J. W. Karl, eds. Technical Reference 6710-1. Bureau of Land Management and Western Association of Fish and Wildlife Agencies, Denver.

2014a. BLM Recreation Strategy: Connecting with Communities. Washington, DC.

2014b. Colorado Instruction Memorandum No. 2014-026, Review of Draft Recreation Step-Down Recreation Strategy for the Bureau of Land Management Colorado.  Denver.

2014c. Handbook Section 8320-1, Planning for Recreation and Visitor Services. Washington, DC.

2014d. Instruction Memorandum No. 2014-094, State Strategy Development to Implement the *BLM Recreation Strategy: Connecting with Communities*. Washington, DC.

2014e. Rangeland Administration System (accessed October 31, 2014).

2014f. Reasonably Foreseeable Development Scenario for Potash in the Moab Master Leasing Plan Area, BLM Canyon Country District.

2014g. Recreation Management Information System (accessed November 14, 2014).

2014h. The BLM: A Sound Investment for America. Washington, DC. http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/ socioeconomic.Par.81563.File.dat/socioeconomic_2012.pdf (accessed July 2, 2015).

2014i. Uncompahgre Resource Management Plan Revision and Environmental Impact Statement, Preliminary Draft RMP/EIS (Internal Draft).

2013a. Approved Land Use Plan Amendments/ROD for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming and FEIS.

2013b. BLM National Training Center Course 8300-25, Planning for Travel and Transportation Management. Washington, DC.

2013c. Final Environmental Impact Statement,  BLM Tres Rios Field Office Land and Resource Management Plan.

2013d. Guidance on Estimating Nonmarket Environmental Values (Instruction Memorandum No. 2013-131). Washington, DC: E. Roberson.

2013e. Instruction Memorandum No. 2013-176, Seed Collection Policy and Pricing. Washington, DC.

2012a. Approved Resource Management Plan Amendments/Record of Decision for Solar Energy Development in Six Southwestern States.

2012b. Instruction Memorandum No. 2012-124. Implementation of Land Health Reporting Data Standard:  A New Standardized System for Reporting and Mapping Achievements in Land Health.

2012c. Colorado Plateau Rapid Ecoregional Assessment Report. http://www.blm.gov/ style/medialib/blm/wo/Communications_Directorate/public_affairs/ landscape_approach/documents1.Par.82149.File.dat/ COP_1_Final_Ch_1_2_and_3.pdf

2012d. Draft Environmental Impact Statement for the Grand Junction Field Office Resource Management Plan.

BLM_0028351

CHAPTER 8 - REFERENCES

2012e. Handbook Section 8342-1, Travel and Transportation Handbook. Washington, DC.

2012f. Instruction Memorandum No. 2012-169, RMP Alternative Development for Livestock Grazing. Washington, DC. August 16, 2012.

2012g. Instruction Memorandum No. 2012-124. Implementation of Land Health Reporting Data Standard: A New Standardized System for Reporting and Mapping Achievements in Land Health.

2012h. Instruction Memorandum No. 2012-043, Greater Sage-Grouse Interim Management Policies and Procedures. Washington, DC. December 22, 2011.

2012i. National Greater Sage-Grouse Planning Strategy, Land Use Plan Amendments and Environmental Impact Statements, Scoping Summary Report. Washington, DC. May 2012.

2011a. BLM History of Public Land Grazing. http://www.blm.gov/ut/st/en/prog/grazing/history_of_public.html (accessed June 8, 2015).

2011b. BLM Utah Grazing Standards. http://www.blm.gov/ut/st/en/prog/grazing/utah_standards_for.html (accessed January 30, 2015).

2011c. BLM Utah Guidelines for Grazing Management. http://www.blm.gov/ut/st/en/prog/grazing/utah_guidelines_for.html (accessed August 3, 2015).

2011d. BLM Utah History of Public Land Grazing. http://www.blm.gov/ut/st/en/prog/grazing/history_of_public.html (accessed June 8, 2015).

2011e. BLM Utah Rangeland Health Standards. http://www.blm.gov/ut/st/en/prog/grazing/utah_standards_for.html (accessed January 30 and August 3, 2015).

2011f. BLM Utah Standards for Rangeland Health. http://www.blm.gov/ut/st/en/prog/grazing/utah_standards_for.html (accessed January 30, 2015).

2011g. Dominguez-Escalante National Conservation Area Analysis of the Management Situation.

2011h. Instruction Memorandum No. 2012-044, Greater Sage-Grouse Land Use Planning Strategy. Washington, DC. December 27, 2011.

2011i. Instruction Memorandum No. 2011-138, Sage-Grouse Conservation Related to Wildland Fire and Fuels Management. Washington, DC. June 13, 2011.

2011j. Instruction Memorandum No. 2011-061, Solar and Wind Energy Applications – Pre-Application and Screening. Washington, DC. February 7, 2011.

2011k. Instruction Memorandum No. 2011-003, Solar Energy Development I Policy. Washington, DC. October 7, 2010.

2011l. Manual Section 1626, Travel and Transportation Manual. Washington, DC.

2011m. Manual Section 8320, Planning for Recreation and Visitor Services. Washington, DC.

2010a. Analysis of the Management Situation for the BLM Uncompahgre Planning Area. Montrose, CO.

BLM_0028352

CHAPTER 8 - REFERENCES

2010b. Instruction Memorandum No. 2011-004, Transmittal of Revised Recreation and Visitor Services Land Use Planning Guidance, Updated Checklist, and Three Land Use Planning Templates. Washington, DC.

2010c. Instruction Memorandum No. 2010-071, Gunnison and Greater Sage-Grouse Management Considerations for Energy Development.

2010d. Instruction Memorandum No. 2010-022, Managing Structures for the Safety of Sage-Grouse, Sharp-Tailed Grouse, and Lesser Prairie-Chicken.

2009a. Canyons of the Ancients Proposed Resource Management Plan and Final EIS.

2009b. Grand Junction Field Office, Colorado Resource Management Plan Revision: Final Analysis of the Management Situation.

2009c. Instruction Memorandum No. 2009-120, Updated Contract Clause for Utilization of Woody Biomass. Washington, DC. May 7, 2009.

2008. BLM Colorado Rangeland Management Standards and Guidelines. http://www.blm.gov/co/st/en/BLM_Programs/grazing/rm_stds_guidelines.html (accessed January 23-30, 2015).

2008a. Handbook Section 1740-01, Renewable Resource Improvement and Treatment Guidelines and Procedures. Washington, DC. February 29, 2008.

2008b. Handbook Section 1790-1, National Environmental Policy Act. Washington, DC. January 2008.

2008c. Manual Section 6840, Special Status Species Management. Washington, DC. December 12, 2008.

2008d. Moab Field Office Proposed Resource Management Plan and Final Environmental Impact Statement.

2008e. Moab Field Office Record of Decision and Approved Resource Management Plan.

2008f. Monticello Field Office Record of Decision and Approved Resource Management Plan.

2008g. Instruction Memorandum No. 2009-043, Wind Energy Development Policy. Washington, DC. December 19, 2008.

2008h. Instruction Memorandum No. 2009-018, Process for Setting Priorities for Issuing Grazing Permits and Leases. Washington, DC. October 31, 2008.

2008i. Instruction Memorandum No. 2008-204, Offsite mitigation. Washington, DC.

2007. Final Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement and Associated Record of Decision. Washington, DC. September 2007.

2006. Moab BLM Field Office Analysis of the Management Situation.

2005a. Canyons of the Ancients National Monument, Analysis of the Management Situation.

2005b. Colorado Instruction Memorandum No. 2005-038, Statement of Interim Policy, Implementation of the Gunnison Sage-Grouse Rangewide Conservation Plan.

BLM_0028353

CHAPTER 8 - REFERENCES

2005c. Handbook Section 1601-1, Land Use Planning Handbook. Washington, DC. March 2005.

2005d. Mineral Potential Report for the Monticello Planning Area.

2005e. Monticello BLM Field Office Analysis of Management Situation.

2005f. Record of Decision, Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments.

2004a. Gunnison Gorge National Conservation Area Approved Resource Management Plan.

2004b. Instruction Memorandum No. 2004-227, Bureau of Land Management's Biomass Utilization Strategy. Washington, DC. August 16, 2004.

2003. Draft Resource Management Plan and Environmental Impact Statement. Gunnison Gorge National Conservation Area. March 2003.

2000. Colorado Instruction Memorandum No. 2001-011, Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado. Washington, DC.

1999. Utilization Studies and Residual Measurements. Interagency Technical Reference.

1998. Riparian Area Management: Process for Assessing Proper Functioning Condition. Technical Reference 1737-9. Revised 1998.

1993. Gunnison Resource Area Record of Decision, Approved Resource Management Plan, and Rangeland Program Summary.

1991a. Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States. Washington, DC. May 1991.

1991b. Gunnison Resource Area Resource Management Plan and Environmental Impact Statement. United States Department of the Interior, Bureau of Land Management, Montrose District, Colorado. March 1991.

1990. Handbook Section 1624-1, Planning for Fluid Mineral Resources. Washington, DC. May 1990.

1989. Draft San Luis Resource Management Plan and Environmental Impact Statement.

1988. Manual Section 1613, Areas of Critical Environmental Concern. Washington, DC. September 29, 1988.

U.S. Department of the Interior, BLM and USFS. 2013. Volume II: Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan.

U.S. Department of the Interior, BLM Interagency Technical Team.

1996a. Interagency Technical Reference for Utilization Studies and Residual Measurements. Technical Reference 1734-3. National Science and Technology Center, Denver.

1996b. Sampling vegetation attributes. Technical Reference 1734-4. National Science and Technology Center, Denver, 172 pp.

U.S. Department of the Interior, Fish and Wildlife Service (FWS).

BLM_0028354

n.d. Using Existing Tools to Expand Cooperative Conservation for Candidate Species across Federal and on Federal Lands. http://www.fws.gov/endangered/esa-library/pdf/CCA-CCAA%20%20final%20guidance%20signed%208Sept08.PDF

2014a. National Survey of Fishing, Hunting, and Wildlife-Associated Recreation. 2011 (rev. 2014). https://www.census.gov/prod/2012pubs/fhw11-nat.pdf (accessed June 30, 2015).

2014b. Final Rule: Threatened Status for Gunnison Sage-Grouse. *Federal Register*, Vol. 79, No. 224, 69192-69310, November 20, 2014.

2014c. Final Rule: Designation of Critical Habitat for Gunnison Sage-Grouse. *Federal Register*, Vol. 79, No. 224, 69312-69363, November 20, 2014.

2013a. Proposed Rule: Endangered Status for Gunnison Sage-grouse. *Federal Register*, Vol. 78, No. 8, 2486-2538, January 11, 2013.

2013b. Proposed Rules: Designation of Critical Habitat for Gunnison Sage-grouse, *Federal Register*, Vol. 78, No. 8, 2540-2570, January 11, 2013.

2013c. Birding in the United States: A Demographic and Economic Analysis (Addendum to the National Survey of Fishing, Hunting, and Wildlife-Associated Recreation). Arlington, VA.

2013d. Greater Sage-grouse (Centrocercus urophasianus) Conservation Objectives: Final Report. U.S. Fish and Wildlife Service, Denver, CO. February 2013.

2011. Candidate Conservation Agreements. Fact Sheet. http://www.fws.gov/endangered/esa-library/pdf/CCAs.pdf.

2010a. Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species. *Federal Register*, Vol. 75, No. 187, 59804-59863, September 27, 2010.

2010b. 12-Month Findings for Petitions to List the Greater Sage-Grouse (Centrocercus urophasianus) as Threatened or Endangered: Notice of 12-month Petition Findings. *Federal Register*, Vol. 75, 13910, March 23, 2010.

2000. Service Interim Guidelines for Recommendations on Communications Tower Siting, Construction, Operation, and Decommissioning. US Fish and Wildlife Service Migratory Bird Program.

U.S. Department of the Interior, Fish and Wildlife Service and BLM. 2010. Programmatic Consultation Agreement between Bureau of Land Management and US Fish and Wildlife Service for Canada Lynx in Colorado.

U.S. Department of the Interior and U.S. Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

U.S. Department of the Interior, U.S. Department of Agriculture, U.S. Department of Energy, U.S. Department of Defense, U.S. Department of Commerce, U.S. Environmental Protection Agency, Federal Emergency Management Agency, and National Association of State Foresters (DOI and USDA et al). 2001. Review and Update of the 1995 Federal Wildland Fire Management Policy, January, 2001.

BLM_0028355

CHAPTER 8 - REFERENCES

U.S. Department of the Interior, Wildland Fire Leadership Council (WFLC). 2009. Guidance for Implementation of Federal Wildland Fire Management Policy. February 2009.

U.S. Department of State. 2010. Fifth U.S. climate action report. Global Publishing Services: Washington, DC. 180 p. http://www.state.gov/e/oes/rls/rpts/car/index.htm

U.S. Energy Information Administration (U.S. EIA).

2015a. U.S. States, State Profiles and Energy Estimates. ttp://www.eia.gov/state/rankings/?sid=US#/series/47 and http://www.eia.gov/state/rankings/?sid=US#/series/46 (accessed July 28, 2015).

2015b. Petroleum and Other Liquids Prices. http://www.eia.gov/dnav/pet/ pet_pri_spt_s1_a.htm (accessed August 10, 2015).

2015c. Annual Energy Outlook 2015.

2014a. Natural Gas Prices. http://www.eia.gov/dnav/ng/ng_pri_sum_dcu_nus_a.htm (accessed November 21, 2014).

2014b. Petroleum and Other Liquids Prices. http://www.eia.gov/dnav/pet/ pet_pri_spt_s1_a.htm (accessed November 21, 2014).

2013a. State Energy Profiles. http://www.eia.gov/state/ state_energy_profiles.cfm?sid=ND (accessed March 19, 2013).

2013b. State Energy Reserves and Supply. http://www.eia.gov/state/ data.cfm?sid=ND#ReservesSupply (accessed March 19, 2013).

2013c. U.S. States, Rankings: Carbon Dioxide Emissions, 2010. http://www.eia.gov/ beta/state/rankings/?sid=US#/series/98 (accessed February 15, 2013).

U.S. Environmental Protection Agency (EPA).

2004-2010. CASTNET Annual Reports. http://java.epa.gov/castnet/documents.do (accessed January 31, 2013).

2010. Primary Distinguishing Characteristics of Level III Ecoregions of the Continental United States, revised July 2010. http://www.epa.gov/wed/pages/ ecoregions/level_iii_iv.htm (accessed August 22, 2011) p. 7.

2011a. Level III Ecoregions of the Continental United States. Revised December 2011.

2011b. Climate Change, Basic Information. http://www.epa.gov/climatechange/ basicinfo.html (accessed October 18, 2011).

2012a. EPA Green Book. http://www.epa.gov/airquality/greenbook/ancl3.html (accessed September 5, 2012).

2012b. Air Quality Statistics Report. http://www.epa.gov/airquality/airdata/ ad_rep_con.html (accessed January 16, 2013).

2012c. Air Quality Index Report. http://www.epa.gov/airdata/ad_rep_aqi.html (accessed September 4, 2012).

BLM_0028356

2012d. Glossary of Climate Change Terms. http://www.epa.gov/climatechange/ glossary.html (accessed January 20, 2013).

2012e. Visibility, Basic Information. http://www.epa.gov/visibility/what.html (accessed January 21, 2013).

2012f. Ground Level Ozone, Basic Information. http://www.epa.gov/airquality/ ozonepollution/basic.html (accessed January 21, 2013).

2012g. Inventory of US Greenhouse Gas Emissions and Sink: 1990-2010. Chapter 3, Land Use, Land-Use Change, and Forestry. April 15, 2012. http://www.epa.gov/ climatechange/ghgemissions/usinventoryreport.html (accessed February 1, 2013).

2013a. Health Effects of Air Pollution. http://www.epa.gov/region07/air/quality/ health.htm (accessed March 20, 2013).

2013b. North Dakota Greater Sage-Grouse EIS/RMPA, Social and Economic Conditions and Analysis Report. TEAMS Planning Enterprise Unit. January 17, 2013.

U.S. Fish and Wildlife Service.   (See U.S. Department of the Interior, Fish and Wildlife Service.)

U.S. Geological Survey (USGS).

2012a. Gap Analysis Program, Protected Areas Database of the United States, Version 1.3. Accessed September 27, 2014 from Economic Profile System, Land Use Report.

2012b. National Hydrography Dataset.

2011. National Gap Analysis Program Land Cover Data Portal. Available online at: http://gapanalysis.usgs.gov/gaplandcover/gap-land-cover-updated/ (accessed January 21, 2015).

2010. GAP Land Cover Data Set, version 2.

U.S. Global Change Research Program. 2009. Global Climate Change Impacts in the United States. Cambridge University Press. Downloads.globalchange.gov/usimpacts/pdfs/climate-impacts-report.pdf.

Utah Department of Administrative Services. Division of Administrative Rules. 2014. Website: http://www.rules.utah.gov/publicat/code/r068/r068-009.htm (accessed April 22, 2015).

Utah Department of Natural Resources (UDNR). 2014. Division of Oil, Gas, and Mining – Statistics. http://oilgas.ogm.utah.gov/Statistics/Statistics.cfm (accessed November 5, 2014).

Van Dyke, Fred, and E. C. Klein. 1996. Response of elk to installation of oil wells. Journal of Mammalogy. 77(4): 1028-1041.

van 't Veld, K. and O. Phillips. 2009. Pegging Input Prices to Output Prices in Long-Term Contracts: CO2 purchase agreements in enhanced oil recovery. Enhanced Oil Recovery Institute: Laramie, WY. 35 p.

Verma, S. and S. Jayakumar. 2012. Impact of forest fire on physical, chemical and biological properties of soil: A review. Proceedings of the International Academy of Ecology and Environmental Sciences 2(3): 168-176.

BLM_0028357

CHAPTER 8 - REFERENCES

Walker B. L. and D. E. Naugle. 2011. West Nile virus ecology in sagebrush habitat and impacts on greater sage-grouse populations. *Greater Sage-Grouse: Ecology of a Landscape Species and Its Habitat.* S. Knick, editor. Cooper Ornithological Union. University of California Press. Berkeley (pp. 127-143).

Walker, B. L., D. E. Naugle, and K. E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. *Journal of Wildlife Management* 71:2644-2654.

Walker, B. L., D. E. Naugle, K. E. Doherty, and T. E. Cornish. 2004. Outbreak of West Nile virus in greater sage-grouse and guidelines for monitoring, handling and submitting dead birds. *Wildlife Society Bulletin* 32: 1-7.

Walters, C. J., and S. Holling. 1990. Large-scale management experiments and learning by doing. *Ecology* 71:53-74.

Wambolt, C. L., K. S. Walhof and M. R. Frisina. 2001. Recovery of big sagebrush communities after burning in south-western Montana.

Warren, S. D. and D. J. Eldridge. 2001. Biological soil crusts and livestock in arid ecosystems: are they compatible? *Ecological Studies*, Vol. 150. J. Belnap and O.L. Lange (eds.) Biological Soil Crusts: Structure, Function and Management. Springer-Verlag Berlin Heidelberg 2001.

Watts, M. J. and C. L. Wambolt. 1996. Long-term recovery of Wyoming big sagebrush after four treatments. *Journal of Environmental Management* Vol. 46, Issue 1, January 1996.

Webb, W. C., W. I. Boarman, and J. T. Rotenberry. 2009. Movements of juvenile common ravens in an arid landscape. *Journal of Wildlife Management* 73(1):72-81

Webb, W. C., W. I. Boarman, and J. T. Rotenberry. 2004. Common raven juvenile survival in a human augmented landscape. *The Condor* 106:517-528.

Weltz, M., Kidwell M., and Fox, H. 1998. Influence of abiotic and biotic factors in measuring and modeling soil erosion on rangelands: State of knowledge. *Journal of Range Management* 51:482-495. Sept 1998.

Westbrooks, R. 1998. Invasive plants, changing the landscape of America: Fact book. Federal Interagency Committee for the Management of Noxious and Exotic Weeds. Washington, DC.

White, E., D. Gooding, and D. Stynes. 2013. Estimation of National Forest Visitor Spending Averages from National Visitor Use Monitoring: Round 2. General Technical Report PNW-GTR-883. U.S. Department of Agriculture, Forest Service: Portland, OR.

Williams, B. K., R. C. Szaro, and C. D. Shapiro (Williams et al). 2009. Adaptive Management: The U.S. Department of the Interior Technical Guide, p. iv. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.

Williams, M. I. and A. L. Hild. 2012. Characteristics of Gunnison Sage-Grouse Habitat in Dry Mountain Loam and Mountain Loam Ecological Sites of the Gunnison Basin. CPW. Report to the Colorado Division of Parks and Wildlife. University of Wyoming, Department of Ecosystem Science and Management, Laramie, WY.

BLM_0028358

CHAPTER 8 - REFERENCES

Wisdom, M. J., C. W. Meinke, S. T. Knick, and M. A. Schroeder. 2011. Factors associated with extirpation of Sage-Grouse. pp. 451-472. S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. *Studies in Avian Biology* vol. 38, University of California Press, Berkeley.

World Bank. 2014. Global Economic Monitor (GEM) Commodities http://data.worldbank.org/data-catalog/commodity-price-data (accessed November 10, 2014).

World Values Survey. 2014. World Values Survey Wave 6: 2010-2014. http://www.worldvaluessurvey.org/WVSOnline.jsp (accessed December 2, 2014).

Wyman, S. et al 2006. Riparian area management: grazing management processes and strategies for riparian-wetland areas. Technical Reference 1737-20. BLM/ST/ST-06/002+1737. U.S. Department of the Interior, BLM, National Science and Technology Center, Denver. 105 pp.

Zeedyk, B. 2014. Restoring wetlands. http://billzeedyk.com/2014/12/10/restoring-wetlands/#more-79 (accessed July 23, 2015).

Zouhar, K. 2003. Bromus tectorum. In: Fire Effects Information System, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory (Producer). http://www.fs.fed.us/database/feis/ (accessed July 30, 2015).

BLM_0028359



# Record of Decision and Approved Resource Management Plan

Dominguez-Escalante National Conservation Area



BLM_0028360

BLM_0028361

# Dominguez-Escalante
# National Conservation Area

# Record of Decision and Approved Resource Management Plan

## BLM/CO/PL-17/005

**Prepared by**

**U.S. Department of the Interior**
**Bureau of Land Management**
**Dominguez-Escalante National Conservation Area**
**Grand Junction, CO**

**January 2017**

BLM_0028362

This page intentionally left blank

BLM_0028363



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7210
www.co.blm.gov



In Reply Refer To:
1610 (CO-933)

**JAN 09 2017**

Dear Reader:

The Bureau of Land Management (BLM) is pleased to announce that after many years of hard work and collaboration, the Dominguez-Escalante National Conservation Area (D-E NCA) Approved Resource Management Plan (RMP) is complete. The Approved RMP includes a comprehensive Travel Management Plan that will provide guidance to protect and conserve the unique and important values of the D-E NCA as directed by the Omnibus Public Land Management Act of 2009, Public Law 111-11 (hereafter also referred to as the Omnibus Act). Part of the BLM's National Conservation Lands, the D-E NCA planning area encompasses 210,172 acres of BLM-managed land in three Colorado counties: Mesa, Delta and Montrose.

The BLM prepared the enclosed Record of Decision and Approved RMP in accordance with the Omnibus Act, Federal Land Policy and Management Act and the National Environmental Policy Act of 1969, as amended. The approval of this Record of Decision serves as the final decision for all land use planning and implementation decisions described in the enclosed D-E NCA Approved RMP.

The Proposed RMP/Final Environmental Impact Statement (EIS) was subject to a 30-day protest period that ended on July 30, 2016. The BLM received seven protest letters. The BLM Director reviewed and denied all of the protests; however, the BLM made minor modifications and clarifications as a result of the protests (discussed in Section 2.3 of the Record of Decision). The 60 day Governor's consistency review period for the Proposed RMP/Final EIS, which ensures consistency with State government plans or policies, concluded August 30, 2016. The Governor's Office did not provide a response or identify any inconsistencies with State government plans or policies.

As directed by the Omnibus Act, the enclosed Record of Decision also approves a Travel Management Plan that includes route designations for D-E NCA. Approval of the Travel Management Plan through signature of the enclosed Record of Decision initiates a 30-day appeal period for travel-related implementation decisions, as discussed in Section 2.2 (Implementation Decisions) of the Record of Decision.

The Record of Decision, Approved RMP and Travel Management Plan are available at http://1.usa.gov/1qKkMVi. Limited printed copies or CD copies are available by request from

BLM_0028364

the Grand Junction Field Office, 2815 H Road, Grand Junction, CO 81506, or by calling (970) 244-3000.

The BLM greatly appreciates all those who contributed to the completion of the D-E NCA RMP, particularly the public that gave us feedback; our cooperating agencies, which included Federal, State, and local governments; the D-E NCA Advisory Council; and Native American Tribes. The extensive public interest and involvement in this planning process has ensured that the Approved RMP will conserve, protect and restore this nationally-significant landscape for the benefit and enjoyment of present and future generations.

Sincerely,

Ruth Welch
Colorado State Director

BLM_0028365

# I. RECORD OF DECISION

BLM_0028366

This page intentionally left blank

BLM_0028367

# Dominguez-Escalante National Conservation Area

# Record of Decision

## For the

## Approved Resource Management Plan
## Approved Travel Management Plan

## BLM/CO/PL-17/005

**Prepared by**

U.S. Department of the Interior
Bureau of Land Management
Dominguez-Escalante National Conservation Area
Grand Junction, CO

**January 2017**

BLM_0028368

This page intentionally left blank

BLM_0028369

# Table of Contents

Acronyms and Abbreviations .................................................................................... vii

1. Introduction ............................................................................................................ 9

    1.1. Overview ......................................................................................................... 9

    1.2. Lands within the D-E NCA Administrative Boundary ...................................... 9

2. Decision ................................................................................................................ 13

    2.1. Decision ........................................................................................................ 13

    2.2. Implementation-Level Decisions .................................................................. 13

    2.3. Clarifications and Modifications .................................................................... 14

3. Alternatives .......................................................................................................... 16

    3.1. Introduction .................................................................................................. 16

    3.2. Draft Resource Management Plan/EIS ........................................................ 16

    3.3. Proposed Resource Management Plan/Final EIS ........................................ 16

    3.4. Alternatives Considered but Not Further Analyzed ...................................... 17

    3.5. Alternatives Considered in Detail ................................................................ 17

        3.5.1. Alternative A (No Action Alternative) ...................................................... 18

        3.5.2. Alternative B ............................................................................................ 18

        3.5.3. Alternative C ............................................................................................ 19

        3.5.4. Alternative D ............................................................................................ 19

        3.5.5. Proposed Plan Alternative ....................................................................... 20

4. Management Considerations in Selecting the Approved Plan ............................... 20

    4.1. Management in Accordance with FLPMA under the Principles of Multiple Use and
Sustained Yield ..................................................................................................... 20

    4.2. Consistency with Existing Plans and Policies of Local, State, and Federal Agencies and
Local Native American Tribes ................................................................................ 22

    4.3. Mitigation Measures ..................................................................................... 22

5. RMP Amendments, Evaluation, Maintenance, and Monitoring ............................. 23

    5.1. RMP Amendments ........................................................................................ 23

    5.2. RMP Monitoring ............................................................................................ 23

    5.3. RMP Evaluation ............................................................................................ 24

BLM_0028370

5.4. RMP Maintenance ........................................................................................... 24

6. Public Involvement in the Planning Process........................................................ 25

6.1. Policies and Legislative Constraints ............................................................ 25

6.2. Public Involvement ....................................................................................... 27

6.2.1. Introduction.......................................................................................... 27

6.2.2. Public Scoping ..................................................................................... 27

6.2.3. Recreation Focus Groups and Community Surveys .............................. 27

6.2.4. Wild and Scenic River Stakeholder Meetings ...................................... 28

6.2.5. Travel Management Outreach............................................................... 28

6.2.6. Socioeconomic Workshops.................................................................. 29

6.2.7. Advisory Council ................................................................................. 29

6.2.8. Public Review and Comment on the Draft RMP................................... 29

6.2.9. Public Review and Protest of the Proposed RMP/Final EIS ................. 30

6.2.10. Results of the Protest Period and Governor's Consistency Review ...... 30

7. Coordination and Consultation ........................................................................... 31

7.1. Cooperating Agencies .................................................................................. 31

7.2. Tribal Consultation ...................................................................................... 32

7.3. State Historic Preservation Office Consultation ........................................... 34

7.4. D-E NCA Advisory Council ......................................................................... 34

7.5. U.S. Fish and Wildlife Service Consultation ................................................ 35

8. Plan Implementation ........................................................................................... 35

9. Availability of the Resource Management Plan ................................................... 35

10. Appeal .............................................................................................................. 36

11. Approval ........................................................................................................... 36

## List of Figures

Figure 1.1. Location of the Dominguez-Escalante National Conservation Area ......................... 10

Figure 1.2. Subsurface Land Status within the Dominguez-Escalante NCA .............................. 12

## List of Tables

Table 1.1. Surface Land Status within the D-E NCA Administrative Boundary ......................... 11

BLM_0028371

Dominguez-Escalante National Conservation Area                                                                                    v
RECORD OF DECISION

Table 1.2. Subsurface Land Status within the D-E NCA Administrative Boundary.................... 11
Table 2.1. Dominguez-Escalante NCA Route Designations in Miles.......................................... 14
Table 6.1. Focus Group Meetings............................................................................................. 27
Table 7.1. Tribal Face-to-Face Consultations for the D-E NCA RMP....................................... 32
Table 7.2. Native American Tribes Contacted during D-E NCA RMP Development................. 33
Table 7.3. D-E NCA Advisory Council Meetings..................................................................... 34

*Table of Contents*

BLM_0028372

This page intentionally left blank

BLM_0028373

# Acronyms and Abbreviations

**ACEC** Area of Critical Environmental Concern

**ATV** All-Terrain Vehicle

**BA** Biological Assessment

**BLM** United States Department of the Interior, Bureau of Land Management

**BMP** Best Management Practice

**CFR** Code of Federal Regulations

**D-E NCA** Dominguez-Escalante National Conservation Area

**DOI** United States Department of the Interior

**EA** Environmental Assessment

**EIS** Environmental Impact Statement

**EPA** United States Environmental Protection Agency

**ERMA** Extensive Recreation Management Area

**FLPMA** Federal Land Policy and Management Act of 1976

**GIS** Geographic Information System

**GJFO** Grand Junction Field Office

**NCA** National Conservation Area

**NEPA** National Environmental Policy Act of 1969

**NHT** National Historic Trail

**NOA** Notice of Availability

**NRLPI** Natural Resource and Land Policy Institute at Colorado Mesa University

**ORV** Outstandingly Remarkable Value

**ROD** Record of Decision

**RMP** Resource Management Plan

*Acronyms and Abbreviations*

Dominguez-Escalante National Conservation Area                                                viii
RECORD OF DECISION

**SHPO** State Historic Preservation Office

**SRMA** Special Recreation Management Area

**TMP** Travel Management Plan

**UFO** Uncompahgre Field Office

**WSR** Wild and Scenic River

*Acronyms and Abbreviations*

BLM_0028375

# 1. Introduction

## 1.1. Overview

This Record of Decision (ROD) and Approved Resource Management Plan (Approved RMP) for the Dominguez-Escalante National Conservation Area (D-E NCA) were prepared by the U.S. Department of the Interior (DOI), Bureau of Land Management (BLM), Grand Junction and Uncompahgre Field Offices (GJFO and UFO) in Colorado. These documents are the culmination of a multi-year planning effort to prepare the first resource management plan for the D-E NCA. The BLM prepared these documents in accordance with the National Environmental Policy Act of 1969, as amended (NEPA), the Federal Land Policy and Management Act of 1976, as amended (FLPMA), implementing regulations, the BLM's Land Use Planning Handbook (H-1601-1), and other applicable law and policy. The management of public lands and Federal mineral estate administered by the BLM within the D-E NCA boundaries is the subject of this document. This ROD documents the approval of the attached Dominguez-Escalante NCA RMP, which provides overall direction for management of all resources on BLM lands within the D-E NCA.

