**WIL-OBJ-02:** *Enhance the rankings for priority species and vegetation attributes that are currently in "fair" or "poor" condition. (Appendix G).*

**WIL-MA-03:** If monitoring indicates allowable wilderness uses are contributing to "fair" or "poor" conditions, include use restrictions as part of any active management strategy.

**WIL-MA-04:** Do not conduct vegetation treatments in the Wilderness unless PPSV indicators are determined to be in "poor" or "fair." Then conduct only the minimum vegetation treatment(s) (e.g., planned fire, chemical, biological) necessary to meet naturalness objectives.

**WIL-MA-05:** Do not conduct post-fire rehabilitation in the Wilderness, unless PPSV indicators are determined to be "poor" or "fair." Then consider the minimum post-fire rehabilitation necessary only if such actions help achieve naturalness objectives.

**WIL-MA-06: Wilderness Zone 1:** No overnight camping.

**Wilderness Zone 2:** Require all overnight visitors to pack out solid human waste.

**Wilderness Zone 3:** Require all overnight visitors to bury solid human waste in a cathole more than 100 meters from a natural water source (rivers, creeks, springs, and seeps).

**WIL-MA-07:** Monitoring devices (e.g., radio collars, stream gauges, cameras) may be installed. Authorize only the minimum number of installations necessary to monitor trends and conditions of naturalness (PPSV indicators), supplemental values, and opportunities for solitude or unconfined recreation.

**WIL-MA-08:** Limit camping to designated sites in the Gunnison River corridor.

Limit camping in other riparian areas to designated sites when conditions are shown to be deteriorating as a result of this use, on the basis of riparian indicators identified in Appendix G.

**WIL-MA-09:** Do not allow non-emergency landing of aircraft, motorized vehicle uses, motorized equipment uses, and mechanized transport uses inside the Wilderness, unless PPSV indicators are determined to be "poor" or "fair." Then allow the minimum necessary to protect or enhance naturalness (e.g., bighorn sheep monitoring to reduce disease risk).

Use of motorized equipment for lawful livestock grazing activities is allowed in accordance with the congressional grazing guidelines and BLM policy.

WIL-MA-10: **Wilderness Zone 1:** Domestic non-working dogs must be on leash to protect desert bighorn sheep ([Map 2-10](#)).

**WIL-OBJ-03: *Wilderness Zone 1:*** *Protect and restore supplemental values (T&E species, cultural and paleo resources).*

***Wilderness Zones 2 and 3:*** *Protect supplemental values (T&E species, cultural and paleo resources).*

**WIL-MA-11:** Wilderness Zone 1 (includes a portion of the Big Dominguez Canyon Heritage Area and all

BLM_0028484

of the Rambo/Little Dominguez Canyon Heritage Area) and the Wilderness portion of the Leonards Basin Heritage Area: Close to overnight camping (Map 2-9).

---

**WIL-MA-12:  Wilderness Zone 1:** Designate as limited to existing routes for horse travel to enhance supplemental values. Allow off-route foot travel. Close trails or areas to foot and horse travel where necessary to protect resources (e.g., trails that lead to cultural sites not allocated to public use).

Inventory routes in Zone 1 to update existing BLM inventory and produce associated map for the public.

---

**WIL-MA-13:  Wilderness Zone 1:** Implement temporary area or activity closures as needed to protect and/or restore supplemental values.

**Wilderness Zones 2 and 3:** Implement temporary area or activity closures for the protection of supplemental values only where such closures are necessary to prevent substantial degradation to (or loss of) supplemental values.

---

**WIL-OBJ-04:** *Protect the undeveloped nature of the Wilderness by minimizing the number of new structures.*

---

**WIL-MA-14:**  Remove existing human developments not needed to achieve wilderness resource objectives (exceptions: necessary livestock developments that existed on the date of designation, significant cultural resources).

---

**WIL-MA-15:**  Authorize the construction or installation of the minimum number of new developments (e.g., livestock water facilities, fences) necessary to protect wilderness values and meet wilderness management objectives.

 **WIL-MA-16:**  Authorize motorized entries for livestock operations using minimum requirements analysis in accordance with Congressional Grazing Guidelines (H. Rept. 101-405).

---

**WIL-OBJ-05:** *Wilderness Zone 1:* Manage recreation to support and protect supplemental values.

*Wilderness Zone 2:* Manage recreation to protect outstanding opportunities for solitude (defined as an average number of contacts per visit of 4 or fewer).

*Wilderness Zone 3:* Manage recreation to support and protect naturalness and provide outstanding opportunities for primitive and unconfined recreation.

---

**WIL-MA-17: Wilderness Zone 1:** Limit group size to 25 people or fewer.

**Wilderness Zones 2 and 3:** Limit group size to 12 people or fewer.

---

**WIL-MA-18:** Limit visitor use only as necessary to meet wilderness objectives and/or to protect public health and safety.

---

**WIL-MA-19:**  Require a permit for placement and maintenance of permanent climbing anchors inside the Wilderness. With partners (climbing organizations, local business, and wilderness organizations) develop and implement a permitting process.

---

BLM_0028485

**WIL-MA-20:**  Identify a trail system that supports wilderness zone objectives (see Appendix N, Travel Management).

**Wilderness Zone 1:** Construct new or reroute designated routes to protect cultural resources

**Wilderness Zone 2:** Construct new routes if necessary to improve opportunities for solitude

**Wilderness Zone 3:** Construct new or reroute designated routes to enhance opportunities for primitive types of recreation.

---

**WIL-MA-21:** Issue low and medium impact (Class I and Class II in Appendix I) commercial and organized group special recreation permits.

---

**WIL-MA-22:** Do not provide for exceptions to group size limitations.

# 2.3.6. Watchable Wildlife Areas

**WWA-GOAL-01:** *Designate watchable wildlife areas in areas with exceptional opportunities for the public to view wildlife.*

---

**WWA-OBJ-01:** *Manage watchable wildlife areas to provide for public wildlife viewing and wildlife-related interpretation and education.*

---

**WWA-MA-01:** Designate the following area as a Watchable Wildlife Area (Map 2-16): Escalante Canyon (11,202 acres).

---

**WWA-MA-02:** Where feasible, complete wildlife habitat improvements to enhance fish/wildlife viewing opportunities, while maintaining protection of fish/wildlife.

---

**WWA-MA-03:**

Provide facilities such as informational and interpretive signs, designated trail systems, and restrooms, as needed to provide enhanced visitor use, enjoyment, and safety. Provide adequate protection (e.g., signing, use stipulations, barricades, and fences) as needed to protect sensitive species and their habitats.

BLM_0028486

This page intentionally left blank

BLM_0028487

# Appendix A. Planning for Priority Species and Vegetation

The BLM used a multi-step process when planning for biological resources in the D-E NCA for the Proposed RMP. The BLM's interdisciplinary team relied in part on a process called "planning for priority species and vegetation" (PPSV) to help organize biological data and analyses, which were used to support decision-making during the development of the Proposed Plan Alternative. PPSV was developed as part of a working agreement between the BLM and the Nature Conservancy. The idea of this process is to systematically focus planning efforts on those priority vegetation types and species that require specific management attention to help streamline biological resource planning.

The first step in this process was to identify species and vegetative types that would be treated as priorities for planning. Priority species were identified as those species in the D-E NCA that require significant management attention from the BLM beyond management of their respective habitat types. This resulted in two priority species for the D-E NCA: desert bighorn sheep and Colorado hookless cactus. Priority vegetation types were those that covered a large portion of the D-E NCA and/or required substantial management attention due to their value for the larger ecosystem. This resulted in eight priority vegetation types for the D-E NCA: desert shrub/saltbush, pinyon-juniper woodlands, sagebrush shrublands, ponderosa pine woodlands, mountain shrub, riparian, seeps and springs, and aquatic systems. These priority vegetation types cover all major vegetation types in the D-E NCA. A list of species that could be considered "nested" special status species under each vegetation type was then produced. "Nested" species are those whose health within the D-E NCA is largely tied to management of a vegetation type. Some of these species are "nested" under multiple vegetation types.

Second, a list of attributes and indicators for assessing the health of these species or vegetative communities was identified. Attributes are general characteristics that could be used to measure the health of a priority species or vegetation type. For example, one way to assess the health of the sagebrush shrublands vegetation type is the composition of invasive species in sagebrush communities. Indicators are more specific and are measurable. The indicator for the attribute described above could be the percentage of understory plants that are invasive. Areas that have a high relative cover of invasive species are not healthy for this attribute and indicator.

Third, the planning team developed standards for assessing the health of each indicator, so that each indicator could be measurably ranked into "poor," "fair," "good" and "very good" categories. Once these standards had been created, the current condition of each indicator was assessed using existing data as much as possible. The majority of the data used to determine current condition were taken from land health assessments conducted in the D-E NCA from 2007 through 2009.

*Appendix A. Planning for Priority Species and Vegetation*

The steps outlined above were initiated in the fall of 2010 when specialists from the BLM met with representatives of CPW, the Nature Conservancy, CNHP, USFS, and USFWS. Over the subsequent months, BLM specialists continued to refine and assemble the attributes, indicators, standards and current condition for each priority species and habitat/vegetation type.

During the development of this RMP, the standards used to assess priority vegetation types and priority species were used as a starting point for the creation of management objectives for those vegetation types and species. This system of attributes, indicators and standards will be used for monitoring the condition of priority species and vegetation through the life of the plan.

Table A.1 provides a detailed summary of the information assembled for the D-E NCA's priority species and vegetation types.

BLM_0028489

**Table A.1. Description of Attributes, Indicators and Current Condition of the Health of Priority Vegetation and Priority Species**

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| **Desert Shrub/Saltbush** | | | | | | | | |
| **Desert Shrub/ Saltbush** | Vegetation structural composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Plant species composition/ dominance | Percentage of sampled acres meeting land health standard 3 | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Disturbance regime | Percentage of sampled acres in early seral stage | Ecological site inventory (GJFO) and land health assessments (UFO) | Greater than 39% of sampled acres | 1-7% or 33-39% of sampled acres | 8-14% or 26-32% of sampled acres | 15-25% of sampled acres | Good |
| **Pinyon-Juniper Woodlands** | | | | | | | | |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028490

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

84

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| **Pinyon-Juniper Woodlands** | Age class structure | Percentage of acres of pinyon-juniper woodlands classified as old growth (GJFO) or late seral (UFO) | Ecological site inventory (GJFO) and PhD dissertation work (UFO) | Less than 35% or more than 95% of sampled acres | 35-45% or 86-95% of sampled acres | 46-55% or 76-85% of sampled acres | 55-75% of sampled acres | Good |
| | Vegetation structural composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs | Land health assessments | Less than 60% of sampled acres | 50-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Good |
| | Dominance of crested wheatgrass | Percentage of sampled acres with acceptable levels (less than 50% relative understory cover) of crested wheatgrass | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Very Good |
| | Presence/ abundance of BLM sensitive plant species | Population trend of BLM sensitive plant species | Best estimation based on CNHP data | Loss of populations | Decreasing population trends | Static to increasing population trend | Increasing population trend | Very Good |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Very Good |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028491

Dominguez-Escalante National Conservation Area                                                                  85
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| **Sagebrush Shrublands** | | | | | | | | |
| **Sagebrush Shrublands** | Age class structure | Percentage of acres that have decadent sagebrush | Land health assessments | More than 50% of sampled acres | 20-50% of sampled acres | 5-20% of sampled acres | Less than 5% of sampled acres | Good |
| | Vegetation Structural Composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs (adequate as described by Ecological Site Descriptions and the Gunnison Sage Grouse Rangewide Conservation Plan guidelines) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Dominance of crested wheatgrass | Percentage of sampled acres with acceptable levels (less than 50% relative understory cover) of crested wheatgrass | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Fair |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028492

Dominguez-Escalante National Conservation Area                                                              86
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Fair |
| | Gunnison sage-grouse winter habitat condition | Percentage of sampled acres with moderate cover of sagebrush (10-30% cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Sagebrush fragmentation and extent | Average size of un-fragmented (defined as route-free) sagebrush parks | BLM vegetation cover data and route inventory information | Average of 40 (or less) acres per unfragmented sagebrush parks | Average of 40-50 acres per unfragmented sagebrush parks | Average of 50-60 acres per unfragmented sagebrush parks | Average of 60 acres (or more) per unfragmented sagebrush parks | Good |
| **Ponderosa Pine** | | | | | | | | |
| **Ponderosa Pine** | Fire regime | Fire regime condition class (FRCC) | FRCC | FRCC 3 | FRCC 2 | FRCC 2 trending toward 1 | FRCC 1 | Fair |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028493

Dominguez-Escalante National Conservation Area                                                                87
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | Understory species composition | Presence of understory ladder fuels | Best estimation based on specialist opinion | Ladder fuels very likely to cause crown fires | Ladder fuels likely to cause crown fires | Ladder fuels unlikely to cause crown fires | Few to no Ladder fuels present | Good |
| | Number and size of stands | Number of stands and size of stands relative to current situation | Best estimation based on specialist opinion | Loss of stands | Decreasing stand size | Increasing stand size | Increasing stand size and new stands | Good |
| Mountain Shrub | | | | | | | | |
| Mountain Shrub | Age class structure | Percentage of acres in early, mid and late age classes | Best estimation based on specialist opinion | Less than 5%of the D-E NCA's mountain shrub communities are within each of the following age classes: early, mid and late seral | At least 5% of the D-E NCA's mountain shrub communities are within each of the following age classes: early, mid and late seral | 15-25% of the D-E NCA's mountain shrub communities are within each of the following age classes: early, mid and late seral | 25% (or more) of the D-E NCA's mountain shrub communities are within each of the following age classes: early, mid and late seral | Good |
| | Vegetation structural composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs (taken from existing LHA data) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Very Good |

*Appendix A. Planning for Priority Species and Vegetation*

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

88

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Good |
| | Vigor | Percent hedging by big game and livestock | Land health assessments (UFO only) | > 50 percent of sites with most of the palatable shrubs severely hedged | 25-50 percent of sites with most of the palatable shrubs severely hedged | 10-24 percent of sites with most of the palatable shrubs severely hedged | less than 10 percent of sites with most of the palatable shrubs severely hedged | Very good |
| **Riparian** | | | | | | | | |
| Riparian | Fire fuel load on Gunnison River | Percentage relative cover of tamarisk (dead or alive) | BLM greenline data (UFO only) | greater than 50% relative cover of tamarisk (dead or alive) | 26-50 % relative cover of tamarisk (dead or alive) | 11-25% relative cover of tamarisk (dead or alive) | Under 10% relative cover of tamarisk (dead or alive) | Good |
| | Stream function | Percentage of sampled miles in proper functioning condition | BLM proper functioning condition data | Less than 60% of sampled miles | 60-79% of sampled miles | 80-94% of sampled miles | More than 95% of sampled miles | Good |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028495

Dominguez-Escalante National Conservation Area                                                           89
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | Invasive species composition on Gunnison River | Percentage of sample sites along the Gunnison River with acceptable levels of invasive plants (less than 20% relative cover) | BLM greenline data (UFO only) | Less than 60% of sample sites | 60-79% of sample sites | 80-94% of sample sites | 95% or more of sample sites | Poor |
| | Invasive species composition on tributary creeks | Percentage of sample sites along tributary creeks with acceptable levels of invasive plants (less than 20% relative cover) | BLM greenline data (UFO only) | Less than 60% of sample sites | 60-79% of sample sites | 80-94% of sample sites | 95% or more of sample sites | Very Good |
| | Presence of saline grasslands | Percent variation from present conditions in extent of saline grasslands in riparian zones | Best estimate based on specialist opinion | >25% decrease from present condition | 6-25% decrease from present condition | Present condition +/- 5% | Greater than 5% increase from present condition | Good |
| | Presence of wetland obligate plant species | Trend (compared to present conditions) in wetland obligate plant cover along riparian reaches | BLM greenline data (UFO only) | Loss of obligates from >25 percent of riparian reaches | Loss of obligates from 5-25 percent of riparian reaches | Loss or gain of obligates from +-5% percent of riparian reaches | Gain of obligates in more than 5% of riparian reaches | Fair |

*Appendix A. Planning for Priority Species and Vegetation*

Dominguez-Escalante National Conservation Area                                              90
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | Vegetation structure | Percentage of suitable stream reaches that support the historical proportions of age classes and vegetation composition of woody native riparian species (e.g., willows, cottonwoods, and others) | BLM greenline data (UFO only) | less than 60% of suitable stream reaches | 60-79% of suitable stream reaches | 80-94% of suitable stream reaches | 95% (or more) of suitable stream reaches | Fair |
| | | | **Seeps and Springs** | | | | | |
| Seeps and Springs | Groundwater hydrology | Number of well and water catchments in the recharge area | BLM Range Improvement Projects inventory | More than current number of water developments at full capacity | Current number of water developments at full capacity | Current number of water developments at current capacity | Fewer water developments than current condition | Good |
| | Groundwater hydrology | 10-year trend in size of wetland/riparian area around naturally occurring seeps and springs | Best estimate based on specialist opinion | Trends toward smaller riparian/ wetland area | Stable to trend toward smaller riparian/wet-land area | Stable trend | Trend toward enlargement | Good |
| | Invasive species composition/ dominance | Percentage of naturally occurring seeps and springs with non-native perennial plant species (e.g., tamarisk, Canada thistle, bull thistle) | Best estimate based on specialist opinion | Greater than 50% of naturally occurring seeps and springs | 16-49% of naturally occurring seeps and springs | 5-15% of naturally occurring seeps and springs | Less than 5% of naturally occurring seeps and springs | Fair |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028497

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

91

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | Presence of wetland obligate plant species | Trend (compared to present conditions) in wetland obligate plant cover around naturally occurring seeps and springs | Best estimate based on specialist opinion | Loss of obligates from >15% of springs/seeps | Loss of obligates from 5-15% of springs/seeps | Loss or gain of obligates from +-5% percent of springs/seeps | Gain of obligates in more than 5% of springs/seeps | Fair |
| | Rare plant presence | Number of seeps with continued presence of rare plants (e.g., canyon bog orchid, Eastwood's monkey-flower, giant helleborine) | Best estimate based on specialist opinion | More than 20% reduction in sites with continued presence | 5-19% reduction in sites with continued presence | plus or minus 5% of continued presence of rare plants | More than 5% increase in presence of rare plants | Good |
| | Surface water hydrology | Percentage of seeps impacted by surface water diversions | Best estimate based on specialist opinion | Increased number of diversions and an increased overall rate | Current number of water diversions at an increased rate | Current number of water diversions at current rate | Decrease in the number of diversions and/or the rate | Good |
| | Trampling and human disturbance | Percentage of naturally occurring seeps and springs with evidence of trampling and human disturbance | BLM inventory data (UFO only) | 50% or more of sites | 21-49% of sites | 6-20% of sites | Less than 5% of sites | Fair |
| **Aquatic Systems** | | | | | | | | |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028498

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| **Aquatic Systems** | Gunnison River channel movement | Percentage of the Gunnison River with evidence of channelization and riprap | BLM GIS data | More than 50% of the Gunnison River has evidence of channelization and riprap | 26- 50% of the Gunnison River has evidence of channelization and riprap | 6-25% of the Gunnison River has evidence of channelization and riprap | 5% (or less) of the Gunnison River has evidence of channelization and riprap | Fair |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028499

Dominguez-Escalante National Conservation Area                                                                                                                          93
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Gunnison River hydrologic regime/surface water | Gunnison River hydrograph comparison to pre-dam conditions | USGS water flow data | Monthly median of the average daily flows during critical spring runoff months (4/1-6/30) falls below the 35th percentile; OR the shape of the natural hydrograph is altered; OR minimum base-flows established by USFWS and BOR for special status fish | Monthly median of the average daily flows is equal to or exceeds the 35th percentile value during critical spring runoff periods (4/1-6/30); and the shape of the natural hydrograph is maintained; and minimum base-flows established by USFWS and BOR for special status fish | Monthly median of the average daily flows is at or above the median value (50th percentile) during critical spring runoff periods (4/1-6/30); and the shape of the natural hydrograph is maintained; and timing of peak runoff is consistent with pre-dam conditions; and minimum base-flows established by USFWS and BOR for special status fish | Monthly median of the average daily flows ranks at or above 75th percentile during critical spring runoff periods (4/1-6/30); and the shape of the natural hydrograph is maintained; and timing of peak runoff is consistent with pre-dam events; and minimum base-flows established by USFWS and BOR for special status fish | Fair |
| | Gunnison River presence/abundance of native fish | Percentage of fish (by number of fish collected) in Gunnison River that are native | BLM and Division of Wildlife fish sampling | Less than 60% native fish in the Gunnison River | 60-79% native fish in the Gunnison River | 80-95% native fish in the Gunnison River | More than 95% native fish in the Gunnison River | Good |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028500

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | species | | | | | | | |
| | Tributary creek hydrologic regime/surface water | Tributary hydrograph comparison | Best estimate based on BLM specialist opinion and intermittent data | Monthly median of the average daily flows during critical spring runoff months (4/1–6/30) falls below the 35th percentile; OR the shape of the natural hydrograph is altered; OR minimum base-flows established by USFWS and BOR for special status fish | Monthly median of the average daily flows is equal to or exceeds the 35th percentile value during critical spring runoff periods (4/1-6/30). The shape of the natural hydrograph is maintained; minimum base-flows established by USFWS and BOR for special status fish | Monthly median of the average daily flows is at or above the median value (50th percentile) during critical spring runoff periods (4/1-6/30); and the shape of the natural hydrograph is maintained; and timing of peak runoff is consistent with pre-dam conditions | Monthly median of the average daily flows ranks at or above 75th percentile during critical spring runoff periods (4/1-6/30); and the shape of the natural hydrograph is maintained; and timing of peak runoff is consistent with pre-dam events | Good |
| | Tributary creek presence/abundance of native fish | Percentage of fish in warm-water reaches of tributary creeks that are native | BLM and Division of Wildlife fish sampling | Less than 60% native fish in perennial warm-water reaches | 60-79% native fish in perennial warm-water reaches | 80-95% native fish in perennial warm-water reaches | More than 95% native fish in perennial warm-water reaches | Good |

*Appendix A. Planning for Priority Species and Vegetation*

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

95

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Cold-water fish composition | Percentage of fish in cold-water reaches that are native | BLM and Division of Wildlife fish sampling | Less than 60% native fish in perennial cold-water reaches | 60-79% native fish in perennial cold-water reaches | 80-95% native fish in perennial cold-water reaches | More than 95% native fish in perennial cold-water reaches | Poor |
| | Cold-water aquatic habitat quality | Percentage of cold-water fish bearing stream miles that rank is good in the Pfankuch stability rating | Best estimate based on BLM specialist opinion | Less than 60% of sites in tributary streams have a good rating on the Pfankuch stability rating | 60-79% of sites in tributary streams have a good rating on the Pfankuch stability rating | less than 80-95% of sites in tributary streams have a good rating on the Pfankuch stability rating | Greater than 95% of sites in tributary streams have a good rating on the Pfankuch stability rating | Good |
| Desert Bighorn Sheep | | | | | | | | |
| Desert Bighorn Sheep | Population structure and recruitment Potential for | Lamb to ewe ratio | CPW surveys | Ratio that will lead to downward population trend | Ratio that will lead to decreasing population trend | Ratio that will lead to stable to increasing population trend | Ratio that will lead to upward population trend | Good |

*Appendix A. Planning for Priority Species and Vegetation*

Dominguez-Escalante National Conservation Area    96
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| | disease transmission | Potential for disease transmission between domestic sheep and goats with desert bighorn sheep | BLM and CPW GIS data | Significant overlap (overlap within high risk areas) occurs between domestic sheep/goats and desert bighorn sheep on BLM lands. | High risk over-lap (permitted sheep/goat grazing within high risk allotments) occurs between domestic sheep/goats and desert bighorn sheep on BLM lands. Risk is reduced in low, medium and high risk allotments using WAFWA recommenda-tions. | There is no high risk overlap (permitted sheep/goat grazing within high risk allotments) between domestic sheep/goats and desert bighorn sheep on BLM lands. Risk is reduced in low and medium risk allotments using WAFWA recommenda-tions. | There is no risk of disease transmission between domestic sheep/goats and desert bighorn sheep on BLM lands. | Poor |
| | Population size* <br><br> *This attribute will only go into effect after CPW develops a herd population goal. | Size (5-year floating average) of the desert bighorn sheep herd | CPW surveys | Population at or below lowest goal | Mid to lower population goal | Mid to upper population goal | Greater than or equal to upper population goal | Good |
| **Colorado Hookless Cactus** | | | | | | | | |

BLM_0028503

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

97

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Poor | Fair | Good | Very Good | Current Condition |
| **Colorado Hookless Cactus** | Habitat quality | Percentage of sites occupied by Colorado hookless cactus that have low levels of invasive weeds (10% or less relative cover) | CNHP specialist opinion | 0-49% of sites | 50-79% of sites | 80-9% of sites | 95% of sites or more | Good |
| | Population structure and recruitment | Percent of populations with evidence of recruitment | CNHP specialist opinion | 0-49% of sites | 50-79% of sites | 80-94% of sites | Greater than 95% of sites | Good |
| | Population size | Population trend (20-year trend) in number of individual hookless cactus in known populations | CNHP | Loss of populations | Decreasing population | Static to increasing population | Increasing population | Fair |

*Appendix A. Planning for Priority Species and Vegetation*

BLM_0028504

This page intentionally left blank

BLM_0028505

# Appendix B. Description of Surface Disturbance Restrictions

This appendix defines surface disturbance restrictions found in section 2 of this Approved RMP. Three surface disturbance restrictions are described below: prohibit surface-disturbing activities (PSD), prohibit disruptive activities, site-specific relocation (SSR), and prohibit in-channel work.

## B.1. Prohibit Surface-Disturbing Activities

This restriction is applied in section 2 to protect sensitive resources from degradation resulting from human-caused disturbance. In some cases, this restriction applies only to a specific time of year. For example, this restriction may be applied within bighorn sheep production areas during the bighorn sheep calving season. See the specific section of section 2 for details regarding the protected resource for a particular restriction.

## Description of Activities Covered in This Restriction

This restriction applies to human-caused disturbance that results in direct and pronounced alteration, damage, removal, displacement, or mortality of vegetation, soil, or substrates; usually entail motorized or mechanized vehicles or tools; typically can also be described as disruptive activities (see following definition). Examples of typical surface disturbing activities include the following:

- Earth-moving and drilling.
- Geophysical exploration.
- Off-route motorized and mechanized travel.
- Vegetation treatments including woodland thinning with chain saws.
- Pyrotechnics and explosives
- Construction of power lines, pipelines, oil and gas wells, recreation sites, livestock improvement facilities, wildlife waters, or new roads.

Examples of casual use and authorized activities that would not normally be considered surface disturbing activities include the following:

- Equestrian use
- Proper livestock grazing
- Cross-country hiking

*Appendix B. Description of Surface Disturbance Restrictions*

BLM_0028506

- Hand-spraying weeds

- Minimal trimming of vegetation to maintain ROWs.

- Motorized and mechanized travel on designated routes. Maintenance of permitted areas and facilities under valid existing rights.

- Minimum impact emergency response activities such as construction of fire line using hand tools as a tactic for suppression and management of unplanned wildland fire.

## Standard Exceptions to Restriction

The D-E NCA Manager may grant an exception if an environmental analysis indicates that the proposed action can be conditioned so as not to adversely impact the protected resource within the project vicinity (the subject of the restriction). The D-E NCA Manager may also grant an exception for actions intended to a) enhance the long-term utility or availability of suitable habitat or b) to meet a PPSV objective.

Disturbances that may improve the resource that are the subject of the limitation (whether the resource is natural, cultural, geological, paleontological, etc.) are exempt, such as designated camp sites in areas where dispersed camping is damaging vegetation, or vegetation/fuel treatments designed to improve habitat conditions. In addition, essential roads, trails, and spring development may be exempted subject to BMPs. When use of heavy equipment is necessary for emergency response activities such as wildland fire suppression, management of unplanned fire, and emergency stabilization, the standard exception would be approved verbally by the BLM authorized officer, as delegated.

## B.2. Prohibit Disruptive Activities

This restriction is applied in section 2 to protect sensitive wildlife resources from activities that could decreases individual fitness of a species or population. This restriction is generally accompanied by a set of dates that indicate the time of year when this restriction applies.

## Description of Activities Covered in This Restriction

This restriction applies to human-caused disturbance that induces stress on an individual of a species population, community, or ecosystem and that causes potential loss of fitness (survival, reproduction, and recruitment) within crucial habitats or other sensitive areas during specified time periods; may or may not entail surface disturbance. This does not include regular background levels of activity (such as hiking or routine livestock management) to which individuals would be accustomed. It also does not include minimum impact emergency response activities such as construction of fire line using hand tools as a tactic for suppression and management of unplanned fire.  Examples of disruptive activities:

*Appendix B. Description of Surface Disturbance Restrictions*

BLM_0028507

- Commercial recreation activities, especially large groups
- Abnormally loud or sustained noise
- Road maintenance

## Standard Exceptions to Restriction

The D-E NCA Manager may grant an exception if the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity for the subject species of the limitation. An exception may also be granted for a) actions intended to enhance the long term utility or availability of suitable habitat for that species (e.g., vegetation treatment to improve species habitat) or b) to meet PPSV objectives.

Disruptive activities that may have long-term benefits to the resource that is the subject of the limitation are exempted (e.g., tamarisk removal). In addition, essential roads, trails, and spring development may be exempted subject to BMPs. When use of heavy equipment is necessary for emergency response activities such as wildland fire suppression, management of unplanned fire, and emergency stabilization, the standard exception would be approved verbally by the BLM authorized officer as delegated.

*Modification:* The D-E NCA Manager may modify the size and time frames of this restriction if CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, or under mild winter conditions for the first 60 days of the closure. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals were concentrated on the winter range during the winter months. Modifications could be authorized if the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition.

*Waiver:* The D-E NCA Manager may grant a waiver if CPW determines that the area is no longer utilized by big game as crucial winter range.

## B.3. Site-Specific Relocation Restrictions

This restriction is applied throughout section 2 in order to protect sensitive resources from potentially damaging activities.

Allows some use and occupancy of public land while protecting identified resources or values. SSR areas are potentially open to surface-disturbing activities but the restriction allows the BLM to require special constraints, or the activity can be shifted (spatially or temporally) to protect the specified resource or value. Activities that are not considered surface disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the area by

BLM_0028508

wildlife. Rights-of-way are not subject to the SSR restriction, because their impacts are mitigated in other ways.

# B.4. Prohibit In-Channel Work

This restriction is applied in section 2 to protect aquatic habitats from potentially damaging activities during critical spawning times for fish.

## Description of Activities Covered in This Restriction

This restriction applies to human-caused disturbance that results in direct and pronounced alteration or damage to stream banks, stream substrate, or riparian vegetation associated with important spawning times of resident fish. Work is usually associated with motorized or mechanized equipment or tools. Examples of typical disturbing activities include the following:

- Earth-moving and drilling
- Geophysical exploration
- Off-route motorized and mechanized travel
- Pyrotechnics and explosives
- Construction of roads, power lines, and pipelines that cross fish bearing streams. In-channel structure work including construction of diversion ditches, headgates, culverts, bridges, and low water crossings.

Examples of casual use and authorized maintenance activities that would not normally be considered in-channel disturbances include the following:

- Minor diversion ditch or headgate maintenance.
- Proper livestock grazing.
- Hand-spraying weeds.
- Minimal trimming of vegetation to maintain ROWs.
- Motorized and mechanized travel on designated routes.
- Maintenance of permitted areas under valid existing rights.

## Standard Exceptions to Restriction

The D-E NCA Manager may grant an exception if an environmental analysis indicates that the proposed action can be conditioned so as not to adversely impact the protected resource within the project vicinity (the subject of the restriction). An exception may also be granted for emergency actions needed to protect life and property.

BLM_0028509

Where both spring and fall spawning species are present in a given stream, the timing limitation will apply to the more sensitive species (e.g., spring spawning cutthroat trout versus fall spawning brook trout). Generally speaking, the late summer and fall base flow time period is the preferred time to complete in-channel work if conflicting resources exist. In addition, essential roads, trails, fire management activities (including fire line construction) and spring developments may be exempted subject to BMPs.

BLM_0028510

This page intentionally left blank

BLM_0028511

# Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep

## C.1. Introduction

The potential effect that association (intermingling) with domestic sheep has on bighorn sheep populations (probability of die-off and population viability) is well documented and recognized. Current science indicates that the bacteria that cause pneumonia in bighorn sheep populations, *Mycoplasma ovipneumoniae* and *Mannheimia haemolytica*, appear only to be transmitted between domestic and bighorn sheep when they come into direct contact (<30-foot separation) (Besser et al. 2012a; Lawrence et al. 2010; Schommer and Woolever 2008). Besser et al. (2012b) identified that epizootic pneumonia of bighorn sheep is a devastating disease, and etiology regarding the bacterial respiratory pathogens is unclear. This is also the case in Colorado (Miller and Wolf 2011). Transmission of *Mannheimia haemolytica* from domestic sheep to bighorn sheep is irrefutable, as demonstrated by Lawrence et al. (2010), and provides justification sufficient for preventing range overlap and potential association of domestic sheep and goats with bighorn sheep (Wild Sheep Working Group 2012). No one form of evidence can conclusively demonstrate that contact with domestic sheep frequently leads to die-offs of bighorn sheep populations in the wild. Taken together, however, the experiments and observations from the lab and the field do indicate that contact of wild bighorn populations with domestic sheep does pose a risk of disease transmission and die-offs in free-ranging bighorn populations.

Lab experiments demonstrate the particular sensitivity of bighorn sheep to some pneumonia-causing bacteria. The controlled conditions available in inoculation and pen experiments show that healthy domestic sheep often carry bacteria that are fatal to bighorn sheep, and that they can transmit those bacteria through close contact. Finally, nearly a century of observations in the field supports the view that proximity to domestic sheep is a risk factor for bighorn sheep due to disease transmission from domestic sheep to bighorn sheep.

Garde et al. (2005) offer the following conclusions summarizing the risk to wild bighorn sheep from *Pasteurella* spp. and *Mannheimia* spp.:

- These bacteria can cause pneumonia in bighorn sheep, but there are benign commensal strains in the upper respiratory tract that have no harmful effects.

- Pathogens that are benign in domestic sheep can be lethal in bighorn sheep.

- The transference of pathogens from domestic to bighorn sheep has been documented in laboratory settings, with resulting mortality in bighorn sheep.

- Domestic sheep, goats, and llamas have been reported to have these bacteria species.

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

BLM_0028512

- Wild sheep and mountain goats have been reported to have these bacteria species.

- Transmission is by direct contact and aerosolization (e.g., fine mist from breathing).

- These bacteria species do not persist in the environment.

- Acute-to-chronic die-offs in bighorn sheep populations can result in low- to 100-percent mortality, although these bacteria can be present in healthy sheep.

- These bacteria are considered opportunistic and can result in pneumonia outbreaks.

- These bacteria can cause clinical disease in domestic sheep and goats but are rarely primary pathogens.

In summary, field observations suggest that bighorn sheep have a high probability of contracting fatal pneumonia following contact with domestic sheep, which has led to numerous independent experiments. These experiments provide strong corroboration that bighorn sheep have a high probability of contracting fatal pneumonia following contact with domestic sheep. The impact of disease on bighorn sheep conservation is likely to increase as habitat loss and fragmentation restrict their movement and concentrate them into smaller areas, increasing contact rates and the spread of disease (Cahn et al. 2011; Scott 1988; Levins et al. 1994). Given the substantial concern raised in the published literature over the past 30 years, management guidance has focused on the separation of these species to prevent disease transmission from domestic sheep to bighorn sheep (The Wildlife Society 2014; Wild Sheep Working Group 2012; Cahn et al. 2011; Foreyt 1989; O'Brien, O'Brien, McCarthy, and Carpenter 2014; USFS 2009).

The Western Association of Fish and Wildlife Agencies (WAFWA) recommends that land management agencies and State wildlife agencies cooperate to complete comprehensive risk assessments of domestic sheep grazing allotments to inform the land use planning  process (Wild Sheep Working Group 2012). BLM Manual 1730–*Management of Domestic Sheep and Goats to Sustain Wild Sheep*, requires BLM to analyze potential risk of wild sheep contact or interaction with domestic sheep or goats and prescribe management practices to provide effective separation. WAFWA provides recommendations for land management agencies, State wildlife agencies, and domestic sheep permittees to consider implementing in order to minimize risk of association between bighorn sheep and domestic sheep commensurate with level of risk. The BLM used GIS and the Risk of Contact (RoC) model to quantify the risk of association between domestic and bighorn sheep populations. The RoC model was developed in Idaho by the U.S. Forest Service and the BLM (see additional discussion below).

The BLM used the level of risk of each allotment to inform the management actions in section 2, to minimize risk of association and provide effective separation. The parameters used in this model were based on existing science, where information could be obtained (see references), but they were also based on professional judgment. Additional information can be found in the Proposed RMP/Final EIS.

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

BLM_0028513

## C.2. Risk of Contact Model

In response to bighorn sheep population viability concerns, the Payette National Forest developed a methodology for calculating the probability and rates of contact between bighorn sheep and active domestic sheep allotments. Subsequently, in 2011, the U.S. Forest Service initiated a process to develop a geospatial platform based on the concepts used in the Payette analyses for application on other national forests. This was subsequently expanded to include the BLM and became an ArcGIS extension available to BLM in early 2014. Information for this model can be found in the extension tool user's guide (USFS 2013a).

This model was developed in an area that was rich in bighorn sheep movement and habitat data. For analysis of the risk of contact, the BLM modified the use of the RoC model based on the best available data for our local bighorn populations. In order to utilize the best available data for model inputs, a series of webinars were conducted between the BLM and CPW biologists to agree upon data usage and assumptions (BLM and CPW 2015).[9]

The RoC model estimates the probability that foraying bighorn sheep will reach a domestic sheep allotment. However, within an allotment, it is not possible to determine where and when domestic sheep would consistently occur or for how long. Use of some areas within an allotment may present less chance of contact with bighorn sheep than others, while some areas (e.g., source habitats) may have higher probability of occurrence. Consequently, because of this uncertainty, the RoC model predicts potential interspecies contact by assuming that contact with an allotment results in interspecies contact.

Of key importance to the model, the core herd home range (CHHR) defines the most important portion of a herd's use area, characterized by most (95 percent) of the use. By definition, where a CHHR overlaps an allotment, there is contact with the allotment, and the assumption is that one or more contacts per year may occur. It is recognized that stray domestic sheep could have implications for bighorn sheep herds, and in many rangeland settings, they may pose a risk of disease transmission as large as or greater than from foraying bighorn sheep. However, the bighorn sheep RoC tool (USFS 2013a) does not model the risk of stray domestic sheep and the subsequent potential for contact with bighorn sheep.

The following is a description of the methodology used to quantify the probability of bighorn sheep (BHS) to have contact with a grazing allotment—and ultimately make contact with domestic sheep (DS), to determine risk posed by domestic sheep grazing within BLM allotments. The model was developed according to procedure outlines in the RoC ArcGIS extension tool user's guide (USFS 2013a).

---

[9] December 12, 2014, January 15, 2015, and February 20, 2015.

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

Inputs to the model include the following:

1. Bighorn suitable habitat model

2. Bighorn CHHR

3. Relative preference for habitat

4. Bighorn ram distance/ewe distance files[10]

5. Bighorn adult herd size and sex ratios

## Suitable Habitat Model

Bighorn sheep occupy rugged canyons, foothills, and mountainous terrain at elevations ranging from 1,450 to 10,500 feet. Key habitat features include steep, rugged, escape terrain; grasses and forbs for forage; and a limited amount of tall vegetation. Bighorn sheep have habitat preferences and select habitat based on factors such as proximity of steep-sloped escape terrain, forage availability, and horizontal visibility (USFS 2013a; O'Brien et al. 2014).

CPW developed a Rocky Mountain bighorn sheep suitable habitat model for the State of Colorado in 2012 (Eichoff et al. 2012), but a desert bighorn sheep model was not available until late in 2014. This was made available by CPW for this modeling effort during the webinars. This model is similar to the Rocky Mountain suitable habitat model, but uses a less rugged terrain feature and only shows habitat to within 35 km of the Dolores and Dominguez desert bighorn herds. As prescribed in the *User's Guide* (USFS 2013a), based on the source habitat model, all areas in the Rocky Mountain and desert suitable habitat models were assigned to one of three habitat classes—source habitat, connectivity area, and non-habitat. Source habitat for bighorn sheep occurs within BLM domestic sheep allotments and adjacent landscape.

## Telemetry Data/Core Herd Home Range Modeling

Usually, CHHR analysis uses bighorn sheep telemetry location points to identify and enclose an area that contains 95 percent of all telemetry points from radio-collared bighorn sheep. CPW did not feel that they had enough telemetry locations to conduct this portion of the model. As stated in the *User's Guide* (USFS 2013a), "If point location data are not available, a polygon layer

---

[10] "Foray distance distribution files" provide the probabilities that individual ram or ewe forays will reach each of the 1-km-wide concentric rings emanating from the CHHR boundary. "Sample data" are provided with the model and were derived from 12 years of Hells Canyon (Idaho) area telemetry data used as part of the Payette National Forest analysis. "The foray distance distributions exhibited by the Hells Canyon area bighorn sheep were consistent with published observations of bighorn sheep movements from several other areas of western North America. These default data should be used unless other well-supported, scientifically derived estimates of foray distance distributions are available for the area under consideration" (USFS 2013a, pages 4–12).

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

containing the CHHR boundaries must be supplied." CPW biologists reviewed their existing spatial data for bighorn sheep home range polygons for overall, summer, and winter ranges, and provided their best professional judgment for boundaries for the populations involved. It was acknowledged that these areas were overestimates of actual CHHR, and will therefore overestimate foray distances.

## Foray Analysis

Bighorn sheep, particularly rams, make occasional long-distance movements beyond their CHHR. Singer et al. (2001) defined these forays as any short-term movement of an animal away from and back to its CHHR. This life-history trait can put bighorn sheep at risk of contact with domestic sheep, particularly when suitable habitats are well connected and overlap with domestic sheep use areas (Singer et al. 2000; Gross et al. 2000), or even when domestic sheep use is outside of CHHR areas. The risk of contact between dispersing bighorn sheep and domestic sheep is related to the number of bighorn sheep in a herd, proximity of domestic sheep use areas (allotments) to a bighorn sheep CHHR, distribution of bighorn sheep source habitats across the landscape, and frequency and distance of bighorn sheep forays outside of the CHHR. The risk of contact can be increased by straying domestic sheep (stocking rates and numbers of straying sheep, frequency and distance of straying, the distance that grazing occurs from bighorn sheep source habitat, and straying sheep persistence on the range), although these risk factors were not analyzed.

The foray model analyzes how often bighorn sheep leave the CHHR, whether they travel far enough to reach an allotment, and whether they then actually intersect an allotment (i.e., rather than intersecting a different area at the same distance from the CHHR). For this analysis, information on habitat preference and foray distance (ram/ewe) was used to generate a foray probability raster. Again, local bighorn herd information was limited, and during the webinar discussion (BLM and CPW 2015), it was agreed by BLM and CPW biologists to use the default Idaho (summer) values as the best available information in the absence of more local information.

## Analysis That a Bighorn Sheep Will Intersect an Allotment

Many animals (particularly ewes) may not travel far, even if they are observed outside of the CHHR. The probability that a bighorn sheep on a foray will reach an allotment decreases as the travelling distance increases. Bighorn sheep rams are more mobile and leave CHHRs significantly more than ewes and have a higher probability of interspecies contact. For this portion of the analysis, information on herd size, sex ratios and foray rates are needed. CPW population and sex ratio information typically includes juvenile bighorn. This model assumes that herd size and sex ratios are of adult animals only. CPW biologists provided their professional adjustment of adult survey numbers for model use. Again, local information was

BLM_0028516

Dominguez-Escalante Resource Management Plan                                    110
APPROVED RESOURCE MANAGEMENT PLAN

limited on foray rates, and during the webinar discussion (BLM and CPW 2015), it was agreed by BLM and CPW biologists to use the default Idaho (summer) values (Distance Distribution Files) as the best available information in the absence of more local information.

Within the RoC model, given that an animal has reached a ring, the probability that it will be in an allotment is proportional to the size of the allotment and to the quality of the habitat in the allotment relative to the size and quality of habitat in the ring as a whole (Table C.1).

**Table C.1. Model Results for Desert Bighorn Risk of Contact with Allotments**

| Allotment Name | Allotment No. | Type of Livestock | Probability of Contact | | Rate of Contact | | |
|---|---|---|---|---|---|---|---|
| | | | Ram | Ewe | Ram | Ewe | Herd |
| Antelope | 14020 | Sheep | a | | | | |
| Bean | 16206 | Cattle | 0.000453 | 0.000261 | 0.005936 | 0.000694 | 0.006629 |
| Cactus Park/Club Gulch | 3278 | Sheep | a | | | | |
| Dominguez Individual | 14001 | Cattle | a | | | | |
| Dominguez Rims | 4293 | Sheep | a | | | | |
| Dry Mesa | 14006 | Cattle | a | | | | |
| Escalante Flats | 14003 | Cattle | a | | | | |
| Gibbler Common | 26301 | Cattle | a | | | | |
| Huff | 4294 | Sheep | a | | | | |
| Joker | 14014 | Cattle | 0.00811 | 0.003867 | 0.10634 | 0.010268 | 0.116608 |
| Kannah Creek Common | 16202 | Cattle | a | | | | |
| Kannah Creek Individual | 6207 | Cattle | a | | | | |
| Lower Escalante | 14002 | Sheep | a | | | | |
| Sawmill Mesa | 14007 | Cattle or Horse | a | | | | |
| Twenty Five Mesa N | 14008 | Cattle | a | | | | |
| Wagon Park AMP | 26302 | Cattle | a | | | | |
| White Ranch | 14015 | Cattle | 0.011617[b] | 0.004463 | 0.152335[c] | 0.011849 | 0.164184[d] |

[a] This allotment intersects the home range polygon and is therefore not included in the RoC analysis.
[b] Given that a ram is on foray, there is a 1.2 percent probability that it will make contact with this allotment.
[c] Given the probability of ram on foray, predicts a rate of 1.5 ram contacts with allotment in 10 years.
[d] Given the probability of foray of bighorn in the population, predicts a rate of 1.6 contacts with allotment in 10 years.

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

BLM_0028517

# Analysis of Disease Outbreak

The RoC model assumes that allotments that intersect with the CHHR have contact with domestic sheep and therefore potential to transmit the disease. The sequence of events by which a disease outbreak could result from contact between a bighorn sheep and a domestic sheep or goats in an active allotment located outside of the bighorn sheep CHHR can be broken down into a number of steps. To reach an occupied allotment, a bighorn sheep must 1) leave the CHHR, 2) travel far enough to reach the allotment, then 3) intersect the allotment (i.e., rather than some other area at the same distance from the CHHR). Once this occurs, in order for disease transmission to occur, the bighorn sheep must 4) come into contact with domestic sheep in the allotment and 5) contract the disease from the domestic sheep. For an outbreak to affect the animal's home herd, the infected bighorn sheep must 6) make its way back to the CHHR and 7) transmit the disease to other members of the herd. Uncertainty is identified within the literature regarding what levels of interspecies contact in a rangeland situation result in disease transmission and disease outbreaks within a bighorn sheep population. Because of this uncertainty, the BLM did not conduct bighorn herd-specific modeling in regard to disease transmission and herd persistence.

There is no scientific evidence to support a specific assumption for acceptable risk of contact and disease outbreak. The results should be viewed as a means of comparing the relative risk of disease outbreak, not as definitive values. Model results support the current knowledge about, and characteristics of, the bighorn sheep herds, and are based on the science behind disease outbreaks that potentially occur from contact between bighorn sheep within an allotment.

A high degree of uncertainty exists regarding the probability that contact of bighorn sheep with an allotment will lead to disease outbreak occurring within a herd (USFS 2013a; Carpenter et al. 2014; O'Brien et al. 2014). Quantification of disease transmission and outbreaks in bighorn sheep populations following contact with domestic sheep or goats, and the subsequent ability of a population to recover, are critical to interpreting the results from the above models; however, the mechanisms of disease transmission and resulting disease outbreaks in bighorn sheep are not fully understood. The BLM currently lacks empirical data to make recommendations regarding the frequency of outbreaks and the effects on population persistence, so the following factors were considered when interpreting results:

- The effects of respiratory disease outbreaks on bighorn sheep populations are often severe (Besser et al. 2012a, 2012b). Controlled pen experiments identified in Besser et al. (2012b) resulted in complete or nearly complete die-offs of bighorn sheep following contact with domestic sheep. It has also been documented that disease perturbations can affect lamb recruitment for several years following a severe population decline resulting from a disease outbreak that rapidly affects many animals in a specific area at the same time (Besser et al. 2012a; Coggins and Matthews 1992;

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

BLM_0028518

Foreyt 1990). Consequently, when bighorn sheep disease die-offs occur, there is a substantial immediate mortality (population decline) and a delayed recovery due to poor lamb recruitment that can follow the disease outbreak for many years (Besser et al. 2013). Population recovery is unlikely where interspecies contact, potentially resulting in disease transmission and subsequent disease outbreak, occurs within a few decades of each other (BLM and CPW 2015). There is no specific guidance on the number of decades required to recover from a disease outbreak; observations of herds that have experienced pneumonic events indicate it likely requires several.

- Another important trend of wild-domestic sheep disease transmission is that an illness's effect on individual bighorn populations can be long-lasting (USFS 2013b). Cahn et al. (2011) explained the trend of suppressed lamb recruitment: "Whether mild or severe, most respiratory disease outbreaks in bighorn populations are followed by several years of pneumonia-caused mortality of lambs, resulting in low recruitment rates and juvenile survival. Continuing lamb infection apparently results from females that remain infective following an outbreak, although mortality or morbidity among the females may not be detectable. Such recurring lamb infections can substantially delay the recovery of depleted populations to pre-outbreak levels."

The BLM recognizes the uncertainty regarding the relationship between the number of bighorn sheep contacts with a domestic sheep allotment and predictions for disease transmission and outbreaks. Because of the uncertainty regarding the probability that contact of a bighorn sheep within an allotment will lead to disease outbreak within a population, modelers estimated disease outbreak with assumptions for a range of values from 0.05 (1 in 20 contacts would result in a disease outbreak) to 1.00 (every contact would result in a disease outbreak). The range of values included the following: 0.05, 0.10, 0.25, 0.50, 0.75, 0.90, and 1.00 (Table C.2).

It is important to disclose that accurate, individual-level modeling of the impacts of disease events is difficult, as the dynamics of respiratory disease in the wild are only partly known. An individual-based model would require understanding many factors, such as the incubation period and active infection durations, the probability and rate of recovery from disease, the rate of effective contact between individuals within the herd, and the possible role of persistently infected individuals in harboring and spreading the disease. Variations in the resistance to disease of individual bighorn sheep and in the virulence of the disease-causing organisms themselves can also affect population dynamics.

Furthermore, modeling population dynamics of large herbivores at the individual level requires estimating numerous parameters, from adult and juvenile survival rates to age at sexual maturity, fecundity, and lamb survival (Gaillard et al. 2000). In addition, the average values for each of those life-history parameters may be modified by interacting impacts of density dependence, weather, forage availability, and predation. Properly estimating these parameters would require

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

BLM_0028519

extensive age- and class-specific population data, ideally from the populations being modeled. Such data are not currently available.

**Table C.2. Years between Potential Disease Events for Allotments That Did Not Intersect with CHHR**

| Allotment Name | Allotment No. | Type of Livestock | Herd Rate of Contact[a] | Years between Contact[b] | Years between Potential Disease Events | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.11 (1.9) | 1:1.333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Bean | 16206 | Cattle | 0.006629 | 151 | 151 | 168 | 201 | 302 | 603 | 1508 | 3017 |
| Joke | 14014 | Cattle | 0.116608 | 9 | 9 | 10 | 11 | 17 | 34 | 89 | 172 |
| White Ranch | 14015 | Cattle | 0.164184 | 6 | 6 | 7 | 8 | 12 | 24 | 61 | 122 |

In a review of other RoC model efforts, general trends appear to develop. The Payette National Forest analysis (USFS 2010) stated that total foray contact rates >0.04 annually (less than a 25-year interval) were deemed unacceptable due to estimated disease return intervals and subsequent impacts to long term viability to bighorn herds. Additionally, they assumed that one in four contacts (0.25) would result in disease transmission, based on local information. The Rio Grande National Forest stated that a disease event occurring within a bighorn herd every 25 years or less would result in high risk to bighorn long term viability and a low probability of population persistence (USFS 2013b).This would result in a bighorn sheep population that is constantly being exposed to ongoing disease transmission and resultant outbreaks.

Given these assumptions, the Joker and White Ranch allotments may be of concern if they were converted to domestic sheep use, with estimated 34-and 24-year (respectively) intervals between potential disease events given the assumption that one in four contacts results in a disease event.

## Additional Discussion

The RoC model was run using the best available science, professional judgment, knowledge of the local bighorn herd at the time (2015) and following the risk of contact tool user's guide (USFS 2013a). With assistance from CPW, the RoC model was run using the best available local bighorn population information to provide the parameters. However, much of the needed data were not available. The following assumptions/issues were made or addressed:

1. CPW bighorn sheep overall range maps (CPW 2013) approximate bighorn sheep CHHR for the purposes of the RoC model.

---

[a] From Table C.1
[b] 1/herd rate of contact

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

    a.  CHHR is the area occupied by bighorn sheep 95 percent of the time, based on telemetry or other location data.

    b.  Telemetry data to generate CHHR within the model were unavailable for this population.

    c.  These areas overestimate the CHHR concept and therefore overestimate foray distances.

2.  Suitable habitat is mapped for the time frame of interest (i.e., domestic sheep grazing period) and is mapped in habitat classes as suitable (1), corridor (2), and non-habitat (10).

    a.  Domestic sheep grazing is predominantly during the winter months.

    b.  Desert bighorn sheep breeding season is August 1 to September 30; Rocky Mountain bighorn sheep breeding season is November 1 to December 31 (Banulis 2011).

    c.  Year-round desert bighorn suitable habitat was mapped and provided by CPW for this modeling effort (K. Eichoff, personal communication, January 26, 2015).

    d.  Summer Rocky Mountain bighorn suitable habitat was mapped and provided by CPW for this modeling effort for those populations.

3.  Default values from Idaho (summer) approximate local desert and Rocky Mountain populations for the domestic grazing season for the following factors:

    a.  Habitat preference

        i.  Habitat Class 1 = 1

        ii.  Habitat Class 2 = 0.177

        iii.  Habitat Class 10 = 0.029

    b.  Ram and ewe foray distances (Distance Distribution Files)

    c.  Foray probabilities (ram 0141; ewe 0.015)

The RoC model provides additional information for the relationship between wild and domestic sheep in the area. The model and the RMP are the first big-scale look at the management situation. At the time of future grazing permit renewal for these areas, the BLM will conduct NEPA analysis using more site-specific information and any new data to determine the bighorn herd's current condition and possible subsequent changes in management in order to provide effective separation. At that time, the BLM will also utilize the currently accepted methodology

*Appendix C. Modeling the Risk of Contact between Bighorn and Domestic Sheep*

and model to conduct the analysis. Because there is uncertainty regarding the management of this species, a flexible management process is prescribed in the RMP.

In the intervening time, the BLM has developed an agreement with CPW to fund and conduct a GPS transmitter study on the Uncompahgre bighorn herd. New information may drive management changes in the future.

# References

Banulis, B. 2011. Comment on breeding dates and locations of desert versus Rocky Mountain bighorn populations. Bighorn/domestic sheep model meeting, Uncompahgre Field Office, October 7, 2011.

Besser, T.E. et al. 2012a. Causes of pneumonia epizootics among bighorn sheep, western United States, 2008-2010. *Emerging Infectious Diseases* 18(3):406–414.

_____. 2012b. Survival of bighorn sheep (*Ovis canadensis*) commingled with domestic sheep in the absences of *Mycoplasma ovipneumoniae*. Short Communications. *Journal of Wildlife Diseases* 48(1):168–172.

_____. 2013. Bighorn sheep pneumonia: sorting out the cause of a polymicrobial disease. *Preventive Veterinary Medicine* 108:83–93.

BLM & CPW (Colorado Parks and Wildlife). 2015. Bighorn/Domestic Sheep Risk of Contact Modeling webinar series. December 12, 2014–February 20, 2015. Montrose, CO: U.S. Department of the Interior, Bureau of Land Management, and Colorado Parks and Wildlife.

Cahn et al. 2011. Disease, population viability, and recovery of endangered Sierra Nevada bighorn sheep. *Journal of Wildlife Management* 75(8):1753–1766.

Carpenter et al. 2014. A spatial risk assessment of bighorn sheep extirpation by grazing domestic sheep on public lands. *Preventative Veterinary Medicine* 114:3-10.

Coggins, V.L., & Matthews, P.E. 1992. Lamb survival and herd status on the Lostine bighorn herd following a *Pasteurella* die-off. *Biennial Symposium of the Northern Wild Sheep and Goat Council* 8:147–154.

CPW. 2013. CPW bighorn sheep shapefiles. Available from the ArcGIS website: http://www.arcgis.com/home/item.html?id=d1359dc6cf6e44979cacbfdbc34691e4.

Eichoff et al. 2012. *Bighorn Sheep Suitable Habitat Modeling in Colorado*. Denver, CO: Colorado Parks and Wildlife.

BLM_0028522

Foreyt, W.J. 1989. Fatal *Pasteurella haemolytica* pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. *American Journal of Veterinary Research* 50:341–344.

_____. 1990. Pneumonia in bighorn sheep: effects of *Pasteurella haemolytica* from domestic sheep and effects on survival and long-term reproduction. In *Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council* 7:92–101.

Gaillard et al. 2000. Temporal variation in fitness components and population dynamics of large herbivores. *Annual Review of Ecology and Systematics* 31:367–393.

Garde, E. et al. 2005. Examining the risk of disease transmission between wild Dall's sheep and mountain goats, and introduced domestic sheep, goats and llamas in the Northwest Territories. Prepared for The Northwest Territories Agricultural Policy Framework, and Environment and Natural Resources, Government of the Northwest Territories, Canada. *Other Publications in Zoonotics and Wildlife Disease.* Paper 29.  http://digitalcommons.unl.edu/zoonoticspub/29.

Gross, J.E., Singer, F.J., & Moses, M.E. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. *Restoration Ecology* 8:25–37.

Lawrence, P.K. et al. 2010. Transmission of *Mannheimia haemolytica* from domestic sheep (*Ovis aries*) to bighorn sheep (*Ovis canadensis*): unequivocal demonstration with green fluorescent protein-tagged organisms. *Journal of Wildlife Diseases* 46(3):706–717.

Levins, R. et al. 1994. The emergence of new diseases. *American Scientist* 82:52–60.

McDaniel, K.C. & Tiedeman, J. 1981. Sheep use on mountain winter range in New Mexico. *Journal of Range Management* 34:102–105.

Miller, M.W. & Wolf, L.W. 2011. *Pasteurellaceae* from Colorado bighorn sheep herds. *Journal of Wildlife Diseases* 47(3):800–804.

O'Brien, J.M., O'Brien, C.S., McCarthy, C., & Carpenter, T.W. 2014. Incorporating foray behavior into models estimating contact risk between bighorn sheep and areas occupied by domestic sheep. *Wildlife Society Bulletin* 38:321–331.

Schommer, T.J. & Woolever, M.M. 2008. *A Review of Disease Related Conflicts between Domestic Sheep and Goats and Bighorn Sheep.* General Technical Report RMRS-GTR-209. May 2008. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Scott, M.E. 1988. The impact of infection and disease on animal populations: implications for conservation biology. *Conservation Biology* 2:40–56.

BLM_0028523

Singer, F.J., Bellew, S., Moses, M.E., & Sloan, W. 2000. Correlates to colonizations of new patches by translocated populations of bighorn sheep. *Restoration Ecology* 8:66–74.

Singer, F.J., Spicer, L., & Zeigenfuss, L.C. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. *Conservation Biology* 15:1347–1354.

The Wildlife Society. 2014. *Impacts of Disease on Bighorn Sheep Management.* Fact sheet. Bethesda, MD: The Wildlife Society.

USFS (United States Department of Agriculture, Forest Service). 2009. *Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep.* Forest Service Agreement No. 09-Mu-I1020000-006; Bureau of Land Management Agreement No. BLM-MOU-CO-482.

_____. 2010. *Final Supplemental Environmental Impact Statement for the Southwest Idaho Ecogroup Land and Resource Management Plans.* McCall, ID: USDA Forest Service, Intermountain Region.

_____. 2013a. *Bighorn Sheep Risk of Contact Tool Users Guide.* Internal document. January 2013. United States Department of Agriculture, Forest Service, Intermountain Region.

_____. 2013b. *Risk of Contact Analysis between Bighorn and Domestic Sheep on the Fisher-Ivy/Goose Lake Domestic Sheep Grazing Allotment.* Del Norte, CO: Rio Grande National Forest, Divide Ranger District.

Wild Sheep Working Group. 2012. *Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat.* Wild Sheep Working Group, Western Association of Fish and Wildlife Agencies.

BLM_0028524

This page intentionally left blank

BLM_0028525

# Appendix D. Colorado Standards for Public Land Health

Standards describe conditions needed to sustain public land health, and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape.

**Standard 1:** Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

*Indicators:*

- Expression of rills, soil pedestals is minimal.

- Evidence of actively eroding gullies (incised channels) is minimal.

- Canopy and ground cover are appropriate.

- There is litter accumulating in place and is not sorted by normal overland water flow.

- There is appropriate organic matter in soil.

- There is diversity of plant species with a variety of root depths.

- Upland swales have vegetation cover or density greater than that of adjacent uplands.

- There are vigorous, desirable plants.

**Standard 2:** Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity.

Water quality is improved or maintained. Stable soils store and release water slowly.

*Indicators:*

- Vegetation is dominated by an appropriate mix of native or desirable introduced species.

- Vigorous, desirable plants are present.

- There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.

BLM_0028526

- Stream bank vegetation is present and is comprised of species and communities that have root systems capable of withstanding high stream-flow events.

- Plant species present indicate maintenance of riparian moisture characteristics.

- Stream is in balance with the water and sediment being supplied by the watershed (e.g., no headcutting, no excessive erosion or deposition).

- Vegetation and free water indicate high water tables. Vegetation colonizes point bars with a range of age classes and successional stages.

- An active floodplain is present.

- Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.

- Stream channels with size and meander pattern appropriate for the stream's position in the landscape, and parent materials.

- Woody debris contributes to the character of the stream channel morphology.

**Standard 3:** Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

*Indicators:*

- Noxious and invasive weeds and undesirable species are minimal in the overall plant community.

- Native plant and animal communities are spatially distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.

- Plants and animals are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations.

- Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.

- Photosynthetic activity is evident throughout the growing season.

- Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.

- Appropriate plant litter accumulates and is evenly distributed across the landscape.

- Landscapes composed of several plant communities that may be in a variety of

*Appendix D. Colorado Standards for Public Land Health*

successional stages and patterns.

**Standard 4:** Special status, threatened and endangered species (Federal and State), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

*Indicators:*

- All the indicators associated with the plant and animal communities standard apply.

- There are stable and increasing populations of endemic and protected species in suitable habitat.

- Suitable habitat is available for recovery of endemic and protected species.

**Standard 5:** The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the water quality standards established by the State of Colorado. Water quality standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

*Indicators:*

- Appropriate populations of macroinvertebrates, vertebrates, and algae are present.

Surface and ground waters only contain substances (e.g., sediment, scum, floating debris, odor, heavy metal precipitates on channel substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the water quality standards established by the State of Colorado (5 CCR 1002-8).

## Guidelines for Livestock Grazing Management

Guidelines are the management tools, methods, strategies, and techniques (e.g., BMPs) designed to maintain or achieve healthy public lands as defined by the standards. Currently, the only guidelines for BLM Colorado that have been developed in concert with the D-E NCA Resource Advisory Council are livestock grazing management guidelines.

1. Grazing management practices promote plant health by providing for one or more of the following:

   - Periodic rest or deferment from grazing during critical growth periods.

   - Adequate recovery and regrowth periods.

   - Opportunity for seed dissemination and seedling establishment.

*Appendix D. Colorado Standards for Public Land Health*

2. Grazing management practices address the kind, numbers, and class of livestock, season, duration, distribution, frequency and intensity of grazing use and livestock health.

3. Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion, to assist in maintaining appropriate soil infiltration and permeability, and to buffer temperature extremes. In riparian areas, vegetation dissipates energy, captures sediment, recharges ground water, and contributes to stream stability.

4. Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity. Where reseeding is required, on land treatment efforts, emphasis will be placed on using native plant species. Seeding of non-native plant species will be considered based on local goals, native seed availability and cost, persistence of non-native plants and annuals and noxious and invasive weeds on the site, and composition of non-natives in the seed mix.

5. Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts to other resources or uses of riparian/wetland and upland sites.

6. Grazing management will occur in a manner that does not encourage the establishment or spread of noxious and invasive weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious and invasive weeds.

7. Natural occurrences such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape, including the maintenance, restoration, or enhancement of habitat to promote and assist the recovery and conservation of threatened, endangered, or other special status species, by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, and thus minimizing habitat fragmentation.

8. Colorado BMPs and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

BLM_0028529

Dominguez-Escalante National Conservation Area                                    123
APPROVED RESOURCE MANAGEMENT PLAN

# Appendix E. Raptor Species Breeding Periods

The information in Appendix E will be used to determine the dates associated with stipulations for raptors described in section 2. The information was assembled from *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (Craig 2002 and CDOW 2008), and internal BLM data (File: Table of Seasonal(Breeding)Buffers.xls, BLM Colorado State Office). Dates were updated using information obtained from CDOW 2008.

| Falconiformes Breeding Period | | |
|---|---|---|
| Osprey | *Pandion haliaetus* | 4/1-8/31 |
| Bald eagle | *Haliaeetus leucocephalus* | 10/15-7/31 |
| Northern harrier | *Circus cyaneus* | 4/1-8/15 |
| Sharp-shinned hawk | *Accipiter striatus* | 3/15-8/31 |
| Cooper's hawk | *Accipiter cooperii* | 3/15-8/31 |
| Northern goshawk | *Accipiter gentilis* | 3/1-9/15 |
| Swainson's hawk | *Buteo swainsoni* | 4/1-7/15 |
| Red-tailed hawk | *Buteo jamaicensis* | 2/15-7/15 |
| Ferruginous hawk | *Buteo regalis* | 2/1-7/15 |
| Rough-legged hawk | *Buteo lagopus* | *Non-breeding* |
| Golden eagle | *Aquila chrysaetos* | 12/15-7/15 |
| American kestrel | *Falco sparverius* | 4/1-8/15 |
| Merlin | *Falco columbarius* | 4/1-8/31 |
| Peregrine falcon | *Falco peregrinus* | 3/15-8/31 |
| Prairie falcon | *Falco mexicanus* | 3/15-7/15 |
| Strigiformes Breeding Period | | |
| Common barn owl | *Tyto alba* | 2/1-9/15 |
| Flammulated owl | *Otus flammeolus* | 4/1-9/30 |
| Western screech owl | *Megascops kennicottii* | 3/1-8/15 |
| Eastern screech owl | *Megascops asio* | 3/1-8/15 |
| Great horned owl | *Bubo virginianus* | 12/1-9/31 |
| Northern pygmy owl | *Glaucidium gnoma* | 4/1-8/1 |
| Burrowing owl | *Athene cunicularia* | 3/15-10/31 |
| Mexican spotted owl | *Strix occidentalis lucida* | 3/1-8/31 |
| Great gray owl | *Strix nebulosa* | 3/1-8/31 |
| Long-eared owl | *Asio otus* | 2/1-8/15 |
| Short-eared owl | *Asio flammeus* | 3/1-8/1 |
| Boreal owl | *Aegolius funereus* | 2/1-7/31 |
| Northern saw-whet owl | *Aegolius acadicus* | 3/1-8/31 |

*Appendix E. Raptor Species Breeding Periods*

BLM_0028530

This page intentionally left blank

BLM_0028531

# Appendix F. Colorado Noxious Weed List

Information for this appendix was taken from the Colorado Department of Agriculture (http://www.colorado.gov/ag/weeds).

## List A

Species in Colorado that are designated by the Commissioner for eradication:

| Common Name | Scientific Name |
|---|---|
| African rue | *Peganum harmala* |
| Camelthorn | *Alhagi pseudalhagi* |
| Common crupina | *Crupina vulgaris* |
| Cypress spurge | *Euphorbia cyparissias* |
| Dyer's woad | *Isatis tinctoria* |
| Giant salvinia | *Salvinia molesta* |
| Hydrilla | *Hydrilla verticillata* |
| Meadow knapweed | *Centaurea pratensis* |
| Mediterranean sage | *Salvia aethiopis* |
| Medusahead | *Taeniatherum caput-medusae* |
| Myrtle spurge | *Euphorbia myrsinites* |
| Orange hawkweed | *Hieracium aurantiacum* |
| Purple loosestrife | *Lythrum salicaria* |
| Rush skeletonweed | *Chondrilla juncea* |
| Sericea lespedeza | *Lespedeza cuneata* |
| Squarrose knapweed | *Centaurea virgata* |
| Tansy ragwort | *Senecio jacobaea* |
| Yellow starthistle | *Centaurea solstitialis* |

## List B

Species for which the Commissioner, in consultation with the State noxious weed advisory committee, local governments, and other interested parties, develops and implements State noxious weed management plans designed to stop the continued spread of these species:

| Common Name | Scientific Name |
|---|---|
| Absinth wormwood | *Artemisia absinthium* |
| Black henbane | *Hyoscyamus niger* |
| Bouncingbet | *Saponaria officinalis* |
| Bull thistle | *Cirsium vulgare* |

*Appendix F. Colorado Noxious Weed List*

| Common Name | |
|---|---|
| Canada thistle | *Cirsium arvense* |
| Chinese clematis | *Clematis orientalis* |
| Common tansy | *Tanacetum vulgare* |
| Common teasel | *Dipsacus fullonum* |
| Corn chamomile | *Anthemis arvensis* |
| Cutleaf teasel | *Dipsacus laciniatus* |
| Dalmatian toadflax- broad leaved | *Linaria dalmatica* |
| Dalmatian toadflax- narrow leaved | *Linaria genistifolia* |
| Dame's rocket | *Hesperis matronalis* |
| Diffuse knapweed | *Centaurea diffusa* |
| Eurasian watermilfoil | *Myriophyllum spicatum* |
| Hoary cress | *Cardaria draba* |
| Houndstongue | *Cynoglossum officinale* |
| Jointed goatgrass | *Aegilops cylindrica* |
| Leafy spurge | *Euphorbia esula* |
| Mayweed chamomile | *Anthemis cotula* |
| Moth mullein | *Verbascum blattaria* |
| Musk thistle | *Carduus nutans* |
| Oxeye daisy | *Chrysanthemum leucanthemum* |
| Perennial pepperweed | *Lepidium latifolium* |
| Plumeless thistle | *Carduus acanthoides* |
| Quackgrass | *Elytrigia repens* |
| Russian knapweed | *Acroptilon repens* |
| Russian-olive | *Elaeagnus angustifolia* |
| Salt cedar | *Tamarix chinensis, T. parviflora, and T. ramosissima* |
| Scentless chamomile | *Matricaria perforata* |
| Scotch thistle | *Onopordum acanthium* |
| Scotch thistle | *Onoporfum tauricum* |
| Spotted knapweed | *Centaurea maculosa* |
| Spurred anoda | *Anoda cristata* |
| Sulfur cinquefoil | *Potentilla recta* |
| Venice mallow | *Hibiscus trionum* |
| Wild caraway | *Carum carvi* |
| Yellow nutsedge | *Cyperus esculentus* |
| Yellow toadflax | *Linaria vulgaris* |

# List C

Species for which the Commissioner, in consultation with the State noxious weed advisory committee, local governments, and other interested parties, will develop and implement State

*Appendix F. Colorado Noxious Weed List*

noxious weed management plans designed to support the efforts of local governing bodies to facilitate more effective integrated pest management on private and public lands. The goal of such plans will not be to stop the continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species.

| Common Name | Scientific Name |
| --- | --- |
| Chicory | *Cichorium intybus* |
| Common burdock | *Arctium minus* |
| Common mullein | *Verbascum thapsus* |
| Common St. Johnswort | *Hypericum perforatum* |
| Downy brome | *Bromus tectorum* |
| Field bindweed | *Convolvulus arvensis* |
| Halogeton | *Halogeton glomeratus* |
| Johnsongrass | *Sorghum halepense* |
| Perennial sowthistle | *Sonchus arvensis* |
| Poison hemlock | *Conium maculatum* |
| Puncturevine | *Tribulus terrestris* |
| Velvetleaf | *Abutilon theophrasti* |
| Wild proso millet | *Panicum miliaceum* |
| Redstem filaree | *Erodium cicutarium* |

*Appendix F. Colorado Noxious Weed List*

This page intentionally left blank

BLM_0028535

# Appendix G. Naturalness in the Dominguez Canyon Wilderness

Naturalness is one of the five wilderness values identified in the Wilderness Act of 1964. Within the BLM, various methods are used to plan for, and monitor, naturalness in designated Wilderness Areas.

For the Dominguez Canyon Wilderness (the Wilderness), the BLM decided to use a multistep process for planning for naturalness. First, the BLM identified priority vegetation types and priority species for the Wilderness. Priority vegetation types for the Wilderness were identified as: desert shrub/saltbush, pinyon-juniper woodlands, sagebrush shrublands, riparian, seeps and springs and aquatic systems. Priority species were identified as desert bighorn sheep and Colorado hookless cactus. Second, the BLM generated key attributes and measurable indicators for the health of those priority vegetation types and species. Third, the BLM came up with standards for each set of attributes/indicators so that health of each set could be placed into one of four categories: "poor," "fair," "good," or "very good." Finally the current condition of each attribute/indicator was calculated, relying as much as possible on existing data sources.

This process was also completed for the entire D-E NCA (including both the Wilderness and non-wilderness lands), and is described in more detail in Appendix A (Planning for Priority Species and Vegetation). The process completed for the entire D-E NCA was used as the basis for the Wilderness process. The attributes, indicators and standards used for the Wilderness can be considered a subset of the larger set of indicators and standards identified in Appendix A.

Table G.1 shows the attributes, indicators, standards and current ratings for each of the six vegetation/habitat types and two priority species identified for the Wilderness.

BLM_0028536

**Table G.1. Indicators Used for Monitoring Naturalness in the Dominguez Canyon Wilderness**

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| **Desert Shrub/Saltbush** | | | | | | | | |
| **Desert Shrub/ Saltbush** | Vegetation structural composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Fair |
| | Plant species composition/ dominance | Percentage of sampled acres meeting Land Health Standard 3 | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Good |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Fair |

BLM_0028537

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

131

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Poor | Fair | Good | Very Good | |
| | Disturbance regime | Percentage of sampled acres in early seral stage | Ecological site inventory (GJFO) and land health assessments (UFO) | Greater than 39% of sampled acres | 1-7% or 33-39% of sampled acres | 8-14% or 26-32% of sampled acres | 15-25% of sampled acres | Very Good |
| **Pinyon-Juniper Woodlands** | | | | | | | | |
| **Pinyon- Juniper Woodlands** | Age class structure | Percentage of acres of pinyon-juniper woodlands classified as old growth or late seral | Ecological Site Inventory (GJFO) and PHD dissertation work (UFO) | Less than 35% or more than 95% of sampled acres | 35-45% or 86-95% of sampled acres | 46-55% or 76-85% of sampled acres | 55-75% of sampled acres | Good |
| | Vegetation structural composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs (taken from existing LHA data) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028538

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

132

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Dominance of crested wheatgrass | Percentage of sampled acres with acceptable levels (less than 50% relative understory cover) of crested wheatgrass | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Very Good |
| | Presence/ abundance of BLM sensitive plant species | Population trend of BLM sensitive plant species | Best estimation based on (CNHP data | Loss of populations | Decreasing population trends | Static to increasing population trend | Increasing population trend | Very Good |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Very Good |
| Sagebrush Shrublands | | | | | | | | |
| **Sagebrush Shrublands** | Age class structure | Percentage of acres that have decadent sagebrush | Land health assessments | More than 50% of sampled acres | 20-50% of sampled acres | 5-20% of sampled acres | Less than 5% of sampled acres | Very Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028539

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

133

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Vegetation structural composition | Percentage of sampled acres containing adequate mixtures of warm and cold season grasses, shrubs and forbs | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Dominance of crested wheatgrass | Percentage of sampled acres with acceptable levels (less than 50% relative understory cover) of crested wheatgrass | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Fair |
| | Understory invasive species | Percentage of sampled acres exhibiting an acceptable composition of understory invasive plant species (<10% relative cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028540

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

134

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Gunnison sage-grouse winter habitat condition | Percentage of sampled acres with moderate cover of sagebrush (10-30% cover) | Land health assessments | Less than 60% of sampled acres | 60-79% of sampled acres | 80-94% of sampled acres | 95% or more of sampled acres | Poor |
| | Sagebrush fragmentation and extent | Average size of unfragmented (fragmentation by routes) sagebrush parks | BLM vegetation cover data and route inventory information | Average of 40 (or less) acres per unfragmented sagebrush parks | Average of 40-50 acres per unfragmented sagebrush parks | Average of 50-60 acres per unfragmented sagebrush parks | Average of 60 acres (or more) per unfragmented sagebrush parks | Very Good |
| Riparian | | | | | | | | |
| Riparian | Stream functionality | Percentage of sampled miles in proper functioning condition | BLM proper functioning condition data | Less than 60% of sampled miles | 60-79% of sampled miles | 80-94% of sampled miles | More than 95% of sampled miles | Very Good |
| | Invasive species composition on tributary creeks | Percentage of sample sites along tributary creeks with acceptable levels of invasive plants (less than 20% relative cover) | Best estimate based on specialist opinion | Less than 60% of sample sites | 60-79% of sample sites | 80-94% of sample sites | 95% or more of sample sites | Very Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

Dominguez-Escalante National Conservation Area

135

APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Presence of saline grasslands | Percent variation from present conditions in extent of saline grasslands in riparian zones | Best estimate based on specialist opinion | >25% decrease from present condition | 6-25% decrease from present condition | Present condition +/- 5% | Greater than 5% increase from present condition | Good |
| | Presence of wetland obligate plant species | Trend (compared to present conditions) in wetland obligate plant cover along riparian reaches | Best estimate based on specialist opinion | loss of obligates from >25 percent of riparian reaches | loss of obligates from 5-25 percent of riparian reaches | loss or gain of obligates from +-5% percent of riparian reaches | gain of obligates in more than 5% of riparian reaches | Good |
| | Vegetation structure | Percentage of suitable stream reaches that support the historical proportions of age classes and vegetation composition of woody native species (willows and cottonwoods) | Best estimate based on specialist opinion | less than 60% of suitable stream reaches | 60-79% of suitable stream reaches | 80-94% of suitable stream reaches | 95% (or more) of suitable stream reaches | Very Good |
| **Seeps and Springs** | | | | | | | | |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028542

Dominguez-Escalante National Conservation Area                                                                136
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| **Seeps and Springs** | Groundwater hydrology | Number of well and water catchments in the recharge area | BLM Range Improvement Projects inventory | More than current number of water developments at full capacity | Current number of water developments at full capacity | Current number of water developments at current capacity | Fewer water developments than current condition | Good |
| | Groundwater hydrology | 10-year trend in size of wetland/ riparian area around naturally occurring seeps and springs | Best estimate based on specialist opinion | Trends toward smaller riparian/ wetland area | Stable to trend toward smaller riparian /wetland area | Stable Trend | Trend toward enlargement | Good |
| | Invasive species composition/ dominance | Percentage of naturally occurring seeps and springs with non-native perennial plant species (e.g., tamarisk, Canada thistle, bull thistle) | Best estimate based on specialist opinion | Greater than 50% of naturally occurring seeps and springs | 16-49% of naturally occurring seeps and springs | 5-15% of naturally occurring seeps and springs | Less than 5% of naturally occurring seeps and springs | Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

Dominguez-Escalante National Conservation Area                                                                137
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Presence of wetland obligate plant species | Trend (compared to present conditions) in wetland obligate plant cover around naturally occurring seeps and springs | Best estimate based on specialist opinion | loss of obligates from >15% of springs/seeps | loss of obligates from 5-15% of springs/seeps | loss or gain of obligates from +- 5% percent of springs/seeps | gain of obligates in more than 5% of springs/seeps | Good |
| | Rare plant presence | Number of seeps with continued presence of rare plants (e.g., canyon bog orchid, Eastwood's monkey-flower, Giant Helleborine) | Best estimate based on specialist opinion | More than 20% reduction in sites with continued presence | 5-19% reduction in sites with continued presence | plus or minus 5% of continued presence of rare plants | More than 5% increase in presence of rare plants | Good |
| | Surface water hydrology | Percentage of seeps impacted by surface water diversions | Best estimate based on specialist opinion | Increased number of diversions and an increased overall rate | Current number of water diversions at an increased rate | Current number of water diversions at current rate | Decrease in the number of diversions and/or the rate | Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028544

Dominguez-Escalante National Conservation Area                                                                          138
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Poor | Fair | Good | Very Good | |
| | Trampling and human disturbance | Percentage of naturally occurring seeps and springs with evidence of trampling and human disturbance | BLM inventory data (UFO only) | 50% or more of sites | 21-49% of sites | 6-20% of sites | Less than 5% of sites | Fair |
| Aquatic Systems | | | | | | | | |
| Aquatic Systems | Tributary creek hydrologic regime/surface water | Tributary hydrograph comparison | Best estimate based on BLM specialist opinion and intermittent data | Monthly average of the average daily flows during critical spring runoff months (4/1-6/30) falls below the 35th percentile;  OR the shape of the natural hydrograph is altered;  OR minimum base-flows established by USFWS and BOR for special status fish | Monthly average of the average daily flows is equal to or exceeds the 35th percentile value during critical spring runoff periods (4/1-6/30).  The shape of the natural hydrograph is maintained;  Minimum base-flows established by USFWS and BOR for special status fish | Monthly average of the average daily flows is at or above the median value (50th percentile) during critical spring runoff periods (4/1-6/30); and  The shape of the natural hydrograph is maintained; and  Timing of peak runoff is consistent with pre-dam conditions | Monthly average value of the average daily flows ranks at or above 75th percentile during critical spring runoff periods (4/1-6/30); and  The shape of the natural hydrograph is maintained; and  Timing of peak runoff is consistent with pre-dam events | Very Good |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

139

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| | Warm-water Aquatic habitat connectivity | Percentage of historic warm-water habitat in the D-E NCA's tributary creeks that is accessible to fish residing in the Gunnison River | Best estimate based on BLM specialist opinion | Access to less than 50% of historic habitats due to human stream modifications | Access to 51-60% of historic/native habitats due to human stream modifications | Access to 61-75% of historic/native habitats due to human stream modifications | Access to more than 75% of historic/native habitats | Poor |
| | Cold-water fish composition | Percentage of fish in cold-water reaches that are native | BLM and Division of Wildlife fish sampling | Less than 60% native fish in perennial cold-water reaches | 60-79% native fish in perennial cold-water reaches | 80-95% native fish in perennial cold-water reaches | More than 95% native fish in perennial cold-water reaches | Poor |
| | Tributary creek presence/ abundance of native warm-water fish | Percentage of fish in warm-water reaches of tributary creeks that are native | BLM and Division of Wildlife fish sampling | Less than 60% native fish in perennial warm-water reaches | 60-79% native fish in perennial warm-water reaches | 80-95% native fish in perennial warm-water reaches | More than 95% native fish in perennial warm-water reaches | Good |
| | Cold-water aquatic habitat quality | Percentage of cold-water fish bearing stream miles that rank is good in the Pfankuch stability rating | Best estimate based on BLM specialist opinion | less than 60% of sites in tributary streams have a good rating on the Pfankuch stability rating | 60-79% of sites in tributary streams have a good rating on the Pfankuch stability rating | less than 80-95% of sites in tributary streams have a good rating on the Pfankuch stability rating | Greater than 95% of sites in tributary streams have a good rating on the Pfankuch stability rating | Very Good |
| Desert Bighorn Sheep | | | | | | | | |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028546

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

140

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| **Desert Bighorn Sheep** | Population structure and recruitment | Lamb to ewe ratio | CPW surveys | Ratio that will lead to downward population trend | Ratio that will lead to stable to decreasing population trend | Ratio that will lead to stable to increasing population trend | Ratio that will lead to upward population trend | Good |
| | Potential for disease transmission. | Potential for disease transmission between domestic sheep and goats with desert bighorn sheep. | BLM and CPW GIS data | Significant overlap (overlap within high risk areas) occurs between domestic sheep/goats and desert bighorn sheep on BLM lands. | High risk overlap (permitted sheep/goat grazing within high risk allotments) occurs between domestic sheep/goats and desert bighorn sheep on BLM lands. Risk is reduced in low, medium and high risk allotments using WAFWA recommendations. | There is no high risk overlap (permitted sheep/goat grazing within high risk allotments) between domestic sheep/goats and desert bighorn sheep on BLM lands. Risk is reduced in low and medium risk allotments using WAFWA recommendations. | There is no risk of disease transmission Between domestic sheep/goats and desert bighorn sheep on BLM lands. | Poor |
| | Population size | Size (5-year floating average) of the desert bighorn sheep herd | CPW surveys | Population at or below lowest goal | Mid to lower population goal | Mid to upper population goal | Greater than or equal to upper population goal | Good |
| **Colorado Hookless Cactus** | | | | | | | | |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028547

Dominguez-Escalante National Conservation Area                                                    141
APPROVED RESOURCE MANAGEMENT PLAN

| Priority Species or Vegetation | Attribute | Indicator | Existing Data Source | Indicator Standards | | | | Current Condition |
|---|---|---|---|---|---|---|---|---|
| | | | | Poor | Fair | Good | Very Good | |
| **Colorado Hookless Cactus** | Habitat quality | Percentage of sites occupied by Colorado hookless cactus that have low levels of invasive weeds (10% or less relative cover) | CNHP specialist opinion | 0-49% of sites | 50-79% of sites | 80-94% of sites | 95% of sites or more | Good |
| | Population structure and recruitment | Percent of populations with evidence of recruitment | CNHP specialist opinion | 0-49% of sites | 50-79% of sites | 80-95% of sites | Greater than 95% of sites | Good |
| | Population size | Population trend (20-year trend) in number of individual hookless cactus in known populations | CNHP | Loss of populations | Decreasing population | Static to increasing population | Increasing population | Fair |

*Appendix G. Naturalness in the Dominguez Canyon Wilderness*

BLM_0028548

This page intentionally left blank

BLM_0028549

# Appendix H. Minimum Requirements Decision Guide Overview

This overview was provided by the Arthur Carhart National Wilderness Training Center.

## H.1. Introduction

The Minimum Requirements Decision Guide (MRDG) is designed to assist wilderness managers in making appropriate decisions in wilderness. Use of the MRDG requires familiarity with the difference between wilderness and other public lands as defined by the Wilderness Act

This Overview document provides general information about the MRDG process, its origination, and how it relates to other processes such as NEPA analysis. Please refer to the accompanying MRDG Instructions and MRDG Worksheets for specific information about completing the MRDG.

## Wilderness Act Guidance

The concept of minimum requirements comes from Section 4(c) of the Wilderness Act of 1964:

*"Except as specifically provided for in this Act, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this Act and except as necessary to meet minimum requirements for the administration of the area for the purpose of this Act (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area"* (emphasis added).

Applicable actions include, but are not limited to, scientific monitoring, research, recreational developments (trails, bridges, signs, etc.), and activities related to special provisions mandated by the Wilderness Act or subsequent legislation (such as grazing, exercising mineral rights, access to inholdings, maintenance of water developments, and commercial services).

The following three questions/answers contain excerpts from the Wilderness Act of 1964 that may be useful reminders of key provisions of the law applicable to the use of this Minimum Requirements Decision Guide. In addition to the Wilderness Act, subsequent legislation and agency policy may influence determination of the minimum required for action. In some instances, agencies have included more guidance and definitions in their respective policies. Please see Agency Guidelines for more specific information.

BLM_0028550

## What Is the Purpose of Wilderness?

"In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States…, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." Section 2(a).

## What Is Wilderness?

"…lands designated for preservation and protection in their natural condition…" Section 2(a).

"…an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation…" Section 2(c).

"…generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable…" Section 2(c).

"…has outstanding opportunities for solitude or a primitive and unconfined type of recreation…" Section 2(c)

"…may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value" Section 2(c).

## How Is Wilderness Administered?

"…shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness…" Section 2(a).

"A wilderness, in contrast with those areas where man and his works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man is a visitor who does not remain" Section 2(c).

"An area of wilderness is…protected and managed so as to preserve its natural conditions and… its preservation and use in an unimpaired condition." Section 2(c).

"…each agency administering wilderness… shall be responsible for preserving the wilderness character of the area…" Section 4(b).

"…wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use" Section 4(b).

BLM_0028551

## H.2. Use of This Guide

The MRDG is a process to identify, analyze, and select management actions that are the minimum necessary for wilderness administration. It applies this direction from the Act and incorporates a two-step process. Step 1 determines whether administrative action is necessary. If action is found to be necessary, then Step 2 provides guidance for determining the *minimum* activity. Step 2 has been referred to as determining the minimum tool but could include any type of activity, method, or equipment.

The MRDG can be used as:

- a process for evaluation and documentation;

- a guide to help discuss proposals with interested parties; or

- a review of on-going management practices to determine if they are necessary or if a less intrusive practice can be implemented

The level of detail and effort necessary to effectively utilize the MRDG process depends on the scope and complexity of the issue or problem being considered. One person might adequately analyze simple actions; complex actions may require the coordination of several resource specialists. Likewise, some issues warrant public scoping and involvement with stakeholders to provide information, gather input, and make a better decision.

The MRDG Worksheets provide a series of questions about the necessity of taking any action to resolve a situation and the most appropriate methods or tools to use. The decision to approve an action is a critical aspect of wilderness management. At times, the decision is not straightforward and requires a delicate balancing act.

## H.3. Emergencies

Do not use the MRDG for emergency situations; follow procedures already outlined in approved emergency plans. The minimum requirements concept should be incorporated into such plans when they are being prepared, so that minimum necessary methods and tools are being utilized to meet the needs of the emergency.

## H.4. Safety

The safety of wilderness visitors, employees, volunteers, and contractors is a priority in all decisions and actions. Complying with Section 4(c) of The Wilderness Act and conducting minimum requirements analysis using the MRDG does not alter or diminish this need.

The MRDG is intended to help identify, analyze and select management actions that are the minimum necessary for wilderness without compromising safety. A fair and honest evaluation of

*Appendix H. Minimum Requirements Decision Guide Overview*

all available options, within agency safety requirements, is needed to make an appropriate decision for wilderness. Wilderness managers are encouraged to learn, cultivate, and share traditional and primitive skills and develop alternative minimum impact methods and tools that allow activities to be accomplished safely with a minimal amount of impairment to the wilderness character.

## H.5. The MRDG and NEPA

The Minimum Requirements Decision Guide is designed to assist with preparation of a NEPA analysis, if needed, but is not a substitute for a NEPA analysis. Portions of the MRDG may be transferable to a subsequent NEPA analysis as shown below.

Agency NEPA guidelines do not necessarily require a process to determine if administrative action in wilderness is necessary or to select the administrative activity that causes the least adverse effect to the wilderness resource and character. The MRDG provides a method to determine the necessity of an action and how to minimize impacts; NEPA analysis compares and discloses the environmental effects of alternatives, documents a decision, and requires public involvement.

| Minimum Requirements Decision Guide | NEPA Analysis |
|---|---|
| **STEP 1: Determine if Action Is Necessary** | |
| Description | Purpose and need for action<br>Existing environment or condition |
| Valid existing rights, special provisions, other legislation, or other guidance from policy or plans (Step 1 A-C) | Management direction |
| Wilderness character (Step 1 E)<br>Public purposes of wilderness (Step 1 F) | Issues |
| **STEP 2: Determine the Minimum Tool** | |
| Alternative descriptions | Proposed Action and Alternatives |
| Alternative comparison criteria | Alternative comparison by issues |
| Effects to wilderness character | Environmental consequences |
| Selected alternative | Decision |
| Rationale | Reasons for the decision |
| Monitoring/reporting requirements | Decision conditions |

## H.6. The MRDG and the Planning Process

The degree to which a MRDG can be useful in the planning process will vary depending on the scope of the process and the objectives for the plan. Listed below are the three typical planning levels in use by the agencies and a suggested use of the MRDG.

*Appendix H. Minimum Requirements Decision Guide Overview*

| Planning Level | Use of the MRDG |
|---|---|
| Comprehensive Land Use Planning (i.e., forest plans, park plans, refuge plans, resource management plans, and wilderness management plans)<br><br>- Establish or modify desired condition, general unit standards or guidelines and/or make land use allocations | Use the MRDG to help screen alternatives in anticipation of the need to authorize actions in the future while insuring the preservation of wilderness resource and character. |
| Programmatic Planning (i.e., trail plans, weed treatment plans, monitoring plans, restoration plans, step down plans, etc.)<br><br>- Analysis of multiple, similar, or routine project proposals or activities (trail maintenance, monitoring, dam maintenance, etc.) in one assessment | Use the MRDG to prepare a single analysis for similar, current, and/or future actions where the social and biophysical values and potential effects will be nearly identical.<br><br>Create a 'decision tree' or 'GO/NO GO checklist' to be able to assess the necessity for action involving the Section 4(c) uses as similar needs come along in the future. |
| Project or Site-Specific Planning (i.e., wildlife survey, stream crossing, trail repair, weed treatment, etc.)<br><br>- Analysis of site-specific or non-recurring actions. | Use the MRDG to determine if administrative action is necessary, and if so, determine the minimum activity. |

# H.7. Habits, Assumptions, and the Spirit of the Wilderness Act

Limited budgets and other priorities for staff and crew time make implementing the minimum requirements provision of the Wilderness Act more challenging. It's tempting to use the Section 4(c) provision, and the MRDG, to justify an exception to allow use of motorized equipment, or any of the other prohibited uses, thinking the job will get done more quickly, easily, or cheaply without staff having to obtain the additional primitive/traditional skill training or tools or utilize an unfamiliar method.

The National Wilderness Preservation System was established, in part, to designate lands as wilderness to guard against a "growing mechanization" and to provide for areas to be managed "in contrast" to other lands. The Wilderness Act contains no provision that mandates the use of "quicker, cheaper, and easier" methods as criteria for authorizing any of the prohibited uses. The only criterion is to determine that it is the minimum necessary requirement. Agency policy further defines or adds to this decision criterion.

The myths about safety, cost, efficiency, and resource protection related to use of primitive/traditional skills, tools, and travel methods versus motorized equipment can be dispelled. Training and tools are available, and the wilderness resource and character can be protected with creative use of information, education, and even temporary closures if necessary. Habits that make people think that motorized equipment is the best choice can be changed, and the MRDG can help if it is used as an analysis tool and not a justification statement or approval form.

*Appendix H. Minimum Requirements Decision Guide Overview*

This page intentionally left blank

BLM_0028555

# Appendix I. Special Recreation Permit Program Overview

The BLM will evaluate all commercial, competitive, and organized group special recreation permit proposals on a case-by-case basis, and their approval or disapproval will be at the discretion of the authorized officer. All SRPs are considered undertakings under the National Environmental Policy Act. Permit approval is dependent on conformance with all applicable land use planning documents and environmental review in accordance with NEPA. All existing permits will be analyzed for conformance to the Land Use Plan.

In order to provide good customer service, to reduce unnecessary application submissions, and to ensure consistent consideration of permit proposals, all new SRP proposals will be evaluated using the process described below. The BLM will complete additional implementation guidance for activities in the D-E NCA, and this will provide applicants with specific information including but not limited to application deadlines, timelines for processing, application package requirements, fees, use reporting, and penalties.

## I.1. Permit Process

## Pre-Application Consultation

The BLM will use a pre-application consultation to determine whether an SRP is required and if so, what type of permit is required. Proposals will be evaluated to determine whether they are consistent with recreation objectives; whether the opportunity is already available under an existing permit; whether there is adequate market competition; and whether the event would create conflict with the public and/or other existing permitted activities; among other factors.

Additionally, during the pre-application consultation, permit proposals will be classified using the classification criteria described below. Once a class determination is made and the type of permit (competitive, organized, or commercial) is established, the following guidelines and administration practices will apply:

1. **Commercial Administration**: If a proposed activity conforms to the BLM's land use planning decisions, will not exceed the carrying capacity of the proposed area, and is within the deadlines described in the D-E NCA permit policy, the applicant will be asked to fulfill all the required SRP application package requirements and pay applicable fees.

2. **Competitive Event Administration**: If a proposed activity conforms to the BLM's land use planning decisions and is submitted at least 180 days prior to the event date, the applicant will be asked to fulfill all the required SRP application package requirements

BLM_0028556

and pay applicable fees.

3. **Vending**: If a proposed activity conforms to the BLM's land use planning decisions, will be held in conjunction with a competitive event or an organized group event, and the proposal is submitted at least 180 days prior to the event date, the applicant will be asked to fill out the required paperwork and pay applicable fees.

4. **Organized Group Permit Administration**: Organized group/event permits are for group outdoor recreational activities or events that are neither commercial nor competitive. The authorized officer determines when a permit is required on the basis of planning decisions, resource concerns, user conflicts, public health and safety, and/or the need for monitoring.

Organized groups above the group size limit of 12 in the Wilderness[17] or above 25 in the remaining D-E NCA are required to contact the BLM prior to their event to determine whether an SRP is required. After reviewing the activity and location with the organizers, the BLM will determine whether or not a permit is required (see section I.3, Matrix for Determining Need for an Organized Group SRP). If a permit is not required, the BLM may document this determination in the form of a *Letter of Agreement*.

# General Permit Administration

All permit administration will be done in accordance with National Environmental Policy Act, BLM Manual: H-2930-1-Recreation Permit Administration, BLM Colorado State SRP Handbook, and all associated BLM SRP instruction memoranda and information bulletins.

# I.2. Application Evaluation

The authorized officer will evaluate the application using the permit application review criteria listed below. The criteria include specific objectives identified in the land use plan for recreation management areas. The issuance or denial of SRPs will be made in accordance with these criteria:

*Permit Application Review Criteria*

Permit proposals described in business and operating plans will be evaluated using the following criteria. These criteria establish an objective framework for the evaluation of SRP applications. The authorized officer will use any or all of the criteria to approve or deny a permit (subject to potential modifications):

1. **Compliance History**: Applicant must be in compliance, and have a history of

---

[17] Group size limit of 12 applies to Wilderness Zones 2 and 3. The group size limit for Wilderness Zone 1 is 25, the same as for other parts of the NCA.

*Appendix I. Special Recreation Permit Program Overview*

compliance, with local, State and Federal regulations. Applicant or authorized representatives must not have been convicted of a Federal, State, or local violation in connection with the proposed activities within the last three years.

2. **Safety and Safety History**: Applicant must demonstrate that they have a history of providing an acceptable level of safety for clients and the affected public.

3. **Consistency with Land Use Planning documents**: Proposals will be evaluated for consistency with current planning documents, including but not limited to the most current revision of the D-E NCA resource management plan and other applicable implementation plans. All activities in the wilderness study areas must be consistent with the BLM's interim management policy, and all proposals in the Dominguez Canyon Wilderness must be consistent with the 1964 Wilderness Act.

4. **Conflicts:** Permits will not be issued in areas where conflicts exist between permittees or between permittees and the public or landowners. Valid conflicts include but are not limited to the following:

   - Overlapping use areas where the same type of use is currently permitted
   - Conflicts with livestock grazing
   - Limited public land ownership and/or related access
   - Camps; location, number, and distance between camps
   - Activities that are not consistent with management guidance for an area or that currently exist within an area (permitted or non-permitted activities)
   - Overcrowding and/or use levels during specific time periods, supporting infrastructure at capacity
   - Enforcement/compliance problems
   - Improper conduct by permittee or employees
   - Unacceptable resource impacts

5. **Diversity of Services**: Applicants must demonstrate that their activity will enhance the diversity of recreational opportunities available for visitors and that the services are needed by the public.

6. **Low Percentage of BLM Public Lands:** Applications may be refused where public lands comprise a low percentage of the total area and recreational management goals are already being met.

7. **Adjoining Lands and Joint Permits:** Preference will not be given to applicants who own or lease private land adjacent to BLM public lands. Preference will not be given to

BLM_0028558

permittees that have a joint permit issued by another land management agency.

These criteria are a means to analyze applications and offset potential problems. Many complex issues are best addressed through an ongoing dialogue between the permittees and the BLM.

If the proposal meets the application review criteria, the appropriate NEPA document will be completed. Permits may be denied as a result of issues identified during the NEPA process. Any stipulations identified during the NEPA process will be included on approved permits.

## I.3. Matrix for Determining Need for an Organized Group SRP

Organized group SRPs are for group outdoor recreational activities or events that are neither commercial nor competitive. The authorized officer determines when a permit is required on the basis of planning decisions, resource concerns, user conflicts, public health and safety, and/or the need for monitoring. The matrix depicted in Table I.1 is to guide a decision process to determine whether a SRP is needed. When determining if an SRP is needed, first determine if the activity is recreational. If it is not recreational, it may need a lands permit. Secondly, determine if the proposal is consistent with recreation program goals and objectives. If the proposal is not consistent with recreation program goals and objectives, the proposal should be denied.

If the proposal is recreational and it is consistent with recreation program goals and objectives, consider the criteria in the matrix to help determine if a permit is needed. If a permit is not needed, consider using a letter of agreement to document that, if the outing is conducted as proposed, a permit is not needed.

**Table I.1. Criteria to Determine Whether a Special Recreation Permit is Needed**

| Criteria | Decision Guidance | | |
| --- | --- | --- | --- |
| | Permit Not Required | Permit Required | Deny As Proposed |
| Is the use appropriate to the site? Is there a management concern for cultural or natural resources or facilities on public land? | Yes; site very conducive to the proposed use; provided for in planning. | Site is appropriate for group size and activity; not specifically provided for in plan. | No; site is not appropriate for use as proposed; does not conform to recreation planning goals; violates recreational opportunity spectrum class (see Glossary) or experience prescriptions. |
| Is monitoring needed? | Nothing beyond one simple site visit. | Monitoring beyond a one-time site visit is required. | Long term monitoring of one or more resources is required. |
| Are there any health and safety concerns? | None | The health and safety of event participants or other public land users may be jeopardized. | Unmitigated, high risk to human health and safety; unreasonable risk, especially to non-participants. |

*Appendix I. Special Recreation Permit Program Overview*

BLM_0028559

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

153

| Criteria | Decision Guidance | | |
|---|---|---|---|
| | Permit Not Required | Permit Required | Deny As Proposed |
| Is bonding desirable to cover reclamation or damage to government property or resources? | No | Bonding is desirable or required. | |
| Is insurance desirable to protect the U.S. Government from claims by group participants or third parties? | No, liability exposure is negligible. | Insurance is desirable due to possible claims for personal injury or property damage. | |
| Are special services required, such as law enforcement, fire protection, exclusive use of public lands, and reserved sites? | No | Yes | |

# I.4. Determining Permit Classification

The purpose of classifying SRPs is to screen proposals to ensure they are consistent with and support planning objectives.

All permit proposals will be evaluated using the classification criteria in Table I.2 and will be assigned to one of the classes in the classification matrix (Table I.3). The classification criteria table includes factors to determine the potential impacts to resources as a result of the proposed activities. Each factor is evaluated as either present or not present or along a continuum ranging from low to moderate or high for each resource.

After permit proposals have been evaluated using the classification criteria table, the results will be applied to the classification matrix to determine whether the proposal is Class 1 (low impact), Class II (medium impact), Class III (moderate impact), or Class IV (high impact). Different proposed activities and outings will have different impacts to the various resources. Not all proposed activities will clearly be classified as I, II, III, or IV. In many situations, there will be one or two resources where impacts are higher than impacts to the other resources. In these cases, the BLM may deny the application, require modification to the proposal, or mitigate the resource concern through permit stipulations.

## Table I.2. Permit Classification Criteria

| Resource | | Anticipated Impact | Description of Impact |
|---|---|---|---|
| Wildlife | Visual | No | Artificial lighting system will not be used or will be less than 1000 candle power. |

*Appendix I. Special Recreation Permit Program Overview*

BLM_0028560

Dominguez-Escalante National Conservation Area                                                                         154
APPROVED RESOURCE MANAGEMENT PLAN

| Resource | | Anticipated Impact | Description of Impact |
|---|---|---|---|
| | | Yes | Artificial lighting system will be 1000 candle power or greater. |
| | Audio | No | A loudspeaker or other broadcasting device will not be used. |
| | | Yes | A loudspeaker or other broadcasting device will be used. |
| Water Quality | | No | Proposed activity will not fall within a water quality impaired stream segment or won't affect stream. |
| | | Yes | Proposed activity will fall within a water quality impaired stream segment, and the activity would affect the stream. |
| Cultural Sensitivity Zones | | Low | Proposed activity will be within area classified as low in the Class 1 cultural survey. |
| | | Moderate | Proposed activity will be within area classified as medium in the Class 1 cultural survey. |
| | | High | Proposed activity will be within area classified as high in the Class 1 cultural survey. |
| Paleontological | | Low | Surface geology consists of PFYC Class 1-3 formations. |
| | | Moderate | Surface geology consists of PFYC Class 4-5 formations. |
| | | High | Known vertebrate fossil site(s) can be seen. |
| Soils/Vegetation | | Low | Site and associated features demonstrate resilience and resistance to anticipated activity or are sufficiently disturbed that they would not be affected. |
| | | Moderate | Site and associated features demonstrate some ability to resist/recover from impacts. |
| | | High | Site and associated features demonstrate limited ability to resist/recover from impacts. |
| Desert Shrub/Saltbush Vegetation Type | | Low | Proposed activity will be outside of desert shrub/saltbush community. |
| | | Moderate | Proposed activity will be within desert shrub/saltbush community but outside intact desert shrub/saltbush vegetation. |
| | | High | Proposed activity will be within intact desert shrub/saltbush vegetation. |
| Riparian Vegetation, Perennial Waters, Seeps and Springs | | Low | Proposed activity will be more than 100 meters from the edge of riparian vegetation and wetlands. |
| | | Moderate | Proposed activity will include use within 100 meters of riparian vegetation on designated trails that cross riparian vegetation or camping at designated campsites. |
| | | High | Proposed activity will include use within riparian vegetation |

*Appendix I. Special Recreation Permit Program Overview*

BLM_0028561

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

155

| Resource | Anticipated Impact | Description of Impact |
|---|---|---|
| | | off designated trails or outside designated campsites. |
| Bighorn Sheep | Low | Proposed activity will be outside bighorn sheep production and summer concentration areas. |
| | Moderate | Proposed activity will be outside bighorn sheep production areas and within summer concentration areas. |
| | High | Proposed activity will be within bighorn sheep production areas. |
| Special Status Species (Colorado Hookless Cactus, Special Status Raptors, Kit Fox, Bats, Prairie Dogs, Gunnison Sage-Grouse) | Low | Proposed activity will be greater than 200 meters from sensitive species. |
| | Moderate | Proposed activity will be greater than 100 meters from sensitive species. |
| | High | Proposed activity will be less than 100 meters from sensitive species. |
| Timing for Wildlife | Low | Proposed activity will not occur between November 1 and April 30 or between May 15 and July 15. |
| | Moderate | Proposed activity will occur between November 1 and April 30 or between May 15 and July 15 and will not affect wildlife. |
| | High | Proposed activity will occur between November 1 and April 30 or between May 15 and July 15 and will affect wildlife. |
| Within Existing Disturbance (Designated Routes, Staging Areas, Designated Campsites, etc.) | Low | < 5 acres |
| | Moderate | 5–40 acres |
| | High | > 40 acres |
| Duration of Use | Low | 1 day or less |
| | Moderate | 2–6 days |
| | High | > 6 days |
| Anticipated Number of Participants (including Wilderness Zone 1) | Low | < 12 |
| | Moderate | 13-25 |
| | High | 25+ |
| Anticipated Number of Vehicles | Low | 1-6 |
| | Moderate | 6-10 |
| | High | 10+ |
| Competitive Event | Yes | The event or activity will be competitive in nature. |
| | No | The event or activity will be noncompetitive. |
| Motorized/Mechanized Support | Yes | Vehicles or other mechanized equipment will be required to support activity. |
| | No | No vehicles or other mechanized equipment will be required. |

*Appendix I. Special Recreation Permit Program Overview*

BLM_0028562

Dominguez-Escalante National Conservation Area                                              156
APPROVED RESOURCE MANAGEMENT PLAN

| Resource | Anticipated Impact | Description of Impact |
|---|---|---|
| BLM Monitoring and Inspection Requirements | Low | No significant pre- or post-permit oversight activities will be required |
| | Moderate | Pre- or post-permit activities will require up to eight hours of BLM oversight. |
| | High | Pre- or post-permit activities will require more than eight hours of BLM oversight. |
| Wilderness Zones 2 and 3 (Group Size) | Low | < 4 |
| | Moderate | 5–9 |
| | High | 10–12 |

## Table I.3. Permit Classification Matrix

| Evaluation Factors | Permit Class | | | |
|---|---|---|---|---|
| | I | II | III* | IV* |
| Wildlife (Visual) | No | Yes | Yes | Yes |
| Wildlife (Audio) | No | Yes | Yes | Yes |
| Water Quality | No | Yes | Yes | Yes |
| Cultural | Low | Moderate | Moderate | High |
| Paleontological | Low | Moderate | Moderate | High |
| Soils/Vegetation | Low | Moderate | Moderate | High |
| Desert Shrub/Saltbush Vegetation | Low | Moderate | Moderate | High |
| Riparian Vegetation | Low | Moderate | Moderate | High |
| Bighorn Sheep | Low | Moderate | Moderate | High |
| Sensitive Species | Low | Moderate | Moderate | High |
| Timing for Wildlife | Low | Moderate | Moderate | High |
| Within Existing Disturbance | Low | Low | Moderate | High |
| Duration of Use | Low | Moderate | Moderate | High |
| Anticipated Number of Participants | Low | Moderate | Moderate | High |
| Anticipated Number of Vehicles | Low | Low | Moderate | High |
| Competitive Event | No | No | Yes | Yes |
| Motorized Support | No | No | Yes | Yes |
| Monitoring and Inspection Requirements | Low | Low | Moderate | High |
| *Class III and IV events are more likely to require cost recovery, because these events will probably need more than 50 hours of BLM staff time for permit administration. | | | | |

*Appendix I. Special Recreation Permit Program Overview*

BLM_0028563

# Appendix J. Best Management Practices for Management Actions

This appendix provides a list of common standard operating procedures and BMPs that are applicable to all alternatives in the resource management plan. Standard operating procedures are established guidelines that are followed by the BLM in carrying out management activities. While the list of standard operating procedures is complete, the list is not intended to be comprehensive; additional standard operating procedures could be developed and implemented to support achieving resource objectives.

BMPs are mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are applied to management actions to aid in achieving desired outcomes for safe, environmentally responsible resource development, by preventing, minimizing, or mitigating adverse impacts and reducing conflicts.

BMPs can also be proposed by project applicants for activities on public lands (e.g., trail construction). BMPs not incorporated into the permit application by the applicant may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or right-of-way stipulations. Standard conditions of approval and rights-of-way stipulations are also provided in this appendix as appropriate. Additional BMPs, conditions of approval, and right-of-way stipulations could be developed to meet resource objectives on the basis of local conditions and resource specific concerns.

## J.1. Air Resources

During construction, decommissioning or maintenance projects, reduce emissions of fugitive dust by requiring operators implement watering (minimum twice daily during dry conditions) or application of other dust-suppressant agents at disturbed areas, including access roads. The authorized officer may direct the operator to change the level and type of dust abatement if the measures being used are insufficient to prevent visible plumes of fugitive dust or deposition of excessive dust on nearby surfaces in conjunction with vehicular traffic, equipment operations, or wind events. Require fugitive dust control plans in conjunction with project construction/development plans.

BLM_0028564

## J.2. Soils

## Best Management Practices

1. Loosen compacted subsoil if needed by ripping to appropriate depth depending on site-specific conditions.

2. Consider hydrologic setting and existing hydrologic features in project design and layout.

3. Minimize soil exposure to erosional forces of wind and water by waiting until just before beginning construction to clear vegetation and to disturb the soil.

4. Minimize the area of bare soil within the approved work zone as much as possible.

5. Where applicable, cover entrances of construction sites with gravel to prevent trucks from tracking sediment from the construction site onto roads. This sediment will eventually end up clogging roadway drainage systems or settling into wetlands.

6. Protect and maximize existing native vegetation and natural forest/rangeland floor, thereby reducing impervious areas on the site.

7. Disperse storm water to areas of undisturbed forest/rangeland floor wherever possible, rather than concentrating it into channels.

8. Determine the volume of available topsoil existing on the site. Topsoil shall be spread at a minimum compacted depth of 4 inches (or as appropriate determined by soil type).

9. Stockpile topsoil so that it meets specifications and does not interfere with work on the site.

10. Allow sufficient time in scheduling for topsoil to be spread and bonded with the subsoil prior to seeding, sodding, or planting.

## Conditions of Approval

1. When saturated soil conditions exist on or along the right-of-way, construction shall be halted until soil material dries out sufficiently for construction to proceed without undue damage and erosion to the right-of-way.

2. All construction and travel on the road and right-of-way shall stop until soils dry if ruts greater than three inches are formed by vehicles and equipment.

3. The grant holder shall provide satisfactory reclamation of all sites disturbed by their activity. This may include installation of additional erosion control devices and seeding

BLM_0028565

at the discretion of the BLM Authorized Officer.

4. Storm water BMPs identified in the Storm Water Management Plan shall be in place prior to any earth-disturbing activity. Additional BMPs will be installed as determined necessary by the BLM Authorized Officer. All temporary BMPs shall be removed once site stabilization and reclamation efforts have been deemed successful by the BLM Authorized Officer.

5. Topsoil shall be conserved during excavation and reused as cover on disturbed areas to facilitate regrowth of vegetation. Topsoil shall only be used for reclamation and shall not be used to bed or pad the pipe during backfilling.

6. To control erosion and sediment transport, roads shall be crowned or sloped, ditched, surfaced, drained with culverts and/or water dips, and constructed to BLM Gold Book standards. Culvert outlets shall incorporate controls such as rip-rap, sediment catchments, and anchored straw bales, to slow water velocity and prevent erosion and soil transport. Initial gravel application shall be a minimum of four inches.

7. The operator shall provide timely year-round road maintenance and cleanup on roads.

8. A regular schedule for maintenance shall include, but not be limited to, crown or slope reconstruction, blading, ditch, culvert and catchment cleaning, road surface replacement, and dust abatement. When rutting within the traveled way becomes greater than three inches, blading, and/or gravelling shall be conducted as approved by the BLM Authorized Officer.

9. The grantee shall construct water bars, kicker dikes, ditch breaks, pocking, or other erosion control techniques, on all of the right-of-way, as directed by the BLM Authorized Officer. The water bars or dikes shall be constructed across the full width of the disturbed area.

10. Disturbed portions of the right-of-way surface shall be left rough and not smoothed to facilitate seed germination and seedling survival.

11. Top soil segregation will not occur when soils are saturated or frozen unless special authorization is granted by the BLM Authorized Officer.

12. A Winter Construction Plan will be submitted and approved by the BLM Authorized Officer before a Notice to Proceed will be authorized for construction activities in frozen soils.

13. Soil or loam that is stored or stockpiled during construction shall be handled in a way to preserve soil quantity and natural soil properties and productivity.

14. The face of cut/fill slopes will be stabilized and the face of all graded slopes shall be

BLM_0028566

protected from surface runoff until they are stabilized.

15. The face of the slope shall not be subject to any concentrated flows of surface water such as from natural drainage ways, graded swales, and downspouts.

16. Subsurface drainage shall be provided where necessary to intercept seepage that would otherwise adversely affect slope stability or create excessively wet site conditions.

17. Slopes shall not be created so close to property lines as to endanger adjoining properties without adequate protection against sedimentation, erosion, slippage, settlement, subsidence or other related damages.

18. All disturbed areas shall be stabilized structurally or with vegetation in compliance with the appropriate BMPs.

19. Require a sediment control plan on all activities that will disturb more than ½ acre or on any ground-disturbing activities within 200 feet of a hydrologic feature. This plan will identify areas with high erosion concerns and list the practices that will be used to prevent sediment from leaving the site.

20. Graded or disturbed areas including slopes shall be protected during clearing and construction in accordance with the approved erosion and sediment control plan until they are adequately stabilized.

21. All erosion and sediment control practices and measures shall be constructed, applied, and maintained in accordance with the approved erosion and sediment control plan.

22. Frozen material or soft, mucky, or highly compressible materials shall not be incorporated into fill slopes or structural fills.

23. Fill shall not be placed on a frozen foundation.

24. Any sign of rill or gully erosion shall be immediately investigated and repaired as needed or requested by the authorizing officer.

25. Fall and winter erosion control measures must be upgraded and refined to protect the site from spring runoff and snowmelt.

26. Topsoil stripping shall be confined to the immediate construction areas. A 4 to 6-inch stripping depth is common, but depth may vary depending on the particular soil. All perimeter dikes, basins, and other sediment controls shall be in place prior to stripping.

27. After the areas to be topsoiled have been brought to grade, and immediately prior to spreading the topsoil, the subgrade shall be loosened by disking or scarifying to a depth of at least two inches (or as site-specific analysis determines appropriate for soil type) to

ensure bonding with subsoil.

28. Topsoil shall not be placed while in a frozen or muddy condition, when the subgrade is excessively wet, or in a condition that may otherwise be detrimental to proper grading or proposed sodding or seeding.

## J.3. Water Resources

## Best Management Practices

1. Design roads for minimal disruption of natural drainage patterns.

2. Reduce road corridor widths by building vertical cut slopes and stabilizing with rock retaining walls.

3. Provide energy dissipaters (e.g., rock piles and logs) where necessary at the downstream end of ditch relief culverts to reduce the erosion energy of the emerging water.

4. Drainage structures shall not be discharged onto erodible soils or fill slopes without outfall protection.

5. Avoid using roads during wet periods if such use will likely damage the road drainage features.

6. Grade road surfaces only as often as necessary to maintain a stable running surface and to retain the original surface drainage.

7. Avoid cutting the toe of cut slopes when grading roads or pulling ditches.

8. Keep road inlet and outlet ditches, catch-basins, and culverts free of obstructions, particularly before and during spring runoff. Routine machine-cleaning of ditches shall be kept to a minimum during wet weather. Leave the disturbed area in a condition that provides drainage with no additional maintenance.

9. Provide for erosion-resistant surface drainage by adding necessary drainage facilities and armoring prior to fall rain or snow. When erosion is anticipated, sediment barriers shall be constructed to slow runoff, allow deposition of sediment, and prevent sediment from leaving the site. In addition, straining or filtration mechanisms may also contribute to sediment removal from runoff.

10. Avoid grading sections of road that do not need maintenance, as this elevates sediment production from the newly disturbed surface. Raise the blade where grading is not needed.

11. Remove berms from the outside edge or roads where runoff is channeled.

BLM_0028568

Dominguez-Escalante National Conservation Area                                                                    162
APPROVED RESOURCE MANAGEMENT PLAN

12. Leave abandoned roads in a condition that provides adequate drainage without further maintenance. Close these roads to traffic, reseed and/or scarify, and if necessary, re-contour and provide cross ditches or drain dips.

13. Cross stream channels at right angles if at all possible.

14. Concentrate right-of-way actions adjacent to stream courses as far landward as safety allows.

15. Remove all temporary stream crossings immediately after use and cross-ditch the ends of skid trails/two tracks/rights-of-way to mitigate erosion from disturbed areas.

16. Place all excess material removed by maintenance operations in safe disposal sites, and stabilize these sites to prevent erosion. Avoid locations where erosion will carry materials into a stream.

17. Evaluate potential effects of stream crossings/channel work on existing structures such as culverts, bridges, buried cables, pipelines, and irrigation flumes prior to construction activities to identify and mitigate foreseen impacts.

18. When designing protective/mitigation measures, consider the changes that may occur in the watershed hydrology and sedimentation over the design life of the measure. Moreover, design and construct roads that are self-maintaining and consider using road surfacing, such as gravel. Design and construct stream crossings that handle the 100-year flood, and consider culvert and bridge designs that facilitate aquatic life passage.

19. Exclude livestock and vehicles from spring sources and riparian areas in which on site evaluation and/or monitoring data indicate degrading conditions.

20. Exclude livestock, wildlife, and vehicles from developed spring sources.

21. Stabilize and maintain grades in natural or artificial channels to prevent the formation and advancement of gullies.

22. Utilize erosion control structures including but not limited to head-cut lay-backs, zuni-bowls, check dams, and sediment basins to retain soils in highly erodible areas and protect water quality.

23. Use vegetation or structures to stabilize and protect banks of streams, lakes, or excavated channels against scour and erosion.

24. Manage and manipulate invasive stands of brush and weeds on forest, range, pasture land by mechanical, chemical, or biological means or by prescribed burning to improve watershed function and condition.

*Appendix J. Best Management Practices for Management Actions*

BLM_0028569

25. Reduce soil erosion and sediment delivery to surface waters by protecting, maintaining, and reestablishing desirable vegetative communities in areas of highly erodible or critically eroding soils.

26. Utilize mechanical treatment methods to roughen and aerate soils in degraded sites identified for reclamation.

27. Avoid alteration of natural hydrologic function and condition in source areas for springs, seeps, and fens. Relocate surface-disturbing activities away from these sensitive areas as site conditions warrant.

28. Restore modified or damaged streams as close as practicable to natural conditions using bioengineering techniques to protect banks, and to reestablish riparian vegetation.

29. Maintain to the greatest extent practicable natural flow rates and chemical and physical properties of surface and groundwater during work within stream channels, floodplains, and/or riparian areas.

30. Low water crossings will be constructed at original streambed elevation in a manner that prevents any blockage or restriction of the existing channel. Material removed will be stockpiled for use in reclamation of the crossings.

31. The operator shall institute measures such as surfacing, watering, and use of non-saline dust suppressants on all roads authorized in this project to minimize impacts from fugitive dust emissions. The use of chemical dust suppressants on public surface will require prior approval from the BLM Authorized Officer.

32. Livestock management practices, such as animal health, feeding, watering, and salting, shall be done in a manner to protect water quality.

33. Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles and heavy machinery.

34. Maintain appropriate vegetative/riparian buffers around water bodies to slow runoff and trap sediments and protect water quality.

35. Time work in wetlands and watercourses to occur during low flow season when conditions are driest. High flows occur during late summer and early fall as a result of high intensity convective thunderstorm events, and in spring due to high flows from snow-melt runoff.

36. Temporary BMPs used to filter sediments from water, thereby preventing sedimentation, shall be installed (per manufacturer's recommendations) before any construction begins, maintained during the activities, and shall subsequently be removed when the project is completed.

*Appendix J. Best Management Practices for Management Actions*

BLM_0028570

37. Consider rehabilitating closed routes to reduce erosion and restore landscapes.

# Stipulations

1. The holder shall adhere to all requirements under the Clean Water Act.

2. Storm water BMPs identified in the applicant's State approved Storm Water Pollution Prevention Plan shall be in place prior to any earth-disturbing activity.

3. Additional BMPs will be implemented as determined necessary by the BLM Authorized Officer.

4. All temporary BMPs shall be removed once site stabilization and reclamation efforts have been deemed successful by the BLM Authorized Officer.

5. Culverts and water-bars shall be installed according to 9113 standards and sized for the 10-year storm event with no static head and to pass a 25-year event without failing.

6. Culverts shall be located on stable and straight stream reaches and along the stream grade. In steeper streams, it may be necessary to install natural channel design techniques downstream to minimize erosion. A hydrologist shall be consulted.

7. Erosion control features shall be maintained through periodic inspection and maintenance, including cleaning dips and cross-drains, repairing ditches, marking culvert inlets to aid in location, and clearing debris from culverts.

8. If requested by the BLM Authorized Officer, the holder shall furnish and install culverts of the gauge, materials, diameter(s), and length(s) as indicated and approved.

9. Culverts shall be free of corrosion, dents, or other deleterious conditions.

10. Spoil material from clearing, grubbing, and channel excavation shall be disposed of in a manner that will not interfere with the function of the channel and in accordance with all local, State, and Federal laws and regulations.

11. To protect water quality, anti-backflow devices shall be utilized while drafting fresh water from streams, springs, and wells.

12. Actions shall not result in adverse effects on the function of streams or stream corridors.

13. Actions shall not impair floodplain function.

14. New stream crossings shall be designed to accommodate a 100-year flood.

15. Provide for erosion-resistant surface drainage by adding necessary drainage facilities and armoring prior to fall rain or snow. When erosion is anticipated, sediment barriers shall

be constructed to slow runoff, allow deposition of sediment, and prevent it from leaving the site. In addition, straining or filtration mechanisms may also contribute to sediment removal from runoff.

16. No operations using chemical processes (except for vegetation management) or other pollutants in their activities will be allowed to occur within 200 feet of any water bodies.

17. All stream crossings affecting perennial streams or streams supporting riparian habitat shall be professionally engineered (design, construction, and maintenance).

18. Water developments (springs, reservoirs, catchments; wells, pipeline and water troughs) will conform to BLM Manual H 1741-2.

19. Actual work in spring and stream beds will be done by hand where possible.

20. The source of all spring developments shall be fenced.

21. The BLM or proponent shall acquire a storm water permit from the State of Colorado and Army Corps of Engineers for new construction that exceeds one acre, and a 404 permit for activities that affect the average high water mark of a stream.

## J.4. Vegetation: Rangeland

Guidance may come from various sources. See individual resources.

## Standard Operating Procedures

1. When making decisions about proposed projects/actions in known sagebrush habitat, existing plans and guidance will be used by interdisciplinary teams and considered in the decision making process. This guidance includes the conservation actions/guidelines identified in

2. the WAFWA's Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly, Knick, Schroeder, and Stiver 2004), the Gunnison Sage Grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005), local working group population plans (Pinyon Mesa population of Gunnison sage-grouse (Pinyon Mesa Gunnison Sage-Grouse Partnership 2000) and Parachute-Piceance-Roan population of greater sage-grouse), the final rule for listing the Gunnison sage-grouse as threatened, the designation of critical habitat, and the anticipated recovery plan for the species.

3. Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007b).

# Best Management Practices

1. Close and rehabilitate roads quickly once they are no longer needed.

2. Close selected routes to protect special status species and significant plant communities

3. Build roads to the appropriate standard, no higher than necessary for use and safety, and utilize primitive or two-track roads rather than newly constructed roads where feasible.

4. Pipelines (and electrical power lines when possible) shall be placed within road corridors to minimize disturbance.

5. Minimize disturbance to soil and native vegetation as much as possible.

6. Stockpile topsoil for use in final reclamation. Topsoil shall be stored separately from other fill materials.

7. When timely natural regeneration of the native plant community is not likely to occur, carefully select species that will not compete with or exclude botanical resources for revegetation efforts. Bare sites shall be seeded as soon as appropriate to prevent establishment of undesirable plant species.

8. Ensure that seed used for revegetation as well as straw and hay bales used for erosion control are certified free of noxious and invasive weeds.

9. Monitor revegetation sites to ensure successful establishment of desired species.

10. Monitor the long-term success of revegetation efforts to ensure successful establishment of desired species and detect any noxious and invasive weed infestations. If revegetation is unsuccessful, continue efforts to establish desired species in disturbed sites.

11. In desert shrub/saltbush communities with biological soil crusts, require reclamation that includes but is not limited to: broadcasting bacterial inoculants, planting native grass, forbs, and shrubs seedlings, and exclosure fences.

# References[18]

BLM. 2007b. *Record of Decision. Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States: Programmatic Environmental Impact Statement.* June 2007. Reno, NV: U.S. Department of the Interior, Bureau of Land Management.

Connelly, J.W., Knick, S.T., Schroeder, M.A., & Stiver, S.J. 2004. *Conservation Assessment of*

---

[18] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028573

*Greater Sage-grouse and Sagebrush Habitats.* Cheyenne, WY: Western Association of Fish and Wildlife Agencies. Available online: http://sagemap.wr.usgs.gov/docs/Greater_Sage-grouse_Conservation_Assessment_060404.pdf

Elliot, B.A., Kurzell, B., & Spackman Panjabi, S. 2011. *Recommended Best Management Practices for Plants of Concern: Practices Developed to Reduce the Impacts of Oil and Gas Development Activities to Plants of Concern.* Prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation. August 25, 2011. Available online: https://cpw.state.co.us/.

# J.5. Vegetation: Riparian Habitat and Wetlands

## Standard Operating Procedures

1. Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007b).

## Best Management Practices

1. Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles and heavy machinery.

2. Locate residue piles (e.g., sawdust, field chipping residue) away from drainages where runoff may wash residue into water bodies or wetlands.

3. Maintain appropriate vegetative/riparian buffers around water bodies to protect water quality.

4. Manage riparian areas to provide adequate shade, sediment control, bank stability, and recruitment of wood into stream channels.

5. Locate project staging areas for refueling, maintenance equipment, materials, and operating supplies in areas not designated as riparian and/or stream bank management zones.

6. Determine the best locations and design for roads, the slope of roads, and the approach to stream crossings through proper planning. On perennial streams roads, which will be used for longer than one year, the crossings will be engineered and approved by the BLM Authorized Officer.

7. Do not locate roads or trails parallel to streams. Where roads must cross streams, cross perpendicularly and immediately exit the buffer zone.

BLM_0028574

8. Appropriate improvements, such as culverts, must be placed at stream crossings to keep vehicles/equipment out of the stream flow and to prevent direct sedimentation of streams.

9. Maintain a minimum of six inch stubble height at the end of October on stream bank (lotic) riparian.

10. Maintain a minimum of four inch stubble height at the end of October on wet meadows (lentic) systems.

11. Roads and trails (off-highway vehicle, horse, bicycle, and hiking) will avoid wetlands and if avoidance is not possible will be designed and constructed in Technical Reference 2E22A68-NPS, Off-highway Vehicle Management.

12. Install and maintain cottonwood protection on existing and planted trees where beaver loss threatens survival. Work with volunteer groups and user groups to help with the maintenance of installed structures.

# References[19]

BLM. 2007b. *Record of Decision. Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States: Programmatic Environmental Impact Statement.* June 2007. Reno, NV: U.S. Department of the Interior, Bureau of Land Management.

# J.6. Noxious and Invasive Weed Prevention

This list incorporates many suggested practices under various land uses, and is designed to allow managers to pick and choose those practices that are most applicable and feasible for each situation.

## Site-Disturbing Projects

*Pre-Project Planning*

1. Environmental analyses for projects and maintenance programs shall assess weed risks, analyze high-risk sites for potential weed establishment and spread, and identify prevention practices.

2. Determine site-specific restoration and monitoring needs and objectives at the onset of project planning.

---

[19] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

*Appendix J. Best Management Practices for Management Actions*

BLM_0028575

3. Learn to recognize noxious and invasive weeds.

4. Inventory all proposed projects for weeds prior to ground-disturbing activities. If weeds are found, they will be treated (if the timing is appropriate) or removed (if seeds are present) to limit weed seed production and dispersal.

5. Be cognizant of moving equipment and machinery from weed-contaminated areas to non-contaminated areas.

6. Locate and use weed-free project staging areas. Avoid or minimize travel through weed infested areas, or restrict travel to periods when spread of disseminules is least likely.

7. Identify sites where equipment can be cleaned. Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts shall be collected and incinerated when possible.

8. If certified weed-free gravel pits become available, the use of certified weed-free gravel will be required wherever gravel is applied to public lands (e.g., roads).

9. Maintain stockpiled, non-infested material in a weed-free condition. Topsoil stockpiles shall be promptly revegetated to maintain soil microbial health and reduce the potential for weeds.

10. Use competitive seed mixes when practical. A certified seed laboratory shall test each lot according to the Association of Official Seed Analysts standards (which include an all-State noxious weed list) and provide documentation of the seed inspection test. The seed shall contain no noxious and invasive, prohibited, or restricted weed seeds and shall contain no more than 0.5 percent by weight of other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended.

11. Livestock feed brought into the NCA shall be certified weed-free per the Colorado Department of Agriculture weed-free forage certification program.

*Project Implementation*

1. Minimize soil disturbance. To the extent practicable, native vegetation shall be retained in and around project activity areas, and soil disturbance kept to a minimum.

2. If a disturbed area must be left bare for a considerable length of time, cover the area with weed barrier until revegetation is possible.

*Post-Project*

1. Clean all equipment before leaving the project site when operating in weed infested

BLM_0028576

areas.

2.  Inspect, remove, and properly dispose of weed seed and plant parts found on clothing and equipment. Proper disposal means bagging and incinerating seeds and plant parts or washing equipment in an approved containment area.

3.  Revegetate disturbed soil where appropriate to optimize plant establishment for that specific site. Define revegetation objectives for each site. Revegetation may include topsoil replacement, planting, seeding, fertilization, and certified weed-free mulching as necessary. Use native material where appropriate and feasible.

4.  Monitor sites where seed, hay, straw, or mulch has been applied. Eradicate weeds before they form seed. In contracted projects, contract specifications could require that the contractor control weeds for a specified length of time.

5.  Inspect and document all ground-disturbing activities in noxious and invasive weed infested areas for at least three growing seasons following completion of the project. For ongoing projects, continue to monitor until reasonably certain that no weeds are present. Plan for follow-up treatments on the basis of inspection results.

## Roads and Utilities

*Pre-Project Planning*

1.  Communicate with contractors, local weed districts or weed management areas about projects and BMPs for prevention.

2.  Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts shall be collected and incinerated when practical, or washed off in an approved containment area.

3.  Avoid acquiring water for road dust abatement where access to water is through weed-infested sites.

4.  Treat weeds on travel rights-of-way before seed formation so construction equipment doesn't spread weed seed.

5.  Schedule and coordinate blading or pulling of noxious and invasive weed-infested roadsides or ditches in consultation with the local weed specialist. When it is necessary to blade weed-infested roadsides or ditches, schedule the activity when disseminules are least likely to be viable.

*Project Implementation*

1.  Retain shade to suppress weeds by minimizing the removal of trees and other roadside

BLM_0028577

vegetation during construction, reconstruction, and maintenance; particularly on south aspects.

2. Do not blade or pull roadsides and ditches infested with noxious and invasive weeds unless doing so is required for public safety or protection of the roadway. If the ditch must be pulled, ensure weeds remain on-site. Blade from least infested to most infested areas.

*Post-Project*

1. Clean all equipment (power or high-pressure cleaning) of all mud, dirt, and plant parts before leaving the project site if operating in areas infested with weeds. Seeds and plant parts shall be collected and incinerated when possible.

2. When seeding has been specified for construction and maintenance activities, seed all disturbed soil (except travel route) soon after work is completed.

3. Use a certified weed-free seed mix suitable for local environmental conditions that includes fast, early growing (preferably native) species to provide quick revegetation. Consider applying weed-free mulch with seeding.

4. Periodically inspect roads and rights-of-way for noxious and invasive weeds. Train staff to recognize weeds and report locations to the local weed specialist. Follow-up with treatment when needed.

5. When reclaiming roads, treat weeds before roads are made impassable. Inspect and follow up on the basis of initial inspection and documentation.

6. To avoid weed infestations, create and maintain healthy plant communities whenever possible, including utility rights-of-way, roadsides, scenic overlooks, trailheads, and campgrounds.

## Recreation Activities

1. Inspect and clean mechanized trail vehicles of weeds and weed seeds.

2. Wash boots and socks before hiking into a new area. Inspect and clean packs, equipment, and bike tires.

3. Avoid hiking through weed infestations whenever possible.

4. Keep dogs and other pets free of weed seeds.

5. Avoid picking unidentified wildflowers and discarding them along trails or roadways.

BLM_0028578

6.  Maintain trailheads, campgrounds, visitor centers, boat launches, picnic areas, roads leading to trailheads, and other areas of concentrated public use in a weed-free condition. Consider high-use recreation areas as high priority sites for weed eradication.

7.  Sign trailheads and access points to educate visitors on noxious and invasive weeds and the consequences of their activities.

8.  Inspect and document travel corridors for weeds and treat as necessary.

9.  Encourage use of pelletized feed for backcountry horsemen and hunters. Pelletized feed is unlikely to contain weed seed.

## Watershed Management

1.  Frequently and systematically inspect and document riparian areas and wetlands for noxious and invasive weed establishment and spread. Eradicate new infestations immediately since effective tools for riparian-area weed management are limited.

2.  Promote dense growth of desirable vegetation in riparian areas (where appropriate) to minimize the availability of germination sites for weed seeds or propagules transported from upstream or upslope areas.

3.  Address the risk of invasion by noxious weeds and other invasive species in watershed restoration projects and water quality management plans.

## Grazing Management

1.  Consider prevention practices and cooperative management of weeds in grazing allotments. Prevention practices may include:

    a.  Altering season of use

    b.  Minimizing ground disturbance

    c.  Exclusion

    d.  Preventing weed seed transportation

    e.  Maintaining healthy vegetation

    f.  Revegetation

    g.  Inspection

    h.  Education

BLM_0028579

      i.  Reporting

2. Provide certified weed-free supplemental feed in a designated area so new weed infestations can be detected and treated immediately. Pelletized feed is unlikely to contain viable weed seed.

3. If livestock may contribute to seed spread in a weed-infested area, schedule livestock use prior to seed-set or after seed has fallen.

4. If livestock were transported from a weed-infested area, annually inspect and treat entry units for new weed infestations.

5. Consider closing infested pastures to livestock grazing when grazing will either continue to exacerbate the condition or contribute to weed seed spread. Designate those pastures as unsuitable range until weed infestations are controlled.

6. Manage the timing, intensity (utilization), duration, and frequency of livestock activities to maintain the competitive ability of desirable plants and retain litter cover. The objective is to prevent grazers from selectively removing desirable plant species and leaving undesirable species.

7. Exclude livestock grazing on newly seeded areas with fencing to ensure that desired vegetation is well established, until objectives for seeding have been met.

8. Reduce ground disturbance, including damage to biological soil crusts. Consider changes in the timing, intensity, duration, or frequency of livestock use; location and changes in salt grounds; restoration or protection of watering sites; and restoration of yarding/loafing areas, corrals, and other areas of concentrated livestock use.

9. Inspect areas of concentrated livestock use for weed invasion, especially watering locations and other sensitive areas that may be particularly susceptible to invasion. Inventory and manage new infestations.

10. Livestock are to be excluded from burned areas until monitoring results show emergency stabilization and rehabilitation objectives have been met.

## Outfitting/Recreation Pack and Saddle Stock Use

1. Allow only certified weed-free hay/feed on BLM lands.

2. Inspect, brush, and clean animals (especially hooves and legs) before entering public land. Inspect and clean tack and equipment.

3. Regularly inspect trailheads and other staging areas for backcountry travel. Bedding in trailers and hay fed to pack and saddle animals may contain weed seed or propagules.

*Appendix J. Best Management Practices for Management Actions*

4.  Tie or contain stock in ways that minimize soil disturbance and prevent loss of desirable native species.

5.  Authorized trail sites for tying pack animals shall be monitored several times per growing season to quickly identify and eradicate new weeds. Trampling and permanent damage to desired plants are likely. Tie-ups shall be located away from water and in shaded areas where the low light helps suppress weed growth.

6.  Educate outfitters to look for and report new weed infestations.

## Wildlife

1.  Periodically inspect and document areas where wildlife concentrate in the winter and spring and cause excess soil disturbance.

2.  Use weed-free materials for all wildlife management activities.

3.  Incorporate weed prevention into all wildlife habitat improvement project designs.

## J.7. Fire

## Fire Management Plans

1.  Prescribed fire plans shall include pre-burn invasive weed inventory and risk assessment components as well as post-burn mitigation components.

2.  Integrate prescribed fire and other weed management techniques to achieve best results. This may involve post-burn herbicide treatment or other practices that require careful timing.

3.  Include weed prevention and follow-up monitoring in all prescribed fire activities. Include in burn plans the possibility for post-burn weed treatment.

## Incident Planning

1.  Increase weed awareness and weed prevention by providing training to new and/or seasonal fire staff on invasive weed identification and prevention.

2.  For prescribed burns, inventory the project area and evaluate potential weed spread with regard to the fire prescription. Areas with moderate to high weed cover shall be managed for at least 2 years prior to the prescribed burn to reduce the number of weed seeds in the soil. Continue weed management after the burn.

3.  On wildfires or prescribed burns in or near weed-infested areas ensure that a qualified

resource advisor familiar with weed issues or who has access to the relevant information is assigned. Include weed prevention practices in fire management briefings

4. Use operational practices to reduce weed spread (e.g., avoid weed infestations when locating fire lines).

5. Identify and periodically inspect potential helispots, staging areas, incident command posts, and base camps and maintain a weed-free condition. Encourage network airports and helibases to do the same.

6. Develop a burned-area integrated pest management plan, including a monitoring component to detect and eradicate new weeds early.

## Firefighting

1. Ensure that all equipment (including borrowed or rental equipment) is free of weed seed and propagules before entering incident location.

2. When possible, use fire suppression tactics that reduce disturbances to soil and vegetation, especially when creating fire lines.

3. Use wet or scratch-lines where possible instead of fire breaks made with heavy equipment.

4. Given the choice of strategies, avoid ignition and burning in areas at high risk for weed establishment or spread.

5. Hose off vehicles on site if they have traveled through infested areas.

6. Inspect clothing for weed seeds if foot travel occurred in infested areas.

7. When possible, establish incident bases, fire operations staging areas, and aircraft landing zones in areas that have been inspected and are verified to be free of invasive weeds.

8. Cover weed infested cargo areas and net-loading areas with tarps if weeds exist and can't be removed or avoided.

9. Flag off high-risk weed infestations in areas of concentrated activity and show weeds on facility maps.

10. If fire operations involve travel or work in weed infested areas, a power wash station shall be staged at or near the incident base and helibase. Wash all vehicles and equipment upon arrival from and departure to each incident. This includes fuel trucks and aircraft service vehicles.

BLM_0028582

11. Identify areas affected by suppression activities that may be vulnerable to weed invasion, and utilize suppression funds to repair.

## Post-Fire Rehabilitation

1. Have a weed specialist review burned area rehabilitation reports to ensure proper and effective weed prevention and management is addressed.

2. Thoroughly clean the undercarriage and tires of vehicles and heavy equipment before entering a burned area.

3. Treat weeds in burned areas. Weeds can recover as quickly as 2 weeks following a fire.

4. Schedule inventories 1 month and 1 year post-fire to identify and treat infestations. Eradicate or contain newly emerging infestations.

5. Restrict travel to established roads to avoid compacting soil that could hinder the recovery of desired plants.

6. Determine soon after a fire whether revegetation is necessary to speed recovery of a native plant community, or whether desirable plants in the burned area will recover naturally. Consider the severity of the burn and the proportion of weeds to desirable plants on the land before it burned. In general, more severe burns and higher pre-burn weed populations increase the necessity of revegetation. Use a certified weed-free seed mix.

7. Inspect and document weed infestations on fire access roads, equipment cleaning sites, and staging areas. Control infestations to prevent spread within burned areas.

8. Seed and straw mulch to be used for burn rehabilitation (e.g., for wattles, straw bales, dams) shall be certified weed-free.

9. As nearly as possible, replace soil and vegetation right side up when rehabbing fire line.

## J.8. Fish and Wildlife Management and Special Status Species

## Standard Operating Procedures

1. Fences constructed will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989b). Current standards for fencing cattle out in deer and elk range is a four strand fence, 40 inches high with a spacing of wires from ground to top of 60" (smooth bottom wire), 6" (second wire barbed), 6" (third wire barbed), 12" (top wire preferably smooth but may need to be barbed in areas of intense cattle use).

BLM_0028583

2. The BLM will consult agency species management plans and other conservation plans as appropriate to guide management and devise mitigation measures when needed. Examples of these plans include but are not limited to the Colorado Wildlife Action Plan, Colorado Sagebrush: A Conservation Assessment and Strategy, National, Rangewide, statewide and local working group conservation plans for Gunnison and greater sage-grouse, Sharing the land with pinyon-juniper birds, Birds in a sagebrush sea: managing sagebrush habitats for bird communities, North American Landbird Conservation Plan, North American Waterbird conservation Plan, National and Colorado Partners in flight Bird Conservation Plans, Colorado Gunnison's and White-tailed Prairie Dog Conservation Strategy and Recovery plans for federally listed species.

3. Lessees will be notified that a lease parcel contains potential habitat for threatened (T), endangered (E), proposed (P), candidate (C) and BLM sensitive (S) plants, fish and wildlife.

4. Existing plant location records will be consulted and site inventories will be conducted to identify suitable habitat for these plants. Surveys for occupied suitable habitat will be conducted prior to any ground disturbance. Surveys will take place when the plants can be positively identified, during the appropriate flowering periods. Surveys will be conducted by qualified field botanists/biologists who will provide documentation of their qualifications, experience and knowledge of the species prior to starting work.

5. For Colorado hookless cactus and other T, E, P, and C species surface-disturbing activities will be avoided within 200 meters of occupied plant habitat

6. For BLM sensitive species surface-disturbing activities will be avoided within 100 meters of occupied plant habitat wherever possible and where geography and other resource concerns allow. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

7. Where development is allowed within 100 meters of occupied habitat for T, E, P and C species or BLM sensitive species, unauthorized disturbance of plant habitat will be avoided by on-site guidance from a biologist, and by fencing the perimeter of the disturbed area, or such other method as agreed to by the Fish and Wildlife Service. In such instances, a monitoring plan approved by the Service will be implemented for the duration of the project to assess impacts to the plant population or seed bank. If detrimental effects are detected through monitoring, corrective action will be taken through adaptive management.

8. Surface disturbance closer than 100 meters from a listed plant may be considered an adverse effect. Mitigating measures within this narrow buffer are very important and helpful to individual plants, but the BLM does not expect that all adverse effects can be fully mitigated within this distance. Some adverse effects due to dust, dust suppression,

BLM_0028584

and loss of pollinator habitat will likely remain. There are two possible exceptions to this rule of thumb: 1) The new disturbance is no closer to a listed plant than preexisting disturbance and no new or increased impacts to the listed plant are expected; or 2) the listed plant is screened from the proposed disturbance (e.g., tall, thick vegetation or a berm acts as a screen or effective barrier to fugitive dust and other potential impacts).

9. Transplantation of potentially affected plants will not be used as a rationale to defend a "not likely to adversely affect" or a "no effect" determination for listed plant species.

10. Documentation will include individual plant locations and suitable habitat distributions. Prior to conducting plant surveys, the operator will provide maps (as hard copy and GIS files) of all proposed areas of disturbance to the BLM. Maps will include existing and proposed roads, pipelines, well pads, pits, parking lots, and all other work areas. Post-construction or as-built maps will also be submitted to account for any deviations from pre-project maps. Specific polygons where rare plant surveys have been conducted will be included, along with the results of those surveys (positive or negative). The locations of any monitoring plots established to measure the status of rare plants and habitat in the vicinity of project activities will also be provided.

11. Protect pollinator species for endangered or threatened species by incorporating the standard operating procedures found in the PEIS for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007b).

12. Biological inventories must be completed prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as, but not limited to, raptor nests, sage-grouse leks, or rare plant communities. Surveys shall be conducted by qualified biologist(s) using protocols established for potentially affected species during the appropriate time period(s) for the species. Survey reports, data, and determinations shall be submitted to the BLM for review and confirmation according to BLM protocols. Operators, the BLM, and the BLM Authorized Officer will use the information gathered to develop an appropriate mitigation plan. Mitigating measures may include, but are not limited to, timing restrictions, relocation of development activities and fencing operations or habitat. If special status species are encountered during operation, operations will cease immediately, and the BLM Authorized Officer will be notified.

13. To protect key wildlife species, special status species, and their habitats, surveys may be required prior to surface disturbance, habitat treatments, or similar activities. Develop and implement standard survey protocol for key species on the basis of the latest science, conservation assessments, CDOW recommendations, and similar information. Special design and construction measures may also be required in order to minimize impacts to special status species

BLM_0028585

# Best Management Practices

1. Coordinate with the Colorado Division of Wildlife (CDOW) on BLM projects and BLM-authorized projects that are proposed within 0.5-mile of a small capacity water development and 2.0-mile of a large capacity wildlife water development. Projects determined to have a detrimental effect on wildlife using wildlife water developments will be avoided or rerouted if possible.

2. Coordinate with CDOW on migratory bird inventories when migratory bird inventories are proposed by the BLM or required of third parties.

3. Raptors:

   a. Protect nest sites from human disturbances by implementing CPW recommended buffers around known nest sites.

   b. Provide perching and nesting structures as mitigation where disturbances are impacting raptors.

   c. Apply guidance from Suggested Practices for Avian Protection on Power Lines: The State of the Art in 2006 (APLIC 2006) and Avian Protection Plan (APP) Guidelines (APLIC and USFWS 2005) or most current guidance for new power line construction (including upgrades and reconstruction) to prevent electrocution of raptors.

4. Coordinate with CDOW when wildlife inventories are proposed by the BLM or required of third parties. The inventories shall be completed using standardized protocols for individual species.

5. Control noxious and invasive weeds using integrated pest management techniques. Limit chemical control in areas with rare plant species to avoid damage to non-target species. Mechanical or chemical control in and near rare plant habitat shall only be implemented by personnel familiar with the rare plants.

6. Prohibit collection of rare plants or plant parts, except as permitted by the BLM Authorized Officer for scientific research. The BLM cannot permit the collection of plant species listed as threatened or endangered under the ESA. The U.S. Fish and Wildlife Service is the responsible agency for granting collection permits for scientific research.

7. The use of deicers and dust suppressants within 100 meters (328 feet) of road-side occurrences of special status plant species will require prior approval from the BLM.

8. Herbicide application shall be kept at least 200 meters from known plant populations,

BLM_0028586

except in instances where weed populations threaten habitat integrity or plant populations. Great care shall be used to avoid pesticide drift in those cases.

9. Retain existing snags for wildlife use in places where they will not create a human hazard

10. Where linear disturbance is proposed edges of vegetation shall be feathered to avoid long linear edges of habitat and allow for greater habitat complexity for wildlife.

11. Protect existing temporary pools to providing breeding and hibernating habitat for amphibians.

12. Avoid fragmentation of wildlife habitat especially in wildlife migration and movement corridors.

13. Where water is taken directly from areas containing special status fish a meshed screen will be placed on the intake hose of an appropriate size to minimize potential intake of specials status fishes.

14. Identify in-channel features (e.g., culverts, water diversion structures) that block aquatic organism movement and/or impair stream connectivity and replace, modify, or remove these impediments as they are identified and as opportunities allow. Consider and address aquatic organism passage and appropriate life-stage requirements when designing new or modifying existing stream crossings.

15. Where construction of in-channel barriers will benefit aquatic species by limiting access from competitive species and/or disease vectors, consider barriers as a management tool on a site-specific basis.

**NOTE:**

- Occupied habitat includes areas historically or currently supporting plants and/or soils containing a viable seed bank. Suitable habitat is defined as an area that contains or exhibits the specific components or constituents necessary for plant persistence, as determined by existing maps plus field inspection and/or surveys. It may or may not be occupied by plants or a seed bank. Potential habitat is defined as an area that satisfies the broad criteria of the species' habitat description. It is usually determined by preliminary in-house assessment.

- An avoidance buffer helps to minimize dust transport, weed invasion, unauthorized vehicular activities, chemical and produced-water spills; and helps to protect pollinator habitat.

BLM_0028587

# References[20]

APLIC. 2006. *Suggested Practices for Avian Protection on Power Lines: The State of the Art in 2006.* Washington, DC and Sacramento, CA: Edison Electric Institute, APLIC, and the California Energy Commission.

APLIC and USFWS (U.S. Fish and Wildlife Service). 2005. *Avian Protection Plan (APP) Guidelines.* April 2005. Washington, DC: Edison Electric Institute and U.S. Fish and Wildlife Service.

BLM. 1989b. H-1741-1 *Fencing.* Release 1-1572. December 6, 1989. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2007b. *Record of Decision. Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States: Programmatic Environmental Impact Statement.* June 2007. Reno, NV: U.S. Department of the Interior, Bureau of Land Management.

Elliot, B.A., Kurzell, B., & Spackman Panjabi, S. 2011. *Recommended Best Management Practices for Plants of Concern: Practices Developed to Reduce the Impacts of Oil and Gas Development Activities to Plants of Concern.* Prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation. August 25, 2011. Available online: https://cpw.state.co.us/.

USFWS and BLM. 2008. *Recommendations for Avoiding Adverse Effects on Threatened, Endangered, Proposed, Candidate and BLM Sensitive plants on BLM Lease Lands in Colorado.* Draft. July 25, 2008.

# J.9. Wildlife Damage Management

## Standard Operating Procedures

1. Control activities conducted by the U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services, will be coordinated with the BLM on an annual basis, including review of authorized control areas and annual submittal of control activities on D-E NCA lands.

2. U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services, will notify the D-E NCA before any damage control activity is implemented within the restricted area(s), and exceptions will be approved on a case-by-case basis.

---

[20] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028588

3.  All U.S. Environmental Protection Agency use restrictions and requirements for toxicants are to be followed where control devices are used on public lands. The D-E NCA must be notified before any toxicants are deployed and a map of the treatment area must be provided. Adequate signage must be provided and maintained.

4.  The GJFO will identify through the U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services, annual work plan process areas of public lands considered special resource use areas on which control activities be avoided except as requested by CPW, or other protective restrictions may apply. Examples may include special status species habitats (e.g., sage-grouse leks and nesting areas, and bald eagle nests).

# J.10. Cultural Resources

## Standard Operating Procedures

1.  If newly discovered historic or archaeological materials or other cultural resources are uncovered during operations, all work in the vicinity of the discovery will stop, and the BLM Authorized Officer (AO) must be notified immediately. The operator shall take any additional measures requested by the BLM to protect discoveries until they can be adequately evaluated by a permitted archaeologist.

    Unless previously determined in treatment plans or agreements, BLM will evaluate the cultural resources, and in consultation with the State Historic Preservation Office and consulting parties, select the appropriate mitigation option within 48 hours of the discovery. The operator/holder/applicant, under guidance of the BLM, will implement the mitigation in a timely manner. The BLM, in cooperation with the operator, will ensure that the discovery is protected from further disturbance until mitigation is completed. The process will be fully documented in reports, site forms, maps, drawings, and photographs. The BLM will forward documentation to the SHPO for review and concurrence. Operations may resume at the discovery site when notification to proceed is issued by the AO.

2.  A standard Education/Discovery stipulation for cultural resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that Federal laws protect cultural resources and they will be subject to prosecution for disturbing or destroying any historic or archaeological sites, or collecting any cultural objects, prehistoric or historic from Federal lands.

3.  Strict adherence to the confidentiality of information concerning the nature and location of archaeological resources will be required of any company issued a land use

authorization and all of their subcontractors (Archaeological Resource Protection Act, 16 U.S. Code 470hh).

# Best Management Practices

1. BLM specialists shall complete a File Search Request form and submit to the D-E NCA Archaeologist as soon as there is proposed BLM activity or BLM authorized activity that will require preparation of a NEPA document. This will provide the specialist with immediate information as to the need for Class III inventory, whether that will be contracted or in-house, or the presence of Cultural Resources that may preclude or impede their project.

2. Once it has been determined that a project will require contracted cultural inventory the BLM specialists shall complete a Request for CR Compliance form and submit to the D-E NCA Archaeologist as soon as they have a final design for a BLM proposed project or activity.

3. Evaluation of all BLM activities and BLM authorized activities shall be made in compliance with BLM Manual 8100, The Foundations for Managing Cultural Resources (BLM 2004a), and subsequent 8100 series (BLM 2004b, 2004c, 2004d, 2004e, 2004f, 2004g, and 2004h); Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources (BLM 1998b); and the current State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office.

4. When possible, locate projects in areas that are previously disturbed. To comply with the NHPA, the BLM must identify significant cultural resources. Under the current regulations and guidelines the BLM may decide that no inventory needs to be conducted, because the proposed action is located in an environment where ground disturbance has modified the surface so extensively that the likelihood of finding intact cultural resources is negligible.

5. When a NEPA document specifically stipulates the need for an archaeological monitor during construction or a project is located in areas that require an archaeological monitor to be present it is the applicant's responsibility to contract an archaeological consultant holding a current Colorado BLM permit and authorized to work in the D-E NCA. Fieldwork authorizations are required prior to any construction monitoring.

6. Where proposed projects or development will adversely affect a cultural resource, testing, data recovery or full excavation to recover scientific information may be required as mitigation.  The applicant or operator bears the full cost of mitigation and is encouraged to consider avoiding adverse effects through project relocation or redesign rather than mitigating adverse effects.

*Appendix J. Best Management Practices for Management Actions*

BLM_0028590

7. A cultural resource must be allocated to public use prior to a) authorizing or implementing any heritage tourism project; b) when special recreation permits are issued that will use a cultural resource; or c) a BLM recreation project is proposed that involves the use or interpretation of a cultural resource.

A *File Search Request* form must be submitted to the Field Office Archaeologist identifying the site and the proposed use, so the allocation to public use can be confirmed.

# References[21]

BLM. 1998b. *Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources.* Revised 2007. Lakewood, CO: U.S. Department of the Interior, Bureau of Land Management.

_____.2004a. *8100 – The Foundations for Managing Cultural Resources.* Release 8-72. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004b. *8110 – Identifying and Evaluating Cultural Resources.* Release 8-73. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004c. *8120 – Tribal Consultation under Cultural Resources.* Release 8-74. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004d. *8120-1 – General Procedural Guidance for Native American Consultation.* Release 8-75. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004e. *8130 – Planning for Uses of Cultural Resources.* Release 8-76. BLM, Washington, DC. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004f. *8140 – Protecting Cultural Resources.* Release 8-77. BLM, Washington, DC. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004g. *8150 – Permitting Uses of Cultural Resources.* Release 8-78. BLM, Washington, DC. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

---

[21] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

*Appendix J. Best Management Practices for Management Actions*

BLM_0028591

_____. 2004h. *8170 – Interpreting Cultural Resources for the Public.* Release  8-79. BLM, Washington, DC. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

# J.11. Tribal Consultation

## Standard Operating Procedures

1.  The BLM has a responsibility to develop a government-to-government relationship with the tribes: the formal relationship that exists between the Federal Government and tribal governments under the laws of the United States. Tribal governments are considered dependent domestic sovereignties with primary and independent jurisdiction (in most cases) over tribal lands. Concerning proposed BLM plans and actions, at least the level of consideration and consistency review provided to State governments must be afforded to tribal governments.

2.  The BLM is responsible for consultation under General Authorities defined as "laws, executive orders, and regulations that are not considered 'cultural resource authorities'." The regulations implementing both Federal Land Policy and Management Act and NEPA require Native American consultation. The American Indian Religious Freedom Act and the Indian sacred sites order (Executive Order 13007) pertain to the free exercise clause of the First Amendment—see BLM H-8120-1,General Procedural Guidance for Native American Consultation (BLM 2004d);, FLPMA Title II, NEPA Section 102; and 40 CFR 1501.2 and 1501.7.

3.  Tribes must be consulted whenever other governmental entities or the public are formally involved in the BLM's environmental review process in any NEPA documentation that entails public involvement or initial discussions with local or State governments—see BLM Handbook H-1790-1, National Environmental Policy Act (BLM 2008a).

4.  NHPA Section 106 consultations for cultural resources that are significant to Indian tribes. Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government. Consultation shall be conducted in a manner sensitive to the concerns and needs of the Indian tribe. (36 CFR 800.2(c)(2)(ii)(C).

BLM_0028592

# Best Management Practices

1. Notification is conducted by simple one-way written means. Consultation is generally construed to mean direct, two-way communication.

2. When publishing notices or open letters to the public indicating that the BLM is contemplating an action and that comments are welcome, managers shall send individual letters, certified mail or delivery confirmed to tribes requesting their input on actions being considered. If this is an opening dialogue, prior to having developed a strong working relationship with the tribe, if a timely response is not received the manager shall follow up with personal telephone calls.

3. For the benefit of both parties, managers are encouraged to strive for the most efficient and effective method of consultation. Whatever method is chosen, all consultation activities shall be carefully documented in the official record.

4. Consultation roles can be facilitated but may not be transferred to others. Cultural resource consulting firms working for land use applicants cannot negotiate, make commitments, or otherwise give the appearance of exercising the BLM's authority in consultations.

5. Owing to their status as self-governing entities, tribes shall be notified and invited to participate at least as soon as (if not earlier than) the Governor, State agencies, local governments, and other Federal agencies.

6. Tribal consultation means dialogue between a BLM manager and an American Indian Tribe. The BLM managers are encouraged to visit tribal councils and appropriate tribal leaders on a recurring basis. This face-to-face meeting helps to develop relationships that can reduce the time and effort spent in later consultation or individual projects. This government-to-government consultation shall be treated with appropriate respect and dignity of position.

# References[22]

BLM. 2004c. *8120 – Tribal Consultation under Cultural Resources*. Release 8-74. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2004d. *8120-1 – General Procedural Guidance for Native American Consultation*. Release 8-75. December 3, 2004. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

---

[22] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028593

_____. 2008a. *BLM National Environmental Policy Act Handbook H-1790–1*. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

# J.12. Geological and Paleontological Resources

## Standard Operating Procedures

1. Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.

2. Require a geologic hazard survey prior to construction projects (e.g., camping areas, trailheads, communication structures, and BLM roads) in order to protect public health and safety.

3. Require pre-construction paleontological surveys for PFYC 4-5 geologic formations.

4. If paleontological materials (fossils) are uncovered during project activities, the operator is to immediately cease activities that might further disturb such materials and to contact the authorized officer (AO). The operator will consult with the authorized officer to determine the best option for avoiding or mitigating paleontological site damage.

# J.13. Visual Resources

## Best Management Practices

1. Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA level review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

2. Any facilities authorized will use the best technology available to minimize light emissions.

3. Any new permits/authorizations, including renewals, will be stipulated to use the best technology available to minimize light emissions as compatible with public health and safety.

4. All new surface-disturbing projects or activities, regardless of size or potential impact, will incorporate visual design considerations during project design as a reasonable attempt to meet the visual resource management (VRM) class objectives for the area and minimize the visual impacts of the proposal. Visual design considerations will be incorporated by:

BLM_0028594

   a. Using the VRM contrast rating process (required for proposed projects in highly sensitive areas, high impact projects, or for other projects where it appears to be the most effective design or assessment tool), or by

   b. Providing a brief narrative visual assessment for all other projects that require an EA or EIS.

   c. Measures to mitigate potential visual impacts could include the use of natural materials, screening, painting, project design, location, or restoration (See Appendix H; BLM Handbook H-8431-1, Visual Resource Contrast Rating for information about the contrast rating process).

5. Restrict visual intrusion in VRM Class I and II areas and within 0.25-mile of historic trails.

6. Screening facilities from view and avoiding placement of production facilities on steep slopes, hilltops, and ridgelines.

7. Paint all facilities a color that best allows the facility to blend with the background (operator-committed BMP).

8. Gravel color of road shall be similar to adjacent dominant soil colors.

9. Bury distribution power lines and flow lines in or adjacent to access roads.

10. Repeat form, line, color, and texture elements to blend facilities with the surrounding landscape

11. All aboveground facilities including power boxes, building doors, roofs, and any visible equipment will be painted a color selected from the latest national color charts that best allows the facility to blend into the background.

12. Conduct final reclamation recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography.

13. To the extent opportunities are practicable, extreme visual contrast created by past management practices or human activities will be minimized. Examples include right-of-way amendments, mineral material sites, abandoned mines, and areas impacted by unauthorized off-road driving.

14. All new roads will be designed and constructed to a safe and appropriate standard, "no higher than necessary" to accommodate intended vehicular use. Roads will follow the contour of the land where practical.

BLM_0028595

# J.14. Wildland Fire Ecology and Management

## Standard Operating Procedures/Best Management Practices: Fuel Management

1. Construct fuel breaks or green strips to protect wildland-urban interface communities and important wildlife habitat and provide for firefighter safety by using mechanical, chemical, biological, and prescribed fire treatment methods.

2. Construct fuel breaks and green strips in areas containing a good understory of native vegetation in order to successfully compete with and deter the establishment and spread of invasive species.

3. Seed green strips in areas that do not have a good understory of desirable native perennials that can successfully compete with annual species.

4. Where practicable, use large-scale landscape planning to connect fuel breaks and avoid small piecemeal projects.

5. Maintain fuel breaks and green strips to ensure effectiveness.

6. Prevent seeded species from being grazed during the first two growing seasons (>18 months) following seeding, or until site-specific analysis and/or monitoring data indicate that vegetation cover, species composition and litter accumulation are adequate to support and protect watershed values, meet vegetation objectives and sustain grazing use.

7. Provide fire prevention and mitigation outreach information and education to communities surrounding the D-E NCA.

## Standard Operating Procedures

*Fire Suppression*

1. Resource Advisors and other applicable specialists shall be utilized to advise the Incident Commander and suppression resources on the natural resource values during the suppression effort.

2. Avoid applying fire retardant in or near drinking water sources.

3. Avoid the application of retardant or foam within 300 feet of a waterway or stream channel. Deviations from this procedure are acceptable if life or property is threatened.

4. Fire lines will not be constructed by heavy equipment within riparian stream zones. If

BLM_0028596

construction is necessary due to threats to life or property, control lines shall terminate at the edge of the riparian zone at a location determined appropriate to meet fire suppression objectives on the basis of fire behavior, vegetation/fuel types, and fire fighter safety.

5. For streams currently occupied by green lineage cutthroat trout, Colorado River cutthroat trout or other aquatic special status species, extractions of water from ponds or pools shall not be allowed if stream inflow is minimal and extraction of water will lower the existing pond or pool level.

6. Lands will be temporarily closed to other uses in areas where fire suppression is being implemented.

7. Stream flow shall not be impounded or diverted by mechanical means in order to facilitate extraction of water from the stream for fire suppression efforts.

8. If it is determined that use of retardant or surfactant foam within 300 feet of a waterway or stream channel is appropriate due to threats to life or property; alternative line construction tactics are not feasible because of terrain constraints, congested areas, or lack of ground personnel; or potential damage to natural resources outweighs possible loss of aquatic life, the unit administrator shall determine whether there have been any adverse effects to federally listed species. If the action agency determines that adverse effects were incurred by federally listed species or their habitats, then the action agency must consult with the Service, as required by 50 CFR 402.05, as soon as practicable.

9. Avoid whenever possible burning out unburned islands of native vegetation, specifically sagebrush communities.

10. Minimize/mitigate impacts to cultural resources and pristine vegetative communities.

11. Before using it on lands administered by the D-E NCA, thoroughly rinse to remove mud and debris from all fire suppression equipment from off-district or out of State and used to extract water from lakes, ponds, streams, or spring sources. Examples of this equipment are helicopter buckets, draft hoses, and screens. After cleaning the equipment, disinfect it to prevent the spread of invasive aquatic species. Do not rinse equipment with disinfectant solutions within 100 feet of natural water sources. Suppression equipment used to extract water from sources known to be contaminated with invasive aquatic species, as identified by the U.S. Fish and Wildlife Service and CPW, shall also be disinfected beforehand on lands administered by the D-E NCA.

12. Vehicle and equipment shall be washed before being assigned to fires to minimize the spread of noxious and invasive weeds. Especially out of area equipment. Larger fires with incident management teams assigned may need to have a weed wash station.

*Appendix J. Best Management Practices for Management Actions*

*Emergency Stabilization and Rehabilitation*

1. Stabilize areas that have low potential to naturally re-vegetate and that have high wind and soil erosion potential.  Treatments include the following:

2. Installing water bars and other drainage diversions, culverts along fire roads, dozer lines, and other cleared areas

3. Seeding and planting to provide vegetative cover

4. Spreading mulch to protect bare soil and discourage runoff

5. Repairing damaged roads and drainage facilities

6. Clearing stream channels of structures or debris that is deposited by suppression activities

7. Installation of erosion control structures

8. Installation of channel stabilization structures

9. Fence or restrict areas to livestock and wild horse and burro grazing to promote success of natural revegetation or establishment of seeded species

10. Lands may be temporarily closed to other uses during emergency stabilization and rehabilitation practices if activities inhibit treatment

11. Repair or replace range improvements and facilities

12. Monitor emergency stabilization and rehabilitation treatments

# J.15. Wilderness and Wilderness Study Areas

## Standard Operating Procedure

All wilderness study areas will be managed in accordance with BLM Manual 6330, *Management of BLM Wilderness Study Areas* (BLM 2012e) and BLM Manual 6340, *Management of Designated Wilderness Areas* (BLM 2012d).

## References[23]

BLM. 2012d. *6340 – Management of Designated Wilderness Areas*. Release 6-135. July 13,

---

[23] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028598

2012. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 2012e. *6330 – Management of Wilderness Study Areas*. Release 6-134. July 13, 2012. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

## J.16. Forestry

## Standard Operating Procedures

No fuel wood cutting of live trees will be allowed for cottonwood, willow, alder; unless resource objectives allow otherwise.

## Standard Design Practices for Forestry Projects

1. The closure of new roads will be considered and planned for during sale preparation in accordance with existing policy.

2. Clear cuts will be considered for use in the pinyon-juniper and aspen types in critical big game winter ranges and other areas where economically feasible.

3. Cuts will maximize the length of edge per amount of area considering natural and man-made boundaries.

4. No point within an opened stand will be more than 200 yards from cover.

5. The removal of cover along edges of existing openings (foraging areas) in the pinyon-juniper type will be discouraged.

6. Cuts that thin the pinyon-juniper canopy cover to 20 percent or less will be favored for use in bighorn sheep ranges. These cuts will focus on the smaller trees in the stand,

7. Large conifer seed trees (three to seven trees per acre) will be left where practical as wildlife shelter on south facing slopes of big game winter ranges to ensure the succession of quality snags.

8. An average of three to seven trees per acre of the largest nonhazardous snags, particularly those adjacent to openings and open water will be left on commercial sale areas.

9. Sale areas with less than 15 percent ground cover in the understory on critical deer and elk winter ranges will be seeded using a mixture of grasses, forbs, and shrubs and will be paid for with wildlife funds.

10. Minimum of 180 year rotation will be allowed for pinyon-juniper stands. Other species will be managed on a rotation of sufficient length to produce cavity trees for flickers and

BLM_0028599

small owls.

11. Harvest plans will be completed on all commercial sales within woodlands and forests, showing access roads, decks and skid trail locations. Approval of these plans by the BLM Authorized Officer is required before harvest can start.

12. A minimum 50 foot buffer will be maintained along all riparian areas.

13. Snags with existing cavities or nests will be priority for retention.

14. Snag diameter for retention will be the largest class on site and will be retained in clusters if possible.

15. If site potential allows, will retain 5-7 snags per acre, preferably in a clumped configuration.

16. If possible, will retain at least 15 live trees per acre for future snag recruitment. Recruitment snags will not have to be structurally superior; live tree with forked and broken tops may be preferred.

17. Do not disturb or destroy active or inactive nests of raptors that are reused.

# Best Management Practices

1. Avoid heavy equipment use in stands of cottonwood, willow, and alder. If heavy equipment use is necessary, allow on a case by case basis and mitigate for adverse impacts.

2. Allow dead and down collection of cottonwood for personal use.

3. Protect seed and important wildlife habitat trees in pinyon-juniper stands.

4. Allow removal of pinyon-juniper encroachment utilizing mechanical, biological, and chemical treatments. Allow tree harvesting for Christmas trees and transplants other woodland products and biomass reduction.

5. Minimize disturbance to the soil such that surface runoff does not result in sediment transport into water bodies. Concentrate skidding on as few skid trails as needed.

6. Limit primary skid trails to 10 percent of the total working area.

7. Avoid widespread or random skidding patterns with repeated passes.

8. Minimize placement and use of skid trails in ephemeral drainages. If skid trails must be within or cross an ephemeral drainage, additional BMPs are needed to protect water quality.

BLM_0028600

9. Create skid trails only as wide as necessary to safely operate your equipment and conduct the forestry operation. Avoid creating two-lane skid trails, which disturb more soil area.

10. Minimize the extent of gouges or trenches upon the ground surface that are created by the skidding of trees or logs.

11. On sloping terrain, skid trails shall follow along the land contours and shall be kept to 25 percent grade or less when practical.

12. If trails must be located on steeper slopes, more BMPs than usual are needed to control and capture runoff to protect water quality.

13. Establish decks at locations where soil disturbance is minimized.

14. Maintain as close to normal (pre-construction) stream flow by maintaining depth, width, gradient and capacity of the stream channel at the crossing.

15. Conduct construction, installation, and removal work during low-water flow if circumstances allow.

16. Stabilize the approach ways and/or stream crossing locations so sediment is not transported into the stream.

17. Approaches to the stream are relatively flat to better control runoff.

18. The crossing can be installed at a right-angle (90 degrees) to the stream channel so crossing distance is minimized.

19. Any trees removed during these processes will be purchased by the applicant prior to construction. The applicant is responsible for a per-cord fee unless removed from the project by the applicant.

## Guidelines for Christmas Tree and Firewood Harvesting

1. Vehicle use is restricted to existing roads and trails.

2. Do not damage adjacent trees.

3. When cutting down standing trees, cut the stump 12 inches or less, or as close to the ground as possible.

4. Scatter lopped branches at least 50 feet from the stump.

5. Do not top a larger tree to obtain a Christmas tree. The tree may be cut at the base and then topped.

BLM_0028601

6. Do not cut trees that have been posted as "Seed Tree Do Not Fall" or "Wildlife Tree Do Not Disturb."

7. Do not harvest any trees within 100 feet of a spring or creek unless trees are identified for selective removal to meet resource objectives.

8. Please pack out your trash as well as trash left by others.

9. No harvesting when soils are saturated to a depth of 6 inches to prevent damage to roads.

# J.17. Livestock Grazing

## Standard Operating Procedures

1. Exclude livestock grazing on newly seeded areas with fencing to ensure that desired vegetation is well established, until objectives for seeding have been met.

2. Development of springs and seeps or other projects affecting water and associated resources shall be designed to maintain the associate riparian area and assure attainment of standards.

3. Disturbance to established rangeland study sites shall be avoided to provide for the continuation of monitoring efforts, which involves comparisons of data to previous records of that site.

4. Facilities shall be constructed a minimum of 0.125-mile from livestock gathering spots such as water sources and gathering facilities to prevent disruption of the use of these facilities and potential damage to the facility by livestock.

5. Exclosures shall be established in areas where the vegetative potential of the area is questionable or to compare the effectiveness of grazing management.

6. New fences shall be constructed to BLM standards allowing for the appropriate wildlife passage.

7. Wildlife escape ramps shall be installed in all troughs. Use most current recommendations for construction of new wildlife escape ramps, as in Taylor and Tuttle (2007).

8. Access routes to functioning range improvements shall be retained to allow for periodic maintenance and prevent cross country travel.

9. Maintain range developments to maintain or improve distribution.

10. Rangeland and vegetation monitoring will be conducted to detect changes in grazing

BLM_0028602

use, trend, and range conditions. These data will be used to support and direct grazing management decisions consistent with national policy. These efforts will help ensure that livestock grazing meets objectives for rangeland health and resolves conflicts with wildlife habitats or may provide a benefit to wildlife habitats.

11. Grazing management decisions will be based on monitoring data, both short-term and long-term, which will be jointly developed by grazing permittees and the appropriate Federal land management agency. Protocols for monitoring will be consistent with the memorandum of understanding in place between the National Public Lands Council and the BLM.

12. All water development activities for livestock grazing use that exceed the minimum depletion level established by U.S. Fish and Wildlife Service must comply with all U.S. Fish and Wildlife Service fees and prescribed mitigations to offset water depletion in the Colorado River.

13. Surface-disturbing activities will be coordinated with livestock grazing permittees to minimize the effects of the surface disturbance on other approved operations. To the maximum extent practicable, this effort will include consulting on scheduling of operations to mutually minimize effects.

14. Any damage to the function of range improvements (e.g., fence damage, cattle guard cleaning, and livestock loss) from other approved operations will be repaired immediately or remedied by the operator causing the damage.

15. Manage domestic sheep grazing to provide effective separation from wild sheep using (as guidance) BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep; the WAFWA recommendations for domestic sheep and goat management in wild sheep habitat; and the interagency MOU for wild sheep management. If monitoring indicates that mitigation measures are not effective at providing effective separation between domestic and wild sheep in an allotment or an area of an allotment, then require the following:

   a. Implement additional measures (using the WAFWA recommendations as guidance) intended to improve effectiveness.

   b. Remove the area from the allotment

   c. Combine that portion with adjacent cattle allotment

   d. Convert allotment to cattle

# Best Management Practices

1. Follow the Grazing Guidelines established along with the Colorado Standards for

Rangeland Health.

2. Livestock grazing could be used as an intensively managed prescriptive grazing practice to control cheatgrass and noxious or invasive weeds.

3. Use grazing systems that contain rotation, deferment, and rest to produce a mosaic of habitat patches and increases the density, height and distribution of native plants.

4. Rotate livestock use areas year to year - not in the same place at the same time each year.

5. Avoid re-grazing the same plants in one growing season.

6. Adjust grazing seasons to benefit both warm and cool season grass species by providing periodic rest from grazing for each type.

7. Avoid grazing an area during the spring and fall period in one year's time.

8. Allow for adequate litter cover following grazing use to protect soil surface and enhance soil moisture retention.

9. In spring, graze for a short duration earlier in the season so that sufficient soil moisture remains for plant recovery.

10. Allow for rest/recovery periods before or after grazing during critical growth periods. Recovery shall include the production of seed to allow for the regeneration of desirable plant species.

11. Occasional grazing use during the dormant season will provide rest during the growing season and will allow plants to recover.

12. Adjust intensity, timing and/or duration of grazing during periods of forage drought

13. Manage livestock grazing, including dormant season use, to insure adequate residual grass when soil moisture and wildlife habitat are concerns.

14. In stands where cheatgrass and native perennial grasses are mixed, grazing during early spring when cheatgrass is sprouting but perennials are still dormant may allow the perennials to better compete with cheatgrass.

15. Avoid use most years in areas of valuable woody plants during times when they are selected.

16. Avoid the following grazing management practices:

    a. Long seasonal use with no recovery time

*Appendix J. Best Management Practices for Management Actions*

    b.  Heavy use - stresses plants,

    c.  Little or no regrowth before winter - little stubble for root crown protection

    d.  Use at the same time every year - repeating the stress

    e.  No rest or growing season recovery - little recovery with long seasons of use

    f.  Little or ineffective herding

    g.  Salt placed in the same locations year after year

    h.  Livestock left behind after pasture moves

    i.  Grazing during the critical growth period year after year

17. When using livestock to control cheatgrass or noxious or invasive weeds, match animal dietary preference or tolerance to the target species.

18. Use the target weed's biology when developing a grazing strategy.

19. Manage heavy grazing on target weed species to account for any intermixed desirable species.

20. If practical, storage pits of water catchments should be covered to prevent evaporation loss during warm to hot months.

## Best Management Practices (Vegetation/Riparian Zone Management Guidelines)

1. To reduce negative impacts to grazing, determine the critical period(s) of a riparian site, and then limit grazing during the critical period(s) to no more often than once every three or four years. Critical periods and impacts are likely to be either in late spring-early summer, when stream banks are more easily broken down by trampling; or late summer-early fall, when excessive browsing may damage vegetation. Each site has its own critical period that shall be individually determined. Important critical period variables are soil moisture, plant species composition, and animal behavior patterns. Site may be grazed every year if use does not occur during the critical period(s). Extended periods of rest or deferment from grazing may be needed to enable recovery of badly degraded sites. Graze earlier in the season when cattle use uplands. (Mosley, Cook, Griffis, and O'Laughlin 1997)

2. To maintain stream bank stability, limit cattle access to surface water when adjacent stream banks and shorelines are overly wet and susceptible to trampling and sloughing. Stream bank trampling can often be reduced by capitalizing on the natural foraging

BLM_0028605

behavior of cattle. Cattle generally avoid grazing excessively wet sites or in cold-air pockets. Cattle seek out wind-swept ridges, and they graze on upland forage when it is more palatable than forage in riparian areas. Avoid hot season grazing of riparian areas. (Mosley, Cook, Griffis, and O'Laughlin 1997)

3.  To graze a site more than once per growing season, moisture and temperature conditions shall be conducive to plant growth. For such sites, allow a recovery period of at least 30 to 60 days, depending on vegetation type, before re-grazing within the same growing season. Grazing more often and for shorter periods-that is, 3 weeks or less at a time-is preferable to fewer and longer grazing periods. (Mosley, Cook, Griffis, and O'Laughlin 1997)

4.  To control the timing, frequency, and intensity of cattle grazing, managers shall consider creating smaller riparian pastures with similar, or homogenous, features. Adjusting timing, frequency, and intensity of grazing in individual pasture units is more important than adopting a formalized grazing season. (Mosley, Cook, Griffis, and O'Laughlin 1997)

5.  To protect stream banks, prevent cattle from congregation near surface waters. Fencing, supplemental feeding, and herding work best. Provide remote watering systems for cattle. Manage the riparian area as a separate and unique pasture. Inappropriate cattle grazing will usually first be evidenced by excessive physical disturbance to stream banks and shorelines. (Mosley, Cook, Griffis, and O'Laughlin 1997)

6.  On riparian areas that are determined to be non-functioning or functioning at risk as a result of livestock grazing impacts, limits of bank disturbance will be determined and included within the Terms and Conditions of the Grazing Permit. Monitoring of bank disturbance will use the Multiple Indicator Method.

7.  Winter grazing minimizes soil compaction and potential stream bank deterioration and allows maximum growth of vegetation and plant vigor. Livestock use shall not exceed 70 percent and stubble height shall be at least four to six inches after the grazing period.

8.  Spring grazing can increase herbaceous plant species, but it must be completed in time to allow plant regrowth. At least 60 to 75 percent of the current growth and six inches of stubble height shall remain at the end of the grazing period (Clary and Leininger 2000).

9.  Hot season grazing (mid to late summer) shall be avoided. During this period livestock tend to concentrate heavily in riparian areas, damaging the vegetation and stream channel.

10. To protect stream banks, discourage trailing up and down the channel by placing logs across trails, perpendicular to the stream channel.

*Appendix J. Best Management Practices for Management Actions*

11. Adjust intensity, timing and/or duration of grazing during periods of forage drought.

# References[24]

Mosley, J.C., Cook, P.C., Griffis, A.J., & O'Laughlin, J. 1997. *Guidelines for Managing Cattle Grazing in Riparian Areas to Protect Water Quality: Review of Research and Best Management Practices Policy.* Report No. 15. December 1997. Moscow, ID: University of Idaho—Idaho Forest, Wildlife and Range Policy Analysis Group.

Taylor, D.A.R. and Tuttle, M.D. 2007. *Water for Wildlife: a Handbook for Ranchers and Range Managers.* Austin, TX: Bat Conservation International.  Available online: http://www.batcon.org/pdfs/water/bciwaterforwildlife.pdf.

# J.18. Recreation

1. Special recreation permits will contain noxious and invasive weed management stipulations (e.g., pre-event inventories to avoid infested areas, event management to avoid or isolate activities that could cause weed introduction or spread, monitoring and treatment of infestations exacerbated by the activity, and other appropriate noxious and invasive weed management stipulations).

2. Lands may be temporarily closed to other uses during recreation events that are conducted under special recreation permits (e.g., equestrian endurance rides or motorcycle events).

3. Roads and trails (off-highway vehicle, horse, bicycle, and hiking) will avoid wetlands and if avoidance is not possible will be designed and constructed in accordance with Technical Reference 2E22A68 (USFS 2002).

4. Use the following strategies to reduce conflicting user interactions: clearly communicate recreation management goals and objectives for different RMAs; manage recreation areas based on social and environmental carrying capacities; separate uses in time or space; educate users to ensure they know what to expect in different recreation areas; provide a wide spectrum of different recreational opportunities (Marcouiller, Scott, and Prey 2008).

5. Use guidelines in Trail Design Criteria (Appendix K) for new trail construction or reroutes of existing trails.

6. Manage recreation to minimize or prevent adverse effects to biological and cultural

---

[24] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028607

impact using Recreation Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado (BLM 2000b).

7. For recreation facility development, utilize the BLM Guidelines for a Quality Built Environment manual (BLM 2010c).

8. Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, websites) and management strategies (i.e., on-site staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about targeted recreation opportunities in the NCA.

9. Promote the seven standard principles of Leave No Trace (https://lnt.org/) outdoor ethics through print and electronic media, and through personal communications with recreation participants.

10. Promote the principles of Tread Lightly (www.treadlightly.org) and Colorado Stay the Trail (http://www.staythetrail.org/) outdoor ethics through print and electronic media, and through personal communication with recreation participants.

11. In SRMAs, monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five year intervals or as funding allows. Monitor activity participation and recreation settings annually during the primary use season.

12. In ERMAs, monitor activity participation and recreation settings annually during the primary use season.

13. Actively pursue partnerships to support all facets of the recreation program; management, monitoring, and information and education. Potential partners include but are not limited to local governments, businesses, user organizations, educational institutions, other Federal agencies, State government, volunteers, and non-profit organizations.

# References[25]

Marcouiller, D.W., Scott, I., & Prey, J. 2008. Outdoor recreation planning: a comprehensive approach to understanding use interaction. *CAB Reviews: Perspectives in Agriculture, Veterinary Science, Nutrition and Natural Resources* 3(090):1–12.

USFS. 2002. *Managing Degraded Off-Highway Vehicle Trails in Wet, Unstable, and Sensitive*

---

[25] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

*Appendix J. Best Management Practices for Management Actions*

*Environments*. Technical Reference 2E22A68—NPS OHV Management.  October 2002. Missoula, MT: U.S. Department of Agriculture, Forest Service, Technology and Development Program.

BLM. 2000b. *Recreation Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado*. December 11, 2000. Attachment to I CO-2001-001: Final Recreation Guidelines. December 20, 2000. Lakewood, CO: U.S. Department of the Interior, Bureau of Land Management.

BLM. 2010c. *Guidelines for A Quality Built Environment*. First Edition. Prepared for Bureau of Land Management by Belt Collins (Belt Collins West, Boulder, CO). December 2010. U.S. Department of the Interior, Bureau of Land Management.

# J.19. Lands and Realty

## Standard Operating Procedures

1.  Power lines shall be constructed in accordance to standards outlined in *Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 2006* (APLIC 2006). Right-of-way applicants shall assume the burden and expense of proving that proposed pole designs not shown in the above publication are "raptor safe." Such proof shall be provided by a raptor expert approved by the BLM Authorized Officer.

2.  Rights-of-way and other lands and realty authorizations, including power lines, pipelines and transmission corridors will contain noxious and invasive plant management terms or stipulations for all ground-disturbing actions. These will include conducting a pre-disturbance noxious and invasive weed inventory, designing to avoid or minimize vegetation removal and weed introduction or spread, managing weeds during the life of the right-of-way or authorization to prevent or minimize weed introduction or spread, abandoning the right-of-way or authorization to establish competitive vegetation on bare ground areas, and monitoring revegetation success and weed prevention and control for a reasonable number of years.

3.  Rights-of-way will be constructed to avoid physical damage to range improvements and rangeland study areas.

## Standard Design Practices

1.  All construction activities shall be confined to the minimum area necessary. The exterior boundaries of the construction area shall be clearly flagged prior to any surface-disturbing activities.

2.  Existing roads will be used wherever possible. Additional roads shall be kept to the

BLM_0028609

minimum. Route locations must be approved by the BLM prior to construction.

3.  When blasting is necessary, the following precautions will be used:

    a.  In areas of human use, blasting blankets will be used.

    b.  Landowners or tenants in close proximity to the blasting will be notified in advance of the blasting so that livestock and other property can be adequately protected.

    c.  Access to the blasting area will be restricted by construction personnel stationed at each end of the area to be blasted.

    d.  Blasting within 0.125 mile of federally owned or controlled springs and flowing water wells must be approved in writing by the area manager.

    e.  No blasting will be permitted within 0.25 mile of historic trails, natural areas, identified archaeological sites, and recreation areas.

    f.  Powder magazines will be located out of sight or at least 0.5 mile from roads. Loaded shot holes will not be left unattended. Approval from the area manager will be obtained for the magazine locations.

4.  Roads will be constructed and maintained to BLM road standards (see BLM 1985b). All vehicle travel will be within the approved driving surface.

## Stipulations

1.  The Holder shall notify the BLM Authorized Officer at least 48 hours prior to the commencement construction, reclamation, maintenance, or any surface-disturbing activities under this grant.

2.  Copies of the right-of-way grant with the stipulations shall be kept on site during construction and maintenance activities. All construction personnel shall review the grant and stipulations before working on the right-of-way or permitted area.

3.  All facilities shall be labeled with the authorization number, operator, and contact information.

4.  No signs or advertising devices shall be placed on the premises or on adjacent public lands, except those posted by or at the direction of the BLM Authorized Officer.

5.  The Holder shall promptly remove and dispose of all waste caused by its activities. The term "waste" as used herein means all discarded matter including, but not limited to, human waste, trash, garbage, refuse, petroleum products, ashes, and equipment. No

burning of trash, trees, brush, or any other material shall be allowed.

6. The Holder shall notify all existing right-of-way holders in the project area prior to beginning any surface-disturbance or construction activities. The Holder shall obtain an agreement with any existing right-of-way holders or other parties with authorized facilities that cross or are adjacent to those of the holder to assure that no damage to an existing right-of-way or authorized facility will occur. The agreement(s) shall be obtained prior to any use of the right-of-way or existing facility.

7. The Holder shall participate in the formation of a Road User's Association for the road if new rights-of-way are granted for use of the existing road. All new users will be required to join the association.

8. The Holder will provide a performance bond for the authorized facility, acceptable to the BLM Authorized Officer, in the amount of $( ) that must be maintained in effect until restoration of the right-of-way has been accepted by the BLM Authorized Officer. The bond shall be furnished by the holder within 30 days of signing the grant(s) and shall be applied to all additional authorizations associated with the project as necessary.

# References[26]

BLM (Bureau of Land Management). 1985b. *9113 – Roads*. Release 9-247. June 7, 1985. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

# J.20. Transportation and Access

## Standard Operating Procedures

1. Continue coordination with counties and other agency road entities to promote utilization of BMPs for road maintenance they conduct within the D-E NCA boundaries.

2. Maintain an inventory of existing road and trail systems.

3. BLM Manual 9113, Roads (BLM 1985b) and BLM Handbook 9113-2, Roads: Inventory and Maintenance (BLM 1985c) will be used to guide all maintenance and road construction designs and requirements. Include definitions for functional road classification and maintenance levels for BLM roads.

4. All highway rights-of-way and other road authorizations will contain noxious and invasive weed stipulations that include prevention, inventory, treatment, and

---

[26] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

revegetation or rehabilitation. Road abandonment will include at least three years of post-abandonment monitoring and treatment.

5. Use the Colorado uniform sign standards for trails and roads.

## Best Management Practices

1. In order to ensure public access and safety, the D-E NCA shall continue an active road maintenance program employing the use of redesign, blading, brush removal for sight distance as appropriate, scarification, graveling, water barring, low water crossings, spur ditching, seeding and installation/cleaning of culverts.

2. NEPA Requirements – No new NEPA analysis will be required for road maintenance activities within the defined maintenance disturbance/easement footprint, which is defined as previously disturbed or maintained. Disturbance outside of the defined maintenance disturbance/easement footprint or road realignment will be subject to additional NEPA compliance.

## References[27]

BLM (Bureau of Land Management). 1985b. *9113 – Roads*. Release 9-247. June 7, 1985. Washington, DC: U.S. Department of the Interior, Bureau of Land Management.

_____. 1985c. *Roads: Inventory and Maintenance*. BLM Manual Handbook H-9113-2. Release 9–250. December 19, 1985. U.S. Department of the Interior, Bureau of Land Management

---

[27] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028612

This page intentionally left blank.

BLM_0028613

# Appendix K. Trail Design Criteria

The following criteria are used to determine suitable locations for new trails and trail reroutes within the D-E NCA. This document utilizes terminology from the *Recommended Standardized Trail Terminology for Use in Colorado* (COTI 2005).

These criteria are to be followed as guidelines. Not all of the criteria can be met on every segment of every trail. Their purpose is to help create sustainable, low maintenance trails that provide quality recreation experiences based on predetermined trail management objectives (TMOs). Specialty trails requiring higher maintenance may be allowed in appropriate locations.

1. **Know and understand trail management objectives**. TMO's provide the framework for what the trail will look like, who will be using the trail, and how the trail will be managed. Different TMO's may allow different applications of the criteria below.

2. **Create loops and avoid dead-end trails**. All trails should begin and end at a trailhead or another trail.  A well-planned stacked loop trail system offers recreationists a variety of trail options. Easier, shorter loops are arranged close to the trailhead, with longer, more challenging loops extending further beyond the trailhead. Occasionally, destination trails to a point of interest will require an out-and-back trail, but only if they cannot be reasonably incorporated into a loop.

3. **Identify control points and use them to guide trail design and layout.** Control points are specific places or features that influence where the trail goes. Basic control points include the beginning and end of the trail, property boundaries, intersections, drainage crossings, locations for turns, and other trails.

   a. <u>Positive control points</u> are places where you want users to visit, including scenic overlooks, historic sites, waterfalls, rock outcroppings, lakes, rivers and other natural features or points of interest. If the trail does not incorporate these features, users will likely create unsustainable social trails to get to them.

   b. <u>Negative control points</u> are places you want users to avoid, such as low-lying wet areas, flat ground, extremely steep cross slopes or cliffs, unstable soils, environmentally sensitive areas, sensitive archaeological sites, safety hazards, and private property.

   c. Knowing these control points provides a design framework. Try to connect the positive control points while avoiding the negative control points.

4. **Use cross slope and avoid flat ground whenever possible.** The trail tread should generally run perpendicular to the cross slope and should utilize frequent grade

BLM_0028614

reversals. This is the best way to keep water off the trail. Use curvilinear design principles to create a trail that follows the natural contours of the topography, sheds water, blends with the surrounding terrain, and provides fun recreation opportunities. The following grade guidelines will help determine appropriate tread locations:

- <u>The Half Rule</u>: "A trail's grade shouldn't exceed half the grade of the hillside or side slope (cross slope) that the trail traverses. If the grade does exceed half the side slope, it's considered a fall-line trail. Water will flow down a fall-line trail rather than run across it. For example, if you're building across a hillside with a (cross slope) of 20 percent, the trail-tread grade should not exceed 10 percent" (IMBA 2004). Steeper cross slopes allow more flexibility for sustainable tread grades while flat or low angle cross slopes can be problematic. There is an upper limit to this rule. Sustaining a 24 percent tread grade, even on a 50 percent cross slope is unlikely. Additionally, trail segments may break this rule on durable tread surfaces such as solid rock.

- <u>The Ten Percent Average Guideline</u>: The average trail grade over the length of the trail should be 10 percent or less for greatest sustainability. Short sections of the trail may exceed this, but the overall grade should remain at 10 percent or less.

- <u>Maximum Sustainable Grade</u>: This is the upper grade limit for those short trail segments that push the limits of the previous two guidelines. It is determined by a site-specific analysis based on TMO's, environmental conditions, and observations of existing trails – what's working, and what's not?

- <u>Grade Reversals</u>: Frequent changes in the direction of tread grade (gentle up and down undulations) will ensure that water is forced off the trail at frequent intervals.

5. **Locate trails in stable soils.** Avoid clays, deep loam and soils that do not drain rapidly. Consider season of use and type of use. A trail on a south aspect will have greater usability and sustainability for winter use. The capabilities of motorized vehicles to function in wet/muddy conditions make it imperative to avoid unstable or poorly drained soils. Trails that are less likely to be used when wet may be located in less-desirable soils if necessary. In western Colorado's arid environment, the best soil conditions for trails are those with high rock content. Utilize slick rock for trail tread when possible. Sand is acceptable in dry washes, but otherwise, avoid sand.

6. **Drainage crossings are key control points and should be selected carefully.** Consider both the trail's impact on the drainage (erosion and sedimentation), and the drainage's impact on the trail (changing tread surface, water channeling onto trail). The trail should descend into and climb out of the drainage to prevent water from flowing down the trail.

*Appendix K. Trail Design Criteria*

Avoid long or steep entries into drainages. Design grade reversals into the trail on each side of the approach to minimize water and sediment entering from the trail. Look for drainage crossings on rock.

7. **Dry washes can be excellent travel ways.** They are well defined, contain noise, and are periodically resurfaced by flowing water. As long as the wash does not support riparian vegetation and has no major safety problems, like water falls, they are well suited to be part of a recreational trail system.

8. **Avoid switchbacks.** Switchbacks are difficult, time-consuming, and expensive to construct, and require regular maintenance. Users often cut them, causing avoidable impacts. Utilizing curvilinear design principles eliminates the need for most switchbacks. Climbing turns are easier to construct and maintain and utilize natural terrain features (benches, knolls, rock outcrops) to change the direction of a trail.

9. **Avoid ridge tops.** Ridge tops are often primary transportation corridors for wildlife, and were often used by Native Americans as travel routes. Noise from ridge top trails is broadcast over a wide area. Locate trails on side hills, off ridge tops, using ridges and watersheds as natural sound barriers to isolate noise.

10. **Use vegetation and other natural features to conceal the trail and absorb noise.** This can be difficult in a desert environment. Try to minimize the visual impact of the trail by following natural transitions in vegetation or soil type. A trail near the base of a side slope or on rim rock is usually less visible than a mid-slope trail. Denser vegetation will hide a trail, lessen noise transmission, and can dissipate the energy of falling raindrops on the bare soil of the trail tread.

11. **Carefully design intersections to avoid safety problems**. When locating a bicycle or motorized vehicle trail be aware of sighting distance and sight lines. Collisions can be avoided if riders can see each other. Avoid four way intersections. Offsetting the cross traffic helps reduce speeds and reduces the risk of collisions.

# References[28]

McCoy, M. & Stoner, M. 2010. *Mountain Bike Trails: Techniques for Design, Construction and Maintenance.* January 25, 2010. Bikecentennial.

Hamilton, N. 1991. *Off-Highway Vehicle Trail Maintenance: Tractor Techniques for Trailbed Preservation.* USDA Forest Service, Mendocino National Forest. Available online: http://nohvcclibrary.forestry.uga.edu/SCANNED%20FILES/T-0001.pdf.

---

[28] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

*Appendix K. Trail Design Criteria*

Dominguez-Escalante National Conservation Area                                            210
APPROVED RESOURCE MANAGEMENT PLAN

Lockwood, C. 1994. *Trails 2000: A Trail Construction and Maintenance Update*. August 1, 1994. USDA Forest Service, Angeles National Forest.

Hesselbarth, W. & Vachowski, B. 2004. *Trail Construction and Maintenance Notebook: 2004 Edition*. 4E42A25-Trail Notebook. April 2004. Missoula, MT: USDA Forest Service.

IMBA (International Mountain Bicycling Association). 2004. *Trail Solutions: IMBA's Guide to Building Sweet Singletrack*. Boulder, CO: International Mountain Bicycling Association.

USFS. 2008. *Trails Management Handbook*. FSH 2309.18. October 16, 2008. USDA Forest Service. Available online:
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5403600.pdf.

BLM_0028617

# Appendix L. Special Recreation Management Area Recreation Setting Descriptions

This appendix outlines the desired setting characteristics for special recreation management areas (SRMAs) identified in section 2 of this Approved RMP. Table L.1 shows a matrix used to identify setting characteristics for the D-E NCA.

BLM_0028618

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN
212

## Table L.1. D-E NCA Recreation Setting Characteristics Matrix

| | Primitive | Back Country | Middle Country | Front Country | Rural | Urban |
|---|---|---|---|---|---|---|
| **Physical – Qualities of the Landscape** | | | | | | |
| Remoteness (Approx. Distance from Routes) | More than ½ mile from any kind of a man-made trail | More than ½ mile from any kind of a man-made ATV or full-sized vehicle route | More than ½ mile from improved gravel roads | More than ½ mile from paved roads and railroad tracks. | More than ½ mile from municipal streets or roads within towns or cities. | Municipal street and roads within towns or cities. |
| Naturalness (Modifications to the Landscape) | Undisturbed natural landscape. | Natural landscape with any modifications in harmony with surroundings and not visually obvious or evident (e.g., stock ponds, trails). | Character of the natural landscape retained. A few modifications contrast with character of the landscape (e.g., fences, primitive roads). | Character of the natural landscape partially modified but none overpower natural landscape (e.g., roads, structures, utilities). | Character of the natural landscape considerably modified (agriculture, residential or industrial). | Urbanized developments dominate landscape. |
| Visitor Facilities | No structures. Foot/horse trails only. | Developed trails made mostly of native materials such as log bridges. Structures are rare and isolated. | Maintained and marked trails, simple trailhead developments and basic toilets. | Rustic facilities such as campsites, restrooms, trailheads, and interpretive displays. | Modern facilities such as campgrounds, group shelters, boat launches, and occasional exhibits. | Elaborate full-service facilities such as laundry, restaurants, and groceries. |
| **Social – Qualities Associated with Use** | | | | | | |
| Contacts (Avg. with Any Other Group) | Fewer than 3 encounters/day at camp sites and fewer than 6 encounters/day on travel routes. | 3-6 encounters/day off travel routes (e.g., campsites) and 7-15 encounters/day on travel routes. | 7-14 encounters/day off travel routes (e.g., staging areas) and 15-29 encounters/day en route | 15-29 encounters/ day off travel routes (e.g., campgrounds) and 30 or more encounters/day in route. | People seem to be generally everywhere. | Busy place with other people constantly in view. |
| Group Size (Average - Other Than Your Own) | Fewer than or equal to 3 people per group. | 4-6 people per group. | 7-12 people per group | 13-25 people per group. | 26-50 people per group. | Greater than 50 people per group. |
| Evidence of Use | No alteration of the natural terrain. Footprints only observed. Sounds of | Areas of alteration uncommon. Little surface vegetation wear observed. | Small areas of alteration. Surface vegetation showing wear with some bare | Small areas of alteration prevalent. Surface vegetation gone with compacted | A few large areas of alteration. Surface vegetation absent with hardened soils. | Large areas of alteration prevalent. Some erosion. Constantly hear |

*Appendix L. Special Recreation Management Area Recreation Setting Descriptions*

Dominguez-Escalante National Conservation Area                                                                213
APPROVED RESOURCE MANAGEMENT PLAN

|  | Primitive | Back Country | Middle Country | Front Country | Rural | Urban |
|---|---|---|---|---|---|---|
|  | people rare. | Sounds of people infrequent. | soils. Sounds of people occasionally heard | soils observed. Sounds of people regularly heard. | Sounds of people frequently heard. | people. |
| **Operational – Conditions Created by Management and Controls Over Recreational Use** | | | | | | |
| Access (Types of Travel Allowed) | All travel is restricted to foot and horse travel. | Mountain bikes and perhaps other mechanized use, but all is non-motorized. | Four-wheel-drive vehicles, ATVs, dirt bikes, or snowmobiles in addition to non-motorized, mechanized use. | Two-wheel drive vehicles predominantly, but also four-wheel drives and non-motorized, mechanized use. | Ordinary highway auto and truck traffic is characteristic. | Wide variety of street vehicles and highway traffic is ever-present. |
| Visitor Services (and Information) | None available. Staff rarely present. | Basic maps; staff infrequently present (e.g., seasonally, high use periods) to provide on-site assistance | Area brochures and maps; staff occasionally (e.g., most weekends) present to provide on-site assistance. | Information materials describe recreation areas and activities; staff periodically present (e.g., weekdays and weekends). | Information described to the left, plus experience and benefit descriptions; staff regularly present (e.g., almost daily). | Information described to the left, plus regularly scheduled on-site outdoor demonstrations and clinics. |
| Management Controls | No visitor regulations or ethics signing on-site. No use restrictions. | Basic user regulations at key access points. Minimum use restrictions | Some regulatory and ethics signing. Moderate use restrictions. (e.g., camping, human waste). | Rules, regulations and ethics clearly posted. Use restrictions, limitations and/or closures. | Regulations strict and ethics prominent. Use may be limited by permit, reservation, etc. | Enforcement in addition to rules to reduce conflicts, hazards, and resource damage. |
| *Source: CMU 2011* | | | | | | |

*Appendix L. Special Recreation Management Area Recreation Setting Descriptions*

BLM_0028620

This page intentionally left blank

BLM_0028621

# Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern

## M.1. Executive Summary

The Bureau of Land Management is preparing a resource management plan for the Dominguez-Escalante National Conservation Area. As part of this planning process, an interdisciplinary team (IDT) reviewed proposals for designation of areas within the D-E NCA as ACECs. Five nominations were submitted for consideration from external sources (including other agencies and the public), six were submitted internally (by BLM specialists), and two are existing ACECs. Therefore, a total of 13 proposed ACECs were considered by the IDT. The team analyzed the 13 areas to determine whether they 1) are within the planning area, 2) contain values that meet the relevance and importance criteria for consideration as potential ACECs, and 3) require special management for the protection of their relevant and important values.

This report presents the methods used in the BLM's evaluation of all existing and proposed ACECs. Seven areas were found to meet the relevance and importance criteria and were found to require some form of special management for their protection. Areas found to meet these criteria were identified as potential ACECs and were considered for designation and management in at least one alternative in Chapter 2 of the Proposed RMP.

The BLM dropped from further ACEC consideration areas that were found not to meet the relevance and importance criteria, did not require special management, or were already included in other proposed areas. Several proposed ACECs overlapped. Therefore, some proposed ACECs were incorporated into other, larger ACECs under consideration.

## M.2. Introduction

To be eligible for designation as an ACEC, an area must meet the relevance and importance criteria described in 43 CFR 1610.7-2 and BLM Manual 1613 (BLM 1988) and must need special management.

The Federal Land Policy and Management Act and BLM Manual 1613 (BLM 1988) require the BLM to give priority to the designation and protection of ACECs during the land-use planning process. The BLM released this report concurrent with, and as an appendix to, the Draft RMP/EIS for the D-E NCA. When completed, this RMP will provide a single, comprehensive land-use plan that will guide management of public land within the D-E NCA planning area, which is jointly administered by the BLM's Grand Junction and Uncompahgre field offices. Only the public lands

BLM_0028622

managed by the BLM within the planning area are considered within this document.

The planning area is in southwestern Colorado (Map 1-1) and encompasses approximately 210,012 acres of BLM-managed land in Mesa, Delta and Montrose Counties in western Colorado (note that the number of acres may vary by up to 30 because of variability in the best available current survey information). Within the D-E NCA, 66,193 acres make up the Dominguez Canyon Wilderness Area (the Wilderness), which was previously part of the Dominguez Canyon Wilderness Study Area. The D-E NCA and the Wilderness were designated in the Omnibus Public Land Management Act of 2009 (Omnibus Act).

Known for its scenic value, the D-E NCA is popular with those wanting to see the spectacular canyon country of the Uncompahgre Plateau. Red-rock canyons and sandstone bluffs contain geological and paleontological (paleo) resources spanning 600 million years, as well as many cultural and historic sites. The Ute Tribes today consider these pinyon- and juniper-covered lands an important connection to their ancestral past. The Escalante, Cottonwood, Little Dominguez and Big Dominguez Creeks cascade through sandstone canyon walls that drain the eastern Uncompahgre Plateau. Nearly 30 miles of the Gunnison River flow through the D-E NCA. The Old Spanish National Historic Trail, a 19th-century land trade route, lies within the D-E NCA. Various species of wildlife call the area home, including desert bighorn sheep, mule deer, golden eagle, turkey, elk, mountain lion, black bear, and collared lizard.

The analysis and findings for ACEC relevance and importance criteria were completed in accordance with FLPMA Section 202 (43 U.S.C. 1712[c][3]), 43 CFR 1610.7-2, and BLM Manual 1613 (BLM 1988).

# M.2.1. Area of Critical Environmental Concern

An area of critical environmental concern is an area of BLM-administered land where special management attention is needed to protect its relevant and important values (as detailed in section M.3.2) from irreparable damage. ACECs are an administrative designation made by the BLM through a land-use plan. It is unique to the BLM in that no other Federal agency uses this form of designation.

# M.2.2. Special Management Attention

*Special management attention* refers to management prescriptions specifically developed during RMP preparation to protect the important and relevant values of an area from the potential effects of actions permitted by the RMP, including proposed actions deemed to be in conformance with the terms, conditions, and decisions of the RMP (BLM 1988). These are management measures that would not be necessary or prescribed if the critical and important features were not present.

A management prescription is considered to be special if it is unique to the area involved and

BLM_0028623

includes terms and conditions specifically designed to protect the values within the area. BLM Manual 1613 (BLM 1988) includes the following guidance on incorporating management prescriptions for potential ACECs into appropriate alternatives:

> During the formulation of alternatives, management prescriptions for potential ACECs are fully developed. Management prescriptions will generally vary across the plan alternatives. If there is no controversy or issues raised regarding the management of a potential ACEC, it may not be necessary to develop a range of management alternatives. In other words, management prescriptions may not vary significantly across alternatives. A potential ACEC (or portion thereof) must be shown as recommended for designation in any or all alternatives in the RMP in which special management attention is prescribed to protect the resource or to minimize hazard to human life and safety. Because special management attention must be prescribed in at least one plan alternative, each potential ACEC will appear as a recommended ACEC in at least one plan alternative. Designation is based on whether or not a potential ACEC requires special management attention in the selected plan alternative.

Within the context of the D-E NCA, special management is slightly different than it is for other BLM lands. Because the designation of the D-E NCA provided a level of protection for many relevant and important values within the D-E NCA, special management was considered anything beyond the protections already afforded by designation in the Omnibus Act. For example, the Omnibus Act withdrew the D-E NCA from mineral and oil and gas development. Therefore, special management would be additional protective management for protection of relevant and important values.

## M.3. Steps in the ACEC Process

The BLM assembled an interdisciplinary team of resource specialists to identify and evaluate proposed and existing ACECs. This section summarizes the major steps in this process.

## M.3.1. Nomination

BLM staff, other agencies, or members of the public may nominate ACECs at any time, but they are only designated during the BLM land-use planning process. In addition, existing ACECs are reconsidered. The BLM may adjust the management or shape of these existing ACECs during this process.

The notice of intent that kicked off the scoping period for the D-E NCA RMP included a request for ACEC proposals from the public. In addition to ACEC proposals received during this scoping period, the BLM considered proposals received during scoping for the RMP revisions also underway for the Grand Junction and Uncompahgre Field Offices when such proposals fell within the boundaries of the D-E NCA.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

IDT members also proposed ACECs during team meetings held during the development of the
D-E NCA Draft RMP.

## M.3.2. Relevance, Importance, and Special Management Criteria

Nominations for ACECs must meet relevance and importance criteria as defined in 43
CFR1610.7-2 and BLM Manual 1613 (BLM 1988). This report considers only these criteria and
does not discuss management prescriptions. Relevance and importance are specifically defined in
BLM Manual 1613 (BLM 1988) as follows:

## Relevance

Areas meeting the relevance criterion possess "significant historic, cultural, or scenic value; a fish
or wildlife resource or other natural system or process; or natural hazard."

An area meets the relevance criterion if it contains *one or more* of the following:

1. A significant historic, cultural, or scenic value (including but not limited to rare or
   sensitive archaeological resources and religious or cultural resources important to Native
   Americans).

2. A fish and wildlife resource (including but not limited to habitat for endangered,
   sensitive, or threatened species or habitat essential for maintaining species diversity).

3. A natural process or system (including but not limited to endangered, sensitive, or
   threatened plant species; rare, endemic, or relic plants or plant communities that are
   terrestrial, aquatic, or riparian; or rare geological features).

4. Natural hazards (including but not limited to areas of avalanche, dangerous flooding,
   landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by
   human action may meet the relevance criteria if it is determined through the resource
   management planning process that it has become part of a natural process.

For the purpose of further defining criteria 2 and 3 described above, the IDT established relevant
plants and wildlife to be those on the BLM Colorado special status species list. This list includes
federally threatened and endangered species, candidate species, as well as BLM sensitive species.
BLM sensitive species are those species determined by the BLM State Director to require focused
management by the BLM.

Vegetation communities were determined to be relevant under criteria 3 if they fell into CNHP's
G1/S1 or G2/S2 categories, which are described in Table M.1 below.

BLM_0028625

**Table M.1. Colorado Natural Heritage Program Element Imperilment Rankings**

| CNHP Global Rarity Ranking (Based on the Range-Wide Status of a Species) | |
|---|---|
| G1 | Critically imperiled globally because of extreme rarity (5 or fewer occurrences, or very few remaining individuals), or because of some factor of its biology making it especially vulnerable to extinction. (Critically endangered throughout its range). |
| G2 | Imperiled globally because of rarity (6 to 20 occurrences), or because of other factors demonstrably making it very vulnerable to extinction throughout its range. (Endangered throughout its range). |
| CNHP State Rarity Ranking (Based on Status of Species [Relative Abundance of Individuals] in Each State) | |
| S1 | Critically imperiled in State because of extreme rarity (5 or fewer occurrences, or very few remaining individuals), or because of some factor of its biology making it especially vulnerable to extirpation from the State. (Critically endangered in State). |
| S2 | Imperiled in State because of rarity (6 to 20 occurrences), or because of other factors demonstrably making it very vulnerable to extirpation from the State. (Endangered or threatened in State). |

# Importance

To meet the importance criterion, the value, resource, system, process or hazard resource must "have substantial significance and value" (BLM 1988). This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource, or qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. A natural hazard can be important if it is a significant threat to human life or property.

An area meets the importance criterion if *one or more* of the following characteristics are present (BLM 1988):

1. Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3. Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

4. Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare.

5. Poses a significant threat to human life and safety or to property.

# Special Management

For values within proposed ACECs that were determined to meet one or more of the relevance and importance criteria outlined above, the BLM determined whether these values required special management within the D-E NCA. Values that were already protected by the components of the D-E NCA's founding legislation (Omnibus Act) were dropped from further consideration. The protective components already in place because of the Omnibus Act are as follows:

The Secretary shall allow only such uses of the Conservation Area as the Secretary determines would further the purposes for which the Conservation Area is established.

Use of motorized vehicles shall be allowed after the effective date of the management plan, only on roads and trails designated in the management plan for the use of motor vehicles.

Withdrawal from all forms of entry appropriation, or disposal under the public land laws.

Withdrawal from location, entry, and patent under the mining laws.

Withdrawal from operation of the mineral leasing, mineral materials, and geothermal leasing laws.

Special management was also not required where an ACEC and its relevant and important values would be protected by another, overlapping proposed ACEC.

# M.3.3. Consideration of Potential ACECs

When a proposed ACEC meets the criteria identified above, it becomes a potential ACEC. Each potential ACEC must be considered during the development of RMP alternatives (see Chapter 2 of the Proposed RMP) and must be proposed for designation in at least one alternative (BLM 1988). As RMP alternatives are developed, management prescriptions are fully developed.

Management prescriptions *may* (not must) vary across the alternatives, as may the size of the potential ACEC (BLM 1988). ACECs recommended for designation in the Preferred Alternative (Alternative E in Chapter 2 of the Draft RMP) are carried forward for designation in the Proposed RMP/Final EIS and Record of Decision.

When determining which ACECs would be recommended for designation in the Preferred Alternative of the Draft RMP, the BLM used the following criteria: would the relevant and

important values be sufficiently protected under this alternative by other administrative actions (e.g., restrictions on allowable uses, travel management decisions, recreation decisions, wilderness decisions, wild and scenic river suitability)? If the answer to this question was no, then the IDT included the ACEC in the Draft Preferred Alternative.

## M.3.4. Comments on Proposed ACECs

The public has the opportunity to comment on the designation recommendations included in this report, and the public may comment on any aspect of the ACEC analysis. An opportunity for comment was provided concurrently with the public comment period associated with the release of the Draft RMP, which included an earlier version of this report.

## M.3.5. Designation

Designation of ACECs occurs when the record of decision for the EIS is signed and the RMP is approved.

## M.4. Evaluation of Proposed ACECs

This section describes each existing and proposed area and provides an evaluation of whether or not it meets the criteria for a potential ACEC. In the columns titled Relevance Criteria and Importance Criteria (see Table M.2) the numbers correspond to the criteria found under in the section entitled *Relevance, Importance and Special Management Criteria*. For example, 3 in the Relevance Criteria column corresponds to relevance criteria number 3, a natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).

**Table M.2. Existing and Proposed ACECs in the Planning Area**

| Proposed ACEC Name | Proposed by Whom? | Carried Forward as Potential ACEC? | Value or Resource | Relevance Criteria | Importance Criteria | Acres |
|---|---|---|---|---|---|---|
| **Gunnison Gravels ACEC** | Existing, from 1987 GJFO RMP | Yes | Geological | 3 | 1 and 2 | Existing = 5 acres<br><br>Proposed adjustment by the BLM = 15 acres |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

| Proposed ACEC Name | Proposed by Whom? | Carried Forward as Potential ACEC? | Value or Resource | Relevance Criteria | Importance Criteria | Acres |
|---|---|---|---|---|---|---|
| **Escalante Canyon ACEC** | Existing, from 1989 UFO RMP | Yes | Rare plants<br>Wildlife<br>Fish<br>Cultural<br>Geological<br>Nat. Hazard | 3<br>2<br>2<br>1<br>3<br>4 | 1 and 2<br>2<br>1 and 2<br>1<br>1<br>4 | Existing = 1,895 acres<br><br>Proposed adjustment by the BLM = 2,281 acres |
| **Expanded Escalante Canyon ACEC and Watchable Wildlife Area** | BLM proposed | Yes | Rare plants<br>Wildlife<br>Cultural<br>Fish<br>Nat. Hazard<br>Geological | 3<br>2<br>1<br>2<br>4<br>3 | 1 and 2<br>2<br>1 and 2<br>1 and 2<br>4<br>1 | 11,202 acres |
| **Cactus Park Track Site, Renamed Gibbler Mountain ACEC** | External and BLM proposal | Yes | Paleo<br>Rare Plants | 3<br>3 | 1 and 2<br>1, 2 and 3 | 1,310 acres |
| **Gunnison River ACEC** | BLM proposal | Yes | Rare plants<br>Cultural<br>Fish<br>Paleo<br>Wildlife | 3<br>1<br>2<br>3<br>2 | 1, 2 and 3<br>1 and 2<br>2 and 3<br>1 and 2<br>2 and 3 | 17,136 acres |
| **River Rims ACEC** | BLM proposal | Yes | Rare plants<br>Paleo | 3<br>3 | 1, 2 and 3<br>1 and 2 | 4,916–5,405 acres |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028629

Dominguez-Escalante National Conservation Area                                                          223
APPROVED RESOURCE MANAGEMENT PLAN

| Proposed ACEC Name | Proposed by Whom? | Carried Forward as Potential ACEC? | Value or Resource | Relevance Criteria | Importance Criteria | Acres |
|---|---|---|---|---|---|---|
| **Big Dominguez Canyon ACEC** | BLM proposal | Yes | Rare plants<br>Vegetation<br>Wildlife<br>Cultural | 3<br>3<br>2<br>1 | 1, 2 and 3<br>2<br>2<br>1 and 2 | 5,626 acres |
| **Bangs and Dominguez North** | External proposal | No, did not meet importance criteria | Cultural | 1 | None | 1,620 acres |
| **Dominguez North–Bangs Canyon ONA** | External proposal | No, did not meet importance criteria. | Cultural<br>Fish<br>Wildlife<br>Vegetation<br>Plants | 1<br>2<br>2<br>3<br>3 | None<br>None<br>None<br>None<br>None | 54,475 acres |
| **Gunnison River Potential ACEC** | External proposal | No, did not meet importance criteria. | Fish<br>Wildlife<br>Vegetation<br>Plants | 2<br>2<br>None<br>3 | None<br>None<br>N/A<br>None | 22,369 acres |
| **Young Egg ACEC** | External proposal | No, incorporated into Gunnison River and River Rims Potential ACECs. | Paleo | 3 | 1 and 2 | 120 acres |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028630

Dominguez-Escalante National Conservation Area                                    224
APPROVED RESOURCE MANAGEMENT PLAN

| Proposed ACEC Name | Proposed by Whom? | Carried Forward as Potential ACEC? | Value or Resource | Relevance Criteria | Importance Criteria | Acres |
|---|---|---|---|---|---|---|
| Cactus Park/ Triangle Mesa ACEC | BLM proposal | No, relevant and important values were incorporated into Gibbler Mountain ACEC. | Plants | 3 | 1 and 2 | 3,387 acres |
| Cottonwood Canyon ACEC | BLM proposal | No did not meet importance criteria | Fish Vegetation | 2 None | None | 4,733 acres |

## M.4.1. Description of Proposed ACECs Not Carried Forward as Potential ACECs

This section describes the seven proposed ACECs that were not carried forward as potential ACECs for further consideration in the Draft RMP. The justification for these areas not being carried forward is also described in this section. The map in Figure M.1 shows all proposed ACECs that were not subsequently carried forward for further consideration as potential ACECs.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028631

Dominguez-Escalante National Conservation Area                                             225
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.1. Proposed ACECs Not Carried Forward as Potential ACECs**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

# Bangs and Dominguez North ACEC

**Status:** Externally proposed during scoping for the Grand Junction RMP Revision.

**General Location:** This proposed ACEC, as originally proposed, included lands within both the GJFO and the D-E NCA. The portions within the D-E NCA are located in Unaweep Canyon and Ninemile Hill in Mesa County, near the community of Whitewater.

**Acreage:** As originally proposed, the ACEC was 2,134 acres. Of the original proposal, 1,620 acres are within the D-E NCA.

**Significance:** The Proposed ACEC contains significant cultural resources.

**Values Assessed:** Cultural Resources

**Relevance Criteria Considered:** 1

**Importance Criteria Considered:** 1

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archaeological resources and religious or cultural resources important to Native Americans). | Yes | The Proposed ACEC does include several significant cultural sites. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | No | The entire D-E NCA is recognized for its cultural resources. The IDT determined that the cultural resources within the Proposed ACEC do not contain more than locally significant qualities. |

**Summary of Finding:** This proposed ACEC did not meet the Importance Criteria for ACECs described above. Therefore, it was dropped from consideration.

# Dominguez North-Bangs Canyon Outstanding Natural Area (ONA)

**Status:** Externally proposed during scoping for the Grand Junction RMP Revision.

**General Location:** This proposed ACEC, as originally proposed, included lands within both the GJFO and the D-E NCA. Within the D-E NCA, the Proposed ACEC is located throughout the Mesa County portion of the D-E NCA.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

**Acreage:** As originally proposed, the ACEC was 109,975 acres. Of the original proposal, 54,475 acres are within the D-E NCA.

**Significance:** The proposed ACEC contains significant scenic values, a number of special status fish and wildlife species and species habitats, as well as rare vegetative communities.

**Values Assessed:** Scenic Values, Fish, Wildlife, Rare Plant Communities, and Rare Plants.

**Relevance Criteria Considered:** 1, 2 and 3

**Importance Criteria Considered:** 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archaeological resources and religious or cultural resources important to Native Americans). | Yes | The area within the Proposed ACEC does contain significant scenic values. |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The Proposed ACEC includes designated critical habitat for the federally endangered Colorado pikeminnow (*Ptychocheilus lucius*) and razorback sucker (*Xyrachen texanus*). Roundtail chub (*Gila robusta*), a BLM sensitive species, and humpback chub (*Gila cypha*), a federally endangered species, have been recorded in this section of the Gunnison River. |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The area of the Proposed ACEC contains habitat for a number of BLM sensitive wildlife species, including the gray vireo, sage sparrow, and longnose leopard lizard. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The Proposed ACEC does include some occurrences of the critically imperiled (G2 in the CNHP rarity rankings) Utah juniper/needle and thread plant community. |

BLM_0028634

Dominguez-Escalante National Conservation Area                                                       228
APPROVED RESOURCE MANAGEMENT PLAN

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The Proposed ACEC does contain the threatened Colorado hookless cactus (*Sclerocactus glaucus*) and the BLM sensitive Grand Junction milkvetch (*Astagalus linifolius*) that qualify as relevant under the criteria established for this ACEC process. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Scenic Values:** The entire D-E NCA and larger region of western Colorado contain significant scenic values. The scenic values within the Proposed ACEC are not more than locally significant, nor does it contain specific qualities or circumstances that qualify this value under criteria 2. |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Fish:** Although the designated critical habitat for the federally endangered Colorado pikeminnow and razorback sucker qualifies as locally significant, the fish habitat within the Proposed ACEC as a whole is not more than locally significant, nor does it contain specific qualities or circumstances that qualify this value under criteria 2. |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Wildlife:** Although the wildlife species within the Proposed ACEC are BLM sensitive species, the wildlife habitat within the Proposed ACEC as a whole is not more than locally significant, nor does it contain specific qualities or circumstances that qualify this value under criteria 2. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028635

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Vegetation Communities**: Although one of the plant communities within the Proposed ACEC does qualify as relevant, the vegetative communities of the ACEC as a whole are not more than locally significant, nor do they contain specific qualities or circumstances that qualify this value under criteria 2. |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Rare Plants:** Although the rare plant species within the proposed ACEC are BLM sensitive or federally threatened species, the plants within the proposed ACEC as a whole are not more than locally significant, nor do they contain specific qualities or circumstances that qualify this value under criteria 2 |

**Summary of Finding:** This proposed ACEC encompasses a wide range of relevant values. However, because of the variability within the proposed ACEC, it did not meet the Importance Criteria for ACECs described above. Therefore, it was dropped from further consideration.

# Gunnison River Potential ACEC

**Status:** Externally proposed during scoping for the Grand Junction RMP Revision.

**General Location:** This ACEC as originally proposed included lands within the GJFO and D-E NCA. Within the D-E NCA, this proposed ACEC includes areas within Mesa County along the Gunnison River, Unaweep Canyon, Triangle Mesa, Deer Creek, and Big and Little Dominguez Canyons.  A small portion of the proposed ACEC within Little Dominguez Canyon extends into Delta County.

**Acreage:** As originally proposed, the ACEC is 42,066 acres. Within the D-E NCA, the proposed ACEC is 22,369 acres.

**Significance:** The proposed ACEC encompasses several Potential Conservation Areas (PCA) identified by CNHP, including the Unaweep Canyon PCA, Little Dominguez Creek PCA, Gunnison River PCA, Cactus Park at Triangle Mesa PCA, Big Dominguez Creek PCA, and Deer Creek PCAs within the D-E NCA planning area. These PCAs include a wide range of rare plants

BLM_0028636

(including known occurrences of the Colorado hookless cactus, a federally threatened species), riparian vegetation communities, the Mesic Western Slope Pinyon-Juniper Woodlands natural community, habitat for several endangered fish, as well as habitat for peregrine falcon (*Falco peregrinus anatum*), canyon tree frog (*Hyla arenicolor*), bald eagles (*Haliaeetus leucocephalus*), and river otters (*Lontra canadensis*).

**Values Assessed:** Fish, Wildlife, Rare Plants and Plant Communities.

**Relevance Criteria Considered:** 2 and 3

**Importance Criteria Considered:** 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A **fish** and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The proposed ACEC includes designated critical habitat for the federally endangered Colorado pikeminnow (*Ptychocheilus lucius*) and razorback sucker (*Xyrachen texanus*). Roundtail chub (*Gila robusta*), a BLM sensitive species, and humpback chub (*Gila cypha*), a federally endangered species, have been recorded in this section of the Gunnison River. |
| 2 | A fish and **wildlife** resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | BLM sensitive wildlife species within the proposed ACEC include peregrine falcons and canyon tree frogs. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or *plant communities that are terrestrial, aquatic, or riparian*; or rare geological features). | No | The plant communities within the proposed ACEC do not qualify as relevant under the criteria established for this ACEC process (ranked as rarity levels of G1, G2, S1, or S2 by CNHP). |
| 3 | A natural process or system (including but not limited to *endangered, sensitive, or threatened plant species; rare, endemic, or relic plants* or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The proposed ACEC does contain threatened plant species (Colorado hookless cactus) and BLM sensitive plant species (Grand Junction milkvetch) that qualify as relevant under the criteria established for this ACEC process. |

BLM_0028637

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Fish:** Although the designated critical habitat for the federally endangered Colorado pikeminnow and razorback sucker qualifies as locally significant, the fish habitat within the proposed ACEC as a whole is not more than locally significant, nor does it contain specific qualities or circumstances that qualify this value under criteria 2. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Wildlife:** Although the wildlife species within the proposed ACEC are BLM sensitive species, the wildlife habitat within the proposed ACEC as a whole is not more than locally significant, nor does it contain specific qualities or circumstances that qualify this value under criteria 2. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | **Rare Plants:** Although the rare plant species within the proposed ACEC are BLM sensitive or federally threatened species, the plants within the proposed ACEC as a whole are not more than locally significant, nor do they contain specific qualities or circumstances that qualify this value under criteria 2 |

**Summary of Finding:** This proposed ACEC encompasses a wide range of relevant values. However, because of the variability within the proposed ACEC, it did not meet the Importance Criteria for ACECs described above. Therefore, it was dropped from further consideration.

# Young Egg ACEC

**Status:** Externally proposed during scoping for the Uncompahgre RMP Revision.

**General Location:** This proposed ACEC is located in Delta County, off the Dominguez Canyon Road.

**Acreage:** As originally proposed, the ACEC is 120 acres.

**Significance:** The proposed ACEC consists of a section of the upper Jurassic Morrison Formation containing thousands of black eggshell fragments. The site represents a nesting site used repeatedly by dinosaurs.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028638

**Values Assessed:** Rare Geological Feature (Paleo)

**Relevance Criteria Considered:** 3

**Importance Criteria Considered:** 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| **#** | **Description** | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or *rare geological features*). | Yes | The paleontological site within this proposed ACEC is a rare geological feature. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| **#** | **Description** | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Paleo**: The Young Egg paleontological site is of special worth and is a cause for concern because of unsanctioned collection and vandalism. The Young Egg paleontological site is fragile, rare, irreplaceable, unique, and vulnerable to adverse change. |

**Summary of Finding:** The IDT determined that this proposed ACEC met the relevance and importance criteria described above. However, the team concluded that ACEC status for this specific site could lead to increases in vandalism and theft, which are currently the main threats to the relevant and important values. Instead, the IDT determined that the relevant and important values would be better protected as part of a larger ACEC. As a result, the paleontological resources of this proposed ACEC were incorporated into the River Rims and Gunnison River Potential ACECs, and the IDT determined that special management of this smaller proposed ACEC was no longer necessary.

# Cactus Park/Triangle Mesa

**Status:** Internally proposed during RMP development by BLM.

**General Location:** This ACEC includes lands within, and outside of, the Dominguez Canyon Wilderness. Site names in the area of the proposed ACEC include Triangle Mesa, Cactus Park, and Gibbler Mountain.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

**Acreage:** 3,387 acres

**Significance:** The proposed ACEC encompasses occurrences of one federally threatened plant species, Colorado hookless cactus, and one BLM sensitive plant species, Grand Junction milkvetch.

**Values Assessed:** Rare Plants

**Relevance Criteria Considered:** 3

**Importance Criteria Considered:** 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to **endangered, sensitive, or threatened plant species; rare, endemic, or relic plants** or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The proposed ACEC does contain threatened plant species (Colorado hookless cactus) and BLM sensitive plant species (Grand Junction milkvetch) that qualify as relevant under the criteria established for this ACEC process. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Rare Plants**: the occurrence of Grand Junction milkvetch in this proposed ACEC is more than locally significant (ranked as Excellent by CNHP). This occurrence is also sensitive, fragile, exemplary, and vulnerable owing to its location outside the Wilderness. The occurrence of Colorado hookless cactus is ranked as good by CNHP, thus it does not qualify under criteria one. This occurrence is also within the Wilderness; therefore it is not vulnerable, because there are restrictions on uses already in place in the immediate vicinity. |

**Summary of Finding:** The IDT determined that the occurrences of Grand Junction milkvetch in the ACEC were both relevant and important. However, the IDT concluded that this relevant and important value could be combined with the Cactus Park Track Site proposed ACEC to become the larger Gibbler Mountain ACEC, which was carried forward for further consideration. Therefore, the IDT determined that special management was no longer necessary for this proposed ACEC.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

# Cottonwood Canyon ACEC

**Status:** Internally proposed during RMP development by BLM.

**General Location:** This ACEC encompasses Cottonwood Canyon on the southeastern edge of the D-E NCA.

**Acreage:** 4,733 acres

**Significance:** The proposed ACEC encompasses high quality riparian vegetative communities and habitat for BLM sensitive fish species.

**Values Assessed:** Fish, and Plant Communities.

**Relevance Criteria Considered:** 2 and 3

**Importance Criteria Considered:** 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A **fish** and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The proposed ACEC is used as spawning grounds by BLM sensitive and federally listed fish species. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or *plant communities that are terrestrial, aquatic, or riparian*; or rare geological features). | No | The plant community within the proposed ACEC does not meet the relevance criteria established for this ACEC process. |

BLM_0028641

| | | | |
|---|---|---|---|
| | | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | The U.S. Fish and Wildlife Service, CPW and BLM have not identified the proposed ACEC as more than locally significant fish habitat. It has also not been identified as fragile, sensitive, rare, or irreplaceable fish habitat. |

**Summary of Finding:** This proposed ACEC did not meet the Importance Criteria for ACECs described above. Therefore, it was dropped from consideration.

## M.4.2. Description of Potential ACECs

This section describes Potential ACECs, which are proposed ACECs that were carried forward for incorporation into the alternatives for the Draft RMP. The map in Figure M.2 below shows these seven ACECs.

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

Dominguez-Escalante National Conservation Area                                    236
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.2. ACECs Carried Forward for D-E NCA**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

# M.4.2.1. Gunnison Gravels ACEC

**Status:** Existing

**General Location:** Mesa County, 13 miles south of Grand Junction, 9 miles southwest of Whitewater and less than a mile off State Highway 141, turning onto Cactus Park Road. Access is south, via a footpath from the Cactus Park Staging Area parking lot (see Figure M.3).

**Acreage:** Existing acreage is nine acres. The BLM proposes reshaping the polygon to better match the relevant and important characteristics on the ground (surficial gravel deposits). This proposed acreage would expand the ACEC to 15 acres.

**Significance:** Unique gravel deposit indicates that the Gunnison River, and possibly the Colorado River, flowed through Cactus Park 1-5 million years ago. The ancient river system is believed to have changed to present day alignments owing to uplift of the Uncompahgre Plateau with its very hard, erosion-resistant rock diverting the river flows into the softer, more easily eroded rocks of the Mancos Shale (Lohman 1965). This deposit is the only one now known to exist on the Uncompahgre Plateau, on the course of the ancient river system.

**General Description:** Designated in the 1987 GJFO RMP. The area is managed to protect the scientific qualities of the site. Triassic Kayenta Formation sandstone is overlain by Quaternary Alluvium composed of approximately 12,000 cubic yards of sand and gravel.

**Values Assessed:** Rare Geological Feature

**Relevance Criteria Considered:** 3

**Importance Criteria Considered:** 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or *rare geological features*). | Yes | Rare, geological feature |

BLM_0028644

Dominguez-Escalante National Conservation Area                                                    238
APPROVED RESOURCE MANAGEMENT PLAN

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Unique gravel deposit proves that the Gunnison River, and possibly the Colorado River, flowed through Cactus Park 1-5 million years ago. The river gravel deposit is one of only a few such deposits on the Uncompahgre Plateau along the course of the ancient river system. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The river gravel deposit is one of only a few such deposits on the Uncompahgre Plateau along the course of the ancient river system. OHV use and gravel removal have threatened the scientific integrity of the site. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028645

Dominguez-Escalante National Conservation Area                                      239
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.3. Existing and Proposed Expansion of Gunnison Gravels ACEC**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

## M.4.2.2. Escalante Canyon ACEC

**Status:** Existing, UFO RMP 1989

**General Location:** Delta County, above and below the Potholes site, on the canyon floor (Figure M.4).

**Acreage:** Existing acreage is 1,895 acres. The BLM proposed modifying the boundary of the ACEC to better conform to the topography of the canyon. This proposed change would expand the ACEC to 2,281 acres.

**Significance:** When originally created, this ACEC noted: "This designation would enhance management and protection of the listed plant species and unique plant associations, and would improve the public's awareness of the recreational hazards of the Escalante Potholes" (BLM 1989a).

The original focus was on two specific plant species and four plant communities:

- Colorado hookless cactus
- Eastwood's monkey-flower
- Cold desert shrublands
- Western Slope pinyon-juniper woodlands
- Western Slope grasslands
- Salt meadows

In recent years, the focus has expanded to the hanging garden community (*Aquilegia micrantha-Mimulus eastwoodiae*).

Recreational opportunities are associated with heritage/scenic touring in Escalante Canyon, big game hunting, OHV riding, picnicking, swimming, and kayaking. The primary recreation activity in the lower part of the canyon is scenic touring. The Potholes of Escalante Canyon attract day-use visitors for picnicking and swimming. During the spring runoff, kayakers are attracted to the Potholes to run the Class IV rapids. The hazards associated with recreation at the Potholes site were determined to require special management in the 1989 Uncompahgre Basin RMP (BLM 1989a).

**General Description:** The Escalante Canyon ACEC was designated in the 1989 Uncompahgre Basin RMP (BLM 1989a) for its unique recreational opportunities and for the existence of rare plants and plant associations. In its reassessment of this ACEC, the BLM proposed adding relevant and important values. This ACEC encompasses 1,895 acres in Delta and Montrose Counties and borders the Wilderness.

BLM_0028647

The Potholes area of Escalante Creek is located within this ACEC, which provides unique recreational opportunities in the form of extreme kayaking, swimming and camping. Restricting camping to designated locations and providing recreationists with restroom facilities appear to have resulted in a cleaner site. ACEC restrictions direct camping and motorized recreation away from these unique and rare plants and plant associations.

**Values Assessed:** Rare plants, Wildlife, Fish, Cultural/Paleo, Geological, Scenic, and Natural Hazard.

**Relevance Criteria Considered:** 3, 2, 2, 1, 3, 1, 4

**Importance Criteria Considered:** 1 and 2, 2, 1 and 2, 1, 1, 1, 4

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| **#** | **Description** | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened **plant species**; rare, endemic, or relic plants or **plant communities** that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The ACEC contains an excellent (A-ranked) occurrence of the federally endangered Colorado hookless cactus, as well as populations of the BLM-sensitive Grand Junction milkvetch and Eastwood's monkey-flower. The canyon also contains an excellent (A-ranked) occurrence of the hanging garden community, which is ranked as globally imperiled by CNHP. |
| 2 | A fish and **wildlife** resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The desert bighorn sheep, a BLM sensitive species, is attracted by forage found in the irrigated fields along Escalante Creek. The sheep use adjacent public land for water along Escalante Creek and for shelter from humans and predators in surrounding cliffs. Peregrine falcons, another BLM sensitive species, forage and nest in the canyon. |
| 2 | A **fish** and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Escalante Creek provides habitat for the following BLM-sensitive fish species: bluehead suckers, roundtail chubs and flannelmouth suckers. |
| 1 | A significant **historic**, cultural, or scenic value (including but not limited to rare or sensitive archaeological resources and religious or cultural resources important to Native Americans). | Yes | Ranching and pioneer history within Escalante Canyon is significant and serves as a major attraction for local communities and tourists. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| **#** | **Description** | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare **geological** features). | Yes | The Escalante Canyon Potholes are a regionally rare geologic and hydrologic streambed feature within the ACEC. There are no other areas in the region where Precambrian gneiss is exposed and shaped by a stream powerful enough to create the feature, yet not so powerful as to completely erode the stream channel smooth. |
| 4 | **Natural hazards** (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process. | Yes | Natural hazards in Potholes area include steep cliffs from which people have jumped into pools of varying width and depth. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| **#** | **Description** | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Rare plants and plant communities:** A-ranked occurrences of the hanging garden community and the Colorado hookless cactus make this value regionally significant. In addition, all of the relevant rare plants and plant communities in the canyon meet criteria 2. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Wildlife:** The relevant wildlife species in Escalante Canyon (desert bighorn sheep and peregrine falcons) are BLM sensitive species, which qualifies them under importance criteria 2. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028649

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

243

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Fish** in Escalante Creek include three native and BLM sensitive species: roundtail chub, bluehead sucker, and flannelmouth sucker. All three of these species are fragile, sensitive and rare. Escalante Creek is believed to be regionally important habitat for all three species. |
| 1 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | **Historical Resources:** The post-settlement history of Escalante Canyon is a regionally significant part of the history of Delta County. |
| 1 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | **Geology:** The Escalante Canyon Potholes are a regionally rare geologic and hydrologic streambed feature within the ACEC. There are no other areas in the region where Precambrian gneiss is exposed and shaped by a stream powerful enough to create the feature, yet not so powerful as to completely erode the stream channel smooth. |
| 4 | Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare. | Yes | **Natural Hazards:** Cliff jumping has resulted in broken bones, concussions and drownings. The Potholes area attracts extreme kayakers during spring runoff.  Special signage and barriers may be needed to protect people at the site. May require closure and removal of attractions (i.e., facilities, parking lots, and designated campsites). |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028650

Dominguez-Escalante National Conservation Area                                    244
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.4. Existing and Adjusted Escalante Canyon ACEC**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028651

# M.4.2.3. Expanded Escalante Canyon ACEC and Watchable Wildlife Area

**Status:** BLM proposed

**General Location:** Delta County, along Escalante Canyon Road, a dirt road that follows Escalante Creek for 16 miles (see Figure M.5).

**Acreage:** 11,202 acres

**Significance:** Larger than the existing Escalante Canyon ACEC, this proposed ACEC would expand the existing ACEC to create a wildlife and fish corridor from the borders of the national forest to the confluence of Escalante Creek and the Gunnison River.

**Biodiversity significance:** BS or Very High

**Global Rarity Ranking:** G2, G3

The most biologically significant occurrences include an excellent (A-ranked) occurrence of the globally imperiled (G2G3/S2S3) hanging garden community, a good (B-ranked) occurrence of globally critically imperiled (G1Q/S1?) Utah juniper/needle and thread grass (*Juniperus osteosperma/Hesperostipa comata*) community, a good (B-ranked) occurrence of the globally imperiled (G2/S2) good-neighbor bladderpod (*Lesquerella vicina*) and an excellent (A-ranked) occurrence of the globally imperiled (G2G3/S2S3) Colorado hookless cactus. There are also populations of Grand Junction milkvetch, Eastwood's milkvetch (*Astragalus eastwoodiae*), long-flower cat's-eye (*Oreocarya longiflora*) and several communities that are vulnerable (G3) throughout their range. This ACEC would also be a Watchable Wildlife Area.

Recreation opportunities include heritage/scenic touring in Escalante Canyon, big game hunting, OHV riding, picnicking, swimming, and kayaking. Much of Escalante Canyon is privately owned. As a result, there is little public access off the main county-maintained road. The primary recreational activity in the lower part of the canyon is scenic touring. Above the confluence of Escalante Creek and the Dry Fork of Escalante Creek, there are two historic structures on CPW lands. Both structures provide visitors with opportunities for heritage experiences. The BLM has partnered with CPW at one site to build a picnic area to accommodate visitors. The Potholes of Escalante Canyon attract day-use visitors for picnicking and swimming. During the spring runoff, kayakers are attracted to the Potholes to run the Class IV rapids.

**General Description:** The Escalante Creek drains approximately 21 percent of the land area of the D-E NCA. Its tributaries include the perennial Dry Fork, Kelso Creek and North Fork. The canyon boasts a rich riparian area, with great diversity due to its wide elevation range, which ranges from 7,800 to 5,000 feet. At its highest elevations, the creek is lined with river birch,

BLM_0028652

mountain willow and various forbs. As the creek enters the canyon, Douglas-fir and narrowleaf cottonwood trees stand above a thick understory of red-osier dogwood, thinleaf alder and mixed willow species in the riparian area. Near the lower end of the creek are Rio Grande cottonwood, narrowleaf cottonwood, skunkbush, coyote willow, seepwillow, spearleaf rabbitbrush, tamarisk, silverberry, sagebrush, and common reed. Seeps at the base of the Wingate sandstone cliffs support hanging gardens.

A number of BLM special status plant species and rare plant associations exist in the seeps that line the canyon's walls and on the benches above Escalante Creek. ACEC restrictions direct camping and motorized recreation away from these unique and rare plants and plant associations.

**Values Assessed:** Rare plants, Wildlife, Cultural/Paleo, Fish, Natural Hazards, Geological and Scenic.

**Relevance Criteria Considered:** 3, 2, 1, 2, 4, 3, 1

**Importance Criteria Considered:** 1 and 2, 2, 1 and 2, 1 and 2, 4, 1,  1

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened **plant species**; rare, endemic, or relic plants or **plant communities** that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The ACEC contains an excellent (A-ranked) occurrence of the federally endangered Colorado hookless cactus, as well as populations of the BLM-sensitive Grand Junction milkvetch and Eastwood's monkey-flower. The canyon also contains an excellent (A-ranked) occurrence of the hanging garden community, which is ranked as globally imperiled by CNHP. |
| 2 | A fish and **wildlife** resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The desert bighorn sheep, a BLM sensitive species, is attracted by forage found in the irrigated fields along Escalante Creek. The sheep use adjacent public land for water along Escalante Creek and for shelter from humans and predators in surrounding cliffs. Peregrine falcons, another BLM sensitive species, forage and nest in the canyon. |
| 1 | A significant **historic**, cultural, or scenic value (including but not limited to rare or sensitive **archaeological** resources and religious or cultural resources important to Native Americans). | Yes | Escalante Canyon has significant prehistoric rock art associated with Native Americans, as well as sites that exemplify the pioneer and ranching heritage of the area. The prehistoric resources are of religious and cultural importance to the Native Americans. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028653

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A **fish** and wildlife resource (including but not limited to habitat for endangered, *sensitive*, or threatened species or habitat essential for maintaining species diversity). | Yes | The lower sections of Escalante Creek provide habitat for the following BLM-sensitive fish species: bluehead suckers, roundtail chubs and flannelmouth suckers.<br><br>The upper stretches of Escalante Creek are a cold-water fishery that provides habitat for native species of trout. |
| 4 | **Natural hazards** (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process. | Yes | The Potholes area has been an attractive nuisance where visitors have been hurt or killed by jumping from surrounding cliffs into small pools. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or **rare geological features**). | Yes | Natural hazards in Potholes area include steep cliffs from which people have jumped into pools of varying width and depth. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1&2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Rare plants and plant communities:** A-ranked occurrences of the hanging garden community and the Colorado hookless cactus make this value regionally significant. In addition, all of the relevant rare plants and plant communities in the canyon meet criteria 2. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028654

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

248

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Wildlife:** The relevant wildlife species in Escalante Canyon (desert bighorn sheep and peregrine falcons) are BLM sensitive species, which qualifies them under importance criteria 2.<br><br>The canyon affords watchable wildlife opportunities for visitors. |
| 1&2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Cultural Resources:** Rock art panels from Native American and prehistoric peoples found on canyon walls, as well as other archaeological sites such as camping sites, lithic work sites and more. These resources are locally significant and are fragile, sensitive and irreplaceable.<br><br>The historical resources in the canyon are regionally significant for Delta County. |
| 1&2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Fish** in Escalante Creek include three native and BLM sensitive species: roundtail chub, bluehead sucker, and flannelmouth sucker. All three of these species are fragile, sensitive and rare. Escalante Creek is believed to be regionally important habitat for all three species. |
| 4 | Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare. | Yes | **Natural Hazards:** Cliff jumping has resulted in broken bones, concussions and drownings. The Potholes area attracts extreme kayakers during spring runoff. Special signage and barriers may be needed to protect people at the site. May require closure and removal of attractions (i.e., facilities, parking lots, and designated campsites). |
| 1 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | **Geology:** The Escalante Canyon Potholes are a regionally rare geologic and hydrologic streambed feature within the ACEC. There are no other areas in the region where Precambrian gneiss is exposed and shaped by a stream powerful enough to create the feature, yet not so powerful as to completely erode the stream channel smooth. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028655

Dominguez-Escalante National Conservation Area                                          249
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.5. Expanded Escalante ACEC and Watchable Wildlife Area**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028656

## M.4.2.4. Gibbler Mountain ACEC

**Status:** Externally proposed (Robert Billerbeck of Colorado Natural Areas Program) as Cactus Park Track Site ACEC. BLM proposed expansion of externally proposed ACEC to include additional relevant and important values. The BLM also renamed the proposed ACEC to Gibbler Mountain ACEC.

**General Location:** Mesa County, off the Cactus Park Road (Figure M.6).

**Acreage:** 1,310 acres

Significance: The Morrison and Chinle formations of this area have produced many scientifically significant fossils, specifically dinosaur tracks (PFYC Class 4-5 or High and Very High likelihood of containing fossils).

This site also supports one of the best known occurrences (A-ranked) of Grand Junction milkvetch (*Astragalus linifolius*), a globally vulnerable plant (G3/S3) and a BLM sensitive plant species.

**Biodiversity Significance:** B2 or Very High

**General Description:** This site contains several small drainages of an unnamed tributary of the Gunnison River, north of Dominguez Canyon. Elevations range from 5,200 to 6,700 feet. Soils are clay and sand, derived from the Morrison, Entrada and Wingate formations. Pinyon and juniper trees, with mountain mahogany, serviceberry, black sagebrush, rabbitbrush, and a variety of other shrubs, forbs and grasses, cover the rocky hillsides. Lower washes have been invaded by tamarisk, but higher elevation drainages are in good condition. The Grand Junction milkvetch is found on the sides of upper dry washes. The Colorado hookless cactus, while a small population, is a good example of the species, having straight central spines and showing no intergradation with the more common species, *Sclerocactus parviflora*.

**Values Assessed:** Paleontological, Rare Plants (Grand Junction milkvetch, BLM sensitive species)

**Relevance Criteria Considered:** 3, 3

**Importance Criteria Considered:** 1 and 2, 2 and 3

BLM_0028657

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

251

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or **rare geological features**). | Yes | The Gibbler Mountain area is rich in fossils, including dinosaur tracks that have been the focus of scientific research. |
| 3 | A natural process or system (including but not limited to endangered, **sensitive, or threatened plant species**; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The Grand Junction Milkvetch is a BLM sensitive species, which is found within the ACEC boundaries. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1&2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Dinosaur tracks have been found in the area. These track sites are regionally significant and area easily damaged. Some sites have been vandalized in the past. |
| 1,2 &3 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The ACEC includes one of the best known occurrences of Grand Junction milkvetch (*Astragalus linifolius*), a globally imperiled and BLM sensitive plant. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028658

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

252



**Figure M.6. Gibbler Mountain ACEC**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

## M.4.2.5. Gunnison River ACEC

**Status:** BLM proposed

General Location: Runs through the northern tier of the D-E NCA for approximately 33 miles. Access points are by river or by county-maintained roads that connect to U.S. Highway 50 (Figure M.7).

**Acreage:** 17,136 acres

**Significance:** The ACEC would protect the relevant and important values within the Gunnison River corridor and the surrounding bluffs. Management would focus on the protection of the hookless cactus, sensitive fish species, paleontology sites, and wildlife in the corridor. The section of the river through the D-E NCA has been designated as critical habitat for the endangered Colorado pikeminnow and razorback sucker.

**Biodiversity Significance:** B2 or Very High

This site supports a good (B-ranked) occurrence of the globally vulnerable (G3/S3) Fremont's cottonwood riparian forest (*Populus deltoides ssp. wislizeni/Rhus trilobata*) and numerous populations of the Colorado hookless cactus, which is listed as threatened by the USFWS.

**General Description:** The Gunnison River drains all of Delta County, as well as a large part of Gunnison, Mesa and Montrose Counties. Because of upstream diversions and dams, much of the floodplain that once periodically flooded is no longer inundated during the spring runoff. Despite its altered flow regime, the river provides critical wildlife and fish habitat in the D-E NCA. Within the arid climate of the western slope, the importance of water sources such as the Gunnison River for fish and wildlife cannot be overstated.

The bluffs above the river also provide important habitat for the Colorado hookless cactus, a federally endangered species. Paleontological can be found within the ACEC and cultural resources are abundant throughout the ACEC.

**Values Assessed:** Rare plants, Cultural, Fish, Paleontology, and Wildlife.

**Relevance Criteria Considered:** 3, 1, 2, 3, 2

**Importance Criteria Considered:** 1, 2 and 3, 1 and 2, 2 and 3, 1 and 2, 2 and 3

BLM_0028660

| | | | |
|---|---|---|---|
| | | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened **plant species**; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The ACEC includes numerous populations of the Colorado hookless cactus, a federally endangered species. |
| 1 | A significant **historic**, cultural, or scenic value (including but not limited to rare or sensitive **archaeological** resources and religious or cultural resources important to Native Americans). | Yes | Native American and ancient peoples frequented the banks of rivers and streams, leaving behind campgrounds and lithic work sites.<br><br>The ACEC also has significant historical resources associated with the settlement of the west, particularly the narrow gauge Denver and Rio Grande railroad that connected Denver and Salt Lake City and ran along the Gunnison River. |
| 2 | A **fish** and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The Gunnison River is designated critical habitat for both the endangered Colorado pikeminnow and razorback sucker. The river also supports populations of three BLM sensitive species: flannelmouth sucker, bluehead sucker and roundtail chub. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or **rare geological** features). | Yes | Chinle and Morrison geologic formations are present in the Gunnison River canyon. They are rich in fossils. Known paleontological sites within the ACEC include the Young Egg Locality, a Jurassic dinosaur nesting site. |
| 2 | A fish and **wildlife** resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The Gunnison River provides habitat that is essential for maintaining species diversity in the area. BLM sensitive wildlife species that use the area include desert bighorn sheep, bald eagle and peregrine falcon. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028661

| Importance criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1,2,3 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.<br><br>Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | **Rare Plants:** The ACEC supports excellent (A-ranked) occurrences of the Colorado hookless cactus at Wells Gulch and McCarty Bench, as well as good occurrences (B-ranked) at South side of the Gunnison River at Escalante, Leonard's Basin, Kelso Gulch, Huff, and West of the Gunnison River. The ACEC also includes a significant population of Colorado hookless cactus around the Krueger parcel in the northern end of the D-E NCA. |
| 1,2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Cultural Resources:** The Gunnison River corridor has played a major role in prehistoric and historic cultures in western Colorado.<br>Cultural sites include rock art panels, camp sites and lithic work sites, as well as historical resources associated with the Denver and Rio Grande railroad.<br><br>All of the cultural resources in the ACEC are fragile, sensitive and irreplaceable. |
| 2,3 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.<br><br>Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | **Fish:** The Gunnison River is designated critical habitat for both the endangered Colorado pikeminnow and razorback sucker. The river also supports populations of three BLM sensitive species: flannelmouth sucker, bluehead sucker and roundtail chub. |
| 1,2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Geology:** Known fossil sites along the Gunnison River are regionally significant, sensitive, and irreplaceable. |

BLM_0028662

| Importance criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2,3 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.<br><br>Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | **Wildlife:** Critical wildlife habitat along the Gunnison River is essential for proper ecosystem function within the region. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

257



**Figure M.7. Gunnison River ACEC**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028664

## M.4.2.6. River Rims ACEC

**Status:** BLM proposed

**General Location:** Four scattered plots on bluffs above the Gunnison River. Two sites are north of the river, and two are south of the river (Figure M.8).

**Acreage:** 4,916–5,405 acres

**Significance:** This proposed ACEC includes four separate sites that would protect the D-E NCA's largest known populations of the globally imperiled and federally endangered (G2G3/S2/S3) Colorado hookless cactus. These sites also contain formations with high paleontological values.

Hookless cactus populations have up to 2,000 individuals, in contrast to much smaller clusters along the river, averaging less than 50 plants. Pollination studies have shown that the major pollinator, a small green bee, is capable of crossing the river, so the occurrences on either side may be genetically connected.

**Biodiversity Significance:** B2 or Very High

**General Description:** Vegetation types are desert shrubland/saltbush, mixed with pinion-juniper. Sites are above the river and associated riparian areas. The typical substrate for the cactus is clay soil derived from Mancos Shale, with rounded cobbles of basalt scattered over the surface. Plants are often concentrated on the lips of benches, under shrubs or in the open. They are rarely on steep hills or in the greasewood flats along the river.

**Values Assessed:** Rare plants and paleontology

**Relevance Criteria Considered:** 3, 3

**Importance Criteria Considered:** 1, 2 and 3, 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened **plant species**; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The ACEC includes large populations of the Colorado hookless cactus, a federally endangered species. |

BLM_0028665

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or **rare geological features**). | Yes | Known paleontological sites within the ACEC include the Young Egg Locality, a Jurassic dinosaur nesting site. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1, 2 and 3 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.<br><br>Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | **Rare Plants:** The ACEC supports excellent (A-ranked) occurrences of the Colorado hookless at Wells Gulch and good occurrences (B-ranked) on the South side of the Gunnison River at Escalante, Kelso Gulch and Huff. The ACEC also includes a significant population of Colorado hookless cactus around the Krueger parcel in the northern end of the D-E NCA. |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Geology:** Known fossil sites along the Gunnison River are regionally significant, sensitive, and irreplaceable. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

Dominguez-Escalante National Conservation Area                                    260
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.8. River Rims ACEC**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

## M.4.2.7. Big Dominguez Canyon ACEC

**Status:** BLM proposed

**General Location:** Big Dominguez Creek is located on the eastern slope of the Uncompahgre Plateau and is the first major drainage southeast of Unaweep Canyon (Figure M.9).

**Acreage:** 5,626 acres

**Significance:** This site supports a good (B-ranked) occurrence of Colorado hookless cactus, a plant that is globally imperiled (G2G3/S2S3), and an excellent (A-ranked) example of Grand Junction milkvetch, a globally vulnerable (G3Q/S3) plant. The Grand Junction milkvetch is confined to the eastern base of the Uncompahgre Plateau in Mesa, Montrose, and Delta Counties.

The State imperiled (G5/S2) and BLM sensitive canyon tree frog is also found here. The canyon tree frog inhabits rocky canyons along intermittent or permanent streams. This desert frog reaches its northern limits in Southern Colorado. Although primarily terrestrial, it breeds in canyon bottom pools surrounded by rock. It is usually found near permanent pools or cottonwoods in the pinyon-juniper zone. Desert bighorn sheep and peregrine falcon, both BLM sensitive species, frequent the canyon as well.

**Biodiversity Significance:** B2 or Very High

**General Description:** Dominguez Creek supports excellent riparian vegetation with a diversity of plant species, vigorous growth of vegetation, low abundance of non-native aggressive species, and diversity of vegetation structure. In a stretch of about 16 air miles from Carson Hole on the Uncompahgre Plateau to the Gunnison River, this beautiful stream descends from 9,000 to 4,800 ft., transitioning from coniferous forests to desert shrubs and cactus.

Near the headwaters, mountain willow (*Salix monticola*) is common along the stream banks. Downstream, in the area of Big Dominguez Campground, the rushing stream forms small waterfalls and trout-filled plunge pools in the Precambrian rock. Riparian vegetation along this middle reach is very lush and diverse. Woolly sedge (*Carex pellita*), cloaked bulrush (*Scirpus pallidus*), Baltic rush (*Juncus balticus*), redtop (*Agrostis gigantea*), fowl mannagrass (*Glyceria striata*), horsetail (*Equisetum arvense*), scouring rush (*Hippochaete laevigata*), wild licorice (*Glycyrrhiza lepidota*), false-Solomon's seal (*Maianthemum stellata*), and canyon bog orchid (*Limnorchis ensifolia*) line the banks, while blue spruce (*Picea pungens*) and narrowleaf cottonwood (*Populus angustifolia*) tower above thickets of river birch (*Betula occidentalis*), thinleaf alder (*Alnus incana*), coyote willow (*Salix exigua*), and red-osier dogwood (*Cornus sericea*).

Approximately one to two miles downstream of the campground, beaver ponds have formed an extensive wetland complex consisting of open still water, scrub-shrub, and emergent wetlands.

BLM_0028668

Above the creek, on the canyon sides, the bright green of pinyon-juniper contrast with red sandstone cliffs. Farther downstream, Plains cottonwood replaces the narrowleaf, as the canyon bottom winds below sheer Wingate sandstone cliffs. Two rare plants are found above the creek: Grand Junction milkvetch grows on rocky slopes and in ephemeral drainages in the pinyon-juniper zone, while Colorado hookless cactus is found in the lower reaches of the canyon in desert shrub communities.

Soils along Big Dominguez Creek are alluvium and generally not mapped on the County soil survey. The Glenberg series, coarse-loamy, mixed (calcareous), mesic, Ustic Torrifluvents, is shown to occur on floodplain terraces within the site (Soil Conservation Service 1978).

**Values Assessed:** Rare plants, Vegetation, Special Status Wildlife, and Cultural.

**Relevance Criteria Considered:** 3, 3, 2, 1

**Importance Criteria Considered:** 1, 2 and 3, 2, 2, 1 and 2

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | A natural process or system (including but not limited to endangered, **sensitive, or threatened plant species**; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The ACEC includes occurrences of the Colorado hookless cactus and Grand Junction milkvetch. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or **plant communities that are terrestrial, aquatic, or riparian**; or rare geological features). | Yes | The excellent condition of riparian vegetation within the canyon is rare within the State of Colorado. |
| 2 | A fish and **wildlife** resource (including but not limited to habitat for endangered, *sensitive*, or threatened species or habitat essential for maintaining species diversity). | Yes | Special status wildlife known to use the ACEC include:<br>• Desert bighorn sheep<br>• Bald eagle<br>• Peregrine falcon<br>• Canyon tree frog |

BLM_0028669

| Relevance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive **archaeological** resources and religious or cultural resources important to Native Americans). | Yes | The canyon bottoms of the Dominguez Canyon area have evidence of human activity dating back thousands of years. There are numerous well-preserved rock art sites that constitute one of the highest concentrations in the planning area. The known rock art sites cover a long period, with some that date from over 2,000 years ago to Ute rock art panels from approximately 100 years ago. |

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1, 2 and 3 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.<br><br>Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | **Rare Plants:** This site supports a good (B-ranked) occurrence of Colorado hookless cactus, a plant that is globally imperiled (G2G3/S2S3), and an excellent (A-ranked) example of Grand Junction milkvetch, a globally vulnerable (G3Q/S3) plant. The Grand Junction milkvetch is confined to the eastern base of the Uncompahgre Plateau in Mesa, Montrose, and Delta Counties. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Vegetative Community:** There is an excellent (A-ranked) occurrence of the State rare (G4/S3) narrowleaf cottonwood/red-osier dogwood riparian forest. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Wildlife:** Special status wildlife known to use the ACEC include:<br><br>• Desert bighorn sheep<br>• Bald eagle<br>• Peregrine falcon<br>• Canyon tree frog<br><br>The canyon tree frog in particular has been identified as a species of greatest conservation concern by the State of Colorado. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028670

| Importance Criterion | | Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 and 2 | Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.<br><br>Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | **Cultural Resources:** The canyon bottoms of the Dominguez Canyon area have evidence of human activity dating back thousands of years. There are numerous well-preserved rock art sites that constitute one of the highest concentrations in the planning area. The known rock art sites cover a long period, with some that date from over 2,000 years ago to Ute rock art panels from approximately 100 years ago.<br><br>All of these cultural resources are sensitive, irreplaceable and exemplary. |

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

Dominguez-Escalante National Conservation Area                                    265
APPROVED RESOURCE MANAGEMENT PLAN



**Figure M.9. Big Dominguez Canyon ACEC**

*Appendix M. Evaluation of Proposed and Existing Areas of Critical Environmental Concern*

BLM_0028672

## M.5. Interdisciplinary Team Members

The following BLM Uncompahgre and Grand Junction Field Office staff members participated in analyzing the proposed ACECs:

| Name | Title |
|---|---|
| Amanda Clements | Ecologist |
| Lynae Rogers | Rangeland Management Specialist |
| Melissa Siders | Wildlife Biologist |
| Anna Lincoln | Ecologist, Threatened and Endangered Species |
| Jim Dollerschell | Rangeland Management Specialist |
| Heidi Plank | Wildlife Biologist |
| Nathan Dieterich | Hydrologist (former) |
| Andy Windsor | Recreation Planner |
| Ben Blom | Planning Team Lead (former) |
| Alissa Leavitt-Reynolds | Archaeologist |
| Scott Gerwe | Geologist (former) |
| Doug Diekman | GIS Specialist |
| Brodie Farquhar | Writer-Editor (former) |

## M.6. References

See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028673

# Appendix N. Comprehensive Travel and Transportation Management Plan

## N.1. Introduction

Travel management is the process of planning for and managing access and travel systems on public lands. This includes route planning, inventory and evaluation, innovative partnerships, user education, mapping, monitoring, signing, field presence, and law enforcement (ICO-2007-020). Comprehensive travel management planning should address all resource use aspects, such as recreational, traditional, casual, agricultural, commercial, and educational, and all modes and conditions of travel on public lands, not just motorized or off-highway vehicle (OHV) activities—see Manual 1626 (BLM 2011c).

Travel management planning for the D-E NCA is concurrent with the development of a resource management plan for the D-E NCA. This is required by the D-E NCA's guiding legislation from Congress. The Omnibus Public Land Management Act of 2009 (Omnibus Act), which created the D-E NCA, specified that "use of motorized vehicles in the Conservation Area shall be allowed…after the effective date of the management plan, only on roads and trails designated in the management plan for the use of motor vehicles." To fulfill both Manual 1626 and the Omnibus Act, this planning effort considered all modes of travel, motorized and non-motorized.

This appendix is written with both the Omnibus Act and the D-E NCA Proposed Resource Management Plan in mind. The Proposed Plan Alternative creates a mix of recreational opportunities that attempt to meet a wide variety of recreational demands while reducing conflict due to different uses. The Proposed Plan Alternative also provides for livestock grazing, the continued operation of public land rights-of-way, traditional uses, and access to private property. Each of these uses, including recreation, requires a supporting travel management system within the D-E NCA. In addition, the Proposed Plan Alternative provides for a variety of protections for the purposes of the D-E NCA. According to the Omnibus Act, these are the area's unique and important geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, and scenic resources.

The ultimate goal of this travel management process is to propose a management framework that supports both current and future use needs, while ensuring conservation, protection, and enhancement of the purposes of the D-E NCA's designation.

Travel management decisions are considered sequentially at two levels of analysis:

- Land-use planning—D-E NCA Proposed RMP, travel-area decisions (i.e., decisions

BLM_0028674

about which areas should be open, closed, or limited for all modes of travel).

- Activity- or implementation-level planning—this appendix, route-by-route decisions (i.e., decisions about which routes will be open or closed for different modes of travel in limited areas).

Note: Land-use planning-level decisions differ from activity- or implementation-level decisions. To change a travel-area decision, the RMP must be amended. Route-by-route decisions do not require an RMP amendment, because they are implementation-level decisions, which are designed to be more adaptable. On the basis of monitoring results, the designated route system can be changed to meet resource and resource-use objectives. Additionally, area designations may be protested, and route-by-route designations may be appealed.

## N.2. Background

## N.2.1. Description of Route System

Within the BLM, travel management has historically focused specifically on motor vehicle use. However, the BLM now considers travel management to include all forms of transportation, including travel by foot, horseback, and mechanized vehicles such as bicycles, as well as the numerous forms of motorized vehicles, from two-wheeled (motorcycles) and four-wheeled ATVs (ATVs) to full-sized vehicles (cars and trucks).

The vast majority of existing routes within the D-E NCA were not constructed by the BLM for recreational use. Instead, they are two-track routes that were created to provide access for timber cutting, mineral and paleontological exploration, range and vegetation management projects, and various rights-of-way. Of these routes, many were not necessarily intended to be left behind or open for recreational use but have become popular routes for visitors engaged in both non-motorized and motorized recreational activities.

Over time, the D-E NCA's route system has been expanded by users themselves, particularly in areas that were previously designated as open for cross-country motorized vehicle travel. These routes are not typically maintained by the BLM; rather, it is the repeated passage of vehicles that maintains these routes. Not designed but created, these routes are often rutted and eroded. In some areas, particularly high route densities confuse visitors and lead to fragmentation of wildlife habitat.

## N.2.2. Description of Process

Travel management planning for the D-E NCA is based on extensive public participation and internal, structured, interdisciplinary team (IDT) analysis.

BLM_0028675

# Inventory and Public Comment

BLM staff in the Grand Junction and Uncompahgre Field Offices inventoried and digitized spatial information regarding the existing route system in the D-E NCA from 1998 through 2010. Over time, the inventory expanded to become a comprehensive inventory of the entire D-E NCA. The majority of this information was collected in the field, but some was digitized remotely using satellite imagery and later verified in the field.

In August 2010, the BLM initiated the public scoping process for the D-E NCA RMP. During this two-month period, the BLM received 39 letters (comment forms, letters, and emails) from the public that specifically addressed travel management in the D-E NCA.

In November 2010, the BLM released its travel management route inventory to the public. Route information was provided online and was available in both .pdf and .kmz formats.

This inventory included all roads and trails identified through the BLM's inventory process. The release of this inventory initiated a public comment period that lasted from November 9,

2010 until June 15, 2011. During this comment period, the BLM sought feedback from the public on the following questions:

- Is the BLM's route inventory accurate and complete?

- Which routes do you value for what uses, and why?

- The BLM held two open houses at the start of the public comment period:

- November 9, 2010, Bill Heddles Recreation Center, Delta, CO; nine members of the public attending.

- November 10, 2010, Mesa County Courthouse Annex, Grand Junction, CO; 27 members of the public attending.

During the comment period for the route inventory, the BLM received 73 letters (comment forms, letters, and emails) from the public that consisted of route-specific and area-specific comments on travel management in the D-E NCA. As comments were received, BLM staff field-verified routes that the public identified as missing or inaccurate in the BLM inventory. Once field verification was done, the BLM finalized its route inventory for the D-E NCA. A total of 652 miles of routes were identified as part of the final inventory. This number excludes county-maintained roads, which were not designated during the travel management planning process.

In May 2013, the BLM released the D-E NCA Draft Travel Management Plan (TMP) simultaneously with the D-E NCA Draft RMP. The BLM also held two open houses at the start of this public comment period. The open houses were held on the following dates:

BLM_0028676

- June 17, 2013, Colorado Mesa University, Grand Junction, CO

- June 19, 2013, Bill Heddles Recreation Center, Delta, CO

During the comment period for the Draft RMP, the BLM received 75 letters (comment forms, letters, and emails) from the public that consisted of route-specific and area-specific comments on travel management in the D-E NCA. These letters consisted of 6 general comments, 10 route inventory comments, 13 route-use comments, 2 comments on the BLM's priorities, and 193 unique route-specific comments. The BLM incorporated and responded to all substantive travel-related comments, and these comments were considered during the Proposed TMP designation process. The BLM made the following changes as a result of public comments:

- The BLM assumed all routes to have recreational value, defined as "providing the opportunity to travel on and across public lands." Consequently, the BLM considered different use designations for all routes, including those routes the BLM had initially identified in the Draft RMP as redundant routes, dead-end routes, or routes having no identified value.

- To help understand the wildlife impacts of seasonal closures, the BLM used route density calculations resulting from combinations of open routes in big game winter range. Chapter 4 of the Proposed RMP includes a discussion of the results of this analysis.

- To determine the extent to which objectives for priority habitats were achieved, the BLM used core area and route density tools in GIS. Chapter 4 of the Proposed RMP includes a discussion of the results of this analysis.

- The BLM reconsidered routes that were designated closed to public use until mitigated. In the Preferred Alternative, 29.9 miles were designated as closed to public use until mitigated. In the Proposed Plan Alternative, 15.2 miles were designated as closed to public use until mitigated.

## Interdisciplinary Meetings for the Proposed Travel Management System

After coding public comments, the BLM incorporated route-by-route comments into a specially designed route designation database, which allowed the BLM to use these comments to develop route-by-route implementation-level decisions (described in this appendix) for the Proposed TMP. The BLM invited cooperating agencies to participate in this phase of the process, which took place over 12 days in April and May of 2014. The purpose of these meetings was to do the following:

- Ensure route designations are consistent with the goals, objectives, and allocations in the Proposed Plan Alternative.

BLM_0028677

- Given the revised assumption that all routes had value (see discussion above), revisit closed routes from the Draft Preferred Alternative to evaluate whether significant resource concerns warranted closure or designation to another type of use in the Proposed TMP.

- For each route, evaluate public comments that substantively support or oppose a particular route designation in the Draft Preferred Alternative.

- Given refined criteria and associated spatial information regarding use needs and resource concerns (identified below), confirm that the justifications for route designations in the Draft Preferred Alternative are as consistent as possible.

- Record the identified conflicts and minimization criteria that warrant specific route designations, the specific mitigation proposed by each resource specialist, and record the purpose and need for the routes in question. Where conflicts with resources existed, the IDT and attending cooperating agency representatives discussed the conflicts, and the IDT proposed a designation for each route.

Public comments, resource information, and pertinent management objectives and actions described in this document drove the decision-making process that resulted in the Proposed TMP, which was reviewed by the cooperating agencies.

## Finalization of the Travel Management Route System

On July 1, 2016, the BLM released the Proposed Resource Management Plan and Final Environmental Impact Statement including the Proposed Travel Management Plan. During the protest period and Governor's consistency review, the Dominguez-Escalante Advisory Council met three times to discuss the Proposed RMP and travel management plan. During this process, the public brought to BLM's attention that some route-specific public comment recommendations had been miscategorized in the route report, and suggested some additional desired route designation changes. As a result, the BLM reviewed the route comments and identified comments that had been miscategorized. The BLM then reviewed each of the subject routes to determine if a change in route designation was warranted. Through this process, a handful of route designations were changed for the Approved Travel Management Plan.

## N.2.3. Laws, Regulations, Policies, and Program Guidance

Currently, 43 CFR 8340 establishes the criteria for designating public lands for OHV use and for establishing controls governing OHV use and operation. This planning effort also addressed non-motorized and non-mechanized uses, and resulting decisions for these forms of travel will be incorporated into supplemental rules for enforcement purposes. Various laws and regulations apply to this process (note that this list is not exhaustive):

- National Environmental Policy Act

BLM_0028678

- Endangered Species Act

- Wilderness Act

- National Historic Preservation Act

- Antiquities Act of 1906

- Wild and Scenic Rivers Act

- Clean Air Act

- Clean Water Act

- Taylor Grazing Act

- Mining Act of 1872 (and subsequent mining acts)

- Federal Land Policy and Management Act for the BLM

- Code of Federal Regulations

- BLM Manuals 6100 (National Landscape Conservation System Management); 6220 (National Monuments, National Conservation Areas, and Similar Designations); 6330 (Management of BLM Wilderness Study Areas); 6340 (Management of Designated Wilderness Areas); 6280 (Management of National Scenic and Historic Trails and Trails under Study or Recommended as Suitable for Congressional Designation); and 1626 (Travel and Transportation Manual).

- BLM Manual 9011 and Handbook H-9011-1

- BLM Manual 9014

- BLM Manual 9015

- Carlson-Foley Act of 1968

- Departmental Manual 517

- Executive Order 13112 of February 3, 1999

- Noxious Weed Control Act of 2004

- Federal Noxious Weed Act of 1974 (7 U.S.C. 2801 et seq.), Section 15

- Plant Protection Act of 2000 (P.L. 106-224)

Federal Regulations 43 CFR 8340 and Executive Order 12608 require the BLM to designate all public lands as open, limited, or closed for OHV use within the following parameters:

The authorized officer shall designate all public lands as open, limited, or closed to OHVs. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of

BLM_0028679

conflicts among various uses of the public lands; and in accordance with the following criteria:

1. Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

2. Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

3. Areas and trails shall be located to minimize conflicts between OHV use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

4. Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that OHV use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

In addition, the Omnibus Act that created the D-E NCA specified that "use of motorized vehicles in the Conservation Area shall be allowed…after the effective date of the management plan, only on roads and trails designated in the management plan for the use of motor vehicles." This means that the BLM will not designate *areas* as open to motorized vehicles within the D-E NCA. This restriction applies to all motorized use, including travel over snow on snow machines or snowmobiles. Exceptions to this are also provided in the Omnibus Act. This exception prevents the BLM from limiting "the use of motor vehicles in the Conservation Area for administrative purposes or to respond to an emergency."

Travel on any land acquired by the BLM over the life of the resource management plan will be managed under the classification criteria identified in 43 CFR 8342.1, limited to existing roads and trails until a site determination and travel management plan are completed for the acquisition.

# N.3. Area-Allocation Travel Decisions

Area-allocation travel management decisions, or land-use-planning travel management decisions, define the areas within the D-E NCA that are designated open, limited, or closed to OHV, mechanized, or cross-country foot and horse travel. "Limited" can mean the following:

- Limited to designated routes

BLM_0028680

- Limited to existing routes

- Limited to a specific season of use (generally done for wildlife or soil protection)

- Limited to a specific class or type of use

The BLM used an interdisciplinary process to make area-allocation travel decisions in the Draft TMP, and to revisit them in the Proposed TMP, as was done for other land-allocation decisions for other resource uses in the D-E NCA. Area decisions reflect the goals and objectives regarding resources and resource uses stated in section 2 of the Approved RMP. All goals and objectives for all D-E NCA uses and resources (e.g., recreation, lands with wilderness characteristics, livestock grazing and vegetation health, wildlife and soils, and water quality) played a role in influencing the land-allocation travel decision-making process.

## N.3.1. Management Required By Law

Because the Omnibus Act requires all motorized travel to occur on designated roads and trails, the BLM's choices for motorized-use area allocation fell into one of the following categories:

- Limited to designated routes

- Limited to a specific season of use

- Limited to a specific class or type of use

- Closed

Travel management within the Dominguez Canyon Wilderness (the Wilderness) is governed by the Wilderness Act of 1964 and BLM Manual 6340 (BLM 2012d)[29]. As a matter of law, there is no recreational motorized or mechanized travel in the Wilderness (66,193 acres). The BLM may authorize administrative use of motorized travel in all areas of the D-E NCA (including the Wilderness). This administrative use would allow for repairs and maintenance, by grazing permittees, of livestock grazing facilities and other livestock grazing operations; for administrative motorized use by the BLM and other cooperating agencies; and for emergencies. All administrative motorized use in the Wilderness will be evaluated using the "Minimum Requirement Decision Guide" (see Appendix H).

The Wilderness Act prohibits motorized and mechanized travel inside the Dominguez Canyon Wilderness. The BLM retains the discretion to decide whether recreational motorized or mechanized travel will be allowed on routes that were documented in the Wilderness Study Area inventory (there are 2,885 acres of Wilderness Study Areas in the D-E NCA).

---

[29] See Chapter 6 of the Proposed RMP for a comprehensive list of references cited in this document.

BLM_0028681

## N.3.2. Description of Area-Allocation Travel Decisions

Please note that these decisions are also included in section 2 of this Approved RMP. They are summarized again here (Tables N.1, N.2, and N.3). The entire D-E NCA decision area is approximately 210,012 acres.

**Table N.1. Area Designations (in Acres) for Motorized Travel**

|  | Closed (Wilderness Lands*) | Limited to Designated Routes (Year-round) | Limited to Designated Routes with Seasonal Closure (12/1–4/30) |
|---|---|---|---|
| Approved TMP | 66,193 | 80,705 | 63,114 |
| *Closed under the Omnibus Act of 2009* | | | |

**Table N.2. Area Designations (in Acres) for Mechanized Travel**

|  | Closed (Wilderness Lands*) | Limited to Designated Routes (Year-round) | Limited to Designated Routes with Seasonal Closure (12/1–4/30) |
|---|---|---|---|
| Approved TMP | 66,193 | 80,705 | 63,114 |
| *Closed under the Omnibus Act of 2009* | | | |

**Table N.3. Area Designations (in Acres) for Foot and Horse Travel**

|  | Closed | Open to Cross- Country Travel | Limited to Existing Routes (Year-round) |
|---|---|---|---|
| Approved TMP | 0 | Foot: 210,012 | Foot: 0 |
|  |  | Horse: 208,426 | Horse: 1,586 |

## Approved Travel Management Plan

The Approved TMP would have no areas closed to motorized and mechanized travel besides the Wilderness (66,193 acres).

There are areas within the D-E NCA that are closed seasonally to motorized and mechanized travel. These seasonal closures will be implemented for the protection of big game winter concentration areas during critical periods. During this time, motorized travel within these 63,114 acres is limited to administrative use only.

BLM_0028682

All remaining acres of the D-E NCA are limited to designated routes for motorized and mechanized travel year-round.

Wilderness Zone 1, consisting of 1,586 acres, is limited to existing trails for horse travel (Map 2-13). The BLM recognizes that the agency inventoried only the major trails within the Wilderness, and many more trails exist on the ground at the time of the publication of the Proposed TMP than are depicted in the published travel maps. Therefore, section 2 includes a management action to update the inventory within Wilderness Zone 1 during travel management implementation, after which an updated inventory will be made available to the public in the form of posted maps. The BLM retains the discretion to close individual existing routes if site-specific resource concerns warrant a closure to horse traffic.

# N.4. Implementation-Level Travel Decisions

Implementation-level decisions include the process of assigning route designations to each route in accordance with alternative themes, while balancing access and resource concerns. Route designation is an implementation-level decision intended to support the D-E NCA's goals and objectives.

The BLM's IDT convened for approximately four weeks during April and May of 2014. Cooperating agencies were invited to participate in this process. During this time, the group examined each route within the D-E NCA to determine its designation. Access needs, resource concerns, recreational objectives and public comment all factored into this process, as described above. The designation criteria used by the IDT are described in detail below, and they reflect the changes the team made from the Draft to the Proposed TMP to further clarify intent, to mirror the objectives and management actions in the Proposed Plan Alternative, and to incorporate the changes recommended by public comment.

Only routes on BLM land within the D-E NCA that were not county-maintained roads were considered during this process. The mileage of county-maintained roads is included in Table N.4 merely to present a complete picture of the travel management system within the D-E NCA.

# N.4.1. Designation Criteria for Each Route

As the BLM analyzed each route within the D-E NCA, the criteria listed below were used to determine the use needs and resource concerns associated with each route. For example, if a route helped meet trail-based recreational objectives for a recreation management area (RMA), this was noted at that stage of the process.

Some of the criteria for identifying environmental concerns and other factors for consideration were treated with more urgency than others when route-by-route designations were being determined. For example, routes that were in big game calving or production areas were

BLM_0028683

considered a far more pressing concern than routes that fell within a big game summer range. In all cases, use needs and concerns stem from management objectives and actions in the RMP.

# Use of the Route

*Recreation*

1. The route or trail helps meet trail-based objectives for recreation (see section 2 decisions for each RMA).

2. The route or trail provides access to recreational opportunities. In response to public comments, the BLM applied this criterion to all routes (TRV-OBJ-01).

3. The route provides access to a dispersed camping site or scenic overlook (REC-OBJ-01).

*Livestock Grazing*

1. The route or trail provides access to existing range developments (TRV-OBJ-01).

2. The route or trail facilitates livestock management (TRV-OBJ-01).

*Lands and Realty*

1. The route or trail provides access to non-Federal lands (TRV-OBJ-01).

2. There is an existing right-of-way associated with the route, or the route provides access to an existing right-of-way (TRV-OBJ-01).

# Environmental Concerns

*Soil Stability*

1. The route is within 25 meters of highly erosive soils (i.e., fragile soils, as defined by the Natural Resources Conservation Service) (SWQ-AU-01).

2. The route crosses areas with slopes between 25–40% (SWQ-AU-02).

3. The route crosses slopes of 40% or greater (SWQ-AU-02).

*Wildlife Habitat*

The route is within elk and mule deer winter concentration areas and severe winter range. In the Proposed TMP, this resource concern is addressed through seasonal closures (F&W-AU-03; TRV-MA-08).

BLM_0028684

1.  The route is within bighorn production areas (SSS-DBS-MA-03).

2.  The route is within a bighorn summer range (SSS-DBS-AU-09).

3.  The route is within bighorn winter concentration areas (SSS-DBS-MA-04).

4.  The route is within pronghorn winter concentration areas (F&W-MA-04).

5.  The route contributes to habitat fragmentation (PSV-MA-08).

6.  The route leads to sagebrush fragmentation (PSV-SGS-MA-05).

*Special Status Species Habitat*

1.  The route is within 0.5 miles of identified raptor nests (SSS-OTH-AU-03).

2.  The route is within potential raptor habitat (SSS-OTH-AU-03).

3.  The route is within Gunnison sage-grouse winter habitat (SSS-OTH-AU-13).

4.  The route is within 50 meters of active prairie dog colonies (SSS-OTH-AU-12).

5.  The route is within 200 meters of Colorado hookless cactus (SSS-CHC-MA-03).

6.  The route is within 100 meters of known occurrences of BLM sensitive plant species (SSS-OTH-AU-02).

7.  The route is within the following CNHP-classified vegetation communities: exemplary, ancient, critically imperiled, imperiled, or vulnerable (SSS-OTH-AU-01).

*Riparian Areas, Water Quality, and Fisheries*

1.  The number of times a route crosses a stream (PSV-RIP-MA-01).

2.  The route is within 100 meters of perennial streams (PSV-SSP-AU-01).

3.  The route is within 30 meters of ephemeral streams (SWQ-AU-03).

*Cultural Resources*

1.  The route is within 100 meters of identified cultural sites/routes (CUL-AU-01).

*Geological/Paleontological Resources*

1.  The route crosses significant paleontological or geological areas (GPA-AU-01).

BLM_0028685

*Special Management Areas*

1. The route is within an area determined to contain wilderness characteristics (LWC-AU-01).

2. The route passes through Escalante Canyon and/or Gunnison Gravels ACECs (ACEC-AU-06, ACEC-AU-01).

3. The route passes through Gibbler Mountain ACEC and within 100 meters of known, significant paleontological sites and/or within 100 meters of BLM sensitive plant occurrences (ACEC-AU-10).

4. The route passes through Gibbler Mountain ACEC and within 200 meters of Colorado hookless cactus (ACEC-MA-08).

5. The route passes through River Rims ACEC and within 200 meters of Colorado hookless cactus (ACEC-MA-11).

6. The route is within the national historic trail management corridor. Close and potentially rehabilitate routes to improve the naturalness of the trail management corridor setting (NHT-MA-03).

## Other Factors for Consideration

1. The route could potentially lead to trespass on private land (TRV-MA-10).

2. The route continues on to adjacent Forest Service and/or State lands managed by CPW (TRV-MA-06).

## Routes of Special Importance to Counties

Mesa, Delta, and Montrose Counties served as cooperating agencies on the planning team, and these counties identified factors and/or individual routes that were important for serving various needs important to local government or to their constituents. These needs included business access (e.g., agriculture) but also included general access and recreation as well. This understanding emerged as an important factor as the planning process continued, with the counties providing input regarding routes important for access and recreation as well as business needs. The BLM planning team worked closely with the counties to review and understand these comments and incorporate them wherever possible given other laws that guide management of public lands.

## N.4.2. Route-by-Route Designation

Once the uses, concerns, and other factors for each route had been reconfirmed, the public

BLM_0028686

comments evaluated, and the minimization criteria identified, the IDT gave each route a designation.

Route designations conformed to the management objectives and actions described in the RMP. Resource protection and recreational objectives, in particular, played a significant role in determining which routes were designated as open, limited, or closed.

Route designations fell into the following categories (letters within parentheses are symbols used for each category):

- Open to all modes of travel
- Closed
- Closed, and targeted for rehabilitation
- Limited to administrative use only
- Limited to foot and horse travel only
- Limited to bicycle, foot, and horse travel only
- Limited to motorcycle, bicycle, foot, and horse travel only
- Limited to ATV, motorcycle, bicycle, foot, and horse travel only

Administrative routes are routes that will be closed to the public but open for use by individuals (e.g., grazing permittees, BLM employees, and CPW employees) who have authorization to travel on such routes. Administrative routes are not open for use by special recreation permit holders. These administrative routes include routes to stock ponds and other range improvements, to guzzlers, and to BLM facilities. Some routes received both an administrative designation and another designation (for example, when a route was designated as a bicycle route, but a grazing permittee still needed administrative motorized access).

The BLM chose to designate routes for horse and foot travel throughout the D-E NCA despite the fact that the D-E NCA is available for cross-country travel on horse and foot, with the exception of Wilderness Zone 1 in the Proposed TMP (which limits horseback travel only to existing routes). This was done in response to public comment from hiking and equestrian user groups that requested designated trails for horse and foot travel. Designating horse and foot routes means these routes would be added to the facility asset system and the BLM could use appropriated funds to maintain the routes.

Inside the Dominguez Canyon Wilderness, routes were also designated for horse and foot travel to create an identifiable trail system. These routes will also be added to the facility asset system, and the BLM would use appropriated funds for maintenance. Other routes inside the Wilderness did not receive a designation. These routes were labeled "wilderness" routes. These routes will

BLM_0028687

not be maintained and will be allowed to change through natural processes. Along with a designation, the BLM classified each open route as a road, primitive road, or trail. The definitions of these three route categories are as follows (BLM 2011c):

- Road: A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

- Primitive road: A linear route managed for use by four-wheel-drive or high-clearance vehicles. These routes do not customarily meet any BLM road design standards. Unless specifically prohibited, primitive roads can also be used for activities such as hiking, biking, and horseback riding.

- Trail: A linear route managed for human-powered, stock, or OHV travel, or for historical or heritage values. Trails are not generally managed for use by four-wheel-drive or high-clearance vehicles.

## Route-by-Route Designation in the Approved TMP

Through the process of route-by-route designation for the approved TMP, the IDT established some guidelines that were applied across all routes:

1. Routes that could lead to private-land trespass and do not provide primary access to non-BLM lands were designated as closed. There are approximately 9 miles of such routes in the D-E NCA that are closed under the approved TMP.

2. Routes that could lead to private-land trespass and that provide primary access to non-BLM lands were designated as limited to administrative use only.

3. Routes that are associated with, or provide primary access to, established rights-of-way were either designated as open or as limited to administrative use only.

4. Routes that lead to existing and necessary livestock facilities were designated as open, ATV, or as limited to administrative use only.

5. Routes were designated to provide consistency with route designations on adjacent National Forest System lands and State lands.

## Approved Travel Management Plan

The Proposed Travel Management Plan route-by-route designations listed in Table N.4 below are based on the process and criteria outlined above.

BLM_0028688

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

282

## Table N.4. Miles of Route Designations

| | BLM Routes Limited to | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Open County-Maintained Roads on BLM Public Lands | Open County-Maintained Roads off BLM Public Lands | Open to All Modes of Travel | Administrative Use Only | ATV, Motorcycle, Bicycle, Horse and Foot | Motorcycle, Bicycle, Horse and Foot | Bicycle, Horse and Foot | Horse and Foot | Non-Maintained Routes* | Closed Routes | Routes Available for Some Form of Public Use |
| Approved TMP | 83 | 30 | 217 | 47 | 96 | 11 | 22 | 102 | 20 | 144 | 551 |

*Non-maintained routes are routes within Zones 2 and 3 of the Wilderness that will remain open to horse and foot use, as cross-country travel throughout the Wilderness (and throughout the remainder of the D-E NCA) by foot and horse is permitted. However, the BLM will not maintain these routes as part of its travel management system.

*Appendix N. Comprehensive Travel and Transportation Management Plan*

BLM_0028689

# N.4.3. Cultural Resources

Through the travel management planning process, the BLM satisfied the requirements of Section 106 of the NHPA, 16 U.S.C. § 470f, for the travel and transportation management decisions relating to the D-E NCA RMP pursuant to Addendum 1 of the economic impacts associated with livestock grazing Colorado State Protocol Agreement (Protocol) between the Colorado State Historic Preservation Officer (SHPO) and the BLM. The Protocol supplements the National Programmatic Agreement between the BLM, the Advisory Council on Historic Preservation (ACHP), and the National Conference of State Historic Preservation Officers and adopts an alternate procedure for compliance with Section 106 of the NHPA as allowed under 36 CFR § 800.14(b).

Addendum 1 recognizes that the BLM's designation of routes and areas is an undertaking triggering compliance with Section 106 of the NHPA and that the BLM must complete the Section 106 requirements as part of route designation during the planning process. The Addendum specifically outlines how the BLM will comply with the requirements for Section 106 for Comprehensive Travel and Transportation Management Planning. As described in the Addendum, "selection of specific route networks and imposition of other use limitations, will avoid impacts on cultural resources where possible. In accordance with 43 CFR 8342, existing cultural resource information must be considered when choosing among the range of alternatives for the design of a planning area travel system, including the potential impacts on cultural resources when determining whether each of the routes or areas in a planning area should be designated as open, limited, or closed."

During the designation process, existing cultural resource information is considered when choosing among the range of alternatives for the design of a planning area travel system. A large number of existing routes and areas are designated in these planning efforts (land use plans and resource management plans). According to Addendum 1, "Designation provides a purposefully designed and clearly delineated travel network, reduces the potential for user-caused route proliferation, and facilitates travel management and law enforcement," all of which are helpful in reducing adverse effects to historic properties.

The steps set forth in the Addendum establish a phased process for the identification, evaluation, and resolution of potential adverse effects to historic properties eligible for or listed on the National Register of Historic Places. The area of potential effect (APE) that is subject to inventory will be determined by the cultural resource specialist as defined by 36 CFR 800.16(d). When defining the APE, the BLM will consider potential direct, indirect, and cumulative effects to historic properties.

The Addendum's phased process for identification is broken down into three steps: planning, route development, and route maintenance.  During the planning phase, existing cultural resource

BLM_0028690

data along with known areas of higher use or concentration of travel are used to determine priority areas for a Class III cultural resource inventory. The SHPO, interested Native American tribes, and other consulting parties are consulted during planning and invited to participate in the development and implementation of identification, monitoring, and treatment options according to the Colorado State Protocol in association with the National Programmatic Agreement.

During the route development phase, when a Class III inventory is being completed, if the BLM identifies historic properties that are eligible for or listed on the National Register of Historic Places that are affected, the BLM will identify ways to avoid, minimize, or mitigate such adverse effects, and outline treatment procedures. The types of avoidance, minimization, or mitigation may include fencing, site testing or excavation, signing, route realignment, or route limitation or closure. The third phase focuses on conducting Class III inventories, as necessary, for those areas identified during the planning phase as being the lowest priority inventory areas with designated routes.

For the D-E NCA RMP travel and transportation management planning process, the BLM identified existing routes throughout the field office and examined the routes to determine the appropriate designation based on public need and known natural and cultural resource concerns. The BLM used current cultural resource inventories and assessments to determine potential cultural resource concerns on a route-by-route basis. The designated routes identify cultural resource concerns along with any other issues or rationale for the route designation, which are reflected in Table N.4. The BLM withheld from public disclosure sensitive cultural resources associated with routes, even though the BLM considered such information during the designation process.

During the RMP planning phase, the BLM consulted with the SHPO and interested Native American tribes and incorporated the comments received into our Proposed Plan Alternative. Once the RMP is finalized, the D-E NCA will move into the phased identification process to determine priority areas for a Class III cultural resource inventory. A priority list of designated routes that require a Class III cultural resource inventory will be completed based on the implementation plan and implementation priorities. The remaining phases will follow the steps of the Addendum as described above. For those routes that the BLM determines may have adverse effects on cultural resources eligible for or listed in the National Register of Historic Places, the D-E NCA will consult with the SHPO, interested Native American tribes, and other interested parties to determine the means to avoid, minimize, or mitigate such adverse effects on a case-by-case basis.

## N.4.4. Guidance for Implementation of Approved Travel Management Plan

As noted above, route-by-route decisions in this TMP are implementation-level decisions

BLM_0028691

designed to support resource and resource use objectives found in section 2 of the Approved RMP. As such, the route-by-route decisions can change through the life of the RMP. Changes to these route-by-route decisions will be based on an evaluation of monitoring information to determine whether a route is supporting RMP objectives.

After the Record of Decision is written, the BLM will develop a strategy to implement this TMP. The following will be included in that strategy:

Priorities:

Priority areas for implementation of the travel plan will be areas of higher use and concentration of travel. In the D-E NCA, these are areas with planning objectives focused on trail-based recreation and where use will likely be highest. Listed in priority, these areas are:

1. Cactus Park RMA

2. Ninemile Hill RMA

3. Hunting Ground RMA

4. Sawmill Mesa/Wagon Park RMAs

Within areas of higher use and concentration of travel, priorities for the travel system implementation plan will include areas or routes that have the highest adverse effect on wildlife, soil, water, and riparian resources. This would include areas identified for seasonal closures to protect wildlife and individual routes that were left open that need mitigation to protect soil, water, and riparian resources. Of course BLM will be strategic in leveraging public and private resources to complete implementation. BLM may shift priority to areas where community groups are able to contribute resources to implement the Travel Management Plan.

Surveys:

Cultural Surveys: In accordance with Addendum 1 to the Colorado State Protocol Agreement discussed above, Class III cultural surveys will be conducted on routes within priority areas with known adverse effects to cultural resources. Class II surveys will also be conducted in priority areas to identify additional routes that need Class III surveys. Class III surveys will be conducted for all new routes or reroutes of designated routes.

Colorado Hookless Cactus Surveys: Surveys for Colorado Hookless Cactus will be conducted on the basis of consultation with the USFWS.

Administrative Route Implementation:

Routes are designated as administrative to facilitate access for livestock grazing permittees,

*Appendix N. Comprehensive Travel and Transportation Management Plan*

rights-of-way, and agency work. Even if a route is not designated with a primary designation as administrative, the BLM provided for administrative access for existing needs at the time of the development of the Proposed Travel Management Plan. Future administrative access not identified at the time of the Proposed Travel Management Plan may be granted on a case-by-case basis for livestock permittees and applicants for rights-of-way. Administrative routes are not open for motorized and mechanized public use. In the case of grazing and right-of-way access, the intent is for the routes to be used solely for the purpose associated with the authorization; therefore, the following implementation actions and guidelines will be used to authorize use on administrative routes:

### Rights-of-Way:

1. The right-of-way holder will be issued a motorized-use authorization that defines the nature of access and any timing limitation that applies.

2. The right-of-way holder will be required to carry a copy of the motorized-use authorization when using authorized administrative routes.

### Livestock Grazing:

1. Motorized use of administrative routes for livestock grazing will be limited to permitted allotments, one week before, during, and one week after the authorized grazing dates defined on the grazing permit. Any use of administrative routes outside these time frames will require written authorization from the BLM (e.g., cleaning a pond outside the permitted grazing dates).

2. In the case of sick or injured livestock, cross-country motorized travel will be permitted. The permittee must notify the BLM following any such cross-country travel. Emergency cross-country use will only be permitted during the authorized grazing dates defined on the grazing permit.

3. Motorized travel will be permitted off administrative routes along fence lines for the purpose of repairing or constructing fences and gates. Motorized travel off administrative routes along fence lines for maintenance will only be authorized one week before and during the authorized grazing dates defined on the grazing permit. Motorized travel off administrative routes along fence lines for construction or reconstruction of fences may be approved outside the authorized grazing dates defined on the grazing permit on a case-by-case basis.

4. All allotment management plans in the D-E NCA will be updated to include an administrative motorized-use authorization. A map will be created showing the administrative routes where use is authorized.

BLM_0028693

5.  The permittee and his/her representatives will be required to carry a copy of the map when using administrative routes.

Implementation Actions:

The implementation plan for the travel system will include signs and information to help the public understand which routes are open to which uses. Route signs will follow the Colorado Interagency Sign Standards (I CO-2011-028). Information kiosks will include stewardship and sustainable trail messages (e.g., Tread Lightly and Stay the Trail).

The implementation plan will include current best management techniques for decommissioning closed routes. This will include techniques that will lead to long-term restoration of closed routes to a natural setting that requires no maintenance.

Any new trails or reroutes of existing trails will be developed following the processes outlined in the "Trail Development Process" section below and constructed in accordance with Appendix K, Trail Design Criteria.

Monitoring:

Monitoring individual routes is necessary to evaluate whether the TMP supports achievement of RMP objectives for the different resources and resource uses. The implementation plan will include a monitoring strategy for individual routes that does the following:

1.  Determines baseline conditions: each route designated as open in the TMP will be assessed to determine its condition.

2.  Sets a frequency for monitoring the route condition: this may be determined by a variety of factors, including but not limited to 1) the route's adverse effects on biological and cultural resources, 2) the type of recreation use, and 3) the intensity of recreation use.

3.  Identifies monitoring indicators: monitoring indicators for individual routes will be linked to RMP objectives for the different resources and resource uses in the RMP (e.g., percentage of naturally occurring seeps and springs that show evidence of trampling and human disturbance).

4.  Identifies standards: similarly to indicators, monitoring standards will be linked to RMP objectives for the different resources and resource uses in the RMP (e.g., 6–20% of naturally occurring seeps and springs have evidence of human disturbance caused by an individual route or routes).

5.  Develops a process or system that documents the monitoring protocols and route data.

*Appendix N. Comprehensive Travel and Transportation Management Plan*

<u>Evaluation:</u>

Monitoring is critical in determining whether the designated route network is supporting resource management objectives. Analysis and evaluation of monitoring data provide an indication of change in use and the effects of that use on the environment. On the basis of an evaluation of the monitoring data, the BLM will determine whether changes to the route network need to be made. This process of monitoring, analyzing, and evaluating allows the BLM to adaptively manage the route network to achieve the resource management objectives identified in the RMP. When routes are not contributing to the achievement of management objectives, the BLM may respond in a variety of ways, including but not limited to the following:

1. Improving information and education for users

2. Rerouting a road or trail

3. Constructing new roads or trails

4. Changing the maintenance intensity of a road or trail

5. Closing a road or trail

## N.5. Maintenance Intensities

Maintenance intensity categories provide consistent objectives and standards for the care and maintenance of BLM routes according to identified management objectives. Maintenance intensities are consistent with land-use-planning management objectives (e.g., biological, cultural, recreational, and visual). They provide operational guidance to field personnel on the appropriate intensity, frequency, and type of maintenance activities that should be undertaken to keep the route in an acceptable condition, and they provide guidance on the minimum standards of care for the annual maintenance of a route. They do not describe route geometry, route type, use type, or other physical or managerial characteristics of the route. Those factors are addressed separately.

Maintenance intensities provide a range of objectives and standards, from identification for removal through frequent and intensive maintenance:

- **Level 0** routes are existing routes that will no longer be maintained and no longer be declared a route. Routes identified as Level 0 are removed from the transportation system entirely.

- **Level 1** routes require minimum (low intensity) maintenance to protect adjacent lands and resource values. These roads may be impassable for extended periods of time.

- **Level 3** routes require more moderate maintenance due to low-volume use (such as

BLM_0028695

seasonal or year-round use for commercial, recreational, or administrative access). Maintenance intensities may not provide year-round access but are intended to provide resources appropriate to maintain a usable route for most of the year.

- **Level 5** routes require high (maximum) maintenance due to year-round needs, high-volume traffic, or significant use. Level 5 designation may also include routes identified through management objectives as requiring high intensities of maintenance or as needing to be kept open on a year-round basis.

A proposed maintenance intensity class is included for each route in the TMP. These classes will provide the basis for updating the BLM Facility Asset Maintenance System (FAMS) database for the project area. Under BLM policy, transportation, maintenance, and repairs may be conducted on Bureau routes on a case-by-case basis depending on need and after NEPA analysis. Maintenance intensities are a general guide for BLM to consider during implementation and do not provide rigid guidance for whether routes will be maintained or not.

# N.6. Trail Development Process

## Introduction

The purpose of this document is to clearly define the process required to create new trails or modify existing trails across public lands managed by the BLM's D-E NCA. Trails provide a wide range of recreational opportunities throughout the D-E NCA. Trails are also a tool used by the agency to provide those diverse recreational opportunities while minimizing impacts to natural and cultural resources. Following the background information below is a step-by-step summary of the process for planning, designing, constructing, maintaining and monitoring trails that are legal, fun, functional and sustainable.

## The Process

For many years, the BLM has actively partnered with organizations and individuals in the Grand Junction area to design and construct many of the trails on public lands in and around the Grand Valley. These trails help support a strong recreation-based infrastructure that makes this area a recreation destination, and an excellent place to live and play. As the popularity of trail-based recreation has grown, so has the need to carefully manage those trails in order to protect recreation opportunities, as well as the many other resources found on local public lands. Effective stewardship of public lands requires collaboration and communication between and among land managers and the many people who use and enjoy those lands. To that end, the BLM recognizes the need to openly communicate the BLM's trail planning and construction process, as well as the BLM's current trail management strategy.

The BLM has worked with trail user groups to implement a trail planning and construction process that creates fun, functional and sustainable trail systems while protecting important

BLM_0028696

natural and cultural resources. Each trail or trail system proposal presents unique opportunities and challenges, but the basic steps for successfully navigating the process are described below.

1. **Formulate a trail proposal or concept**. This is usually the easy part. You've got an idea for a great new trail opportunity, or know of an existing trail that really needs to be fixed. Avoid the temptation to grab a tool and start digging, or to simply start trampling in a new route. Remember these are public lands managed for multiple uses.

2. **Identify the purpose and need for the trail**. Think about why your trail idea is important and what purpose it would serve. Write those ideas down.

3. **Build an appropriate constituency for your proposal**. Find other user groups who may have an interest in the area. Introduce yourself to these other players and begin to develop a relationship of open communication and trust. A few key points to remember about building a constituency are listed below.

   - *Look at the big picture:* Public lands contain many different resources and have many different values to many different people. Those differences require a broad and balanced management perspective.

   - *Communicate effectively:* Ask questions if the process, or another person's perspective, is unclear. Listen carefully to others involved in the process.

   - *Think creatively and collaboratively:* Look for ways to partner with the agency and other user groups to provide the time, talent and funding necessary to move a trail proposal through the process.

4. *Contact the BLM office (or other agency) that manages the land you're interested in.* Call or e-mail to set up an appointment to talk with someone (usually someone from the recreation program staff) about your idea.

5. **Know and understand the process.** Take some time to learn the details of the process summarized in this document. A few key points to remember about the process are as follows:

   - *Be patient!* The trail development process takes time (sometimes years.) The end result will be worth it.

   - *Be flexible.* Changes are often necessary to address issues that arise during the process.

   - *Learn more about trails.* There are many great print and electronic media resources, as well as hands-on training opportunities, to learn more about trail planning, design, layout, construction, maintenance and monitoring. See the reference section at the end of this document.

BLM_0028697

6. **Determine current management direction**. Work with BLM staff to identify laws, management plans, policies, and special designations that may affect the trail proposal. Some of the management components that will likely be involved with trail proposals include the following:

- *Endangered Species Act* – the law that guides managers to protect listed threatened and endangered species.

- *National Environmental Policy Act* – the law that guides any proposed action on Federal lands.

- *National Historic Preservation Act* – the law that guides land managers to consider and protect cultural resources.

- *Resource Management Plan* – provides general management guidance for all resources within the D-E NCA. The recreation section of an RMP will define what types of recreation opportunities are targeted for different areas within the D-E NCA

- *Special area designations*
  - Recreation Management Areas – areas where specific recreation management guidance has been developed in the RMP.
  - Wilderness and Wilderness Study Areas – undeveloped areas that are managed for "primitive and unconfined" recreation and for other wilderness values.

7. **Refine trail proposal and define Trail Management Objectives (TMOs).** Based on management direction findings, adjust proposal to fit within current management objectives and guidelines. If the trail proposal is in a RMA, be sure the TMOs are consistent with objectives for that area in the RMP. Trail Management Objectives define what the trail looks like, and how it's managed. TMOs may include some or all of the following specifications:

- Recreation objective from the RMP

- Trail name/number

- Type of use

- Trail type

- Level of use

- Use season

- Level of difficulty

*Appendix N. Comprehensive Travel and Transportation Management Plan*

BLM_0028698

- Tread width

- Corridor width and height

- Surface condition

- Maximum sustainable grade

- Operations and patrol

- Maintenance requirements

- Special features

- Monitoring requirements

8. **Design and lay out a sustainable trail alignment.** This process is further explained in the document entitled "Trail Design Criteria," which is included as Appendix K in the Proposed RMP. Trail design and layout requires special training and experience. Utilize a qualified trail designer to ensure a high quality sustainable trail alignment. Qualified trail designers may be agency employees, trained volunteers, or hired trail contractors.

9. **Initiate NEPA process.** NEPA (National Environmental Policy Act) provides a framework for analyzing the impacts of a proposed project. It requires input from a wide range of resource specialists from the BLM, and often other agencies as well. NEPA analysis along with the associated field work and paperwork is performed by BLM staff, by a contractor, or by a combination of the two. The NEPA process is a public process and provides opportunities for public input regarding any proposed action on Federal lands. For more information about the NEPA process see the "Citizens Guide to NEPA" referenced at the end of this document.

In most cases, trail project proposals will require an EA, which analyzes impacts on the following resources (this list is representative only and does not include every resource analyzed in an EA):

- BLM sensitive species

- Fisheries/aquatic organisms

- Native American religious concerns

- Federally threatened, endangered, and candidate species

- Soils

- Water

- Geology and mineral resources

- Wildlife

*Appendix N. Comprehensive Travel and Transportation Management Plan*

BLM_0028699

- Vegetation

- Invasive, non-native species

- Cultural resources (historic and prehistoric)

- Paleontological resources

- Range management (livestock grazing)

- Visual resources

- Transportation and access

- Economy

- Recreation

- Wilderness and wild lands

- Wild and scenic rivers

- Special designations

The EA contains the following information:

- <u>Proposed action</u>—the trail proposal plus any associated actions (i.e., trailheads, fencing, etc.)

- <u>Alternatives</u>—in addition to the proposed action, a no-action alternative is analyzed, and sometimes one or more alternative actions are analyzed. This provides a range of information on which to make a management decision.

- Description of current situation

- Description of purpose and need for the proposed action

- Review of relevant laws, management plans and guidance

- Detailed analysis of impacts to resources from the proposed action

- Description of actions to mitigate resource impacts

- <u>Finding of No Significant Impact (FONSI)</u>—statement that mitigated impacts from the proposed action will not be "significant." If the EA determines there will be significant impacts, an EIS must be prepared.

- Decision Record (DR)—a statement detailing the decision on how to proceed regarding the proposed action. A decision will be made that will approve the proposal, deny the proposal, or approve it with modifications. Once the DR is signed by the National Conservation Area Manager, the actions specified in the DR may be implemented.

*Appendix N. Comprehensive Travel and Transportation Management Plan*

Trail EAs often require special field surveys, which can be expensive and time consuming. <u>Partnerships to fund surveys are often critical to moving a trail proposal forward:</u>

- <u>Cultural surveys</u>—on-the-ground assessment of historic and prehistoric human activity in the project area. Federal laws (NHPA and others) mandate the documentation and protection of cultural resources found on Federal lands.

- <u>Plant surveys</u>—on-the-ground assessment of rare, sensitive, threatened or endangered plants in the project area. Federal and State laws mandate the documentation and protection of special status plants found on Federal lands.

- <u>Paleontological surveys</u>—on-the-ground assessment of fossils and other evidence of prehistoric life. Federal laws mandate the documentation and protection of vertebrate fossil resources.

- <u>Wildlife surveys</u>—assessment of sensitive wildlife species or wildlife habitats in the project area. Federal and State laws mandate the documentation and protection of special status fish and wildlife species, and their habitat.

10. **Modify the proposal if required by NEPA.** Sometimes trail reroutes will be required to mitigate impacts to other resources.

11. **Begin construction or maintenance of the trail following completion of the NEPA process.** If the project is approved, and once the EA is signed, implementation of the decision can begin.

12. **Monitor the trail to ensure that TMOs are being met**. This should include the following:

- Physical monitoring: Is the trail maintaining the design and construction specifications identified in the TMO?

- Social monitoring: Is the trail providing the recreational opportunities and experiences specified in the TMO?

Modify the trail if it is not meeting objectives. Any modifications to the trail will require BLM approval.

BLM_0028701

# N.7. References[30]

**Citizens Guide to NEPA:**

CEQ (Council on Environmental Quality). 2007. *A Citizen's Guide to the NEPA: Having Your Voice Heard.* December 2007. Office of the President, Council on Environmental Quality.

**Trail Design References:**

COTI (Colorado Outdoor Training Initiative). 2005. *Recommended Standardized Trail Terminology for Use in Colorado.* http://www.americantrails.org/resources/info/TrailTermCOTI.html#a.

Hamilton, N. 1991. *Off-Highway Vehicle Trail Maintenance: Tractor Techniques for Trailbed Preservation.* USDA Forest Service, Mendocino National Forest. Available online: http://nohvcclibrary.forestry.uga.edu/SCANNED%20FILES/T-0001.pdf

Hesselbarth, W. & Vachowski, B. 2004. *Trail Construction and Maintenance Notebook: 2004 Edition.* 4E42A25-Trail Notebook. April 2004. Missoula, MT: USDA Forest Service.

IMBA (International Mountain Bicycling Association). 2004. *Trail Solutions: IMBA's Guide to Building Sweet Singletrack.* Boulder, CO: International Mountain Bicycling Association.

Lockwood, C. 1994. *Trails 2000: A Trail Construction and Maintenance Update.* August 1, 1994. USDA Forest Service, Angeles National Forest.

McCoy, M. & Stoner, M. 2010. *Mountain Bike Trails: Techniques for Design, Construction and Maintenance.* January 25, 2010. Bikecentennial.

USDA (U.S. Department of Agriculture). 2009a. *U.S. & All States Data – Prices: Grazing Fee Rates.* Online database. U.S. Department of Agriculture, National Agricultural Statistics Service. http://www.nass.usda.gov/index.asp.

Vachowski, B. & Neal, M. 1998. *Off-Highway Vehicle Trail and Road Grading Equipment. 7E72A49—Grooming Equipment for Cycle Trails.* October 1998. Missoula, MT: U.S. Department of Agriculture, Forest Service, Technology and Development Program.

Wernex, J. 1994. *Off-Highway Motorcycle & ATV Trails: Guidelines for Design, Construction, Maintenance, and User Satisfaction.* Second edition. Pickerington, OH: American Motorcyclist Association.

---

[30] See Chapter 6 of the Proposed RMP for a comprehensive list of the references cited in this document.

BLM_0028702

# N.8. Trail Management Objective Form

Trail Management Objective

**Trail Name** _____ **Trail Number**_____

Resource Management Plan Objective _____

Type of use:

Hiking/Running _____ Equestrian _____ Mtn. Biking _____ Motorcycle _____ ATV _____ 4x4 _____

Trail type:

Access _____ Destination _____ Point-to-Point _____ Loop _____

**Level of use:**

**Recreational** Heavy _____ Moderate _____ Light _____

**Competition** Yes _____ No _____

**Commercial** Yes _____ No _____

**Use season:**

Year-round _____ Spring, Summer, Fall _____ Winter _____ Seasonal closure _____

**Level of Difficulty:**

Easiest _____ More Difficult/Intermediate _____ Most Difficult/Advanced _____ Experts Only ___

**Trail Specifications:**

Tread width _____ inches

Corridor Width _____ feet Height _____ feet

Surface smooth _____ moderate _____ rough/technical _____

Maximum sustainable grade _____

**Operations and Patrol:**

Patrolled by: BLM _____ Volunteer(s) _____ Adopt-a-Trail _____

Frequency of patrols: Weekly _____ Monthly _____ Yearly _____

BLM_0028703

Dominguez-Escalante National Conservation Area 297
APPROVED RESOURCE MANAGEMENT PLAN

Type of patrol: Law enforcement ____ Maintenance ____ Monitoring _____ Visitor services
(information/education) _____

**Maintenance:**

Frequency: Six months ____ Annual ____ Three years ____ As needed ____

Work performed by: Agency ____ Contract ____ Volunteers ____

Method: Mechanized ____ Hand work ____

**Features:**

Retaining walls ____ Hardening ____ Bridges ____ Drainage structures ____ Signing:
interpretive and information ____ Switchbacks ____ Drains (culverts, etc.) ____ Other ____

Monitoring:

Photo points: Yes ____ No ____ Frequency _____

*Appendix N. Comprehensive Travel and Transportation Management Plan*

This page intentionally left blank

BLM_0028705

# Appendix O. Wild and Scenic River Suitability Report

## O.1. Executive Summary

In accordance with the Wild and Scenic Rivers Act and BLM Manual 6400 (BLM 2012c), the BLM conducted a wild and scenic river (WSR) study as part of the resource management planning process for the Dominguez-Escalante National Conservation Area (D-E NCA). Evaluation of rivers for possible inclusion in the National Wild and Scenic Rivers System (National System) follows a three-step process: 1) Determination of eligibility, 2) tentative classification, and 3) determination of suitability.

The first two steps in the study process (determination of eligibility and tentative classification) were completed as part of the Grand Junction and Uncompahgre Field Offices' RMP revision processes. The D-E NCA includes lands in both field offices. Therefore, the determination of eligibility and tentative classification of streams in the GJFO portion of the D-E NCA were documented in the WSR Eligibility Report for the GJFO (BLM 2009), and the determination of eligibility and tentative classification of streams in the Uncompahgre Field Office portion were documented in the WSR eligibility report for the Uncompahgre Field Office (BLM 2010d).

Eleven segments on seven streams within the D-E NCA were initially found to be eligible for inclusion in the National System. The findings of these two reports were consolidated in a summary report for the D-E NCA. Since these initial eligibility findings, changes to eligibility have been made and are summarized in this report.

This report finalizes the first two steps and completes the third step in the study process: determination of whether eligible segments are suitable. The suitability step of the study process is designed to answer the following questions:

1.  Should the river/stream's free-flowing character, water quality, and outstandingly remarkable values (ORVs) be protected, or are one or more other uses important enough to warrant doing otherwise?

2.  Will the river/stream's free-flowing character, water quality, and ORVs be protected through designation? Is it the best method for protecting the river corridor? Are there other methods available to protect the river/stream's WSR values?

3.  Is there demonstrated commitment to protect the river/stream by any non-Federal entities that may be partially responsible for implementing protective management?

BLM_0028706

To answer these questions and make a final determination of suitability, the BLM interdisciplinary team (IDT) of resource specialists evaluated information from a variety of sources, including, but not limited to, stream flow data; water rights records; State, county, and local land-use plans; public comments received during the scoping process; cooperating agency recommendations; the Gunnison River Basin stakeholder process; and recommendations of the D-E NCA Advisory Council.

The results of the IDT evaluation and determinations of suitability are summarized in Table O.1 below.

**Table O.1. Summary of Suitability Determinations**

| River or Creek | Segment | Total Segment in Acres* | BLM Acres* | Suitability Determination | Tentative Classification |
|---|---|---|---|---|---|
| Gunnison River | Segment 3 | 6,064 | 3,857 | Not suitable | N/A |
| | Segment 1 | 5,675 | 4,054 | Not suitable | N/A |
| Big Dominguez Creek | Segment 1 | 4,574 | 4,496 | Not suitable | N/A |
| | Segment 2 | 139 | 139 | Not suitable | N/A |
| Little Dominguez Creek | Segment 1 | 3,887 | 3,843 | Not suitable | N/A |
| | Segment 2 | 621 | 621 | Not suitable | N/A |
| Rose Creek | N/A | 1,215 | 1,175 | Not suitable | N/A |
| Escalante Creek | Segment 1 | 2,540 | 1,819 | Not suitable | N/A |
| | Segment 2 | 2,372 | 877 | Not suitable | N/A |
| Cottonwood Creek | N/A | 5,163 | 4,732 | Suitable (3,729 acres) | Wild |
| *Quarter-mile buffer along eligible rivers/streams* | | | | | |

# O.2. Introduction

This report presents an analysis of and recommendations regarding the suitability of 10 eligible river segments within the BLM D-E NCA for inclusion in the National System.

A WSR study was initiated as part of the development of the RMP/EIS for the D-E NCA. The study was conducted in accordance with the WSR Act and BLM Manual 6400.

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028707

WSR studies follow a three-step process: 1) Determination of eligibility, 2) tentative classification, and 3) determination of suitability. The first two steps of the study process were initiated prior to the designation of the D-E NCA in March 2009. Since the D-E NCA includes lands in both the Grand Junction Field Office and the Uncompahgre Field Office, these first two steps in the study process were completed and documented in two separate eligibility reports for the two respective offices.

# Planning Area Description

The planning area for this report is the D-E NCA, which is located in western Colorado (see the map in Figure O.1 below). The D-E NCA encompasses 210,012 acres of BLM-administered land in Mesa, Delta, and Montrose Counties in western Colorado. Within the D-E NCA, 66,193 acres make up the Dominguez Canyon Wilderness Area (the Wilderness), which was once part of the Dominguez Canyon Wilderness Study Area (WSA).

The entire D-E NCA falls within the Gunnison River Basin. Nearly 30 miles of the Gunnison River flow through the D-E NCA. Big and Little Dominguez Creeks, Escalante Creek, Cottonwood Creek, and their tributaries cascade through sandstone canyon walls that drain the eastern Uncompahgre Plateau.

The D-E NCA was designated in the Omnibus Public Land Management Act of 2009 (included as Appendix Q in the Proposed RMP). The purpose of this designation was to conserve and protect for the benefit and enjoyment of present and future generations the following unique and important resources and values: geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, scenic, and water resources.

Known for their scenic value, these lands are popular with those wanting to see the spectacular canyon country of the Uncompahgre Plateau. Red-rock canyons and sandstone bluffs hold geological and paleontological resources spanning 600 million years, as well as many cultural and historic sites. Ute Tribes today consider these pinyon-juniper-covered lands an important connection to their ancestral past. The Old Spanish National Historic Trail, a 19th-century land trade route, lies within the D-E NCA. A variety of wildlife call the area home, including desert bighorn sheep, mule deer, golden eagle, turkey, elk, mountain lion, black bear, and the collared lizard.

BLM_0028708

Dominguez-Escalante National Conservation Area 302
APPROVED RESOURCE MANAGEMENT PLAN



**Figure O.1. Planning Area Overview**

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028709

## Overview of the Wild and Scenic River Study Process

Section 5(d)(1) of the 1968 WSR Act requires Federal agencies to evaluate potential wild and scenic rivers when preparing resource management plans: "In all planning for the use and development of water and related land resources, consideration shall be given by all Federal agencies involved to potential national wild, scenic, and recreational river areas."

As shown in the flowchart in Figure O.2 below, the WSR study process consists of evaluating segments for *eligibility* and *suitability*. Both studies are conducted in accordance with the WSR Act, BLM Manual 6400 (BLM 2012c), and *The Wild and Scenic River Study Process Technical Report* (Interagency Wild and Scenic Rivers Coordinating Council 1999).



**Figure O.2. Overview of the Wild and Scenic River Study Process**

## O.3. Public Participation

Within the D-E NCA, the WSR study process included extensive opportunities for public

BLM_0028710

participation. BLM received public input on this WSR study through the following processes:

- Public scoping
- Public comments on eligibility reports
- Stakeholder input regarding suitability, including the recommendations of the Gunnison Basin Stakeholder Group
- The D-E NCA Advisory Council
- Cooperating agencies

*Public Scoping*

During public scoping for the D-E NCA RMP, the BLM received 25 individual comments regarding this WSR study. A summary of these comments can be found in the D-E NCA *Scoping Summary Report* (BLM 2011d) available for download from the D-E NCA RMP website: http://1.usa.gov/1qKkMVi.

The majority of comments (14) opposed WSR designation and came from livestock and water development interests. Meanwhile, eight comments favored greater protection for river segments in the D-E NCA and Wilderness (BLM 2011d).

*Public Comments on Eligibility Reports*

Following the completion of eligibility reports, the BLM received information from the public and cooperating agencies regarding its eligibility findings. On the basis of the new information, both eligibility reports were updated (see "Eligibility Adjustments" below).

*Gunnison Basin Stakeholder Group*

The Gunnison Basin Stakeholder Group process was initiated by the Colorado River Water Conservation District. This stakeholder group held 10 public meetings during 2010 and 2011 that were initially attended by a wide range of interested parties, including private landowners, State agencies, county governments, environmental groups, water resource management entities, and recreational user groups. Eventually, this stakeholder group split into two groups. One group, called the Gunnison Basin Stakeholder Group, consisted primarily of private landowners, agriculturalists, recreational user groups, county governments, and water resource management entities. A second group, consisting of environmental organizations, was formed to provide separate recommendations regarding suitability to the BLM.

Input from both stakeholder groups was critical in evaluating the suitability of each segment. The BLM received two sets of recommendations for consideration. Table O.2 summarizes the recommendations from both the larger stakeholder group and the environmental coalition. The

*Appendix O. Wild and Scenic River Suitability Report*

full text of each recommendation letter can be found on the D-E NCA planning Web page at
http://1.usa.gov/1qKkMVi.

**Table O.2. Recommendations Regarding Suitability Provided to the BLM by Stakeholders**

| Eligible Segment | Initial ORVs | Gunnison Basin Stakeholder Group | Environmental Coalition |
|---|---|---|---|
| Gunnison River Segment 1 | Recreational, fish, cultural, historical, vegetation | Not suitable | Not suitable |
| Gunnison River Segment 3 | Recreational, fish, cultural, historical, vegetation | Not suitable | Suitable; do not recommend designation to Congress |
| Big Dominguez Creek Segment 1 | Scenic, recreational, wildlife, geological, cultural | Not suitable | Not suitable |
| Big Dominguez Creek Segment 2 | Scenic, wildlife, geological, cultural | Not suitable | Not suitable |
| Little Dominguez Creek Segment 1 | Scenic, wildlife, geological, cultural | Not suitable | Not suitable |
| Little Dominguez Creek Segment 2 | Scenic, wildlife, geological, cultural | Not suitable | Not suitable |
| Rose Creek | Scenic | Not suitable | Suitable; recommend designation to Congress |
| Escalante Creek Segment 1 | Scenic, recreational, geological, wildlife, vegetation | Not suitable | Suitable; do not recommend designation to Congress |
| Escalante Creek Segment 2 | Fish, wildlife, vegetation | Not suitable | Not suitable |
| Dry Fork of Escalante Creek | Vegetation (dropped from eligibility: See "Eligibility Adjustments" below) | Not considered | Suitable (federally owned portion only); recommend designation to Congress |
| Cottonwood Creek | Vegetation | Not suitable | Suitable; do not recommend designation to Congress |

*D-E NCA Advisory Council*

The 10-member D-E NCA Advisory Council was established by the Secretary of the Interior to
provide advice or recommendations to the BLM in developing the RMP for the D-E NCA and the
Wilderness. The Advisory Council held 24 public meetings in 2011 and 2012. The Advisory
Council made recommendations to the BLM on the four river/stream segments where there was
not agreement between the two stakeholder groups described above (Gunnison River Segment 3,
Rose Creek, Escalante Creek Segment 1, and Cottonwood Creek). A fifth segment, Dry Fork of
Escalante Creek, was dropped from eligibility consideration by the BLM and was not considered

BLM_0028712

by the Advisory Council (see "Eligibility Adjustments" below).

The Council unanimously recommended that the BLM protect the ORVs identified in the eligibility reports. The Council then gave the BLM a majority and minority recommendation regarding suitability. The majority recommendation was to find all four segments on which the two stakeholder groups disagreed to be not suitable and protect the ORVs through other legislative and administrative tools. The minority recommendation was to consider the approach recommended by the environmental coalition of finding segments suitable but not recommending them to Congress for designation. One council member specifically recommended that Cottonwood Creek be found as suitable.

*Cooperating Agencies*

Federal, State, and local agencies were invited to participate as cooperating agencies in the RMP process, providing information and reviewing preliminary findings during and between meetings. The following agencies formally participated as cooperating agencies for the planning process:

- Colorado Department of Natural Resources (represented by CPW and the CWCB)
- City of Montrose
- City of Delta
- City of Grand Junction
- Montrose County
- Delta County
- Mesa County
- U.S. Forest Service

During cooperating agency meetings, representatives of the agencies above discussed a wide range of topics, including WSRs. The group did not provide a formal recommendation to the BLM on suitability.

# O.4. Eligibility

## Initial Eligibility and Tentative Classification Determinations

The first step of the WSR study process, eligibility, began with the identification of every known river with a perennial or intermittent flow regime, using a variety of BLM and other data sources. Some waterways were further segmented based upon differences in level of development, physiographic character, land status, or the existence of in-channel diversions or dams.

The river segments were then evaluated to determine whether they meet the dual criteria of being

BLM_0028713

free-flowing and possessing one or more ORVs, as defined in the WSR Act. Eligible river segments were preliminarily classified as wild, scenic, or recreational on the basis of water quality and level of human development along the river corridor. ORVs are defined in BLM Manual 6400 (BLM 2012c) as

> Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act: "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values." Other values that may be considered include, but are not limited to, ecological, biological or botanical, paleontological, hydrological, traditional cultural uses, water quality, and scientific values. The Wild and Scenic Rivers Act does not further define ORVs. Agency resource professionals develop and interpret criteria in evaluating river values (unique, rare, or exemplary) on the basis of professional judgment on a regional, physiographic, or geographic comparative basis.

For the D-E NCA, this first step was conducted separately by the Grand Junction and Uncompahgre Field Offices that jointly administer the D-E NCA. The Grand Junction and Uncompahgre reports can be found here: http://1.usa.gov/1qKkMVi.

In January 2011, the BLM completed a summary report for all eligible segments within the D-E NCA (BLM 2010f) and posted this report on the D-E NCA website. This summary drew from both the Grand Junction Field Office and Uncompahgre Field Office eligibility reports. This summary report also amended relevant sections of both eligibility reports in order to correct some inconsistencies between the two field offices. It is available online: http://1.usa.gov/1qKkMVi.

## Eligibility Adjustments

Since the release of the Grand Junction Field Office, Uncompahgre Field Office, and D-E NCA summary reports, new information has resulted in changes to ORVs for several segments within the D-E NCA. Public input to the BLM from the Gunnison River Basin Stakeholder Group and fish and results from wildlife monitoring that was completed by the BLM after the release of the eligibility reports led the BLM to reconsider its ORV findings on several segments. In addition, changes in the CNHP ranking for imperiled vegetation communities led to changes in a number of vegetation ORVs.

During its initial study of eligibility in the Uncompahgre Field Office, the BLM used criteria for vegetation ORVs that relied upon a ranking system established by CNHP. Using this system, the BLM determined that a vegetation community would qualify as an ORV if that community was creek/river-related (generally riparian) and ranked as either exemplary (A-ranked), globally imperiled (G2), or critically imperiled globally (G1). Using these criteria, the Uncompahgre Field Office Eligibility Report identified vegetation ORVs on five segments: Gunnison River Segment 3, Escalante Creek Segments 1 and 2, Dry Fork of Escalante Creek, and Cottonwood Creek.

*Appendix O. Wild and Scenic River Suitability Report*

After the release of the BLM's eligibility reports, CNHP revised its global rankings for several vegetation communities. The Fremont cottonwood/skunkbush sumac (*Populus deltoides/Rhus trilobata*) forest, identified as an ORV on four segments, was changed from a G2 natural community to a G3 (vulnerable through its range) natural community. As a result, this vegetation type was dropped as an ORV. A similar ranking change occurred for the narrowleaf cottonwood/strapleaf willow/silver buffaloberry (*Populus angustifolia/Salix ligulifolia/Shepherdia argentea*) riparian forest.

# Description of Changes to Eligibility

*Gunnison River Segment 3*

The final Uncompahgre Field Office eligibility report describes a vegetation ORV on this segment as follows:

> This segment contains a large area of Fremont Cottonwood/skunkbush sumac riparian woodland (Populus deltoids/Rhus trilobata), which is classified as globally imperiled (G2).

This vegetation type is no longer classified as G2 by the CNHP. It is now ranked G3. Under the criteria established for vegetation ORVs, this vegetation type no longer qualifies as an ORV. Thus, the vegetation ORV for this segment is dropped.

*Gunnison River Segment 1*

In the final D-E NCA summary eligibility report, a vegetation ORV is included for this segment that is described as follows:

> This segment contains a large area of Fremont Cottonwood/skunkbush sumac riparian woodland (Populus deltoids/Rhus trilobata), which is classified as globally imperiled (G2).

This vegetation type is no longer classified as globally imperiled (G2) by the CNHP. It is now ranked G3. Under the criteria established for vegetation ORVs, this vegetation type no longer qualifies as an ORV. Thus, the vegetation ORV for this segment is dropped.

BLM_0028715

*Escalante Creek Segment 1*

In the final eligibility report there is a vegetation ORV that is described as follows:

> This segment contains several plant communities considered to be rare globally, including occurrences of narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest (*Populus angustifolia/Salix ligulifolia/Shepherdia argentea*), which is critically imperiled globally (G1) and Fremont cottonwood/skunkbush sumac riparian forest (*Populus deltoides ssp.wislizenii/Rhus trilobata*), which is globally imperiled (G2). Giant helleborine orchid (*Epipactis gigantea*), rare in Colorado, occurs along this segment. Hanging gardens arise from seeps on nearby cliffs, and support Mancos columbine/Eastwood's monkeyflower wetland (*Aquilegia micrantha/Mimulus eastwoodiae*), which is categorized as globally imperiled (G2). Just uphill from the stream, these seeps lead into an unusual salt meadow dominated by alkali cordgrass (*Spartina gracilis*), which is ranked as rare in Colorado.

> An ecologically important occurrence of Eastwood's monkey-flower, a rare BLM sensitive species, occurs in the vicinity of Escalante Creek. This species is associated with seeps, springs, and tributaries in hanging garden vegetation communities. Several occurrences are within the Escalante Creek corridor.

> This segment is included in the CNHP-designated Escalante Creek Potential Conservation Area. The BLM manages the hanging gardens and salt meadow vegetation adjacent to the segment as an ACEC. In addition, the Colorado Natural Areas Program recognizes this as a State Natural Area.

The CNHP has revised its rarity rankings for the narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest and Fremont cottonwood/skunkbush sumac riparian forest. Both communities are now listed as G3, which means that they no longer qualify as ORVs (according to the criteria identified above).

In addition, the hanging gardens that support the G2 Mancos columbine/Eastwood's monkey-flower wetland, as well as the salt meadow described above, are not supported by flows through Escalante Creek. Rather, this vegetation is supported by seep water originating in the mesas above Escalante Canyon. As a result, the Mancos columbine/Eastwood's monkey-flower wetland vegetation community and the Eastwood's monkey-flower itself are not dependent on the creek. Accordingly, the vegetation ORV for this segment is no longer valid.

BLM monitoring indicates that this segment of Escalante Creek contains regionally important fish habitat that was not recognized in the final eligibility report. As a result, this segment should

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028716

include a fish ORV that is described as follows:

> Escalante Creek is regionally important habitat for resident populations of
> native roundtail chubs (*Gila robusta*), bluehead suckers (*Catostomus
> discobolus*), and flannelmouth suckers (*Catostomus latipinnis*), as well as
> serving as a spawning site for Gunnison River populations of all three of
> these BLM and Colorado sensitive species.

*Escalante Creek Segment 2*

In the final Uncompahgre Field Office eligibility report there is a vegetation ORV for this
segment described as follows:

> This segment contains an occurrence of Fremont cottonwood/skunkbush
> sumac riparian forest (*Populus deltoides* ssp. *Wislizenii*/*Rhus trilobata*),
> which is classified as globally imperiled (G2). A portion of this segment is
> included in the CNHP-designated Escalante Creek Potential Conservation
> Area.

The vegetation type listed in the eligibility report for this segment is no longer classified as G2 by
the CNHP. It is now ranked G3, which means that this vegetation type does not classify as an
ORV under the criteria identified above for vegetation.

In the final eligibility report there is a fish ORV for this segment that is described as follows:

> Escalante Creek is regionally important habitat for resident populations of
> native bluehead suckers (*Catostomus discobolus*) and flannelmouth suckers
> (*Catostomus latipinnis*), as well as serving as a spawning site for Gunnison
> River populations of both these BLM and Colorado sensitive species.

The BLM has determined through monitoring that Escalante Creek is also regionally important
habitat for resident populations of roundtail chubs. As a result, this ORV description should read
as:

> Escalante Creek is regionally important habitat for resident populations of
> native roundtail chubs (*Gila robusta*), bluehead suckers (*Catostomus
> discobolus*), and flannelmouth suckers (*Catostomus latipinnis*), as well as
> serving as a spawning site for Gunnison River populations of all three of
> these BLM and Colorado sensitive species.

In the final eligibility report there is a wildlife ORV description for this segment that includes the
following statement:

BLM_0028717

River otters (*Lontra canadensis*), a BLM sensitive and Colorado endangered species, also occupy the creek.

The BLM and CPW have determined that river otters no longer occupy this creek. Therefore, this sentence of the wildlife ORV should be dropped.

*Dry Fork Escalante Creek*

In the final eligibility report, there is a vegetation ORV for this segment that is described as follows:

> This segment contains an occurrence of Fremont cottonwood/skunkbush sumac riparian forest (*Populus deltoides* ssp. *Wislizenii/Rhus trilobata*), which is classified as globally imperiled (G2). A portion of this segment is included in the CNHP-designated Escalante Creek Potential Conservation Area.

The vegetation community listed in the eligibility report for this segment is no longer classified as G2 by the CNHP. It is now ranked G3, which means that this vegetation type does not classify as an ORV under the criteria identified above for vegetation.

Because vegetation is the only ORV listed for this segment in the final Uncompahgre Field Office eligibility report, Dry Fork Escalante Creek is dropped entirely from the eligibility report. Eligible segments must have at least one ORV.

## Summary of Final Eligibility Findings

The changes described above are summarized in Table O.3 below, showing each eligible segment and the tentative classification and listing of the initial and final ORVs.

**Table O.3. Summary of Eligible Rivers/Streams in the D-E NCA**

| River/Stream | Segment | Tentative Classification | Initial ORVs | Final ORVs |
|---|---|---|---|---|
| Gunnison River | Segment 1 | Scenic | Recreational, fish, cultural, historical, vegetation | Recreational, fish, cultural, historical |
| | Segment 3 | Recreational | Recreational, fish, cultural, historical, vegetation | Recreational, fish, cultural, historical |
| Big Dominguez Creek | Segment 1 | Wild | Scenic, wildlife, geological, cultural, recreational | Scenic, wildlife, geological, cultural, recreational |
| | Segment 2 | Scenic | Scenic, wildlife, geological, cultural | Scenic, wildlife, geological, cultural |

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028718

Dominguez-Escalante National Conservation Area                                       312
APPROVED RESOURCE MANAGEMENT PLAN

| River/Stream | Segment | Tentative Classification | Initial ORVs | Final ORVs |
|---|---|---|---|---|
| Little Dominguez Creek | Segment 1 | Wild | Scenic, wildlife, geological, cultural | Scenic, wildlife, geological, cultural |
| | Segment 2 | Scenic | Scenic, wildlife, geological, cultural | Scenic, wildlife, geological, cultural |
| Rose Creek | One segment | Wild | Scenic | Scenic |
| Escalante Creek | Segment 1 | Scenic | Scenic, recreational, geological, wildlife, vegetation | Scenic, recreational, geological, wildlife, fish |
| | Segment 2 | Recreational | Fish, wildlife, vegetation | Fish, wildlife |
| Cottonwood Creek | One segment | Scenic | Vegetation | Vegetation |
| Dry Fork of Escalante Creek | One segment | Wild | Vegetation | None (dropped from eligibility) |

# O.5. Suitability

The final step in the WSR study process is to evaluate eligible rivers/streams to determine whether they are suitable for inclusion in the National System. The suitability step of the study process is designed to answer the following questions (Interagency Wild and Scenic Rivers Coordinating Council 1999):

1. Should the river/stream's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?

2. Will the river/stream's free-flowing character, water quality, and ORVs be protected through designation? Is it the best method for protecting the river corridor? Are there other methods available to protect the river/stream's WSR values?

3. Is there demonstrated commitment to protect the river/stream by any non-Federal entities that may be partially responsible for implementing protective management?

The following factors were considered, and, as appropriate, were documented below as a basis for the suitability determination of each river/stream (BLM 2012c):

1. Characteristics that do, or do not, make the area a worthy addition to the National System. These characteristics (free flow and ORVs) are described in the final eligibility reports for the Uncompahgre Field Office and the Grand Junction Field Office.

*Appendix O. Wild and Scenic River Suitability Report*

2. The current status of land ownership and use in the area.

3. The reasonably foreseeable potential uses of the land and water that would be enhanced, foreclosed, or curtailed if the area were included in the National System.

4. The Federal agency that will administer the area should it be added to the National System.

5. The extent to which the agency proposes that administration of the river, including the costs thereof, is shared by State and local agencies.

6. The estimated cost to the United States of acquiring necessary lands or interests in land within the corridor, as well as the cost of administering the area should it be added to the National System.

7. A determination of the extent that other Federal agencies, the State, or its political subdivisions might participate in the preservation and administration of the river should it be proposed for inclusion in the National System.

8. An evaluation of local zoning and other land use controls in protecting the river's ORVs and preventing incompatible development.

9. The State/local government's capacity to manage and protect the ORVs on non-Federal lands. This factor requires an evaluation of the river protection mechanisms available through the authority of State and local governments. Such mechanisms may include, for example, statewide programs related to population growth management, vegetation management, water quantity or quality, or protection of river-related values such as open space and historic areas.

10. The existing support or opposition of designation. Assessment of this factor will define the political context. The interest in designation or non-designation by Federal agencies; State, local, and tribal governments; national and local publics; and the State's congressional delegation should be considered.

11. The consistency of designation with other agency plans, programs, and policies in meeting regional objectives. Designation may help or impede the goals of tribal governments or other Federal, State, or local agencies. For example, designation of a river may contribute to State or regional protection objectives for fish and wildlife resources. Similarly, adding a river that includes a scarce recreational activity or setting to the National System may help meet statewide recreational goals. Designation might, however, limit irrigation and/or flood control measures in a manner inconsistent with regional socioeconomic goals.

12. The contribution to river system or basin integrity. This factor reflects the benefits of a

*Appendix O. Wild and Scenic River Suitability Report*

"systems" approach (e.g., expanding the designated portion of a river in the National System or developing a legislative proposal for an entire river system–headwaters to mouth–or watershed). Numerous benefits may result from managing an entire river or watershed, including the ability to design a holistic protection strategy in partnership with other agencies and the public.

13. The potential for water resources development. Any proposed water resource projects that may be foregone are identified, as designation may limit development of water resources projects as diverse as irrigation and flood control measures, hydropower facilities, dredging, diversion, bridge construction, and channelization.

## BLM Interdisciplinary Team

For each eligible segment, an interdisciplinary team of BLM resource specialists (listed below) compiled information from within their particular area(s) of expertise. The specialists met as a group to evaluate the segments in relation to the suitability criteria. Following their preliminary review, the team collected additional data to fill information gaps.

BLM staff used a variety of resources to analyze and make recommendations for each segment, including the following:

- GIS data
- U.S. Geological Survey stream gauge data and mineral maps
- Land status maps
- State and Federal agency agreements and management plans
- Local and county government land use plans and zoning documents
- Colorado Water Conservation Board stream flow data
- Published books and reports
- River guides
- Water rights tabulations

## Recommendations to the Secretary of the Interior

Congress (or the Secretary of the Interior upon application by a State governor) has the final authority to designate wild and scenic rivers. Members of Congress craft the legislative language for designated segments and develop water protection strategies and measures in support of the WSR Act. As such, neither this suitability evaluation nor the RMP planning process results in designation of a river/stream segment as part of the National System. In accordance with BLM

Manual 6400 (BLM 2012c), this report includes BLM's recommendations to the Secretary of the Interior as to whether Congress should or should not designate suitable river/stream segments.

## O.6. Assessment and Recommendations

This section describes the BLM's findings on the suitability of eligible segments within the D-E NCA for inclusion in the National System (Figure O.3).

BLM_0028722

Dominguez-Escalante National Conservation Area                                        316
APPROVED RESOURCE MANAGEMENT PLAN



**Figure O.3. Suitability Findings for D-E NCA**

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028723

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

317

# Gunnison River Segment 3



**Figure O.4. Gunnison River Segment 3**

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028724

*Total Segment Length:* 17.48 miles

*Lower Terminus:* Latitude, 38.836 N; longitude, 108.361 W

*Upper Terminus:* Latitude, 38.726 N; longitude, 180.185 W

**Eligibility**

*Description:* The Gunnison River is a large, perennially flowing river that is regulated upstream by the Aspinall Unit (Blue Mesa, Morrow Point, and Crystal reservoirs; see Figure O.4). The present flow regime is designed to mimic historic conditions to best meet habitat requirements for native warm water fish. The upper terminus of this segment is the boundary between BLM- and State-managed lands, approximately one-half mile upstream from the D-E NCA. The lower terminus is the boundary between the BLM Uncompahgre and Grand Junction Field Offices (BLM 2010d).

*ORVs:*

<u>Recreational:</u> This section of the Gunnison River provides outstanding opportunities for relatively easy half-day to multiday float trips through the D-E NCA. The river is generally Class I flat water, with an occasional Class II riffle providing a challenge for novice boaters. Though much of this river segment flows through private lands, several BLM campsites and a boat launch provide good public access. Rafts, kayaks, and canoes are the most common types of watercraft used on this section of river.

Because of its nontechnical nature and public access points, the lower Gunnison is extremely popular with novice, family and casual recreationists from across the State. In addition, the river provides the only public access to the mouth of Leonard's Basin, a broad BLM canyon with important recreational and cultural values. Scenic canyon walls, verdant orchards and historic features add to the recreational value of this section (BLM 2010d).

<u>Fish:</u> This river segment is predominantly comprised of native fish species, and is identified as designated critical habitat for both the endangered Colorado pikeminnow and razorback sucker. Both species are known to reside within this segment. In addition, this segment supports exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers, bluehead suckers, and roundtail chubs (BLM 2010d).

<u>Cultural:</u> This segment of the Gunnison River flows through canyon country that has been inhabited by Prehistoric and Historic cultures for over 10,000 years. Over 300 Native American sites have been recorded in the vicinity, ranging from Paleo-Indian sites to Archaic hunting and occupational camps to late Historic period Ute villages. Rock art sites in the Escalante Bridge, Palmer Gulch, and Leonard's Basin areas are of extremely high quality and significance. These sites qualify for nomination to the NRHP under the following criteria (BLM 2009):

BLM_0028725

- Criterion C: Embodies the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction.

- Criterion D: Yielded, or may be likely to yield, information important in history or prehistory.

<u>Historical:</u> The section of the Denver and Rio Grande Railroad (now part of Union Pacific) running next to the Gunnison River was the first line connecting Denver to Grand Junction, reaching the Grand Valley in 1882. This line was soon connected to Salt Lake City, forming a narrow gauge transcontinental railroad link. The line was eventually replaced by a standard gauge track and remains in use through today. The importance of the railroad to the development of the West makes this site eligible for inclusion in the NRHP (BLM 2009).

*Tentative classification:* Recreational

There are several road access points along this reach, as well as a county-maintained road bridge crossing. A railroad runs adjacent to the river along the entire segment. There are also several water diversions, but no impoundments. Several parcels adjacent to the river are irrigated agricultural lands. This river segment has very high biodiversity significance (B2) and lies within the Gunnison River Potential Conservation Area, designated by CNHP in order to protect the endangered fish and threatened cactus. This segment is also on Colorado's 303(d) list for impaired water quality due to the presence of selenium, which is suspected of impacting native warm water fish propagation in the Gunnison River (water body ID COGULG02, Colorado Water Quality Control Commission). The State of Colorado is preparing a draft total maximum daily load report with the goal of reducing the selenium concentration in the Gunnison River (BLM 2010d).

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 63.6% BLM
- 28.0% private
- 8.4% State

Current land uses on the BLM-administered lands include livestock grazing, recreational boating (canoeing, rafting, and kayaking), and recreational prospecting. Current uses on the private lands include agriculture (livestock ranching and fruit orchards) and transportation of materials (coal, freight, etc.) along the Union Pacific Railroad. The State land within the WSR area is used as part of the Escalante State Wildlife Area.

*Appendix O. Wild and Scenic River Suitability Report*

*Mineral and Energy Resource Activities*

Through the legislation designating the NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and were withdrawn from operation under the mineral leasing, mineral materials, and geothermal leasing laws. There is one active mining claim within the WSR area (CMC-247911) that may have attached valid and existing rights. The Federal mineral estate does not extend beyond Federal surface ownership, so the minerals below private and State lands would be available for development. Of the WSR area, 93 percent is classified as having medium potential for oil and gas development, and 7 percent is classified as having low potential (Fowler and Gallagher 2004). There is no known potential for development of coal resources (USFS 2006). The potential for locatable mineral (primarily uranium) is classified as low. Gravel deposits exist not only within the historic flood plain of the river, but also in the adjacent geologic formations (primarily the Dakota Sandstone).

*Water Resource Development*

A dam on the Gunnison River was initially proposed in 1983, and the BOR withdrew mineral rights along the river for the purpose of dam construction. The project was not carried forward as an official BOR project. There are no current Federal Energy Regulatory Commission permits or pending applications for development of hydroelectric power within the river corridor.

*Transportation, Facilities, and Other Developments*

The Union Pacific Railroad has a track along the entire reach of the segment. Currently, up to five trains travel along the segment, generally hauling coal from surrounding coal mines. There are developments on several of the private parcels, including houses and outbuildings associated with farming (fruit orchards) and ranching. There is one bridge that crosses the river at Escalante Creek and three county-maintained roads within the WSR area (see map above). There are pumping stations adjacent to private lands that lift water out of the river for irrigation of fields and orchards.

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area are multiday river boating (canoeing, rafting, kayaking) and camping. There is limited trail-based recreation on old two-track routes, primarily OHV travel.

*Other Resource Activities*

The other primary activities within the WSR area are related to agriculture. There is livestock grazing on the Federal, private, and State lands. This includes both cattle and sheep grazing. On the private lands, the ranching operations include the developments mentioned above, which support grazing operations along with hay/alfalfa fields. There are also several fruit orchards on private lands along the reach.

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028727

*Special Areas*

Of the WSR area, 63.6 percent is within the D-E NCA, and 15 percent overlaps the Wilderness and WSA (631 acres of Wilderness and 189 acres of WSA).

*Socioeconomic Environment*

As mentioned above, the river corridor supports agriculture and recreational businesses. River outfitting businesses provide services to approximately 2,500 visitors annually. There are three orchard operations with approximately 220 acres of fruit trees combined and one livestock ranching operation with approximately 150 acres of irrigated cropland, primarily livestock feed (alfalfa and corn).

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM and the State of Colorado are responsible for the current administration of public lands. As noted above, the State land is managed as a wildlife area and the BLM lands are managed as part of the D-E NCA. If the segment is added to the National System, the BLM would be responsible for its administration. Since State and county budgets are tight, the Federal Government would have sole responsibility for the cost of managing the segment. In addition to administrative costs, purchases of private land or easements would be necessary to ensure protection of the ORVs and the tentative classification.

*Reasonably Foreseeable Potential Uses of the Land and Water That Would be Enhanced, Foreclosed, or Curtailed if the Area Were Included in the National System*

The reasonably foreseeable potential uses along the segment that would be enhanced, foreclosed, or curtailed include a continuation of current recreational use and development of private lands. Designation of this segment would enhance current recreational uses along the segment by providing long-term protection of flows and the scenic landscapes adjacent to the river.

Reasonably foreseeable development of private land includes residential housing and mineral extraction operations (gravel mining). Designation could curtail of foreclose some or all of these private land development options.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

In a biological opinion, the USFWS concluded the re-operation of the Aspinall Unit upstream of the eligible segment would protect habitat for the three listed fish species identified in the fish ORV. The BLM anticipates the cooperative participation between the BOR, USFWS, and the affected water users that developed the reoperation plan will continue.

*Appendix O. Wild and Scenic River Suitability Report*

The private parcels within the WSR area that fall within Delta County. Unless a subdivision is included, no permits are required for single-family residential housing construction.  Records show over 20 unique parcels of private land within the WSR area. Permits are required by  the county to develop gravel mining and processing operations on private land.

*The existing support or opposition of designation*

There is strong opposition from water users, private land owners and county government to WSR designation for this segment. As noted above in the public participation section, the  Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Many of the land owners along the segment participated in the stakeholder process and expressed concern that a WSR designation could impact their private property rights. The water resource managers (Tri-County Water Conservancy District, Terror Ditch and Reservoir Company, Colorado River Water Conservation District, and the North Fork Water Conservancy District) were  concerned about a Federal reserve water right that could accompany designation. There was  general agreement with the stakeholders that the WSR values could best be protected through  local management and authorities in the legislation that established the D-E NCA.

There is support from the environmental coalition for a WSR suitable determination.  The recommendation noted that the segment, as part of a "major and iconic western river of regional importance" is qualified for the type of protection provided under the WSR Act.  That said, the recommendation to the BLM was only for a determination of suitability. The comments specifically stated BLM should not send a recommendation to Congress for designation.

As noted above, the D-E NCA Advisory Council recommended this segment be classified as not suitable and that the WSR values be protected using other administrative and legislative tools.

**Suitability Determination**

The BLM IDT determined that the WSR values and tentative classification would be protected through the administrative actions described in the Proposed Plan Alternative and through applicable legislation.

The IDT determined that the BOR's decision to not carry the dam project forward and  the designation of the D-E NCA and Wilderness would likely preclude development of a dam on the river that would threaten the free-flowing condition of this segment. While a mineral withdrawal still exists along the Gunnison River, the BOR has expressed interest in revoking this withdrawal.

Threats to cultural and historical ORVs for this segment are largely from unauthorized collection and vandalism by visitors to the D-E NCA. Cultural and historical ORVs are protected by a number of Federal laws, including the Antiquities Act of 1906, the NHPA, the American Indian Religious Freedom Act of 1978, the Archaeological Resources Protection Act of 1979, and the

Native American Graves Protection and Repatriation Act of 1990. These laws would protect the cultural and historical ORVs along this segment.

Threats to the recreational ORV on this segment would result from water management that lowers river flows below levels that allow recreationists to float this section of river. The recreational ORV is currently protected by senior water rights associated with the Redlands Canal downstream of the eligible segment. Adequate flows for recreational boating would occur through the segment as water is delivered to the canal's point of diversion near Grand Junction, CO.

Threats to the fish ORV for this segment include management actions that would reduce or damage fish habitat and water quality, as well as river flow regimes that prevent recovery of these fish species under the ESA. It is not likely that a junior Federal reserve water right would provide enhanced protection beyond the management of the existing senior water rights through the Aspinall Unit operations. In addition, the fish ORV is protected by existing restrictions under the ESA.

The tentative classification of the segment (recreational) means that the segment would be administratively protected from incompatible development on BLM-administered lands through Visual Resource Management Class I and II objectives as described in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

*Appendix O. Wild and Scenic River Suitability Report*

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

324

# Gunnison River Segment 1



**Figure O.5. Gunnison River Segment 1**

*Total Segment Length:* 15.73 miles

*Lower Terminus:* Latitude, 38.96; longitude, 108.462 W

*Upper Terminus:* Latitude, 38.836 N; longitude, 108.361 W

**Eligibility**

*Description:* Sections of the Gunnison River west of Highway 50 on BLM land from the southern planning area boundary near Bridgeport to Whitewater (BLM 2009; see Figure O.5).

*ORVs:*

Recreational: This segment of the Gunnison River is popular for float-boating, mostly kayaking and canoeing. This stretch is described as "one of the few places in the Southern Rockies which offers a lengthy, gentle, out-of-the-way canoe trip" (Wheat 1983). Visitors travel from across the State to float through the steep-walled slickrock sandstone canyons (BLM 2009).

Fish: The USFWS designated critical habitat for the federally endangered Colorado pikeminnow (squawfish; *Ptychocheilus lucius*) and the Razorback sucker (*Xyrauchen texanus*) in 1994, which includes this stretch of the Gunnison River (59 FR 13,374 (1994-3-21)) (BLM 2009). Cultural: This segment of the Gunnison River flows through canyon country that has been inhabited by Prehistoric and Historic cultures for over 10,000 years. Over 300 Native American sites have been recorded in the vicinity, ranging from Paleo-Indian sites to Archaic hunting and occupational camps to late Historic period Ute villages. Rock art sites in the Escalante Bridge, Palmer Gulch, and Leonard's Basin areas are of extremely high quality and significance. These sites qualify for nomination to the NRHP under the following criteria:

- Criterion C: Embodies the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction.

- Criterion D: Yielded, or may be likely to yield, information important in history or prehistory. (BLM 2009)

Historical: The section of the Denver and Rio Grande Railroad (now part of Union Pacific) running next to the Gunnison River was the first line connecting Denver to Grand Junction, reaching the Grand Valley in 1882. This line was soon connected to Salt Lake City, forming a narrow gauge transcontinental railroad link. The line was eventually replaced by a standard gauge track and remains in use today. The importance of the railroad to developing the West makes this site eligible for inclusion in the NRHP (BLM 2009).

BLM_0028732

*Tentative classification:* Recreational

The tentative classification of this segment is scenic, due to a mainly inconspicuous railroad line that runs parallel to the river through this segment (BLM 2009).

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 81.3% BLM*
- 18.7% Private

*Acreage change from eligibility report due to BLM acquisition of 400 acres.

Current land uses on the BLM-administered lands include livestock grazing, recreational boating (canoeing, rafting, and kayaking), and recreational prospecting. Current uses on the private lands include agriculture (livestock ranching) and transportation of materials (coal, freight, etc.) along the Union Pacific Railroad.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and were withdrawn from operation under the mineral leasing, mineral materials, and geothermal leasing laws. The Federal mineral rights cover 85 percent of the WSR area, so the minerals below private lands would be available for development. Of the WSR area, 15 percent is classified as having low potential for oil and gas development, and 85 percent is classified as having very low potential. There is no known potential for development of coal resources. The potential for locatable mineral (primarily uranium) development is classified as low. Gravel deposits exist not only within the historic flood plain of the river, but also in the adjacent geologic formations (primarily the Dakota Sandstone).

*Water Resource Development*

A dam on the Gunnison River was initially proposed in 1983, and the BOR withdrew mineral rights along the river for the purpose of dam construction. The project was not carried forward as an official BOR project. There are no current Federal Energy Regulatory Commission permits or pending applications for development of hydroelectric power within the river corridor.

*Transportation, Facilities, and Other Developments*

The Union Pacific Railroad has a track along the entire reach of the segment. Currently, up to five trains travel along the segment, generally hauling coal from surrounding coal mines. There are

*Appendix O. Wild and Scenic River Suitability Report*

developments on three of the private parcels, including houses and outbuildings associated with ranching. There are pumping stations adjacent to two of the private parcels that lift water out of the river for irrigation of fields. There are two bridges over the river. One accesses private ranch lands, and the other provides public access into the Dominguez Canyon Wilderness.

*Recreational Activities*

As mentioned above, the primary recreational activity within the WSR area is multi-day river boating (canoeing, rafting, kayaking) and camping). There is limited trail-based recreation on old two-track routes, primarily OHV travel.

*Other Resource Activities*

The other primary activities within the WSR area are related to agriculture. There is livestock grazing on the Federal lands. On the private lands, the ranching operations include the developments mentioned above, which support grazing and hay/alfalfa fields.

*Special Areas*

Of the WSR area, 83.1 percent is within the D-E NCA, and 10 percent overlaps the Wilderness and WSA (444 acres of Wilderness and 41 acres of WSA).

*Socioeconomic Environment*

As mentioned above, the river corridor supports agriculture and recreational businesses. River outfitting businesses provide services to approximately 2,500 visitors annually. There are two livestock ranching operations with approximately 155 acres of irrigated cropland, primarily for livestock feed (alfalfa and corn).

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM is responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA. If the segment is added to the National System, the BLM would be responsible for its administration. Since State and county budgets are shrinking, the Federal Government would have sole responsibility for the cost of managing the segment. In addition to administrative costs, purchases of private land or easements would be necessary to ensure protection of the ORVs and the tentative classification of this segment.

*Reasonably Foreseeable Potential Uses of the Land and Water That Would be Enhanced, Foreclosed, or Curtailed if the Area Were Included in the National System*

The reasonably foreseeable potential uses along the segment that would be enhanced, foreclosed, or curtailed include a continuation of current recreational use and development of private lands.

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028734

Designation of this segment would enhance current recreational uses along the segment by providing long-term protection of flows and the scenic landscapes adjacent to the river. Reasonably foreseeable development of private land includes residential housing and mineral extraction operations (gravel mining). Designation could curtail some or all of these private land development options.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

In a biological opinion, the USFWS concluded that the re-operation of the Aspinall Unit upstream of the eligible segment would protect habitat for the three listed fish species identified in the fish ORV. The BLM anticipates that the successful cooperation between the BOR, USFWS, and the affected water users, who developed the re-operation plan, will continue.

The private parcels within the WSR area fall within Mesa County's zoning requirements for an Agricultural, Forestry, Transitional (AFT) District. The AFT is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the Rural Planning Area. Permits are required by the county to develop gravel mining and processing operations on private land.

*Existing Support or Opposition of Designation*

There is strong opposition from water users, private land owners and county government to WSR designation for this segment. As noted above in the public participation section, the Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Many of the landowners along the segment participated in the stakeholder process and expressed concern that a WSR designation could impact their private property rights. The water resource managers (Tri-County Water Conservancy District, Terror Ditch and Reservoir Company, Colorado River Water Conservation District, and the North Fork Water Conservancy District) were concerned about a Federal reserve water right that would accompany designation.

There was general agreement among the stakeholders that the WSR values could best be protected through local management and authorities, under the legislation that established the D-E NCA. The environmental coalition also recommended a finding of not suitable for this segment. As noted above, the D-E NCA Advisory Council recommended this segment be classified as not suitable and that the WSR values be protected using other administrative and legislative tools.

**Suitability Determination**

The BLM IDT ultimately determined that the WSR values and tentative classification would be

BLM_0028735

protected through administrative actions in the Preferred Alternative of the Draft RMP and applicable legislation.

The IDT determined that the BOR's decision to not carry the dam project forward and the designation of the D-E NCA and Wilderness would likely preclude development of a dam on the river that would threaten the free-flowing condition of this segment. Although a mineral withdrawal still exists along the Gunnison River, the BOR has expressed interest in revoking this withdrawal.

Threats to cultural and historical ORVs for this segment are largely from unauthorized collection and vandalism by visitors to the D-E NCA. Cultural and historical ORVs are protected by a number of Federal laws, including the Antiquities Act of 1906, the NHPA, the American Indian Religious Freedom Act of 1978, the Archaeological Resources Protection Act of 1979, and the Native American Graves Protection and Repatriation Act of 1990.

Threats to the recreational ORV on this segment are from water management that lowers river flows below what would allow recreationists to float this section of river. The recreational ORV is currently protected by senior water rights associated with the Redlands Canal downstream of the eligible segment. Adequate flows for recreational boating through the segment would continue to occur as water is delivered to the canal's point of diversion near Grand Junction, CO.

Threats to the fish ORV for this segment include management actions that would reduce or damage fish habitat and water quality, as well as river flow regimes that prevent recovery of these fish species under the ESA. It is not likely that a junior Federal reserve water right would provide enhanced protection beyond the management of the existing senior water rights through the Aspinall Unit operations. In addition, the fish ORV is protected by existing restrictions under the ESA.

The tentative classification of the segment (scenic) means that the segment would be administratively protected from incompatible development on BLM-administered lands through Visual Resource Management Class I and II objectives proposed in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028736

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

330

# Big Dominguez Creek Segment 1



**Figure O.6. Big Dominguez Creek Segment 1**

*Total Segment Length:* 15.86 miles

*Lower Terminus:* Latitude, 38.821; longitude, 108.378 W

*Upper Terminus:* Latitude, 38.749 N; longitude, 108.588 W

**Eligibility**

*Description:* From the Big Dominguez Creek boundary with the Uncompahgre National Forest in the southern portion of the planning area to the confluence with Little Dominguez Creek near Bridgeport (BLM 2009; Figure O.6).

*ORVs:*

Recreational: Trails along and near the canyon formed by Big Dominguez Creek are used extensively by locals and also have a regional appeal. The scenic quality, geological interest, and cultural sites along the river corridor attract visitors from around the region and nation. Backpackers frequently camp in the overnight areas near the creek, and the waterfall and rock art sites are popular destinations for day trippers, who also enjoy the primitive and scenic environment (BLM 2009).

Wildlife: The area around the confluence of Big Dominguez Creek and Little Dominguez Creek is an important canyon tree frog (*Hyla arenicolor*) breeding area with many breeding pools found in surveys of this area. The canyon tree frog is a BLM sensitive species and was identified as a species of greatest conservation need by the State of Colorado (CDOW 2006; BLM 2009).

Cultural: The canyon bottoms of the Dominguez Canyon area have evidence of human activity dating back thousands of years. There are numerous high quality rock art sites that constitute one of the highest concentrations in the planning area. The known rock art sites cover a long period, with some that date from over 2,000 years ago to Ute rock art panels from approximately 100 years ago (BLM 2009).

Scenic: Big Dominguez Creek runs through a large mesa dissected by deep red slick rock canyons. This has led to a magnificent contrast between the green vegetation of the immediate areas next to the creek and the steep-walled canyon. This contrast is most spectacular in the segments of the creek running through exposed sections of the incised, dark-colored Precambrian bedrock of the Uncompahgre Plateau that give way to softer benches covered with desert vegetation, before the sheer red sandstone cliffs are encountered. While hiking through the canyon, visitors also encounter many side canyons, alcoves, pinnacles, amphitheaters, and other unique sandstone formations. This unique and spectacular combination of features in conjunction with the WSA, now the Wilderness, allows visitors to encounter an outstanding desert stream in a primitive, wild environment. The stream itself has a wealth of different features, including meandering stretches steeper drops, unique rock features, and waterfalls (BLM 2009).

BLM_0028738

<u>Geological:</u> Throughout the canyon, the Great Unconformity, a large gap in the geologic strata where the Precambrian basement rock is overlaid by the much more recent Chinle formation, is readily accessible and apparent to visitors. The basement rocks of the Uncompahgre Plateau are extremely old and are rarely exposed elsewhere in the world. The forces of erosion that created this canyon have exposed over 600 million years of geological history in addition to creating sandstone formations that make this area outstandingly remarkable (BLM 2009).

*Tentative classification:* Wild

The tentative classification for this segment is wild. The segment is largely contained within a WSA, now the Wilderness and has little-to-no evidence of modern human activity within the river corridor (BLM 2009).

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 98.3% BLM
- 1.7% USFS

Current land uses on the BLM-administered lands include livestock grazing and trailing, hiking, horseback riding, backpacking, camping, picnicking, and OHV riding. Current uses on the USFS-administered lands include livestock grazing, hiking, mountain biking, and backpacking.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation under the mineral leasing, mineral materials, and geothermal leasing laws was ceased. Since there are no privately owned minerals and no active claims within the BLM portion of the WSR area, there would be no mineral or energy development. The small portion of the WSR area that is in the national forest is available for coal, oil, and gas leasing. The potential for oil and gas development is classified as having "no currently recognizable potential" (Fowler and Gallagher 2004). The potential for coal development is classified as "none" (USFS 2006).

*Water Resource Development*

The CWCB holds an instream appropriation for all the annual flows in Big and Little Dominguez Creeks minus a minimal development allowance. There are no proposals to develop impoundments within the WSR area.

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028739

*Transportation, Facilities, and Other Developments*

There is a trail along Big Dominguez Creek from the lower terminus upstream to the Wilderness boundary. The trail is used for foot and horse recreational travel. The trail is also used to trail livestock (cattle) from the Gunnison River to public land grazing allotments on BLM and National Forest Service lands. There is a campground within the WSR area that includes a half a dozen campsites with picnic tables and fire rings. There are two vault toilets at the campground. There are 1.9 miles of a Mesa County–maintained road that cross the WSR area near the campground (see map above). High-clearance four-wheel-drive vehicles are only required during bad weather and when the road has been damaged by erosion from thunderstorms. There is a small two-track route that extends from the county-maintained road to the forest boundary. This route is used by four-wheel-drive vehicles and ATVs on BLM lands. Beyond the BLM lands travel is restrict to foot, horse and bicycles on the forest lands.

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area include hiking, horseback riding and backpacking within the Wilderness and camping and OHV riding outside the Wilderness.

*Other Resource Activities*

The other primary activity within the WSR area is livestock grazing. As mentioned above, cattle are trailed through the canyon between public land grazing allotments on both BLM and National Forest Service lands and the Gunnison River. Outside the Wilderness, the WSR area is included in both BLM and National Forest grazing allotments.

*Special Areas*

Of the WSR area, 82.4 percent overlaps the D-E NCA and the Wilderness (3,774 acres).

*Socioeconomic Environment*

Big Dominguez Canyon is highly valued as a recreational resource. It attracts both local visitors and visitors from outside the area throughout the year. As mentioned above, the WSR area is part of a livestock grazing operation. The WSR area is primarily used for active movement of cattle.

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM and the USFS are responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA, and the Forest Service lands are managed as part of the Uncompahgre National Forest. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Appendix O. Wild and Scenic River Suitability Report*

*Existing Support or Opposition of Designation*

Both the environmental coalition and the Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Both recommendations felt the 1964 Wilderness Act combined with the instream flow allocation would protect the segment. As noted above, the D-E NCA Advisory Council recommended this segment be classified as not suitable and that the WSR values be protected using other administrative and legislative tools.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

The Forest Service evaluated Big Dominguez Creek for WSR eligibility and found the stream to be not eligible. Current Forest Service management direction for the WSR area will include "Wildlife habitat management in hardwood and shrub dominated draws and other areas of woody vegetation on rangelands. Semi-primitive non-motorized, semi-primitive motorized and roaded natural recreation opportunities will be provided. Livestock grazing will be compatible with wildlife habitat management. Vegetation treatment will enhance plant and animal diversity" (USFS 1983).

**Suitability Determination**

The IDT determined that threats to the free-flowing condition and flow-dependent ORVs of this segment would be minimal due to the instream flow appropriation held by the CWCB for Big and Little Dominguez Creeks that protects all the annually available flow minus a minimal development allowance. Additionally, the free-flowing condition would be protected by the 1964 Wilderness Act. The Wilderness Act directs Federal land management agencies to manage wilderness in such a way that its undeveloped character is preserved. The IDT concluded that the combination of the instream flow appropriation and wilderness management would preclude the development of a dam on this segment.

Threats to cultural and historical ORVs for this segment are largely from unauthorized collection and vandalism by visitors to the D-E NCA. Cultural and historical ORVs are protected by a number of Federal laws, including the Antiquities Act of 1906, the NHPA, the American Indian Religious Freedom Act of 1978, the Archaeological Resources Protection Act of 1979, and the Native American Graves Protection and Repatriation Act of 1990. These laws would protect the cultural and historical ORVs along this segment.

The Wilderness Act also directs Federal land management agencies to protect outstanding opportunities for solitude or primitive and unconfined recreation, so the recreational ORV would be protected.

BLM_0028741

The wildlife ORV, which consists of breeding areas for the canyon tree frog, would be protected by the instream flow appropriation and the Wilderness Act, which directs Federal land management agencies to protect biological resources in wilderness.

Along with the protection provided by the Wilderness Act, the tentative classification of the segment (wild) and the scenic ORV would be administratively protected from incompatible development through the Visual Resource Management Class I classification proposed in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028742

## Big Dominguez Creek Segment 2



**Figure O.7. Big Dominguez Creek Segment 2**

*Total Segment Length:* 0.78 miles

*Lower Terminus:* Latitude, 38.825; longitude: 108.38 W

*Upper Terminus* - Latitude, 38.821 N; longitude, 108.378 W

**Eligibility**

*Description:* This segment begins at the confluence with Little Dominguez Creek and continues until the confluence with the Gunnison River near Bridgeport (BLM 2009; Figure O.7).

*ORVs:*

Wildlife: The area around the confluence of Big Dominguez Creek and Little Dominguez Creek is an important canyon tree frog breeding area with many breeding pools found in surveys of this area. The canyon tree frog is a BLM sensitive species and was identified as a species of greatest conservation need by the State of Colorado (CDOW 2006; BLM 2009).

Cultural: The canyon bottoms of the Dominguez Canyon area have evidence of human activity dating back thousands of years. There are numerous high quality rock art sites that constitute one of the highest concentrations in the planning area. The known rock art sites cover a long period with some that date from over 2,000 years ago to Ute rock art panels from approximately 100 years ago (BLM 2009).

Scenic: Big Dominguez Creek runs through a large mesa dissected by deep red slickrock canyons. This has led to a magnificent contrast between the green vegetation characterizing the immediate areas next to the creek and the steep-walled canyon. This contrast is most spectacular in the segments of the creek running through exposed sections of incised, dark-colored Precambrian bedrock of the Uncompahgre Plateau that give way to softer benches covered with desert vegetation, before the sheer red sandstone cliffs. While hiking through the canyon, visitors are also exposed to many side canyons, alcoves, pinnacles, amphitheaters, and other unique sandstone formations. This unique and spectacular combination of features in conjunction with the WSA, now the Wilderness, allows visitors to experience an outstanding desert stream in a primitive, wild environment. The stream itself is characterized by a wealth of different features including meandering stretches, and steeper drops through unique rock features and waterfalls (BLM 2009).

Geological: Throughout the canyon the Great Unconformity, a large gap in rock ages where the Precambrian basement rock is overlaid by the much more recent Chinle formation, is readily accessible and apparent to visitors. The basement rocks of the Uncompahgre Plateau are extremely old and are rarely exposed elsewhere in the world. The forces of erosion that created this canyon have exposed over 600 million years of geologic history in addition to creating sandstone formations that make this area outstandingly remarkable (BLM 2009).

BLM_0028744

*Tentative classification:* Scenic

The tentative classification of this segment is scenic. There is evidence of grazing and an administrative route along this segment (BLM 2009).

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 100% BLM

Current land uses on the BLM-administered lands include livestock grazing and active movement, hiking, and horseback riding.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation under the mineral leasing, mineral materials, and geothermal leasing laws was ceased. Since there are no privately owned minerals and no active claims within the BLM portion of the WSR area, there would be no mineral or energy development activities.

*Water Resource Development*

The CWCB holds an instream appropriation for all the annual flows in Big and Little Dominguez Creeks minus a minimal development allowance. There are no proposals to develop impoundments within the WSR area.

*Transportation, Facilities, and Other Developments*

There is a water diversion on the segment near the confluence with the Gunnison River. There is also a trail/administrative two-track along Big Dominguez Creek. The trail is used for foot and horse recreational travel. The route is also used to trail livestock (cattle) from the Gunnison River to public land grazing allotments on BLM and National Forest lands. The trail/administrative two-track is also used by the holder of a life lease in the Little Dominguez Creek Segment 2 (see Little Dominguez Creek Segment 2 below). In addition to the trail/administrative two-track, there is a historic corral within the WSR area.

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area include hiking and horseback riding.

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028745

*Other Resource Activities*

The other primary activity within the WSR area is livestock grazing. As mentioned above, cattle are trailed through the canyon.

*Special Areas*

Of the WSR area, 100 percent overlaps the D-E NCA and the Wilderness (139 acres).

*Socioeconomic Environment*

Big Dominguez Canyon is highly valued as a recreational resource. It attracts both local visitors and visitors from outside the area throughout the year. As mentioned above, the WSR area is part of a livestock grazing operation. The WSR area is primarily used for active movement of cattle.

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM is responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA and the Wilderness. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Existing Support or Opposition of Designation*

Both the environmental coalition and the Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Both recommendations resulted from the assumption that the Wilderness Act combined with the instream flow allocation would protect the segment. As noted above, the D-E NCA Advisory Council recommended this segment be classified as not suitable and that the WSR values be protected using other administrative and legislative tools.

**Suitability Determination**

The IDT determined that threats to the free-flowing condition and flow-dependent ORVs of this segment would be minimal due to the instream flow appropriation held by the CWCB for Big and Little Dominguez Creeks that protects all the annually available flow minus a minimal development allowance. Additionally, the free-flowing condition would be protected by the 1964 Wilderness Act. The Wilderness Act directs Federal land management agencies to manage wilderness in such a way that the undeveloped character is preserved. The IDT concluded that the combination of the instream flow appropriation and wilderness management would preclude the development of a dam on this segment.

Threats to cultural and historical ORVs for this segment are largely from unauthorized collection and vandalism by visitors to the D-E NCA. Cultural and historical ORVs are protected by a number of Federal laws, including the Antiquities Act of 1906, the NHPA, the American Indian

BLM_0028746

Religious Freedom Act of 1978, the Archaeological Resources Protection Act of 1979, and the Native American Graves Protection and Repatriation Act of 1990. These laws would protect the cultural and historical ORVs along this segment.

The wildlife ORV, which consists of breeding areas for the canyon tree frog, would be protected by the instream flow appropriation and the Wilderness Act, which directs Federal land management agencies to protect biological resources in wilderness.

Along with the protection provided by the Wilderness Act, the tentative classification of the segment (wild) and the scenic ORV would be administratively protected from incompatible development through the Visual Resource Management Class I classification proposed in the D-E NCA Draft Preferred Alternative.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028747

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

341

# Little Dominguez Creek Segment 1



**Figure O.8. Little Dominguez Creek Segment 1**

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028748

*Total Segment Length:* 13.14 miles

*Lower Terminus:* Latitude, 38.795 N; longitude, 108.363 W

*Upper Terminus:* Latitude, 38.696 N; longitude, 108.49 W

**Eligibility**

*Description:* Little Dominguez Creek boundary with the Uncompahgre National Forest in the southern portion of the planning area to approximately two miles from the confluence with Big Dominguez Creek (Figure O.8).

*ORVs:*

Wildlife: The area around the confluence of Big Dominguez Creek and Little Dominguez Creek is an important canyon tree frog breeding area with many breeding pools found in surveys of this area. The canyon tree frog is a BLM sensitive species and was identified as a species of greatest conservation need by the State of Colorado (CDOW 2006).

Cultural: The canyon bottoms of the Dominguez Canyon area have evidence of human activity dating back thousands of years. There are numerous high quality rock art sites that constitute one of the highest concentrations in the planning area. The known rock art sites cover a long period with some that date from over 2,000 years ago to Ute rock art panels from approximately 100 years ago (BLM 2009).

Scenic: Big Dominguez Creek runs through a large mesa dissected by deep red slickrock canyons. This has led to a magnificent contrast between the green vegetation of the immediate areas next to the creek and the steep-walled canyon. This contrast is most spectacular in the segments of the creek running through the exposed sections of incised, dark-colored Precambrian bedrock of the Uncompahgre Plateau that give way to softer benches covered with desert vegetation, before the sheer red sandstone cliffs. While hiking through the canyon, visitors also encounter many side canyons, alcoves, pinnacles, amphitheaters, and other unique sandstone formations. This unique and spectacular combination of features in conjunction with the WSA, now the Wilderness, allows visitors to encounter an outstanding desert stream in a primitive, wild environment. The stream itself has a wealth of different features, including meandering stretches, steeper drops, unique rock features, and waterfalls (BLM 2009).

Geological: Throughout the canyon, the Great Unconformity, a large gap in the geologic strata, where the Precambrian basement rock is overlaid by the much more recent Chinle formation, is readily accessible and apparent to visitors. The basement rocks of the Uncompahgre Plateau are extremely old and are rarely exposed elsewhere in the world. The forces of erosion that created this canyon have exposed over 600 million years of geological history in addition to creating sandstone formations that make this area outstandingly remarkable (BLM 2009).

*Appendix O. Wild and Scenic River Suitability Report*

*Tentative Classification:* Wild

The tentative classification for this segment is wild. The segment is almost entirely contained within a WSA, now Wilderness, and has little to no evidence of modern human activity within the river corridor.

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 99% BLM
- 1% USFS

Current land uses on the BLM-administered lands include livestock grazing and active movement, hiking, horseback riding, and backpacking. Current uses on the USFS-administered lands include livestock grazing, hiking, mountain biking, and backpacking.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation under the mineral leasing, mineral materials, and geothermal leasing laws was ceased. Since there are no privately owned minerals and no active claims within the BLM portion of the WSR area, there would be no mineral or energy development activities. The small portion of the WSR area that is in the National Forest is available for coal, oil, and gas leasing. The potential for oil and gas development is classified as low (Fowler and Gallagher 2004). The potential for coal development is classified as "none" (USFS 2006).

*Water Resource Development*

The CWCB holds an instream appropriation for all the annual flows in Big and Little Dominguez Creeks minus a minimal development allowance. There are no proposals to develop impoundments within the WSR area.

*Transportation, Facilities, and Other Developments*

There is a trail along Little Dominguez Creek from the lower terminus upstream to approximately 5.8 miles. The trail is used for foot and horse recreational travel. The route is also used to trail livestock (cattle) from the Gunnison River to public land grazing allotments on BLM and National Forest lands.

BLM_0028750

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area include hiking, horseback riding, and backpacking within the Wilderness.

*Other Resource Activities*

The other primary activity within the WSR area is livestock grazing. As mentioned above, cattle are trailed through the canyon between public land grazing allotments on both BLM and forest lands and the Gunnison River.

*Special Areas*

Of the WSR area, 99 percent overlaps the D-E NCA and the Wilderness (3,774 acres).

*Socioeconomic Environment*

Little Dominguez Canyon is highly valued as a recreational resource. It attracts both local visitors and visitors from outside the area throughout the year. As mentioned above, the WSR area is part of a livestock grazing operation. The WSR area is primarily used for active movement of cattle.

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM and the USFS are responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA and the Forest Service lands are managed as part of the Uncompahgre National Forest. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Existing Support or Opposition of Designation*

Both the environmental coalition and the Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Both recommendations result from the assumption that the Wilderness Act combined with the instream flow allocation would protect the segment. As noted above, the D-E NCA Advisory Council recommended this segment be classified as not suitable and that the WSR values be protected using other administrative and legislative tools.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

The Forest Service evaluated Big Dominguez Creek for WSR eligibility and found the stream to be not eligible. Current Forest Service management direction for the WSR area will include "Big game winter range in non-forest areas. Semi-primitive non-motorized, semi-primitive motorized and roaded natural recreation opportunities will be provided.  Motorized recreation on local

BLM_0028751

roads is managed to prevent unacceptable stress on big game animals during primary big game use season. Vegetation treatment will enhance plant and animal diversity. Livestock grazing is compatible, but managed to favor wildlife habitat" (USFS 1983).

**Suitability Determination**

The IDT determined that threats to the free-flowing condition and flow-dependent ORVs of this segment would be minimal due to the instream flow appropriation held by the CWCB for Big and Little Dominguez Creeks that protects all the annually available flow minus a minimal development allowance. Additionally, the free-flowing condition would be protected by the 1964 Wilderness Act. The Wilderness Act directs Federal land management agencies to manage wilderness in a way such that the undeveloped character is preserved. The IDT concluded that the combination of the instream flow appropriation and wilderness management would preclude the development of a dam on this segment.

Threats to cultural and historical ORVs for this segment are largely from unauthorized collection and vandalism by visitors to the D-E NCA. Cultural and historical ORVs are protected by a number of Federal laws, including the Antiquities Act of 1906, the NHPA, the American Indian Religious Freedom Act of 1978, the Archaeological Resources Protection Act of 1979, and the Native American Graves Protection and Repatriation Act of 1990. These laws would protect the cultural and historical ORVs along this segment.

The wildlife ORV, which consists of breeding areas for the canyon tree frog, would be protected by the instream flow appropriation and the Wilderness Act, which directs Federal land management agencies to protect biological resources in wilderness.

Along with the protection provided by the Wilderness Act, the tentative classification of the segment (wild) and the scenic ORV would be administratively protected from incompatible development through the Visual Resource Management Class I classification proposed in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028752

# Little Dominguez Creek Segment 2



**Figure O.9. Little Dominguez Creek Segment 2**

BLM_0028753

*Total Segment Length:* 2.45 miles

*Lower Terminus:* Latitude, 38.818; longitude, 108.376 W

*Upper Terminus:* Latitude, 38.795 N; longitude, 108.363 W

**Eligibility**

*Description:* This segment begins approximately two miles above the confluence of Big and Little Dominguez Creeks and ends at the confluence of Big and Little Dominguez Creeks (Figure O.9).

*ORVs:*

<u>Wildlife:</u> The area around the confluence of Big Dominguez Creek and Little Dominguez Creek is an important canyon tree frog breeding area with many breeding pools found in surveys of this area. The canyon tree frog is a BLM sensitive species and was identified as a species of greatest conservation need by the State of Colorado (CDOW 2006).

<u>Cultural:</u> The canyon bottoms of the Dominguez Canyon area have evidence of human activity dating back thousands of years. There are numerous high quality rock art sites that constitute one of the highest concentrations in the planning area. The known rock art sites cover a long period, with some that date from over 2,000 years ago to Ute rock art panels from approximately 100 years ago (BLM 2009).

<u>Scenic:</u> Big Dominguez Creek runs through a large mesa dissected by deep red slickrock canyons.

This has led to a magnificent contrast between the green vegetation of the immediate areas next to the creek and the steep-walled canyon. This contrast is most spectacular in the segments of the creek running through exposed sections of incised, dark-colored Precambrian bedrock of the Uncompahgre Plateau that give way to softer benches covered with desert vegetation, before the sheer red sandstone cliffs are encountered. While hiking through the canyon, visitors also encounter many side canyons, alcoves, pinnacles, amphitheaters, and other unique sandstone formations. This unique and spectacular combination of features in conjunction with the WSA, now the Wilderness, allows visitors to encounter an outstanding desert stream in a primitive, wild environment. The stream itself is characterized by a wealth of different features including meandering stretches and steeper drops through unique rock features and waterfalls (BLM 2009).

<u>Geological:</u> Throughout the canyon, the Great Unconformity, a large gap in the geological strata where the Precambrian basement rock is overlaid by the much more recent Chinle formation, is readily accessible and apparent to visitors. The basement rocks of the Uncompahgre Plateau are extremely old and are rarely exposed elsewhere in the world. The forces of erosion that created this canyon have exposed over 600 million years of geological history in addition to creating sandstone formations that make this area outstandingly remarkable (BLM 2009).

BLM_0028754

*Tentative Classification:* Scenic

The tentative classification of this segment is scenic. There is heavy evidence of grazing, a homestead, and an administrative route along this segment.

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 100% BLM

Current land uses on the BLM-administered lands include livestock grazing and active movement, hiking, and horseback riding.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation under the mineral leasing, mineral materials, and geothermal leasing laws was ceased. Since there are no privately owned minerals and no active claims within the BLM portion of the WSR area, there would be no mineral or energy development activities.

*Water Resource Development*

The CWCB holds an instream appropriation for all the annual flows in Big and Little Dominguez Creeks minus a minimal development allowance. There are no proposals to develop impoundments within the WSR area.

*Transportation, Facilities, and Other Developments*

There is a trail/administrative two-track along Little Dominguez Creek. The trail is used for foot and horse recreational travel. The trail is also used to trail livestock (cattle) from the Gunnison River to public land grazing allotments on BLM and National Forest Service lands. The trail/administrative two-track is also used by the holder of a life lease. The life lease is associated with a homestead that was deeded to the BLM in the late 1980s. As part of the property transfer, the BLM agreed to allow the landowner to continue living on the property through the remainder of his natural life. The homestead includes a cabin and outbuildings associated with a subsistence lifestyle. There is a small water diversion associated with the old homestead.

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028755

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area include hiking and horseback riding.

*Other Resource Activities*

The other primary activity within the WSR area is livestock grazing. As mentioned above, cattle are trailed through the canyon.

*Special Areas*

Of the WSR area, 100 percent overlaps the D-E NCA and the Wilderness. (139 acres)

*Socioeconomic Environment*

Little Dominguez Canyon is highly valued as a recreational resource. It attracts both local visitors and visitors from outside the area throughout the year. As mentioned above, the WSR area is part of a livestock grazing operation. The WSR area is primarily used for active movement of cattle. The homestead in the segment provides a livelihood for the holder of the life lease.

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM is responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA and the Wilderness. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Existing Support or Opposition of Designation*

Both the environmental coalition and the Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Both recommendations resulted from the assumption that the Wilderness Act combined with the instream flow allocation would protect the segment. As noted above, the D-E NCA Advisory Council recommended this segment be classified as not suitable and that the WSR values be protected using other administrative and legislative tools.

**Suitability Determination**

The IDT determined that threats to the free-flowing condition and flow-dependent ORVs of this segment would be minimal due to the instream flow appropriation held by the CWCB for Big and Little Dominguez Creeks that protects all the annually available flow minus a minimal development allowance. Additionally, the free-flowing condition would be protected by the 1964 Wilderness Act. The Wilderness Act directs Federal land management agencies to manage wilderness in a way such that the undeveloped character is preserved. The IDT concluded that the combination of the instream flow appropriation and wilderness management would preclude

*Appendix O. Wild and Scenic River Suitability Report*

BLM_0028756

the development of a dam on this segment.

Threats to cultural and historical ORVs for this segment are largely from unauthorized collection and vandalism by visitors to the D-E NCA. Cultural and historical ORVs are protected by a number of Federal laws, including the Antiquities Act of 1906, the NHPA, the American Indian Religious Freedom Act of 1978, the Archaeological Resources Protection Act of 1979, and the Native American Graves Protection and Repatriation Act of 1990. These laws would protect the cultural and historical ORVs along this segment.

The wildlife ORV, which consists of breeding areas for the canyon tree frog, would be protected by the instream flow appropriation and the Wilderness Act, which directs Federal land management agencies to protect biological resources in wilderness.

Along with the protection provided by the Wilderness Act, the tentative classification of the segment (wild) and the scenic ORV would be administratively protected from incompatible development through the Visual Resource Management Class I classification proposed in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028757

Dominguez-Escalante National Conservation Area
APPROVED RESOURCE MANAGEMENT PLAN

351

# Rose Creek



**Figure O.10. Rose Creek**

*Appendix O. Wild and Scenic River Suitability Report*

*Total Segment Length:* 4.1 miles

*Lower Terminus:* Latitude, 38.702; longitude, 108.439 W

*Upper Terminus:* Latitude, 38.668 N; longitude, 108.485 W

**Eligibility**

*Description:* This perennial tributary of Little Dominguez Creek drains from the east side of the Uncompahgre Plateau and is within the Wilderness (Figure O.10). The creek's upper terminus is the confluence of Barkley Cabin Gulch and Corral Gulch, while the lower terminus is the Uncompahgre Field Office boundary. High flows primarily occur during the spring snowmelt and occasional summer rain events. A perennial base flow occurs throughout most of this segment, which originates from multiple groundwater discharge points at the contact between the Entrada and Chinle geological formations.

*ORVs:*

Scenic: An interdisciplinary BLM field inventory team evaluated the area and assigned a scenic quality classification of A. The following observations were derived from their field notes: Rose Creek possesses very high scenic qualities that are rare in the area of comparison. Prominent vertical and horizontal cliffs, interesting erosional features, major rock outcroppings, narrow chasms, and stepped ridgelines, together with dense and diverse vegetation, especially in the canyon bottoms, make Rose Creek a visually spectacular landscape. Rock formations, small waterfalls, alcoves, hanging gardens, and pools add significantly to the area's visual character. Adjacent landforms provide rich color in contrasting shades of tan, pink, red, orange, brown, and blue. The surrounding vegetation contributes hues of green, gold, yellow, tan, and gray, completing the stunning scene (BLM 2009).

*Tentative classification:* Wild

There are no water diversions, impoundments, or developments of any kind along this remote segment. The entire shoreline is primitive and not accessible by road or trail.

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 96% BLM
- 4% USFS

Current land uses on the BLM-administered lands include livestock grazing and active

BLM_0028759

movement, and hiking.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation under the mineral leasing, mineral materials, and geothermal leasing laws was ceased. Since there are no privately owned minerals and no active claims within the BLM portion of the WSR area, there would be no mineral or energy development activities. The small portion of the WSR area that is in the National Forest is available for coal, oil, and gas leasing. The potential for oil and gas development is classified as low. (Fowler and Gallagher 2004). The potential for coal development is classified as "none" (USFS 2006).

*Water Resource Development*

The CWCB holds an instream appropriation for all the annual flows in Big and Little Dominguez Creeks minus a minimal development allowance (Rose Creek is a tributary of Little Dominguez Creek). There are no proposals to develop impoundments within the WSR area.

*Transportation, Facilities, and Other Developments*

There are no trails or other developments within the WSR area.

*Recreational Activities*

As mentioned above, the primary recreational activity within the WSR area is hiking.

*Other Resource Activities*

The other primary activity within the WSR area is livestock grazing. There is limited livestock grazing on the benches above the canyon.  There is little to no livestock use in the bottom of the canyon.

*Special Areas*

Of the WSR area, 96 percent is within the D-E NCA and the Wilderness (1,175 acres).

*Socioeconomic Environment*

Rose Creek provides wilderness recreational opportunities. Due to its remoteness, there are outstanding opportunities for both primitive recreation and solitude. As noted above, the WSR area has very little livestock use.

BLM_0028760

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM and the USFS are responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA, and the USFS lands are managed as part of the Uncompahgre National Forest. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Existing Support or Opposition of Designation*

The Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. They felt the Wilderness Act combined with the instream flow allocation would protect the segment. The environmental coalition recommended that the BLM determine the segment suitable. Their rationale was based on the assumption that the instream flow appropriation for Big and Little Dominguez Creeks did not include Rose Creek. Since Rose Creek is a tributary of Little Dominguez Creek, the instream flow appropriation would also protect flows in Rose Creek. As noted above, the D-E NCA Advisory Council recommendation for this segment included both a majority and minority recommendation. The majority recommendation was to find the segment not suitable and that the WSR values be protected using other administrative and legislative tools. The minority recommendation was to find the segment suitable but not recommend designation into the National System.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

The USFS evaluated Big Dominguez Creek for WSR eligibility and found the stream to be not eligible. Current Forest Service management direction for the WSR area will include "Wildlife management for one or more management indicator species. Semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities will be provided. Livestock grazing will be compatible with wildlife habitat management. Vegetation treatment will enhance plant and animal diversity" (USFS 1983).

**Suitability Determination**

The IDT determined that threats to the free-flowing condition and flow-dependent ORVs of this segment would be minimal due to the instream flow appropriation held by the CWCB for Big and Little Dominguez Creeks that protects all the annually available flow minus a minimal development allowance. Additionally, the free-flowing condition would be protected by the 1964 Wilderness Act. The Wilderness Act directs Federal land management agencies to manage wilderness in a way such that the undeveloped character is preserved. The IDT concluded that the combination of the instream flow appropriation and wilderness management would preclude the development of a dam on this segment.

*Appendix O. Wild and Scenic River Suitability Report*

Along with the protection provided by the Wilderness Act, the tentative classification of the segment (wild) and the scenic ORV would be administratively protected from incompatible development through the Visual Resource Management Class I classification proposed in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028762

# Escalante Creek Segment 1



**Figure O.11. Escalante Creek Segment 1**

BLM_0028763

*Total Segment Length:* 8.45 miles

*Lower Terminus:* Latitude, 38.679; longitude, 108.313 W

*Upper Terminus:* Latitude, 38.609 N; longitude, 108.406 W

## Eligibility

*Description:* Escalante Creek is a major perennial tributary of the lower Gunnison River that drains from the east side of the Uncompahgre Plateau. This segment of the creek lies within the D-E NCA. The upper terminus is its meeting with the Uncompahgre National Forest boundary, while the lower terminus is the boundary between BLM and State-managed lands (Figure O.11). This stream supports both a trout fishery and native flannelmouth and bluehead suckers.

*ORVs:*

Scenic: An interdisciplinary BLM field inventory team evaluated the area and assigned a scenic quality classification of A. The following observations were derived from their field notes: Escalante Creek offers very high scenic qualities. The cascading white-water creek runs swiftly and linearly here, creating dramatic potholes and waterfalls. A large-scale sandstone canyon provides dramatic vistas, prominent vertical and horizontal cliffs, major rock outcroppings, and jagged ridgelines that dominate the landscape. Landform colors abound in shades of tan, pink, red, orange, brown and blue. The surrounding vegetation adds to the beauty, providing shades of green, golden, yellow, and tan, and the vegetation becomes increasingly dense along the creek.

This canyon has a scenic feature that is rare in the region of comparison: a "double canyon" system. The broader outer canyon bounded by colorful cliffs of sedimentary rock holds within it a smaller, narrow canyon of dark gray and black Precambrian metamorphic rock, within which the creek flows. This vivid contrast is only found in a handful of canyons on the Colorado Plateau (BLM 2010d).

Recreational: This segment has outstanding opportunities for recreation, primarily in the Escalante Potholes recreation site. Escalante Creek has smoothed and sculpted the Precambrian metamorphic rock through which it flows, creating a series of chutes, falls, and plunge pools.

These features are rare. During the spring snowmelt, high water surges through the Potholes area, attracting extreme kayakers from all over the western United States. The complex hydraulic features challenge even the most experienced kayakers. Later in the season, as the snowmelt tapers off and the creek returns to a more sedate and steady flow, the potholes are used for wading, swimming, and streamside camping by groups and individuals, primarily from Colorado's West Slope. Classic Colorado Plateau canyon scenery and the rare occurrence of black Precambrian schist in a perennially flowing streambed combine to make this section of Escalante Creek able to provide an exceptional recreational experience (BLM 2010d).

*Appendix O. Wild and Scenic River Suitability Report*

<u>Geologic:</u> The Escalante Potholes are a regionally rare geological and hydrological streambed feature in the lower reach of this segment. The potholes are hourglass-shaped erosional features occurring in hard Precambrian gneiss where it intercepts the streambed of Escalante Creek.

Stream channel knickpoints have formed in the overlying softer sedimentary rock units, providing high velocity waters with adequate sediment supply and hydrologic energy to produce circulating erosive water currents. The scouring process that occurs primarily during the annual spring snowmelt has taken thousands of years to produce the current state of the potholes.

There are no other areas in the region where Precambrian gneiss is exposed and shaped by a stream powerful enough to create these features, yet not so powerful as to completely erode the stream channel smooth. This rare combination of lithology and erosion demonstrates not only the efficacy of hydrology upon geology, but also the creative sculpturing action that time and water have upon a very resistant medium. With almost any other medium, such as sandstone or even marble, these effects would not have produced such dramatic features as the potholes of Escalante Creek (BLM 2010d).

<u>Wildlife:</u> Escalante Canyon provides exceptionally high quality habitat for peregrine falcons *(Falco peregrinus)* and is considered a regionally important area for this BLM sensitive species. In 1999, the peregrine was delisted from threatened status under the ESA. The BLM monitors the status of peregrine populations to ensure continued recovery of the species. Peregrine falcons are closely associated with steep-walled canyons and often nest near perennial water sources that support prey populations such as waterfowl, songbirds, and shorebirds. Peregrine falcon pairs were observed in Escalante Canyon as recently as 2008 and 2009, and breeding/nesting activity has been confirmed along this segment (BLM 2010d).

<u>Fish:</u> Escalante Creek is regionally important habitat for resident populations of native roundtail chubs, bluehead suckers, and flannelmouth suckers, as well as serving as a spawning site for Gunnison River populations of all three of these BLM and Colorado sensitive species (see "Eligibility Adjustments" in this report).

*Tentative classification:* Scenic

An unpaved county-maintained road runs parallel to Escalante Creek for much of this reach but is primarily well above the stream along a bench and therefore not visible from the stream channel. The road crosses Escalante Creek near the upper terminus. Extensive recreational activity occurs in the Potholes area along this segment. There are water diversions as well, but no impoundments (BLM 2010d).

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 71% BLM

- 3% USFS

- 26% private

Current land uses on the BLM-administered lands include livestock grazing, recreational boating (kayaking), swimming, rock climbing, picnicking, camping, and scenic touring. Current uses on the private lands include agriculture (livestock ranching). Current uses on the USFS-administered lands include livestock grazing and hunting.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation under the mineral leasing, mineral materials, and geothermal leasing laws was ceased. The Federal mineral holdings cover 75 percent of the WSR area. The minerals below private lands would be available for development. Of the WSR area, 100 percent is classified as having low potential for oil and gas development. There is no known potential for developing coal resources. Potential for locatable mineral (primarily uranium) is classified as low. The small portion of the WSR area that is in the national forest is available for coal, oil, and gas leasing. The potential for oil and gas development is classified as low (Fowler and Gallagher 2004). The potential for coal development is classified as "none" (USFS 2006).

*Water Resource Development*

The CWCB holds an instream appropriation for 4.0 cubic feet per second (cfs) (3/1 to 3/31); 8.2 cfs (4/1 to 6/14); 4.0 cfs (6/15 to 7/31); 1.5 cfs (8/1 to 2/28). There are no known proposals to develop impoundments within the WSR area.

*Transportation, Facilities, and Other Developments*

There is a county-maintained gravel road adjacent to the creek (see map above). There is a BLM recreational facility that includes a vault toilet and picnic sites. There are ranch houses and outbuildings on the private lands. There are irrigated fields on the private lands and associated irrigation systems (generally ditches for flood irrigation).

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area are kayaking, swimming, rock climbing, picnicking, camping, and scenic touring.

BLM_0028766

*Other Resource Activities*

The other primary activities within the WSR area are associated with ranching (livestock grazing and irrigated hay farming).

*Special Areas*

Of the WSR area, 71 percent is within the D-E NCA, and 4 percent overlaps the Wilderness and WSA (26 acres of Wilderness and 83 acres of WSA).

*Socioeconomic Environment*

Escalante Creek is valued for its scenic quality, historical resources, and recreational opportunities by residents of the communities in Delta, Montrose and Mesa Counties. As mentioned above, agricultural businesses (primarily ranching) rely on the stream for livestock water and irrigated crops.

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM and the USFS are responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA, and the Forest Service lands are managed as part of the Uncompahgre National Forest. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Reasonably Foreseeable Potential Uses of the Land and Water That Would be Enhanced, Foreclosed, or Curtailed if the Area Were Included in the National System*

Designation of this segment would enhance current recreational uses along the segment by providing long-term protection of flows and the scenic landscapes adjacent to the creek. Reasonably foreseeable development of private land includes residential housing and expansion of existing ranch developments. Designation could curtail or foreclose some or all of these private land development options.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

The Forest Service evaluated Escalante Creek for WSR eligibility and found the stream to be not eligible. Current Forest Service management direction for the WSR area will include "Wildlife management for one or more management indicator species. Semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities will be provided. Livestock grazing will be compatible with wildlife habitat management. Vegetation treatment will enhance plant and animal diversity and big game winter range in non-forest areas. Semi-primitive non-

BLM_0028767

motorized, semi-primitive motorized and roaded natural recreation opportunities will be provided. Motorized recreation on local roads is managed to prevent unacceptable stress on big game animals during primary big game use season.  Vegetation treatment will enhance plant and animal diversity. Livestock grazing is compatible, but managed to favor wildlife habitat." (USFS 1983).

The private parcels within the WSR area that fall within Mesa County are zoned as an Agricultural, Forestry, Transitional District. The AFT zoning is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the Rural Planning Area. The private parcels that fall within Montrose County are zoned to allow subdivision of land into parcels equal to or greater than 35 acres.

*Existing Support or Opposition of Designation:*

There is strong opposition from water users, private land owners and county governments to WSR designation for this segment. As noted above in the public participation section, the  Gunnison Basin Stakeholder Group recommended that the BLM find this segment not suitable. Many of the landowners along the segment participated in the stakeholder process and expressed concern that a WSR designation could impact their private property rights. They were concerned that  a Federal reserve water right and potential scenic easements might remove their property  from local control. There was general agreement among the stakeholders that the WSR values  could best be protected through local management and authorities in the legislation that established the D-E NCA.

There is support from the environmental coalition for a WSR suitable determination. Its recommendation noted that the segment "boasts the highest diversity of ORVs of any in the NCA." That said, the coalition's recommendation to the BLM was only for a determination of suitability. The comments specifically stated that BLM should not send a recommendation to Congress for designation.

As noted above, the D-E NCA Advisory Council recommendation for this segment included both a majority and minority recommendation. The majority recommendation was to find the segment not suitable and that the WSR values be protected using other administrative and legislative tools. The minority recommendation was to find the segment suitable but not recommend designation into the National System.

**Suitability Determination**

The IDT determined that the D-E NCA legislation would provide protection from threats to the free-flowing condition of the creek. The Omnibus Act of 2009 directs the BLM to manage the area "in a manner that conserves, protects, and enhances" the purposes of the D-E NCA, including "the water resources of the area streams, based on seasonally available flows that are necessary to

support aquatic, riparian, and terrestrial species and communities." The IDT concluded that the mandate in the legislation would preclude Federal approval of an impoundment dam along the segment.

The recreational ORV associated with swimming and wading is currently protected by senior water rights associated with irrigation downstream of the eligible segment and instream flow water rights held by CWCB. Adequate flows for the recreational ORV of kayaking are associated with spring snowmelt, and their protection is less certain. Additional storage on private lands above the segment could affect the kayaking ORV.

The senior irrigation water rights below the segment and the instream flow water rights would also provide protection for the wildlife and fish ORVs. Maintaining flows through the irrigation season would support habitat for peregrine falcon prey. The instream flow appropriation is allocated specifically for protection of sensitive fish.

The Escalante ACEC proposed in the Preferred Alternative as part of the D-E NCA Draft RMP would provide additional administrative protection for the segment's fish and wildlife ORVs. The relevant and important values identified for protection in the ACEC are the same as the wild and scenic river ORVs, providing an alternative method of protecting these values.

The tentative classification of the segment (scenic) and the scenic ORV would be administratively protected from incompatible development on BLM-administered lands through the Visual Resource Management Class I and II objectives proposed in the Preferred Alternative as part of the D-E NCA Draft RMP.

**Suitability Finding**

Not suitable; dropped from further Wild and Scenic study.

BLM_0028769

Dominguez-Escalante National Conservation Area                                                363
APPROVED RESOURCE MANAGEMENT PLAN

# Escalante Creek Segment 2



**Figure O.12. Escalante Creek Segment 2**

*Appendix O. Wild and Scenic River Suitability Report*

*Total Segment Length:* 8.48 miles

*Lower Terminus:* Latitude, 38.753; longitude, 108.261 W

*Upper Terminus:* Latitude, 38.679 N; longitude, 108.313 W

**Eligibility**

*Description:* Escalante Creek is a major perennial tributary of the Gunnison River, draining from the east side of the Uncompahgre Plateau. High flows typically occur during spring snowmelt, as well as from runoff generated by occasional summer thunderstorms. This segment is located within the D-E NCA. The upper terminus is the boundary between BLM- and State-managed lands, while the lower terminus is the confluence of Escalante Creek and the Gunnison River Figure O.12).

*ORVs:*

Fish: Escalante Creek is regionally important habitat for resident populations of native roundtail chubs, bluehead suckers, and flannelmouth suckers, as well as serving as a spawning site for Gunnison River populations of all three of these BLM and Colorado sensitive species (see "Eligibility Adjustments" in this report).

Wildlife: This section of Escalante Creek is regionally important habitat for desert bighorn sheep

*(Ovis canadensis)*, primarily due to the presence of a water source. Escalante Canyon provides exceptionally high quality habitat for peregrine falcons *(Falco peregrinus)*, and is considered a regionally important area for this BLM sensitive species. In 1999, the peregrine was delisted from threatened status under the ESA. The BLM monitors the status of peregrine populations to ensure continued recovery of the species. Peregrine falcons are closely associated with steep-walled canyons and often nest near perennial water sources that support prey populations such as waterfowl, songbirds, and shorebirds. Peregrine falcon pairs were observed in Escalante Canyon as recently as 2008 and 2009, and breeding/nesting activity has been confirmed along this segment (BLM 2010d).

*Tentative Classification:* Recreational

An unpaved county-maintained road runs along portions of this stream segment and crosses Escalante Creek via a bridge near the mouth. A low water ford across Escalante Creek provides road access to the Dry Fork of Escalante Creek area. There are several water diversions along this reach, primarily for irrigating agricultural lands along the river corridor.

BLM_0028771

**Suitability Factor Assessment**

*Land Ownership and Land Uses*

Land ownership within ¼ mile of the ordinary high water mark:

- 37% BLM
- 24% State of Colorado
- 39% private

Current land uses on the BLM-administered lands include livestock grazing, hiking, rock climbing, and scenic touring. Current uses on the private lands include agriculture (livestock ranching and farming). Current uses on the Colorado State-administered lands include livestock grazing and hunting.

*Mineral and Energy Resource Activities*

Through the legislation designating the D-E NCA, all Federal minerals were withdrawn from location, entry, and patent under the mining laws; and operation of the mineral leasing, mineral materials, and geothermal leasing laws. The Federal mineral holdings cover 37 percent of the WSR area. As such the minerals below private and State lands would be available for development. Of the WSR area, 55 percent is classified as having low potential, and 45 percent is classified as having medium potential for oil and gas development (Fowler and Gallagher 2004). There is no known potential for developing coal resources. The potential for locatable mineral (primarily uranium) development is classified as low (USFS 2006).

*Water Resource Development*

There are no known proposals to develop impoundments within the WSR area.

*Transportation, Facilities, and Other Developments*

There is a county-maintained gravel road adjacent to the creek (see map above). There are ranch houses and outbuildings on the private lands. There are irrigated fields on the private lands, and associated irrigation systems (generally ditches for flood irrigation).

*Recreational Activities*

As mentioned above, the primary recreational activities within the WSR area are hiking, rock climbing, and scenic touring.

BLM_0028772

*Other Resource Activities*

The other primary activities within the WSR area are associated with agriculture (livestock grazing and irrigated farming).

*Special Areas*

Of the WSR area, 37 percent is within the D-E NCA, and 13 percent overlaps the Wilderness and WSA (261 acres of Wilderness and 46 acres of WSA).

*Socioeconomic Environment*

Escalante Creek is valued for its scenic quality, historical resources, and recreational opportunities by residents of the communities in Delta, Montrose and Mesa Counties. As mentioned above, agricultural businesses (primarily ranching) rely on the stream for livestock water and irrigated crops.

*Current Administration and Funding Needs if Designated*

Within the WSR area, the BLM is responsible for the current administration of public lands. The BLM lands are managed as part of the D-E NCA. If the segment is added to the National System, the BLM would likely be responsible for its administration.

*Reasonably Foreseeable Potential Uses of the Land and Water That Would be Enhanced, Foreclosed, or Curtailed if the Area Were Included in the National System*

Designation of this segment would enhance current recreational uses along the segment by providing long-term protection of flows and the scenic landscapes adjacent to the creek.

Reasonably foreseeable development of private land includes residential housing and expansion of existing agricultural developments. Designation could curtail or foreclose some or all of these private land development options.

*Determination of the Extent That Other Federal Agencies, the State, or its Political Subdivisions Might Participate in the Preservation and Administration of the River Should it be Proposed for Inclusion in the National System*

The private parcels within the WSR area fall within Delta County. Unless a subdivision is included, no permits are required for single-family residential housing construction. Records show six unique parcels of private land within the WSR area.

*Existing Support or Opposition of Designation*

There is strong opposition from water users, private land owners, and county government to WSR

BLM_0028773