**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2015  -  Sep 30, 2016

Bureau of Land Management
Recreation Management Information System

9 January 2018

## Colorado

### LLCOS05000 - Uncompahgre Field Office

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| **Off-Highway Vehicle Travel** | | |
| OHV - ATV | 132,940 | 62,568 |
| OHV - Cars/Trucks/SUVs | 175,966 | 58,368 |
| OHV - Motorcycle | 66,412 | 22,354 |
| **Off-Highway Vehicle TravelTotals:** | 375,318 | 143,290 |
| **Snowmobile & Other Motorized Travel** | | |
| Snowmobiling | 16,403 | 8,116 |
| **Snowmobile & Other Motorized TravelTotals:** | 16,403 | 8,116 |
| **Specialized Motor Sports, Events & Activities** | | |
| Rock Crawling-4WD | 15,893 | 10,595 |
| **Specialized Motor Sports, Events & ActivitiesTotals:** | 15,893 | 10,595 |
| **Specialized Non-Motor Sports, Events & Activities** | | |
| Archery | 9,043 | 4,414 |
| Climbing - Mountain/Rock | 8,061 | 4,151 |
| Hang-Gliding/Parasailing | 271 | 113 |
| Photography | 38,997 | 2,903 |
| Rockhounding/Mineral Collection | 309 | 103 |
| Social Gathering/Festival/Concert | 16,148 | 5,361 |
| Target Practice | 35,605 | 5,799 |
| **Specialized Non-Motor Sports, Events & ActivitiesTotals:** | 108,434 | 22,844 |

Prepared by: LLCOS05000
FY Date Range: Oct 1,2015- Sept 30, 2016
State: CO
Office: LLCOS05000

BLM_0028945

Report # 19

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2015  -   Sep 30, 2016

Bureau of Land Management
Recreation Management Information System

9 January 2018

## Colorado

### LLCOS05000 - Uncompahgre Field Office

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| **Unspecified** | | |
| XX - Unspecified - XX | 522 | 44 |
| **UnspecifiedTotals:** | 522 | 44 |
| **Winter/Non-Motorized Activities** | | |
| Skiing - Cross Country | 15,995 | 5,315 |
| **Winter/Non-Motorized ActivitiesTotals:** | 15,995 | 5,315 |
| **Uncompahgre Field OfficeTotals:** | | 467,508 |
| **Total Matched In Colorado** | | 467,508 |
| **Total:** | | 467,508 |

Report # 19                                                           Page 1 of 4

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2016  -   Sep 30, 2017

Bureau of Land Management
Recreation Management Information System

9 January 2018

## Colorado

| LLCOS05000 - Uncompahgre Field Office | | |
| --- | --- | --- |
| **Visitor Use Activity Groupings** | **Number of Participants** | **Visitor Days** |
| **Boating/Motorized** | | |
| Boat Launching | 23,150 | 3,479 |
| Power Boating | 226 | 38 |
| **Boating/MotorizedTotals:** | 23,376 | 3,517 |
| **Boating/Non-Motorized** | | |
| Canoe/Kayaking | 26,712 | 13,247 |
| Row/Float/Raft | 90,225 | 48,349 |
| **Boating/Non-MotorizedTotals:** | 116,937 | 61,596 |
| **Camping & Picnicking** | | |
| Cabin Use | 491 | 328 |
| Camping | 187,736 | 187,285 |
| Picnicking | 14,851 | 910 |
| **Camping & PicnickingTotals:** | 203,078 | 188,523 |
| **Driving For Pleasure** | | |
| Driving For Pleasure | 157,724 | 40,741 |
| **Driving For PleasureTotals:** | 157,724 | 40,741 |
| **Fishing** | | |
| Fishing - Freshwater | 34,687 | 14,431 |
| **FishingTotals:** | 34,687 | 14,431 |

Prepared by: LLCOS05000
FY Date Range: Oct 1,2016- Sept 30, 2017
State: CO
Office: LLCOS05000

BLM_0028947

Report # 19

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2016  -  Sep 30, 2017

Bureau of Land Management
Recreation Management Information System

9 January 2018

## Colorado

### LLCOS05000 - Uncompahgre Field Office

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| **Hunting** | | |
| Hunting - Big Game | 300,233 | 199,355 |
| Hunting - Other | 170 | 113 |
| Hunting - Predator | 342 | 121 |
| Hunting - Small Game | 34,338 | 8,585 |
| **HuntingTotals:** | 335,083 | 208,174 |
| **Interpretation, Education & Nature Study** | | |
| Environmental Education | 421 | 105 |
| Interpretive Programs | 1,964 | 491 |
| Nature Study | 978 | 82 |
| Viewing - Cultural Sites | 2,367 | 213 |
| Viewing - Other | 15,653 | 3,379 |
| Viewing - Scenery/Landscapes | 22,165 | 3,040 |
| Viewing - Wildlife | 13,632 | 1,136 |
| Viewing -Interpretive Exhibit | 39,474 | 1,519 |
| **Interpretation, Education & Nature StudyTotals:** | 96,654 | 9,965 |
| **Non-Motorized Travel** | | |
| Backpacking | 1,999 | 1,999 |
| Bicycling - Mountain | 143,195 | 51,809 |
| Hiking/Walking/Running | 36,360 | 7,351 |
| Horseback Riding | 84,137 | 23,526 |

Prepared by: LLCOS05000
FY Date Range: Oct 1,2016- Sept 30, 2017
State: CO
Office: LLCOS05000

BLM_0028948

Report # 19                                                          Page 3 of 4

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2016  -  Sep 30, 2017

Bureau of Land Management
Recreation Management Information System

9 January 2018

## Colorado

**LLCOS05000 - Uncompahgre Field Office**

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| **Non-Motorized TravelTotals:** | 265,691 | 84,685 |
| **Off-Highway Vehicle Travel** | | |
| OHV - ATV | 137,206 | 64,550 |
| OHV - Cars/Trucks/SUVs | 278,862 | 90,692 |
| OHV - Motorcycle | 103,530 | 34,725 |
| **Off-Highway Vehicle TravelTotals:** | 519,598 | 189,967 |
| **Snowmobile & Other Motorized Travel** | | |
| Snowmobiling | 17,169 | 8,585 |
| **Snowmobile & Other Motorized TravelTotals:** | 17,169 | 8,585 |
| **Specialized Motor Sports, Events & Activities** | | |
| Rock Crawling-4WD | 72,794 | 47,271 |
| **Specialized Motor Sports, Events & ActivitiesTotals:** | 72,794 | 47,271 |
| **Specialized Non-Motor Sports, Events & Activities** | | |
| Archery | 41,119 | 20,560 |
| Climbing - Mountain/Rock | 7,867 | 4,115 |
| Hang-Gliding/Parasailing | 278 | 116 |
| Photography | 51,750 | 4,571 |
| Racing - Bicycle | 90 | 23 |
| Rockhounding/Mineral Collection | 649 | 216 |
| Social Gathering/Festival/Concert | 17,169 | 5,723 |

Prepared by: LLCOS05000
FY Date Range: Oct 1,2016- Sept 30, 2017
State: CO
Office: LLCOS05000

Report # 19

## Visitor Days and Participants
## by Office, Activity Group and Activity

### Fiscal Year Range

Oct 01, 2016  -  Sep 30, 2017

Bureau of Land Management
Recreation Management Information System

9 January 2018

## Colorado

**LLCOS05000 - Uncompahgre Field Office**

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| Target Practice | 72,404 | 11,911 |
| **Specialized Non-Motor Sports, Events & ActivitiesTotals:** | 191,326 | 47,235 |
| **Unspecified** | | |
| XX - Unspecified - XX | 0 | 0 |
| **UnspecifiedTotals:** | 0 | 0 |
| **Winter/Non-Motorized Activities** | | |
| Skiing - Cross Country | 17,169 | 5,723 |
| **Winter/Non-Motorized ActivitiesTotals:** | 17,169 | 5,723 |
| **Uncompahgre Field OfficeTotals:** | | 910,413 |
| **Total Matched In Colorado** | | 910,413 |
| **Total:** | | 910,413 |

Prepared by: LLCOS05000
FY Date Range: Oct 1,2016- Sept 30, 2017
State: CO
Office: LLCOS05000

**Angie Adams**

| | |
|---|---|
| **From:** | Angie Adams |
| **Sent:** | Tuesday, February 6, 2018 4:41 PM |
| **To:** | ufo- ar |
| **Subject:** | FW: UFO RMP recreation receipts update for socioeconomic section |

**From:** Loscalzo, Matthew [mailto:mloscalzo@blm.gov]
**Sent:** Tuesday, February 06, 2018 3:26 PM
**To:** Angie Adams <angie.adams@empsi.com>
**Subject:** Fwd: UFO RMP recreation receipts update for socioeconomic section

For the UFO AR.

Sorry, I can't find the AR email address at the moment. Can I bother you to send it to me again when you get a chance. Thanks.

---------- Forwarded message ----------
From: **Jackson, Julie** <jmjackson@blm.gov>
Date: Tue, Feb 6, 2018 at 1:34 PM
Subject: Fwd: UFO RMP recreation receipts update for socioeconomic section
To: Matthew Loscalzo <mloscalzo@blm.gov>

Here is the report that Stacy sent me for your admin record.  I already sent an email to Zoe with the total.

Thank You
Julie Jackson
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO  81401
970-240-5310
jmjackson@blm.gov

"To the world you might be one person, but to one person, you just might be the world."

"The happiest people don't have the best of everything. They just make the best of everything."

---------- Forwarded message ----------
From: **Jordan, Stacy** <sljordan@blm.gov>
Date: Tue, Feb 6, 2018 at 11:40 AM
Subject: Re: UFO RMP recreation receipts update for socioeconomic section
To: "Jackson, Julie" <jmjackson@blm.gov>

Hi Julie,
Looks like for 17X LVRDCO220000 had $58,407.58 in receipts.

1

BLM_0028951

# Control Objects Data: Overall Values

**FM Area**          1400 (USD)
**Control Ledger**    9H



| Overall Values of Control Objects | Consumable Amt | Cons |
|---|---|---|
| ▽ 🗀 <Several Fund Values> | 327,100.73 | 1 |
| ▷ 🗀 12XL5413AR | 28,776.81 | |
| ▷ 🗀 13XL5413AR | 23,908.23 | |
| ▷ 🗀 14XL5413AR | 21,409.50 | |

Thanks,
Stacy

On Mon, Feb 5, 2018 at 10:44 AM, Jackson, Julie <jmjackson@blm.gov> wrote:

Hello Stacy

Can you run a report for the following code:

LLCOS05000   L1232   WBS: LVRDCO220000   17X only

Thank you so much and if you have any questions please let me know.
Julie Jackson
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO  81401
970-240-5310
jmjackson@blm.gov

"To the world you might be one person, but to one person, you just might be the world."

"The happiest people don't have the best of everything. They just make the best of everything."


---------- Forwarded message ----------
From: **Zoe Ghali** <zoe.ghali@empsi.com>
Date: Mon, Feb 5, 2018 at 9:51 AM
Subject: RE: UFO RMP recreation receipts update for socioeconomic section
To: "jmjackson@blm.gov" <jmjackson@blm.gov>

2

BLM_0028952

Hi Julie,

I'm following up on my previous request for recreation receipts. Would you be able to provide the total for recreation receipts received for the UFO in fiscal year 2017? I'd like to include this info in the updated Ch 3 socioeconomic section. I don't believe I received this info, my apologies if I am mistaken.

**Zoe Ghali**
Please note our new street address:

EMPSi  Environmental Management and Planning Solutions, Inc.
3005 Center Green Drive, Suite 205
Boulder, CO 80301
tel:  303-447-7160    fax:  866-423-0707

www.EMPSi.com    Twitter: EMPSInc    Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S*

Albuquerque      Denver      Portland      Reno      San Francisco      Santa Fe      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Zoe Ghali
**Sent:** Tuesday, December 19, 2017 2:46 PM
**To:** 'jmjackson@blm.gov' <jmjackson@blm.gov>
**Cc:** Loscalzo, Matthew <mloscalzo@blm.gov>; Angie Adams <angie.adams@empsi.com>
**Subject:** UFO RMP recreation receipts update for socioeconomic section

Hi Julie,

I am updating the socioeconomic section for the UFO RMP Ch 3 and 4. The section contains some information on current recreation use and receipts that is now out of data. Would you be able to supply updated receipts data (i.e. SPR receipts, and other recreation fees) for the most recent fiscal year. One total number is fine.

Thanks for your help, and please let me know if you have any questions.

**Zoe Ghali**
Please note our new street address:

BLM_0028953

EMPSi  Environmental Management and Planning Solutions, Inc.
3005 Center Green Drive, Suite 205
Boulder, CO 80301
tel:  303-447-7160     fax:  866-625-0707

www.EMPSi.com       Twitter: EMPSInc        Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*

Albuquerque      Denver      Portland      Reno      San Francisco      Santa Fe      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

--
Budget Analyst
Southwest District Office
Phone:  (970) 882-6824
Email:  sljordan@blm.gov

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0028954

# Bull Mountain Unit
# Master Development Plan
# Record of Decision

DOI-BLM-CO-S050-2013-0022-EIS







U.S. Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
Phone: (970) 240-5300

BLM_0028955

**MISSION STATEMENT**

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

BLM_0028956

# United States Department of the Interior
# Bureau of Land Management

---

### Record of Decision

### BLM/CO/PL-17/012

---

### October 2017

## Record of Decision
## for the
## Bull Mountain Unit Master Development Plan

*Gunnison County, Colorado*

---

### U.S. Department of the Interior
### Bureau of Land Management
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, CO 81401
### Phone: (970) 240-5300



BLM_0028958



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
SOUTHWEST DISTRICT OFFICE
2465 South Townsend
Montrose, CO 81401
blm.gov/colorado



In Reply Refer To:
1792

Dear Reader:

This Record of Decision (ROD) documents the Bureau of Land Management (BLM) Southwest District Manager's decision to approve, with minor modifications, the preferred alternative (Alternative D) as described in the Final Environmental Impact Statement (FEIS) for the Bull Mountain Unit Master Development Plan (MDP). The selected alternative approves a plan for the exploration and development of up to 146 natural gas wells, four water disposal wells, and associated infrastructure on Federal and private mineral leases within a federally-unitized area known as the Bull Mountain Unit.

The decision includes conditions of approval that specifically address impacts to air resources and air quality related values, water resources and wildlife. Approval of the Preferred Alternative as described in the FEIS (2016), with minor modifications, meets the BLM's purpose and need, provides for natural gas exploration and development, and approves the Federal 12-89-7-1 Application for Permit to Drill (APD).

The Bull Mountain Unit is located within the Colorado River basin, approximately 30 miles northeast of the Town of Paonia, CO, and is bisected by State Highway 133. The boundaries of the unit encompass approximately 19,670 acres of Federal and private oil and gas mineral estate in Gunnison County, Colorado. The unit consists of 440 acres of BLM Federal surface lands and subsurface mineral estate; 12,900 acres of split-estate lands consisting of private surface and Federal mineral estate administered by the BLM; and 6,330 acres of fee land consisting of private surface and private mineral estate.

**Administrative Review**
An adversely affected party may seek administrative review of the decision by the Colorado State Director, as provided in 43 CFR 3165.3. A request for State Director review must be filed in the BLM Colorado State Office within 20 business days from the date of receipt of the decision.

**For Further Information**
Further information and document links are available on the BLM project website at:
http://bit.ly/2vZQi89. If you have any questions or require additional information, please contact
Gina Phillips, BLM Southwest District NEPA Coordinator, at 970-240-5381 or
gphillips@blm.gov or Shannon Borders, BLM Public Affairs Specialist, at 970-240-5399 or
sborders@blm.gov.

Sincerely,

Dana M. Wilson
Acting Southwest District Manager

# TABLE OF CONTENTS

Chapter                                                  Page

SUMMARY ....................................................................................................................... S-1

1. INTRODUCTION .......................................................................................................... 1-1

2. DECISION .................................................................................................................... 2-1

     2.1    What the Decision Provides ................................................................ 2-1
          2.1.1   The Selected Alternative ................................................... 2-1
     2.2    What the Decision Does Not Provide ................................................. 2-9

3. FUTURE NEPA DOCUMENTATION ............................................................................. 3-1

4. OVERVIEW OF THE ALTERNATIVES ........................................................................... 4-1

     4.1    Alternatives Considered ..................................................................... 4-1
     4.2    Alternatives Considered but not Carried Forward for Detailed Analysis ......... 4-4
          4.2.1   Alternatives Considered and Eliminated from EA Development ........ 4-5
          4.2.2   Alternatives Considered and Eliminated from EIS Development ....... 4-5

5. MANAGEMENT CONSIDERATIONS ............................................................................. 5-1

     5.1    Rationale for the Decision ................................................................. 5-1
          5.1.1   Land Use Plan Conformance ............................................ 5-2
          5.1.2   Federal, State, and Local Permitting and Approvals ............................ 5-2

6. MODIFICATIONS TO AND CLARIFICATIONS OF THE PREFERRED ALTERNATIVE ....... 6-1

     6.1    Air Quality Adaptive Management ..................................................... 6-1
     6.2    Greenhouse Gas Emission Reduction and Offset ............................................ 6-2
     6.3    Modifications to Individual COAs ...................................................... 6-2

7. CONSULTATION AND COORDINATION ....................................................................... 7-1

     7.1    Government-to-Government Consultation with Native American Tribes ........ 7-1
     7.2    Colorado State Historic Preservation Officer (SHPO) Consultation ............... 7-2
     7.3    US Fish and Wildlife Service Consultation ........................................ 7-2
     7.4    US Environmental Protection Agency ................................................ 7-3
     7.5    Cooperating Agencies ........................................................................ 7-3

8. PUBLIC INVOLVEMENT .............................................................................................. 8-1

     8.1    Scoping ............................................................................................. 8-1
     8.2    Draft EIS .......................................................................................... 8-2
     8.3    Final EIS .......................................................................................... 8-2

9. APPROVAL ................................................................................................................. 9-1

10. APPEAL PROCESS ..................................................................................................... 10-1

11. REFERENCES .............................................................................................................. 11-1

BLM_0028961

## TABLE                                                          Page

5-1    Federal, State, and Local Permits and Approvals Applicable to the Bull
       Mountain Unit ................................................................................................. 5-2

## FIGURES                                                        Page

S-1    Bull Mountain Unit ........................................................................................... S-2
2-1    The Selected Alternative ................................................................................... 2-2

## APPENDICES

A    Conditions of Approval
B    Wildlife Habitat Plan
C    Master Surface Use Plan of Operations
D    Master Drilling Plan
E    Noxious Weed Management Plan
F    Poly Pipeline Operation Plan
G    12-89-7-1 APD Package
H    Final EIS Errata
I    Response to New Comments on the Final EIS

BLM_0028962

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APD | application for permit to drill |
| AQRV | air quality related values |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BMU | Bull Mountain Unit |
| BOP | blowout preventer |
| BOPE | blowout preventer equipment |
| BTEX | benzene, toluene, ethylbenzene, and xylene |
| CAAQS | Colorado Ambient Air Quality Standards |
| CARMMS | Colorado Air Resources Management Modeling Study |
| CARPP | Comprehensive Air Resources Protection Protocol |
| CDOT | Colorado Department of Transportation |
| CDPS | Colorado Discharge Permit System |
| CDPHE | State of Colorado Department of Public Health and Environment |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| COA | condition of approval |
| COGCC | Colorado Oil and Gas Conservation Commission |
| COGIS | Colorado Oil and Gas Information System |
| CBNG | coal bed natural gas |
| CPW | Colorado Parks and Wildlife |
| DAT | deposition analysis threshold |
| DAU | Data Analysis Unit |
| DOC | dissolved organic carbon |
| DV | differential valve |
| GHG | greenhouse gas |
| EA | environmental assessment |
| EIS | environmental impact statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| GIS | geographic information system |
| HAP | hazardous air pollutant |
| HDPE | high density polyethylene |
| HP | horsepower |
| LIDAR | Light Detection and Ranging |
| LCM | lost circulation materials |
| LSND | low-solids non-dispersed (gel system) |
| MDP | master development plan |
| MD | measured depth |
| MOU | memorandum of understanding |
| MBTA | Migratory Bird Treaty Act |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |

BLM_0028963

| | |
|---|---|
| NPDES | National Pollutant Discharge Elimination System |
| NOS | Notice of Staking |
| NSPS | new source performance standard |
| QA/QC | quality assurance/quality control |
| PAC LV | low viscosity polyanionic cellulose |
| PBA | programmatic biological assessment |
| PBO | programmatic biological opinion |
| PHMSA | USDOT Pipeline and Hazardous Materials Safety Administration |
| PSIG | pounds per square inch gauge |
| PTD | proposed total depth |
| REL | reference exposure levels |
| RMP | resource management plan |
| RfC | reference concentrations |
| ROD | record of decision |
| ROW | right-of-way |
| RSO | restricted surface occupancy |
| SARA | Superfund Amendments and Reauthorization Act |
| SGI | SG Interests I, Ltd. |
| SHPO | State Historic Preservation Officer |
| SPCC | spill prevention, countermeasure and control |
| SUPO | surface use plan of operations |
| SWH | sensitive wildlife habitat |
| the Unit | Bull Mountain Unit |
| TL | timing limitation |
| TPH | total petroleum hydrocarbons |
| TPY | ton per year |
| TVD | true vertical depth |
| UFO | Uncompahgre Field Office |
| USDOT | United States Department of Transportation |
| USFWS | United States Fish and Wildlife Service |
| VOC | volatile organic compound |
| WHP | wildlife habitat plan |
| WDW | water disposal well |

BLM_0028964

# SUMMARY

The United States (US) Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office, received a proposed master development plan (MDP) for natural gas exploration and development from SG Interests I, Ltd. (SGI) for the Bull Mountain Unit. The Bull Mountain Unit proposed MDP described the exploration and development of up to 146 natural gas wells, 4 water disposal wells, and associated infrastructure on federal mineral leases. An MDP provides information common to multiple planned wells, including drilling plans, surface use plans of operations, and future production plans. MDPs are typically prepared for a planned cluster of wells and associated facilities near an oil and gas unit or field or for multiple in-fill wells scattered throughout. MDPs have information on associated facilities, such as roads, pipelines, utility corridors, and compressor stations.

The environmental consequences of future oil and gas exploration and development within the project area were evaluated in the Bull Mountain Unit Draft and Final Environmental Impact Statements (EISs). Based on the analysis in the Final EIS (BLM 2016), the BLM's decision is to approve Alternative D, the BLM's Preferred Alternative, as described in **Chapter 2,** Decision, of this Record of Decision (ROD). Alternative D, the Selected Alternative, addresses the BLM's purpose and need as described in Section 1.2 of the Final EIS. The Selected Alternative allows reasonable access to existing leases while mitigating impacts on wildlife, air, and water resources. In the Final EIS, the BLM considered conceptual locations for this exploration and development project. This decision approves a plan for natural gas exploration and development only within the development area considered, as shown in **Figure S-1**, Bull Mountain Unit. As part of this decision, the BLM is approving one application for permit to drill (APD) for the Federal 12-89-7-1 well APD.[1]

---

[1] SGI submitted the 12-89-7-1 well APD, and the BLM made an on-site inspection on May 16, 2011. The BLM determined the APD to be complete; it has been pending since October 25, 2012.

BLM_0028965



**Bull Mountain Unit**

Source: BLM GIS 2014

Bull Mountain Unit

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Perennial stream

**Figure S-1**

BLM_0028966

# CHAPTER 1
# INTRODUCTION

The United States (US) Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office, received a proposed master development plan (MDP) for natural gas exploration and development from SG Interests, Ltd. (SGI) for the Bull Mountain Unit (the Unit). It includes one APD for the 12-89-7-1 well.[2] In accordance with the National Environmental Policy Act (NEPA), the BLM published a preliminary environmental assessment (EA) on March 23, 2012. The BLM determined it was necessary to prepare an EIS due to projected air quality impacts of the proposed MDP. The BLM published a notice of intent to publish an EIS on April 3, 2013, published a Draft EIS on January 16, 2015, and published a Final EIS on July 8, 2016. Additional details on public involvement are in **Chapter 8**, Public Involvement, of this ROD. The purpose of and need for the EIS are described in the Final EIS, Introduction Section 1.2, Purpose and Need.

The Unit is in the Colorado River Basin, approximately 30 miles northeast of the town of Paonia, Colorado, and is bisected by State Highway 133, as described in Final EIS, Section 1.1.1, Regional Setting.

The Bull Mountain Unit MDP arises from initial studies of the subsurface fluid mineral reserves and the results of previous natural gas drilling, both of which indicate the potential for economically viable reserves of natural gas in the area. An MDP includes information common to multiple planned wells, including drilling plans, surface use plans of operations, and plans for future production. An MDP facilitates early planning, orderly development, and the cumulative effects analysis for all the APDs expected to be drilled by an operator in a developing field. Instead of structuring the development of the federal leases as a series of individual actions, the BLM encourages the use of multi-well development plans to more effectively manage federal lease development (BLM IM 2005-247).

---

[2] SGI submitted the 12-89-7-1 well APD and the BLM made an on-site inspection on May 16, 2011. The BLM determined the APD to be complete; it has been pending since October 25, 2012.

BLM_0028967

In 2003, the BLM approved a Unit agreement for the leases in the Bull Mountain area to provide for orderly, planned, and structured development for extracting natural gas. The Bull Mountain Unit MDP describes the construction of up to 146 natural gas wells, 4 water disposal wells, and associated infrastructure on federal mineral leases in the Unit. The boundaries of the Unit encompass approximately 19,670 acres of federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit encompasses 440 acres of BLM-administered federal surface, underlain by BLM-administered mineral estate; 12,900 acres of split-estate lands, consisting of private surface minerals and BLM-administered minerals; and 6,330 acres of fee land, consisting of private surface and private minerals regulated by the Colorado Oil and Gas Conservation Commission (COGCC; **Figure S-1**, Bull Mountain Unit).

The objective of unitization is to proceed with a program that will adequately explore and develop in a timely manner all committed lands in the Unit area, without regard to internal ownership boundaries. By effectively eliminating internal property boundaries in the Unit, unitization permits the most efficient and cost-effective means of developing the underlying oil and gas resources (BLM 2013a). Under terms of the Unit agreement, SGI is required to diligently develop at least two producing wells per year in order to maintain the Unit's administrative structure. This requirement is currently suspended under an approved suspension of unit obligations while this EIS and ROD are being prepared. Additionally, federal unitization allows wells to be placed in the Unit in a logical fashion, without regard to setbacks from committed lease lines. This is to minimize road development, pipelines, and other surface impacts (BLM 2007); however, the COGCC Rule 318.d(3) setback requirements apply.

BLM_0028968

# CHAPTER 2
# DECISION

## 2.1   WHAT THE DECISION PROVIDES

This decision, which applies to BLM-administered lands and federal mineral estate in the Bull Mountain Unit only, approves a plan for drilling and producing leased federal fluid minerals. The Bull Mountain Unit is depicted in **Figure S-1**, Bull Mountain Unit; the plan is described in the Bull Mountain Final EIS Preferred Alternative (Alternative D). Exploration and development must be approved through subsequent decisions and will be subject to appropriate conditions of approval (COAs) in **Appendix A** (references to appendices are for the ROD, unless noted otherwise).

The BLM has determined that the analysis contained in the Final EIS provides sufficient information for reaching an informed decision on the Bull Mountain Unit Master Development Plan. Additional NEPA documentation will be required for future decisions, as noted in **Chapter 3**, Future NEPA Documentation.

### 2.1.1   The Selected Alternative

The BLM carefully weighed the analysis of the alternatives and determined that Alternative D, the Preferred Alternative, best minimized adverse environmental impacts, while contributing to local and regional economies. The Selected Alternative (Alternative D) is the BLM's Preferred Alternative from the Final EIS (see **Figure 2-1**, The Selected Alternative). Under the Selected Alternative, SGI, or subsequent operator (hereafter referred to as SGI), may drill up to 146 new gas production wells and 4 water disposal wells from up to 33 pads in the project area. SGI also will be allowed to construct new roads and new surface or buried water supply and gas gathering pipelines to support exploration and development.[3] SGI may also build up to three new compressor facilities inside the Unit and one compressor station outside the Unit boundary to the northwest to handle increased production.

---

[3] Up to 16 miles of new roads and 14 miles of improvements to existing roads for access, 14 miles of new pipeline construction collocated with roads, and 10 miles of new cross-country pipeline construction

BLM_0028969

2. Decision



The Selected Alternative

**Legend:**
- Proposed well pad analysis area
- Proposed screw compressor
- Proposed pipeline
- Proposed new road construction
- Existing road requires upgrades for use
- WHP winter closure
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

### The Selected Alternative

New developments under the Selected Alternative will be subject to the Bull Mountain Unit WHP. The WHP will apply throughout the development phase (construction, drilling, and completion); it will not apply to production or maintenance phases.

0   2,000  4,000
Feet

August 13, 2017
BullMtn_ROD_alts_D_WHP_V08pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

Source: SG Interests GIS 2013 and BLM GIS 2014

**Figure 2-1**

BLM_0028970

All actions described below, including those that occur on split-estate lands, will comply with all laws, regulations, and BLM policies. These include the BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (US Department of the Interior and US Department of Agriculture 2007), BLM Manual 9113 (BLM 1985), BLM NEPA Handbook H-1790-1 (BLM 2008a), and additional requirements from the Uncompahgre Basin Resource Management Plan (RMP; BLM 1989). The COAs listed in **Appendix A** will apply as appropriate.

New development phase activities under the Selected Alternative will be subject to the Bull Mountain Unit Wildlife Habitat Plan (WHP; see **Appendix B**). The analysis in the Final EIS assumed that with the application of the WHP in the winter period December 1 through April 15, SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands, resulting in a landscape approach to maintaining winter habitat suitability for big game. The BLM plans to facilitate preparation of a Memorandum of Understanding (MOU) with COGCC and other appropriate agencies, describing how they will coordinate the administration of the WHP on private minerals, federal surface, and split-estate lands. COAs in **Appendix A** from the WHP will apply throughout the development phase (construction, drilling, and completion); they will not apply to the production or maintenance phases. The remaining COAs will apply throughout the life of the federal authorizations, except when the BLM determines them to be not applicable. As stated in Final EIS page 1-11, after drilling, routine well operations do not require BLM approval or notification (43 Code of Federal Regulations (CFR), Subparts 3162.3-2, subsequent well operations).

The BLM Colorado State Office; the US Department of Agriculture, Forest Service, Rocky Mountain Region; and the COGCC signed a MOU, dated July 10, 2009. It addresses the COGCC's final amended rules for oil and gas operations as they apply to federal lands and minerals (including split-estate lands). The MOU facilitates cooperation between the agencies to limit the potential for redundancy or conflicting regulations between the permitting authorities; however, it recognizes that each regulatory agency in Colorado must receive permits from oil and gas operators that comply with and include responses to their own specific rules and regulatory requirements.

In the MOU, the parties agree to advise operators to identify and incorporate applicable standards and practices in the COGCC rules into federal APDs, MDPs, and other authorizations related to oil and gas operations. This would apply as long as such state standards and practices are at least as stringent as comparable federal standards or practices, in order to minimize the potential for multiple reviews.

In split-estate situations, the surface rights and subsurface rights (such as those to develop minerals) for a piece of land are owned by different parties. See the BLM's website on split-estate[4] for additional information and details.

---

[4] https://www.blm.gov/sites/blm.gov/files/documents/files/SplitEstate07.pdf

BLM_0028971

The following plans and strategy documents apply to federal APDs in the Selected Alternative:

- Surface use plans of operations and drilling plans, based on the templates provided in **Appendices C** and **D**, respectively, of this ROD;
- Hazardous Materials Management Summary (Appendix G of the Final EIS);
- Noxious Weed Management Plan (**Appendix E** of this ROD);
- Bainard Augmentation Plan (Appendix L of the Final EIS); and
- Poly Pipeline Operations Plan (**Appendix F** of this ROD).

The BLM will require, monitor, and enforce elements of the project phases, as described in detail in the Final EIS in Section 2.2.5, Elements Common to All Alternatives, and in Section 2.2.9, Alternative D, the BLM's Preferred Alternative. The BLM will require, monitor, and enforce the elements of the project phases: new developments, construction, drilling, completion, interim reclamation, production and maintenance, final reclamation and abandonment, water use and sources, and hazardous materials and sources.

### New Developments
The exact locations of well pads will be identified in those 40-acre analysis area sites[5] best suited to achieve maximum reclamation success. The BLM will determine these locations with on-site visits in consultation with COGCC, Colorado Parks and Wildlife (CPW), State of Colorado Department of Public Health and Environment (CDPHE), the local government designee, and the landowner. **Appendix A** lists COAs that apply to surface-disturbing activities. COAs from the WHP are noted as "WHP" within the individual COA.

New water disposal wells will be sited on existing pads.

### Construction
The Selected Alternative will include the construction of roads, well pads, pipelines, and ancillary facilities. **Appendix A** lists COAs that apply to construction.

### Access Road Construction
The primary access roads are State Highway 133 and County Road 265. Site-specific plans for road construction and upgrades will be included as part of individual future APDs. Roads will be subject to approval from the county, landowners, or the BLM, depending on location.

### Well Pad Construction (Gas and Water Disposal Wells)
The BLM will approve individual well pad construction as part of an APD. Each APD will contain site-specific details on well pad size, construction and well operations, and mitigation measures.

---

[5] The 40-acre analysis area sites were defined in the Final EIS as the locations where SGI will develop pads; exact pad locations were unknown. These areas were found to have fewer environmental constraints, as described in the site analysis found in Appendix A of the Final EIS.

BLM_0028972

The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad will be identified as part of future APDs submitted under this MDP. Additionally, as part of individual APDs, SGI will identify the specific pipeline routes needed to transport the gas and water from the wellhead.

*Pipeline Construction*
Pipelines will be necessary to transport gas from producing wells to the existing sales gas pipeline and to transport produced water to proposed water disposal wells or flowback pits. SGI may also temporarily lay down poly pipelines in order to transport the fresh or recycled water used for completions from the McIntyre Flowback Pits to storage tanks and then to the wellhead (see **Appendix F**). Generally, the pipe strings will follow roads.

*Overhead Electrical Line Construction for Water Disposal Wells*
SGI may construct up to four new overhead electrical lines (one to each water disposal well, up to five poles each line) to supply power to the wellhead.

**Drilling**
*Gas Well Drilling*
All drilling operations and other well site activities will be conducted in compliance with BLM policies, regulations, and APD COAs (**Appendix A**), and with a Surface Use Plan of Operations and Drilling Plan based on the templates in **Appendices C** and **D**, respectively. **Appendix A** lists COAs from the WHP that apply to drilling, including WHP Winter Closure Areas. The specific technical information related to drilling, such as wellbore direction, types of drilling technologies (reserve pit or closed loop systems), target formations, and drilling lubricants will be identified in the APD when submitted to the BLM.

*Water Disposal Well Drilling*
SGI is authorized to drill up to four new water disposal wells to be sited on existing pads. The disposal wells may be completed in the Dakota, Morrison, Entrada, or Maroon Formations.

The BLM will process APDs for on-lease water disposal wells as described in **Appendix A**.

**Completion**
**Appendix A** lists COAs that apply to completion.

*Gas Well Completion*
Gas wells may be completed using hydraulic fracturing. The specific wellbore requirements and casing information will be identified in the Drilling Plan based on the template Master Drilling Plan provided in **Appendix D**. The casing and cementing techniques described in the drilling plan will provide redundant protection of all usable aquifers above the target zones by cementing both the surface and intermediate casing strings from the base of pipe back to the surface.

Water used during completion operations will be recycled, freshwater, or a combination of both, and quantities used will vary in accordance with the formations the wells are completed in. Specifics for how much water each well type required for completion will be provided in the drilling plan.

BLM_0028973

*Flowback Pits*
At full build out, the four McIntyre Flowback Pits will be used to minimize water consumption. Fresh, production, and recycled water will be delivered to the McIntyre Flowback Pits through surface polyethylene (HDPE, referred to here as poly) pipe and existing buried steel water pipelines for temporary storage prior to hydraulic fracturing operations (see **Appendix F**). Temporary water pumps will draw water from the McIntyre Flowback Pits into the temporary surface pipes and existing water pipelines, in order to reduce the number of trucks hauling fluid.

*Water Disposal Well Completion*
Similar to gas wells, a workover rig will be used to complete a water disposal well. The well's steel casing will be perforated and the formation may be hydraulically fractured to improve its ability to accept injected water. Multiple disposal zones will be perforated in order to allow produced water to flow into any of the available receiving formations and to allow for redundancy in receiving formations.

***Interim Reclamation***
**Appendix A** lists COAs that apply to interim reclamation. Reclamation areas will include fill slopes, trenches, wing ditches, edges of disturbance, temporary-use areas no longer needed, and embankments, and those portions of the well pad not needed for production. Reclamation will involve recontouring the well pad to blend with the natural topography, evenly redistributing segregated topsoil, seeding, and monitoring to ensure revegetation is successful.

***Production and Maintenance***
**Appendix A** lists COAs that apply to production and maintenance.

*Production*
If a well is determined to be commercially productive, production facilities will be installed on the well pad. Typically, up to eight 200- to 400-barrel storage tanks will be installed per well for produced water and one storage tank for condensate (if needed). The produced water will be managed as described below in the *Produced Water Management* section. Condensate, if produced, will be transferred to trucks as necessary and transported for sale or to an approved disposal site. Typically, a heated three-phase separator will also be necessary to separate fluids associated with each wellbore. Protective barriers will be installed around the production facilities, including the tanks.

Dehydration facilities to separate water from natural gas will be centralized at compression facilities. Where applicable, wells will be fitted with cavity pumps with either a large 188-horsepower generator or smaller, more efficient turbine generators to power the dehydration facilities. These pump and generator systems can be used on any type of well, whether coal bed methane natural gas or shale, if needed. The prime mover for pump jacks will be 50-horsepower or smaller natural gas-fired internal combustion engines.

*Surface Facilities*
Surface facilities will be installed in accordance with BLM standards, policies, and regulations.

Installed surface facilities for each gas well will include the wellhead and may include artificial lifts, separators, water transfer, pumps, tank batteries, wellhead compression, and gas-metering

BLM_0028974

facilities. Separated produced water from each well will be transported or pumped through in-groundwater lines to an approved disposal well (see *Produced Water Management* below).

Surface facilities for water disposal wells will include the wellhead, water injection pump and housing, filter skid and gas filter skid, and approximately six to eight 400-barrel holding tanks and a 90-barrel facility drain tank. Water storage tanks will be heated during the winter to prevent ice formation in the tanks and lines. The injection pumps for the water disposal well will be powered by electricity supplied by overhead electrical lines or by a natural gas engine.

SGI will use an existing equipment storage yard located on private land at the Forest Service boundary outside of the Unit. SGI will use a second existing storage yard of approximately 250 feet by 400 feet on SGI's property to store materials and equipment (T11S R90W Section 14), which also falls within one of the well pad analysis areas and may also be a future well site.

The BLM Authorized Officer will be promptly notified of work undertaken in response to an emergency.

*Produced Water Management*
Water to be injected into the water disposal wells will be piped or delivered by truck into the holding tanks to allow sediments to settle. The water will then pass through a series of filters to remove solids larger than 10 microns in diameter. Accumulated solids from the settling and filtration process will be periodically removed from the holding tanks and trucked to an approved off-site disposal facility. SGI may use chemical treatment of water to reduce mineral scaling or deposition in the receiving formation as needed and as approved by the COGCC rules and regulations.

Water disposal wells will be drilled to nonproducing, unusable water-bearing formations (i.e., with water quality below state or federal standards for human or agricultural use) capable of accepting water. Nonproducing gas wells may also be converted for water disposal use; if this were proposed, it will be detailed in the specific APD when it is submitted to the BLM.

Until full build-out of the water disposal wells, produced water will be reinjected into the existing water disposal well within the Unit or trucked to an approved disposal site.

*Workover and Maintenance*
Except emergencies as defined by the WHP, **Appendix A** lists COAs from the WHP that apply to workovers during the initial period of development, including WHP Winter Closure Areas. After full development of the Federal wells in Selected Alternative has occurred, the timing restrictions on workovers from the WHP will no longer be applicable to the federal wells within the Winter Closure Areas. However, activities may be subject to a COA limiting activities to daylight hours only. Regardless of timing limitations when performing workovers on federal wells, such operations will be conducted in compliance with the subsequent well operations standards in 43 CFR, Subparts 3162.3 and -2.

**Final Reclamation and Abandonment**
Development of a site-specific reclamation plan will include consultation between the BLM, the surface owner, and SGI. SGI will submit site-specific reclamation status report to the BLM.

BLM_0028975

Appendix A lists COAs that apply to reclamation and reclamation monitoring. SGI will plug wells in compliance with **Appendix A** COAs.

### Water Use and Sources

Water for drilling and completion will be pumped to the well site or trucked in and stored for operations. After use, the water for drilling and completion must be injected into a disposal well, hauled off-site to an approved disposal facility, or stored for reuse in the flowback pits. SGI will reuse water where possible. Flowback fluids used during the same drilling season may be stored in the McIntyre Flowback Pits.

Freshwater needed for access road construction would be obtained from nearby sources (per agreements with landowners and water rights holders) or comport with SGI's water augmentation plan (Final EIS Appendix L). Specific water withdrawal points will be identified in each future drilling application. Water from these sources will be distributed by truck, buried pipeline, or surface poly pipe to the point of use. Produced water and water from drilling and completion of other wells will be reused to the maximum extent practical.

Freshwater used for dust abatement will be in accordance with **Appendix A** COAs.

### Hazardous Materials and Solid Waste

Drilling by-products include solid pieces of waste rock, combined with fluids and lubricants used to maintain smooth drilling operations.

Wastes will be disposed of properly according to the appropriate regulatory requirements.

SGI will use its integrated spill prevention, control, and countermeasures plan and emergency response plan to contain and control oil and chemicals used in the Unit and for fire prevention and protection and emergency reporting. Procedures outlined in the plans are applicable to all SGI personnel and contractors and are included as COAs in **Appendix A**.

Chemicals on the EPA's Consolidated List of Chemicals Subject to Reporting Under Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III) may be used or stored on the Unit. SGI will report thresholds for reportable quantities, as required.

In the course of drilling, SGI can store and use diesel fuel, sand (silica), hydrochloric acid, and carbon dioxide gas, all described as hazardous substances in 40 CFR, Subpart 302.4. In addition, natural gas condensate and crude oil, described as hazardous substances in 40 CFR, Subpart 302.4, may be stored or used in reportable quantities.

During production, hazardous substances described as in 40 CFR, Subpart 302.4 may be stored or used on-site. SGI may store or use on-site small quantities of retail products containing volumes of hazardous substances that do not need to be reported. Extremely hazardous substances (as defined in 40 CFR, Part 355) cannot be used, produced, stored, transported, or disposed of. Hazardous substances will be reported as required by Title III and COGCC chemical inventory programs.

SGI will surround tanks containing hazardous materials in accordance with **Appendix A** COAs.

BLM_0028976

Accumulated trash and nonflammable waste will be hauled to an approved landfill once a week or as often as necessary. All debris and waste materials not contained in the trash containers will be cleaned up, removed from the construction ROW or well pad, and disposed of at an approved landfill. Trash will be cleaned up every day. Sanitary waste equipment and trash bins will be removed from the Unit on completion of access road or pipeline construction, following drilling, and completion operations at an individual well pad, and as required

### APD for Federal 12-89-7-1

As part of the decision, the BLM approves the Federal 12-89-7-1 APD. The well, located on split-estate land, will be drilled to a total depth of 4,700 feet. It will target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well will have a 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet; a 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet; and a 6-inch-diameter casing in an 8.5-inch-diameter borehole to the final depth of 4,700 feet.

As described in the surface use plan of operations specifically for the 12-89-7-1 well (**Appendix G**, 12-89-7-1 APD Package), the well pad will cover about three acres. Up to five wells are planned for this well pad. The wells will target coal bed methane and sandstone and shale gas producing formations. Access will be via the existing Narrows road and then via a road designed to accommodate heavy vehicle traffic. This traffic runs southeast, from Gunnison Energy Corporation's Hotchkiss 12-90 #1-34 well, located a little more than 1 mile northwest of the proposed well pad. The well will also have tie-in lines from the pad to the Narrows Gathering Pipeline to transport gas and produced water. Freshwater sources for the 12-89-7-1 APD could include East and West Muddy Creek, Aspen Leaf Reservoir, and Ault Reservoir/Ault Creek subject to SGI's acquisition of proper authorizations and permissions by the State of Colorado and water rights holders. **Appendix G** lists COAs that apply to this APD.

## 2.2   WHAT THE DECISION DOES NOT PROVIDE

Decisions contained in this document apply only to BLM-administered lands and federal mineral estate. Agencies that have jurisdiction over other mineral estate in the Unit may, at their discretion, require any of the measures contained in this ROD, which have been identified through a comprehensive environmental analysis.

This ROD approves the 12-89-7-1 APD to construct the well, pipelines, and other facilities, but it does not authorize other wells, well pads, associated pipelines, ancillary facilities, or roads.

SGI or a subsequent operator will still be required to submit APDs, sundry notices, and right-of-way (ROW) applications for approval of additional wells, well pads, pipelines, roads, or other ancillary facilities associated with project development in the Unit. NEPA review and approval of such applications are required before surface-disturbing activities may begin.

BLM_0028977

This page intentionally left blank.

BLM_0028978

# CHAPTER 3
# FUTURE NEPA DOCUMENTATION

The BLM has chosen the Selected Alternative for the MDP; however, the exact locations of wells, roads, pipelines, and other facilities will be determined when those wells or facilities are proposed for drilling or construction as part of an APD or other application. The BLM will review and act on each APD. An APD will include the surface use plans of operation and site-specific subsurface drilling plan, such as those submitted with the 12-89-7-1 APD. Submission and approval of such applications are required before the surface is disturbed. Location siting will be subject to the APD process and the appropriate COAs listed in **Appendix A**, plus any best management practices the BLM determines are necessary to reduce adverse impacts. The detailed information required for each APD is identified in Federal Onshore Oil and Gas Order No. 1 and in 43 CFR, 3162.3-1. Information required for cases of split-estate also is identified in Federal Onshore Order No. 1 and is discussed in Split-Estate: Rights, Responsibilities, and Opportunities (BLM 2007).

Documentation of NEPA compliance for future development will be required and could include a tiered environmental assessment, documentation of NEPA adequacy, or documentation of the application of a categorical exclusion, such as those provided in Section 390 of the Energy Policy Act of 2005 (42 US Code, Section 15942).

Because the APD for the 12-89-7-1 well is approved in this decision, no additional NEPA analysis is required for this well; well work and drilling can begin at any time, subject to lease stipulations.

BLM_0028979

This page intentionally left blank.

BLM_0028980

# CHAPTER 4
# OVERVIEW OF THE ALTERNATIVES

## 4.1 ALTERNATIVES CONSIDERED

A brief narrative introduction to each of the four Final EIS alternatives is below. The phases of construction, drilling, completion, reclamation, and final abandonment are the same under all alternatives. Reference to appendices are to those from the Final EIS.

### Alternative A, No Action

Under the No Action Alternative, the Bull Mountain Unit MDP would be denied, and the BLM would not approve the 12-89-7-1 APD.

If the BLM were to select Alternative A, SGI would continue to submit APDs to COGCC for authorization to develop on private lands with private mineral estate and to submit individual APDs to the BLM. The BLM does not approve or control development of private minerals.

The No Action Alternative addresses the direct and indirect impacts of development of the private mineral estate only (for a total of 55 wells and 1 water disposal well). Because federal mineral development would still occur through individual APDs without an MDP, the cumulative impacts analysis considers the impacts associated with development of up to 146 federal wells. However, this development would be spaced over an unknown time frame, due to such factors as availability of drilling equipment, federal permit processing time, and the need for future NEPA analysis. In its analysis of the No Action Alternative, the BLM assumes that previously authorized federal activities and those on private mineral estate would continue and that federal mineral estate would be developed ad hoc without an MDP. Private mineral estate activities would occur, as authorized by the COGCC. This combination of federal mineral and private mineral development that would occur is discussed and analyzed in Section 4.1.3, Cumulative Effects, of the Final EIS.

### Alternative B, SGI's Proposed Action

Alternative B is specific to BLM-administered mineral estate and the actions the BLM would approve under a master development plan. Alternative B describes the development that would occur on federal mineral estate in the Unit. All actions would comply with all laws, regulations, and BLM policies. These include the BLM Surface Operating Standards and Guidelines for Oil

BLM_0028981

and Gas Exploration and Development (US Department of the Interior and US Department of Agriculture 2007), Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Alternative B includes up to 36 new well pads, up to 146 new natural gas wells, and up to 4 new water disposal wells to develop federal mineral estate.

The SGI Proposed Action included the following:

- Approval of the 12-89-7-1 well APD. SGI submitted the APD to the BLM, which inspected the site on May 16, 2011. The APD has been complete and pending since October 25, 2012. The specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD are provided in Appendix O of the Final EIS. This site-specific information is a refinement of the types of development information described in Chapter 2, Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.7, Alternative B, of the Final EIS. For example, while Section 2.2.5 describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD drilling plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

- New developments under the Proposed Action would be subject to the Bull Mountain Unit WHP submitted by SGI. The WHP would apply throughout development phase (construction, drilling, and completion); it would not apply to the production or maintenance phases.

- Three compressor stations, each with one 637-horsepower screw compressor engine in an appropriately sized and muffled building. A fourth station compressor station (outside the Unit boundary to the northwest) with three 3,550-horsepower engines housed in a larger muffled building. Permits for this station have come from the State of Colorado (15GU0015) and Gunnison County (OG2014-05).

- The Volk and Medved pipelines.

The following plans and strategy documents would apply to federal APDs:

- Surface use plans of operations and drilling plans, based on the templates provided in Appendices D and E, respectively, to the Final EIS;

- Hazardous Materials Management Summary (Appendix G of the Final EIS);

- Noxious Weed Management Plan (Appendix I of the Final EIS);

- Bainard Augmentation Plan (Appendix L of the Final EIS); and

- Poly Pipeline Operations Plan (Appendix M of the Final EIS).

The SGI Proposed Action included the following design features:

- All operator actions and measures described in the Final EIS, in Chapter 2, Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.7, Alternative B.

BLM_0028982

To evaluate mitigation on potential adverse impacts, the BLM applied the COAs listed in Appendix C of the Final EIS as mitigation measures. This alternative includes the following additional mitigation measures that may be included as COAs on the 12-89-7-1 APD and any future APD:

- The alternative-specific COAs listed in Appendix C, Design Features, Mitigation Measures, and Conditions of Approval, of the Final EIS;

- Air quality and air quality related value control and monitoring measures; and

- Geologic hazard measures.

### *Alternative C, the BLM's Modified Action*

Alternative C was developed by modifying the geographic information system (GIS) model to minimize surface disturbance by putting greater emphasis on soil types and proximity to existing roads and collocating roads and pipelines. This, in turn, would reduce the miles of roads and pipelines needed to service the pad sites (see Appendix A of the Final EIS for additional details). Like Alternative B, Alternative C is specific to BLM-administered mineral and surface estate, the BLM's authority, and the actions it would approve under an MDP. All actions would be in compliance with all laws, regulations, and BLM policies; plan and strategy documents noted under Alternative B above would also be followed under Alternative C. SGI would construct up to 35 new well pads to develop Federal mineral estate, up to 146 new natural gas wells, and up to 4 new water disposal wells.

Alternative C has design features for addressing the impacts of gas development on wildlife populations, vegetation resources, water quality, air quality, and soil resources, as follows:

- All operator included actions and measures described in Chapter 2, Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.8, Alternative C of the Final EIS;

- Seasonal winter timing limitations within the Negotiated Reduced Winter Activity Areas or a progressive development approach, which would limit drilling and construction over private and federal minerals to no more than one-quarter of the Unit in any given period (December 1 to April 30);

- The alternative-specific COAs listed in Appendix C, Design Features, Mitigation Measures, and Conditions of Approval, of the Final EIS;

- Air quality and air quality related value control and monitoring measures;

- A requirement for an annual meeting to plan and discuss an annual construction and operational activities plan, the order for development phasing around the Unit to avoid widespread impacts on wintering big game species, and the reclamation monitoring status report;

- Annual raptor nesting surveys to identify raptor nests within 0.25 miles of surface-disturbing activities from April 15 to July 15, or until young of the year have fledged, and avoidance of occupied nests from April 15 to July 15;

- A requirement to prevent accumulated water on pads from draining into wetlands or riparian areas; and

BLM_0028983

- Noxious weed control.

Alternative C included approval of the 12-89-7-1 well APD as described in Alternative B.

This alternative includes geologic hazard mitigation measures that may be included as COAs on the 12-89-7-1 APD and any future APD.

### Alternative D, the BLM's Preferred Alternative

Alternative D was based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives in the Draft EIS, cooperating agency input, and public input on the Draft EIS. Alternative D was also noted as the environmentally preferred alternative in the Final EIS. SGI would construct up to 33 new well pads to develop federal mineral estate, up to 146 new natural gas wells, and up to 4 new water disposal wells.

The BLM gave careful consideration of comments submitted by other government agencies, public organizations, local, state, and tribes, and interested individuals. The BLM used public scoping and Draft EIS comments to help identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternatives development process and the EIS process in general. All of the plan and strategy documents noted under Alternative B above would also be followed under Alternative D.

The BLM's Preferred Alternative included the following:

- New developments under the Proposed Action would be subject to the Bull Mountain Unit WHP, as described in **Appendix B** of this ROD;
- Four compressor stations, as described in Alternative B of the Final EIS; and
- The Volk and Medved pipelines.

Alternative D included approval of the 12-89-7-1 well APD, as described in Alternative B of the Final EIS and **Appendix G** of this ROD.

The BLM's Preferred Alternative included the following as design features:

- All operator included actions and measures described in Chapter 2, Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.9, Alternative D, of the Final EIS;
- The alternative-specific COAs listed in Appendix C, Design Features, Mitigation Measures, and Conditions of Approval, of the Final EIS;
- Air quality and air quality related value control and monitoring measures;
- Geologic hazard measures; and
- Water quality monitoring measures.

## 4.2   ALTERNATIVES CONSIDERED BUT NOT CARRIED FORWARD FOR DETAILED ANALYSIS

The range of alternatives for the Draft and Final EISs evolved from public comments and issues ascertained from scoping, the EIS purpose and need, public outreach, and collaboration with

BLM_0028984

cooperating agencies. Other alternatives that the BLM considered did not meet the purpose and need and were therefore not carried forward for detailed analysis but are described below.

### 4.2.1   Alternatives Considered and Eliminated from EA Development

Two alternatives were considered but not carried forward in the preliminary EA, and these two alternatives were also considered in the alternatives development for the EIS but not carried forward. The EA and EIS have similar purpose of the action and the same need for the action.

***500-foot Development Setback***

During initial EA scoping, the Gunnison County Temporary Regulations for Oil and Gas Operations were discussed, and implementation of a required 500-foot development setback from waterways and riparian areas was considered. This setback requirement has since been changed to be a 150-foot requirement and 150-foot to 500-foot requirement for special conditions in the final county regulations.

SGI and the BLM ran a modified GIS modeling program to incorporate this 500-foot setback from waterways and riparian areas. The resulting well site locations would have required an additional 5.6 miles of access roads and an additional 8.3 acres of long-term surface disturbance. This alternative also would have placed development higher on ridges and side slopes. This alternative was considered but eliminated from further analysis, because the additional surface development and additional development on ridges and side slopes would have had greater adverse impacts than the other alternatives considered.

***Proximity to Road Networks***

Another alternative considered but not carried forward during EA development would have minimized the overall length of the roads and, therefore, the amount of surface disturbance under the Proposed Action. The BLM developed a set of weights and values for the GIS model criteria that would minimize road lengths and, therefore, surface disturbance. At the same time, they would have reduced the weights on surface water and surrounding buffer zones. This alternative would have emphasized well pad proximity to existing road networks.

The well pad locations produced from the modified model were not uniformly distributed throughout the Unit and would have been in high-density groups in proximity to existing roads; many pad sites would have been within 300 feet of waterways. As a result, large portions of the Unit would have been excluded from development, and only about half of the Unit's natural gas resource would have been drained. This alternative was considered but eliminated from further analysis because it did not meet the purpose of proposal. Furthermore, it was not consistent with the existing Unit agreement to efficiently develop the federal mineral resources.

### 4.2.2   Alternatives Considered and Eliminated from EIS Development

EIS issues and comments are summarized in the Scoping Summary Report (BLM 2013b). Several commenters suggested additional mitigation measures for consideration in the alternatives. The comments were considered by the resource specialists, and additional mitigation measures were analyzed, as appropriate. In addition, the BLM reviewed and modified the suggestions from scoping and included them in Alternative C of the Draft EIS. Comments requesting specific actions or alternatives are addressed below.

BLM_0028985

### Alternative Water Treatment Facilities

Through scoping, commenters suggested that the BLM consider an alternative form of produced water management; specifically, they suggested the potential for on-site produced water treatment to meet National Pollutant Discharge Elimination System (NPDES) discharge permit requirements and reuse water, rather than being subject to deep well injection. Under all alternatives, during the development phase, water is being managed and reused for operations (e.g., completion) as practicable. Large evaporation ponds and smaller on-site treatment (e.g., reverse osmosis units) were considered for dealing with produced water after the drilling and development and during the production and maintenance phases. Evaporation rates at higher altitudes and cooler temperatures hinder the ability to evaporate large volumes of water from ponds. (Potential mitigation measures and such processes as smaller on-site units to address this issue at the APD stage are identified in Final EIS Chapter 4, page 4-100). Consequently, a separate alternative was eliminated from further analysis.

### New Access Route Entry Points to the Unit

Several commenters suggested that the BLM consider different access routes to well pads that would eliminate new roads and upgrades to existing roads. This included highlighting specific sections of the Unit to avoid, such as the Bull Mountain Ranch. Siting of access routes was considered in the suitability model (see Final EIS Appendix A). The suitability model considered using existing access routes to minimize the need for new roads and upgrades.

The MDP would not prevent the BLM from considering alternate access routes in the future, and other routes may be considered during site-specific analysis at the APD stage. Therefore, Alternatives A, B, C, and D provide an appropriate range of alternatives for analysis at this time.

### Extending Development to a Longer or Shorter Period

Commenters suggested considering additional phasing time frames to extend the drilling horizon past the 6 years estimated in the Proposed Action. Other commenters suggested that the BLM consider requiring all of the development to occur at once and to be completed within 1 year. Drilling all 146 gas wells and 4 water disposal wells in one construction season is unviable due to insufficient rig and labor availability, and because it limits the ability to incorporate the results of recent drilling into future drilling plans. In the cumulative impact analysis of Alternative A, the BLM considered extending the drilling period beyond the 6-year horizon. The BLM assumed that development would be spread out over 10 or more years, depending on how quickly APDs were submitted and approved without an MDP; consequently, a separate alternative longer than 10 years was eliminated from analysis.

### Additional Mitigation Measures

Several commenters suggested that additional mitigation measures should be considered in the alternatives, including greenhouse gas and criteria pollutant emission mitigation measures and well pad berming and lining measures. Several of these suggestions are already addressed under existing regulations. Measures that were not covered under existing regulations or included as operator-committed design measures were included for consideration under one or more alternative.

BLM_0028986

# CHAPTER 5
# MANAGEMENT CONSIDERATIONS

## 5.1   RATIONALE FOR THE DECISION

The rationale for Alternative D being the Selected Alternative is based on the analysis that adverse environmental impacts on air quality, wildlife, and water will be minimized, any potential for significant, adverse long-term impacts will be avoided, and the socioeconomic contributions to local and regional economies outweigh any negative impacts. The Selected Alterative includes **Appendix A** COAs as mitigation measures. This decision conforms with BLM plans and objectives. The Selected Alternative allows for environmentally responsible development of the gas resource while addressing potential impacts and the public's concerns.

Alternative A was not selected because it does not respond to the BLM's purpose and need in its review of the Proposed Action. Alternative B was not selected because it does not have the additional design features of Alternatives C and D, including water quality monitoring; however, some elements of Alternative B were incorporated into the Selected Alternative. Alternative C was not selected because it does not have the WHP or water quality monitoring as a COA; however, some elements of Alternative C were incorporated into the Selected Alternative.

The BLM developed all of the action alternatives to meet its purpose and need in its review of the project, while minimizing or mitigating environmental impacts. These objectives will be accomplished under Alternative D by incorporating and requiring the following key elements of Alternatives B and C:

- Well pad analysis areas that were sited to minimize impacts on wildlife habitat, especially verified elk winter concentration areas. Within the well pad analysis areas, pads can be re-sited at the time of the APD to avoid sensitive resources, including steep slopes, sensitive soils, or wetlands;

- An annual meeting with the BLM and SGI to summarize the results from water quality monitoring, air quality, annual development and mitigation activities for the previous 12 months and to forecast the next year's development and mitigation activities a result of implementing the WHP (see **Appendix A**);

BLM_0028987

- Air quality and air quality related value COAs that limit emissions in order to minimize adverse impacts of development on ambient air quality;

- A WHP (see **Appendix B**);

- A water monitoring program that exceeds COGCC monitoring rules; and

- COAs that will avoid, reduce, and monitor soil, vegetation, water, and wildlife impacts (see **Appendix A**).

Some of these measures may go beyond those required by the approved Uncompahgre Basin RMP, regulations, and statutes or the terms of SGI's valid and existing leases; however, after analysis, the BLM has included them in the ROD.

### 5.1.1   Land Use Plan Conformance

The BLM land use planning decisions for federal lands and minerals in the Unit are contained in the Uncompahgre Basin RMP (BLM 1989). The Selected Alternative is subject to the decisions in the current RMP. The RMP decision relevant to the Bull Mountain Unit MDP states: Federal oil and gas estate will be open to leasing. Seasonal restrictions are required on crucial deer and elk winter range and on bald eagle hunting habitat to protect crucial deer and elk winter range and bald eagle hunting habitat from disturbance (BLM 1989, pages 28 and 32). Additionally, in some cases federal leases within the Unit have timing limitation stipulations, see Final EIS Appendix F, Summary of Lease Stipulations.

### 5.1.2   Federal, State, and Local Permitting and Approvals

The Selected Alternative requires that SGI comply with applicable federal, state, and local laws and regulations. The operator will procure and comply with all required permits, applicable regulations, and easements (**Table 5-1**, below).

**Table 5-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| *Federal Agency* | |
| US Army Corps of Engineers | • Clean Water Act Section 404 and 401 permits |
| US Bureau of Land Management | • NEPA<br>• Approval of the APDs<br>• Sundry notices for construction and other changes<br>• Permits to drill, deepen, or plug back on BLM-administered land (APD/sundry notice process)<br>• ROW grants and temporary use permits for pipelines on BLM-administered land outside the Unit<br>• ROW grants for access roads on BLM-administered land outside the Unit<br>• Authorization for flaring and venting natural gas on BLM-administered land<br>• Plugging and abandoning a well on BLM-administered land<br>• Modifying or making exceptions to lease stipulations<br>• Antiquities, cultural and historic resource permits on BLM-administered land<br>• Paleontological resource use permits<br>• Approval to dispose of produced water on BLM-administered land |

BLM_0028988

**Table 5-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| | • Pesticide use permits<br>• Noxious Weed Act enforcement<br>• Initiation of Section 7 consultation with US Fish and Wildlife Service (USFWS)<br>• Mineral material sales permits |
| US Department of Justice, Bureau of Alcohol, Tobacco and Firearms | • Explosives user permits |
| US Environmental Protection Agency (EPA) Region 8 | • Air quality permits (delegated to CDPHE)<br>• Review and comment on major federal actions<br>• Spill prevention, control, and countermeasure plan<br>• Underground injection control permits (delegated to COGCC) |
| USFWS | • Migratory Bird Treaty Act (MBTA) and Bald and Golden Eagle Protection Act consultations<br>• Section 7 consultation for complying with the Endangered Species Act (ESA) |
| *State Agency* | |
| Colorado Division of Water Resources (Office of the State Engineer) | • Water well permits<br>• Stream alteration permits<br>• Change in nature of use water applications |
| CPW | • Coordination on impacts on wildlife and state sensitive species<br>• Compliance with COGCC rules and regulations<br>• Consistency with essential elements of wildlife mitigation strategy |
| Colorado Oil and Gas Conservation Commission | • Coordination on APDs (including oil and gas location assessment)<br>• Permits to drill, deepen, or re-enter and operate oil and gas or disposal wells<br>• Underground injection control permits (delegated by the Environmental Protection Agency)<br>• Pressure monitoring and well spacing<br>• Disposal facility permits<br>• Permits to flare natural gas<br>• Compliance with safety regulations for oil and gas activities including flowline pipeline compliance |
| CDPHE, Division of Water Quality | • Construction discharge permit for stormwater discharges during project construction (according to current stormwater management plan)<br>• Coordination with COGCC for injection permit applications<br>• Water well permit<br>• Clean Water Act Section 401 water quality certification stream and wetland crossing<br>• Construction dewatering permits<br>• Stream alteration permits<br>• Solid and hazardous waste control |
| CDPHE, Division of Air Quality | • Air quality permits and air pollutant emissions notices (including delegations from the Environmental Protection Agency) for stationary and portable sources<br>• Approval orders and permits for compressors and other stationary emissions sources<br>• Air quality permits to construct<br>• New source review permits<br>• Fugitive dust control |

BLM_0028989

**Table 5-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| Colorado Department of Transportation | <ul><li>Access permits for access to and from State Highway 133</li><li>Utility, relocation, and special use permit for work in the highway ROW</li><li>Oversize/overweight vehicle permits for use of the state highway</li><li>Permits for encroachment and for crossing state roads</li></ul> |
| Colorado Water Court Division 4 | <ul><li>Water augmentation plan</li></ul> |
| *Local Government* | |
| Gunnison County | <ul><li>Gunnison County Land Use Resolution</li><li>Application for an oil and gas/land use change permit</li><li>Performance/utilization bond</li><li>Driveway permits for county road access</li><li>Permits for use of County Road 265 for overweight/oversize equipment</li><li>County zoning/land use plan consultation</li><li>Special use and conditional use permits</li><li>Encroachment permits</li><li>Road conditional use and opening permits</li><li>Solid waste disposal permits</li><li>Construction permits and licenses</li><li>Colorado Noxious Weed Act enforcement</li></ul> |

Sources: BLM 2012; Gunnison County 2012
Table may not be a comprehensive list and is subject to change. The operator must comply with all applicable regulations and permit requirements.

BLM_0028990

# CHAPTER 6
# MODIFICATIONS TO AND CLARIFICATIONS OF THE PREFERRED ALTERNATIVE

The BLM's decision and Selected Alternative were clarified and, in some cases, modified from Final EIS Alternative D, Preferred Alternative. The clarifications and modifications are based upon BLM and public review of the Final EIS. All modifications and clarifications and corrections are within the BLM's range of alternatives and within the range of environmental consequences. Minor corrections to the Final EIS are described in **Appendix H**, Final EIS Errata. **Appendix I**, Response to New Comments on the Final EIS, describes new comments on the Final EIS that contributed to a modification in the BLM's decision or notified the BLM of a minor correction that was needed.

## 6.1    AIR QUALITY ADAPTIVE MANAGEMENT

The BLM has concluded that the near-field air quality and far-field air quality related value (AQRV) impacts projected from new oil and gas development in the Unit (analyzed in the Final EIS) will not cause unnecessary or undue degradation. If site-specific review of proposed development activities identifies additional emissions that were not accounted for in the Final EIS, the BLM may need to perform additional analysis. The purpose of the additional analysis would be to evaluate the extent of the impacts and whether those impacts can be mitigated to an extent that would prevent unnecessary or undue degradation of air and atmospheric values on public lands. ROD **Appendix A** COAs #94, #95, and #96 ensure that SGI will meet specific emission levels analyzed in the Final EIS.

In comments submitted during the Final EIS 30-day review period, the public expressed concern about impacts on air quality, despite the conclusions in the Final EIS. The BLM will use the Air Quality Impact Assessment Process (Colorado Air Resources Instruction Memorandum CO-2015-009) to ensure that impacts from subsequent development decisions are within the scope of those analyzed in the EIS. The BLM will further ensure that the decisions will not result in unnecessary or undue degradation of air and atmospheric values on public lands. The instruction memorandum describes the standard process that the BLM uses in Colorado to review the potential air quality impacts from new oil and gas proposals and applications, including project-specific emissions inventories and near-field air quality impact analyses, as appropriate.

BLM_0028991

In the air quality analysis conducted for the Final EIS and subsequent public involvement, the BLM identified areas where additional analysis and adaptive management may be needed as oil and gas is developed. The Final EIS AERMOD, near-field, air quality impact analysis model for hazardous air pollutants (HAPs) showed that HAP emission impacts are not expected to be a concern for most locations in the project area; however, there would be some potential for adverse impacts. In its review of future development proposals, the BLM will evaluate the adequacy of the analysis of HAP emission impacts in the EIS. The analysis of previous NEPA adequacy will involve reviewing information about HAP levels in the project area and vicinity, collected or estimated using appropriate, defensible, and feasible methods. The BLM will request that the operator provide such information to facilitate the BLM's review of future applications for development approvals. If concentrations of HAPs from specific proposed development activities are expected to result in new impacts not described and analyzed in the Final EIS, additional NEPA analysis and COAs may be necessary for future APD approvals.

## 6.2   GREENHOUSE GAS EMISSION REDUCTION AND OFFSET

The Final EIS greenhouse gas and climate change impact analysis and subsequent public involvement identified several areas where greenhouse gases emissions can be reduced in routine activities or offset through mitigation projects. The current federal and state regulations have strict requirements for the oil and gas industry to eliminate wasteful methane/fugitive emissions; they also include monitoring equipment for gas leaks. The operator must comply with all applicable regulations and permit requirements. The BLM encourages SGI to educate its workers about greenhouse gas and climate change basics and practices to minimize greenhouse gas emissions. Examples are as follows:

- Reducing unnecessary truck idling;
- Double-checking that valves and other equipment are closed where methane (greenhouse gases) can easily escape to the atmosphere; and
- Properly maintaining other operations.

Additionally, trees and other vegetation reduce atmospheric carbon concentrations, even if planted in a location other than the project area. The BLM encourages SGI to offset greenhouse gas emissions by implementing environmental projects such as habitat restoration and revegetation. In order to disclose the environment protection efforts and design features for new oil and gas development, operators are encouraged to submit any voluntary greenhouse gas emissions reduction and offsetting mitigation plans to the BLM when submitting an APD package for new oil and gas development in the Unit.

## 6.3   MODIFICATIONS TO INDIVIDUAL COAs

- ROD **Appendix A** COA #56 reflects a modification of Final EIS Appendix C COA #91. The ROD adopts a portion of Final EIS Alternative C, whereby "The BLM may approve annual exceptions to the lease stipulations for winter timing restrictions on federal minerals in areas outside of the WHP Winter Closure Areas. The portion of the area outside the WHP big game Winter Closure Areas where winter activity may occur under such annual exceptions will be discussed among SGI, BLM, and CPW annually no later than August 1." This modification to the Selected Alternative clarifies that "waivers" to big game-related lease stipulations were not considered in the Final EIS analysis. The

BLM_0028992

federal leases within the Unit in which development proposals may be subject to this exception are the following: COC-64166, COC-64170, COC-64171, COC-64172, COC-66704, COC-66705, and COC-66715.

In its analysis in the Final EIS, the BLM assumed that during the development phase, SGI would implement all aspects of the WHP on both federal and non-federal lands, but that exceptions to federal timing limitations may be granted. Such exceptions would allow winter drilling activity outside the big game winter closure areas. If SGI implements the WHP Unit-wide, the BLM may, within the scope of its existing analysis, approve exceptions to allow the operator to conduct winter drilling outside the big game winter closure areas. Each exception would cover a single season. If SGI does not implement the WHP Unit-wide, the BLM may determine that further NEPA analysis is needed before it can approve APDs or exceptions from timing limitations.

Additionally, SGI must meet annually with the BLM and CPW during development no later than August 1 to assess the implementation of both past and future development in context of the WHP. The rationale for change to COA #56 is that this modification is within the range of alternatives, is consistent with 43 CFR, Subparts 3101.1-4 (modification or waiver of lease terms and stipulations), and recognizes the continued application of the current timing limitation stipulations on the leases per the Uncompahgre Basin RMP (BLM 1989). Waivers would limit the BLM's ability to mitigate impacts on wintering big game during the production phase of the project. The WHP does not apply beyond the development phase of the project.

- ROD **Appendix A** COA #124, water monitoring, reflects a modification of Final EIS Appendix C COA #57 to remove duplicative water sampling, while providing the appropriate level of data. Modifications include the following:

  o Additional wells on an existing pad will require baseline testing; additional wells on an existing well pad that is currently on the sampling schedule will not create a new sampling schedule unless the final year 6 sampling has passed.

  o The maximum number of groundwater samples will be four within a 1-mile radius for conventional and coal bed methane wells.

  o All surface water sources and spring sources will be sampled with a maximum number of four within a 1-mile radius; other acceptable surface water sources include intermittent streams, canals and ditches, lakes, and ponds.

  o Surface water samples will be collected during lower-flow periods after spring runoff.

  o How to proceed when samples are elevated:

    ▪ If sampling constituents are significantly elevated from baseline analysis, and above applicable water quality standards as the result of SGI operations, then immediate sampling of all surface waters downgradient from the well pad location, within 1 mile, shall be tested. In addition, the operator will notify the BLM detailing the elevated levels and additional wells to be sampled.

BLM_0028993

- If methane concentrations exceed 1.0 milligrams per liter, noble gases will be sampled to age date groundwater and, in combination with methane data, can help distinguish between natural sources of methane or those induced from drilling activities.

  o Water quality monitoring data should be summarized and provided to the BLM annually for review. BLM review of the data will evaluate any exceedances of water quality standards or deviations from the baseline monitoring data. If the BLM finds exceedances or deviations, it may require further investigation and remediation. The BLM will determine if further analysis of data may be required by another agency, such as the US Geological Survey. Any additional expenses incurred for further reviews, as required by the BLM, will be the responsibility of the operator. Results from the water quality monitoring will also be presented by SGI to the BLM at the annual meeting, as described in ROD **Appendix A** COA #1.

  o Water monitoring constituents analyzed and quality assurance measures in the ROD are the same as those described in the Final EIS.

- ROD **Appendix A** COA #97 reflects a modification of Final EIS Appendix C COA #32 to specify methods of dust abatement (e.g., freshwater and magnesium chloride) from the Final EIS COA #12. Final EIS COA #12 was eliminated from the ROD because it was redundant with Final EIS COA #32.

- ROD **Appendix A** COA #1 reflects a modification of Final EIS Appendix C COA #65 to require that the annual meeting topics include results from water quality monitoring and air quality emissions, summarize development and mitigation activities from the previous year, and forecast the next year's development and mitigation activities a result of implementing the WHP.

- ROD **Appendix A** COA #15 reflects a modification of Final EIS Appendix C, Design Feature #63 to state "in areas other than cutthroat trout streams," instead of "in other watersheds." ROD COA #15 was also clarified so that this siting requirement also applies to reservoirs and not only natural water bodies. Reservoirs were included in the Water Resources discussions in Final EIS Chapters 3 and 4; as such, this clarification makes the ROD **Appendix A** COA more in line with the analysis.

- ROD **Appendix A** COA #7 provides topsoil protections from surface-disturbing activities. Final EIS Appendix C, Design Feature #76 was eliminated from the ROD because it was redundant with ROD **Appendix A** COA #7.

- COAs listed in ROD **Appendix A** will apply throughout the life of the federal authorizations, except when the BLM determines them to be not applicable. The WHP will apply throughout construction, drilling, and completion; it will not apply to production or maintenance.

BLM_0028994

# CHAPTER 7
# CONSULTATION AND COORDINATION

During the NEPA process for the EIS, the BLM formally and informally consulted and coordinated with other federal agencies, state and local governments, Native American tribes, and the interested public.

This chapter describes the consultation and coordination process, including key consultation and coordination activities undertaken to ensure the BLM's compliance with 40 CFR, Subparts 1501.7 and 1502.19 and Part 1503.

## 7.1   GOVERNMENT-TO-GOVERNMENT CONSULTATION WITH NATIVE AMERICAN TRIBES

The federal government works on a government-to-government basis with Native American tribes (see Executive Order 13175 [65 *Federal Register* 67249, November 6, 2000]). To carry out this commitment, the BLM coordinates with all tribal governments, associated native communities, native organizations, and tribal individuals whose interests might be directly and substantially affected by activities on public lands. In addition, Section 106 of the National Historic Preservation Act (NHPA) requires federal agencies to consult with Native American tribes for undertakings on tribal lands and for historic properties of significance to the tribes that may be affected by an undertaking (36 CFR, 800.2[c][2]). BLM Manual 8120 (BLM 2004a) and BLM Handbook H-8120-1 (BLM 2004b) provide guidance for Native American consultations.

The BLM has given substantial consideration to the proper government-to-government consultations for this project in order to provide for multiple opportunities for tribal consultation. The BLM has invited tribes to comment on, receive information on, and participate in the Bull Mountain Unit MDP EIS on an ongoing basis.

Executive Order 13175 stipulates that, during the NEPA process, federal agencies consult tribes identified as "directly and substantially affected." The BLM contacted the following tribal governments early in the EIS process:

- Southern Ute Indian Tribe;
- Ute Mountain Ute Tribe; and

BLM_0028995

- Ute Tribe of the Uintah and Ouray Reservation.

The BLM informally consulted tribal governments during the earlier EA process and has kept them abreast of the project status during regular coordination meetings. In February 2014, the BLM sent letters to the tribes, inviting them to be cooperating agencies for the EIS and initiating formal consultation. Although no tribes requested to participate as cooperating agencies, some tribal governments responded with a request to be kept informed of the EIS's progress. The tribes received updates and notification of the availability of the Draft and Final EISs.

Government-to-government consultation for the Bull Mountain Unit MDP EIS continued via phone and email to keep tribes informed about the NEPA process for the EIS. In addition, the BLM will continue to engage in government-to-government consultation on a case-by-case basis for site-specific energy development projects on BLM-administered lands and mineral estate in the project area.

## 7.2    COLORADO STATE HISTORIC PRESERVATION OFFICER (SHPO) CONSULTATION

In accordance with the requirements of Section 106 of the NHPA, the BLM coordinated with and solicited input from the Colorado SHPO. The BLM and the SHPO followed the Colorado Protocol relating to EISs; it provides for a phased consultation process related to historic, traditional, and cultural resources for an EIS and subsequent activities that could tier from a ROD. In accordance with these procedures, the BLM wrote to the SHPO on September 10, 2013. The letter introduced the Bull Mountain Unit MDP EIS and specified the need to consult on information about potential development actions. The SHPO formally responded to the letter on September 19, 2013, expressing interest but no specific concerns.

The SHPO did not submit any formal comments on the Draft EIS or the Final EIS.

Section 106 consultation for APD 12-89-7-1 was completed on March 8, 2011.

## 7.3    US FISH AND WILDLIFE SERVICE CONSULTATION

Consultation with the USFWS is required under Section 7(c) of the ESA before the BLM begins any project that may affect federally listed or endangered species or its habitat. The Draft and Final EISs described potential impacts on threatened and endangered species as a result of management actions proposed in the alternatives. The BLM consulted with the USFWS regarding water depletion concerns and lynx habitat near the project area.

As part of the Final EIS, the BLM identified the Preferred Alternative and prepared a biological assessment, evaluating the impacts of the activities on federally listed threatened and endangered species. The BLM submitted the biological assessment to the USFWS for review on September 22, 2015. For each federally listed species, the BLM determined if implementing the Preferred Alternative would affect the species that was the subject of the consultation. The USFWS responded on October 20, 2015, with a memorandum, concurring with the BLM's analysis that project "may affect, is not likely to adversely affect" the threatened greenback cutthroat trout and threatened Canada lynx and that it "may affect, is likely to adversely affect" the four endangered Colorado River fishes. The BLM's finding on the Colorado River fishes falls under its Colorado's programmatic biological assessment (PBA, BLM 2008b) for water depleting

BLM_0028996

activities associated with the BLM's fluid minerals program in the Colorado River Basin in Colorado.

The USFWS issued a Programmatic Biological Opinion (PBO, ES/GJ-6-C0-08-F-0006, USFWS 2008) on December 19, 2008, in which it concurred with the BLM's determination that water depletions are "likely to adversely affect" the Colorado pikeminnow, humpback chub, bonytail chub, and razorback sucker. Water depletion impacts under the Selected Alternative would be similar to and would not exceed those levels described under the programmatic biological opinion. To offset impacts from water depletions, the USFWS authorized the BLM to solicit a one-time monetary contribution to the 1988 Upper Colorado River Endangered Fish Recovery Program. SGI is already a signatory to the Endangered Fish Recovery Agreement. This would comply with the programmatic biological and recovery agreement.

## 7.4    US ENVIRONMENTAL PROTECTION AGENCY

NEPA regulations require that EISs be filed with the EPA (40 CFR, Subpart 1506.9). The BLM submitted the Bull Mountain Unit MDP Draft and Final EISs to the EPA, as required by the Council on Environmental Quality (CEQ) regulations.

## 7.5    COOPERATING AGENCIES

The BLM engaged multiple cooperating agencies for a broader understanding of their issues and concerns about the Bull Mountain Unit MDP and EIS. Cooperating agencies are state or federal agencies or local or tribal governments that enter into a formal relationship with the BLM to help develop an EIS (40 CFR, Subpart 1508.5). A cooperating agency's involvement can include participating in issue identification, collecting inventory data, contributing to alternative formulation, and estimating the impacts of alternatives (40 CFR, Subpart 1501.6). The cooperating agencies on the Bull Mountain Unit MDP EIS are the following:

- Environmental Protection Agency, Region 8;
- Grand Mesa, Uncompahgre, Gunnison National Forest;
- Delta Conservation District;
- Colorado Department of Natural Resources, including Colorado Parks and Wildlife;
- Colorado Department of Public Health and Environment;
- Delta County; and
- Gunnison County.

BLM_0028997

This page intentionally left blank.

BLM_0028998

# CHAPTER 8
# PUBLIC INVOLVEMENT

Throughout the EIS development, the BLM sought information from individuals and organizations with knowledge of or concern about resources in the Bull Mountain Unit MDP project area.

## 8.1   SCOPING

Two scoping periods were conducted for the preliminary EA. The first was from October 28 to December 12, 2008, and the second was from September 17 to November 13, 2009. The preliminary EA was available for a 30-day public comment period from March 23 to April 23, 2012.

A Notice of Intent to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134, April 3, 2013). It notified the public of the BLM's intent to prepare an EIS, provided information on the EA previously completed for the project, and included an overview of the Proposed Action and a list of BLM-identified preliminary issues. The preliminary issues were potential environmental impacts on air quality; water quality and supply; threatened, endangered, and sensitive wildlife species; wildlife and wildlife habitat; recreation and visual resources; socioeconomics; and transportation.

In addition, the BLM notified the public about the EIS through media outlets, postcards, emails, and the BLM's website. A project newsletter issued on May 2, 2013, provided information on the kickoff of the EIS and future public involvement opportunities.

Project newsletters issued on February 1 and September 16, 2014, also provided updates on the EIS schedule and future public involvement opportunities.

Comments received during the scoping period largely fell into several key categories: environmental, socioeconomic, stakeholder involvement, cumulative impact analyses, impact mitigation, alternatives to be analyzed, and coordination with ongoing regional and state planning. The public comments on the preliminary EA from both comment periods were considered in the Scoping Summary Report (BLM 2013b). The Scoping Summary Report and

BLM_0028999

copies of all written comments submitted by mail, email, or in person are available at the BLM Uncompahgre Field Office.

## 8.2   DRAFT EIS

On January 16, 2015, the BLM and EPA published a Notice of Availability for the Draft EIS in the *Federal Register* that marked the beginning of the formal 45-day public comment period (80 *Federal Register* 2438-2439, January 16, 2015). On January 27, 2015, the public comment period was extended for an additional 45 days; it ended on April 16, 2015.

The BLM provided copies of the Draft EIS directly to cooperating agencies and other federal, state, and local agencies. Paper copies were also available at community libraries in Paonia, Hotchkiss, Delta, and Gunnison, Colorado, and the Paonia, Colorado, Forest Service office.

One open house and listening session was held during the 90-day comment period in Paonia, Colorado, on February 10, 2015. The location, date, and time of the open house were announced via email and in the project newsletter that was emailed or mailed to those on the mailing list and was posted to the project's website. It provided information on the content of the Draft EIS and guidance on how, where, and when to comment on the document and provided a question and answer session for the public to voice their thoughts and concerns. Throughout the meeting, the public had an opportunity to submit written comments to the BLM.

The BLM received 565 unique comment letters, forms, and emails from private individuals, organizations, federal agencies, state agencies, local government, and educational institutions during the Draft EIS 90-day public comment period. In addition to the unique submissions, 83 form letters were submitted. Combined, these documents resulted in 360 substantive comments, categorized into 67 issue statements. The comments received on the Draft EIS were similar to the issues raised during both the EA and EIS public scoping periods. The BLM responded to all substantive comments with detailed summaries and responses organized by resource, resource use, or regulation (see Appendix N of the Final EIS).

## 8.3   FINAL EIS

On July 8, 2016, the BLM and EPA published a Notice of Availability for the Final EIS in the *Federal Register* (81 *Federal Register* 44608, July 8, 2016), that marked the beginning of a 30-day review period. The BLM provided copies of the Final EIS directly to cooperating agencies. The 30-day review period was not a formal comment period, but comments received were reviewed. During the 30-day review period, the BLM received comment letters from private individuals, organizations, and federal and state agencies, including over 500 form letters. The BLM also received seven unique comment letters with new information. The BLM reviewed and considered the comments on the Final EIS and determined that none of the comments raised new substantial information to warrant a supplemental EIS. The BLM's decision and Selected Alternative were clarified and, in some cases, modified from Alternative D Preferred Alternative based upon comments on and BLM review of the Final EIS. Changes to the decision from the Final EIS are found in **Chapter 6**, Modifications to and Clarifications of the Preferred Alternative. Minor corrections to the Final EIS are described in **Appendix H**, Final EIS Errata. **Appendix I,** Response to New Comments on the Final EIS, describes comments with new information on the Final EIS that contributed to a modification in the BLM's decision or notified the BLM of a minor correction that was needed.

BLM_0029000

The BLM thanks all the individuals, organizations, and agencies that submitted comments on the Draft EIS and Final EIS, during the scoping periods, and on the EA. Comments resulted in helpful clarifications of and modifications to this ROD and throughout the EIS process.

BLM_0029001

This page intentionally left blank.

BLM_0029002

# CHAPTER 9
# APPROVAL

Having considered a full range of alternatives, associated impacts, and public and agency input, I approve the Selected Alternative for the Bull Mountain Unit Master Development Plan as described in this Record of Decision and subject to the Conditions of Approval, the Wildlife Habitat Plan, the Master Surface Use Plan of Operations, the Master Drilling Plan, the Noxious Weed Management Plan, and the Poly Pipeline Operation Plan as listed as appendices of this Record of Decision and further subject to the Hazardous Materials Management Summary and the Bainard Augmentation Plan, Appendix G and L of the Final EIS, respectively.

I have been advised by the Uncompahgre Field Manager that SGI's APD for federal oil and gas well 12-89-7-1 is complete, as required by 43 CFR 3162.3-1(d) and Federal Onshore Order No. 1, and the BLM has performed the requisite on-site inspection. Based on my review of the information and impacts analysis described in the Final EIS, including the site-specific impacts analysis for the well and infrastructure described in the APD, and the applicant-committed mitigation measures identified in the APD, I approve the APD for federal oil and gas well 12-89-7-1, subject to the Conditions of Approval described in **Appendix G**, 12-89-7-1 APD Package, and the Wildlife Habitat Plan, the Master Surface Use Plan of Operations, the Master Drilling Plan, the Noxious Weed Management Plan, and the Poly Pipeline Operation Plan, as listed as appendices of this Record of Decision and further subject to the Hazardous Materials Management Summary and the Bainard Augmentation Plan, Appendix G and L of the Final EIS, respectively.

Approved

_____     10/4/2017
Dana M. Wilson                                         Date
Acting Southwest District Manager

BLM_0029003

This page intentionally left blank.

BLM_0029004

# CHAPTER 10
## APPEAL PROCESS

In accordance with 43 CFR 3165.3, any adversely affected party contesting this decision may request an administrative review of this decision, before the State Director, either with or without oral presentation. This request, including all supporting documentation, shall be submitted in writing within 20 business days of the date this decision was received, or considered to have been received by the party and shall be sent to Colorado State Director, 2850 Youngfield Street, Lakewood, Colorado 80215-7076. The decision of the State Director may then be appealed to the Interior Board of Land Appeals in accordance with 43 CFR 3165.4.

BLM_0029005

This page intentionally left blank.

BLM_0029006

# CHAPTER 11
# REFERENCES

BLM (United States Department of the Interior, Bureau of Land Management). 1985. BLM Manual 9113—Roads Manual. Internet website: https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual9113.pdf.

_____. 1989. Uncompahgre Basin Resource Management Plan and Record of Decision. BLM, Montrose District, Uncompahgre Basin Resource Area, Colorado. July 1989. Internet website: https://eplanning.blm.gov/epl-front-office/projects/lup/62103/79132/91393/UB_RMP_ROD.pdf .

_____. 2004a. BLM Manual 8120—Tribal Consultation under Cultural Resources (Public). Internet website: http://www.tribalconsultation.arizona.edu/docs/BLM/BLM%20Manual.Pages%20179-212%20from%20Binder%202-2.pdf.

_____. 2004b. BLM Manual H-8120-1—General Procedural Guidance for Native American Consultation (Public). Internet website: https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_H-8120-1.pdf.

_____. 2005. Washington Office Instruction Memorandum 2005-247—National Environmental Policy Act (NEPA) Compliance for Oil, Gas, and Geothermal Development. Available by request from the BLM Uncompahgre Field Office.

_____. 2007. BLM Onshore Oil and Gas Order No. 1—Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations. Available by request from the BLM Uncompahgre Field Office.

_____. 2008a. BLM National Environmental Policy Act Handbook H-1790-1. Internet website: https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf.

BLM_0029007

_____. 2008b. Programmatic Biological Assessment for BLM's Fluid Minerals Program in Western Colorado re: Water Depletions and effects on the Four Endangered Big River Fishes: Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), bonytail chub (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*). Prepared by Tom Fresques, West Slope Fisheries Biologist. Reviewed by BLM Jay Thompson, fisheries lead.

_____. 2012. Bull Mountain Unit Master Development Plan, Preliminary Environmental Assessment. DOI-CO-150-2009-0005 EA. Available by request from the BLM Uncompahgre Field Office.

_____. 2013a. Draft BLM Manual 3180-1—Unitization (Exploratory). Unitization (Exploratory). Available by request from the BLM Uncompahgre Field Office.

_____. 2013b. Bull Mountain Unit MDP Scoping Summary Report. Internet website: https://eplanning.blm.gov/epl-front-office/projects/nepa/66641/81673/95894/Final_Bull_Mountain_ScopingReport.pdf.

_____. 2016. Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan. Available from the BLM Uncompahgre Field Office and Internet website: https://eplanning.blm.gov/epl-front-office/projects/nepa/66641/81730/95952/Bull_Mtn_Final_EIS_July_2016_Vol_I_508_reduced.pdf.

Bureau of Land Management Geographic Information System (BLM GIS). 2014. GIS data used in conjunction with SGI data to form the Selected Alternative. Department of the Interior, BLM, BLM Colorado Uncompahgre Field Office. Dataset was edited from June 2013–June 2014 for DEIS, updated May–September 2015 for Final EIS, and no data changes from Final EIS to ROD 2016.

CPW (Colorado Parks and Wildlife). 2008. Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors. Internet website: https://cpw.state.co.us/Documents/WildlifeSpecies/LivingWithWildlife/RaptorBufferGuidelines2008.pdf.

Gunnison County. 2012. Gunnison County Board of County Commissioners Land Use Resolution 2012-25. Internet website: http://www.gunnisoncounty.org/DocumentCenter/View/108.

Metcalf, J. L., S. L. Stowell, C. M. Kennedy, K. B. Rogers, D. McDonald, J. Epp, and K. Keepers. 2012. "Historical stocking data and 19th century DNA Reveal Human-Induced Changes to Native Diversity and Distribution of Cutthroat Trout." *Molecular Ecology* 21:5194–5207.

SG Interests I, Ltd (SGI). 2013. GIS data describing the alternatives. Houston, TX. Data layers developed were received April 2013–December 2013, updated for existing infrastructure May–June 2015, and no data changes were made from Final EIS to ROD 2017.

BLM_0029008

US Department of Interior and US Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp. Internet website: https://www.blm.gov/sites/blm.gov/files/Gold%20Book%202007%20Revised.pdf.

USFWS (United States Department of the Interior, Fish and Wildlife Service). 2008. Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado. ES/GJ-6-CO-08-F-0006. Internet website: https://eplanning.blm.gov/epl-front-office/projects/nepa/66641/81728/95950/Final_Programmatic_BO_BLM_O&G.pdf.

_____. 2012. Overview of the Endangered Species Act Evaluation Process of Recent Cutthroat Trout Research in Colorado. Internet website: https://www.fws.gov/mountain-prairie/factsheets/Cutthroat%20Trout%20Overview%20Fact%20Sheet_FINAL.pdf.

BLM_0029009

This page intentionally left blank.

BLM_0029010

# Appendices

BLM_0029011

BLM_0029012

# APPENDIX A
# CONDITIONS OF APPROVAL

All federal actions undertaken as a result of the Bull Mountain Unit (BMU or the Unit) Master Development Plan (MDP) Record of Decision (ROD) and undertaken on existing federal authorizations are subject to approval by the Bureau of Land Management (BLM) before they are implemented.

## CONDITIONS OF APPROVAL

Conditions of approval (COAs) are attached to an approved application for permit to drill (APD) to ensure environmental protection, safety, and conservation of the mineral resource. They derive from authorities such as the Federal Land Policy and Management Act, the Endangered Species Act, and the National Historic Preservation Act, and are developed through the National Environmental Policy Act (NEPA) analysis process. They can address topics as wide ranging as protecting wildlife habitat or archeological and paleontological sites, reducing noise, suppressing wildfires, and managing invasive species.

Design features are specific means, measures, or practices for all phases of the natural gas development process, such as construction activities and operating procedures, that could reduce or avoid adverse impacts. The BLM has chosen Alternative D, BLM's Preferred Alternative, as the Selected Alternative and has included Alternative D's required design features as COAs in this ROD. Design features may still be proposed by the operator at the time of the on-site inspection, as described below.

## APD APPROVAL PROCESS

To receive permission to drill a federal oil and gas lease, leaseholders submit an APD to the BLM field office that administers the lands where the lease is located. The APD must comply with the requirements of Federal Onshore Order No. 1 and typically includes the following:

- A subsurface drilling plan that contains a description of the leaseholder's drilling program, geologic data, expected hazards, and proposed mitigation measures to address such hazards; and

BLM_0029013

- A surface use plan of operations that describes the locations of the drill pad, access roads, pipelines, and facilities, along with details of pad construction, methods for containment and disposal of waste material, plans for reclamation, and surface ownership of lands proposed for development.

In addition to review of the APD's compliance with Federal Onshore Order No.1, the BLM's environmental and technical review of the APD also considers whether the information in the APD includes the appropriate COAs from the ROD (see the list below).

Not all the COAs identified in the list below will be applicable to every APD. The BLM conducts a site-specific review, which includes making an on-site inspection, verifying conformance with updated regulations, and addressing specific engineering concerns. At the time of the on-site inspection, the BLM and operator review the COAs and compare them to site-specific concerns for the individual APD. An operator may propose design features that are more restrictive than the COAs listed in this appendix. The BLM will review the operator-proposed design features to determine if they will achieve the same levels of protection as analyzed in the Selected Alternative. The BLM may ask the operator to demonstrate the effectiveness of the proposed design features. For all COAs that contemplate exceptions when not "practicable," the BLM retains sole authority to determine whether an exception should be granted.

When the BLM has completed the necessary environmental and technical review of the APD, it may arrive at one of the following:

- Find that the APD is missing appropriate design features and return the APD to the operator for revisions; or

- Determine that, as proposed, the APD is consistent with the analysis of the Selected Alternative and approve the APD, subject to COAs; the COAs may include those that are applicable from the list below, as well as additional COAs identified through the site-specific NEPA analysis.

In the following list, COAs from the Wildlife Habitat Plan (WHP) will apply throughout the development phase (construction, drilling, and completion); they will not apply to the production or maintenance phases. The remaining COAs will apply throughout the life of the federal authorizations, except when BLM determines them to be not applicable.

BLM_0029014

**Monitoring**

1. WHP: SGI will meet annually with BLM by December 31 of each year to summarize the results from water quality monitoring, air quality adaptive management, annual development (construction and operational activities), and mitigation activities for the previous 12 months and to forecast with best available information the next year's development and mitigation activities as a result of implementing the WHP.

**Surface-Disturbing Activities**

2. Prior to approval of any federal APDs which initiate construction of a well pad analyzed in the Final EIS, alternate siting within a 40-acre area of the federal well pad may be required by the BLM Authorized Officer as a result of reviewing the proposed surface location identified in the operator's corresponding Notice of Staking (NOS)/APD. The 40-acre area is identified by drawing a circle with a radius of 745 feet around the proposed location. Alternate siting may be required by the BLM Authorized Officer to minimize adverse impacts on other resource values, land uses or users not addressed in the lease stipulations, other specific nondiscretionary statutes, and ROD conditions of approval at the time operations are proposed. Alternate siting of a federal well pad beyond the 40-acre limitation may result in additional environmental analysis being required to obtain approval.

3. WHP: SGI will avoid the verified elk winter concentration areas where practicable in re-siting the well pad. The primary constraint in avoiding these areas will be the 40-acre analysis area. Other resources such as slope, soil, and wetlands will also factor into any re-siting analysis. Where this conflict occurs and cannot be resolved, site-specific mitigation measures will be evaluated during future site-specific NEPA analysis.

4. Site-specific slope-stability studies will be conducted in areas of potential geologic hazard as identified in the MDP analysis prior to design and construction of new access roads, pipelines, and well pads, and appropriate mitigation will be included for potential movement of soils and rock.

**Construction—General**

5. Any loose rock occurring in the vicinity will be scaled prior to construction if it presents a safety hazard.

6. Where feasible and consistent with future plans and operations and considering safety concerns, all tanks and production facilities will be situated on the access road side of the well pad in order to maximize the coverage by interim reclamation upon the area necessary to create the well pad.

7. The topsoil (consisting of O and A horizons) will be removed from pad locations during construction, stockpiled in berms, and saved for interim and long-term reclamation and revegetation. Stockpiled topsoil and spoil piles will be separated to prevent mixing during reclamation efforts.

8. Stockpiled soil and disturbed earthen surfaces necessary to build up well pad sites, such as cut/fill slopes, will be seeded with BLM-approved interim seed mix upon cessation of pad construction activities to control erosion and reduce dust generation.

BLM_0029015

In addition, all stockpiled soil and soil disturbed areas will be maintained free of noxious weeds.

9. Use of erosion-control blankets with plastic netting will not be permitted.

10. Following seeding, any woody debris cleared during initial construction will be pulled back over the recontoured/partially reshaped areas to act as flow deflectors and sediment traps. The type and amount of woody debris spread over the reclaimed surface will be subject to review and approval by the BLM.

11. The well pad surface and surfacing material will be maintained until implementation of final reclamation activities, where it will be removed or buried in the cut portion of the location.

12. Rights-of-way (ROWs) will be avoided to the extent possible. If they cannot be avoided, caution will be taken to ensure no impacts to facilities or disruption of use occurs. Existing ROWs will be managed to protect valid existing rights.

13. Rock, road base, and gravel materials for all uses will be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado.

14. WHP: Where practicable, each new facility will be tied into a field-wide produced water gathering system for water disposal.

15. WHP: In addition to installing standard stormwater erosion controls to protect water quality as required by the Colorado Department of Health and Environment (CDPHE), SGI will comply with Colorado Parks and Wildlife (CPW) and Colorado Oil and Gas Conservation Commission (COGCC) recommended buffers for aquatic habitats in the BMU (see LIDAR [Light Detection and Ranging] discussion in Final EIS Appendix A and C). SGI will implement the following best management practices (BMPs) within the BMU:

- Except as outlined on **Figure 2** of the Wildlife Habitat Plan and other excepting activities outlined below, no surface disturbance within 300 feet of a designated cutthroat trout stream;

- In areas other than cutthroat trout streams, well pads and facilities will not be sited, to the extent practicable, within 150 feet of any lake, reservoir, wetland, or perennial or seasonally flowing stream or river;

- Roads crossing CPW-mapped cutthroat trout streams will be bridged or use appropriately sized culverts to prevent stream bed damage and the transfer of disease organisms. Pipelines that cross cutthroat trout streams should be bored if practicable;

- Stream disturbances in or upstream of CPW-mapped cutthroat trout habitat will be avoided between June 1 and August 31 to avoid impacts on spawning cutthroat trout;

- All stream crossing and culverts on perennial and intermittent streams will be designed to allow aquatic species passage;

BLM_0029016

- Minimum ROW widths will be used where pipelines cross riparian areas and streams and crossing will be constructed at right angles to the stream channel;

- Native riparian canopy cover and stream bank vegetation will be left intact to the extent practicable;

- Chemical dust suppression activities will be avoided within 300 feet of the ordinary high water mark of any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river, unless required by surface owner, county, or state requirements;

- Screen water suction hoses to exclude fish and amphibians; and

- Disinfect heavy equipment, hand tools, boots and any other equipment that was previously used in a river, stream, lake, pond, or wetland in a different watershed prior to moving the equipment to the BMU. The disinfection practice applies fieldwide and follows the procedure outlined in COGCC Rule 1204.a.2.

16. Active streams will be crossed outside the spawning season identified by CPW for applicable aquatic species.

17. WHP: SGI will observe the restricted surface occupancy (RSO) buffer restrictions contained in COGCC Rules. If SGI cannot comply with the RSO buffer restrictions for a particular facility, SGI will enter into an individual consultation with CPW on that facility under Rule 306.c. to evaluate options for avoidance, minimization, and mitigation.

**Construction—Road**

18. Vehicle traffic is limited to the bladed/traveled road surface and existing parking areas, pullouts, etc. No new pullouts, off-road parking, or staging areas will be allowed unless specifically authorized by the BLM.

19. The operator will provide timely year-round road maintenance and cleanup on the access roads.

20. Roads will be located so as to minimize their influence on riparian areas and, when stream crossing is necessary, design the approach and crossing perpendicular to the channel. The crossing will be located where the channel is well defined, unobstructed, and straight unless otherwise approved by BLM.

21. Unless otherwise approved by BLM, avoid headwalls, midslope locations on steep, unstable slopes, seeps, old landslides, slopes in excess of 40 percent, and areas where the geologic bedding planes or weathering surfaces are inclined with the slope.

22. Promptly remove slide material when it is obstructing road surface and ditchline drainage. Save all soil or material useable for reclamation and stockpile for future reclamation needs. Use remaining slide material for needed road improvement or place it in a stable waste area. Avoid sidecasting of slide material where it can damage, overload, saturate embankments, or flow into downslope drainage courses.

BLM_0029017

Reestablish vegetation in areas where more than 50 percent of vegetation has been destroyed due to side casting.

23. During wet weather conditions, no mud blading will be allowed. When road conditions are such that vehicles create ruts deeper than 4 inches, travel activities will be temporarily suspended.

24. New road construction and improvements will only occur on an as-needed basis to facilitate access to well pads and other facilities.

25. Access roads will be constructed using standard crown-and-ditch specifications.

26. Roads will be constructed with appropriate drainage and erosion-control features/structures (e.g., cut-and-fill slope and drainage-ditch stabilization, relief and drainage culverts, water bars, wing ditches, and rip-rap).

27. Spur roads to individual well pads will be constructed immediately prior to well pad construction.

## Construction—Pipeline

28. Pipelines and roads will be sited to avoid identified elk winter concentration areas, unless avoiding such habitats will result in greater net surface disturbance or if it is determined to be a detriment to other resource values.

29. WHP: SGI will collocate pipelines adjacent to road ROWs where practicable.

30. Where feasible, trunk lines will be buried in the roadbed or in the borrow ditch to further reduce surface disturbance. No more than a 30-foot-wide disturbance route in addition to the average 16-foot-wide road will be approved for collocated pipelines.

31. Highway crossing methods and construction requirements will be according to the Colorado Department of Transportation (CDOT) permit stipulations and general conditions as necessary.

32. SGI will ensure that access is provided for property owners, tenants, or ROW holders to move vehicles, equipment, and livestock across the trench where necessary. SGI will ensure that livestock can access their water sources.

33. If crossing a road or wetland, SGI can utilize a pipeline bore for the crossing. The bore operations will be set up outside of the wetland or road right-of-way and will be designed to minimize impacts on these features. Temporary use areas before and after the feature to be bored may be needed and will vary in size depending on the terrain and the size of the feature to be bored. Specific route determinations, siting design, and boring methods will be determined at the permitting stage.

34. Carsonite pipeline markers will be installed on the surface and tracer wire will be installed for all buried pipelines.

35. Backfilling of the trench will generally use the subsoil previously excavated from the trench, except in rocky areas where imported select fill material may be needed. Backfill of trenches will not be performed where the soil is frozen to the extent that large consolidated masses have formed that will not "break down." The entire construction zone will be seeded in the first appropriate season after disturbance.

BLM_0029018

36. Flowline pipelines will be pressure tested annually in compliance with COGCC Rules 1101 and 1102 Flowline Guidance.

37. Pipelines will be tested in compliance with CDPHE Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. The operator will submit to BLM a copy of the approved conditions and stipulations from CDPHE and identify on a map the location of the water discharge point. Notification to all nearby residents as well as the Gunnison County Dispatch Center will be made prior to the pressure test and blowdown. Water discharge, if necessary, will occur into upland areas, on gentle slopes, and will be conducted in accordance to the conditions and stipulations in CDPHE's Colorado Discharge Permit System.

38. Pipeline corridors will be recontoured to pre-construction contours as soon as construction activities cease unless otherwise approved by BLM.

**Construction—Electrical Line**

39. Power line and ancillary structure design will adhere to guidance provided in "Suggested Practices for Avian Protection on Power Lines: The State of the Art."

40. Poles and transmission line locations will be selected to achieve the minimum practicable adverse impact on visual quality.

41. WHP: SGI will collocate utilities adjacent to road ROWs where practicable.

42. If the line follows existing two-track roads, construction vehicles will stay on existing disturbance areas. If the line runs cross-country, then appropriate access and vehicle routes will be approved as part of the project design.

**Construction—Well Pad**

43. WHP: SGI will use multiple well pad sites to reduce surface disturbance and overall habitat fragmentation.

44. SGI will ensure that water accumulation on pads is not allowed to drain into wetlands or riparian areas down-gradient from the Unit.

**Drilling—Tanks and Pits**

45. All produced liquids will be contained in a pit or tank, including the dehydrator vent/condensate line effluent. All drill cuttings will be kept in an approved lined pit and/or tanks on the pad of the well being drilled, or hauled to an approved disposal site.

46. Prior to the onset of winter, the operator will remove fluids from any pits allowed to remain open over the winter months in order to reduce or eliminate the potential of spring snowmelt to exceed the two foot freeboard (below the top of the liner) minimum at any time.

47. The operator will skim and eliminate oil from unfenced produced water ponds and reserve pits daily until fences are installed. Once fences are installed, the pit will be kept reasonably free from surface accumulation of liquid hydrocarbons that will retard evaporation.

BLM_0029019

48. BLM's standard will be for closed loop systems to be used to eliminate pits on location and the release of volatile organic compounds (VOCs), unless impacts can be demonstrated to be less when a reserve pit system is used. (There will be no net benefit to using a closed loop system). The type of drilling system will be determined when the drilling application is submitted.

49. When using a closed loop system, the following will apply:

- The reserve pit will be replaced with a series of storage tanks that separate liquids and solids;

- Equipment to separate solids (e.g., screen shakers, hydrocyclones, or centrifuges) and collection equipment (e.g., vacuum trucks) will minimize the volume of drilling waste muds and cuttings that require disposal and will maximize the volume of drilling fluid recycled and reused in the drilling process;

- The recovered drilling fluid will be stored in tanks and reused in active mud systems;

- Drilling fluid will be moved from well-to-well and reconditioned by the dewatering equipment and mud products; and

- Solid wastes will be transferred off-site for disposal at oilfield waste disposal facilities.

50. When using a reserve pit system, the following will apply:

- The reserve pit will not be used to store flowback water during the completion phase nor used to store produced water during the production phase;

- Reserve pit fences will be constructed and maintained according to the permitting agency's requirements;

- Once all drilling wastes are removed from the pit, the pit liners will be removed and disposed of at a permitted waste facility; the pit will be closed in compliance with all COGCC 900 Series pit closure rules or federal regulations;

- The pit will be lined with an impermeable minimum 24-mil plastic liner so as not to leak, break, or allow discharge;

- Reserve pit sizes vary with well type and site conditions but will typically be approximately 50 feet by 150 feet and lined;

- Fencing:

  o Reserve pits will be fenced on three sides during drilling and on the fourth side immediately after the drilling rig is removed in order to keep big game and other wildlife out of the pits; and

  o Silt fencing will be installed around the base of the fences.

- Bird netting will be installed over the pit within 24 hours after drilling has begun;

BLM_0029020

- Two feet of freeboard will be required at all times;

- Pits will have a 2-foot unlined berm in addition to the minimum 2 feet of freeboard around them to prevent snowmelt on the pad from flowing into the pits;

- Fill from the pit will be stockpiled along the edge of the pit and the adjacent edge of the well pad; and

- Erosion control measures will be used, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips, as necessary and appropriate to minimize erosion and surface runoff during well pad construction and operation.

51. Drill cuttings will be processed to remove excess drilling fluids. The cuttings will be stored on location in segregated lined piles or in a storage container. Cuttings will be sampled and tested according to COGCC 900 Series Rules, then transported to a permitted disposal/waste management facility (depending on the concentrations of potential soil contaminants listed in COGCC Table 910-1 and analyzed by an EPA-approved laboratory). Results of cuttings pit testing on federal well sites will be made available to the BLM.

52. WHP: In the event that SGI proposes, and the BLM approves, the use of pits (as opposed to a closed loop, pitless drilling system), SGI will manage pits necessary for production activities to minimize the likelihood of wildlife mortalities. SGI will install wildlife fencing around pits and netting over open pits to exclude birds, bats, and terrestrial wildlife. For reserve pits, the netting will be applied within 24 hours after drilling activities have begun. The netting will be retained and maintained for as long as there are liquids in the reserve pit but may be removed once the pits are dried. For dry pits, SGI will provide escape ramps or other means to allow terrestrial wildlife opportunity to escape from open pits.

53. The integrity of the netting over open pits must be periodically checked by the operator for sagging due to snow accumulation if a pit must stay open through the winter.

**Drilling—Gas Well**

54. For dry holes, the abandonment marker will be capped with a 2-foot by 2-foot steel plate, at least 1/4 inch thick. The plate must be permanently inscribed with the identity requirements of 43 CFR 3162.6d and buried a minimum of 2 feet below the final reclaimed ground level.

55. WHP: SGI will limit the number of drilling rigs operating in the BMU during those times when wintering big game can be most impacted. SGI may operate up to three (3) drilling rigs between April 15 and December 1 of each year. Only one drilling rig may operate from December 1 through April 15 each year.

56. In the winter period, December 1 through April 15, SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands,

BLM_0029021

resulting in a landscape approach to maintaining winter habitat suitability for big game. The BLM may approve annual exceptions to the lease stipulations for winter timing restrictions on federal minerals in areas outside of the WHP Winter Closure Areas. The portion of the area outside the WHP big game Winter Closure Areas where winter activity may occur under such annual exceptions will be discussed among SGI, BLM, and CPW annually no later than August 1.

WHP: To address potential direct and indirect impacts on wintering big game, SGI will limit winter activities in portions of the BMU that have been identified by CPW as the most critical to wintering big game. See **Figure 1**, Winter Closure Areas, in the WHP.

The activities listed below will not occur within the big game Winter Closure Areas between December 1 and April 15 each year:

- Drilling of new wells;
- Well work-over and completion activity intended to increase the production of a well;
- Reclamation activities and existing road maintenance activities that can be delayed until after April 15 each year; and
- New surface-disturbing activities, including pipeline construction and installation, road and pad construction, and other general construction and facility installation.

SGI will limit activities to the following between December 1 and April 15 each year:

- Well production and routine maintenance activities. In this context, well production and routine maintenance activities include:
  - Emergency work-overs or other emergency actions necessary to remedy equipment failures or unanticipated declines in production, or as required by local, state, or federal regulatory agencies;
  - Non-routine pipeline facility maintenance necessary to remedy unanticipated production problems, to address safety issues, or as required by local, state, and federal regulatory agencies;
  - Normal daily production activities including "pumping" of wells, generally requiring up to two (2) vehicle trips per day or less to a well pad; and
  - Snow plowing and the minimum amount of road maintenance necessary to access the well for normal, daily production activities.

57. SGI will install gates and signage to limit access to the extent permitted by the landowners at all entry points to the voluntary big game closure areas shown on WHP **Figure 1**.

58. Freshwater-based drilling will be used for most drilling activities. A small percentage of mineral oil additive may be used, depending on the formation that will be encountered. Mineral oil drilling fluids are preferred in production formations where

BLM_0029022

borehole stability requires it or for directionally drilled wells. Specifics on which type of drilling fluid used will be identified at the APD stage and included on the individual drilling application.

59.    Blowout preventer controls must be installed prior to drilling out the surface shoe and prior to starting workover or completion operations.

**Drilling—Water Disposal Well**

60.    Pressure will be monitored at the surface to detect any loss of packer fluid into surrounding formations and to detect migration of injected water upward into non-target annulus zones, as well as to ensure tubing, packer, and casing integrity.

61.    A water-based mud system will be used for drilling of the surface hole, and a low-solids, non-dispersed gel system will be used for the intermediate and production hole sections of the water disposal well.

62.    The BLM will process APDs for on-lease water disposal wells, then SGI will go through the process of converting a production well to a water disposal well with the BLM and COGCC, as per Federal Onshore Order No. 1 Section G part 1(e) and COGCC Rule 325. The conversion process ensures that no production could come from the well before using it for water disposal.

**Completions—Gas Well**

63.    Per COGCC Order No. 1R-114, operators are required to post their disclosure of chemicals intentionally added to hydraulic fracturing fluids on FracFocus.

64.    Test gas will be flared (combusted) or captured for sale or use (i.e., green completions) to prevent its escape to the atmosphere, in accordance with Federal Notice to Lessees and Operators NTL-4A and COGCC regulation 2 Colorado Code of Regulations 805.b(3).

65.    In the event it becomes necessary to flare a well, a deflector and/or directional orifice will be designed and installed to safeguard both personnel and adjacent lands.

**Completions—Water Well**

66.    Drilling and hydraulic fracturing will follow standard industry and regulatory procedures and will be permitted as under producing wells with the additional process of converting it to a disposal well.

**Interim Reclamation**

67.    The operator will control noxious weeds within the Unit, including on or within well pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other area associated with natural gas development. The measures identified in ROD **Appendix E**, Noxious Weed Management Plan, will be followed.

68.    WHP: SGI will use a CPW-recommended wildlife friendly seed mix for interim and final reclamation where approved by the surface owner. The CPW-recommended wildlife-friendly seed mixes for the BMU are found in the Wildlife Habitat Plan.

69.    Surfaces not needed for long-term operations will be recontoured and seeded as per the requirements set by the landowner agreement, COGCC, and/or BLM.

BLM_0029023

70. Reclamation efforts will continue until all related requirements are met.

71. Removal or burial of any surfacing material used to complete the well pad will be according to the BLM's or authorizing agency's standards.

72. Return areas that are not needed for production operations or for subsequent drilling operations to near-original condition or to the land use designated by the surface landowner.

73. SGI will minimize dust and erosion during the interim reclamation process.

74. Areas needed for production and subsequent drilling operations (those planned within 12 months) will be stabilized to minimize fugitive dust and erosion.

75. Stockpiled topsoil, as well as remnant vegetation (e.g., uprooted sagebrush and oak brush) will be spread over interim reclamation areas. Any remaining stockpiled topsoil not needed for interim reclamation will also be stabilized and reseeded. Prior to reseeding, all reclaimed areas will be scarified and with a slightly roughened surface, but with microtopography (highs and lows) no greater than 2 inches.

**Production—General**

76. WHP: In addition to the daily site inspections at each well pad location, SGI will monitor the following aspects of well production using remote telemetry:

    - Tubing pressure;

    - Casing pressure;

    - Gathering system line pressure;

    - Wellhead differential pressure;

    - Wellhead gas temperature;

    - Wellhead gas rate; and

    - Production tank level alarms.

    SGI will implement this remote monitoring under the following time limits:

    - Wells existing in the BMU on the date of this ROD will be retrofitted and will become compliant with the seven (7) monitored aspects of well production listed above within twenty-four (24) months after that date; and

    - Wells not yet existing in the BMU on the date of this ROD are required to comply with the seven (7) monitored aspects of the well production listed above. A single six- (6-) month grace period for well compliance after a well is placed in production will be allowed.

77. All long-term facility and permanent structures will be painted a flat, nonreflective standard environmental color using the standard environmental colors chart with consideration of the private landowner's views. Facilities will be painted within six months of being on-site. As required by the Occupational Safety and Health Administration, some equipment will be painted for safety considerations such that

BLM_0029024

equipment will retain their safety coloration so they do not blend with the surroundings.

78. Protective barriers will be installed around the production facilities, including tanks.

79. All site security guidelines will be followed as identified in the authorizing agency's statutes, regulations, and policy.

80. Centralized production facilities may be used if it is determined that doing so will provide a net benefit to the impacted resources. Whether centralized production facilities are required or developed as part of a project's design features will be determined at the permitting stage.

81. SGI will conduct the minimal amount of seasonal road maintenance required to pump the well or conduct emergency activities.

**Production—Produced Water Management**

82. Disposal of produced water will be in accordance with a plan approved by the BLM as provided for in Federal Onshore Order No. 7, Disposal of Produced Water, and/or in accordance with a plan approved by the COGCC rules and regulations.

**Production—Workovers**

83. Workover activities will typically be implemented during daylight hours only.

**Maintenance**

84. SGI will be required to prepare and implement a road maintenance plan for all roads used for project-related purposes.

85. SGI is committed to adherence with county road maintenance and encroachment ordinance requirements.

**Final Abandonment**

86. Wells will be plugged in compliance with all BLM standards and all federal regulations. All surface equipment will be removed. Removal or burial of surfacing material will comply with the authorizing agency's standards.

87. Plugging and abandonment of wells will use industry BMPs and comply with all applicable rules and regulations set forth by the BLM and/or the COGCC for plugging. Depending upon surface estate, abandonment will comply with the appropriate surface management agency.

**Reclamation—General**

88. To mitigate additional soil erosion at the well pad and potential increased sediment and salt loading to nearby surface waters, all disturbed areas affected by drilling or subsequent operations, except areas reasonably needed for multi-well drilling and/or production operations, will be reshaped and reclaimed as early and as nearly as practicable to their original condition. SGI will minimize dust and erosion during final reclamation

89. Exposed slopes will be revegetated as soon as possible, with a native seed mix or approved seed mix, at a density and a pattern that replicate what was removed during

BLM_0029025

construction. Nonnative seed mix can create visual impacts through strong color and texture contrast with the surrounding native vegetation.

90. A reclamation status report will be submitted to the BLM annually for all actions that require disturbance of surface soils on BLM mineral estate. Actions may include, but are not limited to, well pad and road construction, construction of ancillary facilities, or power line and pipeline construction. The reclamation status report will be submitted by December of each calendar year and will include the well number, legal description, project description (e.g., well pad or pipeline), reclamation status (e.g., interim or final), whether the well pad or pipeline has been revegetated and/or recontoured, date seeded, photos of the reclaimed site, estimate of acres seeded, and seeding method (e.g., disk-plowed, drilled, or both). Internal and external review of this plan and the process used to acquire the necessary information will be conducted annually, and new information or changes in the reporting process will be incorporated into the plan as necessary.

## Reclamation—Monitoring

91. Revegetation efforts will be considered satisfactory when soil erosion resulting from the operation has been stabilized, and a vegetation cover equal to 70 percent (both cover and diversity of species) of pre-existing or seeded-in vegetation is reestablished as evidenced by pre-and post-construction photo-point monitoring and vegetation plots and transects.

92. SGI will monitor interim and final reclamation progress at 1-, 2-, 3-, and 5-year intervals.

93. Reseeding will be required if satisfactory interim reclamation progress is not being made at year 2 or year 3 monitoring intervals, or if final reclamation is not achieved by year 5.

## Resource Protection—Air Quality

94. The BLM will place a COA on each permit, requiring the operator to emit 5 tons per year (tpy) or less of NOx at each well pad for production operations (post-construction and development phase) as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. The operator will be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 tpy may be acceptable if the operator can demonstrate compliance with the $NO_2$ 1-hour National Ambient Air Quality Standard (NAAQS) for the APD. Any additional impacts analyses will need to be reviewed and approved by BLM prior to BLM authorizing activities.

95. The BLM will place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling/fracturing/completion activities. The operator will be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to use to develop project-specific emissions

BLM_0029026

inventories. Operation of engines totaling greater than 2,000 hp at any one time during the development phase (this total horsepower was analyzed for the Final EIS-specific $NO_2$ 1-hour impacts analysis) can trigger the need for additional impacts analysis and potentially warrant a requirement (COA) for Tier 3–4 engines. The goal of the requirement is for development (drill/completion/fracturing)-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

96. The BLM will require the operator to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory for BLM review that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 tpy of NOx (annual NOx emissions level limit determined using the acceptable project-level nitrogen deposition threshold [0.005 kg/ha-yr] and an equation of a line for the annual NOx emissions levels and corresponding modeled nitrogen deposition). The BLM will place a COA on each permit (APD), requiring the operator to submit a NOx emissions accounting analysis summary that provides information for how the APD emissions fit into the overall Unit-wide production phase (post construction and development) NOx emissions budget (approximately 143 tpy of NOx).

97. The BLM will require SGI to apply continuous watering to keep the surface moist during access road and well pad construction and during heavy traffic periods, including drilling and completion phases of well development. The operator can select and inform the BLM of chosen dust abatement. At a minimum, the application of freshwater will be acceptable. Other examples include: magnesium chloride, emulsified asphalt, gravel, or other dust palliatives to decrease the application frequency normally required when using freshwater only.

98. SGI will be required to utilize and operate pneumatic devices, tanks and dehydrators in accordance with CDPHE and US Environmental Protection Agency (EPA) oil and gas regulations.

**Resource Protection—Noise**

99. This project will be compliant with COGCC and CDPHE standards for noise abatement. COGCC standards applied during operation of production equipment will be those for the residential/agricultural/rural zone.

**Resource Protection—Cultural Resources**

100. Any National Register of Historic Places-eligible sites located in proposed disturbance areas will be avoided by all project-related disturbance, including well pad and water-disposal units, pipelines, and access roads. Should avoidance not be possible then the operator, in consultation with the BLM and the State Historic Preservation Office and with input from other interested parties per 36 CFR Part 800.6 and the Statewide Protocol Section VII, will develop a mitigation plan designed to eliminate the adverse effects.

BLM_0029027

**Resource Protection—Visual Resources**

101. Downlighting will be used for all operating and production facilities.

**Resource Protection—Rangeland Management**

102. A cattle guard and/or gate will be placed at the time of fence construction where a well access road bisects the fenceline that surrounds a well pad's disturbance imprint. Once reclaimed plant species are fully established on disturbed sites as determined by the BLM, the fence and cattle guard will be completely removed by the operator. This will allow for reclaimed plant species to establish without grazing pressure from livestock. Interim reclamation will also include repairing range management facilities and improvements that had been altered by project-related activities, such as the installation of cattle guards where new access roads cross fences.

**Resource Protection—Hazardous Materials and Solid Waste**

103. Signs will be posted on-site that identify potential hazards associated with site operation, including chemical hazards.

104. Solid wastes will be transferred off-site for disposal at oilfield waste disposal facilities.

105. Any surface spills or releases of oil, condensate, produced or flowback water, drilling fluids, or other potentially harmful substances will be contained and immediately removed according to SGI's spill prevention, countermeasure and control (SPCC) plan.

106. Spills will be reported according to the regulations in place for the specific landownership, type of spill, and volume of spill.

107. Tanks containing hazardous materials, including drilling fluids and/or muds, completion fluids, fuels, lubricants, produced liquid hydrocarbons, condensates, and produced water, will be surrounded by a secondary containment berm of sufficient capacity to contain the entire capacity of the largest single container and sufficient freeboard to contain precipitation as required in the authorizing agency's standards. All loading lines and valves will be placed inside the berm surrounding the tank, or catchment basins will be used to contain spills. The tanks will be emptied as necessary, and the liquids will be trucked to market.

108. Portable toilets will be located on active construction sites. A commercial supplier will install and maintain portable toilets and equipment and will be responsible for removing sanitary waste. Sanitary waste facilities (i.e., toilet holding tanks) will be regularly pumped and their contents disposed of at approved sewage disposal facilities in accordance with applicable rules and regulations regarding sewage treatment and disposal.

**Resource Protection—Wildlife and Wildlife Habitat**

109. Bear-resistant dumpsters and trash receptacles will be installed at all facilities.

110. The operator will install screens on all heater-treaters and other exhaust systems to prevent nesting bird activity and bird mortality.

BLM_0029028

111. All lethal and non-lethal injury events that involve migratory birds will be reported to a BLM official immediately.

112. Screened water-suction hoses will be utilized to exclude fish when drawing water from streams, ponds, and lakes.

113. Wildlife crossovers (trench plugs) with ramps will be installed on each side of trenches at maximum 1/4-mile intervals and at well-defined game trails to facilitate passage of big game across the open trench and to allow trapped wildlife to escape the trench.

114. WHP: SGI will conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling activities. SGI will conduct these surveys between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM NOS. Where active raptor nests are identified, SGI will apply CPW's raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors, 2008). When other migratory bird nests are located, SGI will avoid disturbance of nests, nestlings, and fledglings during the breeding season. Nest trees being used by cavity nesting birds will be flagged when located and avoided during the nesting season.

## Resource Protection—Invasive, Nonnative Species

115. The operator will use only certified weed-free seed and erosion-control materials.

116. The operator will monitor for and control noxious or invasive weeds throughout the construction and production phases. Noxious weed control is mandatory on the well pads, pipelines, and access roads used by the lessee/operator for the life of the project. Monitoring and compliance should be performed in coordination with routine maintenance activities and in accordance with state law and BLM regulations.

117. The operator and the operator's contractors will disinfect heavy equipment, hand tools, boots, and any other equipment used previously in a river, lake, pond, or wetland, by routinely cleaning equipment using hot water and high-pressure sprayers to remove dirt, mud, and foreign debris before equipment is brought on-site.

118. All disturbances, pads, roads (private and public), pipelines, and pullouts will be maintained noxious weed free to deter any further weed spread. If gravel is to be used, only gravel that is free of Colorado State A and B listed noxious weed species will be used.

119. Monitoring and control of noxious or invasive weeds attempting to establish within the project boundaries throughout the construction and production phases should be performed in coordination with routine maintenance activities and in accordance with state law and BLM regulations.

## Resource Protection—Geologic Hazards

120. Avoidance of Areas with Geologic Hazards. The most effective mitigation to reduce effects of slope failure is to avoid areas with higher risks. Project-specific conditions

BLM_0029029

will be evaluated during the site permitting process, and avoiding disturbance in areas with higher risks within the proposed sites will minimize hazards.

121. **Engineering Controls.** If geologic hazards cannot be avoided, mitigation measures such as designing drainage systems to reduce soil saturation and prevent erosion in areas with steep slopes, and to stabilize the toes of slopes, can be implemented, based on recommendations following site-specific geotechnical site evaluations.

122. **Monitoring of Landslides.** If landslide-prone areas cannot be avoided, such as east of Highway 133, mass movement of the landslide deposits can be monitored, such as by installation of tensiometers to monitor the rate of differential horizontal movement so that corrective action can be taken. Alarm systems can be installed to enable automated shutoff of gas pipelines at critical points in the event of slope failure.

123. The following measures fall under the State regulations for injection wells and are within their jurisdiction. They are included as measures to apply to BLM-authorized wells:

- Monitoring and Maintenance of Acceptable Injection Pressure. Monitoring of deep well injection pressures and of changes in the transmissivity (a measure of how much fluid can flow horizontally through an aquifer) during injection can provide a means of determining whether deep injection pressures are causing fracturing of the reservoir rock, and injection rates and pressures can be adjusted to reduce the potential for these effects.

- Monitoring of Seismicity. Monitoring of seismic activity with sensitive seismometers can be implemented as a follow-up measure to Monitoring and Maintenance of Acceptable Injection Pressure, to determine whether earthquakes are triggered at the depth of injection, since this will provide additional evidence as to whether the reservoir rock was being fractured by injection pressures within the targeted injection zone.

**Resource Protection—Water**

124. In addition to the State of Colorado (COGCC) baseline sampling and water monitoring rules (608b and 609), the following will be added to the existing monitoring program conducted by the operator:

- Due to the limited number of groundwater wells in the area, the radius for both coal bed methane wells and conventional wells will extend to a radius of 1 mile. The COGCC selection criteria apply, including selecting a maximum of four wells in a 1-mile radius for conventional wells and coal bed methane wells. In addition to groundwater well sampling, all surface water sources and spring sources within 1 mile from well pad location will be sampled. A maximum of four sources should be selected with at least one source upgradient of the well. The preferred surface water sources are springs and perennial streams. Other acceptable surface water sources include intermittent streams, canals and ditches, lakes, and ponds. Surface water samples should be collected during lower flow periods after spring runoff.

BLM_0029030

- Sampling will be conducted prior to drilling a well, and at intervals of 1 year, 3 years, and 6 years following completion of the well. Each additional well on a multi-well location will have baseline testing. New wells proposed on an existing pad with a well that is currently on the above-mentioned sampling schedule will not create a new sampling schedule, unless the final year 6 sampling has passed.

- Groundwater and surface water will be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX (benzene, toluene, ethylbenzene, and xylene), TPH (total petroleum hydrocarbons), dissolved organic carbon (DOC), nutrients, and field properties including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling will include one replicate and one blank during each sampling trip. The replicate and blank will be analyzed for the same constituents as the environmental sample. If any of the above-listed constituents are significantly elevated from baseline analysis and above applicable water quality standards as the result of SGI operations, then immediate sampling of all surface waters downgradient from the well pad location within 1 mile will be tested. In addition, a notice to the BLM will be given detailing elevated levels and additional wells to be sampled.

- Surface water and groundwater samples should include stable isotopes of methane (carbon and deuterium) to determine the origin of the methane (biogenic and/or thermogenic) if free gas or dissolved methane concentration is greater than 1.0 milligram per liter. If methane concentrations exceed 1.0 milligrams per liter, noble gases should also be sampled to age date groundwater and in combination with methane data can help distinguish between natural sources of methane or those induced from drilling activities.

- Sample collection for surface water and groundwater should follow the National field manual for the collection of water-quality data.[1] Instrument logs, well characteristics, and other QA/QC collection methods should be submitted to the BLM.

- Data should be summarized and provided to the BLM annually for review. BLM review of the data will evaluate any exceedances of water quality standards or deviations from the baseline monitoring data. If BLM finds exceedances or deviations, BLM may require further investigation and remediation. BLM will determine if further analysis of data may be required by another agency such as the US Geological Survey. Any additional expenses incurred for further reviews, as required by BLM, will be the responsibility of the operator. Results from the water quality monitoring will also be presented by SGI to the BLM at the annual construction and operation activities meeting.[1]

---

[1] US Geological Survey, variously dated, National field manual for the collection of water-quality data: US Geological Survey Techniques of Water-Resources Investigations, book 9, chapters A1-A9, available online at http://pubs.water.usgs.gov/twri9A.

BLM_0029031

125. Use of surface water will be contingent upon the proper authorizations and permissions by the State of Colorado and water right holders (see Final EIS, Appendix L).

BLM_0029032

# APPENDIX B
# WILDLIFE HABITAT PLAN

New development under the Selected Alternative will be subject to the Bull Mountain Unit (BMU or the Unit) Wildlife Habitat Plan (WHP). The WHP, which was a component of the Selected Alternative analyzed in the Final EIS, will apply throughout development phase activities (construction, drilling, and completion); it will not apply to production or maintenance phase activities.

**Table 1**, Mitigation Measures, addresses the five well pad analysis areas identified by the BLM as requiring additional mitigation measures in the Final EIS Preferred Alternative and Selected Alternative. **Table 1** outlines specific mitigation measures included at these locations in the Selected Alternative.

**Table 1 Mitigation Measures**

| Well | Mitigation Measures |
|------|---------------------|
| **Federal 12-90-2 #1** | SG Interests I, Ltd. (SGI) will construct the access road to this well pad location according to plans developed and approved by a Professional Engineer to avoid potential geo-hazards and/or other resource impacts such as erosion. |
| **Federal 11-89-30 #1** | SGI will route the pipeline to this well pad location adjacent to existing roads where practicable. SGI will implement visual mitigation strategies to reduce visibility from Colorado State Highway 133. These site-specific measures could include adjustment of well pad layout, adjustment of well pad elevation, construction of visual mitigation berms, and low-profile tanks. |
| **Federal 12-89-4 #1** | SGI will work with the surface owner of this well pad location to reduce impacts and conflicts which may arise from the unique operations and activities conducted by this surface owner. |
| **Federal 11-89-29 #2** | SGI will follow the WHP for the Selected Alternative locations as direct mitigation for impacts on elk from the operation of the well pad, road, and pipeline associated with this well pad location. |
| **Federal 11-89-8 #1** | SGI will follow the WHP for the Selected Alternative locations as direct mitigation for impacts on elk from the operation of the road and pipeline associated with this well pad location. |

BLM_0029033

## B.1   INTRODUCTION AND BACKGROUND

This WHP addresses some of the potential impacts on wildlife from SG Interests I, Ltd.'s (SGI's) proposed natural gas development of mineral leasehold interests in the BMU in Gunnison County, Colorado encompassing approximately 19,670 acres (**Figure 1**, Winter Closure Areas). The BMU area surface ownership is approximately 98 percent private and 2 percent public (**Figure 2**, Federal Leases Containing Winter Closures Within the Bull Mountain Unit). The BMU area land use is composed primarily of historic homestead settlements and agricultural operations. The BMU provides a variety of private recreational hunting and fishing opportunities, as well as other private outdoor recreational activities. Public access for recreational purposes is limited to approximately 400 acres of BLM surface inside the BMU (**Figure 2**).

This WHP provides mitigation for some of the potential impacts on wildlife during development of the Unit, in accordance with the Selected Alternative (see **Figure 2-1**, The Selected Alternative, **Section 2.1.1** of this Record of Decision (ROD). Several road and pipeline alignments changed between the Draft EIS and Final EIS to address specific resource concerns. These changes are reflected in **Figures 1** and **3** (Winter Closure Areas and Elk Habitat) attached to this WHP. This WHP is relevant and effective for the well pad locations identified in **Figures 1** and **3**, as all the analysis, including acreage calculations, considered the development shown in these figures.

This WHP is a component of the BLM's Selected Alternative and was analyzed as a design feature of Alternative B (the Proposed Action) and Alternative D (the BLM's Preferred Alternative) in the Final EIS. Since the EIS was a programmatic analysis, the precise locations of the components of the Master Development Plan (MDP) will be determined when those wells or facilities are proposed for drilling as part of an application for a permit to drill (APD) or other application. At that time, each component will be examined on a site-specific basis, and each will be subject to approval by the Colorado Oil and Gas Conservation Commission (COGCC) and the BLM following National Environmental Policy Act (NEPA) review.

The well pad locations, oil and gas roads, and pipelines shown in **Figure 1** include elements proposed by SGI in the Final EIS Alternative A and Alternative B, and elements approved by the BLM in the Selected Alternative. This WHP includes or excludes each well pad location from the Winter Closure Areas as shown in **Figure 1**, even if individual well pad locations are later adjusted based on future site-specific analysis. This approach is valid under a programmatic analysis because exact locations can change within a 40-acre area as analyzed in the Final EIS. More significant changes and adjustments to the well pad locations would require additional analysis by the BLM; this analysis would include all relevant resources, including wildlife.

## B.2   SCOPE OF WILDLIFE HABITAT PLAN

### 1)  Geographic Scope and Jurisdiction

This WHP applies only to SGI's oil and gas activities and facilities that are regulated by COGCC and the BLM and proposed on private and federal lands and mineral estates in the BMU, as approved. The requirements of this WHP in no way alter other federal, state, or county regulatory requirements.

BLM_0029034

2) **Number of Facilities, Activities Addressed, and Duration of the WHP**
This WHP addresses the potential impacts on wildlife resources from developing and operating the wells, pipelines, roads, and other facilities and infrastructure for development of the BMU under the Selected Alternative (**Figure 2-1**). SGI will have up to 6 years to develop these facilities under this WHP. If full development of the facilities contemplated under this WHP is not complete within 6 years, SGI may request that the BLM extend the WHP; however, impacts outside the scope of the EIS would need further NEPA analysis.

3) **Species addressed in the WHP**
As part of the negotiations between SGI and Colorado Parks and Wildlife (CPW) for development of a WHP, CPW, in conjunction with the BLM, evaluated potential target species and habitats for this WHP based on CPW data and biologist recommendations, as well as biological information compiled by SGI's contract wildlife biologist. CPW reviewed the baseline biological information provided in BLM's preliminary draft Environmental Assessment for the BMU (for a complete list of species present see DOI-C0-150-2009-0005 EA, Bull Mountain Unit Master Development Plan Preliminary Environmental Assessment, March 2012). Based on this review, CPW and BLM identified elk wintering within the Unit as having the greatest potential for impacts from the proposed project.

Due to CPW's identification of the importance of specific areas within the BMU to wintering big game in the region, and CPW and the BLM's identification of potential impacts on critical big game winter range and wintering big game populations as primary concerns for the project, those habitats and populations are the focus of many of the mitigation efforts in this WHP. Although impacts on a number of the species and habitats of concern identified by BLM in the Final EIS are not specifically regulated by COGCC (cavity nesting birds as an example), this WHP addresses these species and habitats. The best management practices (BMPs) outlined below are designed to avoid and minimize impacts on many of these species. In addition, CPW advised BLM that the avoidance and mitigation actions selected primarily for big game are likely to benefit these other species and their habitats due to habitat overlap with the targeted species.

**B.3    MEASURES TO AVOID AND MINIMIZE ADVERSE IMPACTS ON WILDLIFE**
1) **Best Management Practices**
CPW conducted an evaluation of habitats that would be potentially impacted by SGI's proposed development activities utilizing a GIS methodology. CPW and the BLM reviewed CPW's habitat evaluation and identified mitigation for direct and indirect impacts. Based on the lack of comprehensive reliable site-specific data regarding known locations of northern goshawk and other raptor nest sites, nesting areas for cavity nesting birds, and occupied habitat for northern leopard frogs, impacts on these species of concern will be addressed primarily through impact avoidance and minimization measures, including preconstruction survey requirements. SGI will implement BMPs as standard operating practices that minimize direct and indirect impacts on these species. These BMPs reduce, but do not eliminate, the direct and indirect impacts associated with each new facility and associated activity. The site-specific operational BMPs to be implemented by SGI at each new facility include:

a) Pre-construction raptor and migratory bird nest surveys and avoidance—SGI will conduct raptor and migratory bird nest surveys at areas proposed for new surface

BLM_0029035

disturbance and heavy construction and drilling activities. SGI will conduct these surveys between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM Notice of Staking. The intent of the surveys is to implement avoidance strategies where possible and minimize potential impact on nesting raptors and migratory birds. These surveys may result in modifications to facility design, minor site location adjustments, and operational awareness that reduce direct and indirect impacts when a habitat of concern is identified. SGI previously conducted these surveys to support compliance with the Bald and Golden Eagle Protection Act, the Migratory Bird Treaty Act (MBTA), and Endangered Species Act (ESA). Where active raptor nests are identified, SGI will apply CPW's raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors, 2008). When other migratory bird nests are located, SGI will avoid disturbance of nests, nestlings, and fledglings during the breeding season. Note that nest trees used by cavity nesting birds will be flagged when located and avoided during the nesting season.

b) Pit management to exclude birds, bats, and other wildlife—In the event that SGI proposes and the BLM approves the use of pits (as opposed to a closed loop, pitless drilling system), SGI will manage pits necessary for production activities to minimize the likelihood of wildlife mortalities. SGI will install wildlife fencing around pits and netting over open pits to exclude birds, bats, and terrestrial wildlife. For reserve pits, the netting will be applied within 24 hours after drilling activities have begun. The netting shall be retained and maintained for as long as there are liquids in the reserve pit, but may be removed once the pits are dried. For dry pits, SGI will provide escape ramps or other means to allow terrestrial wildlife opportunity to escape from open pits.

c) Management of activities in riparian zones to protect water quality and aquatic resources—In addition to installing standard stormwater erosion controls to protect water quality as required by the Colorado Department of Health and Environment (CDPHE), SGI will comply with CPW and COGCC recommended buffers for aquatic habitats in the BMU. SGI will implement the following BMPs within the BMU:

- Except as outlined on **Figure 2** and other excepting activities outlined below, no surface disturbance within 300 feet of a designated cutthroat trout stream;

- In areas other than cutthroat trout streams, well pads and facilities will not be sited, to the extent practicable, within 150 feet of any natural lake, reservoir, wetland, or perennial or seasonally flowing stream or river. Roads crossing CPW mapped cutthroat trout streams will be bridged or use appropriately sized culverts to prevent stream bed damage and the transfer of disease organisms. Pipelines that cross cutthroat trout streams should be bored if practicable;

- Stream disturbances in or upstream of CPW-mapped cutthroat trout habitat will be avoided between June 1 and August 31 to avoid impacts on spawning cutthroat trout;

BLM_0029036

- All stream crossing and culverts on perennial and intermittent streams shall be designed to allow aquatic species passage;

- Minimum right-of-way widths will be used where pipelines cross riparian areas and streams and crossing will be constructed at right angles to the stream channel. Native riparian canopy cover and stream bank vegetation will be left intact to the extent practicable;

- Chemical dust suppression activities will be avoided within 300 feet of the ordinary high water mark of any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river, unless required by surface owner, county or state requirements;

- Screen water suction hoses to exclude fish and amphibians; and

- Disinfect heavy equipment, hand tools, boots and any other equipment that was previously used in a river, stream, lake, pond, or wetland in a different watershed prior to moving the equipment to the BMU. The disinfection practice applies fieldwide and follows the procedure outlined in COGCC Rule 1204.a.2.

## 2) Field-Wide Operating Practices

SGI will implement specific field-wide standard operating practices to reduce impacts on terrestrial wildlife species. These practices typically reduce traffic and/or the extent of human activities occurring on a daily basis across the BMU. These practices include:

- Installation of a produced water gathering system—where applicable, each new facility is tied into a field-wide produced water gathering system for water disposal. This water gathering system, when used in conjunction with temporary surface poly lines, results in a significant reduction in truck traffic and consolidation of water handling facilities;

- Use of multiple-well pad sites—the use of multiple-well pad sites reduces surface disturbance and overall habitat fragmentation and may result in a reduction of heavy equipment on road traffic due to fewer rig mobilizations and de-mobilizations;

- Use of wildlife friendly seed mixes—SGI will use a CPW-recommended wildlife friendly seed mix for interim and final reclamation where approved by the surface owner. The CPW-recommended wildlife friendly seed mixes for the BMU are found in **Attachment A,** below; and

- Collocating pipelines and other utilities adjacent to road rights-of-way where practicable.

## 3) Seasonal Closures

To address potential direct and indirect impacts on wintering big game, SGI will limit winter activities in portions of the BMU that have been identified by BLM and CPW as the most critical to wintering big game. See **Figure 1**, Winter Closure Areas. To define the extent of the Winter Closure Areas, BLM and CPW, in collaboration with SGI, reviewed existing

BLM_0029037

federal lease stipulations and private mineral estate. Because of the somewhat uniform distribution of private mineral estate within the BMU, it was determined that traditional application of federal lease stipulations would not adequately mitigate impacts on wintering big game. Instead, a landscape approach was applied to determine which areas within the BMU were the most critical for wintering big game population maintenance.

Under this WHP, in the winter period December 1 through April 15, SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands, resulting in a landscape approach to maintaining winter habitat suitability for big game. The BLM may approve annual exceptions to the lease stipulations for winter timing restrictions on federal minerals in areas outside of the WHP Winter Closure Areas. The portion of the area outside the WHP big game Winter Closure Areas where winter activity may occur under such annual exceptions will be discussed among SGI, BLM, and CPW annually no later than August 1.

Within the big game Winter Closure Areas identified on **Figure 1**, SGI will limit activities to the following between December 1 and April 15 each year:

- Well production and routine maintenance activities. In this context, well production and routine maintenance activities include:

  o Emergency work-overs or other emergency actions necessary to remedy equipment failures or unanticipated declines in production, or as required by local, state, or federal regulatory agencies;

  o Non-routine pipeline facility maintenance necessary to remedy unanticipated production problems, to address safety issues, or as required by local, state, and federal regulatory agencies;

  o Normal daily production activities including "pumping" of wells, generally requiring up to two (2) vehicle trips per day or less to a well pad; and

  o Snow plowing and the minimum amount of road maintenance necessary to access the well for normal daily production activities. Daily access to each well pad is necessary year-round for site inspections to ensure safe and environmentally responsible operations. For example, formation water produced from wells in the BMU and stored temporarily in tanks on each location, requires daily site visits to ensure prudent and environmentally responsible operations. The combination of large volumes of stored water and extreme low temperatures can potentially result in mechanical failures that can only be effectively monitored by daily site visits. Roads to each location must be plowed to ensure minimal response times for necessary equipment to address any issue which could result in damage to environmental resources. Remote telemetry monitoring cannot provide the same level of assurance and environmental protection that human daily site inspections ensure.

The activities listed below will not be allowed within the big game Winter Closure Areas between December 1 and April 15 each year:

BLM_0029038

- Drilling of new wells;
- Well work-over and completion activity intended to increase the production of a well;
- Reclamation activities and existing road maintenance activities that can be delayed until after April 15 each year; and
- New surface-disturbing activities, including pipeline construction and installation, road and pad construction, and other general construction and facility installation.

In order to implement the big game winter closures, SGI will install gates and signage to limit access to the extent permitted by the landowners at all entry points to the big game Winter Closure Areas shown on **Figure 1**.

### 4) Remote Monitoring

In addition to its daily site inspections, SGI will remotely monitor specific aspects of well production at all fee and federal well pad locations in the BMU. SGI will continuously monitor the following aspects of well production using remote telemetry:

1. Tubing pressure;
2. Casing pressure;
3. Gathering system line pressure;
4. Wellhead differential pressure;
5. Wellhead gas temperature;
6. Wellhead gas rate; and
7. Production tank level alarms.

Remote monitoring will be implemented under the following time limits:

1. Wells existing in the BMU on the date of this ROD shall be retrofitted and will become compliant with the seven (7) monitored aspects of well production listed above within twenty-four (24) months after that date; and

2. Wells not yet existing in the BMU on the date of this ROD are required to comply with the seven (7) monitored aspects of the well production listed above. A single six- (6) month grace period for compliance after a well is placed in production will be allowed.

### 5) Verified Elk Winter Concentration Area Avoidance (Figure 3)

The Draft EIS and Final EIS describe verified elk winter concentration areas identified by E. Petterson in 2012. These areas were identified by field observations of elk concentrations in 2012 at a specific point in time (see Figure 3-14 in the Final EIS).

The majority of these verified elk winter concentration areas are not impacted by well pads identified in the Selected Alternative.

BLM_0029039

There are 10 well pads in the Selected Alternative that overlap with these verified elk winter concentration areas (see **Figure 3**). Where such overlap occurs, SGI will avoid the verified elk winter concentration areas where practicable in re-siting the well pad. The primary constraint in avoiding these areas will be the 40-acre analysis area. Other resources such as slope, soil, and wetlands will also factor into any re-siting analysis. Where this conflict occurs and cannot be resolved, site-specific mitigation measures will be evaluated during future site-specific NEPA analysis.

**6) Drill Rig Count Limitation**

In addition to the Winter Closure Areas, SGI will limit the number of drilling rigs operating in the BMU during those times when wintering big game could be most impacted. Under the Selected Alternative, SGI may operate up to three (3) drilling rigs between April 15 and December 1 of each year. Only one drilling rig may operate from December 1 through April 15 each year.

This mitigation limiting the number of drill rigs in the BMU during the winter months dramatically reduces any potential direct or indirect impacts on big game across those portions on the BMU not restricted by the Winter Closure Areas.

**7) Summary of Protections and Cumulative Benefits to Wildlife**

Approximately 6,391 acres of federal mineral leases within the BMU currently contain lease stipulations providing seasonal timing limitations for big game (**Figure 2**). The big game Winter Closure Areas required by this WHP and shown on **Figure 1** and on **Figure 2-1** cover approximately 12,505 acres as compared to the 6,391 acres subject to seasonal timing limitations in federal lease stipulations. The Winter Closure Areas in this WHP overlap in some areas with the current federal lease timing stipulations.

The BLM will consider annual exceptions to the current federal lease timing stipulations existing outside the Winter Closure Areas. At the termination of this WHP, the original federal lease seasonal timing stipulations will continue to apply. The Winter Closure Areas in this WHP increase the acres closed for the benefit of wintering big game, relative to the areas subject to timing limitation stipulations. The closures apply to the areas within the BMU that BLM and CPW biologists have identified as most critical for wintering big game. Many of the areas with higher habitat value are located above private minerals not subject to federal lease stipulations, and this WHP provides additional protection for those areas.

**B.4   ADDITIONAL RESPONSIBILITIES**

For the facilities described and shown in **Figure 1**, SGI will implement the impact avoidance and minimization measures outlined in this WHP. During the development phase, SGI must meet annually with the BLM and CPW no later than August 1 to assess the implementation of both past and future development in context of the WHP.

For the facilities described in **Figure 1**, SGI will observe the RSO buffer restrictions contained in COGCC Rules. If SGI cannot comply with the RSO buffer restrictions for a particular facility, SGI will enter into an individual consultation with CPW on that facility under Rule 306.c. to evaluate options for avoidance, minimization, and mitigation.

BLM_0029040





**Existing/Proposed Pad by Subsurface Ownership**

- ▢ Federal (40 SG pads)
- ▢ Fee (21 SG pads)

**Pipeline by Status**

- ━ Existing
- ━ Proposed

**Road by Status\***

- ━ Existing
- ━ Proposed

*\*Roads most likely to be upgraded & used for oil & gas*

- ▨ Winter Closure Area (12,505 ac.: 21 SG pads inside, 40 SG pads outside)
- ▨ Elk Winter Concentration Area
- ▨ Mule Deer Winter Concentration Area

**SG Interests I - 77330**
**BMU Proposed Action**

Figure 1:
Winter Closure Areas

0    4,000    8,000 Feet

1 in = 5,000 feet

*Disclaimer: This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information.*

*Prepared for SG Interests, Inc. by TerraCognito GIS, Inc. June 2015*

BLM_0029041



**Figure 2** - Federal Lease Containing Winter Closures Within the Bull Mountain Unit

Existing Facilities
- Well Pads
- Existing SG Gas Field Roads

Proposed Facilities
- Well Pads
- Roads

Winter Closure Stipulations
- NSO - Timing: 11/30 - 5/1
- NSO - Timing: 12/1 - 4/30

Land Ownership
- Bureau of Land Management
- U.S. Forest Service
- Private

0   0.25   0.5        1        1.5        2 Miles

BLM_0029042





*Existing/Proposed Pad by Subsurface Ownership*
- Federal (40 SG pads)
- Fee (21 SG pads)

*Pipeline by Status*
- Existing
- Proposed

*Road by Status\**
- Existing
- Proposed

*\*Roads most likely to be upgraded & used for oil & gas*

- Verified Elk Winter Concentration Area
- Winter Closure Area (12505 ac.: 21 SG pads inside. 40 SG pads outside)
- Elk Winter Concentration Area
- Mule Deer Winter Concentration Area

**SG Interests I - 77330**
**BMU Proposed Action**

Figure 3: Winter Closure Areas and Elk Habitat

0    4,000    8,000 Feet

1 in = 5,000 feet

Disclaimer: This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information.

Prepared for SG Interests, Inc.
by TerraCognito GIS, Inc.
June 2015

BLM_0029043

**ATTACHMENT A   BULL MOUNTAIN UNIT CPW-RECOMMENDED SEED MIX**

**Ecotype: Oakbrush/Mountain shublands**

| Species | | *recommended variety unless locally collected seed is available, in which case locally collected seed is preferred | | | |
|---|---|---|---|---|---|
| GRASSES | Variety* | % of mix | FRPLS* | PLS rate/acre | *based on drill seeding; 2x if broadcasting |
| Slender wheatgrass | San Luis | 15% | 6 | 0.9 | |
| Western wheatgrass | Arriba | 10% | 8 | 0.8 | |
| Bluebunch wheatgrass | Secar/Goldar | 15% | 10 | 1.5 | |
| Idaho fescue | | 10% | 4 | 0.4 | |
| Muttongrass | (UP Colona) | 15% | 1 | 0.15 | |
| Junegrass | Uncomprahgre | 15% | 4 | 0.6 | |
| Sandberg bluegrass | "UP release" | 10% | 2 | 0.2 | |
| Green needlegrass | | 10% | 8 | 0.8 | |
| Mountain brome | Garnet | 10% | 12 | 1.2 | |
| | | 1.1 | | | |
| FORBS* | Variety | | | | |
| Utah sweetvetch | (UP  Uncompahgre) TII | 15% | 15 | 2.25 | *Select 5 of the 9 forb species based on |
| Lewis flax | Maple grove | 15% | 4 | 0.6 | availability |
| Penstemon comarrhenus*+ (dusty) | (UP Delta) | 15% | 1 | 0.15 | |
| Penstemon cyanocaulis* (bluestem) | (UP San Miguel) | 15% | 1 | 0.15 | |
| Penstemon palmeri* (palmer) | | 15% | 2 | 0.3 | |
| Penstemon strictus* (Rcky Mtn) | | 15% | 1 | 0.15 | |
| Silky lupine -sericeus | | 15% | 20 | 3 | |
| American vetch | | 15% | 25 | 3.75 | |
| Oregon daisy | (UP Dry Fork) | 15% | 1 | 0.15 | |
| (Alfalfa) | Ladak | | | | ( ) these species are included to enhance |
| (Small burnet) | | | | | the initial value of the seeding for big |
| (Sainfoin) | | | | | game; include in addition to the 5 native |
| | | | | | |
| SHRUBS* | Variety | | | | |
| Antelope bitterbrush | | | | 1 | *Select 3 of the 4 shrub species based on |
| Mtn. mahogany | | | | 1 | availability |
| Artemisia tridentata ssp. vaseyana | | | | 1 | |
| Utah serviceberry | | | | 1 | |

NOTE: (UP)- The UP varieties are recently released and may not be available in sufficient quantities. Supply and availability may increase in future years

# APPENDIX C
# MASTER SURFACE USE PLAN OF OPERATIONS

This Master Surface Use Plan of Operations (Master SUPO) will be used by SG Interests I, Ltd. (SGI) in preparation of the Surface Use Plan of Operations component of future applications for permit to drill (APDs) associated with development in the Bull Mountain Unit.

The SUPO for an individual APD must address all the elements as required in Federal Onshore Order No. 1. A "complete" SUPO will also include any design features and/or best management practices (BMPs) chosen by the operator to mitigate the impacts of developing a well pad, access road, facilities and utility corridors.

At a minimum, the elements of an APD SUPO will be carefully reviewed by the BLM to ensure that proposed operations and reclamation:

- Describe or show the procedures, equipment, and materials to be used by the operator to facilitate the proposal;

- Are conducted to minimize adverse effects to surface and subsurface resources, prevent unnecessary surface disturbance, and in conformance with currently available technology and practice;

- Are consistent with all applicable Federal and State laws and regulations including, but not limited to: Federal Onshore Orders, BLM Gold Book Standards, the RMP currently in effect, the Clean Air Act, the Clean Water Act, the Endangered Species Act, the National Historic Preservation Act, and Colorado Oil and Gas Conservation Commission (COGCC) regulations;

- Comply with all current lease stipulations.

- Take appropriate measures as specified in orders and notices to lessees to protect the public from any hazardous conditions resulting from operations;

- Identify the private surface owner (if developing on split-estate lands) and engage the private surface owner at the earliest possible opportunity and subsequently throughout the life of the authorization;

BLM_0029045

- Identify and select a drill pad size that is appropriate;

- Site selection, siting of facilities, and/or conducting of operations is appropriate and at a minimum excludes areas subject to mass soil movement, riparian areas, floodplains, lakeshores, and/or wetlands, unless approved otherwise;

- Ensure that any pits proposed comply with appropriate standards for installation, use, removal and closure;

- Structures, facilities, improvements, and equipment are maintained in a safe condition; and

- Provide a sufficiently detailed reclamation plan designed to:

  o Return the area to productive use;

  o Meet the objectives of the Bull Mountain Unit Master Development Plan Final EIS (the Final EIS) and Uncompahgre Basin Resource Management Plan;

  o Help facilitate the identification of needed conditions of approval (COAs);

  o Ensures interim reclamation is performed on the disturbed areas no longer needed after drilling is complete;

  o Ensures at the time of final reclamation that all pads, pits, and roads are reclaimed to a satisfactorily revegetated, safe and stable condition (unless an agreement is made with the landowner to keep a road or pad in place); and

  o Recognize that activities to reestablish vegetation, such as seeding, etc. must be completed within the time period approved by the BLM.

As much as possible, the information below responds to the elements in the SUPO component of an APD as described in Federal Onshore Order No. 1 in terms of existing infrastructure and suggests what may be expected in a forthcoming site specific APD SUPO. However, this Master SUPO does not identify or specify any design features or BMPs. Those can be found in the following appendices associated with the Final EIS:

- Appendix B, Construction, Drilling, Completion, and Reclamation;

- Appendix C, Design Features, Mitigation Measures, and Conditions of Approval; and

- Appendix I, Noxious Weed Management Plan.

## C.1   SURFACE USE PLAN OF OPERATIONS ELEMENTS OF THE APD
The following elements are to be included in the SUPO attached to an APD.

### C.1.1   Diagrams, Geospatial Data and Maps
SUPO information required of Federal Onshore Order No. 1 may be shown on the same map if it is appropriately labeled or on separate diagrams or maps. Any elements of the SUPO that may include corresponding maps will comply with the following criteria:

- All maps must be of a scale no smaller than 1:24,000 unless otherwise stated in the order;

- Geospatial vector and rater data must include appropriate attributes and metadata;

BLM_0029046

- Georeferenced raster images must be from the same source as hardcopy plats and maps submitted in the APD package; and

- Diagrams with cuts and fills must be surveyed, designed, drawn, digitized, and certified by licensed professional engineers.

## C.1.2   Existing Roads

To reach the facilities and well locations in the Bull Mountain Unit from Paonia, travel north on State Highway 133 approximately 27 miles to its intersection with Gunnison County Road 265. Turn northwest on County Road 265. Private access roads to individual well sites intersect County Road 265.

All existing roads regardless of type within the Bull Mountain Unit are depicted in **Figure C-1**, below.

A map showing the proposed well site and its access route will be included in each specific APD. This map will show access to the well site from a locatable public access point. Locations of all existing and proposed road structures (e.g., culverts, bridges, and low water crossings) will also be shown.

Plans for maintenance of access roads will be provided in the surface use plans submitted with individual well APD.

## C.2      NEW OR RECONSTRUCTED ACCESS

Specific temporary and permanent access roads will be identified in individual APDs when they are submitted for processing. Roads that will require reconstruction will be identified on these maps and documents.

Roads will be designed based upon the class or type of road, the safety requirements, traffic characteristics, environmental conditions, and the vehicles the road is expected to carry.

The SUPO in each specific APD will describe for all road construction or reconstruction: road width, maximum grade, crown design, turnouts, drainage and ditch design, on-site and offsite erosion control, revegetation of disturbed areas, location and size of culverts and/or bridges, fence cuts and/or cattle guards, major cuts and fills, source and storage of topsoil, type of surfacing materials, if any, that will be used.

BLM_0029047

**Figure C-1. Existing Roads in the Bull Mountain Unit**



BLM_0029048

For example, when road construction or reconstruction is required, SGI will describe the changes as follows:

- Road width: typically 12 to 18 foot for straight lengths, wider as needed for design vehicle turning radius;

- Maximum grade: up to 12 percent or higher in shorter segments when needed;

- Crown design: see typical drawing below, **Figure C-2**, Typical Access Road Cross-section;

- Any turnouts: intervisible where needed;

- Drainage and road ditch design: see typical cross section below;

- Erosion control features: see typical drawing below;

- Revegetation of disturbed area: according to landowner agreements and/or BLM direction;

- Location and sizes of culverts and/or bridges: Gold Book specifications to be followed;

- Location of fence cuts and/or cattle guards: This is site-specific and will be included in each APD;

- Description of significant cuts and fills: This is site-specific and will be included in each APD;

- Source and storage of topsoil: this is site-specific and will be included in each APD. The BLM typically stipulates the salvage of six to eight inches of topsoil for use in reclamation; and

- Type of road surfacing materials: typically three inches fractured road base. Approximately six to eight inches of road base will be used in road construction and reconstruction.

**Figure C-2. Typical Access Road Cross-Section**



BLM_0029049

## C.3   LOCATION OF EXISTING WELLS

Existing wells in the Bull Mountain Unit are shown in the following map (**Figure C-3**, Existing Wells in the Bull Mountain Unit). This map includes all wells that have been drilled in the unit including abandoned wells. At the time of submittal of an individual APD, SGI will include a map of all known wells within one mile of the proposed location whether it is within or outside the unit. The intent of the order is to show the status of wells in proximity to the proposed location. The map will have a legend symbolizing the wells' status.

**Figure C-3. Existing Wells in the Bull Mountain Unit**

BLM_0029050

## C.4    LOCATION OF EXISTING OR PROPOSED PRODUCTION FACILITIES

For each APD submitted, a map of the existing and proposed facilities associated with the specific project being permitted will be submitted to BLM (see typical facility layout in **Figure C-4**, Typical Well Site Facilities). It may be necessary to add wellhead compression or a pump jack to one or more wells located at a site. SGI also anticipates that one or more meter houses may be on each well pad and, pumps, generators, and other equipment will be proposed and permitted as needed.

**Figure C-4. Typical Well Site Facilities**



## C.5    LOCATION AND TYPE OF WATER SUPPLY

With each APD, SGI will specifically identify the source, access route, and transportation method for all water anticipated for use in drilling the proposed well. Any newly constructed or reconstructed access roads or pipelines crossing Federal lands that are needed to transport the water will be provided in the APD. Any site-specific information included in and APD will generally reflect the following:

- Freshwater may be obtained from one or more of the following sources:
  - Purchased from a landowner;
  - Drawn from free-flowing water sources and augmented from Bainard Reservoir according to the terms of SGI's approved Augmentation Plan;
  - Drawn from free-flowing sources when there is no call on this water; or
  - Purchased from a permitted commercial supplier.

BLM_0029051

- Recycled water will be obtained from the following source:
  - SGI has constructed McIntyre Flowback Pits 3 and 4, which are fully operational and has permitted a second water recycling facility called the McIntyre Flowback Pits 1 and 2 (see **Figure C-5**, Location of the McIntyre Flowback Pits in the Bull Mountain Unit).

Estimated water volumes needed for completion per well type are shown below. These volumes may consist of freshwater and/or recycled water from the McIntyre Flowback Pits.

| Well Type | Estimated Water Usage |
|---|---|
| Vertical Mancos Well<br>S-Shaped Mancos Well<br>Directional Mancos Well | 18,000 BBL per stage with an average of 3 stages per well |
| Vertical Coal Well<br>S-Shaped Coal Well<br>Directional Coal Well | 1,800 BBL for Cameo Coal and 1,500 BBL for South Canyon Coal |
| Vertical Cozzette or Corcoran Well<br>S-Shaped Cozzette or Corcoran Well<br>Directional Coal Well | 2,300 BBL each for Cozzette and/or Corcoran |
| Horizontal Corcoran or Cozzette Well | 30,000 BBL |
| Horizontal Shale Well | 250,000 BBL |
| Deep Water Disposal Well | 2,500 BBL per fracture with two fractures possible |

## C.6   CONSTRUCTION MATERIALS

The types and uses of construction materials will vary according to the specific conditions at an individual well site. Subsequent wells that will be collocated on existing well pads will require less construction materials than those wells that will be first on a new well pad. Wells added to existing well pads may require additional gravel to be added to the road and well pad to support the expected drilling traffic.

## C.7   METHODS FOR HANDLING WASTE

Projects in the Bull Mountain Unit will be covered by SGI's Integrated Spill Prevention, Control, and Countermeasure Plan. The goal of this plan is to prevent spills from occurring due to SGI's operations, control spills if they do occur and safely and effectively clean spills up. Projects will be added to the plan as they are being permitted. The integrated plan requires regular inspections and documentation of those inspections as well as a flowline maintenance program and other inspection, reporting and record-keeping duties. If there is a spill associated with this project, it will be reported as per state and federal law. Gunnison County will be notified as well according to applicable permit conditions and existing regulations.

Construction stormwater discharge is permitted through SGI's general Colorado Department of Public Health and Environment stormwater permit and specific locations are covered in SGI's field-wide stormwater management plan (available separately).

BLM_0029052

**Figure C-5. Location of the McIntyre Flowback Pits in the Bull Mountain Unit**



BLM_0029053

If SGI is unable to reuse produced water and flowback fluids from any particular well location, these fluids will be disposed of responsibly in order to avoid the contamination of freshwater resources or land. In most cases, unusable and/or excess flowback and produced water is transported and disposed of in licensed underground injection control wells in the Bull Mountain Unit.

SGI may also dispose of produced water or flowback fluids at industrial disposal facilities in compliance with applicable state and federal regulations. Offsite disposal would require trucking of these fluids. Currently, SGI has in operation one deep water injection well, the Federal 24-2 WDW (waste disposal well) and one permitted but not drilled water disposal well, the Eck 2 WDW. Four (4) additional water injection wells are proposed (Final EIS Chapter 2, Alternative B).

If a reserve pit is deemed necessary, the SUPO of an individual APD will describe plans for constructing and lining of the reserve pit

## C.8    ANCILLARY FACILITIES
No camps or airstrips are planned at this time. If these ancillary facilities are needed in the future, the location of the facility will be shown on a map and the construction method and materials needed for the facility will be described in the individual APD.

SGI may need another storage yard located on private property to store materials and equipment. It would be approximately 250' × 400' in size. It would be located in section 14 T11S R90W on property owned by Rock Creek Ranch I, Ltd. an entity owned by the principals of SGI (see Final EIS Chapter 2, Alternative B).

## C.9    WELL SITE LAYOUT
For each APD submitted, SGI will provide a well site layout drawing. This drawing will be of a scale not less than 1 inch = 50' and prepared under the supervision of a licensed professional surveyor or professional engineer and will be certified as such. Elements of this drawing will include the location and orientation of the well pad, reserve pit/blooie lines/flare pit (including cuts and fills), access road entry points, cross sections of the well pad with regards to topography, cuts and fills in relation to the topography, orientation and proposed location of the drilling rig, dikes and ditches, and topsoil/spoil pile locations. A typical well site layout is shown in **Figure C-6**, Typical Well Site Layout.

SGI also anticipates that temporary facilities on the typical well pad may include a total of three trailers during drilling operations for the drilling superintendent, the company representative, and the mud logger and mud engineer. These temporary facilities will be used 24 hours per day during drilling operations.

BLM_0029054

**Figure C-6. Typical Well Site Layout**



## C.10    PLANS FOR SURFACE RECLAMATION

For each APD, SGI will submit a plan for surface reclamation and stabilization of all disturbed areas. This plan will cover both interim and final reclamation. In cases where the proposed APD describes an additional well on an existing authorized location, SGI will identify that an existing reclamation plan may be in place and ensure that any modification to the existing reclamation plan as a result of the additional APD(s) is presented in the SUPO.

The following topics may be included in the reclamation plan of an individual APD as appropriate:

- A plan for recontouring the disturbed land;
- A drainage plan for use during operations;
- A plan for separation and storage of topsoil and subsoil;
- Approximate cut and fill volumes of areas to be reclaimed (including pit areas);
- A plan for redistribution of topsoil over area to be reclaimed;
- Any necessary soil treatments or plantings;
- Planned seed mix;
- Planned weed control; and
- A plan for reclamation of associated project areas such as pipeline routes and access roads.

BLM_0029055

These projects will be constructed in compliance with SGI's stormwater discharge permit from Colorado Department of Public Health and Environment. A Stormwater Management Plan has been written for this permit that contains general practices and BMPs for drainage and erosion control (available separately).

Reclamation plans written for specific projects at the time of permitting may be amended at final abandonment if site-specific conditions warrant revision. At the time of the on-site and if future modifications to an existing reclamation plan are necessary, SGI will work with the surface owner and public agencies depending on the specifics of the reclamation project to choose a seed mix.

**Example of a BLM-recommended Seed Mix for Federal Projects in the Unit**

| Species | Cultivar | Desired % of Planting | PLS[1] lbs. per acre |
|---|---|---|---|
| Western Wheatgrass | Arriba | 15 | 1.5 |
| Slender Wheatgrass | San Luis | 15 | 1.05 |
| Bottlebrush Squirreltail | | 15 | 1.2 |
| Mountain Brome | | 15 | 1.8 |
| Big Bluegrass | | 10 | 0.3 |
| Canada Wildrye | | 10 | 1.1 |
| American Vetch | | 3 | 0.75 |
| Rocky Mountain Penstemon | | 6 | 0.12 |
| Western Yarrow | | 6 | 0.06 |
| Mountain Big Sagebrush | | 5 | 0.05 |
| **Total** | | **100** | **7.93** |

[1]Pure live seed

## C.11   SURFACE OWNERSHIP

Public record contact information for each landowner (or public agency) directly affected by the project will be provided in the SUPO submitted with each APD. Those directly affected by a project are landowners who own property on which a well will be located, an access road will cross, and those over which a pipeline route will cross. SGI will make a good faith effort to provide each landowner a copy of the SUPO. SGI will certify that this effort was made for each project.

## C.12   OTHER INFORMATION

SGI will address any other requests for information contained in relevant orders and notices in this section. Site specific information that may be helpful in processing individual APDs will also be noted here.

SGI has a noxious weed management plan for the Bull Mountain Unit that is available in **Appendix E** of this record of decision. This plan identifies measures to be taken by SGI and its contractors to minimize the spread and establishment of noxious weeds and non-native invasive species.

BLM_0029056

Measures identified in this plan apply to work within the project area defined as well pads, pipeline rights-of-way, access roads, temporary use areas, and other areas used in association with the natural gas development within the Bull Mountain Unit and adjacent areas in Gunnison County. All noxious weeds as defined by Gunnison County and the state of Colorado (Colorado Weed Noxious Weed Act, Colorado Revised Statute Title 35, Article 5.5 as amended) will be controlled.

The purpose of this plan is to prescribe methods to treat existing weed infestations, prevent introduction and spread of infestations during construction, and monitor and treat infestations after construction is complete.

In addition to selecting the site-specific BMPs related to each element of the SUPO, additional BMPs and design features that further address the following issues and resources may be included here in future APDs:

- Common siting and surface disturbing BMPs on well pads, roads, and pipelines;
- Natural gas drilling and exploration;
- Noise;
- Protection of archaeological and cultural resources;
- Protection of water resources;
- Wildlife; and
- Invasive, non-native species.

BLM_0029057

This page intentionally left blank.

BLM_0029058

# APPENDIX D
# MASTER DRILLING PLAN

This Master Drilling Plan will be used by SG Interests I, Ltd. (SGI) in preparation of the Drilling Plan component of future applications for permit to drill (APDs) in the Bull Mountain Unit.

Federal Onshore Order No. 2 details the uniform national standards for the minimum levels of performance expected from lessees and operators when conducting drilling operations and for abandonment. The Drilling Plan, sometimes referred to as the 9 Point Drilling Plan, provides the BLM information necessary to ensure that drilling is conducted with appropriate regard for protection of public health and safety, the environment (including subsurface resources such as groundwater), correlative rights and maximum economic recovery of hydrocarbons. The Drilling Plan is submitted in conjunction with the Surface Use Plan of Operations as part of a complete APD package. The elements of an individual APD will be carefully reviewed by the BLM to ensure that proposed operations are adequate.

Drilling plans in the Bull Mountain Unit may address seven different well types or categories:

- Unconventional, vertical and/or short reach directional, Cameo/South Canyon coalbed natural gas (CBNG) wells with relatively shallow total vertical depths (i.e.; those above approximately 4,500 feet Proposed Total Depth – True Vertical Depth [PTD–TVD]);

- Unconventional, long reach horizontal, CBNG wells with relatively shallow total vertical depths (i.e.; those above approximately 4,500 feet PTD–TVD);

- Conventional, vertical and/or short reach directional, Cozzette/Corcoran sandstone gas wells with moderate total vertical depths (i.e.; those approximately 4,500 feet – 5,750 feet PTD–TVD);

- Conventional, long reach horizontal, Cozzette/Corcoran sandstone gas wells with moderate total vertical depths (i.e.; those approximately 4,500 feet – 5,750 feet PTD–TVD);

- Unconventional, vertical and/or short reach directional, Mancos shale gas wells with relatively deep total vertical depths (i.e.; approximately 5,750 feet – 8,500 feet PTD–TVD);

BLM_0029059

- Unconventional, long reach horizontal, Mancos shale gas wells with relatively deep total vertical depths (i.e.; approximately 5,750 feet – 8,500 feet PTD–TVD); and

- Vertical, Entrada/Maroon/Dakota water disposal wells with very deep total vertical depths (i.e.; greater than approximately 8,500 feet PTD–TVD).

The Drilling Plan component of an individual APD must specifically address all the following elements as required in Federal Onshore Order No. 2. A "complete" Drilling Plan will also include any design features/BMPs chosen by the operator to mitigate potential impacts. As much as possible, the information below responds to the elements in the Drilling Plan component of an APD as described in Federal Onshore Order No. 2 and suggests what may be expected in a forthcoming site specific APD. However, this Master Drilling Plan may not identify or specify all design features or BMPs. Those may be found in the following appendices associated with the Bull Mountain Unit Master Development Plan Final EIS:

- Appendix B, Construction, Drilling, Completion, and Reclamation; and

- Appendix C, Design Features, Mitigation Measures, and Conditions of Approval.

**DRILLING PLAN ELEMENTS OF THE APD**

## 1.  Geologic Information

Values in **Table D-1** represent the general range for approximate measured depth to formation tops and estimates for depth and thickness to potential producing and water disposal zones in the Bull Mountain Unit. A complete list will be expected in a submitted drilling plan. Specific measurements included in APDs will differ because formation depths vary throughout the unit.

*A. Estimated Formation Tops*

**Table D-1**
**Estimated Depth, Formation Tops[1]**

| Formation/Group | Depth of Top (feet) |
|---|---|
| Wasatch | Surface |
| Ohio Creek | 2,400 |
| Mesa Verde | 2,700 |
| South Canyon | 3,270–3,870 |
| Cameo Coal | 3,760–4,360 |
| Rollins Sandstone | 3,580–5,400 |
| Cozzette | 4,570–5,180 |
| Corcoran | 4,740–5,380 |
| Mancos Shale | 4,940–5,000 |
| Entrada | 8,900 |
| Maroon | 9,300 |

[1] General range for measured depth to formation tops in the Bull Mountain Unit. Specific measurements included on APDs will differ.

*B. Estimated Depth and Thickness of Formations*

The BLM will also expect to see similar information for useable water and other mineral bearing zones.

BLM_0029060

**Table D-2**
**Estimated Depth and Thickness of Target Formations [1]**

| Name | Depth (feet) | Thickness (feet) |
|------|-------------|------------------|
| South Canyon | 3,270–3,870 | 100 |
| Cameo Coal | 3,760–4,360 | 100 |
| Cozzette-Corcoran | 4,570–5,380 | 300 |
| Mancos | 4,940–5,000 | 3,000 |
| Maroon (primary disposal target) | 9,300 | 100 |
| Entrada (possible disposal target) | 8,900 | 200 |

[1] Estimates for depth and thickness of formations with gas that have been targeted to date.

## 2.    Well Control Requirements

Blowout preventer (BOP) and related equipment (BOPE) shall be installed, used, maintained and tested in manner necessary to assure well control and shall be in place and operational prior to drilling the surface casing shoe unless otherwise approved by the APD.

### A. Minimum Specifications for Pressure Control Equipment

BOP equipment and accessories will meet or exceed BLM requirements outlined in 43 CFR Part 3160. A 3,000 or a 5,000 pounds per square inch gauge (psig) double ram hydraulic BOP will be used (a diagram of the specific device will be attached; see typical diagrams in **Attachment 1**, Typical Pressure Control Mechanisms) for the intermediate portion of the well (generally 400 feet–5,400 feet). Maximum anticipated surface pressure is 2,300–2,500 psig. Accessories to the BOP will meet BLM requirements for the system used. The accumulator system capacity will be sufficient to close all BOPE with a 50 percent safety factor. Fill line, kill line and line to choke manifold will be 2". BOPs will be function-tested every 24 hours and will be recorded on an International Association of Drilling Contractors (IADC) log. Surface casing will be tested to 1,500 psig for 30 minutes. Accessories to BOPE will include upper and lower Kelly cocks with handles, stabbing valve to fit drill pipe on floor at all times, string float at bit, 3000 or 5000 psig choke manifold with 3-inch adjustable and 3-inch positive chokes, and pressure gauge.

## 3.    Casing and Cementing Program

The proposed casing and cementing programs shall be conducted to protect and/or isolate all usable water zones, lost circulation zones, abnormally pressured zones and any prospectively valuable deposits of minerals. Any isolating medium other than cement shall receive approval prior to use. The casing setting depth shall be calculated to position the casing seat opposite a competent formation that will contain the maximum pressure to which it will be exposed during normal drilling operations. Determination of casing setting depth shall be based on all relevant factors including: presence/absence of hydrocarbons, fracture gradients, usable water zones, formation pressures, lost circulation zones, other minerals, or other unusual characteristics. Design criteria, loading assumptions and safety factors for burst, collapse and tension will be included along with the casing design. All indications of usable water encountered shall be reported.

Cementing descriptions will include the amount, type of cement including additives for each slurry, density, yield cement height and any excess cement volume that the operator anticipates needing to achieve that cement height. If stage cementing is going to be done, placement of the differential valve (DV) tool should be listed.

BLM_0029061

*A. Casing Program*

Typical casing details and wellbore diagrams are included in **Attachment 2**. Specific programs will be submitted to BLM with each APD.

*B. Cementing Program*

Typical cementing program details are included in the wellbore diagrams in Attachment 2. Specific programs will be submitted to BLM with each APD. Please note that these wellbore diagrams show a cemented casing string on all horizontal completions. This is the method SGI has used so far; however, the horizontal section of the well may not always be cemented. In the event this section is not cemented, a packer system that swells would be used.

A DV tool will usually be used to help ensure cement is circulated to surface. In coal and Cozzette/Corcoran wells the DV tool will be run in the production string. In vertical and horizontal shale wells the DV tool will be run in the intermediate string. In water disposal wells a DV tool will be run in the intermediate and production strings.

Surface casing cement is calculated to return to the surface (100 percent excess volume). After the cement job is pumped, a one inch pipe is run on the outside of the casing and +/- 50 sacks of cement are used to top off the annulus. If the cement does not circulate back to the surface, a temperature log is run to find the top of cement. At this point, corrective measures are taken if necessary.

**Table D-3** provides an example of a typical casing and cementing program for a horizontal shale well.

**Table D-3**
**Typical Casing and Cementing Program, Horizontal Shale Well**

| String | Size of Hole (inches) | Size of Casing (inches) | Weight Per Foot (lbs.) | Grade | Setting Depth (Measured Depth; MD, feet) | Sacks Cement | Cement Bottom (feet) | Cement Top (feet) |
|---|---|---|---|---|---|---|---|---|
| Conductor | 26 | 20 | 106.5 | X-42/A-53 | 80 | 100 | 80 | Surface (0') |
| Surface | 16 | 13.375 | 54.5 | J-55 | 400 | 260 | 400 | Surface (0') |
| 1st Inter. | 12.125 | 9.625 | 40.0 | J-55 | 5,500 | 1,280 | 5,500 | Surface (0') |
| 2nd Inter. | 8.5 | 7 | 29.0 | P-110 | 9,074 | 355 | 9,074 | 5,300 |
| Prod. Lnr. | 6.125 | 4.50 | 13.5 | P-110 | 12,727–8,110 | 235 | 12,727 | 8,100 |

**Table D-4** provides an example of a casing and cementing program for a vertical coalbed methane well in the Bull Mountain Unit.

BLM_0029062

**Table D-4**
**Typical Casing and Cementing Program, Vertical Coalbed Methane Well**

| String | Size of Hole (inches) | Size of Casing (inches) | Weight per Foot (lbs.) | Grade | Setting Depth (MD, feet) | Sacks Cement | Cement Bottom (feet) | Cement Top (feet) |
|---|---|---|---|---|---|---|---|---|
| Surface | 12.25 | 9.625 | 24 | J-55 | 300 | 210 | 300 | Surface |
| Production | 8.5 | 5.5 | 17 | J-55 | 3,600 | 1st stage: 220<br>2nd stage: 300 + 100 | 3,600 | Surface |

## 4.    Mud Program Requirements

The characteristics, use and testing of drilling mud and the implementation of related drilling procedures shall be designed to prevent the loss of well control. Sufficient quantities of mud materials shall be maintained or readily accessible for the purpose of assuring well control.

*Mud Program*
In general, a freshwater based spud mud system (FW) will be used for the surface hole. Primary product used will be gel for viscosity control. A low-solids, non-dispersed gel system (LSND) will be used throughout the intermediate hole as well as the production hole. Products used may include but not be limited to Barite for weighting material, gel for viscosity control, lime for alkalinity control, low viscosity polyanionic cellulose (Pac LV) for fluid loss, Desco for rheological control and to reduce gel strengths, and lost circulation materials (LCM) such as fibers, saw dust or walnut shells. Solids control equipment will include shakers and a centrifuge.

Fluid densities will be maintained as low as possible to drill with minimal over-balance to reduce the possibility of losing returns and/or differentially sticking the drill sting. Hole conditions and drilling parameters will be monitored closely for indications of increases in formation pressures. Fluid densities will be adjusted accordingly. Optimum hydraulics will be maintained to provide maximum hole cleaning and minimize washout of the wellbore. Rheological properties will be adjusted for optimum bit hydraulics, penetration rates and minimize drag forces on the wellbore. Hole conditions and mud properties will be optimized prior to running logs, running casing and cementing. Adequate amounts of lost circulation and weighting material will be on location if needed as well as sorptive agents to handle potential spills of fuel or lubricants. The maximum mud weight (12.2 pounds per gallon) was experienced at intermediate casing point (+/-5,400 feet).

**Table D-5**
**Drilling Mud Program**

| Depth (feet) | Type | Weight (parts per gallon) | Viscosity (seconds per quart) | Water loss (cubic centimeters) | Solids |
|---|---|---|---|---|---|
| 0–400 | FW | ± 8.5 – 8.7 | 30 – 40 | NC[1] | <7% |
| 400–5,400 | LSND | ± 8.7 – 12.2 | 40 – 70 | 6 – 8 | <7% |
| 5,400–Total depth | LSND | ± 9.0 – 10.0 | 40 – 70 | 6 – 8 | <7% |

[1] Not controlled—Due to the rapid speed of drilling through the first 400 feet, combined with short turnaround time to setting of surface casing, the amount of water loss in this segment cannot be controlled.

BLM_0029063

In some cases, oil-based drilling mud may be used. This mud may be used only on part of the wellbore. Oil-based mud is 85 percent diesel and 15 percent water.

## 5.      Drill Stem Testing Requirements

*Testing, Coring, and Logging Program*
Generally, no drill stem tests or cores are planned (these could be added to a specific well drilling plan submitted with an APD). Open hole logs to include gamma ray, induction, caliper, and density logs generally from 5,400 feet to 400 feet and gamma ray, induction, caliper, density and formation micro image logs generally from TD to 5,400 feet.

## 6.      Special Drilling Operations

*Anticipated Drilling Conditions*
Lost circulation is possible. If encountered, lost circulation material will be maintained on location. Intermediate casing will be set at approximately 5,400 feet to isolate potential shallower lost circulation zones. Both the intermediate and long strings will have two stage cementing jobs performed. No hydrogen sulfide ($H_2S$) is expected in new wells in the Bull Mountain Unit. $H_2S$ been not been encountered in the drilling of any previous wells.

## 7.      Other Facets of the Proposal

*Operations*
When an individual APD is submitted to BLM, the anticipated spud date will be included in this section, along with the estimated drilling timeframe. Average drilling and completion durations for each well type are shown on the wellbore diagrams (**Attachment 2**, Typical Wellbore Diagrams). Completion details will also be included in this section, such as approximate timeframe for completion. All gas wells will require hydraulic fracturing. All horizontal gas wells will have multiple completion stages. **Attachment 2** includes general examples of wellbore diagrams.

BLM_0029064

# ATTACHMENT 1:

# TYPICAL PRESSURE CONTROL MECHANISMS

BLM_0029065

BLM_0029066

# 3-M SYSTEM



BLM_0029067

5-M Choke Manifold Diagram

## 5M BOP



## 5M BOP



5N CHOKE MANIFOLD EQUIPMENT - CONFIGURATION OF CHOKES MAY VARY

Although not required for any of the choke manifold systems, buffer tanks are sometimes installed downstream of the choke assemblies for the purpose of manifolding the bleed lines together. When buffer tanks are so played, valves shall be installed upstream to isolate a failure or malfunction without interrupting flow control. Though not shown on 2M, 3M, 10M, OR 15M drawings, it would also be applicable to those situations.
(Se F5 1502I, Sept. 27, 1989)

6

BLM_0029068

# ATTACHMENT 2:

# TYPICAL WELLBORE DIAGRAMS

BLM_0029069

BLM_0029070



**SG INTERESTS**

**TYPICAL AS DRILLED WBD VERTICAL MANCOS WELL**

**Lease:** Typical Vertical Mancos Well
**Well :**
**Area:** Gunnison County, Colorado
**Field:** Bull Mountain

**Location :**
**BHL:**
**Survey:**
**API No:**

**ESTIMATED DAYS**
**Est. Drill Case & Suspend Days:** 32
**Est. Completion Days:** 14
**Est. Total Days:** 46
**Date:** October 15, 2013

| Directional | Markers | Depth TVD | Depth MD | Casing Profile | Hole Size | Casing Details | Mud Wt. & Type | MAX Dogleg |
|---|---|---|---|---|---|---|---|---|
| None | | | +/- 80' | | Pre-Set | 20" Welded Conductor | N/A | |
| | | | | | 16" Hole | | Water Spud Mud | |
| None | | 400' | 400' | | | 13-3/8" 54.5# J-55 STC | MW=9.1 | <1°/100' |
| None | | | | | | | 9.1 WBM | |
| | 9-5/8"DV Tool | 3,550' | 3,550' | | 12-1/4" Hole | | | |
| | TOC | 4,700' | 4,700' | | | | | |
| | | 5,000' | 5,000' | | | 9-5/8" 40# J-55 LTC | MW=12.2 | <1°/100' |
| | | | | 8.5 PPG KCL | 8-1/2" Hole | | | |
| | Float Collar | 8,160' | 8,160' | | | | WBM | |
| TD | Float Shoe | 8,200' | 8,200' | | | 5-1/2" 17# P-110 LTC | MW 10.8 | <1°/100' |

**Note: Not to Scale**

BLM_0029071



### SG INTERESTS

#### TYPICAL AS DRILLED WBD VERTICAL COZ-COR WELL

**Lease:** Typical Vertical Coz-Cor Well     **Location :**
**Well :**                                   **BHL:**
**Area:** Gunnison County, Colorado          **Survey:**
**Field:** Bull Mountain                     **API No:**

**ESTIMATED DAYS**
**Est Drill Case & Suspend Days:** 18
**Est. Completion Days:** 7
**Est. Total Days:** 25
**Date:** October 15, 2013

| Directional | Markers | Depth TVD | Depth MD | Casing Profile | Hole Size | Casing Details | Mud Wt. & Type | MAX Dogleg |
|---|---|---|---|---|---|---|---|---|
| None | | | +/- 80 | | Pre-Set | 16" 75# J-55 Conductor | N/A | |
| | | | | | 12-1/4" Hole | | Water Spud Mud | |
| None | | 400' | 400' | | | 9-5/8" 40# J-55 LTC | MW=9.1 | <1°/100' |
| None | | | | | | | 9.1 WBM | |
| | | | | | 8-1/2" Hole | | | |
| | 5-1/2" DV Tool | 3,600' | 3,600' | | | | | |
| | | | | 8.5 PPG KCL | 8-1/2" Hole | | | |
| | Float Collar | 5,610' | 5,610' | | | | | |
| TD | Float Shoe | 5,650' | 5,650' | | | 5-1/2" 17# N-80 LTC | WBM MW 12.2 | <1°/100' |

**Note: Not to Scale**

BLM_0029072



# SG INTERESTS

## TYPICAL AS DRILLED WBD VERTICAL COAL WELL

**Lease:** Typical Vertical Coal Well
**Well :**
**Area:** Gunnison County, Colorado
**Field:** Bull Mountain

**Location :**
**BHL:**
**Survey:**
**API No:**

| ESTIMATED DAYS | |
|---|---|
| Est. Drill Case & Suspend Days: | 13 |
| Est. Completion Days: | 7 |
| Est. Total Days: | 20 |

**Date:** October 15, 2013

| Directional | | Markers | Depth TVD | Depth MD | Casing Profile | Hole Size | Casing Details | Mud Wt. & Type | MAX Dogleg |
|---|---|---|---|---|---|---|---|---|---|
| None | | | | +/- 80' | | Pre-Set | 16" 75# J-55 Conductor | N/A | |
| | | | | | | 12-1/4" Hole | | Water Spud Mud | |
| None | | | 400' | 400' | | | 9-5/8" 40# J-55 LTC | MW=9.1 | <1°/100' |
| None | | | | | | 8-1/2" Hole | | 9.1 WBM | |
| | | 5-1/2" DV Tool | 3,031' | 3,031' | | | | | |
| | | | | | | 8-1/2" Hole | | | |
| | | Float Collar | 3,710' | 3,710' | | | | | |
| TD | | Float Shoe | 3,750' | 3,750' | | | 5-1/2" 17# N-80 LTC | WBM MW=9.6 | <1°/100' |

**Note: Not to Scale**

## SG INTERESTS

### TYPICAL AS DRILLED WBD S-CURVE COZ-COR WELL

| | | | | | |
|---|---|---|---|---|---|
| **Lease:** Typical S-Curve Coz-Cor Well | **Location :** | | **ESTIMATED DAYS** | | |
| **Well :** | **BHL:** | | Est. Drill Case & Suspend Days: | | **21** |
| **Area:** Gunnison County, Colorado | **Survey:** | | Est. Completion Days: | | **7** |
| **Field:** Bull Mountain | **API No:** | | Est. Total Days: | | **28** |
| | | | **Date:** October 15, 2013 | | |

| Directional | Markers | Depth | | Casing Profile | Hole Size | Casing Details | Mud Wt. & Type | MAX Dogleg |
|---|---|---|---|---|---|---|---|---|
| | | TVD | MD | | | | | |
| None | | | +/- 80' | | Pre-Set | 16" 75# J-55 Conductor | N/A | |
| | | | | | 12-1/4" Hole | | Water Spud Mud | |
| None | | 400' | 400' | | | 9-5/8" 40# J-55 LTC | MW=9.1 | <1°/100' |
| | | | | | | | 9.1 WBM | |
| KOP 2.5°/100' | KOP 2.5°/100' | 607' | 607' | | | | | 2°/100' |
| EOB (23.6°) Drop | EOB (23.6°) Drop 1.555°/100' | 1,525' | 1,551' | | 8-1/2" Hole | | | 2°/100' |
| Vertical | Vertical | 3,000' | 3,069' | | | | | |
| | 5-1/2" DV Tool | 3,600' | 3,669' | | | | | |
| | | | | 8.5 PPG KCL | 8-1/2" Hole | | | |
| | Float Collar | 5,612' | 5,679' | | | | WBM MW 12.2 | |
| TD | Float Shoe | 5,650' | 5,719' | | | 5-1/2" 17# N-80 LTC | | <1°/100' |

**Note: Not to Scale**

BLM_0029074



## SG INTERESTS

### TYPICAL AS DRILLED WBD S-CURVE MANCOS WELL

| | |
|---|---|
| **Lease:** Typical S-Curve Mancos Well | **Location :** |
| **Well :** | **BHL:** |
| **Area:** Gunnison County, Colorado | **Survey:** |
| **Field:** Bull Mountain | **API No:** |

**ESTIMATED DAYS**
Est. Drill Case & Suspend Days: 35
Est. Completion Days: 14
Est. Total Days: 49
Date: October 15, 2013

| Directional | Markers | Depth TVD | Depth MD | Casing Profile | Hole Size | Casing Details | Mud Wt. & Type | MAX Dogleg |
|---|---|---|---|---|---|---|---|---|
| None | | | +/- 80' | | Pre-Set | 20" Welded Conductor | N/A | |
| | | | | | 16" Hole | | Water Spud Mud | |
| None | | 400' | 400' | | | 13-3/8" 54.5# J-55 STC | MW=9.1 | <1°/100' |
| KOP 2°/100' | KOP 2°/100' | 3,163' | 3,163' | | | | 9.1 WBM | 2°/100' |
| | 9-5/8"DV Tool | 3,550' | 3,551' | | 12-1/4" Hole | | | |
| EOB (20°) Drop | EOB (20°) Drop 1.055°/100' | 4,163' | 4,163' | | | | | |
| | TOC | 4,707' | 4,753' | | | | | |
| | | 5,000' | 5,053' | | | 9-5/8" 40# J-55 LTC | MW=12.2 | 2°/100' |
| Vertical | | 6,000' | 6,059' | | | | | |
| | | | | 8.5 PPG KCL | 8-1/2" Hole | | | |
| | Float Collar | 9,060' | 9,118' | | | | WBM MW 10.8 | |
| TD | Float Shoe | 9,100' | 9,158' | | | 5-1/2" 17# P-110 LTC | | <1°/100' |

Note: Not to Scale

BLM_0029075

## SG INTERESTS

### TYPICAL AS DRILLED WBD S-CURVE COAL WELL

Lease: Typical S-Curve Coal Well  Location :
Well :  BHL:
Area: Gunnison County, Colorado  Survey:
Field: Bull Mountain  API No:

| ESTIMATED DAYS | |
|---|---|
| Est. Drill Case & Suspend Days: | 16 |
| Est. Completion Days: | 7 |
| Est. Total Days: | 23 |
| Date: October 15, 2013 | |

| Directional | Markers | Depth | | Casing Profile | Hole Size | Casing Details | Mud Wt. & Type | MAX Dogleg |
|---|---|---|---|---|---|---|---|---|
| | | TVD | MD | | | | | |
| None | | | +/- 80' | | Pre-Set | 16" 75# J-55 Conductor | N/A | |
| | | | | | 12-1/4" Hole | | Water Spud Mud | |
| | | | 400' | | | 9-5/8" 40# J-55 LTC | MW=9.1 | <1°/100' |
| KOP 2.5°/100' | KOP 2.5°/100' | 607' | 607' | | | | 9.1 WBM | 2°/100' |
| | | | | | 8-1/2" Hole | | | |
| EOB (23.6°) Drop | EOB (23.6°) Drop 1.555°/100' | 1,525' | 1,551' | | | | | 2°/100' |
| Vertical | Vertical | 3,000' | 3,069' | | | | | |
| | 5-1/2" DV Tool | 3,031' | 3,100' | | | | | |
| | | | | 8.5 PPG KCL | 8-1/2" Hole | | | |
| | Float Collar | 3,710' | 3,779' | | | | | |
| TD | Float Shoe | 3,750' | 3,819' | | | | 5-1/2" 17# N-80 LTC | WBM MW=9.6 | <1°/100' |

Note: Not to Scale

BLM_0029076



| OPERATOR: SG Interests | LEASE / WELL: **Typical Horizontal Mancos w/ Protection Casing** | | SURVEY LOCATION: | DATE 10/15/2013 |
|---|---|---|---|---|
| DRILLING RIG: | COUNTY / STATE: **Gunnison County, CO.** | | SURFACE LOCATION: | FIELD: **Bull Mountain Unit** |

**20/40**

### HORIZONTAL HOLE

KOP   7,679'   11° /100'

EOB   8,497'   MD   8,200'   TVD

### TABULAR DATA

| Tubulars | Size | Weight | Grade | Thread | MD | TVD | TOL |
|---|---|---|---|---|---|---|---|
| DRIVE PIPE | | | | | | | |
| CONDUCTOR | 20" | 106.5# | X-42 / A-53 | Welded | 80' | 80' | |
| SURFACE | 13-3/8" | 54.5# | J-55 | ST&C | 400' | 400' | |
| INTERMEDIATE | 9-5/8" | 40# | J-55 | LT&C | 5,000' | 5,000' | |
| PROTECTION | 7" | 29# | P-110 | LT&C | 7,580' | 7,580' | |
| PROTECTION | 7" | 29# | P-110 | BUTT | 8,497' | 8,200' | |
| PROD LINER | 4-1/2" | 13.5# | P-110 | TKC 4040 RTC | 13,497' | 8,200' | 7,580' |
| PROD TIEBACK | | | | | | | |
| PROD LINER | | | | | | | |
| TUBING (Short String) | | | | | | | |
| TUBING (Long String) | | | | | | | |
| COILED TUBING | | | | | | | |

### DRILLING / COMPLETION FLUID

| DRILLING FLUID: | ppg - |
|---|---|
| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| COMPLETION FLUID: | ppg - |
| PACKER FLUID: | ppg - |

### ESTIMATED DAYS

Est. Drill Case & Suspend Days:  64

Est. Completion Days:  21

Est Total Days:  85

ELEVATIONS:
RKB:   GROUND ELEVATION
RKB-ELEV:

---

### WELLBORE SKETCH
**DRAWING NOT TO SCALE**

26" Hole
80'
16"
400'
12-1/4"
TOC
5,000'
8-1/2"
2% KCL Water
7,580'

20"
13-3/8"
**9-5/8" DV Tool @ 3,550'**
9-5/8"
TOL (4.5")

### Formation Tops (TVD)

| DEPTH MD | INCL DEG | DEPTH TVD |
|---|---|---|

COMMENTS:    Working Interest:      PLUG BACK DEPTH:
API #       Net Revenue Interest:    TOTAL WELL DEPTH:
Property#                      | PREPARED OR REVISED BY: | DATE: |
Spud Date:                    | Dennis Romero | October 15, 2013 |

7"   6-1/8" Hole   **Landing Collar@ 12,412'**   4-1/2"

8,497'   5,000'  H O R I Z O N T A L   L A T E R A L   13,497'

### TYPICAL WBD MANCOS HORIZONTAL W/ PROTECTION CASING

BLM_0029077



| | | | | |
|---|---|---|---|---|
| | OPERATOR: SG Interests | LEASE / WELL: Typical Horizontal Mancos No Protection Casing | SURVEY LOCATION: | DATE 10/15/2013 |
| | DRILLING RIG: COMPLETION RIG: | COUNTY / STATE: Gunnison County, CO. | SURFACE LOCATION: | FIELD: Bull Mountain Unit |

**HORIZONTAL HOLE**

| | | | | |
|---|---|---|---|---|
| KOP | 7,679' | 11° /100' | | |
| EOB | 8,497' | MD | 8,200' | TVD |

**DRILLING / COMPLETION FLUID**

| | |
|---|---|
| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| COMPLETION FLUID: | ppg - |
| PACKER FLUID: | ppg - |

**TUBULAR DATA**

| Tubulars | Size | Weight | Grade | Thread | MD | TVD | TOL |
|---|---|---|---|---|---|---|---|
| DRIVE PIPE | | | | | | | |
| CONDUCTOR | 20" | 106.5# | X-42 / A-53 | Welded | 80' | 80' | |
| SURFACE | 13-3/8" | 54.5# | J-55 | ST&C | 400' | 400' | |
| INTERMEDIATE | 9-5/8" | 40# | J-55 | LT&C | 5,000' | 5,000' | |
| PRODUCTION | 5-1/2" | 17# | P-110 | LT&C | 7,580' | 7,580' | |
| PRODUCTION | 5-1/2" | 17# | P-110 | BUTT | 13,497' | 8,200' | |
| PROD LINER | | | | | | | |
| PROD TIEBACK | | | | | | | |
| PROD LINER | | | | | | | |
| TUBING (Short String) | | | | | | | |
| TUBING (Long String) | | | | | | | |
| COILED TUBING | | | | | | | |

**ESTIMATED DAYS**

| | |
|---|---|
| Est. Drill Case & Suspend Days: | 57 |
| Est. Completion Days: | 21 |
| Est Total Days: | 78 |

| | |
|---|---|
| ELEVATIONS: RKB: RKB-ELEV: | GROUND ELEVATION |

**WELLBORE SKETCH**

DRAWING NOT TO SCALE

| Formation Tops (TVD) | | | | DEPTH MD | INCL DEG | DEPTH TVD |
|---|---|---|---|---|---|---|
| 9-5/8" DV Tool @ 3,550' | | | | | | |

| | | | | |
|---|---|---|---|---|
| COMMENTS: | Working Interest: | PLUG BACK DEPTH: | | |
| API # | Net Revenue Interest: | TOTAL WELL DEPTH: | | |
| Property# | | PREPARED OR REVISED BY: | DATE: | |
| Spud Date: | | Dennis Romero | October 15, 2013 | |

**TYPICAL WBD MANCOS HORIZONTAL NO PROTECTION CASING**

O:\01 Bull Mountain Unit\014 BMU General Permits\MDP EIS\EIS Docs\PA docs\WBD Typical Horizontal Gunnison County Colorado Mancos Well No Protection Casing.xls



| OPERATOR: | LEASE / WELL: | SURVEY LOCATION: | DATE |
|---|---|---|---|
| **SG Interests** | **Typical Horizontal Coz-Cor Well** | | **10/15/2013** |
| DRILLING RIG: | COUNTY / STATE: | SURFACE LOCATION: | FIELD: |
| COMPLETION RIG: | **Gunnison County, CO.** | | **Bull Mountain** |

### HORIZONTAL HOLE
20/40

KOP   4,279'   11° /100'

EOB   5,097'  MD   4,800'  TVD

### TUBULAR DATA

| Tubulars | Size | Weight | Grade | Thread | MD | TVD | TOL |
|---|---|---|---|---|---|---|---|
| DRIVE PIPE | | | | | | | |
| CONDUCTOR | 16" | 42# | A-52A | Welded | 80' | 80' | |
| SURFACE | 9-5/8" | 40# | J-55 | LTC | 400' | 400' | |
| INTERMEDIATE | | | | | | | |
| PROTECTION | | | | | | | |
| PROTECTION | | | | | | | |
| PRODUCTION | 5-1/2" | 17# | P-110 | LTC | 4,179' | 4,179' | |
| PRODUCTION | 5-1/2" | 17# | P-110 | BUTT | 10,097' | 4,800' | |
| PROD LINER | | | | | | | |
| TUBING  (Short String) | | | | | | | |
| TUBING  (Long String) | | | | | | | |
| COILED TUBING | | | | | | | |

### ESTIMATED DAYS

Est. Drill Case & Suspend Days:  36

Est. Completion Days:  14

Est Total Days:  50

### DRILLING / COMPLETION FLUID

| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| COMPLETION FLUID: | ppg - |
| PACKER FLUID: | ppg - |

ELEVATIONS:
RKB:
RKB-ELEV:

GROUND ELEVATION

### WELLBORE SKETCH

DRAWING NOT TO SCALE

26"

80'

16"

12-1/4"

12"

9-5/8"

8-1/2"

**5-1/2" DV TOOL @ 3,600'**

2% KCL Water

### Formation Tops (TVD)

| | DEPTH MD | INCL DEG | DEPTH TVD |
|---|---|---|---|

COMMENTS:

API #

Property#

Spud Date:

Working Interest:

Net Revenue Interest:

PLUG BACK DEPTH:

TOTAL WELL DEPTH:

PREPARED OR REVISED BY:
Dennis Romero

DATE:
October 15, 2013

8-1/2" Hole

**Landing Collar@ 10,012'**

5-1/2"

5,097'

5,000 ' H O R I Z O N T A L  L A T E R A L

10,097'

## TYPICAL WBD COZ_COR HORIZONTAL

O:\01 Bull Mountain Unit\014 BMU General Permits\MDP EIS\EIS Docs\PA docs\WBD Typical Horizontal Gunnison County Colorado Coz-Cor Well.xls

BLM_0029079



| OPERATOR: | LEASE / WELL: | SURVEY LOCATION: | DATE |
|---|---|---|---|
| **SG Interests** | **Typical Horizontal Coal Well** | | **10/15/2013** |
| DRILLING RIG: | COUNTY / STATE: | SURFACE LOCATION: | FIELD: |
| COMPLETION RIG: | **Gunnison County, CO.** | | **Bull Mountain** |

20/40

**HORIZONTAL HOLE**

KOP  2,979'   11° /100'

EOB  3,797'  MD  3,500'  TVD

**DRILLING / COMPLETION FLUID**

| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| DRILLING FLUID: | ppg - |
| COMPLETION FLUID: | ppg - |
| PACKER FLUID: | ppg - |

### TUBULAR DATA

| Tubulars | Size | Weight | Grade | Thread | MD | TVD | TOL |
|---|---|---|---|---|---|---|---|
| DRIVE PIPE | | | | | | | |
| CONDUCTOR | 16" | 42# | A-52A | Welded | 80' | 80' | |
| SURFACE | 9-5/8" | 40# | J-55 | LTC | 400' | 400' | |
| INTERMEDIATE | | | | | | | |
| PROTECTION | | | | | | | |
| PROTECTION | | | | | | | |
| PRODUCTION | 5-1/2" | 17# | P-110 | LTC | 2,879' | 2,879' | |
| PRODUCTION | 5-1/2" | 17# | P-110 | BUTT | 8,797' | 3,500' | |
| PROD LINER | | | | | | | |
| TUBING (Short String) | | | | | | | |
| TUBING (Long String) | | | | | | | |
| COILED TUBING | | | | | | | |

### ESTIMATED DAYS

Est. Drill Case & Suspend Days:  25

Est. Completion Days:  14

Est Total Days:  39

ELEVATIONS:
RKB:
RKB-ELEV:

GROUND ELEVATION

---

### WELLBORE SKETCH

DRAWING NOT TO SCALE

26"

80'                    16"

12-1/4"               12"

9-5/8"

8-1/2"

5-1/2" DV TOOL @ 3,031'

2% KCL Water

### Formation Tops (TVD)

| | | | DEPTH MD | INCL DEG | DEPTH TVD |
|---|---|---|---|---|---|

| COMMENTS: | | PLUG BACK DEPTH: | |
|---|---|---|---|
| | Working Interest: | TOTAL WELL DEPTH: | |
| API # | Net Revenue Interest: | **PREPARED OR** | **DATE:** |
| Property# | | **REVISED BY:** | |
| Spud Date: | | Dennis Romero | October 15, 2013 |

8-1/2" Hole                    Landing Collar@ 8,712'          5-1/2"

3,797'    ⟵  5,000 '  H O R I Z O N T A L   L A T E R A L  ⟶    8,797'

## TYPICAL WBD COAL HORIZONTAL

BLM_0029080

# APPENDIX E
# NOXIOUS WEED MANAGEMENT PLAN

## E.1   INTRODUCTION

This Noxious Weed Management Plan (plan) identifies measures to be taken by SG Interests I, Ltd. (SGI) and its contractors (Contractor) to minimize the spread and establishment of noxious weeds and nonnative invasive species.

Measures identified in this plan apply to work within the project area defined as well pads, pipeline rights-of-way, access roads, temporary use areas, and other areas used in association with the natural gas development within the Bull Mountain Unit and adjacent areas in Gunnison County.

### E.1.1   Purpose

SGI is committed to preventing the introduction of noxious weeds during construction and controlling the expansion of existing noxious weed populations over the life of the project. All noxious weeds as defined by Gunnison County and the state of Colorado (Colorado Weed Management Act, Colorado Revised Statue Title 35, Article 5.5 as amended) will be controlled. The purpose of this plan is to prescribe methods to treat existing weed infestations, prevent introduction and spread of infestations during construction, and monitor and treat infestations after construction is complete.

## E.2   NOXIOUS WEED MANAGEMENT
## E.2.1   Weed Identification

The following noxious weeds are listed noxious weeds in the state of Colorado or in the Gunnison Basin Weed District Management Plan (**Table E-1**). The goal for Colorado A Listed weeds is eradication. The goal for B Listed weeds is to stop their spread. C Listed weeds are those weeds that are managed by local jurisdictions within the state of Colorado.

BLM_0029081

**Table E-1**
**Listed Noxious Weeds**

| Weed Name | Scientific Name | Gunnison Co. Listed | Colorado List (A, B, or C) |
|---|---|---|---|
| Absinthe wormwood | *Artemisia absinthium* | √ | B |
| African rue | *Peganum harmala* | | A |
| Black henbane | *Hyoscyamus niger* | √ | B |
| Bull thistle | *Cirsium vulgare* | | B |
| Burdock | *Arctium minus* | | C |
| Camelthorn | *Alhagi pseudalhagi* | | A |
| Canada thistle | *Cirsium arvense* | | B |
| Chicory | *Chichorium intybus* | | C |
| Common crupina | *Crupina vulgaris* | | A |
| Common St. Johnswort | *Hypericum perforatum* | | C |
| Cypress spurge | *Euphorbia cyparissias* | | A |
| Dalmatian toadflax | *Linaria dalmatica* | √ | B |
| Dame's rocket | *Hesperis matronalis* | √ | B |
| Diffuse knapweed | *Centaurea diffusa* | √ | B |
| Dyer's Woad | *Isatis tinctoria* | | A |
| Field bindweed | *Convolvulus arvensis* | √ | C |
| Giant salvinia | *Salvinia molesta* | | C |
| Halogeton | *Halogeton glomeratus* | | C |
| Hoary cress | *Cardaria draba* | √ | B |
| Houndstongue | *Cynoglossum officinale* | | B |
| Hydrilla | *Hydrilla verticillata* | | A |
| Jointed goatgrass | *Aegilops cylindrica* | | B |
| Leafy spurge | *Euphorbia esula* | √ | B |
| Meadow knapweed | *Centaurea pratensis* | | A |
| Mediterranean sage | *Salvia aethopis* | | A |
| Medusahead | *Taeniatherum caputmedusae* | | A |
| Myrtle spurge | *Euphorbia myrsinites* | | A |
| Musk thistle | *Carduus nutans* | √ | B |
| Orange hawkweed | *Hieracium aurantiacum* | √ | |
| Oxeye daisy | *Chrysanthemum leucanthemum* | √ | B |
| Plumeless thistle | *Carduus acanthoides* | √ | B |
| Poison hemlock | *Conium maculatum* | | C |
| Puncturevine | *Tribulus terrestris* | | C |
| Purple loosestrife | *Lythrum salicaria* | √ | A |
| Rush skeletonweed | *Chondrilla juncea* | | A |
| Russian knapweed | *Centaurea repens* | √ | B |
| Russian olive | *Elaeagnus angustifolia* | | B |

BLM_0029082

**Table E-1**
**Listed Noxious Weeds**

| Weed Name | Scientific Name | Gunnison Co. Listed | Colorado List (A, B, or C) |
|---|---|---|---|
| Sericea lespedeza | *Lespedeza cuneata* | | A |
| Scotch thistle | *Onopordum acanthium* | √ | B |
| Spotted knapweed | *Centaurea maculosa* | √ | B |
| Squarrose knapweed | *Centaurea virgata* | | B |
| Tamarisk | *Tamarix parviflora, T. ramosissima* | √ | B |
| Tansy ragwort | *Senecio jacobaea* | | A |
| Yellow starthistle | *Centaurea solstitialis* | | A |
| Yellow toadflax | *Linaria vulgaris* | √ | B |

## E.2.2   Preventative Measures

The following preventative measures will be implemented to prevent the spread of noxious weeds:

- If soil stockpiles are created in infested areas, these stockpiles will be kept as close as possible to the infested areas. No soil from infested areas will be moved until they are leveled and used. Soil from an infested area will not be used in any other area beside where it was collected;

- Vehicles and equipment will be required to arrive at the work site clean, power-washed, and free of soil and vegetative debris capable of transporting weed seeds or other propagules;

- Materials used for erosion control and reclamation (i.e., straw bales and seed mixes) will be obtained from sources that are weed-free. Seed mixes will also be weed-free; and

- Disturbed areas will be reseeded in accordance with the Surface Use Agreement and any applicable permit stipulations as soon as possible after construction activities have been completed.

## E.2.3   Weed Treatment Measures

Depending upon the species of weed and the time planned for construction, methods of weed pre-treatment may include:

- Mechanical: mowing, pulling by hand or tillage could be used;

- Chemical: application of an approved herbicide by a licensed applicator. Herbicides will be selected based on recommendations by local weed control district or BLM or Forest Service and subject to fee-landowner approval. All herbicides will be applied in accordance with all applicable laws and regulations on BLM or Forest Service and fee-lands; and

- Cultural: employing practices such as reseeding with noninvasive species that can outcompete noxious species. This type of treatment will be conducted in some fashion on all disturbed areas associated with the project.

BLM_0029083

Effective control measures vary for different weed species. For many species, a combination of measures should be employed to be most effective. The following table, **Table E-2,** lists the known and potential weeds within the Bull Mountain Unit as well as the best control measures for each.

**Table E-2**
**Noxious Weeds and Appropriate Controls**

| Weed Name | Herbicide Used? | Herbicide Details | Mechanical Measures Used? | Type of Mechanical Control | Cultural Control Used? | Type of Cultural Control |
|---|---|---|---|---|---|---|
| Bull thistle | Yes (ex. Tordon) | Spray rosettes in early spring | Yes | Removal of rosettes and mowing of bolting plants | Yes | Seeding w/desirable species |
| Burdock | No | NA | Yes | Sever tap root | Yes | Seeding w/desirable species |
| Canada thistle | Yes | Mow then spray in late summer or fall | Yes | Mowing prior to spraying | Yes | Seeding w/desirable species |
| Chicory | Possibly | Contact county specialist | No | NA | Yes | Seeding w/desirable species |
| Common St. Johnswort | Yes (ex. Roundup Ultra) | Spray green plants, preflowering | No | NA | Yes | Seeding w/ desirable species |
| Dalmatian toadflax | Yes (ex. Tordon K) | Herbicide w/surfactant in early stages | Yes | Hand grubbing during summer | Yes | Seeding w/ desirable species |
| Diffuse knapweed | Yes | Spray at rosette stage | Yes | Hand pulling of rosettes and plants early in bolting stage | Yes | Seeding w/desirable species |
| Dyer's Woad | Yes | Spray rosettes in spring or fall | Yes | Hand pull bolting plants, bag any heads | Yes | Seeding w/desirable species |
| Field bindweed | Yes (ex. Roundup Ultra) | Spray green plants, early flowering stage | No | NA | Yes | Seeding w/desirable species |
| Halogeton | No | NA | No | NA | Yes | Seeding w/desirable species |
| Hoary cress | Yes | Spray pre- or early bloom stage | No | NA | Yes | Seeding w/desirable species |
| Houndstongue | Yes | Spray prebud or rosette state | Yes | Hand pull after bolting stage, if flowers bag heads | Yes | Seeding w/desirable species |
| Jointed goatgrass | No | NA | Yes | Mow just after seed heads form | Yes | Seeding w/desirable species |
| Leafy spurge | Yes (ex. Tordon 22K) | Spray in spring preflowering and in fall | No | NA | Yes | Seeding w/desirable species |

BLM_0029084

**Table E-2**
**Noxious Weeds and Appropriate Controls**

| Weed Name | Herbicide Used? | Herbicide Details | Mechanical Measures Used? | Type of Mechanical Control | Cultural Control Used? | Type of Cultural Control |
|---|---|---|---|---|---|---|
| Mediterranean sage | No | NA | Yes | Cut flowering plants and bag heads | Yes | Seeding w/desirable species |
| Musk thistle | Yes (ex. Tordon 22K) | Spray rosettes and early bolting stages | Yes | Hand pull, sever tap root, bag heads, mow large infestations at bolting or early flowering | Yes | Seeding w/ desirable species |
| Oxeye Daisy | Yes | Spray preflowering stage | No | NA | Yes | Seeding w/desirable species |
| Plumeless thistle | Yes (ex. Tordon 22K) | Spray rosette to early bolting stage | Yes | Sever tap root, bag heads, mow large infestations bolting to early flower stage | Yes | Seeding w/desirable species |
| Poison hemlock | Yes (ex. phenoxy herbicides or glyphosate) | Spray young plants | No | NA | Yes | Seeding w/desirable species |
| Puncturevine | Yes (ex. chlorsulfuron and 2, 4-D) | Chlorsulfuron pre-emergence and 2, 4-D, soon after emergence | Yes | Cut or hoe plants prior to seeding, bag any heads | Yes | Seeding w/desirable species |
| Purple loosestrife | Yes (2,4-D and glyphosate) | Spray in spring preflowering fall spraying w/removal of flower heads | Yes | Hand pull small plants, mow larger infestations | Yes | Seeding w/desirable species |
| Russian knapweed | Yes (ex. Curtail) | Spray in bud to bloom stage in summer and fall | No | NA | Yes | Seeding w/desirable species |
| Russian olive | Yes (ex. Garlon) | Spray cut stump or apply to basal bark | Yes | Cut trees down or cut basal bark (follow up with chemical treatment) | Yes | Seeding w/desirable species and plant willow cuttings, *Carex* plugs |
| Scotch thistle | Yes (ex. Milestone) | Spray rosettes using surfactant added spray | Yes | Dig rosettes, sever root | Yes | Seeding w/desirable species |
| Spotted knapweed | Yes (ex. Tordon 22K) | Spray rosettes | No | NA | Yes | Seeding w/desirable species |
| Tamarisk | Yes (ex. Garlon 4) | Paint stump w/herbicide, spray sprouts, use basal bark treatment for small diameter trees | Yes | Cut tree (follow up with chemical treatment) | Yes | Seeding w/desirable species, plant willow cuttings, *Carex* plugs |

BLM_0029085

**Table E-2**
**Noxious Weeds and Appropriate Controls**

| Weed Name | Herbicide Used? | Herbicide Details | Mechanical Measures Used? | Type of Mechanical Control | Cultural Control Used? | Type of Cultural Control |
|---|---|---|---|---|---|---|
| Yellow starthistle | Yes (ex. Tordon 22K) | Spray rosettes and early bolting stages | Yes | Hand pull small infestations | Yes | Seeding w/desirable species |
| Yellow toadflax | Possibly | Consult specialists | Possibly | Consult specialists | Yes | Seeding w/desirable species |

Best Management Practices for the Noxious Weeds of Mesa County recommendations with some herbicide recommendations from the 2006 North Dakota Weed Control Guide and from the Weed Control Methods Handbook: Tools and Techniques for Use in Natural Areas, The Nature Conservancy.

If any soil stockpiles are maintained for longer than 90 days, these stockpiles will be treated for weeds.

## E.3   RESEEDING

### E.3.1   Seed Mix

The seed mix will be chosen by the landowner, stipulated in permit conditions of approval, or dictated by the surface management agency. Some possible seed sources are:

- Arkansas Valley Seed Solutions, 877-957-3337; 4625 Colorado Blvd, Denver, CO 80216;

- Pawnee Butte Seed Co., 970-356-7002; P.O. Box 1604, Greeley, CO 80632;

- Sharp Bros, Seed Co., 800-421-4234 104 East 4th Street Road Greeley, Colorado 80631; and

- Southwest Seed, 13260 County Road 29, Dolores, CO 81323.

### E.3.2   Planting Schedule

Areas slated for reclamation will be returned to near pre-construction grades and contours. Topsoil will then be replaced over the disturbed area from which it was stripped.

Final cleanup after work in water bodies and wetlands (primarily associated with pipeline installation) will be concluded, seeding accomplished, and mulching or erosion control mats installed, prior to the end of the following time frames:

- Water bodies—24 hours after initial in-stream disturbance; and

- Wetlands—within 10 days of backfilling in that wetland.

There are exceptions to these time frames, as noted below:

- Seeding and installation of erosion control matting may be deferred until final cleanup (i.e., temporary bridge is removed and water body banks across the travel lane are restored to pre-construction conditions) if the streambanks and all disturbed slopes above the water body are stabilized with an application of mulch extending 25 feet up the slope;

BLM_0029086

- If reclamation and seeding is deferred more than 10 days after final grade restoration near water bodies and wetlands, all disturbed slopes above water bodies and wetlands will be temporarily stabilized by applying straw mulch for a minimum distance of 200 feet above the edge of the water body or wetland. Wetlands will not be seeded unless noxious weeds are present. Successful recolonization by wetland species is generally related to effective topsoil salvage methods and sources of seed and rhizomes in adjacent areas. Streambanks will be seeded immediately upon completion of final cleanup;

- Specific permit conditions may alter the wetland and water body timelines; and

- Weather constraints may alter the time frames.

### E.3.3   Seeding Methods and Procedures

SGI's contractor will employ broadcast or drill seeding as site conditions allow. Seeding activities will be contingent upon weather and soil conditions. Seeding will not be permitted if there is more than 2 inches of snow on the ground unless approved by the surface landowner or surface management agency. On BLM or Forest Service lands and where approved by the fee-landowner, the contractor will randomly distribute any windrowed trees and shrubs or other remaining vegetation debris over the right-of-way (after seeding) by hand or appropriate equipment so as not to disturb the seedbed.

Drill seeding is the preferred seeding method and will be employed wherever soil characteristics and slope allow effective operation of a rangeland seed drill. Drill seeding will be performed perpendicular to the slope. Seed will be placed in direct contact with the soil at an average depth of 0.5-inches, covered with soil, and firmed to eliminate air pockets around the seeds. Seed will be applied using a rangeland seed drill with a seed release and agitation mechanism sufficient to allow seeds of various sizes and densities to be planted at the proper seeding depth.

Broadcast seeding will be employed only in areas where drill seeding is unsafe or physically impossible. Seed will be applied using manually operated cyclone-bucket spreaders, mechanical spreaders, or blowers. Seed will be uniformly broadcast over disturbed areas. Broadcast application rates will be twice that of drill rates. Seed will be applied so that uniform coverage of 20 seeds per square foot is obtained. Immediately after broadcasting, the seed will be uniformly raked, chained, dragged, or cultipacked to incorporate seed to a sufficient seeding depth. If the area is seeded prior to a soil crust forming, harrowing or raking may not be necessary.

### E.3.4   Evaluating Reclamation Success

SGI will conduct intensive monitoring after the first growing season in accordance with Colorado Discharge Permit System (CDPS) requirements. Monitoring will occur routinely thereafter to assess soil stability and revegetation success (as required by CDPS permit).

### E.4   MONITORING

SGI will continue to monitor the distribution and density of noxious weeds for the life of the project. Surveys will be conducted concurrently with reclamation monitoring and will occur as early in the year as feasible to identify and control noxious weeds before they produce seed. Monitoring data collected will include the noxious weed species, location, and extent of infestation. At locations where new populations have been identified or pre-existing populations

BLM_0029087

have expanded, SGI will act to eradicate the population or control their spread. The selection of control methods will be based on the available technology and information of the weed species.

BLM_0029088

# APPENDIX F
# POLY PIPELINE OPERATION PLAN

SG Interests I, Ltd., (SGI) designed and constructed the McIntyre Flowback Pits 3 and 4 to store water for use and reuse for drilling and completion activities associated with wells in the Bull Mountain area. Water stored in these pits is a mixture of freshwater, produced water, and flowback water from previous well completions. McIntyre Flowback Pits 1 and 2 were also designed and permitted, but have not been constructed as of June 2017. The basic plan for use of the facilities is to transport water to be stored in the pits via high density polyethylene (HDPE, referred to here as "poly") pipelines on the ground surface. The diameter and wall thickness required for each project are determined on site-specific conditions, but if feasible, the poly pipeline that SGI purchased will be used. This pipe is 1 inch thick and 12 inches in diameter (DR-9). These pipelines can be laid on the ground without creating significant ground disturbance (see example photo below, **Figure 1**). Wherever possible, these pipelines will be laid alongside or over existing disturbance such as along an existing access road.

Before the pipelines are cut and moved to a new location, they will be dried internally using a foam pig pushed by compressed air. The pig will be pushed back toward the pits allowing the fluid to drain into the pits. The pipeline can then either be dragged with a tracked or rubber tired vehicle whole or in sections to the new location or cut into pieces for storage. Poly pipelines for a well will be moved into place prior to completing the well. Following well completion, the well will flowback at a high rate and the poly pipelines will be used to transport this water back to the pits for recycling. The poly pipelines are expected to be kept in this location for approximately one to three months.

Poly pipelines are constructed between the pits and the well location generally by fusing the first several joints of pipe together end to end. The fuses are created by heating facing ends of pipe until they have melted and can then be cooled and fused together. The resulting fuse is as strong as the poly pipe itself. Where the poly pipe must connect to a metal pipe, it can be connected by a mechanical joining system such as a flange. Once several joints of pipe have been fused together, the pipeline is attached to a tracked or rubber tired vehicle and pulled along the pipeline route. Joints of poly pipe are then added to the end of the string of fused pipeline until the

BLM_0029089



**Figure 1.** Example of poly pipeline laid on surface (photo from WPD)

vehicle can no longer pull the weight of the fused pipe or it has run out of space to pull the pipe. The fusing operation is then moved to the front of the poly pipeline and used to build another pipeline segment.

If the pipeline route passes through an environmentally sensitive area (as defined by Colorado Oil and Gas Conservation Commission, COGCC, 100 Series Rules) the pipe will be dragged into place from a working space to minimize environmental impact. In this scenario, a cable winch would be positioned at the end of the environmentally sensitive area on a work space such as an existing well pad. The cable is then taken back to the pipeline route starting point. The fusing crew would prepare a length of pipe (typically 400–500 feet depending on the weight of the pipe). The cable would then be attached to the end of the length of pipe. The cable would be used to drag the length of pipe into place. Additional lengths of pipe may be fused to the original length if needed and if the weight allows the longer pipe to be dragged into place. Personnel, communicating with hand-held radios, would monitor the operation to ensure that only minimal damage occurs to the outside of the pipe as it is dragged. Some cosmetic damage is expected, but if a gouge exceeds 10 percent of the wall thickness, that section of pipe must be cut out and replaced. A new section of pipe may be fused into its place. Surface poly pipelines that cross sensitive areas will have secondary containment to prevent a leak in a poly line from contaminating surface waters (see **Figure 2**, below). This containment

BLM_0029090

Case No. 1:20-cv-02484-MSK Document 34-12 filed 04/27/21 USDC Colorado pg 147 of 261

**Figure 2.** Sensitive area poly pipeline crossing typical schematic

BLM_0029091

consists of sleeving the pipe within a steel pipe of greater diameter than the poly pipe. The sleeved ends of the steel containment pipe rest in an area in which an appropriately sized diversion channel has been constructed to direct any water leaking from the poly pipe away from the sensitive area. Sensitive areas are generally waterways and wetlands. Once the pipeline has been installed, field personnel perform a pressure test using either air or water. The COGCC Series 1100 regulations have been applied to the approved Form 15 applications as COAs as follows: "Operator shall pressure test surface poly-pipelines in accordance with Rule 1101.e.(1) prior to putting into initial service and following any reconfiguration of the pipeline network. Operator shall notify [the named specialist at] the COGCC 48 hours prior to testing surface poly pipeline." The pressure test will be conducted with freshwater and not recycled or produced water.

In cases where the poly pipeline must cross a road, the pipeline may be placed in a culvert under the road surface. Alternatively, the poly pipe may be attached to a temporary pipe road crossing device. These devices connect between two pieces of poly pipe and provide a drivable steel surface for the crossing (see **Figure 3**, below).



**Figure 3**. Example road crossing feature from Rain for Rent website: www.temporarypipe.com/products/spillguards/road_crossings.aspx

It is possible that due to topography between the pits and the project, booster pumps may need to be installed along the pipeline route. Booster pumps keep the water pressure in the pipeline more consistent and help prevent large pressure changes following elevation loss. Any booster pumps used in this project will have appropriately sized secondary containment to prevent fuel or pump fluids from reaching the ground surface.

The poly pipeline will be monitored and inspected as follows: "Operator shall conduct daily inspections of surface poly pipeline routes for leaks during active transfer of fluids. Inspections shall be conducted by viewing the length of the pipeline; operator will endeavor to minimize surface disturbance during pipeline monitoring. The operator shall maintain records of inspections, findings and repairs, if necessary, for the life of the pits." This is required by the COGCC according to the Form 15 COAs. When booster pumps are used along the route, a sudden loss of pressure as measured by the pump's pressure gauge will alert the pump operator that there is a leak in the pipe. The pump can immediately be shut down and the location of the leak discovered and cleaned up. Pumps are manned during use.

BLM_0029092

# APPENDIX G
# 12-89-7-1 APD PACKAGE

BLM_0029093

BLM_0029094

Form 3160-3
(August 2007)

FORM APPROVED
OMB No. 1004-0136
Expires July 31, 2010

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**APPLICATION FOR PERMIT TO DRILL OR REENTER**

| | |
|---|---|
| 5. Lease Serial No. COC66704 | |
| 6. If Indian, Allottee or Tribe Name | |
| 7. If Unit or CA Agreement, Name and No. | |

1a. Type of Work:  ☒ DRILL  ☐ REENTER

1b. Type of Well:  ☐ Oil Well  ☒ Gas Well  ☐ Other  ☐ Single Zone  ☒ Multiple Zone

8. Lease Name and Well No. FEDERAL 12-89-7 1

2. Name of Operator SG INTERESTS I LTD

Contact: CATHERINE DICKERT
E-Mail: cdickert@sginterests.com

9. API Well No.

| 3a. Address PO BOX 26 MONTROSE, CO 81402 | 3b. Phone No. (include area code) Ph: 970-209-6464 | 10. Field and Pool, or Exploratory EXPLORATORY |
|---|---|---|

4. Location of Well  *(Report location clearly and in accordance with any State requirements.*)

At surface       1431FSL 730FEL 39.025470 N Lat, 107.341720 W Lon

At proposed prod. zone 1431FSL 730FEL 39.025470 N Lat, 107.341720 W Lon

11. Sec., T., R., M., or Blk. and Survey or Area

Sec 7 T12S R89W Mer 6PM

| 14. Distance in miles and direction from nearest town or post office** 20 MILES NORTH OF PAONIA, CO | 12. County or Parish GUNNISON | 13. State CO |
|---|---|---|

| 15. Distance from proposed location to nearest property or lease line, ft. (Also to nearest drig. unit line, if any) 730' TO LEASE/PROPERTY LINE, 1475' TO UNIT LINE | 16. No. of Acres in Lease 2560.70 | 17. Spacing Unit dedicated to this well |
|---|---|---|

| 18. Distance from proposed location to nearest well, drilling, completed, applied for, on this lease, ft. NA NO OTHER WELL ON THIS LEASE | 19. Proposed Depth 4500 MD | 20. BLM/BIA Bond No. on file B03278 |
|---|---|---|

| 21. Elevations (Show whether DF, KB, RT, GL, etc.) 7378 GL | 22. Approximate date work will start 07/15/2012 | 23. Estimated duration 3 WEEKS |
|---|---|---|

24.  Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1, shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan (if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).

4. Bond to cover the operations unless covered by an existing bond on file (see Item 20 above).
5. Operator certification
6. Such other site specific information and/or plans as may be required by the authorized officer.

| 25. Signature (Electronic Submission) | Name (Printed/Typed) CATHERINE DICKERT   Ph: 970-209-6464 | Date 05/01/2012 |
|---|---|---|
| Title MANAGER | | |

| Approved by (Signature) | Name (Printed/Typed) | Date |
|---|---|---|
| Title | Office | |

Application approval does not warrant or certify the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.
Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**Additional Operator Remarks (see next page)**

Electronic Submission #136837 verified by the BLM Well Information System
For SG INTERESTS I LTD,  sent to the Durango

**\*\* OPERATOR-SUBMITTED \*\* OPERATOR-SUBMITTED \*\* OPERATOR-SUBMITTED \*\***

BLM_0029095

**Additional Operator Remarks:**

BLM onsite for this well was held in May 2011.

BLM_0029096

SG Interests I, Ltd.
922 East Second Ave
Durango, CO 81301

Federal 12-89-7 #1 Gas Well
Federal Lease #: COC 066704, Bull Mountain Unit, COC 67120X
Surface Location: 1431' FSL 730' FEL Sec 7 T12S R89W (vertical well)
Gunnison County, CO

## SURFACE USE PLAN OF OPERATIONS

### 1. Existing Roads

From Paonia, CO, travel north on State Highway 133 approximately 25 miles to its intersection with County Road 265. Turn NW on CR 265 and travel approximately 1 ¼ miles. Turn left onto a private road and continue straight ahead for about 1 mile. Keep to the left and stay on the main road for approximately 6 more miles. At Gunnison Energy Corporation's Hotchkiss 12-90 #1-34 well, continue on the main road for 1 ½ miles south to the location.

There is an existing access road to the proposed well location that does not require upgrades. A portion of the access road is on lease COC 66704 and a portion of the road is off this lease.

Table 1. Existing road (not upgraded) lengths and disturbances.

| | Off Lease COC 66704 (Estimates) | On Lease COC 66704 (Estimates) |
|---|---|---|
| Length of existing access road (not upgraded or otherwise changed) | 27,635 feet (5 1/4 miles)  Begin at CR 265 and end at Hotchkiss Sheep Camp. Inc. segment from GEC Hotchkiss 1-34 well to COC 66704 lease line. | 6,410 feet (1 ¼ miles)  Begin at COC 66704 lease line and end where realignment begins. |
| Total distance of access road | 38,370 feet (7 ¼ miles)  Total distance of road off lease COC 66704 (inc upgraded portion). | 6,410 feet (1 ¼ miles)  Total distance of road on lease COC 66704. |
| Total area disturbed when building existing, unchanged access road | 19 acres | 4 ½ acres |

The portion of the existing road that is on lease COC 66704 (6,410 feet beginning at the lease line and continuing to the segment of road that will be realigned, see Figure 1) has been recently upgraded by Gunnison Energy Corporation to access their Hotchkiss 12-90 #1-34 well. This existing access road has a surface that has been designed to support gas drilling traffic. It has been rocked with 3" road base. Nine culverts to move drainage under the road surface have been appropriately located along the road. These culverts are 12" diameter corrugated metal pipe. The roadside ditches along this segment of road are approximately one foot deep and approximately two feet wide. Rock check dams have been constructed in these ditches to slow water flow and these dams have been adequately spaced according to road grade. The turning radius around the road corners will allow larger vehicles to safely travel this portion of the road. There are vehicle pull-offs located along the road segment as needed to allow

1

vehicles to pass one another safely as needed per line of sight distance. The road crown will be maintained at 2˚ from center.

All roads used in conjunction with this project will be maintained in as good or better condition as they were pre-project. The private access road was in existence at the time of project construction and will not be reclaimed at the end of the project unless agreed upon by the surface landowner and SG Interests. This road, both on lease and off lease, will continue to be used for ranching operations during and after the project. The road is gated at the property line and is not open to the general public. The cattle guards along the existing road to the north would be cleaned and maintained as agreed upon with the surface owner. There are three cattle guards along the existing access road. All three cattle guards are 8' by 16' in size and all are located on the portion of the road that is off lease COC66704. One guard is located just past the Rock Creek Ranch and Nick Hughes property line on Rock Creek Ranch property, approximately 850 feet southwest of the intersection of the existing access road with Gunnison CR 265. The second is at the Rock Creek Ranch and Aspen Leaf Ranch property line, approximately 1 2/5 miles south of the intersection of the existing access road with Gunnison CR 265. The third is located at the Aspen Leaf Ranch and Nick Hughes property line, approximately 2.6 miles south of the intersection of the existing access road with Gunnison CR 265. Use of the existing access road will minimize the impact to the environment because a new access road in addition to the existing ranch road is not required for the project. This access road will be used for access to additional sites in the Bull Mountain Unit.

The access road would be maintained so that its integrity is not compromised by the additional truck traffic. This maintenance would not include any additional construction activities; instead more frequent road maintenance is required as traffic volume increases. Fresh water would be applied to the road more frequently as traffic volumes increase (and according to weather patterns) to keep dust down. Approximately 5,000 – 8,000 gallons of fresh water may be used each day to control fugitive dust per mile during dry months (for example in a typical June). Approximately 2,000 – 5,000 gallons of fresh water may be used to control fugitive dust per mile of road during wet months (for example during a typical August). Estimated fresh water usage for dust control on the existing road is 13,000 gallons per day to 52,000 gallons per day (10,500 gallons per day to 42,000 gallons per day off lease and 2,500 gallons per day to 10,000 gallons per day on lease). Roadside ditches would be maintained to control and direct runoff.

Average Daily Traffic estimates are as follows:

Table 2.  Estimated daily traffic on the access road (entire road) by activity.

| Activity | Round Trips | Duration of Activity |
|---|---|---|
| Well Pad Construction | 8 pick-ups per day, 2 4,000 gallon water trucks per day, 4 dump trucks per day, one grader and one dozer brought in by semi 1 round trip each | 10 days |
| Drilling | one drill rig once, 45 trips by rig up trucks total, 10 per day by water trucks, 4 per day by pick-ups | 14 days |
| Completion | 8 by haul trucks total, 4 pick-ups per day | 14 days |
| Production | 2 per day by pick-ups | 365 days, for life of well |

Gravel sources will be checked for possible weed issues and treated as necessary. Graveling of these roads will occur as necessary to maintain the post-construction surface quality. The current gravel

BLM_0029098

source is United's Tri County Pit in Hotchkiss, Colorado. Gravel may be staged on the Federal 11-90-35 #1 for use in graveling this road. If this area is needed for gravel storage SG will permit this use of the well pad accordingly. The speed limit on the access road will be 20 mph.

The right-of-way width of existing roads will be maintained as they presently exist unless authority to widen is given by the surface land owner in writing. The existing access road is approximately 16 feet wide (driving surface). Width of cut and fill slopes of existing access road are dependent on topography. Any damage to county or private roads, resulting from SG's use will be repaired immediately. The operator will use fresh water for dust control on all private roads.

Any required road use permits for CR 265 will be obtained from Gunnison County Public Works. Gunnison County will grade and apply magnesium chloride to County Road 265 annually as per the terms of the agreement between SG Interests I, Gunnison Energy Corporation, and Gunnison County (LI # 10-241).

Operations will cease, excepting emergencies, during periods when mud and silt cannot be contained within the road prism, or when construction specification cannot be achieved because of wet or frozen ground conditions. Vehicles will not be towed through the mud.

The operator will schedule heavy traffic periods, such as moving the rig in or out (see Table 2: Drilling for estimated heavy traffic), to take place during the week on public roads if possible and not on weekends or holidays. All construction signage will be in compliance with the Manual of Uniform Traffic Control Devices. The operator will post warning signs on CR 265 to alert the public of heavy truck traffic. The operator will use flagmen as necessary during drilling and related equipment moves on and off the drill site when utilizing public roads. Figure 2 shows existing access roads and route to the Federal 12-89-7 #1 well.

2.      New or Reconstructed Access

A portion of the existing road (shown on Figure 2) was upgraded to accommodate traffic to another of SG Interests' well sites (Eck 12-90-1 #1 well), per agreement with the surface owner. These road upgrades were entirely off lease COC 66704. This road was widened at the corners to allow larger vehicles such as drill rigs to make the turns. The turning radius is now approximately 70 feet or greater. The driving surface on this portion of road is approximately 16 feet wide and has been surfaced with 6" of 3" fractured road base. Along this portion of road, drainage features were established including drainage ditches and rip/rapping and armoring of culverts. Culverts were placed or upgraded at low spots where needed. Four culverts were added to this section of road and an additional 15 culverts were cleaned and fixed for use. Culverts were 12" diameter corrugated metal pipe. The road has a 2-4% inslope to the ditch for drainage off the road surface. Catchment basins with rock armored outfalls as appropriate were constructed at the culvert ends. Seeding of areas disturbed for this upgrade but not needed for road use is scheduled to take place in the fall of 2012. Seed mixes are per landowner direction and are weed free. Stormwater control BMPs were set as needed during construction and prior to stabilization of these areas in compliance with the Colorado Department of Public Health and Environment permit. Silt fence was installed downslope of disturbed areas to contain any sediment mobilized by rain events. Drainage control features were adjusted in the field as needed to correct flows and prevent sediment mobilization.

Table 3. Reconstructed and Realigned Access Road Lengths and Disturbances

|  | Off Lease COC 66704 (Estimates) | On Lease COC 66704 (Estimates) |
|---|---|---|
| Length of upgraded access road | 10,740 feet (2 miles) <br><br> Begin at Hotchkiss Sheep Camp and end at GEC Hotchkiss 1-34 well. | None <br><br> Existing access road was not upgraded on lease COC 66704. |

3

| Table 3 Continued. | Off Lease COC 66704 (Estimates) | On Lease COC 66704 (Estimates) |
|---|---|---|
| Length of realigned access road | None<br><br>Road alignment is entirely on lease. | 810 feet (0.15 miles)<br><br>Begins approximately 6,410 feet from the lease line along existing road and ends after exiting new well pad. |
| Total distance of road | 38,370 feet (7 ¼ miles)<br><br>Total distance of road off lease COC 66704 (inc. existing section). | 6,410 feet (1 ¼ miles)<br><br>Total distance of road on lease COC 66704. |
| Total area disturbed when upgrading existing access road | 7.4 acres | 0 acres |
| Total area disturbed when realigning existing access road | 0 acres | 1/2 acre |

The existing access road that passes through the planned well pad area will be routed around the pad on its western edge (see Figure 1). The rerouted section is entirely on lease. SG would notify the surface landowner before beginning this construction. This will result in approximately 810' of rerouted roadway. The area of the planned realignment would be cleared of vegetation to create a 30' wide construction zone (to accommodate the drivable road surface and drainage ditches). Cuts along the realigned road section range from 10.4' to 1.7'. The road continues to the south of the pad at level grade with existing topography. The realigned road will be surfaced with 3" fractured road base. Oak removed from the construction zone would be broken up and used in reclamation. No tree branches would be left extending over the roadway. If cuts associated with construction of the road result in fragmented rock, this rock material would be buried in fill areas resulting from construction of the well pad. Construction of the road will not take place when the ground and road-building materials are frozen or too wet to achieve the correct compaction. No fence cuts or cattle guards are needed on the realigned portion of the road. The road width will be maintained through the reroute (approximately 16' drivable surface and approximately 30' total disturbed area width). The road realignment will be constructed using standard crown-and-ditch specifications. The existing road has a drainage ditch on both sides of it and the ditch has rock check dams installed in it to control flow velocity. This ditch and the rock check dams would be replaced along the realigned section of road. These ditches will conform to the slope, grade and shape of the road cross-section and will not have roots, stumps, rocks or other material sticking out into them. The ditch will be constructed at least one foot below the driving surface of the road. Two drainage turn outs will be constructed along the realigned segment of the road. No culverts or bridges are needed for this rerouted section. Topsoil removed from the rerouted road area will be separated and stored with the topsoil that was salvaged from the well pad area (location shown on Figure 7). The cut and fill areas resulting from creation of a level driving surface will be reclaimed as quickly as possible by returning topsoil to these areas and seeding them. Where practicable, SG would scatter woody vegetation over disturbed surfaces during reclamation to serve as mulch and to stabilize the surface.

Average daily traffic estimates for the upgraded and realigned sections of road are the same as those listed in the Existing Roads section of this document (Section 1, Table 2).

3.        Locations of Existing Wells

Figure 3 shows the known gas/oil/water injection, disposal, drilling wells within a one-mile radius of the proposed Federal 12-89-7 #1.

4

BLM_0029100

4. Location of Existing and/or Proposed Production Facilities

The approximately 300 foot long pipeline route runs from the proposed well to the existing Narrows Gathering Pipeline to the west of the proposed well pad location. The approximately 300 foot long Federal 12-89-7 #1 tie-in pipeline system is a 6" diameter gas pipeline and a 4" diameter water pipeline buried within the same trench. From here the Narrows Gathering Pipelines will transport produced water and natural gas north to their final destinations (injection well and sales respectively). This Narrows Gathering Pipeline system gas line is 12"-16" diameter (varies along route) and the water pipeline is 8" diameter. The southern terminus of the Narrows Gathering Pipeline includes gas and water future connections for future wells. A 12" gas line and 8" water line are planned to connect a drilled fee minerals well (Volk 12-89-21 #1) and other future wells to the gathering system, but a construction schedule for this pipeline has not been determined. The Narrows Gathering Pipeline did not have any wetland crossings that were subject to pre-construction notification to the US Army Corps of Engineers. Waters of the US were crossed according to the conditions of Nationwide Permit 12. The Narrows Gathering Pipeline was constructed in a 50' right-of-way over private property. Stormwater BMPs were installed along the route to control stormwater and prevent erosion and sedimentation (Figure 8a). Reclamation of the pipeline route includes returning the work area to near pre-construction contours, returning topsoil to the surface of the right-of-way, scattering any woody debris over the surface and seeding with landowner approved seed mix. Seed mixes are weed free. The Narrows Gathering Pipeline connects future southern pipelines to the Hotchkiss Lateral Pipeline to the north. The Hotchkiss Lateral Pipeline connects to the Bull Mountain Pipeline, the main trunkline in the area.

Table 4. Lengths and Area of Disturbances for Pipelines Associated with this Project

|  | Off Lease | On Lease |
|---|---|---|
| Narrows Pipeline | 16.8 acres (12,075') | 5 ¾ acres (6,275' length) |
| Federal 12-89-7 #1 Pipeline | 0 | .34 acres (300' length) |

Other aboveground facilities on site include the piping and valves at the well head. There will be an enclosed gas/water separator for each well on the pad that will include gas and water meters, heaters and a fuel gas pot. Dimensions of the separator are approximately 11' wide x 20 ft long x 10 ft high. Four 400-BBL tanks will be located on the well pad. These measure approximately 12' wide and 20' high. Tanks have heaters that are used during cold weather conditions. Artificial lift may be needed on one or more of the wells on this location during the life of the well. Examples of lift include a 40 hp walking beam or other pumping unit may be used. Beam lifts are approximately 7 ½' wide x 29' long x 20' high and are located approximately four feet away from the well head. A compressor may be needed on a well during its lifetime. Compressor skids are approximately 14' wide x 20' long x 9' high. Compressor horsepower is decided based on specific well conditions. Compressor engines will be permitted as appropriate through the Air Quality Control Division of the Colorado Department of Public Health and Environment. Possible water transfer pump would be a 20 horsepower natural gas motor with piping and meter enclosed in a shed 6' wide by 12' long by 8' high.

5. Location and Type of Water Supply

Fresh Water to be used during drilling operations will be delivered to the location by water truck. Recycled water to be used in completion operations will be piped to the well site via either an existing buried water pipeline or a temporary surface poly pipeline (HDPE pipe). It is possible that some water may be delivered to the location via water truck, but this is expected to result in few additional truck trips. This water will be stored in the McIntyre Flowback Pits located in T11S R90W Sections 23, 24, and 26 until needed. Flowback water from the well will be piped back to the pits for storage and reuse until it is disposed of in an injection well. Currently, SG Interests has in operation one deep water injection well, the Federal 24-2 WDW (T11S R90W Section 24).

5

Approximately 5,000 BBL of recycled water from the McIntyre Flowback Pits will be needed for each well completion stage for this sandstone/coalbed methane well. The well may be completed in multiple zones or stages, depending on well log information acquired during the drilling of each well. If the well log information from the sandstone formation is favorable, only one completion stage will occur. If the well logs are not favorable for the sandstone formation, the well will be completed in the coal formation and an additional 5,000 BBL of recycled water from the McIntyre Flowback Pits will be required.

Flowback and stimulation fluids will be sent to separators and tanks before the fluids are transferred off location. An estimated eleven flowback tanks will be located on the well pad for approximately one month during completion. The entire level well pad will be surrounded by a berm with a drainage ditch constructed interior to that berm in order to contain any potential release on the well pad. The berm will be approximately 4 feet in height around the pad except at the access road entrance where a culvert will be located and on the west side where the realigned road will be located (reference Figure 7). Any fluid in the interior drainage ditch will be contained in the ditch and culvert until clean up. During fracturing operations, the site will be manned 24-hours per day so that any leak or spill can be quickly identified and dealt with. Tanks will be set on compacted earth to decrease the permeability of the soil in the event of a release. The berm will create a containment capacity greater than 150% of the largest single container on the location.

Water may be drawn from free-flowing fresh water sources and augmented from Bainard Reservoir No. 1 according to the terms of SG's approved Augmentation Plan. SG was granted a Water Augmentation Plan in District Court, Water Division No. 4, Case No. 09CW16. This Water Augmentation Plan is monitored and implemented by Steve Tuck, Colorado Division of Water Resources Water Commissioner, District 40. Water used through SG's augmentation plan is replaced from the Bainard Reservoir No. 1 when required under the terms of the plan. The surface and water rights related to Bainard Reservoir No. 1 are owned by Rock Creek Ranch I, Ltd. Rock Creek Ranch is an entity owned by the principal and general partner of SG Interests I, Ltd. Bainard Reservoir No. 1 itself is not a water source for this project. Fresh water sources could include East and West Muddy Creek, Aspen Leaf Reservoir, Ault Reservoir/Ault Creek (as shown in Figure 5). Water used for dust control will be fresh water only. It is also possible that water for drilling and/or completions may be purchased from a permitted commercial supplier. Commercial water used in SG's operations is trucked from the closest source, which is in Paonia. This water is fresh water, but is non-potable.

6.    Construction Materials

The well pad will be constructed from soils on site. The disturbed area during construction will be approximately 3.4 acres. Topsoil will be salvaged and stored adjacent to the well pad. The top six inches of this soil will be salvaged for use over the reclaimed areas. The rest of the soil that is manipulated for this project will be considered subsoil and if stored on site, it will be stored separately from topsoil. Some topsoil will be used to reclaim areas around the level pad disturbed during construction, but not needed for long-term operations. The area of the level well pad will be approximately 2.9 acres following interim reclamation. The level well pad will be graveled with 3" fractured road base from United's Tri County Pit in Hotchkiss, Colorado (3569 J 75 Drive, Hotchkiss CO), or some similar provider depending on availability.

7.    Methods of Handling Waste Materials

The location and access roads will be kept orderly and as clean as practicable at all times. All garbage and trash will be put in a trash container. The container will be periodically emptied at an approved disposal site. A portable latrine will be provided for human wastes, and wastes will be pumped from portable toilets and hauled to an approved sanitation facility. Sewage will not be buried on location.

No unapproved chemicals will be used during drilling or completion operations. Any petroleum product or other spills will be cleaned up immediately and the material will be hauled to an approved facility.

The operator will prevent gasoline, diesel fuel, oil, grease, or any other petroleum products and drilling fluids from migrating off the location or from entering any live stream or riparian area. A spill kit will be

6

available at the locations shown in SG Interests' SPCC Plan. Fuels and lubricants will be transported by fuels distributors and will be stored in facilities specifically designed for that purpose.

A cuttings bin will be used rather than a cuttings pit. This cuttings bin is typically a lined trailer container that holds cuttings aboveground until the trailer is hauled to an approved cuttings disposal area. Cuttings will not be stored on location past the active drilling phase. No extra space is required to store the cuttings bins. Eight cuttings bins may be located on the well pad at any time during drilling. These will be located on the southeast side of the well pad. Cuttings will be tested in accordance with the requirements of the disposal destination and taken to that facility as soon as possible. Alternatively, cuttings may be buried on location according to state and federal rules and regulations. Currently, cuttings are transported to Adobe Buttes Landfill located at 12211 Trap Club Road, Eckert, Colorado or to Industrial Ecosystems Incorporated located at 49 CR 3150, Aztec, NM. Vehicle trips to haul off cuttings are estimated to be 1 roundtrip per every 1,000' drilled.

Flowback water contained in tanks on location will be transferred to the McIntyre Flowback Pits via temporary surface poly pipelines for storage and reuse or injected into the Federal 24-2 WDW for disposal. If feasible this water may be transferred to the water disposal well via existing buried steel pipeline. Drilling fluids are stored in 500 BBL tanks and trucked to an approved disposal site (currently Envirotech, 5796 U.S. 64, Farmington, NM or Industrial Ecosystems Incorporated located at 49 CR 3150, Aztec, NM.) Unusable and/or excess flowback fluids, along with any solid wastes, will be trucked to an approved industrial disposal facility (Alanco Energy Services, Deer Creek Facility, 5180 Hwy 50, Whitewater, CO 81527).

Gas (if present) will be handled according to applicable regulations at the time of completion activities.

8. Ancillary Facilities

No camps, airstrips, or additional staging areas are planned at this time. If gravel is stored on the Federal 11-90-35 #1 well pad (Figure 6), no additional surface disturbance would be required at that location.

9. Well Site Layout

The initial construction area of the well pad is approximately 3.4 acres. The area of the level pad or working surface will be approximately 2.9 acres after interim reclamation. The shape of the well pad following interim reclamation is shown on the well site layout drawing (Figure 7). Temporary facilities on the typical well pad may include a total of three trailers during drilling operations for the drilling superintendent, the company representative, and the mud logger and mud engineer. These temporary facilities will be used 24 hours per day during drilling and completion operations. Since a closed loop system is employed, cuttings bins will be used rather than a reserve pit or cuttings pit. See Section 7 above for additional details.

SG plans to drill up to five gas wells on the well pad. The estimated lifespan of each gas well is approximately 30 to 40 years. There may be one or two coalbed methane wells; one or two sandstone wells; and/or one to three shale wells on the well pad for a total of up to five wells. Of these wells, at most one would produce a combination of fee and federal minerals and up to five wells would produce federal minerals. These combinations are determined based on the target formation and the proximity of federal and fee leases from the surface location. The Bull Mountain Unit Agreement allows for the drilling and production of gas across lease lines.

10. Plans for Reclamation of the Surface

Following pipeline construction, the disturbed ground (.34 acres) will be contoured to near original topography. A slight mound may be left over the pipeline trench to accommodate any settling. The pipeline will not be constructed during frozen conditions and frozen soil will not be used to backfill the trench. The entire area disturbed during pipeline construction will be covered with salvaged topsoil prior to seeding. The preferred seeding method is drilling, but if this is not feasible on part or the whole route, seed will be broadcast at twice the rate per acre as drilled seed. Any woody debris that was removed from the route and salvaged will be returned to the disturbed area in order to provide surface roughening.

BLM_0029103

Weed-free seed will be used in all reclamation activities. Disturbed areas on lease would be seeded with a BLM-approved weed free seed mix that has also been approved of by the surface landowner. No other plantings are planned at this site.

Areas of the well pad and areas along the realigned road section that were disturbed during construction, but that are not needed for long-term operations, will be reclaimed (approximately 3/4 acre). This reclamation will consist of returning topsoil to these areas, seeding with weed-free seed, and using any salvaged woody debris for surface roughening.

All areas that are disturbed during construction of this project will be covered under SG Interests' field-wide stormwater management plan and discharge permit. SG's plan to control stormwater runoff includes perimeter ditches, silt fence/straw wattles, outfall protection devices, and road side ditches. Figure 8a and Figure 8b depict these controls as currently planned for this project.

When the well is no longer productive, it will undergo final reclamation. The well pad area will be returned to near-original contour and the realigned access road will either be recontoured and reclaimed (if no longer needed by the surface landowner) or replaced to its original alignment. Topsoil will be spread over the disturbed area. The area will be seeded.

SG is committed to preventing the introduction of noxious weeds during construction and controlling the expansion of existing noxious weed populations over the life of the project. All noxious weeds as defined by Gunnison County, BLM, and the state of Colorado (Colorado Weed Management Act CRS Title 35, Article 5.5 as amended) will be controlled (see list in Attachment 3). The purpose of this weed plan is to prescribe methods to treat existing weed infestations, prevent introduction and spread of infestations during construction, and monitor and treat infestations after construction is complete.

The following preventative measures will be implemented to prevent the spread of noxious weeds:

•        If soil stockpiles are created in infested areas, these stockpiles will be kept as close as possible to the infested areas. No soil from infested areas will be moved until they are treated. Soil from an infested area will not be used in any other area beside where it was collected.
•        Vehicles and equipment will be required to arrive at the work site clean, power-washed, and free of soil and vegetative debris capable of transporting weed seeds or other propagules.
•        Materials used for erosion control and reclamation (i.e. straw bales and seed mixes) will be obtained from sources that are weed-free.
•        Disturbed areas will be reseeded in accordance with the Surface Use Agreement and any applicable permit stipulations as soon as possible after construction activities have been completed.

Depending upon the species of weed and the time planned for construction, methods of weed pre-treatment may include:

•        Mechanical—mowing, pulling by hand, or tillage could be used.
•        Chemical—application of an approved herbicide by a licensed applicator. Herbicides will be selected based on recommendations by local weed control district or BLM and subject to fee-landowner approval in consultation with the BLM authorized officer. All herbicides will be applied in accordance with all applicable laws and regulations on BLM and fee-lands.
•        Cultural – employing practices such as reseeding with non-invasive species that can outcompete noxious species. This type of treatment will be conducted in some fashion on all disturbed areas associated with the project.

Effective control measures vary for different weed species. For many species, a combination of measures should be employed to be most effective. The following table lists the known and potential weeds within the Bull Mountain Unit as well as the best control measures for each.

8

BLM_0029104

Table 5. Noxious weeds and appropriate controls

| Weed Name | Herbicide Used? | Herbicide details | Mechanical measures used? | Type of mechan. control | Cultural Control Used? | Type of cultural control |
|---|---|---|---|---|---|---|
| Bull thistle | Yes (ex. Tordon) | Spray rosettes in early spring | Yes | Removal of rosettes and mowing of bolting plants | Yes | Seeding w/desirable species |
| Burdock | No | NA | Yes | Sever tap root | Yes | Seeding w/desirable species |
| Canada thistle | Yes | Mow then spray in late summer or fall | Yes | Mowing prior to spraying | Yes | Seeding w/desirable species |
| Chicory | Possibly | Contact county specialist | No | NA | Yes | Seeding w/desirable species |
| Common St. Johnswort | Yes(ex. Roundup Ultra) | Spray green plants, preflowering | No | NA | Yes | Seeding w/ desirable species |
| Dalmation toadflax | Yes (ex. Tordon K) | Herbicide w/surfacet-ant in early stages | Yes | Hand grubbing during summer | Yes | Seeding w/ desirable species |
| Diffuse knapweed | Yes | Spray at rosette stage | Yes | Hand pulling of rosettes and plants early in bolting stage | Yes | Seeding w/desirable species |
| Dyer's Woad | Yes | Spray rosettes in spring or fall | Yes | Hand pull bolting plants, bag any heads | Yes | Seeding w/desirable species |
| Field bindweed | Yes (ex. Roundup Ultra) | Spray green plants, early flowering stage | No | NA | Yes | Seeding w/desirable species |
| Halogeton | No | NA | No | NA | Yes | Seeding w/desirable species |
| Hoary cress | Yes | Spray pre or early bloom stage | No | NA | Yes | Seeding w/desirable species |
| Hounds-tongue | Yes | Spray prebud or rosette state | Yes | Hand pull after bolting stage, if flowers bag heads | Yes | Seeding w/desirable species |

9

BLM_0029105

| Table 5 continued | | | | | | |
|---|---|---|---|---|---|---|
| Weed Name | Herbicide Used? | Herbicide details | Mechanical measures used? | Type of mechan. control | Cultural Control Used? | Type of cultural control |
| Jointed goatgrass | No | NA | Yes | Mow just after seed heads form | Yes | Seeding w/desirable species |
| Leafy spurge | Yes (ex. Tordon 22K) | Spray in spring pre flowering and in fall | No | NA | Yes | Seeding w/desirable species |
| Mediterran-ean sage | No | NA | Yes | Cut flowering plants and bag heads | Yes | Seeding w/desirable species |
| Musk thistle | Yes (ex. Tordon 22K) | Spray rosettes and early bolting stages | Yes | Hand pull, sever tap root, bag heads, mow large infest. at bolt - early flowering | Yes | Seeding w/ desirable species |
| Oxeye Daisy | Yes | Spray preflowering stage | No | NA | Yes | Seeding w/desirable species |
| Plumeless thistle | Yes (ex. Tordon 22K) | Spray rosette to early bolting stage | Yes | Sever tap root, bag heads, mow large infest. at bolt - early flower stage | Yes | Seeding w/desirable species |
| Poison hemlock | Yes (ex. phenoxy herbicides or glypho.) | Spray young plants | No | NA | Yes | Seeding w/desirable species |
| Puncturevine | Yes (ex. chlorsulfur-on and 2, 4-D) | Chlorsulfur-on preemergence and 2, 4-D , soon after emergence | Yes | Cut or hoe plants prior to seeding, bag any heads | Yes | Seeding w/desirable species |
| Purple loosestrife | Yes (2,4-D and glypho-sate) | Spray in spring preflowering fall spraying w/removal of flower heads | Yes | Hand pull small plants, mow larger infestations | Yes | Seeding w/desirable species |
| Russian knapweed | Yes (ex. Curtail) | Spray in bud to bloom stage in summer and fall | No | NA | Yes | Seeding w/desirable species |

10

BLM_0029106

| Table 5 continued | | | | | | |
|---|---|---|---|---|---|---|
| Weed Name | Herbicide Used? | Herbicide details | Mechanical measures used? | Type of mechan. control | Cultural Control Used? | Type of cultural control |
| Russian olive | Yes (ex. Garlon) | Spray cut stump or apply to basal bark | Yes | Cut trees down or cut basal bark (follow up with chemical treatment) | Yes | Seeding w/desirable species and plant willow cuttings, Carex plugs |
| Scotch thistle | Yes (ex. Milestone) | Spray rosettes using surfactant added spray | Yes | Dig rosettes, sever root | Yes | Seeding w/desirable species |
| Spotted knapweed | Yes (ex. Tordon 22K) | Spray rosettes | No | NA | Yes | Seeding w/desirable species |
| Tamarisk | Yes (ex. Garlon 4) | Paint stump w/herbicide, spray sprouts, use basal bark treatment for small diameter trees | Yes | Cut tree (follow up with chemical treatment) | Yes | Seeding w/desirable species, plant willow cuttings, Carex plugs |
| Yellow starthistle | Yes (ex. Tordon 22K) | Spray rosettes & early bolting stages | Yes | Hand pull small infestations | Yes | Seeding w/desirable species |
| Yellow toadflax | Possibly | Consult specialists | Possibly | Consult specialists | Yes | Seeding w/desirable species |

Best Management Practices for the Noxious Weeds of Mesa County recommendations with some herbicide recommendations from 2006 North Dakota Weed Control Guide (http://www.ag.ndsu.edu/weeds/w253/w253w.htm) and additional information from Weed Control Methods Handbook: Tools and Techniques for Use in Natural Areas, The Nature Conservancy.

If any soil stockpiles are maintained for longer than 90 days, these stockpiles will be treated for weeds.

SG will continue to monitor the distribution and density of noxious weeds for the life of the project. Surveys will be conducted concurrently with reclamation monitoring and will occur as early in the year as feasible to identify and control noxious weeds before they produce seed. Monitoring data collected will include the noxious weed species, location, and extent of infestation. At locations where new populations have been identified or pre-existing populations have expanded, SG will take action to eradicate the population or control their spread. The selection of control methods will be based on the available technology and information of the weed species and its control.

11.   Surface Ownership

The well pad, 6,410 feet of existing access road, and the realigned access road will be located on lease COC 66704 on surface owned by Hotchkiss Ranches, PO Box 479, Hotchkiss, CO 81479; phone: 970-872-4213.

The existing road to the pad crosses private property owned by Hotchkiss Ranches, Nick Hughes, Aspen Leaf Ranch, and Rock Creek Ranch I, LLC (off lease distance of 27,635 feet). These landowners have granted SG Interests access through their lands on this existing road in order to reach project locations.

BLM_0029107

The pipeline route crosses land on lease COC 66704 that is owned by Hotchkiss Ranches.  SG has in place a surface use agreement with Hotchkiss Ranches that covers pipeline construction and operation (Attachment 1).

The existing Narrows Gathering Pipeline crosses property owned by Hotchkiss Ranches Inc., Nick Hughes, and Gunnison Hunting Properties, LLC.  The Nick Hughes and Gunnison Hunting Properties portions, along with the off-lease portion of the route on Hotchkiss Ranches (2,365 feet), is 12,075 in length.  The on-lease portion of the Narrows Gathering System Pipeline is 6,275 feet in length.

12.    Other Information

Firearms and dogs are not allowed on the access road or location during any phase of this project.  The drilling crew will have sufficient fire equipment on hand during fire season for suppressing fires on the well pad, access road, and pipeline route.

BLM_0029108

# BUREAU OF LAND MANAGEMENT
Colorado River Valley Field Office
2300 River Frontage Road
Silt, CO 81652

## Drilling Conditions of Approval (COAs)
## selected by BLM CRV engineering staff,
## specific to the Federal 12-89-7-1 Application to Drill (APD).

| | |
|---|---|
| Operator: | SG Interests I, Ltd. |
| Lease Number: | COC 66704 |
| Well: | SG Interest 12-89-7 1 |
| Surface Location: | Gunnison County, NESE, Section 7, T12S, R89W |

1. At minimum 30 days prior to spudding, operator will notify the BLM by sundry with cement details for all casing cementing operations.

2. Forty-eight hours *prior* to (a) spudding, (b) conducting BOPE tests, (c) cementing/running casing strings, and (d) within 24 hours *after* spudding, the CRVFO shall be notified. One of the following CRVFO inspectors shall be notified by phone. The contact number for all notifications is: 970-876-9064. The BLM CRVFO inspectors are David Giboo, Lead PET; Ed Fancher, PET; Greg Rios, PET; Tim Barrett, PET; Jennifer Robinson, PET; Alex Provstgaard, PET; Brandon Jamison, PET; Kent Lyles, PET; Mitch Schierland, PET.

3. A CRVFO petroleum engineer shall be contacted for a verbal approval prior to commencing remedial work, sidetracking operations, plugging operations on newly drilled boreholes, changes within the drilling plan, changes to the well design, changes or variances to the BOPE, deviating from conditions of approval, and conducting other operations not specified within the APD. Contact the petroleum engineer for verbal approvals (contact information below).

4. If cement is not circulated to surface in either the surface or intermediate hole casing strings then the operator is required to run and immediately submit a cement bond log to the BLM in order to verify the top of cement and ensure the isolation of all potentially usable aquifers and hydrocarbon-bearing zones.

5. If a well control issue or failed test (e.g. kick, blowout, water flow, casing failure, or a bradenhead pressure increase) arises during drilling or completions operations, the petroleum engineer shall be notified within 24 hours from the time of the event. IADC/Driller's Logs and Pason Logs (mud logs) shall be forwarded to CRVFO – Petroleum Engineer, 2300 River Frontage Road, Silt, CO 81652 within 24 hours of a well control event.

6. The BOPE shall be tested and conform to Onshore Order No. 2 for a 3M system and recorded in the IADC/Driller's log.

7. Flexible choke lines shall meet or exceed the API SPEC 16C requirements. Flexible choke lines shall have flanged connections and configured to the manufacturer's specifications. The flexible choke lines shall be anchored in a safe and workmanlike manner. At minimum, all connections shall be effectively anchored in place for safety of the personal on location. Manufacturer specifications shall be kept with the drilling rig at all times and immediately supplied to the authorized officer/inspector upon request. Specifications at a minimum shall include acceptable bend radius, heat range, anchoring, and the working pressure. All flexible choke lines shall be free of gouges, deformations, and as straight/short as possible.

BLM_0029109

8.  An electrical/mechanical mud monitoring equipment shall be function tested prior to drilling out the surface casing shoe. As a minimum, this equipment shall include a pit volume totalizer, stroke counter, and flow sensor.

9.  A gas buster shall be functional and all flare lines effectively anchored in place, prior to drilling out the surface casing shoe. The discharge of the flare lines shall be a minimum of 100 feet from the wellhead and targeted at bends. The panic line shall be a separate line (not open inside the buffer tank) and effectively anchored. All lines shall be downwind of the prevailing wind direction and directed into a flare pit, which cannot be the reserve pit. The flare system shall use an automatic ignition. Where noncombustible gas is likely or expected to be vented, the system shall be provided supplemental fuel for ignition and maintain a continuous flare.

10. On the first well drilled on this pad, a triple combo open-hole log shall be run from the base of the surface borehole to surface and from TD to bottom of surface casing shoe. This log shall be submitted within 48 hours in .las and .pdf format to: CRVFO – Petroleum Engineer, 2300 River Frontage Road, Silt, CO 81652. Contact 970-876-9000 for clarification.

11. Submit the (a) mud/drilling log (e.g. Pason disc), (b) driller's event log/operations summary report, (c) production test volumes, (d) directional survey, and (e) Pressure Integrity Test results within 30 days of completed operations (i.e. landing tubing) per 43 CRF 3160-9 (a).

12. Whether the well is completed as a dry hole or as a producer, "Well Completion and Recompletion Report and Log" (Form 3160-4) will be submitted not later than 30 days after completion of the well or after completion of operations being performed, in accordance with 43 CFR 3164. In accordance with 43-CFR 3162.4(b) submit a complete set of electrical/mechanical logs in .LAS format with standard Form 3160-4, Well Completion or Recompletion Report and Log.

13. When submitting the BLM Form 3160-4 "Well Completion or Recompletion Report and Log" at the conclusion of drilling and completion activities, the operator must report: (a) the total volume of all fresh water (i.e. <1,000 ppm TDS) used to drill and complete the well; and, of that amount, (b) the volume of recycled/reused fresh water used to drill and complete the well. These two fresh water volumes shall be reported in Item #32 (Additional Remarks) of Form 3160-4.

14. Should the well be completed for production, the AO will be notified when the well is placed in a producing status. Such notification will be sent by telegram or other written communication, not later than five (5) days following the date on which the well is placed on production.

15. A schematic facilities diagram as required by 43 CFR 3162.7-5 (b.9. d.), and shall be submitted to the appropriate District Office within sixty (60) days of installation or first production, whichever occurs first. All site security regulations as specified in Onshore Oil & Gas Order No. 3 shall be adhered to. All product lines entering and leaving hydrocarbon storage tanks will be effectively sealed in accordance with 43 CFR 3162.7-5 (b. 4).

16. All off-lease storage, off-lease measurement, or commingling on-lease or off-lease will have prior written approval from the AO.

17. "Sundry Notice and Report on Wells" (Form 3160-5) will be filed for approval for all changes of plans and other operations in accordance with 43 CFR 3162.3-2.

BLM_0029110

**Contact Information**

**Bob Hartman**
Petroleum Engineer
Office:  (970) 244-3041
Cell: (970) 589-6735
bhartman@blm.gov

**Justin Barmore**
Petroleum Engineer
Office: (970) 876-9049
Cell: (970) 987-7436
jbarmore@blm.gov

**Stephen Garcia**
Petroleum Engineer
Office: (970) 876-9031
Cell: (970) 456-2138
sbgarcia@blm.gov

BLM_0029111

Certification

I hereby certify that I, or someone under my direct supervision, have inspected the drill site and access route proposed herein; that I am familiar with the conditions which currently exist; that I have full knowledge of state and federal laws applicable to this operation; that the statements made in this APD package are, to the best of my knowledge, true and correct; and that the work associated with the operations proposed herein will be performed in conformity with this APD package and the terms and conditions under which it is approved. I also certify that I, or the company I represent, am responsible for the operations conducted under this application. These statements are subject to the provisions of 18 USC 1001 for the filing of false statements.

Executed this _29_ day of _October_ , _2015_.

**Catherine Dickert**, Environmental and Permitting Manager,
922 East Second Ave, Durango, CO 81301, Phone: 970-385-0696,
Email: cdickert@sginterests.com

13

BLM_0029112



Figure 1.  Existing access road and road realignment to the Federal 12-89-7 #1 well.

Federal 12-89-7 #1
SG Interests I Ltd
T12S R89W Sec 7

Existing Private Road
To be used as access
6,410' on lease COC66704

Existing private road
realigned around well pad.

Existing Private Road
Not to be used as access

**Legend**   1:10,000

- Federal 12-89-7 #1
- Lease Line
- Planned Well Pad
- Private Road
- Realignment

BLM_0029113

Figure 2. Existing Access Roads.

Gunnison County Road 265

Existing private road

State Highway 133
About 16 miles north
of Somerset, CO

Existing Eck 12-90-1 #1
well pad and access road

GEC's Hotchkiss 1-34 Well

Federal 12-89-7 #1 Location

### Legend

COC066704

Well Pad

**Type Of Road**

Off Lease Exist. Upgraded

Off Lease Exist. Not Upgraded

On Lease Exist. Not Upgraded

To Be Removed

Public Road

Realignment

Eck Access Road

1:24,000   0.4   0.8   1.6 Miles

BLM_0029114



Figure 3. Known gas/oil/water injection, disposal, drilling wells and water wells within a one-mile radius of the proposed Federal 12-89-7 #1.

### Legend

- 1 Mile Radius
- Fed 12-89-7 #1 Well Head
- Gas Well Water Permit
- Dewatering Permit
- Domestic/Stock Water Well
- Monitor Well
- Producing Gas Well
- Permitted Gas Well
- Abandoned Gas Well Location
- Injection Well

N

1:24,000

0   750  1,500       3,000              4,500 Feet

Figure 4 . Location of Proposed and Existing Production Facilities - Pipelines

1:24,000

Legend

Proposed Pipeline
Narrows Gathering Pipeline
GEC Hotchkiss Pipeline
Road
Realigned Road
Well Pad
Lease Boundary

Narrows Gathering Pipeline existing or under construction at time well tie pipeline is approved.

0      2,500      5,000 Feet

N

BLM_0029116



Figure 5. Location of Water Supply

Aspen Leaf Reservoir
Water Point

Point on East
Muddy Creek

Ault Reservoir
Water Point

Point on West
Muddy Creek

Project location

1:24,000

0    0.25    0.5              1              1.5 Miles



Figure 6. Location of Possible Ancillary Facility - Gravel Staging

Possible Gravel Staging Area (to be permitted separately if area is needed)

Proposed Federal 12-89-7 #1 location

1:24,000

0   0.25   0.5   1   1.5 Miles

Figure 7

Well Site Layout

BLM_0029119

AECOM



**Pad Report:** (irregular size)

Top of pad elevation: 7373.0'
Cut Slope: 2.00:1
Fill Slope: 2.00:1

Total cut : 11,081.04 C.Y.
Total fill : 8,690.98 C.Y.
Balance Export: 2,390.06 C.Y.

Area: 3.406 ± acres

Post Interim
Reclamation
Area: 2.987 ± acres

*DETAIL: SOIL BERM TYPICAL SECTION*
N.T.S.

**Note:** See page 2 for cross sections.

**LEGEND:**

~Pre-Construction Contour
~Pre-Construction Index Contour
~Post Construction Contour
~Post Construction Index Contour
~Centerline Ditch (proposed)
~Centerline Soil Berm (proposed)
~BMP's (proposed)
~Interim Reclamation Area

Scale: 1" = 60   U.S. Survey feet
Contour Interval = 1 foot

0'     60'     120'     180'

**Federal 12-89-07 Multi**
Reference Point No.1
(200' to edge of disturbance)
39.02645° N
107.37170° W
S. 13°44'17" E., 367.2' to Well
Head Federal 12-89-07 #4

**Federal 12-89-07 Multi**
Reference Point No.2
(200' to edge of disturbance)
39.02463° N
107.37069° W
N. 33°07'31" W, 363.5' to Well Head
Federal 12-89-07 #4

① **Federal 12-89-07 #1** (vertical):
Surface Location
39.02543° N    1416 FSL
107.37148° W   757 FEL

②A **Federal 12-89-07 #2:**
Surface Location
39.02541° N    1408 FSL
107.37153° W   770 FEL

③A **Federal 12-89-07 #3:**
Surface Location
39.02545° N    1423 FSL
107.37144° W   745 FEL

④A **Federal 12-89-07 #4:**
Surface Location
39.02547° N    1430 FSL
107.37139° W   731 FEL

Grd Elev. = 7377.9'
Pad Elev. = 7373.0'

DRILL RIG

**GAS WELL LAYOUT**

FEDERAL 12-89-07 #1
Located in the SE 1/4 Section 7,
Township 12 South, Range 89 West, 6th P.M.,
Gunnison County, Colorado

| SURVEYED BY:<br>DGN | DWG DATE:<br>10/07/15 | AECOM<br>David G. Nicewicz, PLS<br>604 Colorado Ave, Suite 201 Glenwood Springs Co 81610<br>cell. (720) 456-1104 email: david.nicewicz@aecom.com |
| --- | --- | --- |
| DRAFTED BY:<br>MLD | SCALE:<br>1" = 60' | |
| JOB NO.:   22244264.70300 | | SHEET NO.: 1 of 2 |

BLM_0029120











Scale: 1" = **100**  U.S. Survey feet



**GAS WELL LAYOUT CROSS SECTIONS**

FEDERAL 12-89-07 #1
Located in the SE 1/4 Section 7,
Township 12 South, Range 89 West, 6th P.M.,
Gunnison County, Colorado

| SURVEYED BY: DGN | DWG DATE: 09/27/2015 | AECOM |
| DRAFTED BY: MLD | SCALE: 1" = 100' | David G. Nicewicz, PLS<br>604 Colorado Ave, Suite 201 Glenwood Springs Co 81610<br>cell: (720) 456-1104  email: david.nicewicz@aecom.com |
| JOB NO.: 22244264.70300 | | SHEET NO.  2 of 2 |

BLM_0029121

# Figure 8A. Stabilization of Disturbed Areas - Pipelines

Eck 12-90-1 #1

Lease Boundary Line

Straw Bale Catchment Structures

See Figure 8b

Level Pad
Stabilized, 1° Grade
(see Figure 8b for detail)

Limit of Disturbance
well pad

## Legend

— Federal 12-89-7 #1 Pipeline
— Silt Fence
— Narrows Gathering Pipeline
— Limit of Disturbance
— Road
— Road to be Realigned
▭ Lease Boundary

N



Figure 8B. Stabilization of Realigned Road (Approx 810' in length)

Outfall w/ straw bale protection

Existing road returned to contours, topsoiled and seeded

Silt fence surrounding pad

Road ditch and silt fence down gradient

Road ditch with rock check dams

Crown on road properly maintained

Road Ditch with rock check dams

**Legend**

— Realigned Private Road

◻ Well Pad

Straw wattle may be substituted for silt fence.

N

Attachment 1

Recorded Surface Use Agreement

BLM_0029124

611542 02/28/2012 04:07:17 PM Page 1 of 3
Stella Dominguez, Gunnison County, CO
Rec Fee: $21.00 Doc Fee: $0.00 eRecorded

**NOTICE OF ADDENDUM TO SURFACE USE AND DAMAGE AGREEMENT**

Notice is hereby given that Hotchkiss Ranches, Inc., Owner, has entered into a written ADDENDUM TO SURFACE USE AND DAMAGE AGREEMENT (hereinafter called "AGREEMENT") dated _2/22/12_, that is now valid and subsisting with SG Interests VII, Ltd.. Said ADDENDUM TO SURFACE USE AND DAMAGE AGREEMENT is applicable to the following described lands in Gunnison County, Colorado.

Township 12 South, Range 89 West, 6th P.M.

Section 6:   All
Section 7:   All

Township 12 South, Range 90 West, 6th P.M.

Section 1:   SW/4
Section 2:   E/2SE/4, SW/4SE/4
Section 11:  SE/4, SE/4NE/4, W/2NW/4
Section 12:  All,

Gunnison County, Colorado,

also described in a Notice of Surface Use and Damage Agreement recorded in the Clerk and Recorder's Office, Gunnison County, Colorado, at Reception No. 546004.

This Addendum shall supercede and replace that Surface Use and Damage Agreement executed between these same parties on July 14, 2004 and acknowledged by Notice of Surface Use and Damage Agreement

BLM_0029125

**611542**

02/28/2012 04:07:17 PM 2 of 3

Gunnison County, CO

recorded at Reception No. 546004 in the Clerk and Recorder's Office in Gunnison County, Colorado.

Any party needing further information concerning this Addendum shall contact one of the parties to this Addendum. Addresses are as follows:

SG Interests VII, Ltd.
100 Waugh Drive, Suite 400
Houston, TX 77007

Hotchkiss Ranches Inc., a Colorado Corporation
P.O. Box 479
Hotchkiss, CO 81419

This Notice is given this 22nd day of Feb, 2012.

Hotchkiss Ranches, Inc., a Colorado Corporation

By: _____

Brian K. Farmer, President

SG Interests VII, Ltd., a Texas limited partnership

By:     Gordy Oil Company, General Partner

By: _____

Robert H. Guinn, II, Vice-President-Land

BLM_0029126

**611542**
02/28/2012 04:07:17 PM 3 of 3
Gunnison County, CO
ACKNOWLEDGMENT

STATE OF COLORADO )

                     )ss.

COUNTY OF DELTA )

The foregoing instrument was acknowledged before me this 22nd day of Feb., 2012, by Brian K. Farmer, President of Hotchkiss Ranches, Inc., a Colorado Corporation,

Witness my hand and official seal.

My Commission Expires:
5-24-2015

Notary Public

LEE ANN SLAUGHTER
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 05/24/2015

STATE OF TEXAS )

                     )ss.

COUNTY OF HARRIS )

The foregoing instrument was acknowledged before me this 18th day of February 2012, by Robert H. Quinn, II, Vice President Gordy Oil Company, General Partner of SG Interests VII, Ltd.

Witness my hand and official seal.

My Commission Expires:
4-18-14

JONI BYRD
Notary Public, State of Texas
My Commission Expires
April 18, 2014

Notary Public

Attachment 2

Well Plat and Electronic Geospatial Data  *(previously provided)*

15

BLM_0029128



FOUND GLO BRASS CAP

FOUND GLO BRASS CAP

S 89°57'08" E   2601.72' (M)

S 89°57'" E   2635'(GLO RECORD)

NOTES:
NATURAL GROUND, NO IMPROVEMENTS
USED FOR GRAZING & PASTURE
GROUND ELEVATION = 7377.9' NAVD '88 DATUM
BENCH MARK = USGS BC R268, ELEV. OF 6705.95'
LAT. = 39°01'31.7"N    LAT. = 39.02547N
LON. = 107°22'17.0"W   LON. = 107.37139W
NAD 83 DATUM
GPS OPERATOR: DAVID NICEWICZ
PDOP = 2.0 (MAX)
FIELD DATE : 11/28/11
DRAWING DATE : 12/01/11

7

FOUND GLO BRASS CAP

FOUND GLO BRASS CAP

S 00°03'03" E   2642.18' (M)

N 00°0'56" W   2640' (GLO RECORD)

N 89°57'11" E   5238.50' (M)
2637.20'

S 00°02'30" E 5278.38' (M)

2640.50'

730'

1431'

FOUND GLO BRASS CAP

FOUND GLO BRASS CAP

S 00°00'E   2639' (GLO RECORD)

N 00°05'36" W   2639.99' (M)

BASIS OF BEARING

S 89°59'" W   2603'(GLO RECORD)

S 89°56'30" W   2639.58' (M)

FOUND GLO BRASS CAP

GRAPHIC SCALE
1" = 1000 U.S. SURVEY FEET

0'        1000'        2000'

LEGEND

⬧ FOUND GLO BRASS CAP ON STEEL POST
● WELL HEAD
(M) MEASURED IN FIELD
L 90° SYMBOL

BASIS OF BEARING
THE LINE FROM THE SE CORNER TO THE E 1/4
CORNER OF SECTION 7, TOWNSHIP 12 SOUTH,
RANGE 89 WEST, 6TH P.M., WAS ASSUMED TO
BEAR N 00°05'36" W AS MONUMENTED AND
SHOWN HEREON.

CERTIFICATE OF SURVEY:
I, DAVID G. NICEWICZ, A REGISTERED
PROFESSIONAL LAND SURVEYOR IN THE STATE
OF COLORADO, DO HEREBY CERTIFY THAT THE
SURVEY REPRESENTED BY THIS PLAT WAS MADE
UNDER MY DIRECTION AND SUPERVISION, AND
THAT THIS PLAT ACCURATELY REPRESENTS THIS
SURVEY.

12/7/11

DAVID G. NICEWICZ, P.L.S. NO. 24963

GAS WELL LOCATION

FEDERAL 12-89-7 #1
LOCATED IN S. 7, T. 12 S., R. 89 W., 6th P.M.
GUNNISON COUNTY, COLORADO

E. SCHAAF AND ASSOC., INC. OF DELTA, COLORADO, has in accordance with a
request from ERIC SANFORD, for SG INTERESTS I, LTD, determined the location of
FEDERAL 12-89-7 #1 to be 1431' FSL & 730' FEL Section 7, Township 12 South,
Range 89 West, of the Sixth Principal Meridian, Gunnison County, Colorado.

| SURVEYED BY | DATE | E. SCHAAF AND ASSOC., INC. |
|---|---|---|
| DGN | 12/01/11 | 340 PALMER ST., DELTA, CO. 81416 |
| DRAWN BY | SCALE | ACCT. NO. | |
| FRM | 1"=1000 | WE11155SG | SG INT |

Attachment 3
Listed weeds.

The following noxious weeds are listed noxious weeds by the state of Colorado, included in the Gunnison Basin Weed District Management Plan, or listed by the BLM. The goal for Colorado A Listed weeds is eradication. The goal for B Listed weeds is to stop their spread.  C Listed weeds are those weeds that are managed by local jurisdictions within the state of Colorado. The state also maintains a Watch List for weeds that pose a threat to agriculture and the environment of Colorado.  The goal for weeds on the Watch List is to further understanding of their distribution in order to determine if they should receive official listing.

| Weed Name | Scientific Name | County Listed | Colorado (A, B, C Listed or W for Watch List) | BLM Listed |
|---|---|---|---|---|
| Velvetleaf | *Abutilon theophrasti* | | C | |
| Russian knapweed | *Acroptilon repens* | | B | |
| Jointed goatgrass | *Aegilops cylindrica* | | B | √ |
| Camelthorn | *Alhagi pseudalhagi* | | A | √ |
| European beachgrass | *Ammophila arenaria* | | | √ |
| Spurred anoda | *Anoda cristata* | | B | |
| Scentless chamomile | *Anthemis arvensis* | | B | √ |
| Mayweed chamomile | *Anthemis cotula* | | B | √ |
| Burdock | *Arctium minus* | | C | √ |
| Absinth wormwood | *Artemisia absinthium* | √ | B | |
| Giant reed | *Arundo donax* | | A | √ |
| Fivehorn smotherweed | *Bassia hyssopifolia* | | | √ |
| Black mustard | *Brassica nigra* | | | √ |
| Wild turnip | *Brassica tournefortii* | | W | √ |
| Ripgut brome | *Bromus diandrus* | | | √ |
| Japanese brome | *Bromus japonicas* | | | √ |
| Red brome | *Bromus rubens* | | | √ |
| Downy brome | *Bromus tectorum* | | C | √ |
| Mexican bird-of-paradise | *Caesalpinia gilliesii* | | | √ |
| Lens-podded whitetop | *Cardaria chalepensis* | | | √ |
| Hoary cress | *Cardaria draba* | √ | B | √ |
| Plumeless thistle | *Carduus acanthoides* | √ | B | √ |
| Musk thistle | *Carduus nutans* | √ | B | √ |
| Italian thistle | *Carduus pycnocephalus* | | | √ |
| Slender-flowered thistle | *Carduus teniflora* | | | √ |
| Sea iceplant | *Carpobrotus chilensis* | | | √ |
| Hottentot fig | *Carpobrotus edulis* | | | √ |
| Distaff thistle | *Carthamus lantus* | | | √ |
| Common caraway | *Carum carvi* | | B | √ |
| Longspur sandbur | *Cenchrus longispinus* | | | √ |
| Purple starthistle | *Centaurea calcitrapa* | | | √ |
| Cornflower | *Centaurea cyanus* | | | √ |
| Diffuse knapweed | *Centaurea diffusa* | √ | B | √ |
| Iberian starthistle | *Centaurea iberica* | | | √ |

16

BLM_0029130

| Weed List Cont. | | | | |
|---|---|---|---|---|
| **Weed Name** | **Scientific Name** | **County Listed** | **Colorado (A, B, C Listed or W for Watch List)** | **BLM Listed** |
| Brown knapweed | *Centaurea jacea* | | | √ |
| Bighead knapweed | *Centaurea macrocephala* | | | √ |
| Spotted knapweed | *Centaurea maculosa* | √ | B | √ |
| Malta starthistle | *Centaurea melitenisis* | | | √ |
| Mountain cornflower | *Centaurea montana* | | | √ |
| Black knapweed | *Centaurea nigra* | | | √ |
| Vochin knapweed | *Centaurea nigrescens* | | | √ |
| Meadow knapweed | *Centaurea pratensis* | | A | √ |
| Russian knapweed | *Centaurea repens* | √ | B | √ |
| Yellow starthistle | *Centaurea solstitialis* | | A | √ |
| Feather-headed knapweed | *Centaurea trichocephal* | | | √ |
| Squarrose knapweed | *Centaurea virgata* | | A | √ |
| Chicory | *Chichorium intybus* | | C | √ |
| Rush skeletonweed | *Chondrilla juncea* | | A | √ |
| Oxeye Daisy | *Chrysanthemum leucanthemum* | √ | B | √ |
| Canada thistle | *Cirsium arvense* | | B | √ |
| Bull thistle | *Cirsium vulgare* | | B | √ |
| Chinese clematis | *Clematis orientalis* | | B | √ |
| Poison hemlock | *Conium maculatum* | | C | √ |
| Field bindweed | *Convolvulus arvensis* | √ | C | √ |
| Andean pampas grass | *Cortaderia jubata* | | W | √ |
| Pampas grass | *Cortaderia selloana* | | | √ |
| Bristly hawkweed | *Crepis setosa* | | | √ |
| Common crupina | *Crupina vulgaris* | | A | √ |
| Artichoke thistle | *Cynara cardunculus* | | | √ |
| Bermudagrass | *Cynodon dactylon* | | | √ |
| Houndstongue | *Cynoglossum officinale* | | B | √ |
| Spanish broom | *Cytisus junceum* | | | √ |
| French broom | *Cytisus monspessula* | | | √ |
| Scotch broom | *Cytisus scoparius* | | W | √ |
| Portugese broom | *Cytisus striatus* | | | √ |
| Foxglove | *Digitalis purpurea* | | | √ |
| Common teasel | *Dipsacus fullonum* | | B | √ |
| Blueweed | *Echium vulgare* | | | √ |
| Brazilian waterweed | *Egeria densa* | | | √ |
| Veldt grass | *Ehrharta calycina* | | | √ |
| Water hyacinth | *Eichhornia crassipes* | | W | √ |
| Russian olive | *Elaeagnus angustifolia* | | B | √ |
| Quackgrass | *Elytrigia repens* | | B | √ |
| Lehmann lovegrass | *Eragrostis lehmanniana* | | | √ |
| Australian fireweed | *Erechtites glomerata* | | | √ |
| Redstem filaree | *Erodium cicutarium* | | C | |
| Cypress spurge | *Euphorbia cyparissias* | | A | √ |
| Leafy spurge | *Euphorbia esula* | √ | B | √ |

BLM_0029131

| Weed List Cont. | | | | |
| --- | --- | --- | --- | --- |
| **Weed Name** | **Scientific Name** | **County Listed** | **Colorado (A, B, C Listed or W for Watch List)** | **BLM Listed** |
| Myrtle spurge | *Euphorbia myrsinites* | | A | √ |
| Edible fig | *Ficus carica* | | | √ |
| Fennel | *Foeniculum vulgare* | | | √ |
| Goat's rue | *Galega officinalis* | | | √ |
| Baby's breath | *Gypsophila paniculata* | | W | √ |
| Halogeton | *Halogeton glomeratus* | | C | √ |
| Dame's rocket | *Hesperis matronalis* | √ | B | √ |
| Venice mallow | *Hibiscus trionum* | | B | |
| Orange hawkweed | *Hieracium aurantiacum* | √ | A | √ |
| Mouseear hawkweed | *Hieracium pilosella* | | | √ |
| Yellow hawkweed | *Hieracium pretense* | | | √ |
| Hydrilla | *Hydrilla verticillata* | | A | √ |
| Black henbane | *Hyoscyamus niger* | √ | B | √ |
| Common St. Johnswort | *Hypericum perforatum* | | C | √ |
| Dyer's Woad | *Isatis tinctoria* | | A | √ |
| Blue buttons | *Knautia arvensis* | | | √ |
| Everlasting peavine | *Lathyrus latifolius* | | | √ |
| Perennial pepperweed | *Lepidium latifolium* | | B | √ |
| Himalayan bush clover | *Lespedeza cuneata* | | W | √ |
| Dalmation toadflax | *Linaria dalmatica* | √ | B | √ |
| Yellow toadflax | *Linaria vulgaris* | √ | B | √ |
| Garden loosestrife | *Lysimachia vulgaris* | | | √ |
| Purple loosestrife | *Lythrum salicaria* | √ | A | √ |
| Wand loosestrife | *Lythrum virgatum* | | | √ |
| Chilean tarweed | *Madia sativa* | | | √ |
| Eurasian milfoil | *Myriophyllum spicatum* | | B | √ |
| Matgrass | *Nardus stricta* | | | √ |
| Scotch thistle | *Onopordum acanthium, O. taricum* | √ | B | √ |
| Wild proso millet | *Panicum miliaceum* | | C | √ |
| African rue | *Peganum harmala* | | A | √ |
| Crimson fountain grass | *Pennisetum setaceum* | | | √ |
| Bulbous bluegrass | *Poa bulbosa* | | C | |
| Japanese knotweed | *Polygonum cuspidatum* | | A | |
| Giant knotweed | *Polygonum sachalinense* | | A | |
| Bohemian knotweed | *Polygonum x bohemicum* | | | |
| Sulphur cinquefoil | *Potentilla recta* | | B | √ |
| Bridal veil broom | *Retama monosperma* | | | √ |
| Himalayan blackberry | *Rubus discolor* | | W | √ |
| Mediterranean sage | *Salvia aethopis* | | A | √ |
| Giant salvinia | *Salvinia molesta* | | A | |
| Bouncing bet | *Saponaria officinalis* | | B | √ |
| Brazilian pepper | *Schinus terebrinthifolius* | | | √ |
| Schismus | *Schismus arabicus* | | | √ |
| Tansy ragwort | *Senecio jacobaea* | | A | √ |
| German ivy | *Senecio mikanoides* | | | √ |

BLM_0029132

| Weed List Cont. | | | | |
|---|---|---|---|---|
| Weed Name | Scientific Name | County Listed | Colorado (A, B, C Listed or W for Watch List) | BLM Listed |
| Bitter nightshade | *Solanum dulcamara* | | | √ |
| Perennial sowthistle | *Sonchus arvensis* | | C | √ |
| Johnsongrass | *Sorghum halepense* | | C | √ |
| Medusahead | *Taeniatherum caputmedusae* | | A | √ |
| Tamarisk | *Tamarix parviflora, T. ramosissima, T gallica, T. chinensis, T. pentanda, T. aphylla* | √ | B | √ |
| Common tansy | *Tanacetum vulgare* | | B | √ |
| Puncturevine | *Tribulus terrestris* | | C | |
| Gorse | *Ulex europaeus* | | | √ |
| Siberian elm | *Ulmus pumila* | | | √ |
| Moth mullein | *Verbascum blattaria* | | B | |
| Common mullein | *Verbascum thapsus* | | C | |

BLM_0029133

Attachment 4

Poly Pipeline Route

BLM_0029134



- Temp. Poly Pipeline (above ground)
- Flowback pit
- Parcel Boundary (crossed by pipeline)
- Existing pad/facility

**Existing Road**

- Improved road
- Unimproved road

**Temp. Poly Pipeline Option: Pits 1 and 2**

| Parcel Number | Owner | Pipe segment length (ft) |
|---|---|---|
| 292100000033 | Rock Creek Ranch | 3,439.7 |
| 292100000020 | Aspen Leaf Ranch Inc. | 5,691.73 |
| 292100000027 | Nick R. Hughes | 5,581.0 |
| 298700000002 | Nick R. Hughes | 864.9 |
| 298700000001 | Gunnison Hunting Properties, LLC | 5,929.2 |
| 298700000004 | Hotchkiss Ranches Inc. | 2,342.4 |
| 298900000010 | Hotchkiss Ranches Inc. | 6,401.8 |
| Total | | 30,250.6 |

**Temp. Poly Pipeline Option: Pits 3 and 4**

| Parcel Number | Owner | Pipe segment length (ft) |
|---|---|---|
| 292100000033 | Rock Creek Ranch | 361 |
| 292100000020 | Aspen Leaf Ranch Inc. | 4865.4 |
| 292100000027 | Nick R. Hughes | 5581 |
| 298700000002 | Nick R. Hughes | 864.9 |
| 298700000001 | Gunnison Hunting Properties, LLC | 5929.2 |
| 298700000004 | Hotchkiss Ranches Inc. | 2342.4 |
| 298900000010 | Hotchkiss Ranches Inc. | 6,401.8 |
| Total | | 26,345.7 |

## SG Interests I Ltd.
## Federal 12-89-7 #1

Temporary Poly Pipeline Route

0 0.5 1 Miles

1 in = 3,000 feet

N

*Disclaimer: This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information.*

*Prepared for SG Interests I Ltd. by TerraCognito GIS, Inc. September 2015*

Temporary Poly Pipeline Route map for SG Interests I Ltd., Federal 12-89-7 #1

**SG Interests I Ltd.**

**Federal 12-89-7 #1**

Temporary Poly Pipeline Route

**Legend:**

*Pits 1 & 2: Temporary Poly Pipeline*
- On-lease segment (6,401.8')
- Off-lease segment (23,848.9')

*Pits 3 & 4: Temporary Poly Pipeline*
- On-lease segment (6401.8')
- Off-lease segment (19,943.9')

Flowback pit
Lease Boundary (crossed by pipeline)
Existing pad/facility

*Existing Road*
- Improved road
= = Unimproved road

1 in = 3,000 feet

0    0.5    1 Miles

Disclaimer: This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information.

Prepared for SG Interests I Ltd.
by TerraCognito GIS, Inc.
September 2013

BLM_0029136

SG Interests I, Ltd.
1485 Florida Road, Suite C202
Durango, Colorado 81301

Federal 12-89-7 #1
Lease Number: COC66704
Bull Mountain Unit: COC67120X
1431' FSL, 730' FEL Sec. 7 T12S R89W
Gunnison County, CO

EIGHT POINT DRILLING PROGRAM

The proposed Federal 12-89-7 #1 well is a vertical well to complete in the ███████████ ████████. It is proposed to set and cement 16" conductor pipe to +/-80', drill a 12-1/4" surface hole to ± 970' MD, run and cement with cement returns to surface 9-5/8" surface casing, drill 8-1/2" production hole to ████████████, run and cement 5-1/2" production casing with cement returns to surface. Log offsets for this well are Hotchkiss Federal 18-31, Hotchkiss Federal 17-11, and Hotchkiss Federal 1-34.

1.      Estimated formation tops:

| Federal 12-89-7 - 1 (VERTICAL) | | |
|---|---|---|
| Datum = Ground Level True Vertical Measured Depth in Feet | | |
| Formation/Group | Depth of Top (feet, TVD) | Thickness (feet) |
| Wasatch | Surface | 950 |
| Ohio Creek | 950 | 350 |
| Williams Fork (top of the Mesaverde) | 1,300 | 1,800 |
| Rollins Sandstone | 3,100 | 950 |
| ██████ | ████ | ███ |
| ██████ | ████ | ███ |

1

Federal 12-89-7 #1                                                Drilling Plan

2.        Estimated depth and thickness of formations:

| Federal 12-89-7 - 1 (VERTICAL) | | | | |
|---|---|---|---|---|
| Datum = Ground Level<br>True Vertical Measured Depth in Feet | | | | |
| **Type** | **Name** | **Depth (feet)** | **Thickness (feet)** | **Lithology** |
| None | Wasatch | 0 | 950 | Sand-Shale |
| None | Ohio Creek | 950 | 350 | Sand-Shale |
| ■ |  | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |

3.        Minimum Specifications for Pressure Control Equipment:

BOP equipment and accessories will meet or exceed BLM requirements outlined in 43 CFR Part 3160. A 3,000 or a 5,000 psig double ram hydraulic BOP will be used (see attached diagram) for the production portion of the well (970' – ■). Maximum anticipated formation pressure is 2,000 – 2,200 psig. Accessories to the BOP will meet BLM requirements for the system used. The accumulator system capacity will be sufficient to close all BOPE with a 50% safety factor. Fill line, kill line and line to choke manifold will be 2". BOP's will be function tested every 24 hours and will be recorded on IADC log. Surface casing will be tested to 1,500 psig for 30 minutes.

Accessories to BOPE will include upper and lower Kelly cocks with handles, stabbing valve to fit drill pipe on floor at all times, string float at bit, 3000 or 5000 psig choke manifold with 3" adjustable and 3" positive chokes, and pressure gauge.

2

Federal 12-89-7 #1                                         Drilling Plan

BLM_0029138

4.      Casing and Cementing Program:

| Casing | MD |
|---|---|
| 16" conductor pipe | 80' |
| 9 5/8" surface casing | 970' |
| 5 ½" production casing | ███ |

| String | Size of Hole | Size of Casing | Weight Per Foot (lbs) | Grade | Setting Depth (MD) | Sacks Cement | Cement Bottom | Cement Top |
|---|---|---|---|---|---|---|---|---|
| Conductor | 24" | 16" | 65 | J-55 | 80' | 185 | 80' | Surface (0') |
| Surface | 12 1/4" | 9 5/8" | 40 | J-55 | 970' | 370 | 970' | Surface (0') |
| Production | 8.5" | 5 1/2" | 17 | P-110 | ███ | ███ | ███' | Surface (0') |

Procedure:

Drill 8-1/2" Production hole to ███████ utilizing Water Base Mud.

1.  POOH.
2.  Run 5-1/2" Production Casing to TD and cement same to surface.
3.  Rig down and release rig.

5.      Mud Program:

A native water based spud mud system (FW) will be used for the surface hole (970' of 12-1/4" hole, set 9-5/8" casing). Primary product used will be gel for viscosity control.

A low-solids, non-dispersed gel system (LSND) will be used throughout the production hole ███████ ███████████████████. Products used may include but not be limited to Barite for weighting material, gel for viscosity control, lime for alkalinity control, Pac LV for fluid loss, Desco for rheological control and to reduce gel strengths, and lost circulation materials (LCM) such as fibers, saw dust or walnut shells. Solids control equipment will include shakers and a centrifuge. Fluid densities will be maintained as low as possible to drill with minimal over-balance to reduce the possibility of losing returns and/or of differentially sticking the drill sting. Hole conditions and drilling parameters will be monitored closely for indications of increases in formation pressures. Fluid densities will be adjusted accordingly. Optimum hydraulics will be maintained to provide maximum hole cleaning and minimize washout of the wellbore. Rheological properties will be adjusted for optimum bit hydraulics, penetration rates and minimize drag forces on the wellbore. Holes conditions and mud properties will be optimized prior to running logs, running casing and cementing. Adequate amounts of lost circulation and weighting material will be on location if needed as well as sorbitive agents to handle potential spills of fuel or lubricants.

| Depth | Type | Wt (ppg) | Vis (sec) | Wtr loss | Solids |
|---|---|---|---|---|---|
| 0-970' | FW | ± 8.5-8.7 | 30-40 | NC | <7% |
| 970 ███ | LSND | ± 8.7-9.5 | 40-70 | 6-8 cc | <7% |

6.      Testing, Coring and Logging Program:

Openhole logs will include GR, Induction, Caliper, and Density logs from intermediate casing to surface casing and GR-MWD log from TD to intermediate casing. Mud logging services will be placed on the well from immediately below surface casing (970 ft.) to TD. The Mud logging services include gas detection and monitoring, drilling sample collection and examination for lithology every 30 ft.

Open hole testing such as Drill Stem Testing or Repeat Formation Tester is not planned. No coring of any type is planned. If a decision is made to complete the well, casing will be run and the well will be tested through perforations. Cased hole logs (CBL) will be used to evaluate cement behind pipe in both the surface casing and production intervals.

7.      Anticipated Drilling Conditions: Pressures, Temperatures, Lost Circulation, H2S, etc.:

No abnormal pressures or temperatures are expected in this well. Maximum anticipated reservoir pressure at TD is 2,000 – 2,200 psig with a normal temperature gradient. Lost circulation is possible. Lost circulation material will be maintained on location. Both the surfaces and production strings will be cemented to surface. No H2S is expected nor has H2S been encountered in the drilling of any previous wells.

8.      Operations:

Anticipated spud date is July 15, 2014 or as soon as permits are received and work can be scheduled. Estimated drilling time is 10-15 days. The well will be completed as a cased hole completion, perforated and hydraulically fracture stimulated. Completion operations are expected to take 7-14 days and will commence as soon after completion of drilling operations and scheduling allow.

Federal 12-89-7 #1                                                                                    Drilling Plan

BLM_0029140

5-M Choke Manifold Diagram



5M BOP

5M BOP



5M CHOKE MANIFOLD EQUIPMENT - CONFIGURATION OF CHOKES MAY VARY

Although not required for use of two choke manifold systems, buffer tanks are sometimes installed downstream of the choke assemblies for the purpose of manifolding the bleed lines together. When buffer tanks are employed, valves shall be installed upstream to isolate a failure or malfunction without interrupting flow control. Though not shown on 2M, 3M, 10M, OR 15M drawings, it would also be applicable to these situations.
[54 FR 39528, Sept. 27, 1989]

5

Federal 12-89-7 #1                                                          Drilling Plan

BLM_0029142

# APPENDIX G
# CONDITIONS OF APPROVAL FOR APD 12-89-7-1 PACKAGE

The following surface-use conditions of approval (COAs) shall be implemented to reduce impacts from project activities. These COAs are in addition to all stipulations attached to the respective Federal leases and are selected from the list of COAs presented in this Record of Decision, **Appendix A**, specific to the individual Federal 12-89-7-1 APD.

In cases of split-estate mineral developments, where the surface landowner specifically requests deviation from one or more of these COAs, the desired deviation shall be brought to the attention of the BLM Authorized Officer. Although landowner preferences are accommodated when appropriate, the BLM remains responsible for ensuring that oil and gas activities are conducted in a manner to minimize adverse impacts on other resources and resource uses for which a Federal nexus exists. This includes minimizing impacts on BLM-administered lands and to Federally protected resources both within and outside the private parcels.

### CONDITIONS OF APPROVAL SELECTED FROM THE RECORD OF DECISION, SPECIFIC TO THE FEDERAL 12-89-7-1 APPLICATION FOR PERMIT TO DRILL (APD)

The selected COAs selected are numbered as they appear in ROD **Appendix A**.

For all COAs that contemplate exceptions when not "practicable," the BLM retains sole authority to determine whether an exception should be granted.

BLM_0029143

## Monitoring

1. WHP: SGI will meet annually with BLM by December 31 of each year to summarize the results from water quality monitoring, air quality adaptive management, annual development (construction and operational activities), and mitigation activities for the previous 12 months and to forecast with best available information the next year's development and mitigation activities as a result of implementing the WHP.

## Construction—General

5. Any loose rock occurring in the vicinity will be scaled prior to construction if it presents a safety hazard.

6. Where feasible and consistent with future plans and operations and considering safety concerns, all tanks and production facilities will be situated on the access road side of the well pad in order to maximize the coverage by interim reclamation upon the area necessary to create the well pad.

9. Use of erosion-control blankets with plastic netting will not be permitted.

11. The well pad surface and surfacing material will be maintained until implementation of final reclamation activities, where it will be removed or buried in the cut portion of the location.

12. Rights-of-way (ROWs) will be avoided to the extent possible. If they cannot be avoided, caution will be used to ensure no impacts to facilities or disruption of use occurs. Existing ROWs will be managed to protect valid existing rights.

14. WHP: Where practicable, each new facility will be tied into a field-wide produced water gathering system for water disposal.

15. WHP: In addition to installing standard stormwater erosion controls to protect water quality as required by the Colorado Department of Health and Environment (CDPHE), SGI will comply with Colorado Parks and Wildlife (CPW) and Colorado Oil and Gas Conservation Commission (COGCC) recommended buffers for aquatic habitats in the BMU (see LIDAR [Light Detection and Ranging] discussion in Final EIS Appendix A and C). SGI will implement the following best management practices (BMPs) within the BMU:

   - Except as outlined on **Figure 2** of the Wildlife Habitat Plan and other excepting activities outlined below, no surface disturbance within 300 feet of a designated cutthroat trout stream;

   - In areas other than cutthroat trout streams, well pads and facilities will not be sited, to the extent practicable, within 150 feet of any lake, reservoir, wetland, or perennial or seasonally flowing stream or river;

   - Roads crossing CPW-mapped cutthroat trout streams will be bridged or use appropriately sized culverts to prevent stream bed damage and the transfer of disease organisms. Pipelines that cross cutthroat trout streams should be bored if practicable;

BLM_0029144

- Stream disturbances in or upstream of CPW-mapped cutthroat trout habitat will be avoided between June 1 and August 31 to avoid impacts on spawning cutthroat trout;

- All stream crossing and culverts on perennial and intermittent streams will be designed to allow aquatic species passage;

- Minimum ROW widths will be used where pipelines cross riparian areas and streams and crossing will be constructed at right angles to the stream channel;

- Native riparian canopy cover and stream bank vegetation will be left intact to the extent practicable;

- Chemical dust suppression activities will be avoided within 300 feet of the ordinary high water mark of any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river, unless required by surface owner, county, or state requirements;

- Screen water suction hoses to exclude fish and amphibians; and

- Disinfect heavy equipment, hand tools, boots and any other equipment that was previously used in a river, stream, lake, pond, or wetland in a different watershed prior to moving the equipment to the BMU. The disinfection practice applies fieldwide and follows the procedure outlined in COGCC Rule 1204.a.2.

17. WHP: SGI will observe the restricted surface occupancy (RSO) buffer restrictions contained in COGCC Rules. If SGI cannot comply with the RSO buffer restrictions for a particular facility, SGI will enter into an individual consultation with CPW on that facility under Rule 306.c. to evaluate options for avoidance, minimization, and mitigation.

## Construction—Road

18. Vehicle traffic is limited to the bladed/traveled road surface and existing parking areas, pullouts, etc. No new pullouts, off-road parking, or staging areas will be allowed unless specifically authorized by the BLM.

19. The operator will provide timely year-round road maintenance and cleanup on the access roads.

21. Unless otherwise approved by BLM, avoid headwalls, midslope locations on steep, unstable slopes, seeps, old landslides, slopes in excess of 40 percent, and areas where the geologic bedding planes or weathering surfaces are inclined with the slope.

22. Promptly remove slide material when it is obstructing road surface and ditchline drainage. Save all soil or material useable for reclamation and stockpile for future reclamation needs. Use remaining slide material for needed road improvement or place it in a stable waste area. Avoid sidecasting of slide material where it can damage, overload, saturate embankments, or flow into downslope drainage courses. Reestablish vegetation in areas where more than 50 percent of vegetation has been destroyed due to side casting.

BLM_0029145

24. New road construction and improvements will only occur on an as-needed basis to facilitate access to well pads and other facilities.

27. Spur roads to individual well pads will be constructed immediately prior to well pad construction.

**Construction—Pipeline**

28. Pipelines and roads will be sited to avoid identified elk winter concentration areas, unless avoiding such habitats will result in greater net surface disturbance or if it is determined to be a detriment to other resource values.

30. Where feasible, trunk lines will be buried in the roadbed or in the borrow ditch to further reduce surface disturbance. No more than a 30-foot-wide disturbance route in addition to the average 16-foot-wide road will be approved for collocated pipelines.

32. SGI will ensure that access is provided for property owners, tenants, or ROW holders to move vehicles, equipment, and livestock across the trench where necessary. SGI will ensure that livestock can access their water sources.

34. Carsonite pipeline markers will be installed on the surface and tracer wire will be installed for all buried pipelines.

36. Flowline pipelines will be pressure tested annually in compliance with COGCC Rules 1101 and 1102 Flowline Guidance.

37. Pipelines will be tested in compliance with CDPHE Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. The operator will submit to BLM a copy of the approved conditions and stipulations from CDPHE and identify on a map the location of the water discharge point. Notification to all nearby residents as well as the Gunnison County Dispatch Center will be made prior to the pressure test and blowdown. Water discharge, if necessary, will occur into upland areas, on gentle slopes, and will be conducted in accordance to the conditions and stipulations in CDPHE's Colorado Discharge Permit System.

**Construction—Well Pad**

43. WHP: SGI will use multiple well pad sites to reduce surface disturbance and overall habitat fragmentation.

44. SGI will ensure that water accumulation on pads is not allowed to drain into wetlands or riparian areas down-gradient from the Unit.

**Drilling—Tanks and Pits**

51. Drill cuttings will be processed to remove excess drilling fluids. The cuttings will be stored on location in segregated lined piles or in a storage container. Cuttings will be sampled and tested according to COGCC 900 Series Rules, then transported to a permitted disposal/waste management facility (depending on the concentrations of potential soil contaminants listed in COGCC Table 910-1 and analyzed by an EPA-approved laboratory). Results of cuttings pit testing on federal well sites will be made available to the BLM.

BLM_0029146

**Drilling—Gas Well**

54. For dry holes, the abandonment marker will be capped with a 2-foot by 2-foot steel plate, at least 1/4 inch thick. The plate must be permanently inscribed with the identity requirements of 43 CFR 3162.6d and buried a minimum of 2 feet below the final reclaimed ground level.

55. WHP: SGI will limit the number of drilling rigs operating in the BMU during those times when wintering big game can be most impacted. SGI will operate up to three (3) drilling rigs between April 15 and December 1 of each year. Only one drilling rig will operate from December 1 through April 15 each year.

56. In the winter period December 1 through April 15, SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands, resulting in a landscape approach to maintaining winter habitat suitability for big game. The BLM may approve annual exceptions to the lease stipulations for winter timing restrictions on federal minerals in areas outside of the WHP Winter Closure Areas. The portion of the area outside the WHP big game Winter Closure Areas where winter activity may occur under such annual exceptions will be discussed among SGI, BLM, and CPW annually no later than August 1.

    WHP: To address potential direct and indirect impacts on wintering big game, SGI will limit winter activities in portions of the BMU that have been identified by CPW as the most critical to wintering big game. See **Figure 1**, Winter Closure Areas, in the WHP.

    The activities listed below will not occur within the big game "Winter Closure Areas" between December 1 and April 15 each year:

    - Drilling of new wells;

    - Well work-over and completion activity intended to increase the production of a well;

    - Reclamation activities and existing road maintenance activities that can be delayed until after April 15 each year; and

    - New surface-disturbing activities, including pipeline construction and installation, road and pad construction, and other general construction and facility installation.

    SGI will limit activities to the following between December 1 and April 15 each year:

    - Well production and routine maintenance activities. In this context, well production and routine maintenance activities include:

        o Emergency work-overs or other emergency actions necessary to remedy equipment failures or unanticipated declines in production, or as required by local, state, or federal regulatory agencies;

BLM_0029147

- o Non-routine pipeline facility maintenance necessary to remedy unanticipated production problems, to address safety issues, or as required by local, state, and federal regulatory agencies;

- o Normal daily production activities including "pumping" of wells, generally requiring up to two (2) vehicle trips per day or less to a well pad; and

- o Snow plowing and the minimum amount of road maintenance necessary to access the well for normal daily production activities.

57. SGI will install gates and signage to limit access to the extent permitted by the landowners at all entry points to the voluntary big game closure areas shown on WHP **Figure 1**.

**Completions—Gas Well**

63. Per COGCC Order No. 1R-114, operators are required to post their disclosure of chemicals intentionally added to hydraulic fracturing fluids on FracFocus.

64. Test gas will be flared (combusted) or captured for sale or use (i.e., green completions) to prevent its escape to the atmosphere in accordance with Federal Notice to Lessees and Operators NTL-4A and COGCC regulation 2 Colorado Code of Regulations 805.b(3).

65. In the event it becomes necessary to flare a well, a deflector and/or directional orifice will be designed and installed to safeguard both personnel and adjacent lands.

**Interim Reclamation**

68. WHP: SGI will use a CPW-recommended wildlife friendly seed mix for interim and final reclamation where approved by the surface owner. The CPW-recommended wildlife-friendly seed mixes for the BMU are found in the Wildlife Habitat Plan.

70. Reclamation efforts will continue until all related requirements are met.

71. Removal or burial of any surfacing material used to complete the well pad will be according to the BLM's or authorizing agency's standards.

73. SGI will minimize dust and erosion during the interim reclamation process.

74. Areas needed for production and subsequent drilling operations (those planned within 12 months) will be stabilized to minimize fugitive dust and erosion.

75. Stockpiled topsoil, as well as remnant vegetation (e.g., uprooted sagebrush and oak brush) will be spread over interim reclamation areas. Any remaining stockpiled topsoil not needed for interim reclamation will also be stabilized and reseeded. Prior to reseeding, all reclaimed areas will be scarified and with a slightly roughened surface, but with microtopography (highs and lows) no greater than 2 inches.

**Production—General**

76. WHP: In addition to the daily site inspections at each well pad location, SGI will monitor the following aspects of well production using remote telemetry:

BLM_0029148

- Tubing pressure;
- Casing pressure;
- Gathering system line pressure;
- Wellhead differential pressure;
- Wellhead gas temperature;
- Wellhead gas rate; and
- Production tank level alarms.

SGI will implement this remote monitoring under the following time limits:

- Wells existing in the BMU on the date of this ROD will be retrofitted and will become compliant with the seven (7) monitored aspects of well production listed above within twenty-four (24) months after that date; and
- Wells not yet existing in the BMU on the date of this ROD are required to comply with the seven (7) monitored aspects of the well production listed above. A single six- (6-) month grace period for well compliance after a well is placed in production will be allowed.

77. All long-term facility and permanent structures will be painted a flat, nonreflective standard environmental color using the standard environmental colors chart with consideration of the private landowner's views. Facilities will be painted within six months of being on-site. As required by the Occupational Safety and Health Administration, some equipment will be painted for safety considerations such that equipment will retain their safety coloration so they do not blend with the surroundings.

78. Protective barriers will be installed around the production facilities, including tanks.

79. All site security guidelines will be followed as identified in the authorizing agency's statutes, regulations, and policy.

80. Centralized production facilities may be used if it is determined that doing so will provide a net benefit to the impacted resources. Whether centralized production facilities are required or developed as part of a project's design features will be determined at the permitting stage.

81. SGI will conduct the minimal amount of seasonal road maintenance required to pump the well or conduct emergency activities.

**Production—Produced Water Management**
82. Disposal of produced water will be in accordance with a plan approved by the BLM as provided for in Federal Onshore Order No. 7, Disposal of Produced Water, and/or in accordance with a plan approved by the COGCC rules and regulations.

**Production—Workovers**
83. Workover activities will typically be implemented during daylight hours only.

BLM_0029149

**Maintenance**

84. SGI will be required to prepare and implement a road maintenance plan for all roads used for project-related purposes.

**Final Abandonment**

86. Wells will be plugged in compliance with all BLM standards and all federal regulations. All surface equipment will be removed. Removal or burial of surfacing material will comply with the authorizing agency's standards.

87. Plugging and abandonment of wells will use industry BMPs and comply with all applicable rules and regulations set forth by the BLM and/or the COGCC for plugging. Depending upon surface estate, abandonment will comply with the appropriate surface management agency.

**Reclamation—General**

88. To mitigate additional soil erosion at the well pad and potential increased sediment and salt loading to nearby surface waters, all disturbed areas affected by drilling or subsequent operations, except areas reasonably needed for multi-well drilling and/or production operations, will be reshaped and reclaimed as early and as nearly as practicable to their original condition. SGI will minimize dust and erosion during final reclamation

89. Exposed slopes will be revegetated as soon as possible, with a native seed mix or approved seed mix, at a density and a pattern that replicate what was removed during construction. Nonnative seed mix can create visual impacts through strong color and texture contrast with the surrounding native vegetation.

90. A reclamation status report will be submitted to the BLM annually for all actions that require disturbance of surface soils on BLM mineral estate. Actions may include, but are not limited to, well pad and road construction, construction of ancillary facilities, or power line and pipeline construction. The reclamation status report will be submitted by December of each calendar year and will include the well number, legal description, project description (e.g., well pad or pipeline), reclamation status (e.g., interim or final), whether the well pad or pipeline has been revegetated and/or recontoured, date seeded, photos of the reclaimed site, estimate of acres seeded, and seeding method (e.g., disk-plowed, drilled, or both). Internal and external review of this plan and the process used to acquire the necessary information will be conducted annually, and new information or changes in the reporting process will be incorporated into the plan as necessary.

**Reclamation—Monitoring**

91. Revegetation efforts will be considered satisfactory when soil erosion resulting from the operation has been stabilized, and a vegetation cover equal to 70 percent (both cover and diversity of species) of pre-existing or seeded-in vegetation is reestablished as evidenced by pre-and post-construction photo-point monitoring and vegetation plots and transects.

92. SGI will monitor interim and final reclamation progress at 1-, 2-, 3-, and 5-year intervals.

BLM_0029150

93.  Reseeding will be required if satisfactory interim reclamation progress is not being made at year 2 or year 3 monitoring intervals, or if final reclamation is not achieved by year 5.

**Resource Protection—Air Quality**

94.  The BLM will place a COA on each permit, requiring the operator to emit 5 tons per year (tpy) or less of NOx at each well pad for production operations (post-construction and development phase) as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. The operator will be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 tpy may be acceptable if the operator can demonstrate compliance with the $NO_2$ 1-hour National Ambient Air Quality Standard (NAAQS) for the APD. Any additional impacts analyses will need to be reviewed and approved by BLM prior to BLM authorizing activities.

95.  The BLM will place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling/fracturing/completion activities. The operator will be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to use to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 hp at any one time during the development phase (this total horsepower was analyzed for the Final EIS-specific $NO_2$ 1-hour impacts analysis) can trigger the need for additional impacts analysis and potentially warrant a requirement (COA) for Tier 3–4 engines. The goal of the requirement is for development (drill/completion/fracturing)-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

96.  The BLM will require the operator to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory for BLM review that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 tpy of NOx (annual NOx emissions level limit determined using the acceptable project-level nitrogen deposition threshold [0.005 kg/ha-yr] and an equation of a line for the annual NOx emissions levels and corresponding modeled nitrogen deposition). The BLM will place a COA on each permit (APD), requiring the operator to submit a NOx emissions accounting analysis summary that provides information for how the APD emissions fit into the overall Unit-wide production phase (post construction and development) NOx emissions budget (approximately 143 tpy of NOx).

97.  The BLM will require SGI to apply continuous watering to keep the surface moist during access road and well pad construction and during heavy traffic periods, including drilling and completion phases of well development. The operator can select and inform the BLM of chosen dust abatement. At a minimum, the application of freshwater will be acceptable. Other examples include: magnesium chloride,

BLM_0029151

emulsified asphalt, gravel, or other dust palliatives to decrease the application frequency normally required when using freshwater only.

98. SGI will be required to utilize and operate pneumatic devices, tanks and dehydrators in accordance with CDPHE and US Environmental Protection Agency (EPA) oil and gas regulations.

**Resource Protection—Noise**

99. This project will be compliant with COGCC and CDPHE standards for noise abatement. COGCC standards applied during operation of production equipment will be those for the residential/agricultural/rural zone.

**Resource Protection—Cultural Resources**

100. Any National Register of Historic Places-eligible sites located in proposed disturbance areas will be avoided by all project-related disturbance, including well pad and water-disposal units, pipelines, and access roads. Should avoidance not be possible then the operator, in consultation with the BLM and the State Historic Preservation Office and with input from other interested parties per 36 CFR Part 800.6 and the Statewide Protocol Section VII, will develop a mitigation plan designed to eliminate the adverse effects.

**Resource Protection—Visual Resources**

101. Downlighting will be used for all operating and production facilities.

**Resource Protection—Rangeland Management**

102. A cattle guard and/or gate will be placed at the time of fence construction where a well access road bisects the fenceline that surrounds a well pad's disturbance imprint. Once reclaimed plant species are fully established on disturbed sites as determined by the BLM, the fence and cattle guard will be completely removed by the operator. This will allow for reclaimed plant species to establish without grazing pressure from livestock. Interim reclamation will also include repairing range management facilities and improvements that had been altered by project-related activities, such as the installation of cattle guards where new access roads cross fences.

**Resource Protection—Hazardous Materials and Solid Waste**

103. Signs will be posted on-site that identify potential hazards associated with site operation, including chemical hazards.

105. Any surface spills or releases of oil, condensate, produced or flowback water, drilling fluids, or other potentially harmful substances will be contained and immediately removed according to SGI's spill prevention, countermeasure and control (SPCC) plan.

106. Spills will be reported according to the regulations in place for the specific land ownership, type of spill, and volume of spill.

107. Tanks containing hazardous materials, including drilling fluids and/or muds, completion fluids, fuels, lubricants, produced liquid hydrocarbons, condensates, and produced water, will be surrounded by a secondary containment berm of sufficient

BLM_0029152

capacity to contain the entire capacity of the largest single container and sufficient freeboard to contain precipitation as required in the authorizing agency's standards. All loading lines and valves will be placed inside the berm surrounding the tank, or catchment basins will be used to contain spills. The tanks will be emptied as necessary, and the liquids will be trucked to market.

**Resource Protection—Wildlife and Wildlife Habitat**

109. Bear-resistant dumpsters and trash receptacles will be installed at all facilities.

110. The operator will install screens on all heater-treaters and other exhaust systems to prevent nesting bird activity and bird mortality.

111. All lethal and non-lethal injury events that involve migratory birds will be reported to a BLM official immediately.

112. Screened water-suction hoses will be utilized to exclude fish when drawing water from streams, ponds, and lakes.

113. Wildlife crossovers (trench plugs) with ramps will be installed on each side of trenches at maximum 1/4-mile intervals and at well-defined game trails to facilitate passage of big game across the open trench and to allow trapped wildlife to escape the trench.

114. WHP: SGI will conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling activities. SGI will conduct these surveys between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM NOS. Where active raptor nests are identified, SGI will apply CPW's raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors, 2008). When other migratory bird nests are located, SGI will avoid disturbance of nests, nestlings, and fledglings during the breeding season. Nest trees being used by cavity nesting birds will be flagged when located and avoided during the nesting season.

**Resource Protection—Invasive, Nonnative Species**

117. The operator and the operator's contractors will disinfect heavy equipment, hand tools, boots, and any other equipment used previously in a river, lake, pond, or wetland, by routinely cleaning equipment using hot water and high-pressure sprayers to remove dirt, mud, and foreign debris before equipment is brought on-site.

**Resource Protection—Water**

124. In addition to the State of Colorado (COGCC) baseline sampling and water monitoring rules (608b and 609), the following will be added to the existing monitoring program conducted by the operator:

- Due to the limited number of groundwater wells in the area, the radius for both coal bed methane wells and conventional wells will extend to a radius of 1 mile. The COGCC selection criteria apply, including selecting a maximum of four wells in a 1-mile radius for conventional wells and coal bed methane wells. In addition to groundwater well sampling, all surface water sources and

BLM_0029153

spring sources within 1 mile from well pad location will be sampled. A maximum of four sources should be selected with at least one source upgradient of the well. The preferred surface water sources are springs and perennial streams. Other acceptable surface water sources include intermittent streams, canals and ditches, lakes, and ponds. Surface water samples should be collected during lower flow periods after spring runoff.

- Sampling will be conducted prior to drilling a well, and at intervals of 1 year, 3 years, and 6 years following completion of the well. Each additional well on a multi-well location will have baseline testing. New wells proposed on an existing pad with a well that is currently on the above-mentioned sampling schedule will not create a new sampling schedule, unless the final year 6 sampling has passed.

- Groundwater and surface water will be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX (benzene, toluene, ethylbenzene, and xylene), TPH (total petroleum hydrocarbons), dissolved organic carbon (DOC), nutrients, and field properties including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling will include one replicate and one blank during each sampling trip. The replicate and blank will be analyzed for the same constituents as the environmental sample. If any of the above-listed constituents are significantly elevated from baseline analysis and above applicable water quality standards as the result of SGI operations, then immediate sampling of all surface waters downgradient from the well pad location within 1 mile will be tested. In addition, a notice to the BLM will be given detailing elevated levels and additional wells to be sampled.

- Surface water and groundwater samples should include stable isotopes of methane (carbon and deuterium) to determine the origin of the methane (biogenic and/or thermogenic) if free gas or dissolved methane concentration is greater than 1.0 milligram per liter. If methane concentrations exceed 1.0 milligrams per liter, noble gases should also be sampled to age date groundwater and in combination with methane data can help distinguish between natural sources of methane or those induced from drilling activities.

- Sample collection for surface water and groundwater should follow the National field manual for the collection of water-quality data.[1] Instrument logs, well characteristics, and other QA/QC collection methods should be submitted to the BLM.

- Data should be summarized and provided to the BLM annually for review. BLM review of the data will evaluate any exceedances of water quality standards or deviations from the baseline monitoring data. If BLM finds exceedances or deviations, BLM may require further investigation and remediation. BLM will determine if further analysis of data may be required by another agency such as the US Geological Survey. Any additional expenses incurred for further reviews as required by BLM, will be the responsibility of the operator. Results from the water quality monitoring will

BLM_0029154

also be presented by SGI to the BLM at the annual construction and operation activities meeting.[1]

125. Use of surface water will be contingent upon the proper authorizations and permissions by the State of Colorado and water right holders (see Final EIS, Appendix L).

---

[1] US Geological Survey, variously dated, National field manual for the collection of water-quality data: US Geological Survey Techniques of Water-Resources Investigations, book 9, chapters A1–A9, available online at http://pubs.water.usgs.gov/twri9A.

BLM_0029155

This page intentionally left blank

BLM_0029156

# APPENDIX H
# FINAL EIS ERRATA

The following are minor corrections to errors in the Final EIS (July 2016). These corrections are not significant changes.

## H.1   ALTERNATIVES CONSIDERED AND ELIMINATED FROM EA—500-FOOT DEVELOPMENT SETBACK

Final EIS page 2-102 incorrectly states that the water body setback under Gunnison County Regulations for Oil and Gas Operations is a 300-foot requirement. The water body setback is 150 feet for an inner buffer and 150 feet to 500 feet for an outer buffer (Gunnison County Board of County Commissioners 2012). This correction does not affect the rationale for eliminating this alternative from detailed analysis.

## H.2   GREEN LINEAGE COLORADO RIVER CUTTHROAT TROUT

On Final EIS page 3-88 and elsewhere, the Final EIS refers to populations of cutthroat trout (*Oncorhynchus clarkii*) in Roberts Creek and Henderson Creek in the Bull Mountain Unit as greenback cutthroat trout (*O. c. stomias*), a federally listed species under the Endangered Species Act. These fish are in fact "green lineage" Colorado River cutthroat trout (*Oncorhynchus clarkii pleuriticus*), a taxon not listed under the Endangered Species Act. Based on recent genetic research (Metcalf et al. 2012), only one remaining population of true greenback cutthroat trout exists in Colorado. However, until the genetic and physical characteristic research is interpreted and decisions are made, previously suspected greenback cutthroat trout (including green lineage Colorado River cutthroat trout) populations in western Colorado will continue to be considered as greenback cutthroat trout with regard to Endangered Species Act compliance, in accordance with USFWS direction (USFWS 2012). Based on this information, all references to greenback cutthroat trout in the Final EIS actually refer to green lineage Colorado River cutthroat trout. The Final EIS displays the green lineage cutthroat in Roberts Creek and Henderson Creek in the northwest portion of the Unit on Final EIS Figure 3-12, Fish and Aquatic Habitat, shown as "occupied cutthroat stream." Descriptions of habitat and threats to this taxon, as well as distribution in the Unit, remain as described in the Final EIS.

BLM_0029157

## H.3 PROGRAMMATIC BIOLOGICAL OPINION, WATER DEPLETIONS, AND ENDANGERED COLORADO AND GUNNISON RIVER FISH

Final EIS pages 2-35 and 2-69 state that water depletions would be from the Colorado River; however, the water depletions would be from the Colorado River Basin. The correction is as follows:

> "However, as specific water withdrawal points have not yet been identified by SGI, it is assumed for the purposes of analysis and Section 7 consultation that the entire depletion associated with this project would be a new depletion from the *Colorado River Basin*, and thus would be subject to recovery fees as appropriate."

Final EIS page 3-88 refers to the Programmatic Biological Assessment for the BLM's Fluid Minerals Program in western Colorado but does not identify the total acre-feet of annual depletion for federal wells in western Colorado. Annual depletions in excess of 4,046 acre-feet will trigger reinitiation of consultation for the endangered Colorado and Gunnison River fish (Colorado pikeminnow, humpback chub, bonytail chub, and razorback sucker).

Final EIS pages 4-143 and 4-146 incorrectly refer to 379 acre-feet as the Programmatic Biological Assessment's annual estimated water depletion amount for all oil and gas activities in western Colorado; however, the correct annual estimated depletion amount for all federal wells in western Colorado is 4,046 acre-feet. The estimated annual depletion from the Colorado River sub-basin is 379 acre-feet. The Final EIS incorrectly compares the freshwater use estimates from Table 2-10 for Alternative A (220.7 acre-feet total, or 74 acre-feet annually over 3 years drilling duration) and Alternatives B, C, and D (744.1 acre-feet total, or 124 acre-feet annually over 6 years drilling duration) to the 379 acre-feet for the Colorado River sub-basin. These freshwater use estimates of 74 acre-feet annually (Alternative A) and 124 acre-feet annually (Alternatives B, C, and D) should, instead, be compared to the maximum 4,046 acre-feet.

Final EIS page 4-160 states that 74 acre-feet (220.7 acre-feet over 3 years drilling duration) of freshwater will be depleted under Alternative A. It should be noted that because Alternative A does not involve federal approval of well developments, USFWS does not track those depletions. The 74 acre-feet of annual depletions under Alternative A was considered for analysis purposes. Additionally, Final EIS pages 4-160 and 4-161 describe the Programmatic Biological Assessment, Programmatic Biological Opinion, and Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin under Alternative A. These documents apply to federal actions, and thus apply to Alternatives B, C, and D but not to Alternative A, except in consideration of cumulative impacts from potential federal development.

Final EIS page 4-161 incorrectly states that net water depletions are expected to be lower due to SGI's water augmentation plan. SGI's water augmentation plan (Final EIS, Appendix L) will change the specific water withdrawal point of the freshwater that will be used, but it will not change the net depletion amount.

## H.4 SECTION 4.2.7, FISH AND WILDLIFE

In September 2016, the BLM and CPW further discussed the potential impacts of the WHP under each alternative analyzed in the Final EIS (July 2016). These discussions resulted in minor

BLM_0029158

corrections to Final EIS Section 4.2.7, Fish and Wildlife. These minor corrections are not significant changes, and the Draft EIS and Final EIS analyses support these corrections.

Please also see track changes of Section 4.2.7 posted on the BLM's Bull Mountain Unit MDP website.[1] Final EIS page numbers listed below are for the track changes Section 4.2.7.

Final EIS page 4-129 through 4-130, *Assumptions*

- The assumption regarding big game and small mammals, reptiles, and amphibians was clarified.

Final EIS page 4-131, *Effects Common to All Alternatives*

- As described in **Section H.6** (see below) of this appendix, a pipeline bore may be used to cross a road or wetland.

Final EIS page 4-131, *Habitat Quality*

- The reference Hebarrelewhite was corrected to Hebblewhite.

Final EIS page 4-132, *Alternative A*

- The sentence about the effects of implementing WHP was deleted, as the WHP would not be applied under Alternative A. Alternative A is the No Action Alternative.

Final EIS page 4-133 through 4-134, *Alternative A, Terrestrial Wildlife, Mule Deer*

- The title of Table 4-52 was clarified from "Habitat Categories by Alternative" to "Winter Road Density Habitat Categories by Alternative." The title of Figure 4-15 was clarified from "Habitat Categories by Alternative" to "Winter Road Density Habitat Quality Categories by Alternative."
- The following sentence, "Mule deer have shown considerable ability to acclimate to human activities within the area, and rarely flee very far from vehicular use of roads," was deleted so the paragraph as stated clarifies that, "Deer stress levels, and thus overall fitness, are compromised when mule deer use habitats near and within areas of major natural gas development."

Final EIS page 4-134 through 135, *Alternative A, Terrestrial Wildlife, Mule Deer*

- The following sentences, discussing design features of the WHP, were deleted because the WHP would not be applied under Alternative A: "The BLM will be modifying the lease stipulations for winter timing restrictions in areas outside of the SGI committed winter big game closure areas. These lease modifications will allow a landscape level

---

[1] https://eplanning.blm.gov/epl-front-office/eplanning/legacyProjectSite.do?methodName=renderLegacyProjectSite&projectId=66641

BLM_0029159

approach to effective winter range management and maintenance of effective winter range conditions, which would otherwise not be realized."

- The following sentence was clarified from direct impacts to mule deer "are unlikely" to "would be limited": "Direct impacts (i.e., mortality) to mule deer *would be limited*. Within the Unit, the slow road speeds and mobility of deer would limit traffic-related deer mortality." Also, the phrase "but nominal" was deleted in the following sentence: "The level of traffic on Highway 133 from development of Alternative A would increase by less than 1 percent over the next 6 years (Section 4.3.5, Transportation and Access), which would likely have additive ~~but nominal~~ direct mortality impacts on mule deer wintering in lower elevations along Highway 133."

- The sentence describing Table 4-53 and the title of Table 4-53 were clarified by adding "Direct" before impacts.

Final EIS page 4-136, Figure 4-15

- The title of Figure 4-15 was clarified from "Habitat Categories by Alternative" to "Winter Road Density Habitat Quality Categories by Alternative."

Final EIS page 4-138, *Alternative A, Terrestrial Wildlife, Mule Deer*

- The following sentence was deleted because the statement is inconsistent with the analysis in the paragraph: "In summary, long-term impacts on habitat would decrease after major activities associated with development are complete, and thus traffic levels and heavy construction activities would also decrease."

- The following sentence was deleted because the WHP would not be applied under Alternative A: "Avoidance of winter habitat under the WHP would reduce these impacts."

- The following sentences were deleted because they are inconsistent with the analysis in the paragraph: "With automation of facilities and reduced traffic, disturbance would be reduced, but the facilities would still be maintained year-round. It is conceivable that deer may continue to utilize much of the Unit."

- The phrase "at the Data Analysis Unit (DAU) level" was added to the following sentence: "Overall deer populations would not be expected to decrease *at the Data Analysis Unit (DAU) level*, but deer densities in the Unit would be lower."

- The following sentences were deleted because the statements are inconsistent with the analysis in the paragraph: "Avoidance of winter big game habitat during the drilling and construction phases would protect the deer population in the winter. During the summer and fall, deer seem to be more sensitive to human disturbances (which would coincide with the construction season and fall hunting seasons), while wintering mule deer seem more accepting of human activities (which coincides with reduced human activity in the Unit)."

BLM_0029160

Final EIS page 4-138, *Alternative A, Terrestrial Wildlife, Elk*

- The following sentence was clarified from direct impacts to elk "are unlikely" to "would be limited": "Direct impacts (i.e., mortality) to elk *would be limited*. It is possible that some elk may be struck while attempting to cross a road, but this is relatively unlikely given the road speeds (which are even slower during the winter) and agility of elk." Also, the phrase "but nominal" was deleted in the following sentence: "Traffic increases would likely have additive ~~but nominal~~ direct mortality impacts on elk wintering in lower elevations along Highway 133."

- The following was deleted from the sentence regarding impacts to individual elk because it is inconsistent with the analysis in the paragraph: "…especially when considering that elk would be wintering near Highway 133 when development related-traffic volumes are lower."

- The following sentence was deleted: "The odor of cuttings pits, tarps covering pits, and the presence of livestock fencing around pads would further deter elk from these areas" because it is inconsistent with the analysis in the paragraph.

Final EIS page 4-139, *Alternative A, Terrestrial Wildlife, Elk*

- The following sentence was clarified by adding "direct," "mapped winter," and "and migration routes": "**Table 4-53** shows the quantitative *direct* impacts on mule deer and elk *mapped winter* habitats *and migration routes* that would result from Alternative A."

- The phrase "under the WHP" was deleted from the sentence regarding elk avoidance of winter habitat, because the WHP doesn't apply to Alternative A. Instead the sentence was clarified that "existing winter timing stipulations on federal leases" would apply.

- To clarify the context of the Muddy Creek elk winter concentration area, "of CPW's entire DAU for this elk population" was added at the end of the sentence.

- To quantify the effects, clarification was added to the following sentence: "Despite being geographically isolated and *only 1.5 percent of the DAU*, aerial count data gathered since the 1980s from the Muddy Creek Area indicate that up to 10 percent of the elk in the *entire DAU* winter there."

Final EIS page 4-140, *Alternative A, Terrestrial Wildlife, Elk*

- The phrase "voluntary" was deleted, as timing limitations are not voluntary in Alternative A.

- To clarify impact analysis, "unmitigated residual" was added to emphasize impacts on elk within critical winter habitats.

Final EIS page 4-141, *Alternative A, Aquatic Wildlife*

- The following sentence was removed because the WHP would not be applied under Alternative A: "Measures to protect water quality and aquatic resources in the WHP would further reduce impacts on fish."

BLM_0029161

Final EIS page 4-141, *Alternative B*

- The following design feature from the WHP (applicable to Alternative B) was added for clarification: "Under Alternative B with the application of the WHP in the winter (December 1 through April 15), the BLM assumes that SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands. With the application of the WHP, the BLM may temporarily grant exceptions to lease stipulations for winter timing stipulations in areas outside of the WHP Winter Closure Areas. The annual lease exceptions would be applied on a case-by-case basis and would provide flexibility for the operator to operate during the winter months."

- To clarify long-term impacts on habitat under Alternative B compared to Alternative C, the following sentences were clarified: "Under Alternative C, surface disturbance activities and the lack of effective timing limitations on a landscape scale would not reduce impacts on big game within crucial winter activity areas, compared to Alternative B. Under Alternative B, traffic levels and heavy construction activities would also decrease; thus, long-term impacts on habitat would decrease after major activities associated with development are complete."

Final EIS page 4-142, *Alternative B, Terrestrial Wildlife*

- "Effective winter" was added to clarify the road density analysis and "terrestrial wildlife species" was corrected to "wintering big game."

- The impact analyses for deer and elk were corrected by removing the sentence regarding the timing limitation. Instead, the WHP would apply to Alternative B as stated. The following was added to the paragraph: "Avoidance of winter big game habitat during the drilling and construction phases would minimize impacts on big game populations during the winter."

Final EIS page 4-142, *Alternative B, Terrestrial Wildlife, Mule Deer and Elk*

- "Direct" was added before impacts to distinguish the type of impact.

Final EIS page 4-143, *Alternative B, Terrestrial Wildlife, Mule Deer and Elk*

- The sentence describing Table 4-54 and the title of Table 4-54 were clarified by adding "Direct" before impacts.

- "Effective winter" was added before "habitat quality" to clarify impacts of the road density analysis. "Direct" was added before impacts to distinguish the type of impact.

- Well 12-89-7-1" replaced "the project" and "the site" to clarify the subject.

- The following statement was added to clarify population-level impacts: "This would likely impact individual deer or elk, but no population-level impacts would be expected, especially when considering that elk would be wintering near Highway 133 when development-related traffic volumes are lower."

BLM_0029162

- The following statement was deleted to be consistent with the impacts analysis for 12-89-7-1 well APD: "It is not possible to quantify the impacts on deer and elk populations at this time."

Final EIS page 4-143 through 4-144, *Alternative B, Terrestrial Wildlife, Mule Deer and Elk*

- The following statement was added: "Avoidance of winter habitat under the WHP would reduce potential impacts on wintering elk; however, year-round maintenance activities would occur and could result in elk avoiding habitat."

Final EIS page 4-144, *Alternative B, Aquatic Wildlife*

- As described in **Section H.3** (see above) of this appendix, "379 acre-feet" per year of estimated annual water depletion from the USFWS programmatic biological opinion was corrected to "4,046 acre-feet," as well as the document referenced, from "BLM/USFWS programmatic agreement" to "USFWS programmatic biological opinion."

Final EIS page 4-145, *Alternative C, Terrestrial Wildlife*

- To clarify impacts of the road density analysis, "winter" was added to Category 1 winter habitat and big game impacts.
- Under Alternative C, the language "voluntary seasonal winter timing limitations" was removed.

Final EIS page 4-146, *Alternative C, Terrestrial Wildlife*

- Under Alternative C, the phrase "the voluntary winter timing limitations" was removed.
- To correct Alternative C, "waive" was deleted and edited to state that the BLM may "consider excepting" winter timing limitations (TLs).
- To more fully explain the BLM's potential consideration of excepting winter timing limitations under Alternative C, the following was added regarding winter development: "to be consolidated in limited portions of the Unit."
- For consistency of Alternative C design features, "voluntary seasonal winter timing limitations" was corrected to "progressive development approach."

Final EIS page 4-146 through 4-147, *Alternative C, Terrestrial Wildlife, Mule Deer and Elk*

- The sentence describing Table 4-55 and the title of Table 4-55 were clarified by adding "Direct" before impacts.

Final EIS page 4-147 and 4-148, *Alternative C, Terrestrial Wildlife, Moose*

- For consistency of Alternative C design features, "voluntary winter timing limitations" was corrected to "progressive development approach."

BLM_0029163

Final EIS page 4-148, *Alternative C, Aquatic Wildlife*

- As described in **Section H.3** (see above) of this appendix, "379 acre-feet" per year of estimated annual water depletion from the USFWS programmatic biological opinion was corrected to "4,046 acre-feet," as well as the document referenced, from "BLM/USFWS programmatic agreement" to "USFWS programmatic biological opinion."

Final EIS page 4-148, *Alternative C, Additional Mitigation Measures*

- Under Alternative C, the language "the voluntary winter timing limitations" was removed. The sentences now state: "Alternative C proposes to use a progressive development approach to further reduce the potential for impacting critical winter habitat for deer and elk within the Unit. Progressive development under Alternative C could mitigate for impacts on big game during construction or resource development activities in sensitive winter habitats."

- To correct Alternative C, "waive" was deleted and edited to state that the BLM would "consider exceptions" to winter timing limitations (TLs). For consistency of Alternative C design features, "voluntary seasonal winter timing limitations" was corrected to "progressive development approach."

Final EIS page 4-149, *Alternative D, the Preferred Alternative*

- The following design feature from the WHP (applicable to Alternative D) was added for clarification: "Under Alternative D with the application of the WHP in the winter (December 1 through April 15), the BLM assumes that SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands. With the application of the WHP, the BLM may temporarily grant exceptions to lease stipulations for winter timing stipulations in areas outside of the WHP Winter Closure Areas. The annual lease exceptions would be applied on a case-by-case basis and would provide flexibility for the operator to operate during the winter months."

Final EIS page 4-149, *Alternative D, the Preferred Alternative, Terrestrial Wildlife*

- The following was added to clarify population-level impacts of deer and elk: "Because of this, traffic-related deaths of deer and elk would be limited, and no population level impacts *from traffic mortality* would be expected."

- To clarify impacts of the road density analysis, "winter" was added to Category 1 "winter" habitat and to clarify "winter" road density.

Final EIS page 4-150, *Alternative D, the Preferred Alternative, Terrestrial Wildlife*

- The impact analysis was clarified regarding "winter" wildlife habitat and "winter" habitat quality. In addition, "activities" were clarified as meaning "drilling" activities.

- The following text was added to state: "These reduced activity areas would result in a 40% increase in higher quality *winter* wildlife habitat over Alternative A *during drilling*

BLM_0029164

*activities,* which may result in better habitat suitability for wintering big game *during drilling* (**Figure 4-15**)."

- The following language was added to clarify the type of impacts: "These activities will result in some level of residual impact that will diminish wintering big game habitat quality *over the long term (beyond drilling)* compared to current conditions."

- The following sentence was clarified to state: "As a result it is likely that the Bull Mountain Unit may winter less big game *over the long term* than it currently does."

Final EIS page 4-151, *Alternative D, the Preferred Alternative, Terrestrial Wildlife*

- The sentence describing Table 4-56 and the title of Table 4-56 were clarified by adding "Direct" before impacts.

Final EIS page 4-152 through 4-154, *Cumulative*

- The following was added to the cumulative impacts discussion to clarify Tables 4-57, 4-58, and 4-59: "Cumulative effects were quantified in Tables 4-57, 4-58, and 4-59, summarizing the direct impacts on mule deer and elk habitat for Alternatives A and B combined, A and C combined, and A and D combined." "Direct" was added to the titles of Tables 4-57, 4-58, and 4-59. In addition, the table titles were clarified by adding "Direct" before impacts: "Cumulative *Direct* Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit (Alternatives A and [B, C, and D, respectively] Combined)."

## H.5   WILDLIFE HABITAT PLAN

The Wildlife Habitat Plan presented in Appendix C of the Final EIS was SGI's proposal. The following corrections to this plan have been made to reflect the plan as analyzed in Alternative D. These minor corrections are not significant changes, and the Final EIS Alternatives B and D analysis did not rely on the inaccurate information. The corrected plan that is adopted as part of the BLM's decision is included as **Appendix B** of this ROD.

Page 1 of WHP (Appendix C of Final EIS)

- The following paragraph was deleted: "This voluntary WMP is the culmination of a multi-year collaborative effort between SGI and Colorado Parks and Wildlife (CPW) to develop a plan to mitigate anticipated potential wildlife impacts from development of SGI's Master Development Plan within the guidelines provided by the Colorado Oil and Gas Conservation Commission (COGCC) Rules of Practice and Procedure (Rules) governing oil and gas development activities in Colorado. While SGI and CPW have been able to reach agreement on most aspects of a negotiated WMP, we have been unable to reach agreement on one outstanding issue; compensation for CPW's calculated potential residual impacts to elk."

Page 2 of WHP (Appendix C of Final EIS)

- The following paragraph was deleted: "Once approved by CPW, a WMP satisfies any consultation requirement with CPW that may otherwise be required for each facility

BLM_0029165

within SWH's [Rule 1202.d.(2)], resulting in a streamlined permitting process for individual facilities addressed in the WMP."

- The following sentence was deleted: "This WMP was prepared specifically to satisfy COGCC Rule 1202.d.(2) in making mitigation recommendations for this development to federal, state, and local agencies."

Page 3 of WHP (Appendix C of Final EIS)

- The following sentence was deleted: "CPW agreed that where the voluntary Winter Closure Areas do not overlap with the existing federal lease timing stipulations related to big game, BLM should waive the existing federal lease timing stipulations. In areas with federal lease stipulations regarding winter activities, BLM should apply the voluntary Winter Closure Area stipulations."

## H.6   USE OF A PIPELINE BORE

Final EIS page 4-131 states that "Under all alternatives, pipeline crossings of wetlands, as well as roads, would be bored (not trenched) outside of road ROWs and wetland boundaries." Per Final EIS page 2-18 and Final EIS Appendix C, Design Feature #82, a pipeline bore can be used to cross a road or wetland (applied to all Final EIS alternatives). Impacts remain the same as those described in Final EIS Chapter 4, Section 4.2.6, Vegetation and Invasive, Nonnative Species.

## H.7   RECREATION

*Current Conditions*
As a result of the Final EIS comments and to accurately describe current recreation conditions, the following was added at the end of paragraph 1 in the Final EIS, page 3-120: "The Ragged Mountain Guest Ranch is located along Gunnison County Road 77 (off Colorado State Highway 133) in the southeast corner of the Bull Mountain Unit. The 120-acre private property has developed facilities and is primarily used for camping and nature experiences and may generally receive approximately 2,000 visitors each year."

*Developed Recreation Sites*
The assumption in Final EIS page 4-199 states that, "There are no developed recreation facilities in the project area." This was corrected to: "There are no *BLM-administered developed* recreation facilities in the project area. Private land within the Unit may contain private developed recreation sites, such as camping areas."

To accurately reflect potential impacts of current conditions on recreation, the following text was added (added text in italic) to the last paragraph under Alternative B, in the Final EIS, on page 4-201: "Noise, congestion, and safety concerns resulting from increased traffic on the West Elk Loop Scenic Byway and County Road 265 would adversely impact scenic viewing. Recreational opportunities near these roads may also be diminished if the activities are sensitive to the intrusion of increased truck noise. *Proposed development along Gunnison County Road 77 in the southeast portion of the Unit may diminish the quality of nature experiences associated with camping.* An approximately 21 percent increase in truck traffic (compared to existing conditions) would adversely affect recreational access to nearby designations as a result of lengthened travel

BLM_0029166

times and safety concerns; impacts on access are described in Section 4.3.5, Transportation and Access."

## H.8    FINAL EIS APPENDIX C, COA #84

Final EIS Appendix C, COA #84 incorrectly states that pipelines will be tested in compliance with the US Department of Transportation (USDOT) regulations. There are no pipelines regulated by the USDOT or Pipeline and Hazardous Materials Safety Administration (PHMSA) within the Unit. ROD **Appendix A** COAs #36 and #37 identify the regulatory agencies for pipeline testing as COGCC (flowlines) and CDPHE (water discharge).

## H.9    RESPONSE TO COMMENTS ON THE DRAFT EIS

Three comments on CARMMS analysis from The Endocrine Disruption Exchange (TEDX, letter's unique Draft EIS CommentWorks database code identified as "478_Schultz_K_20150416_emailattach") were incorrectly coded as out-of-scope of the analysis on the Draft EIS. The BLM included responses to these three comments in ROD **Appendix I**, Response to New Comments on the Final EIS.

BLM_0029167

This page intentionally left blank.

BLM_0029168

# APPENDIX I
# RESPONSE TO NEW COMMENTS ON THE FINAL EIS

## INTRODUCTION

On July 8, 2016, the BLM and EPA published a Notice of Availability for the Final EIS in the *Federal Register* (81 *Federal Register* 44608, July 8, 2016), which marked the beginning of a 30-day review period. The 30-day review period was not a formal comment period, but comments received were reviewed. During the 30-day review period, the BLM received comment letters from private individuals, organizations, and federal and state agencies, including over 500 form letters. The BLM also received seven unique comment letters with new information, from the following:

- Colorado Parks and Wildlife (CPW), a cooperating agency;
- Environmental Protection Agency Region 8 (EPA), a cooperating agency;
- SG Interests I, Ltd. (SGI);
- Western Environmental Law Center (WELC);
- The Endocrine Disruption Exchange (TEDX);
- Center for Biological Diversity (CBD); and
- Latter-Day Saints (LDS).

Comments on the Final EIS were reviewed and considered to determine if they identify new significant circumstances or new information or environmental concerns of the proposed action, BLM NEPA Handbook, H-1790-1, BLM 2008a page 102. Final EIS comments were compared to the substantive comments received on the Draft EIS. In many cases, substantive comments were similar to or the same as comments received on the Draft EIS. When the Final EIS comments were the same as comments submitted on the Draft EIS, the BLM reviewed the comments and the BLM's responses. The responses to these comments in the Final EIS did not warrant updating, with the exception of air quality baseline information, as described below in this appendix. Substantive comments on the Draft EIS and the BLM's responses are available for review in Final EIS Appendix N, Response to Comments on the Bull Mountain Unit Master

BLM_0029169

Development Plan Draft EIS. Substantive comments are defined, including examples, in Final EIS Appendix N.

The BLM determined that none of the Final EIS comments raised new substantial information to warrant a supplemental EIS. The BLM's decision and Selected Alternative were clarified and, in some cases, modified from Alternative D, Preferred Alternative, based upon comments on and BLM review of the Final EIS. Changes to the decision from the Final EIS are found in **Chapter 6**, Modifications to and Clarifications of the Preferred Alternative. Additionally, minor corrections to of the Final EIS are described in **Appendix H**, Final EIS Errata. This appendix describes comments with new information on the Final EIS that contributed to a modification in the BLM's decision or notified the BLM of a minor correction needed for the Final EIS.

The BLM thanks all the individuals, organizations, and agencies that submitted comments on the Draft EIS and Final EIS, during the scoping periods, and on the EA. Comments resulted in helpful clarifications of and modifications to this ROD and throughout the EIS process.

BLM_0029170

# SECTION 1. BEST AVAILABLE INFORMATION: AIR
Total Number of New Comments: 3

**Organization: TEDX**
Comment Excerpt Text:

The DEIS relies on emission calculators designed by and reported in the Colorado Air Resource Management Modeling Study (CARMMS; ENVIRON et al. 2015), a bottom-up modeling approach. Research comparing bottom-up estimates to top-down emissions measured directly from the atmosphere have found methane to be vastly underestimated in bottom-up scenarios (Brandt et al. 2014, Jeong et al. 2014, Karion et al. 2013, Miller et al. 2013, Petron et al. 2014). Multiple studies from NOAA researchers collecting top-down emission concentrations on the Front Range found high levels of nonmethane volatile organic compounds (NMVOCs) traced to UOG extraction (Gilman et al. 2013, Petron et al. 2012, Petron et al. 2014, Swarthout et al. 2013). Petron et al. (2014) found benzene levels seven times higher than state inventories that use bottom-up estimates.

In addition, Moore et al. (2014) point out that generic emission inventories typically rely on limited, incomplete, and/or outdated data. Field et al. (2014) also discusses the difficulties of estimating emissions due to incomplete data reporting, as well as the difficulties in quantifying small point and nonpoint sources. In addition to these short-comings, the CARMMS report acknowledges many uncertainties and potential inconsistencies as it attempts to model regional air quality.

**Organization: TEDX**
Comment Excerpt Text:

The CARMMS Report uses a 60 ppb cut-off ozone concentration for its simulation model, much lower than the winter levels found in the above research studies. The report also acknowledges that the model does not allow for accurate calculations from inversion events.

The DEIS estimates an 8 hour ozone level for Bull Mountain at 141 ug/m3, or approximately 72 ppb. The EPA set the NAAQS at 75 ppb in 2008 and has proposed revised standards between 65-70 ppb. The EPA chose these newer standards based on evidence from over 1000 studies reporting increased risk to public health at the current EPA standard (USEPA 2014). Bull Mountain is near the current compliance level and already exceeds the proposed EPA standards. Additional emissions from UOG will only exacerbate this situation.

**Organization: TEDX**
Comment Excerpt Text:

Further, while negative air impacts due to increased well density and mining are considered in the CARMMS report, it does not address the already high numbers of methane drainage wells (MDW) in the area. These wells contribute on average millions of square cubic feet of methane and other gases per day (Arista Midstream Services 2009), many of which are ozone precursors. Two samples from West Elk Mine MDW show the presence of multiple hazardous air pollutants including BTEX and hexane (Arista Midstream Services 2009).

## Summary
The BLM needs to explain the Colorado Air Resources Management Study (CARMMS) assumptions and why CARMMS is used and is sufficient to model air quality.

## Response
The above comments on CARMMS assumptions were incorrectly coded as out of scope in the Draft EIS comment analysis. Although this comment did not result in a modification to the

BLM_0029171

BLM's decision, the BLM's response to these comments is included below. The correction is also noted in **Appendix H**, Final EIS Errata.

The CARMMS uses analysis solidly grounded in science. The CARMMS describes its assumptions, explains any inconsistencies, discloses its methods in detail, records its references, and provides workbooks for public download to eliminate guesswork. The CARMMS analysis procedures for assessing project impacts on potential ozone formation and cumulative (project source emissions and regional source emissions) air quality and air quality related values (AQRV) impacts are not described in the Bull Mountain Unit MDP Final EIS Appendix J, Air Quality Technical Support Document. However, the CARMMS analysis procedures are extensively described in the CARMMS report, including:

- An overview of the modeling approach;
- Air quality standards and AQRV thresholds;
- Detailed description of the CARMMS 2008 modeling platform (the CARMMS Report Appendix B, 2008 CAMx Base Model Performance Evaluation, details information for the year 2008 Model Performance Evaluation);
- The episode approach (i.e., what year will be modeled to address annual average air quality issues and the rationale for choosing that year);
- The 4-kilometer modeling domain and rationale for choosing it;
- The Weather Research and Forecasting meteorological approach; and
- Descriptions of the 2008 base case and future year 2021 modeling scenario emissions inventories (the CARMMS Report Appendix C, Draft Final CARMMS Oil and Gas Emissions Calculator Documentation details for year 2021 emissions inventory development).

The air resources analysis for the Bull Mountain Unit EIS was conducted in cooperation with the Air Quality Interagency Review Team (see Final EIS Appendix J, page J-1-1). The protocols for conducting the Bull Mountain air impact analysis were reviewed, revised, and approved by the Air Quality Interagency Review Team participating agencies prior to performing the analysis. The Air Quality Interagency Review Team ensured that the analysis used the best available data and best available methods.

The Bull Mountain Unit MDP Final EIS air quality analysis used multiple levels of analysis, as follows:

- The Comprehensive Air Resources Protection Protocol (CARPP) helped determine the Bull Mountain Unit MDP emissions modeling;
- The CARMMS to analyze regional/cumulative impacts each at high, medium, and low scenarios (Final EIS Appendix J, Chapter 1, page J-1-2):
  - Ozone
  - AQRVs (visibility and atmospheric deposition of nitrogen and sulfur)

BLM_0029172

- The EPA Guideline model CALPUFF to analyze far-field impacts (Appendix J, Chapter 4, page J-4-1):
    - Nitrogen oxides
    - Sulfur dioxide concentrations
    - Particulate matter ($PM_{10}$ and $PM_{2.5}$)
    - AQRVs

- The EPA Guideline model AERMOD to analyze near field impacts (Final EIS Appendix J, Chapter 3, page J-3-1):
    - Carbon monoxide
    - Nitrogen oxides
    - Sulfur dioxide
    - Ozone
    - $PM_{10}$ and $PM_{2.5}$
    - Hazardous air pollutants (HAPs, including benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde)
    - AQRVs

- In the mitigation information in the Final EIS air quality analysis and supplemental CARPP appendix, the BLM determined air impact mitigation measures for air quality modeling predicted impacts above ambient air quality standards (for Colorado and nationally, CAAQS and NAAQS) and AQRV thresholds (nitrogen deposition analysis threshold [DAT]) for the MDP. ROD **Appendix A** includes air quality COAs to restrict or limit the amount of air pollutant emissions for new oil and gas development, where air quality modeling indicated potential impacts above applicable thresholds (e.g., NAAQS and DATs).

The CARMMS and the Final EIS air quality analysis use the best available data. The Bull Mountain Unit MDP Final EIS air quality analysis is a "hard look" at the air quality impacts and the differences between air quality impacts by alternative.

As described above, the Final EIS used multiple levels of analysis for predicting potential air quality impacts, including the AERMOD near-field analysis. The CARMMS analysis was used for ozone, AQRV, and regional impacts. The CARMMS analysis was not used for hazardous air pollutant impacts. The AERMOD near-field modeling analysis was used to assess potential local impacts for hazardous air pollutants. The AERMOD near-field hazardous air pollutants analysis for the Final EIS did not predict hazardous air pollutants impacts above the applicable short-term reference exposure levels (RELs) and the long term non-carcinogenic reference concentrations (RfCs) with the exception of formaldehyde at nearby ambient receptors within the Unit, and no unacceptable (above thresholds) impacts were predicted at residences or towns more than a few miles away of the proposed oil and gas development. The small predicted impacts for towns in the North Fork Valley is partly due to the complex terrain in the area (complex terrain enhances

BLM_0029173

dispersion of pollutants) and because the dominant wind direction would take pollutants to less-populated areas. The AERMOD near-field HAPs analysis for Alternative B was described on Final EIS pages 4-48 and 4-49.

The AERMOD near-field hazardous air pollutant emissions inventories were developed based directly on operator-provided information. Although it is a "bottom up" approach, the emissions were estimated on sound information. As described in the Final EIS, the BLM will develop new emissions inventories at the time of actual development within the Unit. The BLM will either determine that the analysis is still adequate or that additional air quality impacts analyses are needed. The actual development emissions inventories are based on the adaptive management strategy of the CARPP (which was incorporated into the Final EIS).

The Final EIS disclosed nitrogen impacts above the deposition analysis threshold (DAT) at the nearby Raggeds Wilderness that triggered the need for the $NO_x$ emissions mitigation and cap for the proposed oil and gas development within the Unit. ROD **Appendix A** COA #96 caps the production phase emissions of $NO_x$ to 143 tons per year (TPY).

The CARMMS predicted that ozone concentration, as referenced in the TEDX comments, would be the maximum absolute predicted concentration and not applicable for direct comparison to the ozone NAAQS (3-year average annual 4th highest daily 8-hour average maximum concentrations are compared to the NAAQS ozone standard to determine compliance with the NAAQS). As shown in the CARMMS report, the contribution to the predicted ozone concentrations solely from future Uncompahgre Field Office (UFO) oil and gas development is small (meaning that cumulative ozone concentrations would be reduced by a small amount if future UFO oil and gas development was not allowed according to CARMMS). The ozone contribution from Bull Mountain Unit MDP development would be even smaller.

Final EIS page 4-17, Table 4-3, Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario, discloses that Vessels Coal Mine Methane Capture Project Methane Drainage System captures low-level coal mine methane emissions produced at the Elk Creek Mine as a result of coal extraction and combusted on-site for electrical generation, with excess flared rather than venting directly to the atmosphere. The CARMMS year 2021 emissions inventories for future modeling account for a substantial increase in volatile organic compounds (including hazardous air pollutants) emissions for the region for growth in various emissions source subcategories, including oil and gas and mining. The CARMMS year 2021 emissions inventories for ozone modeling include emissions for the whole suite of volatile organic compounds, including hazardous air pollutants (including benzene, toluene, ethylbenzene, xylenes, and hexane).

BLM_0029174

## SECTION 2. NEPA
Total Number of New Comments: 3

**Organization: TEDX**
Comment Excerpt Text:

The bulk of our comments were focused on air quality. In Section 4.1 on the best available information for air resources, the BLM did not address the problems discussed in several cited peer-reviewed articles showing how the bottom up modeling scenario used in the CARMMS report could be underestimating air quality impacts beginning on page two. This section of our letter may also fall under Section 5.1 general methodology/assumptions. The first four pages of our comment letter addresses impacts to air resources, but none of our concerns were addressed in Section 5.2 or 8.1 on air resources.

**Organization: CPW**
Comment Excerpt Text:

The executed DNR-BLM Cooperating Agency MOU states that the BLM will "use the environmental analysis and proposals of the Cooperating Agencies with jurisdiction by law or special expertise, to the maximum extent possible" [40 CFR 1501.6]. Where BLM and the cooperating agency disagree on the substantive elements of the EIS, the MOU states that "BLM will include a summary of the Cooperator's view in the Draft EIS and the Proposed Final EIS. We are disappointed that this process fell short of the agreements outlined in the MOU under the following circumstances:

1. CPW provided the BLM and their contractor a methodology for evaluating impacts to big game in the Bull Mountain Unit MDP area. The BLM used CPW's methodology, but did not provide CPW an opportunity to review or comment on the contractor's application of the methodology to support the conclusions presented in the FEIS. Likewise, the BLM did not make available for review SG's supplemental "Wildlife Habitat Plan" for addressing impacts to big game until the administrative FEIS was released.

2. CPW provided comments on the administrative FEIS on August 28, 2015. The BLM did not provide a response to CPW's comments or include a response in Appendix N or elsewhere in the public FEIS.

3. CPW received no correspondence on the public FEIS from the BLM or its EIS contractor between the time our comments on the administrative FEIS were submitted (August 28, 2015) and the time the FEIS was published in the Federal Register (July 8, 2016).

**Organization: LDS**
Comment Excerpt Text:

Concerns regarding how this drilling program will affect our property and its usage have not been addressed. The EIS fails to address impacts to the following resource concerns; land use and recreational use on private property in particular; domestic, state, approved, and licensed water treatment systems, lakes, surface water and riparian rights, child care facilities located on private property, traffic pattern change and usage of roads, camping experience, and night skies.

## Summary
The BLM needs to explain why comments were or were not included in Final EIS Appendix N, Response to Comments on the Bull Mountain Unit Master Development Plan Draft EIS. The Final EIS inadequately addresses impacts on private property and does not address impacts on the following resource concerns: land use and recreation on private property, in particular, domestic, state-approved and licensed water treatment systems; lakes, surface water, and riparian rights; child care facilities on private property; traffic pattern changes and road use; camping experiences; and night skies.

BLM_0029175

**Response**

Comments on the Draft EIS received between January 16 and April 16, 2015 were reviewed for substantive content. Those with substantive content were coded by issue and addressed in Final EIS Appendix N. Substantive comments are defined, including examples, in Final EIS Appendix N.

Comments on CARMMS data and that method's adequacy were incorrectly coded as out of scope in the Final EIS. This has been corrected in this appendix in the comment response in Section 1, Best Available Information: Air (above).

Comments from the scoping periods were used to help the BLM identify and shape significant issues, such as environmental consequences related to energy development, air resources, water quality and quantity, and wildlife. Comments from scoping periods were not directly addressed in Final EIS Appendix N.

Comments from cooperating agency administrative reviews were reviewed by the BLM. Responses to each cooperating agency comment were developed by the BLM. Many cooperating agency comments resulted in improvements to the Final EIS. Cooperating agency administrative review comments were not directly addressed in Final EIS Appendix N.

Section 6 of this appendix includes a statement of CPW's concerns with the BLM's analysis and CPW's concerns with long-term indirect wildlife impacts due to production activities.

The BLM reviewed the issues raised during the Final EIS 30-day review period, including nonsubstantive comments not addressed in Final EIS Appendix N. Although the comments were not specifically included in the comment analysis, the issues raised by the organizations and agency were analyzed in the Final EIS. The Final EIS addressed potential environmental consequences on air resources, recreation, water resources (water quality and quantity), hazardous materials and wastes, transportation and access, and visual resources. The Final EIS and ROD include COAs to ensure protection of these resources. ROD **Appendix A** includes COAs to bring about the following:

- Protect air quality (ROD **Appendix A** COAs #94, #95, #96, #97, and #98);

- Monitor water quality (ROD **Appendix A** COA #124);

- Protect wildlife through a WHP (ROD **Appendix A** COAs marked as "WHP");

- Comply with COGCC and Colorado Department of Public Health and Environment (CDPHE) standards for noise abatement (ROD **Appendix A** COA #99);

- Use downlighting to protect visual resources (ROD **Appendix A** COA #101);

- Contain and report spills of potentially hazardous materials (ROD **Appendix A** COAs #105, #106, and #107); and

- Reduce truck traffic (through a field-wide produced water gathering system in conjunction with temporary poly lines, ROD **Appendix A** COA #14; through remote telemetry, ROD **Appendix A** COA #76; and through multiple-well pad siting, ROD **Appendix A** COA #43).

BLM_0029176

When wells or facilities are proposed for drilling or construction as part of an application for permit to drill (APD), the exact locations of wells, roads, pipelines, and other facilities will be reviewed in accordance with scope of the Final EIS analysis. Documentation of NEPA compliance for future development will be required and could include a tiered environmental assessment, documentation of NEPA adequacy, or documentation of the application of a categorical exclusion. Submission and approval of an application are required before the surface is disturbed. Location siting will be subject to the APD process and the appropriate COAs listed in **Appendix A** (including the COAs listed above in this response), plus any best management practices that the BLM determines are necessary to reduce adverse impacts.

The exact locations of well pads will be identified in the 40-acre analysis area sites best suited to reduce impacts on other resource concerns and achieve maximum reclamation success. In consultation with the COGCC, CPW, CDPHE, the local government designee, *and the landowner*, the BLM will conduct a physical on-site inspection. This is to determine that the proposed well pad location, roads, pipelines, and other facilities (including traffic on roads) are commensurate with the provisions of the Final EIS and other state and federal requirements, such as Federal Onshore Order No. 1.

Further, to encourage cooperation with private landowners on split-estate, Federal Onshore Order No. 1 clarifies the roles and responsibilities of the BLM, the operator, and landowners on federal leases overlain by private surface (that is, split-estate). Additionally, Table 1 in ROD **Appendix B**, WHP, discusses additional mitigation measures to address resource concerns, including surface owner's concerns.

The LDS comment resulted in a correction about developed recreation sites and recreation on private property, noted in **Appendix H**, Final EIS Errata, Section H.7.

The TEDX comments resulted in a BLM response to comments in this appendix.

The CPW comments resulted in corrections to the environmental consequences on fish and wildlife, also noted in **Appendix H**.

## SECTION 3. DIRECT AND INDIRECT IMPACTS: PROGRAMMATIC BIOLOGICAL OPINION, WATER DEPLETIONS, AND ENDANGERED COLORADO AND GUNNISON RIVER FISH

Total Number of New Comments: 2

**Organization: CBD**

Comment Excerpt Text:

Finally, in section 5.5.3 on FWS consultation, BLM tiers to the 2008 PBO to fulfill its section 7 duty to consult.[1] As illustrated below the PBO fails to take into account increased depletions from horizontal drilling, which, for the preferred alternative, would exceed the PBO's annual and per-well depletion estimates for the Gunnison river sub-basin. Where

BLM relies on the PBO to fulfill its duty to consult over water depletion impacts resulting from the preferred alternative, BLM must reinitiate consultation over the Fluid Mineral Program. As noted above, the PBO never accounted for potential impacts resulting from horizontal drilling in the action area, or within the Upper Basin generally. Reinitiation of consultation with the FWS is required when "new information reveals effects of the action

BLM_0029177

that may affect listed species or critical habitat in a manner or to an extent not previously considered."[1] Information regarding the enormous water depletion effects of horizontal drilling constitutes new information and triggers BLM's duty to reinitiate consultation.

**Organization: CBD**
Comment Excerpt Text:

The FEIS also improperly dismisses the project's impacts on the endangered fish by suggesting that because the project would rely on previously appropriated water rights, the project's depletion effects on the endangered fish are already part of the environmental baseline and therefore section 7 consultation is not required. In its discussion of the preferred alternative's water depletion impacts on the Colorado River endangered fish,[1] the FEIS states:

"[I]mpacts are anticipated to be similar to [the no action alternative], since SGI has secured previously appropriated water for this project. As such no new water would be depleted...as a result of the construction and drilling phase of this

project. Therefore, actions...are not likely to jeopardize the continued existence of the [Colorado River endangered fish] and are not likely to destroy or adversely modify designated critical habitat."

This brief discussion is the extent of BLM's analysis or explanation of SGI's purported use of previously appropriated water for the preferred alternative. BLM fails to discuss whether or not the previously appropriated water is currently being used or would have been used had SGI not obtained those rights; where and in what capacity that water was previously used, and the water source; and whether use of these water rights has ever undergone section 7 consultation, and, if so, when section 7 consultation was performed. Without such analysis, BLM cannot determine that the use of these water rights is actually part of the environmental baseline, and the depletion effects on the fish in light of existing environmental conditions. Indeed, if consultation on these water rights has not recently been performed, reinitiation of consultation is likely required based on a number of new factors as discussed in the next section below.

**Summary**
The PBO is outdated for per-well water depletion estimates and impacts from horizontal drilling. Because the PBO is outdated, the BLM needs to reinitiate consultation with USFWS on endangered fish. The BLM needs to identify the sources of freshwater to be used by SGI, the current uses of the freshwater, and whether the freshwater to be used has undergone Section 7 consultation.

**Response**
To offset impacts from water depletions, USFWS authorized the BLM to solicit a one-time monetary contribution to the 1988 Upper Colorado River Endangered Fish Recovery Program. SGI is already a signatory to the Endangered Fish Recovery Agreement. This would comply with the existing Programmatic Biological Opinion (PBO) and recovery agreement. As required by the PBO, the BLM has and will continue to track all water depletions associated with its federal fluid minerals program in the upper Colorado River Basin. These depletions have been reported annually to USFWS.

The existing PBO does not specifically address depletions associated with horizontal drilling. However, the PBO states that the consultation analyzes "water used to drill and complete wells (drilling and fracing fluids)" without specifying the type of well drilled. Most wells tracked under the PBO have been traditional vertically or directionally drilled wells. When companies began drilling horizontal wells on BLM-administered lands, the BLM began tracking water

BLM_0029178

depletions associated with horizontally drilled wells (2011 to present) in addition to the vertical and directional wells (horizontal wells are tracked separately). Water depletion logs submitted by the BLM to USFWS show that total statewide depletions from horizontally drilled wells have ranged from 16 acre-feet in 2013 to 633 acre-feet in 2015. Water depletion logs from 2009 to 2015 for western Colorado show that water depletions resulting from fluid minerals actions on BLM-administered lands have remained far below the 4,046 acre-feet per year amount that was consulted on in the PBO. This value, 4,046 acre-feet, is the threshold depletion amount which, if exceeded, would trigger re-initiation of consultation; this has been clarified in ROD **Appendix H**, Final EIS Errata. While the amount of water depleted by an individual horizontally drilled well is greater than the per-well estimates given in the 2008 PBO, the cumulative amount of water depleted by all fluid minerals activities on BLM-administered lands in the upper Colorado River Basin remains far below the 4,046 acre-feet per year amount that was consulted on in the 2008 PBO. Therefore, the effects of the action analyzed in the 2008 PBO remain valid.

Upon review of the letters from the Final EIS 30-day review period, the BLM discussed per-well depletions with USFWS. Based upon this discussion, the BLM disagrees with the commenter's assertion that exceeding the PBO's annual and per-well depletion estimates for the Gunnison River sub-basin should trigger reinitiation of consultation. Although the PBO does provide a water depletion estimate for the Gunnison River sub-basin, the estimates by sub-basin were included simply as a way to estimate the overall water quantity to be consulted on. Exceeding the estimated depletion amount in a given sub-basin is not equivalent to exceeding the overall depletion amount of 4,046 acre-feet per year, and, as such, does not trigger re-initiation of consultation. The sub-basin estimates provided in the PBO are used for tracking purposes and are not intended to serve as triggers for re-initiation of consultation.

As part of the Final EIS, the BLM determined the preferred alternative and prepared a Biological Assessment evaluating the impacts of the activities on federally listed threatened and endangered species. The BLM submitted the Biological Assessment to the USFWS for review on September 22, 2015. The USFWS responded on October 20, 2015 with a memorandum concurring with the BLM's analysis that the project "may affect, is likely to adversely affect" the four endangered Colorado River fishes. The Biological Assessment also reported the Final EIS estimated total acre-feet of water from drilling gas and water wells and well completion estimated for use in the preferred alternative.

The BLM updated its Programmatic Biological Assessment (PBA) and reinitiated consultation with the USFWS on May 31, 2017. The new PBA incorporates information to address new technologies (horizontal drilling, broader use of hydraulic fracturing, and greater use of recycled water). The PBA also includes updated projected water depletion estimates by river sub-basin. The USFWS is reviewing the BLM's PBA. The BLM anticipates that the USFWS will issue a new PBO by mid-October. The existing PBO remains in effect while the USFWS is evaluating the updated PBA. Concurrently with the submission of the PBA, the BLM submitted a Section 7(d) Determination. It documents that water depletions associated with fluid minerals development in the upper Colorado River basin during the consultation process will not jeopardize the continued existence of the endangered big river fish. This determination is used during agency consultation to evaluate whether an ongoing action represents an irretrievable and irreversible commitment of resources. Further, the determination assesses whether the

BLM_0029179

irreversible and irretrievable commitment of resources would foreclose the formulation or implementation of reasonable and prudent alternative measures to avoid jeopardy or the destruction or adverse modification of critical habitat. Ongoing actions may continue after initiation of consultation provided they are not in violation of Section 7(d). After the new PBO is issued, the BLM will track water depletions on federal wells in accordance with the new tracking and reporting requirements contained therein.

The BLM assumed for Final EIS analysis and Section 7 consultation that the entire depletion associated with this project would be a new depletion from the Colorado River Basin. Freshwater would be obtained from nearby sources (per agreements with landowners and water rights holders) or comport with SGI's water augmentation plan (Final EIS Appendix L). Specific water withdrawal points will be identified in each future drilling application. Site-specific water information will be provided in the APD; detailed information is in Final EIS Appendix E, Master Drilling Plan.

## SECTION 4. DIRECT AND INDIRECT IMPACTS: PIPELINES
Total Number of New Comments: 2

**Organization: WELC**
Comment Excerpt Text:

The FEIS lacks an adequate consideration of pipeline safety.

BLM did not consult agencies with pipeline safety jurisdiction. In fact, BLM states that approvals for pipeline construction and operations would be acquired from the Colorado Department of Transportation, which has no jurisdiction over pipelines in Colorado. FEIS at 1-9 (Table 1-1). BLM should have consulted with the Pipeline Hazardous Materials Safety Administration ("PHMSA") and Colorado Public Utilities Commission, which has jurisdiction over pipelines within Colorado per a certification agreement with PHMSA.

BLM did not consider the cumulative impacts and risks of a total of 24 miles of new unregulated gas pipelines. Rural gas gathering lines are exempt from federal pipeline safety regulations, and therefore state regulatory oversight. See 49 CFR § 192. BLM did

not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. BLM did not consider the pipeline safety impacts on hikers, campers, hunters, and anglers utilizing the public lands for recreation purposes. BLM did not consider forest fire risks from pipeline explosions. BLM did not consider.

**Organization: SGI**
Comment Excerpt Text:

COA 84: Pipelines subject to this COA should only be the pipelines subject to USDOT compliance, not all pipelines. BLM to clarify which pipelines held to this COA. SG created a Pipeline Integrity Program to meet COGCC flowline rules, which pressure test annually. Gathering lines not included in this program are tested according to CDPHE hydrostatic discharge permit requirements.

## Summary
The agency that regulates pipelines is incorrect in the Final EIS. The Final EIS did not adequately consider pipeline safety.

BLM_0029180

**Response**
ROD **Appendix A** COAs #36 and #37 were clarified with the state regulatory agencies for pipeline testing, COGCC (flowlines) and CDPHE (water discharge). There are no pipelines regulated by the US Department of Transportation or Pipeline and Hazardous Materials Safety Administration within the Unit.

The Final EIS analyzed and disclosed risks to health and safety, including risks derived from potential pipeline spills or ruptures. Additionally, SGI has a pipeline integrity program used to protect natural gas resources, ensure safety, and comply with COGCC flowline rules. The Selected Alternative will be following various federal, state, and local laws and regulations including pipeline safety requirements. The operator must comply with all applicable regulations and permit requirements.

## SECTION 5. DIRECT AND INDIRECT IMPACTS: RECREATION
Total Number of New Comments: 1

**Organization: LDS**
Comment Excerpt Text:

Our property is used for camping and a nature experiences. Under the section of the EIS that addresses recreational use, it states that there is no recreational use in the Unit. Our land uses have not been acknowledged nor methods to accommodate our special use been discussed.

**Summary**
The Final EIS incorrectly states there are no recreational uses in the Unit.

**Response**
The LDS comment resulted in a correction about developed recreation sites and recreational use on private property, noted in **Appendix H**, Final EIS Errata, Section H.7. There are no BLM-administered developed recreation sites in the Bull Mountain Unit. The assumption in the Final EIS and Draft EIS Chapter 4, Environmental Consequences, Section 4.3.3, Recreation, Methods of Analysis, which states "there are no developed recreation facilities in the project area," was corrected to "there are no BLM-administered developed recreation facilities in the project area. Private land within the Unit may contain private developed recreation sites, such as camping areas." Final EIS page 4-199 acknowledges that: "Recreation is vulnerable to any action that would alter the activities and opportunities in a particular area. These actions could result in changes to recreational access or the amount and quality of a recreational activity." Final EIS page 4-202 also acknowledges impacts on private lands from natural gas development, including intrusive impacts such as "traffic, noise, dust, and human activity, as well as changes in the visual landscape." As described in Section 2, NEPA of this appendix, this ROD includes COAs to protect resources, including resources that relate to recreation.

BLM_0029181

# SECTION 6. DIRECT AND INDIRECT IMPACTS: WILDLIFE, BIG GAME, WHP
Total Number of New Comments: 5

**Organization: WELC**

Comment Excerpt Text:

In its FEIS, BLM includes a new Wildlife Habitat Plan ("WHP"). FEIS at C-6. The Wildlife Habitat Plan is a voluntary, operator-proposed plan that has not been agreed to or approved by Colorado Parks and Wildlife. See Wildlife Habitat Plan, attached to FEIS Appendix C…Even if the full Wildlife Habitat Plan is included in Alternative D, the WHP only applies through the development phase, not to production or maintenance phase activities. This means that impacts to big game will be "significantly greater" for the production and maintenance phases of the project, when "higher quality winter habitat would be reduced by 40 percent," as the BLM describes:

> SG has committed to applying the WHP through the development phase of the project meaning that *once the last wells are drilled and the Bull Mountain Unit is put in to the production phase the WHP would no longer be implemented. Impacts to wintering big game are expected to be considerably greater for this portion of the project.* As equipment and wells age it is conceivable that more maintenance activity and well work-overs may be necessary. *Without commitments to implement the WHP after the development stage it is realistic that more activity will occur during the winter period in the "Winter Closure Areas" during the 30+ year production phase.* With increased winter activity in these areas *it is reasonable to assume that impacts to wintering big game may be greatest during the production phase as higher quality winter habitat would be reduced by 40 percent.*

Thus, in no case does the WHP provide timing limitations to protect wildlife and birds during the 30+ year production phase, and timing limitations may not even be part of the BLM's Preferred Alternative.

**Organization: WELC**

Comment Excerpt Text:

Moreover, the BLM continues to fail to accurately account for the impact of roads on habitat fragmentation and avoidance by wildlife, including big game. The BLM uses route density as a means to characterize habitat quality and assess impacts within the Unit.

However, its analysis fails to accurately account for the impacts the proposed densities would have. Notably, under Preferred Alternative D, impacts on big game species where road densities are greater than 0.5 road mile per square mile would be most pronounced on 16,420 acres, leading to a direct loss of habitat and habitat fragmentation. FEIS at 4-147. Given the long-term increased impacts from roads and increased human activity acknowledged by BLM, FEIS 4-148, the Bull Mountain Unit's ability to remain big game habitat will be significantly compromised, yet the FEIS fails to take the necessary hard look to determine direct, indirect, and cumulative impacts to the local population.

**Organization: CPW**

Comment Excerpt Text:

CPW has substantive concerns about the conclusions in the FEIS regarding the wildlife impact analysis and the effectiveness of the Wildlife Habitat Plan, which were not disclosed in the FEIS. Specifically, CPW disagrees with BLM's assertion that implementing the Wildlife Habitat Plan through the six-year development phase of the project provides greater value to wildlife than implementing longer-term design features (such as remote well monitoring, traffic limitations, and clustered/phased development) for the life of the project. For example, the application of CPW's road density methodology does not support the conclusions in the FEIS if the Wildlife Habitat Plan only applies to the six-year development phase of the project. The scientific literature documents that unrestricted year-round oil and gas production activities have significant

BLM_0029182

negative implications for big game populations beyond the development or "drilling" phase (Buchanan et al. 2014, Hebblewhite. 2008, Sawyer et al. 2009, 2010).

**Organization: CPW**
Comment Excerpt Text:

Finally, it appears that any mitigation commitments made in the Wildlife Habitat Plan only apply during the six-year development phase (FEIS Volume 1, p. 4-148). Since there is overlap between the COAs, design features and mitigation measures listed in Appendix C and those listed in the Wildlife Habitat Plan, it is not clear which measures apply for the life

of the project, and which only apply during the six-year development phase. This complicates the impact analysis which contains multiple conflicting impact statements with respect to big game. CPW encourages BLM to clearly identify in the Record of Decision which specific COAs, design features, and mitigation measures identified in Appendix C and the Wildlife Habitat Plan apply for the life of the project.

**Organization: CPW**
Comment Excerpt Text:

Does Figure 4-15 Alt A accurately represent the federal lease closures?

**Summary**
The BLM's road density analysis is inadequate. Colorado Parks and Wildlife, a cooperating agency for the NEPA effort, expressed concerns with the impact analysis conclusions based on the road density analysis. The BLM should clarify how long the WHP applies and whether timing limitations apply. Commenters state that the production phase of oil and gas operations has significant impacts on big game.

**Response**
As CPW noted, the WHP component of Alternative D would apply only during the development phase, and not during the production or maintenance phases. The BLM has clarified that, with the exception of the WHP COAs, the COAs listed in ROD **Appendix A** will apply throughout the life of the federal authorizations, except when the BLM determines them to be not applicable. The WHP COAs will apply throughout the development phase activities (construction, drilling, and completion); they will not apply to the production or maintenance phases.

The road density analysis uses sound information, and the assumptions of the road density analysis are described in the Final EIS page 4-132 and Table 4-51, Habitat Quality Categories as a Function of Road Density. The BLM analyzed Alternatives B, C, and D road density for effective winter road density (Alternatives B and D with the WHP; Alternative C); and unrestricted spring, summer, and fall development. The Final EIS therefore describes and compares road density of Alternative D with and without the WHP. By showing the differences of Alternative D with the WHP in place during the development phase of the project, and without the WHP during the production phase of the project, the BLM quantified and qualitatively described the anticipated change in impacts likely to occur once the WHP is no longer in effect.

Final EIS Figure 4-15, Winter Road Density Habitat Quality Categories by Alternative (original figure title in the Final EIS was Habitat Categories by Alternative), shows Alternative A routes per square mile, without the federal winter seasonal timing limitation stipulations. This is because Alternative A does not include development of wells on federal leases under an MDP. The road density analysis assumed that areas under the Alternative A winter seasonal timing

BLM_0029183

limitation stipulations would still have increased vehicle use associated with development of private minerals distributed throughout the Unit. Therefore, roads under the timing limitation for Alternative A were not modeled separately, as was done for Alternatives B and D, WHP routes per square mile, and Alternative C. The analysis is for road density; therefore, the Alternative A timing limitation stipulation was not applied to this analysis. Based on the BLM's modeling assumption, Figure 4-15 Alternative A is correct.

ROD **Appendix H**, Final EIS Errata, corrects minor errors in Final EIS Section 4.2.7, Fish and Wildlife. The BLM worked with CPW on the Final EIS Errata (**Appendix H** of this ROD) to accurately reflect impacts on terrestrial wildlife.

The WHP is part of the Selected Alternative. The analysis in the Final EIS Alternative D assumed that with the application of the WHP in the winter period December 1 through April 15, SGI will limit its activities in Winter Closure Areas on private minerals, federal surface, and split-estate lands, resulting in a landscape approach to maintaining winter habitat suitability for big game. The WHP Winter Closure Areas will protect deer and elk winter ranges from development activities (construction, drilling, and completion). The BLM may approve annual exceptions to the lease stipulations for winter timing restrictions in areas outside of the WHP Winter Closure Areas. The analysis of Alternative D in the Final EIS assumed that SGI will apply winter timing limitations on private minerals, in addition to the required application of timing limitations on federal surface and split-estate.

The Wildlife Habitat Plan applies only during the development phase (Final EIS page 4-148). The BLM's analysis discloses long-term indirect impacts during natural gas production phase of the project. Final EIS page 4-148 states: "Over the long-term the production phase may result in fewer wintering big game within the Bull Mountain Unit than what [big game] may persist during the development phase of the project."

For those federal leases in the BMU that include a UFO Basin RMP timing limitation stipulation for wintering big game, the stipulation does not apply to operation and maintenance of production facilities. Operation and maintenance is as described per 43 CFR, Part 3162.3-2, Subsequent Well Operations. Therefore, operation and maintenance may affect wintering big game in the BMU once the full development phase of the Selected Alternative is complete.

**Appendix A** of this ROD also contains the list of COAs that apply, including those associated with the WHP. The BLM carefully weighed the analysis of the alternatives, including impacts on big game, and determined that the Selected Alternative best minimized adverse environmental impacts, while contributing to local and regional economies.

BLM_0029184

# SECTION 7. DIRECT AND INDIRECT IMPACTS: GREEN LINEAGE COLORADO RIVER CUTTHROAT TROUT

Total Number of New Comments: 2

**Organization: CPW**
Comment Excerpt Text:

I am concerned with the naming within the document of the cutthroat trout species that occur in several of the North Fork streams. Currently, the document refers to them as greenback cutthroat trout, which is ESA listed. These fish ARE NOT greenback cutthroat trout, but Colorado River cutthroat trout (not listed, but still of conservation value). The confusion is that there is new genetic information which has identified genetically discrete groups of cutthroat trout, which we are unsure are species or not. We are waiting for USFWS to determine what is a species and what is not do determine what to call them. In the meantime, there we are referring to two "lineages" of Colorado River cutthroat trout as the

"green" and the "blue". The fish in the North Fork are "green lineage" Colorado River cutthroat trout, NOT greenback cutthroat trout, as written

**Organization: EPA**
Comment Excerpt Text:

The EIS also states that lineage Greenback cutthroat trout have not been identified in the Bull Mountain Unit, and contains conflicting information on the presence of Colorado River cutthroat trout (pp. 3-91 and N-81). We understand that these inconsistencies will be reconciled in the ROD to clarify that Colorado River cutthroat trout do exist within the Unit and that the setback will apply to Greenback lineage cutthroat trout streams.

## Summary
The correct name should be used for cutthroat trout.

## Response
A correction was applied in ROD **Appendix H**, Final EIS Errata, to describe and document the trout naming correction change. The correct name is green lineage Colorado River cutthroat trout, *Oncorhynchus clarkii pleuriticus*. Descriptions of habitat and threats to this taxon, as well as distribution in the Unit, remain as described in the Final EIS.

# SECTION 8. COAS: WATER

Total Number of New Comments: 5

**Organization: SGI**
Comment Excerpt Text:

Baseline Water Quality Monitoring, meeting: This page is the only area where a meeting requirement is mentioned, it is not listed as a COA. The BLM and SGI are to hold meetings between themselves or to the public? Please clarify this requirement. COA 57 requires an annual report to the BLM but does not mention a meeting.

**Organization: SGI**
Comment Excerpt Text:

All surface water resources within 1 mile should be defined by a map/layer source. It is unrealistic to ground-truth all surface waters in 1-mile. Running stable isotopes of methane for every sample is excessive, expensive and worthless. IF the methane concentration is below 1 mg/L it is relatively insignificant and thus should not require isotopic analysis. COGCC Rule 609 will be followed which says if methane concentration is greater than 1.0

BLM_0029185

milligram per liter than gas compositional analysis and stable isotope analysis of the methane shall be performed.

**Organization: SGI**
Comment Excerpt Text:

BLM to update text in Chapter 4.2.6 to reflect COA 82 – SGI could utilize a pipeline bore for the crossing.

**Organization: WELC**
Comment Excerpt Text:

The FEIS's Alternative D includes additional baseline water monitoring. FEIS at C-8. The BLM has stated that under the Preferred Alternative, SG Interests will be required to continue a baseline water quality monitoring program as required by Colorado and include additional requirements to monitor for additional compounds. In addition, the BLM will conduct annual meetings with SG Interests in order for SG Interests to report their water quality

monitoring results. We request that the Record of Decision require that the meetings be open to the public and notice of such meetings be posted on the Uncompahgre BLM Field Office web page. In addition, if a written report is submitted by SG Interests to the BLM, this report should also be made available to the public.

**Organization: EPA**
Comment Excerpt Text:

A smaller 150-foot setback is stated in the Final EIS to apply to natural waterbodies "in other watersheds" (pp. 2- 48 and C-9), and we understand that this will be changed in the ROD to apply to "other areas."

**Summary**
The BLM should clarify the water monitoring meeting and the water monitoring requirements. The BLM should clarify other COAs related to water resources.

**Response**
ROD **Appendix A** COA #124, water monitoring, reflects a modification of Final EIS Appendix C COA #57 to remove duplicative water sampling, while providing the appropriate level of data. ROD **Appendix A** COA #124 exceeds COGCC monitoring rules. ROD **Chapter 6,** Modifications to and Clarifications of the Preferred Alternative, describes the modifications to the water monitoring program from the Final EIS. ROD **Appendix A** COA #1 describes the topics for the annual meeting between SGI and the BLM.

ROD **Appendix A** COA #15 reflects a modification of Final EIS Appendix C, Design Feature #63 to state "in areas other than cutthroat trout streams," instead of "in other watersheds." ROD **Appendix A** COA #15 was also clarified so that this siting requirement also applies to reservoirs and not only natural water bodies. ROD **Appendix A** COA #33 states that a pipeline bore can be used to cross a road or wetland. ROD **Appendix H**, Final EIS Errata, describes a correction to Final EIS page 4-131, environmental consequences, based on how a pipeline bore can be used.

BLM_0029186

# SECTION 9. COAS: AIR
Total Number of New Comments: 5

**Organization: EPA**
Comment Excerpt Text:

Mitigation can best be ensured by limiting NOx according to the form of the 1-hour $NO_2$ NAAQS; We continue to recommend that the requirement utilize the lb/1hr $NO_x$ emissions rate or an emissions rate with a shorter timeframe than an hour (such as the modeled gram per second emissions rate), rather than a tons per year limit. This would better align with the BLM's goal of maintaining air quality below the 1-hour $NO_2$ NAAQS. Similarly, for drilling, fracturing and completion, the requirement to operate Tier 2 engines and the use of combined horsepower to trigger the need for additional analysis may not align with the goal of maintaining air quality below the 1-hour $NO_2$ NAAQS. The emissions presented for development activities did not appear to be able to achieve the 1 gram per second NOx emissions rate needed to attain the 1-hour $NO_2$ NAAQS. We recommend that the COA be clear that the overriding requirement is the combined hourly emissions rate. For construction, there is not currently a mitigation measure and corresponding COA to maintain air quality below the 1-hour $NO_2$ NAAQS. Protecting air quality is important during all phases of development. EPA noted in our comments on the Draft EIS that the modeled scenario for construction could achieve the target 1 gram per second NOx emissions rate. The emission inventory utilized in that model scenario assumed that Tier 3 engines would be used for construction. We therefore recommend that use of Tier 3 engines be required, or alternatively, a lb/hr or gram per second $NO_x$ emissions rate be required. By identifying a consistent goal for each phase of construction, the NAAQS will be attained throughout development of this project.

**Organization: WELC**
Comment Excerpt Text:

The air analyses included in the FEIS are not a comprehensive assessment of the environmental and public health impacts resulting from an increase in air pollution in an area already heavily impacted by the adverse effects of increasing development. Without such an analysis, including detailed monitoring of local air quality conditions over time, the BLM cannot know what the impacts of the activities proposed in the MDP will be on air quality, human health, and the natural environment, or whether the BLM will prevent significant deterioration in air quality, as required by the Clean Air Act.

**Organization: WELC**
Comment Excerpt Text:

The only two ozone monitors operating on the western slope (Rifle and Palisade, Colorado) are located too far away from the North Fork Valley to be reliably used to monitor the potential increased levels of ozone likely to be experienced in this area as a result of the oil and gas activity associated with the Bull Mountain Unit. Thus, it is imperative that the baseline levels of ozone existing in the North Fork Valley be ascertained prior to the initiation of development under the Bull Mountain MDP. This monitoring must then continue for the duration of oil and gas exploration and production activities in this region. Therefore, in order to protect the health of the citizens in the North Fork Valley, as part of the Record of Decision for this project, SG Interests must be required to confer and cooperate with the Colorado Department of Public Health and Safety/Air Pollution Control Division in order to fund the installation of an air monitoring station in the North Fork Valley that meets the EPA standards for measuring ozone levels on a continuous basis. This monitoring station must be part of Colorado's publicly available statewide air monitoring network and managed by the state of Colorado. In previous comments, Citizen Groups asked BLM to require mandatory collection of baseline air samples prior to development and ongoing air monitoring to test for chemicals related to drilling and fracking operations, like methane, volatile organic compounds ("VOCs"), and polycyclic aromatic hydrocarbons ("PAHs"). See

BLM_0029187

DEIS Comments at 17-18. Baseline air sampling data is an extremely valuable tool that can prevent future impacts of air pollution by promoting best practices, including regular air monitoring of industrial sites, and it can support remediation efforts when incidents occur. BLM dismissed Citizen Groups' suggestion, reasoning that "there are several other operators and sources that influence the air quality of the region through complex operations," concluding that "a project-specific air modeling station would not be effective in this instance." FEIS at N-124. However, the presence of other operators and sources does not make baseline sampling ineffective. On the contrary, baseline sampling could help BLM determine—and make sensible decisions about—the cumulative effects of oil and gas development throughout the North Fork region. It is possible, moreover, to isolate the "fingerprint" of oil and gas development based on the characteristic chemicals such development releases into the environment, so the presence of non-oil and gas sources does not render baseline monitoring ineffective with respect to oil and gas development. Therefore, BLM's statement that air

monitoring does not make sense because the presence of other sources would render it ineffective is illogical, and its decision not to include such monitoring in the MDP is arbitrary and capricious.

**Organization: SGI**
Comment Excerpt Text:

COAs 31, 147, 12 all say different dust abatement measures "Achieve 50% control and moist conditions at all times" is different than "no visible dust plume." Fresh water application vs operator selected dust abatement. BLM should clarify which dust abatement COA will be implemented. Fresh water necessary to meet the COA may not be available.

**Organization: TEDX**
Comment Excerpt Text:

We are concerned about [substantial air pollution and nonmethane volatile organic compounds] increases in Gunnison and Delta Counties as a result of Bull Mountain UOG.

## Summary

The BLM should clarify how Final EIS air quality and AQRVs COAs (Final EIS Appendix C COAs #29, #30, and #31) would result in the stated emissions reductions for tons per year $NO_x$ for different phases of the project. The BLM's $NO_x$ emissions requirements focus on non-construction phase equipment. The BLM's $NO_x$ emissions requirements could include construction phase operations and equipment. The BLM should clarify the difference between Final EIS dust abatement and water use COAs (Final EIS Appendix C COAs #12 and #32 and design feature #147). The BLM should require baseline and ongoing air sampling.

## Response

ROD **Chapter 6**, Modifications to and Clarifications of the Preferred Alternative, summarizes how the BLM will use adaptive management and the Air Quality Impact Assessment Process. If site-specific review of proposed development activities identifies additional emissions that were not accounted for in the Final EIS, the BLM may need to perform additional analysis. The purpose of the additional analysis would be to evaluate the extent of the impacts and whether those impacts can be mitigated to an extent that would prevent unnecessary or undue degradation of air and atmospheric values on public lands. ROD **Appendix A** COA #1 requires and annual meeting between the BLM and SGI/the operator. Air quality and air quality adaptive management will be discussed at this meeting.

As described in the Final EIS for air quality related mitigation, additional analysis would be needed before authorizing future oil and gas development should emissions information for

BLM_0029188

operator-submitted APDs (based on actual refined oil and gas design plans) suggest that actual oil and gas development and associated emissions and projected air quality impacts at sensitive receptors (e.g., residences) would be above what was analyzed in the Final EIS. The BLM will potentially conduct more air quality analysis for the new operations for the actual oil and gas development if it appears to be substantially more emissions than what was analyzed in the Final EIS. There were several overestimating assumptions included in the near-field short-term nitrogen oxides analysis (including receptor placement) that are considered for actual future oil and gas development. Due to the overestimating assumptions used in the Final EIS analysis, additional analysis and mitigation requirements are unlikely to be needed, if emissions from proposed operations are within the bounds described and analyzed in the Final EIS.

ROD **Chapter 6**, Modifications to and Clarifications of the Preferred Alternative, summarizes the BLM's methods for ongoing review of air quality conditions in the Unit, including concentrations of hazardous air pollutants and other pollutants, as part of its review of future development applications.

ROD **Appendix A** COA #97 reflects a modification of Final EIS Appendix C COA #32 to specify methods of dust abatement (e.g., freshwater and magnesium chloride) from the Final EIS COA #12. Final EIS COA #12 was eliminated from this ROD because it was redundant with Final EIS COA #32.

## SECTION 10. CEQ RULE AND GREENHOUSE GASES
Total Number of New Comments: 2

**Organization: EPA**
Comment Excerpt Text:

Climate Change: new guidance GHG, final product refining and consuming oil and gas, or offsetting The Final EIS does not estimate the GHG emissions that will result from refining and consumption in the cumulative effects section. Given that refining and combustion are reasonably foreseeable activities associated with oil and gas exploration and development, the emissions associated with refining and combustion of the oil and gas should be analyzed as indirect effects in the EIS.

**Organization: EPA**
Comment Excerpt Text:

Finally, we encourage the BLM to commit to implementation of additional measures beyond current regulatory requirements related to climate change. Specifically, we recommend that the ROD discuss measures that would further reduce or eliminate project-related GHG emissions and/or increase resiliency to anticipated climate change, such as offsetting of GHG emissions by implementing one or more environmental projects, including habitat restoration, that would increase resiliency and reduce net emissions; electrification of field equipment, with consideration for renewable energy sources; committing to development in a manner that would allow for the capture or beneficial use of emissions during well completion; and educating workers about the impacts of climate change and how they can help reduce GHG emissions (e.g., by avoiding excessive idling of trucks and equipment.)

BLM_0029189

**Summary**

The Council on Environmental Quality (CEQ) published August 2016 guidance on climate change in NEPA reviews. The BLM should discuss the climate change guidance, including project-related greenhouse gas (GHG) emissions, GHG emissions from refining and consuming natural gas, and resilience to anticipated climate changes.

**Response**

The Final EIS discussed projected total GHG emissions and trends on a multi-scaled basis (state, national, and global), and thus indirectly included project emissions as part of these forecast totals. Because the estimation of downstream emissions is imprecise, analysis of the refining and combustion of natural gas would not further aid the decision-maker and is not needed for an informed decision on this project.

The BLM addressed the EPA's concerns on GHG in ROD **Chapter 6**, Modifications to and Clarifications of the Preferred Alternative, Section 6.2, Greenhouse Gas Emissions Reduction and Offset.

BLM_0029190

## Zoe Ghali

**From:** Jackson, Julie <jmjackson@blm.gov>
**Sent:** Tuesday, February 6, 2018 1:34 PM
**To:** Zoe Ghali
**Cc:** Matthew Loscalzo
**Subject:** Re: UFO RMP recreation receipts update for socioeconomic section

We had a total of $58,407.58 in receipts for 2017.

Please let me know if you need anything else.

Thank you

Julie Jackson
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO  81401
970-240-5310
jmjackson@blm.gov

"To the world you might be one person, but to one person, you just might be the world."

"The happiest people don't have the best of everything. They just make the best of everything."

On Mon, Feb 5, 2018 at 9:51 AM, Zoe Ghali <zoe.ghali@empsi.com> wrote:

Hi Julie,

I'm following up on my previous request for recreation receipts. Would you be able to provide the total for recreation receipts received for the UFO in fiscal year 2017? I'd like to include this info in the updated Ch 3 socioeconomic section. I don't believe I received this info, my apologies if I am mistaken.

**Zoe Ghali**
Please note our new street address:

EMPSi  Environmental Management and Planning Solutions, Inc.
3005 Center Green Drive, Suite 205
Boulder, CO 80301
tel:  303-447-7160    fax:  866-625-0707

www.EMPSi.com    Twitter: EMPSInc    Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S*

Albuquerque     Denver     Portland     Reno     San Francisco     Santa Fe     Washington, DC

BLM_0029191

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Zoe Ghali
**Sent:** Tuesday, December 19, 2017 2:46 PM
**To:** 'jmjackson@blm.gov' <jmjackson@blm.gov>
**Cc:** Loscalzo, Matthew <mloscalzo@blm.gov>; Angie Adams <angie.adams@empsi.com>
**Subject:** UFO RMP recreation receipts update for socioeconomic section

Hi Julie,

I am updating the socioeconomic section for the UFO RMP Ch 3 and 4. The section contains some information on current recreation use and receipts that is now out of data. Would you be able to supply updated receipts data (i.e. SPR receipts, and other recreation fees) for the most recent fiscal year. One total number is fine.

Thanks for your help, and please let me know if you have any questions.

**Zoe Ghali**
Please note our new street address:

EMPSi  Environmental Management and Planning Solutions, Inc.
3005 Center Green Drive, Suite 205
Boulder, CO 80301
tel: 303-447-7160    fax: 866-625-0707

www.EMPSi.com       Twitter: EMPSInc       Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*

Albuquerque      Denver      Portland      Reno      San Francisco      Santa Fe      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0029192

## Angie Adams

| | |
|---|---|
| **From:** | Nicholas Szuch <nszuch@blm.gov> |
| **Sent:** | Thursday, December 21, 2017 4:05 PM |
| **To:** | Zoe Ghali |
| **Cc:** | Angie Adams; Matthew Loscalzo; Teresa Pfifer |
| **Subject:** | RE: UFO RMP- ROW receipts data for socioeconomics Ch 3 update |

Hi Zoe,

We've run a few reports or of LR2000, and are pretty confident this is the most up-to-date info we have,

FY 17 UFO Lands and Realty Receipts (rental rec'd)

## $106,618.58

Let me know if you have any questions.

*Nick Szuch*

Realty Specialist
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401
(970) 240-5322

---

**From:** Zoe Ghali [mailto:zoe.ghali@empsi.com]
**Sent:** Tuesday, December 19, 2017 3:17 PM
**To:** nszuch@blm.gov
**Cc:** Angie Adams <angie.adams@empsi.com>; Loscalzo, Matthew <mloscalzo@blm.gov>
**Subject:** UFO RMP- ROW receipts data for socioeconomics Ch 3 update

Hello Nick,

I am updating the socioeconomic section for the UFO RMP Ch 3. The section contains information on ROW receipts that is now out of date. Would you be able to supply updated ROW receipts data for the most recent fiscal year (one total number is fine)?

Thanks for your help, and please let me know if you have any questions.

**Zoe Ghali**
Please note our new street address:
EMPSi  Environmental Management and Planning Solutions, Inc.
3005 Center Green Drive, Suite 205
Boulder, CO 80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com    Twitter: EMPSInc    Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*

Albuquerque      Denver      Portland      Reno      San Francisco      Santa Fe      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0029193

Mineral Receipts 2017 Data

| Date | Code | Description | Value | No. |
|---|---|---|---|---|
| 10/6/2016 | 539 | PRODUCED VALUE | $13.00 | 1 |
| 10/12/2016 | 539 | PRODUCED VALUE | $13.00 | 2 |
| 10/27/2016 | 539 | PRODUCED VALUE | $13.00 | 3 |
| 10/27/2016 | 539 | PRODUCED VALUE | $13.00 | 4 |
| 10/27/2016 | 539 | PRODUCED VALUE | $13.00 | 5 |
| 11/2/2016 | 539 | PRODUCED VALUE | $13.00 | 6 |
| 11/10/2016 | 539 | PRODUCED VALUE | $13.00 | 3 |
| 11/10/2016 | 539 | PRODUCED VALUE | $13.00 | 7 |
| 11/17/2016 | 539 | PRODUCED VALUE | $13.00 | 8 |
| 5/3/2017 | 539 | PRODUCED VALUE | $13.00 | 9 |
| 5/3/2017 | 539 | PRODUCED VALUE | $13.00 | 12 |
| 5/3/2017 | 539 | PRODUCED VALUE | $13.00 | 13 |
| 5/3/2017 | 539 | PRODUCED VALUE | $13.00 | 15 |
| 5/3/2017 | 539 | PRODUCED VALUE | $13.00 | 16 |
| 5/3/2017 | 539 | PRODUCED VALUE | $26.00 | 10 |
| 5/3/2017 | 539 | PRODUCED VALUE | $26.00 | 14 |
| 5/3/2017 | 539 | PRODUCED VALUE | $39.00 | 11 |
| 5/10/2017 | 539 | PRODUCED VALUE | $13.00 | 17 |
| 5/10/2017 | 539 | PRODUCED VALUE | $13.00 | 18 |
| 5/11/2017 | 539 | PRODUCED VALUE | $13.00 | 20 |
| 5/11/2017 | 539 | PRODUCED VALUE | $13.00 | 21 |
| 5/11/2017 | 539 | PRODUCED VALUE | $13.00 | 22 |
| 5/11/2017 | 539 | PRODUCED VALUE | $13.00 | 23 |
| 5/11/2017 | 539 | PRODUCED VALUE | $13.00 | 24 |
| 5/11/2017 | 539 | PRODUCED VALUE | $13.00 | 25 |
| 5/11/2017 | 539 | PRODUCED VALUE | $26.00 | 19 |
| 5/24/2017 | 539 | PRODUCED VALUE | $13.00 | 26 |
| 5/24/2017 | 539 | PRODUCED VALUE | $13.00 | 27 |
| 5/24/2017 | 539 | PRODUCED VALUE | $13.00 | 28 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 29 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 30 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 32 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 33 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 34 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 35 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 36 |
| 5/31/2017 | 539 | PRODUCED VALUE | $13.00 | 37 |
| 5/31/2017 | 539 | PRODUCED VALUE | $26.00 | 31 |
| 5/31/2017 | 539 | PRODUCED VALUE | $26.00 | 38 |
| 6/7/2017 | 539 | PRODUCED VALUE | $13.00 | 39 |
| 6/7/2017 | 539 | PRODUCED VALUE | $13.00 | 40 |
| 6/12/2017 | 539 | PRODUCED VALUE | $13.00 | 41 |
| 6/21/2017 | 539 | PRODUCED VALUE | $13.00 | 42 |
| 6/21/2017 | 539 | PRODUCED VALUE | $13.00 | 43 |
| 6/21/2017 | 539 | PRODUCED VALUE | $13.00 | 44 |
| 6/21/2017 | 539 | PRODUCED VALUE | $13.00 | 45 |

BLM_0029194

| 6/21/2017 | 539 PRODUCED VALUE | $13.00 | 46 |
| 6/26/2017 | 539 PRODUCED VALUE | $13.00 | 47 |
| 6/26/2017 | 539 PRODUCED VALUE | $13.00 | 48 |
| 7/6/2017 | 539 PRODUCED VALUE | $13.00 | 41 |
| 7/6/2017 | 539 PRODUCED VALUE | $13.00 | 49 |
| 7/6/2017 | 539 PRODUCED VALUE | $13.00 | 50 |
| 7/12/2017 | 539 PRODUCED VALUE | $13.00 | 51 |
| 7/12/2017 | 539 PRODUCED VALUE | $13.00 | 52 |
| 7/18/2017 | 539 PRODUCED VALUE | $13.00 | 53 |
| 7/19/2017 | 539 PRODUCED VALUE | $13.00 | 54 |
| 7/19/2017 | 539 PRODUCED VALUE | $13.00 | 55 |
| 7/26/2017 | 539 PRODUCED VALUE | $13.00 | 56 |
| 7/26/2017 | 539 PRODUCED VALUE | $13.00 | 57 |
| 8/8/2017 | 539 PRODUCED VALUE | $13.00 | 58 |
| 8/8/2017 | 539 PRODUCED VALUE | $13.00 | 59 |
| 8/10/2017 | 539 PRODUCED VALUE | $13.00 | 60 |
| 8/16/2017 | 539 PRODUCED VALUE | $13.00 | 61 |
| 8/16/2017 | 539 PRODUCED VALUE | $13.00 | 62 |
| 8/16/2017 | 539 PRODUCED VALUE | $13.00 | 63 |
| 8/16/2017 | 539 PRODUCED VALUE | $26.00 | 11 |
| 8/29/2017 | 539 PRODUCED VALUE | $13.00 | 64 |
| 8/31/2017 | 539 PRODUCED VALUE | $13.00 | 65 |
| 9/6/2017 | 539 PRODUCED VALUE | $13.00 | 66 |
| 9/6/2017 | 539 PRODUCED VALUE | $13.00 | 67 |
| | 2017 TOTAL | $1,014.00 | |

## Zoe Ghali

| | |
|---|---|
| **From:** | Stark, Russell <rmstark@blm.gov> |
| **Sent:** | Monday, February 5, 2018 10:03 AM |
| **To:** | Zoe Ghali |
| **Subject:** | Fwd: UFO RMP- forestry data for socioeconomics Ch 3 |

Zoe this is what I have from Robin sorry that I did not forward I thought that she may have went direct to you.

---------- Forwarded message ----------
From: **Lewis, Robin** <rlewis@blm.gov>
Date: Tue, Dec 26, 2017 at 10:52 AM
Subject: Re: UFO RMP- forestry data for socioeconomics Ch 3
To: Russell Stark <rmstark@blm.gov>

For FY 17 we had 5855.75 dollars worth of sales for fuelwood, transplants, xmas trees, and fence posts.  That may also include a permit here or there for something like sage brush collecting, which Ken issues for commerical use using one of our contract books.  I don't think I could tell you number of cords of wood unless I had Jane and Julie go back through each permit, which could be tedious, but if you need it we can do it.

Thanks,

Robin

On Wed, Dec 20, 2017 at 9:53 AM, Lewis, Robin <rlewis@blm.gov> wrote:
  I'll look into it and get back to her.

  On Tue, Dec 19, 2017 at 3:37 PM, Russell Stark <rmstark@blm.gov> wrote:
  Robin do you have this info? If so could you forward to Zoe

  Sent from my iPhone

  Begin forwarded message:

> From: Zoe Ghali <zoe.ghali@empsi.com>
> Date: December 19, 2017 at 3:14:29 PM MST
> To: "rmstark@blm.gov" <rmstark@blm.gov>
> Subject: UFO RMP- forestry data for socioeconomics Ch 3
>
> Hello Russel,
>
> I am updating the socioeconomic section for the UFO RMP Ch 3. The section contains some information on forestry receipts that is now out of date. Would you be able to supply updated sales numbers and receipts data for forest and woodland products for the most recent fiscal year?
>
> Thanks for your help, and please let me know if you have any questions.

BLM_0029196

**Zoe Ghali**

| | |
|---|---|
| **From:** | Losasso, Angela <alosasso@blm.gov> |
| **Sent:** | Friday, February 9, 2018 2:13 PM |
| **To:** | Zoe Ghali; Matthew Loscalzo; Jessica Montag |
| **Subject:** | UFO Billed AUMs |
| **Attachments:** | UFO Billed AUMs.xlsx |

Hi Zoe,

Attached is a new spreadsheet for you to use for range impact analysis.  I did some spot checking and the numbers look much more accurate. There shouldn't be a big need to do any further verification; I trust what we have here is correct. You can sort by Fee Year, and get single years or data for multiple years. Hope this helps get you back on track.

Matt: If you need a copy of this spreadsheet for any reason, it is located at:
S:\Planning\RMP UFO Revision\PRMP_FEIS\Impacts Analysis\Individual Resources\23. Livestock Grazing


Angela LoSasso
Rangeland Management Specialist
Uncompahgre Field Office
(970) 240-5390 - Desk
(970) 497-0285 - Mobile

BLM_0029197

| Bill Admin Office Cd10 | Bill Office Name | Bill Allot Admin State Cd | Bill Allotment Number_ | Bill Allotment Number | Bill Allotment Name | Fee Year | Billed AUMs | Report Date | Receipts with Grazing Fee $1.69/AUM |
|---|---|---|---|---|---|---|---|---|---|
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14008 | CO14008 | 25 MESA - NORTH | 2016 | 268 | 02/09/18 | $ 452.92 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05027 | CO05027 | ADOBE | 2016 | 24 | 02/09/18 | $ 40.56 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17253 | CO17253 | ALDER CREEK | 2016 | 10 | 02/09/18 | $ 16.90 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14017 | CO14017 | ALKALI FLATS | 2016 | 302 | 02/09/18 | $ 510.38 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05050 | CO05050 | ALLEN RESERVOIR | 2016 | 39 | 02/09/18 | $ 65.91 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14525 | CO14525 | ANTHRACITE CREEK | 2016 | 92 | 02/09/18 | $ 155.48 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14551 | CO14551 | ASPEN DITCH | 2016 | 57 | 02/09/18 | $ 96.33 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07303 | CO07303 | BARKELEW DRAW COMMON | 2016 | 471 | 02/09/18 | $ 795.99 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05522 | CO05522 | BEAVER HILL | 2016 | 81 | 02/09/18 | $ 136.89 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14013 | CO14013 | BEN LOWE | 2016 | 87 | 02/09/18 | $ 147.03 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07207 | CO07207 | BIG BEAR CREEK | 2016 | 20 | 02/09/18 | $ 33.80 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17061 | CO17061 | BIG BUCKTAIL | 2016 | 99 | 02/09/18 | $ 167.31 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05044 | CO05044 | BIG PASTURE | 2016 | 5 | 02/09/18 | $ 8.45 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05045 | CO05045 | BLACK BULLET | 2016 | 7 | 02/09/18 | $ 11.83 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07219 | CO07219 | BOLINGER DITCH | 2016 | 8 | 02/09/18 | $ 13.52 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07235 | CO07235 | BRAMIER DRAW | 2016 | 20 | 02/09/18 | $ 33.80 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07232 | CO07232 | BUCK | 2016 | 38 | 02/09/18 | $ 64.22 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17033 | CO17033 | BUCKEYE | 2016 | 26 | 02/09/18 | $ 43.94 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14012 | CO14012 | CANAL | 2016 | 427 | 02/09/18 | $ 721.63 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17100 | CO17100 | CARPENTER RIDGE | 2016 | 154 | 02/09/18 | $ 260.26 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05570 | CO05570 | CEDAR | 2016 | 31 | 02/09/18 | $ 52.39 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05535 | CO05535 | CEDAR CREEK | 2016 | 6 | 02/09/18 | $ 10.14 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05012 | CO05012 | CEDAR POINT | 2016 | 21 | 02/09/18 | $ 35.49 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05528 | CO05528 | CHAFFEE GULCH | 2016 | 106 | 02/09/18 | $ 179.14 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17107 | CO17107 | COAL CANYON | 2016 | 61 | 02/09/18 | $ 103.09 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14517 | CO14517 | COAL GULCH | 2016 | 241 | 02/09/18 | $ 407.29 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17027 | CO17027 | COKE OVENS | 2016 | 223 | 02/09/18 | $ 376.87 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05043 | CO05043 | COLLINS | 2016 | 10 | 02/09/18 | $ 16.90 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07222 | CO07222 | COVENTRY | 2016 | 70 | 02/09/18 | $ 118.30 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05566 | CO05566 | COW CREEK | 2016 | 73 | 02/09/18 | $ 123.37 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05018 | CO05018 | CRAWFORD RESERVOIR | 2016 | 7 | 02/09/18 | $ 11.83 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05506 | CO05506 | CUSHMAN | 2016 | 314 | 02/09/18 | $ 530.66 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05518 | CO05518 | DAVE WOOD ROAD | 2016 | 94 | 02/09/18 | $ 158.86 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14524 | CO14524 | DEEP CREEK | 2016 | 3 | 02/09/18 | $ 5.07 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14019 | CO14019 | DEER BASIN-MIDWAY | 2016 | 410 | 02/09/18 | $ 692.90 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 03277 | CO03277 | DELTA PIPELINE | 2016 | 290 | 02/09/18 | $ 490.10 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14023 | CO14023 | DIRTY GEORGE | 2016 | 78 | 02/09/18 | $ 131.82 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17042 | CO17042 | DOBY CANYON | 2016 | 12 | 02/09/18 | $ 20.28 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17004 | CO17004 | DOLORES CANYON | 2016 | 150 | 02/09/18 | $ 253.50 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05028 | CO05028 | DOUG CREEK | 2016 | 51 | 02/09/18 | $ 86.19 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05541 | CO05541 | DOWNING | 2016 | 27 | 02/09/18 | $ 45.63 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05537 | CO05537 | DRY CEDAR | 2016 | 224 | 02/09/18 | $ 378.56 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14549 | CO14549 | DRY CREEK | 2016 | 133 | 02/09/18 | $ 224.77 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05513 | CO05513 | DRY CREEK BASIN | 2016 | 128 | 02/09/18 | $ 216.32 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05525 | CO05525 | DRY CREEK PLACE | 2016 | 17 | 02/09/18 | $ 28.73 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05540 | CO05540 | DRY GULCH | 2016 | 180 | 02/09/18 | $ 304.20 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07300 | CO07300 | DRY PARK | 2016 | 531 | 02/09/18 | $ 897.39 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05514 | CO05514 | EAST FK. DRY CREEK | 2016 | 11 | 02/09/18 | $ 18.59 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05041 | CO05041 | EAST GOULD RESERVOIR | 2016 | 20 | 02/09/18 | $ 33.80 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17101 | CO17101 | EAST PARADOX COMMON | 2016 | 1,127 | 02/09/18 | $ 1,904.63 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14512 | CO14512 | EAST ROATCAP | 2016 | 58 | 02/09/18 | $ 98.02 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17213 | CO17213 | FAR AWAY ALLOTMENT | 2016 | 15 | 02/09/18 | $ 25.35 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17078 | CO17078 | FEEDLOT | 2016 | 7 | 02/09/18 | $ 11.83 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14508 | CO14508 | FIRE MOUNTAIN CANAL | 2016 | 4 | 02/09/18 | $ 6.76 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05501 | CO05501 | FLATIRON | 2016 | 92 | 02/09/18 | $ 155.48 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05512 | CO05512 | FRANKLIN MESA | 2016 | 121 | 02/09/18 | $ 204.49 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07063 | CO07063 | GRAVEL PIT | 2016 | 6 | 02/09/18 | $ 10.14 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05503 | CO05503 | GREEN | 2016 | 28 | 02/09/18 | $ 47.32 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05569 | CO05569 | HAIRPIN | 2016 | 14 | 02/09/18 | $ 23.66 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07209 | CO07209 | HAMILTON MESA | 2016 | 26 | 02/09/18 | $ 43.94 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05549 | CO05549 | HIGH PARK | 2016 | 60 | 02/09/18 | $ 101.40 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05521 | CO05521 | HIGHWAY 90 | 2016 | 169 | 02/09/18 | $ 285.61 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 05562 | CO05562 | HILLSIDE | 2016 | 40 | 02/09/18 | $ 67.60 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07201 | CO07201 | HOME RANCH | 2016 | 27 | 02/09/18 | $ 45.63 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07301 | CO07301 | HORSEFLY | 2016 | 49 | 02/09/18 | $ 82.81 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 07076 | CO07076 | HOUSER | 2016 | 51 | 02/09/18 | $ 86.19 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14516 | CO14516 | HUBBARD CREEK | 2016 | 45 | 02/09/18 | $ 76.05 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14014 | CO14014 | JOKER | 2016 | 46 | 02/09/18 | $ 77.74 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14527 | CO14527 | JUMBO MOUNTAIN | 2016 | 73 | 02/09/18 | $ 123.37 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 14505 | CO14505 | JUNIPER KNOB | 2016 | 2 | 02/09/18 | $ 3.38 |
| LLCOS0500 | UNCOMPAHGRE FO | CO | 17011 | CO17011 | LA SAL CREEK | 2016 | 139 | 02/09/18 | $ 234.91 |

BLM_0029198

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LLCOS0500 | UNCOMPAHGRE FO CO | 07075 | CO07075 | LAVENDER | 2016 | 28 | 02/09/18 | $ 47.32 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14011 | CO14011 | LEE BENCH | 2016 | 40 | 02/09/18 | $ 67.60 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17003 | CO17003 | LEE LANDS | 2016 | 70 | 02/09/18 | $ 118.30 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17024 | CO17024 | LILLYLANDS - WEST | 2016 | 224 | 02/09/18 | $ 378.56 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17012 | CO17012 | LION CANYON | 2016 | 14 | 02/09/18 | $ 23.66 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17044 | CO17044 | LION CREEK BASIN | 2016 | 350 | 02/09/18 | $ 591.50 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07223 | CO07223 | LITTLE BALDY | 2016 | 175 | 02/09/18 | $ 295.75 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07210 | CO07210 | LITTLE MAVERICK DRAW | 2016 | 30 | 02/09/18 | $ 50.70 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05529 | CO05529 | LOG HILL | 2016 | 189 | 02/09/18 | $ 319.41 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07234 | CO07234 | LOWER HAMILTON | 2016 | 25 | 02/09/18 | $ 42.25 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05520 | CO05520 | LOWER HORSEFLY COMBINED | 2016 | 133 | 02/09/18 | $ 224.77 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07213 | CO07213 | LOWER PINION | 2016 | 3 | 02/09/18 | $ 5.07 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05000 | CO05000 | LOWER ROUBIDEAU CYN. | 2016 | 31 | 02/09/18 | $ 52.39 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17018 | CO17018 | MAVERICK DRAW ALLOT | 2016 | 73 | 02/09/18 | $ 123.37 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14532 | CO14532 | MCDONALD CREEK | 2016 | 108 | 02/09/18 | $ 182.52 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17014 | CO17014 | MESA CREEK CRMP | 2016 | 1,658 | 02/09/18 | $ 2,802.02 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07233 | CO07233 | MIDDLE HAMILTON LSE. | 2016 | 74 | 02/09/18 | $ 125.06 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05563 | CO05563 | MOONSHINE PARK | 2016 | 7 | 02/09/18 | $ 11.83 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07230 | CO07230 | MUD SPRINGS | 2016 | 142 | 02/09/18 | $ 239.98 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14519 | CO14519 | MUDDY CREEK | 2016 | 16 | 02/09/18 | $ 27.04 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07203 | CO07203 | NATURITA CANYON | 2016 | 27 | 02/09/18 | $ 45.63 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17035 | CO17035 | NATURITA RIDGE | 2016 | 301 | 02/09/18 | $ 508.69 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14542 | CO14542 | NEEDLE ROCK | 2016 | 8 | 02/09/18 | $ 13.52 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17023 | CO17023 | NORTH WICKSON DRAW | 2016 | 13 | 02/09/18 | $ 21.97 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07218 | CO07218 | NORWOOD HILL ALLOT. | 2016 | 9 | 02/09/18 | $ 15.21 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17082 | CO17082 | NYSWANGER | 2016 | 43 | 02/09/18 | $ 72.67 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07225 | CO07225 | OAK HILL | 2016 | 5 | 02/09/18 | $ 8.45 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14528 | CO14528 | OAK RIDGE COMMON | 2016 | 353 | 02/09/18 | $ 596.57 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14511 | CO14511 | OVERLAND | 2016 | 30 | 02/09/18 | $ 50.70 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17030 | CO17030 | PARK | 2016 | 56 | 02/09/18 | $ 94.64 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17062 | CO17062 | PARKWAY | 2016 | 34 | 02/09/18 | $ 57.46 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05516 | CO05516 | PINEY ALLOTMENT | 2016 | 324 | 02/09/18 | $ 547.56 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05507 | CO05507 | PIPELINE | 2016 | 244 | 02/09/18 | $ 412.36 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17085 | CO17085 | POCKET | 2016 | 8 | 02/09/18 | $ 13.52 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14021 | CO14021 | POINT CREEK | 2016 | 26 | 02/09/18 | $ 43.94 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14531 | CO14531 | POPP RANCH | 2016 | 11 | 02/09/18 | $ 18.59 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 02660 | CO02660 | RADIO TOWER | 2016 | 14 | 02/09/18 | $ 23.66 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05034 | CO05034 | RAWHIDE - COFFEE POT | 2016 | 42 | 02/09/18 | $ 70.98 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17021 | CO17021 | RAWLINGS ALLOTMENT | 2016 | 18 | 02/09/18 | $ 30.42 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 03298 | CO03298 | RAY (WRAY) MESA (17048) | 2016 | 375 | 02/09/18 | $ 633.75 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07227 | CO07227 | REDVALE | 2016 | 20 | 02/09/18 | $ 33.80 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14530 | CO14530 | REYNOLDS/MCDONALD | 2016 | 446 | 02/09/18 | $ 753.74 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05051 | CO05051 | RIM ROCK ALLOTMENT | 2016 | 1 | 02/09/18 | $ 1.69 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17079 | CO17079 | RIVER | 2016 | 11 | 02/09/18 | $ 18.59 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07200 | CO07200 | RIVER ALLOTMENT | 2016 | 117 | 02/09/18 | $ 197.73 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05504 | CO05504 | ROATCAP | 2016 | 126 | 02/09/18 | $ 212.94 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14507 | CO14507 | ROATCAP-JAY CREEK | 2016 | 181 | 02/09/18 | $ 305.89 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17020 | CO17020 | ROC CREEK ALLOTMENT | 2016 | 28 | 02/09/18 | $ 47.32 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17080 | CO17080 | ROWHER CANYON | 2016 | 17 | 02/09/18 | $ 28.73 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05502 | CO05502 | SANDY WASH | 2016 | 184 | 02/09/18 | $ 310.96 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17032 | CO17032 | SAWTOOTH | 2016 | 488 | 02/09/18 | $ 824.72 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17105 | CO17105 | SECOND PARK | 2016 | 40 | 02/09/18 | $ 67.60 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14547 | CO14547 | SECTION 35 | 2016 | 22 | 02/09/18 | $ 37.18 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05003 | CO05003 | SELIG CANAL | 2016 | 37 | 02/09/18 | $ 62.53 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05511 | CO05511 | SHAVANO MESA | 2016 | 160 | 02/09/18 | $ 270.40 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05534 | CO05534 | SHINN PARK/SOUTH CANAL | 2016 | 237 | 02/09/18 | $ 400.53 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05547 | CO05547 | SLAGLE PASS | 2016 | 30 | 02/09/18 | $ 50.70 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05049 | CO05049 | SMITH FORK | 2016 | 6 | 02/09/18 | $ 10.14 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14004 | CO14004 | SOUTH BRANCH | 2016 | 101 | 02/09/18 | $ 170.69 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14548 | CO14548 | SOUTH DRY CREEK | 2016 | 50 | 02/09/18 | $ 84.50 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14534 | CO14534 | SOUTH OF TOWN | 2016 | 105 | 02/09/18 | $ 177.45 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05515 | CO05515 | SOUTH PINEY | 2016 | 32 | 02/09/18 | $ 54.08 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05517 | CO05517 | SPRING CREEK | 2016 | 47 | 02/09/18 | $ 79.43 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05029 | CO05029 | SPRING GULCH | 2016 | 62 | 02/09/18 | $ 104.78 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14513 | CO14513 | STEVENS GULCH COMMON | 2016 | 69 | 02/09/18 | $ 116.61 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14503 | CO14503 | STINGLEY GULCH | 2016 | 97 | 02/09/18 | $ 163.93 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14521 | CO14521 | STOCK DRIVEWAY | 2016 | 32 | 02/09/18 | $ 54.08 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17102 | CO17102 | SUNRISE GULCH | 2016 | 29 | 02/09/18 | $ 49.01 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17081 | CO17081 | SWAIN BENCH | 2016 | 12 | 02/09/18 | $ 20.28 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17031 | CO17031 | TABEGUACHE CREEK | 2016 | 620 | 02/09/18 | $ 1,047.80 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07228 | CO07228 | TAYLOR | 2016 | 36 | 02/09/18 | $ 60.84 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05555 | CO05555 | TAYLOR DRAW | 2016 | 18 | 02/09/18 | $ 30.42 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17103 | CO17103 | THIRD PARK COMMON | 2016 | 490 | 02/09/18 | $ 828.10 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05530 | CO05530 | TINKLER ALLOTMENT | 2016 | 21 | 02/09/18 | $ 35.49 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05505 | CO05505 | TRANSFER ROAD | 2016 | 110 | 02/09/18 | $ 185.90 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17106 | CO17106 | TUTTLE DRAW | 2016 | 39 | 02/09/18 | $ 65.91 |

BLM_0029199

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LLCOS0500 | UNCOMPAHGRE FO CO | 07008 | CO07008 | TWENTY-FIVE MESA-SO. | 2016 | 155 | 02/09/18 | $ 261.95 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07302 | CO07302 | UNCOMPAHGRE | 2016 | 58 | 02/09/18 | $ 98.02 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07007 | CO07007 | UNCOMPAHGRE BENCH | 2016 | 161 | 02/09/18 | $ 272.09 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07208 | CO07208 | UPPER MAILBOX ALLOT | 2016 | 109 | 02/09/18 | $ 184.21 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07202 | CO07202 | UPPER MAVERICK DRAW | 2016 | 6 | 02/09/18 | $ 10.14 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05007 | CO05007 | UPPER PEACH VALLEY | 2016 | 161 | 02/09/18 | $ 272.09 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14514 | CO14514 | UPPER TERROR CREEK | 2016 | 25 | 02/09/18 | $ 42.25 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14025 | CO14025 | WARD CR. DOUGHSPOON | 2016 | 396 | 02/09/18 | $ 669.24 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 05548 | CO05548 | WASHBOARD ROCK | 2016 | 34 | 02/09/18 | $ 57.46 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14016 | CO14016 | WELLS GULCH | 2016 | 1,747 | 02/09/18 | $ 2,952.43 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14510 | CO14510 | WEST ROATCAP | 2016 | 88 | 02/09/18 | $ 148.72 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14515 | CO14515 | WEST STEVENS GULCH | 2016 | 98 | 02/09/18 | $ 165.62 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14015 | CO14015 | WHITE RANCH | 2016 | 10 | 02/09/18 | $ 16.90 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 17010 | CO17010 | WICKSON DRAW | 2016 | 90 | 02/09/18 | $ 152.10 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14502 | CO14502 | WILBANKS | 2016 | 157 | 02/09/18 | $ 265.33 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14523 | CO14523 | WILLIAMS CREEK | 2016 | 8 | 02/09/18 | $ 13.52 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 07220 | CO07220 | WILLIMS DITCH ALLOT. | 2016 | 5 | 02/09/18 | $ 8.45 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14010 | CO14010 | WINTER-MONITOR MESA | 2016 | 388 | 02/09/18 | $ 655.72 |
| LLCOS0500 | UNCOMPAHGRE FO CO | 14537 | CO14537 | YOUNGS PEAK | 2016 | 63 | 02/09/18 | $ 106.47 |
| | | | | | | | | $ 35,319.31 |



# The BLM: A Sound Investment for America 2016

## Economic Contributions from BLM-Managed Lands



Grazing 38,900
Timber 3,400
Recreation 43,900
Geothermal, Wind, and Solar Energy 8,300
Nonenergy Minerals 46,900
Coal 44,700
Oil and Gas 188,200

**374,000 jobs supported**



Recreation $5,900 million
Grazing $2,200 million
Timber $800 million
Geothermal, Wind, and Solar Energy $1,200 million
Nonenergy Minerals $13,300 million
Coal $14,100 million
Oil and Gas $50,400 million

**$88 billion in economic output**

Fiscal Year 2015

The Bureau of Land Management manages 1 in every 10 acres of land in the United States, and approximately 30 percent of the nation's minerals. These acres of land and minerals are found in every state in the country and encompass forests, mountains, rangelands, arctic tundra, and deserts. These are your public lands, and they are some of our nation's greatest assets.

The public lands managed by the BLM generate significant and quantifiable benefits for the nation by providing energy and mineral resources, grazing and timber resources, and more recreational opportunities than lands managed by any other federal agency. Through balanced management, the BLM develops these resources while preserving cultural resources and iconic landscapes and maintaining healthy ecosystems that provide clean air, clean water, and healthy habitat for plants and wildlife.

In fiscal year 2015, the BLM's management of the public lands supported 374,000 jobs and provided $88 billion in economic output throughout the country, while also contributing revenue to the U.S. Treasury and enriching the country environmentally.

BLM_0029201

# Economic Contributions from Restoration Activities

A 2016 report from the U.S. Geological Survey evaluated the local and regional economic activity resulting from 21 restoration projects, including 11 BLM projects.

## Short-term economic activity

**$1 million** investment → **Restoration activities**    sagebrush restoration · fuels reduction · postfire restoration → **$2.5 million** in economic output

Though not addressed in the report, these projects also have the potential for long-term economic impacts and values.

## Long-term economic effects

 Restoration activities →  Improved ecosystem health

Increased business activity and jobs
 recreation   tourism   agriculture   forestry

Increased ecosystem service values
 reduced fire and flood   water quality   wildlife habitat

---

# Nonmarket Benefits from BLM-Managed Lands

Many of the benefits provided by public lands are difficult to quantify in economic terms. These "nonmarket benefits" reflect the value that the public derives from access to our nation's natural, scenic, recreational, and cultural resources.

## Natural and scenic



**5,761 miles** of national scenic and historic trails

**2,423 miles** of wild and scenic rivers

---

## Recreational



**2.2 million** visits to fish

**22.3 million** visits to camp or picnic

**7.4 million** visits for off-highway travel

---

## Cultural, education, and scientific

**1.2 million** visits for interpretive and educational activities

**10.6 million** documented artifacts and specimens in 166 museums and universites nationwide

**4.2 million** visits for guided activities, living history tours, exhibits, and other interpretive programming

**25** national monuments

 **16** national conservation areas

**2,631** horses and burros adopted

BLM_0029202

# Economic Sectors



**Oil and gas:** The BLM leases more than 32.2 million acres of land, from the eastern United States to the National Petroleum Reserve in Alaska, for onshore oil and gas production. Production of crude oil on public lands continued its upward trend in 2015, rising from 148.8 million barrels in 2014 to 166.4 million barrels in 2015.



**Coal:** The BLM administers coal leasing on approximately 570 million acres of federal mineral estate. Coal continues to be a large source of energy in the United States, but the continuing low cost of natural gas has spurred a shift away from coal for retail energy production. A decrease in U.S. coal production from 1,084.4 million short tons in 2010 to 895.4 million short tons in 2015 reflects this shift.



**Nonenergy minerals:** Many types of minerals are nonenergy minerals, including sand, gravel, dirt, and rock, which are essential for everyday construction uses. Mineral materials such as these are vital to local economies. The BLM issued new contract sales and use permits for nearly 20 million cubic yards in 2015, with a combined value of nearly $28 million.



**Geothermal, solar, wind:** The BLM has approved 58 renewable energy projects since 2009, including 35 solar projects, 11 wind projects, and 12 geothermal projects. These projects represent a total of nearly 15,500 megawatts of capacity that could provide power to about 5 million homes and contribute to the Climate Action Plan goal of approving 20,000 megawatts of solar energy capacity on public lands by 2020.



**Recreation:** The public lands managed by the BLM offer more recreational opportunities than lands managed by any other federal agency, with more than 99 percent available for recreation with no fee. Lands used for recreational activities also contribute significantly to local economies. In 2015, BLM lands received more than 62.4 million recreation-related visits, an increase over the previous year.



**Grazing:** In 2015, the BLM permitted 12 million animal unit months (AUMs) for ranchers who graze their livestock, mostly cattle and sheep, on public lands. An AUM is the amount of forage needed to feed a cow and calf or the equivalent for 1 month.  In 2015, the grazing fee was $1.69 per AUM. While the number of AUMs sold each year remains relatively steady, annual variations in use occur due to factors such as drought, wildfire, market conditions, and restoration projects.



**Timber:** One-fourth of the 245 million acres of lands managed by the BLM are forest ecosystems, spread across 13 western states, including Alaska. Through responsible management of these lands, the BLM ensures the health and resilience of the nation's public forest lands as well as the availability of traditional forest products, like timber. In 2015, the BLM offered 243 million board feet of timber for sale. This number has remained relatively steady over the past decade.

BLM_0029203



# Total Economic Output and Jobs for Fiscal Year 2015

|  | Alaska | Arizona | California | Colorado | Eastern States |
|---|---|---|---|---|---|
| **National Totals*** | $528.7 million | $432.2 million | $3,386.9 million | $5,398.6 million | $1,493.3 million |
| **Oil and Gas:** $50,391.3 million | $475.7 million | — | $1,357.8 million | $3,547.1 million | $288.4 million |
| **Coal:** $14,106.9 million | — | — | — | $1,126.7 million | $9.1 million |
| **Nonenergy Minerals:** $13,337.8 million | $10.0 million | $40.4 million | $506.0 million | $8.5 million | $1,184.2 million |
| **Geothermal, Wind, and Solar:** $1,234.2 million | — | $1.8 million | $869.6 million | — |  |
| **Recreation:** $5,927.4 million | $43.0 million | $303.6 million | $570.1 million | $543.0 million | $11.6 million |
| **Grazing:** $2,233.7 million | — | $86.4 million | $78.1 million | $143.6 million | — |
| **Timber:** $784.1 million | — | — | $5.3 million | $29.7 million | — |
| **Jobs:** 374,000 | 1,000 | 5,000 | 17,000 | 24,000 | 5,000 |

\* National totals may differ from the sum of individual state numbers because they take into account activity across state borders and average industry productivity across states.

BLM_0029204



Idaho
Montana (North Dakota and South Dakota)
Nevada
New Mexico (Kansas, Oklahoma, and Texas)
Oregon (Washington)
Utah
Wyoming (Nebraska)
$1,091.8 million
$7,572.4 million
$5,503.3 million
$12,606.5 million
$1,502.4 million
$5,146.2 million
$16,707.0 million
–
$6,6165.2 million
$33.5 million
$10,971.7 million
–
$3,570.1 million
$9,046.0 million
–
$713.0 million
–
$547.6 million
–
$765.6 million
$5,736.2 million
$306.2 million
$1.8 million
$4,441.8 million
$593.0 million
$5.3 million
$92.1 million
$1,460.0 million
–
–
$337.0 million
$1.7 million
$0.1 million
$22.8 million
$1.2 million
$359.0 million
$376.7 million
$466.0 million
$178.9 million
$562.0 million
$527.5 million
$173.0 million
$416.3 million
$311.0 million
$224.6 million
$310.3 million
$212.3 million
$161.4 million
$289.6 million
$10.3 million
$4.7 million
$0.4 million
$3.3 million
$722.7 million
$6.7 million
$0.9 million
11,000
30,000
23,000
53,000
14,000
25,000
43,000