Platts, W.S. 1991. *Responses of salmonids to habitat changes*. In: Influences of forest and rangeland management on salmonid fishes and their habitats, pp. 483–518. American Fisheries Society Special Publication.

Power, T.M. 1991. *Ecosystem preservation and the economy in the Greater Yellowstone area*. Conservation Biology 5:395–404.

Power, T. 1996. *Economic Well-Being and Environmental Protection in the Pacific Northwest: A Consensus Report by Pacific Northwest Economists*. University of Montana, Economics Department. Missoula, MT.

Pulver, G. 1988. *"The changing economic scene in rural America"*. The Journal of State Government 61(1): 3-8.

Quigley, T.M.; Arbelbide, S.J., tech. eds. 1996. *An Assessment of Ecosystem Components in the Interior Columbia Basin and Portions of the Klamath and Great Basins*. Portland, OR: U. S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 2 Vols. (Quigley, T.M. tech. ed. The Interior Columbia Basin Ecosystem Management Project: Scientific Assessment).

Quigley, T.M.; Graham, R.T.; and Haynes, R.W., tech eds. 1996. *An integrated scientific assessment for ecosystem management in the interior Columbia Basin including portions of the Klamath and Great Basin*. USDA Forest Service, Pacific Northwest Research Station, Portland, Oregon.

Quigley, T.M.; Lee, K.; and Arbelbeide, S.J., tech eds. 1997. *Evaluation of EIS Alternatives by the Science Integration Team*. Portland, Oregon.

Quinn, S.S. 1985. *Local Employment Impacts of Boise National Forest Land Management Planning Alternatives: An Input-Ouput Analysis*. Unpublished Masters thesis. Department of Agricultural Economics and Rural Sociology, University of Idaho, Moscow, Idaho.

Rasker, R. 1994. *A new look at old vistas: The economic role of environmental quality in western public lands*. University of Colorado Law Review 65(2):369–399.

Rasker, R. 1995. *A New Home on the Range: Economic Realities in the Columbia River Basin*. Washington, D.C., The Wilderness Society.

Raymond, H.L. 1988. Effects of hydroelectric development and fisheries enhancement on spring and summer chinook salmon and steelhead in the Columbia River Basin. North American Journal of Fisheries Management 8:1-24.

Regional Interagency Executive Committee and Intergovernmental Advisory Committee. 1995. Ecosystem analysis at the watershed scale; Federal guide for watershed analysis, Section I. Version 2.2. Regional Ecosystem Office, Portland, OR. 26 pp.

Reeves, G.H.; Hall, T.D.; Roelofs, T.L. [and others]. 1991. *Rehabilitating and modifying stream habitats*. American Fisheries Society Special Publication 19. 519–557.

Reeves, G.H.; Benda, L.E.;. Burnett, K.M.; [and others] [In press]. *A disturbance-based ecosystem approach to maintaining and restoring freshwater habitats of evolutionarily significant units of anadromous salmonids in the Pacific Northwest*. American Fisheries Society.

Rheiner, B.; Gilman, J.; Connaughton, K.; Herst E. 1996. *The Spotted Owl Region Receives Economic Assistance through the Northwest Forest Plan*. Wild Fish & Forests. Spring: 10-12.

Rhodes, J.J.; McCullough, D.A.; Esponosa, Jr. F.A. 1994. *A coarse screening process for evaluation of the effects of land management activities on salmon spawning and rearing habitat in ESA consultations*. Technical Report 94-4, Columbia River Inter-Tribal Fish Commission.

Robbins, W.G.; Wolf, D.W. 1994. *Landscape and the intermontane northwest: An environmental history*. USDA Forest Service, Pacific Northwest Region. Portland, Oregon. Gen. Tech. Rep. PNW-319. 32 p.

Robison, M.H., Freitag, J. 1994. *The Economic Impact to Local Communities of Eliminating the Wallowa-Whitman National Forest Timber Program*. Unpublished report submitted as part of McKetta, C.W. Socio-Economic Implications of a Below Cost Timber Program on the Wallowa-Whitman National Forest. 1994.

Robison, M.H.; McKetta, C.W.; Peterson, S.S. 1996. *A study of the effects of changing federal timber policies on rural communities in northcentral Idaho*. The Center for Business Development and Research. University of Idaho, Moscow, ID.

BLM_0029310

Robison, M.H.; Peterson, S. 1995. *The "Phone Book" method for allocating county-level employment to communities.* The Center for Business Development and Research. University of Idaho, Moscow, Idaho.

Rosgen, D.L. 1994. *A classification of natural rivers.* Catena 22:169–199.

Rudzitis, G. 1993. *"Nonmetropolitan Geography: Migration, Sense of Place and the American West".* Urban Geography. 14(6): 574-585.

Rudzitis, G. and H.E. Johnson. 1989a. *"Migration into Western Wilderness Counties: Causes and Consequences", Western Wildlands.* Spring: 19-23.

Rudzitis, G. and H.E. Johnson. 1989b. *"Amenities, Migration, and Nonmetropolitan Regional Development". Report to the National Science Foundation.* Moscow, ID. Department of Geography, University of Idaho.

Rudzitis, G., Watrous, C., Johansen, H. 1995. *Public Views on Public Lands: A Survey of Interior Columbia River Basin Residents.* University of Idaho, Department of Geography. Moscow, ID.

Saab, V; Rich, T. [unpubl.]. *Status of neotropical migratory landbirds and their associated habitats within the interior Columbia River basin.* 70 p.

Salwasser, H. 1994. *Factors influencing the context and principles of ecosystem management.* Paper delivered at the Conference on Ecosystem Management. Utah State University, Logan, Utah. May 1994.

Sampson, R.N.; Adams, D. eds. 1994. *Assessing forest ecosystem health in the inland west.* Overview papers from American Forests Scientific Workshop, Sun Valley, ID. Nov. 14-19, 1993. Forest Policy Center.

Sandberg, D.V.; Dost, F.N. 1990. *Effects of prescribed fire on air quality and human health.* In: Walstad, J.D.; Radosevich; Sandberg, D.V. eds. Natural and prescribed fire in Pacific Northwest forests. Oregon State University Press, Corvallis, Oregon.

Sandberg, D.V.; Peterson, J. 1985. *A source strength model for prescribed fires in coniferous logging slash.* In: Proceedings–1985 Air Pollution Control Association, Nov. 12-14, 1984, Portland, OR. Air Pollution Control Association. Pacific Northwest International Section. Portland, Oregon. 10 p.

Schaaf, M.D. 1996. *Development of the Fire Emissions Tradeoff Model (FETM) and application to the Grande Ronde River Basin, Oregon.* USDA Forest Service, Pacific Northwest Region. Contract No. 53-82FT-03-2 CH2M Hill.

Schlager, D.B.; Freimund, W.A. 1994. *Institutional and legal barriers to ecosystem management.* Walla Walla, Washington: Research report submitted to the Eastside Ecosystem Management Project.

Schommer, T.; Silivsky, G. [unpubl.]. *Goshawk status report from Region 6.* U.S. Department of Agriculture, Forest Service, Region 6. Portland, Oregon.

Scire, J.S.; Strimaitis, D.G.; Yamartino, R.J.; and Zhang, X. 1995. *A user's guide for the CALPUFF dispersion model.* Document 1321-2. EARTH TECH, Inc., Concord, Mass.

Scire, J.S.; and Tino, V.R. 1996. *Modelling of wildfire and prescribed burn scenarios in the Columbia River Basin. Vol. 1, Report No. 1459-01.* Prepared for USDA Forest Service, Portland. Contract 53-56A6-3-00838. Submitted by EARTH TECH, Inc., Concord, Mass.

Sedell, J.R.; Reeves, G.H.; Hauer, F.R. [and others]. 1990. *Role of refugia from disturbances: modern fragmented and disconnected river systems.* Environmental Management. 14(5):711-724.

Shannon, M.A. 1994. *Coordination among federal agencies: Agency cultures, budgets, and policies.* Paper delivered at the Congressional Research Service Symposium, "Ecosystem Management: Federal Agency Activities". Seattle, WA: Institute for Resources in Society, University of Washington.

Social Staff Area Report (STAR). See Quigley and Arbelbide 1996.

**TABLE OF CONTENTS**

Society of American Foresters. 1989. *Report of the Society of American Foresters National Task Force on Community Stability.* SAF Resource Policy Series. Bethesday, MD. 42 p.

STARs (Staff Area Reports). See Quigley and Arblbide 1996.

Stoddart, L. A.; Smith, A. D.; and Box, T. W. 1975. *Range Management.* McGraw-Hill, Inc. San Francisco. 532 pp.

Templet, P.H. 1995. *"The positive relationship between jobs, the environment, and the economy: an empirical analysis and review".* Spectrum: The Journal of State Government 68(2): 37-49.

Terrestrial Staff Area Report (STAR). See Quigley and Arblbide 1996.

Thomas, J.W. ed. 1979. *Wildlife habitats in managed forests: The Blue Mountains of Oregon and Washington.* In: Agriculture Handbook 553. Washington, D.C.: USDA Forest Service, USDI BLM, Wildlife Management Institute. 512 p.

Torgersen, T.R. Bull, E.L. 1995. *Down logs as habitat for forest-dwelling ants—the primary prey of pileated woodpeckers in northeastern Oregon.* Northwest Science 69(4):294–296.

Truesdale, D. 1995. *Fire Suppression Costs on Large Fires: A Review of the 1994 Fire Season.* USDA, Forest Service. Washington, D.C.

United States Commission on Civil Rights. 1981. *Indian tribes: A continuing quest for survival.* Washington, D.C.: U.S. Government Printing Office. 188 p.

U.S. Army Corps of Engineers. *Columbia River System Operation Review [FEIS].* 1995. Portland, Oregon: US Army Corps of Engineers, North Pacific Division. Appendix D. DOE/EIS-0170.

U.S. Department of Agriculture (USDA). 1964. *General soils map of Oregon.*

U.S. Department of Agriculture (USDA), Forest Service. 1995. *Inland Native Fish Strategy (INFISH), Environmental Assessment Decision Notice and Finding of No Significant Impact: Interim strategies for managing fish producing watersheds in eastern Oregon and Washington, Idaho, western Montana and portions of Nevada. Intermountain, Northern, and Pacific Northwest Regions.*

U.S. Department of Agriculture (USDA), Forest Service; Johns Hopkins University. 1989. *The effects of forest fire smoke on firefighters: A comprehensive study plan. Third draft.* Prepared for Congressional Committee on Appropriations for Title II related agencies and the National Wildfire Coordinating Group. Intermountain Research Station, Fire Chemical Research Work Unit, Missoula, MT. and School of Hygiene and Public Health, Johns Hopkins University, Baltimore, MD.

U.S. Department of Agriculture, Forest Service; U.S. Department of Interior. 1996. A Framework for Analyzing the Hydrologic Condition of Watersheds. Version 2.2, December 1996. 59 pp.

U.S. Department of Agriculture, Forest Service; USDI Bureau of Land Management. 1994a. *Environment assessment for the implementation of interim strategies for managing anadromous fish-producing watersheds in eastern Oregon and Washington, Idaho, and portions of California.* (PACFISH)

USDA Forest Service and USDI Bureau of Land Management. 1994b. Final Supplemental Environmental Impact Statement on management of habitat for late-successional and old-growth forest related species within the range of the northern spotted owl. Volume II. Portland, OR.

U.S. Department of Commerce National Marine Fisheries Service, USDI Fish and Wildlife Service, and Environmental Protection Agency. 1995. Interagency aquatic conservation strategy in Letter to Jeff D. Blackwood and Stephen P. Mealey, Project Managers, November 8, 1995, Subject Aquatic Conservation Strategy - Advanced Draft.

U.S. Department of Commerce. *Regional Economic Information System [CDROM].* Bureau of Economic Analysis.

U.S. Department of the Interior, Bureau of Land Management. 1994a. *Rangeland Reform '94 Draft Environmental Impact Statement.* Washington D.C.

U.S. Department of the Interior, Bureau of Land Management. 1994b. Riparian area management: Process for assessing proper functioning condition for lentic riparian-wetland areas. TR 1737-11. Denver, CO. 37 pp.

BLM_0029312

U.S. Department of the Interior, Bureau of Land Management. 1993. *Riparian area management: process for assessing proper functioning condition.* Technical Reference 1737-9 1993. BLM/SC/ST-93/003+1737. Denver, CO. 51 p.

U.S. Department of the Interior, Bureau of Land Management. 1991. *Riparian-wetland initiative for the 1990s.* BLM/WO/G1-91/001+4340. Washington D.C. 50 p.

U.S. Department of Interior, Fish and Wildlife Service. 1995. *Endangered species status reports: Interior Columbia Basin Ecosystem Management Project.* Portland, Oregon: 128 p.

U.S. Environmental Protection Agency (EPA). 1992. *Prescribed burning background document and technical information document for best available control measures.* Office of Air Quality Planning and Standards. Research Triangle Park, North Carolina.

U.S. Environmental Protection Agency (EPA). 1994. *National air pollutant emission trends, 1900–1993.* EPA-454/R-94-027. Office of Air Quality Planning and Standards. Research Triangle Park, North Carolina.

Vallentine, J.F. 1990. *Grazing management.* Academic Press, New York.

Vogel, C.A.; Reese, K.P. [unpubl.]. *Mountain quail status report: A preliminary document to a conservation assessment for mountain quail.* Idaho Interagency Conservation/Prelisting Effort. 28 p.

Washington Department of Fish and Wildlife. 1995. *Washington State management plan for Columbian sharp-tailed grouse (Typanuchus phasianellus columbianus).* Olympia, Washington: Game Division, Washington Department of Fish and Wildlife. 94 p.

Wemple, B. 1994. *Hydrologic integration of forest roads with stream networks in two basins, western Cascades, Oregon.* A masters thesis submitted Oregon State University, Corvallis, Oregon. 88 p.

Western Governors' Association. 1995. *Wildland/Urban Interface: Draft Fire Policy Action Report.* Denver, CO.

Western Interstate Energy Board. 1991. *Inactive and abandoned noncoal mines-a scoping study.* Denver, Colorado: Prepared for the Western Governors' Association Mine Waste Task Force, August 1991, Vol. 1. 128 p.

Wissmar, R.C.; Smith, B.A.; McIntosh, H.W. [and others]. 1994. *Ecological health of river basins in forested regions of eastern Oregon and Washington.* U.S. Forest Service Gen. Tech. Rep. PNW-GTR-326. 65 p.

Wondolleck, J.M.; Yaffee, S.L. 1994. *Building bridges across agency boundaries: In search of excellence in the United States Forest Service.* Seattle, WA: U.S. Department of Agriculture, Forest Service, Pacific Northwest Experiment Station.

Woolfenden, W.B. 1993. *Historical Ecology and the Human Dimension in Ecosystem Management.* Manuscript, U.S. Forest Service, Inyo National Forest.

Wright, K.A.; Sendek, K.H.; Rice, R.M.; Thomas, R.B. 1990. *Logging effects on streamflow: Storm runoff at Caspar Creek in northwestern California.* Water Resources Research 26(7): 1657—1667.

Ziemer, R.R. 1981. *Storm flow response to road building and partial cutting in small streams of northern California.* Water Resources Research 17(4):907—917.

40 CFR 1500-1508. Council on Environmental Quality (CEQ). *Regulations for implementing the procedural provisions of the National Environmental Policy Act.* Executive Office of the President.

**GO TO CHAPTER 4**

**GO TO INDEX**

**TABLE OF CONTENTS**

BLM_0029313

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 5 of 319

INTERAGENCY AGREEMENT


BETWEEN


THE BUREAU OF RECLAMATION


AND


THE BUREAU OF LAND MANAGEMENT


December 1982


215-30 - 5/3/83

BLM_0029314

Reclamation Instructions

| Series 210  Land | Part 215  Land Management |
|---|---|

CHAPTER 1  TABLE OF CONTENTS

Section 1.     Purpose

Section 2.     Authority to Enter into an Agreement

Section 3.     Exchange of Services

Section 4.     Reimbursement for Services Rendered

Section 5.     Management of Reclamation Withdrawn and Acquired Lands

Section 6.     Specific Services Applicable to this Agreement

          A.    Withdrawals
          B.    Withdrawal Review
          C.    Land Sales
          D.    Exchanges
          E.    Reservation of Rights-of-way
          F.    Granting Rights-of-way
          G.    Making of Planning Studies and Engineering Investigation
                 on Public Lands
          H.    Mineral and Geothermal Leases
          I.    Cadastral Survey
          J.    Fire Protection During Project Construction
          K.    Forestry
          L.    Grazing and Beekeeping
          M.    Mining Claims
          N.    Recreation
          O.    Fish and Wildlife Mitigation and Enhancement
          P.    Environmental Impact Analyses and Statements
          Q.    Planning Program
          R.    Engineering and Technical Services
          S.    Wild and Free-Roaming Horses and Burros
          T.    Salinity Control on Public Land
          U.    Computer Service
          V.    Discrepancies in Policy
          W.    Hydrometeorological Data
          X.    Road Maintenance
          Y.    Other Specific Services

Section 7.     Supplemental Agreements

215-30 – 5/3/83

BLM_0029315

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 7 of 319

Reclamation Instructions

Section 8.    Implementation

Section 9.    Renegotiation

Section 10.   Termination of Agreement

215-30 – 5/3/83

BLM_0029316

Reclamation Instructions

| Series 210 Land | Part 215 Land Management |
|---|---|

Section 1.  Purpose:  This agreement sets forth the basic principles of the Bureau of Reclamation (Reclamation) and the Bureau of Land Management (BLM) for coordinating land use planning, land resource management, land conveyance and exchange, and cooperative services.  It brings coordinated efforts into compliance with recent laws and policies.  Reclamation will, when requested, provide expertise in the area of water resources conservation, development, and management, to be utilized by BLM in preparing its resource management plans. BLM will, when requested, provide expertise in the areas of land resource, forest, range, oil, gas, and mineral management, to be utilized by Reclamation when preparing its land management plans, and in managing Reclamation administered, acquired, or withdrawn public lands.

This agreement supersedes the March 8, 1972, agreement.  All agreements made supplemental to the 1972 agreement will be reviewed within 5 years, and those that are inconsistent with this agreement will be revised to conform in accordance with section 6 of this agreement or will be cancelled.

Section 2.  Authority to Enter into an Agreement:  Through delegation of authority from the Secretary of the Interior to the Director of BLM and to the Commissioner of Reclamation, agreements may be executed between Reclamation and BLM to provide for mutually beneficial land and water use planning and management activities.  Statutory authority for such agreements includes: section 307, Federal Land Policy and Management Act (FLPMA), 43 U.S.C. 1737; Economy Act, 31 U.S.C. 686; and the Reclamation Act of 1902, 43 U.S.C. Chapter 12, as amended and supplemented.

Section 3.  Exchange of Services:  Either Reclamation or BLM may request services of and perform services for the other, consistent with law, Executive Orders, the Code of Federal Regulations (CFR), each Bureau's instructions, and this agreement.

Section 4.  Reimbursement for Services Rendered:  The cost of work performed shall be reimbursable providing such work is not normally performed by the Bureau doing the work, or adequate funding for such work is not provided to that Bureau through the normal appropriation process.  The requesting Bureau will transfer funds to the other Bureau to cover the estimated cost of work to be performed.  The requesting Bureau will furnish a detailed estimate of the work to be performed.  The transfer of funds from one Bureau to the other will be accomplished by the State Director, BLM, and the Regional Director, Reclamation, by means of a journal voucher and effected on the SF-224 by the billed agency in accordance with a specific executed agreement supplemental to this agreement.  Except under emergency conditions, no work will be performed which cannot be reimbursed from funds available in the current fiscal year's appropriation.  Prior to entering into any supplemental agreements that would require the transfer of funds from BLM to Reclamation, an Economy Act Determination must be prepared and approved by BLM.

BLM_0029317

Reclamation Instructions

Part 215   Land Management                                    Series 210   Land

Appendix I
Sheet 5 of 17          CHAPTER 1   LAND USE PLANNING AND ADMINISTRATION

Where either Reclamation or BLM has agreed to furnish reimbursable service to
the other, the agency requesting the service will supply the other with esti-
mates of the cost of such service, the work to be undertaken, work schedules,
and budgetary information necessary for the agency receiving the service re-
quest to prepare and support its budget requests for the work involved.  Either
bureau will assist the other as requested in supporting budget presentations
for reimbursable work.  Such budgetary information will be provided, whenever
possible, 18 months prior to the budget year plus one.

Section 5.  Management of Reclamation Withdrawn and Acquired Lands:

     A.  Reclamation withdrawn and acquired lands on which there are author-
ized for construction or constructed Reclamation projects.

Reclamation has full management jurisdiction until the withdrawal is revoked
or modified, and over acquired lands until the administration is transferred
to another Federal or non-Federal agency by agreement or law.

At the request of Reclamation, the responsibility for management of Reclamation
withdrawn and acquired lands actively in use for project purposes may be trans-
ferred to BLM through the execution of a supplemental agreement.  In exercis-
ing its management responsibility, BLM will regularly coordinate with Recla-
mation and undertake only those management activities which would not preclude
or adversely affect use of the land for Reclamation project purposes.

     B.  Reclamation withdrawn lands on which there are no authorized for con-
struction or constructed Reclamation projects.

On Reclamation lands which are not within the boundaries of national forests
or under another agency administration and there are no authorized for con-
struction or constructed Reclamation projects, BLM has full administrative
responsibility.

In exercising its statutory responsibilities on Reclamation land (such as those
relating to the U.S. mining and mineral leasing laws, rights-of-way, and cadas-
tral surveys other than farm-unit surveys, and the Recreation and Public Pur-
poses Act, FLPMA, etc.), BLM, in consultation with Reclamation, shall develop
special stipulations, consistent with statutory authority, and terms and con-
ditions, as may be determined necessary by Reclamation, to protect the Recla-
mation withdrawn and acquired land for Reclamation purposes.

Rights-of-way grants issued for lands to be occupied by Reclamation for project
purposes in lieu of a withdrawal will contain a provision for a future agree-
ment specifying management responsibilities.

215-30 - 5/3/83

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 10 of 319

Section 6.  Specific Services Applicable to this Agreement:

A.  Withdrawals.  All withdrawals will be made, modified, extended, or revoked in accordance with section 204 of FLPMA, and implementing rules and regulations, 43 CFR Part 2300, unless otherwise directed by specific statutes.

Reclamation will file a petition and application for a withdrawal as a method of reserving public lands for project uses when Reclamation:  (1) requires administrative and/or management jurisdiction; (2) requires protection for its facilities and project uses against nondiscretionary entries; or (3) intends to transfer administrative and/or management jurisdiction to a third party. Reclamation will apply for a right-of-way for all other uses.  In either case, the application will cover no more land than is needed to construct, operate, maintain, and protect Reclamation project uses and will restrict use and entry only to the minimum necessary to protect project interests.  When possible, an application will be submitted well in advance of need for the land.  Blocking out will be accomplished in accordance with sound real estate and land management practices whenever possible and practical.

A withdrawal to reserve an area for a particular public purpose and/or transfer jurisdiction over surface management and close the lands to nondiscretionary mineral entry and disposal will usually be required for:  (1) lands necessary for permanent structures such as dams, reservoirs, large capacity or lined canals, laterals or drains, and powerplants; (2) critical watershed lands on which nondiscretionary mineral entry would likely result in the degradation of water quality; and (3) lands needed for project operation, maintenance, and dam safety.

A withdrawal only granting the transfer of surface management jurisdiction and/or reserving the land for a particular public purpose will usually be required for:  (1) lands needed to meet present and future fish and wildlife requirements pursuant to the Fish and Wildlife Coordination Act and/or for outdoor recreation as may be authorized by Congress; (2) lands on which sedimentation, and/or wave action may occur; and (3) lands necessary for the relocation of roads, railroads, highways, and utilities required as a result of project construction or operations.

Rights-of-way will be used where the jurisdiction and protection afforded by a withdrawal is not necessary.  Possible examples could include:  (1) lands necessary for project works and facilities such as smaller, unlined laterals, drains, and pipelines; (2) transmission lines, telephone lines, and roads; (3) lands necessary for operation and maintenance buffers; (4) lands required for scenic areas, open space, greenbelts; etc.; and (5) lands needed for floodplain management.

BLM_0029319

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 11 of 319

Within 2 years, or when possible, less, from receipt of a perfected petition
or application for a withdrawal or 1 year or less from the receipt of a per-
fected right-of-way request, BLM will complete the withdrawal or right-of-way
grant process.  If the occupancy and use of the land are mandated by law prior
to these time limits, or a substantial financial savings will result, BLM and
Reclamation will facilitate an accelerated schedule, including an emergency
withdrawal or other methods of authorizing Reclamation's entry onto such land.

   B.  Withdrawal Review.  Under the provisions of sections 204(f) and
204(1) of FLPMA, BLM is required to review, near the date of expiration, all
withdrawals having a definite expiration date, or in the case of withdrawals
made prior to October 1976 having no definite expiration date, the mandated
review will be completed prior to October 1991.  Reclamation and BLM have
established schedules for the review of all Reclamation withdrawn lands by
1991.

Reclamation will propose to convert withdrawals, where appropriate, to rights-
of-way in accordance with Section 6.A. herein.  The withdrawal will be retained
where a right-of-way does not provide Reclamation with:  (1) the necessary ad-
ministrative and/or management jurisdiction to perform all current, planned,
and known future project uses; (2) sufficient protection for its facilities
and project uses against nondiscretionary entries; or (3) the ability to read-
ily transfer administrative or management jurisdiction to a third party, or
to maintain such third party jurisdiction.  In any event, the reservation of
public land by either a withdrawal or right-of-way shall cover no more land
than is needed to permit Reclamation the freedom of use and discretionary
action necessary to meet all of its stated and implied statutory requirements
to construct, operate, maintain, and protect all Reclamation project uses,
and will restrict use and entry only to the minimum degree necessary to protect
project interests.

Rejustification of withdrawals will be made according to the guidelines con-
tained in the BLM Manual Part 2355.3.

In addition to the scheduled review of Reclamation's withdrawals, Reclamation
will review, according to schedules mutually agreed to at the field level, all
of its pending withdrawal applications to determine if Reclamation's purposes
could be served as well by a right-of-way.  If a right-of-way will serve as
well, Reclamation will request the withdrawal application be terminated and
replaced with a right-of-way application, or if the withdrawal of lands is
still needed, Reclamation will act to perfect the withdrawal application.
Reclamation will provide BLM a yearly inventory update of its withdrawn and
acquired lands.  This updated report will be provided to BLM by November 15 of
each year to coincide with Public Land Statistics requirements.

BLM_0029320

Reclamation Instructions

Series 210  Land                                    Part 215  Land Management

C.  Land Sales.  When Reclamation requests relinquishment of withdrawn lands, it may recommend sale of those lands to a specific entity or sale on the open market.  If BLM determines that the lands are appropriate for sale under provisions of section 203 of FLPMA or any other authority, BLM will, within legal constraints, honor Reclamation's recommendation.

In accordance with Departmental Manual delegation, at the request of Reclamation, Reclamation and BLM may enter into a supplemental agreement at the field level providing that Reclamation perform a specific land sale under provisions of section 203 of FLPMA.  Such a supplemental agreement may additionally provide that Reclamation perform requisite land use planning prior to land sale, subject to BLM approval of Reclamation prepared plans.

D.  Exchanges.  When Reclamation determines that an exchange of Federal land, either withdrawn or acquired by Reclamation for private land, would be in the best interest of the Federal Government, and Reclamation does not have authority under section 14 of the Act of August 4, 1939 (43 U.S.C. 389), or other direct authority to make such exchange, BLM will, when requested, effect the exchange through its authorities.  A supplemental agreement under section 7 of this agreement will be entered into at the field level for each exchange.  When Reclamation land to be exchanged is acquired land, Reclamation will prepare a public notice for signature of the Secretary of the Interior and for publication in the Federal Register, which transfers the jurisdiction of the acquired land to BLM, specifically to effect the exchange.  Simultaneously with the transfer of jurisdiction over the land to BLM, BLM will publish a notice of realty action as prescribed in 43 CFR 2200.1 and 2200.2 for the proposed exchange segregating the lands involved from operation of the public land laws including the mineral laws.  The exhange will be consummated by BLM within 2 years.  Reclamation will be responsible for all land appraisals and preparation of legal description and transfer documents.  Lands received by BLM in any such exchange will be transferred to Reclamation's jurisdiction in a mutually agreed to form utilizing a right-of-way or withdrawal.

E.  Reservation of Rights-of-Way.  When Reclamation proposes to relinquish a withdrawal, or to otherwise dispose of withdrawn land under Reclamation's direct jurisdiction and management on which Reclamation needs or anticipates a need for a right-of-way, Reclamation will, when available, provide to BLM field reports, drawings, and descriptions of any rights-of-way reserved across this land under subsection 4-P of the Factfinders Act of 1924 (43 U.S.C. 417).  When mineral entry is requested on Reclamation's withdrawn land, an opening may be granted under the Act of April 23, 1932 (43 U.S.C. 154), and necessary rights-of-way may be reserved, with any conditions or terms of use necessary to protect Reclamation's interests in the land or which have resulted from interagency consultation.  Rights-of-way not meeting the criteria of the above laws will be reserved under section 507 of FLPMA.

215-30 - 5/3/83

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 13 of 319

F. <u>Granting Rights-of-Way</u>. Reclamation will, within its discretion, authority, and rules (section 10 of the Act of August 4, 1939, 43 U.S.C. 387 and section 28 of the Mineral Leasing Act of 1920, as amended), be responsible for reviewing requests and granting rights-of-way across its withdrawn and acquired land and facilities (see section 5.A.). Reclamation will furnish BLM's respective State Director with a copy of all grants on withdrawn lands, including maps, which it issues, to be recorded on BLM's Master Title Plats.

When land under this or any other agreement is managed by a third party, Reclamation will coordinate with that party before issuing rights-of-way that would interfere with the activities of the managing party. On all rights-of-way for which Reclamation lacks authority to make a grant, BLM will issue the grant on all withdrawn or acquired lands, after consultation with Reclamation. Such consultation shall include: (1) questions of whether grant should or should not be granted; (2) modification of location of grant from the location applied for; and (3) terms and conditions and stipulations of the grant.

G. <u>Making of Planning Studies and Engineering Investigation on Public Lands</u>. Under the provisions of section 307(a) or other legal authority, Reclamation may enter onto the public lands to make studies and investigations necessary for project purposes, as required or authorized by Congress. Such studies and investigations will be fully coordinated with the BLM to ensure minimum disruption of ongoing programs.

H. <u>Mineral and Geothermal Leases</u>. Except for those minerals and conditions meeting the provisions of section 10 of the Reclamation Projects Act of 1939 (43 U.S.C. 387), leases for mineral, and geothermal resources on all land acquired or withdrawn by Reclamation will be issued by BLM. Applicants for mineral and geothermal leases on such land should be directed to file their applications with BLM's State offices. BLM will, in all issues involving mineral, and geothermal leases on or under Reclamation lands, request that Reclamation determine whether leasing is permissible and if so to provide any stipulations required to protect the interest of the United States. Reclamation will respond to this request for mineral leasing clearance within 60 days when adequate records are readily available. When adequate records are not available, Reclamation will provide an interm progress report within 30 days. BLM will not issue permits, leases, or licenses on acquired or withdrawn lands under Reclamation's management without Reclamation's consent and concurrence on all conditions and stipulations. Reclamation's recommendations on withdrawn lands under BLM management responsibility are advisory only insofar as Reclamation planned or current project uses are not adversely affected.

215-30 - 5/3/83

BLM_0029322

Reclamation Instructions

Series 210  Land                                    Part 215  Land Management

I.  Cadastral Survey.  BLM will conduct, on a reimbursable basis, cadastral surveys, resurveys, and investigations on existing and future projects in accordance with: (1) jointly agreed to schedule, provided that Reclamation will notify BLM of needs in sufficient time for it to incorporate the work into its authorized work programs; and (2) Reclamation provides the funds. If BLM is unable to accomplish a cadastral survey within Reclamation's time limits, BLM will perform the work on a reimbursable basis by contract, or in lieu of private sector contractors, may contract with Reclamation to conduct the surveys with qualified Reclamation surveyors, according to BLM standards and procedures.  The assigned Reclamation surveyors must conduct the field work and the survey plats and field notes are to be certified by a Reclamation GS-1373 Surveyor on the Surveyor's Certificate.  The survey plat and field notes will be reviewed and, if adequate, be officially accepted by the appropriate BLM State office.  The Reclamation cadastral surveyors will be in accordance with 43 CFR 9185.3-1(c).

BLM public land survey corner monuments, which may be destroyed or rendered useless by reason of Reclamation project construction activities, will be referenced and removed and then replaced, if possible, by Reclamation.  The monuments will be at least equivalent to those existing prior to project construction.

J.  Fire Protection During Project Construction.  On lands described in section 5.A., Reclamation is responsible for fire protection.  This responsibility may, at Reclamation discretion, be contracted out to other agencies. If Reclamation elects to contract with BLM, then prior to BLM accepting fire protection responsibility over Reclamation lands, Reclamation and BLM will cooperatively develop a mutually acceptable fire plan.  Prior to commencing project construction, Reclamation will coordinate with BLM and will formulate fire prevention and control plans and programs, and will provide for fire protection.  During project construction, Reclamation will take reasonable precautions and ensure all contractors take precautions to prevent and suppress forest and range fires.  When a fire starts on land of either party and spreads to the lands of the other party, the administrator of the land at the point of ignition is responsible for rehabilitating the land of the other party to the degree necessary that previous management objectives can be carried out. This includes, but is not limited to, construction of temporary erosion structures, seeding, reforestation, restoration of improvements, and fencing.

K.  Forestry.  Forest/woodland resources present on Reclamation acquired or withdrawn lands, as described in section 5.A., are the responsibility of Reclamation, and when such lands are not located within or adjacent to National Forest lands, they may be managed by BLM in accordance with supplemental agreements entered into between BLM State Directors and Reclamation Regional Directors.

215-30 - 5/3/83

Reclamation Instructions

Prudent forest management actions will be conducted on these lands to the maximum extent consistent with future use of the land for Reclamation project purposes.  When BLM is managing the forest or woodland resources, BLM foresters will coordinate with Reclamation personnel in developing and executing needed management actions.

Sales will be the preferred method of disposing of wood products.  All revenues shall be deposited into a treasury account as directed by Reclamation in accordance with applicable statutes.

L.  Grazing and/or Beekeeping.  On lands under the jurisdiction of Reclamation not located within or adjacent to a National Forest on which grazing and/or beekeeping is compatible with Reclamation's current or planned use of any land area, BLM may, at Reclamation's request, manage grazing and/or beekeeping on those lands, subject to a supplemental agreement made in accordance with this general agreement and under such provisions as Reclamation may deem necessary.  On Reclamation withdrawn or acquired land where the management under supplemental agreement is with BLM, all grazing and/or beekeeping leases or permits issued by BLM shall be issued for BLM's normal permit or lease period, but shall include such special stipulations as determined necessary for Reclamation to protect the land or facilities for Reclamation project purposes.  When Reclamation determines that within 2 years its needs and uses will no longer be compatible with grazing and/or beekeeping, Reclamation will so notify BLM enabling it to notify the lessees and permittees and terminate the leases and/or permits in accordance with section 402 of FLPMA.  Under emergency conditions leases and permits may be terminated with shorter notice.

Grazing and/or beekeeping fees collected by BLM from Reclamation land managed by BLM shall be deposited into a treasury account as directed by Reclamation in accordance with applicable statutes.  BLM will furnish, concurrent with the deposit by BLM, a copy of the certificate of deposit showing the date of deposit, fund symbol, amount, and Reclamation project number.  When authorized by Reclamation, revenues or fees collected may remain with BLM to serve as Reclamation's reimbursement for work performed.

M.  Mining Claims.  Where the construction of a Reclamation water resource project requires the clearance of title to public land encumbered by unpatented mining claims, BLM will conduct, on a reimbursable basis, the examination of all unpatented mining claims.  If construction is imminent, the agencies will work together to expedite clearance.  The validity investigations of mining claims will, whenever possible, be in accordance with jointly agreed to schedules, wherever construction contractual schedules are not the driving force, and time will permit.  Whenever possible, Reclamation will notify BLM of its needs in sufficient time for BLM to incorporate the work into its work program.

215-30 - 5/3/83

Reclamation Instructions

CHAPTER 1  LAND USE PLANNING AND ADMINISTRATION       Appendix I
                                                       Sheet 12 of 17

Reclamation will notify BLM at least 30 months before the beginning of the
fiscal year in which the work is needed; except when Reclamation finds it
cannot give this lengthy notice with respect to clearance of a small area,
such as a damsite, pumping plant, substation, or radio communication site, then
Reclamation and BLM will negotiate a suitable schedule sufficient to protect
Reclamation's facilities.

As soon as Reclamation identifies a need for clearance of title work, Recla-
mation will supply BLM with a statement of the work it needs done, including
necessary maps and other pertinent information.  BLM will supply Reclamation
with estimates of cost, manpower, time required, and other information.  The
State Director and the Regional Director will make necessary arrangements for
incorporating the work into BLM's program.

Upon completion of the validity examination, BLM will notify Reclamation of
the findings and recommendations.  Where BLM believes mining claims are not
supported by discovery, BLM will initiate a contest action and will report to
Reclamation on the results of such actions.

    N.  Recreation.  When the management of Reclamation withdrawn or acquired
land not located within or adjacent to a National Forest is with Reclamation
in accordance with section 5 of this agreement, unless otherwise authorized
by Congress, Reclamation's recreation planning, development, and management
will be in accordance with Public Law 89-72 (79 Stat. 213).  Reclamation will
encourage non-Federal public bodies to manage recreation associated with Rec-
lamation's land and water areas.  When a non-Federal recreation manager cannot
be found, Reclamation will discuss with BLM the option of BLM managing recrea-
tion on Reclamation project lands.  Supplemental agreements will, if necessary,
be utilized to determine the management responsibility and funding reimburse-
ment.  The two agencies will assure coordination and cooperation to promote
compatibility of recreation development and operation (including compatible
recreation fee structure) on adjacent Reclamation/BLM lands.  When Reclamation
plans recreation development on project lands, it will consider recreation use
and recreation potential of BLM administered lands that are adjacent to Recla-
mation project lands.  When BLM plans recreation development on lands adjacent
to Reclamation project lands, it will consider recreation use, recreation po-
tential, and previously developed Reclamation recreation plans for authorized
or constructed Reclamation projects.  If BLM prepares plans or management
actions that could alter recreation potential of a Reclamation project that is
not yet constructed, BLM will consult with Reclamation.

    O.  Fish and Wildlife Mitigation and Enhancement.  Each agency will co-
ordinate with the other when its plans and activities involve fish and wild-
life resources and values related to lands administered by the other.  Where

BLM_0029325

Reclamation Instructions

water-related projects of either agency involve meeting the requirement of
the Fish and Wildlife Coordination Act (FWCA), the agency initiating the ac-
tion will ensure that the coordination and other requirements of the FWCA are
met.  Plans for the management of wildlife resources on lands of interest/
concern to both agencies shall be developed jointly with the State under au-
thority of the Sikes Act (16 U.S.C. 670 a-f).  Management of the lands will
be specified in a habitat management plan (HMP) developed for the area.  The
HMP will become part of Reclamation's land resources management plan for the
area.  Where a supplemental agreement executed for the specific Reclamation
project provides for BLM's implementation of the approved mitigation plans,
Reclamation will transfer the funds necessary to enable BLM to carry out its
agreed to efforts.  State funding and participation will be as specified in
supplemental agreements between the agencies cooperating on the specific proj-
ect, and in accordance with BLM's existing memorandum of understanding with
the concerned State wildlife agency.  Cooperative programs of both agencies
shall be implemented by the State Director and the Regional Director in ac-
cordance with the management plan for the project.  BLM will be responsible
for funding such projects on its lands or on Reclamation lands where no Rec-
lamation project is planned, and on which withdrawals have not bee revoked.
Reclamation will provide funding for wildlife management related plans/
activities/projects on the withdrawn public lands whenever such plans/
activities/projects are for the purpose of mitigating the impacts of Reclama-
tion projects.

    P.  Environmental Impact Analyses and Statements.  All actions taken pur-
suant to this agreement concerning environmental matters will conform to the
requirements of the Council on Environmental Quality regulations, 40 CFR Parts
1500-1508, 516 DM-1-7, the Bureau of Reclamation National Environmental Policy
Act (NEPA) Handbook, and BLM Guidebooks 1791 and 1792.  The agency (BLM or
Reclamation) initiating the action which requires NEPA compliance will be the
lead agency.

Where BLM or Reclamation proposes an action in an area where both Bureaus
have responsibility or interest, the two Bureaus will cooperate in the prep-
aration of the appropriate environmental analysis and, where necessary, the
lead agency as defined above will prepare the categorical exclusion checklist,
environmental assessment, FONSI, or EIS.

Cultural resource protection and managment matters will conform to applicable
sections of 36 CFR 60, 63, and 800; Reclamation Instructions Part 376.11 and
BLM Manuals 8100, 8110, and 8111.

    Q.  Planning Program.  If either agency proposes to prepare a plan or
undertake a study involving lands administered by or affecting the interests
of the other agency, the agency proposing to conduct the study will provide

BLM_0029326

notice to the affected agency at the time when it is proposed.  The agencies
shall fully coordinate their plans and studies allowing ample time for budget
considerations.  When appropriate, the planning agency's plans may be adopted
by the other agency as an amendment to its own land use or resource management
planning document.  Provisions of 43 CFR 1600 and other appropriate authority
will be utilized in revising, amending, or preparing planning or study
documents.

Inconsistencies between the plans of the two agencies will be addressed as
prescribed by the planning authority of each agency.  Differences unresolved
through negotiation will be referred to the Assistant Secretary - Land and
Water Resources for action as deemed appropriate.

In the preparation of all planning documents, BLM will serve where practicable
and legal as the primary supplemental source of expertise for various areas
of multiple use land management when so requested by Reclamation.  Reclamation
will serve where practicable and as requested by BLM as the primary source of
expertise in the planning, management, and development of water resources.
This does not replace or supplement earlier agreements which either agency
has with third parties.

   R.  Engineering and Technical Services.  BLM State Directors may, at any
time, request Reclamation Regional Directors for service in connection with
the planning, investigation, design, inspection, construction, repair, or re-
habilitation of engineering works, including activities under emergency con-
ditions.  There is one exception to this procedure.  In accordance with DM
753 1.3c, requests for services related to dam safety will be initiated by
BLM's Dam Safety Officer, Denver Services Center, or Chief, Division of Engi-
neering, Washington, and submitted to the Reclamation Dam Safety Officer, En-
gineering and Research Center, Denver, or to the Commissioner, Washington.
Requests may be for inspection, site investigations, and other exploratory
work necessary to provide projects of a reconnaissance grade, or feasibility
grade, with sufficient technical details and costs estimates to support BLM's
budget requests.

Requests for engineering services will be made by letter from the State Di-
rector to that Regional Director responsible for the area in which BLM's works
needing services are located.  To the extent practical, such requests shall be
made 18 months prior to the budget year plus one, or as early as possible to
permit coordination with Reclamation work programs.  The requests shall specify
the following:

   a.   Job requirements;
   b.   Nature of the work to be done;

215-30 - 5/3/83

    c.   Extent of engineering and other services to be performed;

    d.   Schedules to be met; and

    e.   Budgetary information.

Where construction work which will cost over $1,000,000 and will extend over more than one fiscal year includes the issuance of invitations to bids and specifications for construction is to be undertaken by Reclamation for BLM, a separate supplemental agreement covering such work, and the record of its financing, shall be executed between the State Director of BLM and the Regional Director of Reclamation.  Reimbursement shall be made promptly upon receipt of information or a detailed statement of cost.  Such budgetary information will be supplied, whenever possible, 18 months prior to the budget year plus one.  The indirect costs charged for work performed by Reclamation or BLM shall include supportable overhead costs associated with work performed under this agreement and based on the guidelines established in part 346, DM 3.4 of the Departmental Manual.  These costs shall not be calculated by using arbitrary factors.

    S.  Wild and Free-Roaming Horses and Burros.  When wild and free-roaming horses or burros inhabit areas crossing administrative boundaries between BLM and Reclamation, their management and protection will be the responsibility of BLM, under its regulations.  Upon request from Reclamation, BLM will cooperate in the removal, and relocation or disposal, of such animals from Reclamation lands (see section 5.A.).

    T.  Salinity Control on Public Land.  Each agency will coordinate with the other when its plans and activities involve salinity control efforts in the Colorado River Basin which relate to or affect the other's management responsibilities or the lands administered by the other.  Coordination at the field administrative/technical level will be accomplished through Federal interagency Salinity Control Coordinating Committee, and supplemental agreements as needed, by the appropriate State Directors and Regional Directors.

    U.  Computer Service.  Whenever either agency has computer programming, time, or other service, which would be of use to the other agency, and such service is requested, the agency having the desirable program, time, or other service, will, within its time and personnel constraints, provide, on a reimbursable basis, the program, time, or service to the requesting agency.  Whenever computer stored information of either agency is compatible with the other agency's computer, and would be of use to the other agency, arrangements will be made for automatic, compatible transfer of such information.

    V.  Discrepancies in Policy.  Where agency differences in policy exist, as described in policy documents and papers of the BLM or Reclamation, the policy of the agency having primary jurisdiction over the lands will prevail.

BLM_0029328

... 

W. Hydrometeorological Data Collection. Requirements for the collection of hydrometeorological data on BLM lands, including wilderness areas, or wilderness study areas, will be determined mutually in order to establish correlation networks with gages outside such areas to enhance scientific study, or weather modification, to improve water supply forecasting, and for public safety in flood forecasting and flood control operations. Agreement for installation of hydrometeorological data collect on devices will be accomplished through the BLM consultation and permit process. Hydromet stations may be placed and maintained within primitive areas, wilderness areas, or wilderness study areas administered by BLM only where approved by BLM, and will be placed and maintained in a manner prescribed by BLM.

X. Road Maintenance. When administratively controlled roads extend across boundary lines between BLM and Reclamation lands, then the agency offices are encouraged to develop local supplemental agreements for exchange of maintenance activities. The purpose of this is to improve efficiency by combining similar or like work across administrative boundaries. All maintenance activities should be accomplished in such a manner so as to protect the environment and performed to a standard that places user safety at the forefront.

Y. Other Specific Services. This agreement may be amended or modified at any time, upon mutual concurrence, to cover any service or requirement overlooked, or developing in the post-signing period. Amendments must be initialed by both agency heads or their designees to become effective.

Section 7. Supplemental Agreements: Supplemental agreements may be entered into by a BLM State Director and a Reclamation Regional Director to implement this master agreement. Those supplemental agreement needs identified within this master agreement that directly affect project authorization will be completed during the planning stage for the project.

Section 8. Implementation: This agreement is effective upon signature of the heads of both agencies. A copy of this agreement will be distributed by each agency to each State and Regional Director.

Section 9. Renegotiation: This agreement is renegotiable at the option of either party.

215-30 - 5/3/83

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 21 of 319

<u>Section 10</u>.  <u>Termination of Agreement</u>:  This agreement may be terminated upon
mutual agreement or upon 90 days written notice of either party.


_Robert N. Broadbent_

Commissioner, Bureau of Reclamation

March 25, 1983
Date


_R. H. J. Burford_

Director, Bureau of Land Management

March 25, 1983
Date

215-30 – 5/3/83

BLM_0029330

BLM_0029331



# ASSESSING THE POTENTIAL FOR RENEWABLE ENERGY ON PUBLIC LANDS



## FEBRUARY 2003

**Download CD ZIP File (248 MB)**

**CD-Lite Version**

**Download CD-Lite ZIP File with no GIS Data or Acrobat Reader Installers (43 MB)**



## U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT



## U.S. DEPARTMENT OF ENERGY ENERGY EFFICIENCY AND RENEWABLE ENERGY

BLM_0029332

# ASSESSING THE POTENTIAL FOR RENEWABLE ENERGY ON PUBLIC LANDS



## U.S. DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT



## U.S. DEPARTMENT OF ENERGY
## ENERGY EFFICIENCY AND RENEWABLE ENERGY

DOE/GO-102003-1704
FEBRUARY 2003

BLM_0029333

COVER PHOTOS (top to bottom): Wind turbines, Palm Springs, CA (PIX 01241, Warren Gretz, NREL); photovoltaic system, Lake Powell, UT (PIX 08022, Warren Gretz); hybrid cottonwood tree farm, Washington State (PIX 00241, Warren Gretz); concentrating solar power system, southwestern U.S. (courtesy of Henry Price, NREL); geothermal power plant, Sierra Nevada range, CA (PIX 10991, courtesy of Geothermal Resources Council).

**NOTICE**

This report was prepared as an account of work sponsored by an agency of the United States government. Neither the United States government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States government or any agency thereof.

Available electronically at http://www.osti.gov/bridge

Available for a processing fee to U.S. Department of Energy and its contractors, in paper, from:
    U.S. Department of Energy
    Office of Scientific and Technical Information
    P.O. Box 62
    Oak Ridge, TN 37831-0062
    phone: 865.576.8401
    fax: 865.576.5728
    email: reports@adonis.osti.gov

Available for sale to the public, in paper, from:
    U.S. Department of Commerce
    National Technical Information Service
    5285 Port Royal Road
    Springfield, VA 22161
    phone: 800.553.6847
    fax: 703.605.6900
    email: orders@ntis.fedworld.gov
    online ordering: http://www.ntis.gov/ordering.htm

 Printed on paper containing at least 50% wastepaper, including 20% postconsumer waste

BLM_0029334

# *Acknowledgments*

David Garman, Assistant Secretary, U.S. Department of Energy (DOE), Energy Efficiency and Renewable Energy, the Federal Energy Management Program (FEMP), and the DOE National Renewable Energy Laboratory (NREL) gratefully acknowledge Ray Brady, Mike Kirby, and Lee Otteni in the Bureau of Land Management (BLM), Department of the Interior, for their contributions to this partnership project in support of BLM's National Energy Policy activities. Their vision and commitment enabled the project partners to assess public lands with the highest potential for renewable energy resource development by industry.

The primary authors of this report are Mike Kirby (National Science and Technology Center, BLM); Doug Dahle, project leader (Federal Energy Management Program, NREL); Donna Heimiller (Distributed Energy Resource Center, NREL); Barbara Farhar (Geothermal Program, NREL); and Brandon Owens (formerly in the Energy Analysis Office, NREL). The authors thank DOE FEMP Director Beth Shearer and FEMP Renewable Energy Program Lead Anne Sprunt Crawley for funding and programmatic support. We also thank DOE Wind & Hydropower Program Manager Peter Goldman for providing NREL technology staff support in the development of the report. And we thank the following NREL staff members for their contributions:

- Mark Mehos and Hank Price (Concentrating Solar Power).
- Byron Stafford and John Thornton (Photovoltaics)
- Ed Cannon, Larry Flowers, and Brian Parsons (Wind)
- Richard Bain, Kevin Craig, and Ralph Overend (Biomass)
- Gerry Nix (Geothermal)
- Liz Brady-Sabeff and Dave Renne' (Distributed Energy Resources Center)
- Tonya Cook, May Anne Dunlap, and Paula Pitchford, (Communications)
- Judy Hulstrom, Kathy Rose, and Margo Stenzel (Information Services)
- Pam Lee-Bull and Judy Powers (NREL FEMP)
- Lynn Kaemmerer (Human Resources).

We are also grateful to these BLM and DOE experts for contributions regarding the geothermal "top-pick" sites:

- Paul Dunlevy (Geothermal Program Lead, BLM, Washington, DC)
- Rich Hoops and Jack Kelly (BLM Nevada State Office)
- Nancy Ketrenos, Duane Dippon, Corey Plank, and Eric Stone (BLM Oregon/Washington State Office)
- Sean Hagerty, Sonja Santillan, and Larry Vredenberg (BLM California State Office)
- Jim Fouts and Al McKee (BLM Utah State Office)
- Jay Spielman and Joe Torrez (BLM New Mexico State Office)
- Bill Lee (BLM Idaho State Office)
- Susan Norwood (Geopowering the West Program, DOE)
- Joel Renner (Idaho National Energy Engineering Laboratory, DOE).

And we thank Mary James, National Aeronautics and Space Administration, and John Townshend, University of Maryland, for contributing biomass data (see Appendix B).

Also acknowledged for their voluntary contributions are these organizations and industry partners in Colorado:

- Dale Osborne (Disgen, Inc.)
- Doug Larson (Western Interstate Energy Board)
- Ron Lehr (Attorney, WindPowering America)
- John Neilson (Colorado Land & Water Fund)
- Randy Manion (Western Area Power Administration)
- Randy Gee (Duke Solar)
- Roger Davenport (Science Applications International Corporation).

Finally, the authors thank all those who responded to BLM's request for public comment on the draft.

BLM_0029335

# Assessing the Potential for
# Renewable Energy on Public Lands

**Contents**                                                                  **Page**

Acknowledgments ........................................................................ iii

Executive Summary ...................................................................... 1

1. Objective ................................................................................. 2

2. Scope ..................................................................................... 2

3. Background ............................................................................. 2

4. The Approach for Assessing Renewable Energy Potential ......................................... 4

   Task 1—Gather available information on renewable energy potential (including low-impact hydro, solar, wind, biomass and geothermal) ......................... 4

   Task 2—Develop appropriate screens ....................................................... 6

   Task 3—Process data identifying broad geographical areas as high-, medium-, and low- or no potential for renewable energy development .................... 11

   Task 4—Report on high-potential areas for inclusion in a Renewable Energy Action Plan ....................................................... 18

5. The Comparative Analysis ........................................................... 18

6. Recommendations ..................................................................... 26

7. List of Appendices ................................................................... 27

   A. Western U.S. Renewable Resource and BLM Land Ownership GIS Maps ....... A1
   B. Detailed Description and Data Sets for GIS Maps ............................. B1
   C. Intermediate and Analysis Results GIS Maps ................................. C1
   D. Intermediate and "Top-Pick" GIS Maps for Geothermal Field-Based Resource Assessment ......................................................... D1
   E. Planning Units with Highest Renewable Energy Potential ..................... E1
   F. State Policies and Financial Incentives for Renewable Energy ............... F1
   G. References ................................................................... G1
   H. BLM, DOE, DOE National Laboratory Contacts ................................ H1

BLM_0029336

**List of Figures**                                                                                                          **Page**

Figure 1: Concentrating Solar Power Analysis Results  ................................................ 13

Figure 2: Photovoltaics Analysis Results  ................................................ 14

Figure 3: Wind Resource Analysis Results  ................................................ 15

Figure 4: Biomass Analysis Results  ................................................ 16

Figure 5: BLM Planning Units with "Top-Pick" Geothermal Sites  ................................ 17


**List of Tables**

Table 1a.  BLM Planning Units with the Largest Total Land Area of High-Potential Concentrating Solar Power Sites with Solar Resources of 6 kWh/m$^2$/Day or Greater  ................................ 19

Table 1b.  BLM Planning Units with the Largest Total Land Area of High-Potential Photovoltaic Sites with Solar Resources of 6 kWh/m$^2$/Day or Greater  ................................ 20

Table 1c.  BLM Planning Units with the Largest Total Land Area in Wind Class 5  ................................ 21

Table 1d.  BLM Planning Units with the Largest Total Land Area of Biomass Sites Having an NDVI Greater than 5  ................................ 22

Table 1e.  BLM Planning Units Identified as Having the Highest Potential for Geothermal Resources  ................................ 23

Table 2.  Western U.S. BLM Planning Units with High Potential for the Development of Three or More Renewable Energy Sources  ................ 24

Table 3.  Summary of Western State Renewable Energy Policies  ................................ 25

v

BLM_0029337

# *Executive Summary*

This report represents an important initial activity of the Bureau of Land Management's (BLM) proposed National Energy Policy Implementation Plan, which is to identify and evaluate renewable energy resources on public lands and any limitations on access to them. Ultimately, BLM will use this information in prioritizing land-use planning activities in order to increase industry's development and use of the renewable energy resources on public lands. These renewable resources include solar, biomass, geothermal, water, and wind energy.

To accomplish this task, BLM and the Department of Energy's National Renewable Energy Laboratory (NREL) established a partnership to conduct an assessment of renewable energy resources on BLM lands in the western United States. The objective of this collaboration was to identify BLM planning units in the western states with the highest potential for private-sector development of renewable resources.

The BLM/NREL team used Geographic Information System (GIS) data to analyze and assess the potential for concentrating solar power (CSP), photovoltaics (PV), wind, and biomass resources and technologies on public lands. BLM, NREL, and several industry representatives jointly developed screening criteria for each of these renewable resources to produce GIS-based maps and analyses. The team identified the top 25 BLM planning units whose areas have the highest potential for CSP, PV, wind, and biomass.

The BLM/NREL team also identified high-potential geothermal energy sites through visits to BLM state offices. The assessment focused on BLM's knowledge of, and experience with, the geothermal resources in seven western states. BLM experts identified 35 "top-pick" sites in 18 planning units in six states as having high potential for near-term development.

The assessment resulted in the following findings:

- Sixty-three BLM planning units in eleven western states have high potential for power production from one or more renewable energy sources.

- Twenty BLM planning units in seven western states have high potential for power production from three or more renewable energy sources.

This assessment report provides BLM with information needed to evaluate the potential for renewable energy development on public lands.

1

# Assessing the Potential for Renewable Energy on Public Lands

## 1. Objective

The U.S. Bureau of Land Management's (BLM) plan for using renewable energy on public lands must begin with an assessment of the renewable resource potential. This assessment has a two-part objective:

1. To assess the potential for geothermal, wind, solar, biomass, and low-impact hydropower resources on BLM lands; and

2. To identify BLM planning units in the western United States with the highest potential for development by industry of power production facilities based on renewable energy.

This report provides information to BLM so that efforts to increase industry's access to public lands for renewable energy development can concentrate on areas with high potential.

## 2. Scope

This renewable resource assessment addressed BLM, Bureau of Indian Affairs (BIA), and U.S. Forest Services lands in the western United States, except Alaska. Alaska was not included because of the lack of transmission system data in Geographic Information System (GIS) format. The renewable energy sources and technologies addressed in the report include concentrating solar power (CSP), photovoltaics (PV), wind, biomass, and geothermal. Low-impact hydropower was not included because the National Renewable Energy Laboratory (NREL), which provided support for the assessment, did not have the resource data required to assess the energy resource potential of that technology. This report does include a CD-ROM with the report in PDF format, releasable GIS data used in the analysis, PowerPoint files of all GIS maps for each renewable resource analyzed, and Excel files for all tables cited in this report containing lists of planning units with the highest potential for renewable energy (Tables 1a-1e, 2, and E-1).

## 3. Background

This BLM assessment of the potential for renewable energy power production facilities on public lands responds to a directive in the National Energy Policy (NEP) report dated May 2001. The National Energy Policy Development (NEPD) Group recommended "that the President direct the Secretaries of the Interior and Energy to re-evaluate access limitations to Federal lands in order to increase renewable energy production such as biomass, wind and solar" (pp. 6-17). The NEPD Group also recommended "that the President direct the Secretary of Interior to determine ways to reduce delays in geothermal lease processing as part of the permitting review process" (pp. 6-17).

2

BLM_0029339

The need for this assessment of the potential for renewable energy power production was also identified as an outcome of the National Conference on Opportunities to Expand Renewable Energy on Public Lands, hosted by the U.S. Department of the Interior (DOI) and the U.S. Department of Energy (DOE) in November 2001 in Washington, D.C. The conference was chaired by the DOI Secretary, Honorable Gale Norton, and the DOE Assistant Secretary for Energy Efficiency and Renewable Energy (EERE), David Garman, representing Energy Secretary Spencer Abraham.

Representatives from the U.S Department of Agriculture (USDA), the Environmental Protection Agency (EPA), the Department of Defense (DOD), the Council on Environmental Quality, and the Federal Energy Regulatory Commission also attended. Attendees heard testimony from industry on issues related to the development of power from geothermal, wind, solar, biomass, and hydropower resources on public lands. As a result of the conference and the NEP directive, a BLM NEP Implementation Plan activity was proposed that is based on the action described here and four supporting tasks. The tasks are described in more detail in the rest of this report.

### Action

The BLM will consider potential for renewable energy development on public lands, as appropriate, in land use decisions and use authorizations.

### Method

Using data readily available from DOE and other sources, as well as appropriate screens related to such matters as transmission facilities and markets, the BLM will determine the best order in which to prepare and amend land-use plans in order to meet the Interior Secretary's commitment to developing energy from renewable resources on public lands. Four tasks will be accomplished to assess the potential for renewable power production and help guide the formulation of a BLM NEP Implementation Plan for renewable energy development on public lands.

### Tasks

1. Gather available information on renewable energy potential including low-impact hydro (low-impact hydro was not addressed as data were not readily available), solar, wind, biomass and geothermal.

2. Develop appropriate screens.

3. Process data identifying broad geographic areas as having high potential for renewable energy development.

4. Provide a report on high-potential areas for inclusion in a Renewable Energy Action Plan.

BLM_0029340

As a result of collaborations begun at the November 2001 conference, BLM requested technical assistance and support from DOE through NREL in Golden, Colorado. BLM Headquarters and its National Science and Technology Center (NSTC) in Denver, Colorado, formed a partnership with NREL to obtain the government's expertise in the use of renewable energy. NREL agreed to provide information and guidance on renewable energy technology development, renewable energy resource potential assessment, GIS mapping of analysis and results, and renewable energy system analysis. Based on this experience, BLM's NSTC, the DOE Golden Field Office, and NREL have developed a Memorandum of Understanding to provide a mechanism for continued cooperation in the assessment and analysis of renewable energy resources.

During the development of this report, staff from DOE Headquarters, NREL, and Oak Ridge National Laboratory met with BLM and renewable energy industry representatives. They provided support for BLM's plan, which focused on the goal of increasing access to public lands for renewable power production projects. Discussions were held on hydropower, solar, wind, biomass, and geothermal energy resources. Preliminary GIS maps supplied by the BLM/NREL team indicated areas with high potential for wind and solar power, including concentrating solar power (CSP).

Most renewable energy uses of the public lands can currently be accommodated by existing BLM land-use plans, and applicants from industry may apply for an authorization under the appropriate authority at any time. These existing land-use plans will identify wilderness areas, Areas of Critical Environmental Concern (ACEC), and other special designated management areas where land-use restrictions may apply to a variety of uses, including renewable energy projects. However, if a land-use plan is prepared to specifically address and provide for renewable energy development within certain areas of a land-use planning area, it may facilitate the accelerated processing of future renewable energy applications. The land-use plan will address environmental issues associated with those proposed uses, which can then be used to tier further environmental review of specific renewable energy project proposals. Identifying land-use plans that could be prioritized to specifically address renewable energy development provides an opportunity to potentially reduce the amount of additional environmental review required. The documentation needed to process applications and make management decisions on renewable energy projects could also be reduced. Therefore, one purpose of this report is to assist BLM in identifying land-use planning areas with the highest potential for the development of renewable energy resources.

## 4. The Approach for Assessing Renewable Energy Potential

### TASK 1—Gather available information on renewable energy potential (including low-impact hydro, solar, wind, biomass and geothermal).

BLM's NSTC staff provided GIS-based land ownership data to NREL. NREL Resource Assessment staff then produced GIS maps illustrating renewable energy resources, with an overlay of BLM land ownership, field offices, and planning units. Maps for CSP, PV, wind, and biomass are provided in Appendix A. Renewable resource and BLM land ownership GIS data descriptions are provided in Appendix B. Resource assessment for high-potential geothermal sites did not include GIS resource and BLM land ownership maps or screening criteria development meetings. Rather, high-potential geothermal sites were identified through site visits and telephone calls with BLM state offices and GIS data sources. (See also Task 2.)

BLM_0029341

NREL resource data for solar, CSP, PV, and wind energy were deemed suitable for a regional-scale analysis. However, the current national biomass resource information appeared to be incomplete, and a comprehensive geothermal resource database did not exist. The resource data used are suitable for a regional analysis, but more detailed data are necessary for site-specific applications. Descriptions of the resource data sets used in the analysis are as follows.

### Solar

NREL has developed a national solar resource assessment for the United States at a resolution of approximately 40 km by 40 km. These data are updated periodically. The most recent update occurred in the summer of 2001 and represents 14 solar collector configurations. The data were developed using NREL's Climatological Solar Radiation Model. Appendix B describes the solar data in further detail.

### CSP

The CSP analysis used direct normal data. These data are pertinent to concentrating systems that track the sun throughout the day, such as trough collectors or dishes.

### PV

Data for flat-plate collectors were used. This is typical for a photovoltaic panel oriented due south at an angle from horizontal equal to the latitude of the collector's location.

### Wind

A low-resolution (~25 km$^2$) U.S. wind resource assessment was produced in 1987. Since then, NREL and other organizations have produced updated higher resolution (0.16 to 1 km$^2$) wind resource assessments that better reflect the effects of terrain on the potential wind resource. The low-resolution wind data captured continental wind patterns. But the coarse scale meant that the assigned wind resource could apply to as little as 5% of the area if, for example, good resources were on ridge crests. Higher resolution digital terrain data allow the updated wind resource assessments to more accurately depict ridge lines and the effects of blocking on potential wind resources. These data also produce a more accurate overall picture of the resource. However, the updated assessments are model-derived data and not a substitute for on-site measurements before actual site development, even with the large increase in resolution.

NREL has completed and validated updated assessments for Washington, Oregon, Idaho, and Montana in the western United States. Updated assessments by other organizations were completed for Colorado and New Mexico, but NREL has not yet validated them. Currently, NREL plans to complete additional updated assessments for Wyoming in April 2002, and late in 2002 for the remaining western states listed in this report. Information on updated wind resource assessments is available at http://www.eren.doe.gov/windpoweringamerica.

For this analysis, the updated NREL assessments were used when completed, and the 1987 assessment was used for the rest of the states. Wherever the Colorado and New Mexico assessments showed higher resource estimates than those shown by the 1987 assessment, those areas were added to the analysis. See Appendix B for more information on data sources.

BLM_0029342

### *Biomass*

Current biomass resource data at NREL contain partial information on municipal solid waste, specific crop residues in eastern states, and timber residues. During the biomass technology meeting, a different approach to rating a resource area was discussed. In that approach, sites are assessed for long-term sustainability to support biomass plants. Given the limited time available to complete this analysis, the monthly Normalized Difference Vegetation Index (NDVI) computed from National Aeronautics and Space Administration's (NASA's) Advanced Very High Resolution Radiometer Land Pathfinder satellite program was chosen as a basis for the initial biomass resource assessment. The NDVI satellite data have a resolution of 8 km by 8 km. Appendix B further describes sources of biomass GIS data.

### *Geothermal*

Southern Methodist University (SMU) produced a national geothermal resource assessment in February 2002. The assessment shows general areas suitable for possible geothermal development assessment; specific areas need to be identified by local-area studies. GIS data also exist on known geothermal resource areas (KGRAs) and on geothermal leases. For a description of the data and method used to identify high-potential geothermal sites, see Task 2 below.

### *BLM-Specific and Other Data*

BLM's NSTC staff provided detailed land ownership data to NREL. BLM staff also supplied information on areas that should be excluded from development (wilderness areas, wilderness study areas[1], national monuments, and national conservation areas) on BLM lands and planning unit boundaries. Areas of Critical Environmental Concern (ACEC) were not included in the BLM GIS land ownership data. However, ACEC are BLM lands excluded from development and will be addressed at Field Office level as required in processing renewable power development applications. Other data used in the analysis included topographical data and data on transmission lines, major roads, and populated areas. For more information on data sources, see Appendix B.

### TASK 2—Develop appropriate screens.

BLM and NREL staff held meetings on CSP, PV, wind, and biomass to develop screening criteria for GIS analysis and characterization of the potential for renewable power production. The objective of each screening criteria development meeting was to identify any criteria that impact the economic and technical feasibility of renewable power production. The list of criteria was then evaluated for its ability to be used in GIS mapping, and GIS data availability and sources were discussed.

Finally, the top three to six most significant criteria in targeting high-potential renewable power opportunities were selected for Task 3 (for CSP, PV, wind, and biomass). High-potential geothermal sites were identified by field visits to selected BLM state offices. Knowledgeable personnel in BLM state offices were consulted during field visits to Nevada, Oregon, Idaho, California, Utah, and Washington. The high-potential geothermal sites were identified without

---

[1]  Wilderness Study Areas are not closed to development, subject to valid existing rights.

BLM_0029343

developing screening criteria. (See *Geothermal High-Potential Site Identification: Direct Data Collection with BLM State Offices* on p. 10.)

### *Solar-CSP Screening Criteria Development Meeting*

On February 14, 2002, the BLM/NREL team met with NREL and industry CSP technology representatives to develop a list of high-potential site screening criteria. The following were identified as the most important screening criteria (in order of importance).

Central Generation Technology Criteria

1. Solar resource is 5 kWh/m$^2$/day of direct normal (at least).
2. Slope of land area at the site must be less than 5%, and ideally less than 1%.
3. Transmission access is within 50 miles (69-345 kV), and transmission capacity is available.
4. Forty acres is the minimum parcel size.
5. Site must have access to roads or rail within 50 miles.

Distributed Generation Technology Criteria

1. Solar resource is 5 kWh/m$^2$/day of direct normal.
2. Slope of land area at the site must be less than 10%.
3. Site must have access to roads.

The following items were also identified by the meeting participants. But they were not identified as the most important screening criteria.

Central Generation Technology Criteria

- The site must have a low average wind speed (average wind speed < 10 miles/hour).
- Water resources must be available.
- The site should be within 25 miles of a main natural gas pipeline for some configurations.
- All vegetation at the site must be removed.
- Federal, state, and local policies are supportive.
- The site must allow structures 15-50 feet high. Some technologies could require structures hundreds of feet high.
- Livestock protection is possible.
- Light reflection at sites near major roads could be an issue for some technologies
- A population center should be within 100 miles.

Distributed Generation Criteria

- The site is within 100 miles of a population center.
- Transmission access, water availability, and minimum parcel size are not an issue.

BLM_0029344

*Solar–PV Screening Criteria Development Meeting*

On February 20, 2002, the BLM/NREL team met with NREL PV technology representatives to develop a well-defined list of screening criteria. The following items were identified as the most important screening criteria (in order of importance).

Large-Scale Technologies

1. Solar resource availability is known, and favorable to large-scale PV.
2. Full cost of competing power (production, transmission and distribution [T&D], environmental costs, etc.) is known and favorable to PV.
3. Transmission line is accessible, plus available capacity.
4. Electric power regulatory regime (want retail access) is favorable to PV.
5. Federal, state, and local policies are supportive.

Small-Scale Technologies

1. Full cost of competing power (production, T&D, environmental costs, etc.) is known and favorable to PV.
2. Current fuel use at the site (especially unpowered and diesel-powered sites) is known and favors PV.
3. Water access is available (important for water-pumping applications).
4. Grazing sites are good small-scale applications.
5. Existing and planned recreation areas are good for remote applications.

The following items were also identified by the meeting participants, but they were not identified as the most important screening criteria.

- Cost of environmental impacts of existing infrastructure is favorable to PV.
- Cost of maintaining existing energy infrastructure is favorable.
- High or unique environmental standards exist in the region.
- Cost of a site-specific environmental assessment is favorable.
- Security must be considered.
- Road access is needed for construction equipment.
- Extending transmission is needed in some cases for large-scale PV systems.
- Projected growth in the region is known, if supplying additional energy.
- Local utilities and peak unit power production costs should be considered.

BLM_0029345

*Wind Screening Criteria Development Meeting*

On January 29, 2002, the BLM/NREL team met with NREL wind technology representatives and selected members of the wind energy community at the National Wind Technology Center (NWTC) to develop a well-defined list of screening criteria. The following items were identified as the most important screening criteria (in order of importance):

1. Wind resource is wind power Class 4 and above for short term, Class 3 and above for long term.
2. Federal, state, and local policies support wind energy.
3. Transmission access is within 25 miles (69-345 kV) and transmission capacity is available.
4. Site must be compatible with wind energy development; scenic areas, view-sheds, and non-development regions must be eliminated.
5. Site must have access to roads within 50 miles.

The following items were also identified by the meeting participants, but were not identified as the most important screening criteria.

- Ease of permitting and siting should be considered.
- Regional market conditions are important (electricity rates, load growth, reserve margins, etc.).
- Site is five miles from the nearest population center.
- Elevation of 3,000-4,500 ft is optimal (generally, the site must be below 7,000 ft).
- Slope of land area is a 14% grade (maximum) or less.
- Minimum parcel size is 20 megawatts (MW) per section (1 square mile) on rolling terrain.
- Large contiguous parcels are best; 10 square miles is optimal and at least 1 square mile is necessary.

*Biomass Screening Criteria Development Meeting*

On March 4, 2002, the BLM/NREL team met with NREL biomass technology representatives to develop a well-defined list of screening criteria. The following items were identified as the most important screening criteria (in order of importance).

1. Sustainable biomass resource is available; biomass power plant must be within 50 miles of the fuel source.
2. Site must be within 50 miles of a population center with a skilled labor force.
3. Proximity of communities in "at risk" regions identified by the National Fire Plan is known and favors biomass power.

BLM_0029346

The following items were also identified by the meeting participants, but were not identified as the most important screening criteria.

- A water supply is needed.
- Land slope is 7%-12% or less.
- The visual impact is an issue.
- Landscape changes caused by harvesting must be considered.
- Invasive species control is a consideration.
- Livestock protection is possible at the site.
- Forest thinning and municipal solid waste applications are good potential sites.
- Full cost of competing power (production, T&D, environmental costs, etc.) is known and favorable to biomass.

### *Geothermal High-Potential Site Identification: Direct Data Collection with BLM State Offices*

The BLM has had statutory authority for leasing geothermal mineral rights under the Geothermal Steam Act of 1970 (P.L. 91-581; 30 U.S.C. §§ 1001-1027, December 24, 1970, as amended 1977, 1988, and 1993). Therefore, the BLM has extensive experience with geothermal resources and environmental impact assessments. In addition, the BLM's sister agency within the DOI, the U.S. Geological Survey (USGS), completed a nationwide assessment of geothermal resources in the United States some years ago. The data were collected in 1978 and published in 1979 as Circular 790 (Muffler 1979).

Although resources are available, geothermal activity has decreased markedly over the past 17 years. In 1985, more than 2 million acres were leased for geothermal activity in the United States, and 1.2 million acres were leased in Nevada alone. (Nationally, there were 29 power plants on line and more than 680 leases.) At that time, it took only two to three months to issue a permit. BLM had a $3.2 million budget, and 464 work months were dedicated to the geothermal program. During the 1990s, when energy economics declined, industry's efforts in geothermal decreased. This lack of activity led to a decrease in geothermal program emphasis within BLM and USGS. As of May 23, 2002, there were 329 leases and 299 pending lease applications. At least 83 of the geothermal lease applications are more than 25 years old.

As a result of this decline in program emphasis, no current resource data provide detailed information on geothermal resources in the United States. The best data currently available are Professor David Blackwell's compilation at Southern Methodist University (SMU) (www.smu.edu/geothermal/georesou/georesourcesmap.htm), based on the 1978 USGS data and other information collected since then. The map is a qualitative composite of heat flow, thermal gradient, sediment thickness, and hot springs. Based on these variables, this map demonstrates broad areas of geothermal resources and rates these resources as "excellent" or "good." The SMU data show general areas suitable for possible geothermal development; specific areas need to be identified by local-area studies. The SMU data were deemed inadequate for purposes of identifying the BLM planning units with the highest near-term geothermal potential because they are too geographically broad. For example, the SMU data classify virtually the entire state of Nevada as having excellent geothermal resource potential, allowing no differentiation among areas within the state.

BLM_0029347

With BLM's guidance, NREL contacted—and in five cases, personally visited—BLM staff responsible for geothermal programs in seven BLM western states: California, Idaho, Nevada, New Mexico, Oregon, Utah and Washington. These states are known for their comparatively high level of geothermal resources and activity. Visits were completed in California, Nevada, New Mexico, and Oregon/Washington between February 15, 2002, and April 5, 2002. NREL asked the lead geothermal staff from each BLM state office to identify the best geothermal sites for near-term geothermal development within each of their states, based on their expert opinion. BLM geothermal staff have the best experience in determining sites because they are responsible for identifying and classifying the known geothermal resource areas (or KGRAs) [2] and for managing the geothermal leasing program within their states. The staff also provided, in digital form when possible, the most recent data on the classification of KGRAs and on BLM leasing activity within the seven states.

The sites the BLM staff identified were termed the top-pick sites for each state, and resulted in 9 top picks for California, 10 for Nevada, 3 for New Mexico, 7 for Oregon, 3 for Utah, and 3 for Washington. Most, but not all, of the top-pick sites were KGRAs.

These locations were then compared with the BLM lease data in GIS format, the KGRA data in GIS format, and the SMU GIS data to check their validity. The top-pick locations correlated well with all of the technical GIS data sets.

On March 17, 2002, staff from NREL and the Idaho National Engineering and Environmental Laboratory met at NREL to review the method and results of the analysis. They found that the analysis met technical criteria and that it was straightforward and sensible given the limited time available. They also found that the top-pick sites identified by BLM state office staff were likely to fall within no more than 20 BLM planning units within the western United States. Therefore, it was not necessary to apply other screening criteria to reduce the number of BLM planning units with geothermal sites identified as having the best potential for near-term development.

**TASK 3—Process data identifying broad geographical areas as high-, medium-, and low- or no potential for renewable energy development.**

This task ultimately focused on processing GIS data to identify high-potential areas for renewable energy development. A Geographical Information System, or GIS, is a computer-based system used to manipulate, manage, and analyze multidisciplinary geographic and related attribute data. All the information in a GIS is linked to a spatial reference system used to store and access the data. GIS data layers can be recombined, manipulated, and analyzed with other layers of information to identify relationships between features, within a common layer or across layers.

This analysis was conducted on a regional scale, and the results are suitable for use at the planning-unit level. On-site measurement and analysis are recommended before the development of any facilities, but this analysis should be useful in refining the prospecting process of site identification.

---

[2] "KGRA" means an area in which the geology, nearby discoveries, competitive interests, or other indicia would, in the opinion of the Secretary of Interior through BLM, engender a belief that prospects for extraction of geothermal steam or associated geothermal resources are good enough to warrant expenditures of money for that purpose.

BLM_0029348

Initial meetings held to develop technology screening criteria identified several categories of GIS data to be used in the screening process. Unfortunately, the GIS data needed to implement several of the screening criteria were not available or could not be fully implemented in the limited amount of time available for this analysis. In particular, one constraint was mentioned in each technology meeting: transmission line congestion and availability. Detailed data are available, but they are not in a spatially referenced format. Several other data sets were not available at the regional scale with the level of informational detail that participants wanted, but they were deemed adequate given the regional nature of the analysis.

The roads data set used in the analysis depicts only major paved roads, although all groups agreed that an upgradeable dirt road would be acceptable. Generally, distance to roads was not a severely limiting factor for development (see the maps in Appendix C), given the acceptable distance for each technology (50 miles). The transmission line data set covers the contiguous United States and is generally complete down to 100 kV. NREL staff thought that lines with lower voltages would be suitable for development, but a consistent nationwide database for lower voltage lines could not be located.

The screening criteria applied to each technology (except geothermal) are described below.

BLM_0029349

*CSP*
1. Direct solar resource is 5 kWh/m$^2$/day or greater.
2. Terrain slope is ≤ 5%.
3. Site is within 50 miles of transmission lines at 115-345 kV.
4. Site is within 50 miles of a major road or railroad.
5. The minimum parcel size of 40 continuous acres is available.
6. Land use is BLM-compatible.



**Figure 1: Concentrating Solar Power Analysis Results**

13

*PV*
1. Direct solar resource is 5 kWh/m$^2$/day or greater.
2. Site is within 50 miles of transmission lines at 115-345 kV.
3. Land use is BLM-compatible.



**Figure 2: Photovoltaics Analysis Results**

14

*Wind*
1. Wind resource is limited to areas in Wind Class 3 or greater.
2. Site is within 25 miles of transmission lines at 69-345 kV.
3. Site is within 50 miles of a major road or railroad.
4. Land use is BLM-compatible.



**Figure 3: Wind Resource Analysis Results**

15

*Biomass*
1. NDVI is 0.4 or greater for at least 4 months between April and September 2000.
2. The terrain slope is ≤ 12%.
3. Site is within 50 miles of a town with at least 100 people.
4. Land use is BLM-compatible.



**Figure 4: Biomass Analysis Results**

16

BLM_0029353

*Geothermal*

High-potential geothermal areas were selected as top-pick sites by expert geothermal personnel at BLM state offices.  Figure 5 shows the top-pick geothermal sites; their coincident planning units are highlighted.



**Figure 5: BLM Planning Units with "Top-Pick" Geothermal Sites**

17

Each screening criterion was developed into a separate data layer indicating whether the criterion was met. The layers were combined into a final data set that included only lands that met all the criteria for each technology. Maps of individual criteria are in Appendix C.

The criteria listed above were used to identify areas with long-term development potential. A more restrictive definition of resource availability was used in identifying the planning units with the highest near-term development potential. These planning units should not be considered the only areas with significant development potential, however.

**Task 4—Report on high-potential areas for inclusion in a Renewable Energy Action Plan.**

This report is the product of this task. To develop recommendations for this report, BLM and NREL performed a comparative analysis. They used the renewable energy GIS maps and geothermal field-based site identifications resulting from Task 3 to conduct the analysis.

## 5. The Comparative Analysis

The GIS maps constructed for Task 3 were used as a starting point to identify the BLM offices with sites having the highest potential for renewable energy development. On March 27 and 28, 2002, NREL technology experts developed the following final technology-specific decision rules. Each rule was used as a last screening criterion to eliminate marginal and less desirable renewable energy sites from the final maps developed under Task 3.

*CSP:* Include all sites with a solar resource of 6 kWh/m$^2$/day or greater and terrain slope less than or equal to 1%.

*PV:* Include all sites with a solar resource of 6 kWh/m$^2$/day or greater.

*Wind:* Include all sites that are in Wind Class 5 or greater and are within the proximity of either a major load center (city) or a major transmission line connecting with a major load center.

*Biomass:* Include all sites with an NDVI of 4 or greater, communities at risk from fire, and proximity to Forest Service lands (less than 100 miles)

*Geothermal:* No final decision rule is required; the highest-potential sites were identified using an alternative process.

After the final decision rules were applied to technology-specific maps, the land area of the remaining renewable energy sites was summed on a planning unit basis. This summed list was then rank-ordered on a technology-by-technology basis. The top 25 offices in the rank-ordered list were identified by the BLM/NREL team as planning units having the highest potential. Planning units and field offices for each technology are presented in descending order of total land area for CSP, PV, wind, and biomass in Tables 1a-1d. Table 1e lists the top-pick sites by state, along with the BLM planning units and field offices where they are located.

BLM_0029355

**Table 1a.  BLM Planning Units with the Largest Total Land Area of High-Potential
Concentrating Solar Power Sites with Solar Resources of 6 kWh/m$^2$/Day or Greater**
*(in descending order of total land area)*

| Planning Unit | Field Office | State |
|---|---|---|
| Battle Mountain | Battle Mountain | Nevada |
| Las Cruces | Las Cruces | New Mexico |
| Ely | Ely | Nevada |
| Winnemucca | Winnemucca | Nevada |
| Salt Lake | Salt Lake | Utah |
| Elko | Elko | Nevada |
| Carlsbad | Carlsbad | New Mexico |
| Roswell | Roswell | New Mexico |
| Fillmore | Fillmore | Utah |
| El Centro | El Centro | California |
| Yuma | Yuma | Arizona |
| Phoenix | Phoenix | Arizona |
| Needles | Needles | California |
| Las Vegas | Las Vegas | Nevada |
| Jordan | Vale | Oregon |
| Safford | Safford | Arizona |
| Socorro | Socorro | New Mexico |
| Arizona Strip | Arizona Strip | Arizona |
| Farmington | Farmington | New Mexico |
| Barstow | Barstow | California |
| Rock Springs | Rock Springs | Wyoming |
| Palm Springs-South Coast | Palm Springs | California |
| Cedar City | Cedar City | Utah |
| Lake Havasu | Lake Havasu | Arizona |
| Carson City | Carson City | Nevada |

BLM_0029356

**Table 1b.  BLM Planning Units with the Largest Total Land Area of
High-Potential Photovoltaic Sites with Solar Resources of 6 kWh/m$^2$/Day or Greater**
*(in descending order of total land area)*

| Planning Unit | Field Office | State |
|---|---|---|
| Battle Mountain | Battle Mountain | Nevada |
| Las Cruces | Las Cruces | New Mexico |
| Roswell | Roswell | New Mexico |
| Ely | Ely | Nevada |
| Las Vegas | Las Vegas | Nevada |
| Fillmore | Fillmore | Utah |
| Ridgecrest | Ridgecrest | California |
| Needles | Needles | California |
| Barstow | Barstow | California |
| Phoenix | Phoenix | Arizona |
| Safford | Safford | Arizona |
| Cedar City | Cedar City | Utah |
| Yuma | Yuma | Arizona |
| Lake Havasu | Lake Havasu | Arizona |
| Arizona Strip | Arizona Strip | Arizona |
| Kingman | Kingman | Arizona |
| Carlsbad | Carlsbad | New Mexico |
| El Centro | El Centro | California |
| Socorro | Socorro | New Mexico |
| Palm Springs-South Coast | Palm Springs | California |
| Carson City | Carson City | Nevada |
| Salt Lake | Salt Lake | Utah |
| Elko | Elko | Nevada |
| Winnemucca | Winnemucca | Nevada |
| Albuquerque | Albuquerque | New Mexico |

20

**Table 1c.  BLM Planning Units with the
Largest Total Land Area in Wind Class 5**
*(in descending order of total land area)*

| Planning Unit | Field Office | State |
|---|---|---|
| Rawlins | Rawlins | Wyoming |
| Rock Springs | Rock Springs | Wyoming |
| Elko | Elko | Nevada |
| Las Cruces | Las Cruces | New Mexico |
| Carson City | Carson City | Nevada |
| Kremmling | Kremmling | Colorado |
| Ridgecrest | Ridgecrest | California |
| Dillon | Dillon | Montana |
| Fillmore | Fillmore | Utah |
| Las Vegas | Las Vegas | Nevada |
| Royal Gorge | Royal Gorge | Colorado |
| Billings | Billings | Montana |
| Salt Lake | Salt Lake | Utah |
| Owyhee | Lower Snake River | Idaho |
| Barstow | Barstow | California |
| Grants Pass | Medford | Oregon |
| Palm Springs-South Coast | Palm Springs | California |
| Albuquerque | Albuquerque | New Mexico |
| Snake River | Upper Snake River | Idaho |
| Grand Junction | Grand Junction | Colorado |
| Surprise | Surprise | California |
| Emerald Empire | Upper Columbia-Salmon Clearwater | Idaho |
| Marys Peak | Salem | Oregon |
| Wenatchee | Wenatchee | Washington |
| Safford | Safford | Arizona |

BLM_0029358

**Table 1d.  BLM Planning Units with the Largest**
**Total Land Area of Biomass Sites Having an NDVI Greater than 5**
*(in descending order of total land area)*

| Planning Unit | Field Office | State |
|---|---|---|
| Phoenix | Phoenix | Arizona |
| Wenatchee | Wenatchee | Washington |
| Safford | Safford | Arizona |
| Missoula | Missoula | Montana |
| Deschutes | Prineville | Oregon |
| Alturas | Alturas | California |
| Eagle Lake | Eagle Lake | California |
| Taos | Taos | New Mexico |
| Central Oregon | Prineville | Oregon |
| Folsom | Folsom | California |
| Lakeview | Lakeview | Oregon |
| Royal Gorge | Royal Gorge | Colorado |
| Klamath Falls | Klamath Falls | Oregon |
| Socorro | Socorro | New Mexico |
| Redding | Redding | California |
| San Juan | San Juan | Colorado |
| Albuquerque | Albuquerque | New Mexico |
| Dillon | Dillon | Montana |
| Kremmling | Kremmling | Colorado |
| Butte | Butte | Montana |
| Las Cruces | Las Cruces | New Mexico |
| Little Snake | Little Snake | Colorado |
| Arizona Strip | Arizona Strip | Arizona |
| Swiftwater | Roseburg | Oregon |
| Mckenzie | Eugene | Oregon |

22

**Table 1e.  BLM Planning Units Identified as
Having the Highest Potential for Geothermal Resources**

| State | Top-Pick Site | BLM Planning Unit | BLM Field Office |
|---|---|---|---|
| **California**<br>**(9 top picks)** | Glass Mountain | Alturas | Alturas |
| | Mono Long Valley | Bishop | Bishop |
| | East Mesa<br>Salton Sea<br>Truckhaven | El Centro | El Centro |
| | Coso<br>Randsburg | Ridgecrest | Ridgecrest |
| | Lake City-Surprise | Surprise | Surprise |
| | Geysers | Ukiah | Ukiah |
| **Nevada**<br>**(10 top picks)** | Beowawe | Battle Mountain<br>Elko | Battle Mountain<br>Elko |
| | Fish Lake | Battle Mountain | Carson City |
| | Salt Wells<br>Soda Lake<br>Steamboat<br>Stillwater | Carson City | Carson City |
| | Dixie Valley | Carson City<br>Winnemucca | Carson City<br>Winnemucca |
| | Brady<br>Rye Patch<br>San Emidio | Winnemucca | Winnemucca |
| **New Mexico**<br>**(3 top picks)** | Lightning Dock<br>Radium Springs<br>Tortugas Mountain | Las Cruces | Las Cruces |
| **Oregon**<br>**(7 top picks)** | Klamath Falls | Klamath Falls | Klamath Falls |
| | Crump<br>Lakeview<br>Summer Lake | Lakeview | Lakeview |
| | Newberry Crater | Upper Deschutes | Prineville |
| | Malheur River<br>Vale | Southeast Oregon | Vale |
| **Utah**<br>**(3 top picks)** | Thermo Hot Springs II<br>Roosevelt Hot Springs | Cedar City | Cedar City |
| | Cove Fort-Sulphurdale | Cedar City<br>Fillmore | Cedar City<br>Fillmore |
| **Washington**<br>**(3 top picks)** | Mt. Adams area<br>Mt. Baker area<br>Wind River area | Wenatchee | Wenatchee |

*Source: Farhar and Heimiller 2002*

23

*Consolidated Information for BLM Use*

Table 2 lists all the planning units that appear on three or more of the technology-specific lists (Tables 1a-1e).  The seven states having planning units with three or more renewable resources are Arizona, California, Nevada, New Mexico, Oregon, Utah, and Washington.  BLM may want to prioritize the land-use planning activities of offices that appear at the top of the table.  However, two important points are in order.

First, while the planning units listed in Tables 1a-e and Table 2 are intended to represent renewable energy sites with the highest potential, these tables are not an exhaustive list of planning units with attractive renewable energy sites.  Second, some planning units may contain outstanding sites for one specific technology to the exclusion of others.  If expected project economics are favorable enough, it may be advisable to rank the land-use planning activities of these offices over those of others that contain favorable sites for multiple technologies.  Thus, Table 2 must be viewed primarily as a starting point for discussions regarding priorities for BLM land-use planning activities.

**Table 2.  Western U.S. BLM Planning Units with High Potential**
**for the Development of Three or More Renewable Energy Sources**

| Planning Unit | Field Office | State | CSP | PV | Wind | Biomass | Geothermal |
|---|---|---|:---:|:---:|:---:|:---:|:---:|
| Las Cruces. | Las Cruces | NM | • | • | • | • | • |
| Safford | Safford | AZ | • | • | • | • | |
| Carson City | Carson City | NV | • | • | • | | • |
| Elko | Elko | NV | • | • | • | | • |
| Fillmore | Fillmore | UT | • | • | • | | • |
| Arizona Strip | Arizona Strip | AZ | • | • | | • | |
| Phoenix | Phoenix | AZ | • | • | | • | |
| Barstow | Barstow | CA | • | • | • | | |
| El Centro | El Centro | CA | • | • | | | • |
| Palm Springs – South Coast | Palm Springs | CA | • | • | • | | |
| Ridgecrest | Ridgecrest | CA | • | • | | | • |
| Battle Mountain | Battle Mountain | NV | • | • | | | • |
| Las Vegas | Las Vegas | NV | • | • | • | | |
| Winnemuca | Winnemuca | NV | • | • | | | • |
| Albuquerque | Albuquerque | NM | | • | • | • | |
| Socorro | Socorro | NM | • | • | | • | |
| Lakeview | Lakeview | OR | | | • | • | • |
| Cedar City | Cedar City | UT | • | • | | | • |
| Salt Lake | Salt Lake | UT | • | • | | • | |
| Wenatchee | Wenatchee | WA | | | • | • | |

As an alternative way of viewing the assessment results, Appendix E contains a list of all 63 planning units that appear on one or more technology-specific list.  Table E-1 lists planning units in alphabetical order and grouped by state.  State Renewable Energy Climate ratings from Table 3 below are also listed in Table E-1.

BLM_0029361

**Western State Government Renewable Energy Policies**

State-level policies are also an important consideration in prioritizing land-use planning activities. As a result of an ongoing deregulating process, many western states have enacted a variety of laws and rules providing incentives for renewable energy use. However, the size of these incentives varies from state to state. Some states have worked aggressively to create an environment in which renewable energy projects have the potential to flourish, while others have adopted a more policy-neutral response. Because the energy policy environment in each state will evolve over time, current state-level incentives should not be the primary driver of BLM's land-use priorities. Current state-level incentives should rather serve as information needed in the prioritizing process. Table 3 summarizes major state-specific renewable energy policies.

### Table 3. Summary of Western State Renewable Energy Policies

| State | Renewable Energy Climate | Key Policies |
|---|---|---|
| *Arizona* | Highly Favorable | Many policies are in place, including (1) green pricing programs, (2) green power aggregation, (3) generation disclosure, (4) net metering, and most important, (5) a renewable energy portfolio standard. |
| *California* | Highly Favorable | Many policies are in place, including (1) a solar and wind energy tax credit, (2) a solar property tax exemption, (3) green pricing programs, (4) green power aggregation, (5) generation disclosure, (6) a net-metering law, (7) a public benefits fund, and (8) a state loan program. |
| *Colorado* | Favorable | Colorado utilities currently offer at least 10 green pricing programs across the state. At least three large Colorado cities aggregate their green power purchases. Colorado also requires generation disclosure and has multiple net-metering laws. |
| *Idaho* | Neutral | Idaho Power offers (1) a green pricing program, (2) income tax deduction, (3) low interest loans for renewable energy resources, and (4) net metering. |
| *Montana* | Favorable | Multiple policies are in place, including (1) a corporate tax credit, (2) a green pricing program, (3) generation disclosure, (4) a mandatory green power option, (5) net metering, (6) a property tax exemption, and (7) a systems benefits fund. |

BLM_0029362

| State | Renewable Energy Climate | Key Policies |
|-------|--------------------------|--------------|
| *Nevada* | Highly Favorable | Many policies are in place, including (1) a property tax exemption, (2) a green pricing program, (3) generation disclosure, (4) a net-metering law, and most important, (5) a renewable energy portfolio standard. |
| *New Mexico* | Favorable | Multiple policies are in place, including (1) electric generation facilities tax incentives, (2) generation disclosure, (3) net metering, and (4) a renewable energy production tax credit. |
| *Oregon* | Favorable | Several policies are in place, including (1) a business tax credit, (2) green pricing programs, (3) a green power purchasing program, (4) generation disclosure, (5) net metering, (6) a public benefits fund, and (7) a state loan program. |
| *Utah* | Neutral | Utah offers (1) a corporate income tax credit for renewable energy systems, (2) a green pricing program, and (3) a green power aggregation program. |
| *Washington* | Favorable | Several policies are in place, including (1) several green pricing programs, (2) generation disclosure, (3) a green option requirement, (4) a net-metering law, and (5) an expanded sales tax exemption. |
| *Wyoming* | Neutral | Wyoming has a green pricing program and enacted a net-metering law that applies to solar, wind, and hydropower systems up to 25 kW. |

## 6.   Recommendations

Table 2 showed the BLM planning units with the highest potential for projects using three or more renewable energy sources, as needed for the BLM NEP implementation plan for renewable energy use on public lands.  The BLM can use Table 2 in prioritizing land-use planning activities.  BLM can then determine the best order in which to prepare or amend land-use plans to meet the Interior Secretary's commitment to using energy from renewable resources on public lands.

### *Other Opportunities*

1.  Consider a follow-on effort to develop a statewide renewable energy resource assessment for Alaska.  Because of the lack of GIS-based transmission data, a key factor used for screening high-potential renewable energy sites, Alaska was not included in this report.  The assessment should consider power production potential and high-potential distributed generation opportunities.

BLM_0029363

2. Investigate the feasibility of developing a renewable resource assessment for low-impact hydro resources.

## 7.    Appendices

A.  Western U.S. Renewable Resource and BLM Land Ownership GIS Maps

B.  Detailed Description and Data Sets for GIS Maps

C.  Intermediate and Analysis Results GIS Maps

D.  Intermediate and Top-Pick GIS Maps for Geothermal Field-Based Resource Assessment

E.  Planning Units with Highest Renewable Energy Potential

F.  State Policy and Financial Incentives for Renewable Energy

G.  References

H.  BLM, DOE, DOE National Laboratory Contacts

BLM_0029364

# Appendix A

# Western U.S. Renewable Resource and BLM Land Ownership GIS Maps

A1

BLM_0029365



**A2**



Map supplied by the National Renewable Energy Laboratory

**A3**

BLM_0029367



**Wind: BLM Renewable Resource Assessment Project**
Wind Resource >= Power Class 3

Wind Resource
Power Class
3
4
5
6
7

This map combines high (0.4 - 1 km) and low
(25 km) resolution wind resource assessments
from NREL and other sources. In areas where
non-NREL high resolution maps were available,
the higher value for each grid cell was used.
The low resolution values may apply to as little
as 5% of the grid cell.

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

21-MAR-2002 1.3.4

Map supplied by the National Renewable Energy Laboratory

**A4**

BLM_0029368

Assessing the Potential for Renewable Energy on Public Lands



Map supplied by the National Renewable Energy Laboratory

**A5**

BLM_0029369

Assessing the Potential for Renewable Energy on Public Lands

# Appendix B

# Detailed Description
# and Data Sets for GIS Maps

BLM_0029370

## Resource Data

**Solar**

NREL has developed a national solar resource assessment for the United States at a resolution of approximately 40 km by 40 km. The data are updated periodically; the most recent update was in the summer of 2001 and represents 14 collector configurations. The CSP analysis utilized direct normal data, which represent concentrating systems that track the sun throughout the day, such as trough collectors or dishes. The PV analysis used data from the flat-plate collector type, typical for a PV panel oriented due south at an angle from horizontal equal to the latitude of the location of the collector.

The data were developed from the Climatological Solar Radiation (CSR) Model, developed by NREL for DOE. This model uses information on cloud cover, atmospheric water vapor and trace gases, and the amount of aerosols in the atmosphere to calculate the monthly average daily total insolation (sun and sky) falling on a horizontal surface. Where possible, existing ground measurement stations were used to validate the model. Nevertheless, uncertainty is associated with the meteorological input to the model, since some of the input parameters are not available at a 40 km resolution. As a result, the modeled values are believed to be accurate to approximately 10% of a true measured value within the grid cell.

Because of terrain effects and other microclimate influences, local cloud cover can vary significantly even within a single grid cell. Furthermore, the uncertainty of the modeled estimates increases with distance from reliable measurement sources and with the complexity of the terrain. Concentrating solar collectors are much more sensitive to solar resource characteristics than flat-plate collectors, so these sources of uncertainty are more important to concentrator applications.

**Wind**

A compilation of data from many different sources was used in this analysis. Updated resource assessments of Idaho, Montana, Oregon, and Washington were produced by TrueWind Solutions in 2000 and 2001. The assessments were produced using the Mesomap system and historical weather data, and were validated with available surface data by NREL and wind energy meteorological consultants. The accuracy of the updated wind resource assessment is generally within 20% for wind power density for 80% of the areas. For more information, see http://www.windpowermaps.org.

An updated assessment of Colorado was produced in 1995 for the Colorado Governor's Office of Energy Conservation "Study to Identify and Characterize Sites for Utility Wind Farm Development in Colorado." This study was conducted by Michael Brower of RLA Consulting in Bothell, WA. The data are available from the Colorado Renewable Resource Database (http://www.coloradoenergy.org/corrd). The resolution of the data is 1 x 1 km, and the 1987 U.S. wind resource assessment was used as a base. These data have not been validated by NREL.

An updated assessment of New Mexico was produced by Brower & Co., Inc., for the New Mexico Energy, Minerals and Natural Resources Department in 1996. The original data produced for the assessment were for 50-m wind speeds. The resolution of the data is 1 x 1 km, and the 1987 U.S. wind resource assessment was used as a base. These data have not been validated by NREL. The data were converted to 50-m wind power density using elevation as a proxy for air density, assuming a wind distribution Weibull k = 2.0.

BLM_0029371

A *Wind Energy Resource Atlas of the United States* was produced in 1987 by staff at the Pacific Northwest National Laboratory. The resolution of the gridded contiguous U.S. wind resource data is 1/4 degree of latitude by 1/3 degree of longitude. Each grid cell was assigned a wind power class, which applies only to sites within the grid cell that are well exposed to the wind. Depending on the terrain type within the grid cell, the portion of the grid cell that is exposed could vary from as little as 5% (ridge crests) to 95% (flat plains). The values were assigned by integrating several subjective factors: quantitative wind data, qualitative indicators of wind speed or power, the characteristics of exposed sites in various terrains, and familiarity with the meteorology, climatology, and topography of the region. As a result, the degree of certainty with which the wind power class can be specified depended on the abundance and quality of wind data, the complexity of the terrain, and the geographical variability of the resource. For more information, see http://rredc.nrel.gov/wind/pubs/atlas.

*Reference:*
Elliott, D.L., C.G. Holladay, W.R. Barchet, H.P. Foote, and W.F. Sandusky. 1987. *Wind Energy Resource Atlas of the United States.* Golden, CO: Solar Energy Research Institute.

**Biomass**

A Normalized Difference Vegetation Index (NDVI) has been shown to be highly correlated to surface vegetation. NDVI is derived from the visible and near-infrared channel reflectances. This data set is produced as part of the NOAA/NASA Pathfinder Advanced Very High Resolution Radiometers Land program. It contains global monthly composites of NDVI at a 1 x 1 degree resolution, resampled to 8 x 8 km pixels in the output product.

NDVI is derived using the following formula:

$$\frac{\text{near-infrared reflectance - visible reflectance}}{\text{near-infrared reflectance + visible reflectance}}$$

The visible channel (0.58 to 0.68 µm) is in a part of the spectrum where chlorophyll causes considerable absorption of incoming radiation. The near-infrared channel (0.73 to 1.10 µm) is in a spectral region where spongy mesophyll leaf structure leads to considerable reflectance.

A few validation checks have been built into the Pathfinder data processing (quality control flags). Automated quality checks are made for consistency in fields such as date and satellite or scan times. Geophysical values are checked to see that they are within a reasonable range. Certain anomalies may exist in the data set because of conditions inherent in the input data—for example, missing scan lines or orbits, incorrect or incomplete calibration coefficients—and many of these data are flagged with the quality control indicator.

The authors wish to thank the Distributed Active Archive Center (Code 902.2) at the Goddard Space Flight Center, Greenbelt, MD 20771, for producing the data in their present form and distributing them. The original data products were produced under the NOAA/NASA Pathfinder program, by a processing team headed by Mary James of the Goddard Global Change Data Center. The science algorithms were established by the AVHRR Land Science Working Group, chaired by Dr. John Townshend of the University of Maryland. The Goddard Center's contributions to these activities were sponsored by NASA's "Mission to Planet Earth" program.

BLM_0029372

**Geothermal**

Data from BLM offices are available as legal descriptions detailing township, range, section, and aliquot portion.  Two offices (California and Nevada) provided digital data depicting the boundaries down to the aliquot portion.  Publicly available data were used to geo-code data from the other four states, which could only be done to the township range level.  Therefore, a square that is shown on the map for Oregon, Idaho, Utah, and New Mexico might represent less than one section (1/36[th]) of the square shown.

Additional data on current and expired BLM geothermal lease locations and a national geothermal resource potential assessment produced by Southern Methodist University Geothermal Laboratory were used to provide assurance that the selected areas were generally perceived as high-potential areas.

**Other GIS Data Used in the Analysis**

Communities at Risk:  Information is available from the GeoMAC Web site on the location of communities at risk of fire hazards.

Roads:  The roads data used represent major roads in the western United States, such as interstates, U.S. and state highways, and other major thoroughfares.  The data were produced by Geographic Data Technology (2000) and are distributed by Environmental Systems Research Institute, Inc.

Topography:  30 arc second digital elevation model (DEM) data from the U.S. Geological Survey were used to calculate percent slope.  The DEM has a nominal resolution of 1 km$^2$.

Populated Place Areas: U.S. populated place areas are represented in this data set, as identified by the U.S. Census Bureau.  Population statistics are based on the 1990 Census.  The data are distributed by Environmental Systems Research Institute, Inc.

Transmission Lines:  The transmission line data used are licensed by NREL from POWERmap, ©2002 Platts, A Division of the McGraw-Hill Companies.  The data are generally complete down to 100 kilovolts (kV) and contain lower voltage lines in selected areas.  The transmission lines have a nominal accuracy of 1 mile.

BLM_0029373

Assessing the Potential for Renewable Energy on Public Lands

# Appendix C

# Intermediate and Analysis Results
# GIS Maps

BLM_0029374

Assessing the Potential for Renewable Energy on Public Lands



**C2**

BLM_0029375



C3

BLM_0029376



BLM_0029377



**CSP: BLM Renewable Resource Assessment Project**
Compatable BLM Lands at Least 40 Acres

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

21-MAR-2002 1.2.1

Map supplied by the National Renewable Energy Laboratory

**C5**

BLM_0029378

*Assessing the Potential for Renewable Energy on Public Lands*



C6

BLM_0029379

Assessing the Potential for Renewable Energy on Public Lands



BLM_0029380

Case No. 1:20-cv-02484-MSK   Document 35-1   filed 04/27/21   USDC Colorado   pg 72 of 319

Assessing the Potential for Renewable Energy on Public Lands



PV: BLM Renewable Resource Assessment Project
Within 50 Miles of Transmission Lines between 115 and 345 kV

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

26-MAR-2002 1.4.3

Map supplied by the National Renewable Energy Laboratory

BLM_0029381



PV: BLM Renewable Resource Assessment Project
Compatable BLM Lands

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

28-MAR-2003 1.4.3

Map supplied by the National Renewable Energy Laboratory

**C9**

BLM_0029382

*Assessing the Potential for Renewable Energy on Public Lands*



C10

BLM_0029383



**C11**

BLM_0029384



**C12**

BLM_0029385

Assessing the Potential for Renewable Energy on Public Lands



Map supplied by the National Renewable Energy Laboratory

**C13**

BLM_0029386



**Wind: BLM Renewable Resource Assessment Project**
Compatable BLM Lands

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

21-MAR-2002 1.3.1

Map supplied by the National Renewable Energy Laboratory

**C14**

BLM_0029387

*Assessing the Potential for Renewable Energy on Public Lands*



C15

BLM_0029388



**BLM Renewable Resource Assessment Project**

DOI Bureau of Indian Affairs, BLM, and USDA Forest Service Lands:
Wind Resource Analysis Results

**Wind Resource**
Power Class

- 3
- 4
- 5
- 6
- 7

The lands shown meet the following criteria:
1) Wind resource >= power class 3
2) Within 25 miles of transmission 69-345 kv
3) Within 50 miles of major road
4) DOI Bureau of Indian Affairs, BLM or USDA Forest Service owned lands
5) BLM and USDA Forest Service compatible land use

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

12-APR-2002 1.3.9

Map supplied by the National Renewable Energy Laboratory

**C16**

BLM_0029389



**C17**

BLM_0029390



Biomass:  BLM Renewable Resource Assessment Project
Within 50 Miles of a Populated Place >= 100 People

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

Map supplied by the National Renewable Energy Laboratory

**C18**

BLM_0029391

*Assessing the Potential for Renewable Energy on Public Lands*



C19

*Assessing the Potential for Renewable Energy on Public Lands*



Map supplied by the National Renewable Energy Laboratory

**C20**

BLM_0029393



**C21**

BLM_0029394

Assessing the Potential for Renewable Energy on Public Lands



The lands shown meet the following criteria:
1) NDVI >= 0.4 at least 4 months between April and September 2000
2) Terrain slope <= 12%
3) Within 50 miles of town of 100 people
4) BOI Bureau of Indian Affairs, BLM or USDA Forest Service owned lands
5) BLM and USDA Forest Service compatible land use

Map supplied by the National Renewable Energy Laboratory

**C22**

BLM_0029395



**Biomass: BLM Renewable Resource Assessment Project**

DOI Bureau of Indian Affairs, BLM and USDA Forest Service Lands:
Biomass Analysis Results

Number of Months
with NDVI >= 0.4

4
5
6

The lands shown meet the following criteria:
1) NDVI >= 0.4 at least 4 months
   between April and September 2000
2) Terrain slope <= 12%
3) Within 50 miles of town of 100 people
4) BOI Bureau of Indian Affairs, BLM or
   USDA Forest Service owned lands
5) BLM and USDA Forest Service
   compatible land use

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

12-APR-2002 1.6.11

Map supplied by the National Renewable Energy Laboratory

**C23**

# Appendix D

# Intermediate and "Top-Pick" GIS Maps for Geothermal Field-Based Resource Assessment

BLM_0029397

Geothermal Intermediate Maps          *Assessing the Potential for Renewable Energy on Public Lands*



D2

BLM_0029398

Assessing the Potential for Renewable Energy on Public Lands



**D3**

BLM_0029399

*Assessing the Potential for Renewable Energy on Public Lands*



**D4**

BLM_0029400



BLM_0029401

# Appendix E

# Planning Units with Highest Renewable Energy Potential

## GIS Maps By Technology
## Source for Tables 1a-1e

## Table of All Planning Units
## Listed Alphabetically by State

BLM_0029402



E2

BLM_0029403

Assessing the Potential for Renewable Energy on Public Lands



E3

BLM_0029404



E4

BLM_0029405



**Biomass: BLM Renewable Resource Assessment Project**
25 Highest Potential Planning Units

U.S. Department of the Interior
Bureau of Land Management

U.S. Department of Energy
National Renewable Energy Laboratory

12-APR-2002 18.18

Map supplied by the National Renewable Energy Laboratory

BLM_0029406

*Assessing the Potential for Renewable Energy on Public Lands*



E6

BLM_0029407

This page intentionally left blank.

BLM_0029408

*Assessing the Potential for Renewable Energy on Public Lands*

# TABLE E-1: PLANNING UNITS WITH HIGH POTENTIAL FOR RENEWABLE POWER (listed alphabetically by state)

| Planning Unit | Field Office | CSP | PV | Wind | Biomass | Geo-thermal | State Policies (see Table 3 & Appendix F) |
|---|---|:---:|:---:|:---:|:---:|:---:|---|
| **ARIZONA** | | | | | | | |
| Arizona Strip | Arizona Strip | ● | ● | | ● | | |
| Kingman | Kingman | ● | ● | | | | |
| Phoenix | Phoenix | ● | ● | | ● | | **Highly Favorable** |
| Safford | Safford | ● | ● | ● | ● | | |
| Yuma | Yuma | ● | ● | | | | |
| **CALIFORNIA** | | | | | | | |
| Alturas | Alturas | | | | ● | ● | |
| Barstow | Barstow | ● | ● | ● | | | |
| Bishop | Bishop | | | | | ● | |
| Eagle Lake | Eagle Lake | | | | ● | | |
| El Centro | El Centro | ● | ● | | | ● | |
| Folsom | Folsom | | | | ● | | **Highly Favorable** |
| Needles | Needles | ● | ● | | | | |
| Palm Springs - South Coast | Palm Springs | ● | ● | ● | | | |
| Redding | Redding | | | | ● | | |
| Ridgecrest | Ridgecrest | | ● | ● | | ● | |
| Surprise | Surprise | | | ● | | ● | |
| Ukiah | Ukiah | | | | | ● | |
| **COLORADO** | | | | | | | |
| Grand Junction | Grand Junction | | | ● | | | |
| Kremmling | Kremmling | | | ● | ● | | |
| Little Snake | Little Snake | | | | ● | | **Favorable** |
| Royal Gorge | Royal Gorge | | | ● | ● | | |
| San Juan | San Juan | | | | ● | | |
| **IDAHO** | | | | | | | |
| Emerald Empire | Upper Columbia – Salmon Clearwater | | | ● | | | |
| Owyhee | Lower Snake River | | | ● | | | **Favorable** |
| Snake River | Upper Snake River | | | ● | | | |
| **MONTANA** | | | | | | | |
| Billings | Billings | | | ● | | | |
| Butte | Butte | | | | ● | | |
| Dillon | Dillon | | | ● | ● | | |
| Great Falls | Great Falls | | | ● | | | **Favorable** |
| Lewistown | Lewistown | | | ● | | | |
| Malta | Malta | | | ● | | | |
| Miles City | Miles City | | | ● | | | |
| Missoula | Missoula | | | | ● | | |

E8

BLM_0029409

Assessing the Potential for Renewable Energy on Public Lands

| Planning Unit | Field Office | CSP | PV | Wind | Biomass | Geo-thermal | State Policies (see Table 3 & Appendix F) |
|---|---|---|---|---|---|---|---|
| **NEVADA** | | | | | | | |
| Battle Mountain | Battle Mountain | ● | ● | | | ● | |
| Carson City | Carson City | ● | ● | ● | | ● | |
| Elko | Elko | ● | ● | ● | | ● | **Highly Favorable** |
| Ely | Ely | ● | ● | | | | |
| Las Vegas | Las Vegas | ● | ● | ● | | | |
| Winnemuca | Winnemuca | ● | ● | | | ● | |
| **NEW MEXICO** | | | | | | | |
| Albuquerque | Albuquerque | | ● | ● | ● | | |
| Carlsbad | Carlsbad | ● | ● | | | | |
| Las Cruces | Las Cruces | ● | ● | ● | ● | ● | |
| Farmington | Farmington | ● | | | | | **Favorable** |
| Roswell | Roswell | ● | ● | | | | |
| Socorro | Socorro | ● | ● | | | ● | |
| Taos | Taos | | | | | ● | |
| **OREGON** | | | | | | | |
| Central Oregon | Prineville | | | | ● | | |
| Deschutes | Prineville | | | | ● | ● | |
| Grants Pass | Medford | | | ● | | | |
| Jordan | Vale | ● | | | | | |
| Klamath Falls | Klamath Falls | | | | ● | ● | **Favorable** |
| Lakeview | Lakeview | | | ● | ● | ● | |
| Malheur | Vale | | | | | ● | |
| Mary's Peak | Salem | | | ● | | | |
| McKenzie | Eugene | | | | ● | | |
| Swiftwater | Roseburg | | | | ● | | |
| **UTAH** | | | | | | | |
| Cedar City | Cedar City | ● | ● | | | ● | |
| Fillmore | Fillmore | ● | ● | ● | | ● | **Neutral** |
| Moab | Moab | | | ● | | | |
| Salt Lake | Salt Lake | ● | ● | ● | | | |
| **WASHINGTON** | | | | | | | |
| Wenatchee | Wenatchee | | | ● | ● | ● | **Favorable** |
| **WYOMING** | | | | | | | |
| Rawlins | Rawlins | | | ● | | | **Neutral** |
| Rock Springs | Rock Springs | ● | | ● | | | |

**E9**

# Appendix F

# State Policies and Financial Incentives for Renewable Energy

BLM_0029411

This appendix provides most of the state policies and financial incentives considered applicable to the development of renewable power production facilities on BLM lands.  Some policies were omitted (e.g., residential solar tax credits) as not being directly applicable to this assessment.  After October 2002, readers are encouraged to consult the Database of State Incentives for Renewable Energy (www.dsireusa.org) for the most current state policies and incentives.

## Arizona (Highly Favorable)

### Green Pricing Programs
- APS - Solar Partners
- SRP - EarthWise Energy
- Tucson Electric Power - GreenWatts

### Green Power Aggregation
Scottsdale – Green Power Purchasing

### Generation Disclosure
The Arizona Corporation Commission adopted disclosure provisions as part of its 1996 Retail Electric Competition Rules. Under the disclosure provisions, all retail suppliers of electricity must disclose composition, fuel mix, and emissions characteristics upon request.

### Net Metering
The original Arizona Corporation Commission regulatory decision allowing net metering was made on July 27, 1981. This ruling allows net metering for qualifying facilities (QF) as defined by PURPA.  This ruling applies to QFs of 10 kW or less for Arizona Public Service or 100 kW or less for Tucson Electric Power.

### Renewables Portfolio Standard
Arizona's Environmental Portfolio Standard (EPS) was formally approved by the Arizona Corporation Commission (ACC) in May 2000, and it became operational on March 30, 2001. Under the standard, regulated utilities in the state are required to provide a certain percentage of their electricity from renewable energy. The standard begins with 0.2% renewables for 2001 and increases to 1.1%.

## California (Highly Favorable)

### Solar and Wind Energy Tax Credit
California Governor Gray Davis approved SB 17 on October 8, 2001. The law provides income tax credits for the purchase and installation of solar energy systems. Solar energy systems are defined as photovoltaic or wind-driven systems with a peak generating capacity of up to, but not more than, 200 kW. The credit is equal to 15% of the cost of a system installed after January 1, 2001, and before January 1, 2004, or $4.50 per rated watt of the system, whichever is less. After January 1, 2004, and before January 1, 2006, a credit of 7.5% of the cost of an installed solar energy system will be available. If an installed system is removed from the state within one year, the credit must be repaid to the state.

BLM_0029412

*Assessing the Potential for Renewable Energy on Public Lands*

**Solar Property Tax Exemption**
According to California Revenue and Taxation Code, section 73, active solar energy systems installed between January 1, 1999, and January 1, 2006, are not subject to property taxes.

**Green Pricing Programs**
- Alameda - Clean Future Fund
- Burbank Water & Power - Clean Green Support
- LADWP - Green Power for a Green LA
- Palo Alto Utilities - Future Green Power
- Roseville Electric - Green Energy
- SMUD - Community Solar
- SMUD - Greenergy
- SMUD - PV Pioneers I
- Turlock Irrigation District - Green Valley Energy

**Green Power Aggregation**
- Santa Barbara

**Generation Disclosure**
California's energy suppliers must disclose to all customers the energy resource mix used in generation. Providers must use a standard label created by the California Energy Commission (CEC), and this information must be provided to end-use customers at least four times per year.

**Net Metering**
California's net metering law requires that all California electric utilities, regulated and unregulated, allow net metering for all customer classes. Bi-directional time-of-use pricing means that net metering customers are entitled to deliver electricity back to the system for the same time-of-use (including real-time) price that they pay for power purchases. Eligible systems are not to exceed 1,000 kW (1 MW) of peak generating capacity. The Los Angeles Department of Water and Power is exempt from the net metering rules.

**Public Benefits Fund**
California set the bar for all other renewable energy funds with the creation of a $540 million fund for renewables in its electric industry restructuring legislation (Assembly Bill 1890) in 1996. The success of that program lead to legislation to extend that funding—at the same annual levels—another 10 years through 2012, creating an additional $1.35 billion in renewables funding. This extended funding was enabled through Assembly Bill 995, which passed in September 2000. The initial funding amount is being collected from 1998 to 2001 from customers of the state's three investor-owned utilities—SDG&E, SCE, and PG&E—which must pay specified amounts each year. The CEC manages the renewables funds.

**State Loan Program**
The California Consumer Power and Conservation Financing Authority (the Power Authority or CPA) offers below-market rate loans to manufacturing companies that use the loan to purchase and install renewable energy systems, energy-efficient equipment, or clean distributed generation systems on their own site(s), or a company that manufactures renewable energy distributed generation systems or components in California. Eligible technologies include photovoltaics, solar thermal electric, fuel cells, small and large wind turbines, biogas, landfill gas, biomass, geothermal electric, solar industrial process heating, and waste heat recovery. Funding for the program includes $30 million of tax-exempt industrial development bonds awarded in March

BLM_0029413

2002, and $3-$8 million scheduled to be awarded in November 2002. The minimum loan amount is $500,000, and the maximum amount is $10 million per applicant, with a limit of $40 million to any one company.

## Colorado (Favorable)

### Green Pricing Programs
- Colorado Springs - Green Power Program
- Estes Park - Wind Power Program
- Fort Collins - Wind Power Program
- Holy Cross Electric - Wind Power Pioneers
- Longmont - Wind Program
- Loveland - Wind Energy Program
- Xcel Energy - Renewable Energy Trust
- Xcel Energy - Solarsource
- Xcel Energy - Windsource
- Yampa Valley Electric Association - Electricity from the Wind

### Green Power Aggregation
- Aspen
- Boulder
- Denver

### Generation Disclosure
Colorado is one of several states to require disclosure without having restructured its electricity market. In January 1999, the Colorado Public Utility Commission (PUC) adopted regulations requiring the state's investor-owned utilities (IOUs) to disclose information regarding their fuel mix to retail customers. Utilities with a total system load of more than 100 MW are required to provide this information as a bill insert or as a separate mailing twice annually, beginning October 1999. The PUC provided a suggested format for the disclosure. Fuel mix percentages are to be based on the power supply mix for the previous calendar year. Supporting documentation concerning the calculations used to determine the power supply mix percentages must be submitted to the PUC for approval.

### Net Metering Rules
- Aspen Electric/Holy Cross Electric
- Fort Collins Utilities
- Xcel Energy

## Idaho (Neutral)

### Green Pricing Program
Avista Utilities - Buck-A-Block for Renewable Energy
Idaho Power - Green Power Program

BLM_0029414

### Income Tax Deduction

Idaho statute 63-3022-C allows taxpayers an income tax deduction for the entire cost (100%) up to a maximum of $20,000 of the cost of a solar, wind, or geothermal device used for heating or electricity generation. Taxpayers can apply for a 40% deduction in the year in which the system is installed and can also deduct 20% of the cost for three years thereafter. The maximum deduction in any one year is $5,000.

### Low-Interest Loans for Renewable Energy Resources

This low-interest loan program, administered by the Energy Division of the Idaho Department of Water Resources, makes funds available at a 4% interest rate for active solar, photovoltaic, wind, geothermal, hydropower, and biomass energy projects. The program also makes loans for energy conservation projects. Residential loans are available from $1,000 to $10,000. In commercial and industrial sectors there is no minimum loan amount, but there is a maximum cap of $100,000. Loans are repaid in five years or less.

### Net Metering

There is no net metering law in Idaho. However, several utilities offer net-metering tariffs approved by the Idaho Public Utilities Commission. Idaho Power Company has offered net metering tariff (Schedule 84) for residential and small commercial customers. Generation facilities that qualify under this tariff include solar, wind, biomass, hydropower, and fuel cells, and they must be rated at 25 kW or less. Avista Utilities also offers a net-metering option under Schedule 62F. This tariff is available to all customer classes in Idaho with an electric generating facility that uses solar, wind, or hydropower of not more than 25 kW.

## Montana (Favorable)

### Commercial or Net-Metering System Investment Credit

This statute allows a 35% tax credit for an individual, partnership, or corporation that makes an investment of $5,000 or more in a wind electricity generating system or facilities that manufacture wind energy equipment. Eligible property includes wind energy system equipment, transmission lines, and equipment used in the manufacture of wind energy devices. The credit must be taken the year the equipment is placed in service; however, excess credit may be carried over for the following 7 years. Certain rules apply when using other state or federal financial incentives. This tax credit broadens the previous tax credit—which applied only to wind systems—to alternative energy systems. Alternative energy systems include solar, wind, geothermal, conversion of biomass, fuel cells that do not require hydrocarbon fuel, small hydroelectric generators producing less than 1 MW, or methane from solid waste.

### Green Pricing Program

Flathead EC - Environmentally Friendly Power

### Generation Disclosure

Montana's 1997 restructuring law called for the disclosure of fuel mix and environmental impact information. Regulations proposed by the Montana Department of Public Service Regulation on November 8, 1999, have yet to be implemented.

### Mandatory Green Power Option

Montana has passed legislation requiring regulated electric utilities to offer their customers an opportunity to purchase "a separately marketed product composed of power from renewable resources," defined as biomass, wind, solar, or geothermal resources. The legislation, HB 474, allows the product to be priced differently

BLM_0029415

from the standard electricity product. The law also extends the state's universal system benefits program funding through 2005.

## Net Metering

Montana's net metering law, enacted July 1, 1999, allows net metering for customers with solar, wind, and hydropower systems of 50 kW or less that are intended primarily to offset part or all of the customer's requirements for electricity. All customer classes are eligible, and no limit on enrollment or statewide installed capacity is specified.

## Property Tax Exemption

This statute exempts from property taxation the value added by a qualified renewable energy source. Qualified equipment includes active and passive solar, wind, hydropower, solid waste, and the decomposition of organic wastes. Such equipment is exempt from taxation for a period of 10 years following installation. The value-added exemption applies to systems with up to $20,000 in value in the case of a single-family residential dwelling and $100,000 in the case of a multifamily residential dwelling or a nonresidential structure.

## System Benefits Fund

As part of its 1997 restructuring legislation, Montana established its Universal System Benefits Program (USBP). Beginning January 1, 1999, all electricity suppliers began contributing 2.4% of their 1995 revenues annually to the USBP. This is an amount equivalent to $14.9 million annually, collected at a rate of 1.1 mills/kWh. The funds support energy efficiency, renewable energy resources, low-income energy assistance, and renewable energy R&D. Montana's USBP is effective until December 31, 2005.

# Nevada (Highly Favorable)

## Property Tax Exemptions

This statute states that any value added by a qualified renewable energy source shall be subtracted from the assessed value of any residential, commercial, or industrial building for property tax purposes. Qualified equipment includes solar, wind, geothermal, solid waste converters, and hydropower systems. This exemption applies for all years following installation.

Enacted in 1993, and most recently revised by S.B. 227 on June 1, 2001, this statute allows a property tax exemption for any business that (1) uses a process where at least 50% of the material or product is recycled, or (2) includes a facility for the generation of electricity from recycled material, whose primary purpose is the conservation of energy or the substitution of other sources of energy for fossil sources of energy. The exemption applies to 50% of the business property—personal and real—for up to 10 years.

Property tax exemptions are managed by the Nevada Commission on Economic Development and include capital investment requirements and wage stipulations.

## Green Pricing

In October 1997, Nevada Power Company applied to the Public Utilities Commission of Nevada for approval of its green pricing program. Today, Nevada Power Company, a subsidiary of Sierra Pacific Resources, and the Desert Research Institute's Research Foundation, a fund-raising and public outreach arm of the Desert Research Institute, are partners in the GreenPower program. Soon, the GreenPower program will be transferred to the Desert Research Institute's Research Foundation, enabling participants to take a tax

BLM_0029416

deduction for past donations in this tax year, or receive a refund check. Nevada Power Company will continue to collect customer contributions through the electric bill statements.

### Generation Disclosure

Beginning January 2002, each electric utility must disclose certain information to its customers, according to regulations established by the Nevada Public Service Commission. The disclosure must be in a standard format and provided in bill inserts twice a year, as well as on utility Web sites. The disclosure must include the average mix of fuel sources used to create electricity, average emissions, customer service information, and information on low-income energy programs.

### Net Metering

This law allows net metering for customers with solar and wind generation units of 10 kW or less. Utilities are required to supply a two-way meter to measure flow in both directions, and the utilities are prohibited from adding any additional charges to the bills of customers participating in net metering. Furthermore, utilities cannot place any additional standards or requirements on customer-generators beyond the requirements established by the National Electric Code and Underwriters Laboratories. Utilities are not required to pay for any net excess generation by the customer-generator. Customers have the option of annualizing the net metering calculation by having net excess generation at the end of a month credited toward the following month's bill.

### Renewables Portfolio Standard

As part of its 1997 restructuring legislation, the Nevada legislature established a renewable energy portfolio standard. Under the standard, utilities must derive a minimum percentage of the total electricity they sell from renewable energy resources. In 2001, the legislature revised the minimum amounts to increase by 2% every two years, starting with a 5% renewable energy requirement in 2003 and achieving a 15% requirement by 2013 and each year thereafter. Not less than 5% of the renewable energy must be generated from solar renewable energy systems.

## New Mexico (Favorable)

### Electric Generation Facilities Tax Incentives

H.B. 143 amends the Industrial Revenue Bond Act and the County Industrial Revenue Bond Act to allow "electricity generation facilities that do not provide retail electric services to customer" to qualify for Industrial Revenue Bonds under the definition of allowed projects.  This legislation also amends the Uniform Division of Income for Tax Purposes Act and the Investment Credit Act to include "electricity from generation facilities that do not provide retail electric services to New Mexico customers" under the definition of manufacturing.  The bill, effective May 15, 2002, authorizes the cost of certain wind energy equipment to be deducted from gross receipts for tax purposes, thereby providing a significant incentive for wind power development.

### Generation Disclosure

As part of New Mexico's Electric Utility Industry Restructuring Act of 1999, the legislature requires the NM Public Regulation Commission (PRC) to "promulgate rules governing competitive electric suppliers for the protection of customers, including required disclosure to a potential customer of unbundled prices, generation sources and fuel mix, and associated emissions." In May 2000, the PRC issued proposed rules that would require environmental disclosure in a standard format at least once a year. The proposed rules would require information on fuel mix to be compared to the national and regional averages, based on data available for the most recent calendar year, except in some circumstances in which forecasted data could be used.

F7

BLM_0029417

## Net Metering

New Mexico Public Regulation Commission Rule 571 differs from the NM Administrative Code Title 17.10.571. Rule 571 applies to cogeneration facilities and small power producers with systems of 10 kW or less, and details a net-metering calculation that credits net energy generation to the consumer from month to month. The excess credit is zeroed out annually. The administrative code offers a second option for calculating the net energy generation credit, which essentially pays the customer the utility's avoided cost, "crediting or paying the customer for the net energy supplied to the utility at the utility's energy rate pursuant to NMPRC Rule 570.17." The utility gets to choose which method it wants to use.

## Renewable Energy Production Tax Credit

S.B. 187, effective May 15, 2002, provides a tax credit against the corporate income tax of one cent per kilowatt-hour for companies that generate electricity from qualifying wind or solar power facilities. The maximum benefit to any corporate taxpayer is $4 million per year, applicable only to the first 400,000 MWh of electricity in each of 10 consecutive years. To qualify, an energy generator must use a zero-emissions generation technology and have capacity of at least 20 MW.  The total incentive program cost is capped at $8 million per year  (800,000 MWh per year). If the amount of the tax credit claimed exceeds the taxpayer's corporate income tax liability, the excess may be carried forward for up to five consecutive taxable years. The provisions of this statute apply to taxable years beginning on or after July 1, 2002.


## Oregon (Favorable)

## Business Tax Credit

Oregon's Business Energy Tax Credit is for investments in energy conservation, recycling, renewable energy resources, or less-polluting transportation fuels. Any Oregon business may qualify. As examples, projects may be in manufacturing plants, stores, offices, apartment buildings, farms, and transportation.

The 35% tax credit is taken over five years: 10% the first and second years and 5% for each year thereafter. Any unused credit can be carried forward up to eight years. Under the "pass-through" option, IOUs and other companies can claim the credit and give customers a lump-sum cash payment of about 28%—the net present value—of their project costs.

## Green Pricing Programs
- Ashland - Solar Pioneer Program
- Eugene W&EB - Windpower
- Pacific Power - Blue Sky
- PGE - Clean Wind Power

## Green Power Purchasing

In 1995, before the deregulation of the electric market in Oregon, the City of Portland signed an innovative five-year contract with Portland General Electric (**PGE**) that allowed direct purchase of renewable resources. The contract allowed the city to take advantage of wholesale rates for a 10 MW minimum purchase and to designate 5% of that purchase to be from wind power.

## Generation Disclosure

Under Oregon's 1999 electric utility restructuring legislation, the state's two largest utilities are required to disclose their fuel mix and emissions. Beginning March 1, 2002, disclosure must be supplied using a format

BLM_0029418

*Assessing the Potential for Renewable Energy on Public Lands*

prescribed by the Oregon Public Utility Commission. Power source and environmental impact information must be provided to all residential consumers at least quarterly.

## Net Metering
Utilities offer net metering for all customers for solar, wind, and fuel cell systems that are 25 kW or less. The utility values the excess power generated by the customer at its avoided cost.

## Public Benefits Fund
Oregon's 1999 utility restructuring legislation included a 3% public benefits charge to be paid by all Portland General Electric and Pacific Power customers. A portion of those funds will provide $8 million to $10 million per year for 10 years toward the above-market cost of new renewable resource generation. Large electricity customers may invest most of their public benefits charges in their own facilities. For renewable resources, they may invest in green power, renewable energy certificates, or on-site generation.

## State Loan Program
The State Loan Program provides up to $20 million per project in low-interest financing for investments in conservation, recycling, alternative fuels, and renewable resources. Individuals, businesses, governments, nonprofits, and tribes are eligible. Funds come from the sale of state general obligation bonds, and borrowers pay the full cost of their loans. Terms range from 5 to 20 years. The program has provided more than $175 million in financing for renewable energy programs to date.

# Utah (Neutral)

## Renewable Energy Tax Credit
This corporate income tax credit for renewable energy systems applies to 10% of the cost of installation of a system, up to $50,000. Eligible technologies include active and passive solar systems, photovoltaics, biomass, hydropower, and wind. For residential buildings owned by the business, the credit is 25% of the cost of installation of a system up to a maximum credit of $2,000 per system. For commercial systems, the credit is 10% of the cost of installation up to $50,000. This tax credit expires on December 31, 2006.

## Green Pricing Program
Utah Power - Blue Sky

## Green Power Aggregation
In July 2002, Salt Lake City became the largest purchaser of wind power in the state of Utah. In an agreement with Utah Power, the City will purchase 350 blocks (or 35,000 kWh) of Blue Sky wind energy each month for the historic City and County Building. This action is consistent with the Salt Lake City Green program and the city's Local Climate Action Plan.

# Washington (Favorable)

## Green Pricing Programs
- Avista Utilities - Buck-A-Block for Renewable Energy
- Benton County PUD - Green Power Program
- Chelan County PUD - Sustainable Natural Alternative Power (SNAP)
- Clark County Utilities - Green Lights
- Orcas Power & Light - Green Power

**F9**

BLM_0029419

- Pacific Power - Blue Sky
- Puget Sound Energy - Green Power Program
- Seattle City Light - Green Power Program
- Snohomish County PUD - Planet Power
- Tacoma - EverGreen Options

### Generation Disclosure

Beginning in May 2001, retail electricity suppliers in Washington must provide a disclosure label in a standard format to their retail customers at least semiannually.  Small utilities and mutual light and power companies must provide the disclosure label annually unless they market a "specific electric product new to that utility."

### Mandatory Green Power Option

On May 8, 2001, the Governor signed EHB 2247, which requires investor-owned and publicly owned utilities to offer customers the option to purchase power generated from renewable sources, defined as power produced by wind, solar, geothermal, landfill gas, wave or tidal action, wastewater treatment gas, some biomass, and "qualified hydropower" that is fish-friendly.

### Net Metering

Washington's net-metering law, enacted March 1998, allows net metering for customers with solar, wind, and hydropower systems of 25 kW or less that are intended primarily to offset part or all of the customer's requirements for electricity.  All customer classes are eligible for enrollment. Enrollment is limited to a statewide installed generating capacity of 0.1% of the utility's 1996 peak demand.

### Sales Tax Exemption

On May 8, 2001, the Governor of Washington signed legislation, H.B. 1859, expanding the sales and use tax exemption for solar, wind, and landfill gas electric generating facilities to include fuel cells. In addition, the exemption now applies to smaller systems—those that have a generating capacity of at least 200 W rather than at least 200 kW, as required previously. This tax exemption takes effect July 1, 2001.


## Wyoming (Neutral)

### Green Pricing Program

Pacific Power - Blue Sky

### Net Metering

Wyoming has enacted its net metering law, which will take effect July 1, 2001. House Bill 195 was passed by the House and Senate of the Wyoming legislature and signed by the Governor on February 22, 2001. The law applies to solar, wind, and hydropower systems up to 25 kW. Systems must meet IEEE and UL standards and cannot be subject to additional interconnection requirements, except that system owners must install a manual, lockable external disconnect.

**F10**

BLM_0029420

Assessing the Potential for Renewable Energy on Public Lands

# Appendix G

# References

BLM_0029421

Agbu, P.A., and M.E. James. 1994. The NOAA/NASA Pathfinder AVHRR Land Data Set User's Manual. Goddard Distributed Active Archive Center. Greenbelt, MD: NASA Goddard Space Flight Center.

Blackwell, D.  2002. Personal communication of data. Dallas: Southern Methodist University (SMU) (www.smu.edu/geothermal/geothermal_resources).

Farhar, B.C., and D. Heimiller. 2002. *Opportunities for Near-Term Geothermal Development on Public Lands in the Western United States*. NREL/TP-550-32581. October. 65 pp.

George, R, and E. Maxwell. 1999. "High-Resolution Maps of Solar Collector Performance Using a Climatological Solar Radiation Model." *Proceedings of the 1999 Annual Conference*, American Solar Energy Society, Portland, ME.

Elliott, D.L., C.G. Holladay, W.R. Barchet, H.P. Foote, and W.F. Sandusky. 1987. *Wind Energy Resource Atlas of the United States*. Golden, CO: Solar Energy Research Institute.

Maxwell, E., R. George, and S. Wilcox. 1998. "A Climatological Solar Radiation Model." *Proceedings of the 1998 Annual Conference*, American Solar Energy Society, Albuquerque NM.

Muffler, L.J.P. (Ed.). 1979.  *Assessment of Geothermal Resource of the United States*. Geological Survey Circular 790. Washington, DC: U.S. Department of the Interior, U.S. Bureau of Land Management. 162 pp.

U.S. Bureau of Land Management. 2002.  Personal communication with data from S. Hagerty and S. Santillan concerning geothermal leases on BLM lands. Sacramento, CA: U.S. Bureau of Land Management.

BLM_0029422

# Appendix H

# BLM, DOE, DOE National Laboratory Contacts

BLM_0029423

Assessing the Potential for Renewable Energy on Public Lands

## Bureau of Land Management (BLM)

| Name | Office | Phone# | e-mail address |
|------|--------|--------|----------------|
| Lee Otteni | Headquarters, Renewable Energy Program Manager | 505-599-0981 | Lee_Otteni@blm.gov |
| Mike Kirby | National Science & Technology Center, Associate Director | 303-236-6491 | Mike_Kirby@blm.gov |
| Paul Dunlevy | Headquarters, Geothermal Program Lead | 202-452-7707 | Paul_Dunlevy@blm.gov |
| Mary Beth Stultz | National Science & Technology Center | 303-236-0100 | Mary_Beth_Stultz@blm.gov |

## Department of Energy (DOE)

| Name | Office | Phone# | e-mail address |
|------|--------|--------|----------------|
| Beth Shearer | Federal Energy Management Program | 202-586-5772 | Elizabeth.Shearer@ee.doe.gov |
| Anne Crawley | Federal Energy Management Program | 202-586-1505 | Anne.Crawley@ee.doe.gov |
| Peter Goldman | Program Manager, Wind & Hydropower | 202-586-1776 | Peter.Goldman@ee.doe.gov |
| Susan Norwood | Technical Coordinator, Geopowering the West Program | 202-586-4779 | Susan.Norwood@ee.doe.gov |

## National Renewable Energy Laboratory (NREL)

| Name | Office | Phone# | e-mail address |
|------|--------|--------|----------------|
| Doug Dahle | Energy & Environmental Applications Office Federal Energy Management Program | 303-384-7513 | Douglas_dahle@nrel.gov |
| Donna Heimiller | Distributed Energy Resources Center Graphic Information System Expert | 303-384-7098 or 303-274-4661 | Donna_heimiller@nrel.gov |
| Dave Renne' | Distributed Energy Resources Center | 303-275-4648 | Dave_renne'@nrel.gov |
| Brandon Owens | Energy Analysis Office (at NREL til 5/02) RDI/Platts Research and Consulting | 720-548-5554 | Brandon.Owens@platts.com |
| Ed Cannon | National Wind Technology Center | 303-384-6920 | Ed_cannon@nrel.gov |
| Larry Flowers | National Wind Technology Center | 303-384-6910 | Lawrence.flowers@nrel.gov |
| Brian Parsons | National Wind Technology Center | 303-384-6958 | Brian_parsons@nrel.gov |
| Mark Mehos | Building and Thermal Systems Center | 303-384-7458 | Mark_mehos@nrel.gov |
| Hank Price | Building and Thermal Systems Center | 303-384-7437 | Henry_price@nrel.gov |
| John Thornton | National Center for Photovoltaics | 303-384-6469 | John_thornton@nrel.gov |
| Byron Stafford | National Center for Photovoltaics | 303-384-6426 | Byron_stafford@nrel.gov |
| Helena Chum | National Bioenergy Center | 303-275-2949 | Helena_chum@nrel.gov |
| Ralph Overend | National Bioenergy Center | 303-275-4450 | Ralph_overend@nrel.gov |
| Rich Bain | National Bioenergy Center | 303-275-2946 | Richard_bain@nrel.gov |
| Kevin Craig | National Bioenergy Center | 303-275-2931 | Kevin_craig@nrel.gov |
| Barbara Farhar | Building and Thermal Systems Center | 303-384-7367 | Barbara_Farhar@nrel.gov |
| Gerry Nix | Building and Thermal Systems Center | 303-384-7566 | Gerry_nix@nrel.gov |
| Chuck Kutscher | Building and Thermal Systems Center | 303-384-7521 | Chuck_kutscher@nrel.gov |

## Idaho National Energy and Environmental Laboratory (INEEL)

| Name | Office | Phone# | e-mail address |
|------|--------|--------|----------------|
| Joel Rennert | INEEL Geothermal Program | 208-526-9824 | rennerjl@inel.gov |

## Oak Ridge National Laboratory (ORNL)

| Name | Office | Phone# | e-mail address |
|------|--------|--------|----------------|
| Lynn Wright | Environmental Sciences Division | 865-574-7378 | Wrightll@ornl.gov |
| Mike Sale | Environmental Sciences Division | 865-574-7305 | Salemj@ornl.gov |

**H2**

BLM_0029424

# REPORT DOCUMENTATION PAGE

*Form Approved*
*OMB NO. 0704-0188*

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503.

| 1. AGENCY USE ONLY (Leave blank) | 2. REPORT DATE February 2003 | 3. REPORT TYPE AND DATES COVERED Technical Report: Special report on assessment of renewable energy resources |
|---|---|---|

**4. TITLE AND SUBTITLE**
Assessing the Potential for Renewable Energy on Public Lands

**5. FUNDING NUMBERS**
FE03.2023

**6. AUTHOR(S)**
D. Dahle, M. Kirby, D. Heimiller, B. Farhar, and B. Owens

**7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES)**
National Renewable Energy Laboratory
1617 Cole Blvd.
Golden, CO 80401-3393

U.S. Department of the Interior
Bureau of Land Management
1849 C St NW
Washington, DC 20240

**8. PERFORMING ORGANIZATION REPORT NUMBER**
NREL/TP-710-33530

**9. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES)**
U.S. Department of Energy
Energy Efficiency and Renewable Energy

**10. SPONSORING/MONITORING AGENCY REPORT NUMBER**
DOE/GO-102003-1704

**11. SUPPLEMENTARY NOTES**

**12a. DISTRIBUTION/AVAILABILITY STATEMENT**
National Technical Information Service
U.S. Department of Commerce
5285 Port Royal Road
Springfield, VA 22161

**12b. DISTRIBUTION CODE**

**13. ABSTRACT** *(Maximum 200 words)*

This report represents an initial activity of the Bureau of Land Management's (BLM) proposed National Energy Policy Implementation Plan: identify and evaluate renewable energy resources on federal lands and any limitations on accessing them. Ultimately, BLM will prioritize land-use planning activities to increase industry's development of renewable energy resources. These resources include solar, biomass, geothermal, water, and wind energy. To accomplish this, BLM and the Department of Energy's National Renewable Energy Laboratory (NREL) established a partnership to conduct an assessment of renewable energy resources on BLM lands in the western United States. The objective of this collaboration was to identify BLM planning units in the western states with the highest potential for private-sector development of renewable energy resources. The assessment resulted in the following findings: (1) 63 BLM planning units in eleven western states have high potential for one or more renewable energy technologies; and (2) 20 BLM planning units in seven western states have high potential for power production from three or more renewable energy sources. This assessment report provides BLM with information needed to prioritize land-use planning activities on the basis of potential for the development of energy from renewable resources.

**14. SUBJECT TERMS**
Solar energy; biomass; geothermal energy; wind energy; federal lands; Bureau of Land Management

**15. NUMBER OF PAGES**

**16. PRICE CODE**

| 17. SECURITY CLASSIFICATION OF REPORT Unclassified | 18. SECURITY CLASSIFICATION OF THIS PAGE Unclassified | 19. SECURITY CLASSIFICATION OF ABSTRACT Unclassified | 20. LIMITATION OF ABSTRACT UL |
|---|---|---|---|

NSN 7540-01-280-5500

Standard Form 298 (Rev. 2-89)
Prescribed by ANSI Std. Z39-18
298-102

BLM_0029425

Assessing the Potential for Renewable Energy on Public Lands

Prepared by the
National Renewable Energy Laboratory
a DOE National Laboratory
and the Bureau of Land Management
for the U.S. Department of Energy
Energy Efficiency and Renewable Energy

DOE/GO-102003-1704
February 2003

PRINTED WITH A RENEWABLE-SOURCE INK ON PAPER CONTAINING AT LEAST 50% WASTEPAPER,
INCLUDING 20% POSTCONSUMER WASTE

BLM_0029426



# Northwest Colorado
# Greater Sage-Grouse
Proposed
Land Use Plan Amendment and
Final Environmental Impact Statement

BLM
USFS

**Volume I: Executive Summary,
Chapters 1, 2, and 3**

US Department of the Interior,
Bureau of Land Management
US Department of Agriculture,
Forest Service
June 2015

BLM_0029427

The Bureau of Land Management's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.

The Forest Service mission is to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations.

BLM/CO/PL-15/010

DOI-BLM-CO-L060-2015-0010-EIS

Cover Photo: Steve Ting

BLM_0029428

# TABLE OF CONTENTS

Chapter                                                                                          Page

## VOLUME I

**ABSTRACT**

**DEAR READER LETTER**

**EXECUTIVE SUMMARY**

**1      INTRODUCTION** ................................................................................................ **1-1**
    1.1       Introduction ........................................................................................... 1-1
        1.1.1      Overview ................................................................................... 1-1
        1.1.2      Partner Agency Involvement.................................................. 1-7
    1.2       Purpose of and Need for the Land Use Plan Amendments ............................ 1-10
    1.3       Description of the Greater Sage-Grouse Planning Area.................................. 1-11
        1.3.1      Overview ................................................................................... 1-11
        1.3.2      Land Uses .................................................................................. 1-20
    1.4       Planning Processes................................................................................. 1-21
        1.4.1      BLM Planning Process............................................................. 1-21
        1.4.2      Forest Service Planning Process............................................. 1-25
        1.4.3      National Greater Sage-Grouse Planning Strategy................ 1-27
    1.5       Scoping and Identification of Issues For Development of Draft Alternatives ............. 1-28
        1.5.1      The Scoping Process................................................................ 1-28
        1.5.2      Issues Identified for Consideration in the Northwest Colorado
                    Greater Sage-Grouse Land Use Plan Amendments ............................ 1-29
    1.6       Planning Criteria ................................................................................... 1-30
    1.7       Laws and Regulations that Apply to the LUPA.................................................. 1-33
    1.8       Relationship to Other Policies, Plans, and Programs ........................................ 1-33
        1.8.1      Programmatic National-Level Environmental Impact Statement
                    Documents ................................................................................ 1-33
        1.8.2      State Plans (Developed by Local Working Groups) ............ 1-34
        1.8.3      County Land Use Plans ............................................................ 1-34
        1.8.4      Other Federal Plans ................................................................. 1-35
        1.8.5      Endangered Species Recovery Plans...................................... 1-35
        1.8.6      Memoranda of Understanding .............................................. 1-35
        1.8.7      Activity Plans and Amendments.............................................. 1-36
        1.8.8      Habitat Management Plans...................................................... 1-36
        1.8.9      Other Greater Sage-grouse-Specific Policies....................... 1-36
    1.9       Description of the Public Comment Process ................................................. 1-37
        1.9.1      Distribution of the Draft Land Use Plan Amendment/Environmental
                    Impact Statement....................................................................... 1-37
        1.9.2      Comment Period and Open House Meetings ...................... 1-37
        1.9.3      Comment Collection and Analysis ......................................... 1-38
    1.10      Changes Between the Draft Land Use Plan Amendment/Environmental Impact
        Statement and the Proposed Land Use Plan Amendment/Final Environmental
        Impact Statement.................................................................................. 1-38

BLM_0029429

1.10.1   Changes to Geographic Information Systems Information...................................1-39
1.10.2   Changes to the Alternatives (Chapter 2) ...........................................................1-39
1.10.3   Changes to Other Chapters and Appendices......................................................1-41

2.   **PROPOSED ACTION AND ALTERNATIVES**..................................................................... **2-1**
2.1   Introduction ..........................................................................................................2-1
2.2   Changes between the Draft Land Use Plan Amendment/ Environmental Impact
Statement and the Proposed Land Use Plan Amendment/ Final Environmental
Impact Statement ..................................................................................................2-2
2.3   Introduction to Draft Alternatives .......................................................................2-4
2.3.1   Components of Alternatives................................................................2-4
2.3.2   Purpose of Alternatives Development ................................................2-5
2.4   Alternative Development Process for the Northwest Colorado Greater
Sage-Grouse Land Use Plan Amendment ............................................................2-5
2.4.1   Develop a Range of Reasonable Alternatives .....................................2-6
2.4.2   Resulting Range of Alternatives in Draft Land Use Plan Amendments/
Environmental Impact Statement........................................................2-7
2.4.3   Selection of and Rationale for Identifying the Preferred Alternative ................2-7
2.5   BLM/Forest Service Resource Programs for Addressing GRSG Threats ....................2-12
2.6   Proposed Plan Amendment...................................................................................2-13
2.6.1   Development of Proposed Land Use Plan Amendments................................2-13
2.6.2   BLM Proposed Land Use Plan Amendment ......................................2-14
2.6.3   Forest Service Proposed Land Use Plan Amendment ........................2-32
2.7   Adaptive Management, Monitoring, and Mitigation ............................................2-42
2.7.1   Adaptive Management Plan..............................................................2-42
2.7.2   Monitoring of the Greater Sage-Grouse Planning Strategy................2-48
2.7.3   Regional Mitigation ........................................................................2-50
2.8   Draft LUPA/EIS Alternatives ...............................................................................2-52
2.8.1   Alternative A (No Action)................................................................2-52
2.8.2   Management Common to Action Alternatives ...................................2-53
2.8.3   Alternative B .................................................................................2-54
2.8.4   Alternative C .................................................................................2-54
2.8.5   Alternative D .................................................................................2-54
2.9   Summary Comparison of Proposed Plan Amendment and Draft Alternatives ...........2-55
2.10   Detailed Description of Alternatives .....................................................................2-57
2.10.1   How to Read Table 2-7 and 2-8 ......................................................2-57
2.11   Alternatives Eliminated from Detailed Analysis .................................................. 2-224
2.11.1   Area of Critical Environmental Concern Proposals Applied to All
Designated Habitat .......................................................................... 2-224
2.11.2   Garfield County Alternative............................................................ 2-224

3.   **AFFECTED ENVIRONMENT** ............................................................................................ **3-1**
3.1   Introduction .......................................................................................................... 3-1
3.1.1   Organization of Chapter 3 ................................................................ 3-2
3.2   Fish and Wildlife..................................................................................................... 3-4
3.2.1   Indicators ........................................................................................ 3-9
3.2.2   Existing Conditions........................................................................... 3-9
3.2.3   Trends ............................................................................................3-22
3.2.4   References .......................................................................................3-30

BLM_0029430

3.3       Special Status Species...................................................................................................3-33
          3.3.1    Existing Conditions......................................................................................3-36
          3.3.2    Trends..........................................................................................................3-68
          3.3.3    References....................................................................................................3-77
3.4       Lands and Realty..........................................................................................................3-81
          3.4.1    Existing Conditions......................................................................................3-81
          3.4.2    Trends..........................................................................................................3-90
          3.4.3    References....................................................................................................3-92
3.5       Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds).........3-92
          3.5.1    Existing Conditions......................................................................................3-93
          3.5.2    Trends ...................................................................................................... 3-104
          3.5.3    References ................................................................................................. 3-107
3.6       Wildland Fire Ecology and Management .................................................................... 3-109
          3.6.1    Existing Conditions ................................................................................... 3-109
          3.6.2    Trends ...................................................................................................... 3-114
          3.6.3    References ................................................................................................. 3-116
3.7       Minerals (Leasable)..................................................................................................... 3-116
          3.7.1    Existing Conditions ................................................................................... 3-120
          3.7.2    Trends ...................................................................................................... 3-130
          3.7.3    References ................................................................................................. 3-132
3.8       Minerals (Locatable).................................................................................................. 3-134
          3.8.1    Existing Conditions ................................................................................... 3-134
          3.8.2    Trends ...................................................................................................... 3-137
          3.8.3    References ................................................................................................. 3-137
3.9       Minerals (Salable) ...................................................................................................... 3-138
          3.9.1    Existing Conditions ................................................................................... 3-138
          3.9.2    Trends ...................................................................................................... 3-140
          3.9.3    References ................................................................................................. 3-141
3.10      Travel Management .................................................................................................... 3-141
          3.10.1   Existing Conditions ................................................................................... 3-142
          3.10.2   Trends ...................................................................................................... 3-148
          3.10.3   References ................................................................................................. 3-149
3.11      Recreation .................................................................................................................. 3-149
          3.11.1   Existing Conditions ................................................................................... 3-151
          3.11.2   Trends ...................................................................................................... 3-156
          3.11.3   References ................................................................................................. 3-158
3.12      Range Management..................................................................................................... 3-159
          3.12.1   Existing Conditions ................................................................................... 3-161
          3.12.2   Trends ...................................................................................................... 3-166
          3.12.3   References ................................................................................................. 3-167
3.13      Wild Horse Management ............................................................................................ 3-167
          3.13.1   Existing Conditions ................................................................................... 3-168
          3.13.2   Trends ...................................................................................................... 3-170
          3.13.3   References ................................................................................................. 3-170
3.14      Special Designations .................................................................................................. 3-170
          3.14.1   Existing Conditions ................................................................................... 3-173
          3.14.2   Trends ...................................................................................................... 3-184
          3.14.3   References ................................................................................................. 3-185
3.15      Water Resources ....................................................................................................... 3-186
          3.15.1   Existing Conditions ................................................................................... 3-187

BLM_0029431

|       | 3.15.2 | Trends ............................................................................................ | 3-194 |
|       | 3.15.3 | References ...................................................................................... | 3-196 |
| 3.16  | Soil Resources .................................................................................................. | | 3-196 |
|       | 3.16.1 | Existing Conditions........................................................................ | 3-197 |
|       | 3.16.2 | Trends ............................................................................................ | 3-202 |
|       | 3.16.3 | References ...................................................................................... | 3-202 |
| 3.17  | Air Quality ......................................................................................................... | | 3-203 |
|       | 3.17.1 | Existing Conditions........................................................................ | 3-204 |
|       | 3.17.2 | Trends ............................................................................................ | 3-213 |
|       | 3.17.3 | References ...................................................................................... | 3-214 |
| 3.18  | Climate Change ................................................................................................. | | 3-214 |
|       | 3.18.1 | Existing Conditions........................................................................ | 3-214 |
|       | 3.18.2 | Trends ............................................................................................ | 3-215 |
|       | 3.18.3 | References ...................................................................................... | 3-216 |
| 3.19  | Visual Resources ............................................................................................... | | 3-217 |
|       | 3.19.1 | Existing Conditions........................................................................ | 3-219 |
|       | 3.19.2 | Trends ............................................................................................ | 3-225 |
|       | 3.19.3 | References ...................................................................................... | 3-225 |
| 3.20  | Lands with Wilderness Characteristics ........................................................ | | 3-226 |
|       | 3.20.1 | Existing Conditions........................................................................ | 3-227 |
|       | 3.20.2 | Trends ............................................................................................ | 3-228 |
|       | 3.20.3 | References ...................................................................................... | 3-229 |
| 3.21  | Soundscapes ...................................................................................................... | | 3-229 |
|       | 3.21.1 | Existing Conditions........................................................................ | 3-230 |
|       | 3.21.2 | Trends ............................................................................................ | 3-233 |
|       | 3.21.3 | References ...................................................................................... | 3-234 |
| 3.22  | Cultural Resources and Native American Religious Concerns ................. | | 3-234 |
|       | 3.22.1 | Existing Conditions........................................................................ | 3-236 |
|       | 3.22.2 | Trends ............................................................................................ | 3-241 |
|       | 3.22.3 | References ...................................................................................... | 3-241 |
| 3.23  | Paleontological Resources .............................................................................. | | 3-243 |
|       | 3.23.1 | Existing Conditions........................................................................ | 3-245 |
|       | 3.23.2 | Trends ............................................................................................ | 3-246 |
|       | 3.23.3 | References ...................................................................................... | 3-247 |
| 3.24  | Social and Economic Conditions (Including Environmental Justice) ............ | | 3-247 |
|       | 3.24.1 | Existing Conditions........................................................................ | 3-250 |
|       | 3.24.2 | References ...................................................................................... | 3-278 |

# TABLES
Page

| 1.1 | Colorado GRSG Management Zones.................................................................................. | 1-3 |
| 1.2 | Planning Area Land Ownership and GRSG Habitat (in Acres)........................................ | 1-12 |
| 1.3 | Decision Area Subsurface Federal Mineral Estate and GRSG Habitat (in Acres)....................... | 1-13 |
| 1.4 | Total Priority Habitat and General Habitat in the Planning Area ................................. | 1-14 |
| 1.5 | Management Areas on the Routt National Forest with GRSG Habitat........................ | 1-20 |
| 1.6 | Public Comment Open House Information ....................................................................... | 1-37 |
| 2.1 | USFWS-Identified Threats to GRSG and Its Habitat and Applicable BLM/Forest Service RMP/LUP Resource Programs for Addressing Threats......................................... | 2-8 |
| 2.2 | Description of BLM Proposed Land Use Plan Amendment ......................................... | 2-14 |

BLM_0029432

| | | |
|---|---|---|
| 2.3 | Seasonal Habitat Desired Conditions for Greater Sage-Grouse | 2-29 |
| 2.4 | Description of Forest Service Proposed LUPA | 2-33 |
| 2.5 | Grazing Guidelines for GRSG Seasonal Habitat | 2-36 |
| 2.6 | Comparative Summary of Allocation Decisions of the Proposed Land Use Plan Amendment and Draft Alternatives (Acres) | 2-55 |
| 2.7 | Description of Alternative A | 2-58 |
| 2.8 | Description of Alternatives B, C, D, and BLM and Forest Service Proposed LUPAs | 2-137 |
| 3.1 | Fish and Wildlife Species of Primary Interest in the Planning Area | 3-4 |
| 3.2 | Routt National Forest Management Indicator Species in the Decision Area | 3-9 |
| 3.3 | Big Game Ranges in PH and GH on BLM-Administered Lands | 3-13 |
| 3.4 | Acres of Mule Deer Winter Range on Federal Mineral Estate | 3-13 |
| 3.5 | Big Game Ranges on PHPH and GH on the Routt National Forest | 3-20 |
| 3.6 | Special Status Animal Species in the Planning Area | 3-37 |
| 3.7 | Special Status Plant Species in the Planning Area | 3-46 |
| 3.8 | Acres of Land Ownership and ADH within Colorado Management Zones | 3-57 |
| 3.9 | Acres of Federal Mineral Estate by PH and GH | 3-58 |
| 3.10 | GH and PH by Land Ownership on the Routt National Forest | 3-67 |
| 3.11 | High Count of Male GRSG from 2008–2012 in the GJFO and WRFO | 3-73 |
| 3.12 | GRSG Population Data within Colorado Management Zones | 3-76 |
| 3.13 | Acres of GRSG Habitat within City Limits in the Planning Area | 3-82 |
| 3.14 | Miles of Transmission Lines within GRSG Habitat in the Planning Area | 3-82 |
| 3.15 | Number of Communication Towers within GRSG Habitat in the Planning Area | 3-82 |
| 3.16 | Utility Corridors within GRSG Habitat in the Planning Area | 3-83 |
| 3.17 | Acres of Vertical Obstructions within GRSG Habitat in the Planning Area | 3-83 |
| 3.18 | Acres of BLM Land Use Authorizations within the Decision Area | 3-86 |
| 3.19 | Number of Special Use Permits on the Routt National Forest | 3-89 |
| 3.20 | Vegetation Communities in GRSG Habitat in the Planning Area | 3-94 |
| 3.21 | Acres of Sagebrush and Pinyon-Juniper Interface within GRSG Habitat in the Planning Area | 3-95 |
| 3.22 | Acres of Cheatgrass Potential within GRSG Habitat in the Planning Area | 3-100 |
| 3.23 | Vegetation Communities on BLM-Administered Lands in GRSG Habitat | 3-101 |
| 3.24 | Vegetation Communities on National Forest System Lands in GRSG Habitat | 3-103 |
| 3.25 | Fire Regime Condition Classes | 3-110 |
| 3.26 | Acres of Wildland Fire within GRSG Habitat in the Planning Area | 3-111 |
| 3.27 | Acres with High Probability for Wildland Fire within GRSG Habitat in the Planning Area | 3-111 |
| 3.28 | Acres by Fire Regime Condition Class within GRSG Habitat on BLM-Administered Lands | 3-112 |
| 3.29 | Fire Occurrence within GRSG Habitat on BLM-Administered Lands (1992–2011) | 3-112 |
| 3.30 | Fire Occurrence within PH on BLM-Administered Lands (1992–2011) | 3-113 |
| 3.31 | Acres of Harvest Activity and Fuels Reduction in GRSG Habitat on the Routt National Forest | 3-113 |
| 3.32 | Fire Starts in GRSG Habitat on the Routt National Forest (1970–2012) | 3-114 |
| 3.33 | Causes of Fire in Planning Area GRSG Habitat | 3-115 |
| 3.34 | Acres of Oil and Gas Potential on Planning Area GRSG Habitat | 3-121 |
| 3.35 | Acres Open and Closed to Oil and Gas Leasing within GRSG Habitat in the Planning Area | 3-121 |
| 3.36 | Acres of Oil and Gas Leases within GRSG Habitat in the Planning Area | 3-122 |
| 3.37 | Active Coal Mines on BLM-Administered Lands | 3-123 |
| 3.38 | Mineral Status in the Planning Area | 3-124 |

BLM_0029433

3.39    Acres of Federal Mineral Estate by PH and GH—Fluid Leasable Minerals................................. 3-124
3.40    Acres of Leased and Unleased Federal Mineral Estate in GRSG Habitat—Fluid
        Leasable Minerals ................................................................................................................................ 3-125
3.41    Acres of Oil and Gas Leasing Categories in Decision Area PH and GH ................................. 3-126
3.42    Coal Potential within GRSG Habitat in the Planning Area ......................................................... 3-129
3.43    Acres of Federal Mineral Estate in GRSG Habitat—Coal ......................................................... 3-129
3.44    Acres of Locatable Mineral Claims within GRSG Habitat in the Planning Area ..................... 3-135
3.45    Locatable Minerals in the Planning Area ........................................................................................ 3-135
3.46    Acres of Mineral Material Disposal Sites within GRSG Habitat in the Planning Area .......... 3-138
3.47    Mineral Materials in the Planning Area ........................................................................................... 3-139
3.48    Roads within GRSG Habitat in the Decision Area ....................................................................... 3-142
3.49    Railroads within GRSG Habitat in the Decision Area .................................................................. 3-142
3.50    Travel Area Designations on BLM-Administered Lands within the Decision Area ................. 3-144
3.51    Special Recreation Management Areas on BLM-Administered Lands within GRSG
        Habitat.................................................................................................................................................. 3-153
3.52    Extensive Recreation Management Areas on BLM-Administered Lands within GRSG
        Habitat.................................................................................................................................................. 3-154
3.53    BLM Grazing Allotments Not Meeting Land Health Standards within GRSG Habitat ......... 3-161
3.54    Cropland within GRSG Habitat in the Planning Area .................................................................. 3-162
3.55    Fences within GRSG Habitat in the Planning Area ...................................................................... 3-162
3.56    BLM-Administered Grazing Allotments within GRSG Habitat................................................... 3-163
3.57    National Forest System Grazing Allotments within GRSG Habitat ........................................... 3-165
3.58    Acres of Wild Horse Areas within GRSG Habitat in the Planning Area ................................. 3-168
3.59    Herd Areas within GRSG Habitat on BLM-administered Lands ................................................ 3-168
3.60    Herd Management Areas within GRSG Habitat on BLM-Administered Lands ....................... 3-169
3.61    Special Designations in ADH ............................................................................................................ 3-173
3.62    ACECs within GRSG Habitat on BLM-Administered Lands ....................................................... 3-174
3.63    WSAs within GRSG Habitat on BLM-administered Lands .......................................................... 3-179
3.64    Eligible and Suitable Stream Segments within GRSG Habitat on BLM-Administered
        Lands..................................................................................................................................................... 3-180
3.65    Special Interest Areas within GRSG Habitat  on National Forest System Lands.................... 3-181
3.66    Inventoried Roadless Areas within GRSG Habitat on National Forest System Lands .......... 3-182
3.67    Hydrologic Basins in the Planning Area........................................................................................... 3-187
3.68    Rivers in GRSG Habitat within the Planning Area ....................................................................... 3-188
3.69    Streams on National Forest System Lands ..................................................................................... 3-191
3.70    Freshwater Ponds and Lacustrine on National Forest System Lands....................................... 3-192
3.71    Air Quality Monitoring Data and National Ambient Air Quality Standard Percent
        Comparison.......................................................................................................................................... 3-205
3.72    Planning Area Emissions Inventory.................................................................................................. 3-207
3.73    Current Visibility Conditions (5-year average, 2006–2010)........................................................ 3-208
3.74    BLM Visual Resource Management Class Descriptions................................................................ 3-218
3.75    GRSG Habitat by Geographic Area, Visual Quality Objective, and Habitat Type on
        the Routt National Forest ............................................................................................................... 3-224
3.76    BLM-Administered Lands with Wilderness Characteristics......................................................... 3-228
3.77    Noise Levels for Oil and Gas Activities .......................................................................................... 3-232
3.78    Inventory Acreage, Sites, and Ratio of Known Cultural Resources Sites to Acres............... 3-237
3.79    BLM and Forest Service Management Units and Counties  within the Socioeconomic
        Study Area............................................................................................................................................ 3-248
3.80    Commuter Patterns in the Socioeconomic Study Area, 2010 ................................................... 3-249
3.81    Population Growth, 1990–2010........................................................................................................ 3-250

BLM_0029434

3.82    Demographic Characteristics, Share in Total Population (percent), 2010 ............................... 3-251
3.83    Employment by Industry Sector within the Socioeconomic Study Area ................................. 3-258
3.84    Labor Income by Industry Sector and Non-Labor Income within the Socioeconomic
         Study Area (2010 dollars) .................................................................................................... 3-259
3.85    Annual Unemployment, 2007–2012 ..................................................................................... 3-263
3.86    Estimated Number of Annual Visits by Field Office and National Forest .............................. 3-265
3.87    Visitor Spending from Recreation on BLM-Administered and National Forest System
         Lands in Socioeconomic Study Area ..................................................................................... 3-265
3.88    Number of Farms and Land in Farms, 2007 .......................................................................... 3-266
3.89    Number of Farms by Type, 2007 .......................................................................................... 3-267
3.90    Farm Earnings Detail, 2010 (2010 dollars) ........................................................................... 3-267
3.91    Active and Billed Animal Unit Months, 2011 ........................................................................ 3-268
3.92    Coal, Gas, and Oil: Sales Volume and  Sales Value from BLM-Administered
         Resources, Fiscal Year 2011 ................................................................................................. 3-269
3.93    Other Mineral Production, 2010 (Tons) ............................................................................... 3-270
3.94    Revenues Received in the Socioeconomic Study Area by County, Government
         Funds, 2010 (Thousands) ...................................................................................................... 3-274
3.95    Tax Revenues Received in the Socioeconomic Study Area by County,
         2010 (Thousands) ................................................................................................................ 3-274
3.96    BLM and Forest Service Employment and Related Expenditures  in the
         Socioeconomic Study Area ................................................................................................... 3-275
3.97    Population Race and Ethnicity, 2010 ..................................................................................... 3-277
3.98    Low-Income Populations, 2006-2010 Average ...................................................................... 3-278

# DIAGRAMS                                                                           Page

1-1     Nine-Step Planning Process ................................................................................................... 1-22
1-2     BLM/Forest Service GRSG Planning Strategy Sub-region/EIS Boundaries ............................ 1-28
3-1     Range-wide Change in the Population Index for GRSG in North America, 1965–2003
         (Connelly et al. 2004) .......................................................................................................... 3-69
3-2     Change in Lek Size for GRSG in Colorado, 1965–2003 (Connelly et al. 2004) ....................... 3-70
3-3     Change in the Population Index for GRSG in Colorado, 1965-2003
         (Connelly et al. 2004) ........................................................................................................... 3-70
3-4     Historic Annual Male High Counts for the Northern Eagle/Southern Routt GRSG
         Population ............................................................................................................................. 3-71
3-5     Recent High Count and 3-year Running Average Data for Northern Eagle/Southern
         Routt GRSG Population ........................................................................................................ 3-72
3-6     Annual Male High Count for the North Park GRSG Population ............................................ 3-75
3-7     Annual Male High Count for the Middle Park GRSG Population .......................................... 3-75
3-8     Nonattainment Areas and Monitoring Locations Within or Near the Planning Area ........... 3-205
3-9     Standard Visual Range Trends for Areas in Table 3.73, Current Visibility Conditions
         (5-year average, 2006–2010) ................................................................................................ 3-208
3-10    Wet Deposition Trends ....................................................................................................... 3-210
3-11    Dry Deposition Trends ........................................................................................................ 3-211
3-12    Total Deposition Trends ...................................................................................................... 3-211
3-13    Typical Noise Levels Near Gas Field Operations ................................................................. 3-233
3-14    Employment Trends by Select Industry Sector within the Socioeconomic Study Area,
         2001-2010 ............................................................................................................................ 3-260

BLM_0029435

3-15    Labor Earnings Trends by Select Industry Sector within the Socioeconomic Study
        Area, 2001-2010 .................................................................................................................. 3-262

# FIGURES *(see Appendix A)*

1-1     Northwest Colorado BLM Greater Sage-Grouse EIS Planning Area Boundaries
1-2     Greater Sage-Grouse WAFWA Management Zones and Northwest Colorado Management
        Zones
1-3     Greater Sage-Grouse Current and Historic Distribution
1-4     Priority Habitat Management Areas, General Habitat Management Areas, and
        Linkage/Connectivity Habitat Management Areas
2-1     Ecological Sites Supporting Sagebrush in Priority Habitat Management Areas
2-2     Alternatives A, B, D, and E: Areas Closed to Livestock Grazing
2-3     Alternative C: Areas Closed to Livestock Grazing
2-4     Alternative A: Right-of-Way Avoidance and Exclusion Areas
2-5     Alternative B: Right-of-Way Avoidance and Exclusion Areas
2-6     Alternative C: Right-of-Way Avoidance and Exclusion Areas
2-7     Alternative D: Right-of-Way Avoidance and Exclusion Areas
2-8     Alternative D: Right-of-Way Avoidance and Exclusion Areas for Large Transmission Lines (>230
        kilovolts)
2-9     Alternative E: Right-of-Way Avoidance and Exclusion Areas
2-10    Alternatives A and D: Areas Closed to Fluid Minerals Leasing
2-11    Alternative B: Areas Closed to Fluid Minerals Leasing
2-12    Alternative C: Areas Closed to Fluid Minerals Leasing
2-13    Alternative E: Areas Closed to Fluid Minerals Leasing
2-14    Alternatives A, B, and C: No Surface Occupancy (NSO)
2-15    Alternative D: No Surface Occupancy (NSO)
2-16    Alternative E: No Surface Occupancy (NSO)
2-17    Alternatives A and D: Areas Closed to Mineral Material Sales
2-18    Alternatives B, C, and E: Areas Closed to Mineral Material Sales
2-19    Alternatives A and D: Areas Closed to Nonenergy Mineral Leasing
2-20    Alternatives B, C, and E: Areas Closed to Nonenergy Mineral Leasing
2-21    Alternatives A, B, D, and E: Areas of Critical Environmental Concern
2-22    Alternative C: Areas of Critical Environmental Concern
3-1     Elk Winter Range
3-2     Mule Deer Winter Range
3-3     Special Status Species
3-4     Greater Sage-Grouse Habitat Types
3-5     Greater Sage-Grouse Breeding Bird Density
3-6     Existing Designated Utility Corridors
3-7     Oil and Gas Basins
3-8     Oil and Gas Leases
3-9     Sodium Potential and Sodium Leases
3-10    Wild Horse and Burro Herd Area and Herd Management Areas
3-11    Special Designations
3-12    Visual Resources Management Classes

BLM_0029436

3-13    Visual Quality Objectives for the Routt National Forest
3-14    Ambient Background Noise Model for Ridge Point During Summer
3-15    Ambient Background Noise Model for Ridge Point During Winter
3-16    Ambient Background Noise Model for Valley Point During Summer
3-17    Ambient Background Noise Model for Valley Point During Winter

BLM_0029437

# VOLUME II

**4.    ENVIRONMENTAL CONSEQUENCES**.................................................................... **4-1**

4.1    Introduction ................................................................................................. 4-1
4.2    Analytical Assumptions.................................................................................. 4-2
        4.2.1    General Method for Analyzing Impacts........................................... 4-4
        4.2.2    Incomplete or Unavailable Information............................................ 4-5
4.3    Fish and Wildlife............................................................................................ 4-6
        4.3.1    General Description........................................................................... 4-6
        4.3.2    Terrestrial Wildlife............................................................................ 4-6
4.4    Aquatic Wildlife, Including Special Status Fish and Aquatic Species ................. 4-49
        4.4.1    Methodology and Assumptions......................................................... 4-49
        4.4.2    Direct and Indirect Impacts on Aquatic Wildlife ............................. 4-55
        4.4.3    Summary of Impacts on Aquatic Wildlife.......................................... 4-74
4.5    Special Status Species.................................................................................... 4-75
        4.5.1    General Description........................................................................... 4-75
        4.5.2    Greater Sage-Grouse........................................................................ 4-76
        4.5.3    Other Special Status Species of Issue ............................................. 4-109
4.6    Lands and Realty ........................................................................................... 4-179
        4.6.1    General Description........................................................................... 4-179
        4.6.2    Methodology and Assumptions......................................................... 4-179
        4.6.3    Direct and Indirect Impacts on Lands and Realty............................ 4-181
        4.6.4    Summary of Impacts on Lands and Realty ....................................... 4-188
4.7    Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds)...... 4-188
        4.7.1    General Description........................................................................... 4-188
        4.7.2    Methodology and Assumptions......................................................... 4-189
        4.7.3    Direct and Indirect Impacts on Vegetation ..................................... 4-190
        4.7.4    Summary of Impacts on Vegetation.................................................. 4-210
4.8    Wildland Fire Ecology and Management ......................................................... 4-211
        4.8.1    General Description........................................................................... 4-211
        4.8.2    Methodology and Assumptions......................................................... 4-211
        4.8.3    Direct and Indirect Impacts on Wildland Fire Ecology and Management... 4-214
        4.8.4    Summary of Impacts on Wildland Fire Ecology and Management................ 4-231
4.9    Minerals (Leasable) ....................................................................................... 4-231
        4.9.1    Fluid Leasable Minerals..................................................................... 4-231
        4.9.2    Coal.................................................................................................. 4-266
4.10   Minerals (Locatable)...................................................................................... 4-290
        4.10.1   General Description........................................................................... 4-290
        4.10.2   Methodology and Assumptions......................................................... 4-290
        4.10.3   Direct and Indirect Impacts on Locatable Minerals......................... 4-292
        4.10.4   Summary of Impacts on Locatable Minerals..................................... 4-298
4.11   Minerals (Salable).......................................................................................... 4-299
        4.11.1   General Description........................................................................... 4-299
        4.11.2   Methodology and Assumptions......................................................... 4-299
        4.11.3   Direct and Indirect Impacts on Salable Minerals............................. 4-301
        4.11.4   Summary of Impacts on Salable Minerals......................................... 4-308
4.12   Travel Management........................................................................................ 4-309
        4.12.1   General Description........................................................................... 4-309
        4.12.2   Methodology and Assumptions......................................................... 4-309
        4.12.3   Direct and Indirect Impacts on Travel Management......................... 4-311

BLM_0029438

|  | 4.12.4 | Summary of Impacts on Travel Management | 4-315 |
| 4.13 | Recreation | | 4-315 |
|  | 4.13.1 | General Description | 4-315 |
|  | 4.13.2 | Methodology and Assumptions | 4-316 |
|  | 4.13.3 | Direct and Indirect Impacts on Recreation | 4-318 |
|  | 4.13.4 | Summary of Impacts on Recreation | 4-334 |
| 4.14 | Range Management | | 4-335 |
|  | 4.14.1 | General Description | 4-335 |
|  | 4.14.2 | Methodology and Assumptions | 4-335 |
|  | 4.14.3 | Direct and Indirect Impacts on Range Management | 4-338 |
|  | 4.14.4 | Summary of Impacts on Range Management | 4-353 |
| 4.15 | Wild Horse Management | | 4-354 |
|  | 4.15.1 | General Description | 4-354 |
|  | 4.15.2 | Methodology and Assumptions | 4-354 |
|  | 4.15.3 | Direct and Indirect Impacts on Wild Horse Management | 4-356 |
|  | 4.15.4 | Summary of Impacts on Wild Horse Management | 4-374 |
| 4.16 | Special Designations | | 4-375 |
|  | 4.16.1 | Areas of Critical Environmental Concern | 4-375 |
|  | 4.16.2 | Wilderness Study Areas | 4-393 |
|  | 4.16.3 | Wild and Scenic Rivers | 4-405 |
|  | 4.16.4 | National Trails and Byways | 4-414 |
| 4.17 | Soil and Water Resources | | 4-431 |
|  | 4.17.1 | General Description | 4-431 |
|  | 4.17.2 | Methodology and Assumptions | 4-431 |
|  | 4.17.3 | Direct and Indirect Impacts on Soil and Water Resources | 4-433 |
|  | 4.17.4 | Summary of Impacts on Soil and Water Resources | 4-445 |
| 4.18 | Air Quality | | 4-446 |
|  | 4.18.1 | General Description | 4-446 |
|  | 4.18.2 | Methodology and Assumptions | 4-447 |
|  | 4.18.3 | Direct and Indirect Impacts on Air Quality | 4-453 |
| 4.19 | Climate Change | | 4-469 |
| 4.20 | Visual Resources | | 4-469 |
|  | 4.20.1 | General Description | 4-469 |
|  | 4.20.2 | Methodology and Assumptions | 4-471 |
|  | 4.20.3 | Direct and Indirect Impacts on Visual Resources | 4-473 |
|  | 4.20.4 | Summary of Impacts on Visual Resources | 4-491 |
| 4.21 | Lands with Wilderness Characteristics | | 4-491 |
|  | 4.21.1 | General Description | 4-491 |
|  | 4.21.2 | Methodology and Assumptions | 4-493 |
|  | 4.21.3 | Direct and Indirect Impacts on Lands with Wilderness Characteristics | 4-495 |
|  | 4.21.4 | Summary of Impacts on Lands with Wilderness Characteristics | 4-504 |
| 4.22 | Soundscapes | | 4-504 |
|  | 4.22.1 | General Description | 4-504 |
|  | 4.22.2 | Methodology and Assumptions | 4-505 |
|  | 4.22.3 | Impacts Common to all Management Actions on Soundscapes | 4-505 |
|  | 4.22.4 | Summary of Impacts on Soundscapes | 4-506 |
| 4.23 | Cultural Resources | | 4-506 |
|  | 4.23.1 | General Description | 4-506 |
|  | 4.23.2 | Methodology and Assumptions | 4-507 |
|  | 4.23.3 | Direct and Indirect Impacts on Cultural Resources | 4-510 |

BLM_0029439

|  | 4.23.4 | Summary of Impacts on Cultural Resources | 4-551 |
| 4.24 | | Paleontological Resources | 4-553 |
|  | 4.24.1 | General Description | 4-553 |
|  | 4.24.2 | Methodology and Assumptions | 4-554 |
|  | 4.24.3 | Direct and Indirect Impacts on Paleontological Resources | 4-557 |
|  | 4.24.4 | Summary of Impacts on Paleontological Resources | 4-584 |
| 4.25 | | Social and Economic Impacts (Including Environmental Justice) | 4-585 |
|  | 4.25.1 | General Description | 4-585 |
|  | 4.25.2 | Methodology and Assumptions | 4-585 |
|  | 4.25.3 | Economic Impacts | 4-589 |
|  | 4.25.4 | Social Impacts | 4-608 |
|  | 4.25.5 | Environmental Justice Impacts | 4-617 |
| 4.26 | | Irreversible and Irretrievable Commitment of Resources | 4-620 |
| 4.27 | | Unavoidable Adverse Impacts | 4-621 |
| 4.28 | | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-623 |
| 4.29 | | References | 4-625 |
|  | 4.29.1 | Fish and Wildlife and Special Status Species | 4-625 |
|  | 4.29.2 | Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds) | 4-634 |
|  | 4.29.3 | Wildland Fire Ecology and Management | 4-635 |
|  | 4.29.4 | Recreation | 4-635 |
|  | 4.29.5 | Range Management | 4-635 |
|  | 4.29.6 | Special Designations—Areas of Critical Environmental Concern/Zoological Areas | 4-635 |
|  | 4.29.7 | Special Designations—Wilderness Study Areas | 4-635 |
|  | 4.29.8 | Special Designations—Wild and Scenic Rivers | 4-635 |
|  | 4.29.9 | Special Designations—National Trails and Byways | 4-636 |
|  | 4.29.10 | Soil and Water Resources | 4-636 |
|  | 4.29.11 | Air Quality | 4-637 |
|  | 4.29.12 | Climate Change | 4-637 |
|  | 4.29.13 | Visual Resources | 4-637 |
|  | 4.29.14 | Cultural Resources | 4-637 |
|  | 4.29.15 | Social and Economic Impacts | 4-637 |

# TABLES                                          Page

| 4.1 | Acres of Federal Mineral Estate in Mule Deer Habitat | 4-26 |
| 4.2 | Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative | 4-110 |
| 4.3 | Known Threatened, Endangered, and Sensitive Plant Species Occurrences within GRSG PHMA, GHMA, and LCHMA, and within a 984-Foot Buffer of these GRSG Habitats | 4-135 |
| 4.4 | Habitats for Special Status Plant Species within the Planning Area, Grouped by Habitat Guilds | 4-137 |
| 4.5 | BLM Special Recreation Permits Authorized in PHMA, GHMA, and LCHMA in the Decision Area | 4-321 |
| 4.6 | Livestock Grazing Management—Alternative C | 4-343 |
| 4.7 | Acreage by Wild Horse Management Unit and Alternative Affected by GRSG Management | 4-357 |

BLM_0029440

4.8     Documents Incorporated by Reference for Environmental Consequences—Air
        Resources ...................................................................................................................... 4-447
4.9     Baseline Pollutant Emissions.......................................................................................... 4-452
4.10    Alternative A GRSG RFD................................................................................................ 4-455
4.11    Alternative B Field Office Colorado Management Zone Analysis of PHMA............................ 4-457
4.12    Alternative B GRSG RFD Analysis ................................................................................... 4-457
4.13    Alternative C Field Office Colorado Management Zone Analysis of All Designated
        Habitat............................................................................................................................ 4-462
4.14    Alternative C GRSG RFD Analysis ................................................................................... 4-462
4.15    Alternative D Field Office Management Zone Analysis of PHMA NSO ................................. 4-467
4.16    Alternative D GRSG RFD Analysis ................................................................................... 4-467
4.17    The Proposed LUPA Field Office Management Zone Analysis of PHMA NSO with
        Lek Buffer ...................................................................................................................... 4-468
4.18    The Proposed LUPA GRSG RFD Analysis ....................................................................... 4-468
4.19    One Year Impact of Management Actions Affecting Grazing on Output,
        Employment, and Earnings, Alternative C Relative to Alternative A........................................ 4-590
4.20    One Year Impact of Management Actions Affecting Grazing on Output,
        Employment, and Earnings by Alternative Relative to Alternative A, Midpoint
        Between Billed and Active AUMs...................................................................................... 4-590
4.21    Average Annual Impact of Management Actions Affecting Recreation on Output,
        Employment, and Earnings by Alternative, Relative to Alternative A........................................ 4-595
4.22    Average Annual Impact of Management Actions Affecting Oil and Gas on Output,
        Employment, and Earnings by Alternative, Relative to Alternative A........................................ 4-599
4.23    Average Annual Federal Royalty and State Severance Taxes on Oil and Gas by
        Alternative, Relative to Alternative A, 2011$ thousands........................................................ 4-606
4.24    Average Annual Impact on Employment and Earnings by Alternative, Relative to
        Alternative A, Primary Study Area .................................................................................... 4-613
4.25    Average Annual Impact on Employment and Earnings by Alternative, Relative to
        Alternative A, Percent of 2010 Baseline ........................................................................... 4-614
4.26    Social Impacts ................................................................................................................ 4-615
4.27    Environmental Justice Impacts......................................................................................... 4-620

BLM_0029441

# VOLUME III

**5.    CUMULATIVE EFFECTS** .................................................................................................. 5-1

5.1     Introduction ........................................................................................................ 5-1
5.2     Cumulative Analysis Methodology .................................................................... 5-1
        5.2.1    Past, Present, and Reasonably Foreseeable Future Actions ............... 5-3
5.3     Fish and Wildlife ................................................................................................ 5-12
5.4     Special Status Species – Greater Sage-Grouse ............................................... 5-12
        5.4.1    Methods .............................................................................................. 5-14
        5.4.2    Assumptions ....................................................................................... 5-17
        5.4.3    Existing Conditions in WAFWA MZ II/VII and the Northwest
                 Colorado Sub-region Planning Area .................................................. 5-18
        5.4.4    Regional Efforts to Manage Threats to GRSG .................................. 5-20
        5.4.5    Relevant Cumulative Actions ............................................................ 5-28
        5.4.6    Threats to GRSG in Management Zone II/VII ................................... 5-29
        5.4.7    Conclusions ........................................................................................ 5-65
        5.4.8    Reasonably Foreseeable Future Actions in MZ II/VII Likely to Impact
                 GRSG Habitat ..................................................................................... 5-70
5.5     Special Status Species (Other Species of Issue) ............................................. 5-78
5.6     Lands and Realty ............................................................................................... 5-79
5.7     Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds) ......... 5-80
5.8     Wildland Fire Ecology and Management .......................................................... 5-80
5.9     Minerals – Leasable, Locatable, Salable, and Nonenergy Leasable ................ 5-82
5.10    Recreation and Travel Management .................................................................. 5-83
5.11    Range Management ............................................................................................ 5-85
5.12    Wild Horse Management .................................................................................... 5-86
5.13    Special Designations .......................................................................................... 5-86
5.14    Soil and Water Resources ................................................................................. 5-87
5.15    Air Quality .......................................................................................................... 5-89
5.16    Climate Change .................................................................................................. 5-91
5.17    Visual Resources ................................................................................................ 5-92
5.18    Lands with Wilderness Characteristics ............................................................ 5-93
5.19    Soundscapes ....................................................................................................... 5-94
5.20    Cultural Resources ............................................................................................ 5-95
5.21    Paleontological Resources ................................................................................. 5-96
5.22    Social and Economic Conditions (Including Environmental Justice) ............... 5-97
5.23    References .......................................................................................................... 5-103
        5.23.1   Special Status Species – Greater Sage-Grouse ................................. 5-103
        5.23.2   All Other Sections .............................................................................. 5-109

**6.    CONSULTATION AND COORDINATION** ...................................................................... 6-1

6.1     Introduction ........................................................................................................ 6-1
6.2     Consultation and Coordination ......................................................................... 6-1
        6.2.1    Native American Tribal Consultation ................................................. 6-2
        6.2.2    Colorado State Historic Preservation Officer Consultation .............. 6-2
        6.2.3    US Fish and Wildlife Service Consultation ......................................... 6-2
6.3     Cooperating Agencies ........................................................................................ 6-3
6.4     Coordination and Consistency ........................................................................... 6-5
6.5     Public Involvement ............................................................................................. 6-6
        6.5.1    Scoping Process ................................................................................... 6-7

BLM_0029442

|  | 6.5.2 | Project Website | 6-8 |
|  | 6.5.3 | Mailing List | 6-8 |
|  | 6.5.4 | Public Comment on the Draft Land Use Plan Amendment/ Environmental Impact Statement | 6-8 |
|  | 6.5.5 | Future Public Involvement | 6-16 |
| 6.6 | | List of Preparers | 6-17 |

**7. REFERENCES** ........................................................................................................ **7-1**

**GLOSSARY** ........................................................................................................ **GLOSSARY-1**

**INDEX** ........................................................................................................ **INDEX-1**

# TABLES

Page

| 5.1 | Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario | 5-4 |
| 5.2 | Estimated Number of Wells and Pads in ADH | 5-10 |
| 5.3 | Management Jurisdiction in MZ II/VII by Acres of Priority and General Habitats | 5-19 |
| 5.4 | Acres Open and Closed to Fluid Mineral Leasing in GRSG Habitat in MZ II/VII | 5-32 |
| 5.5 | Acres with NSO and CSU/TL Stipulations in GRSG Habitat in MZ II/VII | 5-33 |
| 5.6 | Acres Open and Closed to Mineral Material Disposal in GRSG Habitat in MZ II/VII | 5-38 |
| 5.7 | Acres Open and Recommended for Withdrawal from Mineral Entry in GRSG Habitat in MZ II/VII | 5-40 |
| 5.8 | Acres Open and Closed to Nonenergy Leasable Mineral Leasing in GRSG Habitat in MZ II/VII | 5-41 |
| 5.9 | Acres of Rights-of-Way/Special Use Authorization Management in GRSG Habitat in MZ II/VII | 5-44 |
| 5.10 | Acres of Wind Energy Management Areas in GRSG Habitat in MZ II/VII | 5-47 |
| 5.11 | Acres Available and Unavailable to Livestock Grazing in GRSG Habitat in MZ II/VII | 5-52 |
| 5.12 | Acres Identified for Retention and Disposal in GRSG Habitat in MZ II/VII | 5-57 |
| 5.13 | Acres of Travel Management Designations in GRSG Habitat in MZ II/VII | 5-62 |
| 5.14 | Reasonably Foreseeable Future Projects Occurring Within MZ II/VII | 5-72 |
| 5.15 | Projected Employment by Alternative for Eight-County Primary Socioeconomic Study Area | 5-99 |
| 5.16 | Projected Labor Income ($ millions) by Alternative for State of Colorado | 5-100 |
| 6.1 | Cooperating Agencies | 6-3 |
| 6.2 | Scoping Open House Information | 6-7 |
| 6.3 | Public Comment Open House Information | 6-8 |
| 6.4 | Number of Unique Submissions and Comments by Affiliation | 6-12 |
| 6.5 | Number of Comments on the Draft LUPA/EIS by Category | 6-14 |
| 6.6 | Overview of Comments by Category | 6-15 |
| 6.7 | Preparers | 6-17 |

BLM_0029443

# APPENDICES

A      Figures

B      Buffer Distances and Evaluation of Impacts on Leks

D      Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

E      Methodology for Calculating Disturbance Caps

F      Greater Sage-Grouse Monitoring Framework

G      Greater Sage-Grouse Mitigation Strategy

H      Guidelines for Implementation

I      Required Design Features, Preferred Design Features, and Suggested Design Features

O      Greater Sage-Grouse Wildfire and Invasive Species Habitat Assessment

BLM_0029444

# Volume IV

## Appendices

C   Colorado Department of Natural Resources' Colorado Greater Sage-Grouse Conservation
    Plan: The Colorado Package
J   Areas of Critical Environmental Concern Relevance and Importance Rationale
K   BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in
    Colorado
L   Biological Assessment Summary
M   US Forest Service Biological Evaluation and Management Indicator Species Report
N   Socioeconomics Data and Methodology
P   Response to Comments on the Draft Land Use Plan Amendment/Environmental Impact
    Statement

BLM_0029445

## ACRONYMS AND ABBREVIATIONS

Full Phrase

| | |
|---|---|
| ACEC | area of critical environmental concern |
| ADH | all designated habitat (includes PHMA, GHMA, and LCHMA) |
| AUM | animal unit month |
| | |
| BER | Baseline Environmental Report |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| | |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CO | carbon monoxide |
| COA | condition of approval |
| CPW | Colorado Department of Natural Resources, Parks and Wildlife |
| CRVFO | Colorado River Valley Field Office |
| CSU | controlled surface use |
| | |
| decision area | public lands and mineral estate managed by the United States Department of the Interior, Bureau of Land Management, and public lands managed by the United States Department of Agriculture, Forest Service, Routt National Forest, that are within the planning area and are encompassed by all designated habitat (ADH) |
| | |
| EIS | environmental impact statement |
| ERMA | extensive recreation management area |
| ESA | Endangered Species Act |
| ESR | emergency stabilization and rehabilitation |
| | |
| federal mineral estate | subsurface mineral estate administered by the United States Department of the Interior, Bureau of Land Management |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| Forest Plan | United States Department of Agriculture, Forest Service, Land and Resource Management Plan |
| Forest Service | United States Department of Agriculture, Forest Service |
| FRCC | fire regime condition class |
| | |
| GH | general habitat |
| GHMA | general habitat management area |
| GIS | geographical information system |
| GJFO | Grand Junction Field Office |
| GRSG | Greater Sage-Grouse |
| | |
| HMA | herd management area |
| | |
| KFO | Kremmling Field Office |
| | |
| LCHMA | linkage/connectivity habitat management area |
| LSFO | Little Snake Field Office |
| LUP | land use plan |

BLM_0029446

| | |
|---|---|
| MIS | management indicator species |
| MOU | memorandum of understanding |
| MZ | management zone |
| | |
| NEPA | National Environmental Policy Act of 1969 |
| NFMA | National Forest Management Act of 1976 |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NTT | Sage-Grouse National Technical Team |
| | |
| OHV | off-highway vehicle |
| | |
| PDF | preferred design feature |
| PH | priority habitat |
| PHMA | priority habitat management area |
| planning area | Northwest Colorado District boundary, including all lands, regardless of land ownership |
| $PM_{10}$ | particulate matter less than or equal to 10 microns in diameter |
| $PM_{2.5}$ | particulate matter less than or equal to 2.5 microns in diameter |
| PPH | preliminary priority habitat |
| project area | the United States Department of the Interior, Bureau of Land Management Northwest Colorado District boundary, including all lands, regardless of ownership |
| | |
| RDF | required design feature |
| RFDS | reasonable foreseeable development scenario |
| RMP | resource management plan |
| RMPA | resource management plan amendment |
| ROD | record of decision |
| ROW | right-of-way |
| | |
| SDF | suggested design feature |
| SGI | Natural Resources Conservation Service's Sage-Grouse Initiative |
| $SO_2$ | sulfur dioxide |
| SRMA | Special Recreation Management Area |
| SRP | special recreation permit |
| SUA | special use permit |
| | |
| TL | timing limitation |
| | |
| US | United States |
| USC | United States Code |
| US EPA | United States Environmental Protection Agency |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| | |
| VRM | visual resource management |
| | |
| WAFWA | Western Association of Fish and Wildlife Agencies |
| WRFO | White River Field Office |
| WSA | Wilderness Study Area |

BLM_0029447

This page intentionally left blank.

BLM_0029448

# Chapter 4
# Environmental Consequences

BLM_0029449

BLM_0029450

# TABLE OF CONTENTS

Chapter                                                                                                    Page

**4.     ENVIRONMENTAL CONSEQUENCES** ............................................................................... **4-1**

   4.1     Introduction ........................................................................................................ 4-1
   4.2     Analytical Assumptions ...................................................................................... 4-2
            4.2.1     General Method for Analyzing Impacts ............................................. 4-4
            4.2.2     Incomplete or Unavailable Information ............................................. 4-5
   4.3     Fish and Wildlife ................................................................................................ 4-6
            4.3.1     General Description .......................................................................... 4-6
            4.3.2     Terrestrial Wildlife ........................................................................... 4-6
                      Methodology and Assumptions ......................................................... 4-6
                      Direct and Indirect Impacts on Terrestrial Wildlife .......................... 4-9
                      Summary of Impacts on Terrestrial Wildlife ..................................... 4-48
   4.4     Aquatic Wildlife, Including Special Status Fish and Aquatic Species ................. 4-49
            4.4.1     Methodology and Assumptions ....................................................... 4-49
                      General Impacts on Aquatic Wildlife ................................................ 4-49
                      Assumptions .................................................................................... 4-50
            4.4.2     Direct and Indirect Impacts on Aquatic Wildlife ............................ 4-55
                      Impacts from Travel Management on Aquatic Wildlife ..................... 4-55
                      Impacts from Recreation Management on Aquatic Wildlife ............. 4-55
                      Impacts from Lands and Realty Management on Aquatic Wildlife .... 4-56
                      Impacts from Wind Energy Development on Aquatic Wildlife .......... 4-57
                      Impacts from Industrial Solar Energy Development on Aquatic Wildlife ...... 4-58
                      Impacts from Range Management on Aquatic Wildlife ...................... 4-58
                      Impacts from Wild Horse Management on Aquatic Wildlife ............. 4-62
                      Impacts from Fluid Minerals Management on Aquatic Wildlife ......... 4-63
                      Impacts from Solid Minerals—Coal Management on Aquatic Wildlife .......... 4-68
                      Impacts from Locatable Minerals Management on Aquatic Wildlife ........... 4-68
                      Impacts from Nonenergy Leasable Minerals Management on Aquatic
                      Wildlife ............................................................................................ 4-68
                      Impacts from Salable Mineral Management on Aquatic Wildlife ...... 4-68
                      Impacts from Fuels Management on Aquatic Wildlife ...................... 4-68
                      Impacts from Habitat Restoration on Aquatic Wildlife .................... 4-71
                      Impacts from ACEC and Zoological Area Management on Aquatic
                      Wildlife ............................................................................................ 4-73
            4.4.3     Summary of Impacts on Aquatic Wildlife ......................................... 4-74
   4.5     Special Status Species ..................................................................................... 4-75
            4.5.1     General Description ........................................................................ 4-75
            4.5.2     Greater Sage-Grouse ...................................................................... 4-76
                      Methodology and Assumptions ....................................................... 4-76
                      Direct and Indirect Impacts on Greater Sage-Grouse ..................... 4-77
                      Summary of Impacts on GRSG in PHMA, GHMA, and LCHMA ................. 4-109
            4.5.3     Other Special Status Species of Issue ............................................ 4-109
                      Special Status Terrestrial Wildlife ................................................. 4-109
                      Special Status Plant Species ........................................................... 4-131
   4.6     Lands and Realty ............................................................................................ 4-179
            4.6.1     General Description ........................................................................ 4-179
            4.6.2     Methodology and Assumptions ....................................................... 4-179

BLM_0029451

General Impacts on Lands and Realty................................................................. 4-179
Assumptions............................................................................................................ 4-180
4.6.3   Direct and Indirect Impacts on Lands and Realty ............................................ 4-181
Impacts from Travel Management on Lands and Realty................................. 4-181
Impacts from Lands and Realty Management on Lands and Realty ............. 4-182
Impacts from Fluid Minerals Management on Lands and Realty................... 4-185
Impacts from Solid Minerals (Coal, Locatable, Nonenergy, and Salable
Minerals) Management on Lands and Realty ...................................................... 4-187
4.6.4   Summary of Impacts on Lands and Realty ........................................................ 4-188
4.7   Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds)...... 4-188
4.7.1   General Description............................................................................................ 4-188
4.7.2   Methodology and Assumptions ........................................................................ 4-189
General Impacts on Vegetation........................................................................... 4-189
Assumptions............................................................................................................ 4-189
4.7.3   Direct and Indirect Impacts on Vegetation .................................................... 4-190
Impacts from Travel Management on Vegetation............................................. 4-190
Impacts from Recreation Management on Vegetation .................................... 4-192
Impacts from Lands and Realty Management on Vegetation ......................... 4-193
Impacts from Wind Energy and Industrial Solar Development on
Vegetation................................................................................................................ 4-196
Impacts from Range Management on Vegetation ............................................. 4-197
Impacts of Wild Horse Management on Vegetation ........................................ 4-199
Impacts from Fluid Minerals Management on Vegetation............................... 4-200
Impacts from Solid Minerals–Coal Management on Vegetation................... 4-203
Impacts from Locatable Minerals, Nonenergy Leasable Minerals, and
Salable Minerals Management on Vegetation .................................................... 4-204
Impacts from Fuels Management on Vegetation ............................................... 4-204
Impacts from Fire Operations on Vegetation................................................... 4-205
Impacts from Emergency Stabilization and Rehabilitation on Vegetation ... 4-207
Impacts on Vegetation from Habitat Restoration............................................ 4-208
4.7.4   Summary of Impacts on Vegetation.................................................................. 4-210
4.8   Wildland Fire Ecology and Management ........................................................................ 4-211
4.8.1   General Description............................................................................................ 4-211
4.8.2   Methodology and Assumptions ........................................................................ 4-211
General Impacts on Wildland Fire Ecology and Management ...................... 4-211
Assumptions............................................................................................................ 4-213
4.8.3   Direct and Indirect Impacts on Wildland Fire Ecology and Management... 4-214
Impacts from Travel Management on Wildland Fire Ecology and
Management ............................................................................................................. 4-214
Impacts from Recreation Management on Wildland Fire Ecology and
Management ............................................................................................................. 4-216
Impacts from Lands and Realty Management on Wildland Fire Ecology
and Management ..................................................................................................... 4-217
Impacts from Wind and Solar Energy Development on Wildland Fire
Ecology and Management...................................................................................... 4-219
Impacts from Solar Energy Development on Wildland Fire Ecology and
Management ............................................................................................................. 4-220
Impacts from Range Management on Wildland Fire Ecology and
Management ............................................................................................................. 4-220

BLM_0029452

Impacts from Fluid Minerals Management on Wildland Fire Ecology and Management .................................................................................... 4-222
Impacts from Locatable Minerals, Nonenergy Leasable Minerals, and Salable Minerals Management on Wildland Fire Ecology and Management ............ 4-224
Impacts from Fuels Management on Wildland Fire Ecology and Management .................................................................................... 4-224
Impacts from Fire Operations on Wildland Fire Ecology and Management .................................................................................... 4-226
Impacts from Emergency Stabilization and Rehabilitation on Wildland Fire Ecology and Management ............................................................ 4-228
Impacts from Habitat Restoration on Wildland Fire Ecology and Management .................................................................................... 4-229
4.8.4    Summary of Impacts on Wildland Fire Ecology and Management ............... 4-231
4.9    Minerals (Leasable) ............................................................................ 4-231
4.9.1    Fluid Leasable Minerals ..................................................................... 4-231
General Description ......................................................................... 4-231
Methodology and Assumptions ........................................................ 4-232
Direct and Indirect Impacts on Fluid Minerals .................................... 4-234
Summary of Impacts on Fluid Leasable Minerals ................................. 4-263
4.9.2    Coal .............................................................................................. 4-266
General Description ......................................................................... 4-266
Methodology and Assumptions ........................................................ 4-267
Direct and Indirect Impacts on Coal ................................................. 4-269
Summary of Impacts on Coal ........................................................... 4-287
4.10    Minerals (Locatable) ........................................................................... 4-290
4.10.1    General Description ......................................................................... 4-290
4.10.2    Methodology and Assumptions ........................................................ 4-290
General Impacts on Locatable Minerals ............................................. 4-290
Assumptions .................................................................................. 4-291
4.10.3    Direct and Indirect Impacts on Locatable Minerals ............................. 4-292
Impacts from Travel Management on Locatable Minerals ..................... 4-292
Impacts from Lands and Realty Management on Locatable Minerals ....... 4-294
4.10.4    Summary of Impacts on Locatable Minerals ....................................... 4-298
4.11    Minerals (Salable) .............................................................................. 4-299
4.11.1    General Description ......................................................................... 4-299
4.11.2    Methodology and Assumptions ........................................................ 4-299
General Impacts on Salable Minerals ................................................. 4-299
Assumptions .................................................................................. 4-300
4.11.3    Direct and Indirect Impacts on Salable Minerals ................................. 4-301
Impacts from Travel Management on Salable Minerals ......................... 4-301
Impacts from Lands and Realty Management on Salable Minerals .......... 4-302
Impacts from Fluid Minerals, Solid Minerals (Coal), Locatable Minerals, and Nonenergy Leasable Minerals Management on Salable Minerals ......... 4-305
Impacts from Salable Minerals Management on Salable Minerals ........... 4-306
Impacts from ACEC and Zoological Area Management on Salable Minerals ........................................................................................ 4-308
4.11.4    Summary of Impacts on Salable Minerals ........................................... 4-308
4.12    Travel Management ............................................................................. 4-309
4.12.1    General Description ......................................................................... 4-309
4.12.2    Methodology and Assumptions ........................................................ 4-309

BLM_0029453

General Impacts on Travel Management ............................................................. 4-310
Assumptions ............................................................................................................ 4-310
4.12.3   Direct and Indirect Impacts on Travel Management ........................................ 4-311
Impacts from Travel Management on Travel Management ............................ 4-311
Impacts from Lands and Realty Management on Travel Management ......... 4-312
Impacts from Wind Energy and Industrial Solar Development on Travel
Management ............................................................................................................ 4-313
Impacts from Fluid Minerals Management on Travel Management .............. 4-314
Impacts from Solid Minerals, Locatable Minerals, Nonenergy Leasable
Minerals, and Salable Minerals Management on Travel Management ........... 4-315
4.12.4   Summary of Impacts on Travel Management .................................................... 4-315
4.13   Recreation ........................................................................................................................... 4-315
4.13.1   General Description .............................................................................................. 4-315
4.13.2   Methodology and Assumptions ......................................................................... 4-316
General Impacts on Recreation ........................................................................... 4-316
Assumptions ............................................................................................................ 4-317
4.13.3   Direct and Indirect Impacts on Recreation ..................................................... 4-318
Impacts from Travel Management on Recreation ............................................ 4-318
Impacts from Recreation Management on Recreation .................................... 4-320
Impacts from Lands and Realty Management on Recreation ......................... 4-322
Impacts from Wind Energy and Solar Energy Development on
Recreation .............................................................................................................. 4-324
Impacts from Range Management on Recreation ............................................. 4-326
Impacts from Wild Horse Management on Recreation ................................... 4-328
Impacts from Minerals (Fluid, Solid Coal, Locatable, Nonenergy
Leasable, and Salable Minerals) Management on Recreation ......................... 4-329
Impacts from Wildfire Suppression, Fuels Management, and Fire
Rehabilitation on Recreation ............................................................................... 4-331
Impacts from Habitat Restoration on Recreation ........................................... 4-332
Impacts from ACEC and Zoological Area Management on Recreation ....... 4-333
4.13.4   Summary of Impacts on Recreation .................................................................. 4-334
4.14   Range Management ............................................................................................................ 4-335
4.14.1   General Description .............................................................................................. 4-335
4.14.2   Methodology and Assumptions ......................................................................... 4-335
Assumptions ............................................................................................................ 4-336
4.14.3   Direct and Indirect Impacts on Range Management ...................................... 4-338
Impacts from Travel Management on Range Management ............................. 4-338
Impacts from Lands and Realty Management, Wind Energy Development,
and Industrial Solar Development on Range Management .............................. 4-339
Impacts from Range Management on Range Management .............................. 4-341
Impacts from Wild Horse Management on Range Management .................... 4-346
Impacts from Fluid Minerals Management on Range Management ............... 4-346
Impacts from Solid Minerals–Coal Management on Range Management .... 4-349
Impacts from Locatable Minerals Management on Range Management ...... 4-349
Impacts from Nonenergy Leasable Minerals Management on Range
Management ............................................................................................................ 4-350
Impacts from Salable Minerals Management on Range Management ........... 4-350
Impacts from Fuels Management on Range Management ............................... 4-350
Impacts from Fire Operations Management on Range Management ........... 4-352

BLM_0029454

Impacts from Emergency Stabilization and Rehabilitation on Range Management .................................................................................................... 4-352
Impacts from Habitat Restoration on Range Management ............................ 4-353
4.14.4  Summary of Impacts on Range Management .................................................... 4-353
4.15  Wild Horse Management .................................................................................................... 4-354
4.15.1  General Description ............................................................................................. 4-354
4.15.2  Methodology and Assumptions .......................................................................... 4-354
General Impacts on Wild Horse Management .................................................. 4-354
Assumptions .......................................................................................................... 4-355
4.15.3  Direct and Indirect Impacts on Wild Horse Management ............................ 4-356
Impacts from Travel Management on Wild Horse Management ................... 4-356
Impacts from Recreation Management on Wild Horse Management ........... 4-359
Impacts from Lands and Realty Management on Wild Horse Management .......................................................................................................... 4-361
Impacts from Wind Energy Development on Wild Horse Management .... 4-363
Impacts from Industrial Solar Development on Wild Horse Management .......................................................................................................... 4-365
Impacts from Range Management on Wild Horse Management ................... 4-365
Impacts from Fluid Minerals Management on Wild Horse Management .... 4-367
Impacts from Solid Minerals–Coal Management on Wild Horse Management .......................................................................................................... 4-368
Impacts from Locatable Minerals Management on Wild Horse Management .......................................................................................................... 4-370
Impacts from Nonenergy Leasable Materials Management on Wild Horse Management .......................................................................................................... 4-370
Impacts from Salable Minerals Management on Wild Horse Management .......................................................................................................... 4-370
Impacts from Fuels Management on Wild Horse Management ..................... 4-370
Impacts from Fire Operations on Wild Horse Management ......................... 4-372
Impacts from Emergency Stabilization and Response on Wild Horse Management .......................................................................................................... 4-373
Impacts from Habitat Restoration on Wild Horse Management .................. 4-374
4.15.4  Summary of Impacts on Wild Horse Management ........................................... 4-374
4.16  Special Designations ............................................................................................................ 4-375
4.16.1  Areas of Critical Environmental Concern ....................................................... 4-375
General Description ............................................................................................. 4-375
Methodology and Assumptions .......................................................................... 4-376
Direct and Indirect Impacts on ACECs and Zoological Areas ..................... 4-377
Summary of Impacts on ACECs and Zoological Areas ................................... 4-391
4.16.2  Wilderness Study Areas ...................................................................................... 4-393
General Description ............................................................................................. 4-393
Methodology and Assumptions .......................................................................... 4-394
Direct and Indirect Impacts on WSAs .............................................................. 4-396
Summary of Impacts on WSAs ........................................................................... 4-404
4.16.3  Wild and Scenic Rivers ....................................................................................... 4-405
General Description ............................................................................................. 4-405
Methodology and Assumptions .......................................................................... 4-405
Direct and Indirect Impacts on Wild and Scenic Rivers ............................... 4-406
Summary of Impacts on Wild and Scenic Rivers ............................................ 4-413
4.16.4  National Trails and Byways .................................................................................. 4-414

BLM_0029455

General Description.......................................................................................... 4-414
Methodology and Assumptions ...................................................................... 4-416
Direct and Indirect Impacts on National Trails and Byways.......................... 4-417
Summary of Impacts on National Trails and Byways ..................................... 4-430
4.17   Soil and Water Resources.................................................................................... 4-431
       4.17.1   General Description.................................................................................. 4-431
       4.17.2   Methodology and Assumptions ............................................................. 4-431
                General Impacts on Soils and Water Resources ............................... 4-431
                Assumptions.................................................................................... 4-432
       4.17.3   Direct and Indirect Impacts on Soil and Water Resources............................ 4-433
                General Impacts from Surface Disturbance on Soil and Water
                Resources........................................................................................ 4-433
                Impacts from Travel Management on Soil and Water Resources ................ 4-434
                Impacts from Recreation Management on Soil and Water Resources........ 4-434
                Impacts from Lands and Realty Management on Soil and Water
                Resources........................................................................................ 4-435
                Impacts from Range Management on Soil and Water Resources................ 4-437
                Impacts from Wild Horse Management on Soil and Water Resources...... 4-439
                Impacts from Fluid Minerals Management on Soil and Water Resources .. 4-439
                Impacts from Solid, Locatable, and Salable Minerals Management on
                Soil and Water Resources............................................................... 4-443
                Impacts from Mineral Split-Estate Management on Soil and Water
                Resources........................................................................................ 4-444
                Impacts from Wildfire Suppression on Soil and Water Resources............. 4-445
       4.17.4   Summary of Impacts on Soil and Water Resources......................................... 4-445
4.18   Air Quality............................................................................................................ 4-446
       4.18.1   General Description.................................................................................. 4-446
       4.18.2   Methodology and Assumptions ............................................................. 4-447
                Methods of Analysis/Assumptions ................................................... 4-449
                Colorado Management Zone Analysis ............................................. 4-451
       4.18.3   Direct and Indirect Impacts on Air Quality ........................................... 4-453
                Impacts Common to All Alternatives ............................................... 4-453
                Alternative A.................................................................................... 4-454
                Alternative B .................................................................................... 4-456
                Alternative C .................................................................................... 4-461
                Alternative D .................................................................................... 4-466
                Proposed LUPA............................................................................... 4-466
                Summary of Impacts on Air Quality.................................................. 4-468
4.19   Climate Change.................................................................................................... 4-469
4.20   Visual Resources................................................................................................... 4-469
       4.20.1   General Description.................................................................................. 4-469
       4.20.2   Methodology and Assumptions ............................................................. 4-471
                General Impacts on Visual Resources ............................................... 4-471
                Assumptions.................................................................................... 4-472
       4.20.3   Direct and Indirect Impacts on Visual Resources.................................. 4-473
                Impacts from Travel Management on Visual Resources ................... 4-473
                Impacts from Lands and Realty Management on Visual Resources............. 4-477
                Impacts from Wind Energy and Industrial Solar Development on Visual
                Resources........................................................................................ 4-480
                Impacts from Range Management on Visual Resources.................................. 4-481

BLM_0029456

Impacts from Wild Horse Management on Visual Resources ....................... 4-482
Impacts from Fluid Minerals Management on Visual Resources.................... 4-483
Impacts from Solid Minerals–Coal and Locatable Minerals Management
on Visual Resources ................................................................................................ 4-485
Impacts from Nonenergy Leasable Minerals Management on Visual
Resources ................................................................................................................... 4-486
Impacts from Salable Mineral Management on Visual Resources................. 4-486
Impacts from Fuels Management and Fire Operations on Visual
Resources ................................................................................................................... 4-487
Impacts from Emergency Stabilization and Rehabilitation on Visual
Resources ................................................................................................................... 4-488
Impacts from Habitat Restoration on Visual Resources ................................ 4-489
Impacts from ACEC/Zoological Area Management on Visual Resources .. 4-490
4.20.4   Summary of Impacts on Visual Resources ........................................................ 4-491
4.21      Lands with Wilderness Characteristics ........................................................................... 4-491
4.21.1   General Description ................................................................................................ 4-491
4.21.2   Methodology and Assumptions .......................................................................... 4-493
General Impacts on Lands with Wilderness Characteristics ....................... 4-493
Assumptions .............................................................................................................. 4-494
4.21.3   Direct and Indirect Impacts on Lands with Wilderness Characteristics..... 4-495
Impacts from Travel Management on Lands with Wilderness
Characteristics Not in Protected Status ............................................................ 4-495
Impacts from Lands and Realty Management on Lands with Wilderness
Characteristics .......................................................................................................... 4-495
Impacts from Range Management on Lands with Wilderness
Characteristics .......................................................................................................... 4-497
Impacts from Fluid Minerals Management on Lands with Wilderness
Characteristics .......................................................................................................... 4-499
Impacts from Solid Minerals, Locatable Minerals, Nonenergy Leasable
Minerals, and Salable Minerals Management on Lands with Wilderness
Characteristics .......................................................................................................... 4-501
Impacts from Wildfire Suppression and Fire Rehabilitation on Lands with
Wilderness Characteristics .................................................................................... 4-502
Impacts from Habitat Restoration on Lands with Wilderness
Characteristics .......................................................................................................... 4-502
Impacts from ACEC/Zoological Area Management on Lands with
Wilderness Characteristics .................................................................................... 4-503
4.21.4   Summary of Impacts on Lands with Wilderness Characteristics................. 4-504
4.22      Soundscapes ......................................................................................................................... 4-504
4.22.1   General Description ................................................................................................ 4-504
4.22.2   Methodology and Assumptions .......................................................................... 4-505
General Impacts on Soundscapes ........................................................................ 4-505
Assumptions .............................................................................................................. 4-505
4.22.3   Impacts Common to all Management Actions on Soundscapes................... 4-505
Activities That Produce Sound ............................................................................ 4-505
4.22.4   Summary of Impacts on Soundscapes ............................................................... 4-506
4.23      Cultural Resources .............................................................................................................. 4-506
4.23.1   General Description ................................................................................................ 4-506
4.23.2   Methodology and Assumptions .......................................................................... 4-507
General Impacts on Cultural Resources ............................................................ 4-507

BLM_0029457

Assumptions................................................................................................ 4-508
4.23.3   Direct and Indirect Impacts on Cultural Resources ...................................... 4-510
Impacts from Travel Management on Cultural Resources.............................. 4-510
Impacts from Recreation Management on Cultural Resources.................... 4-516
Impacts from Lands and Realty Management on Cultural Resources.......... 4-520
Impacts from Wind and Solar Energy Development on Cultural
Resources ................................................................................................ 4-530
Impacts from Range Management on Cultural Resources............................. 4-530
Impacts from Wild Horse Management on Cultural Resources.................. 4-535
Impacts from Fluid Minerals Management ........................................................ 4-537
Impacts from Solid Minerals, Locatable Minerals, Nonenergy Leasable
Minerals, and Salable Minerals Management on Cultural Resources............ 4-541
Impacts from Fuels Management, Wildland Fire Management, and
Emergency Stabilization and Response on Cultural Resources.................... 4-541
Impacts from Habitat Restoration on Cultural Resources............................ 4-544
Impacts from ACEC/Zoological Area Management on Cultural
Resources ................................................................................................ 4-549
4.23.4   Summary of Impacts on Cultural Resources................................................... 4-551
Alternative A............................................................................................... 4-551
Alternative B ............................................................................................... 4-551
Alternative C .............................................................................................. 4-552
Alternative D .............................................................................................. 4-553
Proposed LUPA .......................................................................................... 4-553
4.24   Paleontological Resources ......................................................................................... 4-553
4.24.1   General Description...................................................................................... 4-553
4.24.2   Methodology and Assumptions .................................................................. 4-554
General Impacts on Paleontological Resources .............................................. 4-554
Assumptions................................................................................................ 4-555
4.24.3   Direct and Indirect Impacts on Paleontological Resources............................ 4-557
Impacts from Travel Management on Paleontological Resources ............... 4-557
Impacts from Recreation Management on Paleontological Resources........ 4-559
Impacts from Lands and Realty Management on Paleontological
Resources ................................................................................................ 4-561
Impacts from Wind Energy Development on Paleontological Resources .. 4-563
Impacts from Industrial Solar Development on Paleontological
Resources ................................................................................................ 4-565
Impacts from Range Management on Paleontological Resources................ 4-567
Impacts from Wild Horse Management on Paleontological Resources...... 4-569
Impacts from Fluid Minerals Management on Paleontological Resources... 4-569
Impacts from Solid Minerals–Coal Management on Paleontological
Resources ................................................................................................ 4-571
Impacts from Locatable Minerals Management on Paleontological
Resources ................................................................................................ 4-573
Impacts from Nonenergy Leasable Minerals Management on
Paleontological Resources........................................................................ 4-574
Impacts from Salable Minerals Management on Paleontological
Resources ................................................................................................ 4-576
Impacts from Fuels Management, Wildland Fire Management, and
Emergency Stabilization and Response on Paleontological Resources........ 4-577
Impacts from Habitat Restoration on Paleontological Resources ............... 4-580

BLM_0029458

Impacts from ACEC/Zoological Area Management on Paleontological Resources .......................................................................................... 4-582
4.24.4  Summary of Impacts on Paleontological Resources ........................................... 4-584
Alternative A........................................................................................... 4-584
Alternative B........................................................................................... 4-584
Alternative C........................................................................................... 4-584
Alternative D........................................................................................... 4-585
Proposed LUPA....................................................................................... 4-585
4.25  Social and Economic Impacts (Including Environmental Justice) ..................................... 4-585
4.25.1  General Description................................................................................. 4-585
4.25.2  Methodology and Assumptions ................................................................... 4-585
Assumptions ............................................................................................ 4-587
4.25.3  Economic Impacts.................................................................................... 4-589
Impacts from Management Actions Affecting Grazing Allotments............... 4-589
Impacts from Management Actions Affecting Recreation........................... 4-594
Impacts from Management of Oil and Gas Leases...................................... 4-598
Impacts from Management of Other Minerals.................................................. 4-601
Impacts from Management Actions Affecting Land and Realty and Travel Management ............................................................................................. 4-603
Impacts from Management Actions Affecting Special Status Species .......... 4-604
Impacts on Tax Revenues and Payments to States and Counties................ 4-606
4.25.4  Social Impacts........................................................................................ 4-608
Impacts from Management Actions Affecting Migration ............................. 4-608
Impacts from Management Actions Affecting Specific Groups and Communities............................................................................................. 4-610
4.25.5  Environmental Justice Impacts.................................................................... 4-617
Potential Impacts on Minority Populations.............................................. 4-617
Potential Impacts on Low-Income Populations ........................................ 4-619
4.26  Irreversible and Irretrievable Commitment of Resources .............................................. 4-620
4.27  Unavoidable Adverse Impacts.................................................................................. 4-621
4.28  Relationship Between Local Short-Term Uses and Long-Term Productivity .......... 4-623
4.29  References....................................................................................................... 4-625
4.29.1  Fish and Wildlife and Special Status Species.................................................... 4-625
4.29.2  Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds)................................................................................................. 4-639
4.29.3  Wildland Fire Ecology and Management ........................................................ 4-640
4.29.4  Recreation ............................................................................................. 4-640
4.29.5  Range Management.................................................................................. 4-640
4.29.6  Special Designations—Areas of Critical Environmental Concern/ Zoological Areas..................................................................................... 4-640
4.29.7  Special Designations—Wilderness Study Areas............................................... 4-640
4.29.8  Special Designations—Wild and Scenic Rivers................................................ 4-640
4.29.9  Special Designations—National Trails and Byways .......................................... 4-641
4.29.10 Soil and Water Resources......................................................................... 4-641
4.29.11 Air Quality............................................................................................. 4-642
4.29.12 Climate Change...................................................................................... 4-642
4.29.13 Visual Resources .................................................................................... 4-642
4.29.14 Cultural Resources.................................................................................. 4-642
4.29.15 Social and Economic Impacts .................................................................... 4-642

BLM_0029459

# TABLES

Page

4.1     Acres of Federal Mineral Estate in Mule Deer Habitat ................................................................4-26
4.2     Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative .......... 4-110
4.3     Known Threatened, Endangered, and Sensitive Plant Species Occurrences within
        GRSG PHMA, GHMA, and LCHMA, and within a 984-Foot Buffer of these GRSG
        Habitats ................................................................................................................................ 4-135
4.4     Habitats for Special Status Plant Species within the Planning Area, Grouped by
        Habitat Guilds ..................................................................................................................... 4-137
4.5     BLM Special Recreation Permits Authorized in PHMA, GHMA, and LCHMA in the
        Decision Area ...................................................................................................................... 4-321
4.6     Livestock Grazing Management—Alternative C ................................................................. 4-343
4.7     Acreage by Wild Horse Management Unit and Alternative Affected by GRSG
        Management .......................................................................................................................... 4-357
4.8     Documents Incorporated by Reference for Environmental Consequences—Air
        Resources ............................................................................................................................. 4-447
4.9     Baseline Pollutant Emissions ................................................................................................ 4-452
4.10    Alternative A GRSG RFD ................................................................................................... 4-454
4.11    Alternative B Field Office Colorado Management Zone Analysis of PHMA.......................... 4-457
4.12    Alternative B GRSG RFD Analysis ..................................................................................... 4-457
4.13    Alternative C Field Office Colorado Management Zone Analysis of All Designated
        Habitat................................................................................................................................... 4-462
4.14    Alternative C GRSG RFD Analysis..................................................................................... 4-462
4.15    Alternative D Field Office Management Zone Analysis of PHMA NSO .................................. 4-467
4.16    Alternative D GRSG RFD Analysis..................................................................................... 4-467
4.17    The Proposed LUPA Field Office Management Zone Analysis of PHMA NSO with
        Lek Buffer .............................................................................................................................. 4-468
4.18    The Proposed LUPA GRSG RFD Analysis .......................................................................... 4-468
4.19    One Year Impact of Management Actions Affecting Grazing on Output, Employment,
        and Earnings, Alternative C Relative to Alternative A .................................................... 4-590
4.20    One Year Impact of Management Actions Affecting Grazing on Output, Employment,
        and Earnings by Alternative Relative to Alternative A, Midpoint Between Billed and
        Active AUMs.......................................................................................................................... 4-590
4.21    Average Annual Impact of Management Actions Affecting Recreation on Output,
        Employment, and Earnings by Alternative, Relative to Alternative A.................................. 4-595
4.22    Average Annual Impact of Management Actions Affecting Oil and Gas on Output,
        Employment, and Earnings by Alternative, Relative to Alternative A.................................. 4-598
4.23    Average Annual Federal Royalty and State Severance Taxes on Oil and Gas by
        Alternative, Relative to Alternative A, 2011$ thousands.................................................... 4-606
4.24    Average Annual Impact on Employment and Earnings by Alternative, Relative to
        Alternative A, Primary Study Area....................................................................................... 4-613
4.25    Average Annual Impact on Employment and Earnings by Alternative, Relative to
        Alternative A, Percent of 2010 Baseline ........................................................................... 4-614
4.26    Social Impacts ....................................................................................................................... 4-615
4.27    Environmental Justice Impacts............................................................................................. 4-620

BLM_0029460

# CHAPTER 4
# ENVIRONMENTAL CONSEQUENCES

## 4.1   INTRODUCTION

This chapter presents the direct and indirect impacts on the human and natural environment anticipated to occur from implementing the alternatives presented in **Chapter 2**, Alternatives. The purpose of this chapter is to describe to the decision-maker and the public how the environment could change if any of the alternatives in **Chapter 2** were to be implemented. It is meant to aid in the decision of which LUPA, if any, to adopt.

This chapter is organized by topic, similar to **Chapter 3**, Affected Environment. Each topic area includes the following:

- A method of analysis section that identifies indicators and assumptions

- An analysis of impacts for each of the four alternatives (in some sections, the analysis has been broken down by alternative; in other sections, if the impacts would be similar, the analyses have been combined)

- A summary comparison of the alternatives

Many management actions proposed in **Chapter 2** are planning-level decisions that do not result in direct on-the-ground changes. However, by planning for land use on surface estate and federal mineral estate administered by the BLM and Forest Service over the life of the plan, the analysis focuses on impacts that could eventually result in on-the-ground changes.

Some BLM and Forest Service management actions may affect only certain resources and alternatives. This impact analysis identifies impacts that may benefit, enhance, or improve a resource as a result of management actions, as well as those impacts that have the potential to impair a resource. If an activity

BLM_0029461

or action is not addressed in a given section, either no impacts are expected or the impact is negligible, based on professional judgment.

The BLM and Forest Service manage public lands for multiple uses, in accordance with the FLPMA and the NFMA. Land use decisions are made to protect the resources, while allowing for different uses of those resources, such as livestock grazing and oil and gas development. These decisions can result in trade-offs, which are disclosed in this chapter. The projected impacts on land use activities and the associated environmental impacts of land uses are characterized and evaluated for each of the alternatives.

Impact analysis is a cause-and-effect process. The detailed impact analyses and conclusions are based on the following:

- The BLM and Forest Service planning team's knowledge of resources and the project area

- Reviews of existing literature

- Information provided by experts in the BLM and Forest Service, other agencies, cooperating agencies, interest groups, and concerned citizens

The baseline used for the impact analysis is the current condition or situation, as described in **Chapter 3**. Impacts on resources and resource uses are analyzed and discussed in detail, commensurate with resource issues and concerns identified through the process. At times, impacts are described using ranges of potential impacts or in qualitative terms.

## 4.2   ANALYTICAL ASSUMPTIONS

Several overarching assumptions have been made in order to facilitate the analysis of the project impacts. These assumptions set guidelines and provide reasonably foreseeable projected levels of development that would occur in the planning area during the planning period. These assumptions should not be interpreted as constraining or redefining the management objectives and actions proposed for each alternative, as described in **Chapter 2**.

The following general assumptions apply to all resource categories. Any specific resource assumptions are provided in the methods of analysis section for that resource.

- Sufficient funding and personnel would be available for implementing the final decision.

- Implementing actions from any of the LUPA alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements.

BLM_0029462

- Implementation-level actions necessary to execute the LUP-level decisions in this LUPA would be subject to further environmental review, including that under NEPA.

- Direct and indirect impacts of implementing the LUPA would primarily occur on the public lands administered by the BLM and the Forest Service in the planning area.

- Local climate patterns of historic record and related conditions for plant growth may change with warmer, drier conditions likely to occur over the life of this plan.

- In the future, as tools for predicting climate changes in a management area improve and changes in climate affect resources and necessitate changes in how resources are managed, the BLM or Forest Service may be required to reevaluate decisions made as part of this planning process and to adjust management accordingly.

- The BLM and Forest Service would carry out appropriate maintenance for the functional capability of all developments.

- The discussion of impacts is based on best available data. Knowledge of the planning area and decision area and professional judgment, based on observation and analysis of conditions and responses in similar areas, are used for environmental impacts where data are limited.

- Restrictions (such as siting, design, and mitigation measures) would apply, where appropriate, to surface-disturbing activities associated with land use authorizations and permits issued on BLM-administered and National Forest System lands and federal mineral estate.

- When authorizing third-party actions that result in habitat loss and degradation, the BLM and Forest Service in their management actions would require mitigation that provides a net conservation gain to the species, which is consistent with valid rights and applicable law. This includes accounting for any uncertainty associated with the effectiveness of such mitigation. This would be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.

In addition, to help implement this LUPA, a WAFWA Management Zone Regional Mitigation Strategy (see **Appendix G**) would be developed within 1 year of the issuance of the ROD. The strategy would elaborate on the components identified in Chapter 2 (avoidance, minimization, compensation, "additionality" [the conservation benefits of compensatory mitigation are demonstrably new and additional and would not have resulted without the compensatory mitigation project; see Glossary], timeliness, and

BLM_0029463

durability). The BLM and Forest Service would consider the strategy for their management actions and third-party actions that result in habitat loss and degradation. Implementing a regional mitigation strategy would benefit GRSG, the public, and land users by reducing threats, increasing public transparency and confidence, and creating a predictable permit process for land use authorization applicants.

- Data from GIS have been used in developing acreage calculations and to generate the figures in **Appendix A**, Figures. Calculations depend on the quality and availability of data. Acreage figures and other numbers are approximate projections for comparison and analysis only; readers should not infer that they reflect exact measurements or precise calculations. In the absence of quantitative data, best professional judgment was used. Impacts were sometimes described using ranges of potential impacts or qualitatively, when appropriate.

### 4.2.1 General Method for Analyzing Impacts

Potential impacts are described in terms of type, context, duration and intensity, which are generally defined below. RDFs have been incorporated into the Forest Service's Proposed LUPA as planning-level guidelines, which would be implemented during site-specific project analysis.

*Type of impact*—Impacts are characterized using the indicators described at the beginning of each resource impact section. The presentation of impacts for key planning issues is intended to provide the BLM and Forest Service decision-maker and reader with an understanding of the multiple use trade-offs associated with each alternative.

*Context*—This describes the area or location (site-specific, local, planning area-wide, or regional) in which the impact would occur. Site-specific impacts would occur at the location of the action; local impacts would occur within the general vicinity of the action area; planning area-wide impacts would affect a greater portion of decision area lands in northwest Colorado; and regional impacts would extend beyond the planning area boundaries.

*Duration*—This describes the duration of an effect, either short term or long term. Unless otherwise noted, short-term is defined as anticipated to begin and end within the first 5 years after the action is implemented; long-term is defined as lasting beyond 5 years to the end of or beyond the life of this LUPA.

*Intensity*—Rather than categorize impacts by intensity (e.g., major, moderate, or minor), this analysis discusses impacts using quantitative data wherever possible.

BLM_0029464

*Direct and indirect impacts*—Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place; indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

For ease of reading, the impacts of the management actions for a particular alternative on a specific resource are generally compared to the status quo or baseline for that resource. However, in order to properly and meaningfully evaluate the impacts under each alternative, the impacts expected under that alternative should be measured against the impacts projected to occur under Alternative A. This alternative is the baseline for comparing the alternatives to one another, as it represents what is anticipated to occur should the LUPAs not take place.

Irreversible and irretrievable commitment of resources is discussed in **Section 4.25**, Irreversible and Irretrievable Commitment of Resources. Irreversible commitments of resources result from actions in which resources are considered permanently changed; irretrievable commitments of resources result from actions in which resources are considered permanently lost.

### 4.2.2   Incomplete or Unavailable Information

The CEQ established implementing regulations for NEPA, requiring that a federal agency identify relevant information that may be incomplete or unavailable for evaluating reasonably foreseeable significant adverse impacts in an EIS (40 CFR, Part 1502.22). If the information is essential to a reasoned choice among alternatives, it must be included or addressed in an EIS, unless the cost of obtaining such information is exorbitant. Knowledge and information is, and would always be, incomplete, particularly with infinitely complex ecosystems considered at various scales.

The best available information pertinent to the decisions to be made was used in developing the LUPA. The BLM and Forest Service have made a considerable effort to acquire and convert resource data into digital format for use in the LUPA, both from the BLM and Forest Service themselves and from outside sources.

Under the FLPMA, the inventory of public land resources is ongoing and continuously updated. However, certain information was unavailable for use in developing the LUPA because inventories either have not been conducted or are not complete. Some of the major types of data that are incomplete or unavailable are the following:

- Comprehensive planning area-wide inventory of wildlife and special status species occurrence and condition
- GIS data used for disturbance calculations on private lands

BLM_0029465

- Site-specific surveys of cultural and paleontological resources

For these resources, estimates were made concerning the number, type, and significance of these resources based on previous surveys and existing knowledge. In addition, some impacts cannot be quantified, given the proposed management actions. Where this gap occurs, impacts are projected in qualitative terms or, in some instances, are described as unknown. Subsequent site-specific project-level analysis would provide the opportunity to collect and examine site-specific inventory data to determine appropriate application of LUP-level guidance. In addition, the BLM and other agencies in the planning area continue to update and refine information used to implement this plan.

## 4.3 FISH AND WILDLIFE

### 4.3.1 General Description

This section discusses impacts on fish and wildlife from proposed management actions. Habitat types are described in **Section 3.5**, Vegetation (Forest, Rangelands, Riparian and Wetlands, and Noxious Weeds); existing conditions concerning fish and wildlife and descriptions of habitat requirements for various species are described in **Section 3.2**, Fish and Wildlife. Impacts on GRSG are found in **Section 4.5.2**, Greater Sage-Grouse.

### 4.3.2 Terrestrial Wildlife

#### Methodology and Assumptions

*General Impacts on Terrestrial Wildlife*
Indicators of impacts on terrestrial wildlife and the measurements used to describe the impacts (where available or appropriate) are as follows:

- Direct habitat loss

    – Acres of habitat lost. Direct habitat loss results when habitat is destroyed or converted to a form that is unsuitable for the impacted species. Direct habitat loss can be a short-term or long-term impact.

- Habitat fragmentation

    – Habitat fragmentation occurs when contiguous habitat is broken into smaller blocks by surface-disturbing activities. Habitat fragmentation could lead to the following:

    – Likelihood of reduced habitat quality and interference with movement patterns, leading to a decreased ability to breed or overwinter successfully to a degree that would lead, in turn, to substantial population declines

    – Likelihood that individual habitat blocks would be reduced

BLM_0029466

- Likelihood of increased percentage of "edge" habitat (juxtaposition or placing side by side of contrasting environments on an ecosystem or a place were two different vegetation types come together) on smaller blocks, when compared to larger blocks

- Disruption to species

  - Direct mortality of species, including predation, collisions with structures (fences, towers, vehicles), and disease; interference with movement patterns due to fragmented landscapes; short- or long-term displacement and physiological or behavioral influences (avoidance of otherwise functional habitats).

- Habitat degradation

  - Weed infestation and understory and overstory reductions indicators (reductions in herbaceous ground cover, lack of residual cover, change in understory plant composition).

  - Miles/acres disturbed. (The assumption is that habitat next to roads that are impacted by dust and dust suppression activities would have some lower level of understory next to the impacted habitat.)

- Habitat restoration and improvement

  - The likelihood of improving or enhancing habitat quality (e.g., increased species diversity, increased habitat connectivity, and decreased weeds).

- Habitat protection

  - Acres protected through stipulations, closures, and special designations (e.g., ACECs). Also, the likelihood of reduced or prohibited surface disturbance.

*Assumptions*

The following list presents basic assumptions about terrestrial wildlife that apply to the impacts assessment for Alternatives A through D in this LUPA/EIS:

- The BLM and the Forest Service are primarily responsible for managing habitat, whereas state agencies such as CPW primarily manage terrestrial and aquatic wildlife species.

- Sufficient habitat exists to maintain current CPW data analysis unit objectives.

- Disruptive activities would displace wildlife, although some wildlife would adapt. In general, direct impacts result from activities authorized by the BLM and Forest Service and generally occur at

BLM_0029467

the same time and place as the management activity or action causing the impact.

- Disturbance of any component of a species' habitat would be detrimental, with the degree of detriment depending on the importance of the habitat component to the maintenance of the population.

- Impacts on populations would not be considered significant if they exceed the current carrying capacity and would not reduce those populations below the carrying capacity.

- The exact locations of future surface-disturbing activities cannot be predicted at the LUPA/EIS level.

- The BLM and Forest Service will use best available information, management and conservation plans, and other research and related directives to guide wildlife habitat management on BLM-administered or National Forest System lands.

- NSOs, TL, CSUs, COAs, and siting conditions would be applied to important wildlife habitats (big game ranges, migratory bird nesting habitat, raptor nest sites and nesting habitat) to mitigate impacts from surface-disturbing activities.

- Raptor nest surveys are required before project implementation in those areas potentially influenced by development or other activities.

- If management actions (grazing, energy development, ROWs) are excluded from PHMA and GHMA, development would occur in non-sagebrush habitats (e.g., pinyon-juniper, mountain shrub, and spruce/fir), with potential adverse impacts on species that inhabit these ranges.

- Under all of the alternatives, proposed actions would comply with BLM Colorado Public Land Health Standard #3 (BLM 1997). Healthy, productive, and diverse plant communities support terrestrial wildlife communities that are productive, resilient, diverse, and vigorous and that are able to reproduce and sustain natural fluctuations and ecological processes; therefore, implementing management actions that contribute to maintaining the condition and quality of wildlife habitat would ensure that BLM Colorado Public Land Health Standard #3 (BLM 1997) would be met throughout the life of the LUPA.

- Federal oil and gas regulations prevent the BLM and Forest Service from being able to apply new or additional lease stipulations to existing leases. However, federal regulations do allow the BLM and Forest Service to apply other protection measures, in conjunction with planning and implementing oil and gas projects. These include

BLM_0029468

applying stipulations consistent with the most recent LUP as terms and conditions for discretionary approvals (e.g., ROW actions) and applying COAs to augment protections related to lease activities.

***Direct and Indirect Impacts on Terrestrial Wildlife***

*Impacts from Travel Management on Terrestrial Wildlife*

<u>Direct Habitat Loss/Habitat Fragmentation/Disruption to Species</u>
Impacts from designating roads and trails for recreation are not expected, but these designations would influence the amount and type of casual use impacts and could influence road construction impacts in an area. Casual use and road and trail building impacts are described under Recreation Management.

In general, the more acres of routes that are designated in the area, the greater the likelihood of habitat fragmentation and disturbance to species and habitats as high concentrations of human use typically occur on or next to motorized routes. Areas designated as open have no restrictions on cross-country travel and therefore have the highest potential for increased route density and associated disturbance. Managing on-site recreation and motorized activity, limiting travel to designated routes, and closing travel routes could prevent or reduce impacts. For example, seasonal closure of routes would prevent impacts on species during sensitive or critical times of the year, such as during winter or birthing. Impacts are more likely to occur in easily accessible areas where visitation would be highest.

Alternative A—Under this alternative the fewest acres would have seasonal restrictions on casual use; some of the areas within GRSG habitat would remain open to cross-country travel. This alternative has the highest potential for impacts on terrestrial wildlife due to the lack of restrictions on activities that cause these impacts.

Alternative B—Under this alternative no areas within PHMA would be designated as open; instead, the field offices and ranger districts would determine where closures and seasonal restrictions are necessary within PHMA to limit impacts on GRSG. This alternative would provide greater protection than Alternative A by reducing the likelihood of impacts from recreation on terrestrial wildlife species using the area. This would be the case particularly if the critical areas and seasons of use for these species were to coincide with the closures and seasonal limitations imposed for GRSG.

Alternative C—Same as Alternative B.

Alternative D—This alternative would implement the most restrictions by including the potential for seasonal limitations as necessary in ADH. It also would prohibit seasonal camping and other nonmotorized recreation within 4

BLM_0029469

miles of a lek. In this case, associated benefits for other terrestrial wildlife species could be expanded to ADH and all habitat within 4 miles of a lek.

Proposed LUPA—See *Habitat Restoration/Improvement*, below.

Habitat Degradation
Habitat degradation impacts from designating roads and trails for recreation are not expected, but these designations would influence the amount and type of casual use impacts and could influence road construction impacts in an area. Casual use and road and trail building impacts are described under Recreation Management.

Alternative A—Under this alternative some of the areas within GRSG habitat would remain open to cross-country travel. This alternative has the highest potential to see impacts on terrestrial wildlife through habitat degradation.

Under all the action alternatives, all areas within PHMA would be limited to designated routes; no PHMA would be open to cross-country travel. The action alternatives are similar and provide the most protection for terrestrial wildlife when compared to Alternative A.

Habitat Restoration/Improvement
Designating an area as closed is expected to result in the eventual revegetation of roads after a closure.

Alternative A—Under this alternative, the fewest acres would be closed to cross-country travel. This alternative includes the fewest acres of habitat restoration as a result of natural revegetation.

Alternatives B, C, and D—Under these alternatives, no areas within PHMA would be designated as open, and the field offices and ranger districts would determine where closures are necessary within PHMA to limit impacts on GRSG. These alternatives would provide the potential for more habitat restoration than Alternative A.

Proposed LUPA—Impacts on terrestrial wildlife from travel management would be similar to those described above for Alternative D for all indicators. Under the Proposed LUPA, however, the Wolford Mountain OHV area would continue to be managed as open to OHVs; this includes 1 acre of PHMA. Under the Proposed Plan/Final EIS for the KFO, there would be an additional 13 acres of PHMA that would be managed as open to OHVs.

*Impacts from Recreation Management on Terrestrial Wildlife*

Direct Habitat Loss/Habitat Fragmentation/Disruption to Species
*Areas Open for Casual Use.* Impacts from recreational use would include impacts from casual use such as nonmotorized recreation or dispersed camping. Such

BLM_0029470

activities are not subject to site-specific environmental review and vegetation impacts would not be apparent until after damage has occurred. Examples of direct impacts on terrestrial wildlife from casual use include habitat loss, fragmentation, and direct mortality from collisions with vehicles.

Some species may adapt to disturbances over time and could recolonize disturbed habitats. Impacts are more likely to occur in easily accessible areas where visitation would be high, and in areas open to intensive motorized use, as cross-country travel facilitates weed spread as well as increasing habitat fragmentation. In general, the more acres of routes in the area, the greater the likelihood of habitat fragmentation and disturbance to species and habitats as high concentrations of human use typically occur on or next to motorized routes.

Indirect impacts on terrestrial wildlife through habitat would include avoidance or displacement (Knight and Cole 1995 in Joslin and Youmans 1999) and subsequent changes in species movement patterns, and impacts on survival or reproduction (Gutzwiller et al. 1998). Both short-term, loud noise (such as from vehicles or construction) and long-term, low-level noise (such as from oil and gas development) have been documented to cause physiological effects, including increased heart rate, increased energy expenditure, altered metabolism, and a change in hormone balance (Radle 2007).

Determining the effect of noise is complicated because different species and individuals have varying responses, and certain species rely more heavily on acoustical cues than others (Radle 2007; Barber et al. 2009). Impacts would be both short term and long term, depending on the type and source of noise.

Human disturbance near raptor nests can result in the abandonment of the nest, high nestling mortality from overheating, chilling, or dehydration when adults are flushed from the nest, premature fledging, and reduced access to resources (Gutzwiller et al. 1998). Some species may adapt to disturbances over time and could recolonize disturbed habitats. On-site management of recreation and motorized activity and designation or closure of travel routes could prevent or reduce impacts. For example, seasonal closure of routes would prevent impacts on species during sensitive or critical times of the year, such as during winter or birthing. Impacts are more likely to occur in easily accessible areas, where visitation would be high and concentrated.

Alternative A—Under this alternative, there would be no special requirements for SRPs or casual use in GRSG habitat. This alternative has the highest potential for impacts on terrestrial wildlife due to the lack of restrictions on activities that may cause these effects.

Alternatives B and C—Under Alternatives B, C, and D, only Special Recreation Permits (SRPs) would be issued, which do not adversely affect GRSG. Under Alternative C, camping and other nonmotorized recreation would be prohibited

BLM_0029471

within 4 miles of a lek. Alternative C would be the most restrictive and would have the greatest potential reduction in impacts from recreation on terrestrial wildlife species associated with GRSG habitat. Alternatives B and D have similar restrictions.

Alternative D—Under Alternative D, the field offices and ranger districts would determine where closures and seasonal restrictions are necessary within PHMA to limit impacts on GRSG. In this case associated benefits for other terrestrial wildlife species could be expanded to ADH and all habitat within 4 miles of a lek.

Impacts from recreation (areas open for casual use) on terrestrial wildlife would be similar to those described under Alternatives B and C.

*Constructing Roads and Trails.* Impacts from constructing, realigning, and upgrading roads and trails as a result of recreation would include habitat loss, fragmentation, or degradation, direct mortality from construction, sedimentation of waterways, increased turbidity, and decreased water quality. In general, the more miles of routes that are constructed in the decision, the greater the likelihood of habitat fragmentation and disturbance to species and habitats. Impacts would be intensified during the construction phase; after construction, impacts would be the same as those discussed under *Casual Use.*

Realigning routes could be beneficial to wildlife species using the area if the existing route were impacting habitat critical for these species; rerouting the route would reduce impacts. An example of this is if a route were impacting a spring used by wildlife and rerouting the route would reduce impacts on the spring. Generally, limiting construction and realigning and upgrading roads is beneficial to terrestrial wildlife species using the habitat.

Indirect impacts would be similar to those discussed under *Casual Use* but would be intensified during the construction phase; after construction, impacts would be the same as those discussed under *Casual Use.*

Alternative A—Under this alternative, restrictions on constructing roads and trails would be implemented on a case-by-case basis throughout the decision area. This alternative has the highest potential to see impacts on terrestrial wildlife using GRSG habitat, due to the lack of restrictions on activities that cause these effects.

Alternative B—Under this alternative constructing and realigning roads and trails would be highly limited in PHMA, as would upgrading existing roads and trails. This alternative also limits new construction in PHMA to access valid existing rights; this is so that any new construction that would cause the area to exceed 3 percent disturbance would require mitigation to offset the disturbance. This alternative provides more protection than Alternatives A and D but less than Alternative C.

BLM_0029472

Alternative C—This alternative is similar to Alternative B but expands the restrictions on constructing, realigning, and upgrading to ADH. In addition, this alternative would expand the 3 percent disturbance cap to the entire area within 4 miles of a lek. Generally this alternative would be the most restrictive for constructing, realigning, and upgrading roads and trails. This alternative provides the most protection to terrestrial wildlife associated with GRSG.

Alternative D—Alternative D applies restrictions to PHMA that are more flexible than those outlined in the NTT report. Other than Alternative A this alternative is the least restrictive for constructing, realigning, and upgrading roads and trails.

Proposed LUPA—See *Habitat Restoration/Improvement*, below.

*Disruption to Species.* Disruption to species from permitted uses include SRPs and Forest Service SUAs. These are for activities typically for larger organized recreation, such as competitive and noncompetitive events, and commercial outfitting services. Allowing competitive events is expected to result in impacts similar to those described under casual use; however, because these events typically involve a much larger concentration of people than casual use, the impacts would be magnified, and displacement of terrestrial wildlife as a result of noise disturbance is intensified. Impacts from commercial outfitting services would be the same as those described under casual use. This is because these activities typically do not involve large concentrations of people at any one time.

Alternative A—Under Alternative A, the BLM and Forest Service would continue issuing SRPs and SUAs on a case-by-case basis and would continue to provide opportunities for competitive and noncompetitive events and commercial outfitting services.

Alternatives B and C—SRPs and SUAs would be authorized only where impacts on PHMA would be neutral or beneficial. Other terrestrial wildlife species within PHMA or sagebrush habitats would also benefit from these restrictions.

Alternative D and the Proposed LUPA—These alternatives limit impacts on disrupting the species as well as PHMA, thus they would also benefit terrestrial wildlife species whose critical use periods coincide with these seasonal restrictions.

Habitat Degradation

*Casual Use.* Impacts from recreational use would include impacts from casual use such as nonmotorized recreation or dispersed camping. Such activities are not subject to site-specific environmental review, and vegetation impacts would not be apparent until after damage has occurred. Examples of terrestrial wildlife habitat degradation from casual use are increased soils and vegetation disturbance leading to an increase in the likelihood of weed invasion and spread in recreation areas. Impacts from casual use are more likely to occur in easily

BLM_0029473

accessible areas, where visitation would be high, and in areas open to intensive motorized use. This is because cross-country travel facilitates weed spread and increases habitat fragmentation.

Alternative A—Under this alternative some of the areas within GRSG habitat would remain open to cross-country travel. This alternative has the highest potential to see impacts on terrestrial wildlife through habitat degradation.

Alternatives B, C, and D and the Proposed LUPA—Under the action alternatives, all areas within PHMA would be limited to designated routes; no PHMA would be open to cross-country travel. The action alternatives provide the greatest protection for terrestrial wildlife habitat.

*Constructing Roads and Trails.* In general, the more miles of routes that are constructed in the decision area, the greater the likelihood of habitat degradation associated with these routes. Direct impacts from construction would be intensified during the construction phase and after construction would be the same as those discussed under casual use. Realignment of routes could be beneficial to wildlife species using the area if the existing route were impacting habitat critical and rerouting would reduce impacts (e.g., if a route were impacting a spring used by wildlife and rerouting it would reduce impacts on the spring). In general, limiting construction and realigning and upgrading roads is beneficial to terrestrial wildlife species.

Alternative A—Under this alternative restrictions on constructing roads and trails would be implemented on a case-by-case basis throughout the decision area. This alternative has the highest potential to have impacts on terrestrial wildlife using GRSG habitat due to the lack of restrictions on activities.

Alternative B—Constructing and realigning roads and trails would be highly limited in PHMA, as would upgrades to existing roads and trails. This alternative would also limit new construction in PHMA to access valid existing rights so that any new construction that would cause the area to exceed 3 percent disturbance would require mitigation to offset the disturbance. This alternative provides more habitat protection than Alternatives A and D, but not as much as Alternative C.

Alternative C—This alternative is similar to Alternative B but expands the restrictions on construction, realignment and upgrading to ADH. In addition, this alternative would expand the 3 percent disturbance cap to the entire area within 4 miles of a lek. Generally this alternative would be the most restrictive for new construction, realignment and upgrading of roads and trails, and therefore is expected to provide the greatest benefit to terrestrial wildlife.

Alternative D—This alternative applies restrictions to PHMA that are more flexible than those outlined in the NTT report. Other than Alternative A, this

BLM_0029474

alternative is the least restrictive for constructing, realigning, and upgrading roads and trails.

Habitat Restoration/Improvement
*Reclamation of Roads and Trails.* Reclamation of roads and trails is expected to have beneficial impacts on terrestrial wildlife species through reduction of the direct and indirect impacts discussed under casual use above.

None of the proposed alternatives require restoration except as a possible mitigation for the disturbance cap (as described above under construction of roads and trails).

Alternative A—Alternative A provides the least direction on habitat restoration for GRSG thus it would result in the least habitat restoration for this habitat type.

Alternatives B and D—Alternatives B and D require consideration of use of transplanted sagebrush in PHMA. Alternatives B and D would have fewer beneficial impacts than Alternative C, but would have more beneficial impacts than Alternative A.

Alternative C—Alternative C requires use of transplanted sagebrush in ADH. As a result it Alternative C could result in the most rapid habitat recovery for GRSG because transplanted sagebrush may provide GRSG-required habitat features faster.

Proposed LUPA—Impacts for the indicators described above (direct habitat loss, habitat fragmentation, and disruption) from recreation on terrestrial wildlife, are similar to those under Alternative D for constructing roads and trails and disrupting and degrading habitat.

*Impacts from Lands and Realty Management on Terrestrial Wildlife*

Direct Habitat Loss/Habitat Fragmentation/Habitat Degradation
In areas where ROWs are permitted, there would be more impacts on terrestrial wildlife species and wildlife habitats than in areas where ROWs are excluded or avoided.

Constructing and operating ROW facilities (such as transmission lines, roads, and pipelines) may result in habitat loss, fragmentation, and degradation. Surface disturbance during construction removes vegetation, reducing important hiding cover and forage for wildlife species. ROWs, such as roads and industrial facilities, may lead to permanent loss of wildlife habitat. Other ROWs, such as pipelines or buried power lines, may lead to a more short-term loss of habitat if the area were reclaimed after construction. In addition to vegetation removal, long-term occupancy of structures (e.g., wind turbines and transmission lines) and facilities leads to direct habitat loss.

BLM_0029475

ROWs may also lead to habitat fragmentation and degradation. ROW projects can reduce patch size and increase edge habitats. These impacts would be more severe on species that require large blocks of intact habitat, but species that require edge habitat could benefit from this disturbance. Surface disturbance can also lead to new weed infestations and spread weeds where infestations already occur. Noxious and invasive weeds are often of lower value to wildlife species and degrade wildlife habitat by reducing optimal cover or food. Fragmentation and habitat degradation may lead to a lower carrying capacity and reduce wildlife populations.

Excluding, limiting, or collocating ROWs in GRSG habitats would benefit wildlife species that occupy sagebrush habitats. In addition, disturbance caps and TLs can protect wildlife species from disturbances. However, if disturbances are moved from GRSG habitat into other habitat types, such as pinyon-juniper woodlands, species that occupy these habitats may experience greater impacts from ROW projects.

Disruption to Species
Both the construction and operation phases of ROW projects can lead to disruption impacts. Noise and an increase in human presence during construction may displace wildlife into lower quality habitat and may disrupt breeding, nesting, wintering, and migration. Although construction impacts are generally short term, many impacts would continue during routine maintenance and operation of the ROWs. Some wildlife species may avoid habitat in the vicinity of infrastructure, resulting in indirect habitat loss. In addition, noise and an increase in traffic during ROW operation and maintenance would disturb and likely displace wildlife. Predation and harassment of prey species can increase when tall structures (power lines and towers) provide additional perch locations for raptors and corvids (Avian Power Line Interaction Committee 2006) or when ROW roads increase mammalian predator densities.

Constructing and operating ROW facilities may also lead to direct mortality of wildlife. This impact would be more pronounced for burrowing animals or wildlife with limited mobility. Direct mortality may occur when such species as bats or birds collide with turbines, power lines, and meteorological towers or their supporting infrastructure, such as guy wires (Erickson et al. 2005). In addition, increased traffic on roads from ROW maintenance and operations can lead to direct mortality through vehicle/wildlife collisions.

Excluding, limiting, or collocating ROWs in GRSG habitats would benefit wildlife species that occupy sagebrush habitats. In addition, disturbance caps, NSOs, and TLs can protect wildlife species from disruptions. However, if disturbances are moved into other habitat types, such as pinyon-juniper woodlands, species that occupy these habitats may experience greater impacts from ROW projects.

BLM_0029476

Habitat Protection

Managing important GRSG habitat as exclusion or avoidance areas would eliminate or reduce the impacts discussed above. Protections afforded to GRSG under the various alternatives would benefit those wildlife species whose ranges are coincident with PHMA or GHMA.

*Withdrawals.* Withdrawing PHMA from mineral entry and other authorized activities would be beneficial to wildlife habitats. Prohibiting surface-disturbing and surface-disrupting activities would benefit terrestrial wildlife by precluding activities that would have direct and indirect impacts on terrestrial wildlife.

*Land Tenure.* In general, proponents of land acquisition or disposal actions would consider land tenure adjustment criteria with the goal that the exchange, acquisition, or disposal would increase public benefits, including wildlife resources. Any acquisition of land that includes high-value GRSG habitat can result in beneficial impacts on wildlife whose ranges are coincident with GRSG. Any disposal of BLM-administered or National Forest System land with high-value habitat is typically avoided; such disposals could increase the risk of habitat loss through development because there would not be any BLM and Forest Service-required mitigation. Lands no longer administered by the BLM and Forest Service could also experience increased human presence that can increase disturbance to wildlife in the area. Consolidating landownership through land tenure adjustments increases the manageability of lands and results in more contiguous blocks of habitat; this would beneficially impact wildlife.

Summary of Impacts by Alternative

Alternative A would have the most areas available for ROWs and would have the most potential to impact wildlife species and their habitat. The impacts described above would be the greatest under this alternative.

Alternative B would have fewer areas available for ROWs through restrictions to protect GRSG habitat. Under this alternative, PHMA would be managed as an exclusion area, and GHMA would be managed as an avoidance area for new ROW projects (see **Figures 2-4** through **2-7**, **Appendix A**). In addition, Alternative B would encourage consolidation of GRSG habitat, facilitating habitat conservation. These conservation measures would be more protective than conservation measures under Alternatives A and D but would be less protective than Alternative C; therefore, potential impacts on wildlife whose ranges overlap GHMA and PHMA would be less than Alternatives A and D but would be greater than Alternative C.

Alternative C would have the most protective measures for GRSG. Under this alternative, ADH would be managed as an exclusion area for new ROW projects. In addition, Alternative C would encourage consolidation of GRSG habitats, facilitating habitat conservation and management. This alternative is expected to have the fewest impacts on wildlife species whose ranges overlap GHMA and PHMA.

BLM_0029477

Under Alternative D, PHMA would be managed as an avoidance area. ROW projects would be allowed in PHMA if the project would not adversely affect GRSG populations. This alternative would be more protective than Alternative A but less protective than Alternatives B and C.

Under the Proposed LUPA, impacts would be similar to those described above for Alternative D. However, additional protections would be greater under the Proposed LUPA for those species that overlap all GRSG habitat. This is because GHMA would also be managed as avoidance for ROWs. Additionally, under the Proposed LUPA, no aboveground structures would be authorized within 1 mile of active leks in occupied habitat. This would provide additional protection for those species vulnerable to avian predation.

Under the Proposed LUPA, both PHMA and GHMA would be managed as exclusion for large transmission lines, with the exception of several ongoing projects. For the description of impacts from proposed large transmission lines in northwest Colorado, see Cumulative Impacts (**Chapter 5**).

*Impacts from Wind Energy Development on Terrestrial Wildlife*

Direct Habitat Loss/Habitat Fragmentation/Habitat Degradation
In areas where wind energy facilities are permitted, there would be more impacts on wildlife species than in areas where wind energy facilities are excluded.

Wind energy facilities would be authorized through ROWs. Impacts on wildlife habitats from constructing and operating wind energy facilities would be similar to the impact for ROWs. These impacts are direct habitat loss, fragmentation, and degradation (see *Impacts from Land and Realty Management on Terrestrial Wildlife*). The potential for wind energy development in northwest Colorado is very limited.

Disruption to Species
In areas where wind energy facilities are permitted, there would be more impacts on wildlife species than in areas where wind energy facilities are excluded.

Impacts on wildlife habitats from constructing and operating wind energy facilities would be similar to the impact for ROWs. These impacts are direct habitat loss, fragmentation, and degradation. Impacts on species could also include mortality, stress, and avoidance of turbines. (See *Impacts from Land and Realty Management on Terrestrial Wildlife.*)

Summary of Impacts by Alternative
Alternative A does not exclude wind energy developments specifically from GRSG habitat. In addition, this alternative would have the most areas available

BLM_0029478

for ROWs and would have more potential to impact wildlife than Alternatives B, C, and D.

Although Alternative B does not exclude wind energy developments specifically from GRSG habitat, this alternative would have fewer areas available for ROWs. Conservation measures would be more protective under Alternative B than under Alternatives A and D but would be less protective than Alternative C; therefore, potential impacts on wildlife whose ranges overlap GHMA and PHMA would be less than Alternatives A and D but would be greater than Alternative C.

Alternative C would have the most protective measures for GRSG by precluding wind developments from ADH; therefore, it would have the fewest impacts on wildlife species whose ranges overlap GHMA and PHMA.

Although Alternative D does not address wind energy specifically, Alternative D would be more protective in respect to all ROWs than Alternative A, but it would be less protective than Alternatives B and C.

Under the Proposed LUPA, wind energy development would be excluded from PHMA; impacts on terrestrial wildlife would therefore be similar to those under Alternative C for those species whose ranges overlap PHMA. However, the impact on terrestrial wildlife from restrictions on wind energy development is not expected to vary between alternatives because the potential for industrial wind energy in northwest Colorado is very limited.

*Impacts from Solar Energy Development on Terrestrial Wildlife*

<u>Direct Habitat Loss/Habitat Fragmentation/Habitat Degradation</u>
In areas where solar energy facilities are permitted, there would be more impacts on wildlife species than in areas where solar energy facilities are excluded. All solar energy projects 20 megawatts and greater are excluded in all LUPs in the planning area, as described in the Solar Energy Development Programmatic EIS Record of Decision (BLM 2012). There is limited potential for industrial solar development in the planning area.

Impacts on wildlife habitats from constructing and operating solar energy facilities would be similar to the impact for ROWs. These impacts are direct habitat loss, fragmentation, and degradation (see *Impacts from Land and Realty Management on Terrestrial Wildlife*).

<u>Disruption to Species</u>
In areas where solar energy facilities are permitted, there would be more impacts on wildlife species than in areas where solar energy facilities are excluded.

BLM_0029479

Impacts on wildlife habitats from constructing and operating solar energy facilities would be similar to the impact for ROWs. These impacts include direct habitat loss, fragmentation, and degradation (see *Impacts from Land and Realty Management on Terrestrial Wildlife*).

Summary of Impacts by Alternative

Alternative A does not exclude solar facilities specifically from GRSG habitat. In addition, this alternative would have the most areas available for ROWs and would have more potential to impact wildlife than Alternatives B, C, and D.

Although Alternative B does not exclude solar facilities specifically from GRSG habitat, it would preclude siting a solar facility in PHMA. Conservation measures would be more protective under Alternative B than Alternatives A and D but would be less protective than Alternative C; therefore, impacts on wildlife whose ranges overlap GHMA and PHMA would be less than Alternatives A and D but would be greater than Alternative C.

Alternative C would have the most protective measures for GRSG by precluding solar facilities from ADH and therefore would have the fewest impacts on wildlife species whose ranges overlap GHMA and PHMA.

Although Alternative D does not address solar facilities specifically, it would be more protective in respect to all ROWs than Alternative A but would be less protective than Alternatives B and C.

*Impacts from Range Management on Terrestrial Wildlife*

Direct Habitat Loss/Habitat Fragmentation/Disruption to Species

In areas that are available for livestock grazing, there could be more impacts on terrestrial wildlife from vegetation management than in areas where livestock grazing is excluded.

The noise from heavy equipment used for treatments and fence construction could temporarily disperse bird species from breeding and nesting habitat and wildlife from occupied habitat. Prescribed burning could also disturb nesting bird species from smoke inadvertently drifting into occupied habitat (see also *Impacts from Wildfire suppression, Fuels Management, and Fire Rehabilitation*). These activities have the potential to remove or alter terrestrial wildlife habitat and could result in disrupted foraging and nesting behavior.

Disturbances from heavy equipment and prescribed burning would be localized and short term. Most wildlife species would move into adjacent untreated areas; however, direct mortality during the vegetation treatments is possible. Direct mortality can also result from fence collisions and entanglement. TLs (such as those for big game birthing areas, raptor nesting, and big game winter habitat), as well as site-specific COAs (such as TLs for migratory bird nesting), could mitigate the short-term impacts resulting from the treatments.

BLM_0029480

Habitat treatments would be beneficial for species that depend on younger seral stages. However, there would also be adverse direct and indirect impacts on species that depend on large blocks of older seral stage habitats until vegetation communities reestablish themselves. Adverse impacts on these species are direct habitat loss, habitat modification, habitat fragmentation, and reduced habitat effectiveness. The timing of rangeland habitat projects could adversely impact nesting birds and young broods by direct mortality; however, most projects occur in the fall, after the nesting season.

A concern of resetting vegetation seral stage through vegetation treatments is the invasion of undesirable plant species. Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds.

Cheatgrass invasion is also a threat to some treatment areas. Invasive nonnative plants with little or no forage value for big game species are increasing in some areas. The greatest impacts have occurred on big game winter range areas with low precipitation rates. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. Cheatgrass would provide some short-term forage benefits to big game species while in the early stages of growth; however, cheatgrass lacks the ability to provide high quality forage during most of the year.

Noxious and invasive weed management includes herbicide use, biological controls, and mechanical treatments in weed-infested areas. Short-term habitat and forage loss for some wildlife could result from treatments; adverse direct impacts could result from accidental chemical drift caused by herbicide use in nearby areas. For example, accidental chemical drift could poison individual bird species or result in mortality of prey. All weed treatments would result in long-term beneficial impacts on terrestrial wildlife species and to their habitats, as native vegetation is, or would be, restored.

Implementation-level grazing decisions would comply with BLM Colorado Public Land Health Standard #3 (BLM 1997). Where the standards are being met, rangeland management is expected to result in minimal impacts on terrestrial wildlife. Healthy, productive, and diverse plant communities support terrestrial wildlife communities that are productive, resilient, diverse, and vigorous and those that are able to reproduce and sustain natural fluctuations and ecological processes; therefore, implementing management actions that contribute to maintaining the condition and quality of wildlife habitat would ensure that BLM Colorado Public Land Health Standard #3 (BLM 1997) would be met throughout the life of the LUPA.

BLM_0029481

Alternative A would allow livestock grazing and has the most potential for vegetation disturbance and range improvements with the fewest restrictions; therefore, Alternative A would have the greatest impact on terrestrial wildlife.

The potential for vegetation disturbance and range improvements would be the same under Alternative B as under Alternative A; however, more restrictions would be in place to protect GRSG habitat, so it would have fewer impacts on terrestrial wildlife.

Removing livestock under Alternative C would lead to substantial improvements in herbaceous understories, which would likely benefit terrestrial wildlife species in general; however, in all practicality, the only way to keep livestock out of these areas would be through fencing. An estimated 5,000 miles of fence would need to be constructed under this alternative (see, **Table 4.6** in **Section 4.13**, Range Management). Increased fence densities may have an impact on terrestrial wildlife species, particularly big game species. Potential impacts would depend on fence design and location (coincident with GRSG habitats).Conversely, if livestock were removed from public lands, there would be no need to maintain existing fences, particularly in areas with large, continuous tracts of publicly owned land.

Alternative D would have the same areas available for livestock grazing as Alternatives A and B. Impacts on terrestrial wildlife would be the same under Alternative D as they would be under Alternative B.

Under the Proposed LUPA, the same areas would be available for livestock grazing as under Alternatives A, B, and D, and the impacts on terrestrial wildlife would be the same.

Habitat Degradation
In areas that are available for livestock grazing, there could be more impacts on terrestrial wildlife than in areas where livestock grazing is excluded.

The impacts resulting from livestock grazing on wildlife habitat are competition for forage and water and habitat use. Grazing invariably reduces the height and ground cover of plants, at least temporarily. This would reduce the cover wildlife species need for protection, escape, feeding (including the availability of prey populations), roosting, breeding, and nesting. Inappropriate grazing, or overgrazing, could change habitat effectiveness and the connectivity of wildlife habitats by changing the structure, composition, or diversity of vegetation. The placement of salt and mineral supplements could lead to cattle concentration in terrestrial wildlife species habitats. This could displace species, cause nests to be trampled, and reduce habitat quality. Impacts could be both short term and long term and could range from minor to major, depending on the grazing intensity, duration, season of use, and local climate.

BLM_0029482

Managing the timing and intensity of livestock grazing is critical to maintaining habitat conditions preferable to wildlife. For example, cattle grazing during the early season could improve the quality of winter forage for elk; however, cattle must be removed early enough in the fall to allow plants to regrow.

Implementation-level grazing decisions would comply with BLM Colorado Public Land Health Standards (BLM1997a). If livestock grazing were the cause for lands not meeting BLM Colorado Public Land Health Standards, changes would be made in order to address the kind, numbers, and class of livestock, as well as the season, duration, distribution, frequency, and intensity of grazing.

Alternative A would allow livestock grazing, with no restrictions in place to protect GRSG habitat specifically and therefore would have the greatest impact on terrestrial wildlife.

Alternative B would have the same areas available for livestock grazing as Alternative A; however, more restrictions would be in place to protect GRSG habitat, so it would have fewer impacts on terrestrial wildlife.

Alternative C would have no areas available for livestock grazing within ADH and therefore would have the fewest impacts on terrestrial wildlife.

Alternative D is similar to Alternative B but would be slightly more restrictive. This is because GRSG habitat objectives within grazing allotments would be applied to ADH and not just PHMA. This alternative would have fewer impacts than Alternative A and would have greater impacts than Alternative C.

Under the Proposed LUPA, livestock grazing would be managed the same as described for Alternative D, and impacts on terrestrial wildlife would be the same.

Habitat Restoration/Improvement
In areas that are available for livestock grazing, there is more opportunity to improve habitat quality for terrestrial wildlife using grazing and vegetation management as tools than in areas where livestock grazing is excluded.

In the long term, wildlife would benefit from most vegetation treatments and grazing. This would be due to decreases in noxious and invasive weeds, increases in vegetation productivity, and increases in plant diversity and age classes. This would, in turn, provide additional forage, cover, and prey base. Mimicking natural periodic disturbance is often necessary to stimulate plant productivity and to increase diversity and nutritional value.

Removing residual cover could hasten spring green-up of the herbaceous understory, thereby providing quality forage for wildlife coming out of stressful winter conditions. Improving vegetation in upland areas would provide more forage to big game species and other herbivorous species that occur in these

BLM_0029483

areas. This would result in direct beneficial impacts. Livestock grazing can also enhance forage and brood-rearing conditions for wildlife species.

Well-designed water developments (e.g., reservoirs) and the associated riparian vegetation create nesting, feeding, and brood-rearing habitat for waterfowl and other migratory birds. The development of water sources in dry regions would allow wildlife use to expand into habitats that previously were used only seasonally. Range improvements for livestock would disperse the impact of livestock on the land, which, in turn, would prevent disturbance, weed spread, and soil compaction in any one area.

Vegetation treatments in upland areas often divert livestock and wildlife use from riparian and wetland areas, thereby increasing the vigor and structural diversity of these plant communities. In addition, benefits resulting from habitat restoration (such as road reclamation, weed spraying, fertilization, and seeding) include increased habitat connectivity, improved pollinator habitat for plants, weed control, soil stability, and a more natural fire regime.

Alternative A would allow livestock grazing, with the most potential for vegetation management and the fewest restrictions; therefore, Alternative A would allow the most flexibility to use these tools to benefit terrestrial wildlife.

The potential for livestock grazing and vegetation management would be more restrictive under Alternative B than under Alternative A. Vegetation treatments would be allowed only if they conserve, enhance, or restore GRSG habitat in PHMA. Thus, there would be less flexibility to use grazing and vegetation management tools to benefit terrestrial wildlife.

Alternative C would not allow livestock grazing in ADH for GRSG, and only treatments that would benefit GRSG would be allowed; therefore, Alternative C would allow the least flexibility to use grazing and vegetation management tools to benefit terrestrial wildlife.

Alternative D would have the same areas available for livestock grazing as Alternatives A and B. The potential to use grazing and vegetation management tools to benefit terrestrial wildlife would be less restrictive under Alternative D, compared to Alternatives B and C, and more restrictive than Alternative A.

Impacts on terrestrial wildlife under the Proposed LUPA are the same as those described under Alternative D above.

*Impacts from Wild Horse Management on Terrestrial Wildlife*

<u>Disruption to Species</u>
Wild horse gathers would create short-term localized disturbance to wildlife from human activity. Vehicle traffic, helicopter use, wranglers on horseback, and the movements of the wild horses during gathers would contribute to wildlife

BLM_0029484

stress and displacement. Managing wild horses may result in range improvement projects, such as fences and water developments. Disturbance from construction and maintenance of range projects are similar to impacts described in the livestock grazing section (see *Impacts from Range Management on Terrestrial Wildlife*).

Habitat Degradation

Grazing by wild horses would be similar to permitted livestock grazing (see above) and may result in competition for forage, water, and available habitat. Season-long grazing by wild horses may impact habitat quality by changing structure, composition, or diversity of vegetation. Since horse diets consist primarily of grass, and horses can clip vegetation close to the ground, year-round grazing by wild horses can remove important cover for nest and concealment. Decreased cover and diversity of grasses and shrubs as well as decreased mammal burrow density have been documented at water sources used by wild horses (Beever and Brussard 2000; Ganskopp and Vavra 1986). Small mammals are a prey base for many species, so less prey can negatively affect raptors and carnivores that may inhabit the area. Grazing by wild horses can also facilitate new weed infestations or spread weeds where infestations already occur.

Wild horses also contribute to riparian-wetland habitat degradation, which reduces the quality or suitability of these habitats for wildlife species. Wild horses that tend to dominate water sources can force wildlife to find alternative water sources. This can displace wildlife into lower-quality habitat or force wildlife to travel farther to find water. Under all alternatives, the BLM has the ability to adjust the appropriate management level of wild horses if resources are being damaged. However, only Alternatives B, C, and D provide management guidelines specific to GRSG habitat.

Summary of Impacts by Alternative

Alternative A would place the fewest restrictions on wild horse management and therefore would have the most potential for impacts on terrestrial wildlife.

Alternative B would place some restrictions on the management of wild horses. Under this alternative, gathers would be prioritized in ADH, and GRSG habitat objectives and management considerations would be incorporated into HMA plans. These management strategies would benefit wildlife species whose ranges overlap PHMA or GHMA. Overall, impacts on terrestrial wildlife are less than Alternative A and D but similar to Alternative C.

Alternative C would have the same impacts on terrestrial wildlife species as Alternative B.

Alternative D would be similar to Alternatives B and C but would consider all resource values in conjunction with GRSG when managing wild horses. For

BLM_0029485

terrestrial wildlife, impacts from this alternative would be similar to Alternatives B and C but more protective than Alternative A.

For the Proposed LUPA, wild horse management would be the same as under Alternative D; impacts are therefore the same.

*Impacts from Fluid Minerals Management on Terrestrial Wildlife*

Impacts on fish and wildlife species would be most pronounced in certain Colorado MZs. These are the zones that currently are strongly influenced by energy development or would experience increases in energy development in the near future. However, all lands with existing lease rights have the potential to be influenced by development activities. See **Table 3.34**, Acres of Oil and Gas Potential on Planning Area GRSG Habitat, in **Section 3.7**.

**Table 4.1** shows the aces of leased and unleased mule deer habitat where it overlaps GRSG habitat. Although multiple big game species occupy sagebrush habitats, mule deer range most closely approximates GRSG habitat.

**Table 4.1**
**Acres of Federal Mineral Estate in Mule Deer Habitat**

| Field Office | Leased | | Unleased | |
|---|---|---|---|---|
| | Severe Winter Range | Summer Range | Severe Winter Range | Summer Range |
| | PHMA | ADH | PHMA | ADH |
| CRVFO | 0 | 80 | 16,600 | 26,600 |
| GJFO | 0 | 3,000 | 0 | 1,400 |
| KFO | 14,100 | 14,100 | 45,600 | 55,900 |
| LSFO | 115,400 | 187,900 | 232,800 | 473,400 |
| WRFO | 17,500 | 98,900 | 3,000 | 59,800 |
| Roan Plateau | 0 | 0 | 0 | 0 |
| Routt National Forest | 10 | 10 | 500 | 500 |

Source: BLM 2013a

<u>Direct Habitat Loss and Modification</u>

Shrubland and woodland clearing and facility occupation would result in long-term modification or loss of woody vegetation as a source of wildlife forage or cover. This condition would persist from about 20 years in mountain big sagebrush sites to 150 to 200 years in pinyon-juniper woodlands. Interim (pad) and final (pipeline) reclamation applied to surface disturbances would not generally regain useful shrubland character for one to two decades; however, it could serve as a source of herbaceous forage and cover in the short term.

In every seasonal range, the presence of early seral (interim/final reclaimed) sites that provide greater horizontal and vertical ground cover or more diverse structural or flowering forms may serve important functional roles to all animal groups. This includes overwinter cover for non-hibernating small mammals,

BLM_0029486

substrate for invertebrate prey of migratory birds and GRSG, and supplemental sources of nutritious herbaceous forage for big game. In the long term, reclamation practices are expected, in varying degrees, to establish herbaceous communities that complement successional advance to former shrubland or woodland character.

The potential to influence big game both positively and negatively would vary by alternative. Big game would benefit (to varying degrees) by conservation measures designed to reduce or eliminate sagebrush loss or alteration. This would be the case where important seasonal ranges are coincident with PHMA or ADH, such as severe winter range (which supports up 90 percent of a herd's population during the most severe winters), summer range, or calving/production areas.

Similarly, reclamation practices designed to promote reestablishment of perennial grass and forb species would benefit big game species in the short term. Excluding or limiting disturbance in sagebrush habitat may increase the removal or modification of other community types that big game rely on (such as pinyon-juniper and mountain shrub) or lead to the occupation of important big game seasonal ranges (such as severe winter ranges and elk production). This could have negative impacts.

The most prevalent habitat-related risk from fluid minerals development in and potentially outside the planning area would extend primarily to woodland nesting raptors (that is, accipiters and owls). This would be the case where the clearing of pinyon-juniper woodlands can alter nest stand conformation or the character of the surrounding habitat for centuries. Because redevelopment of canopy structure suitable for raptor nesting is prolonged (e.g., 150 years or more), reductions in the suitable habitat base can accumulate rapidly at the landscape level. Avoidance of sagebrush habitats associated with each alternative could shift development into other community types, including pinyon-juniper, resulting in long-term habitat loss for many raptor species.

Development would most likely occur in three major vegetation complexes: pinyon-juniper, upland big sagebrush, and mountain shrub. The level of habitat loss in each respective community would vary by alternative. Excluding or limiting development in big sagebrush habitats (associated with PHMA and ADH) would benefit those nongame bird and small mammal species that are closely associated with sagebrush communities.

Additionally, the reestablishment of perennial herbaceous forms capable of providing more effective ground cover from reclamation requirements of the various alternatives would benefit ground or low shrub nesting birds and most small mammals in the short term. Relocation of development into communities that are incapable of supporting GRSG (pinyon-juniper, aspen/spruce/fir, and mountain shrub) could negatively influence those nongame species that rely more on these communities for cover, nesting, and forage.

BLM_0029487

Indirect Habitat Loss and Avoidance (Disruption to Species)

The avoidance of otherwise functional habitats due to human activity adds substantially to overall loss of habitat. Impacts on terrestrial wildlife from constructing and operating well pads and ancillary facilities (including maintenance activities) would be similar to those discussed above under *Impacts from Lands and Realty Management on Terrestrial Wildlife*. Impacts would vary depending on species.

Research has shown that big game have the tendency to avoid human disturbance, most commonly access roads and trails (Rost and Bailey 1979; Preisler et al. 2006). Increased traffic volumes could also increase the frequency of vehicle strikes, resulting in injury or direct mortality.

Raptors as a group and eagles in particular are birds afforded protection under the Migratory Bird Treaty Act and Bald and Golden Eagle Protection Act. Raptors traditionally receive pronounced management attention due to their relatively low abundance (high trophic level) and reproduction potential.

Raptors are considered to be among those birds most susceptible to reproduction failure caused by human activities. As indicated above under *Direct Habitat Loss*, conservation measures designed to avoid or reduce disturbance in sagebrush habitats may result in more concentrated development in other vegetation types, including woodland communities; however, a combination of COAs (nest surveys), NSO, and TL stipulations designed to prevent disrupting ongoing nesting would be applied regardless of alternative. An example of this disruption is development-induced absences of the adult birds sufficient to jeopardize egg or nestling survival from malnourishment, exposure, or predation. Clearing shrubland and woodland canopies would increase foraging habitat available primarily for buteo hawks, falcons, and eagles.

Although the response is species specific, migratory birds tend to avoid siting nests near disturbance. Inglefinger and Anderson (2004) found the nesting density of sagebrush-associated birds was reduced by 40 to 60 percent within 330 feet of roads accessing natural gas fields in Wyoming, with as few as 10 vehicle trips per day. Recent work from Wyoming gas fields (Gilbert and Chalfoun 2011) documents 10 to 20 percent declines in the abundance of sage sparrow and Brewer's sparrow in developed natural gas fields.

Conservation measures under each alternative and designed to reduce or eliminated impacts on GRSG and sagebrush habitat in each Colorado MZ would undoubtedly reduce the indirect influences of fluid minerals development on bird species closely associated with sagebrush communities: Brewer's sparrow, sage thrasher, and vesper sparrow. Activity in woodland and deciduous shrubland communities may intensify as a result of these conservation measures, leading to avoidance-based declines in habitat capacity. COAs, NSO, and TL stipulations may moderate the influence of development on breeding bird activity. Intervening topography and taller shrubland forms (e.g., serviceberry

BLM_0029488

and oakbrush) and woodland vegetation also could moderate development influence.

Habitat Fragmentation and Habitat Degradation

Fluid minerals development (well pads, roads, and associated structures) would physically fragment habitat across the landscape. This would reduce intact expanses of habitat and would increase edge habitats within the habitat matrix. In terms of functional connectivity, development patterns (scale and distribution) could influence animal movement patterns and may, depending on species mobility and behavioral responses, create absolute barriers.

Surface-disturbing activities can alter plant community composition and decrease species diversity and may lead to the proliferation of noxious weeds and invasive plant species. All of these can reduce the habitat quality for resident wildlife species. Conservation measures outlined in each alternative would reduce the potential for fragmentation and degradation across sagebrush landscapes within each Colorado MZ. The potential for development to be relocated into non-sagebrush habitats, either within or next to Colorado MZs, could alter the conformation or character of woodland and shrubland types. This could reduce habitat quality and carrying capacity.

Habitat Restoration/Improvement and Habitat Protection

Protections afforded to GRSG under the various alternatives would benefit those wildlife species whose ranges are coincident with PHMA or ADH. Conservation measures associated with each alternative would reduce or eliminate impacts associated with oil and gas development (see below). These measures include excluding development, limiting surface disturbance (disturbance cap), and applying TL and NSO stipulations.

Depending on the vegetation communities involved, habitat improvement projects and off-site mitigation designed to reduce oil and gas-related impacts on GRSG and sagebrush habitat can both positively and negatively influence other wildlife species. Habitat restoration projects designed to benefit GRSG would ostensibly benefit other sagebrush obligate species, particularly nongame mammals and birds. Modification of other community types (pinyon-juniper and mountain shrub) to promote sagebrush may negatively influence those species that rely on those vegetation types for food, cover, or nesting material.

Impacts may vary depending on scale. Prompt and effective reclamation practices associated with interim (pad) and final (pipeline) reclamation would accelerate the restoration of lands disturbed by development. This would benefit wildlife species in general by improving forage and cover resources (increased forb and perennial grass expression, reductions in annual, invasive species, and noxious weeds).

BLM_0029489

Summary of Impacts by Alternative

Under Alternative A, protective measures would vary by MZ (for existing LUPs, see **Chapter 2**), but generally this alternative would restrict fluid minerals development less than Alternatives B, C, and D. This would result in a greater potential for habitat loss or modification. Additionally, design features would be preferred not required in most instances. This could result in more direct and indirect impacts on sagebrush habitat and those wildlife species inhabiting the area. Overall, this alternative would have the greatest impacts on terrestrial wildlife species.

Under Alternative B, unleased areas in PHMA would be closed to fluid minerals leasing (see exception criteria detailed in **Chapter 2**). No new surface occupancy would be allowed in PHMA for existing leases, with exceptions for those leases located entirely in PHMA or within the 4-mile lek perimeter (see **Chapter 2**). In both cases surface disturbance would be limited to one well, pad, and pipeline per section, with no greater than 3 percent total disturbance per section. Seasonal timing restrictions during the nesting and early brood-rearing periods would apply to exploratory wells only and would be limited to PHMA.

Alternative B would provide greater benefit to terrestrial wildlife species than Alternatives A and D but fewer than Alternative C. Conservation measures applied under this alternative would be limited to PHMA in nearly all instances and could influence 617,500 acres (25 percent) of all federally managed GRSG habitats (ADH).

The above protective measures would benefit those wildlife species whose ranges or habitat are coincident with PHMA. Limiting disturbance to one per section, with no more than 3 percent, would also reduce the extent of direct habitat loss for terrestrial wildlife species whose ranges overlap PHMA. However, scale of disturbance (both direct and indirect) would depend on lease size and configuration within each Colorado MZ. In instances where several small leases occur entirely within PHMA or the 4-mile lek perimeter, pad and road development may have substantial impacts on wildlife species, depending on timing.

Excluding or reducing surface-disturbing activities in PHMA would shift development into habitats outside of PHMA. This may influence those species that use non-sagebrush communities for nesting, cover, and forage. Of particular note would be woodland raptors and migratory birds that commonly nest in pinyon-juniper. Direct removal or modification that compromises nest stand character would reduce the habitat quality or carrying capacity for local raptor and migratory bird populations. This would depend largely on amount and distribution of development.

Under Alternative C ADH would be closed to fluid minerals leasing (see exception criteria outlined in **Chapter 2**). In general, conservation measures

BLM_0029490

addressed in Alternative C are similar to those described for Alternative B; however, protections offered under this alternative would be expanded to include ADH, in most cases. This alternative applies further protective measures by prohibiting the construction of evaporative or infiltration reservoirs (coal bed methane wastewater). This would require agencies to explore options to amend or cancel leases in ACECs and occupied habitats and would disallow waivers to be issued. See **Chapter 2** for a detailed description of conservation measures under this alternative.

Alternative C would provide the greatest protective measures for terrestrial wildlife species whose ranges or habitat are coincident with ADH. This could influence up to 1,094,000 acres (43 percent) of all federally managed GRSG habitat (ADH). Discussions in Alternative B regarding benefits and potential negative impacts on terrestrial wildlife are directly applicable to Alternative C.

Alternative D would make all unleased parcels in PHMA an NSO area. Exception criteria would allow leasing in Colorado MZs where GRSG populations are healthy and stable and where development would not adversely affect GRSG populations. Development may be authorized in excess of the 5 percent disturbance cap (see **Chapter 2**). For leased areas, surface occupancy or disturbance would be prohibited within 4 miles of a lek in PHMA during the lekking and early brood-rearing periods.

Surface disturbance would be limited to 5 percent in any MZ, where practical. In those MZs where surface disturbance exceeds 5 percent, effective mitigation would be required to offset loss of sagebrush habitat; however, the BLM Authorized Officer may approve disturbance in excess of 5 percent without requiring additional mitigation. Exceptions, waivers, and modifications may be granted at the discretion of the BLM Authorized Officer and only with concurrence from the CPW.

Seasonal restrictions identical to those in Alternative B would also be applied to exploratory wells. Design features intended to reduce impacts on GRSG and sagebrush habitat would be preferred rather than required (PDFs).

Similar to Alternative B, conservation measures under Alternative D would be limited to PHMA and could influence 617,500 acres (25 percent) of all federally managed GRSG habitats (ADH). However, the potential for direct habitat loss and indirect impacts would be greater under this alternative, compared with Alternatives B and C. This would be due largely to the 5 percent disturbance cap and allowance for development to occur in PHMA (open for development). As such, this alternative would provide fewer protective measures to those terrestrial wildlife species whose ranges or habitats are coincident with PHMA than Alternatives B and C; however, it would provide more protective measures than Alternative A. As addressed in Alternative B, relocating development into non-sagebrush types may negatively influence those species that use other vegetation communities.

BLM_0029491

*Unleased Fluid Minerals*
Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA (see exception criteria below) and within 2 miles of active leks in GHMA (see **Appendix D**).

Modifications and waivers would not be permitted; the BLM Authorized Officer may grant an exception to this NSO stipulation only under the following circumstances:

1. Where the proposed action would have no direct, indirect, or cumulative effects on GRSG or its habitat

2. When it is proposed as an alternative to a similar action on a nearby parcel and would provide a clear conservation gain to GRSG

Exceptions based on conservation gain (2 above) may be considered only as follows:

- In PHMA of mixed ownership, where federal minerals underlie less than fifty percent of the total surface

- On public lands where the proposed exception is an alternative to an action occurring on a nearby parcel that is subject to a valid federal fluid mineral lease as of the date of this RMP (revision or amendment).

Exceptions based on conservation gain must also include such measures as enforceable institutional controls and buffers sufficient to allow the BLM to conclude that such benefits would last for the duration of the proposed action's impacts.

> *Any exceptions to this lease stipulation may be approved by the Authorized Officer only with the concurrence of the State Director. The Authorized Officer may not grant an exception unless the applicable state wildlife agency, the USFWS, and the BLM unanimously find that the proposed action satisfies [1 or 2 above]. Such finding shall initially be made by a team of one field biologist or other GRSG expert from each respective agency. In the event the initial finding is not unanimous, the finding may be elevated to the appropriate BLM State Director, USFWS State Ecological Services Director, and state wildlife agency head for final resolution. In the event their finding is not unanimous, the exception will not be granted. Approved exceptions will be made publically available at least quarterly.* (**Appendix D**, Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations)

Disturbances would be limited to 3 percent or 1 disturbance per 640 acres density of PHMA in each Colorado Management Zone. No new leasing would be allowed if the disturbance cap exceeds this amount. Seasonal restrictions

BLM_0029492

would apply to construction, drilling, and completion within 4 miles of active leks during the GRSG reproduction period of March 1 to July15.

Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA (see exception criteria below) and within 2 miles of active leks in GHMA (see **Appendix D**).

The Proposed LUPA would provide protections similar to those under Alternatives B and C for wildlife species whose habitat or ranges are within 4 miles of active leks or that coincide with PHMA. Conservation measures applied under the Proposed LUPA could influence approximately 2,374,500 acres of federally managed GRSG habitats (ADH).

The potential for direct habitat loss and indirect impacts is similar to that described under Alternative B. This is because in addition to 1 mile around active leks managed as closed to leasing (224,200 acres), all of the PHMA would be managed as no surface occupancy, with very rare exceptions granted (1,315,500 acres). Additionally a 3 percent disturbance cap or 1 disturbance per 640 acres density would be allowed in each Colorado Management Zone in PHMA. This would increase the potential for direct and indirect impacts on other terrestrial wildlife species.

The Proposed LUPA would provide more protective measures than Alternatives A or D. This is because it would close to leasing areas within 1 mile of active leks (224,200 acres would be closed to leasing under the Proposed LUPA, and no acres would be closed to leasing under Alternatives A and D).

Furthermore, the potential for direct habitat loss and indirect impacts would be reduced under this alternative. This is because no new leasing would be allowed if the disturbance cap were to exceed 3 percent of any Colorado Management Zone, compared with 5 percent under Alternative D. NSO stipulations discussed above would further reduce the amount of direct habitat loss and indirect disturbance to terrestrial wildlife species compared with Alternative D. As addressed in Alternative B, relocating development into non-sagebrush types may negatively influence those species that use other vegetation communities.

*Leased Fluid Minerals*
Under the Proposed LUPA, surface disturbance, surface occupancy, and disruptive activities would be precluded within 1 mile of active leks. Under two scenarios, the criteria described in **Chapter 2, Table 2.8**, Line 47 and the mitigation outlined in **Appendix G** would be used to guide development that would result in the fewest impacts on GRSG and GRSG habitat. The scenarios are as follows:

BLM_0029493

- If it were determined that the restriction would render the recovery of fluid minerals infeasible or uneconomical (considering the lease as a whole)

- If development would exceed the disturbance density of 1 disturbance per 640 acres, or 3 percent of a Colorado Management Zone

These same criteria would be applied to proposed development in the remainder of PHMA (outside of a mile) or GHMA within 4 miles of active leks.

Seasonal restrictions would apply to construction, drilling, and completion within 4 miles of active leks during the GRSG reproduction period of March 1 to July15. The BLM Authorized Officer may adjust the dates of the timing limitation in consultation with the State of Colorado if criteria described in Table 2.4, Line 47 were met.

The Proposed LUPA would provide more protections than Alternatives A and D but fewer than Alternatives B and C to those wildlife species whose habitat or ranges are within 4 miles of active leks or coincide with PHMA.

Conservation measures applied under the Proposed LUPA could influence approximately 1,185,400 acres of all federally managed GRSG habitats. The potential for direct habitat loss and indirect impacts would be greater under this alternative, compared with Alternatives B and C. This is because surface occupancy/disturbance and disruptive activities would be precluded only within 1 mile of active leks, compared with all of PHMA and ADH (with exception criteria [see item 49, **Table 2.4**]), as outlined in Alternatives B and C, respectively. Additionally, a 3 percent or 1 disturbance per 640 acres density would be permitted.

The Proposed LUPA would provide more protective measures to those species whose habitat or ranges are coincident with PHMA than Alternatives A and D. This is because it would preclude surface occupancy/disturbance and disruptive activities within 1 mile of active leks and would limit disturbances to 3 percent or 1 disturbance per 640 acres (when feasible) density in any Colorado Management Zone.

In comparison, Alternative D would limit permitted disturbances to 5 percent of any Colorado Management Zone and would prohibit disturbances and surface occupancy only during the GRSG reproduction period. As addressed in Alternative B, relocating development into non-sagebrush types may negatively influence those species that use other vegetation communities.

BLM_0029494

*Impacts from Solid Minerals—Coal Management on Terrestrial Wildlife*

Surface Mines

*Direct Habitat Loss/Habitat Fragmentation/Species Disruption/Habitat Degradation.* Construction and occupation of surface mines result in a minimum of 30 years habitat loss of forage and cover resources for resident wildlife. These communities would not regain any functional utility for wildlife species for several decades and would greatly depend on reclamation effectiveness. In general, impacts on terrestrial wildlife species would be similar to those described above for fluid minerals but may vary in scale, duration, and intensity.

*Habitat Restoration/Improvement.* Benefits to local wildlife populations would be similar to those discussed above for subsurface mining.

*Summary of Impacts by Alternative.* Alternative A—Although impacts on terrestrial wildlife would be similar to those discussed under Alternative A, the scale of habitat loss is likely to be larger.

Alternative B—Under Alternative B, all coal surface mining would be found unsuitable under the criteria set forth in 43 CFR, Part 3461.5, in PHMA. Additionally, minimizing surface-disturbing or surface-disrupting activities would be applied at the planning level to ADH. Impacts on terrestrial wildlife species would be similar to those discussed under Alternative B, Subsurface Mining.

Alternative C—Impacts on terrestrial wildlife are identical to those discussed under Alternative B.

Alternative D—Under this alternative, the requirements of 43 CFR, Part 3461, would be applied to determine unsuitability (see **Chapter 2**). Impacts on terrestrial wildlife would be similar to those discussed under Alternative D, Subsurface Mining.

Proposed LUPA—No new surface coal mine leases would be allowed in PHMA. Impacts on terrestrial wildlife species would be similar to those under Alternatives B and C.

Subsurface Mining

*Direct Habitat Loss/Disruption to Species/Habitat Degradation.* The largest coal resources and active mining in the range-wide planning area are in the LSFO, followed by the WRFO and GJFO (see **Section 3.7.1**, Minerals—Leasable, Existing Conditions). Aboveground appurtenant facilities generally associated with subsurface coal mines would result in vegetation removal or alteration and longer-term occupation of a site. Impacts on wildlife populations from mining and daily operations and maintenance of aboveground facilities, including traffic, would be similar to those discussed under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*, above; however, these impacts may vary in scale, duration, and intensity.

BLM_0029495

*Habitat Restoration/Improvement.* Benefits to local wildlife populations attributed to habitat improvement projects, off-site mitigation, and reclamation associated with aboveground facilities would be similar to those discussed under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*, above. Protections outlined in each alternative below would benefit those species whose ranges are coincident with PHMA and ADH. These protections include siting new surface facilities outside of PHMA, collocating facilities where appropriate, minimizing/limiting surface disturbance (including operations and maintenance), and applying PDFs. (See detailed discussion under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*.)

*Summary of Impacts by Alternative.* Alternative A—Impacts would vary by Colorado MZ (existing LUPs), with some federal lands being considered as unsuitable based on potential for resource impacts (see **Chapter 2**). Overall, this alternative would have the least restrictive measures on solid minerals leasing and development, and it would result in the greatest potential for habit loss and disruption; therefore, Alternative A would have the highest potential to impact terrestrial wildlife species.

Alternative B—Under this alternative, no new coal leases would be granted unless all appurtenant facilities are located outside of PHMA or priority areas. New facilities associated with an existing lease would be placed outside of PHMA when possible or in previously disturbed areas within PHMA. New facilities would be required to be built to the minimum standard necessary. Minimization of surface-disturbing or surface-disruptive activities would be applied at the planning level to ADH.

Alternative B would result in the least potential for loss of GRSG habitat and would reduce the indirect influences from solid minerals development. Conservation measures designed to exclude or minimize surface-disturbing activities would provide the greatest benefit to those terrestrial wildlife species whose ranges or habitats are coincident with PHMA. Conversely, relocating facilities into habitats outside of PHMA would result in the incremental loss of forage or cover resources and a greater potential for disruption for those wildlife species outside of PHMA.

Alternative C—Impacts on terrestrial wildlife are identical to those described under Alternative B.

Alternative D—No new coal leases would be granted unless all surface-disturbing activities were located outside of PHMA, with exception criteria outlined in **Chapter 2**. Surface-disturbing activities would be limited to 5 percent within each Colorado MZ. If disturbance were to exceed 5 percent, effective mitigation to offset loss of habitat would be required. For existing coal leases, lessees would be encouraged to voluntarily follow PDFs that reduce or mitigate adverse impacts on GRSG and ADH (see **Chapter 2**). Impacts on terrestrial wildlife would be similar to those described under Alternative B;

BLM_0029496

however, because Alternative D allows for greater flexibility in development potential (exception criteria, 5 percent disturbance cap, and voluntary commitment), it would result in greater potential for direct habitat loss and indirect impacts on terrestrial wildlife species than Alternatives B and C.

Impacts on terrestrial wildlife species under the Proposed LUPA would be similar to Alternative D for existing coal leases; however, under this alternative, expansions to existing coal leases may be considered if, after consultation with the State of Colorado, the proposed expansion would not have an adverse influence on GRSG and GRSG habitat based on the criteria outlined in **Table 2.4**, item 62. This alternative has the potential for greater direct and indirect impacts on terrestrial wildlife species, whose habitat or ranges are coincident with PHMA. This is because it may result in development in non-sagebrush communities.

This alternative could allow for mineral recovery without compromising the function and utility of habitats that support GRSG.

For new mining leases, no surface occupancy would be allowed within 2 miles of active leks, with no exceptions. An NSO stipulation would be placed on the remainder of PHMA, but exceptions may be granted. This could allow for surface occupancy within PHMA; however, based on criteria outlined in **Appendix D**, an exception would be granted only if, through consultation with the state, the proposed disturbance were shown to not have a negative influence on GRSG and GRSG habitat. Disturbances would be limited to 3 percent or 1 disturbance per 640 acres density of a Colorado Management Zone; no new leasing would be allowed in PHMA if the disturbance cap were to exceed 3 percent. The Proposed LUPA would allow for greater development potential than would Alternatives B and C.

The Proposed LUPA would have greater potential for direct and indirect impacts on terrestrial wildlife species and habitat than Alternatives B, C, and D, but it would have fewer than Alternative A. Conservation measures applied under Alternatives B, C, and D would effectively influence 1,396,300 acres of PHMA because no new surface occupancy or surface disturbance would be permitted for new mining leases. In comparison, conservation measures in the Proposed LUPA would be applied only within 2 miles of active leks (approximately 118,100 acres of PHMA), with the potential for surface occupancy/disturbance on the remainder of PHMA.

The Proposed LUPA would allow for potential development if, after consultation with the State of Colorado, the proposed surface-disturbing activity were shown to not have an adverse influence on GRSG or GRSG habitat. As such, this alternative would benefit those species that rely on sagebrush communities; however, it may result the incremental loss of forage over cover resources to non-sagebrush obligates (e.g., pinyon-juniper and mountain shrub types).

BLM_0029497

*Impacts from Locatable Minerals Management on Terrestrial Wildlife*

<u>Direct Habitat Loss/Disruption to Species/Habitat Degradation</u>
Impacts from locatable minerals development on terrestrial wildlife populations would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on Terrestrial Wildlife* but may vary in scale, duration and intensity.

<u>Habitat Restoration/Improvement and Habitat Protection</u>
Benefits to local wildlife populations attributed to restoration and reclamation would be similar to those discussed above under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*. Protections outlined in each alternative below would benefit those species whose ranges are coincident with PHMA and ADH. These protections are limiting surface disturbance, clustering developments, placing infrastructure in previously disturbed areas, minimizing road development, avoiding priority sagebrush habitats, and applying PDFs. See detailed discussion in the *Impacts from Fluid Minerals Management on Terrestrial Wildlife* section above.

<u>Summary of Impacts by Alternative</u>
Alternative A—Impacts would vary depending on MZ (existing LUPs); however, overall most public lands would be available for mining claim location with certain exceptions, such as SRMAs, ACECs (LSFO), and WSAs (WRFO), if withdrawn. Seasonal restrictions would be applied if deemed necessary in some situations, with limited potential for additional mitigation requirements. In general, this alternative would have the fewest restrictive measures on locatable minerals development and reclamation provisions. This would result in greater potential for direct habitat loss and indirect influences to terrestrial wildlife species in general.

Alternative B—Alternative B would propose the withdrawal of mineral entry in PHMA, based on impacts on GRSG and associated habitats. See **Table 2.6**, Comparative Summary of Alternatives, for comparison of acres identified for withdrawal by alternative. Existing claims within the withdrawal area would be subject to validity exams. Additional effective mitigation and seasonal restrictions may be applied. RDFs outlined in **Chapter 2** would further reduce direct and indirect impacts in ADH.

Alternative B would provide the greatest protections to terrestrial wildlife species whose ranges or habitats are coincident with ADH, if areas proposed for withdrawal are withdrawn. Reclamation and restoration requirements would benefit those wildlife species as well in the short and long term. Surface-disturbing activities from locatable minerals development would be relocated to areas outside of PHMA. Avoidance of sagebrush communities could impact wildlife species that require non-sagebrush communities for forage, nesting, and cover. Impacts would depend on the level and distribution of development.

BLM_0029498

Alternative C—Impacts on terrestrial wildlife are identical to those described under Alternative B.

Alternative D—Appropriate effective mitigation would be included in plans of operation. Seasonal restrictions would be applied if deemed necessary. Design features outlined in **Chapter 2** would be applied to ADH but would not be required. Overall, Alternative D would offer fewer restrictive measures than Alternatives B and C; therefore, it would have a greater impact on terrestrial wildlife species whose ranges/habitats overlap PHMA and ADH.

The Proposed LUPA—Locatable minerals would be managed the same under this alternative as under Alternative D; impacts are the same as those described for Alternative D, above.

*Impacts from Nonenergy Leasable Minerals Management on Terrestrial Wildlife*

Direct Habitat Loss/Disruption to Species/Degradation
Impacts from nonenergy leasable minerals development on terrestrial wildlife populations would be the same or similar to those discussed under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*, above, but they may vary in scale, duration, and intensity.

Habitat Restoration/Improvement and Habitat Protection
Benefits to local wildlife populations attributed to reclamation would be similar to those discussed under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*, above. Protections outlined in each alternative below would benefit those species whose ranges are coincident with PHMA and GHMA. These protections include limiting surface disturbance, avoiding PHMA, collocating facilities where appropriate, minimizing/limiting surface disturbance (including operations and maintenance), and applying PDFs. See detailed discussion under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*.

Summary of Impacts by Alternative
Alternative A—Impacts would vary depending on MZ (existing LUPs). Under this alternative, a small percentage of PHMA approximately 6 percent or 9,600 acres in MZ 17 would be closed to nonenergy leasable mineral leasing; the remainder of ADH would be open to leasing (including expansion of new leases), with no cap on surface-disturbing activities. As such, this alternative would allow for the greatest amount of direct habitat loss (and indirect influences) and would have the greatest impact on terrestrial wildlife species.

Alternative B—Under this alternative, all PHMA would be closed to nonenergy leasable mineral leasing (1,106,600 acres, or 44 percent of federally managed GRSG habitat [ADH]). Additionally, existing mines would not be permitted to expand. RDFs would be applied for solution mining wells in PHMA. By reducing the amount of direct habitat loss, Alternative B would provide the greatest

BLM_0029499

benefit to terrestrial wildlife species, whose ranges or habitats are coincident with PHMA.

RDFs would also reduce both direct and indirect impacts of nonenergy minerals development. Conversely, the potential for nonenergy leasable minerals development to be relocated outside of PHMA could result in direct habitat loss or modification in non-sagebrush communities (as well as indirect influences). This could have negative impacts on wildlife species inhabiting those areas.

Alternative C—Impacts on terrestrial wildlife species are identical to those described under Alternative B.

Alternative D—Under this alternative PHMA currently available for nonenergy minerals leasing would remain open. Alternative D would consider allowing expansion of existing nonenergy mineral leases. Surface-disturbing activities would be limited to 5 percent in any MZ. If disturbance exceeds 5 percent, additional mitigation would be required to offset the resulting loss of GRSG habitat. Direct habitat loss attributed to the development and expansion of nonenergy leasable minerals, as well as indirect influences, would be greater under this alternative than Alternatives B and C. This would result in greater impacts on terrestrial wildlife species.

Proposed LUPA—No new nonenergy mineral leasing would be allowed in PHMA. Impacts on terrestrial wildlife from managing nonenergy leasable minerals are similar to those described for Alternative B, above.

*Impacts from Salable Mineral Management on Terrestrial Wildlife*

Direct Habitat Loss/Disruption to Species/Habitat Degradation
Impacts from salable minerals development on terrestrial wildlife populations would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*; however, they may vary in scale, duration, and intensity.

Habitat Restoration/Improvement and Habitat Protection
Benefits to local wildlife populations attributed to habitat restoration and reclamation would be similar to those discussed under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*. Protections outlined for each alternative below would benefit those species whose ranges are coincident with PHMA and GHMA. These protections include siting new surface facilities outside of PHMA, collocating facilities where appropriate, minimizing/limiting surface disturbance (including operations and maintenance), and applying PDFs. See detailed discussion under *Impacts from Fluid Minerals Management on Terrestrial Wildlife*.

BLM_0029500

Summary of Impacts by Alternative

Alternative A—Impacts on terrestrial wildlife species would vary by MZ (existing LUPs); however, in most cases this alternative would allow for the continued development of salable minerals, with certain exceptions (such as WSAs and cultural sites; see **Chapter 2**). Overall, this alternative would provide the fewest restrictive measures on salable minerals development and subsequent reclamation requirements; therefore, it could result in more habitat loss than Alternatives B, C, and D. As such, this alternative would have the most potential to impact terrestrial wildlife species.

Alternative B—Under this alternative, PHMA would be closed to mineral material sales (1,246,200 acres, or 50 percent of federally managed GRSG habitat [ADH]). All salable mineral pits located in PHMA that are no longer in use would be restored to meet GRSG habitat conservation objectives. As such, Alternative B would provide the greatest benefit to those wildlife species whose ranges and habitats are coincident with PHMA. Surface-disturbing activities from salable minerals development would be relocated outside of PHMA. This would result in habitat loss or modification of other vegetation types (mountain shrub and pinyon-juniper). This could have negative impacts on those wildlife species associated with non-sagebrush communities.

Alternative C—Impacts on terrestrial wildlife species would be similar to those described under Alternative B, with greater protections for those species whose ranges overlap ADH.

Alternative D—Under this alternative, PHMA currently available for mineral material sales would remain open. Alternative D would consider allowing existing mineral material sale sites to continue operations (including expansions). Surface-disturbing activities would be limited to 5 percent within each MZ. Where disturbance exceeds 5 percent, mitigation to offset habitat loss would be necessary.

Restoration of unused salable mineral pits would be required in ADH. Restoration and reclamation would be required as a long-term goal to improve GRSG habitat. In general, Alternative D could allow for more direct habitat loss by allowing salable minerals development to continue. This would have greater impacts on terrestrial wildlife species whose ranges and habitat are coincident with PHMA than Alternatives B and C. Conversely, restoration and reclamation of unused pits would extend to ADH (compared with PHMA under Alternatives B and C). This would allow for incremental gains in forage and cover resources for many wildlife species. This would greatly depend on reclamation success and effectiveness, but it would provide nominal benefit to most wildlife species in the short and long term.

Proposed LUPA—Locatable minerals management would be the same under this alternative as under Alternatives B and C; impacts are the same as described under those alternatives.

BLM_0029501

*Impacts from Wildfire Suppression, Fuels Management, and Fire Rehabilitation on Terrestrial Wildlife*

<u>Direct Habitat Loss and Habitat Fragmentation</u>
Depending on the extent, location, severity, and seral type affected, unplanned ignitions would have short-term impacts on terrestrial wildlife species by removing or degrading habitat for some species, injuring or killing slow-moving species, causing habitat avoidance and changes in species movement patterns, or reducing population viability and increasing the contribution to the need to list a species. In areas that are available for fuels treatments, changes in vegetation can result in negative impacts on terrestrial wildlife, such as direct habitat loss, habitat fragmentation, and disruption to species; however, it can also result in beneficial impacts, such as habitat restoration.

A concern of resetting vegetation seral stage through fuels management is the invasion of undesirable plant species. Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds.

Cheatgrass invasion is also a threat to some treatment areas. Invasive nonnative plants with little or no forage value for big game species are increasing in some areas. The greatest impacts have occurred to big game winter range areas with low precipitation rates. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. Cheatgrass would provide some short-term forage benefits to big game species while in early stages of growth; however, it lacks the ability to provide high quality forage during most of the year.

Fire suppression removes vegetation and disturbs soil and can have both short- and long-term impacts on big game and other habitats. For example, using heavy equipment to construct fire lines can cause habitat loss, degradation, and fragmentation in the short term. Moreover, if not rehabilitated, these fire lines can cause erosion and provide opportunities for the spread of undesirable plant species, thereby resulting in long-term adverse impacts on wildlife habitat; therefore, timely rehabilitation following fire is important to maintaining the quality of wildlife habitats.

Although both planned and unplanned wildland fire adversely impacts wildlife habitats in the short term by removing vegetation and disturbing soil, the long-term benefits of wildland fire often outweigh the short-term adverse impacts. For example, prescribed fire can be used to restore conditions benefiting wildlife species favoring early plant succession stages and young age classes of woody plants (McAninch et al. 1984). Prolonged fire suppression has allowed

BLM_0029502

fuels to build up to the point that an unplanned wildfire is likely to be much larger in size and greater in intensity.

Some wildlife species thrive on the occurrence of fire. The herbaceous and woody plants that establish following a burn provide abundant leaves and seeds, which are used by small rodents and birds that in turn are important prey for a variety of avian and mammalian predators. Over the short term, the wildlife community is changed dramatically by a fire, as taller and denser vegetation is replaced by a more open habitat.

As the area gradually recovers, however, many of the pre-fire components become reestablished, and the area again supports a community associated with denser forests. This cycle may take decades or centuries, depending on the dominant plant species; or it might never occur if climatic conditions are no longer suitable for the former dominant species. Wallmo (1980) suggests that fire improves the palatability of forage and causes browse plants to resprout close to the ground, putting the current season's growth within reach of deer for several years.

Additionally, wildland fire can improve the quality of wildlife habitat by releasing soil nutrients, reducing fuel load, or setting back trees encroaching into shrubland or grassland habitats.

Fuels treatments could be beneficial for species that depend on younger seral stages. In the long term, wildlife would benefit from most wildfires and fuels management due to an increase in vegetation productivity and to increased plant diversity and age classes; this would, in turn, provide additional forage, cover, and prey base. Mimicking natural periodic disturbance is often necessary in order to stimulate plant productivity, increase diversity, and increase nutritional value.

Foraging opportunities for big game and other herbivores would increase as understory grasses, forbs, and shrubs become reestablished. The benefits for mule deer and elk are likely to be long term. Directly following application of fire there is generally more palatable browse available for wild ungulates.[1] Improving vegetation in upland areas would provide more forage to big game species and other herbivorous species that occur in these areas and would result in direct beneficial impacts. In addition, fuels treatments in upland areas often result in increased forage production, which diverts livestock and wildlife use from riparian and wetland areas. This would increase the vigor and structural diversity of these plant communities.

Following a wildfire, ESR is implemented to protect and conserve habitats that have sustained damage or degradation from catastrophic wildfire. Typically these

---

[1] Hooved grazing animals

BLM_0029503

activities are beneficial for terrestrial wildlife species and are designed to improve the overall condition of the area, which in turn improves habitat for wildlife. For example, weed seed-free seeding would stabilize soil and reduce the spread of noxious weeds. Additionally, replacing organic matter in disturbed areas would protect topsoil and provide a suitable bed for the restoration of a native vegetation community.

Disruption to Species

The noise from heavy equipment and chainsaws could temporarily disperse bird species from breeding and nesting habitat and wildlife from occupied habitat. Prescribed burning could also disturb nesting bird species from smoke inadvertently drifting into occupied habitat. These activities could remove suitable habitat or other desirable vegetation.

Disturbances from heavy equipment, chainsaws, and prescribed burning would be localized and short term. Most wildlife species would move into adjacent untreated areas; however, direct mortality during the vegetation treatments is possible. TLs (such as those for big game birthing areas, raptor nesting, and big game winter habitat), as well as site-specific COAs, could mitigate the short-term impacts resulting from the treatments.

ESR treatments following a wildfire are effective in restoring wildlife habitat. However, equipment is often noisy, and noise may alter animal behavior or cause wildlife to leave an area during the disturbance period. These impacts would be short term and not likely to have much effect on the long-term health and habitat use of wildlife in the treatment area.

Summary of Impacts by Alternative

Alternative A would have the fewest restrictions for fuels management actions, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize fire operations beyond what has already been determined in the fire management plans for the area; therefore, Alternative A would have the greatest impact on terrestrial wildlife.

Alternative B is more restrictive than Alternative A, though all of the restrictions fall within PHMA; therefore, impacts from fuels management on terrestrial wildlife would be less than under Alternative A, but only within PHMA. Additionally, Alternative B would prioritize fire operations in PHMA and GHMA, immediately after life and property; therefore, the potential for disturbance to terrestrial wildlife within these habitats is lower under Alternative B than Alternative A.

Alternative C would prioritize fire operations in PHMA, immediately after life and property; therefore, the potential for disturbance to terrestrial wildlife within PHMA would be the same as Alternative B but less than Alternative B in GHMA. With regard to fuels management, Alternative C is more restrictive than Alternative B since all of the management actions fall within ADH;

BLM_0029504

therefore, impacts from fuels management on terrestrial wildlife would be less than Alternative B. Conversely, Alternative C does not offer as many protective management actions that could benefit terrestrial wildlife as Alternative B and D, so it has more potential for habitat degradation than the other alternatives.

Alternative D would give priority to fire operations in PHMA and GHMA, immediately after firefighter and public safety, unless site-specific conditions warrant an exception. With regard to fuels management, Alternative D is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on terrestrial wildlife are less than Alternative B. Concurrently, Alternative D offers the same protective measures as Alternative B but applies them to ADH; therefore, it has the potential for more benefits to terrestrial wildlife than Alternatives B and C.

Management of wildfire suppression, fuels management, and fire rehabilitation under the Proposed LUPA would be the same as that for Alternative D. Impacts from the Proposed LUPA, therefore, are the same as for Alternative D, above.

*Impacts from Habitat Restoration on Terrestrial Wildlife*

<u>Direct Habitat Loss and Habitat Fragmentation</u>
Depending on the extent, location, treatment, and seral type affected, habitat restoration would have short-term impacts on terrestrial wildlife species. The extent of these disturbances would vary by the extent and type of treatment, as discussed in the sections that follow.

Over the short term, fire and other vegetation treatments could make habitats less suitable for some wildlife species, requiring displaced wildlife to find suitable habitat elsewhere. If these habitats were already at or near capacity in the number of wildlife they could support, displaced animals might perish or suffer lower productivity. In many cases, the treatments would return all or a portion of the treated area to an early successional stage, favoring early successional wildlife species.

In areas where fire suppression has historically occurred, vegetation treatments could benefit native plant communities by mimicking a natural disturbance component that has been missing from these communities. Treatments would also restore native vegetation in areas where weeds and other invasive vegetation have displaced native plant species. Wildlife that occurred historically in these areas would likely increase in numbers, while species that have adapted to the disturbed conditions would decline.

A concern in habitat restoration is the invasion of undesirable plant species from soil disturbance. Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Cheatgrass invasion is also a threat

BLM_0029505

to some treatment areas. Invasive nonnative plants with little or no forage value for big game species are increasing in some areas. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities.

Treatments that remove large amounts of pinyon-juniper woodlands can adversely affect interior species of wildlife and species that feed on insects found on the plant surface and under the bark. Mule deer use pinyon-juniper woodlands, and much of mule deer winter habitat in northwest Colorado is pinyon-juniper. Removal of pinyon-juniper would reduce the amount of food and cover for these animals (Terrell and Spillet 1975). Additionally, pinyon-juniper woodlands support a greater diversity of bird species than many forest communities. Reptiles, rodents, rabbits, and other small and large mammals depend on these communities (Maser and Gashwiler 1978).

Disruption to Species
The noise from heavy equipment and chainsaws could temporarily disperse bird species from breeding and nesting habitat and wildlife from occupied habitat. Disturbances from heavy equipment, chainsaws, and prescribed burning would be localized and short term. Most wildlife species would move into adjacent untreated areas, but direct mortality during the vegetation treatments is possible. TLs (such as those for big game birthing areas, raptor nesting, and big game winter habitat), as well as site-specific COAs (such as TLs for migratory bird nesting), could mitigate the short-term impacts resulting from the treatments.

Habitat Protection
Removal of nonnative species and vegetation from habitats that support terrestrial wildlife populations would likely provide some degree of benefit to most terrestrial species that occur on public lands. It would do this by creating more native habitat conditions and reducing the likelihood of a future catastrophic wildfire. The degree of benefit to terrestrial wildlife would depend, in large part, on the habitat needs of the species and its ability to avoid mechanical equipment or a prescribed fire.

Nonnative plant species reduce the suitability of some habitats to support terrestrial wildlife species. Some species require, or at the very least prefer, certain plants as food sources. Encroachment of nonnative plant species and displacement of native plant species that serve as important sources of food reduce the suitability of the habitat for these wildlife species. For these species, vegetation treatments would likely provide a long-term benefit to habitat and could improve the suitability of other areas. This could create additional habitat into which the population could expand.

Opening dense stands of pinyon and juniper benefits edge species, ground-feeding and ground-nesting birds, and small mammals. Opening 250 acres or less by mechanical means benefits deer, small mammals, and turkeys and other birds.

BLM_0029506

Breeding bird densities differ in treated and untreated areas, with ground-nesting birds being more prevalent in chained versus unchained pinyon-juniper stands (Scott and Boeker 1977; Payne and Bryant 1998).

Leaving slash, debris, and downed trees provides microhabitat for rabbits and songbirds. If harvested material were windrowed or piled, it would provide hiding cover for small mammals and rotting vegetation that could be used by reptiles and amphibians for cover. These species could also forage on insects and other invertebrates found under this debris.

Restoring a variety of native plant species, possibly coupled with controlling noxious weeds and other invasive species, would maintain or improve migratory bird nesting habitat in the long term. Potential impacts on habitat of nongame mammals, native game birds, amphibians, and reptiles would be relatively minor and short term and would be offset in the long term by improved habitat. In general, habitat mitigation treatments would provide a mosaic of perennial grass stands and patches of big sagebrush.

<u>Summary of Impacts by Alternative</u>
Alternative A would have the fewest restrictions for habitat restoration, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize habitat restoration and restoration guidelines beyond what has already been determined in the LUPs for the targeted areas; therefore, Alternative A would have the greatest impact on terrestrial wildlife species.

Requirements for habitat restoration are more restrictive under Alternative B than Alternative A. For example, restoration projects would be prioritized in GRSG habitat so impacts on other species that have different or contrary habitat requirements would be greater under this alternative.

Alternative C is more restrictive than Alternative B, so impacts from habitat restoration on terrestrial wildlife species would be less than Alternative B. Additionally, Alternative C provides guidelines that are specific to the restoration of sagebrush for GRSG, so it would have more impacts on those terrestrial species that have different or contrary habitat requirements.

Alternative D is more restrictive than Alternative A but less than Alternatives B and C. Alternative D offers habitat restoration guidelines but also offers exemptions for other resources valued by the BLM and Forest Service; therefore, there is potential for less impact on terrestrial species under Alternative D from the habitat restoration guidelines than under Alternatives B and C. Management of habitat restoration under the Proposed LUPA would be the same as Alternative D; impacts on terrestrial wildlife from habitat restoration would be the same as described for the Proposed LUPA.

BLM_0029507

*Impacts from ACEC and Zoological Area Management on Terrestrial Wildlife*

Habitat Protection
Areas that are designated as ACECs would be more beneficial to terrestrial wildlife than areas that are not designated as ACECs. Prohibiting surface-disturbing activities and other authorized activities would benefit terrestrial wildlife by precluding activities that would have direct and indirect impacts on terrestrial wildlife.

Alternative A recognizes all of the existing ACEC designations. This would have fewer beneficial impacts on terrestrial wildlife than Alternative C, which would make all PHMA an ACEC.

Alternative B would also recognize only the existing ACEC designations. Impacts under Alternative B would be the same as impacts under Alternative A.

Alternative C would recognize all of the existing ACECs and would also make all PHMA an ACEC for protection of sagebrush habitat. Impacts on terrestrial wildlife under Alternative C would be the same as for Alternatives A, B, and D. ACEC designations would provide no additional protections beyond what is included in the management actions for those alternatives for the protection of GRSG habitat.

Alternative D would recognize all of the existing ACECs but would not designate any new ACECs. Impacts from Alternative D would be the same as for Alternatives A and B.

No new ACECs would be designated under the Proposed LUPA; impacts from designation of ACECs on terrestrial wildlife would be the same as described under Alternative D.

### Summary of Impacts on Terrestrial Wildlife
Alternative A provides the least amount of protection for terrestrial wildlife in the planning area. Alternative A puts very few restrictions on development, which could result in the most modification of the landscape, and consequently, the most impacts on terrestrial wildlife. Alternative A would have the least potential to result in concentration of development in other habitats that do not support GRSG.

Alternative B provides a greater level of protection for terrestrial wildlife than Alternative A, but it would provide a lower level of protection than Alternative C. Alternative B also has a greater potential for development to occur outside of PHMA which would have a greater impact on terrestrial wildlife in those areas.

Alternative C would provide the most protection for terrestrial wildlife. However, Alternative C would have a greater potential for development to

BLM_0029508

occur outside of ADH, which would have a greater impact on terrestrial wildlife in those areas. The most restrictions would be placed on development under Alternative C, which would afford the most protection for terrestrial wildlife.

Alternative D would provide more protection for terrestrial wildlife than Alternative A, but it would provide less protection overall than Alternatives B and C. More flexibility for development is built into Alternative D, which could result in higher levels of development than Alternatives B and C.

The Proposed LUPA would provide slightly greater protections for terrestrial wildlife to those described under Alternative D, due to less flexibility for development and greater restrictions on development in GRSG PHMA and GHMA.

## 4.4 AQUATIC WILDLIFE, INCLUDING SPECIAL STATUS FISH AND AQUATIC SPECIES

Aquatic organisms include fish and amphibians that reside in streams and water bodies as well as those in wetlands and riparian areas.

### 4.4.1 Methodology and Assumptions

#### General Impacts on Aquatic Wildlife

Indicators of impacts on aquatic wildlife and the measurements used to describe the impacts (where available or appropriate) are as follows:

- Loss or reduction of streamside vegetation and cover—Acres of riparian streamside habitat lost or depleted

- Habitat alteration—Changes in habitat that makes it nonfunctional for select species or more conducive to competitive species

- Increased sediment and turbidity—Likelihood of increased sediment loading in waters containing sediment-intolerant fish species; loss of recruitment, stress, habitat alteration, and habitat loss

- Water depletions—Amount of water use

- Decreased water quality—Likelihood of actions altering important water quality parameters, including pH, dissolved oxygen, temperature, and alkalinity

- Disruption to species—Direct mortality of species, obstructions in movement patterns (human-made barriers), reductions in survival and recruitment, displacement (short- and long-term), and behavioral and physiological influences

- Habitat protection—The number of acres protected via withdrawals, closures, NSO, and ACECs; additionally, the likelihood of reduced surface disturbance

- Habitat restoration—The likelihood of an increase or an improvement in habitat and water quality; the likelihood of reduced

BLM_0029509

surface disturbance; the likelihood of increased species diversity in streamside vegetation and the likelihood of decrease in weeds

**Assumptions**

The following list presents basic assumptions related to aquatic wildlife that apply to the impacts assessment for Alternatives A through D in this EIS:

- Impacts on fish and other aquatic wildlife populations and habitat are not discrete; some actions may benefit one species, while at the same time may result in adverse or beneficial impacts on another.

- Maintaining high-quality habitat conditions would have some influence on reducing the severity of outbreaks of, and subsequent losses from, diseases; however, the prevalence in the environment of various diseases cannot be fully controlled, especially at chronic levels of occurrence.

- The health of fish and other aquatic wildlife populations is directly related to the overall health and functional capabilities of aquatic, riparian, and wetland resources, which, in turn, is a reflection of overall watershed health.

- Fish populations fluctuate, sometimes widely, in response to natural factors, such as the abundance of prey or extremes in weather (such as flooding or drought).

- The analysis of roads and road density in a given watershed provides an approximation of the potential for impacts on fish and other aquatic wildlife. It is a measure of lands available for accelerated water transport and potential erosion and off-site sediment transport. However, the actual impacts and the degree of impacts resulting from roads depend on additional variables, including road class (dirt, gravel, or paved), road condition (rutted, bar ditched, or with proper and adequate drainage features), topography, upland and riparian vegetation condition, soil characteristics, climate, and proximity of roads to fish-bearing streams.

- Impacts on fish and other aquatic wildlife are based on exposure/stressor/response

  - Exposure—the likelihood that a given stressor would affect a given species

  - Stressor—the portion(s) of an action that may cause some sort of a reaction by the species

  - Response—the response (adverse, positive, neutral) of the species to the stressor

- Variation of identified impacts by alternative are determined based on

BLM_0029510

- Risk—the likelihood or probability of an action resulting in the identified impact
- Magnitude—the intensity and severity of the identified impact
- Duration—the length of time in which the identified impact would occur
- Scope—the spatial extent or size over which the identified impact would occur, as related to the proximity of the action to the species or habitat

- Unless otherwise noted, short-term impacts are defined as those expected to last 2 years or less.

- Unless otherwise noted, long-term impacts are defined as those expected to last longer than 2 years.

- Impacts analysis focuses on PHMA and habitat that would be designated in an alternative, where actions are reasonably certain to result in an impact, be it direct, indirect, or cumulative, to a particular species or to its habitat. In general, aquatic habitats next to, downstream, or downslope of proposed actions are considered in the impacts analysis.

- Impacts analysis is grouped by species, where appropriate (sediment-intolerant aquatic species, for example, are grouped).

- Sediment-intolerant aquatic species include all trout species (brown, rainbow, brook, and cutthroat), mottled and Paiute sculpin, mountain whitefish, and most all amphibian species. Unless otherwise noted, impacts analysis focuses on these species.

- Unless otherwise noted, sediment-tolerant species (speckled dace, carp, white sucker, channel catfish, and fathead minnow) would be impacted in a similar fashion to sediment-intolerant species; however, any actions that would increase sediment and turbidity in the short term would result in negligible to minimal impacts on these species. Given their biology, feeding habits, habitat needs, and niche in the ecosystem, these species, generally, have a higher tolerance for increased sediments and turbidity to streams and rivers. Habitat alteration and water quality alteration, however, can impact these species in ways similar to sediment-intolerant species addressed above.

- Special status aquatic species that are sediment intolerant include Colorado River cutthroat trout, greenback cutthroat trout, boreal toad, and northern leopard frog. Sediment tolerant species include the Colorado pikeminnow, razorback sucker, bonytail, humpback chub, roundtail chub, pallid sturgeon, flannelmouth sucker, and bluehead sucker. The analysis groups these species as appropriate

BLM_0029511

with regard to addressing impacts, especially those resulting from actions that could increase sediment to occupied habitats.

- Under all of the alternatives, proposed actions would comply with BLM Colorado Public Land Health Standard #3 (BLM 1997). Healthy, productive, and diverse plant communities support aquatic wildlife communities that are productive, resilient, diverse, and vigorous and that are able to reproduce and sustain natural fluctuations and ecological processes; therefore, implementing management actions that contribute to maintaining the condition and quality of wildlife habitat would ensure that BLM Colorado Public Land Health Standard #3 (BLM 1997) would be met throughout the life of the LUPA.

*Water Depletions*

Certain management actions (e.g., fluid minerals development) or activities (e.g., water developments) may reduce water flows, which can impact fish and aquatic wildlife in several ways. Reduced water directly correlates to a loss of wetted habitat, and reduced flows can result in reduced habitat complexity and diversity. Important microhabitats (such us spawning bars, backwaters, and side channels) can be lost. These impacts occur when sediments cannot be efficiently or effectively moved and, therefore, settle out into occupied habitats. Generally, flows are climate dependent; however, water diversions also play a large role with regard to localized flow regimes in a stream or river. Habitats for many fish and aquatic wildlife have been impacted by the alteration of the natural hydrograph of several rivers in northwest Colorado, which, in turn, has reduced seasonal peak flows. This has caused sediment buildup, loss of habitat complexity and diversity, and reduced spawning habitat.

USFWS has determined that any water depletion within the North Platte River, Laramie River, and Upper Colorado River basins jeopardizes the continued existence of one or more federally listed threatened or endangered species and adversely modifies or destroys designated and proposed critical habitat. Depletions within the North Platte River and Laramie River basins may affect and are likely to adversely affect the whooping crane, the interior least tern, the piping plover, the western prairie fringed orchid, and the pallid sturgeon. Depletions within the Upper Colorado River basin may affect and are likely to adversely affect the Colorado pikeminnow, bonytail chub, humpback chub, and razorback sucker.

*Colorado River Basin*

In 2008, the BLM prepared a programmatic biological assessment that addresses water depleting activities in the Colorado River basin. In response to the BLM's programmatic biological assessment, USFWS issued a programmatic biological opinion (#ES/GJ-6-Colorado-08-F-0010) on February 25, 2009.

BLM_0029512

The USFWS determined that water depletions from the Colorado River basin resulting from BLM actions described in the programmatic biological opinion are not likely to jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker or to result in the destruction or adverse modification of their critical habitat. The programmatic biological opinion addresses internal and external BLM projects, including impoundments, diversions, water wells, pipelines, and spring developments.

The programmatic biological opinion instructed the BLM to make an annual payment to the National Fish and Wildlife Foundation to cover all BLM-authorized actions that result in water depletions. Depletions from internal and external BLM projects outside of the fluid minerals program would be covered by this programmatic biological opinion. Water use values would be entered into water depletion logs that are submitted to the Colorado State Office at the end of each fiscal year.

The USFWS determined that projects that fit under the umbrella of the programmatic biological assessment would avoid the likelihood of jeopardy or adverse modification of critical habitat for depletion impacts on the Upper Colorado River Basin. It determined that this would be the case if the projects were to deplete relatively small amounts of water (less than 125 acre-feet) and if the BLM were to make a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin, in an amount equal to the average annual acre-feet depleted by each project.

*Platte River Basin*
The BLM participates in the Platte River Recovery Implementation Program to address water depletions from BLM actions in the North Platte River Basin. The Platte River Recovery Implementation Program was established in 2006 and is designed to assist in the conservation and recovery of the target species and their associated habitats along the central and lower Platte River in Nebraska. The Platte River Recovery Implementation Program, signed by Colorado, Nebraska, and Wyoming, provides a streamlined ESA compliance mechanism for all historic and most new water-related activities in the Platte River basin. As part of the Platte River Recovery Implementation Program, each state and the US Department of the Interior developed "depletion plans," specifying how they would ensure that water development results in no new depletions in the central Platte River.

For federal actions and projects covered under the Platte River Recovery Implementation Program, its Final EIS and the June 16, 2006, programmatic biological opinion serve as the description of the environmental baseline and consequences for the impacts of the federal actions on the listed target species, whooping crane critical habitat, and other listed species in the central and lower Platte River addressed in the programmatic biological opinion. The primary

BLM_0029513

water-depleting activities that the BLM completes are spring developments, pipeline construction, pond construction, and well drilling.

The USFWS determined in the programmatic biological opinion that the continued operation of existing and certain new water-related activities may adversely affect but would not likely jeopardize the continued existence of the endangered whooping crane, interior least tern, and pallid sturgeon or the threatened northern Great Plains population of the piping plover.

Further, the USFWS found that the continued operation of existing and certain new water-related activities may adversely affect but would not likely jeopardize the threatened western prairie fringed orchid associated with the central and lower reaches of the Platte River in Nebraska. It also determined that the activities were not likely to destroy or adversely modify designated critical habitat for the whooping crane.

In 2010, the BLM entered into a memorandum of agreement with the USFWS to offset federal new depletions in the Platte River Basin of Colorado, which is consistent with the Platte River Recovery Implementation Program. Under the agreement, the BLM and USFWS will consult annually on proposed new and expanded water-related activities in the Laramie River Basin of Colorado. Based on that information, the BLM will have the option of offsetting the adverse impacts of depletions from those activities specified in a 2009 agreement, to the extent that adequate offsetting credit remains in the 87.5 acre-foot account provided under that agreement at the time of consultation. The BLM made this agreement—Concerning New Federal Water-Related Activities within the North Platte River Basin in Colorado—with the USFWS, the State of Colorado, the Jackson County Water Conservancy District, and the South Platte Water-Related Activities Program, Inc.

For new federal water-related activities in Jackson County, North Platte River Basin of Colorado, the BLM will consult annually with the USFWS also, providing a characterization of the depletion and its purpose (agricultural, recreational, and environmental). The BLM would have the option of offsetting the adverse impacts of depletions from those activities for the duration of the Platte River Recovery Implementation Program's first increment relative to the target species and designated critical habitat, by means of those activities specified in the 2009 Agreement, to the extent that adequate offsetting credit remains in the 87.5 acre-foot "account." This option would be provided under that agreement at the time of consultation, and to the extent that no more than 100 acre-feet of aggregate federal new depletions in Jackson County are being addressed under the agreement to benefit fish, wildlife, and the environmental.

The BLM made a one-time payment to the USFWS in 2010 to allow the BLM to seek ESA coverage for impacts on the target species of new depletions from new federal water-related activities in the Platte River Basin of Colorado. Federal depletions would be covered by this programmatic biological opinion,

BLM_0029514

and water use values would be noted in the KFO water depletion log, which is submitted to the Colorado State Office and USFWS before February 1 each year.

## 4.4.2 Direct and Indirect Impacts on Aquatic Wildlife

### Impacts from Travel Management on Aquatic Wildlife

*Direct Habitat Loss/Habitat Fragmentation/Disruption to Species*
Impacts on resources would be similar to those discussed under *Impacts from Management of Travel and Transportation on Terrestrial Wildlife*.

*Habitat Degradation*
Impacts on aquatic resources would be similar to those discussed under *Impacts from Management of Travel and Transportation on Terrestrial Wildlife*.

*Habitat Restoration and Improvement*
In general, impacts on resources would be similar to those discussed under *Impacts from Management of Travel and Transportation on Terrestrial Wildlife*. Designating an area as closed is expected to result in the eventual revegetation of the area on its own over time. This would lessen impacts on aquatic resources, such as sediment flow and turbidity, from these routes.

### Impacts from Recreation Management on Aquatic Wildlife

*Permitted Use*
Permitted uses include BLM SRPs and Forest Service SUAs. These are typically granted for larger organized recreation groups, including those in competitive and noncompetitive events, and commercial outfitting services. Allowing competitive events is expected to result in impacts similar to those described under casual use; however, because these events typically involve a much larger concentration of people than casual use, the impacts would be magnified. Displacement of terrestrial wildlife as a result of noise disturbance would be intensified. Impacts from commercial outfitting services typically do not involve large concentrations of people at any one time.

Alternative A—Under Alternative A, the BLM and Forest Service would continue issuing SRPs and SUAs on a case-by-case basis and would continue to provide opportunities for competitive and noncompetitive events and commercial outfitting services.

Alternative B—SRPs and SUAs would be authorized only where impacts on PHMA would be neutral or beneficial. It is expected that other aquatic wildlife species would also benefit from these restrictions.

Alternative C—Same as under Alternative B.

BLM_0029515

Alternative D—This alternative limits impacts on disruption of the species as well as PHMA, so it would also benefit aquatic wildlife species whose critical use periods coincide with these seasonal restrictions.

Management actions for recreation under the Proposed LUPA would be the same as those for Alternative D; therefore, impacts from the Proposed LUPA on aquatic wildlife would be the same as those described under Alternative D, above.

### Impacts from Lands and Realty Management on Aquatic Wildlife

*Habitat Alteration and Loss or Reduction of Streamside Vegetation or Cover and Water Quality Alteration and Increased Sediment Loading and Turbidity*
In areas where ROWs are permitted, there would be more potential for impacts on aquatic wildlife than in areas where ROWs are excluded or avoided.

Constructing and operating ROW facilities would likely result in surface-disturbing activities. Potential impacts from surface disturbance include direct alteration of habitat or loss of individuals from equipment and vehicles. Habitat could also be affected by changes in water quality from increased sedimentation and potential fuel spills. Equipment and vehicle traffic within ROWs and access roads could lead to small stream crossings. Vehicle crossings would result in mortalities to macroinvertebrates and possibly early life stages of fish, it and would alter bottom substrates. Habitat alteration could affect various activities or values for fish, such as cover, feeding, or life stage functions for spawning or early life stage development.

Potential construction at stream crossings would also remove riparian vegetation. Vegetation cover along stream banks provides cover for fish, shading, bank stability, and increased food and nutrient supply as a result of deposition of insect and vegetation matter into the watercourse. Riparian vegetation contributes woody material to streams that are used for fish cover and can be part of forming habitat features, such as pools.

Vehicle and equipment disturbance within or near water bodies also would cause sedimentation. Sediment entering the water column would be redeposited in areas downstream of the disturbed area. The extent of the sedimentation effect would depend on the flow conditions, substrate composition, stream configuration, and types of aquatic communities within the affected areas.

The indirect impacts of sedimentation could range from potential detrimental impacts on species behavior, physiological functions, or spawning (Waters 1995). In general, trout species are more sensitive to increased turbidity than many of the warm water fish species. Sediment deposition in substrates used for spawning could detrimentally affect successful recruitment.

BLM_0029516

Vehicle and equipment use and pipelines that cross or parallel aquatic systems would pose increased risk to aquatic biota from accidental spills or leaks of toxic substances. Depending on the substance, if it were to reach a water body, aquatic species could be exposed to toxic conditions. Impacts could range from sub-lethal, including reducing feeding behavior, lethargy, habitat avoidance, and physical stress, to direct mortality.

The magnitude of impacts would depend on the substance and volume, flow conditions, channel configuration, and presence of aquatic species. Selecting BMPs would help to reduce potential risks.

Excluding, limiting, or collocating ROWs in GRSG habitats would benefit aquatic wildlife species whose ranges are coincident with GHMA or PHMA or are close downstream. In addition, disturbance caps, NSOs, and TLs can protect aquatic wildlife species from disturbances.

Alternative A would have the most areas available for ROWs and would have more potential to impact aquatic wildlife than Alternatives B, C, and D.

Alternative B would have fewer areas available for ROWs through restrictions to protect GRSG habitat. Conservation measures would be more protective under Alternative B than Alternatives A and D, but it would be less protective than Alternative C. In addition, Alternative B would encourage land exchanges that allow for consolidating federally managed lands in GRSG habitats, facilitating habitat conservation; therefore, impacts on aquatic wildlife whose ranges overlap GHMA and PHMA would be less than Alternatives A and D but greater than Alternative C.

Alternative C would have the most protective measures for GRSG and so would have the least impacts on aquatic wildlife species whose ranges overlap GHMA and PHMA. In addition, Alternative C would encourage land exchanges that allow for consolidating federally managed lands in GRSG habitats, facilitating habitat conservation and management.

Alternative D would be more protective than Alternative A but less protective than Alternatives B and C.

Under the Proposed LUPA, impacts would be similar to those described above for Alternative C because both PHMA and GHMA would be managed as avoidance areas for ROWs. Additional protection would be provided for those species that are vulnerable to avian predation because no aboveground structures would be authorized within 1 mile of active leks.

### Impacts from Wind Energy Development on Aquatic Wildlife

Impacts from wind energy development on aquatic wildlife would be similar to those discussed under *Impacts from Lands and Realty Management on Aquatic Wildlife*.

BLM_0029517

**Impacts from Industrial Solar Energy Development on Aquatic Wildlife**

Impacts from solar energy development on aquatic wildlife would be similar to those discussed under *Impacts from Lands and Realty Management on Aquatic Wildlife*.

**Impacts from Range Management on Aquatic Wildlife**

*Habitat Alteration and Loss or Reduction of Streamside Vegetation or Cover and Water Quality Alteration and Increased Sediment Loading and Turbidity*

In areas that are available for livestock grazing, there could be more impacts on aquatic wildlife than in areas where livestock grazing is excluded.

The primary potential impacts on fish and other aquatic species from livestock grazing is habitat alteration, loss or reduction of streamside vegetation and cover, water quality alteration, and increased sediment loading and turbidity. Where livestock grazing is occurring in watersheds containing occupied habitats of sediment-intolerant species (e.g., trout, sculpin species, and mountain whitefish), there is an increased risk of the identified impacts to occur. This is because these species require cold, clear, well-oxygenated water in which to thrive. Impacts are most likely to occur in site-specific areas where improper grazing is occurring. Improper livestock grazing could result in direct adverse impacts at site-specific locations to select streams containing sediment-intolerant aquatic species.

Livestock grazing could lead to changes in vegetation plant species and functional group composition through vegetation removal, disturbance, and trampling and increased potential for weed introduction and spread. Livestock and wildlife grazing in riparian areas can prevent regeneration of woody and herbaceous riparian vegetation necessary to stabilize stream banks. Grazing can also reduce litter and fine fuel loading, which could alter fire size and severity.

Livestock often use riparian areas for water and shade, which may cause greater impacts on these areas by concentrating livestock use. Livestock could cause impacts by altering stream functionality and vegetation structural diversity. Livestock could also contribute to the spread of invasive species in riparian areas.

Livestock grazing can increase sediment load in streams from animal concentration areas, collapsing banks, stream-channel alteration, and vegetation removal in riparian areas. Increased sediment in streams, rivers, and reservoirs decreases the potential for wild fish to reproduce, fills in pools, leads to channel degradation, and increases stream temperatures. Changes in water temperature also would result from changes in the amount of vegetation cover. Changes in the aquatic habitat would lead fish to alter their uses of the stream, moving to different areas for feeding and spawning, depending on habitat conditions.

BLM_0029518

Livestock near aquatic systems could change cold-water aquatic habitat quality through nutrient inputs from manure (Larsen et al. 1994). In addition, livestock grazing could change aquatic habitat connectivity when they are allowed next to or within aquatic systems; grazing could alter bank stabilization and water quality and thus alter habitat conditions in certain areas. Water developments near tributary creeks could affect the hydrologic regime of these systems by withdrawing water.

Under all alternatives, the BLM is managing livestock grazing to comply with all of the BLM Colorado Public Land Health Standards. The BLM could, as needed, change permit terms, adjust AUMs for livestock, implement grazing systems, require rotation or deferment, impose utilization limits, and implement additional measures, such as range improvements, as necessary and feasible to reduce impacts. Intensive livestock management can reduce the magnitude of the impacts listed above by allowing vegetation to adequately rest and recover between periods of domestic grazing. However, vegetation may be damaged until it is detected and management is changed.

*Vegetation Management and Range Improvements*
In areas that are available for livestock grazing, there would be more impacts on aquatic wildlife from vegetation management activities and range improvements than in areas where livestock grazing is excluded.

Areas available for livestock grazing would primarily be associated with vegetation management and range improvements, such as fencing, water developments, weed treatments, chemical, biological, or mechanical vegetation treatments, burning, and seeding of disturbed areas or weed-treated areas. The primary impacts from rangeland vegetation management are habitat alteration and increased sediment loading and turbidity. Where treatments are occurring in watersheds containing occupied habitats of sediment-intolerant species (e.g., trout, sculpin species, and mountain whitefish), there is an increased risk of the identified impacts to occur because these species require cold, clear, well-oxygenated water in which to thrive.

Treatment of rangeland vegetation could result in limited indirect impacts on streams containing sediment-intolerant fish and other aquatic species. For example, there is the potential for the increased spread of weeds where vegetation is treated, which would, in turn, reduce upland habitat condition and increase erosion potential. However, these impacts would be short term and of limited scope and intensity. Where vegetation treatments are used to restore riparian areas (e.g., the removal of tamarisk), there is the potential for short-term impacts on aquatic species, including habitat alteration, increased sediment loading and turbidity, and the reduction or loss of streamside vegetation and cover. Removing invasive species would result in the loss or reduction of streamside vegetation and cover, which would impact fish in the short term. This activity, however, would result in long-term beneficial impacts on aquatic

BLM_0029519

species because native vegetation is, or would be, restored. This would improve stream bank stability, water absorption and infiltration rates, and habitat diversity.

Fish and other aquatic wildlife are considered before the identification and planning of any site-specific projects, and impacts are mitigated. All vegetation treatments are designed with the primary goals of long-term watershed improvement and meeting Standard 3 and Standard 4. In spite of the potential for short-term impacts, rangeland vegetation management results in long-term beneficial impacts on fish and other aquatic wildlife by improving upland watershed health and maintaining productive habitats that provide adequate groundcover. This, in turn, would allow for natural water infiltration and absorption rates and limited erosion potential.

In areas where range improvements associated with livestock management are constructed (such as fencing and upland water developments), there is the potential for short-term impacts on aquatic species, including habitat alteration, increased sediment loading and turbidity, and loss of vegetation. Road construction needed in order to access range improvements can create chronic long-term point sources for increased sedimentation and turbidity.

Upland water developments also tend to concentrate livestock use, which can impact amphibians as sedimentation and turbidity increases and shoreline vegetation is lost. Water developments would permanently remove vegetation within the development's footprint and would concentrate livestock in certain areas, thus reducing vegetation cover and increasing the likelihood for weed invasion and spread. This can reduce watershed health and result in poor soil retention, increased runoff, and poor water infiltration and absorption. However, many of these range improvements would result in long-term benefits to fish and other aquatic species. This is because livestock distribution would be improved, grazing would be reduced along streams, and, in some cases, amphibian habitat would be created as the result of stock pond creation.

Noxious and invasive weed management includes herbicide use, biological controls, and mechanical or manual treatments in weed-infested areas. In areas where proactive weed management in the form of treatments are occurring, or would occur, there is the potential for short-term impacts on aquatic species. This includes the loss or reduction of streamside vegetation and cover and increased sediment loading and turbidity resulting from the loss of vegetation before desirable species become established. All weed treatments would result in long-term beneficial impacts on fish and other aquatic species and to their habitats. This is because native vegetation is, or would be, restored, thereby improving watershed health and, in select cases, stream bank stability, water quantity, and habitat diversity.

Weed management is conducted in accordance with the *National Vegetation Treatments Using Herbicides on Public lands in 17 Western States Final Programmatic*

BLM_0029520

*EIS* (BLM 2009). The analysis of aquatic species and their habitats was addressed in this document, which set the parameters for the treatment of weeds within and near aquatic habitats. In addition, weed management is subject to the BLM Colorado Public Land Health Standards (BLM 1997), which help guide vegetation management on public lands. In areas where these standards are being met, there are reduced potential impacts on fish and other aquatic wildlife resulting from off-site erosion and increased sedimentation due to degraded weed-infested habitats.

Implementation-level grazing decisions would comply with BLM Colorado Public Land Health Standards. Where the standards are being met, rangeland management is expected to result in minimal impacts on fish and other aquatic wildlife. Healthy, productive, and diverse plant communities support aquatic wildlife communities that are productive, resilient, diverse, and vigorous and that are able to reproduce and sustain natural fluctuations and ecological processes; therefore, implementing management actions that contribute to maintaining the condition and quality of aquatic wildlife habitat would ensure that BLM Colorado Public Land Health Standards #3 and #4 would be met throughout the life of the LUPA.

*Summary of Impacts by Alternative*
Alternative A would allow livestock grazing and would have the most potential for vegetation management and rangeland improvements, with the fewest restrictions; therefore, Alternative A would have the greatest impact on aquatic wildlife.

The potential for vegetation management and rangeland improvements would be the same under Alternative B; however, more restrictions would be in place to protect GRSG habitat, so it would have fewer impacts on aquatic wildlife.

Alternative C would allow no livestock grazing in ADH, and no treatments that benefit GRSG would be allowed; therefore, Alternative C would have the fewest impacts on aquatic wildlife because it would have the least potential for vegetation management and rangeland improvements.

Alternative D would have the same areas available for livestock grazing as Alternatives A and B. Impacts on aquatic wildlife would be similar under Alternative D as they would be under Alternative B.

Under the Proposed LUPA, the same areas would be available for livestock grazing as Alternatives A, B, and D. Impacts on aquatic wildlife would be the same as described under those alternatives.

*Water Depletions*
See discussion on water depletions under *Assumptions* at the beginning of the *Aquatic Wildlife, Including Special Status Fish and Aquatic Species* section. In areas

BLM_0029521

that are available for livestock grazing, there would be more impacts on aquatic wildlife from water depletions than in areas where livestock grazing is excluded.

*Summary of Impacts by Alternative*

Alternative A would allow livestock grazing and would have the most potential for projects that deplete water; therefore, Alternative A would have the greatest impact on aquatic wildlife, including special status species.

The potential for projects that result in water depletions would be the same under Alternative B; however, more restrictions would be in place to protect GRSG habitat, so it would have fewer impacts on aquatic wildlife, including special status species.

Alternative C would not allow livestock grazing in ADH, and no new water developments would be allowed from spring or seep sources in ADH; therefore, Alternative C would have the fewest impacts on aquatic wildlife, including special status species, because it would have the least potential for projects that result in water depletions.

Alternative D would have the same areas available for livestock grazing as Alternatives A and B. Impacts on aquatic wildlife, including special status species, would be more restrictive under Alternative D than under Alternatives A and B.

Under the Proposed LUPA, the same areas would be available for livestock grazing as Alternatives A, B, and D. Impacts on aquatic wildlife would be the same as described under those alternatives.

### Impacts from Wild Horse Management on Aquatic Wildlife

Impacts on aquatic wildlife from wild horse management would be similar but to a less broad extent as impacts from livestock grazing.

Alternative A would place the fewest restrictions on wild horse management, and so it would have the most potential for impacts on aquatic wildlife.

Alternative B would place some restrictions on the management of wild horses. Impacts on aquatic wildlife would be less than Alternatives A and D but would be similar to Alternative C.

Alternative C is expected to have the same impacts as Alternative B because the management prescriptions for Alternatives B and C are much the same for managing wild horses.

Alternative D would have fewer impacts than Alternative A but greater impacts than Alternatives A and C because it would allow more flexibility in the management of wild horses.

BLM_0029522

For the Proposed LUPA, wild horse management would be the same as Alternative D; therefore, impacts would be the same as those described under Alternative D

***Impacts from Fluid Minerals Management on Aquatic Wildlife***

*Loss or Reduction of Streamside Vegetation and Habitat Alterations and Disruption to Species*

Fluid minerals development may result in the loss, reduction, or alteration of streamside riparian vegetation. Vegetation loss can alter the nutrient dynamics of an aquatic ecosystem and may result in increased water temperatures, light levels, and autotrophic[2] production. Increased stream temperatures can affect certain aquatic species, such as trout, by reducing their growth efficiency and increasing their likelihood of succumbing to disease.

Changes in a stream's food web can alter the composition of food and thus energy sources that are available to resident fish and aquatic invertebrates. Terrestrial insect diversity and productivity also decreases with reductions in streamside vegetation, which affects food availability for resident fish. Loss or reduction of riparian vegetation can also increase peak flows as vegetation is not sufficient in root mass, size, or abundance to sufficiently slow stream velocities. In addition, the loss of streamside vegetation reduces water percolation and infiltration, leading to unnaturally high and frequent runoff (Holechek et al. 1989). This can accelerate bank erosion and sloughing, increase siltation, elevate stream temperatures, widen and braid stream channels, and cause the loss of overhanging banks. All of these are important factors affecting trout productivity in a given stream (Armour 1977; Behnke 1979a, 1979b; Claire and Storch 1977; Gardner 1950; Glinski 1977; Kaufman et al. 1983).

Stream and stream bank alteration can affect aquatic species in many ways. Actions that affect stream banks can result in soil compaction, increased erosion, and subsequent widening of stream channels. Stream widening results in a loss of habitat complexity and diversity and reduced water depths. This can reduce available habitat and increase stream temperatures. Increased temperatures can increase physiological stress, reduce feeding, and increase disease.

Stream bank alteration also exposes bare soils, which provides for points of invasion by weedy species and increases the risk of further bank erosion. Actions that increase the amount of soil exposed to the erosive effects of water would increase sediment loading and turbidity. This can alter feeding by fish that require water clarity to forage and capture prey.

---

[2]Pertaining to organisms that form nutritional organic substances from simple inorganic substances, such as carbon dioxide

BLM_0029523

*Increased Sediment and Turbidity and Decreased Water Quality*

Actions that increase sediment loading into streams can impact sediment intolerant aquatic species in many ways. Increased sediments in the stream environment reduce dissolved oxygen and raise stream temperature and can cover spawning and rearing areas, thereby reducing the survival of fish embryos and juveniles (Forest Service 2002). Excessive sedimentation can also fill in important pool habitats, reducing their depth and making them less usable to fish and other aquatic organisms. High sediment transport can fill pools and cause reduction or loss of essential salmonid juvenile rearing habitat (Frissell 1992). Pool habitats are important because over-summer and over-winter thermal refugia and, when coupled with stream flows, are often a limiting factor in many small mountain streams.

A number of sub-lethal effects on resident trout may also occur as a result of sedimentation, including avoidance behavior, reduced feeding and growth, and physiological stress (Waters 1995). Over the long term, increased sediment loading reduces primary production in streams (Forest Service 2002). Reduced macroinvertebrate productivity and diversity results when excessive sediment fills in the interstitial spaces of stream substrates needed by these aquatic invertebrates. Food webs can be altered as sediment-intolerant macroinvertebrates are replaced by sediment-tolerant species. Reducing stream productivity can disrupt the food chain and reduce food sources for resident fish species. All of these impacts can reduce population density.

Suspended sediment causes turbidity within streams, which reduces clarity; trout are visual feeders and require clear water in which to forage. The longer the duration of high turbidity the more damage is likely to fish and other aquatic organisms (Newcombe and MacDonald 1991). Roads increase surface runoff and sedimentation, and where they cross water, in-channel structures are often required, such as culverts. Bridges that remove aquatic habitat may be barriers to fish passage (Barrett et al. 1992; Bryant 1981). The effects of changes in water quality are well documented on trout species.

Increased levels of development may increase the risk for leaks or spills and sediments entering aquatic systems. Spills (e.g., of oil, condensate, and produced water) of sufficient concentration that enter streams at or above occupied habitat are likely to have direct impacts on fish populations. Effects can range from sub-lethal (stress, reduced feeding behavior, habitat avoidance) to direct mortality, depending on the type and amount of substance and stream flows. Oil pollution can affect fish (including endangered fish) by asphyxiation, destruction of food organisms, chronic toxicity, resulting in reduced resistance to infection and other stresses, and can interference with behavior.

Considering the number of federal and state regulations that require fugitive sediment and potential contaminants be managed and contained on-site (e.g., Colorado Oil and Gas Conservation Commission Rules and BLM Onshore

BLM_0029524

Orders), it is unlikely that sediment sufficient to degrade downstream aquatic habitats would be generated regardless of alternative. Individual actions that may affect critical habitat or fish populations would prompt ESA Section 7 consultation with USFWS and would result in the development of conservation actions that would prevent substantive adverse direct and indirect influences.

*Water Depletions*
See discussion on water depletions under *Assumptions* at the beginning of the *Aquatic Wildlife, Including Special Status Fish and Aquatic Species* section.

*Habitat Protection and Restoration*
Protections afforded to GRSG under the various alternatives would benefit aquatic systems whose ranges are coincident with PHMA or ADH. Conservation measures associated with each alternative, such as excluding development and limiting surface disturbance (disturbance cap), would reduce or eliminate impacts from oil and gas development (see below). Additionally, RDFs and PDFs would also reduce both direct and indirect impacts on sagebrush habitats. They also would provide incidental benefits to aquatic systems in PHMA and ADH.

*Summary of Impacts by Alternative*
Alternative A—Potential impacts on aquatic systems would vary based on MZ and would largely depend on stipulations outlined in each resource area's LUP. In general, Alternative A would require the fewest restrictions on fluid minerals development, so potential impacts on aquatic systems, including potential for water depletions, would be greatest under this alternative. In most cases, NSO and CSU stipulations and the current suite of state and federal processes regulating the potential for off-site sediment and contaminant delivery would be fully capable of reducing projected oil and gas development effects on discountable levels for aquatic systems.

Alternative B—Alternative B would have more restrictions on fluid minerals development than Alternatives A and D but fewer than Alternative C. Such restrictions would reduce the amount of surface disturbance (as a potential source of sediment and proximity of development as potential contaminant source) in PHMA. Examples of these restrictions are closing PHMA to fluid minerals leasing, prohibiting surface-disturbing activities in PHMA for leased parcels (with certain exceptions), applying a 4-mile NSO around leks, and limiting permitted disturbances to one per section, with no greater than 3 percent per section.

RDFs including clustering development, placing infrastructure in previously disturbed areas, road design and placement, in addition to others (see **Chapter 2**) would also decrease the potential for direct and indirect disturbance of aquatic systems in PHMA. Conservation measures applied under Alternative B would be limited to PHMA in nearly all instances and could influence 617,500 acres (25 percent) of all federally managed GRSG habitats (ADH). In general,

BLM_0029525

conservation measures required under this alternative would benefit aquatic systems in PHMA.

Relocating development into areas outside of PHMA or unsuitable inclusions with PHMA may have some potential to indirectly influence aquatic systems; however, mitigations would reduce the risk of direct and indirect impacts on aquatic habitats These include COAs, NSO, and CSU stipulations, and state and federal regulatory processes that regulate the potential for off-site sediment and contaminant delivery.

In certain MZs where GRSG habitat is limited and naturally fragmented (e.g., MZ 17), restrictions in PHMA, coupled with NSO and CSU stipulations for riparian and aquatic habitats, could limit development options, shifting development into areas more susceptible to erosion (e.g., steeper slopes). This could lead to heavier sedimentation loads, increased fugitive contaminants, and less effective reclamation, all of which increase the risk of indirectly influencing aquatic systems in the immediate area. In general, this alternative would reduce impacts on aquatic systems in areas coincident with PHMA more than Alternatives A and D.

Alternative C—Impacts on aquatic wildlife and associated habitats would be similar to those described for Alternative B, but conservation measures would be expanded to include ADH in nearly all instances. Under Alternative C, protective measures (see Alternative B and **Chapter 2**) would influence approximately 1,094,000 acres (43 percent) of all federally managed GRSG habitat (ADH). Both direct and indirect impacts from fluid minerals development would be the least under this alternative and as such would provide the greatest benefit to those aquatic systems in ADH. Similar to Alternative B, excluding or limiting surface-disturbing activities in ADH would likely shift development into other areas, with the potential to impact aquatic systems in certain MZs (see discussion above for Alternative B).

Alternative D—Alternative D would have more restrictions on fluid minerals development than Alternative A but fewer than Alternatives B and C. Under this alternative, an NSO stipulation would be applied to all unleased PHMA with exception, modification, and waiver criteria. A 5 percent disturbance cap would be applied to each MZ with certain exception, modification, and waiver criteria (see **Chapter 2**).

Similar to Alternative B, conservation measures applied under Alternative D would be limited to PHMA in nearly all instances and could influence 617,500 acres (25 percent) of all federally managed GRSG habitats (ADH). Potential for direct and indirect impacts on aquatic systems would be greater under Alternative D, compared with Alternatives B and C, due largely to the 5 percent disturbance cap and greater potential for surface-disturbing activities to occur (PHMA open for development). However, as stated above, NSO and CSU

BLM_0029526

stipulations in addition to site-specific mitigation measures would reduce or eliminate the risk of direct and indirect impacts on aquatic systems.

Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA (see exception criteria below) and within 2 miles of active leks in GHMA (see **Appendix D**).

No modifications or waivers would be permitted. The BLM Authorized Officer may grant an exception to this NSO stipulation only under one of two scenarios:

1.  The proposed action would not have direct, indirect, or cumulative effects on GRSG or its habitat or

2.  The proposed action would be an alternative to a similar action occurring on a nearby parcel and would provide a clear conservation gain to GRSG

Exceptions based on conservation gain (2, above) may only be considered in PHMA of mixed ownership where federal minerals underlie less than fifty percent of the total surface, or in areas of the public lands where the proposed exception is an alternative to an action occurring on a nearby parcel subject to a valid federal fluid mineral lease existing as of the date of this RMP.

Exceptions based on conservation gain must also include measures, such as enforceable institutional controls and buffers, sufficient to allow the BLM to conclude that such benefits would endure for the duration of the proposed action's impacts.

> *Any exceptions to this lease stipulation may be approved by the Authorized Officer only with the concurrence of the State Director. The Authorized Officer may not grant an exception unless the applicable state wildlife agency, the USFWS, and the BLM unanimously find that the proposed action satisfies [1 or 2, above]. Such finding shall initially be made by a team of one field biologist or other GRSG expert from each respective agency. In the event the initial finding is not unanimous, the finding may be elevated to the appropriate BLM State Director, USFWS State Ecological Services Director, and state wildlife agency head for final resolution. In the event their finding is not unanimous, the exception will not be granted. Approved exceptions will be made publically available at least quarterly.*

Disturbances would be limited to 3 percent or 1 disturbance per 640 acres density of PHMA in each Colorado Management Zone, with no new leasing allowed if the disturbance cap exceeds this amount. Seasonal restrictions would apply to construction, drilling, and completion within 4 miles of active leks during the GRSG reproduction period of March 1 to July 15. The BLM

BLM_0029527

Authorized Officer may grant an exception, modification or waiver in consultation with the State of Colorado if criteria described in Appendix E are met. Impacts on aquatic wildlife due to management of fluid minerals under the Proposed LUPA would be similar to those described under Alternatives B and C.

Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA (see exception criteria below) and within 2 miles of active leks in GHMA (see **Appendix D**).

### Impacts from Solid Minerals—Coal Management on Aquatic Wildlife

Impacts from solid minerals development (surface and subsurface) on aquatic wildlife populations and habitats would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on Aquatic Wildlife* but may vary in scale, duration, and intensity.

### Impacts from Locatable Minerals Management on Aquatic Wildlife

Impacts from locatable minerals development on aquatic wildlife populations and habitats would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on Aquatic Wildlife* but may vary in scale, duration, and intensity.

### Impacts from Nonenergy Leasable Minerals Management on Aquatic Wildlife

Impacts from nonenergy leasable minerals development on aquatic wildlife populations and habitats would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on Aquatic Wildlife* but may vary in scale, duration, and intensity.

### Impacts from Salable Mineral Management on Aquatic Wildlife

Impacts from salable minerals development on aquatic wildlife populations and habitats would be the same or similar to those discussed under *Impacts from Fluid Minerals Management on Aquatic Wildlife* but may vary in scale, duration, and intensity.

### Impacts from Fuels Management on Aquatic Wildlife

*Direct Habitat Loss/Modification/Fragmentation*

A hot fire near an occupied stream, in combination with low flows and high air temperatures, could render some stream reaches inhospitable by removing riparian vegetation as well as upland vegetation on nearby slopes.

Some species have become adapted to fluctuations in climate and environmental conditions over their evolutionary history. Trout are particularly vulnerable to environmental change brought on by fire due to their dependence on cold, clean water. Loss of riparian vegetation could result in unfavorably warm water due

BLM_0029528

to loss of shading. Warm water may affect survivorship and reproduction, in part because warmer waters have lower levels of dissolved oxygen. Denuded riparian habitats also make stream banks vulnerable to erosion and increase the potential for inflow of upland runoff containing high levels of sediments that would normally be filtered. Loss of riparian vegetation could also reduce the amount of allochthanous[3] prey available for aquatic wildlife. Burning of riparian areas under proposed burning plans is unlikely due to low intensity burning strategies and moist riparian plant communities.

Complete removal of upland vegetation is also unlikely, but if it were to occur as a result of the fire, it could lead to increased erosion and sediment loading, which would reduce stream habitat quality. Fine sediments would reduce productivity of macroinvertebrates that serve as the principal prey for many aquatic species.

*Decreased Water Quality and Increased Sedimentation and Turbidity*

Soil erosion after fire can increase sediment input into the stream, which can silting over spawning gravels, smother macroinvertebrate habitat, and fill pools. These impacts depend on the intensity of the burn, slope, aspect proximity to the stream, and time lag to and intensity of precipitation. In a prescribed burn, fire intensities would be low, which would reduce sedimentation effects. Some potential also exists for increased transport of soils into streams from mowing treatments in upland shrubland habitat.

Fire suppression may also increase sediment input into streams. Fire lines would need to be properly constructed and rehabilitated to minimize possible sedimentation. Use of fire retardant would not be allowed within 300 feet of any stream, and use of stream water for fire suppression would have to be approved and closely tracked and monitored throughout the suppression period.

Mechanical treatments in pinyon-juniper woodlands would consist primarily of thinning and piling of debris, often in combination with hand cutting, and then burning or chipping and shredding. Any accelerated rates of runoff and sedimentation from upland areas as a result of mechanical treatments would be small and site specific and would progressively diminish as these surrounding areas achieved proper functioning condition.

Removing vegetation could temporarily increase erosion of surficial soils into nearby streams. Water yield and surface water runoff from the treated areas may increase in response to high-intensity storms. However, because of the small scale of most treatments, the retention of most of the plant cover in a treated area, and the maintenance of vegetated buffers along streams and

---

[3]From outside the stream

BLM_0029529

around ponds, treatment projects are not expected to cause significant habitat changes for aquatic organisms.

Following a wildfire, ESR efforts are implemented to protect and conserve habitats that have sustained damage or degradation from suppression or prescribed fire. These activities are beneficial overall but can have short-term negative impacts on aquatic wildlife species, such as increased sedimentation and erosion during the implementation of these protective measures.

*Habitat Quality and Protection and Habitat and Water Quality Improvement*
A prescribed fire would also contribute to decreasing the threat of a future catastrophic wildland fire that would change large blocks of habitat indiscriminately and probably would result in substantial increases in sediment loading. Over the long term, all treatment methods that remove nonnative and competing vegetation are likely to benefit aquatic habitats by reducing sediment inflow; therefore, vegetation treatments would eventually increase the amount of suitable habitat, potentially increasing populations of desirable species requiring relatively clean waters.

Another long-term benefit of removing woody fuels from sagebrush habitats is the decrease in the risk of a future high severity wildfire. Pinyon and juniper removal would greatly reduce the chance of a high-intensity fire that could spread to woody riparian vegetation. Diverse, vigorous, and dense stands of native riparian vegetation help to protect streams from the direct and indirect impacts of wildfires by buffering streams from temperature increases and filtering ash, woody debris, and mud carried in runoff from nearby slopes. Some disturbance to riparian areas could provide for short-term impacts but long-term maintenance. However, generally, late seral, climax riparian areas provide the best streamside habitat and cover and shading for fish.

Following a wildfire, ESR efforts are often implemented to protect and conserve habitats that have sustained damage or degradation from suppression or prescribed fire. Typically these activities are beneficial for aquatic wildlife species and are designed to improve the overall condition of the area, which in turn improves habitat for wildlife. For example, weed-seed-free seeding would stabilize soil and reduce the spread of noxious weeds. Additionally, replacing organic matter in disturbed areas would protect topsoil and provide a suitable bed for the restoration of a native vegetation community.

*Summary of Impacts by Alternative*
Alternative A would have the fewest restrictions for fuels management actions, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize fire operations beyond what has already been determined in the fire management plans for the area; therefore, Alternative A would have the greatest impact on aquatic wildlife.

BLM_0029530

Alternative B is more restrictive than Alternative A, though all of the restrictions fall within PHMA; therefore, impacts from fuels management on aquatic wildlife would be less than Alternative A, but only within PHMA. Additionally, Alternative B would prioritize fire operations in PHMA and GHMA, immediately after life and property; therefore, the potential for disturbance to aquatic wildlife species within these habitats is lower under Alternative B than Alternative A.

Alternative C would prioritize fire operations in PHMA, immediately after life and property; therefore, the potential for disturbance to aquatic wildlife within PHMA would be the same as Alternative B, but less than Alternative B in GHMA. With regard to fuels management, Alternative C is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on aquatic wildlife species would be less than Alternative B. Conversely, Alternative C does not offer as many protective management actions that could benefit aquatic wildlife as Alternative B and D, so it has more potential for habitat degradation than the other alternatives.

Alternative D would give priority to fire operations in PHMA and GHMA, immediately after firefighter and public safety, but only after other resource values managed by the BLM and Forest Service are considered and if an exemption is warranted. With regard to fuels management, Alternative D is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on aquatic wildlife would be less than Alternative B. Concurrently, Alternative D offers the same protective measures as Alternative B but applies them to ADH; therefore, it has the potential for more benefits to aquatic wildlife species than Alternatives B and C.

Management of Wildfire Suppression, Fuels Management, and Fire Rehabilitation under the Proposed LUPA would be the same as those for Alternative D. Impacts from the Proposed LUPA, therefore, would be the same as described for Alternative D, above.

### Impacts from Habitat Restoration on Aquatic Wildlife

*Direct Habitat Loss/Modification/Fragmentation*
Some species have become adapted to fluctuations in climate and environmental conditions over their evolutionary history. However, habitat restoration near an occupied stream, in combination with low flows and high air temperatures, could render some stream reaches inhospitable by removing riparian and upland vegetation on nearby slopes. Trout are particularly vulnerable to environmental change brought on by vegetation removal due to their dependence on cold, clean water. Loss of riparian vegetation could result in unfavorably warm water due to loss of shading. Warm water may affect survivorship and reproduction, in

BLM_0029531

part because warmer waters have lower levels of dissolved oxygen. Denuded riparian habitats also make stream banks vulnerable to erosion and increase the potential for inflow of upland runoff containing high levels of sediments that would normally be filtered. Loss of riparian vegetation could also reduce the amount of allochthanous prey available for aquatic wildlife. Removing vegetation near riparian areas under proposed projects is unlikely due to the application of vegetation buffers near riparian areas.

*Decreased Water Quality and Increased Sedimentation and Turbidity*
Mechanical treatments in pinyon-juniper woodlands would consist primarily of thinning and piling debris, often in combination with hand cutting, and then burning or chipping and shredding. Any accelerated rates of runoff and sedimentation from upland areas as a result of mechanical treatments would progressively diminish as these surrounding areas achieved PFC. For mechanical treatments in the shrubland communities, mowing of sagebrush, followed by seeding or drilling would be the most likely to occur. Treatments would target woody species (e.g., big sagebrush, rabbitbrush, and greasewood), with the goal of increasing certain other species of shrubs and native perennial grasses and forbs.

Removing vegetation could temporarily increase erosion of surficial soils into nearby streams. Water yield and surface water runoff from the treated areas may increase in response to high-intensity storms. However, because of the retention of most of the plant cover in a treated area and the maintenance of vegetated buffers along streams and around ponds, treatment projects are not expected to cause significant habitat changes for aquatic organisms.

*Habitat Quality and Protection and Habitat and Water Quality Improvement*
Over the long term, all treatment methods that remove nonnative and competing vegetation are likely to benefit aquatic habitats by reducing sediment inflow; therefore, vegetation treatments would eventually increase the amount of desirable vegetation, potentially increasing populations of desirable aquatic species requiring relatively clean waters.

Another long-term benefit of removing woody fuels from sagebrush habitats is the decrease in the risk of a future high severity wildfire. Pinyon and juniper removal would greatly reduce the chance of a high-intensity fire that could spread to woody riparian vegetation. Diverse, vigorous, and dense stands of native riparian vegetation help to protect streams from the direct and indirect impacts of wildfires by buffering streams from temperature increases and filtering ash, woody debris, and mud carried in runoff from nearby slopes. Some disturbance to riparian areas could provide for short-term impacts but long-term maintenance. However, generally, late seral, climax, riparian areas provide the best streamside habitat and cover and shading for fish.

BLM_0029532

*Summary of Impacts by Alternative*

Alternative A would have the fewest restrictions for fuels management actions, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize fire operations beyond what has already been determined in the fire management plans for the area; therefore, Alternative A would have the greatest impact on aquatic wildlife.

Alternative B is more restrictive than Alternative A, though all of the restrictions fall within PHMA; therefore, impacts from fuels management on aquatic wildlife would be less than Alternative A but only within PHMA. Additionally, Alternative B would prioritize fire operations in PHMA and GHMA immediately after life and property. Therefore, the potential for disturbance to aquatic wildlife species within these habitats is lower in Alternative B than in Alternative A.

Alternative C would prioritize fire operations in PHMA immediately after life and property; therefore, the potential for disturbance to aquatic wildlife within PHMA would be the same as Alternative B but less than Alternative B in GHMA. With regard to fuels management, Alternative C is more restrictive than Alternative B since all of the management actions fall within ADH. Therefore impacts from fuels management on aquatic wildlife species would be less than Alternative B. Conversely, Alternative C does not offer as many protective management actions that could benefit aquatic wildlife as Alternative B and D; therefore, it has more potential for habitat degradation than the other alternatives.

Alternative D would give priority to fire operations in PHMA and GHMA immediately after firefighter and public safety, unless site-specific conditions warrant an exception. With regard to fuels management, Alternative D is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on aquatic wildlife would be less than Alternative B. Concurrently, Alternative D offers the same protective measures as Alternative B but applies them to ADH; therefore, it has the potential for more benefits to aquatic wildlife species than Alternatives B and C.

Proposed LUPA—Management of habitat restoration would be the same under the Proposed LUPA as under Alternative D; impacts on aquatic wildlife from this alternative would be the same as those described above under Alternative D.

### Impacts from ACEC and Zoological Area Management on Aquatic Wildlife

*Habitat Protection*

Areas that are designated as ACECs would be more beneficial to aquatic wildlife than areas that are not designated. Prohibiting surface-disturbing activities and other authorized activities would benefit aquatic wildlife by precluding activities that would have direct and indirect impacts on aquatic wildlife.

BLM_0029533

Alternative A would recognize all of the existing ACEC designations. This would have fewer beneficial impacts on aquatic wildlife than Alternative C, which would make all PHMA an ACEC.

Alternative B would also recognize only the existing ACEC designations. Impacts from Alternative B would be the same as impacts from Alternative A.

Alternative C would recognize all of the existing ACECs and would also make all PHMA an ACEC to protect sagebrush habitat. Impacts on aquatic wildlife under Alternative C would be the same as for Alternatives A, B, and D. ACEC designations would provide no additional protections beyond what is included in the management actions for those alternatives for the protection of GRSG habitat.

Alternative D would recognize all of the existing ACECs but does not propose to designate any new ACECs. Impacts from Alternative D would be the same as for Alternatives A and B.

The Proposed LUPA does not propose to designate any new ACECs; therefore impacts from this alternative would be the same as those described above for Alternatives A, B, and D.

### 4.4.3   Summary of Impacts on Aquatic Wildlife

Alternative A provides the least amount of protection for aquatic wildlife in the planning area. Alternative A puts very few restrictions on development, which could result in the most modification of the landscape, and consequently, the most impacts on aquatic wildlife.

Alternative B provides a greater level of protection for aquatic wildlife than Alternative A, but it would provide a lower level of protection than Alternative C.

Alternative C would provide the most protection for aquatic wildlife. The most restrictions would be placed on development, which would afford the most protection for aquatic wildlife.

Alternative D would provide more protection for aquatic wildlife than Alternative A, but it would provide less protection than Alternatives B and C. More flexibility for development is built into Alternative D, which could result in higher levels of development than Alternatives B and C.

The Proposed LUPA would provide slightly greater protections for aquatic wildlife to those described under Alternative D, due to less flexibility for development and greater restrictions on surface-disturbing activities.

BLM_0029534

## 4.5   SPECIAL STATUS SPECIES

### 4.5.1   General Description

This section discusses impacts on special status species, including federally listed species, BLM and Forest Service sensitive species, and state-listed species, from proposed management actions of other resources and resource uses. Existing conditions concerning special status species are described in **Section 3.3**, Special Status Species.

To analyze the potential impacts of the alternatives on special status species, information was gathered from inventories, recovery plans, conservation agreements, the Colorado Natural Heritage Program database, relevant scientific literature, and other sources identifying the potential distribution of these species in and next to the planning area. The analysis is also based on professional expertise of BLM and Forest Service specialists, the BLM Colorado State Office, CPW, and other professional organizations.

In determining impacts, the BLM and Forest Service staff considered how the action would affect listed or candidate species known or suspected to occur in an area. Direct and indirect impacts were considered, together with the impacts of activities that are interrelated or interdependent. Impacts were quantified when possible; in the absence of quantitative data, best professional judgment, based on scientific reasoning, was used. In the following discussion, impacts are sometimes described by using ranges of potential impacts or in qualitative terms, if appropriate.

Special status fish and wildlife health within the planning area is directly related to the overall ecosystem health, habitat abundance and fragmentation, and wildlife security provided; thus, most resource management has at least an indirect impact on fish and wildlife. A large proportion of actions under all alternatives are mitigation measures for other actions and protective measures intended to minimize or reduce impacts on the health of populations or habitats.

Although data on known locations and habitats within the planning area are available, the data are neither complete nor comprehensive concerning all special status species known to occur or with potential habitat. Known and potential special status species and habitat were considered in the analysis, but the potential for species to occur outside these areas was also considered; as a result, some impacts are discussed in more general terms. Further, special status species and potential special status species habitat distributions over the landscape are patchy and localized.

BLM_0029535

### 4.5.2   Greater Sage-Grouse

***Methodology and Assumptions***

*General Impacts on GRSG*

Indicators of impacts on GRSG and the measurements used to describe the impacts (where available or appropriate) are as follows:

- Direct habitat loss—Acres of habitat lost. Direct habitat loss results when habitat is destroyed or converted to a form that is unsuitable for the impacted species. Direct habitat loss can be a short-term or long-term impact.

- Habitat fragmentation—Habitat fragmentation occurs when contiguous habitat is broken into smaller blocks by surface-disturbing activities. Habitat fragmentation could lead to the following:

  - Likelihood of reduced habitat quality and interference with movement patterns, leading to a decreased ability to breed or overwinter successfully to a degree that would lead, in turn, to substantial population declines

  - Likelihood that individual habitat blocks would be reduced

  - Likelihood of increased percentage of edge habitat on smaller blocks when compared to larger blocks

- Disruption to species—Direct mortality of species, including predation, collisions with structures (fences, towers, and vehicles), and disease; interference with movement patterns due to fragmented landscapes; short- or long-term displacement and physiological or behavioral influences (avoidance of otherwise functional habitats).

- Habitat degradation—Weed infestation and understory and overstory reductions indicators (reductions in herbaceous ground cover, lack of residual cover, change in understory plant composition):

  - Miles disturbed (for limits on travel management, recreation, unleased areas)

  - Miles and acres disturbed (the assumption is that habitat next to roads that are impacted by dust and dust suppression activities would have some lower level of understory next to the impacted habitat.)

- Habitat restoration or improvement—The likelihood of improving habitat quality (e.g., increased species diversity, increased habitat connectivity, and decreased weeds).

BLM_0029536

- Habitat protection—Acres protected through stipulations, withdrawals, closures, and special designations (e.g., ACECs). Also, the likelihood of reduced or prohibited surface disturbance.

If the hard trigger is reached (see Chapter 2, **Section 2.7.1**, Adaptive Management), the impacts would be similar to those described for Alternative C.

*Assumptions*
In addition to the assumptions listed under **Section 4.3.2**, Terrestrial Wildlife, the following would apply specifically to GRSG:

- In general, GRSG are highly sensitive to habitat fragmentation, development, or changes in habitat conditions. This is because GRSG inhabit and require large, intact sagebrush ecosystems, and are especially sensitive to disturbance and human presence.

- Alternatives proposing to protect the most GRSG habitat from disturbance are anticipated to have the greatest beneficial impact on GRSG.

- Not all habitats within mapped priority and general GRSG ranges are capable of supporting GRSG populations.

- The mapped ADH represents all occupied habitat for the GRSG. Protection of these areas is sufficient for all occupied habitat of the GRSG in Colorado.

- Historic and potential habitat is not considered in this analysis.

Implementing protective measures specific to water developments may have some influence on reducing the severity of outbreaks and subsequent losses from West Nile virus; however, the prevalence in the environment of West Nile virus cannot be fully controlled, particularly at chronic levels of occurrence.

### Direct and Indirect Impacts on Greater Sage-Grouse

*Impacts from Travel Management on GRSG*

Habitat Degradation
Impacts would be the same as those discussed under *Impacts from Management of Travel and Transportation on Terrestrial Wildlife* (**Section 4.3.2**).

Alternative A—Under this alternative, some of the areas within BLM GRSG habitat would remain open to cross-country travel. This alternative has the highest potential for impacts on GRSG through habitat degradation.

Alternative B—Under this alternative, all areas within PHMA would be limited to designated routes, and no PHMA would be open to cross-country travel.

BLM_0029537

This alternative would reduce the likelihood of impacts from travel management on GRSG.

Alternative C—Same as Alternative B.

Alternative D—Same as Alternative B.

Proposed LUPA—same as Alternative B.

Direct Habitat Loss/Habitat Fragmentation/Disruption to Species
Impacts would be the same as those discussed under *Impacts from Management of Travel and Transportation on Terrestrial Wildlife*.

Alternative A—Under this alternative, the fewest acres would have seasonal restrictions on casual use; some of the areas within GRSG habitat would remain open to cross-country travel. This alternative has the highest potential for impacts on GRSG due to the lack of restrictions on activities that cause these impacts.

Alternative B—Under this alternative, no areas within PHMA would be designated as open to cross-country travel. The field offices and ranger districts would determine where closures and seasonal restrictions are necessary within PHMA to limit impacts on GRSG. This alternative would reduce the likelihood of impacts from travel management on GRSG.

Alternative C— This alternative would have the least potential to impact GRSG because restrictions on route construction would be applied to ADH.

Alternative D—This alternative would include the potential for seasonal limitations as necessary in ADH and would seasonally prohibit camping and other nonmotorized recreation within 4 miles of a lek. In this case, benefits to GRSG could be expanded to ADH and all habitat within 4 miles of a lek.

Proposed LUPA—Travel management would be the same under the Proposed LUPA as Alternative D; therefore impacts on GRSG would be the same as those described under Alterative D, above.

Habitat Restoration
Impacts would be the same as those discussed under *Impacts from Management of Travel and Transportation on Terrestrial Wildlife*.

Alternative A—Under this alternative, the fewest acres would be closed to cross-country travel. This alternative would have the fewest acres of habitat restoration as a result of natural revegetation.

Alternative B—Under this alternative, no areas within PHMA would be designated as open to cross-country travel. The field offices and ranger districts would determine where closures are necessary within PHMA to limit impacts

BLM_0029538

on GRSG. This alternative is expected to provide more habitat restoration than Alternative A.

Alternative C—Same as Alternative B.

Alternative D—Same as Alternative B.

Proposed LUPA—Travel management would be the same under the Proposed LUPA as Alternative D; therefore impacts on GRSG would be the same as those described under Alterative B, above.

*Impacts from Recreation Management on GRSG*

<u>Permitted Use</u>
Impacts from permitted use and the proposed alternatives would be the same as those described under terrestrial wildlife.

Alternative A—Under Alternative A, the BLM and the Forest Service would continue issuing SRPs and SUAs on a case-by-case basis. They would continue to provide opportunities for competitive and noncompetitive events and commercial outfitting services.

Alternative B—SRPs and SUAs would be authorized only where impacts on PHMA would be neutral or beneficial. This alternative is expected to provide more protection for GRSG than Alternative A.

Alternative C—Same as Alternative B.

Alternative D—This alternative limits impacts on disruption of the species as well as PHMA and thus would provide the most protections for GRSG.

Proposed LUPA—Recreation management would be the same as Alternative D; therefore, impacts on GRSG would be the same as those under Alterative D, above.

*Impacts from Lands and Realty Management on GRSG*

<u>Direct Habitat Loss/Fragmentation/Degradation</u>
In areas where ROWs are permitted, there would be more impacts on GRSG and its habitat than in areas where ROWs are excluded or avoided.

Constructing and operating ROW facilities, such as pipelines, roads, and transmission lines, may result in habitat loss, fragmentation, and degradation. Surface disturbance during construction removes vegetation and important habitat components for GRSG and, in most cases, renders the habitat unsuitable. ROWs, such as those for roads and industrial facilities, may lead to permanent loss of GRSG habitat. Other ROWs, such as those for pipelines or buried power lines, may lead to a more short-term loss of habitat if the area

BLM_0029539

were reclaimed after construction. However, following natural succession regimes, sagebrush communities would take 20 to 30 years to return to preconstruction conditions. In addition to removing vegetation, long-term occupancy of structures and facilities leads to direct habitat loss.

ROWs may also lead to habitat fragmentation and degradation. ROW projects can reduce patch size and increase edge habitats. Since GRSG require large blocks of intact habitat, linear disturbances reduce habitat quality. Surface disturbance can also lead to new weed infestations and spread weeds where infestations already occur. Noxious and invasive weeds are often of lower value to wildlife, and degrade wildlife habitat by reducing optimal cover or food.

Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. The loss and degradation of sagebrush habitat can reduce the carrying capacity of local breeding populations of GRSG, especially in areas where high quality sagebrush habitat is limited (Braun 1998; Connelly et al. 2000).

Disruption Impacts
Both the construction and operation phases of ROW projects can lead to disruption impacts. Noise and an increase in human presence during construction may displace GRSG into lower quality habitat and may disrupt breeding and nesting (Holloran 2005). Although construction impacts are generally short term, many impacts would continue during routine maintenance and operation of the ROWs. GRSG would likely avoid habitat in the vicinity of infrastructure (Holloran et al. 2010), resulting in indirect habitat loss. In addition, noise and an increase in traffic during ROW operation and maintenance would disturb and likely displace GRSG (Lyons and Anderson 2003; Holloran 2005). Avoidance of habitat would be most prevalent during levels of high human activity, such as ROW construction. GRSG may avoid otherwise suitable habitat as the density of roads and infrastructure increases (Holloran 2005).

GRSG and other prairie gallinaceous birds[4] have evolved in habitat devoid of tall structures. ROW projects involving tall structures, such as power lines (distribution and transmission lines), communication towers, and meteorological towers, may lead to avoidance of suitable habitat (Pitman et al. 2005; Pruett et al. 2009; Wisdom et al. 2011). Although peer-reviewed science that demonstrated a clear avoidance of tall structures is limited for GRSG, studies conducted on species that have similar life history (i.e., the lesser and greater prairie-chickens) have shown that use of habitat is reduced when these habitats are near tall structures (Pitman et al. 2005; Pruett et al. 2009).

[4]Birds in the order Galliformes, including domestic poultry and game birds

BLM_0029540

Avian predators, particularly raptors and corvids (i.e., crows, ravens, and magpies), are attracted to overhead utility lines because they provide perches for various activities, including hunting (Avian Power Line Interaction Committee 2006). Increased predation and harassment of GRSG may occur from new ROW projects involving power lines or other tall structures (Connelly et al. 2004). In addition, ROW roads may increase mammalian predator densities.

Constructing and operating ROW facilities may also lead to direct mortality of GRSG. The potential for GRSG mortality from project construction would be low and likely limited to nesting hens or young chicks that have limited mobility. Direct mortality may occur when GRSG collide with turbines, power lines, or meteorological towers or their supporting infrastructure, such as guy wires (Connelly et al. 2004; Beck et al. 2006). In addition, an increase of traffic on roads from ROW maintenance and operations can lead to direct mortality through vehicle/GRSG collisions.

Habitat Protection
ROW exclusion or avoidance areas would eliminate or reduce the above-described impacts on GRSG and its habitat by preferentially locating ROWs outside PHMA or GHMA. Disturbances caps would limit surface disturbance and habitat fragmentation in GRSG habitat.

In general, the BLM and Forest Service would consider and analyze benefits to the public from any proposed acquisition or disposal action using land tenure adjustment criteria, with the goal that the exchange, acquisition, or disposal would increase public benefits, including those for GRSG. Any acquisition of land that includes high-value habitat can result in beneficial impacts on GRSG by maintaining or enhancing the habitat using BLM and Forest Service management restrictions or mitigation for surface-disturbing and disruptive activities. Any disposal of BLM-administered or National Forest System land with high-value habitat is typically avoided; such disposals could increase the risk of habitat loss through development because there would not be any BLM and Forest Service-required mitigation.

Lands no longer administered by the BLM or Forest Service could also experience increased human presence that can increase disturbance to wildlife in the area. Consolidating landownership through land tenure adjustments increases the manageability of lands and results in more contiguous blocks of habitat, which would beneficially impact GRSG.

Summary of Impacts by Alternative
Alternative A would have the most areas available for ROWs, with few restrictions in place to protect GRSG specifically. It would have more potential for impacts on GRSG and its habitat than Alternatives B, C, and D. The impacts described above would be greatest under this alternative.

BLM_0029541

Alternative B would have fewer areas available for ROWs through restrictions to protect GRSG habitat. Under this alternative, PHMA would be managed as an exclusion area, and GHMA would be managed as an avoidance area for new ROW projects. Conservation measures would be more protective under Alternative B than Alternatives A and D, but less protective than Alternative C, due to restrictions on siting options. However, in some cases, greater impacts on GRSG or GRSG habitat may occur on private lands as a consequence of certain projects (including linear projects) that would be prohibited on BLM-managed federal land. These management actions would be more restrictive than Alternatives A and D, but less restrictive than Alternative C; therefore, potential impacts on GRSG would be less than Alternative A but would be greater than Alternative C and D.

Alternative C would have the most protective measures for GRSG. Under this alternative, ADH would be managed as an exclusion area for new ROW projects. In addition, Alternative C would encourage consolidation through land tenure, of GRSG habitats, facilitating habitat conservation and management. Due to the extensive amount of ROW exclusion, however, in some cases, greater impacts on GRSG or GRSG habitat would occur on private lands as a consequence of certain projects (linear features) that would be prohibited on BLM-managed federal land. This alternative would have the fewest impacts on GRSG and its habitat overall but would prohibit flexibility in siting projects regardless of landownership.

Under Alternative D, PHMA would be managed as an avoidance area. ROW projects would be allowed only in PHMA if the project would not adversely affect GRSG or GRSG habitat. This alternative would be more protective than Alternative A and less restrictive but more flexible for GRSG or GRSG habitat overall than Alternatives B and C.

The Proposed LUPA would manage all PHMA and GHMA as ROW avoidance areas with exceptions for the TransWest and Energy Gateway South pending large transmission lines (see **Section 4.6.2**, Methodology and Assumptions [Lands and Realty]). Additionally, no aboveground structures would be authorized within 1 mile of active leks. Impacts on GRSG from management of lands and realty under the Proposed LUPA would be similar to those described for Alternatives B and D, with potentially considerable local impacts on GRSG leks and habitat where the PHMA and GHMA are open for TransWest and Energy Gateway South transmission lines. For the description of impacts from proposed large transmission lines in northwest Colorado, see Cumulative Impacts (**Chapter 5**).

BLM_0029542

*Impacts from Wind Energy Development on GRSG*

Direct Habitat Loss/Fragmentation/Degradation
In areas where wind energy facilities are permitted, there would be more impacts on GRSG and its habitat than in areas where wind energy facilities are excluded. Impacts on GRSG from constructing and operating wind energy facilities would be similar to those for ROWs and include direct habitat loss, fragmentation, and degradation (see *Impacts from Lands and Realty Management on GRSG* above).

Disruption Impacts
In areas where wind energy facilities are permitted, there would be more impacts on GRSG and its habitat than in areas where wind energy facilities are excluded. Impacts on GRSG from constructing and operating wind energy facilities would be similar to those for ROWs and include disruption, avoidance, and potential direct mortality (see *Impacts from Lands and Realty Management on GRSG* above).

Summary of Impacts by Alternative
Alternative A does not exclude wind energy developments specifically from GRSG habitat. In addition, this alternative would have the most areas available for ROWs and would lead to more impacts than Alternatives B, C, and D.

Although Alternative B does not exclude wind energy developments specifically from GRSG habitat, this alternative would have fewer areas available for ROWs. Conservation measures would be more protective under Alternative B than under Alternatives A and D but less protective than Alternative C; therefore, impacts on GRSG are less under Alternatives A and D but greater than Alternative C.

Alternative C would have the most protective measures by precluding wind developments from ADH; therefore, it would have the fewest impacts on GRSG.

Although Alternative D does not address wind energy specifically, Alternative D would be more protective in respect to all ROWs than Alternative A but less protective than Alternatives B and C.

Under the Proposed LUPA, wind energy development would be excluded from PHMA; impacts on GRSG would be similar to those under Alternative C. However, the impact on GRSG from restrictions on wind energy development are not expected to vary between alternatives because the potential for industrial wind energy in northwest Colorado is very limited.

BLM_0029543

*Impacts from Solar Energy Development on GRSG*

<u>Direct Habitat Loss/Fragmentation/Degradation</u>
In areas where solar energy facilities are permitted, there would be more impacts on GRSG and its habitat than in areas where solar energy facilities are excluded.

Impacts on GRSG from constructing and operating solar energy facilities would be similar to impacts on ROWs and would include direct habitat loss, fragmentation, and degradation (see *Impacts from Lands and Realty Management on GRSG* above).

<u>Disruption Impacts</u>
In areas where solar energy facilities are permitted, there would be more impacts on GRSG and its habitat than in areas where solar energy facilities are excluded.

Impacts on GRSG from constructing and operating solar energy facilities would be similar to those for ROWs and include disruption, avoidance, and potential direct mortality (see *Impacts from Lands and Realty Management on GRSG* above).

<u>Summary of Impacts by Alternative</u>
Alternative A does not exclude solar facilities specifically from GRSG habitat. In addition, this alternative would have the most areas available for ROWs, with few restrictions in place to protect GRSG, and would lead to more impacts than Alternatives B, C, and D.

Although Alternative B does not exclude solar facilities specifically from GRSG habitat, this alternative would have fewer areas available for ROWs. Conservation measures would be more protective under Alternative B than Alternatives A and D but less protective than Alternative C. Therefore, impacts are less than Alternatives A and D but greater than Alternative C.

Alternative C would have the most protective measures for GRSG by precluding solar facilities from ADH and therefore would have the fewest impacts.

Although Alternative D does not address solar facilities specifically. It would be more protective in respect to all ROWs than Alternative A but less protective than Alternatives B and C.

Under the Proposed LUPA, solar energy development would be excluded from PHMA; impacts on GRSG would be similar to those under Alternative C. The impact on GRSG from restrictions on solar energy development are not expected to vary between alternatives. This is because the potential for solar energy development in northwest Colorado is very limited and because all solar energy projects 20 megawatts and greater are excluded in all LUPs within the

BLM_0029544

planning area, as described in the Solar Energy Development Programmatic EIS Record of Decision

*Impacts from Range Management on GRSG*

Impacts from range management on GRSG would be the same or similar to the impacts from range management on terrestrial wildlife discussed in **Section 4.3.2**, Terrestrial Wildlife, with the addition of the impacts described below.

<u>Habitat Degradation</u>

In areas that are available for livestock grazing, there could be more impacts on GRSG than in areas where livestock grazing is excluded.

Potential impacts of herbivory[5] on GRSG habitat include long-term impacts of historic overgrazing on sagebrush habitat and GRSG habitat changes due to herbivory (Beck and Mitchell 2000).

By altering habitat components necessary for GRSG habitats, livestock grazing can impact the suitability and extent of GRSG habitats (Wyoming Sage-Grouse Working Group 2003). Holloran et al. (2005) suggest that annual livestock grazing in GRSG nesting habitats may adversely impact the next year's nesting success.

Important objectives in managing livestock grazing are to maintain residual cover of herbaceous vegetation to reduce predation during nesting (Beck and Mitchell 2000) and to maintain the integrity of riparian vegetation and other wetlands (Crawford et al. 2004). Proper livestock management (timing, location, and intensity) can assist in meeting GRSG habitat objectives and reduce fuels (Briske et al. 2011). Adams et al. (2004) identify grazing intensity and timing and duration of grazing as the most important factors in maintaining herbaceous cover for GRSG. Other GRSG habitat management objectives that control livestock movements and grazing intensities can be achieved broadly through rotational grazing patterns or locally through water and salt placements (Beck and Mitchell 2000).

Implementation-level grazing decisions would comply with Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997a). If livestock grazing is the cause for lands not achieving Public Land Health Standards, changes would be made in order to address the kind, numbers, and class of livestock, as well as the season, duration, distribution, frequency, and intensity of grazing use.

Alternative A would allow livestock grazing, with no restrictions in place to protect GRSG habitat specifically and therefore would have the greatest impact on GRSG.

---

[5]Plant eating

BLM_0029545

Alternative B would have the same areas available for livestock grazing as Alternative A, but more restrictions would be in place to protect GRSG habitat. Those restrictions include prioritization of land health assessments in PHMA, modification or marking of fences, and restrictions on range improvements and locations of supplements in PHMA. Therefore, Alternative B would have fewer impacts on GRSG.

Alternative C would have no areas available for livestock grazing within ADH and therefore would have the fewest impacts on GRSG habitat. Under Alternative C there would be potential for fence construction in order to prevent trespass onto public lands from adjacent privately owned allotments. Fences have the potential to affect GRSG through direct mortality and habitat fragmentation.

Alternative D would be similar to Alternative B but would be slightly more restrictive as GRSG habitat objectives within grazing allotments would be applied to ADH and not just PHMA. This alternative has fewer impacts than Alternative A and more impacts than Alternative C.

The Proposed LUPA would be slightly more restrictive than Alternative D in that sheep bedding, livestock trailing, and related activities would be more closely controlled. The Proposed LUPA would also include specific habitat objectives to maintain seasonal GRSG habitat. Otherwise, the impacts of this alternative would be the same as Alternative D.

Disruption to Species

Actions that result in habitat loss or disruption to GRSG are grazing, vegetation management, and range improvements.

Potential impacts of grazing and associated activities on GRSG include direct impacts of herbivores on GRSG, such as trampling of nests and eggs, altered GRSG behavior due to presence of herbivores, and impacts on GRSG and their behavior from structures associated with grazing management (Beck and Mitchell 2000). Additionally, collisions with infrastructure have been shown to cause mortality to a number of North American and European tetraonids (Bevanger 1990; Baines and Summers 1997, Bevanger and Broseth 2000; Baines and Andrew 2003).

In particular, mortality associated with fence collisions have been documented in lesser prairie-chickens *(Tympanuchus pallidicinctus)* in Oklahoma (Wolfe et al. 2007) and GRSG in Idaho (Stevens 2011). Stevens et al. (2012) showed that topographic features, proximity to active leks, lek size, and fence design and density can influence collision potential and frequency. It was shown that fences pose a higher risk to GRSG in less rugged terrain and in proximity to  active leks, especially within 1.25 miles (Stevens 2011). Furthermore, fences in areas with higher GRSG population densities had higher collision rates.

BLM_0029546

Fence post type and width of fence segment were also shown to influence collision risk. Fences with more numerous and visible posts, such as larger wooden posts, had fewer instances of collision. Areas where fence densities exceed 1.6 miles per square mile may also pose a risk to GRSG (Stevens 2011). Consideration should be taken when evaluating the need for fences and includes proper siting and design. Marking fences in high priority GRSG habitats may also reduce the risk of collision (Stevens 2011).

Alternative A would allow livestock grazing and has the most potential for vegetation management and rangeland improvements with the fewest restrictions; therefore, Alternative A would have the greatest impact on GRSG.

The potential for livestock grazing, vegetation management, and rangeland improvements is the same under Alternative B as under Alternative A; however, more restrictions would be in place to protect GRSG habitat, so it would have fewer impacts on GRSG.

Under Alternative C ADH would be an exclusion area for livestock grazing and only treatments that benefit GRSG would be allowed. While removing livestock would lead to substantial improvements in herbaceous understories, which would benefit GRSG; in all practicality the only way to keep livestock out of these areas would be fences. An estimated 5,000 miles of fence would need to be constructed under Alternative C (see **Table 4.6** in **Section 4.13**, Range Management).

Some level of GRSG injury or mortality could occur; however, the potential for injury and mortality could be moderated through fence design and siting considerations (see discussion above). Collision risk would be low in large, continuous blocks of publicly owned lands where potential fences would follow the perimeter of ADH. In areas where there is a mosaic of BLM-administered lands or National Forest System lands and privately owned lands it is suspected that fence collisions may be more frequent since private lands would likely require fencing that could bisect higher quality brood and nesting habitat.

In contrast, if livestock were removed from BLM-administered or National Forest System lands, there would be no need to maintain existing fences, particularly in areas with large, continuous tracts of BLM-administered or National Forest System lands. Removal of these fences could reduce the potential for collisions particularly if located in higher quality habitats. While impacts associated with fence construction should be carefully considered, overall Alternative C would be the most protective of GRSG habitat.

Alternative D would have the same areas available for livestock grazing as Alternatives A and B, but more flexibility to apply treatments would be allowed. Impacts on GRSG would be greater under Alternative D than Alternative B and less than Alternative A.

BLM_0029547

The Proposed LUPA would be slightly more restrictive than Alternative D in that sheep bedding, livestock trailing, and related activities would be more closely controlled. Otherwise, the impacts of this alternative would be the same as Alternative D.

*Impacts from Wild Horse Management on GRSG*

<u>Degradation of Habitat</u>
Grazing by wild horses would be similar to permitted livestock grazing (see above) and could reduce habitat effectiveness by changing structure, composition, or diversity of vegetation. Since horse diets consist primarily of grass, and horses can clip vegetation close to the ground, year-round grazing by wild horses can remove important cover for nest and young concealment. This could lead to increased predation of GRSG nests and young, if habitat were to lack hiding cover (Connelly et al. 1991; Schroeder and Baydack 2001).

Horses can also reduce or fragment shrub canopy by trampling, rubbing, and consuming it (Beever and Aldridge 2011). Beever et al. (2008) conducted a study of vegetation response to removing horses in 1997 and 1998 and concluded that sites from which horses had been removed exhibited 1.1 to 1.9 times greater shrub cover, 1.2 to 1.5 times greater total plant cover, 2 to 12 greater plant species richness, 1.9 to 2.9 times greater native grass cover, and 1.1 to 2.4 times greater frequency of native grasses than did horse-occupied sites. Loss of grass and shrub cover reduces the quality of seasonal habitats for GRSG. Horses may also congregate in dry areas, especially during the hot months. This may degrade important brood-rearing areas, which are vital to survival of GRSG chicks (Beever and Aldridge 2011).

Under all alternatives, the BLM has the ability to adjust appropriate management levels of wild horses if resource damage were occurring. However, only Alternatives B, C, and D provide management guidelines specific to GRSG habitat.

For the Proposed LUPA, wild horse management would be the same as Alternative D; impacts would be the same as those described under Alternative D.

<u>Disruption to Species</u>
Wild horse gathers would create short-term localized disturbance to wildlife from human activity related to gathers. Vehicles, helicopters, wranglers on horseback, and the wild horses themselves would contribute to wildlife stress and displacement. Management of wild horses may result in range improvement projects, such as fences and water developments. Disturbance from construction and maintenance of range projects would be similar to impacts described under *Impacts from Range Management on GRSG* (see above). In addition, wild horses themselves could disrupt GRSG.

BLM_0029548

Summary of Impacts by Alternative

Alternative A would place the fewest restrictions on wild horse management, and therefore would have the most potential for impacts on GRSG.

Alternative B would place some restrictions on the management of wild horses. Under this alternative, gathers would be prioritized in ADH and GRSG habitat, and management considerations would be incorporated into HMA plans. These management strategies would benefit wildlife species whose ranges overlap PHMA and GHMA. Overall, impacts on GRSG would be less than Alternatives A and D but would be similar to Alternative C.

Alternative C is expected to have the same impacts as Alternative B because the management prescriptions for Alternative B and C are much the same for wild horses.

Alternative D would be similar to Alternatives B and C but would consider all resource values in conjunction with GRSG when managing wild horses. There may be a slight increase in impacts on GRSG from this alternative in comparison to Alternatives B and C. However, Alternative D would be more protective than Alternative A.

For the Proposed LUPA, wild horse management would be the same as Alternative D; therefore, impacts would be the same as those described under Alternative D.

*Impacts from Fluid Minerals Management on GRSG*

Impacts on GRSG would be greater in those MZs that are strongly influenced by energy development or would experience increases in energy development in the near future. **Table 3.40** in **Section 3.7**, Minerals—Leasable, shows acres of PHMA and GHMA that are currently leased and unleased (medium and high potential).

Direct Habitat Loss/Fragmentation/Indirect Habitat Loss or Avoidance

*Direct Habitat Loss*—Direct habitat loss from fluid minerals development would be attributed to vegetation clearing (from well pad, access road, and ancillary facilities construction) and longer-term facility occupation. Loss or modification of big sagebrush communities would not regain any shrubland character for GRSG for 20 to 30 years, following interim or final reclamation, or longer depending on length of occupation. In some cases, shrubland may not regain functional utility (e.g., roads and permanent facilities) to support GRSG over the life of the plan amendment.

Small herbaceous inclusions in sagebrush-dominated landscapes can serve as important sources of herbaceous and invertebrate forage for brooding GRSG. Because of population size and habitat configuration (natural geographic patterns), these impacts may be more pronounced in certain zones (e.g., Colorado MZ 17). Conservation measures outlined in each alternative would

BLM_0029549

reduce the potential for direct habitat loss across sagebrush landscapes within each MZ.

*Habitat Fragmentation and Alteration*—Development of well pads, roads, and associated anthropogenic (human-caused) features would reduce intact sagebrush communities, creating a mosaic across the landscape and increasing edge habitat. GRSG populations generally require large expanses of intact sagebrush habitat (Connelly et al. 2004). Fragmented or altered landscapes (attributed to energy development) lead to diminished habitat base. They have been shown to influence lek activity, nesting and brood-rearing success, adult and chick survival, and winter habitat selection (Holloran et al. 2010).

Additionally, surface-disturbing activities can alter plant community composition, decrease species diversity, and may lead to the proliferation of noxious weeds and invasive plant species. Shifts in understory composition that lead to more annual dominated or single-species dominated communities could influence local GRSG populations by reducing nesting success and chick survival. Because of population size and habitat configuration (natural geographic patterns), these impacts may be more pronounced in certain zones (e.g., Colorado MZ 17). Conservation measures outlined in certain alternatives would reduce the potential for fragmentation and degradation across sagebrush landscapes within each MZ.

*Indirect Habitat Loss and Avoidance*—In addition to direct habitat loss and alteration, noise and human activity (including impacts from roads) from fluid minerals development has been shown to influence GRSG behavior. Recent studies have consistently demonstrated that oil and gas development and its infrastructure influence GRSG behavior and demographics at distances of up to 4 miles (NTT 2011). This prompts declines in lek persistence and male attendance, yearling and adult hen survival, and nest initiation rates. It also elicits strong avoidance response in yearling age classes, nesting and brooding hens, and wintering birds.

Most GRSG researchers have used various measures of lek use to infer population responses in GRSG subjected to development-related disturbances. Without exception, this work documents increased rates of lek inactivity and declining male attendance in response to increased frequency (vehicle use), intensity (well density), duration, and proximity of development and infrastructure (Doherty 2008; Lyon and Anderson 2003; Walker et al. 2007; Harju et al. 2010; Holloran 2005; see also discussion in Manier et al. 2013).

Doherty (2008) found impacts on GRSG lek persistence and attendance increase with development intensity and proximity. At well densities (as a measure of development activity) of one to three per section, rates of lek inactivity were twice that of background levels, and bird abundance at remaining leks declined 30 to 55 percent. Rates of lek inactivity increased two to five times at well densities of four to eight per section. Influences became undetectable at

BLM_0029550

distances of 2 miles or more. Doherty (2008) considered development activity at intensities of one well or fewer per section in GRSG habitat to be compatible with the conservation of GRSG populations.

Holloran et al. (2010) demonstrated marked avoidance of all development infrastructure by yearling male GRSG. Although adult GRSG exhibit strong fidelity to nesting areas, there are strong indications that infrastructure and activity avoidance by and reduced survival of GRSG, particularly in yearlings, drives declines in GRSG populations that are subjected to development.

Noise from drilling, roads, and ancillary structures has been implicated as an important determinant in declining male lek attendance (Blickley et al. 2012; Holloran 2005; Manier et al. 2013). Holloran (2005) found that leks within 3 miles of drilling experienced significantly greater rates of decline than controls. But this effect was asymmetrical and primarily affected leks downwind of drilling. Likewise, Blickley et al. (2012) found that chronic noise led to a decrease in male lek attendance and was more pronounced for road noise than drilling noise.

Anthropogenic noise may displace birds in and around the area of disturbance. Noise may also indirectly influence GRSG survival by masking sounds of predators. Additionally, anthropogenic noise may mask communication between males and females, resulting in decreases in abundance (Blickley et al. 2012). Vegetation and topography would influence the distance of impact and may influence GRSG differently, depending on MZ.

Many attributes of road networks, such as road density, frequency of use, and timing of use, appear to adversely influence affected populations, including declines in lek attendance and avoidance of high traffic areas (Holloran 2005; Wyoming Wildlife Consultants 2009; Blickley et al. 2012).

Holloran (2005) found road densities that exceeded 0.7 mile per square mile within 2 miles of a lek caused progressive declines in average annual lek attendance from 15 percent (0.7 to 1 mile per square mile) to 56 percent at 1.7 miles per square mile. Birds less consistently avoided producing pads that incorporated fluids gathering systems, which implies that GRSG may also be sensitive to the frequency of vehicle use (Wyoming Wildlife Consultants 2009).

On leks within 1 mile of main access roads, male attendance declined 35 percent in areas used early in the morning during the strutting period; however, attendance declined by 11 percent in the absence of traffic (Holloran 2005). Male lek attendance declined 13 percent and up to 60 percent when vehicle use frequency exceeded 50 axles per day. In addition to indirect influences, vehicle traffic from road systems can also lead to injury or direct mortality of GRSG.

Although the use of traditional stipulations have been widely criticized as ineffective, recent research (Holloran 2005; Holloran et al. 2010; Wyoming

BLM_0029551

Wildlife Consultants 2009) demonstrates that those measures formerly adopted and espoused by the BLM, state wildlife agencies, and the USFWS (i.e., NSO and TL stipulations addressed below) are capable of reducing impacts associated with avoidance. However, based on current understandings, impacts are not reduced to the degree necessary to stem progressive declines in populations subjected to pervasive or prolonged development.

With known weaknesses in the efficacy of traditional stipulations, it is likely that some GRSG populations (defined by MZ) and GRSG habitat may be substantially influenced by fluid minerals development. In those MZs with limited fluid minerals development, conventional TL stipulations and NSO stipulations, siting considerations and moves would likely be sufficient to avoid important habitat features and seasonal activities from reproduction and winter use. It is unlikely that fluid mineral development in those MZs with development occurring at extremely low densities or in fringe areas (Doherty 2008) would have any marked influence on the abundance or persistence of GRSG populations. However, note that fringe populations are important to the overall range of GRSG.

Habitat Protection and Restoration
Conservation measures outlined in each alternative exclude development in PHMA, limit the amount of surface disturbance, design roads to the minimum standards necessary, collocate facilities, and include NSO and TL stipulations, and would benefit GRSG. This would come about by reducing or eliminating the amount of sagebrush modified or lost to energy development, in addition to reducing the amount of or potential for indirect influences.

Restoration projects related to fluid mineral development designed to promote or enhance sagebrush would benefit GRSG in both the short and long term (depending on project design). Interim and final reclamation of ROWs and well pads that use seed mixes with species that provide greater horizontal and vertical ground cover (in contrast to predisturbance composition) and that promote more diverse structural and flowering forms may prove important as substrate for invertebrate prey for GRSG, as well as a cover resource in the short term.

Summary of Impacts by Alternative
See **Table 3.41**, Acres of Oil and Gas Leasing Categories in Decision Area PHMA and GHMA, for a comprehensive table of current stipulations and unleased acres by Colorado MZ.

Alternative A—In general, Alternative A would have the least protective measures for GRSG and sagebrush habitat, but this would vary depending on MZ (existing LUPs). Protective measures would generally include seasonal restrictions during the breeding, brood-rearing, and winter periods, NSO stipulations of 0.25 or 0.60 mile from a lek, and 1 and 5 percent voluntary disturbance caps on existing leases (see **Chapter 2** for specifics). Certain lands

BLM_0029552

(such as WSAs) would be closed to fluid minerals leasing, but this would benefit GRSG and sagebrush habitats only where they are coincident. Overall, Alternative A would have the greatest impacts on GRSG and sagebrush habitat.

Alternative B—Alternative B would have more restrictions on fluid minerals development than Alternatives A and D but fewer than Alternative C. Conservation measures outlined in this alternative would close PHMA to fluid minerals leasing with exception criteria. For leased lands this alternative would exclude new surface occupancy within PHMA. Exceptions include cases where a lease is entirely in PHMA, a 4-mile NSO would be placed around the lek, and disturbance would be limited to one per section, with no greater than 3 percent disturbance. If an entire lease lies within the 4-mile lek perimeter, disturbance would be limited to one per section with no greater than 3 percent disturbance in that section, with development placed the greatest distance from the lek.

Development across the landscape (one per section) could be more detrimental to GRSG than clustering of development in strategic locations to minimize impacts on GRSG habitat. Seasonal restrictions (prohibiting drilling during nesting and brood-rearing) would be applied only to exploratory wells in PHMA (all other wells would not have seasonal restrictions). On undeveloped leases, surface disturbance would not exceed 3 percent of GRSG habitat within each lease but would remain subject to persistent long-term behavioral influences from vehicle access and pad activity (see below). See **Chapter 2** for a detailed description of conservation measures under this alternative.

Conservation measures applied under this alternative would be limited to PHMA in nearly all instances and could influence 617,500 acres (25 percent) of all federally managed GRSG habitats (ADH). The potential for direct habitat loss would be greater under this alternative than Alternative C, but it would be more protective than Alternatives A and D. Exception criteria described above would allow development in PHMA in certain situations, with a disturbance cap of 3 percent, or 1 disturbance per section. RDFs, including road siting, road design, collocating and clustering facilities, and limiting noise, would further reduce direct habitat loss or modification and disruption (indirect influences) to GRSG.

Traditional TLs (generally applied during the nesting and brood-rearing season) would be applied only for exploratory wells. While timing restrictions have been shown to be less effective in those areas with large-scale disturbance or prolonged activity, recent research provides evidence that these stipulations are capable of reducing impacts from avoidance in areas with lower levels of development (Holloran 2005; Holloran et al. 2010; Wyoming Wildlife Consultants 2009; see discussion above for *Indirect Habitat Loss/Avoidance*).

Eliminating TLs, particularly during the breeding season, may increase impacts from fluid minerals development for certain GRSG populations specifically, those populations where there has been little to no development activities (see

BLM_0029553

discussion above). Furthermore, the scale of disturbance (both direct and indirect) would depend on lease size and configuration within each MZ. Without the application of traditional timing stipulations, development under this alternative could have substantial negative impacts on GRSG during the breeding and nesting season.

Alternative C—Conservation measures addressed in Alternative C would be similar to those described above in Alternative B; however, protections offered under Alternative C would be expanded to ADH in most cases. This alternative applies further protective measures by prohibiting the construction of evaporative or infiltration reservoirs (coal bed methane wastewater), requiring agencies to explore options to amend or cancel leases in ACECs and occupied habitats, and disallowing waivers to be issued. See **Chapter 2** for a detailed description of conservation measures under this alternative.

Overall, Alternative C would provide the greatest protective measures for GRSG and sagebrush habitat, potentially influencing up to 1,094,000 acres (43 percent) of all federally managed GRSG habitat (ADH). Limiting disturbance to no greater than one well per section is considered to be compatible with the conservation of GRSG populations (Doherty 2008); however, as stated above, this may not apply with equal efficacy to all GRSG populations. The potential for the direct loss of sagebrush habitat and subsequent impacts on GRSG would be the least under this alternative.

Discussions for Alternative B regarding lack of TLs on nonexploratory wells are also applicable to this alternative. Overall Alternative C would have the least potential to directly or indirectly influence GRSG and sagebrush habitats. Prohibiting surface-disturbing activities, including vehicle travel and other human activity on exploratory wells during the nesting and brood-rearing season in ADH, would substantially reduce the potential for nest disruption and displacement, increase adult and chick survival, and sustain lek attendance. RDFs, including road siting and design, collocating and clustering facilities, and limiting noise, would further reduce direct habitat loss or modification and disruption to GRSG.

Alternative D—Alternative D would be less restrictive than Alternatives B and C but more restrictive than Alternative A in most instances. Under this alternative, surface occupancy or disturbance would be prohibited within 4 miles of a lek in PHMA during the lekking and early brood-rearing periods.

Surface disturbance would be limited to 5 percent in any MZ. In those MZs where surface disturbance exceeds 5 percent, effective mitigation would be required to offset loss of sagebrush habitat; however, the BLM Authorized Officer may authorize disturbance in excess of 5 percent if data-based documentation were available to warrant a conclusion that GRSG populations are healthy and stable or increasing. Exceptions, waivers, and modifications may be granted at the discretion of the BLM Authorized Officer and only with the

BLM_0029554

concurrence of CPW. Seasonal restrictions would be applied within 4 miles of an active lek in ADH. Design features intended to reduce impacts on GRSG and sagebrush habitat would be voluntary (PDFs) rather than required.

Similar to Alternative B, conservation measures would be limited to PHMA and would apply to no more than 617,500 acres (25 percent) of all federally managed GRSG habitats (ADH). The potential for direct habitat loss would be greater under this alternative, compared with Alternatives B and C, due largely to the 5 percent disturbance cap and allowance for development to occur in PHMA (open for development). However, all new leases in PHMA would be managed as NSO.

CSUs and TLs would be applied if exceptions were granted to NSO and to reduce indirect impacts largely dependent on the amount of ongoing fluid minerals development in each MZ. In most cases design features under Alternative D would be voluntary (incorporated in management actions where necessary, appropriate, and technically feasible). As such, this alternative would have greater potential to negatively influence GRSG populations and sagebrush habitat, both directly and indirectly, than Alternatives B and C but less than Alternative A.

Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks and no new surface occupancy would be allowed in PHMA. No modifications or waivers would be permitted. The BLM Authorized Officer may grant an exception to this NSO stipulation only where the proposed action:

1. Would not have direct, indirect, or cumulative effects on GRSG or its habitat

2. Is proposed to be undertaken as an alternative to a similar action occurring on a nearby parcel and would provide a clear conservation gain to GRSG.

Exceptions based on conservation gain (2, above) may only be considered in PHMA of mixed ownership where federal minerals underlie less than fifty percent of the total surface, or areas of the public lands where the proposed exception is an alternative to an action occurring on a nearby parcel subject to a valid federal fluid mineral lease existing as of the date of this RMP. Exceptions based on conservation gain must also include measures, such as enforceable institutional controls and buffers, sufficient to allow the BLM to conclude that such benefits would endure for the duration of the proposed action's impacts.

*Any exceptions to this lease stipulation may be approved by the Authorized Officer only with the concurrence of the State Director. The Authorized Officer may not grant an exception unless the applicable state wildlife agency, the USFWS, and the BLM unanimously find that the proposed action satisfies (i) or (ii). Such*

BLM_0029555

*finding shall initially be made by a team of one field biologist or other GRSG expert from each respective agency. In the event the initial finding is not unanimous, the finding may be elevated to the appropriate BLM State Director, USFWS State Ecological Services Director, and state wildlife agency head for final resolution. In the event their finding is not unanimous, the exception will not be granted. Approved exceptions will be made publically available at least quarterly.*

Additionally, an NSO stipulation would be applied to within 2 miles of active leks in GHMA. Disturbances would be limited to 3 percent and 1 disturbance per 640 acres density of PHMA in each Colorado Management Zone, with no new leasing allowed if the disturbance cap were to exceed this amount. Seasonal restrictions would apply to construction, drilling and completion activities within 4 miles of active leks during the GRSG reproduction period of March 1 to July 15.

Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA (see exception criteria below) and within 2 miles of active leks in GHMA (see **Appendix D**).

The Proposed LUPA would provide more protections to GRSG and GRSG habitat than Alternatives A and D. Because all of PHMA would be managed as NSO, with very rare potential for exceptions, impacts would be similar to those described for Alternative B. The potential for direct habitat loss and indirect impacts would be similar to those described under Alternative B.

One mile around active leks would be managed as closed to leasing (224,200 acres) under the Proposed LUPA; nevertheless, compared with all PHMA (1,315,500 acres), all of PHMA would be managed as NSO with very rare exceptions, making the impacts on GRSG or GRSG habitat similar. Additionally, under the Proposed LUPA, disturbance would be limited to 3 percent in PHMA and density would be limited to 1 energy facility per 640 acres, providing greater protections for GRSG and GRSG habitat than Alternatives A and D and similar to those described for Alternative B.

*Leased Fluid Minerals*—Under the Proposed LUPA, surface disturbance, surface occupancy and disruptive activities would be precluded within 1 mile of active leks. If it were determined that the restriction would render the recovery of fluid minerals infeasible or uneconomical (considering the lease as a whole); if development would exceed the disturbance density of 1 disturbance per 640 acres and 3 percent of a Colorado MZ, then the criteria described in **Table 2.6**, Line 47, and mitigation outlined in **Appendix D** would be used to guide development that would result in the fewest impacts on GRSG and GRSG habitat. These same criteria would be applied to proposed development in the remainder of PHMA (outside of 1 mile) or GHMA within 4 miles of active leks.

BLM_0029556

Seasonal restrictions would apply to construction, drilling, and completion within 4 miles of active leks during the GRSG reproduction period of March 1 to July 15. The BLM Authorized Officer may adjust the dates of the timing limitation, in consultation with the State of Colorado, if criteria described in **Table 2.4**, Line 47, are met.

To authorize an activity based on the criteria above, the environmental record of review must show no significant direct disturbance, displacement, or mortality of GRSG.

For existing leases, the Proposed LUPA would provide more protections to GRSG and GRSG habitat than Alternatives A and D, and similar to those described for Alternatives B and C. Conservation measures applied under the Proposed LUPA could influence1,185,400 acres of all federally managed GRSG habitats (ADH).The potential for direct habitat loss and indirect impacts would be similar to those described under Alternatives B and C. Disturbances could exceed the 3 percent and 1 disturbance per **640** acres density under the Proposed LUPA if the restriction would render the recovery of fluid minerals infeasible or uneconomical.

By contrast, Alternatives B and C would strictly limit disturbances to 3 percent or 1 per section, subject to valid existing rights. Under the Proposed LUPA, criteria provided in **Table 2.6**, line 47 would guide facility siting to minimize impacts on GRSG and GRSG habitat and provide mitigation opportunities

Alternatives B and C would apply a seasonal restriction on exploratory drilling only; however, under the Proposed LUPA, seasonal restrictions would apply to all activities associated with construction, drilling and completion within 4 miles of active leks during the GRSG reproduction period of March 1 to July 15. Depending on the development scenario, this may afford more protections to GRSG during the breeding season than Alternatives B and C.

The Proposed LUPA would provide more protective measures than Alternatives A and D as it would preclude surface occupancy and disturbance and disruption within 1 mile of active leks and would limit disturbances to 3 percent and 1 disturbance per **640** acres (when feasible) density in any Colorado Management Zone.

In comparison, Alternative D would limit permitted disturbances to 5 percent of any Colorado MZ and would only prohibit disturbances and surface occupancy during the GRSG reproduction period.

*Impacts from Solid Minerals—Coal Management on GRSG*

<u>Subsurface Mines</u>
*Direct Habitat Loss/Degradation/Disruption to Species*. Aboveground appurtenant facilities generally associated with subsurface coal mines would result in

BLM_0029557

vegetation removal or alteration and longer occupation of a site. Impacts on GRSG populations from drilling and daily operations and maintenance of aboveground facilities, including traffic, would be similar to those discussed above under *Impacts from Fluid Minerals Management on GRSG*; however, the impacts may vary in scale, duration, and intensity.

*Habitat Restoration and Protection*. Benefits to local GRSG populations attributed to habitat improvement projects, off-site mitigation, and reclamation would be similar to those discussed under *Impacts from Fluid Minerals Management on GRSG*. Protections are outlined in each alternative below include siting new surface facilities outside of PHMA, collocating facilities where appropriate, minimizing or limiting surface disturbance (including roads and operations and maintenance), and applying PDFs. These measures would benefit GRSG populations in both the short and long term. See detailed discussion under *Impacts from Fluid Minerals Management on GRSG*.

*Summary of Impacts by Alternative*. Alternative A—Impacts would vary by MZ (existing LUPs), with some federal lands being considered as unsuitable, based on potential for resource impacts (see **Table 2.2**, Comprehensive Summary of Alternatives). Impacts on GRSG habitat from surface coal mining are likely to be greater in terms of habitat loss. Overall, this alternative would have the fewest restrictive measures on solid minerals leasing and development and would result in the greatest potential for direct loss or modification of sagebrush habit and greater potential for direct and indirect impacts on GRSG; therefore, Alternative A would have the highest potential to impact GRSG and sagebrush communities.

Alternative B—Under this alternative, no new coal leases would be granted unless all appurtenant facilities were located outside of PHMA or priority areas. New facilities associated with an existing lease would be placed outside of PHMA when possible or in previously disturbed areas within PHMA. New facilities would be required to be built to the minimum standard necessary. Minimization of surface-disturbing or disruptive activities would be applied at the planning level to ADH. Alternative B would result in the least potential for loss of sagebrush habitat and would reduce the indirect influences from solid minerals development. Conservation measures designed to exclude or minimize surface-disturbing activities would provide the greatest benefit to GRSG and sagebrush communities.

Alternative C—Impacts on GRSG and its habitat under this alternative are identical to those described under Alternative B.

Alternative D—No new coal leases would be granted unless all surface-disturbing activities were located outside of PHMA, with exception criteria outlined in **Chapter 2**. Surface-disturbing activities would be limited to 5 percent within each MZ. If disturbance exceeds 5 percent, effective mitigation to offset loss of habitat would be required. For existing coal leases, lessees would

BLM_0029558

be encouraged to voluntarily follow PDFs that reduce or mitigate adverse impacts on GRSG and ADH (see **Chapter 2**). Impacts on GRSG and sagebrush communities would be similar to those described for Alternative B; however, because Alternative D allows for greater flexibility in development potential (exception criteria, 5 percent disturbance cap, and voluntary commitment), it would result in greater potential for direct habitat loss and direct and indirect impacts on GRSG than Alternatives B and C.

Proposed LUPA—For existing coal leases, impacts on GRSG and GRSG habitat would be similar to Alternative D; however, under this alternative expansions to existing coal leases may be considered if, after consultation with the State of Colorado, the proposed expansion would not have an adverse influence on GRSG and GRSG habitat based on the criteria outlined in **Table 2.4**, line 62. This alternative could allow for mineral recovery without compromising the function and utility of habitats that support GRSG.

For new coal mine leases, no surface occupancy would be allowed within 2 miles of active leks, no exceptions. A NSO stipulation would be placed on the remainder of PHMA, but exceptions may be granted. This could allow for surface occupancy within PHMA. However, based on criteria outlined in **Chapter 2, Table 2.8**, line 64, and **Appendix D**, an exception would be granted only if, through consultation with the State of Colorado, the location of the proposed facility were shown to have no negative influence on GRSG and GRSG habitat. Disturbances would be limited to 3 percent and 1 disturbance per 640 acres density of a Colorado MZ, and no new leasing would be allowed in PHMA if the disturbance cap were to exceed 3 percent.

The Proposed LUPA would have similar direct and indirect influence on GRSG and GRSG habitat as Alternatives B, C, and D but fewer than Alternative A. Conservation measures in the Proposed LUPA would be applied within PHMA. The Proposed LUPA would allow for potential development if, after consultation with the State of Colorado, the proposed surface-disturbing activity were shown to have no adverse influence on GRSG or GRSG habitat. This alternative would allow for some development without impacting GRSG or compromising the function and utility of habitats that support GRSG.

Surface Mines

*Direct Habitat Loss/Disruption of Species/Degradation/Fragmentation.* Construction and occupation of surface mines typically results in longer term loss of forage and cover for GRSG. These communities may not regain any functional utility for several decades, but this would greatly depend on reclamation effectiveness. In general, impacts on GRSG would be similar to those described under *Impacts from Fluid Minerals Management on GRSG*, but they may vary in scale, duration, and intensity.

*Habitat Restoration/Protection.* Benefits to local GRSG populations attributed to habitat improvement, off-site mitigation, and reclamation of surface-disturbing

BLM_0029559

activities would be similar to those discussed under *Impacts from Fluid Minerals Management on GRSG*. Protections outlined for each alternative below, including siting new surface facilities outside of PHMA, collocating facilities where appropriate, minimizing/limiting surface disturbance (including operations and maintenance), and applying PDFs, would benefit GRSG in both the short and long term. See detailed discussion under *Impacts from Fluid Minerals Management on GRSG*.

*Summary of Impacts by Alternative.* Alternative A—Impacts on GRSG and sagebrush communities would be similar to those described for Alternative A above for subsurface coal mining.

Under Alternative B, all surface mining would be found unsuitable under the criteria set forth in 43 CFR, Part 3461.5. Additionally, surface-disturbing or disruptive activities would be minimized at the planning level for ADH. Impacts on GRSG and sagebrush habitat would be similar to those described for Alternative B above for subsurface coal mining.

Under Alternative C, impacts on GRSG and sagebrush habitat are identical to those described for Alternative B.

Alternative D—Under this alternative, the requirements of 43 CFR, Part 3461, would be applied to determine unsuitability. Impacts on GRSG and sagebrush habitat would be similar to those described for Alternative D above for subsurface mining.

Under the Proposed LUPA, no new surface coal mine leases would be allowed in PHMA. Impacts on GRSG and GRSG habitat would be similar to those discussed in Alternatives B and C.

*Impacts from Locatable Minerals Management on GRSG*

Direct Habitat Loss/Degradation/Disruption to Species
Impacts from locatable minerals development on GRSG populations and sagebrush habitat would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on GRSG*, but they may vary in scale, duration, and intensity.

Habitat Restoration/Protection
Benefits to local GRSG populations from restoration and reclamation would be similar to those discussed under *Impacts from Fluid Minerals Management on GRSG*. Protections outlined in each alternative below—limiting surface disturbance, clustering development, placing infrastructure in previously disturbed areas, minimizing road development, avoiding priority sagebrush habitats, and applying RDFs and PDFs—would benefit GRSG populations. See detailed discussion under *Impacts from Fluid Minerals Management on GRSG*.

BLM_0029560

Summary of Impacts by Alternative

Alternative A—Impacts would vary depending on MZ (existing LUPs), but, overall, most BLM-administered or National Forest System lands would be available for mining claim location, with certain exceptions, such as SRMAs and ACECs (LSFO) and WSAs (WRFO). Seasonal restrictions would be applied if deemed necessary in some situations, with the potential for additional mitigation requirements. In general, this alternative would have the least restrictive measures on locatable minerals development and reclamation, resulting in a greater potential for direct loss of sagebrush habitat and direct and indirect impacts on GRSG.

Alternative B—Alternative B would withdraw mineral entry in PHMA, based on impacts on GRSG and associated habitats. Existing claims within the withdrawal area would be subject to validity exams. Additional effective mitigation and seasonal restrictions may be applied. RDFs outlined in **Chapter 2** would further reduce direct and indirect impacts in ADH. Alternative B would provide the greatest protections for GRSG and sagebrush habitat by reducing the amount of habitat lost. It would also reduce the amount of indirect impacts from locatable minerals development. Reclamation and restoration requirements would benefit GRSG in the short term but would greatly depend on reclamation success and effectiveness.

Alternative C—Impacts on GRSG and sagebrush habitat would be similar to those described for Alternative B.

Alternative D—Appropriate effective mitigation would be included in plans of operation. Seasonal restrictions would be applied if deemed necessary. Design features outlined in **Chapter 2** would be applied to ADH but would not be required for locatable minerals. Overall, Alternative D would offer fewer restrictive measures than Alternatives B and C and subsequently would have a greater impact on GRSG and sagebrush habitat.

The Proposed LUPA—management of locatable minerals would be the same under this alternative as Alternative D; impacts would be the same as described under Alternative D, above.

*Impacts from Nonenergy Leasable Minerals Management on GRSG*

Direct Habitat Loss/Degradation/Disruption to Species

Impacts from nonenergy leasable minerals development on GRSG populations and habitat would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on GRSG* but may vary in scale, duration and intensity.

Habitat Restoration/Protection

Benefits to local GRSG populations attributed to reclamation would be similar to those discussed under *Impacts from Fluid Minerals Management on GRSG.*

BLM_0029561

Minimization measures outlined in each alternative below—limiting surface disturbance, avoiding PHMA, collocating facilities where appropriate, minimizing or limiting surface disturbance (including operations and maintenance), and applying PDFs—would benefit GRSG populations. See detailed discussion under *Impacts from Fluid Minerals Management on GRSG*.

Summary of Impacts by Alternative

Alternative A—Impacts would vary based on MZ (existing LUPs). Under this alternative a small percentage of PHMA in MZ 17 would be closed to nonenergy leasable mineral leasing, with the remainder of ADH open to leasing (including expansion of new leases). There would be no cap on surface-disturbing activities; as such, this alternative would allow for the greatest amount of direct habitat loss (and indirect influences) and would have the greatest impact on GRSG and sagebrush habitat.

Alternative B—Under this alternative, all PHMA would be closed to nonenergy leasable mineral leasing (1,106,600 acres, or 44 percent of all federally managed GRSG habitat [ADH]). Additionally, expansions of existing mines would not be permitted. RDFs would be applied for solution mining wells in PHMA. Alternative B would result in the least sagebrush habitat lost to nonenergy leasable minerals development and would also have the least potential for indirect influences on GRSG. Overall, Alternative B would provide the greatest benefit to GRSG and sagebrush habitat.

Alternative C—Impacts on terrestrial wildlife species are identical to those described for Alternative B.

Alternative D—Under this alternative, PHMA currently available for nonenergy minerals leasing would remain open. Additionally this alternative would consider allowing expansion of existing nonenergy mineral leases. Surface-disturbing activities would be limited to 5 percent in any MZ. If disturbance exceeds 5 percent, additional mitigation would be required to offset the resulting loss of GRSG habitat. Direct habitat loss attributed to the development and expansion of nonenergy leasable minerals, as well as indirect influences, would be greater under this alternative than Alternatives B and C and would result in greater impacts on GRSG and sagebrush habitat.

Proposed LUPA—No new nonenergy mineral leasing would be allowed in PHMA. Impacts on GRSG from management of nonenergy leasable minerals would be similar to those described under Alternative B, above.

*Impacts from Salable Mineral Management on GRSG*

Direct Habitat Loss/Degradation/Disruption to Species

Impacts from salable minerals development on GRSG populations and habitat would be the same or similar to those discussed above under *Impacts from Fluid Minerals Management on GRSG* but may vary in scale, duration, and intensity.

BLM_0029562

Habitat Restoration/Protection

Benefits to local GRSG populations attributed to habitat restoration and reclamation would be similar to those discussed under *Impacts from Fluid Minerals Management on GRSG*. Protections outlined in each alternative below, including siting new surface facilities outside of PHMA, collocating facilities where appropriate, minimizing/limiting surface disturbance (including operations and maintenance), and applying PDFs, would benefit GRSG populations. See detailed discussion under *Impacts from Fluid Minerals Management on GRSG*.

Summary of Impacts by Alternative

Alternative A—Impacts on GRSG species would vary by MZ (existing LUPs), but in most cases this alternative would allow for the continued development of salable minerals (with certain exceptions, such as WSAs and cultural sites; see **Chapter 2**). Overall, this alternative would provide the fewest restrictive measures on salable minerals development and subsequent reclamation requirements and therefore could result in more habitat loss than Alternatives B, C, and D. As such, this alternative would have the most potential to impact GRSG and sagebrush habitat.

Alternative B—Under this alternative, PHMA would be closed to mineral material sales (1,246,200 acres, or 50 percent of all federally managed GRSG habitat [ADH]). All salable mineral pits located in PHMA that are no longer in use would be restored to meet GRSG habitat conservation objectives. This alternative would result in the least direct habitat lost to mineral materials development; however, the reclamation provision would apply only to PHMA, whereas reclamation provisions called for in Alternative D would apply to ADH. Impacts on GRSG would depend heavily on reclamation success and effectiveness. In general, Alternative B would provide the greatest benefit to GRSG and sagebrush habitat.

Alternative C—Impacts on GRSG and sagebrush habitat are identical to those described for Alternative B.

Alternative D—Under this alternative, PHMA currently available for mineral material sales would remain open. Alternative D would consider allowing existing mineral material sale sites to continue operations (including expansions). Surface-disturbing activities would be limited to 5 percent within each MZ. Where disturbance were to exceed 5 percent, mitigation to offset habitat loss would be necessary.

Restoration of salable mineral pits that are no longer in use would be required in ADH; restoration and reclamation would be required as a long-term goal to improve GRSG habitat. In general, Alternative D could allow for more direct habitat loss by allowing salable minerals development to continue. This would have greater impacts on GRSG and sagebrush habitat than Alternatives B and C. Conversely, restoration and reclamation of pits that are no longer in use would extend to ADH (compared with PHMA in Alternatives B and C), allowing for

BLM_0029563

incremental gains in forage and cover. This would greatly depend on reclamation success and effectiveness, but it would provide nominal benefit to GRSG in the short term as the BLM and Forest Service routinely require reclamation that generally satisfies GRSG-related habitat values.

Proposed LUPA—Under this alternative, mineral material sales would be prohibited in PHMA. The management of mineral material sales under this alternative would be similar to that for Alternative B, with more potential for flexibility due to the criteria described in **Chapter 2**. The impacts on GRSG from management of mineral material sales is similar to those impacts described under Alternative B.

*Impacts from Wildfire Suppression, Fuels Management, and Fire Rehabilitation on GRSG*

<u>Direct Habitat Loss/Modification/Fragmentation</u>
Depending on the extent, location, severity of a fire, and seral vegetation[6] type affected, unplanned ignitions would have short-term impacts on GRSG. This would occur by removing or degrading habitat, injuring or killing slow-moving animals, causing habitat avoidance and changes in species movement patterns, or potentially reducing population viability However, fuels treatment can result in beneficial impacts, such as habitat restoration.

A concern associated with resetting vegetation seral stage through fuels management is the invasion of undesirable plant species. Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds, including cheatgrass. The areas that are most at risk for cheatgrass invasion are GRSG winter range areas with low precipitation rates. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities.

Fire suppression removes vegetation and can disturb soil, having both short- and long-term impacts on GRSG and its habitats. For example, using heavy equipment to construct fire lines can cause habitat loss, degradation, and fragmentation in the short term. If not rehabilitated, these fire lines can cause erosion and provide opportunities for the spread of undesirable plant species, thereby resulting in long-term adverse impacts on GRSG habitat. Timely rehabilitation following fire, therefore, is important to maintaining the quality of wildlife habitats, including plans for controlling invasive species.

---

[6]A stage relating to the natural succession within a plant community of an ecosystem

BLM_0029564

Disruption Impacts

The noise from heavy equipment and chainsaws could temporarily disperse GRSG from breeding and nesting habitat and from other occupied habitats. Prescribed burning could also disturb nesting bird species, from smoke inadvertently drifting into occupied habitat. These activities also could remove suitable habitat or other desirable vegetation. Disturbances from heavy equipment, chainsaws, and prescribed burning would be localized and short term. Most wildlife species would move into adjacent untreated areas; however, direct mortality during the vegetation treatments is possible. TLs and site-specific COAs could mitigate the short-term impacts from the treatments.

ESR treatments following a wildfire are effective in restoring wildlife habitat; however, equipment is often noisy, and noise may alter animal behavior or cause wildlife to leave an area during the disturbance. These impacts would be short term and are not likely to have much effect on the long-term health and habitat use in the treatment area.

Habitat Protection

Although both planned and unplanned wildland fire adversely impacts wildlife habitats in the short term by removing vegetation and disturbing soil, the long-term benefits of wildland fire often outweigh the short-term adverse impacts. For example, prescribed fire can be used to restore conditions benefiting wildlife species favoring early plant succession stages and young age classes of woody plants (McAninch et al. 1984). Prolonged fire suppression has allowed fuels to build up to the point that an unplanned wildfire is likely to be much larger and greater in intensity.

Some wildlife species thrive on the occurrence of fire. The herbaceous and woody plants that establish following a burn provide abundant foliar tissue and seeds. These are more palatable for GRSG and provide an influx of insects that provide valuable nourishment for GRSG chicks. Over the short term, the plant community is changed dramatically by a fire, as taller and denser vegetation is replaced by a more open habitat. As the area gradually recovers, however, many of the pre-fire components become reestablished, and the area again supports a healthy plant community. This cycle may take decades or centuries, depending on the dominant plant species.

Alternatively, vegetation restoration might never occur if climatic conditions are no longer suitable for the former dominants. Wallmo (1980) suggests that fire improves the palatability of forage and causes browse plants to resprout close to the ground, putting the current season's growth within reach for several years. Additionally, wildland fire can improve the quality of GRSG habitat by releasing soil nutrients, reducing fuel load, or setting back trees encroaching into shrubland or grassland habitats.

Fuels treatments could be beneficial for species that depend on younger seral stages. In the long term, GRSG could benefit from some wildfires and most fuels

BLM_0029565

management, due to an increase in vegetation productivity and to increased plant diversity and age classes. This would, in turn, provide additional forage and cover. Mimicking natural periodic disturbance is often necessary in order to stimulate plant productivity and increase diversity and nutritional value. Foraging opportunities for GRSG would increase as understory grasses, forbs, and shrubs reestablish. In addition, fuels treatments in upland areas often result in increased forage production, which diverts livestock and wildlife use from riparian and wetland areas, thereby increasing the vigor and structural diversity of these plant communities.

Following a wildfire, ESR is implemented to restore habitats that have sustained damage or degradation from catastrophic wildfire. Typically these activities are beneficial for GRSG and are designed to improve the overall condition of the area, which in turn improves habitat for wildlife. For example, weed-seed-free seeding would stabilize soil and reduce the spread of noxious weeds. Additionally, replacing organic matter in disturbed areas would protect topsoil and provide a suitable bed for the restoration of a native vegetation community.

Summary of Impacts by Alternative

Alternative A would have the fewest restrictions for fuels management actions, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize fire operations beyond what has already been determined in the fire management plans for the area; therefore, Alternative A would have the greatest impact on GRSG.

Alternative B is more restrictive than Alternative A, though all of the restrictions fall within PHMA. Restrictions include no habitat treatments in winter range and no sagebrush treatments using fire in less than 12-inch precipitation zones in PHMA. Therefore, impacts from fuels management on GRSG would be less than Alternative A, but only within PHMA. Additionally, Alternative B would prioritize fire operations in PHMA and GHMA immediately after life and property; therefore, the potential for disturbance to GRSG within these habitats is lower in Alternative B than in Alternative A.

Alternative C would prioritize fire operations in PHMA immediately after life and property; therefore, the potential for disturbance to GRSG within PHMA would be the same as Alternative B but less than Alternative B in GHMA. With regard to fuels management, Alternative C is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on GRSG would be less than Alternative B.

Alternative D would give priority to fire operations in PHMA and GHMA, immediately after firefighter and public safety unless site-specific conditions warrant an exception. With regard to fuels management, Alternative D is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management to GRSG would be less than Alternative B. Concurrently, Alternative D offers the same protective measures

BLM_0029566

as Alternative B but applies them to ADH, so it has the potential for more benefits to GRSG than Alternatives B and C.

Management of wildfire suppression, fuels management, and fire rehabilitation under the Proposed LUPA would be the same as that for Alternative D. Impacts from the Proposed LUPA, therefore, would be the same as described for Alternative D, above.

*Impacts from Habitat Restoration/Improvement on GRSG*

Direct Habitat Loss/Modification/Fragmentation from Habitat Restoration
Depending on the extent, location, treatment, and seral type affected, habitat restoration would have short-term impacts on GRSG by possibly temporarily removing or degrading habitat, injuring or killing slow-moving animals, and causing habitat avoidance and changes in species movement patterns. In areas that are available for habitat restoration, changes in vegetation can result in negative impacts on GRSG, such as direct habitat loss, habitat fragmentation and disruption; however, it can also result in beneficial impacts, such as long-term habitat restoration. For example, sagebrush mowing can temporarily reduce the amount of winter forage, but in the long term it would reinvigorate decadent sagebrush that would offer less value in its pretreated state.

A concern of habitat restoration is the invasion of undesirable plant species from soil disturbance. Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Cheatgrass invasion is also a threat to some treatment areas. Invasive nonnative plants with little or no forage value for GRSG are increasing in some areas. Invasive species can outcompete most native plants when moisture is limited and results in the loss of critical shrub communities through changes in site-specific fire ecology.

Disruption Impacts
The noise from heavy equipment and chainsaws could temporarily disperse GRSG from breeding and nesting habitat and at other times from occupied habitat. Disturbances from heavy equipment, chainsaws, and prescribed burning would be localized and short term. Most GRSG would move into adjacent untreated areas; however, direct mortality during the vegetation treatments is possible. TLs (such as those for lekking and nesting) and site-specific COAs could mitigate the short-term impacts resulting from the treatments.

Habitat Protection
Removing nonnative species and vegetation from habitats that support GRSG populations would benefit most populations that occur on public lands by creating more native habitat conditions and reducing the likelihood of a future catastrophic wildfire. The degree of benefit to GRSG would depend, in large part, on the current habitat condition and the effectiveness of the treatments.

BLM_0029567

Nonnative plant species reduce the suitability of some habitats to support GRSG, which requires certain plants as food. Aside from GRSGs' dependence on sagebrush for winter forage, a variety of perennial grasses and forbs make up a large part of their summer diet and provide habitat for insects, which are essential for successful brood-rearing. Such treatments as interseeding sagebrush stands with a mixture of native grasses and forbs would increase the forage quality as well as the quantity.

For GRSG, it is often the structure, rather than the species composition, of the habitat that makes it suitable. In some cases, invasive plant species alter the structure of habitats, making them less suitable for supporting sensitive wildlife species. Encroachment of nonnative plant species and displacement of native plant species that serve as important sources of food reduce the suitability of the habitat for GRSG. For this species, vegetation treatments would likely provide a long-term benefit to habitat and could improve the suitability of other areas. This could create additional habitat into which the population could expand. Treatments to control encroaching pinyon and juniper trees as well as weed infestations would likely provide a long-term benefit.

Conversion of agricultural fields and restoration of degraded habitat, such as cheatgrass monoculture, would provide long-term benefits to GRSG. Historically many of these areas were sagebrush stands that could have supported GRSG populations. Areas that were converted for agricultural use offer some benefit to GRSG, though much of this depends on the diversity of plant species. The lower the plant diversity, the lower the benefit to GRSG. Converting these areas to sagebrush would benefit GRSG by providing valuable cover and forage, though establishment of a suitable stand could take several years. An area that is severely degraded, such as a cheatgrass monoculture, has little value to wildlife in general and almost none to GRSG. Restoring these areas would have the same benefits as converting agricultural lands but at a much greater scale.

<u>Summary of Impacts by Alternative</u>
Alternative A would have the fewest restrictions for habitat restoration actions, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize habitat restoration and provide restoration guidelines beyond what has already been determined in the LUPs for the targeted areas; therefore, Alternative A would have the greatest impact and least benefit for GRSG.

There are no discernible differences in impacts on GRSG under all of the action alternatives because GRSG habitat treatments would be prioritized in ADH.

*Impacts from ACEC and Zoological Area Management on GRSG*
Alternative A would recognize all of the existing ACEC designations (see **Table 3.62**, ACECs within GRSG Habitat on BLM-Administered Lands). Areas that are

BLM_0029568

designated as ACECs would likely be more beneficial to GRSG than areas that are not so designated.

Alternative B would also recognize all of the existing ACEC designations. Impacts from Alternative B would be the same as impacts from Alternative A.

Alternative C would recognize all of the existing ACECs and would also make all PHMA an ACEC. Impacts on GRSG under Alternative C would be the same as for Alternatives A, B, and D. ACEC designations would provide no additional protections beyond what is included in the management actions for those alternatives for the protection of GRSG habitat.

Alternative D would recognize all existing ACECs; no new ACECs would be proposed. Impacts from Alternative D would be the same as for Alternatives A and B.

No new ACECs would be designated under the Proposed LUPA; impacts from designation of ACECs on GRSG would be the same as described under Alternative D.

### Summary of Impacts on GRSG in PHMA, GHMA, and LCHMA

**Table 4.2** is a summary of which actions could result in greater impacts, as detailed in the above analysis, on GRSG by alternative, and by the threats to the northwest Colorado GRSG populations, as identified by the USFWS.

Acreages cited under Alternative A include all acres currently identified and designated in existing LUPs. There is no identified PHMA, GHMA, or LCHMA associated with this alternative. Acreage values for Alternatives B, C, and D include only identified GRSG habitats classified as PHMA, GHMA, or LCHMA (ADH).

The major threat to GRSG habitats in populations occurring across WAFWA Management Zones II and VII is energy development, primarily oil and gas development and supporting infrastructure (USFWS 2013).

Resources and resource uses identified as threats to the northwest Colorado populations of GRSG in the COT report are identified with an asterisk in **Table 4.2**.

### 4.5.3   Other Special Status Species of Issue

### Special Status Terrestrial Wildlife

#### General Description
This section is a discussion of impacts on special status terrestrial wildlife from proposed management actions of other resources and resource uses.

BLM_0029569

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| **Oil and Gas Development*** | | | | | |
| Unleased Fluid Minerals | | | | | |
| Areas closed to fluid mineral leasing (acres) | 100,200<br><br>Existing acres closed to fluid mineral leasing (mostly WSAs). | 1,347,400<br><br>No new areas would be leased in PHMA. | 2,473,000<br><br>No new areas would be leased in ADH. | 100,200<br><br>No new areas would be closed to leasing. No surface occupancy would be allowed in PHMA. | 324,400<br>acres within 1 mile of active leks would be closed to leasing. |
| Areas open to mineral leasing with NSO stipulation (acres) | 365,000<br><br>Various stipulations apply, but most are not specific to GRSG or GRSG habitat. | 365,000<br><br>PHMA would be closed to new fluid mineral leasing. | 365,000<br><br>ADH would be closed to new fluid mineral leasing. | 1,510,600<br>No surface occupancy would be allowed in PHMA.<br><br>No exceptions to NSO would be granted within 0.6-miles of active leks in ADH.<br><br>If exceptions, modifications, or waivers are granted, additional stipulations may apply. | 1,550,400<br>No surface occupancy would be allowed in PHMA.<br><br>No modifications or waivers. Exceptions subject to criteria described in Table 2.4.<br><br>No Surface Occupancy within 2 miles of active leks in GHMA. |

BLM_0029570

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| Leased Fluid Minerals | | | | | |
| Restrictions on surface disturbance for leased fluid minerals | Low level of protection for GRSG in ADH. | High level of protection for GRSG in PHMA. | Highest level of protection for GRSG in ADH. | High level of protection for GRSG in PHMA. | High level of protection for GRSG in PHMA. |
| | Various stipulations apply, but most are not specific to GRSG or GRSG habitat. | Apply 4-mile NSO around leks in PHMA and limit disturbances to 1 per section with no more than 3 percent disturbance in that section. | Apply 4-mile NSO around leks in PHMA and limit disturbances to 1 per section with no more than 3 percent disturbance in that section. | Apply a TL/CSU in PHMA that would prohibit surface occupancy or disturbance within 4 miles of a lek during lekking and early brood-rearing. Limit permitted disturbance to 5 percent in any Colorado MZ. | No leasing 1 mile from active leks in all occupied GRSG habitat. Apply NSO stipulation to PHMA. Apply a TL/CSU in PHMA that would prohibit surface occupancy or disturbance within 4 miles of active leks during lekking and early brood-rearing. Limit permitted disturbances to 3 percent in PHMA in any Colorado MZ. |
| **Summary of Impacts on GRSG from Oil and Gas Development** | Alternatives B, C, and D and the Proposed LUPA close PHMA to surface occupancy, which responds to the need (identified in the Conservation Objectives Team Report, April 2013) to stop population decline and habitat loss by eliminating activities known to negatively impact GRSG and its habitats through reduction in the threat of habitat loss, degradation and fragmentation. Each action alternative closes GRSG habitat—the greater number of acres the greater reduction in potential activities known to negatively impact GRSG and GRSG habitat. The action alternatives are also in agreement with the following conservation measures identified in the Conservation Objectives Team Report specific to energy development: | | | | The Proposed LUPA provides the additional protection of closing areas within 1 mile of active leks to leasing for fluid minerals. |

BLM_0029571

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| | 1. Avoid energy development in priority areas for conservation (Doherty et al. 2010). Identify areas where leasing is not acceptable, or not acceptable without stipulations for surface occupancy that maintains GRSG habitats. 2. If avoidance is not possible within priority areas for conservation due to preexisting valid rights, adjacent development or split estate issues, development should only occur in nonhabitat areas, including all appurtenant structures, with an adequate buffer that is sufficient to preclude impacts on GRSG habitat from noise and other human activities. | | | | |
| **Infrastructure\*/Anthropogenic** | | | | | |
| ROW avoidance areas (acres) | 82,000 | 58,500 | 0 | 968,300 | **1,081,700** |
| | Various areas managed as ROW avoidance, but most are not specific to protect GRSG and GRSG habitat. | No new acres of avoidance since PHMA would be an exclusion area. | No new acres of avoidance since ADH would be an exclusion area. | Specific criteria would have to be met in order to permit disturbances For example, projects must demonstrate that GRSG populations are stable or increasing at objective levels in that Colorado MZ and disturbances would be capped at 5 percent. | Specific criteria would have to be met in order to allow ROWs in avoidance areas. Subject to 3 percent disturbance in PHMA. |

BLM_0029572

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| ROW exclusion areas (acres); per BLM LUP Handbook, no exceptions permitted | 24,200<br><br>Various ROW exclusion areas designated, but most are not specific to protect GRSG and GRSG habitat. | 934,100<br><br>PHMA would be a ROW exclusion area. | 1,744,100<br><br>ADH would be a ROW exclusion area. | 24,200<br><br>No new exclusion areas for general ROWs identified. | 0 |
| Avoidance areas for large transmission lines (greater than 100 kilovolts; acres) | No avoidance areas for large transmission lines identified. | No avoidance areas for large transmission lines identified. | No avoidance areas for large transmission lines identified. | 66,000<br><br>Parcels identified as avoidance areas for large transmission lines.<br><br>Specific criteria would have to be met in order to permit disturbances. For example, projects must demonstrate that GRSG populations are stable or increasing at objective levels in that Colorado MZ and disturbances would be capped at 5 percent. | 1,751,600<br><br>All of PHMA and GHMA are avoidance for large transmission lines, with the exception of pending projects, as detailed in **Table 2.8**. |

BLM_0029573

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| Exclusion areas for large transmission lines (greater than 230 kilovolts; acres); per BLM LUP Handbook, no exceptions permitted | No exclusion areas for large transmission lines identified. | All ROWs would be excluded in PHMA. | All ROWs would be excluded in ADH. | 873,300<br><br>PHMA, except areas identified as avoidance for large transmission lines would be exclusion area for large transmission lines. | 0 |
| Travel management open/closed/limited areas respectively | 202,600/52,600/1,484,700<br><br>Various restrictions on route construction and upgrades, but most are not specific to protect GRSG and GRSG habitat. | 202,600/42,500/923,200<br><br>Restrictions on route construction and upgrades would be applied to PHMA. | 202,600/42,500/923,200<br><br>Restrictions on route construction and upgrades would be applied to ADH and would include a 4-mile buffer from leks. | 202,600/42,500/923,200<br><br>Construction and upgrades of routes would be subject to 5 percent disturbance cap. | 202,600/42,500/923,200<br><br>Construction and upgrades of routes would be subject to a 3 percent disturbance cap in PHMA. |
| **Summary of Impacts on GRSG from Infrastructure** | Alternatives B, C, and D and the Proposed LUPA close PHMA to surface occupancy, which responds to the need (identified in the Conservation Objectives Team Report, April 2013) to stop population decline and habitat loss by eliminating activities known to negatively impact GRSG and its habitats through reduction in the threat of habitat loss, degradation and fragmentation. Each action alternative closes GRSG habitat—the greater number of acres the greater reduction in potential activities known to negatively impact GRSG and GRSG habitat.<br><br>The action alternatives are in agreement with the following conservation objectives/options identified in the Conservation Objectives Team Report specific to infrastructure:<br>1. Avoid development of infrastructure within priority areas for conservation (objective).<br>2. Avoid construction of these features in GRSG habitat, both within and outside of | | | | |

BLM_0029574

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| | priority areas for conservation (option).<br>3.  Restrictions limiting use of roads should be enforced (option).<br><br>Alternative A, in general has the least protections for GRSG and GRSG habitat from development of infrastructure. Alternative B would have more restrictions on route construction and upgrades, as well as ROWs than Alternative A and D, but would have fewer than Alternative C. See page 4-79 for a complete summary of impacts from lands and realty on GRSG. See page 4-77 for a complete summary of impacts from travel management on GRSG. | | | | |
| **Agriculture/Urbanization\*** | | | | | |
| Areas identified for disposal | Various parcels identified for disposal for consolidation of management without regard for GRSG habitat. | Under all action alternatives (including the Proposed LUPA), GRSG habitat would NOT be identified for disposal, unless consolidation of ownership would benefit GRSG or GRSG habitat. | | | |
| Areas identified for acquisition | No parcels identified in existing plans for acquisition. | Seek to acquire state and private lands with intact subsurface mineral estate by donation, purchase or exchange in order to best conserve, enhance or restore GRSG habitat. | Strive to acquire GRSG habitat in ADH. | Consider GRSG habitat values in acquisitions in ADH. | Consider GRSG habitat values in acquisitions in ADH. |
| **Summary of Impacts on GRSG from Agriculture and Urbanization** | Across all action alternatives (including the Proposed LUPA), the BLM and Forest Service would take advantage of opportunities to consolidate GRSG habitat. Although agriculture and urbanization have been identified as threats in northwest Colorado, the BLM and Forest Service has limited management authority over those types of activities. The Colorado | | | | |

BLM_0029575

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| | Department of Natural Resources' Colorado GRSG Conservation Plan: The Colorado Package (**Appendix N**) identifies those actions included in the conservation strategy in the 2008 Greater Sage Grouse Conservation Plan. The Colorado Department of Natural Resources Package includes a list of those actions (including actions tied to agriculture and urbanization) and their associated responsible parties, implementation and effectiveness to date.<br><br>The action alternatives are in agreement with the following conservation objectives/options identified in the Conservation Objectives Team Report specific to infrastructure:<br>1. Limit urban and exurban development in GRSG habitats and maintain intact native sagebrush plant communities (objective).<br>2. Acquire and manage GRSG habitat to maintain intact ecosystems (option).<br><br>See page 4-79 for a complete analysis of land tenure on GRSG. | | | | |
| **Conifer Invasion*** | | | | | |
| Areas prioritized for vegetation treatments | Few restrictions on habitat restoration actions, with the most potential for vegetation disturbance. There would be no prioritization of habitat restoration in GRSG habitat. | Across all action alternatives (including the Proposed LUPA), treatments would be prioritized to consider GRSG habitat requirements. | | | |

BLM_0029576

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| **Grazing** | | | | | |
| Areas closed to livestock grazing (acres) | No areas identified as closed to livestock grazing. | No areas identified as closed to livestock grazing. | 1,744,100<br><br>BLM-administered and National Forest System lands within ADH would be closed to livestock grazing. | No areas identified as closed to livestock grazing. | No areas identified as closed to livestock grazing. |
| Areas available for livestock grazing (acres) | BLM-administered and National Forest System lands within the planning area would be available for livestock grazing. | 1,702,500<br><br>BLM-administered and National Forest System lands within ADH would be available for livestock grazing. | No areas would be available for livestock grazing on BLM-administered and National Forest System lands within ADH. | 1,702,500<br><br>BLM-administered and National Forest System lands within ADH would be available for livestock grazing. | 1,702,500 |
| Wild horse and burro management | Gathers prioritized without consideration of GRSG habitat requirements. | Prioritize HMAs for gathers that are within PHMA. | Prioritize HMAs for gathers that are within PHMA. | GRSG habitat requirements would be considered with other resource values when prioritizing gathers. | GRSG habitat requirements would be considered with other resource values when prioritizing gathers. |

BLM_0029577

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| **Summary of Impacts on GRSG from Grazing** | GRSG habitat considerations within livestock grazing allotments and wild horse management areas would be similar across all action alternatives. Range improvements are more restricted under Alternative B than under Alternative D and the Proposed LUPA. Under Alternative C, the potential for increased fencing in order to prevent trespass exists. Under Alternative A, grazing would be managed to achieve the standards of rangeland health. Consequently in most scenarios, GRSG habitat requirements would be addressed. However in some localized situations a lack of focus on GRSG-specific issues would result in adverse impacts. The most specific concern is the potential for project infrastructure up to within 0.25-mile of leks that could cause fragmentation, raptor perches, and inappropriate fence locations and designs. Alternative B puts specific focus on GRSG habitat requirements in PHMA to preclude adverse impacts with regard to both the livestock themselves and project infrastructure. Because Alternative C closes ADH to grazing, adverse issues on public lands would be precluded, but actions taken on private land to compensate for loss of public grazing might affect GRSG habitat and could be substantial (for example, volumes of fencing would likely be constructed to hold livestock on private lands). Alternative D and the Proposed LUPA would apply the specific focus on GRSG habitat described for Alternative B to ADH. For additional detail on impacts from range management, see the impacts from range management on GRSG section, beginning on page 4-85. For additional detail on impacts from wild horse management, see the impacts from wild horse management on GRSG sections, beginning on page 4-88. | | | | See paragraph at left. |
| **Invasive Species** | | | | | |
| Weed control priority areas | Analysis of the impacts from weeds on GRSG were considered in the impacts on GRSG section, including, under the impacts from lands and realty on GRSG, impacts from fluid minerals on GRSG and impacts from wildfire suppression, fuels management and fire rehabilitation sections. However, weed infestations are not considered a top threat in northwest Colorado by the Conservation Objectives Team Report (USFWS 2013). | | | | |
| **Wildfire** | | | | | |
| Suppression priority areas | Analyses of the impacts from wildfire suppression on GRSG were considered in the impacts on GRSG section, in the impacts from wildfire suppression, fuels management and fire rehabilitation section. However, wildfire suppression was not considered a top threat in northwest Colorado by the Conservation Objectives Team Report (USFWS 2013. | | | | |

BLM_0029578

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| **Disease** | | | | | |
| Although impacts from West Nile Virus to GRSG are considered in the analysis, the vast majority of GRSG habitat in northwest Colorado exists at elevations above where West Nile virus is commonly found (Naugle et al. 2005). See RDFs, PDFs, and SDFs for a description of features designed to reduce the threat of West Nile Virus (**Appendix I**, Required Design Features, Preferred Design Features, and Suggested Design Features). | | | | | |
| **Coal Mining** | | | | | |
| Areas identified as unsuitable for coal mining | Various areas found unsuitable for coal mining, but few tied specifically to protection of GRSG habitat. | Under Alternatives B and C, the BLM and Forest Service would find PHMA unsuitable for surface mining. The BLM and Forest Service would grant no new sub-surface mining leases unless all facilities could be located outside of PHMA. | | Under Alternative D, the BLM would apply the unsuitability criteria to ADH for surface mining. The BLM would grant no new sub-surface mining leases unless all facilities could be located outside of ADH. Any disturbances associated with coal mining would be subject to the 5 percent disturbance cap. | Under the Proposed LUPA, the BLM would apply the unsuitability criteria to ADH for surface mining. It would grant no new subsurface mining leases unless all facilities could be located outside of ADH. Any disturbances associated with coal mining would be subject to the 3 percent disturbance cap |
| **Weather** | | | | | |
| There is no resource program in an LUP for addressing this threat to GRSG and its habitat. | | | | | |
| **Predation** | | | | | |
| See RDFs and SDFs for Lands and Realty and Minerals for a description of features designed to reduce the threat of predation (**Appendix I**, Required Design Features, Preferred Design Features, and Suggested Design Features). | | | | | |

BLM_0029579

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| **Prescribed Fire** | | | | | |
| Areas suitable for prescribed fire use | Treatments considered on a case-by-case basis, and not prioritized specific to GRSG habitat. | No treatments would be allowed in known winter range in PHMA, unless treatment is designed to strategically reduce wildfire risk around or in winter range and would maintain winter habitat range quality. | No treatments would be allowed in known winter range in ADH, unless treatment is designed to strategically reduce wildfire risk around or in winter range and would maintain winter habitat range quality. | Performance-based objectives, which include canopy cover, would be used when considering treatments in ADH (70/30 sagebrush thresholds). | Performance-based objectives, which include canopy cover, would be used when considering treatments in ADH (70/30 sagebrush thresholds). |
| **Water Development** | | | | | |
| Identify number, type, and location of range water developments | Although impacts from West Nile Virus to GRSG are considered in the analysis, the vast majority of GRSG habitat in northwest Colorado exists at elevations above where West Nile virus is commonly found (Naugle et al. 2005). See RDFs, PDFs, and SDFs for a description of features designed to reduce the threat of West Nile Virus (**Appendix I**, Required Design Features, Preferred Design Features, and Suggested Design Features). | | | | |
| **Hard Rock Mining** | | | | | |
| Locatable Minerals | Various areas recommended for withdrawal/currently withdrawn (mostly special designations). May be some overlap with GRSG habitat. | Alternatives B and C would propose a withdrawal from locatable mineral entry in PHMA. Existing claims in PHMA would be subject to validity exams. | | No new proposed withdrawal from locatable mineral entry. Validity exams, per 43 CFR 3809.100, would be required in PHMA in currently withdrawn areas. | Validity exams, per 43 CFR 3809.100, would be required in PHMA in currently withdrawn areas. |

BLM_0029580

**Table 4.2**
**Comparison of Alleviated Threats to GRSG in Northwest Colorado by Alternative**

| Resource/Resource Use | Alternative A | Alternative B | Alternative C | Alternative D | Proposed LUPA |
|---|---|---|---|---|---|
| Salable Minerals/Mineral Materials | Various areas closed to mineral material sales. May be some overlap with GRSG habitat. | Under Alternatives B and C, PHMA would be closed to mineral material sales. | | Existing mineral material sales sites could continue and potentially expand in PHMA, subject to mitigation and the 5 percent disturbance cap in the Colorado MZs. | Under the Proposed LUPA, PHMA would be closed to mineral material sales. |
| **Summary of Impacts on GRSG from Hard Rock Mining** | Effective mitigation for existing mining claims and mineral material sites is similar across all action alternatives. See the impacts from locatable minerals on GRSG section (page 4-100) and the impacts from salable minerals section to GRSG section (page 4-102) for a complete analysis. | | | | |
| **Hunting** | | | | | |
| There is no resource program in an LUP for addressing this threat to GRSG and its habitat. | | | | | |
| **Climate Change** | | | | | |
| There is no resource program in an LUP for addressing this threat to GRSG and its habitat. However, the BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado include provisions for altering grazing management practices in response to drought conditions. In addition, several programs have contingency plans for management during drought conditions. | | | | | |
| **Contaminants** | | | | | |
| There are no management actions in this LUPA for addressing this threat to GRSG and its habitat. Regulations applied to mineral development and **Appendix I**, Required Design Features, Preferred Design Features, and Suggested Design Features, include requirements and design features to prevent the potential threat of contaminants. | | | | | |

Source: BLM 2013a

BLM_0029581

To analyze the potential impacts of the alternatives on special status terrestrial wildlife, information was gathered from inventories, recovery plans, conservation agreements, the Colorado Natural Heritage Program database, relevant scientific literature, and other sources identifying the potential distribution of these species in and next to the planning area. The analysis is also based on professional expertise of BLM and Forest Service specialists, BLM Colorado State Office specialists, the CPW, and other professional organizations.

*Methodology and Assumptions*

<u>General Impacts on Special Status Terrestrial Wildlife</u>
General impacts on special status terrestrial wildlife are identical to those discussed in **Section 4.3.2**, Terrestrial Wildlife.

<u>Assumptions</u>
The following list presents basic assumptions about special status terrestrial species that apply to the impacts assessment for Alternatives A through D in this EIS.

- The BLM and the Forest Service are primarily responsible for managing habitat, whereas state and federal wildlife management agencies (the CPW and USFWS) primarily oversee management of special status species.

- All permitted activities that could affect federally threatened or endangered species would be required to undergo ESA Section 7 consultation with USFWS.

- Implementation-level actions would be further assessed at an appropriate spatial and temporal scale and level of NEPA analysis. Before any implementation-level activity, a special status species analysis or inventory would occur, in accordance with NEPA, to determine if any such species would be present in the project area.

- The BLM and Forest Service would continue to manage special status fish and wildlife habitats, in coordination with the CPW and USFWS.

- Activities that lead to the listing of a species would not be authorized (Section 6840, Special Status Species Management Manual).

- Management actions aimed at benefiting specific species can have adverse or beneficial impacts on other species.

- Disturbance during sensitive periods adversely impacts special status species.

BLM_0029582

- Federal oil and gas regulations prevent the BLM and Forest Service from being able to apply new or additional lease stipulations to existing leases. However, federal regulations do allow the BLM and Forest Service to apply other protection measures, in conjunction with planning and implementing oil and gas projects. These include applying stipulations consistent with the most recent LUPs as terms and conditions for discretionary approvals (e.g., ROW actions) and applying COAs to augment protections related to lease activities.

- The BLM and Forest Service would use best available information, management and conservation plans, and other research and related directives to guide wildlife habitat management on BLM-administered and National Forest System lands.

- Under all of the alternatives, proposed actions would comply with BLM Colorado Public Land Health Standard #3. Healthy, productive, and diverse plant communities support terrestrial wildlife communities that are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes; therefore, implementing management actions that contribute to maintaining the condition and quality of wildlife habitat would ensure that BLM Colorado Public Land Health Standard #3 would be met throughout the life of the plan amendment.

*Direct and Indirect Impacts on Special Status Terrestrial Wildlife*
Impacts from implementing management for the following resources or resource uses would be the same or similar to those discussed under *Direct and Indirect Impacts on Terrestrial Wildlife* and *Direct and Indirect Impacts on GRSG*: travel and transportation management, recreation management, lands and realty management, wind energy development, solar energy development, range management, wild horse management, and ACECs.

Impacts from Fluid Minerals Management on Special Status Terrestrial Wildlife
In general, impacts on special status terrestrial species would be similar to those discussed under *Impacts from Fluid Minerals Management on Terrestrial Wildlife* and *Impacts from Fluid Minerals Management on GRSG*. Those species more closely associated with sagebrush communities or whose ranges are largely coincident with PHMA and GHMA (e.g., Brewer's sparrow and to a lesser extent white-tailed prairie dog, black-footed ferret, western burrowing owl, and ferruginous hawk) would benefit from conservation measures designed to protect GRSG and sagebrush habitat under each alternative. These species would benefit from conservation measures designed to protect GRSG and sagebrush habitat under each alternative.

Conversely, excluding or avoiding development in GRSG habitats may lead to increased activity in other vegetation types (e.g., pinyon-juniper, mountain shrub, and aspen/spruce/fir). Special status species associated with these habitat

BLM_0029583

types, such as northern goshawk, BLM-sensitive bat species, Canada lynx, and Columbian sharp-tailed grouse, may be adversely influenced to varying degrees, depending on alternative and development scenarios.

Conservation measures designed to decrease or eliminate disturbance to sagebrush communities would reduce the indirect influences of fluid minerals development on those species more closely associated with sagebrush communities. In addition to COAs applied to special status raptor nests and important vegetation communities for migratory bird nesting (e.g., aspen and riparian communities), NSO and TL stipulations would be effective in allowing nesting activity to progress undisturbed during important reproduction times.

Habitat improvement projects or off-site mitigation designed to reduce oil and gas-related impacts on GRSG and sagebrush habitat could both positively and negatively influence other wildlife species, depending on the vegetation communities involved. Habitat restoration projects designed to benefit GRSG would ostensibly benefit other sagebrush obligate species (particularly nongame mammals and birds). Modifying other community types (pinyon-juniper and mountain shrub) to promote sagebrush may adversely influence the species that rely on those vegetation types for food or for cover or nesting substrate. Impacts may vary, depending on scale. Prompt and effective reclamation practices would accelerate the restoration of lands disturbed by development, thus benefiting wildlife species in general by improving forage and cover resources (increased forb and perennial grass expression, reductions in annual invasive species and noxious weeds).

Impacts from Solid Minerals—Coal Management on Special Status Terrestrial Wildlife
Impacts from solid minerals development on special status terrestrial wildlife would be the same or similar to those discussed under *Impacts from Solid Minerals—Coal Management on Terrestrial Wildlife*, *Impacts from Solid Minerals—Coal Management on GRSG*, and *Impacts from Fluid Minerals Management on Special Status Terrestrial Wildlife*, above.

Impacts from Locatable Minerals Management on Special Status Terrestrial Wildlife
Impacts from locatable minerals development on special status terrestrial wildlife would be the same or similar to those discussed in *Impacts from Locatable Minerals Management on Terrestrial Wildlife*, *Impacts from Locatable Minerals Management on GRSG*, and *Impacts from Fluid Minerals Management on Special Status Terrestrial Wildlife*, above.

Impacts from Nonenergy Leasable Minerals Management on Special Status Terrestrial Wildlife
Impacts from nonenergy leasable minerals development on special status terrestrial wildlife would be the same or similar to those discussed in *Impacts from Nonenergy Leasable Minerals Management on Terrestrial Wildlife*, *Impacts from*

BLM_0029584

*Locatable Nonenergy Leasable Minerals Management on GRSG*, and *Impacts from Fluid Minerals Management on Special Status Terrestrial Wildlife*, above.

<u>Impacts from Salable Mineral Management on Special Status Terrestrial Wildlife</u>
Impacts from salable minerals development on special status terrestrial wildlife would be the same or similar to those discussed in *Impacts from Salable Mineral Management, Management on Terrestrial Wildlife*, *Impacts from Salable Mineral Management on GRSG*, and *Impacts from Fluid Minerals Management on Special Status Terrestrial Wildlife*, above.

<u>Impacts from Fuels Management on Special Status Terrestrial Wildlife</u>
*Direct Habitat Loss/Modification/Fragmentation from Fuels Management.* Depending on the extent, location, severity, and seral type affected, unplanned ignitions would have short-term impacts on special status wildlife species. It would do this by removing or degrading habitat for some species, injuring or killing slow-moving species, causing habitat avoidance and changes in species movement patterns, or reducing population viability and increasing the contribution to the need to list a species. In areas that are available for fuels treatments, changes in vegetation can result in negative impacts on special status wildlife species, such as direct habitat loss, habitat fragmentation, and disruption to species; however, it can also result in beneficial impacts, such habitat restoration.

A concern of resetting vegetation seral stage through fuels management is the invasion of undesirable plant species. Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds.

Cheatgrass invasion is also a threat to some treatment areas. Invasive nonnative plants with little or no forage value for special status wildlife species are increasing in some areas. The greatest impacts have occurred on winter range areas with low precipitation rates. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. Cheatgrass may provide some short-term forage benefits to special status wildlife species while in early stages of growth; however, it lacks the ability to provide high quality forage during most of the year.

Fire suppression removes vegetation and disturbs soil and can have both short- and long-term impacts on special status wildlife and other habitats. For example, using heavy equipment to construct fire lines can cause habitat loss, degradation, and fragmentation in the short term. Moreover, if not rehabilitated, these fire lines can cause erosion and provide opportunities for the spread of undesirable plant species, thereby resulting in long-term adverse impacts on wildlife habitat. Timely rehabilitation following fire, therefore, is important to maintaining the quality of wildlife habitats.

BLM_0029585

*Disruption Impacts.* The noise from heavy equipment and chainsaws could temporarily disperse bird species from breeding and nesting habitat and wildlife from occupied habitat. Prescribed burning could also disturb nesting bird species, as the result of smoke inadvertently drifting into occupied habitat. These activities could remove suitable habitat or other desirable vegetation.

Disturbances from heavy equipment, chainsaws, and prescribed burning would be localized and short term. Most wildlife species would move into adjacent untreated areas; however, direct mortality during the vegetation treatments is possible. TLs (such as those for big game birthing areas, raptor nesting, and big game winter habitat), as well as site-specific COAs (such as TLs for migratory bird nesting), could mitigate the short-term impacts resulting from the treatments.

ESR treatments following a wildfire are effective in restoring wildlife habitat, but equipment is often noisy, and noise may alter animal behavior or cause wildlife to leave an area during the disturbance. These impacts would be short term and are not likely to have much effect on the long-term health and habitat use of wildlife in the treatment area.

*Habitat Protection.* Although both planned and unplanned wildland fire adversely impacts wildlife habitats in the short term by removing vegetation and disturbing soil, the long-term benefits of wildland fire often outweigh the short-term adverse impacts. For example, prescribed fire can be used to restore conditions benefiting wildlife species favoring early plant succession stages and young age classes of woody plants (McAninch et al. 1984). Prolonged fire suppression has allowed fuels to build up to the point that an unplanned wildfire is likely to be much larger and greater in intensity.

Some wildlife species thrive on the occurrence of fire. The herbaceous and woody plants that establish following a burn provide abundant leaves and seeds, which are used by small rodents and birds that in turn are important prey for a variety of avian and mammalian predators. Over the short term, the wildlife community is changed dramatically by a fire, as taller and denser vegetation is replaced by a more open habitat. As the area gradually recovers, however, many of the pre-fire components become reestablished, and the area again supports a community associated with denser forests. This cycle may take decades or centuries, depending on the dominant plant species, or it might never occur if climatic conditions are no longer suitable for the former dominants.

Wallmo (1980) suggests that fire improves the palatability of forage and causes browse plants to resprout close to the ground, putting the current season's growth within reach of deer for several years. Additionally, wildland fire can improve the quality of wildlife habitat by releasing soil nutrients, reducing fuel load, or setting back trees encroaching into shrubland or grassland habitats.

*Northwest Colorado Greater Sage-Grouse Proposed LUPA/Final EIS*

BLM_0029586

Fuels treatments could be beneficial for species that depend on younger seral stages. In the long term, wildlife would benefit from most wildfires and fuels management due to an increase in vegetation productivity and to increased plant diversity and age classes, which would, in turn, provide additional forage, cover, and prey base.

Mimicking natural periodic disturbance is often necessary in order to stimulate plant productivity, increase diversity, and increase nutritional value. Foraging opportunities for big game and other herbivores would increase as understory grasses, forbs, and shrubs reestablish. The benefits for mule deer and elk are likely to be long term. Directly following application of fire there is generally more palatable browse available for wild ungulates. Improving vegetation in upland areas would provide more forage to big game species and other herbivorous species that occur in these areas and would result in direct beneficial impacts. In addition, fuels treatments in upland areas often increase forage production, which diverts livestock and wildlife use from riparian and wetland areas, thereby increasing the vigor and structural diversity of these plant communities.

Following a wildfire, ESR is implemented to protect and conserve habitats that have sustained damage or degradation from catastrophic wildfire. Typically these activities are beneficial for special status wildlife species and are designed to improve the overall condition of the area, which in turn improves habitat for wildlife. For example, weed-free seeding would stabilize soil and reduce the spread of noxious weeds. Additionally, replacing organic matter in disturbed areas would protect topsoil and provide a suitable bed for the restoration of a native vegetation community.

*Summary of Impacts by Alternative*
Alternative A would have the fewest restrictions for fuels management actions and the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize habitat restoration beyond what has already been determined in the fire management plans for the area; therefore, Alternative A would have the greatest impact on special status wildlife.

Alternative B is more restrictive than Alternative A, though all of the restrictions fall within PHMA; therefore, impacts from fuels management on special status wildlife would be less than Alternative A, but only within PHMA. Additionally, Alternative B would prioritize fire operations in PHMA and GHMA immediately after life and property; therefore, the potential for disturbance to special status wildlife species within these habitats is lower under Alternative B than Alternative A. The greatest amount of benefit under Alternative B would be provided to those species whose ranges overlap PHMA. There is potential to negatively influence those special status species that use other habitat types.

Alternative C would prioritize fire operations in PHMA immediately after life and property; therefore, the potential for disturbance to special status wildlife

BLM_0029587

within PHMA would be the same as Alternative B but less than Alternative B in GHMA. With regard to fuels management, Alternative C is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on special status wildlife species would be less than Alternative B. Conversely, Alternative C does not offer as many protective management actions that could benefit special status wildlife as Alternatives B and D; therefore, it has more potential for habitat degradation than the other alternatives. However, the greatest amount of benefit under Alternative C would be provided to those species whose ranges overlap ADH. There is potential to negatively influence those special status species that use other habitat types.

Alternative D would give priority to fire operations in PHMA and GHMA, immediately after firefighter and public safety, unless site-specific conditions were to warrant an exception. With regard to fuels management, Alternative D is more restrictive than Alternative B since all of the management actions fall within ADH; therefore, impacts from fuels management on special status wildlife are less than Alternative B. Concurrently, Alternative D offers the same protective measures as Alternative B but applies them to ADH; therefore, it has the potential for more benefits to special status wildlife species than Alternatives B and C.

Management of wildfire suppression, fuels management, and fire rehabilitation under the Proposed LUPA would be the same as that for Alternative D. Impacts from the Proposed LUPA, therefore, are the same as those described for Alternative D, above.

<u>Impacts from Habitat Restoration Special Status Terrestrial Wildlife</u>
*Direct Habitat Loss/Modification/Fragmentation from Habitat Restoration.* Depending on the extent, location, treatment, and seral type affected, habitat restoration would have short-term impacts on special status wildlife species. It would do this by removing or degrading habitat for some species, injuring or killing slow-moving species, causing habitat avoidance and changes in species movement patterns, or reducing population viability and increasing the contribution to the need to list a species.

In areas that are available for habitat restoration, changes in vegetation can result in negative impacts on special status wildlife species, such as direct habitat loss, habitat fragmentation, and disruption to some species; however, it can also result in beneficial impacts, such long-term habitat restoration for others. For example, removing encroaching pinyon and juniper is beneficial for sagebrush-dependent species, but it has negative impacts on pinyon- and juniper-dependent species.

A concern associated with habitat restoration is the invasion of undesirable plant species from the soil being disturbed. Noxious and invasive weeds are often of lower value to wildlife and degrade habitat by reducing optimal cover

BLM_0029588

or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Cheatgrass invasion is also a threat to some treatment areas. Invasive nonnative plants with little or no forage value for big game species are increasing in some areas. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities.

*Disruption Impacts.* The noise from heavy equipment and chainsaws could temporarily disperse bird species from breeding and nesting habitat and wildlife from occupied habitat. Disturbances from heavy equipment, chainsaws, and prescribed burning would be localized and short term. Most wildlife species would move into adjacent untreated areas, but direct mortality during the vegetation treatments is possible. TLs (such as those for big game birthing areas, raptor nesting, and big game winter habitat), as well as site-specific COAs (such as TLs for migratory bird nesting), could mitigate the short-term impacts resulting from the treatments.

*Habitat Protection.* Removing nonnative species and vegetation from habitats that support special status wildlife populations would likely provide some degree of benefit to most special status species that occur on public lands. It would do this by creating more native habitat conditions and reducing the likelihood of a future catastrophic wildfire. The degree of benefit to special status wildlife would depend, in large part, on the habitat needs of the species and its ability to avoid a fire.

Nonnative plant species reduce the suitability of some habitats to support special status wildlife species. Some species require, or at the very least prefer, certain plants as food. Encroaching nonnative plant species and displacing native plant species that serve as important sources of food reduce the suitability of the habitat for these wildlife species. For these species, vegetation treatments would likely provide a long-term benefit to habitat and could improve the suitability of other areas, potentially creating additional habitat into which the population could expand.

For some special status wildlife species, it is the structure, rather than the species composition of the habitat, that makes it suitable. For example, the southwestern willow flycatcher occurs in riparian areas with dense growths of deciduous shrubs and trees (USFWS 1995). In some cases, invasive plant species alter the structure of habitats, making them less suitable for supporting sensitive wildlife species (e.g., the encroachment of pinyon and juniper into GRSG habitat). For these species, treatments to control weed infestations would likely provide a long-term benefit. In other cases, nonnative plant species may invade an area without making drastic structural changes. In such cases, the suitability of the habitat, though not ideal, is maintained (e.g., thickets of salt cedar and Russian olive providing nesting habitat for the southwestern willow flycatcher).

BLM_0029589

For these species, vegetation treatments may result in some improvement of habitat, but the long-term benefits may not outweigh the short-term risks to the species associated with certain treatment methods.

*Summary of Impacts by Alternative*

Alternative A would have the fewest restrictions for habitat restoration actions, with the most potential for vegetation disturbance. Additionally, Alternative A would not prioritize habitat restoration and restoration guidelines beyond what has already been determined in the LUPs for the targeted areas; therefore, Alternative A would have the greatest impact on special status wildlife species.

Alternative B is more restrictive than Alternative A, so impacts from habitat restoration on special status wildlife species would be less than Alternative A. Additionally, Alternative B provides guidelines that are specific to the restoration of sagebrush for GRSG; therefore, Alternative B would have more impacts on those special status species that have different or contrary habitat requirements.

Alternative C is more restrictive than Alternative B, so impacts from habitat restoration on special status wildlife species are less than Alternative B. Additionally, Alternative C provides guidelines that are specific to the restoration of sagebrush for GRSG, so it would have more impacts on those special status species that have different or contrary habitat requirements.

Alternative D is more restrictive than Alternative A but less than Alternatives B and C. Alternative D offers habitat restoration guidelines but offers exemptions for other resources valued by the BLM and Forest Service; therefore, there is potential for less impact on special status species for Alternative D from the habitat restoration guidelines than from Alternatives B and C.

Management of habitat restoration under the Proposed LUPA would be the same as under Alternative D; impacts on special status species from habitat restoration would be the same as those for the Proposed LUPA.

Impacts from ACEC/Zoological Area Management on Special Status Terrestrial Wildlife

Impacts from ACECs on special status terrestrial wildlife would be the same or similar to those discussed under *Impacts from ACECs and Zoological Area Management on Terrestrial Wildlife* and *Impacts from ACECs and Zoological Area Management on GRSG*.

*Summary of Impacts on Special Status Terrestrial Wildlife*

Alternative A provides the least amount of protection for special status terrestrial wildlife in the planning area. It puts very few restrictions on development, which could result in the most modification of the landscape, and consequently, the most special status terrestrial wildlife.

BLM_0029590

Alternative B provides a greater level of protection for special status terrestrial wildlife than Alternative A but would provide a lower level of protection than Alternative C.

Alternative C would provide the most protection for special status terrestrial wildlife. The most restrictions would be placed on development under Alternative C, which would afford the most protection for special status terrestrial wildlife.

Alternative D would provide more protection for special status terrestrial wildlife than Alternative A but would provide less protection than Alternatives B and C. More flexibility for development is built into Alternative D, which could result in higher levels of development than Alternatives B and C.

The Proposed LUPA has greater restrictions than Alternative D, including no leasing within 1 mile of active leks. The impacts on special status species under the Proposed LUPA are less than under Alternatives A and D and would be similar to those under Alternatives B and C.

### Special Status Plant Species

*General Description*
This section discusses impacts on vegetation from proposed management actions of other resources and resource uses.

To analyze the potential impacts of the alternatives on vegetation, information was gathered from the Colorado Natural Heritage Program database, relevant scientific literature, and other sources identifying the potential distribution of vegetation in and next to the planning area. The analysis is also based on professional expertise of BLM and Forest Service specialists, BLM Colorado State Office specialists, the CPW, and other professional organizations.

*Methodology and Assumptions*

<u>General Impacts on Special Status Plant Species</u>
Indicators of impacts on special status plant species and the measurements used to describe the impacts (where available or appropriate) are described below.

*Direct Mortality.* Distributions of special status plants and the number of plants per occurrence vary in number. In small occurrences, loss of a portion of the plants can compromise species viability. Indicators are:

- Number of plants lost

- Number of occurrences suffering mortality

*Direct Habitat Loss.* Direct habitat loss results when habitat is destroyed or converted to a form that is unsuitable for the impacted species. Direct habitat

BLM_0029591

loss can be short term or permanent. Short-term habitat loss can coincide with habitat improvement projects, such as removing encroaching junipers in sagebrush habitats. In general, because special status plants have very specific habitat requirements, any habitat disturbance that alters any required habitat constituent for a particular species would result in habitat loss. Whether habitat loss is short-term or long-term, habitat occupied at the time of loss would coincide with direct mortality to plants and potential extirpation of special status plant occurrences.

- Acres of habitat lost, both short term and long term

*Habitat Degradation and Disruption to Species.* Habitat degradation occurs as an indirect effect of ground-disturbing activities, including roads, trails, power lines, well pads, and pipelines. The area of potential habitat degradation is generally identified as the project impact zone around the area of disturbance. Disturbance factors resulting in habitat degradation include increased dust levels, invasive species establishment and spread, and herbicide drift. Another factor is foot and vehicle trampling and crushing from increased accessibility provided by ground-disturbing activities.

The width of the impact zone varies depending on the type of ground-disturbing activity, but for purposes of this analysis, it is assumed to be 984 feet from the edge of ground disturbance. Within this impact zone, numerous impacts on plants can occur. This does not necessarily result in immediate plant mortality or loss of habitat, but it reduces rare plant success and viability over time. These impacts are as follows:

- Alteration of light and availability of water

- Alteration of temperatures on plants at the microsite level

- Increased dust levels on leaf surfaces

- Alteration of soil properties, such as pH, salinity, nutrient availability, mycorrhizal, microbial communities, and organic matter

- Alterations of herbivory patterns

- Competition from invasive species

- Impacts from herbicide use to control invasive species

- Alteration of fire regimes

- Shifts in competitive advantage to more aggressive native plant species within the overall plant community

- Habitat fragmentation

BLM_0029592

Little is known about the ecophysiology[7] of most special status plant species; because of this, exact environmental needs and how plants might respond to subtle alterations of their environments are generally unknown. These impacts can be assessed at a plant occurrence level, by quantifying plant occurrence changes over time. They can also be addressed at the larger scale of habitat degradation.

- Acres within both a 984-foot zone around ground-disturbing activities and within a 984-foot buffer of special status plant occurrences or suitable special status plant habitat

- Number of invasive species occurrences and the number of acres infested within 984 feet of special status plant occurrences

- Percent reduction in population numbers over time

- Percent reduction in reproduction capability over time, measured as percent reduction in both viable seed set and in new shoots from vegetation reproduction

- Reduction in area of occupied habitat over time

*Pollinator Habitat Fragmentation and Loss.* Habitat fragmentation occurs when contiguous habitat is broken into smaller blocks by surface-disturbing activities, and distances between suitable habitat patches increase. Because pollinators fly only limited distances, they are less likely to use small and isolated patches of habitat, and habitat fragmentation can effectively isolate pollinators from special status plant occurrences. Habitat fragmentation occurs concurrently with habitat loss. As suitable habitat for pollinators decreases in proximity to special status plants that depend on these pollinators for reproduction, plant reproduction success and genetic diversity decrease. This can result in reduced viability at the plant occurrence level and potentially at the species level for species with few occurrences.

- Acres of pollinator habitat lost within buffer zones around plant occurrences

- Buffer width would vary depending on the individual plant species and its potential pollinators

*Habitat Restoration.* Habitat restoration can result from vegetation management projects, restoration of hydrologic function, removing invasive species, restoration of historic fire regimes, alteration of grazing management, or other methods. However, any habitat restoration project for special status plants must be designed specifically for the individual plant species and its specific habitat and site conditions. Generalized habitat restoration projects that do not focus on special status plant needs can have negative impacts on these species.

---

[7]The science of the interrelationships of organisms and their environment

BLM_0029593

- Acres of habitat improved for special status plants

*Habitat Protection.*

- Acres protected through stipulations, withdrawals, closures, or special designations (e.g., ACECs)

<u>Assumptions</u>
The following list presents basic assumptions related to special status plants that apply to the impacts assessment for Alternatives A through D in this EIS.

- The BLM and Forest Service are responsible for managing both habitat and occurrences of special status plants.

- Any special status plant habitat disturbance, unless specifically designed for a particular special status plant species under specific circumstances, would be detrimental to special status plants. This includes sagebrush habitat improvement projects, such as juniper removal, mastication, and prescribed fire, which might have long-term positive impacts but would result in special status plant mortality and habitat degradation in the short term.

- Disruption of any component of a species habitat would be detrimental, with the degree of detriment dependent on the type, intensity, time of year, and extent of the disruption, as well as on the plant species affected. This can also include the disruption of natural disturbance patterns, to which special status plant species may be adapted.

- Different special status plant species grow in different types of habitats, so the relative risk of any given activity or project would vary for each plant species. See **Tables 4.3** and **4.4** for a summary of planning area special status plant species and their habitats.

- The exact locations of future surface-disturbing activities cannot be predicted at the programmatic EIS level.

- Unsurveyed potentially suitable habitat for special status plant species occurs within and next to the identified PHMA, GHMA, and LCHMA. Exact locations of all special status occurrences and acreage of habitat existing for each special status species are unknown.

- Significant plant communities identified by the Colorado Natural Heritage Program are present within the analysis area and may be impacted by GRSG management. Potential impacts on these significant plant communities are not analyzed in this document due to inadequate data from field offices.

BLM_0029594

**Table 4.3**
**Known Threatened, Endangered, and Sensitive Plant Species Occurrences within GRSG PHMA, GHMA, and LCHMA, and within a 984-Foot Buffer of these GRSG Habitats**

| Species Common Name | Species Scientific Name | Field Offices* | Species Status ** | Number of Occurrences | | | Number of Occurrences in 300-meter Buffer | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | In GHMA | In PHMA | In LCHMA | In GHMA | In PHMA | In LCHMA |
| Boat-shaped bugseed | *Corispermum navicula* | KFO | S | 0 | 1 | 0 | 0 | 1 | 0 |
| Cathedral Bluff dwarf gentian | *Gentianella tortuosa* | WRFO | S | 0 | 8 | 0 | 1 | 1 | 0 |
| Cathedral Bluffs meadowrue | *Thalictrum heliophilum* | GJFO, WRFO | S | 1 | 10 | 1 | 16 | 15 | 0 |
| Clay hill buckwheat | *Eriogonum viridulum* | LSFO | S | 1 | 0 | 0 | 0 | 0 | 0 |
| Colorado feverfew | *Parthenium ligulatum* | LSFO, WRFO | S | 3 | 0 | 0 | 3 | 0 | 0 |
| Colorado hookless cactus | *Sclerocactus glaucus* | GJFO | FT | 84 | 1 | 0 | 5 | 0 | 0 |
| DeBeque phacelia | *Phacelia submutica* | GJFO | FT | 5 | 0 | 0 | 60 | 0 | 0 |
| Debris milkvetch | *Astragalus detritalis* | LSFO, WRFO | S | 26 | 3 | 0 | 4 | 0 | 0 |
| Duchesne milkvetch | *A. duchesnensis* | LSFO, WRFO | S | 3 | 0 | 0 | 0 | 0 | 0 |
| Dudley Bluffs twinpod | *Physaria obcordata* | WRFO | FT | 0 | 0 | 0 | 1 | 0 | 0 |
| Ephedra buckwheat | *Eriogonum ephedroides* | WRFO | S | 6 | 0 | 0 | 3 | 0 | 0 |
| Flaming Gorge evening primrose | *Oenothera acutissima* | LSFO, WRFO | S | 3 | 9 | 0 | 0 | 0 | 0 |

BLM_0029595

**Table 4.3**
**Known Threatened, Endangered, and Sensitive Plant Species Occurrences within GRSG PHMA, GHMA, and LCHMA, and within a 984-Foot Buffer of these GRSG Habitats**

| Species Common Name | Species Scientific Name | Field Offices* | Species Status ** | Number of Occurrences | | | Number of Occurrences in 300-meter Buffer | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | In GHMA | In PHMA | In LCHMA | In GHMA | In PHMA | In LCHMA |
| Fragile rockbrake | *Cryptogramma stelleri* | KFO | S | 0 | 0 | 0 | 1 | 0 | 0 |
| Gibbens's beardtongue | *Penstemon gibbensii* | LSFO | S | 11 | 0 | 0 | 0 | 0 | 0 |
| Graham's beardtongue | *P. grahamii* | WRFO | FP | 1 | 0 | 0 | 8 | 0 | 0 |
| Hairy Townsend daisy | *Townsendia strigosa* | LSFO | S | 1 | 0 | 0 | 0 | 0 | 0 |
| Harrington's penstemon | *Penstemon harringtonii* | CRVFO, KFO | S | 58 | 54 | 0 | 23 | 25 | 0 |
| Narrow-stem gilia | *Aliciella stenothyrsa* | WRFO | S | 0 | 0 | 0 | 1 | 0 | 0 |
| Naturita milkvetch | *Astragalus naturitensis* | GJFO | S | 10 | 0 | 0 | 1 | 0 | 0 |
| North Park phacelia | *Phacelia formosula* | KFO | FE | 0 | 85 | 0 | 0 | 0 | 0 |
| Osterhout milkvetch | *Astragalus osterhoutii* | KFO | FE | 36 | 24 | 0 | 7 | 4 | 0 |
| Pale blue-eyed grass | *Sisyrinchium pallidum* | KFO | S | 0 | 1 | 0 | 0 | 0 | 0 |
| Parachute penstemon | *Penstemon debilis* | CRVFO | FT | 2 | 0 | 0 | 0 | 0 | 0 |
| Penland beardtongue | *P. penlandii* | KFO | FE | 5 | 6 | 0 | 0 | 0 | 0 |
| Piceance bladderpod | *Lesquerella parviflora* | GJFO, WRFO | S | 18 | 24 | 21 | 26 | 27 | 1 |

BLM_0029596

**Table 4.3**
**Known Threatened, Endangered, and Sensitive Plant Species Occurrences within GRSG PHMA, GHMA, and LCHMA, and within a 984-Foot Buffer of these GRSG Habitats**

| Species Common Name | Species Scientific Name | Field Offices* | Species Status ** | Number of Occurrences | | | Number of Occurrences in 300-meter Buffer | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | In GHMA | In PHMA | In LCHMA | In GHMA | In PHMA | In LCHMA |
| Roan Cliffs blazingstar | *Mentzelia rhizomata* | CRVFO | S | 2 | 0 | 0 | 2 | 0 | 0 |
| Rock tansy | *Sphaeromeria capitata* | LSFO | S | 0 | I | 0 | 0 | 0 | 0 |
| Rollins cryptantha | *Cryptantha rollinsii* | WRFO | S | 3 | 2 | 0 | 3 | 0 | 0 |
| Singlestem buckwheat | *Eriogonum acaule* | LSFO | S | I | 0 | 0 | 0 | 0 | 0 |
| Tufted cryptantha | *Cryptantha caespitosa* | LSFO | S | 2 | 0 | 0 | I | 0 | 0 |
| Uinta Basin springparsley | *Cymopterus duchesnensis* | LSFO | S | 3 | 0 | 0 | 0 | 0 | 0 |
| Woodside buckwheat | *Eriogonum tumulosum* | LSFO | S | I | 0 | 0 | 2 | 0 | 0 |
| **Total** | | | | **286** | **229** | **22** | **168** | **73** | **I** |

**FE = federally endangered, FT = federally threatened, FC = candidate for federal listing, FP = proposed for federal listing, S = BLM sensitive

**Table 4.4**
**Habitats for Special Status Plant Species within the Planning Area, Grouped by Habitat Guilds**

| Common Name | Scientific Name | Status | Offices | Habitat Type |
|---|---|---|---|---|
| Green River Shale Formation | | | | |
| Narrow-stem gilia | *Aliciella stenothyrsa* | S | WRFO, GJFO | Grassland, sagebrush, mountain mahogany or pinyon-juniper; silty to gravelly loam soils of the Green River Formation, 6,200 to 8,600 feet |
| Rollins cryptantha | *Cryptantha rollinsii* | S | WRFO | White shale slopes of the Green River Formation, in pinyon-juniper or cold desert shrub communities. 5,300 to 5,800 feet |

BLM_0029597

**Table 4.4**
**Habitats for Special Status Plant Species within the Planning Area, Grouped by Habitat Guilds**

| Common Name | Scientific Name | Status | Offices | Habitat Type |
|---|---|---|---|---|
| Ephedra buckwheat | *Eriogonum ephedroides* | S | LSFO, WRFO | Shale and clay flats of slopes in saltbush, sage and pinyon-juniper habitats, 4,900 to 6,900 feet |
| Cathedral Bluff dwarf gentian | *Gentianella tortuosa* | S | WRFO | Barren shale knolls and slopes of the Green River Formation, 8,500 to 10,800 feet |
| Piceance bladderpod | *Lesquerella parviflora* | S | CRVFO, GJFO, WRFO | Shale outcrops of the Green River Formation, on ledges and slopes of canyons in open areas 6,200 to 8,600 feet |
| Roan Cliffs blazingstar | *Mentzelia rhizomata* | S | CRVFO, GJFO | Steep talus slopes of the Parachute Creek Member of the Green River Shale Formation in Garfield County and in wash bottoms with eroded shale 5,800 to 9,000 feet |
| Colorado feverfew | *Parthenium ligulatum* | S | LSFO, WRFO | Barren shale knolls, 5,400 to 6,500 feet |
| Parachute penstemon | *Penstemon debilis* | FT | CRVFO, GJFO | Steep talus slopes of the Parachute Creek Member of the Green River Shale Formation in Garfield County and in wash bottoms with eroded shale, 6,000 to 9,000 feet |
| Graham's beardtongue | *P. grahamii* | FP | WRFO | Talus slopes and knolls of the Green River Formation in sparsely vegetated desert scrub and pinyon-juniper, 5,800 to 6,000 feet |
| White River beardtongue | *P. scariosus* var. *albifluvis* | FC | WRFO | Sparsely vegetated shale slopes of the Green River Formation Desert in shrub and pinyon-juniper communities, 5,000 to 7,200 feet |
| Dudley Bluffs bladderpod | *Physaria congesta* | FT | WRFO | Barren, white shale outcrops of the Green River and Uinta Formations, 6,000 to 6,700 feet |
| Dudley Bluffs twinpod | *P. obcordata* | FT | WRFO, CRVFO | Barren white outcrops and steep slopes of the Parachute Creek Member of the Green River Formation, 5,900 to 7,500 feet |
| Cathedral Bluffs meadowrue | *Thalictrum heliophilum* | S | CRVFO, GJFO, WRFO | Dry shale barren communities in Garfield, Mesa, and Rio Blanco Counties in northwestern Colorado, 6,200 to 8,800 feet |

BLM_0029598

**Table 4.4**
**Habitats for Special Status Plant Species within the Planning Area, Grouped by Habitat Guilds**

| Common Name | Scientific Name | Status | Offices | Habitat Type |
|---|---|---|---|---|
| **Wasatch Formation** | | | | |
| DeBeque milkvetch | *Astragalus debequaeus* | S | CRVFO, GJFO | Varicolored, fine textured, seleniferous or saline soils of Wasatch Formation—Atwell Gulch Member, 5,100 to 6,400 feet |
| DeBeque phacelia | *Phacelia submutica* | FT | CRVFO, GJFO | Sparsely vegetated areas in high clay content soils on low-angle to steep slopes of the Atwell Gulch and Shire Members, Wasatch Formation. Soils often have large cracks or alligator-skin to popcorn surface texture because of the high shrink-swell potential of the clays, 4,700 to 6,200 feet |
| **Juniper** | | | | |
| Naturita milkvetch | *Astragalus naturitensis* | S | CRVFO, GJFO | Sandstone mesas, ledges, crevices, and slopes in pinyon-juniper woodlands, 5,000 to 7,000 feet |
| **Sagebrush to Juniper, in Barren to Gravelly Soils** | | | | |
| Debris milkvetch | *A. detritalis* | S | LSFO, WRFO | Pinyon/juniper and mixed desert shrub, often on rocky soils ranging from sandy clays to sandy loams; also alluvial terraces with cobbles, 5,400 to 7,200 feet |
| Duchesne milkvetch | *A. duchesnensis* | S | LSFO, WRFO | Pinyon/juniper woodland and desert shrub, around sandstone or shale outcrops, 4,600 to 6,400 feet |
| Tufted cryptantha | *Cryptantha caespitosa* | S | LSFO, WRFO | Sparsely vegetated shale knolls, with pinyon-juniper or sagebrush; usually with other cushion plants, 5,500 to 8,100 feet |
| Uinta Basin springparsley | *Cymopterus duchesnensis* | S | LSFO | Cold desert shrub, sagebrush, and juniper communities, in sandy clay and clay soils derived from shales, 4,700 to 6,800 feet |
| Singlestem buckwheat | *Eriogonum acaule* | S | LSFO | Barren hillsides in fine particle soils, 5,680 to 6,820 feet |
| Woodside buckwheat | *E. tumulosum* | S | LSFO | Mixed desert shrub and pinyon-juniper woodlands, on rocky outcrops, sedimentary gravels, or clays, 5,800 to 6,300 feet |
| Clay hill buckwheat | *E. viridulum* | S | LSFO | Sandy or silty flats or clay slopes and hills, in saltbush or sagebrush communities, or pinyon-juniper woodlands, 4,620 to 7,260 feet |

BLM_0029599

Table 4.4
Habitats for Special Status Plant Species within the Planning Area, Grouped by Habitat Guilds

| Common Name | Scientific Name | Status | Offices | Habitat Type |
|---|---|---|---|---|
| Hairy Townsend daisy | Townsendia strigosa | S | LSFO | Shaley, sandy, or alkaline clay substrates in desert shrub, sagebrush, or pinyon-juniper habitats, 4,950 to 6,600 feet |
| **Sagebrush, on Basalt Parent Material Soils** | | | | |
| Harrington's penstemon | Penstemon harringtonii | S | CRVFO, KFO | Open sagebrush or sagebrush sites with encroaching pinyon-juniper. Soils are typically rocky loams and rocky clay loams derived from coarse calcareous parent materials (basalt) 6,200 to 9,200 feet. |
| **Desert Scrub** | | | | |
| Colorado hookless cactus | Sclerocactus glaucus | FT | CRVFO, GJFO | Rocky hills, mesa slopes, and alluvial benches in salt desert shrub communities, often with well-formed microbiotic crusts. Can occur in dense cheatgrass, 4,500 to 6,600 feet |
| Rock tansy | Sphaeromeria capitata | S | LSFO | Dry, rocky hills, and desert flats in silty soil, 7,500 to 7,900 feet |
| **Browns Park Formation** | | | | |
| Gibbens' beardtongue | Penstemon gibbensii | S | LSFO | Sparsely vegetated shale or sandy-clay slopes of the Browns Park Formation. Surrounding vegetation is pinyon-juniper woodland, sagebrush, or greasewood-saltbush, 5,500 to 7,700 feet |
| **Niobrara and Pierre Shales** | | | | |
| Osterhout milkvetch | Astragalus osterhoutii | FE | KFO | Selenium-rich clay soils, derived mostly from Niobrara and Pierre shale, on relatively flat areas and barren knolls within Grand County. **Occurs only within the planning area**, 7,500 to 7,700 feet |
| Penland beardtongue | Penstemon penlandii | FE | KFO | Selenium-rich clay soils, derived mostly from Niobrara and Pierre shale, on relatively flat areas and barren knolls within Grand County. **Occurs only within the planning area,** 7,500 to 7,700 feet |
| **Cold North Park Dunes** | | | | |
| Boat-shaped bugseed | Corispermum navicula | S | KFO | Known only from the cold climate dunes in Northern Colorado. **Known only within the planning area.** |

BLM_0029600

**Table 4.4**
**Habitats for Special Status Plant Species within the Planning Area, Grouped by Habitat Guilds**

| Common Name | Scientific Name | Status | Offices | Habitat Type |
|---|---|---|---|---|
| **Coalmont Formation—North Park** | | | | |
| North Park phacelia | *Phacelia formosula* | FE | KFO | Barren exposures where the Coalmont Formation forms outcrops of sandy soil or ledges. Grows most abundantly on steep, sparsely vegetated and erodible slopes (such as on the sides of deep ravines), within central Jackson County and northwest Larimer County, **almost exclusively within the planning area.** |
| **Riparian and Wet Meadows** | | | | |
| Flaming Gorge evening primrose | *Oenothera acutissima* | S | LSFO, WRFO | Seasonally wet areas in meadows and depressions or along arroyos in mixed conifer forest to sagebrush, on sandy gravelly, or rocky soils 5,300 to 8,500 feet |
| Western prairie fringed orchid | *Platanthera praeclara* | FT | KFO, Routt National Forest | Found in Minnesota, Iowa, Missouri, Nebraska, North Dakota, and Manitoba, Canada. Associated with sedge meadows, primarily within the tallgrass prairie biome, and generally in fire- and grazing-adapted grassland communities. |
| Pale blue-eyed grass | *Sisyrinchium pallidum* | S | KFO | Found in northwest Jackson County and northwest Larimer County. Prefers fens, wet meadows, and stream edges. |
| Ute ladies'-tresses orchid | *Spiranthes diluvialis* | FT | CRVFO, KFO, LSFO, WRFO | Sub-irrigated alluvial soils along streams and in open meadows in floodplains, 4,500 to 7,200 feet |
| **Calcareous Cliff Crevices and Rock Ledges in Coniferous Forest** | | | | |
| Fragile rockbrake | *Cryptogramma stelleri* | S | KFO | Occurs in cool, moist, sheltered calcareous cliff crevices and rock ledges, typically in coniferous forest or other boreal habitats. Has a wide distribution but low abundance within occurrences. |

BLM_0029601

- Special status plant surveys would be conducted at the appropriate time of year for plant identification before any project that could impact any special status plant species or its habitat. In instances where surveys could not be performed, such as in years when annual species do not appear due to annual climatic variability, the presence of special status plant species would be assumed in all potentially suitable habitats, and appropriate conservation measures and protections would be implemented. Section 7 consultations with USFWS would be conducted for any projects with the potential to impact any federally listed plant species. GRSG PHMA and GHMA areas overlap areas of designated critical habitat for two federally listed plant species, Parachute penstemon and DeBeque phacelia.

- The BLM and Forest Service would use the best available science, information, conservation assessments, and related directives as appropriate to guide special status plant management on BLM-administered and National Forest System lands.

- COAs and siting conditions would be applied to all projects near special status plant occurrence sites inside and outside the planning area. NSOs would be applied to all federally listed plant occurrences inside and outside the planning area and to sensitive plant occurrences, to the degree possible.

- If management actions (e.g., grazing, energy development, and travel/recreation) are excluded from PHMA and GHMA, development would occur with increased concentration in non-sagebrush habitats (e.g., barrens, desert shrub, pinyon-juniper, mountain shrub, and spruce-fir), with potential adverse impacts on species that inhabit these habitat types.

- Federal oil and gas regulations prevent the BLM and Forest Service from applying new lease stipulations or additional lease stipulations to existing leases. However, federal regulations do allow the BLM and Forest Service to apply other protection measures in conjunction with planning and implementing oil and gas projects. These include applying stipulations consistent with the most recent LUP as terms and conditions for discretionary approvals (e.g., ROW actions) and applying COAs to augment protections related to lease activities. The latter include requirements for exclosure or temporary construction fencing, botany monitors during construction, dust abatement, site-specific reclamation, weed control with restrictions on herbicide use, and restoration of special status plant species through nursery propagation.

BLM_0029602

*Direct and Indirect Impacts on Special Status Plant Species*

<u>Impacts from Travel Management on Special Status Plant Species</u>

Travel management designates certain areas as closed to motorized vehicle use, open to OHV use, vehicle use limited to existing routes, vehicle use limited to existing routes with seasonal closures, and vehicle use limited to designated routes. The analyzed alternatives include variations from the existing travel management conditions to generally include greater limitations on motorized travel within GRSG habitat, permanent or seasonal road or area closures, limitations on new route construction and realignments, varying restrictions on upgrading existing routes, and restoration of undesignated routes.

*Direct Mortality*. Motorized vehicle use can result in direct mortality to special status plants due to crushing, uprooting, or gradual starvation of plant resources as plants try to recover from repeated vehicle damage. Travel management actions that stop or restrict motorized vehicle use could reduce the risk of direct mortality to special status plants in areas where these plants are present. Upgrading or realigning routes and constructing new routes could result in direct mortality if special status plants were present. Restoring routes would have a low probability for direct mortality, but drill seeding closed routes could crush special status plants if they were present, with a slight risk of direct mortality.

Alternative A—Under the no action alternative, travel management would continue as described in the corresponding field office LUPs. Any direct mortality risks from motorized vehicles would remain unchanged. Because areas of unrestricted cross-country OHV use are permitted under this alternative, it would have the greatest risk of direct mortality to special status plants, particularly those species in habitats where unrestricted motorized use is allowed.

Alternative B—Under Alternative B, motorized travel would be restricted to existing roads, primitive roads, and trails. The need for permanent or seasonal closure of these existing routes would be evaluated. Constructing new routes or upgrading routes would be limited to areas where necessary for safe access to existing ROWs. For any new disturbance exceeding 3 percent for a given habitat area, mitigation would be required to offset loss of GRSG habitat. Undesignated routes would be restored using appropriate seed mixes, and the use of transplanted sagebrush would be considered.

Because this alternative would reduce the area within GRSG habitat where direct mortality from motorized vehicles could occur, this alternative would likely have a reduced risk of direct mortality for special status plants within the PHMA, GHMA, and LCHMA. This would be particularly true for those plants growing in sagebrush and pinyon-juniper habitats. However, it could divert

BLM_0029603

motorized vehicle traffic to sites outside of GRSG habitat and increase the direct mortality risk to special status plant species growing in other habitats.

Alternative C—Alternative C is similar in design and potential direct mortality impacts as Alternative B; however, it would prohibit new road construction within 4 miles of active GRSG leks and would avoid new road construction in occupied GRSG habitat. All existing routes would be upgraded only when necessary for motorist safety. These additional restrictions could provide greater protections to special status plants in sagebrush habitats but could shift the potential mortality risk to species growing in other habitat types.

Alternative D—Alternative D is also similar to Alternative B, except that it has less stringent restrictions on new road construction and road upgrades and allows new disturbance to occur up to a 5 percent disturbance cap without mitigation. This alternative could have a greater risk of direct mortality on special status plants growing in sagebrush habitats, relative to Alternatives B and C.

See *Habitat Restoration*, below.

*Direct Habitat Loss.* Constructing new roads or rerouting existing roads results in direct habitat loss whenever there is potential habitat for a special status species along the route. Cross-country vehicle use can also result in direct habitat loss where vehicles are repeatedly driven across plant habitat, resulting in vegetation loss. The potential for direct habitat loss is therefore contingent on the probability for new road construction or increased cross-country vehicle use resulting in vegetation loss.

Alternative A—Under Alternative A, travel management would continue as described in the corresponding field office LUPs. Direct habitat loss could occur from new road construction. Because areas of unrestricted cross-country OHV use are permitted under this alternative, it would have the greatest risk of direct habitat loss for special status plants. This would be particularly true for those species with habitats in areas where unrestricted motorized use is allowed.

Alternative B—Under Alternative B, motorized travel would be restricted to existing roads, primitive roads, and trails. The need for permanent or seasonal closure of these existing routes would be evaluated. Constructing new routes or upgrading existing routes would be limited to areas where necessary for safe access to existing ROWs. For any new disturbance exceeding 3 percent for a given habitat area, mitigation would be required to offset loss of GRSG habitat. Undesignated routes would be restored using appropriate seed mixes, and the use of transplanted sagebrush would be considered.

Because this alternative would reduce the area within GRSG habitat where direct habitat loss from motorized vehicles could occur, this alternative would likely have a reduced risk of direct mortality for special status plants within the

BLM_0029604

PHMA, GHMA, and LCHMA. This would be particularly true for those growing in sagebrush to pinyon-juniper habitats. However, it could divert motorized vehicle traffic to sites outside of GRSG habitats and increase the direct habitat loss risk for special status plant species growing in other habitat types.

Alternative C—Alternative C is similar in design and potential direct mortality impacts to Alternative B; however, it would prohibit new road construction within 4 miles of active GRSG leks and would avoid new road construction in occupied GRSG habitat. All existing routes would be upgraded only when necessary for motorist safety. These additional restrictions could provide greater protections to special status plants in sagebrush habitats, but they could shift the potential habitat loss risk to species growing in other habitat types.

Alternative D—Alternative D is also similar to Alternative B, except that it has less stringent restrictions on new road construction and road upgrades and allows new disturbance to occur up to a 5 percent disturbance cap without mitigation. This alternative could have a greater risk of direct habitat loss for special status plants growing in sagebrush habitats, relative to Alternatives B and C.

See *Habitat Restoration*, below.

*Habitat Degradation and Disruption to Species.* Impacts of vehicles on established roads or trails can impact many ecological components of plant habitats. Increased dust levels from road traffic, particularly on dirt and gravel roads, can negatively impact plants by clogging openings in the leaves, impeding gas exchange, and reducing the ability of plants to take in carbon dioxide. Dust on the leaf surface can also effectively reduce light availability at the leaf surface. Light and carbon dioxide are both critical for plants to conduct photosynthesis, and reductions in either can reduce the quantity of carbohydrates plants can produce through photosynthesis, thereby reducing plant growth and seed production. Dust on leaf surfaces can also facilitate plant tissue uptake of toxic pollutants (Farmer 1993; Sharifi et al. 1997; Thompson et al. 1984). However, the degree of impact from dust on leaf surfaces is not always measureable in some individual plant species and under some circumstances (Wijayratne et al. 2009).

Dust can also affect snowmelt patterns and resulting hydrology and soil moisture availability, can alter soil pH and nutrient availability, and can result in plant community composition changes (Angold 1997; Auerbach et al. 1997; Field et al. 2010; Gieselman 2010; Johnston and Johnston 2004). Roads and their traffic provide both habitat and transport for noxious weeds and other invasive nonnative plants (Gelbard and Belnap 2003; Larson 2003; Parendes and Jones 2000; Schmidt 1989; Zaenepoel et al. 2006). These nonnative species can negatively impact special status plants, both directly through competition for resources and indirectly through alteration of soil microbial communities

BLM_0029605

(Hierro et al. 2006; Klironomos 2002; Reinhart and Callaway 2006; Vogelsang and Bever 2009).

Herbicide treatments of noxious weeds can also result in negative impacts on or mortality of special status plants if they are collocated (BLM 2007).

Impacts from cross-country vehicles include those associated with vehicle use on established routes. But the degree of these indirect impacts would depend on the amount of vehicle traffic in any given area. Vehicles also provide access for recreation, such as camping, hunting, and hiking. This could have indirect impacts on special status plants farther away from roads. This could result in smashing, trampling, introducing nonnative species, and compacting soil from recreation near roads.

This increase in recreation facilitated by roads could also increase the risk of wildfires from campfires or from sparks generated by vehicles or by camping or wood-cutting equipment. Road closures and subsequent seeding can have both positive and negative impacts on special status plants, depending on the type of vegetation establishing after closures. Use of aggressive nonnative grass species, or even aggressive native grass species, can have negative impacts on special status plants.

Alternative A—Disruption of special status plant species would differ in areas where motorized vehicles remain on established roads and trails and in areas where they are allowed to travel cross country. Potential impacts on particular special status plant species would be contingent on the proximity of roads and cross-country vehicles to plants, road size and amount of traffic, season of use, amount and type of recreation, and individual species and their specific habitat types and ecologies.

Alternative B—Under Alternative B, closing cross-country vehicle use areas within GRSG habitat would reduce the potential for indirect vehicle impacts on special status plants and their habitats within these areas. However, it could increase vehicle use on existing routes. Since habitat degradation and disruption of special status plant species can increase with increased intensity of nearby vehicles, potential impacts on special status plant occurrences near established routes, or outside of sagebrush habitats, could increase.

The types of impacts described under the Alternative A would also occur under Alternative B; however, the distribution of these impacts could shift. Route closures under this alternative would be reseeded using appropriate seed mixes, and the use of sagebrush would be considered. This alternative does not specify that only native species would be seeded. This leaves open the possibility that aggressive nonnative grass species could be used for restoration, and these would have a negative effect on special status plant habitats. Again, actual impacts on special status plants would depend on proximity of plants to motorized vehicles and on the intensity and season of vehicle use.

BLM_0029606

Alternative C—Under Alternative C, the types of potential impacts on special status plants would be the same as for Alternatives A and B; however, this alternative proposes greater protections from roads within a 4-mile buffer around leks. This could provide greater protections for sagebrush habitat plant species but could also shift negative motorized vehicle impacts and cause them to increase in other habitat types. For restoration of closed routes, this alternative specifies that appropriate native seed mixes would be used, as well as transplanted sagebrush. This would reduce the risk of negative impacts on special status plants.

Alternative D—Under Alternative D, the types of potential impacts on special status plants would be the same as for the other three alternatives. However, this alternative would allow for increased road construction and would result in roads being constructed to a higher standard. It would also leave open the possibility of seeding restored routes with nonnative species. Impacts on special status plants would be contingent on how near they are to roads and on road size and amount of traffic. Because of this, Alternative D could result in greater negative impacts on special status plants within sagebrush habitats but potentially fewer impacts on plants growing in other habitat types, relative to Alternatives B or C.

See *Habitat Restoration*, below.

*Pollinator Habitat Fragmentation and Loss.* The importance of pollinator habitat impacts on special status plants varies considerably between individual plant species. For such species as DeBeque phacelia, which appears to be self-pollinated, impacts on pollinator habitat would have no effect. However, most special status plant species are pollinated by insects, including bees, wasps, ants, flies, butterflies, and beetles. For many special status plant species, the pollinator species are unknown (Winder 2012).

Pollinators depend on both appropriate floral communities and on appropriate nesting habitat, and these habitat requirements are often naturally fragmented even in undisturbed sites. However, many pollinators show fidelity to specific habitats, and if these sites become isolated from contiguous habitat by disturbances such as roads, pollinators may be reluctant to cross these barriers to other habitats (Bhattacharya et al. 2002; Osborne and Williams 2001).

Roads and vehicles can negatively impact pollinators by creating barriers, by removing habitat during road construction, and by posing direct mortality through collisions. Fragmentation of pollinator habitat can result in reduced cross-pollination between occurrences of special status plants, with the associated potential for loss of genetic diversity and the associated potential loss of species viability.

Alternative A—Under the No Action Alternative, negative impacts of roads and cross-country vehicles on pollinators would continue. Impacts from cross-

BLM_0029607

country vehicles would likely be less than those from established roads, except in areas where cross-country traffic results in extensive vegetation loss.

Alternative B—Under this alternative, impacts would be similar to Alternative A, but any negative impacts from cross-country traffic would be eliminated within GRSG habitat. Restrictions on new road development would also reduce the potential for negative impacts on pollinators within sagebrush habitats.

Alternative C—This alternative would have similar impacts on pollinators as Alternative B.

Alternative D—This alternative would have similar impacts on pollinators as under Alternatives B and C. However, it would have a somewhat greater risk of pollinator habitat fragmentation and loss due to more lax restrictions on new road construction.

See *Habitat Restoration,* below.

*Habitat Restoration.* Habitat restoration for special status plants could result either from projects specifically designed for particular special status plant habitats or as an indirect effect of other management actions, such as road closures. However, a management action that might be beneficial for a general habitat type would not necessarily be beneficial to special status plant species, since these species usually have very specific habitat requirements.

Alternative A—There would be no special status plant habitat restoration in the context of travel management under this alternative.

Alternative B—There would be some potential for special status plant habitat restoration through the closure of routes within GRSG habitats. However, this restoration would be contingent on the proximity of the restoration site to special status plant habitat and on the particular plant species seeded in the restoration.

Alternative C—This alternative would have some potential for special status plant restoration, contingent on location and species seeded. However, this alternative would require native species for seeding, which would make it somewhat more likely to restore special status plant habitat within sagebrush areas.

Alternative D—This alternative would have a slightly reduced potential for restoration of special status plant habitat relative to Alternative B since it places less emphasis on route closures and does not specifically state that only native species would be used for restoration seeding.

Proposed LUPA—Travel management would be the same under the Proposed LUPA as under Alternative D; therefore, impacts for direct mortality, direct

BLM_0029608

habitat loss, habitat degradation, habitat fragmentation, and habitat restoration from recreation on special status plant species are similar to those under Alternative D.

*Impacts from Recreation Management on Special Status Plant Species*

Direct Mortality/Direct Habitat Loss/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss

While recreation management in general is a complex area with numerous potential impacts on special status plants, the current analysis addresses only recreation special use permitting and seasonal camping prohibitions within 4 miles of active GRSG leks. Permitted uses include SRPs and Forest Service recreational SUAs. These activities are typically larger organized recreational groups and include competitive and noncompetitive events and commercial outfitting services. SUPs can include specific COAs to protect special status plants when appropriate.

Recreation, particularly by large groups, can result in direct mortality to plants from trampling, uprooting, or smashing under tents or other recreation equipment or other forms of direct damage. The risk of direct mortality generally increases as the size of the recreational group increases, but it varies depending on the particular activity, its location, and the plant species potentially impacted. For example, a riparian species, such as Ute ladies'-tresses, would have a greater potential of impact from commercial river rafting than an upland species, and a prickly species, such as Colorado hookless cactus, would likely have a lower risk of being smashed under a tent than a softer textured species. Indirect impacts from these recreation activities can be similar to those described in more detail under travel management. This is because most recreation involves motorized vehicles to access sites, and for some activities, motorized vehicles are integral to the activity itself.

Alternative A—Under this alternative, SRPs and SUAs would continue to be issued on a case-by case basis. The potential for negative impacts on special status plants or their habitats would depend on the types and locations of the permitted activities and the degree to which protections for special status plants were addressed in each case.

Alternative B—Under this alternative, any SRPs or recreational SUAs issued within PHMA would be required to have a neutral or positive effect on this habitat. This could reduce the potential for negative impacts on special status plants or their habitats within the PHMA. Otherwise, the impacts would be identical to Alternative A.

Alternative C—This alternative is identical to Alternative B, except that it would also seasonally prohibit camping within 4 miles of active GRSG leks. Potential negative impacts on special status plants and their habitats would be slightly

BLM_0029609

reduced for those species occurring within 4 miles of active leks, relative to the other alternatives.

Alternative D—This alternative would have potential negative impacts on special status plants and their habitats equivalent to those of Alternative B.

Proposed LUPA—Recreation management under the Proposed LUPA would be the same as under Alternative D; therefore, impacts for direct mortality, direct habitat loss, habitat degradation, habitat fragmentation, and habitat restoration from recreation on special status plant species are similar to those under Alternative D.

*Impacts from Lands and Realty Management on Special Status Plant Species*
This heading addresses utility ROW exclusion and avoidance areas, withdrawal of lands from mineral activity, and retention or disposal of public lands. Developing new ROWs or burial of existing overhead facilities result in ground disturbance, while restricting new ROWs to existing disturbances can reduce the total acreage of disturbance.

Retaining lands under federal ownership provides greater protections for special status plants. Projects with potential impacts on federally listed plants require Section 7 consultation with USFWS when plants are located on federally owned lands or when the project involves accessing federal minerals. Similarly, sensitive plants growing on federal lands or on private or state surface overlying federal minerals receive protections based on agency policies and regulations. Because the State of Colorado has no protections for rare plants, special status plants not connected to federal lands or minerals have no protections in the state; therefore, disposal of federal lands with special status plant occurrences on them would result in loss of protections for these plants.

<u>Direct Mortality/Habitat Loss/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss</u>
Developing ROW exclusion and avoidance areas, relocating utility corridors outside of PHMA, burying existing overhead facilities, and constructing new road, ditch, or other non-utility ROWs would have impacts similar to those addressed more fully under travel management and minerals management. Ground disturbance from utility line installation, particularly buried utilities, is similar to new road construction and pipeline construction from oil and gas development. LUPs, the ESA, and agency policies and regulations protect special status plant species when ground-disturbing activities occur on federal lands or in association with federal minerals. If federal lands are transferred to private or other government ownership, these protections are lost, resulting in a much greater risk of mortality, habitat loss, habitat degradation, and disruption to species and pollinators.

BLM_0029610

Habitat Restoration/Habitat Protection

Restricting development of utility or non-utility ROWs in PHMA would increase habitat protection for special status plant species in sagebrush habitats. However, this could shift potential negative impacts from sagebrush habitat plant species to those special status species occurring in other habitats. Reclamation of habitat immediately following utility installation would help to protect any nearby special status plants or habitat from noxious weed establishment and would be beneficial for these species, as appropriate native plant species are used. Retention of lands in federal ownership continues to provide legal protections for special status plants. Acquisition of new federal lands that have special status plants or habitat, as well as GRSG habitat, would be beneficial for these species.

Summary of Impacts by Alternative

All of the alternatives could negatively impact special status plant species. The variation among alternatives would have more to do with which special status species and habitats would be more likely to receive negative impacts.

Alternative A—Under Alternative A, ROW development and land acquisition and disposal would continue, in accordance with existing LUPs, which would cause the greatest impacts on special status plant species.

Alternative B—Alternative B could provide slightly greater protections for special status plants in GRSG habitats. It would limit total disturbance of these areas to 3 percent, would place new ROWs within existing disturbance to the extent possible, would propose lands within GRSG habitat for mineral withdrawal, would place greater restrictions on disposal of public land parcels to protect GRSG habitat, and would promote acquisition of new lands to enhance GRSG habitat.

Alternative C—Alternative C is similar to Alternative B, but with slightly tighter restrictions to limit new disturbance, protect GRSG habitats, and retain federal landownerships. These restrictions could affect only those special status plant species growing within GRSG habitat.

Alternative D—Alternative D has similar potential impacts on special status plants as Alternatives B and C; however, it would provide slightly lower protections for those species in GRSG habitats. This is because it would allow up to 5 percent disturbance within these habitats, would not propose any lands for mineral withdrawal, and would place fewer restrictions on disposal of isolated federal parcels and less emphasis on land acquisition for conservation, enhancement, or restoration of GRSG habitat.

The Proposed LUPA would manage all PHMA and GHMA as ROW avoidance areas, with exceptions for pending large transmission lines. Additionally, no aboveground structures would be authorized within 1 mile of active leks. Impacts on special status plants from managing lands and realty under the

BLM_0029611

Proposed LUPA are similar to those for Alternative D, with potentially large local impacts where PHMA and GHMA are open for large transmission lines. For the description of impacts from proposed large transmission lines in northwest Colorado, see Cumulative Impacts (**Chapter 5**).

*Impacts from Wind Energy Development on Special Status Plant Species*
In general, wind energy development would require compliance with existing LUPs. Restrictions on wind energy development are specifically addressed only under Alternative C.

Direct Mortality/Habitat Loss/Habitat Degradation and Disruption to Species
Wind energy development would result in ground disturbance impacts similar to those described under the mineral development impact analysis sections of this document. Potential impacts are those from dust, noxious weeds, herbicide application, and alterations of native plant community dynamics described in detail under *Impacts from Management of Travel and Transportation on Special Status Plant Species*. In addition, wind energy could have additional impacts on pollinators if windmill blades were to impact pollinator flight paths or result in pollinator mortality.

Habitat Restoration/Habitat Protection
Wind energy development would provide no benefits in and of itself for special status plant species. Closure of special status plant habitats to wind energy development would protect these plants and their habitats from this disturbance.

Summary of Impacts by Alternative
Alternative A—Under Alternative A the existing LUPs do no specifically address wind energy. Any wind energy development would be permitted in accordance with ROW allocations currently in place.

Alternative B—Alternative B does not specifically address wind energy development; therefore, under this alternative any wind energy development would be managed under the provisions of existing LUPs, and potential impacts on special status plants are identical to those under Alternative A.

Alternative C—Under Alternative C, wind energy development would not be sited within occupied GRSG habitat. This alternative would provide greater protections for special status plant species in occupied GRSG habitat. It would have no additional benefit for special status plant species outside of occupied GRSG habitat. It could increase the potential for negative impacts on these other plants if it were to shift wind energy development from GRSG habitats to other special status plant habitats.

Alternative D—Alternative D does not specifically address wind energy development; therefore, under this alternative, any wind energy development

BLM_0029612

would be managed under the provisions of existing LUPs. Potential impacts on special status plants are identical to those under Alternative A.

Proposed LUPA—Wind energy development would be excluded from PHMA; impacts on special status plant species would be the same as those under Alternative C.

*Impacts from Industrial Solar Energy Development on Special Status Plant Species*
In general, solar energy development would require compliance with existing LUPs. Restrictions on wind energy development are specifically addressed only under Alternative C.

<u>Direct Mortality/Habitat Loss/Habitat Degradation and Disruption to Species</u>
Solar energy development would result in ground disturbance impacts similar to those described under the mineral development impact analysis sections of this document. Potential impacts include those from dust, noxious weeds, herbicide application, and alterations of native plant community dynamics described in detail under *Impacts from Management of Travel and Transportation on Special Status Plant Species*. Additionally, solar energy development would result in a foreseeably permanent loss of plant habitat as solar panels would block sunlight from reaching the ground and thereby would eliminate most plants.

<u>Habitat Restoration/Habitat Protection</u>
Solar energy development would provide no benefits in and of itself for special status plant species. Closure of special status plant habitats to solar energy development would protect these plants by and their habitats from this disturbance.

<u>Summary of Impacts by Alternative</u>
Alternative A—Under Alternative A the existing LUPs do no specifically address solar energy. Any solar energy development would be permitted in accordance with ROW allocations currently in place. Impacts on special status plants would be minimal under this alternative. This would be due to the fact that there is very little development potential for solar energy in the decision area, and there are no solar energy zones identified in the Solar Energy Development Programmatic EIS (BLM 2012) in the decision area.

Alternative B—Alternative B does not specifically address solar energy development; therefore, under this alternative any solar energy development would be managed under the provisions of existing LUPs and potential impacts on special status plants are identical to those under Alternative A.

Alternative C—Under Alternative C, solar energy development would not be sited within occupied GRSG habitat. This alternative would provide greater protections for special status plant species in occupied GRSG habitat. It would have no additional benefit for special status plant species outside of occupied GRSG habitat. It could increase the potential for negative impacts on these

BLM_0029613

other plants if it were to shift solar energy development from GRSG habitats to other special status plant habitat.

Alternative D—Alternative D does not specifically address solar energy development; therefore, under this alternative, any solar energy development would be managed under the provisions of existing LUPs. Potential impacts on special status plants are identical to those under Alternative A.

Proposed LUPA—Solar energy development would be excluded from PHMA; impacts on special status plant species would be the same as those under Alternative C.

*Impacts from Range Management on Special Status Plant Species*

Livestock grazing on BLM lands is currently managed under the guidance of field office LUPs to meet livestock forage needs, while meeting or exceeding BLM Colorado Public Land Health Standards (BLM 1997). These standards also address special status, threatened, and endangered species and their habitats. Periodic land health assessments monitor range conditions and management success in meeting the BLM Colorado Public Land Health Standards.

Livestock grazing can significantly alter plant community composition and densities, depending on how it is managed. Different grazing regimes impact particular plant species and habitat types differently, with some species favored by particular regimes and other species responding negatively. Alternatives analyzed in this document are intended to favor plant communities desirable for GRSG at different stages of its life cycle.

The potential impacts on special status plants from these proposed modifications of grazing regimes would be species specific and site specific, depending on species ecophysiology, species palatability to livestock, soil and moisture conditions. They would also depend on current plant community composition, including presence and densities of noxious weeds and other nonnative plant species, such as nonnative range grasses deemed desirable for livestock grazing. Also, Section 7 consultation has occurred and would continue to occur as needed regarding potential impacts of range management on federally listed plants (BioLogic 2012).

Direct Mortality

Direct mortality of special status plants resulting from range management can occur from livestock trampling or ingesting plants or by workers removing plants while installing range improvements, such as fences, stock ponds, wells, water pipelines, cattle guards, and corrals. The risk of trampling increases greatly in areas where cattle congregate, such as near water sources and salting stations, along fence lines and trailing routes, and near corrals. Riparian areas are particularly vulnerable to livestock trampling since the presence of water, forage, and shade all draw animals to these areas, where use becomes concentrated and vegetation damage ensues (Fitch and Adams 1998).

BLM_0029614

Trampling impacts are generally greater in sparsely vegetated soils when they are wet, as these areas lack dense plant rooting matrices to support the weight of livestock. Livestock hooves can punch deeply into these wet soils, which increases the risk of mortality to small rare plant species, such as DeBeque phacelia.

Direct Habitat Loss

Direct habitat loss is most likely to occur as a result of range improvements, such as stock ponds, corrals, salting stations, wells, and water lines. It also occurs in areas where livestock congregate, such as near water and salt sources, along fence lines and trailing routes, and in corral areas.

Habitat Degradation and Disruption to Species

The indirect impacts of livestock grazing on special status plant species can be overt and easily quantified, such as in degradation of riparian areas. Alternately, it can be subtle and more difficult to quantify, such as in alteration of soil nutrient availability due to trampling of microbiotic soil crusts, alterations of soil microbial community composition, or shifts in plant species' competitive abilities within overall plant community dynamics.

A common indirect impact of livestock grazing is the introduction and spread of noxious weeds and other nonnative plant species. Noxious weed seeds can attach themselves to animal fur or can be embedded in mud on animal hooves and be spread to new sites. Trampled areas create disturbed sites ideal for weed establishment and proliferation. Potential impacts of weeds and of herbicides used to treat weeds on special status plants are described in more detail under *Impacts from Management of Travel and Transportation on Special Status Plant Species*.

Livestock grazing of special status plant species can negatively impact these plants even if grazing does not result in direct mortality. From some special status plant species, the risk of livestock herbivory is quite low, such as with Colorado hookless cactus or DeBeque phacelia, while the potential of herbivory is more likely for other species, such as Harrington's penstemon.

Nonfatal herbivory can reduce plant reproduction success since energy that might otherwise go to flowering and seed production must be used to replace plant tissue lost to herbivory (Hickman and Hartnett 2002).

Livestock also trample and damage biological soil crusts, which can result in lost soil stability, alteration of soil permeability to water, changes in soil temperatures, reduced plant-available nutrients, reduced soil carbon with related impacts on soil microbial communities, and alteration of plant community composition (Belnap et al. 2001). Some of the soil nutrient loss resulting from biological soil crust impacts comes from reduced nitrogen fixation within the crusts themselves, while other nutrients are lost to wind erosion when the stabilizing capability of the crusts is lost (Neff et al. 2005).

BLM_0029615

Grazing impacts on plants can also reduce mycorrhizal colonization of their roots. Most plant species depend on mycorrhizae to enhance nutrient availability to their roots, and certain fungi are dependent on their host plant for the carbon they require to survive. Because of this, grazing can indirectly impact this important component of the soil microbial community (Trent et al. 1988). Mycorrhizal losses can lead to a feedback loop, resulting in the decline of native plants and an increase of nonnative plants. This loss would be worsened where non-mycorrhizal noxious weeds are already established (Vogelsang and Bever 2009).

Livestock grazing can also alter plant community composition through selective grazing. Ungulates graze more heavily on preferred plant species, causing these species to decrease and allowing less preferred or avoided species to increase (Augustine and McNaughton 1998; Cagney et al. 2010; Milchunas and Noy-Meir 2004). These shifts can be positive, negative, or neutral to special status plant species, depending on how the increasing or decreasing plant species interact with the special status plant species.

Species growing in barren sites with few other species may experience little of this effect, while species growing with other species desirable to livestock, such as in sagebrush communities, or in wetland or riparian areas could be more heavily impacted. Plant communities can also be altered intentionally by range management practices, such as seeding nonnative grasses, which withstand grazing pressure but also compete with native species and reduce plant community diversity. These species are smooth brome (*Bromus inermis*), intermediate wheatgrass (*Thinopyrum intermedium*), crested wheatgrass (*Agropyron cristatum*), timothy (*Phleum pratense*), and orchardgrass (*Dactylis glomerata*). Aggressive native range species, such as western wheatgrass (*Pascopyrum smithii*), seeded near special status plant species can also have negative impacts if they encroach on the rare plant habitat and become a source of competition for resources.

Management of rangelands for sustained forage availability can also result in loss of species diversity, with a potential loss of rare plant species (Fuhlendorf et al. 2012). Fragmentation of rare plant habitat can result in declines of special status species, although how any single species might respond to livestock grazing generally cannot be predicted with the available data (Pueyo et al. 2008).

Pollinator Habitat Fragmentation and Loss
The interactions between range management and insect pollinators for special status plant species can be complex. The direct and indirect impacts of livestock grazing on plants, as described above, can have indirect impacts on insect pollinators, particularly bees. Trampling can also have negative impacts on pollinator nesting sites, destroying active nests and causing soil compaction when can prevent new nest construction.

BLM_0029616

Modification of water sources, such as constructing steep-sided stock ponds, can modify water availability for bees since they need to position themselves at the edge of shallow water to drink (Kearns and Inouye 1997). The need to create steep-sided watering areas to reduce mosquito populations and the risk of West Nile disease in GRSG can be at odds with the water needs of bee pollinators. Because special status plants are often pollinated by generalist pollinators, who rely on a diversity of plant species, the overall plant community is important for retaining pollinators needed by special status plants. Livestock grazing can therefore affect pollinator availability for special status plants (Potts et al. 2003).

In areas with established noxious weeds and other invasive species, pollinators can become dependent on these otherwise undesirable species. In these instances, removing noxious weeds to improve range quality can negatively impact special status plants by negatively impacting pollinators. These types of interactions between livestock and special status plants vary among the different special status plant species, depending on which pollinators they depend on and the existing site conditions. For self-pollinating species, such as DeBeque phacelia, pollinator impacts are unimportant.

Habitat Restoration
In very specific instances, livestock grazing can be useful in restoring habitat for special status plants. In areas where noxious weeds have invaded nearby or within special status plant occurrences, use of herbicide to treat the weeds may be precluded due to the probability of also killing the protected plants. Closely controlled, targeted, livestock grazing may be a viable tool for habitat restoration in these instances. Similarly, in areas where nonnative range grasses or highly competitive native grasses have been introduced into rare plant habitat, livestock grazing may be important in controlling or eliminating competition and habitat altering impacts of these introduced species. Carefully controlled livestock grazing at the appropriate time of year could be beneficial for particular special status plant species, such as Ute ladies'-tresses, if it reduces competition from other native plant species without harming the rare plants.

Habitat Protection
Areas occupied by special status plants, and where special status plant habitats are intact, are protected when they are closed to livestock grazing. Closure of these areas in order to protect GRSG habitat would therefore be beneficial to special status plants.

Summary of Impacts by Alternative
The current management focuses on sustainable management of range resources for both livestock grazing and for special status species. The analyzed alternatives vary somewhat in their details, but all have the same objectives, as follows:

BLM_0029617

- Maintaining residual plant cover to reduce GRSG predation during nesting

- Avoiding GRSG habitat changes due to herbivory

- Avoiding direct impacts of herbivores on GRSG such as trampling

- Avoiding altering GRSG behavior due to the presence of herbivores

- Avoiding impacts on GRSG from structures associated with range management

- Maintaining and developing agreements with partners consistent with these objectives

Alternative A—Under Alternative A, range management would continue in accordance with existing LUPs. Periodic land health assessments would be performed to monitor range health and potential grazing impacts on special status plants. Impacts on special status plants are the greatest under this alternative.

Alternative B—Alternative B would emphasize restoration of GRSG habitats, including upland sagebrush, wet meadow, and riparian areas, particularly in those sites with a high potential for successful restoration. This could include restoring areas currently dominated by nonnative range grasses and returning them to sagebrush habitat. This would provide greater benefit to special status plant habitats within these areas than Alternative A. However, it would authorize new water development for diversion from spring or seep sources when GRSG would benefit. This could have negative impacts on special status plants if occurrences or habitat are in the vicinity of these developments.

Alternative C—Alternative C is similar to Alternative B but would provide slightly more stringent habitat protections and would not authorize any new water diversion developments within GRSG habitat. Alternative C would also exclude livestock grazing in ADH, which would be benefit special status plant species whose habitat is coincident with grazing allotments. This would provide better protection for special status plants than Alternative B.

Alternative D—Alternative D is similar to Alternative B but would be slightly less restrictive of range management and range improvement developments. It would provide slightly less protection for special status plant habitats than Alternative B, but greater protections than Alternative A.

Proposed LUPA—This would be slightly more restrictive than Alternative D in that sheep bedding, livestock trailing, and related activities would be more closely controlled. Moreover, those activities would be less likely to impact special status plants. Otherwise, the impacts of this alternative would be the same as those for Alternative D.

BLM_0029618

*Impacts from Wild Horse Management on Special Status Plant Species*

Management is targeted toward maintaining wild horse populations within established appropriate management level. Adjustments are made to the appropriate management level based on monitoring data, rate of herd increase, frequency of gathers, herd genetics, other management options, and competing uses.

<u>Direct Mortality/Direct Habitat Loss/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss</u>

Potential direct and indirect negative impacts of wild horses on special status plants are generally similar to those of livestock grazing. There are likely differences in grazing patterns, congregation areas, and species-specific impacts relative to special status plant species. However, insufficient data exists to adequately analyze these differences; therefore, for purposes of this analysis, the potential negative impacts of wild horses are considered to be essentially the same as for livestock but with a few exceptions. Overall, the wild horse appropriate management levels are lower in number than livestock numbers within grazing allotments. However, they are on the range year-round and their distributions are generally less controlled than the distributions of livestock. As a result, lesser impacts overall might be expected from wild horses than from livestock, but greater impacts per individual animal might be anticipated since they are on the range year-round.

<u>Habitat Restoration/Habitat Protection</u>

Similar to cattle and sheep, wild horses selectively feed on preferred plant species and avoid other species. Since they may graze more heavily on nonnative range grasses, such as smooth brome, intermediate wheatgrass, orchardgrass, timothy, and crested wheatgrass, they may have some benefit to special status plant species by keeping these exotic species in check. Because their movements are mostly unregulated, wild horses probably have little or no potential for habitat restoration through targeted grazing of noxious weeds.

<u>Summary of Impacts by Alternative</u>

The overall goals of the analyzed alternatives are to avoid reductions in grass, forb, and shrub cover and to avoid increasing unpalatable forbs and invasive plants, such as cheatgrass.

Alternative A—Under Alternative A, management of wild horse herds would continue under the direction of existing LUPs. Impacts on special status plants would be the greatest under this alternative.

Alternative B—Under Alternative B, wild horse management would be modified to emphasize protection of GRSG habitats. This alternative would provide slightly greater protections for special status plants occurring within GRSG habitats than would Alternative A.

BLM_0029619

Alternative C—Alternative C would be essentially identical to Alternative B, with the same level of protections for special status plants.

Alternative D—Alternative D would place greater emphasis on range management for GRSG and other uses than on wild horses. While it might provide a slight reduction in negative impacts from wild horses on special status plants than would Alternatives B and C, this could be offset by the relatively greater impacts from other range uses in lieu of wild horse use than would Alternatives B and C.

For the Proposed LUPA, wild horse management would be the same as under Alternative D; impacts are therefore the same as those under Alternative D.

*Impacts from Fluid Minerals Management on Special Status Plant Species*
Fluid minerals management includes several types of ground-disturbing activities, including seismic exploration, well and hydraulic fracturing facility construction, cuttings disposal sites, roads, buried pipelines, and temporary surface pipelines. Temporary reclamation occurs on portions of the initial well pad disturbance area following drilling, with final reclamation on completed pipelines and at well pads following well closure. Reclaimed and temporarily reclaimed areas are reopened frequently as new wells are drilled on existing pads and new pipelines are installed along existing pipeline corridors.

<u>Direct Mortality/Direct Habitat Loss</u>
Directly mortality to special status plants occurs when plants are growing within the disturbance area for any of the roads, pads, pipelines, or associated facilities. In many instances, roads and facilities can be moved sufficiently to avoid direct mortality, but this is not always possible. Direct habitat loss often occurs even when direct mortality of plants is avoided, and it can have long-term impacts for the species. Mortality and habitat loss are greater risks for species with locally abundant occurrences within areas of high development potential for fluid minerals, such as Harrington's penstemon. Restrictions on fluid minerals development within GRSG habitat would reduce the risk of direct mortality for special status plants growing within these areas; however, it would likely shift these impacts on other special status plant species and increase the risk of mortality and habitat loss for non-sagebrush habitat species.

<u>Habitat Degradation and Disruption to Species/Pollinator Habitat Fragmentation and Loss</u>
The types of potential negative impacts of fluid minerals management on special status plant and pollinator habitats are essentially the same as those described for roads under *Impacts from Management of Travel and Transportation on Special Status Plant Species*. Impacts from fluid minerals management are in addition to those of roads and cause an increased cumulative negative impact on special status plants. The focus on selectively protecting GRSG habitats would shift relative impact levels away from sagebrush habitat plant species and onto plant species growing in other habitat types.

BLM_0029620

Habitat Restoration

Habitat restoration COAs are attached to all drilling permits, with specific requirements regarding approved species for seeding, weed management requirements, and protections for any special status species or habitats near the developed areas. The potential to adequately restore habitat for special status plant species following disturbance varies across species and habitat types. Some species, such as Harrington's penstemon, have higher potential for habitat restoration, while others, such as DeBeque phacelia, have very specific soil requirements that cannot be restored after disturbance.

Habitat Protection

When all development from fluid minerals can be kept at least 984 feet from any special status plant or suitable habitat for these species, the habitat can generally be protected. However, there may be some indirect impacts that extend beyond this 984-foot buffer, such as dust, herbicide drift, and pollinator impacts.

Summary of Impacts by Alternative

All of the analyzed alternatives would provide basic protections and mitigations for special status plants under existing LUPs, agency regulations and policies, and ESA compliance. All of the action alternatives would shift development impacts away from GRSG habitats and into other habitats.

Alternative A—Under Alternative A, fluid minerals are managed in compliance with existing LUPs. Surveys for special status plants and noxious weeds are required before any ground-disturbing activity. Use of existing disturbance areas is encouraged whenever possible. Developments are sited away from special status plants to the extent possible, and all permits contain COAs requiring management of noxious weeds, restoration with native plant species, and other project-specific plant protections and mitigations as appropriate.

Alternative B—All of the protections listed under Alternative A would also be implemented under Alternative B. However, this alternative would provide greater protections from ground disturbance within GRSG habitats, so it would provide greater protections for special status plants within these areas.

Alternative C—Alternative C is very similar to Alternative B, but it would provide greater protections because restrictions extend to ADH and include efforts to close existing leases within these habitats, if possible.

Alternative D—Impacts from Alternative D are similar to those under Alternative B, with slightly greater potential for ground disturbance. This is because Alternative D includes a 5 percent, rather than a 3 percent for Alternative B, disturbance cap. Under the Proposed LUPA, no new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA. No modifications or waivers would be permitted. The BLM Authorized Officer may grant an exception to this NSO stipulation only where the proposed action were to result in the following:

BLM_0029621

1. It would not have direct, indirect, or cumulative effects on GRSG or its habitat

2. It is proposed to be an alternative to a similar action occurring on a nearby parcel and would provide a clear conservation gain for GRSG

Exceptions based on conservation gain (2, above) may be considered only in PHMA of mixed ownership, where federal minerals underlie less than fifty percent of the total surface, or in areas of public lands where the proposed exception is an alternative to an action occurring on a nearby parcel subject to a valid federal fluid mineral lease as of the date of this RMP (revision or amendment). Exceptions based on conservation gain must also include measures, such as enforceable institutional controls and buffers, sufficient to allow the BLM to conclude that such benefits would last for the duration of the proposed action's impacts.

> *Any exceptions to this lease stipulation may be approved by the Authorized Officer only with the concurrence of the State Director. The Authorized Officer may not grant an exception unless the applicable state wildlife agency, the USFWS, and the BLM unanimously find that the proposed action satisfies (i) or (ii). Such finding shall initially be made by a team of one field biologist or other GRSG expert from each respective agency. In the event the initial finding is not unanimous, the finding may be elevated to the appropriate BLM State Director, USFWS State Ecological Services Director, and state wildlife agency head for final resolution. In the event their finding is not unanimous, the exception will not be granted. Approved exceptions will be made publically available at least quarterly.* (**Appendix D**, Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations)

Disturbances would be limited to 3 percent or 1 disturbance per 640 acres density of PHMA in each Colorado Management Zone, with no new leasing allowed if the disturbance cap were to exceed this amount.

Proposed LUPA—No new leasing would be permitted within 1 mile of active leks, and no new surface occupancy would be allowed in PHMA (see exception criteria below) and within 2 miles of active leks in GHMA (see **Appendix D**).

The Proposed LUPA would provide more protections than Alternatives A and D to special status plant species that coincide with GRSG and its habitat. Because all PHMA would be managed as No Surface Occupancy, with very rare potential for exceptions, impacts would be similar to those for Alternative B. The potential for direct habitat loss and indirect impacts is similar to that under Alternative B.

BLM_0029622

*Impacts from Solid Minerals—Coal Management on Special Status Plant Species*
Coal management ground disturbance is generally larger in area for surface mining than for underground mining. Disturbed areas include mine sites, facilities locations, and access roads. Mines are generally open for a period during active mining, then closed and reclaimed.

<u>Direct Mortality/Direct Habitat Loss/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss</u>
The potential negative impacts on special status plants and their pollinators from coal management would be similar to those for fluid minerals management and are also described more fully under *Impacts from Management of Travel and Transportation on Special Status Plant Species* and *Impacts from Fluid Minerals Management on Special Status Plant Species*.

<u>Habitat Restoration/Habitat Protection</u>
Habitat restoration and protection considerations would be similar to those for fluid minerals management and are described in more detail under *Impacts from Fluid Minerals Management on Special Status Plant Species*.

<u>Summary of Impacts by Alternative</u>
All of the analyzed alternatives would provide basic protections and mitigations for special status plants under existing LUPs, agency regulations and policies, and ESA compliance. All of the action alternatives would shift development impacts away from GRSG habitats and into other habitats.

Alternative A—Under Alternative A, coal management occurs in compliance with existing LUPs. Surveys for special status plants and noxious weeds are required before any ground-disturbing activity. Use of existing disturbed areas is encouraged whenever possible. Developments are sited away from special status plants to the extent possible, and all permits contain COAs requiring management of noxious weeds, restoration with native plant species, and other project-specific plant protections and mitigations, as appropriate.

Alternative B—All of the protections listed under Alternative A would also be implemented under Alternative B. However, this alternative would place greater restrictions on surface-disturbing activities within GRSG habitats, and thus provide greater protections for special status plants occurring within these areas.

Alternative C—Alternative C would provide essentially the same protections as Alternative B.

Alternative D—Alternative D is very similar to Alternatives B and C, but it would have greater reduced limitations on allowable disturbance area within GRSG habitats than Alternatives B and C.

Proposed LUPA—Impacts would be similar to those for Alternative D. However, additional restrictions on land use and other authorizations would be included for the Proposed LUPA, including restricting surface disturbance to 3 percent in PHMA. Impacts on special status plant species are similar to those for Alternative D, with slightly greater protections for special status plants due to increased restrictions on disturbance and disruption.

*Impacts from Locatable Minerals Management on Special Status Plant Species*
The types of ground disturbance from locatable minerals would be similar to those from coal management, as described above.

<u>Direct Mortality/Direct Habitat Loss/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss</u>
Potential negative impacts on special status plants from locatable minerals would be similar to those described for coal management. In-depth analysis of potential impacts are described more fully under *Impacts from Management of Travel and Transportation on Special Status Plant Species* and *Impacts from Fluid Minerals Management on Special Status Plant Species*.

<u>Habitat Restoration/Habitat Protection</u>
Habitat restoration and protection considerations would be similar to those for fluid minerals management and are described in more detail under *Impacts from Fluid Minerals Management on Special Status Plant Species*.

<u>Summary of Impacts by Alternative</u>
All of the analyzed alternatives would provide basic protections and mitigations for special status plants under existing LUPs, agency regulations and policies, and ESA compliance. All of the action alternatives would shift development impacts away from GRSG habitats and into other habitats.

Alternative A—Under Alternative A, locatable minerals are managed according to existing LUPs. Surveys for special status plants and noxious weeds are required before any ground-disturbing activity. Use of existing disturbance areas is encouraged whenever possible. Developments are sited away from special status plants to the extent possible, and all permits contain COAs, requiring management of noxious weeds, restoration with native plant species, and other project-specific plant protections and mitigations as appropriate.

Alternative B—All of the protections listed under Alternative A would also be implemented under Alternative B. However, this alternative would place greater restrictions on surface-disturbing activities within GRSG habitats, so it would provide greater protections for special status plants in these areas.

Alternative C—Alternative C would provide essentially to same protections as Alternative B.

BLM_0029624

Alternative D—Alternative D is very similar to Alternatives B and C, but it would have more reduced limitations on allowable disturbance area within GRSG habitats that would Alternatives B and C.

Proposed LUPA—Management of locatable minerals would be the same under the Proposed LUPA as under Alternative D; impacts are the same as under Alternative D, above.

*Impacts from Nonenergy Leasable Minerals Management on Special Status Plant Species*
The types of ground disturbance from leasable minerals would be similar to those from coal management, as described above.

<u>Direct Mortality/Direct Habitat Loss/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss</u>
Potential negative impacts on special status plants from leasable minerals would be similar to those described for coal management. In depth analysis of potential impacts are described more fully under *Impacts from Management of Travel and Transportation on Special Status Plant Species* and *Impacts from Fluid Minerals Management on Special Status Plant Species.*

<u>Habitat Restoration/Habitat Protection</u>
Habitat restoration and protection considerations would be similar to those for fluid minerals management and are described in more detail under *Impacts from Fluid Minerals Management on Special Status Plant Species.*

<u>Summary of Impacts by Alternative</u>
All of the alternatives would provide basic protections and mitigations for special status plants under existing LUPs, agency regulations and policies, and ESA compliance. All of the action alternatives would shift development impacts away from GRSG habitats and into other habitats.

Alternative A—Under Alternative A, leasable minerals are managed according to existing LUPs. Surveys for special status plants and noxious weeds are required before any ground-disturbing activity. Use of existing disturbed areas is encouraged whenever possible. Developments are sited away from special status plants to the extent possible, and all permits contain COAs, requiring management of noxious weeds, restoration with native plant species, and other project-specific plant protections and mitigations as appropriate.

Alternative B—All of the protections listed under Alternative A would also be implemented under Alternative B. However, this alternative would place greater restrictions on surface-disturbing activities within GRSG habitats, so it would provide greater protections for special status plants occurring within these areas.

BLM_0029625

Alternative C—Alternative C would provide essentially to same protections as Alternative B.

Alternative D—Alternative D is very similar to Alternatives B and C, but it would have more reduced limitations on allowable disturbance area within GRSG habitats than would Alternatives B and C.

Proposed LUPA—No new nonenergy mineral leasing would be allowed in PHMA. Impacts on special status plants from managing nonenergy leasable minerals are similar to those under Alternative B, above.

*Impacts from Salable Mineral Management on Special Status Plant Species*

<u>Direct Mortality/Habitat Degradation and Disruption to Species and Pollinator Habitat Fragmentation and Loss</u>
Potential negative impacts on special status plants from salable minerals would be similar to those described for coal management. In-depth analysis of potential impacts are described more fully in under *Impacts from Management of Travel and Transportation on Special Status Plant Species* and *Impacts from Fluid Minerals Management on Special Status Plant Species*.

<u>Habitat Restoration/Habitat Protection</u>
Habitat restoration and protection considerations would be similar to those for fluid minerals management and are described in more detail under *Impacts from Fluid Minerals Management on Special Status Plant Species*.

<u>Summary of Impacts by Alternative</u>
All of the analyzed alternatives would provide basic protections and mitigations for special status plants under existing LUPs, agency regulations and policies, and ESA compliance. All of the action alternatives would shift development impacts away from GRSG habitat and into other habitat.

Alternative A—Under Alternative A, salable minerals would be managed according to existing LUPs. Surveys for special status plants and noxious weeds are required before any ground-disturbing activity. Use of existing disturbed areas is encouraged whenever possible. Developments would be sited away from special status plants to the extent possible, and all permits would contain COAs, requiring management of noxious weeds, restoration with native plant species, and other project specific plant protections and mitigations as appropriate.

Alternative B—All of the protections listed under Alternative A would also be implemented under Alternative B; however, this alternative would place greater restrictions on surface-disturbing activities within GRSG habitats, so it would provide greater protections for special status plants in these areas.

BLM_0029626

Alternative C—Alternative C would provide essentially the same protections as Alternative B.

Alternative D—Alternative D is very similar to Alternatives B and C, but it would have more reduced limitations on allowable disturbance area within GRSG habitats than would Alternatives B and C.

Proposed LUPA—Mineral material sales would be prohibited within PHMA; mineral material sales would be considered only if the overall impact on GRSG would be greater if it were not allowed on federal land. The management of mineral material sales under this alternative is similar to that for Alternative B, and the impacts are similar to those for Alternative B.

*Impacts from Fuels Management on Special Status Plant Species*
Fuels management projects can be designed to reduce fuel loading with one or more of the following goals:

- Prevention of high intensity, high severity fires that might threaten developed areas

- Prevention of high severity fires, beyond the normal range of fire severity for a given habitat, which could threaten the survival of special status species

- Reestablishment of fire regimes to those prior to Euro-American contact

- Restoration of fire-adapted habitats impacted by past fire suppression

Fuels management can consist of mechanical fuel removal, prescribed burning, or managing naturally caused wildfires for habitat improvement or fuels management. Different habitat types have evolved with different average fire return intervals and rotations, and individual plant species and communities respond differently to fire. Fire regimes prior to Euro-American contact were artificially altered in many habitat types, although some habitats have likely seen little alteration, such as barrens, rocky habitats, wetlands, and upper subalpine to alpine habitats. Causes of fire regime shifts in impacted habitats are as follows:

- Disrupting Native American burning

- Removing trees for railroad ties during railroad construction

- Removing trees near early settlements for building and mine construction and firewood

- Increasing accidental fire starts from human activities during the early settlement period

BLM_0029627

- Reducing range fires from heavy livestock grazing and resulting removal of fine fuels

- Actively suppressing fires after 1910

- Establishing invasive plant species (particularly cheatgrass), which alter fire regimes

Climate change also plays a part in shifting fire regimes.

Sagebrush communities are among those heavily impacted by these changes, particularly by the impacts of historic heavy livestock grazing, fire suppression, introduction of cheatgrass, and expansion of native pinyon-juniper woodland into sagebrush areas. For this analysis, mechanical fuels treatment impacts on special status plants are covered under GRSG habitat restoration. The fuels management section is focused primarily on fire impacts.

<u>Direct Mortality</u>
Direct mortality of special status plants due to fire can occur either from lethal surface flames or from lethal soil heating. Different plant species have differing abilities to survive fire (Brown and Smith 2000). Some species grow in habitats with natural fire breaks or with such low fuel loading that they effectively do not experience fire; therefore, these species have not adapted to survive fire. At the same time, they are also unlikely to suffer direct mortality from prescribed fire if there continue to be inadequate fuels to carry fire. Special status species in this category include Parachute penstemon, DeBeque phacelia, Dudley Bluffs twinpod, and boat-shaped bugseed (see **Table 4.4**).

However, if nonnative species, such as cheatgrass, invade these habitats, they may create enough fuel loading to carry lethal fire to the special status species. One species of particular concern in this context is Colorado hookless cactus, whose desert scrub habitat now has extensive cheatgrass establishment. Under these conditions, either prescribed fire or wildfire could destroy the cactus.

Grassland species are often well adapted to periodic fire, and many areas now dominated by sagebrush were dominated by grasses before intensive livestock grazing (Baker 2006). Special status plant species occurring within this habitat type may in general be well adapted to survive and resprout or germinate following fire. However, if woody species' densities have increased sufficiently above the norm, fire in these systems could become lethal to special status plants.

Fuels management, which strives for a 15 percent canopy cover of sagebrush, could be beneficial for special status plants in these habitats, as this could prevent higher severity wildfires with a higher likelihood of plant mortality. Special status plants growing within pinyon-juniper forests, such as Naturita milkvetch, may also have a higher risk of mortality with fire. Historic fire return intervals in western Colorado pinyon-juniper woodlands have been estimated at

BLM_0029628