Activity level plans (see Table 1.2) that have been developed as additional NEPA decisions tiered to the 1985 RMP will be reviewed for consistency with the FEIS ROD, and will be carried forward and/or updated, as necessary, in order to implement the plan level decisions made.

**Table 1.2 - Activity Level Plans Developed under the San Juan/San Miguel RMP**

| Activity Plan | Potential Changes as a Result of RMP Revision |
|---|---|
| Perins Peak Wildlife Habitat Management Plan | Revise, as necessary, in order to reflect plan level decisions. |
| Spring Creek Basin Wild Horse Herd Management Area Plan | Revise, as necessary, in order to reflect plan level decisions. |
| Dolores River Corridor Management Plan | Revise, as necessary, in order to reflect plan level decisions. |
| San Miguel Gunnison Sage-Grouse Conservation Plan | Revise, as necessary, in order to reflect plan level decisions. |
| Grandview Ridge Coordinated Resource Management Plan | Revise, as necessary, in order to reflect plan level decisions. |
| American Flats/Silverton & Lower Lake Fork Special Recreation Area Management Plan and Cultural Resource Management Plan | Revise, in conjunction with the Gunnison Field office. Update with ecological resource objectives. |
| Spring Creek Basin/Disappointment Valley Erosion and Salinity Control Watershed Activity Plan | Revise, as necessary, in order to reflect plan level decisions. |
| Dry Creek Coordinated Resource Management Plan | Revise, as necessary, in order to reflect plan level decisions. |
| Cunningham Creek Integrated Activity Plan | Completed. |

### 1.3.2   THE EXISTING USFS SAN JUAN NATIONAL FOREST LAND MANAGEMENT PLAN

The Land and Resource Management Plan for San Juan National Forest (1983) provides management direction for the San Juan National Forest and its three Ranger Districts:  Dolores, Columbine, and Pagosa.

The Land Management Plan for the San Juan National Forest (1983) has been amended 21 times, including in:
- July 30, 1986, with Amendment No. 1 (which added a recreation appendix);
- July 30, 1986, with Amendment No. 2 (which allowed minor changes to timing of projects);
- January 1, 1987, with Amendment No. 3 (which revised the timber sale schedule);
- August 14, 1987 with Amendment No. 4 and No. 5 (which changed management area prescriptions related to the East Fork Ski Area proposal);
- January 6, 1989 with Amendment No. 6 (which adjusted management area boundaries in La Plata Canyon);
- January 6, 1989 with Amendment No. 7 (which incorporated direction from the BLM San Juan/San Miguel Resource Management Plan into the Forest Plan for an area of land transferred from the BLM to the Forest Service on October 31, 1983);
- January 6, 1989 with Amendment No. 8 (which amended wildlife standards and guidelines [rescinded on April 28, 1989]):
- September 7, 1990 with Amendment No. 9 (which adjusted management area boundaries on the Pine [now Columbine] Ranger District);

BLM_0030134

- September 7, 1990 with Amendment No. 10 (which adjusted management area boundaries on the Mancos [now Dolores] Ranger District);
- September 7, 1990 with Amendment No. 11 (which adjusted management area boundaries on the Dolores Ranger District);
- September 15, 1991 with Amendment No. 12 (which removed the seven-year regeneration requirement for lodgepole pine from the Forest Direction);
- July 31, 1991 with Amendment No. 13 (which changed program budget projections);
- May 14, 1992, with Amendment No. 14 (which created a new version of the Forest Plan that superseded the original plan, and incorporated all thirteen earlier amendments; as well as adjusted management areas, lands suited for timber production, and allowable sale quantity and program harvest levels for timber);
- February 21, 1992, with Amendment No. 15 (which changed direction for animal damage management activities on the Forest);
- October 10, 1992, with Amendment No. 16, (which made adjustments to the budget requirement in order to incorporate changes to the timber program goals, objectives, and standards and guidelines issued through Amendment #14);
- December 1992, with Amendment No. 17, (which approved the route for the Trans-Colorado Natural Gas Transmission line on the San Juan);
- December 1992, with Amendment No. 18 (which adjusted the management area prescriptions and designation of Falls Creek Archeological Area);
- February 24, 1994, with Amendment No. 19 (which established management direction for the newly acquired Piedra Valley Ranch lands);
- April 9, 1997, with Amendment No. 20 (which changed the prescribed fire plan); and
- August 3, 1998, with Amendment No. 21, (which changed Wilderness Management Direction).

### 1.3.3   EXISTING USFS OIL AND GAS LEASING

USFS-administered lands in the planning area have been managed for leasing under the analysis and decision for the 1983 San Juan National Forest LMP.  Under the LMP, 1,367,769 acres were open for leasing, mostly under standard lease terms.  Approximately 95,529 acres are currently leased.

USFS-administered lands in the planning area currently are not being leased due to new information and changed circumstances requiring more up-to-date NEPA analysis.  Analysis is needed in order to identify areas available for leasing and subsequent development in a manner compatible with other resource needs.

BLM_0030135

## 1.4     THE PLANNING PROCESS

In general, the USFS and the BLM follow the planning process outlined below. Steps 1 through 7 have been completed for the current process. The results of these steps have been incorporated throughout this DLMP/DEIS, and are as follows:

- ***Step 1 – Planning Issues Identified***: Issues and concerns are identified through a scoping process that includes the public, special interest groups, Native American tribes, other Federal agencies, and State and local governments.

- ***Step 2 – Planning Criteria Development***: Planning criteria are created to ensure that decisions are made to address the issues pertinent to the planning effort.

- ***Step 3 – Data and Information Collection***: Based on planning criteria, data and information for the resources in the planning area are collected.

- ***Step 4 – Analysis of the Management Situation***: Inventory data and other information is analyzed to determine the ability of the planning area to supply goods and services and to respond to identified issues and opportunities.

- ***Step 5 – Alternatives Formulation***: A range of reasonable management alternatives that address issues identified during scoping are developed.

- ***Step 6 – Alternatives Assessment***: The environmental impacts of each alternative are estimated and analyzed.

- ***Step 7 – Preferred Alternative Selection***: The alternative that best resolves planning issues is identified as the Preferred Alternative (Alternative B, which is described in detail in Volume II of this DLMP/DEIS).

- ***Step 8 – Land Management Plan Selection***: A DLMP/DEIS is issued and made available to the public for a review period of 90 calendar days. This document represents this step in the process. During the public review period, the SJPLC will hold additional public meetings in order to further explain the DLMP/DEIS, address public questions, and accept comments in writing. After comments to the draft document have been received and analyzed, the DLMP/DEIS will be revised and modified, as necessary, and the revised LMP/Final EIS (FEIS) Record of Decision (ROD) will be published and made available for public review for 30 calendar days.

- ***Step 9 – Implementation***: Upon approval of the ROD, land use decisions outlined in the approved Land Management Plan would be effective immediately and would require no additional planning or NEPA analysis (except as required for individual projects).

- ***Step 10 – Monitoring***: This process is intended to provide information on progress toward achieving outcomes, desired conditions and objectives and on how well management requirements such as standards and guidelines are being applied.

BLM_0030136

### 1.4.1 KEY DECISIONS TO BE MADE IN THE PLAN REVISIONS

The key decisions to be made in this integrated DLMP/DEIS planning process for the long-term management of the SJPL include:

- The establishment of desired outcomes, including multiple-use goals and objectives (36 CFR 219.11(b), 43 CFR 1601.0-5(k) (3)). (These are primarily expressed as desired conditions in Part 1, and as objectives in Part 2 of Alternative B, the Preferred Alternative, which is described in detail in Volume II.)
- The establishment of management requirements, including measures or criteria that would be applied in order to guide day-to-day activities (36 CFR 219.13 to 219.27, 43 CFR 1601.0-5(k) (2) and (4). (These are primarily expressed as standards and guidelines and other design criteria in Part 3 of Alternative B, the Preferred Alternative.)
- The establishment of management area direction, including identifying allowable uses, and/or allocations, restrictions, and prohibitions (36 CFR 219.11(c) and 43 CFR 1601.0-5(k) (1), (2), and (3)). All lands within the planning area are allocated to one of seven management areas (MAs), or zones, that reflect different levels of development and suitable uses or activities. (Management areas are discussed under geographic areas in Part 1, and under suitability in Part 2 of Alternative B, the Preferred Alternative.)
- The designations of Research Natural Areas (RNAs) and Areas of Critical Environmental Concern (ACECs) (36 CFR 219.25, 43 CFR 1601.0-5(k) (1) and 43 CFR 1601.7-2). (Areas with these designations are identified in the special areas section of Part 2 of Alternative B, the Preferred Alternative.)
- The recommendations of lands for inclusion in the National Wilderness Preservation System (36 CFR 219.17). (These areas are identified in the special areas section of Part 2 of Alternative B, the Preferred Alternative.)
- The identification of river segments that are suitable for inclusion in the National Wild and Scenic Rivers System (PL 90-542 and 36 CFR 219.2(a)). (These are identified in the special areas section of Part 2 of Alternative B, the Preferred Alternative.).
- The designation of suitable timber land (16 USC 1604(k) and 36 CFR 219.14) and the establishment of allowable sale quantity (36 CFR 219.16). (These are described in the suitability and objectives sections of Part 2 of Alternative B, the Preferred Alternative.)
- The establishment of monitoring and evaluation requirements (36 CFR 219.11(d), 43 CFR 1601.0-5(k) (8) and 43 CFR 1610.4-9). (These are described in the monitoring section of Part 2 of Alternative B, the Preferred Alternative.)
- Allocation of livestock forage (AUMs) and areas available for livestock grazing on BLM-administered public lands (43 CFR 4100.0-8, BLM handbook 1601-1 Land Use Planning Appendix C II. B). (These are described in the suitability section of Part 2 of Alternative B, the Preferred Alternative.) and in Appendix L of the DEIS.

Table 1.3 shows how the key decisions, in the terminology of each agency, fit with the different sections of the DLMP/DEIS. The key elements of a BLM and a USFS land use plan overlap, in spite of different planning regulations and handbook direction.

BLM_0030137

**Table 1.3 - Plan Components and USFS and BLM Decision Types**

| PLAN SECTIONS | USFS PLAN DECISIONS | BLM PLAN DECISIONS |
|---|---|---|
| **PLAN PART I – Vision** | | |
| Desired Conditions | Goals<br>Management Area Prescriptions | Desired Outcomes – Goals |
| **PLAN PART II – Strategy** | | |
| Objectives | Objectives | Desired Outcomes: Objectives<br>Management Actions: Actions anticipated to achieve desired conditions, including actions to maintain, restore, or improve land health |
| Suitability | Suitability and Capability | Allowable Uses: Uses, or allocations, that are allowable, restricted, or prohibited |
| Special Areas | Management Area Prescriptions, Congressional Recommendations | Management Actions: Administrative Designations |
| Monitoring | Monitoring Requirements | Monitoring Requirements |
| **PLAN PART III – Design Criteria** | | |
| Standards and Guidelines | Standards and Guidelines (forestwide and management area-specific) | Management Actions: Measures or criteria that will be applied to guide day-to-day activities |

### 1.4.2   KEY DECISIONS MADE REGARDING USFS OIL AND GAS LEASING AVAILABILITY

A planning-related action analyzed in this DEIS is the identification of National Forest System lands that would be administratively available for oil and gas leasing, along with designation of lease stipulations to be applied to future leases in order to protect other resources (36 CFR 228.102(c) and (d)). The oil and gas leasing availability decisions consist of identifying, on maps, those areas that would be:

- open to development, subject to the terms and conditions of the standard oil and gas lease form (including an explanation of the typical standards and objectives to be enforced under the standard lease terms);
- open to development, subject to constraints that would require the use of lease stipulations, such as those prohibiting surface use on areas larger than 40 acres, or such other standards as may be developed in the DLMP/DEIS for stipulation use (with discussion as to why the constraints are necessary and justifiable); or
- closed to leasing, with distinction made between those areas that are closed through exercise of management direction, and those closed by law or regulation.

BLM_0030138

### 1.4.3   MULTIPLE-LEVEL DECISION-MAKING

The USFS and the BLM land use plans are only part of a multiple-level decision-making framework. Land use plans are designed to be consistent with national-level agency policies and regulations, as well as with the USFS and the BLM strategic plans that establish goals, objectives, performance measures, and strategies for each agency.

Land use plans, which apply to an administrative unit such as that administered by the San Juan Public Lands Center, provide the broad guidance and information needed for project and activity decision-making. This DLMP/DEIS will guide relevant resource management programs, practices, uses, and protection measures. Land use plans do not grant, withhold, or modify any contract, permit, or other legal instrument; subject anyone to civil or criminal liability; or create any legal rights. Land use plans also, typically, do not approve or execute projects and/or activities.

This DLMP/DEIS examines potential environmental impacts that could occur as a result of land use allocations and/or the implementation of a typical program of work (i.e., anticipated levels of activities and/or uses) associated with the final planning decisions. Potential subsequent projects and/or activities are discussed in this document in order to analyze the differences between the DLMP/DEIS alternatives. These projects and activities are actions that could occur, but are not authorized or approved by this DLMP/DEIS, and would be required to be analyzed by subsequent environmental analysis (40 CFR 1508.23).

### 1.4.4   CONSISTENCY OF DECISIONS BETWEEN PROJECTS AND PLANS

All projects and/or activities authorized by the BLM and the USFS must be consistent with the DLMP/DEIS (16 USC 1604 (i), 43 CFR 1601.5-3). A project or activity is considered consistent with the DLMP/DEIS if it is consistent with the planning decisions described on the previous pages.
Where a proposed project and/or activity would not be consistent with the DLMP/DEIS decisions, the Responsible Official has the following options:
* to modify the proposal so that the project or activity would be consistent;
* to reject the proposal; and/or
* to amend the land use plan contemporaneously, with the approval of the project and/or activity, so that the project and/or activity would be consistent with the land use plan, as amended. The amendment may be limited, and may only apply to the project and/or activity listed in the amendment. The amendment would require further environmental and public input.

### 1.4.5   CONSISTENCY OF PROJECTS WITH THE OIL AND GAS LEASING AVAILABILITY DECISION

After the oil and gas leasing availability decision is made for NFS lands, the USFS would authorize the BLM to lease specific lands.  Subsequent lease nominations submitted to BLM by industry would be subject to verification that leasing has been adequately addressed in a NEPA document and is consistent with the Forest land and resource management plan; assurance that conditions of surface occupancy identified in the leasing availability decision are properly included as stipulations in resulting leases; and determination that operations and development could be allowed somewhere on each proposed lease, except where stipulations prohibit all surface occupancy.

Ground-disturbing activities, such as drilling exploratory wells, would require further NEPA analysis when an application for permit to drill (APD) is received. Proposals to develop a field would also require site-specific NEPA analysis before being approved.

BLM_0030139

## 1.5    PURPOSE AND NEED

The Council on Environmental Quality (CEQ) regulations (40 Code of Federal Regulation (CFR) 1502.13) require that a Draft EIS "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." The purpose and need section of this DLMP/ DEIS provides a context and a framework for establishing and evaluating the reasonable range of alternatives described in Chapter 2.

The purpose and need for revising the Plans is discussed in Section 1.5.1; the purpose and need for revising the USFS oil and gas leasing availability decision follows in Section 1.5.2.

### 1.5.1    PURPOSE AND NEED FOR PLAN REVISION

In April 2004, the SJPLC initiated a joint revision of the BLM and the USFS land use plans that guide management of the area that the SJPLC now administers. This effort will streamline management and ensure that plan decisions are coordinated between the two agencies, and that they are compatible with mutual goals and objectives. The two previous land use plans will be replaced by one coordinated plan that covers all lands administered by the SJPLC, excluding the Canyons of the Ancients National Monument. The DLMP/DEIS is structured differently than a typical BLM RMP or a USFS LMP, due to the multi-agency nature of this combined planning process. A draft LMP is found in Volume II of this package. The draft LMP corresponds to Alternative B, the Preferred Alternative (also referred to as "the Plan" by the USFS). The ways in which other alternatives vary from the draft LMP are discussed in Chapter 2 of the DLMP/DEIS.

Most aspects of the BLM and the USFS planning processes have been combined. Where laws, regulations, and/ or policies that govern planning for each agency differ, the planning process and associated documents remain separated and are clearly identified as applying to only one agency. Some of the more important and relevant guidance to consider when revising the existing plans is described in section 1.9.

The BLM and the USFS identified the need to revise the existing plans through a formal evaluation of the existing plans; consideration of the Analysis of the Management Situation (AMS); evaluation of USFS monitoring findings; examination of issues identified during the public scoping process; and through collaboration with cooperating local, State and Federal agencies, as well as with Native American tribal agencies and entities. Based on analysis of this information, this DLMP/DEIS will provide updated management direction for the planning area, which is needed due to the fact that social, environmental, and administrative conditions have changed since the San Juan/San Miguel RMP and the San Juan National Forest Land Management Plan were developed. There are a number of new issues; higher levels of controversy around existing issues; and new, unforeseen public land issues and concerns that have arisen over the years that were not included in the previous plans. In addition, new resource assessments and scientific information is available to help the agencies in making more informed decisions.

Management direction in the existing plans needs updating in order to:
- reflect the balance between continued traditional uses of the planning area, such as with timber harvest, grazing, and the diverse mix of recreation activities (many of which require, or are enhanced by, the maintenance of large, contiguous areas of relatively undeveloped land);
- reflect current knowledge of the ecosystems that make up the planning area, based upon new information available due to updated vegetation inventories and studies conducted since the existing plans were developed;

BLM_0030140

- reflect the increased focus that the SJPLC has had on ecological restoration since the existing plans were developed;
- reflect current knowledge about the role of natural fire, insects, disease, and other disturbance processes in the ecosystems that make up the planning area;
- reflect changes in the wood products industry that have occurred since the significant amendment to the San Juan National Forest LMP in 1982;
- reflect the increased focus on working with communities in order to reduce the risk of wildfire in the wildland-urban interface in residential areas;
- reflect the balance between energy production needs and the protection of other resources;
- reflect the population growth in local communities and the increased emphasis on public lands amenities used by people living near the planning area;
- reflect the increased knowledge of the types of benefits, settings, and opportunities people are seeking when they recreate in the planning area;
- help resolve travel management conflicts and provide a better basis for subsequent site-specific decisions on designating routes for motorized travel;
- update land allocations related to downhill ski areas (East Fork, Wolf Creek Valley, and Wolf Creek) in order to reflect changed conditions;
- encourage working collaboratively with stakeholders in order to balance water development opportunities and to protect other resources;
- reflect the emphasis on key areas of the planning area that have unique and outstanding features and legal definition;
- incorporate an updated, more accurate inventory of USFS roadless areas, as a reflection of national policy on roadless area protection, as well as of the State of Colorado's recommendations for management of roadless areas; and
- incorporate an updated inventory of river segments that meet the eligibility requirements of the Wild and Scenic Rivers Act (WSRA), and determine the best mechanisms to protect their outstandingly remarkable values while, at the same time, balancing competing opportunities for water development and other uses.

