**2.8.5 NO LEASE ALTERNATIVE**

The no-leasing alternative is analyzed in compliance with 36 CFR 228.102(c)(2)&(3) which requires the Forest Service, when considering oil and gas leasing, to analyze an alternative of not leasing. Under this alternative acres withdrawn from leasing would be 480,953 acres. The remaining NFS lands (1,392,474 acres) and BLM lands (768,625 acres) would be administratively not available for leasing. Under this alternative, only existing leases would continue to be developed. Any new leases would be deferred, pending a new analysis and decision.

Under this alternative, no lands would be available for lease; either currently unleased lands or leased lands when existing leases expire. As a result, part of the Reasonably Foreseeable Development scenario would not be implemented. Of the 1,185 wells projected in the RFD, 170 wells would be affected and not drilled because leases would not be issued in unleased areas of projected development. All other development projected in the RFD would occur on existing leases unaffected by this leasing analysis. Only when the existing leases expire would the leasing decision made in the LMP revisions apply. A new decision, supported by the appropriate analysis, could change such a decision and make the lands available for leasing.

**Table 2.11 – Oil and Gas Leasing Availability on San Juan Public Lands for the No-Leasing Alternative**
(figures are based on total mineral estate, including private surface)

| OIL AND GAS AVAILABILITY | Forest Service | BLM | Total |
|---|---|---|---|
| Federal Mineral Acres | 1,873,427 | 768,625 | 2,642,052 |
| Acres Withdrawn From Leasing | 480,953 | 0 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 1,392,474 | 768,625 | 2,161,099 |
| Acres Available for Leasing | 0 | 0 | 0 |
| PROJECTED Wells on Unleased Lands | 0 | 0 | 0 |
| PROJECTED Road Miles for Projected Wells | 0 | 0 | 0 |
| PROJECTED Acres Disturbed for Projected Wells | 0 | 0 | 0 |

BLM_0030213

**Figure 2.17 - Oil and Gas Leasing Availability and Stipulations for the No Lease Alternative**



## COMPARISON OF ALTERNATIVE TABLES

**Table 2.9.1 (MA 1) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| *Management Area Allocation (acres)* | | | | |
| **MA 1 - Natural Processes Dominate**<br><br>These relatively pristine lands are places where natural ecological processes operate free from human influences. Succession, fire, insects, disease, floods, and other natural processes and disturbance events shape the composition, structure, and landscape pattern of the vegetation. Roads and human structures are absent.<br><br>All alternatives include: 420,522 areas currently in the National Wilderness Preservation System, the 60,341-acre Piedra Area that was established by the 1993 Colorado Wilderness Act (managed in order to maintain wilderness characteristics), and 55,428 acres of BLM Wilderness Study Areas (WSAs).<br><br>The BLM Wilderness Study Areas would continue to be managed as Management Area (MA 1), even if they are released from WSA status by legislation.<br><br>A primary difference in MA 1 allocation among the alternatives relates to the portion of Inventoried Roadless Areas to be managed as MA 1. | Alternative A would focus on maintaining management flexibility, and on resolving issues on a case-by-case basis. It would place the least amount of emphasis on maintaining core undeveloped areas, when compared with any other alternative. In addition to the wilderness, WSA and Piedra Area, the only other area managed as MA 1 would be the segment of the Piedra River, outside of the Weminuche and Piedra Area that was found suitable for inclusion in the National Wild and Scenic Rivers (WSR) System. | Alternative B would provide a balance between maintaining most of the large, contiguous blocks of undeveloped lands and maintaining working forests and rangelands. Under Alternative B, some Inventoried Roadless Areas (IRAs) would be managed as MA 1. | Alternative C would provide a primary emphasis on maintaining most of the large, contiguous blocks of undeveloped lands. Under Alternative C, most of the IRAs would be managed as MA 1. Much of the area that would be managed as MA 3 under the other alternatives would be managed as MA 1 under Alternative C. | Alternative D would place the greatest emphasis on commodity production and utilization. Under Alternative D, most of the IRAs would be managed as MA 3 and a few as MA 5, rather than as MA 1. |
| | Total = 538,658 | Total = 652,307 | Total = 1,080,621 | Total = 553,786 |

BLM_0030215

**Table 2.9.1 (MA 2) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| *Management Area Allocation (acres)* | | | | |
| **MA 2 - Special Areas and Unique Landscape Areas**<br><br>These areas possess one or more special features or characteristics that make them and their management unique from other areas of the San Juan Public Lands. | Alternative A would continue current special area designations. No new special area designations would occur. | Alternative B would provide additional opportunities for special designations while, at the same time, emphasizing a balanced approach to multiple-use. | Alternative C would place the greatest emphasis on opportunities for special designations. | Alternative D would provide for a limited number of opportunities for special designations while, at the same time, emphasizing resource utilization and multiple-use. |
| | Total = 100,755 | Total = 193,497 | Total = 198,506 | Total = 151,035 |

**Table 2.9.1 (MA 3) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| *Management Area Allocation (acres)* | | | | |
| **MA 3 - Natural Landscape, with Limited Management**<br><br>Management activities are allowed but limited on MA 3 lands, reserved primarily for restoration purposes brought about by natural disturbance events or past management actions. Management activities could include restoration of ecological conditions or habitat components, prescribed fire, wildland fire use, salvage logging, hazardous fuels reduction, invasive species reduction, elimination of man-made structures, or livestock grazing improvements.<br><br>A primary difference in MA 3 allocation among the alternatives relates to the portion of Inventoried Roadless Areas to be managed as MA 3. Alternative A, based on current plans, would provide a wider range of management activities and uses under MA 3 allocations. | Alternative A, based on current plans, would provide a wider range of management activities and uses under MA 3 allocations. | Alternative B would manage more of the USFS IRAs as MA 3 (allowing more options for fuels reduction and for forest health management), than would Alternative C. | Alternative C would manage most of the USFS IRAs as MA 1, when compared to all of the other alternatives. | Alternative D would manage most of the USFS IRAs as MA 3 (allowing more options for fuels reduction and for forest health management). About 45,000 acres in 4 inventoried IRAs would be managed as MA 5, rather than as MA 1 or as MA 3. |
| | Total = 891,718 | Total = 822,143 | Total = 472,010 | Total = 788,289 |

BLM_0030216

**Table 2.9.1 (MA 4) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| *Management Area Allocation (acres)* | | | | |
| **MA 4 - High-Use Recreation Emphasis**<br><br>Note: In terms of allocated acreage, the significant difference under Alternative A from the other alternatives is, in part, due to a different approach toward recreation management and mapping.<br><br>Under Alternatives B, C, and D, MA 4 allocations would be applied to popular recreation destinations (e.g., lakes, campgrounds, day-use areas, etc.) and to popular driving and scenic routes (e.g., the San Juan Skyway, Alpine Loop, Piedra Road, etc.). | Alternative A would continue current management, in terms of recreation emphasis. | Alternative B would manage popular recreation destinations and scenic routes as MA 4, such as lakes, campgrounds, day-use areas, the San Juan Skyway, Alpine Loop, Piedra Road, etc.). | Alternative B would have fewer areas and routes identified as MA 4, and would have fewer areas managed for developed and directed recreation experiences (allowing more undeveloped and unmanaged recreation opportunities). | Alternative D would manage popular recreation destinations and scenic routes as MA 4, similar to the areas and to the emphasis of Alternative B, with the addition of McPhee reservoir. |
| | Total = 148,465 | Total = 79,603 | Total = 54,768 | Total = 86,241 |

**Table 2.9.1 (MA 5) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| *Management Area Allocation (acres)* | | | | |
| **MA 5 - Active Management (commodity production in order to meet multiple-use goals)**<br><br>In general these multiple-use areas are easily accessible, occurring mostly on roaded landscapes with gentle terrain. These are lands where timber production, oil and gas activities, and intensive livestock grazing occur and influence the composition, structure, and landscape pattern of the vegetation. Natural ecological processes and disturbance agents including succession and fire are often influenced by humans on many of these lands. A mosaic of vegetation conditions is often present, some showing the effects of past management activities, others appearing predominantly natural. | Alternative A would manage 119,107 acres of USFS IRAs as MA 5, which would be the highest amount of any of the alternatives. Current management direction within these areas would continue for multiple-use and resource utilization. | Alternative B would provide a balance between maintaining most of the large, contiguous blocks of undeveloped lands and maintaining working forests and rangelands. Under Alternative B, road construction and commercial timber sales would be concentrated in the currently roaded areas. No Inventoried Roadless Areas would be contained within MA 5 under Alternative B. | Under Alternative C, production of goods from vegetation management would continue, but might be secondary to other non-commodity objectives. No Inventoried Roadless Areas would be contained within MA5 under Alternative C. | Alternative D would provide a mix of multiple-use activities with a primary emphasis on the working forest and rangelands, in order to produce the highest amounts of commodity, goods, and services. Alternative D would have the highest amount of lands managed as MA 5, including approximately 45,000 of Inventoried Roadless Acres. |
| | Total = 675,014 | Total = 529,413 | Total = 487,299 | Total = 682,632 |

BLM_0030217

**Table 2.9.1 (MA 7) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| Management Area Allocation (acres) | | | | |
| **MA 7 - Public and Private Lands Intermix**<br><br>These areas are places where the SJPL are in close proximity to private lands, communities and local governments and the houses, structures, people, and values associated with them. The close proximity of these areas to private lands makes them a priority for fuels and vegetation treatments to reduce wildfire hazards. The backyard or rural recreation setting provided by many of these lands is an amenity to the active lifestyles and quality of life for local residents. Winter range for deer and elk is a common component as are seasonal closures to reduce animal disturbance. | The pressures from urban development on the boundaries of the public lands were not addressed in previous land use plans; therefore, under Alternative A (which would continue current management), the emphasis on this type of management would be limited. | Alternative B would provide for resource management and increased coordination with adjacent lands. MA 7 areas most commonly occur along the public land boundaries that are commonly intermixed with private and other public lands. | Alternative C would manage as MA 7 most of the same lands as that proposed under Alternatives B; however, a few areas would be managed as MA 3 and thereby not as intensely managed as MA 7. | Alternative D would manage slightly more areas as MA 7 than Alternative B. |
| | Total = 0 | Total = 81,756 | Total = 71,929 | Total = 89,116 |

**Table 2.9.1 (MA 8) - Management Area Allocations**

| MANAGEMENT AREA ALLOCATIONS | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| Management Area Allocation (acres) | | | | |
| **MA 8 - Highly Developed Areas (e.g., downhill ski areas and dams)** | Alternative A would continue with current management, and would include the two currently permitted downhill ski areas, as well as the three potential ski areas identified in the current land use plans. | Alternative B would drop the three potential ski areas, two of which are defunct. Alternative B would maintain the two currently permitted areas. | Alternative C would limit downhill ski areas to those currently permitted (within the boundaries of current development). | Alternative D would retain one of the potential ski areas and drop the two potential areas that are now defunct. It would also provide for an expansion of the Wolf Creek Ski Area. Alternative D would maintain the two currently permitted areas. |
| | Total = 14,475 | Total = 7,395 | Total = 3,952 | Total = 17,986 |
| **TOTAL MA ACRES** | **2,369,085** | **2,369,085** | **2,369,085** | **2,369,085** |

BLM_0030218

## Table 2.9.2 - Resource and Program Management Activities

| Resource and Program Management Activities [1] | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Timber: Long-Term Sustained-Yield Capacity (LTSYC)** _million cubic feet/million board feet (MMCF/MMBF) (average annual value for first decade)_ | | | | |
| Timber production compatible with desired conditions and objectives | 11.25 / 46 | 8.6 / 35.8 | 8.0 / 33.3 | 9.67 / 40.3 |
| Other lands (timber harvesting in order to meet resource and area desired conditions and objectives, but not for production purposes) | 2 / 7.7 | 2 / 7.7 | .93 / .75 | 2 / 7.7 |
| **Timber Sale Program Quantity (TSPQ)** _MMCF/MMBF (average annual value for first decade)_ | | | | |
| Timber production compatible with desired conditions and objectives | 2.2 / 11* | 2.2 / 11.0 | 2.0 / 10 | 2.8 / 14 |
| Other lands (timber harvesting in order to meet resource and area desired conditions and objectives, but not for production purposes) | 2 / 1 | .2 / 1 | .08 / .4 | .2 / 1 |
| **Timber: Allowable Sale Quantity (ASQ)** _MMCF/MMBF (average annual value for first decade)_ | | | | |
| Allowable sale quantity | 4.8 / 24 | 4.0 / 20 | 3.8 / 19 | 4.6 / 23 |
| **Livestock Grazing: Permitted Animal Unit Months (AUMs)** | | | | |
| Sheep: Permitted AUMs (USFS) | 8,754 | 8,754 | 6,456 | 21,783 |
| Sheep: Permitted AUMs (BLM) | 2,204 | 2,204 | 0 | 2,241 |
| _Total Sheep AUMs_ | 10,958 | 10,958 | 6,456 | 24,024 |
| Cattle: Permitted AUMs (USFS) | 115,312 | 115,312 | 112,554 | 117,791 |
| Cattle: Permitted AUMs (BLM) | 22,101 | 22,100 | 16,530 | 22,290 |
| _Total Cattle AUMs_ | 137,413 | 137,412 | 129,084 | 140,081 |
| **Oil and Gas Wells Anticipated to be Drilled over the Next 15 Years by Major Geologic Areas [2] on Currently Unleased Lands** | | | | |
| San Juan Basin | 0 | 0 | 0 | 0 |
| Paradox Basin | 136 | 133 | 127 | 138 |
| San Juan Sag | 30 | 30 | 30 | 30 |
| _Total Anticipated Wells_ | 167 | 158 | 148 | 165 |
| **Road Construction and Reconstruction (miles)** | | | | |
| Road construction - timber | 3 | 0 | 0 | 3 |
| Road construction - oil and gas (within currently unleased areas) | 70 | 70 | 70 | 70 |
| _Total Road Construction Miles_ | 73 | 70 | 70 | 73 |
| Road reconstruction - timber | 7.2 | 7.6 | 5.6 | 8.2 |
| Road reconstruction - oil and gas | 0 | 0 | 0 | 0 |
| _Total Road Reconstruction Miles_ | 7.2 | 7.6 | 5.6 | 8.2 |

[1] Note: These output levels are projections; they are not planning decisions.
[2] Identified in the Reasonable Foreseeable Development (RFD) scenario for oil and gas.

BLM_0030219

**Table 2.9.3 - Suitable Lands by Alternative**

| SUITABLE LANDS BY ALTERNATIVE | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| *Timber Lands - USFS (acres)* | | | | |
| Tentatively Suitable | 800,154 | 800,154 | 800,154 | 800,154 |
| Not suitable for timber production or harvest | 1,479,644 | 1,564,210 | 1,577,581 | 1,519,707 |
| Suitable for Timber Production | 395,337 | 313,812 | 300,460 | 357,336 |
| Other tentatively suitable lands where timber harvest may occur | 402,351 | 395,979 | 146,405 | 411,883 |
| *Total Acres where Timber Harvesting May Occur* | 797,688 | 701,950 | 446,865 | 769,219 |
| *Livestock Grazing, Suitable and Available (acres)* | | | | |
| Sheep: Suitable areas on active allotments (USFS) | 87,858 | 87,858 | 87,858 | 239,280 |
| Sheep: Available areas on active allotments (BLM) | 8,619 | 8,619 | 1,130 | 9,031 |
| *Total Acres* | 96,477 | 96,477 | 88,988 | 248,311 |
| Cattle: Suitable areas on active allotments (USFS) | 654,837 | 654,837 | 655,038 | 694,321 |
| Cattle: Available areas on active allotments (BLM) | 279,236 | 275,908 | 255,122 | 281,401 |
| *Total Acres* | 934,073 | 930,745 | 910,160 | 975,722 |
| *Motorized Travel over Ground – Summer (acres)* | | | | |
| Not suitable areas (closed) | 549,562 | 1,002,389 | 1,220,387 | 912,881 |
| Suitable areas (limited) [1] | 971,127 | 955,403 | 751,344 | 1,009,048 |
| Suitable opportunity areas (limited) [2] | 848,396 | 411,293 | 397,354 | 447,156 |
| Open Motorized Areas [3] | 866,705 | 0 | 0 | 0 |
| *Motorized Travel over Snow – Winter (acres)* | | | | |
| Not suitable areas | 1,039,919 | 1,521,905 | 1,728,372 | 1,479,140 |
| Suitable areas | 1,329,159 | 847,174 | 640,707 | 889,939 |

[1]  Areas with existing routes for motorized travel.
[2]  Areas with existing routes for motorized travel and where opportunities exist for expanding motorized recreation routes.
[3]  Open Motorized Areas: In Alternative A, 866,705 acres are open to motorized travel off of existing roads and trails.  In compliance with the USFS 2005 Travel Rule and the BLM H-1601-1Land Use Planning handbook, all motorized travel will be restricted to designated routes in Alternatives B, C, and D.

BLM_0030220

**Table 2.9.4 - Special Areas and Unique Landscapes by Alternative**

| SPECIAL AREAS AND UNIQUE LANDSCAPES | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Wilderness acres** Congressionally designated (USFS) | 420,522 | 420,522 | 420,522 | 420,522 |
| **Piedra Area** (USFS) | 60,341 | 60,341 | 60,341 | 60,341 |
| **Wilderness Study Areas** (BLM) | 55,428 | 55,428 | 55,428 | 55,428 |
| **Recommended Wilderness** (USFS) (acres) | | | | |
| Fish Creek | 0 | 0 | 13,537 | 0 |
| Storm Peak | 0 | 0 | 57,623 | 0 |
| Ryman | 0 | 0 | 8,665 | 0 |
| Lizard Head, adjacent | 0 | 2,632 | 5,558 | 0 |
| Blackhawk Mountain | 0 | 0 | 17,545 | 0 |
| Hermosa | 0 | 50,895 | 148,139 | 0 |
| San Miguel | 0 | 0 | 60,311 | 0 |
| West Needle | 0 | 0 | 4,497 | 0 |
| East Animas | 0 | 0 | 16,894 | 0 |
| Baldy | 0 | 0 | 20,032 | 0 |
| Florida River | 0 | 0 | 5,726 | 0 |
| Runlett Park | 0 | 0 | 5,600 | 0 |
| HD Mountains | 0 | 0 | 0 | 0 |
| Piedra Area, adjacent | 0 | 0 | 39,307 | 0 |
| Graham Park | 0 | 0 | 17,325 | 0 |
| Weminuche, adjacent | 0 | 1,428 | 22,683 | 0 |
| Turkey Creek | | 578 | 25,314 | 0 |
| Treasure Mountain | 0 | | 22,512 | |
| South San Juan, adjacent | 0 | 0 | 34,793 | 0 |
| *Total Recommended Wilderness Acres (USFS)* | *0* | *55,533* | *526,344* | *0* |

BLM_0030221

**Table 2.9.4 - Special Areas and Unique Landscapes by Alternative (continued)**

| SPECIAL AREAS AND UNIQUE LANDSCAPES | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Wild and Scenic Rivers (WSRs) Suitable by Alternative** *Miles by Segment and Total Number of Segments (BLM and USFS)* | | | | |
| Dolores, above McPhee | 0 | 0 | 55.5 | 0 |
| Dolores McPhee to Bedrock | 109.0 | 109.0 | 109.0 | |
| Rio Lado | 0 | 0 | 2.83 | 0 |
| West Dolores | 33.7 | 0 | 33.7 | 0 |
| Summit Canyon | 0 | 12.1 | 12.1 | 0 |
| Coyote Wash | 0 | 7.6 | 7.6 | 0 |
| McIntyre Canyon | 0 | 0 | 5.8 | 0 |
| Bull Canyon | 0 | 0 | 6.4 | 0 |
| Animas River, Bakers Bridge to Silverton | | | | |
| Bakers Bridge to Sultan Creek | 0 | 27.2 | 27.2 | 0 |
| Sultan Creek to Silverton | 0 | 0 | 3.6 | 0 |
| Mineral Creek | 0 | 8.7 | 8.7 | 0 |
| Cement Creek | 0 | 0 | 7.6 | 0 |
| Cinnamon Creek | 0 | 0 | 2.0 | 0 |
| Maggie Gulch | 0 | 0 | 4.6 | 0 |
| South Fork Mineral Creek | 0 | 7.4 | 7.4 | 0 |
| West Fork Animas/California Gulch | 0 | 0 | 3.2 | 0 |
| Hermosa Creek and tributaries | 0 | 62.3 | 62.3 | 0 |
| Los Pinos and tributaries above Vallecito | 54.2 | 54.2 | 54.2 | 0 |
| Vallecito Creek | 0 | 0 | 16.6 | 0 |
| Piedra River | | | | |
| North of Hwy 160 to Forks | 21.9 | 21.9 | 22.0 | 0 |
| South of Hwy 160 to Forest boundary (Chimney Rock area) | 0 | 0 | 8.4 | 0 |
| East Fork Piedra River | | | | |
| North of Wilderness boundary | 9.4 | 9.4 | 9.4 | 0 |
| South of Wilderness boundary | 6.6 | 0 | 6.6 | 0 |
| Middle Fork Piedra River | 18.8 | 18.8 | 18.8 | 0 |
| West Fork San Juan River | 0 | 17.3 | 17.3 | 0 |
| Wolf Creek and Fall Creek | 0 | 0 | 7.8 | 0 |
| East Fork San Juan River | 0 | 0 | 13.1 | 0 |
| *Total Suitable WSR Segment Miles* | *253.6* | *355.9* | *533.6* | *0* |
| *Total Suitable WSR River Segments* | *7* | *12* | *24* | *0* |

[1]  Areas with existing routes for motorized travel.
[2]  Areas with existing routes for motorized travel and where opportunities exist for expanding motorized recreation routes.
[3]  Open Motorized Areas: In Alternative A, 866,705 acres are open to motorized travel off of existing roads and trails.  In compliance with the USFS 2005 Travel Rule and the BLM H-1601-1Land Use Planning handbook, all motorized travel will be restricted to designated routes in Alternatives B, C, and D.

