**Table 3.15.10 – Unconstrained (Baseline) Projection of Yearly Averages of Wells, Well Access Road Miles, and Corresponding Acres Disturbed on BLM Lands in Northern San Juan Basin - 2009-2024**

| | Average number of wells, road miles,* and corresponding disturbance acres projected to be drilled per year on NFS lands 2009-2014 | Average number of wells, road miles,* and corresponding disturbance acres projected to be drilled per year on NFS lands 2014-2024 |
|---|---|---|
| Northern San Juan Basin – CBM | 62 wells • 7 miles • 145 acres disturbed | 35 wells • 17 miles • 120 acres disturbed |
| Northern San Juan Basin – Conventional | 1 well • 0 miles • 0 acres disturbed | 1 well • 0 miles • 0 acres disturbed |
| San Juan Sag | 0 wells • 0 miles • 0 acres disturbed | 0 wells • 0 miles • 0 acres disturbed |
| Paradox Basin | 12 wells • 4 miles • 40 acres disturbed | 12 wells, 4 miles • 40 acres disturbed |
| *TOTAL* | 75 wells • 11 miles • 185 acres disturbed | 48 wells • 21 miles • 160 acres disturbed |

\* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road right-of-ways, so road disturbance acres include pipeline disturbance.


Assumptions for surface (land and water) disturbance:

Average pad disturbance per unsuccessful exploration well = 1.5
Average road disturbance per unsuccessful exploration well = 2.4
Average pad disturbance per producing well = 1.0 Ac.
(Average accounts for post-drilling interim reclamation and accommodates all on-lease facilities.)
Average road disturbance per producing well = 2.4 Ac.

TOTAL SURFACE DISTURBANCE PER WELL = 3.9 Ac. (unsuccessful well, otherwise 3.4 acres per producing well after partial reclamation.

Assumptions for air disturbance:
See air quality section of this chapter.

BLM_0030515

**DISCRETIONARY VERSUS NON-DISCRETIONARY DEVELOPMENT**

Non-discretionary development for the purpose of this environmental consequences analysis is defined as development that would take place on currently leased lands over the next 10 years (Tables 3.15.7 and 3.15.9). These lands are held by production, meaning that current energy development on the leases holds the leases as active until production ceases.  Consequently, these lands will not be available for re-leasing until current production ceases and the leases expire. The majority of projected development (the RFD scenario) will occur on these existing leases and is considered non-discretionary. The leasing decisions rendered for this LRMP/ RMP revision effort will not impact the development's implementation. The areas where projected development would occur on existing leases are: the Northern San Juan Basin (385 federal wells and 350 state and private wells) and portions of the Paradox Basin (325 new federal wells and 50 private wells).

Discretionary development for the purpose of this environmental consequences analysis is defined as development that would be directly impacted by the leasing decisions made for this LRMP/RMP revision effort. Areas where the leasing decisions would directly impact the RFDS are on the National Forest portion of the Paradox Basin (140 new wells projected) and in the National Forest portion of the San Juan Sag (30 new wells projected).  Thus the projected level of discretionary development (development that depends on the leasing analysis) may total 170 new wells. The non-discretionary portion of the RFD scenario may, in contrast total 1,015 new wells.

For the purpose of cumulative effects analysis, all wells projected in the RFD scenario are analyzed whether or not they represent discretionary or non-discretionary development. This total level of projected development is also analyzed in relation to current development to evaluate cumulative energy development effects within the cumulative effects area. In contrast, the discretionary level of development by definition is treated as a direct consequence of the leasing decisions associated with each alternative and is treated as such in this environmental consequences section.

## IMPACTS OF THE ALTERNATIVES ON LEASING AND OIL AND GAS DEVELOPMENT OPPORTUNITIES

The San Juan National Forest and BLM San Juan Field Office propose to make certain portions of the federal mineral estate within the planning area available for fluid mineral leasing. The proposed action (and preferred alternative) is to make 1,307,000 acres of National Forest and 704,700 acres of BLM public lands available for leasing, respectively.  Of that land area, 980,100 acres would be subject to a No Surface Occupancy stipulation, 351,900 acres to a Controlled Surface Use stipulation, 333,900 to timing limitations, and the remainder subject to standard lease terms. There is leasing interest in portions of the available lease areas and we project that development of federal mineral estate may take place in those areas if leased. For the purpose of oil and gas leasing analysis, there are four alternatives to the Proposed Action/Preferred Alternative (Alternative B).  These alternatives, including the No Lease Alternative, are described below.

BLM_0030516

**ALTERNATIVES CONSIDERED**

**Alternative A**

Alternative A represents the continuation of current leasing decisions. Much of this direction is contained in the BLM's San Juan/San Miguel Resource Management Plan (1985) and the San Juan National Forest Land and Resource Management Plan (1983), both as amended. Applicable lease stipulations used to condition leases based on resource protection objectives are presented in EIS Volume 3, Appendix H. Existing leasing direction as represented by Alternative A (lands available for lease and applicable lease stipulations) are described in Tables 3-15.11 and 3-15-12.  A total of 2,089,000 acres are available for lease of which 115,000 acres are stipulated with timing limitations, 280,000acres stipulated with controlled surface use, 40,700 acres stipulated with No Surface Occupancy, and 1,653,000 acres stipulated with standard lease terms.  There are some areas which may have both timing limitation and controlled surface use stipulations applied.

**Alternative B – Preferred Alternative**

Alternative B is the BLM and Forest Service Preferred Alternative. A total of 2,003,000 acres would be available for lease of which 115,305 would be stipulated with timing limitations, 282,900 stipulated with controlled surface use, 980,000 acres stipulated with No Surface Occupancy, and 1292,000 acres stipulated with standard lease terms.

Most large areas (greater than 5,000 acres) that are currently unroaded, would remain so. Leases within roadless areas would be issued with No Surface Occupancy stipulations. Other areas of the planning area would be stipulated as required to protect various resource values.

Leasing recommendations associated with Alternative B are described in Tables 3-15-11 and 3-15-12.

**Alternative C**

A total of 1,490,000 acres are available for lease of which 589,000 would be stipulated with timing limitations, 305,000 stipulated with controlled surface use, 518,000 acres stipulated with No Surface Occupancy, and 260,000 acres stipulated with standard lease terms.  Management provisions under this alternative would emphasize the undeveloped character of large blocks of contiguous land and non-motorized recreational activities to a greater degree than the other alternatives. The large contiguous blocks of roadless areas would be managed with No Surface Occupancy stipulations. Other areas of the planning area would be stipulated as required to protect various resource values. Leasing recommendations associated with Alternative C are described in Tables 3-15-11 and 3-15-12.

**Alternative D**

A total of 2,067,000 acres are available for lease of which 336,000, would be stipulated with timing limitations, 352,000 acres stipulated with controlled surface use, 1,044,000 acres stipulated with No Surface Occupancy, and 309,000 acres stipulated with standard lease terms. In this alternative, lease stipulations to protect sensitive resources would tend to be implemented in specific geographic areas rather than across the planning area. Leasing recommendations associated with Alternative D are described in Tables 3.15.11 and 3.15.12.

BLM_0030517

**No Lease Alternative**

The No Lease Alternative represents no new leasing on National Forest and on BLM public lands. This alternative is required of the Forest Service by 36 CFR 228.102. Operationally, on either jurisdiction, no lands would be administratively available for leasing during the life of the LRMP/RMP (approximately 10-15 years); either currently unleased lands or leased lands when existing leases expire (Tables 3.15.11 and 3.15.12). As a result, part of the reasonably foreseeable development scenario would not be implemented. Of the 1,185 wells projected in the RFD, 170 wells would be affected and not drilled because leases would not be issued in currently unleased areas of projected development. All other development projected in the RFD would occur on existing leases unaffected by this leasing analysis. Only when the existing leases expire would the leasing decisions made in the LRMP/RMP revisions apply. A total of 2,089,000 acres of national forest, BLM public lands and federal subsurface would not be available for lease.

**Leasing Availability Decisions**

Standard lease terms are incorporated into every lease and require compliance with laws and regulations to ensure protection of other energy, mineral, and surface resources, such as soil, water, vegetation, cultural, and threatened and endangered species. In addition to standard lease terms, supplemental lease stipulations may be necessary if the authority to control the activity on the lease does not already exist under laws, regulations, or orders. It is important to recognize that the authorized officer has the authority to modify the location and design of facilities and control the rate of development and timing of activities, as well as require other mitigation under Sections 2 and 6 of the standard lease terms (BLM Form 3100-11 and 43 CFR 3101.1-23). Using the Uniform Format for Oil and Gas Leasing Stipulations, March 1989, stipulations have been developed for the following categories: 1) No Surface Occupancy (NSO); 2) Timing Limitations (TL) or seasonal restrictions; and 3) Controlled Surface Use (CSU). These stipulations are presented in detail in Volume 3, Appendix H.

BLM_0030518

**Table 3.15.11 - Acres Available for Leasing and Acres Not Authorized by Alternative**

| PLANNING UNIT | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest** | | | | | |
| Acres Withdrawn from Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 67,726 | 532,957 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 7,578 | 20,371 | 40,077 | 20,371 | 1,392,474 |
| Acres Available for Leasing | 1,384,896 | 1,307,377 | 819,440 | 1,372,103 | 0 |

| PLANNING UNIT | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM Public Lands** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 55,428 | 64,956 | 78,044 | 64,956 | 503,729 |
| Acres Available for Leasing | 448,301 | 439,303 | 425,685 | 439,303 | 0 |

| PLANNING UNIT | Alternative A (No Action) | Alternative B (Preferred) | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Unavailable for Leasing | 8,423 | 7,911 | 13,788 | 7,911 | 264,396 |
| Acres Available for Leasing | 255,973 | 256,455 | 250,578 | 256,456 | 0 |
| **TOTAL** | **2,642,033** | **2,642,053** | **2,642,053** | **2,642,053** | ***0*** |

BLM_0030519

The acreage of public lands available for leasing is greatest in Alternatives A and D and least in Alternatives B and C as a reflection of the goals of the two alternatives (Table 3.15.11). Differences between Alternative C the other alternative is in the amount of area recommended for wilderness – Alternative A has 533,000 acres recommended wilderness as contrasted to the other alternatives which have no more than 68,000 acres of recommended wilderness. The No Lease Alternative would have no acreage available for leasing consistent with its goals as described above.

## GENERAL PURPOSE AND EFFECT OF LEASE TERMS

Oil and gas leases grant the lessee the right to extract the oil and gas resource on leased U.S. Bureau of Land Management (BLM) and National Forest lands within the SJPL. BLM is the agency that issues leases for both BLM and National Forest lands. Section 6 of the BLM standard lease form contains terms which require the lessee to conduct operations in a manner that minimizes adverse environmental impacts, and to take reasonable measures deemed necessary by the BLM (and FS, when National Forest lands are leased) to accomplish this intent. In addition to the standard lease terms, there are two further processes to assure this accomplishment: special lease stipulations, and conditions of approval. Special lease stipulations are applied at the lease issuance stage and are identified in this plan. Conditions of approval are imposed during the oil and gas permitting process, consistent with lease rights previously granted, and are not included in this plan.

### Standard lease terms
All SJPL oil and gas leases are subject to standard lease terms. These are the least-restrictive terms under which an oil and gas lessee may operate. They meet Energy Policy Act direction to encourage development of federal energy resources. They require operators of oil and gas leases to minimize adverse impacts to air, water, land, visual, cultural, and biological resources and to other land uses and users, and to comply with all applicable laws, regulations and formal orders of the agency managing the leased lands. With the exceptions noted below, leases with standard lease terms allow year-round occupancy and use of leased lands. These leases provide full access and the highest potential for discovery and development of oil and gas resources. They also contain the greatest uncertainty for lease operators because some potentially restrictive conditions may not be known until a site-specific field review of the leased lands is conducted. This generally does not occur until an application for a permit to drill is submitted. Lease notices may be included to warn a potential lessee of the likelihood of such conditions, but the extent and restrictive nature of the conditions is still not known at the lease-issuance stage. Operations may be prohibited on the affected parts of the lease, or costs may substantially increase due to protective measures required to protect the resource.

Standard lease terms (regulations at 43 CFR 3101.1-2) allow the SJPL (acting through the BLM or Forest Service) to mitigate potential resource effects by moving the proposed drill site up to 200 meters, or delaying proposed operations by up to 60 days. If these provisions will not accomplish the required resource protection, special lease stipulations are necessary.

### Special lease stipulations
Special lease stipulations are applied to an oil and gas lease if additional restrictions on the rights of lessees are required to protect environmental resources. Stipulations that would be applied to new oil and gas leases under the plan and their purpose and justification are described in Volume 3, Appendix H.

BLM_0030520

Guidelines for application of special lease stipulations for BLM and Forest Service lands are contained in the Uniform Format for Oil and Gas Leasing Stipulations (Rocky Mountain Regional Coordinating Committee, March 1989). In this leasing availability analysis, special lease stipulations for oil and gas operations are identified for the public lands, and the areas to which they will be applied are mapped. Stipulations will be applied to individual leases when they are offered for sale based on this analysis and the resulting oil and gas leasing availability decision. Three categories of stipulations are used for oil and gas leases on federal lands: No Surface Occupancy (NSO), Controlled Surface Use (CSU), and Timing Limitations (TL).

Restrictions on uses represented by lease stipulations and criteria for granting exceptions, modification, or waivers as addressed in this analysis and presented in the plan, also apply to other land uses and management actions. Restrictions on uses or management activities other than oil and gas would be imposed at the time of issuance of a specific permit or other type of authorization.

The stipulations and associated bases for granting exceptions, modifications, or waivers identified in the plan apply to all land uses and management actions for which the BLM has approval responsibility, not only to fluid minerals (oil and gas) development. Restrictions on these other land uses or management activities would be imposed at the time of issuance of a specific permit or other approval.

It is important to note that the following stipulations apply only to new leases (issued after adoption of the SJPL revised plan). Existing leases are subject to the stipulations attached to them under the current Resource Management Plan (BLM, 1992) or Land Management Plan (FS, 1983).

### No Surface Occupancy (NSO)

Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is prohibited to protect identified resource values. However, oil and gas under lands affected by NSO stipulation are legally available for extraction if extraction can be accomplished without occupying the surface (such as through directional drilling or draining the deposit from adjacent lands). Technological limitations and higher cost will affect the recovery of these resources, but they are available. NSO stipulations and their purpose and justification are presented in Volume 3, Appendix H. The effects of NSO leases on leasing opportunities and projected development on the San Juan Public Lands are presented below.

The NSO stipulation is intended for application only where the SJPLC determines that the standard lease terms are insufficient to provide the level of resource protection necessary to protect the public interest. An NSO stipulation is not needed if the desired level of protection can be accomplished by relocating a proposed facility or activity within the lease area or by avoiding that activity for a specified period.

### Controlled Surface Use (CSU)

Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is allowed (unless restricted by a timing limitation (TL) stipulation), but identified resource values require special operational constraints that may modify lease rights. A CSU stipulation allows the SJPLC to require that a proposed facility or activity be relocated by more than 200 meters from the proposed location if necessary to achieve the desired level of protection. CSU provides operating guidance, but does not substitute for NSO or TL stipulations. CSU allows year-round occupancy and accessibility to leased lands while providing mitigation of effects on other resources.

BLM_0030521

The CSU stipulation is intended for application where the SJPLC determines the standard lease terms are insufficient to protect the public interest, but where an NSO is deemed overly restrictive. A CSU is not needed if relocating the proposed facility or activity by up to 200 meters would provide sufficient resource protection. CSU stipulations applied to the SJPL plan alternatives and their purpose and justification are presented in Volume 3, Appendix H.

The equivalent of a CSU for BLM land uses and activities other than oil and gas development is an SSR (site-specific relocation).

**Timing Limitation (TL)**
Use or occupancy of the land surface for fluid mineral (oil and gas) exploration or development is prohibited during a specified period of the year. The scope of the TL stipulation goes beyond ground-disturbing activities to encompass any source of protracted or high-intensity disturbance that could interfere with normal wildlife behavior and adversely affect habitat use. The limitation is applied annually for a specified period lasting more than 60 days. The TL stipulation does not apply to the operation and maintenance of production facilities unless the analysis demonstrates the continued need for such mitigation and that less-stringent project-specific mitigation measures (such as conditions of approval) would not be sufficient. The TL allows the SJPLC to restrict exploration operations on leased lands for more than 60 days. The TL stipulation provides for partial accessibility for a portion of the year and maintains the potential for extraction of oil and gas, but may increase costs due to timing constraints (such as a short operating season).

A TL stipulation is intended for application where the SJPLC deems that standard lease terms are insufficient to protect the public interest, but where an NSO is overly restrictive. A TL is not needed if restricting the proposed operations by up to 60 days would provide sufficient resource protection. TL stipulations applied to the SJPL plan alternatives and their purpose and justification are presented in Volume 3, Appendix H.

A TL requirement may also be applied to BLM land uses and activities other than oil and gas development.

**Exception, modification and waiver of stipulations**
SJPL policies allow for the granting of exceptions, modifications, and waivers to stipulations on oil and gas leases, as laid out in Chapter IV, Section C.3, of BLM Handbook H 1624-1 (Planning for Fluid Mineral Resources) and Forest Service regulations at 36 CFR 228.104. That BLM handbook and Forest Service regulations provide the following definitions:

- *Waivers* - the mitigation measure is permanently removed from the lease. An example is removal of an NSO stipulation to protect a raptor nest in a tree when the tree falls over and can no longer be used as a nest site.

- *Modifications* - the mitigation measure is permanently changed on the lease. An example could be the change in the timing limitation period for the elk on critical winter range, based on new information.

BLM_0030522

- ***Exceptions*** - the mitigation measure is removed on a case-by-case basis An example is removing a timing limitation to protect big-game winter range due to warm weather allowing the elk to leave the winter range earlier than expected in the spring.

  Thus, an exception suspends the restrictions of a stipulation for a specified period of time, activity, or portion of the area where applied but remains in effect relative to other periods of time, activities, or areas where applied. A modification consists of a temporary or permanent change to a stipulation, such as a change in the areas, activities, or periods of time where applied, but does not eliminate the stipulation. A waiver permanently eliminates the restrictions of a stipulation, including all areas, activities, or periods of time to which applied.

  Section C.3 of Chapter IV of BLM Handbook H-1624-1 describes the administrative review procedures for granting a waiver, exception, or modification on BLM public lands. Regulations promulgated in 36 CFR 228.104 describe Forest Service procedures for review and granting of waiver, exception, or modification on national forest lands. After review of an operators request the authorized Forest officer may authorize the BLM to modify, waive, or grant an exception to a stipulation.

**Lease Notice (LN)**

In addition to standard lease terms and special lease stipulations, the SJPLC may attach a lease notice to the lease. The LN provides more detailed information concerning limitations that already exist in law, lease terms, regulation or operational orders. LN also addresses special items the lessee should consider when planning operations, but does not impose new or additional restrictions beyond those already in the standard lease terms or special lease stipulations.

**Notice to Lessees (NTL)**

NTL is not attached to a specific oil and gas lease. It is a written notice issued by the authorized officer, implementing regulations and operating orders and serving as instructions on specific items of importance within a specified area. The NTL does not impose new or additional restrictions on existing leases but may result in new restrictions on future leases.

## ACRES STIPULATED BY ALTERNATIVE

The following table displays acres of land that are withdrawn, deferred or would be made not available for leasing. For those areas available for leasing, the following leasing stipulations would apply by alternative. The total acres include the entire federal mineral estate, whether not the federal government owns the surface. See the oil and gas alternative maps for spatial application of the leasing stipulations.

