## AFFECTED ENVIRONMENT

### Existing Conditions and Trends

The U.S. Department of Energy (DOE) National Renewable Energy Laboratory produced an analysis assessing the potential for renewable energy on public lands.[8] This renewable resource assessment addressed BLM, Bureau of Indian Affairs (BIA), and USFS lands in the western United States, except Alaska. The assessment summarized high potential for five renewable energy uses: CSP-concentrated solar and photovoltaics (PV), wind, biomass, and geothermal. The planning area was identified as only having high potential for biomass energy production (see Table 3.18.1).

**Table 3.18.1 – BLM Planning Areas in Colorado with High Potential for Wind or Biomass Renewable Power**

| PLANNING UNIT | WIND | BIOMASS |
|---|---|---|
| Grand Junction | High Potential | |
| Kremmling | High Potential | High Potential |
| Little Snake | | High Potential |
| Royal Gorge | High Potential | High Potential |
| San Juan | | High Potential |

Currently, within the planning area, there is currently no demand for use of public lands for wind or solar power development, or for the commercial use of biomass material. Personal use of firewood continues at a steady pace. Fuels-reduction projects around communities in the planning area would provide a source of biomass for the development of a new local source of energy. The Energy Atlas for Colorado addresses potential demand for wind, solar, biomass, and geothermal energy for the near future. Potential for commercial development in western Colorado is limited.

### Biomass

Biomass is organic matter available on a renewable basis (including forest and mill residues, agricultural crops and wastes, wood and wood wastes, animal wastes, livestock operation residues, aquatic plants, fast-growing trees and plants, and municipal and industrial wastes). Forest products for fuel-treatment products are available for potential development. However, no current demand exists, and none is expected in the foreseeable future. With significant agricultural operations, Colorado is a good candidate for increased use of biomass fuels, especially those that do not require large amounts of water. Electricity generation potential in Colorado from biomass materials is approximately 4 million MWh/year.

Proposals for the development of biomass generation would comply with timber harvesting and fuels treatment standards when the sources of fuel are removed from public lands. A separate site-specific environmental analysis would be required for such a proposed harvest of biomass fuel.

---

[8]   Assessing the Potential for Renewable Energy on Public Lands. U.S. Department of the Interior, BLM; U.S. Department of Energy. Energy, Efficiency and Renewable Energy (DOE/GO-102003-1704), February 2003. Available at: http://www.nrel.gov/docs/fy03osti/33530.pdf.

## Wind

Areas of Class 3 (medium resource level) or higher wind resource can be found throughout the southern Rocky Mountain region. The most extensive area of wind resource is found over the high plains and uplands of eastern Colorado and eastern New Mexico. Over this area, the annual average wind resource level is mostly Class 3 and Class 4, but can be higher on exposed hilltops that are found over portions of the high plains region. Mountain summits and ridge crests estimated to have Class 3 or higher wind resource exist throughout the southern Rocky Mountain region. Higher mountain ranges are estimated to have at least Class 6 (high wind resource level), but many of these ranges may not be suitable, due to the ruggedness of the terrain as well as to the potential for extreme wind and icing conditions.  Electricity generation potential in Colorado from wind generation is approximately 601 million MWh/yr.

High potential wind energy sites within the planning area are identified on high alpine ridges in the San Juan Mountains. Wind energy development on BLM-administered lands in the Columbine Field Office (identified as having medium to high resource levels) were not considered to have development potential in the Final Environmental Impact Statement on Wind Energy Development completed by the BLM in 2005.5 (A significant scenic conflict issue would need to be resolved at these sites). A site-specific environmental analysis would be required in order to address maintenance of a high visual quality standard before wind power would be permitted within the planning area.

## Solar

Colorado has more than 300 days of sunshine per year, making it an ideal location for solar photovoltaics (PV) and solar thermal technologies. Nearly 30 schools are tapping into the power of the sun, thanks to customers of Xcel Energy who round their bills up to a higher dollar amount and/or contribute to the Renewable Energy Trust Program. Electricity generation potential in Colorado from solar power is approximately 83 million MWh/yr.

No potential has been identified for the development of commercial solar energy generation on public lands in southwestern Colorado. Localized use of solar generators for other uses may occur, and would be addressed in site-specific environmental analysis.

BLM_0030603

**Figure 3.18.1 – Concentrating Solar Resource**



Map supplied by the National Renewable Energy Laboratory

**Figure 3.18.2 – Wind Resource Analysis Results**



BLM_0030605

**Figure 3.18.3 – Biomass Analysis Results**



Map supplied by the National Renewable Energy Laboratory

BLM_0030606

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

With no identified potential for wind or solar power generation on public lands in the planning area, the environmental consequences described in this section only analyze biomass as a potential energy source. Facility construction and operation for biomass energy generation sites would be the same as for the construction and use of other facilities, and would require a specific area to be dedicated to a primary use (and, secondarily, to other compatible uses).

### General Impacts

Potential biomass generation facilities would be located near communities and existing infrastructure. They would rely on existing transportation facilities for moving materials to a centralized generation plant. Design criteria and guidelines would be the same under all of the alternatives, and restrictions on development would be implemented in order to ensure compliance with laws and regulations governing development projects. The impacts related to the cost of production, availability of forest products, and access to markets may influence the development of biomass as an energy source. Alternatives B and C, which would propose less available land for development (primarily in MA 1s and MA 3s), would be the most restrictive. These alternatives would generally prohibiting the development of permanent industrial facilities, or would require limits or prohibitions on road access, as well as lower levels of materials available for biomass energy generation. MA 2s, which would have direction for specific management plans, may impose site-specific closures or restrictions on alternative energy development. MA 4s would direct development to be compatible with overall MA requirements, and may impose high site-specific costs. MA 5s and 7s would be compatible with facility development. MA 8s may be compatible with generation facilities (if they were built to provide energy for the permanent development that would exist in that MA). However, given the minimal expected level of alternative energy development expected during the life of approved LMP, there may be no reasonably measurable differences between the alternatives.

### Impacts Related to Wildlife and Fisheries Management

Wildlife management activities that may result in impacts to alternative energy development are primarily related to management requirements under the ESA, as well as access to resources. Protective measures applied to construction and operations may increase costs. Conservation strategies, critical habitat designations, and biological opinions would address specific management requirements for all energy development within the planning area, and would be the same under all of the alternatives.

***DLMP/DEIS Alternatives***: The impacts related to wildlife and fisheries management on alternative energy development may be similar under all of the alternatives. Differences in the potential impacts on habitat designations, design criteria, and habitat improvement treatments may result in negligible impacts to the development of biomass energy production. Vegetation from habitat treatments may be a viable source for biomass generation facilities under all of the alternatives.

### Impacts Related to Travel Management and Recreation

Within the planning area, public roads would be used to gain access to materials, sight generation plants, and transport energy to markets in order to develop potential biomass energy resources. Limiting the use of existing roads and trails by timing and/or by vehicle-type would restrict general or casual access for moving materials to a generation facility and for actual sighting of a generation plant. Limiting or foreclosing new road construction may increase costs, and may preclude development activity in areas near communities.

BLM_0030607

DLMP/DEIS Alternatives: The impacts related to travel management and recreation on alternative energy development may be similar under all of the alternatives. The impacts from restrictions on biomass harvesting and sighting of production facilities may be negligible, given that the sighting of facilities could occur in MA 7s near communities and existing road systems under all of the alternatives.

**Impacts Related to Timber Harvesting, Fuels Management, and Oil and Gas Development**
Biomass energy development would generally be compatible with timber harvesting, fuels management, and oil and gas development activities. Based on management direction that would encourage facility development using similar infrastructure with these facilities – which could provide a supply of material for biomass generation facilities – impacts may be minor.

***DLMP/DEIS Alternatives***: The impacts related to timber harvesting, fuels management, and oil and gas development activities on alternative energy development may be similar under all of the alternatives. Based upon the availability of harvested material, the sighting of production facilities, and the sharing of infrastructure, impacts may be negligible, given that the sighting of facilities could occur in MA 7s near communities and existing road systems under all of the alternatives.

## CUMULATIVE IMPACTS

Given the minimal level of current use, and the low expectations for future development, there may be no important differences in cumulative impacts to this resource under any of the alternatives. Using existing infrastructure, sighting near communities in MA 7s, providing a market for harvested material from timber management, and using existing or proposed transportation systems, may benefit the future development of biomass generation facilities within the planning area.

BLM_0030608

## INTRODUCTION

Travel is associated with many of the activities that take place within the planning area. Both motorized and non-motorized access are important for outdoor recreation, wildfire management, managing livestock and wildlife, developing natural resources (including timber and minerals), gathering fuel wood, accessing private in-holdings, maintaining electronic sites and utility corridors, and managing and monitoring the planning area. Modes of vehicle travel within the planning area include large commercial trucks, automobiles, pickups, four-wheel drive vehicles, snowmobiles, all-terrain and off-highway vehicles (ATVs and OHVs), motorcycles, mountain bikes, and wheelchairs. Other travel modes include cross-country skiing, horseback riding, and hiking. These modes of travel may be used on designated roads that include paved highways, gravel and dirt roads, unimproved roads, four-wheel drive roads, and trails designated for motorized and/or non-motorized use. Motorized off-road and off-trail travel is allowed only in designated areas.

Motorized route designations are developed through a public travel management planning process. This process is conducted in accordance with the USFS 2005 Travel Management Rule (36 CFR 212.50 through 212.81). This rule requires that motor vehicle use on National Forest System (NFS)roads, on NFS trails, and on any USFS-administered areas allowing cross-country motorized travel, shall be designated according to vehicle class and, if appropriate, to time of year by the responsible official on administrative units or Ranger Districts. The BLM has a similar regulation (43 CFR Subparts 8340 through 8342). The regulation requires that all public lands be assigned an OHV management area designation of "open" or "limited" or "closed" to motorized travel. It prohibits motor vehicle operation that is not in accordance with those designations.

The 2005 Travel Management Rule applies only to USFS-administered lands; however, it meets the requirements of the BLM regulations related to motorized off-road use without exceeding the scope of the BLM's authority. Therefore, the framework provided by the USFS 2005 Travel Management Rule is employed for joint agency travel management planning across the SJPLC-administered planning area.

This travel planning process was initiated in 2006 as a separate process from the development of this DLMP/DEIS. It entails a separate public involvement process and NEPA analysis. Travel planning will use the travel management direction that is currently in place as a baseline for the process until the revised LMP is implemented. At that time, the travel suitability area classifications would be employed as the baseline condition. To date, no motorized travel designations have been completed.

BLM_0030609

## LEGAL AND ADMINISTRATIVE FRAMEWORK

The location, design, operation, and maintenance of roads and trails are specified in the forest-wide standards and guidelines (see Volume 2, Part 3), the Watershed Conservation Practices Handbook, and the manual direction of both the USFS and the BLM. This direction assures that intended uses will be accommodated over time. Maintenance and other activity accomplishments on SJPLC-administered roads are directly dependent upon funding levels, which vary from year to year.

### LAWS

- **The National Forest Management Act of 1976**: This act substantially amends the Forest and Rangeland Renewable Resources Planning Act of 1974. This act strengthens the references pertaining to suitability and compatibility of land areas; stresses the maintenance of productivity; and seeks to avoid the permanent impairment of the productive capability of the land. This act sets forth the requirements for Land Management Plans for the USFS.

### EXECUTIVE ORDERS

- **Executive Order 11644, as amended**: This EO establishes policies and provides procedures to ensure the control of off-road vehicle use on public lands.

### REGULATIONS AND POLICIES

- **Title 36 CFR 212**: This provides the principle regulations for administration of NFS roads and motorized trails, and requires designation of a motorized transportation system.

- **Title 36 CFR 219**: This provides resource management requirements that cannot be met without putting a viable transportation system in place.

- **Title 36 CFR 61**: This prohibits the use of motor vehicles off of the designated transportation system.

- **43 CFR 8340**: This establishes criteria for the designation of public lands as open, limited, or closed to the use of off-road vehicles, and establishes controls governing off-road vehicle use in such areas.

Additional regulations and policies are directed by FSM 7700 (Travel Management); BLM Manual 9100 (Transportation Facilities); BLM Land Use Planning Handbook H-1601-1, Appendix C; FSH 7709.55 (Travel Planning Handbook); and the Forest Service Travel Management Rule of 2005.

### DESIGN CRITERIA

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to access and travel management. Guidelines and design criteria are presented in Part 3 of Volume 2 of the DLMP/DEIS.

BLM_0030610

## AFFECTED ENVIRONMENT

### Existing Conditions and Trends

Currently, there are more than 3,000 miles of authorized USFS and BLM roads and more than 500 miles of authorized USFS and BLM motorized trails within the planning area. Authorized roads and trails may be permanent or temporary routes constructed to meet some access need. They are periodically maintained. USFS-authorized roads are assigned a maintenance category known as an "objective maintenance level," which represents the maintenance target for a specific route. Maintenance levels are assigned based on a set of criteria that describe how the road will be maintained. These criteria include considerations for protection of resources or improvements, the required road smoothness for the design operating speed, season of use, traffic volume and type, and whether dust production is acceptable. The road maintenance levels are described below.

| Maintenance Level | STANDARD |
|---|---|
| 1 | Assigned to intermittent service roads during the period of closure, which must exceed one year. Basic custodial maintenance is performed in order to protect resources and the road investment. Motorized travel is prohibited. |
| 2 | Assigned to roads open to use by high-clearance vehicles. The road surface is generally native material, which can vary from soil to rock. The roads are typically single-lane roads, and can have steep grades. Passenger vehicles are not considered in maintenance. Traffic volume and speed is normally low. Motorized travel is accepted, but passenger vehicle use is generally discouraged. |
| 3 | Assigned to roads open and maintained for travel by a prudent driver in a passenger vehicle. These roads are not maintained for user comfort. These are typically low-speed, single-lane roads with turn-outs. They may be either native or gravel surfaced. |
| 4 | Assigned to roads that provide a moderate degree of user comfort at moderate travel speeds. These roads are typically double-lane, and are gravel surfaced. Dust abatement may be employed. |
| 5 | Assigned to roads that provide a high degree of user comfort. These roads are typically double-lane, paved roads. Some are dust-abated gravel-surfaced roads. |

BLM-authorized roads do not have a corresponding road classification system. BLM roads are typically native-surface, high-clearance roads that are similar to USFS roads maintained for high-clearance vehicles, and will be considered as such for the purposes of this analysis. Sometimes, the on-the-ground maintenance, known as the operational maintenance level, does not coincide with the objective maintenance level. Generally the operational maintenance level is at, or below, that of the objective maintenance level. Table 3.19.1 presents a breakdown of roads by objective maintenance level.

It is estimated that there are more than 3,400 miles of unauthorized roads and trails within the planning area. Unauthorized roads and trails are not considered SJPL system routes; therefore, they are not managed, and are not assigned an objective maintenance level. Unauthorized routes are typically developed through repetitive use of cross-country travel routes. They may also be out-of-service temporary roads that were not decommissioned or not decommissioned adequately to prevent continued unauthorized use. These unauthorized routes tend to occur most often in areas that have been historically open to cross-country motorized travel.

BLM_0030611

**Table 3.19.1 – SJPLC Road Miles**

| Maintenance Level | STANDARD | USFS Miles | BLM Miles |
|---|---|---|---|
| 1 | Basic Custodial Care (closed) | 961 | 0 |
| 2 | Use by High-Clearance Vehicles | 1,016 | 321 |
| 3 | Suitable for Passenger Cars | 598 | 0 |
| 4 | Moderate Degree of User Comfort | 117 | 0 |
| 5 | High Degree of User Comfort | 20 | 0 |
| | *TOTAL AUTHORIZED ROAD MILES* | 2,712 | 321 |
| Unauthorized | Unmaintained | 940 | 2,500 |
| | *TOTAL ROAD MILES* | 3,651 | 2,821 |

Sources: Infra Travel Routes Database (2006); San Juan Field Office Road Maintenance Schedule.

There are approximately 2,300 miles of authorized roads within the planning area that are either closed to motorized vehicles (maintenance level 1) or managed for high-clearance vehicles, such as pickup trucks and four-wheel drive vehicles (maintenance level 2). These roads were designed for a single purpose, have a low traffic volume, are single-lane, and have surfaces consisting of native materials. Some native soil surfaces retain moisture and will rut severely if used when wet; some are prone to erosion and can be easily washed away if proper drainage is not maintained.

Maintenance level 3 roads, which make up approximately 20% of the authorized road system, are maintained in order to accommodate passenger vehicles. However, they do not necessarily provide a comfortable driving experience. These roads have aggregate surfacing, which may consist of pit-run or crushed gravel that has an expected life of 10 to 20 years when adequately maintained. Assuming an average life of 15 years, the SJPLC should resurface a minimum of 40 miles of maintenance level 3 roads per year. In recent years, resurfacing accomplishments have averaged about 10 miles per year due to budget constraints and competing priorities. This has resulted in a large deferred maintenance backlog (totaling more than $30 million in 2006).

Approximately 137 miles (4.5%) of planning area roads are maintained in order to provide a moderately to highly comfortable driving experience (maintenance levels 4 and 5). Maintenance level 4 roads are generally two-lane gravel roads. Maintenance level 5 roads are generally two-lane paved roads. These roads experience the highest volume of traffic and are the most costly per mile to maintain. Budget constraints have also affected the SJPLC's ability to maintain these to standard, resulting in a 2006 deferred maintenance backlog of $8.1 million.

The roads within the planning area are further classified into one of three functional class categories: arterial, collector, or local.

BLM_0030612

- **Arterials**: These roads serve as connections between towns, major county roads, or State highways, and are main thoroughfares through the planning area.

- **Collectors**: These roads link large areas of the planning area to arterials or to other main highways.

- **Locals**: These roads are usually single purpose transportation facilities accessing specific areas.

In general, arterial and collector roads are surfaced with asphalt pavement or aggregate material. Local roads are generally native-surfaced, except when the local road accesses developed recreation facilities (including a campground, picnic area, or trailhead), which often have improved surfacing. Table 3.19.2 lists the miles of authorized SJPL roads by functional class.

**Table 3.19.2 – SJPL Road Miles by Functional Class**

| Functional Class | Miles |
|---|---|
| Arterial | 134 |
| Collector | 769 |
| Local | 2,130 |
| Total | 3,033 |

Sources: Infra Travel Routes Database (2006); San Juan Field Office Road Maintenance Schedule.

**Forest Highways**

Forest Highways are State-, county-, or USFS-administered roads that provide access to, and within, the planning area. They are designated under the Federal Lands Highways program of the Transportation Equity Act for the 21st Century (TEA21). These routes qualify for highway trust funding for improvement or enhancement. Forest highway funding can be used for planning, design, and construction or reconstruction of these designated routes. Enhancement work may include parking areas, interpretive signing, acquisitions of scenic easements or sites, sanitary and water facilities, and pedestrian and bicycle paths.

The seven Forest Highways within the planning area are listed in Table 3.19.3.

BLM_0030613

**Table 3.19.3 – Federally Designated Forest Highways**

| Forest Hwy # | STATE HWY, COUNTY, USFS ROUTE NUMBER | NAME | TERMINI | Length (Miles) |
|---|---|---|---|---|
| 1 | State Highway 145 | Dolores – Rico | Dolores to Lizard Head Pass | 61 |
| 2 | U.S. Highway 550 | Durango – Red Mountain | Durango to Red Mountain Pass | 76.6 |
| 8 | U.S. Highway 160 | Mancos – Hesperus | Mancos Hill to Cherry Creek | 8.5 |
| 60 | NFSR 535 | West Dolores | State Highway 145 to State Highway 145 | 33.4 |
| 61 | NFSR 631 | Piedra | U.S. Highway 160 to Williams Creek | 22.1 |
| 63 | N/A | Dolores – Norwood | Dolores to Norwood | 57.3 |
| 64 | County Road 501 | Vallecito | Bayfield to Vallecito Work Center | 19 |

Source: Infra Travel Routes Database (2006)

**Budget and Maintenance**

Within the planning area, the annual cost to maintain the entire road system to standard is considerably higher than the amount allocated. In prior years, congressionally appropriated road funding was supplemented by road construction and maintenance work performed by timber purchasers, through the commercial timber sale program. This program has steadily declined over the past 20 years, and this decline is expected to continue. Beginning in 1999, the USFS conducted road condition surveys in order to determine the actual cost of maintaining the road system to standard. Work items were also recorded in order to determine the cost of road maintenance deferred in previous years due to lack of funding. Finally, the road improvement work that would be necessary in order to bring the roads up to the desired maintenance level was identified and documented. The primary maintenance work items identified through this analysis are road surfacing, signing, drainage, brushing, gating, and installing cattle guards. Analysis of the data collected showed that the San Juan National Forest (SJNF) is substantially underfunded for the size of its managed road system (Table 3.19.4).

