The project calls for the construction of 226 well pads. Twenty-seven would be located on BLM-administered lands, 100 would be located on NFS lands, and the remaining 99 would be located on private lands. Access would be provided by the construction of 92 miles of roads. Eight miles would be located on BLM-administered lands, 64 miles would be located on NFS lands, and 20 miles would be located on private lands. These roads would not be open for use by the public. The operators would be responsible for construction, maintenance, and the prevention of public access. They would also be responsible for obtaining required easements, ROWs, and permits; controlling noxious weeds; and complying with agency and landowner requirements. Maintenance would blading, ditch and drainage facility cleaning, graveling, and applying dust palliative. The roads would be temporary and the operators would be responsible for reclaiming and revegetating the roads on public lands following project completion.

Since implementation began in 2008, it is estimated about 20% of the road and well pad construction has been completed. Impacts associated with this work include increased storm water runoff, sedimentation, erosion, increased traffic on state and county roads, and diminished visual quality.

<u>Foreseeable Future Impacts</u>

Resource impacts are disclosed in the NSJB-CBM FEIS and would include increased storm water runoff, sedimentation, erosion, wildlife disturbance, noise, increased traffic on state and county roads, and diminished visual quality (BLM and USFS 2006a). The proposed contribution of the road miles constructed and reconstructed as part of the NSJB-CBM project road development is approximately 20% of that estimated for the PLAA. The cumulative impacts would be an increase of the impacts associated with road construction and maintenance during the life of the NSJB-CBM project. These impacts would be diminished as the roads are reclaimed and revegetated; however, these areas are not expected to ever reach pre-existing conditions.

## Impacts Related to Oil and Gas Development on Leased Lands in the Paradox Leasing Analysis Area

<u>Foreseeable Future Impacts</u>

The cumulative effects boundary for this analysis is the PLAA of the planning area, which includes the GSGP, as well as the adjacent area with conventional and gas shale development in Montezuma, Dolores and San Miguel Counties, and includes the potential impacts from projected oil and gas development on leased and unleased federal lands and private and state leases. The three counties that would be most directly impacted by projected development include Montezuma, Dolores, and San Miguel Counties. The three counties are expected to experience low to moderate increases in traffic reflecting a projected increase in population of nearly 20% by 2020. An increase in population growth simultaneous with projected oil and gas development could contribute to increased road congestion on road systems within the potentially impacted counties.

In addition to the potential miles of road described above for unleased lands, there are also projections for more development and roads on lands already leased. An additional 189 miles of road could result from future development on lands currently held under lease on federal mineral estate (112 miles from future gas shale development and approximately 77 miles from conventional gas development). Furthermore, approximately 265 additional miles are projected from development on private and state leases. Cumulatively, a total of 885 miles of road could result throughout the area from conventional and shale gas development on federal leases (including road miles associated with existing wells and projections for federal leased and unleased lands, and from existing development and potential development on private and state lands).

BLM_0033406

Other uses of the forest such timber harvest, livestock grazing, and recreation are all activities that could contribute along with oil and gas development to traffic on the federal, state, and county transportation systems. Community expansion and recreational use of the public lands are projected to moderately increase over the next 15 to 20 years. These trends, in addition to projected oil and gas development, could result in increased traffic congestion, wear and tear on roads, the need for more frequent maintenance, and an increased potential for traffic accidents.

# 3.14 Recreation

## 3.14.1 Introduction

Population growth, new recreation technology, and community interest have increased the focus on management of outdoor recreation settings and opportunities. Strategies incorporated into the various LRMP alternatives aim to maintain and enhance desirable recreation settings, integrate recreation with other resource objectives, provide for sustainable recreation experiences, and promote collaboration with local and regional partners in order to achieve recreation objectives.

## Legal and Administrative Framework

- **The San Juan-Rio Grande National Forest Wilderness Management Direction decision signed August 3, 1998:** This provides direction for the administration of wilderness areas on the San Juan and Rio Grande National Forests.

- **36 CFR 212:** This provides direction for the administration of the Forest Transportation System; the designation of roads, trails, and areas for motor vehicle use; and use by oversnow vehicles.

- **36 CFR 251:** This provides overall direction for land uses, including miscellaneous land uses; special uses (outfitters/guides, for example); appeal of decisions relating to occupancy and use of NFS lands; and access to non-federal lands.

- **36 CFR 261:** This provides general prohibitions on NFS lands.

- **36 CFR 290:** This provides direction for cave resources management on NFS lands. The rules of this part implement the requirements of the Federal Cave Resources Protection Act of 1988.

- **36 CFR 291:** This provides direction for the occupancy and use of developed sites and areas of concentrated public use on NFS lands, including admission fees, recreation use fees, and reservation fees.

- **36 CFR 293:** This provides direction for the administration and use of wilderness and primitive areas on NFS lands.

- **36 CFR 294:** This provides direction for special areas, including recreation areas and IRAs.

- **36 CFR 297:** This provides direction for the administration WSRs under Section 7 of the WSRA of 1968, which provides for the protection of the free-flowing, scenic, and natural values of rivers designated as components or potential components of the National Wild and Scenic Rivers System from the effects of construction of any water resources project.

- **FSM 2300:** This provides direction for management and planning in relation to recreation, wilderness, and related resources.

- **FSM 2709, 2710, and 2720:** These provide the legal framework for special uses on NFS lands.

- **FSM 7300:** This provides direction for planning, development, and managing facilities on NFS lands.

BLM_0033407

- **FSM 7400 and 7409.11:** These provide direction for administration and managing drinking water systems, wastewater systems, effluents, solid waste systems, and food services.

- **FSH 2309.18:** This provides direction for designing, building, and maintaining USFS trails.

- **43 CFR 8342:** This provides direction for the designation of areas and trails on public lands.

- **43 CFR 8340:** This provides direction to establish criteria for designating public lands as open, limited, or closed to the use of OHVs, and for establishing controls governing the use and operation of OHVs in such areas.

- **FSH 7309.11:** This provides direction for managing USFS facilities.

- **BLM Manual 8330:** This provides policy on reasonable accommodations for persons with disabilities.

- **BLM Handbook H-1601-01, Appendix C:** This provides minimum guidance for developing the recreation sections in an RMP.

- **BLM Washington Office IM 2006-060 (BLM 2006b):** This provides direction for incorporating benefits-based management in the recreation program.

- **BLM Washington Office IM 2007-043 (BLM 2007b):** This transmits the "Unified Strategy" describing how best to implement the BLM Priorities for Recreation and Visitor Services Workplan (Purple Book), as outlined in IM 2006-060.

## Existing Conditions and Trends

There are five components that describe existing recreation conditions within the planning area, as follows:

- **Recreation Profile:** This section presents and analyzes the question: What role do public lands play in local and regional lifestyles, and in offering attractions and activities for tourists?

- **Recreation Demographics and Demand Trends:** This section presents and analyzes the question: What do recreation trends suggest about the future of recreation within the planning area?

- **Dispersed Recreation:** This section presents and analyzes the question: What are the important activities and settings that currently characterize dispersed recreation uses within the planning area?

- **Recreation Facilities and Funding:** This section presents and analyzes the question: Within the context of reduced budgets, how can the SJNF and TRFO meet the increasing demand for recreation through partnership opportunities and other non-traditional methods? What realignment of facilities makes sense?

- **Recreation Issues and Need for Change:** This section presents and analyzes the question: Do existing conditions and public scoping comments illuminate the need for change regarding recreation settings, capacities, markets, and suitability? (Preliminary revision issues are identified.)

BLM_0033408

## 3.14.2 Affected Environment

## Recreation Profile

Outdoor adventure in southwest Colorado has a reputation for diversity and excellence, and its appeal is contagious. More than two-thirds of a random sample of prospective visitors views Colorado as an "exciting" place. Portions of the planning area near communities are gaining social value due to the increasing demand for the available recreation settings. Aging Baby-Boomers and people engaging in amenity migration are helping establish more active (and less "retired") populations settling near the planning area boundaries. Many residents value the ability to access the planning area near their homes conveniently, for a variety of recreational activities.

**Tourism:** The spectacular landscape of the San Juan Mountains continues to fuel the tourist economy, regardless of whether visitors actively engage in planning area recreation. For many, proximity and views are enough of a draw to bring them to the region. Colorado, as a whole, attracts visitors who embrace its image as a place for adventure and recreation. Table 3.14.1 through Table 3.14.4 below describe the tourism profiles for each of the geographic areas in the planning area.

Outdoor recreation accounted for approximately 31% all travel into Colorado (including business travel and skiing). According to the America's Byways Resource Center (2004), the total vehicle miles traveled on the San Juan Skyway nearly doubled between 1990 and 2002. Other sections of scenic highway not designated as a scenic byway (including Wolf Creek Pass) are experiencing the same surge in scenic driving. Other visitor surveys (National Visitor Use Monitoring [NVUM], Fort Lewis College surveys [2001]) have found that sight-seeing is the most common activity, and that scenery is the most highly valued resource. Section 30 of the LRMP addresses Scenic and Backcountry Byways in more detail.

**Outdoor Recreation Industry:** A variety of attractions and activities, during all seasons, provide a stable tourism industry.

Tourists make up the majority of the market for guided outdoor recreation on public lands; however, the skiing and outdoor equipment industries are equally fueled by local dollars. These industries are important to the regional economy, as well as to the fiscal well-being of the sales tax dependent local governments.

**Winter Sports:** Downhill skiing in developed ski areas, primarily operating on federally managed public lands, is expected to continue as a huge draw for winter tourists in Colorado. Silverton Mountain, Durango Mountain Resort, and Wolf Creek ski areas play an important role in the communities and economies within the planning area. The ski industry is a large seasonal employer in the region. During the winter of 2003, skiing in La Plata County ranked as the number one private sector job provider.

Winter recreation has been impacted in recent years by the increase in population in southwest Colorado. This has resulted in an increased demand for access to recreational opportunities on snow. In addition, snowmobiles have increased in power and reliability, allowing them to access more terrain. Backcountry skiers now also have better equipment, and there has been an overall surge in adventure skiing. Another emerging sport is hybrid skiing, which is where a snowmobile tows or carries a skier or snowboarder up hills. During the past several decades, backcountry skiers and snowmobilers have had some success in resolving differences regarding where these groups could recreate without conflict. This cooperation has been challenged by the increase in number of users, as well as by changes in technology. The overall increase in winter uses of all types, particularly at

BLM_0033409

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

mountain pass areas along primary highways, has consistently brought use conflicts to the attention of the USFS and BLM. The winter sports conflicts are addressed in the alternatives.

**River Running and Fishing:** The planning area offers some of the highest quality fishing in the United States. From the San Juan Mountain high country to the semiarid San Juan River tailwaters, world-class fishing awaits the angler year-round. Boating is another strong recreational asset of the planning area. Large reservoirs (including McPhee, Williams, Vallecito, and Lemon) offer recreational boating in a mostly natural, scenic setting. Numerous rivers (including the Dolores, Animas, and Piedra) support a robust and beneficial commercial river-running economy.

**Second Homes and Amenity Migration:** Many of the attributes that attract people to visit the San Juan Mountains also prompts some to move, or buy a second home, in the area. Vacation and/or second homes are an economic driver in many local communities, fueling regional economies with outside dollars. This occurs while they are being built (related to construction, development, real estate, and finance), as well as after they are built (related to maintenance and local spending of occupants).

**Table 3.14.1: Tourism Profile of the Dolores Geographic Area**

| Profile Component | Information |
| --- | --- |
| Terrain and access | The Dolores geographic area has the widest variety of terrain and climate zones of all three districts, ranging from the high peaks in the La Plata Mountains to the desert country downriver of McPhee Reservoir. The most extensive and signature country is the foothills and mesas terrain stepping off the La Plata, Rico, and Wilson Mountains. Due to a long history of grazing and logging on these relatively flat mesas and foothills, road access to this area is extensive and well developed. The flat topography also increases the impacts associated with illegal off-road driving. |
| Feedback from area residents | Due to the recent roots in traditional uses of the SJNF and to the long-established and extensive network of access roads on the Dolores District, people on the west end of the planning area have a noticeably strong multiple-use ethic. The idea that the public lands offer recreational opportunities for all types of users was a common refrain from the 2005 Dolores Public Lands Office study groups. Many recognize the challenge of multiple uses; most, however, would prefer to avoid a high degree of use segregation. Most people favor limiting motorized travel to established routes. With the exception of fairly widespread concern about gas well development, the majority of Dolores Public Lands Office residents are tolerant, and even supportive, of traditional uses within the planning area. |
| Strongest recreation – tourism asset | Diversity of terrain and plentiful road access offers a variety of opportunities and disperses uses to many different areas. |
| Recreation – tourism economy | Mesa Verde National Park and hunting are the largest tourist attractions in the area. The proximity to the mountains goes hand-in-hand with the agricultural lifestyles that many recent immigrants have come to enjoy in Cortez, Dolores, and other nearby communities. The planning area offers geographic and climatic relief for the thousands of people who live in the flatter, warmer, and drier terrains. Residents from around the Four Corners region can quickly access the mountains and higher ground to enjoy trails, rivers, streams, lakes, and scenic vistas. |
| Management challenge | Travel management is the number one recreation challenge, and the designation of travel access routes would profoundly influence the recreation setting and experience in this geographic area. |

BLM_0033410

**Table 3.14.2: Tourism Profile of the Pagosa Geographic Area**

| Profile Component | Information |
|---|---|
| Terrain and access | The Pagosa geographic area contains the Weminuche wilderness, which is the largest wilderness area in Colorado. The access opportunities to the wilderness for the Pagosa Public Lands Office are more numerous and geographically dispersed than other places within the planning area. Large open parks with rugged mountain backdrops characterize this geographic area. Pagosa Springs, the main urban center, is experiencing rapid growth. Due to the mix of private and public lands, the WUI is more extensive than in other places within the planning area. Residents value access and proximity to public lands. Consequently, the recreation use of the planning area close to Pagosa Springs is heavy and growing, while recreation public services are lagging. |
| Feedback from area residents | Agricultural roots are important in Pagosa, and many elements of the agricultural lifestyle relate to living near public lands. Some opportunities currently exist for recreation near Pagosa; however, many residents expressed the desire for more WUI recreational opportunities, services, and access. Scenery is very important to local residents and to the local economy. Pagosa residents like to recreate in the winter, and many go to the Wolf Creek Pass area, where the access to higher-elevation snow is easy and snow conditions are good. |
| Strongest recreation – tourism asset | Diverse opportunities for wilderness access offer diverse and high quality wildlife habitat. |
| Recreation – tourism economy | Unobstructed views of the San Juan Mountains are common from any of the thousands of home sites platted around Pagosa Springs. With up to 200 building permits per year, the Archuleta County development industry is accommodating the many new full- and part-time residents. The Wolf Creek ski area plays an important role in the otherwise quiet winter months, while the hunting season provides economic income to the area in the fall. |
| Management challenge | Managing hunting has been the biggest challenge for many years; however, this geographic area is changing from a rural forest to a residential intermixed forest. Management of recreation in the WUI, wilderness, and in relation to heritage tourism, would be the challenges of the future. |

**Table 3.14.3: Tourism Profile of the Columbine Geographic Area**

| Profile Component | Information |
|---|---|
| Terrain and access | The Columbine geographic area offers easier vehicle access to higher-elevation terrain than do either of the other two districts. This is via mining roads, timber roads, and state highways. The Columbine area offers almost limitless possibilities for recreation access along U.S. Highway 550, the San Juan Skyway. The area is also known for its wild country and big peaks. The scenery, and the strong presence of mountain adventurers of all types, reflects the proximity of some of the highest, most impressive, rugged mountains in Colorado. |
| Feedback from area residents | Residents seek high-quality recreation opportunities in the WUI and day trip opportunities to spectacular mountain settings. The easily accessible features of planning area near Durango, Bayfield, Vallecito, and other population centers are used frequently by the fitness-minded population of La Plata County. However, easy access to higher elevations entices recreational users out of the foothills and into the mountains for alpine day trips in winter and summer. |
| Strongest recreation – tourism asset | Easy road access to higher-elevation trailheads, cultural sites, and road-heads offers a remarkable range of recreation opportunities strongly connected to the communities of Durango and Silverton. |

BLM_0033411

| Profile Component | Information |
|---|---|
| Recreation – tourism economy | Durango has the longest history and most experience with tourism of any town in the region. Public land use reflects this experience and commitment to tourism with the Durango and Silverton Narrow Gauge Railroad, Animas River fishing and boating, two ski areas, world-class mountain biking, and the San Juan Skyway and Alpine Loop Scenic Byway. |
| Management challenge | This geographic area would continue to experience growth in population and tourism. Meeting the demand for a wide range of sustainable and diverse, developed and dispersed day-use recreational settings would be the biggest challenge. |

**Table 3.14.4: Tourism Profile of the Tres Rios Geographic Area**

| Profile Component | Information |
|---|---|
| Terrain and access | The Tres Rios geographic area has a wide variety of terrain and climatic zones, ranging from the high peaks in the mountains near Silverton, to the desert country along the lower Dolores River. Sagebrush steppe and pinyon/juniper ecotypes dominate the semiarid lands around the Dolores Canyon. Due to a long history of grazing and mineral extraction on these relatively flat mesas and foothills, road access to the northwestern parts of this area is extensive and well developed. The relatively flat topography of the semiarid areas also increases the impacts associated with OHV use. |
| Feedback from area residents | The local population in this far-western part of the planning area has a noticeably strong multiple-use ethic. A common sentiment expressed during the 2005 study group meeting held at the Dolores Public Lands Office was that the public lands in the area provide recreational opportunities for a wide variety of users. Many recognize the challenge of multiple uses; most, however, would prefer to avoid a high degree of use segregation. Many residents feel strongly about maintaining and not restricting OHV vehicle opportunities. With the exception of fairly widespread concern about gas well development, the majority of Tres Rios geographic area residents are tolerant, and even supportive, of traditional uses within the planning area. |
| Strongest recreation – tourism asset | Diversity of terrain and road access offers a variety of opportunities and disperses uses to many different areas. |
| Recreation – tourism economy | Mesa Verde National Park, hunting, and other traditional uses are the largest tourist attractions in the area. The proximity to the mountains goes hand-in-hand with the agricultural and rural lifestyles that many recent immigrants have come to enjoy in Cortez, Dolores, and other nearby communities. During infrequent dam releases from McPhee Reservoir, the Dolores River provides outstanding and remote rafting opportunities. |
| Management challenge | Travel management is the number one recreation challenge, and the designation of travel access routes would profoundly influence the recreation setting and experience in this geographic area. |

## Recreation Demographics and Demand Trends

The 2008 Colorado Statewide Comprehensive Outdoor Recreation Plan (State of Colorado 2008) provided information about people who visit state parks in southwest Colorado. In combination with NVUM survey results (2001) and information from Cordell et al. (1999), these data represent the general demographics of visitors to the planning area. Most visitors are white males over the age of 30 (with non-local residents being older, mostly over 45), with some college education and a middle-class income. More than 40% of visitors to the planning area are from local communities (including

BLM_0033412

Durango, Farmington, and Pagosa Springs). Wilderness visitors tend to be older than other visitors, with approximately 68% in the 40- to 70-year-old range.

Approximately 60% of visitors seek a setting that has little or no development or has limited trails, camping, boating, and fishing. Key activities for resident visitors include swimming and motorized boating. Non-resident visitors, on the other hand, plan to hike, fish, and camp. Most visitors indicated that "relaxing" and "spending time with family and friends" were their top reason for visiting.

Top primary activities were listed as viewing scenery, downhill skiing, hiking/walking, relaxation, and fishing. The most heavily used facilities include forest roads and trails. The most popular specially designated areas are the scenic byways and the wilderness areas.

Both tourism and regional populations are growing steadily due to the demand for an amenity-rich lifestyle, the centerpiece of which is the planning area. There is increasing participation in recreation activities that occur on public lands, particularly day-use dispersed recreation, motorized activities, and heritage tourism. The trend is a strong and steady increase in recreation demand, primarily driven by residents focused on public lands close to communities. In addition, there is a strong destination market driven by tourists who want to reconnect with rural communities within cultural landscapes.

## Dispersed Recreation

The planning area offers an extraordinary variety of dispersed outdoor settings and opportunities, often defined by a low level of facility development, freedom of choice, and a semi-primitive and predominantly natural environment. A combination of features offers a remote, rustic, and primitive setting; high-quality scenery; and suitable terrain for camping, picnicking, mountain biking, OHV use, snowmobiling, backcountry skiing, hunting, and other dispersed uses. Users value the freedom of choice, remoteness, and naturalness associated with dispersed recreation use. Regardless of the activity, the opportunity to get away from day-to-day stresses and to be with friends and family in a natural setting is the primary benefit that motivate dispersed recreation visitors.

Traditionally used campsites are often clustered along streams in valley bottoms. Concerns have been raised regarding the sanitation, erosion, and wildlife impacts associated with heavily used, and easily accessed, dispersed recreation areas. La Plata Canyon, South Mineral, and Williams Creek are examples of locations with intensive dispersed camping use and with the associated wear and tear. Locations close to communities such as Cortez and Durango also show the impacts of constant and intensive dispersed day use. These issues and areas are addressed in Section 3.14, Recreation and are further described in Volume III, Appendix E.

## Recreation Facilities and Funding

Within the planning area, only a fraction of the cost of providing recreation facilities and infrastructure is paid for by the annual revenues from all recreation fees (including special use fees, outfitter/guide fees, entrance fees, and recreation fees) collected.

The inventory of SJNF and TRFO recreation facilities includes campgrounds, picnic areas, trailheads, scenic overlooks, and marinas. Maintaining these facilities is costly. The SJNF and TRFO have identified maintenance backlogs and implemented a recreation facility master plan process designed to align recreation facility investments with benefits to visitors and available revenue. Implementation of the master plan would continue under all alternatives.

BLM_0033413

Demographic and recreation trends have important implications for the future of recreation facilities within the planning area. Aging populations from urban areas with more available leisure time, a predominance of day use versus overnight use, private/public partnership potential, the demand for heritage tourism, an "undeveloped" environment, "adventure learning" in "outdoor museum environments," and the proximity of the planning area to growing communities are all facts that have important consequences for the appropriate location, type, and amount of future facilities and visitor services. Such considerations have helped guide the formation and implementation of the master plan.

## Recreation Issues and Need for Changes

Historically, use of the planning area has emphasized commodities; however, current social, economic, and demographic changes have significantly increased recreational uses and have changed the nature of recreation demand. Recreation is now the most extensive and economically valuable resource associated with the planning area. Every recreation and leisure trend associated with public lands is reflected within the planning area (including amenity migration, baby boomer demands, wilderness area crowding, motorized recreation, WUI demands, and resort development). In contrast with the past, current management must accommodate and protect recreation values if it is to be successful and sustainable.

The recreation tourism market is expected to grow. Recent trends, as well as future projections, point toward increases in the number of participants, trips, and activity days for outdoor recreation across most activities. For many activities, participant growth would be faster than population growth.

Public land recreation sustainability has become dependent on a wide range of creative and effective partnerships that involve both public and private entities. The SJNF and TRFO must collaborate with commercial enterprise, land trusts, municipalities and state agencies, publishers, outfitter/guides, interpretive associations, and universities, among others. These partnerships would continue to bolster the SJNF and TRFO's ability to effectively manage recreational uses within the planning area. Recreation within the planning area is a local, regional, and national resource. Collaborative efforts would directly affect the ability of the SJNF and TRFO to deliver sustainable recreation settings and benefits.

There are increasing concerns over access to the planning area, as well as regarding visual impacts to scenery. People who recreate within the planning area value scenery and expect a natural environment. They also value existing public lands access and are sensitive to changes in the location, amount, and type of access. The LRMP recognizes recreation as a primary product of the SJNF and TRFO, and this has helped guide decision-making throughout the planning process.

People are generally aware that every acre cannot support every type of recreation. They would like to maintain recreation opportunities and support multiple uses where it is feasible and sensible, while, at the same time, balancing use with recreation values. The range of alternatives offered in the LRMP/FEIS describes different combinations of actions intended to meet the stated emphasis of each alternative.

Recreation travel corridors are the backbone of recreational access to the planning area. These more developed routes serve as essential gateways to a wide range of recreational opportunities. Facilities along these corridors can further provide essential visitor services and serve as information hubs.

Nationally, motorized use of public lands has surged in the last few decades. Travel on scenic highways has doubled, and OHV use continues to grow as baby boomers age and become less

BLM_0033414

physically active. At the same time, the demand for "quiet" use in large remote backcountry areas is on the rise. The LRMP uses MAs and motorized travel suitability areas, among other management tools, to allow for each type of use that is in demand. Areas within the planning area are experiencing this increase, as well as its associated impacts on other users.

Dispersed use and day-use recreation is becoming a predominant recreation use within the planning area. Visitors and residents want quick access to public lands for short visits that are close to home (within a day's drive) in a natural environment. The LRMP identifies several areas as SRMAs, assigns MA designations, and defines travel suitability areas as methods of managing this use long term.

Interpretation and conservation education is critical to stewardship of the planning area. Recent surveys show that the predominantly urban culture knows very little about public lands. Research indicates that people have a keen desire to participate meaningfully in land stewardship, as well as in the protection of their community's public "backyard." SJNF and TRFO managers can facilitate this involvement through continuing the partnership with the San Juan Mountains Association and working with other local interest groups. Such partnerships and conservation education programs would be maintained under all LRMP alternatives.

Colorado is known for its outdoor adventure sports. The planning area has long offered diverse outdoor recreational opportunities for all age groups and activity levels, as well as diverse recreational opportunities beyond adventure sports. Such diversity should continue to benefit the regional economy and allow the planning area to meet the anticipated demand from aging populations (who seek less active, close to home, outdoor recreation).

Heritage tourism, short loop trails, community connections, increased conservation educational offerings, day-use activities on trails and roads, and stewardship opportunities are all likely to offer a welcome complement to Colorado's more traditional adventure sports.

Visitors are generally aware that every acre cannot support every type of recreation, however, maintaining recreation opportunities while supporting multiple uses can be seen as an optimal solution.

## 3.14.3 Environmental Consequences

### General Impacts

Within the planning area, recreation occurs throughout the year. Various types of recreational opportunities, experiences, and settings would continue to be provided in various proportions under all of the alternatives. Within the planning area, recreation opportunities are managed according to their ROS setting, which are primitive, semi-primitive non-motorized, semi-primitive motorized, motorized, roaded natural, and rural. There are no urban settings within the planning area. Each alternative would propose different numbers of acres under the various settings and that, in turn, would change the social, physical, and administrative use of the setting.

In general, recreation opportunities available within each ROS setting would change to some degree between alternatives, and a large portion of the planning area would still be allocated to each ROS setting. Certain activities may be limited in geographic extent but would still be allowable, and other activities may have larger areas managed for that use. SRMAs would be established, but would not change recreational benefits, because the SRMAs are created to identify high-use areas and manage for the use patterns that have already been established within that SRMA boundary. Future

BLM_0033415

management actions may change emphasis on administrative activities; however, the recreational "niche" for the area would stay the same.

Recreation facilities would not be noticeably impacted in relation to any of the alternatives due, in part, to the long-term established use of these facilities, as well as their current capacity, the ability to handle increased occupation, and the considerable public investment in facility operation. Implementation of any of the alternatives would not impact the number and location of facilities. However, budget constraints and/or increases and use trends would result in a dramatic impact to facilities in the future and sites could be closed or decommissioned if adequate funding were not available. This would lead to a reduction in developed recreation opportunities within the planning area.

Allocation of land for potential ski area development on NFS lands (one of the allowable activities in MA 8) is considered a part of this planning process. Allocations made in the LRMP would not preclude the need for or consideration of future ski areas during the life of the LRMP. However, additional NEPA analysis for new ski areas (or the expansion of existing) into areas that are not allocated to such use in the LRMP would require a plan amendment in addition to project-specific NEPA analysis. All alternatives would continue the current permitted ski areas (e.g., Durango Mountain Resort and Silverton Mountain). Alternative D includes allocation of an area for expansion of the existing Wolf Creek ski area onto the SJNF. Wolf Creek ski area has been permitted long-term on the Rio Grande National Forest east of the Continental Divide, but if future development is approved within the allocated area, this would increase developed ski area acreage within the planning area. Alternative A would carry forward ski areas from the 1983 San Juan National Forest Land and Resource Management Plan. Alternative D would also keep the potential ski area in the East Fork of the San Juan River that was in the 1983 San Juan National Forest Land and Resource Management Plan. The East Fork ski area would impact the roadless character of the South San Juan Adjacent IRA and would increase commercial skiable terrain in the planning area (while, at the same time, non-commercial terrain would be lost).

The number of recreation residences would not vary by alternative. There are no other uses identified for the areas occupied by recreation residences. Future use is expected to continue to allow all recreation residences, and the SJNF and TRFO would continue to work in partnership with permit holders until conditions change or until the appropriate environmental analysis shows a higher need for these lands.

BLM WUI areas near Durango and Cortez would be designated as SRMAs under Alternatives B, C, and D, which recognizes the importance of the recreational values found in these areas. A specific Recreation Area Management Plan would then be developed for each new SRMA, which in general would lead to better management of access, recreation, and other resources within these areas, equating to a net positive impact to these areas in the long term.

## Impacts Related to Travel and Access Management Decisions

Currently, travel and access is being affected by national policies adopted by both the BLM and the USFS. In the previous LRMPs, motorized recreation was open to cross-country travel unless closed or limited. The new policies change motorized recreation opportunities on roads, trails, and areas to "closed" unless designated as "limited" or "open." The planning and environmental analyses for specific motorized route designations and the implementation of the landscape-level travel management plans are well beyond the scope of this LRMP (see Cumulative Effects analysis below). Following implementation of these travel management policies, in most cases summer motorized use would be limited to a system of designated routes, regardless of which action alternative is selected

BLM_0033416

for implementation. Efforts to minimize or resolve user conflicts is inherent in each of these travel planning efforts, so the LRMP is not intended to address or resolve specific travel management issues.

The following discussion therefore generalizes impacts per alternative and contrasts the relative impacts to user groups and recreational opportunities between alternatives. Although the travel management planning process would result in a motorized use map, it does consider the entire range of travel modes, from foot through motorized travel (including mountain bike and horseback use). Just as recreation use changes as population rates change within the planning area, so would travel use. Population in the planning area is predicted to increase; therefore, the demand for travel and access would also increase, regardless of alternative implemented.

Alternative A continues existing travel management and access, subject to the policies and landscape-level travel planning completed, underway, or planned throughout the SJNF and TRFO. Alternative C has the least acreage devoted to "suitable" for both categories of motorized use, with a proportional decrease in this type of recreational opportunity. Alternative D has the most acreage available for motorized uses, but this alternative would adversely affect non-motorized users in many of these areas.

Alternative B would do the most to minimize conflicts between winter sports users by directly avoiding contact between users and by maintaining settings consistent with achieving either motorized or non-motorized recreation benefits, rather than by default mixing the two. In general, non-motorized user experiences are adversely affected by concurrent motorized use, but not vice-versa. Therefore, it is important to have some highly desirable winter use areas that are closed to motorized use to allow for quality non-motorized user experiences. Alternatives B and C allow for this, but at the expense of winter motorized use opportunities in those areas. Alternative B allows for a balance of motorized and non-motorized oversnow travel to accommodate the needs of these sometimes polarized user groups. Advances in snow machine technology and capabilities have increased access to previously inaccessible (and often administratively closed) areas, necessitating some changes to area boundaries, particularly near primary highway mountain passes.

Similarly, for over-ground travel, Alternatives A and D would result in the greatest potential for user conflicts because they would offer the least area reserved solely for non-motorized forms of travel. These alternatives are therefore conducive to direct user conflicts such as motor vehicle noise, signs, and odors becoming (or remaining) prevalent in an area sought out for the benefits of quiet and primitive forms of recreation. Alternative C would minimize impacts to non-motorized recreational values in many areas, but at the expense of motorized use experiences in those same areas. Alternative B strikes a balance, with a considerable amount of opportunities available for both motorized and non-motorized uses, but with some areas set aside for quiet, primitive forms of recreation to reduce conflicts.

Generally, the alternatives would not differ in how they manage equestrian and mountain bike travel. User conflicts between motorized users, bicyclists, equestrian, or other non-motorized users that emerge on specific trails or land areas would be addressed in landscape-scale travel management planning. No SJNF and TRFO roads or trails currently available to the public would be designated as unsuitable for equestrian or bicycle travel under any of the alternatives.

Changes in recreation opportunities, in terms of allowing or limiting motorized use, would be most noticeable between alternatives where there are changes in the acreages allocated to MA 1 and 3 (Alternatives B, C, and D). Differences for travel suitability between the alternatives would be especially noteworthy in the areas of Hermosa Creek, Rico, Missionary Ridge, and Red Mountain

BLM_0033417

Pass. Alternative C would allocate the most land to a non-motorized setting (MA 1), Alternative B a lesser amount, and Alternatives A and D the least amount of non-motorized opportunities. Alternatives A, B, and D would offer more motorized access opportunities in both summer and winter when compared to Alternative C.

On BLM lands, the LRMP allocates land areas as open, closed, or limited to designated routes. Limited use areas are the predominant designation, and some areas are closed due to WSA status or other resource protection reasons. Alternatives B, C, and D all reduce overall OHV opportunities and access to some degree due to more closed/limited land allocations when compared to Alternative A. Alternative C has a slightly higher proportion of closed areas than the other alternatives, thus reducing OHV opportunities to some degree when compared to Alternatives A, B, and D. Open areas are very limited in all alternatives so there is no significant difference in impacts between alternatives due to open area designations.

Suitability for motorized travel during the summer months would be limited to designated routes over the entire planning area. Differences in motorized travel suitability recommendations between the alternatives, in terms of wheeled-travel experiences, would generally be subtle (see Volume III, Appendix V, Maps 20–23), as the overall proportion of acreages in each category does not change dramatically between them. Conversely, the long-term potential for maintaining the greatest amount of non-motorized recreation experiences would be highest under Alternative C, followed by Alternatives B, A, and D. Alternative C would have a profound impact on motorcycle experiences by closing several very popular single-track trails, including Calico and Hermosa Creek, to motorized over-ground use. (see Chapter 2 for acres of change by alternative.)

Winter motorized travel suitability recommendations have more differences between alternatives, and these differences would be important to user groups due to the inherent incompatibilities between motorized and non-motorized uses previously discussed in this section. Although some areas may become more prone to conflicts under Alternative B, this would be even more prevalent under Alternatives C and D due to their emphasis on non-motorized and motorized winter use, respectively. This would be due to users of all types vying for access and use of the same areas, particularly along the highway pass corridors. At the same time, motorized oversnow users would be displaced, in some cases, due to closures of areas to such uses, particularly under Alternative C.

Other increases in unsuitable acres between Alternatives A and B would result in impacts to motorized users (under Alternatives B, C, and D) by restricting vehicle use to designated routes within previously open areas. The action alternatives also add acreage as unsuitable within administratively closed areas such as congressionally designated wilderness areas, the Piedra Area, and WSAs and RNAs. In total, these areas account for approximately 536,292 acres (approximately 23%) of the planning area under all of the alternatives.

The alternatives would address oversnow travel in different ways (see Volume III, Appendix V, Maps 24–27). Alternative A would offer the current opportunities, without resolving any of the conflicts between motorized and non-motorized winter use. These areas are typically along major highways near passes, such as Lizard Head, Molas, and Wolf Creek passes. Alternative B would present a mix that would keep the number of suitable acres for both motorized and non-motorized recreation balanced (but would make changes in where use would be allowed). Alternative C would increase the amount of non-motorized suitable acres, while Alternative D would propose a larger amount of motorized suitable acres. Alternatives B and C seek to reduce conflicts by allowing only non-motorized use in some key areas, reducing direct user conflicts yet still allowing motorized use in the same landscape with access from the highways.

BLM_0033418

The alternatives differ in the way they would address winter motorized and non-motorized user conflicts, especially in areas with consistent snow (including Molas Pass, Rico, Red Mountain Pass, Hermosa Creek, Missionary Ridge, and Vallecito Reservoir).

Alternative C would make most of the acreage in these areas unsuitable for motorized oversnow travel, while Alternatives A and D would do the opposite (proposing the highest amount of oversnow motorized suitable acreage, especially in the Rico and Red Mountain areas).

Oversnow motorized use is expected to take place on both groomed trails and cross-country where allowed, and none of the groomed trails are considered for closure under any of the alternatives. Some oversnow motorized users (particularly intermediate and advanced users) would experience a loss of some use under Alternatives B, C, and D, due to identification of some back-country areas as unsuitable for oversnow motorized use as shown on Maps 24 through 27 (Volume III, Appendix V). Conversely, non-motorized oversnow users (particularly intermediate and advanced users) would have additional areas along major roads that provide access to ungroomed backcountry winter play areas under Alternatives B and C. See Chapter 2 for acres of change by alternative.

The following site-specific examples show the differences between alternatives.

**Dolores Canyon Overlook:** Routes along county roads accessing BLM-administered lands, and up to the Dolores Canyon Overlook, would be considered suitable under Alternatives B and D. The area would be open to snowmobiling under Alternative A and closed under Alternative C. Motorized use and experience is not expected to change between Alternatives A, B, and D, and motorized use would be eliminated under Alternative C. This would result in users looking for a motorized oversnow experience moving to other areas where that activity is allowed.

**Lizard Head Pass:** The groomed route up Barlow Pass and the area east of Lizard Head Pass up to the divide between Dolores and Columbine Ranger Districts would be considered suitable under Alternatives A, B, and D. Under Alternative C, only the groomed route up Barlow Pass (down the East Fork of Hermosa Creek) would be suitable. There would be opportunities for hybrid skiing (which uses snowmobiles to tow skiers up the slopes) and backcountry skiing; however, off-route snowmobiling would be prohibited.

**Red Mountain Pass:** Under Alternative A, both sides of U.S. Highway 550 would be open to oversnow motorized use, leading to potential conflicts between motorized users and non-motorized users (e.g., skiers, snowshoers). Under Alternative B, the west side of U.S. Highway 550 (up to the San Miguel County line) would be suitable; however, the east side of U.S. Highway 550 would be unsuitable to motorized use (but open to backcountry skiing). Under Alternative C, both sides of U.S. Highway 550 would be unsuitable for motorized use (but open to backcountry skiing). Under Alternative D, the west side of U.S. Highway 550 would be suitable for motorized use, and the east side of Forest Road 850, as well as the ridge north to McMillan Peak into Prospect Gulch (including Minnehaha Basin) would be suitable for oversnow motorized travel. The areas south of McMillan Peak, east of U.S. Highway 550 and west of CO 110 (Cement Mountain Road) would be unsuitable.

Under Alternatives A and D, Red Mountain Pass would be open to motorized oversnow travel on both sides of U.S. Highway 550. In the past, such an arrangement has resulted in an increase in conflict between motorized and non-motorized users. Both motorized and non-motorized users are accessing this area to experience the easily accessed and outstanding alpine scenery. Under these alternatives, oversnow motorized users would share terrain with non-motorized users, and it is likely that the backcountry skiing community would not have a positive experience due to having snowmobiles in the area. Adverse impacts to skiers' experiences are typically due to snow compaction, noise, and

BLM_0033419

perceived or actual interpersonal conflicts. Under Alternatives B, C, and to a lesser extent D, snowmobiling opportunities would be lost, and oversnow motorized users would be displaced.

**Molas Pass:** Under Alternative A, the 200 acres east of U.S. Highway 550 (around Andrews Lake) would remain unsuitable for motorized use, and the rest of the area that is currently suitable for motorized use would remain suitable. Alternative B would make the area south of Big Molas Lake, as well as east of U.S. Highway 550 down to Lime Creek, unsuitable, and the area west of U.S. Highway 550 to West Lime Creek ridge north toward Grand Turk suitable. The boundary changes on the west side of U.S. Highway 550 would open some new terrain to snow machines, but this area is difficult to access and would primarily serve expert sports users' needs until tracks were broken in and/or the snowpack had consolidated in late winter.

Overall, Alternative C would result in the greatest impacts on motorized recreation opportunities, followed by Alternatives B, D, and A, respectively. In general, travel access and management allocations under Alternative C would result in the greatest benefits to non-motorized recreation (by allocating the most land to those uses and reducing the potential for user conflict), followed by Alternative B and then Alternatives D and A.

## Recreation Opportunity Spectrum

The ROS maps found in Volume III, Appendix V (Maps 28–35) were developed to serve as a guide indicating what, in the managing agencies' best estimation, are the most appropriate recreational use types and experiences for each area of the public lands. The ROS zones vary between each alternative to reflect the overall theme for each alternative as discussed in detail in Chapter 2 of this FEIS. The ROS concept is not to be confused with actual land allocations, such as the MAs on SJNF lands, although efforts were made to ensure ROS zones and MA designations were compatible through the planning process.

## Impacts Related to Oil and Gas Leasing Decisions

In general, the act of leasing public lands for oil and gas development would have little impact on individual recreation experience. Impacts to recreation would occur when oil and gas development under the leases actually begins, not as a direct result of lands being found suitable for oil and gas leasing in this LRMP.

**Paradox Basin (USFS):** The USFS portion of the Paradox Basin is not currently developed for oil or gas. The anticipated 140 new wells that would be constructed in the area would be accessed by existing roads or by short spur roads constructed in this moderately roaded landscape. NFS lands in the Paradox Basin portion of the RFD area are almost one-half (approximately 47%) roaded natural (ROS) setting and show evidence of a multiple-use emphasis. Another one-third of the area (approximately 31%) is in the semi-primitive (ROS) setting (there are no wilderness areas in the USFS portion of the Paradox Basin). One-fifth (approximately 22%) of the area is in the rural setting (ROS) (primarily around McPhee Reservoir, the Dolores River, and above the town of Dolores). Considering existing use types and levels, the terrain, and the recreational experiences available elsewhere in the San Juan Mountains, adverse impacts of oil and gas development in the Paradox Basin area on recreational experiences are expected to be minimal.

**San Juan/San Miguel (USFS):** Within the San Juan Sag area, there have been exploratory wells drilled at an average rate of one well every 3 years, mostly using existing roads. The wells have all been plugged and abandoned, and the sites have been reclaimed. Existing development has had little, if any, impact on dispersed recreation. Future oil and gas development within the area is

BLM_0033420

projected at two wells per year for a period of 10 to 15 years. These wells, similar to past wells, would mostly utilize the existing road system; however, some spur roads would be constructed. Construction activities would introduce noise, dust, and construction traffic. Impacts related to construction activities would be short term and minor. Long-term impacts would depend on the success of continued exploratory activities; however, the anticipated low rate of development would not measurably impact the current dispersed recreation patterns of use (which are mostly driving forest roads for pleasure, firewood gathering, and hunting).

Lands in the San Juan Sag portion of the RFD area would be over one-half (approximately 6%) roaded natural (ROS) settings, primarily along travel corridors and areas showing evidence of a multiple-use emphasis. Another one-quarter of the area (approximately 24%) would be in the semi-primitive (ROS) setting. The remaining 8% would be in the rural (ROS) setting, around the town of Pagosa Springs.

## Direct and Indirect Effects

Recreational impacts may occur over the life of the projected oil and gas development. Specifically, recreation impacts could include:

- Oil and gas development altering the natural setting and visual character of an area used for recreation;
- Oil and gas–related construction, operation, and maintenance disrupting recreation as a result of noise, dust, traffic, and increased human activity; and
- Oil and gas development that may not be compatible with federal, state, or county objectives for recreation in portions of the planning area.

The areas with highest oil and gas potential (e.g., Paradox Basin) toward the west side of the planning area do differ in character from most other parts of the SJNF and TRFO. The areas' drier climate, relatively lower elevation, more arid vegetation types, and more open terrain lend the areas to different types of summer and winter recreation when compared to the eastern portions of the SJNF and TRFO.

Summer recreation that may be impacted by oil and gas leasing and development in the SJNF and TRFO includes viewing (natural feature, wildlife, historic/prehistoric sites), OHV use, mountain biking, hunting, and to a lesser extent hiking, driving for pleasure, camping/picnicking, and fishing. Numerous four-wheel-drive roads and trails traverse the areas of prospective oil and gas development and offer opportunities for dispersed activities. If areas are made available for lease, oil and gas development in the SJNF and TRFO could affect recreation settings and participation in these recreational pursuits.

Impacted winter activities could include cross-country skiing, snowshoeing, and snowmobiling although snow cover is often inadequate or too fleeting in nature to allow these activities in the areas with the highest oil and gas development potential mentioned above.

Due to the standard operating procedures, stipulations, and other permitting requirements incumbent upon any new oil or gas well development, there are similarities in the impacts associated with each well developed, although the total number of wells that could be developed varies, in some cases significantly, between alternatives (e.g., Alternatives C and D). Existing recreational uses in high oil and gas potential areas tend to be of a dispersed, motorized nature, and areas of wells could be avoided during recreational activities.

BLM_0033421

The following leasing stipulations would apply to management of recreation areas and opportunities (Table 3.14.5). NSO stipulations are prescribed to avoid areas where the construction of oil and gas facilities is considered not compatible with recreation, such as protection of viewsheds along major recreation corridors, developed recreation sites, and ski areas. CSU stipulations apply to SRMAs (BLM) to mitigate impacts to high use recreation areas.

**Table 3.14.5: Lease Stipulations for Recreation and Scenery by Alternative**

| Recreation and Scenery | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Developed administrative and recreation sites:** Within 0.25 mile around developed administrative and/or recreation sites. | NSO | NSO | NSO | NSO |
| **Developed administrative and recreation sites:** Surface use or occupancy would be prohibited unless or until the operator demonstrates that operations can be acceptably conducted within 1 mile of developed administrative and recreation sites. | NSO | CSU | NSO | SLT |
| **SRMAs (BLM)**: Durango, Dolores River Canyon, Silverton, and Cortez. | SLT | CSU | CSU | SLT |
| National scenic byways, All American roads and backcountry byways; designated scenic trails, recreation, and historic trails; and recreation-emphasis corridors: Within the identified foreground viewshed, up to 0.5 mile on either side of the following: San Juan Skyway, Trail of the Ancients, the Alpine Loop Back Country Byway, Old Spanish Trail, Continental Divide Trail, Colorado Trail, Calico Trail, Highline Loop Trail, East Fork Road, West Fork Road, First Notch Road, Piedra Road, Poison Park Road, Lime Creek Road, South Mineral Road, La Plata Canyon Road, West Dolores Road, and Durango-Silverton Narrow Gauge Railroad. | CSU/NSO | NSO | NSO | CSU |
| **Old Spanish Trail:** No surface-disturbing activities up to 0.5 mile of either side of the centerline of the congressionally designated trail in high potential segments. | SLT | NSO 0.5 mile | NSO 5 miles | NSO 0.5 mile |
| **Old Spanish Trail-Visual:** CSU for the horizon on either side of the centerline of the congressionally designated trail in high potential segments. | SLT | CSU | CSU | SLT |
| High SIO and VRM Class II areas | CSU | NSO | NSO | SLT |

CSU stipulations are more flexible in terms of ability to mitigate impacts, allowing greater latitude to relocate access roads and drilling sites in the SJNF and TRFO to minimize impacts to the natural character of the environment. The stipulation's flexibility, as prescribed in leasing Alternatives B and C, may be better suited to maintaining opportunities for semi-primitive non-motorized and motorized settings.

An NSO stipulation is also used to mitigate potential impacts to facilities, the recreation experience and safety of users, and the natural environment that initially made a developed site, special area, or travel corridor desirable for the existing use. Access roads would be located outside developed site buffer zones unless alternative routes would be more damaging to the environment. NSO buffer

BLM_0033422

zones along travel corridors would allow limited occupancy for roads and utility transmission facilities if they could be constructed without significantly affecting the values the buffer zone was designed to protect.

Making recreation areas, particularly currently undeveloped areas and special management areas, administratively not available would protect these areas from direct impacts of potential development activity, as does an NSO stipulation. The use of administratively not available decision where NSO could provide the same protection may be more restrictive than necessary.

The Dolores River Canyon is assigned an NSO stipulation within and up to 0.25 mile of the canyon's boundary to protect the natural character and the areas wilderness characteristics, as well as recreational and scenic values. This stipulation does not vary by alternative because it is thought that standard lease terms or CSU cannot protect the outstanding values of an area of this size.

**Alternative Comparison:** Alternatives A, B, and D have similar projected levels of oil and gas development and, therefore, would create similar impacts to recreation settings and activities. The lease stipulations prescribed above should eliminate many development conflicts, particularly in scenic corridors and developed sites, and in other cases would provide for more flexibility to advantageously site oil and gas facilities, reducing potential recreation conflicts. Alternative D would have the least protective stipulations, potentially resulting in the greatest recreation conflicts among the alternatives.

The No Leasing Alternative would still result in development of existing leases, but there would be an approximate 50% reduction in projected oil and gas development and impacts in the Paradox Basin public lands. Oil and gas impacts would be confined to the northern portions of the area of prospective development.

Under standard lease terms prescribed in Alternatives A and D, there is a higher degree of risk that the limitations of permissible constraints would not be sufficient to meet management guidelines. For example, in areas managed for semi-primitive setting and recreation, the limitations on moving facilities under the restriction of standard lease terms may not be adequate to ensure that road systems are located away from dispersed recreation sites or backcountry trails. In areas managed for roaded natural opportunities, standard lease terms may also pose risks that activities cannot be located away from scenic corridors and developed sites.

SRMAs are assigned CSU in Alternatives B and C. SRMAs are landscapes identified by the agency and public to manage the areas primarily for the quality and sustainability of the recreation experience. The CSU stipulation provides more flexibility than standard lease terms to move facilities to best achieve natural screening. The CSU also serves as a notice to the lessee that additional planning and mitigation would be necessary before surface-disturbing activities take place. The standard lease terms utilized in Alternative A do not provide the siting flexibility provided by the CSU stipulation.

NSO would be permitted within the identified foreground viewshed, up to 0.5 mile on either side of a number of heavily used national scenic byways, All American Roads, and backcountry byways; designated scenic, recreation, and historic trails; and recreation-emphasis corridors. The NSO stipulation is considered necessary to protect the integrity of viewsheds in scenic and cultural landscapes along significant, special routes and popular scenic drives. If CSU is utilized for the same routes, there may be higher risk of the auditory and visual impacts of oil and gas development within proximity to those routes. The visible evidence of oil and gas development is inconsistent with the maintenance of high scenic integrity in the foreground of these routes.

BLM_0033423

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

Guidelines for recreation resource management are listed in the LRMP, Volume II. Additional management direction below is contained in the laws, regulations, policies, and handbooks that guide recreation management of the SJNF. The stipulations, standards and guidelines, and below referenced direction present the basis for management of potential conflicts between oil and gas development and recreational pursuits.

Impacts on Dispersed Recreation

As a result of oil and gas development and its visual impacts, there may be a reduction in the number of visitors to developed lease areas in the SJNF and TRFO who drive for pleasure or engage in other recreational activities such as viewing scenery, hiking, camping, hunting, and mountain biking. To a lesser degree, the number of winter recreationists may decrease due to a reduction in visual quality and extensive snowplowing that would accompany the operation of an oil or gas field. The intent of the stipulations is to mitigate impacts to recreation and thereby meet the goals and objectives in the LRMP. There are significant portions of the SJNF and TRFO where oil and gas development would be more compatible with LRMP multiple use objectives and would, therefore, be managed under CSU or standard lease terms. These are generally areas that have fully developed road systems as a result of active management activities, including timber management and past and current oil and gas development.

SJNF and TRFO lands are mostly roaded, reflecting a history of multiple use management. The NFS portion of the Paradox Basin has minor oil and gas development, but portions of the BLM lands are more heavily developed. The anticipated 660 well pads constructed on new leases in the SJNF and TRFO (375 on existing leases) would be accessed by existing roads and by constructing short spur roads off the existing road system. The spur roads would not add motorized recreation opportunities, being closed to public motorized access.

Impacts on Developed Recreation

Recreation facilities in the SJNF and TRFO include campgrounds, picnic sites, trailheads, boating sites, fishing sites, and interpretive sites. A lease stipulation applied in all alternatives requires NSO within 0.25 mile of developed recreation sites. The sounds and sights of well construction could impact campgrounds but would be short term in duration. Each well would be drilled and completed over a 2- to 6-week period, then construction impacts would cease and production activities would begin. The 0.25-mile buffer would reduce or eliminate the sounds of producing wells, and wells would be located, where possible, to eliminate direct sight lines to developed recreation facilities. Some sounds could still be audible from recreation sites and audible to dispersed recreation users during maintenance activities and more consistently from compressor station motors.

Impacts Related to Fire and Fuels Management Decisions

Under all of the alternatives, fuels treatments would be similar. Impacts to recreation would be mitigated, primarily because the activities would be short-term disruptions of the experience to the users that would be mitigated through guidelines applied to the project and implemented while the treatments are taking place. Impacts within SRMAs may be somewhat greater due to the concentrated use in these areas. However, impacts would be adequately mitigated by applicable guidelines and any land use restrictions specific to the project area. It would be difficult to specifically determine impacts to recreation experiences due to fire and fuels activity, but it is reasonable to assume that such impacts would be related primarily to the change in appearance to the visual recreation setting. Some displacement or other inconvenience to recreational users may be realized on occasion due to temporary closures put in place during project work.

BLM_0033424

The impacts related to fire and fuels management on recreation would be similar under all of the alternatives. In addition, recreation facilities, SRMAs, national trails, and scenic byways have already included measures to protect recreation experiences, such as minimum impact suppression tactics in these areas and limitations on motorized equipment use (e.g., bulldozers), among others.

Impacts Related to Timber Management Decisions

Under all of the alternatives, impacts to recreational settings (ROS) related to timber management would remain unchanged, as all of the alternatives include standards and guidelines related to timber harvest that are intended to minimize adverse impacts to many resources, including recreation. Impacts are also reduced since less than 50% of the planning area is classified as suitable for timber production, and timber harvest volumes have been on a steady decline over time (see Section 3.9).

Site-specific impacts to recreation would be minor and primarily short-term disruptions of the experience to the users that would be mitigated through guidelines applied to the project and implemented while the activity is taking place. Impacts due to harvest activities within SRMAs would be moderate because of the concentrated use and interest in these areas; however, such projects would again be mitigated by guidelines specific to MA allocations. BLM SRMAs are required to have area-specific management plans developed, which would include specific guidance on mitigation measures or other project restrictions regarding timber management activities. The addition of new roads may eventually provide some additional opportunities for recreational access once the timber treatment is completed. However, most of the proposed new roads would be in areas that already have extensive road systems and the roads would not be open to public use and/or would be decommissioned when the project was completed; therefore, the impacts would be negligible.

Impacts Related to Minerals Management Decisions

Under all of the alternatives, impacts to recreational settings (ROS) related to minerals management would remain unchanged. Impacts to the recreation setting would be from the long-term disturbance to the area. Users would tend to move from these areas in order to have the experience they desire while the minerals activity is taking place. Given that most of the future mineral activity would take place in areas of former activity, the amount of projected acres for development disruption to recreation experience would be minor.

The impacts related to minerals development on recreation would be similar under all of the alternatives because future minerals development would be subject to standard operating procedures and permitting processes, and demand for development in new areas is expected to be low due to low mineral potential.

## Cumulative Impacts

In addition to trends described at the beginning of this section, the cumulative impacts described below include historic, current, and reasonably foreseeable future activities that were considered with regard to recreation. The next 15 years are considered the timeframe for reasonably foreseeable future cumulative impacts.

**Planning Area Recreation Setting Shift:** Historic project-level decisions (primarily oil and gas development, timber management, and road construction for access to private in-holdings) in the planning area have resulted in a shift in area-wide recreation setting composition, from the semi-primitive non-motorized and semi-primitive motorized to the more developed roaded natural and rural (ROS) settings. This has been a long-term trend and one that is likely to continue due to population

BLM_0033425

increase within the planning area and increasing development and road building adjacent to public land boundaries.

As discussed in the general impacts portion of this section, the existing planning area recreation setting composition would experience the least amount of shift under Alternative B, followed by Alternatives C, D, and A, respectively. Alternative B would result in the greatest potential, over the long term, for loss of remote/wilderness setting. This is due to the differing level of management activities (especially private land in-holding development, oil and gas, timber and fire/fuels management, and associated road construction) that may take place under the various alternatives. As private development continues to encroach upon public land boundaries, recreational use for those seeking primitive experiences would likely shift to more remote and difficult to access areas. However, increased WUI use can be expected as local residents access adjacent public lands from their properties or subdivision property.

**Future Off-trail Travel ("open areas"):** Currently, travel and access is being affected by a major policy shift on a national basis. This paradigm shift (from open unless closed, to closed unless open) is intended to reduce adverse resource impacts related to motorized recreation nationwide. The alternatives allow for motorized use under these policies, but cross-country travel is extremely limited in the planning area. This would likely reduce long-term adverse impacts due to motorized use. Under this new USFS policy (2005), summer motorized use would be restricted to designated routes, regardless of which alternative is selected for implementation. BLM Handbook (H-1601-1) requires all motorized travel to be classified as open, limited, or closed to motorized travel activities.

**Future Oversnow Travel:** Winter recreation has been affected in recent years by the increase in population in southwest Colorado, which has resulted in increased competition for access to recreational opportunities on snow. In addition, snowmobiles have increased in power and reliability, which has allowed more terrain to be used. Backcountry skiers also have better equipment, and there has been an overall surge in adventure skiing. During the past several decades, backcountry skiers and snowmobilers have worked out their differences where individuals would have winter recreation experiences. For the most part individuals, clubs, and communities worked out which areas were available for motorized and non-motorized use. This cooperation has been challenged by the increase in users, as well as by changes in technology.

**Oil and Gas Development Implications:** The majority of development would continue in existing fields. The most noticeable exception is estimated at 125 new wells, with an associated 425 acres of disturbance on NFS lands in the Paradox Basin. Under the No Leasing Alternative this development would not take place. Additional CBM development in the NSJB on both NFS and BLM lands would continue to take place regardless of new leasing or no leasing scenarios. In its November 2006 FEIS regarding the NSJB-CBM project, the SJNF and TRFO arrived at several conclusions with regard to cumulative effects that are pertinent to consider within the framework of recreation implications for the planning area. The development scenario in the San Juan Sag is estimated at between two and seven wells with 50 acres of disturbance that would be reduced to only two exploratory wells under the No Leasing Alternative. Although future development would likely occur under all alternatives, cumulative effects on recreation are not expected to be significant due to the small scale of future disturbance.

The broader cumulative effects analysis area includes areas where oil and gas development has occurred and would continue to take place on private mineral estate adjacent to public lands in the Paradox Basin portion of the planning area. Most of the private lands are not high use recreation areas but serve as gateways to public lands. The additional development on private lands would require pads and access roads, and would generally result in the environmental impacts described

BLM_0033426

above. New oil and gas wells would add an industrial component to the landscape and introduce new sources of vehicle traffic and noise that would diminish the natural setting sought by most recreationists. Oil and gas–related construction, operation, and maintenance could also disrupt recreation and tourism as a result of noise, dust, traffic, and increased human activity. Some of the limited recreational and tourism activities that take place on private lands, such as hunting, could be displaced to the public lands.

**Colorado State OHV Program:** Currently all OHVs (ATVs, dirt bikes, and other unlicensed OHVs) are required to display a Colorado OHV permit while operating on public lands, as well as on other designated trails and areas (mirroring the current snowmobile registration requirements). Just as snowmobile use has increased dramatically since the 1990s, OHV use would likely continue to increase due to increased information and advertising by the State Division of Tourism. Potential adverse impacts that may be anticipated as a result of greater information/promotion would include additional users at trailhead facilities, as well as more encounters on open roads and trails (which may increase the perception of crowding).

# 3.15  Scenery and Visual Resource Management

## 3.15.1 Introduction

Private development and population continue to increase within the planning area, as do the demands on area resources. Concerns about retention of the area's outstanding scenic quality are at the forefront of public interest on the SJNF and TRFO. Visitors and residents alike place a high value on the protection of intact natural and cultural landscapes. The economic and lifestyle benefits of high quality scenery are primary contributors to the wealth of the region.

## Legal and Administrative Framework

### Laws

- **The National Environmental Policy Act of January 1, 1970:** NEPA states that it is the "continuing responsibility of the Federal government to use all practicable means to assure for all Americans, aesthetically and culturally pleasing surroundings." NEPA mandates agencies to develop methodologies for scenery management of "aesthetically and culturally pleasing surroundings" that are capable of being put into practice. NEPA requires "a systematic and interdisciplinary approach, which will ensure the integrated use of the natural and social sciences and the environmental design arts into planning and decision-making which may have an impact on man's environment."

- **The Multiple-Use Sustained-Yield Act of 1960:** Under this act, "National forests are established and shall be used for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple uses and sustained yield, without impairment of the productivity of the land.

- **The Federal Land Policy and Management Act of 1976:** FLPMA states, "…public lands will be managed in a manner which will protect the quality of the scenic (visual) values of these lands."

SIOs for NFS lands are identified on a map that was developed as part of the 1983 San Juan National Forest Land and Resource Management Plan. This information is displayed as Alternative A in this FEIS.

BLM_0033427

Scenic quality objectives for BLM lands were not identified as part of the 1985 San Juan/San Miguel Resource Management Plan. The RMP states that visual resource objectives would be developed on a project specific basis. BLM policy outlines a process to identify interim VRM classes for each project. Consequently VRM classes for BLM lands in Alternative A are not shown in this FEIS.

**Management of Scenic Values on NFS Lands:** On NFS lands, scenic integrity levels are used to assess current scenic conditions and the potential impacts under the alternatives. These scenic integrity levels are determined by mapping the following:

- Dominant landscape characteristics;

- Scenic attractiveness;

- Constituent information and concern levels; and

- Distance zones - Immediate foreground, foreground, middle ground, background, and unseen.

Scenic integrity levels are used to measure the human-caused disturbance that deviates from the dominant valued attributes of the landscape character. These levels are used to compare the impacts between the alternatives. The scenic integrity levels are:

- **Very High Scenic Integrity Level –** This refers to landscapes where the valued landscape character is intact with only minute, if any, deviations. The existing landscape character and sense of place is expressed at the highest possible level.

- **High Scenic Integrity Level –** This refers to landscapes where the valued landscape character appears intact. Deviations may be present; however, they must repeat the form, line, color, texture, and pattern common to the landscape character so completely, and at such a scale, that they are not evident.

- **Moderate Scenic Integrity Level –** This refers to landscapes where the valued landscape character appears slightly altered. Noticeable deviations must remain visually subordinate to the landscape character being viewed.

- **Low Scenic Integrity Level –** This refers to landscape where the valued landscape character appears moderately altered. Deviations begin to dominate the valued landscape character being viewed; however, they borrow valued attributes (including size, shape, edge effect, and pattern of natural openings), vegetative type changes, and/or architectural styles outside the landscape being viewed. These should appear as valued character outside the landscape being viewed, and should be compatible or complimentary to the character within.

- **Very Low Scenic Integrity Level –** This refers to landscapes where the valued landscape character appears heavily altered. Deviations may strongly dominate the valued landscape character. They may not borrow from valued attributes (including size, shape, edge effect, and pattern of natural openings), vegetative type changes, or architectural styles within or outside the landscape being viewed. However, deviations must be shaped and blended with the natural terrain (landforms) so that elements such as unnatural edges, roads, landings, and structures do not dominate the compositions.

Scenic integrity objectives are then developed based, in part, on the scenic integrity levels but may also be determined by other resource allocations and uses as analyzed in the land use planning process. The five scenic integrity objectives are as follows:

- **Very High –** Human-caused change to the landscape is not noticeable.

BLM_0033428

- **High** – Landscape may not be substantially altered by management and other activities.

- **Moderate** – Landscape may be slightly and noticeably altered by management and other activities.

- **Low** – Landscape may be moderately altered by management and other activities.

- **Very Low** – Landscape may be heavily altered by resource management and other activities.

**VRM on BLM Lands:** VRI classes are assigned to land units based on scenic quality, sensitivity level, and distance zones. The VRI for the public lands serves, in part, as the basis for the VRM class determinations, although other resource allocation decisions are also considered when designating VRM classes. However, the BLM is not required to assign a VRM class that mirrors the VRI findings if other resources and/or issues dictate a different VRM class.

A VRM class is based on the degree of acceptable visual change within that landscape, which may factor the physical and sociological characteristics of any given homogeneous area, and serves as a management objective. Each class has an objective, which prescribes the amount of change allowed in the characteristic landscape. The VRM classes are:

- **Class I – Objective:** Preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.

- **Class II – Objective:** Retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

- **Class III – Objective:** Partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

- **Class IV – Objective:** Provide for management activities that require major modifications of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

**Scenic Stability (SJNF only):** Scenic stability is a measure of the degree to which the ecosystem is able to restore, maintain, or continue to exhibit the positive scenic attributes of the landscape. The levels of scenic stability are:

- **High** – High scenic stability is a condition within which the positive scenic attributes of an area are expected to be perpetuated.

- **Low** – Low scenic stability is a condition that puts scenic values in jeopardy of being lost (e.g., catastrophic wildfire).

**Narrative Description of Scenic Character:** This indicator describes what the general forest would look like to the visitor in the short and long term. The narrative describes the dominant landscape character attributes and the impacts to scenery due to management activities and the built environment.

BLM_0033429

**MAs and ROS Settings:** These two indicators are important because they determine a substantial part of the physical setting that is important to recreating visitors. In general, ROS zones and MA classes should be compatible with an area's VRM/SIO. Recognizing the interdependency and interrelationship of these three zoning concepts and balancing their individual intents and desired conditions is a key component of the LRMP process.

Rehabilitation is a key element and management prescription used both long and short term to restore landscapes containing undesirable visual impacts to a desired scenic quality. It may not always be possible to achieve the prescribed SIO/VRM standard with rehabilitation immediately, but it may help to create a more visually desirable landscape in the interim. Economic feasibility would help determine the amount and location of rehabilitation during project level analysis. Rehabilitation may include:

- Vegetation management to eliminate unnatural edges, shapes, patterns, and colors;

- Alteration, concealment, or removal of structures containing unnatural forms, colors, or light reflections; and

- Alteration, concealment, or removal of slash construction debris.

## 3.15.2 Affected Environment

### Existing Conditions and Trends

The planning area encompasses extraordinary scenic resources, including the San Juan Skyway, three national scenic and recreation trails, the Colorado Trail, segments of eligible WSRs, Colorado's largest designated wilderness area, the spectacular Dolores River Canyon, and three cultural landscapes (McPhee, Chimney Rock, and Silverton). The planning area is known for its picturesque groves of aspen and ponderosa pine. Large reservoirs (McPhee, Lemon, Vallecito, and Haviland) and scenic river corridors (including the San Juan, Animas, Dolores, Piedra, and Hermosa Creek) provide water-based recreation settings that are in great demand in the Southwest.

Tourism that is substantially dependent on scenery and heritage resources is an economic mainstay of southwest Colorado. People often come to live in the communities surrounding the planning area in order to benefit from the public land opportunities and amenities found on the nearby public lands.

The National Survey on Recreation and the Environment surveyed 60,000 households in the United States. More than 86% of respondents said "managing forests to leave them natural looking" was important or very important. In 1997, approximately 1.037 million sightseeing excursions were made to national forests, and 671 million people participated in wildlife viewing (Cordell 1999).

According to America's Byways Resource Center (2004), the total vehicle miles traveled on the San Juan Skyway nearly doubled from approximately 700,000 daily vehicle miles traveled in 1990 to more than 1.2 million daily vehicle miles traveled in 2002. The same report concluded that 54% of all travelers on the San Juan Skyway are traveling just to drive the skyway, with no particular destination.

Interviews with people who recreate within the planning area found that nearly everyone made reference to the core value of a pristine natural environment as one of the primary reasons they choose to recreate on public lands (Rural Planning Institute 2004).

BLM_0033430

According to the 2001 NVUM project conducted in the planning area, viewing scenery was the most popular activity, with a 68% participation rate (NVUM 2001).

NFS lands are rated via scenic integrity level evaluations, while BLM lands are assessed via a VRI process. Many of the landscapes in the planning with these ratings have very high visibility and contain high-quality scenery that includes dramatic landscapes with mountains, water, and forests.

An additional indicator of scenic value is the visibility of the landscape. In scenery and visual resource analysis, visibility assesses how much access visitors have to view a given area's scenery on roads, trails, and at recreation sites, as well as how concerned they are about that scenery. The planning area has a landscape with very high visibility and also has visitors with a high concern for scenic quality. Nearly half of the planning area is in the foreground viewshed of a constituency that cares about high-quality scenery.

The current condition of visual resources within the SJNF and TRFO is shown in Table 3.15.1. The table shows that 56% of NFS lands retain very high or high scenic integrity, with the remaining 44% in the moderate or low/very low integrity classes. BLM-administered lands have 24% in the very high or high VRI classes, and 76% in the moderate to low VRI classes.

**Table 3.15.1: Existing Scenic and Visual Resource Condition, Percent of Total Area**

| Existing Scenic and Visual Resource Condition | Very High Integrity; VRI/VRM Class I | High Integrity; VRI/VRM Class II | Moderate Integrity; VRI/VRM Class III | Low/Very Low Integrity; VRI/VRM Class IV |
|---|---|---|---|---|
| NFS lands | 22% | 34% | 38% | 6% |
| BLM lands | 0% | 24% | 21% | 55% |

The table above indicates that within the planning area, management activities have altered the natural landscape character to a moderate degree on about 50% of the planning area as shown in the last two columns of Table 3.15.1. The most visible impacts have most often resulted from energy development, mining, and past timber harvesting activity.

## Scenic Stability (San Juan National Forest only)

Scenery is dependent on a healthy ecosystem. Natural disturbance elements (including fire, flood, landslides, and avalanches) are normal ecosystem processes and create or perpetuate natural scenic conditions. In particular, wildfire is a disturbance factor that has been profoundly affected by fire suppression and other land management activities.

Current conditions in aspen and ponderosa forests place scenic quality in jeopardy because of a lack of age-class diversity, the encroachment of shade-tolerant fir, and the potential for catastrophic wildfires. Although many of the SJNF landscapes may seem as though they are in a naturally appearing state, there is a potential for these landscapes to change from forested to non-forested conditions. Due to past fire suppression, aspen and ponderosa forests may see large-scale changes from wildfires because of reduced age-class diversity and the encroachment of shade-tolerant fir.

BLM_0033431

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## Existing Conditions Related to Oil and Gas Development

To better describe the existing condition as it relates to oil and gas development within the planning area, this section focuses on the four areas where oil and gas development may occur: Paradox Basin (BLM), Paradox Basin (USFS), the NSJB, and the San Juan Sag. These areas include landscapes that generally having positive, but ordinary or common, scenic qualities, as well as portions of the landscape with low scenic quality. The existing scenic condition includes existing oil and gas leases on which development of 1,100 more wells and associated facilities may occur.

Throughout these four areas, particularly the northwestern portion of NSJB and the northern Paradox Basin, the landscape has been modified by agricultural, residential, commercial, transportation, and oil and gas development.

A typical well site and access road affects 4 to 5 acres. The existing visual impact of oil and gas development includes many facilities and components such as tanks, pumpjacks, wellheads, fences, and signs. Wells and associated structures can impact views at all distance zones in the BLM Paradox Basin and the NSJB, but are often screened by vegetation and/or topography at middle ground and background zones. Most of these existing visual impacts occur in foreground views within 0.5 mile of viewers. There are no wellheads currently in the SJNF portion of the Paradox Basin or the San Juan Sag area. Oil and gas facilities are often readily visible from nearby residences, recreational areas, highways, and county roads.

- **Paradox Basin (BLM):** Currently the scenic condition in this area is primarily VRI Classes III and IV, meaning human modification is evident to most viewers throughout the area. The basin also has some small, interspersed areas of VRI Classes I and II that have much less evidence of human activity and modification. This area has low sensitivity due to few viewers and low screening potential due to the predominantly open landscape. The BLM portion of the Paradox Basin contains uranium leases and has approximately 150 operating wells that give an industrial character to portions of the landscape within those areas. Native vegetation has been cleared and access roads constructed to access the wells. A total of 235 wells may be developed in the BLM portion of the Paradox Basin over the next decade under existing leases. The Paradox Basin also contains the Spring Creek HMA, the Dolores Canyon WSA, and other unique features associated with the basin and the Dolores River.  Therefore, although oil and gas development has potential to modify the visual appearance of the landscape, there are protections and terrain features that soften visual impacts across the geographic area of the basin.

- **Paradox Basin (USFS):** The current scenic condition for this area is moderate scenic integrity, which is a slightly altered landscape character. Due to the predominately open landscape, this area has low visibility with few viewers and low screening potential. It has a well-developed road network and substantial evidence of active vegetation management. However, it does not have the same level of oil and gas development as that of the BLM portion of the Paradox Basin.

- **NSJB:** The current scenic condition of this area is moderate to low scenic integrity, which is a slightly to moderately altered landscape character. Due to its mixed deciduous shrub and forest cover, this area has low to high visibility and medium screening potential. In the western portion of the area, approximately 300 wells have been developed on BLM, state, and private lands. An additional 750 wells may be developed on currently leased lands over the next decade. Also in the western BLM portion, five compressor stations are planned in an area where most of the current residential development also exists. There is currently substantial existing gas development visible from individual residences, county roads, and subdivisions, as well as from

424

BLM_0033432

within the WUI. There is visual impact from wells on NFS lands in the Saul's Creek area of the NSJB.

- **San Juan Sag Area:** The current scenic condition is moderate scenic integrity, which is a slightly altered landscape character with some locations of high and some locations of low scenic integrity. Due to varied terrain and forest cover, this area has moderate visibility and high screening potential. The San Juan Sag area has a well-developed road network; however, in other respects the area remains natural in appearance. There may be as many as 30 wells developed in the area at a rate of two wells per year.

In some areas, a legacy of oil and gas development has resulted in an accumulation of visual impacts. This limits the ability to conduct further future activities and still meet desired scenic objectives. Impacts attributable to oil and gas development include, but are not limited to, the following:

- Development of oil and gas has already resulted in visual impacts in the form of access roads, communication towers, well pad sites, pipeline corridors, compressor facilities.

- In some areas, recent exploratory activity for oil and gas has already resulted in impacts that may limit options for future activities in light of visual resource/scenery objectives for the areas.

- On BLM-administered lands, visual resources have to date been addressed on a site-specific basis, but the lack of a completed VRI for the BLM lands has pre-empted a landscape-scale approach to visual resources related to oil and gas development.

- Public concerns about maintaining scenic quality is increasing.

- Increasing WUI development is leading to increased demand for access roads, utility corridors, and cell phone relay towers. These facilities are changing the natural-appearing condition to a modified landscape where the where deviations strongly dominate the existing landscape character

- Large uninterrupted tracts of undeveloped lands are increasingly scarce and valued in the southwestern region, especially as residential development and populations grow.

Valued scenic and cultural landscapes associated with scenic byways remain in jeopardy of development and reduced scenic quality/integrity from a variety of sources, including oil and gas development. Larger numbers of visitors are anticipated to take up driving for pleasure as the overall population increases, and as the nation's population becomes older and less able to engage in more physically active forms of recreation away from primary road corridors.

## 3.15.3 Environmental Consequences

### Direct and Indirect Impacts

Alternative A for BLM lands indicates that all BLM lands are "unclassified" because VRM classes have never before been assigned within the TRFO. Therefore, Alternative A reflects the continuation of no VRM area allocation decisions. The LRMP results in the first formal VRM allocations for BLM lands. For NFS lands, Alternative A reflects scenery objectives from the previous LRMP that would remain in effect if no action were taken to change scenery objectives in this LRMP/FEIS. Alternative A therefore represents a baseline for this visual/scenery management analysis of the other alternatives.

Alternative B has the highest proportion of land area allocated as VRM Class III for the BLM, allowing for a larger degree of modification of landscapes. This allows more management flexibility for the

BLM_0033433

agency, yet still requires that human modification does not dominate viewsheds or cause the casual viewer to perceive the landscape as primarily unnatural in appearance. This alternative also has less acreage in the least protective categories (VRM III and IV, SIO low and moderate) than Alternative D, but slightly more than Alternative A. This would allow for a greater degree of modification to those areas than that of Alternatives A and C.

Alternative C has the highest proportion of acreage in more protective management classes (VRM I and II, SIO high and very high). This would lead to a greater degree of protection for natural landscapes and less impact to the natural appearance of planning area landscapes.

Alternatives A and D in general have the highest proportion of acreage allocated to less restrictive scenery/visual resource objectives (VRM III and IV, SIO low and moderate). However, VRM Class II acreage is higher in Alternative D than that of Alternative B. This allocation would allow for greater overall changes to occur within the landscape under this alternative dependent on future development and project activity scenarios.

The above comparisons are summarized in general in Table 3.15.3, below, which characterizes the proportion of the planning area that would remain natural in appearance under the various alternatives.

See Volume III, Appendix V, Maps 40–43 for scenic integrity objectives and VRM classes by alternative.

## Natural-appearing Landscape

The scenic integrity objectives very high, high, and moderate, and the VRM Classes I, II, and III would result in a relatively natural-appearing landscape. Alternative C would provide for more acres of natural-appearing landscape than would Alternatives A and D. This would be primarily due to the amount of oil and gas, timber harvesting, and fuels reduction activities expected under each alternative, as well as to the associated mitigation measures required for oil and gas development (stipulations).

## Impacts Related to Fire and Fuels Management

All of the alternatives would include treatment for fuels reduction (including mechanical and prescribed burns). Fuels reduction efforts may result in short-term negative scenic impacts, as well as a lowered scenic integrity due to cut vegetation, slash, and disturbed soils. Planning for scenic elements and adherence to standards and guidelines would minimize short-term impacts and reap long-term scenic benefits, meeting scenic integrity objectives.

Fuels reduction activities may result in a more stable forest condition, which may then better resist catastrophic wildfires. Without fuels reduction treatments, catastrophic wildfires may be more likely, and indirect negative impacts may be more likely to result from the use of bulldozers in fire suppression or development of roads for post-fire timber salvage. Natural disturbance factors, such as low-intensity wildfire, have the potential to alter the appearance of the planning area. Periodic low-intensity wildfire is a natural disturbance factor that may change scenic conditions; however, it may have no direct impact on scenic integrity. Generally, low-intensity fire (wild or prescribed) may result in long-term beneficial impacts to scenery.

Alternative D would propose to treat slightly more acres than would the other alternatives; therefore, it would result in the greatest impacts to scenery, in terms of short-term degradation and long-term benefits.

## Impacts Related to Vegetation Management

Timber management activities typically reduce scenic quality in the short term due to the associated visible slash, stumps, landings, and roads. In the long-term, harvesting activities may maintain or enhance scenic qualities and scenic stability, and the ability to resist insects, disease, and catastrophic wildfire. However, with proper planning prior to timber management activities taking place, treated areas should meet the adopted SIO within 2 to 5 years after harvest.

Historic treatments within the planning area have mostly included selective harvesting of ponderosa pine and mixed conifer, clear-cutting of aspen, and thinning of pinyon and juniper trees. Future treatments would use the same prescriptions. Selective tree cutting and partial cutting may enhance forest scenery in the long term. This is because this activity may result in more open park-like groves of trees, enhance structural and species diversity, create vistas, and reduce susceptibility to wildfire. Aspen clear-cutting may result in large-scale openings that have short-term negative elements (including stumps, slash, crushed trees, landings, disturbed soil and ground vegetation, and roads). In the long term, these openings may regenerate with highly valued groves of scenic aspen.

Under all of the alternatives, the short-term impacts related to timber management activities may be adverse. Long-term impacts may be positive to scenic values. Long- and short-term impacts to scenery would be the greatest under Alternative D, which would treat more acres and reconstruct more road miles than would Alternatives A, B, or C.

## Impacts Related to Facilities

The main variables that influence the number of new facilities, as well as the maintenance and restoration of old facilities, are budget, adherence to design guidelines, and partnerships. Since these variables are expected to be the same under all of the alternatives, the related impact to scenic integrity of managing existing facilities and developing new facilities is expected to be site-specific and similar under all of the alternatives.

## Impacts Related to Utility Corridors

The potential impacts of utility corridors on scenery may be the same under all of the alternatives. Site-specific analysis would be undertaken for projects involving new or existing utilities. When this occurs, scenic issues would be identified and addressed.

## Impacts Related to Roads and Trails

Impacts related to roads and trails may include higher road and trail densities within areas suitable for motorized recreation; increased soil and ground-cover disturbance associated with parking, dispersed camping, trail use, and motor vehicle travel; and increased number of signs and gates in the landscape. Alternative C would have fewer impacts related to roads and trails than would the other alternatives. This is due to the reduced area considered suitable for motorized recreation use under Alternative C, as well as the reduced road use for active management.

Travel routes may have a positive social benefit, in that they provide places for people to access and view scenery. From that standpoint, Alternative C would provide the least benefit.

Alternatives D, A, B, and C, respectively, would have the greatest to least adverse impacts to visual resources, even though the travel routes may have a beneficial impact by providing access for people to view scenery.

BLM_0033435

## Impacts Related to Air, Fish, Wildlife, Water, Invasive Plants, and Livestock Management

Potential impacts may be the same under all of the alternatives. Direct impacts may include site-specific construction of structures (including fencing, stock tank installation, water pipelines, and watershed protection structures). The impacts related to these elements would be local. Site-specific planning and design would be undertaken in order to limit adverse impacts to scenery while, at the same time, taking every opportunity to enhance scenery. As a result, these features may be installed so that they are noticeable to the casual observer, but do not dominate the view.

## Impacts Related to Fluid Minerals Management

The analysis of direct and indirect impacts involves approximately 435,000 federal acres on which as many as 170 new wells could be constructed (if the RFD scenario were completely realized). These wells and associated ancillary facilities may directly impact approximately 650 acres. Impacts from, and differences between, alternatives are herein described for the four areas where oil and gas development may occur: Paradox Basin (BLM), Paradox Basin (USFS), the NSJB, and the San Juan Sag.

The potential visual impact of oil and gas development may include components such as tanks, pumps, pits, compressors, pipelines, fences, and signs. Standard leasing stipulations, shown in Table 3.15.2, are incorporated in this LRMP to reduce, but not eliminate, visual impacts due to oil and gas developments.

**Table 3.15.2: Lease Stipulations Related to Recreation and Scenery**

| Recreation and Scenery | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Developed administrative and recreation sites:** Within 0.25 mile around developed administrative and/or recreation sites. | NSO | NSO | NSO | NSO |
| **Developed administrative and recreation sites:** Surface use or occupancy would be prohibited unless or until the operator demonstrates that operations can be acceptably conducted within 1 mile of developed administrative and recreation sites. | CSU | CSU | NSO | SLT |
| **SRMAs:** Durango, Dolores River Canyon, Silverton, Cortez. | SLT | CSU | CSU | SLT |
| National scenic byways, All-American Roads, and backcountry byways; designated scenic, recreation, and historic trails; and recreation-emphasis corridors: Within the identified foreground viewshed, up to 0.5 mile on either side of the following: San Juan Skyway, Trail of the Ancients, the Alpine Loop Back Country Byway, Old Spanish Trail, Continental Divide Trail, Colorado Trail, Calico Trail, Highline Loop Trail, East Fork Road, West Fork Road, First Notch Road, Piedra Road, Poison Park Road, Lime Creek Road, South Mineral Road, La Plata Canyon Road, West Dolores Road, and Durango-Silverton Narrow Gauge Railroad. | CSU/NSO | NSO | NSO | CSU |
| **Old Spanish Trail:** No surface-disturbing activities up to 0.5 mile of either side of the centerline of the congressionally designated trail in high potential | SLT | NSO 0.5 mile | NSO 5 miles | NSO 0.5 mile |

BLM_0033436

| Recreation and Scenery | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| segments. | | | | |
| **Old Spanish Trail-visual:** CSU for the horizon on either side of the centerline of the congressionally designated trail in high potential segments. | SLT | CSU | CSU | SLT |
| High SIO and VRM Class II Areas | CSU | NSO | NSO | SLT |
| **Area-specific** | | | | |
| Dolores River Canyon | NSO | NSO | NAL | NSO |
| IRAs | NSO | NSO | NAL | NSO |
| **State wildlife areas:** Bodo, Dan Noble, Dry Creek, Lone Cone, Lone Dome, Perins, Puett Reservoir, Williams Reservoir, Coalbed Canyon, Devil Creek, Fish Cr., Haviland, and Joe Moore. | SLT | NSO | NAL | CSU |
| WSRs | NSO | NSO | NSO | NSO |
| MA 8 - highly developed areas and ski areas (NSO) | NSO | NSO | NSO | NSO |
| Existing and proposed RNAs (NSO) | NSO | NSO | NAL | NSO |
| **ACECs:** Mud Springs (cultural), San Miguel Basin and Dove Cr. (Gunnison sage-grouse, plants), Gypsum Valley (soils and plants) | NSO- Mud Springs | SLT | NAL | SLT |
| Lands managed for wilderness charateristics | SLT | NSO | NAL | CSU |
| WSAs | NAL | NAL | NAL | NAL |
| NAL = Not available for lease. | | | | |

Under standard lease terms there is a higher degree of risk than with stipulations specific to visual mitigation that visual quality objectives would not meet visual management guidelines. For example, the inability to move a proposed operation more than 200 meters would make it unlikely that the operation would meet visual quality objectives in SIO very high or high (VRM II) areas.

The visual impacts of oil and gas development may change depending on the actual site-specific project location for each well and structure, as well as the leasing stipulations described under each alternative (see Table 3.15.4). Alternatives B, C, and D have potential for more well development and, consequently, more impacts. However, the action alternatives do have more restrictive stipulations aimed at the protection of scenic values than does Alternative A.

**Alternative Comparison – Oil and Gas Leasing:** Each alternative has different objectives for VRM and scenic integrity, which are coupled with and different stipulations. Alternatives B, C, and D prescribe CSU to selected viewsheds and areas with moderate SIOs and NSO stipulations to buffer scenic byways, national scenic trails, recreation emphasis corridors, and historic trails and protect scenic quality. The CSU and NSO stipulations of Alternatives B, C, and D would result in lower visual impact than leasing Alternative A, which prescribes less restrictive stipulations. Based on the projected number of wells developed under the leasing alternatives and the lease stipulations applied, leasing Alternatives A and D would have the greatest potential to impact visual quality followed by leasing Alternatives B and C. In all leasing alternatives, lease stipulations, standards, guidelines, and referenced management direction specified in Volume II, LRMP would be applied to mitigate the visual impacts of oil and gas development.

In Alternatives B, C, and D, NSO would be applied to foreground areas with a high SIO or VRM Class II for the purpose of protecting the scenic values of such areas. These two classifications are the areas where viewers would expect high scenic integrity within the foreground viewshed, and where

the landscape is to be managed for an overall high SIO. Oil and gas exploration and production is typically not compatible with the maintenance of a high scenic integrity (VRM Class II) in the foreground and middle ground distance zones. In Alternative A, standard lease terms would be applied to similar settings. Depending on the terrain and the proposal, standard lease terms would provide the highest risk of not protecting visual quality where there are high SIOs. A CSU stipulation would give the land managers more latitude to relocate proposed activities and minimize adverse impacts but the NSO more effectively mitigates potential impacts to visual quality by prohibiting surface occupancy.

A CSU stipulation would apply to mapped foreground areas with VRM Class III or moderate SIO in Alternatives B, C, and D. This stipulation would be used to assure that site selection and planning, design, and mitigation are applied within landscapes that have these scenery objectives and should satisfy concerns regarding visual impacts of oil and gas development in VRM Class III areas. These areas are places where people have a high or moderate concern for scenic quality and where, generally, active resource management is allowed and may affect the scenic and recreation setting. Alternative A would require the management constraints of standard lease terms only. Depending on the terrain and the proposal, standard lease terms under Alterative A have the highest risk of not protecting visual quality where some modification is allowed (e.g., high or moderate SIO or VRM Classes II and III).

NSO would apply to historic trails and recreation emphasis corridors within the identified foreground, up to 0.5 mile on either side of the following in the PLAA: San Juan Skyway, Trail of the Ancients, Old Spanish Trail, CDNST, Calico Trail, Highline Loop Trail, and West Dolores Road. The NSO stipulation would protect the integrity of viewsheds in scenic and cultural landscapes along significant touring routes and scenic drives. Typically these foreground viewsheds are the most sensitive in terms of visitor expectations for high quality scenery that is compatible with the special route designation. The visible evidence of oil and gas development would be considered inconsistent with the maintenance of high scenic integrity in the foreground of these routes in Alternatives B, C, and D, but not in A where standard stipulations apply.

The No Leasing Alternative would not make any additional BLM or NFS lands available for lease, so consequently lease stipulations do not apply under this alternative. Under the No Lease Alternative, oil and gas development would still proceed on existing leases. The potential visual impacts would be approximately one-half of that projected in Alternatives A through D and would be concentrated in the northwest portion of the PLAA.

The high oil and gas potential areas of the SJNF and TRFO are within a landscape that generally has positive, but ordinary or common, scenic qualities. The northwest portion of the planning area has been modified by agricultural, residential, commercial, transportation, and oil and gas development. Well structures currently impact views at all distance zones in the BLM portion of the Paradox Basin. There are no wellheads currently in the SJNF portion of the Paradox Basin. Most of these existing visual impacts occur in foreground views within 0.5 mile of viewers. Oil and gas facilities are readily visible from nearby residences, recreational areas, highways, and county roads.

Generally, the impacts to scenic resources would be the greatest in the sparsely vegetated, lower-elevation areas of the Paradox Basin and the NSJB. The visual impact of oil and gas development would depend substantially on terrain and vegetative cover (screening capacity). Furthermore, where varied terrain screens a development, the varied topography may result in extensive grading that could detract from scenic quality. To avoid this grading, oil and gas developments may be located on valley bottoms, which are places that may directly impact the views of traveling recreationists.

BLM_0033438

Final Environmental Impact Statement

The current scenic condition for the SJNF portion of the Paradox Basin is moderate scenic integrity, which is a slightly altered landscape character. Due to the predominately open landscape, this area has low screening potential. It has a well-developed road network and substantial evidence of active vegetation management; however, it does not have the same level of oil and gas development as that of the BLM portion of the Paradox Basin. The BLM portion of the Paradox Basin has approximately 90 operating wells that, in patchy areas, result in an industrial landscape character. Approximately 550 wells may be developed on future leases on the BLM and NFS lands in the Paradox Basin over the next 15 years. Full development of existing leases would add proportionally to the visual impacts over the life of the LRMP, although leasing stipulations and BMPs would be applied to all new wells and developments to mitigate these impacts.

The effects of oil and gas development depend substantially on successful application of BMPs. The scenic effects disclosed within this FEIS assume that appropriate BMPs are applied extensively to all oil and gas development, whether under existing leases or future leases, and address both site-specific and cumulative impacts.

In addition to the lease stipulations, management standards, guidelines, BMPs, and other referenced direction would be used to protect scenic resources. These requirements and the BMPs below, if not already expressed as a lease stipulation, would be made part of surface use plans of operation attached to APDs as COAs:

- USDA Handbook 701, Landscape Aesthetics
- USFS Publication FS-710, The Built Environment Image Guide (USFS 2001)
- BLM Handbook 8410-1, Visual Resource Inventory
- BLM Handbook 8431-1, Visual Resource Contrast Rating
- USDOI Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book. 4th ed. 2006 BLM/WO/ST-06/021+3071 (BLM and USFS 2007)
- USFS 2007 Final Decision for SJCBM Scenic Mitigations Conditions of Approval (USFS 2007a)
- Visual Resource Management for Fluid Minerals Best Management Practices (USFS 2007a)
- Visual Resource Management BMPs for Fluid Minerals (USFS 2007a)

**Visual Impacts of Linear Features, Well Pads, and Associated Facilities:** In the middle ground and foreground distance zones, well pads and access roads would be the most obvious feature of oil and gas development. Development of linear facilities (including oil and gas pipelines and roads) may involve clearing dense vegetation and construction on steep slopes. Pipeline, road, and well pad construction may present an obvious contrast in color with the surrounding vegetation. These cleared areas may be visually prominent at foreground and middle ground distance zones for more than a decade.

Disturbed areas associated with well pads, roads, and pipelines would be the most obvious immediately after construction. Impacts would decrease as the disturbed surface began to blend in color, form, and texture when interim reclamation occurs.

BLM_0033439

Visual impacts of well pads, roads, and pipelines would be the most obvious immediately after construction. Impacts would decrease when interim reclamation occurs and the disturbed surface began to blend in color, form, and texture. In the harsh conditions of portions of the PLAA, it may take 10 years or more to establish a cover of grasses and shrubs. If a well is non-productive, site reclamation would occur immediately. Approximately 10% of wells in the PLAA would be non-productive. When wells are abandoned, the facilities would be removed and the entire pad would be contoured and planted in order to blend with the existing topography and vegetation.

Short-term impacts may occur where construction-related equipment, activities, and dust would be visible to observers. During the 10- to 12-day construction period, the presence of heavy equipment and dust generated by construction and traffic may detract from the visual quality of the landscape at each well location. These actions may be visually intrusive to visitors and residents but are generally short term in nature. Visual impacts may be greater for well locations near residential areas, along roads, and in open areas that are not screened by topography or vegetation.

Modified landscapes would have long-term visual impacts at well sites, which may persist for as long as 50 years, depending on production period and reclamation. Long-term impacts may include vegetation removal, alteration of the landscape, and installation of equipment and facilities. These impacts may cluster in some highly productive locations, which may ultimately result in an industrial landscape character.

The most visible component of the proposed facilities would be the pumping units at each well site, as well as the clear-cuts associated with roads, pads, and flowlines. Gas-gathering and water pipelines would be buried adjacent to, or within, ROWs for existing and new roads. These impacts typically change the road character from narrow and rugged to wider lanes and clearance widths. This may have the effect of substantially changing the recreation setting, as well as degrading the natural appearance of the foreground. However, when compared to siting pipelines and utilities along separate cleared corridors, the overall visual impact to the landscape is often reduced.

When abandoned, the facilities would be removed and the wells plugged. The entire pad would be contoured and planted in order to blend with the existing topography and vegetation. Reclamation of the long-term visual disturbance from construction of well pads, roads, facilities, and pipelines would be a decades-long process, with a typically slow rate of vegetative recovery due to the arid conditions in the Southwest.

**Flaring and Compressor Lighting:** Other elements that may degrade scenic quality include activities or components of the facility that result in lighting contrasts (including flaring and lighting from compressor stations). Flaring is a common practice that occurs only when the well is being developed. It is estimated that only one to three wells would be flaring at any one time in the RFD area. Flaring would result in a short-term impact that may last from 3 to 5 days.

Nighttime lighting of compressor stations may be a long-term impact that could substantially degrade scenic quality. However, the use of motion-activated lights in combination with shielded and focused fixtures may greatly reduce or eliminate this impact.

**Table 3.15.3: Direct Impacts Related to Well Development**

| Well Facility (CBM and conventional) | Frequency of Occurrence[1] | Foreground (0–0.50 miles)[2] | Middle Ground (0.50–3 to 5 miles)[2] | Background (middle ground to infinity)[2] |
|---|---|---|---|---|
| Well head | Common | P | U | U |

BLM_0033440

| Well Facility (CBM and conventional) | Frequency of Occurrence[1] | Foreground (0–0.50 miles)[2] | Middle Ground (0.50–3 to 5 miles)[2] | Background (middle ground to infinity)[2] |
|---|---|---|---|---|
| Separator | Common | P | U | U |
| Meter house | Common | P | U | U |
| Pump jack (CBM) | Moderate | P | U | U |
| Dehydrator | Sporadic | P | U | U |
| Condensate tank | Sporadic | P | S | U |
| On-site water storage tanks | Moderate | P | S | U |
| Uncovered pit for produced water | Sporadic | S | U | U |
| Covered pit for produced water | Sporadic | S | S | U |
| Cathodic protection well | Sporadic | S | U | U |
| **Support Facilities** | | | | |
| Water injection well facilities | Sporadic | P | P | S |
| Compressor station/gas plant | Sporadic | P | P | S |
| **Linear Elements** | | | | |
| Access roads | Common | P | P | S |
| Gathering pipeline | Common | P | P | S |
| Transmission pipeline | Common | P | P | S |
| Well pad | Common | P | S/P[3] | U/S[4] |

[1]Sporadic occurance = very few structures; Moderate occurrence = found with only one type of well, optional components of well; Common occurrence = widespread, common distribution of wells

[2]P = prominent, dominates surrounding setting; S = subordinate, begins to attract attention; U = unnoticed, does not attract attention

[3]S if partially reclaimed, P if not partially reclaimed

[4]U if partially reclaimed, S if not partially reclaimed

### Effects of No Leasing Alternative

The effects to scenery of no new leasing would be much the same as what is described under the action alternatives as all valid existing leases would continue to be developed using BMPs regardless of this LRMP decision. If new leases were issued and fully developed under the life of the LRMP, there would be some additional impacts to visual and scenic resources due to the expanded scope of oil and gas development proportional to the newly leased land area leased. Under all oil and gas development scenarios, all future development would be consistent with BMPs and would be required to meet scenery and visual standards for protection of those resources throughout the SJNF and TRFO.

## Cumulative Impacts

Fuels reduction, timber sales, and oil and gas development activities combine to result in cumulative impacts to scenery within portions of the planning area, reducing the overall scenic integrity of the landscape. However, the limited geographic scope of oil and gas leasing, permit stipulations, and visual resource mitigation measures under BMPs would be employed to reduce these impacts to

acceptable levels within the various SIO/VRM zones. Table 3.15.6 shows a comparison of visual integrity per each alternative, which can be used to determine the relative magnitude of potential cumulative impacts for the alternatives.

The cumulative impacts related to oil and gas activity associated with new leases, combined with existing leases, may be major and extensive on portions of the planning area and be visually obvious to the casual observer. Approximately 170 new wells may be constructed on new leases under Alternatives B, C, and D. An estimated 1,000 wells may be permitted on existing leases over the next 15 years under all of the alternatives. The narrative below (and Table 3.15.6) summarizes the extent and magnitude of visual/scenic resource impacts in light of the variable development scenarios presented in the alternatives. When both existing and potential future oil and gas leases are considered together, these activities would increase impacts to visual and scenic resources. For example, if all existing and potential future leases were to be fully developed, the impacted area would essentially double across the landscape.

Cumulative visual impacts would also result from development of federal lands concurrent with development of private leases within or adjacent to the areas of projected development. Within the Paradox Basin, new oil and gas development totaling 700 wells is projected on private lands immediately adjacent to and to the west of the PLAA. This development could occur near and be visible from county roads that serve as a gateway to public lands. The private land development would increase the magnitude and extent of an industrial appearing landscape encountered by residents and visitors.

**Table 3.15.4: Cumulative Impacts Related to Oil and Gas Development**

| Alternative | Existing Condition | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Paradox Basin (BLM) | Change attracts attention but does not dominate views. Natural landscape character predominates. | Major modification of the natural landscape character. Management activities may dominate the view and are major focus. | Change attracts attention but does not dominate views. Natural landscape character predominates. | Change attracts attention but does not dominate views. Natural landscape character predominates. | Change attracts attention but does not dominate views. Natural landscape character predominates |
| Paradox Basin (USFS) | Natural landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Natural landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Natural landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Natural landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Natural landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. |

BLM_0033442

Final Environmental Impact Statement

| Alternative | Existing Condition | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|---|
| NSJB | Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. |
| San Juan Sag | Landscape character appears intact. Management activities are not visually evident. | Landscape character appears slightly altered. Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. | Landscape character appears slightly altered. Landscape character appears slightly altered. Management activities remain visually subordinate to the landscape being viewed. |

Cumulatively, oil and gas development in the RFD area may impact approximately 3,000 acres, or 1% of the RFD area in addition to the 2,100 acres of current impact. As many as 1,200 wells, as well as an unknown number of compressors, could be developed in the RFD area. Approximately 60% of these facilities would be on federal land.

The cumulative effects analysis includes existing oil and gas leases within the four areas on which development of 1,100 more wells and associated facilities may occur.

- **Paradox Basin (BLM):** Under all alternatives, there could be an additional development of 235 wells on already leased land. This may result in a VRM Class III if effective BMPs are applied. The industrial features of the oil and gas development would be visually evident in the landscape of the Paradox Basin. However, the cumulative effect on the landscape is expected to be partial retention of natural character.

- **Paradox Basin (USFS):** Under all alternatives, this area would achieve a moderate scenic integrity (slightly altered).

- **NSJB:** Under all alternatives, this area would achieve a moderate scenic integrity (slightly altered).

- **San Juan Sag Area:** Visual impacts of oil and gas development in the San Juan Sag area would be minor. The area where development may take place has terrain and vegetation to screen most development. Exceptions may occur where companies propose exploratory wells within a specific location in order to test a potential oil or gas trap. In such cases, there may be less flexibility to site facilities away from road corridors or to fully utilize screening techniques. Most well development in the San Juan Sag area would be exploratory in nature, and facilities may be temporary. These disturbed locations would present a visible contrast to the observer for a period of several years. The duration of this impact would depend on the application of BMPs and the success of reclamation.

BLM_0033443

## Other Contributing Factors

Residential and commercial growth would continue along U.S. Highway 160, as well as near many of the county roads north of U.S. Highway 160. Tourism travel would expose more visitors to areas of the Paradox Basin. Oil and gas well operations and facilities would gain greater visibility. Even with the best mitigation and development techniques, site planning, and facility design in the NSJB and the Paradox Basin (BLM), the extensive amount of development would result in viewers (primarily residents on private land and visitors traveling through) experiencing a landscape that is moderately altered by industrial features.

# 3.16 Heritage and Cultural Resources

## 3.16.1 Introduction

The planning area is situated in the heart of an area with a long and rich prehistoric and historic record. Native American occupation of the area dates back approximately 10,000 years. The archaeological record contains some of the earliest agricultural societies in the region. The historic period brought Spanish and Euro-American explorers, trappers, miners, and settlers into the region. This long record of human occupation has left one of the highest densities of prehistoric and historic heritage and cultural resources to be found in the United States. These sites have national, international, and Native American tribal significance.

Heritage and cultural resources are non-renewable resources that include historic and prehistoric artifacts, structures, sites, districts, and archival materials important for their scientific, educational, economic, and social values. Throughout the region advanced archaeological and historical research is an ongoing endeavor. There is a great public interest in visitation to heritage and cultural resources. This visitation is an integral part of the region's economy. Twenty-six Native American tribes and pueblos claim cultural affiliation with heritage and cultural resources located within the planning area.

The SJNF and TRFO are responsible for identifying, evaluating, and protecting heritage and cultural resources on the public lands they manage. The SJNF and TRFO have established an active heritage and cultural resource program that has focused on identifying, preserving, and interpreting heritage and cultural resources, as well as providing research opportunities for the most significant resources.

## Legal and Administrative Framework

## Laws

The laws, regulations, and policies below, in addition to the direction detailed in the LRMP, provide for the basis for USFS and BLM management of cultural and heritage resources within the planning area.

- **The Antiquities Act of 1906:** This act authorizes the President to declare federal lands as national monuments for the purpose of protecting sites and objects of antiquity.

- **The Historic Sites Act of 1935:** This act provided the earliest, and most basic, legislation for protecting cultural resources on federal lands. It provides misdemeanor-level criminal penalties to control unauthorized uses. Appropriate scientific uses may be authorized through permits, and materials removed under a permit must be permanently preserved in a public museum. The 1906

BLM_0033444

act is broader in scope than the 1979 Archaeological Resources Protection Act, which partially supersedes it.

- **The National Historic Preservation Act of 1966, as amended:** This act created the NRHP, the list of National Historic Landmarks, and the posts of State Historic Preservation Offices, with the intent of preserving historical and archaeological sites. The act requires federal agencies to evaluate the impacts of all government-funded construction projects through a process known as "Section 106 Review." Under the act, agencies maintain their own preservation program enjoined by advisory councils on historic preservation.

- **The National Environmental Policy Act of 1969:** NEPA promotes efforts that would prevent or eliminate damage to the environment and biosphere, and enrich the understanding of the ecological systems and natural resources important to the nation.

- **The Federal Land Policy and Management Act of 1976:** FLPMA declares that "…the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." It also states, "Terms and conditions must minimize damage to scenic and aesthetic values and fish and wildlife habitat and otherwise protect the environment."

- **The American Indian Religious Freedom Act of 1978:** This act established national policy designed to protect and preserve, for Native Americans, their inherent right of freedom to believe, express, and exercise their traditional religions (including the rights of access to religious sites, use and possession of sacred objects) and freedom to worship through traditional ceremonies and rites.

- **The Archaeological Resources Protection Act of 1979:** This act provides for the protection of archaeological resources and sites that are on public lands, and Native American tribal lands, in order to foster increased cooperation and the exchange of information between governmental authorities, the professional archaeological community, and private individuals.

- **The Native American Graves Protection and Repatriation Act of 1990:** This act provides a process for museums and federal agencies to return certain Native American cultural items (including human remains, funerary objects, sacred objects, and objects of cultural patrimony) to lineal descendants, culturally affiliated Indian tribes, and Native Hawaiian organizations.

- **National Trails System Act of 1968 (PL 90-543), as amended (2002):** This amendment to the National Trails System Act created the Old Spanish National Historic Trail.

## Executive Orders

- **EO 11593:** This EO provides for the protection and enhancement of the cultural environment.

- **EO 13007:** This EO provides policy with regard to Indian sacred sites.

- **EO 13084:** This EO provides policy with regard to consultation and coordination with Native American tribal governments.

- **EO 13195:** This EO provides policy with regard to "Trails for America in the 21st Century."

- **EO 13287:** This EO establishes federal policy designed to provide leadership in preserving America's heritage by actively advancing the protection, enhancement, and contemporary use of the historic properties owned by the federal government.

BLM_0033445

## Regulations and Policies

- **43 CFR 3**: This provides policy with regard to the preservation of American antiquities and implementing regulations for the Antiquities Act.

- **36 CFR 7**: This provides policy for the protection of archaeological resources.

- **43 CFR 10**: This provides policy in line with the Native American Graves Protection and Repatriation Act Regulations; Final Rule.

- **36 CFR 79**: This provides for the curation of federally owned and administered archaeological collections.

- **36 CFR 60**: This provides policy in line with the NRHP.

- **36 CFR 800**: This provides for the protection of historic properties.

- **BLM Manuals 8100, 8110, 8120, H-8120-1, 8131, 8140, 8150, and 8170**: These provide policy and program guidance for the management of cultural resources

- **FSM 2360, Revised 2008**: USFS Heritage Program Management

- **BLM Departmental Manual Part 411 Museum Property Management (1997)**

- **San Juan Public Lands Fire Management Plan and Appendix B—Polygons (2004) (USFS 2004d)**

- **BLM Emergency Fire Rehabilitation Handbook, H-1742**

- **BLM IM No. CO-90-072 (BLM 1990a)**: This provides policy regarding "Colorado Burial Discovery Procedures."

- **BLM IM No. CO-98-052 (BLM 1998)**: This provides policy regarding "Clarification of Cultural Resource Clearance Responsibilities and Maintenance on Ongoing Projects."

- **BLM IM No. CO-2000-016 (BLM 2000)**: This provides policy regarding "Disposition Policy on Native American Graves Protection and Repatriation Act (NAGPRA) Repatriated Museum Collections."

- **BLM IM IB No. WO-2002-002 (BLM 2002b)**: This provides policy regarding the "New Heritage Education Plan."

- **BLM IM No. CO-2002-029 (BLM 2002c)**: This provides policy regarding "Interim Historic Preservation Guidelines and Procedures for Evaluating the Effect of Rangeland Management Activities on Historic Properties."

- **BLM IB No. WO-2002-101 (BLM 2002d)**: This provides policy regarding "Cultural Resource Considerations in Resource Management Plans."

- **BLM IB No. WO-2003-093 (BLM 2003c)**: This provides policy regarding "Implementation of Executive Order (EO) 13287 and Preserve America Initiative."

- **BLM IM No. WO-2003-147 (BLM 2003d)**: This provides policy regarding "Application for Permit to Drill (APD) – Process Improvement #3 – Cultural Resources."

- **BLM IM No. WO 2004-020 (BLM 2004a)**: This provides policy regarding "Guidance for Recording Cultural and Paleontological Resource Locations for the Bureau of Land Management using Global Positioning System Technology."

BLM_0033446

- **BLM IM No. WO-2004-052 (BLM 2004b)**: This provides policy regarding "Assessing Tribal and Cultural Considerations as Required in IM-2003-233, Integration of the Energy Policy and Conservation Act (EPCA) Inventory Results into the Land Use Planning Process."

- **BLM IB No. WO-2004-154 (BLM 2004c)**: This provides policy regarding "Amendments to 36 CFR Part 800, Protection of Historic Properties."

- **BLM IM No. WO-2005-003 (BLM 2005c)**: This provides policy regarding "Cultural Resources and Tribal Consultation and Fluid Minerals Leasing."

- **BLM IM No. WO-2005-027 (BLM 2005b)**: This provides policy regarding "National Historic Preservation Act (NHPA) Section 106 and Oil and Gas Permitting."

- **BLM IM No. CO-2006-026 (BLM 2006c)**: This provides policy regarding "Cultural Resource Standards and Guidelines for Renewal of Right-of-Way grants and Temporary Use Permits under Section 106 of the National Historic Preservation Act."

- **BLM IM No. WO-2007-002 (BLM 2007d)**: This provides policy regarding "Disposition Policy on Native American Graves Protection and Repatriation Act Repatriated Museum Collections."

## Other Agreements

- Programmatic Agreement among the BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers regarding the manner in which the BLM would meet its responsibilities under the NHPA (BLM and the Advisory Council 1997).

- State Protocol Agreement between the Colorado State Director of the BLM and the Colorado State Historic Preservation Officer regarding the manner in which the BLM would meet its responsibilities under the NHPA and the National Programmatic Agreement among BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers (1998).

- Programmatic Agreement among the BLM, the State of Colorado, the USFS, the State Historic Preservation Office of Colorado, and the Advisory Council on Historic Preservation regarding the Management of Wildland Fire for Resource Benefits (Agreement No. 1102-002-98-038).

- Addendum 1 to the BLM Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning (BLM 2007e).

- Standard Range Recission Strategy for Cultural Resources, San Juan National Forest (USFS 2008d).

- Programmatic Agreement between the USFS and the Advisory Council on Historic Preservation, Regarding Rangeland Management Activities on NFS lands (USFS 2007c).

- Programmatic Agreement among the Advisory Council on Historic Preservation, the Colorado State Historic Preservation Officer, and the USFS Rocky Mountain Region, Arapaho and Roosevelt National Forests, Cimarron-Comanche National Grasslands, Grand Mesa, Uncompahgre and Gunnison National Forests, Medicine Bow-Routt National Forests, Pawnee National Grassland, Pike and San Isabel National Forests, Rio Grande National Forest, and San Juan National Forest Regarding the Reporting of Negative Results Cultural Resource Inventories (Advisory Council et al. 2010).

BLM_0033447

## 3.16.2 Affected Environment

### Existing Conditions and Trends

As of February 2012, BLM-administered lands within the planning area contained approximately 5,434 previously recorded heritage/cultural resources. As of February 2012, NFS lands within the planning area contained approximately 5,919 previously recorded heritage/cultural resources. These heritage/cultural resources represent a variety of site types and chronological periods. The estimated density of sites on BLM lands is approximately 16 sites per square mile. The estimated density of sites on NFS lands is estimated to be approximately 2.8 sites per square mile. Together, these resources document an almost continuous record of human occupation in the planning area for more than 10,000 years.

In general, cultural resources are identified through field inventories conducted by qualified professionals in order to comply with Section 106 of the NHPA of 1966. Informant information and historical records are also used to identify archaeological, historical, and traditional values. Three types of inventories are conducted in order to identify and assess these values on public lands: Class I, Class II, and Class III. An estimated 14% of the BLM lands and 9% of the NFS lands have been inventoried for heritage/cultural resources at the Class III level within the planning area. A majority of the Class III inventories were associated with federal undertakings where cultural properties needed to be identified and evaluated in order to protect significant values and to minimize impacts on these values.

Four Class I level overviews of prehistoric and historic resources in southwest Colorado encompass the planning area and provide a synthesis of available information (Collins et al. 2006; Duke1998; Lipe et al. 1999; Reed and Metcalf 1999). The *Class I of Cultural Resources Overview of Bureau of Land Management* by Collins et al. (2006) divides the BLM lands into 23 geographic units. A predictive model for each of these geographic units was developed that identifies areas with high, medium, and low site potential. This Class I overview also developed management recommendations for each geographic unit (including recommendations for archaeological inventory, monitoring, evaluating sites, and development of cultural RMPs).

Of the 5,274 known sites on the BLM lands within the planning area, 737 have been determined to be eligible for the NRHP, 3,959 have been determined to be not eligible for the NRHP, and 578 need more data before a determination of eligibility for the NRHP can be made. Of these eligible sites, three Historic Districts—Animas Forks Townsite, Gold Prince Mine, Mill and Tram, and the Tobasco Mine, Mill and Tram—and three sites, the Minnie Gulch Cabin, Placer Gulch Boarding House, and Prospect Gulch Cabin, have been listed on the NRHP. Of the 5,919 known sites on the NFS lands within the planning area, 1,132 sites have been determined to be eligible for the NRHP. Of these 1,132 eligible sites, 999 have been formally listed on the NRHP. This includes contributing sites within the Anasazi Archaeological District, Lost Canyon Archaeological District, Spring Creek Archaeological District, Falls Creek Archaeological Area, and Chimney Rock Archaeological District. There are three designated National Historic Landmarks that incorporate, or are adjacent to, public lands: Silverton National Historic Landmark, Durango-Silverton Narrow Gauge Railroad National Historic Landmark, and Shenandoah-Dives Mill National Historic Landmark. National historic trails traversing the planning area include the Dominguez-Escalante National Historic Trail and the Old Spanish National Historic Trail. Authorized by Congress in December 2002, the Old Spanish National Historic Trail commemorates the Santa Fe to Los Angeles route that forged the first overland link from Santa Fe to California. The BLM and NPS are currently writing a Comprehensive Management Plan and Draft EIS to guide the trail's development. While the Old Spanish National Historic Trail is currently mapped as

BLM_0033448

crossing the planning area, very few localities associated with the trail have actually been identified and ground-truthed.

The planning area currently has two special management areas on NFS lands designated for the protection and management of heritage/cultural resources, the Falls Creek Archaeological Area and the Chimney Rock Archaeological Area, and one on BLM lands—the Anasazi Culture Area ACEC. The Anasazi Culture Area ACEC was originally established in 1985. The majority of lands within the ACEC were designated as the Canyons of the Ancients National Monument in 2000. The lands remaining within the Anasazi Cultural Area ACEC are those lands referred to by the BLM Class I overview (2006) as the Mud Springs Geographic Unit (which still contains a high density of significant prehistoric sites). When Canyons of the Ancients National Monument was created the Mud Springs area was originally slated for inclusion, but for various reasons, was omitted from the monument designation.

The LRMP would add one additional special management area on NFS lands, the McPhee Special Management Area, and one special management area on BLM lands, the Mesa Verde Escarpment. Both of these special management areas would emphasize the protection and management of heritage and cultural resources. The LRMP would also expand the boundaries of the Chimney Rock Archaeological Area. Since 2009 there has been tremendous support from local, state, and federal public officials, organizations, and the public to designate the Chimney Rock Archaeological Area as a national monument, which would be managed by the USFS. Such a designation would provide for the long-term protection and recognition of these significant resources.

The planning area is situated at the boundaries of two distinct physiographic and cultural areas: the Rocky Mountains and the Colorado Plateau. Native Americans associated with the two cultural areas have lived on, or traversed through, the lands within the planning area for thousands of years. They hunted, fished, gathered plant foods, farmed, buried their dead, and conducted religious ceremonies on these lands.

The 26 Native American tribes and pueblos maintain active interests in the planning area (Table 3.16.1). Individual tribal members occasionally use public lands to gather plants or other native materials, and to hunt. Consultation efforts with these groups are ongoing. The tribes and pueblos have expressed concerns over the preservation and protection of specific archaeological sites. The Hopi have identified Falls Creek as an area of traditional interest to them. Ethnographic sources indicate that Hesperus Peak in the La Plata Mountains is considered sacred by the Navajo. To date, none of these sites have been formally established as Traditional Cultural Properties.

**Table 3.16.1: Tribes and Pueblos with Cultural Ties or Interests in the Planning Area**

| Tribe/Pueblo | | |
|---|---|---|
| Southern Ute Indian Tribe | Pueblo of Isleta | Pueblo of Sandia |
| Ute Indian Tribe (Uintah and Ouray Reservation) | Pueblo of Jemez | Pueblo of Santa Ana |
| Ute Mountain Ute Tribe | Pueblo of Laguna | Pueblo of Santa Clara |
| Navajo | Pueblo of Nambe | Pueblo of Kewa |
| Jicarilla Apache Tribe | Pueblo of Picuris | Pueblo of Taos |
| Hopi Tribes | Pueblo of Pojoaque | Pueblo of Tesuque |
| Pueblo of Zuni | Pueblo of San Felipe | Pueblo of Zia |
| Pueblo of Acoma | Pueblo of San Ildefonso | Pueblo of Ysleta del Sur |
| Pueblo of Cochiti | Pueblo of Ohkay Owingeh | |

BLM_0033449

## Cultural Chronologies

**Paleoindian Stage (11,500–5550 B.C.):** The Paleoindian stage represents immigrants to the New World who adapted to the environmental changes occurring at the end of the Pleistocene. Based on Paleoindian artifacts, hunting appears to have been the dominant form of subsistence, although in some environments gathering may have played a more significant role. Within the planning area, there are 13 Paleoindian sites recorded on BLM lands and 25 Paleoindian sites recorded on NFS lands.

Archaeological evidence of Paleoindians is limited within the study area. Still, current studies (cf. Pitblado 1993) maintain that there was a significant Paleoindian occupation within southwest Colorado, particularly associated with the Plano complex. Pitblado (1993) notes that not only are Paleoindian sites likely at higher elevations than archaeologists have looked in the past, but they may be under much deeper strata (i.e., Quaternary fill deposits) than normally recorded or researched through surface observation. More excavation and testing of these deposits for potential Paleoindian sites are needed in order to better understand their subsistence and settlement patterns (including the level of seasonal use of the area).

**Archaic Stage (6400–400 B.C.):** The Paleoindian stage transitioned into the Archaic stage, with a shift to a broader subsistence pattern. This pattern was characterized by an increased reliance on smaller animals, more varied projectile point types, an increased focus on gathering plant resources, and the construction of more labor-intensive, long-term habitation structures and pits. These traits may be spread over a slightly smaller geographic area than many of the Paleoindian complexes. There was a significant Archaic population in the planning area. Within the planning area, there are 211 Archaic sites recorded on BLM lands and 179 on NFS lands.

**Early Archaic (6500–3500 B.C) Pioneer Period (6400–4500 B.C.):** The Early Archaic is generally characterized by stemmed projectile points, side scrapers, and large bifacial knives. There may have been a population increase toward the end of the period (Duke 1998). Reed and Metcalf (1999) describe the Pioneer period as a time when Paleoindian populations became more sedentary, adopting seasonal settlement patterns.

**Middle Archaic (4500–1500 B.C.) Settlement Period (4500–2500 B.C.)/Transitional Period:** During the Middle Archaic, there was an apparent increase in population in the area, as well as the introduction of post-holed temporary dwellings. Generally speaking, the Settlement period represents more localized and predictable settlement locations, especially during the winter months. Daub architecture also developed at this time. Many of the traits of the Settlement period are still present in the Transitional period. During the Transitional period, populations may have become more seasonal in their utilization of resources found at higher elevations and slightly less sedentary, and they exhibited greater variability in their material culture (Reed and Metcalf 1999). These behavioral characteristics coincided with a population shift from higher to lower elevations, as the overall temperature rose sometime between 2000 and 1500 B.C. (Lipe et al. 1999). This shift marks the beginning of the Late Archaic.

**Late Archaic (1500–500 B.C.) Terminal Period (1000–400 B.C.):** In the southern Colorado River Basin, the Late Archaic saw a general reduction in mobility (Lipe et al. 1999:105). The reduced mobility coincided with maize use, as early as 1000 B.C., although a maize-based subsistence system did not develop until much later. In the northern Colorado River Basin, the Terminal period populations began to use the bow and arrow, processed more seed, and may have even experimented with maize horticulture, although perhaps to a lesser extent than populations to the south (Reed and Metcalf 1999).

BLM_0033450

**Formative Stage (1000 B.C.–A.D. 1300):** In southwest Colorado, the Formative stage marks the beginning of established maize, bean, and squash agriculture. This time was also characterized by less mobility and more sedentary settlement patterns, demonstrated by the use of permanent habitation structures. Hunting was accomplished using bow and arrow technology. Ceramics were manufactured during this time, as were maize-grinding implements and woven textiles. Within the planning area, there have been 538 Formative stage sites recorded on BLM lands and 1,700 on NFS lands. The Fremont and Ancestral Puebloan cultures are both Formative and exhibit these traits.

**Fremont Tradition (A.D. 200–1500):** Within the northern Colorado River Basin, Fremont sites are generally characterized by varying degrees of reliance on horticulture, as well as on four other characteristics: distinct coiled pottery, one-rod-and-bundle basketry, deer or mountain sheep moccasins, and a trapezoidal, anthropomorphic style of rock or clay figurines. Of these, the pottery is the most diagnostic of a Fremont site. This is due to its durability. The ceramics are more clearly associated with open artifact sites than with rock art (Reed and Metcalf 1999).

**Basketmaker II (1000 B.C.–A.D. 500):** Within the planning area, the highest concentration of Basketmaker II sites is in the vicinity of Durango. These sites sometimes appear more characteristic of the Navajo Reservoir Basketmaker occupation than other Basketmaker occupations within the region. In general, Basketmaker II characteristics across the southern Colorado River Basin include the use of maize and maize-grinding implements (with deeper basins than used previously by forager groups); the use of deer, elk, and mountain sheep; and later, some use of plain, coiled brown ware pottery. However, most sites outside the Durango area have no evidence of pottery and can be difficult to distinguish from Late Archaic and even Protohistoric Ute sites. The habitations from this period are typically shallow pithouses with slab-lined cists and beehive-shaped storage units. Site locations appear to be most common along bluffs and benches, and in rock shelters near ecologically diverse zones (Duke 1998).

There appear to be relatively few documented Basketmaker II sites within the planning area; however, there are difficulties with identifying these sites by surface inspection and survey methods alone. Many of these sites may have been assigned to the Archaic period by the original recorder (Lipe et al. 1999:152). In order to rectify this situation, excavation, testing, diagnostic artifact re-evaluation, and general research are priorities in order to refine the characteristics of Basketmaker II sites within the planning area.

**Basketmaker III (A.D. 500–750):** The Basketmaker III period is generally marked by the introduction of bow and arrow technology (Lipe et al. 1999:143). There is also evidence of the widespread use of maize and squash and the introduction of beans, as well as a corresponding decrease in hunting and the use of wild plants. Some of the habitations were utilized throughout the year, and the archaeological record reflects more activity areas associated with the habitations. Pithouses evolved, becoming gradually deeper and losing the antechamber. Some storage rooms were partially aboveground, and there was an increased number of storage features to accommodate more stored food (Duke 1998; Lipe et al. 1999). Chapin gray ceramics appeared early, followed by Chapin black-on-gray and Sambrito brown/utility wares. Both trough and slab metates were used during this period. Many Basketmaker III sites have been located near farmable land and pinyon-juniper woodlands, as well as on terraces or benches near rivers and other water sources (Lipe et al. 1999).

Basketmaker III sites have several distinctive characteristics; however, their small middens and mostly buried elements make it quite difficult to identify these sites through surface examination alone. For sites with subterranean habitations, subsurface testing and excavation are the best ways to identify and research these occupations (Lipe et al. 1999). With few Basketmaker III sites in the planning area having undergone testing or excavation, it is clear that more research is necessary.

BLM_0033451

Still, increased Class III survey coverage would undoubtedly shed light on the community and landscape level use of the area by Basketmaker III and other occupations.

**Pueblo I (A.D. 750–900):** Pueblo I sites represent a period when populations increased from around 2,000 to more than 4,000 people, distributed over nearly 2,000 square miles of southwest Colorado (Lipe et al. 1999). The habitations were occupied on more of a year-round basis than during the previous period; however, long-term residential occupations were still relatively short. Farming became such an important part of life that households were located close to arable lands. Communities with stockaded settlements became more prevalent than under the previous period, as did surface storage and surface habitation structures (Duke 1998; Lipe et al. 1999). Technological changes are evident in ceramics and projectile points. Pottery styles included plain gray ware, neckbanded, Piedra black-on-white, and Rosa black-on-white. Even some red-on-orange and black-on-red vessels are represented in the ceramic traditions for this period (while projectile points were thinner and side-notched) (Duke 1998:9; Lipe et al. 1999).

The field house was an architectural element that arose during this period. Although not likely used extensively until the Pueblo II and III periods, the presence of this architectural feature demonstrates increased intensification of agriculture, and its importance in the subsistence patterns of the people of this period and later. The unit pueblo was also developed during this period. The great kiva was also introduced, which represented a change in social organization (Lipe et al. 1999).

Pueblo I sites are fragile and they are deteriorating at a rapid rate (Lipe et al. 1999). In order to better protect and understand this period, more Class III block surveys, as well as testing and excavation, are needed in order to better understand the dynamics of the Pueblo I occupation of the planning area.

**Pueblo II (A.D. 900–1150):** The Pueblo II occupation of the southern Colorado River Basin began with a low population density, which gradually increased only to decline again toward the end of the period. Reed and Metcalf (1999) speculate that a small number of Pueblo II groups entered the northern Colorado River Basin during periods of population paucity (although site characteristics are too atypical to easily type the known sites or identify possible sites). Most of the existing recorded Pueblo II sites are situated within the southern Colorado River Basin. Chimney Rock Great House is an excellent example of a Pueblo II Chacoan Outlier.

**Pueblo III (A.D. 1150–1300):** The Early Pueblo III period (A.D. 1150–1225) is notable for a general population decline, then for a late dramatic population increase. Sites of the period became larger and aggregated into large mesa-top villages, with towers and some "great houses" incorporated into their community centers. Other archaeological evidence characteristic of Pueblo III is the production of Dolores and Mesa Verde corrugated wares, and McElmo and Mesa Verde black-on-white wares. Grooved stone axes were abundant, and triangular projectile points lacking stems are most notable (Lipe et al. 1999).

By the Late Pueblo III period (A.D. 1225–1300), populations continued to aggregate into large community centers. However, unlike previous periods, the people congregated into multi-story cliff dwellings or complexes near canyon rims and springs. Great houses were phased out, and tower complexes became more common. There was a rapid population decline at the end of the period, with a migration of area inhabitants to the southeast and southwest.

The Pueblo III period has been the most studied and researched; therefore, it generates more research questions. Although survey data are always helpful, more significant methods for answering research questions include excavation, testing, and climate studies, as well as more detailed analysis

BLM_0033452

of data and collections from the Pueblo III period. As an additional consideration, large communities from this period left a highly visible footprint on the landscape and exhibit massive, often still-standing architecture (including towers and cliff dwellings).

**Protohistoric (A.D. 1300–1880):** The Protohistoric is also called the Post-Puebloan by Lipe et al. (1999). The northern Colorado River Basin context protohistoric stage only includes Ute occupations, while the southern Colorado River Basin discusses Ute and Athabaskan (Navajo and Apache) peoples. Within the planning area, there are 62 Protohistoric sites recorded on BLM lands and 137 Protohistoric sites recorded on NFS lands.

**Protohistoric Ute (A.D. 1300–1881):** The Ute were the primary occupants of much of Colorado throughout the Protohistoric and historic stages, until historic Euro-American settlement. Unfortunately, the archaeological and early historical records of these peoples have been the least studied and understood. It should not be surprising, then, that the southern Colorado River Basin has no chronological sequence for discussing Ute occupation of the area. In the northern Colorado River Basin; however, more studies have been conducted and a basic chronology has been developed. This chronology is split into two phases by Reed (1988) and Reed and Metcalf (1999), the Canalla phase and the Antero phase.

The overall characteristics of the Protohistoric Ute are often considered an "extension" of the Archaic lifestyle. This similarity can make it difficult to distinguish sites from these two time periods. Ute subsistence, however, focused more on foraging than collecting, and their settlement patterns reflect their preference for high residential mobility over the logistical mobility of the Archaic groups (Reed and Metcalf 1999). Still, this is a differentiation that is often difficult to discern, except, perhaps, through excavation or a more intensive analysis of surface manifestations than has been done to date.

**Protohistoric Navajo (A.D. 1485–1760):** Similar to cultural remains of the Ute, little archaeological evidence points to a firm date for the first Navajo occupation of southwest Colorado. Oral traditions from modern Navajo groups detail an emergence from the San Juan Mountains. Hesperus Peak (Dibe nitsaa) is sacred and marks a portion of traditional Navajo boundaries (Lipe et al. 1999). Based on oral tradition, the Navajo occupation of the area started around A.D. 1485. Most Protohistoric Navajo sites in southwest Colorado likely date back prior to A.D. 1750, although some date to before A.D. 1700 (Lipe et al. 1999).

Problems associated with identifying both Navajo and Ute sites from the Protohistoric and historic periods are numerous. Material culture from Navajo, Ute, and Archaic contexts exhibit similar manifestations and infer similar functions. These peoples occupied and utilized similar environments and, sometimes, even the same landscapes. The later Ute and Navajo used much of the same material culture that Euro-Americans did, such that the cultural affiliation of artifact scatters can be difficult to distinguish. One of the biggest problems is the general lack of excavated Navajo and Ute sites within the planning area. Testing and excavation of sites, analysis of collected artifacts, and ethnographic overviews of the Navajo and Ute within the planning area are needed in order to increase the understanding of sites from this period.

**Historic (A.D. 1630–1950):** In spite of its obvious presence across the landscape of the planning area, the historic period is sorely understudied and even undervalued relative to the prehistoric period (Duke 1998). Historic archaeologists and historians need to conduct research on historic sites before the integrity and history of these sites are lost.

BLM_0033453

**Historic Ute (A.D. 1640–1950):** Prior to Euro-American contact, the Ute consisted of at least six bands that occupied portions of what is now Colorado: the Muache, Capote, Weminuche, Uncompahgre, Parasunuch, and Yampa. After Ute and Euro-American contact, a treaty was signed in 1863 that was intended to move the Ute to a reservation (so settlers could move in). After this treaty failed, the size of the reservation was reduced by the Treaty of 1868, which gave the settlers more land and more access to minerals in the mountains. Tension continued to build between the Ute and Euro-American settlers and miners. In 1873, the Brunot Agreement was signed, which moved the Ute to lands away from the San Juan Mountains. By 1881, all Utes had been moved out of western Colorado onto reservations in Utah or southern Colorado. Bands descended from the Muache and Capote were moved to the Southern Ute Reservation. Bands descended from the Weminuche were moved to the Ute Mountain Ute Reservation (Duke 1998; Husband 1984; O'Rourke 1980). Although these reservations were significantly reduced by 1934, each has now increased its size by purchasing surrounding lands (Duke 1998; O'Rourke 1980). The current limitation of Ute territory should not preclude archaeologists and managers from seeking archaeological evidence of these people within their former territories.

**Historic Euro-American (A.D. 1660–1950):** This portion of the chronology encompasses the history of all ethnic groups, other than Native Americans, who occupied the planning area. There are eight general themes represented within the planning area: 1) exploration, 2) mining, 3) transportation, 4) agriculture, 5) logging and lumber industry, 6) recreation and tourism, 7) federal activity, and 8) socio-cultural developments. Within the planning area, there are 512 historic Euro-American sites recorded on BLM lands and 773 historic Euro-American sites recorded on NFS lands.

## Trends

Within the planning area, heritage and cultural resources are currently facing numerous impacts from natural and human disturbances. Over the last 10 years, the San Juan region has experienced unprecedented growth and development. This trend is expected to continue and increase. Growth and development may impact non-renewable heritage and cultural resources, both directly and indirectly. Direct impacts may include disturbance from construction, vandalism, and excessive or inappropriate visitor use. Indirect impacts may include accelerated erosion and visual impacts to cultural landscapes. Once these resources are destroyed, they are lost forever. Implementation of the standards and guidelines, oil and gas stipulations, and the objectives for heritage and cultural resources as outlined in the LRMP should help reduce these impacts to heritage and cultural resources.

In addition to impacts from natural and human disturbances, there is a trend for decreasing USFS and BLM budgets while, at the same time, workloads are increasing. This trend hampers the ability to conduct a proactive heritage and cultural resource program. In order to help address the increasing impacts and decreasing budgets, there is a trend toward increasing opportunities for greater public participation and partnerships in heritage and cultural resources management. The goal of these partnerships is to instill a sense of ownership in visitors and to conduct proactive preservation, research, education, and interpretative projects. This is identified as a high priority goal for heritage and cultural resources in the LRMP.

## Use Categories

BLM planning and manual guidance stresses the importance of meeting specified goals through the allocation of all cultural properties within the planning area into defined "use categories," based on their nature and relative preservation value.

BLM_0033454

Sites located on BLM lands have been allocated to the following use categories (some sites have been allocated to more than one use, and 693 sites are unallocated).

- **Scientific Use:** Under this category, sites would be preserved until research potential is realized (592 sites).

- **Conservation for Future Use:** Under this category, sites would be preserved until conditions for use are met (44 sites).

- **Traditional Use:** Under this category, there would be long-term preservation of sites (0 sites).

- **Public Use:** Under this category, there would be long-term preservation and on-site interpretation (7 sites).

- **Experimental Use:** Under this category, sites would be protected until used (3 sites).

- **Discharged from Management:** Under this category, sites would be removed from protective measures (608 sites).

Sites may be placed into more than one use category. For example, a prehistoric site with little or no scientific value may be placed under a discharged from management category, but may also, however, be useful under the experimental use category. Similarly, a historic site may be placed in the public use category, but may still require stabilization and preservation efforts and, therefore, warrant placement under the conserve for future use category as well.

## Priority Heritage Assets

Priority heritage assets are those USFS heritage assets that are, or should be, actively maintained. In order to be considered a priority heritage asset, an asset must meet one or more of the following criteria:

- The significance and management priority of the property is recognized through a special designation (e.g., listing on the NRHP or State Register of Historic Properties).

- The significance and management priority of the property is recognized through prior investment in preservation, interpretation, and use.

- The significance and management priority of the property is recognized in an approved management plan.

- The property exhibits critical deferred maintenance needs, and those needs have been documented.

The SJNF and TRFO are in the process of designating priority heritage assets.

### 3.16.3 Environmental Consequences

### Direct and Indirect Impacts

Under all of the alternatives, the heritage/cultural resource program would provide support to all resource projects, as required by Section 106 of the NHPA. Prior to any federal undertaking within the planning area, the SJNF and TRFO must consider impacts to heritage and cultural resources. Under all of the alternatives, the preferred management strategy for eligible sites would be to avoid and protect these sites from direct, indirect, and cumulative effects. Eligible sites are non-renewable resources, and they would lose integrity, heritage value, and potentially important information if they were destroyed or altered. Measures would continue to be implemented in order to avoid the impacts

BLM_0033455

to sites under federal jurisdiction. Treatments designed to minimize or mitigate adverse effects to eligible properties may include project relocation, redesign or modification, physical protection measures (including fencing or padding), stabilization, restoration, rehabilitation, documentation, monitoring, repair, and data recovery. Any treatment of an eligible site must be consistent with federal standards and other guidelines, policies, and directions.

In addition, under all of the alternatives, the program would include proactive inventory, documentation, analysis, preservation, monitoring, stabilization, research, stewardship, and public interpretation and education.

Generally, adverse impacts may result from ground-disturbing activities that damage archaeological sites or disrupt cultural landscapes (reducing their information potential). Generally, beneficial impacts may result from minimizing or preventing surface disturbance and avoidance of archaeological sites, as well as from measures used to protect sites. There is also a direct relationship between the number of acres disturbed through project implementation and the number of acres surveyed for heritage/cultural sites. This relationship also exists for the number of heritage/cultural sites located and evaluated.

In spite of inventories, the potential exists for undiscovered sites to be exposed and/or damaged by surface disturbance and/or other events. These sites may, or may not, be noticed in time to allow mitigation. This damage would represent an unavoidable adverse impact related to management activities and programs, which may be similar under all of the alternatives.

There would be some irreversible loss of heritage/cultural resources regardless of the alternative selected. Examples include inadvertently damaged or destroyed sites, vandalized or looted sites, and sites undergoing loss from natural processes. Every alternative would seek to minimize this loss through inventory and evaluation, monitoring, preservation and stabilization, research, interpretation, education, and improved project implementation.

It is difficult to measure individual adverse impact components; therefore, the number of acres of ground disturbance may be used as a relative comparison of alternatives. Estimates of disturbance were compiled from the comparison of alternatives (see Chapter 2). Given the enormity of the planning area (more than 2.5 million acres) and the diversity of its landscapes (which results in a wide variability of heritage/cultural site densities, ranging from three sites per square mile to more than 100 sites per square mile), it would be very difficult to make reasonably accurate quantitative assessments of impacts without activity locality information. Therefore, a descriptive, qualitative analysis of the impacts is presented.

Direct impacts may result from natural events, as well as from human activities that can damage heritage resources or alter their settings. Examples may include surface disturbance, soil compaction, erosion, heating and freezing, wildfire, prescribed burns, livestock trampling, OHV use, alteration of a heritage/cultural resource setting and/or landscape (including introduction of atmospheric or audible intrusions), potential loss of protection for undiscovered heritage/cultural resources if land is transferred from federal to non-federal ownership and from unauthorized uses (including looting of artifacts).

Indirect impacts to cultural resource sites are not always as obvious or immediate as direct impacts and may include impacts that occur off-site from project areas. Indirect impacts may include accelerated erosion due to increased traffic, construction, loss or changes of vegetation, and changes in drainage patterns, as well as inadvertent damage from increased visitation to sites not previously accessible and not "hardened" for public use (which may also result in increased vandalism and

BLM_0033456

removal of artifacts). Projects may also result in piecemeal or incremental loss or degradation of the various elements of integrity such as setting, feeling, association, and location (which includes visual and auditory elements) that may be integral to the cultural landscape and individual site significance. In general, impacts to cultural resources would be managed by applying appropriate surveys and standards and guidelines, and through law enforcement support and education, as appropriate.

## Impacts to Heritage and Cultural Resources from Oil and Gas Management

This FEIS ROD would provide a leasing availability decision to identify areas available to oil and gas leasing. There are two additional NEPA review stages that would occur prior to any ground-disturbing activities associated with oil and gas development. The Leasing Availability Decision considers broad areas in the planning area and is not site specific enough to make quantifiable assessments of the impacts to cultural resources. This analysis is therefore qualitative rather than quantitative. Potential specific adverse impacts to heritage and cultural resources related to oil and gas development would be properly addressed under project-specific oil and gas EAs.

Development of oil and gas would involve local areas of earth disturbance (including the well pad, laydown and support areas, access roads, pipelines, and additional support facilities, such as meter stations and water handling facilities). Any earth-disturbing activities may destroy or diminish heritage/cultural resources, as well as the setting and context that are part of their importance. Direct physical impacts to heritage/cultural resources related to the construction and operation of oil and gas facilities may be immediate and irreversible; however, most of these impacts would be avoidable through the Section 106 process. It is expected that these impacts may be localized.

In addition to the general direct impacts described above, indirect physical impacts related to oil and gas development to heritage/cultural resources may also include deterioration of structures or rock art from vibration, dust, or exhaust produced by construction or operation. Erosion and changes to vegetation that result from off-site construction may also change the characteristics and integrity of a site. If the setting and feeling of a site are essential elements of its importance, visual or auditory intrusions or deterioration of the local environment would also constitute indirect impacts to the aesthetic quality of the site. An additional potential indirect impact may result when development of oil and gas access roads makes some areas more accessible to motorized vehicles. This accessibility may result in the potential for more people to visit sites and, thereby, increase the chance for unintentional deterioration or intentional vandalism. This may be mitigated by closing access roads to public traffic.

Over the long term the combined direct and indirect impacts described above may result in a net loss or degradation of heritage/cultural resources. This cumulative effect may be compounded especially as the density and quality of roads is increased in areas that were not previously easily accessed.

It is projected that over the life of the FEIS, 2,930 acres may potentially be disturbed by oil and gas development on lands currently leased. The Leasing Availability Decision in this FEIS/ROD may make additional acres available for disturbance by oil and gas development. These are additional acres that are within the PLAA and the San Juan Sag. The PLAA covers a large portion of the western half of the planning area and has a great variety of topographic and environmental settings. This variety of landscapes and resources has resulted in a highly variable archaeological site density that varies from low to high throughout the PLAA. Archaeological sites within the PLAA range in age from Paleoindian to historic, providing a complete record of human occupation in southwest Colorado. Archaic sites are especially prominent in the northern half of the PLAA, a time period that has been little studied in this region and is poorly understood. Portions of the southern half of the PLAA have a moderate to high density of Ancestral Puebloan sites. In general, the San Juan Sag has a low

BLM_0033457

archaeological site density. The few archaeological sites that have been recorded in the San Juan Sag range in age from Archaic to historic.

The potential acreage to be disturbed by oil on gas development on lands that may be made available for leasing by this FEIS/ROD varies by alternative. The lands proposed for oil and gas leasing under Alternative A could result in an additional 4,430 acres of disturbance, Alternative B could potentially result in an additional 3,873 acres of disturbance, Alternative C could potentially result in an additional 3,150 acres of disturbance, and Alternative D could potentially result in an additional 4,256 acres of disturbance, while the No Leasing Alternative would result in no additional acres disturbed. All ground-disturbing activities would undergo Section 106 inventory, evaluation, and consultation. Avoidance or mitigation measures would be utilized where eligible heritage/cultural resource sites are present. Standard lease terms would apply to all proposed oil and gas exploration and development. In addition to the standard lease terms, Table 3.16.2 outlines the lease stipulations specific to heritage and cultural resources that would be applied by alternative.

**Table 3.16.2: Lease Stipulations for Heritage and Cultural Resources**

| Resource | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| National Register Districts<br>National Register Districts: Lost Canyon, Spring Creek<br>**Proposed National Register Districts:** Saul's Creek, Peterson Gulch, Turkey Creek, Armstrong Ritter, Mesa Verde Escarpment, Anasazi Culture Area ACEC, Bull Canyon Rock Shelter, and Indian Henry's Cabin | SLT; NSO | NSO | NAL | NSO |
| Chimney Rock National Monument; Falls Creek Archaeological Area; Anasazi National Register District | NAL | NAL | NAL | NAL |
| Old Spanish National Historic Trail | SLT | NSO 0.5 mile | NSO 5 miles | NSO 0.5 mile |
| Viewshed for the Old Spanish National Historic Trail | SLT | CSU | CSU | SLT |
| Viewshed for the Chimney Rock Archeological Area | SLT | NSO | NAL | CSU |
| Viewshed for the Glade Guard Station, and Aspen Guard Station | SLT | CSU | NSO | SLT |

<u>Comparison of Oil and Gas Development Alternatives:</u>

Under all of the alternatives, impacts to heritage and cultural resources from oil and gas development would be alleviated through identification, avoidance, and/or mitigation. However, a minor amount of direct and indirect impacts may still result during surface-disturbing activities due to unanticipated discoveries of heritage and cultural resources, off-site erosion, and increased access to heritage and cultural resources. Therefore, Alternative A, which authorizes the largest amount of acres to be leased, and consequently disturbed, could result in the largest amount of impacts to heritage and cultural resources. This would be followed by Alternative D, which has the second highest amount of acres to be leased and disturbed by oil and gas activities. Alternative B would have less potential impacts to heritage and cultural resources than Alternatives A or D. Alternative C would have less potential impacts to heritage and cultural resources than Alternative B, while the No Leasing

BLM_0033458

Alternative would have the least potential impacts to heritage and cultural resources than all of the other alternatives.

Alternative A would also provide for the least amount of protection for cultural resources, as in most instances only standard lease terms apply. The exceptions are Chimney Rock Archaeological Area, the Falls Creek Archaeological Area, and the Anasazi Archaeological District, which are not available for lease, and NSO for Indian Henry Cabin, the Bull Canyon Rock Shelter, and the Anasazi Culture Area ACEC, which are included in existing management plans.

In addition to the lease stipulations specific for heritage and cultural resources outlined in Table 3.16.2, standard lease stipulations and Section 106 of the NHPA would apply to all oil and gas exploration and development. It is, therefore, expected that oil and gas management may have minor direct adverse impacts to heritage/cultural resources. However, given the high site density of some areas within the proposed PLAA, direct impacts to cultural resources may be unavoidable, in which case mitigation of these impacts would have to occur. Mitigation measures could include excavation. While excavation is beneficial as it expands the archaeological knowledge base, it also results in the loss of archaeological resources and is considered an adverse effect under the NHPA. Indirect and cumulative impacts related to oil and gas management may be minor to moderate, especially in areas with high site densities.

Section 106 archaeological surveys and excavations associated with oil and gas development have long been a major contributor to our knowledge and understanding of heritage/cultural resources. This beneficial impact to archaeology and cultural resource management may continue under all of the alternatives.

Under a no new oil and gas leasing scenario the anticipated minor to moderate indirect and cumulative effects to heritage/cultural resources would not occur, which would be an overall positive benefit to these resources. However, the information regarding heritage/cultural resources that is obtained through Section 106 archaeological surveys and excavation associated with oil and gas development would not be gained.

<u>Cumulative Effects to Heritage and Cultural Resources from Oil and Gas Development</u>

Throughout southwest Colorado, past, current, and future oil and gas development has occurred and is projected to continue to occur within areas that have vary from low to high potential for heritage and cultural resources. Due to the lack of specific location data for oil and gas development, it is not possible to make a quantitative analysis of the cumulative effects of this development on heritage and cultural resources. The oil and gas development that has occurred and is projected to occur on federal lands both leased and currently unleased has been and would continue to be subject to the laws and regulations that protect heritage and cultural resources. However, oil and gas development that has occurred and would continue to occur on private lands with private minerals has not been, and would not in the future be, conducted with the above listed protection and mitigation measures. Therefore, cumulative impacts to heritage and cultural resources on private lands/private minerals could be minor to major, especially when oil and gas development is focused on private lands/private minerals to avoid the costs/restrictions associated with federal protection and mitigation measures.

Over the long term the combined direct and indirect impacts described above could result in a cumulative net loss or degradation of heritage and cultural resources as a result of oil and gas development and the lack of protective laws and regulations for private lands with private minerals. All of the alternatives could result in minor to moderate cumulative impacts especially in areas with high potential for heritage and cultural resources.

BLM_0033459

Cumulative impacts could also occur to heritage and cultural resources as a result of non-sanctioned activities (including vandalism, looting, or illegal excavation). Efforts to control and monitor these activities on public lands would be similar under all of the alternatives and could, therefore, result in a similar minor to moderate level of cumulative adverse impacts to heritage and cultural resources.

## Impacts to Heritage and Cultural Resources from Recreation Management

Recreational use of public lands has increased dramatically over the last 25 years and would most likely continue to increase. Recreational use of the planning area may result in unintentional damage to cultural resources that, although individually minor, may result in widespread, adverse impacts through time. Examples of such impact include robbing boards from historic structures for campfires; creating routes through sites (which accelerates erosion); sitting, standing, or climbing on walls; shooting or defacing rock art panels; and collecting artifacts or relocating artifacts by creating "collector's piles." Some forms of vehicle-assisted recreation may damage sites directly or indirectly by accelerating erosion and/or increasing site accessibility for vandalism and looting. Such impacts have been well documented on the SJNF and TRFO and elsewhere. In 2011 there were three incidents of visitors to the ghost town of Animas Forks removing boards from the historic buildings. From 2011 to 2012 there were four incidents of graffiti in the Falls Creek Rockshelters. The Falls Creek Rockshelters contain very significant 2,000-year-old pictographs. The impacts documented in the reports "The Destruction of Archaeological Sites and Data," by Nickens (n.d. [1990]), and "Site Condition and Vandalism Assessment of Archaeological Sites, Lower and Middle Arch Canyon, San Juan County, Utah," by Spangler (2006) are just a couple examples of recreation impacts to heritage and cultural resources that are very similar to those occurring on the SJNF and TRFO. These recreation-related impacts range from minor collector piles to major impacts and loss of archaeological deposits.

Three new SRMAs would be proposed under Alternatives B, C, and D. The existing Silverton SRMA would be greatly expanded in Alternative B, C, and D. In general, managed recreation, as proposed by the SRMAs, would result in less potential impacts to cultural resources than would dispersed, unmanaged recreation. However, these benefits may not be realized if recreational impacts to heritage and cultural resources are not monitored and mitigated (especially if recreational use dramatically and/or unexpectedly increases as a result of focused management).

Historic cultural resources have long been a focus of management in the Silverton SRMA and would continue to be a focus under all of the alternatives. However, as stated above, the projected increased recreation use would require ongoing monitoring, proactive preservation, education, and mitigation of potential impacts (as directed in the *Alpine Loop Cultural Resource Management Plan* [BLM 1992]).

The Durango SRMA would focus on non-motorized recreation (including hiking, mountain biking, and rock climbing). The BLM Class I overview (Collins et al. 2006) identifies Grand View Ridge as an area of high potential for cultural resources. Grand View Ridge would be included in the Durango SRMA. Additionally, three known rock art sites are currently in an established popular rock climbing area within this proposed SRMA. Under all of the alternatives, the development of trails and facilities would take place under Section 106 of the NHPA; therefore, impacts to cultural resources would be avoided or mitigated. The focused recreation management direction provided by the SRMA under all of the alternatives may result in beneficial impacts to cultural resources.

The Dolores River SRMA would focus on river recreation. There are a high number of cultural resources present and river-related use is topographically constrained; therefore, this area would have a high potential for impacts to cultural resources. Sites in this area that are visible from the river

would be especially at risk from camping, frequent visitation, or vandalism. These impacts may be the same under all of the alternatives. As stated above, a directed management approach provided by the SRMA may limit adverse impacts to cultural resources.

The Cortez SRMA would provide motorized and non-motorized recreation. This area contains the Mud Springs Geographic Unit, as identified in the BLM Class I overview (Collins et al. 2006), which is the remnant Anasazi Culture Area ACEC. It would also include the Stinking Springs Geographic Unit. These areas have a high density of significant and sensitive sites. Due to their proximity to Cortez, these areas currently experience a large volume of cross-country OHV use, which can result in extensive direct damage to cultural resources. Indirectly, the use of OHVs may damage or destroy vegetation, inorganic surface crusts, and natural ground cover, and may also result in visual and auditory impacts. Erosion and compaction of soils and alteration of soil stratigraphy may result from motorized recreation. Increased looting and vandalism may also take place. These impacts may result in the loss of site integrity and significance. Such impacts have been well documented within the SJNF and TRFO and elsewhere. An example is MacMillan's (2007) *Mud Springs Travel Management Cultural Resources Inventory Project, Montezuma County Colorado* (SJ07038) report, which documented OHV damage and looting on five archaeological sites within the project area. These impacts ranged from moderate to major and included the destruction of subsurface features, impacts to human burials, and heavy looting.

Under Alternatives B, C, and D, a management plan would be developed for the Cortez SRMA. This plan would designate routes and trails in order to avoid cultural resources and develop monitoring plans and mitigation (if impacts are identified). As stated above, SRMA designation may result in beneficial impacts through more focused management direction. Under Alternatives B and C, Mud Springs would be removed from the SRMA to emphasize protection of the Anasazi Culture Area ACEC. Therefore, Alternatives B and C would provide more protection for these cultural resources.

**Comparison of Recreation Management Alternatives:** In general, Alternatives B, C, and D may result in similar potential beneficial impacts to cultural resources in the Silverton, Durango, and Dolores SRMAs. The potential benefits would not be realized under Alternative A for these SRMAs, as this alternative does not provide for SRMAs in those areas. A smaller area of the Silverton SRMA would be provided under Alternative A. Alternatives B and C would provide more protection for cultural resources, as the Anasazi Cultural Area ACEC would be removed from the Cortez SRMA

Under all the alternatives, recreation may have a minor to moderate impact on cultural resources in the Silverton SRMA due to the highly visible and fragile nature of its historic resources and the potential for unauthorized recreational impacts in this remote area. Under Alternatives B, C, and D, recreation may have a minor impact to cultural resources in the Durango and Dolores SRMAs due to unauthorized recreational impacts and unanticipated discoveries during the Section 106 process. Recreation may have a minor to moderate impact to cultural resources in the Cortez SRMA under Alternatives A and D, again due to unauthorized recreational impacts and unanticipated discoveries during the Section 106 process. Alternatives B and C could provide more protection for cultural resources in the Cortez SRMA, as the Anasazi Cultural Area ACEC would be removed from the SRMA under these alternatives.

## Impacts to Heritage and Cultural Resources from Travel Management

OHVs driving over heritage/cultural sites may result in major direct impacts. Indirectly, the use of OHVs may damage or destroy vegetation, inorganic surface crusts, and natural ground cover. OHV use may also result in visual and auditory impacts. Erosion and compaction of soils and alteration of soil stratigraphy may result from motorized recreation. Increased looting and vandalism may also take

BLM_0033461

place. These impacts may result in the loss of site integrity and significance. These impacts have been well documented in the SJNF and TRFO and elsewhere. MacMillan's (2007) report mentioned above notes these types of impacts. Wise's (2010) *Cultural Resource Inventory of the Beaver Meadows and Sauls Creek Landscape Travel Management Route Designation Project, La Plata, Archuleta and Hinsdale Counties, Colorado* also documents similar impacts. Impacts from OHVs that caused erosion, damage to artifacts, and collection of artifacts have ranged from minor to major. Motorized travel over snow may result in negligible, if any, impacts to heritage/cultural resources.

Implementation of the 2005 travel management regulations and the 2012 Colorado Roadless Rule would greatly reduce the impacts to heritage/cultural resources by directing motorized travel to designated routes. Travel on designated routes may still have the potential to directly and indirectly impact heritage/cultural resources that have not been avoided or hardened for such use. Designation of specific travel routes would be developed under a travel management plan, which would require a separate NEPA process from this LRMP/FEIS. As part of that separate NEPA process, impacts to heritage/cultural resources on BLM lands within the planning area would be addressed in accordance with *Addendum 1 to the Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning.*

**Comparison of Travel Management Alternatives:** This FEIS identifies areas that are suitable for over-ground and oversnow travel by alternative. Alternatives B and C would designate the largest amount of acreage as not suitable for over-ground motorized travel; therefore, these alternatives may have the least potential to impact heritage/cultural resources. Alternatives A and D would designate the largest amount of acreage as suitable for motorized travel; therefore, the potential for ground disturbance and impacts to heritage/cultural resources may be the highest under those alternatives.

## Impacts to Heritage and Cultural Resources from Fire and Fuels Management

Wildfires and prescribed burns have the potential to directly impact heritage/cultural resources (by burning wooden historic and prehistoric structures and damaging or destroying flammable artifacts and features of archaeological sites, such as wickiups, tepee poles, tree platforms, and brush game drives). Non-flammable artifacts, such as lithic materials, may be impacted by high-intensity fires. Rock art may also be damaged by fire and smoke. Activities carried out under emergency situations in order to control a wildfire (including the construction of firelines) may also directly damage heritage/cultural resources. Indirect impacts related to fire include post-fire erosion losses resulting from burned vegetation cover and hydrophobic soils, deterioration and weathering after the artifacts and features are initially damaged by extreme temperatures, changes in the landscape adjacent to heritage/cultural resources, and looting and vandalism due to increased site visibility. These types of impacts have been well documented within the SJNF and elsewhere. (See Duke et al. [2003] and Buenger [2003] for local examples of these impacts, and Ryan and Jones [2003], and BLM [1998] for regional examples of these impacts.) Overall effects from fire and fuels management to heritage and cultural resources can range from minor to major loss of resources.

Impacts would tend to be greater in wildfire situations than they would for prescribed burns because of extreme fire temperatures, an inability to control the impacts, and because it would be almost impossible to plan inventories of heritage/cultural resources in advance. Some inventories may be conducted during the construction of firelines. Impacts related to fire may be determined, and appropriate mitigation measures may be carried out if a complete inventory of the burned area is conducted shortly after the fire has been controlled. This is not, however, always possible. Therefore, potentially significant impacts related to wildfire may remain undetermined under the alternatives. The number of heritage/cultural resources impacted by wildfire on an annual basis cannot be predicted.

BLM_0033462

Mechanical fuels treatments would have the potential to directly impact heritage/cultural resources. This is because they may result in moderate to high amounts of ground disturbance and mixing of soils. This would especially be the case if tracked vehicles were used on wet soils. Mechanical fuels treatments may also masticate features such as wickiups, tepees, and brush corrals. However, most of these impacts would be avoidable through the Section 106 process. Indirect impacts may include erosion and changes to vegetation that result from off-site projects, which may change the characteristics and integrity of a site. Sites that are avoided and left as "leave islands" within fuels treatment project areas may be more vulnerable to looting and vandalism (because they can be easily identified and targeted). There is some evidence that under the correct conditions, fuels treatments such as "hydro-mulch" may have a beneficial impact to heritage/cultural resources because they may reduce erosion and act as a protective cover. Hazardous fuels reduction may also be beneficial to heritage/cultural resources by providing "defensible space" for resources such as rock art and wooden structures that are especially vulnerable to the impacts related to wildfire.

**Comparison of Fire and Fuels Management Alternatives:** Section 106 inventories, evaluation, and consultation would be completed on the all areas proposed for prescribed burn or other fuels treatments. These areas would be approximately the same under all of the alternatives; therefore, potential impacts to heritage/cultural resources may be the same under all alternatives. These impacts are expected to be minor. This is because all identified significant heritage/cultural resources would be avoided or mitigated; however, there would still be the potential for unanticipated discoveries during the Section 106 process and the potential for increased looting of "leave islands." Location information for these fuels treatments is not yet available; therefore, it is not possible to estimate the number of heritage/cultural resources that may be potentially impacted.

Alternative A calls for a reduced amount of wildfire use acres; it would therefore have less unanticipated/uncontrollable impacts to heritage and cultural resources from wildfire use than the other alternatives. Wildfire is unpredictable; therefore, the potential impacts to heritage/cultural resources are not quantifiable and may range from negligible to major. Cultural resource fire constraint maps for each Ranger District/Field Office identify prescriptions for individual sites, site types, and archaeologically sensitive areas. These maps are referred to in the event of wildfire.

## Impacts to Heritage and Cultural Resource from Livestock Grazing

The impacts of livestock grazing on cultural resources varies due to non-uniform grazing patterns that reflect differences in terrain, forage abundance and preference, soil attributes, and archaeological site distribution. Livestock grazing (especially where animals congregate to drink water or consume minerals, where they shelter under rock overhangs, and/or where they use pathways and stock trails) may result in impacts to heritage/cultural resources in those areas. The stratigraphic soil layers that are very important in establishing cultural chronologies may be churned and distorted by livestock digging, movements, and congregation. Areas were livestock concentrate are often located near springs, rock shelters, cliff faces, drainages, and forest edges—the same areas that are important to humans prehistorically and historically. Cattle may also damage standing prehistoric and historic structures and rock art through rubbing and trampling. Grazing impacts to heritage and cultural resources have been well documented across the western United States. In response to the Comb Wash Decision (1993), the BLM and the USFS have implemented policies to identify and mitigate these impacts (e.g., BLM IM No. CO-2002-029 "Interim Historic Preservation Guidelines and Procedures for Evaluating the Effect of Rangeland Management Activities on Historic Properties" (BLM 2002c); the 2007 Programmatic Agreement Between the U.S. Department of Agriculture, Forest Service, and the Advisory Council on Historic Preservation, Regarding Rangeland Management

BLM_0033463

Activities on National Forest Service Lands (USFS 2007c); and the 2008 Standard Range Recission Strategy for Cultural Resources, San Juan National Forest (USFS 2008).

Typical of the impacts identified as a result of these policies were those described in *Environmental Assessment of #CO-036-99-014 Tomichi Allotment Management Plan & Grazing Permit Reissuance for Tomichi Allotment #06319* (BLM 1999). This EA reported, "Ten of the need data sites and nine of the eligible sites have been severely impacted by historic grazing practices. Such impacts occurred around heavily utilized areas such as springs, salt lick localities, and along fence lines. These impacts include displacement and breakage of artifacts, and accelerated erosion which not only impacted the integrity of the sites, but also contributed to increased looting" (Coleman 2000:10). Impacts from livestock grazing may be direct, indirect, and cumulative, and may result in minor to major impacts.

Impacts of range-related activities (including fence construction, spring developments, wells, stock tanks, pumps, pipelines, water storage, and cattle guards) and non-structural projects (including noxious weed treatments, forage improvements, and mineral supplementation) may have the potential to alter or destroy heritage/cultural resources. These activities would be considered undertakings, and would, therefore, undergo Section 106 inventory, evaluation, and consultation. Avoidance or mitigation measures would be utilized where eligible heritage/cultural resource sites are present. Under all of the alternatives, a cultural assessment (as outlined in BLM IM CO-2002-029: *Interim Historic Preservation Guidelines and Procedures for Evaluating the Effect of Rangeland Management Activities on Historic Properties* [BLM 2002c] and *Standard Range Recission Strategy for Cultural Resources* [USFS 2008d]) would be necessary in order to assess the impacts related to grazing.

**Comparison of Livestock Grazing Alternatives:** Alternative D would propose the most acres suitable for livestock grazing and may, therefore, have the most potential to result in impacts to cultural resources, followed by Alternatives A and B, which may result in similar impacts. Alternative C may have the least potential to result in impacts to heritage/cultural resources. Under all of the alternatives impacts are expected to be minor because all identified significant heritage/cultural resources would be avoided or mitigated. However, there would still be the potential for unanticipated discoveries during the Section 106 process. There is also the possibility that erosion caused by past and current grazing practices may result in additional unanticipated impacts.

Impacts to Heritage and Cultural Resource from Solid Minerals Management

Solid minerals management includes both locatable and salable minerals. Locatable minerals include mining of precious and base metals, and locatable uranium and vanadium. Locatable mineral mining is a statutory right and is not discretionary. However, locatable mineral regulations require that mining activities result in no undue or unnecessary degradation. Salable minerals include the mining of gravel, stone quarries, and collection. Salable minerals are discretionary when the land management agency owns the mineral rights. When private mineral rights are involved, management is less discretionary.

Solid minerals management has the potential to damage or destroy heritage/cultural resources through major ground-disturbing and construction activities related to exploration, mining, milling, and the development of ancillary facilities (including waste rock piles, mill tailings, roads, and loading facilities). Many of the areas with the potential for locatable minerals were mined historically for precious and base metals, as well as for uranium and vanadium. Many of these historic mining/milling sites are now eligible for listing on the NRHP. Gravel operations have the potential to damage or destroy archaeological sites, including buried archaeological sites that have no surface artifacts or features. Stone collection has the potential to damage sites (including prehistoric and historic stone

BLM_0033464

masonry structures, stone game drives, and stone alignments). Mining of both locatable and salable minerals has the potential to indirectly impact heritage/cultural resources as the result of cultural landscape alterations, and visual and auditory intrusions, as well as changes to vegetation that result from off-site projects (which could alter the characteristics and integrity of a site).

Under all of the alternatives, precious and base metals, uranium, and vanadium mining may have a high potential to impact historic mining resources. Salable mineral management may have a moderate potential to impact heritage/cultural resources. Federal land management agencies are responsible for ensuring that Section 106 inventory, evaluation, consultation, and, if necessary, avoidance or mitigation occurs prior to authorizing solid minerals projects.

**Comparison of Solid Minerals Management Alternatives:** Overall, the potential impacts related to solid minerals management on heritage/cultural resources may be the same under all of the alternatives.  Impacts are expected to be minor because all identified significant heritage/cultural resources would be avoided or mitigated; however, there would still be the potential for unanticipated discoveries during the Section 106 process.

## Impacts to Heritage and Cultural Resources from Timber Management

Timber harvesting activities may impact heritage/cultural resources as the result of surface disturbance caused by machinery and vehicles, by the felling trees on certain types of sites, the skidding of logs, theft or vandalism caused by workers, or erosion from vegetation removal or damage. In addition, fuels and oils used by heavy equipment may be spilled or dumped on heritage/cultural sites. Construction or reconstruction of permanent or temporary roads associated with timber sales may have the potential to impact heritage/cultural resources as the result of damage or destruction of areas directly impacted. Construction of roads may also have the potential to result in indirect impacts to heritage/cultural resources (by making sites more accessible). This accessibility may increase the chances for incidental deterioration or vandalism. As noted above, under all of the alternatives, eligible sites would be avoided or mitigation of impacts would occur though the Section 106 process.

**Comparison of Timber Management Alternatives:** Alternative D may have the greatest potential to impact heritage/cultural resources. This is because it would propose the highest amount of ground-disturbing activities, followed by Alternatives A and B. Alternative C would have the lowest amount of proposed road construction and timber treatment; therefore, it may have the least impact on heritage/cultural resources. Under all of the alternatives, impacts are expected to be minor because all identified significant heritage/cultural resources would be avoided or mitigated; however, there would still be the potential for unanticipated discoveries during the Section 106 process.

## Impacts to Heritage and Cultural Resources from Lands and Realty Management

Lands and realty actions may acquire surface and subsurface estate, which would bring the estate under federal protection and, thereby, benefit heritage and cultural resources. Withdrawals restrict certain activities (such as mining and access), which, in turn, decreases uses and visitation. This may also directly benefit heritage and cultural resources. Depending on the size and location of the withdrawal, this could have a negligible to major beneficial effect to heritage and cultural resources.

Land disposals have the potential to remove heritage and cultural resources from federal jurisdiction. However, any land disposal would be subject to the laws and regulations that protect heritage and cultural resources and any potential impact to heritage and cultural resources would be mitigated.

BLM_0033465

However, due to the loss of federal ownership, mitigation of prehistoric resources for land disposals can be very expensive and is considered an adverse effect under the NHPA; it may also be regarded as an unnecessary negative impact by Native Americans to their traditional and cultural properties. There is also the possibility that unexposed and thereby unknown heritage and cultural resource could inadvertently be disposed of. Again, depending on the size and location of the land disposal, this could have a negligible to moderate impact to heritage and cultural resources.

Surface-disturbing activities authorized by the lands and realty programs (including ROWs and communication sites) may result in adverse direct and indirect impacts to heritage and cultural resources. However, these actions would be subject to the laws and regulations that protect heritage and cultural resources and any potential impacts to heritage and cultural resources would be mitigated. Therefore, impacts may be negligible to minor.

**Comparison of Lands and Realty Alternatives:** The potential impacts related to lands actions on heritage and cultural resources may be similar under Alternatives A, B, and D, as these alternatives provide for close to the same amount of lands to be disposed of. Alternative C would have the least potential to impact heritage and cultural resources. This is because several parcels have been removed from the list of lands available for disposal in Alternative C due to the presence of known archaeological sites eligible for the NRHP in those parcels.

Under all of the alternatives identified, significant heritage/cultural resources would be avoided or mitigated; however, there would still be the potential for unanticipated discoveries during the Section 106 process. Therefore, impacts to heritage and cultural resources from lands and reality actions may be negligible to moderate.

## Impacts to Heritage and Cultural Resources from Cultural Resource Management

As stated above, under all of the alternatives cultural resources would continue to be protected under Section 106 of the NHPA. The heritage/cultural resources program would conduct proactive NHPA Section 110 inventory, documentation, analysis, preservation, monitoring, stabilization, research, stewardship, and public interpretation and education under all of the alternatives. While excavation is beneficial because it expands the archaeological knowledge base, it also results in the loss of archaeological resources and is considered an adverse effect under the NHPA.

**Comparison of Cultural Resource Management Alternatives:** Alternatives B and C would provide the most proactive management and, therefore, may result in the most beneficial impacts to heritage/cultural resources. This is because these alternatives would propose the establishment of two additional special management areas—McPhee and Mesa Verde Escarpment—that are not included under the other alternatives. Under these alternatives, McPhee and Mesa Verde Escarpment would be managed specifically for their outstanding heritage/cultural resource values and for their recreational/interpretive/educational opportunities. These MAs would not be included under Alternatives A or D.

Alternatives A, B, and C would provide additional proactive management of heritage/cultural resources. This is because these alternatives would retain the Anasazi Culture Area ACEC (which was established in the previous BLM San Juan/San Miguel Resource Management Plan). This ACEC was established in order to protect significant prehistoric archaeological resources. This ACEC has a multitude of competing uses, including mineral materials and recreation. The acreage of the ACEC under Alternatives B and C has been slightly reduced to avoid these competing uses without

eliminating any significant cultural resources. Retention of the ACEC under Alternatives A, B, and C would ensure a greater level of focused management and protection of cultural resources.

Cultural resource management under Alternatives B and C may result in the greatest benefits to heritage and cultural resource due to the proposed establishment of the greatest number of protective MAs. This would be followed by Alternatives A and then D.

## Cumulative Impacts

Over time, cumulative impacts to heritage/cultural resources may include the loss of sites, or parts thereof (prior to the development of better preservation methods and research techniques), the loss of interpretive values, and the incremental loss of the heritage/cultural resource base.

Past actions that have contributed, cumulatively, to impacts on cultural resources include livestock grazing and vegetation management, mineral development, recreation, looting and vandalism, and ongoing natural erosion. These negative factors are present outside, as well as inside, the planning area.

Prior to Section 106 of NHPA, many activities occurred on public lands with no regard for the protection of heritage and cultural resources. Activities such as vegetation treatments using chains or harrows drug large pieces of equipment across the ground surface in order to remove trees and shrubs. This, along with other mechanical treatments, undoubtedly destroyed numerous archaeological sites within their path. The development of many mines, roads, railroads, timber sales, and campgrounds within the planning area took place prior to Section 106 protection requirements, and untold numbers of archaeological sites were undoubtedly destroyed or disrupted. Thousands of cattle and sheep grazed the public lands with no limitations or regulation from the 1870s up to the 1940s causing extensive resource damage and erosion, which also caused major impacts and loss of archaeological resources.

Loss of heritage and cultural resources on private lands within the planning area has been extensive in the past and is ongoing. "Arrowhead hunting" and "pot hunting" have a long been a favorite recreational and commercial pastime in southwest Colorado. The selling of "Anasazi" pots and artifacts has been a lucrative source of income for over 120 years. Although the Antiquities Act, Archaeological Resource Protection Act, and Native American Graves Protection and Repatriation Act prohibit this on public lands, looting still continues on public lands and is ongoing on private lands, which is only regulated by Colorado State law that prohibits the disturbance of human remains. There has also been a tremendous loss of Ancestral Puebloan sites due to the development of farming, towns and residences in the Great Sage Plain in the southern and western portions of the planning area. Past developments on private and public lands have resulted in major cumulative impacts to heritage and cultural resources.

Current and future land management projects may result in additional surface disturbance and may bring additional people in contact with heritage/cultural resources, which could also lead to additional impacts to those resources. Under the different alternatives, differences in cumulative impacts to heritage/cultural resources would be the result of sanctioned management activities. It is anticipated that overall these impacts would be minor due to the protection and mitigation measures that would be implemented. Alternatives A and D would have the highest projected amounts of development and, therefore, may have the highest potential to impact heritage/cultural resources. Alternatives B and C would provide for a more proactive management of heritage/cultural resources with the establishment of the McPhee and the Mesa Verde Escarpment Special Management Areas. Alternatives A, B, and C would retain the remnant Anasazi Culture Area ACEC and would thereby

BLM_0033467

provide more administrative protection for the heritage and cultural resources located within the ACEC. Alternative C and the No Leasing Alternative call for the least amount of development and would therefore result in the least amount of projected impacts to heritage and cultural resources. The additional inventory and evaluation that may occur under all of the alternatives may lead to more heritage/cultural resources being located, and a potential reduction of adverse cumulative impacts caused by natural processes after heritage/cultural resources are brought under appropriate management (assuming sufficient funding and personnel are available). An additional benefit would be increased knowledge and understanding of heritage/cultural resources. Oil and gas management and fuels management are large contributors to the inventory and evaluation of heritage/cultural resources.

Current and future impacts may also occur to heritage/cultural resources on public lands as a result of non-sanctioned activities (including vandalism, looting, or illegal excavation). Efforts to control and monitor these activities would be similar under all of the alternatives and therefore may result in a similar minor to moderate level of cumulative adverse impacts to heritage/cultural resources. Under Alternatives A and D, there would be less emphasis on controlling and monitoring non-sanctioned activities at McPhee and Mesa Verde Escarpment and, therefore, they may have a greater potential for cumulative impacts. However, under Alternatives B and C, efforts to control and monitor non-sanctioned activities would be more proactive at McPhee and Mesa Verde Escarpment; therefore, the cumulative impacts are expected to be less under those alternatives.

Cumulatively, heritage/cultural resources on federal lands may assume greater importance because such resources on private lands are not provided the same degree of protection. Projects in and around the planning area funded by the federal government are subject to federal requirements for protection of heritage/cultural resources. Construction and development on private land may destroy heritage sites without providing an opportunity for recovery of data or other mitigation. Therefore, it is believed that cumulative impacts to heritage resources on private lands are much greater than on federally administered lands. In essence, federal lands have become the major "repository" of heritage and cultural resources in the region, making the preservation and protection of these resources even more important.

## 3.17 Paleontological Resources

### 3.17.1 Introduction

The term "paleontological resource" means any fossilized remains, traces, or imprints of organisms, preserved in or on the earth's crust, that are of paleontological interest and that provide information about the history of life on earth, except that the term does not include:

(A) any materials associated with an archaeological resource (as defined in Section 3(1) of the Archaeological Resources Protection Act of 1979 [16 USC 470bb(1)]; or

(B) any cultural item (as defined in Section 2 of the Native American Graves Protection and Repatriation Act [25 USC 3001]).

Fossils convey the story of history of life on earth including the evolution and extinction of marine, freshwater, and terrestrial organisms.

BLM_0033468

## Legal and Administrative Framework

Paleontological (fossil) resources are natural resources that occur on public lands; therefore, they are managed in accordance with the requirements of federal laws, primarily the Paleontological Resources Preservation Act of 2009 (PRPA) and NEPA (see below). These laws apply similarly to both BLM and NFS lands, although FLPMA is also applicable to BLM lands. Additional requirements for the collection, preservation, and protection of paleontological resources on applicable federal lands would be addressed in forthcoming federal regulations currently being promulgated. The BLM currently has specific manual guidance (i.e., IM 2008-009 [BLM 2008], IM 2009-011 [BLM 2009b], Manual 8270).

### Laws

- **The Mineral Materials Act of 1947:** This act allows the protection of petrified wood on public lands.

- **The Petrified Wood Act of 1962 (PL 87-713):** This act excludes exclude deposits of petrified wood from appropriation under U.S. mining laws.

- **The National Environmental Policy Act of 1969:** NEPA covers the policy for documentation of effects (impacts) of federal actions on natural resources on public lands, including paleontological resources.

- **The Federal Land Policy and Management Act of 1976:** FLPMA substantially amends the Forest and Rangeland Renewable Resources Planning Act of 1974. This act strengthens the references pertaining to suitability and compatibility of land areas, stresses the maintenance of productivity, and seeks to avoid the permanent impairment of the productive capability of the land.

- **The Federal Cave Resources Protection Act of 1988:** This act serves to secure, protect, and preserve significant caves on federal lands for the perpetual use, enjoyment, and benefit of all people, and to foster increased cooperation and exchange of information between governmental authorities and those who utilize caves located on federal lands for scientific, education, or recreational purposes.

- **The Paleontological Resources Preservation Act of 2009:** The PRPA directs the Secretaries of Agriculture and Interior to manage and protect paleontological resources on NFS lands using scientific principles and expertise. Through this act the USFS and BLM are currently developing appropriate plans for inventory, monitoring, and the scientific and educational use of paleontological resources, in accordance with other applicable agency laws, regulations, and policies. These plans will emphasize interagency coordination and collaborative efforts where possible with non-federal partners, the scientific community, and the general public. Agencies are continuing to use existing policies while new regulations are being drafted.

### Regulations and Policies

- **36 CFR 228.62: Free Use (e) – Petrified Wood.** On NFS lands, this addresses free-use permits that may be issued to amateur collectors and scientists to take limited quantities of petrified wood for personal use. As such, petrified wood in most instances is managed as a minerals material rather than a paleontological resource. In rare instances, deposits of petrified wood that are more appropriately managed as paleontological resources under the PRPA can be designated as such by the Authorized Officer.

- **36 CFR 291:** This will contain rules promulgated under PRPA.

BLM_0033469

- **43 CFR 37:** This addresses the protection of significant caves and cave resources, including paleontological resources.

- **43 CFR 8365:** This addresses the collection of invertebrate fossils and, by administrative extension, fossil plants.

- **43 CFR 3622:** This addresses the free-use collection of petrified wood as a mineral material for non-commercial purposes on BLM-administered lands.

- **43 CFR 3621:** This addresses the collection of petrified wood for specimens exceeding 250 pounds in weight.

- **43 CFR 3610:** This addresses the sale of petrified wood as a mineral material for commercial purposes.

- **43 CFR 3802 and 3809:** These address the protection of paleontological resources from operations authorized under the mining laws.

- **43 CFR 8200:** This addresses procedures and practices for the management of lands that have outstanding natural history values, including fossils, which are of scientific interest.

- **43 CFR 8365.1-5:** This addresses the willful disturbance, removal, and/or destruction of scientific resources or natural objects and Subpart 8360.0-7 identifies the penalties for such violations.

- **Secretarial of the Interior Order 3104:** This grants the BLM the authority to issue paleontological resource use permits for lands under its jurisdiction.

- **FSM:** Policy for management of paleontological resources on NFS lands forthcoming.

- **BLM Manual 8270:** This outlines policy for the management of paleontological resources. With this are updates from BLM Washington Office Internal Memoranda dated post-1998, such as the Potential Fossil Yield Classification (PFYC) and mitigation updates.

- **BLM IM 2012-140 (BLM 2012c):** Collecting Paleontological Resources Under the Paleontological Resources Preservation Act of 2009

- **BLM IM 2012-141 (BLM 2012d):** Confidentiality of Paleontological Locality Information Under the Omnibus Public Lands Act of 2009, Title VI, Subtitle D on Paleontological Resources Preservation

The PRPA stipulates the management of paleontological resources on applicable federal lands using scientific principles and expertise. This direction emphasizes interagency coordination and collaborative efforts where possible with non-federal partners, the scientific community, and the general public. Paleontological resources are managed for scientific, educational, and recreational values, and to protect or mitigate paleontological resources from adverse impacts. To accomplish this goal, paleontological resources are identified and evaluated by qualified paleontologists, and paleontological information is considered in the decision-making process commensurate with other natural resources in accordance with NEPA.

The USFS is developing manual direction for the management of paleontological resources on NFS lands. Previous to the PRPA, collection of paleontological resources on NFS lands was regulated only by 36 CFR 261.9(i), which prohibits "excavating, damaging, or removing any vertebrate fossil or removing any paleontological resource for commercial purposes without a special use authorization." With the forthcoming passage of new USFS regulations (36 CFR 291), the 261.9(i) clause would be abolished.

BLM_0033470

A classification system called the Fossil Yield Potential Classification (FYPC) was developed by the USFS Paleontology Center of Excellence and the Region 2 Paleo Initiative in 1996, although this system was never formally institutionalized by the USFS. In 2008 the BLM instituted a variation of this system under the title of Potential Fossil Yield Classification (BLM IM 2008-009). Predictive modeling systems for the occurrences of paleontological resources provide baseline guidance for assessing the relative occurrence of important paleontological resources and the need for mitigation. Geologic units are classified at the formation or member level, according to the probability of yielding paleontological resources of concern to land managers. Historical classifications such as the Fossil Yield Potential Classification and PFYC are founded upon the likelihood of geologic units to produce "significant" paleontological resources. On NFS lands, managers only need be concerned if paleontological resources are present or absent, and if present then an assessment and management recommendation is undertaken. (See Volume III, Appendix B, for a description of the current PFYC system in place for the BLM).

## 3.17.2 Affected Environment

### Existing Conditions and Trends

Paleontological resources are integrally associated with the geologic rock units (e.g., formations) in which they are located. Particular geologic units with high probability for the occurrence of paleontological resources should be managed accordingly. Within the planning area, various geologic units have differing potentials to contain paleontological resources. Other areas may also contain paleontological resources, but have not been examined and evaluated. The potential for paleontological resources is currently evaluated through the use of the PFYC system, although an alternative system of paleontological resource categorization in geologic units is under development by the USFS paleontology program. No comprehensive survey of paleontological resources has been conducted in the planning area. The need for paleontological resource assessment is handled on a case-by-case basis in consultation with a qualified paleontologist.

In 1899, Walter Granger of the American Museum conducted the first paleontological work in the area. Since that time, scientific investigation has been sporadic. A great deal of the area is remote, and many of known paleontological resources have been reported by the general public.

## Known and Potential Paleontological Resources

Known paleontological resources found within the planning area are dominantly Jurassic and Cretaceous in age, and include various plants (often petrified wood, leaf impressions), invertebrates, and vertebrates (including dinosaur and mammal remains). Various Paleozoic and Tertiary aged rocks within the planning area may also contain unrecognized paleontological resources. Much of the planning area has not been surveyed for paleontological resources, and therefore the extent of paleontological resources is unknown. Noteworthy fossil occurrences within the planning area include:

- San Jose Formation (Paleocene vertebrates – mammal bones)

- Mancos Shale (invertebrates including ammonites, pelecypods, oysters, and gastropods; vertebrates including shark teeth and fish scales, rare occurrences of bony fish and marine reptile remains)

- Dakota Sandstone (leaf and wood impressions, dinosaur tracks, and vertebrate and invertebrate ichnofossils)

BLM_0033471

- Dolores (flowering plants)

- Morrison (Late Jurassic dinosaur bones and skeletons, invertebrates)

- Chinle (late Triassic vertebrate fauna including aetosaur, metoposaur, phytosaur, and archosaur; also fish and plant remains)

- Navajo Sandstone (diversity of tetrapod tracks including early mammals, dinosaurs, pterosaurs, crocodylians, reptiles, and invertebrate traces; petrified wood; dinosaur bone).

Perhaps above all other geologic units, the Morrison Formation is renowned for high potential to produce dinosaur bones and skeletons. The Morrison Formation is also the focus of past and current vanadium and uranium mining on public lands and DOE leases; therefore, there exists the potential need for future focused assessments of the Morrison Formation. Examples of known Morrison Formation localities producing dinosaur remains on the SJNF include the Horse Range Mesa Locality (BLM) and the McPhee Reservoir Sauropod Locality (USFS) currently being managed in partnership with Mesa State College, Grand Junction, Colorado.

In accordance with the PRPA, paleontological resources within the planning are subject to the following direction regarding collection and curation:

- A paleontological resource may not be collected from federal land without a permit issued by the land managing agency. Casual collecting is allowed without a permit on federal land controlled or administered by the BLM or USFS, where such collection is consistent with the laws governing the management of those federal lands and the PRPA. The term "casual collecting" means the collecting of a reasonable amount of common invertebrate and plant paleontological resources for non-commercial personal use, either by surface collection or the use of non-powered hand tools resulting in only negligible disturbance to surface and other resources. The terms "reasonable amount" and "negligible disturbance" would be defined as part of the forthcoming regulations.

- Any paleontological resource, and any data and records associated with the resource, collected under a permit, shall be deposited in an approved repository.

- Safeguards against incompatible land and resource uses may be imposed through withdrawals, area closures, stipulations on leases and permits, design requirements, and similar measures developed and recommended by an appropriately staffed interdisciplinary team.

Due to recreational activity, minimal localized degradation of geologic features, including their contained paleontological resources, is expected to continue. Exposed paleontological resources may be degraded by casual OHV and mountain bike use that occurs off of existing or established routes.

The condition of paleontological resources would likely improve through the availability of public education and awareness program (per the PRPA, Section 6303). Permitting research collection is necessary for the responsible conservation of paleontological resources.

## 3.17.3 Environmental Consequences

### Direct and Indirect Impacts

Federal undertakings and unauthorized uses have the potential to result in irreversible disturbance and damage to non-renewable paleontological resources. The SJNF and TRFO would continue to

BLM_0033472

mitigate impacts to paleontological resources resulting from authorized uses through avoidance, redesign, and specimen recovery. Geologic units with exposures containing paleontological resources may continue to be impacted as the result of natural agents, unauthorized public use, mining, and vandalism.

The current positive and/or negative impacts related to casual collection of common invertebrate and plant paleontological resources is unknown. Applications for research and collection of paleontological resources on the SJNF are relatively few in number.

Management measures common to all alternatives would preserve and protect paleontological resources for present and future generations. Adverse impacts would be mitigated by avoidance, recordation, or collection by a qualified paleontologist.

Under all of the alternatives, the risks of damage or destruction of paleontological resources could result from mining of vanadium/uranium, unauthorized activities (including dispersed recreational activity, OHV use, vandalism, unauthorized collection), and natural processes of weathering. Under all of the alternatives, unquantifiable indirect impacts may occur. Wilderness areas, WSAs, and other special designation area management may reduce access to paleontological resources, as would the management of rivers for the ORVs identified for suitable WSR designation.

Impacts to paleontological resources within the planning area may result from actions proposed under the following resource management programs that have the potential to disturb fossil-bearing geologic formations: minerals development; prescribed fire, fire suppression efforts and fuels management; recreation; lands and reality actions; and travel management.

## Impacts to Paleontological Resource from Minerals Development

Uranium/Vanadium Exploration and Development Impacts

Uranium and vanadium are locatable minerals under the 1872 Mining Law and 43 CFR 3809. These minerals are often found in geological formations with a high potential for vertebrate fossils. Surface-disturbing activities authorized by the mining laws and regulations (including mineral exploration projects and extraction of mineral resources) may result in adverse direct and indirect impacts to paleontological resources. Agency management options for protecting resources during exploration of these minerals under these laws and regulations are limited and have short time frames. Therefore, the potential for direct and indirect effects to paleontological resources during exploration for uranium and vanadium may range from minor to major. Agency management options for protecting resources during development/extraction of uranium and vanadium under these laws and regulations is somewhat broader and potential impacts may be minor to moderate. Potential impacts would be mitigated through assessment for paleontological resources, avoidance, and/or collection and recordation to minimize impacts to acceptable levels.

Oil and Gas Development Impacts

Oil and gas development may disturb geologic formations containing paleontological resources. Disturbances may result from direct (e.g., well pad excavation, road building, pipeline construction) or from indirect impacts resulting from increased accessibility of paleontological resources by the construction of access roads and increased off-site erosion. Potential adverse impacts to paleontological resources related to oil and gas development would be properly addressed under project-specific oil and gas EAs. Under all of the alternatives, prior to the approval of an APD, identified areas of disturbance must be assessed for the likelihood of containing paleontological resources and appropriate mitigation measures employed as warranted. If a locality containing

BLM_0033473

paleontological resources could not be avoided, the area would have to be properly mitigated through collection and recordation. These protections would be provided for in the PRPA, the paleontology guidance provided above, and the standard terms and conditions of all oil and gas leases. In addition to the these protections, the Horse Range Mesa Paleontological Locality is protected through an NSO stipulation in Alternatives A, B, and C, and a CSU stipulation under Alternative D. This NSO includes an exception criterion for permitted paleontological excavation in order to recover important paleontological resources. Even with these protections, it is expected there would be a minor effects to paleontological resources due to unanticipated direct and indirect effects, such as discovery of fossils during pipeline construction, off-site erosion, and looting.

<u>Comparison of Alternatives</u>

**Uranium and Vanadium Exploration and Development:** The exploration and development of uranium and vanadium is regulated by the 1872 Mining Law and 43 CFR 3809. Impacts to paleontological resources from these activities would be the same under all alternatives. Paleontological surveys and excavations performed as a result of uranium/vanadium mining plans of operation could be major contributors to the knowledge and understanding of paleontological resources. This beneficial impact to paleontological management could result under all of the alternatives.

**Oil and Gas Development:** Under all of the alternatives impacts to paleontological resources from oil and gas development would be mitigated through identification, avoidance, and/or collection and documentation. However, a minor amount of direct and indirect impacts may still result during surface-disturbing activities due to unanticipated discoveries of paleontological resources, off-site erosion, and increased access to paleontological resources. Therefore, Alternative A, which authorizes the largest amount of acres to be leased and consequently disturbed, could result in the largest amount of impacts to paleontological resources. This would be followed by Alternative D, which has the second highest amount of acres to be leased and disturbed by oil and gas activities. Alternative B would have less potential impacts to paleontological resources than Alternatives A or D. Alternative C would have less potential impacts to paleontological resources than Alternative B; while the No Leasing Alternative would have the least potential impacts to paleontological resources than all of the other alternatives.

Alternatives A, B, and C would provide the most protection for the Horse Range Mesa Locality with an NSO stipulation for oil and gas leasing. Alternative D would provide the least amount of protection for the Horse Range Mesa Locality with a CSU stipulation. Under all of the alternatives, the McPhee Reservoir sauropod area would be provided protection as it is located within the Anasazi National Register District that is not available for lease under all of the alternatives.

Paleontological surveys and excavations performed as a result of oil and gas development could be a major contributor to the knowledge and understanding of paleontological resources. This beneficial impact to paleontological management could result under all of the leasing alternatives.

## Impacts to Paleontological Resources from Fire and Fuels Management

Mechanical treatments for fuels management in pinyon-juniper, mixed shrub, and ponderosa pine vegetation communities could result in surface disturbances that could have a negligible to minor impact on paleontological resources. Although most paleontological resources are located within a matrix of bedrock and are not impacted by minor surface disturbances such as being driven over by tracked mechanical equipment, some fossils are more fragile (for example dinosaur eggs and nest

BLM_0033474

sites); these fragile resources and can be destroyed through even minor surface disturbance and erosion.

Wildland fire use and prescribed burns may result in direct and indirect impacts to paleontological resources. Fire may result in the direct destruction of organic fossil remains (e.g., Quaternary packrat middens). The removal of vegetative cover by fire may accelerate weathering processes, which, in turn, may result in short-term indirect impacts. However, these impacts may be negligible when compared with similar impacts that occur by natural processes. Fire suppression that involves the use of heavy equipment and the construction of firelines would create surface disturbances that may result in direct minor impacts to paleontological resources.

<u>Comparison of Alternatives</u>

Under all of the alternatives, the potential impacts related to fuels management on paleontological resources may be similar. All of the alternatives project the same number of acres of mechanical treatments in pinyon-juniper, mixed shrub, and ponderosa pine vegetation communities; therefore, all of the proposed alternatives could have a negligible to minor impact to paleontological resources from fuels management, most of which would be mitigated through identification, avoidance, and/or collection and documentation.

Alternative A could result in the least amount of potential impacts from wildland fire use and prescribed burns, as this alternative projects the least amount of acres to be burned. Alternatives B, C, and D could result in similar amounts of minor of impacts to paleontological resources from wildland fire use and prescribed burns, as these alternatives all project similar acreages to be burned. Some of these impacts could be mitigated; however, wildland fire situations may not allow time for identification, avoidance, and/or collection of paleontological resources. Therefore, Alternatives B, C, and D may all result in minor impacts to paleontological resources that might not be mitigated.

## Impacts to Paleontological Resource from Recreation

Recreational use of public lands has increased dramatically over the last 25 years and would most likely continue to increase. Recreational use of the planning area may result in unintentional damage to paleontological resources that, although individually minor, may result in widespread, adverse impacts through time. Examples of such impacts may include illegal collection of protected paleontological resources and the creation of routes through paleontological localities (which may accelerate erosion). Some forms of vehicle-assisted recreation may damage sites directly or indirectly by increasing site accessibility for vandalism and looting.

Three new SRMAs would be proposed under Alternatives B, C, and D. The existing Silverton SRMA would be greatly expanded in these three alternatives. Under Alternatives B, C, and D, management plans would be developed for all of the SRMAs. These plans would designate routes and trails in order to avoid paleontological resources and develop monitoring plans and mitigation (if impacts are identified). In general, managed recreation, as proposed by the SRMAs, would result in less potential impacts to paleontological resources than would dispersed, unmanaged recreation. However, these benefits may not be realized if recreational impacts to paleontological resources are not monitored and mitigated (especially if recreational use dramatically and/or unexpectedly increases as a result of focused management).

The potential for paleontological resources is very limited within the Silverton SRMA. Potential fossil-bearing geologic formations in this area are restricted to Quaternary gravels and Pennsylvanian

BLM_0033475

limestones. There would be a negligible to minor potential for recreational gold panners and recreational hikers to impact these paleontological resources.

Geologic formations within the Durango SRMA range from low to high potential for paleontological resources. The Durango SRMA would focus on non-motorized recreation (including hiking, mountain biking, and rock climbing). In general, these activities have a negligible to minor potential to impact paleontological resources. Impacts could include illegal collecting, erosion, and surface disturbance from trail construction.

Geologic formations within the Dolores River SRMA range from variable to high potential for paleontological resources. The Dolores River SRMA would focus on river recreation. Impacts would most likely be limited to illegal collecting and would be negligible to minor.

Geologic formations within the Cortez SRMA range from variable to high potential for paleontological resources. The Cortez SRMA would provide motorized and non-motorized recreation. Impacts could result from illegal collecting and user-created trails, and erosion and surface disturbance from trail use. Due to their proximity to Cortez, these areas currently experience a large volume of cross-country OHV use, which may result in minor to moderate direct damage to paleontological resources. Erosion from motorized recreation may directly impact paleontological resources. Increased looting and vandalism may also take place. These impacts may result in the loss of fossils and locality integrity.

<u>Comparison of Alternatives</u>

Under all of the alternatives, the development of trails and facilities would take place under the PRPA; therefore, impacts to paleontological resources from these activities would be avoided or mitigated. In general, the focused recreation management direction provided by the SRMAs in Alternatives B, C, and D may result in similar potential benefits/impacts to paleontological resources in the Silverton, Durango, Dolores, and Cortez SRMAs. These potential benefits would not occur under Alternative A in the Durango, Dolores, and Cortez SRMAs, as this alternative does not provide for SRMAs in these areas. A smaller area of the Silverton SRMA would be protected under Alternative A. Under all the alternatives, recreation may have a negligible to minor impact on paleontological resources in the Silverton SRMA. Under Alternatives B, C, and D, recreation may have a negligible to minor impact to paleontological resources in the Durango and Dolores SRMAs. Recreation may have a minor to moderate impact to paleontological resources in the Cortez SRMA under Alternatives A and D. Alternatives B and C could provide more protection for paleontological resources in the Cortez SRMA, as the Anasazi Cultural Area ACEC would be removed from the SRMA under these alternatives. Casual recreational collecting (legal) of paleontological resources would continue under all of the alternatives.

## Impacts to Paleontological Resource from Lands and Realty Management

Lands and realty actions may acquire surface and subsurface estate, which would bring the estate under federal protection and, thereby, benefit paleontological resources. Withdrawals restrict certain activities (such as mining and access), which, in turn, decreases uses and visitation. This may also directly benefit paleontological resources. Depending on the size and location of the withdrawal, this could have a negligible to major beneficial effect to paleontological resources.

Land disposals have the potential to remove paleontological resources from federal jurisdiction. However, any land disposal would be subject to the laws and regulations that protect paleontological resources and any potential impact to paleontological resources would be mitigated. However,

BLM_0033476

unexposed and thereby unknown paleontological resource could inadvertently be disposed of. Again, depending on the size and location of the land disposal, this could have a negligible to moderate impact to paleontological resources.

Surface-disturbing activities authorized by the lands and realty programs (including ROWs and communication sites) may result in adverse direct and indirect impacts to paleontological resources. However, these actions would be subject to the laws and regulations that protect paleontological resources, and any potential impact to paleontological resources would be mitigated. Therefore, impacts may be negligible to minor.

<u>Comparison of Alternatives</u>

The potential impacts related to lands actions on paleontological resources may be similar under all of the alternatives. Under all alternatives, site-specific paleontological surveys would provide for site avoidance of potential fossil-yielding formations, thereby providing a means to identify and avoid disturbance to fossil sites. Therefore, impacts to paleontological resources from lands and reality actions may be negligible to moderate

## Impacts to Paleontological Resources from Travel Management

OHVs driving over paleontological resources may result in minor to major direct impacts. Indirectly, the use of OHVs may damage or destroy vegetation, inorganic surface crusts, and natural ground cover. Erosion that has the potential to expose fossils and/or accelerate their deterioration may result from motorized recreation. Increased looting and vandalism may also take place. These impacts may result in the loss of fossils and locality integrity. Motorized travel over snow may result in negligible, if any, impacts to paleontological resources.

Implementation of the 2012 Colorado Roadless Rule would greatly reduce the impacts to paleontological resources by directing motorized travel to designated routes. Travel on designated routes may still have the potential to directly and indirectly impact paleontological resources that have not been avoided or hardened for such use. Designation of specific travel routes would be developed under a travel management plan, which would require a separate NEPA process from this LRMP/FEIS.

<u>Comparison of Alternatives</u>

This LRMP/FEIS identifies areas that are suitable for over-ground and oversnow travel by alternative. Alternatives B and C would designate the largest amount of acreage as not suitable for over-ground motorized travel; therefore, these alternatives may have the least potential to impact paleontological resources. Alternatives A and D would designate the largest amount of acreage as suitable for motorized travel; therefore, the potential for ground disturbance and impacts to paleontological resources may be the highest under those alternatives.

## Cumulative Impacts to Paleontological Resources

## Cumulative Effects from Minerals Development

**Effects from Uranium and Vanadium Exploration and Development:** Since the turn of the twentieth century, uranium and vanadium exploration and development has been very active throughout western Colorado. The major boom in uranium and vanadium mining occurred in the 1940s and 1950s. During this period there was little concern for resource impacts, including impacts to paleontological resources. Prospectors often targeted petrified trees and dinosaur bones for

BLM_0033047

exploration and development of uranium and vanadium mines, as it was well known that these fossils were exceptionally rich in uranium and vanadium. Untold thousands of paleontological resources were most likely lost during this period. A second boom in uranium and vanadium mining occurred during the 1970s and 1980s. Nascent resource protection laws were implemented with varying success during this period, which also resulted in additional losses of paleontological resources. A large percentage of current uranium and vanadium exploration and development is occurring on lands leased to the DOE. As a federal agency, the DOE is also required to implement the protections provided by the PRPA on the mining operations it oversees. The next largest percentage of current uranium exploration and development is occurring on lands managed by the BLM and USFS. A very small percentage is occurring on privately owned lands. At this point it is hard to quantify the amount of future exploration and development as uranium and vanadium mining are tied to energy, defense, and industry, which are very much in flux at this time.

When assessing past, current, and future effects to paleontological resources, it is evident that past uranium and vanadium exploration and development had the greatest impacts by far to these resources. Overall, cumulative effects to paleontological resources from uranium and vanadium exploration and development have been major. However, with the implementation of current federal laws and regulations to protect paleontological resources, it is expected that current and future impacts from uranium and vanadium development to paleontological resources on public lands would only be minor contributors to the cumulative effects to these resources.

**Cumulative Effects from Oil and Gas Development:** Throughout southwest Colorado, past, current, and future oil and gas development has occurred and is projected to continue to occur within geological formations that have variable to high potential for paleontological resources. The exception to this is the San Juan Sag, which has a low potential for paleontological resources. Due to the sparse locality information currently available for paleontological resources and the lack of specific location data for oil and gas development, it is not possible to make a quantitative analysis of the cumulative effects of this development on paleontological resources. The oil and gas development that has occurred and is projected to occur on federal lands, both leased and currently unleased, has been and would continue to be subject to the laws and regulations that protect paleontological resources. The recent passage of the PRPA would further enhance these protective measures. However, oil and gas development that has occurred and would continue to occur on private lands with private minerals has not been, and would not in the future be, conducted with the above listed protection and mitigation measures. Therefore, cumulative impacts to paleontological resources on private lands/private minerals could be minor to major, especially when oil and gas development is focused on private lands/private minerals to avoid the costs/restrictions associated with federal protection and mitigation measures.

Over the long term the combined direct and indirect impacts described above could result in a cumulative net loss or degradation of paleontological resources as a result of oil and gas development and the lack of protective laws and regulations for private lands with private minerals. All of the alternatives could result in minor to moderate cumulative impacts especially in areas with high potential for paleontological resources. This range of impacts is due to the variability of topography and exposures of fossil-bearing outcrops within the projected areas of oil and gas development.

Cumulative impacts could also occur to paleontological resources as a result of non-sanctioned activities (including vandalism, looting, or illegal excavation). Efforts to control and monitor these activities on public lands would be similar under all of the alternatives and could, therefore, result in a similar minor to moderate level of cumulative adverse impacts to paleontological resources.

BLM_0033478

**Cumulative Effects from Other Resources**

Past activities such as road building, facility development, and ROW development most likely resulted in major impacts to paleontological resources on public and private lands in southwest Colorado. Prior the passage of laws and regulations that provided for the protection of paleontological resources, there was little consideration of the potential impacts from such actions both authorized and unauthorized to these resources on federal lands. Past and current ground disturbance on private lands has occurred and most likely would continue to occur with little to no consideration of the impacts to paleontological resources.

Fossil "hunting" has long been a popular recreational activity on both public and private lands. While some recreational (non-commercial) collecting of common non-vertebrate fossils is permitted on federal lands, collecting of non-common fossils and vertebrate fossils is prohibited. Prior to the enactment and enforcement of the laws prohibiting the collection of non-common and vertebrate fossils there most likely was a substantial loss of these resources. Unauthorized OHV use off designated roads and trails most likely has resulted in moderate impacts paleontological resources in the past, both on federal and private lands. While these impacts currently are and would continue to be avoided or mitigated on public lands, these impacts would most likely continue to occur to paleontological resources on private lands.

There may continue to be unmitigated impacts to paleontological resources associated with unauthorized activities within the planning area (including OHV use, dispersed recreation, vandalism, and unauthorized collection) and natural processes. Actions authorized by this LRMP/FEIS should have negligible to minor impacts to paleontological resources, as the PRPA and related regulations, handbooks, and policy guidance provide for the identification, avoidance, or collection and documentation of paleontological resources prior to any ground-disturbing activities. Therefore, the actions authorized by this LRMP/FEIS should not contribute substantially to past and future cumulative effects to paleontological resources.

## 3.18 Lands and Special Uses

### 3.18.1 Introduction

Special use permits, ROW grants, easements, and leases authorize the occupancy and use of BLM and NFS lands by government agencies, private individuals, or companies for a variety of activities, including roads, dams, pipelines, and other private or commercial uses that cannot be accommodated on private land. Annually, the SJNF and TRFO administer more than 1,000 non-recreational land use authorizations.

The land use permit program also authorizes the occupancy of public lands for pipelines, communication lines, power transmission lines, and communication sites. In order to minimize disturbance, agency policy is to collocate such uses where feasible. Utility corridors are formally designated in order to provide for such use. On SJNF lands, corridor management must comply with the objectives of the MAs crossed by these corridors, unless a specific exception is identified. TRFO lands are generally available for consideration of these uses at the project-planning level, except where restricted by area-specific direction or within exclusion areas. Where pipeline, electric distribution line, and/or communication system line use cannot be collocated, individual authorizations are issued.

BLM_0033479

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## Legal and Administrative Framework

- **Revised Statute 2477 (Act of July 26, 1866: 43 USC 932):** Portion of 1866 mining law that was a Homestead-era federal law in place from 1866 until 1976. It states that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." The statute allowed local governments to acquire a property interest in roads and other public highways they constructed across unreserved federal land. Although the 1866 act was repealed by FLPMA in 1976, rights associated with Revised Statute 2477 were preserved. These rights are determined through a process that is entirely independent of the BLM's or USFS's planning process.

- **The General Mining Law of 1872:** This act authorizes ROWs across public lands for ditches and roads.

- **The Act to Repeal Timber-Culture Laws of 1891:** This act authorizes ditch easements across public lands and forest reserves.

- **The Organic Act of 1897:** This act states that national forests are established "to improve and protect the forest within the boundaries, for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States."

- **The Transfer Act of 1905:** This act transfers forest reserves to the USDA.

- **The General Exchange Act of 1922:** This act authorizes land adjustments within USFS boundaries.

- **The Federal Land Policy and Management Act of 1976:** This act updates authority for management, provides general authority for use and occupancy, requires fair market value for use of public lands, and repeals sections of many previous acts.

- **The Colorado Ditch Bill Act of 1986:** This act provides for permanent easements for agricultural water systems in use before 1976 in relation to NFS lands.

- **The Cabin User Fee Fairness Act of 2000:** This act updates the application of fees and other management direction related to recreation residence permittees on NFS lands.

- **The Telecommunications Act of 1996:** This act directs federal departments and agencies to make available (on a fair, reasonable, and non-discriminatory basis) property, ROWs, and easements under their control for the placement of new telecommunications services.

### 3.18.2 Affected Environment

## Existing Conditions and Trends

The lands and realty programs on the SJNF and TRFO are responsible for various aspects of ownership and management. Broad responsibilities of the program for managing lands and special uses include:

- managing all aspects of land ownership (including surveying and monumenting land boundaries, acquiring and disposing of lands, protecting federal lands from trespass, assuring that federal resource programs do not trespass onto adjacent non-federal lands, and recording and managing land ownership and title records);

472

BLM_0033480

- managing land use and access (including issuing and administering permits, ROWs, easements, and leases for various land uses, roads, trails, pipelines, utility corridors, communication sites, and facilities); and

- administering withdrawals and administrative closures of federal land in relation to specific uses.

## Land Ownership

Public lands in southwest Colorado are intermixed with numerous ownerships including local, state, tribal, and other federal and private lands due to the many ways that land has been acquired historically. Tracts of non-federal land occur throughout the SJNF and TRFO; however, private tracts tend to concentrate in open land areas and along river valleys where settlers homesteaded and where towns were founded. Historic land adjustments sometimes concentrated areas of private land for agricultural or municipal purposes, which involved trading federal land for other private holdings elsewhere or selling federal tracts where there was a public benefit to such action. Patenting of mining claims created complex patchworks of private lands in the Silverton, Dunton-Rico, La Plata Canyon, and Dove Creek areas, leaving small isolated remnants of public lands between the private claims. Erroneous or improper surveying and monumenting of the many federal-private land boundaries created abundant opportunities for accidental, as well as intentional, trespass occupancy and use.

Within the planning area, land exchanges (BLM and USFS), direct sale disposals (BLM), and Small Tracts Act sales (USFS) are used in order to improve land ownership patterns and to resolve trespass situations. Numerous parcels of TRFO lands were identified for eventual disposal in the 1985 San Juan/San Miguel Resource Management Plan. The 1983 San Juan National Forest Land and Resource Management Plan contained a land ownership adjustment plan that identified several parcels of NFS lands for disposal or acquisition by land exchange.

Land acquisition may occur by purchase, exchange, or donation. Purchase is generally funded by the Land and Water Conservation Fund. Land exchanges require an equal exchange of values, in land and cash, and must result in a net public benefit. Donations must meet acceptable public land management purposes.

Public lands policy has trended away from the acquisition of land, except for specific project purposes. Policy has started to favor the disposal of public lands where isolation, adjacent use or development, or lack of public benefit makes the land unsuitable or unmanageable for public land purposes. In terms of land acquisitions, land exchange is the most likely process for the USFS and is a viable option for the BLM.

Over the past 20 years, much of the private land within and adjacent to the SJNF and TRFO has been subdivided for residential and commercial use. Faulty or poorly documented land surveys have left the location of many of these property boundaries in dispute since these lands are surveyed by developers or owners, resulting in instances of trespass. Roads and trails constructed over the last 100 years may also deviate from their granted alignments, or they may lack proper easements where they cross private or federal lands. As more boundary lines are resurveyed, more trespass situations may be discovered. Federal budgets for agency lands programs would likely not be adequate to address all instances of trespass.

## Land Use and Access Authorizations

The occupancy and use of public lands by local, state, tribal, and other federal agencies, as well as by private industry and individuals, require an authorization from the agency involved. In 2012, there

BLM_0033481

were 528 land use authorizations on the TRFO and 606 non-recreation Special Use Permits on the SJNF. Applications for both traditional land uses and new uses are increasing. More people are making use of public lands, and adjacent private land is being developed, which in turn is driving up the demand. In addition, many authorizations that were issued under less strenuous environmental review regulations are being renewed, requiring increased analysis and review. New cost recovery programs would increase the revenue held by local BLM and USFS units from applicants in order to help offset the increasing cost of the programs and the lengthy delays in processing applications for use.

Currently, there are 24 recreation residence cabins located on SJNF lands (the BLM does not permit recreation residences). Permits for recreation residences are issued for 20 years. Under the Cabin User Fee Fairness Act of 2000, policy is not to issue new permits. Current policy is to reissue the existing permits when the current permit tenure expires. There are no plans to designate new summer home groups on the SJNF.

Lack of access to the SJNF and TRFO is a growing concern as adjacent landowners block public access. In addition, some landowners enjoy exclusive use of the public lands adjacent to their property and do not wish to lose that effective ownership by granting access or engaging in land adjustment processes. ROW requests and land exchanges and disposals are often opposed for these reasons.

As former ranching, mining, and homesteading tracts are subdivided and developed, the new owners often want, and expect, a higher level of road access and maintenance than the public lands road system was designed to provide. This demand often includes requests for new roads across public lands in order to access individual private parcels.

Increasing development surrounding the SJNF and TRFO is increasing road use, and, thereby, increasing associated maintenance and improvement costs. Across the SJNF and TRFO, county road agencies are becoming overtaxed and, as a result, are reducing their contribution to the maintenance of these roads. They are also often unwilling to assume jurisdiction over what has effectively changed from a public lands access road to a subdivision or commercial development road. The BLM and USFS are not able to expend public funds in order to provide this improved access. Land managers must balance the access rights granted to in-holding owners with their obligation to regulate road use and protect public investments and resources.

## Withdrawals

Public lands may be closed to certain types of use through administrative action based on legal or resource concerns, including protecting threatened and endangered species and avoiding damage to important watersheds. In some cases, federal law requires the closure of lands to specific uses, such as the withdrawal of designated wilderness areas from entry under the Mining Law of 1872 (which allows U.S. citizens to file mining claims). Other withdrawals protect certain resources or reserve land use for federal interests (including the withdrawal under the Federal Energy Regulatory Commission for rivers that could support hydroelectric facilities). The SJNF and TRFO lands and realty programs are responsible for administering these closures and withdrawals, and for periodically reviewing them for continued need or revocation.

## Utility Corridors, Major Rights-of-way, and Communications Sites

Major electrical transmission lines are found throughout the planning area, and there are currently two designated corridors. They are the Trans-Colorado Pipeline and the Tri-State Electric Corridors (both

BLM_0033482

cross the Dolores District). The Trans-Colorado Pipeline Corridor was designated as a corridor in a 1992 amendment to the 1983 San Juan National Forest Land and Resource Management Plan.

In the 1985 BLM San Juan/San Miguel Resource Management Plan, no corridors were designated. The RMP encouraged location of new transmission facilities along previously disturbed routes, as well as the sharing of ROWs for compatible transmission uses.

The West-Wide Energy Corridor Programmatic EIS (DOE and BLM 2008) evaluated utility corridors for inclusion in the nationwide designations authorized by Section 368 of the Energy Policy Act of 2005. Corridors across the planning area were directed to follow the existing corridor of the Trans-Colorado Natural Gas Pipeline. Corridor upgrades were limited to existing facilities (with measures instituted in order to protect unstable slopes and the visual resources related to the San Juan National Scenic Byway as it crosses the Dolores River Canyon and Lost Canyon).

Areas designated as utility corridors would be designed to be compatible with the management goals of the areas through which they pass. Expansion, as well as other actions, would not be approved if they did meet these requirements. The width of the corridors would be specified in the individual facility Special Use Permit or ROW authorization. Corridors would only be designated for transmission lines over 69 kilovolts and for pipelines more than 10 inches in diameter. Pipelines greater than 24 inches in diameter would require concurrence (simultaneous consent) by Congress prior to development. Local distribution lines and smaller pipelines would not be identified as corridors and would normally be operated in conjunction with the existing road system (or with other previously disturbed areas) in order to minimize environmental impacts.

The Trans-Colorado Pipeline Corridor is the only nationwide corridor crossing the planning area that is considered in the nationwide corridor study authorized by Section 368 of the Energy Policy Act of 2005. In relation to the proposed alternatives, the number of corridors would not change.

Oil and gas development in the Paradox Basin and the NSJB would require gathering lines in order to transport product to major transmission pipelines. Increase in existing pipeline capacity or construction of a new pipeline paralleling the Williams or Trans-Colorado Pipeline may be required to transport GSGP and conventional natural gas from the Paradox Basin portion of the planning area. Urbanization of private lands adjacent to major communities may see an increase in electric distribution lines and an upgrade in major transmission lines already in existence.

## Electronic Sites and Existing Communication Sites

Electronic sites are areas authorized for the location of facilities for communication by radio, television, microwave, and cell telephone systems. Generally, these sites are at the local topographic high points, depending on maximum line-of-sight. Typically, sites are serviced by electric power lines and access roads. Some site users are individual users (due to space limitations, technical considerations, and/or security issues); other site users lease space in their structure and tower for multiple users. The existing electronic sites within the planning area are listed in Table 3.18.1.

Any additional sites for commercial or agency use would require approval of a site plan. The site plan specifications must comply with visual quality and other resource management objectives. The number of sites would not change by alternative.

Future communication and electronic facilities would be encouraged to use existing sites within capacity and compatibility limits. All facilities would comply with visual resource and scenic standards for the desired future conditions in relation to the different alternatives. The increasing demand for

BLM_0033483

cellular telephone coverage is increasing demand for cell phone relay towers. Visual concerns over the spread of towers to more and more topographic high points may increase. Older antenna towers are being replaced by higher and/or stronger towers in order to accommodate more shared use and heavier equipment. Better technology is reducing the problem of interference, allowing more collocation of facilities.

**Table 3.18.1: Electronic and Communication Sites**

| Communication Site | Agency | Elevation (feet) |
|---|---|---|
| Bayfield Ranger Station | USFS | 6,900 |
| Benchmark | USFS | 9,264 |
| Caviness Mountain | USFS | 10,050 |
| Coal Bank | USFS | 10,660 |
| Devil Mountain | USFS | 9,922 |
| Dolores- Montezuma County | USFS | 7,420 |
| Eagle Pass | USFS | 11,880 |
| Eightmile Mesa | USFS | 8,176 |
| Escalante | USFS | 7,080 |
| Expectation Mountain | USFS | 11,680 |
| Grassy | USFS | 9,525 |
| Kendall | BLM | 13,400 |
| Kennebec | USFS | 12,240 |
| Menefee | BLM | 8,823 |
| Missionary | USFS | 9,860 |
| Oak Brush Hill | USFS | 8,623 |
| Pargin | USFS | 8,910 |
| Parrott Peak | USFS | 11,540 |
| Smelter | BLM | 7,725 |
| Spring Creek | USFS | 8,870 |
| Storm Peak | BLM | 13,053 |
| Tuckerville | USFS | 11,640 |
| Yellow Jacket | USFS | 8,397 |

## 3.18.3 Environmental Consequences

### Direct and Indirect Impacts

### General Impacts

The following assumptions were used when assessing the impacts to actions or authorizations that fall under the lands and special uses program:

- The BLM and USFS would use voluntary approaches to acquire surface (and mineral) estate.

- Site-specific impacts caused by development of facilities would be assessed in accordance with NEPA using an EA or EIS process prior to approval by the BLM or USFS, and mitigation measures could be required.

- The demand for special use authorizations and ROWs would increase within the life of the LRMP.

BLM_0033484

- ROW and special use authorization holders may maintain their use and access at their discretion consistent within the terms of their grant or permit.

Land use authorizations would be restricted primarily as a result of decisions related to lands and special uses, terrestrial ecosystems and wildlife, heritage and cultural resources, scenic and visual resources, and travel management.

## Impacts from Lands and Special Uses Management

Under all alternatives, the SJNF and TRFO could acquire land dependent on having a willing seller. The USFS has limited opportunity for direct disposal of NFS lands; therefore, most land adjustments involving NFS lands would be by land exchange. This is not expected to vary by alternative. The BLM would continue its land adjustment program with land exchanges, as well as with the sale or exchange of lands specifically identified for disposal. The potential for disposing of BLM lands is highest in Alternatives B and D with 15,327 acres of lands available for disposal, followed by Alternatives A (10,469 acres) and C (8,004 acres). Additional criteria for identifying other lands for disposal are found in the LRMP and would not vary by alternative. Under all alternatives, through cooperation with other landowners, the emphasis would be for improved land ownership and access patterns that benefit private landowners and the public.

The ability of the SJNF or TRFO to issue land use authorizations in localized areas may be limited by the agencies' obligation to respect valid, existing rights, such as mining claims.

General impacts discussed below are quantified based on the acres of land that are restricted with stipulations (avoidance areas) or that are not available (exclusion areas) for various types of ROWs and special use authorizations under each of the alternatives. Future land activity cannot be predicted as to specific location, scale, and timing; therefore, the most reasonable way to estimate the impacts of proposed alternatives on the lands program is to consider the amount of land that is restricted or unavailable for possible use. Table 3.18.2 shows the acres under each alternative where ROWs and special use authorizations would be restricted under avoidance areas or prohibited by exclusion areas.

**Table 3.18.2: Avoidance and Exclusion Areas**

| Avoidance/Exclusion Areas by Agency | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| SJNF avoidance Acres | 1,030,769 | 787,462 | 509,497 | 937,468 |
| TRFO avoidance Acres | 37,691 | 232,351 | 439,984 | 273,129 |
| Total Avoidance Acres | **1,068,460** | **1,019,813** | **949,481** | **1,210,597** |
| SJNF exclusion Acres | 514,760 | 647,263 | 1,068,710 | 505,900 |
| TRFO exclusion Acres | 68,139 | 69,659 | 70,049 | 56,867 |
| Total Exclusion Acres | **582,899** | **716,922** | **1,138,759** | **562,767** |

Allocation of avoidance and exclusion areas under the various alternatives would impact the accessibility of lands for the location of pipelines, transmission lines, communication sites, and other ROWs or special use authorizations. These allocations would also restrict the amount of area in which expansion to accommodate new utilities or electronic sites could occur. Changing the availability and restrictions on utility routing and communication site use would restrict expansion as well. Generally, utility routes and communication sites would be compatible with MA 7 designations on SJNF lands and throughout most areas on TRFO lands, except where prohibited by area-specific direction or allocation of exclusion areas. Prohibiting development of permanent facilities in exclusion

BLM_0033485

areas, requiring limits or prohibitions on road access, or special stipulations in avoidance areas may place future demand on existing sites or on private land. Under Alternative D, 1,210,597 acres would be within avoidance areas, where land use authorizations such as utility corridors and communications sites can occur but with restrictions, followed by Alternative A, B, and C. Avoidance areas in each alternative encompass lands with wilderness characteristics, the Dolores River Canyon, Mesa Verde Escarpment, Anasazi Culture ACEC, Perins Peak Wildlife Management Area, upper tier CRAs, Falls Creek Archeological Area, SBAs, Chimney Rock National Monument, and VRM II/high SIO areas. Alternative C is the most restrictive in terms of impacts to lands and realty actions with 1,138,759 acres within exclusion areas, followed by Alternatives B, A, and D. Exclusion areas in each alternative encompass WSAs, wild segments of suitable WSRs, MA 1, RNAs, wilderness areas, the Piedra Area, and areas recommended for wilderness designation.

Local utilities would be encouraged to use existing pathways that are generally on lands outside avoidance and exclusion areas. Upgrades to existing corridor locations that do pass through avoidance areas may be allowed. However, they may not accommodate additional linear utility routing needs. Site plans for communication sites would be developed for all existing locations. These site plans would identify compatible uses, visual management criteria, and allowable number of users. Any additional sites for public use would require designation, after appropriate environmental analysis and approval.

Under all of the alternatives, the issuance and administration of land use authorizations would continue to provide for a variety of recreation and non-recreation activities. In general, most land uses may be compatible with most other resource activities, and most impacts to the lands program may be minimized by the use of appropriate design guidelines.

The opportunities for ROW acquisitions would not change by alternative. Under all of the alternatives, the acquisition of access to public lands through easements would be identified in order to serve administrative purposes and public access, with the goal of enhancing the management of the public land resources.

Land withdrawals would not be the direct result of the implementation of any of the alternatives. Recommendations for future land closures and withdrawals are included in the overall LRMP direction, primarily from mineral entry. These recommendations may, or may not, be implemented after separate analysis and decision processes. Therefore, potential impacts are not likely to vary predictably by alternative because the recommendations must be acted upon individually by other authorities and agencies. SJNF or TRFO review and recommendation for continuation or revocation of existing withdrawals would also not be the direct result of implementation of any of the alternatives. Therefore, potential impacts are also not likely to vary by alternative.

## Impacts from Terrestrial Ecosystems and Wildlife Management

Impacts to the lands and special uses program from terrestrial ecosystems and wildlife management may be higher costs for authorized uses and activities, and, in some situations, denial of discretionary land uses or land ownership adjustments. Wildlife management activities that trigger these impacts would be primarily related to management requirements under the ESA. The degree of the impacts would depend on approved conservation strategies, critical habitat designations, and BOs that mandate specific management requirements for land uses. These requirements would not be known until specific project proposals are submitted and assessed. Protective measures applied to land uses may also increase costs. Management related to protecting certain soils and plants would also place restrictions on the potential siting of ROWs and other land use authorizations. These restrictions are based on LRMP standards and guidelines and would not vary by alternative.

BLM_0033486

## Impacts from Heritage Management

Requirements to protect heritage resources (including the protection of Native American rights of access and use) may preclude some uses and activities within the planning area and in some situations may prevent discretionary land uses or land ownership adjustments. Required mitigation measures may increase the costs for authorized uses and activities. The measurable indicator of impacts would be tied to the allocation of avoidance and exclusion areas as described above, since areas with heritage resources (such as the Mesa Verde Escarpment and Fall Creek Archeological Area) are included within these restrictive allocations. Based on the number of acres where ROWs are prohibited or otherwise restricted, Alternative C would have the greatest impact on the lands program, followed by Alternatives B, D, and A (see Table 3.18.2).

## Impacts from Access and Travel Management

Closing areas to motorized travel or designating areas as unsuitable for motorized use would result in further restrictions on land use authorizations in those areas because they would generally be inaccessible. Motorized travel in the majority of the remaining area of the SJNF and TRFO would be restricted to designated routes, which could limit opportunities for land use authorizations to areas along those designated routes if the authorization required motorized vehicle access for construction, operation, or maintenance (unless administrative access was granted for such purposes). Alternative C would include the most acres of closed and unsuitable areas, and thus be the most restrictive alternative, followed by Alternatives B, D, and A.

## Impacts from Scenery and Visual Resource Management

Designating areas as VRM Class II or high SIO would result in restrictions on any required land use authorizations to comply with the objectives for the respective management class, along with any stipulations that might be imposed due to these areas being included within avoidance area allocations. While avoidance areas would not apply to VRM Class III or IV, or moderate, low, or very low SIO, land uses would still need to comply with the applicable scenery objectives/visual management classes. Opportunities for land use authorizations in areas managed as VRM Class I or very high SIO would be prohibited, as these are located within exclusion areas. Areas designated as VRM Class III or IV, or moderate, low, or very low SIO would provide the greatest opportunities for land use authorizations, particularly those that would be noticeable within the landscape. These opportunities would be most available under Alternative A, followed by Alternatives D, B, and C. Alternative C contains the highest acreage within the highest SIO and VRM Classes I and II and would have the greatest impact on lands and special use authorizations, followed by Alternatives B, D, and A).

## Cumulative Impacts

Cumulative impacts related to the implementation of any of the alternatives may result from a continuation of the same policy and budget constraints that existed under the previous land management plans, greater demand for uses by the public and other agencies, and the imposition of newer environmental laws and regulations on such uses. Past impacts related to multiple land ownership, poor survey and boundary monumentation, increasing demand for residential and commercial use and access, and increasing costs of processing and administering land use authorizations may be increased by future impacts because most land uses do not disappear, once established, and new land uses would only increase the complexity of managing various land use in the planning area. Because the avoidance and exclusion areas are based on protection of multiple

BLM_0033487

resource values, expected cumulative impacts would be expected to follow the same pattern by alternative.

Over the next 15 years (which is the timeframe for reasonably foreseeable future cumulative impacts), the annual level of applications for land authorizations within the planning area would be directly tied to demographic changes experienced and projected in southwest Colorado. This is expected to increase over this timeframe, with most authorizations occurring in WUI areas, consistent with current patterns of development.

Acquisition of new access routes would be limited by SJNF and TRFO budgets. The SJNF has identified a number of priority cases needed to provide additional access to NFS lands. Changing public use patterns and needs would add additional cases. There are no other anticipated reasonably foreseeable future actions specific to a particular alternative that would differ between the alternatives for land adjustments and/or ROW acquisitions. The SJNF and TRFO have received expressions of interest in the form of out-year plans and priority lists from land use constituents such as Tri-State Generation and Transmission; however, analysis of these projects would be speculative and they are not considered reasonably foreseeable projects prior to receiving initial applications.

## 3.19 Minerals and Energy: Fluid Minerals

### 3.19.1 Introduction

This section documents 1) the affected environment, 2) scenarios for RFD as a result of fluid mineral leasing, and 3) the impacts of the four LRMP alternatives and the No Leasing alternative on leasing and oil and gas development opportunities on the SJNF and TRFO.

Oil and gas (natural gas and $CO_2$) are defined as leasable minerals under federal law and regulation. The BLM has jurisdiction over management of federal oil and gas resources underlying both BLM and NFS lands, as well as those underlying non-federal surface (split estate) lands within the planning area. The BLM and USFS are joint agencies in this analysis under the 2006 Memorandum of Understanding Concerning Oil and Gas Leasing and Operations (BLM and USFS 2006b).

For BLM public lands and federal leasable minerals under non-federal surface lands, the BLM administers all oil and gas leasing and development activity. The BLM analyzes and makes decisions on leasing availability and discloses impacts in its RMP and EIS. Under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 and implementing regulations at 36 CFR 228 E, the USFS must analyze and make decisions on oil and gas leasing for federal leasable minerals underlying NFS lands. Once the USFS determines what lands are available for leasing and the BLM has adopted the analysis, the BLM may offer the selected NFS lands for lease consistent with those decisions. The ROD for this LRMP revision would document the leasing program adopted for the SJNF and TRFO for the next 15 years.

The oil and gas leasing analysis applies to a total of 2.37 million acres of federal mineral estate within a 3-million-acre analysis area, of which 1.65 million acres (outside wilderness and withdrawn areas) have the potential for the occurrence of oil and gas resources (see Volume III, Appendix V, Map 48). The 0.91 million acres of private mineral estate within the planning area are not included in this oil and gas leasing analysis because the federal government has no leasing authority over privately held minerals regardless of surface ownership. However, surface use guidelines have been developed, other than NSO that the BLM/USFS, to the extent possible, would utilize if and when the holder of private mineral estate proposes to occupy federal surface. Surface use must be negotiated with the

BLM_0033488

private mineral owner. Table 3.19.1 identifies the potential for occurrence of oil and gas resources by mineral estate.

**Table 3.19.1: Potential for Occurrence of Oil and Gas Resources by Mineral Estate**

| Surface Ownership | Total | High | High CBM | Low | Moderate | None |
|---|---|---|---|---|---|---|
| BLM | 500,317 | 250,878 | 5,255 | 1,301 | 199,295 | 43,588 |
| SJNF | 1,864,839 | 10,514 | 44,439 | 520,857 | 889,249 | 399,781 |
| Other federal | 7,672 | 427 | 146 | 2,608 | 3,845 | 646 |
| Tribal | 0 | 0 | 0 | 0 | 0 | 0 |
| Private | 191,974 | 34,957 | 7,066 | 980 | 148,899 | 71 |
| State | 26,630 | 7,803 | 0 | 0 | 18,826 | 0 |
| Total | 2,591,432 | 304,579 | 56,906 | 525,746 | 1,260,114 | 444,086 |

In total, 528,000 acres of public mineral estate (439,000 BLM and 89,500 USFS) are currently leased for oil and gas development, primarily in the NSJB and Paradox Basin portions of the planning area. There are 370,000 acres of lease nomination pending process on the SJNF and TRFO during preparation of the revised LRMPs. The new leasing decisions would apply to the processing of new leases.

## Legal and Administrative Framework

Oil and gas resources on NFS and BLM-administered lands are managed under a large body of laws and regulations. A few, however, are specific to the mineral resource itself and provide direction on the disposition of federally owned oil and gas resources, as well as administration of surface activities associated with development of these resources. These include:

- **The Mineral Leasing Act of 1920:** This act authorizes the Secretary of the Interior to issue leases for the disposal of certain minerals (currently applies to coal, phosphate, sodium, potassium, oil, oil shale, gilsonite, and gas). The act applies to NFS lands reserved from the public domain, including lands received in exchange for timber or other public domain lands and lands with minerals reserved under special authority.

- **The Federal Land Policy and Management Act of 1976:** This reiterates that the 1970 Mining and Minerals Policy Act shall be implemented and directs that public lands be managed in a manner that recognizes the nation's need for domestic sources of minerals and other resources.

- **The Federal Onshore Oil and Gas Leasing Reform Act of 1987:** This act expands the authority of the Secretary of Agriculture in the management of oil and gas resources on NFS lands. Without USFS approval, the BLM cannot issue leases for oil and gas on NFS lands over the objection of the USFS. The USFS also has the authority to regulate all surface-disturbing activities on NFS lands.

- **The Energy Policy Act of 2005:** This act encourages energy efficiency and conservation, promotes alternative and renewable energy sources, reduces dependence on foreign sources of energy, increases domestic production, modernizes the electrical grid, and encourages the expansion of nuclear energy. The BLM and USFS are responsible for making public lands available for orderly and efficient development of these resources under principles of multiple-use management.

BLM_0033489

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## Process for Mineral Leasing and Oil and Gas Exploration and Development

The ROD for the LRMP revisions and the USFS leasing availability analysis would make the following decisions related to mineral leasing:

- **For BLM Lands:** Lands open for leasing (BLM Handbook H1601-1), including conditions (stipulations) under which lands would be open for leasing. A plan-level decision to open the lands to leasing represents the BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable COAs. (Selected alternative would be approved in the LRMP ROD.)

- **For NFS Lands:** Lands administratively available for leasing (36 CFR 228.102(d)), including conditions (stipulations) under which lands would be available. (Selected alternative would be documented in a USFS leasing availability ROD. The Forest Supervisor would make the leasing availability decision.)

The USFS and BLM leasing availability decisions constitute Stage 1 of a three-stage decision-making process for oil and gas leasing, exploration, and development.

At this first stage of analysis—identification of lands available for lease—the timing and location of project-specific actions are unknown, and the relationship between cause (future actions) and effect (impact on resources) is not always known or quantifiable. Therefore, the analysis of impacts is based on projected development assumptions (see Volume III, Appendix F). If the lands made available for lease are leased, there will be another environmental review to approve the location of an exploratory well before the leaseholder can drill the well (stage two). After a lessee has an exploratory and confirmation well, the leaseholder can submit an APD (i.e., to develop the lease). Before field development is authorized, there will be further environmental analysis and the SJNF or TRFO may require a plan of development (stage three). During this third analysis stage, project-specific information (well and road locations) is available and can be used for analysis of impacts. As a result, the impact analysis at the third stage is more specific and refined.

All areas of the SJNF and TRFO public lands exclusive of areas currently withdrawn from leasing and those areas administratively unavailable for leasing are analyzed. These lands include:

- The portions of the SJNF currently available for leasing – approximately 1,337,100 acres.

- TRFO public lands including split-estate lands currently available for leasing – approximately 761,000 acres.

Thus the net acreage analyzed for leasing on both federal jurisdictions totals 2,096,856 acres. The RFD projections for future oil and gas development activity forecast activities within a broad area of 928,000 acres of lands classified as having high or moderate potential for oil and gas. Within that area, if leased, there may be approximately 7,000 acres of land disturbance as a result of oil and gas exploration and development. These lands generally coincide with lands that are already leased and undergoing some level of development, leased and currently undeveloped, or where industry has submitted expressions of interest to lease federal mineral estate.

## Conducting the Leasing Analysis

The leasing analysis provides the basis for making the leasing decision. Following direction in 36 CFR 228 102 (c)(l) and BLM Handbook H1601-1, the analysis identifies:

BLM_0033490

- Lands open to development with standard lease terms (described in Section 6 of every lease);

- Lands open to development, but subject to constraints that require the use of supplementary lease stipulations when the standard lease terms are not sufficient to protect surface and subsurface resources;

- Lands closed to leasing, distinguishing between those areas closed through exercise of management direction by the USFS or BLM and those closed by law or regulation. Such lands are identified in the oil and gas leasing maps for the alternatives (Volume III, Appendix V, Maps 49 through 60);

- Mitigation measures in the form of lease stipulations related to the different emphases of the alternatives for oil and gas management.

Based on their goals and resulting management emphases, LRMP Alternatives A and D emphasize more access for leasing and development with less restrictions. Alternatives B and C have more restrictions. The No Leasing Alternative represents no leasing of federal oil and gas on currently unleased lands and on leased lands when the current lease expires. After analyzing the effects of development on surface resources, including consideration of environmentally sound drilling technology, reclamation, and effects of prohibiting surface occupancy, the USFS or BLM may determine that the impacts are unacceptable for some areas. These areas may be made administratively not available for leasing at the discretion of the USFS or BLM.

The analysis also:

- Identifies land management alternatives that result in a range of possible leasing decisions (36 CFR 228.102 (c)(2) and BLM Handbook H1624-1);

- Includes a projection of the type and amount of post-leasing activity that is reasonably foreseeable as a consequence of conducting a leasing program consistent with that described in the proposal and for each alternative (36 CFR 228.102 (c)(3) and BLM Handbook H1624-1); and

- Analyzes the reasonable foreseeable impact of post-leasing activity projected for the proposal and for each alternative (36 CFR 228.102 (c)(3) and BLM Handbook H1624-1).

These three requirements are addressed below.

## 3.19.2 Affected Environment

### Existing Conditions and Trends

The existing condition is a result of the prior discovery and development of oil and gas resources. In addition to these known and developed resources, the existing condition includes estimates of the potential for the occurrence of undiscovered oil and gas resources, and the likelihood of their development during the 15-year planning period. This oil and gas leasing analysis is divided into the following major topics:

- Oil and gas occurrence potential in the planning area;

- Major oil and gas plays;

- The scenario for future oil and gas exploration and development activity;

- Trends in recent development and exploration activity; and

- The RFD scenario.

BLM_0033491

Each topic section provides a summary of the relevant data.

## Oil and Gas Occurrence Potential

The RFD scenario projects oil and gas development for the planning area. The scenario is based on an assessment of the potential for the occurrence of oil and gas, and an estimate of the level and type of development activity that might occur should the affected lands be leased. This section of the analysis describes regions of different potential for accumulations of oil and gas in the planning area. The estimate of development activity is described in a following section.

A region of defined oil and gas resource potential may include adjacent non-SJNF or TRFO lands where the geology and exploration and development activity are important to describing potential for oil and gas resources in the planning area. The potential for occurrence of oil and gas in the planning area is based on the geology and major plays. Table 3.19.1 summarizes the potential for the occurrence of oil and gas (see Volume III, Appendix V, Map 48). As defined here, a play is a set of oil or gas accumulations that are geologically, geographically, and temporally related and that exist by virtue of identical or similar geological conditions. The oil or gas accumulations may be known to exist or be completely hypothetical and may be discovered or undiscovered. Geological characteristics such as reservoir lithology, timing and migration, trapping mechanisms, and source rock, as well as maturation, are taken into consideration in the definition and evaluation of each play. Estimates of undiscovered oil and gas resources in the planning area are derived from the 1995 and 2000 USGS national assessments of undiscovered oil and gas resources (USGS 2013).

The criteria used for designation of potential are from BLM Handbook H-1624-1, revised December 19, 1994:

- **High Potential:** The play demonstrates existence of source rock, thermal maturation, reservoir strata possessing permeability and porosity, and traps. Demonstrated existence is defined by physical evidence or documentation in the literature.

- **Medium Potential:** The play has geophysical or geological indications that the following may be present: source rock, thermal maturation, reservoir strata possessing permeability and porosity, and traps. Geologic indication is defined by geological inference based on indirect evidence.

- **Low Potential:** The play has specific geophysical or geological indications that one or more of the following may not be present: source rock, thermal maturation, reservoir strata possessing permeability and porosity, and/or traps.

- **No Potential:** The play has no currently recognizable potential. The play has demonstrated absence of source rock, thermal maturation, reservoir rock, and traps. Demonstrated absence is defined by physical evidence or documentation in the literature.

The following discussion provides information from which the oil and gas occurrence potential summary is derived, broken down by specific oil and gas province and play. Within each play, there may be several different estimates of potential for individual rock formations.

<u>San Juan Basin Province</u>

**High Potential:** Lands with high potential in Cretaceous rocks are present in the planning area in the extreme northern part of the San Juan Basin Province based on the presence of subsurface cretaceous rocks. Productive oil and gas fields such as the Ignacio-Blanco and Fruitland–Picture Cliffs, and production from the Dakota, "tight" Dakota, and Mesa Verde plays are in and/or immediately adjacent to the planning area. The oil and gas potential of fractured Mancos Shale is

BLM_0033492

considered to be high, particularly in the sandier and more dolomitic El Vado member. The potential for future oil and gas discoveries and development is high where the Dakota and younger rocks are present.

**Medium Potential:** Within the NSJB area, lands that are characterized by Cretaceous-, Jurassic-, Triassic-, and Permian-age sedimentary rocks at or near the surface are considered to have medium potential. This is particularly true in the vicinity of the southwestern flank of the Archuleta Anticlinorium on the northeastern flank of the San Juan Basin Province. Medium potential is also assigned to the Pennsylvanian rocks in the San Juan Basin Province part of the planning area.

**Low Potential:** Low potential is assigned to areas of the San Juan Basin Province where Mississippian and Devonian sedimentary rocks occur at or near the surface, although escalating oil prices may drive exploration interest higher with time.

**No Currently Recognizable Potential:** Lands that are characterized by pre-Devonian sedimentary rocks or igneous and metamorphic surface outcrops do not have any currently recognizable potential, although escalating oil prices may drive exploration interest higher with time.

San Juan Sag Area

**High Potential:** Cretaceous rocks in the southern and southwestern part of the San Juan Sag generally dip northeasterly away from the Archuleta Anticlinorium that separates the San Juan Sag from the San Juan Basin. The primary reservoirs are the Dakota and possible fractured shale of the Mancos. The Mesa Verde is also a potential objective in the northeastern part of the planning area in the San Juan Sag area. The Dakota and fractured Mancos Shale potential is considered to be high in this part of the planning area where Cretaceous outcrops and subcrops are not covered by tertiary volcanic rocks.

**Medium Potential:** The Entrada Sandstone has medium potential in the San Juan Sag part of the planning area. This is particularly true along the northeastern flank of the Archuleta Anticlinorium.

**Low Potential:** Very little is known about the Pennsylvanian section in the San Juan Sag area. However, it has been mentioned by several operators as a possible objective, if present, beneath the Mesozoic rocks in the sag. It is therefore given a low potential.

**No Current Recognizable Potential:** Mississippian and/or Devonian and older Paleozoic rocks are virtually unexplored and no recognizable potential is given to this stratigraphic package.

Paradox Basin Province

**High Potential:** In the northwestern portion of the planning area, actively producing fields in the Andy's Mesa, Cache, Cocklebur Draw, Flodine Park, Hamilton Creek, Hamm Canyon, Island Butte, McClean, Papoose Canyon, Roadrunner, Sleeping Ute, and Towaoc fields have high potential for continued expansion of production of gas and some oil in the Paleozoic section of the Paradox Basin Province of the planning area. The Carbonate Buildup Play and Structural and Fractured Shale Play both have high potential for oil and associated gas development in this proven area.

**Medium Potential:** The remaining portions of the Paradox Basin Province characterized by a stratigraphic sequence consisting of Cretaceous rocks at or near the surface and underlain by older Mesozoic and Paleozoic strata at depth exhibit moderate potential for the occurrence of oil and/or gas. Although the Mississippian section is still lightly explored, carbonates in the northwestern part of

BLM_0033493

the planning area are still considered prospective by industry and the distribution of hydrocarbons would probably be structurally controlled. They are assigned a medium resource potential

**Low Potential:** Generally, this includes the lands east of those areas with moderate hydrocarbon occurrence potential in the Paradox Basin Province. The low potential region is characterized by surface and near-surface Jurassic and older sedimentary rocks with a sedimentary section at least 1,000 feet thick.

**No Currently Recognizable Potential:** This area includes lands located east of the approximate limit of the Paradox Basin Province in the San Juan Dome Uplift Province of southwest Colorado. Igneous and metamorphic rock dominate the San Juan Dome Uplift with only a thin (<1,000 feet) total stratigraphic section where sedimentary rocks are present. It should also be mentioned that occasional, isolated plutonic rocks related to the uplift that extend into the Paradox Basin Province currently have no recognizable hydrocarbon occurrence potential.

See Volume III, Appendix V, Map 48 for the major tectonic provinces in the planning area.

## Major Oil and Gas Plays

The northwestern portion of the planning area contains a number of important and productive oil and gas plays, many of which have been extensively explored since the last assessment of the region in the early 1990s. Since 1999, an average of 34 new wells has been added annually, equally split between CBM production and conventional oil and gas. In 2004, 331,000 barrels of oil and 89 billion cubic feet (BCF) of gas were produced in the planning area, excluding $CO_2$ production. $CO_2$ production from three wells in Montezuma County added another 321 BCF to the total gas produced in the area.

New potential plays in the planning area that have been upgraded in their resource potential in this analysis include the Entrada Play of the NSJB Province, the Structural and Fractured Shale Play and Mississippian Play in the southeastern Paradox Basin Province, and the GSGP in the central part of the eastern Paradox Basin Province of southwest Colorado. The SJNF and TRFO include parts of two major oil and gas provinces, the San Juan Basin Province (Province 022 of the USGS National Assessment) in the east and the Paradox Basin Province (021) in the west. The planning area also includes the southwestern part of the lightly explored, but oil productive, San Juan Sag. The San Juan Basin, which includes lands within northwest New Mexico and southwest Colorado, is the second largest natural gas field in the United States. CBM development in the San Juan Basin Province accelerated during the late 1980s and is currently the primary focus of natural gas development in the region. The Paradox Basin Province (Table 3.19.2 and Table 3.19.3) is an important oil and gas-producing region, and gas production, in particular, has accelerated in the last decade.

**Table 3.19.2: Major Oil and Gas Fields in the San Juan Basin and San Juan Sag Provinces**

| Name | Type | Producing Reservoirs |
|---|---|---|
| Ignacio - Blanco | CBM/Gas | Mesa Verde Group (Point Lookout), Dakota, Fruitland Coal |
| Chromo | Oil | Fractured Mancos (limited production) |
| Menefee Mountain | Oil | Dakota; tests in Desert Creek, Ismay (limited production) |
| Gramps | Oil | Dakota and fractured Mancos (currently abandoned) |
| Navajo | Oil | Mesa Verde Group, Mancos, Gallup |

BLM_0033494

Because the USGS National Assessment does not provide specific data for the plays in the planning area, the resource quantities given below are for the entire San Juan and Paradox Basin Provinces rather than for those portions within the planning area. An attempt to proportionate or delineate the specific resources of the planning area is presented where appropriate and possible.

**Table 3.19.3: Major Oil and Gas Fields in the Paradox Basin Province**

| Name | Type | Producing Reservoirs |
|------|------|---------------------|
| Andy's Mesa | Gas/Oil | Cutler, Cutler Arkose, Honaker Trail, Ismay |
| Cache | Oil | Ismay |
| Cahone | Oil/Gas | Honaker Trail |
| Cocklebur Draw | Gas | Hermosa, Paradox |
| Double Eagle | Gas | Honaker Trail, Cutler |
| Flodine Park | Oil/Gas | Ismay |
| Hamilton Creek | Gas/Oil | Hermosa, Cutler, Honaker Trail |
| Hamm Canyon | Gas | Hermosa |
| Island Butte | Oil | Desert Creek |
| Lisbon Southeast | Gas/Oil | Leadville |
| McClean | Oil/Gas | Desert Creek |
| Papoose Canyon | Oil/Gas | Desert Creek, Ismay |
| Roadrunner | Oil/Gas | Ismay |
| SE Andy's Mesa | Gas/Oil | Cutler, Cutler Arkose, Honaker Trail, Ismay |
| Sleeping Ute | Oil/Gas | Ismay |
| Stone Pony | Gas/Oil | Ismay |
| Towaoc | Oil/Gas | Ismay |

According to the 2000 USGS National Assessment, the most likely estimates of undiscovered oil and gas resources in the San Juan Basin Province are 19 million barrels of oil (MMBO) and 50 trillion cubic feet (TCF) of gas. Much of the favorable area would be gas prone because of burial depths, source rock type, proximity to intrusive rock heat sources, or various combinations of these. Undiscovered oil resources in the Paradox Basin are larger, estimated at 500 MMBO. Gas is estimated at 1.5 TCF, although the inclusion of shale gas resources could significantly increase this estimate. Most of these resources in the Paradox Basin are likely to be distributed in small to moderate-sized accumulations rather than concentrated in a few large ones.

The CBM area in the San Juan Basin Province likely contains the vast majority of the undiscovered gas resource. Porous carbonate plays in the Paradox Basin Province would likely account for additional undiscovered oil. Substantial new gas reserves are also anticipated from Paleozoic plays in the eastern Paradox Basin Province, particularly from the emerging Pennsylvanian GSGP along the western border of the study area. While Mississippian and Devonian rocks on the western side of the planning area both probably have some potential, the volume of this resource is uncertain due to the presence and percentage of $CO_2$ and water in the natural gas and the likelihood of increased $CO_2$ percentages in the vicinity of the Laramide-age and younger intrusives. Lastly, the potential for undiscovered $CO_2$ as opposed to natural gas in the eastern Paradox Basin is highly uncertain.

<u>San Juan Basin Oil and Gas Plays</u>

Conventional oil and gas exploration and development in the San Juan Basin is largely found in the Ignacio-Blanco field, which produces from the Dakota Sandstone, Fruitland Formation, Pictured Cliffs Sandstone, and the Mesa Verde Group. The field was discovered in 1950. The Dakota Sandstone, Mesa Verde Group, and Pictured Cliffs Sandstone are the principal producing horizons and typically

BLM_0033495

yield dry gas with small quantities of produced water and associated hydrocarbon liquids. By 1995, the Dakota Sandstone had produced 279 BCF of gas. Production from the Dakota Sandstone reached its peak in 1996, but this formation may still have potential for limited development. The Mesa Verde Group produced 678 BCF of gas and 40,000 barrels of condensate from 1952 to 1995. Wells completed in the Pictured Cliffs Sandstone, which includes the Pictured Cliffs Sandstone and Fruitland sand, produced 88 BCF through 1995. Current production is limited to small amounts of oil. As of December 2001, 13 active conventional gas wells existed in the Ignacio-Blanco field.

The majority of the gas produced from the planning area, excluding $CO_2$ production from McElmo Dome in Montezuma County, comes from the Ignacio-Blanco CBM field.

Paradox Basin Province

Most of the production in the province has been from porous carbonate buildups, mainly algal mounds (porous-carbonate buildup play, USGS Code 2102), around the southwestern shelf margin of the Paradox evaporite basin. The giant Aneth field, with more than 1 billion barrels of oil in place, accounts for about two-thirds of the proven resources in the province, and other fields such as the Ismay in this primarily stratigraphic play account for much of the rest. Most of the other plays have a strong structural component, particularly the Buried Fault Blocks, Older Paleozoic (USGS Code 2101), Fractured Interbed (2103), and Salt Anticline Flank (2105) Plays. The Permian-Pennsylvanian Marginal Clastics Play (2104) is a combination of both structure and stratigraphy. The Fractured Interbed Play (2103) is an unconventional, continuous play.

The westernmost part of the planning area lies within the southeastern part of the Paradox Basin Province. The Paradox Basin was formed in Middle Pennsylvanian time as a result of faulting along the pre-existing, northwest-trending Uncompahgre lineament, with uplift to the northeast and corresponding basin down-warping across the faults to the southwest. Salt anticlines developed in the deeper part of the basin, which has the thickest section of evaporates, as salt moved upward in response to sediment-loading from the north. The basin contains the thickest sediments along the northeastern margin, where it is bounded by the Uncompahgre uplift.

Summary of Plays in Paradox Basin Province

The primary oil and gas–producing formation is the Middle Pennsylvanian Paradox Formation, which consists of cyclic carbonates, clastics, and evaporates deposited in a marine environment (Scott 2003). The oldest formation with oil and gas production is the upper Mississippian Leadville Limestone. Overlying Pennsylvanian rocks include the Molas Formation and the Hermosa Group, which includes the Paradox and Honaker Trail formations. The Paradox Formation includes most of the evaporites, and the majority of the production is from the interbedded carbonates. Prodetta clays of the Gothic Shale and Hovenweep Shale Members of the Paradox Formation may contribute to production in the basin in the near future. The overlying Honaker Trail consists of marine carbonates, shales, siltstones, and sandstones. The Permian Cutler Formation consists of fluvial sandstones and shales. The Cutler Formation is the youngest interval of potential gas production within the planning area.

The USGS 1995 National Oil and Gas Assessment project (USGS 2013) identified five major plays in the Paradox Basin Province that overlap with parts of the planning area:

- Buried fault blocks, older Paleozoic (2101) – northwestern corner of planning area;

- Salt anticline flanks (2105) – follows same boundary as Buried Fault Blocks Play;

- Fractured interbeds (2103) – follows same boundary as Buried Fault Blocks Play;

BLM_0033496

- Porous carbonate buildup (2102) – west of Lizard Head wilderness; and

- Permian-Pennsylvanian Marginal Clastics (2104) – northwest part of the planning area adjacent to and east of the Paradox Basin boundary.

## Scenario for Future Oil and Gas Exploration and Development Activity

Projecting expected oil and gas activity is necessary to assess potential effects of leasing the SJNF and TRFO for oil and gas exploration and development. This part of the analysis presents the type and level of potential activity principally based on geology and past and present activity. Economics and technology, access to an area of interest, and the availability of processing facilities and transportation also play a role in exploration and development activity levels. Some of these factors, such as economics and technology, are difficult to predict due to their complexity, interactive nature, and variability in time. This analysis is based on what is currently known about geology and industry activity and does not attempt projections of future fluctuations in oil and gas markets and political factors or rapid and unpredictable changes in technology or discoveries that may trigger new plays in the area.

Projected oil and gas activity may not always equate with geologic potential for the existence of hydrocarbons. In some areas where all the geologic factors indicate a high potential for oil and gas resources, other factors, such as inaccessibility, risk, high exploration costs, and low oil and gas prices, may limit the potential for exploration and development activity. Consequently, an area of high potential for hydrocarbon occurrence may have a low potential for exploration and development activities. Conversely, such factors as rapidly escalating product prices or advances in technology could lead to drilling activity in areas considered to have a low potential for oil and gas occurrence. In any case, current projections of activity are based on currently known conditions and reasonable expected changes in technology and price factors.

Based on an analysis of the geology and plays in the planning area and their resource potential, the parts of the planning area that have high and moderate potential for oil and gas occurrence and development are:

- The clastic terrane in the San Juan Basin Province, largely from source and reservoir rocks (including coals) in the Cretaceous section;

- The Cretaceous and Jurassic section in the San Juan Sag;

- The carbonate terrane in the Paradox Basin Province, largely from source and reservoir rocks in the Pennsylvanian, with lesser contributions from the Permian and Mississippian section; and

- The Pennsylvanian GSGP of the Paradox Basin Province, with highly speculative future potential in similar organic-rich shales (e.g., Hovenweep Shale) of the Paradox Formation.

The EIS for the NSJB-CBM project in La Plata and Archuleta Counties (BLM and USFS 2006a) analyzed a proposal by six companies to drill approximately 300 new CBM wells in the NSJB between 2007 and 2012. One hundred and thirty-eight wells are approved for drilling on federal lands; the remainder of the development would occur on private and state lands. The overall life of this CBM project, including construction, production, and reclamation, would be approximately 30 to 35 years.

<u>Infrastructure</u>

A critical issue is how gas moves into the San Juan Basin pipeline system through the Blanco Hub. Consideration is primarily given to trunk pipelines—large capacity lines used to transport gas or oil to market. Credible data are not available to address local gathering infrastructure. Currently, the

BLM_0033497

Paradox, Piceance, and Uinta Basins all flow south to the Blanco Hub. There is insufficient capacity in these pipelines to accommodate the future development projected in the RFD scenario through 2020. For example, the Trans-Colorado Pipeline (Table 3.19.4), a major conduit for gas from the Paradox Basin, is at or near capacity. As more gathering capacity is built to feed the Blanco system, capacity constraints are likely for transmission out of the Blanco Hub. Currently, transmission capacity is very tight at the Blanco Hub, and if additional Paradox, Piceance, and Uinta gas flows into the system, transmission capacity constraints could emerge.

**Table 3.19.4: Major Pipelines Crossing the San Jan National Forest and Tres Rios Field Office**

| Name | Use |
|---|---|
| Basin | Gas |
| Mid-America | Gas |
| Public Service of Colorado | Gas |
| Rocky Mountain | Gas |
| Trans-Colorado | Gas |
| Trans-Texas | $CO_2$ |
| Northwest | Gas |

It is projected that within the next 5 to 10 years a pipeline parallel to either the existing Trans-Colorado or the Northwest gas pipeline would be required. The parallel pipeline would be mostly located in an existing pipeline corridor ROW. In the interim, the capacity of the Trans-Colorado Pipeline may be increased with additional compression. In addition, some availability currently exists in Williams' Northwest interstate gas pipeline. Although power and road capacity are sufficient to handle near-term development in the RFD area, it is expected that additional transmission lines and new and/or upgraded transportation corridors would need to be established within the next 5 years should the GSGP become a viable development target in the Paradox Basin Province.

In the HD Mountains area, a critical part of the future development of CBM, the only pipeline that is available to transport gas is the Public Service of Colorado line, which is a high-pressure (900 pounds per square inch [psi]) consumer line. CBM from the HD Mountains area may contribute considerably more production than is currently estimated, particularly with the potential for 80-acre down-spacing.

Although the pipeline infrastructure in the planning area is basically in place, capacity for future gas development appears problematic. Current pipeline capacity constraints in the Paradox Basin Province could effectively diminish long-term activity levels in drilling and production in the emerging GSGP. In addition, the need to transport gas from future infill CBM wells of the NSJB Province may further restrict development activities in the planning area if new pipelines are not built to transport gas from the San Juan Basin to eastern markets. A 22-inch pipeline parallel to the existing 22-inch Trans-Colorado Pipeline could alleviate some of the pipeline capacity problems in the study area. In addition, Williams Midstream is considering construction of a large trunkline extending along the existing Northwest pipeline corridor from the eastern Paradox Basin and through the NSJB for processing at the Ignacio Gas Plant in southern Colorado. Such projects are critical infrastructure elements to the future successful development of oil and gas reserves in the planning area.

Impacts of Future Technology

A number of emerging and conventional exploration and development technologies are being used or evaluated in and adjacent to the planning area. These include utilization of directional and horizontal drilling methods, mulit-lateral drilling techniques, and multi-zone/multi-stage hydraulic frac

BLM_0033498

completions. Some of the more important practices relevant to the planning area are discussed below.

Conventional well drilling is still common in the planning area, where vertical wellbores are the preferred drilling and completion method for oil and gas wells. There is lower cost and risk by drilling vertically. Reserves often can be captured adequately with vertical wellbores. When pumping is required to produce the oil, maintenance costs are lower in vertical wellbores. However, directional drilling techniques have been increasingly applied in the planning area. Horizontal and stimulation technologies are also being utilized more frequently in the area, and these techniques are likely to continue to be used at an increasing rate.

<u>Directional and Horizontal Drilling</u>

Directional (purposely deviated) drilling allows operators to target one or more subsurface targets in positions that are laterally offset to the surface location of a given wellbore. Horizontal wells are a subset of directional wells that are initially drilled into the ground surface vertically and then turned to ultimately become horizontal with the earth's surface near the bottom of the borehole. The ability to directionally orient a wellbore enables multiple wells to be drilled from an individual well pad location, thereby confining construction, drilling, and completion operations to the one "multi-well pad" site. Although multi-well pads are somewhat larger than their "single-well pad" counterparts, they typically have less overall surface disturbance as compared to the same number of wells that would have been vertically drilled from several single-well pads. Directional drilling techniques can be particularly helpful in environmentally sensitive or culturally rich areas where valuable surface resources can sometimes be even entirely avoided with slight changes in surface location and subsequent directional drilling to the desired subsurface target. In addition, directional and horizontal wellbores often lead to increased production efficiency because a longer segment of the target interval(s) is available to complete and flow hydrocarbons as compared to the equivalent section in a vertical borehole completion. Although directional drilling practices are rapidly becoming commonplace throughout the planning area, all these benefits are offset by the incremental increase in both well cost (approximately 20%t) and operational risk associated with drilling these more complex boreholes. In general, the more deviated a well, the higher the cost and the greater the trouble-time.

The application of directional drilling technology has only recently become suitable and economically viable in the planning area. In the NSJB, infill CBM wells are now routinely being directionally and horizontally drilled from existing surface locations in an effort to reduce surface disturbance in this intensely developed resource area. The next advancement in horizontal well technology currently emerging in the NSJB is drilling multi-laterals and/or hydraulic fracturing of horizontal wells. Multilaterals could be one, two, or several branched lateral wellbores within a single formation or single laterals in two or more formations.

The drilling of deviated boreholes in the eastern Paradox Basin is even a more recent occurrence than that observed in the San Juan Basin Province. Directional wells have been drilled in the northwestern part of the planning area. The fields in this area are highly compartmentalized and structurally complex, and the ability to stack multiple, offset targets within a single borehole adds incremental reserves to these deviated wellbores. In some cases, existing vertical wells are being re-entered, and directional or horizontal penetrations are being sidetracked out of the original holes in order to accelerate production in proven reservoirs and/or add new, undeveloped reserves from zones that were sub-commercial in lower rate, vertically drilled wellbores. Horizontal drilling in the planning area is just now being introduced with the discovery of GSGP reserves near the western boundary of the planning area. If sustained, economic production rates can be attained in these newly drilled boreholes, then it is anticipated that all future GSGP development wells would be horizontal

BLM_0033499

penetrations. In addition, the average length of the lateral sections is expected to increase as well costs and operational risks are more efficiently managed by the operators over time.

## Reasonable Foreseeable Development

Historical development and price trends, USGS and Energy Policy and Conservation Act resource estimates, current drilling and development activity, existing leases, pending wells, pending leases, and pipeline and power infrastructure were considered in formulating this analysis. The projection of drilling activity, both exploratory and development, is based primarily on the long-term, gradual escalation of oil and gas prices that corresponds closely to the historical drilling activity and would mostly be confined to the high and moderate potential areas (see Volume III, Appendix V, Map 48). Approximately 2,900 new wells may be drilled on all jurisdictions in the planning area during the 15-year period (Table 3.19.5).

The estimates of land disturbance resulting from drilling and production contain estimates of timing (when the disturbance would occur within the 15-year planning period) and estimated disturbance within the provinces. Without site-specific proposals for well site locations, it is not possible to identify exactly where the estimated disturbance would occur. However, it is reasonable to assume that most disturbance would occur at intervals throughout the planning period rather than all at once and/or that the majority of the estimated disturbance would be within or adjacent to existing fields (with the exception of the GSGP) and mostly along existing primary road and pipeline corridors. Estimates of exploratory wells that are dry holes (occupied for 1–2 years) verses production wells (which may be occupied for 20–40 years) are provided.

It is important to note that these projections do not consider the various environmental and land management constraints (such as special lease stipulations and MA direction) that may be imposed by the Preferred Alternative and other alternatives analyzed in this FEIS. Approximately 50% of development is projected to occur on existing leases and hence is not subject to the leasing decisions in the LRMP.

<u>Reasonably Foreseeable Development Projections</u>

Based on the resource occurrence potential discussed in the previous section, industry interviews and leasing trends, and the price and development trends identified above, the following RFD projections are made. These are totals within the planning area including projected development on currently leased and unleased lands, and for all jurisdictions (Table 3.19.5).

**Table 3.19.5: Reasonably Foreseeable Development Scenario for the Planning Area and Number of Wells on All Jurisdictions**

| Land Ownership | Paradox Basin | GSGP | NSJB (remainder of 160-acre spacing units) | NSJB (80-acre spacing units) | San Juan Sag |
|---|---|---|---|---|---|
| BLM public lands (including federal split estate | 185 | 425 | 27 | 57 | 0 |
| NFS lands | 140 | 585 | 111 | 143 | 30 |
| State lands (surface and mineral estate) | 0 | 0 | 7 | 7 | 0 |
| Private lands (surface and mineral estate) | 50 | 760 | 92 | 283 | 0 |

BLM_0033500

| Land Ownership | Paradox Basin | GSGP | NSJB (remainder of 160-acre spacing units) | NSJB (80-acre spacing units) | San Juan Sag |
|---|---|---|---|---|---|
| Total | 375 | 1,770 | 237 | 490 | 30 |

**Paradox Basin:** The Paradox Basin is split into two distinctive plays referred to as the Paradox Basin conventional and GSGP:

- The Paradox Basin Province conventional gas play in the RFD area would grow at an average of 25 wells per year for a period of 15 years (all jurisdictions). This total includes an assumed average development of 10 wells per year (150 wells total) in the Dolores lease nomination area (SJNF) and 15 wells per year (approximately 185 wells total) on BLM public lands in the Paradox Basin RFD area. Total production during the next 15 years in the Paradox Basin Province of the RFD area is projected to be 8.7 MMBO and 740 BCF of conventional gas. There is an approximate 80% success rate for wells drilled in the BLM portion of the Paradox Basin. For the purpose of projecting development on NFS lands, the same 80% success rate is assumed.

- Within the GSGP, development of approximately 1,770 wells is projected over the next 15 years. Of that total, 1,010 wells are projected on federal mineral estate and 760 wells are projected on private mineral estate.

**NSJB:** The following is likely to occur in the NSJB:

- CBM development in the San Juan Basin Province of the RFD area would grow at an average of 40 wells per year for a period of approximately 6 years at current spacing (all jurisdictions). This total of 237 CBM wells is taken from the Industry Proposed Action analyzed in the NSJB FEIS (USFS and BLM 2007).

- In addition, the Fruitland Formation CBM wells could grow at an additional rate of 80 wells per year over a 6-year period or a total of 490 wells north of the Ute Line if 80-acre spacing is approved (all jurisdictions). All wells drilled are projected to be production wells. This would result in an average annual production increase of 16 BCF of CBM and a total increase in annual production to 240 BCF by 2023. The projected total production of CBM over the next 15 years in the San Juan Basin Province of the RFD area is 4.58 TCF.

- Additional exploration for conventional oil and gas in the San Juan Basin Province in the RFD area would result in an average of two exploratory wells per year over the next 15 years (all jurisdictions). Exploration would occur in the Fractured Mancos, Dakota, and Mesa Verde Plays.

**The San Juan Sag** would see exploration activity at an average of two wells per year on NFS lands.

In summary, considering all areas and jurisdictions, this RFD scenario projects approximately 190 wells per year throughout the RFD area on all jurisdictions for the first 5 years and approximately 195 wells per year for the subsequent 10 years, for a total of 2,900 new wells on 2,400 pads (see Table 3.19.5).

<u>Well Disturbance</u>

Table 3.19.6 through Table 3.19.10 describe projected gas development and corresponding land disturbance associated with the above RFD scenario on NFS lands, BLM public lands, and federal subsurface within the area where development is predicted. Also presented is the rate of development on the public lands for the first 5-year and subsequent 10-year development projection.

BLM_0033501

Unconstrained development is projected to be greatest in the GSGP within the Paradox Basin Province followed by 80-acre infill development of CBM wells in the NSJB.

- Assumptions for Paradox Basin conventional gas surface (pads, roads, water ponds) disturbance:
  - Average pad disturbance per well = 1.6 acres (average accounts for post-drilling interim reclamation and accommodates all on-lease facilities).
  - Average road disturbance per well = 2.4 acres.
  - Total surface disturbance per well = 4 acres.
  - Approximately 15-percent of wells are assumed non-productive and reclaimed.
- Assumptions for Paradox Basin GSGP surface (pads, roads, reserve pits, freshwater storage ponds, and construction impacts) disturbance:
  - Average pad disturbance per single well = 4.5 acres.
  - Average pad disturbance per two wells on a single pad = 5.5 acres
  - Average road disturbance per well = 2.4 acres.
  - Total surface disturbance per single well on a single pad = 6.9 acres.
  - Total surface disturbance per two wells/pad = 7.9 acres.
  - Associated flowlines would be collocated in access road ROWs = 0 acres of surface disturbance.
  - Approximately 12% of wells are assumed non-productive and reclaimed.
- Surface Disturbance Assumptions for Additional Infrastructure:
  - One major gas transmission pipeline may be needed as the GSGP develops and is assumed to be located on private surface land.
  - Gathering pipelines, compressor stations, and gas processing plants may be needed and are assumed to be located on public (60%) and private surface (40%) land and parallel to an existing pipeline corridor in the area.
  - Access road ROWs assume collocated associated flowlines. Thus, associated disturbance from flowlines is included in the access road disturbance calculations.
  - Downhole well spacing for the GSGP area is assumed to be 160 acres (i.e., 4 wells per square mile). Pad spacing is assumed to be 320 acres (i.e., 2 pads per square mile).
- Water Consumption Assumptions:
  - Water consumption for a conventional well in the PLAA would equal 32,000 barrels (1,000,000 gallons)—plus or minus 25%, meaning that the exact amount is a function of well depth.
  - A typical GSGP well would use 100,000 barrels (4,200,000 gallons) of water to drill, fracture, and complete the well. No water would be obtained from public lands. All water would be purchased by the gas companies from private sources. There would be a 40% water recycle rate, meaning that 60,000 barrels would be required on average per well after the first well is supplied.
- Disposal of Wastewater and Fracking Material Assumptions:

494

BLM_0033502

Final Environmental Impact Statement

    ❐  No evaporative pits would be authorized on public lands.

    ❐  At a minimum, wastewater would be disposed of according to EPA and CDPHE standards.

**Table 3.19.6: Unconstrained (baseline) Projection of Wells and Well Access Road Miles, and Corresponding Disturbance Acres on National Forest System Lands in the Northern San Juan Basin, San Juan Sag, and Paradox Basin, 2013–2027**

| Existing and Projected Wells – NFS Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 32 | 0 | 0 | 255 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 30 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 5 | 0 | 25 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 2 | 6 | 16 | 96 |
| Paradox Basin – GSGP | 0 | 0 | 12 | 81 | 63 | 427 |
| Total | 32 | 0 | 49 | 342 | 104 | 523 |
| **Existing and Projected Roads\* – NFS Lands** | **Existing Road Miles** | **Existing Road Miles Projected to be Reclaimed (2013–2027)** | **Projected Road Miles for Projected Wells on Existing Leases** | | **Projected Road Miles for Projected Wells on Future Leases** | |
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 16 | 0 | 0 | 70 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 2 | 0 | 12 | 0 |
| Paradox Basin - Conventional | 0 | 0 | 1 | 3 | 8 | 47 |
| Paradox Basin – GSGP | 0 | 0 | 4 | 30 | 23 | 153 |
| Total | 16 | 0 | 7 | 103 | 43 | 200 |
| **Existing and Projected Disturbance Acres** | **Existing Wells and Roads** | | **Projected Disturbance Existing Leases** | | **Projected Disturbance Future Leases** | |
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 110 | 0 | 0 | 585 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 15 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 20 | 0 | 100 | 0 |
| Paradox Basin - Conventional | 0 | 0 | 10 | 25 | 65 | 385 |
| Paradox Basin – GSGP | 0 | 0 | 60 | 435 | 340 | 2,270 |
| Total | 110 | 0 | 105 | 1045 | 505 | 2,655 |

\* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so disturbance acres include pipeline disturbance.

495

BLM_0033503

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.19.7: Unconstrained (baseline) Projection of Yearly Averages of Wells and Access Road miles, and Corresponding Acres Disturbed on National Forest System Lands**

| Development Area | Average Number of Wells, Road Miles,* and Corresponding Disturbance Acres Projected to be Drilled per Year on NFS Lands (2013–2017) | Average Number of Wells, Road Miles,* and Corresponding Disturbance Acres Projected to be Drilled per Year on NFS Lands (2018–2027) |
|---|---|---|
| NSJB – CBM | 13 wells, 7 miles, 52 acres disturbed | 14 wells, 0 miles, 7 acres disturbed |
| NSJB – Conventional | 2 wells, 0 miles, 2 acres disturbed | 2 wells, 0 miles, 2 acres disturbed |
| San Juan Sag | 2 wells, 1 miles, 8 acres disturbed | 2 wells, 1 miles, 8 acres disturbed |
| Paradox Basin | 5 wells, 3 miles, 25 acres disturbed | 10 wells, 5 miles, 40 acres disturbed |
| GSGP | 4 wells, 2 miles, 22 acres disturbed | 35 wells, 18 miles, 190 acres disturbed |
| Total | 26 wells, 13 miles, 109 acres disturbed | 63 wells, 24 miles, 247 acres disturbed |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

**Table 3.19.8: Unconstrained (baseline) Projection of Wells and Well Access Road Miles, and Corresponding Disturbance Acres on Bureau of Land Management–Administered Lands, including Split Estate Federal Minerals, in the Northern San Juan Basin, San Juan Sag, and Paradox Basin, 2013–2027**

| Existing and Projected Wells – BLM Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 30 | 0 | 0 | 84 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 10 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin - Conventional | 90 | 20 | 15 | 88 | 15 | 87 |
| Paradox Basin – GSGP | 0 | 0 | 32 | 216 | 23 | 153 |
| Total | 120 | 20 | 57 | 388 | 38 | 240 |

| Existing and Projected Roads* – BLM Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 20 | 0 | 0 | 14 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 45 | 10 | 7 | 43 | 7 | 44 |
| Paradox Basin – GSGP | 0 | 0 | 14 | 77 | 8 | 54 |
| Total | 65 | 10 | 21 | 134 | 15 | 98 |

BLM_0033504

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 75 | 0 | 0 | 165 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 5 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 360 | 80 | 60 | 350 | 60 | 375 |
| Paradox Basin – GSGP | 0 | 0 | 205 | 1,165 | 120 | 795 |
| Total | 435 | 80 | 270 | 1,680 | 180 | 1170 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

**Table 3.19.9: Unconstrained (baseline) Projection of Yearly Averages of Wells and Access Road miles, and Corresponding Acres Disturbed on BLM-administered Lands**

| Development Area | Average Number of Wells, Road Miles,* and Corresponding Disturbance Acres Projected to be Drilled per Year on BLM lands (2013–2017) | Average Number of Wells, Road Miles,* and Corresponding Disturbance Acres Projected to be Drilled per Year on BLM lands (2018–2027) |
|---|---|---|
| NSJB – CBM | 14 wells, 3 miles, 25 acres disturbed | 0 wells, 0 miles, 0 acres disturbed |
| NSJB – Conventional | 1 well, 0 miles, 0 acres disturbed | 1 well, 0 miles, 0 acres disturbed |
| San Juan Sag | 0 wells, 0 miles, 0 acres disturbed | 0 wells, 0 miles, 0 acres disturbed |
| Paradox Basin | 12 wells, 6 miles, 50 acres disturbed | 12 wells, 6 miles, 50 acres disturbed |
| Gothic Shale | 3 wells, 2 miles, 15 acres disturbed | 25 wells, 13 miles, 135 acres disturbed |
| Total | 30 wells, 11 miles, 90 acres disturbed | 38 wells, 19 miles, 185 acres disturbed |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

**Table 3.19.10: Total Land Disturbance (acres) Projected from Pipelines and Compressors**

| Development Area | Pipelines Outside Road ROWs Including Trunk Lines | Projected Compressors |
|---|---|---|
| NSJB – CBM | 0 | 0 |
| NSJB – Conventional | 0 | 0 |
| San Juan Sag | 0 | 0 |
| Paradox Basin – Conventional | 0 | 0 |
| GSGP | 0 | 32 |
| Total | 0 | 32 |

<u>Non-discretionary versus Discretionary Development</u>

Non-discretionary development for the purpose of this environmental analysis is defined as development that may take place on currently leased lands over the next 15 years (Table 3.19.6 and Table 3.19.8). The right to develop the leases represents an agreement to allow development that is

BLM_0033505

conveyed to the lessee by the federal government. Development of existing leases may proceed if the proposed operations meet the requirements of applicable federal laws (e.g. the ESA and others). Many of the existing leases in the planning area are held by production, meaning that current energy development on the leases holds the leases active until production ceases. Consequently, these lands would not be available for re-leasing until current production ceases and the leases expire. Approximately half of the projected development would occur on existing leases and is considered non-discretionary from the standpoint of this leasing analysis. The areas where projected development would occur on existing federal leases are the NSJB (340 federal wells), portions of the Paradox Basin (180 new federal wells), and portions of the GSGP (375 wells).

Development of existing leases would be conditioned to the extent that their development and operations are to be consistent with the management requirements of the revised plans and within the authority reserved by the terms and conditions of the lease.

For example, surface use and timing restrictions stipulations resulting from the LRMP cannot be retroactively applied to existing leases. However, based on site- or project-specific environmental analysis, COAs implementing LRMP standards and guidelines could be applied at the development stage (individual wells or master development plans) to mitigate potential impacts from oil and gas operations within existing lease areas, providing the leaseholder's right to develop the lease remains intact. The lease stipulations have comparable standards and guidelines in the LRMP.

The potential oil and gas development of existing leases would be consistent with LRMP direction and the terms and conditions of the lease. Impacts from future development on lands currently held under lease are generally subject to the terms and conditions under which they were originally leased. However, the BLM has the discretion to modify surface operations or add specific mitigation measures to the lease terms at the project level when supported by scientific analysis and when necessary to comply with plan direction.

Discretionary development decisions for the purpose of this environmental analysis are defined as development projected to take place on currently unleased lands if leased (see Table 3.19.6 and Table 3.19.8). These lands are subject to leasing availability decisions that would be documented in the ROD for the LRMP revision. Areas of currently unleased lands, where the new leasing decisions would directly impact RFD, include the SJNF portion of the Paradox Basin (110 new conventional gas wells projected on currently unleased lands), the SJNF portion of the San Juan Sag (25 new wells projected on currently unleased lands), the BLM portion of the Paradox Basin (100 new conventional gas wells projected on currently unleased lands), and the BLM/SJNF portions of the GSGP (670 new wells projected). Thus, the projected level of discretionary development, determined by leasing decisions made in the LRMP revisions, totals approximately 900 new wells.

For the purpose of analysis, all wells and associated impacts projected in the RFD scenario are analyzed whether or not they represent discretionary or non-discretionary development. This total level of projected development is also analyzed in relation to current development and development on other land jurisdictions to evaluate the cumulative effects of oil and gas development within the planning area.

<u>Acres Available and Stipulated by Alternative</u>

Table 3.19.11 displays acres that are withdrawn to date and acres administratively not available for leasing as a result of the alternatives. The total acres tabulated include the entire federal mineral estate, whether or not the federal government owns the surface. The oil and gas alternative maps

BLM_0033506

(Volume III, Appendix V, Maps 49–60) provide a spatial depiction of the leasing categories and stipulations.

Table 3.19.11 tabulates oil and gas leasing availability for the combined NFS, BLM, and subsurface mineral estate by alternative, and the stipulations that apply to such lands.

Stipulations are not applied to areas that are withdrawn or administratively not available for lease. As indicated in Table 3.19.11, the acres withdrawn from leasing are constant across alternatives. The acres administratively not available for leasing vary by alternative; Alternative C contains the largest amount of not-available acres due to wilderness recommendations and making several other resources and areas not available, such as the Dolores River Canyon, occupied Gunnison sage-grouse habitat, federal minerals underlying state wildlife areas, municipal watersheds, existing and proposed NRHP districts, and WSR recommendations. Correspondingly, Alternative C also has the least acreage available for lease.

**Table 3.19.11: Oil and Gas Leasing Availability by Alternative**

| Jurisdiction | Alternative A | Alternative B | Alternative C | Alternative D | No Leasing Alternative |
|---|---|---|---|---|---|
| USFS | | | | | |
| Federal mineral acres | 1,863,402 | 1,863,402 | 1,863,402 | 1,863,402 | 1,863,402 |
| Acres withdrawn from leasing | 509,954 | 509,954 | 509,954 | 509,954 | 509,954 |
| Acres administratively not available for leasing | 16,357 | 73,636 | 644,113 | 14,896 | 1,353,448 |
| Acres available for leasing | 1,337,090 | 1,279,811 | 709,335 | 1,338,551 | 0 |
| NSO | 848,806 | 876,266 | 547,642 | 666,105 | 0 |
| CSU | 513,893 | 882,532 | 391,150 | 1,033,242 | 0 |
| TL | 783,302 | 527,489 | 157 | 45,463 | 0 |
| Standard lease terms | 177,162 | 143,722 | 129,069 | 210,570 | 0 |
| BLM | | | | | |
| Federal mineral acres | 503,466 | 503,466 | 503,466 | 503,466 | 503,466 |
| Acres withdrawn from leasing | 0 | 0 | 0 | 0 | 0 |
| Acres administratively not available for leasing | 62,437 | 62,570 | 161,637 | 56,916 | 503,466 |
| Acres available for leasing | 441,030 | 440,896 | 341,829 | 446,550 | 0 |
| NSO | 132,713 | 194,290 | 318,601 | 98,486 | 0 |
| CSU | 35,948 | 401,232 | 300,504 | 406,487 | 0 |
| TL | 343,440 | 321,435 | 64 | 28,679 | 0 |
| Standard lease terms | 48,344 | 22,734 | 16,729 | 35,570 | 0 |
| Federal Subsurface | | | | | |
| Federal mineral acres | 319,957 | 319,957 | 319,957 | 319,957 | 319,957 |
| Acres withdrawn from leasing | 0 | 0 | 0 | 0 | 0 |
| Acres administratively not available for leasing | 0 | 0 | 0 | 0 | 319,957 |
| Acres available for leasing | 319,957 | 319,957 | 319,957 | 319,957 | 0 |
| NSO | 36,041 | 88,548 | 197,478 | 34,565 | 0 |
| CSU | 23,705 | 214,839 | 171,786 | 214,665 | 0 |
| TL | 167,189 | 161,301 | 0 | 461 | 0 |
| Standard lease terms | 128,016 | 82,233 | 110,718 | 104,039 | 0 |

LRMP Alternatives A and D by their emphasis provide more area available for leasing and development with less restrictions or area recommended for wilderness as compared to Alternatives

BLM_0033507

B and C. Alternatives B and C, in contrast, include more restrictions that result in NSO stipulations because of their emphasis on maintaining most of the large, contiguous blocks of undeveloped lands with NSO stipulations or through wilderness recommendations that result in areas not available for leasing. IRAs administratively not available due to wilderness recommendation in Alternative C are not recommended for wilderness and are stipulated NSO in Alternatives B and D.

Acres stipulated with CSU and/or TLs are similar between alternatives, as a result of the stipulation's application to specific resource conditions such as highly erosive soils, steep, slopes, critical wildlife habitat, various game ranges, and other factors that are mostly physical or biological and do not vary by alternative.

Acres with standard lease terms are highest in Alternative A as a reflection of the leasing decisions in the current BLM and USFS land management plans.

The No Leasing Alternative by definition has no areas administratively available for leasing over the period of the revised LRMP.

### 3.19.3 Environmental Consequences

This analysis includes development projections for three development areas. The first, the Paradox Basin (which includes conventional development and the GSGP development area), focuses on the PLAA because it is the area with the highest leasing interest within the planning area, has high development potential as reflected in the RFD projections for the area (1,335 federal wells), and because much of the area is currently unleased (72%) and subject to lease after approval of the LRMP. On the basis of these factors, a focused analysis of this portion of the overall planning area is necessary to inform decision-making regarding whether, where, and how to lease lands with high potential for development over the next 10 to 15 years.

The NSJB also includes high development potential. However, unlike the PLAA, the NSJB is fully leased and developed. Within the NSJB, the remaining question is how to condition further development of existing leases as additional wells are proposed. Anticipated development would involve constructing infill wells on existing, expanded well pads. The analysis of NSJB development and the relation to the revised LRMP decisions is also analyzed in this chapter.

A third area with gas potential is the San Juan Sag. It is projected that one to two exploratory wells would be requested annually over the life of the LRMP and that there would be minor interest in leasing in the San Juan Sag. This level of activity does not warrant analysis of the focus that is applied to the PLAA and would not be documented in detail in this chapter.

## The Leasing Alternatives

## Alternative A

Alternative A represents the continuation of current BLM and USFS leasing direction (). This direction is contained in the BLM Colorado Oil and Gas Leasing and Development EIS (BLM 1991b), the San Juan/San Miguel Resource Management Plan (BLM 1985) and the San Juan National Forest Land and Resource Management Plan (USFS 1983), both as amended. In total, 1,719,484 acres are available for leasing in Alternative A, of which approximately 1,293,931 acres are stipulated with TL, 573,546 acres are stipulated with CSU, and 1,017,560 acres are stipulated with NSO.

Projected oil and gas development for the BLM and NFS lands under Alternative A (Table 3.19.12 and Table 3.19.13) includes approximately 590 well pads. Approximately 90 well locations are

BLM_0033508

projected to be non-productive and reclaimed after production testing. For the GSGP alone, 420 well pads would be constructed on future leases.

Wells potentially displaced by NSO stipulations may total approximately 40, and a total of 30 projected wells may be eliminated because they would be displaced to areas that are administratively not available for leasing.

Under Alternative A, approximately 2,850 acres would be cleared to accommodate projected well pads and access roads on future leases.

Maps 49, 53, and 57 in Volume III, Appendix V depict lands that are available for leasing, lands that are withdrawn from leasing, lands that are administratively not available for leasing, and the stipulations that apply to lands available for leasing under Alternative A.

BLM_0033509

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.19.12: Alternative A: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on National Forest Service Lands, 2013–2027**

| Existing and Projected Wells – NFS Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 32 | 0 | 0 | 255 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 30 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 5 | 0 | 25 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 2 | 6 | 14 | 96 |
| Paradox Basin – GSGP | 0 | 0 | 8 | 59 | 44 | 298 |
| Total | 32 | 0 | 45 | 320 | 83 | 394 |

| Existing and Projected Roads* – NFS Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 16 | 0 | 0 | 70 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 2 | 0 | 12 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 1 | 3 | 7 | 48 |
| Paradox Basin – GSGP | 0 | 0 | 4 | 36 | 22 | 150 |
| Total | 16 | 0 | 7 | 109 | 41 | 198 |

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 110 | 0 | 0 | 585 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 15 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 20 | 0 | 100 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 10 | 25 | 55 | 385 |
| Paradox Basin – GSGP | 0 | 0 | 60 | 435 | 335 | 2265 |
| Total | 110 | 0 | 105 | 1045 | 490 | 2650 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033510

**Table 3.19.13: Alternative A: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres BLM Lands, Including Split Estate Federal Minerals, 2013–2027**

| Existing and Projected Wells – BLM Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 30 | 0 | 0 | 84 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 10 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 90 | 20 | 15 | 88 | 11 | 80 |
| Paradox Basin – GSGP | 0 | 0 | 27 | 153 | 16 | 106 |
| Total | 120 | 20 | 52 | 325 | 27 | 186 |

| Existing and Projected Roads* – BLM Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 20 | 0 | 0 | 14 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 45 | 10 | 7 | 43 | 5 | 40 |
| Paradox Basin – GSGP | 0 | 0 | 13 | 76 | 8 | 53 |
| Total | 65 | 10 | 20 | 133 | 13 | 93 |

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 75 | 0 | 0 | 165 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 5 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 360 | 80 | 60 | 350 | 45 | 320 |
| Paradox Basin – GSGP | 0 | 0 | 205 | 1,165 | 120 | 805 |
| Total | 435 | 80 | 270 | 1,680 | 165 | 1125 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033511

## Alternative B (Preferred Alternative)

Alternative B is the preferred leasing alternative. Approximately 2,040,800 acres are available for lease, of which 1,032,230 acres are stipulated with TL, 1,133,320 acres stipulated with CSU, and approximately 1,097,500 acres stipulated with NSO. Areas that are administratively not available for leasing total approximately 136,073 acres. Table 3.19.11 presents leasing availability and stipulations that would apply to NFS and BLM-administered public lands in Alternative B.

Projected oil and gas development for the BLM and USFS combined under Alternative B (Table 3.19.14 and Table 3.19.15) includes approximately 575 well pads on future leases. Approximately, 90 well locations are projected to be non-productive and reclaimed after production testing. Projected GSGP formation well pads would total 410 on future leases.

Wells potentially displaced by NSO stipulations may total approximately 170. A total of 53 projected wells may be eliminated because their locations would be allocated to lands administratively not available for leasing.

Approximately 2,800 acres would be cleared to accommodate projected well pads and access roads.

Maps 50, 54, and 58 (Volume III, Appendix V) depict lands that are available for leasing, lands that are withdrawn from leasing, lands that are administratively not available for leasing, and the stipulations that apply to lands available for leasing under Alternative B.

BLM_0033512

**Table 3.19.14: Alternative B: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on National Forest System Lands, 2013–2027**

| Existing and Projected Wells – NFS Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 32 | 0 | 0 | 255 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 30 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 5 | 0 | 25 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 2 | 6 | 14 | 93 |
| Paradox Basin – GSGP | 0 | 0 | 8 | 59 | 42 | 279 |
| Total | 32 | 0 | 45 | 320 | 81 | 372 |

| Existing and Projected Roads* – NFS Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 16 | 0 | 0 | 70 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 2 | 0 | 12 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 1 | 3 | 7 | 46 |
| Paradox Basin – GSGP | 0 | 0 | 4 | 36 | 21 | 140 |
| Total | 16 | 0 | 7 | 109 | 40 | 186 |

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 110 | 0 | 0 | 585 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 15 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 20 | 0 | 100 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 10 | 25 | 55 | 370 |
| Paradox Basin – GSGP | 0 | 0 | 60 | 435 | 320 | 2,120 |
| Total | 110 | 0 | 105 | 1,045 | 475 | 2,490 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033513

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.19.15: Alternative B: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on Bureau of Land Management Lands, Including Split Estate Federal Minerals, 2013–2027**

| Existing and Projected Wells – BLM Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 30 | 0 | 0 | 84 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 10 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 90 | 20 | 15 | 88 | 10 | 65 |
| Paradox Basin – GSGP | 120 | 0 | 27 | 153 | 10 | 70 |
| Total | 240 | 20 | 52 | 325 | 20 | 135 |
| Existing and Projected Roads* – BLM Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 20 | 0 | 0 | 14 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 45 | 10 | 7 | 43 | 5 | 33 |
| Paradox Basin – GSGP | 0 | 0 | 13 | 76 | 5 | 35 |
| Total | 65 | 10 | 20 | 133 | 10 | 68 |
| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 75 | 0 | 0 | 165 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 5 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 360 | 80 | 60 | 350 | 40 | 260 |
| Paradox Basin – GSGP | 0 | 0 | 205 | 1,165 | 76 | 532 |
| Total | 435 | 80 | 270 | 1,680 | 116 | 792 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033514

## Alternative C

Under leasing Alternative C, production of goods and services are less than proposed under leasing Alternatives A, B, and D.

Approximately 1,371,120 acres would be available for lease in Alternative C. Designated wilderness areas and the Piedra Area are withdrawn from leasing by law. Approximately 532,300 acres recommended for wilderness or WSR designation (wild river segments) are administratively not available for mineral leasing under Alternative C, the highest among the alternatives. Seventy percent of the areas proposed for withdrawal occurs in no or low potential areas. CRAs not recommended for wilderness in Alternative C are stipulated with NSO. On lands outside CRAs a full range of stipulations are assigned including stipulations such as TL, CSU, and NSO to protect various resources such as highly erosive soils, steep slopes, critical wildlife habitat, and areas with special management designations, such as archaeological areas, among others. Areas that are administratively not available for lease total approximately 873,100 acres.

Projected oil and gas development for the BLM and USFS combined under Alternative C includes approximately 570 well pads on future leases (Table 3.19.16 and Table 3.19.17). Approximately 90 well locations are projected to be non-productive and reclaimed after production testing. Projected GSGP well pads would total 405 on future leases.

Wells potentially displaced by NSO stipulations may total approximately 195, the greatest among the alternatives, and a total of 56 projected wells may be eliminated because their locations would be allocated to lands administratively not available for leasing.

Approximately 2,760 acres would be cleared to accommodate projected well pads and access roads on future leases.

Maps 51, 55, and 59 (Volume III, Appendix V) depict lands that are available for leasing, lands that are withdrawn from leasing, lands that are administratively not available for leasing, and the stipulations that apply to lands available for leasing under Alternative C.

BLM_0033515

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.19.16: Alternative C: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on National Forest Service Lands, 2013–2027**

| Existing and Projected Wells – NFS Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 32 | 0 | 0 | 255 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 30 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 5 | 0 | 25 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 2 | 6 | 10 | 69 |
| Paradox Basin – GSGP | 0 | 0 | 8 | 59 | 37 | 249 |
| Total | 32 | 0 | 45 | 320 | 72 | 318 |

| Existing and Projected Roads* – NFS Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 16 | 0 | 0 | 70 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 2 | 0 | 12 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 1 | 3 | 5 | 35 |
| Paradox Basin – GSGP | 0 | 0 | 4 | 36 | 17 | 125 |
| Total | 16 | 0 | 7 | 109 | 34 | 160 |

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 110 | 0 | 0 | 585 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 15 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 20 | 0 | 100 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 10 | 25 | 40 | 280 |
| Paradox Basin – GSGP | 0 | 0 | 60 | 435 | 250 | 1,670 |
| Total | 110 | 0 | 105 | 1045 | 390 | 1,950 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033516

**Table 3.19.17: Alternative C: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on Bureau of Land Management Lands, Including Split Estate Federal Minerals, 2013–2027**

| Existing and Projected Wells – BLM Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 30 | 0 | 0 | 84 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 10 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 90 | 20 | 15 | 88 | 8 | 57 |
| Paradox Basin – GSGP | 0 | 0 | 27 | 153 | 10 | 63 |
| Total | 120 | 20 | 52 | 325 | 18 | 120 |

| Existing and Projected Roads* – BLM Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 20 | 0 | 0 | 14 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 45 | 10 | 7 | 43 | 4 | 28 |
| Paradox Basin – GSGP | 0 | 0 | 13 | 76 | 5 | 32 |
| Total | 65 | 10 | 20 | 133 | 9 | 60 |

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 75 | 0 | 0 | 165 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 5 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 360 | 80 | 60 | 350 | 35 | 230 |
| Paradox Basin – GSGP | 0 | 0 | 205 | 1165 | 65 | 480 |
| Total | 435 | 80 | 270 | 1680 | 100 | 710 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033517

## Alternative D

Alternative D provides for a mix of multiple-use activities, with a primary emphasis on the "working forest and rangelands" concept in order to produce a higher level of commodity goods and services compared to the other alternatives. This alternative provides for the greatest extent of resource use within the planning area while, at the same time, protecting and sustaining resources. The oil and gas leasing program associated with Alternative D is described below.

Approximately 2,105,058 acres are available for lease in Alternative D, of which approximately 74,603 acres are stipulated with TL, 1,654,394 acres are stipulated with CSU, approximately 799,156 acres are stipulated with NSO, and 350,179 acres are stipulated with standard lease terms. Alternative D does not include any wilderness or WSR recommendations, and thus no proposal for lands to be withdrawn from leasing. CRAs are stipulated NSO in Alternative D. On lands outside IRAs, a full range of stipulations are assigned including TL, CSU, and NSO to protect various resources such as highly erosive soils, steep slopes, critical wildlife habitat, and areas with special management designations such as archaeological areas, among others (see Volume III, Appendix H).

Table 3.19.18 and Table 3.19.19 present leasing availability and stipulations for NFS and BLM-administered lands within Alternative D.

Projected oil and gas development of future leases for the BLM and USFS, combined under Alternative D includes 585 well pads (see Table 3.19.18 and Table 3.19.19). Of this total, approximately 85 wells are projected to be non-productive and would be reclaimed after production testing. Within the GSGP, 415 well pads would be constructed on future leases.

Wells potentially displaced by NSO stipulations may total approximately 150, and a total of 30 projected wells may be eliminated because their location would be allocated to lands administratively not available for leasing.

Approximately 2,850 acres would be cleared to accommodate projected well pads and access roads.

Maps 52, 56, and 60 (Volume III, Appendix V) depict lands that are available for leasing, lands that are withdrawn from leasing, lands that are administratively not available for leasing, and the stipulations that apply to lands available for leasing under Alternative D.

BLM_0033518

**Table 3.19.18: Alternative D: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on National Forest Service Lands, 2013–2027**

| Existing and Projected Wells – NFS Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 32 | 0 | 0 | 255 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 30 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 5 | 0 | 25 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 2 | 6 | 14 | 95 |
| Paradox Basin – GSGP | 0 | 0 | 8 | 59 | 44 | 297 |
| Total | 32 | 0 | 45 | 320 | 83 | 392 |
| Existing and Projected Roads* – NFS Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 16 | 0 | 0 | 70 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 2 | 0 | 12 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 1 | 3 | 7 | 47 |
| Paradox Basin – GSGP | 0 | 0 | 4 | 36 | 22 | 145 |
| Total | 16 | 0 | 7 | 109 | 41 | 192 |
| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 110 | 0 | 0 | 585 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 15 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 20 | 0 | 100 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 10 | 25 | 55 | 380 |
| Paradox Basin – GSGP | 0 | 0 | 60 | 435 | 335 | 2,255 |
| Total | 110 | 0 | 105 | 1,045 | 490 | 2,635 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033519

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.19.19: Alternative D: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on Bureau of Land Management Lands, Including Split Estate Federal Minerals, 2013–2027**

| Existing and Projected Wells – BLM Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 30 | 0 | 0 | 84 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 10 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 90 | 20 | 15 | 88 | 11 | 72 |
| Paradox Basin – GSGP | 0 | 0 | 27 | 153 | 11 | 100 |
| Total | 120 | 20 | 52 | 325 | 22 | 172 |

| Existing and Projected Roads* – BLM Lands | Existing Road Miles | Existing Road Miles Projected to be Reclaimed (2013–2027) | Projected Road Miles for Projected Wells on Existing Leases | | Projected Road Miles for Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 20 | 0 | 0 | 14 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 45 | 10 | 7 | 43 | 5 | 36 |
| Paradox Basin – GSGP | 0 | 0 | 13 | 76 | 5 | 50 |
| Total | 65 | 10 | 20 | 133 | 10 | 86 |

| Existing and Projected Disturbance Acres | Existing Wells and Roads | | Projected Disturbance Existing Leases | | Projected Disturbance Future Leases | |
|---|---|---|---|---|---|---|
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 75 | 0 | 0 | 165 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 5 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 360 | 80 | 60 | 350 | 45 | 290 |
| Paradox Basin – GSGP | 0 | 0 | 205 | 1,165 | 45 | 760 |
| Total | 435 | 80 | 270 | 1,680 | 90 | 1050 |

* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033520

## No Leasing Alternative

The No Leasing Alternative is analyzed per direction in 36 CFR 228.102(c)(2)&(3), which requires the USFS, when considering oil and gas leasing, to analyze an alternative of not leasing. A No Leasing Alternative is also applied to BLM-administered public lands to achieve a consistent set of alternatives among the two land management agencies. Under the No Leasing Alternative, acres withdrawn from leasing total approximately 480,953 acres. The remaining NFS lands (1,381,559 acres) and BLM-administered lands (822,533 surface and subsurface acres) not withdrawn are administratively not available for leasing (Table 3.19.20). Under this alternative, existing leases would not be affected and would continue through their terms.

**Table 3.19.20: Oil and Gas Leasing Availability in the Paradox Basin Analysis Area for the No Leasing Alternative**

| Planning Area | NFS | BLM | Federal Subsurface | Total |
|---|---|---|---|---|
| Federal mineral acres | 1,863,394 | 503,464 | 319,089 | 2,642,052 |
| Acres withdrawn from leasing | 481,035 | 0 | 0 | 480,953 |
| Acres proposed for withdrawal | 0 | 0 | 0 | 0 |
| Acres administratively not available for leasing | 1,381,559 | 503,464 | 319,089 | 2,161,099 |
| Acres available for leasing | 0 | 0 | 0 | 0 |

Oil and gas development would occur on existing leases only. Approximately 830 well pads would be constructed and 2,300 acres would be cleared to accommodate well pads and access road construction (Table 3.19.21 and Table 3.19.22).

Map 61 (Volume III, Appendix V) depicts lands that are available for leasing, lands that are withdrawn from leasing, lands that are administratively not available for leasing, and the stipulations that apply to lands available for leasing under the No Leasing Alternative.

BLM_0033521

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.19.21: No Leasing Alternative: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on National Forest Service Lands, 2013–2027**

| Existing and Projected Wells – NFS Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 32 | 0 | 0 | 255 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 30 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 5 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 2 | 6 | 0 | 0 |
| Paradox Basin – GSGP | 0 | 0 | 8 | 59 | 0 | 0 |
| Total | 32 | 0 | 45 | 320 | 0 | 0 |
| **Existing and Projected Roads[a] – NFS Lands** | **Existing Road Miles** | **Existing Road Miles Projected to be Reclaimed (2013–2027)** | **Projected Road Miles for Projected Wells on Existing Leases** | | **Projected Road Miles for Projected Wells on Future Leases** | |
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 16 | 0 | 0 | 70 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 2 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 1 | 3 | 0 | 0 |
| Paradox Basin – GSGP | 0 | 0 | 4 | 36 | 0 | 0 |
| Total | 16 | 0 | 7 | 109 | 0 | 0 |
| **Existing and Projected Disturbance Acres** | **Existing Wells and Roads** | | **Projected Disturbance Existing Leases** | | **Projected Disturbance Future Leases** | |
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 110 | 0 | 0 | 585 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 15 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 20 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 0 | 0 | 10 | 25 | 0 | 0 |
| Paradox Basin – GSGP | 0 | 0 | 60 | 435 | 0 | 0 |
| Total | 110 | 0 | 105 | 1045 | 0 | 0 |

[a] Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

514

BLM_0033522

**Table 3.19.22: No Leasing Alternative: Projection of Well Pads and Access Road Miles, and Corresponding Disturbance Acres on Bureau of Land Management Lands, including Split Estate Federal Minerals, 2013–2027**

| Existing and Projected Wells – BLM Lands | Existing Producing Wells | Existing Well sites Projected to be Reclaimed (2013–2027) | Projected Wells on Existing Leases | | Projected Wells on Future Leases | |
|---|---|---|---|---|---|---|
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 30 | 0 | 0 | 84 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 10 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 90 | 20 | 15 | 88 | 0 | 0 |
| Paradox Basin – GSGP | 0 | 0 | 27 | 153 | 0 | 0 |
| Total | 120 | 20 | 52 | 325 | 0 | 0 |
| **Existing and Projected Roads\* – BLM Lands** | **Existing Road Miles** | **Existing Road Miles Projected to be Reclaimed (2013–2027)** | **Projected Road Miles for Projected Wells on Existing Leases** | | **Projected Road Miles for Projected Wells on Future Leases** | |
| | | | Non-productive (reclaimed) | Production (long term) | Non-productive (reclaimed) | Production (long term) |
| NSJB – CBM | 20 | 0 | 0 | 14 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 0 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 45 | 10 | 7 | 43 | 0 | 0 |
| Paradox Basin – GSGP | 0 | 0 | 13 | 76 | 0 | 0 |
| Total | 65 | 10 | 20 | 133 | 0 | 0 |
| **Existing and Projected Disturbance Acres** | **Existing Wells and Roads** | | **Projected Disturbance Existing Leases** | | **Projected Disturbance Future Leases** | |
| | Total Acres Disturbed | Total Acres Projected to be Reclaimed | Non-productive Wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads | Non-productive wells and Associated Roads (reclaimed) | Total Acres Disturbed – Production Wells and Roads |
| NSJB – CBM | 75 | 0 | 0 | 165 | 0 | 0 |
| NSJB – Conventional | 0 | 0 | 5 | 0 | 0 | 0 |
| San Juan Sag | 0 | 0 | 0 | 0 | 0 | 0 |
| Paradox Basin – Conventional | 360 | 80 | 60 | 350 | 0 | 0 |
| Paradox Basin – GSGP | 0 | 0 | 205 | 1,165 | 0 | 0 |
| Total | 435 | 80 | 270 | 1,680 | 0 | 0 |

\* Only roads for administrative use (closed to public) are included. Pipelines are projected to be in road ROWs, so road disturbance acres include pipeline disturbance.

BLM_0033523

## Effect of Land Management Emphasis and Physical and Biological Constraints on Leasing and Reasonably Foreseeable Development

This discussion focuses on the effects of land management emphasis and physical and biological constraints that place limits on oil and gas development activities. Key factors that affect oil and gas development potential include the acres available and unavailable for oil and gas development by alternative and acres administratively not available lease as acres of NSO, which constrain development. Hence this analysis includes evaluation of resource stipulation in terms of the constraints they impose on oil and gas development (particularly wells eliminated as a result of NSO stipulations). The baseline for this analysis is the RFD scenario, which is unconstrained. Evaluation of the alternatives is presented in terms of the number of well sites that would be eliminated as a result of the oil and gas leasing stipulations.

Leasable mineral resources would be considered unrecoverable in areas designated not available for leasing. They would also be considered unrecoverable in areas open to leasing but where surface use constraints prohibit development operations on areas larger than can be technically and economically developed from off-site locations.

All alternatives have NSO restrictions on a portion of lands available for mineral leasing, which preclude surface occupancy. Development of the mineral resources in these areas would require off-site methods such as directional drilling. The equipment and personnel for directional drilling increase development costs by at least 10% to 50%. Directional drilling also increases the risks of drilling problems (such as stuck casings) and diminished well production.

## Effects of Major Resource Programs and Constraints on Reasonably Foreseeable Development

This section describes how oil and gas leasing and development may be affected by the proposed LRMP standards and guidelines and associated leasing stipulations developed specifically for physical and biological resource protection (for example, protection of steep slopes or wildlife habitats). Stipulations in addition to standard terms are made part of a lease when the planning record demonstrates the necessity for the stipulations. Land use plans serve as the primary vehicle for determining the necessity for lease stipulations (BLM Handbook H1624-1). Stipulations to be applied to new oil and gas leases issued under the revised LRMP were developed based on environmental protection objectives to achieve compatibility with other management objectives, resources, and activities. Appendix F includes a table of leasing stipulations by alternative and the amount of acres affected by each resource stipulation.

## Effects from Air

Because direct, indirect, and cumulative impacts to air quality may result from oil and gas leasing and development, several standards and guidelines have been adopted to minimize or eliminate many air pollution emissions. In summary, the following standards apply to oil and gas activities: $NO_x$ emissions limits apply to stationary engines; venting of saleable gases is prevented through green completions; leaks associated with production, transport, pipelines, pneumatics, and storage of hydrocarbons is reduced or prevented; and VOC emissions from separators and dehydrators is reduced or eliminated. The following guidelines apply to oil and gas activities: effective dust suppression should be applied to larger construction activities lasting longer than 5 days; venting of VOCs, hazardous air pollutants, and greenhouse gases is reduced or eliminated; collocation/ centralization of new facilities and/or liquid gathering systems and optimization of new engines would be used to minimize air quality impacts; and drill rig engines that meet the most current Tier 2–Tier 4

BLM_0033524

emission standards would be used. Occupancy and use for minerals purposes are not restricted by air management through stipulations. See Volume II, LRMP, for the complete list of air quality standards and guidelines.

It is not anticipated that the air quality standards and guidelines, as stated above, would create any impacts at the leasing stage. Additional cost may be incurred by the operator at the project level (drilling a well) as a result of requirements for green completion, dust mitigation, and other requirements. Should a single well project evolve into a field development project, additional cost may be incurred by the operator as a result of the standards and guidelines for compressors, emissions, pipelines, and other facilities or infrastructure.

## Effects from Fish and Wildlife Management

Stipulations for wildlife are presented in Volume III, Appendix H.  TL restricts drilling activities during critical periods, such as breeding and nesting periods, and usually extend over a specific distance from the site if activities could cause an adverse effect. NSO stipulations buffer areas such as nest and breeding sites from oil and gas activities.

Normally, TL applies to drilling, testing, and new construction phases of oil and gas development and not to operation and maintenance of production facilities. The objective is to prevent nest abandonment and reduced reproductive success. The effect would be that workover operations would have to be conducted outside the period of TL. This does not apply to emergency repairs.

The CSU stipulation usually restricts drilling and other activities within a specified distance from the area requiring protection and is applied if activities would likely result in degradation of habitat, abandonment, disruption, or other failure.

There are approximately 390,000 acres of the SJNF and TRFO, including split estate, where wildlife stipulations would be applied. The majority of the acreage has winter TL applied for protection of big game winter range.

Approximately 60% of the acreage of the Paradox Basin conventional gas play and 30% of the GSGP would have wildlife stipulations assigned to protect various wildlife species and their habitats. NSO stipulations would apply to approximately 20% of the Paradox conventional gas play and 12% of the GSGP.

The effects of wildlife stipulations on projected oil and gas development in the RFD areas would be minor. NSO would apply to approximately 10 well sites in the GSGP. There would be approximately 35 projected wells stipulated with TL and CSU in the SJNF portion of the Paradox Basin and as many as 100 wells stipulated TL or CSU in the GSGP. The TL restrictions would limit the time period in which well drilling and workovers could be completed. Approximately 2% of wells in the RFD areas would be affected by the NSO stipulations that apply to the RFD areas.

## Effects from Water Management

An NSO stipulation has been developed to meet guidelines for water, wetlands, riparian, and floodplain areas. The NSO stipulation is applied to maintain water quality, hydrologic integrity, and riparian area and wetland composition, structure, and function. Access and other development and production-related facilities would be allowed subject to identified operational constraints. Areas adjacent to reservoirs and eligible WSR segments would be stipulated NSO.

BLM_0033525

The effects of water management stipulations on oil and gas development would be minor. Approximately four projected well sites would be stipulated NSO in the Paradox Basin conventional gas play and 15 to 20 wells stipulated NSO in the GSGP, totaling approximately 2% of the wells projected in the RFD scenario for the SJNF portion of the Paradox Basin and the San Juan Sag. An additional seven wells would be stipulated CSU for watershed protection.

## Effects from Vegetation Management

The acreage where special vegetation resource stipulations apply totals approximately 25,000 acres in the planning area. Vegetation stipulation acres are highest in Alternative B, followed by Alternatives D, C, and A. Vegetation stipulations would apply to approximately 2% of the Paradox Basin conventional gas play and 7% of the GSGP.

An NSO stipulation is applied to old growth forests, proposed SBAs, and existing and proposed RNAs for the purpose of protecting those rare or unique vegetation types or forest structural representations. A CSU stipulation is applied to areas of known mapped invasive species infestations for the purpose of alerting lessees to that condition and the need to address it in Surface Use Plans of Operation.

The effects of vegetation stipulations on oil and gas leasing and potential development in the RFD areas would be minor. Vegetation resource stipulations would apply to approximately 1% of the Paradox Basin conventional gas play and 2% of the GSGP.

There would be no well sites eliminated as a result of the application of vegetation stipulations to projected oil and gas development areas. There would be no well sites stipulated as NSO in the Paradox Basin conventional gas play as a result of the vegetation stipulations in Alternatives A, B, C, and D. Approximately three well sites would be stipulated NSO in the GSGP area.

## Effects from Soils Management

An NSO stipulation is applied to steep slopes over 35% and to other ecological land units listed below that have steep slopes and soil characteristics that are of high risk for mass waiting due to disturbance. In addition, the Gypsum Valley area is stipulated as CSU to protect highly erodible soils.

The effects of soil/geology protection stipulations on oil and gas development would be moderate. Approximately 14 projected well sites in the Paradox Basin conventional gas play would be stipulated NSO. An additional 11 wells within the same play would be stipulated CSU for soil/geology protection.

Within the GSGP, approximately 30 well sites would be stipulated NSO and 20 well sites stipulated CSU to protect steep slopes and sensitive soils.

## Effects from Cultural, Heritage, and Historic Resource Management

The acreage to which heritage resource stipulations apply totals approximately 941 acres in Alternative A; 78,720 in Alternative B; 150,206 acres in Alternative C, and 78,120 acres in Alternative D.

Alternative A assigns an NSO stipulation to the Chimney Rock, Falls Creek, and Anasazi Archaeological Districts; otherwise, the three areas are administratively not available for leasing in the other alternatives. An NSO stipulation is applied to existing and proposed national register districts, national historic trails, and cultural areas designated as special interest areas because these features and their use and management would be incompatible with oil and gas development within their

BLM_0033526

immediate bounds. The number of acres assigned heritage management emphasis is greatest in Alternatives B and C, followed by Alternatives A and D.

The effects of heritage management stipulations on oil and gas leasing and potential development in the areas of RFD would be moderate. There would be approximately nine well sites eliminated in the Paradox Basin conventional gas play and 19 well sites eliminated within the Paradox Basin GSGP as a result of heritage protection stipulations. Well sites stipulated NSO would total approximately 10 in the GSGP under Alternatives B and C and fewer in Alternatives A and D.

## Effects from Recreation and Scenery Management

Several NSO stipulations are applied to areas with objectives for scenic integrity protection and areas where well development would be incompatible with recreation areas, including developed recreation sites, ski areas, high SIO areas (VRM Class I and II), special designation trails, recreation-emphasis corridors, and scenic byways. CSU would be prescribed for designated SRMAs, which total approximately 130,000 acres in Alternatives B, C, and D. The CSU stipulation allows surface occupancy and use subject to operational constraints consistent with the desired recreational setting. Access and other development and production-related facilities would be allowed but may be moved or modified to preserve scenic resources. Operational constraints are similar to those utilized for scenery management and may include requirements that reduce recreational conflict, such as using topographic and vegetative screening, matching color tones of facilities with surrounding topographic features, orienting the well pad and facilities, redesigning production facilities to such scale that they may not be evident or blend with the vernacular architecture of the area, or placing facilities outside the affected area.

Effects of recreation protection stipulations are generally the same by alternative; no projected well sites would be eliminated by application of the NSO stipulations. Well sites stipulated by NSO would total approximately three wells on the BLM public lands and between 20 and 30 wells within the GSGP area, meaning the well location would have to be moved to accommodate the recreational use protected. In some instances, wells would have to be moved up to 0.25 mile.

Scenic integrity stipulations would apply to less than 1% of the Paradox Basin conventional gas play and 1% of the GSGP. Effects on the RFD scenario are generally the same by alternative; no projected well sites would be eliminated by application of the NSO stipulations. Where wells are stipulated as NSO, the well location would have to be moved to accommodate the visual quality of the area to be protected.

## Effects from Range Management and Livestock Grazing

Guidelines for range management and livestock grazing do not require stipulations for oil and gas activities. Occupancy and use for minerals purposes are not restricted by range and livestock management activities. Certain grazing activities, such as grazing on mineral sites that are being reclaimed, are addressed in site-specific management requirements at the APD stage of development.

## Effects from Fire and Fuels Management

Heavy equipment use during fire-suppression activities could affect buried pipelines; however, this is addressed in standard operating procedures and BMPs incorporated in the revised LRMP by reference. No stipulations are required.

BLM_0033527

## Effects from Special Use Management

Generally no stipulations are required by guidelines for special uses; however, certain mineral-related activities (roads, pipelines, gathering lines, power lines) may require Special Use Permits and would be affected by guidelines for special uses. Guidelines applied to special use activities associated with oil and gas could increase operator costs. One category, administrative sites, is analyzed in this section. Administrative sites total 600 acres and would be assigned an NSO stipulation within an area inclusive of 0.25 mile of the administrative site. Application of this stipulation would not affect oil and gas development. There is sufficient flexibility in field siting of oil and gas facilities that administrative sites would not be affected.

## Summary - Effects of Management Areas and Physical and Biological Stipulations on Reasonably Foreseeable Development Projection

The following discussion focuses on the differences between the alternatives in terms of the overall consequence of not available for lease and NSO requirements placed on the RFD scenario.

Decisions to not lease lands and stipulations applied by the various alternatives could affect well locations and could, in some cases, eliminate wells, resulting in only a portion of the RFD scenario's implementation. The analysis of the effects of the lease determinations and stipulations applied to the RFD area suggests that approximately 235 well sites would be eliminated in Alternative C as a result of an administratively not available for lease decision and NSO requirements. Alternative A is followed by Alternative B (140 well sites), Alternative D (60 well sites), and Alternative A (33 well sites) for elimination. Well sites eliminated as a percentage of unconstrained RFD would total between 4% and 18% percent (Table 3.19.23 and Table 3.19.24).

**Table 3.19.23: Projected Number of Wells on New and Existing Leases and Total Eliminated by Not Available for Lease or No Surface Occupancy Designations Where the Stipulation May Preclude Development Opportunities**

| Jurisdiction | Unconstrained | Alt A | Alt B | Alt C | Alt D | No Lease |
|---|---|---|---|---|---|---|
| SJNF (wells) | 704 | 687 | 654 | 581 | 685 | 101 |
| TRFO (wells) | 630 | 614 | 540 | 518 | 590 | 351 |
| Total (wells) | **1,334** | **1,301** | **1,194** | **1,099** | **1,275** | **452** |
| **Wells Eliminated as a Result of the Alternatives** | | | | | | |
| Not available for lease | 0 | -16 | -128 | -199 | -39 | -882 |
| NSO core not feasible for development | 0 | -17 | -12 | -36 | -20 | 0 |
| Percent reduction | | **-4%** | **-11%** | **-18%** | **-5%** | **-66%** |

**Table 3.19.24: Projected Number of Well Pads and Total Eliminated by Not Available for Lease or No Surface Occupancy Designations Where the Stipulation May Preclude Development Opportunities**

| Jurisdiction | Unconstrained | Alt A | Alt B | Alt C | Alt D | No Lease |
|---|---|---|---|---|---|---|
| SJNF (well pads) | 540 | 527 | 503 | 440 | 525 | 75 |
| TRFO (well pads) | 511 | 496 | 438 | 421 | 477 | 283 |
| Total (well pads) | **1051** | **1,023** | **941** | **861** | **1002** | **358** |
| **Well Pads Eliminated as a Result of the Alternatives** | | | | | | |
| Not available for lease | 0 | -15 | -101 | -163 | -35 | -713 |
| NSO core not feasible for development | 0 | -13 | -9 | -27 | -14 | 0 |
| Percent reduction | | **-4%** | **-11%** | **-18%** | **-5%** | **-66%** |

BLM_0033528

Table 3.19.25 describes the number of well sites potentially displaced by NSO requirements, both in terms of relative number of sites and percentage of total projected well pads per alternative. Alternative C has the highest impact on oil and gas development opportunities, potentially displacing 465 wells, or 54% of total projected wells under the alternatives. Alternative C is followed in order by Alternatives B, A, and D in descending order of impact. A reasonable assumption is that offset locations may not be available in every case where well sites are displaced by NSO stipulations. Thereby, some percentage of the total wells displaced may be eliminated.

**Table 3.19.25: Projected Number of Well Sites Potentially Displaced by No Surface Occupancy Requirements**

| Jurisdiction | Alt A | Alt B | Alt C | Alt D | No Lease |
|---|---|---|---|---|---|
| **SJNF** | | | | | |
| Conventional gas | 51 | 53 | 52 | 43 | 0 |
| GSGP | 165 | 152 | 248 | 150 | 0 |
| **TRFO** | | | | | |
| Conventional gas | 15 | 22 | 65 | 8 | 0 |
| GSGP | 44 | 50 | 100 | 23 | 0 |
| Total | **275** | **277** | **465** | **224** | **0** |
| Percentage of total well sites | **27%** | **30%** | **54%** | **22%** | **0%** |

In terms of the overall impacts of the alternatives on RFD, Alternative C would eliminate a relative 18% of development potential and would require displacement of 54% of remaining wells. Alternative D would have the smallest impact relatively eliminating 5% of development potential and would require relocation of approximately 22% of remaining well sites due to NSO requirements.

# 3.20 Minerals and Energy: Solid Minerals

## 3.20.1 Introduction

Locatable minerals, mineral materials, and solid leasable minerals are all discussed in this section. Solid mineral resources within the TRFO and SJNF have played a significant role in the past and continue to be important today. Current resource estimates indicate valuable reserves within portions of the planning area. Solid minerals activity is most heavily concentrated on BLM lands in the Slick Rock area near Dove Creek and the associated Uravan Mineral Belt area; however, activity also occurs in the Silverton, Rico, and La Plata areas.

The BLM and USFS manage mineral-related activities consistent with multiple-use management principles. The exploration, development, and production of solid minerals resources are integrated with the use, conservation, and protection of other resources. The BLM also manages approximately 264,400 acres of federally owned mineral estate beneath privately held surface called split estate land.

## Legal and Administrative Framework

## Laws

- **The United States Mining Laws of 1872:** This act allows exploration, development, and production of minerals from mining claims on public lands.

BLM_0033529

- **The Building Stone Placer Act of 1890**: This act made building stone subject to location under placer claims.

- **The Organic Administration Act of 1897:** This act extends the operation of the U.S. Mining Laws to NFS lands reserved from the public domain.

- **Stock Raising Homestead Act of 1916:** Provided homesteads to settlers, but retained mineral rights to the federal government. BLM administers the federal minerals beneath these split estate lands.

- **The Mineral Leasing Act of 1920, as amended:** This act establishes the leasing system for the exploration and development of coal, phosphate, potassium, sodium, oil shale, oil, and gas.

- **The Department of Agriculture Organic Act of 1944:** This act provides for the protection and management of resources of NFS lands.

- **The Mineral Leasing Act for Acquired Lands of 1947:** This act extends the provisions of the mineral leasing laws to the mineral estate on lands acquired by the federal government, including so-called "hard rock" minerals, and requires the consent of the Secretaries of the Interior (BLM) and Agriculture (USFS) prior to leasing, as applicable.

- **The Common Varieties of Mineral Materials Act of 1947:** This act authorizes disposal of mineral materials such as sand, gravel, and common clay (as well as certain vegetative materials) through sale contracts or permits. It also allows free use by government agencies, municipalities, and non-profit organizations.

- **Multiple Mineral Development Act of 1954 (PL 585):** This act amended the mineral leasing and mining laws to allow for the development of multiple mineral development on the same tracts of public lands.

- **Federal Land Policy and Management Act of 1976:** FLPMA requires that mines submit reclamation plans provides penalties for undue or unnecessary degradation. The act requires that public lands be managed in a manner that recognizes the nation's need for domestic sources of minerals, food, timber, and fiber from the public lands, including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 USC 21a) as it pertains to public lands.

- **The Multiple Surface Use Mining Act of 1955 (PL 167):** This act prohibits the location of mining claims for common varieties of mineral materials (such as sand, gravel, and building stone) and provides direction for the multiple uses of surface resources of mining claims.

- **Mining and Minerals Policy Act of 1970:** This act states that, among other things, it "is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals."

- **Geothermal Steam Act of 1970, as amended:** This act declared geothermal energy to be part of federal mineral estate and subject to leasing.

- **The Surface Mining Control and Reclamation Act of 1977:** This act allows the Secretary of Agriculture to enter into agreements with states in order to regulate surface coal mining operations on NFS lands. It also directs the Secretary of Agriculture to conduct a Coal Unsuitability Assessment in order to determine the suitability of NFS lands for surface coal mining operations.

BLM_0033530

- **Energy Policy Act of 2005:** This act gives policy guidance and makes changes to mining and leasing laws regarding oil and gas, coal, oil shale, tar sands, and geothermal energy.

## Regulations and Policies

- **CFR 36 228A:** This requires mining claimants to file an operating plan or notice of intent for proposed mining activities on NFS lands.

- **CFR 36 228B:** Solid Leasable Minerals (Reserved)

- **CFR 36 228C:** This regulates the disposal of common variety mineral materials.

- **CFR 43 3400, 3500, 3600, and 3800:** These provide guidance for the management of coal, mineral materials, and solid leasable and locatable minerals for the BLM.

### 3.20.2 Affected Environment

### Existing Conditions and Trends

Federally owned mineral resources are managed under three categories with differing sets of laws and regulations:

- **Locatable Minerals:** These are subject to claim under the Mining Law of 1872, as amended.

- **Saleable Mineral Materials (common variety):** These are disposable by discretionary direct sale or free use.

- **Leasable Minerals:** These are subject to lease under the Mineral Leasing Act of 1920, as amended. These include fluid leasables (oil and gas) and solid leasable minerals (non-energy minerals such as potash, sodium, phosphate, and other minerals, as well as coal).

For the purposes of this document, locatable minerals (including precious and base metals, as well as uranium and vanadium), saleable mineral materials (including sand, gravel, and construction stone), and some solid leasable minerals (including coal, potash, and sodium) are discussed as "solid minerals." Oil and natural gas (including $CO_2$) are discussed together as "fluid leasable minerals."

## Locatable Minerals

Under the Mining Law of 1872, valuable deposits of minerals on public domain lands are subject to location (mining claims). Minerals subject to location are those not subsequently removed under this act and include deposits of precious metals (e.g., gold, silver, platinum), base metals (e.g., lead, zinc, copper, tin, antimony, cobalt), rare earth elements, uranium, vanadium, and uncommon varieties of mineral materials such as high purity limestone or gypsum.

The Mining Law of 1872 grants the public the right to prospect for, develop, and mine valuable deposits of locatable minerals on public domain lands open to mineral entry. It also allows the public to stake claims in order to establish exclusive possessory rights to explore and develop minerals in a defined area. Lands may be segregated or withdrawn based on mineral entry where there is an irreconcilable conflict between mineral extraction and other land uses. Segregations can be done administratively and are for a finite period of time. Withdrawals are generally done by congressional action.

The mining law provides for types of location: placer claims (alluvial minerals not formed in place such as gold-bearing gravels, and for uncommon varieties of stone), lode claims (for vein minerals, or minerals formed in place), and mill sites claims, which are for processing locatable minerals. Tunnel

BLM_0033531

sites are not a claim per se, but are staked as an exploratory ROW and are seldom used anymore because of advances in exploration drilling technology.

**Placer Claims:** The distribution of open (currently filed) placer claims indicates areas that are most likely to be impacted by placer mining disturbance. Gold is the most commonly mined placer mineral, although other minerals such as garnets, diamonds, and tin are sometimes placer mined. Gold is most likely the target of all of the placer claims in the planning area. Most claims are associated with alluvial deposits along stream channels and valley bottoms. Large-scale development of alluvium may have profound impacts on hydrology and valley bottom morphology. The current level of development on placer claims is low.

**Lode Claims:** Lode claims cover many types of mineral commodities within the planning area. Lode claim distributions, like placer claim distributions, are strong indicators of historic and potential interest and mining activity. The planning area has active lode claims associated with a variety of geological settings and mineral types. Some of these claims are concentrated in the same areas as those for placer claims discussed above (Silverton, the La Plata Mountains, and Rico). They involve the valley bottoms, as well as the headwaters areas, which are the sources of the precious minerals concentrated in the downstream placer claims. The Uravan Mineral Belt has a high concentration of lode claims for vanadium and uranium.

The remainder of the lode claims are scattered across the planning area and are typically isolated historical exploration or small development mining operations.

- Mill sites are for the milling and processing of minerals. They are up to 5 acres in size and must be staked on land that is non-mineral in character.

- Tunnel sites are mostly outdated exploratory tools that give the discoverer of any "blind lodes" encountered during the driving of the tunnel within 3,000 feet of its face the right to those minerals. Failure to work a tunnel for a 6-month period renders the tunnel site void. Tunnel sites are seldom used anymore, because core drilling is often cheaper and faster than tunneling.

Mining claim density can provide an important measure of historic and current interest in areas having potential for both lode and placer minerals, as summarized in Table 3.20.1. It is realized that claim density may also represent speculative interest in the area and may not define potential development. See Map 63 in Volume III, Appendix V for a depiction of locatable mineral potential in the planning area.

Locatable minerals can be mined by a wide variety of surface and underground methods. By staking a claim, a mining claimant is asserting that they have "discovered" a "valuable deposit" of a locatable minerals; however, the claimant does not have to specify in the mining claim records what mineral he or she asserts to have discovered. Claims for locatable minerals can be subject to patent if the claimant can prove that he or she has discovered a "valuable mineral deposit" that meets the requirements for patent; however, from 1995 until the time this document was published, Congress has annually passed a moratorium on the USDI spending any money to process patent applications, which has effectively banned patenting. It is not known whether Congress would continue with this ban in the future. Unpatented mining claims are considered to be a possessory right, and the BLM and USFS have limited discretion in processing mining and exploration proposals for locatable minerals; however, various environmental laws still apply.

BLM_0033532

## Salable Minerals

Saleable minerals include (but are not limited to) common varieties of mineral materials such as sand and gravel, crushed stone, riprap, flag stone, ornamental stone, boulders, building stone, dimension stone, and common clay. They are generally mined using open pit or quarrying methods. Disposal of saleable minerals by the BLM or the USFS is discretionary and may occur in three ways: through the issuance of free use permits (available to government entities and non-profit organizations), through competitive sales contracts, and through non-competitive sales at fair market value. The BLM can make mineral materials available to the public through small sales contracts and may designate areas called "community pits" or "common use areas" for these small sales. Title to lands under mineral material contract remains with the federal government and cannot be patented as a result of the mineral material contract.

## Solid Leasable Minerals

Solid leasable minerals are governed by the Mineral Leasing Act of 1920, as amended. This category includes most chlorides, sulfates, carbonates, borates, silicates, sulfates or nitrates of sodium or potassium and related products, phosphate and related minerals, and vein-type solid hydrocarbons (e.g., gilsonite). Hard rock minerals (i.e., minerals that would otherwise be locatable such as gold, silver, copper, uranium) on acquired lands (lands purchased by the federal government, rather than typical public domain lands) may also be subject to leasing. Leasable minerals are extracted by a broad array of extraction methods, including surface and underground mining methods as well as in-situ mining methods. The same surface use restrictions may be applied to solid leasable minerals as are applied to fluid leasable minerals. Coal is also a leasable mineral, but is also governed by several additional laws for leasing and development, which apply specifically to coal.

**Coal:** The USGS has reported on coal resources in the planning area (Kirschbau and Biewick 2009). Coal in the planning area found in the Upper Cretaceous formations. From oldest to youngest, they are the Dakota Sandstone Formation, the Menefee Formation, and the Fruitland Formation. There are two coal fields located in the planning area. They include a portion of the Nucla-Naturita coal field and the Durango-Pagosa Springs coal field.

The Nucla-Naturita coal field is located in the north-central and northwestern portions of the planning area. The coals are typically thin and discontinuous. They are considered to be of little interest for development.

There are several coal-bearing formations in the Durango-Pagosa Springs coal field. The coals were deposited throughout the San Juan Basin (Volume III, Appendix V, Map 62). They include Dakota Sandstone and the Menefee and Fruitland Formations. There is one coal seam in the Dakota, which can be as much as 8 feet thick. There are up to three coal zones in the Menefee. Seams in the Menefee range up to 9 feet thick. The Fruitland Formation has many beds; the composite thickness is estimated to be up to 40 feet thick.

Coals in the Menefee are considered to be high volatile A and B bituminous. The Fruitland coals are high volatile B and C bituminous. Sulfur content is low in both of these coals (0.7%–0.8% [Fruitland] and 0.6%–1.3% [Menefee]). The ash content is slightly higher in the Fruitland coals (19.5%–26.6% [Fruitland] as compared to 3.4%–16.6% [Menefee]).

Resource estimates in the Durango-Pagosa Springs field is estimated to be 13 billion short tons in the Menefee Formation. This estimate includes public and private lands but does not including resources

BLM_0033533

on tribal lands. The report also concluded that the coals near Pagosa Springs are thinner and dip at a steeper angle. This would make them less amenable to development.

In 1985, the King Coal mine was the only mine that had produced coal from public lands since 1975 (BLM 1985). Since it went into closure, the King Coal II mine (on an adjacent lease) has been the only other producing mine from public lands. The King Coal II is a relatively small mine; average production in 2012 was 700,000 tons/year. Coal from the mine is sent to the parent company's cement plants to be used in the process of making cement. In addition, the fly ash has favorable qualities for strengthening the cement. Some coal is also for several tourist train operations, including the Durango-Silverton Railroad.

The nearest rail loadout is in Gallup, New Mexico. This is a less than favorable option for coal transportation.

**Oil Shale:** The planning area has no known oil shale potential.

**Department of Energy Uranium Lease Tracts:** After World War II, the Atomic Energy Act gave the Secretary of the Interior the authority to withdraw specifically identified tracts of federal lands from location under the 1872 Mining Law specifically for uranium leasing and development, under leases to be administered by the Atomic Energy Commission. These uranium leases are now managed by the Department of Energy, the successor agency to the Atomic Energy Commission. The surface resources continue to be managed by the BLM, and the lands remain open to mineral leasing and mineral material sales, so long as they do not interfere substantially with uranium leases and/or development.

The USFS conducted an assessment of the potential for occurrence of mineral deposits (in relation to NFS lands, the results are summarized in Van Loenen and Gibbons [1997:1–9]). Solid minerals resource potential is based primarily on the geological setting and the interpretations regarding the likelihood that favorable rocks are present. These interpretations consider the results of previous studies, as well as mining history and production, geochemistry and geophysics, and data from mineral files. The attributes of known ore deposits and mineral occurrences were used to define favorable areas within permissive terrains in the planning area on NFS lands (Van Loenen et al. 1997:17–29). Types of solid minerals deposits by area and current activity are summarized in Table 3.20.1.

**Table 3.20.1: Areas Favorable for Solid Minerals and Mineral Activity**

| Area | Mineral Type | Current Activity |
|---|---|---|
| Slick Rock/Dove Creek Uravan Mineral Belt | Uranium, vanadium (includes mining claims and DOE uranium lease tracts) | Mining claims, exploration, development |
| Utah Border – Lisbon area | Copper | Active mining adjacent to planning area |
| Rico-Dunton | Gold, silver, lead, zinc, copper, molybdenum | No current activity |
| Graysill | Vanadium | No current activity |
| La Plata | Gold, silver, lead, copper, possible platinum group elements | Minor underground mining and prospecting, mostly on patented lands |
| Most Animas, Dolores, La Plata, Piedra, San Juan Rivers and several major tributaries | Gold | Minor placer activity |

BLM_0033534

| Area | Mineral Type | Current Activity |
|---|---|---|
| Silverton | Gold, silver, lead, zinc, copper | Minor lode mining activity, mostly on patented lands |
| Needle Mountains | Gold, silver, copper, uranium | No current activity |
| Paradox Basin – western portion of planning area, salt diapirs | Sodium, potash, and related minerals | Proposed prospecting for potash |
| Chimney Rock (Durango Known Recoverable Coal Resource Area) and west planning area | Coal | No current activity |
| Paradox Rim Area | Coal | No current activity |
| Planning area-wide | Mineral materials: glacial deposits, talus slopes, road cuts, rock glaciers, fossil gravel terraces | Small-scale activity across planning area |

High to moderate solid minerals potential also occurs within the Lizard Head wilderness (Mount Wilson/Navajo Basin area), the Weminuche wilderness area (Piedra headwaters area), and the South San Juan wilderness area (Quartz Creek area) (Van Loenen et al. 1997:31–44). These areas, however, are withdrawn from mineral entry under the terms of the Wilderness Act of 1964 and cannot be claimed or developed unless there are valid existing rights. Minimal mineral activity that is considered "recreational" in nature consists of exploration for, and recovery of, gold using hand-panning and small-diameter (less than 4-inch-diameter intake) suction dredging equipment. This activity typically does not result in significant environmental impacts and generally does not result in filing and development of mining claims. Small-diameter suction dredging in active stream channels is excluded from U.S. Army Corps of Engineers Section 404 permit requirements. These operations are typically not bonded and are monitored by the agency with jurisdiction over the affected land. The planning area averages approximately 10 such operations each year (typically during summer).

## Background

<u>Locatable Minerals</u>

Historically, mineral exploration and development have played key roles in defining the character and landscape pattern within the planning area. The subregion is especially well endowed with locatable mineral resources. World-class deposits of precious and base metals occur along a northeast to southwest trend (from Aspen through Silverton, and Telluride southward to the La Plata Mountains). These deposits include massive sulfides, vein, and metallic replacement deposits largely associated with Tertiary-age volcanic centers.

Prospecting and mining in the San Juan Mountains dates back more than 130 years. The first recorded discovery of gold in this region was in 1848 in the Silverton area. This was followed by discoveries in the Durango and Rico areas in the 1860s. Mining of placer gold began in Summitville and Silverton in 1870 and along the La Plata River in 1873. Following a treaty with the Ute Indian Tribe in 1874, most of what is now the planning area was officially opened for mineral prospecting shortly thereafter. Lode deposits of gold and silver were discovered, and mined, from 1875 through 1900 in the Rico, La Plata, Needle Mountains, and Silverton areas.

During the mid-1890s, depletion of easily mined reserves, as well as the collapse of silver prices in 1893, resulted in most mining operations closing down. At the same time, workers developed local

BLM_0033535

coal deposits, which provided an important energy resource to mining and other industries, agriculture, and domestic needs. A new spike in metal mining and production occurred from 1900 to 1910, and continued at varying levels until the closure of gold mines by the government during World War II. After the war, new technologies and the growing economy spurred renewed mining within the region, although several mines never recovered  Uranium mining in the Uravan Mineral Belt, which includes land along the Colorado-Utah border, as well as BLM lands in the western part of the planning area, began in 1898 with uranium ore being used to recover radium for luminescent pigment and other uses (Nelson-Moore et al. 1978). By World War 1, vanadium was being recovered for use as a steel hardener, with minor uses of uranium for a pigment. By World War II, uranium was being mined for atomic weapons. During the cold war, uranium and vanadium mining was booming, with several mills in the area. Uranium was one of the principle economic drivers of the region, providing employment for hundreds, if not thousands, from the late 1940s through the 1980s. By the late 1980s, most of the mining activity had died off. Today there are two permitted uranium mine complexes in the planning area, which are presently idle, as well as several notice-level exploration drilling projects.

Most locatable minerals claims for metals (other than uranium and vanadium) sites are not actively being mined; however, with record prices for gold, silver, and many base metals, the number of claims is likely to increase. Where these sites are on private land and privately owned minerals within the planning area (as a result of patenting of mining claims), the BLM or USFS have no jurisdiction over them within the patent boundaries. For operations on these private lands, the State of Colorado permits or regulates these operations. Streams influenced by mining on these sites may carry sedimentation and contamination downstream across the planning area and beyond (see Section 3.6, Water Resources).

Mining claim density can provide an important measure of historic and current interest in areas having potential for both lode and placer minerals, as summarized in Table 3.20.1. It is realized that claim density may also represent speculative interest in the area and may not define potential development.

Claimants do not have to indicate what mineral they have targeted on their claim, and a single claim gives the rights to any and all locatable minerals on that claim; however, the USFS and BLM can speculate what claims are most likely for, based on their location. In descending order of number of claims filed, the most common locatable mineral commodities claimed are uranium and vanadium, precious metals (gold and silver), and base metal (molybdenum, lead, copper, and zinc). Historically, base and precious metals were the most valuable of the locatable minerals. Today, however, they represent only a modest part of the current activity. The growing level of interest in uranium and vanadium indicates the importance of energy development in the region today.

Deposits of uranium and vanadium were discovered and mined in the in the turn of the twentieth century for radium, and then again during and after WW II at the Graysill (Rico) area and at the Uravan Mineral Belt area. By the mid-1970s, there was a reduced demand for uranium. By the end of the Cold War, most uranium mining had ceased. Recent interest in nuclear power generation, as well as other demands, has kept the interest for uranium alive in the Uravan Mineral Belt.

Limestone valuable for certain chemical and industrial uses may be a locatable mineral. No development is currently active within the planning area; however, deposits of limestone that may meet this criteria occur throughout the planning area. The Animas River valley contains the most significant and most accessible resources. Historic proposals to mine this material led to the withdrawal of deposits in order to protect scenic values along the U.S. Highway 550 corridor. Demand for limestone for use as a chemical scrubber for coal-fired power plants may increase.

BLM_0033536

Solid Leasable Minerals (Non-energy)

Solid non-energy leasable minerals are identified in the Mineral Leasing Act and include potassium, sodium, phosphorus, vein hydrocarbons, and some hard rock minerals when located on acquired lands. Presently, the only non-energy solid leasable minerals that are known to exist with any abundance within the planning area are sodium and potash. Both of these minerals occur as evaporite salts in the Pennsylvanian-age Paradox formation in the western third of the planning area. The potential for either potassium or sodium salts in salt-cored anticlines is very high. The largest current area of interest is the Dolores Anticline, which stretches through the Glade area, across the Dolores River Canyon, through the Egnar area, and continues northwest to become the Lisbon Valley anticline. Presently there are 21 prospecting permit applications being evaluated for potash on the Dolores Anticline. Further to the north, Big Gypsum Valley and Little Gypsum Valley are salt anticlines where the salt-bearing Paradox Formation has actually forced its way to the surface. In these locations, the salt can be up to 14,000 feet thick. Because salt is soluble, much of the salt has been dissolved near the surface, leaving an insoluble residue of gypsum and dolomite and clay-rich soil. This, combined with intense structural deformation, could make mining potash more difficult in these valley locations. Historically a single mineral lease for sodium was issued in the Paradox Valley just north of the planning area. Brines were produced to use in the processing of uranium. No substantial deposits of other solid, non-energy minerals have been found within the planning area, though it is possible that they could exist.

Sodium and potassium may be produced in a variety of ways, including surface, underground, and solution mining. Near Carlsbad, New Mexico, potash is mined underground. In the Moab, Utah, area it is solution mined. The sodium and potassium in the planning area would be more likely candidates for solution mining, though other methods may be proposed depending on the location, depth, and geometry of any deposits that are found. Other minerals, such as lithium, calcium, and magnesium may be co-produced with sodium and potassium. Exploration for these minerals is conducted using a variety of conventional methods.

Under the 43 CFR 3500, the BLM is responsible for exploration, prospecting, leasing, and mining of federal solid non-energy leasable minerals. When these minerals occur on NFS lands, the USFS is responsible for surface management, and the BLM retains responsibility for mining and leasing decision. NEPA compliance is conducted jointly by both government entities, and the USFS makes a recommendation to the BLM regarding its preferred decision based on that NEPA analysis.

In the planning area, the same lands are open to oil and gas leasing and development that may be open to solid leasable minerals development, likely with the same restrictions on surface occupancy. Deep exploration drilling projects, and drilling of production wells for solution mining, are likely to use equipment very similar to oil and gas drilling. It is within the BLM's discretion to use applicable oil and gas planning guidance to advise decision-making for these solid leasable minerals. Additionally, applicable oil and gas policy and regulation may be adopted as COAs for solid leasable minerals permits, licenses, and leases.

Coal

Within the planning area, coal occurs along the margins of the Paradox and San Juan Basins. These outcrops are of late Cretaceous and early Tertiary age.

Coal has been produced in Colorado, New Mexico, and Utah since the middle of the nineteenth century. Due to the expansion of the railroads in the region, coal production in Colorado expanded to become the largest in the West. Production in all three states grew from the turn of the twentieth

BLM_0033537

century, to a peak prior to the Great Depression. Production tapered off through the war years and 1950s, with a resurgence beginning in the 1970s.

Historically, small underground and surface mines that support local markets followed the northern edge of the San Juan Basin between Cortez and Durango east to Pagosa Springs (more or less along the U.S. Highway 160 corridor), and north to Dove Creek. These mines, and related prospects, are largely abandoned. There are currently several coal mines operating in, or adjacent to, the planning area. More recently, large-scale mines have been developed in the region outside the planning area in order to feed regional power generation needs.

**Coal Unsuitability Assessment:** Under the terms of the Surface Mining Control and Reclamation Act of 1977, the SJNF and BLM conducted coal unsuitability assessments to determine the suitability of lands for TRFO surface coal mining, leasing and development operations. Twenty unsuitability criteria and appropriate exceptions and exemptions were applied to the Durango, East Cortez and Menefee Known Recoverable Coal Resource Areas (KRCRA) as identified by the USGS. In summary, 13,400 acres (9%) of the Durango KRCRA, 720 acres (25%) of the East Cortez KRCRA, and 80 acres (100%) of the Menefee KRCRA were identified as unsuitable for surface coal mining operations. Based on the unsuitability assessments (SJNF 1983; BLM 1985), 46,000 acres (31%) of the Durango KRCRA are identified as acceptable for further consideration for coal leasing, with an estimated reserve of 1.5 billion tons. One existing surface coal mine in the Durango KRCRA (Chimney Rock Coal Mine) with operations on both NFS and BLM lands was already in the lease extension application process during the unsuitability assessments. This application was denied for environmental reasons in 1985. Operations at the mine were terminated and the mine site has been reclaimed.  The existing BLM and USFS coal unsuitability assessments for this LRMP revision found that the need does not exist to revise the assessments.

<u>Saleable Mineral Materials</u>

Common varieties of mineral materials are often referred to as saleable minerals and include such resources as sand, gravel, and stone. These minerals are used for building materials, aggregate, bulk fill, riprap, road surfacing, decoration, and landscaping. Disposal of these materials is discretionary; the public does not have a statutory right to these materials, prior to the issuance of a contract.

Deposits of limestone and aggregates were developed in order to build railroads, roads, and provide a source for concrete along with clay for brick and ceramics. Today, common variety mineral (including sand and gravel) development continues to be important in the subregion, as well as in the surrounding western states.

The SJNF has conducted an assessment of the potential for occurrence of mineral material deposits (Van Loenen et al. 1997:131–132), as summarized below. In addition, the BLM has also summarized potential mineral material locations.

Unlike most locatable minerals, deposits of common variety mineral materials occur everywhere, by default. Common sites for natural concentrations of small to large amounts of such materials are canyon walls, stream channels, talus slopes, landslides, ancient river terraces, glacial moraines, and floodplains. Road cuts, quarries, and pits increase the amount of material available for extraction.

Areas with known resources, or areas that are favorable for resources of sand and gravel, may contain materials that are ready for use or that are suitable for screening, washing, or crushing in order to meet size or fine-material requirements. Areas of Quaternary-age alluvium, colluvium, and glacial drift, as well as areas of river terrace deposits, contain sand and gravel suitable for use with

BLM_0033538

minimal treatment. Talus slopes of late Cretaceous and Tertiary-age igneous rock produce material suitable for crushing, lightweight aggregate, and dimension stone. Late Cretaceous and Tertiary-age igneous intrusives produce dimension stone and large aggregate. Late Cretaceous sedimentary rock produces dimension stone and aggregates.

Large boulders are found throughout the planning area in stream deposits, glacial drift, till, landslides, and floodplains. Most are found at higher elevations, and those closest to existing roads are primary targets for purchase.

Mineral materials constitute an administrative class largely made up of sand and gravel borrow pits and large-scale operations. These operations are typically correlated to roadways and valley bottom settings with alluvial deposits.

Currently, the planning area has approximately 20 active sand and gravel sites. Most mineral materials are collected from road cuts, stream channel banks, or alluvial deposits; therefore, the sites typically are located in valley bottoms. Ute Creek, the Animas River, and San Juan River above Pagosa Springs have active sites.

Free use permits for mineral materials may be issued to government entities—such as county road and bridge departments—or to non-profit organizations. Additionally, the BLM and USFS both use substantial amounts of mineral materials, primarily sand, grave, and boulders.

## Trends

The trends noted in previous LRMPs have not changed dramatically, except for the renewed interest in uranium/vanadium mining (both as locatable mining claims and as DOE uranium leases) and interest in potash. However, changes in pricing factors may rapidly alter the level of interest in development of most mineral commodities. A substantial increase in demand for minerals may increase the filing and development of mining claims in established mining districts and areas once considered marginal. This, in turn, would result in increased conflict with other land and resource values and uses; initiate new administrative, political, and legal issues in choosing management priorities; generate public concerns over changing management; place economic pressures on managers and local communities; place local values against regional or national needs; and generate demands to answer all of these concerns within a short time period.

<u>Locatable Minerals</u>

The demand for mineral resources is driven by price, which, in turn, is governed by improvements in technology of exploration, production, refining, transportation, manufacture, and use; changes in lifestyle; changes in regulation and availability of land and access; changes in patterns of supply and demand (both domestically and internationally); and changes in national policy areas (including military conflict, security, and strategic reserves). The planning area has reserves of precious metals used for industrial, cosmetic, and investment purposes, as well as base metals (copper, lead, zinc, molybdenum, tin, tungsten, bismuth, and tellurium) used for a variety of industrial purposes. Exploration drilling of these deposits is a distinct possibility. The planning area has resources of uranium used for domestic power generation, medicine, and weapons, as well as vanadium used in steel production and batteries. Currently, important locatable mineral interests within the planning area are limited to uranium and vanadium (in the Dove Creek area). The increasing interest in nuclear power generation, as well as the need for vanadium (a byproduct of uranium development), for modern energy, air, space, power, and weapons technology could rapidly increase the demand for uranium exploration, development, and processing. High gold prices have increased the number of

BLM_0033539

mining claims in the area; however, no substantial gold mining or exploration projects on public lands have come to fruition in the recent past, but continued high prices would likely mean that there would be increased exploration and development in the near future. Demand for limestone for use as a chemical scrubber for coal-fired power plants may increase.

Demand for uranium increased significantly in the last several years. Long term it is possible that the demand for uranium would continue to grow, as non-fossil fuel resources are sought and as stockpiles are depleted.

The price of gold remained at or below $400 per ounce from the early 1990s through 2004. At these low prices, interest in gold mining waned considerably, and many marginal mines shut down nationwide. In 2004 prices began to climb and by September 2011 it had reached nearly $1,900 per ounce before dropping back to the $1,600-per-ounce range by March 2012. Silver and other precious metals prices have also climbed. New claims (presumably) for gold have begun to be staked in the planning area, but so far no major mining or exploration proposals have occurred.

Locatable minerals are subject to claim and development under the Mining Law of 1872. Management options may be somewhat limited once claims are filed on valuable mineral deposits; however, mining proposals must still be in compliance with state and federal environmental laws and regulations.

A growing interest in small recreational gold placer operations exists throughout the planning area and nationwide.

In areas where land managers have determined that the potential value of the mineral estate does not justify the environmental impacts of development, the surface management agency may propose withdrawal of the land from operation.

<u>Saleable Mineral Materials</u>

Issuance of mineral material permits is discretionary. Federal management options for these materials are, therefore, broad. Planning for development of mineral material sites can be undertaken independent of outside pressure and phased in order to meet demand as it grows. Demands for new types of mineral materials (such as boulders for river renovation projects) can be assessed before these resources are removed.

Within the planning area, demand for small amounts of hand-collected decorative and landscape stone can be met. The competition for gravel and aggregate may likely result in more development of quarries and pits within the planning area, as well as on adjacent private lands (and preference for planning area reserves to be used only for local, state, and federal road agencies).

The economic downturn of 2008 greatly decreased the demand for mineral materials, particularly construction aggregates and building stone. However, when the market picks back up, increasing construction in all area communities is creating a growing demand for aggregate and fill materials, as well as for decorative and landscaping stone. The building of new roads and the maintenance and improvement of existing roads may create increasing demand for aggregate for asphalt and cement and gravel for road surfaces. Large boulders are a growing target for purchase (for landscaping and river improvement projects). Law dictates that mineral materials be sold at fair market value. When fair market value is not known, one must be determined using the costs of comparable materials.

BLM_0033540

Solid Leasable Minerals

Growing world populations and shrinking supplies of fossil fuels are both likely to increase the need for fertilizer in the near future. Phosphate and potash are both leasable minerals and are two of the three main ingredients in fertilizer (along with nitrogen). Potash is the only one of these minerals with any potential to be found in commercially viable quantities. Presently only exploration and prospecting has been proposed for potash. If viable deposits are proved up by exploration, leasing and development could occur in the not-too-distant future. Solution mining presently seems like the most likely development method. Solution mining involves using deep wells to selectively dissolve potash from evaporite beds and pump potash-saturated brines to the surface where the potash can be recovered through some sort of desiccation process. Sodium, too, is a solid leasable mineral and has been produced nearby.

Issuance of leases for solid, non-energy minerals is also discretionary. In this document, solid leasable minerals are generally available in the planning areas that are open to oil and gas leasing and development, and the same surface use restrictions (excluding any applications under consideration at the time of this document is released) may apply.

Coal

Coal is disposed of under the federal coal leasing program. The SJNF and TRFO must review and approve issuance of leases for coal development. Although it cannot be known with certainty when lease applications would be filed and development plans proposed, the agencies can schedule the required analysis process in order to accommodate the workload, as needed.

In relation to the planning area, Durango is the only area with current coal production, which is expected to continue or increase. However, lack of rail lines and small reserves in the eastern (Pagosa) portion of the planning area may limit the potential for significant expansion. There is low potential for small, local markets to redevelop. Coal use for home and small business heating is not likely to increase without significant improvements in environmental protection technology and cost-competitiveness. This may limit the potential for small mining operations to resume operations.

Within the Durango and Menefee KRCRAs, it is unlikely that formerly developed coal deposits would be in demand for renewed development. Substantial new coal deposits are not likely to be discovered or proposed for development.

## 3.20.3 Environmental Consequences

### Direct and Indirect Impacts

The environmental impacts related to the development of mineral resources would result primarily from different methods of extraction. Solid minerals are generally developed by mining methods, open pit or underground mining, or solution mining, which is sometimes called in situ recovery,

The expected environmental impacts related to current and projected solid minerals development activity levels within the planning area are discussed in detail in specific resource program sections of this chapter. This section considers the impacts of implementation of other resource activities on the SJNF and TRFO solid minerals programs.

Under each alternative, impacts are quantified based on the number of acres of land, which are restricted (requiring higher costs) or are not available for solid minerals operations (including mine and support facilities, pits, stockpile and equipment storage areas, mills, waste sites) or for

BLM_0033541

construction and use of access roads. Relatively concentrated impacts related to solid minerals development are associated with the mine or processing mill facilities. They would generally require one or two access roads, one utility corridor, and few, if any, disturbed areas away from the mine or mill. Future solid minerals activity cannot be predicted as to specific location, scale, or timing; therefore, the most reasonable way to estimate the impacts of alternatives on this potential future activity would be to consider the amount of land that is restricted or unavailable for possible use.

## General Impacts

Impacts to the solid minerals program resulting from the implementation of the alternatives could result in the limitation of some areas to mineral activity and increased operating costs (through limitations on road construction and use, facility placement, and operational constraints). These impacts may result from the requirements imposed by other resource programs.

This estimate of impacts would be considered in conjunction with areas where solid minerals potential is known, or is suspected, to exist. Lands may be unavailable for solid mineral activity; however, if the mineral resource does not exist on those lands, any possible impacts from limiting access to those lands may be minor or negligible. The areas most likely to be impacted by the implementation of any of the alternatives (because of potential for solid minerals resources being present) are described in Table 3.20.1.

The Slick Rock/Dove Creek area and associated Uravan Mineral Belt area has a high potential for continued increased uranium and vanadium mining and milling activity. The Dolores and West Dolores River corridors, the Rico/Dunton area, the La Plata Mountains, and the Silverton area have potential for renewed precious and base metal development activity, the Graysill and Elk Park areas have potential for renewed exploration activity for uranium and vanadium. Market prices, commodity supply and demand, and technological advances may influence future interest in exploration, development, and production. Salable mineral sources occur throughout the planning area. The demand for gravel may increase as campgrounds and public and county roads are improved. (Sources to meet expected private needs are available outside the public lands.)

The following table lists the acres of land with moderate to high potential for solid locatable, saleable, and leasable mineral occurrence, coupled with alternative management that would prohibit or restrict development of those resources, if fully implemented. For this analysis, it is assumed that land designations recommended by any of the alternatives that would occur in the future (or are outside the authority of the USFS or BLM) would be implemented as recommended by the SJNF and TRFO. (For example, designation of additional wilderness areas would not lie within agency authority, and agency recommendations for additional wilderness areas may never be acted upon; however, this analysis assumes that such designation would occur within the planning period and that the recommended wilderness areas additions would be withdrawn from leasable mineral entry and development).

Land management actions or recommendations that are proposed within existing withdrawn lands (such as designated wilderness areas) are not considered. This is because the implementation of those proposed new designations would have no impact on lands already withdrawn. Similarly, those land management actions or recommendations under the alternatives that do not impact areas with moderate to high potential for the occurrence of solid mineral resources (see Table 3.20.2) are not considered. The impacts related to "proposed withdrawal acres" include only those proposed designations or areas outside existing wilderness areas and the Piedra Area.

BLM_0033542

**Table 3.20.2: Moderate to High Potential Acres within Areas Proposed to be Petitioned for Withdraw**

| Proposed Withdrawal Areas with Moderate to High Potential | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Recommended wilderness | N/A | 50,266 | 511,578 | N/A |
| Lands with wilderness characteristics | N/A | N/A | 13,519 | N/A |
| Wild segments of WSRs | N/A | 15,929 | 16,063 | N/A |
| Dolores River Canyon | N/A | N/A | 38,205 | N/A |
| Mesa Verde Escarpment | N/A | N/A | 7384 | N/A |

Under all of the alternatives, development of salable mineral materials would be impacted based on the number of acres restricted or recommended for closure to mineral activity since development of these solid minerals resources is discretionary. Locatable minerals subject to claim under the Mining Law of 1872 would not be similarly impacted under all of the alternatives. Unlike mineral materials, which occur throughout the planning area, significant deposits of locatable solid minerals are unlikely to occur outside the areas identified in Table 3.20.1; therefore, impacts to this resource under any of the alternatives may be minor. Impacts to DOE uranium lease tracts would not vary by alternative since these lease tracts are administered by the DOE and are not subject to any of the alternatives. Locatable uranium/vanadium development may be impacted by restrictions related to protection of sage-grouse since the most important uranium/vanadium deposits are in the same geographic area. As noted above, these impacts are not intended to be read as absolute numbers; rather, they serve to indicate the relative restrictive nature of each alternative.

In summary, based on the total acres of the various management actions designations that could limit the development of some solid minerals, Alternative C may result in moderate to minor impacts, followed by Alternatives B, D, and A.

## Impacts Related to Wilderness Area Management

Impacts related to wilderness area management may be the possible closure of designated areas to new solid minerals operations. The measurable indicator of impacts would be the number of acres allocated to MA 1 (proposed wilderness area) that contain areas of moderate or high potential for occurrence of solid minerals. These areas carry an assumption of closure by withdrawal or administrative action from new solid mineral exploration and development (although existing valid claims may allow mineral development). Although withdrawal may not occur without further environmental analysis and decision-making, it is assumed that withdrawal would be implemented, as recommended by the SJNF or TRFO. BLM WSAs in the Slick Rock/Dove Creek area would not impact future uranium and vanadium activity (since these areas are open to mineral development).

Alternative C may result in moderate impacts on solid minerals (due to wilderness area management), followed by moderate impacts under Alternative B. Alternatives A and D may result in no impacts.

## Impacts Related to New Research Natural Area Designations

Impacts related to new RNA designations may be the possible closure of areas to solid minerals operations. The proposed Grizzly Peak and Hermosa RNAs may impact areas with moderate potential for precious and base metal locatable mineral activity.

BLM_0033543

The measurable indicator of impacts would be the number of acres allocated to proposed RNAs (because RNA designation carries an assumption of closure by withdrawal from solid minerals exploration and development). Withdrawal would not occur without further environmental analysis and decision-making; therefore, it is assumed that withdrawal would be implemented, as recommended by the SJNF or TRFO.

Alternatives B and C may result in minor impacts to solid minerals (due to new RNA designations). Alternatives A and D may result in no impacts.

## Impacts Related to Wild and Scenic River Designations

Under the WSR program, designation of river segments as recreational or scenic do not carry constraints on locatable solid mineral activity; however, designation of a river segment as a WSR would carry an assumption that the segment would be withdrawn from new mineral activity. Impacts related to WSR designations may be the closure of areas to discretionary solid minerals operations. Designation of segments of the upper Dolores River may impact lands with high potential for uranium, vanadium, and precious metal resources. DOE uranium lease tracts in this river corridor would not be impacted. The Hermosa River, and tributaries, has moderate potential for precious and base metal occurrences, although there is no current activity.

The measurable indicator of impacts would be the number of miles allocated to suitable WSR designation. Although withdrawal would not occur without further environmental analysis and decision-making, it is assumed that withdrawal would be implemented, as recommended by the SJNF or TRFO.

Alternative B may result in minor impacts to solid minerals (due to WSR designation). Alternatives C and A may result in minor to negligible impacts. Alternative D may result in no impacts.

## Impact Related to Wildlife and Fisheries Management

Impacts related to wildlife and fisheries management may be higher operating costs and the possible closure of areas to new solid minerals operations. Wildlife management activities that trigger these impacts would be primarily related to management requirements under the ESA. Protective measures applied to exploration and development activities may increase costs. Prevention from, and remediation of, acid mine drainage would be the most important factor for the Silverton area. These measures would be required by law and would not change under any alternative. Sage-grouse habitat protection may impact the development of mining claims in the Uravan Mineral Belt (uranium/vanadium) resource area. TRFO lands and DOE uranium leases would be subject to ESA regulation under any of the alternatives; however, such regulation is not within the management authority of the BLM. The degree of the impacts on federal minerals under the BLM's jurisdiction would depend on approved conservation strategies, critical habitat designations, and BOs that mandate specific management requirements for solid minerals exploration and development.

The measurable indicator of impacts would be the number of acres allocated to sage-grouse habitat (see Table 3.20.2). This is because this designation is known and could impact an area of current solid minerals activity (the Slick Rock/Dove Creek uranium/vanadium area) and potentially the solid leasable minerals in the same area. However, its usefulness is as a comparative indicator of impacts, not as an absolute quantifier. Alternatives that would allocate a greater number of acres to this designation may be considered to require a similar degree of restriction on solid minerals activity throughout the planning area, for comparison purposes.

BLM_0033544

Alternatives C, D, and B may all result in moderate to minor impacts on solid minerals from wildlife and fisheries management. Alternative A may result in no impacts.

## Summary of Direct and Indirect Impacts by Alternative

Based on the total acres of the various management actions that could limit the development of solid minerals, Alternative C may result in moderate to minor impacts, followed by Alternatives B, D, and A, all with minor to negligible impacts.

Cumulative Impacts

Cumulative impacts, in relation to the alternatives, would result from a continuation of the same general restrictions on the solid minerals program that existed in the previous LRMP/RMP (BLM 1985; USFS 1983), as well as from the imposition of newer environmental laws and regulations. Table 3.20.2 above summarizes the direct and indirect impacts by alternative; expected cumulative impacts may follow the same pattern by alternative.

Solid minerals activity is scattered and intermittent in location and timing. The intensity of activities, both in numbers and intensity, is expected to be greater in areas of high mineral potential. Future solid minerals activity outside those specific areas would continue this pattern; as previous activities end, others would begin. The general level of activity would remain roughly the same; therefore, the cumulative impacts on the program and resource from implementation of any of the alternatives on lands with low or no potential for solid minerals may be negligible.

For the precious and base metal resource areas identified in Table 3.20.1, the legacy of past activities may exert an influence on future impacts to the solid minerals program. These past impacts, as well as changes in environmental law, restrictions on new operations and more potential closures to future activities, would be coupled with the higher costs of exploration, development, and reclamation. This may limit the success of new developments and of marginal operations, reducing the long-term supply of these metals to the local economy and to the nation. Where applicable, the designation of additional lands for WSAs, RNAs, and WSRs could restrict, withdraw, or make lands administratively unavailable for resource recovery for precious and base metals. However, the expected level of future development in these areas is moderate; therefore, the cumulative impacts on the precious and base metal program and resource from the implementation of any of the alternatives may be minor to moderate for such areas.

For the uranium/vanadium resource areas identified in Table 3.20.1, historic and current activity may not be a strong influence on future activity. Ongoing activity may operate under "grandfathered" existing approved mine plans; however, new mine plans or modifications may fall under modern restrictions. Some historic uranium activity has been cleaned up but there are still many unmitigated historic sites. The visible legacy of disturbance that typifies precious metal resource areas (such as Silverton) still exists, although many of those sites have also been cleaned up or mitigated. Because of this, the BLM and USFS have an active abandoned mined lands program. DOE uranium lease tracts are not subject to any of the alternatives. WSAs would be open to locatable mineral development. Areas open to development would face more stringent restrictions and higher costs than in the past. The cumulative impacts on the uranium/vanadium program and resource may be minor to moderate.

Overall, for the solid minerals resource, Alternative C may result in moderate to minor cumulative impacts. Alternatives B and D may result in minor impacts. Alternative A may result in negligible cumulative impacts.

BLM_0033545

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

# 3.21 Minerals and Energy: Alternative Energy

## 3.21.1 Introduction

Public lands have long provided energy resources for both individual and commercial use. The National Energy Policy has laid the legal groundwork for alternative energy projects on public lands; however, little demand has surfaced in relation to the planning area. Nonetheless, this planning effort addresses alternative energy development in order to offer guidance for projects that are proposed on the SJNF or TRFO.

## Legal and Administrative Framework

### Executive Orders

- EO 13212 of May 2001: This EO requires federal agencies to take appropriate actions, to the extent consistent with applicable law, to expedite projects that serve to increase the production, transmission, or conservation of energy.

### Geothermal Regulations

- Energy Policy Act of 2005 (PL 109-58)
- **36 CFR 228 E**
- **Geothermal Steam Act of 1970** (PL 91-581; 30 USC 1001–1027, December 24, 1970, as amended 1977, 1988, and 1993).
- **43 CFR 3200:** This provides guidance for management of geothermal leases on BLM-administered lands

### Wind

- The BLM's Wind Energy ROD - Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments, December 2005 (BLM 2005d, 2009c)
- BLM IM 2009-043, Wind Energy Development Policy (BLM 2009d)

### Solar

- BLM IM 2007-097, Solar Energy Development Policy (BLM 2007f)
- The Solar Energy Development PEIS is being prepared by the DOE, Energy Efficiency and Renewable Energy Program, and the BLM; the PEIS will document solar guidance and BMPs (Solar Energy Development PEIS Information Center 2013).

### Biomass

- The USFS Woody Biomass Utilization Desk Guide, National Technology and Development Program 2400—Forest Management, September 2007 (USFS 2007b)

Existing land use plans identify wilderness areas and WSAs, ACECs, RNAs, VRM classes, national scenic and historic trails, critical habitat areas, and other special management areas where land use restrictions apply to a variety of uses, including those related to alternative energy site testing and monitoring.

BLM_0033546

## 3.21.2 Affected Environment

### Existing Conditions and Trends

The DOE National Renewable Energy Laboratory produced an analysis assessing the potential for renewable energy on public lands (BLM and DOE 2003). This renewable resource assessment addressed BLM, BIA, and NFS lands in the western United States, except Alaska. The assessment summarized high potential for five renewable energy uses: concentrated solar power and photovoltaics, wind, biomass, and geothermal. The planning area was identified as only having high potential for biomass energy production (see Table 3.21.1).

**Table 3.21.1: BLM Planning Areas in Colorado with High Potential for Wind or Biomass Renewable Power**

| Planning Unit | Wind | Biomass |
|---|---|---|
| Grand Junction | High potential | – |
| Kremmling | High potential | High potential |
| Little Snake | – | High potential |
| Royal Gorge | High potential | High potential |
| San Juan (now TRFO) | – | High potential |
| Source: BLM and DOE 2003 | | |

Within the planning area, there is currently no demand for use of public lands for commercial geothermal, wind, or solar power development or for the commercial use of biomass material. Personal use of firewood continues at a steady pace. Fuels reduction projects around communities in the planning area would provide a source of biomass for the development of a new local source of energy. Potential for commercial development in western Colorado is limited.

## Geothermal

The potential recoverable energy contained within the known geothermal resource areas is small relative to the other fluid energy sources (including oil and natural gas) within the planning area. High-temperature geothermal resources are required for electricity generation. Extensive low- and moderate-temperature geothermal resources support agricultural, municipal, commercial, and residential uses. The geothermal fluid resources that occur within the planning area are of low or medium temperature. They emanate from geysers, springs, and wells and are generally adjacent to faults that serve as conduits for the upward flow of groundwater that has been heated by deep circulation from mainly volcanic sources.

Within the planning area, two types of geothermal resources are being commercially tapped: hydrothermal fluid resources and Earth energy. Hydrothermal fluid resources provide hot water for spa and pool use, as well as for space heating. Earth energy (the heat contained in soil and rocks at shallow depths) is excellent for direct use, as well as in connection with geothermal heat pumps. Within the planning area, the potential for additional noteworthy development of known hydrothermal resources, as well as for locating the presence of undiscovered hydrothermal resources, is slight.

The development of geothermal resources may increase slightly during the planning period. Most demand would involve non-federal lands, due to the proximity between the source of the energy and the facility to be supplied. The BLM and USFS would review, and approve, any plans of operation for

BLM_0033547

geothermal development within the planning area and would apply the appropriate environmental protection measures, as well as monitor for compliance.

Geothermal energy is managed by leases issued by the BLM. The planning area contains four USGS known geothermal resource areas: West Fork, Pagosa Ranger District (approximately 80,577 acres); Pagosa Springs, Pagosa Ranger District (approximately 26,300 acres); Dunton-Rico, Dolores Ranger District (approximately 132,109 acres); and Trimble-Pinkerton, Columbine Ranger District (130, 313 acres).

## Biomass

Biomass is organic matter available on a renewable basis (including forest and mill residues, agricultural crops and wastes, wood and wood wastes, animal wastes, livestock operation residues, aquatic plants, fast-growing trees and plants, and municipal and industrial wastes). Forest products for fuels treatment products are available for potential development. However, no current demand exists, and none is expected in the foreseeable future. With significant agricultural operations, Colorado is a good candidate for increased use of biomass fuels, especially those that do not require large amounts of water. Electricity generation potential in Colorado from biomass materials is approximately 4 million megawatt-hours per year.

Proposals for the development of biomass generation would comply with timber harvesting and fuels treatment standards when the sources of fuel are removed from public lands. A separate site-specific environmental analysis would be required for such a proposed harvest of biomass fuel.

## Wind

Areas of Class 3 (medium resource level) or higher wind resource can be found throughout the southern Rocky Mountain region. The most extensive area of wind resource is found over the high plains and uplands of eastern Colorado and eastern New Mexico. Over this area, the annual average wind resource level is mostly Class 3 and Class 4, but can be higher on exposed hilltops that are found over portions of the High Plains region. Mountain summits and ridge crests estimated to have Class 3 or higher wind resources exist throughout the southern Rocky Mountain region. Higher mountain ranges are estimated to have at least Class 6 (high wind resource level), but many of these ranges may not be suitable, due to the ruggedness of the terrain and the potential for extreme wind and icing conditions. Electricity generation potential in Colorado from wind generation is approximately 601 million megawatt-hours per year.

High potential wind energy sites within the planning area are identified on high alpine ridges in the San Juan Mountains. Wind energy development on BLM-administered lands near Durango (identified as having medium to high resource levels) were not considered to have development potential in the FEIS on Wind Energy Development completed by the BLM in 2005 (BLM 2005d). A site-specific environmental analysis would be required in order to address maintenance of a high visual quality standard before wind power would be permitted within the planning area.

## Solar

Colorado has more than 300 days of sunshine per year, making it an ideal location for solar photovoltaics and solar thermal technologies. Nearly 30 schools are tapping into the power of the sun, thanks to customers of Xcel Energy who round their bills up to a higher dollar amount and/or contribute to the Renewable Energy Trust Program. Electricity generation potential in Colorado from solar power is approximately 83 million megawatt-hours per year.

BLM_0033548

No potential has been identified for the development of commercial solar energy generation on public lands in southwest Colorado. Localized use of solar generators for other uses may occur and would be addressed in site-specific environmental analysis.

## 3.21.3 Environmental Consequences

### Direct and Indirect Impacts

With no to very low potential for commercial geothermal development, wind, or solar power generation on public lands in the planning area, the environmental consequences described in this section only analyze biomass as a potential energy source. Facility construction and operation for biomass energy generation sites would be the same as the construction and use of other facilities, and would require a specific area to be dedicated to a primary use and, secondarily, to other compatible uses.

### General Impacts

Potential biomass generation facilities would be located near communities and existing infrastructure. They would rely on existing transportation facilities for moving materials to a centralized generation plant. Standards and guidelines would be the same under all of the alternatives, and restrictions on development would be implemented in order to ensure compliance with laws and regulations governing development projects. The impacts related to the cost of production, availability of forest products, and access to markets may influence the development of biomass as an energy source. Alternatives B and C, which would propose less available land for development, would be the most restrictive. These alternatives would generally prohibit the development of permanent industrial facilities or would require limits or prohibitions on road access, as well as lower levels of materials available for biomass energy generation. Some site-specific closures or restrictions on alternative energy development may occur. Certain less-developed areas may impose high site-specific costs. However, given the minimal expected level of alternative energy development expected during the life of the LRMP, there may be no reasonably measurable differences between the alternatives.

### Impacts Related to Wildlife and Fisheries Management

Wildlife management activities that may result in impacts to alternative energy development are primarily related to management requirements under the ESA, as well as access to resources. Protective measures applied to construction and operations may increase costs. Conservation strategies, critical habitat designations, and BOs would address specific management requirements for all energy development within the planning area and would be the same under all of the alternatives.

The impacts related to wildlife and fisheries management on alternative energy development may be similar under all of the alternatives. Differences in the potential impacts on habitat designations, standards and guidelines, and habitat improvement treatments may result in negligible impacts to the development of biomass energy production. Vegetation from habitat treatments may be a viable source for biomass generation facilities under all of the alternatives.

### Impacts Related to Travel Management and Recreation

Within the planning area, public roads would be used to gain access to materials, sight generation plants, and transport energy to markets in order to develop potential biomass energy resources. Limiting the use of existing roads and trails by timing and/or by vehicle type would restrict general or

BLM_0033549

casual access for moving materials to a generation facility and for actual sighting of a generation plant. Limiting or foreclosing new road construction may increase costs and may preclude development activity in areas near communities.

The impacts related to travel management and recreation on alternative energy development may be similar under all of the alternatives. The impacts from restrictions on biomass harvesting and siting of production facilities may be negligible, given that the siting of facilities could occur near communities and existing road systems under all of the alternatives.

### Impacts Related to Timber Harvesting, Fuels Management, and Oil and Gas Development

Biomass energy development would generally be compatible with timber harvesting, fuels management, and oil and gas development activities. Based on management direction that would encourage facility development using similar infrastructure with these facilities—which could provide a supply of material for biomass generation facilities—impacts may be minor.

The impacts related to timber harvesting, fuels management, and oil and gas development activities on alternative energy development may be similar under all of the alternatives. Based on the availability of harvested material, the sighting of production facilities, and the sharing of infrastructure, impacts may be negligible, given that the sighting of facilities could occur near communities and existing road systems under all of the alternatives.

## Cumulative Impacts

Given the minimal level of current use, and the low expectations for future development, there may be no important differences in cumulative impacts to this resource under any of the alternatives. Using existing infrastructure, siting near communities, providing a market for harvested material from timber management, and using existing or proposed transportation systems may benefit the future development of biomass generation facilities within the planning area.

# 3.22 Wilderness and Lands with Wilderness Characteristics

## 3.22.1 Introduction

The SJNF shares the management on portions of three wilderness areas (Weminuche, South San Juan, and Lizard Head) with two other forests (the Grand Mesa, Uncompahgre and Gunnison National Forests [combined] and the Rio Grande National Forests). The SJNF also manages the Piedra Area, an area congressionally designated for protection of its wilderness character. The TRFO has management responsibility for eight BLM WSAs: the Dolores River Canyon, McKenna Peak, Menefee Mountain, Weber Mountain, Handies Peak, West Needles Contiguous, Whitehead Gulch, and Weminuche Contiguous. In total, the TRFO manages approximately 56,576 acres of WSAs, and the SJNF manages 420,521 acres of congressionally designated wilderness areas and the Piedra Area (approximately 62,550 acres).

Under the Colorado Wilderness Act of 1993, the Piedra Area was designated by Congress to maintain the area's existing wilderness character. It has potential to be included in the National Wilderness Preservation System; however, under the Act's Section 9(b) Management, (2)(a), the SJNF is not obligated to study the area for official wilderness designation. Based on this

542

Congressional mandate, the FEIS does not include the Piedra Area in its roadless analysis. However, areas adjacent to the Piedra Area were analyzed.

Wilderness is part of the multiple-use management mission of both the BLM and the USFS. Wilderness provides opportunities for solitude, as well as for primitive and unconfined recreational experiences. Wilderness is also important to the maintenance of species diversity, the protection of threatened and endangered species, and the protection of watersheds, scientific research, and various social values. (For additional information about wilderness, WSAs, and/or other special areas, refer to Wilderness Management Direction, amending the LRMP for the San Juan and Rio Grande National Forests, which was completed in August 1998. The San Juan/San Miguel Wilderness EIS [BLM 1990b] is incorporated herein by reference.)

The Wilderness Act of 1964 directs the USFS to analyze additional undeveloped and unroaded lands for proposed inclusion in the National Wilderness Preservation System. The USFS inventories potential wilderness by identifying roadless areas of approximately 5,000 acres or larger and/or roadless areas adjacent to existing wilderness areas. There are three tests applied to roadless areas before they are considered for wilderness area recommendations: capability, availability, and need (see Volume III, Appendix C–Roadless Area Inventory and Wilderness Evaluation). See also Map 64 in Volume III, Appendix V.

On October 21, 1993, the BLM completed its formal wilderness review of the planning area. As a result of the analysis, the areas currently managed as WSAs would remain WSAs, until wilderness legislation is passed or until Congress releases the areas for multiple uses.

## Inventory and Evaluation of Lands with Wilderness Characteristics

In addition to the initial wilderness review required by Section 603 of FLPMA that led to the creation of WSAs, the Secretary of the Interior is also required to "maintain on a continuing basis an inventory of all public lands and their resource and other values," which encompasses wilderness characteristics as a resource (FLPMA, Section 201).

In July 2011 the BLM Director reaffirmed this responsibility via IM 2011-154 (BLM 2011b), which directed field units to review and update their inventory of lands for their wilderness characteristics and established a uniform protocol for doing so. The same IM emphasized that such an inventory "shall not, of itself, change or prevent change of the management or use of the lands." Rather, the findings of the wilderness characteristics inventory are to be considered among all other resource values and potential resource uses during the land use planning process. IM 2011-154 became policy as BLM Manual 6310 in July 2012.

The wilderness characteristics inventory and evaluation applies only to BLM roadless lands that meet specific criteria as described in Volume III, Appendix O. Appendix O contains a detailed description of the initial geographic information system (GIS) and wilderness characteristics field analysis procedures, describes the areas inventoried, and summarizes the findings of the wilderness characteristics evaluation.

Three broad categories of management strategies are used in this FEIS to address wilderness character, and each of the three categories may consist of a variety of land use stipulations, restrictions, or other methods to account for wilderness values.

The "protect" category is used in those areas deemed most critical for protection of wilderness values. Examples of such areas include areas adjacent to existing WSAs or specially designated areas,

BLM_0033551

viewshed areas for other sensitive/protected areas, or areas that offer outstanding primitive recreational opportunities.

The "not protect" category is applied in areas that may be impractical to manage for their wilderness values due to their shape, proximity to non-compatible uses or highways, or may be already leased and have high potential for oil and gas development.  Standard (or more restrictive) land use stipulations and site-specific NEPA analysis would apply in these areas regardless of whether they are managed for their wilderness characteristics or not. Potential impacts to wilderness values would be addressed and evaluated during future project-level planning and environmental analysis.

## Legal and Administrative Framework

### Laws

- **The Wilderness Act of 1964:** This act established a National Wilderness Preservation System for the permanent good of the whole people and other purposes. The act provides guidance for the designation and management of wilderness areas.

- **The Federal Land Policy and Management Act of 1976:** Section 603 of FLPMA instructed the BLM to inventory all of its lands, identify which were definitely not of wilderness quality, and then begin an intensive inventory and analysis to determine which of the remaining lands would be recommended for inclusion into the National Wilderness Preservation System. Section 201 of FLPMA requires the Secretary of the Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values." This requirement includes inventory and evaluation of wilderness values and applies to all BLM lands.

- **The Colorado Wilderness Act of 1993:** This act adds acreages to the following wilderness areas: Buffalo Peaks, Byers Peak, Fossil Ridge, Greenhorn Mountain, Hunter-Fryingpan, La Garita, Lost Creek, Mount Zirkel, Never Summer, Ptarmigan Peak, Raggeds, Sangre de Cristo, Sarvis Creek, South San Juan, Uncompahgre, Vasquez Peak, and Weminuche.

### Regulations and Policies

- **BLM Policy H-8550-1 (1995):** This provides direction for the roles of the states and the BLM in the management of resident fish and wildlife in WSAs; policy for construction of new permanent installations and for surface-disturbing activities in WSAs; policies related to stocking, augmentation, and re-establishment of wildlife species in WSAs; policies for introduction or transplant of wildlife species into WSAs; wildlife damage management in WSAs; and modifications to Chapter 1, Section B, on implementing specific policy guidance related to management of WSAs.

- **FSM 2300:** This provides direction for management and planning in relation to recreation, wilderness, and related resources.

- **2012 Colorado Roadless Rule:** This rule, affecting management of all NFS roadless areas within the State of Colorado, went into effect in June 2012. It specifically directs the agency how to manage roadless areas for the foreseeable future and is incorporated into this LRMP planning effort.

Management of designated wilderness and BLM WSAs is formally dictated by the Wilderness Act and the agency policies noted above. Roadless areas are now managed under the Colorado Roadless Rule of 2012, which was formally approved between the draft and final stages of this planning process.

Volume III, Appendix V, Maps 65 and 66 depict recommended wilderness areas for Alternatives B and C.

## 3.22.2 Affected Environment

### Existing Conditions and Trends

### Roadless Inventory

Using criteria from USFS directives, the SJNF conducted an inventory for this planning process identifying 20 areas (totaling approximately 558,282 acres) as having roadless character. (See Volume III, Appendix C for detailed discussions of the 20 IRAs and for details on the proposed management for each of the IRAs.) Although IRAs are now superseded by the CRAs identified in Appendix C, the IRAs remain in Appendix C for comparative purposes and because their individual evaluations form the rationale for wilderness recommendations.

IRAs included for analysis in this FEIS meet the following criteria from the Wilderness Act and from FSH 1909.12:

- areas contain 5,000 acres, or more;

- areas contain less than 5,000 acres, but are contiguous to existing wilderness areas or to areas recommended for wilderness under other federal ownerships; and

- areas do not contain classified roads.

Classified roads are those that are wholly, or partially, within or adjacent to NFS lands determined to be needed for long-term motor vehicle access. This includes private, local, state, and other federal roads (USFS [36 CFR 212.1])

Roadless areas may contain motorized and non-motorized trails and user-created roads. They may also contain improvements (including motorized trails, unauthorized user-created roads, fences, outfitter/guide camps, and evidence of historical logging activities).

Recent timber harvesting areas, utility corridors, ski areas, and large reservoirs were excluded from the inventory. Table 3.22.1 shows the 20 areas included in the roadless area inventory. The 558,282 roadless acres are approximately 29% of the total SJNF area.

**Table 3.22.1: Roadless Areas Inventoried**

| | Area Number | Inventoried Roadless Area | Acres | Landscape |
|---|---|---|---|---|
| 1 | SJ240 | San Miguel | 64,162 | Columbine and Dolores |
| 2 | SJ284 | South San Juan Adjacent | 35,077 | Pagosa |
| 3 | SJ285 | Treasure Mountain | 22,512 | Pagosa |
| 4 | SJ286 | Turkey Creek | 25,326 | Pagosa |
| 5 | SJ291 | Graham Park | 17,808 | Columbine |
| 6 | SJ292 | Piedra Area Adjacent | 44,789 | Columbine and Pagosa |
| 7 | SJ293 | Runlett Park | 5,618 | Columbine |
| 8 | SJ294 | Florida River | 5,726 | Columbine |
| 9 | SJ295 | HD Mountains | 25,140 | Columbine |
| 10 | SJ302 | East Animas | 16,864 | Columbine |
| 11 | SJ303 | West Needles | 7,049 | Columbine |
| 12 | SJ304 | Blackhawk Mountain | 17,533 | Dolores |
| 13 | SJ305 | Storm Peak | 57,623 | Dolores |
| 14 | SJ306 | Hermosa | 148,139 | Columbine and Dolores |
| 15 | SJ315 | Ryman | 8,665 | Dolores |

BLM_0033553

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

| | Area Number | Inventoried Roadless Area | Acres | Landscape |
|---|---|---|---|---|
| 16 | SJ310 | Fish Creek | 13,537 | Dolores |
| 17 | SJ320 | Weminuche Adjacent | 22,683 | Columbine and Pagosa |
| 18 | SJ235 | Lizard Head Adjacent | 5,558 | Dolores |
| 19 | SJ309 | Baldy | 20,032 | Dolores |
| | | Total | 558,282 | |

## Wilderness Potential Evaluation

Lands evaluated under the roadless inventory were further evaluated for their potential as wilderness areas. This evaluation is based on wilderness capability, availability, and need.

**Capability:** The capability of a potential wilderness area is the degree to which that area contains the basic characteristics that make it suitable for wilderness. The characteristics considered in this analysis are shown in Table 3.22.2.

**Table 3.22.2: Wilderness Characteristics**

| Environment | The degree to which an area appears to be free from disturbance, so that the normal biological processes continue; and the degree to which the area provides visitor opportunity for solitude and sense of remoteness. |
|---|---|
| Challenge | The degree to which the area offers visitors an opportunity to experience adventure and self-reliance, often measured by the physical character of the land (terrain and vegetation) and proximity to sights and sounds of developments and travel systems. |
| Manageability of boundaries | Consideration of the ability to manage the area as wilderness; factors considered are size, shape, and juxtaposition to external influences. |
| Special features | The capability of an area to provide other features such as geologic, scenic, or cultural values. |

**Availability:** The availability of a potential wilderness area is conditioned by the value of the wilderness resource, when compared to the value of, and need for, other resources. Examples of values that may conflict with wilderness values include oil and gas potential and exploration, timber harvesting, motorized travel and mechanical transport (summer or winter), fuels reduction needs, wildlife habitat treatments, and/or water storage needs. All lands identified as capable are further evaluated for availability. Table 3.22.3 lists lands that have been identified as capable and available for wilderness within the planning area

**Table 3.22.3: Roadless Areas Capable of and Available for Wilderness Recommendation**

| Roadless Area Name | Acres | Adjacent Wilderness | Availability | Capability |
|---|---|---|---|---|
| Baldy | 20,343 | Weminuche | Available | Capable |
| Blackhawk Mountain | 17,533 | Lizard Head | Available | Capable |
| East Animas | 16,854 | Weminuche | Available | Capable |
| Fish Creek | 13,533 | Lizard Head | Available | Capable |
| Florida River | 5,720 | Weminuche | Available | Capable |
| Graham Park | 17,808 | Weminuche | Available | Capable |
| HD Mountain | 25,044 | Piedra | Not available | Not Capable |
| Hermosa | 148,103 | Lizard Head, Weminuche | Available | Capable |
| Lizard Head Adjacent | 5,805 | Lizard Head | Available | Capable |
| Piedra Area Adjacent | 40,841 | Piedra | Available | Capable |
| Runlett Park | 5,615 | Weminuche | Available | Capable |
| Ryman | 8,665 | Lizard Head | Available | Capable |
| San Miguel | 64,263 | Lizard Head, | Available | Capable |

BLM_0033554

| Roadless Area Name | Acres | Adjacent Wilderness | Availability | Capability |
|---|---|---|---|---|
| | | Weminuche | | |
| South San Juan Adjacent | 34,899 | South San Juan | Available | Capable |
| Storm Peak | 57,617 | Lizard Head | Available | Capable |
| Treasure Mountain | 22,500 | South San Juan | Available | Capable |
| Turkey Creek | 25,300 | Weminuche | Available | Capable |
| Weminuche Adjacent | 22,614 | Weminuche | Available | Capable |
| West Needle | 6,881 | Weminuche | Available | Capable |
| Winter Hills/Serviceberry Mountain | 5,115 | South San Juan | Available | Capable |

**Need:** In terms of wilderness potential, need addresses the degree to which an area would contribute to the overall National Wilderness Preservation System. Need is evaluated on a regional basis and takes into consideration such factors as geographic distribution and representations of landforms and ecosystems. Table 3.22.4 summarizes the need evaluation for potential areas within the planning area.

**Table 3.22.4: Need Evaluation for Potential Wilderness Areas**

| | Area No. | Roadless Area Name | Acres Needed | Need |
|---|---|---|---|---|
| 1 | SJ310 | Fish Creek | 0 | The area would not add significantly to the National Wilderness Preservation System. Proposed management under all alternatives would protect wilderness characteristics while, at the same time, allowing for additional management tools not allowed under wilderness protection. Recreation use (including mechanical transport) would be allowed while, at the same time, maintaining the character of the area. |
| 2 | SJ305 | Storm Peak | 0 | Same as Number 1. |
| 3 | SJ315 | Ryman | 0 | Same as Number 1. |
| 4 | SJ235 | Lizard Head Adjacent | 2,632 | The area would enhance wilderness management of the existing Lizard Head wilderness area by improving the boundary. |
| 5 | SJ304 | Blackhawk Mountain | 0 | Same as Number 1. |
| 6 | SJ306 | Hermosa | 50,895 | The area would enhance the National Wilderness Preservation System by incorporating the west side of the Hermosa drainage, from the lower-elevation ponderosa pine to the top of Hesperus Mountain. |
| 7 | SJ240 | San Miguel | 0 | Same as Number 1 |
| 8 | SJ303 | West Needle | 0 | Same as Number 1. |
| 9 | SJ302 | East Animas | 0 | Same as Number 1. |
| 10 | SJ309 | Baldy | 0 | Same as Number 1. |
| 11 | SJ294 | Florida River | 0 | Same as Number 1. |
| 12 | SJ293 | Runlett Park | 0 | Same as Number 1. |
| 14 | SJ 292 | Piedra Area Adjacent | 0 | Same as Number 1. |
| 15 | SJ291 | Graham Park | 0 | Same as Number 1. |
| 16 | SJ320 | Weminuche Adjacent | 1,428 | The area would enhance wilderness management of the existing Weminuche wilderness area by improving the boundary. |
| 17 | SJ286 | Turkey Creek | 578 | The area would enhance wilderness management of the existing Weminuche wilderness Area by improving the boundary. |
| 18 | SJ285 | Treasure Mountain | 0 | The area would not add significantly to the National Wilderness Preservation System. Proposed management under all of the alternatives would protect wilderness characteristics while, at the same time, allowing for additional management tools not allowed under wilderness |

BLM_0033555

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

| | Area No. | Roadless Area Name | Acres Needed | Need |
|---|---|---|---|---|
| | | | | protection. Recreation use (including mechanical transport) would be allowed while, at the same time, maintaining the character of the area. |
| 19 | SJ284 | South San Juan Adjacent | 0 | Same as Number 18. |

## Inventory and Evaluation of Lands with Wilderness Characteristics

Existing Conditions and Trends

Twenty land units totaling 107,518 acres were identified for further wilderness characteristics analysis during a preliminary GIS analysis. Of the 20 units, seven units totaling 40,532 acres were found to have wilderness characteristics after research and field evaluations (see Volume III, Appendix V, Maps 67 and 68 for a geographic representation of lands managed for wilderness charateristics for each alternative). These seven units were carried forward into the LRMP and FEIS, and their wilderness characteristics are considered among other resource values as directed in IM 2011-154 (BLM 2011b). A full discussion of the analysis methodology and a description of each analysis unit are included in Volume III, Appendix O.

The BLM received input through a document titled *A Citizen's Wilderness Proposal* (San Juan Citizen's Alliance 2005) as part of the planning process, and this proposal and later iterations have been useful in guiding the wilderness characteristics evaluation process. The information contained in the proposal was considered during the development of various management strategies for wilderness characteristics and was also useful in formulating other broad-scale management recommendations.

Table 3.22.5 presents a summary of lands that were found to contain wilderness characteristics during the wilderness characteristics inventory and analysis. The various units are assigned appropriate management strategies per alternative and the acreage under each strategy is summarized per alternative for comparative purposes.

**Table 3.22.5: Lands with Wilderness Characteristics and Management per Alternative (Bureau of Land Management)**

| Unit Summary | | | Acres Managed for Wilderness Characteristics per Alternative | | | |
|---|---|---|---|---|---|---|
| Area Number | General Location | Acres | A | B | C | D |
| CO-030-251-a | North Menefee Mtn. | 1,157 | N/A | 0 | 1,157 | 0 |
| CO-030-286-b | McKenna Peak | 2,635 | N/A | 0 | 2,635 | 0 |
| CO-030-286-d | McKenna Peak | 2,385 | N/A | 0 | 2,453 | 0 |
| CO-030-286-f | McKenna Peak | 1,578 | N/A | 0 | 2,052 | 0 |
| CO-030-301a | Snaggletooth (west) | 10,144 | N/A | 0 | 9,213 | 0 |
| CO-030-301b | Snaggletooth (east) | 19,518 | N/A | 10,723 | 17,920 | 0 |
| CO-030-290-h | Coyote Wash | 3,115 | N/A | 1,144 | 1,144 | 0 |
| Total acres | | 40,532 | | 11,867 | 36,574 | 0 |

BLM_0033556

## 3.22.3 Environmental Consequences

### Direct and Indirect Impacts

### General Impacts

**Areas Recommended for Wilderness:** Under Alternative B, approximately 54,886 roadless acres would be recommended for wilderness. Under Alternative C, approximately 535,269 roadless acres would be recommended for wilderness. Alternatives A and D would not propose any areas for wilderness. A recommended wilderness determination, however, would not create a wilderness area; Congress must pass legislation designating areas as wilderness. All of the areas recommended for wilderness would be under an MA 1 allocation, which would protect the characteristics that make the area suitable for wilderness designation.

The areas recommended for wilderness were identified using indications of public support, as well as information and data regarding the area's representation of special features (including large areas or topography that provides opportunities for solitude and primitive recreation; underrepresented geology and landforms, especially sedimentary geology and canyons; boundaries contiguous with existing wilderness areas; or areas recommended for wilderness under other federal ownership). The presence of wildlife species (including Canada lynx, Colorado cutthroat trout, water vole, sage-grouse, and/or pine marten), as well as records of bighorn sheep sightings, were considered. Sensitive plants, rare taxa, and their representative vegetation communities were also considered. The presence of cover types underrepresented in existing wilderness areas was identified as special features (including grasses, sagebrush, aspen, cottonwood/willow, Douglas-fir, limber pine, ponderosa pine, and pinyon-juniper). (See Volume III, Appendix C, for additional documentation of the special features of each area.)

The areas recommended for wilderness are typically somewhat smaller than the inventory areas. However, under Alternative C, all of the roadless areas (except for the HD Mountains) would be recommended for designation as a wilderness area, a WSR, or an RNA. The HD Mountains roadless area would not be available for wilderness because 88% of the area is leased for oil and gas development.

### Lands with Wilderness Characteristics (Bureau of Land Management)

The alternatives present a range of options with regards to lands to be managed for their wilderness characteristics as shown in Table 3.22.5 above. When compared to Alternatives A and D, Alternatives B and C both offer greater protection for the wilderness characteristics in these areas. Alternative C protects all seven units and 36,574 acres, with Alternative B protecting 2 units and 11,867 acres. Thus, Alternative C offers the greatest degree of protection for wilderness characteristics and Alternative B to a lesser degree. Both Alternatives A and D offer no specific protection for wilderness characteristics in the seven units, although future project-level NEPA analyses would address impacts to wilderness character among other resources.

In general, the configuration, size, and presence of other compatible resource values within lands managed for their wilderness characteristics in Alternative B lend themselves to management for these values. In addition, lands to be managed for their wilderness characteristics were evaluated as to existing oil and gas leases and other potentially conflicting resource allocation decisions within the LRMP prior to deciding upon each alternative management strategy.

BLM_0033557

Protective measures for lands with wilderness charcteristics are not prescribed or required by agency policy, which states that wilderness characteristics must be considered along with the other resource values associated with the inventory areas. However, adverse impacts to wilderness values identified via subsequent project-level NEPA analysis within lands with wilderness characteristics would be closely scrutinized. In any case, wilderness characteristics identified through the wilderness characteristics inventory process would be duly considered along with other resources and values during subsequent project-specific NEPA analysis.

## Impacts Related to Management Area Allocations

Table 3.22.6 shows the distribution of roadless acres inventoried across the range of MAs by alternative. Alternative C has the highest acreage in MAs 1–3, with Alternatives B, A, and D with less, respectively. In general, MAs 1–3 offer the greatest degree of protection for currently undeveloped "core" areas.

**Table 3.22.6: Roadless Acres in Management Areas by Alternative**

| Management Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| 1 | 1,803 | 113,286 | 528,173 | 16,321 |
| 2 | 522 | 41,601 | 29,417 | 28,879 |
| 3 | 384,379 | 371,014 | 1 | 418,754 |
| 4 | 45,381 | 25,312 | 183 | 27,109 |
| 5 | 119,107 | 464 | 508 | 55,657 |
| 7 | 0 | 4,181 | 0 | 4,196 |
| 8 | 7,090 | 2,423 | 0 | 7,366 |

The highest degree of protection of lands from development is found in Alternative C, with a lesser degree in Alternative B. Alternative D has the least degree of protection for lands from development actions. Under all alternatives CRAs would be managed under the direction of the 2012 Colorado Roadless Rule which prescribed prohibited activities and situations by which exceptions to prohibitions are permissible.

## Impacts Related to Livestock Grazing

The Wilderness Act (Section 4(d)(4)) allows livestock grazing "where established prior to the effective date of this Act…subject to such reasonable regulations as are deemed necessary." Permitted grazing would continue in roadless areas, and there would be a minor increase in grazing. The impacts related to livestock grazing on wilderness and roadless areas may be similar under all of the alternatives.

For BLM lands managed for wilderness characteristics, the potential for short-term grazing related impacts exists in areas already under active grazing allotments, but where current allotment management stipulations do not account for protection of wilderness character. Any new grazing leases, or reauthorization or changes to existing leases, would be analyzed in site-specific NEPA, and protecting wilderness character would be necessary when designing stipulations, season of use, water developments, etc.  New grazing developments under Alternatives B and C could impact wilderness character and would be subject to any mitigation measures identified within site-specific NEPA analysis. Although impacts could be reduced from protective measures (see LRMP Section 3.8), they may not be eliminated entirely if new projects are implemented.  Under Alternatives A and D, wilderness characteristics on all 40,532 acres where they were found on the TRFO would be

BLM_0033558

subject to impacts from livestock grazing because no protection of wilderness characteristics is proposed in either of these alternatives.

## Impacts Related to Recreation Management

Areas recommended for wilderness would be managed in the same manner as lands currently designated as wilderness. Opportunities for primitive and non-motorized recreation would be emphasized in roadless areas recommended for wilderness designation. This is because these areas would provide the best opportunities for solitude, as well as exhibit the absence of motorized vehicles, vehicles used for mechanical transport, and the absence of human developments. Alternative B and C would provide areas managed and recommended for wilderness; Alternative A and D would not.

Roadless areas that are assigned to other MAs would be managed for the recreation opportunities available under those MAs. Generally, the existing settings are remote and semi-primitive (ROS) in character, although motorized trails occur in some areas. Snowmobiles traveling over snow (on trails or cross-country) would occur in some roadless areas. The alternatives, ranked from proposing the largest to least amount of acres with remote, semi-primitive (ROS) settings are Alternatives C, B, A, and D.

Alternative C may result in greatest beneficial impacts to wilderness and roadless areas, followed by Alternatives B, A, and D. This would be mainly due to MA designations that would retain and protect remote, semi-primitive (ROS) non-motorized settings.

## Impacts Related to Timber Management

Roadless areas that allocated to MA 1 (recommended wilderness) would not be available for timber harvesting. Roadless areas allocated to MAs other than recommended wilderness are to be managed under the Colorado Roadless Rule and are subject to the prohibitions and exceptions under standard and upper tier designations.

Alternatives D and A may result in impacts to portions of some roadless areas as a result of timber harvesting. Those impacts may be minor as such projects would be subject to Colorado Roadless Rule prohibitions and exceptions. Alternatives B and C may result in the least impacts to roadless areas because timber harvesting would generally not be allowed.

## Impacts Related to Travel Management

Depending on travel suitability and MA allocations, roadless areas may provide a variety of travel opportunities. Roadless areas recommended for wilderness would permit foot and horse travel, and would prohibit motorized travel and mechanical transport. Other MA designations would allow for some motorized recreation and use of vehicles for mechanical transport. The impacts to roadless areas related to travel management may be the same as the impacts related to recreation management.

Overall, travel management designations under Alternative C may result in the greatest beneficial impacts to wilderness and roadless areas, followed by Alternatives B, A, and D, because they would retain and protect remote, semi-primitive (ROS) non-motorized settings.

Lands managed to protect wilderness characteristics in Alternatives B and C are closed to motorized travel, which would promote naturalness and opportunities for primitive recreation.  Under Alternative D, naturalness and opportunities for primitive recreation across the 40,532 acres found to have wilderness character would be promoted to a lesser extent than Alternatives B and C and possibly

BLM_0033559

diminished due to these areas being open to motorized travel on designated routes.  Under Alternative A, areas with wilderness characteristics would still be open to cross-country motorized travel, which could cause wilderness character to be diminished or eliminated in these areas.

## Impacts Related to Special Area Designations

Under all of the alternatives, RNA proposals (MA 2) and WSR recommendations would overlap portions of the wilderness and roadless areas and, therefore, may result in no impacts to the capability or need for wilderness recommendation. This is because their management would be compatible with the management of wilderness areas, WSAs, and proposed wilderness areas. RNA and WSR designations would protect wilderness values, even if the areas were managed for other purposes. The impacts related to special area designations would be the same under all of the alternatives.

## Impacts Related to Fire and Fuels Management

Under MA 1s, earth-moving equipment would not be used in order to manage wildfire. Wildfire for ecological benefit may occur under MAs 1, 2, and 3, if site-specific fire management planning is completed. Fuels treatment would be allowed under MAs 1, 2, and 3, when it is compatible with wilderness values and the Colorado Roadless Rule. Impacts from fire and fuels management may be mitigated by design and process, and may result in impacts to roadless area qualities. The impacts related to fire and fuels management may be the same under all of the alternatives.

On BLM lands managed for wilderness characteristics, use of motorized heavy equipment such as dozers would be limited and/or rehabilitation would be required after active suppression using such tools because permanent impacts to wilderness character would not be allowed in those areas. Active fuels reduction projects would also be required to mitigate any long-term impacts to wilderness character.  Fire and fuels management activities could diminish wilderness charateristics under Alternatives A and D as these alternatives offer no protection of wilderness characteristics from these activities.  However, impacts to existing wilderness characteristics would need to be considered during project level analysis.

## Impacts Related to Oil, Gas, and Minerals Development

Roadless areas under MA 1 would be administratively unavailable for oil, gas, and mineral development; therefore, they would be largely unaffected by development. Management of NFS roadless areas is now directed by the 2012 Colorado Roadless Rule, which is incorporated by reference into appropriate portions of the LRMP.

Formally designated wilderness areas and the Piedra Area are withdrawn from mineral leasing. BLM WSAs are administratively not available for mineral leasing.

Roadless areas on the SJNF have MA direction under the four alternatives that permit oil and gas leasing using an NSO stipulation, but any such development must also be consistent with the Colorado Roadless Rule. Roadless areas on the SJNF generally have no to low oil and gas resource potential. Consequently, under all of the alternatives, based on present knowledge of geology, there would be no minor lease interest in these areas.

McKenna Peak, a BLM WSA, has moderate oil and gas resource potential and there is gas development within the area's general proximity. McKenna Peak would remain administratively not available for lease and the northern portion of the WSA has been recently nominated for wilderness

BLM_0033560

designation in the 2009 Colorado Wilderness Bill. The alternatives are similar in terms of potential for oil and gas leasing, oil and potential is low, and leases would be issued under terms of NSO.

Significant portions of BLM lands containing wilderness characteristics are currently leased for oil and gas development, and other areas are available for potential future leasing under the alternatives.  A majority of the 11,867 acres to be managed for wilderness characteristics under Alternative B are already leased for oil and gas development, so impacts from potential oil and gas development would be expected, including construction of temporary roads and sights and sounds that would diminish naturalness and solitude.  New areas made available for leasing within lands managed for wilderness character would be subject to surface occupancy restrictions and the other proective standards for lands with wilderness character.

Under Alternative B, 6,779 acres of the total 11,867 acres to be managed for wilderness characteristics would be available for leasing and subject to new oil and gas leasing stipulations. Lands managed for wilderness characteristics would have some degree of protection from impacts under Alternatives B, but such protections would not supersede valid rights under existing leases. Under Alternative C, lands managed for wilderness characteristics are not available for lease, so there would be no new impacts frm oil and gas leasing and development under Alternative C.  Oil and gas leasing and development in Alternatives A and D could heavily impact a large portion of the 40,532 acres of wilderness characteristics found throughout the TRFO as these areas areas are generally high to moderate in oil and has potential and Alternatives A and D offer no protective stipulations or mitigation measures for wilderness characteristics.  However, impacts to these resource would be considered during subsequent analysis, prior to oil and gas development activity.

Mineral sales and extractive commercial uses would not impact wilderness characteristics as those activities would not be allowed within lands managed for wilderness characteristics.

## Cumulative Impacts

Roadless area characteristics are changed as the result of many types of development (including roads, timber management, recreation facilities, and reservoirs). Although the total acres developed in the past planning period was relatively small, the decrease in acres with roadless characteristics is a long-term and continuing trend (although perhaps not noticeable within the implementation life of the final approved LRMP). Historically, the development of roads and the management of timber stands have impacted the most acres. This trend, however, has slowed dramatically and is likely to continue to decline in the future.

Development of private in-holdings, as well as oil and gas development (especially in the HD Mountains roadless area) has been the primary reason for the loss of roadless characteristics. The impact of development extends from the past into the future and would apply to the general planning area (outside wilderness areas). The impacts may be least under Alternative B and C (where areas are recommended for wilderness designation), and the greatest under Alternatives A and D. Under a no leasing scenario, all of the roadless areas except for the HD Mountain's and 974 acres of the South San Juan Adjacent IRA would not have any potential for oil and gas exploration.

OHV use (including jeeps, sport utility vehicles, ATVs, mountain bikes, motorcycles, and other vehicles) has increased within the planning area. A motorized rider or one traveling by mechanical transport can travel across larger areas in a shorter amount of time than most other recreation users; therefore, the demand for access to more terrain is likely to increase. Advocates for OHV use are expected to request increased access to roadless areas over the life of the LRMP.

BLM_0033561

Unauthorized motorized routes, both roads and trails, have been created and/or extended within the planning area. The lack of adequate well-maintained signs contributes to this problem. Use of unauthorized routes has occurred in both roaded and unroaded parts of the planning area. If this use continues, it may diminish roadless area values. As local and national populations continue to age, the demand for easier access, primarily vehicle access, to destinations with roadless areas is expected to increase. The current impacts related to user-created routes are widespread within the planning area. User-created routes, however, are expected to decline in the future as a result of the elimination of areas open to cross-country use under all of the alternatives and as a result of the restoration of existing user-created routes. The impacts related to user-created routes are expected to decline in the future under Alternative C (as a result of prohibiting motorized use in areas recommended for wilderness area designation). Currently, instances of unauthorized use are managed through peer pressure and law enforcement. The implementation of the 2005 Travel Management Rule may move the trend away from unauthorized use.

Roadless areas may be impacted by development activities that are permissible under the Colorado Roadless Rule and motorized recreation.

# 3.23 Wild and Scenic Rivers

## 3.23.1 Introduction

The WSRA was enacted by Congress in order to preserve select rivers in a free-flowing condition and to protect other river-related values. As of 2013, segments of 203 rivers totaling 12,602 miles were designated as a component of the National Wild and Scenic Rivers System (wild rivers [6,168 miles], scenic rivers [2,722 miles], and recreational rivers [3,712 miles]). These nationally recognized rivers make up a valuable network of natural and cultural values. In total, WSR designations have been made on slightly more than 0.25% of the nation's rivers.

The WSRA requires the Secretary of the Interior and the Secretary of Agriculture to undertake studies and investigations to determine which additional wild, scenic, and recreational rivers must be evaluated through land use planning. To be eligible, a river must be free-flowing and must possess one or more ORVs. To be suitable, a decision is made that the identified values should be protected and that adding the river to the national system is the best method for protecting identified values.

### Legal and Administrative Framework

The WSRA of 1968, as amended, states:

> It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dams and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

The WSRA establishes a method for providing federal protection for the nation's remaining free-flowing rivers, preserving them and their immediate environments. Rivers are included in the system

BLM_0033562

so that they may benefit from the protective management and control of development for which the act provides.

The USDA/USDI Guidelines for Eligibility, Classification, and Management of River Areas (USFS and BLM 1982) supplements the WSRA. These guidelines provide uniform direction for evaluation, classification, and management of rivers for congressionally mandated studies under Section (5) of the WSRA and for other agency studies.

FSH 1909.12 Chapter 80 describes the process for identifying and evaluating potential additions to the Wild and Scenic Rivers System on NFS lands and the interim management of identified rivers.

BLM Manual 6400 describes the process for identifying and evaluating potential additions to the Wild and Scenic Rivers System on BLM lands and the interim management of identified rivers.

Protective measures for WSR corridors established by agency guidance referenced above takes precedence over land use decisions and guidance in the LRMP.

The Interagency Wild and Scenic River Coordinating Council (see: National Wild and Scenic Rivers System 2013) also guides the work of agencies in studying potential WSR and managing designated rivers as part of the National Wild and Scenic River System.

The Responsible Official may authorize site-specific projects and activities on NFS and BLM lands within river corridors that are eligible or suitable. This direction is more fully articulated in interim management guidelines found at FSM 1909.12, Chapter 80, and BLM Manual 6400, Sections 3.5 and 3.6. The interim management guidelines for both agencies provide for continued use of the rivers and surrounding lands, including certain mineral development, water development, road and trail construction, ROWs or easements for utilities, recreational developments, motorized travel, fish and wildlife management projects, vegetation management including weed control, and livestock grazing. These uses, however, must be managed, designed, or regulated to protect the free-flowing character, water quality, ORVs, and recommended classification. Agency guidance further states that BLM RMPs and USFS LRMPs should provide management direction for the river corridors to 1) ensure that Authorized Officers consider interim management guidelines when implementing the plan through authorizing projects and activities, and 2) identify the desired conditions, objectives, and suitability of areas to be used in the design of projects and activities.

Agency guidance provides for the interim protection of all stream segments identified as eligible or determined to be suitable. The USFS and BLM manuals provide for the interim protection necessary to maintain a study river as a potential WSR to be modified or discontinued for identified rivers upon a finding of ineligibility or unsuitability. Where agency plan decisions make determinations of suitability, study stream segments not carried forward as "suitable" are properly removed from interim protection under the WSRA guidance and would be managed according to the respective land use plan guidance for the area. The results of the comprehensive inventory of eligibility and determinations of suitability for the planning area are presented in Volume III, Appendix D and would be retained for future planning purposes.

## 3.23.2 Affected Environment

### Existing Conditions and Trends

With the passage of the WSRA in 1968, Congress directed the USDA and the USDI to prepare studies of selected rivers on the national forests and public lands as potential additions to the Wild

BLM_0033563

and Scenic Rivers System. Suitability studies were prepared for the Los Pinos, Piedra, and Dolores Rivers. WSR study reports and EISs were completed for these three rivers and were submitted to Congress with recommendations for designation for most river segments. All of these studies were completed in partnership with the Colorado Department of Natural Resources. These three rivers were also re-evaluated as part of the development of this LRMP/FEIS.

- **The Dolores River:** A total of 105 miles of river was recommended for WSR designation in 1977. Of the 105 miles, 33 miles were recommended as wild, 41 miles were recommended as scenic, and 31 miles were recommended as recreational (Colorado Department of Natural Resources et al. 1976). In 1989, the USFS re-evaluated the WSR eligibility and classification recommendations for the Dolores River. Changes to the management of public lands occurred between the 1976 and 1989 studies. Of the original 105 miles of recommended river, 94 miles of river on the SJNF were transferred to the BLM. The remaining 9 river miles on the SJNF were again recommended as eligible with a recreation river classification in 1989.

- **The Piedra River:** A total of 50.9 miles of the river was recommended for designation. Of the 50.9 miles, 32.5 miles were recommended as wild, 12.9 miles were recommended as scenic, and 5.5 miles were recommended as recreational (USFS et al. 1979). The WSR eligibility and classification recommendations for the Piedra River were re-evaluated in 1989. No changes to the original 1979 study findings were recommended.

- **The Los Pinos River:** A total of 20 miles of the Los Pinos, as well as 34 miles of its tributary streams, was recommended for designation. All 54 miles of river segments were recommended as wild. The recommended tributaries were Lake Creek, Flint Creek, Rincon La Osa, Rincon La Vaca, Snowslide Canyon Creek, and Sierra Vandera. The WSR eligibility and classification recommendations for the Los Pinos River were re-evaluated in 1989. No changes to the original 1979 study findings were recommended.

In addition to the rivers Congress authorized for study, other rivers within the planning area were also suggested for study. The Heritage Conservation and Recreation Service conducted a nationwide inventory of study river candidates for the Wild and Scenic Rivers System. This list is now managed by the NPS. In addition to the three congressionally designated study rivers, the Animas River and the San Juan Rivers (including the East and West Forks) were included on the list.

- **The Animas River:** This river was determined to not be eligible for inclusion in the Wild and Scenic Rivers System (USFS 1983). Although free-flowing, the 1983 study determined that the Animas River was highly modified in places and did not meet state water quality standards in any study segment. Most water quality impacts were attributable to historic mining in headwaters areas.

- **The San Juan River:** The mainstem San Juan and the East Fork San Juan rivers were determined to not be free-flowing. Although no impoundments occur on these rivers, channel alterations on parts of the East Fork and mainstem San Juan River were considered a disqualification for the free-flowing characteristics required by the WSRA (USFS 1983). No ORVs were found on the West Fork San Juan River.

## Wild and Scenic River Evaluation Process

The WSR study process used in this analysis follows the guidance in the above documents. This guidance requires that determinations be made regarding all planning area rivers with regard to eligibility and classification, and recommends an analysis of suitability during land management planning. The list of all rivers analyzed is found at the end of Volume III, Appendix D. Eligibility and classification represent an inventory of existing conditions. Eligibility is an evaluation of whether a

BLM_0033564

river is free-flowing (without major dams, diversions, or channel modifications) and possesses one or more ORV. These values may include scenery, recreational, geological, fish, wildlife, prehistory, history, and/or other values. These values should be a unique or exceptional representation for the area studied and must be related to the river. The results of the eligibility analysis are below.

If found eligible, a river is analyzed as to its current level of development (water resources projects, shoreline development, and accessibility), and a recommendation is made that it be placed into one or more of three classes: wild, scenic, or recreational. The results of this classification are found for each eligible river in Volume III, Appendix D.

- **Wild rivers:** Wild rivers are those rivers, or sections of rivers, that are free of impoundments and generally inaccessible except by trail with watersheds or shorelines essentially primitive and waters unpolluted.

- **Scenic rivers:** Scenic rivers are those rivers, or sections of rivers, that are free of impoundments with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

- **Recreational rivers:** Recreational rivers are those rivers, or sections of rivers, that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

The final step in this analysis process is to evaluate eligible rivers for suitability. This step includes a discussion of the consequences of designating or not designating the river as a component of the national system (in terms of social and economic values, impacts to other resources, and other uses of the area). A suitability analysis is designed to answer the following questions:

- Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?

- Would the river's free-flowing character, water quality, and ORVs be protected through designation?

- Is it the best method for protecting the river corridor?

- Is there a demonstrated commitment to protect the river by any non-federal entities that may be partially responsible for implementing protective management?

In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered.

Rivers are added to the national system by an act of Congress or by the Secretary of the Interior by designation. Secretarial designation requires that a river be a part of a state river protection system and that the State Governor submit an application to the Secretary. A recommendation by the USFS or BLM for any particular river, or river segment, does not guarantee that Congress would proceed with the recommendation and designate a river to be part of the national system.

Since the passage of the WSRA in 1968, only one river in Colorado has been designated a WSR. There is increasing interest locally in both the development and the protection of rivers.

BLM_0033565

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## 3.23.3 Environmental Consequences

### Direct and Indirect Impacts

### General Impacts

The miles of river with preliminary findings of suitability by alternative are displayed in Section 2.4. Only the previously studied and recommended rivers are found suitable in Alternative A. Alternative C finds all river segments identified as eligible through the inventory process for this planning effort and FEIS to also be suitable. Alternative D shows none of the rivers to be found suitable. Alternative B finds about two-thirds of river miles to be suitable. Potential impacts related to all other activities on WSR would be proportional to the number of miles of river found preliminarily suitable, as the suitable river corridors have higher standards for protection and less tolerance for development activities. Conversely, if designated as WSRs by Congress or the Secretary of the Interior, positive impacts upon river resources would result due to the higher level of protection afforded them under the WSRA. Interim management, as articulated in FSM 1909.12, Chapter 80, and BLM Manual 6400, Sections 3.5 and 3.6, show how the ORVs and classification would be protected on rivers found suitable. An analysis of potential for conflict of WSR with other resource management is found in Volume III, Appendix D.  The ORVs of each segment are listed in Table 3.23.1.

Alternative C would result in the most potential protection to rivers under the WSRA, followed by Alternatives B and A, respectively. This comparison is based directly on miles of river found to be suitable. Alternative D would result in no additional river corridor protection, although standard BMPs regarding riparian corridors and water resource protection would still apply to any projects within those zones.

**Table 3.23.1: Stream Segments with Outstandingly Remarkable Values**

| Stream Name | Fish ORV | Wildlife ORV | Recreation ORV | Geology ORV | Scenery ORV | Ecological (plants) ORV | Archaeology ORV |
|---|---|---|---|---|---|---|---|
| Dolores above McPhee | – | – | San Juan Skyway | – | – | – | – |
| Dolores McPhee to Bedrock* | Roundtail chub, flannelmouth sucker, bluehead sucker | Canyon treefrog | Boating | Cliffs, linear canyons | Cliffs, canyons, groves | New Mexico privet, Eastwood's monkey flower | Archeology |
| Rio Lado | High-purity cutthroat | – | – | – | – | – | – |
| West Dolores | – | Black swift nesting colonies | – | – | – | – | – |
| McIntyre Canyon | – | – | – | – | – | Eastwood's monkey flower | – |
| Bull Canyon | – | – | WSA, hiking to pools | – | – | – | – |

558

| Stream Name | Fish ORV | Wildlife ORV | Recreation ORV | Geology ORV | Scenery ORV | Ecological (plants) ORV | Archaeology ORV |
|---|---|---|---|---|---|---|---|
| Coyote Wash | – | – | WSA, hiking sandy wash | – | – | Kachina daisy, Eastwood's monkey flower | – |
| Animas River, Baker's Bridge to Silverton | – | – | Train, rafting/kayaking | – | Canyon, train | – | Historic sites, facilities, and railroad |
| Cement Creek | – | – | – | – | – | Iron fens | – |
| Cinnamon Creek | – | – | Alpine Loop | – | – | Altai cottongrass, thickleaf whitlowgrass | – |
| Maggie Gulch | – | – | – | – | – | Showy, Colorado Divide, and thickleaf whitlowgrass | – |
| Mineral Creek | – | – | San Juan Skyway | – | San Juan Skyway, wetland, colorful valley displaying geologic features | Chattanooga iron fen, sphagnum balticum | – |
| South Fork Mineral Creek | – | Black swift nesting colonies | – | – | – | Iron fen wetland | – |
| West Fork Animas and California Gulch | – | – | – | – | – | Altai cottongrass, clustered sedge | – |
| Hermosa Creek and Tributaries | High-purity cutthroat and reintro-duction habitat | – | Hermosa Trail used by outfitters, hunters, mountain bikes, and motorized vehicles | – | – | – | – |
| Los Pinos above Vallecito* | – | – | Heavy-use trail | – | Scenic valley | – | – |

BLM_0033567

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

| Stream Name | Fish ORV | Wildlife ORV | Recreation ORV | Geology ORV | Scenery ORV | Ecological (plants) ORV | Archaeology ORV |
|---|---|---|---|---|---|---|---|
| Los Pinos Tributaries previous recommend-ation* | – | – | – | – | Scenic valley | – | – |
| Vallecito Creek | – | – | Heavy-use trail, kayaking | – | Canyon, surroundin gs | – | – |
| Piedra River, Chimney Rock area to Forks* | – | – | Whitewater boating, fishing | Headwaters complex | Box canyons, hot springs | – | Prehistory |
| East Fork Piedra River | High-purity cutthroat | – | – | – | Waterfalls | – | – |
| Middle Fork Piedra River* | – | – | General recreation | General geology | General scenery | – | – |
| West Fork San Juan River | – | – | – | San Juan volcanic field, glaciation | – | – | – |
| Wolf Creek and Fall Creek | – | Black swift nesting colonies | – | – | Treasure Falls | – | – |
| East Fork San Juan River | – | – | – | Textbook glaciation and volcanics | – | – | Archeology |

*Streams that were previously recommended for inclusion in the National Wild and Scenic Rivers System.

## Impacts Related to Minerals Management Decisions

Minerals development, consistent with the required guidelines, may result in localized, decreased vegetation in the riparian corridor, and small and/or temporary increases in sedimentation. These activities are not expected to impact the ORVs. The rivers most likely to be impacted are those with high mineral potential, which include:

- Dolores River, above McPhee (near Rico)
- Dolores River, McPhee to Bedrock
- West Dolores (near Dunton)
- Summit Canyon
- Animas River Bakers Bridge to Silverton (near Elk Park and Whitehead Gulch)
- Cement Creek
- Cinnamon Creek

BLM_0033568

- Maggie Gulch

- Mineral Creek

- South Fork Mineral Creek

- West Fork Animas River in California Gulch

- The very upper portions of South Fork Hermosa and Clear Creek

- The very lowest portions of the mainstem of Hermosa Creek

- East Fork San Juan River

The impacts related to minerals management on WSRs would be similar under all of the alternatives, although Alternatives B and C have more potential for conflict. The potential conflicts under Alternatives B and C are due primarily to the 0.25-mile protected corridor associated with any WSR designations, which would make mineral extraction less economical or unviable in those zones. Access road building would also be restricted within those zones.

## Impacts Related to Oil and Gas Management Decisions

A management corridor would be established for rivers found suitable for protection under the WSRA. In the PLAA, the Dolores River would be stipulated. Segments of the river would be classified as wild, scenic, or recreational, depending on the amount of development allowed. Each of the WSR river classifications requires a different level of protection from other potentially incompatible activities including oil and gas leasing and development.

Lease Stipulations

The lease stipulation shown in Table 3.23.2 would apply to river segments within the PLAA with a preliminary finding of WSR suitability. For segments falling within NFS lands, FSM 1909.12_80 states that "leases, licenses, and permits under mineral leasing laws are subject to conditions necessary to protect the values of the river corridor in the event it is subsequently included in the National System." Oil and gas development with surface occupancy is considered not compatible with the purpose and status of those areas. Development classifications of wild and scenic require that there be no substantial evidence of human activity, so withdrawal or NSO is required. In recreational classifications there can be substantial evidence of human activity, but the physical attributes of the river corridors (e.g., Canyon walls, steep slopes, floodplains) would make surface occupancy incompatible with environmental protection requirements. Consequently, all river segments found suitable are assigned a NSO stipulation or, in the case of wild segments, are proposed for withdrawal within the alternatives.

Table 3.23.2: Surface Stipulations for Suitable River Segments per Alternative

| Resource | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Dolores River Canyon | NSO | NSO | NAL | NSO |
| WSR | NSO | NSO | NSO | NSO |

The Dolores River lease stipulation requires NSO within 0.25 mile of the canyon's rim. This stipulation would provide additional scenic protection adjacent to the river corridor directly outside the portion recommended for wild, scenic, or recreational.

BLM_0033569

Overall, as a result of the stipulations assigned in the alternatives, oil and gas leasing and development would generally not affect the recommended river segments within their corridors.

Suitable rivers classified as wild in each alternative are administratively unavailable for oil and gas leasing, while rivers classified as scenic or recreational can be leased. Under the No Leasing Alternative, leasing would also be prohibited on suitable rivers classified as scenic or recreational. This would offer additional protection to some of the ORVs.

## Impacts Related to Livestock Grazing Decisions

The continuation of livestock grazing may have little impact on WSRs. ORVs have been maintained under current grazing management, and no dramatic changes are expected if rivers are found eligible or suitable. Most WSR corridors have some acres of range allotments within them; however, standards and guidelines are in place in order to manage for desired conditions (as identified in AMPs). If new facilities are needed for livestock management, they would be designed to fit into the classification. The impacts related to livestock grazing on WSRs would be similar for all alternatives.

## Impacts Related to Recreation Decisions

Current recreation management has not precluded the finding of ORVs along eligible river segments. Continued recreation at the same intensity may, therefore, have little or no impact on WSRs. As recreation increases, either due to a general increase related to population pressure or due to the findings of "suitable," additional impacts (e.g., trash not disposed of properly and human-caused fires) may occur, but such instances are anticipated to be low. The protection of more river miles found suitable in Alternatives B and C would enhance primitive and semi-primitive recreation experiences in those areas.

## Impacts Related to Vegetation Management Decisions

Timber harvest should not impact eligible rivers, since no suitable timber lands are within WSR corridors in any alternative. Vegetation management for fuels reduction may impact some segments but since those projects are allowed in WSR corridors only if they protect, enhance, or restore the river environment, impacts are expected to be low. The impacts related to vegetation management on WSRs would be similar under all of the alternatives.

## Impacts Related to Water Resource Projects

A finding of suitability does not create a water right. A water resource project proposed on a suitable river would be analyzed as to its effect on a river's free-flow, water quality, and ORVs, with adverse effects prevented to the extent of existing agency authorities (such as special use authority) and subject to valid existing rights. Projects on a suitable river may be subject to more intense analysis and additional mitigation, compared to rivers not eligible or suitable, and no approvals would be granted for storage impoundments within suitable stream segments. Many of the suitable segments would have numerous conflicts with water resources. Additional information on existing water rights, conditional water rights, and expected development on specific river segments is found in Volume III, Appendix D.

If any of the rivers found in this planning process to be suitable were to be designated a WSR by Congress or the Secretary of the Interior, a federal water right would be created. Typically, the quantification of the federal reserved right is left to the federal agency that manages the river. The agency conducts studies to determine the minimum flow rates needed to support the ORVs. Then the

BLM_0033570

federal agency submits an application containing the proposed quantification to a state court for confirmation and integration into the state water rights system. This quantity would have an appropriation date as of the date of the legislation, and would be junior to all existing water rights. Future diversions for the wild and scenic segment, or from tributaries or upstream reaches, could be challenged by the federal agency holding the water right if the proposed diversion causes flows to go below the quantified amount of the federal right. Findings of eligibility or determinations of suitability do not involve a federal reserved right.

The federal reserved right, along with all other existing water rights, could hamper water developments proposed after the WSR designation and could complicate changes in points of diversion and use of rights that are senior to the congressional designation of a WSR. The mechanism for protecting a federal reserved water right in Colorado would be through the state's water courts, following the opposition process established for all other holders of water rights in the state. The impacts related to water resources development on WSRs would correlate with the river miles found suitable as WSR. Alternatives B and C have more potential for conflict.

Maps 69 through 71 in Volume III, Appendix V, depict the wild and scenic river segments for Alternatives A, B, and C.

## Cumulative Impacts

The 1983 San Juan National Forest Land and Resource Management Plan incorporated the recommendations previously made for the Dolores, Los Pinos, and Piedra Rivers, as well as the state recommendation for the West Dolores River. These rivers have been managed as suitable WSR management corridors within the planning area since that time, with their unique qualities protected by specific standards and guidelines. The BLM manages the Dolores River below McPhee Reservoir in order to protect the ORVs and has enacted a specific river management plan written specifically for the corridor. Findings of eligibility or suitability in this decision would not change the current situation substantially for these rivers previously determined to be suitable; therefore, they would not add cumulative impacts to these streams.

Findings of eligibility or suitability for the other streams listed above as eligible could have three impacts:

1. Recreation pressure may increase for the streams that have been identified as having ORVs. This is not expected to be substantial. There could be a larger increase in recreation if any of these streams are designated as WSR in the national system. Increased recreation could affect eligible WSRs (e.g., trash not disposed of properly and human-caused fires), but the effects are anticipated to be low. In a few cases, additional regulation may have to be imposed and enforced to maintain the ORVs.

2. Proposals to dam or divert these streams would be analyzed as to their effect on a river's free-flow, water quality, and ORVs, with adverse effects prevented to the extent of agency authorities. Project-level decisions are also to provide for the preservation of the tentative classification of the study segment (i.e., wild, scenic, or recreational). The result of these requirements may include longer review and processing times for proposed water developments and decisions could include requirements to modify the proposed water development or otherwise mitigate impacts to the study segment. In some cases, these reviews could result in denial of the Proposed Action. BLM Manual 6400 and FSH 1909.12 Chapter 80 provide guidance the agencies must follow in reviewing proposed water resources projects on rivers found suitable for inclusion in the National Wild and Scenic River System.

BLM_0033571

Should Congress or the Secretary of the Interior designate a stream segment as a WSR, new storage dams would be prohibited on that segment and a federal reserved water right would be established. New diversions or changes to diversions involving a state water court action might be opposed, prohibited, or otherwise affected to prevent injury to federal reserved water rights that would be established through congressional action, and to protect ORVs and river classification. As a result, the ability to obtain or modify upstream water rights could be limited to various extents, and the prohibition of new storage dams within the designated river segment could limit the amount of water that could be stored for downstream water users or require alternative approaches to providing sufficient water.

3. The cumulative impacts related to management policy and, if designated, statutory direction would be the protection of river resources and natural processes over time.

# 3.24 Scenic, Historic, and Backcountry Byways

## 3.24.1 Introduction

The planning area contains a majority of the 232-mile-long San Juan Skyway, which was designated by the USFS as a national scenic byway in 1988. In 1989, it was also designated by the State of Colorado Scenic Byway Commission as a State Scenic and Historic Byway. Both of these were the first such designations for the State of Colorado. The byway was given further distinction when it was recognized as an All-American Road. In order to receive the distinction of an All-American Road designation, the San Juan Skyway had to be considered a "destination unto itself"—a primary destination for a trip that provides an exceptional travel experience for visitors.

The San Juan Skyway also passes through the Grand Mesa, Uncompahgre, and Gunnison National Forests, as well as by Mesa Verde National Park. The San Juan Skyway links the historic towns of Durango, Silverton, Ouray, Telluride, and Cortez. This byway traverses some of the most spectacular, rugged, and primitive landscapes in America. The area is rich in cultural and historic resources from ancient Native American inhabitation (with Native Americans using and accessing the San Juan area for possibly up to 10,000 years) to the colorful mining era of the San Juan Mountains in the 1800s (including the development of the narrow-gauge railways through the area). In keeping with the primary goals of the National Scenic Byway Program, the physical development of the highway, its associated facilities, and the management of surrounding landscapes is vital to the conservation of its unique and valued attributes.

The 65-mile Alpine Loop National Backcountry Byway also passes through the San Juan Mountains (often along routes that follow ancient paths Native Americans used as they returned to their traditional summer hunting camps). The route connects the towns of Lake City, Silverton, and Ouray. Unlike scenic byways, which are located on paved roads, backcountry byways focus on out-of-the-way routes that are typically graveled. Spectacular higher-elevation scenery and numerous historical markers explain the mining history of the area as the route travels through the towering San Juan Mountains.

The Trail of the Ancients Scenic Byway highlights the long and intriguing inhabitation of the Four Corners region by Native American peoples. It escorts visitors to remote archaeologically, culturally, and historically significant sites in Colorado, Utah, and Arizona. The section of the byway within the planning area travels mainly within the Canyon of the Ancients National Monument (BLM), Hovenweep National Monument (NPS), Ute Mountain Ute tribal lands, and communities (including Cortez and Dolores). A total of 114 miles of this scenic byway is located within Colorado.

BLM_0033572

## Legal and Administrative Framework

Congress established the National Scenic Byways Program under the Intermodal Surface Transportation Efficiency Act of 1991 and strengthened it further with the passage of the Transportation Equity Act for the 21st Century in 1998 and subsequently with the Safe, Accountable, Flexible, and Efficient Transportation Equity Act - A Legacy for Users, in 2005.

The National Scenic Byways Program is under the administration of the U.S. Department of Transportation, Federal Highway Administration. Based on one or more archaeological, cultural, historic, natural, recreational, and/or intrinsic scenic qualities, the U.S. Secretary of Transportation recognizes certain roads as America's Byways, All-American Roads, or national scenic byways.

The Colorado Scenic and Historic Byways Program is a statewide partnership intended to provide recreational, educational, and economic benefits to Coloradoans and state visitors. This system of outstanding touring routes in Colorado affords the traveler interpretation and identification of key points of interest while, at the same time, providing for the protection of significant resources.

Scenic and Historic Byways are designated by the Colorado Scenic and Historic Byways Commission based on their exceptional scenic, historic, cultural, recreational, and natural features.

Backcountry Byways are vehicle routes that traverse scenic corridors utilizing secondary or backcountry road systems.

## 3.24.2 Affected Environment

## Existing Conditions and Trends

Currently, driving for pleasure is one of the most popular forms of recreation occurring within the planning area—with scenic byways and backcountry byways serving as some of the most popular routes through the San Juan Mountains (experiencing moderate to high use on a regular basis).

Along these byways, many interpretive opportunities remain untapped and out of reach to the public. Valued scenic and cultural landscapes remain exposed to development and, consequently, degradation due to a variety of impacts. Basic safety information and sanitary facilities are still lacking in key areas.

As the population increases, and as baby boomers grow older and become less able to engage in more physically active forms of recreation, larger numbers of visitors are anticipated to take up driving for pleasure. Heritage tourism, which is the fastest growing segment of the tourism industry, is often combined with a scenic drive. Cultural heritage sites along byways (including early historic mining and Native American sites) offer increasing opportunities for interpretation and education.

## 3.24.3 Environmental Consequences

## Direct and Indirect Impacts

Under all of the alternatives, the condition of the viewshed on the SJNF and TRFO would be conserved for valued scenic and cultural elements to the extent that partnerships, resources, and funding allow. Generally, all of the alternatives are similar with respect to desired future conditions, thematic direction, and design guidelines for land management of the routes (and adjacent lands) within the viewsheds. Differences exist between the alternatives regarding oil and gas stipulations (Table 3.24.1). In reference to oil and gas leasing stipulations, Alternatives A and D (under CSU)

BLM_0033573

would provide less scenic protection to these roads and trails than would Alternatives B or C (which prescribe NSO stipulations), although all propose more protective oil and gas stipulations. If no new oil and gas leases were made available, the impacts to scenic byways would be similar under all alternatives because most of the development would occur on existing leases only. The ability to move facilities to eliminate visual impacts may be limited by CSU, allowing surface occupancy within closer proximity of, or within the 0.5-mile corridors; therefore, visual impacts would have a higher probability of occurring under CSU than under an NSO requirement.

The PLAA contains approximately 20 miles of the 232-mile-long San Juan Skyway. In keeping with the primary goals of the National Scenic Byway Program, the management of surrounding landscapes is vital to the conservation of its unique and valued attributes.

The San Juan Skyway's corridor is characterized by steep, rugged terrain and traverses areas within the PLAA that have low oil and gas potential. The corridor's protective stipulation and the lack of resource potential within the corridor would both result in no to very minor development impacts to the San Juan Skyway where it passes through the PLAA.

**Table 3.24.1: Oil and Gas Leasing Stipulations for Areas in Each Alternative**

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|------|---------------|---------------|---------------|---------------|
| National scenic byways, All-American Roads, and backcountry byways; designated scenic, recreation, and historic trails; and recreation-emphasis corridors: Within the identified foreground viewshed, up to 0.5 mile on either side of the following routes would be protected: San Juan Skyway, Trail of the Ancients, the Alpine Loop Back Country Byway, Old Spanish Trail, Continental Divide Trail, Colorado Trail, Calico Trail, Highline Loop Trail, East Fork Road, West Fork Road, First Notch Road, Piedra Road, Poison Park Road, Lime Creek Road, South Mineral Road, La Plata Canyon Road, West Dolores Road, and Durango-Silverton Narrow Gauge Railroad. | CSU/NSO | NSO | NSO | CSU |

## Cumulative Impacts

The main cumulative impact to these scenic routes is related to the development of non-public lands visible from, or adjacent to, these routes. These impacts are outside the scope of this FEIS. Over the next decade, many private parcels may be developed for residential and commercial use. Some of this development may cumulatively impact these byways. Changes in the character of the visible viewshed from these routes may be likely to occur, especially as lands become more industrial and urbanized. Under the No Leasing Alternative, none of the scenic byways would have any potential for oil and gas exploration.

A portion of the San Juan Skyway exiting the SJNF and traversing private lands between Dolores and Mancos is underlain by the GSGP. Oil and gas development of the private lands could degrade the scenic quality of that section of the San Juan Skyway as one travels south on the skyway on NFS lands.

BLM_0033574

# 3.25 National Recreation, Scenic, and Historic Trails

## 3.25.1 Introduction

**National Recreation Trails:** This is a designation given to certain publicly accessible trails in the United States that contribute to health, conservation, and recreation goals. There are approximately 1,000 national recreation trails currently designated in all 50 states, ranging from less than a mile to 485 miles long, which are located on local, state, federal, and privately owned lands. National recreation trails may be nominated for designation each year. The USFS and the NPS jointly administer the National Recreation Trails Program, with help from a number of other federal (including the BLM) and non-profit partners.

**National Scenic Trails:** This designation protects trails within areas of special natural beauty. National scenic trails are authorized under the National Trails Systems Act of 1968, along with national historic trails and national recreation trails. National scenic trails and national historic trails may only be designated by an act of Congress.

**National Historic Trails:** This designation protects extended trails that closely follow a historic trail or route of travel of national significance. Designation identifies and protects historic routes, historic remnants, and artifacts for public use and enjoyment.

## Legal and Administrative Framework

**The National Trails System Act of 1968:** This act authorized the creation of a national trail system composed of national recreation trails, national scenic trails, and national historic trails. Although national scenic trails and national historic trails may only be designated by an act of Congress, national recreation trails may be designated by the Secretary of the Interior or the Secretary of Agriculture, in order to recognize exemplary trails of local and regional significance (in response to an application from the trail's managing agency or organization). Through designation, these trails are recognized as part of America's national system of trails.

## 3.25.2 Affected Environment

## Existing Conditions and Trends

The Calico and Highline National Recreation Trails cross the planning area, typically within areas that are managed for semi-primitive recreation (ROS) opportunities. Neither of these trails are at or near their use capacity at this time.

The 22-mile Calico National Recreation Trail is a multi-use trail that stays above 8,500 feet in elevation, traveling along ridgelines and through forested areas. Mountain bikers and hikers share the trail with horseback riders and motorcycle riders. Consistent with its multi-use management, this trail has sufficient access from developed roads and trailheads.

The non-motorized Highline Loop National Recreation Trail crosses the planning area for approximately 17 miles with a minimum elevation of 9,000 feet. Within the planning area, this trail is also includes a portion of the Colorado Trail and follows a spectacular mountain ridgeline with long-distance views. Consistent with its primitive character, this trail has sufficient access from primitive four-wheel drive roads.

BLM_0033575

Acting upon a vision of a 3,100-mile primitive and challenging backcountry trail that would travel from Canada to Mexico along the backbone of America, Congress designated the CDNST in 1978. The CDNST Comprehensive Plan was completed in 2009, outlining management priorities and guidelines (USFS 2009).

A long section of the CDNST crosses the planning area, traversing the spectacular and remote high country of the San Juan Mountains within the Weminuche and South San Juan wilderness areas. From the Weminuche wilderness area, the CDNST travels north onto BLM-administered lands near Silverton. Most of this section of the CDNST meanders between the San Juan and the Rio Grande National Forests, necessitating shared management responsibility for many miles of this significant trail.

A CDNST management plan has been completed, identifying specific goals and objectives for trail segments and trailhead facilities. Current trailhead access and development is consistent with CDNST Comprehensive Plan direction. Issues related to trail alignment are nearly all resolved for sections managed by the SJNF and TRFO.

The Colorado Trail is Colorado's premier long-distance, non-motorized trail. Stretching almost 500 miles from Denver to Durango, it travels through the spectacular Rocky Mountains (including six wilderness areas and eight mountain ranges), topping out at 13,334 feet. Within the planning area, some of the Colorado Trail follows the same route as the CDNST. A portion of the Colorado Trail within the planning area follows the Highline Loop National Recreation Trail.

Within the planning area, most of the Colorado Trail travels within remote backcountry, wilderness areas, and other lightly traveled areas. Issues resulting from conflicts with motor vehicle use are few. The southernmost section of the Colorado Trail near Durango is heavily used by the community for day-use hiking and biking.

In 2002, Congress formally designated the Old Spanish Trail as the nation's 15th national historic trail. The "Main Branch" trail route is now under Highway 184, directly in front of the Dolores Public Lands Office. Between 1829 and 1848, the Old Spanish Trail was used by immigrants and traders on yearly pack-train expeditions between Santa Fe and the Pueblo of Los Angeles (San Gabriel Mission). The trail was used by trappers, travelers, and military expeditions. Some of the travelers on the Old Spanish Trail (in whole or in part) include Gunnison, Wheeler, Kit Carson, Rowland, Workman, Antoine Rubidium, Howard Ruffed, Pablo Vigil, and Antonio Amigo, to name but a few. This trail offers outstanding cultural tourism and interpretive opportunities.

### 3.25.3 Environmental Consequences

### Direct and Indirect Impacts

In relation to the action alternatives, Alternative A would not propose the same viewshed protection for these trails as Alternatives B, C, and D. Alternatives B, C, and D all establish these trails as important viewer locations, and they do incorporate standards, guidelines, and stipulations designed to protect the foreground viewshed along these routes. Alternative B would impose varying degrees of viewshed protection, primarily dependent on the MA designation of the lands within which the routes travel. Via the MA allocations, Alternative B contains somewhat more restrictive management criteria than Alternative D, but to a lesser degree than Alternative C. Alternative C would allow the lowest potential for developments or other active management activities that would be visible from or otherwise affect the trails. On the contrary, Alternative D has the greatest potential for allowing developments that would be visible or otherwise affect the trail corridors. Other issues, including trail

BLM_0033576

access, shared use, way-finding, and maintenance, would not differ between the alternatives. If no new oil and gas leases were made available, the impacts to the national recreation and scenic trails would be similar to the impacts under all alternatives because most of the development would occur on existing leases.

Regardless of the alternatives, the 1968 National Trails System Act prevents land management agencies from taking actions that would directly and/or significantly alter the immediate surroundings of the trail corridors or that would degrade the specific resources for which the trail was designated.

## Cumulative Impacts

The main cumulative impact for the future of these routes would be related to the development of non-public lands visible from, or adjacent to, these routes. This impact would be outside the scope of this FEIS. Over the next decade, private parcels near the trails would likely be developed for residential and commercial use. Some of this development may result in cumulative impacts to these scenic, historic, and recreational routes. Changes in the character of the visible viewshed from these routes are likely to occur, especially as lands become more industrial and urbanized.

# 3.26  Research Natural Areas

## 3.26.1 Introduction

RNAs are NFS lands that are part of a network of ecological reserves designated in perpetuity for non-manipulative research, education, monitoring, and for the preservation of ecological diversity. They are relatively unaltered by past management activities and managed to allow natural ecological processes to proceed with minimum human intervention. They also serve as reference areas for the study of ecological processes, disturbances, and ecological changes. Most management activities are prohibited in RNAs unless they are needed to achieve desired conditions or maintain the features for which the RNA was established. Forest plans shall include the analysis of proposed RNAs and shall make recommendations for the establishment of RNAs (FSM 4063.03). RNAs on the SJNF are protected areas and as such are key components of the LRMP sustainable ecosystems strategy.

The following objectives pertain to the establishment of RNAs:

1. Maintain a wide spectrum of high-quality areas that represent the major forms of variability in forests, shrublands, herbaceous lands, and other lands that have scientific interest and importance that, in combination, form a national network of ecological areas for research, education, and the maintenance of biological diversity.

2. Preserve and maintain genetic diversity, including threatened, endangered, and sensitive species.

3. Protect against human-caused environmental disruptions.

4. Serve as reference areas for the study of natural ecological processes including disturbance.

5. Provide on-site and extension educational activities.

6. Serve as baseline areas for measuring long-term ecological changes.

7. Serve as control areas for comparing results from manipulative research.

8. Monitor effects of resource management techniques and practices.

BLM_0033577

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## 3.26.2 Affected Environment

### Existing Conditions and Trends

The SJNF currently contains two RNAs: Narraguinnep and Williams Creek. Twenty-one additional areas were proposed for RNA consideration through the LRMP revision process, primarily selected from roadless areas, vacant or closed grazing allotments, and lands with few management conflicts (Volume III, Appendix V, Map 72). Potential RNAs were selected to represent as much ecological diversity as possible, including vegetative, topographic, geologic, and climatic diversity and to include complete watersheds when possible. After further analysis, eight potential RNAs were recommended for RNA designation through this planning process because they represent most of the major vegetation types on the SJNF, they represent many of the vegetation types targeted for inclusion in the Rocky Mountain Region RNA system, and because they best meet RNA criteria (quality, condition, viability, and defensibility).

**The Narraguinnep RNA** is located on the west side of the SJNF about 13 miles northwest of Dolores. It contains about 1,900 acres at elevations ranging from 6,690 to 8,000 feet. Key features include old growth ponderosa pine forests, pinyon-juniper woodlands, mountain shrublands, steep canyon escarpments, and sedimentary geology.

**The Williams Creek RNA** is located about 15 miles northwest of Pagosa Springs. It contains about 550 acres at elevations ranging from 8,350 to 9,650 feet. Key features include white fir-dominated cool-moist mixed conifer forests, spruce-fir forests, gentle mountain topography, and volcanic geology.

**The Electra RNA** is located east of Electra Lake in the southern San Juan Mountains. It totals about 2,200 acres at elevations ranging from 7,400 to 8,800 feet. The area is characterized by glacial mountain topography associated with metamorphic and igneous geology. Key features include glacial topography, kettle ponds, old growth ponderosa pine forests, mixed conifer forests, aspen forests, wetlands, and fens.

**The Grizzly Peak RNA** is located in the Rico Mountains. It totals about 3,000 acres at elevations ranging from 10,000 to 13,700 feet. The area is characterized by rugged mountain topography. Three rock glaciers and a number of well-defined cirque basins occur within the RNA. Key features include periglacial topography, sedimentary geology, fens, old growth spruce-fir forests, willow carrs, alpine tundra, Thurber fescue mountain grasslands, and wetlands.

**The Hermosa RNA** is located about 13 miles north of Durango. It totals about 8,000 acres at elevations ranging from 7,000 to 12,000 feet. The area is characterized by highly dissected mountain topography and sedimentary geology. Key features include old growth forests, Colorado cutthroat trout, alpine tundra, spruce-fir forests, aspen forests, ponderosa pine forests, mixed conifer forests, and mountain shrublands.

**The Hidden Mesas RNA** is located about 15 miles southwest of Pagosa Springs. It totals about 4,400 acres at elevations ranging from 6,600 to 8,300 feet. The area is characterized by mesas, canyons, and sedimentary geology. Key features include old growth ponderosa pine forests, mixed conifer forests, pinyon-juniper woodlands, and mountain shrublands.

**The Martinez Creek RNA** is located about 9 miles north of Pagosa Springs. It totals about 1,800 acres at elevations ranging from 9,400 to 11,400 feet. The area is characterized by gentle to rugged

570

BLM_0033578

mountain topography and volcanic and sedimentary geology. Key features include old growth spruce-fir forests.

**The Navajo River RNA** is located about 19 miles east of Pagosa Springs. It totals about 7,000 acres at elevations ranging from 9,200 to 12,700 feet. It is located within the South San Juan wilderness area. The area is characterized by rugged mountain topography and volcanic geology. Key features include Colorado cutthroat trout, alpine tundra, spruce-fir forests, Thurber fescue mountain grasslands, riparian areas, wetlands, and fens.

**The Piedra RNA** is located about 23 miles northwest of Pagosa Springs. It totals about 6,900 acres at elevations ranging from 7,500 to 10,500 feet. It is located within the Piedra Area. The area is characterized by rugged mountain topography and volcanic geology. Key features include old growth warm-dry mixed conifer and cool-moist mixed conifer forests, spruce-fir forests, aspen forests, Thurber fescue mountain grasslands, riparian areas, and wetlands.

**The Porphyry Gulch RNA** is located about 21 miles north of Pagosa Springs. It totals about 12,000 acres at elevations ranging from 8,500 to 12,500 feet within the Weminuche wilderness area. The area is characterized by rugged mountain topography and volcanic geology. Key features include alpine tundra, spruce-fir forests, Thurber fescue mountain grasslands, riparian areas, wetlands, and fens.

## 3.26.3 Environmental Consequences

### Direct and Indirect Impacts

The designation of RNAs would change the future management activities allowed in some areas. After designation, the implementation of management activities (fire management, livestock grazing, and recreation) in individual RNA management plans within the next 15 years would cause impacts to RNAs (as described below) on a small percent of the SJNF as described in Section 3.4, Riparian Areas and Wetland Ecosystems; Section 3.2, Terrestrial Ecosystems and Plant Species; and Section 3.16, Heritage and Cultural Resources. Natural ecological processes and disturbances (including succession, flooding, fire, insects, and disease) would also impact RNAs as evidenced by the spruce beetle epidemic that is currently killing Engelmann spruce trees in the proposed Martinez Creek RNA and as evidenced by the Narraguinnep Fire in the Narraguinnep RNA in 2009. LRMP components (desired conditions, standards, and guidelines) in the LRMP and in individual RNA management plans would prevent or minimize adverse impacts to RNAs.

## Impacts Related to Recreation

Non-motorized and non-mechanized recreation activities (camping, hiking, horseback riding, outfitter guide activities, and trail maintenance) would cause impacts to the soils and vegetation (mostly along trail corridors) of RNAs on a small number of acres of the SJNF, as described in Section 3.2, Terrestrial Ecosystems and Plant Species; and Section 3.4, Riparian Areas and Wetland Ecosystems. Recreation would likely continue in RNAs at its current level unless it begins to adversely affect the ecological integrity of the RNAs.

## Impacts Related to Fire Management

Prescribed fire (management-ignited fire and planned natural ignitions), which could be used to maintain or restore ecological conditions of RNAs, would cause impacts to the soils and vegetation of

BLM_0033579

RNAs potentially on a large number of acres of the SJNF, as described in Section 3.2, Terrestrial Ecosystems and Plant Species; and Section 3.4, Riparian Areas and Wetland Ecosystems.

**Impacts Related to Livestock Grazing**

Horses, mules, and llamas used for recreation activities (including those used by outfitter guides) would impact RNAs by trampling and grazing, and could impact RNAs by overgrazing, causing soil erosion or soil compaction (as described in Section 3.2, Terrestrial Ecosystems and Plant Species; and Section 3.4, Riparian Areas and Wetland Ecosystems) and by the introduction or spread of invasive plants that compete with native plants for space, water, and nutrients (Monz et al. 2009; Pickering et al. 2010).

**Alternatives:** Alternative C proposes the most RNAs, so it would provide the most lands for research, education, and reference sites; the most protection for biodiversity; and the most amount of protected areas. Alternative B proposes the second most RNAs, so it would provide the second most lands for research, education, and reference sites; the second most protection for biodiversity; and the second most amount of protected areas, followed by Alternative D. Alternative A proposes the fewest RNAs and would provide the fewest lands for research, education, and reference sites; the least protection for biodiversity; and the least amount of protected areas.

## Cumulative Impacts

The past designation of RNAs did not cause adverse impacts to the SJNF and the future designation of RNAs, including ones associated with the LRMP and ones that could be designated in the foreseeable future on the SJNF (beyond the 15-year life of the LRMP), would not cause adverse impacts, so there would be no adverse cumulative impacts associated with designating RNAs.

Currently there are two RNAs on the SJNF that provide lands for research, education, and reference sites, protect the biodiversity in the planning area, and serve as protected areas. Additional RNAs designated through this LRMP and those that could be designated in the foreseeable future (beyond the 15 year life of the LRMP), would provide additional lands for research, education, and reference sites, would further protect the biodiversity, and would provide additional lands to serve as protected areas.

# 3.27 Areas of Critical Environmental Concern

## 3.27.1 Introduction

ACECs are BLM lands where special management attention is required to prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards (BLM Manual 1613). FLPMA mandates the BLM to give priority to the nomination and designation of ACECs through the development and revision of lands use plans.

## 3.27.2 Affected Environment

## Existing Conditions and Trends

The TRFO currently contains one ACEC, the Mud Springs/Remnant Anasazi Culture ACEC. Twenty-two additional areas have been nominated for ACEC consideration through the LRMP revision process, primarily selected from potential conservation areas (PCAs) that were developed by the

BLM_0033580

Colorado Natural Heritage Program. A PCA, which often includes both federal and non-federal lands, represents the land needed to support the long-term survival of the rare species or plant communities within it. Nineteen of the twenty-two sites were further identified as potential ACECs because they met both the relevance and importance criteria described in BLM Manual 1613.  Four potential ACECs are analyzed in the alternatives (Anasazi Culture, Grassy Hills, Gypsum Valley, and Silvey's Pocket).  See Volume III, Appendix U for detailed information on ACECs, including descriptions and the analysis of all the nominated ACECs.

The current Mud Springs/Remnant Anasazi Culture ACEC is located in Montezuma County about 1 mile west of Cortez. Its elevation is 5,800 to 6,000 feet, its size is about 1,100 acres, and it is mostly associated with pinyon-juniper woodlands and mountain shrublands. It contains a portion of the original Anasazi Culture ACEC that was not designated as the Canyons of the Ancients National Monument in 2000. It is currently the only ACEC within the planning area. This ACEC meets the relevance and importance criteria due to its significant cultural values and rare plants, as described in Volume III, Appendix U.

The Grassy Hills potential ACEC is located in San Miguel County, situated on a sandstone bench southwest of the confluence of Gypsum Creek and the Dolores River.  Its elevation is 6,700 feet and its size is 420 acres.  This area contains rare needle and thread Great Basin herbaceous vegetation. This nominated area meets the relevance and importance criteria due to its rare plants, as described in Volume III, Appendix U.

The Gypsum Valley potential ACEC is located in San Miguel County about 14 miles southwest of Naturita. It contains BLM lands associated with the Big Gypsum Valley and Little Gypsum Valley PCAs. Its elevation is 6,100 to 6,500 feet, its size is about 18,931 aces, and it is mostly associated with semi-desert grasslands and semi-desert shrublands. The Gypsum Valley ACEC meets the relevance and importance criteria due to its rare plants and unique soils, as described in Volume III, Appendix U.

The Silvey's Pocket potential ACEC is located in Montrose County, 8.5 miles southwest of Bedrock, and includes mesa tops and a broad bench south of Coyote Wash. Its elevation is 5,300 to 5,800 feet and its size is 707 acres.  This area contains rare Naturita milkvetch and aromatic Indian breadroot (*Pediomelum* sp.), as well as needle and thread Great Basin herbaceous vegetation.  This nominated area meets the relevance and importance criteria due to its rare plants, as described in Volume III, Appendix U.

See Maps 73 and 74 in Volume III, Appendix V for a depiction of ACECs proposed for each alternative.

## 3.27.3 Environmental Consequences

### Direct and Indirect Impacts

Implementation of management activities (including oil and gas development, solid minerals development, utility corridor development, livestock grazing, and recreation) in potential and existing ACEC units within the next 15 years would cause impacts to ACECs as described in the Section 3.2, Terrestrial Ecosystems; Section 3.4, Riparian Areas and Wetland Ecosystems; and Section 3.16, Heritage and Cultural Resources (BLM Manual 1613 [BLM 1988]). LRMP components (desired conditions, standards, and guidelines) in the LRMP and in individual ACEC management plans would prevent or minimize adverse impacts to ACECs and their relevance and importance values. Natural

BLM_0033581

ecological processes and disturbances (including succession, flooding, fire, insects, and disease) would also impact ACECs.

Alternative C would designate the most ACECs, so it would provide the most protection for the relevance and importance values and biodiversity. Alternative B proposes the second most ACECs, so it would provide the second most protection for the relevance and importance values and for biodiversity, followed by Alternative A. Alternative D would designate the fewest ACECs and would provide the least protection for the relevance and importance values and biodiversity.

## Cumulative Impacts

The past designation of ACECs did not cause adverse impacts to resources within the planning area and the future designation of ACECs, including ones associated with the LRMP and ones that could be designated beyond the 15-year life of the LRMP, would not cause adverse impacts, so there would be no adverse cumulative impacts associated with designating ACECs.

Currently there is one ACEC that protects the biological diversity and the relevance and importance values. Additional ACECs designated through the LRMP and those that could be designated in the foreseeable future (beyond the 15-year life of the LRMP) would further protect the biological diversity and the relevance and importance values.

# 3.28 Wild Horses/Herd Management Areas

## 3.28.1 Introduction

The Spring Creek Basin HMA was designated in the 1985 San Juan/San Miguel Resource Management Plan (BLM 1985). The management document for the herd area, the Spring Creek HMA Herd Management Plan (BLM 1994), replaced the 1986 Spring Creek Basin Wild Horse Herd Management Area Plan (BLM 1986). The emphasis of the herd management plan focused on maintaining or improving resource conditions for wild horses, livestock, and eagle winter concentrations, as well as protecting the McKenna Peak WSA and controlling erosion and salinity in the HMA and Disappointment Creek watershed.

Wild horse management on BLM-administered lands of the TRFO follows the Wild Free Roaming Horse and Burro Act of 1971 (PL 92-195) and 43 CFR 4700, Protection, Management and Control of Wild and Free Roaming Horses and Burros.

## 3.28.2 Affected Environment

## Current Conditions

The Spring Creek Basin HMA comprises approximately 21,932 acres of public and state land. The HMA is located in San Miguel and Dolores Counties, about 45 miles northeast of Dove Creek and 33 miles southwest of Norwood off San Miguel County Road 19Q.

The current Appropriate Management Level (AML) is 35 to 65 wild horses and does not include the current year's foals. The AML was established in the 1994 Spring Creek Basin HMA Plan and reaffirmed in 2005 through the Spring Creek Grazing Allotment/Spring Creek Basin HMA land health assessment and determination (CO-800-2005-027-EA) following an in-depth analysis of habitat suitability and resource monitoring and population inventory data, with public involvement. This AML range is confirmed as the number of wild horses that can be maintained without causing rangeland

574

BLM_0033582

damage. In the future, if rangeland damage is accruing AML may be adjusted to prevent rangeland damage and make progress toward a thriving natural ecological balance. Establishing AML as a population range allows for the periodic removal of excess animals.

The current estimated population of wild horses is 52, with a herd sex ratio of 55% stallions/colts and 45% mares/fillies. This number is based on census surveys completed in spring of 2012 by volunteers with the Disappointment Wild Bunch Partners and BLM staff, and includes the 2012 foal crop (two foals at the time of the count, plus five mares yet to deliver). Wild horse numbers have increased an average of 18% per year since the HMA was last gathered, thereby reducing the frequency of gathers.

Horses were last gathered in September 2011. At that time, 53 wild horses were gathered, 40 removed, and 13 released back to the range. Of the released horses, five mares were treated with fertility control (Porcine Zona Pellucida, PZP-22) vaccine and freeze marked with the letters "DC" on the left hip. Post-gather, an estimated 40 wild horses remained within the HMA.

Topography varies from open, rolling hills to rugged mountainous country to the north, south, and east boundaries. Elevation ranges from 6,200 to 7,400 feet. Precipitation averages from 12 to 16 inches per year.

Vegetation varies from salt desert shrub community in the valley and piñon-juniper woodland on the slopes and higher elevations. Green rabbitbrush, shadscale, black sage, galleta grass, Indian ricegrass, winterfat, and needle and thread grass make up the primary forage items in the horses' diet.

At various times of the year, the HMA provides habitat for elk, mule deer, bald eagles, golden eagles, peregrine falcons, coyotes, prairie dogs, and the occasional black bear and mountain lion. Rattlesnakes are common throughout the HMA. Recreational opportunities include hunting, sightseeing, and access to the McKenna Peak WSA.

The Spring Creek Grazing Allotment No. 17056 is the only grazing allotment that encompasses the HMA. This grazing allotment is slightly larger than the HMA, as it includes a section of state land and a lesser amount of public land, in the Klondike Basin area that is not within the HMA. Based on EA No. CO-800-2005-027 EA, on May 27, 2005, the BLM issued a grazing decision reducing the permitted livestock (Table 3.28.1).

**Table 3.28.1: Permitted Livestock Grazing Reductions in the Spring Creek Basin Herd Management Area**

| Spring Creek Basin HMA | Livestock | | Grazing Period | | Percent Public BLM | |
|---|---|---|---|---|---|---|
| | Numbers | Kind | Begin | End | Land | AUMs |
| Original Numbers | 180 | Cattle | 12/01 | 02/28 | 94% | 501[*] |
| Reduction Numbers | 125 | Cattle | 12/01 | 02/25 | 88% | 326[*] |
| [*] AUM refers to animal unit month, defined as the amount of forage required to sustain one cow, or its equivalent for one month. | | | | | | |

A second grazing permit for another 400 public land livestock AUMs in the HMA was acquired by the National Mustang Association in 1999 and relinquished by in 2002. As a result, 2,079 BLM livestock grazing AUMs have been cancelled or retired within the HMA in the last 20 years, with 326 remaining active. This 86% reduction in BLM livestock AUMs has increased plant production and availability for use by the horses and wildlife species, as well as soil protection.

BLM_0033583

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## Trends

Eight gathers have been held between 1985 and 2011. Gathers have been conducted every 2 to 6 years, dependent on herd size and rangeland health conditions. After the 2011 gather, 13 mares have been treated with PZP-22, a fertility control drug requiring a first time primer and subsequent annual booster. The program includes mares released during the most recent gather, as well as other mares identified for PZP-22 treatment in the 2011 gather Spring Creek Basin EA Decision Record (DOI-BLM-CO-S010-2011-0062DR). Mares and stallions from other herds have been introduced while removing Spring Creek horses in order to increase the genetic diversity, as well as color and conformation. The *Genetic Analysis of the Spring Creek Basin HMA, CO* (Cothran 2010) states that the small herd size requires the introduction of mares from other herds that could restore variability without having a major impact on the genetic character of the herd or population size.

Continuation of the PZP-22 program combined with the introduction of mares from other herd areas should allow for a genetically diverse and viable herd while reducing the number of horses removed through approved gather methods.

## 3.28.3   Environmental Consequences

## Direct and Indirect Impacts

Following the passage of the Wild Free-Roaming Horses and Burros Act in 1971, the BLM was directed to identify areas where wild horses and burros were located. These areas were designated as herd areas. Through land use planning, the BLM evaluated each herd area to determine if sufficient food, water, cover, and space were available to support long-term healthy and diverse populations of wild horses and burros. Areas that met these criteria were then designated as HMAs.

### General Impacts

Impacts on wild horses often result from activities that disrupt horse herds or have an impact on range resources that support healthy herds. Range resources such as water and forage are not only impacted by climatic conditions or wildlife but also by any surface-disturbing activities such as oil and gas or solid mineral development. Ongoing grazing, recreation, and energy or mineral development in the Spring Creek Wild Horse HMA could affect range resources including forage, water, habitat, or the wild horses themselves.

The primitive character of the Spring Creek Wild Horse HMA is an important part of the success of the wild horse program. Management that maintains the character of the basin where human pressure is minimized by limited roads, rough topography, and the remote nature of the area preserves the integrity of the HMA. Management activities that disturb the herd's use of habitat or elevate the human interaction with the herd impedes normal wild horse behavior while reducing the wild and free-roaming nature of wild horses.

In some circumstances, manipulation of the ecosystem could occur in order to maintain or improve range resources. These actions include horse gathers (bait trapping or helicopter gathers), seeding, and stock pond improvements or development. In these situations, there may be no major adverse impacts to the composition, structure and/or function to the wild horses or HMA. Impacts described in this section could occur under all of the alternatives.

BLM_0033584

## Impacts Related to Livestock and Rangeland Management

Dependent on the alternative that is chosen, livestock grazing would or would not occur in the HMA.

If grazing continues, the annual season of use would be December 1 to February 28. Grazing would be closely monitored so that adverse ecological impacts would not occur and a healthy ecosystem is maintained.

Healthy uplands, watersheds, and soils would increase the potential for increased forage and water productivity that would indirectly benefit wild horses and big game animals. Management actions designed to reduce erosion, control salinity, or improve soils and vegetative cover could indirectly benefit wild horses and big game by increasing forage and maintaining or improving plant communities. It would also limit competition for forage between wild horses and big game animals.

Managing riparian areas and springs in proper functioning condition would provide reliable water sources for all users of the range. Maintaining as many water sources as possible within the HMA allows the greatest opportunity to disperse the population of wild horses.

Alternative C proposes to close the allotment in the HMA and remove 326 AUMs. The AML of 35 to 65 wild horses in the HMA would continue to be monitored to ensure there are healthy wild horses on healthy rangelands.  Removal of grazing could result in a stable or general upward trend in the conditions of the ecosystem in the Spring Creek Wild Horse HMA

Current cattle grazing in the HMA occurs in the winter when plants are dormant, indirectly affecting plant vigor. The removal of cattle grazing maintains or improves rangeland health by leaving more residual plant material on the ground, which aids in maintaining or improving soil stability and controlling salinity issues that affect the Disappointment Creek watershed. Alternatives A, B, and D would not change the current direction of management in the basin.

## Impacts Related to Recreation

The current level of hunting, sightseeing, and access to Spring Creek Basin and the McKenna Peak WSA and other low-impact recreational uses of the basin would continue unless the use(s) pose a threat to the values for which the HMA was established. Impacts associated with these activities may be minor and may impact a small percentage of the acreage within the HMA. However, the construction of new roads would be prohibited except to correct resource damage or access minerals. The impacts of recreation in the HMA would be similar under all alternatives.

## Impacts Related to Invasive Plant Species Control

Within the planning area, invasive plant species would be controlled, where feasible, in order to protect the unique features for which the HMA was established. The impacts of these treatments would not adversely impact native species, plant communities, or wild horses.  The impacts of invasive plant species control in the HMA would be similar under all alternatives.

## Impacts Related to Fire Management

Wildland fire would have varying impacts to wild horses and the HMA dependent on the size, timing, and locality of the fire. Wildland fire could displace, injure, or kill horses. Short-term impacts include forage reduction, while long-term impacts could improve forage production. Size and intensity of wildland fire would remain low due to the limited fuel types in the basin except in the denser pinyon-

BLM_0033585

juniper woodlands near the boundaries of the HMA.  The impacts of wildfire in the HMA would be similar under all alternatives.

## Impacts Related to Minerals and Energy Development

Solid and fluid minerals extraction could temporarily or permanently remove forage for wild horses, depending on the location of the mineral extraction project. Activities associated with exploration (including geophysical seismic operations) and extraction could disrupt herd dynamics and increase human interaction with the herd. Withdrawal or closure of areas for mineral development would reduce the potential for impacts to the herd and HMA. However, leasable and locatable mineral extraction would be allowed under all alternatives but subject to restrictions through stipulations to protect resources.

Dependent on the alternative, the application of CSU would require NSO within a 2,000-foot radius around mapped water sources in the Spring Creek Basin HMA. The intent of this stipulation is to prevent disruption to horses when seeking water and to protect water quality. In addition, any oil and gas well pads within the HMA would require fencing and gates during development, production, and reclamation to prevent both horse access and unauthorized vehicle travel to production facilities. In order to protect wild horse foaling, disturbance (such as vehicle use associated with energy production) must be infrequent and of low impact except on designated roads.  The TL to protect wild horse foaling is applicable to all alternatives, while CSU to protect water sources is applicable only to Alternatives B and C.

## Impacts Related to Lands and Special Uses

Short- and long-term impacts from lands and realty actions including power and pipeline infrastructure, land transfers, other ROW projects, or Special Use Permits (filming) could displace or disrupt wild horses and remove forage. Actions would be restricted to minimize disruption to the herd. The impacts of lands and realty actions in the HMA would be similar under all alternatives.

### Cumulative Impacts

The planning area currently has one wild horse HMA. Alternative C would close the allotment (cattle grazing) in the HMA while maintaining the current AML of 35 to 65 wild horses. There are no adverse ecological impacts related to the ongoing management of wild horses. Therefore, there would be no adverse cumulative impacts associated with the management of wild horses in the Spring Creek Wild Horse HMA.

## 3.29 Economics

### 3.29.1 Introduction

Economic consequences of managing the SJNF and TRFO stretch across Colorado, New Mexico, Arizona, and Utah. While the planning area contains portions of eleven counties within Colorado, a five-county area that includes Archuleta, Dolores, La Plata, Montezuma, and San Juan Counties is recognized as the most affected region by the management of these public lands and serves as the focus of the economic analysis. San Juan County, New Mexico, is a significant provider of support activities to the oil and gas industry in southwest Colorado and is therefore discussed in the context of minerals management on the SJNF and TRFO. In this section, San Juan County, New Mexico, would also be referred to as Farmington, given its classification as a micropolitan statistical area by the U.S.

BLM_0033586

Census Bureau. The base year of this section has been updated from 2004 (used in the Draft EIS and Supplement to the Draft EIS) to 2010.

A portion of new natural gas activity addressed in the Supplement to the Draft EIS and the FEIS is expected to occur in the remote, southwest parts of San Miguel County. Unlike other Colorado counties in the area with natural gas resources, few economic transactions are expected to occur within San Miguel County. Given existing transportation systems and the location of oil and gas industry support in southwest Colorado, materials and labor are expected to be brought into and out of the county from the south during both field development and production. Because business transactions within San Miguel County associated with natural gas within the SJNF and TRFO are expected to be minimal, the county is not included in the economic impact area.

Comprehensive economic data are generally unavailable at the community level. However, interpretations of larger-scale analyses can sometimes be made and offer insights into particular communities. These are presented where possible.

The population impacts that flow from the economic impact analysis are presented in Section 3.30, Demographics. Fiscal impacts to local governments are provided in Section 3.31, Local Governments. Because decisions associated with this FEIS potentially affect the fiscal conditions of local government jurisdictions differently than more general economic conditions, the reader is encouraged to note geographic area distinctions between this section and Section 3.31. For example, economic impacts of natural gas development and production are expected to be minimal in San Miguel County, while fiscal impacts of natural gas production are expected to be important.

## Changes since the Draft Environmental Impact Statement and Supplement

Important changes in economic conditions and SJNF and TRFO management have occurred since the Draft EIS and Supplement to the Draft EIS were prepared. The most influential change has been shifting the base year to 2010. The Draft EIS and Supplement to the Draft EIS used a base year of 2004. In 2004, the U.S. economy was in the midst of a housing boom, the stock market was strong, and consumer spending was vibrant. By 2010, the United States was still reeling from a severe recession with no sign of a housing recovery. Consumers were focusing on personal debt reduction, and capital was extremely difficult to obtain for business and households alike. To ground the economic analysis of this FEIS in the most recent available data and to use the best available science, the new base year was moved to 2010.

Commodity prices are a very influential factor in the economic contributions and effects discussed below. Timber stumpage from the SJNF was $18 per MMCF of sawtimber in 2004; it was $7 in 2010. Natural gas prices in Colorado were $5.21 per MMCF in 2004 and $3.96 in 2010. Forage in Colorado was $13.50 per AUM in 2004; it was $15.32 in 2010. These price changes profoundly affect the relationship between employment, wages, and sales of output across many industries. Even if the economic models and management activity by alternative had been held constant, analysis results would be different.

IMPLAN, the proprietary input-output economic modeling system used for the economic analysis in the Draft EIS, Supplement to the Draft EIS, and FEIS, has also changed since the Draft EIS was prepared. New data and estimation methodologies have improved dramatically over the years. Because of these upgrades, prior year models and estimates are not always comparable to the latest estimates. The latest versions of IMPLAN modeling data (2010) and software (2011) were used for the FEIS.

BLM_0033587

Physical resource outputs by alternative that have economic implications were held constant in some cases and updated in others. Natural gas development/production and wood products production were updated from the Draft EIS/Supplement to the Draft EIS. Grazing levels were unchanged. Recreation use and spending profiles were updated, but they remain constant across alternatives.

Financial activities tied to managing the SJNF were also updated. Budgets and employment were revised, even though they remain constant across alternatives. Federal payments to local governments were also updated and revised to be more comprehensive and consistent with state regulations.

The year of comparison among alternatives was shifted from 2015 in the Supplement to the Draft EIS to 2020 in this FEIS to better represent full plan implementation and relate to economic projections of the area. While this shift did not affect output levels for most resources, it did affect representation of natural gas development. The rate of growth projected for basin development in the Supplement to the Draft EIS is unchanged for the FEIS. However, 2020 in the FEIS represents a point 3 years further down the growth path in basin development than 2015 in the Supplement to the Draft EIS. Consequently, the reader will find notable increases in the economic effects of the SJNF and TRFO minerals program compared to the Supplement to the Draft EIS.

Unchanged from the Supplement to the Draft EIS is the inclusion of the No Leasing Alternative required by regulation. Only oil and gas activity was analyzed for this alternative. To maintain a level of continuity in tables from the Draft EIS and Supplement to the Draft EIS, results for the No Leasing Alternative are provided in the text only.

## Legal and Administrative Framework

### Laws

- **The National Environmental Policy Act:** NEPA requires that consequences to the human environment be analyzed and disclosed. The human environment includes economic and social, as well as physical and biological, components of the affected area. The extent to which these environmental factors are analyzed and discussed is related to the nature of public comments received during the public involvement process, from scoping through preparation of the FEIS.

- **The National Forest Management Act:** This NFMA requires examination of local economic impacts and economic cost-efficiency considerations when preparing or revising land management plans.

- **The Federal Land and Policy Management Act:** FLPMA and its implementing regulations require a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and social effects consistent with NEPA.

### 3.29.2 Affected Environment

## Employment and Income

Current distribution of employment by industry, trends in employment, and average earnings per job are important measures of an area's economic condition. Employment is reported by the Bureau of Economic Analysis and by the Colorado Department of Local Affairs on an annual monthly average basis. This means that 12 monthly employment estimates are averaged for the given year. For sectors that are highly seasonal (with high employment during several months and low employment during the remainder of the year), the estimates may seem low; they are, however, correct. Sectors

BLM_0033588

with a sizeable stake in tourism, such as lodging and restaurants, are among those with highly seasonal employment. Employment and income data for San Juan County, New Mexico, are provided by IMPLAN (IMPLAN Group, Inc. [IMPLAN, Inc.] 2011). These data are derived from a variety of federal government sources, such as the U.S. Census Bureau, the Bureau of Economic Analysis, and the Bureau of Labor Statistics.

Table 3.29.1 and Table 3.29.2 show that in 2010 service industries were the leading employer in both the five-county Colorado and Farmington, New Mexico, areas. Because both Durango and Farmington are regional service centers and host a sizeable tourism industry, services dominate their respective economies. Visitor services include lodging, food and drinking establishments, and firms that provide recreation services (e.g., downhill skiing, whitewater rafting, and theater groups) accounted for 12% of employment in southwest Colorado and 8% in Farmington. Other services that include real estate, information, professional, administrative, and personal service firms provided a third of total jobs in the Colorado area, but only 9% in the Farmington area. In 2010, mining (which includes oil and gas) accounted for just 2% of all jobs in the five-county area, but over 11% in the Farmington area. Construction provided from 8% to 9% of all jobs in both areas. Government employment was also very similar in both areas, accounting for 18% of total employment. Manufacturing was the smallest sector in each region.

**Table 3.29.1: Employment (jobs) by Major Industry in the Five-county Colorado Area, 2010**

| Industry | Total Jobs |
|---|---|
| Agriculture | 1,799 |
| Mining | 1,030 |
| Construction | 4,642 |
| Manufacturing | 1,114 |
| Transportation and utilities | 1,541 |
| Trade | 6,542 |
| Visitor services | 6,045 |
| Other services | 17,149 |
| Government | 9,318 |
| Total | **49,180** |
| Source: Colorado Department of Local Affairs, State Demography Office (2011). | |

**Table 3.29.2: Employment (jobs) by Major Industry in San Juan County, New Mexico, 2010**

| Industry | Total Jobs |
|---|---|
| Agriculture | 1,675 |
| Mining | 6,890 |
| Construction | 4,888 |
| Manufacturing | 1,339 |
| Transportation and utilities | 2,845 |
| Trade | 9,034 |
| Visitor services | 5,491 |
| Other services | 17,837 |
| Government | 11,031 |
| Total | 61,030 |
| Source: IMPLAN, Inc. (2011). | |

Employment in the five-county area has generally held steady from 2005 to 2010, but is expected to grow at a rate of 2.25% out to 2030. Figure 3.29.1 shows the recent history of total employment in the

BLM_0033589

area, as well as projections prepared by the Colorado State Demography Office. Figure 3.29.2 shows
that employment in San Juan County, New Mexico, has also been somewhat flat since 2005, but is
expected to grow at a rate of 1.8% out to 2020. Projections beyond 2020 are not available.



**Figure 3.29.1: Employment (jobs) Forecast for the Five-county Colorado Area, 2000–2030**
(Source: Colorado State Demography Office 2012b)



**Figure 3.29.2: Employment (jobs) Forecast for San Juan County, New Mexico, 2000–2030**
(Source: Bureau of Economic Analysis 2012; New Mexico Department of Workforce Solutions 2012)

Table 3.29.3 and Table 3.29.4 show labor income in 2010 for the two areas. Labor income includes
all wages and salaries, plus benefits, for employees, as well as for the self-employed. This table
follows the same pattern shown above for employment. Labor income, also called earnings, ranges
from $12,800 per job in agriculture to $115,400 in mining for the five-county area. In the Farmington

BLM_0033590

area, the range starts at $16,100 per job for visitor services and tops out at $86,300 for transportation and utilities. With the exception of mining, earnings per job in the five-county Colorado area are generally lower than Farmington. Areas abounding with high-valued amenities, such as southwest Colorado, often draw an excess labor force that can dampen wages. Workers would often hold down multiple jobs at lower wages rather than move away to areas with lesser amenities.

**Table 3.29.3: Labor (jobs) Earnings by Major Industry in the Five-county Colorado Area, 2010**

| Industry | $ Million | $ per Job |
|---|---|---|
| Agriculture | $23.1 | $12,846 |
| Mining | $118.8 | $115,430 |
| Construction | $159.1 | $34,262 |
| Manufacturing | $36.8 | $33,050 |
| Transportation and utilities | $99.6 | $64,626 |
| Trade | $197.4 | $30,168 |
| Visitor services | $106.5 | $17,622 |
| Other services | $672.1 | $39,189 |
| Government | $485.3 | $52,080 |
| Total | $1,898.7 | $38,606 |
| Source: Colorado Department of Local Affairs, State Demography Office (2011); IMPLAN, Inc. (2011). | | |

**Table 3.29.4: Labor (jobs) Earnings by Major Industry in San Juan County, New Mexico, 2010**

| Industry | $ Million | $ per Job |
|---|---|---|
| Agriculture | $36.9 | $22,022 |
| Mining | $569.1 | $82,597 |
| Construction | $240.2 | $49,140 |
| Manufacturing | $62.6 | $46,733 |
| Transportation and utilities | $245.5 | $86,305 |
| Trade | $308.4 | $34,138 |
| Visitor services | $88.1 | $16,054 |
| Other services | $712.3 | $39,932 |
| Government | $573.3 | $51,973 |
| Total | $2,836.4 | $46,475 |
| Source: IMPLAN, Inc. (2011). | | |

Another important aspect of an economy is the sources of personal income for workers and residents. Personal income, as shown in Figure 3.29.3, is composed of three parts: 1) labor earnings that represent wages, salaries, and self-employed income; 2) investment income that represents revenue from dividends, interest, and rent; and 3) transfer payments, which are primarily government payments to individuals (including Social Security, Medicare, and Medicaid).

Labor earnings are considered to be "earned income." Transfer payments and investment income are considered to be "unearned income." As an established destination for retirees and those in their mid- or late-career stage, unearned income is becoming increasingly important in southwest Colorado. At 41%, the five-county Colorado area exceeds statewide averages, as well as the national average, in its share of unearned income. A quarter of all personal income comes from investments. In the Farmington area, non-earned income is about 35% of total personal income. Nearly a quarter of all personal income comes from transfer payments. Areas with a high percentage of personal income that is unearned are generally less vulnerable to local economic fluctuations, but may be more

BLM_0033591

vulnerable to national economic shocks. Transfer payments largely consist of Social Security payments—a very stable, if somewhat small source, of income. Areas with a high proportion of transfer payments generally experience less vulnerability to changing economic conditions.

As a population ages, unearned income generally increases as a percentage of total personal income. A relatively high level of investment income in southwest Colorado is consistent with a somewhat older population compared with residents in the Farmington area (Bureau of Economic Analysis 2012).



**Figure 3.29.3: Shares of Personal Income by Source by Region, 2010 (percent)**
(Source: Bureau of Economic Analysis 2012)

Personal income in the five-county area generally increased from 2000 to 2010, but is expected to grow at over 5% annually out to 2030. Figure 3.29.4 shows the recent history of personal income in the area as well as projections prepared by the Colorado State Demography Office. Figure 3.29.5 shows that personal income in San Juan County, New Mexico, has also generally increased from 200 to 2010. Projections beyond 2010 are not available.

BLM_0033592



**Figure 3.29.4: Personal Income (dollars) Forecast by Source for the Five-county Colorado Area, 2000–2030** (Source: Colorado State Demography Office 2012b)



**Figure 3.29.5: Personal Income (dollars) Forecast by Source for San Juan County, New Mexico, 2000–2030*** (Source: Bureau of Economic Analysis 2012); *forecasts unavailable

## Major Communities in the Planning Area

While the planning area contains portions of 11 counties within Colorado, a five-county area that includes Archuleta, Dolores, La Plata, Montezuma, and San Juan Counties is recognized as the most affected region by the management of these public lands and serves as the focus of the economic

BLM_0033593

analysis. These five counties have the greatest acreage and population associated with the planning area.

## Archuleta County

Pagosa Springs is the only incorporated town on the east side of the five-county area and is a small service center for the surrounding rural vicinity. Ample sources of developed water, as well as large areas of developable and desirable private land, have made the Pagosa Springs area a favorite spot for residential development. The tourism market is active throughout the year, with a range of recreation opportunities in the summertime and with downhill skiing at Wolf Creek ski area in the winter.

## La Plata County

Durango, located at the junction of U.S. Highways 160 and 550, is the seat of La Plata County, and economic hub of the five-county Colorado area. Long established as a professional service and retail center, Durango is also the tourism hotspot of southwest Colorado. With a ski resort and a long list of summertime, wintertime, and shoulder-season recreational opportunities, tourism remains the largest employer (and source of income). However, education (including Fort Lewis College) and government also play important roles. Amenity-driven migration and retirement bring non-labor income into residents' mailboxes, creating additional economic activity. As in most of the San Juan region, real estate development, sales, and financing are important sectors. In terms of employment opportunities, the oil and gas industry is relatively small; however, the jobs that they do provide pay very well and are an important economic asset.

The other towns in La Plata County (Bayfield and Ignacio) are, for the most part, economically tied to Durango. They are, however, increasingly developing their own economic momentum, including Native American tribal investments. The Sky Ute Casino is owned by the Southern Ute Indian Tribe and is one of two gaming businesses owned and operated by tribes in Colorado. The other is located in Montezuma County.

## Montezuma County

Cortez serves as a service and supply center for the Montezuma Valley and the west end of the five-county area. Continued efforts by community leaders to promote Mesa Verde National Park, as well as other attractions, and business investments in lodging, restaurants, and entertainment, make Cortez a major player in the regional tourist market. Although the real estate development is different in character and occurs at a slower pace, Montezuma County is experiencing a significant amount of activity in the real estate market.

Towaoc, headquarters for the Ute Mountain Ute Tribe, is home to several tribal businesses, including the Ute Mountain Casino. The town also includes retail shops, Bureau of Indian Affairs offices, and a clinic run by the U.S. Indian Health Service.

Growth in the Town of Mancos, and in the Mancos Valley, is driven, in part, by its commuting proximity to both Durango and Cortez. The productive agricultural lands south of U.S. Highway 160 have remained primarily in agricultural use. Ownership, however, is beginning to move from traditional ranching families to affluent buyers who pursue ranching or horse-breeding/training as an amenity lifestyle. A major attraction in the northern part of the Mancos Valley is the area's proximity to the boundary of the SJNF.

BLM_0033594

The Dolores River valley is another important area within Montezuma County. Lying upriver and to the east of Dolores, its scenic appeal, and proximity to Telluride have resulted in the escalation of land values throughout the valley. The construction of McPhee Reservoir has limited the expansion of the town of Dolores downriver and to the west.

## Dolores County

The western, or Dove Creek, side of Dolores County was settled in the 1800s around dry-land farming. The availability of irrigation water from the Dolores Project has benefitted the agricultural industry and rural communities in recent years. Historically, farmers and rural residents outside Dove Creek had to haul water in for domestic use. Beginning in the 1990s, rural domestic water supplied by Montezuma Water Company was extended into rural Dolores County. This prompted an increase in residential settlement, much of it in the form of 35-acre parcels. A primary appeal of western Dolores County is its wide-open vistas.

The eastern, or Rico/West Fork, side of Dolores County is characterized by forested, mountainous landscapes. For the most part, limited private land is confined to the river valley floor. Property in the West Fork has become high value, with both seasonal and year-round homes being developed. Rico has grown in recent years because of both a workforce that commutes into Telluride and an increasing population of seasonal and retired residents.

## San Juan County, Colorado

The intensity of high-altitude winters coupled with the seasonal nature of summer tourism generated by the Durango to Silverton Narrow-Gauge Railroad and the "Million Dollar Highway" has resulted in a significant number of seasonal residents in San Juan County. In recent years, Silverton has been discovered by those seeking pleasant summer weather and unique recreational opportunities. In response to increased interest in seasonal homes, property values have been rising steadily.

San Juan County now contains the newly developed Silverton Mountain ski area. There have been concerted attempts to make Silverton more of a winter destination and smooth out some of the seasonal economic fluctuations. The ski area is the most significant move towards accomplishing this.

## San Juan County, New Mexico

With a number of smaller cities around Farmington, such as Aztec and Bloomfield, San Juan County is the third most populated county in New Mexico. These cities first provided supplies to ranching and Native American communities, followed in the early 1950s with the discovery of oil and natural gas. Today Farmington is both an energy development and regional service center providing essential goods and services throughout the Four Corners area. The nearest population centers exceeding San Juan County in size are Albuquerque, New Mexico, to the southeast and Grand Junction, Colorado, to the north—both about 200 miles.

Durango is about a 1-hour drive from Farmington and within its regional trade circle. With less than 2% of the workforce in either La Plata County or San Juan County commuting between these centers (U.S. Census Bureau 2011), the labor connection between these centers has all but disappeared.

BLM_0033595

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## Cost of Living

The cost of living in the Rocky Mountain West can be somewhat higher than it is in other parts of the country, especially the Midwest and South. A recent study by Colorado State University indicates that the cost of living across Colorado, and in the five-county Colorado area, varies greatly.

Figure 3.29.6 shows how area counties compare with other parts of Colorado. La Plata and San Juan Counties are in the higher range of Colorado counties, Archuleta and Montezuma Counties are near the mid-range, and Dolores County is the most affordable. Housing costs are highly influential in the overall cost of living; therefore, the index is also a good indicator of real estate values. San Juan County, New Mexico, is more affordable than La Plata County, but more expensive than Montezuma County (Sperling's Best Places 2012).



**Figure 3.29.6: Cost of Living Index for Colorado Counties, 2007** (Source: Sullins and Garner n.d. [2007].)

Economic Dependency

Every economy has one or more "engines" that ultimately provide residents with jobs and income. In a real sense, every job and dollar of income in an economy depend on the size and vitality of these engines.

The economic dependency of the planning area can be discerned by breaking down employment into three components: direct, indirect, and induced. The direct component (sometimes called "basic") is that which brings money in from outside the area. The most visible form of this is the exporting of goods and services, or selling them to non-residents. Tourism is an excellent example of an export industry in the planning area. Other export industries include agriculture and mining. While these industries are often viewed as the principal exporters of a region, they are not alone. In fact, a portion of every industry sells goods and services to non-residents. This export activity is an important "engine" or "driver" for a local economy. While exporting is the most recognized engine in an economy, it is not the only one and may not be the most important. Sales to government, capital investments, and household spending of outside income can also be very important economic drivers. As noted above in the discussion of personal income, outside income includes transfer

588

payments, investments (dividends, interest, and rent), and wages paid by businesses located outside the area. Once spending in the local economy is started by these four engines, indirect and induced effects are triggered.

The indirect component of an economy supports the production of direct or basic activities by supplying a variety of goods and services as inputs to their production. Wholesale trade and trucking would be examples of indirect components in the economy. Many firms are involved in the supply chain of local businesses, even those that are considered exporters. For example, ranches that export cattle may also sell to local restaurants. Supply chains throughout a local economy can be quite complex.

The induced component of an economy (sometimes called "local resident services") is the final piece. This component is founded on the payrolls paid by firms involved in direct and indirect sales. Local residents who earn a living working for local direct or indirect-type industries spend a portion of their income to purchase goods and services from local merchants. These local household purchases include such things as groceries, gasoline, medical care, and recreation equipment.

In the Figure 3.29.7 and Figure 3.29.8 below, drivers of the five-county Colorado economy are portrayed. Employment and labor income include jobs and payroll at firms selling to non-residents (exports), governments, capital investments, and local households using outside income. The estimates also include all the indirect and induced effects triggered by these direct sales. Because every job and dollar of labor income in the five-county area can be traced back to direct sales, the total economy is represented.

In recent years, economic driver studies were completed for Archuleta, Dolores, La Plata, and Montezuma Counties (Lloyd Levy Consulting 2008, 2010). In those studies, the direct or basic components of the economy were identified by industry (e.g., mining) or purchaser (e.g., second home owners). In the charts below, the direct or basic components of the economy are identified only by the four driving purchasers of goods and services.

Figure 3.29.7 portrays the jobs generated by each of the four driving purchasers of goods and services in the five-county area. Exports (sales to non-residents) generate the largest share of jobs in each economy. Approximately 40% of all jobs are generated this way. Tourism is a major portion of these jobs. Sales to all levels of government—federal, state, and local—is the second largest driver of the area, generating approximately 37% of all jobs. Education, including both local school districts and Fort Lewis College, is typically the most important share of employment driven by government. Sales to households spending outside income generate 17% of all jobs in the five-county area. Finally, capital investments, like construction of buildings, generate only 6% of the total jobs in the area. Difficulties in acquiring investment funding during the recessionary year of 2010 could account for the modest role of capital improvements.

BLM_0033597

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan



**Figure 3.29.7: Employment (jobs) Generated by Spending Source in the Five-county Colorado Area Economy, 2010**

Figure 3.29.8 shows the influence of economic drivers on labor income, rather than employment. Labor income includes wages and salaries, benefits, and bonuses received by both employees and business owners of firms doing business in the five-county area. The pie chart is very similar to employment. Generally, sales to government and exports are slightly more important for labor income than employment. Conversely, sales to households spending outside income are less important for labor income compared with employment.



**Figure 3.29.8: Labor Income Generated by Spending Source in the Five-County Colorado Area Economy, 2010 ($ million)**

Management of the SJNF drives a piece of the five-county economy. Table 3.29.5 and Table 3.29.6 show the jobs and labor income, respectively, that are supported by current land management. The top portion of each table shows the driver by resource program, and the bottom portion translates that by major industry. The export portions of SJNF and TRFO management are primarily grazing, wood products, and mineral production. Government purchases are primarily SJNF and TRFO operations (federal) and spending of federal payments made to local governments attributable to these public lands. The federal payments are discussed in detail in Section 3.31. It is worth noting that local government spending of federal payments generates more jobs in the five-county area than any

BLM_0033598

Case No. 1:20-cv-02484-MSK   Document 36-6   filed 04/27/21   USDC Colorado   pg 194 of 264

Final Environmental Impact Statement

resource program, except recreation. From an income standpoint, the minerals program generates more earnings in the area than any other resource activity, except recreation.

The recreation program serves the local economy as both a driver and non-driver of jobs and income. The driving portion of the recreation program is generated by non-local visitors who come to recreate on public land and spend their dollars on such things as lodging, meals, and gasoline. This is the tourism piece of public land recreation. However, locals that receive outside income also spend a portion of their income at local businesses as they recreate on public lands. The expenditures are lower per person than non-locals, but well over a hundred jobs are generated by locals with outside income. As a result of tourists, but also some locals, recreation is by far the most important economic driver among SJNF and TRFO programs for both employment and income.

Table 3.29.5 and Table 3.29.6 also show jobs and income generated locally that are not driver-based. These are jobs and income resulting from spending by locals who earn a paycheck at local businesses. These workers earn a paycheck because their employer is directly or indirectly involved as a driver in the five-county economy. For example, a chocolate manufacturer that exports its products to Denver and local businesses that are part of the manufacturer supply chain employ workers and pay them wages. Workers at both the manufacturer and its local suppliers spend a portion of their wages on gasoline to mountain bike on public lands. Because their spending is already credited to the chocolate manufacturer, they cannot be counted again as a driver. But their spending nonetheless generates employment locally and it is attributable to public land recreation.

Once the related non-driver activity is added to the driver portion of public land recreation, the result is the total contribution of the SJNF and TRFO recreation program. Other programs are analyzed similarly, but only the recreation program of public land management has a sizeable element that is not a driver. The balance of this section focuses on the total contribution of SJNF and TRFO programs. Compared with all jobs in the five-county area, SJNF and TRFO programs account for just over 6% of employment and 5% of labor income.

**Table 3.29.5: Total Contribution to Employment (jobs) by San Juan National Forest and Tres Rios Field Office Program and Industry in the Five-county Colorado Area Economy, 2010**

| Program | Driver | Non-driver | Total Contribution |
|---|---|---|---|
| | $ Million | | |
| Recreation | 1,857 | 147 | 2,005 |
| Grazing | 268 | – | 268 |
| Wood products | 29 | – | 29 |
| Minerals | 278 | – | 278 |
| Operations | 102 | – | 102 |
| Payments to local governments | 379 | – | 379 |
| Total | 2,913 | 147 | 3,061 |
| Industry | Driver | Non-driver | Total Contribution |
| | $ Million | | |
| Agriculture | 277 | 3 | 280 |
| Mining | 145 | 0 | 145 |
| Construction | 39 | 0 | 39 |
| Manufacturing | 50 | 4 | 54 |
| Transportation and utilities | 41 | 4 | 45 |
| Trade | 340 | 47 | 386 |
| Visitor services | 1,296 | 66 | 1,365 |
| Other services | 342 | 16 | 358 |
| Government | 383 | 6 | 389 |

BLM_0033599

| Total | 2,913 | 147 | 3,061 |
|---|---|---|---|
| Percent of all jobs in five-county area | 5.9% | 0.3% | 6.2% |

**Table 3.29.6: Total Contribution to Labor Income and Industry in the Five-County Colorado Area Economy, 2010 ($ million)**

| Program | Driver | Non-driver | Total Contribution |
|---|---|---|---|
| | $ million | | |
| Recreation | $44.8 | $4.1 | $49.0 |
| Grazing | $1.0 | – | $1.1 |
| Wood products | $1.1 | – | $1.1 |
| Minerals | $23.2 | – | $23.2 |
| Operations | $4.4 | – | $4.4 |
| Payments to local governments | $15.8 | – | $15.8 |
| Total | $90.3 | $4.1 | $94.6 |
| Industry | Driver | Non-driver | Total Contribution |
| | $ million | | |
| Agriculture | $1.1 | $0.0 | $1.1 |
| Mining | $18.7 | $0.0 | $18.7 |
| Construction | $1.5 | $0.0 | $1.5 |
| Manufacturing | $1.5 | $0.1 | $1.6 |
| Transportation and utilities | $2.1 | $0.2 | $2.4 |
| Trade | $10.3 | $1.5 | $11.8 |
| Visitor services | $24.2 | $1.2 | $25.5 |
| Other services | $12.5 | $0.6 | $13.1 |
| Government | $18.4 | $0.5 | $18.9 |
| Total | $90.3 | $4.1 | $94.6 |
| Percent of all labor income in five-county area | 4.8% | 0.2% | 5.0% |

A detailed analysis of economic dependency was not prepared for San Juan County, New Mexico. The focus of its economic relationship to the SJNF and TRFO is limited in this document to connections with natural gas development. This relationship has been documented in *Oil and Gas Economic Impact Analysis*, a recent study prepared by Booz Allen Hamilton (2007) for the Colorado Energy Research Institute.

### 3.29.3 Environmental Consequences

#### Economic Impact Analysis

To estimate the economic impacts to the planning area economy, one model covering five counties was developed. The counties included Archuleta, Dolores, La Plata, Montezuma, and San Juan. This area matches both state and local recognition of a functional social and economic planning area. Labor flows between towns and counties are generally contained within these five counties. Interstate flows of labor, goods, and services between this area and San Juan County in New Mexico (Farmington, Bloomfield, and Shiprock) were not captured in the model, but considered as exports or imports along with other parts of the country. A separate model for San Juan County, New Mexico, was created to model oil and gas effects in the Farmington area.

IMPLAN was used to build and run the model. IMPLAN is a software package that uses the latest national input-output tables from the Bureau of Economic Analysis, secondary economic data at the

BLM_0033600

county level from a variety of sources, and proprietary procedures to develop input-output models for every county or group of counties in the nation. The software was originally developed by the USFS and is now owned by IMPLAN, Inc. The model was calibrated to employment estimates in 2010 using data from the Colorado Department of Local Affairs, State Demography Office. The State Demography Office works closely with counties in the planning area to establish mutually agreed-upon estimates of population, employment, and personal income for current conditions and projections out to 2030. Model calibration was done using output per employee and similar ratios from the IMPLAN dataset with employment estimates from the State Demography Office.

Economic impacts were estimated for the base year 2020 for each alternative. The alternatives were evaluated in year 2020 because the Colorado State Demography Office forecasts are available in 5-year increments, and this year offers sufficient time for implementation of each alternative during the first decade.

## Dependency and Contribution Analysis

The IMPLAN model was used to assess the economic dependencies of the planning area. Economic dependency is a way of assessing the strength of regional or local economies. Regional economies generally depend on exports to sustain local income and employment. However, sales to governments, capital investments, and resident households with outside income must also be examined. A measure of reliance upon each aspect of the area economy was estimated and displayed. Dependency on economic activity associated with the SJNF and TRFO was also analyzed. In all cases but recreation, the economic activities are drivers in the economy. Recreation is both a driving and non-driving component of the local economy. Resource outputs and governmental expenditures by the SJNF and TRFO in 2010 were the elements analyzed for both driving and non-driving components.

## Economic Impact Analyses

Impact analysis describes what happens when a change in spending for goods and services occurs in the model region. Changes in sales are the result of multiplying production data (e.g., grazing AUMs or recreation visits) times spending by users of public lands. Economic impacts were estimated for 2020 using the best available production and sales data.  Baseline prices and data sources of each economic activity are listed in Table 3.29.7 and Table 3.29.8.

Impacts to local economies were measured using two metrics: employment and labor income. Employment is expressed in jobs. A job can be seasonal or year-round, full-time or part-time. Jobs represent the annual average of 12 monthly estimates. There is no seasonality in this measure. The income measure used is labor income expressed in 2010 dollars. Labor income includes both employee compensation (pay plus benefits) and income received by proprietors (self-employed).

Projections of employment and income to 2030 are made by the Colorado State Demography Office. These projections implicitly incorporate some level of land management, and that level is assumed to be Alternative A, or the current management alternative. Whether each alternative would increase, decrease, or not affect the projections is the purpose of the cumulative effects analysis. Projections for 2020 (2025 for the minerals analysis) are used for this analysis. These projections provide a context for understanding alternative impacts. A full description of cumulative effects is provided below.

BLM_0033601

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

## Data and Assumptions

<u>Oil and Gas</u>

Estimates of well drilling and natural gas production are based on oil and gas potential and RFD scenarios prepared for the planning area. Assumptions include wells that would be drilled in areas of high potential for oil and gas and new wells that would be drilled in areas with current production. Natural gas production on state and private lands over the federal mineral estate is included in the analysis of each alternative, but does not vary by alternative.

Market prices for domestic natural gas and oil were obtained from the DOE, Energy Information Administration. The cost of well drilling by basin was obtained from staff petroleum engineer estimates based on typical drilling conditions. Field development and production estimates were provided by the SJNF and TRFO planning and minerals staff.

<u>Recreation</u>

Data from the NVUM project for the SJNF (2011) are used to estimate recreational use on the SJNF. BLM estimates were provided by the TRFO. Visits estimated by the NVUM project and used in the Draft EIS had been mistakenly overstated, then corrected after publication. New estimates for the FEIS are in line with the corrected visits.

To estimate the economic impact of recreation, it is necessary to first separate local resident visits from other Colorado residents and non-resident (out-of-state) visits. For purposes of this analysis, Colorado residents from outside the five-county area and out-of-state residents are considered as non-locals. Typically, spending by non-locals is substantially higher than locals per visit and therefore must be analyzed separately.

The visitor expenditure profiles used in the analysis were obtained from the NVUM project. Each national forest is classified as a high, average, or low spending area by comparing local spending with national averages. Spending on the SJNF best matched higher than average spending rates. It is assumed that spending by BLM visitors was similar to those visiting the SJNF.

There are several major determinants of recreation visitor spending: 1) downhill skiing versus all other recreation activities, 2) local versus non-local residence, 3) day versus overnight trips, and 4) overnight stays on or off public lands. All of these determinants are factored into the economic impacts of recreation use. All expenditures are adjusted to 2010 dollars to be compatible with the economic models.

<u>Timber Production</u>

Financial values associated with timber harvest from the SJNF were based on a 3-year average, from 2009 to 2011. This is done to account for annual variations in timber harvest from USFS and BLM lands. All timber activity was assumed to involve local logging and processing.

Due to the price fluctuations associated with lumber products, the direct economic activity associated with wood products processing was based on quantities of timber production. Estimates of direct employment and labor income per centrum cubic feet (CCF) were provided by the Bureau of Business and Economic Research, University of Montana (see Table 3.29.7 and Table 3.29.8). Estimates of the total employment associated with timber production from the SJNF were developed using IMPLAN employment multipliers from wood products sectors in the model.

BLM_0033602

Livestock Grazing

SJNF and TRFO records indicate that there are over 148,000 AUMs of forage use on public lands in the planning area. Ninety-three percent of the total AUMs were cattle grazing and 7% were sheep grazing. Livestock prices were estimated using inventory and marketing data from the National Agricultural Statistics Service for Colorado in 2010.

Operating Budget and Employment

SJNF and TRFO data indicate that the 2010 budget totals for the both the SJNF and TRFO combined is approximately $18 million. The budget supported approximately 250 BLM and USFS employees in the five-county area. About 200 of these workers were permanent employees

**Table 3.29.7: Direct Economic Activity Used in Economic Impact Analysis**

| Activity | Units | Direct Economic Activity ($) |
|---|---|---|
| Tourism/Recreation spending[1] | | |
| Downhill skiing | | |
| Non-local day | Party-trip | $69 |
| Non-local overnight | Party-trip | $893 |
| All other recreation | | |
| Local day trip | Party-trip | $30 |
| Non-local overnight (on public lands) | Party-trip | $352 |
| Non-local overnight (off public lands) | Party-trip | $782 |
| Livestock market values[2] | | |
| Cattle | Animal | $1,273 |
| Sheep | Animal | $178 |
| Oil and gas market values[3] | | |
| Natural gas (wellhead) | MMCF | $3.96 |
| Oil and gas well drilling costs[4] | | |
| Dry hole – NSJB | Well | $231,000 |
| Producer – NSJB | Well | $517,000 |
| Dry hole – Paradox/Gothic Basins | Well | $1,384,000 |
| Producer – Paradox/Gothic Basins | Well | $3,099,000 |
| SJNF and TRFO operations[5] | | |
| Budget in 2010 | Dollars | $18,135,000 |
| Employment in 2010 | Full-time employment | 247 |
| Wood products processing[6] | | |
| Logging | Jobs/MMCF | 18 |
| Sawmills | Jobs/MMCF | 32 |
| Other | Jobs/MMCF | 86 |

1 White and Stynes (2010).
2 National Agricultural Statistics Service (2011).
3 U.S. Energy Information Administration (2011).
4 Thrash and Powers (2007).
5 Duvall (2012).
6 Morgan and Keegan (2011).

## Financial and Economic Efficiency Analysis

Financial efficiency is defined as how well the dollars invested in each alternative produce revenues to the government. Economic efficiency is defined as how well the dollars invested in each alternative produce benefits to society. Present net value (PNV) is used as an indicator of financial and economic efficiency.

BLM_0033603

Quick-Silver, a public domain Windows-based program, was used to discount revenues, benefits, and costs over a 50-year period (2013–2063). A 4% discount rate is specified by agency policy and used for these analyses.

Some economic values were based on actual revenues where markets exist. For natural gas and grazing, these values are based on the same sources discussed above for economic impact analysis. For timber, financial values are based on USDA and USFS records for the SJNF from 2009 through 2011. These data are reported by the agency in both the annual Timber Cut and Sold Reports and Periodic Timber Sale Accomplishment Reports (USFS 2009–2012a; USFS 2009–2012b). Values for recreation represent a market-clearing estimate of willingness-to-pay evaluations. These economic values were developed by Bowker et al. (2009). Values are net of fees paid by recreations (e.g., lift tickets, camp fees). As discussed in the FEIS, willingness-to-pay estimates for non-use values such scenery, existence values, or bequest values have not been established by the agency and were therefore excluded from this analysis. All values were adjusted to 2010 dollars. Table 3.29.8 displays the economic values and revenues used for each resource.

**Table 3.29.8: Economic Benefits and Financial Revenue Values**

| Activity | Unit | Economic Benefit ($) | Agency Financial Value ($) |
|---|---|---|---|
| **Recreation** | | | |
| Downhill skiing | Visit | $208.18 | N/A |
| Cross-country skiing | Visit | $208.18 | N/A |
| Snowmobiling | Visit | $127.23 | N/A |
| Hunting | Visit | $76.71 | N/A |
| Fishing | Visit | $98.17 | N/A |
| Viewing scenery/wildlife | Visit | $54.41 | N/A |
| OHV use | Visit | $86.34 | N/A |
| Driving | Visit | $78.56 | N/A |
| Hiking/Biking | Visit | $108.19 | N/A |
| Developed camping | Visit | $46.11 | N/A |
| Primitive camp/backpacking | Visit | $48.30 | N/A |
| Other recreation | Visit | $49.46 | N/A |
| **Grazing** | | | |
| Cattle | HM | N/A | $1.35 |
| Sheep | HM | N/A | $0.27 |
| Permittee costs-cattle | HM | $14.08 | N/A |
| Permittee costs-sheep | HM | $6.24 | N/A |
| Forage | AUM | $12.81 | N/A |
| **Timber** | | | |
| Sawtimber | CCF | N/A | $10.44 |
| Pulpwood | CCF | N/A | $2.73 |
| Poles | CCF | N/A | $6.34 |
| Posts | CCF | N/A | $6.48 |
| Fuelwood | CCF | N/A | $11.41 |
| Non-sawtimber | CCF | N/A | $26.14 |
| Miscellaneous convertible | CCF | N/A | $6.11 |
| Green biomass | CCF | N/A | $1.65 |
| **Natural gas** | | | |
| Wellhead Price | MMCF | $3.96 | N/A |

BLM_0033604

| Dry hole drilled – NSJB | Well | $231,000 | N/A |
|---|---|---|---|
| Producer drilled – NSJB | Well | $517,000 | N/A |
| Dry hole drilled – Paradox/Gothic | Well | $1,384,000 | N/A |
| Producer drilled – Paradox/Gothic | Well | $3,099,000 | N/A |
| Royalties | MMCF | $0.50 | N/A |
| Operations | MMCF | $1.00 | N/A |
| Note: Total budgets for public lands management were held constant and assumed to be fully spent for each alternative. "N/A" has been used for values where the economic benefits and financial values are not equivalent. | | | |

## Direct and Indirect Impacts

Direct and indirect impacts on planning area jobs and income are the result of changes in recreational uses of the public lands, mineral development and extraction, the use of timber and forage resources, agency expenditures (including salaries, equipment, contracts), and local government spending of federal payments. A change in recreation, mineral, and/or in timber production may mean a change in jobs and income to local communities. In addition, if production is decreased in one resource and increased in another, there may be a shifting of jobs from one industry to another. To estimate changes in income and employment for each alternative, a computer model of the area economy was developed. The model was calibrated to employment estimates established by the Colorado State Demography Office (2011).

Throughout the planning area, employment and labor income attributable to the planning area are estimated for the year 2020. The year 2020 was selected because it provided both an approximate mid-point of the next decade and is a year for which the Colorado State Demography Office provides detailed forecasts (2012). In addition, 2020 would allow time for changes in program levels to materialize. The base year for all comparisons is 2010 (the latest year for which complete economic data are available). Jobs are defined as annual average jobs, some of which may be part-time. Labor income includes all wages and salaries plus benefits paid by business proprietors to employees and to themselves.

The analysis uses actual outputs of the planning area for 2010 and estimates for 2020. As shown above, there are six programs administered by the SJNF and TRFO that may impact local economies: recreation (including hunting, fishing, and other wildlife-based activities), grazing, wood products, minerals (especially natural gas), administrative expenses, and local government spending of federal payments.

## Impacts Related to Recreation

The visitor expenditure profiles used in the analysis were obtained from two sources. Expenditures for local and non-local recreationists were obtained from the NVUM system. NVUM is a statistically reliable national survey of recreation visitors to national forests. Each national forest is classified as a high-, average-, or low-spending area by comparing local spending with national averages. Spending on the SJNF is classified as a high-spending area. NVUM spending patterns were also applied to recreation visitors on BLM lands. Statistically, visitor spending is dependent on whether they 1) are local/non-local, 2) stay overnight, and if so 3) whether they spend the night on or off the public lands. Visitor spending is similar for all public lands recreation activities except downhill skiing. Downhill skiers have markedly higher spending, so they are analyzed separately.

As discussed in the Section 3.14, Recreation, the total number of visitors to the planning area is projected to hold steady over the planning horizon for all of the alternatives. Current recreation

BLM_0033605

patterns are also expected to hold steady across alternatives. Therefore, the economic effects of recreation are not expected to vary.

## Impacts Related to Livestock Grazing

Compared with the current management alternative (Alternative A), livestock grazing production would be generally maintained under Alternative B, would drop by approximately 13% under Alternative C, and would increase by approximately 37% under Alternative D. Some permittees may maintain, or potentially even increase, the number of AUMs, with more intensive management. Some permittees may choose to reduce AUMs (due to market and personal factors that are outside the scope of this analysis).

## Impacts Related to Wood Products

Over the last decade, timber industry reliance upon the SJNF has undergone major changes. Because of the dramatic contraction in the national housing industry and reduced supplies from public lands, wood processors in the five-county area have responded in one or more of the following ways: 1) adjusted their source of timber supplies, 2) updated their mills to improve efficiency, 3) changed their product mix, or 4) closed. This analysis assumes that the remaining mills have successfully made adjustments and would continue to operate in the future. The actual economic contribution of the timber program reported in 2010 is just 10% of the timber contribution predicted for 2010 in the 2007 Draft EIS, which used assumptions based on the timber industry conditions and trends of that earlier time

The wood products program is one of two resource outputs that vary by alternative. Under Alternatives A and B, total harvest volume would increase by 40% compared with the 2009–2011 average. Harvest volume would increase by 19% under Alternative C and by 76% under Alternative D. In all cases, the mix of products (e.g., sawtimber, fuelwood, and biomass) would remain unchanged from the 3-year average. It is assumed that local processing capacity would be sufficient to process all volume harvested.

## Impacts Related to Oil and Gas Exploration and Development

Natural gas field exploration, development, and production are anticipated to expand greatly over the planning horizon under all alternatives. By 2020, nearly 50 additional producing wells in the NSJB and 40 in the Paradox and Gothic Basins are expected to be drilled and completed annually on public lands. Approximately 50 miles of pipelines and 40 miles of road would be constructed each year. Another 7 to 16 miles of roads would be reclaimed each year. Annual production on public lands is expected to reach between 69 and 71 BCF of natural gas, depending on the alternative. By comparison, 30 producing wells in all basins were drilled in 2010 with total production of 95 BCF per year. Details of anticipated mineral activity are found in the energy and mineral sections of this FEIS (see Sections 3.19–3.21).

Variations driven by resource management concerns are not expected to result in substantial economic differences between the alternatives. Alternatives A and D have the largest number of wells and the highest production levels. Table 3.29.9 shows that by 2020 minerals-based employment in the five-county area would increase by about 470 jobs for Alternatives A and D, and by 450 jobs for Alternatives B and C. It should be noted that while job estimates are reported down to a single job, the reader should look for changes in relative magnitude between alternatives. Thus, the range of 20 jobs between the highest and lowest impact alternatives should not be regarded as substantial. The

BLM_0033606

No Lease Alternative would result in about 400 additional jobs over 2010 employment levels, or 70 jobs less than either Alternatives A or D in 2020.

Employment in San Juan County, New Mexico, associated with oil and gas activities on the SJNF and TRFO was estimated to be about 475 jobs in 2010 (Table 3.29.10). Under the assumption that most of the specialized work for field development would be done by firms in the Farmington area, oil and gas employment in San Juan County, New Mexico, would more than double base year levels (150% more) by 2020.

## Impacts Related to Administrative Expenditures

The total operating budget for managing the SJNF and TRFO would remain constant by alternative. The budget has declined in recent years, but is expected to remain relatively stable, after adjustments for inflation, for the next decade. A sizable natural gas leasing program, however, would offset some budget and staffing reductions anticipated for the future. Permit administration, monitoring, and environmental documentation would require funding and workforce supplements. The jobs shown in Table 3.29.9 are not just federal government positions, but addition jobs created in the five-county Colorado area because of local federal spending.

## Impacts Related to Local Government Expenditures of Federal Payments

Federal payments paid to local governments would remain generally constant by alternative in the five-county area. However, payments by the NFS may change from 2010. The 1-year extension of the Secure Rural Schools and Community Self-Determination Act of 2000 expired at the end of 2012. If the act is not extended, payments by the NFS would revert to 25% of annual receipts. Given the uncertainty of this situation, the more conservative 25% payments were used to estimate economic effects. This accounts for the 20-job reduction from 2010 to 2020.

Table 3.29.9 and Table 3.29.10 display likely job changes associated with SJNF and TRFO programs; Table 3.29.11 and Table 3.29.12 display the same results by industry. Industries in the five-county Colorado area most impacted by employment changes (from 2010 to 2020) are likely to be mining, construction, and other services. These sectors would be primarily impacted by changes in natural gas development. Between 2010 and 2020, overall growth in jobs related to the SJNF and TRFO are estimated to vary from a low of approximately 13% (under Alternative C) to a high of approximately 20% (under Alternative D). The No Leasing Alternative would likely result in increases of 230 jobs in the mining and construction sectors combined compared with 2010 levels.

From 2010 through 2020, all employment increases; however, the magnitude of increase varies somewhat by alternative. Differences by alternative are mainly due to changes in the minerals and grazing programs. Most job growth and most of the variation would be attributable to planning area–based natural gas development. Impacts related to natural gas development and extraction would likely be experienced in all counties except San Juan County, Colorado.

In the Farmington area, all action alternatives (A–D) would likely result in about 730 more jobs in 2020 than would be attributable to the SJNF and TRFO minerals programs in 2010. The No Leasing Alternative would likely result in increases of 270 jobs, about one-third of the increase estimated for Alternative A. Regardless of the alternative, about 85% of employment effects in San Juan County, New Mexico, would likely be experienced in the mining, construction, and other services sectors. Estimates for the No Leasing Alternative only consider changes to the SJNF and TRFO minerals program.

BLM_0033607

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.29.9: Projected Changes in Employment (jobs) for the Five-county Colorado Area in 2020**

| Program | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
| | | | Alternative B | Alternative C | Alternative D |
| | Average Annual Jobs | | | | |
| Recreation | 2,005 | 2,005 | – | – | – |
| Grazing | 268 | 268 | (0) | (35) | 85 |
| Wood products | 29 | 41 | – | (6) | 10 |
| Minerals | 278 | 744 | (24) | (26) | 12 |
| Payments to state/counties | 102 | 80 | (0) | (0) | 0 |
| SJNF/TRFO operations | 379 | 379 | – | – | – |
| Total | 3,061 | 3,517 | (24) | (67) | 107 |
| Percent (%) change in total jobs from base year | – | 15% | 14% | 13% | 18% |

**Table 3.29.10: Projected Changes in Employment (jobs) for San Juan County, New Mexico, Related to the SJNF and TRFO Minerals Programs by Alternative in 2020**

| Program | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
| | | | Alternative B | Alternative C | Alternative D |
| | Average Annual Jobs | | | | |
| Minerals | 475 | 1,201 | (43) | (54) | (3) |
| Percent (%) change in total jobs from base year | -- | 153% | 144% | 141% | 152% |

**Table 3.29.11: Projected Changes in Employment (jobs) for the Five-county Colorado Area Related to All SJNF and TRFO Programs by Major Industry by Alternative in 2020**

| Industry | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
| | | | Alternative B | Alternative C | Alternative D |
| | Average Annual Jobs | | | | |
| Agriculture | 281 | 275 | (1) | (34) | 83 |
| Mining | 145 | 328 | (10) | (10) | 4 |
| Construction | 39 | 143 | (6) | (7) | 4 |
| Manufacturing | 55 | 62 | (0) | (4) | 7 |
| Transportation and utilities | 45 | 50 | (0) | (1) | 1 |
| Trade | 386 | 434 | (2) | (3) | 2 |
| Visitor services | 1,363 | 1,389 | (1) | (2) | 1 |
| Other services | 358 | 457 | (4) | (6) | 5 |
| Government | 389 | 379 | (0) | (0) | 0 |
| Total | 3,061 | 3,517 | (24) | (67) | 107 |
| Percent (%) change in total jobs from base year | -- | 15% | 14% | 13% | 18% |

BLM_0033608

**Table 3.29.12: Projected Changes in Employment (jobs) for San Juan County, New Mexico, Related to the SJNF and TRFO Minerals Programs by Major Industry by Alternative in 2020**

| | 2010 | 2020 | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
| Industry | Base Year | Alternative A | Alternative B | Alternative C | Alternative D |
| | | | Average Annual Jobs | | |
| Agricnlture | 0 | 0 | (0) | (0) | 0 |
| Mining | 141 | 330 | (11) | (12) | 6 |
| Construction | 44 | 149 | (8) | (14) | (11) |
| Manufacturing | 0 | 1 | (0) | (0) | (0) |
| Transportation and utilities | 9 | 22 | (1) | (1) | (0) |
| Trade | 41 | 103 | (4) | (5) | (0) |
| Visitor services | 29 | 73 | (3) | (3) | 0 |
| Other services | 208 | 515 | (16) | (19) | 2 |
| Government | 3 | 8 | (0) | (0) | 0 |
| Total | 475 | 1,201 | (43) | (54) | (3) |
| Percent (%) change in total jobs from base year | – | 153% | 144% | 141% | 152% |

Table 3.29.13 and Table 3.29.14 provide a look at impacts related to labor income—first by program and then by industry. As noted earlier, labor income includes all wages and salaries, plus benefits, for employees and for the self-employed. Labor income is estimated to increase the most for those affected by the minerals program. The mining industry is characterized by both a highly skilled workforce and conditions that warrant premium pay. These factors result in compensation levels that often exceed other local industries. Both the five-county Colorado and the Farmington areas exhibit these features in their economies. The No Leasing Alternative is likely to result in income levels that are about $100 million less than Alternative A for the minerals program in 2020.

**Table 3.29.13: Projected Changes in Labor Income ($ million) for the Five-county Colorado Area Related to all SJNF and TRFO Programs by Alternative in 2020**

| | 2010 | 2020 | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
| Program | Base Year | Alternative A | Alternative B | Alternative C | Alternative D |
| | | | $ million | | |
| Recreation | $49.0 | $49.0 | $0 | $0 | $0 |
| Grazing | $1.0 | $1.0 | -$0 | -$0.1 | $0.3 |
| Wood products | $1.1 | $1.6 | $0 | -$0.2 | $0.4 |
| Minerals | $23.2 | $57.1 | -$1.7 | -$1.8 | $0.8 |
| Payments to state/counties | $4.4 | $3.5 | -$0 | -$0 | $0 |
| SJNF/TRFO operations | $15.8 | $15.8 | $0 | $0 | $0 |
| Total | $94.5 | $128.0 | -$1.7 | -$2.1 | $1.5 |
| Percent (%) change in total income from base year | – | 35% | 34% | 33% | 37% |

BLM_0033609

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

**Table 3.29.14: Projected Changes in Labor Income ($ million) for San Juan County, New Mexico, Related to the SJNF and TRFO Minerals Programs by Alternative in 2020**

|  | 2010 | 2020 | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
|  | Base Year | Alternative A | Alternative B | Alternative C | Alternative D |
| **Program** | $ million | | | | |
| Minerals | $27.0 | $67.4 | -$2.4 | -$2.9 | $0 |
| Percent (%) change in total income from base year | – | 149% | 140% | 138% | 149% |

Changes to labor income by industry are presented in Table 3.29.15 and Table 3.29.16. Mining and construction are the sectors most likely to benefit from any of the alternatives. This demonstrates how the sizable effects of natural gas development and production contribute a dominant share of the impact of all resource programs taken as a whole. Other services are the sectors next most likely to see substantial gains. These sectors benefit the most from potential changes in tourist activity, but they also respond to changes in energy development. Because differences among the action alternatives are small for natural gas development and production, the pattern of industry impacts changes little across Alternatives A through D.

**Table 3.29.15: Projected Changes in Labor Income for the Five-county Colorado Area Related to All SJNF and TRFO Programs by Major Industry by Alternative in 2020 ($ million)**

|  | 2010 | 2020 | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
|  | Base Year | Alternative A | Alternative B | Alternative C | Alternative D |
| **Industry** | $ million | | | | |
| Agriculture | $1.1 | $0.9 | -$0.0 | -$0.1 | $0.2 |
| Mining | $18.7 | $42.6 | -$1.1 | -$1.2 | $0.4 |
| Construction | $1.5 | $5.4 | -$0.2 | -$0.3 | $0.2 |
| Manufacturing | $1.6 | $1.9 | $0.0 | -$0.2 | $0.3 |
| Transportation and utilities | $2.4 | $2.7 | -$0.0 | -$0.0 | $0.1 |
| Trade | $11.8 | $13.1 | -$0.1 | -$0.1 | $0.1 |
| Visitor services | $25.4 | $25.9 | -$0.0 | -$0.0 | $0.0 |
| Other services | $13.1 | $17.0 | -$0.1 | -$0.2 | $0.2 |
| Government | $18.9 | $18.5 | -$0.0 | -$0.0 | $0.0 |
| Total | $94.5 | $128.0 | -$1.7 | -$2.1 | $1.5 |
| Percent (%) change in labor income from base year | -- | 35% | 34% | 33% | 37% |

**Table 3.29.16: Projected changes in labor income for San Juan County, New Mexico related to all SJNF and TRFO programs by major industry by alternative in 2020 ($ million)**

|  | 2010 | 2020 | Change from Alternative A in 2020 | | |
|---|---|---|---|---|---|
|  | Base Year | Alternative A | Alternative B | Alternative C | Alternative D |
| **Industry** | $ million | | | | |
| Agriculture | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Mining | $12.4 | $29.0 | -$1.0 | -$1.1 | $0.5 |
| Construction | $2.2 | $7.6 | -$0.4 | -$0.7 | -$0.6 |
| Manufacturing | $0.0 | $0.0 | -$0.0 | -$0.0 | $0.0 |
| Transportation and utilities | $0.6 | $1.5 | -$0.1 | -$0.1 | -$0.0 |
| Trade | $1.4 | $3.5 | -$0.1 | -$0.1 | -$0.0 |

BLM_0033610

| Visitor services | $0.5 | $1.2 | -$0.1 | -$0.0 | $0.0 |
|---|---|---|---|---|---|
| Other services | $9.7 | $24.1 | -$0.7 | -$0.9 | $0.1 |
| Government | $0.2 | $0.5 | -$0.0 | -$0.0 | $0.0 |
| Total | $27.0 | $67.4 | -$2.4 | -$2.9 | $0.0 |
| Percent (%) change in labor income from base year | – | 149% | 140% | 138% | 149% |

Because of activity under current leases, the No Leasing Alternative may result in labor income increases of $28 million across all industries compared with 2010 levels. Most of the increase would occur in the mining and construction sectors.

In the Farmington area, all action alternatives (A–D) would likely result in about $67 million more in 2020 that were attributable to the SJNF and TRFO minerals programs in 2010. The No Leasing Alternative would likely result in increases of $41 million, about 60% of labor income increases estimated for Alternative A. Regardless of the alternative, about 90% of employment effects in San Juan County, New Mexico, would likely be experienced in the mining, construction, and other services sectors. Estimates for the No Leasing Alternative only consider changes to the SJNF and TRFO minerals programs.

## Cumulative Impacts

In the future, social and economic change in the planning area would emerge from the combined actions of many individuals, businesses, governments, and other organizations. A vast number of decisions made by thousands of players over the next decade would affect growth and change in employment, housing, and transportation. For economic impact purposes, it is impossible to account for and project the effect of all such decisions separately. However, standard projections of employment and income that carry forward the economic momentum observed in current conditions and trends are often taken as a measure of how the economy is likely to develop, absent of unforeseen inputs. The cumulative analysis takes this approach by using a generally accepted projection of employment and income to 2020 to account for future levels of economic development, except for the effects of the alternatives themselves.

Projections used in the FEIS were based on estimates generated by the Colorado State Demography Office (2012b). Employment projections for San Juan County, New Mexico, are based on growth rates provided by the New Mexico Department of Workforce Solutions, Economic Research and Analysis Bureau (2012). However, the rates are available only to 2020. Labor income was assumed to increase at the same rate as employment. Table 3.29.17 displays the cumulative effects of all SJNF and TRFO programs.

If projections made by the State of Colorado bear out, the five-county Colorado area would experience healthy growth. Between 2010 and 2020 employment in the five-county Colorado area is projected to grow by 33%. In the Farmington area, total employment is expected to grow about 20% in the same time period. From an income perspective, the five-county Colorado area is projected to see a doubling in labor income from 2010 to 2020. While no projection for income is available for the Farmington area, it is assumed here that labor income would grow at approximately the same rate as employment.

As shown in Table 3.29.17, the public lands contribution to the area is expected to increase in terms of both jobs and income but to not grow as fast. Consequently, the share contributed by the SJNF and TRFO to the area economy is expected to decrease somewhat by 2020. The SJNF and TRFO

BLM_0033611

share of employment would drop about 1%, and income would drop about 2%. The difference in the magnitude of change among the alternatives is likely to be very small. Durango would potentially experience the most change among all communities in the five-county area because of its size and its role as a regional center. Retirees and late-career households may continue to move to the area as before or perhaps in greater numbers, creating additional service and trade jobs of all types.

**Table 3.29.17: Estimated Cumulative Impacts of All SJNF and TRFO Programs on Employment and Labor Income in the Five-county Colorado Area by Alternative for 2020**

| Economic Indicator | 2010 | | Forecast in 2020 | | | | |
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| **Employment** | | | | | | | |
| Total (jobs) | 49,180 | 3,060 | 65,564 | 3,516 | 3,492 | 3,449 | 3,623 |
| Percentage (%) of area total | 100% | 6.2% | 100% | 5.4% | 5.3% | 5.3% | 5.5% |
| Percentage (%) change from Alternative A | – | – | – | – | -0.1% | -1.9% | 3.0% |
| **Labor Income** | | | | | | | |
| Total ($ million) | $1,898.6 | $94.5 | $4,127.8 | $128.0 | $126.3 | $125.9 | $129.5 |
| Percentage (%) of area total | 100% | 5.0% | 100% | 3.1% | 3.1% | 3.1% | 3.1% |
| Percentage (%) change from Alternative A | – | – | – | – | **-1.3%** | **-1.6%** | **1.2%** |

Table 3.29.18 shows SJNF and TRFO-based employment shares of total area employment for the minerals program only. This table shows that employment associated with SJNF and TRFO minerals would grow increasingly important in the five-county area. Shares that were only 0.6% in 2010 are estimated to become approximately 1.1% in 2020 and about 2% in 2025.

**Table 3.29.18: Estimated Cumulative Impacts of the SJNF and TRFO Minerals Programs on Employment in the Five-county Colorado Area by Alternative for Selected Years**

| Indicator | 2010 | | Forecast in 2020 | | | | |
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total (jobs) | 49,180 | 278 | 65,564 | 744 | 721 | 718 | 756 |
| Percentage (%) of area total | 100% | 0.6% | 100% | 1.1% | 1.1% | 1.1% | 1.2% |
| Percentage (%) change from Alternative A | – | – | – | – | **-3.1%** | **-3.5%** | **1.6%** |
| **Indicator** | **2010** | | **Forecast in 2025** | | | | |
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total (jobs) | 49,180 | 278 | 72,926 | 1,507 | 1,418 | 1,425 | 1,498 |
| Percentage (%) of area total | 100% | 0.6% | 100% | 2.1% | 1.9% | 2.0% | 2.1% |
| Percentage (%) change from Alternative A | – | – | – | – | **-5.9%** | **-5.4%** | **-0.6%** |

BLM_0033612

Table 3.29.19 shows the same pattern for labor income shares in the five-county area. Shares of labor income associated with SJNF and TRFO minerals that were 1.2% in 2010 are estimated to increase to 1.4% in 2020 and 2.2% in 2025. The income share from SJNF and TRFO minerals shows a slower growth rate than employment. This is because total labor income is projected to grow faster than employment in the five-county area over the next 7 years.

**Table 3.29.19: Estimated Cumulative Impacts of the SJNF and TRFO Minerals Programs on Labor Income in the Five-county Colorado Area by Alternative for Selected Years**

| Indicator | 2010 | | Forecast in 2020 | | | | |
|---|---|---|---|---|---|---|---|
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total ($ million) | $1,898.6 | $23.2 | $4,127.8 | $57.2 | $55.5 | $55.4 | $57.9 |
| Percentage (%) of area total | 100% | 1.2% | 100% | 1.4% | 1.3% | 1.3% | 1.4% |
| Percentage (%) change from Alternative A | – | – | – | – | -3.0% | -3.1% | 1.2% |
| Indicator | 2010 | | Forecast in 2025 | | | | |
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total ($ million) | $1,898.6 | $23.2 | $5,345.4 | $119.3 | $112.6 | $113.6 | $118.3 |
| Percentage (%) of area total | 100% | 1.2% | 100% | 2.2% | 2.1% | 2.1% | 2.2% |
| Percentage (%) change from Alternative A | – | – | – | – | -5.6% | -4.8% | -0.8% |

Table 3.29.20 compares employment and income generated from SJNF and TRFO minerals with total employment and income in San Juan County, New Mexico. Projections for this area are only available for employment to 2020. Labor income in 2020 has been projected using the same rate of growth as employment. Employment shares are estimated to increase from 0.8% of total area employment in 2010 to 1.6% in 2020.

Table 3.29.21 labor income generated by SJNF and TRFO minerals is expected to grow from 1.0% in 2010 to 2% in 2020. If these activity projections materialize, job growth estimated for SJNF and TRFO minerals would grow substantially faster than total area job growth between 2010 and 2020.

**Table 3.29.20: Estimated Cumulative Impacts of the SJNF and TRFO Minerals Programs on Employment in San Juan County, New Mexico, by Alternative for Selected Years**

| Indicator | 2010 | | Forecast in 2020 | | | | |
|---|---|---|---|---|---|---|---|
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total (jobs) | 61,030 | 475 | 74,701 | 1,201 | 1,158 | 1,147 | 1,198 |
| Percentage (%) of area total | 100% | 0.8% | 100% | 1.6% | 1.6% | 1.5% | 1.6% |
| Percentage (%) change from Alternative A | – | – | – | – | -3.5% | -4.5% | -0.2% |

BLM_0033613

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

| Indicator | 2010 | | Forecast in 2025 | | | | |
|---|---|---|---|---|---|---|---|
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total (jobs) | 61,030 | 475 | n/a | 2,338 | 2,180 | 2,191 | 2,284 |
| Percentage (%) of area total | 100% | 0.8% | – | – | – | – | – |
| Percentage (%) change from Alternative A | – | – | – | – | -6.8% | -6.3% | -2.3% |

Table 3.29.21: Estimated Cumulative Impacts of the SJNF and TRFO Minerals Programs on Labor Income in San Juan County, New Mexico, by Alternative for Selected Years

| Indicator | 2010 | | Forecast in 2020 | | | | |
|---|---|---|---|---|---|---|---|
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total ($ million) | $2,836.4 | $27.0 | $3,389.7 | $67.4 | $65.0 | $64.4 | $67.4 |
| Percentage (%) of area total | 100% | 1.0% | 100% | 2.0% | 1.9% | 1.9% | 2.0% |
| Percentage (%) change from Alternative A | – | – | – | – | -3.6% | -4.4% | 0.0% |
| Indicator | 2010 | | Forecast in 2025 | | | | |
| | Area Totals | SJNF and TRFO Share | Area Totals | SJNF and TRFO Share | | | |
| | | | | A | B | C | D |
| Total ($ million) | $2,836.4 | $27.0 | (not available) | $135.1 | $126.0 | $127.1 | $132.2 |
| Percentage (%) of area total | 100% | 1.0% | – | – | – | – | – |
| Percentage (%) change from Alternative A | – | – | – | – | -6.7% | -5.9% | -2.1% |

## Summary

The size of anticipated natural gas development and production for all action alternatives (A–D) dominates the economic effects. Because the alternatives have small differences in field development and production levels, the difference in economic effects is likewise small. Jobs across all sectors in the five-county Colorado area that are associated with natural gas are expected to more than double, going from about 280 jobs in 2010 to over 710 in 2020. Because earnings associated with energy development would affect a variety of sectors, some with high wages and others with very modest wages, total labor income would increase somewhat less than jobs. With healthy growth projected for southwest Colorado in the years to come, the share of all jobs related to SJNF and TRFO resource management would decrease somewhat by 2020. However, job growth related to energy activity on the SJNF and TRFO is expected to grow at a 13% annual rate between 2010 and 2025.

The Farmington area can also expect substantial job growth related to natural gas development and projection on the SJNF and TRFO. The increase is nearly identical for all action alternatives. Employment and income generated by this activity would increase fourfold, rising from 475 jobs in 2010 to about 1,200 in 2020. Labor income would increase from $27 million in 2010 to $65 million in 2020. This growth is anticipated to be faster than total job growth projected for the Farmington area.

BLM_0033614

From 2010 to 2025, jobs and labor income related to SJNF and TRFO energy activity are expected to grow at an 11% annual rate.

## Financial/Economic Efficiency

Both financial and economic efficiency are analyzed in this section. Financial efficiency examines revenue and cost implications from the perspective of the government agency. (It could also be said that this is the perspective of the taxpayer.) Only those revenues and costs that are recorded in financial records are included in this analysis.

Economic efficiency examines a broader definition of benefits by including values for public land uses that are not captured in the marketplace. Willingness-to-pay values for recreation use are the primary additions over a financial analysis. Estimated market value for meat gained by grazing livestock on public land is also included.

Many non-market, non-use values are excluded from this economic efficiency analysis. Some outcomes or impacts—including those related to biological diversity, wildlife habitat, ecosystem function, water quality, climate change, visual amenities, bequest values, and existence values—have no monetary values or costs that have been established by the USFS or BLM. Academic research studies have explored the monetary expression of such values and preferences in a variety of physical and social settings. However, it is also reasonable and consistent with the Council on Environmental Quality regulations (40 CFR 1502.23) to handle these items in a non-monetary fashion, as is done in other sections of this FEIS. The agency cost of achieving these non-monetary outputs is included in both the economic and financial analyses.

Net public benefit is an important concept for carrying out an LRMP revision. Net public benefit is defined as the overall value to the nation of all outputs and positive impacts (benefits), minus all the associated inputs and adverse impacts (costs) for producing those primary benefits, whether they can be quantitatively valued or not. Conceptually, net public benefits are the sum of this economic analysis, plus the net value of non-priced outputs and costs. It is not the result of an economic analysis alone. This concept is the basis upon which the decision-maker selects an alternative for implementation.

The main criterion used in assessing financial or economic efficiency is PNV. PNV is defined as the value of discounted revenues or benefits, respectively, minus discounted costs. An economic efficiency analysis includes all outputs (timber, grazing, minerals, and recreation) for which monetary values are assigned. As noted above, the monetary values include both market and non-market values received by the public.

In addition, a financial efficiency analysis was completed in order to determine the net financial returns of each alternative. A financial efficiency analysis is the PNV of agency revenues and costs. The following table displays the economic and financial PNV for each alternative. All monetary values are expressed in constant dollars (no allowance for inflation). A 4% discount rate was used over a 50-year period (2013 to 2063). Federal revenues are reduced for payments made to States and/or counties. The reduction of PNV under any alternative, as compared to the highest present net value, is the economic trade-off (or opportunity cost) of achieving that alternative.

As shown in Table 3.29.22, the present value of financial net revenues (public lands revenues minus public lands costs) may vary from a low of $486 million under Alternative B, to a high of $513 million under Alternative A. In all cases, public lands revenues would exceed costs. High natural gas extraction levels would cause Alternative A to exhibit the highest financial net revenues. Alternatives

BLM_0033615

with a preservation emphasis, such as Alternative C, show lower net revenues to the taxpayer. This is because there are lower agency revenues associated with these emphases in order to offset similar levels of expense. The No Leasing Alternative, which only includes oil and gas production without new leases and no other resource outputs or management, has financial net revenues of $683 million. Only the variable cost of managing the SJNF and TRFO oil and gas programs is included in this estimate, while all government revenues from oil and gas are counted.

**Table 3.29.22: Economic and Financial Efficiency by Alternative ($ million)**

| Indicator | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| | $ million | | | |
| Financial net revenues | $513 | $486 | $493 | $508 |
| Economic net benefits | $7,428 | $7,381 | $7,399 | $7,418 |
| Difference from highest economic net benefit | – | -$47 | -$29 | -$10 |

The economic net benefits (society benefits minus all costs) may range from a low of $7.38 billion under Alternative B, to a high of $7.43 billion under Alternative A. The net economic benefits are larger than net financial revenues primarily because the market value of natural gas greatly exceeds federal royalties and more than offsets the cost of natural gas drilling and extraction. The total net value of natural gas production would not vary greatly between alternatives. This suggests that even with the limited monetary values available for this analysis, society would benefit greatly from the implementation of any of the full alternatives considered in this document. The economic net benefits of the No Leasing Alternative are $5.05 billion.

# 3.30 Demographics

## 3.30.1 Introduction

This section first presents a snapshot of demographic conditions and trends in the five counties most substantially within the SJNF and TRFO: Archuleta, Dolores, La Plata, Montezuma, and San Juan Counties, Colorado (referred to in this section as the analysis area). The section concludes with discussion of the impacts to population potentially occurring under the range of alternatives for the LRMP. The economic activity levels presented in Section 3.29, Economics, drive the impacts to population discussed here.

## Legal and Administrative Framework

- **EO 12898:** This Presidential order requires every federal agency to comply by "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." The purpose of the assessment is to address the environmental justice of federal actions.

## 3.30.2 Affected Environment

## Existing Conditions and Trends

The West has been in a measurable growth cycle since before the U.S. Census Bureau began keeping tabs on demographics. Figure 3.30.1 shows how the West's share of U.S. population has grown steadily decade over decade for more than 150 years.

BLM_0033616

Final Environmental Impact Statement



**Figure 3.30.1: U.S. Regions Share of Total Population through 2010** (Source: U.S. Census Bureau 2002a, 2002b, 2010b)

In the 20 years from 1990 to 2010, population in the analysis area grew to from 58,550 to 91,716 (57%), compared to 53% for Colorado as a whole. The Colorado State Demographer's Office forecasts that population in the area would grow another 73% to 158,455 in 2040 from 2010 (Figure 3.30.2) compared to 57% forecasted for Colorado as a whole. This reflects an assessment that the analysis area would sustain a relatively high growth rate.



**Figure 3.30.2: Total Historical and Forecasted Population of the Analysis Area (**Source Colorado State Demography Office 2012a, 2012b)

A comparison of the age structure of the five-county analysis area in 2010 to the age structure of the nation as a whole (Figure 3.30.3) depicts a "top-heavy" population in the analysis area. The younger age groups—under 19 years old and from 20 to 44 years old—are under-represented. Persons in the middle age to pre-retirement cohort (45–64 years old), persons of retirement age (65 to 85 years old), and the elderly (over 85 years old) are over-represented. The lower proportion of youth and early

BLM_0033617

working age persons in the analysis area indicates that the area's population growth is dominated by a migration of older people into the area and is not primarily due to natural increase (i.e., to a surplus of births over deaths).

The age structure of the population also supports the common observation that large fractions of the population moving into the area are baby boomers (born from 1946 to 1964) and older generations. Another statistic that supports this observation is the rise in non-labor income (such as dividends and interest from financial assets and distributions from retirement accounts) as a contributor to personal income in the analysis area. This is consistent with retirees or near-retirement age people moving to the analysis area, bringing their accumulated wealth and channeling the income into the community through asset purchases and personal consumption expenditures (see Section 3.29, Economics, for details on the income structure within the planning area.)

Many of the same attributes that attract people to visit the mountains, mesas, canyons, and communities of the analysis area also prompt some to take up residence or to buy a second home. As portrayed in Figure 3.30.4, positive net migration (migration in, minus migration out) since 1989 has contributed about 20,000 persons to the population of the analysis area through 2010, with peaks of 2,000 net in-migrants per year occurring in 1995 and 2000. Since 2000, net migration has slowed to around 500 net in-migrants per year but is still a driver of population growth.



BLM_0033618

**Figure 3.30.3: Age Structure of the Analysis Area Compared to the United States in 2010 (**Source: U.S. Census Bureau 2010c)



**Figure 3.30.4: Net Migration, 1985–2005 (**Source: Colorado State Demography Office 2012c)

As net in-migration has slowed, the proportion of residents of the analysis area who have lived in the area at least 5 years has grown. In both 1990 and 2000, nearly one of three residents in the analysis area had reported moving into the county within the previous 5 years, with about one in five moving in from another state. In 2010, as shown in Figure 3.30.5, the U.S. Census Bureau's American Community Survey estimated that 8% of the population had moved into the area in the past 5 years from other counties, states, or foreign countries. Thus, people are moving into the analysis area in lower numbers than before 2000, and "newcomers" are a smaller share of the analysis area population in 2010 than they were in 2000.

BLM_0033619

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan



**Figure 3.30.5: In-migrants as a Share of the Population in the Analysis Area** (Source: U.S. Census Bureau 2010d)

In 2000, largely due to the continued efforts of the Colorado State Demography Office, the U.S. Census Bureau began counting seasonal and second homes. In 2000, about one in six housing units in the analysis area was classified as "seasonal" or "recreational" residences. Now, data from the 2010 Census show that seasonal and second homes are about 13% of all housing units, a lower but still substantial share of the housing stock (Figure 3.30.6).

Figure 3.30.6 also depicts the owners-versus-renters dimension of housing occupancy. The data in the figure from the 2010 Census show that 57% of all housing units are owner occupied and 23% are renter occupied. When considering just occupied housing units, the split was roughly 70% owners and 30% renters in 2010.

BLM_0033620



**Figure 3.30.6: Occupancy Status of Housing Units in the Analysis Area (**Source: U.S. Census Bureau 2010c)

## Environmental Justice

A specific consideration of equity and fairness in resource decision-making is encompassed in the concept of environmental justice and civil rights. As required by EO 12898, all federal actions must consider potentially disproportionate adverse effects on minority and low-income communities. Principles for considering environmental justice are outlined in environmental justice guidance under NEPA. Those principles are recognized and have been considered in this analysis.

The data in Table 3.30.1 show that four of five counties in the analysis area have higher proportions of American Indian persons in the population than the state of Colorado as a whole, and in two counties the percentage of American Indian persons is many times that of the state as a whole. American Indian persons are almost 6% of the population in La Plata County, where the Southern Ute Indian Reservation is found, and 12% of the population in Montezuma County, locus of the Ute Mountain Ute Indian Reservation. In Colorado as a whole, American Indian persons are about 1% of the population. Outreach to tribes, in recognition of their special status under EO 12898 and other statutes, regulations, and orders, is discussed later in this section.

**Table 3.30.1: Percent of Population by Race in 2010 for Colorado and Counties in the Analysis Area**

| Colorado/County | White | American Indian | Black | Asian-Pacific Islander | Multi-Race |
|---|---|---|---|---|---|
| Colorado | 81.3% | 1.1% | 4.0% | 2.9% | 10.7% |
| Archuleta | 86.4% | 1.9% | 0.3% | 0.7% | 10.7% |
| Dolores | 93.0% | 2.9% | 0.2% | 0.2% | 3.7% |
| La Plata | 86.6% | 5.8% | 0.4% | 0.7% | 6.5% |
| Montezuma | 81.1% | 12.2% | 0.2% | 0.6% | 5.9% |
| San Juan | 92.6% | 0.3% | – | 1.1% | 6.0% |
| Source: U.S. Census Bureau (2010c). | | | | | |

Table 3.30.2 shows that Hispanic persons are a large minority in four of five counties in the analysis area: Archuleta County (17.8%), San Juan County (12.0 %), La Plata County (11.8%), and

BLM_0033621

Montezuma County (11%). However, the percentage of Hispanic persons in these counties is lower than for Colorado as a whole, where Hispanic persons are 20.7% of the population.

**Table 3.30.2: Percent of Population by Hispanic Ethnicity in 2010 for Colorado and Counties in the Analysis Area**

| Colorado/County | Non-Hispanic | Hispanic |
|---|---|---|
| Colorado | 79.3% | 20.7% |
| Archuleta | 82.2% | 17.8% |
| Dolores | 96.0% | 4.0% |
| La Plata | 88.2% | 11.8% |
| Montezuma | 89.0% | 11.0% |
| San Juan | 88.0% | 12.0% |
| Source: U.S. Census Bureau (2010c). | | |

American Indians have a relationship with the land that started long before the SJNF and TRFO were established. Because of this relationship and their standing as sovereign nations, the 25 Native American tribes and pueblos that claim cultural affiliation with lands within the SJNF and TRFO were contacted about the LRMP revision efforts and were offered visits from USFS and BLM managers to gather input and provide further information about the LRMP revision. Please see Chapter 4 of this FEIS for a list of tribes with which the SJNF and TRFO have consulted and a summary of consultation activities.

As of publication of this FEIS, SJNF and TRFO managers have met with representatives of the Jicarilla Tribe, Ute Mountain Ute Tribe, the Hopi Tribe, the Pueblo of Jemez, the Pueblo of Laguna, the Pueblo of Nambe, the Pueblo of Santa Ana, the Pueblo of Santa Clara, and the Navajo Nation. The two tribes with adjacency to the planning area, the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe, have also participated in the Governmental Water Roundtable dealing with revision of the LRMP. All 25 tribes and pueblos are on the LRMP revision mailing list and would continue to receive meeting and draft document notifications, as well as government-to-government consultation meetings with SJNF and TRFO managers as requested.

The Ute Mountain Ute and the Southern Ute Indian Tribes are both major contributors to the area economy and are among the largest employers in Montezuma and La Plata Counties, respectively. Both tribes have diversified economies, including gaming, oil and gas development, and natural resource development on tribal lands. The Southern Ute Indian Tribe also plays a major role in land and housing development in La Plata County.

EO 12898 on environmental justice also pertains to low-income communities. Table 3.30.3 shows the percentage of families in each county below the poverty line in 2010.

**Table 3.30.3: Estimated Poverty Rates in 2010**

| Colorado/County | Percentage | Margin of Error |
|---|---|---|
| Colorado | 8.6% | +/-0.2 |
| Archuleta | 4.7% | +/-2.2 |
| Dolores | 10.7% | +/-6.3 |
| La Plata | 5.7% | +/-1.3 |
| Montezuma | 14.2% | +/-3.3 |
| San Juan | 12.2% | +/-7.1 |

BLM_0033622

| Colorado/County | Percentage | Margin of Error |
|---|---|---|
| Data for Archuleta, Dolores, La Plata, and Montezuma Counties are estimated percentages of families in poverty. San Juan County is an estimated percentage of persons in poverty. Source: U.S. Census Bureau (2010e). | | |

There was some reduction in poverty from 1990 to 2000 because of in-migrants bringing new wealth into the communities in the analysis area, investing in housing, and stimulating the construction industry. However, the rate of in-migration fell after 2000, and the recession and financial crisis of 2007 to 2009 harmed the entire U.S. economy and slowed housing construction and lowered tourism in the analysis area. Thus, as the economy slid back and has only slowly recovered the poverty rates in 2010 are not very different from 2000. Note that the percentages in Table 3.30.3 are survey-based estimates and have large margins of error in most counties because of small sample sizes.

## Existing Conditions and Trends Summary

It is clear that population growth remains likely for the analysis area in the future. With a net migration of about 20,000 new residents between 1990 and 2010 and a total population growth of more than 33,000 people over that period, migration is evidently the primary agent of population growth. Given the age structure of the analysis area in 2010, baby boomers and older generations appear to be the larger part of this migration.

Second homeowners are not counted as resident population in a federal Census. However, the U.S. Census Bureau reported in 2010 that 13 housing units in 100 in the analysis area were vacant for seasonal, recreational, or occasional use. Therefore, second homeowners are a considerable presence and are certainly a large contributor to the socioeconomic character of the analysis area.

New residents of all kinds bring productive capacity and wealth to an area. In-migration and the investments by second homeowners contributed to an obvious appearance of more prosperity in 2000 with fewer households living below the poverty line than in 1990. The recession and financial crisis that happened from 2007 to 2009 reversed some of the momentum and prevented some counties of the analysis from showing economic improvement in 2010 compared to 2000.

However, the potential evidenced by the attractiveness of the analysis area in the past remains a fact, and the potential for a resumption of growth when conditions permit is reflected in the most recent State Demographer's population forecast of an increase of more than 70% in the area's population by 2040.

Reasons for Migration: Push-Pull Factors

Demographers analyze causes of migration in terms of push factors (a force that acts to drive people away from a specific place) and/or pull factors (what draws people to a new location).

A multitude of factors influence an individual's or household's decision to relocate a primary residence. Wealth, mobility, and communication technology make for an increasingly foot-loose population willing, and able, to move to new places. Adverse conditions in certain regions (including smog, traffic, and school violence) may prompt people to move. For some who choose southwest Colorado as a new place of residence, the idea of fishing everyday may be the main reason for their choice. For other people, it may be a job opportunity or a desire to be near family who already live in the area. The migration into the area is the result of many different decisions by many people and conditions in places that are thousands of miles away.

BLM_0033623

<u>Availability of Jobs</u>

Often, the most substantial pull factors are job opportunities. Demographers have long established that where jobs are created, people would follow. In fact, the Colorado Demography Office population projections are derived in part from job forecasts. In virtually every Colorado region that has experienced population growth approaching that witnessed in southwest Colorado, there has also been a similar increase in jobs.

Unemployment rates are an indicator of job availability when population and the labor force are growing. The recent unemployment trend indicates continued job availability in the larger counties of the analysis area, especially La Plata County where the unemployment rate was lower than state and national levels in 2010. Dolores and San Juan Counties typically have higher unemployment rates than the rest of the region, in part because of a narrow economic base.

<u>Amenities – Perceived Quality of Life</u>

The availability of jobs, however, is not the only pull factor at work in southwest Colorado. Natural amenities and perceived quality of life attract prospective workers, entrepreneurs, and traditional and early retirees.

In a 2006 survey, the Region 9 Economic Development District of Southwest Colorado (which represents the counties of the analysis area) asked residents and second homeowners about their attraction to the region. Residents were asked why they purchased a residence in the area. The top four reasons—cited by from 50% to 71% of the 154 residents that responded—were small town atmosphere, scenery/surroundings, climate, and recreational amenities. Twenty-five percent said it was employment opportunities. Figure 3.30.7 illustrates this comparison.

The same survey in 2006 asked second homeowners why they bought their properties. The top four reasons—cited by 11% to 14% of the 299 second homeowners that responded—were scenery/surroundings, recreational amenities, small town atmosphere, and intent to vacation in the region for years. Six percent said it was investment potential. The comparison is illustrated in Figure 3.30.8. These data suggest that amenities that are not directly bought and sold anchor the pull factors that affect migration and help to drive the market for investment in residential structures in the analysis area.

BLM_0033624



**Figure 3.30.7: Region 9 Resident Homeowner Survey in 2006: "Why did you purchase a home in this area?"—top four reasons vs. employment (Source: Region 9  Economic Development District of Southwest Colorado 2006)**



**Figure 3.30.8: Region 9 Second Homeowner Survey in 2006: "Why did you buy this property?"—top four reasons vs. investment** (Source: Region 9 Economic Development District of Southwest Colorado 2006)

## 3.30.3 Environmental Consequences

### Direct and Indirect Impacts

The affected environment description identified two migration pull factors: 1) the availability of jobs and 2) amenities (perceived quality of life). These facts are important to the migration currently underway. The purpose of the remainder of this analysis is to determine whether demographic trends would be impacted by the alternatives.

BLM_0033625

## Impacts Related to the Availability of Jobs

The Colorado Demography Office commonly points out that population trends often follow economic trends. People in search of jobs move into an area as jobs are created. A slight variation on this would be when a household wanted to relocate for other reasons (including amenities or family), and the employment opportunity would make such a move possible.

The description of the Affected Environment in Section 3.29, Economics, suggests that there are no known events outside SJNF and TRFO management activities that would cause an abrupt change in the current trajectory of area population trends. Therefore, impacts to population from SJNF and TRFO management would occur almost entirely from changes to oil and gas development under the alternatives.

The number of new jobs created because of change to SJNF and TRFO activities under the alternatives would potentially range from 389 jobs under Alternative C to 563 jobs under Alternative D (Table 3.29.9). Almost all the new jobs created under the various alternatives come from potential new development under the SJNF and TRFO oil and gas programs. The No Leasing Alternative would result in even fewer jobs.

The jobs created because of oil and gas development would be expected to stimulate in-migration, some as individuals and others as households. Using a population-to-jobs ratio of about 1.9 in 2010 as a factor, the analysis area could see from 725 to 1,050 persons added to the population by 2020 under the alternatives. This equates to average in-migration of 90 or more persons per year over the 8 years from 2012 through 2020 and, perhaps, demand for 45 housing units a year or more (assuming 1.9 persons per household).

Compared to past numbers of net in-migrants, the arrival of 90 new persons (net) per year in the analysis area equates to an increase of 18% over the flow of approximately 500 net in-migrants per year observed since 2000 (see Figure 3.30.4). On its own, the impact to net migration would be noticeable but would not cause the flow of new arrivals to the analysis area to approach the peaks seen in 1993 to 1995 or 1999 and 2000.

The cumulative population rise by 2020 of 725 to 1,050 persons would be an increase of less than 1% over the current forecast for the analysis area as a whole (see Figure 3.30.2). Because of where new well drilling would occur under the alternatives, all counties of the analysis area could see some population change, with the exception perhaps of San Juan County. However, the population impact would likely be heavily concentrated in La Plata and Montezuma Counties.

## Impacts Related to Amenities and Perceived Quality of Life – Recreation and Travel Management

Of central importance, in relation to recreation, are two planning tools: SRMAs and recreation prescriptions in the form of the ROS. SRMAs have specific management guidance because these areas demand attention (due to their identified recreation markets, location, special resources, and high public demand). SRMAs are areas that, due to high demand or to the vulnerability of sensitive resources, need focused dedication of management resources and capital investment.

ROS prescriptions offer a framework in which to establish diverse settings for recreation, with an eye towards diverse access, remoteness, naturalness, proximity to built structures, and other setting characteristics. In essence, these recreation planning tools were introduced into the planning process

BLM_0033626

in order to continue to diversify recreational opportunities and meet future demand for recreation in a prioritized manner, as necessitated by tangible fiscal limits.

The general policies and desired conditions all aim to provide existing, and future, recreational opportunities and demand. In this respect, the SJNF and TRFO may continue to play a role in area migration as a major pull factor.

Alternatives would allocate different acreages to the various ROS prescriptions. The availability of land under ROS prescriptions varies between alternatives (for example, Alternative C would propose far more "primitive" acres than would the other alternatives). However, while the presence of recreational opportunities seems to influence migration, it is nearly impossible to determine how allocation of acreages for one setting or another may impact migration. All of the alternatives offer diverse recreation settings, and this may result in a wide appeal for continued migration into the region. However, it would overstate the scope of the descriptive methodology used in this analysis to attempt to determine how, and to what degree, the alternatives may impact pull factors.

## Impacts Related to Amenities and Perceived Quality of Life – Scenery

All of the alternatives would involve the assignment of public lands to various BLM VRM classes and USFS scenic integrity levels. The alternatives would all aim to preserve scenery and enhance access to opportunities to enjoy it. In this respect, the potential impacts of any of the alternatives may contribute to maintaining scenery as an important pull factor for migration into the analysis area.

Alternative C would be expected to provide the highest quality scenery, followed by Alternatives B, D, and A, respectively. Differences in migration pull factors due differing acreages designated under scenic integrity levels or VRM classes under the various alternatives are likely to be small.

## Impacts Related to Environmental Justice

Minorities, including American Indians and Hispanics, and those with incomes below the poverty level should not see a disproportionate impact as a result of LRMP decisions. Impacts to the general population and communities as a whole are expected to be negligible. There is no reason to anticipate that whatever impacts do occur generally would have a disproportionate impact to those specifically considered within the scope of environmental justice.

## Environmental Consequences Summary

Impacts to population would be a potential rise by 2020 of 800 to 1,000 persons in the analysis area. This would be an increase of less than 1% over the current forecast for the analysis area as a whole (see Figure 3.30.2). Because of the where new well drilling would occur under the alternatives, population change would occur throughout the analysis area, with the exception perhaps of San Juan County, and would likely be concentrated in La Plata and Montezuma Counties.

## Cumulative Impacts

The recreational opportunities and scenery offered by the public lands within the planning area constitute an important component of the overall package of pull factors enticing new residents into the area. However, migration is also a result of many other decisions, some of which involve push factors in places thousands of miles away (including smog, crime, and traffic). There are also other attractions in the area, such as Mesa Verde National Park, that pull people to the area. The LRMP guidance for recreation and scenery is aimed at continuing to provide these amenities as the region grows and more demands are put upon the SJNF and TRFO. The alternatives would offer various

BLM_0033627

policies and approaches designed to help land managers prepare for the continued population growth and maintain the attractiveness of the area. No alternative, however, would, by itself, trigger migration. Therefore, selection of any particular alternative may not have an identifiable direct impact on area demographic trends.

# 3.31 Local Government

## 3.31.1 Introduction

The fiscal capacity of local government determines how well counties and other units of local government can deliver local services to the community and maintain public infrastructure. SJNF and TRFO managers place a strong emphasis on working in cooperation with all of the local governments within the region to sustain fiscal capacity and minimize the burden of SJNF and TRFO activities.

The following discussion is primarily about the local governments in the counties of Archuleta, Dolores, La Plata, Montezuma, and San Juan, Colorado, referred to collectively as the analysis area. For some revenues, the impacts to San Miguel County are discussed because the alternatives include oil and gas development in this county.

## Legal and Administrative Framework

### Federal Laws

- **The Mineral Leasing Act for Acquired Lands of 1920, as amended through 1990:** This act established the program administered by the USDI that monitors, collects, and distributes royalties for energy and mineral resources produced and removed from federal and tribal lands.

- **The Materials Act of 1947:** This law authorizes the BLM to sell mineral materials at fair market value and to grant free use permits for mineral materials to government agencies and for a limited amount of material to non-profit organizations.

- **The USDA Appropriations (National Forest Payments) Act of May 23, 1908, as amended:** This act requires payments equal to a 25% share of annual revenue coming from the sale of forest products, user fees, and Special Use Permits (including from grazing) on each national forest.

- **The Secure Rural Schools and Community Self-Determination Act of 2000:** This act offers counties an option for compensation payments that do not fluctuate with national forest revenues. The 1-year extension of the Secure Rural Schools and Community Self-Determination Act of 2000 expired at the end of 2012.

- **The Payment in Lieu of Taxes (PILT) Act of 1976:** This act determined the formula regarding compensation to local governments for the presence of tax-exempt federal lands within their jurisdictions. PILT is a federal revenue-sharing program administered by the BLM. The compensation to local governments is based on the amount of non-taxable acreage within their boundaries, with adjustments for other federal payments.

### Colorado Influences

Under Colorado law, there are many ways financial resources originating from activities based on the resources of the SJNF and TRFO flow to local governments. This analysis focuses on the most important of these activities.

BLM_0033628

- The main sources of federal revenue transferred to Colorado local government are the land payments derived from the Secure Rural Schools/Forest Payments Act and the PILT Act, as well as the minerals payments derived from the Mineral Leasing Act. The receipts go first to the state level, and Colorado law and regulations governs how they are distributed to local governments.

- Federal minerals production also generates state severance taxes, which are partly redistributed to local government.

- The value of federal minerals produced in a Colorado county is subject to the local property tax.

- Purchases by minerals operators on federal lands and their employees indirectly generate Colorado and local sales taxes.

## 3.31.2 Affected Environment

### Local Government Revenues

This discussion focuses on the current contribution to local government of the principal revenue sources that may be directly or indirectly related to activities occurring with the planning area:

- Federal PILT;

- National forest payments;

- Federal mineral lease payments as direct distributions from the Colorado Local Government Mineral Impact Fund (LGMIF);

- Colorado property taxes levied directly by local governments;

- Colorado severance tax payments as direct distributions from the LGMIF; and

- Colorado sales and use taxes levied by state and local government.

### Payment in Lieu of Taxes

The PILT Act of 1976 determined the formula regarding compensation to local governments for the presence of tax-exempt federal lands within their jurisdictions. PILT is a federal revenue-sharing program administered by the USDI. The formula takes into account such factors as other forms of revenue sharing, acreage, and population. These payments are made directly to counties, and monies may be used for any purpose. PILT can be, and recently have been, limited by Congress through the appropriations process. Since 1994, Congress has not appropriated sufficient funds in order to fully compensate counties. Federal land payments for 2010 are shown in Table 3.31.1.

**Table 3.31.1: Payment in Lieu of Taxes in 2010 to Counties of the Analysis Area**

| County | Total PILT from NFS and BLM Lands |
|---|---|
| Archuleta | $871,871 |
| Dolores | $139,213 |
| La Plata | $552,252 |
| Montezuma | $156,648 |
| San Juan | $70,826 |
| Source: USDI (2013) | |

BLM_0033629

## National Forest Payments

National forest payments under the National Forest Payments Act equal a 25% share of annual revenues coming from the sale of forest products, user fees, and Special Use Permits (including from grazing) on each national forest. As an alternative, the Secure Rural Schools and Community Self-Determination Act in 2000 provided counties with a fixed-payment alternative to the variable 25% of revenue rule for national forest payments. In the past, Archuleta, Dolores, La Plata, Montezuma, and San Juan Counties all chose fixed payments, and Table 3.31.2 reflects this choice. The Secure Rural Schools and Community Self-Determination Act expired at the end of fiscal year 2012. Unless the law is extended by Congress, all counties would revert to 25% payments under the National Forest Payments Act.

**Table 3.31.2: National Forest Payments in 2010 to Counties of the Analysis Area**

| County | Total of National Forest Payments |
|---|---|
| Archuleta | $558,202 |
| Dolores | $407,952 |
| La Plata | $249,673 |
| Montezuma | $286,451 |
| San Juan | $146,141 |
| Source: USFS (2010b); All Services Receipts, Final Detail Report PNF (ASR 10-03). | |

## Federal Mineral Lease Payments

A portion of federal receipts are also returned to states and local governments from minerals royalties, and these are substantial in the analysis area. Table 3.31.3 shows the amount disbursed to schools and local governments within the State of Colorado from federal mineral lease revenues in 2010.

**Table 3.31.3: Federal Mineral Lease Disbursement to Counties in 2010**

| County | Disbursement in 2010 |
|---|---|
| Archuleta | $12,909 |
| Dolores | $477,768 |
| La Plata | $637,069 |
| Montezuma | $2,338,336 |
| San Juan | $92 |
| Source: Colorado Department of Local Affairs (2012). | |

## Other Federal Payments

Other federal payments to local governments in the analysis area include shares of receipts from the minerals sales from BLM lands. The amount returned was about $15,000 in 2010. Based on reports from Colorado's Office of the State Auditor, the only other federal payments made to counties in the analysis area were from minerals sales under the Materials Act of 1947.

## Colorado Local Property Tax

In Colorado, state law allows local government (counties, cities and towns, schools, and special districts) to tax oil and gas property located within their boundaries. Property tax receipts fund county government services, especially roads and bridges, law enforcement, and the administration of social

BLM_0033630

services at the local level. A county may tax all property within its boundaries, so the share of total revenue a county generates from oil and gas property is proportional its share of assessed value. Table 3.31.4 shows the assessed value of all taxable property in 2010 for each county of the analysis area. The table also identifies the amount and percentage of total assessed value that was contributed by oil and gas property in 2010.

**Table 3.31.4: Total Assessed Value for 2010 and Percentage from Oil and Gas**

| County | Assessed Value | Oil and Gas Assessed Value | Percentage of Property Tax Base from Oil and Gas |
|---|---|---|---|
| Archuleta | $424,332,879 | $20,354,060 | 5% |
| Dolores | $78,952,586 | $36,096,749 | 46% |
| La Plata | $2,354,797,050 | $937,311,060 | 40% |
| Montezuma | $543,765,410 | $241,485,350 | 44% |
| San Juan | $57,605,250 | – | 0% |
| San Miguel | $965,168,630 | $26,180,490 | 3% |
| Total | $4,424,621,805 | $1,235,247,219 | 28% |
| Source: Colorado Department of Local Affairs (2012). | | | |

Where there is more than one school district, the districts divide up the county tax base. In the analysis area, Archuleta, Dolores, and San Juan Counties each contain one school district. La Plata and Montezuma Counties each contain three school districts.

The size of a school district's tax base largely determines the share local property owners contribute to funding their public schools, with general revenue from the state filling in the rest up to the authorized amount per pupil. Since property is taxed where it is found, taxable values including those from oil and gas may be divided up unevenly in cases where there are several districts in a county.

The tax base of a special district is generally a fraction of the larger county tax base because special districts are created to fund improvements and services in specific areas outside cities and towns. Special districts, too, may have uneven shares of a county's total oil and gas property valuation.

Though cities and towns rely mostly on the sales tax (see the section on sales taxes below) they can tax property, and many do, to raise revenue for improvements. However, city limits in the analysis area historically do not contain much oil and gas property, so oil and gas has not been a large revenue source for cities and towns.

Emphasis in the past on development of the San Juan Basin has given La Plata County the majority of oil and gas property value in the analysis area, totaling about $1 billion in 2010 and equaling about 40% of total assessed value in La Plata County (see Table 3.31.4). Montezuma and Dolores Counties have smaller tax bases and smaller amounts of oil and gas assessed value. However, oil and gas was a bigger share of the tax base in 2010 in Montezuma County (44%) and Dolores County (46%). For the analysis area as a whole, oil and gas assessed value was $1.2 billion in 2010 and 28% of total assessed value (Figure 3.31.1).

BLM_0033631

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan



**Figure 3.31.1: Oil and Gas as Share of the Total Property Tax Base in 2010 for All Counties of the
Analysis Area (Source: Colorado Department of Local Affairs 2010b)**

Table 3.31.5 shows how much the different types of local government received from property taxes in
2010 in the analysis area. All types of government in the five counties of the analysis area—
Archuleta, Dolores, La Plata, Montezuma, and San Juan—collected $132 million in property taxes in
2010; the total was $171 million if San Miguel County is included in the group.

**Table 3.31.5: Property Tax Revenue by County for 2010**

| County | County Government | Municipalities and Special Districts | School Districts | Total |
|---|---|---|---|---|
| Archuleta | $7,784,387 | $7,727,449 | $9,402,636 | $24,914,472 |
| Dolores | $2,211,699 | $806,529 | $1,574,946 | $4,593,174 |
| La Plata | $20,015,775 | $20,637,752 | $33,838,662 | $74,492,189 |
| Montezuma | $7,750,832 | $7,670,368 | $11,115,294 | $26,536,494 |
| San Juan | $1,162,416 | $466,030 | $764,652 | $2,393,098 |
| San Miguel | $9,767,507 | $18,495,955 | $10,103,778 | $38,367,240 |
| Source: Colorado Department of Local Affairs (2010b). | | | | |

Colorado severance tax is calculated on the gross income from oil and gas and $CO_2$ production, with
the exception that taxpayers are allowed a credit of 87.5% of the local property tax paid on oil or gas
production (though not the property tax on oil and gas facilities or equipment).

Distribution of total state severance tax revenue is similar to distribution of federal mineral lease
receipts. Fifty percent is retained by the state and 50% goes to the LGMIF. From the LGMIF, 30% is
distributed directly to local governments (using formulas slightly different from but similar to the

BLM_0033632

federal mineral lease formulas). The remainder is for competitive grants to local government. Table
3.31.6 shows the amount of severance tax revenue distributed to the local government in the analysis
area in 2010.

**Table 3.31.6: Severance Tax Revenue Direct Distributions by County for 2010**

| County | County Government | Municipalities | Total |
|---|---|---|---|
| Archuleta | $15,473 | $3,566 | $19,039 |
| Dolores | $55,014 | $23,265 | $78,279 |
| La Plata | $637,728 | $211,961 | $849,689 |
| Montezuma | $194,241 | $74,904 | $269,145 |
| San Miguel | $111,599 | – | $11,599 |
| Source: Colorado Department of Local Affairs (2010a). | | | |

## Sales Tax Revenues

Sales tax rates vary between 1% and 4% for counties and municipalities associated with the planning
area. Due to Colorado's fiscal structure, the sales tax is the most important revenue source for
municipalities. Sales tax collections rise and fall with changes in the migration of people to the
analysis area and the ups and downs of tourist-related sales. Table 3.31.7 shows the sales tax
revenues at the state and local government levels in the analysis area in 2010. The sales tax revenue
to state government is the second largest input to the general fund. The principal local benefit of the
state general fund is funding of public elementary and secondary schools, which is the largest single
line-item appropriation in the state general fund.

**Table 3.31.7: Sales Tax Revenues to Colorado and Local Government, 2010**

| County | To State<br>FY 2010 | To County<br>Government<br>FY 2010 | To Cities<br>& Towns<br>FY 2010 | Total to County,<br>Cities, and Towns<br>FY 2010 |
|---|---|---|---|---|
| Archuleta | $3,315,087 | $2,858,733 | $1,713,801 | $4,572,534 |
| Dolores | $230,347 | $0 | $156,879 | $156,879 |
| La Plata | $20,136,534 | $13,887,265 | $15,778,346 | $29,665,611 |
| Montezuma | $7,471,917 | $0 | $8,842,891 | $8,842,891 |
| San Juan | $351,871 | $446,487 | $108,384 | $554,871 |
| Total | $31,505,756 | $17,192,485 | $26,600,301 | $43,792,786 |
| Source: Colorado Department of Revenue (2010) for sales tax revenue to the State of Colorado. Local government tax revenue was estimated by Lloyd Levy Consulting LLC. | | | | |

## Local Government Costs

As population increases occur, private development often increases near USFS and BLM boundaries.
Typically, homes situated adjacent to planning area boundaries offer more privacy, better views,
greater opportunities for recreation and wildlife viewing, and more pleasant immediate surroundings
than those situated further away from public lands. These amenities are highly valued by
homeowners. However, along with these developments come higher costs of services provided by
local governments. Irregular boundaries, less developed roads, and longer distances from community
centers make for expensive law enforcement, public school systems, and emergency services.

BLM_0033633

The costs borne by local governments for serving visitors to the planning area include law enforcement and judicial services and rescue and other emergency services, as well as the costs associated with increased wear on local public infrastructure.

## Road Maintenance and Improvement

The state highway system, county road networks, municipal streets, and USFS/BLM roads form the transportation network in southwest Colorado. Public lands are often accessible only by county road and municipal streets. Some costs are associated with providing maintenance for roads taking public use traffic onto public lands.

The use of heavy trucks results in increased impacts to roads when compared to passenger vehicles. Oil and gas development and construction are the two principal sources of heavy truck traffic in non-municipal parts of the analysis area.

Some counties of the analysis area have directly addressed the cost of road use by oil and gas development. La Plata County has individual MOUs with each operator of the wells in the 80-acre infill area of the Fruitland Formation, a gas field. The fee in 2012 was $8,900 per well. The fee is based on an assessment of the cost of the county road maintenance required when produced water (water that comes from a well along with the gas) is taken away by pipeline instead of by truck. The direct costs of water trucking have not been studied recently.

### 3.31.3 Environmental Consequences

### Direct and Indirect Impacts

An estimate of the value of LRMP outputs under each alternative drives assessment of local government fiscal impacts. Impacts to public revenues were estimated by applying factors extrapolated from recent trends or taken directly from the tax rates and apportionments stated in Colorado law and regulations. For each type of revenue, the change in LRMP outputs is translated into a resulting increase or decrease in local government revenue under Alternative A and the difference between other alternatives and Alternative A.

The mechanics of revenue collection, the timing of payments, and the intergovernmental transfers that occur under state law justify the classification of all revenue impacts as "indirect" impacts of the alternatives. Some revenues are more direct than others, as in the case of federal mineral lease and Colorado severance tax direct distributions to local government and the local government property tax.

Sales tax revenues at all levels are an indirect impact because they arise from market transactions that are partly secondary to industry spending and that hinge upon choices made by businesses and households located some distance in time and place from resource development.

Grants and loans made to local government from federal mineral lease and severance tax receipts are discretionary and therefore indirect. The grant program was suspended altogether in August 2010 so that funds could be diverted to the state's general fund to help address budget shortfalls. It was reinstated in 2012 with a new round of grants to be issued starting in February 2013.

## Comparison among Alternatives

The state and local government revenue impacts under the SJNF and TRFO minerals programs would vary by alternative. The differences among the alternatives, as presented below, have been

BLM_0033634

calculated for the year 2020. Using Alternative A as a reference point, impacts would generally be lower (less revenue) under Alternatives B and C and higher (more revenue) under Alternative D.

The differences among the alternatives are small and may become very small or even nil in specific instances when the impacts are rounded to thousands of dollars, which is an appropriate way to express the magnitude of these projections given the kinds of uncertainty and the inherent imprecision that surrounds them.

The impacts to revenues are shown below in the order they were presented in the Affected Environment section above. The section concludes with a qualitative assessment of the impact to local government costs.

Impacts to Payment in Lieu of Taxes

Current law requires that a county's PILT be reduced dollar for dollar by the FML payments they receive, down to a minimum PILT allowance. Using these assumptions, PILT payments for Archuleta, La Plata, and San Miguel Counties would not change under the alternatives because predicted rises in federal mineral lease payments (see below) would be offset equally by lowering PILT. Dolores and Montezuma Counties have already been receive the minimum allowed PILT, so PILT would not be affected by the alternatives and impacts to federal mineral lease payments to these counties would be a net gain.

Impacts to National Forest Payments

The Secure Rural Schools and Community Self-Determination Act expired at the end of fiscal year 2012 and has not been reauthorized by Congress in the current term. This analysis has assumed the Secure Rural Schools and Community Self-Determination Act would not be reauthorized and that all counties in the planning area would receive payments equaling 25% of receipts under the original Forest Payments Act.

Payments under the Forest Payments Act would be very similar across all of the alternatives and counties would receive much less under the 25% rule than they have previously under the Secure Rural Schools and Community Self-Determination Act. In 2010, total national forest payments under the Secure Rural Schools and Community Self-Determination Act were $1.8 million total to the counties in the planning area as a whole. Under the 25% rule, payments to these counties going forward would likely total about $200,000. This amount would not vary across the alternatives. If Congress extends the Secure Rural Schools and Community Self-Determination Act, payments would likely be closer to those of the past.

National forest payment amounts do not vary much across alternatives because they are based on the SJNF and TRFO timber, recreation, range, special uses, and non-oil and gas minerals programs. These programs are generally smaller than the oil and gas leasing program and they do not vary by alternative.

Impacts to Federal Mineral Lease Payments

Federal mineral lease royalty payments to the State of Colorado are one of the most immediate revenue effects of the LRMP alternatives. The payments directly shadow the value of oil and gas produced from federal minerals.

Approximately 49% of FML royalties are returned to the state. Twenty percent of the state's receipts are directly distributed to local general-purpose governments according to a formula based on the

BLM_0033635

royalty revenue generated by the county, oil and gas worker residency at the county and municipal level, and population and road miles at the sub-county level. Another 1.7% is directly distributed to local school districts according to a formula based on the royalty revenue generated directly by each county, worker residency by county and place, and the number of oil and gas related students by school district.

Table 3.31.8 presents the impact to the state's federal mineral lease receipts under the range of alternatives in the year 2020, assuming a 12.5% royalty rate on the projected value of production at the 2010 price of $3.96 per thousand cubic feet.

**Table 3.31.8: Impacts to Local Receipts from Direct Distribution of Federal Mineral Lease Revenue in 2020 by Alternative (in thousands of dollars)**

| County | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | | No Leasing Alternative |
|---|---|---|---|---|---|---|
| | | | Alternative B | Alternative C | Alternative D | |
| Archuleta | $871,871 | $3,266 | ($41) | ($33) | $6 | $(403) |
| Dolores | $139,213 | $120,400 | ($1,509) | ($1,208) | $232 | ($14,856) |
| La Plata | $552,252 | $160,638 | ($2,013) | ($1,611) | $310 | ($19,821) |
| Montezuma | $156,648 | $589,656 | ($7,389) | ($5,914) | $1,137 | ($72,756) |
| San Miguel | $0,826 | $2,167 | ($779) | ($623) | $120 | ($7,671) |

Other state and local federal mineral lease revenues are also considerable but uncertain, so they are not estimated here. These include the 20% of state federal mineral lease receipts from production royalties that go to the Energy and Minerals Impact Assistance Fund for competitive grants to local jurisdictions that were reinstated in May of 2012 after have been suspended in 2010. The announced resumption included plans to grant $20 million to local governments affected by energy minerals development beginning as early as February 2013.

Federal mineral lease receipts from production royalties are also retained at the state level for the Public School Fund, the Water Conservation Board, and the Higher Education Fund. Federal mineral lease bonus payments (one-time payments made when a mineral lease is granted) go to the Higher Education Reserve Fund and the Local Government Permanent Fund. The latter is used to smooth out the direct distributions to local government.

Impacts to Other Federal Payments

In the SJNF and TRFO, this category of federal payments includes just the sale of materials under the Materials Act of 1947. The total received in the past for the entire SJNF and TRFO has been about $15,000. No impact is predicted to this current level of receipts under the alternatives.

Impacts to the Colorado Local Property Tax

The local property tax on oil and gas development is location-specific. The tax is levied and received by the jurisdiction that contains the well or other property. Most taxable value is directly attributable to the mineral estate (the minerals deposit that lies underground); the adjusted sales value of the oil or gas that is produced and sold is used as the actual value of this kind of property. Approximately 87.5% of the actual value is the assessed value subject to the tax rate, or mill levy.

The LRMP alternatives locate new wells by county only, so there is no way to project revenue to particular jurisdictions. Instead, Table 3.31.9 presents an estimate of total "rural" property tax revenue, assuming virtually all development is outside cities and towns. The tax rate that is used to

BLM_0033636

make the projected revenue is the average calculated for all non-municipal tax jurisdictions using the last year of complete data, which is 2010 for this analysis.[1] As is done when calculating the impacts to federal mineral lease payments, production is valued for the property tax calculation at the 2010 price of $3.96 per thousand cubic feet.

**Table 3.31.9: Impacts to Local Property Tax in 2020 by Alternative (in thousands of dollars)**

| County | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | | |
|---|---|---|---|---|---|---|
| | | | Alternative B | Alternative C | Alternative D | No Leasing Alternative |
| Archuleta | $24,914 | $1,620 | ($20.30) | ($16.25) | $3.123 | $2,800 |
| Dolores | $4,593 | $1,748 | ($21.91) | ($17.54) | $3.371 | $1,533 |
| La Plata | $74,492 | $3,053 | ($38.25) | ($30.61) | $5.885 | $2,676 |
| Montezuma | $26,536 | $3,794 | $7.315 | ($38.05) | $7.315 | $3,326 |
| San Miguel | $38,367 | $1,091 | ($13.67) | ($10.94) | $2.104 | $956.5 |

Impacts to the Colorado Severance Tax

Impacts to revenue from severance tax direct distributions in 2020 to counties in the analysis area would be small in absolute terms under all alternatives and small relative to the base year. Table 3.31.10 presents the sum of local government receipts within each county.

**Table 3.31.10: Impacts to Local Receipts from State Severance Tax in 2020 by Alternative (in thousands of dollars)**

| County | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | | |
|---|---|---|---|---|---|---|
| | | | Alternative B | Alternative C | Alternative D | No Leasing Alternative |
| Archuleta | $19.04 | $0.315 | ($0.004) | ($0.003) | $0.001 | $0.284 |
| Dolores | $78.28 | $2.519 | ($0.032) | ($0.025) | $0.005 | $2.272 |
| La Plata | $849.7 | $13.04 | ($0.163) | ($0.131) | $0.025 | $11.76 |
| Montezuma | $269.1 | $5.038 | ($0.063) | ($0.051) | $0.010 | $4.545 |
| San Miguel | $111.6 | $0.441 | ($0.006) | ($0.004) | $0.001 | $0.398 |

Severance tax direct distributions to local governments come from a pool of 15% of total severance tax payments to the state. Another 35% of the total goes to the Energy and Minerals Impact Assistance Fund, where it is commingled with the earmarked federal mineral lease receipts and used for grants and loans as described above. As a whole, the severance tax is a variable source of revenue and is difficult to project from just the trend in the value of production. This is because payments in a given year are reduced by the allowance of a deduction for the property taxes paid by the operator 2 years ago.

Impacts to the Colorado State and Local Sales Tax

The sales tax is the most important revenue source for municipalities and is a substantial revenue source for some counties in the analysis area. Table 3.31.11 presents impacts to state and local

---

[1] For each county, the 2010 average rural tax rate (expressed in "mills" or cents per thousand dollars of assessed value) is derived by subtracting the municipal property tax revenue from the total property tax revenue and dividing by total county assessed value. The revenue estimate approximates the sum impacts to the property tax revenue of county government, school districts, and special districts from new wells in rural areas of each county.

BLM_0033637

sales tax revenue originating in the analysis area in 2020 compared across all alternatives. Projections of the total economic impact of each alternative, as presented in Section 3.29 of this document, drive the sales tax impacts.[2] The impacts in the table reflect only the business activity attributable to the use and development of resources on the SJNF and TRFO. The base year 2010 revenue shown for purposes of comparison is an estimate of the contribution of business activity attributable to use and development of resources on the SJNF and TRFO at the 2010 level and before potential change due to the alternatives.

**Table 3.31.11: Impacts to State and Local Sales Tax in 2020 by Alternative (in thousands of dollars)**

| County of Origin | Paid to | 2010 Base Year | 2020 Alternative A | Change from Alternative A in 2020 | | | |
|---|---|---|---|---|---|---|---|
| | | | | Alternative B | Alternative C | Alternative D | No Leasing Alternative |
| Archuleta | State | $639.5 | $840.0 | ($6.1) | ($7.2) | $4.7 | $160.2 |
| | Local | $882.0 | $1,158.6 | ($8.4) | ($10.0) | $6.5 | $220.9 |
| Dolores | State | $56.19 | $82.98 | ($0.7) | ($1.2) | $1.3 | $21.0 |
| | Local | $38.27 | $56.52 | ($0.5) | ($0.8) | $0.9 | $14.3 |
| La Plata | State | $2,944.1 | $5,059.9 | ($52.1) | ($53.4) | $25.7 | $1,676.0 |
| | Local | $4,337.4 | $7,454.3 | ($78.3) | ($78.6) | $37.8 | $2,469.1 |
| Montezuma | State | $983.8 | $1,560.5 | ($15.0) | ($16.6) | $10.1 | $457.8 |
| | Local | $1,164.3 | $1,846.8 | ($17.7) | ($19.6) | $12.0 | $541.8 |
| San Juan | State | $70.31 | $88.40 | ($0.5) | ($0.6) | $0.3 | $14.5 |
| | Local | $110.87 | $139.41 | ($0.8) | ($0.9) | $0.5 | $22.8 |

Impacts to Local Government Costs

Local governments in the analysis area shoulder the cost of providing general government services, such as property assessment, recordation of documents, elections, planning, and finance. Local governments also provide police and detention services, either through the county sheriff or through municipal departments. They operate courts and employ judges, administer and house local and state funded social services programs, and maintain and repair roads.

Impacts to county expenditures from the LRMP alternatives may be expected to some degree, but they have not been quantified for this analysis. Comparing the alternatives in terms of indicators that have been quantified, namely the employment impacts described in Section 3.29 (of this document) and the revenue impacts described above, strongly indicates that impacts to government costs, should they occur, would be very much the same regardless of alternative.

Past experience in the analysis area and in other public lands regions of Colorado has identified which activities associated with SJNF and TRFO resources are most likely to impose costs on local government under the LRMP alternatives. Passenger vehicle and light truck traffic is the predominant impact associated with recreation resources. The use of heavy trucks for other types of development causes higher impacts to public roads than do the passenger vehicles and light trucks of local residents, livestock operators, and tourism and recreation users of public lands.

---

[2] The net sales tax yield as a percentage of gross sales was calculated for each industry in the economic model for the base year 2010. This percentage was held constant for all years and for all counties in the model, so the projections of sales tax impacts reflect only the projected changes by alternative in economic activity, expressed as gross sales. The source for data for the net sales tax yield is Colorado Department of Revenue (2010).

BLM_0033638

Oil and gas development is the predominant heavy industrial use of SJNF and TRFO resources anticipated under the alternatives. The labor force commuting associated with this activity may subject specific public roads to traffic volumes and axle weights that exceed design capacities and structure. This can raise maintenance, repair, and policing costs. Well sites and facilities may require more service and different types of equipment than public safety agencies might use otherwise for typical urban and rural needs and the light vehicle traffic associated with commuting.

Detailed quantitative analysis is needed but not provided here to determine whether these types of costs related to oil and gas activities would exceed revenues under the alternatives. State policy intends for impact revenues from minerals development, as projected above, to balance development-driven impact costs.

Impacts to government operating costs from demand for housing and community services also may occur within the region. These costs are driven by population changes associated with the employment impacts projected in Section 3.29, Economics. The pattern set by minerals development in the region in the recent past is for contractors and their workers to commute into the area from Farmington, New Mexico, which is the region's industry hub. If the pattern holds, population growth and associated community services costs related to the SJNF and TRFO minerals programs would be avoided.

The size of the SJNF and TRFO minerals programs, as measured by the number of wells that would be developed under the alternatives, indicates that the future pace of development would be comparable to that of the recent past. This strongly suggests that new demand for community services that can be tied specifically to the alternatives would be limited, and it is likely that local government would be able to serve limited community growth from the alternatives, should it occur, within the current revenue structure.

In the past, additional costs over and above those offset by the state and local revenues shown above have been identified in connection with oil and gas development. Each county of the analysis area has addressed the issue in its own way, consistent with legal requirements and the local political consensus.

Most past oil and gas development on the SJNF and TRFO has focused, in stages over time, on extraction from conventional, unconventional, and coalbed formations, with $CO_2$ gas being a resource unique to Montezuma County. The local policies of the past on the management of the fiscal impact of oil and gas development have been based on the experience of these resource types. Different amounts or types of impact may occur as development occurs in shale formations. This possibility is noted here but not examined for lack of a specific "track record" for this type of activity.

BLM_0033639

# CHAPTER 4 – PUBLIC INVOLVEMENT AND COORDINATION

## 4.1 Introduction

This FEIS and LRMP represent the efforts and involvement of a broad range of participants, including public agencies, tribal councils, and private organizations and individuals. The BLM and USFS met and consulted with various federal, state, tribal, and local agencies throughout the process, including coordination with the Town of Rico and Montezuma County, which assumed more formal roles as cooperating agencies. The SJNF and TRFO conducted and attended many meetings throughout the planning process to keep all interested parties informed and to solicit opinions and input germane to management of resources within the planning area. SJNF and TRFO staff and community participants engaged in dozens of professionally facilitated, well-attended planning events, meetings, study groups, and workshops. In an effort that has far exceeded requirements and typical expectations for public involvement processes, the SJNF and TRFO engaged citizens, community organizations, and government agencies using professional support and innovative media and forums that focused community input directly toward development of the LRMP and FEIS. The focus on features, uses, and conditions of the land resulted in remarkably civil and thoughtful conversations and comments that are pertinent to the task at hand: revising the plans that guide decision-making about managing the land under the jurisdiction of the USFS and BLM. The bulk of this public outreach effort was focused toward the beginning of the plan revision process so that the LRMP could be developed around the issues of most concern to the public.  This chapter summarizes this effort.

## 4.2 Summary of the Scoping Process

The USFS and BLM conducted a broad, thorough, and innovative community-based public input process that far exceeds the typical efforts of a federal lands scoping process and easily meets the basic requirements. The scoping process included several components summarized in Table 4.2.1.

Table 4.2.1: Scoping Overview

| Scoping Component | Duration | Forum |
|---|---|---|
| Study groups | Jan. 2005–Jan. 2006 | 21 facilitated open public meetings |
| On-site town meetings | Summer 2005 | 3 facilitated open public meetings |
| Recreation interviews | Jan.–May 2004 | 83 interviews with recreation groups, outfitters, conservationists |
| Written comments | 1999–2006 | Written comments submitted to the SJNF and TRFO |
| Governmental water roundtable | May 2005 - March 2006 | 10 monthly meetings |
| Aspen workshop | Dec. 2004 | 1 focused workshop |

### 4.2.1 Study Group Meetings

The core of the community input process consisted of 21 study group meetings over a period of 8 months with more than 450 registered attendees (many of which attended several meetings) and dozens of "drop-ins" that attended meetings or portions of meetings but chose not to register for the meetings (see Table 4.2.2). Some meetings attracted over 100 participants. Meetings were held according to 35 specific geographic areas or landscapes making up the planning area (see Table 4.2.2).

BLM_0033640

All study group meetings were well attended by SJNF and TRFO staff representing the full spectrum of land management disciplines and creating a broad knowledge base for meeting discussions. SJNF and TRFO staff introduced each landscape and provided an active role in facilitating and informing all meeting exercises and discussions. The Fort Lewis College Office of Community Services developed the study group concept and provided meeting scheduling and logistics and partnered with RPI Consulting, facilitator Marcia Porter-Norton, and other local planning professionals for facilitation and comment processing of the study group meetings.

Each study group meeting was open to all participants and was heavily advertised. Each week prior to a scheduled meeting, agency staff sent public notices to dozens of media and information clearinghouse organizations, including the Durango Herald, Denver Post, DCAT TV, KDUR, City Span TV, KSUT, HubWest, Cortez Journal, Telluride Daily Planet, KVFC, Southern Ute Indian Tribe, Free Press, Mancos Times, Rico Bugle, Pagosa Sun, Pine River Times, High Country News, Durango Telegraph, and many other key information dissemination contacts. Meetings were also posted on the official planning website hosted by Fort Lewis College Office of Community Services.

**Table 4.2.2: Study Group Meetings**

| District and Meeting Location | Meeting Date | Geographic Focus |
|---|---|---|
| Columbine District FLC Ballroom, Durango, CO | 1/25/2006 | Missionary Ridge, Lakes |
| | 2/22/2005 | Hermosa Creek, La Plata Canyon, Wild Oats |
| | 3/30/2005 | Durango, Mayhan |
| | 4/21/2005 | Beaver Meadows and HD Mountains |
| | 5/24/2005 | Weminuche, Silverton, Animas Valley |
| | 6/29/2005 | Vision and Niche Statement |
| | 8/04/2005 | Vision and Niche Statement and Wrap-up |
| Dolores District KoKo's, Cortez, CO | 1/20/2005 | Upper Dolores, Mesas |
| | 2/17/2005 | Boggy Draw, Big Glade |
| | 3/17/2005 | Haycamp Mesa, Mancos-Cherry Creek |
| | 4/14/2005 | Dove Creek, McPhee, and Cortez |
| | 5/18/2005 | Slick Rock, Dry Creek, Disappointment |
| | 6/29/2005 | Vision and Niche Statement |
| | 8/04/2005 | Vision and Niche Statement and Wrap-up |
| Pagosa District Jr. High, Pagosa, CO | 1/27/2005 | Williams Reservoir |
| | 2/24/2005 | Turkey Springs, Ute |
| | 3/31/2005 | Mosca, Piedra |
| | 4/28/2005 | Wolf Creek, Pagosa |
| | 5/25/2005 | Square Top, South San Juan |
| | 6/30/2005 | Vision and Niche Statement |
| | 8/02/2005 | Vision and Niche Statement and Wrap-up |
| On-site Meetings | 6/07/2005 | Norwood On-site Meeting: Norwood Area |
| | 6/28/2005 | Silverton On-site Meeting: Silverton, Weminuche |
| | 8/31/2005 | Rico On-Site Meeting: Rico Area |

Each participant attending the study group meeting had the opportunity to register four written place-specific comments about each landscape covered in each meeting. The comments were organized

BLM_0033641

into four categories: Primary Use, Outstanding Features, Concerns, and Opportunities.  Participants
recorded each of the written comments on individual comment sheets while they placed
corresponding icon stickers representing various comment categories (motorized uses, pet impacts,
wildlife habitat, mineral and gas development, etc.) onto full-sized maps to specify the location
specific to the comment. Well over 3,000 place-specific comments were collected in this manner.

At the beginning of each study group meeting, participants viewed a slide show presenting the
aggregate results of the individual, place-specific comments about the landscapes from the previous
meeting in 3-D format. Taking this into consideration, study group participants were randomly
assigned to tables with five to 10 participants, one or two professional facilitators, and a SJNF or
TRFO staff member to discuss the draft management themes for each landscape. Each comment
was recorded by the facilitators during the meeting.

The Fort Lewis College Office of Community Services and RPI Consulting entered all of the input
received during study group meetings into a master database and presented it in map database
format, enabling agency staff and the interested public to view the comments in their geographic
context. Processed comments and accompanying maps were posted on the official planning website
so that they were accessible to anyone visiting the website. Processed public input was distributed to
LRMP interdisciplinary team meetings where it was carefully considered in the initial stages of
planning and in drafting the alternative management themes.

## 4.2.2   On-site Town Meetings

Since the geographic extent of the SJNF and TRFO encompasses many different transportation
corridors, some communities such as Norwood, Rico, and Silverton are isolated from the core of the
planning area along U.S. 160, where the majority of the meetings took place. In order to encourage
geographically diverse participation and to reach these communities, the SJNF and TRFO took the
study group meetings on the road. These meetings were conducted similarly to the regular study
group meetings in Cortez, Durango, and Pagosa Springs and were heavily advertised and relatively
well attended, with 50+ participants in Silverton, for example.

## 4.2.3   Recreation Interviews

Recognizing the importance of recreation for public lands planning and to lifestyles in the Southwest,
the USFS and BLM initiated a recreation group interview process, conducted by the Fort Lewis
College Office of Community Services partnering with RPI Consulting. In total, 83 interviews were
conducted with leaders of organized recreation groups, commercial outfitters, stewardship groups,
outdoor equipment retailers, and other organized groups with an interest in recreation on public lands.
RPI Consulting built a geographic database of the interviews to capture place-specific comments and
produced a qualitative summary of the interview findings for use in the planning process. These
interviews, conducted during the winter of 2004, were an important component of the information and
public input foundation upon which the ensuing recreation components of the scoping process were
built.

## 4.2.4   Written Comments

More than two dozen written comments were submitted to the SJNF and TRFO during the initial
scoping period beginning in 1999. This may be a relatively low number of written comments for a full
plan revision, but is indicative of the extra time and resources devoted to conducting a meaningful
scoping process built on the diverse set forums for authentic community participation.  Nonetheless,
written comments are an important form of community input and generally offer well-written, concise

BLM_0033642

statements about specific issues. The written comments represent a broad array of interests ranging from potentially adverse impacts of WSR designations on private land values to a call for protection of three specific freshwater springs in the HD Mountains. Many of the written comments are summaries of concerns voiced during informal meetings with agency staff.

## 4.2.5   Governmental Water Roundtable

Water resource concerns cut across jurisdictional boundaries and so should planning efforts surrounding water. Recognizing the jurisdictional complexity of water resource management, the USFS and BLM invited local governments, tribal representatives, water conservation districts, and state agencies to be part of the Governmental Water Roundtable. In total, 10 Governmental Water Roundtable meetings were held between May 2005 and March 2006.  The purpose of this effort was to:

- Develop mutual understanding of key local issues related to water;
- Develop ideas for the LRMP;
- Guide land management agencies to make water resource portions of land management plans more accessible and easily identifiable;
- Identify issues beyond the scope of the LRMP and discuss forums that would be appropriate for working on those issues; and
- Evaluate proposed and existing WSR designations for area rivers.

## 4.2.6   Aspen Workshop

The SJNF convened a focused "aspen workshop" in order to draw insights from a number of local and regional authorities on various aspects of aspen ecology, function, and management. Topics included aspen ecology and interdependency with wildlife history and implications of aspen management, the role of aspen in the regional economy, and aspen aesthetics and environmental values.  Broad sponsorship for this focused resource workshop included the SJNF, Montezuma County Federal Lands Program, Fort Lewis College Office of Community Services, Mountain Studies Institute, Colorado Timber Industry Association, Rocky Mountain Experiment Station, San Juan Citizens Alliance, Colorado Wild, and Colorado State Forest Service.

## 4.2.7   Other Relevant Planning Efforts

The LRMP and FEIS draw from an enormous depth of information and community input. Several important planning efforts have been underway during the LRMP revision process, and the USFS and BLM have applied knowledge gained from these related efforts to the LRMP revision.  These efforts include community wildfire protection planning, the Northern San Juan Basin Coal-Bed Methane Environmental Impact Statement and Record of Decision (2006), development of the CRA regulations, the Biodiversity Model Project, various USFS and BLM travel management plans, and many other planning projects that have occurred since the initiation of the LRMP revision in 2004.

# 4.3  Cooperating Agencies

To integrate a regional land management perspective into the LRMP, the USFS and BLM invited more than 30 local governments, tribes, and state and federal agencies to become cooperating agencies for the LRMP revision process (Table 4.3.1). Cooperating agency status provides the opportunity for USFS and BLM managers and other government leaders to work together to achieve desired land management outcomes. It also offers the opportunity for interested agencies or

BLM_0033643

governments to take on additional roles and responsibilities beyond basic participation opportunities such as attending public meetings and reviewing and commenting on draft documents.

**Table 4.3.1: Cooperating Agency Invitees**

| City | County | State of Colorado | Federal | Tribes |
|------|--------|-------------------|---------|--------|
| Bayfield | Mineral | Governor | USFWS | All affiliated tribes (see Table 4.4.1 below) |
| Ignacio | Archuleta | Colorado Department of Natural Resources | Bureau of Reclamation | |
| Pagosa Springs | Hinsdale | CPW | Mesa Verde | |
| Durango | La Plata | Colorado Department of Transportation | USDA - Animal and Plant Health Inspection Service - Wildlife Services | |
| Cortez | Montezuma | State Historic Preservation Office | | |
| Dolores | Dolores | | | |
| Mancos | San Juan | | | |
| Rico | San Miguel | | | |
| Silverton | Conejos | | | |
| Telluride | Rio Grande | | | |
| Dove Creek | | | | |

In addition to being specifically invited to be cooperators, these governments and agencies were encouraged to attend study group meetings with public notices sent to key government or agency contacts for each meeting.  The Town of Rico and Montezuma County formally agreed to be cooperating agencies during the planning process and developed an MOU with the USFS and BLM outlining each party's various responsibilities with regard to the planning process.

Additionally, representatives from other interested federal and state agencies and tribes provided the USFS and BLM with ongoing verbal and/or written comments, as well as planning information, including geographic data layers and information. During May and June 2013, USFS and BLM officials met with the Boards of County Commissioners from Archuleta, Dolores, Hinsdale, La Plata, Mineral, Montezuma, San Juan, and San Miguel Counties to provide a general overview of the LRMP.  Agency officials met with the Town of Rico in May 2013.

## 4.4 Consultation with Tribes

In accordance with NEPA, the NHPA, and EO 13007, the USFS and BLM have consulted with the 26 tribes affiliated with lands managed by the SJNF and TRFO since the initiation of the LRMP revision effort.  All 26 tribes were informed of the process and were offered a visit from agency officials to gather input and provide further information about the LRMP revision (Table 4.4.1). These tribes were invited to be cooperating agencies on the LRMP revision.

**Table 4.4.1: Affiliated Tribes**

| | |
|--|--|
| Jicarilla Apache Nation | Pueblo of San Ildefonso |
| Kewa Pueblo  (formerly Pueblo of Santo Domingo) | Pueblo of Sandia |
| Navajo Nation | Pueblo of Santa Ana |

BLM_0033644

| | |
|---|---|
| Ohkay Owingeh (formerly Pueblo of San Juan) | Pueblo of Santa Clara |
| Pueblo of Acoma | Pueblo of Taos |
| Pueblo of Cochiti | Pueblo of Tesuque |
| Pueblo of Isleta | Pueblo of Zia |
| Pueblo of Jemez | Southern Ute Indian Tribe |
| Pueblo of Laguna | The Hopi Tribe |
| Pueblo of Nambe | Uintah and Ouray Ute Indian Tribe |
| Pueblo of Picuris | Ute Mountain Ute Tribe |
| Pueblo of Pojoaque | Ysleta del Sur Pueblo |
| Pueblo of San Felipe | Zuni Tribe |

During the course of the planning process there were several face to face meetings with the tribes and pueblos, in addition to letters updating them on the progress of the LRMP and inviting them to consult. Table 4.4.2 summarizes these consultation efforts. Comment letters were received from some of the tribes during the formal comment periods for the Draft EIS and Supplement to the Draft EIS. Details and full text of comments can be found in the project record.

**Table 4.4.2: Tribal Consultation**

| Step in Process | Date | Forum | Tribes/Pueblos Involved | Results |
|---|---|---|---|---|
| Scoping | Jan. 20, 2005 | Letter and invitation to be cooperators | 26 affiliated tribes | Jicarilla requested meeting. |
| | Mar. 10, 2005 | Meeting | Jicarilla Apache Nation | No comments. |
| Draft LRMP/EIS | Oct. 5, 2007 | Meeting with Mark Stiles, Center Manager, San Juan Public Lands Center | Navajo Nation, Pueblo of Jemez, Pueblo of Laguna, Pueblo of Nambe, Pueblo of Santa Ana, Pueblo of Santa Clara | No comments. |
| | Oct. 16, 2007 | Meeting with Mark Stiles, Center Manager, San Juan Public Lands Center | Ute Mountain Ute Tribal Council | No comments. |
| | Oct. 19, 2007 | Letter | Southern Ute Tribal Chairman | No response. |
| | Dec. 14, 2007 | Draft LRMP/EIS documents and letter | 26 affiliated tribes | No comments. |
| | Jan. 15, 2008 | Follow-up letter | 26 affiliated tribes | March 2008: The Navajo Nation stated they did not have any Traditional Cultural Properties within the SJNF and TRFO.  The letter also stated that they wished to be kept informed of the planning process. The Hopi Tribe stated they would prefer the No Lease Alternative, and that they consider all Ancestral Puebloan sites within the SJNF and TRFO to be Traditional Cultural Properties. |

BLM_0033645

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

| Step in Process | Date | Forum | Tribes/Pueblos Involved | Results |
|---|---|---|---|---|
| Draft LRMP/EIS (Continued) | April 23, 2008 | Hopi CRATT meeting in Kykotsmovi, Arizona, with Mark Stiles, Center Manager, San Juan Public Lands Center, Thurman Wilson, Assistant Center Manager for Planning, and Julie Coleman, San Juan Public Lands Lead Archaeologist | The Hopi Tribe | Preferred Alternative C and the No Leasing Alternative. Would like the LRMP/EIS to focus on special designations to prevent surface disturbance on more of a landscape scale instead of at the site scale. Leasing stipulations were explained by specific area. They stated that they are most interested in the more southern half of the planning area, including Chimney Rock. They stated that enlarging the area around Chimney Rock with CSU or NSO is a good example of what they want. |
| | Sept. 9, 2009 | Annual USFS and BLM tribal consultation meeting held at the Anasazi Heritage Center, with Mark Stiles, Center Manager, San Juan Public Lands Center | Navajo Nation, Pueblo of Acoma, Pueblo of Cochiti, Pueblo of Isleta, Pueblo of Jemez, Pueblo of Nambe, Pueblo of San Ildefonso, Pueblo of Sandia, Pueblo of Santa Ana, Pueblo of Santa Clara, Pueblo of Zia, Southern Ute Indian Tribe, Ute Mountain Ute Tribe, Ysleta del Sur Pueblo, Zuni Tribe | No comments. |
| | Sept. 7, 2010 | Annual USFS and BLM tribal consultation meeting held at the Anasazi Heritage Center with Mark Stiles, Center Manager, San Juan Public Lands Center | Jicarilla Apache Nation, Ohkay Owingeh, Pueblo of Jemez, Pueblo of Nambe, Pueblo of Santa Ana, Pueblo of Santa Clara, Southern Ute Indian Tribe, Ute Mountain Ute Tribe, Pueblo of Acoma, Zuni Tribe | The Southern Ute Indian Tribe had questions about the impact of fracturing geologic formations on the water. Ohkay Owingeh wanted to know how much the federal government receives from the oil and gas leases. |

638

BLM_0033646

| Step in Process | Date | Forum | Tribes/Pueblos Involved | Results |
|---|---|---|---|---|
| Supplemental LRMP/EIS | Sept. 8, 2011 | Annual USFS and BLM tribal consultation meeting held at the Anasazi Heritage Center, with Mark Stiles, Center Manager, San Juan Public Lands Center | Jicarilla Apache Nation, Navajo Nation, Ohkay Owingeh, Pueblo of Acoma, Pueblo of Jemez, Pueblo of Nambe, Pueblo of San Ildefonso, Pueblo of Santa Ana, Pueblo of Santa Clara, Pueblo of Zia, Southern Ute Indian Tribe, Ute Mountain Ute Tribe, Northern Ute Tribe | Ohkay Owingeh concerned over the impact of drilling to water. Thought it would be good if there was a bit more control so it could be done step by step, maybe the local tribal experts (Southern Ute, Jicarilla, and Ute Mountain Ute) could be involved. The Navajo Nation questioned when and how cultural surveys are required within the leasing/development process on such a large geographic area. Santa Ana Pueblo was concerned that the tribes do not have an opportunity to participate. This impacts their ancestral homes. |
|  | Sept.28, 2011 | Supplement to the Draft EIS | 26 affiliated tribes | No formal comments. |
|  | Sept. 6, 2012 | Annual USFS and BLM Tribal consultation meeting held at the Anasazi Heritage Center, with Mark Stiles, Supervisor, SJNF and  Connie Clementson, Tres Rios Field Office Manager | Jicarilla Apache Nation, Ohkay Owingeh, Pueblo of Acoma, Pueblo of San Ildefonso, Pueblo of Santa Ana, Pueblo of Santa Clara, Southern Ute Indian Tribe, The Hopi Tribe, Ute Mountain Ute Tribe | No comments. |

## 4.5  Public meetings on Draft Land and Resource Management Plan and Environmental Impact Statement

In early 2008, accompanying the release of the Draft LRMP and EIS, and during the comment period, the SJNF and TRFO held a series of 10 public meetings: three were held in Durango, two in Cortez, two in Pagosa Springs, one in Rico, one in Silverton, and one in South Fork.  Approximately 650 people attended these meetings.

Meetings were also held with many governmental entities including the EPA, CPW, Mesa Verde National Park, the Colorado State Historic Preservation Office, the Town of Rico, and the surrounding county governments of La Plata, Montezuma, Mineral, and San Miguel.  Tribal meetings are described in Section 4.4 above.

Additionally, meetings were held with stakeholder groups who had been involved with development of the LRMP, such as the Governmental Water Roundtable, San Juan Citizen's Alliance, Southwest Resource Advisory Council, Town of Ouray, and Air Quality Stakeholders Group.

BLM_0033647

The purpose of all of these meetings was to answer questions and explain the content of the Draft LRMP and EIS. The meetings also encouraged submission of comments during the official 120-day comment period.

## 4.6  Public Meetings on the Supplement to the Draft Environmental Impact Statement

When the Supplement to the Draft EIS was released in the fall of 2011, additional meetings were held to explain the content and analysis in the supplement. Four public meetings were held in Durango, Norwood, Dove Creek, and Cortez.  These are the communities most likely to be impacted by oil and gas development, which is the subject of the Supplement to the Draft EIS.

Governmental and organizational meetings were also held with Mesa Verde National Park, La Plata County, Southwest Resource Advisory Council, Town of Rico, Southern Ute Indian Tribe, Ute Mountain Ute Tribe, and San Juan Citizen's Alliance.  Conference calls were held with other Counties of San Miguel, Montezuma, and Dolores.

## 4.7  Public Comments on the Draft and Supplemental Land and Resource Management Plan and Environmental Impact Statement

Regulations require that lead agencies evaluate comments received from persons who review a Draft LRMP/EIS and prepare a written response.  Volume III, Appendix S is a summary of the substantive public comments received on the Draft LRMP/EIS and the Supplement to the Draft EIS for the SJNF and TRFO, and the agency responses to those comments.

The SJNF and TRFO provided the public a 120-day comment period for the Draft LRMP/EIS.  The comment period began on December 14, 2007, and ended on April 11, 2008. A 90-day comment period was also provided on the Supplement to the Draft EIS from August 26 to November 25, 2011. Approximately 54,000 letters were received from members of the public; city, county, state, tribal and federal officials; public interest organizations; and private businesses during these two comment periods.  Of these, the vast majority were form letters, with approximately 1,500 letters consisting of original responses or form letters with additional original text.

A standardized content analysis process was conducted to analyze the public letters received, which is designed to extract comments from each letter, evaluate similar comments from different letters, and identify specific topics of concern. Similar topics of concern were grouped together into public concern statements. The final step of content analysis involved determining whether a comment or public concern was *substantive* or *non-substantive* in nature.  After completion of the content analysis, substantive public concerns were given to members of the interdisciplinary team for response.  Non-substantive comments and public concerns did not receive responses. Further details about this process can be found in Volume III, Appendix S.

Substantive comments originated from over 250 commenters, resulting in identification of approximately 642 public concerns.  The most public concerns were identified in the areas of minerals and water quality. Volume III, Appendix S lists the public concerns and the agency responses, along with a table showing which public concerns were stated by which commenters.

BLM_0033648

## 4.8  List of Preparers

**No longer assigned to the SJNF or TRFO.

**DAVID BAKER****

*Recreation/Special Use/Wilderness Program Leader, San Juan National Forest*

*Education:*  Bachelor of Science, Recreation Resource Management University of Montana, 1980.

*Experience:*  Over 25 years of experience with the USFS and BLM. Outdoor Recreation Planner for the BLM in Cody and Worland, Wyoming. Since 2002, work experience on the SJNF included fire restoration, planning, recreation and lands special uses, developed and dispersed recreation, and wilderness.

**MARK BALL**

*Wildlife Biologist Program Leader, San Juan National Forest*

*Education:*  Bachelor of Science, Wildlife Ecology, 1976; Master of Science, Range Ecosystem Management, University of Florida, 1979.

*Experience:*  Thirty-three years of experience with the USFS on four national forests and national grasslands in two regions as a Range Technician, Range Conservationist, and a Wildlife Biologist. Current Assignment: providing technical assistance and practical knowledge for the wildlife sections of the LRMP and FEIS.

**JULIE BELL**

*Archaeologist, Tres Rios Field Office*

*Education:*  Bachelor of Arts, Sociology, University of California, Los Angeles, 1989; Master of Science, Anthropology (emphasis Archaeology), University of California, Riverside, 1998.

*Experience:*  Twenty-one years of experience with the National Park Service and the BLM, including Research Archaeologist with Mesa Verde National Park and Field Office Archaeologist with the TRFO. Experience includes historic preservation, documentation, and compliance with historic preservation laws.

**MARY J. BLANCHARD**

*Civil Engineer, San Juan National Forest*

*Education:*  Bachelor of Science, Environmental Engineering, University of Florida, 1991.

*Experience:*  Nineteen years of engineering and environmental experience, including 9 years with the SJNF and the Tongass National Forest, Alaska, as well as 10 years in engineering and environmental consulting. Experience includes transportation and travel management planning, civil design, facility management, construction management, permitting, regulatory compliance, and soil and water remediation.

**ROBERT BRANTLINGER**

*Resource Information Specialist (GIS), San Juan National Forest*

*Education:*  Bachelor of Science, Environmental Resource Management, Forestry, Pennsylvania State University, 1985.

BLM_0033649

*Experience:* Twenty-eight years of experience with the USFS in Colorado. Past work experience in recreation, hydrology, fisheries, fire, rangeland management and resource information. The last 15 year on the SJNF as Resource Information Specialist with an emphasis on GIS.

## SARA BRINTON

### *NEPA Coordinator and Ecologist, Pagosa Ranger District, San Juan National Forest*

*Education:* Bachelor of Science, Forestry (concentration Forest Biology), Colorado State University, 1991.

*Experience:* Twenty-four years of experience with the USFS in Colorado, working in ecology, botany, forestry, rangeland management, fuels management, and fire.

## JENNIFER M. BURNS**

### *Landscape Architect, San Juan National Forest*

*Education:* Bachelor of Science, Renewable Natural Resources, University of Arizona, 1980; Masters in Landscape Architecture, University of Arizona, 1987.

*Experience:* Twenty-five years of experience in public land management. Experience includes work as a Landscape Architect in Regions 2, 3, and 6 on the Mt. Hood and Deschutes National Forests, Oregon, and the Prescott and Coconino National Forests, Arizona; and work as a Resource Management Specialist for the National Park Service at Grand Canyon National Park and Chiricahua National Monument, Arizona, and Lassen National Park, California.

## JEFF CHRISTENSON

### *Supervisory Outdoor Recreation Planner, Tres Rios Field Office*

*Education:* Bachelor of Science, Forest Recreation Resources, option in Resource Planning, Oregon State University, Corvallis Oregon, 1997.

*Experience:* Eleven years of experience as an Outdoor Recreation Planner for the BLM on the Challis Field Office, Idaho, and TRFO. Previous work experience includes fieldwork in the recreation program for the BLM and USFS from 1995 to 2001.

## JULIE COLEMAN

### *Heritage Team Leader, San Juan National Forest*

*Education:* Bachelor of Art, Geology (emphasis in Archaeology), Western State College, 1990; Master of Arts, History (emphasis in Historic Preservation), Colorado State University, 1992.

*Experience:* Twenty-two years of experience with the BLM and the USFS. Field Office Archaeologist for the BLM in Worland, Wyoming; Gunnison, Colorado; and Montrose, Colorado. Since 2006, work includes Heritage Team Lead for the San Juan Public Lands Center and SJNF.

## DAVID DALLISON**

### *Timber Program Leader, San Juan National Forest*

*Education:* Bachelor of Science, Forest Management Science, Colorado State University, 1975.

*Experience:* Twenty-nine years of experience with the USFS in timber management and fire management, and as a Certified Silviculturist and Fire Behavior Analyst.

BLM_0033650

**BRAD DODD**

*Associate Field Manager/Physical Resources, Tres Rios Field Office*

*Education:*  Bachelor of Science, Geology, Mesa College 1978.

*Experience:*  Six years of experience with the BLM and the USFS in Colorado and Utah, working primarily in geology and physical resources. Twenty-eight years experience with the Bureau of Reclamation in Utah, Colorado, and Wyoming in geology, hydrogeology, and safety of dams.

**DAVE GERHARDT**

*Fisheries Program Leader, San Juan National Forest*

*Education:*  Bachelor of Science, Environmental Biology, Fort Lewis College, 1983; Master of Science, Aquatic Ecology, University of Wyoming, 1989.

*Experience:*  Twenty-three years of experience with the USFS as a forest-level Fishery Biologist. Education and experience includes emphasis on fish-habitat relationships, population ecology, threatened and endangered species management, and water management.

**ANTHONY GARCIA**

*Wildlife Biologist Program Leader, Pagosa Ranger District, San Juan National Forest*

*Education:*  Bachelor of Arts, Wildlife Biology, Adams State College, Colorado, 1995.

*Experience:*  Twenty-two years of experience with the USFS in Colorado, including 17 years as Wildlife Biologist on the SJNF (district and forest-level) and 5 years as a Wildlife Biologist Trainee on the Rio Grande National Forest.  Work experience includes management of wildlife and fisheries populations and habitats, ESA Section 7 consultation with the USFWS, NEPA analysis, and prescribed fire and wildland fire management.

**IVAN GEROY**

*Hydrologist, San Juan National Forest*

*Education:*  Bachelor of Science, Fisheries and Wildlife Management, Oregon State University, Corvallis Oregon, 2002; Master of Science, Civil Engineering with an emphasis in water resources, Boise State University, Boise Idaho, 2010.

*Experience:*  Six months experience as a Hydrologist with the SJNF.  Previous work experience includes 5 years as a Nuclear Propulsion Officer in the U.S. Navy and several field seasons as a graduate student, hydrologic technician, and wildlife technician.

**CARA GILDAR**

*Ecologist, San Juan National Forest*

*Education:*  Bachelor of Science, Zoology, Minor in English, University of Florida 1996; Master of Science, Forestry, Northern Arizona University, 2002.

*Experience:*  Thirteen years of experience with the USFS on two national forests and national grasslands in two regions as a Botanist and Ecologist. Six years of experience supporting the BLM in Colorado. Several field seasons as a graduate student, plant ecology technician, and undergraduate researcher.

**STEVE HARTVIGSEN**

*Supervisory Forester, Headwaters Timber Zone (Columbine/Pagosa Ranger Districts), San Juan National Forest*

BLM_0033651

*Education*:  Bachelor of Science, Forest Management, Utah State University, 1977.

*Experience:*  Thirty-three years of forest vegetation management with the USFS in Utah, Idaho, and Colorado on six national forests.  Certified Silviculturist since 1998.  ID team member, Rio Grande National Forest Plan Revision (1994–1997).  Also, Utah State University research technician conducting forest vegetation sampling/mapping and cover type development (ECOSYM), Manti-LaSal National Forest.

## MICHAEL G. JOHNSON

### Renewable Resource Staff Officer, San Juan National Forest

*Education:*  Bachelor of Science, Resource Conservation, University of Montana, 1975; Master of Science, Forest Hydrology, Oregon State University, 1978.

*Experience:*  Thirty-five years of experience with the USFS in Arizona, Idaho, Montana, and Colorado on three national forests and in one regional office. Work experience includes Forest Hydrologist, Regional Hydrologist, District Ranger/Field Office Manager, Staff Officer/Assistant Center Manager, and Renewable Resources Staff Officer.

## JUSTIN KINCAID

### Hazard Fuels Specialist, Southwest District Bureau of Land Management and San Juan National Forest

*Education:*  B.S., Forest Management, 1996 Colorado State University.

*Experience:*  Twenty-three years of service in wildland fire and fuels management (USFS, National Park Service, and BLM).

## TOM KOCHANSKI

### Resource Information Specialist, San Juan National Forest GIS Team

*Education:*  Bachelor of Science, Marketing, North Adams State College 1982; Master of Science, Forestry, University of Massachusetts 1987.

*Experience:* Twenty-one years in GIS/Resource Management.  Twelve years working for the USFS on two national forests (SJNF and Santa Fe), 1 year working at Hawaii Volcanoes National Park, and 8 years as the GIS Coordinator for the City of Cortez.

## MARK B. LAMBERT

### Staff Officer for Planning and Public Service, San Juan National Forest

*Education*:  Bachelor of Science, Planning and Resource Management, Brigham Young University, Provo, Utah, 2001;  Master of Science, Environmental Studies, University of Montana, Missoula, Montana, 2003.

*Experience:*  Ten years of experience in public land management.  Experience includes current position as Planning Program Lead on the SJNF; previous work as Monument Manager of Ironwood Forest National Monument, NEPA and Planning Specialist for the BLM Tucson Field Office, and Planning and Environmental Analyst for BLM Washington Office.

## PAMELA LESCHAK

### Fluids Geologist, Tres Rios Field Office

*Education*:  Master of Science, Geology, Texas A&M University, 1985; Bachelor of Science, Geology, University of South Carolina, 1982.

BLM_0033652

*Experience*:  Ten years of experience with Amoco Production Company, New Orleans, Louisiana, and Houston, Texas, as a Petroleum Geologist; nine years with the Minerals Management Service, Office of Production and Development, in New Orleans as a Petroleum Geologist; three years with the BLM as a Geologist in the White River Field Office, Meeker, Colorado; and as a Fluids Geologist in the San Juan Public Lands Center in Durango, Colorado. Work experience includes subsurface geological and geophysical field and prospect mapping, cross-section construction, openhole well log analysis and correlation, and integration of engineering and geochemical data into subsurface reservoir models.

**RANDY LEWIS\*\***

*Hazardous Fuels Specialist, Tres Rios Field Office*

*Education:*  Associates Degree, Civil Engineering Technology, Idaho State University, 1974.

*Experience:*  Thirty-three years of experience with the BLM in Idaho and Colorado as a Civil and Petroleum Engineering Technician, Environmental Protection Specialist, and Hazardous Fuels Specialist. Thirty-five years of training and experience with wildfires and the use of wildland fire as a management tool.

**SHANNON MANFREDI**

*Plan Revision Team Leader (Raintree Consulting)*

*Education:*  Bachelor of Arts, Humanities, Fort Lewis College 1993; Master of Arts, Political Science, University of Colorado at Denver, 2008.

*Experience:*  Twelve years land management planning experience, including leading interdisciplinary teams in the NEPA process, writing and reviewing environmental analysis documents. Ten years experience in community development, public meeting facilitation, and non-profit management.

**STEPHANIE O'DELL\*\***

*Abandoned Mine Lands Project Manager/Hazardous Materials Coordinator, Tres Rios Field Office*

*Education:*  Bachelor of Arts, Biology (Minors in Chemistry and Geology), University of Northern Colorado, 1980.

*Experience:*  Eight years of experience with the City of Loveland as a Chemist, Industrial Pretreatment Coordinator, and Environmental Protection Specialist/Hazardous Materials (HazMat) Coordinator; 2 years with the Southern Ute Indian Tribe as a Water Quality Specialist/HazMat Coordinator; 7 years with the BLM as a Superfund Site Remedial Project Manager and HazMat Coordinator in Farmington, New Mexico; and 10 years with the BLM and the USFS as the Upper Animas Abandoned Mine Lands Pilot Project Manager/HazMat Coordinator in Durango, Colorado.

**KELLY PALMER**

*Hydrology/Air Program Leader, San Juan National Forest*

*Education:*  Bachelor of Science, Geology, Fort Lewis College 1985; Master of Science, Watershed Science, Colorado State University, 1991.

*Experience:*  Twenty-five years of experience with the USFS as a Hydrologist on the Idaho Panhandle National Forest, Idaho; as a District Hydrologist on the Ochoco National Forest, Oregon; and as a Forest Hydrologist/Air Manager on the Dixie National Forest, Utah, and the SJNF. Work experience includes surface and groundwater hydrology, water chemistry, water

BLM_0033653

rights, fluvial geomorphology, geology, soils, and air management, including air quality and visibility protection.

**JIM POWERS\*\***

*Minerals/Lands Staff, San Juan National Forest*

*Education:* Bachelor of Science, Forest Products, Business Management, University of Idaho, 1977; Master of Science, Forest Resource Management, University of Idaho, 1988.

*Experience:* Twenty-eight years of experience in public lands management, including assignments as a Forestry Technician, Recreation Technician, Recreation (and non-recreation) Lands Staff, Operations Research Analyst, Forest Planner, NEPA Coordinator, and Minerals and Lands Program Coordinator.

**ANDREW G. RABY\*\***

*Physical Scientist/Geologist, San Juan National Forest*

*Education:* Bachelor of Science, Geology, University of New Orleans, 1978; Master of Science, Geology, New Mexico Institute of Mining and Technology, 1982.

*Experience:* Twenty-seven years of experience with the USFS and the BLM on one national forest and two Regional Offices as a Geologist in the minerals, Comprehensive Environmental Response, Compensation, and Liability Act, lands, and heritage programs; manager of the Chimney Rock Archaeological Area; summer intern with the USGS, CUSMAP project; and uranium geology exploration intern with Plateau Resources LTD.

**JESSICA RAMIREZ**

*Geographer/GIS Specialist, San Juan National Forest*

*Education:* Bachelor of Science, Environmental Studies and Geology, St. Lawrence University, 1999; Master of Arts, Geography, University of Montana, 2004.

*Experience:* Ten years of experience with the USFS as a GIS Specialist on the SJNF.

**JEFF REDDERS\*\***

*Ecology and Soils Program Leader, San Juan National Forest*

*Education:* Bachelor of Science, Natural Resources, University of Wisconsin, Madison, 1978.

*Experience:* Seventeen years of experience with the USFS as an Ecologist/Soil Scientist on the SJNF; 3 years as an Ecologist/Soil Scientist in the Southwestern Regional Office, New Mexico; 4 years as an Ecologist/Soil Scientist on the Carson National Forest, New Mexico; 3 years as an Ecologist/Soil Scientist on the Apache/Sitgreaves National Forest, Arizona; and 1 year as a Soil Scientist on the Hiawatha National Forest, Michigan.

**THOMAS RICE**

*Assistant Field Manager, Tres Rios Field Office*

*Education:* Bachelor of Arts, Humanities-Anthropology and Geology, Fort Lewis College, 1990.

*Experience:* More than 25 years of experience in Four Corners Region Natural Resource Management that includes private sector, tribal, and federal experience with an emphasis on energy, water, cultural resource, infrastructure, and recreation issues.

BLM_0033654

**BRANDY RICHARDSON**

*Wildlife Biologist Pagosa Ranger District, San Juan National Forest*

*Education*:  Bachelor of Science in Wildlife and Fisheries Ecology Oklahoma State University, 2007.

*Experience*:  Seven years of experience with the USFS on three national forests across Colorado, California, and Utah.  Work experience includes management and inventory of wildlife and fisheries populations and habitats, ESA Section 7 consultation with the USFWS, NEPA analysis, and other wildlife program support work.

**MARK ROPER**

*Resource Information Specialist (GIS), Pagosa Ranger District, San Juan National Forest*

*Education:*  Bachelor of Science, Natural Resources Recreation and Tourism, Colorado State University, 1994.

*Experience:*  Nineteen years of experience with the USFS across Colorado and Nebraska, including the SJNF, Pike and San Isabel National Forests, Comanche and Cimarron National Grasslands, Rio Grande National Forest, Nebraska and Samuel R. McKelvie National Forests, & Oglala, and Buffalo Gap and Ft. Pierre National Grasslands.  Work experience includes Recreation Technician, Cartographic Technician, GIS and GPS Coordinator, database management, map production and data analysis for projects and NEPA planning, wildlife surveys, and wildland and prescribed fire support.

**CHRIS SCHULTZ**

*Wildlife Biologist, Wildlife Program Leader, Columbine Ranger District, San Juan National Forest*

*Education:*  Bachelor of Science, Wildlife Biology, University of Vermont, 1982; Master of Science, Ecology (Biology), Utah State University, 1996.

*Experience:*  Twenty years of experience with the USFS and BLM in Colorado on the SJNF and Grand Mesa, Uncompahgre and Gunnison National Forests, and San Juan Field Office as a Wildlife Biologist; 5 years of experience with the Rocky Mountain Regional Office as a Migratory Bird Program Coordinator; and 10 years of experience in private sector migratory bird and raptor research. Work experience includes raptor ecology, migratory bird ecology, carnivore ecology, wildlife management, and Forest Protection Officer.

**JARED SCOTT**

*GIS Coordinator, Tres Rios Field Office*

*Education:*  Bachelor of Arts, Geography, University of Colorado, Bolder, 2005; Master of Science, Forestry, Northern Arizona University, Flagstaff, 2008.

*Experience:*  Five years of GIS and natural resource management experience with the with the USFS and BLM.  Before working at the TRFO, worked at the Kaibab National Forest for 4 years and was a core member of the Kaibab National Forest Land Managment Plan Revision team. Experience in GIS, cartography, forest ecology, forest pathology, and dendrochronology.

**LAURA STRANSKY**

*Planning Assistant, San Juan National Forest*

*Education:*  Bachelor of Arts, Biological Science, Concordia College, Minnesota, 1975.

BLM_0033655

*Experience:* Twenty-eight years of experience with the USFS working in timber inventories, public information, and as an Old-Growth Inventory Coordinator and Planning Assistant.

**GARY THRASH\*\***

*Planning and Environmental Analyst, San Juan National Forest*

*Education:* Bachelor of Science, Biological Science, Colorado State University, 1971.

*Experience:* Twenty-nine years of experience with the BLM in three offices in two states as a Range Technician, Realty/Recreation Specialist, Environmental Analyst, Ecologist, Resources Staff Supervisor, RMP Team Leader, and as a Planning/Environmental Analyst. Work experience includes 8 years as a Seasonal Technician with the National Park Service and the USFS in Colorado and Washington. Current Assignment: providing technical assistance and practical knowledge for the paleontology, utility corridors, electronic sites, ACECs, and monitoring sections of the LRMP and FEIS.

**MARK TUCKER**

*Rangeland Management Program Leader, San Juan National Forest*

*Education:* Bachelor of Science, Range Management, Humboldt State University, 1979.

*Experience:* Thirty-four years of experience with the USFS in rangeland and noxious weed management in Colorado and Wyoming. Work experience includes assignments in minerals management, recreation, wildlife, watershed, and special uses.

**NATHANIEL WEST**

*Wildlife Biologist Program Leader, Tres Rios Field Office*

*Education:* Bachelor of Science, Wildlife Biology and Management, 1999.

*Experience:* Ten years of experience with the USFS and BLM on two national forests and one national grassland and three BLM field offices in three states, including Land Use Compliance Officer, Natural Resource Specialist, and Wildlife Biologist.

**BRIAN WHITE**

*Recreation, Wilderness, and Trails Program Manager, San Juan National Forest*

*Education:* Bachelor of Science, Environmental Science, California State University, Chico, 1994; Master of Science, Natural Resource Management, Central Washington University, 2000.

*Experience:* Fifteen years in recreation and wilderness program management with BLM and USFS in Washington, Montana, Arizona, California, Idaho. Started on the SJNF in 2011.

**THURMAN WILSON\*\***

*Planning and Public Services Assistant Center Manager, San Juan National Forest*

*Education:* Bachelor of Science, Forest Resource Management, Ohio State University, 1977.

*Experience:* Twenty-eight years of experience with the USFS on four national forests (in the Rocky Mountain and Pacific Northwest Regions, the Regional Office for the Rocky Mountain Region, and the Washington Office) as a Forester, Economist, Operations Research Analyst, District Ranger, Staff Officer, and Assistant Center Manger (6 years with shared BLM/USFS duties).

BLM_0033656

**CATHLEEN A. ZILLICH**

*Physical Scientist, Tres Rios Field Office*

*Education:* Bachelor of Science, Watershed Management, Colorado State University, 1978.

*Experience:* Thirty-five years of experience with the USFS and BLM on three national forests in two regions, at district and supervisor offices, and for BLM field offices. Work experience includes Forest Hydrologist; water rights, minerals and lands administration; GIS stream inventory; fire restoration; and abandoned mine reclamation. Current assignment: providing technical assistance and practical knowledge for the WSR section of the LRMP/FEIS.

## Tres Rios Field Office Leadership

| | |
|---|---|
| **CONNIE CLEMENTSON** | *Field Office Manager* |
| **BRAD DODD** | *Associate Field Manager/Physical Resources* |

## San Juan National Forest Leadership

| | |
|---|---|
| **MARK STILES** | *Forest Supervisor* |
| **MATT JANOWIAK** | *Columbine District Ranger* |
| **KEVIN KHUNG** | *Pagosa District Ranger* |
| **DEREK PADILLA** | *Dolores District Ranger* |

BLM_0033657

Final San Juan National Forest and Proposed Tres Rios Field Office
Land and Resource Management Plan

# CHAPTER 5 – REFERENCES

## 5.1 References Cited

Advisory Council on Historic Preservation, Colorado State Historic Preservation Officer, and USDA Forest Service. 2010. *Programmatic Agreement Among the Advisory Council on Historic Preservation, the Colorado State Historic Preservation Officer, and the USDA Forest Service Rocky Mountain Region, Arapaho and Roosevelt National Forests, Cimarron-Comanche National Grasslands, Grand Mesa, Uncompahgre and Gunnison National Forests, Medicine Bow-Routt National Forests, Pawnee National Grassland, Pike and San Isabel National Forests, Rio Grande National Forest, and San Juan National Forest Regarding the Reporting of Negative Results Cultural Resource Inventories.* Denver, Colorado. On file at San Juan Public Lands Center, Durango, Colorado.

Agee, J.K. 1998. Landscape Fire Regimes and their Implications for Wildlife. In: *Fire and Wildlife in the Pacific Northwest: Research, Policy, and Management.* Symposium of the Northwest Section of The Wildlife Society, April 6-8, 1998. Spokane, Washington.

Air Resource Specialists, 2009. *Air Quality Analysis Technical Support Document for San Juan Public Lands Center Land Management Plan and Environmental Impact Statement.* Available at: http://ocs.fortlewis.edu/forestplan/supplement/SJPLC-TSD_Report_051111.pdf. Accessed August 6, 2013.

America's Byways Resource Center. 2004. America's Scenic Byway–The Colorado Report. Available at: http://www.santafetrailscenicandhistoricbyway.org/corcontents.html. Accessed August 6, 2013.

Anderegg, W.R., J.A. Berry, D.D. Smith, J.S. Sperry, L.D.L. Anderegg, C.B. Field. 2012. The roles of hydraulic and carbon stress in a widespread climate-induced forest die-off. *Proceedings of the National Academy of Sciences* 109(1):233–237.

Anderson, D.G. 2004. *Population Status Survey of Schmoll's Milkvetch (*Astragalus schmolliae C.L. Porter*) – Final Report.* Prepared for National Park Service, Mesa Verde National Park. Fort Collins, Colorado: Colorado Natural Heritage Program.

Anderson, R.M., and G. Stewart. 2007. *Impacts of Stream Flow Alterations on the Native Fish Assemblage and their Habitat Availability as Determined by 2D Modeling and the Use of Fish Population Data to Support Instream Flow Recommendations for the Sections of the Yampa, Colorado, Gunnison, and Dolores Rivers in Colorado.* Special Report 80. Fort Collins, Colorado: Colorado Division of Wildlife.

Applied Hydrology Associates, Inc. 2000. 3M Project, San Juan Basin, Colorado and New Mexico, hydrologic modeling report. Prepared for the Southern Ute Indian Tribe, Colorado Oil and Gas Conservation Commission, and the U.S. Bureau of Land Management.

Arrington, K. 2006. Personal communication. Archaeologist, San Juan Public Lands Center, Durango, Colorado.

Aubry, K.B., K.S. McKelvey, and J.P. Copeland. 2007. Distribution and broadscale habitat relations of the wolverine in the contiguous United States. *Journal of Wildlife Management* 71:2147–2158.

BLM_0033658

Balph, D.F., and J.C. Malecheck. 1985. Cattle trampling of crested wheatgrass under short-duration grazing. *Journal of Range Management* 38:226–227.

Beidleman, C.A. (facilitator). 2000. *Colorado Partners in Flight Land Bird Conservation Plan*. Colorado Partners-In-Flight. Estes Park, Colorado.

Bezzerides, N., and K. Bestgen. 2002. *Status Review of Roundtail Chub* Gila robusta*, Flannelmouth Sucker* Catostomus latipinnis*, and Bluehead Sucker* Castostomus discobolus *in the Colorado River Basin*. Fort Collins, Colorado: Colorado State University Larval Fish Laboratory.

Bird, D., D. Varland, and J. Negro. 1996. *Raptors in Human Landscapes, Adaptations to Built and Cultivated Environments*. New York: Academic Press.

Blair, R., T.A. Casey, W.H. Romme, and R.N. Ellis. 1996. *The Western San Juan Mountains, Their Geology, Ecology, and Human History*. University Press of Colorado. Fort Lewis College Foundation.

Blickley J L., D. Blackwood, and G. Patricelli. 2012. Experimental evidence for the effects of chronic anthropogenic noise on abundance of greater sage-grouse at leks. *Conservation Biology* 26(3):471–471.

Bock, C.E., and W.M. Block. 2005. Fire and birds in the southwestern United States. In *Fire and Avian Ecology in North America*, edited by V.A. Saab and H.D.W. Powell, pp. 14–32. *Studies in Avian Biology* No. 30.

Bockheim, J.G., S.W. Lee, and J.E. Leide. 1983. Distribution and cycling of elements in a *Pinus resinosa* plantation ecosystem in Wisconsin. *Canadian Journal of Forest Research* 13:609–619.

Booz Allen Hamilton. 2007. *Oil and Gas Economic Impact Analysis*. Prepared for the Colorado Energy Research Institute.

Boreal Toad Recovery Team and Technical Advisory Group. 2001. Conservation Plan and Agreement for the Management and Recovery of the Southern Rocky Mountain Population of the Boreal Toad (*Bufo boreas boreas*). Unpublished, 97 pages.

Bowker, J.M., C.M. Starbuck, D.B.K. English, J.C. Bergstrom, R.S. Rosenberger, and D.W. McCollum. 2009. *Estimating the Net Economic Value of National Forest Recreation: An Application of the National Visitor Use Monitoring Database*. Faculty Series Working Paper, FS 09-02. Athens, Georgia: University of Georgia.

Braun, C.E., R.W. Hoffman, and G.E. Rogers. 1976. Wintering areas and winter ecology of white-tailed ptarmigan in Colorado. Special Report Number 38. Denver: Colorado Division of Wildlife.

Braun, C.E., and G.E. Rogers. 1971. *The White-Tailed Ptarmigan in Colorado*. Technical Publication Number 27, GFP-R-T-27. Denver: Colorado Division of Game, Fish and Parks.

Braun, C.E., D.R. Stevens, K.M. Giesen, and C.P. Melcher. 1991. Elk, white-tailed ptarmigan and willow relationships: a management dilemma in Rocky Mountain National Park. *Transactions of the North American Wildlife and Natural Resources Conference* 56:74–85.

BLM_0033659

Brown, P.M., and R. Wu. 2005. Climate and disturbance forcing of episodic tree recruitment in a southwestern ponderosa pine landscape. *Ecology* 86:3030–3038.

Buechling, A., and W.L. Baker. 2004. A fire history from tree rings in a high elevation forest of Rocky Mountain National Park. *Canadian Journal of Forest Research* 34:1259–1273.

Buenger, B.A. 2003. *The Impact of Wildland and Prescribed Fire on Archaeological Resources*. Department of Anthropology, University of Kansas. On file, San Juan Public Lands Center, Durango, Colorado.

Bull, E.L., C.G. Parks, and T.R. Torgersen. 1997. Trees and Logs Important to Wildlife in the Interior Columbia River Basin. USDA Forest Service General Technical Report, PNW-GTR-391. Portland, Oregon.

Bureau of Land Management (BLM). 1985. *San Juan/San Miguel Resource Management Plan*. U.S. Department of the Interior, Bureau of Land Management. San Juan Field Office, Durango, Colorado.

———. 1986. BLM. Wild Horse Herd Management Area Plan (HMAP). Rev. 1994. Durango, Colorado: San Juan Public Lands Center.

———. 1990a. BLM Colorado Instruction Memorandum CO-90-072, Colorado Burial Discovery Procedures.

———. 1990b. San Juan/San Miguel Wilderness Final EIS.  Montrose District.  Available at BLM Southwest District Office, Montrose, Colorado.

———. 1991a. Colorado Wilderness Study Report. U.S. Department of the Interior, Bureau of Land Management, Volume 3 Montrose District Study Areas, pp. 169–352.

———. 1991b. *Colorado Oil and Gas Leasing and Development Final Environmental Impact Statement and Amendment to the San Juan/San Miguel Resource Management Plan*. U.S. Department of the Interior, Bureau of Land Management. Montrose District. Durango, Colorado.

———. 1992. *The Alpine Loop Cultural Resource Management Plan*. On file, Bureau of Land Management Tres Rios Field Office, Dolores, Colorado.

———. 1994. *Spring Creek Basin Wild Horse Herd Management Area Plan*. San Juan Resource Area. Durango, Colorado: U.S. Department of the Interior, Bureau of Land Management, Montrose District.

———.1997. Colorado Public Land Health Standards and Guidelines. Colorado State Office USDI Bureau of Land Management. BLM Instruction Memorandums and Bulletins related to the agency livestock grazing management program.

———. 1998. BLM IM No. CO-98-052: *Clarification of Cultural Resource Clearance Responsibilities and Maintenance on On-Going Projects*.

———. 1999. *Environmental Assessment of #CO-036-99-014 Tomichi Allotment Management Plan and Grazing Permit Reissuance for Tomichi Allotment #06319*. On file, San Juan Public Lands Center, Durango, Colorado.

BLM_0033660

————. 2000. BLM IM No. CO-2000-016. *Disposition Policy on Native American Graves Protection and Repatriation Act (NAGPRA) Repatriated Museum Collections*.

————. 2002a. *Final Environmental Impact Statement for Oil and Gas Development on the Southern Ute Indian Reservation*. Available at San Juan Public Lands Center, Durango, Colorado.

————. 2002b. BLM IM IB No. WO-2002-002: New Heritage Education Plan.

————. 2002c. BLM IM No. CO-2002-029, *Interim Historic Preservation Guidelines and Procedures for Evaluating the Effect of Rangeland Management Activities on Historic Properties*. Available at: http://www.blm.gov/style/medialib/blm/co/information/efoia/2002/2002_im.Par.58943.File.dat/COIM2002-029.pdf. Accessed July 26, 2013.

————. 2002d. BLM IB No. WO-2002-101: *Cultural Resource Considerations in Resource Management Plans*.

————. 2003a. BLM Technical Reference 1737-16. *Riparian Area Management – A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lentic Areas*. Denver: U.S. Department of the Interior, Bureau of Land Management, National Applied Resource Sciences Center.

————. 2003b. *Farmington Resource Management Plan with Record of Decision. Farmington, New Mexico*. Farmington, New Mexico: U.S. Department of the Interior, Bureau of Land Management, Farmington Field Office.

————. 2003c. BLM IB No. WO-2003-093: *Implementation of Executive Order (EO) 13287 and Preserve America Initiative*.

————. 2003d. BLM IM No. WO-2003-147: *Application for Permit to Drill (APD) – Process Improvement #3 – Cultural Resources*.

————. 2004a. BLM IM No. WO-2004-020: *Guidance for Recording Cultural and Paleontological Resource Locations for the Bureau of Land Management using Global Positioning System Technology*.

————. 2004b. BLM IM No. WO-2004-052: *Assessing Tribal and Cultural Considerations as Required in IM-2003-233, Integration of the Energy Policy and Conservation Act (EPCA) Inventory Results into the Land Use Planning Process*.

————. 2004c. BLM IB No. WO-2004-154: Amendments to 36 CFR Part 800, Protection of Historic Properties.

————. 2005a. Wild Horse Appropriate Management Level in the Spring Creek Basin HMA (EA #CO-800-2005-027). Durango, Colorado: San Juan Public Lands Center.

————. 2005b. BLM IM No. WO-2005-027: National Historic Preservation Act (NHPA) Section 106 and Oil and Gas Permitting.

————. 2005c. BLM IM No. WO-2005-003: Cultural Resources and Tribal Consultation and Fluid Minerals Leasing.

BLM_0033661

————. 2005d. Wind Energy ROD - Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments, December 2005.

————. 2006a. Surface Operating Standards and Guidelines for Oil and Gas Development.The Gold Book. Fourth Edition—2006.

————. 2006b. BLM Washington Office IM 2006-060: This provides direction for incorporating benefits-based management in the recreation program.

————. 2006c. BLM IM No. CO-2006-026: Cultural Resource Standards and Guidelines for Renewal of Right-of-Way grants and Temporary Use Permits under Section 106 of the National Historic Preservation Act.

————. 2007a. Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States Programmatic Environmental Impact Statement (PEIS).

————. 2007b. Vegetation Treatments on BLM Lands in 17 Western States Programmatic Environmental Report (PER).

————. 2007c. BLM Washington Office IM 2007-043. "Unified Strategy" describing how best to implement the BLM Priorities for Recreation and Visitor Services Workplan (Purple Book), as outlined in IM No. 2006-060.

————. 2007d. BLM IM No. WO-2007-002: Disposition Policy on Native American Graves Protection and Repatriation Act Repatriated Museum Collections.

————. 2007e. Addendum 1 to the BLM Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning.  Available at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/efoia/2007/2007_im.Par.53849.File.dat/COIM2007-023ATT1.pdf. Accessed August 2, 2013.

————. 2007f. BLM IM 2007-097, Solar Energy Development Policy.

————. 2008. BLM IM 2008-009. Probable Fossil Yield Classification.

————. 2009a. Addendum to the Oil and Gas Potential and Reasonable Foreseeable Development (RFD) Scenarios in the San Juan National Forest and BLM Public Lands, Colorado. U.S. Department of the Interior. Bureau of Land Management. Durango, Colorado.

————. 2009b. BLM IM 2009-011. Assessment and Mitigation of Potential Impacts to Paleontological Resources.

————. 2009c. Wind ROD BMPs: BLM Wind Energy Program Policies and Best Management Practices. Available at: http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2009.Par.34083.File.dat/IM2009-043_att1.pdf. Accessed August 6, 2013.

————. 2009d. BLM IM 2009-043, Wind Energy Development Policy.

————. 2010a. *Canyon of the Ancients National Monument Record of Decision and Resource Management Plan*. Washington, D.C.: U.S. Department of the Interior, Bureau of Land Management. Available at: http://www.blm.gov/style/medialib/blm/co/programs/land_use_planning/rmp/canm/documents/

BLM_0033662

final_rmp_and_rod.Par.99533.File.dat/CANM_ROD_PLAN_with_signature_pages_scanned. pdf. Accessed August 6, 2013.

————. 2010b. Memorandum of understanding between the U.S. Department of the Interior Bureau of Land Management and the U.S. Fish and Wildlife Service to promote the conservation of migratory birds. Signed April 12, 2010. Unpublished document. 13 pages.

————. 2010c. BLM Instruction Memorandum CO-2010-028. Lakewood, Colorado: U.S. Department of the Interior, Bureau of Land Management, Colorado State Office. Available at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/efoia/2010.Par.16266.File.dat/COI M2010-028.pdf. Accessed June 12, 2013.

————. 2011a. Integrated Weed Management Plan, BLM, San Juan Public Lands Center (CO-800-2008-075 EA).

————. 2011b. BLM Washington Office IM 2011-154 which directed field units to review and update their inventory of lands for their wilderness characteristics and established a uniform protocol for doing so

————. 2012a. *Record of Decision for Surface Management of Gas Leasing and Development, Carson National Forest, Jicarilla Ranger District. NEPA # DOI-BLM-NM-F010-2013-0417-EIS*. Available at: http://www.blm.gov/pgdata/etc/medialib/blm/nm/field_offices/farmington/farmington_planning/ ffo_eis.Par.12897.File.dat/Jicarilla%20EIS%20-%20BLM%20Adoption%20ROD%2012%206%2012.pdf. Accessed July 30, 2013.

————. 2012b. BLM Road Maintenance Schedule, unpublished listing of maintained Tres Rios Field Office roads, updated April 2012, available at the Tres Rios Field Office, Dolores, Colorado.

————. 2012c. BLM IM CO-2012-002: Processing Livestock Grazing Permit Applications. On file, San Juan Public Lands Center, Durango, Colorado.

————. 2012d. BLM IM 2012-140: Collecting Paleontological Resources Under the Paleontological Resources Preservation Act of 2009

————. 2012c. BLM IM 2012-141: Confidentiality of Paleontological Locality Information Under the Omnibus Public Lands Act of 2009, Title VI, Subtitle D on Paleontological Resources Preservation

————. 2013. State and Transition Model (STM). Available at: http://www.blm.gov/wo/st/en/prog/more/soil2/soil2/model.html .

Bureau of Land Management (BLM) and Advisory Council on Historic Preservation. 1997. Programmatic Agreement among the BLM, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers regarding the manner in which BLM will meet its responsibilities under the National Historic Preservation Act.

Bureau of Land Management (BLM) and Bureau of Indian Affairs. 2009. Programmatic EA for 80 Acre Infill Oil and Gas Development on the Southern Ute Indian Reservation. Ignacio, Colorado. Available at: http://suitdoe.com/Documents/SUIT_PEA_08.5.09.pdf. Accessed July 30, 2013.

BLM_0033663

Bureau of Land Management and U.S. Department of Energy (BLM and DOE). 2003. *Assessing the Potential for Renewable Energy on Public Lands*. DOE/GO-102003-1704. Available at: http://www.nrel.gov/docs/fy03osti/33530.pdf . Accessed August 7, 2013.

Bureau of Land Management and U.S. Forest Service (BLM and USFS). 2006a. *Northern San Juan Basin Coal Bed Methane Project Draft Environmental Impact Statement*. Volume 1, Groundwater Section, pp. 3-58–3-78. Durango, Colorado: San Juan Public Lands Center.

———. 2006b. Memorandum of Understanding Between USFS and BLM Concerning Oil and Gas Leasing and Operations. Available at: http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_ PROTECTION_/energy/epca_chart.Par.42324.File.dat/BLM_MOU_WO_300-2006-07.pdf. Access August 6, 2013

———. 2007. *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book*. 4th ed. BLM/WO/ST-06/021+3071. Denver: Bureau of Land Management. Available at: http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_ PROTECTION_/energy/oil_and_gas.Par.18714.File.dat/OILgas.pdf. Accessed August 7, 2013.

———. 2010. *Oil and Gas Potential and Reasonable Foreseeable Development Scenarios in the San Juan National Forest and BLM Public Lands, Colorado*. Cortez, Colorado: Bureau of Land Management and U.S. Department of Agriculture, Forest Service.

Bureau of Land Management (BLM), State of Colorado, U.S. Forest Service (USFS), Colorado State Historic Preservation Office (SHPO), and Advisory Council on Historic Preservation. 1998. Programmatic Agreement among BLM, the State of Colorado, the USFS, National Forests in the State of Colorado, USFS, the State Historic Preservation Office of Colorado, and the Advisory Council on Historic Preservation regarding the Management of Wildland Fire for Resource Benefits (Agreement No. 1102-002-98-038).

Bureau of Reclamation. 2009. McPhee Dam. Available at: http://www.usbr.gov/projects/Facility.jsp?fac_Name=McPhee+Dam. Accessed August 7, 2013.

Buskirk, S.W., and L.F. Ruggiero. 1994. American marten. In *The Scientific Basis for Conserving Forest Carnivores, American Marten, Fisher, Lynx, and Wolverine, in the Western United States*, edited by L.F. Ruggier, K.B. Aubry, S.W. Buskirk, L.J. Lyon, and W.J. Zielinski, pp. 7–37. USDA Forest Service General Technical Report RM-254. Fort Collins, Colorado.

Byrne, G., and J. Copeland. 1997. An Aerial Survey for Wolverine (*Gulo gulo*) in Colorado. Unpublished report, Colorado Division of Wildlife.

Cade, T.J., M. Martell, P. Redig, G. Septon, and H. Tordoff. 1996. Peregrine falcons in urban Nroth America. In *Raptors in Human Landscapes, Adaptations to Built and Cultivated Environments*, edited by D. Bird, D. Varland, and J. Negro, pp. 3–13. New York: Academic Press.

Center for Biological Diversity. 2010. Petition to list the white-tailed ptarmigan, (Lagopus leucura) as a threatened species under the Endangered Species Act, August 24, 2010. Unpublished

BLM_0033664

document, Center for Biological Diversity, Portland, OR. 52 pages. Available at: http://www.biologicaldiversity.org/species/birds/white-tailed_ptarmigan/pdfs/WTP_Petition.pdf

Chamberlin, T. W., R. D. Harr, and F. H. Everest. 1991. Timber harvest, silviculture, and watershed processes. American Fisheries Society Special Publication 19:181-205.

Clow, D.W. 2007. Changes in the Timing of Snowmelt and Streamflow in Colorado: A Response to Recent Warming. Journal of Climate, V.23, pp. 2293-2306.

Colborn TC, Kwiatkowski C, Shultz K, and Backstrom M. 2011. Natural gas operations from a public health perspective. Int J Hum Ecol Risk Assess. In press.

Cole, E. K., M. D. Pope, and R. G. Anthony. 1997. Effects of road management on movement and survival of Roosevelt elk. Journal of Wildlife Management 61:1115-1126.

Coleman, J. 2000. *Environmental Assessment #CO-036-99-01 Tomichi Allotment Management Plan & Grazing Permit Reissuance for Tomichi Allotment #06319*. On file, Bureau of Land Management, Gunnison Field Office, Gunnison, Colorado.

Collins, S.K., W.J. Grimm, and A. Wise. 2006. Class I Cultural Resources Overview of Bureau of Land Management Lands in the San Juan Field Office, Southwestern Colorado. Prepared by Sandstone Archaeology, LLC. Mancos, Colorado.

Colorado Department of Local Affairs. 2012. 2011 Biennial Report, Direct Distribution. Available at: http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DOLA-Main%2FDocument_C%2FCBONDefault&cid=1251594705227&pagename=CBONWrapper. Accessed August 6, 2013.

Colorado Department of Natural Resources. 2004. *10–Year Strategic Plan on the Comprehensive Removal of Tamarisk*. Tamarisk Coalition. Grand Junction, Colorado.

———. 2005. *Report on the Health of Colorado's Forests 2004 – Special Issue: Ponderosa Pine Forests*. Denver: Colorado Department of Natural Resources, Division of Forestry.Colorado Department of Natural Resources et al. 1976. Dolores River

Colorado Department of Natural Resources, Colorado Water Conservation Board, and Bureau of Land Management (BLM). 2011. Memorandum of Understanding between the Colorado Department of Natural Resources, the Colorado Water Conservation Board, and the BLM regarding the management of water and water uses on BLM lands in Colorado.  Available at: http://cwcb.state.co.us/legal/Pages/GovernmentalAgreements.aspx  Accessed July 29, 2013.

Colorado Department of Natural Resources and U.S. Forest Service (USFS). 2009. MOU between the Colorado Department of Natural Resources and the U.S. Department of Agriculture, Forest Service. Available at: http://cwcb.state.co.us/legal/Pages/GovernmentalAgreements.aspx Accessed July 29, 2013.

Colorado Department of Public Health and Environment, Colorado Air Quality Control Commission. 2011. Regulation Number 9, Open Burning, Prescribed Burning, and Permitting. 5 CCR 1001-11.  Available at: http://www.colorado.gov/cs/Satellite?c=Page&childpagename=CDPHE-Main%2FCBONLayout&cid=1251601911433&pagename=CBONWrapper.  Accessed July 30, 2013.

BLM_0033665

————. 2006. Colorado's Section 303(D) List of Inpaired Waters and Monitoring and Evaluation List. 5 CRR 1002-93 Regulation #93, Adopted March 14, 2006.

————. 2012. Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List.

Colorado Department of Revenue. 2010. State of Colorado Department of Revenue, Sales Tax Statistical Summary, January to December 2010, In Thousands of Dollars. Available at: http://www.colorado.gov/cs/Satellite/Revenue-Main/XRM/1213954128545. Accessed August 7, 2013.

Colorado Division of Water Resources. 2012. GIS data of water rights in Colorado Water Division 7. Available at: http://water.state.co.us/DataMaps/GISandMaps/Pages/GISDownloads.aspx. Accessed August 7, 2013.

Colorado Division of Wildlife. 2002. Threatened and Endangered Species. Denver: Colorado Division of Wildlife. Available at: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/ThreatenedEndangeredList/ListO fThreatenedAndEndangeredSpecies.htm. Accessed January 2002.

————. 2006. *Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans*. Denver: Colorado Division of Wildlife.

Colorado Forest Restoration Institute. 2010. *Mixed-Conifer Forests in Southwest Colorado – A Summary of Existing Knowledge and Considerations for Restoration and Management*. Fort Collins, Colorado: Colorado Forest Restoration Institute, Colorado State University.

Colorado Natural Heritage Program. 2002. Status and Ranking. Fort Collins, Colorado: Colorado Natural Heritage Program, Colorado State University. Available at: http://www.cnhp.colostate.edu/list.html. Accessed January 2002.

Colorado Parks and Wildlife (CPW). 2004. Fungus contamination prevention guidelines. In Procedures for Monitoring and Surveying Boreal Toad Populations, slide show by L.J. Livo. Available at: http://wildlife.state.co.us/Research/Aquatic/BorealToad/Pages/BorealSurveying.aspx. Accessed July 20, 2013.

————. 2008. Recommended buffer zones and seasonal restrictions for Colorado raptors. Unpublished report by Colorado Division of Wildlife. Available at: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/WildlifeSpecies/LivingWithWildlife/R aptorBufferGuidelines2008.pdf . Accessed August 7, 2013.

————. 2012a. Colorado bighorn sheep management plan, data analysis unit RBS-20, Weminuche herd. Unpublished report, Colorado Parks and Wildlife, Denver. Available at: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Hunting/BigGame/DAU/BighornShe ep/RBS20DAUPlan.pdf. Accessed August 7, 2013.

————. 2012b. Colorado bighorn sheep management plan, data analysis unit RBS-21, San Juans West. Unpublished report, Colorado Parks and Wildlife, Denver. Available at: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Hunting/BigGame/DAU/BighornShe ep/RBS21DAUplan_SanJuansWest.pdf. Accessed August 7, 2013.

BLM_0033666

Colorado River Cutthroat Trout Task Force. 2001. *Conservation Agreement and Strategy for Colorado River Cutthroat Trout (*Oncorhychus clarki pleuriticus*) in the States of Colorado, Utah, and Wyoming*. Fort Collins, Colorado: Colorado Division of Wildlife.

Colorado State Demography Office. 2011. Population Totals for Colorado Counties. Available at: http://www.colorado.gov/cs/Satellite?c=Page&childpagename=DOLA-Main%2FCBONLayout&cid=1251593346867&pagename=CBONWrapper. Accessed August 6, 2013.

————. 2012a. Historical census population. Available at: https://dola.colorado.gov/demog_webapps/hcp_parameters.jsf. Accessed July 13, 2012.

————. 2012b. Population forecasts—years 2000 to 2040. Most recent forecasts produced in September, 2011. Available at: http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DOLA-Main%2FDocument_C%2FCBONAddLinkView&cid=1251593369324&pagename=CBONWrapper. Accessed July 13, 2012.

————. 2012c. Components of population change. Available at: https://dola.colorado.gov/demog_webapps/cpc_parameters.jsf. Accessed July 13, 2012.

Colorado State University. 2013. Cheatgrass and wildfire. Available at: http://www.ext.colostate.edu/pubs/natres/06310.html. Accessed August 6, 2013.

————. 2010. *Colorado's Water Supply Future: State of Colorado 2050 Municipal & Industrial Water Use Projections*. Denver: Colorado Water Conservation Board.

Cordell, H.K., C. Betz, J.M. Bowker, D.B.K. English, S.H. Mou, J.C. Bergstrom, R.J. Teasley, M.A. Tarrant, and J. Loomis. 1999. *Outdoor Recreation in American Life: A National Assessment of Demand and Supply Trends*. Champaign, Illinois: Sagamore Publishing.

Cothran, E.G.. 2010. *Genetic Analysis of the Spring Creek Basin HMA, CO*. Department of Veterinary Integrative Bioscience, Texas A&M University, June 21, 2010.

Covington, W.W., and M.M. Moore. 1994. Southwestern ponderosa pine forest structure: changes since Euro-American settlement. *Journal of Forestry* 92:39–47.

Cowardin, L.M., V. Carter, F.C. Golet, and E.T. LaRoe. 1979. *Classification of Wetlands and Deepwater Habitats of the United States*. FWS/OBS-79/31. U.S. Fish and Wildlife Service. Washington, D.C.

Cox, D., P. Onsager, J. Thomson, R. Reinke, G. Gianinny, C. Vliss, J. Hughes, and M. Janowiak. 2001. *San Juan Basin Ground Water Modeling Study: Ground Water–Surface Water Interactions between Fruitland Coalbed Methane Development and Rivers*. Sponsored by the Ground Water Protection Research Foundation.

Crawford, D. 2008. *San Juan Public Lands Fuels Project Contract History*. On file at the San Juan Public Lands Center, Durango, Colorado.

Dadkhah, M., and G.F. Gifford. 1981. Influence of vegetation, rock cover and trampling on infiltration rates and sediment production. *Water Resources Bulletin* 16:979–986.

BLM_0033667

Dahms, W.C., and B.W. Geils. 1997. *An Assessment of Forest Ecosystem Health in the Southwest. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station and Southwestern Region*. General Technical Report RM-GTR-295.

Debyle, N.V. 1995. Wildlife. In *Aspen: Ecology and Management in the Western United States*, edited by N.V. DeByle and R.P. Winokur, pp. 29–33. General Technical Report RM-119. Fort Collins, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

DeVelice, R.L., J.A. Ludwig, W.H. Moir, and F. Ronco, Jr. 1986. *A Classification of Forest Habitat Types of New Mexico and Southern Colorado*. General Technical Report RM-131. Washington, D.C.: U.S. Department of Agriculture, Forest Service.

Duke, P. 1998. *Management Summary of an Overview of the Archaeological Resources in the San Juan-Rio Grande National Forest: Mancos-Dolores, Columbine and Pagosa Districts*. Durango, Colorado: Center for Southwest Studies, Fort Lewis College.

Duke, P., D. Cave, and R. Kimmick. 2003. *The Effects of Fire on Cultural Resources*. Durango, Colorado: Department of Anthropology, Fort Lewis College. On file, San Juan Public Lands Center, Durango, Colorado.

Duvall, R. 2012. SJNF and TRFO operations, unpublished data. San Juan Public Lands Center, Durango, Colorado.

Eager, T. 2010. Personal communication. Gunnison Service Center, Region 2 Forest Health Management.

Ehle, D.S., and W.L. Baker. 2003. Disturbance and stand dynamics in ponderosa pine forests in Rocky Mountain National Park, USA. *Ecological Monographs* 73:543–566.

Ellingson, A.R. 2003. Uncompahgre fritillary butterfly monitoring and Inventory: 2002 field report and recommendations. Unpublished report. Prepared for the U.S. Fish and Wildlife Service, the U.S. Forest Service, and the U.S. Bureau of Land Management. Fort Collins, Colorado.

Engler, T.W., B.S. Brister, H. Chen, and L.W. Teufel. 2001. *Oil and Gas Resource Development for San Juan Basin, New Mexico: A 20-year, Reasonable Foreseeable Development (RFD) Scenario Supporting the Resource Management Plan for the Farmington Field Office, Bureau of Land Management*. Farmington, New Mexico: U.S. Department of the Interior, Bureau of Land Management, Farmington Field Office.

Environmental Protection Agency (EPA). 2005. Mercury, Cleaner Power Plants, Safer Environment. Available at: http://www.epa.gov/airquality/powerplanttoxics/#. Accessed August 6, 2013.

———. 2009. Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2007. Available at: http://epa.gov/climatechange/emissions/usinventoryreport.html . Accessed August 6, 2013.

———. 2011. *Passive Sampling of Ambient Reactive Gaseous Mercury In the Four Corners Area, Eastern Oklahoma, and Central/East Texas: Important Method Evaluation and Baseline Work*. Available at: http://www.epa.gov/ttnamti1/files/ambient/airtox/2011workshop/day4MarkSatherPassiveMercury.pdf. Accessed August 6, 2013.

BLM_0033668

Environmental Protection Agency. 1995. AP 42, Compilation of Air Pollutant Emission Factors. Available at: http://www.epa.gov/ttnchie1/ap42/. Access July 30, 2013.Ferland, C. 2005. Northern goshawk (*Accipiter gentillis atricapillus*) breeding status in the San Juan and Rio Grande National Forests, Southwestern Colorado. Unpublished report. Prepared for the San Juan and Rio Grande National Forests. Washington, D.C.: U.S. Department of Agriculture, U.S. Forest Service.

Finch, D.M. (ed.) 2012. *Climate Change in Grasslands, Shrublands, and Deserts of the Interior American West: A Review and Needs Assessment*. General Technical Report RMRS-GTR-285. Fort Collins, Colorado: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Finch, D.M., and L.F. Ruggiero. 1993. Wildlife habitats and biological diversity in the Rocky Mountains and Northern Great Plains. *Natural Areas Journal* 12:191–203.

Fitzgerald, J.P., C.A. Meaney, and D.M. Armstrong. 1994. *Mammals of Colorado*. Niwot, Colorado: Denver Museum of Natural History and University of Colorado Press.

Fleischner, T.L. 1994. Ecological costs of livestock grazing in western North America. *Conservation Biology* 8(3):629–644.

Floyd, L.M., W.H. Romme, and D.D. Hanna. 2000. Fire history and vegetation pattern in Mesa Verde National Park, Colorado, USA. *Ecological Applications* 10(6):1666–1680.

———. 2004. Historical and recent fire regimes in pinon-juniper woodlands on Mesa Verde Colorado, USA. *Forest Ecology and Management* 198:269–289.

Friedlander, J. D. 1980. The Status of Rare and Endangered Plant Species in Mesa Verde National Park, Colorado. M.S. Thesis, Colorado State University, Fort Collins, CO.

Fuller, M.R. 2010. *Raptor Nesting Near Oil and Gas Development: An Overview of Key Findings and Implications for Management Based on Four Reports by Hawk Watch International*. BLM Technical Note 432. Prepared for U.S. Department of the Interior, Bureau of Land Management Utah State Office, Colorado State Office, and Wyoming State Office. Boise, Idaho: Forest and Rangeland Ecosystem Science Center, U.S. Geological Survey.

Geist, V. 1971. *Mountain Sheep: A Study in Behavior and Evolution*. Chicago: University of Chicago Press.

Gellhorn, J. 2007. *White-tailed Ptarmigan, Ghosts of the Alpine Tundra*. Boulder, Colorado: Johnson Books.

George, J.L., R. Kahn, M.W. Miller, and B. Watkins. 2009. *Colorado Bighorn Sheep Management Plan, 2009–2019*. Special Report No. 81. Denver: Colorado Division of Wildlife.

Giesen, K.M., and C.E. Braun. 1992. Winter home range and habitat characteristics of white-tailed ptarmigan in Colorado. *Wilson Bulletin* 104:263–272.

Glenne, G. 2013. U.S. Fish and Wildlife Service Grand Junction Ecological Services Field Office. Personal communication regarding Knowlton's cactus.

BLM_0033669