

# Final Environmental Assessment

# South Canal Drop 4 Hydropower Project

**Western Colorado Area Office**

**Upper Colorado Region**



**August 2014**

BLM_0034165

BLM_0034166

# *Table of Contents*

CHAPTER 1 – INTRODUCTION ............................................................................................... 1

    PROPOSED ACTION ........................................................................................................ 1

    NEED FOR AND PURPOSE OF ACTION........................................................................ 1

    BACKGROUND INFORMATION .................................................................................... 2

        Uncompahgre Project.................................................................................................. 2

        Lease of Power Privilege ............................................................................................ 2

    PUBLIC SCOPING ........................................................................................................... 3

CHAPTER 2 – PROPOSED ACTION AND ALTERNATIVES ................................................. 4

    NO ACTION ALTERNATIVE .......................................................................................... 4

    PROPOSED ACTION ........................................................................................................ 4

        South Canal Drop 4..................................................................................................... 5

        Hydropower Project Design......................................................................................... 5

        Operation..................................................................................................................... 7

    SUMMARY ....................................................................................................................... 8

CHAPTER 3 – AFFECTED ENVIRONMENT & ENVIRONMENTAL CONSEQUENCES .... 9

    UNCOMPAHGRE PROJECT OPERATIONS AND WATER RESOURCES......................... 9

    ENERGY AND SOCIOECONOMIC CONDITIONS............................................................ 11

    WETLANDS AND WATER QUALITY ............................................................................ 12

    FISHERIES...................................................................................................................... 14

    WILDLIFE AND VEGETATION ................................................................................... 15

    THREATENED AND ENDANGERED SPECIES ............................................................ 18

    RECREATION ................................................................................................................ 20

    INDIAN TRUST ASSETS & ENVIRONMENTAL JUSTICE............................................ 20

    CULTURAL RESOURCES .............................................................................................. 20

    AIR QUALITY AND NOISE .......................................................................................... 21

    VISUAL RESOURCES.................................................................................................... 22

    CUMULATIVE IMPACTS.............................................................................................. 23

    SUMMARY AND ENVIRONMENTAL COMMITMENTS............................................. 23

        Mitigation Measures and Environmental Commitments ...................................... 23

BLM_0034167

CHAPTER 4 – CONSULTATION & COORDINATION.......................................................... 26

    GENERAL ................................................................................................................... 26

    DISTRIBUTION LIST ................................................................................................ 26

    COMMENTS ON DRAFT EA..................................................................................... 27

REFERENCES ................................................................................................................. 29

ATTACHMENT A – Preliminary Lease of Power Privilege (Contract No. 2014-0031-CF-0002)

ATTACHMENT B – Bureau of Land Management's Uncompahgre Field Office list of Species of Concern

ATTACHMENT C – Draft MOA

ATTACHMENT D – Draft EA Comment

BLM_0034168



Figure 1.  Project Area

BLM_0034169

BLM_0034170

# CHAPTER 1 – INTRODUCTION

## PROPOSED ACTION

The Uncompahgre Valley Water Users Association (UVWUA) has requested approval to develop hydropower at Drop 4 of the South Canal of the federal Uncompahgre Project.  Under the proposed action, the Bureau of Reclamation (Reclamation) would execute a Lease of Power Privilege with UVWUA.  The lease would authorize the use of federal lands, facilities and Uncompahgre Project water to construct, operate and maintain a 4.8 megawatt (MW) hydropower facility.  Reclamation would also issue license agreements to allow the construction, operation, and maintenance of 1.27 miles of overhead power lines to connect the new facility to the existing electrical grid.  The hydropower project would be located in Montrose County, Colorado, approximately 5.2 miles southeast of the town of Montrose, Colorado as shown in Figure 1.

The Drop 4 hydropower project would be located in a section of the South Canal approximately 0.8 miles downstream from the existing Drop 3 hydropower project completed in 2013.  This section of the South Canal drops approximately 71 feet.  Water that currently flows through the South Canal would be diverted into a penstock and through the hydropower plant before returning to the Canal to meet irrigation delivery demands downstream.  The project also includes 1.27 miles of new overhead interconnection line across federal lands (Bureau of Land Management (BLM) and Reclamation).

This Environmental Assessment (EA) is prepared in accordance with the National Environmental Policy Act, the Council on Environmental Quality Regulations for Implementing the Procedural Provisions of NEPA (40 CFR 1500-1508), and the U.S. Department of the Interior's regulations (43 CFR Part 46).  The EA evaluates the environmental effects of issuing the LOPP for construction and operation of the Drop 4 hydropower project.

## NEED FOR AND PURPOSE OF ACTION

A Lease of Power Privilege (LOPP) is needed to permit a non-federal entity to use a Reclamation facility for electric power generation. The LOPP would ensure that the development of hydropower would be implemented consistent with established authorities, purposes, and water operations for the Uncompahgre Project.

The purpose of the Drop 4 Hydropower Project is to develop a 4.8 megawatt (MW) hydropower plant on the South Canal at Drop 4 to provide a clean, renewable energy source that is locally controlled.  Current Federal policy encourages non-Federal development of environmentally sustainable hydropower potential of Federal water resource related projects.    The electricity

1

generated by the Project would provide the UVWUA with an additional source of revenue that can be used to defray annual operating expenses and assist in the maintenance and improvement of the Uncompahgre Project.

# BACKGROUND INFORMATION

## Uncompahgre Project

The Uncompahgre Project is an irrigation project in west-central Colorado developed by the Bureau of Reclamation and operated by the UVWUA.  Irrigated lands surround the town of Montrose and extend 34 miles along both sides of the Uncompahgre River to Delta, Colorado. Project features include Taylor Park Dam and Reservoir in Gunnison County, the Gunnison Tunnel, 7 diversion dams, 128 miles of main canals, 438 miles of laterals, and 216 miles of drains.  The systems divert water from the Uncompahgre and Gunnison rivers to serve over 76,000 acres of irrigated land.

The Uncompahgre Project was authorized by the Secretary of the Interior on March 14, 1903, under the provisions of the Reclamation Act.  Construction began in July 1904, and the first water for irrigation was available during the irrigation season of 1908 from the Uncompahgre River.  The Gunnison Tunnel was completed in 1909 and the Gunnison Diversion Dam was completed in January 1912 to deliver Gunnison River water to the Uncompahgre Valley.  Taylor Park Dam, built from funds allotted under the National Industrial Recovery Act, was completed in 1937.  The project was transferred to the UVWUA for operation and maintenance in 1932.

The Uncompahgre Project plan provides for water storage in Taylor Park Reservoir on the Taylor River, which is a part of the Gunnison River Basin.  The Gunnison Diversion Dam on the Gunnison River, about 12 miles east of Montrose, diverts Gunnison River direct flows, as well as releases from the Taylor Park Dam into the Gunnison Tunnel and then into the South Canal.  The tunnel is 5.8 miles long and has a capacity of approximately 1,100 cubic feet per second (cfs). The South Canal extends from the end of the Gunnison Tunnel generally southwest 11.4 miles to the Uncompahgre River.  Part of the canal is concrete lined; the remainder is unlined.

To distribute the waters of the Gunnison and Uncompahgre rivers, the South and West Canals were constructed, and the larger existing private canals that take water directly from the Uncompahgre River were purchased, enlarged, and extended.  Laterals were constructed to deliver water from the South Canal to project lands.

## Lease of Power Privilege

The Lease of Power Privilege (LOPP) is a contract between a non-Federal entity and the United States to use federal project facilities for electric power generation consistent with Reclamation project purposes.  The LOPP must not impair the efficiency of Reclamation generated power or water deliveries, jeopardize public safety, or negatively affect any other Reclamation project purpose.  The Uncompahgre Project includes the development of hydropower as an authorized project purpose.  A LOPP has terms of 40 years, and the general authority includes, among

2

BLM_0034172

others, the Town Sites and Power Development Act of 1906 (43 U.S.C. 522), and the Reclamation Project Act of 1939 (43 U.S.C. 485h(c)).

On August 3, 2013, Congress passed the Bureau of Reclamation Small Conduit Hydropower Development and Rural Jobs Act.  This act requires that Reclamation first offer a LOPP to the irrigation district or water users association operating the federal project, or to the irrigation district or water users association receiving water from the federal project.  The UVWUA operates the Uncompahgre Project.

On May 14, 2014, a Preliminary Lease of Power Privilege (Contract No. 2014-0031-CF-0002) was entered into by Reclamation and the UVWUA to permit federal cost-recovery for the NEPA compliance, engineering review, and development of the LOPP.    A copy of the Preliminary LOPP is included for reference as Attachment A.  The final LOPP must accommodate existing contractual, water delivery, and environmental commitments related to operation and maintenance of the South Canal and the Uncompahgre Project.

# PUBLIC SCOPING

Scoping is an early and open process to determine the issues and alternatives to be addressed in the EA.  Public scoping was conducted in conjunction with the LOPP negotiation meeting held at the UVWUA office in Montrose on June 12, 2014.  Notice of the public meeting was published in the local Montrose Daily Press newspaper.

Reclamation also utilized issues and concerns previously identified during public scoping for another LOPP process for hydropower development of Drops 1 and 3 on the South Canal completed in 2011 and 2012 (Reclamation 2012).  Issues identified during that scoping process included:

- Visual impacts from new power lines,
- Impacts to existing water deliveries,
- Impacts to rainbow and brown trout fisheries in the South Canal and Uncompahgre River,
- Changes in diversions from the Gunnison River,
- General support for renewable energy,
- Effects on endangered plants, and
- Protection of cultural resources.

BLM_0034173

# CHAPTER 2 – PROPOSED ACTION AND ALTERNATIVES

Alternatives evaluated in this EA include the No Action Alternative and the Proposed Action Alternative.

## NO ACTION ALTERNATIVE

Under this alternative, Reclamation would not issue a LOPP and the proposed hydropower development at Drop 4 on the South Canal would not be constructed at this time.

## PROPOSED ACTION

Under the Proposed Action, Reclamation would execute a LOPP to permit UVWUA to construct, operate, and maintain a 4.8 MW hydropower plant and associated facilities adjacent to the South Canal. The hydropower project would divert water from the South Canal, just above Drop 4, and move the water 1,342 feet downhill through a 10-foot diameter buried penstock to a powerplant, and return the water to the Canal (Figure 2).



Figure 2. Proposed hydropower project design.

BLM_0034174

**South Canal Drop 4**

The original alignment of the South Canal at the Drop 4 site consisted of a 2,312-ft.long concrete channel that included six drop structures. This section was abandoned in 1935 when a concrete chute was built as a Public Works Administration project immediately northwest of the original alignment to bypass the section. The concrete chute is 8-ft. wide with vertical side walls of 6-inch concrete. The chute parallels the abandoned drop structures and runs about 0.5 miles before opening into a wider, concrete lined channel.

**Hydropower Project Design**

Project designs would be reviewed and approved by Reclamation prior to authorizing construction. Existing diversion structures would remain in place and would be maintained to meet irrigation deliveries during construction and if the penstock or hydropower plant are down for repairs or maintenance during the irrigation season. Power produced would be wheeled by the Delta Montrose Electric Association (DMEA) to the Municipal Energy Association of Nebraska (MEAN).

Project designs include construction of an intake to convey flows parallel to the existing canal through 1,342' of 10' diameter repurposed pipe before producing power through the proposed 4.8 MW facility. Flow will then return to the existing canal. This will be a parallel bypass of water and will not alter irrigation deliveries. A summary of the hydropower project features are described in greater detail below. Additional details can be found in the project's supporting design report (Sorenson Engineering 2014):

A. **Canal System** – The portion of the South Canal in the project area is a concrete flume structure which services the Uncompahgre Valley Water Users Association.

B. **Intake Channel** – The channel will be adjacent to the existing canal at the upstream end of the project. It will be approximately 900' in length and utilizes the abandoned Drop 4 alignment. Combined in the intake channel are the diversion, bypass, and overflow. The diversion will consist of a 12' wide by 15.75' high roller gate that will be set in the existing concrete canal to divert water to the intake channel. This gate will also be used as a bypass.

   The overflow structure will consist of five 10' wide automatic trip gates (ATGs) which will function as a redundant safe guard in the event the plant shuts down for any reason and the bypass gate is not able to divert the required flows. In conjunction with the ATGs, a 4' long weir wall will be added at the intake to return excess flows to the canal.

C. **Intake Structure** – The intake portion of the structure will be an approximately 100' long by 30' wide section of new concrete canal to spread and slow the water before entering a deep intake channel. The water will then cross through a bar screen trash removal system to remove debris. It will then enter the 10' diameter penstock pipe placed within the abandoned Drop 4 Canal which will deliver water 1,342' downstream to the powerhouse. During turbine shutdown or startup, the intake roller gate will operate

5

at rates to match the turbine wicket gates, i.e. maintain constant upstream water level and thus constant movement of flow, including upstream flow modifications.

D. **Powerhouse** – The powerhouse will be a steel and/or concrete building structure with a steel reinforced concrete foundation. The foundation will embed the turbine housing, steel draft tube, and tailrace stop gates. The building will be approximately 40' wide by 30' long and house the generator and mechanical/electrical auxiliaries. The building will be equipped with a roof access hatch to facilitate future maintenance. The tailrace will be approximately 750' in length and follow the old Drop 4 Canal alignment before returning to the South Canal.

E. **Turbine** – The turbine will be a vertical double regulated Kaplan. The turbine will be of American/European design built in China, as will be the generator. The turbine manufacturer is represented by Far East Engineering of Boise, Idaho. Nearly identical units were installed on the South Canal Drop 1 and Drop 3 projects constructed earlier this year.

The project will also require 1.27 miles of new overhead power line to connect the new hydropower plant to the power grid. The interconnection line will cross BLM and Reclamation land, originating at the Drop 4 hydropower plant, and will cross adobe hills as it extends to its tie-in at the existing Drop 3 hydropower plant (Figure 3). The power line will initially be owned by Shavano Falls LLC, with possible future ownership transferred to the Delta Montrose Electric Association (DMEA).

Construction of the hydropower facility is currently a private venture; however, UVWUA is considering applying for grants from state and federal sources. Construction is expected to take 10 months at a cost of approximately $7 million. Construction activities would be coordinated with canal operations and on-going irrigation delivery. Normal irrigation deliveries would be maintained throughout construction. Storage areas and staging areas during construction would be adjacent to the South Canal. Existing roads would be used for construction access, in addition to a new bridge structure and new access roadway which will be constructed across the South Canal between the intake structure and the powerhouse. UVWUA would be responsible for obtaining any required Federal, state, or local permits to construct and operate the Project, including permits under the Clean Water Act (Section 402 and 404 permits) which may be needed for dewatering or other construction activities.

Disturbed land would be contoured to prevent erosion, and topsoil, where available, will be stockpiled during construction for later use in re-vegetation. A seeding mix specifically designed for the impact area would be used, and long-term weed control would be implemented. Additional information is found in Chapter 3 under Environmental Commitments.

BLM_0034176



Figure 3. The yellow line indicates the proposed alignment of the new overhead power line. The blue line represents the location of the South Canal, with brown indicating where the canal is tunneled through the adobe hills.

## Operation

UVWUA anticipates that the units would be operated by an automatic computer (unmanned) control located at the plant, fitted with a dial-in signal to allow remote monitoring of the plant, including critical variables (temperature, voltage, etc.), from any telephone. In addition, the control panel will be fitted with an automatic telephone dialer to alert of alarm conditions. The facilities will be utility grade with battery system operation of essential features during power outages.

At the beginning of each irrigation season, water would be discharged through the irrigation system and power plant to exercise the gates and make certain all systems associated with the project are in working order.

The facilities would be designed and equipped with structures to protect the canal and irrigation flows. When the hydropower facilities go off-line, flows would be immediately diverted back into the canal to prevent any disruption to the irrigation supplies.

7

The hydropower project would only use normal irrigation flows in the South Canal. The Uncompahgre Project was constructed as an irrigation project and irrigation will remain as its primary purpose with all other uses playing secondary roles. The hydropower project would be operated as a run-of-canal plant. During the irrigation season, the Project would divert irrigation flow from the canal, pass it through the power plant, and return the water to the canal immediately below the power plant. Increases in diversions from the Gunnison River through the Gunnison Tunnel to the South Canal would not be permitted under the LOPP for the hydropower project. Hydropower production would occur in the March through October period. Water resources are discussed further in Chapter 3.

The electricity generated by the Project would provide UVWUA a source of revenue that may be used to defray annual operating expenses.

# SUMMARY

Table 1. Summary of potential impacts for alternatives

| Resource | No Action Alternative | Hydropower Development at Drop 4 |
|---|---|---|
| Energy Production | None | 15,744 megawatt-hours (MWh) of energy per year. |
| Wetlands & Riparian Resources | No effect | No effect |
| Recreation Use | No effect | No effect |
| Visual Resources | No effect | Minor effects |
| Fisheries | No effect | No effect |
| Water Rights | No effect | No change in water rights. |
| Endangered Species | No effect | No change to endangered fish, no effect to other listed species. |
| Wildlife and Vegetation | No effect | Temporary impacts associated with construction and maintenance of the hydropower facilities. |
| Water supply for Irrigation and Municipal Uses | No effect | No effect |
| Cultural Resources | No effect | Adverse effects to NRHP eligible historic resources, impacts will be mitigated as stipulated in an MOA developed between Reclamation and SHPO. |
| Air Quality | No effect | Minor changes in air quality during construction associated with fugitive dust. Active dust abatement program implemented to keep changes in air quality to an insignificant level. Offset emission of carbon dioxide (estimated at 32,000,000 to 34,000,000 pounds per year) and other greenhouse gases. |
| Noise | No effect | Temporary increase of noise levels during construction; distance from any nearby structures combined with enclosure of project equipment will result in no significant long-term effect. |
| Socio-economics | No effect | Assist in providing a source of renewable energy for MEAN to market to retail municipal utilities throughout Colorado; temporary benefit of increased construction jobs. Increased employment/tax revenues. Long-term benefit to UVWUA members resulting from sale of power. |

BLM_0034178

# CHAPTER 3 – AFFECTED ENVIRONMENT & ENVIRONMENTAL CONSEQUENCES

This chapter discusses resources that may be affected by actions taken to construct and operate a hydropower plant at Drop 4 on the South Canal. For each resource, existing conditions and impacts are described. This chapter is concluded with a list of environmental commitments.

## UNCOMPAHGRE PROJECT OPERATIONS AND WATER RESOURCES

*Existing Conditions:* The Uncompahgre Project is authorized and operated to provide water supplies for irrigation in the Uncompahgre Valley. Irrigation supplies are developed from four sources: direct flow diversions from the Uncompahgre River, storage water from Ridgway Reservoir, direct flow diversions from the Gunnison River, and storage water from Taylor Park Reservoir.

Taylor Park and Gunnison River water is diverted through the Gunnison Tunnel to the South Canal. Diversions generally begin in March and end in October. During peak irrigation months, approximately 1,050 cfs is diverted through the tunnel. Minimum irrigation diversions are approximately 400 cfs, an amount that is sufficient to operate head gates on the South Canal. Several laterals carry water from the South Canal to portions of the eastern Uncompahgre Valley, but the majority of the South Canal water enters the Uncompahgre River and the West Canal south of Montrose, Colorado. A series of diversion dams on the Uncompahgre River then direct water to much of the remaining Uncompahgre Valley.

Water deliveries are also periodically made from the South Canal to fill Fairview Reservoir, which supplies municipal and industrial water to Ouray, Montrose, and Delta Counties. Outside the irrigation season, between 50 to 100 cfs is delivered via the Gunnison Tunnel and South Canal for one to two days to refill the reservoir.

Figure 4 shows the range of Gunnison Tunnel diversions based on daily diversion data from 1991 through 2010. The average daily diversion rate during this 20 year period is portrayed by the green line. The average annual diversion volume between 1991 and 2010 was 360,600 acre-feet. The maximum daily diversion during this 20 year period is shown by the blue line and the minimum daily diversion during this same period is shown by the red line. The maximum and minimum daily diversion lines do not portray any historical diversion patterns but simply show the maximum and minimum daily diversion rate that occurred on that particular day during the period between 1991 and 2010.

9

BLM_0034179



Figure 4- Gunnison Tunnel Diversions, 1991-2010

As can be seen, irrigation diversions generally begin increasing in mid-March, peak in the May through August period, and gradually decreases until the end of October or early November. Diversions in the non-irrigation months are for filling Fairview Reservoir, as discussed above. Total diversions by year are shown in Table 2. It can be seen that there is variability between years based on crop and weather patterns, reservoir storage, and basin water conditions.

Table 2. Annual diversions from the Gunnison River to the South Canal (acre-feet)

| Year | Gunnison Tunnel Diversion (af) | Year | Gunnison Tunnel Diversion (af) |
|------|-------------------------------|------|-------------------------------|
| 1991 | 361,653 | 2001 | 395,524 |
| 1992 | 352,996 | 2002 | 360,054 |
| 1993 | 319,246 | 2003 | 352,777 |
| 1994 | 363,770 | 2004 | 354,890 |
| 1995 | 287,862 | 2005 | 360,234 |
| 1996 | 365,832 | 2006 | 385,717 |
| 1997 | 278,700 | 2007 | 362,228 |
| 1998 | 369,798 | 2008 | 360,220 |
| 1999 | 376,640 | 2009 | 409,355 |
| 2000 | 395,618 | 2010 | 399,586 |

10

BLM_0034180

*No Action Alternative:*  Under the No Action Alternative, there would be no changes to current irrigation deliveries or operations.  Gunnison Tunnel diversions vary from year to year due to water availability, weather patterns, crop and land use patterns, and other factors.  This variability would continue with or without the hydropower project.  Changes in climate or major changes in cropping or land use patterns may also affect irrigation diversions and water use patterns.

*Proposed Action:*  Under the proposed action, the water diverted into the Gunnison Tunnel for irrigation would also be used for hydropower production at Drop 4.  There would be no change in operations, the timing, or the amount of water diverted into the Gunnison Tunnel.  The power plant would be operated as a run-of-canal facility, and existing irrigation supplies and deliveries would not be affected.  Hydropower production would only occur during the irrigation season.

# ENERGY AND SOCIOECONOMIC CONDITIONS

*Existing Conditions:*  Hydropower has been developed previously at two sites along the South Canal, a site on the Montrose and Delta (M&D) Canal known as Shavano Falls, and additional hydropower developments are planned at other locations.  The existing and proposed Uncompahgre Project hydropower projects are located in the Rocky Mountain Power Area of the Western Electric Coordination Council Region of the North American Electric Reliability Council.

In the short-term, the proposed project would be used to meet a portion of the electricity demand in Municipal Energy Agency of Nebraska's (MEAN) service territory.  MEAN is part of the Nebraska Municipal Power Pool and was organized in 1980 to secure power supply for its members and provide related administrative and technical services.  MEAN combines the capacities of a number of municipally-owned plants with Western Area Power Administration power and purchased power.  MEAN supplies power and energy to approximately 40 municipalities in Nebraska, Colorado and Kansas.  There is existing potential for future power produced from Drop 4 to be used to meet future local power demands.  Demands for electricity in Delta-Montrose Energy Association's service territory have been on an increasing trend for decades.  The peak demand and annual energy requirements for the area are projected to increase at an average annual compound rate of 1.8 to 2.0 percent over the 10-year planning period of 2007 through 2017 (WECC 2004).  The proposed project would help meet this rising demand.

Amendment 37 to the Colorado Constitution established a Renewable Energy Standard which requires each provider of retail electric service in the State of Colorado that serves over 40,000 customers to secure a minimum percentage of electricity (10% by 2015) from renewable energy sources such as wind, solar, and hydroelectricity.

The Uncompahgre Project and water supplies from the Gunnison and Uncompahgre rivers are critical to the economies of Delta and Montrose Counties, and west-central Colorado.  The Uncompahgre Project supports over 66,000 acres of irrigated agriculture through a series of over 500 miles of canals and laterals.  Principle crops harvested on the irrigated lands include alfalfa, wheat, corn, dry beans, and small grains (Colorado Decision Support Systems).  Up to 23,000

11

acre-feet (af) of water is also diverted from the South Canal to Project 7 Water Authority's Fairview Reservoir for municipal and industrial water in Ouray, Montrose, and Delta Counties. Project 7 Water Authority provides treatment of the water supplied by a water exchange from Ridgway Reservoir.  Because of the physical location of the Project 7 Water Authority's water treatment plant east of Montrose, and because the quality of water in the Gunnison River is superior to that of the Uncompahgre River, an exchange of Ridgway Reservoir storage water with direct flow water from the Gunnison River via the Gunnison Tunnel and South Canal has been established for municipal and industrial water from Ridgway to be used for irrigation.

*No Action Alternative:*  Under the No Action Alternative, UVWUA would not build a hydropower facility at Drop 4 and economic opportunities associated with the hydropower project would be forgone.

*Proposed Action:*  The new hydropower project would produce an estimated average of 15,744 megawatt-hours (MWh) of energy per year based on run of the canal flows, and would help meet regional power demands in the future.  Power from the proposed project would be distributed through MEAN facilities in Colorado, Nebraska, and Wyoming.

The life of the project is expected to extend well beyond 50 years, and could thus provide UVWUA a long-term, reliable revenue stream.  According to initial estimates, revenues could be relatively small at first, dependent on financial terms of interest and amortization schedule, but the project should produce positive cash flow once operations start.  The projections are highly dependent on interest rates and actual operation and maintenance costs.  However, after the project debt is paid, the long-term life for which the project will be designed results in revenues to the UVWUA to help pay for Uncompahgre Project operation, maintenance and improvement costs.

The proposed project will provide an additional source of renewable energy for MEAN to market throughout Colorado, which could then help those agencies reach the Renewable Energy Standard.

There would be short-term employment and spending on goods, services, and materials during the construction phase.  This would benefit local communities and businesses, as well as increase tax revenues from taxes collected on these purchases.

The transport and delivery of irrigation or municipal and industrial water in the South Canal would not be affected by hydropower development during construction, operation, or any future maintenance projects.

# WETLANDS AND WATER QUALITY

*Existing Conditions:*  The Clean Water Act (CWA) establishes the basic structure for regulating discharges into the waters of the United States.  Section 402 of the CWA states that, any person who proposes to discharge pollutants from a point source to waters of the United States must apply for a Non-Point Discharge Elimination System (NPDES) Permit (Section 402 Permit).

BLM_0034182

Section 404 of the CWA requires permits for the discharge of dredged or fill material into waters of the United States. Wetland areas adjacent to waters of the United States may also be subject to permit requirements. Authorization can either be issued under nationwide or individual permits and are site specific. Nationwide permits include entire groups of activities. The South Canal has direct connection between the Gunnison River and the Uncompahgre River, and has previously been considered as waters of the United States for other projects.

*No Action Alternative:* Under the No Action Alternative, there would be no changes in wetlands or water quality in the South Canal.

*Proposed Action:* Under the Proposed Action, a Section 402 Permit would not be required, unless construction activities occurred during the irrigation season and resulted in direct discharges into waters of the United States. Construction dewatering permits would be required if pumped ground water is directly discharge into to waters of the United States. Outside the irrigation season, the South Canal is dewatered and has no direct connection to waters of the United States.

Under Section 404, Nationwide Permit (NWP) No. 17 (Hydropower Projects) addresses discharges of dredged or fill material associated with hydropower projects having: 1) less than 5000 kW at existing facilities, and 2) are issued exemption granted by FERC (in this case exempt from FERC through the Lease of Power Privilege). UVWUA would be responsible for obtaining this Nationwide permit prior to construction. There would be no effect on the water quality of the South Canal.

NWP No. 12 (Utility Line Activities) includes activities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2 –acre of waters of the United States for each single and complete project. The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if any of the following criteria are met: 1) the activity involves mechanized land clearing in a forested wetland for the utility line right-of-way; 2) a section10 permit is required; 3) the utility line in waters of the United States, excluding overhead lines, exceeds 500 feet; and 4) the utility line is placed within a jurisdictional area (i.e. water of the United States), and it runs parallel to or along a stream bed that is within that jurisdictional area. Copies of both NWP 12 & 17 can be found at: http://www.spk.usace.army.mil/Missions/Regulatory/Permitting/NationwidePermits.aspx.

13



Figure 5.  Riparian area supported by canal seepage.  The orange line indicates the proposed powerline alignment. The blue line represents South Canal, with the brown sections indicating where the canal tunnels through the adobe hills.

There is one riparian area about 0.6 miles to the north of Drop 4 which appears to be supported only by canal seepage (Figure 5) and is considered non-jurisdictional under the Clean Water Act. Plant species include cattail, tamarisk, coyote willow, and cottonwoods.  The proposed powerline alignment crosses through the western edge of this riparian area.  The powerpoles are pre-authorized under the requirements of the CWA, as they are wooden and will be anchored directly to the ground.  As currently designed, the project will not require pre-construction notification for construction of the power line and meets the requirements for NWP 12.

# FISHERIES

*Existing Conditions:*  The Gunnison River, the water source for the South Canal, is an important fishery.  Water is diverted by the Gunnison Diversion Dam through the Gunnison Tunnel to the canal to provide irrigation water to Montrose and Delta Counties.  The Gunnison River has been designated a Gold Medal fishery, and the river upstream from the Gunnison Diversion Dam

14

supports the highest biomass of wild rainbow trout of any reach of the river. This section of the river serves as an important broodstock source for managing rainbow trout throughout Colorado. Downstream from the Gunnison Diversion Dam, the river flows through the Black Canyon of the Gunnison National Park and the Gunnison Gorge National Conservation Area, and is managed as a Gold Medal and wild trout fishery.

Historically, there were significant numbers of fish that entered the South Canal from the Gunnison River via the Gunnison Tunnel diversion each irrigation season. Some of the fish from the Gunnison River, would move through the South Canal and into the Uncompahgre River or West Canal downstream, or would be harvested by anglers in the South Canal.

With the 2012 installation of the electronic fish barrier at the entrance to the Gunnison Tunnel, fish entrainment into the South Canal is expected to be greatly reduced. This benefits both the recreational fishery in the Gunnison River upstream and downstream of the Gunnison Tunnel, and the fishery management programs supported by the reach of the river above the Gunnison Diversion Dam. Recreational fishing and snagging in the South Canal is believed to have been correspondingly reduced or lost as the number of fish diverted into the canal has been reduced. However, the possibility exists that some fish continue to be diverted into the canal, and there is a percentage of mortality to fish that might enter the canal and go through the turbines at Drops 1 and 3. The number of fish that historically traveled through the canal to the Uncompahgre River or West Canal has been reduced. In addition, any impacts to recreational fishing in the South Canal and Uncompahgre River as a result of South Canal hydropower development were fully mitigated with the installation of the fish barrier and the purchase of additional fishing access along the Uncompahgre River by DMEA.

*No Action Alternative:* Under the No Action Alternative, no changes in current fishery conditions in the South Canal are predicted.

*Proposed Action:* Diversions from the Gunnison River would not change due to operation of the hydropower project. Habitat conditions in the Gunnison River will not change. The electronic fish barrier would continue to deter fish from entering the Gunnison Tunnel, and fish that manage to go through the tunnel would continue to experience a level of mortality by passing through the turbines at Drops 1 and 3. A percentage of fish which successfully pass through turbines at Drops 1 and 3 would experience a level of mortality by passing through the turbine at Drop 4. Because of the electronic fish barrier at the Gunnison Tunnel, fishery conditions in the South Canal are not expected to significantly deviate from existing conditions with the construction of a hydropower facility at Drop 4. No additional mitigation would be required.

# WILDLIFE AND VEGETATION

*Existing Conditions:* In the general Project area, non-irrigated lands include areas of adobe hills or eroded Mancos shale. Soils are often highly alkaline with little organic material. Low precipitation, high rates of erosion and adobe soils create a harsh environment with sparse and limited, although in some cases rare or unique, vegetation.

15

BLM_0034185

The BLM has designated or proposed several Areas of Critical Environmental Concern (Fairview, South Fairview) on public lands to the north and south of the Project area (BLM 2010). These designations are based primarily on the presence of rare endemic vegetation on the adobe hill areas.

Native vegetation in the study area consists of salt desert shrub communities dominated by species of saltbush, with generally sparse vegetation. Mancos shale hills have mat saltbush, shadscale, Gardner saltbush, and black sagebrush. Grasses include bottlebrush squirreltail, galleta, Salina wildrye, Indian rice grass, annual wheatgrass, and cheatgrass. Other species include winterfat, pricklypear cactus, yellow milkvetch, woody aster and Canada thistle. Greasewood occurs in areas with elevated groundwater along the canal and areas with salt grass and sea-blight occur in swales.

The South Canal introduced a water supply to the area approximately 100 years ago. Seepage from the canal supports patches of greasewood and tamarisk and, in wetter areas, willows and cattails. Road sides and other disturbed areas support rabbitbrush, Russian knapweed, halogeton, cheatgrass, and annual mustards. Where not concrete-lined, banks of the South Canal support a narrow strip of canary reedgrass, willows, and cattails.

The location of the hydropower project features has been disturbed in the past with significant earth moving due to the original construction of the South Canal, canal rehabilitation projects over the years, access roads and storage areas, disposal of spoil material, and development of borrow areas.

There is a raptor nest in one of the cottonwood trees supported by the riparian area adjacent to the proposed power line. Inspection of the nest found no activity (no birds, green vegetation or droppings), indicating this is not an active nest.

Colorado Parks and Wildlife GIS data (CPW 2014) shows the project area within winter range and severe winter range for both mule deer and elk. The project area is also listed as a winter concentration area for elk. There are no prairie dog towns or known active raptor nests in the hydropower impact area. Waterfowl make occasional use of the low velocity sections of the South Canal outside of the drop area.

Appendix B includes a listing of plant and animal species of special concern developed by the BLM's Uncompahgre Field Office for the general region, and includes species potentially occurring in the Project area.

*No Action Alternative:* Under the No Action Alternative, a hydropower facility at Drop 4 would be not developed and there would be no changes to the existing wildlife and vegetation conditions.

*Proposed Action:* Much of the project area has been disturbed in the past with significant earth moving due to the original construction of the South Canal, canal rehabilitation projects over the years, access roads and storage areas, disposal of spoil material, and development of borrow areas.

16

Construction of the power line will not remove or disturb the inactive raptor nest. However, if the power line construction is delayed until after March 1st, the nest should be revisited, and if active, all construction activities within 1/8 mile avoided until after the nest fledges.

Temporary impacts to wildlife and other vegetation would occur due to the construction of the hydropower facilities. Approximately 12 acres of land would be disturbed during construction of the hydropower facilities at Drop 4. Erosion-control Best Management Practices for drainage and sediment control will be implemented to prevent or reduce nonpoint source pollution during and following construction. Fuel storage, equipment, maintenance, and fueling procedures will be developed to minimize the risk of spills and the impacts from these incidents. A Spill Prevention Control and Countermeasure Plan (SPCC) will be prepared prior to construction. With these control measures in place, wildlife impacts are predicted to be minor, and due primarily to direct disturbance associated with construction. Wildlife may avoid using the area during construction.

Invasive and non-native plant species such as Russian knapweed, Russian olive, and kochia will be controlled within the project area for the life of the project by UVWUA as a condition of the LOPP, which will benefit native plant and animal species that utilize the area. UVWUA is responsible for consultation with Reclamation for acceptable weed control measures, including pesticides/herbicides approved for use on Reclamation land. Use of pesticides/herbicides will comply with the applicable Federal and state laws, and will be used only in accordance with their registered uses and within limitations imposed by the Secretary of the Interior. All construction equipment will be power-washed and free of soil and debris prior to entering the construction sites to reduce the spread of noxious and unwanted weeds. Topsoil, where available, will be stockpiled during construction for later use in re-vegetation. Disturbed areas will be contoured to reduce erosion and facilitate re-vegetation and will be re-seeded with a Reclamation approved seed mixture which contains greasewood and sagebrush. The plan for re-vegetation and related erosion control/re-contouring and implementation will require approval by Reclamation. The UVWUA will work directly with Reclamation and adjacent landowners to re-vegetate disturbed areas and develop appropriate seed mixtures.

To minimize potential impacts to wintering mule deer and elk, construction activities associated with the new power line will be restricted between January 1st and March 31st. Power line construction during the January-March time period may occur during a mild winter, but only after additional discussions with the local Colorado Parks and Wildlife Office. It is anticipated that the majority of other major construction activities associated with the hydropower facilities will occur outside this time period, and disturbances to local deer and elk population is predicted to be minimal.

Above-ground power line and power pole designs will meet recommended standards as outlined in the *Avian Protection Plan Guidelines* developed by the US Fish and Wildlife Service and Industry (APLIC 2005). A copy of these standards can be viewed at: http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Aprl2005.pdf

17

BLM_0034187

# THREATENED AND ENDANGERED SPECIES

*Existing Conditions:* Table 3 includes species which are listed under the Endangered Species Act as endangered, threatened, or are a candidate for listing which are potentially occurring in Montrose County or in downstream rivers.

**Table 3. Special status species in Montrose County**

| Common Name | Scientific Name | Status | General Habitat |
|---|---|---|---|
| Black-footed ferret | *Mustela nigripes* | Endangered | Prairie dog towns |
| Bonytail | *Gila elegans* | Endangered | Colorado River and major tributaries |
| Colorado hookless cactus | *Sclerocactus glaucus* | Threatened | River benches, xeric slopes with cobbles and pebbles |
| Clay-loving wild buckwheat | *Eriogonum pelinophilum* | Endangered | Adobe hills |
| Colorado pikeminnow | *Ptychocheilus lucius* | Endangered | Colorado River and major tributaries |
| Greenback cutthroat trout | *Oncorhynchus clarki stomias* | Threatened | Small, high elevation streams |
| Gunnison prairie dog | *Cynomys gunnisoni* | Candidate | Western Montrose County |
| Gunnison sage grouse | *Centrocercus minimus* | Proposed Endangered | Colorado plateau, basin big sagebrush |
| Mexican spotted owl | *Strix occidentalis lucida* | Threatened | Closed-canopy forests or rocky canyons |
| North American wolverine | *Gulo gulo luscus* | Candidate | Mountainous wilderness areas |
| Skiff milkvetch | *Astragalus microcymbus* | Candidate | Sagebrush parks |
| Yellow-billed cuckoo | *Coccyzus americanus* | Proposed Threatened | Riparian, cottonwood woodland |

Generated by the U.S. Fish & Wildlife Service's Environmental Conservation Online System on 06/10/2014.

The clay-loving wild buckwheat is found in specific microhabitats in the adobe hill areas along the eastern side of the Uncompahgre Valley, and it is endemic to Delta and Montrose Counties, Colorado.  In the past, its habitat was fragmented and lost due to agricultural, road, and housing development.  Currently, habitat is threatened by off-road vehicle use and expansion of housing areas.  Vegetation surveys of the project's direct and indirect impact area did not record this species (Bio-Logic 2013 and BLM UFO 2014).  While the vegetation communities of the surrounding hillsides were typical of suitable Clay-loving buckwheat habitat, the hills themselves were much too steep to be indicative of the plant, which prefers more gradual slopes.

The Colorado hookless cactus occurs primarily on alluvial benches (soils deposited by water) along the Colorado and Gunnison Rivers and their tributaries.  The cactus generally occurs on gravelly or rocky surfaces on river terrace deposits and lower mesa slopes, and it is endemic to Delta, Montrose, Mesa, and Garfield Counties, Colorado.  Ongoing and foreseeable threats

BLM_0034188

include mineral and energy development, illegal collection, recreational off-road vehicle use, and grazing.

The endangered bonytail, Colorado pikeminnow, humpback chub, and razorback sucker are found in the Gunnison and/or Colorado Rivers downstream from the project area, and are influenced by water use activities in the basin that affect both the quantity of flows and quality of water. In accordance with Section 7 of the Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. 1531 et seq.), and the Interagency Cooperation Regulations (50 CFR 402), the Fish and Wildlife Service (FWS 2009) issued a Programmatic Biological Opinion (PBO) for the Gunnison River and effects on the endangered Colorado pikeminnow, humpback chub, bonytail, and razorback sucker and their critical habitats. Consultation for the Gunnison River Basin included the continued operations and depletions associated with existing Reclamation projects, including the Uncompahgre Project, other Federal projects, and existing non-federal water depletions.

Potential habitat for other listed species does not occur in areas affected by the hydropower project. Designated critical habitat occurs about 18 miles downstream below the confluence of the Gunnison and Uncompahgre rivers.

*No Action Alternative:* Under the no action alternative, there would be no change in effect to any threatened, endangered, or candidate species in Montrose County, Colorado.

*Proposed Action:* Under the proposed action, there would be no new effects on endangered, threatened, or candidate species or their habitat due to the development of any features of the hydropower project. There are no listed species present in areas that would be affected by construction, and there would be no changes in river flows or water quality that could affect the downstream endangered fish. Water depletions associated with the Uncompahgre Project were consulted on and addressed in the Gunnison Basin Programmatic Biological Opinion (FWS 2009) and no additional consultation is needed for this project.

Vegetation surveys of the Project's direct and indirect impact area did not find any threatened or endangered species. Two surveys were completed for endangered plants: one for the hydropower plant location (Bio-Logic 2013) and one for the powerline alignment (BLM UFO 2014). The construction footprint, powerline corridor and construction access areas were inventoried and no Colorado hookless cactus was identified. The project area is considered to provide marginal habitat for Clay-loving buckwheat. Known clay-loving buckwheat populations occur just east and north of the project area, and changes in project plans may require additional surveys prior to construction.

In the event of discovery of threatened or endangered species, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation. Work will not be resumed until approved by Reclamation.

19

# RECREATION

*Existing Conditions:*  Areas adjacent to any canal and drops are dangerous.  The maintenance road along the canal is steep and narrow in places and can be dangerous, especially when wet. For these reasons, public access is not allowed.

*No Action Alternative:*  Under the No Action Alternative, hydropower facilities would not be constructed at Drop 4.   There would be no change in recreation from existing conditions.

*Proposed Action:*  Under the proposed action, hydropower facilities would be constructed at Drop 4.  The water course created by the South Canal spill water will be located within the buried penstock, which will alter the ambience of the water coursing down-gradient.  The project would have no effect on recreation.

# INDIAN TRUST ASSETS & ENVIRONMENTAL JUSTICE

Indian Trust Assets (ITAs) are legal interests in property held by the United States for Indian Tribes or individuals.  Reclamation and other Federal agencies share the responsibility to protect these assets.  There are no potentially affected ITA's in the project area, and therefore no impacts are projected.

Executive Order 12898 on Environmental Justice provides that Federal agencies analyze programs to assure that they do not disproportionately adversely affect minority or low income populations or Indian Tribes.  There are no potentially affected minorities or low income populations or Indian Tribes affected by the project, and therefore, no impacts are predicted under the alternatives.

# CULTURAL RESOURCES

*Existing Conditions:*  The project impact area has been inventoried for cultural resources (Alpine 2013).  There were no prehistoric sites located; however, Reclamation determined that the affected portions of the South Canal contribute to an officially eligible site on the National Register of Historic Places (NRHP), and the South Canal Construction Camp at Tunnel 3 is eligible for inclusion on the NRHP.  The Colorado State Historic Preservation Officer (SHPO) has reviewed and concurred with Reclamation determinations.   A brief description of these cultural resources is presented below.

The South Canal was the first large-volume canal built to transport water from the Gunnison Tunnel throughout the Uncompahgre Valley.  The South Canal is 11.4 miles long, and carries up to 1,010 cfs of water directly from the opening of the Gunnison Tunnel to a point on the Uncompahgre River about 9 miles south of Montrose.  Construction of the South Canal took place in divisions between 1904 and 1909.  The acreage brought under cultivation by the

20

BLM_0034190

Gunnison Tunnel and the South Canal was more than twice what was possible before the project was built.

The South Canal Construction Camp at Tunnel 3 is a historic labor camp associated with construction of the South Canal. The camp is on the portion of the South Canal constructed between September 1905 and October 1907.

*No Action Alternative:* Under the No Action Alternative, no hydropower facilities would be constructed at Drop 4. There would be no impact to cultural resources.

*Proposed Action:* Under the proposed action, hydropower facilities would be constructed at Drop 4. Reclamation determined that the proposed project will adversely affect NHPA eligible cultural resources and has consulted with the SHPO. A Memorandum of Agreement (MOA) between Reclamation and the SHPO to mitigate the effects is being finalized. A draft of the MOA is included as Attachment C. The MOA will be executed and mitigation measures implemented prior to commencing with construction.

In the event of discovery of evidence of possible cultural or paleontological resources, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation. Work will not be resumed until approved by Reclamation.

If any additional areas of impact (for example: access roads, borrow pits, or waste areas) are identified during the course of the undertaking, they will be inventoried for cultural resources and consulted on with the SHPO. No construction work will occur at or near the additional impact area until this consultation is completed.

# AIR QUALITY AND NOISE

*Existing Conditions:* Air quality is generally excellent in the project area, and there are no air quality non-attainment areas in the vicinity (EPA 2013). Agricultural operations and construction activities can be sources of dust pollution during wind events in the general region.

There are no significant noise sources or problems in the project area. The primary source of noise in the project area is the noise of flowing water in the South Canal over Drop 4.

*No Action Alternative:* Under the No Action Alternative, no hydropower facilities would be constructed at Drop 4. There would not be a change in air quality and noise.

*Proposed Action:* Under the proposed action, a hydropower facility would be constructed at Drop 4.

There would be minor noise impacts during excavation for the powerplant and from construction traffic. During operation, the turbines and generators would produce machinery noise, representing a new potential noise source; however, such equipment would be fully enclosed, located a considerable distance from any dwellings, and should have no discernible impact.

21

After construction of the project facilities, the distance from and enclosure of equipment to any residences will drop noise associated with operations of the hydropower facilities below detectable levels.

There would be short-term dust impacts during excavation work, although this is predicted to be insignificant because dust abatement Best Management Practices would be followed during construction and operation of the hydropower facilities. Reclamation will require watering to minimize/control dust from cleared areas and along roadways. There would be no long-term adverse impacts on air quality due to operation and maintenance of the hydropower facilities. As with other hydropower projects, there would be a beneficial offset of emissions of carbon dioxide ($CO_2$) and other greenhouse gases. According to the U.S. Energy Information Administration (EIA), in 2012 "the average annual electricity consumption for a U.S. residential customer was 10,837 kWh." With an average annual energy generation of 15,744,000 kWh, the Drop 4 hydropower project would provide enough clean energy to power 1,453 homes each year. Table 4 has been modified to demonstrate the number of pounds of $CO_2$ that could be removed annually for the average U.S. household utilizing steam-electric generators in 2012 for the specific fuels identified (EIA 2013). Reclamation estimates that Carbon dioxide emissions would be reduced by an estimated 32,000,000 to 34,000,000 pounds per year based on the size of the hydropower project and the Energy Information Administration's reduction numbers.

**Table 4. Drop 4 Hydroelectric Development Associated Carbon Reduction**

| Fuel Type: Coal | Lbs of $CO_2$ per Million Btu | Heat Rate (Btu per kWh) | Lbs $CO_2$ per kWh | Lbs of $CO_2$ removed when using clean energy |
|---|---|---|---|---|
| Bituminous | 205.300 | 10,107 | 2.08 | 32,747,520 |
| Sub-bituminous | 212.700 | 10,107 | 2.16 | 34,007,040 |
| Lignite | 215.400 | 10,107 | 2.18 | 34,321,920 |

Last updated:  April 17, 2014 (http://www.eia.gov/tools/faqs/faq.cfm?id=74&t=11)

# VISUAL RESOURCES

*Existing Conditions:*  The BLM uses a Visual Resource Management (VRM) system to assess visual resources. BLM lands in the vicinity of Drop 4 are VRM Class IV, a category that accepts major modifications in the landscape. The visual appearance of the landscape along the South Canal is dominated by Mancos Shale adobe hills with irrigated land developed along flats below the canal. Lands west or downhill from the canal show considerable modification to the landscape by the construction of ditches and roads, maintenance activities, and agricultural development. Lands east or uphill from the canal show less evidence of development and have a more natural appearance.

*No Action Alternative:*  Under the No Action Alternative, no hydropower facilities would be constructed at Drop 4. There would be no changes to visual resources.

22

*Proposed Action:*  Under the proposed action, approximately 1.27 miles of new power line would be constructed across BLM and Reclamation land to connect power generated at the proposed hydropower station to the grid.  Power poles would be painted with colors to blend with the existing landscape and would be non-reflective.  Disturbed areas would be contoured and re-vegetated.  Construction material and existing debris from previous construction would be disposed of at designated landfills.

# CUMULATIVE IMPACTS

Cumulative impacts are impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.  Overall, the construction of the hydropower plant would not result in significant cumulative impacts.

# SUMMARY AND ENVIRONMENTAL COMMITMENTS

The primary effect of the proposed action would be to develop a renewable energy resource. There would be short-term economic benefits due to construction expenditures and employment. In the long-term, UVWUA and their members would benefit from income generated from the project.

## Mitigation Measures and Environmental Commitments

The following measures will be implemented and followed by UVWUA and its contractors.  The LOPP requires that these commitments be followed and met.  An environmental commitment plan will be prepared to document how environmental commitments and mitigation measures will be implemented during design, construction, and operation of the Project.

- The construction and operation of the hydropower project is required to be operated in a manner that does not interfere with the irrigation supplies or maintenance of the Uncompahgre Project.
- Existing access roads will be used to access the construction areas.  No new access roads will be constructed. A new bridge structure has already been constructed by UVWUA across the South Canal between the intake structure and the powerhouse to allow for improved access.
- Erosion-control Best Management Practices for drainage and sediment control will be implemented to prevent or reduce nonpoint source pollution during and following construction.
- All construction equipment shall be power-washed and free of soil and debris prior to entering the construction site to reduce the spread of noxious and unwanted weeds.
- Topsoil, where available, will be stockpiled during construction for later use in re-vegetation.  Disturbed areas will be contoured to reduce erosion and facilitate re-

23

vegetation. Disturbed areas will be re-seeded with a Reclamation approved seed mixture which includes greasewood and sagebrush. The plan for re-vegetation and related erosion control/re-contouring and implementation will require approval by Reclamation.

- Dust abatement Best Management Practices will be undertaken in all areas disturbed during construction.
- Fuel storage, equipment maintenance, and fueling procedures will be developed to minimize the risk of spills and the impacts from these incidents. A Spill Prevention Control and Countermeasure Plan (SPCC) will be prepared prior to construction.
- UVWUA will be responsible for obtaining any required Federal, state, or local permits to construct and operate the project, including permits under the Clean Water Act (Section 402 and 404 permits) which may be needed for dewatering or other activities.
- In the event of discovery of threatened or endangered species, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation. Work will not be resumed until approved by Reclamation.
- In the event of a change in project plans which would require work outside of areas inventoried for clay-loving wild buckwheat, Reclamation will be consulted to determine if additional surveys are required.
- To minimize potential impacts to wintering mule deer and elk, construction activities associated with the new power line will be restricted between January 1st and March 31st. Power line construction during the January-March time period may occur during a mild winter, but only after additional discussions with the local Colorado Parks and Wildlife Office.
- All new power lines and power poles will follow the recommended standards as outlined in the *Avian Protection Plan Guidelines* developed by the US Fish and Wildlife Service and Industry (Edison Electric Institute 2005). A copy these standards can be viewed at: http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Aprl2005.pdf
- If the power line construction is delayed until after March 1st, the nearby raptor nest should be revisited. If active, all construction activities within 1/8 mile of the nest should be avoided until after the nest fledges.
- In the event of discovery of evidence of possible cultural or paleontological resources, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation. Work will not be resumed until approved by Reclamation.
- Cultural mitigation measures agreed to in a Memorandum of Agreement with the Colorado State Historic Preservation Officer will be completed by UVWUA before project construction commences.
- If any additional areas of impact (for example: access roads, borrow pits, or waste areas) are identified during the course of the undertaking, they will be inventoried for cultural resources and consulted on with the SHPO. No construction work will occur at or near the additional impact area until this consultation is completed.
- Powerhouses and substations will be non-reflective and painted to blend with the project area background.
- There will be no increase in diversions from the Gunnison River solely for hydropower use permitted under the LOPP. The hydropower facility will be operated based on irrigation diversion patterns.
- Irrigation supplies and canal maintenance access will be maintained during construction at all times. Water supplies to Fairview Reservoir will not be interrupted.

24

BLM_0034194

- The UVWUA will be responsible for noxious weed control within the limits of the facility for the life of the project.  UVWUA is responsible for consultation with Reclamation for acceptable weed control methods, including pesticides/herbicides approved for use on public land.  Use of pesticides/herbicides will comply with the applicable Federal and state laws.  Pesticides/herbicides will be used only in accordance with their registered uses and within limitations imposed by the Secretary of the Interior. A copy of the Montrose County Weed Management Plan is available at: http://www.montrosecounty.net/162/Weed-Mitigation.
- Disturbance to nearby shrubs and other ground cover will be kept to a minimum, with disturbance occurring only in those areas which are absolutely necessary for project construction.

25

# CHAPTER 4 – CONSULTATION & COORDINATION

## GENERAL

The public was invited to attend a negotiation meeting between Reclamation and UVWUA.  The meeting was held on June 12, 2014 in Montrose to discuss the terms and conditions associated with the construction and operation of the South Canal Drop 4 Hydropower Project. Reclamation also used this public meeting to provide an opportunity for the public to identify issues and concerns with the proposed project.  No interested parties attended the meeting. Reclamation and the UVWUA have had informal discussions with adjacent landowners, and local, county, and state agencies.  Reclamation also relied on issues that were previously identified for other hydropower projects recently constructed in the Lower Gunnison Basin on the Dallas Creek Project at Ridgway Dam, South Canal at Drops 1 & 3, and the Montrose & Delta Canal at Shavano Falls in preparing this draft EA.

In addition, Reclamation has conducted consultations with the Colorado State Historic Preservation Officer under Section 106 of the National Historic Preservation Act and the U.S. Fish and Wildlife Service under the Endangered Species Act.  Results of these consultations have been incorporated into the project analysis and discussions in Chapter 3.

Availability of the draft EA was announced through a press release and through a distribution letter sent to nearby landowners and interested agencies.  A draft EA was distributed for agency review and comment on July 24, 2014.  Comments were requested by August 8, 2014.

## DISTRIBUTION LIST

News Releases announced the availability of the Draft EA, and the EA was placed on Reclamation's website at: www.usbr.gov/uc/ under environment documents.  The draft EA was also announced in a distribution letter to an updated mailing list as shown below:

- Colorado State Representatives
- Colorado State Senator
- Delta County Commission, Delta CO
- Montrose County Commission, Montrose CO
- Colorado Division of Water Resources, Montrose CO
- Colorado Parks and Wildlife, Montrose CO
- Colorado State Historic Preservation Office, Denver CO
- Tri-County Water Conservancy District, Montrose CO
- Delta-Montrose Electric Association, Montrose CO

BLM_0034196

- Uncompahgre Valley Water Users Association, Montrose CO
- Project 7 Water Authority, Montrose CO
- Montrose Daily Press, Montrose CO
- Telluride Watch, Telluride CO
- Ouray Plain Dealer, Ouray CO
- Western Slope Conservation Center, Paonia CO
- Daily Sentinel, Grand Junction CO
- Western Resource Advocates, Boulder CO
- High Country Citizens Alliance, Crested Butte CO
- Southern Ute Indian Tribe, Ignacio CO
- Ute Mountain Ute Indian Tribe, Towaoc CO
- Fish and Wildlife Service, Grand Junction CO
- Corps of Engineers, Grand Junction CO
- U.S. Environmental Protection Agency, Denver CO
- U.S. Geological Survey, Grand Junction CO
- Individuals and Landowners

# COMMENTS ON DRAFT EA

A total of one written comment was received on the Draft EA, and a copy is provided as Attachment D.

**Comment Letter – Colorado Parks and Wildlife**

Comment:  The proposed project lies inside CPW mapped winter range for mule deer, and is occupied by chucker and Gambel's quail.  To offset impacts to wildlife, the following steps could be taken:

1) Minimizing construction, operations and maintenance from December 1st through April 31st each year to reduce impacts to wintering mule deer.
2) Minimize impacts to shrubs and other ground cover.  Gamble's quail and chukar rely on the shrubs for feeding, nesting and cover.

Response:  Reclamation held an onsite meeting on August 22, 2014 with District Wildlife Manager Matt Ortega.  The project was discussed, along with potential impacts to wintering mule deer.  It was agreed upon to add an additional environmental commitment to the Final EA which requires UVWUA to consult with Colorado Parks and Wildlife prior to approving construction of the new power line if construction will occur between January 1st and March 31st.  If the winter is mild, Colorado Parks and Wildlife may support additional power line construction activities within the January-March time period.  In addition, UVWUA is committed to completing most major construction activities at the hydropower site prior to the critical winter months, which would minimize disturbances to wintering mule deer and elk .

BLM_0034197

Impacts to shrubs and other ground cover in the project area will be kept to a minimum. It was agreed upon that the Reclamation approved seed mixture for revegetation after project completion will include greasewood and sagebrush.

28

BLM_0034198

# REFERENCES

Alpine 2013.  Cultural Resource Inventory of Three Potential Hydropower Sites, Montrose County, Colorado.  Alpine Archaeological Consultants, Inc.  October 2013.

APLIC 2005.  Avian Protection Plan (APP) Guidelines.  The Edison Electric Institute's Avian Power Line Interaction Committee and U.S. Fish and Wildlife Service.  April 2005.

BLM 2010.  Draft Evaluation of Proposed and Existing Areas of Critical Environmental Concern for the Uncompahgre Planning Area.  Bureau of Land Management Uncompahgre Field Office.  June 2010.  Accessed on June 10, 2014.  Website at: http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.96192.File.dat/Draft%20ACEC%20Report%20071510.pdf.

BLM UFO 2014.  South Canal Hydroelectric Project Survey for the Federally Endangered Clay-loving Wild Buckwheat (Eriogonum pelinophilum).  Bureau of Land Management Uncompahgre Field Office.  May 2014.

Bio-Logic, Inc. 2013.  Sorenson Engineering & Uncompahgre Valley Water Users Association South Canal and Montrose & Delta Canal Hydroelectric Projects Rare Plant Survey Report.  BIO-Logic, Inc. Natural Resource Consultants, Montrose, Colorado.  October 10, 2013.

CPW  2014. Resource Stewardship Geographic Information System (GIS).  Colorado Parks and Wildlife.  Accessed on August 26, 2014.  Website at: http://cpw.state.co.us/aboutus/Pages/ResourceStewardshipGIS.aspx

EPA 2013.  Currently Designated Nonattainment Areas for all Criteria Pollutants. Environmental Protection Agency.  December 5, 2013.  Accessed on June 10, 2014.  Website at:  http://www.epa.gov/airquality/greenbook/ancl3.html.

FWS 2009.  Final Gunnison River Basin, Programmatic Biological Opinion.  Fish and Wildlife Service, Ecological Services, Colorado Field Office, Denver, Colorado.  December 4, 2009.

Reclamation 2012.  Final Environmental Assessment South Canal Hydropower Project.  Bureau of Reclamation, Western Colorado Area Office.  February 2012.

Sorenson Engineering 2014.  Supporting Design Report for South Canal Drop 4 Hydroelectric Project.  Rep. Idaho Falls, Idaho: Sorenson Engineering, 2014.

WECC 2004.  10-Year Coordinated Plan Summary; Planning and Operation for Electric System Reliabiility.  Western Electricity Coordinating Council, 2004.  Accessed on June 10, 2014.  Website at: http://www.wecc.biz/library/WECC%20Documents/Publications/10-

29

Year%20Coordinated%20Plan%20Summaries/2004-2013%2010-Year%20Coordinated%20Plan%20Summary.pdf.

BLM_0034200

ATTACHMENT A – Preliminary Lease of Power Privilege (Contract No. 2014-0031-CF-0002)

**Contract No.**   2014-0031-CF-0002

### PRELIMINARY LEASE AND FUNDING AGREEMENT
### BETWEEN
### BUREAU OF RECLAMATION
### AND
### UNCOMPAHGRE VALLEY WATER USERS ASSOCIATION
### FOR
### SOUTH CANAL DROP 4 LEASE OF POWER PRIVILEGE
### COST-RECOVERY

1.     THIS PRELIMINARY LEASE AND FUNDING AGREEMENT (Agreement) is made pursuant to the Reclamation Act of 1902 approved June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto, particularly the Contributed Funds Act of March 4, 1921 (43 U.S.C. § 395), among the Bureau of Reclamation (Reclamation) and the Uncompahgre Valley Water Users Association (Association) for the purpose of contributing funds to Reclamation to perform environmental, and other services necessary to establish and implement a Lease of Power Privilege (LOPP).

### WITNESS TO

2.     EXPLANATORY RECITALS

2.1     WHEREAS,  the Uncompahgre Project, located on the western slope of the Rocky Mountains in west-central Colorado, was authorized for construction by the Secretary of the Interior on March 14, 1903, under the provisions of the Reclamation Act of 1902; and

2.2     WHEREAS, the Uncompahgre Project was authorized to allow for the sale of hydroelectric power under the Act of June 22, 1938 (52 Stat. 941), Sale of Surplus Power, Uncompahgre Valley Project; and

2.3     WHEREAS, the electricity generated by the proposed hydropower plant to be located on the South Canal at Drop 4 will provide a clean, renewable energy source; and

2.4     WHEREAS, a proposal was reviewed by Reclamation staff, and it has been determined that negotiations should proceed with the Association for the LOPP on the South Canal at Drop 4.

2.5     WHEREAS, under Reclamation law and policy, the Association is required to pay in advance all costs associated with work undertaken by Reclamation necessary for completion of this project; and

1

31

BLM_0034201

2.6     WHEREAS, the Contributed Funds Act provides authority for the Secretary of the Interior, acting through Reclamation, to receive moneys, without further appropriation. The law states: "All moneys after March 4, 1921, from any State, municipality, corporation, association, firm, district, or individual for investigations, surveys, construction work, or any other development work incident thereto involving operations similar to those provided for by the Reclamation law shall be covered into the Reclamation fund, and shall be available for expenditure for the purposes for which contributed in like manner, as if said sums had been specifically appropriated for said purposes."

**NOW THEREFORE,** in consideration of the foregoing the parties agree to the following:

## 3.    PURPOSE

3.1     The purpose of this Agreement is to receive funding from the Association for Reclamation's assistance in the development of the LOPP on the South Canal at Drop 4, and identify timelines for the LOPP process.

## 4.    RESPONSIBILITIES

4.1     Reclamation will assure that all actions identified in its Scope of Work below are complete.

4.2     The Association will assure that all actions identified in its Scope of Work below are complete.

## 5.    RECLAMATION'S SCOPE OF WORK

5.1     Reclamation will be the lead agency for ensuring compliance with the National Environmental Policy Act (NEPA), Endangered Species Act (ESA) and the National Historic Preservation Act (NHPA); and request consultation from the U.S. Fish and Wildlife Service pursuant to Section 7 of the ESA, if consultation is required.

5.2     Reclamation LOPP lead contact on this project will be Mr. Ryan Christianson, as identified in Article 11.1 herein. Reclamation shall schedule a meeting within 30 calendar days of the execution of this Agreement. The attendees will be Reclamation staff and the Association representatives. The purpose of this meeting will be to ensure all attendees understand the roles and responsibilities of each of the parties in the LOPP process. The agreed upon terms, roles and responsibilities resulting from this meeting will be documented in a manner agreeable to the parties involved.

2

BLM_0034202

5.3    Reclamation shall perform tasks related to the development and implementation of the LOPP, including, but not limited to: contract development, design review, and technical assistance, as needed, related to construction, operation, maintenance and security of the power facility.

5.4    Reclamation may contract with another person or entity, in consultation with the Association, for obligations described herein. All costs, including Reclamation's actual costs for administering the contract(s), shall be paid by the Association.

5.5    Reclamation shall establish a specific account (Federal Account) to receive funds advanced by the Association.

5.6    Reclamation shall provide a monthly accounting of its expenses for work performed to establish and implement the LOPP.

## 6.    ASSOCIATION'S SCOPE OF WORK

6.1    The Association shall provide Reclamation with representatives to participate on the LOPP contract negotiation team.

6.2    The Association shall assist Reclamation, as requested, with completion of activities required to comply with NEPA, ESA, NHPA, and other applicable Federal laws as required.

6.3    The Association shall assist Reclamation in arranging public involvement, including meeting places and notices to the public, if so determined to be necessary by Reclamation for NEPA compliance.

6.4    The Association shall pay all costs in the manner described in Article 10, herein. Reclamation has estimated the costs associated with NEPA compliance and other tasks listed in Exhibit A to be $70,000. Upon execution of this Agreement and prior to initiation of required tasks by Reclamation, the Association shall advance to Reclamation the estimated costs associated with the completion of such tasks. The Association shall make an initial deposit into the Federal Account in the amount of $40,000. At such time when the balance in the Federal Account is anticipated to be reduced to $10,000 or less, Reclamation will request additional deposits be made into the Federal Account. The Association shall deposit the requested funds into the Federal Account within 30 days of receipt of the request.

6.5    The Association shall provide a timeline schedule for completing the necessary steps to execute the LOPP contract and begin construction.

3

33

BLM_0034203

## 7. TERM OF THE AGREEMENT

7.1     The date of execution for this Agreement shall be the date this Agreement is signed by the Regional Director.

7.2     This Agreement shall be effective for a period of 15 months from the date of the execution, or until either execution of the LOPP contract, or the Association ceases to pursue a LOPP contract.

## 8. TERMINATION

8.1     Either party may terminate this Agreement with 30 days written notice to the other party.

## 9. MODIFICATION(S) TO THE AGREEMENT

9.1     Either party may formally request modification of this Agreement. Modifications shall be by mutual consent of the parties by the issuance of a written modification to this Agreement, signed and dated by the parties, to any changes being performed.

## 10. BUDGET AND METHOD OF PAYMENT

10.1    In order to comply with 43 U.S.C. 395 Contributed Funds Act of March 4, 1921, Reclamation will issue written requests to the Association for advancement of funds to be deposited into the Federal Account (Article 5.5, herein). Requests for deposits will include work estimates for the deposit requested. Reclamation will not perform any work until adequate funds are available in the Federal Account. The Association will be allowed 30 days from the date it receives a request to make the requested deposits. The fund amount will be based upon the estimate shown on Exhibit A. If the estimate does not cover all of Reclamation's costs, Reclamation will request additional funds from the Association in advance of continuing work.

4

34

BLM_0034204

10.2     If this Agreement is terminated prior to execution of a LOPP contract (Article 8.1, herein), or if this Agreement is no longer in effect (Article 7.2, herein), remaining funds deposited in the Federal Account (Article 5.5, herein) shall be returned to the Association within 30 days of the date of termination, or of the first day when the Agreement was no longer in effect.

10.3     Upon the execution of a LOPP contract, remaining funds deposited in the Federal Account (Article 5.5, herein) shall remain in the Federal Account. The Federal Account shall be maintained and the funds deposited in this account shall be utilized to pay Reclamation's costs associated with administering the LOPP during the term of the LOPP contract.

## 11.    NOTICES AND AUTHORIZED REPRESENTATIVES

11.1     Any and all notices required to be given by parties hereto, unless otherwise stated in this Agreement shall be in writing and be deemed communicated when mailed through the United States Postal Service, certified, return receipt requested, and addressed as follows:

To Uncompahgre Valley Water Users Association

Mr. Steve Fletcher
Manager
P.O. Box 69
Montrose CO 81402

To Bureau of Reclamation

Mr. Ryan Christianson
Western Colorado Area Office
445 West Gunnison, Suite 221
Grand Junction CO 81501

The parties may change their leads or address for the purpose of this section by giving written notice of such change to the other in the manner herein provided.

## 12.    GENERAL PROVISIONS

12.1     Nothing herein shall be construed to obligate Reclamation to expend or involve the United States of America in any contract or other obligation requiring funding.

5

35

BLM_0034205

12.2    No Member of or Delegate to the Congress, Resident Commissioner, or official of the Association shall benefit from this Agreement, other than as a water user or landowner in the same manner as other water users or landowners.

12.3    Any information furnished to Reclamation, under this Agreement, is subject to the Freedom of Information Act (5 U.S.C. 552)

In Witness Whereof, the parties hereto have executed this Agreement as of the last date written below.

Larry Walkoviak, Regional Director
Upper Colorado Regional Office
Bureau of Reclamation

$\frac{5/14/14}{\text{Date}}$

George Etchart, President
Uncompahgre Valley Water Users Association

$\frac{5 - 6 -14}{\text{Date}}$

6

36

BLM_0034206

EXHIBIT A

Work provided by the Bureau of Reclamation in the development and construction of the hydro-powerplant on the South Canal located at Drop 4, within the Uncompahgre Project boundary.

Advancement estimates:

| Description | Cost ($) |
|---|---|
| Negotiation and Development of Lease | 25,000 |
| Planning and Design Technical Assistance | 4,000 |
| NEPA Review | 25,000 |
| Travel -- Region | 5,000 |
| Contingencies | 11,000 |
| TOTAL ADVANCEMENT ESTIMATES | $70,000 |

7

37

BLM_0034207

ATTACHMENT B – Bureau of Land Management's Uncompahgre Field Office list of Species of Concern

**BLM Uncompahgre Field Office**
**Special Status Species and Birds of Conservation Concern**
Last Update: November 18, 2013

| THREATENED AND ENDANGERED SPECIES OF THE UFO [1] | | | |
|---|---|---|---|
| SPECIES | STATUS | HABITAT DESCRIPTION [2] | DESIGNATED CRITICAL HABITAT IN FIELD OFFICE? |
| Black-footed ferret [2]<br>*Mustela nigripes* | E | Prairie dog colonies for shelter and food; >200 acres of habitat with at least 8 burrows/acre | No |
| Bonytail<br>*Gila elegans* | E | Warm-waters of the Colorado River mainstem and tributaries, some reservoirs; flooded bottomlands for nurseries; pools and eddies over rocky substrates with silt-boulder mixtures for spawning; no designated critical habitat in UFO | No |
| Clay-loving wild buckwheat<br>*Eriogonum pelinophilum* | E | Mancos shale badlands in salt desert shrub communities, often with shadscale, black sagebrush, and mat saltbush; 5200' – 6400' in elevation | Yes |
| Colorado pikeminnow<br>*Ptychocheilus lucius* | E | Warm-waters of the Colorado River mainstem and tributaries; deep, low velocity eddies, pools, runs, and nearshore features; uninterrupted streams for spawning migration and young dispersal; also floodplains, tributary mouths, and side canyons; highly complex systems | Yes |
| Humpback chub<br>*Gila cypha* | E | Warm-water, canyon-bound reaches of Colorado River mainstem and larger tributaries; turbid waters with fluctuating hydrology; young require low-velocity, shoreline habitats such as eddies and backwaters; no designated critical habitat in | No |
| Razorback sucker<br>*Xyrauchen texanus* | E | Warm-water reaches of the Colorado River mainstem and larger tributaries; some reservoirs; low velocity, deep runs, eddies, backwaters, sidecanyons, pools, eddies; cobble, gravel, and sand bars for spawning; tributaries, backwaters, floodplain for nurseries | Yes |
| Southwestern willow flycatcher [3]<br>*Empidonax traillii extimus* | E | For breeding, riparian tree and shrub communities along rivers, wetlands, and lakes; for wintering, brushy grasslands, shrubby clearings or pastures, and woodlands near water | No |
| Uncompahgre fritillary butterfly [3]<br>*Boloria acrocnema* | E | Restricted to moist, alpine slopes above 12,000' in elevation with extensive snow willow patches; restricted to San Juan Mountains | No |
| Canada lynx<br>*Lynx canadensis* | T | Spruce-fir, lodgepole pine, willow carrs, and adjacent aspen and mountain shrub communities that support snowshoe hare and other prey | No |

38

BLM_0034208

| Species | Status | Habitat | Critical Habitat |
|---|---|---|---|
| Colorado hookless cactus *Sclerocactus glaucus* | T | Salt-desert shrub communities in clay soils on alluvial benches and breaks, toe slopes, and deposits often with cobbled, rocky, or graveled surfaces; 4500' – 6000' in elevation | No |
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | T | Cold water streams and lakes with adequate spawning habitat (riffles), often with shading cover; young shelter in shallow backwaters | No |
| Mexican spotted owl [3] *Strix occidentalis* | T | Mixed-conifer forests and steep-walled canyons with minimal human disturbance | No |
| Gunnison sage grouse [7] *Centrocercus minimus* | PE | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | Proposed |
| North American Wolverine *Gulo gulo luscus* | PT | Alpine and arctic tundra, boreal and mountain forests (primarily coniferous). Limited to mountains in the south, especially large wilderness areas. Usually in areas with snow on the ground in winter. Riparian areas may be important winter habitat. May disperse through atypical habitat. When inactive, occupies den in cave, rock crevice, under fallen tree, in thicket, or similar site. Terrestrial and may climb trees. | Not yet designated |
| Western yellow-billed cuckoo [6] *Coccyzus americanus* | PT | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Not yet designated |

[1] U.S. Fish and Wildlife Service. 2009. Federally listed species in Colorado. Official correspondence. February.

[2] Van Reyper G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office. Montrose, CO, updated 2009/2010.Unpublished document.

[3] Assessment based on UFO files and GIS data, partner data, and local knowledge.

[4] Black-footed ferret believed to be extirpated from this portion of its range.

[5] Species not known to occur within UFO boundaries, but known to occur in close proximity.

[6] Federal candidate species; in accordance with BLM policy and Manual 6840, candidate and proposed species are to be managed and conserved as BLM sensitive species. For the Gunnison prairie dog, candidate status includes only those populations occurring in the "montane" portion of the species' range.

[7] U.S. Fish and Wildlife Service. 2013. 78FR2486 Proposed Listing, 78FR7540 Prpoosed Critical habitat.

BLM_0034209

| BLM SENSITIVE SPECIES OF THE UFO [1] | | |
|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2, 3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| *FISH* | | |
| Roundtail chub<br>*Gila robusta* | Warm-water rocky runs, rapids, and pools of creeks and small to large rivers; also large reservoirs in the upper Colorado River system; generally prefers cobble-rubble, sand-cobble, or sand-gravel substrate | |
| Bluehead sucker<br>*Catostomus discobolus* | Large rivers and mountain streams, rarely in lakes; variable, from cold, clear mountain streams to warm, turbid streams; moderate to fast flowing water above rubble-rock substrate; young prefer quiet shallow areas near shoreline | |
| Flannelmouth sucker<br>*Catostomus latipinnis* | Warm moderate- to large-sized rivers, seldom in small creeks, absent from impoundments; pools and deeper runs often near tributary mouths; also riffles and backwaters; young usually in shallower water than are adults | |
| Colorado River cutthroat trout<br>*Oncorhynchus clarki pleuriticus* | Cool, clear streams or lakes with well-vegetated streambanks for shading cover and bank stability; deep pools, boulders, and logs; thrives at high elevations | |
| *MAMMALS* | | |
| Desert bighorn sheep<br>*Ovis canadensis nelsoni* | Steep, mountainous or hilly terrain dominated by grass, low shrubs, rock cover, and areas near open escape and cliff retreats; in the resource area, concentrated along major river corridors and canyons | |
| White-tailed prairie dog<br>*Cynomys leucurus* | Level to gently sloping grasslands and semi-desert grasslands from 5,000' – 10,000' in elevation | |
| Kit fox<br>*Vulpes macrotis* | Semi-desert shrublands of saltbrush, shadscale and greasewood | |
| Gunnison's prairie dog [10]<br>*Cynomys gunnisoni* | Level to gently sloping grasslands, semi-desert shrublands, and montane shrublands, from 6,000'-12,000 in elevation | |
| Allen's (Mexican) big-eared bat<br>*Idionycteris phyllotis* | Ponderosa pine, pinyon-juniper woodland, oak brush, riparian woodland (cottonwood); typically found near rocky outcrops, cliffs, and boulders; often forages near streams and ponds. | |

BLM_0034210

| | | |
|---|---|---|
| Big free-tailed bat<br>*Nyctinomops macrotis* | Rocky areas and rugged terrain in desert and woodland habitats; roosts in rock crevices in cliffs and in buildings caves, and occasionally tree holes | |
| Spotted bat<br>*Euderma maculatum* | Desert shrub, ponderosa pine, pinyon-juniper woodland, canyon bottoms, open pasture, and hayfields; roost in crevices in cliffs with surface water nearby | |
| Townsend's big-eared bat<br>*Corynorhinus townsendii* | Mesic habitats including coniferous forests, deciduous forests, sagebrush steppe, juniper woodlands, and mountain; maternity roosts and hibernation in caves and mines; does not use crevices or cracks; caves, buildings, and tree cavities for night roosts | |
| Fringed myotis<br>*Myotis thysanodes* | Desert, grassland, and woodland habitats including ponderosa pine, pinyon/juniper, greasewood, saltbush, and scrub oak; roosts in caves, mines, rock crevices, and buildings | |
| *BIRDS* | | |
| Bald eagle [5]<br>*Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | |
| American peregrine falcon [5]<br>*Falco peregrines anatum* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | |
| Northern goshawk<br>*Accipiter gentilis* | Nests in a variety of forest types including deciduous, coniferous, and mixed forests including ponderosa pine, lodgepole pine, or in mixed-forests with fir and spruce; also nest in aspen or willow forests; migrants and wintering individuals can be observed in all coniferous forest types | |
| Ferruginous hawk<br>*Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | |
| Burrowing owl [9]<br>*Athene cunicularia* | Level to gently sloping grasslands and semi-desert grasslands; Prairie dog colonies for shelter and food | |
| Columbian sharp-tailed grouse [5]<br>*Tympanuchus phasianellus columbian* | Native bunchgrass and shrub-steppe communities for nesting; mountain shrubs including serviceberry are critical for winter food and escape cover | Extirpated |
| Long-billed curlew<br>*Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | Spring/ fall migrant, non-breeding |
| White-faced ibis<br>*Plegadis chihi* | Marshes, swamps, ponds and rivers | Spring/ fall migrant, non-breeding |

41

| American white pelican<br>*Pelecanus erythrorhynchos* | Typically large reservoirs but also observed on smaller water bodies including ponds; nests on islands | |
| Brewer's sparrow<br>*Spizella breweri* | Breeds primarily in sagebrush shrublands, but also in other shrublands such as mountain mahogany or rabbitbrush; migrants seen in wooded, brushy, and weedy riparian, agricultural, and urban areas; occasionally observed in pinyon-juniper | |
| Black swift [9]<br>*Cypseloides niger* | Nests on precipitous cliffs near or behind high waterfalls; forages from montane to adjacent lowland habitats | |
| **REPTILES AND AMPHIBIANS** | | |
| Longnose leopard lizard<br>*Gambelia wislizenii* | Desert and semidesert areas with scattered shrubs or other low plants; e.g., sagebrush. areas with abundant rodent burrows, typically below 5,000' in elevation | |
| Midget faded rattlesnake<br>*Crotalus viridis concolor* | Rocky outcrops for refuge and hibernacula, often near riparian; upper limit of 7500'-9500' in elevation | |
| Milk snake<br>*Lampropeltis triangulum taylori* | Variable types including shrubby hillsides, canyons, open ponderosa pine stands and pinyon-juniper woodlands, and river valleys and canyons, animal burrows, and abandoned mines; hibernates in rock crevices | |
| Northern leopard frog [3]<br>*Rana pipiens* | Springs, slow-moving streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes; in summer, commonly inhabits wet meadows and fields; may forage along water's edge or in nearby meadows or fields | |
| Canyon treefrog<br>*Hyla arenicolor* | Rocky canyon bottoms along intermittent or perennial streams in temporary or permanent pools or arroyos ; semi-arid grassland, pinyon-juniper, pine-oak woodland, scrubland, and montane zones; elevation 1000' - 10,000' | |
| Boreal toad<br>*Anaxyrus boreas boreas* | Mountain lakes, ponds, meadows, and wetlands in subalpine forest (e.g., spruce, fir, lodgepole pine, aspen); feed in meadows and forest openings near water but sometimes in drier forest habitats | |
| **PLANTS** | | |
| Grand Junction milkvetch<br>*Astragalus linifolius* | Sparsely vegetated habitats in pinyon-juniper and sagebrush communities, often within Chinle and Morrison Formation and selenium-bearing soils; elevation 4800' – 6200' | |
| Naturita milkvetch<br>*Astragalus naturitensis* | Cracks and ledges of sandstone cliffs and flat bedrock area typically with shallow soils, within pinyon-juniper woodland; elevation 5400' – 6700' | |
| San Rafael milkvetch<br>*Astragalus rafaelensis* | Banks of sandy clay gulches and hills, at the foot of sandstone outcrops, or among boulders along dry watercourses in seleniferous soils derived from shale or sandstone formations; elevation 4500'– 5300' | |
| Sandstone milkvetch<br>*Astragalus sesquiflorus* | Sandstone rock ledges (Entrada formation), domed slickrock fissures, talus under cliffs, sometimes in sandy washes; elevation 5000' – 5500' | |

BLM_0034212

| Gypsum Valley cateye<br>*Cryptantha gypsophila* | Confined to scattered gypsum outcrop and grayish-white, often lichen-covered, soils of the Paradox Member of the Hermosa Formation; often the dominant plant at these sites; elevation 5200' – 6500' | |
| Fragile (slender) rockbrake<br>*Cryptogramma stelleri* | Cool, moist, sheltered calcareous cliff crevices and rock ledges | |
| Kachina daisy (fleabane) [9]<br>*Erigeron kachinensis* | Saline soils in alcoves and seeps in canyon walls; elevation 4800' – 5600' | |
| Montrose (Uncompahgre) bladderpod<br>*Lesquerella vicina* | Sandy-gravel soil mostly of sandstone fragments over Mancos Shale (heavy clays) mainly in pinyon-juniper woodlands or in the ecotone between it and salt desert scrub; also in sandy soils derived from Jurassic sandstones and in sagebrush steppe communities; elevation 5800' – 7500' | |
| Colorado (Adobe) desert parsley<br>*Lomatium concinnum* | Adobe hills and plains on rocky soils derived from Mancos Formation shale; shrub communities dominated by sagebrush, shadscale, greasewood, or scrub oak; elevation 5500' – 7000' | |
| Paradox Valley (Payson's) lupine<br>*Lupinus crassus* | Pinyon-juniper woodlands, or clay barrens derived from Chinle or Mancos Formation shales, often in draws and washes with sparse vegetation; elevation 5000' – 5800' | |
| Dolores skeleton plant [5]<br>*Lygodesmia doloresensis* | Reddish purple, sandy alluvium and colluviums of the Cutler Formation between the canyon walls and the river in juniper, shadscale, and sagebrush communities; elevation 4000' – 5500' | |
| Eastwood's monkey-flower<br>*Mimulus eastwoodiae* | Shallow caves and seeps on steep canyon walls; elevation 4700' – 5800' | |
| Paradox (Aromatic Indian) breadroot<br>*Pediomelum aromaticum* | Open pinyon-juniper woodlands in sandy soils or adobe hills; elevation 4800' – 5700' | |
| *INVERTEBRATES* | | |
| Great Basin silverspot butterfly<br>*Speyeria nokomis Nokomis* | Found in streamside meadows and open seepage areas with an abundance of violets | |

[1] Based on Colorado BLM State Director's Sensitive Species List (Last update: November 20, 2009).

[2] Van Reyper G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office. Montrose, CO, updated 2009/ 2010. Unpublished document.

[3] Spackman SB, JC Jennings, C Dawson, M Minton, A Kratz, C Spurrier. 1997. Colorado rare plant field guide. Prepared for the BLM, USFS, and USFWS by the Colorado Natural Heritage Program.

[4] Assessments based on UFO files and GIS data, partner data, and local knowledge.

[5] ESA delisted species

[6] Species not known to occur in UFO.

[7] Validity of subspecies designation is in question by taxonomists.

[8] Species currently under status review by FWS and a 12-month finding is pending; i.e., listing of the species throughout all or a significant portion of its range may be warranted.

[9] Species not on BLM Colorado State Director's Sensitive List; included at the Field Office level to account for recent sightings, proximate occurrences, and/or potential habitat.

[10] 12-month Finding Not Warranted 78 FR 68660; Removed from USFWS list

| BIRDS OF CONSERVATION CONCERN OF THE UFO [1] | | | |
|---|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2] | RANGE AND STATUS IN THE UFO [3, 3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| Gunnison sage grouse *Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | Year-round resident, breeding | See assessment under Sensitive Species Section |
| American bittern *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/ summer resident, breeding confirmed in the region but not within the UFO | |
| Bald eagle [5] *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident, no confirmed breeding | See assessment under Sensitive Species Section |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/ winter resident, non-breeding | See assessment under Sensitive Species Section |
| Golden eagle *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident, breeding | |
| Peregrine falcon [5] *Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident, breeding | See assessment under Sensitive Species Section |
| Prairie falcon *Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident, breeding | |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | Spring/ fall migrant, non-breeding | See assessment under Sensitive Species Section |
| Snowy plover [6] *Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Spring migrant, non-breeding | |

| Mountain plover<br>*Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies ; short vegetation | Spring/ fall migrant, non-breeding | |
| Yellow-billed cuckoo<br>*Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident, breeding | See assessment under Sensitive Species Section |
| Flammulated owl<br>*Otus flammeolus* | Montane forest, usually open and mature conifer forests; prefers ponderosa pine and Jeffrey pine | Summer resident, breeding | |
| Burrowing owl<br>*Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Summer/ fall resident, breeding | See assessment under Sensitive Species Section |
| Lewis's woodpecker<br>*Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa), riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident, breeding | |
| Willow flycatcher<br>*Empidonax traillii* | Riparian and moist, shrubby areas; winters in shrubby openings with short vegetation | Summer resident, breeding | |
| Gray vireo<br>*Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident, breeding | |
| Pinyon jay<br>*Gymnorhinus cyanocephalus* | Pinyon-juniper woodland | Year-round resident, breeding | |
| Juniper titmouse<br>*Baeolophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident, breeding | |
| Veery<br>*Catharus fuscescens* | Deciduous forests, riparian, shrubs | UFO is outside known range. Possible summer resident, observed recently in Gunnison County, possible breeding. | |
| Bendire's thrasher<br>*Toxostoma bendirei* | Desert, especially areas of tall vegetation, cholla cactus, creosote bush and yucca, and in juniper woodland | UFO is outside known range | |
| Grace's warbler<br>*Dendroica graciae* | Mature coniferous forests | Summer resident, breeding | |

BLM_0034215

| Brewer's sparrow<br>*Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident, breeding | See assessment under Sensitive Species Section. |
|---|---|---|---|
| Grasshopper sparrow<br>*Ammodramus savannarum* | Open grasslands and cultivated fields | UFO is outside known range | |
| Chestnut-collared longspur<br>*Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant, non-breeding | |
| Black rosy-finch<br>*Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds/ nests in alpine areas near rock piles and cliffs | Rare winter resident, non-breeding | |
| Brown-capped rosy-finch<br>*Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer residents, breeding | |
| Cassin's finch<br>*Carpodacus cassinii* | Open montane coniferous forests; breeds/ nests in coniferous forests | Year-round resident, breeding | |

[1] U.S. Fish and Wildlife Service. 2008. Birds of Conservation Concern 2008. United States Department of Interior, Fish and Wildlife Service, Division of Migratory Bird Management, Arlington, Virginia. 85 pp. [Online version available at <http://www.fws.gov/migratorybirds/>].

[2] Cornell Lab of Ornithology. All about birds: bird guide. <http://www.allaboutbirds.org/guide/> Accessed 05/15/2009.

[3] San Juan Institute of Natural and Cultural Resources. Colorado Breeding Bird Atlas. Fort Lewis College, Durango, Colorado. <http://www.cobreedingbirdatlasii.org/> Accessed: 05/15/2009.

[4] Assessment based on UFO files and GIS data, partner data, and local knowledge.

[5] ESA delisted species.

[6] Non-listed subspecies/ population.

[7] ESA candidate species.

ATTACHMENT C – Draft MOA

**MEMORANDUM OF AGREEMENT**
**BETWEEN**
**BUREAU OF RECLAMATION, WESTERN COLORADO AREA OFFICE**
**AND COLORADO STATE HISTORIC PRESERVATION OFFICER**
**REGARDING THE SOUTH CANAL DROP 4 HYDROPOWER PROJECT,**
**UNCOMPAHGRE PROJECT, COLORADO**

**WHEREAS,** the Bureau of Reclamation (Reclamation) and the Uncompahgre Valley Water Users Association (UVWUA) plan to construct a hydropower plant on the South Canal in Montrose County, Colorado (Project); and

**WHEREAS,** Reclamation plans to issue a Lease of Power Privilege (LOPP) for the Project pursuant to the Bureau of Reclamation Small Conduit Hydropower Development and Rural Jobs Act, thereby making the Project an undertaking subject to review under Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, and its implementing regulations, 36 CFR Part 800; and

**WHEREAS,** Reclamation has defined the undertaking's area of potential effect (APE) as described in Attachment A; and

**WHEREAS,** the Bureau of Reclamation (Reclamation) as lead Federal agency has determined that the Project will have an adverse effect on the South Canal (5MN1851.7 and 5MN1851.8). These cultural resources have been determined by Reclamation, in consultation with the Colorado State Historic Preservation Officer (SHPO),  to be eligible for inclusion on the National Register of Historic Places under Criterion  C; and

**WHEREAS,** UVWUA is the sponsor of the Project.  UVWUA has participated in the consultation and has been invited by Reclamation to sign this Memorandum of Agreement (MOA);

**WHEREAS,** in accordance with 36 CFR § 800.6(a)(1), Reclamation has notified the Advisory Council on Historic Preservation (Council) of its adverse effects determination and provided the specified documentation, and the Council has chosen not to participate in the consultation pursuant to 36 CFR § 800.6(a)(1)(iii);

**NOW, THEREFORE,** pursuant to Section 106 of the NHPA, Reclamation and the SHPO agree that the undertaking shall be implemented in accordance with the following stipulations in order to take into account the effect on historic properties.

STIPULATIONS

1.  Reclamation shall ensure that the following measures are carried out:

47

a.  Prior to any modifications associated with this undertaking, Reclamation will ensure that the segments of the South Canal (5MN1851.7 and 5MN1851.8) are recorded in accordance with the guidance for Level II Documentation found in "Historic Resource Documentation, Standards for Level I, II, and III Documentation" (Office of Archaeology and Historic Preservation Publication 1595, October 2007).

b.  Reclamation will ensure that South Canal Tunnel 3 Construction Camp (5MN10212) is not affected.  The site's boundary will be flagged and avoid during construction.

c.  Documentation will include mapping and photographic documentation of those portions of the historic property to be included in the hydropower project. Photographs will be black and white archival quality (4" x 6") prints. Features will be plotted on the maps with GPS waypoints and will be extensively described and indexed in the report.

d.  Reclamation will supplement the Level II Documentation with a descriptive and historical narrative. The narrative will synthesize the existing documentation on file and describe the canal in the context of the development and history of the Uncompahgre Project area.  The narrative will include photographs of the landscape features taken during the cultural resources survey. A Summary Report for the recorded segment, which includes the Level II Documentation and the narrative, will be prepared.

e.  The documentation will include basic measured drawings to scale on archival paper. The drawings will give the basics on size and shape of the resource.  The drawings can be in pencil or archival ink.  A site map will be included, and should include topographic elevations.  The map will be prepared using data collected with a GPS with submeter accuracy.

The Summary Report will be prepared within one year of the execution of this MOA.

2.  Monitoring: The signatories may monitor activities pursuant to this MOA, and the Council will review such activities if so requested by a party to this MOA.  Reclamation will cooperate with the signatories in carrying out their review and monitoring responsibilities.

3.  Dispute Resolution: Should the SHPO object within 30 days to any documentation provided for its review pursuant to this agreement, Reclamation shall consult with the SHPO to resolve the objection.  If Reclamation determines the objection cannot be resolved Reclamation shall forward all documentation relevant to the dispute to the Council.  Within 30 days after receipt of all pertinent documentation the Council will:

a.  Advise the agency that the Council concurs in the agency's proposed response to the objection, whereupon the agency will respond to the objection accordingly;

48

BLM_0034218

b.   Provide the agency with recommendations, which the agency shall take into account in reaching a final decision regarding its response to the objection; or

c.   Notify the agency that the objection will be referred for comment pursuant to 36 CFR § 800.7(a)(4), and proceed to refer the objection and comment. The agency shall take the resulting comment into account in accordance with 36 CFR § 800.7(c)(4).

4.   Amendment and Termination: Any signatory to this agreement may request that it be amended, whereupon the parties will consult to reach a consensus on the proposed amendment. Where no consensus can be reached, the agreement will not be amended.

5.   Duration:  This MOA will be null and void if its stipulations are not carried out within five (5) years from the date of its execution.  At such time, and prior to work continuing on the undertaking, Reclamation shall either (a) execute a MOA pursuant to 36 CFR § 800.6, or (b) request, take into account, and respond to the comments of the Council under 36 CFR § 800.7.  Prior to such time, Reclamation may consult with the other signatories to reconsider the terms of the MOA and amend it in accordance with Stipulation 4 above. Reclamation shall notify the signatories as to the course of action it will pursue.

6.   In the event that Congress amends Section 106 of the NHPA or in the case of substantial changes to 36 CFR Part 800, the parties to this agreement will consider whether it would be appropriate to amend the agreement.  Any signatory to this agreement may terminate it by providing thirty (30) days notice to the other parties, provided that the signatories and concurring parties will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

7.   Failure to Carryout Terms: Failure to carry out the terms of this MOA requires that Reclamation again request the Council's comments in accordance with 36 CFR Part 800. If Reclamation cannot carry out the terms of the MOA, it will not take or sanction any action or make an irreversible commitment that would result in an adverse effect to the historic property covered by the MOA or that would foreclose the Council's considerations of modifications or alternatives that could avoid or mitigate the adverse effect on the properties until the commenting process has been completed.

Execution of this MOA by Reclamation and the SHPO, its subsequent acceptance by the Council, and implementation of its terms, evidence that Reclamation has afforded the Council an opportunity to comment and that Reclamation has taken into account the effects of the undertaking on historic properties.

49

Colorado State Historic Preservation Office


By:_____ Date:
      Edward C. Nichols, State Historic Preservation Officer

Bureau of Reclamation, Western Colorado Area Office


By:_____ Date:
      Ed Warner, Area Manager

Uncompahgre Valley Water Users Association


By:_____ Date:
      Steve Fletcher, Manager

50

## ATTACHMENT A



BLM_0034221

ATTACHMENT D – Comment Letter



## COLORADO
**Parks and Wildlife**

Department of Natural Resources

Montrose Office
2300 S. Townsend Avenue
Montrose, CO 81401
P 970.252.6000 | F 970.252.6053

August 8, 2014

Ed Warner
Area Manager
Bureau of Reclamation
Western Colorado Area Office
445 West Gunnion Ave, Suite 221
Grand Junction, CO 81501

RE: Draft Environmental Assessment, South Canal Drop 4 Hydropower Project

Dear Mr. Warner,

Thank you for the opportunity to comment on the draft Environmental Assessment (EA) for the South Canal Drop 4 Hydropower Project. Colorado Parks and Wildlife (CPW) has visited the site of the proposed project, and have a few concerns with possible impacts to wildlife.

The area of the proposed project lies inside CPW mapped winter range for mule deer, and is occupied by chuckar and Gambel's quail. To offset impacts to wildlife the following steps could be taken;
1. Minimizing construction, operations and maintence from December 1st, through April 31st each year, to reduce impacts to wintering mule deer.
2. Minimize impacts to shrubs and other ground cover. Gambe'sl quail and chuckar rely on the shrubs for feeding, nesting and cover.

Again, thank you for the opportunity to comment on the draft Environmental Assessment for the South Canal Drop 4 Hydropower Project. If you have further questions please contact myself, or District Widlife Manager Matt Ortega at (970)-252-6011.

Sincerely,

Renzo DelPiccolo
Area Wildlife Manager
970.252.6010

cc: Matt Ortega-DWM, Brian Mcgee-Land Use Coordinator, Patt Dorsey-SW Region Manager, John Holst-Energy Liaison

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission; Robert W. Bray • Chris Castilian, Secretary • Jeanne Horne
Bill Kane, Chair • Gaspar Perricone • Dale Pizel • James Pribyl • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp

52

# RECLAMATION
## *Managing Water in the West*

# Final Environmental Assessment
# South Canal Drop 5 Hydropower Project

**Western Colorado Area Office**
**Upper Colorado Region**



**August 2015**

BLM_0034223

## *Table of Contents*

CHAPTER 1 – INTRODUCTION ........................................................................................ 1
  1.1 – Proposed Action .............................................................................................. 1
  1.2 – Need for and Purpose of Action...................................................................... 1
  1.3 – Background Information .................................................................................. 2
    1.3.1 – Uncompahgre Project............................................................................... 2
    1.3.2 – Lease of Power Privilege ......................................................................... 2
  1.4 – Relationship to Other Projects ....................................................................... 3
  1.5 – Public Scoping ................................................................................................ 9
CHAPTER 2 – PROPOSED ACTION AND ALTERNATIVES ......................................... 10
  2.1 – No Action Alternative .................................................................................... 10
  2.2 – Proposed Action ............................................................................................ 10
    2.2.1 – South Canal at Drop 5 ............................................................................ 12
    2.2.2 – Hydropower Project Design .................................................................... 12
    2.2.3 – Operation and Maintenance ................................................................... 14
CHAPTER 3 – AFFECTED ENVIRONMENT & ENVIRONMENTAL CONSEQUENCES .. 16
  3.1 – Uncompahgre Project Operations and Water Resources ............................... 16
  3.2 – Energy and Socioeconomic Conditions ......................................................... 18
  3.3 – Wetlands and Water Quality .......................................................................... 19
  3.4 – Fisheries ......................................................................................................... 20
  3.5 – Wildlife and Vegetation ................................................................................. 21
  3.6 – BLM Sensitive Species .................................................................................. 23
  3.7 – Threatened and Endangered Species .............................................................. 26
  3.8 – Recreation ...................................................................................................... 30
  3.9 – Indian Trust Assets ........................................................................................ 30
  3.10 – Environmental Justice .................................................................................. 31
  3.11 – Cultural Resources ....................................................................................... 31
  3.12 – Air Quality and Noise .................................................................................. 32
  3.13 – Cumulative Impacts ..................................................................................... 33
  3.14 – Summary ...................................................................................................... 33
  3.15 – Environmental Commitments ...................................................................... 34
CHAPTER 4 – CONSULTATION AND COORDINATION .............................................. 37
  4.1 – General ........................................................................................................... 37
  4.2 – Distribution List ............................................................................................ 37

BLM_0034224

4.3 – Draft EA Comments ................................................................................................. 38

REFERENCES ................................................................................................................ 42

ABBREVIATIONS AND ACRONYMS ....................................................................... 44

## Figures

Figure 1. Project Location.................................................................................................iv
Figure 1a. Location of Drop 5 in relation to other projects ...............................................4
Figure 2. South Canal Drop 5 Site Plan........................................................................... 11
Figure 3. Aerial Photo of South Canal Features at Drop 5 ............................................... 12
Figure 4. Conceptual hydropower project design............................................................. 14
Figure 5. Gunnison Tunnel Diversions to the South Canal, 1995-2014............................17

## Tables

Table 1. Annual diversions from the Gunnison River to the South Canal (acre-feet)................... 17
Table 2. BLM Sensitive species with the potential to occur in the Project Area ..................... 23
Table 3. Federally-listed species occurring in or near the Proposed Action Area......................... 26
Table 4. Summary of potential impacts for alternatives................................................... 33

## Appendices

Appendix A – Preliminary Lease of Power Privilege (Contract No. 2015-0031-CF-0004)
Appendix B – Coordination with Colorado Parks and Wildlife
Appendix C – Cultural Resources Documentation
Appendix D – Draft Environmental Commitment Plan
Appendix E – Comments Received During Public Scoping
Appendix F – BLM Recommended Native Seed Mixture

BLM_0034225



**Figure 1. Project Location**

BLM_0034226

# CHAPTER 1 – INTRODUCTION

## 1.1 – Proposed Action

The Uncompahgre Valley Water Users Association (UVWUA) has requested approval to develop hydropower at Drop 5 of the South Canal of the federal Uncompahgre Project. Under the proposed action, the Bureau of Reclamation (Reclamation) would execute a Lease of Power Privilege (LOPP) with the UVWUA for construction, operation, and maintenance of the Drop 5 hydropower project. The lease would authorize the use of federal lands, facilities and Uncompahgre Project water to construct, operate and maintain a 2.4 megawatt (MW) hydropower facility. The hydropower project would be located approximately 4.3 miles southeast of the town of Montrose, in Montrose County, Colorado, as shown in Figure 1.

The Drop 5 hydropower project would be located in a section of the South Canal approximately 4 miles downstream from the existing Drop 4 hydropower project, which was completed in 2015. Drop 5 and the proposed hydropower plant are located entirely on Reclamation withdrawn lands, while upstream segments of the South Canal which will require modification are located on lands administered by the Bureau of Land Management Uncompahgre Field Office (BLM-UFO). This reach of the South Canal drops 38.5 feet in elevation over approximately 2,900 linear feet. Water that currently flows through the South Canal would be diverted into an intake channel and through the hydropower plant before returning to the Canal to meet irrigation delivery demands downstream.

This Environmental Assessment (EA) is prepared in accordance with the National Environmental Policy Act, the Council on Environmental Quality Regulations for Implementing the Procedural Provisions of NEPA (40 CFR 1500-1508), and the U.S. Department of the Interior's regulations (43 CFR Part 46). The EA evaluates the potential environmental effects of issuing the LOPP for construction, operation, and maintenance of the Drop 5 hydropower project.

## 1.2 – Need for and Purpose of Action

A Lease of Power Privilege (LOPP) is needed to permit a non-federal entity to use a Reclamation facility for electric power generation. The LOPP would ensure that the development of hydropower would be implemented consistent with established authorities, purposes, and water operations for the Uncompahgre Project.

The purpose of the Drop 5 Hydropower Project is to develop a 2.4 MW hydropower plant on the South Canal at Drop 5 to provide a clean, renewable energy source that is locally controlled. Current Federal policy encourages non-Federal development of environmentally sustainable hydropower potential of Federal water resource related projects. The electricity generated by the Project would provide the UVWUA with an additional source of revenue that can be used to

BLM_0034227

defray annual operating expenses and assist in the maintenance and improvement of the
Uncompahgre Project.

# 1.3 – Background Information

### 1.3.1 – Uncompahgre Project

The Uncompahgre Project is an irrigation project in west-central Colorado developed by
Reclamation and operated by the UVWUA.  Irrigated lands surround the town of Montrose and
extend 34 miles along both sides of the Uncompahgre River to Delta, Colorado.  Project features
include Taylor Park Dam and Reservoir in Gunnison County, the Gunnison Tunnel, 7 diversion
dams, 128 miles of main canals, 438 miles of laterals, and 216 miles of drains.  The systems
divert water from the Uncompahgre and Gunnison Rivers to serve over 76,000 acres of irrigated
land.

The Uncompahgre Project was authorized by the Secretary of the Interior on March 14, 1903,
under the provisions of the Reclamation Act.  Construction began in July 1904, and the first
water for irrigation was available during the irrigation season of 1908 from the Uncompahgre
River.  The Gunnison Tunnel was completed in 1909 and the Gunnison Diversion Dam was
completed in January 1912 to deliver Gunnison River water to the Uncompahgre Valley.  Taylor
Park Dam, built from funds allotted under the National Industrial Recovery Act, was completed
in 1937.  The project was transferred to the UVWUA for operation and maintenance in 1932.

The Uncompahgre Project plan provides for water storage in Taylor Park Reservoir on the
Taylor River, which is a part of the Gunnison River Basin.  The Gunnison Diversion Dam on the
Gunnison River, about 12 miles east of Montrose, diverts Gunnison River direct flows, as well as
releases from the Taylor Park Dam into the Gunnison Tunnel and then into the South canal.  The
tunnel is 5.8 miles long and has a capacity of approximately 1,100 cubic feet per second (cfs).
The South Canal extends from the end of the Gunnison Tunnel generally southwest 11.4 miles to
the Uncompahgre River.  Part of the canal is concrete lined; the remainder is unlined. The South
Canal was constructed between 1904 and1909.

To distribute waters of the Gunnison and Uncompahgre Rivers, the South and West Canals were
constructed, and the larger existing private canals that take water directly from the Uncompahgre
River were purchased, enlarged, and extended.  Laterals were constructed to deliver water from
the South Canal to project lands.

### 1.3.2 – Lease of Power Privilege

The Lease of Power Privilege (LOPP) is a contract between a non-Federal entity and the United
States to use federal project facilities for electric power generation consistent with Reclamation
project purposes.  The LOPP must not impair the efficiency of Reclamation-generated power or
water deliveries, jeopardize public safety, or negatively affect any other Reclamation project
purpose.  The Uncompahgre Project includes the development of hydropower as an authorized
project purpose.  An LOPP has a term of 40 years, and the general authorities include, among
others, the Town Sites and Power Development Act of 1906 (43 U.S.C. 522), and the
Reclamation Project Act of 1939 (43 U.S.C. 485h(c)).

BLM_0034228

On August 3, 2013, Congress passed the Bureau of Reclamation Small Conduit Hydropower Development and Rural Jobs Act. This act requires that Reclamation first offer an LOPP to the irrigation district or water users association operating the federal project, or to the irrigation district or water users association receiving water from the federal project. The UVWUA operates the Uncompahgre Project.

On June 18, 2015, a Preliminary Lease of Power Privilege (Contract No. 2015-0031-CF-0004) was entered into by Reclamation and the UVWUA to permit federal cost-recovery for the NEPA compliance, engineering review, and development of the LOPP. A copy of the Preliminary LOPP is included as Appendix A. The final LOPP must accommodate existing contractual, water delivery, and environmental commitments related to operation and maintenance of the South Canal and the Uncompahgre Project.

## 1.4 – Relationship to Other Projects

Other hydropower projects in progress or recently implemented (between 2012 and 2015) in the general vicinity include the following (Figure 1a):

- Drop 1 Hydropower Project – A 4.0 MW hydropower project on the South Canal. This hydropower plant is approximately 6.3 miles northeast of Drop 5.

- Drop 2 Hydropower Project – This hydropower project has not been constructed, however NEPA documentation has been completed and an LOPP has been issued to Percheron Power and UVWUA. Once constructed, Drop 2 would house a 987 kW hydropower plant located approximately 5.6 miles northeast of Drop 5.

- Drop 3 Hydropower Project – A 3.5 MW hydropower project on the South Canal. This hydropower plant is approximately 5 miles northeast of Drop 5.

- Drop 4 Hydropower Project – A 4.8 MW hydropower project on the South Canal. This hydropower plant is approximately 4 miles northeast of Drop 5.

BLM_0034229



**Figure 1a.  Location of Drop 5 in relation to other hydropower projects.**

BLM_0034230

# 1.5 – Public Scoping

Scoping is an early and open process to determine the issues and alternatives to be addressed in the EA. Public scoping was conducted in conjunction with the LOPP negotiation meeting held at the UVWUA office in Montrose on July 1, 2015. Notice of the public meeting was published on Saturday, June 27, 2015, in the local Montrose Daily Press newspaper.

Reclamation also utilized issues and concerns previously identified during public scoping for other LOPP processes for hydropower development of Drops 1, 2, 3, and 4 on the South Canal. Issues identified included:

- Visual impacts from new power lines
- Impacts to existing water deliveries
- Impacts to rainbow and brown trout fisheries in the South Canal and Uncompahgre River
- Changes in diversions from the Gunnison River
- General support for renewable energy
- Effects on endangered plants
- Protection of cultural resources

BLM_0034231

# CHAPTER 2 – PROPOSED ACTION AND ALTERNATIVES

Alternatives evaluated in this EA include the No Action Alternative and the Proposed Action Alternative.

## 2.1 – No Action Alternative

Under the No Action Alternative, Reclamation would not issue an LOPP, and the proposed hydropower development at Drop 5 on the South Canal would not be constructed at this time.

## 2.2 – Proposed Action

Under the Proposed Action, Reclamation would execute an LOPP to permit UVWUA to construct, operate, and maintain a 2.4 MW hydropower plant and associated facilities adjacent to the South Canal. The hydropower project would divert water from the South Canal, just above Drop 5, and move the water approximately 80 feet downhill through an intake channel to a powerplant, and return the water to the Canal. The project is expected to cause a backwater effect that will increase the water level of the canal for a short distance upstream of the powerplant on the South Canal. In order to compensate for this increase in water level, a 330-foot portion of the South Canal, located approximately 400 feet upstream of the proposed hydropower plant, will be capped. In addition, the sides of the canal will be raised by 1 to 2 feet in a 435-foot segment approximately 1,600 feet upstream of the proposed hydropower plant location.

BLM_0034232



**Figure 2.  South Canal Drop 5 Site Plan**

BLM_0034233

## 2.2.1 – South Canal at Drop 5

The segment of the South Canal considered Drop 5 begins approximately 435 feet upstream of the intake to the Dry Cedar Creek Siphon.  After exiting the siphon, the canal spans approximately 330 feet before passing through Tunnel 5 and ends about 400 feet below the exit of a concrete-lined chute.  A 12-foot wide dirt access road runs along the canal on either the western or eastern side of the canal (Figure 3).



**Figure 3.  Aerial Photo of South Canal Features within the Drop 5 project area.**[1]

## 2.2.2 – Hydropower Project Design

Project plans would be reviewed and approved by Reclamation prior to authorizing construction.  Existing diversion structures would remain in place and would be maintained to meet irrigation deliveries during construction and if the intake channel or hydropower plant are down for repairs or maintenance during the irrigation season.  Power produced would be transported by the Delta Montrose Electric Association (DMEA), to the Municipal Energy Association of Nebraska (MEAN).  The project includes a new transmission line to connect the hydropower plant to the

[1]Figure 3 Key: A = Lower extent of project area.  B = DMEA interconnect.  C = Powerplant location.  D = Canal access road.  E = Tunnel 5.  F = Canal segment to be capped.  G = Dry Cedar Creek Siphon.  H = Canal segment where the sides will be raised.  I= Upper Extent of Project Area.  Visible portions of the South Canal (within the project area) have been highlighted in light blue.

BLM_0034234

electric grid, and will require installation of 5 new power poles and approximately 200 feet of new overhead line to reach the connection to the grid.

The project design includes construction of an intake channel to convey flows from the existing canal to the proposed 2.4 MW facility. Flow will then return to the existing canal. The design will allow for a parallel bypass of water and will not alter irrigation deliveries. A summary of the hydropower project features are described in greater detail below (see Figure 4 for the conceptual hydropower design). Additional details can be found in the project's supporting design report (Sorenson Engineering 2015):

A. **Canal System** – The portion of the South Canal in the project area is a concrete flume structure which services the Uncompahgre Valley Water Users Association. Water will be backed up through the first upstream tunnel (Tunnel 5) and inverted siphon to attain an increased head. This will require capping the existing canal flume for approximately 330 feet upstream of the Tunnel 5 inlet.

B. **Intake Channel** – The intake channel will be approximately 200 feet long, conveying water from the existing canal to the intake/power house structure. A bypass structure would be constructed at the upstream end of the intake channel.

C. **Bypass Structure** – The bypass structure will be located upstream of the intake channel. An approximately 12-foot wide by 18-foot high roller gate will be set in the existing concrete canal to divert water into the intake channel. This gate will also be used as a bypass to direct flows back into the South Canal in the event the hydropower plant is not functioning. Five (5) 10-foot wide automatic trip gates (ATG) will function as a redundant safe guard in the event the plant shuts down for any reason and the bypass gate is not able to divert flows back into the South Canal.

D. **Intake/Power House Structure** – The intake portion of this steel reinforced concrete structure will be approximately 80-feet long by 23-feet wide by 50-feet high. This will convey water from the intake channel to the scroll case in the powerhouse. A steel bar trash screen will be installed in the structure to remove debris.

   The power house portion of this steel reinforced concrete structure will be approximately 50-feet wide by 36-feet long with a metal roof. The power house foundation will embed the turbine housing steel draft tube, and tailrace stop gates. The tailrace stop gates will be used to dewater the unit during maintenance. The building will house the generator and mechanical/electrical auxiliaries. The building will be equipped with a roof access hatch to facilitate future maintenance. The tailrace will be approximately 100 feet long.

E. **Turbine** – The turbine will be a vertical double regulated Kaplan. The turbine is an American/European design built in China, as is the generator. The turbine manufacturer is represented by Far East Engineering of Boise, Idaho. Nearly identical units were installed on the South Canal Drops 1, 3, and 4 hydropower projects.

F. **Substation and Transmission Line** – DMEA has an underground 12.4 kV line approximately 200 feet from the power house location. A new overhead line and 5 power poles will be installed for this 200-foot span.

BLM_0034235



**Figure 4.  Conceptual hydropower project design**

Construction of the hydropower facility is currently a private venture of UVWUA; however, UVWUA has applied for grants from state and federal entities for assistance in funding the proposed project.  Construction is expected to take 10 months at a cost of approximately 7.2 million dollars.  Construction activities would be coordinated with canal operations and on-going irrigation delivery.  Normal irrigation deliveries would be maintained throughout construction. Construction storage and staging areas would be adjacent to the South Canal (Figure 2b). Existing roads would be used for construction access.  UVWUA would be responsible for obtaining any required Federal, state, or local permits to construct and operate the Project, including permits under the Clean Water Act (Section 402 and 404 permits) which may be needed for dewatering or other construction activities.

Disturbed land would be re-contoured to prevent erosion, and topsoil, where available, will be stockpiled during construction for later use in revegetation.  A seed mix approved by Reclamation would be used to revegetate disturbed areas, and long-term weed control would be continued (see Appendix F).  Additional information regarding environmental commitments is discussed further in Section 3.14.

### 2.2.3 – Operation and Maintenance

UVWUA would operate and maintain the Drop 5 hydropower facilities.  The facilities would be controlled by an automated computer (unmanned) system located at the plant, fitted with a dial-in signal to allow remote monitoring of the plant, including critical variables (temperature, voltage, etc.), from any telephone.  In addition, the control panel will be fitted with an automatic telephone dialer to alert UVWUA of unsatisfactory conditions, such as the generator turning on or off, changes in temperature of bearings, generator, and cooling water, and canal water intake

BLM_0034236

levels above and below the trash racks. The facilities will be equipped with a battery system for operation of essential features during power outages.

At the beginning of each irrigation season, water would be discharged through the irrigation system and power plant to exercise the gates and make certain all systems associated with the project are in working order.

The facilities would be designed and equipped with structures to protect the canal and irrigation flows. When the hydropower facilities go off-line, flows would be immediately diverted back into the canal to prevent any disruption to irrigation supply and delivery.

The hydropower project would only use normal irrigation flows in the South Canal. The Uncompahgre Project was constructed as an irrigation project and irrigation will remain as its primary purpose with all other uses playing secondary roles. The hydropower project would be operated as a run-of-canal plant. During the irrigation season, the Project would divert irrigation flow from the canal, pass it through the power plant, and return the water to the canal immediately below the power plant. No increase in diversions from the Gunnison River through the Gunnison Tunnel to the South Canal would be permitted under the LOPP for this hydropower project. Hydropower production would occur in the March through October irrigation period. Water resources are discussed further in Chapter 3.

BLM_0034237

# CHAPTER 3 – AFFECTED ENVIRONMENT & ENVIRONMENTAL CONSEQUENCES

This chapter discusses resources that may be affected by the Proposed Action and the No Action Alternatives. For each resource, the potentially affected area and/or interests are identified, existing conditions described, and potential impacts predicted under the No Action and Proposed Action Alternatives. This section is concluded with a summary of impacts and a list of environmental commitments.

## 3.1 – Uncompahgre Project Operations and Water Resources

*Existing Conditions:* The Uncompahgre Project is authorized and operated to provide water supplies for irrigation in the Uncompahgre Valley. Irrigation supplies are developed from four sources: direct flow diversions from the Uncompahgre River, storage water from Ridgway Reservoir, direct flow diversions from the Gunnison River, and storage water from Taylor Park Reservoir.

Taylor Park Reservoir and Gunnison River water is diverted through the Gunnison Tunnel to the South Canal. Diversions generally begin in March and end in October. During peak irrigation months, approximately 1,050 cfs is diverted through the tunnel. Minimum irrigation diversions are approximately 400 cfs, an amount that is sufficient to operate head gates on the South Canal. Several laterals carry water from the South Canal to portions of the eastern Uncompahgre Valley, but the majority of the South Canal water enters the Uncompahgre River and the West Canal south of Montrose, Colorado. A series of diversion dams on the Uncompahgre River then direct water to much of the remaining Uncompahgre Valley.

Figure 5 shows the range of Gunnison Tunnel diversions based on daily diversion data from 1995 through 2014. The average daily diversion rate during this 20 year period is portrayed by the green line. The average annual diversion volume between 1995 and 2014 was 367,300 acre-feet (af). The maximum daily diversion during this 20 year period is shown by the blue line and the minimum daily diversion during this same period is shown by the red line. The maximum and minimum diversion lines do not portray any historical diversion patterns but simply show the maximum and minimum daily diversion rate that occurred on that particular day during the period between 1995 and 2014.

BLM_0034238



**Figure 5. Gunnison Tunnel Diversions to the South Canal, 1995-2014**

As can be seen, irrigation diversions generally begin increasing in mid-March, peak in the May through September period, and gradually decrease until mid-November.  Diversions in the non-irrigation months are for filling Fairview Reservoir.  Total diversions by year are shown in Table 1.  It can be seen that there is variability between years based on crop and weather patterns, reservoir storage, and basin water conditions.

Table 1. Annual diversions from the Gunnison River to the South Canal (acre-feet).

| Year | Gunnison Tunnel Diversion (af) | Year | Gunnison Tunnel Diversion (af) |
|------|-------------------------------|------|-------------------------------|
| 1995 | 228,192 | 1996 | 383,994 |
| 1997 | 266,965 | 1998 | 364,829 |
| 1999 | 369,467 | 2000 | 391,541 |
| 2001 | 393,227 | 2002 | 357,643 |
| 2003 | 350,644 | 2004 | 351,961 |
| 2005 | 364,778 | 2006 | 396,624 |
| 2007 | 355,401 | 2008 | 358,592 |
| 2009 | 408,867 | 2010 | 399,553 |
| 2011 | 414,031 | 2012 | 364,693 |
| 2013 | 378,147 | 2014 | 386,353 |

BLM_0034239

*No Action Alternative:*  Under the No Action Alternative, water diverted into the Gunnison Tunnel for irrigation would not be used for hydropower production at Drop 5.  There would be no changes to current irrigation deliveries or operations.  Gunnison Tunnel diversions vary from year to year due to water availability, weather patterns, crop and land use patterns, and other factors.  This variability would continue with or without the hydropower project.  Changes in climate or major changes in cropping or land use patterns may also affect irrigation diversions and water use patterns.

*Proposed Action:*  Under the proposed action, the water diverted into the Gunnison Tunnel for irrigation would also be used for hydropower production at Drop 5.  There would be no change in the operations, timing, or amount of water diverted into the Gunnison Tunnel.  The minimum amount of water required for the hydropower plant to produce power is 300 cfs.  The maximum amount of water that will be routed through the facility is 840 cfs.  Water routed through the hydropower plant would be returned to the South Canal immediately below the hydropower facility.  The power plant would be operated as a run-of-canal facility, and existing irrigation supplies and deliveries would not be affected.  Hydropower production would only occur during the irrigation season.

## 3.2 – Energy and Socioeconomic Conditions

*Existing Conditions:*  Hydropower has been developed previously at three sites along the South Canal (Drops 1, 3 and 4), and at a site on the Montrose and Delta (M&D) Canal known as Shavano Falls.  An LOPP has been awarded to UVWUA to construct a hydropower plant at Drop 2 of the South Canal as well; however, construction has not yet begun on the Drop 2 hydropower project. The existing and planned Uncompahgre Project hydropower projects are located in the Rocky Mountain Power Area of the Western Electric Coordination Council Region of the North American Electric Reliability Council.

In the short-term, the proposed project would be used to meet a portion of the electricity demand in Municipal Energy of Nebraska's (MEAN) service territory.  MEAN is part of the Nebraska Municipal Power Pool and was organized in 1980 to secure power supply for its members and provide related administrative and technical services.  MEAN combines the capacities of a number of municipally-owned plants with Western Area Power Administration power and purchased power.  MEAN supplies power and energy to approximately 40 municipalities in Nebraska, Colorado and Kansas.  There is existing potential for future power produced from Drop 5 to be used to meet future local power demands.  Demands for electricity in Delta Montrose Electric Association's service territory have been on an increasing trend for decades. The peak demand and annual energy requirements for the area are projected to increase at an average annual compound rate of 1.8 to 2.0 percent over the 10-year planning period of 2007 to 2017 (WECC 2004).  The proposed project would help meet this rising demand.

Amendment 37 to the Colorado Constitution established a Renewable Energy Standard which requires each provider of retail electric service in the State of Colorado that serves over 40,000 customers to secure a minimum percentage of electricity (10% by 2015) from renewable energy sources such as wind, solar, and hydroelectricity.

BLM_0034240

The Uncompahgre Project and water supplies from the Gunnison and Uncompahgre Rivers are critical to the economies of Delta and Montrose Counties, and west-central Colorado. The Uncompahgre Project supports over 66,000 acres of irrigated agriculture through a series of over 500 miles of canals and laterals. Principle crops harvested on the irrigated lands include alfalfa, wheat, corn, dry beans, and small grains. Up to 23,000 af of water is also diverted from the South Canal to Project 7 Water Authority's Fairview Reservoir for municipal and industrial water in Ouray, Montrose, and Delta Counties.

*No Action Alternative:* Under the No Action Alternative, UVWUA would not build a hydropower facility at Drop 5 and energy production and economic opportunities associated with the hydropower project would be forgone.

*Proposed Action:* The new hydropower project would produce an estimated average of 8,623 megawatt-hours (MWh) of energy per year based on run-of-canal flows, and would help meet regional power demands in the future. Power from the proposed project would be distributed through MEAN facilities in Colorado, Nebraska, and Wyoming.

The life of the project is expected to extend well beyond 50 years, and could provide the UVWUA a long-term, reliable revenue stream. According to initial estimates, revenues could be relatively small at first, dependent on financial terms of interest and amortization schedule, but the project should produce positive cash flow once operations start. The projections are highly dependent on interest rates and actual operation and maintenance costs. However, after the project debt is paid, the long-term life for which the project will be designed would result in revenues to the UVWUA to help pay for Uncompahgre Project operation, maintenance and improvement costs.

The proposed project will provide an additional source of renewable energy for MEAN to market throughout Colorado, which could then help those agencies reach the Renewable Energy Standard.

There would be short-term employment and spending on goods, services, and materials during the construction phase. This could benefit local communities and businesses, as well as increase tax revenues from taxes collected on those purchases.

The transport and delivery of irrigation or municipal and industrial water in the South Canal would not be affected by hydropower development during construction, operation, or any future maintenance projects.

## 3.3 – Wetlands and Water Quality

*Existing Conditions:* The Clean Water Act (CWA) establishes the basic structure for regulating discharges into waters of the United States. Section 402 of the CWA states that any person who proposes to discharge pollutants from a point source to waters of the United States must apply for a Non-Point Discharge Elimination System (NPDES) Permit (Section 402 Permit). Section 404 of the CWA requires permits for the discharge of dredged or fill material into waters of the United States. Wetland areas adjacent to waters of the United States may also be subject to permit requirements. Authorization can either be issued under nationwide or individual permits

BLM_0034241

and are site specific.  Nationwide permits include entire groups of activities.  The South Canal is a direct connection between the Gunnison River and the Uncompahgre River, and has previously been determined to be waters of the United States.  The other waters of the United States in the project area are Dry Cedar Creek and adjacent wetlands (Figure 5).

*No Action Alternative:*  Under the No Action Alternative, there would be no changes to wetlands or other waters of the United States or water quality in the South Canal.

*Proposed Action:*  Under the Proposed Action, a Section 402 NPDES Permit is required, as the ground disturbance activities associated with this project are greater than one acre in size.  These discharges are covered under the Colorado Department of Public Health and Environment's (CDPHE) General Permit No. COR-030000, Colorado Discharge Permit System General Permit: Stormwater Discharges Associated with Construction Activity, Authorization to Discharge under the Colorado Discharge Permit System.  As per the permit requirements, UVWUA will be responsible for preparing a Storm Water Management Plan (SWMP) and submitting an application form as provided by CDPHE at least ten (10) days prior to the commencement of construction activities. The application requires certification that a SWMP has been completed for the construction project (CDPHE 2012).

Construction dewatering permits would be required if pumped ground water is directly discharged into waters of the United States.  Outside the irrigation season, the South Canal is dewatered and has no direct connection to waters of the United States.

Under Section 404, Nationwide Permit (NWP) No. 17 (Hydropower Projects) addresses discharges of dredged or fill material associated with hydropower projects having: 1) less than 5000 kW at existing facilities, and 2) are issued exemption granted by FERC (in this case exempt from FERC through the Lease of Power Privilege).  UVWUA would be responsible for obtaining this Nationwide Permit prior to construction.  Construction within the South Canal would occur when the canal is dry; therefore, water quality in the South Canal would not be affected during construction.  After completion of construction, water quality in the South Canal will not be affected by the hydropower operations.

Project construction activities will not occur within Dry Cedar Creek.  Best Management Practices, including drainage, erosion control, and sediment control will be implemented to prevent or reduce point source pollution during and following construction.  A Storm Water Management Plan will be developed and filed with CDPHE.  Fuel storage, equipment, maintenance, and fueling procedures will be developed to minimize the risk of spills and the impacts from these incidents, and these procedures will be submitted to CDPHE prior to construction.  A Spill Prevention Control and Countermeasure Plan (SPCC) will be prepared and submitted to CDPHE along with the SWMP prior to construction.

# 3.4 – Fisheries

*Existing Conditions:*  The Gunnison River, the water source for the South Canal, is an important recreational fishery.  Water is diverted by the Gunnison Diversion Dam through the Gunnison Tunnel to the South Canal to provide irrigation water to Montrose and Delta Counties.  The Gunnison River has been designated a Gold Medal fishery, and the river upstream from the

BLM_0034242

Gunnison Diversion Dam supports the highest biomass of wild rainbow trout of any reach of the river. This section of the river serves as an important brood stock source for managing rainbow trout throughout Colorado. Downstream from the Gunnison Diversion Dam, the river flows through the Black Canyon of the Gunnison National Park and the Gunnison Gorge National Conservation Area, and is managed as a Gold Medal and wild trout fishery.

Historically, there were significant numbers of fish that entered the South Canal from the Gunnison River, via the Gunnison Tunnel diversion, each irrigation season. Some of the fish from the Gunnison River would move through the South Canal and into the Uncompahgre River or West Canal downstream, or would be harvested by anglers in the South Canal.

With the 2012 installation of the electronic fish barrier at the entrance to the Gunnison Tunnel, fish entrainment into the South Canal was expected to be greatly reduced. However, the electronic fish barrier has not proven to be as effective as expected in deterring fish from entering the Gunnison Tunnel. It is likely that some fish continue to enter the South Canal, and there is some mortality to fish that enter the canal. These fish may eventually go through the turbines at Drops 1, 3 and 4, upstream of the proposed action area; fish survival through the turbines is estimated to range between 88-100% (Cada et al.). Any impacts to recreational fishing in the South Canal and Uncompahgre River as a result of South Canal hydropower development were fully mitigated with the purchase of additional fishing access along the Uncompahgre River by DMEA as part of the mitigation commitments for Drops 1 and 3 in 2012.

*No Action Alternative:* Under the No Action Alternative, no changes to current fishery conditions in the South Canal are expected.

*Proposed Action:* Diversions from the Gunnison River would not change due to operation of the hydropower project. Habitat conditions in the Gunnison River will not change. Fish that enter the South Canal through the Gunnison Tunnel would continue to experience a level of mortality by passing through the turbines at Drops 1, 3 and 4. Any fish that successfully pass through turbines at Drops 1, 3, and 4 may experience a level of mortality by passing through the turbine at Drop 5.

The Kaplan turbine design will incorporate recommended design concepts 1, 4, and 6 as outlined in the *A Summary of Environmentally Friendly Turbine Design Concepts* developed by the US Department of Energy (DOE 1999) to help ensure the Kaplan turbine is designed in an environmentally friendly manner. A copy of this summary can be viewed at: http://www1.eere.energy.gov/wind/pdfs/doewater-13741.pdf. Fishery conditions in the South Canal are not expected to significantly differ from existing conditions with the construction of a hydropower facility at Drop 5. No additional mitigation for fisheries is warranted.

# 3.5 – Wildlife and Vegetation

*Existing Conditions:* In the general Project area, non-irrigated lands include areas of clay hills or eroded Mancos shale. Soils are highly alkaline with little organic material and only about 40% vegetative cover. Low precipitation, high rates of erosion, and clay soils create a harsh environment with sparse and limited, although in some cases rare or unique, vegetation.

BLM_0034243

Native vegetation in the study area consists of salt desert shrub communities dominated by species of saltbush. Mancos shale hills contain mat saltbush, shadscale, Gardner saltbush, and black sagebrush. Grasses include bottlebrush squirreltail, galleta, Salina wildrye, and Indian rice grass. Other species include winterfat, prickly pear cactus, yellow milkvetch, woody aster, and Canada thistle. Greasewood occurs in areas with elevated groundwater along the canal and areas with salt grass and sea-blight occur in swales. Clay-loving wild buckwheat have been identified near the project area (see Section 3.7).

The South Canal introduced a water supply to the area approximately 100 years ago. Seepage from the canal supports patches of greasewood and tamarisk and, in wetter areas, willows and cattails. Road sides and other disturbed areas support rabbitbrush, Russian knapweed, halogeton, cheatgrass, and annual mustards.

Dry Cedar Creek, a perennial tributary of the Uncompahgre River, crosses the project area. Wetland vegetation adjacent to Dry Cedar Creek is comprised primarily of willows, cattails, and reed canary grass, with greasewood and Russian knapweed occurring on the upland periphery of the wetland/riparian areas.

Much of the project area has been disturbed in the past due to substantial earth moving associated with the original construction of the South Canal, canal rehabilitation and maintenance projects, access roads and storage areas, and disposal of spoil material.

The Project area is located in winter range for mule deer, and the area supports high densities of wintering mule deer. There are no prairie dog towns or known active raptor nests in the project area. Waterfowl make occasional use of the low velocity section of the South Canal downstream of the project area.

*No Action Alternative:* Under the No Action Alternative, a hydropower facility at Drop 5 would not be developed and there would be no changes to the existing wildlife and vegetation conditions.

*Proposed Action:* Temporary impacts to wildlife and other vegetation would occur due to the construction of the hydropower facilities. Approximately six acres of land would be disturbed during construction of the hydropower facilities at Drop 5. The project's borrow area is about three acres in size, and will be restored to pre-project conditions after construction. Construction of the project will result in approximately three acres of permanent disturbance. Best Management Practices, including drainage, erosion control, and sediment control measures will be implemented to prevent or reduce non-point and point source pollution during and following construction. Fuel storage, equipment maintenance, and fueling procedures will be developed to minimize the risk of spills and the impacts from these incidents. A Spill Prevention Control and Countermeasure Plan (SPCC) will be prepared prior to construction. With these control measures in place, wildlife impacts are predicted to be minor and temporary due primarily to direct disturbance associated with construction. Wildlife, including deer, would likely avoid using the area during construction. Upon completion of construction, wildlife use should return to pre-construction levels.

BLM_0034244

Reclamation coordinated with Colorado Parks and Wildlife (CPW) to determine any impacts the construction (including the timing of construction) may have on area wildlife. CPW determined that the construction area is located in an area that supports high densities of wintering mule deer, and that this project is likely to impact deer during winter construction. CPW recommended that UVWUA limit activity, noise, truck travel, and hours of operation to the greatest extent possible to reduce impacts to wintering mule deer (see Appendix B). Construction of the hydropower project will require work to be completed during the non-irrigation season, which may have temporary negative impacts on wintering deer. Normal operation and maintenance of the hydropower plant after the construction period is not expected to impact wintering deer. Potential impacts to wintering deer during construction will be minimized by conducting the majority of construction activities during daylight hours, which will minimize stress to the deer as they are more active in the late afternoon through early morning.

Invasive and non-native plant species such as Russian knapweed, Russian olive, and kochia, will be controlled within the project area for the life of the project by UVWUA, which will benefit native plant and animal species that inhabit or utilize the area. UVWUA is responsible for consultation with Reclamation for acceptable weed control measures, including pesticides/herbicides approved for use on Reclamation land. UVWUA will adhere to their 2012 *Pesticide Discharge Management Plan and Integrated Pest Management Plan for Uncompahgre Valley Water Users Association*, as well as Montrose County's 2011 *Montrose County Weed Mitigation Department Weed Management Plan*. UVWUA will focus on ensuring the control of invasive weeds within the project area, especially Russian knapweed. Use of pesticides/herbicides will comply with the applicable Federal and state laws, and will be used only in accordance with their registered uses and within limitations imposed by the Secretary of the Interior. All construction equipment will be power-washed and free of soil and debris prior to entering the construction sites to reduce the spread of noxious and unwanted weeds. Topsoil, where available, will be stockpiled during construction for later use in revegetation. Immediately upon completion of construction, disturbed areas will be re-contoured and seeded to reduce erosion and facilitate revegetation. The plan for re-contouring, revegetation and related erosion control measures will require approval by Reclamation. The UVWUA will work directly with Reclamation to revegetate disturbed areas using a Reclamation approved seed mixture (see Appendix F).

Above-ground power line and power pole designs will meet recommended standards as outlined in the *Avian Protection Plan Guidelines* developed by the US Fish and Wildlife Service and Industry (APLIC 2005). A copy of these standards can be viewed at: http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Aprl2005.pdf.

## 3.6 – BLM Sensitive Species

*Existing Conditions:* The Proposed Action is located partially on lands managed by BLM's Uncompahgre Field Office (UFO). According to BLM Manual Part 6840, BLM Sensitive species are "species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the Endangered Species Act." BLM Sensitive species are designated by the BLM's state director. Of the 34 species identified as BLM Sensitive Species of the UFO, 22 species were determined to have the potential to occur

BLM_0034245

within or near the Proposed Action Area, based on a review of habitat requirements for each species (Table 2) (BLM 2015).

Table 2.  BLM Sensitive Species with the potential to occur in the project area.

| Species | Habitat Description | Potential Effects of Project |
|---|---|---|
| White-tailed prairie dog *Cynomys leucurus* | Level to gently sloping grasslands and semi-desert grasslands. | No burrows observed in impact area |
| Kit fox *Vulpes macrotis* | Semi-desert shrublands of saltbrush, shadscale and greasewood. | Insignificant loss of potential habitat |
| Gunnison's prairie dog *Cynomys gunnisoni* | Level to gently sloping grasslands, semi-desert shrublands, and montane shrublands. | Habitat not affected |
| Allen's big-eared bat *Idionycteris phyllotis* | Ponderosa pine, pinyon-juniper woodland, oak brush, riparian woodland (cottonwood); typically found near rocky outcrops, cliffs, and boulders; often forages near streams and ponds. | Habitat not affected |
| Spotted bat *Euderma maculatum* | Desert shrub, ponderosa pine, pinyon-juniper woodland, canyon bottoms, open pasture, and hayfields; roost in crevices in cliffs with surface water nearby. | Insignificant loss of potential breeding habitat |
| Townsend's big-eared bat *Corynorhinus townsendii* | Mesic habitats, including coniferous forests, deciduous forests, sagebrush steppe, juniper woodlands, and mountain; maternity roosts and hibernation in caves and mines; does not use crevices or cracks; caves, buildings, and tree cavities for night roosts. | Habitat not affected |
| Fringed myotis *Myotis thysanodes* | Desert, grassland, and woodland habitats including ponderosa pine, pinyon/juniper, greasewood, saltbush, and scrub oak; roosts in caves, mines, rock crevices, and buildings. | Insignificant loss of potential feeding habitat |
| Bald eagle *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby. | Insignificant effect on potential hunting habitat |
| Golden eagle *Aquila chrysaetos* | Lives in open and semi-open country featuring native vegetation; generally avoid developed areas and uninterrupted stretches of forest. Canyonlands, rimrock terrain, and riverside cliffs and bluffs.  Nests on cliffs and steep escarpments in grassland, chapparal, shrubland, forest, and other vegetated areas. | Insignificant effect on potential hunting habitat |
| American peregrine falcon *Falco peregrines anatum* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags. | Insignificant effect on potential hunting habitat |

BLM_0034246

| Species | Habitat Description | Potential Effects of Project |
|---|---|---|
| **Ferruginous hawk** *Bueto regalis* | Open, rolling, and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops. | Insignificant effect on potential hunting habitat |
| **Burrowing owl** *Athene cunicularia* | Level to gently sloping grasslands and semi-desert grasslands; Prairie dog colonies for shelter and food. | Habitat not affected |
| **Brewer's sparrow** *Spizella berweri* | Breeds primarily in sagebrush shrublands, but also in other shrublands such as mountain mahogany or rabbitbrush; migrants seen in wooded, brushy, and weedy riparian, agricultural, and urban areas; occasionally observed in pinyon-juniper. | Habitat affected would be poor to not suitable |
| **Longnose leopard lizard** *Gambelia wislizenii* | Desert and semidesert areas with scattered shrubs or other low plants; e.g. saberush; areas with abundant rodent burrows. | Not recorded in impact area |
| **Midget faded rattlesnake** *Crotalus viridis concolor* | Rocky outcrops for refuge and hibernacula, often near riparian. | Habitat not affected |
| **Northern leopard frog** *Rana pipiens* | Springs, slow-moving streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes; in summer, commonly inhabits wet meadows and fields; may forage along water's edge or in nearby meadows or fields. | Habitat not affected |
| **Crandall's rockcress** *Arabis crandallii (Boechera crandallii)* | Grows in limestone chip-rock and stony areas, often among sagebrush, ridges, and steel hill slopes.  Grows in more open, sometimes windswept places.  Endemic to the Gunnison Basin. | Habitat not affected |
| **Grand Junction milkvetch** *Astragalus linifolius* | Sparsely vegetated habitats in pinyon-juniper and sagebrush communities, often within Chinle and Morrison Formation and selenium-bearing soils. | Habitat not affected |
| **Montrose bladderpod** *Lesquerella vicina* | Sandy-gravel soil mostly of sandstone fragments over Mancos shale (heavy clays) mainly in pinyon-juniper woodlands or in the ecotone between it and salt desert scrub; also in sandy soils derived from Jurassic sandstones and in sagebrush steppe communities. | Potential habitat affected |
| **Colorado desert parsley** *Lomatium concinnum* | Adobe hills and plains on rocky soils derived from Mancos Formation shale; shrub communities dominated by sagebrush, shadscale, greasewood, and scrub oak. | Potential habitat affected |

BLM_0034247

| Species | Habitat Description | Potential Effects of Project |
|---|---|---|
| **Pardox Valley lupine** *Lupinus crassus* | Pinyon-juniper woodlands, or clay barrens derived from Chinle or Mancos Formation shales, often in draws and washes with sparse vegetation. | Habitat not affected |
| **Paradox breadroot** *Pediomelum aromaticum* | Open pinyon-juniper woodlands in sandy soils or adobe hills. | Habitat not affected |

*No Action Alternative:*  Under the no action alternative, there would be no effect to any BLM Sensitive species.

*Proposed Action:*  Under the Proposed Action, there would be no significant effects to BLM Sensitive species.  The project area on BLM land is within UVWUA's existing right-of-way. Potential for impacts to any of the BLM Sensitive Species would be unlikely due to the ongoing disturbance from routine operation and maintenance within the canal right-of-way.

# 3.7 – Threatened and Endangered Species

*Existing Conditions:*  The Endangered Species Act (ESA) of 1973 protects federally listed endangered, threatened and candidate plant and animal species and their critical habitats.

Table 3 summarizes the federally-listed species that may occur within or near the project area (FWS 2015) and explains habitat requirements and potential effects of the Proposed Action on each species.  Species with suitable habitat in the Proposed Action Area, or otherwise potentially affected by the Proposed Action, are discussed following Table 3.  Unless otherwise specified, all information related to the species below was obtained from resources available on FWS' Environmental Conservation Online System (ecos.fws.gov).

Table 3.  Federally-listed species occurring in or near the Proposed Action Area

| Species | Status | General Habitat | Range in Project Area? | Habitat in Project Area? | Effect of Proposed Action |
|---|---|---|---|---|---|
| **Gunnison sage grouse** *Centrocercus minimus* | Threatened | Prefers large contiguous patches of sagebrush (>200 acres) with an abundant herbaceous understory, interspersed with wet swales. | Historic range only | No | No Effect |
| **Mexican spotted owl** *Strix occidentalis lucida* | Threatened | Generally nests in older mature conifer stands, and on walls of shady wooded canyons. | Potential | No | No Effect |

BLM_0034248

| Species | Status | General Habitat | Range in Project Area? | Habitat in Project Area? | Effect of Proposed Action |
|---|---|---|---|---|---|
| **Yellow-billed cuckoo** *Coccyzus americanus* | Threatened | Breeds in low elevation river corridors with fairly extensive mature cottonwood galleries. | Yes | No | No Effect |
| **Greenback cutthroat trout** *Oncorhynchus clarki stomias* | Endangered | High elevation cold water streams and cold water lakes with adequate stream spawning habitat present during spring. | Yes | No | No Effect |
| **Bonytail** *Gila elegans* | Endangered | Although no habitat is present within the Project area for these four species, downstream designated critical habitat on the Colorado & Gunnison Rivers is affected by consumptive use of water from the South Canal | No, but designated critical habitat is down-stream | No, but critical habitat is down-stream | No Effect |
| **Colorado pikeminnow** *Ptychocheilus lucius* | Endangered | Although no habitat is present within the Project area for these four species, downstream designated critical habitat on the Colorado & Gunnison Rivers is affected by consumptive use of water from the South Canal | No, but designated critical habitat is down-stream | No, but critical habitat is down-stream | No Effect |

BLM_0034249

| Species | Status | General Habitat | Range in Project Area? | Habitat in Project Area? | Effect of Proposed Action |
|---|---|---|---|---|---|
| **Humpback chub** *Gila cypha* | Endangered | Although no habitat is present within the Project area for these four species, downstream designated critical habitat on the Colorado & Gunnison Rivers is affected by consumptive use of water from the South Canal | No, but designated critical habitat is down-stream | No, but critical habitat is down-stream | No Effect |
| **Razorback sucker** *Xyrauchen texanus* | Endangered | Although no habitat is present within the Project area for these four species, downstream designated critical habitat on the Colorado & Gunnison Rivers is affected by consumptive use of water from the South Canal | No, but designated critical habitat is down-stream | No, but critical habitat is down-stream | No Effect |
| **Clay-loving wild buckwheat** *Eriogonum pelinophilum* | Endangered | Endemic to the rolling clay (adobe) hills and flats immediately adjacent to the communities of Delta and Montrose, Colorado. | Yes | Yes | No Effect |
| **Colorado hookless cactus** *Sclerocactus glaucus* | Threatened | Alluvial benches along the Colorado and Gunnison Rivers and their tributaries. Colorado hookless cactus generally occurs on gravelly or rocky surfaces on river terrace deposits and lower mesa slopes. | Yes | No | No Effect |

The endangered wild clay-loving buckwheat is found in specific microhabitats in the adobe hill areas along the eastern side of the Uncompahgre Valley, and it is endemic to Delta and Montrose

BLM_0034250

Counties, Colorado. In the past, its habitat was fragmented and lost due to agricultural, road, and housing development. Currently, habitat is threatened by off-road vehicle use and expansion of housing areas. Vegetation surveys recorded this species nearby but outside of the project's direct and indirect impact areas (Bio-Logic Inc. 2013 and 2015).

The Colorado hookless cactus occurs primarily on alluvial benches (soils deposited by water) along the Colorado and Gunnison Rivers and their tributaries. The cactus generally occurs on gravelly or rocky surfaces on river terrace deposits and lower mesa slopes, and it is endemic to Delta, Montrose, Mesa, and Garfield Counties, Colorado. Ongoing and foreseeable threats include mineral and energy development, illegal collection, recreational off-road vehicle use, and grazing. The Colorado hookless cactus does not occur within the project's direct or indirect impact areas (Bio-Logic Inc. 2013 and 2015).

The Gunnison Sage Grouse requires a variety of habitats such as large expanses of sagebrush with a diversity of grasses and forbs along with wetland and riparian ecosystems. It requires sagebrush for cover and for fall and winter food. The most substantial current and future threats to the Gunnison Sage Grouse include habitat loss and decline due to human development and associated infrastructure. Other threats include overgrazing, mineral development, predation, and recreation (FWS 2014). The project area is not located within designated critical habitat. There is unoccupied critical habitat about 1.5 miles to the southeast of the project area. The nearest occupied critical habitat is about 3 miles south of the project area, on the south side of the Uncompahgre River.

The endangered bonytail, Colorado pikeminnow, humpback chub, and razorback sucker are found in the Gunnison and Colorado Rivers downstream from the project area, and are influenced by water use activities in the basin that affect both the quantity of flows and quality of water. Designated critical habitat occurs downstream below the confluence of the Gunnison and Uncompahgre Rivers. In accordance with Section 7 of the Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. 1531 et seq.), and the Interagency Cooperation regulations (50 CFR 402), the U.S. Fish and Wildlife Service issued a Programmatic Biological Opinion (PBO) for the Gunnison River and effects on the endangered Colorado pikeminnow, humpback chub, bonytail, and razorback sucker and their critical habitats (FWS 2009). Consultation for the Gunnison River Basin included the continued operations and depletions associated with existing Reclamation projects, including the Uncompahgre Project, other Federal projects, and existing non-federal water depletions.

Suitable habitat for the other federally-listed species does not occur in areas affected by the hydropower project.

*No Action Alternative:* Under the no action alternative, there would be no effect to any threatened, endangered, or candidate species as a result of the proposed Project.

*Proposed Action:* Under the proposed action, there would be no effect on endangered, threatened, or candidate species or their habitat due to the development of any features of the hydropower project. There are no listed species present in areas that would be affected by construction, and there would be no changes in river flows or water quality that could affect the downstream endangered fishes. Water depletions associated with the Uncompahgre Project were

BLM_0034251

consulted on and addressed in the Gunnison Basin Programmatic Biological Opinion (FWS 2009).  No additional depletions would be caused by the proposed Project.

Vegetation surveys of the Project's direct and indirect impact areas did not identify clay-loving wild buckwheat within the project area; however, there is a known population of clay-loving wild buckwheat near the project area.  The lands surrounding the project area may provide suitable habitat for clay-loving wild buckwheat, and plant populations outside the surveyed areas are anticipated.  Construction in the project area nearest to the clay-loving buckwheat will consist of raising the walls of the South Canal.  Substantial increases in dust above baseline conditions is not expected to result from this activity, which will avoid potential indirect effects to the buckwheat.  To ensure project construction will have no impact on clay-loving wild buckwheat populations outside the project area, UVWUA and its contractors will fence or mark the entirety of the project action area prior to construction, to prevent vehicle access or disturbance outside the fenced/marked areas during construction.  With implementation of this environmental commitment, the Proposed Action will have no effect on clay-loving wild buckwheat.

In the event of discovery of any threatened or endangered species, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation.  Work will not be resumed until approved by Reclamation.

## 3.8 – Recreation

*Existing Conditions:*  Areas adjacent to any canal, hydraulic drops and other infrastructure are potentially dangerous.  The maintenance road adjacent to the canal is on Mancos shale soils and can be slippery and dangerous, especially when wet.  The canal and canal road crosses private land, and the canal road is often gated and signed at private property boundaries.  For these reasons, public access is not allowed, and recreation is not authorized within the canal right-of-way.

*No Action Alternative:*  Under the No Action Alternative, hydropower facilities would not be constructed at Drop 5.  There would be no change in recreation from existing conditions.

*Proposed Action:*  Under the proposed action, hydropower facilities would be constructed at Drop 5.  The maintenance road would continue to be slippery and dangerous, especially when wet, and public access and recreation along the canal and canal road would continue to be unauthorized. The project would have no effect on recreation.

## 3.9 – Indian Trust Assets

Indian Trust Assets (ITAs) are legal interests in property held by the United States for Indian Tribes or individuals.  Reclamation and other Federal agencies share the responsibility to protect these assets.  There are no potentially affected ITAs in the project area, and therefore no ITAs will be affected by the No Action Alternative or the Proposed Action.

BLM_0034252

# 3.10 – Environmental Justice

Executive Order 12898 on Environmental Justice provides that Federal agencies analyze programs to assure that they do not disproportionately adversely affect minority or low income populations or Indian Tribes.  There are no potentially affected minorities or low income populations or Indian Tribes affected by the proposed project, and therefore no impacts are expected under either alternative.

# 3.11 – Cultural Resources

Section 106 of the National Historic Preservation Act (NHPA) requires Federal agencies to take into account the effects of their undertakings on cultural resources.  Cultural resources are defined as physical or other expressions of human activity or occupation.  Such resources include culturally significant landscapes, prehistoric and historic archaeological sites, isolated artifacts or features, traditional cultural properties, Native American and other sacred places, and artifacts and documents of cultural and historical significance.

*Existing Conditions:*  The project area of potential effect has been inventoried for cultural resources (Alpine 2013 and 2015).  There were no prehistoric sites located; however, Reclamation determined that the affected portions of the South Canal contribute to an officially eligible site on the National Register of Historic Places (NRHP), and a construction camp adjacent to the project area is eligible for inclusion on the NRHP.  The Colorado State Historic Preservation Officer (SHPO) has reviewed and concurred with Reclamation's determinations.  A brief description of these cultural resources is presented below.

The South Canal was the first large-volume canal built to transport water from the Gunnison Tunnel throughout the Uncompahgre Valley.  The South Canal is 11.4 miles long, and carries up to 1,010 cfs of water directly from the opening of the Gunnison Tunnel to a point on the Uncompahgre River about 9 miles south of Montrose.  Construction of the South Canal took place between 1904 and 1909.  The acreage brought under cultivation by the Gunnison Tunnel and the South canal was more than twice what was possible before the project was built.

The construction camp is an historic labor camp associated with construction of the South Canal between September 1904 and July 1905.

*No Action Alternative:*  Under the No Action Alternative, hydropower facilities would not be constructed at Drop 5.  There would be no impact to cultural resources.

*Proposed Action:*  Under the proposed action, hydropower facilities would be constructed at Drop 5.  Reclamation determined that the proposed project will adversely affect segments of the South Canal, an NRHP eligible cultural resource, and has consulted with the SHPO.  Reclamation determined that the project will have no effect on other NRHP eligible cultural resources.  UVWUA and its contractors will install temporary fencing to prevent vehicle access or disturbance to the NRHP eligible cultural resource located outside of but immediately adjacent to the Action Area.  A Memorandum of Agreement (MOA) between Reclamation and the SHPO to mitigate the effects to the NRHP-eligible cultural resource has been executed.

BLM_0034253

Cultural mitigation stipulations outlined in the MOA will be completed by UVWUA before construction commences (Appendix C).

In the event of discovery of currently unknown cultural or paleontological resources, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation.  Work will not be resumed until approved by Reclamation.

If any additional areas of impact (for example, access roads, borrow areas, or waste areas) are identified during the course of the undertaking, they will be inventoried for cultural resources and consulted on with the SHPO.  No construction work will occur at or near the additional impact area until this consultation is completed.

# 3.12 – Air Quality and Noise

*Existing Conditions:*  Air quality is generally excellent in the project area, and there are no air quality non-attainment areas in the vicinity (EPA 2015).  Agricultural operations and construction activities can be sources of dust pollution, which is made worse during wind events.

There are no significant noise sources or problems in the project area.  The primary source of noise in the project area is flowing water in the South Canal over Drop 5.

*No Action Alternative:*  Under the No Action Alternative, no hydropower facilities would be constructed at Drop 5.  There would not be a change in air quality and noise.

*Proposed Action:*  Under the proposed action, a hydropower facility would be constructed at Drop 5.

There would be an increase in noise levels during excavation and grading for the hydropower facilities and from construction traffic.  During operation, the turbines and generators would produce machinery noise, representing a new noise source; however, such equipment would be fully enclosed, located a minimum of 950 feet from any dwellings, and should have minimal effects on existing noise levels.  After construction of the project facilities, the enclosure of the equipment, combined with the distance to any residences and intervening topography will diminish the noise associated with hydropower facility operations at any residences.  The expected increase in noise levels in the immediate vicinity of the powerplant due to operation is minimal, and therefore noise increases at any residences are anticipated to be at minimal or non-detectable levels.

There would be short-term dust impacts during excavation work, although this is predicted to be insignificant because Best Management Practices for dust abatement would be followed during construction and operation of the hydropower facilities.  Reclamation will require watering to minimize/control dust from cleared areas and along roadways.  There would be no long-term adverse impacts on air quality due to operation and maintenance of the hydropower facilities.  As with other hydropower projects, there would be a beneficial offset of emissions of carbon dioxide ($CO_2$) and other greenhouse gases.  According to the U.S. Energy Information Administration (EIA), in 2013 "the average annual electricity consumption for a U.S. residential customer was 10,903 kilowatt hours (kWh) (EIA 2013)."  With an average annual energy

BLM_0034254

generation of 8,623 MWh, the Drop 5 hydropower project would provide enough clean energy to power about 790 homes each year.  By providing 8,623 MWh of clean energy to the electrical grid which may otherwise have been provided by fossil fuels, Reclamation estimates that $CO_2$ emissions would be reduced by an estimated 17,849,610 to 18,711,910 pounds per year with implementation of the hydropower project, based on the size of the hydropower project and the Energy Information Administration's reduction numbers (EIS 2013a).

## 3.13 – Cumulative Impacts

Cumulative impacts are impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Three other hydropower plants have been constructed at Drops 1, 3, and 4, and an additional hydropower plant is proposed at Drop 2, on the South Canal upstream of the Proposed Action Area.  Drop 2 may be under construction concurrently with Drop 5, however these plans are not yet finalized.  At this time, there are no other known federal, state, or local projects that occur or are proposed to be constructed within, or in the immediate vicinity of, the Proposed Action Area. Implementation of the Proposed Action is not expected to raise cumulative impacts to a significant level.

## 3.14 – Summary

Table 4 summarizes the predicted impacts of the No Action and Proposed Action Alternatives analyzed in this EA.

Table 4. Summary of Impacts for the No Action and Proposed Action Alternatives.

| Resource | No Action Alternative | Hydropower Development at Drop 5 |
|---|---|---|
| Energy Production | None | 8,623 megawatt-hours of energy per year. |
| Wetlands & Riparian Resources | No effect | No effect |
| Recreation Use | No effect | No effect |
| Fisheries | No effect | No effect |
| Water Rights | No effect | No change in water rights. |
| Threatened & Endangered Species | No effect | No effect to federally-listed threatened, endangered or candidate species or critical habitat. |
| Wildlife and Vegetation | No effect | Temporary impacts associated with construction of the hydropower facilities. |

BLM_0034255

| Resource | No Action Alternative | Hydropower Development at Drop 5 |
|---|---|---|
| BLM Sensitive Species | No effect | Insignificant temporary effects to potential breeding habitat for the spotted bat, and potential hunting habitat for the bald eagle, golden eagle, American peregrine falcon, and ferruginous hawk.  Permanent loss of approximately 3 acres of potential habitat for the kit fox, Montrose bladderpod, and Colorado desert parsley. |
| Water supply for Irrigation and Municipal Uses | No effect | No effect |
| Cultural Resources | No effect | Adverse effect to NRHP eligible historic resources.  Impacts will be mitigated as stipulated in an MOA between Reclamation, UVWUA, BLM, and SHPO. |
| Air Quality | No effect | Minor and insubstantial changes in air quality during construction associated with fugitive dust.  Active dust abatement program implemented will keep any temporary negative changes in air quality to a minimal level.  Offset emission of carbon dioxide (estimated at 17,849,610 to 18,711,910 pounds per year) and other greenhouse gases with implementation of the proposed action. |
| Noise | No effect | Temporary increase of noise levels during construction.  Distance from nearby structures combined with enclosure of project equipment will result in no significant long-term increases in noise. |
| Socio-economics | No effect | Assist in providing a source of renewable energy for municipal utilities in the Rocky Mountain Power Area of the Western Electric Coordination Council Region of the North American Electric Reliability Council.  Temporary benefit of increased construction jobs and temporary increase in employment/tax revenues.  Long-term benefit to UVWUA members resulting from sale of power. |
| Cumulative Impacts | No effect | Implementation of the Proposed Action is not expected to raise cumulative impacts to a significant level. |

# 3.15 – Environmental Commitments

The primary effect of the proposed action would be to develop a new source of renewable energy for use by the public.  There would be short-term economic benefits due to construction expenditures and employment.  In the long-term, UVWUA and their members would benefit from income generated from the project.

The following measures will be implemented by UVWUA and its contractors.  The LOPP requires that these commitments be followed and met.  An environmental commitment plan has been prepared and is included in Appendix D of this Final EA to document how environmental

BLM_0034256

commitments and mitigation measures will be implemented during design, construction, and operation of the Project.

- The construction and operation of the hydropower project will be carried out in a manner that does not interfere with the irrigation supplies or maintenance of the Uncompahgre Project.
- Existing access roads will be used to access the construction, staging, and stockpile areas. No new access roads will be constructed.
- Best Management Practices, including drainage features, erosion and sediment control measures, will be implemented to prevent or reduce point source pollution during and following construction.  A Storm Water Management Plan will be developed and filed with the Colorado Department of Health and Environment (CDPHE).
- Prior to construction, erosion and sediment control measures will be applied around wetland and riparian vegetation associated with Dry Cedar Creek to ensure no fill material enters the wetlands or creek.
- All construction equipment will be power-washed and free of soil and debris prior to entering the construction site to reduce the spread of noxious and invasive weeds.
- Topsoil, where available, will be stockpiled during construction for later use in restoration and revegetation of disturbed areas.  Immediately upon completion of construction, disturbed areas will be re-contoured and seeded to reduce erosion and facilitate revegetation (see Appendix F).  The plan for re-contouring and revegetation will require pre-approval by Reclamation.
- Best Management Practices for dust abatement will be followed during construction and operation of the hydropower facilities.  Watering is required to minimize and control dust from cleared areas and along roadways.
- Fuel storage, equipment maintenance, and fueling procedures will be developed to minimize the risk of spills and the impacts from these incidents.  A Spill Prevention, Control and Countermeasure Plan (SPCC) will be prepared prior to construction and kept on-site at all times.  The procedures and the SPCC will be submitted to CDHPE prior to construction.
- UVWUA will be responsible for obtaining any required Federal, state, or local permits to construct and operate the project, including permits under the Clean Water Act (Section 402 and 404 permits).
- UVWUA will be responsible for submitting an application for a Colorado Industrial Stormwater General Permit as provided by CDPHE at least ten (10) days prior to the commencement of construction activities. The application requires certification that a Storm Water Management Plan has been completed for the construction project.
- Prior to construction, UVWUA and its contractors will fence or mark the entirety of the project action area, and no work, access, or disturbance will occur outside the fenced/marked area, in order to avoid potential impacts to federally-listed species or cultural resources.
- In the event of discovery of threatened or endangered species, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation. Work will not be resumed until authorized by Reclamation.
- The Kaplan turbine design will incorporate recommended design concepts 1, 4, and 6 as outlined in *A Summary of Environmentally Friendly Turbine Design Concepts* developed

BLM_0034257

by the US Department of Energy (DOE 1999) to help ensure the Kaplan turbine is designed in an environmentally friendly manner. A copy of this summary can be viewed at: http://www1.eere.energy.gov/wind/pdfs/doewater-13741.pdf.

- To ensure project construction will have no impact on the NRHP-eligible cultural resource located immediately adjacent to the project area, UVWUA and its contractors will install high visibility construction fencing along the project area boundary in the vicinity of the resource, and no construction work, access, or disturbance will occur outside the fenced area.

- In the event of discovery of evidence of possible cultural or paleontological resources, the UVWUA will immediately cease all ground-disturbing activities in the vicinity and notify Reclamation. Work will not be resumed until authorized by Reclamation.

- UVWUA will comply with all Stipulations contained in the Memorandum of Agreement with the Colorado State Historic Preservation Officer (Appendix C).

- If any additional areas of impact (for example: access roads, borrow areas, or waste areas) are identified during the course of the undertaking, they will be inventoried for threatened and endangered species and cultural resources and consulted on with the U.S. Fish and Wildlife Service and the State Historic Preservation Officer, as applicable. No disturbance will occur outside of the identified project area boundaries until the required consultations are completed.

- Above-ground power line and power pole designs will meet recommended standards as outlined in the Avian Protection Plan Guidelines developed by the US Fish and Wildlife Service and Industry (APLIC 2005). A copy of these standards can be viewed at: http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Aprl2005.pdf.

- Powerhouses and substations will be non-reflective and painted to blend with the project area background in order to minimize visual impacts.

- The water utilized for power development will be non-consumptive. No new water rights will be appropriated for the purposes of operating the facility. The operation of the facility will not interfere or conflict with the purpose and operations of the Uncompahgre Project, including but not limited to the South Canal. There will be no increase in diversions from the Gunnison River solely for hydropower use permitted under the LOPP. The hydropower facility will be operated based on irrigation diversion patterns.

- Irrigation supplies and canal maintenance access will be maintained during construction at all times. Water supplies to Fairview Reservoir will not be interrupted.

- The UVWUA will be responsible for noxious weed control within the limits of the facility for the life of the project. UVWUA is responsible for consultation with Reclamation for acceptable weed control methods, including pesticides/herbicides approved for use on public land. UVWUA will adhere to their 2012 *Pesticide Discharge Management Plan and Integrated Pest Management Plan for Uncompahgre Valley Water Users Association*, as well as Montrose County's 2011 *Montrose County Weed Mitigation Department Weed Management Plan*. UVWUA will focus on ensuring the control of invasive weeds within the project area, especially Russian knapweed. Use of pesticides/herbicides will comply with the applicable Federal and state laws. Pesticides/herbicides will be used only in accordance with their registered uses and within limitations imposed by the Secretary of the Interior.

BLM_0034258

# CHAPTER 4 – CONSULTATION AND COORDINATION

## 4.1 – General

Public scoping for this EA was conducted in conjunction with the LOPP negotiation meeting between Reclamation and UVWUA.  Notice of the meeting was published in the Montrose Daily Press on June 27, 2015.  The meeting was held on July 1, 2015, in Montrose to discuss the terms and conditions associated with the construction and operation of the South Canal Drop 5 Hydropower Project.  Reclamation also used this public meeting to provide an opportunity for the public to identify issues and concerns with the proposed project.  The meeting was attended by UVWUA, Reclamation, DMEA, Mountain States Hydro, and one interested party.  Reclamation and the UVWUA have had informal discussions with adjacent landowners, and local, county, and state agencies.  Reclamation also relied on issues that were previously identified for other hydropower projects recently constructed in the Lower Gunnison Basin on the Dallas Creek Project at Ridgway Dam, South Canal at Drops 1, 3, & 4, and the Montrose & Delta Canal at Shavano Falls in preparing the draft EA.

In addition, Reclamation has coordinated with the Colorado State Historic Preservation Officer under Section 106 of the National Historic Preservation Act, the U.S. Fish and Wildlife Service under the Endangered Species Act, the Bureau of Land Management Uncompahgre Field Office, and Colorado Parks and Wildlife.  Results of the consultations have been incorporated into the project analysis and discussions in Chapter 3 and written correspondence is included in the appendices.

## 4.2 – Distribution List

News Releases announced the availability of the draft EA, and the EA was made available upon request via mail or email on August 27, 2015.  Comments were requested by September 14, 2015.  The draft EA was also announced with a request for comments in a distribution letter mailed to agencies, nearby landowners, and stakeholders, as shown below:

No comments were received on the draft EA.

- State Representative Jared Polis
- State Representative Ken Buck
- State Representative Mike Coffman
- State Representative Diana DeGette
- State Representative Ed Perlmutter
- State Representative Scott Tipton
- State Representative Doug Lamborn
- State Senator Cory Gardner

BLM_0034259

- State Senator Michael Bennet
- Montrose County Commission, Montrose, CO
- Bureau of Land Management, Uncompahgre Field Office, Montrose, CO
- Colorado Division of Water Resources, Montrose, CO
- Colorado Parks and Wildlife, Montrose, CO
- Colorado State Historic Preservation Office, Denver, CO
- Tri-County Water Conservancy District, Montrose, CO
- Delta-Montrose Electric Association, Montrose, CO
- Uncompahgre Valley Water Users Association, Montrose, CO
- Project 7 Water Authority, Montrose, CO
- Montrose Daily Press, Montrose, CO
- Telluride Watch, Telluride, CO
- Ouray Plain Dealer, Ouray, CO
- Western Slope Conservation Center, Paonia, CO
- Daily Sentinel, Grand Junction, CO
- Western Resource Advocates, Boulder, CO
- High Country Citizens Alliance, Crested Butte, CO
- Southern Ute Indian Tribe, Ignacio, CO
- Ute Mountain Ute Indian Tribe, Towaoc, CO
- Fish and Wildlife Service, Grand Junction, CO
- U.S. Army Corps of Engineers, Grand Junction, CO
- U.S. Environmental Protection Agency, Denver, CO
- U.S. Geological Survey, Grand Junction, CO
- Individuals and Landowners

# 4.3 – Draft EA Comments

A Draft EA was released for public review and comment on August 27, 2015, and comments from the general public were accepted up to and through September 14, 2015. The BLM-UFO received an extended comment period due to portions of the Proposed Action occurring on BLM land. During the comment period, Reclamation received one response, which was from the BLM-UFO (Appendix E). Following are responses to comments received on the Draft EA:

**COMMENTS FROM THE BUREAU OF LAND MANAGEMENT UNCOMPAHGRE FIELD OFFICE:**

**COMMENT 1:** Page 14, Section 2.2.2, Paragraph 3: Please refer to comments made under Section 3.5, Page 22, Paragraph 8 and Page 23, Paragraph 3.

**RESPONSE 1:** BLM provided Reclamation with a recommended native seed mixture which includes species which are not overly competitive with the Clay-loving wild buckwheat. This seed mixture is the Reclamation approved seed mixture referenced throughout the document, and has been included in Appendix F.

BLM_0034260

**COMMENT 2:**  Page 20, Section 3.3:  Fuel storage, equipment, maintenance, and fueling procedures should be developed and submitted to CDPHE prior to construction along with SWMP and SPCC.

**RESPONSE 2:**  Reclamation has included this commitment in the referenced section, and has added it to the project's environmental commitments.

**COMMENT 3:**  Page 22, Section 3.5, Paragraphs 2, 3, and 4:  Description of "native vegetation" should not include reference to introduced and invasive species (e.g. "annual wheatgrass", "Russian knapweed", "cheat-grass", "Canada thistle", "tamarisk", "halogeton", and "annual mustards". It is recommended that this section introduce the federally listed *Eriogonum pelinophilum* (Clay-loving wild buckwheat), with reference to section 3.7.

**RESPONSE 3:**  The description of "native vegetation" did not include references to Russian knapweed, Canada thistle, tamarisk, halogeton, or annual mustards.  Those species have been identified on road sides and other disturbed areas within the project area, and have therefore been included in the Wildlife and Vegetation section of the Final EA.  Annual wheatgrass and cheatgrass have been removed from the native vegetation paragraph in the Final EA.  Clay-loving wild buckwheat has been included in the native vegetation paragraph in the Final EA, with a reference to section 3.7.

**COMMENT 4:**  Page 22, Section 3.5, Paragraph 8:  How will area be restored to pre-project conditions after construction? Due to the probable spread of weeds (e.g. Russian knapweed) on disturbed land during/post construction, how will such effects be minimized? A more complete description of fuel storage, equipment maintenance, and fueling procedures 'to be developed' to minimize risk of spills and impacts from such incidents should be included.

**RESPONSE 4:**  The area will be restored to pre-project conditions by re-contouring the disturbed land to prevent erosion, stockpiling and replacing topsoil within the project area, and by planting a Reclamation approved seed mixture (see Response 1).  The Final EA includes environmental commitments for the control of weeds (i.e. all construction equipment will be power-washed and free of soil and debris prior to entering the construction site, UVWUA will be responsible for noxious weed control within the limits of the facility for the life of the project, etc).  As per BLM recommendation in Comment 2, the fuel storage, equipment maintenance, and fueling procedures to be developed will be submitted to CDPHE prior to construction along with the SWMP and SPCC.  Additional information will not be included in the Final EA.

**COMMENT 5:**  Page 23, Section 3.5, Paragraph 3:  We recommend a native seed mix be utilized for revegetation, and include species which are not overly competitive with the Clay-loving wild buckwheat. We can assist in recommendations for this. The seed mix should be disclosed prior to application.

**RESPONSE 5:**  BLM provided Reclamation with a recommended native seed mixture which includes species which are not overly competitive with the Clay-loving wild buckwheat.  This seed mixture is the Reclamation approved seed mixture referenced throughout the document, and has been included in Appendix F.

**COMMENT 6:**  Page 35, Section 3.15, Bullet 3:  S/A above.

BLM_0034261

**RESPONSE 6:** See Response 5.

**COMMENT 7:** Page 28, Section 3.7, Paragraph 1: At what location within project area was Clay-loving wild buckwheat recorded?

**RESPONSE 7:** Clay-loving wild buckwheat was not recorded within the project area, as defined. During initial discussions of the proposed project with BLM, the project included modifying canal segments further upstream of the proposed project area, however, the scope of the proposed project has been modified to completely avoid impacts to the Clay-loving wild buckwheat. The nearest Clay-loving wild buckwheat populations are located approximately 130 feet north of the project area.

**COMMENT 8:** Page 29, Section 3.7, Paragraph 5: We recommend the employment of a 3rd party bio-monitor to oversee the fencing off of project areas, to ensure the protection of Clay-loving wild buckwheat populations, as well as to offer guidance to work crews, ensure the maintenance of such fencing and compliance to its boundaries.

**RESPONSE 8:** The threatened and endangered species surveys for the proposed project included land outside of the project area. UVWUA and its contractors will be required to fence the project area, which will require work approximately 130 feet south of the nearest recorded Clay-loving wild buckwheat. Because of the distance between the proposed fencing and any Clay-loving wild buckwheat plants, it is unnecessary to require a third party bio-monitor to oversee the fencing off of the project area.

**COMMENT 9:** Page 35, Section 3.15, Bullet 8: S/A above.

**RESPONSE 9:** See Response 8.

**COMMENT 10:** Page 29, Section 3.7, Paragraph 6: In the event of discovery of any T/E species, the UVWUA will notify BLM and FWS in addition to Reclamation.

**RESPONSE 10:** In the event of discovery of any T&E species, the UVWUA will notify Reclamation, and Reclamation, as lead Federal agency, will notify BLM and FWS.

**COMMENT 11:** General Comment: In the event of a change of project plans which would require work in areas with known T/E species, as well as any work to be conducted outside of previously surveyed areas, BLM and FWS will be consulted, in addition to Reclamation, to determine if additional surveys are required before proceeding with any such work.

**RESPONSE 11:** Reclamation, as lead Federal agency, will be responsible for consulting with BLM, FWS, USACE, EPA, SHPO, or any other agency as determined necessary in the event of a change in project plans, including changes which would require work in areas with known T&E species, or work to be conducted outside of previously surveyed areas.

**COMMENT 12:** General Comment: It is strongly recommended that UVWUA and BOR commit to treating Russian knapweed along canal where it has intermingled, and where it is encroaching upon *E. pelinophilum* populations, as it is having adverse effects which will most likely increase due to disturbances to *E. pelinophilum* habitat. UVWUA and BOR should consult

BLM_0034262

with USFWS to develop and coordinate an effective plan to treat Russian knapweed (and any other weeds) which is specific to simultaneously controlling such invasives and employs cautionary measures for *E. pelinophilum* populations.

**RESPONSE 12:**  UVWUA will be responsible for controlling invasive weeds, including Russian knapweeds, within the project area.  UVWUA and BOR have previously developed a plan to treat weeds in their 2012 *Pesticide Discharge Management Plan and Integrated Pest Management Plan for Uncompahgre Valley Water Users Association*.  UVWUA will also be responsible for controlling weeds in accordance with Montrose County's Weed Management Plan.  The following has been included as an environmental commitment in the Final EA:

"UVWUA will adhere to their 2012 *Pesticide Discharge Management Plan and Integrated Pest Management Plan for Uncompahgre Valley Water Users Association*, as well as Montrose County's 2011 *Montrose County Weed Mitigation Department Weed Management Plan*. UVWUA will focus on ensuring the control of invasive weeds within the project area, especially Russian knapweed."

BLM_0034263

# REFERENCES

Alpine 2013.  Cultural Resource Inventory of Three Potential Hydropower Sites, Montrose County, Colorado.  Alpine Archaeological Consultants, Inc.  October 2013.

Alpine 2015.  Cultural Resource Inventory of Three Additional Areas along the South Canal for the Drop 5 Hydropower Project, Montrose County, Colorado.  Alpine Archaeological Consultants, Inc.  July 2015.

APLIC 2005.  Avian Protection Plan (APP) Guidelines.  The Edison Electric Institute's Avian Power Line Interaction Committee and the U.S. Fish and Wildlife Service.  April 2005.

Bio-Logic, Inc. 2013.  Sorenson Engineering & Uncompahgre Valley Water Users Association South Canal and Montrose & Delta Canal Hydroelectric Projects Rare Plant Survey Report.  BIO-Logic, Inc. Natural Resources Consultants, Montrose, Colorado.  October 10, 2013.

Bio-Logic, Inc. 2015.  South Canal Drop 5 Hydroelectric Project: Expanded Rare Plant Survey Results.  BIO-Logic, Inc. Natural Resources Consultants, Montrose, Colorado.  July 3, 2015.

BLM 2015.  BLM Uncompahgre Field Office Special Status Species and Birds of Conservation Concern.  Pg. 3 – 5.  Accessed on: August 21, 2015.  Website at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/documents/biological.Par.58495.File.dat/2015-0715%20UFO%20Special%20Status%20Species.pdf.

Cada et al.  Cada, Glenn F., Laura A. Garrison, and Richard K. Fisher, Jr.  Determining the Effect of Shear Stress on Fish Mortality during Turbine Passage.  Hydro Review Nov. 2007: 52-59. Accessed on: August 21, 2015.  Website at: http://www.hydroworld.com/articles/hr/print/volume-26/issue-7/technical-articles/determining-the-effect-of-shear-stress-on-fish-mortality-during-turbine-passage.html.

CDPHE 2012.  CDPS General Permit, Stormwater Discharges Associated with Construction Activity, Authorization to Discharge under the Colorado Discharge Permit System.  Colorado Department of Public Health and Environment.  Accessed on: July 29, 2015.  Website at: https://www.colorado.gov/pacific/sites/default/files/cor030000%20permit.pdf.

DOE 1999.  A Summary of Environmentally Friendly Turbine Design Concepts.  United States Department of Energy Idaho Operations Office.  July 1999.  Accessed on:  August 21, 2015.  Website at:  http://www1.eere.energy.gov/wind/pdfs/doewater-13741.pdf.

BLM_0034264

EIA 2013.  Frequently Asked Questions: How Much Electricity Does an American Home Use?.  U.S. Energy Information Administration.  February 20, 2015.  Accessed on: June 11, 2015.  Website at: http://www.eia.gov/tools/faqs/faq.cfm?id=97&t=3.

EIA 2013a.  Frequently Asked Questions:  How Much Carbon Dioxide is Produced per Kilowatt-hour When Generating Electricity with Fossil Fuels?  U.S. Energy Information Administration.  March 20, 2015.  Accessed on: June 11, 2015.  Website at: http://www.eia.gov/tools/faqs/faq.cfm?id=74&t=11.

EPA 2015.  Currently Designated Nonattainment Areas for all Criteria Pollutants.  U.S. Environmental Protection Agency.  January 30, 2015.  Accessed on: June 11, 2015.  Website at: http://www.epa.gov/airquality/greenbook/ancl3.html.

FWS 2009.  Final Gunnison River Basin, Programmatic Biological Opinion.  U.S. Fish and Wildlife Service, Ecological Services, Colorado Field Office, Denver, Colorado.  December 4, 2009.

FWS 2014.  Gunnison Sage-Grouse; Threatened Designation and Responsibilities under the Endangered Species Act.  U.S. Fish and Wildlife Service.  November 2014.

FWS 2015.  The Environmental Conservation Online System's Information and Planning and Conservation Tool.  U.S. Fish and Wildlife Service.  Accessed on: July 28, 2015.  Website at: http://ecos.fws.gov/ipac/.

Montrose.  Montrose County Weed Mitigation Department Weed Management Plan.  Montrose County, Colorado.  April 18, 2011.  Accessed on: September 24, 2015.  Website at: http://www.montrosecounty.net/DocumentView.aspx?DID=1516.

Reclamation 2012.  Pesticide Discharge Management Plan and Integrated Pest Management Plan for Uncompahgre Valley Water Users Association.  Bureau of Reclamation, Western Colorado Area Office.  May 2012.

Reclamation 2014.  Draft Environmental Assessment South Canal Drop 4 Hydropower Project.  Bureau of Reclamation, Western Colorado Area Office.  July 2014.

Sorenson Engineering 2015.  Supporting Design Report for South Canal Drop 5 Hydroelectric Project.  Sorenson Engineering.  April 15, 2015.

WECC 2004.  10-Year Coordinated Plan Summary; Planning and Operation for Electric System Reliability.  Western Electricity Coordinating Council, 2004.

BLM_0034265

# ABBREVIATIONS AND ACRONYMS

- af – acre-feet
- ATG – automatic trip gates
- BLM – U.S. Bureau of Land Management
- CDPHE – Colorado Department of Public Health and Environment
- cfs – cubic feet per second
- $CO_2$ – Carbon dioxide
- CPW – Colorado Parks and Wildlife
- CWA – Clean Water Act
- DMEA – Delta-Montrose Electric Association
- EA – Environmental Assessment
- EIS – Energy Information Administration
- ESA – Endangered Species Act
- FERC – Federal Energy Regulatory Commission
- FWS – U.S. Fish and Wildlife Service
- ITA – Indian Trust Asset
- kW - kilowatt
- kWh – kilowatt hours
- LOPP – Lease of Power Privilege
- M&D – Montrose & Delta Canal
- MEAN – Mutual Energy Association of Nebraska
- MOA – Memorandum of Agreement
- MW – megawatt
- MWh – megawatt hours
- NPDES – Nonpoint Discharge Elimination System
- NRHP – National Register of Historic Places
- NWP – Nationwide Permit
- PBO – Programmatic Biological Opinion
- Reclamation – Bureau of Reclamation
- SHPO – State Historic Preservation Officer
- SPCC – Spill Prevention, Control and Countermeasure Plan
- UFO – Uncompahgre Field Office
- USACE – U.S. Army Corps of Engineers
- UVWUA – Uncompahgre Valley Water Users Association

BLM_0034266

## Appendix A – Preliminary Lease of Power Privilege (Contract No. 2015-0031-CF-0004)

Contract No. 2015-0031-CF-0004

PRELIMINARY LEASE AND FUNDING AGREEMENT
BETWEEN
BUREAU OF RECLAMATION
AND
UNCOMPAHGRE VALLEY WATER USERS ASSOCIATION
FOR
SOUTH CANAL DROP 5 LEASE OF POWER PRIVILEGE
COST-RECOVERY

1.    THIS PRELIMINARY LEASE AND FUNDING AGREEMENT (Agreement) is made pursuant to the Reclamation Act of 1902 approved June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto, particularly the Contributed Funds Act of March 4, 1921 (43 U.S.C. § 395), among the Bureau ofReclamation (Reclamation) and the Uncompahgre Valley Water Users Association (Association) for the purpose of contributing funds to Reclamation to perform environmental, and other services necessary to establish and implement a Lease of Power Privilege (LOPP).

WITNESS TO

2.    EXPLANATORY RECITALS

2.1    WHEREAS, the Uncompahgre Project, located in west-central Colorado, was authorized for construction by the Secretary of the Interior on March 14, 1903, under the provisions of the Reclamation Act of 1902; and

2.2    WHEREAS, the Uncompahgre Project was authorized to allow for the sale of hydroelectric power under the Act of June 22, 1938 (52 Stat. 941), Sale of Surplus Power, Uncompahgre Valley Project; and

2.3    WHEREAS, the electricity generated by the proposed hydropower plant to be located on the South Canal at Drop 5 will provide a clean, renewable energy source; and

2.4    WHEREAS, a proposal was reviewed by Reclamation staff, and it has been determined that negotiations should proceed with the Association for the LOPP on the South Canal at Drop 5.

2.5    WHEREAS, under Reclamation law and policy, the Association is required to pay in advance all costs associated with work undertaken by Reclamation necessary for completion of this project; and

2.6    WHEREAS, the Contributed Funds Act provides authority for the Secretary of the Interior, acting through Reclamation, to receive moneys, without further appropriation.

BLM_0034267

The law states: "All moneys after March 4, 1921, from any State, municipality, corporation, association, firm, district, or individual for investigations, surveys, construction work, or any other development work incident thereto involving operations similar to those provided for by the Reclamation law shall be covered into the Reclamation fund, and shall be available for expenditure for the purposes for which contributed in like manner, as if said sums had been specifically appropriated for said purposes."

**NOW THEREFORE,** in consideration of the foregoing the parties agree to the following:

3.   PURPOSE

     3.1   The purpose of this Agreement is to receive funding from the Association for Reclamation's assistance in the development of the LOPP on the South Canal at Drop 5, and identify timelines for the LOPP process.

4.   RESPONSIBILITIES

     4.1   Reclamation will assure that all actions identified in its Scope of Work below are complete.

     4.2   The Association will assure that all actions identified in its Scope of Work below are complete.

5.   RECLAMATION'S SCOPE OF WORK

     5.1   Reclamation will be the lead agency for ensuring compliance with the National Environmental Policy Act (NEPA), Endangered Species Act (ESA) and the National Historic Preservation Act (NHPA); and request consultation from the Fish and Wildlife Service pursuant to Section 7 of the ESA, if consultation is required.

     5.2   Reclamation LOPP lead contact on this project will be Mr. Ryan Christianson, as identified in Article 11.1 herein. Reclamation shall schedule a meeting within 30 calendar days of the execution of this Agreement. The attendees will be Reclamation staff and the Association representatives. The purpose of this meeting will be to ensure all attendees understand the roles and responsibilities of each of the parties in the LOPP process. The agreed upon terms, roles and responsibilities resulting from this meeting will be documented in a manner agreeable to the parties involved.

     5.3   Reclamation shall perform tasks related to the development and implementation of the LOPP, including, but not limited to: contract development, design review, and technical assistance, as needed, related to construction, operation, maintenance and security of the power facility.

     5.4   Reclamation may contract with another person or entity, in consultation with the Association, for obligations described herein. All costs, including Reclamation's actual costs for administering the contract(s), shall be paid by the Association.

     5.5   Reclamation shall establish a specific account (Federal Account) to

BLM_0034268

receive funds advanced by the Association.

     5.6     Reclamation shall provide a monthly accounting of its expenses for work performed to establish and implement the LOPP.

6.     ASSOCIATION'S SCOPE OF WORK

     6.1     The Association shall notify Reclamation in writing with the names of representatives who will participate on the LOPP contract negotiation team.

     6.2     The Association shall assist Reclamation, as requested, with completion of activities required to comply with NEPA, ESA, NHPA, and other applicable Federal laws as required.

     6.3     The Association shall as ist Reclamation in arranging public involvement, including meeting places and notices to the public, if so determined to be necessary by Reclamation for NEPA compliance.

     6.4     The Association shall pay all costs in the manner described in Article 10, herein. Reclamation has estimated the costs associated with NEPA compliance and other tasks listed in

. Exhibit A to be **$70,000.**  Upon execution of this Agreement and prior to initiation of required tasks by Reclamation, the Association shall advance to Reclamation the estimated costs associated with the completion of such tasks.  The Association shall make an initial deposit into the Federal Account in the amount of **$40,000.**  At such time when the balance in the Federal Account is anticipated to be reduced to **$10,000** or less, Reclamation will request additional deposits be made into the Federal Account.  The Association shall deposit the requested funds into the Federal Account within 30 days of receipt of the request.

     6.5     The Association shall provide a timeline schedule for completing the necessary steps to execute the LOPP contract and begin construction.7.   TERM OF THE AGREEMENT

     7.1     The date of execution for this Agreement shall be the date this Agreement is signed by the Regional Director.

     7.2     This Agreement shall be effective for a period of 15 months from the date of the execution, or until either execution of the LOPP contract, or the Association ceases to pursue a LOPP contract.

8.     TERMINATION

     8.1     Either party may terminate this Agreement with 30 days written notice to the other party.

9.     MODIFICATION(S) TO THE AGREEMENT

BLM_0034269

9.1     Either party may formally request modification of this Agreement. Modifications shall be by mutual consent of the parties by the issuance of a written n1odification to this Agreetnent, signed and dated by the parties, to any changes being performed. ·

10.    BUDGET AND METHOD OF PAYMENT

10.1    In order to comply with 43 U.S.C. 395 Contributed Funds Act of March 4, 1921, Reclamation will issue written requests to the Association for advancement of funds to be deposited into the Federal Account (Article 5.5, herein). Requests for deposits will include work estimates for the deposit requested. Reclamation will not perform any work until adequate funds are available in the Federal Account. The Association will be allowed 3Q days from the date it receives a request to make the requested deposits. The fund amount will be based upon the estimate shown on Exhibit A. If the estimate does not cover all of Reclamation's costs, Reclamation will request additional funds from the Association in advance of continuing work.

10.2    If this Agreement is terminated prior to execution of a LOPP contract (Article

8.1, herein), or if this Agreement is no longer in effect (Article 7.2, herein), remaining funds deposited in the Federal Account (Article 5.5, herein) shall be returned to the Association within 30 days of the date of termination, or of the first day when the Agreement was no longer in effect.10.3 Upon the execution of an LOPP contract, remaining funds deposited in the Federal Account (Article 5.5, herein) shall remain in the Federal Account. The Federal Account shall be maintained and the funds deposited in this account shall be utilized to pay Reclamation's costs associated with administering the LOPP during the term of the LOPP contract.

11.    NOTICES AND AUTHORIZED REPRESENTATIVES

11.1    Any and all notices required to be given by parties hereto, unless otherwise

stated in this Agreement shall be in writing and be deemed communicated when mailed through the United States Postal Service, certified, return receipt requested, and addressed as follows:

To Uncompahgre Valley Water Users Association

Mr. Steve Fletcher
Manager
P.O. Box 69
Montrose CO  81402

To Bureau of Reclamation

Mr. Ryan Christianson
Western Colorado Area Office
445 West Gunnison, Suite 221

BLM_0034270

Grand Junction CO 81501

The parties may change their leads or address for the purpose of this section by giving written notice of such change to the other in the manner herein provided.

12.   GENERAL PROVISIONS

12.1     Nothing herein shall be construed to obligate Reclamation to expend or involve the United States of America in any contract or other obligation requiring funding.

12.2     No Member of or Delegate to the Congress, Resident Commissioner, or official of the Association shall benefit from this Agreement, other than as a water user or landowner in the same manner as other water users or landowners.

12.3     Any information furnished to Reclamation, under this Agreement, is subject to the Freedom of Information Act (5 U.S.C. 552)

In Witness Whereof, the parties hereto have executed this Agreement as of the last date written below.

Brent Rhees, Regional Director
Upper Colorado Regional Office
Bureau of Reclamation

6/18/15
Date

APPROVED

Regional Solicitor's Office

George Etchart, President
Uncompahgre Valley Water Users Association

6-11-15
Date

BLM_0034271

EXHIBIT A

Work provided by thBureau of Reclamation in the development and construction of the hydro-powerplant on the South Canal located at Drop 5, within the Uncompahgre Project boundary.

Advancement estimates:

| Description | Cost ($) |
|---|---|
| Negotiation and Development of Lease | 25,000 |
| Planning and Design Technical Assistance | 4,000 |
| NEPA Review | 25,000 |
| Travel- Region | 5,000 |
| Contingencies | 11,000 |
| TOTAL ADVANCEMENT ESTIMATES | $70,000 |

BLM_0034272

## Appendix B – Coordination with Colorado Parks and Wildlife



COLORADO
Parks and Wildlife
Department of Natural Resources

Montrose Office
2300 S. Townsend Avenue
Montrose, CO 81401
P 970.252.6000  |  F 970.252.6053

July 23, 2015

Jennifer Ward
Environmental Protection Specialist
Bureau of Reclamation
Western Colorado Area Office
445 West Gunnion Ave, Suite 221
Grand Junction, CO 81501

RE: Draft Environmental Assessment, South Canal Drop 5 Hydropower Project

Dear Ms. Ward,

Thank you for the opportunity to comment on the draft Environmental Assessment (EA) for the South Canal Drop 5 Hydropower Project. Colorado Parks and Wildlife (CPW) staff as visited the site of the proposed project, and we do have a few minor concerns with possible impacts to wildlife.

The proposed project site lies on the South Canal north of Trout Road and south of Kinikin Road, southeast of Montrose. The habitat consists of pinon and juniper trees, sage brush, greasewood and small seasonal wetlands.

The area of the proposed project lies inside CPW mapped winter range for mule deer and the area supports high densities of wintering mule deer. Deer populations throughout western Colorado have been generally declining. This project is likely to impact deer that winter in this area. Our standard stipulations and recommendations are as follows. We recommend construction activities be performed before December 1st and avoiding construction from December 1ST through April 30$^{s}$t each year. If this is not possible with this project, we would recommend to limit activity, noise, truck travel and hours of operation to the greatest extent possible to reduce impacts to wintering mule deer. Activity should be restricted to as early in winter as possible to not stress to deer in late winter when they are in their worst body condition and most vulnerable to stress. In addition, limiting construction and traffic into the area

BLM_0034273

between the hours of 9am and 4pm would minimize stress to deer as they are more active late afternoon through the night into early morning. CPW does not have concern for normal operations of the completed project.

Again, thank you for the opportunity to comment on the draft Environmental Assessment for the South Canal Drop 5 Hydropower Project. If you have further questions please contact myself, or District Wildlife Manager Matt Ortega at (970)-252-6011.

Sincerely,

Renzo DelPiccolo
Area Wildlife Manager
970.252.6010

cc: Matt Ortega-DWM, Patt Dorsey-SW Region Manager, Jon Holst-Energy Resource Specialist, Brian Magee-Land Use Coordinator

BLM_0034274

## Appendix C – Cultural Resources Documentation

HISTORY *Colorado*

June 20, 2014

Ed Warner
Area Manager
Bureau of Reclamation
Upper Colorado Region
Western Colorado Area Office
445 West Gunnison Avenue, Suite 221
Grand Junction, Colorado 81501

Re:  Finding of Adverse Effect to the South Canal Construction Camp (Tunnel 3), South Canal Drop 4 Hydropower Project, Montrose, Colorado (CHS #65599)

Dear Mr. Warner:

Thank you for your additional correspondence dated June 12, 2014 (received by our office on June 16, 2014) regarding the subject undertaking which is supplemental to our prior Section 106 consultation for the Shavano Falls Hydropower Project.

At the time of our prior Section 106 consultation, National Register eligibility for five sites and two isolated finds as well as project effects for the South Canal Drop 4 and 5 project areas was not requested due to ongoing engineering redesign. While the subject of your current consultation is limited to the South Canal Drop 4 area of potential effects, we are providing comment for all remaining sites including those located within the Drop 5 locality to facilitate any future Section 106 consultation that may be required for the latter.

After review of the remaining resource forms provided, we concur that sites 5MN2351 and 5MN10212 are eligible for listing to the National Register of Historic Places (NRHP). We concur that linear segments 5MN1851.7, 5MN1851.8, and 5MN1851.9 retain sufficient historical integrity to support the overall eligibility of the larger resource. We concur that isolated finds 5MN10213 and 5MN10214 are not eligible for listing to the NRHP.

With respect to the South Canal Drop 4 hydropower project, we concur that if avoidance is not possible that the proposed undertaking will result in an adverse effect to the following NRHP-eligible and supporting properties: 5MN1851.7, 5MN1851.8, and 5MN10212. Consequently, we find the proposed mitigation satisfactory as outlined within the survey report and inventory forms and we look

53 | P a g e

forward to developing a Memorandum of Agreement and Treatment Plan between all applicable parties to mitigate the effect of this undertaking on these historic properties.

Please note that as stipulated in 36 CFR 800.6(a)(1), the lead agency official shall notify the Advisory Council on Historic Preservation of the adverse effect determination so that it may indicate whether it wishes to participate in the resolution of effects.  The consultation process does involve other consulting parties such as local governments and Tribes, which as stipulated in 36 CFR 800.3 are required to be notified of the undertaking. Additional information provided by the local government, Tribes or other consulting parties may cause our office to re-evaluate our comments and recommendations.

Thank you for the opportunity to comment.  If we may be of further assistance, please contact Mark Tobias, Section 106 Compliance Manager at (303) 866-4674 or mark.tobias@)state.co.us.

Sincerely,

Edward C. Nichols
State Historic Preservation Officer
ECN/MAT

BLM_0034276



HISTORY Colorado

18 August 2015

Ed Warner
Area Manager
Bureau of Reclamation
Western Colorado Area Office
445 W. Gunnison Ave., Suite 221
Grand Junction, CO 81501

RE: South Canal Drop 5 Hydropower Project, Uncompahgre Project, Montrose County

Dear Mr. Warner:

Thank you for your recent correspondence dated 22 July 2015, concerning the proposed construction of a hydropower plant at Drop 5 of the South Canal (5MN.1851). Our office has reviewed the submitted materials. We concur with your assessment that this undertaking will have an adverse effect on three segments of the South Canal, all of which support the eligibility of the overall resource (which itself is eligible for listing on the National Register of Historic Places). The proposed undertaking will have no adverse effect on the National Register-eligible canal construction camp (5MN.2348).

If the avoidance of an adverse effect is not possible, we believe that mitigation of the historic resources should be outlined in a Memorandum of Agreement (MOA) signed by our respective offices. Please note that under 36.CFR.800.6(a)(1), the Advisory Council on Historic Preservation needs to be notified of the adverse effect determination and given the opportunity to decide whether to participate in the resolution of the adverse effect.

If you have any questions, please contact Joseph Saldibar, Architectural Services Manager, at (303) 866-3741.

Sincerely,

Edward C. Nichols
State Historic Preservation Officer, and
President, Colorado Historical Society

BLM_0034277

# MEMORANDUM OF AGREEMENT
## BETWEEN
## THE WESTERN COLORADO AREA OFFICE, BUREAU OF RECLAMATION
## AND THE COLORADO STATE HISTORIC PRESERVATION OFFICER
## REGARDING SOUTH CANAL DROP 5 HYDROPOWER PROJECT, UNCOMPAHGRE
## PROJECT, MONTROSE COUNTY, COLORADO

**WHEREAS,** the Bureau of Reclamation (Reclamation) and the Uncompahgre Valley Water Users Association (UVWUA) plan to construct a hydropower plant on the South Canal in Montrose County, Colorado (Project); and

**WHEREAS,** Reclamation plans to issue a Lease of Power Privilege (LOPP) for the Project pursuant to the Bureau of Reclamation Small Conduit Hydropower Development and Rural Jobs Act, thereby making the Project an undertaking subject to review under Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, and its implementing regulations, 36 CFR Part 800; and

**WHEREAS,** Reclamation has defined the undertaking's area of potential effect (APE) as described in Attachment A; and

**WHEREAS,** Reclamation as lead Federal agency has determined that the Project will have an adverse effect on three recorded segments of the South Canal (5MN1851.9, 5MN1851.12, and 5MN1851.13). These cultural resources have been determined by Reclamation, in consultation with the Colorado State Historic Preservation Officer (SHPO), to be eligible for inclusion on the National Register of Historic Places under Criteria A and C (5MN1851.9), and Criterion C (5MN1851.12 and 5MN1851.13); and

**WHEREAS,** the UVWUA is the sponsor of the Project, has participated in the consultation, and has been invited to sign the Memorandum of Agreement (MOA); and

**WHEREAS,** a portion of this hydropower project occurs on land administered by the Bureau of Land Management – Uncompahgre Field Office (BLM). The BLM has participated in the consultation, and has declined our invitation to sign the MOA; and

**WHEREAS**, in accordance with 36 CFR § 800.6(a)(1), Reclamation has notified the Advisory Council on Historic Preservation (Council) of its adverse effect determination providing the specified documentation, and the Council has chosen not to participate in the consultation pursuant to 36 CFR § 800.6(a)(1)(iii);

**NOW, THEREFORE,** pursuant to Section 106 of the NHPA, Reclamation and the SHPO agree that the undertaking shall be implemented in accordance with the following stipulations in order to take into account the effect on historic properties.

BLM_0034278

## STIPULATIONS

Reclamation shall ensure that the following measures are carried out:

I.    Prior to any modification associated with this undertaking, Reclamation will ensure that the 5MN1851.9, 5MN1851.12, and 5MN1851.13 segments of the South Canal will be recorded in accordance with the guidance for Level II Documentation found in "Historic Resource Documentation, Standards for Level I, II, and III Documentation" (Office of Archaeology and Historic Preservation Publication 1595, March 2013). The documentation will be of archival quality, and will include mapping of the properties and photographic documentation of the portions of the historic properties to be included in the hydropower project. Photographs will be black and white archival quality (4" x 6") prints. Features will be plotted on the maps with GPS waypoints and will be extensively described and indexed in the report.

II.    Reclamation will supplement the Level II Documentation with a descriptive and historical narrative. The narrative will synthesize the existing documentation on 5MN1851.9, 5MN1851.12, and 5MN1851.13, and describe the canal in the context of the development and history of the Uncompahgre Valley area.  The narrative will include photographs of the landscape features taken during the cultural resources survey. A Summary Report for the recorded segments, which includes the Level II Documentation and the narrative, will be prepared.

III.    The South Canal Construction Camp at Tunnel 5 (5MN2348) is not anticipated to be impacted by this project.  In the event that the proposed Project plan changes and the South Canal Construction Camp at Tunnel 5 will be impacted, Reclamation will reinitiate consultation with SHPO prior to any construction activities occurring in the South Canal Construction Camp at Tunnel 5 area.

IV.    Reclamation will submit a copy of the Level II Documentation to the SHPO within one (1) year of the execution of this MOA.  The Level II Documentation shall be subject to SHPO review and approval.

V.    All of the above stipulations must be satisfied prior to construction and/or any earth disturbances within the APE.

## VI.    DURATION

This MOA will be null and void if its terms are not carried out within five (5) years from the date of its execution.  Prior to such time, Reclamation may consult with the other signatories to reconsider the terms of the agreement.  Unless terminated pursuant to Stipulation XI, below, this MOA will be in effect through Reclamation's implementation of the stipulations of this MOA, and will terminate and have no further force or effect when Reclamation, in consultation with the SHPO, determines that the terms of the MOA have been fulfilled in a satisfactory manner.

## VII.    POST-REVIEW DISCOVERIES

BLM_0034279

If potential historic properties are discovered or unanticipated effects on historic properties found, the UVWUA shall implement the discovery plan included as Attachment B of this MOA.

## VIII.   MONITORING AND REPORTING

Each year following the execution of this MOA until its stipulations are carried out, it expires, or is terminated, UVWUA shall provide all parties to this MOA a summary report detailing work carried out pursuant to its terms. Such report shall include any scheduling changes proposed, any problems encountered, and any disputes and objections received in UVWUA's efforts to carry out the terms of this MOA.

The signatories may monitor activities pursuant to this MOA, and the Council will review such activities if so requested by a party to this MOA. Reclamation will cooperate with the signatories in carrying out their review and monitoring responsibilities.

## IX.   DISPUTE RESOLUTION

Should any signatory or concurring party to this MOA object at any time to any actions proposed or the manner in which the terms of this MOA are implemented, Reclamation shall consult with such party to resolve the objection. If Reclamation determines that such objection cannot be resolved, Reclamation will:

a.   Forward all documentation relevant to this dispute, including Reclamation's proposed resolution, to the ACHP. The ACHP shall provide Reclamation with its advice on the resolution of the objection within thirty (30) days of receiving adequate documentation. Prior to reaching a final decision on the dispute, Reclamation shall prepare a written response that takes into account any timely advice or comments regarding the dispute from the ACHP, signatories and concurring parties, and provide them with a copy of this written response. Reclamation will then proceed according to its final decision.

b.   If the ACHP does not provide its advice regarding the dispute within the thirty (30) day time period, Reclamation may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, Reclamation shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories and concurring parties to the MOA, and provide them and the ACHP with a copy of such written response.

c.   Reclamation's responsibilities to carry out all other actions subject to the terms of this MOA that are not the subject of the dispute remain unchanged.

## X.   AMENDMENTS

This MOA may be amended when such an amendment is agreed to in writing by all signatories. The amendment will be effective on the date a copy signed by all of the signatories is filed with the ACHP.

BLM_0034280

## XI.    TERMINATION

If any signatory to this MOA determines that its terms will not or cannot be carried out, that party shall immediately consult with the other signatories to attempt to develop an amendment per Stipulation X, above.  If within thirty (30) days (or another time period agreed to by all signatories) an amendment cannot be reached, any signatory may terminate the MOA upon written notification to the other signatories.

Once the MOA is terminated, and prior to work continuing on the undertaking, Reclamation must either (a) execute an MOA pursuant to 36 CFR § 800.6 or (b) request, take into account, and respond to the comments of the ACHP under 36 CFR § 800.7. Reclamation shall notify the signatories as to the course of action it will pursue.

**Execution** of this MOA by UVWUA, Reclamation and SHPO, and implementation of its terms evidence that Reclamation has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

BLM_0034281

**SIGNATORIES**:

SIGNATORIES:

**Colorado State Historic Preservation Officer**

By: _____ Date: 10/20/15

Edward C. Nichols, SHPO

**Bureau of Reclamation, Western Colorado Area Office**

By: _____ Date: 10/16/15

for   Ed Warner, Area Manager

**Uncompahgre Valley Water Users Association**

By: _____ Date: 10/14/15

Steve Fletcher, Manager

BLM_0034282

## ATTACHMENT A – AREA OF POTENTIAL EFFECT



---

[2] This map originated from the July 2015 Cultural Survey Report. The APE includes both the Previously Inventoried Area (hatchmarks) and the extended Inventory Area (blue polygons).

BLM_0034283

## ATTACHMENT B – UNANTICIPATED DISCOVERY PLAN

### PLAN AND PROCEDURES FOR THE UNANTICIPATED DISCOVERY OF CULTURAL RESOURCES

### THE SOUTH CANAL DROP 5 HYDROPOWER PROJECT, UNCOMPAHGRE PROJECT, MONTROSE COUNTY, COLORADO

### 1. INTRODUCTION

The Uncompahgre Valley Water Users Association (UVWUA) plans construct a hydropower plant on Drop 5 of the South Canal.  The purpose of this project is to construct a hydropower plant capable of generating 2.4 MW annually. The following Unanticipated Discovery Plan (UDP) outlines procedures to follow, in accordance with state and federal laws, if archaeological materials are discovered.

### 2. RECOGNIZING CULTURAL RESOURCES

A cultural resource discovery could be prehistoric or historic. Examples include:

- An accumulation of shell, burned rocks, or other food related materials
- An area of charcoal or very dark stained soil with artifacts,
- Stone tools or waste flakes (i.e. an arrowhead, or stone chips),
- Clusters of tin cans or bottles, logging or agricultural equipment that appears to be older than 50 years,
- Buried railroad tracks, decking, or other industrial materials.

When in doubt, assume the material is a cultural resource.

### 3. ON-SITE RESPONSIBILITIES

STEP 1: STOP WORK. If any UVWUA employee, contractor or subcontractor believes that he or she has uncovered a cultural resource at any point in the project, all work adjacent to the discovery must stop. The discovery location should be secured at all times.

STEP 2: NOTIFY MANAGER. Notify the Project Manager.  The Project Manager will follow the provisions of this Unanticipated Discovery Plan.

STEP 3: NOTIFY BUREAU OF RECLAMATION. Contact the Project Overseer at the Bureau of Reclamation:

| Project Manager: | Reclamation Project Overseer: |
|---|---|
| Mr. Steve Fletcher | Jennifer Ward |
| (970)-249-3813 | 970-248-0651 |
| sfletcher@montrose.net | jward@usbr.gov |

BLM_0034284

The Project Manager or the Reclamation Project Overseer will make all other calls and notifications.

If human remains are encountered, treat them with dignity and respect at all times. Cover the remains with a tarp or other materials (not soil or rocks) for temporary protection in place and to shield them from being photographed. Do not call 911 or speak with the media.

## 4. FURTHER CONTACTS AND CONSULTATION

A.  Project Manager's Responsibilities:

- Protect Find: The UVWUA Project Manager is responsible for taking appropriate steps to protect the discovery site. All work will stop in an area adequate to provide for the total security, protection, and integrity of the resource. Vehicles, equipment, and unauthorized personnel will not be permitted to traverse the discovery site. Work in the immediate area will not resume until treatment of the discovery has been completed following provisions for treating archaeological/cultural material as set forth in this document.

- Direct Construction Elsewhere On-site: The UVWUA Project Manager may direct construction away from cultural resources to work in other areas prior to contacting the concerned parties.

- Contact CR Manager: If there is a CR Program Manager, and that person has not yet been contacted, the Project Manager will do so.

- Contact Project Overseer:  If the Project Overseer at the Bureau of Reclamation has not yet been contacted, the Project Manager will do so.

- Identify Find: The Project Manager will ensure that a qualified professional archaeologist examines the find to determine if it is archaeological.

    o  If it is determined not archaeological, work may proceed with no further delay.

    o  If it is determined to be archaeological, the Project Manager will continue with notification.

    o  If the find may be human remains or funerary objects, the Project Manager will ensure that a qualified physical anthropologist examines the find. If it is determined to be human remains, the procedure described in Section 5 will be followed.

B.  Project Overseer's Responsibilities

- Notify SHPO: The Project Overseer will notify the Colorado State Historic Preservation Office (SHPO).

BLM_0034285

Colorado State Historic Preservation Office:

Mr. Edward C. Nichols
State Historic Preservation Officer
Colorado Historical Society
1200 Broadway
Denver CO, 80203
(303)-866-3355

C.  Further Activities

- Archaeological discoveries will be documented as described in Section 6.

- Construction in the discovery area may resume as described in Section 7.

## 5. SPECIAL PROCEDURES FOR THE DISCOVERY OF HUMAN SKELETAL MATERIAL

Any human skeletal remains, regardless of antiquity or ethnic origin, will at all times be treated with dignity and respect.

Because the project is a Federal undertaking, the provisions of the Native American Graves Protection and Repatriation Act of 1990 apply, and the Project Overseer will follow its provisions.

In the event possible human skeletal remains are discovered, UVWUA will comply with applicable state and federal laws, and the following procedure:

A.  Notify Law Enforcement Agency or Coroner's Office:

In addition to the actions described in Sections 3 and 4, the Project Manager will immediately notify the local law enforcement agency or coroner's office.

The coroner (with assistance of law enforcement personnel) will determine if the remains are human, whether the discovery site constitutes a crime scene, and will notify SHPO.

Montrose County Coroner
(970)-249-7755

B.  Further Activities:

When consultation and documentation activities are complete, construction in the discovery area may resume as described in Section 7.

## 6. DOCUMENTATION OF ARCHAEOLOGICAL MATERIALS

Archaeological deposits discovered during construction will be assumed eligible for inclusion in the National Register of Historic Places under Criterion D until a formal Determination of Eligibility is made.

BLM_0034286

The Project Manager will ensure the proper documentation and assessment of any discovered cultural resources in cooperation with the Bureau of Reclamation, SHPO, affected tribes, and a contracted consultant (if any).  All prehistoric and historic cultural material discovered during project construction will be recorded by a professional archaeologist in accordance with all state and federal laws.

## 7. PROCEEDING WITH CONSTRUCTION

Project construction outside the discovery location may continue while documentation and assessment of the cultural resources proceed. A professional archaeologist must determine the boundaries of the discovery location. In consultation with SHPO and affected tribes, the Project Manager and Project Overseer will determine the appropriate level of documentation and treatment of the resource.

Construction may continue at the discovery location only after the process outlined in this plan is followed and UVWUA and the Bureau of Reclamation determine that compliance with state and federal laws is complete.

BLM_0034287

## Appendix D – Draft Environmental Commitment Plan

Uncompahgre Valley Water Users Association
Drop 5 Hydropower Project
Environmental Commitment Plan

This Environmental Commitment Plan (ECP) has been prepared to satisfy the requirements of the National Environmental Policy Act (NEPA). The Bureau of Reclamation is the lead federal agency with primary responsibility for complying with NEPA on the Drop 5 Hydropower Project. As such, Reclamation is responsible for ensuring the environmental commitments are implemented. The Drop 5 Hydropower Project Environmental Assessment recommended mitigation measures to avoid, minimize, rectify, reduce, eliminate or compensate for impacts caused by construction, operation and maintenance of the project. Implementation of the ECP will reduce potentially significant impacts to a less than significant level. The Reclamation group responsible for ensuring each environmental commitment has been implemented or followed by the Uncompahgre Valley Water Users Association (UVWUA) is listed below, as well as the required timing of compliance. UVWUA may utilize this ECP to document compliance with each commitment, and may use this record as a portion of their Environmental Commitment Checklist which will be submitted to Reclamation.

**Table 1. UVWUA Drop 5 Hydropower Project Environmental Commitments: Pre-Construction**

| MITIGATION MEASURE or PROJECT DESIGN FEATURE | AGENCY MONITOR[3] | DATE OF COMPLIANCE |
|---|---|---|
| An application will be submitted for a Colorado Industrial Stormwater General Permit as provided by the Colorado Department of Public Health and Environment at least ten (10) days prior to the commencement of construction activities. | Reclamation - EPG | |
| A Storm Water Management Plan will be developed and filed with the Colorado Department of Public Health and Environment. | Reclamation - EPG | |
| Fuel storage, equipment, maintenance, and fueling procedures will be developed to minimize the risk of spills and impacts from these incidents. | Reclamation - EPG | |
| A Spill Prevention Control and Countermeasure Plan will be prepared. | Reclamation - EPG | |

---

[3] KEY:
Reclamation EPG = Reclamation's Environmental Planning Group
Reclamation WRG = Reclamation's Water Resources Group

BLM_0034288

| MITIGATION MEASURE or PROJECT DESIGN FEATURE | AGENCY MONITOR[3] | DATE OF COMPLIANCE |
|---|---|---|
| All construction equipment will be power-washed and free of soil and debris prior to entering the construction site to reduce the spread of noxious and invasive weeds. | Reclamation - EPG | |
| All required Clean Water Act Section 404 permits will be obtained. | Reclamation - EPG | |
| Prior to construction, UVWUA and its contractors will fence or mark the entirety of the project action area, and no work, access, or disturbance will occur outside the fenced/marked area, in order to avoid potential impacts to federally-listed species or cultural resources. | Reclamation - EPG | |
| In the event of a change in project plans which would require work outside of areas inventoried for threatened and endangered species or cultural resources, Reclamation will be consulted prior to any work to determine if additional surveys are required. | Reclamation - EPG | |
| To ensure project construction will have no impact on the NRHP-eligible cultural resource located immediately adjacent to the project area, UVWUA and its contractors will install high visibility construction fencing along the project area boundary in the vicinity of the resource, and no construction work, access, or disturbance will occur outside the fenced area. | Reclamation - EPG | |
| All field work required to complete Level II Documentation of the cultural resources impacted by this project will be completed before construction commences. | Reclamation - EPG | |
| Best Management Practices, including drainage, erosion control, and sediment control will be implemented to prevent or reduce point source pollution during and following construction. | Reclamation - EPG | |
| Drainage, erosion control, and sediment control Best Management Practices will be applied around riparian vegetation associated with the Dry Cedar Creek to ensure no fill material enters the creek. | Reclamation - EPG | |

**Table 2. UVWUA Drop 5 Hydropower Project Environmental Commitments: During Construction**

| MITIGATION MEASURE or PROJECT DESIGN FEATURE | AGENCY MONITOR | DATE OF COMPLIANCE |
|---|---|---|
| Existing access roads will be used to access the construction, staging, and stockpile areas. No new roads will be constructed. | Reclamation - EPG | |
| Best Management Practices, including drainage, erosion control, and sediment control will be implemented to prevent or reduce point source pollution during and following construction. | Reclamation - EPG | |

BLM_0034289

| MITIGATION MEASURE or PROJECT DESIGN FEATURE | AGENCY MONITOR | DATE OF COMPLIANCE |
|---|---|---|
| Drainage, erosion control, and sediment control Best Management Practices will be applied around riparian vegetation associated with the Dry Cedar Creek to ensure no fill material enters the creek. | Reclamation - EPG | |
| Best Management Practices for dust abatement will be followed during construction of the facilities. Watering will be required as necessary to minimize and control dust from cleared areas and along roadways. | Reclamation - EPG | |
| In the event of discovery of threatened or endangered species, all ground-disturbing activities in the area will immediately cease, and Reclamation will be notified. Work will not be resumed until authorized by Reclamation. | Reclamation - EPG | |
| Topsoil, where available, will be stockpiled during construction for later use in restoration and revegetation of disturbed areas. | Reclamation - EPG | |
| In the event of a change in project plans which would require work outside of areas inventoried for threatened and endangered species, Reclamation will be consulted to determine if additional surveys are required. | Reclamation - EPG | |
| In the event of discovery of evidence of possible cultural or paleontological resources, all ground disturbing activities in the area will immediately cease, and Reclamation will be notified. Work will not be resumed until authorized by Reclamation. | Reclamation - EPG | |
| If additional areas of impact (for example: access roads, borrow pits, or waste areas) are identified during the course of the undertaking, they will be inventoried for cultural resources and consulted on with the State Historic Preservation Officer. No construction work will occur at or near the additional impact areas until this consultation is completed. | Reclamation - EPG | |
| The hydropower plant will be constructed in a manner that does not interfere with the irrigation supplies or maintenance of the Uncompahgre Project. | Reclamation - WRG | |
| Irrigation supplies and canal maintenance access will be maintained during construction at all times. Water supplies to Fairview Reservoir will not be interrupted. | Reclamation - WRG | |

BLM_0034290

**Table 3. UVWUA Drop 5 Hydropower Project Environmental Commitments: Post Construction**

| MITIGATION MEASURE or PROJECT DESIGN FEATURE | AGENCY MONITOR | DATE OF COMPLIANCE |
|---|---|---|
| Disturbed land will be re-contoured to prevent erosion, and topsoil, where available, will be stockpiled during construction for later use in revegetation. The Reclamation-approved seed mix included in Appendix F of the Final EA will be used to revegetate disturbed areas, and long-term weed control will be implemented. | Reclamation - EPG | |
| Level II Documentation as agreed to in the Memorandum of Agreement (MOA) will be submitted to Reclamation within one year of the execution of the MOA. | Reclamation - EPG | |
| Noxious weed control is required within the limits of the facility for the life of the project. Reclamation will be consulted for acceptable weed control methods, including pesticides/herbicides approved for use on public land. Use of pesticides/herbicides will comply with applicable Federal and state laws. Pesticides/herbicides will be used only in accordance with their registered uses and within imitations imposed by the Secretary of the Interior. | Reclamation - EPG | |
| The hydropower plant will be operated and maintained in a manner that does not interfere with the irrigation supplies or maintenance of the Uncompahgre Project. | Reclamation - WRG | |
| The water utilized for power development will be non-consumptive. No new water rights will be appropriated for the purposes of operating the facility. The operation of the facility will not interfere or conflict with the purpose and operations of the Uncompahgre Project, including, but not limited to, the South Canal. There will be no increase in diversions from the Gunnison River solely for hydropower use permitted. | Reclamation - WRG | |
| The hydropower facility will be operated based on irrigation diversion patterns. | Reclamation - WRG | |
| Above-ground power line and power pole designs will meet recommended standards as outlined in the Avian Protection Plan Guidelines developed by the US Fish and Wildlife Service and Industry (APLIC 2005). A copy of these standards can be viewed at: http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Aprl2005.pdf, | Reclamation - WRG | |
| Powerhouses and substations will be non-reflective and painted to blend with the project area background in order to minimize visual impacts. | Reclamation - WRG | |

BLM_0034291

## Appendix E – Comments Received During Public Scoping

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**BUREAU OF RECLAMATION – 3RD PARTY DRAFT EA FOR S. CANAL DROP 5 HYDROELECTRIC PROJECT**

### Comments on Draft EA for Field Office Review Due September 24, 2015

| Cmt # | Page # | Section # | BLM Commentor | Comment |
|---|---|---|---|---|
| 1. | 14 | 2.2.2 (pgh3) | Elizzabeth Kaufman - Bio | Please refer to comments made under section 3.5, pg22, pgh8 and pg23 pgh3. |
| 2. | 20 | 3.3 | Elizzabeth Kaufman - Bio | Fuel storage, equipment, maintenance, and fueling procedures should be developed and submitted to CDPHE prior to construction along with SWMP and SPCC. |
| 3. | 22 | 3.5 (pgh2,3, and 4) | Elizzabeth Kaufman - Bio | Description of "native vegetation" should not include reference to introduced and invasive species (e.g. "annual wheatgrass", "Russian knapweed", "cheat-grass", "Canada thistle", "tamarisk", "halogeton", and "annual mustards". It is recommended that this section introduce the federally listed *Eriogonum pelinophilum* (Clay-loving wild buckwheat), with reference to section 3.7. |
| 4. | 22 | 3.5 (pgh8) | Elizzabeth Kaufman - Bio | How will area be restored to pre-project conditions after construction? Due to the probable spread of weeds (e.g. Russian knapweed) on disturbed land during/post construction, how will such effects be minimized? A more complete description of fuel storage, equipment maintenance, and fueling procedures 'to be developed' to minimize risk of spills and impacts from such incidents should be included. |
| 5. | 23 | 3.5 (pgh3) | Elizzabeth Kaufman - Bio | We recommend a native seed mix be utilized for revegetation, and include species which are not overly competitive with the Clay-loving wild buckwheat. We can assist in recommendations for this. The seed mix should be disclosed prior to application. |
| 6. | 35 | 3.15 (Bullet 3) | Elizzabeth Kaufman - Bio | S/A above. |
| 7. | 28 | 3.7 (pgh1) | Elizzabeth Kaufman - Bio | At what location within project area was Clay-loving wild buckwheat recorded? |
| 8. | 29 | 3.7 (pgh5) | Elizzabeth Kaufman - Bio | We recommend the employment of a 3rd party bio-monitor to oversee the fencing off of project areas, to ensure the protection of Clay-loving wild buckwheat populations, as well as to offer guidance to work crews, ensure the maintenance of such fencing and compliance to its boundaries. |
| 9. | 35 | 3.15 (Bullet 8) | Elizzabeth Kaufman - Bio | S/A above. |
| 10. | 29 | 3.7 (pgh6) | Elizzabeth Kaufman - Bio | In the event of discovery of any T/E species, the UVWUA will notify BLM and FWS in addition to Reclamation. |
| 11. | General Comments | | Elizzabeth Kaufman - Bio | In the event of a change of project plans which would require work in areas with known T/E species, as well as any work to be conducted outside of previously surveyed areas, BLM and FWS will be consulted, in addition to Reclamation, to determine if additional surveys are required before proceeding with any such work. |

BLM_0034292

| Cmt # | Page # | Section # | BLM Commentor | Comment |
|---|---|---|---|---|
| 12. | General Comments | | Elizzabeth Kaufman - Bio | It is strongly recommended that UVWUA and BOR commit to treating Russian knapweed along canal where it has intermingled, and where it is encroaching upon *E. pelinophilum* populations, as it is having adverse effects which will most likely increase due to disturbances to *E. pelinophilum* habitat. UVWUA and BOR should consult with USFWS to develop and coordinate an effective plan to treat Russian knapweed (and any other weeds) which is specific to simultaneously controlling such invasives and employs cautionary measures for *E. pelinophilum* populations. |

BLM_0034293

## Appendix F – BLM Recommended Native Seed Mixture

### Suggested Native Seed Mix for Restoration in *Eriogonum pelinophilum* Habitat

| Species | (A) Desired % of planting | (B) Multiplier (A x 0.01) | (C) PLS lbs for full stand | (D) PLS lbs per acre needed for mix (B x C) | (E) PLS lbs per acre for project (D x # acres) |
|---|---|---|---|---|---|
| Bottlebrush squirreltail (*Elymus elemoides*) | 15 | 0.15 | 8 | 1.2 | |
| | | | | | |
| Galleta Grass (*Hilaria* or *Pleuraphis jamesii*) | 40 | 0.4 | 8 | 3.2 | |
| Indian Ricegrass (*Acnatherum hymenoides*) Variety Paloma | 20 | 0.2 | 8 | 1.6 | |
| | | | | | |
| | | | | | |
| Annual sunflower (*Helianthus annuus*) | 5 | 0.05 | 10 | 0.5 | |
| | | | | | |
| Shadscale (*Atriplex confertifolia*) | 10 | 0.10 | 5 | 0.5 | |
| Gardner saltbush (*Atriplex gardneri*) | 5 | 0.05 | 5 | 0.25 | |
| Black Sagebrush (*Artemisia nova*) | 5 | 0.05 | 1 | 0.05 | |
| Totals | 100 | 1.0 | | 7.3 | |

The rate shown is for a drilled seeding, or some other method that incorporates the seed into the soil. Rates should be doubled if the seed is to be aerially applied.

BLM_0034294

MENU

# Upper Colorado Region - Western Colorado Area Office

*Reclamation / Upper Colorado / Western Colorado Office / Paradox Valley Unit*

UC REGION

# Paradox Valley Unit
# Environmental Impact Statement

Related Documents | Contact Us

## Background



*Aerial view of the Paradox Valley Unit*

The Paradox Valley Unit (PVU) was constructed to assist in meeting the objectives and standards of the Federal Water Pollution Control Act of 1948 (P.L. 80-845) and the Colorado River Basin Salinity Control Act of 1974, as amended and supplemented (P.L. 93-320). The Salinity Control Act authorizes the construction, operations, and maintenance of works in the Colorado River Basin to control the salinity of water delivered to users in the United States and the Republic of Mexico.

The PVU is located along the Dolores River in western Montrose County, approximately 50 miles southwest of Grand Junction, Colorado, and 10 miles east of the Colorado-Utah border. The PVU extracts naturally-occurring brine groundwater in the Paradox Valley, thereby preventing it from entering the Dolores River. Saline concentrations of this natural brine

BLM_0034295

groundwater have been measured in excess of 250,000 milligrams per liter, which, prior to the PVU, added more than 205,000 tons of salt to the Dolores River annually. The Dolores River is a major tributary to the Colorado River. The PVU is designed to prevent the natural salt load from degrading the water quality of the main stem of the Colorado River.



The PVU consists of facilities to intercept shallow brine and inject it into the Leadville geologic formation via a Class V deep injection well. The PVU has been injecting brine since 1996. Approximately 100,000 tons of salt are injected annually; this correlates to about ten percent of the total salinity control in the Colorado River, making the PVU one of the most effective salinity control projects in the Colorado River Basin.

### Environmental Impact Statement

The existing brine injection well may be nearing the end of its useful life, so the Bureau of Reclamation (Reclamation) is investigating alternatives for intercepting the brine in order to enhance and protect the quality of water available in the Colorado River for use in the United States and the Republic of Mexico. Reclamation intends to prepare an environmental impact statement (EIS) to identify and evaluate brine disposal alternatives to replace or supplement the existing brine injection well.

BLM_0034296

Reclamation published a Notice of Intent (NOI) in the Federal Register on September 10, 2012. The NOI announced Reclamation's intent to prepare an EIS, and initiated the scoping process which will guide the development of the EIS. Formal scoping activities for the EIS extended from September through November 2012.

Based on internal and external scoping, Reclamation's interdisciplinary team has identified the following alternatives that will be analyzed in the EIS:

- No Action (future without well and salinity control)
- Additional Injection Well
- Evaporation Ponds
- Brine Crystallization

A draft EIS and a final EIS will be prepared to provide decision makers appropriate information and to inform the public of the proposed action, reasonable alternatives, and the impacts of the alternatives. In addition to scoping of significant issues and alternatives, key activities include analysis of alternatives that support the purpose and need, evaluation of applicable issues, and selection of a preferred alternative. The final decision will be documented in a Record of Decision (ROD) following the final EIS. The ROD will officially present the Department of the Interior's decision on brine disposal at the PVU.

Questions and comments can be submitted to: paradoxeis@usbr.gov

For more information please contact:

| | |
|---|---|
| Lesley McWhirter, Chief | Andy Nicholas, Facility Operations Specialist |
| Environmental and Planning Group | Paradox Valley Field Office |
| Bureau of Reclamation | Bureau of Reclamation |
| Western Colorado Area Office | P.O. Box 20 |
| 445 West Gunnison Avenue, Suite 221 | Bedrock, CO 81411 |
| Grand Junction, CO 81501-5711 | (970) 859-7214 or anicholas@usbr.gov |
| (970) 248-248-0608 or lmcwhirter@usbr.gov | |

## Environmental Impact Statement Documents

- Supplement to January 2013 Scoping Report Paradox Valley Unit EIS (December 2016)

- Peer Review and Information Quality Plan for the Paradox Valley Unit Alternatives Study Environmental Impact Statement (July 2016)
- Paradox Valley Unit EIS Scoping Report (January 2013)
- Paradox Valley Unit Scoping Presentation (Presented in 2012 Scoping Meetings)
- News Release (September 2012)
- Federal Register Notice of Intent (September 2012)
- Final Scoping Report – Paradox Evaporation Pond Pilot Study (April 2012)

**Environmental Impact Statement Related Documents**

- Technical Studies and Evaluations for the Second Injection Well Alternative at the Paradox Valley Unit (September 2017)
- Air Quality Technical Report Salinity Control Investigations Paradox Valley Unit Final Report (March 2017)
- Paradox Valley Unit Salinity Control Investigations Study 1 - Hydrogen Sulfide Management 50% Design Final Report (March 2017)
- Pond Design Strategy Final Report - Pond Optimization Study 2 (February 2017)
- Feasibility and Cost Analysis Findings and Recommendation Report Paradox Valley Unit Byproducts Disposal Study (January 2017)
- Pond Operational Strategy Final Report - Pond Optimization Study 2 (January 2017)
- Paradox Valley Unit Salinity Control Investigations Study 1 - Hydrogen Sulfide Management Bedrock, CO, Treatment Options Bench Testing Final Report (November 2016)
- Site Selection Report Pond Optimization Study 2 for Paradox Valley Unit Evaporation Ponds (August 2016)
- Predictive Ecological Risk Assessment Proposed Solar Evaporation Pond System - Paradox Valley Unit (August 2016)
- Evidence for Far-Field Reservoir Pressurization: Report and Injection Data (*zip file*)
- Memo – Paradox Valley Unit Second Well Site Investigation Consultant Review Board (February 2014)
- Assessment of a Potential Second Injection Well Site – Paradox Valley Unit Saline Water Disposal Project (April 2013)
- Review of Geologic Investigations and Injection Well Site Selection, Paradox Valley Unit (November 2012)

*Last Updated: 10/10/17*

## STAY IN TOUCH

Contact Us  |  Site Index

Accessibility | Disclaimer | DOI | FOIA | No Fear Act | Notices | Privacy Policy |
Quality of Information | Recreation.gov | USA.gov

BLM_0034299

# Valuing Undiscovered Attributes: A Combined Revealed-Stated Preference Analysis of North American Aboriginal Artifacts

Peter C. Boxall
Canadian Forest Service,
Natural Resources Canada

Jeffrey Englin
Department of Applied Economics and Statistics
University of Nevada-Reno

and

Wiktor L. Adamowicz
Department of Rural Economy
University of Alberta

5 April 1998

The authors thank the participants at the 25th Workshop of the W-133 Project in Portland, Oregon in March 1997 for their comments on this manuscript and gratefully acknowledge David Watson for creative field work in the Shield country and for assisting with the survey design and administration. Kent Baylis, Dan Benoit, Jennifer Lidgett and Janet Lutz also provided valuable field assistance. This research was funded by the Canada-Manitoba Partnership Agreement in Forestry and the Socioeconomic Research Network of the Canadian Forest Service.

1

# Valuing Undiscovered Attributes: A Combined Revealed-Stated Preference Analysis of North American Aboriginal Artifacts

This paper examines the result of discovery of new attributes in recreation site choice models using joint revealed-stated preference. The empirical application involved the discovery of aboriginal rock paintings along wilderness canoe routes in eastern Manitoba. A 4 year study of wilderness recreation trips included a stated preference experiment in which canoeists were asked if they would change their site choices in response to the presence of two types of rock paintings: a "pristine" painting and another spoiled by human vandals. The resulting stated site preferences (with new attributes) were combined with the revealed site preferences (without the attributes) in the econometric analysis. The results suggest that preferences over the SP and RP models were not statistically different. Welfare measures for the presence of "pristine" paintings range from $4.79 - $6.81 per trip, and are about 12-13 times greater than those for vandalised paintings.

2

BLM_0034301

**Introduction**

A challenge in the valuation of environmental amenities is the *ex ante* measurement of values associated with unknown goods and services. The behaviour inherent in any revealed preference information is, of course, associated with the *ex ante* situation. Newly discovered goods and services such as new species or cultural artifacts will result in new alternatives and/or new attributes of existing alternatives that may affect future behaviour. Since these goods or services are currently unknown or unavailable, there is no revealed preference information to use in their valuation. As a result, one is forced to rely upon stated preference information to examine the new attribute or alternative. Nevertheless, it is important to maintain consistency with revealed behaviour associated with the *ex ante* situation. The challenge is to acknowledge and exploit all of the information available when valuing newly discovered attributes.

This analysis examines the potential discovery of aboriginal rock paintings along wilderness canoe routes in the Precambrian Shield region in central Canada. The region contains about 400 paintings on rock faces along water courses (Rajnovich 1994), and some of these faces are located in popular canoeing areas (e.g. Quetico Provincial Park, Dewdney and Kidd (1962)). Many other areas in North America contain similar paintings or rock carvings (Grant 1983). Anthropological scholars call the paintings pictographs and the carvings petroglyphs because they represent picture writing, not necessarily works of art. These drawings were used to communicate among individuals or with the spirit world by the aboriginal peoples.

Anthropologists believe some of the pictographs in the Shield region to be 2000 years old (Rajnovich 1994). Thus, there has been concern regarding their documentation and preservation

3

BLM_0034302

for historical and cultural reasons.  Of particular concern is the destruction of pictographs and petroglyphs by flooding caused by the construction of dams.[1]  Discoveries of pictographs and other artifacts are still occurring as a result of proposed hydroelectric developments in parts of the Canadian Shield and new pictographs are catalogued periodically.

Pictographs in the Shield still have spiritual and cultural significance to Aboriginal peoples which is evidenced by the discovery of recent offerings of tobacco, clothing, and prayer sticks (pers. observ.; Dewdney and Kidd 1962).  However, they are also sought by wilderness recreationists who consider them an important feature of a wilderness experience (Boxall unpublished).  Pictographs are also promoted by ecotourism operators who use them to attract clients interested in cultural experiences.  The discovery of pictographs may increase visitation levels to wilderness areas, and while generating recreation and tourism benefits, may also increase the chances of vandalism.  Steinbring and Elias (1968), Dewdney and Kidd (1962) and others describe pictographs which have been shot at by hunters and where non-aboriginal individuals have spray painted their initials over them.  Therefore, tensions exist among the value of pictographs to recreationists, the importance of them to aboriginal cultures, and risks of vandalism. Wilderness managers should be interested in forecasting demand to view pictographs not only to estimate their benefits, but also to provide information on the probabilities their defacement.

The paper proceeds by developing the random utility model RUM used in this analysis. This model directly incorporates revealed preference information about existing recreation site attributes and stated preference information about, as yet, undiscovered site attributes.  In this

---

1  For example, the Glen Canyon contained some spectacular petroglyphs which are now submerged beneath Lake

4

BLM_0034303

section the combined revealed–stated preference approach is developed. This is followed by a description of the data used in this analysis. The empirical section applies the combined revealed preference-stated preference model to the hypothetical discovery of aboriginal rock paintings along water courses in an actual wilderness area. The empirical application also examines the effect of vandalism on the benefits generated by the rock paintings.

**Theory**

A variety of modelling frameworks has been proposed to analyse combined revealed and stated preference data (e.g. Cameron (1992); Englin and Cameron (1996); Adamowicz et al. 1994, 1997). The Adamowicz et al. (1994, 1997) RUM framework is especially appealing in settings where most individuals make a single trip. In this setting the single trip nature of pure random utility models is less troubling than in other contexts (see Morey (1994)). The appeal of the RUM is its ability to handle substitution between site attributes and the direct measurement of economic welfare, while retaining the ability to econometrically test the consistency of the revealed and stated preference components of the model.

Consider a recreationist who makes a choice from a set of C possible sites. The probability ($\pi$) that site $j$ will be visited is equal to the probability that the utility gained from visiting $j$ is greater than or equal to the utilities of choosing any other site in C. In this framework indirect utility consists of the sum of two components: an observed component, $V_j$, and a random component $e_j$. The probability of selecting site j can be written as :

$$(j) = \Pr\{V_j + e_j \geq V_k + e_k; \forall\, k\, in\, C\}.$$

_____

Powell (Grant 1983).

Empirical implementation of (1) requires the selection of a distribution to characterise the random component of the model ($e_l$). The conditional logit model can be used to estimate these probabilities if the random components of the indirect utility functions are assumed to be independently distributed with a Type-I Extreme Value distribution (Weibull).

This model is typically estimated with the observable component, $V_j$, expressed as a linear function of m site attributes and the cost of visiting a site. A new attribute introduced into this framework will take the form of an additional attribute in the indirect utility function:

$$V_j = \sum_1^m \beta_m X_{jm} + \alpha X_{jnew} + \gamma(Y_n - p_j),$$

where $X_{jm}$ represents existing choice based attributes, $X_{j\,new}$ represents a new attribute, $Y_n$ is income, $p_j$ is the cost of visiting site j, and $\beta$, $\alpha$, and $\gamma$ are unknown parameters. However, by definition, the only revealed preference data available are based on behaviour that does not take into account the discovery of the new attribute. As a result of this, the $\alpha$ parameter will be impossible to estimate. An estimable model requires situations where data exist on choices with and without the new attribute.

One alternative is to obtain a set of choice data from another location that include the new attribute and transfer the values in a benefits transfer process. Alternatively, the *ex post* valuation of the attribute could be explored using revealed preference data after the discovery of the attribute. In neither case, however, can one tailor predictions of the effects of a discovery to a specific area or site. Since there is no market information about the effect of the new attribute on choice behaviour, the original revealed preference data must be augmented in this situation. One way to augment the revealed preference data is to add stated preference data. Stated preference

6

BLM_0034305

data can be used to assess the change in intended behaviour that results from the introduction of new attribute.  A potential solution to these problems is a combined analysis where revealed and stated preference information for the same set of individuals is pooled.

An empirical issue is the appropriate combination of the revealed and stated preference data.  If only revealed or stated preference data is used McFadden (1973) has shown that the choice probabilities take the form:

$$\exp \mu(V_j) / \sum_{k \text{ in } C} \exp \mu(V_k),$$

where $\mu$ is a scale parameter.  Since this parameter is not identified in a single set of data it is typically normalised to 1.  Once the variables in the deterministic component of the indirect utility function, V, are specified and a functional form selected, the model becomes estimable using maximum likelihood methods.

When multiple data sets such as stated and revealed preference data are pooled an important issue is the consistency of the data sets with each other.  A useful measure of this consistency is a test of the equality of the scale parameters in the two data sets.  An econometric test of the equality of the scale parameters can be constructed.  This is done by normalising *one* scale parameter in (3) and letting the scale parameter from the other data set vary in the estimation process as shown by Swait and Louviere (1993), and Adamowicz et al. (1994; 1997).  This method involves the notion that in any one data set $\mu$ is not identifiable, but that in any two (or more) datasets their ratio(s) can be identified (e.g. $\mu_1/\mu_2$).  Thus, for a pooled revealed and single stated preference data set this process involves the concatenation of the choice probabilities as follows:

7

$$RP: \quad (j) = \exp(\,_{rp}V_j)/\sum_{kinC} \exp(\,_{rp}V_k)$$

$$SP: \quad (j) = \exp(\,_{sp}V_j)/\sum_{kinC} \exp(\,_{sp}V_k),$$

where $\mu_{rp}$ will be set to 1 and the $\mu_{sp}$ is a parameter to be estimated. Of course, this methodology can be used to extend the number of pooled data sets to any arbitrary size. If there were multiple new attributes one could extend the number of pooled data sets and concatenate choice probabilities.

In this paper the method is applied to three data sets. The three data sets correspond to a single revealed and two stated preference data sets. The precise log likelihood function for this problem, given a sample of N individuals, is given by:

$$LL = \sum_{n=1}^{N(RP)}\sum_{kinC}\ln \,_n\{j\,|\,\,\} + \sum_{n=1}^{N(SP_1)}\sum_{kinC}\ln \,_n\{j\,|\,\,,\,_{sp1}\} + \sum_{n=1}^{N(SP_2)}\sum_{kinC}\ln \,_n\{j\,|\,\,,\,_{sp2}\}.$$

The first part of the log likelihood corresponds to the revealed preference data while the second two pieces correspond to the two stated preference data sets. While there really are three scale parameters, note that only two are estimated. These two are then compared to the normalised scale parameter to determine whether they are statistically different from 1.0.

*Data*

The study involves wilderness recreation in Nopiming Provincial Park, Manitoba (Figure 1). The park is a 1440 km$^2$ area located about 145 km east of Winnipeg and is situated in the

8

Precambrian or Canadian Shield.  The area contains numerous rock outcrops that can rise as much as 36 m above the surrounding countryside.  These are a dominant feature and are sought after by recreationists. Pictographs are frequently found on rock outcrops along watercourses in this region, and while no paintings have been reported in the park, there are some in similar areas around Nopiming and in more remote areas in Ontario (Rajnovich, 1994).  The park has several river systems that contain small rapids and waterfalls and thus are attractive to backcountry recreationists interested in canoeing and kayaking.  Most of the park is forested.  Jack pine is the most abundant tree species in the park, although considerable areas of black spruce, aspen and white spruce can be found.

The wilderness recreation in this park and the surrounding region has been carefully studied in recent years.  This involved an economic assessment of the importance of fire, forest ecosystems and other features (Boxall et al.1996; Englin et al.1996).  As a result there is a detailed inventory of features along canoe routes that was verified through intensive field work and GIS databases obtained from the provincial forest management agency.  These inventories, and in particular the site visits, identified areas in Nopiming that could potentially have rock paintings.

A registration system was developed to provide an understanding of the frequency of visitation to the backcountry areas of the park.  In 1995 the registrants were surveyed.  The survey included a stated preference experiment in which backcountry visitors were asked to respond to the possible presence or discovery of rock paintings in the park.  The survey sample was created using the names of the leaders of the recreation parties who registered for a backcountry trip in Nopiming Park in 1993 or 1994.  The original sample of 661 registrants was

9

BLM_0034308

reduced to 587 by eliminating incomplete addresses, and multiple trips by the same individual.  In this latter case there were very few recreationists who took more than one trip in a year.  The final sample included individuals from 5 Canadian provinces, and 3 American states.

The experiment involved presenting pictures of two pictographs to respondents.  The first involved a "pristine" pictograph.  This pictograph exists in a more remote wilderness area in Ontario northeast of Nopiming.  The second involved a picture of a pictograph located in a remote area in northern Manitoba that had been defaced by vandals and appears to be weathered.  These pictures and the stated preference questions used in the experiment are shown in Figure 2.

The survey design exploited the knowledge of historical trip behaviour.  Each respondent was offered the chance to change his or her trip to another route to see a rock painting.  Since the original trip was known, each respondent was offered the rock paintings at a site they had not visited during the study period (1991-1994).  Thus, the experiment ensured that every respondent had an opportunity to change his or her original site choice to a different site.  The pictographs were offered at two routes: the Seagrim Lake canoe route and the Manigotagan River route.  These sites were chosen because they were the only routes in the park that had rock outcrops similar to those where pictographs are typically found.

The survey included a total of three mailouts.  First, a questionnaire and cover letter was sent to the 587 individuals in early March 1995.  Two weeks later a reminder post card was sent to any individual that had not responded.  Finally, five weeks after the original mailout, a second questionnaire and cover letter was sent to nonrespondents.  These procedures resulted in the return of 431 completed questionnaires which, adjusting for undeliverables (e.g. people moving etc.), represented a response rate of 81%.

10

BLM_0034309

The final data sets used for analysis consist of actual site choices for the respondents for 1993 and 1994 (revealed preference data) and their stated choices from the questionnaire (stated preference data). In this information, the choice set was limited to the eight major routes in the park. Any respondent whose actual trips were not to any of these eight routes was excluded from the analysis. This resulted in a final sample consisting of 386 respondents with complete trip data.

Boxall et al. (1996) identified 14 route attributes that explained the choice of a canoe route in the same park. These included travel costs, the incidence of historical fires, the amounts of various forest ecosystems, indicators of the level of physical effort required to complete the route, and some alternative specific constants. All of these variables and various combinations were initially examined as explanators of site choice, but only travel costs and 3 others (not including pictographs) could be identified in this study. The Boxall et al. study, however, used 20 routes in the analysis, of which 8 were the same as those in the present study. Thus, the reduced number of routes suggests that only a subset of the full set of the independent variables used previously may be significant explanators of site choice.

Figure 3 illustrates the creation of the three data sets and the construction of the pictograph variables. In each set of data the 8 routes form the choice set, and 4 independent variables form the route characteristics ($X_{RP}$). Since there are two types of pictographs one dummy variable was formed for each type. The first involved the pristine pictograph (P in Fig. 3) which has a value of 1 at the route it was presented to the respondent in the questionnaire (Seagrim or Manigotagan) and a value of 0 otherwise. The defaced pictograph variable (D) was similarly constructed. Since there was no pictograph present in the RP choice data both pictograph variables had values of 0 at each of the 8 routes.

11

BLM_0034310

The econometric analysis proceeded by constructing separate conditional logit models for each of the three datasets. Two additional models were estimated on the combination of the RP data with each of the SP datasets. In this estimation, the two sets of data were stacked as shown in Figure 3. Finally, a joint model estimated on the concatenation of all three datasets was performed. In each of the three joint models the likelihood function in equation (5) was adjusted to account for the number of datasets combined in the estimation.

**Results**

The actual site choices of the respondents and their response to the SP experiment is shown in Table 1. Note that the Tulabi route was the most popular route actually chosen. About 42% of the respondents in the sample indicated they would change their actual route choice to another route to view a pristine painting. This change would occur regardless of the route where a painting was discovered (Seagrim and Manigotagan). However, only about 10% of the respondents would change their behaviour to view a defaced painting. The effect of the pictograph attributes on site choice is portrayed in Figure 4 where the cumulative increase in the number of trips to Seagrim and Manigotagan is shown relative to the availability of the two types of paintings.

The welfare measures associated with both the pristine and vandalised rock paintings are quantified in this analysis. In this analysis, the *a priori* hypothesis was that the pristine painting provides substantial positive benefits to the recreationists. This arises because the paintings enhance the attributes of some alternatives in the choice set. Thus, sites with paintings should exhibit an increased probability of visitation. It was further hypothesised that the vandalised

12

paintings would not provide benefits as large as the pristine painting. However, defacement aside, the vandalised picture may still induce some change in trip behaviour by increasing the probability of visiting the sites with paintings.

Table 2 shows the parameters for six econometric models. The first three columns in the table report results for the individual revealed preference, pristine pictograph stated preference, and defaced pictograph stated preference models. Column 4 shows the results of the model combining revealed preference data with the pristine stated preference data and column 5 the results of combining revealed preference with defaced stated preference data. The last column shows the final model that includes the revealed preference data and **both** sets of the stated preference data.

In all of the models the parameters on the distance between an individual's home and the recreation site, hectares of recent burned areas, and hectares of black spruce old growth ecosystems are negative and significant. The parameters on hectares of white spruce growth and the single alternative specific constant for the Manigatogan canoe routes are positive and significant. These results are consistent with previous research on site choice behaviour in the park involving a larger set of canoe routes (Boxall et al. 1996) and with trip data from different years (1991 and 1992) and a smaller set of routes( Englin et al 1996) . In the RP model there is no parameter for pictographs because the paintings are not available. However, pictograph parameters are in the SP data. For the pristine pictograph model, the pictograph parameter is large and positive, while in the defaced pictograph model the parameter on the pictograph is smaller, but still positive. These findings are consistent with *a priori* expectations. In the three joint models the individual parameters are similar to those in the other models.

13

Tests of the equality of the restricted (joint) and unrestricted (single) models were conducted using likelihood ratio tests. These results are reported in Table 3. In each comparison the hypothesis of equality between models is not rejected at better than the 5% level of significance. In particular, the hypothesis of equality for the three-way joint model (RP+SPp+SPd) is not rejected. This means that the single RP and SP models share the same preference structures as the joint RP-SP models. Thus, unlike Adamowicz et al. (1994; 1997) it is **not** necessary to scale the SP data to the RP data. The ratios of scale parameters in these data are not significantly different than 1.0.

These specification tests support the use of the RP-SPp-SPd model to assess switching behaviour and the welfare effects of discovering pictographs at the two routes in the park. First, simulations were conducted to assess the effect of the presence of the pristine pictographs on the probability of visiting each of the eight major routes in the park. Figure 5 shows the distribution of the mean probabilities for 3 scenarios. The scenario with no pictographs suggests that the Tulabi route is most favoured by the average individual in the sample. However, discovery of a pictograph at the Seagrim route increases the probability of taking a trip there by almost six times. A pictograph at the Manigotagan route increases the probability of taking a trip there about five fold. The presence of pictographs significantly changes the distribution of trip probabilities. A discovery at either of the two routes suggests considerable switching of site choices and that many more recreationists would visit those routes than would otherwise.

Second, welfare measures associated with the two types of pictographs were estimated using Hanemann's (1982) formula. At Seagrim and Manigotagan the change in site choice behavior as a result of the presence of pristine pictographs provides benefits valued at $6.81 and

14

BLM_0034313

$4.79 per trip respectively. These benefits would fall to $0.55 and $0.36 per trip if the painting was vandalised (Figure 6). Thus at these routes, a pristine pictograph would provide about 12-13 times the benefits of a vandalised one. Simulating the presence of pictographs at the other six routes suggests that the magnitudes of the benefits are higher or lower, but the pattern of the difference between the pristine and defaced paintings is similar. The overall magnitudes of the benefits across the sites reflect the complementarity of the pictographs with other attractive or negative features of the routes used in the choice models.

**Discussion**

One important challenge facing managers of public lands is the tension between use, overuse and risk. Clear cases in point are cultural resources such as the pictographs studied in this paper. In this analysis the value of pictographs to wilderness recreationists is examined. Pristine pictographs are quite valuable, in some cases as much as $7.00 per trip. This compares favorably with museum admission charges. A defaced pictograph, however, is worth about one twelfth of the pristine pictograph. This difference in values between vandalized and unvandalized attributes is frequently speculated in the literature (e.g. Harrison 1976), and is empirically verified in this study. The contrast in values suggests that concerns over the effect of vandalism on tourism or recreational experiences are well founded. Of course, knowing the values of pictographs does not solve the management challenge. There remains the question of whether it is worthwhile forgoing the benefits associated with the pristine pictograph to reduce the risk of the pictograph being vandalized. Knowledge of the risk of vandalism is also needed to conduct a rational policy discussion. However, without estimates of values, no economic discussion of the

15

BLM_0034314

merits of different policies can be conducted.

An additional problem faced by public land managers concerned with areas currently used by indigenous peoples is the protection of spiritual and cultural artifacts. In Canada information about the location of these features is collected at times from aboriginal peoples, but is frequently not released to the public for fear of depreciative behavior on the part of non-aboriginal peoples. The approach used in this paper to examine switching behavior of recreationists in response to discoveries of pictographs would allow the forecasting of visitation levels. Managers could use these forecasts to design access plans or other policies to reduce the chances of discovery of places of significance to aboriginal peoples, and thus decrease the probabilities of vandalism or other depreciative behaviors.

Early work joining stated and revealed preference data in random utility models struggled to develop methods that tested the consistency of the behavior suggested by revealed and stated data. Quite often the two data sets were not consistent with one another unless one was scaled (e.g. Adamowicz et al. 1994, Ben-Akiva and Morikawa 1990). In this analysis the two (actually three) data sets do support the hypothesis that the stated and revealed data come from consistent behavioral models. This finding is likely to have resulted from several factors. One is the clarity of the good in question. Pictographs are well known to Canadians who live in the study region, and are well known to those who visit wilderness areas there. Secondly, the population of canoeists is sufficiently homogeneous to make simple specifications of the scale parameter possible. A more heterogeneous population may not provide the scaling results seen in this study. Finally, this study was undertaken as part of a larger effort focused on modeling wilderness site choice behavior in the Canadian Shield region. In this larger context the role of landscape

16

BLM_0034315

features, ecosystem processes such as forest fires, and wilderness managerial features were understood. This knowledge helped to clarify the processes that are driving the choices of wilderness canoeists in the region. Furthermore, the detailed information base about the recreationists allowed the survey used in this study to be "custom designed" for each respondent. This design, in concert with the high level of knowledge of the factors affecting site choice behavior, may have contributed to the success of the modeling effort reported in this paper.

This paper raises a number of questions. For example, an important issue is the possibility of the model over-predicting switching behaviour. Ben-Akiva and Morikawa (1990) found this feature in their analysis of travel modes using a similar combined estimation approach. Furthermore, it is unclear whether the switching of routes would remain in the long run. It is possible that dynamic forces may play a role in site choice behaviour with discoveries causing switching once or twice but not permanently. An additional issue is the effect of discoveries on the *levels* of visitation. In the empirical example examined in this paper, very few individuals actually took more than one trip a year. Related research on these recreationists suggests that trip quantities do not vary with changes in route qualities (Englin et al. 1996). There is no reason to believe that the presence of pictographs would change this behavior. Nevertheless, this issue and the questions of dynamic behavior raised above represent worthy future research in this area.

The objective of this paper was to understand the demand by recreationists for aboriginal artifacts in wilderness areas. The approach used to examine this issue was a combined revealed and stated preference analysis. The results suggest that wilderness users would switch their site choices to areas with artifacts and that this would generate large recreation benefits. However, with increased levels of visitation comes an increased risk of vandalism, which in turn affects the

17

BLM_0034316

generation of benefits to recreationists and aboriginal peoples.

The successful management of wilderness areas containing aboriginal artifacts will require the development of extensive and reliable databases.  The effectiveness of the stated preference design used in this study was only possible due to high levels of understanding of the users of the wilderness areas.

18

BLM_0034317

# LITERATURE CITED

Adamowicz, W.L., J. Louviere, and M. Williams. 1994. Combining stated and revealed preference methods for valuing environmental amenities. *Journal of Environmental Economics and Management* 26:271-296.

Adamowicz, W.L., J. Swait, P.C. Boxall, J. Louviere, and M. Williams. 1997. Perceptions versus objective measures of environmental quality in combined revealed and stated preference models of environmental valuation. *Journal of Environmental Economics and Management* 32:65-84.

Ben-Akiva, M. and T. Morikawa. 1990. Estimation of switching models from revealed preferences and stated intentions. *Transportation Research A* 24A:485-495.

Boxall, P.C., D.O. Watson, and J. Englin. 1996. Backcountry recreationists' valuation of forest and park management features in wilderness parks of the western Canadian Shield. *Canadian Journal of Forest Research* 26:982-990.

Cameron, T.A. 1992. Combining contingent valuation and travel cost data for the valuation of nonmarket goods. *Land Economics* 68(3):302-317.

Dewdney, S. and K. Kidd. 1962. *Indian Rock Paintings of the Great Lakes.* University of Toronto Press, Toronto.

Englin, J., P.C. Boxall, K. Chakraborty, and D.O. Watson. 1996. Valuing the impacts of forest fires on backcountry forest recreation. *Forest Science* 42(4):450-455.

Englin, J. and T. A. Cameron. 1996. Augmenting travel cost models with contingent behavior data. *Environmental and Resource Economics* 7(2):133-147.

Grant, C. 1983. *The Rock Art of the North American Indians.* Cambridge University Press, Cambridge.

Hanemann, W. M., 1982. Applied welfare analysis with qualitative response models, Working Pap. No. 241. Univ. California, Berkeley, 26 pp.

Harrison, A. 1976. Problems: vandalism and depreciative behavior. Chapter 24, in G.W. Sharpe (editor) *Interpreting the Environment.* New York: J. Wiley and Sons Inc.

Maddala, F. S. 1983. *Limited-Dependent and Qualitative Variables in Econometrics.* New York: Cambridge University Press.

McFadden, D. 1973. Conditional logit analysis of qualitative choice behavior. In: P. Zarembka (Editor), *Frontiers in Econometrics.* Academic Press, New York, pp. 105-142.

19

BLM_0034318

Morey, E. R. 1994. "What is consumer surplus per day of use, when is it a constant independent of the number of days of use, and what does it tell us about consumer surplus?" Journal of Environmental Economics and Management. 26:257- 270.

Rajnovich, G. 1994. *Reading Rock Art: Interpreting the Indian Rock Paintings of the Canadian Shield.* Toronto: Natural Heritage/Natural History Inc.

Steinbring, J. and D. Elias. 1968. A key pictograph from the Bloodvein River, Manitoba. *American Antiquity* 33:499-501.

Swait, J. R. and J. J. Louviere. 1993. The role of the scale parameter in the estimation and comparison of multinomial logit models. *Journal of Marketing Research* 30:305-314.

20

Table 1.  Actual and hypothetical site choices in response to aboriginal pictographs by wilderness recreationists at Nopiming Provincial Park, Manitoba.

| Routes | Original number of trips | No of surveys where pictographs were offered | No. of people switching for a pristine pictograph | No. of people switching for a defaced pictograph |
|---|---|---|---|---|
| Tulabi | 183 | | | |
| Shoe | 12 | | | |
| Rabbit | 58 | | | |
| Seagrim | 41 | 246 | 103 | 28 |
| Gem | 12 | | | |
| Beresford | 40 | | | |
| Manigotagan 1 | 19 | 140 | 58 | 14 |
| Manigotagan 2 | 21 | | | |
| | | | | |
| Total | 386 | | 161 | 42 |

21

BLM_0034320

Table 2.  Parameters (standard errors) from Conditional Logit Models used to Examine Recreation Site Choice in Nopiming Provincial Park, Manitoba.

| Variables | Single Models | | | Joint Models (Combined RP-SP) | | |
|---|---|---|---|---|---|---|
| | RP | SPp | SPd | RP + SPp | RP + SPd | RP+SPp+SPd |
| | No Pic | Pristine Pic | Defaced Pic | | | |
| Distance | -0.0415[*] (.0043) | -0.0364[*] (.0046) | -0.0331[*] (.0039) | -0.0420[*] (.0032) | -0.0379[*] (.0029) | -0.0384[*] (.0025) |
| Recent Burns | -0.2112[*] (.0210) | -0.1499[*] (.0027) | -0.1451[*] (.0215) | -0.1921[*] (.0162) | -0.1799[*] (.0147) | -0.1743[*] (.0128) |
| Black Spruce Old Growth | -1.3294[*] (.1394) | -0.9455[*] (.1555) | -0.8511[*] (.1321) | -1.1685[*] (.1038) | -1.0984[*] (.0961) | -1.0481[*] (.0814) |
| White Spruce Old Growth | 5.8763[*] (.7410) | 4.0251[*] (.9015) | 3.5704[*] (.7304) | 5.6880[*] (.5897) | 5.0427[*] (.5325) | 4.9443[*] (.4620) |
| Pristine Pictograph | | 2.1462[*] (.1573) | | 2.3629[*] (.1296) | | 2.2703[*] (.1206) |
| Defaced Pictograph | | | 0.3302[*] (.1892) | | 0.4923[*] (.1772) | 0.4382[*] (.1735) |
| ASC-Man | 2.8415[*] (.4843) | 2.7282[*] (.4974) | 2.1039[*] (.4286) | 3.1169[*] (.3505) | 2.5693[*] (.3272) | 2.7292[*] (.2726) |
| Log L | -666.31 | -640.97 | -717.40 | -1307.38 | -1383.45 | -2027.02 |

22

BLM_0034321

Table 3.  Hypothesis tests of parameter equality between the recreation site choice models.

| Models | Log Likelihood | Likelihood Ratio Test | |
|---|---|---|---|
| | | $\Sigma$ Log L | $\chi^2$ |
| No Pictograph (RP) | -666.31 | | |
| Pristine Pictograph (SPp) | -640.97 | | |
| Defaced Pictograph (SPd) | -717.40 | | |
| RP + SPp | -1307.38 | -1307.28 | 0.20 |
| RP + SPd | -1383.45 | -1383.71 | 0.52 |
| RP + SPp + SPd | -2027.02 | -2024.68 | 4.68 [1] |

[1] critical $\chi^2$ at P=0.05, 7 df is 14.07

BLM_0034322



Available online at www.sciencedirect.com



Resource and Energy Economics 27 (2005) 248–269



www.elsevier.com/locate/econbase

# The impact of oil and natural gas facilities on rural residential property values: a spatial hedonic analysis

Peter C. Boxall [a,*], Wing H. Chan [b], Melville L. McMillan [c]

[a] *Department of Rural Economy, University of Alberta, Edmonton, Alta., Canada T6G 2H1*
[b] *Department of Economics, Wilfrid Laurier University, Waterloo, Ont. Canada*
[c] *Department of Economics, University of Alberta, Edmonton, Alta., Canada*

Received 27 January 2004; received in revised form 3 August 2004; accepted 9 November 2004
Available online 26 February 2005

**Abstract**

This paper examines the impact of oil and gas facilities on rural residential property values using data from Central Alberta, Canada. The influences are evaluated using two groups of variables characterizing hazard effects and amenity effects. A spatial error model was employed to capture the spatial dependence between neighbouring properties. The results show that property values are negatively correlated with the number of sour gas wells and flaring oil batteries within 4 km of the property. Indices reflecting health hazards associated with potential rates of $H_2S$ release (based on information from Emergency Response Plans and Zones) also have a significant negative association with property prices. The findings suggest that oil and sour gas facilities located within 4 km of rural residential properties significantly affect their sale price.
© 2005 Elsevier B.V. All rights reserved.

*JEL classification:* Q32; Q49

*Keywords:* Sour gas; Hedonic prices; Property value impacts

* Corresponding author. Tel.: +1 780 492 5694; fax: +1 780 492 0268.
*E-mail address:* peter.boxall@ualberta.ca (P.C. Boxall).

0928-7655/$ – see front matter © 2005 Elsevier B.V. All rights reserved.
doi:10.1016/j.reseneeco.2004.11.003

BLM_0034323

*P.C. Boxall et al./Resource and Energy Economics 27 (2005) 248–269* 249

## 1. Introduction

The oil and gas sector is large, important and ubiquitous in the Alberta economy. In particular, the natural gas sector has grown in importance with production doubling since the mid-1980s. Almost a third of the natural gas output is "sour" gas; that is, contains levels of hydrogen sulphide ($H_2S$) that imposes potential health risks. Because, with the exception of the tar sands, oil and gas activity is concentrated in the populated regions of the province, the industry must co-exist with other industries, largely agriculture, and with neighbouring communities. Amenity and, in the case of sour gas, health and safety considerations are often concerns of those located near industry facilities. The expansion of natural gas production has heightened those concerns. Surprisingly, relatively little is known of the impacts of industry proximity. For example, examinations into the health implications of long-term exposure to low-level $H_2S$ are ongoing. Also, unlike for many other activities (e.g., airports, power plants and lines, hog operations, air pollution, schools and parks), investigations into the impact of oil and gas industry activity on the values of neighbouring properties seem rare. The purpose of this study is to contribute towards correcting this deficiency by studying the effects of the presence of sour gas and other oil and gas facilities on the values of rural residential properties in the vicinity of the City of Calgary, Alberta.

The paper begins with a section elaborating upon the industry–community interface and the risks associated with sour gas. The data employed in this study are then reviewed. The fourth section outlines the hedonic model and the spatial econometric analysis. This part is followed by presentation and discussion of the empirical results. A brief conclusion completes the paper.

## 2. The industry–community interface

### 2.1. Scope of the sector

The oil and gas sector in Alberta represents a major component of the provincial economy. Although the contribution in any year varies considerably with prices, the oil and natural gas industry (exploration, production, transport and processing) represents 20–25 percent of provincial output and contributes a similar share to provincial government revenues directly in the form of royalties and lease revenues from Crown-owned resources. Alberta currently supplies about 12% of the natural gas consumption in the US, over 50% of Canadian consumption, and gas is an input into a provincial petrochemical industry servicing domestic and export markets. The industry has become important and has grown rapidly over the last 50 years. This expansion has been paralleled by a substantial growth in the Alberta population, particularly in and around the urban centres in the province. The rapid expansion of the oil and gas sector (both primary and downstream processing and manufacturing), the expanding urban regions, and the importance of agriculture to the provincial economy has set the stage for conflict between the oil and gas industry and rural residents.

BLM_0034324

## 2.2. Sour gas and associated concerns

Although disagreements involve a number of issues, a major concern in the province is the production of sour gas. Sour gas is a natural gas that contains hydrogen sulphide, a colourless flammable compound that has an unpleasant smell similar to that emitted by rotten eggs and that is hazardous to humans and animals in relatively low concentrations.[1] Gas containing at least 1% $H_2S$ is considered "sour" and gas with less than 1% $H_2S$ is considered "sweet." While some $H_2S$ can be released due to accidents and equipment failures at sour gas facilities, the industry converts about 97% of the $H_2S$ in the gas to elemental sulphur that is used in the manufacturing of fertilisers, pharmaceuticals, plastics and other products (Petroleum Communication Foundation, 2000). The remaining $H_2S$ is usually burned in flares or incinerators that results in the conversion of $H_2S$ to sulphur dioxide ($SO_2$), small quantities of other toxic compounds such as carbonyl sulphide (COS) and carbon disulphide ($CS_2$), nitrogen oxides (NOx) and volatile organic compounds (VOCs).

The production of sour gas has naturally led to concerns over the health effects of the various compounds found in the gas, as well as general air and water quality (Marr-Laing and Severson-Baker, 1999). These concerns have been expressed in various public forums and in public advisory groups established by the industry and government to address and study them (Provincial Advisory Committee on Public Safety and Sour Gas, 2000; Nikiforuk, 2002a). The scientific studies conducted in the province to date have neither found adverse effects of emissions on lakes or rivers, nor have researchers found convincing evidence of impacts of low levels of exposure to $H_2S$ on the health of humans or livestock. This is, however, a topic of ongoing research. Despite the limited evidence, some people hold strong opinions about possible negative effects and, in a few cases, there have been widely publicized conflicts between the industry and persons neighbouring sour gas facilities (Nikiforuk, 2002a, 2002b). While sour gas occurrences have diminished in recent years due to increased care and regulation, there has been several larger scale sour gas events involving well blow-outs or uncontrolled releases in the province and fatal accidents involving industry workers overcome by $H_2S$. However, there have been no casualties among the general public.

About 30% of Alberta's natural gas production is sour gas and much of that is found near populated areas (Nikiforuk, 2002a). Furthermore, the rising demand for natural gas has expanded its exploration and production and has increased the number of Alberta residents facing actual or proposed sour gas developments in their communities. Naturally, residents neighbouring proposed and existing sour gas developments are concerned about the possible health risks and other potential negative impacts. It is expected that those concerns may have a negative effect on property values. This paper examines the impacts of sour

---

[1] $H_2S$ can be detected by the human olfactory system in concentrations of 0.01–0.03 ppm. Levels of 1–5 ppm can cause nausea and headaches; concentrations of 50–250 ppm result in olfactory paralysis; and imminent threat to life can occur when concentrations reach 300–500 ppm (Gephart, 1997). The human olfactory system is deadened with concentrations above 100 ppm, giving a false sense of security that no danger is present (Marr-Laing and Severson-Baker, 1999).

BLM_0034325

natural gas facilities, and of other oil and gas developments, on property values of residential acreages in selected areas around the City of Calgary, Alberta.

Health and safety risks are a clear concern associated with sour gas facilities because they represent a special hazard. This situation is recognized to an extent in regulations requiring minimum setback distances between sour gas and oil facilities and the nearest residence, business, or occupied area (such as campgrounds and recreational areas). The setback distance varies according to the level of the hazard represented by the facility. In addition to setbacks, emergency plan response zones (EPZs) are established around all facilities that have the potential to affect public safety. For sour natural gas facilities, the size of these zones can range up to several kilometres and the size is related to the maximum potential volumes or rates of release of gas. In conjunction with these zones, emergency response plans (ERPs) are established to determine the procedures to notify the relevant members of the affected public in the event of an emergency. The industry is required to conduct regular tests of their emergency response, which includes routine contact with residents living within an EPZ. Also, upon the sale of property within one or more EPZs, the seller is required to inform the buyer of the EPZs affecting the property. Thus, one can expect property values to reflect health and safety considerations.

The presence of industry infrastructure and associated activities may also adversely impact nearby property values for amenity reasons. Industrial structures and activities on what landowners may perceive as natural landscapes can detract from enjoyment of property. Many acreage owners choose to live in rural areas to escape urban and industrial development. Even though regulations require that the land affected by oil and gas wells must be restored to at least the equivalent of its previous condition, a typical well in Alberta exists and produces for about 20 years. In addition, other types of facilities such as pipelines, pumping stations, gas processing plants and oil batteries are typically associated with wells. The presence of such facilities near acreages may further reduce enjoyment of these properties and, thus, could negatively affect their values.

## 2.3. Assessing the implications for property values

Despite the importance of this issue in Alberta, and likely also in similarly developed jurisdictions in the USA, there have been few studies that examine the effects of oil and gas production facilities on property prices although there are obvious potential hazard and amenity implications. We are aware of only three (all consultant reports commissioned by oil companies operating in Alberta). Those reported little to no impacts of infrastructure on prices of (Deloitte et al., 1988; Lore and Associates Ltd., 1988; Serecon, 1997). The methods employed in these studies, however, have not been the typical techniques employed by economists examining the impacts of environmental amenities and health risks on property values. These studies grouped relatively small samples of properties according to their proximity to infrastructure and compared prices across these groupings (or in pairs of similar properties), or used price regression that included few property or industry variables.

The principle technique used by economists to examine such impacts has been hedonic price analysis (Taylor, 2003). Examples of studies that have uncovered reasonably large effects on residential land prices include the transport of hazardous wastes (Gawande and

Case No. 1:20-cv-02484-MSK   Document 36-9   filed 04/27/21   USDC Colorado   pg 163 of 182

Jenkins-Smith, 2001), electricity transmission lines, (Hamilton and Schwann, 1995) changes in water quality (Leggett and Bockstael, 2000) and hog operations (Palmquist et al., 1997). The single hedonic study we uncovered on the effects of oil and gas infrastructure on prices is by Flower and Ragas (1994) who examined the influence of large-scale oil and gas infrastructure in the form of refineries on residential property prices.

This paper reports efforts to determine the impact of proximity to small to medium oil and gas production facilities on rural residential property values. To the extent our data permit, efforts were made to assess the effects of both hazard and amenity considerations. Spatial hedonic methods were explored and ultimately used in this analysis.

## 3. The data

The data come from areas having significant sour gas activity near the City of Calgary, a city of approximately one million residents in southern Alberta, Canada. The shaded areas in Fig. 1 show the townships comprising the study area. A township is a 6-mile × 6-mile block. Thirty full townships and parts of six other are included. Oil and gas facilities in the selected townships ranged from sparse to dense. The area spans three rural jurisdictions— the Municipal Districts of Rocky View and Foothills, and Mountain View County.[2] Arm's length sales of "country residential" properties in this area during the period January 1994 (when data in electronic form became available) to March 2001 were analyzed.

The initial sample contained information on the sale of 612 residential properties that ranged in size from 1 to 40 acres. The acreage limitation essentially ensured that the property was rural but also residential in that it did not have commercial agricultural value. Furthermore, to minimize the potential influence of a few unusual properties (characterized by abnormally low or high prices), only properties priced from \$150,000 to \$450,000 were included. This restriction deleted 59 observations. Within this reduced sample, 21 properties had oil and gas facilities located on them. Because the owners at the time of facility establishment are eligible for financial compensation by the companies owning these facilities, and it was not always possible to determine the timing of facility development relative to the property sale, these properties were excluded from the analysis. After these various exclusions a final sample of 532 sales remained.[3]

The model underlying hedonic price analysis is that the price of a residential property is determined by the buyer's appraisal of those characteristics (Taylor, 2003). This appraisal can involve both objective and subjective evaluations. The number of characteristics can be quite extensive, typically including factors such as structural characteristics (e.g., area, number of bedrooms and the presence of a basement or garage), location attributes (e.g., distance to the central business district, proximity to schools and shopping, etc.) and environmental influences (e.g., views, levels of industrial emissions and noise). The basic attributes of the sample properties were gathered from the Multiple Listing Service (MLS)

---

[2] For our purposes, the distinction between municipal districts and counties is not relevant.

[3] These restrictions deleted about half of the approximately 30 observations considered influential in the various models. The remaining influential observations were not omitted. Failure to do so does not affect our results. In fact, the pattern of the results is robust across the alternative samples (532, 553 and 612 observations).

BLM_0034327

*P.C. Boxall et al. / Resource and Energy Economics 27 (2005) 248–269*      253



Fig. 1. A map of the study area in Alberta, Canada. Grey areas represent townships in which data on property values and oil and gas infrastructure was collected.

records of the Calgary Real Estate Board. A list and summary statistics of the conventional property attributes are included in Table 1.

Four variables were added that warrant comment. Because many rural residential residents commute to work in Calgary, the distance to downtown Calgary was included. Also, during the 5(+)-year period over which sales data were gathered, house prices in the Calgary market increased considerably. Hence, the real average residential price of property in the City of Calgary (in constant 2000 $CDN) was included to control for the

BLM_0034328

Table 1
Property attributes from MLS sources[a]

| Variable | Description | Mean | S.D. |
|---|---|---|---|
| RPRICE | Sale price of the property (2001 $CDN) | 290593.8 | 69815.48 |
| ACRES | Size of the land associated with the residential structure (acres) | 7.15 | 6.44 |
| AGE | Age of the residential structure at time of sale (years) | 10.48 | 7.94 |
| AREA | Area of the residential structure ($m^2$) | 176.31 | 63.06 |
| BATH | Number of bathrooms | 2.25 | 0.75 |
| BEDRM | Number of bedrooms | 2.91 | 0.84 |
| CALGARY | Distance from the City of Calgary (km) | 31.07 | 12.23 |
| DECK | Deck or balcony present (DV) [b] | 0.67 | 0.47 |
| NGARAGE | Number of garage spaces for vehicles | 2.18 | 1.09 |
| MUNWATR | Water supplied by municipality (DV) | 0.02 | 0.13 |
| NOBASEMENT | Basement of residential structure is not present (DV) | 0.02 | 0.15 |
| RAVP | Monthly average residential property prices in Calgary (2000 $CDN) | 136519.7 | 9478.30 |
| VMTN | View of the Rocky Mountains | 0.40 | 0.49 |
| ROCKY | Located in Municipal District of Rocky View | 0.37 | 0.48 |
| MOUNTAIN | Located in County of Mountain View | 0.05 | 0.21 |

[a] Multiple Listing Service.
[b] DV signifies that the variable is a dummy variable (0, 1).

strong housing market in the region. Property values depend partly upon local government taxes and services. Public services are difficult to measure and property tax information was not included in the data. Property taxes are the dominant source of municipal and county government revenue. Hence, dummy variables for the local jurisdiction a property was located in were introduced to capture differences in municipal taxes and services that are reflected in the prices.[4,5] These variables are also described in Table 1.

Numerous other features of the properties were collected and many were initially assessed but ultimately excluded from the final specification. A deficiency of the data was the lack of information on structures beyond the house—that is, out buildings such as stables, barns, corrals and large shops or garages for recreational and utility vehicles.[6] Because horse-back riding is very popular in the area and many properties include significant riding related facilities, this omission is believed to detract from the explanatory power of our regressions.

The principle connections between the presence of oil and gas facilities and residential prices were hypothesized to be visual impacts, noise, traffic, odour and perceived health hazards. Accordingly, additional property attributes were gathered or constructed to

[4] It was not necessary to consider school districts and school financing. While administered by local (district) school boards, schools in Alberta have been fully funded by the province in Alberta since 1995 and a provincial property tax that contributes (about one-third in 2001) to school financing is uniformly levied at a provincial rate. In addition, the school districts match the municipal authorities in the study area.
[5] As reflected in a recent study (Alberta EUB, 2003), the oil and gas industry impacts localities in many ways—for example, direct and indirect jobs, municipal revenues and services. There is no attempt to identify the more obtuse local impacts in this analysis.
[6] The latter may be captured in part by the number of garage spaces variable (Table 1).

BLM_0034329

Table 2
Oil and gas facility variables

| Variable | Description | Mean | S.D. | No. of affected properties in sample |
|---|---|---|---|---|
| EPZINDEX | Emergency planning zone (EPZ) index (sum of radii of all EPZs a property is located within) | 6.83 | 12.29 | 246 |
| BATINDEX | Flaring battery index (sum of $H_2S$ released from all batteries within 4 km of property) | 49.91 | 246.83 | 91 |
| NEAREST | Distance to the nearest operating sour gas plant (km) | 16.73 | 7.01 | 532 |
| NEPZWELL | Number of well EPZs the property was located within | 0.61 | 2.06 | 98 |
| NEPZPIPE | Number of pipeline EPZs the property was located within | 1.25 | 2.03 | 187 |
| FLARING | Number of flaring batteries within 4 km of property | 0.31 | 0.85 | 91 |
| SWEETWELL | Number of sweet oil and gas wells within 4 km of property | 1.94 | 3.43 | 250 |
| SOURWELL | Number of sour oil and gas wells within 4 km of property | 3.25 | 3.43 | 373 |
| ALLWELL | Total number of oil and gas wells (both sweet and sour) within 4 km of property | 5.19 | 4.98 | 434 |
| ALLPIPE | Total number of pipelines with recorded $H_2S > 0\%$ within 4 km of property | 11.31 | 9.22 | 495 |

*Source*: Alberta Energy and Utilities Board.

characterize the nature, location and extent of any nearby oil and gas facilities. First, each property in the database was located on a Geographical Information System (GIS), and a 4-km buffer was established around each property. The range of 4 km was predetermined by energy experts based on evidence regarding the probable maximum range for impacts that extend from the typical facilities such as wells, pipelines or batteries.

Industry variables were then constructed based upon information held by the Energy Utilities Board. The information used to generate the facility variables came from the Board's GIS databases (accurate to May/June 2001) and information on the EPZs from the emergency response plans submitted by oil and gas companies to the Board. All distance and count measurements were undertaken using the GIS. These variables are described in Table 2.

One group of facility variables was developed to explore the price impacts of the *intensity* of oil and gas developments nearby each property. For each property, the number of natural gas producing facilities within the 4-km buffer of each property was determined. Those included (separately or in combination with oil) sweet gas wells (SWEETWELL), sour gas wells (SOURWELL) and flaring oil batteries (FLARING).

It was expected that property values could be affected by the *proximity* of the various oil and gas facilities. To examine this, the numbers of sour, sweet and oil wells were counted within each of four, 1-km concentric rings around each property. Proximity to sour gas plants was also examined. Plants are few in number and are relatively large processing (versus extraction) facilities. The importance of proximity to the nearest operating sour gas plant (NEAREST) was not limited to the 4 km distance.

BLM_0034330

In order to focus on the health risk, a second group of variables was selected. Those variables utilized information on the emergency planning zones of the sour gas facilities associated with each property. One measure is the simple counts of the number of EPZs associated with wells (NEPZWELL) or with pipelines (NEPZPIPE) in which a residence is situated.[7] An alternative measure yields a third variable, EPZINDEX, an index of EPZs reflecting the potential volume of escaped $H_2S$. EPZINDEX was calculated as the sum of the radii (in kilometres) of each of the EPZs overlapping a property. The radius of each EPZ is a function of the potential rate of release of $H_2S$ from the well or pipeline. Thus, a higher EPZINDEX represents a higher potential $H_2S$ exposure intensity or health risk in the event of an emergency.[8] Similarly, the annual volumes of $H_2S$ gas flared at flaring oil batteries within 4 km of a property were summed to construct a flaring battery index (BATINDEX).

Note that pipelines are included in the health risk measures but not the intensity/proximity measures. This distinction was made primarily because data were available only for pipelines carrying natural gas with an $H_2S$ content exceeding 0%. These pipelines are considered sour in this study because they pose some health hazard. Other pipelines, such as those carrying sweet gas and oil, are present but were not included in the data. Pipelines in this area are underground and so are relatively unobtrusive facilities posing minimal amenity problems.

## 4. The hedonic model and econometric analysis

The hedonic method is one technique in a class of valuation approaches commonly labelled "indirect" valuation. These techniques rely on observable market transactions to obtain values for various characteristics of heterogeneous products. Housing markets are well suited to hedonic methods as the choices of housing location and neighbourhood amenities are observable to researchers. Thus, the choices of properties and their associated prices imply implicit choices of environmental amenities and other characteristics linked to the transacted properties.

In this paper, a first-stage hedonic analysis is reported in which the hedonic price function was estimated using prices and characteristics of a sample of transacted properties. This procedure estimates the implicit prices of the characteristics and reveals information on the underlying preferences for these characteristics. Rosen (1974) suggested the possibility of a second-stage estimation using the implicit prices derived from the hedonic price function and other information to estimate actual household

---

[7] No EPZ variables were incorporated for sour gas plants directly because the EPZs for gas plants are defined by the zone of the largest volume pipelines serving them. Therefore, the risk of failure for these facilities is described in terms of the pipeline EPZs.

[8] This interpretation of the EPZ index assumes that prospective home-buyers are well informed about the number and size of EPZs in which a property is located. Operators are required to conduct regular tests of their emergency response plan procedures, which include routine contact with residents within a zone and, when a property is sold, it is the obligation of the seller to inform the buyer of the EPZ(s) affecting a property. Thus, property owners should be aware of EPZs and are required to inform potential buyers.

BLM_0034331

demand for attributes. That step cannot be pursued here because information such as income and household demographics that should be included is lacking.[9]

Three basic issues are involved in constructing a hedonic price model. Two of these, functional form and model specification, are common to all hedonic price analyses. While a range of hedonic price function specifications are possible, this study used the double log specification which was chosen based on preliminary Box–Cox regression procedures and confirmed by LM tests developed by Baltagi and Li (2001) for the specifications reported here. Cropper et al., 1988 have shown that the log–log function is best in terms of measuring marginal prices in the presence of model misspecification relative to linear, linear–log and other quadratic functions. The log–log formulation provided the best fit and allowed construction of price elasticities that aid in the interpretation of the implicit price coefficients. A small constant was added to all non-dummy variables with zero values before logarithmic transformation. Adding a small constant before logarithmic transformation is not uncommon (Antweiler and Frank, 2002; Jacoby, 1992; MaCurdy and Pencavel, 1986).

To determine the specification of the hedonic model, property prices were regressed against both the property (non-industrial) variables and certain combinations of the (industry) facility variables. All facility variables could not be included in the model due to concerns regarding multicollinearity. Final choice of facility variables in the specification involved consideration as to whether the variable likely represented an amenity concern or a health concern. After considerable testing, two health risk specifications and two amenity specifications were chosen. The first health risk model (H1) involved the two index variables, EPZINDEX and BATINDEX and a proximity variable, NEAREST. The second health risk model (H2) included three frequency variables, FLARING, NEPZWELL and NEPZPIPE. Both amenity specifications involved frequency variables; the first (A1) focused on the two types of wells (SOURWELL and SWEETWELL) and the second (A2) used the total number of wells and pipelines (ALLWELL and ALLPIPE).

The third issue involves the treatment of spatial dependencies and whether spatial considerations should be formally considered in the error structure of the model. Spatial dependencies affect hedonic studies from either structural relationships among the observations (lagged dependency) or from the omission of spatially correlated explanatory variables that impact the spatial dependency among the error terms. Researchers have demonstrated the importance of accounting for spatial dependencies in hedonic applications (e.g., spatial lagged dependencies (Can and Megbolugbe, 1997; Gawande and Jenkins-Smith, 2001) and spatially autocorrelated errors (Bell and Bockstael, 2000; Leggett and Bockstael, 2000)).

Anselin (1988) describes spatial regression models that attempt to incorporate these effects. Spatial dependence can be incorporated using a spatial lag model that is defined in the following equation using the double log functional form:

$$\ln Y = \alpha + \rho W \ln Y + \beta \ln X_c + \delta X_d + u \tag{1}$$

---

[9] The second-stage process is fraught with endogeneity and identification problems that, despite considerable effort and ingenuity (see Taylor, 2003), have led at least one group of analysts to conclude that the method has not yet been used successfully to estimate willingness to pay functions (Deacon et al., 1998).

BLM_0034332

In this equation, $Y$ represents property prices, $X_c$ are continuously measured property attributes and industry variables, $\delta$ is the vector of intercept shifts that correspond to attributes measured using dummy variables $X_d$, and $u \sim N(0, \Omega)$. The effect of the spatial lag is assessed through the parameter $\rho$ and a spatial weighting matrix $W$, which defines the spatial relationships among the property prices. Alternatively, the spatial error model suggested by Anselin (1988) with the double log functional form is defined by:

$$\ln Y = \alpha + \beta \ln X_c + \delta X_d + \varepsilon \tag{2}$$

$$\varepsilon = \lambda W \varepsilon + u \tag{3}$$

This model includes a normal disturbance $u \sim N(0, \Omega)$, a spatial weighting matrix ($W$) and a coefficient ($\lambda$) for the spatial autoregressive structure for the disturbance ($\varepsilon$). A non-zero $\lambda$-value represents the presence of spatial errors and if present, OLS estimates will be unbiased yet inefficient.

Because the data analyzed in this study were spatial in nature, these spatial issues were examined. A key element in this approach is the determination of the "spatial weighting matrix" which involves selecting the properties within a certain range or distance of the given property and determining the relative weight of each on the property of interest. Guided by various specifications in the spatial hedonic literature (e.g., Bell and Bockstael, 2000) a number of specifications of the weighting matrix were examined. A matrix of the inverse distances between properties ($1/d_{ij}$) within 4 km was chosen as the spatial weighting matrix in which the diagonal elements contain zero values:

$$W = \begin{bmatrix} 0 & & & & \\ \frac{1}{d_{1,2}} & 0 & & & \\ \frac{1}{d_{1,3}} & \frac{1}{d_{2,3}} & \ddots & & \\ \vdots & \ddots & \ddots & 0 & \\ \frac{1}{d_{1,N}} & \cdots & \cdots & \frac{1}{d_{N-1,N}} & 0 \end{bmatrix}$$

Specifications using distances of 1, 2 and 10 km were examined; the $(1/d)^2$ form was tried, and weights matrices producing a lattice structure by including only 2, 3 or 5 of the closest neighbours were examined. While these various specifications did not produce results appreciably different than those reported here, intuitively it was felt that properties which are further apart should be given smaller weight due to the minimal impacts they might have on each other. Thus, the distance specifications were preferred over the lattice structure. The 4 km distance was chosen because the 1 km limit (especially) seems rather tight for this data and also because it matches the 4 km cut-off used to study the facility impacts.

A researcher must select a spatial autoregressive model by testing for the presence of a spatial lag ($\rho \neq 0$) or spatial error ($\lambda \neq 0$) through a variety of statistical tests. In addition to the standard Lagrange Multiplier (LM) tests, robust LM tests and Kelejian and Robinson (1999) tests are often performed to provide additional evidence for the spatial error structure. Moran's $I$-test can be used as a general test of model misspecification when considering the presence of spatial effects. The Kelejian and Robinson test is designed for

BLM_0034333

the same purpose with the additional features of being robust to non-normality of the error terms and non-linear structure in the price equation. While it is possible that independent tests suggest that both a lag and an error model are appropriate, Anselin and Florax (1995) suggest that comparison of the statistical significance of LM tests and robust LM tests will identify the superior specification for capturing spatial dependence.

The results presented below involve models chosen on the basis of the overall fit and statistical significance of the individual parameters. Due to the number of variables assessed in this study, and that the parameters of the property characteristics are of secondary interest and are not sensitive to the inclusion of the facility variables, we present the parameters for the property characteristics and facility variables separately for ease of presentation.

## 5. Results and discussion

### 5.1. (Non-industrial) property characteristics

Table 3 presents OLS parameter estimates for the non-industry property characteristics associated with the residence gathered from the standard real estate Multiple Listing Service forms. The characteristics having significant coefficients are AGE, AREA, the number of bedrooms (BEDRM), the number of bathrooms (BATH), the presence of a deck (DECK), the number of garage spaces (NGARAGE), the size of the property (ACRES), a view of the mountains (VMTN), distance from the City of Calgary (CALGARY), the inflation adjusted monthly average price of residential property in Calgary (RAVP) and Municipal District of Rocky View (ROCKY) and the County of Mountain View (MOUNTAIN). Since the local government dummy variables are not significantly different from each other in any of the three models in Table 3 ($F$-tests; $P > 0.30$), there is a significant difference in prices between similar properties in these two jurisdictions and those in the Municipal District of Foothills.

All of the signs of the parameters are as expected. For example, the larger the area of the residence, the greater its price. Also, the marginal impacts of these variables on price appear to be reasonable (see Appendix A). Note that the impact of an added bedroom is negative but that reflects that the area (and number of bathrooms) in the house remain the same. That is, another bedroom is "squeezed" into the average sized house. Robust $t$-ratios were also calculated due to the presence of heteroskedasticity indicated by the Breusch–Pagan test results are reported in Table 3. The statistical significance of no variable changed as a result of using the robust $t$-ratios.

The property characteristics model was then subjected to spatial adjustment and further statistical testing. The results supported the use of the spatial error model over the spatial lag. Inclusion of the jurisdiction dummy variables (ROCKY and MOUNTAIN) removed evidence of spatial lag. However, the spatial error parameter was found to be positive and significant at the 1% level (Table 3; last column). Upon adjustment of the error term, the parameters of the property variables did not change appreciably except for MUNWTR which was found to be statistically significant in the spatial results but not for the non-spatial results.

Table 3
Regression results for the hedonic model of property characteristics on prices

| Non-industry Characteristics | OLS (*t*-ratio) | OLS (Robust *t*-ratio) | Spatial error (*t*-ratio) |
|---|---|---|---|
| INTERCEPT | −1.1650 (1.1345) | −1.1650 (1.1399) | −0.1246 (0.1291) |
| ln(AGE) | **0.0178**[a] (2.2401) | **0.0178** (2.3972) | **0.0185** (2.4734) |
| ln(AREA) | **0.3884** (17.0194) | **0.3884** (14.0514) | **0.3518** (16.2612) |
| ln(BEDRM) | **−0.1010** (4.9116) | **−0.1010** (4.6536) | **−0.0765** (4.1461) |
| ln(BATHRM) | **0.0752** (4.0596) | **0.0752** (3.5506) | **0.0744** (4.4419) |
| NOBASEMENT | −0.0314 (0.7735) | −0.0314 (0.7437) | −0.0529 (1.4364) |
| DECK | **0.0324** (2.5111) | **0.0324** (2.4305) | **0.0296** (2.4944) |
| ln(NGARAGE) | **0.0789** (5.3260) | **0.0789** (4.7299) | **0.0804** (5.7397) |
| ln(ACRES) | **0.0922** (10.4423) | **0.0922** (10.1550) | **0.0917** (10.1486) |
| VMTN | **0.0279** (2.2501) | **0.0279** (2.1973) | **0.0276** (2.2475) |
| MUNWTR | 0.0812 (1.7225) | 0.0812 (1.9115) | **0.0946** (2.1911) |
| ln(CALGARY) | **−0.1744** (8.0164) | **−0.1744** (7.4646) | **−0.1734** (5.8598) |
| ln(RAVP) | **1.0296** (11.8386) | **1.0296** (11.9227) | **0.9553** (11.7621) |
| ROCKY | **−0.1015** (7.4950) | **−0.1015** (7.5967) | **−0.0983** (5.0629) |
| MOUNTAIN | **−0.1183** (3.3462) | **−0.1183** (3.1067) | **−0.1119** (2.4953) |
| λ | | | **0.4239** (7.6757) |
| Adjusted $R^{2b}$ | 0.6739 | | 0.6811 |
| Multicollinearity condition number | 2.7361 | | |
| Jarque–Bera test on normality | 0.1738 | | |
| *P*-value | 0.9167 | | |
| Breusch–Pagan test for heteroskedasticity | 26.0762 | | |
| *P*-value | 0.0253 | | |

[a] Parameter estimates in bold indicate significance at 5% level for a two-tailed test.
[b] The $R^2$ reported for the spatial error model is the squared correlation between the predicted values and the actual values of the dependent variable.

### 5.2. (Industrial) facility characteristics

Having chosen a "base" set of property characteristics, combinations of facility variables were added to the hedonic model to arrive at the results presented in Table 4. The property variables in Table 3 were included in these models but since the associated coefficients are not substantially different when facility characteristics are included, the coefficients for these variables are not reported.

The combinations of facility characteristics in each model in Table 4 were chosen based upon consideration of the correlations among the facility variables and whether the combinations represented perceived hazard or amenity effects. The significant Moran's *I*-statistics lend support to consideration of spatial dependencies. Thus, all of these models were spatially adjusted. While both spatial tests were employed, regression diagnostics continued to suggest that when industry characteristics were added, spatial error effects were present in the data as shown by the LM tests and their robust counterparts reported in the bottom of Table 4. In each case, the tests suggest that the spatial error specification be chosen over the spatial lag because the associated LM statistics for the spatial error models were larger and more statistically significant than those from the spatial lag models. The significant Kelejian–Robinson statistics also lend support to the use of spatial error specification. The superiority of the spatial error model holds across all of the hazard and amenity specifications reported below.

BLM_0034335

Table 4
Spatial error hedonic models for the effects of oil and gas facilities on property prices[a]

| Industry variables | Hazard H1 (t-ratio) | Hazard H2 (t-ratio) | Amenity A1 (t-ratio) | Amenity A2 (t-ratio) |
|---|---|---|---|---|
| ln(EPZINDEX) | **−0.0182**[b] (2.5483) | | | |
| ln(BATINDEX) | **0.0113** (2.6011) | | | |
| ln(NEAREST) | −0.0036 (0.1560) | | | |
| ln(FLARING) | | **−0.0541** (2.6715) | | |
| ln(NEPZWELL) | | −0.0253 (1.5327) | | |
| ln(NEPZPIPE) | | **−0.0319** (2.9037) | | |
| ln(SOURWELL) | | | **−0.0311** (3.2963) | |
| ln(SWEETWELL) | | | −0.0181 (1.5930) | |
| ln(ALLWELL) | | | | **−0.0410** (3.6722) |
| ln(ALLPIPE) | | | | 0.0104 (1.0933) |
| λ | **0.3889** (6.7782) | **0.3920** (6.8531) | **0.3577** (6.0409) | **0.3655** (6.2195) |
| $R^2$ (Buse)[c] | 0.9672 | 0.9678 | 0.9613 | 0.9629 |
| Moran's $I$-test | 7.3166 | 7.7614 | 6.8661 | 7.0791 |
| $P$-value | [0.0000] | [0.0000] | [0.0000] | [0.0000] |
| LM test (error) | 43.5302 | 49.3745 | 38.7233 | 41.3565 |
| $P$-value | [0.0000] | [0.0000] | [0.0000] | [0.0000] |
| Robust LM test (error) | 42.2604 | 47.9214 | 37.5261 | 39.9373 |
| $P$-value | [0.0000] | [0.0000] | [0.0000] | [0.0000] |
| Kelejian–Robinson (error) | 121.2155 | 162.6337 | 190.1173 | 208.3861 |
| $P$-value | [0.0000] | [0.0000] | [0.0000] | [0.0000] |
| LM test (lag) | 4.6055 | 5.0801 | 4.6081 | 5.9726 |
| $P$-value | [0.0318] | [0.0242] | [0.0318] | [0.0145] |
| Robust LM test (lag) | 3.3357 | 3.6274 | 3.4109 | 4.5534 |
| $P$-value | [0.0678] | [0.0568] | [0.0648] | [0.0329] |

[a] Not reported in this table are the coefficients for the property characteristics found in Table 3 that were also included in each estimated model.

[b] Parameter estimates in bold indicate significance at 5% level for a two-tailed test.

[c] The $R^2$ reported for the spatial error model is the adjusted $R^2$ measure adjusted for non-spherical errors (Buse, 1973).

Additional specification tests were conducted on the oil and gas facility models and the results are reported in Table 5. First, LM tests devised by Baltagi and Li (2001) were conducted to simultaneously test for functional form and spatial error. The log–log specification in the presence of spatial errors was supported by the insignificance of the test results (Table 5). Second, the problem of heteroskedasticity was examined using Breusch–Pagan tests. The resulting statistics suggest that this problem may be present, but none of the statistics were significant at the 5% level. The statistic for the H1 model exhibited the level of significance closest to the 5% level.

Hazard model H1 in Table 4 includes the EPZINDEX for wells and pipelines, the annual volume of gas flared from neighbouring batteries (BATINDEX), and the distance to the nearest operating sour gas plant (NEAREST). Both the EPZINDEX and the BATINDEX

BLM_0034336

Table 5

Specification tests for spatial error hedonic models for the effects of oil and gas facilities on property prices

| | Models | | | |
|---|---|---|---|---|
| | H1 | H2 | A1 | A2 |
| Test for log–log model and spatial error | | | | |
| LM test[a] | 0.2544 | 0.6851 | 0.5825 | 0.4497 |
| P-value | [0.6139] | [0.4078] | [0.4453] | [0.5024] |
| Test for heteroskedasticity | | | | |
| Spatial Breusch–Pagan test | 26.4089 | 24.9566 | 22.6888 | 23.5729 |
| P-value | [0.0673] | [0.0956] | [0.1223] | [0.0992] |

[a] LM tests from Baltagi and Li (2001) were used to test the null of double log model conditional on the presence of spatial error structure.

parameters were negative and statistically significant, while NEAREST has a negative influence on property value as expected, but was statistically insignificant. The insignificance of the NEAREST coefficient may be partly due to the relatively high, −0.51, correlation with EPZINDEX and the fact that observations nearby plants, and so most likely affected, will also be in EPZ areas. Hazard model H2 included the number of well and pipe EPZs affecting the property (NEPZWELL and NEPZPIPE) and the number of flaring batteries within 4 km (FLARING). All three parameters were negative and those for NEPZPIPE and FLARING are significant, suggesting that these facilities lowered property prices consistent with expectations. The number of well EPZs was statistically insignificant, however, which may be explained by the small number of properties (98) in the sample affected by well EPZs (Table 2).

The amenity models concentrated on the number and proximity of facilities rather than their sour gas content. The numbers of sour and sweet wells within 4 km of each property (SOURWELL and SWEETWELL) were incorporated into amenity model A1. Pipelines, which are less conspicuous, were ignored. The coefficients of both the well variables are negative but that for the number of sour wells was significant at the 5% level while that for the number of sweet wells significant only at the 15% level. The marginal effect of the sour wells on prices is almost twice the size of that from the sweet wells. Because one cannot disentangle the hazard effect of the sour wells from their amenity impact, one should expect a larger impact for the sour wells. Amenity model A2 divided facilities into the total number of wells (both sour and sweet together, ALLWELL) and the total number of sour pipelines (ALLPIPE). (Recall that we have no data on pipelines not carrying sour gas.) The results suggest that it is the total numbers of wells but not the number of sour pipelines that have significant negative impacts on property prices.

A variety of unreported models were also estimated. The general pattern of the results in these is similar to those described above, but some outcomes merit noting. In numerous cases (various specifications and with some variations in the data), the coefficients for sweet and sour wells were both significantly negative. Also, the coefficient for the sweet wells was typically less than or, at most, equal to that for sour wells suggesting an added penalty for sour wells. An effort was made to assess proximity to wells by distinguishing

BLM_0034337

Table 6
Marginal and mean effects of the presence of oil and gas facility variables on the average property price

| Facility variable | Mean level of the variable in the sample (S.D.) | Price effect from 0 to the first unit of the variable | Price effect from 0 to the mean level of the variable | Marginal effect at the mean level of the variable |
|---|---|---|---|---|
| EPZINDEX** | 6.83 (12.29) | −3647.61 | −10698.29 (−15470.56)[a] | −676.10 (−263.13) |
| BATINDEX** | 49.91 (246.83) | −2271.38 | −12645.85 (−18147.92) | −64.62 (−11.05) |
| NEAREST | 16.73 (7.01) | −717.42 | −2904.84 (−3263.85) | −61.94 (−43.86) |
| FLARING** | 0.31 (0.85) | −10702.70 | −4174.46 (−11867.57) | −12042.53 (−7282.91) |
| NEPZWELL | 0.61 (2.06) | −5044.35 | −3487.41 (−9389.53) | −4552.22 (−2000.53) |
| NEPZPIPE** | 1.25 (2.03) | −6350.31 | −7399.44 (−13152.57) | −4124.28 (−2166.31) |
| SOURWELL** | 1.94 (3.43) | −6206.40 | −12805.28 (−17881.68) | −2129.64 (−1177.98) |
| SWEETWELL | 3.25 (3.43) | −3621.51 | −5614.59 (−9570.23) | −1788.38 (−825.92) |
| ALLWELL** | 5.19 (4.98) | −8148.20 | −20942.20 (−27394.35) | −1926.27 (−1067.51) |
| ALLPIPE | 11.31 (9.22) | 2110.78 | 7718.81 (9465.22) | 246.40 (140.88) |

(**) Refers to the whether the facility variable is significant at the 5% level.
[a] All effects are reported in 2001 Canadian dollars. Numbers in parentheses for the effects refer to the effect with one standard deviation added.

those in successive one kilometre concentric rings on the property (i.e., less than 1 km, 1–2 km, etc., up to 4 km) and employing econometric procedures similar to those used by Palmquist et al. (1997) in their analysis of the effect of hog operations on property values.[10] Other than revealing that wells within one kilometre had the greatest impact on price, the other coefficients did not demonstrate a consistently diminishing effect. Information on whether facilities predated our study period or were built after 1993 provided some interesting insights. The age of wells did not matter. However, "new" post-1993 pipelines typically had a significant negative effect on price; perhaps because the disruption of their construction was still more clearly visible.

*5.3. The marginal impacts of industry facilities*

Table 6 presents the marginal sale price effects of the oil and gas facility characteristics on the price of the average property in the database in a number of different ways. First, the marginal effect from 0 to 1 represents the impact of the introduction of the first unit of a typical facility on the price of the average property. Second, the mean level effect refers to the effects of the presence of facilities at the average level for that facility type in the sample. Finally, the marginal effect at the variable mean refers to the impact of an additional unit of a facility given that the average property already is impacted by existing facilities of the type under consideration. To demonstrate the pattern over a broader range, the price and marginal effects are also presented at the mean plus one standard deviation.

The price effects in Table 6 indicate that proximity to and $H_2S$ volumes of EPZs and gas flaring batteries as measured by the two index variables EPZINDEX and BATINDEX have significant negative effects on property values. EPZINDEX, which refers to a weighted sum of all EPZ sizes overlaying properties, has a first unit effect of −$3647.61 and a total

---

[10] Because our data did not include facilities beyond 4 km from a property, it was not possible to explore for potential impacts of more distant facilities.





Fig. 2. The effects of increasing the exposure of rural residential properties to sour gas hazards as measured by the emergency planning zones index (EPZINDEX); (a) presents the cumulative effects of additions to the index and (b) presents the marginal effects of increases in the index.

effect at its mean level (6.83) of −$10,698.29 or approximately 3.8% of the value of the average property. The marginal effect on price declines from −$3647.61 to −$676.10 at the mean and to −$263.13 at the mean plus one standard deviation level (19.12). Fig. 2 illustrates further the diminishing effect of additional increments to the EPZINDEX. Fig. 2a shows the total effect on price of the average property as EPZINDEX levels increase and Fig. 2b shows the marginal values at the different levels. A similar conclusion can be made for the flaring battery index (BATINDEX, which represents the weighted sum of the annual volume of flared solution gas in units of $m^3$) and for which a similar pattern is found. The impact of the first unit is −$2271.38, the mean level effect is −$12,645.85 (which is a decline of approximately 4.3% of the average price) and the marginal value at the mean is −$64.62.

Hazard model H2 gives results similar to those of the two indices reported above. The presence of the first flaring battery within 4 km (FLARING) causes a decline of −$10,702.70 in price. This is the highest first-unit marginal value among the 10 facility variables examined in Table 6. At the mean plus one standard deviation value for

FLARING (1.16 batteries), the total level impact is −$11,867 and the marginal effect is −$7283. The number of pipeline EPZs (NEPZPIPE) has a first-unit effect on value of −$6,350.31 and the price effect at the mean level (1.25 EPZs) is −$7399. At the mean level, the marginal impact declines to −$4124. Both hazard models indicate that the presence of oil and gas facilities cause significant negative effects on property values in proximity to the facilities examined.

Turning to the amenity variables, the marginal effects of the presence of wells on price are similarly negative. Sour wells (SOURWELL) have a much higher impact than sweet wells (and recall that the sweet well parameter was significant at the 15% level only). However, the combined effects of both sour and sweet wells (ALLWELL) are also negative and larger in magnitude (Table 4). Introduction of a sour gas well reduces price by $6206 while the reduction at the mean of 1.94 wells amounts to $12,805 and the reduction when the number is increased to the mean plus one standard deviation (5.37 wells) is $17,882. The marginal effects of adding sour wells drops rapidly, from −$6206 for the first well, to −$2129.64 at the mean number of wells, and to −$1178 at the mean plus one S.D. of 5.37 wells. These effects are illustrated further in Fig. 3a and b. The combined effects of both



Fig. 3. The effects of increasing the number of sour gas wells within 4 km on the average prices of rural residential properties in Alberta; (a) presents the cumulative effects of additional wells and (b) presents the marginal effects.

BLM_0034340

sour and sweet wells are also negative. The total number of wells (ALLWELL) is more influential with a first-unit effect of −$8148.20 and a mean effect (at 5.19 wells) of −$20,942.20, representing approximately 7% of average property value.

One can employ the amenity model parameters to make some estimates of the hazard effect of wells with $H_2S$ present independent of the amenity effects. Sour wells have both an amenity impact and a hazard impact while sweet wells likely have only an amenity effect on property values. While the magnitude of the hazard is not measured by the SOURWELL variable, these wells are known to have $H_2S$ present and so present some health risk. Similarly, ALLWELL has a sour well component and thus some associated risk. Accepting the SWEETWELL parameter estimate as a valid approximation of the magnitude of the impact of the presence of $H_2S$ risk-free wells on property prices even if significant at only the 15 percent level, allows attribution of the difference between that and the sour well effect caused by the presence of $H_2S$. For example, the first sweet well reduces the average property's value by $3621 while the first sour well reduces the value by $6206. These amounts imply an extra cost to the sour gas well of $2585. The ALLWELL parameter implies a somewhat higher cost per well; $8148 for the first well, which would be a combination (0.373:0.626) sweet to sour. Extrapolating from this estimate, the extra cost of the initial well being sour as opposed to sweet is $4006. At the mean number of 5.19 wells, if all were sour, the market value of the average property would be reduced by $14,507 while, if all those wells were sweet wells, the reduction would be $8533. The extra effect of the sour gas is $5974. Similarly, if the ALLWELL parameter is used, the estimate of the additional impact on price due to the presence of sour gas is $9359. Hence, it appears that property buyers discount properties neighbouring oil and gas wells and even when relying upon variables that do not account specifically for health hazards, it appears that they discount more heavily those posing a health hazard due to sour gas.

## 6. Conclusions

The results of this analysis strongly suggest that the presence of oil and gas facilities can have significant negative impacts on the values of neighbouring rural residential properties. These results contrast with those of earlier consulting reports addressing this question in the Alberta context. However, given the relatively extensive (though admittedly not ideal) data and the use of current methodologies—specifically, a double log hedonic model with spatial error adjustment—plus the reasonableness of the magnitudes and behaviour of the estimates, we have confidence in the outcomes presented.

Measures of both hazard and (dis)amenity attributes were found to have negative effects on property values. Hazard characteristics included either volume of hazardous gas indexes or number of hazardous zones measures. Measures of both types had significant coefficients. Number of wells measures or the number of wells and pipelines were variables in the amenity models. The presence of wells, especially sour gas wells, was found to depress property values but the number of pipelines carrying sour gas variable did not have a significant coefficient. At the mean level of industry facilities within 4 km, property values are estimated to be reduced between 4 and 8 percent. The impact can easily be twice that depending upon the level and composition of the nearby industry activities—for

example, if all the wells in the 4-km zone were sour gas wells rather than the typical mix of sour gas and other wells.

To our knowledge, this is the first academic study of the implications of oil and gas production facilities upon property values. While, naturally, the results must be considered with some caution (and await further investigation to confirm, refine or refute), they are broadly consistent with studies of the impacts of other industries having potentially detrimental influences on the use and enjoyment of property. As such, we believe the impacts implied by this analysis and the estimates derived will be of interest to and potentially valuable to residents, firms, the oil and gas industry and regulators. For example, the estimates indicate that there are negative economic consequences related to proximity to certain (but not all) types of industry facilities and this evidence may help all to better understand the economic reasons underlying concerns and disagreements. In addition, this work may assist all the players in making better site decisions and regulators, in particular, in mediating disputes and in assessing the merits for compensation should a facility be introduced near existing rural residential property.

## Acknowledgements

The authors gratefully acknowledge the contribution of the Alberta Energy Utilities Board in constructing the data sets used in this study as well as the comments of an anonymous referee. Terry Molik, Kevin Johnson, Elaine Smith and Michael Fujda of the EUB, and Rastislav Elgr are thanked for their invaluable assistance.

## Appendix A

Marginal price effects of the property attributes

| Name | Mean | S.D. | Minimum | Maximum | Marginal values at mean | 95%C.I. upperbound[a] | 95%C.I. lowerbound[a] |
|---|---|---|---|---|---|---|---|
| AGE** | 10.48 | 7.94 | 1.00 | 99.00 | −514.27 | −106.75 | −921.80 |
| AREA** | 176.31 | 63.06 | 73.10 | 546.20 | 579.87 | 649.77 | 509.98 |
| BED** | 2.91 | 0.84 | 1.00 | 8.00 | −7633.09 | −4024.65 | −11241.52 |
| BATHS** | 2.25 | 0.75 | 1.00 | 7.00 | 9591.16 | 13823.27 | 5359.05 |
| NOBASEMENT | 0.02 | 0.15 | 0.00 | 1.00 | −15376.16 | | |
| DECK** | 0.67 | 0.47 | 0.00 | 1.00 | 8602.33 | | |
| GARAGE** | 2.18 | 1.09 | 0.00 | 6.00 | 7342.97 | 9850.44 | 4835.49 |
| ACRES** | 7.15 | 6.44 | 1.00 | 40.00 | 3727.00 | 4446.80 | 3007.21 |
| VMTN** | 0.40 | 0.49 | 0.00 | 1.00 | 8017.92 | | |
| MUNWTR** | 0.02 | 0.13 | 0.00 | 1.00 | 27481.89 | | |
| CALGARY** | 31.07 | 12.23 | 9.40 | 72.20 | −1621.48 | −1079.12 | −2163.84 |
| RAVP** | 136519.7 | 9478.3 | 118126.9 | 153993.2 | 2.03 | 2.37 | 1.69 |
| ROCKY** | 0.37 | 0.48 | 0.00 | 1.00 | −28578.85 | | |
| MOUNTAIN** | 0.05 | 0.21 | 0.00 | 1.00 | −32507.57 | | |

(*) Refers to 10% significance and (**) refers to 5% significance.

[a] Refer to the confidence limits of the mean of the property attribute.

BLM_0034342

# References

Alberta Energy and Utilities Board (Alberta EUB), 2003. Nature of local benefits to communities impacted by sour gas development, public safety and sour gas recommendation 79. Final Report of the I-79 Stakeholder Steering Committee, September.

Anselin, L., 1988. Spatial Econometrics: Methods and Models. Kluwer, Dordecht.

Anselin, L., Florax, R.J.G.M., 1995. Small sample properties of tests for spatial dependence in regression models. In: Anselin, L., Florax, R.J.G.M. (Eds.), New Directions in Spatial Econometrics. Springer, Berlin.

Antweiler W., Frank M.Z., 2002. Is all that talk just noise? The information content of Internet stock message boards. University of British Columbia. Working Paper.

Baltagi, B.H., Li, D., 2001. LM tests for functional form and spatial error correlation. International Regional Science Review 24, 194–225.

Bell, K.P., Bockstael, N.E., 2000. Applying the generalized-moments estimation approach to spatial problems involving microlevel data. Review of Economics and Statistics 82, 72–82.

Buse, A., 1973. Goodness-of-fit in generalized least squares estimation. The American Statistician 27, 106–108.

Can, A., Megbolugbe, I., 1997. Spatial dependence and house price index construction. Journal of Real Estate Finance and Economics 14, 203–222.

Cropper, M.L., Deck, L.B., McConnell, K.E., 1988. On the choice of functional form for hedonic price functions. Review of Economics and Statistics 70, 668–675.

Deacon, R.T., Brookshire, D.S., Fisher, A.C., Kneese, A.V., Kolstad, C.T., Scrogin, D., Smith, V.K., Ward, M., Wilen, J., 1998. Research trends and opportunities in environmental and natural resource economics. Environmental and Resource Economics 11, 383–397.

Deloitte, Haskins, Sells, 1988. The effect of sour gas facilities on property values in the Crossfield, Okotoks and Pincher Creek Regions of Alberta. Report Prepared for Shell Canada, 59 pp.

Flower, P.C., Ragas, W.R., 1994. The effects of refineries on neighborhood property values. Journal of Real Estate Research 9, 319–338.

Gawande, K., Jenkins-Smith, H., 2001. Nuclear waste transport and residential property values: estimating the effects of perceived risks. Journal of Environmental Economics and Management 42, 207–233.

Gephart, R., 1997. Hazardous measures: an interpretive textual analysis of quantitative sensemaking during crises. Journal of Organizational Behaviour 18, 583–622.

Hamilton, S.W., Schwann, G.M., 1995. Do high voltage electric transmission lines affect property value? Land Economics 71, 436–444.

Jacoby, H.G., 1992. Productivity of men and women and the sexual division of labor in peasant agriculture of the Peruvian Sierra. Journal of Development Economics 37, 265–287.

Leggett, C.G., Bockstael, N.E., 2000. Evidence of the effects of water quality on residential land prices. Journal of Environmental Economics and Management 39, 121–144.

Lore, J. and Associates Ltd., 1988. The effect of sour gas facilities on land values in West Central Alberta. Report Prepared for Shell Canada, 19 pp.

MaCurdy, T.E., Pencavel, J.H., 1986. Testing between competing models of wage and employment determination in unionized markets. Journal of Political Economy 94, S3–S39.

Marr-Laing, T., Severson-Baker, C, 1999. Beyond eco-terrorism: The deeper issues affecting Alberta's oilpatch. Report prepared for the Pembina Institute for Appropriate Development, Drayton Valley, Alberta, 23 pp.

Nikiforuk, A, 2002a. Flare up. National Post Business Magazine (October 2002), 94–101.

Nikiforuk, A., 2002b. Saboteurs: Wiebo Ludwig's War Against Big Oil. Walter & Ross, Macfarlane, 296 pp.

Palmquist, R.B., Roka, F.M., Vukina, T., 1997. Hog operations, environmental effects, and residential property values. Land Economics 73, 114–124.

Petroleum Communication Foundation, 2000. Sour gas: questions and answers. Petroleum Communication Foundation, Calgary, Alberta, 36 pp.

Provincial Advisory Committee on Public Safety and Sour Gas, 2000. Public safety and sour gas: findings and recommendations final report. Alberta Energy and Utilities Board, Calgary, Alberta, 63 pp.

Rosen, S., 1974. Hedonic prices and implicit markets: product differentiation in pure competition. Journal of Political Economy 82, 34–55.

BLM_0034343

Serecon Valuation and Agricultural Consulting Inc. 1997. Impact of sour oil/gas facilities on property values. Report Prepared for Shell Canada, 14 pp.

Taylor, L.O., 2003. The hedonic method. In: Champ, P.A., Boyle, K.J., Brown, T.C. (Eds.). A Primer on Nonmarket Valuation. Kluwer, Dortrecht, pp. 331–393.

BLM_0034344

ECOLOGICAL ECONOMICS 63 (2007) 616–626



available at www.sciencedirect.com


ScienceDirect

www.elsevier.com/locate/ecolecon



## ANALYSIS

# What are ecosystem services? The need for standardized environmental accounting units☆

## James Boyd[b,*], Spencer Banzhaf[a]

[a]Georgia State University, United States
[b]Energy and Natural Resources Division, Resources for the Future, 1616 P St., NW Washington, DC 20036 202-328-5013, United States

ARTICLE INFO

Article history:
Received 2 March 2006
Received in revised form
21 September 2006
Accepted 9 January 2007
Available online 28 February 2007

Keywords:
Environmental accounting
Ecosystem services
Index theory
Nonmarket valuation

JEL classification:
Q51; Q57; Q58; D6

ABSTRACT

This paper advocates consistently defined units of account to measure the contributions of nature to human welfare. We argue that such units have to date not been defined by environmental accounting advocates and that the term "ecosystem services" is too ad hoc to be of practical use in welfare accounting. We propose a definition, rooted in economic principles, of final ecosystem service units. A goal of these units is comparability with the definition of conventional goods and services found in GDP and the other national accounts. We illustrate our definition of ecological units of account with concrete examples. We also argue that these same units of account provide an architecture for environmental performance measurement by governments, conservancies, and environmental markets.

© 2007 Elsevier B.V. All rights reserved.

## 1. Introduction

This paper articulates a precise definition of "ecosystem services" to advance the development of environmental accounting and performance systems. Colloquially, ecosystem services are "the benefits of nature to households, communities, and economies." The term has gained currency because it conveys an important idea: that ecosystems are socially valuable and in ways that may not be immediately intuited (Daily, 1997). Beyond that, however, ecology and economics have failed to standardize the definition and measurement of ecosystem services. In fact, a brief survey of definitions reveals multiple, competing meanings of the term. This is problematic because environmental accounting systems increasingly are adopting "services" as the units they track and measure. The development and acceptance of welfare accounting and environmental performance assessment are hobbled by the lack of standardized ecosystem

☆ We thank William Desvousges, Paul Ferraro, Geoffrey Heal, Mun Ho, Glenn-Marie Lange, Kerry Smith, Robert Smith, David Tilman, Roger van Haefen, Lisa Wainger, Will Wheeler, an anonymous referee, members of the EPA Science Advisory Board Committee on Valuing the Protection of Ecological Systems and Services, and participants at the Research Triangle Environmental Workshop a National Science Foundation Biocomplexity conference, and a recent RFF conference on ecosystem services for valuable comments. We also thank Graham Bullock for valuable research assistance.
* Corresponding author.
E-mail address: boyd@rff.org (J. Boyd).

0921-8009/$ - see front matter © 2007 Elsevier B.V. All rights reserved.
doi:10.1016/j.ecolecon.2007.01.002

ECOLOGICAL ECONOMICS 63 (2007) 616–626   **617**

service units. To address that problem, this paper proposes that environmental accounts focus on *final* services and offers a definition of such services that is objective, rather than qualitative, and rooted in both economic and ecological theory. A virtue of the definition is that it constrains, and thereby standardizes, units of ecosystem account.[1]

Loose definitions undermine accounting systems. They muddy measurement and lead to difficulties in interpretation. Our ultimate goal is the development of national-scale environmental welfare accounting and performance assessment, potentially consistent with national income accounting and hence a broad "green GDP."[2] Accordingly, we seek more rigorously and consistently defined ecosystem service units. In this context, an operationally useful definition of services will be clear and precise, consistent with the principles of the underlying ecology, and with the economic accounting system to which it relates. It also serves to narrow the range of things to be counted, thereby establishing priorities for limited data-collection budgets.[3]

The paper proceeds as follows. First, we demonstrate the public policy demand for standardized units of ecosystem measurement. Second, we advance and defend an economic definition of units of account. Our overall perspective is that the goal of social policy is to maximize human well-being as opposed to a purely ecological objective. Third, we contrast this definition with existing definitions of services and environmental accounting units. Fourth, we concretely illustrate our definition via an inventory of measurable ecosystem services.

Clear units of account are fundamental to two policy initiatives whose social desirability we take as self-evident: the effective procurement of environmental quality by governments and clear national measures of well-being arising from environmental public goods and market goods—otherwise known as a green GDP.[4] As we will argue ultimately, one particular set of accounting units is applicable to both of these broad applications. Before turning to our definition, however, we discuss the need for standardized units, relate them to accounting and procurement, and explain why such units have been slow to develop.

## 2.    Standardized units will improve environmental procurement and accounting

If green accounting is to be taken seriously, the accounts must not be only concerned with the ways in which services are weighted (the missing prices problem) but also with the definition of services themselves. Moreover, it is desirable to define ecosystem service units in a way that is methodologically and economically consistent with the definition of goods and services used in the conventional income accounts. In a nutshell, the national income accounts add up things bought and sold in the economy, weighted by their prices, in order to arrive at an aggregate, such as the nation's gross domestic product (GDP). These accounts are by no means simple to devise, but they are aided by two kinds of readily available data. The first kind of data is prices. The second kind of data is the units of things bought and sold (cars, homes, insurance policies, etc). Because these things are traded in markets, we tend to take their units for granted. Everyone knows what a car or a house is. If we are to similarly account for environmental welfare, however, we run into an immediate problem: there are no such defined units.

Because most ecosystem services are public goods, markets are not available to provide clear units of account. Instead, units of trade and compensation have to be defined by governments, governments being the trustees of environmental quality. The question then is, do governments do a good job of defining units and policing their quality? There is ample evidence that they have not.[5] An aim then of our inquiry is to advocate units that will improve governments' ability to consistently and defensibly measure and police environmental quality affected by regulation, ecosystem trades, compensation, and expenditures.

While the challenge is significant, the history of markets and income accounting gives us hope that such problems can be overcome. We draw three lessons in particular. First, for millennia governments have played an active role in creating and stabilizing markets by establishing uniform weights and measures and monetary units of account. The fact that these measures are now firmly entrenched in tradition makes the role of governments easy to forget but no less important. Second, as national income and price accounts were established in the early decades of the last century, the pioneers of those systems faced daunting problems of their own. They did not have "readily available" prices and quantities. They had to gather those data. Moreover, they often faced a great deal of heterogeneity in product quality and in the forms of price quotes (apples of various grades, each by pound, bushel, or number). Finally, even today, the keepers of price and income

---

[1] Similar debate over the definition of goods and services in the conventional economic accounts has taken place over the last hundred years. Today, we take these definitions largely for granted (e.g., the units of goods measured by GDP or the bundle of goods used to calculate the cost of living). In fact, they are the product of decades of debate within government and the economics profession.

[2] This goal is widely shared (Nordhaus, 2005; World Bank, 2005; U.S. Bureau of Economic Analysis, 1994; United Nations Environment Programme, 1993). National accounts do not measure welfare itself (an impossibility), rather they are proxies for components of welfare. For example, GDP is not the value of the economy, it is a *measure of* the value of the economy. Similarly, our ecosystem measure should be thought of as a measure of nature's value, not the value itself. This distinction is important to any interpretation of national accounting numbers.

[3] Smith (2004) makes the same point. Without a theoretical framework, such as the one we provide in this paper, the selection of variables is "subjective and may tend toward a large set since nothing constrains the number chosen."

[4] In this article, "green GDP" denotes explicit accounting for the current services of ecosystems enjoyed by people, the approach advanced by Mäler (1991), Peskin and Delos Angeles (2001), and Grambsch, Michaels, and Peskin (1993). This is different from, but not inconsistent with, depreciating ecosystem stocks (Repetto et al., 1989; U.S. BEA, 1994). For overviews, see Hecht (2005), Lange (2003), and Nordhaus and Kokkelenberg (1999).

[5] See U.S. General Accounting Office (2005b) (wetlands); Ando and Khanna (2004) (natural resource damage compensation); Houck (2002) (water quality); and U.S. General Accounting Office (2000) (federal land swaps).