## 1.2. Lands within the D-E NCA Administrative Boundary

The D-E NCA is part of the BLM's National Conservation Lands and is an administrative unit within the BLM's Southwest District. It is located in western Colorado (Figure 1.1). The southwest boundary of the NCA planning area borders the Uncompahgre National Forest. The northwest boundary runs along Colorado Highway 141 and includes approximately 10 miles of the Tabeguache-Unaweep Scenic and Historic Byway. The northeastern boundary is defined by U.S. Highway 50 and adjacent private lands, while the southeastern boundary is defined by Delta-Nucla (25 Mesa) Road, which runs south to the national forest boundary. Elevations within the NCA range from approximately 4,700 feet to over 8,200 feet above sea level, resulting in great biological, geological, and topographical diversity.

The planning area for the NCA consists of 210,172 acres of BLM-administered public land surface, 6,256 acres of private land surface, and 1,965 acres of State of Colorado land surface (Table 1.1). The acreage number for BLM-administered public land surface includes 209,610 acres designated in the Omnibus Act, as well as 562 acres that were subsequently acquired by the Federal Government (note that the reported acreage figure may differ throughout this document by up to 30 acres because of variability in the best available current survey information). The most recent acquisition, known as the American Mountain Men acquisition (160 acres), occurred during the development of the RMP. Although not shown as public land on maps found in the RMP, the intent for the American Mountain Men acquisition lands is to manage them similarly to the surrounding lands. Corrections to maps of the NCA to account for this acquisition will be done at a future date under plan maintenance.

*1. Introduction*

Dominguez-Escalante National Conservation Area                                    10
RECORD OF DECISION



**Figure 1.1. Location of the Dominguez-Escalante National Conservation Area**

*1. Introduction*

BLM_0028377

**Table 1.1. Surface Land Status within the D-E NCA Administrative Boundary**

| Land Status | Acres | Percentage of Area |
|---|---|---|
| BLM | 210,172 | 96.2% |
| State of Colorado | 1,965 | 0.9% |
| Private | 6,256 | 2.9% |
| TOTAL | 218,393 | 100% |

The planning area also includes some split-estate lands, where surface ownership differs from subsurface ownership. Within the planning area, the Federal Government owns surface lands but does not fully own the subsurface (mineral) estate on approximately 800 acres (0.4 percent of the planning area) (see differences between Tables 1.1 and 1.2, and Figure 1.2). Also, the Federal Government owns the subsurface (mineral) estate on 134 acres of privately held land surface (0.1 percent of the planning area). Due to the withdrawals written into the Omnibus Act that preclude Federal mineral development within the D-E NCA, split-estate public subsurface/private surface lands are not discussed in detail in this document.

**Table 1.2. Subsurface Land Status within the D-E NCA Administrative Boundary**

| Land Status | Acres | Percentage of Area |
|---|---|---|
| Federal (BLM) | 209,380 | 95.7% |
| Non-Federal | 9,013 | 4.3% |
| TOTAL | 218,393 | 100% |

The Omnibus Act withdrew the D-E NCA from (Section 2405)

> *(1) all forms of entry, appropriation, or disposal under the public land laws;*
> *(2) location, entry, and patent under the mining laws; and*
> *(3) operation of the mineral leasing, mineral materials, and geothermal leasing laws.*

This withdrawal was subject to valid existing rights that predate the Omnibus Act. There is one existing mining claim in the D-E NCA, which is located upstream of Rattlesnake Gulch along the Gunnison River. The holder of this claim has legal right to access, explore, and mine. All other claims that were in existence prior to the Omnibus Act have since expired.

The decision area for this RMP includes only the BLM-administered surface land within the D-E NCA boundary and does not include any private inholdings within the D-E NCA's boundaries or State of Colorado lands (Table 1.1 and Figure 1.1).

BLM_0028378

Dominguez-Escalante National Conservation Area                                    12
RECORD OF DECISION



**Figure 1.2. Subsurface Land Status within the Dominguez-Escalante NCA**

*1. Introduction*

BLM_0028379

# 2. Decision

## 2.1. Decision

The decision is hereby made to approve the attached Approved RMP and associated Travel Management Plan (TMP) for the Dominguez-Escalante National Conservation Area. The Approved RMP was prepared under the regulations implementing the Federal Land Policy and Management Act of 1976 (43 CFR 1600). An environmental impact statement was prepared for this RMP in compliance with the National Environmental Policy Act of 1969. The Approved RMP carries forward the land use planning decisions of the Proposed Plan Alternative in the Proposed RMP/Final EIS released to the public on July 1, 2016, with a few minor revisions.

The Approved RMP makes substantive changes to management under the previous guidance in the 1987 Grand Junction RMP, as amended, and the 1989 Uncompahgre Basin RMP, as amended, particularly regarding its decisions about resources, programs, and opportunities. Specific management decisions for public lands under the jurisdiction of the D-E NCA are shown by resource in section 2 and Appendices A through O and R of the Approved RMP. Clarifications and corrections made since the Proposed RMP and hereby adopted by this ROD and Approved RMP are described in section 2.3, Clarifications and Modifications.

## 2.2. Implementation-Level Decisions

Implementation-level decisions are actions the BLM takes to implement land use plan decisions and are generally appealable to the Interior Board of Land Appeals (IBLA) under 43 CFR 4.410. The BLM is using this decision document to approve the RMP (land use plan decisions) as well as the identified implementation-level actions. Appendix C in the BLM Handbook H-1601-1 (BLM 2005[1]) provides program-specific guidance to separate land use plan decisions from implementation decisions.

Most implementation-level decisions are developed following adoption of an RMP with subsequent, site-specific environmental analyses. However, in some cases, implementation decisions are made within this Approved RMP. When implementation-level decisions are included in the impact analysis for an RMP, further NEPA analysis is not required to begin implementing these decisions. Route designations in the Approved D-E NCA comprehensive Travel and Transportation Management Plan are implementation-level decisions and are summarized in Table 2.1 below.

TMP implementation-level decisions may be appealed to the Interior Board of Land Appeals. See section 10, Appeals, for more information.

---

[1] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028380

**Table 2.1. Dominguez-Escalante NCA Route Designations in Miles**

| Designation | Miles |
|---|---|
| Open county-maintained roads on BLM lands | 83 |
| Open county-maintained roads off BLM lands | 30 |
| Open to all modes of travel | 217 |
| Administrative use only | 47 |
| ATV, motorcycle, bicycle, horse, and foot | 96 |
| Motorcycle, bicycle, horse, and foot | 11 |
| Bicycle, horse, and foot | 22 |
| Horse and foot | 102 |
| Non-maintained routes[2] | 20 |
| Closed routes | 144 |
| Routes available for some form of public use | 551 |
| TOTAL | 742 |

# 2.3. Clarifications and Modifications

## Notice of Clarifications and Modifications to the Proposed RMP Adopted by this ROD and Approved RMP

The following clarifications and modifications were made to the Proposed RMP/Final EIS. These clarifications and modifications are shown in the attached Approved RMP.

## Editorial, Organizational and Technical Changes

Based on internal review by the BLM, discussions with the advisory council, and as a result of information submitted during the protest period, minor changes were made to the Proposed RMP. The Proposed RMP was reorganized in order to present the Approved RMP in a decision document format. Each decision was numbered by program and type (e.g., goal, objective, management action/allowable use). Management actions and allowable uses were re-ordered to facilitate numbering and readability. An introduction was included (section 1.1) to explain how the Approved RMP is structured. Appendices, similar to what was in the Proposed RMP/Final EIS, were attached to support the decisions in the Approved RMP. GIS data (e.g., acreages and the associated quantifications, route data) were checked and updated. Editorial changes were made to improve clarity, and technical changes were made to correct inaccuracies and inconsistencies. The BLM reviewed these minor changes and determined a supplement was not necessary under 40 CFR 1502.9(c). Notable changes include the following:

---

[2] Non-maintained routes are routes within Zones 2 and 3 of the Wilderness that will remain open to horse and foot use, as cross-country travel throughout the D-E NCA, except for Wilderness Zone 1, by foot and horse is permitted. However, the BLM will not maintain these routes as part of its travel management system.

BLM_0028381

- GPA-AU-04 was rephrased to clarify that casual collection of rocks is not prohibited but surface disturbance in order to collect rocks is prohibited.
- PSV-SGS-MA-04 was modified to clarify that all new routes and reroutes will be sited to minimize impacts to sagebrush shrubland patches.
- SSS-DBS-AU-03 was modified to prohibit changing permitted class of livestock from cattle to sheep in moderate risk allotments except when swapping sheep grazing from a high risk to a moderate risk allotment. This is necessary to avoid additional disease transmission risks and was considered under Alternative B, under which no domestic sheep grazing would be permitted.
- LWC-AU-01 was modified to clarify the intent that new motorized routes would not be allowed within the areas managed for wilderness characteristics: Dry Fork of Escalante and Cottonwood Canyon.
- REC-AU-06 added an example of non-mechanized equipment.
- REC-AU-09 clarified that target shooting is not allowed at campgrounds and trailheads. This is already a Federal regulation—43 CFR 8365.2-5 (a)—and is applied to all alternatives.
- REC-ERMA-AU-06—the distance from designated routes where camping is allowed outside designated sites was changed from 200 meters to ¼ mile.
- REC-SRMA-AU-11 was edited to limit camping to designated campsites and/or campgrounds. Camping may be limited to campgrounds to protect the recreation setting.
- REC-ERMA-OBJ-05; REC-ERMA-MA 17, 18, 19; REC-ERMA-AU-19 and 20 designated the Escalante Triangle Recreation Management Zone within the Sawmill Mesa/Wagon Park ERMA and provided associated objectives, management actions, and allowable uses. These decisions were considered for this area under Alternative D—Lower Sawmill Mesa SRMA.
- SSS-DBS-AU-06 added the Escalante Triangle Recreation Management Zone (when trails are constructed) as an area where dogs must be on leash. This was included in Alternative B, under which leashes would be required throughout bighorn sheep range.
- ACEC-AU-11 protects Colorado hookless cactus in the Gibbler Mountain ACEC. These protections were considered under Alternative B in the special status species section.
- ACEC-AU-03 was modified to clarify that casual use surface collection of rocks and minerals is prohibited in the Gunnison Gravels ACEC.
- ACEC-MA-11 was modified to clarify which modes of travel the routes would be closed to.
- Maps 2-2 and 3-9 were updated to reflect newly discovered occurrences of special status plants.

*2. Decision*

# 3. Alternatives

## 3.1. Introduction

An RMP provides broad guidance for managing public lands. FLPMA directs the BLM to develop RMPs as the primary means to identify and allow for appropriate uses of public land. RMP decisions guide future land management actions and subsequent site-specific implementation decisions and help establish goals and objectives (desired outcomes) for resource management. In addition, measures necessary for achieving the outcomes are expressed as actions (proactive management techniques) and allowable uses (lands that are open or closed to certain uses), including any restrictions on uses.

NEPA requires the development and consideration of a reasonable range of alternatives, including a No Action Alternative, to analyze impacts and guide decision makers in developing and selecting the Approved RMP. All alternatives must be viable and reasonable. During the planning process, the BLM developed and studied alternative proposed actions, in compliance with BLM policies, Federal regulations, and NEPA requirements.

## 3.2. Draft Resource Management Plan/EIS

Five potential management plans encompassing a broad range of resource uses in various combinations were developed to address planning issues. To be considered "reasonable," an alternative must meet the identified purpose and need, offer a mix of resource protection, management use, and development, effectively respond to identified issues and planning criteria, and meet all Federal laws, regulations, and BLM policies. Input provided during public scoping and by BLM resource experts, along with guidance from enabling legislation, helped planners refine and formulate five alternatives, which were then analyzed for potential environmental impacts in the Draft RMP. The BLM initiated a 90-day public comment period immediately following the public release of the Draft RMP, which was subsequently extended by 45 days.

## 3.3. Proposed Resource Management Plan/Final EIS

The Proposed RMP was the culmination of over two years of collaborative effort and communication among BLM staff, local citizens; local, State, tribal, and Federal agencies and organizations; and the D-E NCA Advisory Council. Public comments on the Draft RMP helped BLM formulate the Proposed Plan Alternative, which replaced the Draft Preferred Alternative (Alternative E).

BLM_0028383

## 3.4. Alternatives Considered but Not Further Analyzed

Some alternatives raised during the scoping process were considered but not carried forward for further analysis. These alternatives were generally addressed by classifying them as follows:

- Those that would be addressed through internal policy or administrative actions
- Those already required by law
- Those that were already being addressed, or would be addressed independently of the current planning process
- Those determined to be beyond the scope of the current planning process. These included alternatives associated with areas outside of the planning area, or broader agency-wide or statewide alternatives.

The following alternatives were considered but, for the reasons described above, eliminated from detailed analysis:

- No-grazing alternative
- Designate additional wilderness study areas
- Describe existing and reasonably foreseeable energy development

## 3.5. Alternatives Considered in Detail

Land use planning regulations and NEPA require the BLM to develop a reasonable range of alternatives during the planning process. The basic intent of developing alternatives is to prepare different possible management scenarios that do the following:

- Address the identified major planning issues
- Explore opportunities to enhance or expand resources or resource uses
- Resolve conflicts among resources and resource uses
- Meet the purpose of and need for the RMP as defined in the Final EIS

Alternatives help the BLM and the public understand the various ways of addressing conflicts concerning alternative uses of available resources, and they also provide the BLM decision-maker with a reasonable range of alternatives upon which to make an informed decision. The impact analysis chapter of the Final EIS (Chapter 4) projects what would happen in the future if the BLM implemented any of the alternatives, thus allowing the consequences of the decisions to be understood.

For each alternative within the RMP, the BLM established desired outcomes (goals and objectives) for management of public lands and identified the management actions and allowable

BLM_0028384

uses necessary to achieve those desired outcomes. Because RMPs are broad in scale, site-specific implementation-level decisions are typically made after the RMP is approved. In some cases, these implementation-level decisions were included within the RMP and incorporated within the alternatives. The management alternatives from the Final EIS are summarized below.

## 3.5.1. Alternative A (No Action Alternative)

This alternative would continue current management direction and leave prevailing conditions under existing guidance and legislation, including the 1987 Grand Junction RMP, as amended; the 1989 Uncompahgre Basin RMP, as amended; the Omnibus Act; and the 2010 BLM Interim Management Policy for the D-E NCA and the Dominguez Canyon Wilderness. In cases where guidance from the Uncompahgre Basin or Grand Junction RMP conflicts with the language of the Omnibus Act (or the NCA Interim Management Policy derived from the Omnibus Act), the language of the Omnibus Act would prevail.

Under this alternative, new management decisions (particularly those for livestock grazing and recreation) would not be made or would be deferred pending site-specific analysis. Alternative A is a valid course of action that has so far resulted in the continued presence of the unique and important resources of the D-E NCA. However, this alternative no longer meets the area's management purposes and needs. The Omnibus Act of 2009 directed the BLM to develop a "comprehensive management plan for the long-term protection and management of the Conservation Area." The existing RMPs do not satisfy this legislative requirement.

Under Alternative A, all eligible wild and scenic river (WSR) segments would remain eligible for WSR designation. No national trail management corridor would be established for the Old Spanish National Historic Trail (NHT). The two ACECs in Escalante Canyon and the Gunnison Gravels would remain designated. All existing travel routes, except those that have already been closed because of previous management decisions, would be available for public use.

## 3.5.2. Alternative B

Under Alternative B, which may be considered the environmentally preferred alternative per 40 CFR 1505.2 (b), the BLM would implement few active management techniques to address resource issues within the D-E NCA, instead relying on natural processes and restriction of allowable uses to conserve and protect NCA resources. Although resources would not be managed through active techniques, the health of some biological resources would be expected to improve over time as a result of certain restrictions.

Wilderness would be managed with an emphasis on untrammeled wilderness values and opportunities for primitive and unconfined recreation. Recreation would be managed under an extensive recreation management area (ERMA) approach, where the BLM would commit to

BLM_0028385

providing opportunities for certain activities but not specific recreational outcomes or settings. This alternative would restrict livestock grazing the most.

Under Alternative B, portions of the Gunnison River and Cottonwood Creek would be managed as suitable for WSR designation. A trail corridor would be established for the Old Spanish National Historic Trail. ACEC designations would be dropped, and no new designations would be sought. Travel routes that conflict with resource protection goals, as well as redundant and dead-end routes, would be closed and allowed to naturally rehabilitate.

## 3.5.3. Alternative C

Under Alternative C, the BLM would actively manage for biological restoration and cultural resource protection. A variety of vegetation treatments (e.g., mechanical treatments, prescribed fire, site rehabilitation) would be used to achieve ambitious biological objectives. Management of the Wilderness would emphasize the wilderness values of naturalness, supplemental wilderness values, and outstanding opportunities for solitude.

Two areas within the D-E NCA would be managed as non-motorized special recreation management areas (SRMAs). The rest of the D-E NCA would not have specific recreational objectives and would be restricted as necessary to meet resource objectives. Livestock grazing would be intensively managed to help improve the condition of biological resources.

All eligible WSR segments would be managed as suitable for WSR designation. A trail corridor would be established for the Old Spanish National Historic Trail. The BLM would designate two new ACECs and continue management of the Escalante Canyon ACEC. A large number of travel routes would be closed to reduce conflicts with resource protection goals, and closed routes would be rehabilitated to return them to a more natural state.

## 3.5.4. Alternative D

Under Alternative D, the BLM would commit to trail-based recreation and specific recreational outcomes and settings (SRMA-style management). The BLM would designate nine new SRMAs, including two motorized trail-based SRMAs and two non-motorized trail-based SRMAs. In managing natural and biological resources, the BLM would focus on active restoration, but goals would be less ambitious than with Alternative C. The Wilderness would be split into three management zones with different management emphases. Livestock grazing would be managed similarly as under Alternative A, with more lands opened for livestock grazing than are currently allocated.

Under Alternative D, all eligible WSR segments would be dropped from suitability consideration. A trail corridor would be established for the Old Spanish National Historic Trail. The BLM would designate two new ACECs and expand both existing ACECs to protect sensitive resources in areas where impacts from recreational use would be expected to increase.

The route system of the D-E NCA would be designated to provide high-quality recreational experiences while still ensuring protection of resources. Redundant and dead-end routes would be closed and rehabilitated to return them to a more natural state.

## 3.5.5. Proposed Plan Alternative

The Proposed Plan Alternative is based upon the Draft Preferred Alternative, which was largely a blend of management approaches already considered under other alternatives, as well as on the Draft EIS completed for Draft Alternatives A through E. Management actions unique to the Proposed Plan Alternative were crafted in response to public comments on the Draft RMP. Public comments often identified opportunities to better resolve conflicts or impacts or expressed the need for greater clarity.

As with the Draft Preferred Alternative, the Proposed Plan Alternative would set objectives for biological resources that are more ambitious than those in Alternative D but less ambitious than those in Alternative C. As with Alternatives C and D, a wide range of tools would be available to achieve these objectives. Management of the Wilderness would be similar to management under Alternative D, with each of three zones managed with a different emphasis. Livestock grazing management would include components of both Alternatives C and D. The BLM would designate three SRMAs. Much of the rest of the D-E NCA outside of the Wilderness would be designated as ERMAs.

Under the Proposed Plan Alternative, one WSR segment on Cottonwood Creek would be managed as suitable for WSR designation, two new ACECs would be established, and the BLM would continue to manage two existing ACECs. A 23,131-acre trail corridor would be established for the Old Spanish National Historic Trail. The second largest number of miles of routes would be open to the public under the Proposed Plan Alternative (second only to Alternative A).

# 4. Management Considerations in Selecting the Approved Plan

## 4.1. Management in Accordance with FLPMA under the Principles of Multiple Use and Sustained Yield

The Approved RMP seeks the best combination of management decisions to meet the purpose and need for a land use plan in consideration of the planning issues and management concerns identified through the planning process. It is prepared to ensure that the public lands in the D-E NCA are managed in accordance with FLPMA under the principles of multiple use and sustained yield and with the designating legislation, the Omnibus Public Land Management Act of 2009.

BLM_0028387

Section 103 (c) of FLPMA defines "multiple use" as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. . . ." The combination of planning decisions is driven by the diverse resources values on the public lands and how to best realize the broad spectrum of available opportunities. This combination of decisions also recognizes the limits of the ecosystems' sustainability and is within the constraints of applicable laws and regulations.

The BLM's allocation of uses is specifically provided for under FLPMA, which further defines multiple use as the "most judicious use of the land for some or all of these resources . . ." and "the use of some land for less than all of the resources . . . ." The trade-offs resulting from the allocation of resources were fully analyzed and disclosed in the Final EIS, providing for an informed decision that acknowledges their consequences on the human environment.

Another important component of multiple use under FLPMA is accounting for "the long term needs of future generations for renewable and non-renewable resources . . ." These needs will be provided for through decisions included in the Approved RMP designed to meet the RMP's goals and objectives for sustainable productivity of renewable resources and healthy ecosystems, habitat, and waters.

The Dominguez-Escalante NCA Approved RMP is consistent with the policy direction in BLM Manual MS-1730, *Management of Domestic Sheep and Goats to Sustain Wild Sheep*, issued in March, 2016. MS-1730 established the BLM policy "to (1) achieve effective separation of BLM authorized domestic sheep or goats from wild sheep on BLM lands, and (2) to minimize the risk of contact between the species. Effective separation is defined as the spatial or temporal separation between wild sheep and domestic sheep or goats, resulting in minimal risk of contact and subsequent transmission of respiratory disease between animal groups." MS-1730 also established policy regarding modeling for risk of contact. Specifically, it directed field offices to conduct a risk analysis "when domestic sheep or goat grazing authorizations, including trailing, or other activities, are under consideration when (1) land-use plans are developed, including revisions, relevant amendments, and implementation-level plans; (2) issuing or renewing domestic sheep or goat grazing permits; and (3) when risk has not previously been analyzed or when new/updated science, information, analysis tools, models, or maps could substantially affect the results of a previous risk analysis, as determined by the BLM authorized officer (normally the BLM field manager)."

The D-E NCA ARMP incorporates MS-1730 direction regarding modeling by basing the decisions on a Risk of Contact model, the results of which can be found in Appendix C, and in decision SSS-DBS-AU-01, which requires a risk assessment when making decisions at the implementation level. The Manual provides direction stating, "Where domestic sheep or goats are authorized (including trailing and for vegetation management), or where recreational sheep or goats use (e.g., pack animals) may occur, and there is a potential for inter-species contact of wild sheep and domestic sheep or goats, land use plans and/or implementation-level plans will

*4. Management Considerations in Selecting the Approved Plan*

BLM_0028388

prescribe management practices to provide effective separation." The D-E NCA ARMP prescribes dozens of management practices in decisions SSS-DBS-AU-02, SSS-DBS-AU-03, and SSS-DBS-AU-04 to provide effective separation, and further requires in SSS-DBS-AU-01 that if measures are ineffective, further action will be taken at the implementation level to achieve effective separation of wild sheep and domestic sheep or goats. The Manual further directs that if effective separation is not achievable, "consider cancelling a domestic sheep or goat authorization." The D-E NCA ARMP specifically includes this policy statement in decision SSS-DBS-MA-01, which requires that if the measures are not effective at providing separation, the BLM will require additional measures including considering cancelling the domestic sheep authorization and converting the allotment to cattle.

## 4.2. Consistency with Existing Plans and Policies of Local, State, and Federal Agencies and Local Native American Tribes

Management decisions in the Approved RMP are consistent with the existing plans and policies of adjacent local, State, and Federal agencies and local Native American tribes to the extent these are consistent with the purposes, policies, and programs of Federal law and regulations applicable to BLM lands. No formal comments were received from Federal or State agencies or tribal governments indicating the Proposed RMP was inconsistent with other existing plans or policies. The Governor's Office did not identify any inconsistencies concerning State or local plans, policies, and programs following the 60-day Governor's Consistency Review of the D-E NCA Proposed RMP/Final EIS.

## 4.3. Mitigation Measures

All practicable means to avoid or minimize environmental harm, commensurate with the landscape level of planning, are included in the Approved RMP and appendices. In developing the alternatives, the BLM used a variety of management methods and tools, including the identification of allowable uses; temporal, spatial, and/or methodological restrictions on uses; where specific uses would be prohibited; and specific actions needed to achieve the goals and objectives. Restrictions on land uses include seasonal closures, stipulations on surface disturbances, and the application of best management practices (BMPs).

Appendix J in the Approved RMP gives a list of BMPs that are applicable to land use activities authorized in the D-E NCA. Best management practices are state-of-the-art mitigation measures that may be applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts of land use activities. The BMPs included in this RMP are not intended to be a complete list but to show examples of commonly used practices the D-E NCA may require to reduce impacts of surface-disturbing activities, use, or occupancy. More explicit BMPs based on local conditions and resource-specific concerns could be

BLM_0028389

developed once a specific proposal is evaluated through the environmental analysis process. Additional BMPs can be proposed by project applicants for activities on BLM lands.

# 5. RMP Amendments, Evaluation, Maintenance, and Monitoring

## 5.1. RMP Amendments

RMP decisions are subsequently changed through either a plan amendment or another RMP revision. The process for conducting plan amendments is basically the same as the land use planning process used in developing or revising RMPs. The primary difference is that circumstances may allow for completing a plan amendment through the environmental assessment (EA) process, rather than through an EIS. Plan amendments (43 CFR 1610.5-5) change one or more of the terms, conditions, or decisions of an approved land use plan. Plan amendments are most often prompted by the need to consider a proposal or action that does not conform to the plan; implement new or revised policy that changes land use plan decisions; respond to new, intensified, or changed uses on BLM land; and consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

## 5.2. RMP Monitoring

Land-use-plan decision monitoring is a continuous process occurring over the life of the RMP. The aim is to maintain a dynamic RMP. Monitoring data are collected, examined, and used to draw conclusions about 1) whether planned actions have been implemented in the manner prescribed by the RMP (implementation monitoring), 2) whether RMP allowable use and management action decisions and the resultant implementation actions are effective in achieving program-specific objectives or desired outcomes (effectiveness monitoring), and 3) calculating the cost of delivering a service or product (efficiency monitoring by program elements).

The BLM uses conclusions drawn from monitoring to make recommendations on whether to continue current management or to determine what changes need to be made to implementation practices to better achieve RMP goals. Indicators, methods, locations, units of measures, frequency, and action triggers can be established by national policy guidance, in RMPs, or by technical specialists in order to address specific issues.

Based on staffing and funding levels, monitoring is annually prioritized consistently with the goals and objectives of the RMP. The BLM may work in cooperation with local, State, and other Federal agencies, or it may use data collected by other agencies and sources when appropriate and available.

BLM_0028390

## 5.3. RMP Evaluation

In accordance with the BLM's Land Use Planning Handbook (H-1601-1), the Approved RMP will be evaluated periodically to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented effectively. More specifically, the RMP will be evaluated to determine whether 1) the decisions remain relevant to current issues, 2) decisions are effective in achieving or making progress toward achieving the desired outcomes specified in the plan, 3) any decisions are in need of revision, 4) any decisions need to be dropped from further considerations, or 5) any areas require new decisions.