In the planning process for this DLMP/DEIS, existing decisions were reviewed for their relevance, as well as for their potential effectiveness, in the continued management of resources. Relevant decisions from the existing RMP, LMP, and Activity Plans will be carried forward. Examples include, but are not limited to, the following:
- Wild Horse Herd Management (2005);
- Management of existing USFS Wilderness (1998); and
- Management of BLM Wilderness Study Areas (1991).

BLM_0030141

### 1.5.2   PURPOSE AND NEED FOR THE USFS OIL AND GAS LEASING AVAILABILITY DECISION

In order to respond to formal requests for oil and gas leases, the Forest Service needs to identify lands on the San Juan National Forest that will be available for oil and gas leasing.  The need for identifying lands available for leasing arises from the public's demand for energy, specifically oil and natural gas, and the Federal Government's policy to "foster and encourage private enterprise in… the orderly and economic development of domestic mineral resources…" *(Mining and Minerals Policy Act of 1970.)*

The purpose of making NFS lands available for oil and gas leasing is to facilitate the production of energy resources in support of local and regional economies and a secure and stable domestic energy supply.  Making lands on the San Juan National Forest available for oil and gas leasing would contribute to meeting the need for energy resources developed and produced in an environmentally sound manner.

Oil and gas leasing on the San Juan National Forest would:
- be consistent with the Revised Land Management Plan;
- comply with the requirements for leasing analysis and decisions at 36 CFR 228.102;
- allow processing of pending lease nominations (approximately 110,000 acres, mostly on the western portion of the San Juan National Forest) and future nominations;
- reflect changes in land allocations (management areas) from amendments to the existing San Juan National Forest LMP, as well as with additional changes proposed in the DLMP/DEIS;
- reflect the updated inventory of USFS roadless areas, consistent with national policy on roadless area protection, and reflect the State of Colorado's recommendations for management of roadless areas.

### 1.6   SCOPING PROCESS

The National Environmental Policy Act (NEPA) requires that Federal agencies hold an open and early process for determining the scope of issues to be addressed in order to identify the significant issues that could be associated with the proposed action. The term "scope" is defined as the range of actions, alternatives, and impacts to be considered during NEPA analysis. Scoping process objectives are intended to:
- identify potentially interested parties;
- identify public and agency concerns;
- define the range of issues that will be examined in the DLMP/DEIS;
- ensure that relevant issues are identified early and drive the process; and
- establish a public record.

The SJPLC conducted a broad community-based public input process. The scoping process included the following sixteen components (see Table 1.4).

BLM_0030142

**Table 1.4 - Overview of Scoping Process**

| SCOPING COMPONENT | DURATION | FORUM | COMMUNITY INPUT SUMMARY SOURCES |
|---|---|---|---|
| Community study groups | Jan. 2005 - ongoing | 25 facilitated open public meetings | 66 comment summary sheets and 33 maps on forest planning website: http://ocs.fortlewis.edu/forestPlan |
| On-site town meetings | Summer 2005 | 3 facilitated open public meetings | Input integrated into study group comment summaries: http://ocs.fortlewis.edu/forestPlan |
| Cooperating agency MOUs | ongoing | State, local, and tribal governments were invited to be cooperating agencies. Montezuma County and the Town of Rico accepted. | Documentation available at SJPLC |
| Meetings with local and State government representatives | ongoing | County Commissioner meetings and other meetings with representatives of local and State governments | Documentation available at SJPLC |
| Meetings with tribal governments | ongoing | Tribal Council meetings and other meetings with tribal representatives | Documentation available at SJPLC |
| Recreation interviews | Jan. - May 2004 | 83 interviews with recreation groups, outfitters, conservationists | Report: Interviews conducted for Recreation Planning: http://ocs.fortlewis.edu/forestPlan |
| Written comments | 1999 -ongoing | Written comments submitted to SJPLC | Written comments available at SJPLC |
| Web comments | Jan. 2005 - ongoing | Available during study group meetings on forest planning website | Digital database available at SJPLC |
| Governmental water roundtable | May 2005 - ongoing | 14 monthly meetings so far, with more scheduled | Meeting summaries and resources on forest planning website: http://ocs.fortlewis.edu/forestPlan |
| Aspen workshop | Dec. 2004 | 1 focused workshop | Meetings summaries available at SJPLC |
| Community wildfire protection planning | 2001 - ongoing | Separate process, but input and fire plans considered in plan revision | Documents available at Southwest Colorado Information Clearinghouse: http://www.southwestcoloradofires.org |
| Northern San Juan Basin EIS | Summer, Fall 2004 | Separate process, but input considered in plan revision | Contact SJPLC for EIS documentation |
| Roadless Area Taskforce public meeting | Dec. 2005 | 1 facilitated meeting in La Plata County | Meeting documentation available at http://www.keystone.org/htm |
| **Information Carried Forward From Earlier Community Participation Processes** | | | |
| Community study groups (1st Round) | April 1996 – May 1997 | Monthly facilitated open public meetings | Summary Report and background materials available at SJPLC |
| Community working groups (1st Round) | June 1997 – Jan. 1998 | Monthly facilitated open public meetings | Summary Report and background materials available at SJPLC |
| Community study groups (1st Round) plenary session | June 2, 1998 | Facilitated open public meeting | Report available at SJPLC |

BLM_0030143

**SCOPING ISSUES**

Issues identify demands, concerns, and/or conflicts regarding the use and/or management of public lands and resources. These issues typically express potential impacts on land and on resource values. The main topic areas addressed in this DEIS were identified based on input from interagency consultation, other Federal agencies, State and local government, cooperating agencies, internal review, the public, industry representatives, and special interest groups. The issues represent the challenges that exist with current management, with the current BLM and USFS plans, and with the current USFS oil and gas leasing availability decision. The SJPLC has documented each of the issues in a scoping report and has placed each in one of three categories:

1. Issues to be Resolved in the DLMP/oil and gas leasing availability decision/DEIS;
2. Issues to be Resolved through Policy or Administrative Action; or
3. Issues beyond the Scope of this DLMP/oil and gas leasing availability decision/DEIS.

The scoping report provided rationale for each issue placed in category 2 or 3. The scoping report is available in the administrative record (AR).

The identified issues in category 1 are addressed in Alternative B, the Preferred Alternative (which is described in detail in Volume II of this DLMP/DEIS). The other alternatives vary in terms of program emphasis, land allocations, and suitable uses. Not all aspects of the existing land use plans need to be changed; consequently, some things are held constant between alternatives. For example, management direction for existing wilderness does not vary by alternative, based on the analysis determining that no change in direction was needed. On the other hand, recommendations for new additions to the National Wilderness Preservation System do vary between alternatives.

Four main issues drove the development of alternatives in this DLMP/DEIS. The alternatives reflect where people had notably different ideas about how to manage and/or how to use different areas administered by the SJPLC. These different ideas came from the community study groups, scoping meetings, written comments, and other scoping activities. These issues are described below.

**Balancing management between the ideas of maintaining "working forest and rangelands" and retaining "core undeveloped areas"**

Two key features that describe the planning area include: 1) it has large expanses of relatively pristine lands, and 2) people value the fact that a broad mix of traditional uses and activities still occur. Much of the discussion in community meetings focused on how to best maintain a good balance between these two key features. When people discussed maintaining a "working forest," the emphasis included the ideas of respecting valid and existing rights to resources, retaining access and commodity production activities that are important to the economy of local communities, and continuing historical uses in areas where access and infrastructure investments have already been made.

The desires expressed by the people who discussed retaining "core undeveloped areas" included retaining areas that have not been developed in order to provide high-quality wildlife habitat and corridors, minimize ecosystem fragmentation, and support natural ecosystem functions. Maintaining the roadless character of much of the planning area was identified as important by wildlife managers, sportsmen, and by many interested citizens.

**Recreation and Travel Management**

The public lands administered by the San Juan Public Lands Center are becoming increasingly important as a scenic backdrop, as well as a place to recreate, to residents of nearby communities and to people visiting the area. Discussion at community meetings often included the need to find a balance between the way long-time residents, new arrivals, and visitors use the public lands. Opinions were divided on the appropriate mix of different types of recreation settings and opportunities that should be provided on public lands. Opinions also differed on where to emphasize motorized travel versus non-motorized travel.

BLM_0030144

**Management of Special Areas and Unique Landscapes**

A number of unique and special areas were identified during the scoping process as meriting special attention. The importance of maintaining scenic views and recreation opportunities along important travel routes, such as along the San Juan Skyway, the Alpine Loop Backcountry Byway, the Continental Divide Trail, and the Colorado Trail, were common to all alternatives. Some established designations, such as the Chimney Rock Archeological Area and the Spring Creek Wild Horse Herd Area, were also carried forward in all alternatives. Suitability of roadless areas of the San Juan National Forest for inclusion in the National Wilderness Preservation System, and the suitability of rivers and streams on both BLM and National Forest System lands for inclusion in the National Wild and Scenic Rivers System are examined and analyzed in alternatives. Alternative ways of managing some unique landscapes, including the Dolores River Canyon, Silverton, Rico, and the HD Mountains, are also examined.

**Oil and Gas Development**

The lands administered by the SJPLC contain several areas with moderate to high potential for oil and gas resources. A key challenge for the future is providing for potential energy development while, at the same time, protecting other resource values. People expressed concerns regarding both where and how development might occur.

Community participants noted that Land Management Plan and oil and gas leasing availability decisions need to be coordinated so that the infrastructure needs (roads, well pads, and pipelines) for oil and gas development are compatible with desired conditions for specific areas of land.  Comments mostly related to whether new road construction should occur in areas that are currently undeveloped.  Areas available for leasing vary by alternative in order to reflect the different land allocations and management emphases in the Land Management Plan alternatives.

Lease stipulations provide protection for other resource values and/or land uses, such as unique soil conditions, steep slopes, ecological integrity, wildlife habitat, cultural resources, high-use recreation areas, and scenic quality.  Stipulations would be applied to new leases in order to respond to issues of how development might occur.

Four alternatives (discussed in detail in Chapter 2) with varying management area allocations and objectives were developed in order to focus on resolving these issues. A number of other alternatives were considered but not analyzed in detail.

## 1.7    POLICY

A broad range of Federal policies, decisions, and laws guide development of the DLMP/DEIS and the oil and gas leasing availability analysis. Key laws with bearing on the decisions are discussed below.

**Federal Land Policy Management Act (FLPMA)**

The Federal Land Policy Management Act (FLPMA) establishes the land management authority of the BLM and provides guidance for how public lands are to be managed by the BLM. The BLM manages public lands on the basis of multiple use and sustained yield. It requires that the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values be protected. Sections 201 and 202 of the FLPMA establish the BLM's land use planning requirements.

BLM_0030145

**National Forest Management Act (NFMA)**
The National Forest Management Act (NFMA) amended the Forest and Rangeland Renewable Resources Planning Act (RPA) of 1974 to require preparation of Land Management Plans for National Forests and National Grasslands. Land management plans provide guidance and direction to the agency for all resource management activities on the unit.

Under the NFMA, the Forest Service must prepare land management plans using an Interdisciplinary (ID) team and public participation. In addition, the Forest Service must comply with the National Environmental Policy Act (NEPA) in the development, review, and revision of LMPs. Permits, contracts, plans, and other instruments used in managing National Forest System lands—such as timber sale contracts, grazing permits, and mine reclamation plans—must be consistent with the land management plan.

**The National Environmental Policy Act (NEPA)**
The National Environmental Policy Act (NEPA) established a national policy to maintain conditions under which people and nature can exist in productive harmony while, at the same time, fulfilling the social, economic, and other requirements of present and future generations of Americans. It established the Council on Environmental Quality (CEQ) in order to coordinate environmental matters at the Federal level and to advise the President on such matters. Under the law, all Federal actions that could result in a significant impact on the environment are subject to review by Federal, State, local, and Native American tribal environmental authorities, as well as by affected parties and interested citizens.

**The Clean Air Act (CAA)**
The United States Congress passed the Clean Air Act in 1963, the Air Quality Act in 1967, the Clean Air Act Extension of 1970, and Clean Air Act Amendments in 1977 and 1990. The 1963 Clean Air Act relied on states to issue and enforce regulations regarding air pollution. Congress amended the Clean Air Act in 1970 and established the Environmental Protection Agency (EPA) to set and enforce national standards for air pollution. In 1990, the EPA was authorized to set National Ambient Air Quality Standards (NAAQS), which establish acceptable concentrations of six criteria pollutants: ozone ($O_3$), carbon monoxide ($CO$), sulfur dioxide ($SO_2$), lead (Pb), nitrogen dioxide ($NO_2$), and particulate matter ($PM_{2.5}$).

**The Clean Water Act (CWA)**
The Clean Water Act (CWA), or the Federal Water Pollution Control Act, is the principal law governing pollution of the nation's surface waters (33 USC 1251). Originally enacted in 1948, it was revised, by subsequent amendments, to spell out programs for water quality improvements; programs that are still being implemented by industries and municipalities. The Clean Water Act consists of two major parts. The first provision authorized Federal financial assistance for municipal sewage treatment plant construction. The second provision, which is regulatory, established a national policy to maintain conditions under which people and nature can exist in productive harmony while, at the same time, fulfilling social, economic, and other requirements.

**The Endangered Species Act (ESA)**
Management activities on private and public lands are subject to the Federal Endangered Species Act (ESA), as amended. It directs project proponents or government agencies, as appropriate, to consult with the United States Fish and Wildlife Service (USFWS) and/or the National Oceanic and Atmospheric Administration Fisheries Service (NOAA Fisheries) in order to address the impacts of management activities on threatened and endangered species and designated critical habitat. This consultation leads to the issuance of a Biological Opinion (BO), and may result in the issuance of a Section 10(a) permit (for non-Federal actions) or a Section 7 permit (for Federal actions) by the USFWS and/or NOAA Fisheries. The SJPLC is consulting with the USFWS regarding any actions that may, under this DLMP/DEIS affect ESA listed species. To this end, a Biological Assessment (BA) has been prepared for the actions proposed through this DLMP/DEIS.

BLM_0030146

**The National Historic Preservation Act (NHPA)**
The National Historic Preservation Act (NHPA) is the primary Federal law providing for the protection and preservation of cultural resources. The NHPA established the National Register of Historic Places (NRHP), the Advisory Council on Historic Preservation (ACHP), and the State Office of Historic Preservation (SHPO).

**The Migratory Bird Treaty Act (MBTA)**
The Migratory Bird Treaty Act (MBTA) is the domestic law that implements the United States' commitment to four international conventions (with Canada, Japan, Mexico, and Russia) for the protection of a shared migratory bird resource. Under this law, all migratory birds and their parts (including eggs, nests, and feathers) are fully protected. Each of the conventions protects select species of birds that are common to multiple countries (i.e., they occur in both more than one country at some point during their annual life cycle). The law is implemented by the USFWS. The SJPLC would be required to manage the bird populations on USFS- and BLM-administered public lands in the planning area consistent with the requirements of the MBTA.

**Multiple-Use and Sustained-Yield Act of 1960**
States the "National Forests are established and administered for outdoor recreation, range, timber, watershed, and fish and wildlife purposes," (16 USC 528).

The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the National Forests for multiple use and sustained-yield of the several products and services obtained therefrom. In the administration of the National Forest due consideration shall be given to the relative values of the various resources in particular cases. The establishment and maintenance of the areas of wilderness are consistent with the purposes and provisions of section 528 to 531 of this title, (16 USC 529). The Secretary is also authorized to cooperate with State and local governmental agencies in management of National Forests, (16 USC 529).

**Federal Land Transaction Facilitation Act (FLTFA) (P.L. 106-248)**
Authorizes the Secretary of the Interior to sell or exchange public lands nationwide under the Federal Land Policy and Management Act of 1976. The FLTFA authorizes the proceeds generated from the sale or exchange of public lands, identified for disposal in an approved land use plan in effect on July 25, 2000, to be dedicated to the acquisition of certain lands and for expenses necessary to carry out disposals under the FLTFA. Proceeds generated from the disposal of public land may be properly dedicated to the acquisition of inholdings and other land that will improve the resource management ability of the Federal land management agencies and adjoining landowners. Provisions of law expire 10 years after the date of enactment of the Act (July 25, 2010).

**Mineral Leasing Act of 1920 as amended**
Provides for the leasing of deposits of coal, phosphate, sodium, potassium, oil, oil shale, native asphalt, solid and semi-solid bitumen, and bituminous rock or gas, and lands containing such deposits owned by the United States, including those in national forest, but excluding those acquired under other acts subsequent to February 25, 1920.

**Federal Onshore Oil and Gas Leasing Reform Act of 1987**
Amended the Mineral Leasing Act of 1920. Established a new oil and gas leasing system, and changed certain operational procedures for onshore Federal lands. The Federal Onshore Oil and Gas Leasing Reform Act of 1987 states that the BLM cannot lease over the objection of the Forest Service and authorizes the Forest Service to regulate all surface disturbing activities conducted pursuant to a lease. The act requires the Forest Service to evaluate National Forest System lands for potential oil and gas leasing. The Forest Service decides whether or not lands will be available for leasing and decides under what conditions (stipulations) the leases will be issued.

BLM_0030147

**Mining and Minerals Policy Act of 1970 (P.L. 91-631)**
The Mining and Minerals Policy Act declares that it is the continuing policy of the Federal government in the national interest to foster and encourage the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security, and environmental needs.

**Energy Policy Act of 2005 (P.L. 109-58)**
Sec. 368. Energy right-of-way corridors on Federal land.  Provides for the Secretaries of Interior and Agriculture to designate, under their respective authorities, corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on Federal land in the eleven contiguous Western States (as defined in section 103(o) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702(o)); Designated corridors are to be incorporated into the Forest Service and BLM land use and resource management plans.

**Energy Security Act of 1970 (P.L. 96-294)**
The Energy Security Act established the intent of Congress that the Secretary of Agriculture shall process applications for leases of National Forest System lands and for permits to explore, drill, and develop resources on land leased from the Forest Service, notwithstanding the current status of Land Management Plans.

**The Brunot Agreement**
The Brunot Agreement, ratified by Congress in 1874, withdrew over 5,000 square miles in the mountains of southwestern Colorado from the 1868 Ute Reservation. The agreement, entered into between the United States (as represented by Felix Brunot) and the Ute Indians in Colorado, was passed into law (18 Stat., 36) by the House of Representatives and the Senate of the U.S. Congress on April 29, 1974. Under the "reserved rights doctrine," hunting rights on reservation lands relinquished by the Utes were retained; that is, the tribes retained such rights as part of their status as prior and continuing sovereigns. Article II of the Bruno Agreement specified that "the United States shall permit the Ute Indians to hunt upon said lands so long as the game lasts and the Indians are at peace with the white people." These hunting rights currently apply only to the Ute Mountain Ute Indian Tribe, acknowledged when the tribe sued the State of Colorado for their historical hunting rights in 1978. The rights were granted to the tribe under a consent decree that gives enrolled members of the Ute Mountain Ute Tribe the right to hunt deer and elk in the Brunot area for subsistence, religious, or ceremonial purposes. The consent decree specifies that tribal members may hunt deer and elk without a State license year-round, providing that they obtain a tribal hunting permit. Other game animals may be hunted without a license and without bag limits, but only during hunting seasons established by the Colorado Division of Wildlife (CDOW).