BLM_0030222

**Table 2.9.4 - Special Areas and Unique Landscapes by Alternative (continued)**

| SPECIAL AREAS AND UNIQUE LANDSCAPES | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Research Natural Areas (RNAs) (USFS)** | | | | |
| Electra | 0 | 2,450 | 2,450 | 2,450 |
| Grizzly Peak | 0 | 4,676 | 4,676 | 0 |
| Hermosa | 0 | 15,469 | 15,522 | 0 |
| Martinez Creek | 0 | 1,664 | 1,664 | 0 |
| Hidden Mesas | 0 | 3,761 | 3,761 | 3,761 |
| Navajo River | 0 | 7,168 | 7,168 | 7,168 |
| Needles Mountain | 0 | 0 | 12,823 | 0 |
| Piedra | 0 | 6,423 | 6,423 | 0 |
| Porphyry Gulch | 0 | 12,191 | 12,199 | 0 |
| Narraguinnep | 1,971 | 1,971 | 1,971 | 1,971 |
| Williams Creek | 486 | 486 | 486 | 486 |
| *Total RNA Acres* | *2,457* | *56,259* | *69,143* | *15,836* |
| *Total RNA Areas* | *2* | *10* | *11* | *5* |

| SPECIAL AREAS AND UNIQUE LANDSCAPES | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Areas of Critical Environmental Concern (ACECs) (BLM)** | | | | |
| Mud Springs | 1,160 | 0 | 1,160 | 0 |
| Big Gypsum Valley | 0 | 6,062 | 17,112 | 0 |
| Silveys Pocket | 0 | 0 | 707 | 0 |
| Grassy Hills | 0 | 0 | 420 | 0 |
| *Total ACEC Acres* | *1,160* | *6,062* | *19,399* | *0* |
| *Total ACEC Areas* | *1* | *1* | *4* | *0* |

BLM_0030223

**Table 2.9.4 - Special Areas and Unique Landscapes by Alternative (continued)**

| SPECIAL AREAS AND UNIQUE LANDSCAPES | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Other Special Areas and Unique Landscapes (acres)** | | | | |
| Dolores River Canyon Unique Landscape (BLM and USFS) | 33,908 | 33,504 | 35,241 | 33,490 |
| HD Mountains Unique Landscape (USFS) | 0 | 44,115 | 48,671 | 44,115 |
| Rico Unique Landscape (USFS) | 0 | 9,293 | 2,303 | 1,604 |
| Silverton Unique Landscape (BLM and USFS) | 39,486 | 39,703 | 39,583 | 39,703 |
| McPhee Unique Landscape (USFS) | 0 | 14,985 | 14,985 | 0 |
| Falls Creek Archaeological Area (USFS) | 1,453 | 1,453 | 1,453 | 1,453 |
| Chimney Rock Archeological Area (USFS) | 3,144 | 3,144 | 3,144 | 3,144 |
| Mesa Verde Escarpment Archeological Area (BLM) | 0 | 7,373 | 7,373 | 0 |
| Spring Creek Wild Horse Herd Area | 21,534 | 21,534 | 21,534 | 21,534 |
| Perin's Peak Habitat Management Area (BLM) | 3,787 | 2,274 | 2,274 | 2,274 |
| Willow Creek Habitat Management Area (BLM) | 0 | 876 | 876 | 876 |
| O'Neal Hill Botanical Area (USFS) | 328 | 328 | 328 | 328 |
| Chatanooga Fen Botanical Area (USFS) | 0 | 273 | 273 | 273 |
| Burro Bridge Fen Botanical Area (USFS) | 0 | 76 | 76 | 76 |
| Old-growth restoration sites Unique Landscape (USFS): Boggy (2,534 acres); Smoothing Iron (2,314 acres) | 0 | 0 | 4,848 | 0 |

BLM_0030224

**Table 2.9.5 - Other Lands by Alternative**

| OTHER LAND IDENTIFICATIONS BY ALTERNATIVE | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Downhill Ski Areas (acres)** | | | | |
| Durango Mountain Resort (existing) | 5,593 | 5,593 | 2,149 | 5,593 |
| Silverton Ski Area (existing) | 1,201 | 1,201 | 1,201 | 1,201 |
| East Fork (potential) | 5,009 | 0 | 0 | 5,009 |
| Wolf Creek Ski Area expansion (potential) | 0 | 0 | 0 | 4,719 |
| Stoner (defunct) | 276 | 0 | 0 | 0 |
| Wolf Creek Valley (defunct) | 2,412 | 0 | 0 | 0 |
| *Total Downhill Ski Acres* | *14,491* | *6,794* | *3,350* | *16,522* |
| **Structured Recreation Management Areas (SRMAs) (acres)** | | | | |
| Cortez SRMA (BLM) | 0 | 4,777 | 4,777 | 4,777 |
| Dolores River SRMA (BLM and USFS) | 49,324 | 56,031 | 56,031 | 56,031 |
| Durango SRMA (BLM and USFS) | 5,461 | 9.949 | 9,949 | 9,949 |
| Silverton SRMA (BLM and USFS) | 44,889 | 72,399 | 72,399 | 72,399 |
| *Total SRMAs* | *99,674* | *143,156* | *143,156* | *143,156* |
| **Lands Available for Disposal (BLM) (acres)** | | | | |
| BLM acres available for disposal | 10,850 | 8,773 | 8,773 | 8,773 |

BLM_0030225

**Table 2.9.6 - Oil and Gas Availability by Alternative**

| Oil and Gas Leasing Availability by Alternative | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan Public Lands Fluid-Minerals - Oil and Gas (acres)** *(figures are based on total mineral estate, including private surface)* | | | | | |
| *Total San Juan Public Lands Oil and Gas* | *2,642,053* | *2,642,053* | *2,642,053* | *2,642,053* | *2,642,053* |
| Withdrawn from Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Proposed for Withdrawal | 0 | 67,726 | 532,957 | 0 | 0 |
| Administratively Not Available for Leasing | 63,851 | 93,238 | 118,821 | 93,238 | 2,161,100 |
| Available for Leasing | 2,097,278 | 2,000,135 | 1,509,321 | 2,067,861 | 0 |
| No Surface Occupancy (NSO) | 40,741 | 980,102 | 517,645 | 1,043,999 | 0 |
| Controlled Surface Use (CSU) | 370,507 | 303,922 | 320,573 | 292,797 | 0 |
| CSU and Timing Limitations (TL) | 58,200 | 89,938 | 85,610 | 85,674 | 0 |
| Timing Limitations (TL) | 115,305 | 333,954 | 305,921 | 336,475 | 0 |
| Standard Lease Terms | 1,512,545 | 292,219 | 279,572 | 308,917 | 0 |

BLM_0030226

**Table 2.9.6 - Oil and Gas Availability by Alternative (continued)**

| Oil and Gas Leasing Availability by Alternative | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Currently Leased and Unleased Lands (acres)** San Juan Public Lands Fluid-Minerals (Oil and Gas) *(figures are based on total mineral estate, including private surface)* | | | | | |
| *Total San Juan Public Lands Oil and Gas* | *2,642,053* | *2,642,053* | *2,642,053* | *2,642,053* | *2,642,053* |
| *Total Lands Currently Leased* | *528,069* | *528,069* | *528,069* | *528,069* | *528,069* |
| *Total Unleased Lands* | *2,113,984* | *2,113,984* | *2,113,984* | *2,113,984* | *2,113,984* |
| **Currently Unleased Lands (acres)** San Juan Public Lands Fluid-Minerals (Oil and Gas) *(figures are based on total mineral estate, including private surface)* | | | | | |
| *Total Unleased Lands* | *2,113,984* | *2,113,984* | *2,113,984* | *2,113,984* | *2,113,984* |
| Withdrawn from Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Proposed for Withdrawal | 0 | 67,726 | 532,957 | 0 | 0 |
| Administratively Not Available for Leasing | 63,851 | 93,238 | 118,821 | 93,238 | 1,633,031 |
| Available for Leasing | 1,569,180 | 1,472,067 | 981,253 | 1,539,793 | 0 |
| No Surface Occupancy (NSO) | 22,469 | 827,559 | 362,288 | 894,144 | 0 |
| Controlled Surface Use (CSU) | 60,276 | 259,114 | 277,520 | 248,221 | 0 |
| CSU and Timing Limitations (TL) | 15,017 | 78,937 | 75,176 | 72,150 | 0 |
| Timing Limitations (TL) | 46,019 | 122,151 | 112,463 | 129,078 | 0 |
| Standard Lease Terms | 1,425,399 | 184,306 | 153,806 | 196,200 | 0 |

BLM_0030227

**Table 2.9.6 - Oil and Gas Availability by Alternative (continued)**

| Oil and Gas Leasing Availability by Alternative | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan Public Lands Fluid-Minerals (Oil and Gas) within Major Geologic Basins[4] (acres)** | | | | | |
| **Paradox Basin (acres)** | | | | | |
| *Total San Juan Public Lands in Paradox Basin* | *649,263* | *649,263* | *649,263* | *649,263* | *649,262* |
| Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Proposed for Withdrawal | 0 | 0 | 182 | 0 | 0 |
| Administratively Not Available for Leasing | 38,690 | 61,203 | 80,908 | 61,203 | 649,262 |
| Available for Leasing | 610,573 | 588,060 | 568,173 | 588,060 | 0 |
| No Surface Occupancy (NSO) | 9,862 | 146,705 | 147,163 | 142,703 | 0 |
| Controlled Surface Use (CSU) | 161,031 | 54,827 | 54,545 | 53,649 | 0 |
| CSU and Timing Limitations (TL) | 44,009 | 8,700 | 8,179 | 11,178 | 0 |
| Timing Limitations (TL) | 92,268 | 243,632 | 227,825 | 246,250 | 0 |
| Standard Lease Terms | 303,403 | 134,196 | 130,461 | 134,280 | 0 |
| **Paradox Basin – Currently Unleased Lands (acres)** | | | | | |
| *Total Unleased Lands in Paradox Basin* | *272,724* | *272,724* | *272,724* | *272,724* | *272,724* |
| Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Proposed for Withdrawal | 0 | 0 | 182 | 0 | 0 |
| Administratively Not Available for Leasing | 35,512 | 59,431 | 79,091 | 59,431 | 272,724 |
| Available for Leasing | 237,212 | 213,293 | 193,451 | 213,293 | 0 |
| No Surface Occupancy (NSO) | 2,162 | 52,771 | 42,960 | 53,670 | 0 |
| Controlled Surface Use (CSU) | 31,828 | 23,283 | 24,888 | 22,414 | 0 |
| CSU and Timing Limitations (TL) | 4,064 | 3,997 | 3,610 | 3,439 | 0 |
| Timing Limitations (TL) | 26,226 | 57,269 | 49,411 | 57,784 | 0 |
| Standard Lease Terms | 172,932 | 75,973 | 72,582 | 75,986 | 0 |
| **San Juan Sag (acres)** | | | | | |
| *Total San Juan Public Lands in San Juan Sag* | *205,804* | *205,804* | *205,804* | *205,804* | *205,804* |
| Withdrawn from Leasing | 13,884 | 13,884 | 13,884 | 13,884 | 13,884 |
| Proposed for Withdrawal | 0 | 0 | 74,419 | 0 | 0 |
| Administratively Not Available for Leasing | 87 | 1,005 | 1,005 | 1,005 | 191,920 |
| Available for Leasing | 191,833 | 190,915 | 116,496 | 190,915 | 0 |
| No Surface Occupancy (NSO) | 0 | 104,042 | 38,614 | 113,472 | 0 |
| Controlled Surface Use (CSU) | 961 | 38,315 | 34,381 | 33,959 | 0 |
| CSU and Timing Limitations (TL) | 1,748 | 17,859 | 12,811 | 12,785 | 0 |
| Timing Limitations (TL) | 5,048 | 14,690 | 14,685 | 14,690 | 0 |
| Standard Lease Terms | 184,076 | 16,009 | 16,005 | 16,009 | 0 |

[4] Identified in the Reasonable Foreseeable Development (RFD) scenario for oil and gas.

BLM_0030228

**Table 2.9.6 - Oil and Gas Availability by Alternative (continued)**

| Oil and Gas Leasing Availability by Alternative | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan Sag – Currently Unleased Lands (acres)** | | | | | |
| *Total Unleased Lands in San Juan Sag* | 194,780 | 194,780 | 194,780 | 194,780 | 194,780 |
| Withdrawn from Leasing | 13,884 | 13,884 | 13,884 | 13,884 | 13,884 |
| Proposed for Withdrawal | 0 | 0 | 74,181 | 0 | 0 |
| Administratively Not Available for Leasing | 81 | 1,005 | 1,005 | 1,005 | 180,896 |
| Available for Leasing | 180,815 | 179,891 | 105,710 | 179,891 | 0 |
| No Surface Occupancy (NSO) | 0 | 101,284 | 35,513 | 110,134 | 0 |
| Controlled Surface Use (CSU) | 784 | 34,279 | 30,413 | 29,991 | 0 |
| CSU and Timing Limitations (TL) | 457 | 16,589 | 12,054 | 12,028 | 0 |
| Timing Limitations (TL) | 4,300 | 13,167 | 13,162 | 13,167 | 0 |
| Standard Lease Terms | 175,274 | 14,572 | 14,568 | 14,571 | 0 |
| **San Juan Basin (acres)** | | | | | |
| *Total San Juan Public Lands in San Juan Basin* | 73,622 | 73,622 | 73,622 | 73,622 | 73,622 |
| Withdrawn From Leasing | 0 | 0 | 0 | 0 | 0 |
| Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Administratively Not Available for Leasing | 0 | 3,273 | 3,273 | 3,273 | 73,622 |
| Available for Leasing | 73,622 | 70,349 | 70,349 | 70,349 | 0 |
| No Surface Occupancy (NSO) | 79 | 40,972 | 40,906 | 40,972 | 0 |
| Controlled Surface Use (CSU) | 7,924 | 7,754 | 7,744 | 7,754 | 0 |
| CSU and Timing Limitations (TL) | 2,268 | 3,407 | 3,452 | 3,407 | 0 |
| Timing Limitations (TL) | 619 | 13,781 | 13,746 | 13,781 | 0 |
| Standard Lease Terms | 62,732 | 4,435 | 4,501 | 4,435 | 0 |
| **San Juan Basin – Currently Unleased Lands (acres)** | | | | | |
| *Total Unleased Lands in San Juan Basin* | 17,522 | 17,522 | 17,522 | 17,522 | 17,522 |
| Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Administratively Not Available for Leasing | 0 | 1,264 | 1,264 | 1,264 | 17,522 |
| Available for Leasing | 17,522 | 16,258 | 16,258 | 16,258 | 0 |
| No Surface Occupancy (NSO) | 39 | 8,272 | 8,205 | 8,272 | 0 |
| Controlled Surface Use (CSU) | 1,505 | 3,443 | 3,443 | 3,443 | 0 |
| CSU and Timing Limitations (TL) | 942 | 607 | 607 | 607 | 0 |
| Timing Limitations (TL) | 0 | 1,744 | 1,744 | 1,744 | 0 |
| Standard Lease Terms | 15,036 | 2,192 | 2,259 | 2,192 | 0 |

BLM_0030229

This section provides a narrative comparative summary of the effects of the alternatives on each resource and resource program area.  This summary is organized into three parts—Sustaining Ecological Systems, Sustaining Social and Economic Systems, and Special Areas.  Detailed environmental analysis information related to these resources and resource programs are provided in Chapter 3 of this DEIS.

## AIR QUALITY

General effects to air quality can be the generation of air pollutants and greenhouse gases emissions from a variety of sources.  Air pollutants of specific concern are sulfur dioxide, oxides of nitrogen, mercury, ozone, and particulate matter. Although many of the documented air quality impacts are associated with external sources (those outside public land boundaries and jurisdiction), some public land activities have the potential to impact air quality. These activities include prescribed fires, oil and gas development, solid minerals development, developed recreation and use of travel-ways. Several activities occur on the SJPL that may generate greenhouse gases emissions.  Oil and gas development, large fires, and recreation using combustion engines, can potentially generate $CO_2$, methane, and water vapor.  The potential impacts to air quality from these activities would be similar under all alternatives.

## SOILS

General effects to soils, can include erosion, compaction, displacement, and severe burning.  Management activities that can influence the degree of impact to soils include timber harvest, mechanical fuels treatment, fire management, livestock grazing, oil and gas development, solid minerals development, utility corridors and recreation.  The projected output levels for mechanical fuels, fire management, solid minerals development, utility corridors, and recreation would not change under any of the alternatives thus the predicted level of impacts would be similar amongst the alternatives. For those activities where impacts potentially could vary by alternative, the following are relative impact rankings (from highest to lowest): timber harvest, oil and gas development – A, D, B, C; livestock grazing – D, A, B, C.

## WATER

General effects to water resources can include water quality impacts due to pollution or sedimentation, and changes in water quantity or flows.  Management activities that can influence positive or negative impacts to water resources include watershed improvements, roads, livestock grazing, timber harvest, mechanical fuels treatment, water developments, oil and gas development, solid minerals development, and mine reclamation. The predicted impact levels for watershed improvements, mechanical fuels treatment, water developments, oil and gas development, solid minerals development, and mine reclamation would not change under any of the alternatives. For those activities where impacts potentially could vary by alternative, the following are relative impact rankings (from highest to lowest): timber harvest and roads – A, D, B, C; livestock grazing – D, A and B, C. Alternatives C and D would result in the greatest benefits to water resources due to proposed road decommissioning, watershed improvement and restoration activities. The benefits in Alternative C are a result of fewer activities and fewer impacts to water resources, while the benefits that result from Alternative D occur because of increased activity with requirements for watershed improvements and reclamation activities.

BLM_0030230

## FISHERIES AND AQUATIC ECOSYSTEMS

General effects to fisheries and aquatic species can involve reduced or eliminated stream-flows, reduced streamside vegetation, reduced or eliminated fishery habitat, and degraded habitat due to erosion and sedimentation. Additional impacts can also include increased stream temperatures and reduced dissolved oxygen levels. Based on an assessment of current aquatic conditions, it appears the greatest risks to fish and aquatic species are from management activities with direct impacts on streams, riparian areas, and aquatic community composition. These activities include water use and development projects, livestock grazing and big game use, road construction and road management, oil and gas development, mining, mining reclamation, timber harvesting, and mechanical fuels reduction. A summary of alternative impacts by activity for fisheries and aquatic ecosystems would be similar to those described under water.

## RIPARIAN AREAS AND WETLAND ECOSYSTEMS

General effects to riparian areas and wetland ecosystems can include reduced native hydrophytic species (most notably cottonwood and willows), increased invasive species, changed dominant life forms from trees and shrubs to herbs, reduced water flow, and lowered water tables.  Management activities that can impact riparian and wetland areas include: timber harvest, livestock grazing, oil and gas development, fire and recreation.  The riparian and wetland impact levels for fire and recreation would not change under any of the alternatives. For those activities where impacts potentially could vary by alternative, the following are relative effects rankings (from highest to lowest): livestock grazing – D, A and B, C; oil and gas development – A, D, B, and C.

## TERRESTRIAL ECOSYSTEMS AND PLANT SPECIES

General effects to terrestrial ecosystems and plant species involve ground disturbance or vegetation removal that can alter major vegetation types and plant species.  Management activities that can impact terrestrial ecosystems and plant species include: livestock grazing, timber harvest, oil and gas development, fire, mechanical fuels treatments, recreation, solid minerals development, and utility corridors. The projected output levels for mechanical fuels, fire, recreation, solid minerals development, utility corridors, would not change under any of the alternatives thus the predicted level of impacts would be similar amongst the alternatives.  For those activities where impacts potentially could vary by alternative, the following are relative impact rankings (from highest to lowest): livestock grazing – D, A and B, C; oil and gas development and timber harvest – A, D, B, C. Alternatives A and D have the highest potential to positively affect vegetation types through vegetative restoration/improvement activities since these alternative would treat the greatest number of acres compared to Alternatives B and C.

## SPECIAL BIOLOGICAL DIVERSITY FEATURES

General effects to special biological diversity features (i.e., old-growth forests, mountain grasslands, hanging gardens, critically imperiled species and communities, and unroaded lands) may be degradation, removal, or fragmentation of individual features or the systems that sustain them.  Since project design and design criteria that avoid or minimize impacts to special biological diversity features will be implemented during projects, negative impacts would not occur, be minor, or would not affect these ecosystems.  Impacts to special biodiversity features are similar for all alternatives.  Alternative C proposes the most unroaded acres, thus would provide the most area of unaltered ecosystems.  Alternative B proposes the next highest amount of unroaded lands, followed by Alternatives D and A.

BLM_0030231

## FIRE AND FUELS

Management activities that can influence the degree of benefits derived from fire and fuels management programs include timber management, travel management, special area designations (Wilderness, WSA, RNA), livestock grazing, insects and disease and noxious weeds.  For those actions where the benefits of fire and fuels management could vary by alternative, the following are relative benefit rankings (from highest to lowest): timber management (fuels reduction), insects and disease – A, D, B, C; travel management (miles of fire break roads) – D, A, B, C; Special area designations (WFU opportunities) – C, B, D, A. Livestock grazing and noxious weeds would have similar impacts to fire and fuels management under all alternatives.

## INSECTS AND DISEASE

Management activities that can influence the occurrence of insects and disease include fire and fuels management, timber management, Wilderness management and recreation.  The likelihood for increased insects and disease infestations would be greatest under Alternative C, since there would be fewer management options to address insects and disease issues, followed by Alternatives B, D, and A, respectively.

## TERRESTRIAL WILDLIFE AND WILDLIFE SPECIES

Management actions that have the potential to impact wildlife habitat and species include timber management, fire and fuels, travel management, livestock grazing, oil and gas leases, solid minerals and wildlife program. Where projected management activity output levels vary, the potential for effects to wildlife generally vary. Timber management, livestock grazing, oil and gas leases have projected output levels that vary.  Based on the output levels of these activities, the following is an overall effects ranking (from highest to lowest): D, A, B, and C. Projected output levels for fire and fuels, travel management, solid minerals and wildlife program would not vary appreciably by alternative, thus impacts to wildlife would be similar under all alternatives.

## INVASIVE SPECIES

Noxious weeds and other invasive plant species establish as a result of ground disturbance and where a seed source is present.  Weeds are introduced and spread in many ways including people, wildlife, vehicles, wind, water, and fire.  Noxious weeds and other invasive species can affect water quality, wildlife habitat, fisheries, forage production, and soil productivity. Invasive species can also displace native species.  Based on the potential area of ground disturbance the following is a relative impacts ranking (from highest to lowest) by alternative: A, D, B, and C.

## TIMBER MANAGEMENT AND WOOD PRODUCTS

Activities which can impact timber management include: insects and disease, fuels treatments, wildland fire use, oil and gas development and recreation.  Alternative C would result in the greatest potential impacts to timber due to the increased potential for insects and disease in MA 1 areas and some MA 3 areas, followed by Alternatives B, A, and D, respectively.  Alternative D would result in the greatest benefits from fuels treatments, while the benefits of the remaining alternatives would be similar.  Levels of WFU and oil and gas development that could impact timber management are similar in all alternatives thus effects would be similar.  The impacts on timber management from recreation would be similar for Alternatives A, B, and D; and slightly reduced in Alternative C.  Overall, Alternatives A and D have the highest potential for benefits, followed by Alternatives B and C, respectively.

## SPECIAL FOREST PRODUCTS

The impacts of the personal use convertible products are negligible and dispersed over a wide area. The collection of convertible products generally benefits the public, and helps reduce stand density and incrementally hazardous fuels.  Nonconvertible products or botanical products are usually not collected for large commercial purposes, therefore, little impact is expected. Overall, impacts are similar under all alternatives for both convertible and nonconvertible forest products.

BLM_0030232

## LIVESTOCK GRAZING MANAGEMENT

Management activities that can impact forage availability, amount of suitable grazing, stocking levels and permittee operations include: fire and fuels, minerals, RNA designations, Wilderness, timber, wildlife and fisheries management, and travel management.  For those activities where impacts could vary by alternative, the following are relative impacts rankings (from highest to lowest): RNA designations and travel management – C, B, D and A; Wilderness and timber – C, B, A, and D. Impacts to grazing would be similar under all alternatives for fire and fuels, minerals, and wildlife and fisheries management. Overall, Alternative D has the highest potential for benefits, followed by Alternatives A, B and C, respectively.