BLM_0030523

**Table 3.15.12 Acres Stipulated by Alternative**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | | | | | |
| Federal Mineral Acres | 1,873,427 | 1,873,427 | 1,873,427 | 1,873,427 | 1,873,427 |
| Acres Withdrawn from Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 67,726 | 532,957 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 20,371 | 20,371 | 20,371 | 1,392,474 |
| Acres Available for Leasing | 1,392,474 | 1,304,377 | 839,146 | 1,372,103 | 0 |
| No Surface Occupancy | 1,705 | 741,524 | 278,232 | 810,994 | 0 |
| Controlled Surface Use | 169,485 | 248,636 | 265,420 | 235,850 | 0 |
| Controlled Surface Use/Timing Limitations | 559 | 77,176 | 73,089 | 69,843 | 0 |
| Timing Limitation | 1,390 | 69,935 | 67,826 | 71,693 | 0 |
| Standard Lease Terms | 1,219,355 | 167,106 | 154,579 | 183,723 | 0 |

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM Public Lands** | | | | | |
| Federal Mineral Acres | 504,259 | 504,259 | 504,259 | 504,259 | 504,259 |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 55,428 | 64,956 | 78,044 | 64,956 | 504,259 |
| Acres Available for Leasing | 448,831 | 439,303 | 425,658 | 439,303 | 0 |
| No Surface Occupancy | 35,846 | 166,119 | 170,923 | 161,280 | 0 |
| Controlled Surface Use | 135,765 | 31,438 | 31,407 | 33,123 | 0 |
| Controlled Surface Use/Timing Limitations | 45,295 | 10,437 | 10,308 | 13,040 | 0 |
| Timing Limitation | 71,748 | 197,686 | 179,438 | 198,208 | 0 |
| Standard Lease Terms | 160,177 | 33,623 | 33,609 | 33,652 | 0 |

BLM_0030524

**Table 3.15.12 Acres Stipulated by Alternative, continued**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface** | | | | | |
| Federal Mineral Acres | 264,366 | 264,366 | 264,366 | 264,366 | 264,366 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 8,423 | 7,911 | 13,788 | 7,911 | 264,366 |
| Acres Available for Leasing | 255,973 | 256,455 | 250,578 | 256,456 | 0 |
| No Surface Occupancy | 3,190 | 72,459 | 68,490 | 71,725 | 0 |
| Controlled Surface Use | 65,257 | 23,848 | 23,746 | 23,824 | |
| Controlled Surface Use/Timing Limitations | 12,346 | 2,325 | 2,213 | 2,791 | 0 |
| Timing Limitation | 42,167 | 66,333 | 64,745 | 66,574 | 0 |
| Standard Lease Terms | 133,013 | 91,490 | 91,384 | 91,542 | 0 |
| **TOTAL** | **2,642,033** | **2,642,053** | **2,642,053** | **2,642,053** | 0 |

LRMP/RMP Alternatives A and D emphasize more area available for leasing and development with less restrictions or area allocated to recommended wilderness as compared to Alternatives B and C. Alternatives B and C use more restrictions that result in no-surface-occupancy stipulations because of the alternatives' primary emphasis on maintaining most of the large, contiguous blocks of undeveloped lands with NSO stipulations or as wilderness recommendations not available for lease. After analyzing the effects of development on surface resources, including consideration of environmentally sound drilling technology, reclamation, and effects of prohibiting surface occupancy, the Forest Service or BLM may determine that the impacts are unacceptable for some areas. These areas may be closed to leasing at the discretion of the Forest Service or BLM. The No Lease Alternative, which is analyzed by Forest Service regulation (see above), has no areas administratively available for leasing over the period of this Plan.

BLM_0030525

## EFFECT OF MANAGEMENT AREAS AND RESOURCE PROTECTION MEASURES ON OIL AND GAS LEASING

Effects from various aspects of the revised management plans and associated leasing decisions are discussed in the following sections. This section outlines the methods used to determine the magnitude of the effects. The management areas and guidelines in the revised management plans were converted into stipulations that would be applied to new leases. Locations of the various resources where the stipulations would apply were mapped. Because the stipulations developed for the EIS represent the best management practices, a consistent set of stipulations was used in Alternatives A through D where specific resource and wildlife conditions occurred (e.g., steep slopes, special threatened or endangered habitat condition, etc). Alternatives A through D vary by areas allocated to various management areas and their applicable lease terms (Table 3.15.12). The No-lease alternative by objective does not contain stipulations since no leasing would take place on either National Forest and BLM administered lands.

The reasonably foreseeable development (RFD) scenario, which projects the number of wells over the next 10-15 years, was developed for areas where leasing decisions will be made. The RFD scenario projects a number of wells that may be drilled (assuming the geologic and economic assumptions come true) if there were no BLM or Forest Service limitations on drilling. The RFD scenario projections assume compliance with all other federal and state laws and regulations (e.g., Clean Air Act, Clean Water Act, state spacing regulations, etc.).

The magnitude of the effects of leasing decisions on the ability to carry out the RFD scenario is determined using a proportionate impact method. For both the Forest Service and BLM units, the number of acres of RFD area, by basin, was calculated with a constraint, either by stipulation or management area direction, put on oil and gas leasing. Based on the amount of constrained acres, the proportionate number of wells to be eliminated or affected was determined for selected portions of the RFD scenario area. The only areas where leasing decisions incorporated in this plans Record of Decision will affect the RFD's implementation are the National Forest portion of the Paradox Basin which is substantially unleased and the San Juan Sag, which is also substantially unleased. Leasing decisions made in both of these areas would directly affect the implementation of the RFD scenario. In contrast, a large portion of the RFD scenario would be carried out on existing leases in the San Juan and Paradox basins.  Leasing decisions made for the LRMP and RMP revisions would therefore not affect the implementation of that portion of the RFD scenario.

Decisions to make lands not administratively available for leasing precludes the exploration and the potential discovery of oil and gas resources and can make subsurface federal mineral estates unrecoverable. If drilling and production occurs on adjacent private lands, drainage of federal reserves may occur, resulting in lost federal revenues and associated reduced returns to counties and states. The opportunity to explore and produce on adjacent leased lands may also be affected by precluding exploration and production from reservoirs under unavailable lands. Designating lands as "not administratively available" in areas where a NSO stipulation could provide the same protection may be more restrictive than necessary.

BLM_0030526

**Figure 3.15.6 – Oil and Gas Leasing Stipulations Alternative A**

BLM_0030527



San Juan Public Lands
Oil and Gas Leasing Stipulations
Alternative A

**Legend**

**Revised Oil and Gas Stipulations**
- Withdrawn from Leasing
- Administratively Not Available for Leasing
- No Surface Occupancy
- Controlled Surface Use
- Controlled Surface Use and Timing Limitations
- Timing Limitations
- Standard Stipulations
- Restrictions 1983
- USFS/BLM - Ranger Districts / Field Office Boundary
- forest_bdy
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available. Geospatial data accuracy varies by theme on the map. Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial inputs without notification.

JET
NAD 83, Polyconic Projection
November 8, 2007

Miles
0  5  10    20

**Figure 3.15.7 - Oil and Gas Leasing Stipulations Alternative B**



Case No. 1:20-cv-02484-MSK    Document 35-8    filed 04/27/21    USDC Colorado    pg 15 of 87

**Figure 3.15.8 – Oil and Gas Leasing Stipulations Alternative C**



**Figure 3.15.9 - Oil and Gas Leasing Stipulations Alternative D**



Table 3.15.12 (above) displays acres of land that would be made not available, and available for leasing. The total acres include the entire federal mineral estate whether or not the federal government owns the surface. See the oil and gas alternative maps for spatial application of the leasing stipulations.

The following table summarizes the management areas applied to each alternative and the stipulations applied to each management area. Management Area 1 and Management Area 5 are the predominant emphases applied to management of the National Forest and BLM Public lands, followed by Management Area 3. Management Areas 1 and 3 are also the most restrictive, requiring no lease or the NSO stipulation in most instances. Management Area 5 areas are the areas within which much of the RFD scenario activity would be located. Also most of the RFD scenario would occur on existing leases unaffected by the leasing-availability decisions made for the LRMP/RMP revisions. Areas where the RFD scenario would be affected by the leasing decisions, the San Juan Sag and National Forest portion of the Paradox Basin, would be allocated to Management Area 5 under most alternatives. Management Area 5 areas in addition to standard lease terms may contain CSU and TL and terms.

BLM_0030531

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 1** | | | | | |
| Acres Withdrawn from Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 56,953 | 528,010 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 45 | 116 | 0 |
| NSO | 0 | 58,089 | 5,180 | 16,376 | 0 |
| CSU | 533 | 0 | 0 | 0 | 0 |
| CSU/TL | 9 | 0 | 0 | 0 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 2,456 | 0 | 0 | 0 | 0 |
| **TOTAL** | 483,942 | 595,995 | 1,014,188 | 497,445 | 480,953 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 2** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 5,601 | 22,130 | 22,090 | 7,150 | 7,519 |
| NSO | 1 | 64,581 | 58,099 | 50,517 | 0 |
| TL | 3 | 918 | 918 | 918 | 0 |
| CSU | 10 | 4,386 | 6,662 | 4,291 | 0 |
| CSU/TL | 4 | 512 | 2,127 | 509 | 0 |
| Std. L only | 1,899 | 3,422 | 3,710 | 3,422 | 0 |
| **TOTAL** | 7,519 | 95,950 | 93,609 | 66,807 | 7,519 |

BLM_0030532

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 3** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 17,585 | 3,924 | 3,912 | 12,483 | 637,770 |
| NSO | 489 | 477,201 | 127,728 | 544,709 | 0 |
| TL | 1,100 | 41,623 | 44,711 | 40,195 | 0 |
| CSU/TL | 539 | 13,548 | 6,821 | 6,200 | 0 |
| CSU | 119,193 | 33,172 | 24,887 | 23,156 | 0 |
| Std. L only | 498,863 | 21,681 | 32,596 | 21,807 | 0 |
| **TOTAL** | 637,770 | 591,149 | 240,656 | 648,551 | 637,770 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 4** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 1,504 | 48 | 48 | 5,544 | 150,922 |
| NSO | 6 | 75,264 | 50,385 | 76,408 | 0 |
| TL | 6.81 | 0 | 0 | 0 | 0 |
| CSU | 41,538 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 107,866 | 0 | 0 | 0 | 0 |
| **TOTAL** | 150,922 | 75,312 | 50,433 | 81,952 | 150,922 |

BLM_0030533

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 5** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 304 | 132 | 73 | 579,258 |
| NSO | 1,209 | 49,824 | 47,543 | 104,452 | 0 |
| TL | 279 | 25,222 | 20,028 | 28,404 | 0 |
| CSU | 7,686 | 190,330 | 213,693 | 187,641 | 0 |
| CSU/TL | 7 | 50,131 | 52,657 | 50,007 | 0 |
| Std. L only | 570,076 | 139,249 | 95,812 | 140,485 | 0 |
| **TOTAL** | 579,258 | 455,061 | 429,866 | 511,061 | 579,258 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 7** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 1,189 | 1,144 | 1,189 | 0 |
| NSO | 0 | 10,913 | 4,166 | 10,771 | 0 |
| TL | 0 | 2,170 | 2,167 | 2,175 | 0 |
| CSU | 0 | 20,747 | 20,176 | 20,761 | 0 |
| CSU/TL | 0 | 12,985 | 11,483 | 13,128 | 0 |
| Std. L only | 0 | 2,755 | 2,755 | 2,755 | 0 |
| **TOTAL** | 0 | 50,761 | 41,892 | 50,780 | 0 |

BLM_0030534

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **San Juan National Forest - MA 8** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 594 | 594 | 1,440 | 14,520 |
| NSO | 0 | 8,599 | 2,185 | 15,388 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| CSU | 1,050 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 13,470 | 0 | 0 | 0 | 0 |
| **TOTAL** | 14,520 | 9,194 | 2,780 | 16,828 | 14,520 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 1** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 55,428 | 55,302 | 55,302 | 55,302 | 55,428 |
| NSO | 0 | 1,271 | 11,781 | 1,271 | 0 |
| CSU | 0 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 55,428 | 56,574 | 67,083 | 56,574 | 55,428 |

BLM_0030535

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 2** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 876 | 876 | 876 | 93,368 |
| NSO | 25805 | 77,303 | 79,806 | 63,855 | 0 |
| TL | 6,089 | 11,762 | 13,708 | 11,762 | 0 |
| CSU | 5,371 | 3351 | 4,899 | 3,351 | 0 |
| CSU/TL | 6,949 | 3,900 | 3,906 | 3,900 | 0 |
| Std. L only | 49,152 | 175 | 1,562 | 175 | 0 |
| **TOTAL** | 93,368 | 97,367 | 104,758 | 83,919 | 93,368 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 3** | | | | | |
| Acres Withdrawn from Leasing | | | | | |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 150 | 3,168 | 150 | 258,564 |
| NSO | 9,030 | 53,218 | 46,918 | 35,369 | 0 |
| TL | 42,350 | 147,833 | 139,983 | 86,230 | 0 |
| CSU/TL | 29,903 | 1,805 | 1,678 | 927 | 0 |
| CSU | 100,648 | 19,885 | 19,916 | 14,410 | 0 |
| Std. L only | 76,633 | 13,137 | 24,338 | 7,596 | 0 |
| **TOTAL** | 258,564 | 236029 | 236,002 | 144,682 | 258,564 |

BLM_0030536

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 4** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 0 | 0 | 38 |
| NSO | 38 | 5,868 | 5,868 | 5,868 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| CSU | 0 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 38 | 5,868 | 5,868 | 5,868 | 38 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 5** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 1,685 | 14,557 | 1,685 | 96,840 |
| NSO | 972 | 25,294 | 17,836 | 44,338 | 0 |
| TL | 23,309 | 27,960 | 19,856 | 91,755 | 0 |
| CSU | 29,745 | 3,523 | 1,913 | 9,083 | 0 |
| CSU/TL | 8,442 | 75 | 65 | 3,556 | 0 |
| Std. L only | 34,372 | 16,515 | 3,911 | 22,056 | 0 |
| **TOTAL** | 96,840 | 75,052 | 58,138 | 172,473 | 96,840 |

BLM_0030537

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 7** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 429 | 429 | 429 | 0 |
| NSO | 0 | 8,470 | 7,510 | 9,374 | 0 |
| TL | 0 | 10,115 | 10,116 | 14,957 | 0 |
| CSU | 0 | 4,678 | 4,678 | 6,278 | 0 |
| CSU/TL | 0 | 4,657 | 4,657 | 4,657 | 0 |
| Std. L only | 0 | 3,816 | 3,816 | 3,844 | 0 |
| **TOTAL** | 0 | 32,166 | 31,207 | 39,540 | 0 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM - MA 8** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 1,200 | 1,200 | 1,200 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| CSU | 0 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 0 | 1,200 | 1,200 | 1,200 | 0 |

BLM_0030538

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 1** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 2,416 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 0 | 0 | 231 |
| NSO | 1 | 2,893 | 518 | 712 | 0 |
| CSU | 98 | 0 | 0 | 0 | 0 |
| CSU/TL | 39 | 0 | 0 | 0 | 0 |
| TL | 4 | 0 | 0 | 0 | 0 |
| Std. L only | 95 | 0 | 0 | 0 | 0 |
| **TOTAL** | 231 | 2,893 | 2,934 | 712 | 231 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 2** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 135 | 135 | 1,376 | 1,376 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| TL | 738 | 555 | 631 | 555 | 555 |
| CSU | 220 | 170 | 178 | 170 | 170 |
| CSU/TL | 214 | 2 | 47 | 2 | 2 |
| Std. L only | 1,171 | 79 | 227 | 79 | 79 |
| **TOTAL** | 2,380 | 941 | 1,218 | 2,182 | 2,182 |

BLM_0030539

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 3** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 2,038 | 3,657 | 2,079 | 227,293 |
| NSO | 3,060 | 48,071 | 45,824 | 39,245 | 0 |
| TL | 24,513 | 42,277 | 40,724 | 36,130 | 0 |
| CSU/TL | 8,596 | 882 | 725 | 730 | 0 |
| CSU | 63,768 | 18,514 | 18,394 | 18,283 | 0 |
| Std. L only | 127,354 | 78,803 | 78,690 | 74,080 | 0 |
| **TOTAL** | 227,293 | 190,585 | 188,013 | 170,546 | 227,293 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 4** | | | | | |
| Acres Withdrawn from Leasing | 0<br>0 | 0<br>0 | 0<br>0 | | 0<br>0 |
| Acres Proposed for Withdrawal | 0<br>0 | 0<br>1,908 | 0<br>2,209 | 0 | 1,940<br>0 |
| Acres Administratively Not Available for Leasing | 366<br>2<br>2 | 0<br>0<br>0 | 0<br>0<br>0 | 0<br>0<br>1,914 | 0<br>0<br>0 |
| NSO | 1,570<br>1,940 | 0<br>1,908 | 0<br>2,208 | 0<br>0 | 0<br>1,940 |
| TL | | | | 0 | |
| CSU | | | | 1,914 | |
| CSU/TL | | | | | |
| Std. L only | | | | | |
| **TOTAL** | | | | | |

BLM_0030540

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 3** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 2,038 | 3,657 | 2,079 | 227,293 |
| NSO | 3,060 | 48,071 | 45,824 | 39,245 | 0 |
| TL | 24,513 | 42,277 | 40,724 | 36,130 | 0 |
| CSU/TL | 8,596 | 882 | 725 | 730 | 0 |
| CSU | 63,768 | 18,514 | 18,394 | 18,283 | 0 |
| Std. L only | 127,354 | 78,803 | 78,690 | 74,080 | 0 |
| **TOTAL** | 227,293 | 190,585 | 188,013 | 170,546 | 227,293 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 4** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 0 | 0 | 1,940 |
| NSO | 0 | 1,908 | 2,209 | 1,914 | 0 |
| TL | 366 | 0 | 0 | 0 | 0 |
| CSU | 2 | 0 | 0 | 0 | 0 |
| CSU/TL | 2 | 0 | 0 | 0 | 0 |
| Std. L only | 1,570 | 0 | 0 | 0 | 0 |
| **TOTAL** | 1,940 | 1,908 | 2,208 | 1,914 | 1,940 |

BLM_0030541

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 5** | | | | | |
| Acres Withdrawn from Leasing | | | | | |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 5,186 | 7,259 | 5,186 | 30,308 |
| NSO | 94 | 11,234 | 9,157 | 20,438 | 0 |
| TL | 16,543 | 6,629 | 6,629 | 13,006 | 0 |
| CSU | 1,166 | 621 | 640 | 822 | 0 |
| CSU/TL | 3,495 | 1,421 | 1,420 | 2,039 | 0 |
| Std. L only | 9,010 | 240 | 194 | 4,965 | 0 |
| **TOTAL** | 30,308 | 25,332 | 25,300 | 46,457 | 30,308 |

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 7** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 405 | 405 | 405 | 0 |
| NSO | 0 | 6,152 | 6,152 | 6,095 | 0 |
| TL | 0 | 16,872 | 16,872 | 16,882 | 0 |
| CSU | 0 | 4,543 | 4,543 | 4,548 | 0 |
| CSU/TL | 0 | 20 | 20 | 20 | 0 |
| Std. L only | 0 | 12,369 | 12,369 | 12,419 | 0 |
| **TOTAL** | 0 | 40,361 | 40,361 | 40,371 | 0 |

BLM_0030542

**Table 3.15.13  Acres of Stipulations by Management Area by Alternative, continued**

| PLANNING UNIT | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Federal Subsurface - MA 8** | | | | | |
| Acres Withdrawn from Leasing | 0 | 0 | 0 | 0 | 0 |
| Acres Proposed for Withdrawal | 0 | 0 | 0 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 0 | 0 | 2,213 |
| NSO | 0 | 0 | 0 | 2,181 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| CSU | 1 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 2,212 | 0 | 0 | 0 | 0 |
| **TOTAL** | 2,213 | 0 | 0 | 2,181 | 2,213 |

Management provisions under Alternative C would emphasize wilderness recommendations that maintain the undeveloped character of large blocks of contiguous land and non-motorized recreational activities to a greater degree than the other alternatives. The large contiguous blocks of roadless areas would be not available for leasing. Alternatives B and D would also maintain large contiguous blocks of roadless areas, Hover these roadless areas would be managed as backcountry roadless and not recommended for wilderness.  An NSO stipulation would apply to these areas.  As such, NSO stipulations would be applied to slightly more land area than Alternative B. Alternative A has the most area available for lease under Management Area 5 which provides for a strong multiple use emphasis.  Alternative A also has the most acres available for lease using standard lease terms.  This strong reliance on implementing standard lease terms is a result of Alternative A's direction to implements the leasing decisions in current land management plans. The No-leasing Alternative equates to no issuance of leases during the period of the plan and consequently no oil and gas development would occur.  The objectives of the No-leasing alternative are not related to management areas and their allocations but represent over-arching prohibition on leasing regardless of management area allocation. The effects of each alternatives management area allocations on reasonably foreseeable development is presented below.

BLM_0030543

**Effect of management areas on leasing and on the RFD scenario**

This discussion focuses on management areas that, by their own management direction, place limits on oil and gas activities. Some management areas are proposed wilderness recommendation not available for leasing or areas not administratively available for leasing, or have guidelines more restrictive than standard lease terms. Standard lease terms apply to all leases, whether or not they have additional special stipulations. Some management areas with management direction that do not require use of an area-wide stipulation may still include leases with special stipulations designed to protect certain specified resources.

Some management areas contain provisions that require NSO stipulations over large blocks of land. The effects of these large blocks of NSO are potentially greater than spatially small areas of NSO because the interiors may be potentially inaccessible.

The following discussion describes restrictions placed on oil and gas development based on management area direction. For effects of the stipulations on the development of oil and gas resources for the protection of other resources, such as wildlife, refer to the Effects on Oil and Gas by Type of Stipulation section.

**Management Area 1 - natural processes dominate – NSO or unavailable for leasing**

In Management Area 1 areas, natural processes operate relatively free from the influence of humans with the existing landscape character gradually changing over time through natural processes. Resources are managed to perpetuate semi-primitive and pristine conditions. This MA includes designated wilderness, Wilderness Study Areas, Wild and Scenic river designation/eligible areas, wilderness recommendations, and other special/ primitive areas. Oil and gas leasing is not authorized or no surface occupancy is prescribed where compatible with Management area 1 management. Road construction for geophysical uses is prohibited. Portable techniques must be used. The following are Management Area 1 allocations by alternative and the stipulations that apply to Management Area 1 areas.