**Table 3.19.4 – Estimated Funding Needs for SJNF Road Maintenance and Operations**

| Maintenance Level | ANNUAL MAINTENANCE | | DEFERRED MAINTENANCE | |
|---|---|---|---|---|
| | $/mile | Total $ | $/mile | Total $ |
| 1 | $170 | $163,370 | $6,755 | $144,549 |
| 2 | $3,284 | $3,336,544 | $25,020 | $6,662,958 |
| 3 | $6,153 | $3,679,494 | $50,763 | $30,804,332 |
| 4 | $6,854 | $801,918 | $70,951 | $8,103,483 |
| 5 | $6,537 | $130,740 | $4,574 | $32,977 |
| *TOTAL* | | *$8,112,066* | | *$45,748,299* |

Sources:   Annual Maintenance: Forest Infra Condition Surveys, as of October 1, 2005.
Deferred Maintenance: Infra database, as of June 23, 2006.
Average $/mile: Determined using only those roads for which costs have been entered into Infra.

BLM_0030614

SJPLC strategies employed in order to reduce maintenance costs and to allocate the limited maintenance funding include:

- seeking opportunities to transfer road management responsibilities to other jurisdictions (including counties), especially where the roads provide access to large private in-holdings and developments;

- working with partners in order to perform necessary road decommissioning and trail maintenance; and

- reducing road maintenance levels for low-value roads, or converting low-value roads to trails.

**Road Use**

In recent years there has seen a shift in the volume, and in the mix, of travel modes accessing the planning area. Traditionally, commercial use of the transportation system was dominated by the timber industry and, to a lesser degree, by the oil and gas industry. Since the 1990s, commercial timber use has experienced a continual decline. Other commercial use of the transportation system, however, has experienced a marked increase (including oil and gas, Outfitting/Guiding, and recreational vehicle guided tours). Most forms of recreation travel have risen in volume, some more noticeably than others (see Recreation section in this chapter for indicators and trends). Some of this recreation demand has been driven by a local development surge that began in the late 1990s -- a surge that has pushed the urban interface closer to the SJPL boundary.

As use of the planning area increases, travel management planning is becoming an increasingly important tool for reducing resource impacts and for coordinating uses. Over the past 20 years, the use of four-wheel drive vehicles, ATVs/OHVs, snowmobiles, and mountain bikes has increased dramatically. These uses have lead to a proliferation of unauthorized, user-created routes, especially in areas that have historically been open to cross-country motorized travel. Through travel management, the agencies would continue to work closely with the public, as well as with local, State, Native American tribal, and other Federal agencies, in order to identify access needs for the various public land uses. The goal is a balance between motorized and non-motorized recreation opportunities, which would likely require compromises by each user group.

There is a current, and future, anticipated need to provide access for private in-holdings. The Alaska National Interest Lands Conservation Act of 1980 (ANILCA) guarantees that landowners within public lands have a reasonable right of access, commensurate with their use. This act obligates land management agencies to regulate this access in order to limit resource damage. When private access becomes the dominant use, or requires significant improvement of the roads, the users must contribute to maintenance or improvement of the roads. Otherwise, use must be limited to levels that would not result in unacceptable damage to the road. Requests for in-holding access consist of both requests for new road construction and winter access. New access requests are expected to increase as land values increase, making development of in-holdings more profitable. Winter access requests are expected to increase as in-holding development increases, and as property owners seek to inhabit in-holding-located residences year-round.

BLM_0030615

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

### General Impacts
Maintenance and Reconstruction - The ability of the SJPLC to maintain and reconstruct roads and trails to meet standards is a direct function of the funding allocated for that purpose by Congress. Decisions of where to utilize this funding on the ground is aided by a process known as travel analysis. Travel analysis prioritizes each route based on its value to the overall planning area, as well as its risk to the environment, the traveling public, and the SJPLC (in terms of loss of agency investment). None of the alternatives would alter this process, or the ability to secure funding; therefore, there would be no difference between the alternatives for route maintenance or reconstruction.

*Access Needs* - Under all of the alternatives, coordination and collaboration with other Federal, state, and county officials in the management of transportation facilities to, and through, the SJPLC would be continued in order to ensure that access is maintained, standards are consistent, safety issues are addressed, and efficiency is considered at all times. Reasonable access to private in-holdings has to be considered in travel management. Existing rights-of-way (ROWs) and easements would be maintained, and future easements would be pursued, as needed, to ensure that there is appropriate public access to public lands.

### Impacts Related to Management Area (MA) Designations
General travel management schemes are tied to each of the action alternatives, and are illustrated in the acreages allocated to motorized travel suitability areas (see Chapter 2, Comparison of Alternatives Table, Suitable Lands by Alternative). The MA designations and route densities proposed under each alternative are discussed below. Motorized travel suitability is based on the allocation of the MA prescriptions by alternative and, therefore, is applied to areas. Summer motorized travel suitability is divided into three classes: "not suitable" or "suitable" or "suitable opportunity." Winter motorized travel is divided into two classes: "not suitable" or "suitable." (The suitability classifications are described in Chapter 2, Section 2.4.2.2.) These motorized travel suitability areas satisfy the BLM requirements in 43 CFR 8340. They define the parameters by which future motorized road and trail designations may be subsequently made, in accordance with the USFS 2005 Travel Management Rule and BLM travel management regulations.

*DLMP/DEIS Alternatives*: Under Alternative A, the current summer travel management direction and motorized travel suitability areas would remain unchanged. Alternatives B, C, and D would increase the area not suitable for motorized travel by approximately 66% (Alternative D), 82% (Alternative B), and 222% (Alternative C). (See the motorized over-ground suitability figures and the motorized over-snow suitability figures located in Chapter 2 for a geographic representation of motorized travel suitability proposed under each alternative.) The primary reason for this major change is that each of the action alternatives would result in eliminating areas open to cross-country motorized travel, as is allowed under the current travel management. The suitable acres allocated under Alternative C would be approximately 23% less than under current conditions (Alternative A). Alternative B would be approximately 1% less than under current conditions (Alternative A), and Alternative D would be approximately 4% greater than under current conditions (Alternative A). Relative to the existing conditions represented by Alternative A, the suitable opportunity acres allocated under Alternative C would be approximately 53% less; Alternative B would be approximately 52% less; and Alternative D would be approximately 47% less. The acreages allocated to the suitable and suitable opportunity classes would be fewer under Alternative C than they would be under any of the other alternatives (primarily due to the MA 1 emphasis of this alternative).

BLM_0030616

Under Alternative A, the current winter travel management direction and winter motorized travel suitability areas would remain unchanged, with more than 1.3 million acres suitable for over-snow motorized travel. Compared with Alternative A, over-snow motorized travel would be reduced by approximately 36% under Alternative B; by 52% under Alternative C; and by 33% under Alternative D. The primary reason for this major reduction is that approximately 482,000 acres of BLM lands (located primarily in the northwest portion of the planning area), which are currently classified as suitable in Alternative A, would become classified as not suitable for over-snow motorized travel under all of the other (action) alternatives. These lands lie in a lowland area with unpredictable snow patterns, and, therefore, are not reliable as over-snow recreation areas. In addition, restriction of motorized over-snow travel may be required during heavy snow pack years, since this land may serve as critical winter range for wildlife. (See the Recreation section for additional discussion on motorized travel suitability.)

Alternative A would maintain current travel management direction, and would leave large areas (approximately 908,651 acres) open to cross-country motorized travel. The anticipated impacts would include development of additional user-created routes, impacts to terrestrial and aquatic habitats and wildlife, and conflicts between motorized and non-motorized users. Alternatives B, C, and D would eliminate cross-country motorized travel, and would result in the development of a designated system of roads and trails for motorized travel. Development and implementation of a designated system of motorized roads and trails, and closure of areas currently open to cross-country motorized travel, is expected to have the following beneficial impacts: reduced user conflicts, reduced habitat and wildlife impacts, reduced erosion and sedimentation, and improved health of aquatic systems.

Under Alternatives B, C, and D, maximum road densities within the planning area would be prescribed under the specific guidelines established for MA 3s (less than 1 mile/square mile), MA 5s (less than 3 miles/square mile), and MA 7s (less than 1.5 miles/square mile). Also, by default, the road density guideline in MA 1 in Wilderness Areas, WSAs, and the Piedra Area, would be zero (because natural processes would dominate in these areas). These guidelines would result in a reduction of road densities and road miles available for public use in these management areas. Road densities would remain unchanged under Alternative A. Table 3.19.5 presents the resulting average road densities by alternative for MA 1s, 3s, 5s, and 7s, that would result with full implementation of these guidelines (and assuming that the entire MAs lie within a 6th HUB watershed). The average road density over the four management areas (MA 1, MA 3, MA 5, and MA 7) for each of the alternatives would be less than under the current management (Alternative A). The lowest density would be experienced under Alternative C (due to a major road density reduction), followed by Alternative B (due to a moderate road density reduction), and then by Alternative D (due to a minor road density reduction). Since actual road density reductions would be performed at a project level, this is more of a qualitative analysis. It does, however, illustrate that there is variation in road densities by alternative, which would, in turn, result in a variation in resource impacts. Reduced road densities would benefit water resources and aquatic species (by reducing run-off and sedimentation) and wildlife species (by reducing habitat segmentation). They would also reduce necessary expenditures by the SJPLC for route maintenance and repairs.

BLM_0030617

**Table 3.19.5 – Estimated Route Density by Alternative with Full Implementation of Route Density Guidelines**

| Management Area | Road Density Guideline (Mile/Sq. Mile) | MANAGEMENT AREA ACRES BY ALTERNATIVE | | | |
|---|---|---|---|---|---|
| | | Alternative A (no-action alternative) | Alternative B (preferred alternative) | Alternative C | Alternative D |
| 1 | 0 | 538,658 | 652,307 | 1,080,621 | 553,786 |
| 3 | 1 | 891,718 | 822,143 | 472,010 | 788,289 |
| 5 | 3 | 675,014 | 529,413 | 487,299 | 682,632 |
| 7 | 1.5 | 71,9291 | 81,756 | 71,929 | 89,116 |
| *Average Route Density Estimate by Alternative* | | 1.44 | 1.21 | 0.97 | 1.41 |

[1] Urban Interface prescription not in current LMP;  assumed minimum from Alternative C for comparative purposes.

**Impacts Related to Timber Management**

Timber management activities may result in the need for construction of new roads or in the reconstruction of existing roads (in order to accommodate the resulting increased and heavier traffic). There may also be an increased need for road maintenance of the new or reconstructed roads developed to access timber, as well as existing collector and arterial roads used to transport timber off the planning area. Road construction and timber hauling may potentially impact roadway safety (due to increased traffic and to mixing haul trucks with recreational traffic, including light-duty passenger vehicles, recreation vehicles (RVs), and ATVs/OHVs). Other impacts may include increased noise levels, and an increased need for dust abatement.

There may be long-term impacts related to temporary roads when decommissioning does not require recontouring. A temporary road that is not recontoured so that it blends in with the natural grade can contribute to the development of an unauthorized route. This is because it offers easy (minimal grade and vegetation obstructions) off-road access.

***DLMP/DEIS Alternatives***: Projected road construction projects related to timber management, which would be similar under all of the alternatives, would be negligible (less than a 0.27% increase). The road construction projected for Alternatives A and D is 3 miles. No construction is projected under Alternatives B and C. Projected reconstructed road miles would vary under the alternatives, from 5.6 miles for Alternative C to 8.2 miles for Alternative D. These roads would be temporary and would not be made available for public use. These mileage projections do not represent a major difference between the alternatives. The projected road construction under Alternatives A and D would represent an increase of 0.1% to the current road system. The projected road reconstruction would increase the existing road system by 0.25% under Alternative B, by 0.18% under Alternative C, and by 0.27% under Alternative D.

**Impacts Related to New Oil and Gas Development Leasing**

Oil, gas, and mineral exploration and development requires roads to be available for drilling, construction, maintenance, and production. These roads would not be available for use by the public; however, they may be used by the SJPLC for resource management purposes. These roads would be constructed and maintained by the permittee; however, many would intersect with collector and arterial roads within the planning area.

BLM_0030618

The amount of new roads constructed, in conjunction with any new oil and gas development leasing would be concentrated in the Paradox Basin and San Juan Sag areas. There would be minimal to no road development in other portions of the planning area. Some roads may be temporary (including where unsuccessful exploratory drilling is conducted). The speculative nature of mineral exploration makes it difficult to predict where, when, and how much road development would be needed. The need for road development is based on the estimated number of well sites by alternative that would be developed on currently unleased lands. It is estimated that the number of new well sites constructed would be 166 for Alternative A, 166 for Alternative B, 157 for Alternative C, and 168 for Alternative D. Based on the number of potential wells, it is estimated that 70 miles of new road construction would be needed, regardless of which alternative is selected.

New oil and gas development leasing would affect several various aspects of access and travel management. There would be an increased demand of agency staff and resources, as well as impacts on ecological resources. Agency resource and engineering staff would be needed to monitor the design, construction, maintenance, and reclamation activities associated with the development of the roads and well pad facilities. Resource impacts would include increased storm water runoff, sedimentation, erosion, wildlife disturbance, increased noise, diminished visual quality, and increased traffic on state and county collector and arterial roads. There would be increased commercial traffic on arterial and collector roads that intersect these oil and gas development roads. This increased traffic would likely require increased maintenance and could require reconstruction of segments of these roads. Commercial use may potentially increase safety hazards due to increased traffic and to mixing commercial vehicles with recreational traffic, such as light-duty passenger vehicles, RVs, and ATVs/OHVs.

***DLMP/DEIS Alternatives***: There is no difference between the alternatives in terms of projected oil and gas development (or associated road miles needed); therefore, there would be no difference among the alternatives in terms of access and travel management. If no new oil and gas leases were made available, none of the oil and gas associated impacts related to access and travel management would occur.

### Impacts Related to Recreation

Table 3.19.6 summarizes the changes in road and motorized trail miles that would result from the full implementation of motorized route designations, in accordance with the summer motorized suitability classifications, by alternative. This illustrates that Alternative C would result in a major (38%) reduction in motorized trail miles, and a minor (3%) reduction in road miles. Alternative B would result in a moderate (11%) reduction in motorized trail miles, and a minor (1%) reduction in road miles. Alternative D would result in a minor (6%) reduction in motorized trail miles, and a negligible (0.6%) reduction in road miles. The reductions in road and motorized trail miles correspond to the area allocated to MA 1 by alternative. Therefore, Alternative C would result in the greatest MA 1 allocation, followed by Alternative B, then by Alternative D. Alternative A would not alter current travel management; therefore, there would be no change in travel suitability. There would be no change to the number of miles of designated roads and motorized trails under this alternative. (See the Recreation section for an evaluation of the recreational opportunity impacts related to reducing the available miles of designated roads and motorized trails.)

BLM_0030619

**Table 3.19.6 – Approximate Change in Designated Road and Motorized Trail Mileage by Alternative**

| ROADS | | APPROXIMATE CHANGE IN MILEAGE BY ALTERNATIVE | | | |
|---|---|---|---|---|---|
| Route Number | Route Name | A | B | C | D |
| 039 | Fall Creek | 0 | -3.3 | -7.5 | -3.3 |
| 060 | Lewis Creek | 0 | -0.9 | -0.9 | -0.9 |
| 071 | Baldy Mountain | 0 | -2.8 | -2.8 | -2.8 |
| 209 | Mavreeso | 0 | -3.5 | -3.5 | 0 |
| 251 | Groundhog Cutoff | 0 | -1.8 | -1.8 | 0 |
| 307 | Wommer | 0 | -1.0 | -1.0 | -1.0 |
| 332 | Golconda | 0 | 0 | -0.9 | 0 |
| 344 | Bedrock Creek | 0 | 0 | -1.0 | 0 |
| 353 | Caviness Mountain | 0 | 0 | -0.2 | 0 |
| 424.A | Lizard Head A | 0 | -1.1 | -1.5 | 0 |
| 475 | Cabin Rim | 0 | 0 | -0.4 | 0 |
| 525 | Trail Canyon | 0 | 0 | -0.9 | 0 |
| 525.G | Trail Canyon G | 0 | 0 | -0.2 | 0 |
| 538 | Johnny Bull | 0 | -0.6 | 0 | 0 |
| 559 | Millwood | 0 | 0 | -0.7 | 0 |
| 560 | Lost Canyon | 0 | 0 | -3.8 | 0 |
| 566.A1 | Echo Basin A1 | 0 | 0 | -0.6 | 0 |
| 568 | Railroad Grade | 0 | 0 | -0.9 | 0 |
| 571 | La Plata Canyon | 0 | -0.3 | -0.3 | -0.3 |
| 585 | South Mineral | 0 | -1.4 | -1.4 | -1.4 |
| 631 | Piedra | 0 | 0 | -18.3 | 0 |
| 638 | Palisade Lake | 0 | -0.1 | -0.1 | 0 |
| 642 | San Bench | 0 | 0 | -2.5 | 0 |
| 657.C | Blanco Basin C | 0 | -0.5 | -0.5 | -0.5 |
| 661 | Black Mountain | 0 | -2.9 | -2.9 | -2.9 |
| 665 | Nipple Mountain | 0 | -2.4 | -0.1 | 0 |
| 665.H | Nipple Mountain H | 0 | -0.1 | 0 | 0 |
| 665.H1 | Nipple Mountain H1 | 0 | -0.3 | 0 | 0 |
| 802 | Grassy Mountain | 0 | -0.5 | -0.6 | -0.5 |
| 809 | Freeman Park | 0 | -0.4 | -0.4 | -0.4 |
| 821 | Silver Cloud | 0 | 0 | -0.3 | 0 |
| 822 | Bullion King | 0 | 0 | -1.3 | 0 |
| 823 | Black Bear | 0 | 0 | -1.9 | 0 |
| 854.B | Sand Divide B | 0 | 0 | -1.1 | 0 |
| 855 | Coldwater | 0 | 0 | -2.6 | 0 |
| *TOTAL CHANGE IN ROAD MILES* | | 0 | -23.9 | -64.0 | -13.4 |

Notes and Assumptions:
1) Trails identified are either existing designated motorized trails or are system trails located in areas open to cross-country motorized travel.
2) No non-system, user-created, or system routes that are not depicted on SJNF Visitors Map (2005) are included in this analysis.
3) Road and trail miles were calculated using the geographic information systems (GIS) data current as of August 24, 2007. Road and trail mile reductions were calculated from the mileage of roads and trails situated within areas identified as unsuitable for motorized travel in accordance with MA prescriptions that correspond to each of the action alternatives.