In making these determinations, the BLM's evaluation will consider whether mitigation measures such as those described in the Approved RMP are satisfactory, whether there are significant changes in the related plans of other entities, or whether there is significant new information.

In addition to periodic evaluations, special evaluations may also be required to review unexpected management actions or significant changes in the related plans of Native American tribes, other Federal agencies, and State and local governments, or to evaluate legislation or litigation that has the potential to trigger an amendment or revision to the RMP. Evaluations may identify resource needs as well as the means for correcting deficiencies and addressing issues through plan maintenance, amendments, or revisions. Evaluations should also identify where new and emerging issues and other values have surfaced.

## 5.4. RMP Maintenance

During the life of the RMP, the BLM expects that new information gathered from field inventories and assessments, other agency studies, and other sources will allow the agency to update GIS data and BMPs. To the extent that this new information addresses issues covered in the plan, the BLM will integrate the data through plan maintenance. BLM regulations in 43 CFR 1610.5-4 stipulate that RMP decisions and supporting actions can be maintained to reflect minor changes in data.

Maintenance is limited to further refining, documenting, or clarifying a previously approved decision incorporated in the plan. Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved RMP. For example, adjusting the parameters of special status species habitat based on new inventory information or adjusting fire management polygons due to changes in fuel source or urban interface patterns may be reasonable maintenance actions.

Maintenance may be especially necessary to update acreage figures shown throughout the RMP. Acreages are based on GIS data, which are subject to constant refinement. Any potential

BLM_0028391

discrepancies within the acreage figures or future refinements in the data may be corrected or updated in the RMP through plan maintenance.

# 6. Public Involvement in the Planning Process

## 6.1. Policies and Legislative Constraints

FLPMA is the primary authority for the BLM to manage public lands. This law establishes provisions for land use planning, land acquisition and disposition, administration, rangeland management, rights-of-way, and designated management areas, and for the repeal of certain laws and statutes. NEPA provides the basic national charter for environmental responsibility, and requires the consideration and public availability of information on the environmental impacts of major Federal actions significantly affecting the quality of the human environment. In concert, FLPMA and NEPA provide the overarching guidance for all activities on BLM lands.

RMPs are the primary mechanism for guiding BLM activities so that the mission and goals outlined in the BLM Strategic Plan are achieved. See the BLM's Land Use Planning Handbook (H-1601-1) for program-specific guidance. RMPs ensure that BLM lands are managed in accordance with the intent of Congress as stated in FLPMA, under the principles of multiple use and sustained yield.

As required by FLPMA, as well as by BLM policies and guidelines, public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and  archaeological values; and that, where appropriate, will [Sec. 102 43 U.S.C. 1701 (a)(3)]:

- Preserve and protect certain public lands in their natural condition.

- Provide food and habitat for fish, wildlife, and domestic animals.

- Provide for outdoor recreation and human occupancy and use.

- Recognize the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands.

In addition to FLPMA and NEPA (and their associated regulations), the BLM must comply with the mandate and intent of all applicable laws, regulations, guidelines, and policies that apply to BLM-administered lands and Federal mineral estate. The planning process is intended to develop RMP decisions that resolve conflicts between program priorities, policies, and guidelines, and that meet the multiple use and sustained yield mandate of FLPMA.

BLM_0028392

The Omnibus Public Land Management Act of 2009, Public Law 111-11 (hereafter also referred to as the Omnibus Act), which created the Dominguez-Escalante NCA, included specific direction to guide decisions within the D-E NCA and the Wilderness. It identified "unique and important values" that the NCA should conserve and protect "for the benefit and enjoyment of present and future generations," namely, the "geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, and scenic resources of the public lands, as well as the water resources of area streams, based on seasonally available flows, that are necessary to support aquatic, riparian, and terrestrial species and communities."

In considering consistency between the Omnibus Act and FLPMA, Section 302 of the FLPMA states that public lands are to be managed under the principles of multiple use and sustained yield "except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." Therefore, if management of the BLM's multiple use and sustained yield mission conflicts with the Omnibus Act, the language provided within the Omnibus Act applies (BLM 2012b[3]).

Management of the Dominguez Canyon Wilderness must comply with the Wilderness Act of 1964. The Wilderness Act established a National Wilderness Preservation System and identified a wilderness area as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." The Wilderness Act goes on to further define a wilderness area as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions." More specific language within the Wilderness Act pertains to the management of wilderness areas, including the Dominguez Canyon Wilderness.

Management of the Old Spanish NHT must comply with the National Trails System Act of 1968, as amended. The National Trails System established a national system of trails and identified national historic trails as "extended trails which follow as closely as possible and practicable the original trails or routes of travel of national historic significance. Designation of such trails or routes shall be continuous, but the established or developed trail, and the acquisition thereof, need not be continuous on site. National historic trails shall have as their purpose the identification and protection of the historic route and its historic remnants and artifacts for public use and enjoyment" (Sec. 3(a)(3)).

---

[3] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

*6. Public Involvement in the Planning Process*

BLM_0028393

## 6.2. Public Involvement

## 6.2.1. Introduction

The BLM makes its decisions in accordance with Council on Environmental Quality requirements and the U.S. Department of the Interior and BLM policies and procedures for implementing NEPA, and the associated regulatory and policy framework, which require Federal agencies to involve the public in the planning process. The BLM made open, public dialogue integral to this RMP planning process, recognizing the interests of a wide range of public, private, and governmental representatives in the management of BLM lands. The opportunities that the BLM provided for the public to engage in the planning process for this RMP are described below.

## 6.2.2. Public Scoping

The formal public scoping process for the D-E NCA RMP began on August 3, 2010, with the publication of a notice of intent in the *Federal Register*. This scoping period lasted through October 1, 2010. Public outreach during this scoping period included two open houses, a press release, and information fliers posted in retail businesses and centers and in BLM information kiosks. Notices of the scoping meetings were also emailed to interested individuals and posted on the D-E NCA website.

## 6.2.3. Recreation Focus Groups and Community Surveys

This planning process for the D-E NCA RMP was informed by a series of community discussions (Table 6.1) and user surveys around the topics of recreation and wilderness management conducted by the Natural Resource and Land Policy Institute (NRLPI) at Colorado Mesa University (CMU 2011[4]).

**Table 6.1. Focus Group Meetings**

| Zone | Meeting Location | Meeting Date | Participants |
|------|------------------|--------------|-------------:|
| 1 | Grand Junction | 9/20/2010 | 15 |
| 2 | Delta | 9/22/2010 | 10 |
| 3 | Grand Junction | 9/27/2010 | 24 |
| 5 | Delta | 9/29/2010 | 28 |
| 4 (Wilderness) | Grand Junction | 10/4/2010 | 27 |
| 4 (Wilderness) | Delta | 10/6/2010 | 13 |
| TOTAL | | | 117 |

---

[4] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028394

Between April 2009 and July 2010, the NRLPI at Colorado Mesa University administered surveys to visitors in the D-E NCA. Data were collected from a brief on-site survey and a comprehensive take-home survey. These surveys were designed to collect, identify, and catalog the benefits of recreation for D-E NCA public lands users. Once the data from these surveys were processed and analyzed, the NRLPI produced a report (CMU 2011) that was posted on the D-E NCA planning website.

## 6.2.4. Wild and Scenic River Stakeholder Meetings

In anticipation of the requirement that the BLM evaluate wild and scenic river suitability during this planning process as well as for the RMP revision being undertaken by the Uncompahgre Field Office, a group of stakeholders convened a series of independent meetings in 2010 and early 2011.

Five meetings were used to discuss D-E NCA segments. All of these meetings were held in Delta, CO, and took place on February 24, March 9, March 23, April 5 and April 13, 2011. Information regarding these meetings, as well as meeting notes, were posted on the BLM planning website.

These meetings were used to assemble information on existing uses and local values, potential threats to the outstandingly remarkable values (ORVs) identified by the BLM in its eligibility report, and to identify existing protections for these ORVs. Individuals also articulated the activities and attributes they felt were  most important to protect on the eligible stream segments and their recommendations for managing them, including whether or not the segments should be found to be and managed as "suitable" for inclusion in the National Wild and Scenic Rivers System. The BLM, along with Colorado Parks and Wildlife and representatives of other agencies and organizations, attended this series of discussions to provide information and answer questions.

## 6.2.5. Travel Management Outreach

The Omnibus Act specified that the RMP for the D-E NCA include a comprehensive travel management plan. During development of the RMP, the BLM solicited public input regarding its travel management route inventory and designation process.

The BLM held two open houses to initiate a public comment period for travel management, one in Delta on November 9, 2010, and one in Grand Junction on November 10, 2010. At these two open houses, the BLM provided an overview of the travel management planning process and provided instructions for how to provide feedback to the BLM. The questions that the BLM asked the public were the following:

- Is our inventory complete and accurate?

BLM_0028395

- Which routes are important to you and why?

The public comment period lasted from November 9, 2010, through May 1, 2011. Because of higher than normal snowfall, the deadline was subsequently extended to June 15, 2011. The BLM received 73 letters, emails, and comment forms during this public comment period. These were used by the BLM interdisciplinary team to inform the travel management designation process in the summer of 2011.

## 6.2.6. Socioeconomic Workshops

The BLM conducted two socioeconomic workshops to discuss socioeconomic data and conditions and the role that the D-E NCA plays in its surrounding communities. One meeting was held in Grand Junction on October 18, 2011, and another was held in Delta on October 19, 2011. Information collected during these workshops was used in the development of this RMP.

## 6.2.7. Advisory Council

The Omnibus Act directed the Secretary of Interior to establish the D-E NCA Advisory Council to advise the Secretary of Interior with respect to the preparation and implementation of the management plan, in accordance with the Federal Advisory Committees Act and FLPMA.

As directed by the Omnibus Act, the Council is comprised of 10 members appointed by the Secretary of the Interior. These members represent the purposes for which the NCA was established and the interests of the stakeholders that are affected by the planning and management of the NCA. During the development of this RMP, the D-E NCA Advisory Council met more than 35 times. Meetings were open to the public, with 10 to over 60 people attending.

## 6.2.8. Public Review and Comment on the Draft RMP

The formal public comment period for the D-E NCA Draft RMP began on May 17, 2013, with the publication of the notice of availability in the *Federal Register.* The NOA, posters placed in kiosks within the D-E NCA and at local libraries, announcements in local newspapers, and a newsletter (sent to all those agencies, organizations, and members of the public that were on the project distribution list) announced the availability of the Draft RMP and listed the time and place for BLM open house meetings.

The BLM distributed copies of the Draft RMP to those organizations and individuals who had previously requested copies or submitted requests subsequent to the publication of the NOA. The Draft RMP was also available at public libraries in Delta and Grand Junction, at the local BLM field offices, and for download from the BLM's project website.

Under BLM planning regulations, a Draft EIS public comment period must last for at least 90 days. Initially, the BLM set a 90-day public comment period that lasted until August 24, 2013.

BLM_0028396

Before the end of the comment period, the BLM received multiple requests to extend the comment period and subsequently extended it by another 30 days to September 23, 2013.

The BLM hosted two open house meetings, one in Grand Junction on June 17, 2013, and one in Delta on June 19, 2013, to provide the public with the opportunity to hear an overview and ask questions about the project and planning process, to meet the RMP team members, to review dozens of resource-specific maps, and to offer comments. The open house format was chosen over the more formal public meeting format to encourage broader participation and to allow attendees to talk with BLM representatives in an informal setting. A total of 90 people attended the meetings.

At the open house meetings, attendees were able to talk directly with BLM staff and managers and could also submit comments directly to the BLM through the BLM's National Land Use Planning Register (ePlanning) website or in the form of email or paper statements. All written comments received by the BLM were logged, categorized, evaluated, and considered in the development of the RMP. Most comments were submitted electronically by email.

## 6.2.9. Public Review and Protest of the Proposed RMP/Final EIS

Pursuant to the BLM's planning regulations in 43 CFR 1610.5-2, any person who participated in the D-E NCA RMP planning process and had an interest that might be adversely affected by the planning decisions could protest the proposed planning decisions within 30 days from the date the EPA published the NOA in the *Federal Register*. The 30-day protest period for the D-E NCA Proposed RMP began on July 1, 2016, and ended on July 31, 2016.

## 6.2.10. Results of the Protest Period and Governor's Consistency Review

### Protest Period

The BLM received seven protest letters with standing during the 30-day protest period provided on the proposed land use plan decisions contained in the D-E NCA Proposed RMP/Final EIS in accordance with 43 CFR 1610.5-2. These protests were subsequently denied, or dismissed by the BLM Director, whose decision constitutes final agency action for the U.S. Department of the Interior. Issues raised by protestors included effects to livestock grazing, domestic and wild sheep interactions, mountain biking, lands with wilderness characteristics, and wild and scenic river suitability.

BLM_0028397

The BLM Director and staff at the BLM Washington Office appropriately reviewed and resolved all proposed planning decisions protested by the public. The BLM Director concluded that the BLM Colorado State Director followed the applicable laws, regulations, and policies and considered all relevant resource information and public input in developing the Proposed RMP, and did not require significant changes to the Proposed RMP. The Director's resolution report is available on the BLM's Protest Resolution website: https://www.blm.gov/programs/planning-and-nepa/public-participation/protest-resolution-reports.

## Governor's Consistency Review

As required by BLM regulations in 43 CFR 1610.3- 2 (e) to ensure consistency with State government plans or policies, the BLM initiated the Colorado Governor's Consistency Review for the D-E NCA Proposed RMP/Final EIS by letter from the BLM State Director dated July 1, 2016. The consistency review period concluded August 30, 2016. The Governor did not identify any inconsistencies with approved State or local plans, policies, or programs.

# 7. Coordination and Consultation

## 7.1. Cooperating Agencies

The benefits of enhanced collaboration among agencies in preparing NEPA analyses are many: relevant information is disclosed early in the analytical process; available technical expertise and staff support is used; duplication with other Federal, State, tribal, and local procedures is avoided; and a mechanism for addressing intergovernmental issues is established.

Eight agencies agreed to become formal cooperating agencies for the development of the D-E NCA RMP on the basis of their special expertise and/or legal jurisdiction. Each of these agencies had an opportunity to suggest alternative management actions, contribute to the impact analysis, identify concerns with management actions early in the planning process, and work with the BLM and the rest of the planning team to understand and resolve those concerns. The cooperating agencies were as follows:

- City of Delta
- City of Grand Junction
- City of Montrose
- Colorado Division of Natural Resources, including Colorado Parks and Wildlife and Colorado Water Conservation Board
- Delta County
- Mesa County
- Montrose County
- U.S. Forest Service

BLM_0028398

## 7.2. Tribal Consultation

In 2007, the BLM initiated the Ute Ethnohistory Project, which actively involved Ute cultural resource staff and traditional leaders in the identification of issues and concerns for resource management plans for the BLM's Grand Junction and Uncompahgre Field Offices, as well as for the Dominguez-Escalante NCA. Through this project, the BLM determined that the Ute Tribes consider the D-E NCA part of their ancestral homeland.

In August 2010, the BLM invited the three federally recognized Ute Indian tribes to participate as cooperating agencies for the D-E NCA RMP (see Table 7.1 below): the Ute Indian Tribe based in Fort Duchesne, UT, the Ute Mountain Ute Indian Tribe based in Towoac, Colorado, and the Southern Ute Indian Tribe based in Ignacio, Colorado.

The BLM did not enter into memoranda of understanding regarding this RMP with these tribes. Nonetheless, the BLM pursued formal consultations with the tribal councils for these tribes in a government-to-government capacity during the development of this RMP/EIS. During this time, the BLM cultural resource staff continued ongoing consultations with tribal cultural staff that included discussions regarding this RMP. Tribal face-to-face consultation dates for the D-E NCA RMP are shown in Table 7.1.

**Table 7.1. Tribal Face-to-Face Consultations for the D-E NCA RMP**

| Organization | Date(s) |
|---|---|
| Ute Mountain Ute Tribal Historic Preservation Officer | February 7, 2012<br>May 7, 2013<br>April 28, 2014<br>October 15, 2014<br>October 18, 2016 |
| Ute Mountain Ute Tribal Council | March 13, 2012 |
| Ute Indian Tribal Council (Uintah and Ouray Reservations) | June 5, 2013 |
| Ute Indian Tribe Cultural Staff | April 28, 2014<br>October 15, 2014<br>October 22, 2015<br>December 4, 2015<br>October 18, 2016 |
| Southern Ute Indian Tribal Council | July 31,2013 |
| Southern Ute Indian Tribe Cultural Staff | April 28, 2014<br>October 15, 2014<br>October 22, 2015<br>December 4, 2015 |

On May 22, 2013, letters were sent to the Ute tribal councils asking for comments on the D-E NCA RMP. In 2014, the Jemez Pueblo contacted the BLM Director about being involved with

BLM_0028399

Dominguez-Escalante National Conservation Area                                                           33
RECORD OF DECISION

planning for lands where the Fremont was present. The BLM initiated consultation with the tribal councils in 2012.

One of the outcomes of the Ute Ethnohistory Project, which went from February 2007 to September 2008, was a recommendation that the BLM engage a wider number of tribes in order to gauge their interest in ongoing NEPA and RMP development. As a result, BLM staff from the D-E NCA and Grand Junction Field Office sent letters to the tribes listed in Table 7.2 below. These letters were sent in August 2010 through February 2011. The BLM did not receive feedback suggesting these tribes would like to be actively engaged in ongoing NEPA or RMP development for the Dominguez-Escalante NCA.

**Table 7.2. Native American Tribes Contacted during D-E NCA RMP Development**

| Organization | City | State |
|---|---|---|
| Comanche Nation of Oklahoma | Lawton | OK |
| Eastern Shoshone Tribe | Fort Washakie | WY |
| Hopi Tribe | Kukotsmovi | AZ |
| Jicarilla Apache Nation | Dulce | NM |
| Kiowa Tribe of Oklahoma | Carnegie | OK |
| Navajo Nation | Window Rock | AZ |
| Ohkay Owingeh (Pueblo of San Juan) | San Juan | NM |
| Paiute Indian Tribe of Utah | Cedar City | UT |
| Pueblo de Cochiti | Cochiti | NM |
| Pueblo of Pojoaque | Santa Fe | NM |
| Pueblo of Santa Ana | Santa Ana Pueblo | NM |
| San Ildefonso Pueblo | Santa Fe | NM |
| Santa Clara Pueblo | Espanola | NM |
| Shoshone-Bannock Tribes | Fort Hall | ID |
| Southern Ute Indian Tribe | Ignacio | CO |
| Standing Rock Sioux Tribe | Fort Yates | ND |
| Ute Indian Tribe | Fort Duchesne | UT |
| Ute Mountain Ute Indian Tribe | Towoac | CO |

*7. Coordination and Consultation*

BLM_0028400

Dominguez-Escalante National Conservation Area                                          34
RECORD OF DECISION

## 7.3. State Historic Preservation Office Consultation

The BLM consulted with SHPO in 2006, resulting in Addendum 1 to the State Protocol that fulfilled BLM's Section 106 responsibilities for all land use planning efforts involving travel management planning decisions. This programmatic agreement applied to all land use plans initiated after the 2006 agreement. Case-by-case consultation is only required for new routes and new open areas, by planning area.

The Colorado Protocol, Section IV, requires SHPO involvement in BLM planning processes, and the BLM shall provide the SHPO the opportunity to participate at the development stage and all subsequent phases of land use planning. The D-E NCA sent an interested party letter to the SHPO in August 2013. The BLM did not receive a reply from the SHPO on the D-E NCA plan. The BLM will continue to work with the SHPO on site-specific projects within the D-E NCA.

## 7.4. D-E NCA Advisory Council

The D-E NCA Advisory Council has met 39 times since its establishment in December 2010 (Table 7.3). Each of these meetings was open to the general public and provided an opportunity for the Council to make recommendations to the BLM regarding the RMP. At each meeting, members of the public had the opportunity to provide comments and give their opinions on topics that interested them. In addition to these meetings, the Advisory Council participated in two field trips—on May 26, 2011, along the Gunnison River, and on November 19, 2011, in Cactus Park.

**Table 7.3. D-E NCA Advisory Council Meetings**

| Date | Meeting Location | Date | Meeting Location |
|------|------------------|------|------------------|
| 1/5/2011 | Delta | 3/6/2012 | Grand Junction |
| 2/2/2011 | Grand Junction | 3/21/2012 | Delta |
| 3/2/2011 | Delta | 4/4/2012 | Grand Junction |
| 4/6/2011 | Grand Junction | 5/2/2012 | Delta |
| 5/4/2011 | Delta | 4/3/2013 | Grand Junction |
| 5/18/2011 | Grand Junction | 6/26/2013 | Delta |
| 6/1/2011 | Delta | 7/17/2013 | Grand Junction |
| 6/15/2011 | Grand Junction | 7/31/2013 | Delta |
| 7/6/2011 | Delta | 8/19/2013 | Grand Junction |
| 7/20/2011 | Grand Junction | 8/21/2013 | Delta |
| 8/3/2011 | Delta | 10/24/2013 | Grand Junction |
| 8/17/2011 | Grand Junction | 11/5/2013 | Delta |
| 9/7/2011 | Delta | 1/22/2014 | Grand Junction |
| 9/21/2011 | Grand Junction | 4/16/2014 | Delta |
| 10/5/2011 | Delta | 7/23/2014 | Grand Junction |
| 11/2/2011 | Grand Junction | 11/18/2014 | Delta |

BLM_0028401

Dominguez-Escalante National Conservation Area                                                          35
RECORD OF DECISION

| Date | Meeting Location | Date | Meeting Location |
|------|------------------|------|------------------|
| 12/14/2011 | Delta | 7/13/2016 | Grand Junction |
| 1/4/2012 | Grand Junction | 7/27/2016 | Delta |
| 1/25/2012 | Grand Junction | 8/31/2016 | Grand Junction |
| 2/1/2012 | Delta | | |

## 7.5. U.S. Fish and Wildlife Service Consultation

To comply with Section 7 of the Endangered Species Act of 1973 as amended (16 U.S.C 1531 et. seq.), the BLM consulted the U.S. Fish and Wildlife Service (FWS) throughout the RMP planning process. The FWS provided input on planning issues, data collection and review, and alternatives development.

The BLM worked with the FWS to develop a draft biological assessment (BA) following release of the Draft RMP/ EIS. The FWS provided preliminary comments that were used to prepare the BA. The BLM prepared a BA and submitted it to FWS on November 10, 2014, and submitted a corrected final version on December 19, 2014. The FWS responded with a biological opinion on June 12, 2015. The FWS determined that the RMP would not jeopardize the existence of federally listed species.

# 8. Plan Implementation

The Approved RMP will be implemented as funding and staff availability allow. The BLM will develop an implementation strategy to identify and prioritize the work needed to meet the goals and objectives of the RMP. Most of the land use plan decisions in this document are effective upon approval; however, some decisions will take a number of years to implement on the ground. Through implementation monitoring, the BLM will track which decisions have been implemented and when. The BLM will work with cooperating agencies and the Dominguez-Escalante National Conservation Area Advisory Council to prioritize implementation actions.

# 9. Availability of the Resource Management Plan

## Printed Copies of the ROD/Approved RMP

Printed copies of the D-E NCA ROD/Approved RMP are available at the following public libraries:

- **Mesa County Public Library Central branch:** 443 N 6th St, Grand Junction, CO 81501, 970-243-4442

BLM_0028402

- **Delta County Library:** 211 West 6th Street, Delta, CO, 970-874-9630
- **Montrose Regional Library:** 320 South 2nd Street, Montrose, CO, 970-249-9656

## ROD/Approved RMP on Compact Disk

Compact disks (CDs) with electronic copies of the ROD/Approved RMP are available by request from the BLM Grand Junction and Uncompahgre Field Offices:

- **BLM Grand Junction:** 2815 H Road, Grand Junction, CO 81506, 970-244-3000
- **BLM Uncompahgre:** 2465 South Townsend Avenue, Montrose, CO 81401, 970-249-1010

## ROD/Approved RMP Online

The ROD/Approved RMP is also available online at the BLM's National Land Use Planning Register (ePlanning) website: http://1.usa.gov/1qKkMVi.

# 10. Appeal

Travel Management Plan implementation-level decisions may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4. Public notification of this decision will be considered to have occurred on the date that the notice of availability (NOA) is published in the *Federal Register*. Within 30 days of this decision, a notice of appeal must be filed in the office of the Authorized Officer at 2850 Youngfield Street, Lakewood, Colorado 80215. The last day to file an appeal is 30 days after the Notice of Availability is published in the *Federal Register*. If a statement of reasons for the appeal is not included with the notice, it must be filed with the Interior Board of Land Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy St., Suite 300, Arlington, VA 22203 within 30 days after the notice of appeal is filed with the Authorized Officer.

# 11. Approval

The decision is hereby made to approve the attached Approved RMP and associated Travel Management Plan for the D-E NCA. This ROD serves as the final decision for the decisions in the Approved RMP and associated TMP, and the Approved RMP and TMP become effective on the date this ROD is signed.

BLM_0028403

Dominguez-Escalante National Conservation Area 37
RECORD OF DECISION

## APPROVAL

### NATIONAL CONSERVATION AREA MANAGER RECOMMENDATION

Having considered a full range of alternatives, associated impacts and public and agency input, I recommend the adoption and implementation of the Dominguez-Escalante National Conservation Area Approved Resource Management Plan, which includes a comprehensive Travel Management Plan.

Recommended:

JAN 09 2017

_____
Collin Ewing
National Conservation Area Manager
Dominguez-Escalante National Conservation Area

_____
Date

### DISTRICT MANAGER CONCURRENCE

I concur with the adoption and implementation of the Dominguez-Escalante National Conservation Area Approved Resource Management Plan and associated Travel Management Plan.

Concurrence:

JAN 09 2017

_____
Joe Meyer
District Manager
Southwest District

_____
Date

### STATE DIRECTOR APPROVAL

In consideration of the foregoing, I approve the Dominguez-Escalante National Conservation Area Approved Resource Management Plan, and the associated Travel Management Plan implementation decisions.