**Additional Planning Guidance for both Agencies:**
- Executive Orders:
  - Executive Order 13007 (Indian Sacred Sites);
  - Executive Order 13112 (Invasive Species);
  - Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments); and
  - Executive Order 13186 (Migratory Birds)
- the Healthy Forest Restoration Act of 2003 (USC 2003); and
- the National Fire Plan (USFS 2000).

BLM_0030148

**Additional Planning Guidance for the BLM:**
- the Code of Federal Regulations (43 CFR 1600);
- the Land Use Planning Handbook (BLM 2005a);
- the BLM National Management Strategy for Motorized Off-Highway Vehicle (OHV) Use on Public Lands (BLM 2001b);
- Manual H-8410-1, BLM Visual Resources Inventory, Section V, Visual Resources Classes and Objectives (BLM 2003b);
- 43 CFR 2400, Lands for Retention, Proposed Disposal, or Acquisition;
- Sections 205, Acquisitions, and Section 206, Exchanges, of the FLPMA;
- 43 CFR 2300, Land Management Guidelines Regarding Withdrawal Areas;
- 43 CFR 2740, 2912, 2911, and 2920, Land Use Authorizations; and
- the BLM Instruction Memoranda (IM), including, but not limited to:
  - Washington Office IM-2002-034, Fire Management Planning (BLM 2002a);
  - Washington Office IM-2002-196, Additional Guidance on Right-of-Way Management in Land Use Planning (BLM 2002b);
  - Washington Office IM-2005-024, National Sage-Grouse Habitat Conservation Strategy (BLM 2005e); and
  - Washington Office IM-2006-073, Weed-Free Seed Use and Lands Administered by the Bureau of Land Management (BLM 2006b).

**Additional Oil and Gas Leasing Guidance for the USFS:**
36 CFR 228, Regulations governing minerals resources on National Forest System Lands.  Section 228.102 is specific to leasing analyses and decisions for oil and gas resources.

BLM_0030149

**SAN JUAN PUBLIC LANDS**
*Draft Land Management Plan / Draft Environmental Impact Statement*

VOLUME 1 ■ Draft Environmental Impact Statement

# Chapter 2
# ALTERNATIVES

## 2.1   INTRODUCTION

This chapter describes the four LMP alternatives (including the No-Action Alternative and the Preferred Alternative) that describe different approaches to the management of the public lands and resources jointly administered by the U.S. Forest Service (USFS) and Bureau of Land Management (BLM) under a cooperative Service First partnership covering the San Juan Public Lands (SJPL) planning area, as administered by the San Juan Public Lands Center (SJPLC). Also a No Lease Alternative for oil and gas is described as part of the oil and gas leasing availability decision in Section 2.8.

One alternative, Alternative A (the "No-Action Alternative"), describes the continuation of current management. This alternative is required by the Council on Environmental Quality (CEQ) regulations, under the National Environmental Policy Act (NEPA), and serves as a baseline for the comparison of the other alternatives. Alternatives B, C, and D (the "Action Alternatives") describe proposed changes to current management, as well as what current management would be carried forward into future management. Alternative B is the Preferred Alternative, and is described in further detail in Volume 2 of this Draft Land Management Plan/Draft Environmental Impact Statement (DLMP/DEIS). Each of the Action Alternatives represents a complete and reasonable set of proposed objectives, actions, and allocations analyzed during the planning process that would meet the purpose and need described in Chapter 1; varying with regard to their emphasis on allowable uses and on management actions that would guide future conservation and development in the planning area.

The USFS and BLM manage public lands and resource values according to the principles of multiple use and sustained yield. Given these principles, as well as the inherent conflicting nature of resource conservation and resource development, alternative formulation occurs within the limits of planning criteria that address the needs of present and future generations while, at the same time, meeting the requirements of all applicable laws, rules, regulations, standards, policies, and guidelines governing both the USFS and the BLM. Additional action alternatives, or their components (e.g., allowable uses and management actions), that did not fall within the planning criteria; did not meet the purpose and need; or that are already part of an existing plan, policy, requirement, or administrative function that would continue under the Final Land Management Plan/Final Environmental Impact Statement (FEIS) Record of Decision (ROD), were considered, but were not carried forward for detailed analysis in this DLMP/DEIS.

A major goal of the DLMP/DEIS planning process is to ensure a consistent, coordinated approach to managing lands and resources within the planning area. Major themes and management actions for the most emphasized issues within the alternatives are presented in the following sections.

BLM_0030150

This chapter summarizes the management alternatives and the differences between alternatives that were considered during the planning process for this DLMP/DEIS (the revision of the BLM San Juan Resource Management Plan (1985) and the San Juan National Forest Land and Resource Management Plan (1983)). Descriptive, narrative, and tabular materials are presented under the following sections:

- ***Development of Alternatives***: This section describes how the alternatives were developed during the agency and public scoping process, as well as how each alternative emphasizes or reflects different aspects of the "San Juan Niche" (i.e., what makes the area unique).

- ***Important Points for All Alternatives***: This section describes how the alternatives would represent, to varying degrees, the principles of multiple use and sustained yield of USFS- and BLM-administered lands in the planning area, as directed by all applicable laws, rules, regulations, standards, policies, and guidelines.

- ***Alternatives Considered but Eliminated from Detailed Analysis***: This section details several issues that were raised during the scoping process that were considered, but not carried forward, for further analysis as alternatives, including:
  - Exclusive Use or Elimination of Traditional Uses Alternatives, including:
    - A No-Livestock Grazing Alternative;
    - A No-Coalbed Methane Gas Development in the HD Mountains Alternative;
    - A Maximum Timber-Yield Alternative;
  - The Citizens for the Wild San Juans Alternative; and
  - The Citizens Wilderness Proposal Alternative.

- ***General Description of the Alternatives***: This section describes the differences between alternatives, in relation to their different land allocations, or "management areas" (MAs), as well as in relation to issues and concerns raised during the scoping process.
  - ***Management Areas***: Areas within the planning area have been allocated to one of eight MAs, ranging from areas where natural processes dominate to areas that are intensely managed, including:
    - ***MA 1***: Natural Processes Dominate;
    - ***MA 2***: Special Areas and Unique Landscapes;
    - ***MA 3***: Natural Landscapes with Limited Management;
    - ***MA 4***: High-Use Recreation Emphasis;
    - ***MA-5***: Active Management (commodity production to meet multiple use goals);
    - ***MA 6***: Grasslands (Not applicable for the planning area);
    - ***MA 7***: Public and Private Lands Intermix; or
    - ***MA 8***: Highly Developed Areas.

BLM_0030151

- **Issues and Concerns**: This section describes the four main issues regarding the use and/or management of public lands and resources in the planning area analyzed in this DLMP/DEIS, including:

  - **Issue One**: Balancing Management Between the Ideas of Maintaining "Working Forest and Rangelands" and of Retaining "Core Undeveloped Lands;"

  - **Issue Two**: Providing Recreation and Travel Management within a Sustainable Ecological Framework;

  - **Issue Three**: Management of Special Area Designations and Unique Landscapes; and

  - **Issue Four**: Managing Impacts from Oil and Gas Leasing and Development.

- **Description of the LMP Alternatives Considered In Detail**: This section describes, in detail, the four LMP alternatives considered in detail in this DLMP/DEIS in relation to their different MA allocations, as well as in relation to the four main issues raised during the scoping process, including:

  - **Alternative A**: Alternative A, the No-Action Alternative, would represent the continuation of current management direction;

  - **Alternative B**: Alternative B, the Preferred Alternative, would provide for a mix of multiple-use activities, with a primary emphasis on maintaining most of the large, contiguous blocks of undeveloped lands and enhancing various forms of recreation opportunities while, at the same time, maintaining the diversity of uses and active forest and rangeland vegetation management;

  - **Alternative C**: Alternative C would provide for a mix of multiple-use activities, with a primary emphasis on preserving the undeveloped character of the planning area; and

  - **Alternative D**: Alternative D would provide for a mix of multiple-use activities, with a primary emphasis on preserving the "working forest and rangelands" character of the lands administered by the SJPLC in order to produce the highest amounts of commodity goods and services.

- **Description of the Oil and Gas Leasing Availability Alternatives**: This section describes, in detail, the oil and gas leasing availability and stipulations for the four alternatives considered in detail, plus a No Lease Alternative.  The "No Lease Alternative" is included (as required by 36 CFR 228.102(c)(2)&(3)) which requires the Forest Service, when considering oil and gas leasing, to analyze an alternative of not leasing.  The oil and gas leasing availability decisions and stipulations described in this section compliment the Description of Alternatives Considered in Detail described in the proceeding section.

- **Summary Comparison Table of Alternatives Considered in Detail**: This table presents a tabular overview of the alternatives.

- **Summary of Environmental Consequences**: This section provides a comparative summary of the effects of the alternatives on each resource.

Land use planning regulations and the National Environmental Policy Act (NEPA) require the USFS and the BLM to develop a range of reasonable alternatives during the planning process. The basic goal of developing alternatives is to prepare different combinations of management scenarios in order to address all identified issues and to resolve conflicts among uses. Alternatives must meet the purpose and need; must be reasonable; must provide a mix of resource protection, use, and development; must be responsive to the issues; and must meet the established planning criteria. Each of the alternatives proposed for this DLMP/DEIS is a complete land use plan that would provide a framework for multiple-use and sustained-yield management of the full spectrum of resources, resource uses, and programs present in the planning area. Under all of the alternatives, the SJPLC will manage the public lands in accordance with all applicable laws, regulations, policies, standards, and guidelines.

The development of management alternatives for this DLMP/DEIS was guided by applicable provisions of the National Forest Management Act of 1976 (NFMA), the Federal Land Policy and Management Act of 1976 (FLPMA), governing the development of land management plans (LMPs), and implementation of the National Environmental Policy Act (NEPA). Management actions (alternatives), including the No-Action Alternative, were developed in order to address these planning issues, concerns, and requirements; and to provide direction for resource programs influencing land management and resource use in the planning area. The alternatives were developed using an iterative process that focused on improving current management. Each management alternative would represent a different combination of resource uses, management allocations, and environmental consequences (see Chapter 3).

The development of the alternatives analyzed in this DLMP/DEIS included a public scoping process that allowed interested members of the public; Native American tribal governments and entities; special interest groups; and Federal, State and local agencies, to comment on, and contribute input with regard to, the planning process. On September 23, 1999, a Notice of Intent (NOI) to revise the USFS Land Management Plan (LMP) for the San Juan National Forest was published in the Federal Register. On December 14, 2004, a second NOI was published, updating timelines and informing all interested parties that the BLM Resource Management Plan (RMP) would be revised concurrently.

Detailed analyses of conditions and trends for social, economic, and ecological elements related to the planning area were developed early in the process. These analyses included consideration of relevant new information, as well as legal, regulatory, and policy changes that have occurred since the last planning period. This work is documented in several assessments and is summarized in the Analysis of the Management Situation (AMS) report. Results from the analyses were used in the public scoping process in order to inform stakeholders, focus the issues, and enhance overall communication.

The public scoping process began in January 2005. Alternatives were developed using a community participation process that centered on a series of meetings held in local communities. Web-based mechanisms were also offered so that all interested parties could interact using the Internet. People were encouraged to participate in the entire series of community study group meetings in order to build upon knowledge gained during earlier meetings, and to stay informed as alternative development progressed. It was a mutual learning experience, for both community members and agency personnel.

During the scoping process, public lands in the planning area were divided into 33 smaller landscapes. This was done so that people could discuss conditions, concerns, and solutions for issues in the context of specific places, rather than at an abstract level. Scoping participants identified outstanding features, primary uses, concerns with current management, and opportunities for improvement for each landscape.

BLM_0030153

Management direction was depicted primarily in terms of land allocations, or management areas (MAs), that varied in terms of levels of development and suitability for different uses and/or activities. Using information gathered by the public, as well as their knowledge of the area, the SJPLC Interdisciplinary (ID) Team and Ranger District/Field Office staff created a preliminary draft of management area allocations. After a presentation by agency staff, participants discussed the proposed land allocations in facilitated small groups. For many areas within each landscape, participants agreed with the proposed land allocations; for other areas, people suggested changes and described their reasoning for the changes.

The ID Team used the expanded and developing information to improve the proposed land allocations and to delineate additional options that would later be used to develop other alternatives. Alternative A, the No-Action Alternative, was developed by translating the land allocations found in the two existing land management plans into the new management areas. Alternative B, the Preferred Alternative, was developed by agency staff making improvements to the current land allocations incorporating agency and public input, as described above. Other options discussed and analyzed for the planning area were used to develop Alternatives C and D (with options focused on low levels of development and "quiet-use" areas shaping Alternative C, and options focused on commodity production and motorized recreation shaping Alternative D).

During meetings held in June and August of 2005, community study group participants discussed the land allocations within the contexts of each USFS Ranger District/BLM Field Office, as well as within the context of the entire planning area. Suggestions from these meetings were used to further refine the alternatives. During this set of meetings, participants also helped refine the "niche" of the SJPL -- what makes the San Juan unique in comparison to other public lands.

The proposed alternatives analyzed in this DLMP/DEIS emphasize different aspects of SJPL. This is especially true with regard to the varying emphasis on either maintaining large expanses of undeveloped lands versus an emphasis on increasing the levels of development (primarily in the portions of the planning area that currently contain roads). Other key differences in alternatives include the mix of motorized versus non-motorized forms of travel, recreation opportunities, and the management of unique landscapes. The amount of lands available for oil and gas leasing also vary under the alternatives, however, the levels of projected development do not vary significantly (due to the fact that most of the currently unleased lands with either moderate or high oil and gas potential are in areas that already contain higher levels of development, including roads).

Alternative development was also influenced by consultation and discussions with other Federal agencies, State and local governments, Cooperating Agencies, Native American tribal agencies, the Colorado Division of Wildlife (CDOW), the SJPL Governmental Water Roundtable, Colorado's Roadless Areas Review Task Force, and local recreation organizations, as well as by written comments from all interested parties.

**San Juan Public Lands "Niche"**

The San Juan Public Lands consist of diverse landscapes, including large expanses of relatively pristine lands, as well as more developed areas where roads and a wider variety of human activities are evident. Overall, these public lands provide opportunities for a broad range of human activities and uses, as well as natural processes, to occur.

The San Juan Public Lands are known for beautiful scenery, outstanding prehistoric and historic features, relatively unconfined recreation opportunities, and clean water and clean air. In fact, a large portion of the water in southwestern Colorado originates in mountainous, headwater areas of the San Juan Public Lands.

The USFS and BLM lands that make up the San Juan Public Lands are managed in order to provide multiple benefits to a variety of people in a manner that is sustainable over time. The premise is that the benefits people need and desire will only be sustained as long as the ecosystems from which they are derived are sustained.

The people of southwestern Colorado, as well as numerous visitors to the area, have a strong motivation to participate in the management of their public lands. Many existing relationships and partnerships (with a variety of interests and organizations) serve as tangible evidence of how important attachments to these public lands are -- public lands that offer many opportunities for use, enjoyment, and cooperative stewardship.

BLM_0030154

## 2.4                                          IMPORTANT POINTS COMMON TO ALL ALTERNATIVES

All of the alternatives developed and analyzed for this DLMP/DEIS represent, to varying degrees, the philosophies of multiple-use and sustained-yield ecosystem management on USFS- and BLM-administered lands. All of the alternatives would provide basic protection of resources in the planning area. All of the alternatives could be implemented, and all alternatives are fully achievable. In accordance with all applicable laws, rules, regulations, standards, guidelines, and polices governing both agencies, all alternatives would:

- protect basic soil, air, water, and land resources in order to encourage long-term, healthy, and sustainable ecosystems;

- meet the BLM Colorado Public Land Health Standards;

- provide for diverse ecosystems (although differing with regard to the emphasis placed on native plant and animal management);

- recognize the important role Federal lands play in providing for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives.  Fish and wildlife habitat is managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.

- provide recreation settings and maintain scenic quality in response to the needs of USFS and BLM public land users, as well as to the needs of local communities;

- protect heritage resources, in accordance with applicable laws and regulations, while, at the same time, providing recreational and educational opportunities;

- sustain multiple uses, products, and services in an environmentally acceptable manner (including timber harvesting, livestock grazing, locatable and leasable minerals development, and recreational uses);

- emphasize, through cooperation with other landowners, improved landownership and access patterns that would benefit both private landowners and the public;

- emphasize cooperation with individuals, organizations, Native American tribes, and other agencies in order to better coordinate the planning and implementation of projects;

- implement the revised standards, guidelines and other referenced guidance found in Volume 2, Part Three of this DLMP/DEIS;

- promote rural development opportunities in order to enrich cultural life, enhance the environment, provide employment, and improve living conditions;

- promote actions that would continue to encourage active public participation in the planning and management processes; and

- manage the Inventoried Roadless Areas in compliance with the DLMP and applicable Roadless Rule. In recent years, the management of Inventoried Roadless Areas has been the subject of continuing litigation. Currently, management of the Inventoried Roadless Areas is governed by the 2001 Roadless Area Conservation Rule (36 CFR Part 294) in addition to the Land Management Plan.  The State of Colorado is entering into Roadless Rulemaking with the Forest Service for the Inventoried Roadless Areas within the State.  While the San Juan DEIS has analyzed several options, future management of the Inventoried Roadless Areas will be governed by both the LMP and the applicable Roadless Rule.

BLM_0030155

A number of designations and activities would not change under the alternatives, including:

- existing ski-based resorts (although boundaries may vary by alternative);
- existing components of the National Wilderness Preservation System;
- existing developed recreation sites, utility corridors, and electronic sites;
- currently designated national scenic and recreation trails;
- currently designated scenic byways;
- currently designated National Register of Historic Places (NRHP), Archeological Districts;
- currently designated BLM Wilderness Study Areas (WSAs);
- currently designated BLM Wild Horse Herd Management Areas (HMAs); and
- the development of coalbed methane gas in the HD Mountains (as described in the Record of Decision for the Northern San Juan Basin EIS, although availability of that area for new leases may vary by alternative).
- existing current, valid mineral lease rights (lands leased as of the date of the plan decision would be subject to valid existing rights under lease terms);
- currently withdrawn areas from oil and gas leasing within the SJPL, including the designated Wilderness areas—Lizard Head Wilderness, Weminuche Wilderness, South San Juan Wilderness—and the Piedra Area.

Under this DLMP/DEIS, budget estimates have been prepared in order to project potential land management activities and outputs so that a typical program of work could be analyzed for each alternative. Estimated budgets were allocated among the resource programs based on a 3-year historical average, and were modified by anticipated upward or downward trends in some program areas. The funding levels for some resource programs varied based on the emphasis of each alternative, as well as on differences in the relative sizes of the proposed Management Areas.