## FLUID MINERALS

The primary management activities/conditions that can impact fluid minerals leasing and development include: the amount of area recommended for Wilderness, acres of Inventoried Roadless Areas, and resource constraints and opportunities for new leases.  Lesser impacts on mineral leasing and development result from, soils management, watershed management, recreation management, vegetation management, and heritage resource management.  A "no new leases" alternative was considered during the analysis. This alternative would have the greatest impact on the fluid minerals program compared to Alternatives A, B, C and D.  Regarding Alternatives A through D, based on the level of impacts to the fluid mineral program, the alternatives would be ranked (highest to lowest impact) as follows: C, B, D, and A.  The impacts of the alternatives on oil and gas well development as the result of Not Available and no surface occupancy stipulations (NSO) are as follows: wells eliminated: A – 3, B – 12, C – 22, D – 6; wells stipulated by NSO: A – 9, B – 50, C – 65, D – 53.

## SOLID MINERALS

Management actions that can impact solid minerals include: Wilderness management, RNA designations, wild river designations and wildlife and fisheries management.  In summary, based on the total acres of the various designations that could limit the development of solid minerals, Alternative C would have moderate to minor impact, followed by Alternatives B, D and A, all with minor to negligible impact.

## GEOTHERMAL ENERGY

Impacts to the geothermal energy program includes closure of areas to geothermal leasing through formal withdrawal or administrative closure, and increased operating costs through limitations on road and pipeline construction and use, facility placement, and operational constraints.  Management actions/conditions that impact geothermal energy development are proposed Wilderness additions, Roadless areas and natural landscapes. Based on the varying levels proposed for these actions/conditions, Alternative C would have moderate to minor impact, followed by Alternatives B  and A with minor impacts. Alternative D would have no impact.

## ALTERNATIVE ENERGY SOURCES

The primary management activities that can impact alternative energy sources include wildlife and fisheries management, travel management, timber management, and fuels management. The impacts of these activities would be similar under all alternatives. Based on proposed levels of vegetative management (timber harvest/ fuels reduction), Alternatives A and D would offer the largest supply of biomass material for generation, followed by Alternatives B and C.

BLM_0030233

## ACCESS AND TRAVEL MANAGEMENT

Management actions that can impact access and travel management include: timber management, oil and gas development, recreation, and wildlife management.  Alternative A would not alter the existing road system.  Road construction associated with timber management under Alternatives A and D is projected to be 3 miles, with no construction projected for Alternatives B and C. Projected reconstructed road miles would vary from 5.6 miles for Alternative C to 8.2 miles for Alternative D.  The projected road reconstruction would increase the existing road system by 0.25 percent in Alternative B, 0.18 percent in Alternative C, and 0.27 percent in Alternative D.  Under Oil and gas development, based on the number of potential wells, it is estimated that 70 miles of new road construction would be needed, regardless of which alternative is selected.  Access and travel management would be most impacted under Alternative C. Alternative C would result in a major reduction in motorized trail miles and a minor reduction in road miles, followed by Alternatives B and D.  Wildlife management impacts would be similar under all alternatives, being primarily seasonal restrictions.

## RECREATION

General impacts to recreation are influenced by the Recreation Opportunity Spectrum setting classes for both summer and winter and the number of acres suitable for motorized or non-motorized travel, both over ground and over snow.  Management actions that can impact recreation include: oil and gas development, fire and fuels management, timber management, and minerals. These activities are expected to have minor and similar impacts to recreation under all alternatives. Overall, Alternative C would result in the greatest impacts on motorized recreation opportunities, followed by Alternatives B and D, and then Alternative A.  In general, travel access and management allocations in Alternative C would result in the greatest benefits to non-motorized recreation by allocating the most land to those uses and reducing the potential for user conflict, followed by Alternative B and then Alternatives D and A.

## HERITAGE AND CULTURAL RESOURCES

In all alternatives, the preferred management strategy for eligible sites is to avoid and protect these sites from direct, indirect, and cumulative effects. Impacts to cultural resources can result from both, natural events and human activities that can damage heritage resources or alter their settings. Other impacts are not always as obvious or immediate and involve effects that occur off-site from project areas. Such impacts may include accelerated erosion and inadvertent damage from increased visitation to sites not previously accessible. Management actions that have potential to impact cultural resources include: cultural resources management, recreation, travel management, fire and fuels management, oil and gas development, livestock grazing, minerals and timber management. For those activities where projected output levels and/or impacts vary by alternative, the following are relative rankings of potential for impacts cultural resources (from highest to lowest): travel management, livestock grazing and timber management – D, A, B, and C; oil and gas development – A, D, B, and C.  Fire and fuels and minerals would have impacts similar for all alternatives.  Cultural resource management under Alternatives B and C would result in the greatest benefits to heritage and cultural resources by establishing the greatest number of protective management areas, followed by Alternatives A and D.

BLM_0030234

**SCENERY, VISUAL RESOURCES, AND THE BUILT ENVIRONMENT**

Effects to scenery and visual resources involve alterations to scenic integrity and/or visual quality. Alterations can be from natural or human induced events. The primary management actions that can impact scenery include: fire and fuels management, timber management, utility corridors, roads and trails and oil and gas development. Under fire and fuels program Alternative D treats slightly more acres than the other alternatives and would have the greatest effect to scenery in terms of short-term degradation and long-term benefits. Under timber management short-term effects of treatments under all of the alternatives would generally be negative, while long-term impacts would generally be positive to scenic values. The effect of utility corridors on scenery is the same under all of the alternatives. Regarding roads and trails, the greatest impact to scenery would be Alternative D followed by Alternatives A, B, and C. For oil and gas development, Alternatives A and D have potential for more well development and consequently more impacts compared to Alternatives B and C. Alternative A provides far less scenic protection with standard stipulations than do Alternatives B, C, and D which have more protective oil and gas stipulations. The No Lease Alternative would have the least potential impact to scenery and visual resources.

**LANDS AND SPECIAL USES**

The primary management actions that can impact land and special uses include constraints related to wildlife, fish and heritage resources: Based on the ability to mitigate most concerns for heritage and wildlife and fisheries, impacts to lands and special uses would be moderate to minor under Alternative C, minor under Alternative B, and would be negligible under Alternatives A and D.

**UTILITY CORRIDORS AND COMMUNICATION SITES**

The Management Areas may affect the accessibility of lands for location of pipelines, transmission lines and communication sites. Given the minimal expected level of demand for major new utility transmission facilities and new communication site development during the life of the Land Management Plan, there are no measurable differences between alternatives.

**ECONOMICS**

Impacts to planning area jobs and income are generated by changes in recreational uses of the Public Lands, mineral extraction, the use of timber and forge resources, and agency expenditures (salaries, equipment, and contracts). Employment and income in the area is expected to increase, with most of the growth not directly attributable to management of the San Juan Public Lands. Slight changes are predicted associated with the alternatives. Alternative D would probably result in the largest growth, followed by Alternative A, Alternative B, and finally by Alternative C.

The difference by alternative is mainly due to changes in the minerals and timber programs. Most job growth and most of the variation would be attributable to planning area-based natural gas development. Although the impacts related to timber may be experienced primarily in Montezuma County, some of the secondary, and all of the tourism-based, impacts may be felt in all communities. Industries most impacted by employment changes may be Mining, Agriculture and Natural Resources, and Manufacturing. These sectors may be primarily impacted by changes in natural gas development and timber harvesting. Although growth in the service sectors attributable to San Juan Public Land management may be modest, they may exhibit some change by alternative (due to spending by employees in other sectors).

Between 2004 and 2015, overall growth in jobs, related to the SJPL LMP alternatives, may vary from a low of approximately 12% (under Alternative C), to a high of approximately 21% (under Alternative D). No growth in jobs would be expected under the No Leasing Alternative.

BLM_0030235

Net financial revenues are expected to be highest under Alternative D, followed by Alternatives B, A, C, and the No Leasing Alternative, respectively. Economic net benefits are expected to be highest for Alternative C, followed by Alternatives A, B, D, and the No Leasing Alternative, respectively.

## DEMOGRAPHICS

For the counties most closely tied to the SJPL, the Colorado State Demographer's office projects a near doubling of the 2005 population by 2035, an 88% projected increase. Economic projections suggest that there are no known SJPL management actions or events that would cause an abrupt change in the current trajectory of area population trends. It is likely that area populations will increase over the next decade, primarily due to oil and gas activity. The small change that SJPL activities are projected to have suggests that the Public Lands will not be a major player in affecting population trends regardless of the alternative.

## LOCAL GOVERNMENTS

Two aspects of county government revenues that could be directly or indirectly related to activities on SJPL are 1) Federal land payments and 2) receipts from assessed property and sales taxes. Alternative A is predicted to generate the most revenue to State and local governments (mostly based on natural gas royalties) followed by D, B, C, and the No leasing Alternative, respectively. Changes in sales tax revenues are likely be imperceptible between alternatives. Since property taxes revenues are affected by levels of oil and gas development and production, county revenues are sensitive to trends in the industry. So long as production remains or increases, it will produce significant revenues for local government. The No Leasing Alternative, followed by Alternatives, C, B, D, and A, respectively, would have the most potential to result in (small) increases in property taxes.

## RESEARCH NATURAL AREAS

Most management activities including timber harvest, wood gathering, mechanical fuels treatments, recreation and facilities development, road construction, solid mineral development, oil and gas development with surface occupancy, and summer motorized use are generally prohibited in the proposed RNAs. Since these management activities would not occur within RNAs under any of the alternatives, they would not impact RNAs. Alternative C proposes the most new RNAs, thus it contributes the most new sites and new vegetation types to the Regional and National RNA systems. Alternative B proposes the second most RNAs followed by Alternatives D and A.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

ACEC values may be impacted by oil and gas development, locatable and saleable mineral development, unmanaged recreation use, unmanaged livestock grazing and invasive species. Designation of ACEC would include special management measures that address the effects of these activities on the identified values. Potential impacts on ACEC resource values would be greatest in Alternatives A and D. Alternative C would provide for the greatest focus on managing for ACEC values, followed by Alternative B.

## PALEONTOLOGICAL RESOURCES

Management activities that have the potential to impact paleontological resources include: oil and gas development, vegetation, fire and fuels management, recreation, lands and realty management, travel management, special area designations. Based on projected activity levels, Alternative A has the highest potential for negative impacts to paleontological resources, followed by Alternatives D, B, and C, respectively. Alternative C would result in the greatest potential benefits to paleontological resources due to protective special area designations, followed by Alternative B.

BLM_0030236

**SCENIC BYWAYS**

Under all of the alternatives, the condition of the scenic byways viewshed on SJPL will be conserved for valued scenic and cultural elements. Differences exist between the alternatives regarding oil and gas stipulations. Alternative A provides far less scenic protection with standard stipulations than do Alternatives B, C, and D which have more protective oil and gas stipulations.

**NATIONAL RECREATION AND SCENIC TRAILS**

Impacts to National Recreation and Scenic Trails are determined by the amount of viewshed protection. Alternative A does not have the same viewshed protection for these trails that Alternatives B, C, and D offer. Alternative A offers a varying degree of protection depending on the Management Emphasis within which the route is located. Alternatives B, C, and D establish these trails as important viewer locations and incorporate guidelines and stipulations to protect the foreground viewsheds along these routes.

**WILD AND SCENIC RIVERS**

Management actions that have the potential to impact Wild and Scenic Rivers Outstandingly Remarkable Values (ORVs) include: minerals management, livestock and recreation. These activities are not expected to impact the Wild and Scenic Rivers ORVs. Based on miles of river found suitable, Alternative C would result in the greatest benefits to Wild and Scenic Rivers, followed by Alternatives B and A, respectively. Alternative D would result in no benefits.

**WILDERNESS AND ROADLESS AREAS**

Management actions that have the potential to impact Wilderness and Roadless areas include: livestock grazing, recreation management, timber management, travel management, special interest areas, fire and fuels and oil, gas and mineral development. For those activities where the potential for impacts varies by alternative, the following is an impacts ranking (highest to lowest potential impact): recreation, timber, travel, oil, gas and minerals – D, A, B, and C. The potential impacts of livestock grazing, fire and fuels management and special interest areas would be the same for all alternatives. Alternative C would have the greatest potential to provide benefits to Wilderness and Roadless areas since it recommends the most Roadless area for Wilderness, followed by Alternative B. Alternatives A and D do not recommend any Roadless areas for Wilderness.

BLM_0030237

**SAN JUAN PUBLIC LANDS**
*Draft Land Management Plan / Draft Environmental Impact Statement*

VOLUME 1 ■ **Draft Environmental Impact Statement**

# Chapter 3
# AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

## INTRODUCTION

Chapter 3 combines two chapters often published separately in Draft Land Management Plans/Draft Environmental Impact Statements: the affected environment and environmental consequences (described below). The purpose of this chapter is to describe the ecological, social, and economic elements of sustainability of the U.S. Forest Service (USFS) and the Bureau of Land Management (BLM) public lands in the planning area, as administered by the San Juan Public Lands Center (SJPLC), and to convey how each of the alternatives are predicted to affect the natural and human environment. These two discussions have been combined in order to provide a clearer understanding of how each resource might be affected (impacted), depending on the alternative selected.

- *Affected Environment*: In this section, the current physical, biological, human, and land use environments of the planning area are discussed. This description provides a baseline against which to compare the impacts that might result from implementing any of the four alternatives.

- *Environmental Consequences*: In this section, a description and comparison of the predicted environmental consequences from implementing any of the four different alternatives are discussed. In terms of complying with the National Environmental Policy Act (NEPA), the specific purpose of this chapter is to present the analysis of the alternative management actions and to disclose the impacts of the Federal action on the human and natural environment. For this Draft Land Management Plan/ Draft Environmental Impact Statement (DLMP/DEIS), the Federal action is the SJPLC's selection of an alternative, which will serve as the framework for future land use planning direction and for the appropriate use of the public lands that comprise the San Juan Public Lands (SJPL). The human environment is considered to include both the natural environment (resources) and the USFS and the BLM multiple-use and sustained-yield land management environment (resource uses).



BLM_0030238

## CHAPTER OVERVIEW

Chapter 3 describes the analysis used in the planning process to help predict how each alternative might affect resources in the planning area. Resources include ecosystem components (such as soils, forested vegetation, wildlife, etc.) as well as human uses and values (such as domestic livestock grazing, timber, recreation, heritage resources, scenic byways, etc.). The SJPLC Interdisciplinary (ID) Team evaluated each of these resource subject areas separately.

This DLMP/DEIS discusses and reviews the current conditions of each resource, as well as relevant scientific information that could affect these conditions. This is followed by a discussion of environmental consequences. This presents an analysis of the effects (impacts) of the alternatives on the resources as a result of differences in management emphasis, management area prescription allocations, management activities, and/or projected outcomes.

## IMPACT ANALYSIS, METHODS, AND ASSUMPTIONS

### Analysis of Alternatives

Effects described in this chapter are associated with projected projects, activities and alternative output levels described in Chapter 2 and the Projected Activities Appendix F that are guided by the management direction contained in the Plan. Potential subsequent projects and activities have been developed to analyze implementation of the different alternatives that are anticipated to take place over the life of the Plan or a ten to fifteen year period (some resource conditions may take longer to achieve). These projects and activities are actions that could occur but are not authorized or approved by this EIS and would be covered by subsequent NEPA analysis.

Subsequent projects and activities are projected to occur based on actions needed to move towards plan desired conditions and objectives, and are based on projected experienced budgets. However, there is some uncertainty because of factors such as budget changes, changes in environment and weather, unknown location of projects, and other unforeseen events.

If a particular allowable use or management action is not discussed for a particular resource, it is because no impacts are expected, or the anticipated impact is not considered significant.

BLM_0030239

**Impact Analysis**

When applicable, definitions of the following types of impacts are included in the evaluation of environmental consequences (all possible impacts are not described and, unless otherwise stated, impacts described in this chapter are assumed to be adverse), including:

- ***Direct/Indirect Impacts***: In general, direct impacts result from activities authorized by the SJPLC and generally occur at the same time and place as the management activity or action causing the impact. For example, for the action of building a road, a direct adverse impact is surface disturbance. Surface disturbance is the impact (the effect) of heavy equipment (the cause) removing existing vegetation as it grades the proposed road location. Indirect impacts often occur at some distance or time from the action. In the above example, an indirect impact could occur days after the surface is disturbed, as well as some distance from the disturbance. Heavy precipitation following the removal of vegetation and/or disturbance of the ground surface could erode soil and transport sediment into streams. The impact on stream-water quality is considered an indirect adverse impact.

- ***Short- or Long-Term Impacts***: When applicable, the short-term or long-term aspects of impacts are described. For purposes of this DLMP/DEIS, short-term impacts occur during or after the activity or action and may continue for up to 2 years. Long-term impacts occur beyond the first 2 years.

- ***Cumulative Impacts***: Cumulative impacts result from the interaction of impacts resulting from the implementation of an alternative, along with impacts resulting independently from unrelated actions and activities. Cumulative impacts may include public lands in the planning area, as well as both private and public lands adjacent to, or near, the planning area.

Past, present and reasonably foreseeable future actions and trends considered in the cumulative effect analysis are described in the affected environment discussions for each resource section and/or within the cumulative effects narratives.

Quantification of cumulative impacts is difficult for the resources, land uses, and management actions due to:

- uncertainties regarding the location, scale, and/or rate of changes on public lands resulting from the alternatives;

- uncertainties about the location, scale, and rate of changes on private lands adjacent to, or near, the planning area that would occur irrespective of the alternative; and

- uncertainties about the location, scale, and rate of changes resulting from the general human population growth of the surrounding area.

BLM_0030240

Also germane to the discussion of cumulative impacts are the boundaries used to define impact sources and levels. These differ by resource. For example:

- for wide-ranging wildlife, such as deer and elk, the cumulative impact area may include offsite habitats that are used to some extent by onsite populations, and that are subject to impacts from development in the offsite areas;

- for air quality, the cumulative impact area may be an entire airshed, including all emission sources that affect the same air quality parameters potentially impacted by the implemented alternative;

- for surface water quality, the cumulative impact area may be one or more watersheds, including all pollutant sources that affect the same water quality parameters potentially impacted by the implemented alternative; and

- for socioeconomics, the cumulative impact area may be one or more towns or counties, including all sources of beneficial and adverse impacts on tax revenues, employment, housing, and/or quality of life considerations reasonably (i.e., not too remotely) affected by changes related to the implemented alternative.

Although these are only examples, they illustrate that cumulative impact boundaries may not only differ considerably among resources, but that the boundaries may be either natural or artificial.

All of the environmental impacts associated with the implementation of any of the alternatives would be in addition to ongoing existing impacts occurring on USFS- and BLM-administered lands in the planning area, as well as both public and private lands adjacent to, or near, the planning area. Even where an estimate of cumulative impacts resulting from offsite causes is available (e.g., the number of oil and gas wells in surrounding counties in 20 years), it is not known how much long-term surface disturbance would result; to what degree adverse impacts would be avoided or mitigated; or how the impacts would affect other resource values and land uses, such as hunting, OHV-travel, hiking, scenic driving, livestock grazing, and so forth. Therefore, the descriptions of cumulative impacts for the individual resources addressed in this chapter may be qualitative as well as quantitative.

Beyond the 20-year planning horizon, the impact assessments are more speculative and less reliable. This is due to a large number of economic, geopolitical, environmental, regulatory, technological, and/or other factors that could affect conditions in the planning area beyond 20 years (and are themselves subject to change in unexpected ways and/or degrees). In general, however, it can reasonably be assumed that the planning area would continue to support existing multiple uses beyond the 20-year timeframe.

BLM_0030241

## METHODS AND ASSUMPTIONS

Due to the programmatic and strategic nature of this DLMP/DEIS, the timing and specific location of project-specific actions that could impact resource values are not defined. Moreover, the relationship between cause (future actions) and effect (impact on resources) is not always known or quantifiable. For these reasons, the analysis of alternatives is both qualitative and quantitative, and is based on a series of assumptions. Assumptions common to all alternatives and all resources are listed below, whereas assumptions unique to specific resources and resource uses are discussed under the appropriate resource section.

- All alternatives are implemented in compliance with standard practices, best management practices (BMPs), guidelines for surface-disturbing activities, and applicable laws, standards, policies, and implementation plans, as well as with all USFS and BLM polices and regulations.

- An oil and gas lease grants the lessee the "right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits" in the leased lands, subject to the terms and conditions incorporated in the lease (BLM Form 3100-11, Lease for Oil and Gas). The Secretary of the Interior has the authority and responsibility to protect the environment within Federal oil and gas leases; therefore, restrictions are imposed on the lease terms.

- Provisions in leases that expressly provide the SJPLC the authority to deny or restrict development, in whole or in part, depend on a opinion provided by the U.S. Fish and Wildlife Service (USFWS) regarding impacts to endangered or threatened species or to habitats of plants and animals that are listed or proposed for listing. If the USFWS concludes that the development likely would jeopardize the continued existence of any endangered or threatened plant or animal species, then the development may be denied in whole or in part.

- Comparison of impacts among resources is intended to provide an impartial assessment to help inform the decisionmaker and the public. The impact analysis does not imply or assign a value or numerical ranking to impacts. Actions resulting in negative impacts to one resource may impart a beneficial impact to other resources.

- Key planning issues identified in Chapter 1 provide the focus for the scope of impact analyses presented in this chapter.

- In general, impacts described in this chapter are considered important if they result from, or relate to, the key planning issues described in Chapter 1, and the context and/or intensity of impacts suggest impacts to public health and safety or potential impacts to unique resources.

- The comparison of individual alternatives is qualitative, relative to Alternative A (the No-Action Alternative), and based on impact findings, professional judgment and consideration of the context and intensity of allowable uses and management actions anticipated to impact resources and resource uses.

- Analysis of environmental consequences focuses on the anticipated incremental and meaningful impact of management actions and the allowable uses proposed under each alternative. The impact of past and present actions is encompassed within the description of existing conditions, Affected Environment, discussed concurrently in this chapter along with Environmental Consequences.

BLM_0030242

**Resource Protection Measures**

Federal laws require that the USFS and the BLM ensure the long-term productivity of public lands. Both land management agencies, working cooperatively under a Service First partnership administered by the SJPLC for this planning area, have established regulations and policies to implement these laws. Additionally, the SJPLC has established standards, guidelines, and planning/design criteria that aim to protect the environment in the planning area from extreme or undesirable consequences. These standards and guidelines apply to all management activities and desired future conditions regardless of the alternative selected for implementation. (These guidelines and design criteria are described in detail in Volume II of this DLMP/DEIS, under Alternative B, the Preferred Alternative)

Mitigation measures, as defined by 40 CFR 1508.20, include:

- avoiding the impact altogether by declining to take an action, or part of an action;

- minimizing impacts by limiting the degree or magnitude of an action or its implementation;

- rectifying the impact by repairing, rehabilitating, and/or restoring the affected environment;

- reducing or eliminating the impact over time by preservation and maintenance operations during the life of an action; and/or

- compensating for the impact by replacing or providing substitute resources or environments.

At the programmatic planning level, planning/management area guidelines and design criteria should provide the appropriate mitigation measures for all of the alternatives (See Volume II, Alternative B, the Preferred Alternative. Under each resource section described under Alternative B – also referred to as "the Plan" by the USFS – the key legal and administrative guidance, such as laws, regulations, policies, and area-wide guidelines, are listed.) At the project level, analysis may indicate the need for additional mitigation in order to resolve site-specific issues. Monitoring efforts will help the SJPLC determine the effectiveness of mitigation measures. (See the Monitoring and Evaluation section of Volume II, Alternative B, the Preferred Alternative.)

BLM_0030243

**Relationship between Programmatic and Site-Specific Analysis**

This DLMP/DEIS is a programmatic document. It discusses environmental effects on a broad scale. Over the lifetime of the Final Land Management Plan (FLMP), the selected alternative and the accompanying area-wide guidelines and design criteria will set management direction by establishing and affirming rules and policies for use of natural resources.