BLM_0030544

**Table 3.15.14 - Management Area 1**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | 480,953 | 595,988 | 1,014,188 | 497,455 | 480,953 |
| Acres Withdrawn from Leasing | 480,953 | 480,953 | 480,953 | 480,953 | 480,953 |
| Acres Proposed for Withdrawal | 0 | 56,956 | 528,010 | 0 | 0 |
| Acres Administratively Not Available for Leasing | 0 | 0 | 45 | 116 | 0 |
| MA 1 (no special land designations) | NSO | NSO | NSO | NSO | Not Stipulated no Lease |
| CBM High Potential | 0 | 0 | 60 | 0 | 0 |
| High Potential | 0 | 0 | 65 | 0 | 0 |
| High-Moderate Potential | 0 | 18,286 | 75,013 | 13,304 | 0 |
| Moderate Potential | 0 | 6,077 | 78,303 | 1,898 | 0 |
| Low Potential | 0 | 69,851 | 273,396 | 0 | 0 |
| No Potential | 0 | 5,166 | 85,400 | 1,134 | 0 |
| Undefined Potential | 0 | 20 | 240 | 12 | 0 |
| **TOTAL** | 0 | 99,401 | 512,477 | 16,349 | 0 |
| MA 1 RNA (NSO) | | | | | |
| High Potential | 0 | 0 | 0 | 0 | 0 |
| High-Moderate Potential | 0 | 0 | 0 | 0 | 0 |
| Moderate Potential | 0 | 0 | 0 | 0 | 0 |
| Low Potential | 0 | 15,469 | 20,192 | 0 | 0 |
| No Potential | 0 | 0 | 0 | 0 | 0 |
| Undefined Potential | 0 | 0 | 5 | 0 | 0 |
| **TOTAL** | 0 | 15,469 | 20,197 | 0 | 0 |
| MA 1 (no special land designations) | CSU, TL, Std. Stipulation | CSU, TL, Std. Stipulation | CSU, TL, Std. Stipulation | CSU, TL, Std. Stipulation | Not Stipulated no Lease |
| | 2,367 | 0 | 0 | 0 | 0 |
| CBM High Potential | 0 | 0 | 0 | 0 | 0 |
| High Potential | 0 | 0 | 0 | 0 | 0 |
| High-Moderate Potential | 0 | 0 | 0 | 0 | 0 |
| Moderate Potential | 454 | 0 | 0 | 0 | 0 |
| Low Potential | 0 | 0 | 0 | 0 | 0 |
| No Potential | 1,912 | 0 | 0 | 0 | 0 |
| Undefined Potential | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 2,367 | 0 | 0 | 0 | 0 |

BLM_0030545

**Table 3.15.14 - Management Area 1, continued**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM Public Lands** | 55,427 | 56,573 | 67,083 | 56,573 | 55,427 |
| MA 1 (no special land designations) | 55,427 | 55,302 | 55,302 | 55,302 | 55,427 |
| Administratively not Available | 0 | 1,271 | 11,781 | 1,271 | 0 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| CSU | 0 | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 0 | 0 | 0 |
| TL | 0 | 0 | 0 | 0 | 0 |
| Std. L | 0 | 1,271 | 11,781 | 1,271 | 0 |
| *TOTAL* | | | | | |
| Oil and Gas Potential: | | | | | |
| CBM High Potential | 0 | 0 | 0 | 0 | 0 |
| High Potential | 0 | 0 | 0 | 0 | 0 |
| High-Moderate Potential | 0 | 0 | 0 | 0 | 0 |
| Moderate Potential | 0 | 1,271 | 11,781 | 1,271 | 0 |
| Low Potential | 0 | 0 | 0 | 0 | 0 |
| No Potential | 0 | 0 | 0 | 0 | 0 |
| Undefined Potential | 0 | 25 | 25 | 25 | 0 |
| **TOTAL** | 0 | 1,271 | 11,781 | 1,271 | 0 |

BLM_0030546

Management of and protection of Wilderness Study Areas, recommended wilderness, wild rivers, etc. would impact oil and gas. Effects would range from increased costs of production to the loss of some rental income, and loss of oil and gas resources and associated royalties. The magnitude of the loss would depend on the resources available in the particular area.

Alternative C has the most acres allocated to the Management Area 1, followed by Alternatives B, D and A. Much of the Management Area 1 allocation is in existing wilderness which is statutorily unavailable for leasing and in recommended wilderness which has an objective among other things of withdrawal from mineral entry. Much of the land proposed for withdrawal has no to low potential for oil and gas. The allocation of Management Area 1 does not measurably affect those lands on which the RFDS is projected. All lands within Management Area 1 would not be administratively available for lease or are currently withdrawn from leasing under the No Lease Alternative.

For Alternatives A through D the assignment of portions of the BLM and National Forest lands to Management Area 1 would have a minor effect on the RFD scenario (Table 3.15.15). Of the 1,185 wells projected in the RFD scenario, approximately 1,015 would be developed on existing leases and the remainder, a projected 170 wells, would be subject to the leasing decisions made in this LRMP/RMP revision. Of the 170 projected wells on currently unleased lands, as many as 13 wells could be eliminated by the assignment of portions of the National Forest and BLM public lands to Management Area 1 as a result of wilderness recommendations. Additionally, approximately three projected wells would not be able to be drilled on site because of an NSO stipulation (Table 3.15.14). Thus, Management Area 1 allocations associated with Alternatives A through D would overall have minor effect on projected oil and gas development. The No-lease Alternative would significantly impact oil and gas development on the national forest portion of the study area. A total of 170 projected wells would be eliminated as a result of the No-lease Alternative.

BLM_0030547

**Table 3.15.15 – Effects of Management Area 1 on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario as a Result of Management Area 1 Application**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| *RFD Area Affected:* | | | | | |
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| MA 1 Acres | 0 | 0 | 2,215 | 0 | 0 |
| Not Available for Lease Acres | 0 | 0 | 182 | 0 | 0 |
| NSO Stipulation Acres | 0 | 0 | 2,032 | 0 | n/a |
| Std, CSU or TL Stipulation Acres | 229,945 | 229,945 | 227,923 | 229,945 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| MA 1 Acres | 13,884 | 34,571 | 88,354 | 27,395 | 13,884 |
| Not Available for Lease Acres | 13,884 | 14,267 | 88,349 | 13,884 | 13,884 |
| NSO Stipulation Acres | 0 | 20,304 | 0 | 13,512 | n/a |
| Std, CSU or TL Stipulation Acres | 191,920 | 171,233 | 117,450 | 178,409 | n/a |
| *Wells Eliminated:* | | | | | |
| **National Forest** | 2 | 2 | 13 | 2 | 2 |
| **BLM Public Lands** | 0 | 0 | 0 | 0 | 0 |
| *Wells Stipulated with NSO:* | | | | | |
| **National Forest** | 0 | 3 | 1 | 3 | n/a |
| **BLM Public Lands** | 0 | 0 | 0 | 0 | n/a |

BLM_0030548

**Management Area 2 - Special Interest Areas**

These management areas are numerous and are managed to protect or enhance areas with unusual characteristics, including areas such as research natural areas, special biological or geological areas, areas of critical environmental concern or cultural historical areas. Oil and gas leasing with surface occupancy is generally not authorized unless determined compatible with the management plan developed for the Management Area 2 area. Areas where there is compatible surface management are the HD Mountains. Areas, for example, where an NSO stipulation applies include the Research Natural Areas listed in Table 3.15.16.

**Table 3.15.16 - Stipulations Within Management Area 2**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **NATIONAL FOREST** | | | | | |
| **Anasazi Archaeological District** | | | | | |
| Acres Administratively Not Available for Lease | n/a | 14,971 | 14,971 | n/a | 14983 |
| Stipulated Acres | n/a | NSO | NSO | n/a | n/a |
| Low Potential | n/a | 11 | 12 | n/a | n/a |
| **Chimney Rock** | | | | | |
| Acres Administratively Not Available for Lease | 3145 | 1569 | 1569 | 1569 | 3145 |
| Stipulated Acres | 0 | Predominantly NSO | Predominantly NSO | Predominantly NSO | n/a |
| CBM High Potential | 0 | 1576 | 1576 | 1576 | n/a |
| Moderate Potential | 0 | 1576 | 1576 | 1576 | n/a |
| **Existing RNAs** (Williams Creek and Narraguinnep) | | | | | |
| Acres Administratively Not Available for Lease | 2456 | 0 | 0 | 0 | 2456 |
| Stipulated Acres | 0 | NSO | NSO | NSO | n/a |
| Moderate Potential | 0 | 2,456 | 2,456 | 2,456 | n/a |
| **Falls Creek** | | | | | |
| Acres Administratively Not Available for Lease | | 1392 | 1392 | 1392 | 1453 |
| Stipulated Acres | STD | NSO | NSO | NSO | n/a |
| Moderate Potential | 757 | 3 | 3 | 3 | n/a |
| No Potential | 695 | 58 | 58 | 58 | n/a |
| **Fens** (Chattanooga and Burro Bridge) | | | | | |
| Acres Administratively Not Available for Lease | n/a | 0 | 0 | 0 | 348 |
| Stipulated Acres | n/a | NSO | NSO | NSO | n/a |
| Low Potential | n/a | 64 | 64 | 64 | n/a |
| No Potential | n/a | 284 | 284 | 284 | n/a |
| **Old Growth Areas** (Smoothing Iron, Boggy) | | | | | |
| Acres Administratively Not Available for Lease | n/a | n/a | 0 | n/a | 4849 |
| Stipulated Acres | n/a | n/a | Predominantly NSO | n/a | n/a |
| CBM High Potential | n/a | n/a | 0 | n/a | n/a |
| Moderate Potential | n/a | n/a | 0 | n/a | n/a |
| Low Potential | n/a | n/a | 4849 | n/a | n/a |

BLM_0030549

**Table 3.15.16 - Stipulations Within Management Area 2, continued**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **NATIONAL FOREST, continued** | | | | | |
| **Proposed RNAs** | | | | | |
| Acres Administratively Not Available for Lease | n/a | 2783 | 2783 | 2783 | 12,559 |
| Stipulated Acres | n/a | NSO | NSO | NSO | n/a |
| CBM High Potential | n/a | 970 | 970 | 970 | n/a |
| Moderate Potential | n/a | 1667 | 1667 | 3 | n/a |
| Low Potential | n/a | 4,670 | 0 | 0 | n/a |
| No Potential | n/a | 2469 | 2460 | 2460 | n/a |
| **Special Botanical Areas** (O'Neal Hill) | | | | | |
| Acres Administratively Not Available for Lease | 0 | 0 | 0 | 0 | 328 |
| Stipulated Acres | STD | NSO | NSO | NSO | n/a |
| Moderate Potential | 328 | 328 | 328 | 328 | n/a |
| **Unique Landscapes** (Dolores River, HDs, Rico, Silverton) | | | | | |
| Acres Administratively Not Available for Lease | | 2050 | 2050 | 2050 | 60,863 |
| Stipulated Acres | STD | Predominantly NSO | Predominantly NSO | Predominantly NSO | n/a |
| CBM High | n/a | 41,660 | 46,217 | 41,660 | n/a |
| Moderate Potential | 5 | 159 | 159 | 158 | n/a |
| Low Potential | n/a | 13,089 | 5,980 | 5,400 | n/a |
| No Potential | n/a | 3,905 | 3,904 | 3,905 | n/a |
| **BLM PUBLIC LANDS** | | | | | |
| **Anasazi Archaeological District** | | | | | |
| Acres Administratively Not Available for Lease | n/a | 57 | 57 | n/a | 57 |
| Stipulated Acres | n/a | 0 | 0 | n/a | n/a |
| Low Potential | n/a | 0 | 0 | n/a | n/a |
| **ACECs** (Gypsum Management Area, Grassy Hills, Mud Springs, Silvey's Pocket) | | | | | |
| Acres Administratively Not Available for Lease | 0 | 0 | 0 | n/a | 22,956 |
| Stipulated Acres | Predominantly STD | NSO | NSO | n/a | n/a |
| High Potential | n/a | 7151 | 21,642 | n/a | n/a |
| No Potential | 1,410 | 0 | 1,314 | n/a | n/a |
| **Falls Creek** | | | | | |
| Acres Administratively Not Available for Lease | 0 | 78 | 78 | 78 | 86 |
| Stipulated Acres | STD | NSO | NSO | NSO | n/a |
| Moderate Potential | 30 | 8 | 8 | 8 | n/a |
| No Potential | 56 | 0 | 0 | 0 | n/a |
| **Habitat Areas** (Perins Peak, Willow Creek) | | | | | |
| Acres Administratively Not Available for Lease | 0 | 876 | 876 | 876 | 4,190 |
| Stipulated Acres | Predominantly NSO | Predominantly NSO | Predominantly NSO | Predominantly NSO | n/a |
| Moderate Potential | 4,802 | 3,314 | 3,314 | 3,314 | n/a |

BLM_0030550

**Table 3.15.16 – Stipulations Within Management Area 2, continued**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **BLM PUBLIC LANDS, continued** | | | | | |
| **Mesa Verde Escarpment** | | | | | |
| Acres Administratively Not Available for Lease | n/a | 0 | 0 | n/a | 7,417 |
| Stipulated Acres | n/a | NSO | NSO | n/a | n/a |
| Low Potential | n/a | 7231 | 7231 | n/a | n/a |
| No Potential | n/a | 186 | 186 | n/a | n/a |
| **McIntyre Canyon** | | | | | |
| Acres Administratively Not Available for Lease | n/a | n/a | 0 | n/a | 2947 |
| Stipulated Acres | n/a | n/a | Predominantly NSO | n/a | n/a |
| High Potential | n/a | n/a | 2947 | n/a | n/a |
| **Old Growth Areas** (Smoothing Iron, Boggy) | | | | | |
| Acres Administratively Not Available for Lease | n/a | n/a | 0 | n/a | 29 |
| Stipulated Acres | n/a | n/a | NSO | n/a | n/a |
| Low Potential | n/a | n/a | 29 | n/a | n/a |
| **Slick Rock Hill** | | | | | |
| Acres Administratively Not Available for Lease | n/a | n/a | 0 | n/a | 1945 |
| Stipulated Acres | n/a | n/a | Predominantly STD | n/a | n/a |
| High Potential | n/a | n/a | 1945 | n/a | n/a |
| **Unique Landscapes** (Dolores River, HDs, Rico, Silverton) | | | | | |
| Acres Administratively Not Available for Lease | 0 | 0 | 0 | 0 | 67,273 |
| Stipulated Acres | NSO, STD | NSO | NSO | NSO | n/a |
| CBM High Potential | n/a | 69 | 191 | 69 | n/a |
| High Potential | 15,514 | 17,338 | 17,043 | 17,325 | n/a |
| Moderate Potential | 19,499 | 17,279 | 6733 | 17,279 | n/a |
| Low Potential | 1200 | 274 | 270 | 132 | n/a |
| No Potential | 38,301 | 32,313 | 32,313 | 32,313 | n/a |
| **Spring Creek Wild Horse Herd Mgmt.** | | | | | |
| Acres Administratively Not Available for Lease | | | | | |
| Stipulated Acres | Predominantly TL | Predominantly TL | Predominantly TL | Predominantly TL | 15,070 |
| High Potential | 3,289 | 3289 | 3289 | 2,926 | n/a |
| Moderate Potential | 11,781 | 11,781 | 11,781 | 11,821 | n/a |

BLM_0030551

Most of the Management Area 2 areas on National Forest occur in areas of moderate to low potential for oil and gas occurrence. Three exceptions are the Hidden Mesas potential research natural area Chimney Rock Archaeological Area, HD Mountains and the Dolores River Canyon, which are classified as having high potential for CBM gas occurrence. Most lands available for leasing within Management Area 2 areas on National Forest are assigned NSO stipulations in Alternatives B through D and standard stipulations in Alternative A.  All areas allocated to Management Area 2 in the No Lease Alternative are not available for leasing during the 10-15 year duration of the revised management plans.

On the BLM public lands, the Big Gypsum Valley and Dolores River Canyon are both classified as having high potential for conventional gas occurrence. Both areas are available for lease with NSO stipulations. The Dolores River Canyon is not suitable for surface occupancy due to its high recreational value and terrain constraints that block reasonable access. In general, however, most BLM lands allocated to Management Area 2 over the planning unit have moderate potential for oil and gas occurrence.

Management Area 2 application within the RFD area would have minor effect on reasonably foreseeable development in Alternatives A through D (Table 3.15.17). No wells would be eliminated as a result of the management area's application. Similarly, wells within lands available for lease stipulated with an NSO stipulation would total approximately 5 percent of the total wells projected within the two RFD areas affected by leasing decisions made in this LRMP/RMP revision. The CSU and timing limitation stipulation would not impact projected wells in the two RFD areas.  With the No-leasing Alternative no leasing would occur on currently unleased lands and consequently no oil or gas development would occur in the management area.

**Table 3.15.17 -  Effects of Management Area 2 Application on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,757 | 229,757 | 229,757 | 229,757 | 229,757 |
| MA 2 Acres | 1,975 | 1,971 | 17,384 | 1,971 | 1,975 |
| Administratively Not Available for Lease Acres | 1,971 | 14,857 | 14,857 | 0 | 1,975 |
| NSO Stipulation Acres | 0 | 1,982 | 3,681 | 1,971 | n/a |
| CSU or TL Stipulation Acres | 0 | 3 | 544 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,745 | 205,745 | 205,745 | 205,745 | 205,745 |
| MA 2 Acres | 0 | 0 | 0 | 0 | 0 |
| Administratively Not Available for Lease Acres | | | | | |
| NSO Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| CSU or TL Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 1 | 9 | 9 | 0 | 1 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 1 | 2 | 1 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030552

**Management Area 3 - natural landscapes with limited management**

These areas are managed to emphasize the natural character of the landscape. Resource management activities may occur, but natural ecological processes and resulting patterns will predominate. Oil and gas leasing may be allowed. Controlled surface use, timing restrictions and/or no surface occupancy are employed to protect natural settings and wildlife; however, NSO is the predominant stipulation utilized for this management emphasis area. Much of the Management Area 3 is applied to roadless areas in Alternatives B and D. Roadless areas in Alternative C are allocated to Management Area 1. The application of Management Area 3 has the following effect.

**Table 3.15.18 – Stipulations Within Management Area 3**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | | | | | |
| Stipulations : | | | | | |
| Administratively Not Available for Lease Acres | 17,585 | 3,924 | 3,912 | 12,483 | 637,770 |
| NSO | 489 | 477,201 | 127,728 | 544,709 | 0 |
| TL | 1,100 | 41,623 | 44,711 | 40,195 | 0 |
| CSU/TL | 539 | 13,548 | 6,821 | 6,200 | 0 |
| CSU | 119,193 | 33,172 | 24,887 | 23,156 | 0 |
| Std. L only | 498,863 | 21,681 | 32,596 | 21,807 | 0 |
| Total | 637,770 | 591,149 | 240,656 | 648,551 | 637,770 |
| Oil and Gas Potential: | | | | | |
| CBM High Potential | 54,408 | 14,668 | 14,612 | 14,662 | 54,408 |
| High Potential | 893 | 958 | 893 | 893 | 893 |
| High-Moderate Potential | 75,825 | 78,678 | 30,279 | 70,784 | 75,825 |
| Moderate Potential | 141,585 | 160,788 | 108,420 | 146,144 | 141,585 |
| Low Potential | 355,747 | 250,033 | 75,235 | 333,176 | 355,747 |
| No Potential | 58,280 | 86,024 | 11,217 | 82,892 | 58,280 |
| **BLM Public Lands** | | | | | |
| Stipulations: | | | | | |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 258,563 |
| NSO | 9,030 | 53,218 | 46,918 | 35,369 | 0 |
| TL | 42,350 | 147,833 | 139,983 | 86,230 | 0 |
| CSU/TL | 29,903 | 1,805 | 1,678 | 927 | 0 |
| CSU | 100,648 | 19,885 | 19,916 | 14,410 | 0 |
| Std. L only | 76,633 | 13,137 | 24,338 | 7,596 | 0 |
| Total | 258,564 | 236,029 | 236,002 | 144,682 | 258,563 |
| Oil and Gas Potential: | | | | | |
| High Potential | 171,991 | 159,757 | 159,931 | 84,976 | 171,991 |
| Moderate Potential | 73,882 | 75,766 | 75,565 | 59,200 | 73,882 |
| Low Potential | 12,691 | 506 | 506 | 506 | 12,691 |

BLM_0030553

Alternative B has the most acres allocated to Management Area 3, followed by Alternatives D, A, and C. On National Forest, acreage allocated to Management Area 3 ranges from 648,000 acres in Alternative A to 241,000 acres in Alternative C. Alternative C has the fewest acres allocated to Management Area 3, because many of the roadless areas in the alternative are allocated to Management Area 1. Most of the National Forest areas allocated to Management Area 3 have moderate to low to no potential for oil and gas occurrence. On BLM lands, areas of high potential allocated to Management Area 3 are generally stipulated with timing limitations and controlled-surface-use stipulations.