BLM_0030620

**Table 3.19.6 – Approximate Change in Designated Road and Motorized Trail Mileage by Alternative, continued**

| TRAILS | | APPROXIMATE CHANGE IN MILEAGE BY ALTERNATIVE | | | |
|---|---|---|---|---|---|
| Route Number | Route Name | A | B | C | D |
| 102 | First Notch Winter | 0 | -0.4 | -0.4 | -0.4 |
| 190 | Mcjunkin | 0 | 0 | -0.9 | 0 |
| 200 | Section House | 0 | 0 | -0.1 | 0 |
| 203 | Kilpacker | 0 | -0.5 | -0.5 | -0.5 |
| 207 | Wildcat | 0 | -2.6 | -2.8 | 0 |
| 208 | Calico | 0 | 0 | -17.5 | 0 |
| 435 | Rough Canyon | 0 | 0 | -3.8 | 0 |
| 501 | Blackhawk - Co.Trail | 0 | 0 | -0.4 | 0 |
| 509 | Columbine Lake | 0 | 0 | -2.3 | 0 |
| 514 | Hermosa Creek | 0 | 0 | -14.1 | 0 |
| 521 | Corral Draw | 0 | -5.1 | -5.3 | 0 |
| 524 | Pine-Piedra | 0 | -9.8 | -9.8 | -9.8 |
| 530 | Runlett Park | 0 | 0 | -4.7 | 0 |
| 534 | Endlich Mesa | 0 | -3.3 | -3.3 | -3.3 |
| 550 | Clear Creek | 0 | -4.9 | -4.9 | 0 |
| 565 | Treasure Mountain | 0 | 0 | -6.8 | -6.8 |
| 566 | Windy Pass | 0 | 0 | -3.8 | -3.8 |
| 569 | Fourmile Stock Drive | 0 | -0.6 | 0 | 0 |
| 577 | Navajo Peak | 0 | 0 | -1.9 | 0 |
| 580 | Turkey Creek | 0 | 0 | -1.6 | -1.5 |
| 581 | Coal Creek | 0 | -0.4 | -0.5 | 0 |
| 582 | Connection | 0 | 0 | -1.8 | 0 |
| 589 | Middle Fork | 0 | 0 | -1.0 | 0 |
| 592 | Weminuche | 0 | -2.2 | -2.3 | 0 |
| 593 | Sand Creek | 0 | 0 | -3.4 | 0 |
| 600 | Devil Mtn. | 0 | 0 | -3.0 | 0 |
| 607 | Bear Creek | 0 | -7.7 | -8.0 | 0 |
| 608 | Grindstone | 0 | -4.0 | -4.0 | 0 |
| 609 | Little Bear | 0 | -0.8 | -0.8 | 0 |
| 610 | Morrison | 0 | 0 | -1.7 | 0 |
| 617 | Box Canyon | 0 | 0 | -2.1 | 0 |
| 618 | Gold Run | 0 | -2.0 | -2.0 | 0 |
| 621 | West Mancos | 0 | 0 | -6.4 | 0 |
| 624 | Stoner Mesa | 0 | 0 | -10.4 | 0 |
| 625 | Stoner Creek | 0 | 0 | -3.8 | 0 |
| 626 | Horse Creek | 0 | 0 | -2.7 | 0 |
| 627 | Spring Creek | 0 | 0 | -0.5 | 0 |
| 629 | Eagle Peak | 0 | 0 | -6.0 | 0 |
| 631 | Aspen Loop | 0 | 0 | -4.7 | 0 |

BLM_0030621

**Table 3.19.6 – Approximate Change in Designated Road and Motorized Trail Mileage by Alternative, continued**

| TRAILS, continued | | APPROXIMATE CHANGE IN MILEAGE BY ALTERNATIVE | | | |
|---|---|---|---|---|---|
| Route Number | Route Name | A | B | C | D |
| 634 | Groundhog | 0 | -1.5 | -1.5 | -1.5 |
| 635 | Navajo Lake | 0 | -0.2 | -0.2 | -0.2 |
| 638 | East Fork | 0 | 0 | -4.8 | 0 |
| 639 | Johnny Bull | 0 | 0 | -5.5 | 0 |
| 640 | West Fall Creek | 0 | 0 | -1.8 | 0 |
| 641 | Burnett Creek | 0 | 0 | -2.0 | 0 |
| 645 | Priest Gulch | 0 | -4.1 | -5.1 | 0 |
| 646 | East Fall Creek | 0 | 0 | -1.5 | 0 |
| 647 | Fish Creek | 0 | 0 | -0.3 | 0 |
| 648 | Geyser Spring | 0 | -0.6 | -1.2 | 0 |
| 649 | Burro Bridge | 0 | -0.7 | -0.7 | -0.7 |
| 650 | Groundhog Creek | 0 | 0 | -1.5 | 0 |
| 654 | Middle Mountain | 0 | 0 | -2.3 | 0 |
| 656 | North Canyon | 0 | 0 | -0.1 | 0 |
| 660 | School House | 0 | 0 | -0.1 | 0 |
| 662 | Stump Lake | 0 | 0 | -0.0 | 0 |
| 663 | Lost Lake | 0 | 0 | -0.4 | 0 |
| 666 | Ute Creek | 0 | -1.4 | -1.8 | 0 |
| 707 | Devils-Hole | 0 | -2.9 | -2.9 | -2.9 |
| 733 | Salt Creek | 0 | 0 | -0.4 | 0 |
| 735 | Ryman Creek | 0 | 0 | -4.7 | 0 |
| 738 | Loading Pen | 0 | 0 | -0.2 | 0 |
| 739 | West Twin Springs | 0 | 0 | -0.5 | 0 |
| 746 | Owens Basin | 0 | 0 | -2.5 | 0 |
| 815 | Cave Basin | 0 | 0 | -0.1 | 0 |
| *TOTAL CHANGE IN ROAD MILES* | | 0 | -55.7 | -192.1 | -31.4 |

Notes and Assumptions:
1) Trails identified are either existing designated motorized trails or are system trails located in areas open to cross-country motorized travel.
2) No non-system, user-created, or system routes that are not depicted on SJNF Visitors Map (2005) are included in this analysis.
3) Road and trail miles were calculated using the geographic information systems (GIS) data current as of August 24, 2007. Road and trail mile reductions were calculated from the mileage of roads and trails situated within areas identified as unsuitable for motorized travel in accordance with MA prescriptions that correspond to each of the action alternatives.

BLM_0030622

**Impacts Related to Travel Management from Wildlife**

Wildlife habitat improvements and seasonal restrictions for key habitats (including winter concentration areas, winter severe range, and spring calving/fawning areas) may lead to fewer miles of road open to motorized travel in certain areas. Habitat improvements may include reducing road densities through decommissioning roads, rehabilitating abandoned roadbeds, and allowing the growth of cover vegetation along road corridors. Seasonal closures are used in order to protect wildlife during critical periods while, at the same time, allowing for motorized use during less critical times.

Protection measures for Canada lynx and lynx habitat may result in minor impacts to road-related activities. In terms of lynx protection, there would be no difference between the alternatives. The protection measures identified are already required under current SJPLC policies and procedures, in compliance with the ESA and the Lynx Conservation Assessment Strategy (LCAS).

***DLMP/DEIS Alternatives***: Wildlife management strategies would apply regardless of the alternative selected; therefore, there would be no difference between the alternatives in terms of impacts related to wildlife management.

BLM_0030623

**Table 3.19.7 – Summary of Direct and Indirect Impacts by Alternative**

| AREA OF DIRECT/ INDIRECT EFFECT | Alternative A (no-action alternative) | Alternative B (preferred alternative) | Alternative C | Alternative D |
|---|---|---|---|---|
| Management Area Designations | Approximately 908,651 acres open to summer cross-country motorized travel. Route Density = 1.44 miles/sq. mile. Continued impacts on terrestrial and aquatic habitats and wildlife, and conflicts between motorized and non-motorized users would occur. | Zero acres open to summer cross-country motorized travel. Route Density = 1.21 miles/sq. mile. Reduced user conflicts, reduced habitat and wildlife impacts, reduced erosion and sedimentation, and improved health of aquatic systems would occur. | Zero acres open to summer cross-country motorized travel. Route Density = 0.97 miles/sq. mile. Reduced user conflicts, reduced habitat and wildlife impacts, reduced erosion and sedimentation, and improved health of aquatic systems would occur. | Zero acres open to summer cross-country motorized travel. Route Density = 1.41 miles/sq. mile. Reduced user conflicts, reduced habitat and wildlife impacts, reduced erosion and sedimentation, and improved health of aquatic systems would occur. |
| Timber Management | Potential safety impacts due to increased traffic and from mixing haul trucks with recreational traffic would occur. Need for road maintenance and dust abatement construction traffic noise would occur. Easy access from decommissioned roads may encourage unauthorized motorized use. Approximately a 0.1% temporary increase in road system and approximately a 0.24% increase in road system reconstruction would occur. | Impacts similar to Alternative A would occur, except, approximately a 0.25% increase in road system reconstruction would occur. | Impacts similar to Alternative A would occur, except approximately a 0.18% increase road system reconstruction would occur. | Impacts similar to Alternative A would occur, except approximately a 0.1% temporary increase in road system and approximately a 0.27% road system reconstruction would occur. |
| Oil and Gas Development | Approximately 70 miles of road constructed. Increased traffic and maintenance needs on SJPL roads. Potential safety impacts due to increased traffic and from mixing commercial vehicles with recreational traffic would occur. | Impacts similar to Alternative A would occur. | Impacts similar to Alternative A would occur. | Impacts similar to Alternative A would occur. |
| Recreation | No change in designated road and motorized trail mileage. | Designated road miles reduced by 23.9 miles. Motorized trail miles reduced by 55.7 miles. | Designated road miles reduced by 64 miles. Motorized trail miles reduced by 192.1 miles. | Designated road miles reduced by 13.4 miles. Motorized trail miles reduced by 31.4 miles. |
| Wildlife Management | Seasonal restrictions to motorized travel in key habitats during critical periods for the species of concern would occur. Road closures designed to reduce densities and improve habitat may result in fewer miles of road open to motorized travel in certain areas. | Impacts similar to Alternative A would occur. | Impacts similar to Alternative A would occur. | Impacts similar to Alternative A would occur. |

BLM_0030624

## CUMULATIVE IMPACTS

### Impacts Related to Providing Access to Private Land In-holdings
The following impacts are predicted to be the same under all of the alternatives, since the influence of private land development would be similar under each alternative.

### Historical Impacts
Since the late 1990s, there has been a surge in residential and commercial development in southwestern Colorado. This has resulted in increased land values, as well as in changes in land use. Increased land values have made the development of in-holdings highly profitable.

### Current Impacts
The planning area is experiencing mounting pressure from private land in-holding owners to provide reasonable access, as required under ANILCA. This issue is further complicated when system roads pass through some portion of an in-holding and then continue on to provide public lands access.

### Foreseeable Future Impacts
There may be several cumulative impacts related to providing access to private land in-holdings. Increased road miles and densities are expected to have the longest reaching cumulative impacts because this would have connected impacts on aquatic resources, aquatic species, wildlife, and road maintenance. Development of in-holdings would increase traffic on SJPLC-administered roads -- roads needed for access to the development. This may result in an increased need for maintenance and may require upgrading some public lands roads to all-weather roads. Where routes pass through private in-holdings, legal agreements and/or ROW easements may be needed. In cases where a road, or a segment of a road, becomes primarily a private in-holding access road, it may be appropriate to transfer the jurisdiction to the county.

### Impacts Related to Providing Access to Utility Corridors
The demand for utility corridor access is expected to increase, regardless of the alternative selected; therefore, there would be no difference between the alternatives for the following cumulative impacts.

### Historical and Current Impacts
The southwestern region of the United States has experienced a surge in oil and gas, and electrical energy development. This surge has created a demand for creating new utility corridors, and upgrading existing utility corridors, in order to convey fuel and power economically. These corridors cross many miles of public lands and are generally linear in construction. Some impacts during construction (predominantly those related to ground disturbance for corridor installation and construction of temporary roads, including sedimentation, erosion, and increased run-off) would be relatively short-lived. These impacts would diminish with the re-establishment of vegetation over time. Other impacts related to the operation of the utility corridor would continue for the life of the facility (including increased run-off, sedimentation, and erosion due to increased road densities; visual impacts resulting from linear corridor and access roads contrasting with the surrounding natural areas; increased disturbance to wildlife, and impacts to "quiet-use" recreation when the corridor crosses an otherwise non-motorized area).

BLM_0030625

**Foreseeable Future Impacts**

Existing utility corridors are aging, with some facilities in excess of 30 years old. These aging facilities are often in need of maintenance or replacement. Utility company requests for permanent roads to construct, maintain, and replace facilities have increased in recent years. These requests may result in new road construction and increased road densities. Increased road miles and densities would have connected impacts on aquatic resources, aquatic species, and wildlife. These types of roads are generally closed to public use; therefore, no impacts related to public traffic are expected. Road use permits would be issued for commercial use, requiring more agency staff time to manage the permits.

**Impacts Related to the Northern San Juan Basin Coal Bed Methane Project**

**Foreseeable Future Impacts**

A record of decision (ROD) was issued in April 2007 for the Northern San Juan Basin Coal Bed Methane (NSJB-CBM) project that would allow for the development of coal bed methane (CBM) on USFS, BLM, and private lands within the project area. The ROD is currently under appeal. However, regardless of the outcome, there would be some CBM development that occurs within the project area. For the purposes of this analysis, it is assumed that the project would reach full build-out, as described in the NSJB-SBM FEIS and associated ROD.

The project calls for the construction of 226 well pads. Twenty-seven would be located on BLM-administered lands, 100 would be located on USFS-administered lands, and the remaining 99 would be located on private lands. Access would be provided by the construction of 92 miles of roads. Eight miles would be located on BLM-administered lands, 64 miles would be located on USFS-administered lands, and 20 miles would be located on private lands. These roads would not be open for use by the public. The operators would be responsible for construction, maintenance, and the prevention of public access. They would also be responsible for obtaining required easements, ROWs, and permits; controlling noxious weeds, and complying with agency and landowner requirements. Maintenance would blading, ditch and drainage facility cleaning, gravelling, and applying dust palliative. The roads would be temporary and the operators would be responsible for reclaiming and revegetating the roads on public lands following project completion.

The impacts of this project to access and travel management would include an increased demand of agency staff and resources, as well as impacts to ecological resources. Agency resource and engineering staff would be needed in order to monitor the design, construction, maintenance, and reclamation activities associated with the development of the NSJB-CBM project roads and well pad facilities. Resource impacts are disclosed in the NSJB-CBM FEIS and would include increased storm water run-off, sedimentation, erosion, wildlife disturbance, noise, increased traffic on State and county roads, and diminished visual quality.

The proposed contribution of the road miles constructed and reconstructed within this DLMP/DEIS is approximately equal to the miles of road planned on public lands as part of the NSJB-CBM project road development. The cumulative impacts would be a doubling of the impacts associated with road construction and maintenance during the life of the NSJB-CBM project. Impacts related to the alternatives under the DLMP/DEIS, however, would be distributed over a much larger area of 2.6 million acres, verses 125,000 acres in the NSJB-CBM project. These impacts would be diminished as the roads are reclaimed and revegetated; however, these areas are not expected to ever reach pre-existing conditions.

If no new oil and gas leases were made available, new oil and gas development road construction would be about one-half of that if new leasing were to occur. Reducing the road construction by one-half would also reduce the impacts associated with road construction by one-half. Most new road construction would be associated predominantly with the NSJB-CBM project. Access and travel management in the areas proposed for leasing under the alternatives would remain unchanged.

BLM_0030626

## INTRODUCTION

Population growth, new recreation technology, and community interest have increased the focus on management of outdoor recreation settings and opportunities. Strategies incorporated into the various DLMP/ DEIS alternatives aim to maintain and enhance desirable recreation settings, integrate recreation with other resource objectives, provide for sustainable recreation experiences, and promote collaboration with local and regional partners in order to achieve recreation objectives. (The complete text of this analysis is presented in the Analysis of the Management Situation (AMS), which is on file at the SJPLC.)

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- **The Architectural Barriers Act of 1968**: This act requires access to facilities designed, built, altered, or leased with Federal funds.

- **The Rehabilitation Act of 1973, Section 504, as amended**: This act prohibits discrimination on the basis of a disability.

### REGULATIONS AND POLICIES

- **The San Juan-Rio Grande National Forest Wilderness Management Direction decision signed 8/3/1998**: This provides direction for the administration of Wilderness areas on the San Juan and Rio Grande National Forests.

- **Title 36 CFR 212**: This provides direction for the administration of the Forest Transportation System; the designation of roads, trails, and areas for motor vehicle use; and use by over-snow vehicles.

- **Title 36 CFR 251**: This provides overall direction for land uses, including miscellaneous land uses; special uses (Outfitter/Guides, for example); appeal of decisions relating to occupancy and use of USFS lands; and access to non-Federal lands.

- **Title 36 CFR 261**: This provides general prohibitions on USFS lands.

- **Title 36 CFR 290**: This provides direction for cave resources management on USFS lands. The rules of this part implement the requirements of the Federal Cave Resources Protection Act of 1988.

- **Title 36 CFR 291**: This provides direction for the occupancy and use of developed sites and areas of concentrated public use on USFS lands, including admission fees, recreation use fees, and reservation fees.

- **Title 36 CFR 293**: This provides direction for the administration and use of Wilderness and primitive areas on USFS lands.

BLM_0030627

- **Title 36 CFR 294**: This provides direction for special areas, including recreation and inventoried roadless areas (IRAs).

- **Title 36 CFR 297**: This provides direction for the administration of Wild and Scenic Rivers (WSRs) under Section 7 of the Wild and Scenic Rivers Act (WSRA) of 1968, which provides for the protection of the free-flowing, scenic, and natural values of rivers designated as components or potential components of the National Wild and Scenic Rivers System from the effects of construction of any water resources project.

- **FSM 1909.15 and 1950**: This provides direction for implementing the National Environmental Policy Act (NEPA) and Council on Environmental Quality (CEQ) regulations.

- **FSM 2300**: This provides direction for management and planning in relation to recreation, Wilderness, and related resources.

- **FSM 2709, 2710, and 2720**: These provide the legal framework for special uses on USFS lands.

- **FSM 7300**: This provides direction for planning, development, and managing facilities on USFS lands.

- **FSM 7400 and 7409.11**: These provide direction for administration and managing drinking water systems, waste water systems, effluents, solid waste systems and food services.

- **FSH 2309.18**: This provides direction for designing, building and maintaining USFS trails.

- **Title 43 CFR 8342**: This provides direction for the designation of areas and trails on public lands.

- **Title 43 CFR 8340**: This provides direction to establish criteria for designating public lands as open, limited, or closed to the use of off-road vehicles, and for establishing controls governing the use and operation of off-road vehicles in such areas.

- **FSH 7309.11**: This provides direction for managing USFS facilities.

- **BLM Manual 8330**: This provides policy on reasonable accommodations for persons with disabilities.

- **BLM Handbook 1601, Appendix C**: This provides minimum guidance for developing the Recreation sections in a Resource Management Plan

- **BLM Washington Office IM 2006-060**: This provides direction for incorporating benefits-based management in the recreation program.

- **BLM Washington Office IM 2007-043**: This Instruction Memorandum transmits the "Unified Strategy" describing how best to implement the BLM Priorities for Recreation and Visitor Services Workplan (Purple Book), as outlined in IM No. 2006-060.

BLM_0030628

## DESIGN CRITERIA

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to recreation. Guidelines and design criteria are presented in Part 3 of Volume 2 of the DLMP/DEIS.

### Existing Conditions and Trends

There are five components that describe existing recreation conditions within the planning area, as follows:

- *Recreation Profile*: This section presents and analyzes the question: What role do public lands play in local and regional lifestyles, and in offering attractions and activities for tourists?

- *Recreation Demographics and Demand Trends*: This section presents and analyzes the question: What do recreation trends suggest about the future of recreation within the planning area?

- *Dispersed Recreation*: This section presents and analyzes the question: What are the important activities and settings that currently characterize dispersed recreation uses within the planning area?

- *Recreation Facilities and Funding*: This section presents and analyzes the question: Within the context of reduced budgets, how can the SJPLC meet the increasing demand for recreation through partnership opportunities and other non-traditional methods? What realignment of facilities makes sense?

- *Recreation Issues and Need for Change*: This section presents and analyzes the question: Do existing conditions and public scoping comments illuminate the need for change regarding recreation settings, capacities, markets, and suitability? (Preliminary revision issues are identified.)

### Recreation Profile

Outdoor adventure in southwestern Colorado has a reputation for diversity and excellence, and its appeal is contagious. More than two-thirds of a random sample of prospective visitors views Colorado as an "exciting" place. Portions of the planning area near communities are gaining social value due to the increasing demand for the available recreation settings. Aging Baby-Boomers and people engaging in amenity migration are helping establish more active (and less "retired") populations settling near the planning area boundaries. Many residents value the ability to conveniently access the planning area near their homes, for a variety of recreational activities.

*Tourism* - The spectacular landscape of the San Juan Mountains continues to fuel the tourist economy, regardless of whether visitors actively engage in planning area recreation. For many, proximity and views are enough of a draw to bring them to the region. Colorado, as a whole, attracts visitors who embrace its image as a place for adventure and recreation.

Outdoor recreation accounted for approximately 31% all travel into Colorado (including business travel and skiing) . According to America's Scenic Byways, the Colorado Report , the total vehicle miles traveled on the San Juan Skyway nearly doubled between 1990 and 2002. Other sections of scenic highway not designated as a scenic byway (including Wolf Creek Pass) are experiencing the same surge in scenic driving. Other visitor surveys (National Visitor Use Monitoring/NVUM, Fort Lewis College surveys) have found that sight-seeing is the most common activity, and that scenery is the most highly valued resource.

BLM_0030629

**Outdoor Recreation Industry** - A variety of attractions and activities, during all seasons, provide a stable tourism industry. Tourists make up the majority of the market for guided outdoor recreation on public lands; however, the skiing and outdoor equipment industry are equally fueled by local dollars. These industries are important to the regional economy, as well as to the fiscal well-being of the sales tax dependent local governments.

**Winter Sports** - Nationally, the increase in annual skiing days is expected to be approximately 110% percent by 2050, with the largest increase in the Rocky Mountain Region. Silverton Mountain, Durango Mountain Resort, and Wolf Creek ski areas play an important role in the communities and economies within the planning area. The ski industry is a large seasonal employer in the region. During the winter of 2003, skiing in La Plata County ranked as the number one private sector job provider.