Approved:

JAN 09 2017

_____
Ruth Welch
Colorado State Director

_____
Date

_11. Approval_

This page intentionally left blank

BLM_0028405

# II. APPROVED RESOURCE MANAGEMENT PLAN

BLM_0028406

This page intentionally left blank

BLM_0028407

# Dominguez-Escalante National Conservation Area

# Approved Resource Management Plan

## BLM/CO/PL-17/005

**Prepared by**

**U.S. Department of the Interior**
**Bureau of Land Management**
**Dominguez-Escalante National Conservation Area**
**Grand Junction, CO**

**January 2017**

BLM_0028408

This page intentionally left blank

BLM_0028409

# Table of Contents

Acronyms and Abbreviations ........................................................................................ xi

1. Resource Management Plan Decisions ...................................................................... 15

    1.1. Purpose of and Need for the RMP ........................................................................ 15

    1.2. Decisions ............................................................................................................... 17

    1.3. List of Appendices ............................................................................................... 19

2. Decisions by Category ............................................................................................... 21

    2.1. RESOURCES ......................................................................................................... 21

        2.1.1. Geological and Paleontological Resources .................................................. 21

        2.1.2. Biological Systems—Priority Species and Vegetation ............................... 22

        2.1.3. Special Status Species and Natural Communities ..................................... 31

        2.1.4. Fish and Wildlife (Non–Special Status) .................................................... 37

        2.1.5. Noxious and Invasive Weeds ...................................................................... 39

        2.1.6. Fire and Fuels .............................................................................................. 39

        2.1.7. Soils and Water Quality .............................................................................. 40

        2.1.8. Cultural Resources ...................................................................................... 42

        2.1.9. Lands with Wilderness Characteristics ....................................................... 46

        2.1.10. Scenic Resources ....................................................................................... 47

        2.1.11. Air ............................................................................................................. 48

    2.2. RESOURCE USES ................................................................................................. 48

        2.2.1. Recreation .................................................................................................... 48

        2.2.2. Scientific Use .............................................................................................. 63

        2.2.3. Educational Use ........................................................................................... 64

        2.2.4. Livestock Grazing ....................................................................................... 65

        2.2.5. Transportation and Travel Management ...................................................... 68

        2.2.6. Land Tenure and Land Use Authorizations ................................................ 69

    2.3. SPECIAL DESIGNATIONS ................................................................................... 72

        2.3.1. Areas of Critical Environmental Concern ................................................... 72

        2.3.2. National Historic Trails ............................................................................... 74

        2.3.3. Wild and Scenic Rivers .............................................................................. 75

BLM_0028410

2.3.4. Wilderness Study Areas ...................................................................................... 76

2.3.5. Wilderness ........................................................................................................ 76

2.3.6. Watchable Wildlife Areas ................................................................................. 79

Appendix A. Planning for Priority Species and Vegetation ........................................... 81

Appendix B. Description of Surface Disturbance Restrictions ...................................... 99

B.1. Prohibit Surface-Disturbing Activities ............................................................... 99

B.2. Prohibit Disruptive Activities ........................................................................... 100

B.3. Site-Specific Relocation Restrictions ............................................................... 101

B.4. Prohibit In-Channel Work ................................................................................. 102

Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep ................ 105

C.1. Introduction ...................................................................................................... 105

C.2. Risk of Contact Model ...................................................................................... 107

Appendix D. Colorado Standards for Public Land Health ......................................... 119

Appendix E. Raptor Species Breeding Periods .......................................................... 123

Appendix F. Colorado Noxious Weed List ................................................................. 125

Appendix G. Naturalness in the Dominguez Canyon Wilderness .............................. 129

Appendix H. Minimum Requirements Decision Guide Overview .............................. 143

H.1. Introduction ...................................................................................................... 143

H.2. Use of This Guide ............................................................................................. 145

H.3. Emergencies ...................................................................................................... 145

H.4. Safety ................................................................................................................ 145

H.5. The MRDG and NEPA ...................................................................................... 146

H.6. The MRDG and the Planning Process ............................................................... 146

H.7. Habits, Assumptions, and the Spirit of the Wilderness Act ............................... 147

Appendix I. Special Recreation Permit Program Overview ....................................... 149

I.1. Permit Process .................................................................................................... 149

I.2. Application Evaluation ........................................................................................ 150

I.3. Matrix for Determining Need for an Organized Group SRP ............................... 152

I.4. Determining Permit Classification ..................................................................... 153

Appendix J. Best Management Practices for Management Actions ............................ 157

J.1. Air Resources ..................................................................................................... 157

BLM_0028411

J.2. Soils ........................................................................................................... 158

J.3. Water Resources ........................................................................................ 161

J.4. Vegetation: Rangeland .............................................................................. 165

J.5. Vegetation: Riparian Habitat and Wetlands ............................................. 167

J.6. Noxious and Invasive Weed Prevention ................................................... 168

J.7. Fire ............................................................................................................. 174

J.8. Fish and Wildlife Management and Special Status Species ...................... 176

J.9. Wildlife Damage Management .................................................................. 181

J.10. Cultural Resources .................................................................................. 182

J.11. Tribal Consultation .................................................................................. 185

J.12. Geological and Paleontological Resources ............................................. 187

J.13. Visual Resources ..................................................................................... 187

J.14. Wildland Fire Ecology and Management ................................................ 189

J.15. Wilderness and Wilderness Study Areas ................................................ 191

J.16. Forestry .................................................................................................... 192

J.17. Livestock Grazing ................................................................................... 195

J.18. Recreation ................................................................................................ 200

J.19. Lands and Realty ..................................................................................... 202

J.20. Transportation and Access ...................................................................... 204

Appendix K. Trail Design Criteria ................................................................... 207

Appendix L. Special Recreation Management Area Recreation Setting Descriptions .............. 211

Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern . 215

M.1. Executive Summary ................................................................................. 215

M.2. Introduction ............................................................................................. 215

M.2.1. Area of Critical Environmental Concern ............................................. 216

M.2.2. Special Management Attention .............................................................. 216

M.3. Steps in the ACEC Process ...................................................................... 217

M.3.1. Nomination ............................................................................................ 217

M.3.2. Relevance, Importance, and Special Management Criteria .................. 218

M.3.3. Consideration of Potential ACECs ........................................................ 220

M.3.4. Comments on Proposed ACECs ............................................................ 221

*Table of Contents*

M.3.5. Designation ........................................................................................... 221

M.4. Evaluation of Proposed ACECs ................................................................. 221

M.4.1. Description of Proposed ACECs Not Carried Forward as Potential ACECs ......... 224

M.4.2. Description of Potential ACECs ............................................................ 235

M.5. Interdisciplinary Team Members .............................................................. 266

M.6. References ............................................................................................ 266

Appendix N. Comprehensive Travel and Transportation Management Plan ............................ 267

N.1. Introduction .......................................................................................... 267

N.2. Background ........................................................................................... 268

N.2.1. Description of Route System ................................................................ 268

N.2.2. Description of Process ......................................................................... 268

N.2.3. Laws, Regulations, Policies, and Program Guidance ................................ 271

N.3. Area-Allocation Travel Decisions ............................................................. 273

N.3.1. Management Required By Law .............................................................. 274

N.3.2. Description of Area-Allocation Travel Decisions ................................... 275

N.4. Implementation-Level Travel Decisions .................................................... 276

N.4.1. Designation Criteria for Each Route .................................................... 276

N.4.2. Route-by-Route Designation ............................................................... 279

N.4.3. Cultural Resources ............................................................................. 283

N.4.4. Guidance for Implementation of Approved Travel Management Plan .................. 284

N.5. Maintenance Intensities .......................................................................... 288

N.6. Trail Development Process ....................................................................... 289

N.7. References ............................................................................................ 295

N.8. Trail Management Objective Form ............................................................ 296

Appendix O. Wild and Scenic River Suitability Report ................................................... 299

O.1. Executive Summary ................................................................................ 299

O.2. Introduction ......................................................................................... 300

O.3. Public Participation ............................................................................... 303

O.4. Eligibility ............................................................................................. 306

O.5. Suitability ............................................................................................ 312

O.6. Assessment and Recommendations .......................................................... 315

BLM_0028413

O.7. Participation ............................................................................................................... 374

O.8. References.................................................................................................................... 374

Appendix P. Air Resources.................................................................................................. 375

P.1. Introduction................................................................................................................. 375

P.2. Emission Calculation Tables....................................................................................... 375

P.3. Comprehensive Air Resource Protection Protocol ..................................................... 387

Appendix Q. Omnibus Public Land Management Act of 2009 (Subtitle E—Dominguez-
Escalante National Conservation Area) ............................................................................... 413

Appendix R. Maps .............................................................................................................. 421

Appendix S. Biological Opinion.......................................................................................... 459

## List of Tables and Figures

Table 1.1. Resource Program Categories and Abbreviations ................................................. 18

Table 1.2. Resource Use Program Categories and Abbreviations........................................... 18

Table 1.3. Special Designation Program Categories and Abbreviations .................................. 19

Table 1.4. List of Appendices................................................................................................. 19

Table A.1. Description of Attributes, Indicators and Current Condition of the Health of Priority
Vegetation and Priority Species.............................................................................................. 83

Table C.1. Model Results for Desert Bighorn Risk of Contact with Allotments ...................... 110

Table C.2. Years between Potential Disease Events for Allotments That Did Not Intersect with
CHHR ..................................................................................................................................... 113

Table G.1. Indicators Used for Monitoring Naturalness in the Dominguez Canyon Wilderness
.............................................................................................................................................. 130

Table I.1. Criteria to Determine Whether a Special Recreation Permit is Needed.................... 152

Table I.2. Permit Classification Criteria ................................................................................. 153

Table L.1. D-E NCA Recreation Setting Characteristics Matrix.............................................. 212

Table M.1. Colorado Natural Heritage Program Element Imperilment Rankings ..................... 219

Table M.2. Existing and Proposed ACECs in the Planning Area.............................................. 221

Figure M.1. Proposed ACECs Not Carried Forward as Potential ACECs ................................. 225

Figure M.2. ACECs Carried Forward for D-E NCA .............................................................. 236

Figure M.3. Existing and Proposed Expansion of Gunnison Gravels ACEC ........................... 239

Figure M.4. Existing and Adjusted Escalante Canyon ACEC.................................................. 244

BLM_0028414

Figure M.5. Expanded Escalante ACEC and Watchable Wildlife Area...................................... 249

Figure M.6. Gibbler Mountain ACEC ........................................................................................ 252

Figure M.7. Gunnison River ACEC ............................................................................................ 257

Figure M.8. River Rims ACEC.................................................................................................... 260

Figure M.9. Big Dominguez Canyon ACEC ............................................................................... 265

Table N.1. Area Designations (in Acres) for Motorized Travel .................................................. 275

Table N.2. Area Designations (in Acres) for Mechanized Travel ............................................... 275

Table N.3. Area Designations (in Acres) for Foot and Horse Travel .......................................... 275

Table N.4. Miles of Route Designations...................................................................................... 282

Table O.1. Summary of Suitability Determinations .................................................................... 300

Figure O.1. Planning Area Overview .......................................................................................... 302

Figure O.2. Overview of the Wild and Scenic River Study Process ........................................... 303

Table O.2. Recommendations Regarding Suitability Provided to the BLM by Stakeholders.... 305

Table O.3. Summary of Eligible Rivers/Streams in the D-E NCA ............................................. 311

Figure O.3. Suitability Findings for D-E NCA............................................................................ 316

Figure O.4. Gunnison River Segment 3 ...................................................................................... 317

Figure O.5. Gunnison River Segment 1 ...................................................................................... 324

Figure O.6. Big Dominguez Creek Segment 1 ............................................................................ 330

Figure O.7. Big Dominguez Creek Segment 2 ............................................................................ 336

Figure O.8. Little Dominguez Creek Segment 1 ......................................................................... 341

Figure O.9. Little Dominguez Creek Segment 2 ......................................................................... 346

Figure O.10. Rose Creek.............................................................................................................. 351

Figure O.11. Escalante Creek Segment 1 .................................................................................... 356

Figure O.12. Escalante Creek Segment 2 .................................................................................... 363

Figure O.13. Cottonwood Creek .................................................................................................. 368

Figure O.14. Cottonwood Creek Suitable Segment..................................................................... 370

Table O.4. Members of the BLM's Interdisciplinary Team ........................................................ 374

Figure P.1. Livestock Grazing Fugitive Dust Emissions from Heavy Equipment Operations... 376

Figure P.2. Livestock Grazing Exhaust Emissions Factors for Diesel Heavy Equipment .......... 377

Figure P.3. Livestock Grazing Exhaust Emissions from Diesel Heavy Equipment.................... 378

Figure P.4. Livestock Grazing Fugitive Dust Emissions from Commuting Traffic .................... 379

BLM_0028415

Figure P.5. Livestock Grazing Exhaust Emissions from Commuting Traffic ............................ 380

Figure P.6. Livestock Grazing Methane Emissions Factors ...................................................... 381

Figure P.7. Livestock Grazing Methane Emissions ................................................................... 381

Figure P.8. Recreation Exhaust Emissions Factors for OHVs .................................................. 382

Figure P.9. Recreation Exhaust Emissions from OHVs ............................................................ 382

Figure P.10. Recreation Fugitive Dust from OHV Use ............................................................ 383

Figure P.11. Trail and Travel Management Exhaust Emissions Factors for Heavy Equipment  384

Figure P.12. Trail and Travel Management Exhaust Emissions from Heavy Equipment .......... 385

Figure P.13. Trail and Travel Management Dust and Exhaust Emissions from Road Maintenance
.................................................................................................................................................... 386

*Table of Contents*

This page intentionally left blank

BLM_0028417

# Acronyms and Abbreviations

**ACEC** Area of Critical Environmental Concern

**AO** Authorized Officer

**APE** Area of Potential Effect

**APLIC** Avian Power Line Interaction Committee

**APP** Avian Protection Plan

**ATV** All-Terrain Vehicle

**AUM** Animal Unit Month

**BLM** United States Department of the Interior, Bureau of Land Management

**BMP** Best Management Practice

**BOR** United States Department of the Interior, Bureau of Reclamation

**CARPP** Comprehensive Air Resource Protection Plan

**CDOW** Colorado Division of Wildlife

**CEQ** Council on Environmental Quality

**CFR** Code of Federal Regulations

**CNHP** Colorado Natural Heritage Program

**COTI** Colorado Outdoor Training Initiative

**CPW** Colorado Parks and Wildlife

**CWCB** Colorado Water Conservation Board

**D-E NCA** Dominguez-Escalante National Conservation Area

**DR** Decision Record

**EA** Environmental Assessment

**EIS** Environmental Impact Statement

**EPA** United States Environmental Protection Agency

BLM_0028418

**ERMA** Extensive Recreation Management Area

**ESA** Endangered Species Act of 1973

**FLPMA** Federal Land Policy and Management Act of 1976

**FONSI** Finding of No Significant Impact

**FRCC** Fire Regime Condition Class

**GIS** Geographic Information System

**GJFO** Grand Junction Field Office

**IDT** Interdisciplinary Team

**IMBA** International Mountain Bicycling Association

**LHA** Land Health Assessment

**MIST** Minimum Impact Suppression Tactics

**MOU** Memorandum of Understanding

**NCA** National Conservation Area

**NEPA** National Environmental Policy Act of 1969

**NHPA** National Historic Preservation Act of 1966

**NHT** National Historic Trail

**NRCS** U.S. Department of Agriculture Natural Resources Conservation Service

**NRHP** National Register of Historic Places

**OHV** Off-Highway Vehicle

**Omnibus Act** Omnibus Public Land Management Act of 2009

**ORV** Outstandingly Remarkable Value

**PEIS** Programmatic EIS

**PFC** Properly (or Proper) Functioning Condition

**P.L.** Public Law

**PFYC** Potential Fossil Yield Category

*Acronyms and Abbreviations*

BLM_0028419

**PPSV** Planning for Priority Species and Vegetation

**PSD** Prohibit Surface Disturbance

**RMA** Recreation Management Area

**RMP** Resource Management Plan

**RMZ** Recreation Management Zone

**RoC** Risk of Contact

**ROW** Right-of-Way

**SHPO** State Historic Preservation Office

**SRMA** Special Recreation Management Area

**SRP** Special Recreation Permit

**SSR** Site-Specific Relocation

**T&E** Threatened and Endangered

**TMDL** Total Maximum Daily Load

**TMO** Trail Management Objective

**TMP** Travel Management Plan

**UFO** Uncompahgre Field Office

**USDA** United States Department of Agriculture

**USFS** United States Forest Service

**USFWS** United States Fish and Wildlife Service

**USGS** United States Geological Survey

**VRM** Visual Resource Management

**WAFWA** Western Association of Fish and Wildlife Agencies

**WSA** Wilderness Study Area

**WSR** Wild and Scenic River

*Acronyms and Abbreviations*

This page intentionally left blank

BLM_0028421

# 1. Resource Management Plan Decisions

## 1.1. Purpose of and Need for the RMP

The purpose of this RMP is to provide for long-term conservation and protection of the "unique and important values" of the D-E NCA that were identified in the area's enabling legislation: the Omnibus Public Land Management Act of 2009, Public Law 111-11. These values include the "geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, and scenic resources of the public lands, as well as the water resources of area streams, based on seasonally available flows, that are necessary to support aquatic, riparian, and terrestrial species and communities." The Omnibus Act specified that these values be conserved and protected "for the benefit and enjoyment of present and future generations." Furthermore, in recognition of the historic and current traditional use of the NCA area for livestock grazing, the Omnibus Act specifically stated that the BLM "shall issue and administer any grazing leases or permits in the Conservation Area in accordance with the laws (including regulations) applicable to the issuance and administration of such leases and permits on other land under the jurisdiction of the Bureau of Land Management."

In determining the suite of management actions necessary to protect, conserve, and enjoy the D-E NCA's important resources and manage its uses over time, this plan responds to four important sources of overarching guidance:

- The portion of the Omnibus Act (Section 2402) that established the D-E NCA and provided guidelines for its management, specifically the direction to manage the area "in a manner that conserves, protects, and enhances the resources and values of the Conservation Area" and to "develop a comprehensive management plan for the long term protection and management of the Conservation Area."

- The portion of the Omnibus Act (Section 2002) that established the National Landscape Conservation System and provided a vision for how the components of this system should be managed, specifically the direction to "conserve, protect, and restore" the system's components for the "benefit of current and future generations."

- The portion of the Wilderness Act of 1964 that governs the management of designated Wilderness Areas, including the Dominguez Canyon Wilderness, which was also established in the Omnibus Act (Section 2403) and falls within the D-E NCA.

- The Federal Land Policy and Management Act of 1976, including the portion that established the concept of multiple use as the practice of managing

    the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all

BLM_0028422

of these resources or related services over areas large enough to provide
sufficient latitude for periodic adjustments in use to conform to changing
needs and conditions; the use of some land for less than all of the resources;
a combination of balanced and diverse resource uses that takes into account
the long-term needs of future generations for renewable and nonrenewable
resources, including, but not limited to, recreation, range, timber, minerals,
watershed, wildlife and fish, and natural scenic, scientific and historical
values; and harmonious and coordinated management of the various
resources without permanent impairment of the productivity of the land and
the quality of the environment with consideration being given to the relative
values of the resources and not necessarily to the combination of uses that
will give the greatest economic return or the greatest unit output.

In considering consistency between the Omnibus Act and FLPMA, Section 302 of FLPMA states
that public lands are to be managed under the principles of multiple use and sustained yield
"except that where a tract of such public land has been dedicated to specific uses according to
any other provisions of law it shall be managed in accordance with such law." Therefore, if
management of the BLM's multiple use and sustained yield mission conflicts with the Omnibus
Act, the language provided within the Omnibus Act applies (BLM 2012b)[1].

Recognizing these purposes, a new RMP is needed to ensure that the long-term management of
these lands achieves a level of protection and conservation consistent with the legislative
guidance described above.

The planning area is currently managed under two RMPs: the 1987 Grand Junction RMP (BLM
1987) as amended and the 1989 Uncompahgre Basin RMP (BLM 1989a) as amended. Although
the planning area has long been recognized for its outstanding resource and recreational values, a
new plan is needed to ensure consistency across the D-E NCA. This new plan will ensure that the
D-E NCA is managed as a single unit, rather than as a collection of individual values, and will
ensure that the BLM responds to its internal guidance that all national conservation areas have
stand-alone land use plans (BLM 2012b).

Other major issues contributing to the need for a new RMP include the following:

- Increased (and more varied) recreation demand due to population growth,
  demographic changes, and technological advances.

- New information in fields such as climate science, biology, ecology, geology,
  paleontology, hydrology and archaeology.

---

[1] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

*1. Resource Management Plan Decisions*

BLM_0028423

- Increased demand for educational opportunities associated with public lands.

# 1.2. Decisions

This D-E NCA Approved RMP describes goals, objectives, allowable use and management action decisions, as well as some implementation-level decisions established for BLM lands within the D-E NCA. The decisions are described in detail by program in section 2 under three category headings: Resources, Resource Uses and Special Designations. To make them easier to refer to, program areas have been assigned specific, abbreviated category codes (see Tables 1.1 to 1.3). Decisions within each program area have been coded in a way that shows the hierarchy of decision-making, from goals to implementation decisions:

- TRV-GOAL-01: First transportation and travel management program goal
  - TRV-OBJ-01: First transportation and travel management program objective
    - TRV-MA-01 or TRV-AU-01: First transportation and travel management program management action or allowable use decision
    - TRV-MA-02 or TRV-AU-02: Second transportation and travel management program management action or allowable use decision
      - TRV-IMP-01: First transportation and travel management program implementation decision

Please note that all acreages and maps in this Approved RMP are estimations based on current data. Updating these data is considered plan maintenance, which will occur over time as the BLM implements the Approved RMP, completes additional surveys, and obtains new information. Most allocation decisions were made based on a 210,012-acre planning area that includes the original 209,610 acres of public land within the NCA boundary at the time of the designation of the NCA in 2009, plus lands acquired between designation and the beginning of the RMP planning process. The BLM has since acquired 160 additional acres during the planning process that were not included in RMP allocation acreages but will be managed in accordance with the surrounding area allocations.

Note that acreage figures may vary throughout this document because of variability in the best available current survey and Geographic Information System (GIS) data for each resource. For example, the 2009 Omnibus Act designated the 66,280 acre Dominguez Canyon Wilderness Area. Since the act, updated survey data have resulted in changes to the Geographic Coordinate Data Base, whereby private land boundary location information has been refined. Therefore, where the Wilderness boundary as defined by Congress corresponds to private land boundaries, the Wilderness boundary is now more precisely mapped, and the acreage is a more accurate estimation of the lands contained within the boundaries. Maps and acreage calculations are only depictions of RMP decisions; although acreage calculations and mapping may change through

BLM_0028424

plan maintenance, the text descriptions of the area allocations are planning-level decisions that would require an RMP amendment to change.

## Table 1.1. Resource Program Categories and Abbreviations

| Resource Category | Code |
| --- | --- |
| Geological and paleontological resources | GPA |
| Biological systems—priority species and vegetation | PSV |
| Desert shrub/saltbush | PSV-DSS |
| Pinyon-juniper woodlands | PSV-PJW |
| Sagebrush shrublands | PSV-SGS |
| Ponderosa pine | PSV-PPN |
| Mountain shrubland | PSV-MTS |
| Riparian | PSV-RIP |
| Seeps and springs | PSV-SSP |
| Aquatic systems | PSV-AQS |
| Special status species and natural communities | SSS |
| Desert bighorn sheep | SSS-DBS |
| Colorado hookless cactus | SSS-CHC |
| All other special status species and communities | SSS-OTH |
| Fish and wildlife (non-special status) | F&W |
| Noxious and invasive weeds | INV |
| Fire and fuels | WFM |
| Soils and water quality | SWQ |
| Cultural resources | CUL |
| Lands with wilderness characteristics | LWC |
| Scenic resources | VIS |
| Air | AIR |

## Table 1.2. Resource Use Program Categories and Abbreviations

| Resource Use Category | Code |
| --- | --- |
| Recreation | REC |
| Special recreation management areas | REC-SRMA |
| Extensive recreation management areas | REC-ERMA |
| Scientific use | SCI |
| Educational use | EDU |
| Forestry | FOR |

BLM_0028425

| Resource Use Category | Code |
|---|---|
| Livestock grazing | GRZ |
| Transportation and travel management | TRV |
| Land tenure and land use authorizations | LAN |

**Table 1.3. Special Designation Program Categories and Abbreviations**

| Special Designation Category | Code |
|---|---|
| Areas of critical environmental concern | ACEC |
| National historic trails | NHT |
| Wild and scenic rivers | WSR |
| Wilderness | WIL |
| Wilderness study areas | WSA |
| Watchable wildlife areas | WWA |

# 1.3. List of Appendices

Table 1.4 briefly describes the Appendices in this Approved RMP, which provide supporting information for the BLM's decisions. Maps depicting resource information, stipulations applicable to surface-disturbing activities, and travel management route designations are in Appendix R.

**Table 1.4. List of Appendices**

| Appendix | Description |
|---|---|
| Appendix A. Planning for Priority Species and Vegetation | Describes the process used by the BLM to help organize biological data and analyses, which were used to support the BLM's decisions. |
| Appendix B. Description of Surface Disturbance Restrictions | Defines the types of surface disturbance restrictions: prohibit surface-disturbing activities (PSD), prohibit disruptive activities, site-specific relocation (SSR), and prohibit in-channel work. |
| Appendix C. Modeling the Probability of Bighorn/Domestic Sheep Association | Describes the methodology used by the BLM to model the probability of association between bighorn sheep and domestic sheep. |
| Appendix D. Colorado Standards for Public Land Health | Describes the conditions needed to sustain public land health, and relates to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape. |
| Appendix E. Raptor Species Breeding Periods | Has a table of information that will be used to determine the dates associated with stipulations for raptors |

BLM_0028426

Dominguez-Escalante National Conservation Area                                                    20
APPROVED RESOURCE MANAGEMENT PLAN

| Appendix | Description |
|---|---|
| Appendix F. Colorado Noxious Weed List | Information from the Colorado Department of Agriculture (http://www.colorado.gov/ag/weeds). |
| Appendix G. Naturalness in the Dominguez Canyon Wilderness | Describes the multi-step process used by the BLM to plan for naturalness. |
| Appendix H. Minimum Requirements Decision Guide Overview | Provides general information about the MRDG process, its origination, and how it relates to other processes such as NEPA analysis. |
| Appendix I. Special Recreation Permit Program Overview | Describes the process by which the BLM will evaluate all new special recreation permit (SRP) proposals |
| Appendix J. Best Management Practices for Management Actions | Provides a list of common standard operating procedures and best management practices that are followed by the BLM. |
| Appendix K. Trail Design Criteria | Describes criteria that are used to determine suitable locations for new trails and trail reroutes within the D-E NCA. |
| Appendix L. Special Recreation Management Area Recreation Setting Descriptions | Outlines the desired setting characteristics for special recreation management areas (SRMAs). |
| Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern | Presents the methods used in the BLM's evaluation of all existing and proposed areas of critical environmental concern (ACECs). |
| Appendix N. Comprehensive Travel and Transportation Management Plan | Describes how the BLM will plan for and manage access and travel systems on its public lands. |
| Appendix O. Wild and Scenic River Suitability Report | Finalizes the first two steps in the wild and scenic river study process (determination of eligibility and tentative classification) and completes the third step: determination of whether eligible segments are suitable. |
| Appendix P. Air Resources | Provides detailed information on the emissions inventory calculations and results for the BLM's management activities and includes the Comprehensive Air Resource Protection Plan (CARPP). |
| Appendix Q. Omnibus Public Land Management Act of 2009 (Subtitle E—Dominguez-Escalante National Conservation Area) | Contains the portions of the Omnibus Public Land Management Act of 2009 (Public Law 111–11) that created the Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness. |
| Appendix R. Maps | Contains the maps referred to in this document. |
| Appendix S. Biological Opinion | Biological opinion from U.S. Fish and Wildlife Service on effects to federally threatened and endangered species. |

*1. Resource Management Plan Decisions*

# 2. Decisions by Category

## 2.1. RESOURCES

### 2.1.1. Geological and Paleontological Resources

**GPA-GOAL-01:**[2] *Conserve and protect the D-E NCA's paleontological resources, unique geologic features, and examples of geologic processes.*

**GPA-OBJ-01:** *Maintain the unique geological and paleontological purposes of the D-E NCA by identifying, protecting and preserving fossil sites and unique geologic landforms.*

**GPA-AU-01:** Apply site-specific relocation (See Appendix B and Map 2-2) in areas where outstanding geological features have been identified and could be damaged, including examples of faults, ripple marks, cross-bedding, lithified mud cracks, angular unconformities, or geomorphological features.

**GPA-MA-01:** Conduct geological mapping for outstanding geologic features in the following areas:

- Escalante Canyon
- East Creek
- Other areas with potential for damage to outstanding geologic features

**GPA-AU-02:** Prohibit the installation of permanent climbing anchors in areas where outstanding geologic features could be damaged.

**GPA-MA-02:** Require paleontological clearances/surveys and/or mitigation prior to bedrock-disturbing activities in Potential Fossil Yield Category (PFYC) Class 4 and 5 areas, as well as Class 3 areas that are likely to contain high potential for scientifically significant fossils (Map 3-2). Avoid or recover significant resources through the authorization process.

**GPA-MA-03:** Prioritize monitoring of known surficial localities of vertebrate or other scientifically important fossils in order to protect these resources from vandalism and theft.

**GPA-AU-03:** Restrict collecting of fossils (including vertebrate, trace, plant and invertebrate fossils) to scientific purposes and Native American spiritual or traditional uses, and require valid BLM Paleontological Resources Use Permits.

**GPA-AU-04:** Do not issue permits for collection of rocks in the D-E NCA, except where collection is intended for legitimate scientific uses or Native American spiritual or traditional uses. For these exceptions, applicants will acquire a permit from the BLM by providing documentation to the satisfaction of the

---

[2] See section 1.1 for an explanation of category codes.

BLM_0028428

responsible management official.

Casual use surface collection of rocks is allowed, however surface disturbance (i.e., digging holes in soil or bedrock in order to find or collect samples) is prohibited.

---

**GPA-GOAL-02:** *Increase knowledge of undocumented paleontological and unique geological resources in the D-E NCA.*

---

**GPA-OBJ-02:** *Provide for scientific and educational opportunities related to paleontological and geological resources.*

---

**GPA-OBJ-03:** *Strive to inventory 10% of areas classified as PFYC Class 4 and 5 within 20 years.*

---

**GPA-MA-04:** Continue the ongoing compilation and analysis of all available paleontological and geological resource data and literature to provide an informed basis for understanding paleontological and geological resources within and/or near the D-E NCA and to provide immediate protection for paleontological resources at risk.

---

**GPA-AU-05:** Allow paleontological research that improves understanding of the resource under valid BLM paleontological resource use permits and for geologic research using a combination of hand tools and mechanical equipment. Exception: where more restrictive wilderness rules apply.

---

**GPA-OBJ-03:** *Provide public education opportunities through self-guided exploration and through interpretation.*

---

**GPA-MA-05:** Identify appropriate opportunities for interpretation (both on-site and off-site) related to paleontology and geology.

---

**GPA-MA-06:** As sites are identified, allocate appropriate sites (including active or retired research sites) for education and interpretative use by the public.

---

**GPA-MA-07:** If these areas can be protected in doing so, provide interpretive sites at the following locations:

- Gunnison Gravels site
- Escalante Canyon
- Young Egg Locality
- Burrit Bone Bed locality

## 2.1.2. Biological Systems—Priority Species and Vegetation

**PSV-GOAL-01:** *Conserve, protect and enhance the natural, riparian, wildlife and water resources of the D-E NCA.*

---

BLM_0028429

**PSV-OBJ-01:** *Enhance or maintain all rankings for priority species and vegetation attributes that are currently in "good" or "very good" condition (Appendix A).*

**PSV-OBJ-02:** *Enhance the rankings for priority species and vegetation attributes that are currently in "fair" or "poor" condition to move toward "good" condition. (Appendix A).*

**PSV-MA-01:** Reassess or re-evaluate priority species and vegetation standards and current condition in association with land health assessments, or on a more frequent basis than land health assessments.

**PSV-MA-02:** Use vegetation treatments and/or restrictions on allowable uses to meet priority species and vegetation objectives.

**PSV-MA-03:** All use of plant materials for restoration and revegetation efforts should be designed in order to meet biological objectives. Emphasize the use of native plant materials for restoration and revegetation efforts using the following prioritization criteria:

1. Locally derived
2. Regionally derived
3. Native to ecoregion
4. Native to North America

If criteria 1 through 4 are not feasible, use of noninvasive, non-native plant materials may be used outside the Dominguez Canyon Wilderness. Non-native plant materials will not be used within the Wilderness.

Ensure seed mixes are free of State-listed noxious weed seeds.

**PSV-MA-04:** Restrict, adjust, or intensively manage allowable uses that are currently preventing achievement of priority species and vegetation objectives.

**PSV-AU-01:** Allow for the authorized collection of plant materials (including firewood) within the D-E NCA, where doing so helps achieve biological and/or cultural resource objectives.

Evaluate yearly and designate as-needed firewood collection areas in order to conserve, protect or enhance biological and/or cultural resources, while maintaining the recreational value of this traditional use for the communities.