**2.5**          **ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS**

An infinite number of alternatives could be considered for revising the existing USFS and BLM land management plans. Several alternatives were considered during the planning process, but were eliminated from further detailed analysis. Public input, past management experience, and laws and regulations were used by the ID Team in designing the alternatives that were analyzed in detail during the planning process.  Many of the suggestions proposed by interested parties and the public were used to develop and shape the analyzed alternatives (even if they were presented in an alternative that was not carried forward in its entirety). A discussion of alternatives not considered in detail, including the reasons why they were eliminated, is presented below.

**EXCLUSIVE USE OR ELIMINATION OF TRADITIONAL USES ALTERNATIVES**

Alternatives proposing exclusive use, or protection of one resource at the expense of other resources, were not considered. Several laws mandate that the BLM and the USFS manage public lands for multiple uses and sustained yield. This legal and regulatory requirement eliminates exclusive-use alternatives, such as alternatives that would close all public lands to livestock grazing, or alternatives that would manage only for wildlife values at the expense of other considerations. In addition, the existing on-the-ground resource conditions do not warrant eliminating any of the traditional resource programs currently managed in the planning area. Several proposed alternatives for exclusive use or elimination of traditional uses include:

***A No-Livestock Grazing Alternative***: This alternative would propose to close the entire planning area to livestock grazing; therefore, it would not meet the purpose and need of revising and combining the existing land management plans. The NEPA requires that agencies study, develop, and describe appropriate alternatives in order to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources. No issues or conflicts have been identified during this land use planning process that would require the complete elimination of livestock grazing within the planning area for their resolution. Closures and adjustments to livestock use have been incorporated into the alternatives, as appropriate, on an area basis in order to address identified issues. Since the USFS and the BLM, as jointly administered by the SJPLC, have considerable discretion, through their livestock grazing regulations, to determine and adjust stocking levels, seasons-of-use, and livestock grazing management activities, as well as to allocate forage, the analysis of an alternative to entirely eliminate livestock grazing is not needed.

An alternative that proposes to close the entire planning area to livestock grazing would also be inconsistent with the intent of the Taylor Grazing Act (TGA) of 1934 (3 USC Section 315-316(o)). The TGA directs the BLM to provide for livestock use of BLM-administered lands; to adequately safeguard livestock grazing privileges; to provide for the orderly use, improvement, and development of the range; and to stabilize the livestock industry dependent upon the public range.

The FLPMA requires that public lands be managed on a "multiple-use and sustained-yield basis" (Section 302(a) and Section 102(7)). The FLPMA includes livestock grazing as a principal or major use of public lands. The multiple-use mandate does not require that all lands be used for livestock grazing; however, complete removal of livestock grazing on the entire planning area would be arbitrary and would not meet the principles of multiple-use and sustained-yield management.

BLM_0030157

Livestock grazing is, and has been, an important use of the public lands in the planning area for many years and is a continuing government program. For this reason, as well as those stated above, a No-Livestock Grazing Alternative for the entire planning area has been dismissed from further consideration in this analysis.

***A No-Coalbed Methane Gas Development in the HD Mountains Alternative***:  This alternative, suggested by many people, would propose to no longer allow development on existing leases in the HD Mountains. This alternative would not meet the purpose and need for revising and combining the existing land management plans. This alternative would not be feasible, due to valid existing rights. Some people also recommended that this area be recommended for inclusion in the National Wilderness Preservation System, and/or be managed as a MA 1, where natural process dominate. The HD Mountains Roadless Area was analyzed; however, it was found to not be available for Wilderness, due to its high mineral potential and approved plans to develop existing leases within the area.

The Record of Decision (ROD) for the Northern San Juan Basin Coalbed Methane Development EIS describes how development of current leases will proceed in the HD Mountains. This EIS addresses future management of the HD Mountains, including whether or not the area should be available for leasing after the current leases expire.

***A Maximum Timber Yield Alternative***: This alternative would propose to maximize timber production; therefore, it would not meet the purpose and need for revising and combining the existing land management plans. This alternative was considered, but eliminated, because it was not considered reasonable (given the required consideration of other resource desired conditions and objectives, likely budget levels, local mill capacities, and expected demand for timber products).

## CITIZENS FOR THE WILD SAN JUANS ALTERNATIVE

This alternative would propose to expand and protect large, wild core habitats; return native fish and wildlife species; secure critical landscape connections; and promote living, working, and playing in harmony with native species and wild habitats in the planning area. In its entirety, this alternative would not meet the purpose and need for revising and combining the existing land management plans. This alternative was presented to the SJPLC by the San Juan Citizens Alliance, with endorsements from the Southern Rockies Ecosystem Project, The Wilderness Society, the Sierra Club – Rocky Mountain Chapter, the Rocky Mountain Recreation Initiative, the Center for Native Ecosystems, the Sinapu, the Biodiversity Conservation Alliance, the Colorado Environmental Coalition, the Colorado Wild, the Western Resource Advocates, and the Upper Arkansas South Platte Project.

This alternative, along with similar comments and suggestions from participants in the community study group process, was the primary basis for Alternative C. Many ideas from this alternative would be represented under Alternative B, and, to a lesser extent, under Alternative D. The exact alternative was not analyzed in detail because it included Wilderness recommendations for some lands that were found not to be capable, or available, for Wilderness status; and Wild and Scenic River (WSR) recommendations for some stream segments that were found not to be eligible for WSR status.

BLM_0030158

**THE CITIZENS WILDERNESS PROPOSAL ALTERNATIVE**

This alternative would recommend Citizens Proposed Wilderness areas to be managed by the SJPLC. In its entirety, this alternative would not meet the purpose and need for revising and combing the existing land management plans. This alternative was presented to the SJPLC by the San Juan Citizens Alliance, the Colorado Environmental Coalition, The Wilderness Society, the Southern Rockies Ecosystem Project, the Rocky Mountain Recreation Initiative, the Colorado Wild, the Sinapu, the Central Colorado Wilderness Coalition, the Sierra Club – Rocky Mountain Chapter, the Western Resource Advocates, the Upper Arkansas South Platte Project, the Colorado Mountain Club, the Center for Native Ecosystems, and the San Luis Valley Ecosystem Council. This group provided information and suggestions on Wilderness character and Wilderness characteristics of the citizens-proposed Wilderness area.

Most of the Wilderness recommendations from this proposal are represented under Alternative C. The exact alternative was not analyzed in detail. This is due to the fact that it included Wilderness recommendations for some lands that were found to not be capable, or available, for Wilderness status. Also, the BLM is no longer considering additional WSAs (IM-2003-075). Although the addition of new WSAs, or boundary changes to existing WSAs, was not considered in detail, management of the areas proposed is being analyzed with regard to their Wilderness characteristics, such as naturalness, solitude, and unconfined and uncontrolled opportunities for recreation.

BLM_0030159

## 2.6 GENERAL DESCRIPTION OF THE ALTERNATIVES

This section summarizes the alternatives analyzed in detail as part of this DLMP/DEIS process. These alternatives were fully developed in order to analyze management goals and objectives within a reasonable range of management actions, and to assist decisionmakers and the public in understanding the potential consequences and benefits of alternative scenarios.

In order to implement actions permitted under the selected plan alternative, site-specific environmental analysis would have to be completed at the project level. For example, although some oil and gas leasing would be allowed under the alternatives and made available for lease, actual oil and gas development of the leases would not be permitted until proposed well locations, road and pipeline alignments, and other facility plans were subjected to site-specific environmental analysis.

Additionally, while the assumptions associated with the alternatives represent reasonable projections of what could occur, it is impossible to predict with certainty the precise outcome of any of the alternatives due to the large number of variables involved. Actual resource use and/or development may differ substantially from the scenarios presented. Under all of the alternatives, any action or development must be consistent with applicable Federal, State, and local laws and regulations. Nothing presented in the following discussion of the alternatives would exempt activities from applicable legal or regulatory requirements.

The differences between the alternatives analyzed in detail in this DLMP/DEIS can be understood primarily by their different land allocations. Management areas (MAs) with different themes, or emphasis on varying levels of development and suitability for uses and activities, are used to characterize the land allocations. The MAs are described below.

### 2.6.1 MANAGEMENT AREAS (MAS)

Management emphasis, the desired level of development, and the suitability for different resource uses and activities varies from location to location across the planning area. To aid in the scoping and planning process, areas within the planning area have been allocated to one of eight management areas (MAs). These MAs range from areas where natural processes dominate and shape the landscape to areas that are intensely managed. MAs are intended to describe the overall appearance desired within the area, as well as the uses and activities that may occur. Briefly, the eight different MAs are described below (see Suitability in Volume 2 of this DLMP/DEIS for a complete description of MAs):

- *MA 1 - Natural Processes Dominate*: Areas allocated under this MA would include relatively pristine lands where natural ecological processes operate free from human influences. Succession, fire, insects, disease, floods, and other natural processes and disturbance events shape the composition, structure, and landscape pattern of the vegetation. These areas would continue to contribute significantly to ecosystem and species diversity and sustainability. They would also continue to serve as habitat for fauna and flora, wildlife corridors, reference areas, primitive recreation sites, and places for people seeking natural scenery and solitude. Roads and human structures would be absent and management activities would be limited on MA 1 lands. In most case, motorized travel and equipment would be prohibited. MA 1s would include designated Wilderness, WSAs, the Piedra Area, and other non-designated lands where the desired condition would be to maintain the undeveloped natural character of the landscape.

BLM_0030160

- ***MA 2 - Special Areas and Unique Landscapes***: Areas allocated under this MA would include areas possessing one or more special feature, or characteristic, that would make them and their management unique from other areas within the planning area. MA 2s would include Research Natural Areas (RNAs), Areas of Critical Environmental Concern (ACECs), Wild Horse Herd Management Area, Archaeological Areas, Habitat Management Areas (HMAs), Botanical Areas, and other unique areas that have a mix of special features and uses. In general, MA 2s would be managed in order to protect and/or enhance their unique characteristics and, as such, management intensity and suitability would vary by each area.

- ***MA 3 - Natural Landscapes with Limited Management***: Areas allocated under this MA would include relatively unaltered lands where natural ecological processes operate mostly free from human influences. Succession, fire, insects, disease, floods, and other natural processes and disturbance events would continue to predominantly shape the composition, structure, and landscape pattern of the vegetation (although management activities might also have an influence). These areas would continue to contribute to ecosystem and species diversity and sustainability, and to serve as habitat for fauna and flora, wildlife corridors, reference areas, primitive and semi-primitive recreation sites, and places for people seeking natural scenery and solitude. Roads and human structures would be present, although uncommon.

   Management activities would be allowed, but would be limited in MA 3s. They would be reserved primarily for restoration purposes brought about by natural disturbance events and/or by past management actions. Management activities could include restoration of ecological conditions or habitat components; prescribed fire; wildland fire use; salvage logging following fire, insect epidemics, or a wind event; hazardous fuels reduction; invasive species reduction; etc. Temporary road construction and motorized equipment could be used in order to achieve desired conditions; however, most roads would be closed upon project completion. Motorized and non-motorized recreation opportunities would exist, and livestock grazing would occur on many of these lands.

- ***MA 4 - High-Use Recreation Emphasis***: Areas allocated under this MA would include places where recreation would be managed in order to provide a wide variety of opportunities and experiences to a broad spectrum of visitors. The area allocations would be associated with, and would often provide access to, popular destinations, transportation corridors, scenic byways, scenic vistas, lakes, and/or streams. These areas tend to be altered, but would also include some more undeveloped places, such as backcountry travel corridors. In MA 4s, visitors could expect to see a wide range of human activities and development including roads, trails, interpretive sites, campgrounds, trailheads, fences, mountain bikes, and day-use facilities. Motorized and non-motorized activity would be common. Natural ecological processes and disturbance agents, including succession and fire, would often be influenced by humans on most of these lands. Resource uses (such as livestock grazing, timber management, wildlife management, etc.) might occur in conjunction with surrounding recreation and scenic objectives.

BLM_0030161

- **MA 5 - Active Management (commodity production to meet multiple use goals)**: Areas allocated under this MA would include multiple-use areas where active management would occur in order to meet a variety of social, economic, and/or ecological objectives. These areas would be easily accessible, occurring mostly on roaded landscapes and on gentle terrain. These would include lands where timber harvesting, oil and gas activities, and intensive livestock grazing would occur, and would, as a result, influence the composition, structure, and landscape pattern of the vegetation. Natural ecological processes and disturbance agents, including succession and fire, would be influenced by humans on many of these lands. A mosaic of vegetation conditions would often be present, with some showing the effects (impacts) of past management activities, and others appearing predominantly natural. These areas would continue to contribute to ecosystem and species diversity, and to serve as habitat for fauna and flora.

  Visitors in MA 5s could expect to see a wide range of human activities, development, and management investments (including roads, trails, fences, corrals, stock ponds, timber harvesting equipment, oil and gas wells, mountain bikes, and/or livestock). Maintenance of past and current investments is anticipated to be continued for future management opportunities. Motorized and non-motorized recreation opportunities would be easily accessed by the relatively dense network of roads found on these lands. Hiking trails would provide access for visitors who could expect contact with others. Developed recreational facilities that provide user comfort, and resource protection would be present.

- **MA 6 - Grasslands**: This MA does not occur in the SJPL planning area.

- **MA 7 - Public and Private Lands Intermix**: Areas allocated under this MA would include places where public lands are in close proximity to private lands (in such a manner that coordination with communities and local governments would be essential in order to balance the needs of both parties). MA 7s would often be associated with towns and cities, as well as with the houses, structures, people, and values associated with them. Visitors in MA 7s could expect to see a wide range of human activities and development (including roads, trails, fences, signs, mountain bikes, ATVs, pets, and/or livestock).

  The close proximity of these areas to private lands would make them a priority for fuels and vegetation treatments in order to reduce wildfire hazards. The "backyard" or rural recreation setting provided by many of these lands would be an amenity to the active lifestyles and quality of life for local residents. Hiking and biking could be common activities. These areas would continue to contribute to ecosystem and species diversity, and to serve as habitat for fauna and flora. Winter range for deer and elk would continue to be a common component of MA 7s, as would seasonal closures in order to reduce animal disturbance. Natural ecological processes and/or disturbance agents, including succession and fire, would be influenced by humans on most of these lands.

  Land exchanges, acquisitions, and/or land disposals could be used in order to improve the intermingled land ownership patterns that are common in MA 7s. Cooperation with adjacent landowners and local governments would continue to be necessary in order to improve access and to convey roads to county jurisdictions, where appropriate. Such cooperation would also be necessary in order to improve the transportation network, protect resources, and allow authorized legitimate access to public lands. Utility and communication distribution lines would tend to be more common in these areas.

- **MA 8 - Highly Developed Areas**: Areas allocated under this MA would include places where human activities have permanently changed the planning area, and have, in most cases, completely altered the composition, structure, and function (ecological processes and disturbance agents) of the associated ecosystems. On SJPL, these areas, which often provide large socioeconomic benefits, include downhill ski areas and the McPhee Dam and Marina.

BLM_0030162

**Table 2.1 - Comparison of Management Areas by Alternatives**

| MANAGEMENT AREAS | Alternative A (No-Action Alternative) | Alternative B (Preferred Alternative) | Alternative C | Alternative D |
|---|---|---|---|---|
| MA 1  Natural Processes Dominate | 538,658 | 652,307 | 1,080,606 | 553,786 |
| MA 2  Special Areas and Unique Landscape Areas | 100,755 | 193,503 | 198,512 | 151,040 |
| MA 3  Natural Landscape with Limited Management | 891,718 | 825,000 | 472,022 | 788,289 |
| MA 4  High-Use Recreation Emphasis | 148,465 | 79,711 | 54,765 | 86,236 |
| MA 5  Active Management (commodity production in order to meet multiple-use goals) | 675,014 | 529,413 | 487,299 | 682,632 |
| MA 7  Public and Private Lands Intermix | 0 | 81,756 | 71,929 | 89,116 |
| MA 8  Highly Developed Areas | 14,475 | 7,395 | 3,952 | 17,986 |
| **TOTAL ACRES** | **2,369,085** | **2,369,085** | **2,369,085** | **2,369,085** |

BLM_0030163

**Figure 2.1 - Management Areas Alternative A**



**Figure 2.2 - Management Areas Alternative B**

BLM_0030165



**Figure 2.3 - Management Areas Alternative C**



**Figure 2.4 - Management Areas Alternative D**

BLM_0030167



San Juan Public Lands
Management Areas
Alternative D

Legend

1 W - Natural Processes Dominate: Designated Wilderness, Wilderness Study Areas and Piedra Area
1 - Natural Processes Dominate: Other Areas
2 - Special Areas and Unique Landscapes
3 - Natural Landscape with Limited Management
4 - High Use Recreation Emphasis
5 - Active Management
7 - Public and Private Lands Intermix
8 - Highly Developed Areas
USFS/BLM - Ranger Districts / Field Office Boundary
San Juan National Forest Boundary
Cities and Towns
Major Lakes
Major Rivers
State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available. Geospatial data accuracy varies by theme on the map. Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial inputs without notification.

Miles
0  5  10      20

JET
NAD 83, Polyconic Projection
October 29, 2007

## 2.6.2 ISSUES AND CONCERNS

The varying composition of MAs (in terms of the desired future conditions and the variety of multiple uses that may occur within each MA) represents the primary differences among the alternatives. The composition of MAs was used in the planning process as a starting point for developing and analyzing land and resource suitability (such as, but not limited to, determining lands suitable for timber development, lands suitable and capable for livestock grazing, and lands suitable for motorized travel); as well as for discussing and analyzing related issues and concerns.

In this DLMP/DEIS, issues represent a matter of conflict or controversy, with regard to choice, over how resource management activities and/or land uses are to be managed (i.e., "this way" or "that way"). Considering the principles of multiple-use and sustained-yield management governing the administration of public lands, it is understood that different user groups, different individuals, and different agencies have differing opinions, goals, and desires as to the use of their public lands. Basically, different entities have different interests in the resources, different values for those resources, and different ideas (alternatives) as to how to resolve the competition or demand.

In contrast to "issues," concerns represent questions regarding a specific resource management activity or land use (i.e., "Why this?" or "What now?"). Although some concerns overlap with broader issues, a management or public concern is generally more important to an individual, or to a few individuals, and is generally agreed upon by the greater public (as opposed to an "issue," which has a more widespread point of conflict). During the public scoping process, many concerns were identified, yet there was not a pronounced point of conflict or debate. Rather, most agreed on the concern and wanted the planning process to address the concern. For example, most agree that invasive plant species are a problem and that ponderosa pine stands need restoration. These concerns did not shape different alternatives; rather they are addressed in the Draft Land Management Plan sections (including desired conditions, objectives, and design criteria) and are common to all alternatives.