This document contains a planning area-wide level of analysis; therefore, it does not predict what will happen when such broad-based standards and guidelines are implemented on individual, site-specific projects. Nor does it convey the long-term environmental consequences of any site-specific project. The actual effects (impacts) will depend on the extent of each project, the environmental conditions at the site (which can vary widely across the public lands), and the mitigation measures and their effectiveness.

In this chapter, the focus is on presenting and discussing which consequences are most likely to occur under each alternative in relation to different resources, and why they are likely to occur. By combining this broad-based assessment with site-specific information, the reader can make a reasonable prediction about the kinds of environmental effects that could result from a specific project.

Given the complexity of natural systems, this DLMP/DEIS does not describe every environmental process or condition. This would be an impractical, if not impossible, undertaking. The purpose of this DLMP/DEIS is to provide a survey of the broader environmental, social, and economic factors that are relevant to the programmatic planning process.

After the Final Land Management Plan/Final Environmental Impact Statement (FLMP/FEIS) Record of Decision (ROD) is approved, the analysis presented in this DLMP/DEIS will be used in "tiering." (The NEPA defines "tiering" as the coverage of general matters in broader EISs with subsequent narrower statements or environmental analyses that incorporate by reference the general discussions, allowing discussions to then concentrate solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when it helps the lead agency, or agencies in this case, to focus on the new issues and exclude from consideration issues already decided). Thus, the broader analysis and conclusions analyzed in this document can then be used as a starting point for future site-specific project planning in the planning area. Each future project's environmental effects analysis document will incorporate, by reference, the information found in the FLMP/FEIS, without the need to repeat the broader analysis process.

BLM_0030244

## INTRODUCTION

The primary goal of air quality management is to protect air quality within, and outside of, the planning area. The management objectives related to this goal is to:

- ensure that the air quality within the planning area meets State and Federal air quality standards and regulations;

- protect visibility at Class I areas and scenic and important vistas located within the planning area;

- protect all air quality related values in wilderness areas; and

- cooperate with the State of Colorado and other Federal agencies regarding air quality issues.

Under the Federal Land Policy Management Act of 1976 (FLPMA) and the Clean Air Act (see Legal and Administrative Framework), the SJPLC cannot conduct or authorize any activity that does not conform to all applicable local, State, Native American Tribal, and Federal air quality laws, statutes, regulations, standards, policies, and implementation plans. Therefore, an extensive air quality impact assessment, based on atmospheric AERMOD dispersion modeling, was conducted in order to analyze the potential impacts of the action alternatives.

Atmospheric dispersion models, including the one used for this analysis, are computer programs that use mathematical algorithms designed to stimulate how pollutants in the ambient atmosphere disperse and, in some cases, how they react in the atmosphere. The dispersion models are used to estimate or to predict the downwind concentration of air pollutants emitted that can impact ambient air quality. The dispersion models require the input of data that includes:

- meteorological conditions, such as wind speed and direction; the amount of atmospheric turbulence; the ambient air temperature; and the height to the bottom of any inversion aloft that may be present;

- emissions parameters, such as source location and height, source vent stack diameter and exit velocity, exit temperature, and mass-flow rate;

- terrain elevations at the source location and at the receptor location; and

- location, height, and width of any obstructions (such as buildings or other structures) in the path of the emitted gaseous plume.

AERMOD, the EPA-approved atmospheric dispersion model used in this analysis, is an integrated system that includes three modules:

- a steady-state dispersion model designed for short-range (up to 50-kilometers) dispersion of air pollutant emissions from stationary industrial sources;

BLM_0030245

- a meteorological data preprocessor (AERMET) that accepts surface meteorological data, upper air soundings and, optionally, data from onsite instrument towers (which then calculates atmospheric parameters needed by the dispersion model, such as atmospheric turbulence characteristics, mixing heights, friction velocity, etc.); and

- a terrain preprocessor (AERMAP) whose main purpose is to provide a physical relationship between terrain features and the behavior of air pollution plumes (which generates location height data for each receptor location and provides information that allows the dispersion model to stimulate the effects of air flowing over hills or splitting to flow around hills). (Source: http://www.epa.gov/scram001/dispersion_prefrec.htm)

All dispersion models, regardless of their level of complexity, are mathematical approximations of the behavior of the atmosphere. Therefore, especially given the uncertain nature of the number and potential location of sources under the analyzed alternatives, the results need to be appropriately viewed as estimates of possible future concentrations and not as exact predictions in time and space.

Dispersion modeling is generally conducted using assumptions that ensure that the modeled results do not underestimate actual future impacts so that appropriate planning decisions can be made. For example, sources may be assumed to operate for longer periods or emit more pollutants than actual conditions in order to ensure that health-based standards are protected. On the other hand, analyses are not conducted assuming "worst-case" conditions across the board, because this typically leads to results that are unreasonable and unrealistic. Hence, dispersion modeling uses the best available information and methods (EPA-approved models, emission factors, etc.) when possible, combined with the best scientific and professional judgment in an attempt to ensure that projections of future air quality are neither under-predicted nor unrealistically over-predicted.

Potential air quality impacts were analyzed in order to determine maximum "near-field" (local or Class II) ambient air pollutant concentrations and hazardous air pollutant impacts, as well as to determine maximum "far-field" (regional or Class I) impacts on ambient air pollutant concentrations, visibility, and atmospheric deposition of sulfur and nitrogen ("acid rain" constituents).

Near-field and far-field air quality parameters, grouped by Class I and Class II analyses, were inventoried and analyzed and are described below.

**Near-Field (Class II)**
- Criteria Pollutant Emissions (National Ambient Air Quality Standard (NAAQS) and PSD increments): NOx (including NO22), CO, SO2, PM10, and PM2.5

- Hazardous Air Pollutants (HAPs): formaldehyde

**Far-Field (Class I)**
- Emissions of Criteria Pollutants (NAAQS and PSD increments): NOx (including NO2), CO, SO2, PM10, and PM2.5

- Visibility

- Sulfur and nitrogen deposition

BLM_0030246

## LEGAL AND ADMINISTRATIVE FRAMEWORK

The U.S. Congress recognized the importance of preserving air quality through passage of the Clean Air Act (CAA) of 1963, as amended. One purpose of the CAA is to "preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value" (Clean Air Act, Sec. 160).

In the most outstanding special areas, Congress mandates that Federal land managers (e.g. Forest Supervisors, BLM Field Office Managers) have "an affirmative responsibility to protect the air quality related values within class I areas" (Clean Air Act, Sec. 165(d)(2)(B)) through the Federal New Source Review process.

Class I areas include large Wilderness areas or national parks in existence before August, 1977. Table 1.2 summarizes the Class I areas located within the planning area, and other nearby areas.

**Table 3.1.1 - Class I Areas of the Four Corners Region**

| Class I Area | State | Administering Agency |
|---|---|---|
| Weminuche Wilderness | Colorado | USFS |
| Mesa Verde National Park | Colorado | NPS |
| Canyonlands National Park | Utah | NPS |

The State of Colorado has established air quality standards in relation to carbon monoxide, nitrogen dioxide, ozone, lead, particulate matter, and sulfur dioxide. Colorado has also designated special places with outstanding scenic vistas in the Vista Database of Scenic and Important Views. Table 3.1.2 summarizes official vistas on public lands designated through this program. Visibility at these vistas is considered by the State of Colorado when permitting new large emissions sources (PSD permits/New Source Review) or when issuing smoke emission permits associated with prescribed burning.

**Table 3.1.2 - Scenic, Important Views on the San Juan Public Lands**

| Scenic, Important Views | | |
|---|---|---|
| Andrews Lake Overlook | McPhee Overlook | Cimarron Peak, Weminuche Wilderness |
| Durango Mountain Resort | Cave Basin Ridge | Chalk Mountain, South San Juan Wilderness |
| Bolam Pass Overlook | San Juan Overlook | Benchmark Lookout |
| Lizard Head Pass Overlook | Chimney Rock Archaeology Area | Sockrider Peak |
| Kennebec Pass Overlook | Mt. Wilson, Lizard Head Wilderness | Dolores Canyon Overlook |
| Animas Overlook | Lookout Peak | |
| Jersey Jim Fire Tower | Mt. Eolus, Weminuche Wilderness | |

CDPHE 2005

BLM_0030247

**LAWS**

The Clean Air Act of 1963, as amended: This is the comprehensive Federal law that regulates air emissions from area, stationary, and mobile sources. This law authorizes the U.S. Environmental Protection Agency to establish National Ambient Air Quality Standards (NAAQS) to protect public health and the environment. This act, as amended, significantly broadened the authority and responsibility of the USFS and the BLM by requiring:

- compliance with all applicable Federal, State, tribal, or local air control rules, regulations, and directives;

- compliance with substantive and procedural requirements imposed by a Federal, State, Native American tribal, or local administrative authority or court; and

- consultation with each State having delegated authority on all matters concerning the prevention of significant deterioration of air quality, visibility, air quality maintenance plan requirements, and non-attainment requirements.

The CAA (through the New Source Review Process) also gives Federal land managers an affirmative responsibility to:

- protect the air quality related values on any lands managed by them within a Class I Area; and

- consider, in consultation with the Administrator of the EPA, whether a proposed major emitting facility will have an adverse impact on air quality related values.

This act states that Wilderness Areas are to be managed in order to retain their primeval character, protected and managed so as to preserve natural conditions.

Section 102 provides that: "… the public lands will be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmosphere, and archaeological values…" and "…in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection. This act states that USFS programs must protect and/or improve the quality of soil, water, and air resources.

**REGULATIONS AND POLICIES**

- ***FSM 2500, Chapter 2580***: This outlines USFS regulation, policy and direction regarding air resource management.

- ***EPA Interim Air Quality Policy on Wildland and Prescribed Fires, 1998***: This provides guidance on mitigating air pollution impacts caused by wildland and prescribed burns while, at the same time, recognizing the current role of fire in wildland management.

BLM_0030248

# AFFECTED ENVIRONMENT

## AIR QUALITY

The mountain and desert country within the planning area offer world class scenery, viewed by millions of people annually. Residents and tourists visiting the area expect, and anticipate, clean air. The Four Corners region, and the planning area, are rich in energy resources. Large oil and gas production fields and many coal-fired power plants are located in the Four Corners region. These industries produce air pollution emissions that are recognized as major contributors to degraded air quality impacting the planning area. Specific concerns include maintaining air quality sufficient to comply with National Ambient Air Quality Standards (NAAQS), the Colorado Ambient Air Quality Standards, and the Prevention of Significant Deterioration (PSD) increment requirements; as well as those related to compliance, degradation of visibility, and increased deposition.

Air pollutants of specific concern are sulfur dioxide, oxides of nitrogen, mercury, ozone, and particulate matter. Although many of the documented air quality impacts are associated with external sources (those outside public land boundaries and jurisdictions), some management activities within the planning area have the potential to impact air quality. These activities include prescribed burns, oil and gas development, mining, developed recreation, and use of travelways.

### Atmospheric Deposition and Surface Water Quality Impacts

Over the last decade, the SJPLC has monitored lakes for atmospheric deposition. Monitoring has demonstrated that certain high elevation lakes in the Weminuche Wilderness Area are sensitive to changes in chemistry, and, therefore, are good indicators of changes in atmospheric deposition. These pure water Wilderness lakes should be very limited in nutrients and other chemicals, but data suggests they are becoming seasonally saturated with nitrogen (Musselman and Slausen, 2004).

Elevated levels of oxides of sulfur and nitrogen are of significant concern because they also lead to the acidification of precipitation and surface waters. These chemicals may result in significant changes in Wilderness ecosystems. The source of nitrogen is largely atmospheric. Atmospheric (wet) deposition monitoring at Molas Pass shows that since the 1990's there has been a increasing trend in nitrate concentration. There has also been a decreasing trend of sulfate concentration in precipitation for the same time period (National Atmospheric Deposition Program, 2007; National Park Service, 2005).

Mercury levels on, and near, the planning area are also elevated in places. McPhee Reservoir, and nearby Narraguinnep, Puett, and Totten Reservoirs, as well as Vallecito Reservoir adjacent to the Weminuche Wilderness (CDPHE,2007) have fish consumption restrictions due to mercury contamination. Total Maximum Daily Loads (TMDL) have been developed by the State of Colorado to address water mercury contamination issues in McPhee and Narraguinnep reservoirs (CDPHE 2003). Although the source of mercury has not been identified conclusively, mercury in the atmosphere, as well as subsequent deposition in the aquatic environment, is commonly associated with coal-fired power plants (EPA 2005).

BLM_0030249

## Air Pollution

Ground-level ozone has been an increasing concern in the Four Corners region. Mesa Verde National Park, located adjacent to the planning area, has been monitoring ozone since 1993. A significant trend of increasing ozone has been observed within the Park. (National Park Service 2004). Ozone levels approaching the new EPA 8-hour standard have also been measured near the Colorado/New Mexico border. The high ozone levels in the Four Corners region are similar to those found in large metropolitan areas, and are considered unusual for a rural area (New Mexico Environment Department 2007).In 2005, in response to local concerns about ozone, the SJPLC began monitoring ozone near Bayfield, Colorado. The highest 1-hour ozone averages for this site were 99, 89 and 85 ppb in 2006. The Colorado Ambient Air Quality Standard for ozone (1-hour averaging time) is 80 ppb, although limited exceedances are allowed.

The protection of visibility is a requirement of the Clean Air Act in mandatory Federal Class I areas, such as the Weminuche Wilderness Area and Mesa Verde National Park. Data collected locally show that visibility is degrading (haziness is increasing) at Mesa Verde National Park. At Mesa Verde National Park, organic carbon, fine soil particles, and sulfates are the largest contributors to degraded visibility. In the Weminuche Wilderness Area, there is an increasing trend for nitrates, but no trend for sulfates, organics or fine soil (Sisler et al., 1993; Malm et al., 2000)

## Coalbed Methane Development

Large-scale coalbed methane (CBM) development is a relatively new large local source of air pollutants. CBM development began approximately 18 years ago. However, as a result of the current energy boom, well development has accelerated rapidly within the San Juan Basin, which is one of the largest CBM reserves in the nation. A portion of the planning area is in the northern San Juan Basin (approximately 60,000 acres). The majority of the Basin is located downwind, within the bounds of the Southern Ute Reservation and northwestern New Mexico. There are approximately 23,000 CBM wells in the San Juan Basin, and development of 11,000 more wells is projected over the next 20 years. CBM wells, and the associated infrastructure, are cumulatively large sources of NOx, SO2, and VOCs. Construction and traffic on unpaved well roads are sources of dust and fine particulates.

## Power Plants

Coal-fired power plants are the largest point sources of air pollution emissions in the Four Corners region. There are several coal-fired power plants in the region, including the San Juan Generating Station in New Mexico (1850 megawatts), the Four Corners Power Plant in New Mexico (2270 megawatts), and the Navajo Generating Station in Arizona (2250 megawatts). There are proposals for two new coal-fired power plants in New Mexico, both are currently going through the PSD permit process. The proposed Desert Rock facility (1500 megawatt) would be located on the Navajo Nation in northwestern New Mexico. The proposed Mustang Power Plant (300 megawatt) facility would also be located in northwestern New Mexico. Air quality and visibility protection would be issues of concern with respect to the permitting of these new facilities. Coal-fired power plants are sources of NOx, SO2, VOCs, carbon dioxide (CO2), mercury, and other emissions.

## Fire and Fuels Management

Since the late 1990's, the USFS and the BLM have increased their emphasis on reducing the threat of catastrophic wildfire on public lands. As a result, prescribed burning and other hazardous fuel-reducing techniques have increased (see Wildfire and Fuels Management). Similarly, wildfire, even from distant locations, can significantly impact local air quality, especially visibility. Reducing fuels across the western states on public lands may help reduce this source of air quality degradation. When conducting prescribed burns, the agencies must obtain permits from the State of Colorado ensuring the protection of public health, safety and visibility related to the impacts of smoke.

BLM_0030250

**Regional Growth and Development**

The population of the Four Corners region is continuing to increase at a rapid rate. The population of Archuleta County is predicted to increase from 10,028 to 27,048 (a 170% increase) by 2030. La Plata County population is projected to increase from 44,500 to 80,600 (an 81% increase) during the same time period. Montezuma County is projected to increase from 23,900 to 40,200 (a 68% increase) (Davis et al., 2004). Large communities are developing adjacent to the Weminuche Wilderness Class I Area. The Durango Mountain Resort community development project proposes 1,650 new residences, and additional commercial development, within 1 mile of the Weminuche Wilderness Class I Area. The Durango Mountain Resort has started a visibility monitoring program to ensure the protection of scenic views from the ski area.  The Wolf Creek Village proposal is for 2,100 new residences (accommodating up 10,500 people), and associated commercial development, within 1 mile of the Weminuche Wilderness class I Area. All of the activities have the potential to impact air quality within the planning area.

**Table 3.1.3 – Air Quality Standards, Increments, Significant Impact Levels, and AQRV Criteria**

| Pollutant/ AQRV | Averaging Interval | EPA Class II SILs (µg/m3) | NAAQS (µg/m3) | Class II PSD Increment (µg/m3) | EPA Proposed Class I SILs (µg/m3) | Class I PSD Increment (µg/m3) | AQRV Thresholds |
|---|---|---|---|---|---|---|---|
| NO2 | Annual | 1 | 100 | 25 | 0.1 | 2.5 | -- |
| SO2 | 3-Hour | 25 | 1300 | 512 | 1.0 | 25 | -- |
|  | 24-Hour | 5 | 365 | 91 | 0.2 | 5 | -- |
|  | Annual | 1 | 80 | 20 | 0.1 | 2 | -- |
| PM10 | 24-Hour | 5 | 150 | 30 | 0.3 | 10 | -- |
|  | Annual | 1 | 50 | 17 | 0.2 | 5 | -- |
| PM2.5 | 24-Hour | -- | 35 | -- | -- | -- | -- |
|  | Annual | -- | 15 | -- | -- | -- | -- |
| CO | 1-Hour | 2,000 | 40,000 | -- | -- | -- | -- |
|  | 8-Hour | 500 | 10,000 | -- | -- | -- | -- |
| Ozone | 8-Hour | 100 tpy VOC | 0.08 ppm | -- | -- | -- | -- |
| Lead | Quarterly | 0.1 | 1.5 | -- | -- | -- | -- |
| Visibility (deciviews) | 24-Hour | -- | -- | -- | -- | -- | 1.0 |
| Nitrogen Deposition (kg/ha-yr) | Annual | -- | -- | -- | -- | -- | 3.0 |
| Sulfur Deposition (kg/ha-yr) | Annual | -- | -- | -- | -- | -- | 5.0 |

BLM_0030251

The State of Colorado has also established an annual PM10 ambient air quality standard of 50 µg/m3, a 1-hour ozone ambient air quality standard of 0.12 ppm, a 3-hour SO2 ambient air quality standard of 700 µg/m3, as well as a program similar to the Federal PSD increments limiting additional amounts of SO2 above baseline conditions.  The Federal Land Mangers Air Quality Related Value Workgroup Guideline (FLAG) Guideline (FLAG 2000) has established visibility AQRV thresholds.  he FLAG "just noticeable change" 1.0 deciview threshold is used to assess the significance of potential visibility impacts. The USFS has established cumulative deposition impacts thresholds of concern (Fox et al., 1989).

**Table 3.1.4 – Background Air Quality and AQRV Data**

| Pollutant/AQRV | Averaging Interval | Background Level (µg/m3) | Monitoring Station |
|---|---|---|---|
| NO2 | Annual | 16.9 | La Plata, Colorado |
| SO2 | 3-Hour[a]<br>24-Hour[a]<br>Annual | 68<br>21<br>5 | Farmington, New Mexico |
| PM10 | 24-Hour<br>Annual | 64<br>21 | La Plata, Colorado |
| PM2.5 | 24-Hour<br>Annual | 22.5<br>6.9 | Mesa Verde National Park, Colorado<br>Farmington, New Mexico |
| CO | 1-Hour[a]<br>8-Hour[a] | 2,288<br>1,831 | Ignacio, Colorado |
| Ozone | 1-Hour[a]<br>8-Hour[A] | 0.077 ppm<br>0.071 ppm | Mesa Verde National Park, Colorado |
| Visibility (deciviews) | Annual | 23.6 | Mesa Verde National Park, Colorado |
| Nitrogen Deposition (kg/ha-yr) | Annual | 2.3 | Mesa Verde National Park, Colorado |
| Sulfur Deposition (kg/ha-yr) | Annual | 1.2 | Mesa Verde National Park, Colorado |

Source: Ecology & Environment, 2006
[a]  Maximum 2nd - Highest Value

Recent regional modeling efforts have concluded that the cumulative impacts related to activities such as those described above, could lead to significant visibility and other air quality impacts (BLM and USFS 2006).  In response, Colorado and New Mexico (including Federal, Native American tribal, and local interested parties) formed the Four Corners Air Quality Task Force in 2005. The goal of the Task Force is to develop strategies designed to reduce emissions and improve air quality in the Four Corners region. Ultimately, air quality regulators, as well as Federal land managers, would consider these emissions reduction strategies as part of their overall responsibilities to protect and improve regional air quality.

BLM_0030252

## ENVIRONMENTAL CONSEQUENCES

### Class I Areas  (Weminuche Wilderness Area)

Maintaining pristine Class I Area air quality conditions within the Weminuche Wilderness Area is a high priority, in addition to managing air quality across the planning area. Pristine conditions are measured directly through air quality monitoring, and indirectly through air quality related values (AQRVs). AQRVs for the Weminuche Wilderness Class I Area include lake chemistry, soil chemistry, flora and fauna assemblages, atmospheric deposition and chemistry, snow and snowmelt chemistry, and visibility.  Under all of the alternatives, monitoring commitments would continue long-term as stated in the Weminuche Wilderness Monitoring Plan (USFS 1991), and through agreements made with the EPA and the State of Colorado.

### Class II Areas

Within the planning area, several air pollutants have become major concerns (including  mercury, nitrogen, sulfur, and ozone). Most of these pollutants originate from outside the planning area. The SJPLC would pursue appropriate actions in order to reduce the impacts of pollutants from sources both within and outside of the public lands. These measures would include active membership in the Four Corners Air Quality Task Force, PSD Permit Review, and monitoring commitments.

### Global Climate Change

On-going scientific research has identified the potential impacts of so-called "greenhouse gas" (GHG) emissions (including carbon dioxide, $CO_2$; methane; nitrous oxide; water vapor; and several trace gasses) on global climate. Through complex interactions on a regional and global scale, these GHG emissions cause a net warming effect of the atmosphere (making surface temperatures suitable for life on Earth), primarily by decreasing the amount of heat energy radiated by the Earth back into space. Although GHG levels have varied for millennia (along with corresponding variations in climatic conditions), recent industrialization and burning of fossil carbon sources have caused $CO_2$ concentrations to increase dramatically, and are likely to contribute to overall climatic changes, typically referred to as global warming.  Increasing $CO_2$ concentrations also lead to preferential fertilization and growth of specific plant species.

The assessment of GHG emissions and climate change is in its formative phase. It is not yet possible to know with confidence the net impact to climate. Observed climatic changes may be caused by GHG emissions, or they may reflect natural fluctuations. However, the Intergovernmental Panel on Climate Change (IPCC 2007) recently concluded that "warming of the climate system is unequivocal" and that "most of the observed increase in globally average temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic [man-made] greenhouse gas concentrations."