Management Area 3 application within the RFD area would have moderate effect on reasonably foreseeable development (Table 3.15.19). At most, one well may be eliminated as a result of the management area's application. However, wells stipulated with an NSO stipulation would total approximately 10-15 percent of the total wells projected within the two RFD areas affected by leasing decisions made in this LRMP/RMP revision. The CSU and timing limitation stipulation would also impact 10-15 percent of projected wells in the two RFD areas.  The No-action alternative would affect the projection of reasonably foreseeable development within the Paradox and Basin and San Juan Sag.  As many as 70 wells would be eliminated within the management area as a result of no leasing during the plan period of 10-15 years.

**Table 3.15.19 - Effects of Management Area 3 Application on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,757 | 229,757 | 229,757 | 229,757 | 229,757 |
| MA 3 Acres | 93,885 | 108,247 | 114,502 | 108,247 | 93,885 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 93,885 |
| NSO Stipulation Acres | 10,293 | 30,557 | 20,459 | 29,687 | n/a |
| CSU or TL Stipulation Acres | 18,371 | 39,505 | 41,957 | 39,782 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,745 | 205,745 | 205,745 | 205,745 | 205,745 |
| MA 3 Acres | 86,263 | 88,025 | 42,570 | 79,650 | 86,263 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 86,263 |
| NSO Stipulation Acres | 3,647 | 56,925 | 11,181 | 49,316 | n/a |
| CSU or TL Stipulation Acres | 2,358 | 18,894 | 19,173 | 18,128 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | 78 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 6 | 27 | 16 | 25 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 14 | 27 | 28 | 27 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030554

**Management Area 4 - recreation emphasis areas**

Management Area 4 lands are managed to emphasize recreation opportunities while maintaining the natural landscape. These areas are typically centered on recreational destinations, transportation corridors or bodies of water. Oil and gas leasing may be allowed but limited to protect the natural setting and recreational experience. Controlled-surface-use, timing-limitation and/or no-surface-occupancy stipulations would be used to achieve recreation area objectives.

**Table 3.15.20 - Stipulations Within Management Area 4**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | | | | | |
| Stipulations : | | | | | |
| Administratively Not Available for Lease Acres | 1,504 | 48 | 48 | 5,868 | 147,908 |
| NSO | 6 | 73,691 | 48,856 | 74,832 | 0 |
| TL | 7 | 0 | 0 | 0 | 0 |
| CSU/TL | 41,538 | 0 | 0 | 0 | 0 |
| CSU | 0 | 0 | 0 | 0 | 0 |
| Std. L only | 104,866 | 0 | 0 | 0 | 0 |
| Total | 147,908 | 73,731 | 48,904 | 80,700 | 147,908 |
| | | | | | |
| Oil and Gas Potential: | | | | | |
| CBM High Potential | 5,101 | 327 | 321 | 327 | 5,101 |
| High Potential | 11,705 | 5,919 | 3,052 | 5,454 | 11,705 |
| High-Moderate Potential | 8,718 | 7,756 | 6,816 | 7,756 | 8,718 |
| Moderate Potential | 99,996 | 41,894 | 25,381 | 49,151 | 99,996 |
| Low Potential | 22,383 | 17,758 | 13,076 | 17,754 | 22,383 |
| No Potential | 0 | 77 | 77 | 77 | 0 |
| **BLM Public Lands** | | | | | |
| | 0 | 0 | 0 | 0 | 38 |
| Stipulations: | 38 | 5,868 | 5,868 | 5,868 | 0 |
| Administratively Not Available | 0 | 0 | 0 | 0 | 0 |
| for Lease Acres | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| TL | 38 | 5,868 | 5,868 | 5,868 | 38 |
| CSU/TL | | | | | |
| CSU | | | | | |
| Std. L only | 38 | 216 | 216 | 216 | 38 |
| Total | 0 | 814 | 814 | 814 | 0 |
| Oil and Gas Potential: | 0 | 4,759 | 4,759 | 4,759 | 0 |
| High Potential | 0 | 77 | 77 | 77 | 0 |
| Moderate Potential | | | | | |
| Low Potential | | | | | |

BLM_0030555

Alternative A has the most acres allocated to Management Area 4, followed by Alternatives D, B and C, respectively. On National Forest, acreage allocated to Management Area 4 ranges from 148,000 acres in Alternative A to 49,000 acres in Alternative C. Most of the National Forest area allocated to Management Area 4 has low to no potential for oil and gas occurrence. On BLM public lands, area allocated to Management Area 4 ranges from 5,900 acres in Alternative D to 40 acres in Alternative A. Most of the BLM areas allocated to Management Area 4 have low to no potential for oil and gas occurrence.

Management Area 4 application within the RFD area would have minor effect on implementation of the RFD (Table 3.15.21). One well may be eliminated as a result of the management area's application. Additionally, wells stipulated with an NSO stipulation would total approximately 3 percent of the total wells projected within the two RFD areas affected by leasing decisions made in this LRPM/RMP revision. The No-action alternative would affect the projection of reasonably foreseeable development within the Paradox and Basin and San Juan Sag. As many as 70 wells would be eliminated within the management area as a result of no leasing during the plan period of 10-15 years.

**Table 3.15.21 - Effects of Management Area 4 Application on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| MA 3 Acres | 12,619 | 6,415 | 6,201 | 11,929 | 12,619 |
| Administratively Not Available for Lease Acres | 0 | 43 | 43 | 5,545 | 12,619 |
| NSO Stipulation Acres | 0 | 6,372 | 6,157 | 6,384 | n/a |
| CSU or TL Stipulation Acres | 5,914 | 0 | 0 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| MA 3 Acres | 13,018 | 6,700 | 4,136 | 6,233 | 13,018 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 13,018 |
| NSO Stipulation Acres | 0 | 6,700 | 4,136 | 6,233 | n/a |
| CSU or TL Stipulation Acres | 722.83 | 0 | 0 | 0 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 3 | 14 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 5 | 5 | 5 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 5 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030556

**Management Area 5 – active management**

Management Area 5 lands are managed with a strong multiple-use emphasis on various resource objectives. These areas are often characterized by a substantially modified natural environment and include areas that currently can and potentially provide a broad range of multiple uses including oil and gas development. The stipulations applied to Management Area 5 areas would be a function of the underlying resource conditions within the area (for example, steep slopes, wildlife constraints, soil constraint, etc) and not a function of the Management Area 5 application. Management Area 5 has no stipulation constraints but would ordinarily be stipulated with standard stipulations. Consequently, the statistics presented below reflect the application of resource constraints.

**Table 3.15.22 - Stipulations Within Management Area 5**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | | | | | |
| Stipulations : | | | | | |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 579,258 |
| NSO | 1,209 | 49,548 | 47,675 | 104,525 | 0 |
| TL | 15 | 25,222 | 20,028 | 28,404 | 0 |
| CSU/TL | 7,686 | 190,330 | 213,693 | 187,641 | 0 |
| CSU | 27 | 50,131 | 52,657 | 50,007 | 0 |
| Std. L only | 570,076 | 139,249 | 95,812 | 140,485 | 0 |
| Total | 579,258 | 455,061 | 429,866 | 511,061 | 579,061 |
| Oil and Gas Potential: | | | | | |
| CBM High Potential | 9,180 | 1,824 | 1,824 | 1,830 | 9,180 |
| High Potential | 2,954 | 2,889 | 2,889 | 2,954 | 2,954 |
| High-Moderate Potential | 60,008 | 36,671 | 37,207 | 43,260 | 60,008 |
| Moderate Potential | 228,881 | 171,747 | 158,131 | 192,236 | 228,881 |
| Low Potential | 202,562 | 199,318 | 187,725 | 220,873 | 202,562 |
| No Potential | 75,673 | 42,612 | 42,090 | 49,808 | 75,673 |
| **BLM Public Lands** | | | | | |
| Stipulations: | | | | | |
| Administratively Not Available for Lease Acres | 0 | 1,685 | 14,557 | 1,685 | 96,814 |
| NSO | 972 | 25,294 | 17,836 | 44,338 | 0 |
| TL | 23,309 | 27,960 | 19,856 | 91,755 | 0 |
| CSU/TL | 29,745 | 3,523 | 1,913 | 9,083 | 0 |
| CSU | 8,442 | 75 | 65 | 3,556 | 0 |
| Std. L only | 34,372 | 16,515 | 3,911 | 22,056 | 0 |
| Total | 96,840 | 75,052 | 58,138 | 148,884 | 172,473 |
| Oil and Gas Potential: | | | | | |
| High Potential | 63,917 | 68,068 | 51,154 | 23,175 | 63,917 |
| Moderate Potential | 31,462 | 6,616 | 6,616 | 81 | 31,462 |
| Low Potential | 1,696 | 81 | 0 | 81 | 1,696 |
| Undefined Potential | 1,696 | 81 | 0 | 376 | 1,696 |

BLM_0030557

Much of the RFD development would occur in areas stipulated as Management Area 5 – active management. Alternative D allocates the most area to Management Area 5, followed by Alternatives A, B, and C, respectively. On National Forest, acreage allocated to Management Area 5 ranges from 580,000 acres in Alternative A to 430,000 acres in Alternative C. A substantive amount of the National Forest area allocated to Management Area 5 has high to moderate potential for oil and gas occurrence. On BLM public lands, the area allocated to Management Area 5 ranges from 221,000 acres in Alternative D to 84,000 acres in Alternative C. Most of the BLM area allocated to Management Area 5 has moderate to high potential for oil and gas occurrence.

Under Alternatives A through D, Management Area 5 application within the RFD area would have no effect on implementation of the RFD (Table 3.15.23). No wells would be eliminated as a result of the management area's application. Areas within Management Area 5 areas may be stipulated with an NSO stipulation, but that would be as a result of resource and/or wildlife constraints within the areas. The No-leasing alternative applied to areas allocated to Management Area 5 would result in elimination of approximately 70 wells projected in currently unleased lands where leasing, exploration and development are expected.

**Table 3.15.23 - Effects of Management Area 5 Application on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| MA 3 Acres | 100,240 | 107,467 | 88,984 | 107,500 | 100,240 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 65 | 100,240 |
| NSO Stipulation Acres | 1,208 | 5,888 | 5,020 | 5,778 | n/a |
| CSU or TL Stipulation Acres | 879 | 32,971 | 29,426 | 32,973 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| MA 3 Acres | 81,819 | 44,763 | 45,331 | 51,759 | 81,819 |
| Administratively Not Available for Lease Acres | 0 | 48 | 48 | 48 | 81,819 |
| NSO Stipulation Acres | 0 | 3,988 | 3,996 | 10,984 | n/a |
| CSU or TL Stipulation Acres | 6,644 | 32,121 | 32,623 | 32,121 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | 73 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 1 | 5 | 5 | 5 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 2 | 25 | 23 | 24 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030558

**Management Area 7 – residential-forest intermix**

Management Area 7 lands are public lands intermingled with private lands to such an extent that management objectives for public lands are generally secondary to community or landowner uses and objectives. Energy and mineral production including oil and gas leasing is allowed but limited to protect the natural setting and public health/safety through controlled surface use, timing restrictions, and/or no surface occupancy.

**Table 3.15.24 - Stipulations Within Management Area 7**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | | | | | |
| Stipulations : | | | | | |
| Administratively Not Available for Lease Acres | 0 | 442 | 395 | 441 | 0 |
| NSO | 0 | 10,913 | 4,011 | 10,771 | 0 |
| TL | 0 | 2,170 | 2,167 | 2,175 | 0 |
| CSU/TL | 0 | 20,747 | 20,176 | 20,761 | 0 |
| CSU | 0 | 12,985 | 11,486 | 13,128 | 0 |
| Std. L only | 0 | 2,755 | 2,755 | 2,755 | 0 |
| Total | 0 | 56,940 | 40,990 | 50,031 | 0 |
| Oil and Gas Potential: | | | | | |
| CBM High Potential | 0 | 4594 | 38 | 4594 | 0 |
| High Potential | 0 | 12,454 | 9406 | 12,454 | 0 |
| High-Moderate Potential | 0 | 38,302 | 31,023 | 31,329 | 0 |
| Moderate Potential | 0 | 809 | 0 | 900 | 0 |
| Low Potential | 0 | 781 | 523 | 754 | 0 |
| No Potential | | | | | |
| **BLM Public Lands** | | | | | |
| Stipulations: | | | | | |
| Administratively Not Available for Lease Acres | 0 | 430 | 430 | 430 | 0 |
| NSO | 0 | 8,446 | 7,487 | 8,444 | 0 |
| TL | 0 | 10,115 | 10,415 | 14,983 | 0 |
| CSU/TL | 0 | 4,506 | 4,533 | 6,105 | 0 |
| CSU | 0 | 4,657 | 4,655 | 4,655 | 0 |
| Std. L only | 0 | 3,815 | 3,815 | 3,843 | 0 |
| Total | 0 | 31,969 | 31,335 | 38,460 | 0 |
| Oil and Gas Potential: | | | | | |
| CBM High Potential | 0 | 960 | 838 | 960 | 0 |
| Moderate Potential | 0 | 1,981 | 8,983 | 8,476 | 0 |
| Low Potential | 0 | 20,685 | 13,360 | 20,682 | 0 |
| No Potential | 0 | 60 | 59 | 59 | 0 |
| Undefined Potential | 0 | 8,283 | 8,095 | 8,283 | 0 |

BLM_0030559

Some portion of the RFD development would occur in areas allocated to Management Area 7 – residential-forest intermix generally within the south end of the San Juan Sag. Alternative D allocates the most area to Management Area 7, followed by Alternatives B, C, and A, respectively. On National Forest, acreage allocated to Management Area 7 ranges from 54,900 acres in Alternative D to zero acres in Alternative A and the No-lease Alternaive. A substantial amount of the National Forest area allocated to Management Area 7 has high to moderate potential for oil and gas occurrence. On BLM public lands, the area allocated to Management Area 7 ranges from 84,500 acres in Alternative D to zero acres in Alternative A. Most of the BLM area allocated to Management Area 7 has moderate to high potential for oil and gas occurrence.

Management Area 7 application within the RFD area would have minor effect on implementation of the RFD scenario (Table 3.15.25). No wells would be eliminated as a result of the management area's application. Wells stipulated with an NSO stipulation would total approximately 2 percent of the total wells projected within the two RFD areas affected by leasing decisions made in this LRPM/RMP revision. There would be no wells stipulated with either a CSU or TL in the two RFD areas.

**Table 3.15.25 - Effects of Management Area 7 Application on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,757 | 229,757 | 229,757 | 229,757 | 229,757 |
| MA 3 Acres | 0 | 0 | 0 | 0 | 0 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 0 |
| NSO Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| CSU or TL Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,745 | 205,745 | 205,745 | 205,745 | 205,745 |
| MA 3 Acres | 0 | 15,854 | 12,806 | 15,854 | 0 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 0 n/a |
| NSO Stipulation Acres | 0 | 3670 | 622 | 963 | n/a |
| CSU or TL Stipulation Acres | 0 | 2536 | 2536 | 3068 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | 0 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 2 | 1 | 1 | 0 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 3 | 3 | 4 | 0 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |

BLM_0030560

## Management Area 8 - permanently developed areas

Management Area 8 areas are generally small in scale, and are permanently altered by human activities. Examples of permanently developed sites include highly developed and concentrated recreation complexes such as ski areas, utility corridors, mining sites or districts, oil and gas fields and administrative sites. Energy and mineral production including oil and gas leasing is allowed but limited to protect the developed area through no surface occupancy. Associated lease stipulations are predominantly NSO.

**Table 3.15.26 - Stipulations Within Management Area 8**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Forest** | | | | | |
| Stipulations : | | | | | |
| Administratively Not Available for Lease Acres | 0 | 594 | 594 | 1,440 | 14,520 |
| NSO | 0 | 8,599 | 2,185 | 15,388 | n/a |
| TL | 0 | 0 | 0 | 0 | n/a |
| CSU/TL | 1,050 | 0 | 0 | 0 | n/a |
| CSU | 0 | 0 | 0 | 0 | n/a |
| Std. L only | 13,470 | 0 | 0 | 0 | n/a |
| Total | 14,520 | 9,194 | 2,750 | 16,828 | 14,520 |
| Oil and Gas Potential: | | | | | |
| High-Moderate Potential | 7,421 | 2,174 | 0 | 3,551 | 7,421 |
| Low Potential | 6,826 | 6,734 | 2,454 | 12,900 | 6,826 |
| No Potential | 297 | 296 | 296 | 296 | 297 |
| **BLM Public Lands** | | | | | |
| Stipulations: | | | | | |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 1,200 | 1,200 | 1,200 | n/a |
| TL | 0 | 0 | 0 | 0 | n/a |
| CSU/TL | 0 | 0 | 0 | 0 | n/a |
| CSU | 0 | 0 | 0 | 0 | n/a |
| Std. L only | 0 | 0 | 0 | 0 | n/a |
| Total | 0 | 1,200 | 1,200 | 1,200 | 1,200 |
| Oil and Gas Potential: | | | | | |
| Moderate-High Potential | 0 | 0 | 0 | 0 | 0 |
| No Potential | 0 | 1,200 | 1,200 | 1,200 | 0 |

BLM_0030561

Some portion of the RFD development would occur in areas stipulated as Management Area 8 – permanently developed areas. Alternative A allocates the most area to Management Area 8, followed by Alternatives D, B and C, respectively.  On National Forest, acreage allocated to Management Area 8 ranges from 20,000 acres in Alternative A to 2,200 acres in Alternative C. A substantive amount of the National Forest area allocated to Management Area 8 has moderate potential for oil and gas occurrence. On BLM public lands, the area allocated to Management Area 8 ranges from 2,200 acres in Alternative A to 1,250 acres in Alternatives B, C and D. Most of the BLM area allocated to Management Area 8 has moderate to high potential for oil and gas occurrence. Management Area 8 application within the RFD area would have minor effect on implementation of the RFD (Table 3.15.27). No wells would be eliminated as a result of the management area's application. Wells stipulated with an NSO stipulation would total approximately 1 percent of the total wells projected within the two RFD areas affected by leasing decisions made in this LRPM/RMP revision. There would be no wells stipulated with either a CSU or TL in the two RFD areas.

**Table 3.15.27 - Effects of Management Area 8 Application on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| NF Basin Acres | 229,757 | 229,757 | 229,757 | 229,757 | 229,757 |
| MA 3 Acres | 1,328 | 1,459 | 62 | 1,459 | 1,378 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 1,378 |
| NSO Stipulation Acres | 41 | 1,458 | 62 | 1,459 | n/a |
| CSU or TL Stipulation Acres | 285 | 1 | 0 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,745 | 205,745 | 205,745 | 205,745 | 205,745 |
| MA 3 Acres | 9,649 | 2,183 | 0 | 3,562 | 9,649 |
| Administratively Not Available for Lease Acres | 0 | 0 | 0 | 0 | 9,649 |
| NSO Stipulation Acres | 0 | 1,925 | 0 | 3,562 | n/a |
| CSU or TL Stipulation Acres | 0 | 257 | 0 | 0 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | 2 |
| BLM Public Lands | 0 | 0 | 0 | 0 | 0 |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 1 | 0 | 1 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030562

## EFFECTS OF MAJOR RESOURCE PROGRAMS ON RFD

This section discusses how oil and gas leasing and development is affected by the proposed land use plan management guidelines and associated stipulations developed for other resources. Stipulations in addition to a standard stipulation are to be part of a lease only when the environmental and planning record demonstrates the necessity for the stipulations. Land use plans serve as the primary vehicle for determining the necessity for lease stipulations (BLM Manual 1624).  Stipulations that would be applied to new oil and gas leases issued during implementation of the revised land and resource management plans were developed based on environmental protection objectives, to achieve compatibility with other management objectives, resources and activities.

In the following tables, the acres shown with the various stipulations include the entire federal mineral estate exclusive of areas withdrawn from mineral leasing. The complete set of stipulations and their purpose and justification are presented in detail in Volume 3, Appendix H.

### Effects from air
None of the management objectives or guidelines developed for air quality requires oil and gas stipulations. Mineral development and operations do generate emissions; however, these are regulated by the states and no further standards and guidelines are required. The Four Corners Air Quality Task Force is establishing small engine and compressor emissions limits that will apply to all jurisdictions including National Forest and BLM public lands.

### Effects from fire and fuels management
Heavy equipment use during fire-suppression activities could affect buried pipelines; however, this is addressed in standard operating procedures and best management practices incorporated in the revised management plans by reference. No stipulations are required.

### Effects from fish and wildlife management
The following table describes the application of NSO and dates of the TL stipulations and the acreages affected under each alternative. Reference also the discussion below for effects on projected oil and gas development from these two types of stipulations. Briefly, TLs restrict drilling activities during critical periods, such as breeding and nesting periods, and usually extend over a specific distance from the site if activities could cause an adverse effect. NSO stipulations buffer areas such as nest and breeding sites from oil and gas activities. Normally, timing limitations apply to drilling, testing, and new-construction phase of oil and gas development and not to operation and maintenance of production facilities. The objective is generally to prevent nest abandonment and reduced reproductive success. The effect will be that workover operations will have to be conducted outside the period of timing limitation. This does not apply to emergency repairs.