Winter recreation has been affected (impacted) in recent years by the increase in population in southwestern Colorado. This has resulted in an increased demand for access to recreational opportunities on snow. In addition, snowmobiles have increased in power and reliability, allowing them to access more terrain. Backcountry skiers now also have better equipment, and there has been an overall surge in adventure skiing. Another emerging sport is hybrid skiing, which is where a snowmobile tows or carries a skier or snowboarder up hills. During the past several decades, backcountry skiers and snowmobilers have had some success in resolving differences regarding where these groups could recreate without conflict. This cooperation has been challenged by the increase in number of users, as well as by changes in technology. This increase in overall number of users has polarized users, and communities, to the point that segregation of users is being asked for by the non-motorized community.

**River-Running and Fishing** - The planning area offers some of the highest quality fishing in the United States. From the San Juan mountain high country to the semi-arid San Juan River tailwaters, world-class fishing awaits the angler year-round. Boating is another strong recreational asset of the planning area. Large reservoirs (including McPhee, Williams, Vallecito, and Lemon) offer recreational boating in a mostly natural, scenic setting. Numerous rivers (including the Dolores, the Animas, and the Piedra) support a robust and beneficial commercial river-running economy.

**Second-Homes and Amenity Migration** - Many of the attributes that attract people to visit the San Juan Mountains also prompts some to move, or buy a second home, in the area. Vacation and/or second homes are an economic driver in many local communities, fueling regional economies with outside dollars. This occurs while they are being built (related to construction, development, real estate, and finance), as well as after they are built (related to maintenance and local spending of occupants). As the demand for residential access across the planning area, the recreation setting desired by visitors would be impacted.

**Table 3.20.1 – Tourism by Geographic Area (Dolores)**

| Maintenance Level | RECREATION – TOURISM PROFILE OF DOLORES GEOGRAPHIC AREA |
|---|---|
| Terrain and Access | The Dolores Geographic Area has the widest variety of terrain and climate zones of all three districts, ranging from the high peaks in the La Plata Mountains to the desert country downriver of McPhee Reservoir. The most extensive and signature country is the foothills and mesas terrain stepping off of the La Plata, Rico, and Wilson mountains. Due to a long history of grazing and logging on these relatively flat mesas and foothills, road access to this area is extensive and well-developed. The flat topography also increases the impacts associated with illegal off-road driving. |
| Feedback from Area Residents | Due to the recent roots in traditional uses of the forest, and to the long-established and extensive network of access roads on the Dolores District, people on the west end of the planning area have a noticeably strong multiple-use ethic. "There's something for everyone out there" was a commonly stated phrase in the 2005 Dolores Public Lands Office (PLO) Study Groups. Many recognize the challenge of multiple uses, most, however, would prefer to avoid a high degree of use segregation. Most people favor limiting motorized travel to established routes. With the exception of fairly widespread concern about gas well development, the majority of Dolores PLO residents are tolerant, and even supportive, of traditional uses within the planning area. |
| Strongest Recreation - Tourism Asset | Diversity of terrain and plentiful road access offers a variety of opportunities, and disperses uses to many different areas. |
| Recreation - Tourism Economy | Visiting Mesa Verde National Park and going hunting are the largest tourist attractions in the area. The proximity to the mountains goes hand-in-hand with the agricultural lifestyles that many recent immigrants have come to enjoy in Cortez, Dolores, and other nearby communities. The planning area offers geographic and climatic relief for the thousands of people who live in the flatter, warmer, and drier terrains. Residents from around the Four Corners region can quickly access the mountains and higher ground to enjoy trails, rivers, streams, lakes, and scenic vistas. |
| Management Challenge | Travel management is the number one recreation challenge, and the designation of travel access routes would profoundly influence the recreation setting and experience in this geographic area. |

BLM_0030631

**Table 3.20.2 – Tourism by Geographic Area (Pagosa)**

| Maintenance Level | RECREATION – TOURISM PROFILE OF PAGOSA GEOGRAPHIC AREA |
|---|---|
| Terrain and Access | The Pagosa Geographic Area contains the Weminuche Wilderness, which is the largest Wilderness Area in the State of Colorado. The access opportunities to the Wilderness in the Pagosa PLO are more numerous and geographically dispersed than other places within the planning area. Large open parks with rugged mountain backdrops characterize this geographic area. Pagosa Springs, the main urban center, is experiencing rapid growth. Due to the mix of private and public lands, the urban interface is more extensive than in other places within the planning area. Residents value access and proximity to public lands. Consequently, the recreation use of the planning area close to Pagosa Springs is heavy and growing, while recreation public services are lagging. |
| Feedback from Area Residents | Agricultural roots are important in Pagosa, and many elements of the agricultural lifestyle relate to living near public lands. Some opportunities currently exist for recreation near Pagosa; however, many residents expressed the desire for more urban interface recreational opportunities, services, and access. Scenery is very important to local residents, and to the local economy. Pagosa residents like to recreate in the winter, and many go to the Wolf Creek Pass area, where the access to higher-elevation snow is easy and snow conditions are good. |
| Strongest Recreation - Tourism Asset | Diverse opportunities for Wilderness access; diverse and high quality wildlife habitat. |
| Recreation - Tourism Economy | Unobstructed views of the San Juan Mountains are common from any of the thousands of home sites platted around Pagosa Springs. With up to 200 building permits per year, the Archuleta County development industry is accommodating the many new full- and part-time residents. The Wolf Creek Ski Area plays an important role in the otherwise quiet winter months, while hunting season gets area cash registers ringing in the fall. |
| Management Challenge | Managing hunting has been the biggest challenge for many years; however, this geographic area is changing from a rural forest to a residential intermixed forest. Management of recreation in the urban interface, Wilderness, and in relation to heritage tourism, will be the challenges of the future. |

BLM_0030632

**Table 3.20.3 – Tourism by Geographic Area (Columbine)**

| Maintenance Level | RECREATION – TOURISM PROFILE OF COLUMBINE GEOGRAPHIC AREA |
|---|---|
| Terrain and Access | The Columbine Geographic Area offers easier vehicle access to higher-elevation terrain than do either of the other two districts. This is via mining roads, timber roads, and State highways. The Columbine Geographic Area offers almost limitless possibilities for recreation access along Highway 550, the San Juan Skyway. The Columbine is also known for its wild country and big peaks. The scenery, and the strong presence of mountain adventurers of all types, reflects the proximity of some of the highest, most impressive, rugged mountains in Colorado. |
| Feedback from Area Residents | Residents seek high-quality recreation opportunities in the urban interface, and day trip opportunities to spectacular mountain settings. The easily accessible features of planning area near Durango, Bayfield, Vallecito, and other population centers are used frequently by the fitness-minded population of La Plata County. However, easy access to higher elevations entices recreational users out of the foothills and into the mountains for alpine day trips, in winter and summer. |
| Strongest Recreation - Tourism Asset | Easy road access to higher-elevation trailheads, cultural sites, and road-heads offers a remarkable range of recreation opportunities strongly connected to the communities of Durango and Silverton. |
| Recreation - Tourism Economy | Durango has the longest history and most experience with, tourism of any town in the region. Public-land use reflects this experience and commitment to tourism with the Durango and Silverton Narrow Gauge Railroad, Animas river fishing and boating, two ski areas, world-class mountain biking, and the San Juan Skyway and Alpine Loop Scenic Byways. |
| Management Challenge | This geographic area will continue to experience growth in population and tourism. Meeting the demand for a wide range of sustainable and diverse, developed and dispersed day-use recreational settings will be the biggest challenge. |

BLM_0030633

**Recreation Demographics and Demand Trends**

The 2003 Colorado Statewide Comprehensive Outdoor Recreation Plan (SCORP) provided information about people who visit State Parks in southwestern Colorado. In combination with National Visitor Use Monitoring (NVUM) survey results and information from Cordell (1999), these data represent the general demographics of visitors to the planning area. Most visitors are white males over the age of 30 (with non-local residents being older, mostly over 45), with some college education and a middle-class income. More than 40% of visitors to the planning area are from local communities (including Durango, Farmington, and Pagosa Springs). Wilderness visitors tend to be older than other visitors, with approximately 68% in the 40- to 70-year-old range. Approximately 60% of visitors seek a setting that has little or no development, or has limited trails, camping, boating, and fishing. Key activities for resident visitors include swimming and motorized boating. Non-resident visitors, on the other hand, plan to hike, fish, and camp. Most visitors indicated that "relaxing" and "spending time with family and friends" were their top reason for visiting.

Top primary activities were listed as viewing scenery, downhill skiing, hiking/walking, relaxation and fishing. The most heavily used facilities include forest roads and trails. The most popular specially designated areas are the scenic byways and the Wilderness Areas.

Key national recreation findings indicate that the five fastest growing outdoor recreation activities are expected to be: visiting historic places ("heritage tourism"), downhill skiing, snowmobiling, sightseeing, and non-consumptive wildlife activity (Cordell 1999). The five slowest growing outdoor recreation activities (activity days) are expected to be: fishing, primitive camping, cross-country skiing, off-road vehicle driving, and hunting. Both tourism and regional populations are growing steadily due to the demand for an amenity-rich lifestyle, the centerpiece of which is the planning area. There is increasing participation in recreation activities that occur on public lands, particularly day-use dispersed recreation, motorized activities, and heritage tourism. The trend is a strong and steady increase in recreation demand, primarily driven by residents focused on public lands close to communities. In addition, there is a strong destination market driven by tourists who want to reconnect with rural communities within cultural landscapes.

**Dispersed Recreation**

The planning area offers an extraordinary variety of dispersed outdoor settings and opportunities, often defined by a low level of facility development, freedom of choice, and a semi-primitive and predominantly natural environment. A combination of features offers a remote, rustic and primitive setting; high-quality scenery; and suitable terrain for camping, picnicking, mountain biking, OHV-driving, snowmobiling, backcountry skiing, hunting, and other dispersed uses. Users value the freedom of choice, remoteness, and naturalness associated with dispersed recreation use. Regardless of the activity, the opportunity to get away from day-to-day stresses, and to be with friends and family in a natural setting, is the primary benefits that motivate dispersed recreation visitors.

An inventory of dispersed campsites shows camps often clustered along streams in valley bottoms. Concerns have been raised regarding the sanitation, erosion, and wildlife impacts associated with heavily used, and easily accessed, dispersed recreation areas. La Plata Canyon, South Mineral, and Williams Creek are examples of locations with intensive dispersed camping use, and with the associated wear-and-tear. Locations close to communities such as Cortez and Durango also show the impacts of constant and intensive dispersed day use.

BLM_0030634

### Recreation Facilities and Funding

Within the planning area, only a fraction of the cost of providing recreation facilities and infrastructure is paid for by the annual revenues from all recreation fees (including special-use fees, Outfitter/Guide fees, entrance fees, and recreation fees) collected.

The inventory of SJPLC-administered recreation facilities includes campgrounds, picnic areas, trailheads, scenic overlooks, and marinas. Maintaining these facilities is costly. The SJPLC has identified maintenance backlogs, and has implemented a recreation facility master plan process designed to align recreation facility investments with benefits to visitors and revenues available.

Demographic and recreation trends have important implications for the future of recreation facilities within the planning area. Aging populations from urban areas with more available leisure time, a predominance of day use versus overnight use, private/public partnership potential, the demand for heritage tourism, an "undeveloped" environment, "adventure learning" in "outdoor museum environments," and the proximity of the planning area to growing communities are all facts that have important consequences for the appropriate location, type, and amount of future facilities and visitor services.

### Recreation Issues and Need for Changes

Historically, use of the planning area has emphasized commodities; however, current social, economic, and demographic changes have significantly increased recreational uses, and have changed the nature of recreation demand. Recreation is now the most extensive, and economically valuable, resource associated with the planning area. Every recreation and leisure trend associated with public lands exists within the planning area (including amenity migration, Baby-Boomer demands, Wilderness Area crowding, motorized recreation, wildland-urban interface (WUI) demands, and resort development). In contrast with the past, current management must accommodate, and protect, recreation values if it is to be successful and sustainable. The recreation tourism market is expected to grow. Recent trends, as well as future projections, point toward increases in the number of participants, trips, and activity days for outdoor recreation across most activities. For many activities, participant growth will be faster than population growth. This growth offers challenge, as well as opportunity.

Public land recreation sustainability has become dependent upon a wide range of creative and effective partnerships that involve both public and private entities. The SJPLC must collaborate with commercial enterprise, land trusts, municipalities and State agencies, publishers, Outfitter/Guides, interpretive associations, and universities, among others. Recreation within the planning area is a local, regional, and national resource. Collaborative efforts would directly affect the ability of the SJPLC to deliver sustainable recreation settings and benefits.

There are increasing concerns over access to the planning area, as well as regarding visual impacts to scenery. People who recreate within the planning area value scenery, and expect a natural environment. They also value existing public lands access, and are sensitive to changes in the location, amount, and type of access.

People are generally aware that every acre cannot support every type of recreation. They would like to maintain recreation opportunities and support multiple uses where it is feasible and sensible, while, at the same time, balancing use with recreation values.

BLM_0030635

Recreation travel corridors are the backbone of recreational access to the planning area. These more-developed routes serve as essential gateways to a wide range of recreational opportunities. Facilities along these corridors can further provide essential visitor services, and can serve as information hubs.

Nationally, motorized use of public lands has surged in the last few decades. Travel on scenic highways has doubled, and OHV-use continues to grow as Baby-Boomers age and become less physically active. At the same time, the demand for "quiet" use in large remote backcountry areas is on the rise. Areas within the planning area are experiencing this increase, as well as its associated impacts on other users.

Dispersed-use and day-use recreation is becoming a predominant recreation use within the planning area. Visitors and residents want quick access to public lands for short visits that are close to home (within a day's drive) in a natural environment. Recreation facilities and travel infrastructure can better support this dispersed day use.

Interpretation and conservation education is critical to stewardship of the planning area. Recent surveys show that the predominantly urban culture knows very little about public lands. Research indicates that people have a keen desire to participate meaningfully in land stewardship, as well as in the protection of their community's public "backyard." SJPLC managers can facilitate this involvement, building ownership with individuals and communities, and a conservation ethic that benefits people and the land.

Colorado is known for its outdoor adventure sports. The planning area can offer diverse outdoor recreational opportunities for all age groups and activity levels, as well as diverse recreational opportunities beyond adventure sports. Such diversity would benefit the regional economy, and better enable the planning area to meet the anticipated demand from aging populations (who seek less-active, close-to-home, outdoor recreation). Heritage tourism, short loop trails, community connections, increased conservation educational offerings, day-use activities on trails and roads, and stewardship opportunities are all likely to offer a welcome complement to Colorado's more traditional adventure sports.

Population growth implies added recreational-use conflicts. The SJPLC would do well to invest in management actions that minimize conflicts (including providing better recreation-related information to people so they can make better decisions about the settings they seek; implementing improved signing, in order to encourage stewardship behaviors and the sharing of trails and roads; and separating uses as a last, but necessary, resort). A major factor accounting for the projected increase in many recreation activities (e.g., skiing, snowmobiling, and camping) appears to be the strong positive relationship to personal income, as well as the rather large expected increase in real personal income over the next 50 years (Cordell 1999). These projections, however, assume that the distribution of income within the population would remain constant, which it has not done in recent years. The proportion of people in the "middle class" has gotten smaller, and there has been a widening gap between the very rich and the very poor. Should this trend continue, participation in some outdoor recreation activities may be reduced while others may increase.

BLM_0030636

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

### General Impacts

Within the planning are, recreation occurs throughout the year. Recreational opportunities, experiences, and settings would continue under all of the alternatives. Within the planning area, recreation opportunities are managed according to their ROS setting, which are: Primitive, Semi-Primitive Non-motorized, Semi-Primitive Motorized, Roaded Natural, and Rural. There are no Urban settings within the planning area. Each alternative would propose different numbers of acres under the various settings and that, in turn, would change the social, physical, and administrative use of the setting.

In general, recreation experiences and benefits would not change between alternatives, and although new Structured Recreation Management Areas (SRMAs) would be established, there would be no change in benefits. This is because the SRMAs merely identify the use patterns that have already been established within that SRMA boundary. Future management actions may change emphasis on administrative activities; however, the recreational "niche" for the area would stay the same.

Recreation facilities would not be noticeably impacted in relation to any of the alternatives. This would be due, in part, to the long-term established use of these facilities, as well as to the current capacity, the ability to handle increased occupation, and the considerable public investment in facility operation. Implementation of any of the alternatives would not impact the number and location of facilities; however, budget constraints and/or increases and use trends would result in a dramatic impact to facilities in the future.

Allocation of land for potential ski area development (one of the activities in MA 8) would be consistent with the land use planning process. Allocation would not preclude the need for future ski area planning and additional NEPA analysis. All alternatives would continue the current permitted ski areas (Durango Mountain Resort and Silverton Mountain). Alternative A would carry forward ski areas from the 1983 LMP. Alternative D would also keep the potential ski area in the East Fork of the San Juan .that was in the 1983 Land Management Plan  The East Fork ski area would impact the roadless character of the South San Juan Adjacent IRA, and would increase commercial skiable terrain in the planning area (while, at the same time, non-commercial terrain would be lost).

The number of recreation residences would not vary by alternative. There are no other uses identified for the areas occupied by recreation residences. Future use is expected to continue to allow all recreation residences, and the SJPLC would continue to work in partnership with permit holders until conditions change, or until the appropriate NEPA analysis shows a higher need for these lands.

BLM_0030637

**Impacts Related to Travel and Access Management**

Currently, travel and access is being affected by national policies adopted by both the BLM and the Forest Service. In the previous LMPs, motorized recreation was open to cross-country travel unless closed or limited. The new policies change motorized recreation opportunities on roads, trails and areas to "closed" unless designated as "limited" or "open". The planning and environmental analyses for the implementation of these agency policies are well beyond the scope of this plan (see "Cumulative Affects" analysis). However, following implementation of these travel management policies, summer motorized use will be limited to a system of designated routes, regardless of which action alternative is selected for implementation. Although the travel management planning process would result in a motorized use map, the planning process would also consider the entire range of travel modes, from foot through motorized travel (including mountain bike and horseback use). Just as recreation use changes as population rates change within the planning area, so would travel use. Population in the planning area is predicted to increase; therefore, the demand for travel and access would also increase, regardless of alternative implemented.

.

BLM_0030638

**Figure 3. 20.1 - Summer Recreation Opportunity Spectrum (ROS) Alternative A**



San Juan Public Lands
Summer Recreation Opportunity Spectrum
Alternative A

Legend

**Summer ROS**
- Primitive Wilderness, WSA's and Special Areas
- Primitive
- Semi-Primitive Non-Motorized
- Semi-Primitive Motorized
- Roaded Natural
- Rural
- USFS/BLM - Ranger Districts / Field Office Boundary
- San Juan National Forest Boundary
- Cities and Towns
- Major Lakes
- Major Rivers
- State & Federal Highways

The USFS and BLM attempt to use the most current and complete geospatial data available. Geospatial data accuracy varies by theme on the map. Using this map for other than their intended purpose may yield inaccurate or misleading results. The USFS and BLM reserve the right to correct, update or modify geospatial data without notification.

D 83, Polyconic Projection
:ober 29, 2007

Miles
0  5  10    20

**Figure 3.20.2 - Summer Recreation Opportunity Spectrum (ROS) Alternative B**



**Figure 3.20.3 - Summer Recreation Opportunity Spectrum (ROS) Alternative C**



**Figure 3.20.4 - Summer Recreation Opportunity Spectrum (ROS) Alternative D**



The alternatives that encompass either the most non-motorized suitability (Alternative C) or split the areas relatively equally between motorized and non-motorized (Alternative B) would best minimize conflicts between winter sports users (by directly avoiding contact between users and by maintaining settings consistent with achieving either motorized or non-motorized recreation benefits, rather than by always mixing the two). Similarly, for over-ground travel, Alternatives A and D would result in the greatest potential for user conflicts. This is because they would offer the most overlapping acreage for motorized travel suitability and cross-country motorized travel (Alternative A), and non-motorized travel. This situation would be conducive to direct user conflicts between groups with differing values, and would result in the highest likelihood of conflicting recreation setting attributes (including motor vehicle noise in an area sought out for the benefits of natural quiet).

Generally, the alternatives would not differ in how they manage equestrian and mountain bike travel, except in terms of indirect impacts related to travel suitability allocations. No SJPLC roads currently available to the public would be unsuitable under any of the alternatives.

Anticipated annual trail construction/maintenance levels would not vary by alternative. Travel provisions regarding individual roads and trails are not being addressed through this planning process. They would be addressed through more site-specific travel management planning.