**PSV-AU-02:** Designate Christmas tree cutting areas where doing so helps meet goals and objectives established for biological resources in the D-E NCA, and evaluate such areas on yearly basis.

**PSV-MA-07:** Priority habitats for the D-E NCA are desert shrub/saltbush, pinyon-juniper woodlands, sagebrush shrublands, ponderosa pine, mountain shrub, riparian, seeps and springs, and aquatic systems.

**PSV-OBJ-03:** *Reduce habitat fragmentation throughout the D-E NCA, with an emphasis on maintaining or improving corridors for plants, fish and wildlife.*

**PSV-MA-08:** Reduce route density through travel management decisions in order to minimize habitat

BLM_0028430

fragmentation and to meet PPSV objectives.

## 2.1.2.1. Desert Shrub/Saltbush

**PSV-DSS-GOAL-01:** *Conserve, protect and enhance desert shrub/saltbush vegetative communities and associated wildlife.*

**PSV-DSS-OBJ-01:** *Improve the plant composition of the D-E NCA's desert shrub/saltbush vegetation type to achieve public land health standards and move toward the following management targets:*

1. *80% (or more) of sampled acres contain adequate mixtures of warm and cold season grasses, shrubs and forbs*

2. *80% (or more) of sampled acres exhibit an acceptable composition of understory invasive plant species (<10% relative cover)*

3. *80% (or more) of sampled acres meet Land Health Standard 3.*

**PSV-DSS-MA-01:** Use vegetation treatments (e.g., introduction of biological controls, chemical treatments, seeding) to improve native vegetation composition and structure in desert shrub/saltbush communities. Prior to completing vegetation treatments: establish research or pilot plots in the D-E NCA to determine successful treatment prescriptions (exemption: noxious and/or invasive weed treatments); or ensure that likely outcomes are known on the basis of other tests conducted in the region. Use existing research or pilot plots from the D-E NCA or tests being conducted in similar habitats to inform vegetation treatment prescriptions in this vegetation type.

**PSV-DSS-MA-02:** Minimize disturbance of intact desert shrub/saltbush vegetation from authorized uses that are shown to cause substantial degradation (e.g., sheep bed grounds, livestock active movement, livestock salt and water placement, livestock developments, routes and recreational developments). Also minimize ground disturbing fire suppression activities.

**PSV-DSS-MA-03:** Allow unplanned fire for resource benefit where it can be demonstrated that fire is neutral to or can help achieve biological resource objectives.

**PSV-DSS-MA-04:** To improve conditions in desert shrub/saltbush communities, limit the grazing use period below 6,000 feet elevation (due to low annual precipitation) to October 1 to April 15 in order to avoid times when plants are actively growing.

This limitation may be modified in an allotment management plan or grazing use agreement intended to help achieve biological objectives; e.g., 1 year of grazing during spring/summer followed by 2 years of rest.

The change in the grazing use period will be phased in over a 3-year period.

## 2.1.2.2. Pinyon-Juniper Woodlands

**PSV-PJW-GOAL-01:** *Conserve, protect and enhance pinyon-juniper woodlands vegetative communities and associated wildlife including: Montrose bladderpod, Grand Junction milkvetch (Astragalus linifolius), Naturita milkvetch (Astragalus naturitensis), midget-faded rattlesnake, spotted bat, Townsend's big-eared bat, fringed myotis, northern goshawk, milk snake, longnose leopard lizard and various migratory bird species.*

**PSV-PJW-OBJ-01:** *Manage for public land health standards in the D-E NCA's pinyon-juniper woodlands and*

BLM_0028431

*move toward the following conditions in the D-E NCA's pinyon-juniper woodlands:*

- *55-75% of sampled acres are classified as old growth or late seral*
- *95% (or more) of sampled acres contain adequate mixtures of warm and cold season grasses, shrubs, forbs and trees*

---

**PSV-PJW-MA-01:** Avoid vegetation treatments and use of planned wildland fire in ancient pinyon-juniper woodlands (note: these stands are rarer than old growth or late seral pinyon-juniper woodlands). In balance with other resource and fire objectives, protect ancient pinyon-juniper woodlands in the case of unplanned wildland fire.

---

**PSV-PJW-MA-02:** Use vegetation treatments (e.g., introduction of biological controls, chemical treatments, seeding, and targeted grazing) as well as management of planned and unplanned wildland fire to improve plant composition and structure in pinyon-juniper woodland communities.

Emphasize management in previously treated woodlands.

## 2.1.2.3. Sagebrush Shrublands

**PSV-SGS-GOAL-01:** *Conserve, protect and enhance sagebrush shrublands vegetative communities and associated wildlife, including: Gunnison sage-grouse, Grand Junction milkvetch, Brewer's sparrow and various migratory bird species.*

---

**PSV-SGS-OBJ-01:** *Improve the plant composition of the D-E NCA's sagebrush shrublands vegetation type to achieve public land health standards and move toward the following management targets:*

- *80% (or more) of sampled acres contain adequate mixtures of warm and cold season grasses, shrubs and forbs*
- *95% (or more) of sampled acres exhibit an acceptable composition of understory invasive plant species (<10% relative cover)*
- *95% (or more) of sampled acres have acceptable levels (less than 50% relative understory cover) of crested wheatgrass*
- *80% (or more) of sampled acres have moderate cover of sagebrush (10-30% cover)*

---

**PSV-SGS-MA-01:** Use vegetation treatments (e.g., mechanical treatments, chemical treatments, planned and unplanned wildfire, reseeding, targeted grazing) to move towards meeting structural habitat guidelines and primary constituent elements of designated critical habitat found within the Gunnison sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005), or comparable, best available scientific guidance.

---

**PSV-SGS-MA-02:** Apply vegetation treatments to reintroduce and/or increase cover of sagebrush in old vegetation treatment areas where it was removed.

---

**PSV-SGS-MA-03:** Apply vegetation treatments to reintroduce native grass, forb and shrub species in old vegetation treatment areas where crested wheatgrass is now a dominant species.

Prior to completing vegetation treatments: establish research or pilot plots in the D-E NCA to determine successful treatment prescriptions (exemption: noxious and/or invasive weed treatments); or ensure that

BLM_0028432

likely outcomes are known on the basis of other tests conducted in the region.

Use existing research or pilot plots from the D-E NCA or surrounding region to inform vegetation treatment prescriptions in this vegetation type.

---

**PSV-SGS-OBJ-02:** *Reduce fragmentation and disturbance in the D-E NCA's sagebrush shrublands to achieve public land health standards, benefit Gunnison sage-grouse and other sagebrush obligate species and move toward the following management target:*

- *60 acres (or more) is the average size of unfragmented sagebrush shrublands.*

---

**PSV-SGS-MA-04:** Prohibit the construction of new routes in existing, unfragmented sagebrush shrublands 60 acres or larger.

Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met:

- Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere.
- New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation.

New routes and reroutes will be sited to avoid encompassing more than half of the perimeter of the patch.

---

**PSV-SGS-MA-05:** Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks. Prioritize the largest patches in sage-grouse critical habitat.

---

**PSV-SGS-MA-06:** On sites where the Ecological Site Description potential is for sagebrush shrublands, prevent expansion of pinyon-juniper vegetation into these areas using mechanical and/or manual treatments, and planned or unplanned wildfire.

## 2.1.2.4. Ponderosa Pine

**PSV-PPN-GOAL-01:** *Conserve, protect, and enhance ponderosa pine vegetative communities and associated wildlife, including: northern goshawk, milk snake, spotted bat, Townsend's big-eared bat, fringed myotis and various migratory bird species.*

---

**PSV-PPN-OBJ-01:** *Improve the fire regime condition class (FRCC) in ponderosa pine stands in order to achieve public land health standards and move toward the following management target:*

- *FRCC 2 trending toward 1*

---

**PSV-PPN-MA-01:** Reduce the amount of ladder fuels and young trees, and reduce tree density in existing ponderosa pine stands with FRCCs 2 or 3. Retain larger snags to maintain wildlife habitat function.

---

**PSV-PPN-OBJ-02:** *Manage for the historic area and age class distribution of ponderosa pine woodland, while managing for public land health standards. Emphasize retention of old-age trees and snags.*

---

**PSV-PPN-MA-02:** Identify the historic extent of ponderosa pine woodlands.

BLM_0028433

Where the current extent of ponderosa pine woodlands is shown to have contracted, use vegetation treatments, natural and prescribed and planned and unplanned wildland fire to support the expansion of ponderosa pine woodlands.

Use natural and active revegetation to achieve diversity in age classes across the landscape

## 2.1.2.5. Mountain Shrubland

**PSV-MTS-GOAL-01:** *Conserve, protect and enhance mountain shrub vegetative communities and associated wildlife including various migratory birds.*

**PSV-MTS-OBJ-01:** *Manage for public land health standards in the D-E NCA's mountain shrub communities, while maintaining the following condition:*

- *15% (or more) of the D-E NCA's mountain shrub communities are within each of the following age classes: early, mid and late seral.*

**PSV-MTS-MA-01:** Use planned and unplanned fire and vegetation treatments, as appropriate, to maintain or improve the current diversity of age classes in mountain shrub communities.

## 2.1.2.6. Riparian

**PSV-RIP-GOAL-01:** *Conserve, protect and enhance riparian vegetative communities and associated wildlife including: bonytail, humpback chub, razorback sucker, Colorado pikeminnow, roundtail chub, bluehead sucker, flannelmouth sucker, green lineage cutthroat trout, canyon tree frog, Northern leopard frog, bald eagle, Western yellow-billed cuckoo, white-faced ibis, American white pelican, black swift, big free-tailed bat, spotted bat, Townsend's big-eared bat, fringed myotis and various migratory birds and waterfowl.*

**PSV-RIP-OBJ-01:** *Manage for public land health standards in the D-E NCA's riparian communities, while moving toward the following management target:*

- *95% (or more) of sampled riparian miles are in PFC*

**PSV-RIP-AU-01:** To protect riparian values, limit livestock use in riparian areas along the following rivers/creeks to active movement between grazing areas (see Livestock Grazing, section 2.2.4, GRZ-AU-01, and Map 2-4):

- Big and Little Dominguez Creeks
- Dry Fork of Escalante Creek
- Escalante Creek below forks
- Escalante Creek above forks
- Rose Creek

If land health concerns associated with livestock use are documented along the Gunnison River or in other riparian areas, limit livestock use in the riparian area to active movement between grazing areas.

**PSV-RIP-AU-02:** Limit camping to designated sites in the Gunnison River corridor.

Limit camping in other riparian areas to designated sites when conditions are shown to be deteriorating as a result of this use, on the basis of riparian indicators identified in Appendix A.

BLM_0028434

**PSV-RIP-AU-03:** Prohibit campfires in riparian and wetland areas, except as permitted at designated or developed campsites. See section 2.2.1.1, Gunnison River SRMA, for specific guidance on camping.

**PSV-RIP-MA-01:** Minimize travel routes in and crossing riparian and wetland areas. When routes are contributing to continued decline, do one or more of the following:

- Close and rehabilitate
- Relocate the routes
- Re-engineer these routes

Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.).

**PSV-RIP-MA-02:** Locate new routes outside of riparian and wetland areas. Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or protect crossings at necessary crossing locations.

**PSV-RIP-MA-03:** Apply SSR (see Appendix B and Map 2-2) restrictions within a minimum of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage) of streams possessing lotic riparian characteristics.

However, where the riparian corridor width is greater than 100 meters (328 feet) from the ordinary high-water mark, apply SSR restrictions within the riparian zone.

**PSV-RIP-OBJ-02:** *Manage riparian areas for desirable native wetland vegetation composition and structure in order to achieve public land health standards and move toward the following management targets:*

- *80% (or more) of sampled sites along the Gunnison River have acceptable levels (20% relative cover or less) of invasive plants*
- *Gain wetland obligates in more than 5% of riparian reaches (relative to current conditions)*
- *95% (or more) of suitable stream reaches support historical proportions of age classes and vegetation composition of woody native species (willows and cottonwoods)*

*See INV-MA-01 to 05 in section 2.1.5 for more information on noxious and invasive weed treatment.*

*See SWQ-MA-01 to 03 in section 2.1.7 for more information on water flow protections*

**PSV-RIP-MA-04:** Restore native riparian species in degraded areas by planting, seeding and by relying on natural regeneration associated with flooding and successional processes.

**PSV-RIP-MA-05:** Within SRMAs: Prioritize non-native plant treatments to most efficiently achieve both biological and recreation objectives.

In all other areas: Prioritize non-native plant treatments to most efficiently achieve biological resource objectives.

**PSV-RIP-MA-06:** Treat tamarisk, Russian olive and elm (and other woody non-native plants) with a

BLM_0028435

phased approach. Remove patches of woody non-natives to:

- Allow for the establishment of native species in treated patches prior to treating adjacent patches
- Minimize disruption to habitat connectivity
- Conduct active restoration in disturbed patches

---

**PSV-RIP-AU-04:** Prohibit firewood harvest or collection of native species in riparian and wetland areas (exception: driftwood). Allow for noncommercial (permitted) or commercial harvest of non-native species such as tamarisk or other approved species.

## 2.1.2.7. Seeps and Springs

**PSV-SSP-GOAL-01:** *Conserve, protect and enhance naturally occurring seeps and springs as important landscape features within the D-E NCA, including rare plants such as Eastwood's monkey-flower.*

---

**PSV-SSP-OBJ-01:** *Manage the D-E NCA's seeps and springs in order to achieve public land health standards and move toward the following management targets:*

- *Stable 10-year trend of wetland/riparian area around naturally occurring seeps and springs*
- *Less than 5% of naturally occurring seeps and springs have evidence of trampling and human disturbance in the wetland area*

---

**PSV-SSP-AU-01:** Apply SSR (see Appendix B and Map 2-2) within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone of naturally occurring seeps and springs (lentic riparian areas). Also apply SSR to the spring/seep recharge zone where it is determined to extend more than 100 meters from the riparian zone.

---

**PSV-SSP-MA-01:** In spring and seep recharge areas, maintain existing water developments in functional condition where needed to meet livestock management or wildlife needs. Otherwise, reclaim water developments to achieve biological resource objectives where practicable.

---

**PSV-SSP-MA-02:** For all new water developments, inspect and characterize all springs and seeps located inside the affected watershed, down gradient and within one mile of proposed development. Allow for new water developments when needed to achieve biological resource objectives and:

a)   Surface disturbing actions would not directly impact the source area

b)   Characterization of the spring/seep indicates recharge potential would not be significantly altered

---

**PSV-SSP-OBJ-02:** *Improve plant composition in and around seeps and springs in order to achieve public land health standards and move toward the following management targets:*

*For seeps and springs that contain rare species and communities:*

- 5% (or less) of naturally occurring seeps and springs have non-native perennial plants
- Gain wetland obligates in more than 5% of naturally occurring seeps and springs.

*For other seeps and springs:*

- 15% (or less) of naturally occurring seeps and springs have non-native perennial plants

BLM_0028436

- Loss or gain of wetland obligates from +- 5 percent of naturally occurring seeps and springs

---

**PSV-SSP-MA-03:** Reintroduce appropriate native, wetland obligate plant species to seeps and springs that have been degraded. Emphasize reintroductions in springs and seeps that lack rare species and communities.

---

**PSV-SSP-MA-04:** Categorize seeps and springs as high priorities for weed control. See section 2.1.5, INV-MA-01 to 05, for more details on weed control.

## 2.1.2.8. Aquatic Systems

**PSV-AQS-GOAL-01:** *Conserve, protect and enhance hydrologic and aquatic systems and associated fish and wildlife including bonytail, humpback chub, razorback sucker, Colorado pikeminnow, roundtail chub, flannelmouth sucker, bluehead sucker, green lineage cutthroat trout, canyon tree frog, and northern leopard frog.*

---

**PSV-AQS-OBJ-01:** *Improve BLM management of the Gunnison River corridor in order to achieve public land health standards and move toward the following management target:*

- *25% (or less) of the Gunnison River has evidence of channelization and riprap*

---

**PSV-AQS-MA-01:** Remove barriers to river channel movement in historically flood prone areas on BLM-administered lands along the Gunnison River to allow for periodic channel movement and the creation of microhabitats (e.g., backwaters, side channels, overflow channels, flooded bottom lands) for aquatic species.

---

**PSV-AQS-MA-02:** Minimize BLM actions that would further restrict natural migration of the Gunnison River.

---

**PSV-AQS-OBJ-02:** *Improve BLM management of the water resources of the D-E NCA's perennial creeks and river in order to meet public land health standards and move toward the following management targets:*

- *Shape and timing of spring runoff are comparable to natural conditions*
- *Quantity of water during critical spring runoff periods (4/1- 6/30) is at or above the 50th percentile of pre-dam (Gunnison River) and pre-diversion (tributary creeks) flow rates.*

---

**PSV-AQS-MA-03:** Engage in collaborative discussions with Gunnison River stakeholders—including Bureau of Reclamation (BOR), National Park Service, water users, Colorado River District, etc.—to manage the flow regime of the Gunnison River to support flow-dependent values (e.g., recreation, riparian, fish).

---

**PSV-AQS-MA-04:** Make recommendations to the Colorado Water Conservation Board for appropriation of new instream flow water rights or enlargement of existing instream flows on tributary streams to the Gunnison River within the D-E NCA in cases where data show that existing stream flow protection is insufficient to support water-dependent values.

---

**PSV-AQS-MA-05:** Apply to the Colorado water court for water rights in the name of the Federal

BLM_0028437

Government on all point water sources (e.g., springs, wells, ponds) located on BLM-administered lands within the D-E NCA.

**PSV-AQS-MA-06:** Work with appropriate local, State, and Federal agencies as well as adjoining land owners to fund and implement watershed restoration projects that would improve overall ecosystem health and contribute to the sustainability of existing State in-stream flow water rights in tributary creeks.

**PSV-AQS-OBJ-03:** *Improve BLM management of the D-E NCA's fish habitat in order to meet public land health standards and move toward the following management targets:*

- *95% (or more) of cold-water fish bearing stream miles rank as good in the Pfankuch stability rating*

- *Improve from current status (61–75%) the extent of historic warm-water habitat in the D-E NCA's tributary creeks that is accessible to fish residing in the Gunnison River.*

**PSV-AQS-MA-07:** Prohibit in-channel stream work (see Appendix B) in all cold-water occupied trout habitat during spring and fall spawning periods.

**PSV-AQS-MA-08:** Prohibit in-channel stream work (see Appendix B) in warm-water spawning habitat used by flannelmouth sucker, bluehead sucker, and roundtail chub from March 1 to June 30.

**PSV-AQS-MA-09:** Remove or modify man-made fish barriers between the Gunnison River and tributary creeks as opportunities or partnerships present themselves in order to improve aquatic habitat connectivity.

# 2.1.3. Special Status Species and Natural Communities

## 2.1.3.1. Desert Bighorn Sheep

**SSS-DBS-GOAL-01:** *Conserve, protect and enhance the D-E NCA's resident population of desert bighorn sheep.*

**SSS-DBS-OBJ-01:** *Maintain and improve habitat for desert bighorn sheep with an emphasis on supporting Colorado Parks and Wildlife (CPW) population goals for the Dominguez-Escalante herd.*

*Actions affecting desert shrub/saltbush, riparian areas, and pinyon-juniper woodlands are also related to this habitat objective (see section 2.1.2).*

**SSS-DBS-OBJ-02:** *Improve BLM management of domestic sheep grazing in the D-E NCA in order to meet public land health standards and reduce probability of association and disease transmission between domestic sheep/goats and desert bighorn sheep in accordance with BLM Manual MS-1730.*

**SSS-DBS-AU-01:** Exclude domestic goat but permit domestic sheep grazing and active movement in occupied bighorn sheep habitat. Manage domestic sheep grazing in occupied bighorn sheep habitat on an allotment-by-allotment basis using a model that assesses risk of contact or association between wild sheep

BLM_0028438

and domestic sheep (see Appendix C, Map 3-8B, and BLM Manual MS-1730). The risk of association assessment will be updated periodically as occupied bighorn habitat changes or when new science (e.g., vaccines, monitoring of desert bighorn sheep, improved modeling techniques) provides additional information.

**SSS-DBS-MA-01:** Manage domestic sheep grazing to provide effective separation from wild sheep using (as guidance) BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep; the WAFWA recommendations for domestic sheep and goat management in wild sheep habitat; and the interagency MOU for wild sheep management.

If monitoring indicates that mitigation measures are not effective at providing effective separation between domestic and wild sheep in an allotment or an area of an allotment, then require at least one of the following:

1. Implement additional measures (using the WAFWA recommendations as guidance) intended to improve effectiveness.

2. Remove the area from the allotment.

3. Combine that portion with adjacent cattle allotment.

4. Convert allotment to cattle.

Prioritize allotments with high risk of contact for site-specific grazing permit environmental analysis.

**SSS-DBS-AU-02:** Manage domestic sheep with the following restrictions on all allotments (Appendix C and Map 3-8B):

During domestic sheep permit renewal, assess domestic sheep season of use and bighorn breeding season overlap and make changes, if necessary:

- All domestic ewes must be bred before turn out onto the NCA.

- Mandatory use of at least two guard animals per domestic sheep band to deter comingling.

- Only healthy domestic sheep shall be turned out onto the NCA.

- No scheduled lambing of domestic sheep shall occur on NCA lands.

- Sweep allotments within 24 hours of moving off to capture any stray domestic sheep.

- Use of marker domestic sheep within bands; at least 1/100 head.

- Use only highly gregarious breeds of domestic sheep.

- Require submission of Actual Use Report at the end of grazing season.

- Require domestic sheep permittees to report all bighorn sheep sightings to the NCA.

- Remove sick, physically disabled or dead domestic sheep from the band on BLM-administered lands as soon as possible after discovery.

- Maintain a band of no greater than 2,000 head, based on manageability by herder.

**SSS-DBS-AU-03:** Manage domestic sheep with the following additional restrictions in moderate and high risk allotments (Appendix C and Map 3-8B):

All items in SSS-DBS-AU-02 plus the following:

- When opportunities arise, consider changing class of livestock (sheep to cattle or cattle to sheep) in allotments with moderate risk of contact between domestic and wild sheep if doing so would reduce risk.

*2. Decisions by Category*

BLM_0028439

- Prohibit the changing of permitted class of livestock from cattle to sheep unless new science and technology nullifies risk. Exception: when swapping sheep grazing from a high risk to a moderate risk allotment.

- No domestic rams will be permitted.

- Mandatory use of at least two guard animals per domestic sheep band to deter comingling. Additional guard animals will be determined through coordination between permittee and the BLM, considering WAFWA recommendations, permittee's effectiveness at preventing association in previous years, and recreation conflicts.

- Require a submission of Dead Report to be turned in with Actual Use Report.

- Decrease risk of association between bighorn and domestic sheep by creating barriers to movement (fences, herding, etc.), utilizing available topographic and natural barriers where feasible.

- During spring use, limit band size for ewes with lambs. Numbers will be determined at permit renewal based on site-specific information.

**SSS-DBS-AU-04:** Manage domestic sheep with the following restrictions in high risk allotments (Appendix C and Map 3-8B):

All items in SSS-DBS-AU-02 and SSS-DBS-AU-03 plus the following:

- Where feasible shorten the time period spent close to known bighorn use areas.

- When opportunities arise, change permitted class of livestock from sheep to cattle.

**SSS-DBS-AU-05:** Actively seek opportunities for swapping of allotments with permitted domestic sheep grazing use for allotments with permitted cattle grazing use in order to move domestic sheep grazing from high or moderate risk allotments to low risk allotments (Appendix C and Map 3-8B). Do not allow swapping of cattle use for sheep use in high risk or moderate risk allotments except when swapping sheep grazing from a high risk to a moderate risk allotment.

Any conversion of an allotment from sheep to cattle will be a one-way, permanent conversion for that allotment.

Convene a stakeholder group to identify opportunities and solutions.

**SSS-DBS-MA-02:** Coordinate with CPW when proposed bighorn sheep population augmentations may affect BLM permitted activities.

**SSS-DBS-OBJ-03:** *Manage the D-E NCA's desert bighorn sheep habitat and manage allowable uses to meet the Colorado Standards for Public Land Health and to support bighorn sheep population objectives identified in CPW herd management plans.*

**SSS-DBS-AU-06:** Domestic non-working dogs must be on leash within Wilderness Zone 1 (see Map 2-10) and in the Escalante Triangle Recreation Management Zone (RMZ) in the Sawmill Mesa ERMA (when the loop trail system is constructed). In all other areas within bighorn sheep range, domestic non-working dogs must be on leash or under voice control. Coordinate with CPW on additional area requirements as issues are identified between domestic non-working dogs and desert bighorn sheep.

**SSS-DBS-AU-07:** Prohibit use of domestic pack goats and llamas.

*2. Decisions by Category*

BLM_0028440

**SSS-DBS-MA-03:** Reduce (close and rehab) miles of motorized and mechanized routes through desert bighorn crucial breeding habitat (production areas, as defined by CPW).

**SSS-DBS-MA-04:** Close and rehab BLM routes within desert bighorn sheep winter concentration areas to motorized and mechanized travel (does not apply to administrative access and county-maintained roads).

**SSS-DBS-MA-05:** Prohibit the construction of new motorized or mechanized routes in desert bighorn sheep production areas (see Map 3-7).

Limit construction of new foot/horse trails in desert bighorn sheep production areas to the area above the rim of the Gunnison Slopes.

**SSS-DBS-AU-08:** Prohibit surface-disturbing activities in mapped desert bighorn sheep production areas from February 1 to May 1 (see Appendix B and Map 3-7).

**SSS-DBS-AU-09:** Apply SSR restrictions (see Appendix B and Map 2-2) to surface-disturbing activities within bighorn sheep summer range.

## 2.1.3.2. Colorado Hookless Cactus

**SSS-CHC-GOAL-01:** *Conserve, protect and promote recovery of the Colorado hookless cactus.*

**SSS-CHC-OBJ-01:** *Manage Colorado hookless cactus habitat in order to meet public land health standards and maintain the condition of the following measure of health:*

- *80% (or more) of sites occupied by Colorado hookless cactus have low levels of invasive weeds (10% or less relative cover).*

**SSS-CHC-MA-01:** Reduce noxious and/or invasive weed spread in occupied Colorado hookless cactus habitat by spot treating weeds, and by intensively managing permitted activities in occupied habitat (grazing, recreation, and road and trail construction). Exclosures may be used if needed.

**SSS-CHC-OBJ-02:** *Improve BLM management of the Colorado hookless cactus in order to meet public land health standards and move toward the following management targets:*

- *80% (or more) of populations of hookless cactus show evidence of recruitment.*
- *Static or increasing population trend (20-year trend) in number of individual hookless cactus in known populations.*

**SSS-CHC-MA-02:** Minimize impacts from livestock grazing, trail development and other permitted activities in habitat supporting excellent and good (defined by CNHP) occurrences of the Colorado hookless cactus.

**SSS-CHC-MA-03:** During travel management planning, reduce as much as practicable the density (miles/square mile) of routes within 200 m of known Colorado hookless cactus occurrences throughout the

BLM_0028441

D-E NCA. If occurrences are identified in the future that conflict with route designations, consider reroutes. See ACECs (section 2.3.1) for area-specific restrictions related to routes and Colorado hookless cactus.

---

**SSS-CHC-AU-01:** Limit livestock use on public land in Escalante Canyon to active movement between grazing areas. See Livestock Grazing (section 2.2.4) for more details, and Map 2-4.

---

See SSS-OTH-MA-03 for additional protections for federally listed and candidate plant species.

See ACEC-MA-11 for additional restrictions for the River Rims ACEC to protect Colorado hookless cactus.

## 2.1.3.3. All Other Special Status Species and Communities

**SSS-OTH-GOAL-01:** *Manage special status species and their habitats to provide for their conservation and restoration as part of an ecologically healthy system, and support the goals contained in Standard 4 of the Colorado Standards for Public Land Health (BLM 1997[3] and Appendix D).*

---

**SSS-OTH-OBJ-01:** *Maintain, restore, and enhance special status fish, wildlife and plant populations/communities and associated habitats by applying mitigation measures on allowable uses and by prohibiting or limiting activities that would be detrimental to subpopulations, populations or habitats.*

---

**SSS-OTH-AU-01:** Apply SSR restrictions (see Appendix B and Map 2-2) in the following vegetation communities:

- Exemplary (defined by CNHP)
- Ancient
- Critically imperiled (defined by CNHP)
- Imperiled (defined by CNHP).
- Vulnerable (defined by CNHP)

---

**SSS-OTH-AU-02:** Apply SSR restrictions (see Appendix B and Map 2-2) within 200 meters (656 feet) of known occurrences of federally listed and candidate plant species; and apply SSR in occupied habitat or designated critical habitat of federally listed and candidate animal species (exception: where more restrictive restrictions apply).

Apply SSR restrictions within 100 meters (328 feet) of known occurrences of BLM sensitive plant species.

Prohibit actions that pose adverse impacts to BLM sensitive species subpopulations or connectivity between subpopulations to a degree that is expected to decrease the viability of the subpopulation or population.

---

**SSS-OTH-AU-03:** Special Status raptors: Prohibit disruptive and surface-disturbing activities during the period from nest territory establishment to dispersal of young from nest (see Appendix E, Raptor Species Breeding Periods) within 0.50 miles of active special status raptor nest sites.

---

[3] See Chapter 6 of the Proposed RMP for a comprehensive list of references cited in this document.

*2. Decisions by Category*

**SSS-OTH-AU-04:** Other raptors (except American kestrel): Prohibit surface-disturbing activities from nest territory establishment to dispersal of young from nest (see Appendix E, Raptor Species Breeding Periods) within 0.25 miles of active raptor nest sites during the period.