The four primary issues addressed by the different alternatives considered in this DLMP/DEIS analysis are:

- ***Issue One - Balancing Management between the Ideas of Maintaining "Working Forest and Rangelands" and of Retaining "Core Undeveloped Lands"***: This issue reflects the debate about which lands should be actively managed (including for timber production, and roads) versus which should be managed in a manner that allows natural processes to shape the landscape. In general, alternatives with greater land allocations to MA 4s, 5s, 7s, and 8s would primarily represent preferences for working forest and rangelands. Alternatives with more MA 1 and MA 3 allocations would represent preferences for retaining core undeveloped areas. Options for MA 2 lands would vary, depending on the objectives of each area.

  The differences in emphasis between MA 1 and MA 3 allocations reflect the point of debate regarding how much management flexibility there should be, as well as whether or not options that address forest and rangeland health concerns should be used. In addition, whether or not USFS IRAs should be managed as MA 1 (and recommended or not for inclusion in the National Wilderness Preservation System) or as MA 3, is one of the main differences between the alternatives.

  Commercial timber production would occur only on MA 5 lands. Timber harvesting might occur on some lands in other management areas (except for MA 1s) in order to meet resource objectives other than timber production, including hazardous fuels treatments, and insect and disease management.

New permanent road construction would primarily be associated with either timber harvesting or with oil and gas exploration and development occurring on MA 5 lands. Roads constructed for these activities in other management areas would normally be temporary, and would be reclaimed after the project was completed.

MA 7 lands would be intensely managed in order to address various activities and mixed-land ownership patterns that occur near communities. MA 7 allocations would vary only slightly among alternatives, because there was general agreement on how and where MA 7 management should be emphasized.

MA 8 allocations would be applied to downhill ski areas and the McPhee dam. The MA 8 acreage differences among the alternatives represent the debate about whether or not existing ski areas should be expanded and whether or not more areas should be considered for ski resort development.

The Management Area maps displayed for each alternative in this chapter provide an illustration of MA land allocations.

- ***Issue Two - Providing Recreation and Travel Management within a Sustainable Ecological Framework***:
This issue reflects the debate about access, as well as about how many areas should be made available for recreational motorized or non-motorized travel in both the summer and winter (i.e., over-ground and over-snow motorized areas). Travel suitability would be determined based on the need for access, recreational experiences, resource protection, reducing user conflicts, and/or wildlife habitat considerations.

MA 1 lands would be considered unsuitable for over-ground motorized travel. Most MA 3 lands that do not currently have motorized routes would also be considered unsuitable. The "suitable" category identifies areas with existing motorized roads, and trails where the desire is to maintain the current motorized route density. Suitable areas would be generally represented by MA 2s, 3s, 4s, and 7s where motorized routes currently exist.

The "suitable opportunity" category identifies areas with existing routes for motorized travel and where opportunities exist for expanding motorized recreation routes. Most suitable opportunity over-ground motorized areas would correlate with the MA 5 roaded and actively managed areas. In general, areas that would be allocated to MA 5s currently have an existing road and/or a motorized trail system, as well as the potential to improve and increase motorized opportunities (by connecting existing roads or trails in order to create loop opportunities using existing unauthorized roads and/or trails, or by adding road and/or trail segments).

With regard to motorized travel, some of the more predominant areas that change by alternative would include the northwestern BLM lands on the Dolores District/Field Office; the Canyons, primarily on the Dolores District/Field Office; the Taylor Mesa, Stoner Mesa, and Ryman areas on the Dolores District/Field Office; and the Hermosa area of the Columbine District/Field Office.

Over-snow motorized suitability would be divided into two classes: 1) unsuitable, and 2) suitable. In general, unsuitable acres would consist of MA 1 lands, as well as most RNAs and areas considered critical winter wildlife habitat. In determining suitability for over-snow motorized uses, consideration was given to the availability of parking/staging areas, to the goal of reducing user conflicts, as well as to concerns regarding resources and wildlife. Particular areas of difference in the over-snow motorized travel suitability included Molas Pass, Red Mountain Pass, Lizard Head Pass, and Wolf Creek Pass.

BLM_0030169

The recreation and travel management issue also reflects public comments regarding improving recreation management (especially in heavily used recreation areas) and to improving how users are directed to areas where they can seek particular recreation experiences. Under all of the alternatives, the concentration of users recreating in the "backyard" of communities on public lands are identified as MA 7s under the different alternatives. The over-snow and over-ground motorized travel suitability maps are presented for each alternative in the discussion of Alternatives Considered in Detail section of this chapter.

- ***Issue Three: Management of Special Area Designations and Unique Landscapes***: This issue reflects the point of debate about which areas should be recommended for special designations and/or managed in order to emphasize unique features. Special designations would include recommendations for inclusion in the National Wilderness Preservation System, identification of river segments suitable for inclusion in the National Wild and Scenic Rivers System, and designations of RNAs and ACECs. Additional unique landscapes with management emphasizing heritage, recreation, scenery, and/or botanical resources are identified as MA 2s under the different alternatives.

- ***Issue Four: Managing Impacts from Oil and Gas Leasing and Development***: This issue reflects the debate about where energy development should take place, and how it should be done. The planning area contains locations of known, high and moderate potential energy reserves, some of which have been developed. Oil and gas production is a significant sector of local economies and affects most local residents through its favorable impact on local property taxes, as well as on its fiscal contribution to county tax bases and to local school systems. People are concerned about how to best balance the extraction of oil and gas with the protection of other resources and values.

Oil and gas development on lands under lease as of the date of the revised LMP will be managed under the terms of those leases. Most existing leases are in the San Juan Basin portion of the SJPL; some existing leases are in the Paradox Basin portion of the SJPL. The revised LMP and Forest Service oil and gas leasing availability decision will, however, provide for where and how oil and gas development may occur on future leases by identifying National Forest System and BLM lands available for leasing and identifying where certain lease stipulation (restrictions) will apply to future leases on SJPL.

Under all alternatives, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag both of which have expression of interest for oil and gas leasing.

Oil and gas leasing availability alternatives are described in detail in Section 2.8 of this chapter to accommodate both USFS and BLM leasing availability requirements and decision making authorities. The oil and gas leasing availability decisions are described by alternative and compliment Alternatives A, B, C, and D described Section 2.7 - Description of the Alternatives Considered in Detail. Additionally, this section includes a No Lease Alternative and as required by 36 CFR 228.102 (c)(2)&(3).

BLM_0030170

| 2.7 | DESCRIPTION OF THE LMP ALTERNATIVES CONSIDERED IN DETAIL |
|---|---|

Four LMP alternatives are considered in detail in this DLMP/DEIS. These alternatives, discussed in relation to proposed MA allocation, as well as in relation to the four major issues raised during the agency and public scoping process, are described below.

### 2.7.1   ALTERNATIVE A (THE NO-ACTION ALTERNATIVE)

Under this DLMP/DEIS, Alternative A would represent the continuation of existing management under the existing BLM and USFS land management plans (the BLM's San Juan/San Miguel Resource Management Plan (1985) and the San Juan National Forest Land and Resource Management Plan (1983), both as amended). It meets the requirements of the NEPA (40 CFR Part 1502.14) that a No-Action Alternative be considered. ("No-Action" means that existing management practices based on existing land use plans and other management decision documents would continue.) This alternative would serve as a baseline for comparing the impacts of the other alternatives. Direction from existing laws, regulation, and policy would also continue to be implemented.

Alternative A is based on reasonably foreseeable actions, available inventory data, existing planning decisions and policies, and existing land use allocations and programs. The current levels of products, services, and outputs based on multiple-use and sustained-yield management of the public lands in the planning area would continue, except for fluctuations due to budget.

Alternative A is based more on historical and expected output levels than on projections of outputs from the earlier land management plans. For example, the San Juan National Forest has only been harvesting about one-half as much timber as was estimated in the existing plan. This is due to both budget constraints and to lower demand for wood products.

Issues were identified where travel management direction conveyed in the Visitor Map for the planning area and on-the-ground signing was inconsistent with existing plan direction. In those instances, Alternative A would be based on how the area is currently being managed.

Alternative A would emphasize allowing a wide variety of uses to occur on any given piece of land, and resolving conflicts on a case-by-case basis as they arise. This alternative would have less separation of potentially conflicting uses of the public lands, and fewer designations of special areas than would any of the other alternatives.

**Alternative A - MA Land Allocations**

Figure 2.1 - Management Areas Alternative A illustrates where management areas would occur. The table below shows the distribution of MAs for Alternative A.

BLM_0030171

**Table 2.2 - Alternative A Management Area Allocations**

| MANAGEMENT AREA | | Alternative A (acres) | Percentage (%) of Geographic Area (USFS and BLM Lands only) |
|---|---|---|---|
| MA 1 | Natural Processes Dominate | 538,658 | 22.7% |
| MA 2 | Special Areas and Unique Landscapes | 100,755 | 4.3% |
| MA 3 | Natural Landscapes with Limited Management | 891,718 | 37.6% |
| MA 4 | High-Use Recreation Emphasis | 148,465 | 6.3% |
| MA 5 | Active Management (commodity production in order to meet multiple-use goals) | 675,014 | 28.5% |
| MA 7 | Public and Private Lands Intermix | 0 | 0% |
| MA 8 | Highly Developed Areas | 14,475 | 0.6% |
| | **TOTAL** | **2,369,085** | **100%** |

Note: The current resource emphasis land allocations used in the existing BLM and USFS plans were converted to the Management Areas for comparison of alternatives and analysis purposes.


**Alternative A - Issues and Concerns**

Alternative A (the No-Action Alternative) was analyzed in relation to the four primary issues raised during the scoping process, and the oil and gas leasing availability decisions described in Section 2.8.

- ***Issue One - Balancing Management between the Ideas of Maintaining "working Forest and Rangelands" and of Retaining "Core Undeveloped Lands"***: As under all of the alternatives, commercial timber production occurs only within the MA 5 lands. Alternative A would include the largest amount of acreage suitable for timber production, including about 119,107 acres in IRAs. However, timber harvesting conducted in these areas would be incompatible with the 2001 Roadless Area Conservation Rule. In the decade preceding this Rule, few timber sales were conducted in roadless areas due to their high costs, and to the tradeoffs with other resource values. This, along with changes in mill capacity and timber demand, has resulted in difficulty in meeting the levels of timber harvesting projected under the existing plan. Timber harvesting conducted in order to meet resource objectives, other than timber production, was allowed within most of the MA 3 lands under the existing land management plan; however, some of these lands are in IRAs and would not be compatible with the 2001 Roadless Area Conservation Rule.

  This alternative would continue the range management practices required under the existing USFS and BLM land management plans. No changes to allotment status or stocking rates are proposed under this alternative.

BLM_0030172

Under this alternative, the land allocation for the Durango Mountain Resort would remain the same as under current management, allowing potential expansion mostly to the north. The land allocation for Silverton Mountain would also remain as currently approved. The proposed East Fork and Wolf Creek Valley Ski Areas would continue to remain in MA 8, with the potential for ski area development. Expansion of Wolf Creek Ski Area onto the public lands in the planning area would not meet desired conditions under this alternative. More detailed site-specific analysis would be required before any development plans were authorized.

Under Alternative A, the only lands identified as MA 1 are USFS designated Wilderness areas, the Piedra Area, BLM WSAs, and the wild portion of the Piedra River corridor that was found suitable as a WSR in an earlier study. This alternative would offer the least protection for the currently undeveloped portions of the planning area.

- ***Issue Two - Providing Recreation and Travel Management within a Sustainable Ecological Framework***:
  Under this alternative, travel management opportunities would continue as they currently exist, with 1,819,523 acres suitable for motorized travel over-ground; and 1,329,159 acres suitable for over-snow motorized travel. Overall, this alternative would have the least amount of acres identified as "unsuitable" for over-ground motorized travel. It would have the largest amount of acres suitable (counting both "suitable" and "suitable opportunity" areas) out of all the alternatives. However, for more than one-quarter of the NFS lands, this would be inconsistent with the 2005 Travel Management Rule. Also, travel management for most of the BLM lands outside of the Silverton area would be inconsistent with existing BLM policy. Under this alternative, nearly all of the lands on the Dolores District/Field Office would be identified as suitable or suitable opportunity areas, with the exception of Wilderness, WSAs, RNAs, the segment of the Dolores River that was found suitable as a WSR, and a couple of other areas. Under this alternative, the areas of particular interest would be identified as suitable or suitable opportunity areas. Again, many of these areas would be inconsistent with the 2005 Travel Management Rule, as well as with the BLM policy.

Alternative A would have the largest amount of acres identified as suitable for over-snow motorized travel. With regard to the over-snow motorized opportunities on the passes, this alternative would keep both sides of Lizard Head Pass suitable for motorized use, both sides of Red Mountain Pass suitable for motorized use, and the largest amount of motorized suitable acres in the Wolf Creek Pass area. The over-snow motorized acres for Molas Pass would be the same as that proposed under Alternative D.

Under Alternative A, existing BLM Structured Recreation Management Areas (SRMAs) would continue to be managed as SRMAs. These areas would specifically include the Dolores River Canyon SRMA, the Silverton SRMA, and the Durango SRMA. The Cortez SRMA would not be included under this alternative.

BLM_0030173

**Figure 2.5 – Overground Motorized Suitability - Alternative A**



San Juan Public Lands
Proposed Over-Ground Travel Suitability
Alternative A

Legend
- 1 - Unsuitable
- 1 - Unsuitable: Designated Wilderness, Wilderness Study Areas and Piedra Area
- 2A- Suitable: Designated, Authorized or System Roads and Trails
- 2B- Suitable: Opportunity Areas
- USFS/BLM - Ranger Districts / Field Office Boundary
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available. Geospatial data accuracy varies by theme on the map. Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial maps without notification.

JET
NAD 83, Polyconic Projection
October 29, 2007

0   10   20   40   Miles

**Figure 2.6 – Over Snow Motorized Suitability - Alternative A**



BLM_0030175

- **Issue Three: Management of Special Designations and Unique Landscapes**: Under Alternative A, no new additions to the National Wilderness Preservation System would be recommended. The existing Weminuche, South San Juan, and Lizard Head Wilderness Areas, the Piedra Area, and the BLM WSAs would continue to provide solitude, and primitive and unconfined recreational opportunities.

Under this alternative, segments of the Dolores, West Dolores, Los Pinos, and Piedra Rivers that were found suitable for designation as WSR in previous studies would continue to be managed in order to protect their outstandingly remarkable values, and to maintain their classification as wild, scenic, or recreational.

Under this alternative, no new BLM ACECs would be proposed. The 1,160-acre portion of the Mud Springs ACEC that was not included in the proclamation that designated The Canyons of the Ancients National Monument would continue to be managed as an ACEC in order to mitigate archaeological impacts from other resource activities in the area. Two RNAs, totaling 2,450 acres, would remain on NFS lands; no new RNAs would be recommended under Alternative A.

This alternative would not identify any new unique landscapes as MA 2s; however, it would continue to manage the ones identified in the existing plans:  the Dolores River Canyon, the Wild Horse Herd Management Area, Silverton, the Falls Creek and Chimney Rock Archaeological Areas, and the Perins Peak Habitat Areas.

BLM_0030176

## 2.7.2    ALTERNATIVE B (THE PREFERRED ALTERNATIVE)

Based on public scoping, Alternative B would represent a balance among the revision issues. This alternative would provide for a mix of multiple-use activities, with a primary emphasis on maintaining most of the large, contiguous blocks of undeveloped lands and on enhancing various forms of recreation opportunities while, at the same time, maintaining the diversity of uses and active forest and rangeland vegetation management.

This alternative would represent a mix and a variety of actions that would resolve the issues and management concerns raised during public scoping, in consideration of all of the resource values and all of the management programs. Alternative B would incorporate the goals of the Forest Service's Strategic Plan (36 CFR 219.12(f)(6)), the Department of the Interior's Strategic Plan, and the BLM's Annual Operating Plan.

The Responsible Officials, the Regional Forester for USFS lands and the State Director for BLM lands, have identified Alternative B as the Preferred Alternative in this DLMP/DEIS.

### Alternative B - MA Land Allocations

Figure 2.2 - Management Areas Alternative B illustrates where MAs would occur. The table below shows the distribution of management areas for Alternative B.

### Table 2.3 - Alternative B Management Area Allocations

| MANAGEMENT AREA | | Alternative B (acres) | Percentage (%) of Geographic Area (USFS and BLM Lands only) |
|---|---|---|---|
| MA 1 | Natural Processes Dominate | 652,307 | 27.5% |
| MA 2 | Special Areas and Unique Landscapes | 193,503 | 8.2% |
| MA 3 | Natural Landscapes with Limited Management | 825,000 | 34.8% |
| MA 4 | High-Use Recreation Emphasis | 79,711 | 3.4% |
| MA 5 | Active Management (commodity production in order to meet multiple-use goals) | 529,413 | 22.3% |
| MA 7 | Public and Private Lands Intermix | 81,756 | 3.5% |
| MA 8 | Highly Developed Areas | 7,395 | 0.3% |
| | *TOTAL* | *2,369,085* | *100.00%* |

BLM_0030177

## Alternative B - Issues and Concerns

Alternative B (the Preferred Alternative) was analyzed in relation to the four primary issues raised during the scoping process, and the oil and gas leasing availability decisions described in Section 2.8.

- ***Issue One - Balancing Management between the Ideas of Maintaining "Working Forest and Rangelands" and of Retaining "Core Undeveloped Lands"***: Under Alternative B, the lands suitable for timber production would be 20% smaller than that proposed under Alternative A. This is due to the fact that lands within IRAs are not included. Projected timber harvesting levels would remain the same as under current management. That would be possible because mill capacity, the demand for timber, and the available budget for preparing and administering timber sales would be more limiting than the land base. Under Alternative B, timber harvesting conducted in order to meet resource objectives other than timber production would remain at similar levels as that proposed under Alternative A. However, it would be more likely to occur closer to communities for fuels reduction purposes, rather than in roadless areas.

  Under Alternative B, lands suitable and capable for livestock grazing would be relatively similar to that proposed under Alternative A, with some exceptions. The 11 "C" category BLM allotments in the Pagosa District/Field Office would be closed (due to the difficulties of managing small parcels of public lands within larger private land parcels undergoing development). Also, the remaining unstocked "C" category allotments would also be closed across the planning area in order to improve program administration efficiency.

  This alternative would allocate currently permitted ski resorts (Silverton Mountain and the Durango Mountain Resort) as MA 8s. The land allocation for the Durango Mountain Resort would remain the same as under current management, allowing potential expansion mostly to the north.

  The potential East Fork and Wolf Creek Valley Ski Areas would be managed as MA 1 and 3 in Alternative B and would not be compatible for ski development. Under Alternative B, ski area development would not meet the desired conditions for these areas, and would only occur if the FLMP/FEIS was amended, based on a detailed site-specific analysis.

  Under this alternative, most of the IRAs would be managed as either MA 1s or as MA 3s in order to preserve their undeveloped, natural character. Compared with Alternative C, this alternative would identify more of the IRAs to be managed as MA 3s in order to retain more management options addressing forest health problems. Under this alternative, no new permanent road construction would occur in IRAs.