Global mean surface temperatures have increased nearly 1.0°C (1.8°F) from 1890 to 2006 (Goddard Institute for Space Studies,2007). However, observations and predictive models indicate that average temperature changes are likely to be greater in the Northern Hemisphere.  Figure 3.1.1 demonstrates that northern latitudes (above 24° N ) have exhibited temperature increases of nearly 1.2°C (2.1°F) since 1900, with nearly a 1.0°C (1.8°F) increase since 1970 alone. Without additional meteorological monitoring systems, it is difficult to determine the spatial and temporal variability and change of climatic conditions, but increasing concentrations of GHG are likely to accelerate the rate of climate change.

BLM_0030253

In 2001, the IPCC indicated that by the year 2100, global average surface temperatures would increase 1.4 to 5.8°C (2.5 to 10.4°F) above 1990 levels. The National Academy of Sciences (2006) has confirmed these findings, but also indicated that there are uncertainties regarding how climate change may affect different regions. Computer model predictions indicate that increases in temperature will not be equally distributed, but are likely to be accentuated at higher latitudes. Warming during the winter months is expected to be higher than during the summer.

Several activities occur within the planning area that may generate GHG emissions. Oil and gas development, large fires, and recreation using combustion engines, can potentially generate $CO_2$ methane and water vapors.

**Figure 3.1.1 – Annual Mean Temperature Change for Northern Latitudes (24 - 90° N)**



Source: Goddard Institute for Space Studies (2007)

State agencies, the USFS, the BLM, and the National Park Service have installed several monitoring stations to track existing conditions and trends for local and regional air quality.  These stations track several pollutants of concern.  Table 3.1.4 presents both the applicable significance thresholds (ambient air quality standards, etc.) and monitored background concentrations.

The Western Regional Air Partnership (WRAP) has compiled comprehensive inventories of regional pollutant emissions. This inventory also forecasts the likely emissions for the year 2018. The WRAP study projects that emissions of oxides of nitrogen (NOx), sulfur dioxide (SO2), volatile organic compounds (VOCs), carbon monoxide (CO), and Particulate Matter less than 10 and 2.5 microns in diameter, respectively  (PM10 and PM2.5) will increase across the Four Corners States over the next 12 years (Western Regional Air Partnership, 2002).

BLM_0030254

# DIRECT AND INDIRECT IMPACTS

## Impacts Related to Oil and Gas Development

There are several pollutants of concern associated with large-scale fluid-minerals development on, and adjacent to, the planning area. Table 3.1.5 summarizes potential issues associated with each pollutant.

**Table 3.1.5 - Pollutants Common to Oil and Gas Development Emissions**

| POLLUTANT | Nitrogen Oxide | Sulfur Dioxide | Carbon Monoxide | Particulates | VOC, HAP, Ozone | Greenhouse Gases |
|---|---|---|---|---|---|---|
| **AIR QUALITY ISSUE** | Human health, visibility, atmospheric deposition | Human health, visibility, atmospheric deposition | Human health | Human health, visibility | Human health, visibility | Climate change |

Modified from Four Corners Air Quality Task Force, 2006

In terms of fluid-minerals development, wellhead engines, compressor stations, gas plants, and refineries are primary sources of these pollutants. Emissions are also associated with fluid-minerals exploration and production activities (including drilling, flaring, and transportation).

Within the planning area, oil and gas development potential varies from moderate to high. The reasonably foreseeable development (RFD) scenario would be the same under all of the alternatives. The projection over the next 15 years is for 750 new and infill CBM wells in the northern San Juan Basin, 375 new wells in the Paradox Basin, and 30 exploration wells in the San Juan Sag area. Of that total, 1,015 new wells would be on existing leases not impacted by the leasing decisions in the final approved LMP, and 170 wells could be on unleased lands directly impacted by decisions in the final approved LMP.

Oil and gas well development would also require infrastructure construction. All alternatives for oil and gas leasing may result in up to 70 miles of new road construction, increased traffic on existing unpaved roads, and the construction of new compressor stations, pipelines, and well pads. Dust (particulate matter) would be the primary pollutant associated with road construction and road traffic. All alternatives would result in the same amount of road and well pad construction; therefore, impacts to air quality from dust would not vary. Road construction in the Paradox Basin would have the potential to produce periodic high levels of dust due to road construction materials and the dry weather conditions. Impacts related to Dust would be dependent upon the amount of road traffic, as well as on weather conditions. Air quality impacts related to dust would tend to be periodic; however, they would be chronic unless dust abatement measures were applied to the road surface and the roads were properly maintained. Implementing LMP guidelines that require dust abatement during construction and drilling periods would reduce fugitive dust pollution. If dust abatement measures were not used, fugitive dust pollution may be chronic and short-term (ranging from 1 to 4 months during active construction and drilling periods), and, at a reduced level, long-term (as service trucks access well sites).

The San Juan Sag area has moderate potential for oil and gas development. Within the Sag area, 2 exploratory wells are predicted to be drilled per year. Chronic and short-duration air impacts from road and construction dust, and drilling rig emissions are expected. The exploratory wells are not anticipated to become long-term production wells, therefore, long-term air quality impacts may be low, or may not occur in the San Juan Sag. The air quality impact assessment was based on the best available engineering data and assumptions,

BLM_0030255

meteorology data, and EPA dispersion modeling procedures, as well as professional engineering and scientific judgment. However, where specific data or procedures were not available, "reasonable but conservative" assumptions were incorporated. For example, the air quality impact assessment assumed that all potential oil and gas wells would go into production without any decline in production (no dry holes), then operate at full production levels (no "shut ins") throughout the implementation-life of the final approved LMP. Therefore, this NEPA analysis assumes a development scenario that is not likely to actually occur.

The air pollutant dispersion modeling was based on 3-years of meteorological data collected at Mesa Verde National Park. These data were determined to be representative of the study area. This was based on 10 m wind speed and direction, solar radiation, and delta temperature measurements (at 2 and 10m heights), while achieving a 90% data capture rate for the period of 2001 through 2003 (Ecology & Environment Inc., 2006).

The criteria for determining the significance of potential air quality impacts include the Colorado Ambient Air Quality Standards (AAQS) and the NAAQS, which set maximum limits for several air pollutant concentrations, as well and PSD increments that limit the incremental increase of specific air pollutants (including $NO_2$, $PM_{10}$, and $SO_2$) above legally defined baseline concentration levels. Where legal limits have not been established, the appropriate scientific information was used in order to identify thresholds of potential significant adverse impacts. Thresholds have been identified for potential atmospheric deposition impacts to terrestrial ecosystems and sensitive lake water chemistry, and a "just noticeable change" in potential visibility impacts.

When reviewing the predicted near-, mid-, and far-field impacts, it is important to understand the conservative assumptions made regarding potential oil and gas activities, such as the uncertainty regarding ultimate development practices (i.e., number of wells, equipment to be used, specific locations, etc.). The analysis was also based on a reasonably foreseeable development (RFD) scenario, including some conservative assumptions:

- Measured 2nd maximum 24-hour background air pollutant concentrations were assumed to occur at all locations in the region throughout the life of the LMP. In addition, the maximum predicted air quality impacts may occur only in the vicinity of the anticipated emission sources. Actual impacts may be beyond the predicted points of maximum impact.

- All emission sources were assumed to operate at their reasonably foreseeable maximum emission rates simultaneously throughout the life of the LMP. Given the number of sources occurring throughout the study area, the likelihood of this happening over an entire year (or even 24-hours) is small. This assumption is typically used in modeling analyses; however, the resulting predicted impacts may be overstated.

- Maximum predicted air quality impacts are based on the potential activity that would occur towards the end of the implementation life of the LMP. Since actual development would be phased in gradually, actual operational air quality impacts may also begin low, but increase throughout the life of the LMP.

- All potential oil and gas wells were assumed to be fully operational (no dry holes), at their maximum production rates. They would remain operating (no "shut ins") throughout the life of the LMP. This also includes an assumed centralized 1,200 HP compression station. In reality, well-development equipment would be added or removed incrementally, as actual development requirements changed.

- Total predicted short-term air pollutant impact concentrations were assumed to be the sum of the 2nd highest measured background concentration, plus the applicable maximum cumulative modeled concentrations. This would actually occur under very different meteorological conditions and are not likely to coincide.

BLM_0030256

- Potential near-field PM10 and PM2.5 impacts were modeled for 8 different orientations (at 22.5 degree intervals), to ensure that impacts from all directional layouts and meteorological conditions were assessed. However, actual orientation of future development activities is not known.

Given the conservative analysis assumptions described above, which may actually compound one another, the predicted impacts represent an upper estimate of potential air quality impacts that are, in reality, unlikely to actually be reached. Before any actual development could occur, additional project-specific NEPA analyses would be performed, and the applicable air quality regulatory agencies (including CDPHE-APCD and EPA) would review specific preconstruction permit applications (which examine potential project-wide air quality impacts). As part of these permits (depending upon source size), the air quality regulatory agencies may require additional air quality impacts analyses or mitigation measures. Thus, before development occurs, additional site-specific air quality analyses, based on actual facility engineering data, would be performed to ensure the protection of air quality. Air quality impacts may occur during construction (due to surface disturbance by earth-moving equipment, vehicle traffic fugitive dust, well testing, and drilling rig and vehicle engine exhaust) and production (including natural gas separation and dehydration heaters, and small well-head engine exhaust).

As stated above, the criteria air pollutants CO, NO2, PM10, PM2.5, and SO2 were analyzed using the EPA approved air dispersion model AERMOD (Nicholls 2007). Due to the complex nature of photochemical ozone formation, ozone impacts cannot be predicted using standard atmospheric dispersion models. However, given the limited nature of potential reactive VOC emissions, it is not anticipated that ozone formation would be significant. Three different modeling scenarios were analyzed: 1) near-field maximum impacts, which was based on a generic scenario of construction vehicle traffic, two wells under construction, two wells in production, a central processing facility, and wind erosion emissions from pads, access roads, and pipeline ground disturbance (corresponding to 7 acres of total disturbance per well), as analyzed by Ecology & Environment, Inc. (2006); 2) mid-field maximum impacts based on cumulative site-specific well development of up to 375 oil and gas wells (each including well head heaters and engines, and fugitive PM emissions from exposed well pads and servicing traffic) plus a centralized 1,200 HP compression station. Additional authorized, but not operational facilities identified by the CDPHE-APCD were also included in the cumulative analyses. This scenario was designed to compare the maximum cumulative impacts to ambient air quality standards and the PSD Class II increments; and 3) far-field maximum impacts based on the same assumed development, but to determine potential impacts to PSD Class I increments, as well as potential visibility at sensitive distant receptors.

Maximum predicted near-field air quality impacts are presented in Table 3.1.6. All total cumulative impacts were predicted to be below the applicable ambient air quality standards, except the 24-hour PM2.5 maximum total concentration. Since the analysis scenario combined construction and production activities, as well as a conservative modeling approach, it is likely that actual development could take place without violating the 24-hour PM2.5 standard (taking into account a less conservative, more refined modeling method, potential fugitive dust mitigation strategies, as well as accounting for allowable exceedances of short-term ambient air quality standards). The maximum predicted "near-field" air pollutant concentrations occur close to, and between, well locations (so close to each other that adding additional wells in other field locations would not increase the maximum predicted "near-field" concentration). Finally, since construction activities are not subject to PSD regulations, no comparison to PSD Class II increments should be made.

BLM_0030257

As recommended by the EPA, the AERMOD modeling system is appropriate for a "screening" analysis. If no significant impacts are predicted to occur using this screening approach, then the decision maker can be confident that no significant impacts would actually occur at the time of development. However, if significant impacts are predicted, a less conservative, refined modeling analysis should be performed to provide more confidence in the predicted impacts. The screening-level air analysis does show potential significant impacts to visibility, exceedence of maximum nitrogen deposition for Class I areas, and potential violations of the recently revised 24-hour average PM2.5 National Ambient Air Quality Standard. In following the screening analysis approach, the next step will be to refine the air quality analysis using a more sensitive long-range transport model. The refined air analysis will be conducted between the Draft and Final EIS, and should give more accurate, less conservative estimates of air quality impacts. The analysis should also include potential mitigation methods to better predict potential visibility impacts.

**Table 3.1.6 - Near-Field Comparison of Direct Impacts to Ambient Air Quality Standards (µg/m3)**

| POLLUTANT/AVERAGING TIME | Direct Maximum | Background Concentration | Total Concentration | AAQS | Percentage (%) of AAQS |
|---|---|---|---|---|---|
| CO - 1-hr | 357 | 2288 | 2645 | 40000 | 7% |
| CO - 8-hr | 184 | 1831 | 2015 | 10000 | 20% |
| NO2 - Annual | 20.5 | 16.9 | 37.4 | 100 | 37% |
| PM10 - 24-hr | 70.6 | 64.0 | 134.6 | 150 | 90% |
| PM10 - Annual | 12.6 | 21.0 | 33.6 | 50[a] | 67% |
| PM2.5 - 24-hr | 29.7 | 22.5 | 52.2 | 35 | **149**% |
| PM2.5 - Annual | 4.3 | 6.9 | 11.2 | 15 | 75% |
| SO2 - 3-hr | 94.5 | 68 | 162.5 | 700[a] | 23% |
| SO2 - 24-hr | 26.9 | 21 | 47.9 | 365 | 13% |
| SO2 - Annual | 3.6 | 5 | 8.6 | 80 | 11% |

Source: Ecology & Environment, 2006
[a] State of Colorado Ambient Air Quality Standard is more stringent than the NAAQS.

Maximum predicted mid-field air quality impacts are presented in Table 3.1.7. All direct impacts were predicted to be below the applicable PSD Class II increments. Total cumulative impacts were predicted to be below the applicable ambient air quality standards. Cumulative impacts include the direct impacts, plus impacts from the assumed CDPHE cumulative inventory and Monticello NEPA sources. However, all NEPA analysis comparisons to the PSD Class II increments are intended to evaluate a threshold of concern, and do not represent a regulatory PSD Increment Consumption Analysis.

BLM_0030258

**Table 3.1.7 - Mid-Field Comparison of Direct and Cumulative Impacts to PSD Class II Increments and Ambient Air Quality Standards (µg/m3)**

| POLLUTANT/ AVERAGING TIME | Direct Maximum | Cumulative Maximum | PSD Class II Increment | Background Concentration | Total Cumulative Concentration | AAQS | % of AAQS |
|---|---|---|---|---|---|---|---|
| CO - 1-hr | 2291 | 2291 | --- | 2288 | 4579 | 40000 | 11% |
| CO - 8-hr | 452 | 452 | --- | 1831 | 2283 | 10000 | 23% |
| NO2 - Annual | 4.7 | 5.4 | 25 | 16.9 | 37.4 | 100 | 37% |
| PM10 - 24-hr | 10.7 | 12.6 | 30 | 64.0 | 76.6 | 150 | 51% |
| PM10 - Annual | 0.4 | 0.8 | 17 | 21.0 | 21.8 | 50[a] | 44% |
| PM2.5 - 24-hr | 1.1 | 2.0 | --- | 22.5 | 24.5 | 35 | 70% |
| PM2.5 - Annual | 0.2 | 0.4 | --- | 6.9 | 7.3 | 15 | 49% |
| SO2 - 3-hr | 49 | 49 | 512 | 68 | 117 | 700[a] | 17% |
| SO2 - 24-hr | 14.1 | 14.1 | 91 | 21 | 47.9 | 365 | 13% |
| SO2 - Annual | 1.4 | 1.4 | 20 | 5 | 8.6 | 80 | 11% |

Source: Nicholls, 2007
[a] State of Colorado Ambient Air Quality Standard is more stringent than the NAAQS.

Maximum predicted far-field air quality impacts are presented in Table 3.1.8. All direct impacts were predicted to be below the applicable PSD Class I increments, and total cumulative impacts were predicted to be below the applicable ambient air quality standards. As stated previously, all NEPA analysis comparisons to the PSD Class II increments are intended to evaluate a threshold of concern, and do not represent a regulatory PSD Increment Consumption Analysis.

**Table 3.1.8 - Far-Field Comparison of Direct and Cumulative Impacts to PSD Class I Increments and Ambient Air Quality Standards (µg/m3)**

| POLLUTANT/ AVERAGING TIME | Mesa Verde Maximum | Weminuche Maximum | PSD Class I Increment | Background Concentration | Mesa Verde Total Concentration | Weminuche Total Concentration |
|---|---|---|---|---|---|---|
| NO2 - Annual | 0.3 | <0.1 | 2.5 | 16.9 | 17.2 | 17.0 |
| PM10 - 24-hr | 0.5 | 0.1 | 10 | 64.0 | 64.5 | 64.1 |
| PM10 - Annual | <0.1 | 0.1 | 5 | 21.0 | 21.0 | 21.1 |
| SO2 - 3-hr | 0.8 | 0.1 | 25 | 68 | 68.8 | 68.1 |
| SO2 - 24-hr | 0.1 | <0.1 | 5 | 21 | 21.1 | 21.0 |
| SO2 - Annual | <0.1 | <0.1 | 2 | 5 | 5.0 | 5.0 |

Source: Nicholls, 2007

BLM_0030259

Potential cumulative atmospheric deposition (acid rain) and visibility impacts to the Mesa Verde National Park and Weminuche Wilderness PSD Class I Area were also calculated. As shown in Table 3.1.9, the maximum direct and total nitrogen deposition within these areas were predicted to be well above the 3 kg/ha-year threshold (Fox et al., 1989), although the maximum total sulfur deposition values were below the significance threshold. In addition, significant changes in Acid Neutralizing Capacity (ANC) at 4 lakes within the Weminuche Wilderness Area were predicted to occur (primarily due to these high total nitrogen deposition levels) (USFS 2000). No sensitive lakes were identified within Mesa Verde National Park.

**Table 3.1.9 - Far-Field Atmospheric Deposition Analysis (kg/ha-yr)**

| POLLUTANT (WET & DRY) | Mesa Verde Maximum | Weminuche Maximum | Background Concentration | Mesa Verde Total Concentration | Weminuche Total Concentration | Significance Threshold |
|---|---|---|---|---|---|---|
| nitrogen | 22.0 | **4.4** | **2.3** | **24.3** | **6.7** | 3.0 |
| sulfur | 0.1 | <0.1 | 1.2 | 1.3 | 1.2 | 5.0 |

Source: Nicholls, 2007

Potential cumulative visibility impacts to the Mesa Verde National Park and Weminuche Wilderness PSD Class I Area were calculated based on Daily Refined Visibility Analyses (Archer 2007a and 2007b). The Federal Land Mangers' Air Quality Related Values Workgroup (FLAG) published method were used in order to evaluate potential visibility impacts at mandatory Federal PSD Class I areas (FR 66:2, pp 382-383; Wednesday, January 3, 2001), observed hourly relative humidity, as well as speciated aerosol concentrations measured between 1988 and 2005. If the predicted air quality impacts had occurred during the observed visibility measurement period, a 1.0 deciview "just noticeable change" would have been exceeded between 2 and 7 days per year at the Weminuche Wilderness Area. However, given the conservative assumptions incorporated into the analysis, these direct impacts are not likely to occur. Significant adverse visibility impacts were predicted to occur within the mandatory Federal Mesa Verde PSD Class I area – ranging from 56 to 146 days per year. Again, based on the conservative nature of this analysis, the actual extent (numbers of days) of these perceptible visibility impacts is likely to be less. However, a more refined modeling method, including specific potential mitigation methods, should be applied in order to better predict potential visibility impacts.

In order to mitigate potential short-term PM2.5 impacts, roads and well locations constructed on soils susceptible to wind erosion would be appropriately surfaced in order to reduce the amount of fugitive dust generated by traffic or other activities. Dust inhibitors (including surfacing materials, non-saline dust suppressants, and water) would be used, as necessary, on unpaved collector, local and resource roads that presented fugitive dust problems. To further reduce fugitive dust, Operators may establish and enforce speed limits (15 to 30 miles per hour) on all project-required roads in, and adjacent to, the planning area.

The SJPLC would continue to participating with the Colorado and New Mexico air quality regulatory agencies, Native American tribal, industry, and environmental organizations, as  well as with the general public, through the Four Corners Air Quality Task Force. The goal would be to further identify potential air pollutant emission control methods and procedures that could then be used to lower potential air quality impacts throughout the region. For example, the Oil and Gas Workgroup (Four Corners Air Quality Task Force, 2006) has identified a wide range of control measures that would limit emissions (including installing electric compression;

BLM_0030260

optimizing/centralizing facilities; using Non-Selective Catalytic Reduction, three-way catalysts, and/or air/fuel ratio controllers engines; installing lean-burn engines; adding oxidation catalysts and air/fuel ratio controllers to existing lean burn engines; using natural gas-fired rig engines; and using flare less (green) well completion methods). The work of the Task Force and its final report would be seriously considered by the SJPLC, and would result in positive air quality impacts.

In addition, the SJPLC would could continue to cooperate with existing atmospheric deposition and visibility impact monitoring programs. The need for, and the design of, additional monitoring would include the involvement of the CDPHE-APCD and EPA Region 8 staff. Based upon future recommendations, Operators may also be required to cooperate in the implementation of a coordinated air quality monitoring program. Oil and gas lease terms (Section 6) require the lessee, within the lease rights granted, to take measures deemed necessary by the lessor for the conduct of operations in a manner that minimizes adverse impacts to air quality, as well as other resources.

A more refined modeling analysis should be performed, based on less conservative techniques, as well as on comments received from the public and agencies (including with regard to potential mitigation measures) for disclosure in the Final EIS/LMP Record of Decision (ROD).

If additional mitigation processes and measures are ultimately required by the SJPLC in the ROD, they must ensure that implementing these measures is monitored and enforced.  For example, if Operators are required to use dust suppressants to reduce fugitive dust, the SJPLC would verify the proper materials are actually used. In addition, if the SJPLC has reason to believe that required mitigation measures are not being met, then additional monitoring (such as continuous PM2.5 monitors) and/or enforcement action (such as stopping operations) may be necessary.

Both the Clean Air Act and the FLPMA require all Federal activities (whether conducted directly, or approved through use authorizations) to comply with all applicable local, State, Native American tribal, and Federal air quality law, statutes, regulations, standards and implementation plans. Potential oil and gas development under all of the alternatives would conform to these requirements.

Some decrease in air quality may occur under all of the alternatives; however, based upon the conservative modeling assumptions, these impacts are expected to be below applicable significance thresholds except nitrogen deposition and visibility impacts within the Mesa Verde and Weminuche mandatory Federal PSD Class I Areas.

When oil and gas activities stop, and disturbed lands are revegetated,  potential air quality impacts from oil and gas development would cease. Therefore, there may be no irreversible or irretrievable impacts on air quality.

***DLMP/DEIS Alternatives***: No significant, adverse impacts to climate are anticipated from implementation of the proposed action or alternatives. Potential impacts to air quality were analyzed as described. Potential air quality impacts from oil and gas development (proposed action and alternatives) were analyzed and reported solely under the requirements of NEPA, in order to assess and disclose reasonably foreseeable impacts to both the public and Federal decision-makers before the LMPs are finalized. Due to the preliminary nature of this NEPA analysis, it should be considered a conservative upper estimate of predicted impacts. Actual impacts at the time of development (subject to air pollutant emission source permitting by CDPHE-APCD) may be lower than those predicted in this analysis.