The CSU stipulation usually restricts drilling and other activities within a specified distance from the area requiring protection and is applied if activities would likely result in degradation of habitat, abandonment, disruption, or other failure (see the following table for the species and acreages affected by this stipulation).

BLM_0030563

**Table 3.15.28 - Acres with Stipulations for Wildlife Species**

| SPECIES STIPULATED | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Mexican Spotted Owl** (species not identified on the San Juan Public Lands) (protected activity centers (NSO) TL - 4/1 to 8/31 w/in ½ of known nests | not mapped not mapped | not mapped not mapped | not mapped not mapped | not mapped not mapped | n/a n/a |
| **Lynx** CSU – landscape linkage areas CSU - denning and winter foraging habitat | 0 0 | 5,606 95,302 | 4,720 90,526 | 4,695 92,411 | n/a n/a |
| **Uncompahgre Fritillary Butterfly** NSO – known suitable habitat | not mapped | not mapped | not mapped | not mapped | n/a |
| **Gunnison Sage Grouse** NSO – within 0.6 miles of known lek site NSO– nesting habitat within 0.6 mi. to 4.0 mi. of lek site TL - winter habitat | 0 0 330 | 280 67,757 | 196 53,522 | 280 69,061 | n/a n/a |
| **Bald Eagle** NSO – within ¼ mile of nest or winter roost site TL – 11/15 to July 31 w/in ½ mile of nest | 3,710 4,113 | 547 249 | 547 250 | 547 249 | n/a |
| **Peregrine Falcon** NSO – within ½-mile radius of cliff nesting complex | 3,018 | 6,551 | 6,551 | 7,568 | n/a |
| **Big Game Winter Habitat** TL - big game winter habitat | 123,767 | 10,059 | 10,059 | 10,906 | n/a |
| **Pronghorn Antelope** TL – fawning area 5/1 to 7/15 | not mapped | not mapped | not mapped | not mapped | n/a |
| **Mule Deer** TL – Calving areas 4/15 to June 30 TL – Winter range 12/1 to 4/30 | 0 | 22,308 | 22,280 | 26,289 | n/a |
| **Elk** TL – Calving areas 4/15 to June 30 TI - Production areas TL –Winter range 12/1 to 4/30 | 4,839 0 0 | 674 69,304 279,798 | 674 70,068 257,344 | 674 69,815 279,411 | n/a n/a n/a |
| **Bighorn Sheep** TL – Production areas, 3/15 to 5/31 TL - Lambing areas 2/1 to 6/30 TL – Overall range 12/15 to 4/30 | 0 2,680 | 11 0 4,247 | 12 0 4,246 | 11 0 4,246 | n/a n/a n/a |
| **Goshawk** NSO – within 30 acres of known occupied and alternate nests TL – No surface use is allowed 4/15 to 8/15 within ½ mile of a known occupied and alternate nest site | not mapped not mapped | not mapped not mapped | not mapped not mapped | not mapped not mapped | n/a n/a |
| **Raptors (osprey)** NSO - to protect raptor nests TL – 2/1 to 8/15 within ¼ mile of nest sites | 79 122 | 0 49 | 0 49 | 0 49 | n/a n/a |

BLM_0030564

**Table 3.15.28 – Acres with Stipulations for Wildlife Species, continued**

| SPECIES STIPULATED | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Bats**<br>NSO – within ¼ mile of known maternity roosts | not mapped | not mapped | not mapped | not mapped | n/a |
| **Colorado River Cutthroat Trout**<br>NSO – within one-quarter mile of known pure populations | not mapped | not mapped | not mapped | not mapped | n/a |
| **Wild Horse Herd Foaling Area** | not mapped | not mapped | not mapped | not mapped | n/a |

The effects of wildlife stipulations on oil and gas leasing and potential development in the RFD area would be minor. There would be approximately two wells stipulated as NSO in the San Juan Sag as a result of the wildlife stipulations in Alternatives B, C, and D, and no wells stipulated as NSO as a result of Alternative A. There would be approximately 40 wells stipulated with TLs and CSU stipulations in the National Forest portion of the Paradox Basin and the San Juan Sag as a result of Alternatives B, C, and D, and four wells stipulated as a result of Alternative A. The TL restrictions would limit the time period in which well drilling and workovers could be completed as described in Table 3.15.28 above.  The No-lease Alternative makes all lands that are not withdrawn, administratively not available for lease.  Therefore, none of the above stipulations apply.

**Table 3.15.29 – Effects of Fish and Wildlife Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **RFD Area Affected** | | | | | |
| **Paradox Basin (NF Portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Wildlife Stipulation Acres | 4,500 | 56,400 | 55,800 | 56,200 | n/a |
| NSO Stipulation Acres | 0 | 200 | 200 | 200 | n/a |
| CSU or TL Stipulation Acres | 4,500 | 56,300 | 55,600 | 56,000 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,945 |
| Wildlife Stipulation Acres | 6,800 | 42,600 | 35,654 | 35,600 | n/a |
| NSO Stipulation Acres | 0 | 1,700 | 1,688 | 1,700 | n/a |
| CSU or TL Stipulation Acres | 6,800 | 41,000 | 33,966 | 33,900 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 2 | 2 | 2 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 4 | 39 | 39 | 39 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030565

**Effects from heritage resource management**

An NSO stipulation is applied to the Chimney Rock Archaeological Area, national scenic trails, national historic trails, national recreation trails, cultural areas designated as special interest areas, and existing National Register districts because these features and their use and management would be incompatible with oil and gas development within their immediate bounds.

**Table 3.15.30 -  Acreage with Heritage Resource Stipulations by Alternative**

| | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| Heritage Districts (NSO) | n/a | 4700 | 4700 | 4700 | n/a |
| Heritage Areas (NSO) | n/a | 5900 | 5900 | 5900 | n/a |
| National Historic Trails (NSO) Stipulation | na | 4900 | 4900 | 4900 | n/a |
| Glade Lake Site (NSO) | na | 300 | 300 | 300 | n/a |
| Bull Canyon (NSO) | 0 | 20 | 20 | 20 | n/a |
| Horse Range Mesa Paleo Site (NSO) | na | 70 | 70 | 70 | n/a |
| Grandview (CSU) | 0 | 40 | 40 | 40 | n/a |
| Indian Henry's Cabin (NSO) | 0 | 10 | 10 | 10 | n/a |
| Mesa Verde Escarpment (NSO) | 0 | 7400 | 7400 | 0 | n/a |
| Sam's World / Mud Springs (NSO) | 0 | 1200 | 0 | 0 | n/a |
| To Protect Archaeological Values | 600 | 500 | 500 | 500 | n/a |

The effects of heritage management stipulations on oil and gas leasing and potential development in the RFD area would be minor. There would be no wells stipulated as NSO, CSU or timing limitations in the San Juan Sag or National Forest portion of the Paradox Basin as a result of the heritage management stipulations in all four of the alternatives.  The No-lease Alternative makes all lands that are not withdrawn, administratively not available for lease resulting in elimination of the oil and gas development projected in the reasonably foreseeable development scenario.  By definition the stipulations described above would not be applied in the No-lease Alternative.

BLM_0030566

**Table 3.15.31 – Effects of Heritage Resource Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| RFD Area Affected | | | | | |
| **Paradox Basin (NF portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Heritage Stipulation Acres | 0 | 300 | 300 | 300 | n/a |
| NSO Stipulation Acres | 0 | 300 | 300 | 300 | n/a |
| CSU or TL Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | |
| Heritage Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| NSO Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| CSU or TL Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| **Wells Eliminated** | 0 | 0 | 0 | 0 | n/a |
| National Forest | | | | | |
| BLM Public Lands | | | | | |
| **Wells Stipulated with NSO** | 0 | 0 | 0 | 0 | n/a |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | | | | | |

**Effects from range management and livestock-grazing**

Guidelines for range management and livestock-grazing do not require any stipulations for oil and gas activities. Occupancy and use for minerals purposes are not restricted by range and livestock management activities. Certain grazing activities, such as grazing on mineral sites that are being reclaimed, are addressed in site-specific management requirements at the application for permit to drill (APD) stage of development.

**Effects from vegetation management**

An NSO stipulation is applied to old-growth forests, proposed special botanical areas and existing and proposed research natural areas for the purpose of protecting those rare or unique vegetation types or structural representations. A CSU stipulation is applied to areas of known mapped invasive-species infestations for the purpose of alerting lessees to that condition and the need to address it in surface-use plans of operation.

BLM_0030567

**Table 3.15.32 - Acreage with Vegetation Stipulations by Alternative**

| | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| Old-Growth Stands (NSO), Ponderosa Pine, Warm-Dry Mixed Conifer, and Pinyon-Juniper | 0 | 3,300 | 2,800 | 3,300 | n/a |
| Special Botanical Areas (NSO) | 0 | 300 | 300 | 300 | n/a |
| Existing and Proposed Research Natural Areas (NSO) | 0 | 11,600 | 7,000 | 5,300 | n/a |
| Invasive Species (CSU) | 0 | 11,000 | 8,700 | 11,100 | n/a |

The effects of vegetation stipulations on oil and gas leasing and potential development in the RFD area would be minor. There would be approximately two wells stipulated as NSO in the San Juan Sag as a result of the vegetation stipulations in Alternatives B, C, and D, and no wells stipulated as NSO as a result of Alternative A. By definition the stipulations described above would not be applied in the No-lease Alternative.

**Table 3.15.33 - Effects of Vegetation Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **RFD Area Affected** | | | | | |
| **Paradox Basin (NF Portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Vegetation Stipulation Acres | 0 | 5,900 | 4,700 | 5,900 | n/a |
| NSO Stipulation Acres | 0 | 2,600 | 2,200 | 2,600 | n/a |
| CSU or TL Stipulation Acres | 0 | 3,200 | 2,500 | 3,200 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| Vegetation Stipulation Acres | 0 | 800 | 800 | 800 | n/a |
| NSO Stipulation Acres | 0 | 300 | 300 | 300 | n/a |
| CSU or TL Stipulation Acres | 0 | 500 | 500 | 500 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 1 | 1 | 1 | n/a |
| **Wells Stipulated with CSU** | 0 | 2 | 1 | 1 | n/a |

BLM_0030568

### Effects from recreation management and use

Several no-surface-occupancy stipulations are applied to areas with objectives for scenic integrity protection and areas where well development would be incompatible with developed recreation-site use, such as ski areas and developed recreation sites. Table 3.15.34 presents the areas stipulated and the acreage stipulated for recreation purposes by alternative.

### Table 3.15.34  –  Acres with Stipulations for Recreation by Alternative

| SPECIES STIPULATED | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Ski Area** NSO – within ski area boundary | 0 | 21,900 | 4,400 | 21,900 | n/a |
| **Developed Recreation Sites** NSO within ¼ mile of developed site | 0 | 6,300 | 6,300 | 6,300 | n/a |
| **Administrative Sites** NSO within ¼ mile of site | 0 | 600 | 600 | 600 | n/a |
| **Dolores River Canyon** NSO | 0 | 33,800 | 23,000 | 33,800 | n/a |
| **National Recreation Trails and the Colorado Trail** NSO – ¼ mile either side of designated trail | 0 | 2,600 | 6,700 | 7,300 | n/a |
| **Recreation-Emphasis Corridors** (Management Area 4) NSO – ¼ mile of major recreation corridors | 0 | 25,400 | 25,600 | 24,900 | n/a |
| **Designated Structured Recreation Management Area** CSU | 0 | 130,500 | 128,500 | 130,400 | n/a |
| **San Juan Skyway** NSO within 1/3 mile of skyway corridor north of Durango | 0 | 12,200 | 12,200 | 12,200 | n/a |
| **To Protect Recreational and Visual Values of the Dolores River Canyon, and Menefee and Weber Mountains** NSO | 27,700 | 1,100 | 1,000 | 1,100 | n/a |

BLM_0030569

Table 3.15.35 presents the effects that recreation NSO stipulations have on implementation of the RFD scenario. Effects are generally the same by alternative; no projected wells would be eliminated by application of the NSO stipulations. Wells stipulated by NSO would approximately total four, meaning the well location would have to be moved to accommodate the recreational use protected. In some instances, wells would have to be moved up to ¼ mile. In other instances, such as with stipulations applied to the Dolores River Canyon, wells would not be permitted within the Canyon proper. This stipulation's effect may be to preclude leasing of tracts within the Canyon or to displace development to the Canyon's rim. There are currently no expressions of interest in leasing within the Dolores River Canyon and the canyon has been previously stipulated as NSO.

**Table 3.15.35 -  Effects of Recreation Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **RFD Area Affected** | | | | | |
| **Paradox Basin (NF portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Recreation Stipulation Acres | 1,411 | 20,000 | 18,100 | 19,100 | n/a |
| NSO Stipulation Acres | 1,411 | 4,200 | 4,200 | 4,200 | n/a |
| CSU or TL Stipulation Acres | 0 | 15,800 | 14,000 | 14,900 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| Recreation Stipulation Acres | 0 | 19,300 | 19,600 | 19,000 | n/a |
| NSO Stipulation Acres | 0 | 2,400 | 2,700 | 2,100 | n/a |
| CSU or TL Stipulation Acres | 0 | 16,900 | 16,900 | 16,900 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 3 | 3 | 3 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 12 | 11 | 10 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030570

Effects from scenery management

A number of stipulations were developed to meet guidelines for scenery management, including:

- High scenic-integrity objective (VRM Class I and II) (NSO) stipulation

- Moderate scenic-integrity objective (VRM Class III) (CSU) stipulation

- Dolores River Canyon (NSO) stipulation

- Special designation trails (NSO) stipulation

- Recreation-emphasis corridors (NSO or CSU) stipulation

- Scenic byways (NSO) stipulation

The NSO stipulations apply to areas with high scenic-integrity objectives including scenic and recreation corridors. The CSU stipulation applies to areas with a moderate scenic-integrity objective. Additional NSO stipulations apply to areas listed above for the purpose of maintaining scenic integrity.  The CSU stipulation allows surface occupancy and use subject to operational constraints consistent with the desired landscape character. Access and other development- and production-related facilities would be allowed but may be moved or modified to preserve scenic resources. Operational constraints may include utilizing topographic and vegetative screening, matching color tones of facilities with surrounding topographic features, orienting the well pad and facilities, redesigning production facilities to such scale that they may not be evident or blend with the vernacular architecture of the area, or placing facilities outside the affected area. Delays and mitigation could increase operator costs. The areas affected by alternative and scenic integrity objectives are shown in the following table.

**Table 3.15.36 - Acreage with Scenic Integrity Stipulation by Alternative**

| | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **National Scenic Trails** (NSO) Stipulation | 0 | 400 | 400 | 400 | n/a |
| **Chimney Rock Viewshed** (CSU) Stipulation | 0 | 1,800 | 1,800 | 1,800 | n/a |
| **High Scenic-Integrity Objective and Level II Visual Resource Foreground Management Area** NSO within mapped foreground areas | 0 | 45,700 | 77,900 | 70,900 | n/a |
| **Moderate Scenic-Integrity Objective and Level III Visual Resource Foreground Management Area** CSU within mapped foreground areas | 0 | 63,000 | 90,100 | 47,100 | n/a |
| **To Protect Scenic Values and Resources (NSO)** Stipulation | 9,300 | 1,600 | 1,600 | 2,400 | n/a |

BLM_0030571

Table 3.15.37 presents the effects that visual-quality NSO and CSU stipulations have on implementation of the RFD scenario. Effects are generally the same by alternative; no projected wells would be eliminated by application of the NSO stipulations. Wells stipulated by NSO and CSU would total two and zero wells respectively. Where wells are stipulated as NSO, the well location would have to be moved to accommodate the visual quality of the area to be protected. In some instances, wells would have to be moved up to one-quarter mile. In the Dolores River Canyon, wells would not be permitted within the canyon proper. This stipulation's effect may be to preclude leasing of tracts within the canyon or to displace development to the canyon's rim. There are currently no expressions of interest in leasing within the Dolores River Canyon and the canyon has been previously stipulated as NSO. The objective of the No-lease Alternative is to make all lands that are not withdrawn, administratively not available for lease. This would result in elimination of all oil and gas development on unleased lands projected in the reasonably foreseeable development scenario. By definition the stipulations described above would not be applied in the No-lease Alternative.

**Table 3.15.37 - Effects of Scenery Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Paradox Basin (NF Portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Scenery Management Stipulation Acres | 8 | 3,700 | 9,700 | 4,400 | n/a |
| NSO Stipulation Acres | 8 | 2,500 | 5,300 | 4,400 | n/a |
| CSU or TL Stipulation Acres | 0 | 1,200 | 4,400 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| Scenery Management Stipulation Acres | 0 | 23,400 | 28,900 | 27,500 | n/a |
| NSO Stipulation Acres | 0 | 2,400 | 14,600 | 13,600 | n/a |
| CSU or TL Stipulation Acres | 0 | 20,900 | 14,300 | 13,900 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 1 | 2 | 5 | 5 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 4 | 5 | 2 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

**Effects from soils management**

An NSO stipulation is applied to steep slopes over 40 percent and to ecological land units listed below that have steep slopes and soil characteristics that are of high risk for mass waiting due to disturbance. In addition, the Gypsum Valley Management Area is stipulated as NSO to protect highly erodible soils.

The effect of soil/geology protection stipulations on oil and gas development would be moderate. Approximately 16 projected wells would be stipulated as NSO. That is approximately 10 percent of the wells projected in the RFD for the National Forest portion of the Paradox Basin and the San Juan Sag. An additional seven wells would be stipulated CSU for soil/geology protection (Table 3.15.39). Most of the steep-slope stipulation acres are in areas outside of the RFD area. By contrast, the RFD area has about 10 percent of the land area that would require application of an NSO stipulation for steep-slope conditions.

**Table 3.15.38 –  Acreage with Soils Stipulations by Alternative**

| | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| Slopes Greater than or Equal to 40% NSO | 0 | 149,900 | 142,800<br>0<br>75,800 | 144,800<br>0<br>81,600 | n/a<br>n/a |
| Slopes Greater than or Equal to 40% CSU | 245,900 | 0 | 20,000<br>600<br>10,800 | 20,200<br>3,800<br>10,800 | n/a |
| Slopes of 25% to 40% (CSU) | 0 | 80,500 | | | |
| Ecological Land Units 254, 386, 606, 720, 926, 20511D, 30506D, 34301D, 34306D, 34506D, 50803D, 50806D, 70806D, 70807D, 74803D, 80604D, 80803D, 80804D (NSO) | 0 | 22,200 | | | n/a<br>n/a<br><br><br>n/a |
| Gypsum Soils (CSU) | 0 | 600 | | | |
| Fruitland Formation at Outcrop Zone and 1½ mile Basinward (NL) - Other horizons (e.g., Mesa Verde) available | 0 | 10,800 | | | |

BLM_0030573

**Table 3.15.39 - Effects of Soil Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **RFD Area Affected** | | | | | |
| **Paradox Basin (NF Portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Soil Management Stipulation Acres | 32,000 | 33,500 | 32,500 | 33,400 | n/a |
| NSO Stipulation Acres | 0 | 20,500 | 19,700 | 20,400 | n/a |
| CSU or TL Stipulation Acres | 32,000 | 13,000 | 12,800 | 13,000 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| Soil Management Stipulation Acres | 2,700 | 26,300 | 23,400 | 23,500 | n/a |
| NSO Stipulation Acres | 0 | 18,100 | 15,200 | 15,300 | n/a |
| CSU or TL Stipulation Acres | 2,700 | 7,200 | 7,200 | 7,200 | n/a |
| **Wells Eliminated** | | | | 0 | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | | n/a |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 16 | 16 | 16 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 7 | 7 | 7 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

**Effects from special use management**

Generally no stipulations are required by guidelines for special uses. However, certain mineral-related activities (roads, pipelines, gathering lines, power lines) may require special use permits and will be affected by guidelines for special uses. Guidelines applied to special use activities associated with oil and gas could increase operator costs. One category, administrative sites, is analyzed in this section. Administrative sites total 600 acres and would be assigned an NSO stipulation within an area inclusive of one-quarter mile of the administrative site. Application of this stipulation would not affect oil and gas development. There is sufficient flexibility in field siting of oil and gas facilities that administrative sites would not be affected.

**Effects from water management**

An NSO stipulation is developed to meet guidelines for water, wetlands, riparian, and floodplain areas. The NSO stipulation is applied to maintain water quality, hydrologic integrity, and riparian area and wetland composition, structure, and function. (See the Revised Management Plans, Appendix H, Oil and Gas Stipulations). Access and other development- and production-related facilities would be allowed subject to identified operational constraints. Refer to the table below for acreages where the stipulation would be applied. Areas adjacent to reservoirs and eligible Wild and Scenic river segments would be stipulated NSO.