Changes in recreation experience, in relation to allowing or limiting motorized use, would be the most noticeable between alternatives where there are changes between MA 1s and 3s (Alternatives B, C, and D). Differences for travel suitability and for ROS between the alternatives would be especially noteworthy in the areas of Hermosa Creek, Rico, Missionary Ridge, and Red Mountain Pass. Alternative C would allocate the most land to a non-motorized setting (MA 1). Alternatives A, B, and D would offer more motorized access opportunities in both summer and winter.

Suitability for motorized travel during the summer months would be limited to designated routes over the entire planning area. Differences in visitor use across alternatives, in terms of wheeled-travel experiences, would generally be subtle (see Figure 3.20.1 - Summer Recreation Opportunity Spectrum (ROS) Alternative A, B, and D), especially in the earlier years of the new plan. Areas would become more crowded due to an increased awareness of the area through word-of-mouth, volunteer projects, signing, and maps. Conversely, the long-term potential for maintaining the greatest amount of non-motorized recreation experiences would be highest under Alternative C, followed by Alternative B, and then D. Alternative C would have a profound impact on motorcycle experiences (by closing several very popular single-track trails, including Calico and Hermosa Creek, to motorized over-ground use). (See Chapter 2 for acres of change by alternative.)

BLM_0030643

**Figure 3.20.5 - Winter Recreation Opportunity Spectrum (ROS) Alternative A**



**Figure 3.20.6 – Winter Recreation Opportunity Spectrum (ROS) Alternative B**



**Figure 3.20.7 - Winter Recreation Opportunity Spectrum (ROS) Alternative C**



**Figure 3.20.8 - Winter Recreation Opportunity Spectrum (ROS) Alternative D**



BLM_0030647

Other increases in unsuitable acres between Alternative A and Alternative B would result in impacts (from restricting motorized use under Alternatives B, C, and D to designated routes, and showing areas that do not currently have motorized opportunities as unsuitable). For example, congressionally designated Wilderness Areas, the Piedra Area, and administratively designated WSAs and RNAs are now shown as unsuitable areas, and account for approximately 536,292 acres (approximately 23%) of the planning area under all of the alternatives.

Alternatives would address over-snow travel in different ways (see the maps and tables in Chapter 2). Alternative A would offer the current opportunities, without resolving any of the conflicts between motorized and non-motorized winter use. Alternative B would present a mix that would keep the number of suitable acres for both motorized and non-motorized recreation balanced (but would make changes in where use would be allowed). Alternative C would increase the amount of non-motorized suitable acres, while Alternative D would propose a larger amount of motorized suitable acres.

The alternatives differ in the way they would address winter motorized and non-motorized user conflicts, especially in areas with consistent snow (including Molas Pass, Rico, Red Mountain Pass, Hermosa Creek, Missionary Ridge, and Vallecito Reservoir).

Alternative C would make most of the acreage in these areas unsuitable for motorized over-snow travel, while Alternatives A and D would do the opposite (proposing the highest amount of over-snow motorized suitable acreage, especially in the Rico and Red Mountain areas).

Over-snow motorized use is expected to remain primarily on groomed trails, and none of the groomed trails are being considered for closure under any of the alternatives. The result would be that most motorized users would not experience a loss of use under any of the alternatives. Intermediate and advanced snow machine riders would experience a loss in areas under Alternatives B, C, and D. Conversely, intermediate and advance non-motorized over-snow users would have additional areas along major roads that provide access to ungroomed backcountry winter play area under Alternatives B and C. (See Chapter 2 for acres of change by alternative.) The following specific examples show the differences between alternatives.

***Dolores Canyon Overlook*** - Routes along county roads accessing BLM-administered lands, and up to the Dolores Canyon Overlook, would be considered suitable under Alternatives B and D. The area would be open to snowmobiling under Alternative A, and closed under Alternative C. Motorized use and experience is not expected to change between Alternatives A, B, and D, and motorized use would be eliminated under Alternative C. This would result in users looking for a motorized over-snow experience to relocate to other areas; however, very few, if any, users would drop out of the sport if the area were to be closed.

***Lizard Head Pass*** - The groomed route up Barlow Pass, and the area east of Lizard Head Pass up to the divide between Dolores and Columbine RD/FO, would be considered suitable under Alternatives A, B, and D. Under Alternative C, only the groomed route up Barlow Pass (down the east fork of Hermosa Creek) would be suitable. There would be opportunities for hybrid skiing and backcountry skiing; however, off-route snowmobiling would be prohibited.

BLM_0030648

**Red Mountain Pass** -  Under Alternative A, both sides of Highway 550 would be open to over-snow motorized use, and to non-motorized backcountry skiing. Under Alternative B, the west side of Highway 550 (up to the San Miguel County line) would be suitable; however, the east side of Highway 550 would be unsuitable to motorized use (but open to backcountry skiing). Under Alternative C, both sides of Highway 550 would be unsuitable for motorized use (but open to backcountry skiing). Under Alternative D, the west side of Highway 550 would be suitable for motorized use, and the east side of FSR 850, as well as the ridge north to McMillan Peak into Prospect Gulch (including Minnehaha Basin) would be suitable for over-snow motorized travel. The areas south of McMillan Peak, east of Highway 550 and west of CO 110 (Cement Mountain Road) would be unsuitable.

The impacts between alternatives would reflect an increased awareness that Red Mountain Pass would be open to motorized over-snow travel (which has, in the past, resulted in an increase in conflict between motorized and non-motorized users). Both motorized and non-motorized users have similar recreation experiences to gain in the area. Although over-snow motorized users would share terrain with non-motorized users, the backcountry skiing community would not have a positive experience with snowmobiles in the area (due to snow compaction, noise, and perceived interpersonal conflicts). Under In Alternatives B, C, and D, some snowmobiling opportunities would be lost, and over-snow motorized users would be displaced.

**Molas Pass** - Under Alternative A, the 200 acres east of Highway 550 (around Andrews Lake) would remain unsuitable for motorized use, and the rest of the area that is currently suitable for motorized use would remain suitable. Alternative B would make the area south of Big Molas Lake, as well as east of Highway 550 down to Lime Creek, unsuitable, and the area west of Highway 550 to West Lime Creek ridge north toward Grand Turk suitable.

**DLMP/DEIS Alternatives**: Overall, Alternative C would result in the greatest impacts on motorized recreation opportunities, followed by Alternatives B and D, and A, respectively. In general, travel access and management allocations under Alternative C would result in the greatest benefits to non-motorized recreation (by allocating the most land to those uses and reducing the potential for user conflict), followed by Alternative B and then Alternatives D and A.

## Impacts Related to Oil and Gas Leasing

In general, the act of leasing public lands for oil and gas development would have little impact on individual recreation experience. Impacts to recreation would occur when oil and gas development begins. Specifically, recreation impacts under all of the alternatives would include:

- oil and gas development altering the natural setting or character of an area used for recreation;

- oil and gas-related construction, operation, and maintenance disrupting recreation (due to noise, dust, traffic, and increased human activity);

- oil and gas development increasing vehicle access into previously roadless or inaccessible areas; and

- oil and gas development that may not be compatible with local, State, and/or Federal objectives for recreation in the RFD Area.

BLM_0030649

**Impacts Related to Recreational Use**

Additional wells projected in the RFDS would add to this industrial component of the landscape, and would introduce new sources of vehicle traffic and noise that would diminish the recreational setting sought by visitors. Overall use, however, is not expected to decrease in the area due to development. Regardless of the location of development, recreation use would disperse and users would locate in areas away from development for most activities. Development in the SRMAs would be mostly mitigated by CSU stipulations (and would still see some use leave the area). A major field development in a SRMA would change the overall recreation experience, even with the CSU stipulation. Development along major travel corridors would be mitigated with NSO stipulations. The gas well access roads may be gated and closed to public motorized use in order to provide non-motorized opportunities in the "backyard" setting. Development in the backcountry setting, which is included in most of the IRAs, would be mitigated by NSO stipulations. However, any development would displace users seeking remote experiences, as well as some Outfitting/Guide operations (by forcing them to relocate to other remote areas).

*Paradox Basin (USFS)* - The USFS portion of the Paradox Basin is not currently developed for oil or gas. The anticipated 140 new wells that would be constructed in the area would be accessed by existing roads or by short spur roads constructed in this moderately roaded landscape. USFS lands in the Paradox Basin portion of the RFD Area are almost one-half (approximately 47%) Roaded Natural (ROS) setting, and show evidence of a multiple-use emphasis. Another one-third of the area (approximately 31%) is in the Semi-primitive (ROS) setting (there are no Wilderness Areas in the USFS portion of the Paradox Basin). One-fifth (approximately 22%) of the area is in the Rural Setting (ROS) setting (primarily around McPhee Reservoir, the Dolores River, and above  the town of Dolores).

*San Juan/San Miguel (USFS)* - Within the San Juan Sag area, there have been exploratory wells drilled at an average rate of 1 well per every 3 years, mostly using existing roads. The wells have all been plugged and abandoned, and the sites have been reclaimed. Existing development has had little, if any, impact on dispersed recreation. Future oil and gas development within the area is projected at 2 wells per year, for a period of 10 to 15 years. These wells, similar to past wells, would mostly utilize the existing road system; however, some spur roads would be constructed. Construction activities would introduce noise, dust, and construction traffic. Impacts related to construction activities would be short-term and minor. Long-term impacts would depend upon the success of continued exploratory activities; however, the anticipated low rate of development would not measurably impact the current dispersed recreation patterns of use (which are mostly driving forest roads for pleasure, firewood gathering, and hunting).

Lands in the San Juan Sag portion of the RFD Area would be over one-half (approximately 6%) Roaded Natural (ROS) settings, primarily along travel corridors and areas showing evidence of a multiple-use emphasis. Another one-quarter of the area (approximately 24%) would be in the Semi-primitive (ROS) setting. The remaining 8% would be in the Rural (ROS) setting, around the town of Pagosa Springs.

*DLMP/DEIS Alternatives*:  The impacts related to oil and gas leasing on recreation would be similar under all of the alternatives.

BLM_0030650

**Impacts Related to Fire and Fuels Management**

Under all of the alternatives, fuels treatments would be similar. Impacts to recreation would be negligible, primarily because the activities would be short-term disruptions of the experience to the users that would be mitigated through guidelines applied to the project and implemented while the treatments are taking place. Impacts within SRMAs would be greater (due to the increased emphasis of the area); however, they would be mitigated by guidelines. More unpredictable to determine would be the impacts to recreation related to wildfire (which may alter both short-term and long-term experiences by changing the appearance of the recreation setting).

*DLMP/DEIS Alternatives*: The impacts related to fire and fuels management on recreation would be similar under all of the alternatives.  If no new leases were made available, the impacts to the recreation resource would be similar to the impacts under all alternatives because most of the development will occur on existing leases. In addition recreation facilities, SRMAs, National trails and scenic byways have already been mitigated to protect recreation experiences.

**Impacts Related to Timber Management**

Under all of the alternatives, impacts to recreational settings (ROS) related to timber management would remain unchanged. Site-specific impacts to recreation would be minor, and would be, primarily, short-term disruptions of the experience to the users that would be mitigated through guidelines applied to the project and implemented while the activity is taking place. Impacts within SRMAs would be moderate (because of the increased emphasis on the area); however, they would be mitigated by guidelines. The addition of new roads would provide some additional opportunities for recreational access, once the timber treatment is completed. However, most of the proposed new roads would be in areas that already have extensive road systems; therefore, the impacts would be negligible.

*DLMP/DEIS Alternatives*: The impacts related to timber management on recreation would be similar under all of the alternatives.

**Impacts Related to Minerals Management**

Under all of the alternatives, impacts to recreational settings (ROS) related to minerals management would remain unchanged. Impacts to the recreation setting would be from the long-term disturbance to the area. Users would tend to move from these areas in order to have the experience they desire while the mineral activity is taking place. Given that most of the future mineral activity will take place in areas of former activity, the amount of projected acres for development disruption to recreation experience would be minor.

*DLMP/DEIS Alternatives*: The impacts related to mineral development on recreation would be similar under all of the alternatives.

BLM_0030651

## CUMULATIVE IMPACTS

In addition to trends described at the beginning of this section, the cumulative impacts described below include historic, current, and reasonably foreseeable future activities that were considered with regard to recreation. The next 15 years are considered the timeframe for "reasonably foreseeable future" cumulative impacts.

Planning area recreation setting shift - Historic project-level decisions (primarily oil and gas development, timber management, and road construction for access to private in-holdings) in the planning area have resulted in a shift in area-wide recreation setting composition, from the Semi-Primitive Non-Motorized and Semi-Primitive Motorized to the more developed Roaded Natural and Rural (ROS) settings. This has been a long-term trend, and one that is likely to continue slowly. Some minor ROS setting shifts, however, would take place over the next 15 years, depending upon the alternative chosen.

As discussed in the general impacts portion of this section, the existing planning area recreation setting composition would experience the least amount of shift under Alternative B, followed by Alternatives C, D, and A, respectively. Alternative B would result in the greatest potential, over the long term, for loss of remote/ Wilderness setting. This is due to the differing level of management activities (especially private land in-holding development, oil and gas, timber and fire/fuels management, and associated roading) that may take place under the various alternatives.

*Future off-trail travel ("open areas")* - Currently, travel and access is being affected by a major policy shift on a national basis. This paradigm shift (from open unless closed, to closed unless open) would change resource impacts related to motorized recreation beyond the scope of this plan. Under this new USFS policy (2005), summer motorized use would be restricted to designated routes, regardless of which alternative is selected for implementation. BLM Handbook (H-1601-1) requires all motorized travel to be classified as open, limited, or closed to motorized travel activities.

*Future over-snow travel* - Winter recreation has been affected in recent years by the increase in population in southwestern Colorado, which as, in turn, resulted in increased competition for access to recreational opportunities on snow. In addition, snowmobiles have increased in power and reliability, which has, in turn, allowed more terrain to be used. Backcountry skiers also have better equipment, and there has been an overall surge in adventure skiing. Another emerging sport is hybrid skiing (where a snowmobile tows or carries a skier or snowboarder up hills), which has, in turn, resulted in direct competition with ski areas, commercial snowcat operators, and heli-skiing operators. During the past several decades, backcountry skiers and snowmobilers have worked out their differences where individuals would have winter recreation experiences. For the most part individuals, clubs, and communities worked out which areas were available for motorized and non-motorized use. This cooperation has been challenged by the increase in users, as well as by changes in technology. This increase in overall users has polarized users, and communities, to the point that segregation of users is being asked for by the non-motorized community.

*Oil and gas development implications*:  The majority of development will continue in existing fields. The most noticeable exception is estimated 125 new wells, with an associated 425 acres of disturbance on USFS land in the Paradox Basin. Under a no lease scenario this develop would not take place.  Additional coal bed methane (CBM) development in the Northern San Juan Basin on both USFS and BLM lands will continue to take place regardless of new leasing or no leasing scenarios.  In its November 2006 FEIS regarding the Northern San Juan Coal Bed Methane Project, the SJPLC arrived at several conclusions with regard to cumulative effects that are pertinent to consider within the framework of recreation implications for the San Juan planning area. The development scenario in the San Juan Sag is estimated at between 2 and 7 wells with 50 acres of disturbance would be reduced to only 2 exploratory wells under the no lease scenario.

Colorado State OHV program - Currently all OHVs (ATVs, dirt bikes, and other unlicensed OHVs) are required to display a Colorado OHV permit while operating on public lands, as well as on other designated trails and areas (mirroring the current snowmobile registration requirements). Just as snowmobile use has increased dramatically since the 1990s, OHV use would likely continue to increase (due to increased information and advertising by the State Division of Tourism). Potential adverse impacts that may be anticipated as a result of greater information/promotion would include additional users at trailhead facilities, as well as more encounters on open roads and trails (which may increase the perception of crowding). Potentially positive impacts that would be anticipated include the chance of additional funds to benefit the trail system within the planning area (in the form of signage, enhanced education and enforcement initiatives), as well as additional improvements in trail opportunities (through construction or reconstruction, as opportunities arise).

**The Future of Public Land Recreation Management**

A number of recent trends are having a significant impact on recreational opportunities within the planning area. Federal budgets are being reduced, and are projected to continue declining. The same trend is projected for the size of the Federal work force. Therefore, the number of public land recreation professionals available to deliver good quality recreation products and services has fallen. The result is a loss of technical expertise when demand is dramatically increasing. Consequently, agencies are finding it difficult to maintain the level of visitor services offered in the past. In addition, the backlog in maintenance of recreation facilities has increased. In light of this issue, the importance of developing effective working relationships with volunteer groups cannot be overstated, especially with regard to trail maintenance efforts within the planning area. Volunteer groups (including the San Juan Mountain Association, Trails 2000, VOC, Backcountry horsemen, hiking clubs, and motorized clubs) can provide a critical source of human capital to assist the SJPLC in accomplishing trail maintenance goals. In addition, the State of Colorado OHV-grants, as well as Colorado Snowmobile funds, are available to perform maintenance, rehabilitation, and development work.

The above listed partnership options/strategies mesh well with the 2001 USFS Recreation Agenda: "Continuing to support existing and establishing new professionally managed partnerships and intergovernmental cooperative efforts area significant means to accomplish the recreation job" (USFS 2000).

These realities would affect the planning area to differing levels, based on the alternative chosen. Given that recreation budget levels would be slightly less under Alternatives A and D (due to the emphasis placed on timber management and the need to fund a higher level of activity in that program in those alternatives), it would be more difficult to maintain the same level of services as it would under Alternative C (which would fund the recreation program at the higher level). As a result, this impact would be exaggerated under Alternatives A and D, and minimized under Alternative C. Alternatives B and D would likely fund the developed recreation budget at, or near, current levels.

BLM_0030653

## INTRODUCTION

The planning area is situated in the heart of an area with a long and rich prehistoric and historic record. Native American occupation of the area dates back approximately 10,000 years. The archaeological record contains some of the earliest agricultural societies in the region. The historic period brought Spanish and Euro-American explorers, trappers, miners, and settlers into the region. This long record of human occupation has left one of the highest densities of prehistoric and historic heritage and cultural resources to be found in the United States. These sites have national, international, and Native American tribal significance.

Heritage and cultural resources are non-renewable resources that include historic and prehistoric artifacts, structures, sites, districts, and archival materials important for their scientific, educational, economic, and social values. Throughout the region advanced archaeological and historical research is an on-going endeavor.  There is a great public interest in visitation to heritage and cultural resources. This visitation is an integral part of the region's economy. Twenty-five Native American Tribes and Pueblos claim cultural affiliation with heritage and cultural resources located within the planning area.

The SJPLC is responsible for identifying, evaluating, and protecting heritage and cultural resources on the public lands they manage. SJPLC managers have established an active heritage and cultural resource program that has focused on identifying, preserving, and interpreting heritage and cultural resources; as well as on providing research opportunities for the most significant resources.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- ***The Antiquities Act of 1906***: This act authorizes the President to declare Federal lands as national monuments for the purpose of protecting sites and objects of antiquity.

- ***The Historic Sites Act of 1935***: This act provided the earliest, and most basic, legislation for protecting cultural resources on Federal lands. It provides misdemeanor-level criminal penalties to control unauthorized uses. Appropriate scientific uses may be authorized through permits, and materials removed under a permit must be permanently preserved in a public museum. The 1906 Act is broader in scope than the 1979 Archaeological Resources Protection Act, which partially supersedes it.

- ***The National Historic Preservation Act of 1966, as amended***: This act created the National Register of Historic Places (NRHP), the list of National Historic Landmarks, and the posts of State Historic Preservation Offices (SHPOs), with the intent of preserving historical and archaeological sites. The act requires Federal agencies to evaluate the impacts of all government-funded construction projects through a process known as "Section 106 Review." Under the act, agencies maintain their own preservation program enjoined by advisory councils on historic preservation.

- ***The National Environmental Policy Act of 1969***:  This act promotes efforts that would prevent or eliminate damage to the environment and biosphere, and enrich the understanding of the ecological systems and natural resources important to the nation.

BLM_0030654

- *The Federal Land Policy and Management Act of 1976*: This act declares that "…the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." It also states that "Terms and conditions must minimize damage to scenic and aesthetic values and fish and wildlife habitat and otherwise protect the environment."

- *The American Indian Religious Freedom Act of 1978*: This act established national policy designed to protect and preserve, for Native Americans, their inherent right of freedom to believe, express, and exercise their traditional religions (including the rights of access to religious sites, use and possession of sacred objects), and freedom to worship through traditional ceremonies and rites.

- *The Archaeological Resources Protection Act of 1979*: This act provides for the protection of archaeological resources and sites that are on public lands, and Native American tribal lands, in order to foster increased cooperation and the exchange of information between governmental authorities, the professional archaeological community, and private individuals.