**SSS-OTH-AU-05:** Year-round, apply SSR within the following areas:

- Bald Eagle: within 0.25 mile of active and inactive nest sites or within 100 meters of abandoned nests (i.e., unoccupied for 5 consecutive years but with all or part of the nest remaining).

- Golden Eagle: within 0.25 mile of active and inactive nest sites.

- Ferruginous Hawk, Peregrine Falcon, Prairie Falcon, and Northern Goshawk: within 0.50 mile of active and inactive nest sites.

- Other Special Status Raptors (except Mexican spotted owl): within 0.25 mile of active and inactive nest sites.

**SSS-OTH-AU-06:** Apply SSR within 100 meters (328 feet) of active nest sites and associated alternate nests of other raptors (except American kestrel, red-tailed hawk, and great-horned owl).

**SSS-OTH-AU-07:** Prohibit disruptive and surface-disturbing activities from December 1 to April 30 within bald eagle winter concentration areas.

**SSS-OTH-MA-01:** If Mexican spotted owls or any other federally listed species are newly discovered within the D-E NCA, adopt measures consistent with current recovery plans. For existing federally listed species found within the D-E NCA, adopt measures consistent with current recovery plans.

**SSS-OTH-AU-08:** Prohibit surface-disturbing and disruptive activities from February 15 to August 30 within 0.25 miles of active kit fox dens (see Appendix B). Apply SSR restrictions within 200 meters (656 feet) of active kit fox dens year-round.

**SSS-OTH-AU-09:** Apply SSR within 0.25 miles of federally listed, BLM sensitive, and Colorado State Species of Concern bat maternity roost sites and winter hibernacula, including all entrances to cave/mine network (see Appendix B).

**SSS-OTH-AU-10:** Prohibit surface-disturbing and disruptive activities from April 1 through August 31 within 50 meters (164 feet) of all entrances to cave/mine network associated with special status bat species' maternity roost sites (see Appendix B).

Prohibit surface-disturbing and disruptive activities from October 15 to April 15 within 50 meters (164 feet) of all entrances to cave/mine networks associated with special status species winter hibernacula (see Appendix B).

**SSS-OTH-MA-02:** Where bat roosting, maternity sites and winter hibernacula occur, bat gates would be required for closing abandoned mine lands.

**SSS-OTH-AU-11:** Apply SSR restrictions (see Appendix B) within 200 meters (656 feet) of identified

BLM_0028443

BLM sensitive reptile hibernacula.

---

**SSS-OTH-MA-03:** In coordination with CPW, maintain healthy white-tailed prairie dog populations in the D-E NCA as part of healthy salt desert shrub/saltbush vegetation communities.

---

**SSS-OTH-AU-12:** Prohibit surface-disturbing or disruptive activities from March 1 to June 15 within 50 meters (164 feet) of the edge of active (occupied within the last 10 years) white-tailed prairie dog towns (see Appendix B).

---

**SSS-OTH-OBJ-02:** *Advance the conservation of Gunnison sage-grouse and its habitat in accordance with national, State, and local working group recommendations and policy.*

---

**SSS-OTH-AU-13:** Prohibit surface-disturbing activities from December 15 to March 15 within occupied winter critical habitat for Gunnison sage-grouse (see Appendix B and Map 2-3). If other winter habitats are determined to be occupied, implement conservation measures consistent with the current final rule for the species (USFWS 2014b). Use most up-to-date rule or recovery plan for guidance.

## 2.1.4. Fish and Wildlife (Non–Special Status)

**F&W- GOAL-01:** *Promote and conserve native species by managing aquatic and terrestrial habitats to emphasize ecosystem diversity, productivity, viability, and natural processes.*

---

**F&W-OBJ-01:** *Maintain integrity and extent of migratory bird nesting habitat throughout the D-E NCA in conformance with the Migratory Bird Treaty Act.*

---

**F&W-MA-01:** Protect breeding habitats of migratory birds by managing for priority vegetation type objectives (see section 2.1.2).

---

**F&W-AU-01:** Prohibit surface-disturbing or disruptive activities during the migratory bird nesting season from May 15 to July 15 (see Appendix B). Modify dates as needed, based upon updated CPW and USFWS recommendations.

---

**F&W-OBJ-02:** *Work cooperatively with CPW and USFWS to actively manage to eliminate non-native, invasive fish and wildlife.*

---

**F&W-MA-02:** Reduce risk of introduction and expansion, and work to eradicate invasive fish and wildlife in the D-E NCA through appropriate measures in coordination with CPW and other appropriate entities (e.g., removal of non-native rainbow trout and restocking with native cutthroat trout).

---

**F&W-MA-03:** Remove non-native aquatic competitors (e.g., bull frogs) from active native aquatic breeding grounds in coordination with CPW and other appropriate entities.

---

**F&W-OBJ-03:** *Provide sufficient forage, cover, and protection from disturbance for large ungulates (deer, elk, bighorn sheep, and pronghorn antelope) to maintain healthy viable populations across the landscape*

BLM_0028444

*commensurate with the BLM Colorado's Standards for Public Land Health.*

---

**F&W-AU-02:** Prohibit disruptive activities in mapped big game crucial winter range (including severe winter range and winter concentration areas) as follows:

- Pronghorn antelope: December 1 to April 30 (Map 3-11)
- Mule deer: December 1 to April 30 (Map 3-12)
- Elk: December 1 to April 30 (Map 3-13)
- Desert bighorn sheep: November 1 to April 30 (Map 3-7)

See Appendix B.

---

**F&W-AU-03:** If CPW determines that big game herds are highly stressed during crucial winter periods, reduce human-induced stressors by seasonally closing BLM routes in areas of concern to public motorized and mechanized use within big game crucial winter range (severe winter range and winter concentration areas) during the following time periods:

- Pronghorn antelope: December 1 to March 31 (Map 3-11)
- Elk severe winter range: December 1 to April 30 (Map 3-13)
- Desert bighorn sheep: November 1 to April 30 (Map 3-7)
- Mule deer severe winter range (December 1 to April 30; Map 3-12)

---

**F&W-MA-04:** Close and rehab BLM routes within pronghorn winter concentration areas to motorized and mechanized travel where necessary (does not include administrative access and county-maintained roads).

---

**F&W-MA-05:** Within pronghorn range, minimize the number of fences that present barriers to pronghorn. Construct new fences to accommodate passage by pronghorn, and replace existing fences that do not accommodate pronghorn passage.

---

**F&W-OBJ-03:** *Manage to prevent the introduction and spread of wildlife diseases into the D-E NCA (for information on bighorn sheep disease issues, see section 2.1.3.1, SSS-DBS, of this RMP).*

---

**F&W-MA-06:** Coordinate with the State of Colorado to prevent the spread of whirling disease and non-native aquatic organisms.

---

**F&W-MA-07:** In the event of a bat disease outbreak, such as White Nose Syndrome, close public access (except for scientific research) to any caves and other structures utilized by bats.

When the BLM adopts an adaptive management strategy for the disease outbreak, that strategy will be adopted as well for the D-E NCA. This includes Early Detection Rapid Response strategy.

---

**F&W-MA-08:** Any introduction or augmentation of fish or wildlife populations must come from healthy population sources.

BLM_0028445

# 2.1.5. Noxious and Invasive Weeds

**INV-GOAL-01:** *Through integrated pest management, prevent, control, suppress and eradicate, where possible, noxious and invasive species to support healthy native plant communities across the planning area.*

**INV-OBJ-01:** *Manage lands in the planning area under integrated pest management strategies to support biological, cultural and recreation objectives.*

**INV-MA-01:** Ensure noxious and invasive weed preventive measures are applied to special recreation permit activities, construction activities, road maintenance and mechanical vegetation treatment activities as outlined in contracts, permits, and cooperative agreements.

**INV-MA-02:** In coordination with the counties, use early detection/rapid response to contain and (where possible) eradicate all State listed species and selected BLM species of concern (see Appendix F for list of State weeds).

**INV-MA-03:** Focus weed inventory surveys and treatments on high use areas (roads, trails, ponds, river, etc.), federally listed species habitat, and in Cottonwood Creek.

**INV -MA-04:** Increase community and partner involvement in the application of integrated pest management, including development of weed plans, coordinated efforts across boundaries, and efficient use of resources.

**INV-MA-05:** Where feasible, require the use of road maintenance or construction materials that come from quarries that are free of all State listed species and selected BLM species of concern.

# 2.1.6. Fire and Fuels

**WFM- GOAL-01:** *Manage fire to maximize ecological health benefits and provide first for firefighter and public safety.*

**WFM-OBJ-01:** *Use a full range of wildfire management actions when responding to unplanned ignitions, from full suppression to managing for multiple objectives including, but not limited to, resource benefit.*

**WFM-MA-01:** Allow natural unplanned ignitions to be managed for multiple objectives (including resource benefit) within 208,568 acres of the D-E NCA to meet biological resource objectives. This excludes the Gunnison River riparian corridor.

**WFM-OBJ-02:** *Restore areas of FRCCs 2 and 3 toward FRCC 1. Maintain areas of FRCC.*

**WFM-MA-02:** Use mechanical, chemical, and biological treatment; unplanned natural ignitions; and prescribed fire to improve FRCC and to meet biological and cultural resource objectives.

**WFM-OBJ-03:** *Manage fire and fuel activities to prevent and lessen negative impacts to the following values*

BLM_0028446

*that include, but are not limited to, human life, private property/improvements, power lines, communication sites, recreation sites, special status species habitat, cultural resources, watershed and other high value natural resources.*

---

**WFM-MA-03:** Manage fire and fuels to protect private property, infrastructure, cultural and biological resources, and watersheds.

---

**WFM-MA-04:** Implement emergency stabilization and rehabilitation as needed to meet biological, recreation and cultural resource objectives.

## 2.1.7. Soils and Water Quality

**SWQ-GOAL-01:** *Ensure soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes (Colorado Public Land Health Standard 1, Appendix D).*

---

**SWQ-OBJ-01:** *Minimize or control elevated levels of salt, sediment, and selenium contribution from Federal lands to stream systems in the planning area.*

---

**SWQ-OBJ-02:** *Maintain or improve soil productivity, including retention of topsoil quality and reestablishing soil capability, potential, and functionality when disturbed.*

---

**SWQ-OBJ-03:** *Preserve proper function and condition of upland soils (maintain or improve the number of acres meeting Colorado Public Land Health Standard 1; see BLM 1997 and Appendix D).*

---

**SWQ-MA-01:** Ensure surface disturbances do not cause accelerated erosion (e.g., rills, soil pedestals, actively eroding gullies) on a watershed scale (e.g., 4th field watershed).

---

**SWQ-MA-02:** All new facilities would be designed to meet BLM standards.

---

**SWQ-MA-03:** Avoid and/or mitigate disturbance to biologic soil crusts that are determined to be key in sustaining proper function and condition of upland soil health.

---

**SWQ-AU-01:** Apply SSR within a minimum of 25 meters (82 feet) of "fragile soils" (distance may be extended on the basis of site-specific conditions) (see Appendix B and Map 2-2). On-site evaluation of site-specific soil characteristics would be conducted by the BLM verifying that NRCS soil mapping unit descriptions are appropriate to the site.

---

**SWQ-AU-02:** Prohibit surface-disturbing activities on slopes greater than or equal to 40 percent to maintain site stability (see Appendix B and Map 2-1). Apply SSR in areas with natural slopes in the range of 25 to 40 percent (see Appendix B and Map 2-2).

---

**SWQ-GOAL-02:** *Protect, conserve, and/or enhance "natural" watershed functions in the capture, retention, and release of water in quantity, quality, and time to meet the purposes outlined in the Omnibus Act.*

BLM_0028447

**SWQ-GOAL-03:** *Protect, conserve, and/or enhance the geomorphic balance of area streams (e.g., stream channel width/depth, sinuosity, slope, and substrate are appropriate for the given landscape setting and geology) with the water and sediment being supplied by watersheds within the planning area.*

**SWQ-OBJ-04:** *Manage public land activities within the planning area in a manner that contributes to the long term improvement of surface and groundwater quality and minimizes or controls elevated levels of salts, sediment, selenium, and other potential contaminant contributions from Federal lands (or Federal actions) to water resources.*

**SWQ-AU-03:** Apply SSR within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank-full stage) of ephemeral streams (see Appendix B and Map 2-2).

**SWQ-MA-04:** Monitor water quality, morphology, and channel stability of streams with concerns identified through land health assessments or inventories.

**SWQ-OBJ-05:** *Promote delisting of water quality impaired stream segments; improve water quality limited stream segments that require total maximum daily loads (TMDLs). Waters needing TMDLs are identified in 5 CCR 1002-93, the 303(d) list.*

*Maintain water quality on segments meeting State water quality standards (stream segments not on the 303(d) list of the Lower Gunnison River Basin).[4]*

**SWQ-MA-05:** Pursue acquisition of land within the D-E NCA from willing sellers on properties with high potential to improve water resource conditions.

**SWQ-MA-06:** Maintain, replace, improve, or remove and reclaim structures within streams that are contributing to morphologic destabilization and increased sedimentation to surface waters. This would not include non-Federal diversions associated with valid existing water rights.

**SWQ-AU-04:** Apply SSR for all surface disturbing activities in watersheds of water quality impaired stream segments (303d-listed stream segments) and water quality limited stream segments that require TMDLs when land health conditions and/or BLM land use authorizations contribute towards impairment (see Appendix B and Map 2-2). Reclaim other anthropogenic disturbances where monitoring shows they are contributing to water quality degradation.

**SWQ-MA-08:** In watersheds with water-quality-impaired stream segments (303d-listed stream segments) that require TMDLs, close and rehabilitate all routes not necessary to meet other program objectives (in accordance with the travel management plan).

**SWQ-MA-09:** Within the planning area, restore degraded and excessively eroding landscapes (per land

---

[4] See the Colorado Department of Public Health and Environment's website for maps and GIS files: https://www.colorado.gov/pacific/cdphe/clean-water-gis-maps

*2. Decisions by Category*

BLM_0028448

health determinations) to a better functioning condition (as defined by Land Health Standards and Proper Functioning Condition and guided by ecological site descriptions).

# 2.1.8. Cultural Resources

**CUL-GOAL-01:** *Identify, preserve, and protect significant cultural resources in order to ensure they are available for appropriate uses by present and future generations (i.e., for research, education, and preservation of cultural heritage).*

---

**CUL-OBJ-01:** *Allocate cultural resources to preserve or utilize their educational, traditional, and scientific potential or discharge them from further management consideration.*

---

**CUL-MA-01:** Allocate all cultural resources currently recorded, or projected to occur on the basis of existing data synthesis, to Use Allocations according to their nature and relative preservation value (BLM Manual 8110.42 [BLM 2004b[5]] and planning handbook H-1601-1 [BLM 2005]; see glossary for more information regarding cultural use allocations). Cultural use allocations include the following:

| Use Category Allocation | Management Action | Desired Outcome |
|---|---|---|
| a. Scientific use | Permit appropriate research | Preserved until research or data recovery potential is realized |
| b. Conservation for future use | Protective measures/ designation | Preserved until conditions for use are met |
| c. Traditional use | Consult with tribes, determine limitations | Long-term preservation |
| d. Public use | Determine permitted use | Long-term preservation, on-site interpretation |
| e. Experimental use | Determine nature of experiment | Protected until used |
| f. Discharge from management | Remove protective measures | No use after recordation; not preserved |

---

**CUL-OBJ-02:** *Manage cultural resources for their allocated values.*

---

**CUL-MA-02:** Preserve and protect eligible properties and/or landscapes to protect the integrity of setting and sense of place, and their scientific and/or traditional values.

---

**CUL-MA-03:** Manage potentially eligible properties ("needs data") as eligible until evaluative testing or additional evidence determines whether the site is eligible or not eligible.

---

**CUL-OBJ-03:** *Identify and list appropriate National Register of Historic Places (NRHP) sites and districts for*

---

[5] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028449

*locations within the D-E NCA that have unique and concentrated cultural values.*

**CUL-MA-04:** Manage scientifically and publicly valuable archaeological and cultural resources through documentation and nomination to the NRHP and completion of cultural resource management plans. Annually identify areas of significance for future inventory and designate high-value areas for special management actions annually based upon criteria outlined in the resource protection planning process reports and cultural resource management guide for the resource area.

**CUL-MA-05:** Nominate applicable individual eligible sites to the NRHP.

**CUL-MA-06:** Nominate groups of eligible sites on the basis of NRHP multiple property submissions for the following themes: Roads, Rails, and Trails; Paleoindian and Archaic Transition; rock art; Fremont; Protohistoric Camps, and shelters, caves, and alcoves.

**CUL-MA-07:** Conduct stabilization and rehabilitation of significant sites listed on the NRHP.

**CUL-OBJ-04:** *Promote public awareness, cultural resource education, and stewardship in the D-E NCA.*

**CUL-MA-08:** Respond to basic Section 106 and Section 110 responsibilities and identify measures such as the following to proactively protect, manage and preserve cultural resources:

- Interpret sites (on or off-site).
- Stabilize and protect sites that are becoming degraded through erosion, recreation or other impacts.
- Prioritize interpretation of National Register Sites and/or Districts (on or off-site).
- Organize and conduct educational programs for the public, school groups, vocational archaeology groups, project proponents, permittees, contractors, and others about cultural resource ethics, and encourage their help in reporting new discoveries and incidents of vandalism.
- Develop heritage tourism sites using Best Management Practices (BMPs).
- Limit archaeological excavation in certain areas or on certain types of site to preserve some cultural resources for future technologies or concerns.

**CUL-OBJ-05:** *Maintain and protect the integrity of setting and place of areas where natural, cultural, and historic resources combine to form a cohesive, important landscape. Respond to the tribes' identified interest in landscape-level attention by managing the following locations as heritage areas.*

**CUL-MA-09:** Manage 327 acres in Little Dominguez Canyon as the Rambo/Little Dominguez Canyon Heritage Area to maintain and protect the integrity of setting and place as a historic homestead location (Map 2-9). Within this area:

- Focus on the education, interpretation and protection/preservation of the historic Rambo homestead.
- The area will be for day use only (closed to camping) to prevent the likelihood of destruction of structures.

BLM_0028450

**CUL-MA-10:** Manage 1,652 acres in Big Dominguez Canyon as the Big Dominguez Canyon Heritage Area to maintain and protect the integrity of setting and place with a focus on prehistoric rock art, trails, historic railroad area, and biological heritage (Map 2-9). Within this area:

- Focus on the education and interpretation (outside of the Wilderness boundaries) of the following locations and topics: Bridgeport Siding, rock art, Denver and Rio Grande Railroad, historic and current ranching, trails (e.g., Ute trails, mining roads, paleo roads), natural resources (particularly BLM special status species found within the area).

- The Wilderness within the heritage area will be for day use only (closed to camping) to reduce vandalism and theft.

**CUL-MA-11:** Manage 2,034 acres in High Park as the High Park Heritage Area to maintain and protect the integrity of setting and preserve the natural landscape characteristics of the area. This area will be used to provide Native American groups with traditional use opportunities (Map 2-9). Within this area:

- Provide access to traditional use areas for members of Native American tribes. This could mean opening routes, or allowing administrative access or construction of new routes for traditional use purposes.

- Promote natural processes in land management.

- Intensively manage recreation or livestock grazing use in the area if monitoring indicates that desired natural landscapes and settings are being degraded by these uses, as defined by biological objectives.

- Manage using VRM Class II.

- Promote ponderosa pine regeneration and, expansion in the area, while minimizing the use of ground disturbing vegetation treatments (preference would be for the use of prescribed fire and hand treatments (e.g., chain saws).

- Consult with Native American tribes to set management objectives.

**CUL-MA-12:** Manage 450 acres in Leonards Basin as the Leonards Basin Heritage Area to maintain and protect the integrity of setting and place with a focus on prehistoric rock art, geological and biological heritage (Map 2-9). Within this area:

- Focus management on the education and interpretation of prehistoric rock art.

- Intensively manage recreation or livestock grazing use in the area if monitoring indicates that desired natural landscapes and settings are being degraded by these uses, as defined by biological objectives.

- The Wilderness portion of the area will be for day-use only (no camping).

- Consult with Native American tribes to set management objectives.

**CUL-MA-13:** Manage the Escalante Canyon RMA (Map 2-8) as a heritage area to provide opportunities for heritage tourism. See the Recreational Use section (2.2.1) for more details.

**CUL-GOAL-02:** *Promote activities that fall under Section 110 of the National Historic Preservation Act (NHPA), including interpretive materials, research surveys, site stabilization, detailed recording and monitoring.*

**CUL-OBJ-06:** *Promote professional cultural resource research, preservation, and excavation.*

*2. Decisions by Category*

BLM_0028451

**CUL-OBJ-07:** *Conduct Section 110 (of the NHPA) surveys.*

**CUL-MA-14:** Strive to conduct Section 110 (of NHPA) surveys on 100 or more acres per year.

**CUL-MA-15:** Prioritize Section 110 efforts on inventory of areas that are likely to contain the most scientifically valuable archaeological resources, testing of "needs data" sites and research excavation of eligible sites.

**CUL-MA-16:** Develop a monitoring plan that identifies sites that are to receive regular patrols and documentation by BLM law enforcement rangers.

**CUL-GOAL-03:** *Reduce imminent threats from natural or human-caused deterioration and resolve potential conflicts with other resource uses by ensuring that all authorizations for land use and resource use comply with Section 106 of the National Historic Preservation Act.*

**CUL-OBJ-08:** *Protect and preserve remaining high value sites as prescribed by law and policy or as opportunities and situations arise. The preferred method of cultural resource mitigation or protection would be to design projects so as to avoid sites.*

**CUL-AU-01:** Apply SSR within 100 meters (328 feet) of eligible or potentially eligible sites allocated to public, scientific, conservation, and experimental uses. Consider applying SSR within 100 meters of non-eligible, allocated sites based on the nature of the development, site type and topography.

**CUL-AU-02:** Apply SSR within 200 meters (656 feet) of eligible or potentially eligible sites allocated to traditional use. Consider applying SSR within 200 meters of non-eligible sites allocated to traditional use based on the nature of the development, site type and topography.

**CUL-MA-17:** Identify cultural properties requiring physical or administrative protection measures to protect site integrity and implement necessary measures.

**CUL-AU-03:** Authorized actions must include a stipulation that requires the applicant to protect cultural resources from damages associated with inadvertent discovery or intentional or unauthorized use.

**CUL-GOAL-04:** *Uphold government-to-government responsibilities with Native Americans to manage cultural resources and landscapes associated with their ancestral homeland and to accommodate traditional uses.*

**CUL-OBJ-09:** *Engage in cooperative projects with Native American tribes with connections to the D-E NCA. Through consultation, continue to compile information regarding traditional cultural properties, sacred sites, traditional uses, and cultural landscapes. Information obtained from available literature and field visits to known Ute cultural resources in consultation with the Ute Tribes provided the following management actions. Consultation with other Native American tribes may result in new information, identifying new resources that will require additional protection.*

*2. Decisions by Category*

BLM_0028452

**CUL-MA-18:** In coordination with other travel management objectives, work with tribal cultural departments and tribal members to reestablish and interpret traditional trails.

**CUL-MA-19:** In consultation with Native Americans and other groups with heritage values in the D-E NCA, develop additional heritage areas (additional to the areas described above) and manage those landscapes to preserve the existing character of the cultural and physical landscape to the maximum extent possible.

**CUL-MA-20:** Maintain and, where appropriate, improve natural and cultural resource conditions to enhance opportunities for Native Americans to use cultural landscapes and properties in their traditional homeland.

**CUL-MA-21:** Considering other resource decisions to the extent possible, work with tribal cultural departments and tribal members to provide administrative access to authorized tribal members to access appropriate cultural properties and/or locations for the collection of appropriate natural resources needed to maintain traditional lifeways.

## 2.1.9. Lands with Wilderness Characteristics

**LWC-GOAL-01:** *Provide appropriate levels of protection for areas determined to possess wilderness characteristics outside of existing WSAs and Dominguez Canyon Wilderness, while considering competing resource demands and manageability.*

**LWC-OBJ-01:** *Preserve and/or enhance wilderness characteristics in lands managed for their wilderness characteristics.*

**LWC-MA-01:** Manage the following areas for their wilderness characteristics (Map 2-11):

- Dry Fork of Escalante (7,021 acres)
- Cottonwood Canyon (6,576 acres)

**LWC-MA-02:** Manage for solitude and primitive/unconfined recreation in lands with wilderness characteristics by providing opportunities for quiet, non-motorized recreation.

**LWC-MA-03:** Leave existing human developments in place in the Dry Fork of Escalante and Cottonwood Canyon and allow them to degrade over time (exception: existing and necessary livestock developments).

**LWC-MA-04:** For any non-emergency implementation action in the Dry Fork of Escalante and Cottonwood Canyon, consider how proposed actions would impact inventoried naturalness and opportunities for solitude and/or primitive and unconfined recreation.

In the response to wildfire, use Minimum Impact Suppression Tactics (MIST) to limit impact to wilderness characteristics. Do not allow tactics involving ground disturbance with heavy equipment unless life and/or property is threatened.

BLM_0028453

Dominguez-Escalante National Conservation Area 47
APPROVED RESOURCE MANAGEMENT PLAN

**LWC-AU-01:** To protect naturalness, apply SSR within the Dry Fork of Escalante and Cottonwood Canyon (see Appendix B and Map 2-2), and do not allow construction of new motorized routes.

**LWC-MA-05:** To protect opportunities for unconfined recreation, limit visitor use in the Dry Fork of Escalante and Cottonwood Canyon only as necessary to prevent substantial degradation to wilderness characteristics (i.e., naturalness and opportunities for solitude).

# 2.1.10. Scenic Resources

**VIS-GOAL-01:** *Protect the open spaces, the natural aesthetics, and the scenic vistas that are considered a social, economic, and environmental benefit.*

**VIS-OBJ-01:** *Maintain visual quality and integrity in accordance with VRM classes:*

- *Class I Objective: The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it allows for very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.*

- *Class II Objective: The objective of this class is to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Changes can be seen but should not attract the attention of the casual viewer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.*

- *Class III Objective: The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.*

- *Class IV Objective: Not applicable in the D-E NCA.*

**VIS-MA-01:** Manage the following acres to achieve VRM class objectives (Map 2-12):

- VRM Class I: 82,830 acres
- VRM Class II: 127,169 acres

**VIS-MA-02:** Prioritize placing communication towers, facilities, and associated structures adjacent to existing communication sites to minimize overall visual impacts.

**VIS-MA-03:** Reduce visual impacts from past and minimize visual impacts from future vegetation treatments, consistent with VRM objectives.

**VIS-MA-04:** Manage heritage areas outside of the Wilderness as VRM II (Map 2-9).

**VIS-MA-05:** Manage the Wilderness and Wilderness Study Area as VRM I.

**VIS-MA-06:** Manage the following lands with wilderness characteristics as VRM I (Map 2-11):

*2. Decisions by Category*

BLM_0028454

- Cottonwood Canyon
- Dry Fork of Escalante.

---

**VIS-MA-07:** Designate the Old Spanish NHT corridor VRM II.

---

**VIS-MA-08:** Construct facilities to repeat the basic elements of form, line, color, and texture found in the predominant natural features of the adjacent landscape.

## 2.1.11. Air

**AIR-GOAL-01:** *Protect air quality within and surrounding the D-E NCA.*

---

**AIR-OBJ-01:** *Ensure that the air quality within the D-E NCA meets State and Federal air quality standards and regulations.*

---

**AIR-MA-01:** Manage air quality within the scope of BLM's authority, and ensure that air quality and air quality-related values are adequately protected by analyzing the effects of activities or resource uses authorized by the BLM, and cumulative actions. Protect air resources in accordance with the methodology and provisions outlined in the BLM Comprehensive Air Resource Protection Protocol. As part of the CARPP strategy, develop and assign air quality-related management actions or control requirements when actual planning area projects are proposed and when predicted air quality impacts for project-level analyses suggest the need for additional mitigation.

---

**AIR-MA-02:** Obtain State of Colorado permits for emissions for all prescribed burns.

---

# 2.2. RESOURCE USES

## 2.2.1. Recreation

**REC-GOAL-01:** *Provide a diversity of recreational opportunities that support outdoor-oriented lifestyles, add to participants' and local communities' quality of life, and foster protection of natural and cultural resources.*

---

**REC-OBJ-01:** *Provide quality recreational opportunities that are consistent with, and contribute to, the conservation, protection and enhancement of the resources that were identified as purposes of the designation of the D-E NCA. Manage recreation consistent with biological, natural and cultural resource objectives.*

---

**REC-MA-01:** Ensure that all sources of D-E NCA recreation information (e.g., kiosks, brochures, web sites) include an educational component regarding the D-E NCA's purposes.

---

**REC-AU-01:** Do not issue competitive SRPs that authorize motorized events where speed or time determines winners.

---

BLM_0028455

**REC-AU-02:** Navigational recreational activity (e.g., geocaching) requires BLM authorization prior to placement. Allow physical caches outside the Wilderness. Only allow earth (not physical) caches inside the Wilderness. Evaluate existing sites for resource concerns.

**REC-AU-03:** Prohibit metal detecting activities to protect cultural and natural resources from vandalism and theft, unless administratively authorized.

**REC-MA-02:** When camping or campfires contribute to a failure to meet cultural, biological, recreation and other natural resource objectives:

- Close areas to camping and campfires; or
- Designate campsites and limit overnight camping and/or campfires to designated sites.