- ***Issue Two - Providing Recreation and Travel Management within a Sustainable Ecological Framework***: Alternative B would aim to find a balance between motorized and non-motorized opportunities. Under this alternative, approximately 1,002,388 acres would be unsuitable for over-ground motorized travel. In general, about half of this acreage consists of designated as Wilderness, WSAs, and/or other areas that prohibit motorized travel; the other half would include IRAs and areas not conducive to motorized road and trail systems (due to resource, wildlife habitat, recreation experiences, and/or construction feasibility reasons). Under this alternative, approximately 955,403 acres would be identified as suitable areas for motorized travel on designated roads and trails. These areas generally have an existing developed road and/or motorized trail system that adequately serves the recreation and resource access needs of the particular area. Compared with Alternative A, this alternative would reduce the "suitable" and "suitable opportunity" acres for motorized travel. This would be done primarily by tightening the suitable boundaries in order to reflect areas with existing and desirable motorized routes, identifying areas without any existing motorized routes as unsuitable, and identifying suitable opportunity areas

BLM_0030178

**Figure 2.7 – Over Ground Motorized Suitability - Alternative B**



San Juan Public Lands
Proposed Over-Ground Travel Suitability
Alternative B

Legend

- 1 - Unsuitable
- 1 - Unsuitable:  Designated Wilderness, Wilderness Study Areas and Piedra Area
- 2A - Suitable:  Designated, Authorized or System Roads and Trails
- 2B - Suitable:  Opportunity Areas
- USFS/BLM - Ranger Districts / Field Office Boundary
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available.  Geospatial data accuracy varies by theme on the map.  Using this map for other than their intended purpose may yield inaccurate or misleading results.  The USFS and BLM reserve the right to correct, update or modify geospatial inputs without notification.

JET
NAD 83, Polyconic Projection
October 29, 2007

0   10   20   40   Miles

**Figure 2.8 – Over Snow Motorized Suitability - Alternative B**



within MA 5s. In general, MA 5s would have an existing road and/or motorized trail system, as well as the potential to improve and increase motorized opportunities by connecting existing roads or trails in order to create loop opportunities using existing unauthorized roads or trails, or by adding road or trail segments.

The NW BLM lands on the Dolores District/Field Office identified as "suitable opportunity areas" under Alternative A would be identified as "suitable" under Alternatives B, C, and D in order to keep travel on existing routes and reduce the road density in these areas that have erosive and sensitive soils. Canyons on the Dolores District/Field Office that are identified as "suitable opportunity" areas under Alternative A, would be identified as "suitable" in this Alternative, thereby retaining and limiting access to the existing motorized roads and trails.  The Hermosa area under Alternative B would mostly be identified as "unsuitable" to motorized travel, with the exception of the Hermosa trail and existing motorized routes on the east side. Motorized routes on the west side would not be compatible with Alternative B, and would be closed, pending future NEPA analysis.  In Alternative B, Stoner Mesa and the Ryman area on the Dolores District/Field Office would tighten the boundary of suitable area to areas with existing motorized road/routes, and would identify areas currently without motorized roads/routes as unsuitable. Taylor Mesa, which is "suitable" under Alternative A, would change to a "suitable opportunity area" under Alternative B.

Under Alternative B, approximately 847,174 acres would be identified as suitable for motorized over-snow travel. Approximately 440,000 acres identified as suitable for winter motorized travel under Alternative A would be identified as unsuitable under Alternative B. The change would primarily affect the lands in the northwest portion of the planning area, where unpredictable snowfall and big-game winter range needs limit over-snow motorized travel opportunities. Additionally, the west side of Red Mountain Pass would be unsuitable for over-snow motorized travel under this alternative. The east side of Red Mountain Pass would remain suitable. Compared with Alternative A, there would be fewer acres suitable for motorized travel around Molas Pass and Wolf Creek Pass under Alternative B.

Under Alternative B, existing BLM Structured Recreation Management Areas (SRMAs) would continue to be managed as SRMAs.  In addition to the four existing BLM SRMAs, this alternative would add the BLM Cortez SRMA.

BLM_0030181

- ***Issue Three: Management of Special Designations and Unique Landscapes***: This alternative would recommend a portion (50,895 acres) of the west side of the Hermosa IRA for inclusion in the National Wilderness Preservation System. Additionally, portions of the Lizard Head IRA, portions of the Weminuche Adjacent IRA (specifically, Elk Park and Monk Rock), and portions of the Turkey Creek IRA would be recommended for inclusion in the National Wilderness Preservation System. Nearly all other IRAs would be managed as either MA 1s, 2s, or 3s under this alternative, in order to retain their undeveloped character. Twelve river segments, totaling approximately 356 miles would be considered suitable for addition to the National Wild and Scenic Rivers System under this alternative.

Under this alternative, one new ACEC, the Big Gypsum, would be designated. Under this alternative, the Mud Springs ACEC (a remnant area that was not included in the proclamation that designated The Canyons of the Ancients National Monument) would no longer be managed as an ACEC. While the archealogical values would still be recognized, Alternative B emphasizes the recreation use of the area and identifies it as a BLM Structured Recreation Management Area (SRMA).  In addition to the 2 existing RNAs, 8 new RNAs totaling 56,318 acres, would be designated under this alternative. Two new Botanical Areas, the Chatanooga Iron Fen, and the Burro Bridge Iron Fen would be designated, in addition to the existing O'Neal Hill Frosty Bladder Pod Area.

Under Alternative B, the Dolores River Canyon boundary would be expanded, when compared with Alternative A, in order to include Norma Jean Canyon and Dolores River Canyon at Disappointment (areas with unique plant communities). The Silverton MA 2 boundary would be expanded, when compared with the BLM lands under Alternative A, to include adjacent NFS lands with similar characteristics, uses, and management challenges. This alternative would allocate the largest acreage to the Rico MA 2 to emphasize a cooperative working relationship between the Town and the USFS and to manage these lands in ways that complement Town and agency goals.  Under this alternative, the HD Mountains area, consisting of 44,115 acres, would be identified as a MA 2, with a management prescription that would address the protection of unique features in an area planned for coalbed methane development. It would provide for the areas' reclamation after the coalbed methane project is completed.

BLM_0030182

### 2.7.3   ALTERNATIVE C

Alternative C would provide for a mix of multiple-use activities, with a primary emphasis on the undeveloped character of the planning area. Production of goods from vegetation management would continue, but might be secondary to other non-commodity objectives. Under Alternative C, production of goods and services would be slightly more constrained than that proposed under Alternatives A, B, and D. And, in some cases and in some areas, uses would be excluded in order to protect sensitive resources. Alternative C identifies more resources and areas as Management Area 2 - Special Areas and Unique Landscapes than the other alternatives. Management provisions under this alternative would emphasize the undeveloped character of large blocks of contiguous land and non-motorized recreational activities to a greater degree than would any of the other alternatives.

**Alternative C - MA Land Allocations**

Figure 2.3 - Management Areas Alternative C illustrates where management areas would occur. The table below shows the distribution of management areas for Alternative C.

**Table 2.4 - Alternative C Management Area Allocations**

| MANAGEMENT AREA | | Alternative C (acres) | Percentage (%) of Geographic Area (USFS and BLM Lands only) |
|---|---|---|---|
| MA 1 | Natural Processes Dominate | 1,080,606 | 45.6% |
| MA 2 | Special Areas and Unique Landscapes | 198,512 | 8.4% |
| MA 3 | Natural Landscapes with Limited Management | 472,022 | 19.9% |
| MA 4 | High-Use Recreation Emphasis | 54,765 | 2.3% |
| MA 5 | Active Management (commodity production in order to meet multiple-use goals) | 487,299 | 20.6% |
| MA 7 | Public and Private Lands Intermix | 71,929 | 3.0% |
| MA 8 | Highly Developed Areas | 3,952 | 0.2% |
| | **TOTAL** | **2,369,085** | **100.00%** |

BLM_0030183

**Figure 2.9 – Over Ground Motorized Suitability - Alternative C**



**Figure 2.10 – Over Snow Motorized Suitability - Alternative C**



San Juan Public Lands
**Proposed Over-Snow Travel Suitability**
**Alternative C**

Legend
- 1 - Unsuitable: Designated Wilderness, Wilderness Study Areas and Piedra Area
- 1 - Unsuitable
- 2 - Suitable
- USFS/BLM - Ranger Districts / Field Office Boundary
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available. Geospatial data accuracy varies by theme on the map. Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial inputs without notification.

JET
NAD 83, Polyconic Projection
October 29, 2007

0   10   20   40  Miles

**Alternative C - Issues and Concerns**

Alternative C was analyzed in relation to the four primary issues raised during the scoping process and the oil and gas leasing availability decisions described in Section 2.8.

- ***Issue One - Balancing Management between the Ideas of Maintaining "Working Forest and Rangelands" and of Retaining "Core Undeveloped Lands"***: Under this alternative, the lands suitable for timber production and projected harvesting levels would be slightly less than under Alternative B (due to a smaller emphasis on commodity production under this alternative and to fewer lands allocated as MA 5). Under this alternative, timber harvesting conducted in order to meet resource objectives other than timber production would be approximately 40% less than under the other alternatives (because more land is allocated as MA 1).

   Given the overall theme of this alternative, livestock grazing objectives would be secondary in order to provide for other biodiversity and species objectives. In addition to the allotment management changes proposed under Alternative B, Alternative C would propose to close all vacant USFS and BLM sheep allotments, as well as all active sheep allotments in the Silverton area, in order to avoid potential conflicts with bighorn sheep. Allotments within the proposed HD unique landscape area, Sagehen, the Spring Creek Wild Horse Management Area, old growth unique landscape areas, MA 1s and 3s within the Hesperus landscape, and along the Highway 160 corridor between Bayfield and the La Plata County line would also be closed under this alternative. The goal of this management action would be to improve cultural-resource preservation, improve big-game winter range, and increase the rate of soil and water improvement. Stocking rates on other livestock grazing allotments would be reduced to light or moderate rates (i.e., greater than 7 acre/AUM) in order to improve watershed, fisheries, and big-game winter range habitat, as well as in order to reduce recreation conflicts. Overall, Alternative C would be the most conservative alternative, in terms of addressing livestock management and stocking.

   Alternative C would allocate currently permitted ski resorts, Silverton Mountain and the Durango Mountain Resort, as MA 8s. The land allocation for Durango Mountain Resort would be confined to the currently developed areas, thereby eliminating the potential expansion to the north identified under all of the other alternatives.

   The expansion of the Wolf Creek Ski Area onto public lands in the planning area would be allocated within MA 1; therefore, it would not meet the desired conditions for this alternative. The potential East Fork and Wolf Creek Valley Ski Areas would be managed as MA 1 and 3; therefore, ski area development would not meet the desired conditions for this alternative.

   Under this alternative most of the IRAs would be managed as either a MA 1s or as MA 3s in order to preserve their undeveloped natural character. Compared with Alternative B, this alternative would identify more of the IRAs as MA 1s. With the exception of providing access to valid inholdings, no new permanent or temporary road construction would occur in IRAs identified as MA 1 under Alternative C.

- ***Issue Two - Providing Recreation and Travel Management within a Sustainable Ecological Framework***: This alternative would emphasize non-motorized recreation and quiet-use areas. Most of the areas identified as MA 1 would be unsuitable for over-ground and over-snow motorized travel. Areas suitable for motorized travel generally have an existing developed road and/or motorized trail system. In general, this alternative would identify suitable opportunity areas only within MA 5s, where there are existing road and/or motorized trail systems, as well as the potential to improve and increase motorized opportunities by connecting existing roads or trails to create loop opportunities using existing unauthorized roads or trails, or by adding road or trail segments.

BLM_0030186

Under this alternative, the NW BLM lands on the Dolores District/Field Office would be identified as "suitable" but would not be a "suitable opportunity" area (as they are under Alternative A) in order to keep travel on existing routes and reduce the road density in these areas that have erosive and sensitive soils. Many of the canyons on the Dolores District/Field Office would be identified as unsuitable in Alternative C. New and existing motorized routes in these areas would not be compatible with this alternative; therefore, they would be closed, pending future NEPA analysis. This alternative would identify the most acres as unsuitable for motorized travel in the Hermosa area, including the Hermosa trail, which would be closed pending future NEPA analysis. Compared with the other alternatives, this alternative would identify the most unsuitable motorized acreage around Stoner Mesa and the Ryman area.

This alternative would allocate the least amount of acres for over-snow motorized travel. Under this alternative, both sides of Red Mountain Pass would be identified as unsuitable for over-snow motorized travel. The east side of Lizard Head Pass would be identified as unsuitable. Molas Pass would have fewer acres on the east side identified as suitable for over-snow motorized travel, than would the other alternatives. As in Alternative B, approximately 440,000 acres previously found suitable for winter motorized travel under Alternative A would be changed to unsuitable in the northwest BLM lands. The change would primarily affect the lands in the northwest portion of the planning area, where unpredictable snowfall and big-game winter range needs limit over-snow motorized travel opportunities.

Under Alternative C, existing BLM Structured Recreation Management Areas (SRMAs) would continue to be managed as SRMAs. In addition to the three existing SRMAS, this alternative would add the Cortez SRMA.

- ***Issue Three: Management of Special Designations and Unique Landscapes***: Under Alternative C, all IRAs that meet the available and capable requirements for Wilderness would be recommended for inclusion in the National Wilderness Preservation System (approximately 532,446 acres). Nearly all other IRAs would be managed as either MA 1s, 2s, or 3s, in order to retain their undeveloped character. Under this alternative, 24 river segments, totaling approximately 534 miles, would be considered suitable for addition to the National Wild and Scenic Rivers System. This is the total amount of segments considered eligible due to their Outstandingly Remarkable Values (ORVs) and free-flowing character.

This alternative would recommend three new ACECs: Silveys Pocket, Grassy Hills, and Big Gypsum Valley (all of which were identified as Potential Conservation Areas by the Colorado Natural Heritage Program due to their significant biodiversity). The Big Gypsum ACEC would be larger under this alternative than it would be under Alternative B. The culturally significant Mud Springs ACEC (a remnant area that was not included in the proclamation that designated The Canyons of the Ancients National Monument) would continue to be managed as an ACEC under this alternative. In addition to the two existing RNAs, this alternative would recommend the most new areas for RNA designation. Under this alternative, 9 new RNAs would be recommended, totaling 69,141 acres.

The Rico and Silverton MA 2s would be smaller under this alternative (with more of the areas surrounding these towns as MA 1s). The HD Mountains MA 2 would be the largest under this alternative, extending the management direction to the adjacent Sauls Creek area (an area that has cultural resources, mixed private and public lands, and multiple-use activities including coalbed methane development). Also, under this alternative, the Dolores River Canyon MA 2 would be the largest, because it would include some side canyons on adjacent USFS-administered lands.

BLM_0030187

## 2.7.4   ALTERNATIVE D

Alternative D would provide for a mix of multiple-use activities, with a primary emphasis on the "working forest and rangelands" concept in order to produce the highest amounts of commodity goods and services when compared with all of the other alternatives. This alternative would allow the greatest extent of resource use within the planning area while, at the same time, maintaining ecosystem management principles in order to protect and sustain resources. Under this alternative, potential impacts to sensitive resource values would be mitigated on a case-by-case basis.

**Alternative D - MA Land Allocations**

The table below shows the distribution of management areas for Alternative D. The Management Areas-Alternative D Map illustrates where management areas would occur.

**Table 2.5 - Alternative D Management Area Allocations**

| MANAGEMENT AREA | | Alternative D (acres) | Percentage (%) of Geographic Area (USFS and BLM Lands only) |
|---|---|---|---|
| MA 1 | Natural Processes Dominate | 553,786 | 23.4% |
| MA 2 | Special Areas and Unique Landscapes | 151,040 | 6.4% |
| MA 3 | Natural Landscapes with Limited Management | 788,289 | 33.3% |
| MA 4 | High-Use Recreation Emphasis | 86,236 | 3.6% |
| MA 5 | Active Management (commodity production in order to meet multiple-use goals) | 682,632 | 28.8% |
| MA 7 | Public and Private Lands Intermix | 89,116 | 3.8% |
| MA 8 | Highly Developed Areas | 17,986 | 0.8% |
| | TOTAL | 2,369,085 | 100.0% |

**Alternative D - Issues and Concerns**

Alternative D was analyzed in relation to the four primary issues raised during the scoping process and the oil and gas leasing availability decisions described in Section 2.8.

- ***Issue One - Balancing Management between the Ideas of Maintaining "Working Forests and Rangelands" and of Retaining "Core Undeveloped Lands"***: Out of all of the alternatives, Alternative D would have the greatest number of acres allocated as MA 5s, and the greatest amount of "lands suitable for timber production." Increase in the "lands suitable for timber production" would be achieved by entering portions of 4 IRAs, totaling approximately 45,000 acres, where road construction, timber harvesting, and oil and gas development could occur (unless limited by the 2001 Roadless Protection Rule or other restrictions).

BLM_0030188

**Figure 2.11– Over Ground Motorized Suitability - Alternative D**



San Juan Public Lands
Proposed Over-Ground Travel Suitability
Alternative D

Legend
- 1 - Unsuitable
- 1 - Unsuitable:  Designated Wilderness, Wilderness Study Areas and Piedra Area
- 2A - Suitable:  Designated, Authorized or System Roads and Trails
- 2B - Suitable:  Opportunity Areas
- USFS/BLM - Ranger Districts / Field Office Boundary
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available.  Geospatial data accuracy varies by theme on the map.  Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial inputs without notification.

JET
NAD 83, Polyconic Projection
October 29, 2007

0   10   20   40   Miles

**Figure 2.12 – Over Snow Motorized Suitability - Alternative D**



San Juan Public Lands
Proposed Over-Snow Travel Suitability
Alternative D

Legend
- 1 - Unsuitable: Designated Wilderness, Wilderness Study Areas and Piedra Area
- 1 - Unsuitable
- 2 - Suitable
- USFS/BLM - Ranger Districts / Field Office Boundary
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available. Geospatial data accuracy varies by theme on the map. Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial inputs without notification.

JET
NAD 83, Polyconic Projection
October 29, 2007

0    10    20    40 Miles

Alternative D would allow more permitted livestock grazing than would any of the other alternatives. Under this alternative, all vacant sheep allotments could be stocked. Stocking rates within suitable and capable lands would be increased to at least 6 acres/AUM, within those allotments, due to planned restoration activities. All currently vacant BLM allotments would be offered for livestock grazing permits, per existing IM policy, and four USFS allotments would be offered for livestock grazing permits, via the grant process.

This alternative would have the greatest amount of potential ski area development. This alternative would allocate currently permitted ski resorts, Silverton Mountain and the Durango Mountain Resort, as MA 8s. The land allocation for the Durango Mountain Resort would remain the same as under current management, allowing potential expansion mostly to the north.

An expansion of approximately 3,600 acres of the Wolf Creek Ski Area onto public lands in the planning area would meet the desired conditions for this alternative. This potential expansion would include lift-served ski terrain and facilities, including parking lots and a ticket office. More detailed site-specific analysis would be required before any development plans would be authorized.