BLM_0030261

For the No Lease alternative, none of the air quality impacts associated with 170 potential new wells and associated infrastructure would occur. Specifically, the short range impacts associated with dust from road, pad, and pipeline construction and long-term road use would not occur. The short-range impacts within the proposed leasing area from drilling activities and long-term production would also not occur and there would be no production of SO2, NOx, or VOC's to affect short-range air quality.

## Impacts Related to Fire and Fuels Management

### Smoke Management

Prescribed burns and wildland fire use (WFU) have the potential to produce smoke that may impact the public. Receptors such as nursing homes, hospitals, and other populations that are sensitive to temporary air pollution would be important considerations for smoke management. The impacts of smoke on the highly valued scenic vistas within the planning area would also be a concern. Smoke would be managed in conjunction with the State of Colorado (through burning permits) and would address local concerns, visibility, and safety.

Periodic prescribed burns are a necessary tool designed to prevent heavy fuel accumulation -- accumulations that may send larger amounts of smoke into the air should an uncontrolled wildfire occur. Wildfires and prescribed burns within the planning area may produce temporary, but major, amounts of particulates, carbon monoxide, NOx, organics, and hydrocarbons. These pollutants may be a threat to human health and may reduce visibility.

### DLMP/DEIS Alternatives: All of the alternatives would propose the same amount of prescribed burns, and

may, therefore, all result in the same direct and indirect impacts to air quality. Although producing smoke is an unavoidable part of prescribed burns, strategies to limit smoke would be an important part of every burn plan. For each burning project within the planning area, a burn prescription would be written. The burn would be conducted in a manner that minimized emissions as well as smoke-related impacts to visibility and human health. The burn prescription would show the measures that would be used in order to mitigate the adverse impacts of smoke, and would carefully consider smoke-sensitive individuals or populations. Permits for prescribed burns are required by the Colorado Air Pollution Control Division. The permitting process may require smoke risk ratings and burning alternatives, as well as the use of the Simple Approach Smoke Estimation Model (SASEM; Sestak and Riebau 1988) and mitigation and smoke contingency plans. High smoke risk burns may require a public comment period. Although prescribed burns would increase short-term air pollution emissions, these burns may help to decrease the very large emissions from catastrophic wildfires by reducing fuel loading over the long term. Smoke-related  impacts from prescribed burns may range from minor to moderate, depending upon proximity to smoke-sensitive individuals or population centers. It may also be short term, lasting from a few hours to a week.

The impacts to air quality from WFU may be highly variable, but are not expected to vary between alternatives. All of the alternatives estimate between 0 and 30,000 acres of WFU annually. Smoke management would be a primary consideration for go/no-go decisions (allowing wildland fires to burn or to be suppressed). Smoke impacts to sensitive individuals, population centers, and/or to visibility would be highly dependant upon the location of the fire and the burning conditions. Smoke management for these types of burns would include daily assessment of fire behavior and smoke. Public notice/education and public input, as well as the input from the State of Colorado, regarding smoke would be used in fire management decisions. Although unlikely, if conditions were favorable, a fire could start early in the season and burn for much of the fire season. However, if there are smoke issues, overall fire management strategies would be adjusted in order to mitigate smoke impacts to sensitive individuals, communities, and to visibility in important areas. Mitigation may include fire suppression.

BLM_0030262

**Impacts Related to Transportation System**

Dust generated from general use of the transportation system within the planning area may also impact air quality. The primary uses of the transportation network include recreation, administrative use, hunting during the fall, and administrative/land use activities (including timber harvesting, grazing, and fuels and fire management). The amount of dust generated would be largely dependent upon the season of use, the amount of traffic, rainfall patterns, and materials selected for road construction. Dust issues would tend to be greatest where conditions are typically dry, and/or where roads are constructed from fine-grained materials and do not have a paved or gravel surface.  (These conditions exist on many of the low elevation areas of the planning area.)

Recreation use of the transportation system can occur at varying levels of intensity throughout the drier summer and fall months, when dust can be problematic.  Recreational use can occur on any open road. Dust abatement measures are not applied on most system roads due to budget priorities, and would not occur on any non-system road. Dust generated from recreation activities may vary from low to high in the long-term, but would not vary by alternative. Impacts would likely not be mitigated, except on roads with the highest traffic and/or safety issues.

Road use associated with mineral development, timber harvesting, and, in some instances, fire and fuels management may require dust-abatement measures.  Implementation of dust-abatement measures would reduce or eliminate impacts to air quality. Dust generated from timber harvesting would be greatest for Alternatives A and D, which propose the highest amount of harvesting and associated road construction and road use.


# CUMULATIVE IMPACTS

### Global Climate Change
The assessment of so-called "greenhouse gas" emissions and climate change is in its formative phase; therefore, it is not yet possible to know with confidence the net impact to climate. However, the Intergovernmental Panel on Climate Change (IPCC 2007) recently concluded that "warming of the climate system is unequivocal" and "most of the observed increase in globally average temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic [man-made] greenhouse gas concentrations."

The lack of scientific tools designed to predict climate change on regional or local scales limits the ability to quantify potential future impacts. However, potential impacts to air quality due to climate change are likely to be varied. For example, if global climate change results in a warmer and drier climate, increased particulate matter impacts would occur (due to increased wind blown dust from drier and less stable soils). Cool season plant species' ranges are predicted to move north and to higher elevations, and extinction of endemic threatened/endangered plants may be accelerated. Due to loss of habitat, or to competition from other species whose ranges may shift northward, the population of some animal species may be reduced. Less snow at lower elevations would be likely to impact the timing and quantity of snowmelt, which, in turn, would impact aquatic species.

BLM_0030263

**Power Plants**

No coal-fired power plants exist within the planning area; however, there are several power plants that exist, or are planned for construction, in the Four Corners region. Coal-burning power plants are major long-term sources of NOx, SO2, mercury, particulates, greenhouse gases. and other pollutants that impact air quality. These pollutants would impact air quality related values (including visibility, water quality, and high elevation flora and fauna ecosystems). The SJPLC is an active participant in the permitting process for large emission sources, including power plant projects. Through this process, mitigation strategies designed to prevent air quality impacts to the Weminuche Wilderness Class I Area would be developed.

The cumulative impacts related to existing power plants were addressed in the air quality impact dispersion modeling. The USFS has recently concluded that the potential is high for the proposed Desert Rock Coal Energy Facility to result in significant air quality impacts to the Weminuche Wilderness Class I Area. This facility would produce additional large amounts of SO2 and NOx within 80 miles of the Weminuche Wilderness Area. Impacts to visibility within this Class I Area, therefore, expected. There would also be the potential for increased mercury deposition because the proposed PSD permit does not require mercury control measures. Mercury deposition resulting from this facility may accelerate the current trend of increasing contamination of water and fish within the planning area.

**Oil and Gas Development**

With regard to cumulative impacts, further development of existing leases, as well as the development of currently un-leased lands is considered. In total, 1,185 new wells are projected on Federal, State, and private lands within the planning area. There are also over 2,000 additional new wells that would be drilled immediately south of the planning area (within the bounds the Southern Ute Reservation). The cumulative impacts of existing emission sources were evaluated through air quality modeling.

For the No Lease alternative, none of the air quality impacts associated with 170 potential new wells and associated infrastructure would occur. However, compared to the ongoing and projected cumulative effects of oil and gas development on currently leased lands, or private and tribal lands, a reduction of 170 wells would likely result in a small, but potentially measurable improvement to regional air quality.

**Regional Development and Population Growth**

The Four Corners region is currently experiencing large and rapid growth. This is especially true for Archuleta and La Plata Counties, where growth is expected to increase by 81% and 170%, respectively, by 2030 (Davis, 2004). Air quality protection issues continue to challenge management of air quality within the planning area. This is especially true in areas where large new resort towns are constructed within a few miles of the Class I areas. Wood and coal-heating emissions, road dust, and vehicle emissions, as well as other mobile and stationary sources, are all common pollution sources that may potentially impact air quality within the planning area. Regional development would not be impacted by the implementation of the LMP, and would not vary by alternative.

BLM_0030264

The Four Corners Air Quality Task Force has recognized that air quality is being degraded in the Four Corners region. The Task Force is in the process of developing and considering a number of mitigation options for regional sources of air pollution (including coal power plants, oil and gas activities, and other large and small pollution sources). The objective would be to provide air quality regulatory agencies and Federal land managers in the Four Corners area with many options, as well as with a possible strategy designed to improve regional air quality. SJPLC management are Air Quality Task Force members, and would, therefore, participate in developing effective air quality mitigation measures that would apply to the planning area.

**Effectiveness of Alternatives in Meeting Desired Conditions**
With respect to air quality, there would not be significant differences between the alternatives. The desired condition is to maintain and/or improve air quality conditions within the planning area (including in the Weminuche Wilderness Area). Strategies and design criteria implemented under any of the alternatives would reduce the amount of air pollution emissions generated from activities such as oil and gas development. Cumulatively, permitted and currently leased fluid-minerals development within the planning area, combined with large sources of air pollution close to, but outside of the planning area, may result in overall air quality degradation.



BLM_0030265

## INTRODUCTION

Soils are a physical element of the environment made up of mineral particles (e.g., sand, silt, and clay), air, water, and organic matter. Soils form by the interaction between climate, organisms, topography, parent material, and time. Soils store water, supply nutrients for plants, and provide a medium for plant growth. Soils also provide habitat for a diverse number of below-ground organisms. Due to their slow rate of formation, soils are essentially a non-renewable resource.

Soils are described, and classified, in relation to their biological, chemical, and physical properties including texture, structure, consistence, drainage, permeability, depth to bedrock, rock fragment content, soil moisture regime, soil temperature regime, and pH (Soil Survey Staff 2001).

Soils information needed at both the programmatic planning level and the project level. This planning level DLMP/DEIS provides a general description of soils found within the planning area, and describes the potential impacts to those soils that may result from activities proposed under the different alternatives. More detailed site-specific soils information would be gathered and used in order to analyze impacts to soils at the project level.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- ***The National Forest Management Act of 1976***: This act requires that the agency ensure "...the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land."

- ***The Multiple-Use Sustained-Yield Act of 1960***: This act established that the sustained yield of goods and services must be conducted without resulting in permanent impairment of the productivity of the land.

- ***The National Environmental Policy Act of 1969***: This act declares a national policy that encourages productive and enjoyable harmony between people and their environment, promotes efforts that will prevent or eliminate damage to the environment and biosphere, and enriches the understanding of the ecological systems and natural resources important to the nation.

## AFFECTED ENVIRONMENT

### EXISTING CONDITIONS

Within the planning area, soil productivity has not changed significantly since 1983 and 1985, when the San Juan National Forest (SJNF) Land Management Plan (LMP) and the BLM San Juan/San Miguel Resource Management Plan (RMP), respectively, were implemented. This is based on the USFS 15% guideline for determining when a change becomes detrimental or significant (FSH 2509.18). Most soils within the planning area have not been affected (impacted) by historic management activities. Project designs, as well as the implementation of BMPs and design criteria, have served to protect soils and soil productivity on lands where past management activities did occur.

BLM_0030266

Soils associated with some log landings, some heavily used skid trails, and some temporary roads used during past timber harvesting activities were detrimentally compacted. This is demonstrated by a lack of tree regeneration on those sites. However, these impacts are minor, and occur on less than 1% of the planning area. Timber harvesting operations and mechanical fuels projects have resulted in some short-term soil displacement and soil erosion. These impacts, however, were minor and are no longer occurring on those sites. Project design that eliminated unsuitable lands from these activities; focused on lands with gentle slopes, short slope lengths, and adequate ground cover; and implemented BMPs and design criteria, served to protect soils from major impacts.

Some lands, most notably in the mountain grassland vegetation type, display some soil compaction and erosion. This is the result of livestock grazing, most of which presumably occurred before 1983 (Romme et al. 2006). Evidence of compaction includes platy soil structure in soil surface horizons (Robinson and Alderfer 1952). Evidence of erosion includes pedestaled plants, soil deposition, rills, gullies, and altered surface horizons. Other management activities (including the construction of new roads, structures, and utility corridors; and recreation activities) have resulted in some short-term and long-term soil compaction and erosion. However, since 1983, very few acres within the planning area have been impacted by these activities.

Some soils within the planning area have experienced slope failures and mass movement of soils. Steep canyon sideslopes, lands with shale substrates, and lands found within the Morrison and Mancos Shale geologic formations are highly susceptible to these naturally occurring disturbance events. Some minor slope failures and mass movement of soils have also occurred due to management activities (including the construction of roads). The Missionary Ridge Wildfire of 2002 does not appear to have resulted in detrimental severe burning to soils. It also does not appear to have adversely impacted soil productivity (although high amounts of bare soil, as well as some erosion, did result from that fire). This is demonstrated by the excellent post-fire vegetation regeneration and productivity within the burn area.

The sand dunes on BLM-administered lands in Flodine Park and Yellowjacket Canyon are ecologically unique and subject to severe wind erosion.

Gypsum-derived soils on BLM-administered lands in Big Gypsum Valley are ecologically unique because they are associated with rare lichens and plants.

Organic soils (histosols) that occur in fens, as well as in some other high-elevation riparian areas and wetland ecosystems located within the planning area, are ecologically unique because they are rare in the southern Rocky Mountains.

The Lewis and Mancos shale geologic formations are highly erosive, contributing sediment and salts to the drainages of associated watersheds.

BLM_0030267

**TRENDS**

Most soils within the planning area may not be impacted by management activities; therefore, soil impacts may not occur. Soils, therefore, would continue to maintain their soil productivity. Projects would be designed in order to minimize adverse impacts, and the implementation of design criteria and guidelines would serve to protect soils and soil productivity. Sites that currently display compacted soils (including some mountain grasslands, log landings, heavily used skid trails, and temporary roads) are expected to recover over time as the natural processes of freeze/thaw, nutrient cycling, plant root movement, and soil biota movement act to create openings and pore space within the compacted soil. The high amount of bare soil that resulted from the Missionary Ridge Wildfire of 2002 may continue to be reduced as native vegetation and litter increase in abundance and distribution in the burn area.

## ENVIRONMENTAL CONSEQUENCES

Under all of the alternatives, the primary goal of soil management would be to maintain or enhance soil productivity (FSH 2509.18). Soil productivity is defined as the inherent capacity of a soil to support the growth of specified plants or plant communities. Specified plants or plant communities consist, in most cases, of native plant species that occur, or that have the potential to, occur on the site.

Soil compaction, displacement, erosion, severe burning, and protective plant cover are the properties used to categorize and measure changes in soil productivity. A guideline of a 15% reduction in inherent soil productivity would be used for determining when a change in soil properties becomes significant or detrimental (FSH 2509.18).

Management activities with the greatest potential to impact soils within the planning area may be those that involve ground disturbance or vegetation removal (including oil and gas development, livestock grazing, timber harvesting, mechanical fuels treatments, fire management, recreation development, utility corridors, and solid minerals development).

## DIRECT AND INDIRECT IMPACTS

The effects described below could occur in the future when specific projects are identified and implemented. Effects assume that direction and design criteria in the land management plan, and stipulations in the DEIS for oil and gas activity will be followed and implemented. Design criteria, presented in Part 3 of the accompanying land management plan, are environmental protection measures that will be applied at the project level to protect resources.

Most activities within the planning area are designed to avoid or minimize adverse impacts to soils, and to their associated ecosystems. This would be accomplished by using existing road networks, and by eliminating unsuitable lands from project areas (including lands associated with high mass movement potential, highly erosive soils, highly unproductive soils, steep slopes, and riparian areas and wetland ecosystems). Additionally, most activities have occurred, and would continue to occur, on lands that have thick litter layers, abundant dead wood on the ground surface, and abundant herb and shrub cover -- factors that protect the soils from natural and human-caused disturbances. Management activities, therefore, would not result in detrimental erosion, compaction, displacement, or severe burning; and would not detrimentally remove ground cover, organic matter, or nutrients from the soil; therefore, the long-term productivity of the soils within the planning area would be preserved. The desired conditions for soils within the planning area would, therefore, be achieved.

BLM_0030268

**Impacts Related to Timber Harvesting**

As the result of equipment operations involving cutting, skidding, decking, and loading trees, as well as the piling of logging slash, proposed timber harvesting activities within the planning area may would disturb the ground surface. Ground cover may be disturbed (including the removal of vegetation), and may, therefore, result in some exposure of mineral soil. Although direct timber harvesting operations may result in some local soil movement, soil displacement and soil erosion are expected to be minor. This is because most harvest units are designed to have slopes that are not steep (less than 35%), short slope lengths, and adequate ground cover and topsoil that would remain intact. Slash distribution in cut units following timber harvesting may also protect exposed mineral soils from raindrop impacts and erosion.

Soil compaction resulting from the weight of harvesting equipment, is expected to be minor if soils are adequately dry (with soil moisture content below the plastic limit) when harvesting activities occur. Thick litter layers, thick organic matter-rich soil surface horizons, abundant dead wood on the ground surface, and abundant herbaceous plant cover (all of which are common attributes of most harvest units within the planning area) may help to buffer mineral soils from compaction and erosion. Log landings, temporary roads, and heavily used skid trails would be designed in order to minimize compaction and erosion; however, soils may be compacted. These compacted soils would be expected to recover over time as the natural processes of freeze/thaw, nutrient cycling, plant root movement, and soil biota movement act to create openings and pore space within the compacted soil. In some cases, ripping may be implemented in order to reduce compaction more quickly.

Timber harvesting would remove organic matter, as well as the associated nutrients, from harvest units. However, the harvested stems (boles) would remove relatively small amounts of nutrients, when compared to the total nutrient reserves on most sites (Webber and Madgwick 1983). These nutrient losses may be replaced, in most cases, by soil weathering and natural inputs. Timber harvesting activities may not substantially impact the nutrients, organic matter, soil fertility, or soil productivity of harvest units. This is because the associated soils tend to be inherently fertile and contain adequate organic matter and adequate depths of mineral soil (including thick, nutrient-rich surface horizons). In addition, an abundance of organic matter, as well as the associated nutrients, would be left on harvest units. This would include most of the nutrient-rich leaves, branches, and bark, where the highest nutrient concentrations are found (Welch and Klemmendson 1975; Bockheim et al. 1983; Madgwick et al. 1977).

New road construction required for timber harvesting within the planning area would remove vegetation along the road corridor, expose mineral soil, and result in soil compaction along the roadbed. Roads are the dominant source of erosion and sediment in forests (Swank and Crossley 1988; Reid 1981). Typically, there is a pulse of erosion from roads during the first 2 years following road construction or reconstruction (USFS 1981). Slope failures and mass movement of soils may occur as the result of road construction. New roads may also provide an avenue for the invasion and establishment of invasive plant species. New temporary roads would be closed, obliterated, and revegetated following use, in most cases. Road design, avoidance of problem soils, appropriate design criteria, and road closures would be implemented in order to minimize impacts to soils.

***DLMP/DEIS Alternatives***: The impacts described above may occur, to varying degrees, under all of the alternatives. Alternative A would propose the largest amount of acres for timber harvesting; therefore, it may have the greatest potential to impact soils, when compared to the other alternatives. Alternative D may have the next greatest potential to impact soils, followed by Alternative B. Alternative C may have the least potential to impact soils (because it would propose the least amount of acres for timber harvesting).

BLM_0030269

**Impacts Related to Mechanical Fuels Treatments**

The impacts related to mechanical fuels treatments on soils may be similar to those described above for timber harvesting.

*DLMP/DEIS Alternatives*: The impacts to soils from mechanical fuels treatments may be similar under all of the alternatives. This is because the number of acres proposed for treatment would be similar under all of the alternatives.

**Impacts Related to Fire Management**

Impacts to soils tend to be greater from wildland fires and wildland fire use fires. This is because these fires tend to be high-intensity, stand-replacing events that burn hot and consume lots of vegetation and ground-cover. The impacts resulting from management-ignited prescribed burns would be minimal and would be minimized through effective planning, and through the avoidance of areas with high potential for adverse impacts. Stabilization and rehabilitation efforts designed to protect and sustain soils and ecosystems and to restore them to pre-burn conditions may include seeding, ripping, water-barring, and the installation of erosion-control devices. These efforts may result in short-term adverse impacts on soils.

*DLMP/DEIS Alternatives*: The impacts related to fire management activities may occur under all of the alternatives. The impacts to soils from wildfire and fire management may be similar under all of the alternatives. This is because the number of acres proposed for such treatments would be similar under all of the alternatives.

**Impacts Related to Livestock Grazing**

Within the planning area, livestock grazing occurs in all the major vegetation types. Potential adverse impacts resulting from livestock grazing may include overgrazing and trampling (Fleischner 1994, Wuerthner 1992, Clary and Webster 1989). This may decrease the abundance, distribution, and vigor of plant species, which, in turn, may decrease the amount of litter and organic matter and increase the amount of bare soil, leading to soil compaction (Dadkhah and Gifford 1980, Lewis 1980). Soil compaction may reduce infiltration (Lull 1959, Smith 1967) and increase run-off and erosion (Lull 1959, Orr 1975). Additionally, livestock grazing may impact biological soil crusts by crushing, breaking, or displacing the crusts.

Livestock grazing may also adversely impact the ecological processes of energy flow and nutrient cycling when livestock utilize too much of the biomass (which leaves little organic matter for microorganisms to decompose and move through the detrital food chain (Golley 1960, Odum 1971).

Within the planning area, livestock grazing practices are designed to protect the soil productivity of the ecosystems that are impacted by such practices. Adverse impacts would be more likely if the timing, intensity, and duration of livestock grazing were not appropriate or sustainable. Impacts to soils from livestock grazing may be minor if DLMP/DEIS planning direction and design criteria, as well as the allotment management plans, are adhered to.

*DLMP/DEIS Alternatives*: The impacts related to livestock grazing may occur under all of the alternatives. Alternative D would propose the largest amount of suitable acres for livestock grazing; therefore, it may have the greatest potential to impact soils, when compared to the other alternatives. Alternative A may have the next greatest potential to impact soils (because it would propose the second largest number of suitable acres for livestock grazing), followed by Alternative B. Alternative C may have the least potential to impact soils as the result of livestock grazing (because it would propose the least number of suitable acres for livestock grazing).

BLM_0030270

### Impacts Related to Oil and Gas Development

Oil and gas development may remove vegetation and litter, expose and remove mineral soil, and result in soil compaction on well pad locations (and on the roadbeds needed for access to the pads). Compaction of soils on well pads and roads may result in long-term adverse impacts, and may reduce soil productivity (vegetation growth) until reclamation efforts were implemented. Roads are a dominant source of erosion and sediment (Swank and Crossley 1988; Reid 1981). There is typically a pulse of erosion from roads during the first 2 years following road construction or reconstruction (USFS 1981). Slope failures and mass movement of soils may occur as the result of road construction, especially on steep slopes. New roads may also provide an avenue for the invasion and establishment of invasive plant species.

When oil and gas extraction is complete, which can be from 25 to 30 years, all roads and pads constructed specifically for the oil and gas development would be reclaimed. This activity may include contouring, plowing, mulching, fertilizing, and seeding. Erosion-control features would be installed, as necessary.

*DLMP/DEIS Alternatives*: The impacts from oil and gas development could occur under all of the alternatives. Alternative A would propose the largest number of "standard lease" acres and the least amount of NSO acres; therefore, it may result in the most ground-disturbing impacts, as well as in the most impacts to soils, when compared to the other alternatives. Alternative D may have the next greatest potential impacts to soils. Alternatives B and C may have the least ground-disturbing impacts, and the least impacts to soils from oil and gas development. This is because they would propose the least number of "standard lease" acres. The No Leasing Alternative would have no ground-disturbing impacts, so it would have no adverse direct or indirect impacts to soils.