BLM_0030574

**Table 3.15.40 – Acreage with a Water Management Stipulation by Alternative**

| | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| Reservoirs Greater than 100 acres within ¼ mile of reservoir NSO | 0 <br><br> 0 | 4,000 | 4,000 | 4,000 | n/a |
| Eligible Wild and Scenic River Segments NSO / CSU | | 58,700 | 42,000 | 68,600 | n/a |
| Known Wetland and Riparian Areas CSU | 15,800 | 2,700 | 2,700 | 2,700 | n/a |
| Wetlands, Floodplains, Riparian Areas, Water Influence Zones and Fens (NSO) | 0 | 17,100 | 16,500 | 17,000 | n/a |

The effect of water management on oil and gas development would be minor to moderate. Approximately four projected wells would be stipulated with NSO. That is approximately 2 percent of the wells projected in the RFD for the National Forest portion of the Paradox Basin and the San Juan Sag. An additional seven wells would be stipulated CSU for watershed protection (Table 3.15.41).

**Table 3.15.41 – Effects of Water Management on Oil and Gas Development Based on the Reasonably Foreseeable Development Scenario**

| JURISDICTION | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **RFD Area Affected** | | | | | |
| **Paradox Basin (NF Portion)** | | | | | |
| Total Acres | 229,945 | 229,945 | 229,945 | 229,945 | 229,945 |
| Water Management Stipulation Acres | 2 | 7,600 | 7,600 | 7,600 | n/a |
| NSO Stipulation Acres | 0 | 7,600 | 7,600 | 7,600 | n/a |
| CSU or TL Stipulation Acres | 2 | 0 | 0 | 0 | n/a |
| **San Juan Sag** | | | | | |
| Total Acres | 205,804 | 205,804 | 205,804 | 205,804 | 205,804 |
| Water Management Stipulation Acres | 0 | 7,800 | 4,100 | 7,700 | n/a |
| NSO Stipulation Acres | 0 | 7,800 | 4,100 | 7,700 | n/a |
| CSU or TL Stipulation Acres | 0 | 0 | 0 | 0 | n/a |
| **Wells Eliminated** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with NSO** | | | | | |
| National Forest | 0 | 6 | 6 | 6 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |
| **Wells Stipulated with CSU or TL** | | | | | |
| National Forest | 0 | 0 | 0 | 0 | n/a |
| BLM Public Lands | 0 | 0 | 0 | 0 | n/a |

BLM_0030575

**Effect of NSO stipulations on RFD projection**
The following discussion primarily focuses on the differences between the alternatives in terms of how the amount of acres under NSO affects the oil and gas resource. Although acres where a CSU would be applied vary by alternative, a CSU stipulation permits year-round occupancy on leased lands, offers access, and maintains the potential for discovery and development of oil and gas resources. Timing stipulations allow drilling at certain times of the year and thus maintain the potential for discovery and development of oil and gas resources.

In addition to the amount of acres stipulated, the shape of an area with an NSO stipulation affects the ability to access the subsurface resource from adjacent lands. In Alternatives B and C, areas assigned an NSO stipulation generally tend to be large  blocks, whereas in Alternatives A and D, areas with NSO tend to be smaller units. Refer to the oil and gas alternative maps for further illustration.

Wells that would not be able to be drilled with surface occupancy on leased lands were identified for each alternative (see the following table).

"Affected" is defined as those wells that were projected in the RFD that are subject to the leasing decisions made in this LRMP/RMP revision. For each of the wells that would be displaced, the cost of drilling is greater, and the optimum location for best recovery of the resource may not be realized. The effects may be considerable.

Decisions to not lease lands and stipulations applied by the various alternatives could affect well locations and could, in some cases, eliminate wells, resulting in only a portion of the RFD scenario's implementation. The analysis of the effects of the stipulations applied to the RFD area suggests that approximately 13 wells would be eliminated in Alternative C and approximately four wells in the other alternatives as a result of a not-available-for-lease decision. The use of an NSO stipulation would more heavily impact the RFD projection.  The 170 projected wells that would be drilled in the National Forest portion of the Paradox Basin and within the San Juan Sag would be directly influenced by leasing decisions made for this LRMP/RMP revision. Of that total, a high of 65 wells in Alternative C and a low of nine wells in Alternative A would be stipulated by an NSO (Table 3.15.42). The differences between the alternatives are primarily a function of the number of acres within each alternative that emphasize the undeveloped character of large blocks of contiguous land and non-motorized recreational activities. Alternative C provides that emphasis to a larger degree than the other alternatives. In contrast, Alternative A (current management) has the least amount of acres allocated to stipulations other than standard stipulations and least amount of acres stipulated NSO.

Projected development activity levels may not change across alternatives as a result of the number of NSO areas and their acreage (Table 3.15.42 above); however, the amount of NSO acres by alternative suggests that Alternative A presents the greatest opportunity for oil and gas development, followed by Alternatives C, B and D. It is assumed that if a no-surface-occupancy lease is purchased, then the lessee would pursue development. However, if the NSO areas are large, operators may choose to nominate only portions of the NSO areas for lease. In such case, there would be fewer wells drilled in those NSO areas with potential for oil and gas development. Table 3.15.43 presents a summary of the NSO stipulations that apply to the San Juan Public Lands and their acreage.

BLM_0030576

**Table 3.15.42 - Effects of Alternatives on Oil and Gas Development as a Result of Not Available and NSO Stipulations - Based on the Reasonably Foreseeable Development Scenario**

| | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| Total Wells Projected (RFDS) Currently Unleased lands | 170 | 170 | 170 | 170 | 170 |
| Wells Eliminated | 3 | 12 | 22 | 5 | 170 |
| Wells Stipulated by NSO - National Forest and BLM Public Lands | 7 | 56 | 39 | 41 | n/a |

BLM_0030577

## Table 3.15.43 - NSO Stipulations by Acres

| SPECIES STIPULATED | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Mexican Spotted Owl** (Species not identified on the San Juan Public Lands) (Protected Activity Centers (NSO) | not mapped | not mapped | not mapped | not mapped | n/a |
| **Uncompahgre Fritillary Butterfly** NSO – known suitable habitat | not mapped | not mapped | not mapped | not mapped | n/a |
| **Gunnison Sage Grouse** NSO – within 0.6 miles of known lek site NSO– nesting habitat within 0.6 mi. to 4.0 mi. of lek site | 0 0 | 280 67,757 | 196 53,522 | 280 69,061 | n/a |
| **Bald Eagle** NSO – within ¼ mile of nest or winter roost site | 3,710 | 547 | 547 | 547 | n/a |
| **Peregrine Falcon** NSO – within ½-mile radius of cliff nesting complex | 3,018 | 6,551 | 6,551 | 7,568 | n/a |
| **Goshawk** NSO – within 30 acres of known occupied and alternate nests | not mapped | not mapped | not mapped | not mapped | n/a |
| **Raptors (osprey)** NSO - to protect raptor nests | 79 | 79 | 79 | 79 | n/a |
| **Bats** NSO – within ¼ mile of known maternity roosts | not mapped | not mapped | not mapped | not mapped | n/a |
| **Colorado River Cutthroat Trout** NSO – within 1/4 mile of known pure populations | not mapped | not mapped | not mapped | not mapped | n/a |
| **Water Sources in Wild Horse Herd Area** NSO – within 2,000-ft. radius of water sources | 0 | 2,667 | 2,667 | 2,667 | n/a |
| **Sharp-Tailed Grouse Display Grounds** TL- March 1 - June 15 within line of site of display ground | not mapped | not mapped | not mapped | not mapped | n/a |
| **Heritage Districts** (NSO) | n/a | 4,700 | 4,700 | 4,700 | n/a |
| **Heritage Areas** (NSO) | n/a | 5,900 | 5,900 | 5,900 | n/a |
| **National Historic Trails** (NSO) Stipulation | n/a | 4,900 | 4,900 | 4,900 | n/a |
| **Glade Lake Site** (NSO) | n/a | 300 | 300 | 300 | n/a |
| **Bull Canyon** (NSO) | n/a | 20 | 20 | 20 | n/a |
| **Horse Range Mesa Paleo Site** (NSO) | 0 | 70 | 70 | 70 | n/a |
| **Indian Henry's Cabin** (NSO) | 0 | 10 | 10 | 10 | n/a |
| **Mesa Verde Escarpment** (NSO) | 600 | 7,400 | 7,400 | 0.00 | n/a |

BLM_0030578

**Table 3.15.43 - NSO Stipulations by Acres, continued**

| SPECIES STIPULATED | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Sam's World / Mud Springs** (NSO) | | 1200 | 0 | 0 | n/a |
| **To Protect Archeological Values** (NSO) | 0 | 500 | 500 | 500 | n/a |
| **Old-Growth Stands** (NSO), Ponderosa Pine, Warm-Dry Mixed Conifer, and Pinyon-Juniper | 0 | 0 | 0 | 0 | n/a |
| **Special Botanical Areas** (NSO) | 0 | 0 | 0 | 0 | n/a |
| **Existing and Proposed Research Natural Areas** (NSO) | 0 | 0 | 0 | 0 | n/a |
| **Ski Area** NSO – within ski area boundary | 0 | 21,900 | 4,400 | 21,900 | n/a |
| **Developed Recreation Sites** NSO within ¼ mile of developed site | 0 | 6,300 | 6,300 | 6,300 | n/a |
| **Administrative Sites** NSO within ¼ mile of site | 0 | 600 | 600 | 600 | n/a |
| **Dolores River Canyon** NSO | 0 | 33,800 | 23,000 | 33,800 | n/a |
| **National Recreation Trails and the Colorado Trail** NSO – ¼ mile either side of designated trail | 0 | 2,600 | 6,700 | 7,300 | n/a |
| **Recreation-Emphasis Corridors** (Management Area 4) NSO – ¼ mile of major recreation corridors | 0 | 25,400 | 25,600 | 24,900 | n/a |
| **San Juan Skyway** NSO within 1/3 mile of Skyway corridor north of Durango | 27,700 | 12,200 | 12,200 | 12,200 | n/a |
| **To Protect Recreational and Visual Values of the Dolores River Canyon, Menefee, and Weber Mountains** NSO | 0 | 1,100 | 1,000 | 1,100 | n/a |
| **Roadless Areas** allocated to NSO | 0 | 452,800 | 25,500 | 504,000 | n/a |
| **National Scenic Trails** - (NSO) Stipulation | 0 | 400 | 400 | 400 | n/a |
| **High Scenic-Integrity Objective and Level II** | 9,300 | 45,700 | 77,900 | 70,900 | n/a |
| **Visual Resource Foreground Management Area** - NSO within mapped foreground areas | 0 | 1,600 | 1,600 | 2,400 | n/a |
| **To Protect Scenic Values and Resources** (NSO) Stipulation | 0 | 149,900 | 142,800 | 144,800 | n/a |
| **Slopes Greater than or Equal to 40%** NSO | 0 | 22,200 | 20,000 | 20,200 | n/a |

BLM_0030579

**Table 3.15.43 - NSO Stipulations by Acres, continued**

| SPECIES STIPULATED | Alternative A | Alternative B | Alternative C | Alternative D | No Lease Alternative |
|---|---|---|---|---|---|
| **Ecological Land Units** 254, 386, 606, 720, 926, 20511D, 30506D, 34301D, 34306D, 34506D, 50803D, 50806D, 70806D, 70807D, 74803D, 80604D, 80803D, 80804D (NSO) | 0 | 10,800 | 10,800 | 10,800 | n/a |
| **Fruitland Formation Outcrop Zone** (NSO) Reservoirs Greater than 100 acres  Within ¼ Mile of Reservoir NSO | 0 | 4,000 | 4,000 | 4,000 | n/a |
| **Eligible Wild and Scenic River Segments** NSO / CSU | 0 | 58,700 | 42,000 | 68,600 | n/a |
| **Wetlands, Floodplains, Riparian Areas, Water Influence Zones, and Fens** (NSO) | 0 | 17,100 | 16,500 | 17,000 | n/a |

BLM_0030580

## INTRODUCTION

The following section deals with locatable minerals, mineral materials, and solid leasable minerals.

Within the planning area, mineral resource has been significant in the past. Current resource estimates indicate valuable reserves within portions of the planning area. Major solid-minerals activity is primarily restricted to the Slick Rock area (Dove Creek/BLM). Minor activity may occur on a small scale in the Silverton (BLM), Rico (USFS), and La Plata (USFS) areas of the SJPL.

The BLM and the USFS manage mineral-related activities consistent with multiple-use management principles. The exploration, development, and production of solid-minerals resources is integrated with the use, conservation, and protection of other resources.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- **The United States Mining Laws of 1872**: This act allows exploration, development, and production of minerals from mining claims on public lands.

- **The Organic Administration Act of 1897**: This act extends the operation of the U.S. Mining Laws to USFS lands reserved from the public domain.

- **The Mineral Leasing Act of 1920**: This act establishes the leasing system for the exploration and development of coal, phosphate, sodium, oil shale, oil, and gas.

- **The Department of Agriculture Organic Act of 1944**: This act provides for the protection and management of resources of USFS lands.

- **The Mineral Leasing Act for Acquired Lands of 1947**: This act extends the provisions of the mineral leasing laws to the mineral estate on lands acquired by the Federal government, and requires the consent of the Secretary of the Interior (BLM) or Agriculture (USFS) prior to leasing.

- **The Common Varieties of Mineral Materials Act of 1947**: This act authorizes disposal of common variety minerals. It also allows free use by government agencies, municipalities, and nonprofit organizations.

- **The Multiple Use Mining Act of 1955**: This act allows the sale of mineral materials (including sand and gravel) and provides direction for the multiple uses of surface resources of mining claims.

- **The Endangered Species Act of 1973**: This act requires the protection of habitat for endangered species.

- **The Surface Mining Control and Reclamation Act of 1977**: This act allows the Secretary of Agriculture to enter into agreements with States in order to regulate surface coal-mining operations on USFS lands. It also directs the Secretary of Agriculture to conduct a Coal Unsuitability Assessment in order to determine the suitability of USFS lands for surface coal mining operations.

BLM_0030581

**REGULATIONS AND POLICIES**

- **Title CFR 36, Part 228A**: This requires mining claimants to file an operating plan or notice of intent for proposed mining activities on USFS lands.

- **Title CFR 36, Part 228C**: This regulates the disposal of common variety mineral materials.

- **Title CFR 43, Parts 3400, 3600, and 3800**: These provide guidance for the management of coal, mineral materials, and locatable minerals for the BLM.

**DESIGN CRITERIA**

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to solid minerals. Guidelines and design criteria are presented in Part 3 of Volume II of the DLMP/DEIS.

## AFFECTED ENVIRONMENT

**EXISTING CONDITIONS AND TRENDS**

Federally owned mineral resources are managed under three categories, all with differing sets of laws and regulations:

- **locatable minerals**: These are subject to claim under the Mining Law of 1872, as amended;

- **mineral material/common variety**: These are disposable by discretionary direct sale or free use; and

- **leasable minerals**: These are subject to lease under the Mineral Leasing Act of 1920, as amended).

Most locatable minerals (including precious and base metals, uranium, and certain types of limestone), mineral materials (including sand, gravel, and construction stone), and some leasable minerals (including coal) are extracted by mining methods. Due to the similarity in development techniques and environmental impacts, these minerals are discussed as solid minerals. The non-solid or fluid leasable minerals category includes oil, gas, and geothermal energy. Due to the dissimilarity in development techniques, methods, and environmental impacts, oil, gas, and geothermal energy are discussed in separate sections. The SJPLC conducted an assessment of the potential for occurrence of mineral deposits.(In relation to USFS-administered lands, the results are included in Van Loenen et al. (1997), and summarized in the Solid Minerals, Geothermal Energy, and Fluid Minerals sections in this chapter.)

Solid-minerals resource potential is based primarily on the geological setting and the interpretations regarding the likelihood that favorable rocks are present. These interpretations consider the results of previous studies, as well as mining history and production, geochemistry and geophysics, and data from mineral files. The attributes of known ore deposits and mineral occurrences were used to define favorable areas within permissive terrains in the planning area (Van Loenen et al. 1997). Types of solid-minerals deposits by area and current activity are summarized in Table 3.16.1.

BLM_0030582

**Table 3.16.1 – SJPL Areas Favorable for Solid Minerals and Mineral Activity**

| AREA | MINERAL TYPE | CURRENT ACTIVITY |
|---|---|---|
| Slick Rock/Dove Creek Uravan Mineral Belt | Uranium, vanadium | Mining claims, exploration, development |
| Rico-Dunton | Gold, silver, lead, zinc, copper | No current activity |
| Graysill | Vanadium | No current activity |
| La Plata | Gold, silver, lead, copper | Minor placer-mining activity |
| Silverton | Gold, silver, lead, zinc, copper | Minor lode mining activity |
| Needle Mountains | Gold, silver, copper, uranium | No current activity |
| Chimney Rock (Durango KRCRA) | Coal | No current activity |
| SJPL-wide | Mineral materials: glacial deposits, talus slopes, road cuts, rock glaciers, fossil gravel terraces | Small-scale activity across SJPL |

High to moderate solid-minerals potential also occurs within the Lizard Head Wilderness (Mount Wilson/Navajo Basin area), the Weminuche Wilderness Area (Piedra headwaters area), and the South San Juan Wilderness Area (Quartz Creek area) (Van Loenen et al. 1997). These areas, however, are withdrawn from mineral entry under the terms of the Wilderness Act of 1964, and cannot be claimed or developed unless there are valid existing rights.

Mineral activity that is considered "recreational" in nature consists of exploration for, and recovery of, gold using hand-panning and small-diameter (less than 4-inch diameter intake) suction dredging equipment. This activity typically does not result in environmental impacts, and does not result in filing and development of mining claims. Small-diameter suction dredging in active stream channels is excluded from U.S. Army Corps of Engineers Section 404 permit requirements. These operations are typically not bonded, and are monitored by the agency with jurisdiction over the affected land. The planning area averages approximately three such operations each year (typically during summer).

### Locatable Minerals

Historically, mineral exploration and development have played key roles in defining the character and landscape pattern within the planning area. The subregion is especially well endowed with locatable mineral resources. World-class deposits of precious and base metals occur along a northeast-to-southwest trend (from Aspen through Silverton, and Telluride southward to the La Plata Mountains). These deposits include massive sulfides, vein, and metallic replacement deposits largely associated with Tertiary volcanic centers.

Prospecting and mining in the San Juan Mountains dates back more than 120 years. The first recorded discovery of gold in this region was in 1848, in the Silverton area. This was followed by discoveries in the Durango and Rico areas in the 1860s. Mining of placer gold began in Summitville and Silverton in 1870, and along the La Plata River in 1873. Following a treaty with the Ute Indian Tribe in 1874, most of what is now the planning area was officially opened for mineral prospecting. Lode deposits of gold and silver were discovered, and mined, from 1875 through 1900 in the Rico, La Plata, Needle Mountains, and Silverton areas.

BLM_0030583

During the mid-1890s, depletion of easily mined reserves, as well as the the collapse of silver prices in 1893, resulted in most mining operations closing down. At the same time, workers developed coal deposits, which provided an important energy resource to mining and other industries, agriculture, and domestic needs. A new spike in metal mining and production occurred from 1900 to 1910, and continued at varying levels until the closure of gold mines by the government during World War II. After the war, new technologies and the growing economy spurred renewed mining within the region.

Most solid-mineral sites are historic and not currently active. Where these sites are on private land within the planning area (as a result of patenting of mining claims), they are of particular concern to SJPLC management. Streams influenced by mining on these sites carry sedimentation and contamination downstream across the planning area and beyond (See the Water section in this chapter).

**Mining Claim Density**

Mining claim density provides an important measure of historic and current interest in areas having potential for both lode and placer minerals, as summarized in Table 3.16.1.

**Placer Claims**

The distribution of open (currently filed) placer claims indicates areas that are most likely to be affected (impacted) by placer mining disturbance. Most claims are associated with alluvial deposits along stream channels and valley bottoms. Large-scale development of alluvium may have profound impacts on hydrology and valley-bottom morphology. The current level of development on placer claims is low. There are 38 claims containing approximately 1,821 acres of valley bottoms along Mineral Creek and the Animas River (downstream from Silverton), Cascade Creek (below the La Plata Mountains), and Dolores River (downstream from Rico).

Closed placer claims have been terminated, abandoned, or are otherwise no longer subject to development. There are 655 closed claims in the same geographic trends as open placer claims. The presence of current, or historical, claims does not directly indicate disturbance at any level; it merely indicates the possibility of disturbance. Many of the current and closed claims show no disturbance. Even so, the patterns highlight areas deserving of attention and monitoring, and point to areas with likely historic, current, and foreseeable future disturbance.

**Lode Claims**

Placer claims are almost entirely filed for the extraction of gold. Lode claims cover many types of mineral commodity within the planning area. Lode claim distributions, like placer claim distributions, are strong indicators of historic and potential interest and mining activity. The planning area has 486 open lode claims associated with a variety of geological settings and mineral types. Approximateley one-half of these claims are concentrated in the same areas as those for placer claims discussed above (Silverton, the La Plata Mountains, and Rico). They involvie the valley bottoms, as well as the headwaters areas, which are the sources of the precious minerals concentrated in the downstream placer claims.

An important area that does not include placer claims is the Uravan mineral belt along the Dolores River (in the Slick Rock and Dove Creek areas), which hosts important sandstone-based deposits of uranium and vanadium. These deposits were the object of significant development activity in the 1950s and 1960s, which lead to an economic boom at that time. The boom influenced the growth of important Colorado Plateau communities including Cortez, Durango, Grand Junction, and Moab.