- *The Native American Graves Protection and Repatriation Act of 1990*: This act provides a process for museums and Federal agencies to return certain Native American cultural items (including human remains, funerary objects, sacred objects, and objects of cultural patrimony ) to lineal descendants, culturally affiliated Indian tribes, and Native Hawaiian organizations.

## EXECUTIVE ORDERS

- *Executive Order 11593*: This EO provides for the protection and enhancement of the cultural environment.

- *Executive Order 13007*:  This EO provides policy with regard to Indian Sacred Sites.

- *Executive Order 13084*: This EO provides policy with regard to consultation and coordination with Native American tribal governments.

- *Executive Order 13195*:  This EO provides policy with regard to "Trails for America in the 21st Century."

- *Executive Order 13287*:  This EO establishes Federal policy designed to provide leadership in preserving America's heritage by actively advancing the protection, enhancement, and contemporary use of the historic properties owned by the Federal government.

## REGULATIONS AND POLICIES

- *Title 43 CFR Part 3*: This provides policy with regard to the preservation of American antiquities, and implementing regulations for the Antiquities Act.

- *Title 36 CFR Part 7*: This provides policy for the protection of archaeological resources.

- *Title 43 CFR Part 10*: The provides policy in line with the Native American Graves Protection and Repatriation Act Regulations; Final Rule.

- *Title 36 CFR 79*: This provides for the curation of federally owned and administered archaeological collections.

- *Title 36 CFR Part 60*: This provides policy in line with the National Register of Historic Places.

- *Title 36 CFR Part 800*:  This provides for the protection of historic properties.

BLM_0030655

- **BLM Manual 8100, 8110, 8120, H-8120-1, 8131, 8140, 8150, and 8170**: These provide policy and program guidance for the management of cultural resources

- **FSM 2360**: This provide policy for special interest areas.

- **BLM Departmental Manual Part 411 Museum Property Management**

- **SJPL Fire Management Plan and Appendix B—Polygons (2004)**

- **BLM Emergency Fire Rehabilitation Handbook, H-1742**

- **IM No. CO-90-072**: This provides policy regarding "Colorado Burial Discovery Procedures."

- **BLM IM No. CO-98-052**: This provides policy regarding "Clarification of Cultural Resource Clearance Responsibilities and Maintenance on On-Going Projects."

- **BLM IM No. CO-2000-016**: This provides policy regarding "Disposition Policy on Native American Graves Protection and Repatriation Act (NAGPRA) Repatriated Museum Collections."

- **BLM IM IB No. WO-2002-002**: This provides policy regarding "New Heritage Education Plan."

- **BLM IM No. CO-2002-029**: This provides policy regarding "Interim Historic Preservation Guidelines and Procedures for Evaluating the Effect of Rangeland Management Activities on Historic Properties."

- **BLM IB No. WO-2002-101**: This provides policy regarding "Cultural Resource Considerations in Resource Management Plans."

- **BLM IB No. WO-2003-093**: This provides policy regarding "Implementation of Executive Order (EO) 13287 and Preserve America Initiative."

- **BLM IM No. WO-2003-147**: This provides policy regarding "Application for Permit to Drill (APD) – Process Improvement #3 – Cultural Resources."

- **BLM IM No. WO 2004-020**: This provides policy regarding "Guidance for Recording Cultural and Paleontological Resource Locations for the Bureau of Land Management using Global Positioning System Technology."

- **BLM IM No. WO-2004-052**: This provides policy regarding "Assessing Tribal and Cultural Considerations as Required in IM-2003-233, Integration of the Energy Policy and Conservation Act (EPCA) Inventory Results into the Land Use Planning Process."

- **BLM IB No. WO-2004-154**: This provides policy regarding "Amendments to 36 CFR Part 800, Protection of Historic Properties."

- **BLM IM No. WO-2005-003**: This provides policy regarding "Cultural Resources and Tribal Consultation and Fluid Minerals Leasing."

- **BLM IM No. WO-2005-027**: This provides policy regarding "National Historic Preservation Act (NHPA) Section 106 and Oil and Gas Permitting."

- **BLM IM No. CO-2006-026**: This provides policy regarding "Cultural Resource Standards and Guidelines for Renewal of Right-of-Way grants and Temporary Use Permits under Section 106 of the National Historic Preservation Act."

- **BLM IM No. WO-2007-002**: This provides policy regarding "Disposition Policy on Native American Graves Protection and Repatriation Act Repatriated Museum Collections."

## OTHER AGREEMENTS

- Programmatic Agreement among the BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers regarding the manner in which BLM will meet its responsibilities under the National Historic Preservation Act.

- State Protocol Agreement between the Colorado State Director of the BLM and the Colorado State Historic Preservation Officer regarding the manner in which BLM will meet its responsibilities under the National Historic Preservation Act and the National Programmatic Agreement among BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers.

- Programmatic Agreement among BLM, the State of Colorado, the USFS, National Forests in the State of Colorado, USFS, the State Historic Preservation Office of Colorado, and the Advisory Council on Historic Preservation regarding the Management of Wildland Fire for Resource Benefits (Agreement No. 1102-002-98-038).

- Addendum 1 to the Colorado Protocol: Section 106 requirements For Comprehensive Travel and Transportation Management Planning.

## DESIGN CRITERIA

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve heritage and cultural resources. Guidelines and design criteria are presented in Part 3 of Volume 2 of the DLMP/DEIS.

## AFFECTED ENVIRONMENT

### Existing Conditions and Trends

As of June 2006, BLM-administered lands within the planning area contained approximately 1,868 previously recorded heritage/cultural resources. As of May 1998, USFS-administered lands within the planning area contained approximately 2,950 previously recorded heritage/cultural resources. These heritage/cultural resources represent a variety of site types and chronological periods. The estimated density of sites on BLM lands is 16 sites per square mile. The estimated density of sites on USFS lands is estimated to be approximately 2.8 sites per square mile. The known heritage/cultural resources on BLM lands include 1,360 prehistoric and 508 historic sites. The known heritage/cultural resources on USFS lands include 2,408 prehistoric sites, 441 historic sites, and 95 multi-component historic-prehistoric sites. Together, these resources document an almost continuous record of human occupation in the planning area for more than 10,000 years.

In general, cultural resources are identified through field inventories conducted by qualified professionals in order to comply with Section 106 of the National Historic Preservation Act (NHPA) of 1966. Informant information and historical records are also used to identify archaeological, historical, and traditional values. Three types of inventories are conducted in order to identify and assess these values on public lands: Class I, Class II, and Class III. An estimated 11% of the BLM lands and 9.5% of the USFS lands have been inventoried for heritage/cultural resources at the Class III level. A majority of the Class III inventories were associated with Federal undertakings where cultural properties needed to be identified and evaluated in order to protect significant values and to minimize impacts on these values.

BLM_0030657

Four Class I level overviews of prehistoric and historic resources in southwestern Colorado encompass the planning area, and provide a synthesis of available information (Duke1998; Lipe et al. 1999; Reed and Metcalf 1999; Collins et al. 2006). The "Class I of Cultural Resources Overview of Bureau of Land Management" by Collins et al. (2006) divides the BLM lands into 23 geographic units. A predictive model for each of these geographic units was developed that identifies areas with high, medium, and low site potential. This Class I Overview also developed management recommendations for each geographic unit (including recommendations for archaeological inventory, monitoring, evaluating sites, and development of Cultural RMPs).

Of the 1,868 known sites on the BLM lands within the planning area, 468 have been determined to be eligible for the National Register of Historic Places (NRHP), 800 have been determined to be not eligible for the NRHP, and 600 sites need more data before a determination of eligibility for the NRHP can be made. Of the 2,944 known sites on the USFS lands within the planning area, 1,132 sites have been determined to be eligible for the NRHP. Of these 1,132 eligible sites on national forest lands, 997 have been formally listed on the NRHP. This includes contributing sites within the Anasazi Archaeological District, Lost Canyon Archaeological District, Spring Creek Archaeological District, Falls Creek Archaeological Area, and Chimney Rock Archaeological District. There are two designated National Historic Landmarks that incorporate, or are adjacent to, public lands: Silverton National Historic Landmark and Durango-Silverton Narrow Gauge Railroad National Historic Landmark. National Historic Trails traversing the planning area include the Dominguez-Escalante National Historic Trail and the Old Spanish National Historic Trail.

The planning area is situated at the boundaries of two distinct physiographic and cultural areas: the Rocky Mountains and the Colorado Plateau. Native Americans associated with the two cultural areas have lived on, or traversed through, the lands within the planning area for thousands of years. They hunted, fished, gathered plant foods, farmed, buried their dead, and conducted religious ceremonies on these lands.

The 25 Native American Tribes and Pueblos maintain active interests in the planning area. Individual tribal members occasionally use public lands to gather plants or other native materials, and to hunt. Consultation efforts with these groups are on-going. The tribes and pueblos have expressed concerns over the preservation and protection of specific archaeological sites. The Hopi have identified Falls Creek as an area of traditional interest to them. Ethnographic sources indicate that Hesperus Peak in the La Plata Mountains is considered sacred by the Navajo. To date, none of these sites have been formally established as Traditional Cultural Properties.

**Table 3.21.1 – Tribes and Pueblos with Cultural Ties or interests in the Planning Area**

| TRIBES AND PUEBLOS | | |
|---|---|---|
| Pueblo of Isleta | Pueblo of Pojoaque | Pueblo of Santa Ana |
| Pueblo of Jemez | Pueblo of San Felipe | Pueblo of Santa Clara |
| Pueblo of Laguna | Pueblo of San Ildefonso | Pueblo of Santo Domingo |
| Pueblo of Nambe | Pueblo of San Juan | Pueblo of Taos |
| Pueblo of Picuris | Pueblo of Sandia | Pueblo of Tesuque |

BLM_0030658

## Cultural Chronologies

***Paleoindian Stage (11500 to 5550 B.C.)*** - The Paleoindian Stage represents immigrants to the New World who adapted to the environmental changes occurring at the end of the Pleistocene. Based upon Paleoindian artifacts, hunting appears to have been the dominant form of subsistence, although in some environments gathering may have played a more significant role. Within the planning area, there are 13 Paleoindian sites recorded on BLM lands and 25 Paleoindian sites recorded on USFS lands.

Archaeological evidence of Paleoindians is limited within the study area. Still, current studies (cf. Pitblado 1993) maintain that there was a significant Paleoindian occupation within southwestern Colorado, particularly associated with the Plano complex. Pitblado (1993) notes that not only are Paleoindian sites likely at higher elevations than archaeologists have looked in the past, but they may be under much deeper strata (i.e., Quaternary fill deposits) than normally recorded or researched through surface observation. More excavation and testing of these deposits for potential Paleoindian sites are needed in order to better understand their subsistence and settlement patterns (including the level of seasonal use of the area).

***Archaic Stage (6400 to 400 B.C.)*** - The Paleoindian Stage transitioned into the Archaic Stage, with a shift to a broader subsistence pattern. This pattern was characterized by an increased reliance on smaller animals, more varied projectile point types, an increased focus on gathering plant resources, and the construction of more labor-intensive, long-term habitation structures and pits. These traits may be spread over a slightly smaller geographic area than many of the Paleoindian complexes. There was a significant Archaic population in the planning area. Within the planning area, there are 211 Archaic sites recorded on BLM lands, and 179 on USFS lands.

***Early Archaic (6500 sc-3500 B.C) Pioneer Period (6400 ec-4500 B.C.)*** - The Early Archaic is generally characterized by stemmed projectile points, side scrapers, and large bifacial knives. There may have been a population increase toward the end of the period (Duke 1998). Reed and Metcalf (1999) describe the Pioneer Period as a time when Paleoindian populations became more sedentary, adopting seasonal settlement patterns. Middle Archaic (4500 to 1500 B.C.) Settlement Period (4500 to 2500 B.C.) Transitional Period - During the Middle Archaic, there was an apparent increase in population in the area, as well as the introduction of post-holed temporary dwellings. Generally speaking, the Settlement Period represents more localized and predictable settlement locations, especially during the winter months. Daub architecture also developed at this time. Many of the traits of the Settlement Period are still present in the Transitional Period. During the Transitional Period, populations may have become more seasonal in their utilization of resources found at higher elevations and slightly less sedentary, and they exhibited greater variability in their material culture (Reed and Metcalf 1999). These behavioral characteristics coincided with a population shift from higher to lower elevations, as the overall temperature rose sometime between 2000 and 1500 BC (Lipe et al. 1999). This shift marks the beginning of the Late Archaic.

***Late Archaic (1500 to 500 B.C.) Terminal Period (1000 to 400 B.C.)*** - In the southern Colorado River Basin, the Late Archaic saw a general reduction in mobility (Lipe et al. 1999:105). The reduced mobility coincided with maize use, as early as 1000 B.C., although a maize-based subsistence system did not develop until much later. In the northern Colorado River Basin, the Terminal Period populations began to use the bow and arrow, processed more seed, and may have even experimented with maize horticulture, although perhaps to a lesser extent than populations to the south (Reed and Metcalf 1999).

BLM_0030659

***Formative Stage (1000 B.C. to A.D. 1300)*** - In southwestern Colorado, the Formative Stage marks the beginning of established maize, bean, and squash agriculture. This time was also characterized by less mobility, and more sedentary settlement patterns, demonstrated by the use of permanent habitation structures. Hunting was accomplished using bow-and-arrow technology. Ceramics were manufactured during this time, as were maize-grinding implements and woven textiles. Within the planning area, there have been 538 Formative Stage sites recorded on BLM lands, and 1,700 on USFS lands. The Fremont and Ancestral Puebloan cultures are both Formative and exhibit these traits.

***Fremont Tradition (A.D. 200 to 1500)*** - Within the northern Colorado River Basin, Fremont sites are generally characterized by varying degrees of reliance on horticulture, as well as on four other characteristics: distinct coiled pottery; one-rod-and-bundle basketry; deer or mountain sheep moccasins; and a trapezoidal, anthropomorphic style of rock or clay figurines. Of these, the pottery is the most diagnostic of a Fremont site. This is due to its durability. The ceramics are more clearly associated with open artifact sites than with rock art (Reed and Metcalf 1999).

***Basketmaker II (1000 B.C. to A.D. 500)*** - Within the planning area, the highest concentration of Basketmaker II sites is in the Columbine Geographic Area. These sites sometimes appear more characteristic of the Navajo Reservoir Basketmaker occupation than other Basketmaker occupations within the region. In general, Basketmaker II characteristics across the southern Colorado River Basin include the use of maize and maize-grinding implements (with deeper basins than used previously by forager groups); the use of deer, elk, and mountain sheep; and later, some use of plain, coiled brown ware pottery. However, most sites outside of the Durango area have no evidence of pottery, and can be difficult to distinguish from Late Archaic and even Protohistoric Ute sites. The habitations from this period are typically shallow pithouses with slab-lined cists and beehive-shaped storage units. Site locations appear to be most common along bluffs and benches, and in rock shelters near ecologically diverse zones (Duke 1998).

There appear to be relatively few documented Basketmaker II sites within the planning area; however, there are difficulties with identifying these sites by surface inspection and survey methods alone. Many of these sites may have been assigned to the Archaic period by the original recorder (Lipe et al. 1999:152). In order to rectify this situation, excavation, testing, diagnostic artifact reevaluation, and general research are priorities in order to refine the characteristics of Basketmaker II sites within the planning area.

***Basketmaker III (A.D. 500 to 750)*** - The Basketmaker III Period is generally marked by the introduction of bow-and-arrow technology (Lipe et al. 1999:143). There is also evidence of the widespread use of maize and squash and the introduction of beans, as well as a corresponding decrease in hunting and the use of wild plants. Some of the habitations were utilized throughout the year, and the archaeological record reflects more activity areas associated with the habitations. Pithouses evolved, becoming gradually deeper and losing the antechamber. Some storage rooms were partially aboveground, and there was an increased number of storage features to accommodate more stored food (Duke 1998; Lipe et al. 1999). Chapin gray ceramics appeared early, followed by Chapin black-on-gray and Sambrito brown/utility wares. Both trough and slab metates were used during this period. Many Basketmaker III sites have been located near farmable land and pinyon-juniper woodlands, as well as on terraces or benches near rivers and other water sources (Lipe et al. 1999).

BLM_0030660

Basketmaker III sites have several distinctive characteristics; however, their small middens and mostly buried elements make it quite difficult to identify these sites through surface examination alone. For sites with subterranean habitations, subsurface testing and excavation are the best ways to identify and research these occupations (Lipe et al. 1999). With few Basketmaker III sites in the planning area having undergone testing or excavation, it is clear that more research is necessary. Still, increased Class III survey coverage will undoubtedly shed light on the community and landscape level use of the area by Basketmaker III and other occupations.

**Pueblo I (A.D. 750 to 900)** - Pueblo I sites represent a period when populations increased from around 2,000 to more than 4,000 people, distributed over nearly 2,000 square miles of southwestern Colorado (Lipe et al. 1999). The habitations were occupied on more of a year-round basis than during the previous period; however, long-term residential occupations were still relatively short. Farming became such an important part of life that households were located close to arable lands. Communities with stockaded settlements became more prevalent than under the previous period, as did surface storage and surface habitation structures (Duke 1998; Lipe et al. 1999). Technological changes are evident in ceramics and projectile points. Pottery styles included Plain gray ware, neckbanded, Piedra black-on-white, and Rosa black-on-white. Even some red-on-orange and black-on-red vessels are represented in the ceramic traditions for this period (while projectile points were thinner and side-notched) (Duke 1998:9Lipe et al. 1999).

The field house was an architectural element that arose during this period. Although not likely used extensively until the Pueblo II and Pueblo III periods, the presence of this architectural feature demonstrates increased intensification of agriculture, and its importance in the subsistence patterns of the people of this period and later. The unit pueblo was also developed during this period. The great kiva was also introduced, which represented a change in social organization (Lipe et al. 1999).

Pueblo 1 sites are fragile. They are deteriorating at a rapid rate (Lipe et al. 1999). In order to better protect and understand this period, more Class III block surveys, as well as testing and excavation, are needed in order to better understand the dynamics of the Pueblo I occupation of the planning area.

**Pueblo II (A.D. 900 to 1150)** - The Pueblo II occupation of the southern Colorado River Basin began with a low population density, which gradually increased only to decline again toward the end of the period. Reed and Metcalf (1999) speculate that a small number of Pueblo II groups entered the northern Colorado River Basin during periods of population paucity (although site characteristics are too atypical to easily type the known sites or identify possible sites). Most of the existing recorded Pueblo II sites are situated within the southern Colorado River Basin. Chimney Rock Great House is an excellent example of a Pueblo II Chacoan Outlier. Pueblo III (A.D. 1150 to 1300) - The Early Pueblo III period (A.D. 1150 to 1225) is notable for a general population decline, then for a late dramatic population increase. Sites of the period became larger and aggregated into large mesa-top villages, with towers and some "great houses" incorporated into their community centers. Other archaeological evidence characteristic of Pueblo III is the production of Dolores and Mesa Verde corrugated wares, and McElmo and Mesa Verde black-on-white wares. Grooved stone axes were abundant, and triangular projectile points lacking stems are most notable (Lipe et al. 1999).

By the Late Pueblo III period (A.D. 1225 to 1300), populations continued to aggregate into large community centers. However, unlike previous periods, the people congregated into multi-story cliff dwellings or complexes near canyon rims and springs. Great houses were phased out, and tower complexes became more common. There was a rapid population decline at the end of the period, with a migration of area inhabitants to the southeast and southwest.

BLM_0030601

The Pueblo III period has been the most studied and researched; therefore, it generates more research questions. Although survey data are always helpful, more significant methods for answering research questions include excavation, testing, and climate studies; as well as more detailed analysis of data and collections from the Pueblo III period. As an additional consideration, large communities from this period left a highly visible footprint on the landscape and exhibit massive, often still-standing architecture (including towers and cliff dwellings).

***Protohistoric (A.D. 1300 to 1880)*** - The Protohistoric is also called the Post-Puebloan by Lipe et al. (1999). The northern Colorado River Basin context protohistoric stage only includes Ute occupations, while the southern Colorado River Basin discusses Ute and Athabaskan (Navajo and Apache) peoples. Within the planning area, there are 62 Protohistoric sites recorded on BLM lands, and 137 Protohistoric sites recorded on USFS lands.

***Protohistoric Ute (A.D. 1300 to 1881)*** - The Ute were the primary occupants of much of Colorado throughout the protohistoric and historic stages, until historic Euro-American settlement. Unfortunately, the archaeological and early historical records of these peoples have been the least studied and understood. It should not be surprising, then, that the southern Colorado River Basin has no chronological sequence for discussing Ute occupation of the area. In the northern Colorado River Basin; however, more studies have been conducted and a basic chronology has been developed. This chronology is split into two phases by Reed (1988) and Reed and Metcalf (1999), the Canalla phase and the Antero phase.