**REC-AU-04:** Prohibit paintball activities in the D-E NCA to protect the D-E NCA's scenic resources.

**REC-AU-05:** Prohibit glass containers for beverages, food or other items in the following areas to protect the scenic resources of these areas (Map 2-8):

Potholes Recreation Site (Escalante Canyon)

Gumison River RMA

In other areas of the NCA, if monitoring data indicate an increase in broken glass that negatively impacts the NCA's scenic resources, consider prohibiting glass containers in the NCA.

**REC-MA-03:** Implement temporary area or activity closures as needed to achieve biological, cultural and wilderness objectives, as well as to protect public health and safety.

**REC-AU-06:** Allow casual use recreational gold panning in the NCA. Panning will be restricted to collection of material with non-motorized and non-mechanized equipment below the surface of the water. It will also be restricted to processing of material with non-motorized and non-mechanized equipment (e.g., underwater sluices). Re-evaluate if resource conditions warrant restrictions or closures.

Close the D-E NCA to all other forms of recreational prospecting.

**REC-MA-04:** All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I). Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met.

**REC-OBJ-02:** *Reduce known or identified unhealthy or unsafe human-created conditions, and achieve a minimum level of conflict between recreation participants and between recreation and other resource uses.*

**REC-AU-07:** Require solid human waste and fire ash to be packed out using portable toilet systems and fire pans for all overnight camping in undeveloped camp sites in the following recreation management areas:

- Gunnison River
- Cactus Park

*2. Decisions by Category*

- Escalante Canyon
- Other areas if monitoring indicates impacts to dispersed campsites from human waste or fire ash.

---

**REC-MA-05:** In the following ERMAs, use the following strategies to reduce conflicting user interactions: 1) clearly communicate recreation management objectives for different RMAs, 2) manage RMAs based on social and environmental carrying capacities, 3) separate uses in time or space, and 4) educate users to ensure they know what to expect in different RMAs:

- Hunting Ground ERMA
- Ninemile Hill ERMA
- Sawmill Mesa/Wagon Park Dispersed ERMA
- East Creek ERMA

In the following SRMAs, reduce conflicting user interactions by using the strategies listed above for ERMAs plus promote only those activities that are compatible with targeted activities and outcomes (experiences and benefits) outlined in the RMA objective:

- Gunnison River SRMA
- Cactus Park SRMA
- Escalante Canyon SRMA

---

**REC-OBJ-03:** *Manage shooting activities for an appropriate balance between this recreational use and protection of the resources and values identified as the purposes of the D-E NCA in the Omnibus Act, the ability of the BLM to meet its recreational outcome and setting objectives, and the ability of the BLM to minimize issues related to public health and safety and conflict between recreation users and private landowners.*

---

**REC-AU-08:** Continue to allow hunting throughout the D-E NCA (210,012 acres) in accordance with CPW regulations.

---

**REC-AU-09:** Close the following areas (totaling 9,995 acres) to recreational target shooting, which includes discharge of firearms, pellet/BB guns, air soft guns, and archery (Map 2-7):

- Dominguez Canyon Wilderness Zone 1 (for public health and safety concerns associated with recreational target shooting in a confined canyon with high levels of recreational visitation, and for protection of vulnerable cultural resources and scenic geological features)

- Gunnison River SRMA (for public health and safety concerns associated with recreational target shooting in a confined canyon with high levels of recreational visitation and interspersed private lands with residences, and for protection of vulnerable scenic geological features).

- Escalante Canyon SRMA (for public health and safety concerns associated with recreational target shooting in a confined canyon with high levels of recreational visitation and interspersed private lands with residences, for protection of vulnerable cultural resources and scenic geological features, and due to conflict between recreational target shooting and management of this area as an education emphasis/watchable wildlife area)

- East Creek ERMA (for public health and safety concerns associated with recreational target shooting in a confined canyon with highway traffic, high levels of recreational visitation and interspersed private lands with residences, and for protection of vulnerable scenic geological features).

BLM_0028457

- Campgrounds and trailheads

If monitoring reveals that recreational target shooting is preventing achievement of the objectives identified in this RMP for the purposes of the D-E NCA, as identified in the Omnibus Act of 2009 (e.g., recreation, wilderness natural resources), then consider closure or restriction of affected areas to recreational target shooting.

If monitoring reveals that recreational target shooting is causing or is likely to cause impacts to public health and safety, or is causing damage to nearby private property, consider closure or restriction of affected areas to recreational target shooting. Any closure of an area to recreational target shooting would require an RMP amendment.

Any subsequent closure or restriction of target shooting based on these criteria must be implemented in accordance with the regulations and procedures detailed in 43 CFR 8364.1, Closure and Restriction Orders.

In areas not subject to area closure, firearms must be discharged toward a proper backstop sufficient to stop the projectiles forward progress beyond the intended target. Targets must be constructed of wood, cardboard, paper or similar non-breakable materials. All targets, clays, and shells are considered litter after use and must be removed and disposed of properly.

## 2.2.1.1. Special Recreation Management Areas

Special Recreation Management Areas (SRMAs)[6] are administrative units where the existing or proposed recreation opportunities and desired recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation.

## Management Focus

SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. SRMAs may be subdivided into recreation management zones to further delineate specific recreation opportunities. Within SRMAs, management of recreation and visitor services is recognized as the predominant land management focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis.

## Requirements

SRMAs must have measurable outcome-focused objectives. Supporting management actions and allowable use decisions are required to 1) sustain or enhance recreation objectives, 2) protect the desired recreation setting characteristics, and 3) constrain uses, including non-compatible recreation activities that are detrimental to meeting recreation or other critical resource objectives (e.g., archaeology or threatened and endangered species).

---

[6] See Appendix L for full descriptions of SRMAs.

BLM_0028458

Dominguez-Escalante National Conservation Area                                                    52
APPROVED RESOURCE MANAGEMENT PLAN

# Best Management Practices

The BLM will utilize current best management practices (Appendix J) during implementation of the plan. BMPs will likely evolve over the life of the plan. Implementation of management actions should be based on the most current BMPs.

The BLM will utilize current best management practices (Appendix J) and the *Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado* to reduce impacts on other resources from recreation, including impacts on one type of recreation from another type of recreation.

## Gunnison River SRMA—3,746 acres

**REC-SRMA-OBJ-01:** *Manage the recreation area targeting non-motorized float boaters that seek the recreational outcomes described below. Target the following activities: non-motorized float boating and camping.*

**REC-SRMA-OBJ-02:** *Recreation Outcome Objective: within five years, and continuing throughout the life of the plan, the majority of participants in visitor/community assessments report realization of the following targeted experience and benefit outcomes:*

1. *Enjoying group affiliation and togetherness, experiencing natural surroundings, being with others that enjoy the same things I do.*

2. *Developing stronger ties with family and/or friends.*

3. *Greater community ownership and stewardship of recreation resources.*

4. *Increased awareness and protection of recreation resources.*

**REC-SRMA-MA-01:** Designate the Gunnison River corridor as an SRMA (3,746 acres; see Map 2-8).

**REC-SRMA-MA-02:** Support outcome objectives by managing the desired recreation settings described below. If monitoring indicates outcome objectives are not being achieved, settings will be incrementally adapted until monitoring shows the settings are supporting the outcome objectives:

**Physical Setting:**

*Facilities:* At primary access points, develop boat launch, parking, and toilet facilities; along the river between access points, maintain primitive campsites with little or no development.

**Social Setting:**

*Average Contacts:* On the river, participants encounter a season average of up to 10 encounters per day.

*Average Group Size:* On the river, participants encounter a season average of up to 25 people per group.

*Evidence of Use:* Sounds of people occasional.

**Operational Setting:**

*Access:* BLM river access points are for non-motorized boats during the boating season.

BLM_0028459

*Management Controls:* Permit system used where needed to regulate conditions of use and achieve social settings.

*Visitor Services:* On-site information including kiosks and maps with words and pictures; regular BLM personnel presence.

---

**REC-SRMA-AU-01:** Limit group size on the river to 25 (including guides and dogs).

---

**REC-SRMA-AU-02:** Close BLM boat ramps and campsites to motorized boat use from May 1 through Labor Day weekend.

---

**REC-SRMA-AU-03:** Limit overnight camping to designated campsites (outside of developed campgrounds).

---

**REC-SRMA-AU-04:** Close the mouth of Big Dominguez Canyon to non-boating overnight camping from May 1 through Labor Day weekend and develop and implement a reservation system for these sites.

---

**REC-SRMA-AU-05:** All non-working dogs must be on leash in defined high use areas (currently boat ramps and mouth of Big Dominguez Canyon).

---

**REC-SRMA-MA-03:** Develop and implement a reservation system for designated campsites at the mouth of Big Dominguez Canyon from Memorial Day weekend through Labor Day weekend.

---

**REC-SRMA-MA-04:** Manage the campsite allocation at the mouth of Dominguez Canyon to generally achieve a 50/50 split between commercial and private groups.

---

**REC-SRMA-MA-05:** Develop and implement an allocation system for commercial groups camping at the mouth of Dominguez Canyon that is based on historic use over the past five years.

---

**REC-SRMA-MA-06:** Implement a Special Area SRP requirement for all overnight private boaters (for the purpose of monitoring and to achieve RMA objectives).

---

**REC-SRMA-AU-06:** Implement a seven-day camping limit within the RMA, unless otherwise authorized.

---

**REC-SRMA-AU-07:** Issue vending SRPs only in conjunction with commercial permits.

---

**REC-SRMA-AU-08:** Competitive SRPs: Do not issue competitive SRPs.

---

**REC-SRMA-AU-09:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA objectives.

---

**REC-SRMA-AU-10:** Organized Group SRPs: Only issue low and medium impact (Class I and II in

*2. Decisions by Category*

BLM_0028460

Appendix I) organized group SRPs that are consistent with RMA objectives.

## Cactus Park SRMA—27,406 acres

**REC-SRMA-OBJ-03:** *Manage the recreation area targeting motorized trail riders that seek the recreational outcomes described below. Target the following activities: ATV and motorcycle trail riding, and associated camping activities.*

**REC-SRMA-OBJ-04:** *Recreation Outcome Objective: within five years, and continuing throughout the life of the plan, the majority of participants in visitor/community assessments report realization of the following targeted experience and benefit outcomes:*

1. *Enjoying group affiliation and togetherness, experiencing natural surroundings, enjoying frequent access to outdoor recreation activities, youth learning outdoor recreation skills, practicing sustainable outdoor recreation skills.*

2. *Developing stronger ties with family; living a more outdoor-oriented lifestyle.*

3. *Greater community ownership and stewardship of recreation resource; increased desirability as place to live or retire.*

4. *Increased awareness and protection of recreation resources.*

5. *Increased stewardship and awareness of the D-E NCA resources and natural surroundings.*

**REC-SRMA-MA-07:**  Designate Cactus Park as an SRMA (27,406 acres; Map 2-8).

**REC-SRMA-MA-08:** Support outcome objectives by managing the desired recreation settings described below. If monitoring indicates outcome objectives are not being achieved, settings will be incrementally adapted until monitoring shows the settings are supporting the outcome objectives:

**Physical Setting:**

*Naturalness:* Maintain the undeveloped nature of the RMA.

*Facilities:* At trailheads, develop parking and toilet facilities; develop the necessary trailheads, trails, and camping facilities to meet RMA objectives.

**Social Setting:**

*Average Contacts:* Away from parking areas, participants encounter a seasonal average of up to 8 groups per day.

*Average Group Size:* Away from parking areas, participants encounter a seasonal average of up to 25 people per group.

*Evidence of Use:* Sounds of people frequent.

**Operational Setting:**

*Access:* Motorized (ATVs, motorcycles and high-clearance 4x4s).

*Management Controls:* Clearly post necessary rules to support RMA objectives.

*Visitor Services:* On-site information including kiosks and maps with words and pictures; regular BLM personnel presence.

**REC-SRMA-MA-09:** Designate BLM routes to meet RMA objectives. Close routes as needed to meet

BLM_0028461

cultural, biological or other natural resource objectives.

---

**REC-SRMA-MA-10:** Designate campsites and/or campgrounds. Construct developed campground(s) as necessary to minimize impacts to biological and cultural resources and to meet RMA objectives.

---

**REC-SRMA-AU-11:** Limit overnight camping to designated campsites and/or campgrounds.

---

**REC-SRMA-MA-11:** With partners (e.g., user groups, retail shops, and service providers), develop a motorized loop trail system consistent with RMA objectives (use current BMPs for trail construction and maintenance; e.g., see Wernex 1994 and Webber 2007)[7]. During implementation, as new routes are constructed, existing routes may be closed and rehabbed.

---

**REC-SRMA-AU-12:** From April 1 through Labor Day weekend, implement a seven-day camping limit within the RMA, unless otherwise authorized.

---

**REC-SRMA-AU-13:** Vending SRPs: Issue vending SRPs only in conjunction with organized group or competitive SRPs.

---

**REC-SRMA-AU-14:** Competitive SRPs: Only issue low and medium impact (Class I and II in Appendix I) competitive SRPs that are consistent with RMA objectives.

---

**REC-SRMA-AU-15:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA objectives.

---

**REC-SRMA-AU-16:** Organized Group SRPs: Only issue low, medium and moderate impact (Class I, II, and III in Appendix I) organized group SRPs that are consistent with RMA objectives.

## Escalante Canyon SRMA—2,880 acres

**REC-SRMA-OBJ-05:** *Manage the recreation area targeting visitors interested in the heritage and ecological resources of the area and tourism service providers who seek the outcomes described below. Target the following activities: auto touring and picnicking.*

---

**REC-SRMA-OBJ-06:** *Recreation Outcome Objective: within five years, and continuing throughout the life of the plan, the majority of participants in visitor/community assessments report realization of the following targeted experience and benefit outcomes:*

1. *Learning more about the wildlife, cultural, and historical resources of the area, connecting with the experiences of those who traveled through the area in the past.*

2. *Increased appreciation of the area's cultural history and wildlife resources.*

3. *Sustainability of the community's cultural heritage.*

---

[7] See Chapter 6 of the Proposed RMP for a comprehensive list of references cited in this document.

*2. Decisions by Category*

BLM_0028462

4. *Greater support for protection of cultural and wildlife resources.*

---

**REC-SRMA-MA-11:** Designate Escalante Canyon as an SRMA (2,880 acres; see Map2-8).

---

**REC-SRMA-MA-12:** Support outcome objectives by managing the desired recreation settings described below. If monitoring indicates outcome objectives are not being achieved, settings will be incrementally adapted until monitoring shows the settings are supporting the outcome objectives:

**Physical Setting:**

*Naturalness*: Maintain the rural nature of the RMA; all future changes to the landscape should complement the RMA objectives and not result in changes to the historic setting.

*Facilities:* Improve existing developed facilities; coordinate with CPW to develop facilities on State lands that complement RMA objectives.

**Social Setting:**

*Average Contacts:* Participants encounter a seasonal average of up to 20 groups per day.

*Average Group Size:* Participants encounter a seasonal average of up to 25 people per group.

*Evidence of Use:* Sounds of people frequent.

**Operational Setting:**

*Access:* All motorized or non-motorized use including sedan or full-sized vehicles.

*Management Controls:* Moderate level of restrictions on overnight camping.

*Visitor Services:* On-site interpretation including kiosks and maps with words and pictures; regular BLM personnel presence.

---

**REC-SRMA-MA-13:** Designate Escalante Canyon as a Watchable Wildlife Area (see Watchable Wildlife Areas, section 2.3.6, for more details).

---

**REC-SRMA-AU-17:** Allow climbing and kayaking to continue where it does not create conflicts with targeted recreation uses and outcomes (e.g., competition for parking and other facilities) and/or cultural or biological resource objectives.

Intensively manage climbing activities (access routes, belay stations, climbing routes) to reduce risks to biological, cultural, and paleontological resources. This may include route closures when monitoring shows degradation of NCA resources

---

**REC-SRMA-MA-14:** With partners, (climbing clubs, retail service providers, etc.) close climbing routes that are causing resource concerns; identify and improve primary access trails to and between climbing routes to protect biological and cultural resources.

---

**REC-SRMA-AU-18:** Implement climbing closures during critical raptor nesting seasons when active nests have been identified.

---

**REC-SRMA-MA-15:** To reduce resource impacts on the top of routes, encourage placement of permanent rappel anchors

---

BLM_0028463

**REC-SRMA-MA-16:** Develop education program with partners to teach climbing resource ethics (Leave No Trace for climbing)

**REC-SRMA-AU-19:** To protect visual resources, require all permanent anchors to match the color of the rock surface (fixtures, hardware and webbing, etc.).

**REC-SRMA-AU-20:** Designate campsites within the RMA. Overnight camping limited to developed campgrounds and designated campsites.

**REC-SRMA-MA-17:** Provide opportunities for partners (e.g., local school districts, recreation and interpretive associations, Friends Groups) to assist the BLM in providing biological/ecological, cultural and historical education/interpretation to help promote learning about the past and natural systems.

**REC-SRMA-AU-21:** Vending SRPs: Do not issue vending SRPs.

**REC-SRMA-AU-22:** Competitive SRPs: Do not issue competitive SRPs.

**REC-SRMA-AU-23:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA and ACEC objectives.

**REC-SRMA-AU-24:** Organized Group SRPs: Only issue low and medium impact (Class I and II in Appendix I) organized group SRPs that are consistent with RMA and ACEC objectives.

## 2.2.1.2. Extensive Recreation Management Areas

Extensive Recreation Management Areas (ERMAs) are recreation areas that are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. ERMA management is commensurate and considered in context with the management of other resources and resource uses. The following general approaches apply to protect activities within the ERMAs designated in this RMP:

# Management

In ERMAs, new recreation facilities (e.g., trails, trailheads, restrooms) to effectively address demand for identified recreation activity created by growing communities and recreation-tourism will be considered if 1) the proposal is consistent with interdisciplinary land use plan objectives; and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or managing partners, visitor fees, or other sources.

# Funding

In ERMAs, BLM funding and staff will be prioritized toward effectively addressing visitor

BLM_0028464

health and safety and user interaction issues and resource protection issues created by recreation activities.

# Visitor Services

In ERMAs, visitor services (e.g., visitor information/maps, directional signage, facilities, on-the-ground staff presence) will generally be provided at the level to maintain activity participation opportunities and achieve ERMA objectives.

# Access

In ERMAs, recreation access will be maintained to and through BLM lands by creating route connectivity and/or by creating loop trails, and by maintaining and developing appropriate trails and trailhead facilities to achieve ERMA objectives and facilitate targeted recreation activities.

# Partnerships

For ERMAs, the BLM will focus on partnerships to maintain recreation activity opportunities (e.g., partner with the business community to encourage collaborative efforts on BLM lands, partner with ATV and mountain biking groups where appropriate).

# Information/Education

For ERMAs, information boards, web-based materials, brochures, etc. will be used to explain conditions of use for recreation participants and encourage stewardship.

The BLM will partner with local chambers of commerce, tourism boards, and private service providers to communicate appropriate recreation information (e.g., accurate recreational opportunity information, user ethics, distinctiveness of the area, and user expectations).

# Monitoring

In ERMAs, the BLM will monitor visitor use, visitor safety, and resource conditions through BLM staff, volunteers and recreation-tourism partnerships (e.g., towns, outfitters, recreation organizations, CPW). Monitoring methods include direct visitor contact, electronic traffic counters, visitor/community assessments, and physical resource condition measurements.

# Best Management Practices

The BLM will utilize current best management practices (Appendix J) during implementation of the plan. BMPs will likely evolve over the life of the plan. Implementation of management actions should be based on the most current BMPs.

BLM_0028465

The BLM will utilize current best management practices (Appendix J) and the *Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado* to reduce impacts on other resources from recreation, including impacts on one type of recreation from another type of recreation.

## Hunting Ground ERMA—23,131 acres

**REC-ERMA-OBJ-01:** *Focus recreation and visitor services on protecting and facilitating visitor opportunities to participate in motorized and non-motorized trail-based activities and dispersed camping.*

*The RMA will provide a recreation setting commensurate with other uses that 1) retains a low level of contrast between developments and the natural surrounding; 2) provides the necessary recreation facilities (trails, trailheads, campsites) to facilitate activity participation; 3) provides basic on-site visitor services (signage, maps, etc.); and 4) clearly posts conditions of use throughout the area.*

*Manage ERMA commensurate with Old Spanish National Historic Trail management corridor (see section 2.3.2).*

**REC-ERMA-MA-01:** Designate the Hunting Ground as an ERMA (23,131 acres; Map 2-8).

**REC-ERMA-MA-02:** Connect/reroute routes to make loop opportunities as necessary; reroute/repair unsustainable and eroding routes; designate BLM routes to meet RMA objectives and Old Spanish National Historic Trail Management Corridor objectives (see section 2.3.2).

**REC-ERMA-MA-03:** With partners (e.g., local governments, trail organizations, user groups, service providers, and tourism councils), design and develop a mixed-use connective trail between Whitewater and Delta. This trail should utilize existing routes where possible and may require changes to route designations, adoption of user created routes, and construction of new routes.

**REC-ERMA-AU-01:** Implement a seven-day camping limit within the RMA, unless otherwise authorized.

**REC-ERMA-MA-04:** Manage the RMA as VRM Class II to meet recreational setting objectives.

**REC-ERMA-AU-02:** Issue vending SRPs only in conjunction with competitive SRPs.

**REC-ERMA-AU-03:** Competitive SRPs: The only competitive SRPs that will be considered are low, medium, and moderate impact (Class I, II and III in Appendix I) non-motorized competitive SRPs that are consistent with RMA objectives.

See River Rims ACEC (section 2.3.1) for area-specific restrictions.

**REC-ERMA-AU-04:** Organized Group SRPs: Only issue low and medium impact (Class I and II in Appendix I) organized group SRPs that are consistent with RMA objectives.

See River Rims ACEC (section 2.3.1) for area-specific restrictions.

BLM_0028466

**REC-ERMA-AU-05:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA objectives.

See River Rims ACEC (section 2.3.1) for area-specific restrictions.

## Ninemile Hill ERMA—10,440 acres

**REC-ERMA-OBJ-02:** *Focus recreation and visitor services management on protecting and facilitating visitor opportunities to participate in equestrian and hiking trail activities and dispersed camping.*

*The Ninemile Hill RMA will provide a recreation setting commensurate with other uses that 1) retains a low level of contrast between developments and the natural surrounding; 2) provides the necessary recreation facilities (trails, trailheads, campsites) to facilitate activity participation; 3) provides basic on-site visitor services (signage, maps, etc.); and 4) clearly posts conditions of use throughout the area.*

**REC-ERMA-MA-05:** Designate Ninemile Hill as an ERMA (10,440 acres; Map 2-8).

**REC-ERMA-AU-06:** Limit vehicle camping to designated, undeveloped vehicle campsites (outside of developed campgrounds). Dispersed horse and foot camping is allowed outside designated sites if at a distance greater than ¼ mile off motorized routes.

**REC-ERMA-AU-07:** Implement a seven-day camping limit within the RMA, unless otherwise authorized.

**REC-ERMA-MA-06:** Designate BLM routes to meet RMA objectives.

**REC-ERMA-MA-07:** Develop a quality foot and horse trail system that incorporates existing routes, while ensuring connectivity of the Tabeguache Trail through the Ninemile Hill RMA to Cactus Park for all motorized and non-motorized uses.

**REC-ERMA-MA-08:** In order to protect bighorn sheep production areas, limit construction of new trails to the area above the rim of the Gunnison Slopes.

**REC-ERMA-AU-08:** Do not issue vending permits.

**REC-ERMA-AU-09:** Competitive SRPs: The only competitive SRPs that will be considered are low, medium, and moderate impact (Class I, II and III in Appendix I) non-motorized competitive SRPs that are consistent with RMA objectives.

**REC-ERMA-AU-10:** Organized Group SRPs: Only issue low, medium and moderate impact (Class I, II and III in Appendix I) Organized Group SRPs that are consistent with RMA objectives.

**REC-ERMA-AU-11:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA objectives.

BLM_0028467

## East Creek ERMA—1,783 acres

**REC-ERMA-OBJ-03:** *Focus recreation and visitor services management on protecting and facilitating visitor opportunities to participate in auto touring and climbing.*

*The ERMA will provide a recreation setting commensurate with other uses that 1) retains a low level of contrast between developments and the natural surrounding; 2) provides the necessary recreation facilities (parking areas, trails, interpretation sites) to facilitate activity participation; 3) provides basic on-site visitor services (signage, maps, etc.); and 4) clearly posts conditions of use throughout the area.*

**REC-ERMA-MA-09:** Designate East Creek as an ERMA (1,783 acres; Map 2-8)

**REC-ERMA-AU-12:** Close the RMA to overnight use and camping.

**REC-ERMA-MA-10:** With partners (climbing clubs, retail service providers, etc.), identify and improve primary access trails to and between climbing routes.

**REC-ERMA-AU-13:** Implement climbing closures during critical raptor nesting seasons when active nests have been identified. See SSS-OTH-AU-04 through 06 for guidance.

**REC-ERMA-MA-11:** To reduce resource impacts on the top of routes, encourage placement of permanent rappel anchors.

**REC-ERMA-MA-12:** Develop education program with partners to teach climbing resource ethics (Leave No Trace for climbing).

**REC-ERMA-AU-14:** To protect visual resources, require all permanent anchors to match the color of the rock surface (fixtures, hardware and webbing, etc.).

**REC-ERMA-MA-13:** Intensively manage climbing activities (access routes, belay stations, climbing routes) to reduce risks to biological, cultural, and paleontological resources. This may include route closures when monitoring shows degradation of NCA resources.

**REC-ERMA-AU-15:** Vending SRPs: Do not issue vending SRPs.

**REC-ERMA-AU-16:** Competitive SRPs: Do not issue competitive SRPs.

**REC-ERMA-AU-17:** Organized Group SRPs: Only issue low and medium impact (Class I and II in Appendix I) organized group SRPs that are consistent with RMA objectives.

**REC-ERMA-AU-18:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA objectives.

BLM_0028468

Dominguez-Escalante National Conservation Area                                            62
APPROVED RESOURCE MANAGEMENT PLAN

## Sawmill Mesa/Wagon Park ERMA—58,718 acres

**REC-ERMA-OBJ-04:** *Focus recreation and visitor services management on protecting and facilitating visitor opportunities to participate in hiking, horseback riding, mountain biking, motorcycle riding, ATV riding, big-game hunting, dispersed camping, and backcountry auto touring.*

*The ERMA will provide a recreation setting commensurate with other uses that 1) retains a low level of contrast between developments and the natural surrounding; 2) provides the necessary recreation facilities (trails, trailheads, campsites) to facilitate activity participation; 3) provides basic on-site visitor services (signage, maps, etc.); and 4) clearly posts conditions of use throughout the area.*

**REC-ERMA-MA-14:** Designate the Sawmill Mesa/Wagon Park area as an ERMA (58,718 acres; see Map 2-8).

**REC-ERMA-MA-15:** Designate BLM routes to maintain access and opportunity for motorized, mechanized and non-motorized non-mechanized recreation where not in conflict with cultural, biological or other natural resources.

**REC-ERMA-MA-16:** Designate routes to meet RMA objectives and connect/reroute routes to make loop opportunities as necessary; reroute/repair unsustainable and eroding routes.

**REC-ERMA-AU-19:** Vending SRPs: Do not issue vending SRPs

**REC-ERMA-AU-20:** Competitive SRPs: Only issue low, medium and moderate impact (Class I, II, and III in Appendix I) competitive SRPs that are consistent with RMA objectives.

**REC-ERMA-AU-21:** Organized Group SRPs: Only issue low and medium impact (Class I and II in Appendix I) organized group SRPs that are consistent with RMA objectives.

**REC-ERMA-AU-22:** Commercial SRPs: Only issue low and medium impact (Class I and II in Appendix I) commercial SRPs that are consistent with RMA objectives.

**REC-ERMA-MA-17:** Recreation Management Zone 1: Designate 53,024 acres of RMA as RMZ1 to be managed as described in REC-ERMA-OBJ-04, REC-ERMA-MA-15 & 16, and REC-ERMA-AU-19 through 22.

**REC-ERMA-OBJ-05:** *Escalante Triangle Recreation Management Zone 2: In addition to general RMA objectives, focus recreation and visitor services management on protecting and facilitating visitor opportunities to participate in mountain biking.*

**REC-ERMA-MA-17:** Escalante Triangle Recreation Management Zone 2: Designate the area north of the Escalante Rim Road and outside the River Rims ACEC as the Escalante Triangle RMZ (5,659 acres; see Map 2-8).

*2. Decisions by Category*

BLM_0028469

**REC-ERMA-MA-18:** In the Escalante Triangle RMZ, when feasible with support of local community and partners (e.g., user groups, retail shops, service providers), complete and implement an activity level plan to develop a non-motorized "Loop" trail system designed for mountain bikes. During implementation, as new routes are constructed, existing routes would be closed and rehabbed or rehabbed to a single track trail.

---

**REC-ERMA-AU-19:** Escalante Triangle RMZ: All domestic non-working dogs must be on leash.

---

**REC-ERMA-AU-20:** Escalante Triangle RMZ: Limit overnight camping to designated campsites and/or developed campgrounds.

---

**REC-ERMA-MA-19:** If additional management controls are needed to control camping, construct a developed campground in or near the Escalante Triangle RMZ, outside the River Rims ACEC.

## 2.2.2. Scientific Use

**SCI-GOAL-01:** *Encourage, support, and conduct scientific research within the D-E NCA to improve understanding, management, and protection of the D-E NCA's resources.*

---

**SCI-OBJ-01:** *Encourage, support, and conduct scientific research while minimizing disturbance and consumption of resources and maximizing benefits to the management goals of the D-E NCA and to the scientific community.*

---

**SCI-AU-01:** Require a permit or authorization from BLM for all research (paleontological, cultural, and other). Require reports as part of the permitting and authorization process.