Development of the potential East Fork Ski Area would meet the desired conditions for this alternative. The potential Wolf Creek Valley Ski Area that was identified in the 1982 Forest Plan would change to MA 3 and would not be compatible for ski development. Ski area development would not be considered feasible under this alternative due to the fact that the adjacent private land that might have served as a base for the ski area was placed under a conservation easement.

Compared with Alternatives B and C, this alternative would identify more of the IRAs as MA 3s, in order to retain management options addressing forest health problems on more acres across the planning area. This alternative would provide slightly more opportunity for fuels treatment and for timber harvesting than would Alternatives B and C, thereby potentially reducing the threat of catastrophic fires and suppression costs.

- ***Issue Two - Providing Recreation and Travel Management within a Sustainable Ecological Framework***: This alternative would have more emphasis on motorized recreation opportunities. Most of the areas of particular interest on the Dolores District would be identified as suitable or suitable opportunity areas, with very few areas identified as unsuitable.

The NW BLM lands on the Dolores District/Field Office identified as "suitable opportunity areas" under Alternative A would be identified as "suitable" under Alternatives D in order to keep travel on existing routes and reduce the road density in these areas that have erosive and sensitive soils.  In Alternative D the canyons on the Dolores District/Field Office would be identified as "suitable," retaining and limiting access to the existing motorized roads and trails. Nearly all of the lands in the Taylor Mesa, Stoner Mesa, and Ryman areas of the Dolores District/Field Office would be identified as either suitable or suitable opportunity areas, in this alternative.  The Hermosa Trail and other existing motorized trails on the east side of the Hermosa area of the Columbine District/Field Office would be continue to be suitable to motorized recreation in this alternative.

BLM_0030191

This alternative would identify more acres for over-snow travel than would Alternative B or C. The greatest change from Alternative A would be the identification of approximately 440,000 acres previously found suitable for winter motorized travel in the northwest portion of the planning area as unsuitable (due to unpredictable snowfall and big game winter range needs limiting over-snow motorized travel opportunities). With regard to the over-snow motorized opportunities on the passes, this alternative would keep both sides of Lizard Head Pass suitable for motorized use, both sides of Red Mountain Pass suitable for motorized use, and slightly less acres on the east side of Wolf Creek Pass suitable than would Alternative A. Molas Pass over-snow motorized acres would be the same as under Alternative A.

Under Alternative D, existing BLM Structured Recreation Management Areas (SRMAs) would continue to be managed as SRMAs. In addition to the three existing SRMAs, this alternative would add the Cortez SRMA.

- ***Issue Three: Special Designations and Unique Landscapes***: Under this alternative, no new areas or river segments would be recommended for inclusion in the National Wilderness Preservation System or in the Wild and Scenic Rivers System. Under this alternative, no new ACECs would be designated. Mud Springs (a remnant area that was not included in the proclamation that designated The Canyons of the Ancients National Monument) would no longer be designated as an ACEC. It would be managed with a recreation emphasis. Under Alternative D, 4 new RNAs would be recommended, in addition to the 2 existing RNA's, totaling 28,016 acres.

The Dolores River Canyon MA 2 boundary would be the smallest under this alternative. It would be slightly less than the current management boundary (due to the alignment of the boundary with the canyon rim). The Silverton and HD Mountains MA 2s would be the same as under Alternative B. This alternative would allocate the least amount of acreage to the Rico MA 2.

BLM_0030192

## 2.8          DESCRIPTION OF THE OIL AND GAS LEASING AVAILIBILITY ALTERNATIVES

This section describes in detail the oil and gas leasing availability by alternative for NFS and BLM lands. Public scoping comments identified concerns and debate about where energy development should take place, and how it should be done on SJPL. The range of alternatives described in this section reflects public scoping comments and compliments Alternatives A, B, C, and D described earlier in Section 2.7 - Description of the Alternatives Considered in Detail.

In compliance with 36 CFR 228.102(c)(2)&(3) the Forest Service lands available for leasing, withdrawn, recommended for withdrawal, administratively not available, and stipulated acres for all lands available that are not legally or administratively available are identified and described. Additionally, regulations for management of oil and gas leasing and operations on NFS lands require the Forest Service, when considering oil and gas leasing, to analyze an alternative of not leasing [36 CFR 228.102(c)(2)&(3)]. This means that the Forest Service must analyze lands being considered for leasing as administratively not available for leasing over the life of the Plan. In compliance with this regulation and for comparison purposes, this section includes a "No Lease Alternative" description. As this is a joint USFS and BLM plan, this section will provide descriptions for both NFS and BLM Lands, where appropriate.

For all alternatives, lands already under lease as of the date of the revised LMP will be managed under the terms of those oil and gas leases. Most existing leases are in the San Juan Basin portion of the SJPL; some existing leases are in the Paradox Basin portion of the SJPL. Neither the Revised LMP nor the USFS oil and gas leasing availability decision will change or limit the terms of the valid existing rights of those leases. The revised LMP and USFS oil and gas leasing availability decision will, however, provide for where and how oil and gas development may occur on future leases by identifying lands available for leasing and identifying where certain lease stipulation (restrictions) will apply to future leases on SJPL.

The planning area contains locations of known moderate to high potential energy reserves, some of which have been developed. Oil and gas production is a significant sector of local economies and affects most local residents through its favorable impact on local property taxes, as well as through its fiscal contribution to county tax bases and to county school systems. People are concerned about how to best balance the extraction of oil and gas with the protection of other resources and values.

The most likely areas for new fluid mineral leasing would be in currently unleased lands with moderate or high potential in the Paradox Basin and San Juan Sag. An evaluation of reasonably foreseeable development scenarios and production has been developed for the planning area and these lands. The areas most likely for new fluid mineral leasing are the same for all alternatives; however, due to the different composition of land allocations (i.e., MAs and lands recommended for Wilderness designation) and related constraints from the land allocations, the acres available for leasing vary by alternative and the number of wells projected to be developed varies slightly by alternative.

Within the planning area, lands are considered available for leasing, unless they are withdrawn, proposed for withdrawal, or administratively not available.

BLM_0030193

- **Withdrawn**: This legal classification refers to land designations made by the Department of Interior and/or Congress that preclude the appropriation and disposal of Federally-owned mineral resources under the Mineral Leasing Act of 1920, subject to valid existing rights.  Minerals held under valid existing rights may still be extracted. For all alternatives and the No Lease Alternative, the lands withdrawn from mineral leasing include the designated Wilderness areas – Lizard Head Wilderness, Weminuche Wilderness, South San Juan Wilderness – and the Piedra Area.  Combined they total 475,950 acres on Forest Service lands and are within Management Area 1.

- **Proposed for Withdrawal**: This classification refers to areas that the U.S. Forest Service desires to have legally precluded from appropriation under the Mineral Leasing Act of 1920. The Forest Service must submit a request to the Department of Interior via the Bureau of Land Management, as only Congress and the Department of Interior can legally withdraw Federally owned minerals from appropriation. Until the land is legally designated as withdrawn, the Forest Service can still, through its administrative authority, preclude new mineral material sales and mineral leases, but can not prevent new mining claims or deny the extraction of locatable minerals. Within the SJPL, areas recommended for Wilderness designation, and wild segments of rivers recommended for Wild and Scenic River designation are identified as "areas proposed for withdrawal" and occur within Management Area 1. The areas proposed for withdrawal vary by alternative because the acres recommended for Wilderness and Wild and Scenic River designations vary by alternative.

- **Administratively Not Available**: this classification applies to lands that the authorized officer has determined should not be leased for oil and gas based on potential for oil and gas occurrence and development, environmental factors, and/or other uses disclosed in this DEIS.  This designation would apply only to lands not withdrawn from leasable mineral appropriation. Within the SJPL, four resource areas have been identified as administratively not available for oil and gas leasing because it would be detrimental to other resource values, and would not be able to be mitigated, including the following.

  - BLM WSAs are administratively not available in all alternatives for the purpose of ensuring that the Wilderness characteristics are protected until Congress acts to designate them for Wilderness or release them from their WSA status.

  - Chimney Rock, Anasazi, and Falls Creek Archeological Districts are administratively not available in all alternatives for the purpose of protecting the outstanding archeological values and landscape features that are integral to the sites' integrity of setting and feeling.

  - Lands within the outcrop of the Fruitland Formation are administratively not available for the purpose of preventing or minimizing future methane seepage and water depletion impacts.

  - Lands identified as occupied Gunnison sage-grouse habitat are administratively not available for the purpose of protecting lek sites and nesting habitat for Gunnison sage grouse.

- **Available for Leasing**: This classification applies to lands that the authorized officer has determined can be leased for oil and gas based on potential for oil and gas occurrence and development, environmental factors, and/or other uses disclosed in this DEIS.

For lands available for leasing, stipulations are applied to describe how leasing would occur. In general, stipulations are applied to minimize adverse impacts specific to air, water, land, visual, cultural, and biological resources, and other land uses. The stipulation definitions below describe how leasing would occur:

BLM_0030194

- **No Surface Occupancy (NSO)**: Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is prohibited to protect identified resource values. However, oil and gas under lands affected by NSO stipulation are legally available for extraction if extraction can be accomplished without occupying the surface (such as through directional drilling or draining the deposit from adjacent lands). Technological limitations and higher costs will affect the recovery of these resources, but they are available. Within Alternatives B, C, and D, the NSO stipulation has been applied for specific resource conditions, as well as to Management Areas 1, 4, and 8.

- **Controlled Surface Use (CSU)**: Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is allowed (unless restricted by a Timing Limitation (TL) stipulation), but identified resource values require special operational constraints that may modify lease rights. A CSU stipulation allows the SJPL to require that a proposed facility or activity be relocated by more than 200 meters from the proposed location, if necessary to achieve the desired level of protection. CSU provides operating guidance but does not substitute for NSO or TL stipulations. CSU allows year-round occupancy and accessibility to leased lands while providing mitigation of effects on other resources.

- **Timing Limitations (TL)**: Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is prohibited during a specified period of the year. The scope of the TL stipulation goes beyond ground-disturbing activities to encompass any source of protracted or high-intensity disturbance that could interfere with normal wildlife behavior and adversely affect habitat use. The limitation is applied annually for a specified period lasting more than 60 days. The TL stipulation provides for partial accessibility for a portion of the year and maintains the potential for extraction of oil and gas, but may increase costs due to timing constraints (such as a short operating season).

- **Standard Lease Terms**: All SJPL oil and gas leases are subject to standard lease terms. These are the least restrictive terms under which an oil and gas lessee may operate. They require operators of oil and gas leases to minimize adverse impacts to air, water, land, visual, cultural, and biological resources and other land uses and users, and to comply with all applicable laws, regulations and formal orders of the agency managing the leased lands.

Alternative A continues current management direction for oil and gas leasing, i.e., lands available for leasing and stipulations would continue under the current leasing direction.  For Alternatives B, C, and D (the action alternatives) the oil and gas leasing availability and stipulations have been revised. The resource values for which stipulations have been developed are consistently applied across Alternatives B, C, and D. For example, the NSO stipulation for steep slopes or riparian areas is applied consistently in Alternatives B, C, and D where those resource values are present. Areas where stipulations would apply have been mapped by alternative, and/ or are described in Appendix H - Oil and Gas Leasing Stipulations. Standards and guidelines (found in Volume 2-DLMP) would also provide additional resource protection during ground-disturbing activities, including those related to oil and gas exploration and development.

While resource stipulations generally do not vary by alternative, differences in special area designations, management area composition, and unique landscapes do vary by alternative and, as a result, cause differences in lands available for leasing and acres stipulated by alternative.

BLM_0030195

The differences in areas recommended for Wilderness cause the greatest variance in acres available for leasing between Alternatives B, C, & D.  For example, IRAs recommended for Wilderness are classified as "recommended for withdrawal," thus removing those acres from the total acres available for leasing.  Whereas, IRAs contained within MAs 1, 2 and 3 and not recommended Wilderness remain available for leasing and are stipulated with an NSO. The areas recommended for Wilderness vary by alternative, and thus, the lands available for leasing vary by alternative.

In Alternatives B, C, and D, Management Areas 1, 4, and 8 would be stipulated with "No Surface Occupancy" (NSO) to compliment the desired conditions for these MAs.  For example, MA 1, where natural processes dominate, would not allow for road construction or surface disturbing activities.  The recreation experience desired conditions for MA 4s (High-Use Recreation Emphasis) and MA 8s (Highly Developed Areas) would also be stipulated with NSO in order to mitigate impacts to the facilities, investment, and experiences these areas provide.  In general MA 4 and MA 8 lands are recreation-based stipulations and include developed ski areas, national recreation and scenic trails, Scenic Byways, campgrounds, marinas and developed recreation sites, etc. Desired conditions related to scenery integrity objectives and recreation experiences are more restrictive to oil and gas development in these MAs.   The amount of lands allocated to MA 1, 4 and 8s varies by alternative, and accordingly, the amount of NSO resulting from these MA designations varies by alternative.

Oil and gas development in MA 2s, 3s, 5s, and 7s could generally occur, and would be stipulated by resources (water, soils, habitat, etc.) rather than by management areas. However, MA 2s & 3s often have limitations on road construction, as well as other constraints that may limit or preclude development within them.

Stipulations have been developed for most of the special area designations and unique landscapes, such as Wild and Scenic Rivers, Areas of Critical Environmental Concern, RNAs, archaeological landscapes, botanical areas, etc., and in most cases are stipulated with NSO. Special areas and unique landscapes vary by alternative, and accordingly, vary the acres stipulated by alternative.

BLM_0030196

**Table 2.6 - Oil and Gas Leasing Availability by Alternative on USFS and BLM Lands**

| OIL AND GAS LEASING AVAILABILITY ON SAN JUAN PUBLIC LANDS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest Fluid-Minerals - Oil and Gas (acres)** | | | | | |
| Acres Withdrawn From Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 67,726 | 532,957 | 0 | 0 |
| Acres Administratively Not Available for leasing | 0 | 20,371 | 20,371 | 20,371 | 1,392,474 |
| Acres Available for Leasing | 1,392,474 | 1,304,377 | 839,146 | 1,372,103 | 0 |
| No Surface Occupancy (NSO) | 1,705 | 741,524 | 278,232 | 810,994 | 0 |
| Controlled Surface Use (CSU) | 169,485 | 248,636 | 265,420 | 235,850 | 0 |
| CSU and Timing Limitations (TL) | 559 | 77,176 | 73,089 | 69,843 | 0 |
| Timing Limitations | 1,390 | 69,935 | 67,826 | 71,693 | 0 |
| Standard Lease Terms | 1,219,355 | 167,106 | 154,579 | 183,723 | 0 |
| **BLM Fluid-Minerals - Oil and Gas (acres)** <br> *(figures are based on total mineral estate, including private surface)* | | | | | |
| Acres Withdrawn From Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 63,851 | 72,867 | 98,450 | 72,867 | 768,625 |
| Acres Available for Leasing | 704,804 | 695,758 | 670,175 | 695,758 | 0 |
| No Surface Occupancy (NSO) | 39,036 | 238,578 | 239,413 | 233,005 | 0 |
| Controlled Surface Use (CSU) | 201,022 | 55,286 | 55,153 | 56,947 | 0 |
| CSU and Timing Limitations (TL) | 57,641 | 12,762 | 12,521 | 15,831 | 0 |
| Timing Limitations | 113,915 | 264,019 | 238,095 | 264,782 | 0 |
| Standard Lease Terms | 293,160 | 125,113 | 124,993 | 125,194 | 0 |

BLM_0030197

## 2.8.1 ALTERNATIVE A - OIL AND GAS LEASING AVAILABILITY ON SJPL

Under Alternative A, approximately 2,642,000 acres of the planning area would be available (open) to leasing, excluding lands withdrawn, proposed for withdrawal, or administratively not available. Designated Wilderness areas and the Piedra Area are withdrawn by law from leasing. Alternative A continues current management and, therefore, no additional lands would be recommended for Wilderness or Wild and Scenic River designation and, therefore, there are no new areas recommended for withdrawal. Under current management, approximately 63,851 acres are administratively not available, consisting primarily of BLM WSAs.

Approximately 72% (1,512,545 acres) of the lands available for lease are stipulated with standard lease terms. Under Alternative A, most of the USFS IRAs would potentially be available for leasing, subject to restrictions required of the 2001 Roadless Area Conservation Rule, or to any new rule that might modify it. As with all alternatives, the most likely areas for new leases would be in currently unleased lands with moderate or high potential in the Paradox Basin and in the San Juan Sag. Approximately 167 wells are projected for development on future leases under Alternative A. Compared with all alternatives, Alternative A projects the greatest projection of wells considering the RFD and stipulations.

Table 2.7 discloses the leasing availability and stipulations for Forest Service and BLM lands within Alternative A.

### Table 2.7 – Oil and Gas Leasing Availability on San Juan Public Lands for Alternative A
(figures are based on total mineral estate, including private surface)

| OIL AND GAS AVAILABILITY | Forest Service | BLM | Total |
|---|---|---|---|
| Federal Mineral Acres | 1,873,427 | 768,625 | 2,642,052 |
| Acres Withdrawn from Leasing | 480,953 | 0 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 63,851 | 63,851 |
| Acres Available for Leasing | 1,392,474 | 704,804 | 2,097,278 |
| No Surface Occupancy | 1,705 | 39,036 | 40,741 |
| Controlled Surface Use | 169,485 | 201,022 | 370,507 |
| Controlled Surface Use/Timing Limitations | 559 | 57,641 | 58,200 |
| Timing Limitation | 1,390 | 113,915 | 115,305 |
| Standard Lease Terms | 1,219,355 | 293,190 | 1,512,545 |
| PROJECTED Wells on Unleased Lands | 167 | 0 | 167 |
| PROJECTED Road Miles for Projected Wells | 56 | 0 | 56 |
| PROJECTED Acres Disturbed for Projected Wells | 550 | 0 | 550 |

**Summary of Leasing Availability on Forest Service Lands Under Alternative A**

Alternative A continues current oil and gas leasing availability and stipulations on NFS lands. Accordingly, no additional lands would be recommended for Wilderness or Wild and Scenic River designation and, therefore, no lands are recommended for withdrawal. There are no NFS lands identified as administratively not available in Alternative A. Compared to the other alternatives, Alternative A has the most NFS lands available for leasing; approximately 1,392,474 acres, 88% of which have standard lease terms. Overall, on NFS lands, Alternative A is the least restrictive alternative, with NSO applied to 1,705 acres. Approximately 171,400 acres would be stipulated with CSU and TL stipulations, and approximately 1,219,300 acres with standard lease terms in Alternative A.

Under Alternative A, as with the other alternatives, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag, both of which have expression of interest for oil and gas leasing. Development of approximately 167 wells is projected on future leases under Alternative A.

Figure 2.13 is a map that shows what lands would be open to leasing, what lands are withdrawn from leasing, what lands are administratively not available for leasing, and where the different categories of stipulations would apply on lands open to leasing under Alternative A.