### Impacts Related to Solid Minerals and Utility Corridors

Impacts related to solid minerals development activities and utility corridors may disturb the ground surface (often due to the equipment operation involved in such activities). Ground-cover may be disturbed, and mineral soil may be exposed. Management activities would result in some local soil displacement and soil erosion. However, the impacts may be minor, and may only impact a small percentage of soils within the planning area. Implementing design criteria described in the Watershed Conservation Practices Handbook would minimize adverse soil impacts.

*DLMP/DEIS Alternatives*: The impacts from solid minerals development activities and utility corridors could occur under all of the alternatives. Impacts to soils from solid minerals development and utility corridors may be similar under all of the alternatives. This is because the number of acres proposed for such treatments would be similar under all of the alternatives.

### Impacts Related to Recreation

Recreational uses shown to impact soils include off-road motor vehicles, camping, hiking, mountain biking, ski areas, and horseback riding -- all of which may result in erosion and compaction. These impacts tend to be minor, and may occur on only a small percentage of the planning area. Implementing design criteria described in the Watershed Conservation Practices Handbook would minimize adverse soil impacts.

*DLMP/DEIS Alternatives*: The impacts from recreation could occur under all of the alternatives. The impacts to soils from recreation may be similar under all of the alternatives. This is because the number of acres proposed for such treatment would be similar under all of the alternatives.

BLM_0030271

**Impacts Related to Special Soils**

Impacts to the sand dunes on BLM-administered lands in Flodine Park and Yellowjacket Canyon, the gypsum-derived soils in Big Gypsum Valley, and the organic soils (histosols) that occur in fens and other higher-elevation wetlands may not occur, or may be minor. This is because these lands, and their soils, would be avoided, whenever practicable.

*DLMP/DEIS Alternatives*: The impacts to special soils could occur under all of the alternatives. The impacts to special soils may be similar under all of the alternatives because these lands, and their soils, would be avoided, whenever practicable, for all alternatives.

**Positive Impacts Related to Soils**

SJPLC management objectives designed to restore or improve soil productivity on 20 miles of road that would be closed and reclaimed; and to improve the soil productivity on 2 middle elevation Kentucky bluegrass-dominated mountain grasslands, would apply to all of the alternatives. This may, in turn, result in beneficial impacts to the soils within the planning area. The impacts of fire on soils may include increased nutrient availability, which may, in turn, lead to increased vigor and productivity in plants.

*DLMP/DEIS Alternatives*: The positive impacts to soils could occur under all of the alternatives. These positive impacts to soils may be similar under all of the alternatives because all of the alternatives would have the same objectives.


## CUMULATIVE IMPACTS

Historic, current, and foreseeable future impacts to the soils within the planning area would be result of the combination of management activities (including oil and gas development, livestock grazing, timber harvesting, mechanical fuels treatments, fire management, recreation development, utility corridors, and solid minerals development).

Historic timber harvesting and mechanical fuels treatment activities within the planning area have resulted in some short-term soil compaction, displacement, and erosion. However, they have not resulted in long-term detrimental erosion, compaction, or displacement. They have not detrimentally removed ground cover, organic matter, or nutrients from the harvest sites. Foreseeable future timber harvesting and mechanical fuels treatment activities within the planning area may result in some minor short-term soil compaction, displacement, and erosion. However, these activities are not expected to result in long-term detrimental erosion, compaction, displacement, or detrimentally remove ground cover, organic matter, or nutrients from the harvest units. The impacts described above may occur under all of the alternatives.

Historic adverse impacts related to livestock grazing within the planning area began around the turn of the Twentieth Century, as livestock grazed and overgrazed rangelands. This resulted in soil compaction and erosion on some lands. These impacts are still present in some places. Foreseeable future livestock grazing within the planning area may result in some additional impacts to soils. However, these impacts are expected to be minor. Past oil and gas development activities within the planning area resulted in some short-term and long-term soil compaction, displacement, and erosion. Many of these impacts are still present, as wells continue to operate. Foreseeable future oil and gas development activities within the planning area may result in some additional impacts to soils. However, these impacts may be minor.

BLM_0030272

Historic impacts to soils within the planning area related to recreation, solid minerals development, and utility corridors were localized and relatively small in extent. However, many of these impacts are still present. Foreseeable future impacts on soils from these activities may result in some additional impacts to soils. However, these impacts may be minor.

Historic impacts to soils within the planning area related to road construction permanently reduced soil productivity along the road corridors. These impacts are still present. Foreseeable future impacts on soils from new permanent road construction may result in some additional impacts to soils. However, these impacts may be minor.

Past WFU and prescribed burns have not resulted in detrimental soils impacts. Future impacts related to WFU and prescribed burns may be minor. The Missionary Ridge Wildfire of 2002 created a large area of bare soil and produced a high amount of soil erosion. Foreseeable future wildfires similar to the Missionary Ridge Fire, should they occur, may result in similar detrimental impacts to soils (due to erosion and severe burning).

In summary, there have been minor short-term and long-term adverse impacts to soils from past management activities within the planning area. However, those that have occurred were relatively small, considering the almost 2.6 million acres within the planning area. Foreseeable future management activities may impact soils, as described above. However, these activities are not expected to result in detrimental short and long-term adverse impacts to soils due to project designs and the implementation of the design criteria. Overall, there has not been, nor are there likely to be anticipated detrimental short-term or long-term adverse cumulative impacts to the soils and soil productivity within the planning related to management activities.



BLM_0030273

## INTRODUCTION

In 1891, public concern regarding the issue of having adequate supplies of clean water led to the establishment of federally protected forest reserves in the United States. The importance of water protection was evident in the wording of the Organic Act of 1897, the legislation that founded the USFS, which stated that "no public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows…"

The protection of water on BLM-administered lands is also emphasized in several acts, most notably the Federal Land Management Policy Act (FLPMA) of 1976, which declares that public lands are to be managed, among other things, for the protection of water and water-related resources. Today, public lands, especially USFS-administered lands, are a large and important source of clean water for this nation. Watersheds throughout the planning area, as administered by both agencies under the management of the SJPLC, provide a multitude of benefits, including for aquatic and riparian habitat, municipal water supplies, flood reduction, low-flow augmentation, recreation opportunities, as well as for providing a continuous supply of clean water for many additional uses.

Water quality within the planning area is typically good (CDPHE 2006a). In the few water bodies having water quality problems, mercury, heavy metals, sediment, and salinity are common pollutants. In some places, mine-related heavy-metals pollution is being cleaned up as a result of the aggressive abandoned mine reclamation program being conducted within the planning area.

Development and depletion of ground-water resources are emerging issues on SJPL, especially in relation to fluid-minerals extraction and private land development. Factors such as high road densities, poor road locations, and inadequate road design/maintenance have caused water quality, floodplain, and channel morphology changes in some watersheds.

Over the past decade, drought has also impacted the planning area. The prolonged drought has resulted in lower water tables in some areas, which has, in turn, resulted in reduced water flow in streams, springs, and seeps. Dry upland conditions have increased grazing pressure on riparian areas. The drought-related increase of large wildfires has impacted many watersheds by resulting in increased flooding, erosion, sedimentation, and damage to private property adjacent to, or near, the boundaries of the planning area.  Large and small proposals for new water-development projects have also increased, in part, as a result of long-term drought. Accommodating increasing public needs for water while, at the same time, protecting aquatic ecosystems may be one of the biggest challenges for the management of public lands over the next few decades.

BLM_0030274

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- **The Organic Administration Act of June 4, 1897, as amended**: This act contains the initial, basic authority of watershed management on USFS lands. The purpose for the establishment of national forests, as stated in this act, includes securing favorable conditions of water-flows.

- **The Multiple-Use Sustained- Yield Act of 1960**: Under this act, "National forests are established and shall be used for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple uses and sustained yield, without impairment of the productivity of the land.

- **The Federal Water Pollution Control Act of July 9, 1956, as amended**: The intent of this act is to enhance the quality and value of the water resource, and to establish a national policy for the prevention, control, and abatement of water pollution. The act was amended by the Federal Water Pollution Control Act/ Amendments of 1961; the Water Quality Act of 1965; the Clean Water Restoration Act of 1966; the Water Quality Improvement Act of 1970; the National Environmental Policy Act of 1969; the Federal Water Pollution Act of 1969; the Federal Water Pollution Control Act Amendments of 1972; and the Clean Water Act of 1977.

- **The National Environmental Policy Act of January 1, 1970**: This act requires an environmental assessment, including an evaluation of impacts on water resources, for all major Federal actions.

- **The Colorado River Basin Salinity Control Act of June 24, 1974**: This act directs the U.S. Department of the Interior (USDOI) to undertake research and development projects in order to identify methods designed to improve the water quality of the Colorado River.

- **The National Forest Management Act of 1976**: This act substantially amends the Forest and Rangeland Renewable Resources Planning Act of 1974. This act strengthens the references pertaining to suitability and compatibility of land areas; stresses the maintenance of productivity, as well as the need to protect and improve the quality, of soil and water resources; and seeks to avoid the permanent impairment of the productive capability of the land.

- **The Federal Land Policy and Management Act of October 21, 1976**: This act declares that "…the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." It also states that "Terms and conditions must minimize damage to scenic and aesthetic values and fish and wildlife habitat and otherwise protect the environment."

- **The Clean Water Act of 1977**: This act amends the Federal Water Pollution Control Act of 1972. Section 313 of the act stresses that Federal agencies must comply with Federal, State, and local substantive and procedural requirements related to the control and abatement of pollution to the same extent as required of non-governmental entities. Section 404 of the Clean Water Act regulates the discharge of dredged, excavated, and/or fill material in wetlands, streams, rivers, and other U.S. waters. (The U.S. Army Corps of Engineers is the Federal agency authorized to issue Section 404 Permits for certain activities conducted in wetlands or other U.S. waters.) Activities that may be exempt from Section 404 Permits, or that are covered under the general permit, are identified in the legislation (include normal silviculture, forest roads using BMP, and stream-bank erosion control).

BLM_0030275

- **The Surface Mining and Control and Reclamation Act of August 3, 1977**:  This act may require the BLM to make determinations of "probable hydrologic consequences" in relation to mining and reclamation activities.

## EXECUTIVE ORDERS

- **Executive Order 11288**: his EO requires that Federal agencies develop pollution-abatement plans and preventative measures for the discharge of hazardous waste into waters.

- **Executive Order 11752**: This EO mandates that Federal agencies provide national leadership in order to protect and enhance the quality of air, water, and land resources through compliance with applicable Federal, State, interstate, and local pollution standards.

- **Executive Order 11988**: This EO requires that Federal agencies  provide leadership and take action to: a) minimize adverse impacts associated with the occupancy and modification of floodplains and reduce risks of flood loss; b) minimize impacts of floods on human safety, health, and welfare; and c) restore and preserve the natural and beneficial values served by floodplains.

- **Executive Order 11990**: This EO requires Federal agencies take action in order to minimize the destruction, loss, or degradation of wetlands; and to preserve and enhance the natural and beneficial values of wetlands.

## REGULATIONS AND POLICIES

- **FSM 2500 and FSH 2500**: These consolidate USFS regulation, policy, and direction regarding watershed management. These documents also stipulate limitations of resource use in order to protect watershed conditions.

- **BLM Manual Supplement 7200**: This provides policy and direction regarding water-use management on BLM-administered lands.

- **BLM Manual Supplement 7240**: This manual provides policy and direction regarding water-quality management on BLM-administered lands.

## OTHER AGREEMENTS

- **Memorandum of Understanding (MOU) between the State of Colorado Department of Natural Resources, the State of Colorado Water Conservation Board, and the BLM, 2005**: This MOU provides a formal cooperative framework between the State of Colorado and the BLM in relation to water management on BLM-administered lands in Colorado.

- **Memorandum of Understanding between the State of Colorado Department of Natural Resources and USFS, 2004**: This MOU provides a formal cooperative framework between the State of Colorado and the USFS in relation to water management on USFS-administered lands in Colorado.

BLM_0030276

**DESIGN CRITERIA**

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to water and water quality. Guidelines and design criteria are presented in Part 3 of Volume II of the DLMP/DEIS.

## AFFECTED ENVIRONMENT

### EXISTING CONDITIONS AND TRENDS

#### Aquatic Resources

The SJPLC-administered lands are located within the upper Colorado River Basin. The principal rivers that drain these lands are the Dolores, Mancos, La Plata, Animas, Florida, Los Pinos, Piedra, and San Juan Rivers. All of these river systems drain into the Colorado River. In general, the headwaters of these rivers originate in the higher-elevation igneous or metamorphic rocks of the southern Rocky Mountains. Upon leaving the mountainous terrain, the rivers often create canyons and valleys of variable size as they flow through the sedimentary rocks of the Colorado Plateau, which is located to the south and west of the mountains.

The higher-elevation headwater areas receive the bulk of annual precipitation as snow, and run-off is snowmelt-dominated. The point of greatest measured precipitation within the planning area (Wolf Creek Pass, at an elevation of 9,440 feet) averages 40.85 inches per year. Per year, this site averages 352 inches of snow. The point of lowest measured precipitation (Uravan, at an elevation of 5,020 feet) averages 12.5 inches per year. Per year, this site averages 9.5 inches of snow (NOAA 2005). As with most of the rivers in the arid West, the mountain headwaters are critical for producing the majority of discharge for all the principal rivers originating within the planning area.

There are approximately 1,960 miles of perennial streams within the planning area, and approximately 3,122 mapped lakes and reservoirs. Only 1.6% of the lakes and reservoirs are greater than 10 acres. The largest natural lake is Emerald Lake (approximately 284 acres), which is located within the Weminuche Wilderness Area. The largest reservoir is McPhee Reservoir (approximately 4,328 acres), which is on the Dolores River.

Within the planning area, water quality varies across the landscape. In general, the water quality of most forested watersheds is good. Table 3.3.1 summarizes the streams within the planning area that have been recognized by the State of Colorado as having water quality impairment problems.

Some rangelands in the western portions of the planning area have large areas of exposed marine-derived Lewis and Mancos shale. In these watersheds, salinity and the delivery of salts to the Colorado River is of national concern. Over the past decade, the BLM has focused a great deal of effort on inventorying, monitoring, and designing erosion-control measures that reduce the salt transport to the Colorado River. Figure 3.3.1 shows the surface locations of the Lewis and Mancos shale formations. The highest priorities for future salinity reduction work would occur in the watersheds where these formations are present over large areas.

#### Groundwater

There are four major regional aquifers within the planning area, all located primarily in sedimentary rocks of the Colorado Plateau. Local aquifers also exist, and can be found in alluvium along major rivers, as well as in volcanic or fractured crystalline rocks. These aquifers have formed as a result of long-term irrigation practices. Table 3.3.2 summarizes the aquifers and their characteristics.

BLM_0030277

**Table 3.3.1 – Waterbodies Classified as Water Quality Impaired**

| WATERBODY | POLLUTANT | STATUS |
|---|---|---|
| McPhee Reservoir | Mercury | State 303(d) List 2006 |
| Silver Creek (above Rico domestic water diversion) | Cadmium, Zinc | State 303(d) List 2006 |
| Silver Creek | Copper, Zinc | State 303(d) List 2006 |
| East Mancos River | Copper | State 303(d) List 2006 |
| Rio Blanco River (lower Rio Blanco) | Sediment | TMDL List for State 305(b) Report 2006 |

Sources: Colorado Division of Public Health and Environment (CDPHE), 2005; Colorado Water Quality Control Division, 2006.

**Table 3.3.2 – SJPL Regional and Local Aquifers**

| AQUIFER | CHARACTERISTICS | WATER QUALITY |
|---|---|---|
| Uinta-Animas | Important regional aquifer of the San Juan Structural Basin.[2] Locally, it is found within the Nacimento and Animas formations and is discontinuous with very slow recharge rates.[1] | Fresh to saline. Fresh water usually located close to recharge areas.[2] |
| Mesa Verde | Aquifer of the San Juan Basin that is confined by the Mancos shale. Primary recharge from higher-elevation areas in north and central New Mexico.[2] | Highly variable. |
| Coconino-DeChelly | Located in north and central portions of SJPL.[2] | No detailed water quality data is available. |
| Dakota-Glen Canyon | Located within several formations, including the Dakota and Morrison Formations.[2] | Locally, good quality water may be present where it is close to the surface. Where it is located at great depths, highly dissolved solids limit its potential use.[2] |
| Fruitland-Pictured Cliffs | Aquifer of the San Juan Basin. Recharge areas exist within the planning area in La Plata and Archuleta Counties.[4,5] | Water quality varies from good (in recharge areas) to highly saline (near the San Juan River in New Mexico[4],).[5] |
| Florida Mesa | Local aquifer located in southeast La Plata County. Recharge from historic and current irrigation.[1] | No detailed water quality data is available. |
| Major Alluvial Aquifers | Largest quaternary alluvial aquifers are located along the La Plata, Animas, Florida, and Los Pinos Rivers. Most wells completed in these aquifers are less than 170 feet.[3] | Water quality is typically good, but highly variable. Headwater aquifers of the Animas and La Plata Rivers contain high concentrations of heavy metals and are acidic.[3] |

[1] La Plata County , 2005.
[2] Ground Water Atlas of the United States (Robson and Blanta 1995).
[3] Tropper et al. (2003). Ground Water Atlas of Colorado.
[4] USDI BLM and USFS (2006). Northern San Juan Basin Project.
[5] Cox et al. (2001). Ground Water-Surface Water Interactions between Fruitland Coalbed Methane Development and Rivers.

BLM_0030278

**Figure 3.3.1 – Lewis and Mancos Shale in HUC 4 Watersheds**

BLM_0030279

## Human Activities and Management Activities

Over time, human activity within the planning area has resulted in widespread and varied alterations to hydrologic systems. Stream-system alterations include changes in flow regime, sediment transport, riparian vegetation, stream stability, floodplain function, and aquatic ecosystems. The majority of these changes are associated primarily with land management activities, including road construction, livestock grazing, vegetation management, recreation use, aquatic species management, water diversion/regulation, and mineral development.

## Roads

The construction and maintenance of roads has long been recognized as a potential and major source of sediment in forested watersheds (Megahan and Kidd 1972; Reid and Dunne 1984). Roads can change natural run-off patterns by increasing the amount of impervious surface in a watershed, and/or by intercepting overland flow or shallow subsurface run-off. The network of road drainages often routes this water, and the associated sediment, directly into streams (MacDonald and Stednick 2003). Sediment is the major pollutant associated with roads on public lands. Sedimentation in streams impacts water quality, which can, in turn, impact aquatic life. Sediment can also alter channel morphology, which can, in turn, impact aquatic habitat (CDPHE 2002). Road construction and maintenance activities can result in physical changes to streams, including floodplain and riparian habitat modifications, channel degradation, and fish passage reduction. When roads and streams interact, there can also be economic impacts, including higher road maintenance and stabilization costs, and higher water treatment costs for public water supplies. It can also lead to rapid sedimentation, filling in water storage reservoirs and ponds. Ecological impacts commonly associated with stream/road interactions include aquatic, riparian, and wetland habitat degradation (USFS 2005a).

There are an estimated 7,000 miles of road within the planning area. Most roads on the San Juan National Forest (SJNF) were initially built to facilitate timber harvesting. Some of these roads now serve multiple uses as part of the managed road system. Many roads persist on the landscape in an unmanaged state because they were never decommissioned after use. Most roads on BLM-administered lands were built primarily for minerals development and/or exploration, or oil and gas development (and associated seismic exploration activities). Many areas within the planning area exhibit road-related watershed impacts. In relation to roads, most of these watersheds were developed prior to current-day road construction standards and mitigation measures. The lack of funding for adequate road maintenance continues to be a serious problem on much of the 3,000 miles of authorized roads within the planning area. The thousands of miles of unauthorized or unmanaged roads are also problematic. Unauthorized roads have few plans in place or funds authorized to correct erosion/drainage/public use problems that are causing chronic impacts to some watersheds. It is anticipated that degraded watershed conditions will persist until funds and/or priorities address road problems on a watershed-wide basis.

Road densities across the planning area vary from undeveloped Wilderness Areas (such as Middle Vallecito Creek, with no roads) to road densities of more than 7 miles per square mile (such as in the Naturita Creek and McElmo/Crow Canyon watersheds). The average road density across the planning area is 2 miles per square mile. Watersheds with very high authorized and unauthorized road densities often show the greatest road-related impacts. Watersheds with the highest overall road densities within the planning area are summarized in Table 3.3.3.

BLM_0030280

**Table 3.3.3 – Watersheds with the Highest Road Densities within SJPL (Data Includes Authorized and Unauthorized Roads)**

| WATERSHED | ROAD DENSITY (mi/mi2) | AGENCY | WATERSHED ID (HUC 6) |
|---|---|---|---|
| Naturita Creek | 7.4 | USFS/BLM | 140300036101 |
| McElmo Creek – Crow Canyon* | 7.4 | BLM | 140802020107 |
| Lower Florida River – Cottonwood Gulch* | 6.7 | BLM | 140801040902 |
| Upper Lost Canyon | 6.4 | USFS | 140300020401 |
| East Fork Hermosa Creek | 6.3 | USFS | 140801040402 |
| Lower Alkali Canyon-Narraguinnep Canyon* | 6.1 | USFS | 140802020106 |
| House Creek | 5.5 | USFS | 140300020407 |
| Mud Creek - McElmo Creek | 5.5 | BLM | 140802020301 |
| Spruce Water Canyon | 5.4 | USFS | 140300020402 |
| Upper Cat Creek* | 5.3 | USFS | 140801010604 |
| East Paradox Creek* | 5.2 | | 140300021103 |
| Dolores Canyon - Cabin Creek | 5.1 | BLM USFS/BLM | 140300020603 |
| Hartman Canyon* | 5.1 | BLM | 140802020103 |
| Upper Beaver Creek | 5.1 | USFS | 140801011601 |

*Watersheds with less than 1,000 acres in Federal ownership

**Livestock Grazing**

Grazing practices that favor good range and riparian conditions typically have good water-quality outcomes. Within the planning area, grazing has impacted riparian health, stream-channel conditions, upland infiltration and erosion, and water quality. The most common livestock-caused impacts include fecal/bacterial contamination, sedimentation, and increased temperatures. Livestock grazing activities with the highest potential for direct and indirect impacts to water resources include long-term concentrated grazing in riparian areas, and trampling/trailing near water sources. Direct bank damage may add large amounts of sediment directly into streams, especially in wet meadow streams or erosive topography that is prone to gully formation (USFS 2005). Unrestricted livestock use of water features (including streams, springs, seeps, and ponds) can also lead to water-quality contamination (e.g., fecal and microbial).

Concentrated livestock grazing in riparian areas and wetland ecosystems may occur anywhere within the planning area; however, the lower-elevation drier rangelands tend to show more riparian grazing impacts when compared to higher-elevation forested watersheds. Long-term heavy grazing can shift native woody and herbaceous riparian vegetation into riparian areas dominated by non-native grasses and other vegetation, and result in a great reduction in native woody plants (USFS 2005). This can, in turn, lead to the destabilization of streams and to aquatic-habitat degradation.