The remainder of the lode claims are scattered across the planning area, and are typically isolated historical exploration or small-development mining operations.

BLM_0030584

In descending order of number of claims filed, the most important locatable mineral commodities claimed are uranium, vanadium, base metal (lead, copper, and zinc), silver, and gold. Historically, base and precious metals were the most valuable of the locatable minerals. Today, however, they represent only a modest part of the current activity. The growing level of interest in uranium indicates the importance of energy development in the region today. Vanadium, likewise, is of modern interest, as a critical metal for hardening steel.

Deposits of uranium and vanadium (recovered as a by-product of uranium refining) were discovered and mined in the 1950s at the Graysill (Rico) area and at the Slick Rock/Dove Creek area (driven by the nuclear arms race and the growth of the domestic nuclear energy program and nuclear medicine). By the mid-1970s, environmental regulations, the Three Mile Island accident, and the slow-down in the arms race, reduced the demand for uranium. By the end of the Cold War, most uranium mining had ceased. Recent interest in nuclear power generation, as well as other demands, have kept the interest for uranium alive in the Slick Rock/Dove Creek area (locally known as the Uravan Mineral Belt). As of January 2007, there were an estimated 500 mining claims filed within the planning area for uranium and vanadium.

Limestone valuable for chemical and industrial use is locatable. No development is currently active within the plannin area; however, deposits of suitable limestone occur throughout the planning area. The Animas River Valley contains the most significant, and most accessible, resources. Historic proposals to mine this material led to the withdrawal of deposits in order to protect scenic values along the U.S. Highway 550 corridor. Demand for limestone for use as a chemical scrubber for coal-fired power plants may increase, unless technology replaces limestone's usefulness. If limestone remains valuable for this purpose, proposals for mining of limestone in the Animas Valley may be filed.

Other solid minerals, including coal and mineral materials (gravel and stone), are extracted by mining methods. They are not, however, subject to claim under the Mining Law. Coal deposits are developed under a Federal leasing program. Mineral materials are disposed of under discretionary sale authority, and are discussed below. The SJPLC may request that the Department of Interior institute formal withdrawal from locatable mineral entry if mineral development would conflict with the management area (MA), or for other management reasons. Within the DLMP/DEIS, some areas are recommended for land designations that would require withdrawal (including Wilderness Area designation); however, the DLMP/DEIS does not request the withdrawal process to be initiated. There are currently no pending requests for withdrawal of SJPLC-administered lands. Withdrawal is a function of the SJPLC lands program (See the Lands and Realty section in this chapter).

### Mineral Materials
Mineral materials, also referred to as "Salable" and "Common Variety" minerals, are generally low-value deposits of sand, clay, and stone. These materials are used for building materials, aggregate, bulk fill, rip-rap, road surfacing, decoration, and landscaping. Disposal of these materials is discretionary; the public does not have a statutory right to these materials.

Deposits of limestone and aggregates were developed in order to build railroads, roads, and provide a source for concrete along with clay for brick and ceramics. Today, common variety mineral (including sand and gravel) development continues to be important in the subregion, as well as in the surrounding western states. The SJPLC has conducted an assessment of the potential for occurrence of mineral material deposits (Van Loenen et al. 1997), as summarized below.

BLM_0030585

Unlike most locatable minerals, mineral material resources occur as a result of erosion, deposition, or exposure of widespread geological formations (rock types or layers). Common sites for natural concentrations of small to large amounts of such materials are canyon walls, stream channels, talus slopes, landslides, ancient river terraces, glacial moraines, and floodplains. Road cuts, quarries, and pits increase the amount of material available for extraction.

Areas with known resources, or areas that are favorable for resources of sand and gravel, may contain materials that are ready for use; or that are suitable for screening, washing, or crushing in order to meet size or fine-material requirements. Areas of Quaternary Age alluvium, colluvium and glacial drift, as well as areas of river terrace deposits, contain sand and gravel suitable for use with minimal treatment. Talus slopes of late Cretaceous and Tertiary Age igneous rock produce material suitable for crushing, lightweight aggregate, and dimension stone. Late Cretaceous and Tertiary Age igneous intrusives produce dimension stone and large aggregate. Late Cretaceous sedimentary rock produces dimension stone and aggregates.

Large boulders are found throughout the planning area in stream deposits, glacial drift, and till, landslides, and floodplains. Most are found at higher elevations, and those closest to existing roads are primary targets for purchase.

Mineral materials constitute an administrative class largely made up of sand and gravel borrow pits and large-scale operations. These operations are typically correlated to roadways and valley bottom settings with alluvial deposits.

Currently, the planning area has approximately 20 active sand and gravel sites. Due to the informal nature of many borrow pits, and to the lack of reporting, it is likely that this number does not include all sites. Most mineral materials are collected from road cuts, stream channel banks, or alluvial deposits; therefore, the sites typically are located in valley bottoms. Ute Creek, the Animas River, and San Juan River above Pagosa Springs have active sites.

## SOLID LEASABLE MINERALS

### Uranium

The U.S. Department of Energy (DOE) leases several tracts of withdrawn public land within the planning area (the Slick Rock, and a portion of the Paradox Lease Tract areas) for uranium and vanadium mining (Uranium Leasing Program Environmental Assessment, US DOE, July 2007). The DOE estimated the reasonably foreseeable development level for its lease tracts over a 15-year period (the equivalent of the San Juan LMP implementation period) at 42 new and 1 existing mining operation, with a total of approximately 420 acres of surface disturbance spread across all proposed and current lease tracts. The SJPLC-administered lease tracts currently have 31 acres of disturbance related to active operations, which is approximately 7% of the total DOE lease tract disturbance. The DOE did not project disturbance figures for individual lease tracts; however, it is reasonable to assume an additional 160 acres of disturbance over the LMP period for the planning area lease tracts.

BLM_0030586

## Coal

Within the planning area, coal occurs along the margins of the Paradox and San Juan Basins. These outcrops are of late Cretaceous and early Tertiary Age.

Coal has been produced in Colorado, New Mexico, and Utah since the middle of the Nineteenth Century. Due to the expansion of the railroads in the region, coal production in Colorado expanded to become the largest in the West. Production in all three States grew from the turn of the Twentieth Century, to a peak prior to the Great Depression. Production tapered off through the war years and 1950s, with a resurgence beginning in the 1970s. Historically, small underground and surface mines that support local markets followed the northern edge of the San Juan Basin between Durango east to Pagosa Springs (more or less along the U.S. Highway 160 corridor). These mines, and related prospects, are largely abandoned. There are currently six coal mines operating in, or adjacent to, the planning area. Four of these are located immediately west of Durango; two are located between Durango and the Piedra River. More recently, large-scale mines have been developed in the region outside of the planning area in order to feed regional power generation needs. Of the 56 regional coal mining sites, these constitute major operations with significant disturbance of surface and subsurface systems.

## Coal Unsuitability Assessment

Under the terms of the Surface Mining Control and Reclamation Act of 1977 (SMCRA), the San Juan National Forest (SJNF) conducted a Coal Unsuitability Assessment in order to determine the suitability of certain USFS lands for surface coal mining leasing and development operations. Twenty Unsuitability Criteria and appropriate Exceptions and Exemptions were applied to the Durango and Menefee Known Recoverable Coal Resource Areas (KRCRAs), as identified by the U.S. Geological Survey. The results defined a portion of the Durango KRCRA as suitable for surface coal-mining operations, and were included in the 1983 SJNF Land and Resource Management Plan. (The results of that assessment are incorporated herein by reference.) One surface coal mine was in application for lease extension and surface coal mining operational approval (Chimney Rock Coal Mine). Operations were conducted on both USFS and BLM lands. In 1985, operations at the mine were terminated, and the mine site has since been reclaimed.

## Trends

The trends noted in previous LMPs have not changed dramatically, except for the renewed interest in uranium/vanadium mining (both as locatable mining claims and as DOE uranium leases) driven by energy and military demand. However, changes in pricing factors may rapidly alter the level of interest in development of most mineral commodities. A substantial increase in demand for minerals may increase the filing and development of mining claims in established mining districts and areas once considered marginal. This, in turn, would result in increased conflict with other land and resource values and uses; initiate new administrative, political, and legal issues in choosing management priorities; generate public concerns over changing management; place economic pressures on managers and local communities; place local values against regional or national needs; and generate demands to answer all of these concerns within a short time period.

Locatable minerals are subject to claim and development under the Mining Law. Management options are often limited once claims are filed on valuable mineral deposits. It is also difficult to plan for, or prepare to deal with, the demands for locatable mineral development. This is because it cannot be known with certainty when claims will be filed and development plans proposed.

BLM_0030587

In areas where land managers have determined that the potential value of the mineral estate does not justify the environmental impacts of development, the surface management agency may propose withdrawal of the land from operation of the Mining Law. In withdrawn areas where claims exist, the agency may challenge the validity of the claims. When Plans of Operation for mining claims are proposed, the agency would review and approve those Plans, with appropriate environmental protection measures applied and monitored for compliance.

Mineral materials are subject to disposal at the discretion of SJPLC; the public does not have a statutory right to demand development. SJPLC management options are, therefore, broad. Planning for development of mineral material sites can be undertaken independent of outside pressure, and phased in in order to meet demand as it grows. Demands for new types of mineral materials (such as boulders for river renovation projects) can be assessed before these resources are removed.

In areas where land managers have determined that the potential value of the mineral material does not justify the environmental impacts of development, the agency may preclude any development, or accept and consider development proposals on a case-by-case basis. The SJPLC may approve Plans of Operation for mineral material development, with appropriate environmental protection measures applied and monitored for compliance, or may deny such Plans.

Coal is disposed of under the Federal coal leasing program. The SJPLC must review and approve issuance of leases for coal development. Although it cannot be known with certainty when lease applications would be filed and development plans proposed, the SJPLC can schedule the required analysis process in order to accommodate the workload, as needed.

In areas where land managers have determined that the potential value of the coal estate does not justify the environmental impacts of development, the agency may deny applications for coal leases, thereby precluding any development. When Plans of Operation for existing leases are proposed, the agency would review and approve those Plans, with appropriate environmental protection measures applied and monitored for compliance.

### Locatable Minerals

The demand for mineral resources is driven by price, which, in turn, is governed by improvements in technology of exploration, production, refining, transportation, manufacture, and use; changes in lifestyle; changes in regulation and availability of land and access; changes in patterns of supply and demand (both domestically and internationally); and changes in broad national policy areas (including military conflict, security, and strategic reserves). The planning area has reserves of precious metals used for industrial, cosmetic, and investment purposes; as well as base metals (copper, lead, zinc, molybdenum, tin, tungsten, bismuth, and tellurium) used for a variety of industrial purposes. The planning area has reserves of uranium used for domestic power generation, medicine, and weapons; as well as vanadium used in steel production. Currently, important locatable mineral interests within the planning area are limited to uranium and vanadium (in the Dove Creek area). The increasing interest in nuclear power generation, as well as the need for vanadium (a by-product of uranium development), for modern energy, air, and space, power, and weapons technology, are likely to rapidly increase the demand for uranium exploration, development, and processing. Demand for limestone for use as a chemical scrubber for coal-fired power plants may increase, unless technology replaces limestone's usefulness. If limestone remains valuable for this purpose, proposals for mining of limestone in the Animas Valley may be filed.

BLM_0030588

A growing "recreational" interest in gold exists throughout the planning area. Gold prices are now about double what they were for the previous decade, and the leisure industry (coupled with powerful improvements in metal-detection technology), have spurred on the hobby "prospector."

Recent increases in copper demand domestically, and the continued growth of demand overseas for base metal reserves may result in increased domestic exploration and production (once prices rise enough to of-fset the increasing costs of environmental protection).

## Mineral Materials

Within the planning area, demand for small amounts of hand-collected decorative and landscape stone can be met. The competition for gravel and aggregate may likely result in more development of quarries and pits within the planning area, as well as on adjacent private lands (and preference for planning area reserves to be used only for local, State, and Federal road agencies).

Increasing construction in all area communities is creating a growing demand for aggregate and fill materials, as well as for decorative and landscaping stone. The building of new roads, and the maintenance and improvement of existing roads, may create increasing demand for aggregate for asphalt and cement and gravel for road surfaces. Large boulders are a growing target for purchase (for landscaping and river improvement projects). Prices charged for all mineral materials are low, and a new series of appraisals is needed in order to adjust prices to meet current economics.

## SOLID LEASABLE MINERALS

### Uranium

The DOE has issued a decision (July 2007) to expand its uranium leasing program to reactivate currently inactive lease tracts. This would increase the areas subject to potential uranium/vanadium mining activity within the planning area by approximately 120%. The DOE does not project that mining would occur on all potential lease tracts; however, the primary limiting factor cited by the DOE to expanded uranium/vanadium mining is the lack of regional milling capacity.

### Coal

In relation to the planning area, Durango is the only area with current coal production, which is expected to continue or increase. As new coal-fired power plants are built in the region, greater demand for production from existing mines, and possibly the development of new mines, may occur. However, lack of rail lines and small reserves in the eastern (Pagosa) portion of the planning area may limit the potential for significant expansion. There is low potential for small, local markets to redevelop. Coal use for home and small business heating is not likely to increase without significant improvements in environmental protection technology and cost-competitiveness. This may limit the potential for small mining operations to resume operations.

Within the Durango and Menefee KRCRAs, it is unlikely that formerly developed coal deposits would be in demand for renewed development. Substantial new coal deposits are not likely to be discovered or proposed for development.

BLM_0030589

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

The environmental impacts related to the development of mineral resources would result primarily from their different methods of extraction. Solid minerals are developed by mining methods, either surface (collecting, quarrying, and open pit mining) or subsurface (underground mining). Fluid minerals (including oil and gas and geothermal energy) are developed by drilling. The two development and extraction techniques produce different types of surface effects (impacts); therefore, they are discussed under separate sections of this chapter. The expected environmental impacts related to current and projected solid-minerals development activity levels within the planning area are discussed in detail in specific resource program sections of this chapter. This section considers the impacts of implementation of other resource activities on the SJPLC solid-minerals program.

Under each alternative, impacts are quantified based on the number of acres of land, which are restricted (requiring higher costs) or are not available for solid-minerals operations (including mine and support facilities, pits, stockpile and equipment storage areas, mills, waste sites), or for construction and use of access roads. Unlike most fluid minerals (including oil and gas), development impacts (including numerous individual well sites, connecting road systems, multiple support facilities, and pipeline networks spread over hundreds to thousands of acres), typical impacts related to solid-minerals development would be concentrated at the mine or mill facility. This would require one or two access roads, one utility corridor, and few, if any, disturbed areas away from the mine or mill. Future solid-minerals activity cannot be predicted as to specific location, scale, or timing; therefore, the most reasonable way to estimate the impacts of alternatives on this potential future activity would be to consider the amount of land which is restricted or unavailable for possible use.

### General Impacts

Impacts to the solid-minerals program resulting from the implementation of the alternatives  would be closure of areas to mineral activity (through formal withdrawal or administrative closure) and increased operating costs (through limitations on road construction and use, facility placement, and operational constraints). These impacts may result from the requirements imposed by other resource programs, and from the implementation of the specific MA direction. Although MA direction does not change current law or regulation for development of solid minerals within the planning area, it may impact, in some cases, the accessibility of lands for solid-minerals development. Some MA allocations would recommend changes to current land status that would, if implemented later, change the accessibility of lands for solid-minerals development. These changes would not automatically result from the implementation of any of the alternatives.

The opportunity to explore for, and produce, solid minerals on public lands may also be impacted by limiting or restricting motor vehicle access on existing roads and precluding new road construction. Recommendations that result in withdrawal of lands from availability for locatable mineral development or leases for coal, if later implemented, may would preclude the exploration and potential development of economic mineral resources, which would, in turn, result in lost Federal revenues and associated reduced returns to counties and States. Alternatives A through D would vary, depending upon the acres allocated to various MAs. MA 1s and MA 5s would be the predominant MAs applied to management of the planning area, followed by MA 3s. MA 1s and MA 3s would be the most restrictive, recommending land management or land designations that would result in withdrawal or closure of these areas to solid-minerals development or would require limits or prohibitions on road access. MA 2s would require specific management plans that may impose site-specific closures or restrictions on solid-minerals activity. MA 4s would require that solid-minerals activity be compatible with MA requirements, and may impose unacceptable site-specific costs. MA 5s and MA 7s would generally be compatible with solid-minerals development. Locatable mineral withdrawal would not be implemented by any of the alternatives; rather, proposed withdrawals would be subject to further analysis and decision processes. The alternatives would also not affect existing mineral leases or solid-minerals operations already approved. Table 3.16.2 summarizes the impacts on the SJPLC solid-minerals program by alternative.

This estimate of impacts would be considered in conjunction with areas where solid-minerals potential is known, or is suspected, to exist. Lands may be unavailable for solid-mineral activity, as noted above; however, if the mineral resource does not exist on those lands, any possible impacts from limiting access to those lands may be minor or negligible. The areas most likely to be impacted by the implementation of any of the alternatives (because of potential for solid-minerals resources being present) are described in Table 3.16.1. The Slick Rock/Dove Creek area has a high potential for continued to increased uranium and vanadium mining and milling activity. The Dolores and West Dolores River corridors, the Rico/Dunton area, the La Plata Mountains, and the Silverton area have low to moderate potential for renewed precious and base metal development activity, the Graysill and Elk Park areas have low potential for renewed exploration activity for uranium and vanadium. Market prices, commodity supply and demand, and technological advances may influence future interest in exploration, development, and production. Salable mineral sources occur throughout the planning area. The demand for gravel may increase as campgrounds and public and county roads are improved. (Sources to meet expected private needs are available outside of the public lands.)

The following table lists the acres of land with moderate to high potential for solid locatable and leasable mineral occurrence, coupled with alternative management that would prohibit or restrict development of those resources, if fully implemented. For this analysis, it is assumed that land designations recommended by any of the alternatives that would occur in the future (or are outside the authority of the SJPLC) would be implemented as recommended by the SJPLC. (For example, designation of additional Wilderness Area would not lie within SJPLC authority, and SJPLC recommendations for additional Wilderness Areas may never be acted upon; however, this analysis assumes that such designation would occur within the planning period and that the recommended Wilderness Areas additions would be withdrawn from mineral entry and development).

Land management actions or recommendations that are proposed within existing withdrawn lands (such as designated Wilderness Areas) are not considered. This is because the implementation of those proposed new designations would have no impact on lands already withdrawn. Similarly, those land management actions or recommendations under the alteratives that do not impact areas with moderate to high potential for the occurrence of solid-mineral resources (see Table 3.16.1) are not considered. The impacts related to those management actions or recommendations may be minor to negligible. MA 4 (recreation emphasis) and MA 8 (developed areas) are linear features or encompass relatively small areas and include few areas with moderate to high solid-minerals potential; therefore, their imapcts on the solid-minerals resource may be negligible.

BLM_0030591

**Table 3.16.2 – Environmental Effects to Solid Minerals by Alternative**

| | Alternative A (no-action alternative) | Alternative B (preferred alternative) | Alternative C | Alternative D |
|---|---|---|---|---|
| **Proposed withdrawal areas with moderate to high potential** | | | | |
| Proposed wilderness additions | 0 | 53,527 | 145,819 | 0 |
| Proposed RNAs | 0 | 70,000 | 70,000 | 0 |
| Suitable WSRs | 5,747 | 10,362 | 5,919 | 0 |
| **Total proposed withdrawal acres** | | | | |
| Wildlife and fisheries | 0 | 133,889 | 221,738 | 0 |
| Sage-grouse total acres | 0 | 77,566 | 82,953 | 78,871 |

"Proposed withdrawal acres" include only those proposed designations or areas outside of existing Wilderness Areas, the Piedra Area, and existing RNAs. "Sage-grouse acres" include lek sites and nesting habitat.

Under all of the alternatives, the impacts to salable mineral materials would be proportional to the number of acres restricted or recommended for closure to mineral activity (since development of these solid-minerals resources is discretionary in the planning area). Impacts to locatable minerals (those solid minerals subject to claim under the Mining Law) may be similarly proportional under all of the alternatives. Unlike mineral materials, which occur throughout the planning area, important deposits of locatable solid minerals are unlikely to occur outside of the areas identified in Table 3.16.1; therefore, impacts to this resource under any of the alternatives may be minor. Impacts to leasable (DOE withdrawn lease tract) uranium/vanadium would not vary by alternative (since these lease tracts are administered by DOE and are not subject to any of the alternatives). Impacts to locatable (USFS and BLM land) uranium/vanadium may be proportional with the acres listed for sage-grouse (since the most important uranium/vanadium deposits are in the same geographic area). As noted above, these impacts are not intended to be read as absolute numbers; rather, they serve to indicate the relative restrictive nature of each alternative.

***DLMP/DEIS Alternatives***: In summary, based on the total acres of the various management actions designations that could limit the development of solid minerals, Alternative C may result in moderate to minor impacts, followed by Alternatives B, D and A, all with minor to negligible impacts.