The overall characteristics of the Protohistoric Ute are often considered an "extension" of the Archaic lifestyle. This similarity can make it difficult to distinguish sites from these two time periods. Ute subsistence, however, focused more upon foraging than collecting,  and their settlement patterns reflect their preference for high residential mobility over the logistical mobility of the Archaic groups (Reed and Metcalf 1999). Still, this is a differentiation that is often difficult to discern, except, perhaps, through excavation or a more intensive analysis of surface manifestations than has been done to date.

***Protohistoric Navajo (A.D. 1485 to 1760)*** - Similar to cultural remains of the Ute, little archaeological evidence points to a firm date for the first Navajo occupation of southwestern Colorado. Oral traditions from modern Navajo groups detail an emergence from the San Juan Mountains. Hesperus Peak (Dibe nitsaa) is sacred and marks a portion of traditional Navajo boundaries (Lipe et al. 1999). Based upon oral tradition, the Navajo occupation of the area started around A.D. 1485. Most Protohistoric Navajo sites in southwestern Colorado likely date back prior to A.D. 1750, although some date to before A.D. 1700 (Lipe et al. 1999).

Problems associated with identifying both Navajo and Ute sites from the protohistoric and historic periods are numerous. Material culture from Navajo, Ute, and Archaic contexts exhibit similar manifestations, and infer similar functions. These peoples occupied and utilized similar environments and, sometimes, even the same landscapes,. The later Ute and Navajo used much of the same material culture that Euro-Americans did, such that the cultural affiliation of artifact scatters can be difficult to distinguish. One of the biggest problems is the general lack of excavated Navajo and Ute sites within the planning area. Testing and excavation of sites, analysis of collected artifacts, and ethnographic overviews of the Navajo and Ute within the planning area are needed in order to increase the understanding of sites from this period.

***Historic (A.D. 1630 to 1950***) - In spite of its obvious presence across the landscape of the planning area, the historic period is sorely understudied and even undervalued relative to the Prehistoric period (Duke 1998). Historic archaeologists and historians need to conduct research on historic sites before the integrity and history of these sites are lost.

BLM_0030662

*Historic Ute (A.D. 1640 to 1950)* - Prior to Euro-American contact, the Ute consisted of at least six bands that occupied portions of what is now Colorado: the Muache, Capote, Weminuche, Uncompahgre, Parasunuch, and Yampa. After Ute and Euro-American contact, a treaty was signed in 1863 that was intended to move the Ute to a reservation (so settlers could move in). After this treaty failed, the size of the reservation was reduced by the Treaty of 1868, which gave the settlers more land, and more access to minerals in the mountains. Tension continued to build between the Ute and Euro-American settlers and miners. In 1873, the Brunot Agreement was signed, which moved the Ute to lands away from the San Juan Mountains. By 1881, all Utes had been moved out of western Colorado onto reservations in Utah or southern Colorado. Bands descended from the Muache and Capote were moved to the Southern Ute Reservation. Bands descended from the Weeminuche were moved to the Ute Mountain Ute Reservation (Duke 1998; Husband 1984; O'Rourke 1980). Although these reservations were significantly reduced by 1934, each has now increased its size by purchasing surrounding lands (Duke 1998; O'Rourke 1980). The current limitation of Ute territory should not preclude archaeologists and managers from seeking archaeological evidence of these people within their former territories.

*Historic Euro-American (A.D. 1660 to 1950)* - This portion of the chronology encompasses the history of all ethnic groups, other than Native Americans, who occupied the planning area. There are eight general themes represented within the planning area: 1) exploration, 2) mining, 3) transportation, 4) agriculture, 5) logging and lumber industry, 6) recreation and tourism, 7) Federal activity, and 8) socio-cultural developments. Within the planning area, there are 512 historic Euro-American sites recorded on BLM lands, and 773 historic Euro-American sites recorded on USFS lands.

## Trends

Within the planning area, heritage and cultural resources are currently facing numerous impacts from natural and human disturbances. Over the last 10 years, the San Juan region has experienced unprecedented growth and development. This trend is expected to continue and increase. Growth and development may impact non-renewable heritage and cultural resources, both directly and indirectly. Direct impacts may include disturbance from construction, vandalism, and excessive or inappropriate visitor use. Indirect impacts may include accelerated erosion and visual impacts to cultural landscapes. Once these resources are destroyed, they are lost forever.

In addition to impacts from natural and human disturbances, there is a trend for decreasing USFS and BLM budgets (while, at the same time, workloads are increasing). This trend hampers the ability to conduct a proactive heritage and cultural resource program. In order to help address the increasing impacts and decreasing budgets, there is a trend toward increasing opportunities for greater public participation and partnerships in heritage and cultural resources management. The goal of these partnerships is to instill a sense of ownership in visitors, and to conduct proactive preservation, research, education, and interpretative projects.

BLM_0030663

**Use Categories**

BLM planning and manual guidance stress the importance of meeting specified goals through the allocation of all cultural properties within the planning area into defined "use categories," based on their nature and relative preservation value.

Sites located on BLM lands have been allocated to the following use categories (some sites have been allocated to more than one use, and 693 sites are unallocated).

- *Scientific Use*: Under this category, sites would be preserved until research potential is realized (592 sites).

- *Conservation for Future Use*: Under this category, sites would be preserved until conditions for use are met (44 sites).

- *Traditional Use*: Under this category, there would be long-term preservation of sites (0 sites).

- *Public Use*: Under this category, there would be long-term preservation and on-site interpretation (7 sites).

- *Experimental Use*: Under this category, sites would be protected until used (3 sites)0

- *Discharged from Management*: Under this category, sites would be removed from protective measures (608 sites).

Sites may be placed into more than one use category. (For example, a prehistoric site with little or no scientific value may be placed under a Discharged from Management category, but may also, however, be useful under the Experimental Use category. Similarly, a historic site may be placed in the Public Use category, but may still require stabilization and preservation efforts and, therefore, warrant placement under the Conserve for Future Use category as well.)

**Priority Heritage Assets (PHA)**
Priority Heritage Assets (PHAs) are those USFS heritage assets that are, or should be, actively maintained. In order to be considered a PHA, an asset must meet one or more of the following criteria:

- The significance and management priority of the property is recognized through a special designation (e.g., listing on the National Register or State Register of Historic Place).

- The significance and management priority of the property is recognized through prior investment in preservation, interpretation, and use.

- The significance and management priority of the property is recognized in an approved management plan.

- The property exhibits critical deferred maintenance needs, and those needs have been documented.

The SJPLC is in the process of designating Priority Heritage Assets.

BLM_0030664

## ENVIRONMENTAL CONSEQUENCES

## DIRECT AND INDIRECT IMPACTS

Under all of the alternatives, the heritage/cultural resource program would provide support to all resource projects, as required by Section 106 of the NHPA. Prior to any Federal undertaking within the planning area, the SJPLC must consider impacts to heritage and cultural resources. Under all of the alternatives, the preferred management strategy for eligible sites would be to avoid and protect these sites from direct, indirect, and cumulative effects. Eligible sites are non-renewable resources, and they would lose integrity, heritage value, and potentially important information if they were destroyed or altered. Measures would continue to be implemented in order to avoid the impacts to sites under Federal jurisdiction. Treatments designed to minimize or mitigate adverse effects to eligible properties may include project relocation, redesign or modification, physical protection measures (including fencing or padding), stabilization, restoration, rehabilitation, documentation, monitoring, repair, and data recovery. Any treatment of an eligible site must be consistent with Federal standards and other guidelines, policies, and directions.

In addition, under all of the alternatives, the program will include proactive inventory, documentation, analysis, preservation, monitoring, stabilization, research, stewardship, and public interpretation and education. Generally, adverse impacts may result from ground-disturbing activities that damage archaeological sites or disrupt cultural landscapes (reducing their information potential). Generally, beneficial impacts may result from minimizing or preventing surface disturbance, and avoidance of archaeological sites, as well as from measures used to protect sites. There is also a direct relationship between the number of acres disturbed through project implementation and the number of acres surveyed for heritage/cultural sites. This relationship also exists for the number of heritage/cultural sites located and evaluated.

In spite of inventories, the potential exists for undiscovered sites to be exposed and/or damaged by surface disturbance and/or other events. These sites may, or may not, be noticed in time to allow mitigation. This damage would represent an unavoidable adverse impact related to management activities and programs, which may be similar under all of the alternatives.

There will be some irreversible loss of heritage/cultural resources regardless of the alternative selected. Examples include inadvertently damaged or destroyed sites, vandalized or looted sites, and sites undergoing loss from natural processes. Every alternative would seek to minimize this loss through inventory and evaluation, monitoring, preservation and stabilization, research, interpretation, education, and improved project implementation.

It is difficult to measure individual adverse impact components; therefore, the number of acres of ground disturbance may be used as a relative comparison of alternatives. Estimates of disturbance were compiled from the Comparison of Alternatives (see Chapter 2). Given the enormity of the planning area (more than 2.5 million acres) and the diversity of its landscapes (which results in a wide variability of heritage/cultural site densities, ranging from 3 sites per square mile to more than 100 sites per square mile) it would be very difficult to make reasonably accurate quantitative assessments of impacts without activity locality information. Therefore, a descriptive, qualitative analysis of the impacts is presented.

BLM_0030665

Direct impacts may result from natural events as well as from human activities that can damage heritage resources or alter their settings. Examples may include surface disturbance, soil compaction, erosion, heating and freezing, wildfire, prescribed burns, livestock trampling, OHV use, alteration of a heritage/cultural resource setting and/or landscape (including introduction of atmospheric or audible intrusions), potential loss of protection for undiscovered heritage/cultural resources if land is transferred from Federal to non-Federal ownership, and from unauthorized uses (including commercial looting of artifacts).

Indirect impacts to cultural resource sites are not always as obvious or immediate as direct impacts, and may include impacts that occur off-site from project areas. Indirect impacts may include accelerated erosion due to increased traffic, construction, loss or changes of vegetation, and changes in drainage patterns; and inadvertent damage from increased visitation to sites not previously accessible and not "hardened" for public use (which may also result in increased vandalism and removal of artifacts). Projects may also result in piecemeal or incremental loss or degradation of the various elements of integrity such as setting, feeling, location (which includes visual and auditory elements) that may be integral to the cultural landscape and individual site significance. In general, impacts to cultural resources would be managed by applying appropriate surveys and the design criteria (listed above), and through law enforcement support and education, as appropriate.

### Impacts Related to Cultural Resources Management

As stated above, under all of the alternatives cultural resources would continue to be protected under Section 106. The heritage/cultural resources program would continue to include proactive inventory, documentation, analysis, preservation, monitoring, stabilization, research, stewardship, and public interpretation and education under all of the alternatives.

Alternatives B and C would provide the most proactive management and, therefore, may result in the most beneficial impacts to heritage/cultural resources. This is because it would propose the establishment of two additional Special Area 2 Archaeological Areas (McPhee and Mesa Verde Escarpment) that are not included under any of the other alternatives. Under these alternatives, McPhee and Mesa Verde Escarpment would be managed specifically for their outstanding heritage/cultural resource values and for their recreational/ interpretive/educational opportunities. These Management Areas (MAs) would not be included under Alternative A or D.

Alternatives A and C would provide additional proactive management of heritage/cultural resources. This is because it would retains the Anasazi ACEC (which was established in the previous BLM San Juan/San Miguel RMP.) This ACEC was established in order to protect significant prehistoric archaeological resources. The majority of lands within the ACEC were designated as the Canyons of the Ancients National Monument (the Monument). The lands remaining within the Anasazi ACEC are the same as those designated by the BLM Class I (2006) as the Mud Springs Geographic Unit (which still contain a high density of significant prehistoric sites). This ACEC has a multitude of competing uses, including mineral materials and recreation. Retention of the ACEC under Alternatives A and C would ensure a greater level of focused management and protection of cultural resources.

***DLMP/DEIS Alternatives***: Cultural resource management under Alternatives B and C may result in the greatest benefits to heritage and cultural resource (due to the proposed establishment of the greatest number of protective MAs). This would be followed by Alternatives A, and then Alternative D.

BLM_0030666

**Impacts Related to Recreation Management**

Recreational use of public lands has increased dramatically over the last 25 years, and will most likely continue to increase. Recreational use of the planning area may result in unintentional damage to cultural resources that, although individually minor, may result in widespread, adverse impacts through time. Examples of such impacts may include robbing boards from historic structures for campfires; creating routes through sites (which accelerates erosion); sitting, standing, or climbing on walls; shooting or defacing rock art panels; collecting artifacts or relocating artifacts by creating "collector's piles." Some forms of vehicle-assisted recreation may damage sites directly or by increasing site accessibility for vandalism and looting.

Four major, and 15 minor, SRMAs would be proposed under Alternatives B, C, and D. In general, managed recreation, as proposed by the SRMAs, would result in less potential impacts to cultural resources than would dispersed unmanaged recreation. However, this benefit may not be realized if recreational impacts to heritage and cultural resources are not monitored and mitigated (especially if recreational use dramatically and/or unexpectedly increases as a result of focused management).

Historic cultural resources have long been a focus of management in the Silverton SRMA, and would continue to be a focus under all of the alternatives. However, as stated above, the projected increased recreation use would require on-going monitoring, proactive preservation, education, and mitigation of potential impacts (as directed in The Alpine Loop Cultural Resource Management Plan).

The Durango SRMA would focus on non-motorized recreation (including hiking, mountain biking, and rock climbing). The BLM Class I Overview (2006) identifies Grand View Ridge as an area of high potential for cultural resources. Grand View Ridge would be included in the Durango SRMA. Additionally, three known rock art sites are currently in an established popular rock climbing area within this proposed SRMA. Under all of the alternatives, the development of trails and facilities would take place under Section 106 of the NHPA; therefore, impacts to cultural resources would be avoided or mitigated. The focused recreation management direction provided by the SRMA under all of the alternatives may result in beneficial impacts to cultural resources. The Dolores River SRMA would focus on river recreation. There are a high number of cultural resources present and river-related use is topographically constrained; therefore, this area would have a high potential for impacts to cultural resources. Sites in this area that are visible from the river would be especially at risk from camping, frequent visitation, or vandalism. These impacts may be the same under all of the alternatives. As stated above, a directed management approach provided by the SRMA may limit adverse impacts to cultural resources.

The Cortez SRMA would provide motorized and non-motorized recreation. This area contains the Mud Springs Geographic Unit, as identified in the BLM Class I (2006), which is the remnant Anasazi ACEC. It would also include the Stinking Springs Geographic Unit. These areas have a high density of significant and sensitive sites. Due to their proximity to Cortez, these areas currently experience a large volume of open OHV-use, can result in extensive direct damage to cultural resources. Indirectly, the use of OHVs may damage or destroy vegetation, inorganic surface crusts, natural ground cover, and may also result in visual and auditory impacts. Erosion and compaction of soils and alteration of soil stratigraphy may result from motorized recreation. Increased looting and vandalism may also take place. These impacts may result in the loss of site integrity and significance. Under Alternatives B, C, and D, a management plan would be developed for the Cortez SRMA. This would designate routes and trails in order to avoid cultural resources and develop monitoring plans and mitigation (if impacts are identified). As stated above, SRMA designation may result in beneficial impacts.

BLM_0030667

The minor SRMAs proposed under all of the alternatives would not overlap with any currently identified sensitive archaeological areas, with the exception of Saul's Creek and Sage Hen. Saul's Creek has been identified as a potential National Register Historic District. Sage Hen overlaps with the Anasazi National Register District. Like the 4 major SRMAs discussed above, these areas currently experience extensive unmanaged recreational use. Development of the Saul's Creek and Sage Hen SRMAs may result in beneficial impacts to cultural resources. This is because managed recreation may result in fewer potential impacts to cultural resources than would dispersed unmanaged recreation. However, as stated above, this benefit may not be realized if recreational impacts to heritage and cultural resources are not monitored and mitigated, especially if recreational use dramatically and/or unexpectedly increases as a result of focused management.

***DLMP/DEIS Alternatives***: In general, Alternatives B, C, and D may result in similar potential benefits/impacts to cultural resources (due to the proposed establishment of SRMAs). These potential benefits/impacts may be less apparent in Alternative A.

### Impacts Related to Travel Management

OHVs driving over heritage/cultural sites may result in extensive direct damage. Indirectly, the use of OHVs may damage or destroy vegetation, inorganic surface crusts, natural ground cover. It may also result in visual and auditory impacts. Erosion and compaction of soils and alteration of soil stratigraphy may result from motorized recreation. Increased looting and vandalism may also take place. These impacts may result in the loss of site integrity and significance. Motorized travel over snow may result in negligible, if any, impacts to heritage/cultural resources.

Implementation of the 2005 Travel Management Rule would greatly reduce the impacts to heritage/cultural resources by directing motorized travel to designated routes. Travel on designated routes may still have the potential to directly and indirectly impact  heritage/cultural resources that have not been avoided or hardened for such use. Designation of specific travel routes would be developed under a Travel Management Plan, which would require a separate NEPA process from this DLMP/DEIS. As part of that separate NEPA process, impacts to heritage/cultural resources within the planning area would be addressed in accordance with the "Addendum 1 to the Colorado Protocol: Section 106 requirements for Comprehensive Travel and Transportation Management Planning."

***DLMP/DEIS Alternatives***: This DLMP/DEIS identifies areas that are suitable for over-ground and over-snow travel by alternative. Alternatives B and C would designate the largest amount of acreage as not suitable for over-ground motorized travel; therefore, these alternatives may have the least potential to impact heritage/cultural resources. Alternatives A and D would designate the largest amount of acreage as suitable for motorized travel; therefore, the potential for ground disturbance and impacts to heritage/cultural resources may be the highest under those alternatives.

BLM_0030668

**Impacts Related to Fire and Fuels Management**

Wildfires and prescribed burns have the potential to directly impact heritage/cultural resources (by burning wooden historic and prehistoric structures and damaging or destroying flammable artifacts and features of archaeological sites, such as wickiups, tepee poles, tree platforms, and brush game drives). Non-flammable artifacts, such as lithic materials, may be impacted by high-intensity fires. Rock art may also be damaged by fire and smoke. Activities carried out under emergency situations in order to control a wildfire (including the construction of firelines) may also directly damage heritage/cultural resources. Indirect impacts related to fire include post-fire erosion losses resulting from burned vegetation cover and hydrophobic soils; deterioration and weathering after the artifacts and features are initially damaged by extreme temperatures; changes in the landscape adjacent to heritage/cultural resources; and looting and vandalism due to increased site visibility. Impacts would tend to be greater in wildfire situations than they would for prescribed burns. This is because of extreme fire temperatures, an inability to control the impacts, and because it would be almost impossible to plan inventories of heritage/cultural resources in advance. Some inventories may be conducted during the construction of firelines. Impacts related to fire may be determined, and appropriate mitigation measures may be carried out if a complete inventory of the burned area is conducted shortly after the fire has been controlled. This is not, however, always possible. Therefore, potentially significant impacts related to wildfire may remain undetermined under all of the alternatives. The number of heritage/cultural resources impacted by wildfire on an annual basis cannot be predicted.

Mechanical fuels treatments would have the potential to directly impact heritage/cultural resources. This is because they may result in moderate to high amounts of ground disturbance and mixing of soils. This would especially be the case if tracked vehicles were used on wet soils (which may masticate features such as wickiups, tepees, and brush corrals). However, most of these impacts would be avoidable through the Section 106 process. Indirect impacts may include erosion and changes to vegetation that result from off-site projects, which may change the characteristics and integrity of a site. Sites that are avoided and left as "leave islands" within fuels treatment project areas may be more vulnerable to looting and vandalism (because they can be easily identified and targeted). There is some evidence that under the correct conditions, fuels treatments such as "hydro-mulch" may have a beneficial impact to heritage/cultural resources (because they may reduce erosion and act as a protective cover). Hazardous fuels reduction may also be beneficial to heritage/cultural resources by providing "defensible space" for resources (including rock art and wooden structures) that are especially vulnerable to the impacts related to wildfire.

Annually, Section 106 inventories, evaluation, and consultation would be completed on the estimated 12,500 acres in response to prescribed burn plans or other fuels treatments. This estimated acreage would be approximately the same under all of the alternatives; therefore, potential impacts to heritage/cultural resources may be the same under all of the alternatives. These impacts are expected to be minimal. This is because all identified significant, or potentially significant, heritage/cultural resources would be avoided or mitigated. Location information for these fuels treatments is not yet available; therefore, it is not possible to estimate the number of heritage/cultural resources that may be potentially impacted. Wildfire is unpredictable; therefore, the potential impacts to heritage/cultural resources is not quantifiable. Wildfire Cultural Resource Constraint Maps for each Ranger District/Field Office identifies prescriptions for individual sites, site types, and archaeologically sensitive areas. These maps are referred to in the event of wildfire.