---

**SCI-MA-01:** The general management approach regarding collection would be to prohibit collection of materials from the D-E NCA except when specimens are unique, uncommon, or scientifically or educationally significant, and when there are significant benefits to understanding the D-E NCA's purposes, management goals, or significant advances in general scientific understanding to be gained by collection, or when the site is vulnerable to vandalism or theft and there is no preferred *in situ* method of protecting the site. Significant as determined on a case-by-case basis by the appropriate resource specialist(s).

---

**SCI-OBJ-02:** *Improve baseline knowledge of the species present in the D-E NCA, and general understanding of the ecosystem processes (e.g., food web dynamics, vegetation succession, and water dynamics); cycles (e.g., fire return and nutrient cycles) and anthropogenic influences (e.g., grazing, recreation) at work in the D-E NCA.*

---

**SCI-MA-02:** Continue basic trend and baseline monitoring and encourage and support research both internally and from external sources that inform management decisions. Research would include smaller 'pilot' projects, as well as longer term, larger projects. Research would be used to inform management decisions and actions.

---

**SCI-MA-03:** Encourage research, both internally and externally that addresses priority species and vegetation objectives and evaluates priority species and vegetation rankings (Appendix A and Appendix G).

BLM_0028470

**SCI-MA-04:** Focus monitoring on the resources identified as purposes of the D-E NCA. See individual resource sections for resource-specific monitoring guidance.

**SCI-OBJ-03:** *Improve baseline knowledge and general understanding of geological, cultural, historical, archaeological, and paleontological resources.*

**SCI-MA-05:** Continue baseline and trend monitoring and encourage and support research both internally and from external sources. See Geological and Paleontological Resources, section 2.1.1 (GPA), and Cultural Resources, section 2.1.8 (CUL), for resource-specific monitoring guidance.

**SCI-OBJ-04:** *Improve understanding of the social, economic, and recreational benefits associated with the D-E NCA.*

**SCI-MA-06:** Use a variety of tools and techniques (including but not limited to surveys, economic studies, focused discussions) to determine social and economic non-market as well as market economic benefits of the NCA. Implement appropriate monitoring and inventory as funding allows. Engage partners to accomplish goals, as appropriate.

Conduct monitoring and inventories with affected communities (on-site visitors, local communities, partners, etc.) to increase understanding of recreation activity, setting and outcome preferences.

## 2.2.3. Educational Use

**EDU-GOAL-01:** *Provide public education opportunities that increase awareness, understanding, and appreciation of the resources and stewardship values relevant to D-E NCA.*

**EDU-OBJ-01:** *Education Outcome Objective: Participants in visitor/community assessments report realization of the following targeted experience and benefit outcomes:*

- *Learning more about the area's unique and important resources and values (purposes of the D-E NCA).*
- *Greater appreciation for and stewardship of the natural and cultural resources in the D-E NCA.*
- *Greater appreciation of the historical interaction of human activities with the D-E NCA's landscape.*

**EDU-MA-01:** Emphasize the use of interpretive services (kiosks, guided tours, self-guided tours, etc.) and materials to inform youth and the general public about D-E NCA's natural and cultural resources and management actions.

**EDU-MA-02:** Manage the following areas as outdoor classroom/education emphasis areas for natural, geological, paleontological and cultural resources:

Escalante Canyon Watchable Wildlife Area (Map 2-16)

Old Spanish NHT (Map 2-17)

BLM_0028471

**EDU-MA-03:** Provide opportunities for partners (e.g., local school districts, recreation and interpretive associations, Friends Groups) to assist the BLM in providing biological/ecological, cultural and historical education/interpretation to help promote learning about the past and natural systems.

# 2.2.4. Livestock Grazing

**GRZ-GOAL-01:** *Support local agricultural communities, while achieving Colorado Public Land Health Standards and maintaining healthy, sustainable ecosystems in balance with the goals and objectives of the purposes of the D-E NCA.*

**GRZ-OBJ-01:** *Meet the forage demands of livestock operations consistent with achieving the Colorado Public Land Health Standards (BLM 1997[8] and Appendix D) and consistent with recreational, biological, natural and cultural resource objectives.*

**GRZ-MA-01:** Make 206,127 acres available for livestock grazing (Map 2-4). Provide 14,349 initial AUMs of livestock forage. Both acreage and AUM numbers may be adjusted based on the results of ongoing rangeland monitoring and site-specific analysis.

**GRZ-MA-02:** Close the following areas to livestock use (3,850 acres; see Map 2-4):

- 3,489 acres of unallotted lands
- Bean Allotment (361 acres, due to conflicts with adjoining private lands)

**GRZ-AU-01:** Within the acreage available to grazing, protect riparian values, sensitive plants, and saline seeps by limiting livestock use in riparian areas along the following rivers/creeks to active movement between grazing areas (12,510 acres; Map 2-4):

- Big and Little Dominguez Creeks
- Dry Fork of Escalante Creek
- Escalante Creek below forks
- Escalante Creek above forks
- Rose Creek

Limitation will be implemented through changes to grazing permit terms and conditions, allotment management plans, and/or issuance of crossing permits.

Intensively manage grazing in the Gunnison River riparian zone to improve riparian vegetation and minimize conflicts with recreation.

If land health concerns associated with livestock use are documented along the Gunnison River or in other riparian areas not identified above, limit livestock use in the riparian area to active movement between grazing areas.

**GRZ-MA-04:** Future land acquisitions will be evaluated and closed or allotted to neighboring permittees on a case-by-case basis considering topography and resource objectives.

---

[8] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028472

**GRZ-MA-05:** Changes (increases or decreases) in forage allocation for livestock grazing could be made where such changes would allow for progress toward the achievement of biological objectives.

**GRZ-MA-06:** In order to improve consistency of domestic sheep management within the D-E NCA, administratively divide two allotments that span the D-E NCA and the UFO and are separated by Highway 50. Wells Gulch west of Hwy 50 is named the Dominguez Rim Allotment; Alkali Flats west of Hwy 50 is named the Huff Allotment (see Map 2-4).

**GRZ-MA-07:** Manage livestock grazing to provide effective separation of domestic and wild sheep. Please see the decisions under Special Status Species and Natural Communities in section 2.1.3.1 (SSS-DBS) for a description of management actions taken to reduce the probability of disease transmission between domestic sheep and desert bighorn sheep.

**GRZ-MA-08:** Construct new livestock facilities (e.g., water developments, fences, corrals) as needed to achieve RMP objectives.

**GRZ-AU-02:** BLM may authorize the construction of up to 17 water developments in the Wilderness portion of the Dominguez allotment in accordance with Section 4(d)(4) of the Wilderness Act and the congressional grazing guidelines.

Specific locations and number of developments to be constructed would be implemented on the basis of the minimum requirements analysis, which includes:

- Prioritizing locations outside wilderness

- Minimizing the number of developments necessary to meet biological objectives and to improve naturalness

- Placement of developments supports an allotment management strategy that protects wilderness values.

Until an allotment management strategy that protects wilderness values is fully implemented; adopt an interim management strategy that addresses improvement and protection of naturalness.

**GRZ-MA-09:** Intensively manage areas with conflicts between livestock grazing and cultural resource objectives. If intensive management fails to resolve the conflict, evaluate all or part of allotment for closure.

**GRZ-MA-10:** In areas where monitoring shows that livestock grazing is preventing achievement of biological resource objectives, adjust timing of use or intensively manage to reduce impacts to biological resources.

If intensive management fails to resolve the conflict, evaluate for AUM reduction and/or closure of all or part of the allotment(s).

**GRZ-MA-11:** Periodically assess AUM availability using rangeland monitoring and/or vegetative inventory data (e.g., NRCS carrying capacity protocol, land health assessments).

Prioritize areas where livestock grazing is preventing achievement of biological resource objectives.

BLM_0028473

**GRZ-AU-03:** To improve conditions in desert shrub/saltbush communities, limit the grazing use period below 6,000 feet elevation (due to low annual precipitation) to October 1 to April 15 in order to avoid times when plants are actively growing.

This limitation may be modified in an allotment management plan or grazing use agreement intended to help achieve biological objectives ; e.g., one year of grazing during spring/summer followed by 2 years of rest.

The change in the grazing use period will be phased in over a 3-year period.

---

**GRZ-MA-12:** Designate allotments into one of three categories (I, M or C) on the basis of the following criteria:

"I" = Intensively manage allotment because of conflicts with other resource objectives, such as conserving threatened and endangered (T&E) species and/or meeting land health standards.

"M" = Maintain allotment with current management. The allotment causes no immediate conflicts with other resources and is meeting land health standards.

"C" = Custodial Allotment. The allotment is small in size and AUM numbers and has lower priority than larger allotments. It does not cause major conflicts with other resources.

---

**GRZ-MA-13:** Based on biological resource objectives, evaluate and allocate vacated or relinquished allotments, or unallotted areas for:

- Combining with active allotments to provide for additional management options.
- Establishing grass banks
- Closure to grazing

---

**GRZ-MA-14:** Include periodic rest during the active growing season as part of authorized use (where appropriate for achieving biological resource objectives).

---

**GRZ-MA-15:** Livestock grazing permits will include seasonal utilization limits for palatable forage that reflect BMPs and are consistent with meeting land health standards or other biological objectives. Lower limits will be established for grazing allotments with land health problems where grazing is contributing to those problems.

---

**GRZ-OBJ-02:** *Manage livestock grazing and recreation to discourage conflicts.*

---

**GRZ-MA-16:** Resolve conflicts between livestock grazing and recreation on a case-by-case basis in accordance with BLM policies.

---

**GRZ-MA-17:** When developing grazing strategies, consider livestock management practices inside SRMAs that reduce livestock concentration (with associated livestock waste and trampling) in and around developed and undeveloped recreation facilities during key recreation periods.

---

**GRZ-GOAL-02:** *Develop and encourage public and stakeholder understanding of livestock grazing management within the D-E NCA.*

---

*2. Decisions by Category*

**GRZ-OBJ-03:** *Improve communication and understanding of range standards and expectations between the BLM, grazing permittees and the general public. Improve understanding of livestock grazing as a traditional and continuing current use in Mesa, Delta, and Montrose Counties and communities.*

**GRZ-MA-18:** Educate public on livestock grazing as a traditional and continuing, appropriate use of public lands through educational and interpretive messaging.

Include educational messaging about sheep guard dogs.

## 2.2.5. Transportation and Travel Management

**TRV-GOAL-01:** *Define a travel and transportation network that supports the goals and objectives of the purposes of the D-E NCA.*

**TRV-OBJ-01:** *Manage the D-E NCA's route system to meet objectives for the purposes of the D-E NCA (including recreation), while allowing continued use of the D-E NCA for livestock grazing, land authorizations and access to non-Federal property.*

**TRV-MA-01:** Designate the Dominguez Canyon Wilderness as closed to off-highway vehicle (OHV) use (66,193 acres; Map 2-13).

Designate all other areas of the D-E NCA as limited to designated routes for motorized travel (143,819 acres; see Map 2-13).

**TRV-MA-02:** Authorize the use of motorized vehicles for administrative purposes within areas that are closed to OHV use (see Glossary). Authorization would be evaluated on a case-by-case basis. Use of motorized equipment in the Wilderness for lawful livestock grazing activities is allowed in accordance with the congressional grazing guidelines and BLM policy.

**TRV-MA-03:** Designate the Dominguez Canyon Wilderness as closed to mechanized travel (e.g., bicycles, game carts) (66,193 acres; see Map 2-13).

Designate all other areas of the D-E NCA as limited to designated routes for mechanized (e.g., bicycles) travel (143,819 acres; see Map 2-13). In these areas, allow for use of non-motorized game carts off designated routes for game retrieval.

**TRV-MA-04:** Designate the Wilderness Zone 1 as limited to existing routes for horse travel (1,585 acres; Map 2-13). Allow off-route foot travel. Close trails or areas to foot and horse travel where necessary to protect resources (e.g., trails that lead to cultural sites not allocated to public use).

Inventory routes in Zone 1 to update existing BLM inventory and produce associated map for the public.

**TRV-MA-05:** Any land acquired by the BLM for the Dominguez-Escalante NCA will be managed under the limited classification criteria as identified in 43 CFR 8342.1, limited to existing roads and trails until a site determination and travel management plan are completed for the acquisition (43 CFR 8342.2).

**TRV-MA-06:** Manage the D-E NCA's route system for consistency with adjacent public land (USFS and CPW) travel designations, except when in conflict with limitations in this plan.

BLM_0028475

**TRV-MA-07:** Excluding county-maintained roads and administrative use, implement a seasonal closure for motorized and mechanized travel in the following areas to protect big game winter concentration areas (63,114 acres) (Map 2-13):

- Gibbler Gulch
- Wagon Park
- Sowbelly
- Upper Sawmill Mesa
- Dry Mesa

**TRV-MA-08:** Implement seasonal closures from December 1 to April 30 in Gibbler Gulch, Wagon Park, Sowbelly, Upper Sawmill Mesa, and Dry Mesa.

Exception: The Farmers Canyon route, within the seasonal closure, would remain open year-round to provide a motorized "loop" opportunity until a new route can be connected north of Farmers Canyon to divert use away from the seasonal closure area as much as practicable.

**TRV-MA-09:** Construct recreation trails consistent with the Trail Design Criteria (Appendix K).

**TRV-OBJ-02:** *Manage the D-E NCA's route system to reduce the potential for trespass onto private land.*

**TRV-MA-10:** Consider closing and rehabilitating routes that dead-end at private land and that are not used as primary access for private landowners.

**TRV-MA-11:** Consider limiting motorized and mechanized travel on the following types of routes to administrative use:

- Routes that end at private land and provide primary access to private property (to prevent trespass)
- Routes that end at ROW structures such as communication towers, power lines, pipelines and are not needed to meet recreation objectives (to prevent vandalism)
- Routes that dead-end at livestock facilities and are not needed to meet recreation objectives (to prevent vandalism and livestock harassment).

**TRV-IMP-01:** Implementation-level route designations. See Appendix N (as well as Map N-1) for implementation-level route designation decisions.

## 2.2.6.  Land Tenure and Land Use Authorizations

**LAN-GOAL-01:**  *Any new proposed facilities must be consistent with protecting the resources and values within the Conservation Area and be consistent with BLM Manual 6220 (BLM 2012b). Consider allowing realty authorizations, such as right-of-way grants (ROWs) and permits, only when required for local, essential community services and when no siting alternatives exist outside the NCA.*

**LAN-OBJ-01:** *Evaluate realty authorization requests using evaluation criteria designed to protect*

BLM_0028476

*Conservation Area resources and values. Determine whether the proposal is consistent with BLM Manual 6220, including the provision that BLM will only develop new facilities in the NCA where they are necessary for public health and safety, required under law, necessary for the exercise of valid existing rights or other non-discretionary uses, needed to prevent impacts to fragile resources, or needed to further the purposes for which the area was designated.*

---

**LAN-AU-01:** Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2-14), except to allow for:

- Reasonable access and utilities to non-Federal property and existing ROW facilities.
- Upgrades or modifications to existing facilities.

---

**LAN-AU-02:** Manage 1,022 acres as ROW avoidance areas. Apply special stipulations and mitigation measures while processing ROWs within these areas consistently with VRM II objectives and the purposes of the NCA:

- 75-foot buffer along Highway 50 (96 acres).
- Unaweep Canyon, ¼ mile buffer along Highway 141 within the walls of the canyon (926 acres):
  - Telephone/fiber optic and low voltage power lines.
  - Any new above-ground facilities within must be placed on wooden poles.

Applications for new ROWs will follow BLM Manual 6220 policy [Section 1.6 (E)].

---

**LAN-AU-03:** No utility corridors are designated. Remove the portion of the West-wide Energy Corridor that is within the NCA. That part of the West-wide Energy Corridor that is outside the NCA remains unchanged.

---

**LAN-MA-01:** While processing ROW renewals, in accordance with all applicable law and policy, work with holders of existing ROWs to consider new, additional, or modified terms and conditions to minimize impacts to the NCA's values.

---

**LAN-AU-04:** Allow for reasonable access to non-Federal property with the following limitations:

- All ROWs on existing roads administered by the BLM will be maintained in their current condition unless an upgrade in condition would better protect natural and cultural resources.
- Any new roads would be authorized and constructed in a way that minimizes impacts to natural and cultural resources.
- Any new roads will be gated as needed to prevent or limit public vehicle access.
- Utilities to non-Federal property must be co-located within a 50-foot buffer of the access road to the property, unless an exception would reduce impacts to natural and cultural resources.

---

**LAN-AU-05:** Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA.

---

**LAN-AU-06:** Allow for the location of one new communications site within ROW exclusion area of the Delta or Montrose County portion of the D-E NCA, only if a new location is necessary for improved

BLM_0028477

communications coverage and leads to equivalent or better protection of visual, natural and cultural resources than co-location would.

**LAN-MA-02:** Continue to manage in accordance with the Ninemile Hill communications site plan, except where limitations are identified elsewhere in this plan.

**LAN-AU-07:** Any new towers within the D-E NCA must be:

- Self-supporting structures
- Without night lighting
- Not greater than 100 feet
- Constructed to repeat the basic elements of form, line, color, and texture found in the predominant natural features of the adjacent landscape.

**LAN-GOAL-02:** *Process land tenure adjustments to protect resource values, improve management, and reduce administration costs.*

**LAN-OBJ-02:** *Continue to work with willing sellers to acquire non-Federal land within, and/or adjacent to, the Conservation Area boundary if the acquisition will contribute to achieving the goals and objectives for the purposes of the D-E NCA.*

**LAN-MA-03:** Acquire lands or interests in lands from willing sellers through exchanges, purchases, easements or donations.

**LAN-MA-04:** Manage acquired lands or interests in lands consistent with the objectives of surrounding BLM-administered lands.

**LAN-MA-05:** Any land acquired by the BLM for the Dominguez-Escalante NCA will be managed under the limited classification criteria as identified in 43 CFR 8342.1, limited to existing roads and trails until a site determination and travel management plan are completed for the acquisition (43 CFR 8342.2).

**LAN-OBJ-03:** *Resolve trespass or encroachment issues as they are identified and prioritized.*

**LAN-MA-06:** Consider land exchanges on a case-by-case basis in order to resolve trespass or encroachment issues if the exchange is in the public interest.

**LAN-MA-07:** Resolve trespass cases through termination of the unauthorized activity, legalizing the activity under an appropriate land use authorization, or title transfer through land exchange, as appropriate.

**LAN-OBJ-04:** *Manage existing withdrawals in cooperation with the identified agency (e.g., BOR) until the withdrawals are revoked.*

*2. Decisions by Category*

BLM_0028478

**LAN-MA-08:** Upon revocation of existing withdrawals, manage the lands consistent with the objectives of adjacent or comparable public lands within the D-E NCA.

# 2.3. SPECIAL DESIGNATIONS

## 2.3.1. Areas of Critical Environmental Concern

**ACEC-GOAL-01:** *Protect the integrity of sensitive and/or unique areas within the D-E NCA through the designation of ACECs.*

**ACEC-OBJ-01:** *Gunnison Gravels*

*Protect, and educate the public about, the unique and sensitive geological resources of the Gunnison Gravels area.*

**ACEC-MA-01:** Manage the Gunnison Gravels ACEC (15 acres) to protect evidence of unique geological processes (Appendix M; Map 2-5).

**ACEC-AU-01:** Prohibit surface-disturbing activities within the Gunnison Gravels ACEC (see Appendix B and Map 2-1). Construct a fence to exclude motorized travel from the ACEC.

**ACEC-AU-02:** Manage the Gunnison Gravels ACEC as ROW exclusion.

**ACEC-AU-03:** Do not issue permits for collection of rocks and minerals in the Gunnison Gravels ACEC except where collection is intended for legitimate scientific uses or Native American spiritual or traditional uses. For these exceptions, applicants will acquire a permit from the BLM by providing documentation to the satisfaction of the responsible management official. Casual use surface collection of rocks and minerals is prohibited.

**ACEC-OBJ-02:** *Escalante Canyon*

*Protect the unique and sensitive plant, fish and wildlife resources of Escalante Canyon, while educating the public about the area's unique natural hazards, plants, wildlife, fish, geological and cultural resources.*

**ACEC-MA-03:** Manage 2,281 acres of Escalante Canyon as an ACEC (Appendix M; Map 2-5).

**ACEC-AU-04:** Manage livestock grazing in the Escalante Canyon ACEC so as to protect unique and sensitive plant resources.

To protect riparian values and unique and sensitive plants, limit livestock use in riparian areas along Escalante Creek below forks to active movement between grazing areas.

**ACEC-MA-04:** Informational signs identifying potential recreational hazards in the Escalante Canyon ACEC will be provided.

**ACEC-AU-05:** To prevent accidental destruction of listed species and unique plant associations, woodland

BLM_0028479

harvests will not be permitted in the Escalante Canyon ACEC.

**ACEC-AU-06:** Apply SSR restrictions within the Escalante Canyon ACEC (see Appendix B; Map 2-2).

**ACEC-MA-05:** Provide the public with outdoor classroom opportunities related to the Escalante Canyon ACEC's unique and sensitive plants, wildlife, fish, geological and cultural resources.

**ACEC-MA-06:** Reduce, as much as practicable, barriers to fish and wildlife movement through the Escalante Canyon ACEC.

**ACEC-AU-07:** Where the Escalante Canyon ACEC overlaps the Escalante Canyon RMA, designate campsites within the RMA. Overnight camping limited to developed campgrounds and designated campsites (see section 2.2.1).

**ACEC-AU-08:** Manage SRPs in the Escalante Canyon ACEC consistent with SRMA, ACEC, and Watchable Wildlife objectives. No Vending or Competitive SRPs will be issued. Low and medium impact Commercial and Organized Group SRPs will be issued.

**ACEC-AU-09:** Manage the Escalante Canyon ACEC as ROW exclusion.

**ACEC-OBJ-03:** *Gibbler Mountain*

*Protect the unique and sensitive paleontological and rare plant resources within the Gibbler Mountain area.*

**ACEC-MA-07:** Manage 1,310 acres within the Gibbler Mountain area as an ACEC (Appendix M; Map 2-5).

**ACEC-AU-10:** Prohibit surface-disturbing activities within 100 meters of known, significant paleontological sites and within 100 meters of BLM sensitive plant occurrences in the Gibbler Mountain ACEC (see Appendix B and Map 2-1).

**ACEC-MA-08:** Reduce, as much as practicable, route density within 200 meters of BLM sensitive plant occurrences in the Gibbler Mountain ACEC.

**ACEC-AU-11:** Prohibit surface-disturbing activities that pose adverse impacts to Colorado hookless cactus occurrences in the Gibbler Mountain ACEC.

**ACEC-AU-12:** Manage the Gibbler Mountain ACEC as ROW exclusion.

**ACEC-OBJ-04:** *River Rims*

*Protect the unique and sensitive rare plants and paleontological resources on the benches and slopes above the Gunnison River.*

*2. Decisions by Category*

BLM_0028480

**ACEC-MA-09:** Manage 5,405 acres as the River Rims ACEC (Appendix M; Map 2-5).

**ACEC-AU-13:** Prohibit surface-disturbing activities within the River Rims ACEC (see Appendix B and Map 2-1).

**ACEC-MA-10:** Manage livestock grazing and active movement in the River Rims ACEC so as to protect unique and sensitive plant resources.

**ACEC-AU-14:** Prohibit competitive special recreation permits in the River Rims ACEC. Allow low impact commercial and organized group special recreation permits. Commercial river outfitters will not be allowed to camp in the ACEC.

**ACEC-AU-15:** Manage the River Rims ACEC as ROW exclusion.

**ACEC-MA-11:** Close BLM routes to motorized and mechanized use within 200 meters of Colorado hookless cactus (does not include county-maintained roads) except the minimum necessary to provide public access to the Gunnison River and administrative access. If occurrences are identified in the future that conflict with route designations, consider reroutes to avoid cactus.

# 2.3.2. National Historic Trails

**NHT-GOAL-01:** *Safeguard the nature and purposes of the congressionally designated Old Spanish NHT, which are to afford the public the opportunity to connect to the trail resources and the trail story.*

**NHT-OBJ-01:** *Manage the Old Spanish NHT Management Corridor for auto-tour interpretive opportunities (along designated routes, Highway 50 and county-maintained roads).*

**NHT-OBJ-02:** *Maximize opportunities for shared Old Spanish NHT stewardship.*

**NHT-OBJ-03:** *Reduce the potential for uses that substantially interfere with the nature and purposes of the Old Spanish NHT.*

**NHT-OBJ-04:** *Mitigate impacts of or avoid activities that are incompatible with the purposes for which the Old Spanish NHT was established.*

**NHT-OBJ-05:** *Identify and protect the historic route and historic remnants and artifacts of the Old Spanish NHT for their scientific and educational value.*

**NHT-OBJ-06:** *Identify and manage high potential historic sites or high potential route segments, including any additional recommended Federal Protection Components.*

BLM_0028481

**NHT-MA-01:** Establish a national trail management corridor comprised of 23,131 acres in the D-E NCA to be called the Old Spanish NHT Management Corridor (Map 2-17).

---

**NHT-MA-02:** Designate the trail corridor VRM II.

---

**NHT-AU-01:** Manage the trail management corridor as ROW exclusion (Map 2-14), with the exception of a 75-foot buffer from the edge of the south-bound lane of Highway 50 managed as ROW avoidance. Apply special stipulations and mitigation measures to this area to protect NHT resources (see Appendix B).

---

**NHT-MA-03:** Close and potentially rehab routes as needed to improve the naturalness of the trail management corridor setting.

---

**NHT-MA-04:** With partners (local governments, trail organizations, user groups, service providers, tourism councils, etc.), develop auto-tour interpretive opportunities (roadside kiosks, brochures, etc.).

## 2.3.3. Wild and Scenic Rivers

**WSR-GOAL-01:** *Protect the wild and scenic river values within the D-E NCA.*

---

**WSR-OBJ-01:** *Manage rivers and creeks found suitable for WSR designation to protect their free-flowing condition, outstandingly remarkable values (ORVs), water quality, and tentative classification, as identified in the suitability report in the final record of decision.*

---

**WSR-MA-01:**

Manage the following river/creek segment as suitable for WSR designation (Map 2-15):

- Cottonwood Creek, Wild Classification (3,728 acres)

Release all other eligible rivers and creeks from further WSR studies.

See Wild and Scenic River Suitability Report (Appendix O).

Note: The BLM determination that Cottonwood Creek is suitable is a preliminary administrative determination subject to further review by the U.S. Department of the Interior. At this time, the BLM will not forward this determination to the Secretary, Congress, or the President for further review and action. If the BLM is able to obtain an alternative form of flow protection to support the vegetation outstandingly remarkable value (ORV), the BLM will recommend that action not be taken on the suitability determination and will consider changing the determination to "not suitable" during the next available land use plan amendment process. Limits on allowable uses as directed in the National Conservation Area designation legislation, as well as management actions designed to protect riparian vegetation are sufficient to address land uses that may threaten the vegetation ORV.

---

**WSR-MA-02:** Approve no actions altering the free-flowing condition of suitable segments of Cottonwood Creek.

---

**WSR-MA-03:** Approve no actions that would measurably diminish a stream segment's identified ORVs. Approve no actions that would allow modification of the setting of a suitable river segment to a degree that would change its tentative classification.

BLM_0028482

**WSR-MA-04:** Implement measures designed to enhance the ORVs, water quality, and free-flowing condition of suitable segments (e.g., removing tamarisk or planting native riparian species).

**WSR-MA-05:** If Congress designates wild and scenic rivers in the D-E NCA, take additional measures to protect each segment's ORVs, free-flowing condition and water quality until a comprehensive river management plan is completed for the WSRs.

## 2.3.4. Wilderness Study Areas

**WSA-GOAL-01:** *Preserve the wilderness character of remaining wilderness study areas.*

**WSA-OBJ-01:** *Preserve wilderness characteristics in WSAs in accordance with non-impairment standards as defined in BLM Manual 6330—Management of Wilderness Study Areas (BLM 2012e), until Congress either designates these lands as wilderness or releases them for other purposes.*

**WSA-MA-01:** If the WSA (3,032 acres; Map 1-1) is released by Congress, manage the released WSA lands for consistency with management of adjacent lands outside the Dominguez Canyon Wilderness.

In the interim, manage the WSA to preserve wilderness characteristics in accordance with non-impairment standards. See Scenic Resources (VIS) for more specific guidance.

**WSA-MA-02:** In the response to wildfire, use Minimum Impact Suppression Tactics to limit impact to wilderness characteristics. Only allow ground-disturbing mechanical tactics (e.g., bulldozers) if life and/or property is threatened.

## 2.3.5. Wilderness

**WIL-GOAL-01:** *Preserve, protect, or enhance the qualities of wilderness character in the Dominguez Canyon Wilderness.*

**WIL-OBJ-01: *Wilderness Zone 1:*** *Manage with an emphasis on protecting and restoring naturalness and supplemental values (federally listed species, cultural and paleo resources).*

***Wilderness Zone 2:*** *Manage with an emphasis on protecting supplemental values, and protecting and restoring naturalness and opportunities for solitude*

***Wilderness Zone 3:*** *Manage with an emphasis on protecting supplemental values, and protecting and restoring naturalness and opportunities for primitive and unconfined recreation.*

**WIL-MA-01:** Allow trammeling only as needed to meet the above wilderness objectives, or in the case of emergencies where such an action is needed for the protection of public health and safety.

**WIL-MA-02:** For any non-emergency implementation action in the Wilderness, conduct and use a minimum requirements analysis to achieve the resource objectives (emergency involves wildland fire activities and the health and safety of persons in the area) (see Appendix H).

BLM_0028483