BLM_0030199

**Figure 2.13 - Oil and Gas Leasing Availability and Stipulations for Alternative A**



San Juan Public Lands
Oil and Gas Leasing Stipulations
Alternative A

Legend

**Revised Oil and Gas Stipulations**

- Withdrawn from Leasing
- Administratively Not Available for Leasing
- No Surface Occupancy
- Controlled Surface Use
- Controlled Surface Use and Timing Limitations
- Timing Limitations
- Standard Stipulations
- Restrictions 1983
- USFS/BLM - Ranger Districts / Field Office Boundary
- forest_bdy
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the
most current and complete geospatial
data available. Geospatial data accuracy
varies by theme on the map. Using this
map for other then their intended purpose
may yield inaccurate or misleading results.
The USFS and BLM reserve the right to
correct, update or modify geospatial
inputs without notification.

JET
NAD 83, Polyconic Projection
November 8, 2007

Miles
0   5   10        20

## 2.8.2 ALTERNATIVE B - OIL AND GAS LEASING AVAILABILITY ON SJPL

Under Alternative B, approximately 2 million acres of the planning area would be available (open) to leasing, excluding lands withdrawn, proposed for withdrawal, or administratively not available. Designated Wilderness areas and the Piedra Area are withdrawn from leasing by law. Approximately 67,726 acres recommended for Wilderness or Wild and Scenic river designation (wild segments) would be proposed for withdrawal under Alternative B. Areas that are administratively not available total 93,238 acres. Based on the reasonably foreseeable development scenario (RFD), lands administratively not available have the following oil and gas resource potential:

- WSAs (BLM): approximately 55,400 acres are primarily located within moderate potential areas (62%) and high potential areas (29%);

- Chimney Rock, Anasazi and Chimney Rock archaeological sites, which occur predominately on NFS lands are primarily located within low potential areas (87%);

- The occupied Gunnison sage grouse areas are primarily located within moderate potential areas (70%) and high potential areas (30%); and

- The Fruitland Formation at the outcrop primarily occurs within high coalbed methane potential areas (71%).

In Alternative B, lands that have surface occupancy prohibited through application of No Surface Occupancy stipulation total approximately 987,000 acres, or 49% of the lands available for leasing. Approximately 46% of the NSO stipulations would be applied to IRAs and MA 1 areas, of which 63% occur within no to low potential areas. Soil-related stipulations comprise an additional 17% of NSO-stipulated lands in Alternative B, of which 43% occur in no to low potential areas and 34% occur in moderate potential areas. Recreation-related stipulations comprise approximately 11% of the NSO-stipulated land, of which 58% occur in no to low potential areas and 23% in moderate areas. The remaining stipulated NSO areas include protections for water, wildlife, scenery, archeological areas, ACECs and RNAs. Approximately 727,800 acres would be stipulated with CSU and TL stipulations, and approximately 219,200 acres with standard lease terms in Alternative B.

Under Alternative B, as with the other alternatives, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag, both of which have expression of interest for oil and gas leasing. Development of approximately 158 wells is projected on future leases under Alternative B.

Table 2.8 discloses the leasing availability and stipulations for Forest Service and BLM lands within Alternative B.

BLM_0030201

**Table 2.8 – Oil and Gas Leasing Availability on San Juan Public Lands for Alternative B**
(figures are based on total mineral estate, including private surface)

| OIL AND GAS AVAILABILITY | Forest Service | BLM | Total |
|---|---|---|---|
| Federal Mineral Acres | 1,873,427 | 768,625 | 2,642,052 |
| Acres Withdrawn from Leasing | 480,953 | 0 | 480,953 |
| Acres Proposed for Withdrawal | 67,726 | 0 | 67,726 |
| Acres Administratively Not Available for Leasing | 20,371 | 72,867 | 93,238 |
| • Wilderness Study Areas | 0 | 55,428 | 55,428 |
| • Fruitland Formation | 7130 | 2057 | 9187 |
| • Archaeological Areas | 13,241 | 200 | 13,441 |
| • Gunnison Sage Grouse | 0 | 15,182 | 15,182 |
| Acres Available for Leasing | 1,304,377 | 695,758 | 2,000,135 |
| No Surface Occupancy | 739,588 | 247,946 | 987,533 |
| • IRAs | 454,074 | 0 | 454,074 |
| • Soils and Steep Slopes | 91,858 | 80,217 | 172,075 |
| • Recreation | 64,045 | 42,618 | 106,663 |
| • Scenery | 44,128 | 1,979 | 46,107 |
| • Other No Surface Occupancy Lands | 87,419 | 113,764 | 201,183 |
| Controlled Surface Use | 248,636 | 55,286 | 303,922 |
| Controlled Surface Use/Timing Limitations | 77,176 | 12,762 | 89,938 |
| Timing Limitation | 69,935 | 264,019 | 333,954 |
| Standard Lease Terms | 167,106 | 125,113 | 292,219 |
| PROJECTED Wells on Unleased Lands | 158 | 0 | 158 |
| PROJECTED Road Miles for Projected Wells | 53 | 0 | 53 |
| PROJECTED Acres Disturbed for Projected Wells | 533 | 0 | 533 |

BLM_0030202

**Summary of Leasing Availability on Forest Service Lands Under Alternative B**

A total of 1,304,377 acres of NFS lands are available for leasing under Alternative B. Areas that are proposed for Wilderness and Wild and Scenic River designations (wild segments only) total approximately 67,726 NFS lands in Alternative B. Of the 93,238 acres administratively not available across the SJPL, 20,371 of those acres are on NFS lands within the Fruitland Formation and in archaeological areas. No Surface Occupancy stipulations on NFS lands constitute approximately 76% of the overall NSO-stipulated acres in Alternative B. Approximately xx% of the NSO stipulations would be applied to IRAs and MA 1 areas on NFS lands, of which 62% occur within no to low potential areas and 16% occur in moderate potential areas. Soil-related stipulations comprise an additional 12% of NSO stipulated NFS lands in Alternative B, of which 52% occur in no to low potential areas and 32% occur in moderate potential areas.

The remaining stipulated NSO areas include protections for water, wildlife, scenery, archeological areas, and RNAs. Approximately 395,700 acres would be stipulated with CSU and TL stipulations and approximately 167,000 acres with standard lease terms in Alternative B.

Under alternative B, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag where there is an expression of interest for oil and gas leasing. Approximately 158 wells are projected on future leases under Alternative B, using existing roads for most of the access.

Figure 2.14 is a map that shows what lands would be open to leasing, what lands are withdrawn from leasing, what lands are administratively not available for leasing, and where the different categories of stipulations would apply on lands open to leasing under Alternative B.

BLM_0030203

**Figure 2.14 - Oil and Gas Leasing Availability and Stipulations for Alternative B**



**2.8.3 ALTERNATIVE C - OIL AND GAS LEASING AVAILABILITY ON SJPL**

Under Alternative C, approximately 1.5 million acres of the planning area would be available (open) to leasing, excluding lands withdrawn, proposed for withdrawal, or administratively not available. Designated Wilderness areas and the Piedra Area are withdrawn from leasing by law. The approximately 533,000 acres that are recommended for Wilderness or Wild and Scenic river designation (wild river segments) would be proposed for withdrawal under Alternative C, thereby removing 20% of the lands from availability. Seventy-one percent of these areas occur in no or low potential areas. Areas that are administratively not available total approximately 138,500 acres. Based on the Reasonably Foreseeable Development Scenario (RFD), lands administratively not available have the following oil and gas resource potential:

- WSAs (BLM): approximately 55,400 acres are primarily located within moderate potential areas (62%) and high potential areas (29%);

- Chimney Rock, Anasazi and Chimney Rock archaeological areas, which occur predominately on NFS lands, are primarily located within low potential areas (87%);

- The occupied Gunnison sage grouse areas are primarily located within high potential areas (62%) and moderate potential areas (38%). Lands administratively not available under Alternative C for occupied Gunnison sage grouse include the Federal mineral estate under the Coalbed Canyon, Dry Creek Basin, and Dan Noble State Wildlife areas.

- The Fruitland Formation at the outcrop primarily occurs within high coalbed methane potential areas (71%).

Lands that have surface occupancy prohibited through application of No Surface Occupancy stipulation in Alternative C total approximately 517,645 acres, or 34% of the lands available for leasing. Soil-related stipulations comprise the greatest amount (31%) of the NSO stipulated lands in Alternative C, of which 45% occur in no to low potential areas and 34% occur in moderate potential areas. Whereas, in Alternatives B and D the greatest NSO resource allocation would be for IRAs; Alternative C recommends more IRAs for Wilderness and, thus, they would be proposed for withdrawal rather than stipulated with an NSO. The remaining IRAs and MA 1s in Alternative C are stipulated with an NSO. No Surface Occupancy stipulations related to recreation and scenery desired conditions, including MA 4s and 8s, comprise an additional 30% of NSO-stipulated acres in Alternative C, of which approximately 60% occur in no to low potential areas. The remaining NSO-stipulated areas include protections for water, wildlife, scenery, archeological areas, ACECs and RNAs. Approximately 712,000 acres would be stipulated with CSU and TL stipulations and approximately 279,600 acres with standard lease terms in Alternative C.

Under Alternative C, as with the other alternatives, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag, both of which have expression of interest for oil and gas leasing. Development of approximately 148 wells is projected on future leases under Alternative C.

Table 2.11 discloses the leasing availability and stipulations for Forest Service and BLM lands within Alternative C.

BLM_0030205

**Table 2.9 – Oil and Gas Leasing Availability on San Juan Public Lands for Alternative C**
(figures are based on total mineral estate, including private surface)

| OIL AND GAS AVAILABILITY | Forest Service | BLM | Total |
|---|---|---|---|
| Federal Mineral Acres | 1,873,427 | 768,625 | 2,642,052 |
| Acres Withdrawn from leasing | 480,953 | 0 | 480,953 |
| Acres Proposed for Withdrawal | 532,957 | 0 | 532,957 |
| Acres Administratively Not Available for Leasing | 20,371 | 98,450 | 118,821 |
| • Wilderness Study Areas | 0 | 55,428 | 55,428 |
| • Fruitland Formation | 7130 | 1772 | 8902 |
| • Archaeological Areas | 13,241 | 259 | 13,500 |
| • Gunnison Sage Grouse | 0 | 40,991 | 40,991 |
| Acres Available for Leasing | 839,146 | 670,175 | 1,509,321 |
| No Surface Occupancy | 278,232 | 239,413 | 517,645 |
| • IRAs | 25,534 | 0 | 25,534 |
| • Soils and Steep Slopes | 83,920 | 78,929 | 162,850 |
| • Recreation | 46,722 | 31,954 | 78,676 |
| • Scenery | 75,878 | 2,393 | 78,271 |
| • Other No Surface Occupancy Lands | 46,178 | 126,137 | 172,314 |
| Controlled Surface Use | 265,420 | 55,153 | 320,573 |
| Controlled Surface Use/Timing Limitations | 73,089 | 12,521 | 85,610 |
| Timing Limitation | 67,826 | 238,095 | 305,921 |
| Standard Lease Terms | 154,579 | 124,993 | 279,572 |
| PROJECTED Wells on Unleased Lands | 148 | 0 | 148 |
| PROJECTED Road Miles for Projected Wells | 50 | 0 | 50 |
| PROJECTED Acres Disturbed for Projected Wells | 487 | 0 | 487 |

BLM_0030206

**Summary of Leasing Availability on Forest Service Lands Under Alternative C**

In Alternative C, approximately 839,000 NFS lands are available for leasing. Aside from the No Lease Alternative, Alternative C has the least amount of acres available of all alternatives. Alternative C recommends the most Wilderness and Wild and Scenic river designations (wild segments), resulting in approximately 533,000 acres that would be proposed for withdrawal and removed from availability. Of the approximately 118,800 acres administratively not available across the SJPL, only 20,371 of those acres are on NFS lands and include Fruitland Formation and archaeological areas. In Alternative C, approximately 278,000 acres would be stipulated with NSO stipulations on NFS lands. Soil-related stipulations comprise 29% of NSO stipulated NFS lands in Alternative C, of which 54% occur in no to low potential areas and 32% occur in moderate potential areas. Recreation-related stipulations comprise 16% of the NSO stipulated NFS lands Alternative C, 79% of which occur in no to low potential areas. The remaining stipulated NSO areas include protections for water, wildlife, scenery, archaeological areas, and RNAs. Approximately 406,300 acres would be stipulated with CSU and TL stipulations, and approximately 154,500 acres with standard lease terms in Alternative C.

Under Alternative C, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag, where there is an expression of interest for oil and gas leasing. Approximately 148 wells are projected on future leases under Alternative C, using existing roads for most of the access.

Figure 2.15 is a map that shows what lands would be open to leasing, what lands are withdrawn from leasing, what lands are administratively not available for leasing, and where the different categories of stipulations would apply on lands open to leasing under Alternative C.

BLM_0030207

**Figure 2.15 - Oil and Gas Leasing Availability and Stipulations for Alternative C**



**2.8.4 ALTERNATIVE D - OIL AND GAS LEASING AVAILABILITY ON SJPL**

Under Alternative D, approximately 2,067,000 acres of the planning area would be available (open) to leasing, excluding lands withdrawn, proposed for withdrawal, or administratively not available. Designated Wilderness areas and the Piedra Area are withdrawn from leasing by law. In Alternative D, no lands are recommended for Wilderness or Wild and Scenic River designation and, therefore, no lands are recommended for withdrawal. Areas that are administratively not available total approximately 93,200 acres. Based on the Reasonably Foreseeable Development Scenario (RFD) lands administratively not available have the following oil and gas resource potential:

- WSAs (BLM): approximately 55,400 acres are primarily located within moderate potential areas (62%) and high potential areas (29%);

- Chimney Rock, Anasazi and Chimney Rock archaeological areas are primarily located within low potential areas (87%);

- The occupied Gunnison sage grouse areas are primarily located within moderate potential areas (70%) and high potential areas (30%); and

- The Fruitland Formation at the outcrop primarily occurs within high coalbed methane potential areas (71%).

Many lands classified as administratively not available under Alternatives B and C (due to Wilderness recommendation) would be stipulated for NSOs under Alternative D. In Alternative D lands that have surface occupancy prohibited through application of No Surface Occupancy stipulation total approximately 1,044,000 acres, or 50% of the lands available for leasing. Approximately 48% of the NSO-stipulated areas would be applied to IRAs and MA 1 lands, of which 65% occur within no to low potential areas. Soil-related stipulations comprise an additional 16% of the total NSO lands in Alternative D, of which 44% occur in no to low potential areas and 34% occur in moderate potential areas. Recreation-related stipulations, including MA 4 and 8 lands comprise 10% of the NSO-stipulated lands in Alternative D, of which 59% occur in no to low potential areas and 23% in moderate potential areas. The remaining stipulated NSO areas include protections for water, wildlife, scenery, archaeological areas, vegetation and RNAs. Approximately 715,000 acres would be stipulated with CSU and TL stipulations and approximately 309,000 acres with standard lease terms in Alternative D. This alternative has approximately the same acres where standard lease terms would apply as Alternative B, significantly less standard lease acres than Alternative A, and more standard lease acres than Alternative C.

Under Alternative D, as with the other alternatives, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag, both of which have expression of interest for oil and gas leasing. Development of approximately 165 wells is projected on future leases under Alternative B.

Table 2.12 discloses the leasing availability and stipulations for Forest Service and BLM lands within Alternative D.

BLM_0030209

**Table 2.10 – Oil and Gas Leasing Availability on San Juan Public Lands for Alternative D**
(figures are based on total mineral estate, including private surface)

| OIL AND GAS AVAILABILITY | Forest Service | BLM | Total |
|---|---|---|---|
| Federal Mineral Acres | 1,873,427 | 768,625 | 2,642,052 |
| Acres Withdrawn from leasing | 480,953 | 0 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 20,371 | 72,867 | 93,238 |
| • Wilderness Study Areas | 0 | 55,428 | 55,428 |
| • Fruitland Formation | 7130 | 2057 | 9187 |
| • Archaeological Areas | 13,241 | 200 | 13,441 |
| • Gunnison Sage Grouse | 0 | 15,182 | 15,182 |
| Acres Available for Leasing | 1,372,103 | 695,758 | 2,067,861 |
| No Surface Occupancy | 810,994 | 233,005 | 1,043,999 |
| • IRAs | 504,021 | 0 | 504,021 |
| • Soils and Steep Slopes | 84,697 | 80,229 | 164,926 |
| • Recreation | 64,350 | 42,626 | 106,977 |
| • Scenery | 68,885 | 2,458 | 71,343 |
| • Other No Surface Occupancy Lands | 89,041 | 107,692 | 196,733 |
| Controlled Surface Use | 235,850 | 56,947 | 292,797 |
| Controlled Surface Use/Timing Limitations | 69,843 | 15,831 | 85,674 |
| Timing Limitation | 71,693 | 264,782 | 336,475 |
| Standard Lease Terms | 183,723 | 125,194 | 308,917 |
| PROJECTED Wells on Unleased Lands | 165 | 0 | 165 |
| PROJECTED Road Miles for Projected Wells | 55 | 0 | 55 |
| PROJECTED Acres Disturbed for Projected Wells | 545 | 0 | 545 |

BLM_0030210

**Summary of Leasing Availability on Forest Service Lands under Alternative D**

In Alternative D, approximately 1,372,100 acres on NFS lands are available for leasing, just slightly fewer acres than Alternative A. Alternative D does not propose any lands for withdrawal. Of the 93,238 acres administratively not available across the SJPL, only 20,371 of those acres are on NFS lands, and include the Fruitland Formation and archaeological areas. In Alternative D, approximately 811,000 acres would be stipulated with NSO stipulations on NFS lands. Approximately 62% of the NSO stipulations would be applied to IRAs and MA 1 lands, of which approximately 65% occur within no to low potential areas. Soil-related stipulations comprise an additional 10% of NSO stipulated NFS lands in Alternative D, of which 54% occur in no to low potential areas and 34% occur in moderate potential areas. Recreation-related stipulations comprise 8% of the NFS lands in alternative D, 33% of which occur in no to low potential areas. The remaining stipulated NSO areas include protections for water, wildlife, scenery, archeological areas, vegetation and RNAs. Approximately 377,400 acres would be stipulated with CSU and TL stipulations and approximately 183,700 acres with standard lease terms in Alternative D.

Under Alternative D, the most likely areas for new leases would be in currently unleased lands with moderate or high potential on NFS lands in the Paradox Basin and in the San Juan Sag, where there is an expression of interest for oil and gas leasing. Approximately 165 wells are projected on future leases under Alternative D, using existing roads for most of the access.

Figure 2.16 is a map that shows what lands would be open to leasing, what lands are withdrawn from leasing, what lands are administratively not available for leasing, and where the different categories of stipulations would apply on lands open to leasing under Alternative D.

BLM_0030211

**Figure 2.16 - Oil and Gas Leasing Availability and Stipulations for Alternative D**