BLM_0030281

Over time, there has been a shift from a predominance of sheep grazing on public lands to a current predominance of cattle grazing, with lower overall stocking rates. For example, in the 1930s, approximately 216,684 sheep and 41,968 cattle were permitted on the San Juan National Forest (SJNF). In 2005, approximately 11,905 sheep and 22,382 cattle were permitted. Decreasing livestock numbers has, in turn, reduced watershed-wide impacts from overgrazing; however, localized problems still exist.

Livestock tend to follow predictable patterns of distribution on the landscape. In general, forested rangelands are not areas where widespread livestock impacts to water occur. Livestock use is often concentrated in high-preference sites, including riparian areas and meadows. During the planning process, high-preference grazing areas were mapped for the planning area. Some watersheds have a high proportion of cattle preference areas located in valley floors where floodplains, streams, and riparian areas exist. These areas would most likely show more direct and indirect impacts to streams and riparian areas from historic and current livestock grazing (USFS 2005b).

**Table 3.3.4 – Watershed Percent of Valley Floor in High Cattle Preference Grazing Areas**

| HYDROLOGIC UNIT BASIN | WATERSHED | PERCENTAGE (%) OF VALLEY FLOOR IN HIGH CATTLE PREFERENCE AREAS |
|---|---|---|
| 140300020305 | Beaver Creek - Trail Canyon Dolores River - Salter Canyon | 68.1 |
| 140300020601 | | 60.1 |
| 140300020306 | McPhee Reservoir - Beaver Creek Inlet | 56.0 |
| 140300020602 | Narraguinnep Canyon Natural Area | 55.8 |
| 140300030407 | House Creek | 55.2 |
| 140801040801 | Florida River Headwaters | 52.3 |
| 140300020403 | Middle Lost Canyon | 49.3 |
| 140300020509 | Pine Arroyo | 48.7 |
| 140300020507 | Dawson Draw | 48.1 |
| 140801020103 | Williams Creek | 46.5 |
| 140801010404 | Middle Rio Blanco | 46.1 |

Within the planning area, vegetation management is expected to comply with policies and management techniques, as developed during last 5 years. Range condition should continue on the same trend as the last decade; however, the protection and improvement f riparian areas and wetland ecosystems would likely receive additional emphasis.

**Vegetation Management**

Hydrology, water quality, riparian areas and wetland ecosystems health and function, as well as channel and biotic conditions, may all be adversely impacted by large-scale vegetation management (Chamberlin et al. 1991). The primary vegetation management tools used within the planning area include timber harvesting, timber stand improvements (TSIs), range management treatments, and fuels reduction. Table 3.3.5 shows the approximate total acreage within the planning area that had different types of vegetation management treatments over the past 30 years.

BLM_0030282

Range treatments on USFS-administered lands include seeding, planting, and piling slash. Timber activities occur almost exclusively on the USFS-administered lands within the planning area, and include activities such as site preparation (burning and mechanical), harvesting (regeneration cuts, intermediate cuts, and salvage), and slash treatment.

**Table 3.3.5 – Vegetation Treatments on SJPL**

| TREATMENT TYPE | ACRES SINCE 1976 | AGENCY | LAND BASE ON SJPL |
|---|---|---|---|
| Range Improvement | 40 | USFS | 0.01% |
| Timber Activities | 227,300 | USFS | 12% |
| Range and Other Vegetation Treatments | 49,600 | BLM | 7% |

Timber harvesting on USFS-administered land has been concentrated in some watersheds, while no harvesting has occurred in other watersheds. Watersheds that have the highest level of harvest, in relation to the clear-cutting method, are summarized in Table 3.3.6.

**Table 3.3.6 – Greatest Clear-Cut Harvest Areas on SJPL**

| WATERSHED | PERCENTAGE (%) WATERSHED HARVESTED BY CLEAR-CUTTING | PERCENTAGE (%) RIVER VALLEY FLOOR HARVESTED BY CLEAR-CUTTING | HUC 6 ID |
|---|---|---|---|
| Roaring Forks Creek | 11.26% | 0.62% | 140300020205 |
| Upper Lost Canyon | 10.61% | 2.36% | 140300020401 |
| Upper Beaver Creek | 10.52% | 1.40% | 140801011601 |
| Hermosa Creek Headwaters | 7.76% | 0.40% | 140801040401 |

Some watersheds have been affected (impacted) by large areas of clear-cut harvesting; however, only a small amount of activity has occurred within river valley floors. When all harvesting methods over the past 40 years are considered, approximately 204,700 acres have been harvested in uplands, and approximately 44,700 acres have been harvested within river valley floors.

Harvesting large areas of timber, especially stand conversion timber harvesting, can result in changes in soil water content and water yield; and may create localized site-stability issues. The watersheds identified in Table 3.3.6 may be the most at-risk watersheds for these types of impacts. However, the cumulative impacts of physically harvesting, skidding, building roads, transporting logs, disposing of slash, and preparing sites have a much greater impact on watersheds, when compared to the changes made to vegetation alone. Some watersheds are highly sensitive to disturbances, including to timber harvesting activities (see Appendix J, Volume 3, Sensitive Watersheds on NFS Lands). Watersheds with a large amount of suitable timber lands can be compared to watersheds that are likely to be scheduled for harvesting to determine watershed sensitivity.

BLM_0030283

**Water Uses**

Development of water for human use has long been a common occurrence in southwestern Colorado. Limited irrigation occurred as far back as the Pueblo III period (between A.D. 1150 and A.D. 1300). Around Dolores, Mancos, Dove Creek, and Cortez, springs and seeps were developed in order to irrigate small terraces of usually less than 5 acres (Arrington 2006). Along with the earliest European settlements, diversion of water was a common occurrence and included irrigation and mining activities.

Today, there are approximately 1,500 water rights that divert water from streams and springs located within the planning area. A majority of these water rights are owned by non-Federal entities. The size of private water developments, and well as the related amount of water diverted, varies greatly. Small developments for individual families often use less than 15 gallons/minute, while larger irrigation or hydroelectric diversions can be 50 cfs or more. McPhee Reservoir, the largest on-channel reservoir within the planning area, has a total storage capacity of approximately 381,195 acre-feet (BOR 2006).

There are also hundreds of water impoundments located throughout the planning area. Water impoundments and water diversion projects have resulted in numerous direct and cumulative impacts to stream channels, floodplains, aquatic, and riparian area and wetlands ecosystems. Ditch failures and maintenance activities often introduce large quantities of sediment into waterways. Diverting water from streams into ditches can result in major alterations to stream-transport processes. This practice can also reduce or eliminate flow, which, in turn, can affect aquatic ecosystems and habitat. Dam regulation can change stream-flow timing and quantity, and disrupt sediment routing, which, in turn, can affect ecosystems and physical stream characteristics.

There are many examples of developments for water storage and diversion affecting water-dependent resources within the planning area. One example is the McPhee Reservoir. This project affects almost 100 miles of the Dolores River within the planning area. Since the construction of the reservoir, native and desired non-native fisheries have declined, and recreational boating has been curtailed. Riparian areas and wetland ecosystems, river channels, and floodplains have also been greatly modified. Several grassroots efforts have focused on possible solutions designed to improve conditions on the lower Dolores River.

The Blanco Tunnel diverts water from the Blanco River into an underground tunnel for delivery to New Mexico reservoirs. Approximately 8 miles of the Blanco River within the planning area below the Blanco Tunnel are impacted by the greatly reduced flows. Sedimentation problems exist, in part, due to these reduced-flow and diversion operations. Due to sediment-related water quality problems, this river is on the State of Colorado Monitoring and Evaluation List (CDPHE 2006a).

At times, Cascade Creek is completely dewatered below a diversion that has eliminated and/or greatly reduced flows. Loss of flow has impacted fisheries and aquatic ecosystems.

Although one large diversion or impoundment may result in large aquatic resource impacts, many small diversions may also cumulatively impact streams. Watersheds identified in Table 3.3.7 have the greatest number of diversions found within the planning area, and are, as a result, most likely to exhibit cumulative impacts from water-development activities.

BLM_0030284

**Table 3.3.7 – Watersheds with the Most Water Diversions**

| HUC 6 | HUC | NUMBER OF DIVERSIONS |
|---|---|---|
| 140801070205 | Upper Navajo Canyon | 39 |
| 140801070204 | Mancos River-Soda Canyon | 33 |
| 140801070203 | Morfield Canyon | 24 |
| 140801040101 | Animas River above Howardsville | 21 |
| 140801040102 | Cement Creek | 18 |
| 140801011404 | Vallecito Reservoir | 18 |
| 140801070302 | Navajo Wash-Cottonwood Wash | 16 |
| 140801040103 | Mineral Creek | 14 |
| 140801050102 | Mayday Valley | 13 |
| 140801040601 | Junction Creek | 12 |
| 140801040803 | Lemon Reservoir | 12 |
| 140300020408 | McPhee Reservoir - Dolores River | 12 |
| 140802020301 | Mud Creek-McElmo Creek | 12 |
| 140801010403 | Rio Blanco River - Blanco Basin | 12 |
| 140802020210 | Bridge Canyon - Yellow Jacket Canyon | 11 |
| 140801040502 | Elbert Creek | 11 |
| 140801010302 | Fourmile Creek | 11 |
| 140801010404 | Middle Rio Blanco | 11 |
| 140801020503 | Piedra River - Navajo Reservoir Inlet | 11 |
| 140802020102 | Stinking Springs Canyon | 11 |

This data shown above reflects ditches and pipelines with water rights diverted from streams. The demand for water development from public lands will continue to increase over time. Projections show that populations could increase by approximately 89% throughout the Dolores, San Juan, and San Miguel basins over the next 30 years (Colorado Water Conservation Board 2004). The current drought cycles being experienced throughout the Southwest will add to water development pressure. New water-storage projects are continually proposed on public lands. After the 2002 drought, the number of water rights filings within the planning area greatly increased. The drought also caused the State of Colorado to comprehensively study water-shortage issues up to the year 2030, and created a process to help solve predicted shortages. It is expected that some local solutions from the Statewide Basin Roundtable process would include new water development within the planning area.

BLM_0030285

During the creation of this DLMP/DEIS, desired future conditions for water dependent resources were developed. The emphasis would be placed on protecting aquatic ecosystems, and maintaining streams, floodplains, and watersheds that function well. Maintaining or restoring functioning watersheds and stream systems would ensure that water quality and habitat are protected, as required by Federal and State laws, regulations, and policies. However, demand for new water projects, as well as for proposals to change existing water facilities, may occur. For large water projects, it would be a challenge to provide for large increases in water use while, at the same time, minimizing potential adverse impacts to the environment.

**Table 3.3.8 – Largest Reservoirs on SJPL**

| RESERVOIR | WATER SOURCE | USE |
|---|---|---|
| Electra Lake | Cascade Elbert Creeks | Hydroelectric power generation; irrigation |
| Jackson Gulch Jackson Gulch Reservoir | Mancos River System | Irrigation and domestic use in Mancos Valley; hydroelectric |
| Lemon Reservoir | Florida River | Irrigation for Florida Mesa, La Plata County; hydroelectric |
| McPhee Reservoir | Dolores River | Irrigation and domestic in Cortez, Dove Creek, Ute Mountain Ute Tribe, and other irrigated lands; hydroelectric |
| Summit Lake | Lost Canyon | Irrigation for lands in Montezuma County |
| Vallecito Reservoir | Los Pinos River | Irrigation for Southern Ute Tribe and other irrigated lands; hydroelectric |
| Williams Creek Reservoir | Piedra River System | Wildlife, Colorado Division of Wildlife |

Sources: Southwestern Water Conservancy District; BOR; Colorado Division of Water Resources, Colorado Water Conservation Board

**Wells and other Groundwater Developments**
Previous resource management plans related to the planning area did not, for the most part, address groundwater resources. Over the last 5 years, proposals to develop large quantities of groundwater for consumptive use have been steadily increasing. It was recently recognized that the large volumes of groundwater produced during fluid-minerals extraction could impact aquifers as well as the connected surface-water features. A comprehensive groundwater policy has not yet been adopted for USFS-administered lands. For these reasons, direction for groundwater management was developed during the planning process for the DLMP/DEIS. There are approximately 437 water wells located within the planning area. Table 3.3.9 summarizes basic information about existing wells.

Over the past 30 years, 23,000 oil and gas production wells have been drilled in the San Juan Basin. In order to recover methane gas, many of these wells require pumping of groundwater from the Fruitland and Pictured Cliffs Formations. An estimated 25,000 barrels of water per day is produced from the San Juan Basin as a result of coalbed methane (CBM) development. To date, a typical CBM well in this basin has produced 250,000 barrels of water. Almost all of this water is disposed of through reinjection into deep aquifers of poor water quality (BLM and USFS 2006).

BLM_0030286

**Table 3.3.9 – Wells on SJPL**

| PRIMARY USE | USFS | BLM |
|---|---|---|
| Commercial | 25 | 2 |
| Municipal | 7 | 4 |
| Domestic | 211 | 44 |
| Livestock | 1 | 7 |
| Industrial | 2 | 4 |
| Geothermal | 3 | 0 |
| Monitoring | 17 | 47 |
| Recreation | 3 | 1 |
| Irrigation | 11 | 4 |
| Storage | 6 | 0 |
| Other | 26 | 12 |
| Total | 312 | 125 |

Data includes wells decreed and permitted by the State of Colorado (Colorado Division of Water Resources 2006)

According to a body of evidence drawn by researchers studying the issue of groundwater surface water interaction in the San Juan Basin, groundwater pumping from the Fruitland Formation has the potential to impact surface water quality. As the dewatering of the Fruitland Formation continues, there may be widespread reduction in water quantity to streams, springs, seeps, and riparian areas and wetland ecosystem.

Groundwater pumping also occurs in conjunction with $CO_2$ development in the Leadville Limestone on BLM-administered lands in the western portions of the planning area. Quantities of water vary from 1,000 to 2,166 barrels per day, and the water is of poor quality with high total dissolved solids and salt (Kinder Morgan 2005). Within the planning area, large-scale energy development would continue to result in changes within the Fruitland Formation aquifer. Pumping produced water would continue as existing wells, and a projected 11,000 new wells, are drilled within the San Juan Basin (including in New Mexico) over the next 10 years. At some point, the Fruitland Formation aquifer would be effectively dewatered. Some projections show that it would take several centuries to recharge this aquifer (Cox et al. 2001). Dewatering of this aquifer may cause some springs, seeps, streams, and wetlands located on the Fruitland Formation outcrop to run dry (BLM and USFS 2006).

**Mining and Mineral Development**

The mountains surrounding Silverton, Rico, Mancos, and La Plata City have historically been areas of intensive mining. Early placer and hydraulic mining resulted in impacts to  floodplains and water quality in the La Plata, Dolores, and Mancos Rivers. Hard-rock mine drainage and tailings have increased the natural geologic background of metals and acidity, and have further impacted the water quality of several rivers and aquifers in the Animas River (near Silverton), the La Plata River, the East Fork Mancos River, the Dolores River (near Rico), and the West Fork Dolores River (near Dunton).

BLM_0030287

Water-quality trends vary across the planning area. Some streams and rivers within the upper Animas River watershed were determined to be impaired by the State of Colorado due to heavy metals pollution. The SJPLC has an active abandoned mine and lands clean-up program. Current clean-up efforts have focused primarily on the upper Animas River watershed. Clean-up work in the upper Animas River, and other polluted watersheds, is anticipated to continue over the next 15 years.

Coalbed methane and CO2 extraction processes may impact groundwater resources, while the infrastructure necessary for fluid-minerals development and transport (e.g., roads, well pads, pipelines, and compressor stations) may result in large impacts to SJPLC-managed watersheds. Where well densities are high, the impacts of infrastructure may be more pronounced. Sedimentation and altered run-off patterns are perhaps the largest contributing factors to surface watershed degradation associated with this type of energy development (BLM and USFS 2006). Even with widespread mitigation, the cumulative impacts associated with building roads, pipelines, well pads, and other infrastructure have been large in some areas. For example, mitigation measures would be implemented in order to reduce sediment delivery to surface water sources; however, high road, pipeline, and well-pad densities may continue to cumulatively impact water resources.

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

### Impacts Related to Watershed, Riparian, and Aquatic Habitat Improvement Projects

As a result of the cumulative impacts of previous management activities, many watersheds located within the planning area exhibit poor conditions. Maintaining healthy stream-channel function would be a central focus under all of the alternatives, with the goal being that streams effectively transport discharge, sediment and periodic flooding; and provide aquatic and riparian habitat, as well as a broad spectrum of recreational opportunities. Under all of the alternatives, benefits to pollutant reduction on State 303(d) listed streams, saline soil watersheds, or watersheds identified as having the highest level of cumulative impacts or high sensitivity to management activities would be priorities for SJPLC watershed-restoration programs.

*DLMP/DEIS Alternatives*: Each of the DLMP/DEIS alternatives would propose annual watershed restoration projects (including erosion control, stream restoration, riparian/lake/fen treatments, road decommissioning, and/or fish habitat improvement). However, Alternatives C and D would propose the greatest number of treatments per year, and may, therefore, result in the greatest benefits overall.

### Impacts Related to Roads and Road Densities

Utilizing current direction or guidance for the management of roads may greatly reduce impacts to water-dependent resources. Direction can be found in the Water Conservation Practices Handbook (Rocky Mountain Region Forest Service 2006) and the Surface Operating Standards for Oil and Gas Development (USDOI 1989). Effective measures would include locating roads away from streams, riparian areas, steep slopes, landslide-hazard areas, and high erosion areas. Providing adequate drainage, enforcing seasonal road closures, preserving sediment-filtration buffers, and constructing perpendicular road crossings may also serve as effective mitigation measures.

BLM_0030288

Current standards and guidelines do not address limiting road densities in order to protect watersheds. Under all of the action alternatives, new guidelines would focus efforts on reducing road miles, as well as road densities in high priority areas. New guidelines would also suggest upper limits for road densities in MA 3s, 5s, and 7s (where most road-related issues are expected). New guidelines would emphasize road decommissioning for unauthorized roads, and would direct focus to watersheds sensitive to disturbance, watersheds with high existing road densities, and watersheds with salinity concerns. These guidelines may result in positive trends in some areas; however, progress is expected to be slow due to limited resources and to the large numbers of unauthorized roads that currently exist.

***DLMP/DEIS Alternatives***: All of the alternatives would propose some road decommissioning; however, Alternatives C and D would propose the greatest number of miles and may, therefore, have the greatest watershed benefit.

### Impacts Related to New Road Construction and Reconstruction

The amount of new road construction and reconstruction occurring within the planning area would vary primarily with the amount of timber harvesting and oil and gas development proposed under each alternative. The majority of the road-related potential impacts to watersheds would be associated with new oil and gas activities. Under all of the alternatives except the no lease alternative which would result in no new road construction , new oil and gas leasing may result in 70 miles of new road construction. If the reasonable foreseeable development (RFD) for oil and gas development is fully realized, many of the new oil and gas roads could be constructed in watersheds with high existing road densities, watersheds with salinity concerns, or within watersheds extremely sensitive to disturbance. With the exception of the upper Disappointment Valley watershed, all watersheds within the potential new lease areas are of concern. This is due to salinity issues, high road densities, and/or sensitivity to disturbance (Table 3.3.10). Specifically, the Dolores Canyon-Cabin Creek watershed has very high existing road densities (5.1 miles per square mile), and has been determined to be very sensitive to disturbance (USFS 2006b). This watershed is within a lease area that may require more road construction for oil and gas development, which could further intensify the potential for watershed degradation. Even with the implementation of guidelines and mitigation measures designed to reduce sediment, the construction of new roads may result in watershed impacts. Mitigation measures would reduce, but would not eliminate, sediment delivery. Roads interrupt and concentrate overland flow, contribute to erosion, and, m some areas, add to existing high road densities, which may add cumulative watershed impacts. Increased delivery of salt and sediment to the upper Colorado River, and increased impacts to streams and aquatic habitat may occur under all of the alternatives. However, the direct, indirect, and cumulative impacts of oil and gas development are speculative. This is because more precise impacts cannot be determined until the timing, location, and exact design of the projects are authorized.

***DLMP/DEIS Alternatives***: Plans for future timber harvesting may require new road construction and reconstruction. At this time, the size, timing, and/or location of future timber harvesting is not known; therefore, road impacts can only be discussed in a general sense. As a result of timber harvesting, Alternatives A and D may result in higher total road construction needs. These alternatives may also have the highest potential for watershed impacts because road construction associated with timber harvesting in forested watersheds is typically the largest source of sediment (Reid and Dunne 1984; Megahan and Kidd 1972).

Smaller amounts of new road construction may also be associated with recreation development, minerals development, Special Use Permits, and other activities. Although the amount of road construction necessary for these activities is unknown until projects are proposed, the impacts of these activities are not expected to vary by alternative.

BLM_0030289

**Impacts Related to Livestock Grazing**

Excessive or unrestricted grazing by permitted livestock and big game may result in widespread impacts on watershed health and water resources. On drier BLM-administered lands it is common for livestock to concentrate within valley/canyon floors, and in riparian areas. This results in water quality (including in riparian areas and wetland ecosystems) and rangeland degradation. Cattle favor the easy access to water and the better forage found in lower-elevation riparian areas. For the majority of USFS watersheds within the planning area, grazing over the last decade has had moderate to low direct and indirect impacts on watershed or stream health (USFS 2005a). Long-term chronic grazing problems that impact water resources occur in localized areas across the planning area. Areas commonly impacted by livestock grazing include mountain grasslands, riparian areas and wetland ecosystems, alpine vegetation, semi-desert grasslands, as well as places where livestock concentrate directly on or near water sources.

**Table 3.3.10 – Watersheds Potentially Affected by Oil and Gas Development as a Result of New Leasing Decisions**

| HUC 6 | WATERSHED | WATER-SHED ACRES | NUMBER (#) OF WELLS PER WATERSHED | MILES OF NEW ROAD | TOTAL ACRES OF DISTURBANCE* |
|---|---|---|---|---|---|
| 140300020406 | Upper Dolores River - Italian Creek | 13,217 | 2 | 1 | 8 |
| 140300020509 | Pine Arroyo | 10,944 | 29 | 14.5 | 116 |
| 140300020507 | Dawson Draw | 18,108 | 22 | 11 | 88 |
| 140300020604 | Dolores Canyon - Lake Canyon | 45,632 | 4 | 2 | 16 |
| 140300020404 | Stapleton Valley | 12,070 | 8 | 4 | 32 |
| 140300020504 | Ryman Creek | 15,937 | 5 | 2.5 | 20 |
| 140300020505 | Upper Disappointment Creek | 26,104 | 19 | 9.5 | 76 |
| 140300020602 | Narraguinnep Canyon Natural Area | 24,900 | 9 | 4.5 | 36 |
| 140300020603 | Dolores Canyon - Cabin Creek | 21,823 | 14 | 7 | 56 |
| 140300020601 | Dolores River - Salter Canyon | 14,672 | 26 | 13 | 104 |
| 140300020510 | Upper Disappointment Valley | 11,953 | 1 | 0.5 | 4 |
| 140300020306 | McPhee Reservoir - Beaver Creek Inlet | 11,686 | 1 | 0.5 | 4 |
| | TOTAL | 227,046 | 140 | 70 | 560 |

*Approximately 4 acres of disturbance per well, including new roads.

Watersheds with salinity concerns.

Watersheds with high existing road densities that are sensitive to disturbance.

No shading indicates watersheds sensitive to disturbance.
This is the reasonably foreseeable development (RFD) scenario.

BLM_0030290