**Impacts Related to Wilderness Area Management**
Impacts related to Wilderness Area management may be the possible closure of designated areas to solid-minerals operations. Wilderness Areas are withdrawn by law from all forms of mineral exploration and development. The measurable indicator of impacts would be the number of acres allocated to MA 1s (proposed Wilderness Area) that contain areas of moderate or high potential for occurrence of solid minerals. These areas carry an assumption of closure by withdrawal or administrative action from solid mineral exploration and development. Although withdrawal may not occur without further environmental analysis and decision-making, it is assumed that withdrawal would be implemented, as recommended by the SJPLC. BLM WSAs in the Slick Rock/Dove Creek area would not impact future uranium and vanadium activity (since these areas are open to mineral development).

***DLMP/DEIS Alternatives***: Alternative C may result in moderate to minor impacts on solid minerals (due to Wilderness Area management), followed by minor impacts under Alternative B. Alternatives A and D may result in no impacts.

BLM_0030592

**Impacts Related to New Research Natural Area (RNA) Designations**

Impacts related to new RNA designations may be the possible closure of areas to solid-minerals operations. The proposed Grizzly Peak and Hermosa RNAs may impact areas with moderate potential for precious and base metal locatable mineral activity.

The measurable indicator of impacts would be the number of acres allocated to proposed RNAs (because RNA designation carries an assumption of closure by withdrawal from solid-minerals exploration and development). Withdrawal would not occur without further environmental analysis and decision-making; therefore, it is assumed that withdrawal would be implemented, as recommended by the SJPLC.

*DLMP/DEIS Alternatives*: Alternatives B and C may result in minor impacts to solid minerals (due to new RNA designations). Alternatives A and D may result in no impacts.

**Impacts Related to Wild and Scenic River (WSR) Designations**

Under the Wild and Scenic Rivers (WSR) program, designation of river segments as recreational or scenic do not carry constraints on locatable solid-mineral activity; however, designation of a river segment as a WSR would carry an assumption that the segment would be withdrawn from mineral activity. Impacts related to WSR designations may be the closure of areas to solid-minerals operations. Designation of segments of the upper Dolores River may impact lands with high potential for uranium, vanadium, and precious metal resources. DOE uranium lease tracts in this river corridor would not be impacted. The Hermosa River, and tributaries, have moderate potential for precious and base metal occurrences, although there is no current activity.
The measurable indicator of impacts would be the number of miles allocated to suitable WSR designation. Although withdrawal would not occur without further environmental analysis and decision-making, it is assumed that withdrawal would be implemented, as recommended by SJPLC.

*DLMP/DEIS Alternatives*: Alternative B may result in minor impacts to solid minerals (due to WSR designation). Alternatives C and A may result in minor to negligible impacts. Alternative D may result in no impacts.

**Impact Related to Wildlife and Fisheries Management**

Impacts related to wolidfe and fisheries management may be higher operating costs and the possible closure of areas to solid-minerals operations. Wildlife management activities that trigger these impacts would be primarily related to management requirements under the Endangered Species Act (ESA). No areas would be proposed for withdrawal from solid-minerals activity under any of the alternatives in relation to wildlife and fisheries management; however, protective measures applied to exploration and development activities may increase costs. Prevention from, and remediation of, acid mine drainage would be the most important factor for the Silverton area. Sage-grouse habitat protection may impact the development of mining claims in the Slick Rock/Dove Creek uranium/vanadium resource area. DOE uranium leases would be subject to ESA regulation under any of the alternatives; however, such regulation is not within the management authority of SJPLC. The degree of the impacts would depend upon approved conservation strategies, critical habitat designations, and biological opinions that mandate specific management requirements for solid-minerals exploration and development. These requirements would not be known until specific project proposals are submitted and assessed.

The measurable indicator of impacts would be the number of acres allocated to sage-grouse habitat (see Table 3.16.2). This is because this designation is known and would impact an area of current solid-minerals activity (the Slick Rock/Dove Creek uranium/vanadium area). However, its usefulness is as a comparative indicator of impacts, not as an absolute quantifier. Alternatives that would allocate a greater number of acres to this designation may be considered to require a similar degree of restriction on solid-minerals activity throughout the planning area, for comparison purposes.

BLM_0030593

**DLMP/DEIS Alternatives**: Alternatives C, D and B may all result in moderate to minor impacts on solid minerals in relation wildlife and fisheries management. Alternative A may result in no impacts.

### Summary of Direct and indirect Impacts by Altnerative

Based on the total acres of the various management actions designations that could limit the development of solid minerals, Alternative C may result in moderate to minor impacts, followed by Alternatives B, D and A, all with minor to negligible impacts.

## CUMULATIVE IMPACTS

Cumulative impacts, in relation to the alternatives, would result from a continuation of the same general restrictions on the solid-minerals program as existed in the previous land and resource management plans (USFS 1983; BLM 1985), as well as from the imposition of newer environmental laws and regulations. Table 3.16.2 above summarizes the direct and indirect impacts by alternative; expected cumulative impacts may follow the same pattern by alternative.

Except for the areas identified for precious and base metals and uranium/vanadium in Table 3.16.1, solid-minerals activity is scattered and intermittent in location and timing. Future solid-minerals activity outside of those specific areas would continue this pattern; as previous activities end, others would begin. The general level of activity would remain roughly the same; therefore, the cumulative impacts on the program and resource from implementation of any of the alternatives on lands with low or no potential for solid minerals may be negligible.

For the precious and base metal resource areas identified in Table 3.16.1, the legacy of past activities may exert an influence on future impacts to the solid-minerals program. Acid mine drainage, watershed degradation, tailings and spoils piles, and high road densities exist even where there is no current solid-minerals activity. These past impacts, as well as changes in environmental law, restrictions on new operations and more potential closures to future activities, would be coupled with the higher costs of exploration, development, and reclamation. This may limit the success of new developments and of marginal operations, reducing the long-term supply of these metals to the local economy and to the nation. The additional withdrawals of land from mineral development for WSAs, RNAs, and WSRs would reduce the land base and potential resource recovery for precious and base metals. However, the expected level of future development in these areas is moderate; therefore, the cumulative impacts on the precious and base metal program and resource from the implementation of any of the alternatives may be minor for such areas.

For the uranium/vanadium resource areas identified in Table 3.16.1, historic and current activity may not be a strong influence on future activity. Historic and current activity operates under existing restrictions; implementation of any of the alternatives may only impact future activity. Most historic uranium activity has been cleaned up, or has not left the visible legacy of disturbance that typifies precious metal resource areas (such as Silverton). DOE uranium lease tracts are not subject to any of the alternatives. BLM WSAs would be open to mineral development. SJPL areas open to development would face more stringent restrictions and higher costs than in the past. The cumulative impacts on the uranium/vanadium program and resource may be minor to moderate.

Overall, for the solid-minerals resource, Alternative C may result in moderate to minor cumulative impacts. Alternatives B and D may result in minor impacts. Alternative A may result in negligible cumulative impacts.

BLM_0030594

## INTRODUCTION

Within the planning area, geothermal energy development has been minor, and has occurred primarily in relation to springs for bathing and for low-temperature private and commercial space heating.

The BLM and the USFS manage mineral-related activities consistent with multiple-use management principles. The exploration, development, and production of geothermal energy is integrated with the use, conservation, and protection of other resources.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- *The Mineral Leasing Act of 1920*: This act established the leasing system for the exploration and development of coal, phosphate, sodium, oil shale, oil, and gas.

- *The Organic Act of 1944*: This act provides for the protection and management of resources within USFS lands.

- *The Mineral Leasing Act for Acquired Lands of 1947*: This act extends the provisions of the mineral leasing laws to the mineral estate on lands acquired by the Federal government; it requires the consent of the Secretary of the Interior (BLM) or the Secretary of Agriculture (USFS) prior to leasing.

- *The Geothermal Steam Act of 1970*: This act established the leasing system for geothermal energy.

### REGULATIONS AND POLICIES

- *Title 36 CFR, Part 228 E*: This provides guidance for the management of surface use of geothermal leases on USFS-administered lands.

- *Title 43 CFR, Part 3200*: This provides guidance for management of geothermal leases on BLM-administered lands.

### DESIGN CRITERIA

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to geothermal energy. Guidelines and design criteria are presented in Part 3 of Volume 2 of the DLMP/DEIS.

BLM_0030595

## AFFECTED ENVIRONMENT

## EXISTING CONDITIONS AND TRENDS

Geothermal energy is disposed of (managed) by leases issued by the BLM. The planning area contains 4 USGS Known Geothermal Resource Areas (KGRAs). These are:

- West Fork, Pagosa RD/FO (approximately 80,577 acres);

- Pagosa Springs, Pagosa RD/FO (approximately 26,300 acres);

- Dunton-Rico, Dolores RD/FO (approximately 132,109 acres); and

- Trimble-Pinkerton, Columbine RD/FO (130, 313 acres).

The potential recoverable energy contained within these KGRAs is small relative to the other fluid-energy sources (including oil and natural gas) within the planning area (Van Loenen et al. 1997; Gault Group 2006). Currently within the planning area, there are no geothermal leases. However, in 1974 and 1980, applications for leases for large tracts within the Dunton-Rico KGRA were filed (Neubert et al. 1992). These lease applications were later withdrawn by the applicant.

High-temperature geothermal resources are required for electricity generation. Extensive low- and moderate-temperature geothermal resources support agricultural, municipal, commercial, and residential uses. The geothermal fluid resources that occur within the planning area are of low or medium temperature. Geothermal fluid resources that occur within the planning area, as well as within the surrounding areas, are warm. They emanate from geysers, springs, and wells. Most warm springs are located near faults. These faults serve as conduits for the upward flow of ground water that has been heated by deep circulation from mainly volcanic sources.

Within the planning area, two types of geothermal resources are being commercially tapped: hydrothermal fluid resources and Earth energy. Hydrothermal fluid resources provide hot water for spa and pool use, as well as for space heating. Earth energy (the heat contained in soil and rocks at shallow depths) is excellent for direct use, as well as in connection with geothermal heat pumps. Direct-use applications require moderate temperatures; geothermal heat pumps can operate with low-temperature resources. A number of residences adjacent to, or near, the planning area, are using this resource in order to supplement space heating.

Widely separated areas within the region contain one or more thermal springs or artesian wells (Van Loenen et al. 1997). Except for the town of Pagosa Springs (where hot water from hot springs is currently used in order to heat buildings and public sidewalks), the thermal springs are currently either undeveloped or are developed for recreational and therapeutic uses in private and public pools. Geyser Spring, in the Dunton-Rico KGRA, is Colorado's only geyser. Eruptions, at approximately 30-minute intervals, are marked by fountaining to a height of about 1 foot above the resting level of the geyser pool.

Within the planning area, the potential for additional noteworthy development of known hydrothermal resources, as well as for locating the presence of undiscovered hydrothermal resources, are slight. Most of the thermal springs yield only moderately hot water, and in only relatively small quantities. Moreover, most are remote from markets. Only 3 springs are located within the planning : Geyser, Piedra, and Rainbow. Heating State-owned buildings in Durango with water piped in from thermal springs in the Animas River Valley was evaluated, and was found to be uneconomic (Meyer et al. 1981).

BLM_0030596

The low level of heat produced, as well as the small supply, would limit geothermal use in the plannign area to small-scale recreational, agricultural, and space-heating systems. As energy costs increase, however, the development of geothermal resources for these uses is expected to increase slightly during the planning period. Most demand would involve non-Federal lands, due to the proximity between the source of the energy and the facility to be supplied. The SJPLC would review, and approve, any Plans of Operation for geothermal development within the planning area, and would apply the appropriate environmental protection measures. They would also monitor for compliance.

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

The environmental impacts related to the development of mineral resources would result, primarily, from their different methods of extraction. Fluid minerals, such as oil and gas and geothermal energy, are developed through the process of drilling. Within the planning area, the expected environmental impacts from current and projected mineral development activity levels are discussed in detail in specific resource program sections of this chapter. This section considers the impacts of implementation of other resource activities on the geothermal energy program.

Under each alternative, impacts are quantified based on the number of acres of land that would be restricted (requiring higher costs), or that would not be available for geothermal mineral operations (including well pads and support facilities, power generation facilities, equipment storage areas, water processing, and storage facilities), or for construction and use of pipeline and access road systems. Unlike typical solid-minerals development impacts (which are concentrated at the mine or mill facility requiring 1 or 2 access roads; and a utility corridor; and resulting in few, if any, disturbed areas away from the mine or mill) geothermal development impacts may include multiple well sites, connecting road systems, power-generation facilities, multiple support facilities, and pipeline networks spread over hundreds of acres. Future geothermal activity cannot be predicted as to specific location, scale, or timing; therefore, the most reasonable way to estimate the impacts related to the alternatives on this potential future activity is to consider the amount of land that is restricted or unavailable for possible use.

### General Impacts

Within the planning area, impacts to the geothermal energy program resulting from the implementation of any of the alternatives may include the closure of areas to geothermal leasing (through formal withdrawal or administrative closure), and increased operating costs (through limitations on road and pipeline construction and use, facility placement, and operational constraints). These impacts may occur as the result of the requirements imposed by other resource programs, as well as as the result of the implementation of the specific MA direction. MA direction would not change current law or regulation for the development of geothermal energy within the planning area; however, it would, in some cases, affect the accessibility of lands for geothermal development. The opportunity to explore for, and develop, geothermal resources on public lands may also be impacted by management activities that limit or restrict motor vehicle access on existing roads and/or precludes new road or pipeline construction. Recommendations to not lease for geothermal energy, if later implemented, would preclude the exploration and the potential development of economic mineral resources, which, in turn, may result in lost Federal revenues and in the associated reduced returns to counties and States.

BLM_0030597

All of the alternatives vary by the number of acres that would be allocated to various MAs. MA 1s and 5s would be the predominant MAs applied to the management of SJPLC-administered lands, followed by MA 3s. MA 1s and 3s would also be the most restrictive, in terms of recommending withdrawal or closure of these areas to mineral development, or in terms of requiring limits or prohibitions on road access. MA 2s would require specific management plans, which may impose site-specific closures or restrictions on mineral activity. MA 4s would require mineral activity to be compatible with Management Area requirements, and may impose unacceptable site-specific costs. MA 5s and 7s would be generally compatible with mineral development. Table 3.17.1 summarizes the impacts by alternative, as further discussed below.

**Table 3.17.1 – Environmental Impacts Related to Geothermal Energy by Alternative**

|  | Alternative A (no-action alternative) | Alternative B (preferred alternative) | Alternative C | Alternative D |
|---|---|---|---|---|
| MA 1  Proposed Additional Wilderness Acres | 0 | 0 | 132,109 | 0 |
| MA 1  Roadless Acres | 0 | 130,313 | 130,313 | 0 |
| MA 3  Natural Landscape Acres | 262,422 | 132,109 | 0 | 0 |

Under Alternative B, MA 1 and MA 3 acres would include acres allocated to MA 2s.

Table 3.17.1 is not intended to be read as offering absolute numbers. The areas most likely to be affected (impacted) by the implementation of any of the alternatives (due to the potential for geothermal resources) would be the KGRAs noted above. Not all acres within each KGRA have equal potential for geothermal development; specific potential areas within each KGRA have not been identified. For this reason, the total acreage for each KGRA is listed. The table indicates the relative restrictive nature of each alternative. Site-specific proposals would be required in order to make a more detailed estimate of impacts.

Currenlty, there are no geothermal leases or operations within the planning area, and the potential for future leasing or operations during the life of final approved LMP is low. Future activities would most likely involve small and local use of geothermal heat or steam for domestic and commercial heating, limited agriculture or aquaculture operations, or recreational and health-spa facilities.

***DLMP/DEIS Alternatives:***

- Under all of the alternatives, the West Fork KGRA would be within designated Wilderness; therefore, it would be withdrawn from mineral development. The Pagosa Springs KGRA is on private land; therefore, it is not subject to SJPLC regulation.

- Under Alternative A, the Dunton-Rico KGRA would be allocated to MA 3. However, hot springs use is a traditional practic in this area and, therefore, may be favored in future management decisions. The Trimble-Pinkerton KGRA is dominantly on private land; therefore, it is not subject to SJPLC regulation. Potential expansion areas within the planning area would be allocated to MA 3; however, no expected development is likely.

BLM_0030598

- Under Alternative B, the Dunton-Rico KGRA would be partly allocated to MA 2 (approximately 50%), which would require a special management plan. The remainder would be allocated to MA 3 (roadless management), which would limit development activities. However, hot spring use is a traditional practice in this area and, therefore, may be favored in future management. The portion (approximately 50%) of the Trimble-Pinkerton KGRA within the planning area would be allocated to MA 2 or 1; however, no expected development is likely.

- Under Alternative C , the portion of the Dunton-Rico KGRA within the planning area would be allocated to MA 1 (recommended additional Wilderness), which would result in withdrawal from future mineral activity. The portion of the Trimble-Pinkerton KGRA within the planning area would be allocated to MA 1 (roadless management); however, no expected development is likely.

- Under Alternative D, the Dunton-Rico KGRA would be allocated to MA 5, which would not restrict hot springs development. The portion of the Trimble-Pinkerton KGRA within the planning area would be allocated to MA 5; however, no expected development is likely.

**Impacts Related to Wildlife and Fisheries Management**

Impacts to the geothermal energy program related to wildlife and fisheries management may include higher operating costs and the possibility of areas being closed to geothermal operations. Wildlife management activities that may trigger these impacts are, primarily, related to management requirements under the Endangered Species Act (ESA). Protective measures applied to exploration and development activities may increase costs. The degree of the impacts would depend upon approved conservation strategies, critical habitat designations, and biological opinions mandating specific management requirements for all mineral exploration and development within the planning area. These requirements would not be known until specific project proposals were submitted and assessed.

*DLMP/DEIS Alternatives*:  Based on its general level of restriction on development activities, Alternative C may result in moderate to minor impacts to geothermal energy. Alternatives B and D may result in minor to negligible impacts. Alternative A may result in no impacts.

**Impacts Related to Travel and Wilderness Management**

Impacts to the geothermal energy program related to travel and wilderness management may include higher operating costs and the possibility of areas being closed to geothermal operations. Public land roads and trails are used by those exploring for, and developing, mineral resources. Limiting use of existing roads and trails by timing or by vehicle type may restrict general or casual access. Limiting or foreclosing new road or pipeline construction may increase costs, and may preclude geothermal development activity. However, in most cases, geothermal exploration or development proposals may be accommodated with site-specific permits and protection measures.

The measurable indicator of impacts would be the total number of acres allocated to MA 1s and 3s. MA 1s (recommended additional Wilderness) would prohibit development. MA 1s (roadless management) would be administered in a manner that preserves the roadless character of the affected (impacted) lands. MA 3s would limit the construction of new roads, and would constrain the use of existing roads. All of these factors may increase the cost of exploration and development, which may, in turn, limit operational feasibility.

BLM_0030599

***DLMP/DEIS Alternatives***:  Alternative C may result in moderate impacts to geothermal energy development. Alternatives B and A may result in minor impacts. Alternative D may result in no impacts.

**Summary of Direct and Indirect Impacts by Alternative**

Based on the total number of acres under the various MA designations that could limit the development of geothermal energy, Alternative C may result in moderate to minor impacts. This would be followed by Alternatives A and B, which may result in minor impacts. Alternative D may result in no impacts.

## CUMULATIVE IMPACTS

Given the lack of current use, and the low expectations of future development, Alternative C may result in minor cumulative impacts to this resource. The other alternatives may result in negligible, to no, cumulative impacts.



BLM_0030600

## INTRODUCTION

Public lands have long provided energy resources for both individual and commercial use. The National Energy Policy has laid the legal groundwork for alternative energy projects on public lands; however, little demand has surfaced in relation to the planning area. Nonetheless, this planning effort addresses alternative energy development in order to offer guidance for projects that are proposed on SJPLC-administered lands.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

The President's National Energy Policy encourages the development of renewable energy resources, including wind energy, as part of an overall strategy designed to develop a diverse portfolio of domestic energy supplies for the future. The National Energy Policy Development (NEPD) Group recommended "that the President direct the Secretaries of the Interior and Energy to re-evaluate access limitations to Federal lands in order to increase renewable energy production such as biomass, wind and solar."[7]

### EXECUTIVE ORDERS

- ***Executive Order 13212 of May 2001***: This EO requires Federal agencies to take appropriate actions, to the extent consistent with applicable law, to expedite projects that serve to increase the production, transmission, or conservation of energy.

### REGULATIONS AND POLICIES

Geothermal Steam Act of 1970 (P.L. 91-581; 30 U.S.C. §§ 1001-1027, December 24, 1970, as amended 1977, 1988, and 1993).

Existing land use plans identify Wilderness Areas and WSAs, ACECs, RNAs, visual resource management (VRM) areas, National Scenic and Historic trails, National Landscape Conservation System units, critical habitat areas, and other special management areas where land use restrictions apply to a variety of uses, including those related to alternative energy site testing and monitoring.

### DESIGN CRITERIA

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to alternative energy sources. Guidelines and design criteria are presented in Part 3 of Volume 2 of the DLMP/DEIS.

---

[7] National Energy Policy (NEP) report dated May 2001. The National Energy Policy Development (NEPD) Group.

BLM_0030601