**DLMP/DEIS Alternatives**: Potential impacts to heritage/cultural resources may be similar under all of the alternatives.

BLM_0030669

**Impacts Related to Oil and Gas Management**

The DLMP/DEIS planning decision to identify areas open or closed to oil and gas and geothermal leasing is an undertaking under Section 106 of the NHPA. This activity would require a specific analysis of existing cultural and heritage information in order to identify "no leasing" areas or "open areas" with special stipulations or standard stipulations. Native American tribal and State Historic Preservation Office (SHPO) consultation would specifically address oil and gas leasing as a Section 106 undertaking that required their input.

Development of oil and gas would involve local areas of earth disturbance (including the drilling location itself, laydown and support areas, access roads, pipelines, and additional support facilities, such as meter stations and water handling facilities). Any earth-disturbing activities may destroy or diminish heritage/cultural resources, as well as the setting and context that are part of their importance. Direct physical impacts to heritage/cultural resources related to the construction and operation of oil and gas facilities may be immediate and irreversible; however, most of these impacts would be avoidable through the Section 106 process. It is expected that these impacts may be localized.

In addition to the general direct impacts described above, indirect physical impacts related to oil and gas development to heritage/cultural resources may also include deterioration of structures or rock art from vibration, dust, or exhaust produced by construction or operation. Erosion and changes to vegetation that result from off-site construction may also change the characteristics and integrity of a site. If the setting and feeling of a site are essential elements of its importance, visual or auditory intrusions or deterioration of the local environment would also constitute an indirect impact to the aesthetic quality of the site. An additional potential indirect impact may result when development of oil and gas access roads makes some areas more accessible to motorized vehicles. This accessibility may result in the potential for more people to visit sites and, thereby, increase the chance for incidental deterioration or vandalism. This may be mitigated by closing access roads to public traffic.

There may be as many as 1,185 new wells developed in the RFD Area over the 15-year life of the RFD projection. The total disturbance for these new wells is projected to be 290 acres per year, with a total surface disturbance of 4,350 acres over the 15-year period. Each well and ancillary facility location would undergo Section 106 inventory, evaluation, and consultation. Avoidance or mitigation measures would be utilized where eligible heritage/cultural resource sites are present. Location information for these wells is not yet available; therefore, it is not possible to estimate the quantity of heritage/cultural resources that may be potentially impacted. Under all of the alternatives (except Alternative A), Chimney Rock Archaeological Area, Falls Creek Archaeological Area, and Anasazi Archaeological District would be designated No Lease. This is because these areas contain very significant archaeological resources and these resource values would be very difficult, if not impossible, to avoid or mitigate. The Chimney Rock and Falls Creek also have great significance for Native Americans. The Anasazi Archaeological District has a very high site density, with 907 sites listed on the NRHP. In addition, the viewshed of Chimney Rock is integral to maintaining its integrity and significance. Therefore, the portion of the foreground viewshed, which is not included in the No Lease area, and middle viewshed, would be protected with CSU stipulations.

BLM_0030670

The following National Register Historic Districts, Proposed National Register Historic Districts, and sites would be protected with NSO stipulations under all of the alternatives (except Alternative A, which is the No-Action Alternative):

- Spring Cr. National Register Historic District;

- Lost Canyon National Register Historic District;

- Saul's Cr. Proposed National Register Historic District;

- Peterson Gulch Proposed National Register Historic District;

- Turkey Cr. Proposed National Register Historic District;

- Armstrong Ritter Proposed National Register Historic District;

- Mesa Verde Escarpment;

- Anasazi ACEC remnant (a.k.a. Mud Springs);

- Indian Henry Cabin;

- Bull Canyon Rockshelter; and

- Dolores River Corridor.

Under all of the alternatives (except for Alternative A) Grandview Ridge would be protected with a CSU stipulation.

***DLMP/DEIS Alternatives***: Alternatives B, C, and D would provide for equal amounts of protection of heritage/cultural resources. Alternative A would provide for less protection. Standard stipulations and Section 106 of the NHPA would apply to all heritage/cultural resources outside of the above areas with designated No Lease, NSO, and CSO stipulations. It is, therefore, expected that oil and gas management may have limited direct adverse impacts to heritage/cultural resources. Indirect and cumulative impacts related to oil and gas management may be moderate. Section 106 archaeological surveys and excavations associated with oil and gas development have long been a major contributor to our knowledge and understanding of heritage/cultural resources. This beneficial impact to archaeology and cultural resource management may continue under all of the alternatives. Under a no new oil and gas lease scenario the anticipated moderate indirect and cumulative effects to heritage/cultural resources would not occur, which would be an overall positive benefit to these resources.  However, the information regarding heritage/cultural resources which is obtained through Section 106 archaeological surveys and excavation associated with oil and gas development would not be gained.

### Impacts Related to Livestock Grazing

The impacts of livestock grazing on cultural resources varies due to non-uniform grazing patterns that reflect differences in terrain, forage abundance and preference, soil attributes, and cultural resource site distribution. Livestock grazing (especially where they congregate to drink water or consume minerals, where they shelter under rock overhangs, and/or where they use pathways and stock trails), may result in impacts to any heritage/cultural resources in those areas. The stratigraphic soil layers that are very important in establishing cultural chronologies may be churned and distorted by livestock digging, movements, and congregation. Areas were livestock concentrate are often located near springs, rock shelters, cliff faces, drainages, and forest edges -- the same areas that are important to humans prehistorically and historically. Cattle may also damage standing prehistoric and historic structures and rock art through rubbing and trampling. These impacts may be direct, indirect, and cumulative.

BLM_0030671

Impacts of range-related activities (including fence construction, spring developments, wells, stock tanks, pumps, pipelines, water storage, and cattle guards) and non-structural projects (including noxious weed treatments, forage improvements, and mineral supplementation) may have the potential to alter or destroy heritage/cultural resources. These activities would be considered undertakings, and would, therefore, undergo Section 106 inventory, evaluation, and consultation. Avoidance or mitigation measures would be utilized where eligible heritage/cultural resource sites are present. Under all of the alternatives, a cultural assessment (as outlined in BLM IM No. CO-2002-029: "Interim Historic Preservation Guidelines and Procedures for Evaluating the Effect of Rangeland Management Activities on Historic Properties") would be necessary in order to assess the impacts related to grazing.

***DLMP/DEIS Alternatives***: Alternative D would propose the most acres suitable for livestock grazing and may, therefore, have the most potential to result in impacts to cultural resources, followed by Alternatives A and B, which may result in similar impacts. Alternative C may have the least potential to result in impacts to heritage/cultural resources.

### Impacts Related to Solid Minerals Management

Solid-minerals management includes both locatable minerals and salable minerals. Locatable minerals include mining of precious and base metals, and locatable uranium and vanadium. Locatable mineral mining is a statutory right and is not discretionary. However, locatable mineral regulations require that mining activities result in no undue or unnecessary degradation. Salable minerals include the mining of gravel, and stone quarries and collection. Salable minerals are discretionary when the land management agency owns the mineral rights. When private mineral rights are involved, management is less discretionary.

Solid-minerals management has the potential to damage or destroy heritage/cultural resources through major ground-disturbing and construction activities related to mining, milling, and the development of ancillary facilities (including waste rock piles, mill tailings, roads, and loading facilities). Many of the areas with the potential for locatable minerals were mined historically for precious and base metals, as well as for uranium and vanadium. Many of these historic mining/milling sites are now eligible for listing on the NRHP. Gravel operations have the potential to damage or destroy archaeological sites, including buried archaeological sites that have no surface artifacts or features. Stone collection has the potential to damage sites (including prehistoric and historic stone masonry structures, stone game drives, and stone alignments). Mining of both locatable and salable minerals has the potential to indirectly impact heritage/cultural resources as the result of cultural landscape alterations, and visual and auditory intrusions, as well as of changes to vegetation that result from off-site projects (which could alter the characteristics and integrity of a site).

Under all of the alternatives, precious and base metal, and uranium and vanadium, mining may have a high potential to impact historic mining resources. Salable mineral management may have a moderate potential to impact heritage/cultural resources. Federal land management agencies are responsible for ensuring that Section 106 inventory, evaluation, consultation, and, if necessary, avoidance or mitigation occurs prior to authorizing solid-minerals projects.

***DLMP/DEIS Alternatives***: Overall, the potential impacts related to solid-minerals management on heritage/cultural resources may be the same under all of the alternatives.

**Impacts Related to Timber Management**

Timber harvesting activities may impact heritage/cultural resources as the result of surface disturbance caused by machinery and vehicles, by the felling trees on certain types of sites, by the skidding of logs, by theft or vandalism caused by workers, or by erosion from vegetation removal or damage. In addition, fuels and oils used by heavy equipment may be spilled or dumped on heritage/cultural sites. Construction or reconstruction of permanent or temporary roads associated with timber sales may have the potential to impact heritage/cultural resources, as the result of damage or destruction of areas directly impacted. Construction of roads may also have the potential to result in indirect impacts to heritage/cultural resources (by making sites more accessible). This accessibility may increase the chances for incidental deterioration or vandalism. As noted above, under all of the alternatives, eligible sites would be avoided, or mitigation of impacts would occur though the Section 106 process.

**DLMP/DEIS Alternatives**: Alternative D may have the greatest potential to impact heritage/cultural resources. This is because it would propose the highest amount of ground-disturbing activities, followed by Alternatives A and B. Alternative C would have the lowest amount of proposed road construction and timber treatment; therefore, it may have the least impact on heritage/cultural resources.


## CUMULATIVE IMPACTS

Over time, cumulative impacts to heritage/cultural resources may include the loss of sites, or parts thereof (prior to the development of better preservation methods and research techniques); the loss of interpretive values, and the incremental loss of the heritage/cultural resource base.

Past actions that have contributed, cumulatively, to impacts on cultural resources include livestock grazing and vegetation management, mineral development, recreation, looting and vandalism, and ongoing natural erosion. These negative factors are present outside, as well as inside, the planning area.

Prior to Section 106 of NHPA, many activities occurred with no regard for the protection of cultural resources. Activities such as vegetation treatments using chains or harrows drug large pieces of equipment across the ground surface in order to remove trees and shrubs. This, and other mechanical treatments, undoubtedly destroyed many archaeological sites within their path. In addition, many roads within the planning area were constructed prior to Section 106 protection requirements, and were, as a result, destroyed or disrupted. Many of these cultural sites continue to be impacted by increased vehicle use and erosion.

Land management projects may result in surface disturbance, may bring additional people in contact with heritage/cultural resources, and/or may affect the fabric of prehistoric and historic structures. Under the different alternatives, differences in cumulative impacts to heritage/cultural resources would be the result of sanctioned management activities (which would be low due to the protection and mitigation measures that would be implemented). Alternatives A and D would have the projected highest amounts of development and, therefore, may have the highest potential to impact heritage/cultural resources. Alternatives B and C would provide for a more proactive management of heritage/cultural resources of McPhee and the Mesa Verde Escarpment. Alternatives A and C would retain the remnant Anasazi ACEC, and would, thereby, provide more administrative protection for the cultural resources located within the ACEC.

BLM_0030673

Cumulative impacts may also occur to heritage/cultural resources as a result of non-sanctioned activities (including vandalism, looting, or illegal excavation). Efforts to control and monitor these activities would be similar under all of the alternatives, and may, therefore, result in a similar moderate level of cumulative adverse impacts to heritage/cultural resources. Under Alternatives A and D, there would be less emphasis on controlling and monitoring non-sanctioned activities at McPhee and Mesa Verde Escarpment and, therefore, they may have a greater potential for cumulative impacts. However, under Alternatives B and C, efforts to control and monitor non-sanctioned activities would be more proactive at McPhee and Mesa Verde Escarpment; therefore, the cumulative impacts are expected to be less under those alternatives.

Alternatives that result in more acres of planned and budgeted management activities, such as Alternatives A and D, may reduce adverse cumulative impacts. This is because more inventory and evaluation would be required under these alternatives. The additional inventory and evaluation may lead to more heritage/cultural resources being located, and a potential reduction of adverse cumulative impacts caused by natural processes after heritage/cultural resources are brought under appropriate management (assuming sufficient funding and personnel are available). An additional benefit would be increased knowledge and understanding of heritage/cultural resources. Oil and gas management and fuels management are large contributors to the inventory and evaluation of heritage/cultural resources.

Cumulatively, heritage/cultural resources on Federal lands may assume greater importance because such resources on lands of other ownership are not provided the same degree of protection. Projects in, and around, the planning area funded by the Federal government would be subject to Federal requirements for protection of heritage/cultural resources. However, construction on, and development of, private land may destroy heritage sites without providing an opportunity for recovery of data or other mitigation.

It is believed that cumulative impacts to heritage resources on State and private lands are much greater than for federally administered lands because: 1) little or no inventory or evaluation is being conducted on State or private lands; and 2) implementation of protection or mitigation measures is extremely rare on State or private lands.

BLM_0030674

## INTRODUCTION

As development around the planning area continues, and as populations and tourism grow, demand for, and concern about, scenic quality is also increasing. Visitors and residents place a high value on the protection of intact natural and cultural landscapes. The economic and lifestyle benefits of high-quality scenery are a primary contribution to the wealth of this region.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

### LAWS

- ***The National Environmental Policy Act of January 1, 1970***: NEPA states that it is the "continuing responsibility of the Federal government to use all practicable means to assure for all Americans, aesthetically and culturally pleasing surroundings." NEPA mandates agencies to develop methodologies for scenery management of "aesthetically and culturally pleasing surroundings" that are capable of being put into practice. NEPA requires "a systematic and interdisciplinary approach, which will ensure the integrated use of the natural and social sciences and the environmental design arts into planning and decision-making which may have an impact on man's environment."

- ***The Multiple-Use Sustained-Yield Act of 1960***: Under this act, "National forests are established and shall be used for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple uses and sustained yield, without impairment of the productivity of the land.

- The Federal Land Policy and Management Act of 1976 (FLPMA) states, "...public lands will be managed in a manner which will protect the quality of the scenic (visual) values of these lands."

### DESIGN CRITERIA

Management guidelines and design criteria describe the environmental protection measures that would be applied to all of the alternatives at the project level in order to protect, enhance, and, where appropriate, improve resources related to scenery, visual quality, and the built environment. Guidelines and design criteria are presented in Part 3 of Volume 2 of the DLMP/DEIS.

Scenic quality objectives for Forest Service Lands are identified on a map that was developed as part of the 1983 LRMP. This information is displayed as Alternative A in this EIS.

Scenic quality objectives for BLM lands were not identified as part of the 1985 San Juan/San Miguel RMP. The RMP states that visual resource objectives will be developed on a project specific basis. BLM policy outlines a process to identify Interim VRM Classes for each project. Consequently VRM Classes for BLM lands in Alternative A are not shown in this EIS.

BLM_0030675

## AFFECTED ENVIRONMENT

### Existing Conditions and Trends

The planning area encompasses extraordinary scenic resources, including the San Juan  Skyway, three National Scenic and Recreation Trails, the Colorado Trail, segments of eligible Wild and Scenic Rivers (WSRs) Colorado's largest Wilderness (the Weminuche), the spectacular Dolores River Canyon, and three cultural landscapes (McPhee, Chimney Rock, and Silverton Structured Recreation Management Area). The planning area is known for its picturesque groves of aspen and ponderosa pine. Large reservoirs (including McPhee, Lemon, Vallecito, and Haviland) and scenic rivers (including the Animas, the Dolores, the Piedra, and the Hermosa Rivers) provide scenic recreation settings.

Tourism that is substantially dependent upon scenery and heritage resources is an economic mainstay of southwestern Colorado. People live in area communities, in large part, in order to benefit from high-quality scenery.

The National Survey on Recreation and the Environment surveyed 60,000 households in the United States. More than 86% of respondents said "managing forests to leave them natural looking" was important or very important. In 1997, approximately 1.037 million sightseeing excursions were made to national forests, and 671 million people participated in wildlife viewing (Cordell 1999).

According to the 2003 "America's Scenic Byways, The Colorado Report," the total vehicle miles traveled on the San Juan Skyway nearly doubled from approximately 700,000 daily vehicle miles traveled in 1990 to more than 1.2 million daily vehicle miles traveled in 2002. The same report concluded that 54% of all travelers on the San Juan Skyway are traveling just to drive the Skyway, with no particular destination.

Interviews with people who recreate within the planning area found that nearly everyone made reference to the core value of a pristine natural environment as one of the primary reasons they choose to recreate on public lands (San Juan Interviews 2004 http://ocs.fortlewis.edu/forestPlan/reports.asp).

According to the 2001 National Visitor Use Monitoring (NVUM) project conducted in the planning area, viewing scenery was the most popular activity, with a 68% participation rate (NVUM, San Juan data). SJPL has some of the highest scenic values found in Southwest Colorado. This is indicated by the 95 percent of SJPL that are rated as Scenic Class 1-3 and VRM Inventory Class I – III. Landscapes with these ratings have very high visibility and demand for high-quality scenery, as well as dramatic landscapes with mountains, water, and aspen.

The planning area exhibits extraordinary inherent scenic values. This is indicated by the 95% of San Juan Public Lands (SJPL) that are inventoried as Scenic Class 1-3 and VRM Inventory Class I – III.  (USFS lands are rated by Scenic Integrity Levels; BLM lands are rated by Visual Resource Inventory (VRM) Class.) Landscapes with these ratings have very high visibility and demand for high-quality scenery, as well as inherently dramatic landscapes with features such as mountains, water, and aspen. The value of scenery within the planning area is high, when compared with other geographic areas in the southwestern United States.

An additional indicator of scenic value is the visibility of the landscape. "Visibility" assesses how much access visitors have to view scenery on roads, trails, and at recreation sites, as well as how concerned they are about scenery. The planning area has a landscape with very high visibility, and also has visitors with a high concern for scenic quality. Nearly half of the planning area is in the foreground viewshed of a constituency that cares about high-quality scenery.

BLM_0030676

Most USFS-administered lands retain their high or moderate scenic integrity. The condition of BLM-administered lands is not as intact, with 69% equal to the Moderate to Low VRM Class. The existing conditions are shown in Table 3.22.1.

**Table 3.22.1 – Existing Scenic and Visual Resource Condition – Percent of Total Area**

| EXISTING SCENIC AND VISUAL RESOURCE CONDITION | Activities not visible<br><br>Very High Integrity<br>VRM Class I | Activities may be visible, but do not attract attention<br><br>High Integrity<br>VRM Class II | Activities may attract attention, but do not dominate view<br><br>Moderate Integrity<br>VRM Class III | Activities may dominate the view<br><br>Low – Very Low Integrity<br>VRM Class IV – V |
|---|---|---|---|---|
| USFS Lands | 22% | 34% | 38% | 6% |
| BLM Lands | 10% | 21% | 68% | 1% |

Within the planning area, management activities have altered the natural landscape character. The most visible impacts result from energy development and past timber harvesting activity.

**Scenic Stability**
Scenery is dependent upon a healthy ecosystem. Natural disturbance elements (including fire, flood, landslides, and avalanches) are normal ecosystem processes, and create or perpetuate natural scenic conditions. In particular, wildfire is a disturbance factor that has been profoundly affected (impacted) by landscape management.

Current conditions in aspen and ponderosa forests place scenic quality in jeopardy. This includes the lack of age-class diversity, the encroachment of fir, and the potential for catastrophic wildfires.

**Existing Conditions Related to Oil and Gas Development**
To better describe the existing condition as it relates to oil and gas development within the planning area, this section focuses on the four areas where oil and gas development may occur: Paradox Basin (BLM), Paradox Basin (USFS), the Northern San Juan Basin, and the San Juan Sag. These areas include landscapes that generally having positive, but ordinary or common, scenic qualities, as well as portions of the landscape with low scenic quality. The existing scenic condition also includes existing oil and gas leases on which development of 1,100 more wells and associated facilities may occur.

Throughout these four areas, particularly the northwestern portion of San Juan Basin and the northern Paradox Basin, the landscape has been modified by agricultural, residential, commercial, transportation, and oil and gas development.

A typical well site and access road affects 4 to 5 acres. The existing visual impact of oil and gas development includes many facilities and components such as tanks, pumpjacks, wellheads, fences, and signs. Well structures currently impact views at all distance zones in the BLM Paradox Basin and the northern San Juan Basin. There are no wellheads currently in the SJNF portion of the Paradox Basin or the San Juan Sag area. Most of these existing visual impacts occur in foreground views within ½ mile of viewers. Oil and gas facilities are readily visible from nearby residences, recreational areas, highways, and county roads.

BLM_0030677