A view upriver from the Bradfield Ranch.  Bureau of Reclamation photo.   October 1974.

BLM_0035826

most popular hunting areas in all Colorado - ranking second in numbers
of deer hunters and third in elk hunters.

Winter recreation is limited almost exclusively to skiing and snow-
mobiling in the higher elevation areas of the Dolores River basin.
The new Telluride Ski Area, first opened in 1972, is projected as a
major winter sports area.  During the 1974-1975 season there were
62,500 skier visits here with a peak day of 1,051 skiers.  Projected
build-up would expand the area's capacity to 9,000 skiers per day.
Two smaller ski slopes in the basin are normally operated on a weekends-
only basis:  the Stoner Ski Area 15 miles northwest of Dolores and the
Dallas Divide Area 15 miles northwest of Placerville.  The latter area
did not open in 1974-1975.  A small potential winter sports site is
located near Dunton in the West Dolores Corridor.

Table II-5 gives a recreational participation profile of the basin in
1974.

The San Juan Mountain Range and the canyons of the Dolores River are the
renowned outstanding scenic resources of the basin.  The jagged San Juans
have been nicknamed the "Colorado Alps."  While not so well known, the
spectacular forested canyon of the Dolores River has been referred to as
the "Grand Canyon of the Dolores," and the enchanting desert Slick Rock
Canyon has been compared to the Glen Canyon of the Colorado which has
been inundated by Lake Powell.  Pastoral landscapes with imposing
mountain or desert backdrops are found throughout the basin.  Landscapes
rated as characteristic scenery within the basin context would be con-
sidered magnificent in other regions of the United States.  But there
are also extensive desert basins without physiographic or vegetative
variety.

## Cultural, Historic and Archaeologic Resources

The cultural, historic and archaeologic resources of the Dolores River
basin fall into two distinct categories:  those relating to prehistoric
and historic Indian occupations, and those relating to 19th century
white settlement of the area.

The Dolores River basin is almost archaeologically unknown.  Preliminary
surveys of the McPhee Dam area and the river corridor downstream for
about 30 miles, and of the river corridor from Slick Rock to Bedrock
have turned up a number of sites, most of them apparently related to the
Pueblo I Period (750 to 950 A.D.) of the Anasazi culture which reached
its height at Mesa Verde only 17 miles south of the town of Dolores.
In addition, four sites in the proposed McPhee Reservoir site produced
much earlier projectile points similar to a type dated around 7,000 B.C.

16

BLM_0035827

Table II-5.--Participation in Activity Days for Selected
Recreational Pursuits in the Dolores River
Basin 1974.  1/

| Activity | Colorado Resident Participation | Non-Resident Participation | Total Participation |
|---|---|---|---|
| Camping | 201,400 | 320,600 | 522,000 |
| Off-road Vehicles | 178,400 | 52,600 | 231,000 |
| Hiking and Mountain Climbing | 180,700 | 470,900 | 651,600 |
| Horseback Riding | 112,000 | 71,000 | 183,000 |
| Boating | 4,600 | 21,400 | 26,000 |
| Swimming | 93,800 | 19,100 | 112,900 |
| Playing Outdoor Games | 180,700 | 18,300 | 199,000 |
| Sightseeing | 306,500 | 452,900 | 759,400 |
| Picnicking | 96,100 | 371,500 | 467,600 |
| Skiing  2/ | 49,100 | 20,600 | 69,700 |
| Big Game Hunting  3/ | 31,300 | 35,200 | 66,500 |
| Small Game Hunting  3/ | 11,300 | 200 | 11,500 |
| Fishing  3/ | 96,200 | 28,200 | 124,400 |
| TOTALS | 1,542,100 | 1,882,500 | 3,424,600 |

1/  Except as noted below, data are derived from calculated
recreation participation in 1974 Interim Colorado
Comprehensive Outdoor Recreation Plan.

2/  Data provided by Forest Service, U.S.D.A., based on
estimates of actual use at three basin ski areas
noted in text.  Resident and non-resident use
allocations are Study Team estimates.

3/  Data provided by Colorado Division of Wildlife,
based on estimates of actual use.

BLM_0035828



This abandoned homestead in Dolores Canyon is one of several sites of more recent historical interest along the Dolores. May 1975.

BLM_0035829

BLM_0035830

Along Tabeguache Creek near Uravan on the east-central rim of the basin, caves containing stratified deposits have been investigated; fire pits, grinding stones and projectile points were found, but their provenance is uncertain. Petroglyph panels have been found at several sites in the Gateway area in the lower basin.

From these preliminary surveys, professionals have concluded that further extensive reconnaissance and excavation are warranted.

There are a number of sites in the basin at which relics of early-day mining and homesteading are preserved. At present Telluride is a designated Historic District, and the old Rico City Hall is on the National Register of Historic Places. These are but two highlights of the 19th century mining era whose remains are scattered throughout the San Juans in the upper end of the basin, and more sporadically in its lower reaches.

Remnants of early-day farming and ranching are less prominent and largely uninventoried. Narraguinnep Fort, 18 miles northwest of Dolores town, was built in 1885 to protect stockmen from marauding Ute Indians. The Fort, the Ecalate archaeological sites near the town of Dolores, McPhee (an old sawmill townsite about five miles from Dolores), and the site of Big Bend (an early, major settlement on the Dolores) may qualify for nomination to the National Register of Historic Places.

In 1776 the Escalante-Dominguez expedition crossed the Dolores River in several places, and is being commemorated with an interpretative sign program at various points in the basin.

18

BLM_0035831

BLM_0035832

CHAPTER III

DOLORES RIVER CORRIDOR DESCRIPTION

Preface

The following description of the Dolores River and its corridor presents a closeup view of a potential Wild and Scenic River Area (about 1/4-mile wide from either bank) and the lands associated with it in a visual corridor 1/2 to 2 miles wide.  Included is information on the various resources within the corridor, their uses, and existing or potential conflicts in those uses.  These are the basic data used by the Study Team in its subsequent evaluations.

The four segments designated for study by P.L. 93-621 are (1) the main stem from its source downstream to the town of Rico, (2) the West Dolores River from its source downstream to its confluence with the main stem, (3) the main stem from a point 1.3 miles below the site of McPhee Dam to 1 mile above State Highway 90, and (4) the main stem from its confluence with the San Miguel River to the Colorado-Utah State Line.

A. Review of the four segments follows:

Segment I - Main Stem From Its Source to Rico (15 Miles)

This mountainous reach of the river breaks into three distinct subsegments:

1) Headwaters Area (2 Miles) - The Dolores River rises at an elevation of over 11,600 feet in Tin Can Basin in the Western San Juans.  Here a number of alpine rivulets drop from Sliderock Ridge and join from the river's first definable channel, which slowly enlarges for 2 miles.  The Basin is a historic mining area. Several primitive roads climb to its south side; another crosses it to the river then parallels it for 2 miles before dead-ending.

2) Subalpine Area (4 Miles) - Here the Dolores is 10 to 15 feet wide as it meanders through an area of open parks surrounded by heavy stands of spruce and fir.  A National Forest trail follows the river.

3) Highway Area (9 Miles) - Six miles from its source, the Dolores meets another trail, the abandoned Rio Grande Southern Railroad grade, and Colorado State Highway 145, all of which parallel it for the next 9 miles to Rico.  There is also scattered evidence

19

BLM_0035833

of mining along this stretch, which above Snow Spur Creek flows
between high, steep banks and below becomes a meandering stream
with low banks and occasional riffles.  At several points, high-
way fill slopes have spilled into the river and altered its
course, but there are no impoundments.

Width of the Dolores along this reach varies from 20 feet at its
upper end to 35 feet at the highway bridge just north of Rico.  The
Main Stem Dolores map shows the location and extent of the visual
corridor of this segment.

## Segment II - The West Dolores (35 Miles)

This is also a mountain portion of the river system which traverses
four life zones.  It can be broken into three subsegments:

1) Headwaters Area (2 Miles) - The West Dolores rises among the
snowfields high in the eastern end of Navajo Basin in the Wilson
Mountains Primitive Area, at an elevation near 12,300 feet.  The
setting is extremely rugged - El Diente (14,159 feet), Mount Wilson
(14,246 feet), Gladstone Peak (13,913 feet), and a high, nameless
ridge (13,498 feet) ring the Basin with steep sidewalls and high
summits.  Toward the west end of this elongated alpine bowl, the
river flows through 10-acre Navajo Lake before dropping from the
tundra zone into a rolling subalpine forest.

National Forest trails, the remains of several small 19th Century
mines, and barely visible contemporary prospecting are the only
visual signs of man's activity here.

2) Subalpine Area (6 Miles) - Below Navajo Basin, the West Dolores
drops over a small waterfall and then tumbles through a rolling
area of conifers and numerous grassy peaks.  At the upper end of
this stretch, the river is 5 to 10 feet wide, banks are 10 to
30 feet high, and there is no flood plain or valley bottom.  Below
Kilpacker Creek, the terrain east of the West Dolores becomes
steeper and aspens more common.  The Navajo Lake Trail (National
Forest) follows the river, and there is an old cabin about midway
between Kilpacker Creek and Navajo Lake.

3) Lower Area (27 Miles) - Burro Bridge begins the third distinct
reach of the West Dolores, all of it paralleled by a graveled
Forest Service Road (No. 535).  From the old mining settlement of
Dunton onward, the river flows through a glaciated, U-shaped valley
a mile to a mile and one-quarter in width.  At Dunton, the West
Dolores is 10 to 20 feet across, and at the confluence with the
Main Stem Dolores River is 60 feet.  This is a meandering stretch
of the river with occasional riffles; streambanks are low.

20

BLM_0035834

MAIN STEM - HEADWATERS TO RICO



WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2=1 Mile

0    1    2    3 Miles

National Forest Land

National Resource Land

Private Land

Visual Corridor

BLM_0035835

BLM_0035836

Dwellings, barns, and ranch buildings, three National Forest
campgrounds, fences, two picnic grounds, and croplands are all
visible from the lower West Dolores; State Highway 145 crosses
it a quarter-mile from its confluence with the main stem. All
told, nine road bridges cross the river; approximately 10.5 of
its 35 miles flow through private land. Maps 1 and 2 show the
location and extent of the visual corridor of this segment.

Segment III - Main Stem from McPhee Damsite to Bedrock (105 Miles)

This is a long, diverse stretch of the Dolores, beginning in the
low foothills of the San Juans and ending on the high desert of the
Colorado Plateau. The natural flow of the Dolores River is charac-
terized by relatively high flows during snowmelt and low flows during
the remainder of the year. Natural low flows are diminished by irri-
gation diversions of the Montezuma Valley Irrigation Company. The
Dolores Project will have the further effects of reducing high flows
and increasing low flows to provide year-round flows for fish and
wildlife purposes.

On the basis of natural features, access, and physical characteris-
tics, this segment can be divided into four distinct parts:

1) McPhee Dam to Bradfield Ranch (11 Miles) - This is a gentle,
   pastoral stretch of the Dolores. In the spring, riverflow is
   moderate (2 to 3 mph at 2,000 cfs), with no rapids and only a
   few splashes of white water. The valley floor is from one-quarter
   to one-half mile wide, about 8 miles of it privately owned ranch-
   land. During the spring, summer, and fall, livestock graze the
   pasturelands; native hay is harvested in late summer. Ranch build-
   ings, fences, and Forest Service Road No. 504 are all visible from
   the river, but there is no evident mining activity in the immediate
   river corridor. Cottonwoods, willows, and shrubs grow along the
   river bottoms, with steep, conifer-covered mountains rising from
   600 to 1,000 feet on either side.

2) Bradfield Ranch to Disappointment Creek (41 Miles) - For several
   miles, the river continues to flow easily through a small valley
   before beginning to sink into Dolores Canyon, the first of five
   on the lower study segments. Riverflow picks up (3 to 4 mph at
   2,000 cfs), and the first rapids of consequence appear. The
   canyon remains varied as it grows deeper; the walls are variously
   sloping, stairstepped, or sheer. Red and tawny sandstone predomi-
   nates, often broken into many irregular outcrops. Height from
   river to rim ranges from 1,200 to 2,300 feet. Overstory vegeta-
   tion is mainly conifers - tall ponderosa pine on the stream
   terrace and pinon-juniper woodland above.

21

MAP I



WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2 = 1 Mile

National Forest Land

National Resource Land

Private Land

Visual Corridor

BLM_0035838



MAP 2



WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2"=1 Mile

0    1    2    3 Miles

National Forest Land

National Resource Land

Private Land

Visual Corridor

BLM_0035839

Snaggletooth Rapids is the major white-water stretch on this
segment; in a run of 400 yards, the river drops approximately
20 feet through channel irregularly studded with boulders that
have broken away from the canyon wall above. It is a difficult,
challenging rapid, no matter what the riverflow, and is more
often portaged than floated. The Dolores moves briskly from
here on for a number of miles (4 to 7 mph at 2,000 cfs); below
Snaggletooth is a demanding, intermittent sequence of lesser
rapids, all of them requiring tricky, technical maneuvering.

Dolores Canyon remains deep until 5 miles below Horseshoe Bend;
the walls and slopes then gradually taper downward until the rim
is but 600 feet above the river. Scenic quality along this entire
stretch is high, especially because of the stark, dramatic, and
varied geology. Wildlife is typical of the region, but more
concentrated along the river because of the generally arid land
bordering the Dolores. Mule deer, coyotes, songbirds, waterfowl,
and raptors are commonly seen on spring river trips. A number of
archeologic sites have been inventoried along this subsegment,
including a cliff dwelling tucked beneath a rock outcrop near
the tip of Mountain Sheep Point.

Downstream from Bradfield Ranch, traces of ranching activity
including cattle, fences, sheds, and corrals are evident for
about 4 miles. A powerline is intermittently visible on the
skyline of the west canyon rim. It crosses the river about
9 miles downstream of Bradfield Ranch. Further down, the town
of Dove Creek has a water pumping plant on the river's west bank.
From Horseshoe Bend on, signs of uranium mining activity appear
sporadically on the high canyon rims.

3) Disappointment Creek to the bridge at Little Gypsum Valley
(20 Miles) - This is a varied subsegment, beginning with a
narrow valley, pinching in to a tight canyon, and finally
opening out into a broad, pastoral valley.

The stretch from Disappointment Creek to below Poverty Flats is
a narrow valley rolling away to hills and mesas on either side.
Sandstone walls still intermittently line the river, but their
color pales from red to tan; vegetation is more sparse. The
small settlement of Slick Rock lies near the midpoint of this
stretch; here the lands above shore are moderately developed
by Western standards. This is a historic uranium mining area;
signs of substantial activity are evident on hillsides and
escarpments at Slick Rock. Three bridges span the river, one
of them for State Highway 141, the only paved road on this
entire 105-mile segment. In addition, there is a post office-
cafe-gas station, a natural gas compressor plant, the remains

BLM_0035840



A raft drops into the **upper** end of Snaggletooth Rapids in Dolores Canyon.
May 1975.

BLM_0035841

BLM_0035842

of a uranium ore concentration plant, plus cabins, sheds, trailers, and rusted car bodies and other debris.  Alfalfa fields dot the valley bottoms.

Riverflow here decreases to 2 to 3 mph at 2,000 cfs, and from here on heavy silt loads from the erosive soils of the Disappointment Creek drainage degrade water quality.  A few road fills encroach on the river near Slick Rock.

Two miles below Poverty Flats, the Dolores slides abruptly into a 6-mile long scenic, red-walled canyon with many striking cliffs, buttresses, and intricate and irregular sandstone facets. The rust color of the rock contrasts sharply with the green of the vegetation.  Tamarisk, cottonwoods, and box elder grow near the shore; pinon and juniper further back.  No intrusions are visible from the river along this reach.

Below comes another sharp visual contrast as the Dolores meanders into Gypsum Valley, a broad, pastoral area of relaxed, rolling scenery and a distant vista west to the snowcrested La Sal Range, over 20 miles away in Utah.  Large cottonwoods line the river and ranching and mining activity dominate the valley.  An improved county road parallels the river on the bank for several miles. There are several petroglyph sites of archeological interest in this valley.

4) Slick Rock Canyon (33 Miles) - Beyond Gypsum Valley, the Dolores makes an S-shaped bend and drops suddenly into a massive, narrow, twisting, red sandstone gorge.  Slick Rock Canyon is usually considered the most scenic on the entire river; partisans also note that it is one of the outstanding reaches of desert river canyon left in the Southwest - reminiscent of the now flooded Glen Canyon on the Colorado River - even though it can be floated for only a short time each year.  Depth from river to rim varies between 600 and 1,800 feet, and the rims are often only one-quarter mile or less apart.  The red walls may be streaked with blue-black "desert varnish," smooth and sheer, or cracked and fractured into arrays of fantastic shapes and color.  Tamarisk is often thick along the shore; beyond are thinner stands of pinon and juniper wherever the terrain is level enough and the soil adequate for them to take root.  At one point, the river flows under a large, arching overhang; at many others, it bends, loops, twists, and doubles so that all sense of direction, distance, and time is lost.  Three major side canyons mysteriously beckon, offering opportunities for rewarding hikes.

23



The sheer walls of Slick Rock Canyon dwarf raft and river.  May 1975.

BLM_0035844

MAP 3



WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2=1 Mile

National Forest Land

National Resource Land

Private Land

Visual Corridor

BLM_0035845



MAP 4

WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2=1 Mile

National Forest Land

National Resource Land

Private Land

Visual Corridor

BLM_0035846

MAP 5



WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2 = 1 Mile

National Forest Land

National Resource Land

Private Land

Visual Corridor

BLM_0035847



MAP 6

WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

BLM_0035848

MAP 7



WILD AND SCENIC RIVER STUDY
DOLORES RIVER BASIN
COLORADO AND UTAH
VISUAL CORRIDOR

SCALE: 1/2=1 Mile

National Forest Land

National Resource Land

Private Land

Visual Corridor

Spring riverflow in Slick Rock Canyon is slow - only 2 to 3 mph at 2,000 cfs - with no rapids, only an occasional riffle, one chute, and many long, lazy stretches. A dirt road parallels the Dolores on the west for 3.5 miles upstream from Bedrock; otherwise Slick Rock Canyon is wild and inaccessible by vehicle of any kind.

Maps 3, 4, 5, and 6 show the location and extent of the visual corridor in this segment.

### Segment IV - San Miguel River Confluence to the Colorado-Utah State Line (39 Miles)

The lowest study segment of the Dolores breaks naturally into two reaches - one long, the second comparatively short.

1) From the San Miguel-Dolores confluence for 31 miles downstream to the State Highway 141 bridge at the town of Gateway, the river flows through another varied sequence of landforms. The first 4 miles drop through a deep, scenic, red sandstone canyon with several brisk rapids; the remainder is a broader valley - U-shaped and known either as Red or Mesa Canyon. By comparison, this is a heavily developed portion of the river. The upper reaches have seen scattered mining activity - both for gold and for uranium; access roads, prospects, tipples, and powerlines are all visible from the river though generally dwarfed by the natural landforms. The lower two-thirds of this reach was heavily homesteaded and is now mostly farm and/or ranch along the river bottoms. Colorado Highway 141 parallels the Dolores for 29 of these miles.

2) From Gateway to the Colorado-Utah line - 8 miles - the river flows through a broad, arid valley; red sandstone cliffs bound it nearby on the west, but to the east they are more distant. Tall, twisted cottonwoods dominate parts of the shoreline; beyond is a combination of sage and salt desert shrubs. Streamflow is moderate (3 to 5 mph at 2,000 cfs), with several easy rapids followed by "The Narrows" at the State Line. The latter is the longest rapid on the river and is fully as challenging as Snaggletooth. Near Gateway, a high, narrow butte - the Palisade (or sometimes "Knife Edge") - is the dominant landform. From the State Line, the Dolores flows another 22.5 miles before emptying into the Colorado River near Cisco, Utah.

Dirt roads used in local ranch operations parallel this reach of the river on both sides. Range cattle, fences, and occasional sheds are also visible from the river. Maps 6 and 7 show the location and extent of the visual corridor of this segment.

24



The rapid known as "The Narrows" begins right at the Colorado-Utah state line.   May 1975.

BLM_0035851

B.   Geology and Physiography

Sedimentary rocks exposed in the Dolores River Canyon range from
Upper Devonian to Late Cretaceous in age.  Because the layers dip
gently westward from the San Juan Mountains, many of the same forma-
tions are exposed throughout the length of the canyon.  The Cretaceous
Burro Canyon Formation, Dakota sandstone, and Mancos shale underlie the
surface of the mesas and canyon rims and can be seen as outcrops along
the West Dolores and in Slick Rock Canyon.  These locations are 60 air
miles apart and have an elevation difference of 2,000 feet.

All told, the rock sequence exposed along the river corridor covers
a time span of 250 million years.  The oldest are the limestones and
early sandstones of the Pennsylvanian period; the youngest are the
tuffs and breccias formed during the last burst of tertiary volcanism -
perhaps 50 million years ago.  Neither Canyonlands, Zion, nor Bryce
Canyon National Park has rock exposures that represent such a long span
of time.

The following review touches on some major geologic and physiographic
features of the Dolores River corridor:

Segment I - Main Stem, Headwaters

From its source above timberline along Sliderock Ridge, the main
stem of the Dolores drops approximately 3,000 feet in only 15 miles.
Though the relief is extreme, this is not a dramatic mountain area
as are many others in the San Juans.  Where the Dolores joins State
Highway 145, the corridor is about 1 mile wide.  It is rolling
meadowland rising steeply to conifer-covered mountains, with a
view north toward the Wilson Mountains Primitive Area.  Below this
point, the river drops quickly into a narrow, U-shaped canyon.

The upper end of the headwaters reach of the Dolores is underlain
by sedimentary rocks intruded by stocks, laccoliths, dikes, and
sills.  Near Rico, the dominant structural feature is the Rico Dome,
roughly circular and up to 15 miles across; here Precambrian sedi-
mentary and metamorphic rocks were intruded by volcanic stocks and
sills and finally folded by faulting.

Segment II - West Dolores

The West Dolores heads among two of the westernmost volcanic land-
marks in the San Juan Mountains - the Wilson and Dolores Peak stocks.
Navajo Basin is a deep, mile-wide glacial bowl gouged from the west
flank of the former, its nearly vertical walls rising as much as
2,100 feet from floor to rim or summit.  From this source, the river

25



The Dolores River ranks high in geologic interest.  Here differential erosion shows in a wall of Entrada sandstone in Slick Rock Canyon.  Scour marks show height and power of water in flood times of ages past. May 1975

BLM_0035853

drops close to a vertical mile during its 35-mile course; for 27 of those miles it flows through a U-shaped valley ranging from 1,200 to 1,500 feet deep and 1 to 2 miles wide.

Six sedimentary formations are exposed along the West Dolores and its tributaries - the oldest, the Permian Cutler Formation (deposited about 275 million years ago); the youngest, the Late Jurrasic Morrison Formation (laid down approximately 150 million years ago). In the headwaters area, thick zones of Mancos shale and Telluride conglomerate are stacked over these earlier strata; all these layers were intruded by tertiary volcanic stocks, dikes, and sills. Below the headwaters area of the West Dolores, intrusives of the same general age underlie Black Mesa and the southern slopes of Groundhog Mountain.

## Segments III and IV - McPhee to State Line (Excluding Paradox Valley)

After flowing generally southwest out of the San Juans, the river makes an abrupt bend near the town of Dolores and angles north-northwesterly toward Utah. A sequence of five canyons is the dominant physiographic feature of this 150-mile reach of the river; the canyons are separated by a series of structural valleys alined along local synclines and anticlines. Especially in the two largest canyons, the Dolores has cut through 2,000 feet of relatively flat-lying sedimentary strata from the Cutler Formation to the Early Cretaceous Dakota sandstone (deposited about 130 million years ago). In so doing, the river has exposed an imposing geologic clock - a record of what happened in this region over nearly incomprehensible time periods.

Dolores Canyon (on the upper part of Segment III, where the foothills of the San Juans merge with the high desert) reaches a maximum depth of 2,300 feet not far below Snaggletooth rapids. Its width varies from 3/4 to 1-1/2 miles; its walls are usually either steep slopes or stairstepped. Slick Rock Canyon (on the lower part of Segment III in the desert province) is never deeper than 1,800 feet but is very narrow - only 1/4 to 3/4 mile across - often with nearly vertical walls. The three other canyons studied are less dramatic in relief - a small canyon between Poverty Flats and Gypsum Valley; a short, tight canyon at and below the confluence with the San Miguel; and Red Canyon (or Mesa Canyon) which extends from 4 miles below the confluence to Gateway.

26

BLM_0035854



The Dolores River carves its deepest canyons through the tablelands of
the Colorado Plateau.  Slick Rock Canyon above Bedrock, May 1975.

BLM_0035855

Structural features along these two segments are dominated by a
series of northwest-trending synclines and anticlines - the most
prominent of these lying along Disappointment Creek, Gypsum Valley,
and Paradox Valley.

Exhibit 3 is a cutaway view showing the strata exposed along the
lower portions of Dolores Canyon at the Dolores-San Miguel County
line.  A list of the geologic strata found in the river corridor
appears in Appendix I of this report.

## C.  Soils

Though seven distinct soil types are present in the Dolores River
corridor, by far the most prominent is the rock outcrop-shallow soil
complex of the canyons.  This type dominates all the way from the
McPhee Dam area, downstream to the Colorado-Utah State Line.  Above
McPhee, three mountain soil types border the river; a combination of
dark soils with light subsurface horizons is the most common.

The rock outcrop-shallow soil type of the canyons has a low water-
holding capacity (i.e., runoff is rapid and erosion can be severe);
it yields from less than 0.2 to 1.0 acre-foot of sediment per square
mile per year.  Another 45 percent of this type is bare rock, mainly
sandstone.  Another 49 percent is thin soil, loamy and light colored
on the surface, overlying sandstone.  Because of the many steep slopes
and its general shallowness, this is seldom an economically productive
type.  Where it lies in wide valleys, a few irrigated hayfields occur.
Otherwise, the dominant ground cover is pinon-juniper at lower eleva-
tions and oakbrush, serviceberry, and grasses higher up.

The predominant dark-colored mountain soil type is high in organic
content, deep, and neutral to acid.  It is economically productive,
but the short growing season at these higher elevations generally
limits crops to hay and pasture.  Spruce, fir, ponderosa pine, oak-
brush, aspen, and grasses grow abundantly on this type.

Table II-1 in Chapter II gives an overview of the soils of the Dolores
River corridor, relating them to both the physiography and climate of
the larger basin.

## D.  Vegetation

Vegetation along the Dolores River is generally typical of the five
Western life zones through which it flows.  However, two features
combine to produce distinctive local plant communities within those
zones.  First, on the stream terraces, water from the river and

27

Figure 3

## GEOLOGIC SECTION

perpendicular to the Dolores River where it crosses the
Dolores County–San Miguel County line



HORIZONTAL SCALE 1:24,000



VERTICAL SCALE EXAGGERATED TWO TIMES

ANDREW F. BATEMAN, JR.

BLM_0035857





The Dolores River Canyon from Glade Point.   Pinon pine and
juniper cover the dry slopes and rim while large ponderosa
pine thrive along the river.

A pinon pine in Dry Canyon near McPhee Dam
estimated to be about 900 years old.

BLM_0035858

related aquifers permits a greater (and slightly different) variety
of growth than that found where rainfall and groundwater are the only
sources.  Secondly, the abundance of north and south facing slopes
creates situations where there are visible vegetative differences
from one side of the river to the other.  Particularly in the upper
reaches of Segment III in the Dolores Canyon, these factors make for
the simultaneous presence of communities normally not found so closely
and intricately intermingled.

Information on Plants of the Dolores River Basin, Colorado, Which May
be Candidates for Threatened or Endangered Listing by the Department
of the Interior and Candidates for Rare and Endangered Status by the
State of Colorado

The Federal Register 40(127, V), page 27847, (Appendix H-27 of this
report) contains a list of 23 endangered and 17 threatened candidate
plant species in Colorado, as determined by the Smithsonian Institute.

Appendix H of this report (page H-16, et seq.) lists several plant
genera for which species are indicated in the Federal Register notice,
to wit:  Senecio, Arabis, Lesquerella, Stellaria, Astragalus, Oxytropis,
Trifolium, Phacelia, Eriogonum, Aquilegia, Mertensia, and Draba.  It
remains to be determined whether the species listed in the Federal
Register and especially those of the above-noted genera occur within
the Dolores River Basin and the wild and scenic river study area.

Also, Carex microptera is mentioned in Appendix H, and Carex microptera
var. crassinervia is in the Federal Register notice.  The presence or
absence of the variety in the basin and study area remains to be
determined.

According to Dr. William A. Weber, University of Colorado Museum,
Boulder, Colorado, who has prepared a draft list of rare and endangered
plants of Colorado, Adiantum capillus-veneris and Bothriochloa barbinodis
are found in the Dolores Basin, and Mentzelia pterosperma and Mimulus
eastwoodiae are likely to be in the basin.  Dr. Weber has indicated that
the cliffs of the Dolores River area are not well known botanically
because of their poor accessibility on foot.  Thus, the area might have
significant "hanging gardens" containing important floral elements.

Segment I

Vegetation along the main stem from its headwaters to Rico is
typically alpine and subalpine.  Along Sliderock Ridge, fingers
of Engelmann spruce and subalpine fir reach upward along the river
to tree limit.  Scrub willow is also common, especially along the
river and in wetter areas.  Below the headwaters, growth is about

28

BLM_0035859

half forest and half open parks; aspen becomes more common.  From
Snow Spur Creek down to Rico, the Dolores flows through a narrow
bottom, mostly meadow, with occasional clumps of conifers.  Other
typical vegetation is grasses, sedges, and mountain wild flowers.

## Segment II

The 35-mile West Dolores takes in the greatest vegetative diversity
of the four study segments.  Its headwaters, high in Navajo Basin,
appear almost above the alpine tundra zone; at 13,000 feet there
is little growing, save lichen on rock.  As one descends toward
Navajo Lake, diminutive grasses, sedges, and flora become more
common in the sandy soils between boulders.  From these elevations
down to Dunton, growth along the West Dolores is generally similar
to that of the main stem above Rico, but below Dunton (elevation
about 8900 feet), species typical of the montane zone begin to
dominate.  Douglas-fir, ponderosa pine, white fir, and cottonwoods
all appear, as do bitterbrush, mutton grass, junegrass, needlegrass,
serviceberry, mountain mahogany, and other grasses and shrubs.  At
the mouth of the West Dolores (elevation 7380 feet), vegetation
includes cottonwood, aspen, willow, alder, wildrose, bindweed,
virgins bower, fireweed, grasses, and sedges.

All told, this river corridor traverses four distinct life zones.

## Segment III

The Dolores River from the McPhee Damsite to Bedrock takes in only
two life zones - foothills and Upper Sonoran - with lower remnants
of montane communities on some of the high canyon slopes.  Elevation
at McPhee is approximately 6700 feet; at Bedrock it is 4980 feet.

The Dolores Canyon below Bradfield Ranch is one of the least
disturbed areas studied.  Here vegetation comes close to reflecting
that of primitive conditions.  In a few areas, livestock use has
modified the natural ecosystems.  In the upper portion of the canyon,
imposing stands of virgin ponderosa pine, many of them over 120 feet
tall, dominate the stream terrace, with an understory of oakbrush,
shrubs, and grasses.  Lower in Dolores Canyon, the ponderosa thin
out, giving way to cottonwoods and an occasional box elder.  Back
from the stream terrace, juniper-pinon woodland is by far the most
common type.

From Disappointment Creek through to the end of this segment, Upper
Sonoran vegetation prevails.  The first streamside tangles of
tamarisk appear, growing progressively more dense as elevations drop.
Cottonwoods remain the dominant tree, especially notable in large
groves in Gypsum Valley.  In Slick Rock Canyon, juniper and pinon

29



Shorebirds (Wilson's phalaropes) typify the birdlife found along the Dolores
River.  Photograph taken below the settlement of Slick Rock.  May 1975.



A wide-angle view of the walls of Slick Rock Canyon.  Note the beginnings of a
natural arch just to the left of the center of this photo.  May 1975.

BLM_0035861

are the only trees of any significance; these stubby, often gnarled trees appear to grow wherever there is enough soil for seeds to take root, sometimes in improbable niches and on ledges far up the face of cliffs.  Understory is a varying combination of grasses, sage, some browse shrubs, cactus, yucca, etc.

Segment IV

From the confluence of the San Miguel to the State Line, the basic Upper Sonoran communities continue, with an increase in irrigated cropland above Gateway and in salt desert shrub cover below.  Large cottonwood groves dominate the shoreline near Gateway.  Common plants include pinon pine, juniper, prickly pear, greasewood, and shadscale.

A comprehensive list of the plants found in the Dolores corridor appears in Appendix H of this report.

E. Fish and Wildlife

Fish and wildlife in the Dolores River corridor are generally abundant and varied.  Species common to all five of the river's life zones may be found.  Some, like the mule deer, mountain lion, beaver, and coyote, appear in all the Dolores' environments; others, like the bighorn sheep, ptarmigan, various lizards, and trout, are confined to more specialized zones.

1. Fish

Historically, the Dolores was once an excellent trout fishery from its headwaters to Slick Rock and a notable catfish fishery below. However, in the last 90 years, mining, water diversion, road construction, and channelizing have decimated significant parts of the river.

Segment I

The main stem to Rico is a good fishery though, after the river joins State Highway 145, spills and slumps from road construction destroy some of the habitat.  Species of trout caught here are cutthroat, brook, brown, and rainbow.  The Colorado Division of Wildlife stocks this segment with trout to supplement natural reproduction.

Segment II

From Navajo Lake to Dunton, the West Dolores supports an excellent trout fishery; stream conditions are conducive to natural reproduction, and cutthroat, rainbow, and brook trout are all present.

30

BLM_0035862



BLM_0035863

Below Dunton, the fishery is good all the way to the mouth.  Brown trout become more common at lower elevations.  Some of the private lands below Dunton are closed to fishing.  The Colorado Division of Wildlife currently stocks rainbow and cutthroat trout in both Navajo Lake and the West Dolores.  About 5,000 pounds of trout are stocked yearly; they average three to four per pound.

## Segment III

The fishery from the McPhee Damsite to Bedrock is now marginal, at best, due to diversions of the Montezuma Valley Irrigation Company.

Despite its seasonal depletion, this segment of the Dolores does support fish year round in its deeper holes.  A 1973-1974 Colorado Division of Wildlife survey of the waters between McPhee and Slick Rock turned up the following:  black bullhead, green sunfish, brassy and flathead minnow, dace, flannelmouth sucker, roundtail chub, red shiner, and carp.  Brown trout are present, and until recently channel catfish were abundant in the Dolores from Slick Rock to Bedrock.

Development of the Dolores Project, with provisions of a year-long flow from McPhee Dam, will restore the fishery along this segment.

## Segment IV

Historically, a warm water fishery existed in this segment of the river.  The river was considered habitat for three endangered fish species of the Upper Colorado River Basin - the humpback sucker, the bonytail chub, and the Colorado squawfish.  In addition, truck-loads of channel catfish were taken from the river at Gateway for transplanting elsewhere in Western Colorado.  However, the rise of the uranium-vanadium industry near Uravan in the late 1950's virtually destroyed the fishery on the lower San Miguel and on the Dolores, downstream from their confluence.  Discharges of radioactive matter, toxic metals, and ammonia from ore processing facilities triggered this decline; these sources are now being progressively controlled so that fish and other aquatic life will return to the affected waters.

31

BLM_0035864

2. Wildlife

As noted in Chapter II, the entire Dolores River Basin is an excellent
wildlife area.  The river corridor reflects this, often in an intensi-
fied way, since the streamflow tends to create a richer "ribbon of life"
(riparian habitat) along the river terrace and also serves many species
directly as a drinking source.

Wildlife species along the four study segments are generally typical
of the five life zones found here.  A complete inventory of animals
and their current status appears in Appendix H of this report.  This
inventory includes one mammal, the marten, and two bird species, the
golden eagle and ferruginous hawk.  The Department of the Interior has
been requested to consider whether they are threatened species.  Such
a review is now underway.  Also, two of the bird species in the
inventory--the southern bald eagle and the peregrine falcon--are on
the Department of the Interior's endangered species list.

Two of the three known colonies of a butterfly, the nokomis Fritillary
(Speyeria nokomis nokomis), are found in Colorado.  The third colony
is in Utah.  This butterfly is a candidate for the Department's
endangered fauna list.  These two colonies occur within the Dolores
River Basin near two tributaries of the Dolores River:  above West
Creek in a series of springs in Unaweep Canyon (Mesa County); and
adjacent to Paradox Creek in Montrose County.  The species may be
found in the study area, but this has not yet been determined.

The following review highlights some of the more important and/or
unique wildlife populations, communities, and uses in the four study
segments.

### Segments I and II

The upper main stem and the West Dolores serve as spring, summer,
and fall habitats for deer, elk, bighorn sheep, bear, and smaller
animals.  Important elk calving areas lie along the West Dolores
and several of its tributaries; marginal elk winter range (usable
in low snowfall years only) is present along the lower part of
this segment and also on Stoner Creek near Dunton.

### Segment III

From the McPhee Damsite downstream to Disappointment Creek, the
Dolores flows through plant communities of the foothills zone.

32

BLM_0035865

This is an area of critical winter range both for deer and elk, and six heavily used elk migration routes cross the river between the town of Dolores and the Bradfield Ranch. Black bears appear to concentrate near Dolores and from Bradfield Ranch to the Dove Creek pumping plant. Principal mountain lion areas are near Dolores and 7 miles upstream from Slick Rock. Golden eagle aeries have been noted in Dolores Canyon.

Below Disappointment Creek, the Upper Sonoran communities of the high desert take over, and the variety and number of species decreases in these less supportive ecosystems. Here the riparian area is of increased importance. Mule deer are often year-round residents of the river bottoms and adjacent lands, seldom migrating to higher elevations in the warm months. Mountain lions prey on these deer and exist in stable numbers; numerous abandoned mines provide good denning sites. Fur bearers and nongame species occur in this area.

Segment IV

The Upper Sonoran zone continues below the confluence with the San Miguel, and wildlife communities remain generally similar to those immediately upstream. Near Gateway, large cottonwood groves are used by nesting great blue herons. Bald eagles winter here.

This is by no means an exhaustive review of the wildlife of the Dolores River corridor. Rafting and/or hiking Segments III or IV, for example, are almost invariably rich wildlife experiences because numerous wildlife species are attracted to the river corridor.

33

## F. Waterflow

Natural flow in the Dolores River is erratic, with a high spring
runoff followed by moderate to low summer flows and low discharges
in fall and winter.  Stream-gaging records at Dolores (USGS No. 1665)
show that about 33 percent of the total annual runoff occurs during
May, the month of largest runoff, and about 72 percent occurs during
the 3-month period April through June.  Daily climatic variations
often cause significant short-term flow variations - a warm spell in
the spring will accelerate runoff, while a cold snap will slow it;
likewise, intense summer showers can sometimes cause flash flooding,
especially on the lower segments where soils hold water poorly.

### Segment I

The main stem above Rico is narrow, shallow, and not floatable.
The stream gradient here averages just under 200 feet per mile.
A stream-gaging station (USGS No. 1650) is located 2 miles below
Rico.  The discharge at this station during May and June, the
months of peak runoff, averages 470 cfs, while the discharge
during July through September averages 110 cfs.  The mean dis-
charge is 130 cfs, and the average annual discharge is 95,600
acre-feet, or about 13 percent of total undepleted water supply
from the Dolores River Basin.

### Segment II

The West Dolores is larger than the upper main stem, but still
not a floatable river.  Stream gradient from Navajo Lake to
Burro Bridge is 399 feet per mile; below, it is 67 feet per mile.
A stream-gaging station (USGS No. 1660) was established and
maintained near the river's mouth from 1941 to 1944.  Flow during
the spring runoff in this period averaged about 640 cfs.  It
averaged only 130 cfs during July through September.  Annual
discharge was about 139,200 acre-feet.  These data are the best
available and are believed to be very representative of the
river today.

### Segment III

Below the McPhee Damsite, the stream gradient decreases.  From
the Bradfield Ranch to Slick Rock, the river drops 24 feet per
mile; from Slick Rock to Bedrock, only 11 feet per mile.

BLM_0035867



Figure 1

AVERAGE MONTHLY DISCHARGE
DOLORES RIVER
WATER YEARS 1939-1952

At Dolores

Near McPhee

BLM_0035868

Flows of the Dolores River in this segment are affected by irrigation diversions made both upstream of and along this segment. Largest of these water users is the Montezuma Valley Irrigation Company (MVIC), which has absolute water rights as follows: 707.7 cfs for irrigation and 100 cfs for domestic use. In addition the Company has a conditional decree for 592.3 cfs for irrigation. The MVIC diversion point is located just below the town of Dolores and just above the beginning of this segment. The effects of these diversions are most noticeable during July through September. During May and June the irrigation requirements are relatively small while the flows are relatively large, but during July through September the irrigation requirements are relatively large and the flows are small. Figure 1 compares the Dolores River flows at Dolores (USGS No. 1665) above the MVIC diversion with flows at McPhee (USGS No. 1675) below the diversion and also shows the seasonal variation of its natural flows.

Streamflow records at McPhee are available from 1939 to 1952 and can be considered representative of existing conditions at the upper end of this segment. During May and June mean discharge was 1,480 cfs, while the mean discharge from July through September was 70 cfs. The effect of MVIC diversions on the July through September flows is apparent. The average annual discharge was 403 cfs, or 292,000 acre-feet.

This segment is the most popular white-water rafting and kayaking reach of the river, but these activities are normally possible only in May and June. Studies performed by the U. S. Bureau of Reclamation show that, on the average, launching days have occurred 13 days during the year. This is an average figure; the actual number of launching days in any one year varied from none to more than 50, depending on winter snowpack and the rate at which it melted. Launching days were counted when the flows were between 1,000 cfs and 2,500 cfs for 5 consecutive days or more. Days when flows exceeded 2,500 cfs were not counted.[1]

Segment IV

From its confluence with the San Miguel, the Dolores drops almost lazily at a rate of 10 to 15 feet per mile. Waters from the San Miguel measurably increase the size of the Dolores, with an average annual discharge of 251,000 acre-feet (USGS No. 1770). Average flow of the San Miguel is 925 cfs during spring runoff and 74 cfs in January. At Gateway, the flow of the Dolores averages 2,830 cfs during spring runoff and 187 cfs in January.

---

[1] These days were not counted because of hazardous conditions created by flows exceeding 2,500 cfs. Management agencies cannot encourage boating use under these conditions.

35

BLM_0035869





Running Snaggletooth Rapids

BLM_0035870

G. Water Quality

A purpose of the Wild and Scenic Rivers Act is to protect the water
quality of designated rivers (Section 1(b)).  The Act also specifies
that Wild River areas will have waters that are unpolluted (Section
2(b)(1)).  The guidelines for evaluating wild and scenic rivers further
state that all rivers included in the national system should meet the
"Esthetics - General Criteria" as defined by the National Technical
Advisory Committee (NTAC) on Water Quality report entitled Water
Quality Criteria, 1968, and that rivers can be designated Wild River
areas only if they also meet the minimum criteria for primary contact
recreation, except as the criteria might be exceeded by natural
background conditions.

A subsequent report published by NTAC entitled Water Quality Criteria,
1972, which supersedes the 1968 report, includes a discussion of water
quality requirements for specialized recreation.  One conclusion of
this report is that "water quality supportive of general recreation
is adequate to provide for the intended uses of wild and scenic rivers.
Water suitable for general recreation should be esthetically pleasing,
free from chemicals in concentrations as to be toxic to man if small
quantities are ingested, and they should not contain chemicals in such
concentrations as to be irritating to the skin or mucous membranes of
the human body upon brief immersion.  No recommendation is given con-
cerning microbiological qualities because in most cases gross micro-
biological polluted waters will be accompanied by other foreign sub-
stances of such magnitude as to cause the water to be esthetically
unacceptable.  Microbiological pollution is one of the main indicators
that untreated or inadequately treated human wastes are entering the
water course.  In addition to the requirements for general recreation
water, quality for primary contact recreation, such as swimming, has
special requirements.  For example, the water should not cause an
appreciable decrease in the deep body temperature of swimmers.  Waters
should not irritate the eye.  For swimming waters, this irritation is
minimized if the pH is within the range of 6.5 and 8.3; however, where
waters naturally exceed this pH a range of 5.0 and 9.0 may be tolerated.
Also, swimming waters should be clear enough for users to estimate
depth and to see subsurface hazards easily and clearly.  Table III-1
shows the thermal limitation of waters.

36



Rafting in Slick Rock Canyon, May 1975.

BLM_0035872

Table III-1

LIFE EXPECTANCY IN WATER

(Expected duration in hours for adults wearing life
vests and immersed in waters of varying temperature)

| Duration hours | Temperature of the Water | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 32° F 0° C | 41° F 5° C | 50° F 10° C | 59° F 15° C | 68° F 20° C | 78° F 25° C | 86° F 30° C | 95° F 35° C | 104° F 40° C |
| 0.5 | M | M | S | S | S | S | S | S | M |
| 1.0 | L | M | M | S | S | S | S | S | L |
| 2.0 | L | L | M | M | S | S | S | S | L |
| 3.0 | L | L | L | M | S | S | S | S | L |
| 4.0 | L | L | L | L | M | S | S | S | L |

L = Lethal, 100 percent expectancy of death
M = Marginal, 50 percent expectancy of unconsciousness,
      probably drowning
S = Safe, 100 percent survival

Adapted from tables by Pan American Airways and others.

One of the most important indicators of a health hazard in water is its
microbiological quality. Although Water Quality Criteria, 1972 does not
recommend a specific limit on this parameter, Colorado standards for
waters that will be used for body contact state that bacteriological
concentrations shall not exceed a geometric mean of 200 coliform groups
per 100 milliliters from five samples obtained in a 30-day period.  These
standards are slightly more stringent than U. S. Public Health Service
standards.  Mean coliform groups at Dolores, Bedrock, and Gateway have
averaged 55, 24, and 39 groups, respectively, indicating bacteriologically
good quality water.  Table III-2 shows the water quality parameters for
the Dolores River segments.

Specific standards for toxic or poisonous substances have not been
formulated for recreational waters; however, if the water is safe to
drink, then it should be safe for swimming.  Except for dissolved solids
concentrations below Paradox Valley and occasionally manganese from the
San Miguel, toxic or poisonous substances are either absent or occur in
such small concentrations that U.S. Public Health Service drinking water

37

BLM_0035873

standards are not violated.  The dissolved solid standard is based upon the laxative effect to persons unaccustomed to drinking such water. High concentrations of manganese (greater than 0.05 mg/l) stains clothes when it is used for washwater.  Neither of these constituents affects the suitability of the water for primary contact recreation.

The waters of the Dolores River segments studied presently meet requirements for water quality.  Below the confluence of the San Miguel River, the waters of the Dolores were polluted by wastes from the Union Carbide mill at Uravan on the San Miguel in the 1950's and 1960's.  In recent years, discharge of wastes from the mill have been brought under control.  The water is not a hazard to human health, and aquatic life is reported to be returning to this segment of the river.

Effluent limitations that have been placed on present discharges to the river and which will be placed on future discharges will insure that the present water quality will be maintained even if the river is not included in the National System.  Natural forces and the activities of man that alter the physical, chemical, and biological character of the waters of the Dolores River are discussed by segments.

Segments I and II

Water quality in the upper main stem and the West Dolores has not been sampled.  It appears to be suitable for both recreation and the propagation of aquatic life natural to both streams.  Historic mining activity on the upper main stem above Rico has not had a measurable effect on the aquatic biota of that segment.  Wastes from the few homes in the old settlement of Dunton on the West Dolores are treated in septic tanks and should not have a signifi- cant impact on stream water quality.  Considerable summer and fall camping along both segments occurs in developed and undeveloped sites.  Waste from these activities does not now affect water quality, but if use increases rapidly, added precautions--such as self-contained waste treatment systems, vault storage and pumping of water, or linkage of recreation sites to regional collection systems--will be necessary.

Sediment yield on these reaches is low.  Higher elevations in the Dolores River Basin yield an average of 641 acre-feet of water per square mile per year, but only 214 tons of sediment per square mile per year.

BLM_0035874

Table III-2

SUMMARY – WATER QUALITY PARAMETERS –
DOLORES RIVER MEAN VALUES

| Criteria | Standards | | Effects | Sampling Location | | |
|---|---|---|---|---|---|---|
| | Primary Contact Recreation | USPHS Drinking Water Standards | | Dolores | Bedrock | Gateway |
| Temperature (°F) | See Table A | – | Cause loss of deep body temperature | 45° F | 56° F | 52° F |
| pH | 5.0–9.0 6.5–8.3 desirable | – | Cause eye irritation | 8.2 | 8.3 | 8.1 |
| Coliform (Geometric Mean) | 200 | – | Indicate sanitary cleanliness | 44 | 29 | 34 |
| Dissolved Oxygen | 5 mg/l | – | Indicate ability of aquatic life to thrive | 8.6 | 8.5 | 8.0 |
| Poisonous Substances | | | | | | |
| Arsenic | – | 0.05 mg/l | | 0.0001 | 0 | 0 |
| Cadmium | – | 0.01 mg/l | | 0 | 0 | 0 |
| Chromium | – | 0.05 mg/l | | 0 | 0 | 0 |
| Cyanide | – | 0.20 mg/l | | 0 | 0 | 0 |
| Lead | – | 0.01 mg/l | | 0.00009 | 0.00073 | 0.00094 |
| Silver | – | 0.05 mg/l | | 0 | 0 | 0 |
| Toxic Substances | | | | | | |
| Radium-226 (pc/l) | | 3* | | 0 | 0.71 | 1.0 |
| Total Dissolved Solids (mg/l) | | 500 recommended 1,000 – Find alternate source | Laxative effect | 295 | 3,679 | 2,331 |
| Manganese (mg/l) | | 0.05 | Staining | 0 | 0.014 | 0.018 |

* When this concentration is exceeded, a water supply shall be approved by the certifying authority if surveillance of total intakes of radioactivity from all sources indicates that such intakes are within the limits recommended by the Federal Radiation Council for control action.

BLM_0035875

BLM_0035876

Segment III

Water quality in the 105-mile stretch below McPhee Damsite
deteriorates for a number of reasons.  Municipal and industrial
sources, irrigation depletions, increasingly erosive soils, and
natural springs and seeps all contribute to this decline.

Industrial pollution sources are presently limited.  Upstream from
this segment at Rico, toxic metals pollution from mine drainage
has degraded the river for 9 miles.  However, this is not as
serious as accidental spills from a base metals mill; despite pre-
cautions, this mill has periodically dumped sulfuric acid, sodium
cyanide, and other chemicals into the Dolores.  A 1974 mishap
released 3,000 gallons of cyanide into the river and killed fish
for 30 miles downstream.  While none of this activity has affected
the study segment, it does remain a threat.

At Slick Rock in the 1950's and 1960's, uranium was taken from the
Burro Mine and concentrated (upgraded) nearby; the effluent went
into the river.  Today however, the mined ore is shipped to Uravan
for concentrating, and there are no discharges at Slick Rock.  Old
tailing piles from the upgrader have been stabilized; however,
there is a small amount of intermittent drainage from the tailing
piles of the Burro Mine.  There is little or no threat of contami-
nation from either.

At present, municipal sources are not serious polluters.  Communi-
ties along the river are small and scattered, and existing levels
of domestic waste are easily assimilated.  The town of Dolores does
not always treat its wastewaters to meet secondary effluent
standards.  This affects only a small reach of the river not
included in this study.  A new sewage treatment facility, to enable
Dolores to meet secondary standards, will be provided when McPhee
Dam is built.  The most serious problem with domestic wastes appears
to be in the future - active and potential land subdivisions along
the river could eventually have significant adverse impacts.

Natural sources contribute heavily to the declining water quality
along this segment.  Below the town of Dolores, the sediment yield
of the Dolores Basin increases rapidly to produce an average yield
of 590 tons per square mile per year.  The silt load of the river
is moderate to the mouth of Disappointment Creek.  At this point,
the Dolores is colored an opaque light tan, mostly by suspended
matter from the light-colored erosive soils in Disappointment
Valley.

39

BLM_0035877

Dissolved solids also increase on this segment of the Dolores. At Bedrock, these salts have reached an average concentration of 319 mg/l (or 456 tons per day). Nearly all of this amount, almost double the salinity of the river upstream at the town of Dolores, is attributable to natural sources.

Segment IV

Two major sources of pollution are responsible for a sharp decline in water quality downstream from Bedrock. Under present conditions, water here does not meet the criteria for fisheries because of high ammonia levels from industry on the San Miguel and high salinity from the Dolores as it flows through Paradox Valley. The latter is a natural source of pollution and does not detract from the wild and scenic values of the river.

Mining and processing of uranium and vanadium have occurred along the Dolores River and its major tributary - the San Miguel River - since the 1880's. Effluent from the Union Carbide mill on the San Miguel River grossly polluted the San Miguel and Dolores Rivers during the late 1950's and early 1960's. Effluent from the mill contained toxic wastes, suffered extreme variations in pH, and contained radioactive materials. Prior to 1956, the Dolores River, below the confluence of the San Miguel, was considered a good cat-fish stream and a source of broodstock that was harvested for transplanting to other areas. Wastes discharged from the mill resulted in severe population declines by 1966.

The investigations in 1966 showed that radioactivity, namely Radium-226, increased in the San Miguel from 0.23 picocurries/liter (pc/l) above the Uravan mill to 2.33 pc/l below the mill. Radioactive levels have been reduced to 0.5 pc/l in recent years (1970-1974, Colorado Health Department data) because of cleanup efforts by Union Carbide and strict effluent limitations on wastes discharged to the river. Radium-226 levels at Dolores, Bedrock, and Gateway are shown in Table III-2. Radioactivity in the Dolores River does not now constitute a health hazard.

Currently, the greatest water-quality problem on the Dolores is the exfiltration of ammonia from holding ponds at Uravan. Excessive concentrations of un-ionized ammonia are toxic to aquatic life; however, there is no agreement to the toxic level. Research by Union Carbide Corporation indicates that catfish are returning to, and surviving in, the Dolores and San Miguel Rivers. Their most recent discharge permit requires them to maintain un-ionized ammonia levels in the San Miguel at concentrations that are not toxic to the aquatic life in the river.

40

Between Bedrock and the confluence with the San Miguel (about 12 miles), the Dolores meanders through the Paradox Valley and picks up one of the heaviest concentrations of salts found anywhere in the Colorado River Basin. Paradox Valley is a salt anticline, adding approximately 548 tons of dissolved solids to the river daily - an amount equal to one-third of the Dolores River's salt contribution to the Colorado River and about 11 percent of the total salt content of the Colorado River at Cisco, Utah. The total dissolved solids discharged by the Dolores into the Colorado is about 600,000 tons per year.

In June 1974, Congress passed the Colorado River Basin Salinity Control Act (P.L. 95-320) which authorized construction of four units, one of them in the Paradox Valley, to reduce its salt discharge into the Dolores. Several design alternatives are under study by the Bureau of Reclamation, the agency charged with carrying out this project. The goal is to remove as much as 180,000 tons of salt per year. When achieved, water quality in the lower Dolores will be vastly improved.[1]

---

[1] The Paradox Valley Unit is the reason that the 6-mile segment of the Dolores flowing through the Paradox Valley is excluded in the legislation authorizing this study. For a discussion of these exclusions, see Appendix F.

41

BLM_0035879

## H. Water Rights

Like much of the West, Colorado is an "oasis civilization," without
sufficient water to satisfy the needs of various users.  This situation
has led to the evolution of a complex system of State water laws
focused on the doctrine of prior appropriation.  Basically, water
rights are acquired by appropriation, which is actually applying the
water to a beneficial use.  Priorities are awarded solely on the basis
of who appropriated or used the water first; the phrase "first in time -
first in right," summarizes this doctrine.  It follows that when water
supply in a stream is limited (as in a dry year), the oldest (or
"senior") rights are the first served.  The Colorado Constitution
recognizes three beneficial water uses:  domestic, agriculture, and
manufacturing.  Impoundment for recreation and preservation of the
natural environment has received statutory recognition.  In Colorado,
water rights are awarded by special water courts and administered by
the State Engineer.

All told, there are 81 decreed water rights on the Dolores and West
Dolores Rivers.  These include conditional and absolute direct flow
decrees (allowing diversion for direct use) and conditional and
absolute storage decrees (allowing storage for later use).  The oldest
of these rights dates back to 1879; the most recent, 1951; the majority
in the 1880's and 1890's.  A summary of absolute water rights located
in the study segments is given in Appendix J.

There are certain Indian water right claims involved in the Dolores
River System.  Nothing in this proposal, or any actions taken with it,
are intended to encroach upon or in any way violate these water right
claims.

## I. Water Uses and Related Developments

A small proportion of the Dolores River water supply is used in the
Dolores River Basin.  There are small irrigated areas along the West
Dolores, below McPhee Dam, in the Slick Rock-Gypsum Valley area, and
below the confluence with the San Miguel River.  Otherwise, the
diversions carry water out of the Basin, principally to the adjoining
Montezuma Valley in the San Juan River Basin.  In-stream water uses
include esthetics, recreation, and fishing on the upper main stem and
the West Dolores.  Esthetics, fish, and recreation are important uses
from the Bradfield Ranch to the Bedrock Segment.

The Energy Research and Development Administration does not foresee the
development of any additional uranium or vanadium milling facilities in
the Basin.  They feel that land values, associated environmental pro-
tection costs and the need to purchase water rights from a senior right

42



Water use on the Dolores River:  the Montezuma Valley Irrigation Company's diversion supplies irrigation for over 35,000 acres of cropland.  The streambed is in the middleground, left.  October 1974.  Bureau of Reclamation Photo.

BLM_0035881

holder, if they would hope to use Dolores River water, will cause any milling facilities to be located elsewhere.

The Dolores Project will develop water for irrigation and municipal use in the Montezuma Valley, the Dove Creek area, and Ute Mountain Reservation near Towaoc, and will also significantly alter the existing flow regime of the river below McPhee.  Two additional purposes of the Dolores Project are as follows:

First, the Project will provide a minimum flow that will meet many of the fish, wildlife, and esthetic needs; in normal hydrologic years, this will be 50 cfs, increasing to 78 cfs in wet years, decreasing to 20 cfs in dry years.  Using flow data from the period 1928-1973, the Bureau of Reclamation has estimated that the 78 cfs would have been released 33 percent of the years, the 50 cfs released during 45 percent of those years, and the 20 cfs release would have been necessary only during 22 percent of the period.  The main impact of these releases will be to assure flow in the river below the McPhee Dam and thereby establish a trout fishery below the dam.  The fishery is expected to extend 56 miles downstream to Slick Rock.  Improved waterfowl habitat is also an envisioned benefit, but many other wildlife species also stand to gain.

Second, the Dolores Project will have an impact on the already limited number of recreational boating days.  After the project is constructed, riverflows below McPhee will be sufficient for rafting and kayaking only in those years when the reservoir fills and spills water.  Reviewing the period 1928-1973, it was calculated that the average annual spill, had McPhee been in place during those years, would have been 76,000 acre-feet.  This would have enabled an average of 13 launching days annually; launching days are counted when the flows are between 1,000 and 2,500 cfs for 5 consecutive days or more.  Days when flows exceed 2,500 cfs are not counted.

However, average figures offer an incomplete picture.  Historically, flows sufficient for launching occurred during 31 of the 46 years between 1928 and 1973.  Had McPhee been in place, sufficient boating flows would have occurred during 21 years.  Thus, boating opportunities would have occurred 10 fewer years.  The effect of the Dolores Project will be to reduce boating opportunity during dry years and increase them during wet years.

43

BLM_0035882

When spills are sufficient for boating, there will be an added
benefit. Ever since the Dolores was first run by raft in 1948,
boaters have been dependent on the uncertainties of nature, i.e.,
the depth of the winter snowpack and the rate of its runoff.
Boating opportunities are now unpredictable - a string of warm
days can increase runoff up to 4,000 cfs, while a cold spell can
drop it to 100 cfs. With McPhee Dam in place, this unpredicta-
bility will be largely eliminated. In years when snowpack data
indicate there will be spills, releases from the dam can be made
earlier in the spring in anticipation of later runoff filling
the reservoir. Summer flows cannot be augmented since once
the snowpack is gone there would be no replacement water for
releases. Thus, boating days can be (a) predicted,
(b) scheduled, and (c) grouped. For example, in a hypothetical
year when the snowpack is such that spills are anticipated,
river runners will know that a boating release is scheduled
to begin on day X, that it will be discharged at Y cfs, and that
it will last for Z days. This situation will hold except during
those periods when the reservoir is at capacity and spills will,
of necessity, be equal to the amount that natural upstream
inflow demand exceeds project demands; that is, an element of
unpredictability will remain. At any rate, rafters will be able
to utilize a larger proportion of the boating opportunity
because they will know well in advance when the opportunities
will occur.

Though total numbers of boating days will be slightly reduced,
there will be a gain in those days which are grouped to assure a
river trip of predictable duration - normally 3 to 5 days since
those are the two most common lengths of time on the Dolores.

An interesting comparison of boating (rafting) benefits can be
made with the Dolores Project irrigation benefits. River manage-
ment proposals developed jointly by the Bureau of Land Management
and the Forest Service would enable three parties to launch per
day. It was assumed that 50 percent of the parties launching each
day would be commercial, and the other 50 percent would be private.
This controlled use of the river would allow approximately 40 to 50
people on the river each day. With an estimated value of $14 per
boating day,[1]/ the estimated maximum daily boating benefits are
$700. It would require a minimum flow of 1,000 cfs for 24 hours
to accrue the above benefits. The same 1,000 cfs released for
irrigation would amount to 2,000 acre-feet per day, or just about
enough water to irrigate 1,000 acres for an entire irrigation season.

---

[1]/ Commercial boat trips usually cost $25 to $40 per day.

44

BLM_0035883

The U. S. Bureau of Reclamation estimates irrigation benefits at $50 per acre-foot of water, at $100 per acre of land, to produce a total annual irrigation benefit of $100,000, which would be foregone if the water were used to provide a minimum boating day. Thus, the cost to provide Project water for boating would average $2,000 per day for each user, and the total cost of a 3-day boating experience would be $6,000 per person in terms of benefits foregone.

## J. Access

Access to the four study segments of the Dolores varies from none to unlimited. In some areas, the river travels through near wilderness, in others it flows through towns and along State highways.

### Segment I

Approximately 75 percent of the 15-mile upper main stem is accessible either by primitive road or State Highway 145. Two old mining roads reach into Tin Can Basin and the headwaters area - one which travels up Barlow Creek, one which climbs over Bolem Pass from the adjoining Hermosa Creek drainage. For approximately 2 miles downstream from its source, a primitive road follows the Dolores; for the next 4 miles a Forest Service trail parallels the river.

Highway 145 follows the Dolores for 9 miles from the confluence of Snow Spur Creek to Rico. A bridge crosses the river near the mouth of Barlow Creek, and there is a ford at a millsite a quarter mile upstream from Rico.

### Segment II

About 77 percent of the 35-mile West Dolores is accessible by road. From its headwaters in Navajo Basin downstream to Burro Bridge, a distance of 8 miles, only a Forest Service trail follows the river. Below, for the next 27 miles, the Dunton Road (National Forest Road No. 535) runs along the river, seldom more than 1/8 mile from its banks. This well-graveled route is used by as many as 30 loaded logging trucks daily working timber harvest outside the study area. Nine road bridges and a footbridge cross the West Dolores.

### Segment III

Long reaches of the 105-mile stretch of the main stem from McPhee to Bedrock are inaccessible by road. Only one paved highway crosses this segment; otherwise, vehicles must reach the river via graveled or primitive road as follows:

45



The Dove Creek pumping station - a road to the river provides a convenient launch and recover site.   In this October 1974 photo the river is dry.   Bureau of Reclamation photograph.

BLM_0035885

- McPhee Dam to Bradfield Ranch. - A well-maintained all-weather gravel road parallels the river.  At Bradfield Ranch, the river is crossed by a gravel road from Cahone.

- Dove Creek Pumping Plant. - A graveled road drops down from the town of Dove Creek to its pumping plant on the west bank of the river.  A county-maintained, bladed, dirt road (National Forest No. 474) used by prospectors, by recreationists, and boaters parallels the river for a distance of 10 miles downstream on the west.  Intermittent traces of four-wheel-drive-vehicle use are evident on both banks from Bradfield Ranch to Disappointment Creek.  Apparently, the riverbed is used to gain access to the canyon during summer and fall.

- Disappointment Creek, Slick Rock, Poverty Flats. - Several rough roads reach upriver from the settlement of Slick Rock as far as Disappointment Creek.  At Slick Rock, three bridges - one of them for State Highway 141 - cross the Dolores.  A San Miguel County-maintained road parallels the river for 6 miles downstream from Slick Rock.

- Gypsum Valley. - Another San Miguel County-maintained road gives access to the river in Gypsum Valley, paralleling the Dolores for about 5 miles before bridging it and stopping at the upper end of Slick Rock Canyon.

- Paradox Valley. - A primitive road travels 3 miles upriver from Bedrock on the west bank.

Segment IV

This 39-mile segment from the confluence of the San Miguel to the State Line is the most accessible of those studied.  Only its upper 4 miles, sunk into a narrow canyon, are not paralleled by a road. State Highway 141 bridges and runs along the Dolores for 29 miles to the town of Gateway; from there, graveled ranch roads parallel the river on both sides to the State Line.

46

K. Landownership and Use

Approximately 75 percent of the lands in the Dolores River corridor are public - either National Forest lands or National Resource lands. Most of the private lands are either homesteads or patented mining claims.  Table III-3 gives a breakdown of landownership on the four study segments.

Principal land uses are agriculture (primarily livestock grazing), mining (especially for uranium and vanadium), and recreation.

Table III-3

LANDOWNERSHIP WITHIN VISUAL CORRIDOR BY
STUDY SEGMENTS, DOLORES RIVER, 1975

| Ownership or Administration | Total | Segment I | Segment II | Segment III | Segment IV |
|---|---|---|---|---|---|
| | | | —Acres— | | |
| Private | 14,280 | 200 | 2,600 | 5,180 | 6,200 |
| Federal | | | | | |
|   USDA Forest Service | 39,780 | 4,600 | 19,800 | 15,180 | 0 |
|   USDI Bureau of Land Management | 44,600 | 0 | 0 | 36,040 | 8,200 |
| Total | 98,660 | 4,800 | 22,400 | 56,400 | 14,400 |

Segment I

The 15-mile-long, 1/2-mile-wide corridor along the main stem above Rico includes 4,800 acres of land - 96 percent of it in the San Juan National Forest, the remaining 4 percent private.  The latter is centered on 26 patented mining claims near Rico; these cover about 200 acres.

Significant land uses include recreation (especially fishing), sheep grazing, mining, and highway right-of-way.  The Forest Service has withdrawn 370 acres in the corridor for recreational sites, and the Federal Power Commission 1,900 acres for a powerline paralleling Highway 145.  The only active mining is 1/2 mile above Rico.

47

Segment II

The 35-mile-long, 1/2-mile-wide corridor along the West Dolores
takes in about 11,200 acres, almost 70 percent of it in the San
Juan National Forest. A visual corridor, about 1 mile wide, contains
22,400 acres, of which 88 percent is National Forest. Approximately
2,600 acres are privately owned in 13 separate holdings scattered
along the segment (included among these are 140 acres of patented
mining claims). There is a question regarding the accuracy of old
land surveys in the valley, and private landownership along the river
may vary.

Ranching, farming, mining, and recreation are the prime land uses.
The pasturelands along the West Dolores are summer range for cattle
and sheep; farming is confined largely to hay on the lower half of
the river. Dunton and the upper (eastern) reaches of Navajo Basin
are historic mining areas; today the most significant mining activity
is copper prospecting in Navajo Basin. No timber has been harvested
along the West Dolores for several decades, though cutting continues
in areas out of the river's view corridor. A number of the cabins
around Dunton serve as summer homes. A possible winter sports site
(for downhill skiing) has been inventoried about 1/2 mile east of
Dunton.

The Forest Service has withdrawn 832 acres in the corridor for nine
recreational and two administrative sites.

Segment III

This 105-mile segment includes a visual corridor 0.18 to 4 miles wide,
containing 56,400 acres - 27 percent of it in the San Juan National
Forest, 64 percent National Resource Land, and 9 percent private.
Private lands lie in four principal areas - the McPhee-to-Bradfield
stretch, the Slick Rock-Poverty Flats area, Gypsum Valley, and
Bedrock. Total area of these private holdings is 5,280 acres.
Patented mining claims are limited largely to the Slick Rock area
and Gypsum Valley.

Foremost land uses are uranium prospecting and mining (on public
lands), livestock grazing, and recreation. Uranium prospecting has
picked up sharply in recent years and shows no signs of tapering off.
(A total of 443 claims that affect about 6,600 acres have been filed
upon.) There are active mines on the rims of the lower Dolores

48

Canyon, in the Slick Rock-Poverty Flats area, on hillsides and rims above Gypsum Valley, and on the plateau lands above Slick Rock Canyon (out of sight of river users). Cropland is about 3,000 acres, most of it in hay and alfalfa, between the McPhee Damsite and the Bradfield Ranch and near Slick Rock.

Segment IV

Landownership between the San Miguel and the Colorado-Utah line is about 57 percent National Resource Land and 43 percent private, in a 1/2-mile-wide river corridor totaling 14,400 acres. On the upper end of this segment, patented mining claims dominate the private holdings, while the middle and lower reaches have mostly old homestead lands. About another 5,800 acres are involved in 390 unpatented claims.

Land uses here are almost exclusively mining and agriculture. Uranium activity from 3 to 10 miles downstream of the San Miguel is extensive. Below that, ranch and farmland take over along the river bottoms, the principal crops being hay, alfalfa, and pasture. From about 12 miles above Gateway to the State Line, ranching is by far the dominant use. Recreational boating from the San Miguel to Gateway is negligible, but picks up below town; the 32-mile run over to the confluence with the Colorado in Utah is increasing in popularity and includes some of the most challenging rapids on the entire Dolores.

Most of the Bureau of Land Management lands along the river, from the San Miguel to Gateway, are covered by Federal Power site withdrawals. However, no projects are currently planned.

Table III-4

RIVER OWNERSHIP - DOLORES RIVER CORRIDOR

| Study Segment | Ownership | | | |
|---|---|---|---|---|
| | National Forest | National Resource Land | Private | Total |
| | ----------Linear Miles------------- | | | |
| Dolores River above Rico | 14 | - | 1 | 15 |
| West Dolores River | 23 | - | 12 | 35 |
| Dolores River from McPhee Damsite to Bedrock | 16 | 67 | 22 | 105 |
| San Miguel River to Colorado-Utah State Line | - | 22 | 17 | 39 |
| CORRIDOR TOTALS | 53 | 89 | 52 | 194 |

49

## L. Minerals

The Dolores River corridor has supported vigorous mining activity in selected areas for almost a century. The two major historic centers are Rico, where a silver boom was touched off in 1879, and Slick Rock where uranium was mined before the turn of the century. Lesser efforts occurred in Navajo Basin at the head of the West Dolores, around Dunton also on the West Dolores, and on the main stem just below the confluence with the San Miguel.

Today mining interest on long reaches of the corridor remains high. Rico is a small but steady producer of base metals, and prospecting for a variety of minerals (especially copper, uranium, aluminum, and gold) continues in the upper main stem and West Dolores area. On the lower two segments, uranium and vanadium are the subject of both active mining and intensive prospecting.

### Segment I

Mining activity along the upper main stem is presently concentrated in the lower reaches near Rico where the Rico-Argentine Mining Company produces silver, lead, zinc, copper, and gold. Pyrite mined in the Rico area is used to produce sulfuric acid at a plant in the town. Exploration for new deposits continues, and old dumps are being leached for silver.

Other mineralization includes:

Coal. - Bituminous coal is present in the Dakota sandstone; most beds are less than 5 feet thick. Historically, these deposits were used in making coke for the Rico smelters and for home heating.

Aluminum. - Disseminated alunite deposits are present in the Calico Peak area on the divide between the headwaters and West Dolores basins. The resource is estimated at 6 million tons, 17.1 percent alunite. This deposit is also a potential source of potassium.

Oil and Gas. - Sedimentary rocks suitable for oil and gas production are present. To date, there has been little exploration and no production.

Gypsum. - A bed of gypsum 15 to 30 feet thick has been identified near Rico.

BLM_0035890



An aerial view of town of Slick Rock showing the Gas
Plant, mines, and other intrusions.

BLM_0035891

Sodium. - Layers of salt and potash minerals underlie the
extreme southwest corner of the headwaters basin at
considerable depth.

Geothermal. - Iron or Railroad Spring, 3/4 mile north of
Rico flows 25 to 30 gallons of 82°F water per minute.
It is undeveloped.

Uranium and Vanadium. - Both minerals have been mined from
surface deposits on the North Fork of Hermosa Creek
immediately south of Tin Can Basin. Claims associated with
this operation reach into the upper Dolores Basin, extending
2 miles down the river from its source. These claims were
test drilled in the mid-1960's. Uranium and vanadium have
also been mined on Barlow Creek, a short tributary which
joins the main stem 5 miles above Rico.

## Segment II

Historically, the West Dolores area has not been a major mineral
producer. Navajo Basin was the site of gold and silver activity
before the turn of the century, but the most ambitious mine here -
the Rock of Ages - was never profitable. Silver, gold, and a little
lead have come from the Dunton area, but the mines are now inactive.
Today, most of the mineral resources of the West Dolores exist in
potential:

Coal. - Lenticular bituminous beds, usually less than
5 feet thick, are present in the Dakota sandstone.

Oil and Gas. - Sedimentary rocks suitable for the
occurrence of oil and gas underlie the West Dolores.
To date, these have been explored little.

Geothermal. - Dunton Hot Springs flows 20 gallons per
minute at 110°F; other hot springs exist along Geyser
Creek, southwest of Dunton. Their potential is un-
quantified.

Copper. - In 1972, the U.S. Geological Survey reported
the presence of disseminated copper in Navajo Basin.
Subsequently, Texas Gulf, Inc., filed 800 acres of claims
in the area and prospected intensively. As of August 31,
1975, activity on these claims had been stopped due to
economic conditions at this time.

51

BLM_0035892

**Antimony and Arsenic.** - Both could be produced from the ruby silver ores of the Dunton district.

**Sodium.** - Salt beds in the Paradox Member of the Hermosa Formation underlie the western two-thirds of the West Dolores Basin at depths of from 5,000 to 6,000 feet. Thickness is unknown.

## Segments III and IV

Uranium and vanadium are the principal minerals found in and adjacent to the lower study segments. Almost all deposits occur in the Salt Wash member of the Jurassic Morrison Formation, and the major deposits occur largely in the area draining into the corridor from near T. 42 N. northward (i.e., below Snaggletooth Rapids). This formation is usually exposed on slopes and canyon rims high above the river surface. There are many deposits in this area, but most have been mined out. Current economic conditions relating to the value per pound determine the amount and extent of mineral resources. If uranium is selling at $15 per pound, only the portion of known deposits economical to mine at that value are classified as reserves. If the price goes up, ores with lower amounts of $U_3O_8$ can be mined economically. If the price drops, only richer ore is taken. Presently, uranium on old contracts is averaging $15 per pound. Prices for future delivery range from $25 to $35 per pound. Current resource calculations are based on $15 per pound. At $15 per pound of $U_3O_8$ concentrate, known reserves within the line-of-sight land along the river are estimated to total over 257,000 pounds. This represents about 0.03 percent of the U.S. total known $15 reserves.

Most present day prospecting and mining is on the tablelands to either side of the river, above the canyon, and usually out of the view corridor. Most of the uranium claims in the river area were staked during the "U-boom" era of the mid-1950's, but since 1968 there has been a second-generation upswing in activity. Anaconda Copper and Phillips Petroleum Companies have filed claims on substantial areas in or near the corridor in the last 2 years. Some are in the Chinle Formation, which is believed to contain uranium, but is unproven. The Chinle Formation is often located in close proximity to the river in the canyon bottom. The Energy Research and Development Administration (ERDA) has estimated probable potential uranium and vanadium resources in the river corridor at between 4 and 8 million pounds of $U_3O_8$ and between 23 and 28 million pounds of $V_2O_5$. This represents about 0.32 percent of the total probable potential $30 resource of $U_3O_8$ in the United States.

52



Uranium exploration roads and prospecting near
Slick Rock.   Bureau of Land Management Photo.



Uranium mine near Slick Rock.
Bureau of Land Management Photo.

BLM_0035894

Although portions of Mesa County contain oil shale deposits, they do not occur in the Dolores River basin.

Other minerals found along the lower two segments are:

Coal. - The coal-bearing beds in the Dakota sandstone have been eroded from the Dolores River canyons, but they are present on the higher mesas. There are no active mines in the area; access to coal to be mined in the future may be easiest by adits from the canyons.

Oil and Gas. - The entire lower segments are underlain by sedimentary rocks suitable for the occurrence of oil and gas, but there is only one small, producing field in the drainage basin - at Andy's Mesa west of Slick Rock Canyon.

Potassium and Sodium. - Potassium and sodium minerals are present at depth beneath the entire corridor. Total amount of salt is very large, but information is insufficient for meaningful estimates.

Gypsum. - Outcrops of gypsum occur in Gypsum Valley and elsewhere as a cap rock over the salts. Again, information is insufficient for any estimates of reserves.


M. Recreation

Because of its relative isolation from major population centers, its areas of inaccessibility, and its restricted seasonal recreational use, the Dolores has not been a major recreational area. As a result, developed sites are minimal on most of the segments.

Segment I

The upper main stem is not a major recreational area. The scenery is not sufficiently outstanding to attract any significant number of hikers or climbers, and the fishery while good is equaled or surpassed by many other streams in southwestern Colorado. In the winter, occasionally, ski touring and snowmobiling take place near Lizard Head Pass. The one developed campground on this segment is just off State Highway 145 at the mouth of Barlow Creek; it contains 27 units and space for travel trailers.

53

BLM_0035895

## Segment II

At present, the West Dolores supports the heaviest recreational use
of the four study segments. Four developed campgrounds (all on the
San Juan National Forest) adjoin the river; these have a total of
48 camping units plus space for travel-trailers. In addition, there
is a small National Forest picnic area. Trout fishing, camping, and
sightseeing are the major summer recreational pursuits. Estimated
visitor days of fishing and camping use in 1974 totaled 20,000 and
12,000, respectively. This use appears to be increasing. The trail
along the river from Burro Bridge up into Navajo Basin and the area
of spectacular 14,000-foot peaks above is popular with hikers, back-
packers, and mountaineers. The West Dolores Valley and the hill-and-
mesa country above are popular deer and elk hunting areas in the fall.
In the winter, ski touring and snowmobiling are the major activities.
The hot springs and rustic resort at Dunton are also recreational
attractions.

## Segment III

Below McPhee Dam, hunting and river boating are the most popular
recreational activities. Boating is by far the best known activity
to nonresidents. The main launch points are the Bradfield Ranch
11 miles downstream of the proposed damsite and at Slick Rock.

Until recently, this Dolores River segment languished in com-
parative obscurity, primarily because of its short, unpredictable
rafting season. At least a half-dozen rivers within a 150-mile
radius may be run for most of the entire summer, and over the
years convenience has made them more attractive, especially for
commercial operators who must carefully schedule their trips.[1]
From 1948, when it was first run, until the early 1970's, the
Dolores was known only to a small cadre of white-water enthusiasts.

In the last 3 years, however, awareness of the Dolores has picked
up sharply. Part of this rise can be attributed to the general
surge of interest in river-running throughout the West. This
popularity is such that many streams are now under permit systems,
with limits on numbers of boaters established according to recre-
ational carrying capacities. With demand exceeding opportunities

---

[1] For comparative purposes, a series of sketches of "Nearby Rivers
Offering Similar Recreational Opportunities" is included as
Appendix D of this report.

BLM_0035896



Mining and prospecting for uranium and vanadium is extensive on the table-
lands above the canyon rims.  This view shows widespread road development
above Dolores Canyon, but it is not generally visible from the river.

BLM_0035897

on many of the more popular rivers (e.g., the Colorado in Grand, Cataract, and Westwater Canyons; the Snake in Grand Teton National Park and Hell's Canyon; the Middle Fork and Main Salmon in Idaho), river-runners have been forced to look elsewhere - including the Dolores. In addition, publicity associated with this Study and the legislation which enabled it has also stimulated interest in the Dolores. Heavy winter snowpack made 1975 an excellent boating year with the season lasting from early May to mid-July. While records have not been kept, in 1975 an estimated 800 persons enjoyed a total of approximately 2,800 visitor days of boating use, probably the greatest amount of rafting-use days the river has ever received. About 92 percent of this activity occurred on Segment III; the other 8 percent was on the stretch from Gateway to the Colorado River in Utah.

There are few developments on the Dolores to accommodate this or other recreation uses. The 11-mile stretch from the McPhee Damsite to Bradfield Ranch is infrequently floated because there are no significant rapids, and there are fences across the river. In the spring, however, it carries sufficient water for both kayaks and rafts. The adjoining, graveled National Forest road makes it accessible for day-use activities such as picnicking and fishing. With the completion of McPhee Dam, these are expected to improve substantially because of the maintenance of a minimum fishing flow and development of several recreation sites around the reservoir and in the downstream segment.

Bradfield Ranch is the most popular launching site for white-water boaters. Most parties launching here run the entire 97 miles to Bedrock in from 3 to 5 days. The privately owned ranch contains no developed facilities. To date, there has been no objection to boaters using this as a staging area, though as many as 30 people have camped here for the night prior to an early launch the next morning.

Downriver, there are many level waterside benches, so that parties are not pressed to find places to beach and camp for the night. Even in Slick Rock Canyon, with its many sheer walls and steep slopes, there are ample sites for smaller groups.

The broad benches along the west bank of the river at Snaggletooth Rapids are among the few areas along the river to receive heavy recreational use by boaters. Here, all parties put ashore to scout the rapids before running them. Many groups portage and, because the site is about a day's float (approximately 25 miles) from Bradfield Ranch, overnight camping is also heavy. There are no developments to accommodate this concentrated use, save a primitive road which doubles as a portage path and occasionally as an access route.

55

BLM_0035898





A view of the Canyon taken from the rim in June 1909.

Dolores Canyon on the Dolores River between the Bradfield Ranch
and Slick Rock.  Maximum depth of this gorge is 2,300 feet.  The
pinon-juniper growing along the walls is typical.  June 1973.

BLM_0035899

Many parties beach their rafts in the Slick Rock area.  Some take
out and others put in to run the lower portion of this segment to
Bedrock.  Since almost all the shoreline in the Slick Rock area
is privately owned, these activities usually occur in trespass,
and there have been minor conflicts with owners.  No designated
take-out or launch sites exist at Slick Rock.  There is an undeveloped
put-in site on public land at the Little Gypsum Valley Bridge near
the mouth of Slick Rock Canyon.

Most boating parties terminate their trips just above the Highway 90
bridge at Bedrock.  The take-out area here is on private land, and
space is limited.

Other recreational uses in the Bradfield-to-Bedrock corridor are
minor, though opportunities are great.  In addition to fall hunting,
mostly for deer, there is a modest amount of sightseeing, fishing,
camping, and picnicking.  Off-road vehicle use and rock and artifact
collecting also occur.  The San Juan National Forest maintains an
overlook site and small picnic area on the rim of the Dolores west
of Dove Creek.  It is the only developed recreation site between
McPhee Damsite and Bedrock.  Both Slick Rock and Dolores Canyons
could become popular hiking corridors in the low-flow season,
comparable to Grand Gulch and Dark Canyon (BLM) Primitive Areas in
Utah and Paria Canyon in Arizona.  There is also potential for sig-
nificant fishing, camping, and picnicking-use increases.  These
opportunities complement the boating and fall hunting activities and
extend the recreation use season.

Recreation facilities are planned along the River as a part of the
Dolores Project.  Between the damsite and Bradfield Ranch, four
sites are planned for development.  These include two sites that
contain boat launching facilities and fisherman parking and two
additional sites for fisherman parking only.  Between Bradfield
and Bedrock, a campground and three access/boat launching
facilities are planned.

Segment IV

The lower segment of the Dolores from the San Miguel River confluence
to the State Line is not a popular rafting stretch.  Immediately
below the confluence is a narrow scenic canyon and a portion of the
historic hanging flume.  Approximately 4 miles from the San Miguel,
the river flows into a more open landscape and is paralleled by State
Highway 141.  A float trip on this stretch would require 2 days;
landing and camping sites are ample.  Red Canyon, as this broad cut
is known, is actually deeper than Slick Rock Canyon above Bedrock,
but its greater width and less spectacular canyon slopes diminish the
scenic impact.  Maverick Canyon, one of a number of tributary canyons

56

BLM_0035900

off the Uncompahgre Plateau, offers a unique hiking experience -
a one and one-half mile walk to Juanita Arch, one of the few
natural bridges in Colorado.

At Gateway, there is a moderately popular launchsite below the
Colorado Highway Department sheds. River-runners putting in here
usually float the Dolores to its confluence with the Colorado River
near Cisco, Utah. This is a 2-day or long 1-day trip covering
34 river miles, including 3 miles on the Colorado River to the
principal take-out point.

As with the upper segments, hunting is a popular activity here,
especially up the canyons and draws draining the western edge of
the Uncompahgre Plateau. Mule deer are common.

Table III-5 gives an overview of the recreational picture in the
Dolores River corridor in 1974.

---

### Table III-5

ESTIMATED PARTICIPATION IN RECREATION DAYS
FOR SELECTED ACTIVITIES IN THE DOLORES
CORRIDOR - 1974

| Activity | Total Estimated Participation | Estimated Percent of Resident Use |
|---|---|---|
| Camping | 24,200 | 39 |
| Picnicking | 2,710 | 21 |
| Hiking and Mountain Climbing | 7,050 | 28 |
| Rafting and Kayaking | 2,800 | 18 |
| Other | 41,900 | 59 |
| Hunting | 78,000 | 89 |
| Fishing | 54,800 | 86 |
| | | |
| TOTAL | 211,460 | NA |

57



A relic of 19th century mining activity in Navajo Basin above the headwaters of the West Dolores. The old ore cart was left behind at the Rock of Ages Mine.    July 1973.

BLM_0035902

N. History

The Dolores River corridor includes a variety of historic resources
from two distinct periods:   (a) Indian occupation from 7000 B.C. or
earlier to the early 19th Century and (b) White settlement in the last
decades of the 19th Century.

### Segments I and II

Historic interest along these two upper segments is primarily of
local significance and focuses almost exclusively on the boom days
of the 1880's when "Rico silver" was a magnet for many hopeful
prospectors.  Along the upper main stem, the only relic of this
era is the Rio Grande Southern Railroad grade abandoned in 1951, but
as one nears Rico weathered cabins and other mining structures
become more prominent.   The Rico City Hall and a row of coke ovens
just below town are included in the National Register of Historic
Sites.   In 1889, Butch Cassidy followed an escape route along the
Dolores from Snow Spur Creek downstream after launching his career
with a bank holdup in Telluride.

Historic sites along the West Dolores are modest in number and
significance.   High in Navajo Basin, only a tattered cabin and a
rusted ore cart remain from the old Rock of Ages mine.   Old cabins
and mine buildings are prominent around Dunton.

### Segment III

Archaeologists believe that this 105-mile segment is a potentially
rich, prehistoric resource.   Today, the region is still virtually
unexplored, though three reconnaissance-type studies have been made.

- 1972-1973 - An archaeological reconnaissance of portions of the
  Dolores Project area was completed.   This is the most extensive
  work done in the river area to date.   A total of 190 sites were
  recorded, including four which produced projectile points that
  may date back to 7000 B.C.

  Twelve sites were recommended for general or test excavation.
  Reference:  "Report of the Dolores River Project, Archaeological
  Reconnaissance, 1972-1973," NPS Contract No. 2-920-P2-0880
  (Principal Investigator, Dr. David A. Breternitz).

- May 22-25, 1972 - An 11-man crew made a hasty investigation along
  the banks of the Dolores from Slick Rock to Bedrock.   A total of
  17 sites were recorded, most of them surface materials, but also

BLM_0035903

potential depositional sites beneath rock overhangs, pictographs,
and petroglyphs. Reference: "Final Report of Inventory of
Indian Ruins, Dolores River Area, May 22-25, 1972," Bureau of
Land Management Contract (Renewal) No. 14-11-0008, (Director,
Dr. David A. Breternitz).

- June 11-22, 1974 - A two-man team surveyed the river corridor from
  near McPhee to a point 3.5 miles north of the Dove Creek pumping
  plant. A total of 41 sites (five with more than one area) were
  discovered. Reference: "Archaeological Resources of the Dolores
  River Canyon Below the Proposed McPhee Reservoir; Montezuma,
  Dolores, and San Miguel Counties; June 11-12, 1974," Bureau of
  Land Management Contract (Renewal) No. 14-11-0008-3159,
  (Investigators, H. W. Toll, III, and D. D. Dykemann).

  It is presumed, in a general way, that many of these sites are of
  the same provenance as those at nearby Mesa Verde National Park,
  Hovenweep National Monument, and Lowery Pueblo. However, much
  specific work needs to be done before precise determinations can
  be made.

More recent historical sites along this segment are limited. It is
known that Don Juan Marra de Rivera explored the river, probably from
near the present town of Dolores to the Paradox Valley, in 1765; but
no signs of this journey remain. Fathers Francisco Atanasio Dominguez
and Silvestre Velez de Escalante explored the area in 1776, but no
evidence of their journey has been found.

There are, however, signs of early homesteading along the Dolores
in the form of old cabins and dugouts, two of the more notable being
about 10 miles below Snaggletooth Rapids and near the mouth of
Disappointment Creek. The uranium activity around Slick Rock is of
historic interest; in 1898 the Smithsonian Institute shipped carno-
tite ore from here to France where Mme Curie extracted radium.

Segment IV

From the mouth of the San Miguel to the State Line, knowledge of the
historic resources of the Dolores River corridor is sketchy.
Immediately below the confluence is the Hanging Flume, remnant of a
placer gold-mining operation. Ten miles south of Gateway on State
Highway 141 is a large petroglyph panel of unknown origins.

59



A prehistoric petroglyph panel on a rock face in Gypsum Valley.
Origins are unknown.  The more recent graffiti underlines the need
for protection of these archaeological sites.    June 1973.

BLM_0035905



BLM_0035906





The Hanging Flume

BLM_0035907



BLM_0035908

CHAPTER IV

WILD AND SCENIC RIVER CLASSIFICATION SUITABILITY

After gathering relevant data on the four study segments of the Dolores River, the Study Team determined potential suitability in the following ways:

- first, the four segments were evaluated in terms of their eligibility for inclusion in the National System;

- second, segments judged eligible were broken into classifiable units according to length and similarity of character;

- third, the classification (wild, scenic, or recreational) which best describes the existing conditions of each unit was determined; and

- fourth, all inputs from the public were evaluated.

The Wild and Scenic Rivers Act contains the basic criteria for rivers or segments of rivers that are being considered for inclusion in the National System. They must be free flowing and possess one or more outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar value.

. . . . . . .

Basic criteria in the Wild and Scenic Rivers Act are supplemented by the 1970 Guidelines (Appendix A). Pages 2-5 of that paper spell out the general characteristics of rivers to be included in the system, and outline the approach to be taken in evaluating them. For the Dolores, the most important of these are:

- free flowing: "Without impoundment, diversion, straightening, rip-rapping or other modification of the waterway. However, low dams, diversion works, and other minor structures will not automatically preclude the river unit from being included ...."

- water volume: "There should be sufficient volume of water during normal years to permit, during the recreation season, full enjoyment of water-related outdoor recreation activities

60

generally associated with comparable rivers.  In the event
the existing supply of water is inadequate, it would be
necessary to show that additional water can be provided
reasonably and economically without unreasonably diminish-
ing the scenic, recreational, and fish and wildlife values
of the area."

- length:  "The river or river unit must be long enough to provide
  a meaningful experience.  Generally, any unit included in the
  system should be at least 25 miles long.  However, a shorter
  river or segment that possesses outstanding qualifications
  may be included in the system."

- water quality:  "The river should be of high quality water or
  susceptible of restoration to that condition."

- outstandingly remarkable qualities:  no definition is offered.

- methodology:  "The investigator has to exercise his judgment,
  not only on the specific criteria as they apply to a particular
  river, but on the river as a whole, and on their relative weights.
  For this reason, these guidelines are not absolutes.  There may
  be extenuating circumstances which would lead the appropriate
  Secretary to recommend ... a river for inclusion in the system
  because it is exceptional in character and outstandingly
  remarkable even though it does not meet each of the criteria
  set forth in these guidelines."

Table IV-1, "Capsule Summary of Eligibility," shows how these guidelines
measured the eligibility of the four segments of the Dolores.

. . . . . . .

Of the two segments judged to be eligible, only the 105-mile reach
from the McPhee Dam site to Bedrock required subdivision into smaller
units.  The extreme variations in scenery, geology, and degree of
shoreline (and visual corridor) development made this step necessary.
In addition, the eight-mile part of Segment IV from Gateway to the
State line was also considered eligible -- if future legislation and
study joined it with the 22-mile reach of the Dolores in Utah.

. . . . . . .

Components of the Wild and Scenic Rivers System must be classified,
designated, and administered as one of the following:

Wild river areas - Those rivers or sections of rivers that are
free of impoundments and generally inaccessible except by trail,
with watersheds or shorelines essentially primitive and water
unpolluted.  These represent vestiges of primitive America.

61

BLM_0035910

Scenic river areas - Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

Recreational river areas - Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

· · · · · · ·

An intrinsic part of this study effort was to solicit and obtain public input. In the pursuit of this goal two series of public meetings were scheduled. The first series was held in Denver, Grand Junction, and Cortez the week of March 24, 1975. The intent was to provide the public with basic information about the objectives and direction of the study and to give individuals an opportunity to become involved. At each of these meetings, participants received a form asking their interest in the study, level of involvement, and general attitudes toward the study. Several individuals became members of the Steering Committee.

The second series of meetings was held the week of July 7, 1975, in Denver, Grand Junction, Norwood, and Cortez. The basic intent of this series was to provide a sounding board for alternative views, new data, and general public opinion. To provide a basis for comparison, the study team presented four conceptual alternatives based on the data which had been compiled up to that point. Under a workshop format, the public was asked to analyze a condensed version of the data utilized in forming these alternatives and to form new alternatives or affirm the study team alternatives.

Two polarized alternatives, based on divergent philosophies, evolved from the public participation. Alternative Four, "No Action," was generally chosen by residents living in or adjacent to the study area, while "Citizens' Alternative Five," prepared by the University of Colorado Wilderness Study Group, was supported by a number of conservationist organizations and individuals. Alternative Five suggested that the entire river basin should be studied and proposed designation for the river in its entirety. The attitudes expressed at the public meetings and in the communications received from individuals since the meetings have mostly been divided between these two alternatives.

Those supporting Alternative Four, "No Action," generally state there now is adequate protection afforded by the State and Federal agencies responsible for the river corridor and associated lands. Landowners in the study corridor expressed concern over phrases such as "scenic easement,"

62

"visual corridor," "public access," and "condemnation." Fears were expressed concerning the loss of grazing rights on public land in the basin. Mining interests pointed to the need for energy development and questioned the compatibility of designation with national energy problems.

The status of the Dolores Project, however, overshadows nearly all other concerns of those in support of Alternative Four. Despite the fact that the project area was expressly excluded from the study area by Congress and was accepted as "in place" by the study team, misunderstanding persists equating designation of the Dolores River and the death of the project. Alternative Four is a viable alternative which is covered under the "No Action" plan in Chapter 5.

Alternative Five was developed by the Colorado University Wilderness Study Group and represents the recommendations of a number of conservationist organizations. These recommendations are made on the premise of "Total Basin Planning" and favor designation of the entire Dolores River Basin as a component of the National Wild and Scenic River System.

Alternative Five recommends:

1. West Fork - Headwaters of the West Fork to 1.0 mile above Burro Bridge. Length 5.6 miles. *WILD*

2. West Fork - From 1.0 mile above Burro Bridge to the confluence with the main Dolores. Length 29.0 miles. *RECREATIONAL*

3. Main Dolores - Headwaters of the Main Dolores to Beaver Creek confluence. Length 77.0 miles. *RECREATIONAL*

4. Beaver Creek confluence to Cahone Bridge. Length 13.0 miles. *SCENIC* (However, inclusion of this would conflict with the Dolores Project and may cause it to be foregone.)

5. Cahone Bridge - (Bradfield Ranch) to confluence with Disappointment Creek. Length 39.0 miles. *WILD* Excluding 1/4 mile on each side of the Dove Creek pumping station which is recommended for "Scenic" classification.

6. Disappointment Creek confluence to 1/4 mile after the bridge in Little Gypsum Valley. Length 24.5 miles. *RECREATIONAL*

7. Little Gypsum Valley to 1.0 mile above Highway 90 Bridge near Bedrock. Length 33.5 miles. *WILD*

63

8.  1.0 mile above Highway 90 Bridge near Bedrock to 1/2 mile
    after Bridge at Gateway.  Length 41.5 miles.  *RECREATIONAL*
    (However, this conflicts with the Paradox Valley Salinity
    Control Project and may cause it to be foregone.)

9.  Gateway to confluence with Beaver Creek in Utah just after
    Stateline.  Length 8.5 miles.  *SCENIC*

10. Beaver Creek to Dolores River - Colorado River confluence.
    Length 22.5 miles.  *WILD*


After sifting this material and weighing it along with the data
generated by this study, two alternatives were selected as having the
best qualities for further analysis.  Each was judged to satisfy the
eligibility requirements of the 1970 Guidelines.  Table IV-2 shows
these two alternatives.

64

BLM_0035913

Table IV-1.--Capsule Summary of Eligibility, Dolores River

| Characteristics | Main Stem Source to Rico | West Dolores Source to Main Stem | McPhee Dam to Bedrock | San Miguel Confluence to State Border |
|---|---|---|---|---|
| **Free-flowing Nature Affected by:** | | | | |
| Impoundments | None | None | None | None |
| Diversions | None | 9 | 7 | 10 |
| Road fills | Several | Several | Few | Many |
| Length | 15 miles | 35 miles | 105 miles | 38 miles |
| **Water Quality Meets Criteria for:** | | | | |
| Primary Contact Recreation | No* | No* | No* | No* |
| Secondary Contact Recreation | Yes | Yes | Yes | Yes |
| Water Esthetics | Yes | Yes | Yes | Yes |
| Fish and Aquatic Life Propagation | Yes | Yes | Yes | No** |
| **Outstandingly Remarkable:** | | | | |
| Scenic Values | No | Yes | Yes | No |
| Recreation Values | No | No | No | No |
| Geologic Values | No | Yes | Yes | No |
| Fish and Wildlife Values | No | No*** | No | No |
| Historic (Archaeologic) Values | No | No | Yes | No |
| Cultural Values | No | No | Yes | No |
| **ELIGIBILITY FOR NATIONAL WILD AND SCENIC RIVERS SYSTEM** | Not Eligible | Eligible | Eligible | Not Eligible |

\* Not suitable because of natural causes.
\** Currently unsuitable, but being restored.
\*** State believes segment possesses outstanding fish and wildlife values.

BLM_0035914

Table IV-2.--Classification Alternatives, Dolores River, Colorado

| Segment | Miles | Alternative 1 | Alternative 2 |
|---|---|---|---|
| I:  Main stem, source to Rico | 15 | NC | NC |
| II:  West Dolores, source to main stem | 35 | Recreational | Recreational |
| III:  McPhee Dam to Bedrock | 105 | | |
| A) McPhee Dam to Bradfield Ranch | 11 | Recreational | Recreational |
| B) Bradfield Ranch to Disappointment Creek | 41 | Scenic | Scenic |
| C) Disappointment Creek through Little Gyp. Valley | 20 | Recreational | NC |
| D) Little Gyp. Valley to Bedrock | 33 | Wild | Wild |
| IV:  San Miguel Confluence to State border | 39 | | |
| A) Confluence to Gateway | 31 | NC | NC |
| B) Gateway to State border | 8 | NC * | NC * |

NC = No Classification

* = This segment meets eligibility criteria except length.
 Any classification of Utah segment, now outside study area,
 should include this segment.

BLM_0035915

Determination of Classification Levels

The following criteria are summarized from the "Guidelines for
Evaluating Wild, Scenic, and Recreational River Areas proposed ...
under Section 2, Public Law 90-542." These were used to determine
the classification eligibility of the various river segments.

WILD

1. *Flow* – Free flowing.  Low dams, diversion works or other
   minor structures which do not inundate the natural
   riverbank may not bar consideration as wild.
   Future construction restricted.

2. *Accessibility* – Generally inaccessible by road.  No roads
   in narrow, incised valley.  If broad valley, no road
   within 1/4 mile of riverbank.  One or two inconspicuous
   roads to the area may be permissible.

3. *Shorelines* – Shorelines essentially primitive.  One or two
   inconspicuous dwellings, limited amount of domestic
   livestock, and land devoted to production of hay may be
   permitted.  Watershed natural-like in appearance.

4. *Water Quality* – Water quality meets minimum criteria for
   primary contact recreation except where such criteria
   could be exceeded by natural background conditions and
   esthetics and capable of supporting propagation of
   aquatic life normally adapted to habitat of the
   stream.

SCENIC

1. *Flow* – Free flowing.  Low dams, diversion works or other
   minor structures which do not inundate the natural
   riverbank may not bar consideration.  Future
   construction restricted.

2. *Accessibility* – Accessible by roads which may occasionally
   bridge the river area.  Short stretches of conspicuous
   and well-screened roads or railroads paralleling river
   area may be permitted, but consider type of road use.

3. *Shoreline* – Shoreline and immediate river environs still
   have overall natural character.  Small communities
   limited to short reaches of total area.  Agricultural
   practices which do not adversely affect river area
   may be permitted.  This could include unobtrusive
   row crops and timber harvest.

65

BLM_0035916

4. *Water Quality* – Water quality should meet minimum criteria for desired types of recreation except where such criteria would be exceeded by natural background conditions and esthetics and capable of supporting propagation of aquatic life normally adapted to habitat of the stream, or is capable of and is being restored to that quality.

## RECREATIONAL

1. *Flow* – May have undergone some impoundment or diversion in the past. Water should not have characteristics of an impoundment for any significant distance. Future construction restricted.

2. *Accessibility* – Readily accessible, with likelihood of paralleling roads or railroads along riverbanks and bridge crossings.

3. *Shoreline* – Some shoreline development. May include all agricultural uses, small communities, or dispersed or clustered residential.

4. *Water Quality* – Should meet minimum criteria for desired types of recreation except where such criteria would be exceeded by natural background conditions and esthetics and capable of supporting propagation of aquatic life normally adapted to habitat of the stream, or is capable of and is being restored to that quality.

## NO CLASSIFICATION

Segment does not meet minimum general characteristics and one or more specific criteria described in the evaluation "guidelines."

66

SUMMARY OF ATTRIBUTES AND CLASSIFICATION

ELIGIBILITY FOR RIVER SEGMENTS

Segment I - Main Stem, Source to Rico

1.  Major Attributes

*Flow* - Small stream.  No impoundments, some highway fills.
Insufficient flow for boating.

*Accessibility* - Easy access.  Paralleled by Colorado
Highway 145.  One bridge.

*Shoreline* - Moderately narrow valley bottom, bordered by
moderate to steep forested slopes.  Scenic, but typical
mountain landscape.  Developments are paralleling highway,
roads, and powerline, and one Forest Service recreation
site, one bridge.

*Water Quality* - Generally clear, no significant pollution
sources.  Quality sufficient for recreation and propa-
gation of aquatic life normally adapted to habitat of
stream.

2.  Most protective classification for which segment is eligible
based on existing conditions:

No Classification.  Ineligible for inclusion in system;
lacks outstandingly remarkable values.

3.  Alternative classifications considered by study team:

None, because of ineligibility.

Segment II - West Dolores, Source to Main Stem

1.  Major Attributes

*Flow* - Small stream; at high flow about 70 feet wide at mouth,
30 feet wide near Dunton.  Nine diversion structures.
Insufficient flow for boating.  No impoundments, some
road fills.

67

*Accessibility* – Easy access.  Paralleled by county-maintained Forest Service road and private roads, except 8 miles in headwaters.  Ten bridges.

*Shoreline* – Narrow valley bottom, bordered by moderate to steep forested slopes.  Prospecting in Dunton area.  Below Dunton, numerous year-round and seasonal dwellings, ranchland, and support facilities, and bridges.  Outstanding mountain scenic and geologic values in upper reaches; attractive pastoral views below.  Five Forest Service recreation sites.

*Water Quality* – Good.  No pollution sources above Dunton; several below Dunton from bordering habitations.  Suited for recreation activities and propagation of normal aquatic life.

2. Most protective classification for which segment is eligible based on existing conditions:

   Recreational

3. Alternative classifications considered by study team:

   Nonclassification.

## Segment III-A – McPhee Dam to Bradfield Ranch

1. Major Attributes

   *Flow* – Seasonal, relatively slow, unchallenging water.  Several irrigation diversions.  Existing diversion below town of Dolores nearly dries up stream by late summer.

   *Accessibility* – Moderate.  Private lands limit access along much of reach.  Paralleled by gravel county road.  Bridge at lower terminus.

   *Shoreline* – Moderately broad valley floor bordered by high, steep slopes.  Hayfields and grazing lands, with ranching facilities on bottomland.  Cottonwood, willows, and shrubs along stream course, pinon-juniper types near rims.

   *Water Quality* – Some minor pollutants from habitations and gravel operations.  No health hazards to recreationists.  Light silt load.  High pH.  Lack of year-round water limits fisheries.

68

BLM_0035919

2.  Most protective classification for which segment is eligible based on existing conditions:

    Recreational

3.  Alternative classifications considered by study team:

    Nonclassification.

## Segment III-B - Bradfield Ranch to Disappointment Creek

1.  Major Attributes

    *Flow* - Seasonal outstanding opportunities for white water floating in primitive environment.  Average gradient about 24 feet/mile.  Contains reaches with nearly continuous series of river's most challenging and technically difficult rapids. Diversions nearly dry up stream by late summer.

    *Accessibility* - Bradfield Ranch is a primary entry point for commercial and private users.  Dove Creek pumping plant dirt access road provides an entry/recovery site; below plant, truck road parallels river about 11 miles.  Remnants of old trail or 4-wheel drive road near lower terminus and upstream of Dove Creek pumping plant.

    *Shoreline* - Striking contrasts of lush vegetation and colorful geologic formation in deep and impressive V-shaped canyon. Narrow valley bottom with a number of wooded and grassy flats. Tall ponderosa pine and thick deciduous trees along shore; pinon-juniper and oakbrush at high elevations.  Cows, fences, and corral in first 3 to 4 miles.  Large powerline intermittently visible on west rim until crossing gorge near Chicken Aspen Canyon.  Other intrusions are the Dove Creek pumping station, followed by 11-mile paralleling dirt road. Evidence of mining activity in this area.

    *Water Quality* - Similar to Segment III-A.

2.  Most protective classification for which segment is eligible based on existing conditions:

    Scenic

3.  Alternative classifications considered by study team:

    Nonclassification, Recreational and Wild.

69

Segment III-C - Disappointment Creek through Little Gypsum Valley

1.  Major Attributes

*Flow* - Seasonal, relatively slow, no significant rapids.
Wire fence crossing above Slick Rock.  Water diversions in
Slick Rock and Gypsum Valley areas.  River is usually nearly
dry by summer.

*Accessibility* - River easily accessible at numerous points,
three bridges, Highway 141, and several gravel and dirt
roads, including paralleling roads in Slick Rock and
Gypsum Valley areas.  Primary launch/recovery site at
Highway 141; several others available.

*Shoreline* - One mile above Cougar Canyon to Big Gypsum Valley,
a scenic 6-mile long canyon with campsites available;
otherwise segment of little scenic interest.  Roads,
bridges, buildings, mining and industry activity, mine
spoil area, powerlines, irrigated pastureland, and large
private land ownership detract from natural river setting.
Petroglyphs in Big Gypsum Valley.

*Water Quality* - High silt content during spring runoff.
Natural and man-caused seepage of ammonia, radioactive, and
other contaminates.  Aquatic life limited.

2.  Most protective classification for which segment is eligible,
based on existing conditions:

Recreational

3.  Alternative classifications considered by study team:

Nonclassification.

Segment III-D - Little Gypsum Valley to Bedrock

1.  Major Attributes

*Flow* - Seasonal, free-flowing, relatively slow; several
easy rapids.  Safe for novice boaters.  Average drop
about 11 feet per mile.  Slow flow permits appreciation
of outstanding scenery, geology, and isolation.  River
usually low or nearly dry by summer.

70

*Accessibility* – Totally inaccessible, except for 3-1/2-mile primitive road from Colorado Highway 90 at Bedrock.

*Shoreline* – A pristine, narrow, winding canyon between high, sheer and mostly unscalable red, yellow, and buff sandstone cliffs – some rising vertically over 1,000 feet from water's edge. No man-made intrusions. Limited number of sites for overnight stops.

*Water Quality* – Heavy silt load during spring runoff. Low levels of radioactive and ammonia contaminates are present. Aquatic life limited, but apparently primarily due to past pollution.

2. Most protective classification for which segment is eligible, based on existing conditions:

   Wild

3. Alternative classifications considered by study team:

   Nonclassification, Scenic, and Recreational.

## Segment IV-A - San Miguel River to Gateway

1. Major Attributes

   *Flow* – Relatively slow. A few white water riffles and fairly easy rapids.

   *Accessibility* – Gravel county road between Bedrock and Uravan provides access at confluence with San Miguel (but does not follow the Dolores downstream). Limited space here for parking and launching. First 4 miles, inaccessible canyon. Below this, river paralleled by busy Colorado Highway 141 and numerous gravel and dirt roads. Access to river good, except on some private lands.

   *Shoreline* – Scenic quality of canyon moderately high, characteristic of region. First 4 miles narrow, deep, scenic red sandstone canyon; historic hanging wooden flume on right bank cliffs. Remainder of canyon U-shaped, and moderately broad. Extensive mining activity; access roads, bridge, tailings, tipples in upper 10 miles. Lower 15 miles: considerable ranchland with support facilities and cattle. Highway a fairly serious source of visual and noise pollution for river users.

BLM_0035922

*Water Quality* – Very silty and salty.  Low level ammonia and heavy metal-radioactive pollution hazard from uranium developments on San Miguel.  Water presently not potable.  Aquatic life eliminated by past pollution, but apparently improving.

2. Most protective classification for which segment is eligible based on existing conditions:

   No Classification due to lack of outstandingly remarkable values.

3. Alternative classifications considered by study team:

   None, because of ineligibility.

Segment IV-B - Gateway to State Line

1. Major Attributes

   *Flow* – Several easy rapids.  Slow to moderate river flow. One diversion structure/ford in Section 39, creates significant rapid at high flow.  A long, major rapid in Utah begins at State line.

   *Accessibility* – Initial access off Highway 141 at Colorado Highway Department yard at Gateway.  County road parallels right bank.  Road approximately parallels south bank.

   *Shoreline* – Arid, wide, agricultural, and nearly barren valley.  Bordering pinon-juniper covers 1,200-1,700-foot bluffs and red sandstone cliffs 1 to 3 miles from river. Palisade Bluff, a prominent landmark, is at upper end. Willow thickets and large cottonwood groves are along river.  Ranchland, cattle, and supporting structures visible.  Rich in birdlife.

   *Water Quality* – Same as Segment IV-A.

2. Most protective classification for which segment is eligible, based on existing conditions:

   No Classification due to short length (8 miles). (However, if combined with Utah portion, may be eligible.)

3. Alternative classifications considered by study team:

   None, because of ineligibility.

72

BLM_0035923



BLM_0035924

CHAPTER V

ANALYSIS OF ALTERNATIVES

Preface

The Water Resources Council developed and tested an analytical procedure for weighing costs and benefits of alternative water and land resource development plans in 1971. The process was first known as the multi-objective planning process since alternative plans for four, often conflicting, objectives were developed. The process was substantially modified and finally adopted by Executive Order as the "Principles and Standards for Planning Water and Related Land Resources" (Federal Register Volume 38, No. 174, September 10, 1973). Although this procedure is intended primarily for water resource development analysis, it is also mandatory for wild and scenic river studies. This section describes the results of such analysis of eight alternative plans for the Dolores River segments found eligible for inclusion in the National Wild and Scenic Rivers System. A complete step-by-step description of the Principles and Standards analysis is included in Appendix E.

Purpose

This analysis provides a basis for recommendations of inclusion or exclusion of eligible Dolores River segments into the National Wild and Scenic Rivers System. This section describes and quantifies, to the extent possible, the costs and benefits of each alternative plan. Both monetary and nonmonetary effects are considered. A total of eight plans are analyzed. Five of the alternatives describe various environmentally oriented wild and scenic river options. Two plans are concerned with economic development and one plan, "No Action," reflects a continuation of current land and water use and management. Each plan is compared to the No Action Plan and the additional impacts, as well as the total effects, are given for these alternatives. It is important to note that the Economic Plans have some positive environmental effects just as the Environmental Quality Plans have some positive economic effects. Neither is completely one-sided.

The Principles and Standards procedure specifies that each alternative be evaluated within the framework of a four-account system. These accounts are National Economic Development, Environmental Quality, Regional Development, and Social Well-Being and each plan is discussed within this framework. Appendix E also includes a series of tables which display the effect of each plan on each account in greater detail.

73

BLM_0035925

## Management Authorities and Programs

The mixture of National Forest, National Resource, and private lands along the Dolores and West Dolores Rivers results in several authorities governing uses and management of the river and its associated land corridor. This section briefly reviews major laws and policies governing water and land use and management along the river to set the stage for the No Action Plan.

## National Forest

Among the many statutory authorities of the Secretary of Agriculture in National Forest Administration are:

- The Multiple Use - Sustained Yield Act of 1960 (74 Stat. 215). This Act reaffirms the policy that Congress established the National Forests with the intent that they be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The Act does nothing to preclude mineral development. National Forests are administered in accord with this directive. Multiple Use Plans establish management direction for various zones or areas of National Forest lands. Consideration is given to relative values of the various resources in each particular area. Generally, management seeks the combination of resources that will best meet the needs of the American people. Judicious use of the land for some or all of these resources over areas large enough to provide sufficient latitude for periodic adjustments in response to changing needs and conditions is the objective. Multiple use management is directed to harmonious and coordinated resource use with consideration of the relative value of each and not necessarily to the combination of uses that yields the greatest economic return or maximum output.

Multiple Use Management Guides exist for all National Forest lands. Management zones for the Dolores River area are Special, Crest, Intermediate, Travel Influence and Water Influence Zones.

A Special Zone is an area of land which has been established by the Secretary of Agriculture, Chief of the Forest Service, or Regional Forester due to particular conditions of public significance. The Wilson Mountains Primitive Area, containing the headwaters of the West Dolores River, is an example of a Special Zone. Management direction for this area is the same as for a Wilderness Area. Special Zones override all other zones.

The Crest Zone is high elevation areas and is characterized by rugged, alpine peaks. The lower boundary is generally considered to be at the upper edge of the commercial timber type. The headwaters of the West Dolores River and the Dolores River above Rico are both within this zone. Recreation is a key value of the Crest Zone and management is directed toward minimum modification of natural conditions.

74

BLM_0035926

The Intermediate Zone is the general forest area extending from the Crest Zone to the lower edge of the commercial timber growing area. The major goal is production of the optimum quantity and quality of water with stable soil conditions. Where commercial timber production is possible lands are managed to obtain a sustained volume of timber with good watershed conditions. On lands best suited for grazing, livestock and wildlife forage is maintained and improved. The West and Main Dolores flow through this zone. Intensive recreation use within the zone occurs primarily in the Travel and Water Influence Zones.

The Travel Influence Zone parallels designated roads and trails. It includes the most accessible areas and provides for the most intensive occupancy and use. Width of the zone varies from a few hundred feet to a mile or more. Resource management and use is guided by the recreational and occupancy demands resulting from accessibility. Scenic values are protected and enhanced. Recreation sites may be developed on suitable areas as needed, but with due regard for esthetic values. The roads and the trails paralleling the West Dolores River and Dolores River are Travel Influence Zones.

The Water Influence Zone varies in width along or around rivers, streams, lakes, and reservoirs. The key values are those associated with quantity and quality of the water and the attractiveness of adjoining lands. This zone transects all other zones except Special Zones. All of the West Dolores River and all of the Dolores River including their headwaters are Water Influence Zones to the canyon rim or valley crests. Management direction is to:

1. Maintain and improve the onsite and downstream usefulness of water.

2. Maintain and improve soil stability of shore areas and water channels, protect and develop riparian vegetation needed for soil stabilization and wildlife habitat and fisheries.

3. Provide optimum recreation opportunities and scenic values consistent with soil and water needs.

4. Protect and improve fish and wildlife habitat.

5. Provide reasonable public access.

- The Organic Administration Act of 1897 (30 Stat. 35) which gives the Secretary of Agriculture control over the uses to be made of national forests. Among other things, the Act provides control over surface effects of mining, and of trespass.

BLM_0035927

- The U. S. Mining Laws Act of 1872 (17 Stat. 91) and the Secretary of Agriculture's Regulations provide statutory rights for miners and prospectors to explore and produce minerals from public lands. The Secretary's Regulations reinforce the Forest Service authority to control and protect the land surface. Mineral claimants are required to file notices of intent, operating plans, and to protect and restore surface resources affected by mining or exploration.

- The General Exchange Act of 1922 (42 Stat. 465) is a law which allows land and/or easement acquisitions. The purpose of this Act is to advance the public interests by allowing acquisition of lands within the exterior boundaries of the National Forest that are valuable for National Forest purposes.

Bureau of Land Management

The Secretary of the Interior has broad and inherent authority to manage all resources on the National Resource Lands for multiple use values. The basic authority and power over the national resource (public domain) lands are derived from Article IV of the Constitution. Congress delegated this authority to the Secretary of the Interior by the Act of April 25, 1812 (2 Stat. 716).

The Picket Act of June 25, 1910, as amended (43 U.S.C. 141, 142), and Executive Order 10355 of May 25, 1952 (17 F.R. 4831) delegated to the Secretary of the Interior full authority to withdraw or reserve "... land owned or controlled by the United States ... and to issue such rules and regulations ... as are necessary for the exercise of this authority." Pursuant to this authority, the Secretary may withdraw lands for any public purpose, including scenic and open space corridors. The lands may be withdrawn from certain uses or laws if they are incompatible with the purpose and intent of the withdrawal, including the mining laws (30 U.S.C., Ch. 2). Only the Secretary of the Interior has the authority to order such withdrawals on either National Forest or National Resource Lands.

The Classification and Multiple Use Act of September 19, 1964 (43 U.S.C. 1411-18) directed all lands administered by the Secretary through the Bureau of Land Management will continue to be administered for multiple use and sustained yield of the several products and services obtainable therefrom. Consistent with the provisions of applicable law, the land will be managed "... to attain the widest range of beneficial uses of the environment, to preserve important historic, cultural, and natural aspects of our national heritage; management for fish and wildlife development and utilization and provision and maintenance of public access thereto (Sec. 9, Taylor Grazing Act (43 U.S.C. 315h)), F&W Coord. Act (16 U.S.C. 661-666c), (43 CFR 2420.2(b)(2)); management for outdoor recreation, protection, regulated use, and development of lands having open space value (4 U.S.C. 1500-1500e), (43 CFR 2420.2(b)(5)) in a manner that will preserve their values and will make them available for appropriate recreation enjoyment by the public (16 U.S.C. 460:1 et seq.), (43 CFR 2420(b)(5)); and to manage for wilderness preservation and regulating such uses."

76

BLM_0035928

The National Environmental Policy Act of 1969 (P.L. 91-190), (E.O. 11514) gives authorities for the protection, preservation and regulation of public values, including open space, unique characteristics and natural beauty as listed in 43 CFR 1725.3-3(f) and (j), and in P.L. 89-285 (1965 Highway Beautification Act).

Under the regulations contained in 43 CRF 2070 (78 Stat. 986; R.W. 2478, as amended); (43 U.S.C. 1411, 1201), the Secretary may designate Areas and Sites, and to specify the nature and effect of such designations.

Criteria for the Protection and Preservation of Natural Values is set forth in 43 CFR 6200 (secs, 1, 3, 5), (50 Stat. 874, 875); (43 U.S.C. 1181 (a)(c)(e)); (R.W. 2476); (43 U.S.C. 1201). The objectives include the preservation and protection of significant, natural, historic, and cultural resources, and provide for their public use and development consistent with preservations goals. Subpart 6222 sets forth the policy on scenic corridors and buffer zones. Scenic corridors may be established along rivers and streams, trails, and other lands for the preservation, protection and enhancement of scenic and natural values. Size and use of scenic corridors shall be consistent with the purposes for which they are established (35 F.R. 9795, June 13, 1970). Lands so identified may be designated pursuant to 43 CFR 2070 and segregated pursuant to 43 CFR 2440.

Public Law 90-542 requires that public values are to be preserved on land lying within or near the National Wild and Scenic River System. BLM Manual 2031.3, Environmental Quality and Natural Beauty sets forth the criteria "...classification and management procedures, take into consideration public values in relation to the scenic rivers system ... the character of such public use is to be consistent with the objectives of the scenic rivers system ... adequate stipulations are to be provided to protect scenic values and regulate use consistent with the preservation of public values."

The Bureau Planning System (D.M. 135.1.2; 235.1; 603.3.4, BLM 1601-1608) and BLM Manual 2032 (Act of 9/19/1964) (78 Stat. 986), (43 U.S.C. 1411-18); (43 CFR 1725.2 (a)); (43 1725.3.3 (f and j); (43 CFR 2410) defines the objectives, responsibilities, and policy to protect open space values in the planning system. National Resource Lands having open space or buffer zone values will be identified and protected (43 CFR 2410.1-2).

<u>Private Lands</u>

- The Local Government Land Use Enabling Act of 1974 (H.B. 1034, 1974 Session Laws). This statute gives local governments authority to plan and zone land use in several areas. These include:

    i.   regulating development in hazardous areas;

77

BLM_0035929

      ii.    protecting lands critical to wildlife; and

     iii.    preservation of areas of historical and archaeological importance.

This statute is directed to controlling how a subdivider may divide and sell lots rather than preservation of natural or scenic values. It does not provide any procedures for such regulation--it implies that any regulation will be done through the normal zoning function. The statute does not specify that regulation must be done.

- H.B. 1041, 1974 Session Laws. This statute gives the local governments the authority to designate areas of state interest (natural hazard areas, mineral resource areas, and natural or archaeological resource areas). It does not affect activities presently planned and approved by local governments nor those presently planned for land of compatible zoning. Development within an area of state interest is not precluded but only restricted to the extent it will have minimum damage. The initial decision of designating an area of state interest belongs to the local government. If the local government fails to designate an area as such, then the Colorado Land Use Commission can request it to do so. If it still fails to designate, the Land Use Commission must go to the local district court and seek judicial review. There is no guarantee that a court will order local government to designate an area as requested by the Land Use Commission.

Both H.B. 1034 and H.B. 1041 share a common shortcoming. In a river corridor, the size of the Dolores', numerous local governments are involved (five counties, in the case of the Dolores). Each has the same freedoms and rights to refuse to regulate and to designate under the bills.

- The Antiquities Act of 1906 (34 Stat. 225). This law protects historic or prehistoric remains, "or any antiquity," on Federal lands. Specifically, it establishes criminal sanctions for unauthorized destruction or appropriation of antiquities; it authorizes the President to proclaim National Monuments; and authorizes the scientific investigation of antiquities on Federal lands, subject to permit and regulations.

- National Historic Preservation Act/National Register of 1966. This Act establishes a Federal policy of encouraging the preservation of the Nation's historic and archeologic resources by placing worthy resources on the National Register of Historic Places. Federally licensed or funded projects affecting properties on or eligible for the National Register must be evaluated by the Advisory Council on Historic Preservation.

78

BLM_0035930

- Executive Order 11593.  Executive Order 11593 directs federal agencies to inventory U.S. Government-owned property to identify possible National Register entries and directs the agencies to protect properties listed on the National Register or eligible to be listed.

- State Antiquities Act (131-12-1).  The State Antiquities Act (131-12-1) reserves title to all historical, prehistorical and archaeological resources relating to the historical or prehistorical culture of people in Colorado.  It established the Office of the State Archaeologist within the State Historical Society to administer the Act and to identify, collect, and preserve archaeological resources.  The State Archaeologist is empowered to consult and advise agencies on archaeological problems and to issue permits for the investigation, excavation, gathering, or removal of historical, prehistorical, or archaeological resources.

- Endangered Species Act of 1973.  This Act is designed to protect and perpetuate species that are endangered with extinction and those species that are threatened with endangerment.

## Alternative Plans

### NO ACTION PLAN - Continue Current Management

This plan involves Federal, State, and local agencies.  It is based on continued application of current management authorities to protect scenic, recreation, geologic, fish and wildlife, archaeologic, and other values.  It also assumes that current trends in the use and development of resources will continue and that no new action will be taken as a result of this study.

The visual corridor area of the two eligible segments contains about 79,500 acres.  Of this area, about 71,500 acres, or 90 percent, are administered and managed by Federal agencies.  The Forest Service manages 35,200 acres, of which 19,800 are along the West Dolores and 15,400 are along the Dolores below McPhee Dam.  The Bureau of Land Management manages 36,400 acres, all along the Dolores below McPhee Dam.  Private lands are subject to county regulations governing land use.  The State's authority to regulate land use is untested.

### Environmental and Land Use Impacts

No changes in the types of land use within the foreseeable future are expected.  Ranching, recreation, and mining will continue to be the predominant activities along the Dolores and its tributaries.  The intensity of some of these uses, especially recreation, subdivision for vacation homes, and uranium-vanadium mining, is expected to increase in some segments.  Federal control and administration of these uses will continue

79

BLM_0035931

on the public lands within the corridor.  The Forest Service and Bureau
of Land Management will utilize the full range of their management
authorities to protect and preserve scenic, recreational, fish,
wildlife, and other values of the river and corridor.

Besides the Dolores Project, two other water conservation projects in the
Dolores River basin have been authorized by Congress for construction.
These projects could be built regardless of River designation.  The Paradox
Unit of the Colorado River Basin Salinity Control Project would affect
the River near Bedrock, Colorado (outside of study area).  The San
Miguel Project would withdraw between 50,000 to 80,000 acre feet annually
from the San Miguel River near Norwood, Colorado, and have some effect
on the Dolores River flows (about 10% for uranium and vanadium, and mineral prospecting could degrade water quality.  Both State and Federal
safeguards and enforcement programs will concentrate on preventing such
degradation.  The land managing agencies require soil and watershed pro-
tection measures in all exploration and operating plans.  Sedimentation
and other adverse effects of mining and prospecting will be controlled
to the maximum practicable extent.

Major portions of these river segments are now in public ownership.
Mineral development poses a significant threat to the natural
value of these public lands.

Most existing residential and industrial developments occur on the West
Dolores, between the proposed McPhee Damsite and Bradfield Ranch on the
main stem and in the Slick Rock-Gypsum Valley area.  Additional resi-
dential, industrial, and mineral development may reduce the natural
quality of the river corridor in these reaches.  A high potential exists
for subdivisions in development of vacation homes and multi-family
dwellings on privately owned land along the West Dolores and in the
general area of the proposed McPhee Reservoir.  As a part of the Dolores
Project fishermen's access easements are planned to be acquired along
the river between McPhee Dam and Bradfield Ranch.

Economic and Regional Development Impacts

Present yields from croplands and pasturelands will remain the same.
Most of the farms and ranches in the River area are stable and provide
a major source of economic value in the area.  Since the primary use of
agricultural land in the corridor is for the production of range live-
stock, agricultural production is measured in terms of animal unit

BLM_0035932

months (AUM).  The estimated production is about 27,000 AUM annually
with a value of $121,500.  Corridor lands are not used for commercial
timber production.

There are about 5,000 mineral claims and about 10 working mines in the
corridors of the two eligible river segments.  Uranium and vanadium will
continue to be an important part of the local and national economy.  The
value of mineral production is expected to be about $5,000,000 annually
by 1990 if current rates of production continue.  Minerals on Federal
lands will be available for appropriation under the Mining Laws and the
mineral leasing laws will be operative.

Recreation use in the Basin and the River area has been increasing
slightly over the past 25 years.  Modest increases (5-10 percent per
year) are anticipated.  Most use would occur on the developed Forest
Service sites along the West Dolores, at the McPhee Reservoir, and in
the Dolores Canyon.  As a part of the Dolores Project, the Bureau of
Reclamation plans to construct boat launching and fisherman parking
facilities immediately below the dam and at Bradfield Ranch along with
two sites containing fisherman parking facilities.  A campground is
planned at Mountain Sheep point and boat launching facilities at Slick
Rock, Little Gypsum Valley and Bedrock.  Major development of facilities
including campgrounds, boat ramps, etc., is planned around McPhee Reser-
voir.  By 1990, about 223,000 recreation use days are expected to occur
annually.  The value of this use is estimated to be $1,101,700
annually.

## Social Impacts

The No Action Plan will have little effect on individuals in the Dolores
River area.  Little change in land use is expected, and growth of the
area will be modest.  Recreation activity and agriculture will in-
crease in and around the McPhee Reservoir.  Tourists and recreationists
will come to the area at about the same rate and numbers.  More boaters
may seek to use the Dolores as other rivers reach maximum capacity.
About half of these will be from out-of-State.  The major economic
activities will continue to be agriculture and mining.

Owners of private land generally recognize and appreciate the scenic and
natural values of the river.  The private land (10 percent of the corri-
dor) could suffer from misuse and subsequent degradation, but on the
basis of expressed attitudes this is not expected.  However, historic
and archaeological sites on private lands would not receive additional
protection and could be degraded.

## NATIONAL ECONOMIC DEVELOPMENT PLANS

The basis of a National Economic Development Plan (NED) is the increased
output of goods and services or the increased economic efficiency in the
output of goods and services.

81

BLM_0035933

Realistically, there is little that State or Federal Governments can do to promote rapid or maximum economic development within the Study Area. The local economy is based on agriculture and mining and is likely to remain so, even under stimulated economic conditions. Thus, the distinction between an NED Plan and the No Action Plan is one of degree rather than kind. These options outline the likely impacts of possible, rather than probable, programs of maximum resource exploitation. They are presented for comparison purposes and are not proposed for implementation.

In the formulation of alternative plans, one must arrange the component needs that are essentially complementary, i.e., the satisfaction of one component need does not preclude satisfaction of, or add to, the cost of other needs. "NED Plan A" is essentially a plan which generates maximum recreational benefits. "NED Plan B" is a plan which maximizes mineral development and output. It was the assumption of the study team that the satisfaction of the mineral needs - uranium, vanadium, copper - and geothermal resources inhibited, not precluded, the satisfaction of picnicking, camping, hiking, and boating component needs. Neither plan wholly precludes environmental quality objectives; however, satisfaction of environmental quality is reduced.

## National Economic Development Plan A

### Increased Recreation Development

There is a national need for boating, fishing, hiking, camping, picnicking, and livestock production; and the goal of this NED plan is to maximize the opportunities to satisfy these needs. This would be done on the West Dolores River and on about 105 miles of the Dolores River between McPhee Damsite and the community of Bedrock.

### Environmental and Land Use Impacts

If selected, this alternative would develop recreation on public lands to about twice the level considered consistent with maintaining a high-quality environment. Development of facilities for recreation under this plan is physically possible and economically beneficial, even though the density of recreation use could cause environmental impacts. These impacts could cause some loss of diversity and density of wildlife, soil erosion, disturbance of vegetative cover, vandalism, litter, loss of auditory and visual qualities due to overcrowding, and a general reduction of those qualities which make the Dolores River a valuable addition to the National Wild and Scenic Rivers System.

Development of public land for other uses under this plan would have to be kept at a minimum to allow for recreation development and use. Environmental controls would have to be placed on mineral extraction between Dove Creek pumping plant and Little Gypsum Valley bridge.

82

These controls would cost the industry approximately $100,000 annually.
It is expected that there would be some degree of conflict between
recreationists and grazing stock.

### Conservation/Recreation Costs and Trends

If selected, this plan would result in development of 203 camping units,
66 picnic units, 103.4 miles of trail, and additional recreation and
recreation access.  Recreation development would cost approximately
$1,480,000.  Operation and maintenance (including a sinking fund) costs
for these developments would require about $137,000 annually.  In addi-
tion, management and operation expenses for plan administration would
be approximately $193,000 annually.  It would cost about $2 million to
do validity determinations on mining claims in the corridor.  This does
not include costs of acquisition of valid claims.

Under existing circumstances and developments planned by other agencies,
an estimated 224,000 recreation days would occur on public recreation
facilities within the area by 1990.  With the developments proposed by
this plan, a total of 478,000 recreation days would be generated annually
by 1990 without exceeding unmet demand.  This would consist primarily of
increases in camping, picnicking, boating, and hiking.  The value is es-
timated to be an additional $410,000.

### Energy Impacts

There are no hydroelectric sites on the Dolores River with economic poten-
tial, so this plan would have no effects on this energy source.  It is
also expected to have no significant impact on fossil fuel energy sources.
There is some active uranium mining in the corridor, and this plan would
place a burden of about $100,000 annually on that energy industry (as
discussed in the Environmental and Land Use Impact Section of this plan).
However, since the area affected by this plan (a corridor 0.5 to 2.0
miles wide) contains only about 0.03 percent and 0.26 percent of the
United States' total known resources and probable potential reserves
of $U_3O_8$, respectively, this impact is small but could affect national
and regional energy production.

### Economic and Regional Development Impacts

There are no adverse economic effects other than those discussed in Con-
servation/Recreation Costs and Trends and Energy Impacts.  However, recre-
ation users are expected to spend $430,000 more annually in the basin by
1990 than they would without this plan.

### Social Impacts

Although the amount of recreation use would increase greatly under this
plan, there would be a significant degradation of the quality of the ex-
perience.  Additionally, destruction and some vandalism of cultural sites
is expected to increase if this plan is selected.

BLM_0035935

## National Economic Development Plan B

### Increased Mineral Development

The authorized study portions of the Dolores River visual corridor contain approximately 0.03 percent and 0.32 percent of the United States' total supply of known $15 reserves and probable potential $30 resources of $U_3O_8$, respectively.  Vanadium occurs in many of the uranium-bearing ores in this area.  Management for the maximization of yield and efficient production of these two strategic minerals is the basis of NED Plan B.  Other minerals occur within the visual corridor but are not presently economic to extract.  If this plan is selected, it is possible that extraction of these minerals would become economically feasible.

According to the Energy Research and Development Administration, additional methods to increase mineral extraction, if this plan is selected, might include:

-   the provision of low-interest loans through the Office of Mineral Exploration (USDI)

-   development of access roads

-   a Government-guaranteed base price for these minerals

-   maintenance of present safety and environmental controls which are considered adequate by the industry

-   development of a program to train miners (which are now in short supply)

-   development of additional housing and public services (such as health and education) to encourage miners to move into and stay in this area

If this plan is selected, it is expected to significantly increase production of minerals in this area by 1990.  Access roads and minimum environmental controls could probably be implemented in the local area by the Forest Service and Bureau of Land Management.  However, the production would have to be increased without an adverse effect on production in other areas to fall within the criteria for an NED plan. (That is, production in the corridor cannot exceed the proportioned share of national demand.)

84

BLM_0035936

### Environmental and Land Use Impacts

Under this plan, adverse environmental impacts would increase signifi-
cantly. Much of the scenic, geologic, recreation, fish, wildlife, and
cultural qualities which make the affected areas valuable for inclusion
in the National Wild and Scenic Rivers System would be lost.

Shifts in land use from agriculture and grazing to mineral extraction
and the associated support services (such as more housing, schools, and
mills) would occur.

### Conservation/Recreation Costs and Trends

The adverse effects of this plan on recreation would be twofold. First,
the quality and value of a recreation day would decrease, and secondly
the number of recreationists using the area would decline significantly.

### Energy Impacts

This plan would significantly increase the production of $U_3O_8$ and, there-
fore, make it more available to the nuclear-powered utilities.

### Economic and Regional Development Impacts

This plan would improve the economy in the area by providing jobs; more
stable employment, and increased income to area residents. It would,
however, tend to lessen the diversity of the local economy.

### Social Impacts

If selected, this plan would have adverse social impacts. They primarily
include the loss of cultural sites and recreational opportunities.

However, positive social impacts of this alternative, such as increased
health services, educational opportunities, and housing, would also occur.

### WILD AND SCENIC RIVER PLANS

Significant, long-term preservation of the Dolores River Systems' out-
standing values may be accomplished by designating wild and scenic river
segments. The river's great length and outstanding values permit con-
sideration of a variety of protection options depending upon the extent
of environmental preservation desired and the degree of accommodation
with incompatible resource uses found necessary. Although formulated to
satisfy the Environmental Quality Objective, each plan has economic
benefits. Five feasible options are evaluated here. These range from
designation of about 105 river miles to designation of all 140 miles
which qualify for wild and scenic river status to non-designation, in
order to protect archaeologic and cultural resources. Classification
options are also discussed.

85

Wild and Scenic River Plan A   (EQ A)

(Colorado Department of Natural Resources Recommendation)

Plan Summary Table

| Eligible Segments | Recommended for Designation | Proposed Classification |
|---|---|---|
| West Dolores River | Yes | Recreational |
| Section 2, T. 16 N., R. 38 W. to Bradfield Ranch Bridge | Yes | Recreational |
| Bradfield Ranch Bridge to Disappointment Creek | Yes | Scenic |
| Disappointment Creek to Little Gypsum Valley Bridge | Yes | Recreational |
| Little Gypsum Valley Bridge to one mile above Highway 90 | Yes | Wild |

This wild and scenic river option would protect 140 miles of river
classified as wild, scenic, and recreational.  Under this plan, the
35-mile West Dolores River and 105 miles of the main stem of the
Dolores River from about 1 mile below the proposed McPhee Damsite
to about 1 mile above the State Highway 90 bridge, near the community
of Bedrock, would receive protection.

As with all wild and scenic river proposals considered, resource value
protection would be achieved primarily through scenic and public use
easements.  If this plan were implemented, a total of over 78,000 acres
would be protected.  Approximately 8,000 acres of private land would be
protected by easements, and the remaining 70,000 acres are public lands
in the visual corridor.  No fee title acquisition is expected.  A
graphic display of scenic and public use easement relations to the cor-
ridor is given in Figure 2.

Environmental and Land Use Impacts

This alternative offers more statutory preservation of the Dolores River
than any other alternative discussed.  It would protect about 1,900
acres of cold and warm water fishery habitat and would ensure protection
for all eligible study portions of the river at the highest classifica-
tion for which those segments are suitable.  These eligible stream seg-
ments include 35 miles of the West Dolores River and 105 miles of the
Dolores River between McPhee Damsite and Bedrock.  These two river seg-
ments cross a total of five life zones from alpine through high Sonoran.

BLM_0035938



**TYPICAL VISUAL CORRIDOR CONFIGURATION AND RELATIONSHIP OF SCENIC AND PUBLIC USE EASEMENT AREAS**

BLM_0035939

BLM_0035940

Selection of this alternative would not affect logging since there has been none in the corridor for decades. However, environmental controls on mineral extraction between Dove Creek pumping plant and Little Gypsum Valley bridge would cost the industry approximately $100,000 annually. Some minor impacts on present farming and grazing may occur but cannot be quantified. Probable future subdivisions expected along the West Dolores River and between McPhee Damsite and Bradfield Ranch would have an adverse impact on the existing environment in the river corridor, so they would be planned to minimize their impact.

Conservation/Recreation Costs and Trends

This plan would require no known transfers of private land to public ownership. Development of public recreational facilities would include two picnic sites (totaling 15 units), two primitive camping areas in the wild river segment, and two standard campsites (totaling 42 units). In addition, 64 miles of hiking trail would be developed. Recreation development would cost approximately $780,000. Operation and maintenance costs for these developments would be about $60,000 annually (including a sinking fund). In addition, management and operation expenses for plan administration would be about $95,000 annually. The cost for doing validity determinations on mining claims in the corridor would be about $2 million. This does not include the cost of acquiring valid claims. No relocation costs would be incurred; however, easement costs are estimated to be $323,000.

Under existing circumstances and developments planned by other agencies, an estimated 223,000 recreation days will occur on public recreation facilities by 1990. The interest and publicity which normally attends wild and scenic river designation is expected to generate a total of 323,000 recreation days by 1990, if this plan were adopted. This increment in recreation days will consist primarily of increases in camping, picnicking, boating, hiking, and fishing. No significant overcrowding is expected, although management agencies will have to monitor recreation use to ensure this.

Energy Impacts

There are no hydroelectric sites on the Dolores River with economic potential so this plan would have no effects on this energy source. It is also expected to have no significant impact on fossil fuel energy sources. The plan is not expected to have an effect on the ability to mine coal in areas drained by Dolores River tributaries if adequate standard surface protection measures are utilized. There is some active uranium mining in the corridor, and this plan would place a burden of about $100,000 annually on that energy industry (as discussed in the environmental and land use impact section of this plan). However, the designation area contains only about 0.03 percent and 0.32 percent of the United States' total known $15/lb reserves and probable potential $30 resources of $U_3O_8$, respectively. Minerals on Federal lands which constitute the bed, or bank, or situated within 1/4 mile of the bank of the river, would be withdrawn

87

from all forms of appropriation under the mining laws and from operation of the leasing laws.

Economic and Regional Development Impacts

The primary economic impact resulting from adoption of this alternative would be from a significant increase in regional tourism. Tourists are expected to spend about $208,000 per year more in the Basin by 1990 with adoption of this alternative than without. All adverse economic effects that would be caused by adoption of this alternative are discussed in the sections on Conservation/Recreation Costs and Trends and Energy Impacts. Mineral and agricultural uses, costs, and values are about the same as described in the No Action Plan.

Social Impacts

The quality and variety of outdoor recreation available within the plan's boundaries would be protected and enhanced if this plan is selected. Additionally, the cultural, archeological, and historical resources of the plan area would be surveyed, protected, and possibly receive some interpretive work and access so that the public can receive benefits from their use. Designation of the river would not preclude future highway improvements in the basin.

## Wild and Scenic River Plan B   (EQ B)

### (Federal Recommendation)

### Plan Summary Table

| Eligible Segments | Recommended for Designation | Proposed Classification |
|---|---|---|
| West Dolores River | No | None |
| Section 2, T. 38 N., R. 16 W. to Bradfield Ranch Bridge | Yes | Recreational |
| Bradfield Ranch Bridge to Disappointment Creek | Yes | Scenic |
| Disappointment Creek to Little Gypsum Valley Bridge | Yes | Recreational |
| Little Gypsum Valley Bridge to one mile above Highway 90 | Yes | Wild |

88

BLM_0035942

This alternative would protect 105 miles of river from about 1 mile below McPhee Damsite to about 1 mile above the State Highway 90 bridge, near the community of Bedrock.

About 70 percent of the West Dolores Corridor, including the areas with highest scenic, recreation, geologic, fish and wildlife values, is federally owned. Because of this and because designation would incur high costs for easements, development, operation and administration and adverse environmental impacts, it is not included in this alternative. The Federal agencies believe that the federal lands along the West Dolores can be protected best by continuing Forest Service Multiple Use Management.

Resource value protection would be achieved under this plan primarily through scenic and public use easements. Easements would be secured on about 5,600 acres of private land within the proposed area of designation. There are also about 50,800 acres of public land in this area which would also be protected. No fee title acquisition is required.

Environmental and Land Use Impacts

Environmental and land use impacts on the Dolores River below McPhee Dam to Bedrock would be the same as in the Wild and Scenic River Plan A.

The West Dolores is not included in this alternative. The protection and management for it would be the same as provided in the No Action Alternative. The Forest Service would continue to protect the resource values of National Forest lands on this stream through existing authorities. County zoning could be used to protect River values.

About 1,700 acres of cold and warm water fishery and the most outstandingly remarkable resource values on the river would still be protected if this plan is selected.

Nondesignation of the West Dolores River avoids conflicts with the owners of many private holdings which are scattered along about one-third of this segment, while at the same time protecting this segment. However, if subdivisions are constructed along the West Dolores River, this could lead to degradation of the designated stream segments below, due to domestic waste. If State and Federal water quality standards are met, this will not be a problem.

BLM_0035943

## Conservation/Recreation Costs and Trends

This plan will require no known transfers of land from private to public ownership. Development of additional public recreation facilities would include one picnic site (totaling 12 units), two primitive campsites, and one standard campsite (totaling 28 units). In addition, 36.5 miles of hiking trail would be developed. Recreation development would cost approximately $453,000. Operation and maintenance costs for these developments would be about $40,000 annually (including a sinking fund).

In addition, plan administration would require about $50,000 annually. No relocation costs would be included; however, easements are expected to cost $220,000. This is the least costly of any of the wild and scenic river plans developed by this study.

Under existing circumstances and recreational developments already planned, an estimated 168,000 recreation days will occur on public recreation facilities within this plan's boundaries by 1990. The interest and publicity which normally attends wild and scenic river designation is expected to generate a total of about 220,000 recreation days by 1990 if this plan is selected. This would consist primarily of increases in camping, picnicking, boating, and hiking. No significant overcrowding is expected, although plan management agencies would have to monitor recreation use to ensure this.

## Energy Impacts

Energy impacts under this plan are the same as discussed under Wild and Scenic River Plan A. Minerals on Federal lands in the river bed, bank, or within 1/4 mile of the bank, would be withdrawn from appropriation under the mining laws and from operation of the leasing laws.

## Economic and Regional Development Impacts

These impacts are also basically the same as in Wild and Scenic River Plan A; however, tourists under this plan are expected to spend about $122,000 more annually in the basin by 1990 than they would without this plan.

## Social Impacts

Social impacts under this plan are the same as under Wild and Scenic River Plan A, except the social impacts under this plan are of lesser magnitude due to non-inclusion of the West Dolores.

90

Wild and Scenic River Plan C   (EQ C)

Plan Summary Table

| Eligible Segment | Recommended for Designation | Proposed Classification |
|---|---|---|
| West Dolores, Source to Main Stem | Yes | Recreational |
| Section 2, T. 38 N., R 18 W. to Bradfield Ranch | Yes | Recreational |
| Bradfield Ranch to Disappointment Creek | Yes | Scenic |
| Disappointment Creek to Little Gypsum Valley Bridge | Yes | Recreational |
| Little Gypsum Valley Bridge to one mile above Highway 90 | Yes | Scenic |

This alternative would protect 140 miles of the Dolores.  The degree and kind of protection would be similar to that afforded under Plan A, except in the last segment where the "Wild" classification would be lowered to "Scenic." Easements and acquisitions would be the same as under Plan A.

Environmental and Land Use Impacts

Resource protection would be identical to that offered by Plan A, with the exception of the Little Gypsum to Bedrock segment. Here the major difference would be the continuation of mineral exploration and development, with environmental controls in Slick Rock Canyon. Existing land use patterns would not change significantly.

Conservation/Recreation Costs and Trends

Recreation use and developments would be the same as would occur without a plan in all but the last segment. In this segment, there would be about 59,200 more visitor days by 1990 than would occur without a plan. This would require a boat launching area, an additional 32 miles of hiking trail, 33 camping units, and 5 picnic units at an annualized cost of $34,630, or a total construction cost of $438,354. The annual operation and maintenance costs, including a replacement sinking fund, would be approximately $28,500. As with Plan A, no relocation expenses would be incurred since no landowners or leases would be displaced.

91

BLM_0035945

Energy Impacts

Impacts on energy resources would vary from those described in Plan A
only in the lower segment. By classifying this segment "Scenic" in-
stead of "Wild," it would be possible to continue exploration for ura-
nium and vanadium or other minerals. At the discretion of administer-
ing agencies, these lands could be withdrawn from mineral entry. If
not withdrawn, minerals on Federal lands would be available for appro-
priation under the mining laws and the leasing laws would be operative.
These activities would be conducted under controls that would ensure
retention of the scenic qualities of this area. Since methods of meet-
ing long-term energy demands are not now predictable, the need for
energy resources that may exist in this corridor is uncertain. It
should be noted that river management objectives associated with national
designation can be modified or reversed if at some future time it is
determined that exploitation of the energy resources in the Dolores
corridor is in the national interest.

Economic and Regional Development Impacts

Classification of the lower segment as "Scenic" instead of "Wild" would
have the effect of permitting a greater amount of mineral and recrea-
tional activity in this area. Although there are no known reserves of
uranium or vanadium, the scenic designation would permit exploration,
whereas "Wild" will not. This activity would not add significant
economic benefits to the region unless major deposits of national
importance were discovered. Their economic value to the region would
then depend on national priorities of need for their extraction to
meet energy demands.

Annual expenditures by recreationists would reach about $393,000 over
those that would occur without a plan by 1990. Publicity associated
with this study and the legislation which enabled it has stimulated
considerable interest in this previously obscure segment of the river.
This most likely will result in an even greater amount of nonresident
participation than the estimated 55 percent. Although the number of
boaters would necessarily remain relatively low because of the short
floating season, it is this activity that likely would continue to have
the highest percent of nonresident participation. Nonresident parti-
cipation in camping, picnicking, and hiking would remain high.

Social Impacts

Social impacts under this plan would be similar to those under Plan A.
However, by allowing more recreation use of the lower segment under a
"Scenic" classification, more recreation opportunities would be provided
at the expense of lowering the quality of the experience for some. Also,
by permitting continued exploration for minerals in Slick Rock Canyon,
it is possible that rich deposits of uranium/vanadium may be discovered
that could help fulfill the national goal of energy independence.

92

BLM_0035946

Wild and Scenic River Plan D   (EQ'D)

Plan Summary Table

| Eligible Segment | Recommended for Designation | Proposed Classification |
|---|---|---|
| West Dolores, Source to Main Stem | Yes | Recreational |
| Section 2, T. 38 N., R. 18 W. to Bradfield Ranch | Yes | Recreational |
| Bradfield Ranch to Disappointment Creek | Yes | Recreational |
| Disappointment Creek to Little Gypsum Valley Bridge | Yes | Recreational |
| Little Gypsum Valley Bridge to one mile above Highway 90 | Yes | Recreational |

This alternative would offer the least degree of protection to the 140 miles of the Dolores that were found eligible for classification. Under this alternative, the "Wild" and "Scenic" segments in Plan A would be changed to "Recreational."

Environmental and Land Use Impacts

At the discretion of the land managing agency, the area could be withdrawn from mineral entry. If not withdrawn, resource protection could be the same as that offered by Plan A in three of the segments. Classification of the other two as "Recreational," however, would allow a more intensive and greater variety of activity than under Plan A, with some environmental degradation expected.

Mining activities would include both exploration and extraction in all segments to a degree that they could degrade wild and scenic values. Existing land use patterns could continue and be intensified within the limits of the resource capability.

Conservation/Recreation Costs and Trends

Recreation use and developments would be increased considerably in the segments proposed as "Wild" and "Scenic" in Plan A. By 1990, there would be about 99,700 visitor days in the "Wild" segment and about 47,500 in the "Scenic" segment over what would occur without a plan.

93

BLM_0035947

This degree of use would require an addition of 52 miles of hiking trail all in the lower segment, 93 camping units, and 38 picnicking units. Costs associated with this development would be about $65,500 annually, or a total of about $828,500. The annual operation and maintenance costs, including a replacement sinking fund, would approximate $81,000. As with Plan A, there would be no relocation costs and no displacement of current landowners.

Energy Impacts

By changing the classification of the "Wild" and "Scenic" segments to "Recreational," it would be possible to continue the exploration and extraction of minerals with little constraint, at the discretion of the management agencies. Minerals on Federal lands would be available for appropriation under the mining laws and the leasing laws would be operative. Costs associated with rehabilitation of mined areas would be less than if the areas were in a higher classification. As a result, there would be some loss of natural and scenic quality. The extent to which this would occur would be in direct relation to the extent that mining occurs, which would be a product of the richness of the uranium/vanadium deposits and the national need for these ores to meet energy demands.

Economic and Regional Development Impacts

More favorable economic impacts could result from a "Recreational" classification of the "Wild" and "Scenic" segments proposed in Plan A. These would result primarily from an increase in activities associated with mineral exploration and extraction and from the increased recreational uses that would be permitted. The economic values are directly related to the national need for uranium/vanadium deposits that may be located in these segments. The amount that may be extracted and its value cannot be predicted.

Annual expenditures by recreationists would reach about $443,000 over those that would occur without a plan by 1990. Increased interest and knowledge of the Dolores would result from this study and would result in more people wanting to experience the river's resources. The increase of nonresident use would be similar to that mentioned under Plan C.

Social Impacts

Social impacts will be similar to those described under Plan C.

94

BLM_0035948

Environmental Quality Plan E

(Maximum Cultural Resources Protection)

Plan Summary Table

| Eligible | Recommended for Designation | Proposed Classification |
|---|---|---|
| West Dolores River | No | None |
| Section 2, T. 38 N., R. 18 W. to Bradfield Ranch Bridge | No | None |
| Bradfield Ranch Bridge to Disappointment Creek | No | None |
| Disappointment Creek to Little Gypsum Valley Bridge | No | None |
| Little Gypsum Valley Bridge to one mile above Highway 90 | No | None |

The intent of this plan is to preserve the historical, archeological, and cultural resources along 140 miles of river. These resources would be protected along the 35 miles of the West Dolores River and the 105 miles of the Dolores River between about 1 mile below the McPhee Damsite and about 1 mile above the State Highway 90 bridge, near the community of Bedrock. This plan does not propose designation or classification of any of the study segments.

## Environmental and Land Use Impacts

If selected, this plan would protect only the environment of cultural sites. It would only affect land use on or near these sites. Protection would require a complete survey of all sites. Analyses would then be made to determine if the sites warrant protection because of their historical, archaeological or cultural values.

## Conservation/Recreation Costs and Trends

This plan would probably require transfers of some land from private to public ownership. It would also require a significant amount of funding for land purchase and protective measures. However, it is impossible to estimate costs of this plan before a complete survey and analysis of the significance of the cultural resources is done.

95

As protection is considered incompatible with use of these resources, no additional recreation days would occur as a result of selection of this plan. This plan, if adopted, may interfere with selection of future sites for recreation development and may conflict with existing recreation uses, if these uses or proposed development areas occur near a site.

Energy Impacts

If a site is on or near an area of uranium extraction, a conflict may occur. Mine shafts, portals, and access roads may not be able to locate where it is most economical to do so, and the cost of mineral extraction may increase. Minerals on Federal lands will be available for consideration under the mining laws and the mineral leasing laws would be operative.

Economic and Regional Development Impacts

There are virtually no beneficial economic impacts to this plan. It may conflict with regional development in the areas of recreation use and energy development.

Social Impacts

This plan will protect historical, cultural, and archeological resources until future generations desire to use these resources for scientific, educational, or other purposes.

BLM_0035950

Summary and Comparison of Effects of Alternative Plans

Net annual benefits of the seven alternative plans range from $829,595 to $1,088,995. Neither of the NED plans nor EQ Plan E contributes to the Wild and Scenic River component of the EQ objective. EQ Plans A, C, and D maximize the mileage of designated river; however, EQ Plans C and D would result in classification of river segments at levels less restrictive than they are qualified to be. EQ Plan B would include 105 miles of the river in the National System. Every segment would be classified at the most restrictive level for which it qualifies in both EQ Plans A and B.

NED Plan A was eliminated since it has a total net annual benefit lower than several EQ plans and it contributes significantly less to the EQ objective.

NED Plan B was eliminated because it has the highest annual cost and a benefit/cost ratio of 1:1.3, significantly lower than many EQ plans and NED A. NED Plan B would adversely affect the preservation of natural beauty, free-flowing stream, and historic and cultural components of the EQ objective.

EQ Plans C and D were eliminated because of high annual costs and lower satisfaction of the EQ objective components.

EQ Plan E has the lowest cost and best benefit/cost ratio. However, it contributes nothing to the preservation of the free-flowing stream component and provides for the lowest preservation of natural beauty of any EQ plan.

EQ Plan A and B differ only in that Plan B does not recommend inclusion of the West Dolores River. The net annual benefit for both plans is identical; however, EQ Plan A has $86,000 more in annual development costs, $8,300 more in annual cost for scenic and access easements, and $48,000 more in annual administration costs (the latter two are environmental quality costs).

Under EQ Plan B the West Dolores River would continue to be managed and utilized at about the same intensity and in the same ways as it currently is. EQ Plan A would result in legislative action to preserve 35 miles of stream and about 1,900 acres of private land more than does EQ B. Under EQ B the National Forest portions of the West Dolores River will be protected and scenic, recreational, and other values on these lands pre- served according to principles of multiple use. EQ A would provide additional statutory protection for free-flowing qualities of the West Dolores River and would include private land use controls to insure retention of the scenic, recreation, fish and wildlife, and other values now found in portions of the corridor. An impact from trail construction, fence adjustment, and recreation site development would occur along the West Dolores with EQ A.

The Federal agencies recommend adoption of EQ Plan B. The State of Colorado recommends adoption of EQ Plan A.

BLM_0035951

BLM_0035952

See

Table V-1. Summary & Comparison of Effects of Alternative Plans

BLM_0035954

CHAPTER   VI

CONCLUSIONS AND RECOMMENDATIONS

The conclusions and recommendations are:

...The Dolores River main stem from Rico upstream to its source
   including its headwaters and the main stem segment from the
   Dolores-San Miguel River confluence to the Colorado-Utah border
   are not eligible and should not be included in the National Wild
   and Scenic Rivers System.  Federal, State, and local governments
   should continue to protect and enhance the values of these
   segments through application of existing land management and
   land use authorities.

...The Dolores Project is compatible with designation of the Dolores
   as a component of the National Wild and Scenic Rivers System.
   The McPhee Dam will enhance and complement such designation.

...The Dolores River from the west boundary, Section 2, Township 38
   North, Range 16 West, NMPM, below the proposed McPhee Dam,
   downstream to 1 mile above Highway 90 should be included in the
   National Wild and Scenic Rivers System (EQ Plan B as described in
   Chapter V).

...The Colorado Department of Natural Resources finds that the entire
   West Dolores fully meets the criteria for inclusion in the National
   Wild and Scenic Rivers System (EQ Plan A).  The West Dolores
   traverses three of the five western life zones represented in the
   Dolores River Basin and possesses outstanding scenic, geologic, and
   fish and wildlife values.  The West Dolores provides a variety of
   recreational activity commensurate with the natural variety
   inherent in the three life zones.  The fact that the upper 9 miles
   are being considered for addition to the National Wilderness System
   is immaterial.  If the costs of including and thereafter maintaining
   the West Dolores as a recreational component of the National System
   are excessive for the preservation of a unique national heritage,
   then it appears that the provisions of the National Wild and Scenic
   Rivers Act have no meaning.

   Although the West Dolores River generally meets the minimum criteria
   for inclusion in the National System, the Federal Study Team believes

98

BLM_0035955

it is the nine-mile portion of the West Dolores above Dunton that contains the outstandingly remarkable scenic and geologic values (Table IV-1).  That portion of the stream is entirely National Forest land that is being considered for addition to the National Wilderness Preservation System.  Below Dunton, the West Dolores is an attractive stream typical of high mountain valleys throughout the Rocky Mountains. The segment below Dunton has extensive intermingling of private lands with many houses, barns, mines, fences, and water diversions. Because of the short length of the outstandingly remarkable section and the potentially difficult and costly administration of the lower segment, the Federal agencies do not recommend inclusion of the West Dolores River in the National System.

...Although part of a larger segment deemed ineligible, the 8-mile reach of river from Gateway to the State line is eligible and should be added to the National System at such time as the Utah portion of the river is included.  Classification of this segment should be determined by the Utah Study.

Classification Recommendations

The recommendations expressed below are based on the premise that the Dolores Project will be constructed.  Its construction will enhance the outstanding wild and scenic values of the Dolores River by ensuring that a live streamflow will be maintained below McPhee Dam.

In accordance with Public Law 90-542 and the Guidelines issued by the Secretaries of Agriculture and Interior, the 105-mile Main Dolores segment is proposed for classification as follows:

(1)  From the west boundary, Section 2, Township 38 North, Range 16 West, NMPM, below the proposed McPhee Dam, downstream to the Bradfield Ranch Bridge (about 11 miles)------------------------Recreational

(2)  Bradfield Ranch Bridge to the Disappointment Creek confluence (about 41 miles)-------------Scenic

(3)  Disappointment Creek confluence to the Little Gypsum Valley Bridge (San Miguel-Montrose County Line) (about 20 miles)------------------------Recreational

(4)  Little Gypsum Valley Bridge to one mile above the Highway 90 Bridge (about 33 miles)------Wild

BLM_0035956

(Note:  For purposes of the Dolores River, it is proposed that
legislation including the river in the National Wild and Scenic
Rivers System include a provision modifying the (wild) area
withdrawn from mineral development.  This provision would call
for establishing the withdrawn area boundaries during the
management planning period, with the objective of conforming
the boundaries to the unique, sheer-wall canyon topography in
Slick Rock canyon, rather than establishing an arbitrary
quarter-mile wide zone each side of the river.  This would
protect the canyon while allowing maximum utilization of the
minerals outside the canyon.  See page 104.)

The Colorado Department of Natural Resources recommends:

The West Dolores River from its source to the Main Stem
confluence (about 35 miles)--------------Recreational

## Management Plan

The Wild and Scenic Rivers Act allows a period of about <u>one year</u>
after wild and scenic rivers designation for the administrative agency
to prepare a management plan, including detailed boundaries (governed
by provisions of the Act), classifications, and plans for necessary
developments in accordance with its classifications.  This management
plan must be published in the Federal Register and does not become
effective until 90 days after it has been forwarded to the President
of the Senate and the Speaker of the House of Representatives.  The
objective of this plan should be to protect and enhance the values
that caused it to be included in the national system with a minimum
impact on private landowners and existing land use practices.
Provisions in this plan determine the nature and the extent of the
effects that inclusion in the National Wild and Scenic River System
will have on private landowners.  It is recommended that this plan
be prepared in cooperation with concerned Federal, State, and
local interests.

Since the primary purposes of designation of the River are to protect
the river environment and provide public recreation uses, some
controls on land in the corridor are necessary.  These can best be
provided through the use of scenic and public access easements.
These are agreements between the administering agency and the land-
owners in which the administrator buys certain uses on selected
portions of the owners' land.  Scenic easements are written to prevent
any degrading of the view from along the river by, for example, bill-
boards, trash piles, excessive timbering, high density building
construction and commercial sand and gravel operations.  These agree-
ments generally bind present and future landowners to existing uses
and prevent developments that detract from the scenic and natural

BLM_0035957

character of the land.  They do not:  (1) give the general public
access, or (2) restrict or change any present land uses -- unless
the owner agrees to do so.

Public use easements allow public use of a continuous corridor along
the river shore.  The width of this corridor generally would be
between 100 and 200 feet on both sides of the river centerline.
Normally one easement is obtained and contains both scenic and public
use stipulations.

County zoning and land use regulation under Colorado State H.B. 1034
and H.B. 1041 cannot be considered acceptable means of protection to
reduce the need for scenic easements.  Guarantees do not exist that
counties will not award variances to zoning regulations nor that
zoning regulations will not be made less restrictive or removed
completely.  H.B. 1034 has no direct application to preservation of
scenic or natural values.  The permissive authority and the ability
to recognize areas of state interest contained in H.B. 1041 is not a
mandate that it will be done.  In addition, the number of local
jurisdictions involved would create an extremely complex problem to
provide uniform and adequate protection even if the counties were
willing.

Management Recommendations for the Main Dolores,
McPhee Dam to Highway 90 Bridge

Inclusion of this stretch of the Dolores River in the National Wild and
Scenic Rivers System will provide statutory protection and preser-
vation of the natural and scenic values of the river and its immediate
area.  Approximately 56,400 acres of the Dolores River corridor (Maps
3 through 6) should be included in the designation.  This is based
on a "visual corridor" which varies from 0.18 mile to 4.0 miles.  Lands
included should be refined in the detailed boundary description
prepared by the designated administering agencies.

The administration of the Dolores River should be divided between the
U.S. Department of Agriculture, Forest Service, and the U.S. Department
of the Interior, Bureau of Land Management, at the Dolores-San Miguel
County line.  The Forest Service will administer and manage the river
area upstream of the county line and the Bureau of Land Management will
administer the segments downstream of the line.  Public land within and
adjacent to the McPhee Reservoir Project and the recreation developments
from the Dam to and including the Bradfield Ranch site will be
administered by the Forest Service.

101

BLM_0035958

The Coordinated Management Plan should refine and specifically delineate detailed boundaries of the River area and contain specific development and administration plans.  The preparation of this plan should fully and actively involve Federal, State, and local government agencies, industry representatives, and interested citizens of the local area.  The general management objectives of the Coordinated Management Plan should be to protect and enhance the natural values of the River.  The Plan should be implemented with minimum impact on private landowners and existing land use practices.  Designation of the River will not interfere with operation of the town of Dove Creek water supply facility.

In general, each component of the National Wild and Scenic Rivers System should be administered in accord with these goals:

- Maintain the free-flowing condition of the River between McPhee Dam and Bedrock.

- Preserve the natural scenic values, undeveloped and nearly primitive character, and the historical and archaeological features of the corridor.  Use screening techniques such as vegetation and natural rock and non-specular (flat, non-reflective, earth tone pigments) paints to enhance scenic values.

- Prevent degradation of existing water quality; encourage water quality improvements so long as scenic, recreational, geologic, fish and wildlife, cultural, historic, and similar values are not adversely affected.

- Provide public access, use, and interpretation of the corridor and its resources in a way which is consistent with the protection and enhancement of the quality of the River and the corridor.

- Provide high-quality recreational opportunities associated with a free-flowing river at a level of use that does not cause deterioration of the resources, lower the quality of experiences, or adversely affect riparian landowners.

- Provide for the protection, use, and enhancement of fish and wildlife resources within the framework of appropriate Federal and State laws.

- Provide for and emphasize public safety in all activities and recreation uses of the River and adjacent areas.

BLM_0035959

These goals should serve as a working tool for the administering agencies
in preparation of their Coordinated Management Plan.  They should also
provide individual landowners a means of determining how their property
might be affected.

As stated, the amount of land needed to manage and protect the River
corridor values will have to be identified in detail in the Coordinated
Plan.  This will require intensive investigation before the need and
extent of control can be determined.  The estimates of private lands
to be acquired in fee title and of-scenic and access easements should
not be viewed as absolute or final.  They are approximations made for
cost estimates and to aid the administering agencies in the more
intensive planning to follow.

Selected sites for stream access and essential basic recreation develop-
ments are planned for construction by the Bureau of Reclamation as part
of the Dolores Project.  Should the River be added to the National
System, and if the Dolores Project's downstream recreation developments
are eliminated from final Project plans, these facilities should be
constructed by the management agencies.

Recreation use is increasing in the Dolores River Basin and in the
entire Four-Corners Region.  Designation of the Dolores River is
expected to accelerate the rate of recreation use.  Fishing, rafting,
hiking, camping, and riding are expected to increase substantially on
the Dolores River.  Without adequate controls and well-planned
developments, the very qualities that make the Dolores unique could
be destroyed by the users attracted to the area.  The projections of
recreation use developed by the Study Team indicate that the limited
carrying capacity of the River and its corridor will be exceeded by
1980.

Five major and two minor public recreation sites would be developed
to accommodate anticipated use of the River below McPhee Dam.  As
currently planned, the five major sites will be developed in con-
junction with the Dolores River Project.  The sites are:  (1) Bradfield
Ranch, (2) Dove Creek Pumping Station, (3) Slick Rock, (4) Little
Gypsum Valley, and (5) one mile upstream of Bedrock.  These sites will
have minimum basic development, probably consisting of sanitation
facilities, river access and boat launch/recovery sites, tables,
fireplaces, and parking areas.  About 52 miles of hiking and riding
trails will also be developed below McPhee Dam.  Though a part of the
Dolores Project, these developments would also serve to meet recreation
development needs of the Wild and Scenic River proposal.

103

BLM_0035960

If the River is designated as proposed, some additional facilities will be needed at three points. One point is at Little Gypsum Valley where the site planned as part of the Dolores Project would be enlarged to accommodate Wild and Scenic River recreation use. Two primitive sites will be located in the proposed Wild River section. These will be addressed specifically in the Coordinated Management Plan. These sites will be limited to boat recovery areas, fireplaces, and sanitation facilities. Approximately 36.5 miles of trails would also be needed, with the trails tentatively to be located between Disappointment Creek and Little Gypsum Valley and in side canyons off Slick Rock Canyon.

The development costs relate only to the additional sites to be developed if the recommendation is adopted. It should be clear, however, that the five sites proposed in conjunction with the Dolores Project must be provided.

Each site would serve as a visitor information center. Each site will be designed to accommodate up to 80 to 100 people at one time. In addition to these sites it will be necessary to provide hiking and riding trail access along 36.5 miles of river, since there is insufficient water for boat access throughout the recreation season. Where the proposed trail crosses private land, easements will be acquired. This development proposal is conceptual in nature and subject to refinement by the administering agencies.

The Wild and Scenic Rivers Act (Sec. 9(a)(iii)) states that "... subject to valid existing rights, the minerals in Federal Lands which are part of the System and constitute the bed or bank or are situated within one-quarter mile of the bank of any river designated a Wild River under this Act or any subsequent Act are hereby withdrawn from all forms of appropriations under the mining laws and from operation of the mineral leasing laws ..." Because of the high mineral potential and canyon width, it is proposed that, for purposes of the Dolores River designation, the withdrawn area be modified by a provision in any legislation which includes the River in the National System. The provision should consist of the following (or similar language):

> Notwithstanding the provisions of section 9(a)(iii) of the Wild and Scenic Rivers Act, the detailed boundaries of the area to be withdrawn from appropriation under the mining laws and from operation of the mineral leasing laws, shall be established as part of the management plan developed pursuant to section 3(b) of the Wild and Scenic Rivers Act.

104

The purpose of this provision is to allow for the determination of the most logical location of the withdrawal boundary; generally this will be along the top of the canyon rims.

At present there 10 active surface and subsurface mines within the River corridor. Most of these mines and the great majority of the 4,000 claims in the area are for uranium. A closely associated mineral, vanadium, is produced in great quantities in the basin. Minerals management will be an integral part of the Coordinated Management Plan. These points will be considered:

- Determine the extent and grade of mineral reserves in the visual corridor and associated lands.

- Determine the type of mining most feasible for obtaining the mineral reserves.

- Compare the feasibility and acceptability of deep mining from the canyon rim rather than into the canyon walls or along the river.

- If necessary to mine within the corridor or canyon walls, determine what controls are necessary to prevent adverse impacts while allowing economic mining.

The study should be made jointly by the U.S. Department of the Interior, Colorado Geological Survey, and the Energy Research and Development Administration.

Scenic and access easements on 23 miles of private land adjoining the River are expected to cost $220,000. Development of recreation facilities are estimated to cost about $453,000. Operation and maintenance costs for recreation are estimated to be about $40,000 annually. The administering agencies estimate that annual administration of the proposed National Wild and Scenic River System will be $50,000 per year. An additional cost, but not a Federal expense, is the added cost of mineral production which may be imposed to prevent adverse impacts on the Wild, Scenic, and Recreational Rivers' values. This is estimated to be about $100,000 annually if current economic conditions continue and the highest practicable level of mineral development occurs.

The total estimated costs of the proposed designation is $693,000 for development and acquisition and $90,000 annually for operation, maintenance, and administration.

105

BLM_0035962

Management Recommendations for the West Dolores

Inclusion of the West Dolores in the National Wild and Scenic River System would provide for the statutory preservation of the natural and scenic values of the river and its immediate area. Approximately 22,400 acres would be included in the visual corridor (Maps 1 and 2) which is about 1 mile wide. About 30 percent of land in the corridor is privately owned; the remainder is National Forest. Detailed boundary locations should be determined in the preparation of the Management Plan for the West Dolores.

If designated, the West Dolores RECREATIONAL RIVER would be administered by the Forest Service. The Management Plan for the West Dolores should have the same goals as those stated earlier in this chapter for the Main Stem of the Dolores River. The Colorado Division of Wildlife should be especially involved in the preparation of this Management Plan. Mineral development would be allowed in accord with the 1872 mining laws, the Secretary of Agriculture's 1872 Act Use Regulations (1974), and Section 8 - Wild and Scenic Rivers Act. Mining claims on National Forest lands (approximately 1,000) will, as the need arises, be examined for validity as part of normal ongoing operations.

Existing land uses, including grazing and other agricultural activities, will be continued with minimum impact. New land uses and development would be regulated through acquisition of scenic easements. Public use easements would be acquired to provide public access to a continuous corridor along the West Dolores.

The corridor width required for this purpose would range from 100 to 200 feet on both sides of the river centerline. If necessary to construct or relocate fences to insure continuation of existing agricultural or other land uses, this would be done at Government expense.

A conceptual development plan prepared by the study team calls for the development of four additional camping/picnicking areas. These would all be located on National Forest land, and no privately owned land would be required.

The total cost of including the West Dolores RECREATIONAL RIVER in the National Wild and Scenic Rivers System would be about $430,000. This cost includes $103,000 for scenic easements on 10.5 miles of privately owned land and $327,000 for the development of recreation facilities. Annual costs are $20,000 for the operation and maintenance of the recreation facilities and $45,000 for administration.

106

BLM_0035963

The Colorado Department of Natural Resources will participate in the administration, operation, and development of the West Dolores River should it be included in the National Wild and Scenic Rivers System. The Department of Natural Resources offers such assistance as may be subsequently authorized by the Colorado General Assembly or by the Governor.  The State cannot commit itself to joint funding, either through direct cost-shares or in-kind participation, at this time. If the West Dolores River is designated a component of the National Wild and Scenic Rivers System, the Forest Service and the Colorado Department of Natural Resources should jointly prepare a detailed management plan which will give consideration to, among other items, administrative arrangements for river area management and cost-sharing for easements, developments, and operation and maintenance.

BLM_0035964

# APPENDIX A

## WILD AND SCENIC RIVERS ACT AND GUIDELINES

### Wild and Scenic Rivers Act
### as Amended through Public Law 93–621
### (January 3, 1975)

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) this Act may be cited as the "Wild and Scenic Rivers Act". **Wild and Scenic Rivers Act.**

(b) It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

(c) The purpose of this Act is to implement this policy by instituting a national wild and scenic rivers system, by designating the initial components of that system, and by prescribing the methods by which and standards according to which additional components may be added to the system from time to time.

SEC. 2. (a) The national wild and scenic rivers system shall comprise rivers (i) that are authorized for inclusion therein by Act of Congress, or (ii) that are designated as wild, scenic or recreational rivers by or pursuant to an act of the legislature of the State or States through which they flow, that are to be permanently administered as wild, scenic or recreational rivers by an agency or political subdivision of the State or States concerned without expense to the United States, that are found by the Secretary of the Interior, upon application of the Governor of the State or the Governors of the States concerned, or a person or persons thereunto duly appointed by him or them, to meet the criteria established in this Act and such criteria supplementary thereto as he may prescribe, and that are approved by him for inclusion in the system, including, upon application of the Governor of the State concerned, the Allagash Wilderness Waterway, Maine, and that segment of the Wolf River, Wisconsin, which flows through Langlade County. **National wild and scenic rivers system.** **82 STAT. 906** **82 STAT. 907**

(b) A wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in section 1, subsection (b) of this Act. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following: **Eligibility for inclusion.**

(1) Wild river areas—Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

(2) Scenic river areas—Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

(3) Recreational river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

A-1

BLM_0035965

National wild
and scenic
rivers.

SEC. 3 (a) The following rivers and the land adjacent thereto are hereby designated as components of the national wild and scenic rivers system:

(1) CLEARWATER, MIDDLE FORK. IDAHO.—The Middle Fork from the town of Kooskia upstream to the town of Lowell; the Lochsa River from its junction with the Selway at Lowell forming the Middle Fork, upstream to the Powell Ranger Station; and the Selway River from Lowell upstream to its origin; to be administered by the Secretary of Agriculture.

(2) ELEVEN POINT, MISSOURI.—The segment of the river extending downstream from Thomasville to State Highway 142; to be administered by the Secretary of Agriculture.

(3) FEATHER, CALIFORNIA.—The entire Middle Fork; to be administered by the Secretary of Agriculture.

(4) RIO GRANDE, NEW MEXICO.—The segment extending from the Colorado State line downstream to the State Highway 96 crossing, and the lower four miles of the Red River; to be administered by the Secretary of the Interior.

(5) ROGUE, OREGON.—The segment of the river extending from the mouth of the Applegate River downstream to the Lobster Creek Bridge; to be administered by agencies of the Departments of the Interior or Agriculture as agreed upon by the Secretaries of said Departments or as directed by the President.

82 STAT. 907
82 STAT. 908.

(6) SAINT CROIX, MINNESOTA AND WISCONSIN.—The segment between the dam near Taylors Falls, Minnesota, and the dam near Gordon, Wisconsin, and its tributary, the Namekagon, from Lake Namekagon downstream to its confluence with the Saint Croix; to be administered by the Secretary of the Interior: *Provided,* That except as may be required in connection with items (a) and (b) of this paragraph, no funds available to carry out the provisions of this Act may be expended for the acquisition or development of lands in connection with, or for administration under this Act of, that portion of the Saint Croix River between the dam near Taylors Falls, Minnesota, and the upstream end of Big Island in Wisconsin, until sixty days after the date on which the Secretary has transmitted to the President of the Senate and Speaker of the House of Representatives a proposed cooperative agreement between the Northern States Power Company and the United States (a) whereby the company agrees to convey to the United States, without charge, appropriate interests in certain of its lands between the dam near Taylors Falls, Minnesota, and the upstream end of Big Island in Wisconsin, including the company's right, title, and interest to approximately one hundred acres per mile, and (b) providing for the use and development of other lands and interests in land retained by the company between said points adjacent to the river in a manner which shall complement and not be inconsistent with the purposes for which the lands and interests in land donated by the company are administered under this Act. Said agreement may also include provision for State or local governmental participation as authorized under subsection (e) of section 10 of this Act.

(7) SALMON, MIDDLE FORK, IDAHO.—From its origin to its confluence with the main Salmon River; to be administered by the Secretary of Agriculture.

(8) WOLF, WISCONSIN.—From the Langlade-Menominee County line downstream to Keshena Falls; to be administered by the Secretary of the Interior.

(9) LOWER SAINT CROIX, MINNESOTA AND WISCONSIN.—The segment between the dam near Taylors Falls and its confluence with the Mississippi River: *Provided,* (i) That the upper twenty-seven miles of this river segment shall be administered by the Secretary of the Interior; and (ii) That the lower twenty-five miles shall be designated by the Secretary upon his approval of an application for such designation made by the Governors of the States of Minnesota and Wisconsin.

A-2

BLM_0035966

(10) CHATTOOGA, NORTH CAROLINA, SOUTH CAROLINA, GEORGIA.—
The Segment from 0.8 mile below Cashiers Lake in North Carolina to
Tugaloo Reservoir, and the West Fork Chattooga River from its junction with Chattooga upstream 7.3 miles, as generally depicted on the
boundary map entitled 'Proposed Wild and Scenic Chattooga River
and Corridor Boundary', dated August 1973; to be administered by
the Secretary of Agriculture: *Provided,* That the Secretary of Agriculture shall take such action as is provided for under subsection (b) of
this section within one year from the date of enactment of this paragraph (10): *Provided further,* That for the purposes of this river, **Appropriation.**
there are authorized to be appropriated not more than $2,000,000 for
the acquisition of lands and interests in lands and not more than
$809,000 for development. .

(b) The agency charged with the administration of each component
of the national wild and scenic rivers system designated by subsection

(a) of this section shall, within one year from the date of this Act,
establish detailed boundaries therefor (which boundaries shall include
an average of not more than three hundred and twenty acres per mile
on both sides of the river); determine which of the classes outlined in
section 2, subsection (b), of this Act best fit the river or its various
segments; and prepare a plan for necessary developments in connection
with its administration in accordance with such classification. Said **Publication in**
boundaries, classification, and development plans shall be published **Federal Register.**
in the Federal Register and shall not become effective until ninety
days after they have been forwarded to the President of the Senate
and the Speaker of the House of Representatives. **82 STAT. 908**

Sec. 4. (a) The Secretary of the Interior or, where national
forest lands are involved, the Secretary of Agriculture or, in
appropriate cases, the two Secretaries jointly shall study and submit to the President reports on the suitability or nonsuitability
for addition to the national wild and scenic rivers system of
rivers which are designated herein or hereafter by the Congress as
potential additions to such system.  The President shall report to
the Congress his recommendations and proposals with respect to the
designation of each such river or section thereof under this Act.
Such studies shall be completed and such reports shall be made to
the Congress with respect to all rivers named in subparagraphs
5(a) (1) through (27) of this Act no later than October 2, 1978.
In conducting these studies the Secretary of the Interior and the
Secretary of Agriculture shall give priority to those rivers (i)
with respect to which there is the greatest likelihood of developments which, if undertaken, would render the rivers unsuitable for
inclusion in the national wild and scenic rivers system, and (ii)
which possess the greatest proportion of private lands within their
areas.  Every such study and plan shall be coordinated with any
water resources planning involving the same river which is being
conducted pursuant to the Water Resources Planning Act (79 Stat.
244; 42 U.S.C. 1962 et seq.),

A-3

Each report. including maps and illustrations. shall show among **Contents.** other things the area included within the report; the characteristics which do or do not make the area a worthy addition to the system; the current status of land ownership and use in the area; the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed if the area were included in the national wild and scenic rivers system; the Federal agency (which in the case of a river which is wholly or substantially within a national forest, shall be the Department of Agriculture) by which it is proposed the area, should it be added to the system, be administered; the extent to which it is proposed that such administration, including the costs thereof, be shared by State and local agencies; and the estimated cost to the United States of acquiring necessary lands and interests in land and of administering the area, should it be added to the system. Each such report shall be printed as a Senate or House document.

(b) Before submitting any such report to the President and the Congress, copies of the proposed report shall, unless it was prepared jointly by the Secretary of the Interior and the Secretary of Agriculture, be submitted by the Secretary of the Interior to the Secretary of Agriculture or by the Secretary of Agriculture to the Secretary of the Interior, as the case may be, and to the Secretary of the Army, the Chairman of the Federal Power Commission, the head of any other affected Federal department or agency and, unless the lands proposed to be included in the area are already owned by the United States or have already been authorized for acquisition by Act of Congress, the Governor of the State or States in which they are located or an officer designated by the Governor to receive the same. Any recommendations or comments on the proposal which the said officials furnish the Secretary or Secretaries who prepared the report within ninety days of the date on which the report is submitted to them, together with the Secretary's or Secretaries' comments thereon, shall be included with the transmittal to the President and the Congress. No river or portion of any river shall be added to the national wild and scenic rivers system subsequent to enactment of this Act until the close of the next full session of the State legislature, or legislatures in case more than one

State is involved, which begins following the submission of any recommendation to the President with respect to such addition as herein provided.

(c) Before approving or disapproving for inclusion in the national wild and scenic rivers system any river designated as a wild, scenic or recreational river by or pursuant to an act of a State legislature, the Secretary of the Interior shall submit the proposal to the Secretary of Agriculture, the Secretary of the Army, the Chairman of the Federal Power Commission, and the head of any other affected Federal department or agency and shall evaluate and give due weight to any recommendations or comments which the said officials furnish him within **Publication in** ninety days of the date on which it is submitted to them. If he approves **Federal Register.** the proposed inclusion, he shall publish notice thereof in the Federal Register.

**Potential additions. Designation.** Sec. 5. (a) The following rivers are hereby designated for potential addition to the national wild and scenic rivers system:

(1) Allegheny, Pennsylvania: The segment from its mouth to the town of East Brady, Pennsylvania.

(2) Bruneau, Idaho: The entire main stem.

(3) Buffalo, Tennessee: The entire river.

(4) Chattooga, North Carolina, South Carolina, and Georgia: The entire river.

(5) Clarion, Pennsylvania: The segment between Ridgway and its confluence with the Allegheny River.

(6) Delaware, Pennsylvania and New York: The segment from Hancock, New York, to Matamoras, Pennsylvania.

(7) Flathead, Montana: The North Fork from the Canadian border downstream to its confluence with the Middle Fork; the Middle Fork from its headwaters to its confluence with the South Fork; and the South Fork from its origin to Hungry Horse Reservoir.

A-4

BLM_0035968

(8) Gasconade, Missouri: The entire river.

(9) Illinois, Oregon: The entire river.

(10) Little Beaver, Ohio: The segment of the North and Middle Forks of the Little Beaver River in Columbiana County from a point in the vicinity of Negly and Elkton, Ohio, downstream to a point in the vicinity of East Liverpool, Ohio.

(11) Little Miami, Ohio: That segment of the main stem of the river, exclusive of its tributaries, from a point at the Warren-Clermont County line at Loveland, Ohio, upstream to the sources of Little Miami including North Fork.

(12) Maumee, Ohio and Indiana: The main stem from Perrysburg, Ohio, to Fort Wayne, Indiana, exclusive of its tributaries in Ohio and inclusive of its tributaries in Indiana.

(13) Missouri, Montana: The segment between Fort Benton and Ryan Island.

(14) Moyle, Idaho: The segment from the Canadian border to its confluence with the Kootenai River.

(15) Obed, Tennessee: The entire river and its tributaries, Clear Creek and Daddys Creek.

(16) Penobscot, Maine: Its east and west branches.

(17) Pere Marquette, Michigan: The entire river.

(18) Pine Creek, Pennsylvania: The segment from Ansonia to Waterville.

(19) Priest, Idaho: The entire main stem.

(20) Rio Grande, Texas: The portion of the river between the west boundary of Hudspeth County and the east boundary of Terrell County on the United States side of the river: *Provided*, That before undertaking any study of this potential scenic river, the Secretary of the Interior shall determine, through the channels of appropriate executive agencies, that Mexico has no objection to its being included among the studies authorized by this Act.

(21) Saint Croix, Minnesota and Wisconsin: The segment between the dam near Taylors Falls and its confluence with the Mississippi River.

(22) Saint Joe, Idaho: The entire main stem.

(23) Salmon, Idaho: The segment from the town of North Fork to its confluence with the Snake River.

(24) Skagit, Washington: The segment from the town of Mount Vernon to and including the mouth of Bacon Creek; the Cascade River between its mouth and the junction of its North and South Forks; the South Fork to the boundary of the Glacier Peak Wilderness Area; the Suiattle River from its mouth to the Glacier Peak Wilderness Area boundary at Milk Creek; the Sauk River from its mouth to its junction with Elliott Creek; the North Fork of the Sauk River from its junction with the South Fork of the Sauk to the Glacier Peak Wilderness Area boundary.

(25) Suwannee, Georgia and Florida: The entire river from its source in the Okefenokee Swamp in Georgia to the gulf and the outlying Ichetucknee Springs, Florida.

(26) Upper Iowa, Iowa: The entire river.

(27) Youghiogheny, Maryland and Pennsylvania: The segment from Oakland, Maryland, to the Youghiogheny Reservoir, and from the Youghiogheny Dam downstream to the town of Connellsville, Pennsylvania.

(28) American, California: The North Fork from the Cedars to the Auburn Reservoir.

(29) Au Sable, Michigan: The segment downstream from Foot Dam to Oscoda and upstream from Loud Reservoir to its source, including its principal tributaries and excluding Mio and Bamfield Reservoirs.

(30) Big Thompson, Colorado: The segment from its source to the boundary of Rocky Mountain National Park.

(31) Cache la Poudre, Colorado: Both forks from their sources to their confluence, thence the Cache la Poudre to the eastern boundary of Roosevelt National Forest.

A-5

(32) Cahaba, Alabama: The segment from its junction with United States Highway 31 south of Birmingham downstream to its junction with United States Highway 80 west of Selma.

(33) Clarks Fork, Wyoming: The segment from the Clark's Fork Canyon to the Crandall Creek Bridge.

(34) Colorado, Colorado and Utah: The segment from its confluence with the Dolores River, Utah, upstream to a point 19.5 miles from the Utah-Colorado border in Colorado.

(35) Conejos, Colorado: The three forks from their sources to their confluence, thence the Conejos to its first junction with State Highway 17, excluding Platoro Reservoir.

(36) Elk, Colorado: The segment from its source to Clark.

(37) Encampment, Colorado: The Main Fork and West Fork to their confluence, thence the Encampment to the Colorado-Wyoming border, including the tributaries and headwaters.

(38) Green, Colorado: The entire segment within the State of Colorado.

(39) Gunnison, Colorado: The segment from the upstream (southern) boundary of the Black Canyon of the Gunnison National Monument to its confluence with the North Fork.

(40) Illinois, Oklahoma: The segment from Tenkiller Ferry Reservoir upstream to the Arkansas-Oklahoma border, including the Flint and Barren Fork Creeks.

(41) John Day, Oregon: The main stem from Service Creek Bridge (at river mile 157) downstream to Tumwater Falls (at river mile 10).

(42) Kettle, Minnesota: The entire segment within the State of Minnesota.

(43) Los Pinos, Colorado: The segment from its source, including the tributaries and headwaters within the San Juan Primitive Area, to the northern boundary of the Granite Peak Ranch.

(44) Manistee, Michigan: The entire river from its source to Manistee Lake, including its principal tributaries and excluding Tippy and Hodenpyl Reservoirs.

(45) Nolichuckey, Tennessee and North Carolina: The entire main stem.

(46) Owyhee, South Fork, Oregon: The main stem from the Oregon-Idaho border downstream to the Owyhee Reservoir.

(47) Piedra, Colorado: The Middle Fork and East Fork from their sources to their confluence, thence the Piedra to its junction with Colorado Highway 160, including the tributaries and headwaters on national forest lands.

(48) Shepaug, Connecticut: The entire river.

(49) Sipsey Fork, West Fork, Alabama: The segment, including its tributaries, from the impoundment formed by the Lewis M. Smith Dam upstream to its source in the William B. Bankhead National Forest.

(50) Snake, Wyoming: The segment from the southern boundaries of Teton National Park to the entrance to Palisades Reservoir.

(51) Sweetwater, Wyoming: The segment from Wilson Bar downstream to Spring Creek.

(52) Tuolumne, California: The main river from its source on Mount Dana and Mount Lyell in Yosemite National Park to Don Pedro Reservoir.

(53) Upper Mississippi, Minnesota: The segment from its source at the outlet of Itasca Lake to its junction with the northwestern boundary of the city of Anoka.

(54) Wisconsin, Wisconsin: The segment from Prairie du Sac to its confluence with the Mississippi River at Prairie du Chien.

(55) Yampa, Colorado: The segment within the boundaries of the Dinosaur National Monument.

(56) Dolores, Colorado: The segment of the main stem from Rico upstream to its source, including its headwaters; the West Dolores from its source, including its headwaters, downstream to its confluence with the main stem; and the segment from the west boundary, section 2, township 38 north, range 16 west, NMPM, below the proposed McPhee Dam, downstream to the Colorado-Utah border, excluding the segment from one mile above Highway 90 to the confluence of the San Miguel River.

A-6

Studies and reports.

(b)(1) The studies of rivers named in subparagraphs (28) through (55) of subsection (a) of this section shall be completed and reports thereon submitted by not later than October 2, 1979: *Provided*, That with respect to the rivers named in subparagraphs (33), (50), and (51), the Secretaries shall not commence any studies until (i) the State legislature has acted with respect to such rivers or (ii) one year from the date of enactment of this Act, whichever is earlier.

(2) The study of the river named in subparagraph (56) of subsection (a) of this section shall be completed and the report thereon submitted by not later than January 3, 1976.

Appropriations.

(3) There are authorized to be appropriated for the purpose of conducting the studies of the rivers named in subparagraphs (28) through (56) such sums as may be necessary, but not more than $2,175,000.

(c) The study of any of said rivers shall be pursued in as close cooperation with appropriate agencies of the affected State and its political subdivisions as possible, shall be carried on jointly with such agencies if request for such joint study is made by the State, and shall include a determination of the degree to which the State or its political subdivisions might participate in the preservation and administration of the river should it be proposed for inclusion in the national wild and scenic rivers system.

(d) In all planning for the use and development of water and related land resources, consideration shall be given by all Federal agencies involved to potential national wild, scenic and recreational river areas, and all river basin and project plan reports submitted to the Congress shall consider and discuss any such potentials. The Secretary of the Interior and the Secretary of Agriculture shall make specific studies and investigations to determine which additional wild, scenic and recreational river areas within the United States shall be evaluated in planning reports by all Federal agencies as potential alternative uses of the water and related land resources involved.

Land acquisition.

SEC. 6. (a) The Secretary of the Interior and the Secretary of Agriculture are each authorized to acquire lands and interests in land within the authorized boundaries of any component of the national wild and scenic rivers system designated in section 3 of this Act, or hereafter designated for inclusion in the system by Act of Congress, which is administered by him, but he shall not acquire fee title to an average of more than 100 acres per mile on both sides of the river. Lands owned by a State may be acquired only by donation, and lands owned by an Indian tribe or a political subdivision of a State may not be acquired without the consent of the appropriate governing body thereof as long as the Indian tribe or political subdivision is following a plan for management and protection of the lands which the Secretary finds protects the land and assures its use for purposes consistent with this Act. Money appropriated for Federal purposes from the land and water conservation fund shall, without prejudice to the use of appropriations from other sources, be available to Federal departments and agencies for the acquisition of property for the purposes of this Act.

(b) If 50 per centum or more of the entire acreage within a federally administered wild, scenic or recreational river area is owned by the United States, by the State or States within which it lies, or by political subdivisions of those States, neither Secretary shall acquire fee title to any lands by condemnation under authority of this Act. Nothing contained in this section, however, shall preclude the use of condemnation when necessary to clear title or to acquire scenic easements or such other easements as are reasonably necessary to give the public access to the river and to permit its members to traverse the length of the area or of selected segments thereof.

A-7

BLM_0035971

(c) Neither the Secretary of the Interior nor the Secretary of Agriculture may acquire lands by condemnation, for the purpose of including such lands in any national wild, scenic or recreational river area, if such lands are located within any incorporated city, village, or borough which has in force and applicable to such lands a duly adopted, valid zoning ordinance that conforms with the purposes of this Act. In order to carry out the provisions of this subsection the appropriate Secretary shall issue guidelines, specifying standards for local zoning ordinances, which are consistent with the purposes of this Act. The standards specified in such guidelines shall have the object of (A) prohibiting new commercial or industrial uses other than commercial or industrial uses which are consistent with the purposes of this Act, and (B) the protection of the bank lands by means of acreage, frontage, and setback requirements on development.

(d) The appropriate Secretary is authorized to accept title to non-Federal property within the authorized boundaries of any federally administered component of the national wild and scenic rivers system designated in section 3 of this Act or hereafter designated for inclusion in the system by Act of Congress and, in exchange therefor, convey to the grantor any federally owned property which is under his jurisdiction within the State in which the component lies and which he classifies as suitable for exchange or other disposal. The values of the properties so exchanged either shall be approximately equal or, if they are not approximately equal, shall be equalized by the payment of cash to the grantor or to the Secretary as the circumstances require.

(e) The head of any Federal department or agency having administrative jurisdiction over any lands or interests in land within the authorized boundaries of any federally administered component of the national wild and scenic rivers system designated in section 3 of this Act or hereafter designated for inclusion in the system by Act of Congress is authorized to transfer to the appropriate secretary jurisdiction over such lands for administration in accordance with the provisions of this Act. Lands acquired by or transferred to the Secretary of Agriculture for the purposes of this Act within or adjacent to a national forest shall upon such acquisition or transfer become national forest lands.

(f) The appropriate Secretary is authorized to accept donations of lands and interests in land, funds, and other property for use in connection with his administration of the national wild and scenic rivers system.

(g)(1) Any owner or owners (hereinafter in this subsection referred to as "owner") of improved property on the date of its acquisition, may retain for themselves and their successors or assigns a right of use and occupancy of the improved property for noncommercial residential purposes for a definite term not to exceed twenty-five years or, in lieu thereof, for a term ending at the death of the owner, or the death of his spouse, or the death of either or both of them. The owner shall elect the term to be reserved. The appropriate Secretary shall pay to the owner the fair market value of the property on the date of such acquisition less the fair market value on such date of the right retained by the owner.

(2) A right of use and occupancy retained pursuant to this subsection shall be subject to termination whenever the appropriate Secretary is given reasonable cause to find that such use and occupancy is being exercised in a manner which conflicts with the purposes of this Act. In the event of such a finding, the Secretary shall tender to the holder of that right an amount equal to the fair market value of that portion of the right which remains unexpired on the date of termination. Such right of use or occupancy shall terminate by operation of law upon tender of the fair market price.

Right of use and occupancy.

A-8

(3) The term "improved property", as used in this Act, means a detached, one-family dwelling (hereinafter referred to as "dwelling"), the construction of which was begun before January 1, 1967, together with so much of the land on which the dwelling is situated, the said land being in the same ownership as the dwelling, as the appropriate Secretary shall designate to be reasonably necessary for the enjoyment of the dwelling for the sole purpose of noncommercial residential use, together with any structures accessory to the dwelling which are situated on the land so designated.

"Improved property."

SEC. 7. (a) The Federal Power Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act (41 Stat. 1063), as amended (16 U.S.C. 791a et seq.), on or directly affecting any river which is designated in section 3 of this Act as a component of the national wild and scenic rivers system or which is hereafter designated for inclusion in that system, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of approval of this Act. No department or agency of the United States shall recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration, or request appropriations to begin construction of any such project, whether heretofore or hereafter authorized, without advising the Secretary of the Interior or the Secretary of Agriculture, as the case may be, in writing of its intention so to do at least sixty days in advance, and without specifically reporting to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of this Act and would affect the component and the values to be protected by it under this Act.

Water resources projects. Restrictions.

BLM_0035973

49 Stat. 863.
16 USC 791a.

(b) The Federal Power Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act, as amended, on or directly affecting any river which is listed in section 5, subsection (a), of this Act, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval—

(i) during the ten-year period following enactment of this Act or for a three complete fiscal year period following any Act of Congress designating any river for potential addition to the national wild and scenic rivers system, whichever is later, unless, prior to the expiration of the relevant period, the Secretary of the Interior and, where national forest lands are involved, the Secretary of Agriculture, on the basis of study, determine that such river should not be included in the national wild and scenic rivers system and notify the Committees on Interior and Insular Affairs of the United States Congress, in writing, including a copy of the study upon which the determination was made, at least one hundred and eighty days while Congress is in session prior to publishing notice to that effect in the Federal Register: Provided, That if any Act designating any river or rivers for potential addition to the national wild and scenic rivers system provides a period for the study or studies which exceeds such three complete fiscal year period the period provided for in such Act shall be substituted for the three complete fiscal year period in the provisions of this clause (i); and

(ii) during such additional period thereafter as, in the case of any river the report for which is submitted to the President and the Congress, is necessary for congressional consideration thereof or, in the case of any river recommended to the Secretary of the Interior for inclusion in the national wild and scenic rivers system under section 2(a)(ii) of this Act, is necessary for the Secretary's consideration thereof, which additional period, however, shall not exceed three years in the first case and one year in the second.

Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area on the date of approval of this Act. No department or agency of the United States shall, during the periods hereinbefore specified, recommend authorization of any water resources project on any such river or request appropriations to begin construction of any such project, whether heretofore or hereafter authorized, without advising the Secretary of the Interior and, where national forest lands are involved, the Secretary of Agriculture in writing of its intention so to do at least sixty days in advance of doing so and without specifically reporting to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of this Act and would affect the component and the values to be protected by it under this Act.

A-10

BLM_0035974

(c) The Federal Power Commission and all other Federal agencies shall, promptly upon enactment of this Act, inform the Secretary of the Interior and, where national forest lands are involved, the Secretary of Agriculture, of any proceedings, studies, or other activities within their jurisdiction which are now in progress and which affect or may affect any of the rivers specified in section 5, subsection (a), of this Act. They shall likewise inform him of any such proceedings, studies, or other activities which are hereafter commenced or resumed before they are commenced or resumed.

(d) Nothing in this section with respect to the making of a loan or grant shall apply to grants made under the Land and Water Conservation Fund Act of 1965 (78 Stat. 897; 16 U.S.C. 460l-5 et seq.).

SEC. 8. (a) All public lands within the authorized boundaries of any component of the national wild and scenic rivers system which is designated in section 3 of this Act or which is hereafter designated for inclusion in that system are hereby withdrawn from entry, sale, or other disposition under the public land laws of the United States.

(b) All public lands which constitute the bed or bank, or are within one-quarter mile of the bank, of any river which is listed in section 5, subsection (a), of this Act are hereby withdrawn from entry, sale, or other disposition under the public land laws of the United States for the periods specified in section 7, subsection (b), of this Act.

SEC. 9. (a) Nothing in this Act shall affect the applicability of the United States mining and mineral leasing laws within components of the national wild and scenic rivers system except that— *Mining and mineral leasing laws.*

(i) all prospecting, mining operations, and other activities on mining claims which, in the case of a component of the system designated in section 3 of this Act, have not heretofore been perfected or which, in the case of a component hereafter designated pursuant to this Act or any other Act of Congress, are not perfected before its inclusion in the system and all mining operations and other activities under a mineral lease, license, or permit issued or renewed after inclusion of a component in the system shall be subject to such regulations as the Secretary of the Interior or, in the case of national forest lands, the Secretary of Agriculture may prescribe to effectuate the purposes of this Act;

(ii) subject to valid existing rights, the perfection of, or issuance of a patent to, any mining claim affecting lands within the system shall confer or convey a right or title only to the mineral deposits and such rights only to the use of the surface and the surface resources as are reasonably required to carrying on prospecting or mining operations and are consistent with such regulations as may be prescribed by the Secretary of the Interior or, in the case of national forest lands, by the Secretary of Agriculture; and

(iii) subject to valid existing rights, the minerals in Federal lands which are part of the system and constitute the bed or bank or are situated within one-quarter mile of the bank of any river designated a wild river under this Act or any subsequent Act are hereby withdrawn from all forms of appropriation under the mining laws and from operation of the mineral leasing laws including, in both cases, amendments thereto.

Regulations issued pursuant to paragraphs (i) and (ii) of this subsection shall, among other things, provide safeguards against pollution of the river involved and unnecessary impairment of the scenery within the component in question.

(b) The minerals in any Federal lands which constitute the bed or bank or are situated within one-quarter mile of the bank of any river which is listed in section 5, subsection (a) of this Act are hereby withdrawn from all forms of appropriation under the mining laws during the periods specified in section 7, subsection (b) of this Act. Nothing contained in this subsection shall be construed to forbid prospecting or the issuance or leases, licenses, and permits under the mineral leasing laws subject to such conditions as the Secretary of the Interior and, in the case of national forest lands, the Secretary of Agriculture find appropriate to safeguard the area in the event it is subsequently included in the system.

A-11

BLM_0035975

Administration.

SEC. 10. (a) Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

(b) Any portion of a component of the national wild and scenic rivers system that is within the national wilderness preservation system, as established by or pursuant to the Act of September 3, 1964 (78 Stat. 890; 16 U.S.C., ch. 23), shall be subject to the provisions of both the Wilderness Act and this Act with respect to preservation of such river and its immediate environment, and in case of conflict between the provisions of these Acts the more restrictive provisions shall apply.

16 USC 1131 note.

(c) Any component of the national wild and scenic rivers system that is administered by the Secretary of the Interior through the National Park Service shall become a part of the national park system, and any such component that is administered by the Secretary through the Fish and Wildlife Service shall become a part of the national wildlife refuge system. The lands involved shall be subject to the provisions of this Act and the Acts under which the national park system or national wildlife system, as the case may be, is administered, and in case of conflict between the provisions of these Acts, the more restrictive provisions shall apply. The Secretary of the Interior, in his administration of any component of the national wild and scenic rivers system, may utilize such general statutory authorities relating to areas of the national park system and such general statutory authorities otherwise available to him for recreation and preservation purposes and for the conservation and management of natural resources as he deems appropriate to carry out the purposes of this Act.

(d) The Secretary of Agriculture, in his administration of any component of the national wild and scenic rivers system area, may utilize the general statutory authorities relating to the national forests in such manner as he deems appropriate to carry out the purposes of this Act.

Cooperative agreements with State or local governments.

(e) The Federal agency charged with the administration of any component of the national wild and scenic rivers system may enter into written cooperative agreements with the Governor of a State, the head of any State agency, or the appropriate official of a political subdivision of a State for State or local governmental participation in the administration of the component. The States and their political subdivisions shall be encouraged to cooperate in the planning and administration of components of the system which include or adjoin State- or county-owned lands.

Assistance in financing State and local projects.

SEC. 11. (a) The Secretary of the Interior shall encourage and assist the States to consider, in formulating and carrying out their comprehensive statewide outdoor recreation plans and proposals for financing assistance for State and local projects submitted pursuant to the Land and Water Conservation Fund Act of 1965 (78 Stat. 897), needs and opportunities for establishing State and local wild, scenic and recreational river areas. He shall also, in accordance with the authority contained in the Act of May 28, 1963 (77 Stat. 49), provide technical assistance and advice to, and cooperate with, States, political subdivisions, and private interests, including nonprofit organizations, with respect to establishing such wild, scenic and recreational river areas.

16 USC 4601-4 note.

16 USC 4601-4601-3.

A-12

BLM_0035976

(b) The Secretaries of Agriculture and of Health, Education, and Welfare shall likewise, in accordance with the authority vested in them, assist, advise, and cooperate with State and local agencies and private interests with respect to establishing such wild, scenic and recreational river areas.

Sec. 12. (a) The Secretary of the Interior, the Secretary of Agriculture, and heads of other Federal agencies shall review administrative and management policies, regulations, contracts, and plans affecting lands under their respective jurisdictions which include, border upon, or are adjacent to the rivers listed in subsection (a) of section 5 of this Act in order to determine what actions should be taken to protect such rivers during the period they are being considered for potential addition to the national wild and scenic rivers system. Particular attention shall be given to scheduled timber harvesting, road construction, and similar activities which might be contrary to the purposes of this Act.

*Administration and management policies. Review.*

(b) Nothing in this section shall be construed to abrogate any existing rights, privileges, or contracts affecting Federal lands held by any private party without the consent of said party.

(c) The head of any agency administering a component of the national wild and scenic rivers system shall cooperate with the Secretary of the Interior and with the appropriate State water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river.

Sec. 13. (a) Nothing in this Act shall affect the jurisdiction or responsibilities of the States with respect to fish and wildlife. Hunting and fishing shall be permitted on lands and waters administered as parts of the system under applicable State and Federal laws and regulations unless, in the case of hunting, those lands or waters are within a national park or monument. The administering Secretary may, however, designate zones where, and establish periods when, no hunting is permitted for reasons of public safety, administration, or public use and enjoyment and shall issue appropriate regulations after consultation with the wildlife agency of the State or States affected.

*Fish and wildlife. Jurisdiction under State and Federal laws.*

(b) The jurisdiction of the States and the United States over waters of any stream included in a national wild, scenic or recreational river area shall be determined by established principles of law. Under the provisions of this Act, any taking by the United States of a water right which is vested under either State or Federal law at the time such river is included in the national wild and scenic rivers system shall entitle the owner thereof to just compensation. Nothing in this Act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

*Compensation for water rights.*

(c) Designation of any stream or portion thereof as a national wild, scenic or recreational river area shall not be construed as a reservation of the waters of such streams for purposes other than those specified in this Act, or in quantities greater than necessary to accomplish these purposes.

(d) The jurisdiction of the States over waters of any stream included in a national wild, scenic or recreational river area shall be unaffected by this Act to the extent that such jurisdiction may be exercised without impairing the purposes of this Act or its administration.

*82 STAT. 917*

(e) Nothing contained in this Act shall be construed to alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by any States which contain any portion of the national wild and scenic rivers system.

*82 STAT. 918*

(f) Nothing in this Act shall affect existing rights of any State, including the right of access, with respect to the beds of navigable streams, tributaries, or rivers (or segments thereof) located in a national wild, scenic or recreational river area.

A-13

BLM_0035977

Easements and rights-of-way.

(g) The Secretary of the Interior or the Secretary of Agriculture, as the case may be, may grant easements and rights-of-way upon, over, under, across, or through any component of the national wild and scenic rivers system in accordance with the laws applicable to the national park system and the national forest system, respectively: *Provided,* That any conditions precedent to granting such easements and rights-of-way shall be related to the policy and purpose of this Act.

Claim and allowance as charitable contribution or gift.
76 Stat. 1034.
68A Stat. 410.

SEC. 14. The claim and allowance of the value of an easement as a charitable contribution under section 170 of title 26, United States Code, or as a gift under section 2522 of said title shall constitute an agreement by the donor on behalf of himself, his heirs, and assigns that, if the terms of the instrument creating the easement are violated, the donee or the United States may acquire the servient estate at its fair market value as of the time the easement was donated minus the value of the easement claimed and allowed as a charitable contribution or gift.

Definitions.

SEC. 15. As used in this Act, the term—

(a) "River" means a flowing body of water or estuary or a section, portion, or tributary thereof, including rivers, streams, creeks, runs, kills, rills, and small lakes.

(b) "Free-flowing", as applied to any river or section of a river, means existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway. The existence, however, of low dams, diversion works, and other minor structures at the time any river is proposed for inclusion in the national wild and scenic rivers system shall not automatically bar its consideration for such inclusion: *Provided,* That this shall not be construed to authorize, intend, or encourage future construction of such structures within components of the national wild and scenic rivers system.

(c) "Scenic easement" means the right to control the use of land (including the air space above such land) within the authorized boundaries of a component of the wild and scenic rivers system, for the purpose of protecting the natural qualities of a designated wild, scenic or recreational river area, but such control shall not affect, without the owner's consent, any regular use exercised prior to the acquisition of the easement.

Sec. 16. (a) There are hereby authorized to be appropriated, including such sums as have heretofore been appropriated, the following amounts for land acquisition for each of the rivers described in section 3(a) of this Act:

     Clearwater, Middle Fork, Idaho, $2,909,800;
     Eleven Point, Missouri, $4,906,500;
     Feather, Middle Fork, California, $3,935,700;
     Rio Grande, New Mexico, $253,000;
     Rogue, Oregon, $12,447,200;
     St. Croix, Minnesota and Wisconsin, $11,768,550;
     Salmon, Middle Fork, Idaho, $1,237,100; and
     Wolf, Wisconsin, $142,150.

(b) The authority to make the appropriations authorized in this section shall expire on June 30, 1979.

INT: 3620-75

A-14



GUIDELINES FOR EVALUATING WILD,

SCENIC AND RECREATIONAL RIVER

AREAS PROPOSED FOR INCLUSION IN

THE NATIONAL WILD AND SCENIC

RIVERS SYSTEM UNDER SECTION 2,

PUBLIC LAW 90-542.

February 1970

A-15

BLM_0035979

BLM_0035980

PURPOSE

The following criteria supplement those listed in Section 2 of the Wild and Scenic Rivers Act, which states that rivers included in the National Wild and Scenic Rivers System shall be free-flowing streams which possess outstandingly remarkable scenic, recreational, geological, fish and wildlife, historic, cultural and other similar values.

These guidelines are intended to define minimum criteria for the classification and management of free-flowing river areas proposed for inclusion in the national system by the Secretary of the Interior or the Secretary of Agriculture, and for State rivers included in the system by the Secretary of the Interior.

In reading these guidelines and in applying them to real situations of land and water it is important to bear one important qualification in mind. There is no way for these statements of criteria to be written so as to mechanically or automatically indicate which rivers are eligible and what class they must be. It is important to understand each criterion; but it is perhaps even more important to understand their collective intent. The investigator has to exercise his judgment, not only on the specific criteria as they apply to a particular river, but on the river as a whole, and on their relative weights. For this reason, these guidelines are not absolutes. There may be extenuating circumstances which would lead the appropriate Secretary to recommend, or approve pursuant to Section 2(a)(ii), a river area for inclusion in the system because it is exceptional in character and outstandingly remarkable even though it does not meet each of the criteria set forth in these guidelines. However, exceptions to these criteria should be recognized only in rare instances and for compelling reasons.

The three classes of river areas described in Section 2(b) of the Wild and Scenic Rivers Act are as follows:

"(1) Wild river areas--Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive

A-16

and waters unpolluted.  These represent
vestiges of primitive America.

"(2) Scenic river areas--Those rivers or sections of
rivers that are free of impoundments, with shore-
lines or watersheds still largely primitive and
shorelines largely undeveloped, but accessible in
places by roads.

"(3) Recreational river areas--Those rivers or sections
of rivers that are readily accessible by road or
railroad, that may have some development along
their shorelines, and that may have undergone some
impoundment or diversion in the past."

## GENERAL CHARACTERISTICS

The Wild and Scenic Rivers Act, Section 10(a), states that,
"Each component of the national wild and scenic rivers system
shall be administered in such manner as to protect and en-
hance the values which caused it to be included in said sys-
tem without, insofar as is consistent therewith, limiting
other uses that do not substantially interfere with public
use and enjoyment of these values.  In such administration
primary emphasis shall be given to protecting its esthetic,
scenic, historic, archeologic, and scientific features.
Management plans for any such component may establish vary-
ing degrees of intensity for its protection and development,
based on the special attributes of the area."

In order to qualify for inclusion in the national system, a
State free-flowing river area must be designated as a wild,
scenic, or recreational river by act of the State legisla-
ture, with land areas wholly and permanently administered in
a manner consistent with the designation by any agency or
political subdivision of the State at no cost to the Federal
Government, and be approved by the Secretary of the Interior
as meeting the criteria established by the Wild and Scenic
Rivers Act and the guidelines contained herein.  A river or
related lands owned by an Indian tribe cannot be added to the
national system without the consent of the appropriate
governing body.

A-17

In evaluating a river for possible inclusion in the system or for determining its classification, the river and its immediate land area should be considered as a unit, with primary emphasis upon the quality of the experience and overall impressions of the recreationist using the river or the adjacent riverbank. Although a free-flowing river or river unit frequently will have more than one classified area, each wild, scenic, or recreational area must be long enough to provide a meaningful experience. The number of different classified areas within a unit should be kept to a minimum.

Any activity, use, or development which is acceptable for a wild river is also acceptable for scenic and recreational river areas, and that which is acceptable for a scenic river is acceptable for a recreation river area. Activity and development limitations discussed below should not necessarily be interpreted as the desired level to which development or management activity should be planned. Hunting and fishing will be permitted, subject to appropriate State and Federal laws.

● The Wild and Scenic Rivers Act provides that rivers must be in a free-flowing natural condition, i.e., a flowing body of water or estuary or a section, portion, or tributary thereof, including rivers, streams, creeks, runs, kills, rills, and small lakes which are without impoundment, diversion, straightening, rip-rapping or other modification of the waterway. However, low dams, diversion works, and other minor structures will not automatically preclude the river unit from being included in the National Wild and Scenic Rivers System, providing such structures do not unreasonably diminish the free-flowing nature of the stream and the scenic, scientific, geological, historical, cultural, recreational, and fish and wildlife values present in the area.

● The river or river unit must be long enough to provide a meaningful experience. Generally, any unit included in the system should be at least 25 miles long. However, a shorter river or segment that possesses outstanding qualifications may be included in the system.

● There should be sufficient volume of water during normal years to permit, during the recreation season, full enjoyment of water-related outdoor recreation activities general-

A-18

BLM_0035983

ly associated with comparable rivers.  In the event the existing supply of water is inadequate, it would be necessary to show that additional water can be provided reasonably and economically without unreasonably diminishing the scenic, recreational, and fish and wildlife values of the area.

● The river and its environment should be outstandingly remarkable and, although they may reflect substantial evidence of man's activity, should be generally pleasing to the eye.

● The river should be of high quality water or susceptible of restoration to that condition.  A concept of nondegradation whereby existing high water quality will be maintained to the maximum extent feasible will be followed in all river areas included in the national system.

All rivers included in the national system should meet the "Aesthetics--General Criteria" as defined by the National Technical Advisory Committee on Water Quality in the Federal Water Pollution Control Administration's Water Quality Criteria, April 1, 1968.  Water quality should meet the criteria for fish, other aquatic life, and wildlife, as defined in that document, so as to support the propagation of those forms of life which normally would be adapted to the habitat of the stream.  Where no standards exist or where existing standards will not meet the objectives of these criteria, standards should be developed or raised to achieve those objectives.  Wild river areas can be included in the national system only if they also meet the minimum criteria for primary contact recreation, except as these criteria might be exceeded by natural background conditions.  Scenic or recreation river areas which qualify for inclusion in the system in all respects except for water quality may be added to the system provided adequate and reasonable assurance is given by the appropriate Federal or State authority that the water quality can and will be upgraded to the prescribed level for the desired types of recreation, and support aquatic life which normally would be adapted to the habitat of the stream at the prescribed level of water quality.  At such time as water quality fully meets the criteria, it may be desirable to change the classification of a river.

● New public utility transmission lines, gas lines, water

A-19

BLM_0035984

lines, etc., in river areas being considered for inclusion in the national system are discouraged. However, where no reasonable alternative exists, additional or new facilities should be restricted to existing rights-of-way. Where new rights-of-way are indicated, the scenic, recreational, and fish and wildlife values must be evaluated in the selection of the site in accordance with the general guidelines described in the Report of the Working Committee on Utilities prepared for the President's Council on Recreation and Natural Beauty, December 1968.

● Mineral activity subject to regulations under the Act must be conducted in a manner that minimizes surface disturbance, sedimentation and pollution, and visual impairment. Specific controls will be developed as a part of each management plan.

## CRITERIA FOR RIVER DESIGNATION

The following criteria for classification, designation, and administration of river areas are prescribed by the Act. These criteria are not absolutes, nor can they readily be defined quantitatively. In a given river, a departure from these standards might be more than compensated by other qualities. However, if several "exceptions" are necessary in order for a river to be classified as wild, it probably should be classified as scenic. If several "exceptions" are necessary in order for a river to be classified as scenic, it probably should be classified as recreational.

### Wild River Areas

The Wild and Scenic Rivers Act states that "these represent vestiges of primitive America," and they possess these attributes:
1. "Free of impoundments"
2. "Generally inaccessible except by trail"
3. "Watersheds or shorelines essentially primitive"
4. "Waters unpolluted"

● Classification criteria.

Despite some obvious similarities, the "wildness" associated with a wild river area is not synonymous with the "wildness"

A-20

BLM_0035985

involved in wilderness classification under the Wilderness Act of 1964. One major distinction, in contrast to wilderness, is that a wild river area also may contain recreation facilities for the convenience of the user in keeping with the primitive setting.

1. An "impoundment" is a slack water pool formed by any man-made structure. Except in rare instances in which esthetic and recreational characteristics are of such outstanding quality as to counterbalance the disruptive nature of an impoundment, such features will not be allowed on wild river areas. Future construction of such structures that would have a direct and adverse effect on the values for which that river area was included in the national system, as determined by the Secretary charged with the administration of the area, would not be permitted. In the case of rivers added to the national system pursuant to Sec.2(a)(ii), such construction could result in a determination by the Secretary of the Interior to reclassify or withdraw the affected river area from the system.

2. "Generally inaccessible" means there are no roads or other provisions for overland motorized travel within a narrow, incised river valley, or if the river valley is broad, within 1/4 mile of the riverbank. The presence, however, of one or two inconspicuous roads leading to the river area will not necessarily bar wild river classification.

3. "Essentially primitive" means the shorelines are free of habitation and other substantial evidence of man's intrusion. This would include such things as diversions, straightening, rip-rapping, and other modifications of the waterway. These would not be permitted except in instances where such developments would not have a direct and adverse effect on the values for which that river area was included in the national system as determined by the Secretary charged with the administration of the area. In the case of rivers added to the national system pursuant to Section 2(a)(ii), such construction could result in a determination by the Secretary of the Interior to reclassify or withdraw the affected river area from the system. With respect to watersheds, "essentially primitive" means that the portion of the watershed within the boundaries has a natural-like appearance. As with shorelines, developments within the boundaries should emphasize a natural-

A-21

BLM_0035986

like appearance so that the entire river area remains a
vestige of primitive America. For the purposes of this Act,
a limited amount of domestic livestock grazing and pasture
land and cropland devoted to the production of hay may be
considered "essentially primitive." One or two inconspicu-
ous dwellings need not necessarily bar wild river classi-
fication.

4. "Unpolluted" means the water quality of the river at
least meets the minimum criteria for primary contact recrea-
tion, except where exceeded by natural background conditions,
and esthetics as interpreted in the Federal Water Pollution
Control Administration's Water Quality Criteria, April 1,
1968. In addition, the water presently must be capable of
supporting the propagation of aquatic life, including fish,
which normally would be adapted to the habitat of the
stream. Where no standards exist or where existing
standards will not meet the objectives of these criteria,
standards should be developed or raised to achieve those
objectives.

● Management objectives.

The administration of a wild river area shall give primary
emphasis to protecting the values which make it outstandingly
remarkable while providing river-related outdoor recreation
opportunities in a primitive setting.

To achieve these objectives in wild river areas, it will be
necessary to:

1. Restrict or prohibit motorized land travel, except where
such uses are not in conflict with the purposes of the Act.

2. Acquire and remove detracting habitations and other non-
harmonious improvements.

3. Locate major public-use areas, such as large campgrounds,
interpretive centers or administrative headquarters, outside
the wild river area. Simple comfort and convenience facili-
ties, such as fireplaces, shelters, and toilets, may be pro-
vided for recreation users as necessary to provide an enjoy-
able experience, protect popular sites, and meet the manage-
ment objectives. Such facilities will be of a design and

A-22

BLM_0035987

location which harmonize with the surroundings.

4.  Prohibit improvements or new structures unless they are clearly in keeping with the overall objectives of the wild river area classification and management.  The design for any permitted construction must be in conformance with the approved management plan for that area.  Additional habitations or substantial additions to existing habitations will not be permitted.

5.  Implement management practices which might include construction of minor structures for such purposes as improvement of fish and game habitat; grazing; protection from fire, insects, or disease; rehabilitation or stabilization of damaged resources, provided the area will remain natural appearing and the practices or structures will harmonize with the environment.  Such things as trail bridges, an occasional fence, natural-appearing water diversions, ditches, flow measurement or other water management devices, and similar facilities may be permitted if they are unobtrusive and do not have a significant direct and adverse effect on the natural character of the area.

<u>Scenic River Areas</u>

The Wild and Scenic Rivers Act states that scenic rivers:

    1.  Are "free of impoundments"
    2.  Are "accessible in places by road"
    3.  Have "shorelines or watersheds still largely primitive and shorelines largely undeveloped"

● Classification criteria.

1.  An "impoundment" is a slack water pool formed by any man-made structure.  Except in rare instances in which esthetic and recreational characteristics are of such outstanding quality as to counterbalance the disruptive nature of an impoundment, such features will not be allowed on scenic river areas.  Future construction of such structures that would have a direct and adverse effect on the values for which that river area was included in the national system as determined by the Secretary charged with the administration of the area, would not be permitted.  In the case of rivers added to the national

A-23

system pursuant to Section 2(a)(ii), such construction could result in a determination by the Secretary of the Interior to to reclassify or withdraw the affected river area from the system.

2.  "Accessible in places by road" means that roads may occasionally bridge the river area.  Scenic river areas will not include long stretches of conspicuous and well-traveled roads closely paralleling the riverbank.  The presence, however, of short stretches of conspicuous or longer stretches of inconspicuous and well-screened roads or screened railroads will not necessarily preclude scenic river designation.  In addition to the physical and scenic relationship of the free-flowing river area to roads, consideration should be given to the type of use for which such roads were constructed and the type of use which would occur within the proposed scenic river area.

3.  "Largely primitive" means that the shorelines and the immediate river environment still present an overall natural character, but that in places, land may be developed for agricultural purposes.  A modest amount of diversion, straightening, rip-rapping, and other modification of the waterway would not preclude a river from being considered for classification as a scenic river.  Future construction of such structures would not be permitted except in instances where such developments would not have a direct and adverse effect on the values for which that river area was included in the national system as determined by the Secretary charged with the administration of the area.

In the case of rivers added to the national system pursuant to Section 2(a)(ii), such construction could result in a determination by the Secretary of the Interior to reclassify or withdraw the affected river area from the system. "Largely primitive" with respect to watersheds means that the portion of the watershed within the boundaries of the scenic river area should be scenic, with a minimum of easily discernible development.  Row crops would be considered as meeting the test of "largely primitive," as would timber harvest and other resource use, providing such activity is accomplished without a substantially adverse effect on the natural-like appearance of the river or its immediate environment.

A-24

BLM_0035989

4. "Largely undeveloped" means that small communities or any concentration of habitations must be limited to relatively short reaches of the total area under consideration for designation as a scenic river area.

● Management objectives.

A scenic river area should be managed so as to maintain and provide outdoor recreation opportunities in a near natural setting. The basic distinctions between a "wild" and a "scenic" river area are degree of development, type of land use, and road accessibility. In general, a wide range of agricultural, water management, silvicultural and other practices could be compatible with the primary objectives of a scenic river area, providing such practices are carried on in such a way that there is no substantial adverse effect on the river and its immediate environment.

The same considerations enumerated for wild river areas should be considered, except that motorized vehicle use may in some cases be appropriate and that development of larger scale public-use facilities within the river area, such as moderate size campgrounds, public information centers, and administrative headquarters, would be compatible if such structures were screened from the river.

Modest facilities, such as unobtrusive marinas, also would be possible if such structures were consistent with the management plans for that area.

Recreational River Areas

The Wild and Scenic Rivers Act states that recreational rivers:

    1. Are "readily accessible by road or railroad"
    2. "May have some development along their shoreline"
    3. May have "undergone some impoundment or diversion in the past"

● Classification criteria.

1. "Readily accessible" means the likelihood of paralleling roads or railroads on one or both banks of the river, with the possibility of several bridge crossings and numerous

A-25

BLM_0035990

river access points.

2.  "Some development along their shorelines" means that lands may be developed for the full range of agricultural uses and could include small communities as well as dispersed or cluster residential developments.

3.  "Undergone some impoundment or diversion in the past" means that there may be water resources developments and diversions having an environmental impact greater than that described for wild and scenic river areas.  However, the degree of such development should not be to the extent that the water has the characteristics of an impoundment for any significant distance.

Future construction of impoundments, diversions, straightening, rip-rapping, and other modification of the waterway or adjacent lands would not be permitted except in instances where such developments would not have a direct and adverse effect on the values for which that river area was included in the national system as determined by the Secretary charged with the administration of the area.  In the case of rivers added to the national system pursuant to Section 2(a)(ii), such construction could result in a determination by the Secretary of the Interior to reclassify or withdraw the affected river area from the system.

● Management objectives.

Management of recreational river areas should be designed to protect and enhance existing recreational values. The primary objectives will be to provide opportunities for engaging in recreation activities dependent on or enhanced by the largely free-flowing nature of the river.

Campgrounds and picnic areas may be established in close proximity to the river, although recreational river classification does not require extensive recreational developments.  Recreational facilities may still be kept to a minimum, with visitor services provided outside the river area.

Adopted:

_Harrison Loesch_   2-2-70
Department of the Interior   (Date)

_Edward P Cliff_   2-3-70
Department of Agriculture   (Date)

A-26

BLM_0035991

SUMMARY 1/
Attributes and management objectives of the three river classifications for
inclusion in the National Wild and Scenic River System

| | Wild | Scenic | Recreation |
|---|---|---|---|
| Attributes | 1. Free-flowing. Low dams, diversion works or other minor structures which do not inundate the natural riverbank may not bar consideration as wild. Future construction restricted. | 1. Free-flowing. Low dams, diversion works or other minor structures which do not inundate the natural riverbank may not bar consideration. Future construction restricted. | 1. May have undergone some impoundment or diversion in the past. Water should not have characteristics of an impoundment for any significant distance. Future construction restricted. |
| | 2. Generally inaccessible by road. One or two inconspicuous roads to the area may be permissible. | 2. Accessible by roads which may occasionally bridge the river area. Short stretches of conspicuous or longer stretches of inconspicuous and well-screened roads or railroads paralleling river area may be permitted. | 2. Readily accessible, with likelihood of paralleling roads or railroads along river banks and bridge crossings. |
| | 3. Shorelines essentially primitive. One or two inconspicuous dwellings and land devoted to production of hay may be permitted. Watershed natural-like in appearance. | 3. Shoreline largely primitive. Small communities limited to short reaches of total area. Agricultural practices which do not adversely affect river area may be permitted. | 3. Shoreline may be extensively developed. |
| | 4. Water quality meets minimum criteria for primary contact recreation except where such criteria would be exceeded by natural background conditions and esthetics 2/ and capable of supporting propagation of aquatic life normally adapted to habitat of the stream. | 4. Water quality should meet minimum criteria for desired types of recreation except where such criteria would be exceeded by natural background conditions and esthetics 2/ and capable of supporting propagation of aquatic life normally adapted to habitat of the stream, or is capable of and is being restored to that quality. | 4. Water quality should meet minimum criteria for desired types of recreation except where such criteria would be exceeded by natural background conditions and esthetics 2/ and capable of supporting propagation of aquatic life normally adapted to habitat of the stream or is capable of and is being restored to that quality. |
| Management objectives | 1. Limited motorized land travel in area. | 1. Motorized vehicles allowed on land area. | 1. Optimum accessibility by motorized vehicle. |
| | 2. No unharmonious or new habitations or improvements permitted. | 2. No unharmonious improvements and few habitations permitted. | 2. May be densely settled in places. |
| | 3. Only primitive-type public use provided. | 3. Limited modern screened public use facilities permitted, i. e. campgrounds, visitor centers, etc. | 3. Public use areas may be in close proximity to river. |
| | 4. New structures and improvement of old ones prohibited if not in keeping with overall objectives. | 4. Some new facilities allowed, such as unobtrusive marinas. | 4. New structures allowed for both habitation and for intensive recreation use. |
| | 5. Unobtrusive fences, gauging stations and other management facilities may be permitted if no significant adverse effect on natural character of area. | 5. Unobtrusive fences, gauging stations and other management facilities may be permitted if no significant adverse effect on natural character of area. | 5. Management practice facilities permitted. |
| | 6. Limited range of agriculture and other resource uses permitted. | 6. Wide range of agriculture and other resource uses may be permitted. | 6. Full range of agriculture and other resource uses may be permitted. |

1/ To be used only in conjunction with the text.
2/ Federal Water Pollution Control Administration's Water Quality Criteria, April 1, 1968.

February 1970

G P O  864·100

APPENDIX B

LIST OF DATA SOURCES

A study team consisting of the Colorado Water Conservation Board repre-
senting the Colorado Department of Natural Resources, the Bureau of
Outdoor Recreation representing the Department of the Interior, and the
Forest Service representing the Department of Agriculture, was responsi-
ble for the conduct of the Dolores Wild and Scenic Rivers Study and the
preparation of this report.

It must be made clear, however, that although this small group was respon-
sible, neither the study nor the resultant report could have been completed
without the whole-hearted cooperation of many other State and Federal
agencies and bureaus, private organizations, and private individuals.

Many of these joined forces and formed a steering committee that provided
coordination and guidance for the study team, participated in meetings
and field examinations with the study team, and provided the study team
with invaluable information, technical data and professional insight.

Information, technical data, professional opinions and advice were also
provided by a group of State and Federal bureaus and agencies, private
organizations and private citizens unable (because of travel and financial
constraints or work pressures) to participate on the steering committee.

A listing of these sources of help follows.  The study team wishes to
express its heartfelt gratitude to them for the help they provided and
also extends a sincere apology for any names that were unintentionally
omitted.

Steering Committee

Group 1 - State Agencies

    Colorado Department of Natural Resources
    Colorado Division of Wildlife
    Colorado Division of Parks and Outdoor Recreation
    Colorado Division of Planning
    Colorado State Historical Society

Group 2 - Federal Agencies

    Bureau of Outdoor Recreation
    Bureau of Land Management
    Bureau of Reclamation
    Fish and Wildlife Service
    Geological Survey
    National Park Service
    Bureau of Mines

BLM_0035993

Economic Research Service
Forest Service
Soil Conservation Service

Group 3 - Organizations

Southwestern Water Conservation District
The Wilderness Society
Western River Guides Association
Colorado White Water Association
Federal Timber Purchasers Association
Colorado Trout Unlimited
University of Colorado Wilderness Study Group
Rocky Mountain River Expeditions
Colorado Cattlemen's Association

Group 4 - Individuals

Joseph Hartt
Dave Herrick
David Sumner
George Kelly
Earl Perry
Preston Ellsworth

Non-Steering Committee Participants

Federal Agencies

Environmental Protection Agency
Army Corps of Engineers
Bureau of Indian Affairs
The President's Advisory Council on Historic Preservation
U. S. Energy Research and Development Administration

Organizations

American Canoe Association
American Rivers Conservation Council
Upper Colorado River Commission
Four Corners Regional Commission

Public input was obtained through a series of three public information meetings held in Denver, Grand Junction, and Cortez on March 14, 26, and 27, 1975, respectively. Another series of four public meetings was held in these same locations, as well as at Norwood, during the week of July 7, 1975. Public response was solicited at these meetings, and all comments received were considered in the preparation of the report and environmental statement.

B-2

BLM_0035994

APPENDIX C

The Dolores Project:  An Overview

The Dolores Project, located in Dolores and Montezuma Counties in south-western Colorado, was authorized by Congress in 1968 as part of the Colorado River Storage Project.  It will be constructed by the U. S. Bureau of Reclamation to regulate the Dolores River for irrigation, municipal and industrial purposes, fish and wildlife enhancement and recreation, plus flood control.  The Dolores Water Conservancy District, which includes parts of Dolores and Montezuma Counties, is the con-tractual agency for the project; the Ute Mountain Indian Tribal Council is also a sponsor.

The principal storage feature will be the 4,470-acre McPhee Reservoir, fronted by a dam to be constructed 11 miles downstream from the town of Dolores.  Total capacity will be approximately 381,000 acre-feet; an inactive pool of 152,000 acre-feet will provide flat water recreation. Most of the stored water will be diverted out of the Dolores River Basin for irrigation in the Montezuma Valley in the San Juan River Basin immediately to the south and west.  A 178-mile system of canals and laterals, plus seven pumping plants, will distribute this water, and will be constructed as part of the Project.  Two smaller reservoirs will also be built:  Monument Creek (84 acres) to provide the town of Dove Creek with municipal and industrial storage, and Dawson Draw (294 acres) in Montezuma Valley for fish and wildlife management purposes.

Table 1 gives a breakdown of Dolores Project water allocations.  Plans for supplying irrigation water to new lands (mostly in the Dove Creek area where dry farmers need water in order to diversify their crops) are based on sprinkler systems to insure efficient water use and to minimize adverse effects on downstream water quality.

The Bureau of Reclamation is continuing work on the Definite Plan Report and Draft Environmental Statement.  Both should be completed in early calendar year 1976.

BLM_0035995

TABLE 1 -- Dolores Project Water Allocations

DOLORES PROJECT

### IRRIGATED LAND

(Acres)

|  | Supplemental | Full | Total |
|---|---|---|---|
| MONTEZUMA VALLEY | 26,300 | ---- | 26,300 |
| TOWAOC | ---- | 7,500 | 7,500 |
| DOVE CREEK | ---- | 27,860 | 27,860 |
| TOTAL | 26,300 | 35,360 | 61,660 |

### WATER

(Acre-Feet)

| | |
|---|---|
| IRRIGATION.......................................... | 90,900 |
| CORTEZ MUNICIPAL & INDUSTRIAL.............................. | 6,200 |
| DOVE CREEK MUNICIPAL & INDUSTRIAL......................... | 600 |
| DOLORES WATER CONSERVANCY DISTRICT........................ | 900 |
| TOWAOC MUNICIPAL & INDUSTRIAL............................. | 1,000 |
| FISH, WILDLIFE & ESTHETIC RELEASES BELOW McPHEE DAM........ | 25,400 |
| FUTURE FISH AND WILDLIFE ENHANCEMENT...................... | 800 |
| UTE MOUNTAIN UTE FUTURE FISH & WILDLIFE ENHANCEMENT........ | 800 |
| TOTAL | 126,600 |

C-2

BLM_0035996

APPENDIX D

Nearby Rivers Offering Similiar Recreational Opportunities

The following series of sketches is included to provide comparative in-
formation on recreational opportunities offered by rivers within a
150-mile radius of the Dolores.  Emphasis is on white water boating,
one of the recreational uses of the Dolores below McPhee Dam.  Basic
comparative parameters include:  a) length of river segment, b) duration
of float trip, c) duration of season, d) recreational use, e) difficul-
ty, and f) scenic, archaeological and other features.1/

1.  San Juan River, Utah.  This 30-mile run is considered easy by most
    boatmen, and is usually made in three days.  There are several inter-
    mediate rapids on this reach, but the San Juan's unique "sand waves"
    provide a high level of recreational enjoyment.  Running as high as
    four feet, these waves create a roller-coaster-like ride, while offering
    minimal threat of danger.  The San Juan also ranks high in geologic
    and archaeological interest.  After meandering in a gentle valley for
    a few miles, the river drops into a gorge which reaches a maximum
    depth of 800 feet.  Numerous pre-Columbian Indian (Anasazi) ruins
    may be seen en route.

    Commercial operators have run the San Juan since the 1930's.  The
    river now supports heavy recreational use - approximately 2,500 visi-
    tor days annually, with a season that runs from May to September
    (inclusive).  The San Juan is under a permit system which was ini-
    tiated by BLM in 1973.

2.  Colorado River, Westwater Canyon, Utah.  Westwater Canyon was seldom
    run until the late 1960's, but it is now one of the most popular trips
    in the region; visitor days in 1974 totaled 6,750.  The run is 17
    1/2 miles long and is normally made in one or two days, with put-in
    at Westwater Ranger Station and take out at Rose Ranch.  The commer-
    cial operation here is substantial, as is private use; in addition,
    various Colorado public school systems are running the river for
    student seminars.  Permits and reservations are required.

    Attractions in Westwater are about evenly divided between scenery,
    history, geology and river-running challenge.  The canyon is often
    considered a miniature Grand Canyon, with a similar geology on a

---

1/ The bulk of this information was provided to the Study Team by Earl
   Perry, Conservation Chairman of the Colorado Whitewater Association,
   Lakewood, Colorado.

BLM_0035997

less grand scale - with layers of red sandstone giving way to about
200 feet of basement rock, mostly dark gneiss and schist.  The heavy
volume and high velocity of the Colorado has bored tall potholes and
flutings in the rock.

Difficulty depends greatly on flow.  Below 7,000 cfs it is an inter-
mediate, heavy water challenge; above 13,000 cfs Westwater is for
experts only.  This canyon can be run from late March through November,
but is best May through September.

3.   Colorado River, Cisco to Moab, Utah.  This is a lazy run, 46 miles in
     length with only a few minor rapids; at high water, these produce
     large and simple tail waves.  Most float parties make the run in two
     or three days.  Permits are required.  1975 is the first year use
     data is being compiled and the data is not as yet available.

     The run is through a spacious red rock gorge, paralleled most of the
     way by Utah State Highway 128.  The Fisher Towers and La Sal Mountains
     are visible in the southeast, and Arches National Park borders the
     last eight miles on the west.  This is a good family or beginner's
     trip.

4.   Colorado River, Cataract Canyon, Utah.  This large, steep, dangerous
     reach of the Colorado in Canyonlands National Park may be reached
     from two launch points.  One put-in is on the Colorado at the potash
     docks 20 miles downriver from Moab; the other is on the Green River,
     which joins the Colorado in the Park, at the town of Green River,
     Utah.  Length of the run from below Moab is 112 miles and normally
     takes three to five days, and 170 miles or four to six days from
     Green River.  Take out is at Hite on Lake Powell.

     Cataract Canyon itself is only 15 miles long, but the two approaches
     take boaters through quiet, scenic canyon country before the heavy
     water begins to kick up.  The Green above the confluence is a long,
     entrenched meander with walls of Navajo and Wingate sandstone.
     Through lower Labyrinth and Stillwater Canyon there are a number of
     interesting geologic formations, and riparian benches with tamarisk,
     sage, cottonwood and deer.  The 60-mile stretch of the Colorado above
     the confluence is characterized by dark, red rock near the river and
     the white rim above.  Power boat use on these reaches is considerable,
     particularly the annual Memorial Day Friendship Cruise at which time
     300 to 400 boats make a three-day run from Green River to Moab.

     Cataract Canyon begins about 2 1/2 miles below the confluence of the
     two rivers at Spanish Bottoms.  Trails here lead off to some of the
     more choice and remote sections of Canyonlands National Park, but
     most boaters head into the rapids which are severe.  The first of
     these, Brown Betty, is also known as "the Graveyard of the Colorado"
     in honor of the lives it has taken.  Others follow Mile Long, Big
     Drop, and Satan's Gut.  Below 15,000 cfs, the run is intermediate;

                                    D-2

BLM_0035998

above 40,000 cfs it is for experts only, and at 70,000 the canyon is a continuous, gigantic rapid until swallowed by Lake Powell. Between 25 and 30 miles of tedious rowing on flat water completes the trip.

Cataract Canyon can be run by permit only; restrictive Park Service policies and dangerous waters limit the private use of this run, but commercial operation is substantial. Four thousand and seventy-eight people made the run in 1974 during a season that begins in March and ends in November. Primary use is from May to September.

5. <u>Green River, Desolation and Gray Canyons, Utah</u>. There are two launch points for this run - the most popular at Ouray, the preferred at Sand Wash. The normal trip covers 127 miles to the town of Green River, but since the first 60 of these are flat and notorious for their mosquitoes, many people opt for cutting off 35 miles and starting at Sand Wash. The longer trip usually runs about five days, the shorter about three.

From Ouray down, the Green moves in broad curves through alluvial shore lines with tamarisk and cottonwood; gradually the river entrenches itself in the rock of Tavaputs Plateau, and at Jack Creek, 58 miles downstream the rapids begin. Jack Creek is also an area slated for oil shale development. Desolation Canyon is far from desolate: a deep (2,700 feet), spacious cut which supports one of the largest mule deer herds in Utah. The rapids, especially at high water, are large, but not difficult. Numerous side canyons, several with Anasazi pictographs, are popular for day hikes.

Recreational use of this reach of the Green is moderate; passenger days in 1974 were 12,947. Permits are required.

6. <u>Lower Animas River, Colorado</u>. Beginning at Durango about 55 miles east of the town of Dolores, this river is becoming increasingly popular for short half-day or full-day family trips.

White water rapids occur in the first mile of the river below the Highway 160 bridge in Durango. Below this white water stretch there is quiet water with short stretches of easy rapids and rocks. About five miles below town the river enters a dry shale canyon country with rounded canyon walls and a predominent pinyon, juniper and oakbrush vegetative cover. There are scattered cottonwoods and willows along the banks.

In most years the river can be run by skilled boatmen from May through July. The river is also run by amateurs using a variety of craft. One aluminum row boat can be seen impaled on a rock just below Durango.

The River is becoming increasingly popular especially for one-half day commercial trips. The trips are advertised in the local newspaper and information concerning the trips is available at motels in the area.

D-3

7.  Piedra River, Colorado.  Only kayakers or hikers can traverse this
    stream which is located in the San Juan Range about 45 miles east
    of Durango.  Its length is only about 30 miles and it is a mountain
    stream with almost continuous rapids; normal spring crest is about
    1,500 cfs, but in heavy snowpack years it boils to 5,000 cfs.
    Kayakers must time their trips carefully in the spring to catch the
    run-off and so far very few have; only five kayakers are known to
    have run the Piedra, and because of its difficulty and short season,
    use is unlikely to increase.

    The upper portion (15 miles) cuts two vertical walled sandstone gor-
    ges and contain a series of intermediate to expert rapids; lower
    down is a third major gorge which can be run only at high water and
    is extremely difficult.

    Portaging is impossible, unless a party ropes up the sheer canyon wall.

8.  Conejos River, Colorado.  The 45-mile Conejos is rarely used by
    boaters, despite the fact that it runs through a scenic, forested
    gorge.  Its volume and steep gradient make it impractical to run at
    either high or low water stages.  Along its lower reaches, a road
    parallels the Conejos.  Best estimate is that one or two parties run
    this annually.

9.  Rio Chama, El Vado Dam to Abiquiu Dam, New Mexico.  This 30-mile run
    follows a wilderness canyon, triple-tiered with palisades and heavily
    wooded with ponderosa pine.  Wildlife is abundant - especially deer,
    coyotes and raptors.  Trout fishing is excellent.

    With the closing of the headgates of Cochiti Dam on the Rio Grande,
    this is now New Mexico's only overnight wilderness river trip.  Most
    parties take two leisurely days, and scenery rather than white water
    is the main attraction, even though there are some good intermediate
    rapids.  Normally the Rio Chama crests in mid-May between 800 and
    1,200 cfs - allowing for a boating season of about 45 days.  In good
    water years, when run-off peaks at 3,500 cfs, the river can be run
    from April into late August.

10. Rio Chama, Abiquiu Dam to Confluence with the Rio Grande.  Abiquiu
    Dam, a flood control structure of the Army Corps of Engineers, con-
    trols flow on this segment of the Rio Chama, with spring peak be-
    tween 1,500 and 4,000 cfs.  The normal run covers 30-35 miles and
    is a one day trip.

    Boatmen consider this a "training river," as the challenges are modest
    and not dangerous.  At flows over 2,500 cfs, sand waves develop, and
    there are three irrigation dams - two of which create runable rapids,
    one which must be portaged.  This reach of the Rio Chama is rich in
    history, with many settlements dating back to the 1600's and 1700's.
    Geology is generally dull; farming and ranching occupy the floodplain,
    but these activities are largely screened from the river by thick
    coppices of willow.

D-4

BLM_0036000

Recreational use is moderate; in 1974, there were 30-40 visitor days here.

11.  Rio Grande, Lower Box Canyon (or Taos Box), New Mexico.  Near the Colorado-New Mexico border the Rio Grande cuts through a level, lava plain, carving a gorge up to 700 feet deep.  Upstream from the Arroyo Hondo Bridge, the river is fearsome and un-runable; below is a 20-mile stretch of almost solid expert white water.  Most of the rapids result from talus slides off the canyon walls; these are extraordinarily steep runs (for example, Powerline Cascade drops 12 vertical feet in 25 to 30 river feet).  Kayakers consider this to be one of the finest technical white water runs in the West, but it is not for beginners or for leisure floating.  The lower Box is usually run at 1,500 to 4,500 cfs; over 4,000 cfs, the hydraulics make it almost impossible to stop on the lower, steepest four miles here.  The gorge is strikingly scenic, and trout fishing is excellent (though seldom mixed with boating).

Commercial use in the Lower Box is limited as the run demands small, nearly indestructible and very expensive rafts.  Private use by kayakers is high.  Total visitor days in 1974 were 500.

12.  Rio Grande, Pilar Rapids, New Mexico.  This brief run, only five miles long, begins at the town of Pilar about 25 miles south of Taos.  It is another technical piece of water; rapids are continuous and difficult, and a parallel road makes it possible for one to shoot this water as many as four times in a day.  Scenery is desolate and fishing poor, but the rapids compensate for this; an annual river race has been held here since the mid-1950's.  Visitor days run about 500 yearly.

Conclusion:  From the foregoing it is obvious that an abundance of river-running recreational opportunities exist within a 150-mile radius of the Dolores.  If the Dolores River is unique, it is so because of the unique and rich combination of qualities which bring together many of the best features of other rivers in the region.  Scenery, geologic interest, historic and archaeological sites, wildlife, a short but challenging white water season, placid flat water, and ecological diversity are all to be found along the Dolores.  Dolores Canyon is an intermediate to expert run; Slick Rock Canyon is a beginner's trip.  Also of note is the fact that the Dolores is among the longest of the river segments noted; the 105-mile McPhee Dam-to-Bedrock stretch is exceeded only by reaches on the Colorado and Green Rivers in Utah.  Finally, the Dolores is intermediate in size, larger than the Piedra and Conejos, but smaller than the Colorado and the Green.  Partisans maintain that Slick Rock Canyon is second to none in desert river scenery in the West.

D-5

BLM_0036002

DOLORES RIVER WILD AND SCENIC RIVER STUDY
UTAH AND COLORADO
NEARBY RIVERS OFFERING SIMILAR RECREATIONAL OPPORTUNITY



U.S.D.A. FOREST SERVICE 1975

BLM_0036003

BLM_0036004

APPENDIX E

Outline and Application of Principles

and Standards Procedures to Alternative Actions

## INTRODUCTION

In 1971, the Water Resources Council (WRC) conceived an analytical process for developing and evaluating alternative plans for water and related land resource uses. This procedure was tested under a variety of conditions around the Nation. The adopted process was published in the Federal Register, Volume 38, Number 174, on September 10, 1973 as an Executive Order.

According to the Principles and Standards, planning for the use and development of the Nation's resources is undertaken to serve two major, co-equal, objectives:  National Economic Development (NED) and Environmental Quality (EQ).  In most cases the objectives can be served by complementary actions; however, in some cases trade offs which allow less than maximum satisfaction of goals must be made.  In some cases outright conflicts among objectives occur, and satisfaction of one precludes the others.  Because of these aspects, a number of alternatives must be developed, analyzed, evaluated, and tested.  The end result is identification of the one preferred plan for NED and the one preferred EQ plan. From these it may be possible to select an optimum or compromise plan which has a satisfactory combination of both economic and environmental features.  Both objectives are equal in importance and are treated with equal weight in the analysis.  Each alternative is measured in terms of satisfaction of the objective for which it was formulated and its effects on the other objective.  Additionally, the beneficial and adverse effects of each alternative are compared in a system of accounts which includes national economic development, environmental quality, regional development, and social well-being.  The procedure is designed to present a range of acceptable and relevant alternatives together with a full display of all effects and interrelationships to decision-makers.  The planners present facts and analyses of facts, while reserving options and decisions for appropriate officials.

## APPLICATION OF WRC PLANNING PROCESS

Specification of Objectives.--The first step in the process is identification of the components of the major objectives.  The components must be of concern to the Nation, and they should be related to the use and management of the resources in the planning setting.  In addition, they

E-1

BLM_0036005

have to be defined so that the type, quantity, and quality of effect are evident. Finally, the components should be those which can be substantially influenced through the management and development alternatives available to the planners.

<u>National Economic Development Components</u>.--The NED objective can be served in two basic ways: (1) increasing economic values by <u>increasing output or production</u> of goods and services and (2) <u>increasing economic efficiency</u> in the production of goods and services.

The description of the Dolores Basin in Chapter III established that, economically, the area is largely resource oriented. Major goods and services produced in the broad area containing the River are agricultural products, timber, minerals and outdoor recreation. National economic development can be served by increasing production of any of these components, provided that the share of national demand allocated to the Dolores River area exceeds the current or projected supply (production). More efficient production of these goods or services will also contribute to the NED objective.

The components of NED identified in the Dolores River Basin are increased or more efficient:

    (1)  output of outdoor recreation services and uses

    (2)  production of agricultural products

    (3)  production of timber

    (4)  production of mineral resources

    (5)  hunting opportunities

<u>Environmental Quality Components</u>.--The components of EQ identified in the Dolores River Basin are:

    (1)  preserve and protect areas of natural beauty and river segments with wild, scenic, or recreational river characteristics

    (2)  preserve and protect areas with historic, archaeologic, and cultural value

    (3)  preserve and protect endangered or threatened wildlife or vegetation

    (4)  preserve or enhance air and water quality

    (5)  preserve freedom of choice to future resource users by avoiding irreversible or irretrievable effects

<div align="center">E-2</div>

BLM_0036006

<u>Second Level Specification of Components</u>.--A second level specification was made to determine which components are relevant to the Dolores River Study Segments, the potential wild and scenic river area, and the action available to planners under authority of this study.

NED components which were identified in the second level specification are:

    (1)  outdoor recreation uses

        (a)  kayaking, white-water rafting, or other boating

        (b)  fishing

        (c)  hiking, climbing, or walking for pleasure

        (d)  camping

        (e)  picnicking

    (2)  more efficient production of range livestock products through improved irrigation water management and systems improvements

    (3)  increased production of minerals to meet national demands

        (a)  uranium

        (b)  vanadium

        (c)  other minerals (precious, base, and non-metallic)

    (4)  increased use of geothermal resources to meet energy demands

Several components of NED were eliminated in the second level specification:

    (1)  Increased production of agriculture through land use changes was eliminated, since most land in the corridor with cropland capability is now being utilized.

    (2)  Increased agricultural production through application of irrigation water to lands in the corridor was eliminated, since there is no surplus water.

    (3)  Increased or more efficient timber production was eliminated since there are no commercial forest lands available in the corridor.

    (4)  Increased hunting opportunity was eliminated, since the corridor is currently utilized to optimum capacity.

BLM_0036007

EQ components which were identified in the second level specification are:

(1)  preserve and protect 33 miles of Wild River characteristics
     on the Main Dolores, beginning at the Little Gypsum Valley
     Bridge and ending one mile above the Highway 90 Bridge.

(2)  preserve and protect 41 miles of Scenic River characteristics
     on the Main Dolores, beginning at the Bradfield Ranch and
     ending at the Disappointment Creek confluence.

(3)  preserve and protect 35 miles of Recreational River charac-
     istics of the West Dolores segment; and on the Main Dolores,
     the 11-mile subsegment beginning one mile below the proposed
     McPhee Dam and ending at the Bradfield Ranch Bridge, and the
     20-mile subsegment beginning at the Disappointment Creek
     confluence and ending at the Little Gypsum Valley Bridge.

(4)  identify and protect prehistoric Indian cultural artifacts
     and sites in the river corridor.

(5)  provide recreation interpretation and enjoyment through manage-
     ment of historic, archaeologic, and cultural resources.

(6)  avoid irreversible and irretrievable commitment of resources
     and preserve freedom of choice on 140 miles of the Dolores
     River and West Dolores River eligible for inclusion in the
     National Wild and Scenic Rivers System.

Several components of EQ were eliminated in the second level specification:

(1)  Preservation and protection of endangered species of wildlife or
     vegetation were eliminated from analysis because actions to
     provide protection are beyond the direct authority provided by
     the Wild and Scenic Rivers Act and is thus not an alternative
     available to the planners.  However, statutes, regulations, and
     policies will be recognized in management plans for designated
     segments to provide for protection and preservation of endangered
     and threatened species.

(2)  Preservation of air and water quality were eliminated as com-
     ponents, since improvement of air or water quality is not a
     direct purpose of the Wild and Scenic Rivers Act.  As above,
     statutes, regulations, and policies will be recognized in
     management plans for designated segments to provide for pro-
     tection of water and air quality and to safeguard against
     degradation.

Table 1 is a comparison of demand, supply, and identification of need for
the NED components.

E-4

BLM_0036008

Table 1

DEMAND, SUPPLY, AND NEED FOR COMPONENTS OF NED OBJECTIVE

| COMPONENT OF NED | UNIT | 1975 | | | 1980 | | | 1990 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | DEMAND | SUPPLY | NEED | DEMAND | SUPPLY | NEED | DEMAND | SUPPLY | NEED |
| Boating (all types) | RD 1/ | 2,500 | 6,900 | None | 5,300 | 6,900 | None | 14,400 | 6,800 | 7,500 |
| Fishing | RD | 26,000 | 27,000 | None | 61,600 | 69,700 | None | 77,200 | 69,700 | 7,500 |
| Hiking-Walking | RD | 100,000 | 6,300 | 93,300 | 214,600 | 68,800 | 145,800 | 443,600 | 69,000 | 374,600 |
| Camping | RD | 170,300 | 17,300 | 153,000 | 201,400 | 53,500 | 147,900 | 263,400 | 53,500 | 209,900 |
| Picnicking | RD | 39,500 | 8,600 | 30,900 | 84,700 | 26,600 | 58,100 | 175,100 | 26,600 | 148,500 |
| Livestock | AUMS | 27,300 | 27,100 | 200 | 28,600 | 28,000 | 600 | 34,500 | 33,400 | 1,100 |
| Uranium | Tons | 2,000/4,000 | 2,000/4,000 | - | 4,900 | 2,000/4,000 | 2,900/900 | 12,250 | 2,000/4,000 | 10,254/8,250 |
| Vanadium | Tons | 11,500/14,000 | 11,500/14,000 | - | 12,000 | 11,500/14,000 | 0/500 | 20,000 | 11,500/14,000 | 6,000/8,100 |
| Other Minerals | Tons | Unquantified | Presently None | Unquantified | Unquantified | Presently None | Unquantified | Unquantified | Presently None | Unquantified |
| Geothermal Resources | BTUS | Unquantified | None developed | Unquantified | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |

Note - Other minerals are known to occur in the formations present in the corridor.  Exploration shows high potential but supply is unquantified.
Geothermal resources occur in West Dolores area but presently undeveloped and quantity is undefined.  Uranium-Vanadium reserves are expanding as more becomes known as result of exploration.  Current production is 32,030 pounds of Uranium and 185,380 pounds of Vanadium annually.
1/ A recreation day is participation in the activity by one person for all or any part of a day.

E-5

BLM_0036009

## Assumptions for Component Need Specification

(1) Assumptions related to derivation of demand and supply for the NED components are:

(a) Boating demand is based on extrapolation of current (1975) usage. The boating or white water floating demand is expected to reach allowable capacity by 1980. Capacity or supply is computed on the assumption of no classification of any segment. After 1980, demand will equal supply.

(b) Fishing demand is derived from Colorado Division of Wildlife studies for the Dolores River Project (McPhee Reservoir). Supply includes the downstream fishing which would be created by McPhee Reservoir releases plus existing fishing in the West Dolores River.

(c) Hiking and walking demand is derived from historic use data and is projected using historic growth rates. Supply is computed on the basis of miles of trail and estimated use for hiking on undeveloped National Forest and national resource lands. The supply does not include opportunities for hiking in undeveloped areas or off-trail use.

(d) Camping demand is based on historic use data from the San Juan National Forest. Supply is based on the capacity of existing developed public sites added to the capacity of sites which will be developed in conjunction with McPhee Reservoir.

(e) Picnicking demand and supply assumptions are identical to Camping.

(f) Livestock demands are the proportional share of the national demand developed in the 1972 Office of Business Economics - Economic Research Service (OBERS) Series C projections for the Colorado-Dolores Water Resources Sub-region. Demand was assumed to equal supply in 1973. Supply is based on the assumption that the demand for irrigation water and cropland is a derived demand induced by the demand for livestock products and that most land within the Dolores River corridor, which has cropland capability, is currently being used for this purpose.

E-6

BLM_0036010

(g) The demands for uranium and vanadium resources are based on projections of population growth, energy and minerals use, and economic growth developed by the U.S. Geological Survey, Bureau of Mines, and the Energy Research and Development Administration. Supply is based on published reports of these agencies. It is assumed that in the Dolores River corridor the demand for these resources is equal to or greater than the supply.

(2) Assumptions related to derivation of need for EQ components are:

(a) There is a national need for the beneficial esthetic, environmental and spiritual effects associated with preservation of free-flowing streams that have out-standingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values.

(b) Eligible segments were evaluated for their wild, scenic, or recreational character. It is assumed that the greatest contribution to the EQ components is provided by wild river designation; the next greatest, by scenic river designation; and the least by recreational river designation, providing in each case that the river segments meet minimum classification criteria.

(c) Preservation of archaeological and historic resources of man's cultural heritage may be adversely affected by publicity and increased recreation use which may result from designating the Dolores as a National Wild and Scenic River.

(d) The demand for use of wild, scenic, or recreational rivers will exceed the carrying capacity of the eligible segments by 1980.

Formulation of Alternatives and Options.--Alternative plans are developed by arranging component needs that are essentially complementary - that is, the satisfaction of one component need does not preclude satisfaction of, or add to, the cost of other needs. Actions to satisfy the complementary needs are the nucleus of an alternative plan.

Table 2 is the array for NED component needs with relevant means of meeting each. Table 3 is the array and relevant means for satisfying EQ component needs.

Using this array of complementary components, a range of alternative plans was developed. The No-Action plan - which visualizes continuation of current types and rates of use - is the base for all comparisons.

E-7

Table 2

COMPLEMENTARY COMPONENT NEEDS AND MEANS, NED OBJECTIVE

| COMPONENT NEED | UNIT | MEANS OF MEETING NEED | COMPLEMENTARY ARRAY A | COMPLEMENTARY ARRAY B |
|---|---|---|---|---|
| Boating | RD | Develop launching sites, access, parking | Develop boating | Additional development non-complementary |
| Fishing | RD | Maintain stream flow and quality, stocking, provide access | Develop fishing | Additional development non-complementary |
| Hiking (if a a component need - if not so state) | RD | Maintain or develop trails - provide sanitation | Develop hiking | Additional development non-complementary |
| Camping | RD | Develop campsites, provide sanitation and access | Develop camping | Additional development non-complementary |
| Picnicking | RD | Develop picnic sites, provide sanitation and access | Develop picnicking | Additional development non-complementary |
| Livestock Production | AVMS | Improve irrigation efficiency - upgrade systems | Improve efficiency | Improve efficiency |
| Uranium Production | Tons | Prospect for, mine and process uranium | Additional development non-complementary | Provide uranium - |
| Vanadium Production | Tons | Prospect for, mine and process vanadium | Additional development non-complementary | vanadium |
| Other minerals (precious base and non-metalic) | Tons | Prospect for, mine and process other minerals | Additional development non-complementary | Provide other minerals |
| Geothermal Resources | | Prospect for, test, and develop geothermal steam power production | Additional development non-complementary | Develop geothermal resources |

E-8

BLM_0036012

Table 3

COMPLEMENTARY COMPONENT NEEDS AND MEANS, EQ OBJECTIVES

| COMPONENT NEED | UNIT | MEANS OF MEETING NEED | COMPLEMENTARY ARRAY A | COMPLEMENTARY ARRAY B |
|---|---|---|---|---|
| Preserve and protect wild river segments | Miles | Designate 33 miles as wild; provide appropriate recreation and use facilities | Designate wild segments; develop for appropriate use | May be imcompatible with archeologic site protection |
| Preserve and protect scenic river segments | Miles | Designate 41 miles as scenic; provide appropriate recreation and use facilities | Designate scenic segments, develop for use | May be imcompatible with archeologic site protection |
| Preserve and protect recreational river segments | Miles | Designate 66 miles as recreation; provide appropriate recreation and use facilities | Designate recreational segments; develop for use | May be imcompatible with archeologic site protection |
| Identify and protect archeologic and historic resources | Sites | Inventory and manage estimated 500 to 1,000 sites | May conflict with historic site preservation and protection | Identify and protect all sites |
| Interpret and recreation use of archeologic and historic sites | RD | Inventory sites, provide information and interpretive services, access, and accommodations | Develop sites for use | Imcompatible with site preservation |
| Preserve freedom of choice on eligible segments | Miles | Include 140 miles of eligible stream segments in the national wild and scenic river system | Designate as wild, scenic, or recreational river as appropriate | May be conflicting with historic-cultural site protection |

E-9

BLM_0036013

The beneficial and adverse effects which are in addition to those associated with No-Action are shown in Tables 4 and 5. The effects are displayed for subsegments of each of the potentially eligible major segments. Two segments - the Main Stem from Rico to its source, and the Dolores from the San Miguel confluence to the State border - were judged to be ineligible. The planners believe that this finding removed these two segments from being influenced by alternatives available in the planning setting. The No-Action alternative is held to be the only one available for ineligible rivers or segments thereof.

Alternatives for fulfillment of the EQ objective have been increased by including less restrictive classification options for the potentially wild and scenic river segments. The alternatives which provide the greatest amount of component need satisfaction are displayed in Table 6. It should be noted that the economic plans also contribute to environmental needs, while the environmental plans contain significant economic benefits. The selected plan provides a good balance between maximization of the two objectives.

E-10

BLM_0036014

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF NED ALTERNATIVES

West Dolores River Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. NED Components | | | | | | | | | | |
| Boating | RD | None | - | - | None | - | - | | | |
| Fishing | RD | 27,000 | $5,520 | $202,500 | None | $40,500 | - | | | |
| Hiking - Developed Trail | RD | 6,750 | 3,770 | 20,250 | 27,500 | $38,707 | $48,250 | | | |
| Camping - Developed Sites | RD | 17,280 | 4,440 | 56,160 | 43,200 | 22,000 | 79,920 | | | |
| Picnicking - Developed Sites | RD | 4,320 | 5,000 | 12,960 | 12,600 | 16,712 | 20,880 | | | |
| Livestock Production | AUM | 10,845 | Unquanti- ified | 20,000 | None | - | - | | | |
| Uranium | Lb | None | - | | None | - | - | None in this area | - | - |
| Vanadium | Lb | None | | | None | - | - | None in this area | - | - |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | Presently none - good potential, but amounts and value are unknown | - | - | None, but potential uses may be restric- ted | - | - | Mineral devel- opment may occur, but none posi- tively known | - | - |
| Interpretation and Use of Cultural Sites and Areas | RD | None presently identified | - | - | None | - | - | None | - | - |
| Geothermal | Mega- watt | Potential exists but undeveloped and amounts unknown | - | - | None | - | - | None | - | - |

E-11

BLM_0036015

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF N.E.D. ALTERNATIVES

West Dolores River Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Effect of N.E.D. Plan A on Components | | Effect of N.E.D. Plan B on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **2. EQ Component** | | | | | | |
| Designate National Recreation River | Miles | None | None | Non-designation will not assure free-flowing stream and preservation of scenic and recreational values thru long-term stream protection. Private land values likely to be degraded by various developments. Development impacts would reduce the density of flora and fauna, and alter the eco-system. | None | Same as N.E.D. Plan A. However, additional degradation is expected to occur to water quality, flora, fauna, recreational and scenic values if mining occurs. |
| Protect historic and cultural area | Sites | A few additional sites may be discovered and protected under existing federal and state statutes and authorities. (Inventories to be completed.) | None | Recreational and other developments are likely to destroy sites and artifacts. Increased recreation use will likely damage sites and artifacts. | None | Same as N.E.D. Plan A. However, mineral exploration and extraction likely to result in increased damage. |
| Preserve freedom of choice | Alternatives | None | None | Long-term preservation of freedom of choice to future users of the resources is not assured. | Mineral developments may provide additional national security and preserve options in international affairs. Geothermal developments may preserve choices in petroleum and coal resource areas. | Mineral developments result in a greater loss of freedom of choice to future users of the resource. |

E-12

BLM_0036016

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF NED ALTERNATIVES

Dolores River - McPhee to Bradfield Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| I. NED Components | | | | | | | | | | |
| Boating | RD | 1,150 | $ 8,470 | $23,000 | None | - | - | | | |
| Fishing | RD | 7,600 | 12,480 | 45,600 | None | - | - | | | |
| Hiking - Developed Trails | RD | 1,800 | 2,855 | 3,600 | 13,560 | $16,670 | $27,170 | | | |
| Camping - Developed Sites | PD | None | - | - | None | - | - | | | |
| Picnicking - Developed Sites | RD | 18,000 | 26,150 | 36,000 | None | - | - | | | |
| Livestock Production | AUM | 3,795 | - | 7,000 | None | - | - | | | |
| Uranium | Lb | None | - | - | None | - | - | None in this area | - | - |
| Vanadium | Lb | None | - | - | None | - | - | None in this area | - | - |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | None known - Potential slight | - | - | None | - | - | None in this area | - | - |
| Interpretation and Use of Cultural Sites and Areas | RD | None | - | - | None | - | - | None | - | - |
| Geothermal | Mega-watt | None | - | - | None | - | - | None | - | - |

E-13

BLM_0036017

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF N.E.D. ALTERNATIVES

McPhee Dam to Bradfield Ranch Bridge Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Effect of N.E.D. Plan A on Components | | Effect of N.E.D. Plan B on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **2. EQ Component** | | | | | | |
| Designate National Recreational River | Miles | None | None | Non-designation will not assure free-flowing stream and preservation of scenic and recreational values thru long-term stream protection.  Private land values likely to be degraded by subdivisions, industrial, commercial, and recreational developments. Development impacts would reduce the density and diversity of flora and fauna populations. Alteration of the eco-system is probable. | None | Same as N.E.D. Plan A. However, additional degradation is expected to occur to water quality, flora, fauna, eco-systems, recreational values and scenic qualities if mining occurs. |
| Protect historic and cultural areas | Sites | An unknown number of additional sites may be discovered and protected under existing federal and state statutes. | None | Subdivision, industrial, commercial, and recreational developments are likely to destroy sites and artifacts.  Increased recreational use will likely result in damage to sites and artifacts. | None | Same as N.E.D. Plan A. However, mineral exploration and extraction is likely to result in damage or destruction of sites and artifacts. |
| Preserve freedom of choice | Alternatives | None | None | Long-term preservation of freedom of choice to future users of the resources is not assured. | Mineral developments may provide additional national security and preserve options in international affairs. Nuclear or geothermal developments may preserve choices in petroleum and coal resource areas. | Mineral developments result in a greater loss of freedom of choice to future users of the resources. |

E-14

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF NED ALTERNATIVES

Dolores River - Bradfield Ranch to
Disappointment Creek Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| 1. NED Components | | | | | | | | | | |
| Boating | RD | 1,400 | $ 4,440 | $ 49,000 | 900 | $ 5,880 | Net loss | None | $ 25,000 | - |
| Fishing | RD | 30,400 | 6,220 | 228,000 | None | 45,600 User value loss | None | None | 100,000 | - |
| Hiking - Developed Trails | RD | 50,280 | 61,270 | 150,840 | 12,000 | 41,030 | Net loss | None | 68,500 | - |
| Camping - Developed Sites | RD | 17,000 | 7,730 | 55,250 | 19,200 | 8,780 | $26,200 | None | 44,800 | - |
| Picnicking - Developed Sites | RD | 4,320 | 4,980 | 12,960 | 21,600 | 27,930 | $38,880 | None | 28,500 | - |
| Livestock Production | AUM | 2,710 | - | 5,000 | None | | | None | | |
| Uranium | Lb/Ton | 6,215 lbs | 43,300 | 50,950 | None | 13,650* | None | 375 tons | 521,910 | $614,020 |
| Vanadium | Lb/Ton | 55,780 lbs | 27,200 | 32,000 | None | 7,800 | None | 1,563 tons | 105,290 | 123,870 |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | None known | - | - | None | - | None | None | - | - |
| Interpretation and Use of Cultural Site and Areas | RD | Unknown but present on significant numbers | - | - | None | - | - | None | - | - |
| Geothermal | Mega-watt | | | | | | | | | |

*Added Costs

E-15

BLM_0036019

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF N.E.D. ALTERNATIVES

Bradfield Ranch Bridge to Disappointment Creek Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Effect of N.E.D. Plan A on Components | | Effect of N.E.D. Plan B on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **2. EQ Component** | | | | | | |
| Designate National Recreational River | Miles | None | None | Non-designation will not assure free-flowing stream and preservation of scenic and recreational values thru long-term stream protection. Private land values likely to be degraded by subdivisions, industrial, commercial, and recreational developments. Development impacts would reduce the density and diversity of flora and fauna populations. Alteration of the eco-system is probable. Largely primitive value lost. | None | Same as N.E.D. Plan A. However, additional degradation is expected to occur to water quality, flora, fauna, eco-systems, recreational values and scenic qualities if mining occurs. Greater loss of primitive values. |
| Designate Nat'l. Scenic River | Miles | None | None | Same as above - with additional loss of scenic characteristics. | None | Same as above. |
| Protect historic and cultural areas | Sites | An unknown number of additional sites may be discovered and protected under existing federal and state statutes. | None | Subdivision, industrial, commercial, and recreational developments are likely to destroy sites and artifacts. Increased recreational use will likely result in damage to sites and artifacts. | None | Same as N.E.D. Plan A. However, mineral exploration and extraction is likely to result in damage or destruction of sites and artifacts. |
| Preserve freedom of choice | Alternatives | None | None | Long-term preservation of freedom of choice to future users of the resources is not assured. Largely primitive values will be lost if developments occur. | Mineral developments may provide additional national security and preserve options in international affairs. Nuclear or geothermal developments may preserve choices in petroleum and coal resource areas. | Mineral developments result in a greater loss of freedom of choice to future users of the resources. Mineral developments would also result in irreversible damage to the largely primitive nature of area. |

E-16

BLM_0036020

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF NED ALTERNATIVES

Dolores River - Disappointment Creek
to Little Gypsum Valley Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| 1. NED Components | | | | | | | | | | |
| Boating | RD | 1,150 | $ 4,440 | $ 23,000 | None | - | - | None | 17,250 | |
| Fishing | RD | 4,000 | 819 | 24,000 | None | - | - | None | 18,000 | |
| Hiking - Developed Trails | RD | None | - | - | 25,320 | $ 31,130 | $50,640 | None | 37,980 | |
| Camping - Developed Sites | RD | 9,600 | 4,360 | 21,600 | 9,600 | 4,190 | 21,600 | None | 32,400 | |
| Picnicking - Developed Sites | RD | None | - | - | 7,200 | 9,300 | 14,400 | None | 10,800 | |
| Livestock Production | AUM | 7,320 | - | 13,500 | None | - | - | None | | |
| Uranium | Lb/Ton | 25,815 lb | 179,900 | 211,660 | None | $ 56,700 | - | 37.5 tons | $783,940 | $922,280 |
| Vanadium | Lb/Ton | 129,600 lb | 63,200 | 74,385 | None | 18,145 | - | 192 tons | 187,000 | 220,000 |
| Other Minerals - (Precious, Base, and Nonmetallic) | Lb/Ton | Amounts Unknown - No commerical deposits known | Unknown | Unknown | None | - | - | Unknown | Unknown | Unknown |
| Interpretation and Use of Cultural Sites and Areas | RD | None known | Effects unknown until inventories are completed. | | | | | | | |
| Geothermal | | None | | | None | - | - | None | - | - |

E-17

BLM_0036021

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF N.E.D. ALTERNATIVES

Disappointment Creek to Little Gypsum Valley Bridge Sub-Segment

| Component<br><br>Need | Unit | Amount Satisfied Without a Plan | Effect of N.E.D. Plan A on Components | | Effect of N.E.D. Plan B on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| 2. EQ Component | | | | | | |
| Designate National Recreational River | Miles | None | None | Non-designation will not assure free-flowing stream and preservation of scenic and recreational values thru long-term stream protection. Private land values likely to be degraded by subdivisions, industrial, commercial, and recreational developments. Development impacts would reduce the density and diversity of flora and fauna populations. Alteration of the eco-system is probable. Essentially primitive characteristics of six miles of canyon may be lost. | None | Same as N.E.D. Plan A. However, additional degradation is expected to occur to water quality, flora, fauna, eco-systems, recreational values and scenic qualities if mining occurs. Essentially primitive characteristics of six miles of canyon will likely be lost. |
| Protect historic and cultural areas | Sites | An unknown number of additional sites may be discovered and protected under existing federal and state statutes. | None | Subdivision, industrial, commercial, and recreational developments are likely to destroy sites and artifacts. Increased recreational use will likely result in damage to sites and artifacts. | None | Same as N.E.D. Plan A. However, mineral exploration and extraction is likely to result in damage or destruction of sites and artifacts. |
| Preserve freedom of choice | Alternatives | None | None | Long-term preservation of freedom of choice to future users of the resources is not assured. Essentially primitive nature of six miles of canyon may be lost. | Mineral developments may provide additional national security and preserve options in international affairs. Nuclear or geothermal developments may preserve choices in petroleum and coal resource areas. | Mineral developments result in a greater loss of freedom of choice to future users of the resources. Essentially primitive nature of six mile canyon will likely be lost. |

E-18

BLM_0036022

Table 4

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF NED ALTERNATIVES

Dolores River - Little Gypsum Valley
Bridge to Bedrock Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| **1. NED Components** | | | | | | | | | | |
| Boating | RD | 900 | $ 3,480 | $45,000 | 1,400 | $ 4,500 | $ 1,000 | | | |
| Fishing | RD | 700 | 140 | 6,300 | None | 2,100 | None | | | |
| Hiking - Developed Trails | RD | 10,000 | 21,000 | 42,500 | 40,200 | 49,400 | 57,900 | | | |
| Camping - Developed Sites | RD | 9,600 | 4,360 | 43,200 | 16,800 | 7,700 | 16,200 | | | |
| Picnicking - Developed Sites | RD | None | None | None | 3,600 | 4,700 | 7,200 | | | |
| Livestock Production | AUM | 2,440 | - | 4,500 | None | - | - | None | - | - |
| Uranium | Lb/Ton | No known reserves | Unknown | Unknown | None | - | - | 35 tons Potential | $422,200 | $496,700 |
| Vanadium | Lb/Ton | No known reserves | Unknown | Unknown | None | - | - | 79 tons | 42,600 | 50,200 |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | None known | - | - | None | - | - | None | - | - |
| Interpretation and Use of Cultural Sites and Areas | RD | None known | - | - | Effects unknown until inventories are complete. | | | | | |
| Geothermal | Mega-watt | None | - | - | None | - | - | None | - | - |

E-19

BLM_0036023

Table 4
COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF N.E.D. ALTERNATIVES

Little Gypsum Valley to Bedrock Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Effect of N.E.D. Plan A on Components | | Effect of N.E.D. Plan B on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **2. EQ Component** | | | | | | |
| Designate National Recreational River | Miles | None | None | Non-designation will not assure free-flowing stream and preservation of scenic and recreational values thru long-term stream protection. Private land values likely to be degraded by subdivisions, industrial, commercial, and recreational developments. Development impacts would reduce the density and diversity of flora and fauna populations. Alteration of the eco-system is probable. Largely pristine environmental qualities lost. | None | Same as N.E.D. Plan A. However, additional degradation is expected to occur to water quality, flora, fauna, eco-systems, recreational values and scenic qualities if mining occurs. Loss of pristine, primitive and scenic environmental qualities due to mining. |
| Designate Natl. Scenic River | Miles | None | None | Same as above - with additional loss of scenic characteristics. | None | Same as above. |
| Designate Natl. Wild River | Miles | None | None | Same as above - with additional loss of wild characteristics. | None | Same as above. |
| Protect historic and cultural areas | Sites | An unknown number of additional sites may be discovered and protected under existing federal and state statutes. | None | Subdivision, industrial, commercial, and recreational developments are likely to destroy sites and artifacts. Increased recreational use will likely result in damage to sites and artifacts. | None | Same as N.E.D. Plan A. However, mineral exploration and extraction is likely to result in damage or destruction of sites and artifacts. |
| Preserve freedom of choice | Alternatives | None | None | Long-term preservation of freedom of choice to future users of the resources is not assured. Largely pristine environmental qualities lost. | Mineral developments may provide additional national security and preserve options in international affairs. Nuclear or geothermal developments may preserve choices in petroleum and coal resource areas. | Mineral developments result in a greater loss of freedom of choice to future users of the resources. Greater loss of largely pristine environmental qualities due to mining. |

E-20

BLM_0036024

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

West Dolores River Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Additional Effects of EQ Plan A on Components | | Additional Effects of EQ Plan E on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **1. EQ Component** | | | | | | |
| Preserve wild river area | Miles | None | Not present in West Dolores | | | |
| Preserve scenic river area | Miles | None | Not present in West Dolores | | | |
| Preserve recreational river area | Miles | None | Maintain and protect 35 miles of free-flowing river and enhance values and recreation use. | None | None | None |
| Identify & protect historic & cultural sites | Sites | A presently unknown number of sites may be protected under existing authorities. | An additional number of sites would likely be protected at an undetermined cost. | Designation as Natl. Rec. River may attract more use, resulting in vandalism of sites. | Identification & protection of sites assured. Less hazard of damage. | Without designation of river, protection will be about same as currently; would result in loss of management and funds which designation would bring (opportunity costs). |
| Preserve freedom of choice | Alternatives | None | Maintain scenic, recreation & geologic values present. Preserves free-flowing river. Avoids irretrievable commitments. | Restricts immediate use of resources. | Preserves options for future use of cultural sites. | Prohibits interpretive and other use of these sites. |

E-21

BLM_0036025

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

West Dolores River Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| 2. NED Components | | | | | | | | | | |
| Boating | RD | None | -- | - | None | | | | | |
| Fishing | RD | 27,000 | $5,520 | $202,500 | 13,000 | $ 4,110 | $37,500 | | | |
| Hiking - Developed Trails | RD | 6,750 | 3,770 | 20,250 | 27,500 | 38,700 | 48,250 | | | |
| Camping - Developed Sites | RD | 17,280 | 4,440 | 56,160 | 5,780 | 7,370 | None | | | |
| Picnicking - Developed Sites | RD | 4,320 | 5,000 | 12,960 | 1,620 | 3,270 | None | | | |
| Livestock Production | AUM | 10,845 | Unquanti-fied | 20,000 | None | - | - | | | |
| Uranium | Lb | None | - | - | | | | | | |
| Vanadium | Lb | None | - | - | | | | | | |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | Presently none - Good potential but amounts and value unknown | - | - | | | | | | |
| Interpretation and Use of Cultural Sites and Areas | RD | None presently known | - | - | | | | | | |
| Geothermal | Mega-watt | Potential exists but undeveloped | - | - | | | | | | |

E-22

BLM_0036026

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

McPhee Dam to Bradfield Ranch Bridge Sub-Segment (Approx.)

| Component Need | Unit | Amount Satisfied Without a Plan | Additional Effects of EQ Plan A on Components | | Additional Effects of EQ Plan E on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **1. EQ Component** | | | | | | |
| Preserve wild river area | Miles | None | Not present in this sub-segment | | | |
| Preserve scenic river area | Miles | None | Not present in this sub-segment | | | |
| Preserve recreational river area | Miles | None | Maintain and protect 11 miles of free-flowing river and preserve and enhance values and recreation use. | None | None | None |
| Identify and protect historic & cultural sites | Sites | Preliminary survey indicates 37 sites, several of which may be protected under existing authority. | An additional number of sites would be protected at an undetermined cost. | Designation as Nat. Rec. River may attract more use, resulting in damage or vandalism of sites. | Identification and protection of sites assured. Less hazard of damage. | Without designation protection will be about the same as currently; would result in loss of management & funds which desig. would bring (oppor. costs). |
| Preserve freedom of choice | Alternatives | None | Maintain scenic recreation & geologic values present. Preserves free-flowing river; avoids irretrievable commitments. | Restricts immediate use of resources. | Preserves options for future use of archeologic sites. | Prohibits interpretive and other uses of these sites. |

E-23

BLM_0036027

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

Dolores River - McPhee Dam to
Bradfield Ranch Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| 2. NED Components | | | | | | | | | | |
| Boating | RD | 1,150 | $ 8,470 | $23,000 | None | None | Maintains present values | None | | |
| Fishing | RD | 7,600 | 12,480 | 45,600 | None | None | " | None | | |
| Hiking - Developed Trails | RD | 1,800 | 2,855 | 3,600 | -120 | $11,500 | " | None | | |
| Camping - Developed Sites | RD | None | - | - | None | None | " | None | Site selection limited | |
| Picnicking - Developed Sites | RD | 18,000 | 36,000 | 36,000 | -2,150 | 4,300 | " | None | | |
| Livestock Production | AUM | 3,795 | - | 7,000 | None | None | " | None | | |
| Uranium | Lb/Ton | None | - | - | None | - | - | None | | |
| Vanadium | Lb/Ton | None | - | - | None | - | - | None | | |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | None | - | | None | May limit future sites and increase costs | - | None | | |
| Interpretation and Use of Cultural Sites and Areas | RD | None | - | - | Probably some increase but unquantified | - | | None | - | - |
| Geothermal | Megawatt | None | - | - | None | - | - | | | |

E-24

BLM_0036028

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

Bradfield Ranch Bridge to Disappointment Creek Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Additional Effects of EQ Plan A on Components | | Additional Effects of EQ Plan D on Components | | Additional Effects of EQ Plan E on Components | |
|---|---|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **1. EQ Component** | | | | | | | | |
| Preserve wild river area | Miles | None | Not present in this sub-segment | | | | | |
| Preserve scenic river area | Miles | None | Maintain and protect 41 miles of free-flowing river and preserve and enhance values and rec. use. | None | Not a feature of Plan A-2 | | None | None |
| Preserve recreational river area | Miles | None | Not a feature of Plan A-1 | | Maintain and protect 41 miles of free-flowing river and preserve & enhance values and rec. use. | Loss of scenic river qualities and use experience | None | None |
| Identify and protect historic and cultural site | Sites | An unknown number of additional sites and areas may be protected under existing federal and state statutes. | An additional number of sites would be protected at an undetermined cost. (Inventory incomplete.) | Designation as Natl. Rec. River may attract more use, resulting in damage or vandalism of sites. | Same as A-1 | Same as A-1 | Identification and protection of sites assured. Less hazard of damage. | Without designation of river, protection will be about the same as currently; would result in loss of mgmt. & funds which desig. would bring (oppor. costs). |
| Preserve freedom of choice | Alternatives | None | Maintain scenic, rec. & geologic values present. Preserves free-flowing river; avoids irretrievable commitments in river area. | Restricts immediate use of resources. | Same as A-1 | Same as A-1 | Preserves options for future use of archeologic sites. | Prohibits interpretive and other uses of these sites. |

II-25

BLM_0036029

Table 5
COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

Dolores River - Bradfield Ranch to
Disappointment Creek Subsegment

2. NED Components

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A — Amount | Annual Cost | Annual Value | Additional Effects of Plan B — Amount | Annual Cost | Annual Value | Additional Effects of Plan E — Amount | Annual Cost | Annual Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Boating | RD | 1,400 | $ 4,440 | $ 49,000 | None | - | - | 722 $ 4,670 | | Net loss due to lower unit value | None | - | - |
| Fishing | RD | 30,400 | 6,220 | 228,000 | None | - | - | None | - | - | None | - | - |
| Hiking - Developed Trails | RD | 50,280 | 61,270 | 150,840 | None | - | - | 8,510 | 36,150 | Net loss due to lower unit value | None | - | - |
| Camping - Developed Sites | RD | 17,000 | 7,730 | 55,250 | None | - | - | 15,900 | 7,260 | $18,800 | None | - | - |
| Picnicking - Developed Sites | RD | 4,320 | 4,980 | 12,960 | None | - | - | 22,300 | 28,800 | 40,270 | None | - | - |
| Livestock Production | AUM | 2,710 | - | 5,000 | None | - | - | None | - | - | None | - | - |
| Uranium | Lb/Ton | 6,215 lbs | 43,300 | 50,950 | None | $13,650* | - | None | $13,650 * | - | None | Production sites limited | |
| Vanadium | Lb/Ton | 55,780 lbs | 27,200 | 32,000 | None | 8,900 | - | None | 8,900 | - | None | Production sites limited | |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | None known | - | - | None | - | - | | | | None | May limit exploration and sites available | |
| Interpretation and Use of Cultural Sites and Areas | RD | Unknown, but significant numbers of sites present | - | - | Unknown | Possible loss for scientific uses | Unknown, could be significant | Unknown | Unknown losses | Unknown benefits | None Not a feature of B | None | None |
| Geothermal | Mega-watt | None | - | - | None | - | - | None | - | - | None | - | - |

*Added Costs

E-26

BLM_0036030

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

Disappointment Creek to Little Gypsum Valley Bridge Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Additional Effects of EQ Plan A on Components | | Additional Effects of EQ Plan B on Components | |
|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| **1. EQ Component** | | | | | | |
| Preserve wild river area | Miles | None | Not present in this sub-segment | | | |
| Preserve scenic river area | Miles | None | Not present in this sub-segment | | | |
| Preserve recreational river area | Miles | None | Maintain & protect 20 miles of free-flowing river and preserve & enhance values and rec. use. | None | None | None |
| Identify and protect historic & cultural sites | Sites | An unknown number of additional sites and areas may be protected under federal & state statutes. | An additional number of sites would be protected at an undetermined cost. | Designation as Natl. Rec. River may attract more use, resulting in damage or vandalism of site. | Identification and protection of sites assured. Less hazard of damage. | Without designation protection will be about the same as currently; would result in loss of mgt. & funds which desig. would bring. (opportunity costs). |
| Preserve freedom of choice | Alternatives | None | Maintain scenic, recreational, & geologic values present. Preserves free-flowing river; avoids irretrievable commitments in river area. | Restricts immediate use of resources. | Preserves options for future use of archeologic sites. | Prohibits interpretive and recreational uses of these sites. |

E-27

BLM_0036031

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

Dolores River - Disappointment Creek
to Little Gypsum Valley Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| **2. NED Components** | | | | | | | | | | |
| Boating | RD | 1,150 | $ 4,440 | $ 23,000 | None | - | - | None | - | - |
| Fishing | RD | 4,000 | 819 | 24,000 | 1,920 | $ 2,370 | $11,520 | None | - | - |
| Hiking - Developed Trails | RD | None | - | - | 30,234 | 36,970 | 60,500 | None | - | - |
| Camping - Developed Sites | RD | 9,600 | 4,360 | 21,600 | 13,330 | 6,130 | 30,000 | None | May limit sites | - |
| Picnicking - Developed Sites | RD | None | - | - | 8,600 | 11,115 | 17,200 | None | May limit sites | - |
| Livestock Production | AUM | 7,320 | - | 13,500 | None | - | - | None | None | - |
| Uranium | Lb/Ton | 28,815 lb | 179,900 | 211,660 | None | 56,700 * | None | None | May limit production | - |
| Vanadium | Lb/Ton | 129,600 lb | 63,200 | 74,385 | None | 18,145 | None | None | May limit production | - |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | Amounts unknown - No commercial deposits known | - | - | None | Production site limits - May increase costs | None | None | May limit production | - |
| Interpretation and Use of Cultural Sites and Areas | RD | None known | | | Effects unknown until inventories are completed. | | | | | |
| Geothermal | Mega-watt | None | - | - | None | | | None | - | - |

E-28

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF EQ ALTERNATIVES

Little Gypsum Valley Bridge to Bedrock Sub-Segment

| Component Need | Unit | Amount Satisfied Without a Plan | Additional Effects of EQ Plan A-1 on Components | | Additional Effects of EQ Plan A-2 on Components | | Additional Effects of EQ Plan B on Components | | Additional Effects of EQ Plan E on Components | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect | Beneficial Effect | Adverse Effect |
| 1. EQ Component | | | | | | | | | | |
| Preserve wild river area | Miles | None | Maintain and protect 33 miles of free-flowing river and wild river characteristics | None | Not a feature of Plan A-2 | | Not a feature of Plan A-3 | | None | None |
| Preserve scenic river areas | Miles | None | Not a feature of Plan A-1 | | Maintain and protect 33 miles of free-flowing river for scenic values. | Loss of Wild River values | Not a feature of Plan A-3 | | None | None |
| Preserve recreational river area | Miles | None | Not a feature of Plan A-1 | | Not a feature of Plan A-2 | | Maintain and protect 33 miles of free-flowing river for recreation values. | Loss of Wild and Scenic values | None | None |
| Identify and protect historic and cultural sites | Sites | An unknown number of sites may be protected under existing federal and state statutes. | An additional number of sites would be protected at an undetermined cost. | None | Same as Plan A | Designation as a Natl. Scenic River may attract more use and result in damage or vandalism of sites. | Same as Plan A | Designation as a Rec. River will attract more use and will result in damage or vandalism of sites. | Identification & protection of sites assured for scientific purposes. Less hazard of damage. | Without designation of river, protection about as currently; would result in less of mgt. & funds which desig. would bring (opportunity costs). |
| Preserve freedom of choice | Alternatives | None | Maintains wild, scenic, & rec. values. Maintains scenic, rec. & geologic values in present condition. Avoids irretrievable commitments of resources & preserves free-flowing river. | Restricts immediate use of resources | Same as Plan A | Some loss of options due to mineral development. Same as Plan A. | Same as Plan A | Some environmental restrictions imposed on minerals development. Same as A. | None in this alternative. | Prohibits interpretive and recreational uses of these sites. |

B-29

BLM_0036033

Table 5

COMPONENT NEEDS SATISFIED WITHOUT A PLAN AND BENEFICIAL
AND ADVERSE EFFECTS OF BY ALTERNATIVES

Dolores River - Little Gypsum Valley
Bridge to Bedrock Subsegment

| Component Need | Unit | Amount Provided Without National Designation | Annual Estimated Cost | Annual Estimated Value | Additional Effects of Plan A | | | Additional Effects of Plan C | | | Additional Effects of Plan D | | | Additional Effects of Plan B | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Annual Cost | Amount Value | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value | Amount | Annual Cost | Annual Value |
| **2. MIB Components** | | | | | | | | | | | | | | | | |
| Boating | RD | 900 | $ 3,480 | $45,000 | None | - | - | 1,537 | $ 6,860 | $51,295 | 2,440 | $ 7,860 | $ 21,840 | None | - | - |
| Fishing | RD | 700 | 140 | 6,300 | 336 | $17 | $3,020 | None | - | - | 336 | 500 | None, due to unit value loss | None | - | - |
| Hiking - Developed Trails | RD | 10,000 | 21,000 | 42,500 | None | - | - | 38,400 | 47,210 | 103,655 | 62,970 | 76,920 | 103,400 | None | - | - |
| Camping - Developed Sites | RD | 9,600 | 4,360 | 45,200 | None | - | - | 16,900 | 7,210 | 49,130 | 28,760 | 13,575 | 45,100 | None | - | - |
| Picnicking - Developed Sites | RD | None | - | - | None | - | - | 3,640 | 4,470 | 10,310 | 5,234 | 6,720 | 10,470 | None | - | - |
| Livestock Production | AUM Lb/Ton | 2,440 | 4,660 | - | None None | Prohibits exploration and use on 1/4-mile area on either side of riverbed | - | None None | May limit sites May limit sites | - | None None | - | - | None None | - | - |
| Uranium | No known reserves | | | | | | | | | | | | | | | |
| Vanadium | Lb/Ton | No known reserves | - | - | None | | - | None | May limit sites | - | None | - | - | None | - | - |
| Other Minerals - (Precious, Base, and Nonmetallic) | Ton | No known reserves | - | - | None | | - | None | May limit sites | - | None | - | - | None | - | - |
| Interpretation and Use of Cultural Sites and Areas | RD | Inventory incomplete | - | - | None | Unknown until inventories are completed. | - | None | | - | None | - | - | None - Fire and recreation development prohibited. | | |
| Geothermal | Mega-watt | None | - | - | None | | - | None | | - | None | - | - | None | - | - |

BLM_0036034

Table 6

SUMMARY OF ECONOMIC AND OTHER BENEFITS AND COSTS
FOR TWO DOLORES RIVER ALTERNATIVES

WEST DOLORES RIVER

| Measurement | No Designation | Designated National Wild and Scenic River |
|---|---|---|
| | Effects | Effects |
| Recreation Use:   Recreation days | 55,350 | 103,250 |
| Value of recreation use | $291,870 | $377,620 |
| Annual cost of recreation use | $ 18,840 | $ 96,300 |
| Fee title acquisition | | |
| Annual Cost | None | None |
| Access and scenic easements | | |
| Miles | None | 10.5 |
| Easements costs (annual) | None | $   8,300 |
| Mineral claim clearance | | |
| Number of claims | None | None |
| Annual cost of clearance | None | None |
| Added annual production costs | | |
| Minerals | None | Unquantified – higher potentially |
| Livestock | None | Uquantified – expected to be higher |
| Administration – Annual costs | $ 55,350 | $103,240 |
| Total Annual Costs | $ 74,190 | $207,840 |
| Total Annual Benefits | $291,870 | $372,600 |

BLM_0036035

(Table 6 - Continued)

SUMMARY OF ECONOMIC AND OTHER BENEFITS AND COSTS
FOR TWO DOLORES RIVER ALTERNATIVES

DOLORES RIVER BETWEEN McPHEE DAM AND BEDROCK

| Measurement | No Designation | Designated National Wild and Scenic River |
|---|---|---|
| | Effects | Effects |
| Recreation Use:   Recreation days | 167,900 | 220,050 |
| Value of recreation use | $809,850 | $931,850 |
| Annual cost of recreation use | $173,490 | $220,800 |
| Fee title acquisition - acres | 10 | None |
| Annual Cost | Included in recreation cost | None |
| Access and scenic easements | | |
| Miles | None | 21.8 |
| Annual easement cost | None | $ 17,200 |
| Mineral claim clearance | | |
| Number of claims | None | 3,999 |
| Annual cost of clearance | None | $154,560 |
| Added annual production costs | | |
| Minerals | None | $ 96,300 |
| Livestock | None | Unquantified-Expected to be Higher |
| Administration - Annual Costs | $168,400 | $220,200 |
| Total Annual Costs | $341,890 | $709,060 |
| Total Annual Benefits | $834,850 | $954,020 |

E-32

BLM_0036036

BLM 0036037

See

Table E-8  Effects of Alternative Plans
for the Dolores River

BLM_0036038

APPENDIX F

PARADOX VALLEY UNIT
COLORADO RIVER BASIN SALINITY CONTROL PROJECT
BUREAU OF RECLAMATION
U.S. DEPARTMENT OF THE INTERIOR

F-1

BLM_0036039

PARADOX VALLEY UNIT, COLORADO

## Introduction

Paradox Valley, located in Montrose County of southwestern Colorado, has been identified as a significant natural contributor to salinity in the Colorado River Basin. The Bureau of Reclamation is conducting a basin-wide program to minimize salinity levels in the Colorado River system. The ultimate objective would be to limit any further increases in salinity while the Upper Basin States - parts of Utah, Arizona, New Mexico, Wyoming, and Colorado - continue to develop their water resources. Title II of the Colorado River Basin Salinity Control Act (Public Law 93-320) of June 24, 1974, authorized the Secretary of the Interior to construct, operate, and maintain four salinity control units, referred to as units, in the Colorado River Basin in order to control salinity. The units include Las Vegas Wash, Nevada; Crystal Geyser, Utah; Grand Valley, Colorado; and Paradox Valley, Colorado.

Studies conducted over the last three years by the Bureau of Reclamation have indicated that the Dolores River picks up approximately 200,000 tons of salt annually in Paradox Valley from a natural source and discharges the salt into the Colorado River northeast of Moab, Utah. The salinity of the Colorado River has been increasing, particularly in the Lower Basin states - parts of Arizona, California, Utah, Nevada, and New Mexico - as a result of man's use and reuse of the river. About 10 million tons of salt are now carried by the river each year, posing economic problems for water users because of lower crop yields and increased treatment costs. The total costs of salinity in the Lower Basin were about $53 million in 1973 and could reach $124 million annually by the year 2000 if corrective measures are not taken and if development continues.

## PARADOX VALLEY DESCRIPTION

Paradox Valley, about 24 miles in length from northwest to southeast and about 3 to 5 miles wide, is crossed near its midpoint by the Dolores River. The surrounding walls of brilliantly-colored sandstone and shale layers are quite steep and rugged, while the floor itself is relatively flat. Economic activity consists of about 3,600 acres of privately irrigated cropland in the northwestern half of the valley, livestock grazing, mining and oil exploration, and a lumber mill in the town of Paradox. The climate of the valley is generally semiarid, typically hot and dry during the summer and cold and dry during the winter. The average precipitation at the town of Paradox is 10.8 inches per year. Much of this precipitation occurs during the summer, primarily from thunderstorms of brief duration.

Paradox Valley is one of five major collapsed salt anticlines (elongated swells) in southwestern Colorado and southeastern Utah. The region is about 100 miles long and is marked by the protruding mass of the La Sal Mountains situated prominently over its center. Paradox Valley, lying along the axis of one of the largest anticlines, has been formed by the erosion of faulted

F-2

BLM_0036040

and uplifted sandstone and shale formations, exposing a residual gypsum cap which covers about 15,000 feet of nearly pure salt and salt-rich shale.

Briefly stated, the emergence of distant mountainous uplifts on each side of the area has placed intense lateral pressures on the intervening sedimentary formations, resulting in warping and fracturing along weak zones. Under these pressures and the weight of the overlying formations, a deeply buried layer of salt (Paradox Member) from an ancient inland sea has flowed upward into the fractured area of the fold to create an elongated swell known as an anticline. As this has taken place, the Dolores River has remained in its original streambed and, in conjunction with weathering and erosion, has removed the upper materials to form the valley. These geological processes are still active today in the valley.

Ground water comes into contact with the top of the salt formation, where it becomes nearly saturated, and surfaces as salt brine in the channel of the Dolores River near the middle of the valley The effect of the brine varies considerably, depending upon the amount of water in the river. High riverflows mix with and considerably dilute the brine; consequently, the salt content of the stream may increase from 250 milligrams per liter (mg/l) as it enters the valley to 450 mg/l as it exits the valley. With low riverflows,

however, the salinity of the river increases from 1,000 mg/l to as high as 166,000 mg/l (approximately five times as saline as sea water) as it crosses Paradox Valley.

## POSSIBLE CONTROL MEASURES

The Bureau of Reclamation is studying possible methods of controlling the movement of brine ground water. Several of the alternatives involve drilling a series of wells along the river near mid-valley. Prior tests have indicated that pumping from the wells would reduce the water pressure and prevent most of the brine from surfacing in the riverbed. The brine from the wells could then be piped to one or more solar evaporation ponds for evaporation. Another alternative would be to inject the brine away from ground water movement into the salt dome at mid-valley or into deep wells outside the area. Appropriate sites for injection have not yet been identified, and this way of disposal may only be a short term alternative to solar evaporation.

Another measure being considered involves routing the Dolores River across the valley in a lined channel and allowing the groundwater to surface and evaporate in the natural flood plain. The required facilities would be designed to accomodate the high spring floods of the river.

Before these and other plans can be adequately assessed, additional research must be conducted to acquire more information about the sources, behavior, and chemical composition of the ground water. While

F-3

BLM_0036041



### PARADOX ANTICLINE
### PRESENT STAGE OF DEVELOPMENT
Colorado   River   Basin   Salinity   Control   Project
Paradox Valley Unit, Colorado

F-4

BLM_0036042

investigations are being conducted,
coordination will be maintained
with appropriate state agencies
and the Paradox Valley Unit Advis-
ory Team, a local interest group.
The selection of a final plan will
be based upon considerations of
effectiveness, economics, and en-
vironmental impacts.


## ECONOMIC DATA

In terms of June 1975 prices,
construction costs would be nearly
$20 million, and total annual costs
would be $1.6 million.  The cost
for removing one ton of salt would
be $9.00.  The control facilities
in Paradox Valley would remove up
to 180,000 tons of salt per year,
thereby decreasing the salinity at
Imperial Dam by about 16 mg/l
annually.  This salinity reduction
would affect the water users in
the Lower Colorado River Basin in
terms of increased crop yields,
reduced soil leaching requirements,
reduced management costs, lower
water treatment costs, less pipe
corrosion, and reduced use of soap
and detergents.


F-5

BLM_0036043

Potential Effects and Costs

Unit  Paradox Valley

| | |
|---|---|
| Present salt loading of Dolores River (tons per year) | 200,000 |
| Estimated reduction in salt | 180,000 |
| Effect of reduction at Imperial Dam (mg/l) | 16 |

Cost effectiveness (5.625 percent over a 100 year period)

| | |
|---|---|
| Construction cost  (Jan 1975 prices) | $19,460,000 |
| Interest during construction | 2,006,000 |
| Less preauthorization costs | -449,000 |
| Total investment | $21,017,000 |
| Annual equivalent of investment | 1,187,000 |
| Annual OM&R | 438,000 |
| Total annual cost | $1,625,000 |
| Cost per ton of salt removed | $9.00 |

F-6

BLM_0036044

FRESH WATER ZONE

Interface

BRINE

GYPSUM and SALT

*SCHEMATIC SECTION ALONG PARADOX VALLEY*
*(LOOKING DOWNSTREAM)*
*Colorado River Basin Salinity Control Project*
*Paradox Valley Unit, Colorado*

BLM_0036045



**PARADOX ANTICLINE
EARLY STAGE OF DEVELOPMENT**
Colorado River Basin Salinity Control Project
Paradox Valley Unit, Colorado

F–8

BLM_0036046

# PARADOX VALLEY, COLORADO



EXPLANATION

■ Relift Pumping Plants
⊢—⊣— Brine Pipe Line

BLM_0036047

BLM_0036048

APPENDIX   G

FEDERAL RESERVED WATER RIGHTS

Federal reserved water right claims beyond the scope of the Indian water
right claims are currently being litigated in Colorado.  Insofar as
National Forest lands are concerned, the United States claims that
amount of water which is reasonably necessary to fulfill the purposes
of the National Forests, but the claim does not include any water
appropriated by water users prior to the date of the Forest reser-
vations.  The National Forest reservation which included the lands
adjacent to the West Dolores and the Dolores River above Rico was made
on June 13, 1905.  The National Forest reservation which included the
lands adjacent to the Dolores River below the proposed McPhee Damsite
was made on March 2, 1907.  Much of the water in the Dolores River
system was appropriated prior to these dates.  The National Forest
reserved water right claims are, therefore, not expected to have a
significant effect on water users in the area.

The federal reserved right claim includes both diverted and storage
type uses and instream flows and lake levels.  It has not yet been
quantified, pending direction to do so as a part of the litigation.

G-1

BLM_0036049

BLM_0036050

APPENDIX H

Related habitat type and status of mammals found within the Dolores River Basin

| Common name | River Bottom | Salt Flats | Cropland | Piñon Juniper | Ponderosa, Spruce, Fir Forests |
|---|---|---|---|---|---|
| Mule Deer | C | C | C | C | C |
| Elk | C | | C | C | C |
| Mountain Lion | C | | | UC | C |
| Black Bear | UC | | | | C |
| Coyote | C | C | C | C | C |
| Bobcat | C | | | C | |
| Ringtail | | | | UC | |
| Gunnison Prairie Dog | UC | C | C | | |
| Beaver | C | | | | |
| Muskrat | C | | | UC | |
| Cottontail Rabbit | C | C | C | | |
| Pika | | | | | C (Talus slopes) |
| Black-tailed Jackrabbit | | C | C | | |
| Yellow-bellied Marmot | | | | | C |
| Striped Skunk | C | C | | UC | |
| Raccoon | C | | | | |
| Gray Fox | C | | | C | |
| Porcupine | C | C | | | C |
| Bushy-tailed Woodcat | C | | | C | |

C = Common
UC = Uncommon

H-1

BLM_0036051

Related habitat type and status of mammals found within the Dolores River Basin

| Common name | River Bottom | Salt Flats | Cropland | Pinon Juniper | Ponderosa, Spruce, Fir Forests |
|---|---|---|---|---|---|
| Meadow Vole | C | | | | C |
| Deer Mouse | C | C | C | | |
| Pocket Gopher | C | | | | UC |
| Rock Squirrel | C | | UC | C | |
| Colo. Chipmunk | C | | | C | |
| Least Chipmunk | C | | | | |
| Golden-mantled Ground Squirrel | C | | UC | C | |
| Abert's Squirrel | | | | UC | C |
| Red Squirrel | | | | | C |
| Short-tailed Weasel | C | | | | C |
| Marten | | | | | UC |
| Mink | UC | | | | |
| Badger | C | | | | |

C = common
UC = uncommon

H-2

BLM_0036052

Habitat Preference by Species

| Species | River Bottom | Canyon | Crop-land | Salt Flats | Pinon Juniper | Ponderosa, Spruce, Fir Forests |
|---|---|---|---|---|---|---|
| Turkey Vulture | X | X | X | X | (X) | (X) |
| Osprey | (X) | | | | | (X) |
| Bald Eagle | X | | X | X | X | |
| Golden Eagle | X | X | X | X | X | X |
| Red-Tailed Hawk | X | (X) | X | X | X | X |
| Ferruginous Hawk | | | X | (X) | (X) | |
| Rough-Legged Hawk | X | | X | X | X | X |
| Goshawk | (X) | | X | X | X | (X) |
| Cooper's Hawk | X | | X | X | X | (X) |
| Sharp-shinned Hawk | (X) | X | (X) | (X) | X | (X) |
| Peregrine Falcon | (X) | (X) | | | | |
| Merlin | | | X | X | (X) | |
| American Kestrel | X | (X) | X | X | X | |
| Marsh Hawk | X | | X | X | (X) | |
| Great Horned Owl | (X) | | X | X | (X) | (X) |
| | | | | | | |
| Total Observed Species | 8 | 3 | 12 | 11 | 8 | 3 |
| Total Assumed Present | 13 | 6 | 13 | 13 | 13 | 9 |

X  = Actual Sightings
(X) = Not actually sighted, but assumed to be present.

H-3

BLM_0036053

Seasonal occurrence and status of waterfowl and
shorebirds found on impoundments in the Dolores River Basin

| Species | Seasonal Occurrence | Resident Status | Inventoried Status |
|---|---|---|---|
| Common Loon | Sp, F | M | UC |
| Horned Grebe | Sp, F | M | C |
| Western Grebe | Sp, F | M | C |
| Great Blue Heron | Sp, S, F | M | UC |
| Black Crown Night Heron | Sp, S, F | M | UC |
| Canada Goose | Sp, F, W | R – M | C |
| Snow Goose | Sp, F | M | C |
| Mallard | Sp, S, F, W | R – M | C |
| Gadwall | Sp, S, F, W | R – M | C |
| Green-winged Teal | Sp, S, W | R – M | C |
| Blue-winged Teal | Sp, S | R – M | C |
| Cinnamon Teal | Sp, S | R – M | C |
| American Widgeon | W | R – M | C |
| Shoveler | Sp | R – M | C |
| Ring-necked Duck | Sp | M | C |
| Red Headed Duck | Sp, F | M | C |
| Canvasback Duck | Sp, F | M | C |
| Ruddy Duck | Sp, F | M | C |

Sp - Spring     R - Resident     C  - Common
S  - Summer     M - Migratory    UC - Uncommon
F  - Fall
W  - Winter

H-4

BLM_0036054

Seasonal occurrence and status of waterfowl and
shorebirds found on impoundments in the Dolores River Basin

(continued)

| Species | Seasonal Occurrence | Resident Status | Inventoried Status |
|---------|---------------------|-----------------|--------------------|
| Buffle-head | Sp, F | M | C |
| Common Merganser | Sp, S, F | M | C |
| Coot | Sp, S, F, W | R - M | C |
| Killdeer | Sp, S, F, W | R | C |
| Franklin's Gull | Sp, S, F, W | R - M | C |
| Belted Kingfisher | Sp, S, F | M | C |

Sp - Spring     R - Resident    C  - Common
S  - Summer     M - Migratory   UC - Uncommon
F  - Fall
W  - Winter

H-5

BLM_0036055

<u>Seasonal occurrence and resident status</u>
<u>of passerines and upland game birds</u>
<u>found in the Dolores River Basin</u>

| Species | Seasonal Occurrence | Resident Status |
|---------|---------------------|-----------------|
| Ring-necked Pheasant | | R |
| Turkey | | R |
| Rock Dove | | R |
| Band-tailed Pigeon | S | M |
| Morning Dove | Sp, S, F | M |
| Common Nighthawk | Sp, S, F | M |
| Common Flicker | | R |
| Downy Woodpecker | | R |
| Lewis Woodpecker | | R |
| Cassin's Kingbird | S | M |
| Western Kingbird | S | M |
| Say's Phoebe | | R - M |
| Western Flycatcher | S | M |
| Ash-throated Flycatcher | S | M |
| Western Wood Pewee | S | M |
| Violet-green Swallow | Sp, F | M |
| Tree Swallow | | R |
| Bank Swallow | | R |
| Rough-winged Swallow | | R |
| Barn Swallow | | R |
| Cliff Swallow | | R |

H-6

BLM_0036056

**Seasonal occurrence and resident status**
of passerines and upland game birds
found in the Dolores River Basin
(continued)

| Species | Seasonal Occurrence | Resident Status |
|---|---|---|
| Purple Martin | Sp, F | M |
| White-throated Swift | | R |
| Steller's Jay | | R |
| Black-billed Magpie | | R |
| Common Crow | | R |
| Common Raven | | R |
| Scrub Jay | | R |
| Pinon Jay | | R |
| House Wren | S | M |
| Robin | | R - M |
| Mountain Bluebird | | R |
| Starling | | R |
| Solitary Vireo | S | M |
| Warbling Vireo | S | M |
| Yellow Warbler | S | M |
| Yellow-throat | S | M |
| Yellow-breasted Chat | | R - M |
| Western Meadowlark | | R |
| Yellow-headed Blackbird | Sp, S, F | M |
| Red-winged Blackbird | Sp, S, F | M |
| Brewer's Blackbird | Sp, S, F | M |
| Common Grackle | Sp, S, F | M |

H-7

Seasonal occurrence and resident status
of passerines and upland game birds
found in the Dolores River Basin
(continued)

| Species | Seasonal Occurrence | Resident Status |
|---|---|---|
| Brown-headed Cowbird | Sp, S, F | M |
| Western Tanager | S | M |
| Black-headed Grosbeak | S | M |
| Evening Grosbeak | S | M |
| Blue Grosbeak | S | M |
| Lark Bunting | S | M |
| Lazuli Bunting | S | M |
| Indigo Bunting | S | M |
| Pine Siskin | | R |
| American Goldfinch | S | M |
| Rufous-sided Towhee | | R |
| Green-tailed Towhee | S | M |
| Grey-headed Junco | | R |
| Oregon Junco | | R |
| House Sparrow | | R |
| Savannah Sparrow | | R |
| Vesper Sparrow | | R - M |
| Lark Sparrow | | R - M |
| Chipping Sparrow | | R - M |
| Song Sparrow | | R |
| Brewer's Sparrow | S | M |

H-8

BLM_0036058

Seasonal occurrence and resident status
of passerines and upland game birds
found in the Dolores River Basin
(continued)

| Species | Seasonal Occurrence | Resident Status |
|---|---|---|
| House Finch | | R |
| Bewick's Wren | S | M |
| Lesser Goldfinch | S | M |
| Blue-grey Gnatcatcher | | R |
| Empidonax | S | M |
| Horned Lark | | R |
| Mockingbird | S | M |

Sp - Spring       R - Resident
S  - Summer       M - Migrant
F  - Fall
W  - Winter

H-9

BLM_0036059

Inventory status of passerines and upland gamebirds
in terrestrial zones in the Dolores River Basin

| Species | River Bottom | Crop-land | Pinon Juniper | Salt Flats | Spruce Fir Ponderosa Forests |
|---|---|---|---|---|---|
| Ring-necked Pheasant | C | C | | | |
| Turkey | C | | C | | |
| Rock Dove | C | C | | C | |
| Band-tailed Pigeon | C | C | | | |
| Morning Dove | C | C | C | C | C |
| Common Nighthawk | C | | C | | |
| Common Flicker | C | | C | | |
| Downy Woodpecker | UC | | | | |
| Lewis Woodpecker | C | C | C | | |
| Cassin's Kingbird | C | | | | |
| Western Kingbird | C | | | | |
| Say's Phoebe | C | | | | |
| Western Flycatcher | C | | | | |
| Ash-throated Flycatcher | C | | | | |
| Western Wood Pewee | C | | | | |
| Violet-green Swallow | C | C | | | |
| Tree Swallow | C | | | | |
| Bank Swallow | C | | C | | |
| Rough-winged Swallow | C | | C | | |
| Barn Swallow | C | C | | | |
| Cliff Swallow | C | | C | | |

H-10

BLM_0036060

Inventory status of passerines and upland gamebirds
in terrestrial zones in the Dolores River Basin
(continued)

| Species | River Bottom | Crop-land | Pinon Juniper | Salt Flats | Spruce Fir Ponderosa Forests |
|---|---|---|---|---|---|
| Purple Martin | UC | | | | |
| White-throated Swift | C | C | C | | |
| Steller's Jay | C | C | C | C | C |
| Black-billed Magpie | C | C | C | C | C |
| Common Crow | C | C | C | C | C |
| Common Raven | C | C | C | C | C |
| Scrub Jay | C | | C | | |
| Pinon Jay | C | | C | C | |
| House Wren | C | | | | |
| Robin | C | C | C | C | C |
| Mountain Bluebird | C | C | | | C |
| Starling | C | C | C | C | C |
| Solitary Vireo | C | | | | |
| Warbling Vireo | UC | | | | |
| Yellow Warbler | UC | | | | |
| Yellow-throat | C | | | | |
| Yellow-breasted Chat | C | | | | |
| Western Meadowlark | C | C | | C | |
| Yellow-headed Blackbird | C | C | | C | |
| Red-winged Blackbird | C | C | | C | |
| Brewer's Blackbird | C | C | | | |

H-11

Inventory status of passerines and upland gamebirds
in terrestrial zones in the Dolores River Basin
(continued)

| Species | River Bottom | Crop-land | Pinon Juniper | Salt Flats | Spruce Fir Ponderosa Forests |
|---------|:---:|:---:|:---:|:---:|:---:|
| Common Grackle | C | C | | C | |
| Brown-headed Cowbird | C | C | | | |
| Western Tanager | C | | | | |
| Black-headed Grosbeak | C | | | | |
| Evening Grosbeak | C | | | | |
| Blue Grosbeak | UC | | | | |
| Lark Bunting | C | | | | |
| Lazuli Bunting | C | | | | |
| Indigo Bunting | R | | | | |
| Pine Siskin | C | C | | C | |
| American Goldfinch | C | | | | |
| Rufous-sided Towhee | C | | | | |
| Bullock's Oriole | C | | | | |
| Grey-headed Junco | C | | C | C | |
| Oregon Junco | C | | C | C | |
| House Sparrow | C | C | C | C | |
| Savannah Sparrow | UC | | | | |
| Vesper Sparrow | UC | | | | |
| Lark Sparrow | C | | | | |
| Chipping Sparrow | C | | | | |

H-12

Inventory status of passerines and upland gamebirds
in terrestrial zones in the Dolores River Basin
(continued)

| Species | River Bottom | Crop-land | Pinon Juniper | Salt Flats | Spruce Fir Ponderosa Forests |
|---|---|---|---|---|---|
| Song Sparrow | C | | | C | |
| Brewer's Sparrow | UC | | | | |
| House Finch | C | | | | |
| Bewick's Wren | C | | | | |
| Lesser Goldfinch | C | | | | |
| Blue-grey Gnatcatcher | UC | | | | |
| Empidonax | R | | | | |
| Horned Lark | | C | | C | |
| Mockingbird | R | | | | |

C  - Common
UC - Uncommon
R  - Rare

H-13

BLM_0036063

Species list, Occurrence and Status of Raptors in the Dolores River Basin

| Species | Seasonal Occurrence | Status |
|---|---|---|
| Turkey Vulture (Cathartes cura) | S m | C |
| Osprey (Pandion haliaetus) | m | UC* |
| Bald Eagle (Haliaetus teucocephalus) | m W | C |
| Golden Eagle (Aquila chrysaetus) | S M W | C |
| Red-Tailed Hawk (Buteo jamaicensis) | S M W | C |
| Ferruginous Hawk (Buteo regalis) | S M W | UC |
| Rough-Legged Hawk (Buteo pagopus) | m W | C |
| Goshawk (Accipter gentilis) | m W | UC |
| Cooper's Hawk (Accipter cooperii) | S M W | C |
| Sharp Shinned Hawk (Accipter strigtuss) | S M W | C |
| Peregrine Falcon (Falcon peregrinus) | s m w | R* |
| Prarie Falcon (Falco mexicanus) | S m w | UC |
| Merlin (Falco columbarius) | m w | UC |
| American Kestrel (Falco sparverius) | S M w | C |

H-14

Species list, Occurrence and Status of Raptors in the Dolores River Basin

| Species | Seasonal Occurrence | Status |
|---|---|---|
| Marsh Hawk (Circus cyaneus) | S M W | C |
| Great Horned Owl (Bubo virginianus) | S M W | C |

C  – common          S – Summer resident
UC – uncommon        M – Migrant
R  – rare            W – Winter resident

* Not actually observed, but assumed to be present.

Upper case letters – major time of occurrence

Lower case letters – occasional

H-15

BLM_0036065

<u>Vegetation of the Dolores River</u>

<u>Scientific Name</u>                                        <u>Common Name</u>

Grasses - Can be Found

| Scientific Name | Common Name |
|---|---|
| Agropyron spp. | Wheatgrass |
| "       cristatum | Crested wheatgrass |
| "       dasystachyum | Thickspike wheatgrass |
| "       intermedium | Intermediate wheatgrass |
| "       scribneri | Scribner or spreading wheatgrass |
| "       smithii | Western wheat or |
|                 | Colorado bluestem |
| "       subsecundum | Bearded wheatgrass |
| "       trachycaulum | Slender wheatgrass |
| Agrostis spp. | Bentgrass |
| "       alba | Redtop bentgrass |
| "       scabra | *Ticklegrass |
| Alopecurus spp. | Meadow or alpine foxtail |
| Blepharoneuron tricholepis | Pine dropseed |
| Bouteloua spp. | Grama grass |
| "       gracilis | Blue grama |
| Bromus spp. | Bromegrass |
| "       anomalus | Nodding brome |
| "       carinatus | Mountain brome |
| (B. polyanthus, B. marginatus, etc.) | |
| "       inermis | Smooth Brome |
| "       tectorum | Cheatgrass brome, Downy brome |
| Buchloc spp. | Buffalograss |
| Calamgrostis spp. | Reedgrass |
| "       canadensis | Bluejoint reedgrass |
| "       purpurascens | Purple pinegrass |
| Danthonia intermedia | Timber danthonia |
| "       parryi | Parry danthonia |
| Deschampsia caespitosa | Tufted hairgrass |
| Distichlis spp. | Saltgrass |
| "       stricta | Inland saltgrass |
| Elymus spp. | Wildrye |
| "       ambiguus | Colorado wildrye |
| "       canadensis | Canada wildrye |
| "       cinereus (condensatus) | Giant wildrye |
| "       glaucus | Blue wildrye |
| Festuca spp. | Fescue |
| "       arizonica | Arizona fescue |
| "       brachyphylla | Alpine fescue |
| "       idahoensis | Idaho fescue |
| "       ovina | Sheep fescue |
| "       thurberi | Thurber fescue |
| Helictotrichon spp. | Alpine oat |
| "       mortonianum | |

BLM_0036066

| Scientific Name | Common Name |
|---|---|

Grasses - Can be Found (Cont.)

| Scientific Name | Common Name |
|---|---|
| Hesperochloa kingi | Spike fescue |
| Hilaria jamesii | Galleta grass |
| Hordeum spp. | Barley |
| "      brachyantherum | Meadow barley |
| Koeleria cristata | Junegrass |
| Melica spp. | Oniongrass |
| Muhlenbergia spp. | Muhly |
| "      montana | Mountain muhly |
| "      richardsonis | *Mat muhly |
| "      torreyi | *Ring muhly |
| Oryzopsis spp. | Ricegrass |
| "      hymenoides | Indian ricegrass |
| Panicum spp. | Panicum; Witchgrass |
| Phleum spp. | Timothy |
| Poa spp. | Bluegrass |
| "      alpina | Alpine bluegrass |
| "      ampla | Big bluegrass |
| "      canbyi | Canby bluegrass |
| "      compressa | Canada bluegrass |
| "      cusicki | |
| "      fendleriana | Mutton bluegrass |
| "      pratensis | Kentucky bluegrass |
| "      rupicola | Timberline bluegrass |
| "      secunda | Sandberg bluegrass |
| Sitanion hystrix | Squirreltail |
| Sporobolus spp. | Dropseed |
| Stipa spp. | Needlegrass |
| "      columbiana | Subalpine needlegrass |
| "      comata | Needleandthread |
| "      lettermani | Letterman needlegrass |
| "      neomexicana | |
| "      richardsoni | Richardson needlegrass |
| "      viridula | Green needlegrass |
| Trisetum spp. | Trisetum |
| "      spicatum | Spike trisetum |

* Indicates plants commonly photographed because of their flower.

BLM_0036067

| Scientific Name | Common Name |
|---|---|
| **Grasses - May possibly be Found** | |
| Agropyron griffithsi | Griffiths wheatgrass |
| " spicatum | Bluebunch wheatgrass |
| Andropogon spp. | Broomsedge; Bluestem; Turkeyfoot |
| " gerardi (A.furcatus) | Big bluestem |
| " halli | Sand bluestem |
| " scoparius | Little bluestem |
| Aristida spp. | Threeawn grass |
| " fendleriana | Fendler threeawn |
| " longiseta | Red threeawn |
| Bouteloua curtipendula | Sideoats grama |
| " hirsuta | Hairy grama |
| " ciliatus | Fringed brome |
| " japonicus | Japanese brome |
| " pumpellianus | Pumpelly brome |
| Buchloc spp. | Buffalograss |
| Calamovilfa longifolia | Prairie sandgrass |
| Danthonia californica | California danthonia |
| " spicata | Poverty danthonia |
| Eragrostis spp. | Lovegrass |
| " Trichodes | Sand lovegrass |
| Melica spp. | Showy oniongrass |
| Muhlenbergia cuspidata | Stonyhills muhly |
| " filiculmis | Slimstem muhly |
| Panicum virgatum | Switchgrass |
| Poa interior | Inland bluegrass |
| " reflexa | Nodding bluegrass |
| Redfieldia spp. | Blowoutgrass |
| " flexuosa | Blowoutgrass |
| Sporobolus cryptandrus | Sand dropseed |
| " heterolepis | Prairie dropseed |
| Stipa spartea | Porcupinegrass |

H-18

BLM_0036068

| Scientific Name | Common Name |
|---|---|

**Grass-like**

| | |
|---|---|
| Carex spp. | Sedge |
| "       albonigra | |
| "       aquatilis | Water sedge |
| "       arapahoensis | Arapaho sedge |
| "       aurea | Golden sedge |
| "       brevipes | |
| "       capillaris | |
| "       chalciolepis | Bronzescale sedge |
| "       drummondiana | Drummond sedge |
| "       ebenea | Ebony sedge |
| "       egglestoni | |
| "       eleocharis | Needleleaf sedge |
| "       elynoides | |
| "       festivella | Ovalhead sedge |
| "       filifolia | Threadleaf sedge |
| "       foenea | Silvertop sedge |
| "       geyeri | Elk sedge |
| "       heliophila | Sun sedge |
| "       lanuginosa | Woolly sedge |
| "       microptera | Smallwing sedge |
| "       nebraskensis | Nebraska sedge |
| "       nigricans | Black alpine sedge |
| "       nova | |
| "       obtusata | |
| "       petasata | Liddon sedge |
| "       phaeocephala | Dunhead sedge |
| "       praegracilis | |
| "       pseudoscirpoidea | |
| "       raynoldsii | Raynolds sedge |
| "       rostrata | Beaked sedge |
| "       scopulorum | Cliff sedge |
| "       tolmiei | Tolmie sedge |
| Juncus spp. | Rush |
| "       balticus | Baltic rush |
| "       drummondii | Drummonds rush |
| "       parryi | Parrys rush |
| Kobresia myosuroides (Elyna) | Kobresia |
|       (K. bellardi) | |
| Luzula spp. | Woodrush |
| "       spicata | Spike woodrush |

BLM_0036069

| Scientific Name | Common Name |
|---|---|

Forbs - Can be Found

| Scientific Name | Common Name |
|---|---|
| Achillea spp. | *Yarrow; Milfoil |
| "    lanulosa | *Western Yarrow |
| Aconitum spp. | Monkshood |
| "    columbianum | Columbia monkshood |
| Actinea (see Hymenoxys) | |
| Agastache spp. | Gianthyssop; Horsemint |
| Agoseris spp. | Agoseris; Mountain dandelion |
| Allium spp. | *Wild onion |
| Anaphalis spp. | Pearleverlasting |
| Androsace | Rockjasmine |
| Anemone spp. | *Anemone |
| Angelica spp. | Aneglica or wild parsnip |
| Antennaria spp. | *Pussytoes |
| Aplopappus spp. (Haplopappus) | *Goldenweed |
| Apocynum | Dogbane |
| Aquilega spp. | *Columbine |
| "    coerulea | *Colorado columbine |
| Arabis spp. | Rockcress |
| Arenaria spp. | *Sandwort |
| "    fendleri | *Tuber starwort |
| "    obtusiloba | |
| Arnica spp. | Arnica |
| Aster spp. | *Aster |
| Astragalus spp. | *Milkvetch; Loco |
| Balsamorhiza spp. | Balsamroot |
| "    incana | Hoary balsamroot |
| "    saggitata | Arrowleaf balsamroot |
| Besseya spp. | Kittentails |
| Calochortus spp. | *Mariposa lily |
| Caltha spp. | *Marshmarigold |
| Campanula spp. | *Harebell |
| Castilleja spp. | *Paintbrush |
| Cerastium spp. | *Chickweed |
| Chaenactis spp. | *Chaenactis; False yarrow |
| Chrysopsis spp. | *Goldaster |
| "    villosa | *Hairy goldaster |
| Cirsium spp. | *Thistle |
| Cogswellia (Lomatium) | Biscuit root |
| Comandra spp. | Comandra |
| Crepis spp. | Hawksbeard |
| Delphinium spp. | *Larkspur |
| Dodecatheon spp. | *Shootingstar |
| Draba spp. | Draba |
| Dryas octopetala | *Alpine avens; Mt. Washington dryad |
| Echinacea spp. | Echinacea |
| Epilobium (Chamaenerion) | *Willoweed; Fireweed |

* Indicates plants commonly photographed because of their flower.

BLM_0036070

| Scientific Name | Common Name |
|---|---|

Forbs - Can Be Found - (Contd)

| Scientific Name | Common Name |
|---|---|
| Erigeron spp. | *Fleabane or wild daisy |
| "        flagellaris | *Trailing daisy |
| Eriogonum spp. | *Buckwheat |
| Eritrichum spp. | |
| Erysimum spp. | Erysimum |
| Erythronium spp. | Fawnlily |
| Euphorbia spp. | Euphorbia |
| Fragaria spp. | *Strawberry |
| Gaillardia spp. | Gaillardia |
| Galium boreale | Northern bedstraw |
| Gentiana spp. | *Gentian |
| Geranium spp. | *Geranium |
| Geum (Sieversia) spp. | *Avens |
| Gilia spp. | Gilia |
| "        aggregata | *Skyrocket gilia |
| Hedysarum spp. | Sweetvetch |
| Helenium hoopesii | *Sneezeweed |
| Helianthella spp. | Little sunflower |
| Heracleum lanatum | Cowparsnip |
| Heuchera spp. | Alumroot |
| Hymenoxys spp. | Actinea |
| "        acaulis | |
| "        grandiflora | |
| "        richardsoni | |
| Iris missouriensis | *Rocky Mountain Iris or Blue flag |
| Lathyrus spp. | Peavine |
| "        leucanthus | Aspen peavine |
| Lesquerella spp. | Bladderpod |
| Ligusticella (see Pdistera) | |
| Ligusticum spp. | Ligusticum |
| "        porteri | Osha or loveroot |
| Linum spp. | *Flax |
| Lloydia spp. | *Alplily |
| Lomatium spp. | Lomatium |
| Lupinus spp. | *Lupine |
| Madia spp. | Tarweed |
| Mertensia spp. | *Bluebell |
| Oenothera spp. | Eveningprimrose; Sundrops |
| Osmorhiza spp. | Sweetanise; Sweetroot |
| "        occidentalis | Sweetanise |
| Oxytropis spp. (Aragallus) | *Crazyweed |
| Pedicularis spp. | Lousewort |
| "        groendlandica | *Elephanthead |
| Penstemmon spp. | *Penstemon; Beardstongue |

* Indicates plants commonly photographed because of their flower.

H-21

BLM_0036071

| Scientific Name | Common Name |
|---|---|

**Forbs - Can Be Found - (Cont)**

| Scientific Name | Common Name |
|---|---|
| Perideridia spp. | |
| Phacelia spp. | Phacelia |
| Phlox spp. | *Phlox |
| Polemonium spp. | *Polemonium; Jacob's Ladder; Skypilot |
| Polygonum spp. | Knotweed |
| "    bistortoides | *Bistort |
| Potentilla spp.  (Herbaceous) | *Cinquefoil |
| Pseudocymopteris spp. | False carrot |
| Psoralea spp. | Scurfpea |
| Pteridium spp. | *Bracken fern |
| Pulsatilla spp. | *Pasqueflower; Anemone |
| Ranunculus spp. | *Buttercup |
| Rudbeckia spp. | *Coneflower or niggerhead |
| Rumex spp. | Dock |
| Saxifraga spp. | Saxifrage |
| Sedum spp. | *Stonecrop |
| "    integrifolium | *Kings Crown |
| "    rhodanthum | *Queens crown |
| "    stenopetalum | Wormleaf stonecrop |
| Selaginella densa | Selaginella |
| Senecio spp. | Groundsel |
| Sibbaldia procumbens | *Sibbaldia or Falsestrawberry |
| Silene acaulis | *Moss silene |
| Solidago spp. | Goldenrod |
| "    petradoria | *Rock goldenrod |
| Sphaeralcea (Malvastrum) | Globemallow |
| Stellaria spp. (Alsine) | *Starwort |
| Swertia spp. | Swertia |
| "    perennis | Alpinebog swertia |
| "    radiata | Elkweed |
| (Frasera speciosa) | |
| Taraxacum officinale | *Common dandelion |
| Thalictrum spp. | Meadowrue |
| Thermopsis spp. | *Goldenbanner |
| Thlaspi spp. | Pennycress |
| Townsendia spp. | Townsendia; Easter daisy |
| Trifolium spp. | Clover |
| "    dasyphyllum | Whiproot clover |
| "    gymmocarpon | Hollyleaf clover |
| "    nanum | Dwarf clover |
| "    parryi | *Parry clover |
| "    repens | White clover |
| Valeriana spp. | Valerian |
| Veratrum californicum | *Falsehellebore or skunk cabbage |
| Vicia spp. | Vetch |
| Viguierra multiflora | *Showy goldeneye; or many flowered sunflower |
| Viola spp. | *Violet |
| Wyethia spp. | *Mulesear wyethia |
| Zygadenus spp. | *Deathcamas |

H-22

BLM_0036072

| Scientific Name | Common Name |
|---|---|
| **Forbs - May Be Found** | |
| Trifolium brandegei | Brandegee clover |
| **Woody - Can Be Found** | |
| Acer glabrum | Rocky Mountain maple |
| Amelanchier spp. | Serviceberry |
| Amorpha spp. | Amorpha |
| Arctostaphylos spp. | Manzanita; Kinnikinnick |
| Artemisia spp. | Sagebrush |
| " cana | *Silver sage |
| " dracunculoides | *Falsetarragon sagebrush |
| " frigida | *Fringed sage |
| " gnaphalodes | *Cudweed sagewort |
| " ludoviciana | Louisiana sagebrush |
| " Scopulorum | *Alpine sagebrush |
| " tridentata | *Big sagebrush |
| Atriplex spp. | Saltbush |
| " canescens | Fourwing saltbush |
| " confertifolia | Shadscale saltbush |
| Nuttallii gardneri | Garner saltbush |
| Berberis spp. | Barberry |
| Ceanothus spp. | Ceanothus |
| Cercocarpus spp. | Mountain Mahogany |
| " montanus | True mountainmahogany |
| Chrysothamnus spp. | *Rabbitbrush |
| " depressus | Dwarf rabbitbrush |
| " nauseosus | Rubber rabbitbrush |
| " parryi | Parry rabbitbrush |
| " vaseyi | Vasey rabbitbrush |
| " viscidiflorus | Douglas rabbitbrush |
| Cornus spp. | Dogwood |
| Crataegus spp. | Hawthorn |
| Eurotia spp. | Winterfat |
| Fendlera rupicola | Cliff fendlerbush |
| Holodiscus spp. (Sericotheca) | Rockspirea |
| Jamesia spp. | Jamesia |
| Juniperus spp. | Juniper |
| " communis | Common juniper |
| " osteosperma | Utah juniper |
| (J. utahensis) | |
| " scopulorum | Rocky Mountain juniper |
| Gutierrezia sarothrae | *Broom snakeweed |
| Lonicera spp. | Honeysuckla |
| Mahonia spp. | Mahonia |
| Opuntia spp. | Pricklypear |
| Peraphyllum spp. | Squawapple |
| Potentilla fruticosa | * Shrubby cinquefoil |

BLM_0036073

| Scientific Name | Common Name |
|---|---|

**Woody - Can be Found - (Contd)**

| Scientific Name | Common Name |
|---|---|
| Prunus spp. | Chokecherry |
| "      virginiana | Common chokecherry |
| (P. melanocarpa) | |
| Purshia tridentata | Bitterbrush |
| Quercus gambeli | Gambel Oak |
| Rhus spp. | Sumac |
| "      glabra | Smooth sumac |
| "      trilobata | Skunkbush sumac |
| Ribes spp. | Currant; Gooseberry |
| Rosa spp. | Rose |
| Salix spp. | Willow |
| Sambucus spp. | Elderberry |
| Symphoricarpos spp. | Snowberry |
| Tetradymia spp. | *Horsebrush |
| Vaccinium spp. | Whortleberry |
| Yucca spp. | *Yucca; Scapweed |
| Juniperus monosperma | One-seed juniper |
| Juniperus scopulorm | Rocky Mountain juniper |

**Woody - May be Found**

| | |
|---|---|
| Cercocarpus ledifolius | Curlleaf mountain mahogany |
| Eurotia lanata | Common winterfat |
| Physocarpus spp. (Opulaster) | Ninebark |

**Woody - Can Be Found**
(Trees)

| | |
|---|---|
| Abies concolor | White fir |
| Abies lasiocarpa | Sualpine fir (Corkbark fir) |
| Acer glabrum | Rocky Mountain Maple |
| Acer negundo | Boxelder |
| Picea engelmann | Engelmann spruce |
| Picea pungens | Blue spruce |
| Pinus edulis | Pinyon |
| Pinus flexilis | Limber pine |
| Pinus ponderosa | Ponderosa |
| Populus acuminate | Lanceleaf cottonwood |
| Populus angustifolia | Narrow leaf cottonwood |
| Populus tremuloides | Aspen |
| Pseudotsuga mensiesii | Douglas-fir |

* Indicates plants commonly photographed because of their flower.

BLM_0036074

| Scientific Name | Common Name |
|---|---|

### Lower Montane Forest

| | |
|---|---|
| Pinus ponderosa | *Ponderosa pine |
| Quercus gambelii | *Gambel oak |
| Poa fendleriana | *Mutton grass |
| Mahonia repens | Oregon grape |
| Koelaria cristata | Junegrass |
| Purshia tridentata | Bitterbrush |
| Lotus wrightii | Lotus |
| Corallorhiza maculata | Coral root orchid |

### Pinyon - Juniper Woodland

| | |
|---|---|
| Pinus edulis | *Pinyon pine |
| Juniperus osteosperma | *Utah juniper |
| Mahonia repens | Oregon grape |
| Opuntia fragilis | |
| Ericgonum alatum | Winged eriogonum |

### Brushland - Mountain Shrub

| | |
|---|---|
| Quercus gambelii | *Gambel oak |
| Artimesia tridentata | *Big sagebrush |
| Rhus trilobata | Skunkbush sumac |
| Agropyron smithii | Western wheatgrass |
| Bouteloua gracilis | Blue grama grass |
| Sitanion hystrix | Squirrel tail grass |
| Sporobolus cryptandrus | Sand dropseed grass |
| Chrysothamnus nauseosus | Rabbitbrush |

### Riparian Community

| | |
|---|---|
| Populus angustifolia | *Narrowleaf cottonwood |
| Salix exigua | *Willow |
| Coleogyne ramosissima | *Blackbrush |
| Alnus tenuifolia | Thinleaf alder |
| Rosa nutkana | Wild rose |
| Acer negundo | Boxelder |
| Betula occidentalis | Rocky Mountain birch |
| Convolvulus arvensis | Bindweed |
| Epilobium hornemanni | Dwarf fireweed |
| Clematis legusticifolia | Virgin's bower |
| Atriplex confertifolia | Shadscale |

* A dominant plant in either the superstory or in the substory.

H-25

BLM_0036075

| Scientific Name | Common Name |
|---|---|

Swamp Areas

| | |
|---|---|
| Typha angustifolia | *Cattail |
| Typha latifolia | *Cattail |
| Carex spp. | *Sedges |
| Juncus spp. | *Rushes |
| Equisetum laevigatum | Horsetail |
| Eleocharis macrostachya | Spikesedge |
| Tris missouriensis | Iris |
| Thalictrum fendleri | Meadow rue |

Slickrock Canyon is a transition zone.  Vegetation changes from the more mesic types (excluding riparian and swampy area communities) to a generally more zeric type.  This area includes the following communities:

Pinyon-juniper woodland

Brushland - Mountain shrub

Riparian

Swamp area

 and the drier

Semidesert

Semidesert

| | |
|---|---|
| Hilaria jamesii | *Galleta grass |
| Bouteloua gracilis | *Blue grama grass |
| Yucca angustissima | Narrowleaf yucca |
| Opuntia phaeacantha | Prickly-pear cactus |
| Sarcobatus vermiculatus | Greasewood |
| Atriplex confertifolia | Shadscale |
| | Salt cedar |

* A dominant plant in either the superstory or in the substory.

H-26

BLM_0036076

FEDERAL REGISTER-40(127,V)                    27847

NOTICES

List A

State lists of endangered and threatened species of the continental
United States

| State | Status | Family | Species |
|-------|--------|--------|---------|
| Colorado | Endangered | Boraginaceae | Cryptantha weberi |
| Colorado | Endangered | Brassicaceae | Arabis oxylobula |
| Colorado | Endangered | Brassicaceae | Braya humilis ssp. ventosa |
| Colorado | Endangered | Brassicaceae | Eutrema penlandii |
| Colorado | Endangered | Brassicaceae | Lesquerella pruindsa |
| Colorado | Endangered | Cactaceae | Sclerocactus glaucus |
| Colorado | Endangered | Caryophyllaceae | Stellaria irrigua |
| Colorado | Endangered | Fabaceae | Astragalus deterior |
| Colorado | Endangered | Fabaceae | Astragalus detritalis |
| Colorado | Endangered | Fabaceae | Astragalus lutosus |
| Colorado | Endangered | Fabaceae | Astragalus microcymbus |
| Colorado | Endangered | Fabaceae | Astragalus naturitensis |
| Colorado | Endangered | Fabaceae | Astragalus osterhoutii |
| Colorado | Endangered | Fabaceae | Astragalus schmollae |
| Colorado | Endangered | Fabaceae | Oxytropis obnapiformis |
| Colorado | Endangered | Fabaceae | Trifolium lemmonii |
| Colorado | Endangered | Hydrophyllaceae | Phacelia formosula |
| Colorado | Endangered | Onagraceae | Gaura neomexicana ssp. coloradensis |
| Colorado | Endangered | Polygonaceae | Eriogonum ephedroides |
| Colorado | Endangered | Ranunculaceae | Aquilegia micrantha var. mancosana |

H-27

BLM_0036077

List A (Continued)

| State | Status | Family | Species |
|---|---|---|---|
| Colorado | Threatened | Boraginaceae | Cryptantha elata |
| Colorado | Threatened | Boraginaceae | Cryptantha stricta |
| Colorado | Threatened | Boraginaceae | Mertensia viridis var. cana |
| Colorado | Threatened | Brassicaceae | Arabis gunnisoniana |
| Colorado | Threatened | Brassicaceae | Draba exunguiculata |
| Colorado | Threatened | Brassicaceae | Parrya nudicaulis |
| Colorado | Threateded | Brassicaceae | Rorippa coloradensis |
| Colorado | Threatened | Cactaceae | Sclerocactus mesae-verdae |
| Colorado | Threatened | Cyperaceae | Carex microptera var. crassinervia |
| Colorado | Threatened | Fabaceae | Astragalus wetherillii |
| Colorado | Threatened | Fumariaceae | Corydalis caseana ssp. caseana |
| Colorado | Threatened | Poaceae | Phippsia algida |
| Colorado | Threatened | Polygonaceae | Eriogonum brandegei |
| Colorado | Threatened | Polygonaceae | Eriogonum saurinum |
| Colorado | Threatened | Polygonaceae | Eriogonum viridulum |
| Colorado | Threatened | Ranunculaceae | Aquilegia chrysantha var. rydbergii |
| Colorado | Threatened | Saxifragaceae | Sullivantia purpusii |

H-28

BLM_0036078

APPENDIX  I

Geology and Mineral Resources

of

the Dolores River Basin, Colorado

Prepared by

Andrew F. Bateman, Jr., Chief,
Branch of Mineral & Water Classification
Geological Survey, U.S. Dept. of Interior
9277 W. Alameda Avenue, Lakewood, CO 80226

I-1

BLM_0036079

## Description of the Dolores River Basin

### Summary

The Dolores River heads on the north slope of Hermosa Peak and Graysill Mountain in the San Juan Mountains of southwestern Colorado and flows in a canyon with a general northwestward course for approximately 200 miles through the Canyonlands country into the Colorado river.  The drainage basin is underlain by sedimentary rocks ranging in age from Pennsylvanian to Cretaceous except for a few tertiary strata and intrusive bodies in the headwaters area.

### Geology

The uppermost part of the Dolores drainage basin is on the southwestern slopes of the San Juan Mountains but most of it is in the Canyon Lands Section of the Colorado Plateaus Physiographic Province. In it, the Dolores and other streams have eroded the country into a series of relatively flat-topped tabular blocks separated by deep narrow canyons.

Strata exposed in the basin are as follows:

Oligocene (?)

Telluride Conglomerate - red to light-gray arkosic conglomerate, conglomeratic sandstone, sandstone, and mudstone.  It rests unconformably in the older rocks and is overlain by volcanic rocks.  It is 900 to 1,000 feet thick.

Upper Cretaceous

Mesa Verde Group - yellowish-gray, thick-bedded sandstone beds separated by light-gray shale.  Beds are both marine and nonmarine in origin and are about 1,200 feet thick.

Mancos Shale - dark gray to black, soft, fissile marine shale with thin sandstone beds.  The upper beds intertongue with and grade vertically into the lower part of the Mesa Verde Group.  Thickness is about 4,000 feet.

Upper and Lower Cretaceous

Dakota Sandstone - yellowish-brown to gray quartzitic fluvial sandstone and conglomeratic sandstone in thick beds with thin lenticular beds of gray claystone, impure coal and carbonaceous shale.  Thickness of the formation varies from 50 to 225 feet.

I-2

BLM_0036080

Lower Cretaceous

Burro Canyon Formation - lenticular light-brown fluvial quartzose
sandstone and conglomerate with siltstone, shale, and mudstone.
About 150 feet thick but varies from a few feet to more than
200 feet.

Upper Jurassic

Morrison Formation - fluvial and lacustrine sandstone and mudstone
alluvial deposits about 600 feet thick, although total thickness
ranges from 450 to 950 feet.

Junction Creek Sandstone - pink or reddish orange fine-to-coarse
grained, poorly sorted, cross-bedded eolian sandstone about
275 feet thick.  It merges northward with the upper part of
the Summerville Formation.

Wanakah Formation - greenish-gray to reddish-brown limy siltstone,
thinly-bedded fine-grained quartz sandstone and a dark gray
bituminous limestone 25 to 100 feet thick.  It is the lateral
equivalent of the Summerville Formation to the north.

Entrada Sandstone - pale to greenish-gray massive sandstone with
large low-grade vanadium-uranium deposits at some localities.
It ranges from 70 to 440 feet in thickness and averages about
150 feet.

Triassic

Navajo Sandstone - white, gray, or yellowish-gray, fine-grained,
well-sorted, highly cross-bedded eolian sandstone.  More than
400 feet thick to the west but thins to an irregular wedge
edge near the Dolores River.

Kayenta Formation - gray, purplish-gray irregularly bedded fluvial
sandstone and siltstone with some mudstone, conglomerate, and
limestone.  Thickness varies from zero to 240 feet.  These beds
are found only in the lower Dolores River Canyon.

Windgate Sandstone - reddish-brown to buff, fine-grained, massive,
thick-bedded, prominently cross-bedded eolian sandstone.  It is
present in the Dolores River Canyon but is thin and wedges out
eastward.  To the west it attains a thickness of 350 feet.

I-3

BLM_0036081

Chinle Formation - red, reddish-brown, and orange-red siltstone with lenses of red sandstone and shale, limestone pebble, and shale pellet conglomerate.  It is terrestrial in origin. Thickness increases from a few feet southward to 600 feet.

Dolores Formation - bright red to reddish orange fluvial siltstone, sandstone and shale with a few thin layers of limestone shingle conglomerate about 400 feet thick.  It is the approximate lateral equivalent to parts of the Windgate, Sandstone and Chinle Formation.

Moenkopi Formation - chocolate-brown, ripple-bedded shale, brick-red sandy mudstone, brown sandstone and arkosic conglomerate with local gypsum beds.  Thickness ranges from 0 to more than 1,000 feet.

Permian

Cutler Formation - a continental sequence of grayish- to purplish-red fluvial micaceous sandstone, siltstone, and arkosic conglomerate.  Total thickness ranges from 0 to 3,000 feet.

Permian or Pennsylvanian

Rico Formation - light gray, fossiliferous, cherty marine limestone, reddish-brown fine-to-medium-grained fluvial sandstone, and reddish-brown, gray-green or purple micaceous and gypsiferous siltstone about 300 feet thick.

Pennsylvanian

Hermosa Formation - gray and light-brown, thick-bedded, fossiliferous, cherty marine limestone and dolomite, gray fine-grained micaceous crossbedded sandstone and siltstone, dark-gray shale, and gypsum. It is about 1,800 feet thick at Rico.

The mountainous portions of the basin are underlain by the Hermosa Formation and younger strata up through the Mancos Shale intruded by stocks and laccoliths of microgranogabbro to adamellite, dikes and sills of intermediate composition and lamprophyre dikes.  The Telluride Conglomerate unconformably overlies the Mancos Shale on Mount Wilson and a few of the higher peaks.

In the southern part of the basin, the mesas between the streams are underlain mostly by the Dakota Sandstone or the Burro Canyon Formation. In the central part, much of the area is underlain by the Mancos Shale with the higher areas underlain by the Mesa Verde Formation.  In the northern portion, the Dakota Sandstone and the Morrison Formation are at the surface.

I-4

BLM_0036082

The western part of the San Juan Mountains is a broad dome formed in Laramide time. The relatively flat-lying sedimentary rocks of the Plateau Province rise gently but steadily eastward toward the San Juan dome. A few miles east of the Dolores River drainage basin, the strata bend upward along the San Juan monoclinal fold on the flank of the dome.

The principal tectonic feature of the basin is the Paradox fold and fault zone that lies southwest of and parallel to the Uncompahgre Uplift. It consists of four prominent northwest trending anticlines, the Paradox Valley, Gypsum Valley, Dolores and Dove Creek anticlines and the intervening synclines. These folds and a number of roughly parallel faults die out to the southeast and merge with the general rise of strata toward the San Juan Mountains. At least two of the folds, the Paradox Valley and Gypsum Valley anticlines, have intrusive cores of salt from the Paradox Member of the Hermosa Formation.

### Mineral Deposits

The mineral deposits are discussed separately for three portions of the basin.

### Headwaters basin

The headwaters basin above Rico, Colorado, is a mountainous area with great topographic relief. Altitudes range from about 8,800 feet on the Dolores River at Rico to more than 12,000 feet at the headwaters drainage divides. Mt. Wilson at the head of Slate Creek attains an altitude of 14,246 feet.

The exposed stratigraphic section includes the Hermosa Formation up through the Telluride Conglomerate. These sedimentary rocks are overlain by the San Juan Tuff and the Silverton volcanic series on the higher ridges of Mt. Wilson and nearby peaks and were intruded by stocks and laccoliths ranging in composition from microgranogabbro to adamellite, by numererous dikes and sills of intermediate composition and by several lamprophyre dikes. The sedimentary rocks are nearly flat-lying with a gentle rise toward the San Juan monocline except where they have been disturbed by the intrusion of the igneous rocks.

Leasable Minerals

The lands underlain by the Dakota sandstone are valuable for coal, parts of the headwaters basin are valuable for oil and gas and geothermal resources, and a small area near Rico is valuable for potassium and sodium.

I-5

BLM_0036083

Coal.---In this area the Dakota Sandstone consists of an upper sandstone member, a middle carbonaceous shale member and a lower conglomeratic sandstone member. Lentincular beds of coal, most of them less than five feet thick are present in the middle member. The coal is bituminous in rank. Formerly, the coal was mined on the south side of the Dolores River just east of Barlow Creek and on the north side of the river just east of Coal Creek. This coal was used in making coke for smelting operations at Rico and for household heating. Remains of the coke ovens can be seen along the Dolores River between Coal Creek and Coke Oven Creek.

Geothermal Resources.---Lands designated valuable for geothermal resources were placed in this category because of the Dunton Hot Spring in the canyon of the West Dolores, NW¼SW¼ sec. 33, T. 41 N., R. 11 W. reported to flow 20 gallons of water per minute at a temperature of 110° F. and the Iron Spring or Railroad Spring, NW¼NE¼ sec. 25, T. 40 N., R. 11 W., 3/4 miles north of Rico, reported to flow 25 to 30 gallons per minute of water at a temperature of 82° F. There has been no development of these resources.

Oil and Gas.---Sedimentary rocks suitable for the occurrence of oil and gas are present, but to date there has been no production and very little exploration.

Potassium.---Disseminated deposits of alunite formed by the altera-tion of a monzonite porphyry are present at Calico Peak on the divide between the headwaters basin and the West Dolores River basin. Resources are estimated at 6,000,000 tons, 17.1 percent alunite.

Sodium.---Layers of salt and potash minerals are interbedded with anhydrite, limestone, dolomite and shale in the Paradox Member of the Hermosa Formation. These beds underlie the extreme southwest corner of the headwaters basin at considerable depth. The potash does not extend this far eastward but salt probably is present. Little or nothing is known concerning its thickness.

Nonmetallic Minerals

Gypsum.---A bed of gypsum 15 to 30 feet thick is present in the lower part of the Hermosa Formation at Newman Hill in the Rico district.

Sulfur.---The Rico Argentine Mining Co., in October 1955, began operating a one and one-half million dollar sulfuric acid plant at Rico. The plant has a capacity of 200 tons of acid per day made from pyrite obtained from nearby deposits. A by-product is red hematite.

Metallic Minerals

Calico Peak District.---Aluminum might be recovered from the alunite deposits discussed as a source of potassium.

I-6

Mt. Wilson Area.---This area is on the boundary between the headwaters basin and the West Dolores River basin.  Since most of the mining activity has been in the West Dolores River basin, it is discussed under that heading.

Rico District.---Since the first claim was staked in 1879, Rico has been an active mining district.  Silver, largely from Newman Hill southeast of the town was the chief product in the early days. Since 1900 lead and zinc have been the principal products.  Gold and copper also have been produced and silver has remained an important by-product.  The production of the Rico district from 1879 to 1968 has been about 14,500,000 ounces of silver, 83,000 ounces of gold, 84,000 tons of lead, 83,000 tons of zinc and 5,600 tons of copper.

The Rico Mining District is in the Rico Mountains, a small group iso-lated from the main range of the San Juan Mountains and carved from a low structural dome roughly circular in outline and 12 to 15 miles across.  The town of Rico on the Dolores River lies near the center of the dome.  Rocks involved in the folding include Precambrian greenstone and metadiorite,  the Precambrian Uncompahgre Quartzite, the Leadville Limestone of Mississippian age, and overlying sedimentary strata up to those of Jurassic age.  These rocks were intruded by sills and dikes of hornblende latite porphyry throughout the central part of the dome. One of the sills is 525 feet thick.  Somewhat later the Rico stock of monzonite about two miles long in an East-West direction and one mile wide was intruded west of the river at Rico.  The invaded rocks were metamorphosed for 1.7 miles east of the stock.  Faulting followed the doming and igneous activity.  The major faults trend east-west parallel to the long direction of the stock.  A horst block containing the Precambrian rocks is on an eastward prolongation of the stock and is the highest structural element.  Long blocks and wedge-shaped slices between the main faults drop step-like away from the horst.  Dip of the strata decreases progressively away from the center of the dome.  The major faults are normal and with one exception have a steep dip.

Production has been from the northeast, east and southeast sides of the stock and from several types of ore deposits.  A large part of the early-day production came from the "Enterprise blanket" and other blanket deposits in the lower part of the Hermosa Formation on Newman Hill. These were replacement deposits in the residual debris from solution of a 15- to 3-foot gypsum bed where broken by fissures.  They were exhausted before the year 1900.  Massive sulfide replacement deposits in lime-stones of the Hermosa Formation have been the major source of ore in the 20th century and accounts for practically all of the current pro-duction of base metals and the by-products, silver and gold.  Contact-metamorphic deposits of sulfides and iron oxides in limestones of the Ouray and Leadville Limestones and to a lesser extent of the Hermosa

I-7

Formation were productive of base-metal sulfides and by-products of silver and gold during the 1920'a and in World War II but are not now productive. They consisted or irregular pods scattered through masses of specularite, magnetite and chlorite in marbleized and serpentinized limestone. Fissure veins along fractures and small faults, especially in sandstones and arkoses of the Hermosa Formation, are widespread. Most of them are too small to be mined profitably except where they intersect breccia zones, limestone beds, or gypsum beds and widen to form large irregular bodies.

The principal ore minerals, pyrite, sphalerite, galena, and chalco-pyrite, are present in all of the deposits. Most of the silver taken from Newman Hill before 1900 was from the silver minerals argentite, proustite, polybasite, and pearceite, but most of the silver currently produced is from finely disseminated argentiferous tetrahedrite-tennantite. Native gold is a small but significant by-product. The gangue minerals are quartz, rhodochrosite, rhodonite, fluorite, calcite, sericite, and locally, barite.

In the past there have been two lead smelters and numerous mills in the Rico district, and at present there is a plant producing sulfuric acid from pyrite. Antimony and arsenic could be recovered from the high-grade silver ores.

### West Dolores Basin

The bed of the West Dolores River rises from 7,380 feet at its mouth to over 12,000 feet at its source. Peaks along the drainage divide reach elevations between 13,000 feet and 14,300 feet. For about eight miles the stream flows through mountainous country and then for the next 22 miles flows in a canyon less than one mile wide and from 1,200 to 1,500 feet deep between mesas whose surfaces slope southwestward at a rate of about 200 feet per mile.

The mesas are underlain by rocks of the Dakota and Burro Canyon Formations. In the canyons of the West Dolores River and its tributaries, the Morrison Formation, Junction Creek Sandstone, Wanakah Formation, Entrada Sandstone, the Dolores Formation and the Cutler Formation are exposed.

A large Tertiary intrusive body underlies Black Mesa and the southern slopes of Groundhog Mountain. Smaller intrusives are present at Middle Peak and Mt. Wilson. The sedimentary rocks are cut by dikes and small silts of trachybasaltic lamprophyre.

I-8

BLM_0036086

The Calico Peak anticline trends west northwest across the southern part of the basin and the parallel Groundhog syncline lies several miles to the north.  Structure in the extreme southwest portion of the basin consists of a southwest plunging syncline.  A large number of north-northwest trending faults and a few northeast trending faults cut the sedimentary rocks in the eastern part of the basin.

Leasable Minerals

About two-thirds of the area is valuable for coal and slightly more is valuable for oil and gas.  Roughly the eastern half is valuable for geothermal resources and the western two-thirds is valuable for potassium and sodium.

Coal.---Lenticular beds of bituminous coal are present in the Dakota Sandstone.  Beds are usually less than 5 feet thick.  Development probably will come only after the better fields in the Durango and other nearby areas are exhausted.

Geothermal Resources.---The lands valuable for geothermal resources are a westward extension of the Dunton-Rico area discussed under the headwaters basin.  There has been no development.

Oil and Gas.---Sedimentary rocks suitable for the occurrence of oil and gas are present.  To date, there has been no production and very little exploration.

Potassium.---Disseminated deposits of alunite at Calico Peak extend into the West Dolores River basin.  Potash beds in the Paradox Member of the Hermosa Formation probably do not extend far enough eastward to underlie any of the West Dolores River Basin.

Sodium.---Salt beds in the Paradox Member of the Hermosa Formation underlie the western two-thirds of the West Dolores River basin at depths of 5,000 to 6,000 feet.  Very little is known concerning the thickness of the salt beds in this area.

Nonmetallic Minerals

Antimony and arsenic.---Antimony and arsenic could be produced from the ruby silver ores of the Dunton district as discussed under metallic minerals.

I-9

BLM_0036087

## Metallic Minerals

Calico Peak District.---The alunite deposits previously discussed
extend into the extreme southeast corner of the West Dolores Basin.
Aluminum might be recovered from them at some time in the future.

Dunton District.---North northwest trending faults and dikes and
sills of quartz diorite or quartz monzonite from the Rico Mountains
igneous center cut the sedimentary rocks.  Silver, gold, and a little
lead have been produced.  Massive deposits of the ruby silver minerals
pyrargyrite and proustite are abundant in the zone of the secondary
sulfide enrichment.  Antimony and arsenic could be produced from them
and stibnite has been reported as radiating crystals lining vugs.

Mount Wilson District.---This district lies in a group of high peaks
separated topographically from the main range of the San Juan Mountains
and on the boundary between the Headwaters Basin and the West Dolores
Basin.  The Telluride conglomerate here is a series of sandstones
and shales about 1,000 feet thick.  Overlying it the San Juan Tuff
and Silverton volcanic series are exposed on the higher ridges.  The
sedimentary rocks are intruded by a large stock of diorite to monzo-
nite which makes up the main mass of the mountains.  The ore deposits
are in fissure veins within the stock or in nearby sedimentary rocks
that strike N 70° E to S 70° E and dip at angles of 70° or more.
They are offset by barren veins striking north.  The most productive
veins are quartz-filled fissures containing pyrite, chalcopyrite and
arsenopyrite with lesser amounts of galena, sphalerite, tetrahedrite,
stibnite and calcite.  The pay streaks within the veins vary from
3 inches to 5 feet, but are generally narrow and average less than
2 feet.  The silver-lead ores are widely distributed and consist of
galena, sphalerite and pyrite with subordinate chalcopyrite, tennan-
tite and tetrahedrite in a gangue of quartz, calcite, and lesser
amounts of barite and rhodochrosite.  The gold ore is mostly pyrite
with subordinate amounts of chalcopyrite and arsenopyrite with a
gangue of quartz, some carbonaceous minerals and barite.  The gold
is very fine-grained.  Gold, silver, lead, copper, and some zinc
have been produced, but the principal values have been in gold and
silver.  Total production has been about $3 million.  The Silver
Pick mine is by far the largest mine in the district.  It has pro-
duced more than 32,000 ounces of gold and 95,000 ounces of silver.

The Dolores River Corridor

Downstream from the proposed McPhee damsite, sec. 2, T. 38 N.,
R. 16 W., N.M.P.M., the Dolores River corridor follows a general

I-10

north-northwest course.  The river flows in a deep narrow canyon.
The entire section of sedimentary rocks from the Cutler Formation
up through the Dakota Sandstone is exposed in the corridor.

The principal structure along the southern half of the corridor
is the Dolores anticline, which trends northwest for more than 40
miles from T. 39 N., R. 15 W., to T. 44 N., R. 19 W.  From McPhee
damsite to Glade Canyon, sec. 18, T. 41 N., R. 17 W., the river
flows in a canyon from 3/4 to 1-1/2 miles wide that has been
superimposed part way down the southwest flank of the Dolores
anticline.  Depth of this canyon varies from 500 to 1,900 feet.
Glade Canyon is in a narrow west-northwest trending graben about
15 miles long but only about half a mile wide.  The Dolores river
crosses the Glade Graben near its west end, turns to a more
northerly course, and cuts diagonally across the Dolores anticline,
crossing the axis in sec. 14, T. 42 N., R. 18 W., in a canyon
nearly 2,300 feet deep.

From this point, the Dolores river crosses a number of large
northwest-trending structural valleys that are aligned along the
Disappointment syncline, the Gypsum Valley anticline, several
smaller anticlines and synclines, and the Paradox Valley anticline
to the mouth of the San Miguel River.  In the valleys the inner
canyon may be as little as 400 feet deep, but between them the
canyons are as much as 1,800 feet deep.  The river crosses the
broad, flat-bottomed Paradox Valley at right angles to its axis
and is not entrenched into the valley at all.  From the mouth of
the San Miguel River, the Dolores River angles down the southwest
flank of the Nucla syncline to the town of Gateway.  From this
point to its mouth, the river flows along the axis of the Nucla
syncline.

Leasable Minerals

Most of the lands drained by the Dolores River from the proposed
McPhee damsite to its mouth is valuable for coal, oil and gas,
potassium and sodium.

Coal.---Coal is present in the Dakota Sandstone and underlies the
mesas between the streams, but has been eroded from the Dolores
River Canyon and the tributary canyons.  There are no active mines
in the area and there was little or no mining in the past because
of the isolated location and small population.  However, access to
coal mined in the future may be easiest by adits from the canyons.

I-11

BLM_0036089

Oil and Gas.---The entire drainage area is underlain by sedimentary
rocks suitable for the occurrence of oil and gas. There is one
small producing gas field within the drainage basin, Andy's Mesa
Field, in sections 19, 20, 21, 27, 28, 34 and 35, T. 44 N., R. 16 W.
Production is from the Cutler Formation. There are several small gas
fields south and southwest of the drainage basin. No doubt more
discoveries will be made. Chief hindrance to oil and gas development
from designation of some stretches of the river as wild or scenic
would be in restricting the building of roads and thus limiting
access to possible locations of tests for oil and gas.

Potassium and Sodium.---Potash and sodium minerals are interbedded
with anhydrite, limestone, dolomite and shale in the Paradox Member
of the Hermosa Formation which underlies the entire area at depth.
The center of the salt-bearing area is near Egnar, sec. 11, T. 42 N.,
R. 19 W., 7 miles west of the Dolores River. The salt is approximately
2,000 feet thick but is 6,000 feet or more below the ground surface.
Southward from Egnar the beds are nearly horizontal, but the salt
thins gradually. Northward, the beds have been folded into a series
of parallel anticlines and synclines. In the Paradox Valley, one
well was in salt for nearly 14,000 feet. The total amount of salt
is very large, but information is not sufficient to make an estimate
of the total.

Potassium salts are present in about two-thirds of the area underlain
by salt beds, none being present east of 108°30' longitude. Hence
potassium salts can be expected under most of the drainage basin.
However, even less is known about them than of the salt beds but the
total amount of rock containing potassium salts is probably large. In
a mine near Moab, Utah, a high-grade body of potash averages 11 feet
in thickness and is 2,400 to 4,000 feet below ground surface.

Nonmetallic Minerals

Gypsum.---Gypsum occurs as a cap rock at the top of the salt and crops
out in Big Gypsum Valley. The resources of gypsum in this area are
probably large, but there is not enough information to make any esti-
mate on the total amount.


Selected References

Argall, G. O., Jr., 1949, Industrial Minerals of Colorado: Quarterly
of the Colorado School of Mines, Vol. 44, No. 2, 477 p.


I-12

BLM_0036090

Branch of Mineral Classification, Conservation Division, 1971, Reported occurrences of selected minerals in Colorado:  U.S. Geological Survey Map MR-57.

Bromfield, C. S., 1967, Geology of the Mount Wilson Quadrangle, Western San Juan Mountains, Colorado:  U.S. Geological Survey Bulletin 1227, 100 p.

Del Rio, S. M. and others, 1960, Mineral Resources of Colorado, First Sequel:  Denver, Colorado, State Mineral Resources Board, 764 p.

Finley, E. A., 1951, Geology of Dove Creek Area, Dolores and Montezuma Counties, Colorado:  U. S. Geological Survey Oil and Gas Investigations Map OM 120.

Haynes, D. D., Vogel, J. D., and Wyant, D. G., 1972, Geology, structure and uranium deposits of the Cortez quadrangle, Colorado and Utah:  U.S. Geological Survey Map I-629.

McKnight, E. T., 1974, Geology and ore deposits of the Rico District, Colorado:  U.S. Geological Survey Prof. Paper 723.

Steven, T. A., Lipman, P. W., Hail, W. J., Jr., Barker, Fred and Luedke, R. G., 1974, Geologic map of the Durango Quadrangle, Southwestern Colorado:  U.S. Geological Survey Map I-764.

Stokes, W. L. and Phoenix, D. A., 1948, Geology of the Egnar-Gypsum Valley Area, San Miguel and Montrose Counties, Colorado:  U.S. Geological Survey Oil and Gas Investigations Preliminary Map 93.

U.S. Geological Survey, 1964, Mineral and water resources of Colorado:  U.S. Interior and Insular Affairs Comm. Print, Geological Survey Special Report.

Vanderwilt, J. W. and others, 1947, Mineral Resources of Colorado:  Denver, Colorado, State Mineral Resources Board, 547 p.

Williams, P. L., 1964, Geology, structure, and uranium deposits of the Moab quadrangle, Colorado and Utah:  U.S. Geological Survey Map I-360.

I-13

BLM_0036092

APPENDIX J

WATER RIGHTS LISTING

| Reference No. | Structure Name | Use | Type | Source | Township | Range | Section | Direct Flow CFS | Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dolores Water | M&O | * | Dolores River | 38-N | 14-W | 33 SESWSW | 1.0 | | Abs. | 02-01-1892 | 05-31-1879 |
| 2 | Main Canal #1 and/or Main Canal #2 | I | D | Dolores River | 37-N | 15-W | 17 NENWSW | 1.1 | | Abs. | 02-01-1892 | 05-31-1879 |
| | | | | | | | | 1.1 | | Abs. | | 04-15-1880 |
| | | | | | | | | 1.0 | | Abs. | | 05-31-1882 |
| | | | | | | | | 1.0 | | Abs. | | 05-31-1883 |
| | | | | | | | | 707.7 | | Abs. | | 11-25-1885 |
| | | *** | D | | | | | 592.3 | | Cond. | | 11-25-1885 |
| | | | | | | | | 100.0 | | Abs. | | 11-25-1885 |
| 3 | Sheek | I | D | Dolores River | 37-N | 15-W | 10 SESENW | 0.9 | | Cond. | 02-01-1892 | 05-31-1879 |
| | | | | | | | | 2.0 | | Abs. | 12-18-1933 | 04-15-1903 |
| 4 | Illinois Ditch | I | D | Dolores River | 37-N | 14-W | 8 SWNWNE | 2.763 | | Abs. | 02-01-1892 | 04-15-1880 |
| | | | | | | | | 1.137 | | Cond. | | |
| | | DS | D | | | | | 0.14 | | Abs. | 03-22-1963 | 12-22-1933 |
| | | | | | | | | 0.333 | | Abs. | | |
| 5 | Home Ditch | IDS | D | Dolores River | 38-N | 14-W | 15 SENESE | 3.0 | | Abs. | 02-01-1892 | 05-01-1880 |
| | | DS | D | | | | | 0.25 | | Abs. | 03-22-1963 | 05-01-1880 |
| 6 | Italian Ditch | I | D | Dolores River | 38-N | 14-W | 33 SWSESE | 1.0 | | Abs. | 02-01-1892 | 05-01-1880 |
| | | | | | | | | 1.0 | | | | 06-12-1891 |
| | | I | D | | | | | 1.0 | | | 12-18-1933 | 04-01-1903 |
| | | DS | D | | | | | 0.12 | | | 03-22-1963 | 05-01-1880 |
| | | | | | | | | 0.33 | | | | |
| 7 | Moriarity Ditch | I | D | East Fork Dolores | 38-N | 13-W | 5 NWSESE | 1.0 | | Abs. | 02-01-1892 | 12-31-1880 |
| | | | | | | | | 2.8 | | Abs. | 06-18-1891 | 06-18-1891 |
| | | | S | | | | | 0.7 | | Abs. | 03-22-1963 | 12-31-1890 |
| | | | I | | | | | 0.5 | | Abs. | | |
| | | | | | | | | 2.0 | | Cond. | | |

J-1

BLM_0036093

APPENDIX J

WATER RIGHTS LISTING

| Refer-ence No. | Structure Name | Use | Type | Source | Town-ship | Range | Section | Amount Direct Flow CFS | Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | House and Sommers | I | D | Dolores River | 38-N | 15-W | 31 SENENW | 1.0<br>1.4 | | Abs.<br>Abs. | 02-01-1892 | 03-01-1881<br>04-06-1891 |
| 9 | Bean Ditch | I | D | Dolores River | 37-N | 15-W | 11 SWSENE | 1.0<br>1.4 | | Abs.<br>Abs. | 02-01-1892 | 04-01-1881<br>06-24-1891 |
| 10 | Burch and Longwill | I | D | Dolores River | 38-N | 14-W | 27 NENWNE | 1.0<br>0.8<br>2.0<br>4.0 | | Abs.<br>Cond.<br>Abs.<br>Abs. | 02-01-1892<br><br><br>03-22-1963 | 04-10-1881<br>05-31-1882<br>06-17-1891<br>04-10-1881 |
| 11 | Geo. P. Moore Ditch | I | D | Dolores River | 39-N | 16-W | 33 NWSNNW | 0.7<br>1.1 | | Abs.<br>Cond. | 02-01-1892 | 04-30-1881 |
| 12 | Aztec Ditch | I | D | Dolores River | 37-N | 15-W | 7 NENWNE | 1.0<br>4.0 | | Abs.<br>Abs. | 02-01-1892 | 05-01-1881<br>05-23-1891 |
| 13 | D. D. Williams Ditch | I | D | Dolores River | 39-N | 17-W | 15 SESWNW | 1.0<br>1.8<br>1.0 | | Abs.<br>Cond.<br>Abs. | 02-01-1892 | 05-01-1881<br><br>01-10-1891 |
| 14 | Kuhlman Ditch | I | D | Dolores River | 38-N | 15-W | 20 SWNWSE | 1.0<br>0.8 | | Abs.<br>Abs. | 02-01-1892 | 05-01-1881 |
| 15 | Hammond and Clark | I | D | Dolores River | 38-N | 14-W | 11 SWSENE | 1.0<br>2.0<br>1.6<br>3.0 | | Abs.<br>Abs.<br>Cond.<br>Abs. | 02-01-1892<br>02-01-1892<br><br>03-22-1963 | 05-10-1881<br>06-17-1891<br><br>06-17-1891 |
| 16 | Lone Dome Ditch | I | D | Dolores River | 39-N | 16-W | 19 SESWSE | 1.0<br>1.2<br>2.4 | | Abs.<br>Abs.<br>Cond. | 02-01-1892 | 02-20-1882<br>06-04-1891 |

J-2

BLM_0036094

APPENDIX J

WATER RIGHTS LISTING

| Reference No. | Structure Name | Use | Type | Source | Township | Range | Section | Amount Direct Flow CFS | Amount Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | Gould A. Moriarity | I | D | East Fork Dolores | 38-N | 13-W | 4 SENNSW | 2.25 | | Abs. | 02-01-1892 | 05-15-1882 |
| | | I | D | | | | | 1.75 | | Cond. | | |
| | | DSO | D | | | | | 1.0 | | Abs. | 03-22-1963 | 12-31-1894 |
| | | | | | | | | 1.0 | | Abs. | | |
| 18 | Dunham and Johnson | I | D | Dolores River | 37-N | 15-W | 8 SWNENW | 1.0 | | Abs. | | 06-01-1891 |
| 19 | Sebastian Tam Ditch | I | D | Dolores River | 38-N | 14-W | 11 NWSENW | 1.0 | | Abs. | 02-01-1892 | 05-31-1883 |
| | | | | | | | | 0.6 | | Cond. | | |
| 20 | Monument Rock Ditch | I | D | East Fork Dolores | 38-N | 13-W | 10 SENENW | 2.0 | | Abs. | 02-01-1892 | 06-01-1885 |
| 21 | Lyons Ditch | I | D | East Fork Dolores | 38-N | 14-W | 1 NWNWNW | 0.3 | | Abs. | 02-01-1892 | 04-30-1891 |
| | | | | | | | | 0.7 | | Cond. | | |
| 22 | Quarry #1 Ditch | I | D | East Fork Dolores | 38-N | 12-W | 6 SWSWSW | 6.5 | | Abs. | 12-18-1933 | 03-21-1882 |
| 23 | Dickinson Ditch | I | D | Dolores River | 38-N | 15-W | 17 SWNESW | 1.66 | | Abs. | 12-18-1933 | 10-31-1882 |
| 24 | Porter Ditch | I | D | Dolores River | 38-N | 15-W | 30 SENNSW | 1.38 | | Abs. | 12-18-1933 | 05-01-1883 |
| 25 | Koenig Ditch | I | D | West Fork Dolores | 39-N | 13-W | 9 SWNWNW | 4.0 | | Abs. | 03-08-1937 | 06-01-1883 |
| 26 | Rogers Ditch | P | D | Fish Creek | 40-N | 13-W | 12 NWSESW | 3.0 | | Abs. | 03-08-1937 | 06-01-1884 |
| 27 | East Eder Ditch | I | D | West Fork Dolores | 40-N | 12-W | 18 NESWSE | 1.0 | | Abs. | 03-08-1937 | 06-01-1885 |
| | | | | | | | | 8.5 | | Abs. | | 06-01-1887 |

J-3

BLM_0036095

APPENDIX J

WATER RIGHTS LISTING

| Reference No. | Structure Name | Use | Type | Source | Township | Range | Section | Amount Direct Flow CFS | Amount Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | West Eder Ditch | I | D | Fish Creek | 40-N | 13-W | 13 NWSENE | 1.0 7.0 1.0 | | Abs. Abs. Cond. | 03-08-1937 | 06-01-1885 06-01-1887 07-01-1936 |
| 29 | Goebel Ditch | I | D | West Fork Dolores | 40-N | 13-W | 24 NWSWNW | 6.8 | | Abs. | 03-08-1937 | 06-01-1887 |
| 30 | Jesse Love Ditch | I | D | West Fork Dolores | 40-N | 12-W | 11 SWSWSW | 6.0 | | Abs. | 03-08-1937 | 06-01-1887 |
| 31 | Sulphur Gulch Ditch | I | D | Sulphur Creek | 40-N | 12-W | 15 SENNNE | 0.65 | | Abs. | 03-08-1937 | 06-01-1887 |
| 32 | Keystone Ditch | I | D | Dolores River | 37-N | 15-W | 12 SWSENW | 2.0 | | Abs. | 12-18-1933 | 04-01-1889 |
| 33 | Bradfield Ditch | I | D | Dolores River | 38-N | 16-W | 1 SENNSW | 3.0 | | Abs. | 12-18-1933 | 05-01-1891 |
| 34 | Ortiz Ditch | I | D | Dolores River | 38-N | 14-W | 33 SENESE | 1.0 | | Abs. | 12-18-1933 | 05-01-1891 |
| 35 | Linstrom Ditch | I | D | East Fork Dolores | 38-N | 13-W | 11 NWSWNE | 4.5 | | Abs. | 12-18-1933 | 12-31-1894 |
| 36 | Van Winkle Ditch | I | D | Dolores River | 38-N | 15-W | 19 SENENE | 1.5 | | Abs. | 12-18-1933 | 05-01-1895 |
| 37 | Roubidoux Ditch | I | D | East Fork Dolores | 38-N | 12-W | 5 SWSWNW | 3.5 | | Abs. | 12-18-1933 | 08-15-1899 |
| 38 | Rieva Ditch | I | D | West Fork Dolores | 39-N | 14-W | 24 NESENE | 5.0 | | Abs. | 12-18-1933 | 03-21-1900 |

J-4

BLM_0036096

APPENDIX J

WATER RIGHTS LISTING

| Reference No. | Structure Name | Use | Type | Source | Township | Range | Section | Amount Direct Flow CFS | Amount Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | Garbarino Ditch #2 #3 | I | D | West Fork Dolores | 39-N 39-N 39-N | 14-W 14-W 14-W | 25 NENWNW 25 SWNENE 24 NWNESW | 1.75 2.0 1.0 | | Abs. Abs. Abs. | 12-18-1933 | 12-31-1900 |
| 40 | Rossi Ditch | I | D | West Fork Dolores | 39-N | 13-W | 18 SWSWSE | 1.25 | | Abs. | 12-18-1933 | 12-31-1906 |
| 41 | Ritter Ditch | I | D | Dolores River | 37-N | 15-W | 17 NENWNW | 1.0 | | Abs. | 12-18-1933 | 04-01-1908 |
| 42 | Lawrence E. Rogers | I | D | Dolores River | 44-N | 19-W | 25 SESWNE | 1.5 | | Abs. | 03-08-1937 | 04-01-1919 |
| 43 | Carter Ditch | I | D | East Fork Dolores | 38-N | 14-W | 1 NENESE | 4.12 | | Abs. | 12-18-1933 | 06-01-1930 |
| 44 | Riverside Ditch | I | D | East Fork Dolores | 38-N | 13-W | 11 NESENW | 2.6 | | Abs. | 12-18-1933 | 06-08-1931 |
| 45 | Bear Creek Ditch | ID | D | Dolores River | 38-N | 12-W | 9 NESWSW | 10.6 | | Abs. | 03-22-1963 | 06-01-1880 |
| 46 | Frank Robinson | ID | D | East Fork Dolores | 38-N | 12-W | 5 SESESW | 4.1 | | Abs. | 03-22-1963 | 06-01-1880 |
| 47 | Starret Ditch | ID | D | East Fork Dolores | 39-N | 14-W | 36 SESWNW | 2.3 | | Abs. | 03-22-1963 | 06-01-1882 |
| 48 | Donald Wallace #2 | ID | D | West Fork Dolores | 39-N | 13-W | 36 NWNESE | 2.0 | | Abs. | 03-22-1963 | 07-10-1882 |
| 49 | Stoner Ditch | *** | D | East Fork Dolores | 38-N | 13-W | 6 NWNESW | 2.0 | | Abs. | 03-22-1963 | 07-15-1882 |

J-5

BLM_0036097

APPENDIX J

WATER RIGHTS LISTING

| Refer-ence No. | Structure Name | Use | Type | Source | Town-ship | Range | Section | Amount Direct Flow CFS | Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 | McPhee Pipeline | ND | D | Dolores River | 37-N | 15-W | 5 NWSESW | 2.17 | | Abs. | 03-22-1963 | 11-01-1927 |
| 51 | Alexander Ditch | IDS | D | Dolores River | 36-N | 15-W | 7 NENWNE | 1.0 | | Abs. | 03-22-1963 | 12-22-1933 |
| 52 | Troy Rose Diversion | IS | * | Dolores River | 44-N | 18-W | 31 NWNWNW | 2.0 | | Abs. | 06-11-1968 | 06-01-1908 |
| 53 | McPhee Reservoir | *** | R | Dolores River | 38-N | 16-W | 1 SWNWNW | | 400,000 250,000 100,000 | Cond. Cond. Cond. Cond. | 03-22-1963 | 09-10-1940 |
| | McPhee Reservoir Inlet | | | | | | | 585.0 | | | | |
| 54 | Donald Wallace #1 | I | D | West Fork Dolores | 39-N | 13-W | 36 SESWSW | 3.0 | | Cond. | 03-22-1963 | 09-17-1950 |
| 55 | Silvey Ditch | IS I | D D | East Fork Dolores | 39-N | 11-W | 31 NENESW | 0.8 1.6 | | Abs. Cond. | 03-22-1963 | 09-21-1951 |
| 56 | Dove Creek Dolores River Supply | *** | * | Dolores River | 41-N | 18-W | 23 SWNWNW | 0.39 0.69 | | Abs. Cond. | 06-11-1968 | 07-16-1951 |
| 57 | Galloway Ditch | I | D | West Paradox Creek | 47-N | 18-W | 18 NWNESE 18 SENE 18 NWNESE | 0.67 0.05 1.0 0.15 0.15 1.0 2.13 7.5 | | Abs. Abs. Abs. Abs. Cond. Abs. Abs. Abs. | 02-01-1892 02-01-1892 02-01-1892 02-01-1892 02-01-1892 02-01-1892 01-19-1926 01-19-1926 | 04-30-1881 04-30-1883 05-31-1883 05-10-1884 05-10-1884 05-31-1884 04-02-1909 03-01-1915 |

J-6

BLM_0036098

APPENDIX J

WATER RIGHTS LISTING

| Refer-ence No. | Structure Name | Use | Type | Source | Town-ship | Range | Section | Amount Direct Flow CFS | Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58 | Neathery Ditch #2 | I | D | West Paradox Creek | 47-N 47-N | 18-W 18-W | 18 NESWNE 18 NWSENE | 0.23 0.45 | | Cond. Cond. | 02-01-1892 02-01-1892 | 04-30-1881 04-30-1883 |
| 59 | W. D. Hamilton Private | I | D | West Paradox Creek | 47-N 47-N | 18-W 18-W | 18 NESW | 0.34 0.66 | | Abs. Cond. | 02-01-1892 02-01-1892 | 12-31-1883 12-31-1883 |
| 60 | Morrill Springs Ditch | I | * | East Paradox Creek | 47-N | 18-W | 27 NWNENW | 0.08 | | Abs. | 03-28-1911 | 04-01-1909 |
| 61 | Lower Swain Ditch | I | D | West Paradox Creek | 47-N | 18-W | 17 NESWNE | 0.99 | | Abs. | 01-19-1926 | 04-02-1909 |
| 62 | Amended Laura Ditch | I | D | West Paradox Creek | 47-N | 18-W | 18 NWSWNE | 1.0 | | Abs. | 01-19-1926 | 04-02-1909 |
| 63 | Nafus Ditch #2 | I | D | West Paradox Creek | 47-N | 18-W | 17 NWSWNW | 0.42 0.25 | | Abs. Abs. | 01-19-1926 01-19-1926 | 04-30-1910 04-30-1919 |
| 64 | Sand Wash Ditch | I | * | Dolores River | 47-N | 18-W | 8 SE | 720.0 | | Abs. | 09-25-1942 | 07-20-1909 |
| 65 | Gamboleer Pipeline | DO | * | Dolores River | 46-N | 17-W | 31 SENWNW | 0.05 | | Abs. | 09-25-1942 | 12-01-1921 |
| 66 | West | I | D | Dolores River | 48-N | 18-W | 4 | 1.17 | | Abs. | 02-11-1939 | 04-01-1898 |
| 67 | Wines #1 | I | D | Dolores River | 15-S | 104-W | 21 SESWSE 27 SWNWNW | 0.86 5.81 | | Abs. Abs. | 02-11-1939 02-11-1939 | 11-01-1899 05-01-1900 |
| 68 | Bartholomew Hatch | I D | D | West Creek | 51-N | 19-W | 15 SESWNE | 3.75 1.30 | | Abs. Abs. | 02-11-1939 02-11-1939 | 02-01-1900 02-01-1900 |

J-7

BLM_0036099

APPENDIX J

WATER RIGHTS LISTING

| Reference No. | Structure Name | Use | Type | Source | Township | Range | Section | Direct Flow CFS | Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 69 | Ren Hatch | I | D | West Creek | 51-N | 19-W | 15 | 0.39 | | Abs. | 02-11-1939 | 03-15-1901 |
| | | | | | | | | 0.78 | | Abs. | 02-11-1939 | 02-10-1939 |
| 70 | Cottonwood | I | D | Dolores River | 51-N | 19-W | 22 NWSW | 2.6 | | Abs. | 02-11-1939 | 06-15-1902 |
| | | | | | | | | 2.45 | | Cond. | 02-11-1939 | 06-15-1913 |
| | | | | | | | | 5.2 | | Abs. | 02-11-1939 | 02-10-1939 |
| | | | | | | | | 4.9 | | Cond. | 02-11-1939 | 02-10-1939 |
| 71 | Boyd | I | D | Dolores River | 15-S | 104-W | 27 SWNW | 0.9 | | Abs. | | 10-15-1909 |
| | | | | | | | | 0.42 | | | | 11-16-1937 |
| 72 | L. L. Hall | I D I | D | West Creek | 51-N | 19-W | 14 NWNE | 0.75 | | Abs. | 02-11-1939 | 03-15-1910 |
| | | | | | | | | 0.39 | | Abs. | 02-11-1939 | 03-15-1910 |
| | | | | | | | | 1.25 | | Abs. | 02-11-1939 | 02-10-1939 |
| | | | | | | | | 1.02 | | Cond. | 02-11-1939 | 02-10-1939 |
| 73 | Cliff Ranch | I D I | D | West Creek | 51-N | 19-W | 15 NESESE | 3.36 | | Abs. | 02-11-1939 | 10-01-1910 |
| | | | | | | | | 0.52 | | Abs. | 02-11-1939 | 10-01-1910 |
| | | | | | | | | 3.34 | | Abs. | 02-11-1939 | 02-10-1939 |
| 74 | Calamity | I | D | Dolores River | 50-N | 18-W | 35 | 0.91 | | Abs. | 02-11-1939 | 06-10-1916 |
| | | | | | | | | 0.26 | | Cond. | | 11-16-1937 |
| 75 | Tom Watkins | I | D | Dolores River | 49-N | 18-W | 4 SWSWSW | 1.04 | | Abs. | 02-11-1939 | 07-20-1916 |
| | | | | | | | | 2.08 | | Abs. | 02-11-1939 | 02-10-1939 |
| | | | | | | | | 0.52 | | Cond. | 02-11-1939 | 02-10-1939 |
| | | | | | | | | 0.26 | | | | 04-01-1936 |
| 76 | Red Cross | I | D | Dolores River | 51-N | 19-W | 22 SENW | 5.2 | | Abs. | 02-11-1939 | 06-15-1918 |
| | | | | | | | | 4.89 | | Cond. | 02-11-1939 | 06-15-1918 |

J-8

BLM_0036100

APPENDIX J

WATER RIGHTS LISTING

| Refer-ence No. | Structure Name | Use | Type | Source | Town-ship | Range | Section | Amount Direct Flow CFS | Storage AF | Type Adj. | Adjudicated Date | Appropriation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 77 | Moffet | I | D | Dolores River | 50-N | 19-W | 13 NENE | 3.18 1.25 | | Abs. Cond. | 02-11-1939 02-11-1939 | 09-25-1922 09-25-1922 |
| 78 | Foster Miner | I | D | Dolores River | 50-N | 18-W | 31 NWSENE | 10.15 | | Cond. | 02-11-1939 | 10-11-1922 |
| 79 | Dotsero | I | D | Dolores River | 48-N | 18-W | 11 | 2.08 | | Cond. | 02-11-1939 | 08-01-1933 |
| 80 | Gateway Westside | I | D | Dolores River | 51-N | 19-W | 35 | 12.2 | | Cond. | 02-11-1939 | 06-01-1936 |
| 81 | Wilcox Ditch | I | D | West Paradox Creek | 47-N | 18-W | 17 NWSE | 3.0 | | Abs. | 09-25-1942 | 08-03-1941 |

J-9

BLM_0036101

BLM_0036102

APPENDIX   K

OFFICIAL COMMENTS ON NOVEMBER 1975 DRAFT REPORT

K-1

BLM_0036103

BLM_0036104

UNITED STATES DEPARTMENT OF AGRICULTURE

SOIL CONSERVATION SERVICE

Washington, D. C. 20250

SUBJECT: INTERA - Wild and Scenic River Study Report
and Draft Environmental Statement - Dolores
River, Colorado

DATE: NOV 2 6 1975

TO: T. B. Glazebrook
Director of Watershed and Minerals Management
Forest Service

This is in response to your memorandum of November 19, 1975, requesting
our review and comment on the Preliminary Draft Report for the Dolores
River Wild and Scenic River study.

We prefer to review the study report and draft environmental statement
at the same time if at all possible. Based on our review of the pre-
liminary report alone, the recommended plan does not appear to have
any adverse effects on Soil Conservation Service programs.

We have only the following comment for your consideration when you
prepare the final report and EIS:

The discussion of the impact of the alternative plans on
agriculture - pages 81, 83 and 85, under the heading of
Environmental and Land Use Impacts, is vague. We suggest
the report and the environmental statement use quantitative
rather than subjective statements in describing the impact
on agriculture.

Sheldon G. Boone
Assistant Deputy Administrator -
River Basins



DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY
WASHINGTON, D.C. 20310

Honorable Earl L. Butz
Secretary of Agriculture
Washington, D. C. 20250

Dear Mr. Secretary:

This letter is in response to a request from Assistant Secretary
Long for views of the Department of the Army on your proposed report
recommending inclusion of the Dolores River, Colorado, in the national
wild and scenic rivers system.

Affirmative action by Congress on your proposed recommendation
would not adversely affect water resource programs or projects
administered by the Corps of Engineers, or other elements of this
Department.

We appreciate the opportunity afforded us to review and comment
on your proposed report and hope that these comments will be of
assistance.

Sincerely,

Victor V. Veysey
Assistant Secretary of the Army
(Civil Works)



GENERAL COUNSEL OF THE
DEPARTMENT OF COMMERCE
Washington, D.C. 20230

DEC 23 1975

Honorable Robert W. Long
Assistant Secretary
Department of Agriculture
Washington, D. C.  20250

Dear Mr. Long:

This is in response to your letter of December 9, 1975,
to Secretary Morton requesting this Department's views
on the Dolores River Wild and Scenic River Study Report.

Our primary concern is that a thorough mineral inventory
be conducted prior to the inclusion of the proposed area
in the Wild and Scenic Rivers System.  At the bottom of
page 98 and the top of page 99 of the report in regard
to the Main Dolores, it is stated:  "At present there are
ten active surface and subsurface mines within the River
corridor.  Most of these mines and the great majority
of the 4,000 claims in the area are for uranium.  A
closely associated mineral, vanadium, is produced in
great quantities in the basin.  Minerals management will
be an integral part of the Coordinated Management Plan."
Subsequently, it is indicated that a determination will
be made of the extent and grade of mineral reserves in
the visual corridor and associated lands.  We support
the recommendation that the U.S. Department of the
Interior and the Energy Research and Development Admin-
istration participate in this study since these agencies
are in a good position to determine the availability of
these and other minerals in the proposed area and to
judge the importance of the estimated quantities relative
to the nation's overall needs.

Regarding the West Delores, we note that mineral develop-
ment will be allowed in accordance with existing laws and
regulations and, therefore, we have no comment on this
portion of the proposal.



- 2 -

We appreciate the opportunity to comment on the study report.

Sincerely,

Betsy Ancker-Johnson, Ph.D.

BLM_0036108



FEDERAL ENERGY ADMINISTRATION

WASHINGTON, D.C.  20461

FEB 2 1976

OFFICE OF THE ADMINISTRATOR

Honorable Robert W. Long
Assistant Secretary of Agriculture
Washington, D. C.   20250

Dear Mr. Long:

In response to your request of December 9, 1975, the Federal Energy Administration (FEA) has reviewed the Dolores River Wild and Scenic River Report.  The report was most informative and we support the efforts of both the Department of the Interior and the Department of Agriculture to preserve wild and scenic portions of our Nation's rivers to the extent that these goals are not incompatible with national energy needs.  Our comments below address certain energy concerns and implications of the proposed designation.

The report, in Section L, discusses the various minerals which are located within the Dolores River Basin.  Some of these minerals are presently contributing to the Nation's energy supplies and could play a more significant role in the future.  For example, it is apparent that uranium ore could be an important energy source, particularly if the price of uranium per pound continues to increase.  If uranium is mined and milled in the vicinity of the Dolores River Basin, it may require large amounts of processing water presumably from the Dolores River.  We are concerned that the report has not presented important data on water availability from the Dolores River.  If a segment of the Dolores River is designated as a Wild and Scenic River, it will be necessary to know potential impacts for uranium processing, as well as for vanadium which is also extracted in the Basin.

Although the coal reserves in the actual river corridor are small, the potential coal resources in the Dolores River Basin could be significantly greater.  The report does not address the effect that designation of part of the Dolores River as a Wild and Scenic River would have on the ability to mine coal in areas drained by tributaries of the Dolores River.

2

In several paragraphs under the discussion of "geothermal,"
the temperature of the water has been given.  However,
the report does not specify whether the degrees are in
centigrade or fahrenheit.  This information is important
to have in order to assess accurately the geothermal potential
of the Dolores River Basin.

Further, the report does not mention oil shale as either
a potentially valuable mineral or one which is found
within the Basin.  The outer fringes of the Piceance Creek
Basin extend into Mesa County, Colorado, the same county
that the Dolores River passes through.  Since the Piceance
Creek Basin contains some of the world's richest oil shale
reserves, it would be useful to know whether oil shale
deposits are found in or near the Dolores River Basin.

In light of our continuing national energy needs, we believe
an assessment should be made of the impact that the proposed
Wild and Scenic River designation may have on western
energy development and water use before a final decision
is made.

We appreciate the opportunity to express our views on the
Dolores River report and hope our comments will be useful
to you.

Sincerely,

Frank G. Zarb
Administrator

BLM_0036110



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

Mr. Robert W. Long
Assistant Secretary
Department of Agriculture
Washington, DC 20250

Dear Mr. Long:

    In response to your request, the Environmental Protection Agency has performed a review of the final Study Report on the Dolores River, proposing candidacy for the Wild and Scenic River System. Due to the short time frame, this could only be a cursory review.

    We have no objection to this proposal designating the Dolores River as a member of the Wild and Scenic River System. We noted, though, that this study report did not address many of our previous concerns as expressed in our comments of November 21, 1975.

    We appreciate the opportunity to review this Study Report.

Sincerely yours,

Kenneth E. Biglane, Director
Oil & Special Materials Control
Division (WH-548)

cc: Region VIII

BLM_0036112



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, D.C. 20460

NOV 21 1975

Chairman, Interdepartmental Study Group on
    Wild and Scenic Rivers
Bureau of Outdoor Recreation
U.S. Department of the Interior
Washington, D.C. 20240

Dear Sir:

Per your request, we have reviewed the Dolores Wild and Scenic
River Study Proposed Review Draft Report. Due to the very limited
review time, we have been able to perform only a cursory review.
Consequently our response is not as in depth or complete as we would
have liked.

In addition, our review was quite difficult due to the unclear
printing, particularly evident on the maps and pictures. We
appreciate the pressure under which you had to prepare this
material, but we feel our review would have been much easier
and more meaningful with better copies of the maps and pictures.

One of the assumptions of the Federal-State team was that
both the McPhee reservoir site of the Dolores Project and
the Paradox Valley site for the Colorado Salinity Control Project
were "in-place". Thus no consideration could be given to these areas
as potential wild and scenic river stretches.

Information provided by the Bureau of Reclamatrion (USBR) and others
have indicated that the McPhee reservoir area is a significant elk and
deer migratory route. Restricted access by the 300 foot deep reser-
voir could have serious consequences for these game animals and their
natural predators. Further information suggests that the McPhee dam
area may have significant archaeological importance. Approximately
80 sites were identified in a recent study of the area.

We do not wish to unnecessarily impede these Bureau of Reclama-
tion projects; however, it should be pointed out that apparently neither
the Dolores nor the Paradox Valley Projects have had the benefit of a
National Environmental Policy Act review. The USBR has mentioned
elsewhere that 50 alternative sites to the McPhee reservoir had been
considered although these have never been identified to the best of
our knowledge. Similarly, the Paradox Valley Project should
be evaluated for cost-effectiveness, environmental impact and
project alternatives. Some of the project alternatives could
possibly be compatible with one or more of the wild and scenic
river designations. We thus suggest that it seems premature to
dismiss these areas from consideration at this time.

BLM_0036113

If the sections of the Dolores river recommended for wild and scenic designation are approved by Congress, the exclusion of the upper reaches of the main stem of the Dolores could pose some formidable management problems for the lower segment. Water quality, fish and wildlife in particular, may be adversely affected by streamside mining or other operations. The value of a recreational designation for this reach could provide a set of consistent criteria for any private activities in the stream corridor under which to operate. The Wild and Scenic Rivers Act intends to preserve existing private ownership and activity patterns, so long as the activities are compatible with the uses of the river under the wild, scenic, and recreational classifications.

We support the idea of considering the entirety of the Dolores river under the Wild and Scenic River Act criteria on the merits of each of the important stream segments, including the main stem of the Dolores, the West Dolores, McPhee dam area, the Paradox Valley area and the lower reach from the San Miguel river to Gateway. By restricting their consideration of the segments, the Federal-State team may have compounded the problem of evaluation of the Dolores and Paradox Valley projects under NEPA. Information on these two sites relevant to wild and scenic status could have been useful information for decision-making on alternatives to these projects. It may result that the present McPhee damsite is the best for environmental reasons; however, such a judgment at this time could create problems when the EIS's for the Dolores River and Paradox Valley projects are released.

It is our understanding that the EIS for the Dolores Project will be released in early 1976. The Federal-State team may wish to consider the possibility of recommending that a decision on wild and scenic status for the Dolores River await the outcome of the NEPA review on both projects.

In addition, we note per your November 11, 1975 memorandum that the draft EIS will be sent to the Forest Sevice (FS) and the Bureau of Outdoor Recreation (BOR) for transmittal to Congress along with the report. We question whether the National Environmental Policy Act (NEPA) requirements can be fulfilled unless Congress awaits comments from the final EIS. We appreciate the time restrictions, however the decision makers should be made well aware of this particular point and the fact that the public comment period will not be complete.

Whereas variations in flow in the Dolores River result in periodic situations when very little water is available for some recreational activities, we suggest that more emphasis should have been placed on the non-water related actitities. The Dolores River represents a unique adventure in a semi-arid ecological system that experiences distinctive hydrological cycles. The opportunities of hiking, back-packing, nature observations should be stressed, demonstrating how they can complement the water-related activities. The changing ecosystems from mountainous to desert along the Dolores River could provide a worthwhile experience for visitors providing them with an appreciation of this unusual type of river system with its natural beauty, wide variety of ecological diversity, abundant wildlife, all with the ever-changing scenic grandeur. This river passes through five distinct life zones in its course.

Since the "Guidelines" state that mining activity must be conducted in such a way to minimize surface disturbance, sedimentation and pollution, and visual impairment, the information in the Report indicates it would be possible to carry on the uranium mining out of the visual sight. However, all necessary steps should be exercised to prevent water pollution and to minimize secondary impacts from mining.

The dual management of different sections of the river raises a question as to the uniformity of the management for the overall program. We suggest that a complete assessment should be made by the Bureau of Land Management (BLM) and FS of all resources, including the river. The assessment should include any plans and provisions of projected land management, as well as all impacts that might result from land adjustments. Until this can be accomplished to the satisfaction of all concerned, we question whether a designation of management is meaningful at this time. We suggest that the report state that the management plans will be determined and developed after being jointly assessed. The most important aspect should be that whatever determination is made will be to the benefit of the river and its environment. A Coordinated Management Plan should reflect a meaningful and coordinated approach.

We suggest the following specific points be clarified.

1. Page 2 of the memorandum of 11/14/75, item 2, uses the figures "60 and 30 percent ... of the visual corridor... respectively." This apparently refers to the previous mention of the "FS and BLM administration" in the previous sentence. However, Table III-3 (page 43) shows the reverse; BLM has approximately 60% of the visual corridor and FS 30%. Which data are correct?

2. Table IV-1, Capsule Summary of Eligibility, Dolores River, presents some seeming discrepancies. This table shows that both the West Dolores and the McPhee Dam to Bedrock segments have no recreational values. This is contrary to the designations proposed in this report. West Dolores is eligible for the Recreational classification and 2 of the 4 sections of the McPhee Dam to Bedrock segment are classified as Recreational.

3. On page 96, we suggest that the use of non-specular paints to enhance scenic values be briefly explained.

4. Page 35. Last sentence on the page. What type of precautions are planned to insure these wastes do not adversely affect water quality?

We appreciate the opportunity to review this report. If you have any questions regarding our comments, please do not hesitate to contact us.

Sincerely yours,

Kenneth E. Biglane, Director
Division of Oil and Special
Materials Control

BLM_0036116



**U.S. DEPARTMENT OF TRANSPORTATION**
FEDERAL HIGHWAY ADMINISTRATION
REGION EIGHT
COLORADO DIVISION
10488 WEST 6th PLACE
DENVER, COLORADO 80215

December 19, 1975

IN REPLY REFER TO.

08-08.22-A

Honorable Earl Butz, Secretary of Agriculture
Administration Building
Washington, D. C.  20250

Dear Mr. Secretary:

Subject:  Dolores River Wild and Scenic River Study Report

We have reviewed the subject study report and are replying
direct to you as requested by the U. S. Forest Service
Regional Office in Denver, Colorado.

We note on page 12 of the report that five paved state
highways, totaling 309 miles in length, are mentioned
as winding through the Dolores River Basin and that these
two-lane routes form the major transportation network in
the area.  We suggest the study identify these routes and
address the impact of the proposed action on possible
future highway improvements.

Thank you for the opportunity to comment on this study.

Sincerely yours,

A. J. Siccardi
Division Administrator

BLM_0036117



OFFICE OF THE SECRETARY OF TRANSPORTATION

WASHINGTON, D.C.  20590

DEC 3 1 1975

Mr. Robert W. Long
Assistant Secretary of Agriculture
Washington, D.C.  20250

Dear Mr. Long:

This is in response to your December 9 letter to Secretary
Coleman soliciting our views on the report on the Dolores
River as required by the Wild and Scenic Rivers Act.  Our
brief review has disclosed no problem areas.  However, we
are providing a copy of the report and your request to the
regional representative of the Secretary for further review.
We have asked him to review the report and provide comments,
if any, directly to you as expeditiously as possible.

Sincerely,

for   Martin Convisser, Director
Office of Environmental Affairs
Office of Environment, Safety,
and Consumer Affairs

cc:  Mr. Robert Kessler
Secretarial Representative
Denver, Colorado



DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
REGIONAL OFFICE
FEDERAL BUILDING, 1961 STOUT STREET
DENVER, COLORADO 80202

REGION VIII

December 23, 1975

IN REPLY REFER TO:
8DE

Mr. Craig W. Rupp
Deputy Regional Forester
Department of Agriculture
11177 West 8th Avenue
P.O. Box 25127
Lakewood, Colorado  80225

Dear Mr. Rupp:

This is in response to your letter of December 10, 1975, concerning the Wild and Scenic River Study Report.

As you may know this Department's concern includes the effect of a proposed action on the urban environment.  It does not appear that this proposal will have any effect regarding our concern; therefore, we would offer no objections.

Sincerely,

Robert J. Matuschek
Assistant Regional Administrator
Community Planning and Development

Insuring Offices
Casper, Wyoming · Denver, Colorado · Fargo, North Dakota · Helena, Montana · Salt Lake City, Utah · Sioux Falls, South Dakota

BLM_0036119



DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

DEC 30 1975

OFFICE OF THE ASSISTANT SECRETARY
FOR COMMUNITY PLANNING AND DEVELOPMENT

IN REPLY REFER TO:

Honorable Robert W. Long
Assistant Secretary
Department of Agriculture
Office of the Secretary
Washington, D. C. 20250

Dear Assistant Secretary Long:

Secretary Hills has asked me to respond to your letter of December 9, 1975, concerning your report on the Dolores River in Colorado.

We customarily ask the affected Regional Office for its comments on these matters. Since you have already done so, we will work with the field to expedite your request. You will shortly be hearing directly from the Denver Regional Office.

Thank you for allowing us the opportunity to respond to your report.

Sincerely,

David O. Meeker, Jr., FAIA AIP
Assistant Secretary

BLM_0036120

FEDERAL POWER COMMISSION
WASHINGTON, D.C.  20426

IN REPLY REFER TO:

JAN 15 1976

Honorable Earl L. Butz
Secretary of Agriculture
Washington, D.C.  20250

Dear Mr. Secretary:

This is in reply to Assistant Secretary Long's letter of December 9, 1975, transmitting for the Commission's comments, pursuant to the provisions of the Wild and Scenic Rivers Act (P.L. 93-621), the study report prepared by the Departments of the Interior and Agriculture and the State of Colorado on the Dolores River, Colorado.

The study report recommends that the 105-mile segment of the Dolores River upstream from the town of Bedrock be included in the National Wild and Scenic Rivers System.  Of this 105-mile segment, 33 miles would be classified as wild, 41 miles would be scenic, and 31 miles would be recreational.  The report concluded that the 8-mile reach of the Dolores River upstream of the Utah State line was eligible for inclusion in the National Wild and Scenic Rivers System but was too short to be included by itself.  Although the Colorado Department of Natural Resources recommended that the entire length of the West Dolores River should be considered by Congress for inclusion in the National Wild and Scenic Rivers System, the Federal Study Team agencies did not find that the West Dolores warranted inclusion at this time.

The Federal Power Commission staff has reviewed the study report to determine the effects of the proposals on matters affecting the Commission's responsibilities.  Such responsibilities relate to the development of hydroelectric power and assurance of the reliability and adequacy of electric service under the Federal Power Act, and the construction and operation of natural gas pipelines under the Natural Gas Act.

The staff review indicates that there are no existing electric generating plants in any of the river corridors considered for inclusion in the National Wild and Scenic Rivers System.  There is a site for the possible development of a pumped storage hydroelectric power project located near Mountain Sheep Point where the Dolores River is proposed for scenic designation.  The amount of generating capacity that could be developed at this pumped storage site is not known.  There are no known plans under consideration for development of the site.  As indicated



Honorable Earl L. Butz                    -2-

in the study report, an existing power transmission line crosses the 105-mile segment of the Dolores River recommended for scenic river classification. Presumably, continued operation and maintenance of this crossing would not conflict with the desired characteristics of the proposed river classification.

As noted in the study report, the Dolores River is in an area which appears favorable for the production of natural gas. The staff notes that, should natural gas deposits underlie river corridors considered for wild, scenic, or recreational classification, production from these deposits could be achieved by slant drilling from outside the corridors. The staff review indicates that an existing 6-inch natural gas pipeline crosses the Dolores River near the mouth of Disappointment Creek, a point located in the river segment recommended for inclusion in the national system. Apparently this crossing would not conflict with the proposed river classification.

The staff also notes that additional powerline and natural gas pipeline crossings of the river segments proposed for classification may be required in the future. However, it is expected that such crossings could be avoided by routing around classified corridors or, if this is not practicable, they could be planned for environmental compatibility with the desired objectives of the river classifications.

Based on its consideration of the study report, and the studies of its own staff, the Commission advises that it has no objection to the proposed inclusion of segments of the Dolores and West Dolores Rivers in the National Wild and Scenic Rivers System, provided that existing and necessary future crossings of the river by powerlines or natural gas pipelines be permitted.

Sincerely yours,

Richard L. Dunham
Chairman



# UNITED STATES WATER RESOURCES COUNCIL

SUITE 800 • 2120 L STREET, N.W. WASHINGTON, D.C. 20037

FEB 23 1976


Honorable Robert W. Long
Assistant Secretary of Agriculture
Washington, D.C. 20250

Dear Mr. Long:

This is in reply to your letter dated December 9, 1975, requesting
the Water Resources Council to review and comment on the
Dolores Wild and Scenic River Study Report as proposed by your
Department, the Department of the Interior and the State of
Colorado. The Council has completed its review and has no
objection to the report.

For your information the Council Representative from the
Department of Commerce has identified a concern, which he
requested I include in this correspondence. The following is
that concern:

> "...the declaration of an area as wild and scenic or
> as a wilderness can restrict the placement of rain and
> stream gages necessary for forecasting stream flow.
> Thus, (1) planning for networks, budget requests,
> and program development are affected; and (2) pro-
> tection of life and property may be decreased due to
> inability to provide an adequate forecast warning
> system for such things as flash floods. Obviously for
> (1) above, it would be helpful to the National Oceanic
> and Atmospheric Administration to have as much lead
> time as possible. And for (2), it should be noted in
> the report as a possible consequence of declaring an
> area wild and scenic."

MEMBERS: SECRETARIES OF INTERIOR, AGRICULTURE, ARMY, COMMERCE, HOUSING AND URBAN DEVELOPMENT,
TRANSPORTATION; ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY; CHAIRMAN, FEDERAL POWER COM-
MISSION — OBSERVERS: ATTORNEY GENERAL; DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET; CHAIRMEN,
COUNCIL ON ENVIRONMENTAL QUALITY, TENNESSEE VALLEY AUTHORITY, RIVER BASIN COMMISSIONS, BASIN IN-
TERAGENCY COMMITTEES.



BLM_0036123

2

The Council acknowledges the large effort that has been made in this proposed report to provide coordination and the information required by the Principles and Standards. The review of the report would have been facilitated, however, if the analysis of the alternative programs and the resulting rationale for the study recommendations had been described more fully.

The Council appreciates the opportunity to comment on the proposed report.

Sincerely,

Warren D. Fairchild
Director

BLM_0036124



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C.   20240

November 18, 1975

Memorandum

To:      Chairman, Interdepartmental Study Group on Wild and
         Scenic Rivers

From:    Chief, Division of Intergovernmental Coordination,
         Office of Land Use and Water Planning

Subject: Wild and Scenic River Study – Dolores River

The subject study has been reviewed only in respect to major issues as
your memorandum of November 17, 1975 requested.

The report strikes a practical compromise in a number of areas.  First,
land acquisition is held to a minimum (easements only) as a means of
maintaining private land in its present use.  Second, the important
mineral resources will not be tied-up and appropriate mining in the
future will be allowed.  Third, the report recognizes the importance
of the proposed water project and the plan is compatible with this
development.

It does appear that the section recommended for inclusion in the system
has high values for white water use, but the fishing potential is not
outstanding.  This may suggest that to provide for well rounded use the
State proposal to include the West Dolores might be given more consideration.
Water quality in various sections of Dolores Creek is affected by previous
development.  Close attention, and perhaps additional pollution abatement
activities, will be required by the State to assure water quality is not
further degraded.

Joseph Krivak

CONSERVE
AMERICA'S
ENERGY

*Save Energy and You Serve America!*

BLM_0036125



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20210

December 17, 1975

Memorandum

To:      Chairman, Interdepartmental Study Group on Wild and Scenic Rivers

From:    Chief, Division of Intergovernmental Coordination, Office of Land Use and Water Planning

Subject: Wild and Scenic River Study – Dolores River

Your memorandum of December 12, 1975, requested comments on the subject report. We have no comments to add to those submitted by this office in our memorandum of November 18, 1975 on the Dolores River Study.

We do want to acknowledge the treatment of this report under the Principles and Standards. Appendix E of the report is a valuable addition to the study.

Joseph A. Krivak



## United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

December 31, 1975

In Reply Refer To:
D4219--Dolores River

Dear Mr. Secretary:

We are pleased to respond to Assistant Secretary Robert W. Long's December 9 request for our review and comment on the Dolores Wild and Scenic River Study Report.

As recognized, completion of the reviews within the time constraints has been difficult. However, we have identified no major substantive problems with the proposal. Accordingly, we concur in the recommendation that a 105-mile segment of the Dolores River in Colorado be added to the National Wild and Scenic Rivers System.

The Bureaus and Offices which reviewed the report made several comments, suggested revisions and editorial changes which should be accommodated in any rewrite or reissuance of the report. These are being furnished directly to Mr. Shenkyr.

The opportunity to comment on the report is appreciated.

Sincerely yours,

*Kent Frizzell/FL*

Under Secretary of the Interior

Honorable Earl L. Butz
Secretary, Department of
   Agriculture
Washington, D. C. 20250

CONSERVE
AMERICA'S
ENERGY

*Save Energy and You Serve America!*

BLM_0036128



ADDRESS ONLY THE DIRECTOR, FISH AND WILDLIFE SERVICE

United States Department of the Interior

FISH AND WILDLIFE SERVICE

WASHINGTON, D.C. 20240

In Reply Refer
To:   FWS/OES/EA

DEC 19 1975

Memorandum

To:        Director, Bureau of Outdoor Recreation

From:      Deputy Associate
           Director, Fish and Wildlife Service

Subject:   Dolores River (Colorado) Wild and Scenic River Study--Comments
           on Joint Agriculture/Interior Proposed Report

In response to Mr. Underhill's memorandum of December 12, we have made an
expedited review of the subject report in order to meet the necessarily
short deadline and offer the following comments. These comments are the
same or similar to comments we made on the Preliminary Draft Report (FWS
memorandum of November 21, copy enclosed) and are herein referenced to
the Preliminary Report comments in order to avoid repetition. We believe
the earlier comments are still very much germane to the present report.

1.  Findings (No. 6, page IV). Our Preliminary Report Comment No. 1 is
    still applicable.

2.  Findings (2nd sentence, last paragraph). This sentence and paragraph
    in slightly different form appeared in Recommendation No. 1 of the
    Preliminary Draft Report, and we suggested a revision of the sentence
    in the first paragraph of our Preliminary Report Comment No. 2. The
    sense of that proposed revision also applies largely to the comparable
    2nd sentence cited above. Therefore we suggest it read: "Its con-
    struction and operation will enhance most, if not all, the outstanding
    wild and scenic river values of the Dolores River in such a manner as
    to ensure that a live stream flow will be maintained below McPhee Dam."

3.  Recommendation No. 3 (page V, and Table IV-1 following page 60). This
    recommendation appeared in the previous draft report as No. 4. Our
    support of the former Recommendation 4 (Preliminary Report Comment No. 2)
    applies also to No. 3 of the present report, as does the request in that
    Comment to amend the footnote of Table IV-1.

CONSERVE
AMERICA'S
ENERGY

*Save Energy and You Serve America!*

- 2 -

4. Vegetation (pages 26-27). Preliminary Report Comment No. 3 (together with the related enclosures of our memorandum of 11/21/75) applies to the paragraphs on these pages, as well as to those under the Vegetation heading on page 7 of the present report.

5. Wildlife (page 30). Our Preliminary Report Comment No. 4 pertains to the text under this heading, and to page 7 under Fish and Wildlife.

6. Endangered Species Act of 1973 (under Management Authorities and Programs, pages 74-75). Preliminary Report Comment No. 5 is still applicable to the report on the above pages.

We appreciate the opportunity to comment on the report. If you should have any questions pertaining to comments on threatened or endangered plant and animal species, please contact Mr. Gene Ruhr of our Office of Endangered Species (phone (202) 343-7814).

*W. A. Dick Jr.*

Enclosure



ADDRESS ONLY THE DIRECTOR,
FISH AND WILDLIFE SERVICE

United States Department of the Interior

FISH AND WILDLIFE SERVICE

WASHINGTON, D.C.  20240

In Reply Refer To:
FWS/OES/EA

NOV 21 1975

Memorandum

To:        Director, Bureau of Outdoor Recreation
           Acting Deputy Associate
From:      Director, Fish and Wildlife Service

Subject:   Dolores River (Colorado) Wild and Scenic River Study—Comment
           on Preliminary Draft Report

In response to Mr. Underhill's memorandum of November 17, we have made
a necessarily expedited review of the subject report in order to meet
the deadline of November 21 and offer the following comments.

1.  Findings (No. 6, page IV).  The last sentence of No. 6 should be
revised by the addition of the word "many" after "enhance".  We do not
think that existing documented knowledge of the effects downstream of
McPhee Reservoir warrants the implication of the present sentence that
all fish and wildlife values will be enhanced.

2.  Recommendations (No 1, page IV; No. 4, page V, and related material in
report).  We suggest improving the sense of Recommendation No. 1 by
revising it slightly in the second and third lines after "construction"
to read as follows: ". . . and operation of the Dolores Reclamation
Project in such a manner as to ensure that a live stream flow is
maintained. . . ."

We support the Colorado Department of Natural Resource Recommendation
No. 4 which recommends consideration by the Congress of inclusion of
the 35-mile West Dolores River in the National System under Forest



-2-

Service Management, in cooperation with the State of Colorado.  From the standpoint of eligibility of existing natural resources of this segment including fish and wildlife, we believe the West Dolores qualifies for inclusion in the National System--as much if not more so than some segments which have been recommended for inclusion (those of Recommendation No. 2, page IV).

We believe this viewpoint is supported by our own knowledge of the segment and by the portions of the report which discuss the segment; e.g., pages 19, 29-30 (Fish and Wildlife), 64, and 65 (1st paragraph, 2nd line), as well as Table IV-1 (following page 58).

In Table IV-1--"Capsule Summary of Eligibility. . .", please revise the 3-starred footnote (re fish and wildlife values) by adding after "State" the words '. . . and the U.S. Fish and Wildlife Service believe. . . ."

3.  Vegetation of the River Corridor (pages 26-27).  At present, knowledge of the occurrence in the study area of plant species which are Candidates for the Department of the Interior Threatened or Endangered Lists or Candidates for the Colorado State Rare and Endangered List is somewhat limited.  However, we think the report should include a brief summary of the enclosed information on the subject.  This material should be inserted as part of the general commentary on pages 26-27, preceding the sectional discussions on page 27.  A related insert would also be appropriate under Vegetation (of the Basin) on page 7.

4.  Wildlife (page 30).  The general comments in the first two paragraphs should be augmented by inclusion (perhaps in the second paragraph) of the following information:  This inventory (Appendix H) includes one mammal, the marten, and two bird species, the golden eagle and ferruginous hawk, which the Department of the Interior has been requested to consider whether they are Threatened species.  Such a review is under way.  Also, two of the bird species in the inventory, the southern bald eagle and the peregrine falcon, are on the Department of the Interior's Endangered species list.

A new third paragraph on page 30 should mention the fact that in Colorado are found two of the three known colonies (the third is in Utah) of a butterfly, the nokomis fritillary (Speyeria nokomis nokomis), which is a Candidate for the Department's Endangered fauna list.  These two colonies occur within the Dolores River Basin near two tributaries of the Dolores River:  above West Creek in a series of springs in Unaweep Canyon (Mesa County); and adjacent to Paradox Creek in Montrose County.  The species may be found in the study area but this has not yet been determined.

-3-

A brief reference to the above facts should also appear under Fish and Wildlife (of the Basin) on page 8, where the peregrine falcon is already mentioned in the above content.

In addition, the legal considerations of section 7 of the Endangered Species Act of 1973 are applicable to those species which have been determined to be Endangered or Threatened (southern bald eagle and peregrine falcon) and will apply to any other species of plant or animal which subsequently are so determined.

5.  Endangered Species Act of 1973 (under Management Authorities and Program, pages 71-75.  The legislative and administrative policy authorities listed on these pages should include the above Act.

We appreciate the opportunity to comment on the report.  If you should have any questions pertaining to comments on threatened or endangered plant and animal species, please contact Mr. Gene Kuhr of our Office of Endangered Species (phone (202) 343-7814).

Enclosures:

BLM_0036133

Enclosure

Information on Plants of the Dolores River Basin, Colorado, Which May be Candidates for Threatened or Endangered Listing by the Department of the Interior and Candidates for Rare and Endangered Status by the State of Colorado

The Federal Register 40(127, V)—copy enclosed—contains a list (page 27847) of 23 endangered and 17 threatened candidate plant species in Colorado, as determined by the Smithsonian Institution.  Appendix H of the Dolores River Report (page H-16, et seq.) lists several plant genera for which species are indicated in the Federal Register Notice; to wit:  Senecio, Arabis, Lesquerella, Stellaria, Astragalus, Oxytropis, Trifolium, Phacelia, Eriogonum, Aquilegia, Mertensia, and Draba.  It remains to be determined whether the species listed in the Federal Register and especially those of the above-noted genera occur within the Dolores River Basin and the wild and scenic river study area.

Also, Carex microptera is mentioned in Appendix H, and Carex microptera var. crassinervia is in the Federal Register notice.  The presence or absence of the variety in the basin and study area remains to be determined.

According to Dr. William A. Weber, University of Colorado Museum, Boulder, Colorado, 80302 (phone 303/492/6171), who has prepared a draft list of rare and endangered plants of Colorado, Adiantum capillus-veneris and Bothriochloa barbinodis are found in the Dolores Basin, and Mentzelia pterosperma and Mimulus eastwoodiae are likely to be in the basin. Dr. Weber has indicated to us that the cliffs of the Dolores River area are not well known botanically because of their poor accessibility on foot.  Thus, the area might have significant "hanging gardens" containing important floral elements.

If and when the study area is included in the national system, efforts should be made to protect any of the above species which may be located in the area.

NOTICES 27847

## List A

STATE LISTS OF ENDANGERED AND THREATENED SPECIES OF THE CONTINENTAL UNITED STATES

| STATE | STATUS | FAMILY | SPECIES |
|-------|--------|--------|---------|
| COLORADO | ENDANGERED | BORAGINACEAE | CRYPTANTHA WEBERI |
| COLORADO | ENDANGERED | BRASSICACEAE | ARABIS OXYLOBULA |
| COLORADO | ENDANGERED | BRASSICACEAE | BRAYA HUMILIS SSP. VENTOSA |
| COLORADO | ENDANGERED | BRASSICACEAE | EUTREMA PENLANDII |
| COLORADO | ENDANGERED | BRASSICACEAE | LESQUERELLA PRUINOSA |
| COLORADO | ENDANGERED | CACTACEAE | SCLEROCACTUS GLAUCUS |
| COLORADO | ENDANGERED | CARYOPHYLLACEAE | STELLARIA IRRIGUA |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS DETERIOR |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS DETRITALIS |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS LUTOSUS |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS MICROCYMBUS |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS NATURITENSIS |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS OSTERHOUTII |
| COLORADO | ENDANGERED | FABACEAE | ASTRAGALUS SCHMOLLAE |
| COLORADO | ENDANGERED | FABACEAE | OXYTROPIS OBNAPIFORMIS |
| COLORADO | ENDANGERED | FABACEAE | TRIFOLIUM LEMMON.I |
| COLORADO | ENDANGERED | HYDROPHYLLACEAE | PHACELIA FORMOSULA |
| COLORADO | ENDANGERED | ONAGRACEAE | GAURA NEOMEXICANA SSP. COLORADENSIS |
| COLORADO | ENDANGERED | POLYGONACEAE | ERIOGONUM EPHEDROIDES |
| COLORADO | ENDANGERED | RANUNCULACEAE | AQUILEGIA MICRANTHA VAR. MANCOSANA |
| COLORADO | THREATENED | BORAGINACEAE | CRYPTANTHA ELATA |
| COLORADO | THREATENED | BORAGINACEAE | CRYPTANTHA STRICTA |
| COLORADO | THREATENED | BORAGINACEAE | MERTENSIA VIRIDIS VAR. CANA |
| COLORADO | THREATENED | BRASSICACEAE | ARABIS GUNNISONIANA |
| COLORADO | THREATENED | BRASSICACEAE | DRABA EXUNGUICULATA |
| COLORADO | THREATENED | BRASSICACEAE | PARRYA NUDICAULIS |
| COLORADO | THREATENED | BRASSICACEAE | RORIPPA COLORADENSIS |
| COLORADO | THREATENED | CACTACEAE | SCLEROCACTUS MESAE-VERDAE |
| COLORADO | THREATENED | CYPERACEAE | CAREX MICROPTERA VAR. CRASSINERVIA |
| COLORADO | THREATENED | FABACEAE | ASTRAGALUS WETHERILLII |
| COLORADO | THREATENED | FUMARIACEAE | CORYDALIS CASEANA SSP. CASEANA |
| COLORADO | THREATENED | POACEAE | PHIPPSIA ALGIDA |
| COLORADO | THREATENED | POLYGONACEAE | ERIOGONUM BRANDEGEI |
| COLORADO | THREATENED | POLYGONACEAE | ERIOGONUM SAURINUM |
| COLORADO | THREATENED | POLYGONACEAE | ERIOGONUM VIRIDULUM |
| COLORADO | THREATENED | RANUNCULACEAE | AQUILEGIA CHRYSANTHA VAR. RYDBERGII |
| COLORADO | THREATENED | SAXIFRAGACEAE | SULLIVANTIA PURPUSII |
| CONNECTICUT | ENDANGERED | ORCHIDACEAE | ISOTRIA MEDEOLOIDES |
| CONNECTICUT | ENDANGERED | RANUNCULACEAE | TROLLIUS LAXUS |
| CONNECTICUT | ENDANGERED | ROSACEAE | PRUNUS GRAVESII |
| CONNECTICUT | THREATENED | CISTACEAE | HELIANTHEMUM DUMOSUM |
| CONNECTICUT | THREATENED | CYPERACEAE | SCIRPUS LONGII |
| CONNECTICUT | THREATENED | ISOETACEAE | ISOETES EATONII |

BLM_0036135

BLM_0036136



# United States Department of the Interior

BUREAU OF OUTDOOR RECREATION
WASHINGTON, D.C.  20240

IN REPLY REFER TO:

D4219--Dolores River

JAN 12 1975

Mr. John R. McGuire, Chief
Forest Service
Washington, D. C.  20250

Dear Mr. McGuire:

This supplements Under Secretary Frizzell's letter of
December 31, 1975, to Secretary Butz with respect to
the Dolores Wild and Scenic River Study Report.  As stated
in that letter, comments from Interior Bureaus and Offices
were being furnished directly to Mr. Shenkyr.

Enclosed is a memorandum from the Bureau of Land Management
which supplements their previous comments.  We request that
BLM's concerns be accommodated in any rewrite or reissuance
of the report.

Sincerely yours,

John Crutcher
Director

Enclosure

IN REPLY REFER TO:

United States Department of the Interior       6223 (370)

BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.   20240

DEC 0 1 1975

Memorandum

To:        Director, Bureau of Outdoor Recreation

From:      Director, Bureau of Land Management

Subject:   Dolores River Wild and Scenic River Study Report

This is supplemental to our memorandum of December 22, 1975, concerning
the Dolores Wild and Scenic River Study Report.

1.  The sentences on pages vi, 79, and 83, which discuss the cost
    of clearing mining claims at $2,000,000, reflect only the
    cost to determine validity.  It should also be pointed out
    that potential acquisition costs of valid rights are not
    included in this figure.

2.  On page 46, the discussion on alunite should be updated to
    reflect new market possibilities based on current research
    and production in Utah.

3.  On page 48, the discussion on uranium values should be
    updated to reflect a current price of $35.00 per pound.

Acting Assistant

CONSERVE
AMERICA'S
ENERGY

*Save Energy and You Serve America!*

BLM_0036138



IN REPLY REFER TO:

6223 (370)



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.  20240

DEC ? . 1975

Memorandum

To:        Director, Bureau of Outdoor Recreation

Through:   Assistant Secretary, Land and Water Resources

From:      Director, Bureau of Land Management

Subject:   Review of Dolores River Wild and Scenic River Study
           Report

We have reviewed the draft report on the Dolores River and have
the following comment:

> The "Summary of Findings and Recommendations" section at the
> front of the report should reflect both a finding and
> recommendation regarding the proposed amendment to section
> 9(a)(iii) of the Wild and Scenic Rivers Act.  Language
> from report chapter VI could be easily carried forward.

George L. Turcott

Associate

CONSERVE
AMERICA'S
ENERGY

*Save Energy and You Serve America!*

BLM_0036139

BLM_0036140



## United States Department of the Interior

BUREAU OF MINES
WASHINGTON, D.C.  20240

December 22, 1975

Memorandum

To:        Assistant Director for State Programs and Studies, Bureau of Outdoor
           Recreation

From:      Member Interdepartmental Study Group, Bureau of Mines

Subject:   Joint Interior/Agriculture Wild and Scenic River Study Report,
           Dolores River, Colorado

The Bureau of Mines has reviewed the joint Interior/Agriculture wild and scenic
river study report for the Dolores River in Colorado. We previously reviewed a
draft version of this report and suggested changes at the November 24, 1975,
Interdepartmental Study Group meeting.

The most significant compromise resulting from the above meeting has been included
in this final report on page 98 as follows:

> The Wild and Scenic Rivers Act (Sec. 9(a) (iii) states that "...
> subject to valid existing rights, the minerals in Federal lands
> which are part of the System and constitute the bed or bank or
> are situated within one-quarter mile of the bank of any river
> designated a Wild River under this Act or any subsequent Act
> are hereby withdrawn from all forms of appropriations under
> the mining laws and from operation of the mineral leasing laws. . . ."
> Because of the high mineral potential and canyon width, it is proposed
> that, for purposes of the Dolores River designation, Section 9(a) (iii)
> be amended to read "... the minerals ... in the bed and bank or are
> situated within an average of one-quarter mile of the bank as
> determined in the management plan of any river designated a Wild
> River under this Act or any subsequent Act are hereby withdrawn
> from all forms of appropriations under the mining laws and from
> operation  of the mineral leasing laws...."

We believe that this compromise will allow for the exploration and development of
most of the uranium and vanadium potential of this segment of the river without
adversely affecting the integrity of the proposal.

-2-

In general, most of our recommendations have been included in this final document. Those not included are:

1. Page 72, first paragraph. It was proposed that a sentence be included in this paragraph to the effect that the Multiple Use Sustained Yield Act stated that nothing will preclude mineral development.

2. Page 76, third full paragraph. The words "the only" were recommended to be replaced by the term "a."

3. Page 77, first full paragraph. The number 4,671,000 was proposed to be changed to 5,000,000.

4. Page 79, Conservation/Recreation Costs and Trends, first paragraph, last sentence. "Clear mineral" was recommended to be changed to "do validity determinations on mining claims in the corridor."

5. Page 83, Conservation/Recreation Costs and Trends, first paragraph, line 10. Same situation as No. 4 above.

This report is an excellent example of inter-and intradepartmental cooperation where compromise offers optimum success and protects the interests of participating agencies.

W. L. Dare

BLM_0036142



# United States Department of the Interior

NATIONAL PARK SERVICE
WASHINGTON, D.C.   20240

IN REPLY REFER TO:

L76-LF

DEC 1 9 1975

Memorandum

To:        Director, Bureau of Outdoor Recreation
           Attention:  Assistant Director for State Programs and Studies

Through:   Assistant Secretary for Fish and Wildlife and Parks

From:      Deputy Associate Director, Legislation

Subject:   Joint Interior/Agriculture proposed report on the Dolores
           River in Colorado

In his memorandum of December 12, 1975, the Assistant Director for
State Programs and Studies requested our comments on the subject
report.

Our memorandum of November 21, 1975, contains comments on the Dolores
River study draft report which is essentially identical to the pro-
posed report now under review.  Accordingly, we believe the comments
in our November 21 memorandum are applicable also to the subject
proposed report.

Robert M. Landa



BLM_0036144



# United States Department of the Interior

NATIONAL PARK SERVICE
WASHINGTON, D.C. 20240

IN REPLY REFER TO:

L76-LF                              NOV 21 1975

Memorandum

To:        Director, Bureau of Outdoor Recreation
           Attention:  Chairman, Interdepartmental Study Group
                       on Wild and Scenic Rivers

Through:   Assistant Secretary for Fish and Wildlife and Parks

From:      Acting
           Associate Director, Legislation

Subject:   Draft report on the Dolores River wild and scenic
           river study

We are pleased to offer our comments on the subject draft report in
accordance with Chairman Underhill's request of November 17, 1975.

We realize that it was necessary to prepare this draft report quickly
to comply with the provisions of P.L. 93-621.  Accordingly we wish
to express our admiration to the Field Task Force for accomplishing
such a difficult task in so short a time.  Our comments are intended
less as criticism of this study than as reminders of information or
discussion needed in more detailed future planning studies.

It is apparent, and in part admitted in the study, that very little
is known about the cultural resources that may exist along the
Dolores and its tributaries.  The best archeological surveys have
obviously been done not as part of this study but in preparation
for the Dolores River dam project.  Full surveying, adequate identi-
fication of resources eligible for the National Register, and
consultation with the State Historic Preservation Officer and the
Advisory Board on Historic Preservation are required by law in
further planning.  Once identification and evaluation of historic
resources has occured, planners should then match historic resource
preservation requirements against the alternatives being considered
for use and development.

We appreciate recognition in the report that archeological and
historic resources may not be better protected with a Wild and Scenic
River designation; that in fact, greater opportunity for damage and
vandalism may exist.  In our judgment, that represents a more realistic



2

assessment of potential harm than we sometimes have observed in Wild and Scenic River studies. However, that perception of potential harm would seem to require greater examination of how cultural resources may be affected by the differing designations of "wild," "scenic," or "recreational." Correspondingly, since any opening of the river to further recreation use will almost automatically expose the cultural resources to greater harm, further studies must include discussion either of planning measures that will prevent harm or full mitigation for the harm anticipated.

We also appreciate the inclusion of a separate alternative offering maximum protection for cultural resources. The presence of that alternative calls attention to the equal value held by cultural resources when compared with natural, social, geologic or recreational resources.

We suggest that the description of the National Historic Preservation Act of 1966 on pages 74 and 75 be changed to read as follows: This Act establishes a Federal policy of encouraging the preservation of the Nation's historic and archeologic resources by placing worthy resources on the National Register of Historic Places. Federally licensed or funded projects affecting properties on or eligible for the National Register must be evaluated by the Advisory Council on Historic Preservation.

Another minor detail is that in the third paragraph on page 54, the NPS contract number for the "Report of the Dolores River Project, Archeological Reconnaissance, 1972-1973" should be 2-920-P2-0080 not 2-920-0080.

Robert M. Landau

BLM_0036146



United States Department of the Interior

BUREAU OF RECLAMATION
WASHINGTON, D.C.  20240

IN REPLY
REFER TO:   725

DEC 29 1975

·Memorandum

To:      Assistant Director for State Programs and Studies
         Bureau of Outdoor Recreation

         Assistant
From:    Commissioner of Reclamation

Subject: Dolores River Wild and Scenic River Study Report

Your memorandum of December 12 requested our review of the subject
report and submittal of comments no later than the close of
business on December 22.

The 10-day review period (10 days from the date of your memorandum)
is inadequate to allow a full review of the report.  We recognize
.there are unique time constraints on the completion of the report
but it should be noted that the Wild and Scenic Rivers Act pro-·
vides for a 90-day review period, and that provision was not
amended or revised for this study.  We question the advisability
of going forward with the report without providing an adequate
review period.  In any event, we do not believe that we can make
a·commitment on the report without further time for review.

One of the basic concerns which we have in connection with the
present report is that there are several places where it implies
that the "Wild and Scenic River" designation for the Dolores River
may take place without the construction of the Dolores Project.
It has been our understanding that the Dolores Project was assumed
to be in place for the purposes of the wild and scenic river study
and that designation as a "Wild and Scenic River" would not be
recommended without stipulating that the recommendation was
predicated on the existence of the Dolores Project.  We believe
that those sections of the report which imply "Wild and Scenic
River" designation without construction of the Dolores Project
must be revised.  We have noted some of those sections in our
specific comments.



BLM_0036147

On November 17 we received a draft of the subject report and were requested to provide comments thereon.  Due to time limitations the review was handled informally with the understanding that we would have the present opportunity to provide official comments.  None of the comments provided at that time were incorporated in the present report.  Therefore, those comments are being included with this memorandum.

We are attaching a list of specific comments which we believe should be accommodated.

Enclosure

2

BLM_0036148

Bureau of Reclamation Comments
Dolores River Wild and Scenic River Study Report

1. The report refers to the Dolores Reclamation Project in several places. The official name, "Dolores Project," should be used throughout.

2. Page iv, item number 6. - The second sentence should be modified so that although the total number of boating days is reduced, the quality of and opportunities for boating are enhanced by the ability to predict and group desirable flow levels.

3. Page vi - The report recommends that the designation of the portion of the Dolores River below the proposed McPhee Dam be dependent on the construction of the Dolores Project. We concur in that recommendation. Footnote $\underline{2/}$ on page vi, however, implies that the designation could take place without construction of the project. We recommend the second sentence of footnote $\underline{2/}$ be deleted.

4. Page 2, paragraph 1. - We suggest deleting the last sentence. The purpose of the amendment, as we understand it, was to avoid delaying progress on the Dolores Project while the wild and scenic river study was completed rather than to speed up the identification of conflicts.

5. Page 3, paragraph 1. - The last sentence mentions the receipt of 400 letters concerning the study. The general thrust of those letters is discussed but the full disclosure of the content of the letters is not made as required by the September 10, 1973, Federal Register (Vol. 38, No. 174, page 96).

6. Page 5, paragraph 2. - The third sentence should be deleted and replaced with the following in order to clarify the statement: "An average of 44% of the annual streamflow volume as measured at the town of Dolores can presently be diverted by the Montezuma Valley Irrigation Company. With the Dolores Project in place the flow volume as measured at the McPhee damsite would be reduced 70%. The 70% reduction would be 39% non-project diversion and 31% project (including evaporation from McPhee Reservoir) diversion.

7. Page 8, last paragraph. - The values in the last full sentence are inaccurate and the sentence should be replaced with the following: "With Dolores Project, out-of-basin exports would average 238,700 A.F. annually. This value does not include the average annual evaporation loss from McPhee Reservoir of 5,400 A.F. Therefore, the total reduction in volume is 244,100 A.F. annually. The average annual discharge of the Dolores River at its confluence with the Colorado River would be reduced to 415,600 A.F. annually. 25,000 A.F. of the reduction due to project diversions would be returned to the Colorado River as return flows to the San Juan River."

8. Page 20, first full paragraph. - The last sentence should be revised to read ". . . reducing high flows and increasing low flows to provide year-round . . . ."

9. Page 32, paragraph 3. - The water right value in the second sentence is incorrect. The end of the first sentence should

2

be revised as follows ". . . rates up to 707.7 cfs for irrigation.

In addition they have ~~conditional~~ rights to divert up to 100 cfs
←conditional
for domestic use and 592.3 cfs for irrigation.

10. <u>Page 33, paragraph 1</u>. - The 19 in the first line should be

changed to 13, and the 30 in line 3 should be 50.

11. <u>Page 38, paragraph 3</u>. - The 188,000 tons referred to in line

six should be changed to 180,000 tons.

12. <u>Page 39, paragraph 5</u>. - This paragraph should be revised to

read as follows: "The Dolores Project will develop water for

irrigation and municipal use in the Montezuma Valley and Dave

Creek area, and Ute Mountain Reservation near Towaoc, and will

also significantly alter the existing flow regime of the river

below McPhee Dam.  Two additional purposes of the Dolores

Project are as follows:

"First the project will provide a minimum flow that will
many of
meet the fish, wildlife, and esthetic needs; . . ."

13. <u>Page 40, paragraph 2</u>. - The "18" on line "8" should be "13"

and line "9" should be revised by inserting ". . . and 2,500

cfs . . ." after 1,000 cfs.

14. <u>Page 40, paragraph 3</u>. - the "22" on line four should be "21"

and the "9" on line five should be "10."

15. <u>Page 51, paragraph 1</u>. - The last two lines should be revised

to read as follows: ". . . substantially because of the

maintenance of a minimum fishing flow and the development of

several recreation sites around the reservoir and in the

downstream segment." In addition, the ability to forecast

BLM_0036151

white water flows to allow better white water boating oppor-
tunities should be discussed here.

16. Page 54, paragraph 2. - The first line should be revised to
read "1972-1973 - an archeological reconnaissance of portions
of the Dolores . . . ."

17. Page 69, paragraph 1. - The Principles and Standards are
incorrectly referred to as an Executive Order.  It is also
incorrectly stated that the Principles and Standards are
"intended primarily for water resource development analysis."
They are intended for all water resource planning.

The "no action" plan is treated as a "without situation"
since each plan is compared with it.  Furthermore, some
assumptions are made regarding the "no action" plan that makes
it inappropriate for use either as a "no action" plan or as the
"without situation;" e.g., on page 75 it is stated that the "no
action" plan "assumes that current trends in use and develop-
ment of resources will continue."  This implies action and a
with situation.  Perhaps the term "no development plan" would
be more appropriate.

18. Page 76, paragraph 2. - The "+ 10%" on line 8 would be more
appropriate if it were changed to "about 10%."

19. Page 76, paragraph 6. - We question the assumption that crop
yields will remain the same.  It is normally assumed that
improved technology will result in yield increases in the
future.

4

BLM_0036152

20. Page 78, paragraph 3. - We suggest revising the first sentence to read "There is a national need for boating, fishing, hiking, camping, and picnicking and the goal of this NED plan is to maximize the opportunities to satisfy those needs."

21. Page 93, paragraph 2. - We suggest revising the last sentence to more accurately describe the influence of the project by deleting it and inserting "Without the Dolores Project, the recommendations made in this report could not be accomplished."

22. Page 93. - It is not clear as to which one of the alternatives discussed in chapter V and summarized in Table E-8 is being recommended.

23. Page 96, paragraph 1. - The last sentence indicates that the Forest Service will administer public land within and adjacent to McPhee Dam. That determination has not been made at this time. In addition, those lands are in the area specifically excluded from the ild and scenic river study area. Therefore, the last sentence should be revised as follows: "Recreation development from McPhee Dam to and including the Bradfield Ranch site will be administered by the Forest Service."

24. Page 97, paragraph 4. - The last sentence states that "Should the river be added to the National System, and if the Dolores Project construction funds are not provided, these facilities should be constructed by the management agencies." This implies that the Dolores River may be designated a Wild and Scenic River without the completion of the Dolores Project.

5

BLM_0036153

The entire study was predicated on the Dolores Project being in place and if the Dolores Project is not completed, we believe the area should be restudied to determine whether or not the river should be so designated without the project.

25. Page C-1, paragraph 2. - The last two lines should be deleted and replaced with ". . . Valley for fish and wildlife management purposes."

26. Page C-1, paragraph 3. - The last two sentences should be deleted because the values used are outdated and are presently undergoing substantial revision.

27. Page C-1, paragraph 4. - The paragraph should be deleted because there are so many unknowns involved. It should be replaced with "The Bureau of Reclamation is continuing work on the Definite Plan Report and Draft Environmental Statement. Both should be completed in early calendar year 1976."

28. Page C-2, Table I. - The water section of the table should be revised to show supplies for "Dove Creek Municipal and Industrial, 600 AF, Dolores Water Conservancy District, 900 AF," and a new line added showing "Fish and Wildlife Enhancement, 1,600 AF." The total should then be changed to 126,600 AF.

29. Page E-1. - The first step in any planning endeavor should be the identification of needs or problems, not identification of

6.

30. <u>Page E-2</u>. - The items listed on this page as a component of National Economic Development and Evironmental Quality should be listed as potential components for evaluation since many are eliminated after further evaluation.

31. <u>Page E-3</u>. - Agricultural production is eliminated from consideration since there is no additional cropland or surplus water. Are all lands producing to full potential? How was it determined that there was no surplus water? There will be spills from McPhee Dam which have the potential for development. Were they considered?

32. <u>Page E-5</u>. - The unit RD should be defined.

33. <u>Page E-6</u>. - Series E population of the OBERS projections is the presently accepted series for use by the Federal Government and should be used in lieu of Series C. Item (f) implies that all croplands in the Dolores River corridor are irrigated. We question the validity of that implication.

34. <u>Page E-7</u>. - What support exists for the statement that "There is a national need for the beneficial esthetic, environmental and spiritual effects associated with preservation of free-flowing streams that have outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values?"

2

35. <u>Page E-8</u>. - Table/is not clear. What is meant by complementary "array A" and "array B"?

36. <u>Page E-9</u>. - VD should be defined.

7

37. Page E-31. - The dollar sign should be removed from the number of visitor days in the third column.

38. Page E-32. - The dollar signs should be removed from the number of visitor days in the second and third columns.

39. Table E-8 (following page E-32). - This table attempts to summarize and compare the alternative plans, however, the plan numbers do not correspond to those used in chapter V, Analysis of Alternatives. As pointed out earlier, it is not clear which alternative has been recommended nor is the rationale for the selection clear.
How can benefits and costs be derived from a "no action" situation?

40. Page F-1. - This is the cover page for the description of the Paradox Valley Unit. It lists the Colorado River Basin Salinity Control Advisory Council as though it were the entity planning the unit. The title page should be revised as follows:

APPENDIX F

Paradox Valley Unit
Colorado River Basin Salinity Control Project
Bureau of Reclamation
U.S. Department of the Interior

41. Page F-6, last paragraph. - The 198,000 tons on line three should be 180,000 tons, and the entire last sentence should be deleted.

42. Page G-1 and G-2. - The last 2-1/2 lines on G-1 and the first 2 lines on G-2 should be deleted making the last sentence read:

8

"They are willing to work with other residents in order to cooperatively solve the water problems of the whole area."

BLM_0036157

BLM_0036158



## State of Colorado

EXECUTIVE CHAMBERS

DENVER

RICHARD D. LAMM
Governor

January 9, 1976

Mr. John McGuire, Chief, Forest Service
U. S. Department of Agriculture
South Building, 12th and Independence Ave., S.W.
Washington, D. C.  20250

Attention:  Mr. Douglas Shenkyr, Division of Watershed Mgmt.

Dear Mr. McGuire:

Pursuant to your letter request of December 16, 1975, this communication constitutes my comments on the Dolores River Wild and Scenic River Study Report which was transmitted to me along with your letter.  Since the study is the first of its kind within the State of Colorado, it has received a great deal of attention by both our Department of Natural Resources and my own personal staff.  As your letter points out, the study from its inception to its completion was carried on as a cooperative venture between the participating federal agencies and representatives of the State of Colorado.  My comments are therefore based upon an exhaustive and thorough review of all available information pertaining to the study as presented to me by my own staff, the Colorado Department of Natural Resources and the participating federal agencies.

I wish to state at the outset that I wholeheartedly endorse the philosophy and intent of the Wild and Scenic Rivers Act.  At the same time, I recognize that the setting aside of considerable land areas for special purposes must be carefully examined in the light of how such purposes might affect the utilization of our natural resources and the lives of our people who are dependent upon such resources.

The constant degradation of our natural environment and the increasing occupation of our land resources has been of such serious concern to our citizens as to cause the Congress to enact such laws as the Wild and Scenic Rivers Act and the Wilderness Preservation Act. On the other hand, our citizens are also deeply concerned about their freedom of choice to occupy lands of their choosing and to earn a livelihood.  It is with full recognition of these competing demands that I offer the comments herein contained.

With one major exception, I am in complete agreement with

Mr. John McGuire
January 9, 1976
Page two

the conclusions and recommendations set forth in chapter VI of the
study report. I commend the study team for a job well done. As the
report accurately sets forth, the Dolores is truely a unique and
remarkable river. Within a relatively short distance it traverses
five western life zones from the relatively wet and high alpine areas
of the San Juan Mountains to the semi-arid areas of high western desert.
The rapid transition of the river from high alpine meadows through
heavily vegetated mountain valleys to a lower terminus of almost
perpendicular sheer rock canyons of the high desert zone compels recog-
nition that the Dolores River is indeed remarkable and unique.

Pursuant to the direction of Congress, the study team
evaluated four segments of the Dolores River and its tributaries. The
study team concluded that two segments, the Main Dolores from Rico
upstream to its source and the river from its confluence with the San
Miguel River to the Colorado-Utah border, did not qualify for inclusion
in the national wild and scenic rivers system. However, the study
team recommended that the eight-mile reach from Gateway to the Colorado-
Utah border could qualify if added to that portion of the Dolores River
flowing through the State of Utah. I fully concur with the conclusions
and recommendations of the study team concerning these two segments.

The study team recommended that the one hundred five mile
section of the Dolores River between the proposed McPhee Dam to one
mile above the Highway 90 bridge be designated as a part of the national
wild and scenic rivers system. One detracting factor pointed out in
the study report is the absence of a live stream through much of this
section during the late summer and fall months. However, as set forth
in the report, the proposed McPhee Dam, a part of the authorized Dolores
federal reclamation project, would provide for live stream releases
throughout the year in that stretch of the river below the dam. The
State of Colorado through both its executive and legislative branches
of government, together with the local people involved, are totally
committed to the construction of the Dolores federal reclamation project
I therefore fully concur with the findings in the study report that the
authorized Dolores project is not only completely compatible with the
proposed wild river designation, but will greatly enhance that desig-
nation by providing a live stream flow through that section of the
river which is now depleted by upstream irrigation and municipal diver-
sions. Much of this middle section of the Dolores River bears little
or no evidence of the activities of man. Through part of this section
the Dolores River has carved spectacular rock-walled canyons. The
members of the study team were in unanimous agreement as to the
desirability of including this one hundred and five mile segment in
the national wild and scenic rivers system. I concur in this recom-
mendation.

The remaining study section of the Dolores River system,

BLM_0036160

Mr. John McGuire
January 9, 1976
Page three

the West Dolores, presented a more difficult problem to the study group and the divided recommendation contained in the study report is the major exception which I previously referred to. The study team apparently had no great difficulty in determining that the West Dolores is in fact eligible for inclusion as a part of the wild and scenic rivers system. However, the federal representatives on the team recommended that the West Dolores not be included "at this time" because of "extensive intermingling of private lands and structures leading to potentially difficult and costly administration".

While admitting that there would be administrative problems, the members of the study team representing the Colorado Department of Natural Resources believe that it would be a serious mistake to eliminate consideration of the alpine and mountain valley zones of the West Dolores River. This one divergence of opinion reflected in the study report has presented me with the greatest problem in formulating the position of the State of Colorado. I am sure that this divergence is also of equal concern to the Departments of Agriculture and Interior.

The study report states that almost seventy percent of the thirty-five mile long, one-half mile corridor along the West Dolores River is within the San Juan National Forest. The remaining thirty percent or so of the river corridor is in private ownership which is intermingled with forest lands. While these percentages may not be exact, they are accurate enough to determine that condemnation in fee title of private lands would not be permitted under the provisions of the Wild and Scenic Rivers Act. However, scenic and public access easements could be obtained if the river were given a recreational status as recommended by the Colorado Department of Natural Resources.

While there are no incorporated areas or industrial activities within the West Dolores River corridor, there are several ranching operations and a number of summer cabins and homes occupying the 2,600 acres of privately owned land. There are approximately fifteen separate private land holdings along the river corridor, all of which are occupied by one or more homes or summer cabins. The majority, if not all, of the landowners are opposed to any type of special designation for the West Dolores River.

The existing landowners in the West Dolores corridor and others are genuinely concerned about the impact of a recreational river designation on the river. These people for the most part are sympathetic with the purposes of the National Wild and Scenic Rivers Act, but point out that they also are opposed to any further commercialization of the river area, and that they, in cooperation with the Forest Service, can maintain the river corridor essentially as it is today. They also fear a loss in the farm economy if the river is made a part of the federal system. These fears are all related to the overriding concern that

Mr. John McGuire
January 9, 1976
Page four

both their privacy and quality of life will be invaded if the river
receives a recreational designation.

We have given a great deal of deliberation to the fears
expressed by the local people.  Those fears are not entirely without
foundation.  From a narrow political viewpoint, it might be popular,
at least locally, to agree that the provisions of the Wild and Scenic
Rivers Act should not apply to the West Dolores River.  However, from
the explicit provisions of the act, it seems clear that the existing
farming and other occupations now carried on within the river corridor
cannot be interfered with.  I am therefore unable to concur with any
fear that the existing economy of the area will in any way be affected.
Tourism is a major industry of southwestern Colorado and will most
certainly be enhanced by wild and scenic river designations in that
area.  It cannot be denied, however, that the private enjoyment of that
area by the present residents will be interfered with to some extent.

I have no doubt as to the desire of the present landowners
in the area to maintain the river corridor essentially as it is today.
However, both life and land ownership are fleeting and fragile things.
The number of man-made structures along the West Dolores will most
certainly continue to increase with the passage of time, until it
becomes, like most other river valleys in the United States, a veritable
jungle of homes with the ever attendant roads, power lines, telephone
lines and the other evidences of modern civilization.

While the possible designation of the West Dolores, or any
other river in Colorado, under the national wild and scenic rivers
system is of considerable local political importance, it is my
unswerving conviction that there are unique and precious natural environ-
ments in Colorado which should be preserved for both present and future
generations of America.  If any reasonable quality of life is to be
maintained in this country, we cannot permit the continued exploitation
and degradation of our few remaining natural assets.

It has been stated in the study report that the cost of
acquiring and thereafter maintaining the West Dolores as a recreational
segment of the national system is too great to warrant designation.
The estimated one-time cost for establishing the West Dolores corridor
is $430,000, and the annual cost thereafter is estimated at $65,000.
If this is an excessive cost to this nation for the preservation of a
unique national heritage, then it appears that the provisions of the
National Wild and Scenic Rivers Act have no meaning.

The designation of the middle reaches of the Dolores River
throughout its canyon land area is essential if the river is to be
designated at all.  However, to ignore that portion of the river which
originates in alpine meadows and flows through the mountain valleys

BLM_0036162

Mr. John McGuire
January 9, 1976
Page five

subverts both the unique characteristics of the Dolores River and the purposes of the Wild and Scenic Rivers Act.

For the various reasons expressed herein, I therefore recommend that the West Dolores segment of thirty-six miles, along with the one hundred and five mile segment below the proposed McPhee Dam, be included in the wild and scenic rivers system with the specific designations as set forth in the study report. This recommendation is made upon the following assumptions:

1.  That the authorized Dolores federal reclamation project, now in the preconstruction stage, will proceed to completion.

2.  That condemnation of private lands in fee title by the federal government in the West Dolores River corridor will not be permitted.

3.  That existing farming or other occupations or occupancies on private lands in the West Dolores River corridor will not be interfered with, except for the acquisition of scenic and access easements.

4.  That no existing privately owned water rights or diversions within any designated river corridors will be interfered with.

5.  That the State of Colorado will be consulted in the preparation of the required management plan, in the event Congress includes any segments of the Dolores River in the national wild and scenic rivers system.

Sincerely yours,

RICHARD D. LAMM
Governor

RDL:mm

BLM_0036163

BLM_0036164

BLM_0036165



WILD AND SCENIC RIVER STUDY

DOLORES RIVER BASIN
COLORADO and UTAH

LOCATION MAP

BLM_0036166



TABLE E - 8 - EFFECTS OF ALTERNATIVE PLANS FOR THE DOLORES RIVER

MEASUREMENT OF EFFECTS OF ALTERNATIVE PLANS

| ACCOUNT | COMPONENTS | NO ACTION | NED A | NED B | EQ A | EQ B | EQ C | EQ D | EQ E |
|---|---|---|---|---|---|---|---|---|---|
| NATIONAL | OUTDOOR RECREATION | | | | | | | | |
| | BOATING (Annual recreation days) | 4,600 | 6,900 | 4,600 | 84,955 | 44,955 | 5,940 | 7,760 | 4,600 |
| | FISHING (Annual recreation days) | 69,700 | 69,700 | 60,700 | 84,955 | 92,195 | 84,955 | 84,955 | 69,700 |
| | HIKING-WALKING (Annual recreation days) | 68,830 | 187,410 | 68,830 | 126,445 | 49,530 | 164,845 | 197,925 | 68,830 |
| | CAMPING (Annual recreation days) | 53,480 | 141,280 | 53,680 | 72,590 | 28,770 | 88,100 | 117,250 | 53,480 |
| | PICNICKING (Annual recreation days) | 26,640 | 71,640 | 26,640 | 34,710 | | 38,150 | 62,245 | 26,640 |
| | SUB-TOTAL ANNUAL BENEFITS | $1,102,000 | $1,512,000 | $1,102,000 | $1,310,000 | $1,224,000 | $1,495,000 | $1,545,000 | $1,102,000 |
| | SUB-TOTAL ANNUAL COSTS | $ 192,000 | $ 569,000 | $ 575,000 | $ 350,000 | $ 264,000 | $ 418,000 | $ 532,000 | $ 192,000 |
| | AGRICULTURAL PRODUCTION (A.U.M.) | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 |
| | SUB-TOTAL ANNUAL BENEFITS | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 |
| | SUB-TOTAL ANNUAL COSTS | unquantified | unquantified | unquantified | unquantified | unquantified | unquantified | unquantified | unquantified |
| | TIMBER PRODUCTION | NONE | NONE | NONE | NONE | NONE | NONE | NONE | NONE |
| | MINERAL PRODUCTION | | | | | | | | |
| | URANIUM (Annual pounds) | 32,030 | 32,030 | 895,000 | 32,030 | 32,030 | 32,030 | 32,030 | 32,030 |
| | VANADIUM (Annual pounds) | 185,380 | 185,380 | 3,853,580 | 185,380 | 185,380 | 185,380 | 185,380 | 185,380 |
| | OTHER MINERALS (Tons) | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN |
| | GEOTHERMAL RESOURCES (Megawatts) | Potential exists but unquantified | Unquantified Potential | Unquantified Potential | Unquantified Potential | Unquantified Potential | Unquantified Potential | Unquantified Potential | Unquantified Potential |
| | SUB-TOTAL ANNUAL BENEFITS | $ 368,596 | $ 368,593 | $2,795,665 | $ 368,595 | $ 368,595 | $ 368,595 | $ 368,595 | $ 368,595 |
| | SUB-TOTAL ANNUAL COSTS | $ 313,506 | $ 409,600 | $2,376,315 | $ 409,600 | $ 409,600 | $ 409,600 | $ 409,600 | $ 409,600 |
| | HUNTING OPPORTUNITIES (Annual participation) | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 |
| | GRAND TOTAL ANNUAL BENEFITS | $1,528,596 | $1,990,596 | $3,947,000 | $1,728,595 | $1,642,595 | $1,913,595 | $1,963,595 | $1,520,595 |
| | GRAND TOTAL ANNUAL COSTS | $ 505,606 | $ 978,600 | $2,951,315 | $ 750,600 | $ 673,600 | $ 834,600 | $1,154,260 | $ 601,600 |
| | NET ANNUAL BENEFITS | $1,014,989 | $ 951,995 | $ 995,685 | $ 968,995 | $ 968,995 | $1,088,998 | $ 829,595 | $ 918,995 |

| ENVIRONMENTAL QUALITY | COMPONENTS | NO ACTION | NED A | NED B | EQ A | EQ B | EQ C | EQ D | EQ E |
|---|---|---|---|---|---|---|---|---|---|
| | PRESERVATION OF AREAS OF NATURAL BEAUTY | Natural beauty will be preserved on about 70,000 acres of public land under multiple use management | Natural beauty will be preserved on about 69,000 acres of public land under multiple use management. Beauty may be impaired on about 1,000 acres of intensive recreation development | Natural beauty will be preserved on about 10,000 acres of public land under multiple use management. Scenic values may be degraded by mining on 60,000 acres | National Wild & Scenic River designation will preserve beauty on about 76,000 acres of public and private lands | National Wild & Scenic River designation will preserve beauty on about 56,400 acres of public and private land. About 19,700 acres of public land will be protected by multiple use management | National Wild & Scenic River designation will preserve beauty on about 78,000 acres of public and private land | National Wild & Scenic River designation will preserve beauty on about 78,000 acres of public and private land | Natural beauty will be preserved on about 70,000 acres of public land under multiple use management. Some private land may be acquired by federal agencies and protected. |
| | PRESERVATION OF FREE FLOWING STREAM | NONE GUARANTEED | NONE | Developments & recreation site construction and higher levels of use will cause damage to sites and artifacts | 149 miles | 105 miles | 140 miles | 140 miles | NONE |
| | PRESERVATION OF HISTORIC & CULTURAL RESOURCES | Federal & State laws protect site-use damage to areas on private land could occur | Developments & recreation site construction and higher levels of use will cause damage to sites and artifacts | Developments & mineral exploration & extraction likely to damage or destroy sites or artifacts | National designation will attract more visitors and may result in increased damage & vandalism | National designation will attract more visitors and may result in increased damage & vandalism | National designation will attract more visitors and may result in increased damage & vandalism | National designation will attract more visitors and may result in increased damage & vandalism | Identification and protection of sites is assured. Management specifically for these resources will reduce damage and enhance values. |
| | PROTECTION OF ENDANGERED OR THREATENED SPECIES | | | | | | | | |
| | HIGHLINE | Migratory peregrin falcons will be protected and habitat preserved. | Migratory falcons could be harrassed and portions of habitat disturbed | Mining could disturb migratory falcons and destroy habitat | Migratory falcons could be disturbed. Habitat will be preserved | Migratory falcons could be disturbed. Habitat will be preserved | Migratory falcons could be harrassed/disturbed by increased use.Habitat preserved | Migratory falcons could be harrassed or disturbed & some habitat could be damaged | Migratory falcons will be protected & habitat preserved. |
| | VEGETATION | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN |
| | PRESERVATION OF AIR QUALITY | High Quality maintained | High Quality maintained | Dust and other pollutants could lower quality | High Quality preserved | High Quality preserved | High Quality preserved | High Quality preserved | High Quality preserved |
| | PRESERVATION OF WATER QUALITY | State standards met | State standards met but some local degradation could occur | State standards could be lowered-degradation likely | State standards will be met | State standards will be met | Some local degradation could occur | State standards met with local degradation likely | State standards met |
| | PRESERVATION OF FREEDOM OF CHOICE | Many options preserved | Options on developed sites lost | Options on mined areas lost but national security enhanced | Maintain scenic,recreation,wildlife options - lose development choices | Maintain scenic,recreation,wildlife options - lose development choices | Maintain scenic,recreation,wildlife options - lose development choices | Maintain scenic,recreation,wildlife options - lose development choices | Preserve cultural site options foregoes development and use |
| | AVOID IRREVERSIBLE OR IRRETRIEVABLE EFFECTS | Some loss of scenic and recreation values on private land | Loss of Scenic and mid-life values on developed sites and private land | Mineral development would affect scenic wild-life & Recreation values | NONE | NONE | NONE | NONE | Prohibits interpretive and other utility uses |

| REGIONAL DEVELOPMENT | COMPONENTS | NO ACTION | NED A | NED B | EQ A | EQ B | EQ C | EQ D | EQ E |
|---|---|---|---|---|---|---|---|---|---|
| | REGIONAL INCOME GENERATED | | | | | | | | |
| | MINING | $2,152,000 | $2,174,400 | $2,375,500 | $2,153,175 | $2,153,075 | $2,153,150 | $2,153,200 | $2,152,000 |
| | AGRICULTURE | $ 49,700 | $ 53,500 | $ 49,760 | $ 51,500 | $ 50,000 | $ 51,300 | $ 51,800 | $ 49,700 |
| | SERVICES (Recreation & Tourism) | $ 546,500 | $ 727,200 | $ 557,600 | $ 630,600 | $ 600,600 | $ 633,600 | $ 644,100 | $ 546,500 |
| | TRADE AND MANUFACTURING | $ 66,400 | $ 79,200 | $ 70,000 | $ 72,200 | $ 70,100 | $ 71,700 | $ 73,100 | $ 66,400 |
| | TOTAL | $2,814,600 | $3,034,300 | $3,050,660 | $2,907,075 | $2,873,275 | $2,869,750 | $2,922,200 | $2,819,500 |
| | VALUE ADDED | | | | | | | | |
| | MINING | $3,036,900 | $3,966,880 | $3,847,900 | $3,037,280 | $3,037,130 | $3,037,230 | $3,037,260 | $3,036,900 |
| | AGRICULTURE | $ 88,400 | $ 94,900 | $ 88,475 | $ 91,500 | $ 90,250 | $ 91,400 | $ 91,700 | $ 88,400 |
| | SERVICES (Recreation & Tourism) | $ 770,500 | $1,019,700 | $ 787,700 | $ 886,300 | $ 842,100 | $ 876,700 | $ 894,900 | $ 770,500 |
| | TRADE AND MANUFACTURING | $ 104,800 | $ 125,800 | $ 110,100 | $ 114,900 | $ 111,400 | $ 114,100 | $ 116,550 | $ 104,900 |
| | TOTAL | $4,000,700 | $4,182,900 | $4,334,075 | $4,129,760 | $4,080,880 | $4,119,030 | $4,140,470 | $4,000,700 |
| | EMPLOYMENT - Man Years | | | | | | | | |
| | MINING | 124 | 126 | 137 | 124 | 124 | 124 | 124 | 124 |
| | AGRICULTURE | 5 | 6 | 5 | 5 | 5 | 5 | 5 | 5 |
| | SERVICES (Recreation & Tourism) | 84 | 115 | 83 | 99 | 93 | 97 | 101 | 84 |
| | TRADE AND MANUFACTURING | 8 | 9 | 8 | 9 | 9 | 9 | 9 | 8 |
| | TOTAL | 221 | 256 | 233 | 237 | 230 | 235 | 239 | 221 |

| SOCIAL | COMPONENTS | NO ACTION | NED A | NED B | EQ A | EQ B | EQ C | EQ D | EQ E |
|---|---|---|---|---|---|---|---|---|---|
| | EDUCATION, CULTURAL, & RECREATIONAL OPPORTUNITIES | Diversity of recreation opportunity enhanced by provision of activities shown in NED Account above | Diversity of recreation opportunity enhanced by provision of activities shown in NED Account | Diversity of recreation limited but activities shown above in NED Account will provide some opportunity | Diversity of recreation opportunity enhanced by provision of activities shown in NED Account | Diversity of recreation opportunity enhanced by provision of activities shown in NED Account | Diversity of recreation opportunity enhanced by provision of activities shown in NED Account | Diversity of recreation opportunity enhanced by provision of activities shown in NED Account | Diversity of recreation limited to that of No Action. Education & Cultural opportunities greatly enhanced by preservation and management of archeologic sites |
| | LIFE, HEALTH, AND SAFETY | This plan is neutral for this component | This plan is neutral for this component | This plan is neutral for this component | The plan is neutral for this component | The plan is neutral for this component | The plan is neutral for this component | The plan is neutral for this component | The plan is neutral for this component |
| | INCOME DISTRIBUTION | | | | | | | | |
| | MINING | | | | | | | | |
| | AGRICULTURE | There is insufficient data to assess the income distribution effects of the Alternative Plans. | | | | | | | |
| | SERVICES (Recreation & Tourism) | | | | | | | | |
| | TRADE AND MANUFACTURING | | | | | | | | |
| | EMERGENCY PREPAREDNESS | Strategic materials and scarce fuels will be available | Strategic materials and scarce fuels will be available due to higher cost | Strategic materials and scarce fuels will be developed and used to maximum | Availability of strategic materials & scarce fuels will be restricted.Higher cost will limit production | Availability of strategic materials & scarce fuels will be restricted.Higher cost will limit production | Strategic materials & scarce fuels will be available due to higher cost | Strategic materials and scarce fuels will be less available due to higher cost | Minor restrictions on availability of strategic materials and scarce fuels in archeologic areas |
| | FREEDOM OF TRAVEL | No restrictions on | No restrictions on | No restrictions on | Minor restrictions on | Minor restrictions on | Minor restrictions on | Minor restrictions on | Little restriction on |

BLM_0036168

Table V-1.--Summary and Comparison of Effects of Alternative Plans

| Measurement of Effect | Unit | Alternative Plans | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | No Action | NED A | NED B | EQ A | EQ B 1/ | EQ C | EQ D | EQ E |
| Visual corridor scenic values protected | Acres | 70,000 | 69,000 | 10,000 | 78,000 | 76,100 | 78,000 | 78,000 | 70,000 |
| Free-flowing river preserved | Miles | None guaranteed | None | None | 140 | 105 | 140 | 140 | None guaranteed |
| Boating | RD | 4,600 | 6,900 | 4,600 | 4,600 | 4,600 | 5,940 | 7,760 | 4,600 |
| Fishing | RD | 69,700 | 69,700 | 69,700 | 84,955 | 44,955 | 84,955 | 84,955 | 69,700 |
| Hiking | RD | 68,830 | 68,830 | 68,830 | 126,445 | 92,195 | 164,845 | 107,925 | 68,830 |
| Camping | RD | 53,480 | 187,410 | 53,480 | 75,590 | 49,530 | 88,590 | 117,250 | 53,480 |
| Picnicking | RD | 26,640 | 142,280 | 26,640 | 34,710 | 28,770 | 38,150 | 62,245 | 26,640 |
| Annual recreation use | Recreation Days | 223,250 | 477,930 | 223,250 | 323,300 | 220,050 | 382,480 | 470,135 | 223,250 |
| * Camping units | Number | 245 | 448 | 245 | 287 | 273 | 278 | 338 | 245 |
| * Picnic units | Number | 78 | 144 | 78 | 93 | 90 | 83 | 116 | 78 |
| * Hiking-riding trails | Miles | 10 | 113 | 10 | 74 | 47 | 42 | 62 | 10 |
| Recreation use value | $1,000 | 1,102 | 1,512 | 1,102 | 1,310 | 1,224 | 1,495 | 1,545 | 1,102 |
| Recreation development cost | $1,000 | 192 | 569 | 575 | 350 | 264 | 415 | 532 | 192 |
| Annual mineral production: | | | | | | | | | |
| Uranium | Lbs. | 32,030 | 32,030 | 895,500 | 32,030 | 32,030 | 32,030 | 32,030 | 32,030 |
| Vanadium | Lbs. | 185,380 | 185,380 | 3,853,380 | 185,380 | 185,380 | 185,380 | 185,380 | 185,380 |
| Annual mineral production value | $1,000 | 368.6 | 368.6 | 2,795.7 | 368.6 | 368.6 | 368.6 | 368.6 | 368.6 |
| Annual mineral production costs | $1,000 | 313.3 | 409.6 | 2,376.3 | 409.6 | 409.6 | 409.6 | 409.6 | 409.6 |
| Annual agricultural production | AUM | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 | 27,110 |
| Recreational river area | Miles | 0 | 0 | 0 | 66 | 31 | 66 | 140 | 0 |
| Scenic river area | Miles | 0 | 0 | 0 | 41 | 41 | 74 | 0 | 0 |
| Wild river area | Miles | 0 | 0 | 0 | 33 | 33 | 0 | 0 | 0 |
| Archaeologic and historic values preserved and protected | Sites | Protects all sites, but allows uses and conflicts. | Sites protected but some conflicts and degradation may occur. | Sites protected but if mineral values exist, sites may be damaged by development. | All sites protected, but some conflict and damage may occur. | Same as EQ A. | Same as EQ A. | Same as EQ A. | All sites will be identified preserved and protected. Conflicting uses not allowed. |
| Preservation of threatened or endangered species | Wildlife vegetation | None | None | None | None | None | None | None | None |
| Freedom of choice | Qualitative | Many options preserved | Options on sites developed for recreation are lost. | Options on mined areas lost. Nat'l security enhanced and choices for alternate fuels preserved. | Options for scenic, recreation, wildlife, etc. values preserved. Development choices are lost. | Same as EQ A. | Same as EQ A. | Same as EQ A. | Options for use, study, and development of cultural values preserved. Other choices in sites are lost. |
| Regional income generated | $1,000 | 2,815.5 | 3,034.3 | 3,050.6 | 2,907.5 | 2,874.6 | 2,899.8 | 2,922.2 | 2,815.5 |
| Value added | $1,000 | 4,000.7 | 4,307.8 | 4,334.8 | 4,129.8 | 4,080.9 | 4,119.0 | 4,150.5 | 4,000.7 |
| Employment generated by activities in corridor | Man-years | 221 | 256 | 235 | 237 | 230 | 235 | 239 | 221 |
| Educational, cultural and recreational opportunities: | Qualitative | Diversity of recreation is enhanced. | | | | | | | |
| Emergency preparedness | Qualitative | Strategic materials and scarce fuels will be available. No restrictions on transportation. | Strategic materials and scarce fuels will be less available due to higher costs. No restrictions on transportation. Access may be improved. | Strategic materials and scarce fuels will be developed and used to maximum. No restrictions on transportation. Access may be improved. | Availability of strategic materials and scarce fuels will be limited. Higher costs will limit production. Transportation restricted, and some limits on access. | Same as EQ A. | Same as EQ A. | Same as EQ A. | Same as EQ A except less restriction on transportation. |

* Recreation Developments shown for NED A, EQA, EQB, EQC, and EQD are those which will be built in addition to those shown in the No Action column

1/ It should be noted that the EQB column does not reflect activities on the West Dolores River.



Colorado Department
of Public Health
and Environment



# Colorado Source Water Assessment and Protection Pilot Planning Project (PPP) Grants

## *"An ounce of prevention is worth a pound of cure". Benjamin Franklin*

**PPP GRANT SUMMARY**

- ➢ **Maximum $50,000 grant**
- ➢ **Semi-annual progress reporting required**
- ➢ **Submittal of the plan at 30%, 60%, and 90% completion**
- ➢ **Exemplary protection plans**
- ➢ **Case study of costs to replace water source(s) is required**
- ➢ **Scope of work required**
- ➢ **Formal presentation required upon plan completion.**
- ➢ **Monthly reimbursement submittals**
- ➢ **Final report required and posted on SWAP website**
- ➢ **50% matching funds (cash or in-kind)**

**Technical Assistance Available Thru:**

**Colorado Department of Public Health and Environment Water Quality Control Division 4300 Cherry Creek Drive South Denver, CO 80246 303-692-3592phone 303-691-7802 fax E-mail: cdphe.wqswap@state.co.us**

**Source Water Assessment and Protection Pilot Planning Project Grant Details**

**1) Program Goal:** The Colorado Source Water Assessment and Protection Project is charged with increasing protection planning interest, involvement, and source water knowledge to the public, educators and entities involved in protecting the raw water quality of drinking water sources.

**2) Grant Objective:** The Colorado Source Water Assessment and Protection (SWAP) Pilot Planning Project grant awards funds to active public water systems (excluding non-community private for profit water systems) and governmental entities to develop exemplary and comprehensive source water protection plans. The completion of a limited number, but broad spectrum, of protection plan pilot projects will provide planning results to other protection planning entities. The pilot projects should assist and promote source water protection planning efforts across Colorado.

**3) The Grants:** The grants in this program are awarded by the Colorado Department of Public Health and Environment's Water Quality Control Division on a cost-reimbursement basis. The grants will be issued for source water protection pilot project planning efforts. The awards can range up to $50,000. Grant awards will require a one to one financial match (cash or in-kind services). Grant awards are subject to availability of funds.

**4) Eligibility:** Active public water systems (excluding non-community private for profit water systems) and governmental entities may apply to participate in the pilot planning grant project program. Applicants can apply by completing the electronic pilot project grant application on the Division's website at http://www.cdphe.state.co.us/wq/sw/Grantapplications.html.

# Pilot Planning Project Guidance

This document will summarize the pilot project grant application process and provide the necessary guidance to complete the application. Typical pilot project grants will range from $25,000 to $35,000, with a grant maximum of $50,000. Matching funds are required, but may be either in-kind services or cash—increasing the reach of your program.

♦ **What?** Source water protection pilot projects involve comprehensive protection planning efforts to minimize potential threats from all sources of contamination in a specific source water area.

♦ **Why?** Protection planning plays an important role in minimizing potential contaminant threats to public water systems. The protection plans developed will be used to provide other public water systems with exemplary protection plans and encourage source water protection planning and implementation across the state.

♦ **How?** Submit a grant proposal to the WQCD that includes the information requested on electronic grant proposal application for the Pilot Planning Project grant located on the Division's website at http://www.cdphe.state.co.us/wq/sw/Grantapplications.html. In addition, grant applicants must submit a cover letter on the grant awardees' letterhead with an original signature (via mail).

♦ **When?** Proposals will be accepted throughout the year. Proposals are reviewed on a first come, first serve basis and grants are awarded based on available funding.

♦ **Funding:** Grants are issued on a cost-reimbursable basis for expenses incurred, based on the line items in the project budget, up to the amount approved in the award. SWAP protection pilot grants require a 50 percent match of the total project cost. Matching funds can be cash contributions to the project or in-kind donations such as the source water protection planning coordinator's time and efforts, costs incurred by community sponsors/supporters, use of resources, outside consultants, or other types of donations. The intended matching funds must be identified in the project scope of work attached to the grant application.

♦ **Scope of Work:** The scope of work format will vary, dependent on the project's needs. The written scope of work required with this grant is an opportunity to discuss additional project components that may not have been clearly defined or mentioned in the electronic grant application.

♦ **Products and Outcomes:**

1. Completion of the Colorado Department of Public Health and Environment's Source Water Protection Plan Template and associated materials.
2. A case study indicating the current estimated value of the existing water source. In addition, the Division requires a secondary expense analysis of all costs related to replacing the current water source (ie: acquiring water rights, re-structuring water supply system, economic impacts, etc.)
3. A scope of work (supplied by the applicant) submitted with the electronic grant application and approved by the Division.
4. Assignment of one internal source water protection planning coordinator to establish one point of contact for the project.
5. A semi-annual progress report must be submitted to the Division. The Division will provide the Semi-annual reporting format for submittal. Refer to the Division's website at http://www.cdphe.state.co.us/wq/sw/swaphom.html for the electronic semi-annual reporting form.

BLM_0036170

6. Submittal of the protection plan template for review following 30%, 60% and 90% completion of the plan.
7. A final project summary report will be submitted to the Division to exhibit on the source water assessment and protection website. As part of your final report, you will submit copies of all materials produced by your project.
8. At least one "Best Management Practice (BMP)" must be implemented to receive final payment on the grant. 10% percent of the grant amount will be withheld until the final report is submitted and one BMP is implemented.
9. You will be expected to give at least one presentation at the end of the project to other interested source water protection planning entities in your local area.
10. Invoicing will be submitted to the Division's SWAP Coordinator on a monthly basis. All invoicing is subject to Division approval.

♦ **Non reimbursable expenses:**

1. Groundwater and/or surface water monitoring and sampling expenses.
2. Physical improvements to groundwater wells and/or surface water intakes.
3. Water system infrastructure and capital improvements.

♦ **Proposals?** Submit electronic grant applications, with "Pilot Project Proposal" in the subject line. In addition to submitting an electronic grant proposal, grant applicants must send a cover letter on the grant awardees' letterhead with an original signature (via mail).To submit your proposal or get additional information, contact:

John M. Duggan, Source Water Assessment and Protection Program Coordinator
CDPHE – Water Quality Control Division, Restoration and Protection Unit
4300 Cherry Creek Drive South
Denver, CO 80246-1530
Phone: 303-692-3592
Fax: 303-691-7802
E-mail: cdphe.wqswap@state.co.us

# SOURCE WATER ASSESSMENT REPORT

## Surface Water Sources and
## Ground Water Sources Under the Direct Influence of Surface Water

### GREELEY, TOWN OF

### Public Water System ID: CO0162321

### GREELEY, CO

### WELD County

### 07/26/2013



**Colorado Department of Public Health and Environment**
**Water Quality Control Division**
**Source Water Assessment and Protection Program**
**4300 Cherry Creek Drive South**
**Denver, Colorado  80246-1530**

BLM_0036172

GREELEY, TOWN OF                                                    Surface Water Sources
PWSID: CO0162321

# SOURCE WATER ASSESSMENT SUMMARY

## Background

The Colorado Department of Public Health and Environment (CDPHE) has completed a source water assessment for **GREELEY, TOWN OF** as required by the 1996 Safe Drinking Water Act amendments and in accordance with Colorado's Source Water Assessment and Protection (SWAP) program.  The purpose of this assessment is to analyze the potential susceptibility of each public drinking water source to contamination, and to supply pertinent information so that decision-makers voluntarily can develop and implement appropriate preventive measures to protect these water sources. The Safe Drinking Water Act requires that the public water system and its consumers be informed of the assessment results.

## SWAP Process

The SWAP program is a multi-step two-phased process (Figure 1) designed to assist public water systems in preventing accidental contamination of their untreated drinking water supplies.  These phases include the assessment phase and the protection phase as depicted in the upper and lower portions of Figure 1, respectively.

Figure 1.  Source Water Assessment and Protection Process.



The assessment phase involves understanding where each public water system's source water comes from, what contaminant sources potentially threaten the water source(s), and how

BLM_0036173

susceptible each water source is to potential contamination. The product of the assessment phase is contained in this report.

The protection phase occurs when local decision-makers use the source water assessment results and other pertinent information to develop management and response strategies to protect the water sources from potential contamination.

## Assessment Process

As depicted in the upper portion of Figure 1, the source water assessment for all public water systems consists of four primary elements. These elements include:

1) delineating the source water assessment area for each drinking water source;
2) conducting a contaminant source inventory to identify potential sources of contamination within each of the source water assessment areas;
3) conducting a susceptibility analysis to determine the potential susceptibility of each public drinking water source to the different sources of contamination and;
4) reporting the results of the source water assessment to the public water systems and the general public.

Public water systems were given the opportunity to review and provide corrections and/or feedback on draft versions of their source water assessment area delineations and their contaminant source inventories. All pertinent corrections and feedback were incorporated into this assessment.

### Delineation of Source Water Assessment Area

The source water assessment area defines the area or region of the watershed or aquifer contributing untreated water to the public water system's source water intake. The area also defines where potential contamination of this water source could occur.

A public water system may have rights to use one or more source water types for drinking water. These source water types include:

- Surface water source - any "untreated" water source that is diverted directly from a stream, river, lake, pond or similar surface water body.
- Ground water source - any "untreated" water source that is diverted directly from an underground source of water (i.e., an aquifer).
- Ground water source under the direct influence of surface water - any "untreated", shallow, ground water source that testing has shown to be in hydrologic connection to a nearby surface water body.

For surface water systems and ground water systems under the influence of surface water, the source water assessment area includes the watershed drainage area above the intake, and any secondary diversion structures used to divert untreated water from other watersheds.

BLM_0036174

A public water system also may have purchased water sources.  A purchased water source includes any "treated" surface water source, ground water source and/or ground water source under the influence of surface water that is purchased from another public water system.

This assessment report presents the results only for active surface water sources and/or ground water sources under the direct influence of surface water that the public water system has rights to use for drinking water.  Assessment results for any purchased water sources that the public water system may have are presented in the source water assessment report(s) for the public water system that supplies the purchased water source.

*Contaminant Source Inventory*

Drinking water sources are susceptible to contamination from a wide variety of natural and man-made threats.  Figure 2 illustrates some of the potential contaminant sources that might be encountered for surface water and ground water sources, and how contaminants from these sources can enter the source water.  Potential contaminant sources include anything likely to manufacture, produce, use, store, dispose, or transport regulated and unregulated contaminants of concern.  Potential contaminant sources were divided into two groups for this assessment:

- Discrete contaminant sources – generally include facility-related operations from which the potential release of contamination would be confined to a relatively small area.
- Dispersed contaminant sources – generally include broad based land uses and miscellaneous sources from which the potential release of contamination would be spread widely over a relatively large area.

BLM_0036175

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

Figure 2.  Examples of Potential Contaminant Sources and How Contaminants Can Enter Your Source Water.



- 5 -

BLM_0036176

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

This page intentionally left blank.

BLM_0036177

*Susceptibility Analysis*

The current analysis looks at the susceptibility of a water source to individual potential contaminant sources (referred to as individual susceptibility), as well as the total susceptibility of a water source to all of the individual potential contaminant sources that were inventoried within its source water assessment area. The susceptibility of a surface water source or a ground water source under the direct influence of surface water to an underlined individual potential contaminant source depends on the two primary factors: physical setting vulnerability and contaminant source threat, as shown in Figure 3.

Figure 3.  Components of Water Source Susceptibility.



Physical Setting Vulnerability – involves an evaluation of the ability of the watershed setting in the source water assessment area to provide a sufficient buffering capacity to mitigate potential contaminant concentrations in the source water.  This ability is affected by physical characteristics like the total size of the source water assessment area, annual precipitation, soil properties and vegetative cover within the source water assessment area, as well as the structural soundness of the intake itself.

Contaminant Source Threat – involves an evaluation of the potential for a contaminant source to provide contaminants in sufficient amounts for the source water to become contaminated at concentrations that may pose a health concern to consumers of the water.  The potential threat is affected by the types and volumes of potential contaminants that might be present, the likelihood that contaminants might be released, and the proximity of the contaminant source to the source water intake and its proximity to the surface water body supplying the untreated source water.

The total susceptibility of a water source is determined from its cumulative susceptibility to all of the discrete contaminant sources and all of the dispersed contaminant sources that were inventoried in its source water assessment area.  In other words, the total susceptibility of a water source is a reflection of the combined individual susceptibilities posed by all of the discrete and all of the dispersed contaminant sources inventoried in the source water assessment area.

BLM_0036178

Therefore, the susceptibility of a water source to all discrete contaminant sources is a reflection of the combined individual susceptibilities posed by each discrete contaminant source that was inventoried.  Likewise, the susceptibility of a water source to all dispersed contaminant sources is a reflection of the combined individual susceptibilities posed by each dispersed contaminant source that was inventoried.

In order to determine the susceptibility of a water source to potential contamination, the Colorado Department of Public Health and Environment developed a unique susceptibility analysis model and scoring system to evaluate the different physical setting vulnerability and contaminant threat factors that contribute to the susceptibility of a water source.  This unique model and scoring system serves as the benchmark by which the potential susceptibility of other like water sources in the state can be measured or judged.  *Therefore, the results of your source water assessment are not directly comparable to results from other states.  These assessment results are only meaningful when compared to other surface water sources and ground water sources under the direct influence of surface water in Colorado.*

To provide the reader a general sense of the degree of potential risk to a water source, the total susceptibility scores, individual susceptibility scores and physical setting vulnerability scores are assigned qualitative ratings of Low, Moderately Low, Moderate, Moderately High, or High based on statistical indicators established by the Colorado Department of Public Health and Environment.  In developing the qualitative ratings for these particular factors, a commonly applied statistical approach is used to group the scores for each of these factors into the five possible rating categories.  This approach is not unlike what a teacher uses in grading student test scores.  The statistical approach determines the factor score's relative position within the statewide populations of total susceptibility scores, individual susceptibility scores or physical setting vulnerability scores for the more than 500 surface water sources and ground water sources under the direct influence of surface water that were analyzed.

In general, the higher the susceptibility rating for the water source, the greater the risk for potential contamination of the water source.  For example, a total susceptibility rating of Moderately High or High generally means that the potential vulnerability posed by the physical setting of the water source and the cumulative potential threats posed by the various contaminant sources are proportionately higher than the vulnerability and cumulative threats posed to an average surface water source or ground water source under the direct influence of surface water in the state.  Similarly, an individual susceptibility rating of Moderately High or High generally means that the potential vulnerability posed by the physical setting of the water source and the potential threat posed by an individual contaminant source is proportionately higher than the vulnerability and individual threat posed to an average surface water source or ground water source under the direct influence of surface water in the state.

Likewise, the higher the physical setting vulnerability rating for the water source, the more vulnerable the water source is to potential contamination.  A physical setting vulnerability rating of Moderately High or High generally means that the physical setting of the water source potentially provides proportionately less buffering capability to mitigate potential contaminant concentrations in the source water when compared to an average surface water source or ground water source under the direct influence of surface water in the state.

BLM_0036179

The results of the statistical evaluations are easier to understand by plotting the statewide distribution of the total and individual susceptibility ratings, and the physical setting vulnerability ratings for all surface water sources and ground water sources under the direct influence of surface water that were analyzed. The final statewide total susceptibility, individual susceptibility and physical setting vulnerability rating distribution plots generated from the evaluations are presented in the assessment results section of this report. These rating distribution plots present the numerical scoring ranges associated with a given rating category, and the number of water sources or contaminant sources throughout the state that received a specific rating.

The Colorado Department of Public Health and Environment has provided two source water assessment methodology documents that can be downloaded from the Colorado SWAP web site (**www.cdphe.state.co.us/wq/sw/swaphom.html**) and reviewed. These documents present a more detailed discussion on the assessment methodology used for surface water sources and ground water sources under the direct influence of surface water, and ground water sources for people who are interested.


### *Protection Process*

Public water systems and communities are strongly encouraged to use their source water assessment information to voluntarily enter the protection phase of SWAP. The next step involves developing and continuously implementing a source water management or protection plan at the local level. **No statutory authority has been given to the Colorado Department of Public Health and Environment to force the adoption or implementation of source water protection measures. The authority to do so rests with local communities and governments.**

As depicted in the lower portion of Figure 1, the source water protection phase for all public water systems consists of four primary elements. These elements include:

1) involving stakeholders in the planning process;
2) developing a comprehensive protection plan for all of your drinking water sources;
3) implementing the protection plan on a continuous basis to reduce the risk of accidental contamination of the drinking water sources; and
4) monitoring the effectiveness of the protection plan and updating it accordingly as future assessment results indicate.


### *Involve Stakeholders*

Public participation is crucial to the overall success of Colorado's SWAP program. Source water protection was founded on the concept that informed citizens, equipped with fundamental knowledge about their drinking water source and the threats to it, will be the most effective advocates for protecting this valuable resource.

BLM_0036180

The public water supplier or any other well-suited local interest group may take the lead in organizing public participation in the local SWAP protection planning effort. For public participation to be effective, there must be a well-organized effort to raise public awareness, identify groups and individuals interested in helping, and to define and implement the necessary assessment and planning tasks. The lead group is encouraged to involve all types of stakeholders – individuals, groups, organizations and local decision-makers affected by or concerned with the community's drinking water – in the local source water protection planning efforts.

*Develop Protection Plan*

A source water management or protection plan essentially identifies (1) the specific management tools the public water system and community will use or the actions they will take to protect their source water, and (2) how the public water system and community will carry them out. A companion contingency plan is usually developed as part of the overall management plan. The contingency plan is essentially an emergency response plan for the water system that lays out a coordinated plan for responding rapidly, effectively, and efficiently to any emergency incident that threatens or disrupts the community water supply. Emergency incidents are any man-made events (e.g., chemical contamination, fire, vandalism, terrorism) or natural events (e.g., drought, fire, tornado) that can adversely affect the capability of the public water system to provide a steady supply of safe drinking water to its consumers. Public water systems and communities are encouraged to be creative in developing these plans.

*Implement Protection Plan*

The reduction of risk of accidental contamination of drinking water sources is affected by how well the public water system and community carry out the specific management tools they use or the actions they take to protect their source water. This requires a proper commitment of funding resources and personnel by the public water system and community to implement the source water protection measures they have developed. Considering the high cost of cleaning up contaminants once they have been released to the environment, this commitment may well be a reasonable investment to protect the natural quality of the drinking water source and avoid potential costly treatment of a contaminated water supply and/or costly development of a new water supply. The Colorado Department of Public Health and Environment also encourages public water systems and decision-makers to use their source water assessment results in making local land use decisions. Public water systems and communities interested in developing and implementing source water protection measures may be able to find limited financial assistance through the Colorado Department of Public Health and Environment.

*Monitor and Update Protection Plan*

Public water systems and communities are encouraged to monitor the effectiveness of the source water protection measures they have implemented and to update their source water protection plan accordingly as future assessment results indicate. In developing a protection plan, each public water system is encouraged to identify measurable results that can be used to monitor the success of the protection measures they have implemented. Source water protection plans may need to be revised to address new potential threats over time as new assessment results become

BLM_0036181

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

available.  As shown in Figure 1, SWAP was designed to be an iterative process, alternating back and forth between assessment and protection phases.

The primary elements of the protection phase discussed above are meant as a guide to public water systems and communities.  In actual practice, developing and implementing source water protection may be more or less complicated depending on the local community's willingness to adopt and implement source water protection measures.  Additional source water protection information can be obtained by going to the U.S. Environmental Protection Agency's source water protection website (**www.epa.gov/safewater/protect.html**).  Staff members at the Colorado Department of Public Health and Environment also are available to provide assistance with source water protection efforts.

BLM_0036182

## Assessment Results

The source water assessment for **GREELEY, TOWN OF** rendered the following results:

➤ At the time of this assessment, the water supply consists of:

- 2 active surface water sources
- 0 active ground water sources under the influence of surface water
- 0 active, purchased surface water sources and/or purchased ground water sources under the influence of surface water

➤ Table 1 presents the cumulative results of the total susceptibility of the water source(s) to potential contamination from both discrete and dispersed contaminant sources. Water sources with total susceptibility ratings of Moderately High or High generally are at greater risk for potential contamination than those receiving lower ratings. As shown in Table 1, 2 active water source(s) was/were determined to have a Moderately High or High susceptibility to potential contamination.

There may be cases where the assessment was unable to verify the presence of discrete and dispersed contaminant sources based on the databases used for the contaminant inventory. In these cases, unless new information is identified and analyzed, the water source(s) is/are not currently known to be susceptible to potential contamination from any known discrete or dispersed contaminant sources. This situation is indicated in Table 1 by water sources receiving an overall susceptibility rating of "No Known Susceptibility."

Table 1. Total Susceptibility Ratings for Water Sources.

| Number of Water Sources | Susceptibility Rating |
|---|---|
| 0 | No Known Susceptibility |
| 0 | Low |
| 0 | Moderately Low |
| 0 | Moderate |
| 2 | Moderately High |
| 0 | High |

BLM_0036183

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

Figure 4 presents the statewide total susceptibility rating distribution plot for all surface water sources and ground water sources under the direct influence of surface water that were analyzed. The rating distribution plot presents the numerical scoring ranges associated with a given rating category, and the number of surface water sources and ground water sources under the direct influence of surface water throughout the state that received a specific qualitative rating. By comparing the results in Table 1 to Figure 4, one can see how the total susceptibility of the water source(s) in Table 1 compared to the total susceptibility of the other surface water sources and ground water sources under the direct influence of surface water throughout the state.

Figure 4. Statewide Total Susceptibility Rating Distribution Plot.



➤ Table 2 presents a summary of the individual susceptibility of the water source(s) to various types of discrete contaminant sources that were evaluated. Water sources with a Moderately High or High individual susceptibility to a discrete contaminant source generally are at greater risk for potential contamination from the discrete contaminant source than water sources receiving lower individual susceptibility ratings to similar or different discrete contaminant sources. The water source(s) has/have the greatest risk to potential contamination from the following types of discrete contaminant sources:

BLM_0036184

Table 2.  Susceptibility of Water Source(s) to Discrete Contaminant Sources.

| Contaminant Source Type | Individual Susceptibility Rating Summary (cumulative count for all water sources) | | | | |
|---|---|---|---|---|---|
| | Low | Mod. Low | Moderate | Mod. High | High |
| EPA Superfund Sites | 0 | 0 | 7 | 0 | 0 |
| EPA Abandoned Contaminated Sites | 0 | 0 | 0 | 0 | 0 |
| EPA Hazardous Waste Generators | 0 | 3 | 6 | 0 | 0 |
| EPA Chemical Inventory/Storage Sites | 1 | 0 | *14* | *1* | *3* |
| EPA Toxic Release Inventory Sites | 0 | 0 | *3* | 0 | 0 |
| Permitted Wastewater Discharge Sites | 0 | 8 | *29* | 2 | 0 |
| Aboveground, Underground and Leaking Storage Tank Sites | 1 | *169* | *471* | *41* | 3 |
| Solid Waste Sites | 0 | 1 | *5* | 1 | 0 |
| Existing/Abandoned Mine Sites | 0 | *57* | *155* | *56* | 33 |
| Concentrated Animal Feeding Operations | 0 | 0 | 0 | *1* | *0* |
| Other Facilities | 5 | *82* | *200* | *31* | *2* |
| | | | | | |
| **TOTAL:** | 7 | *320* | *890* | *131* | *41* |

Figure 5 presents the statewide rating distribution plot of the individual susceptibility to various types of discrete contaminant sources for all surface water sources and ground water sources under the direct influence of surface water that were analyzed.  The rating distribution plot presents the numerical scoring ranges associated with a given rating category, and the number of discrete contaminant sources throughout the state that received a specific qualitative rating.  By comparing the total count results in Table 2 to Figure 5, one can see how the individual susceptibility results of the water source(s) in Table 2 compared to the combined individual susceptibility results of the other surface water sources and ground water sources under the direct influence of surface water throughout the state.

BLM_0036185

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

Figure 5.    Statewide Rating Distribution Plot of Individual Susceptibility to Discrete
Contaminant Sources.



> Table 3 presents a summary of the individual susceptibility of the water source(s) to
various types of dispersed contaminant sources that were evaluated.  Water sources with
a Moderately High or High individual susceptibility to a dispersed contaminant source
generally are at greater risk of potential contamination from the dispersed contaminant
source than water sources receiving lower individual susceptibility ratings to similar or
different dispersed contaminant sources.  The water source(s) has/have the greatest risk to
potential contamination from the following types of dispersed contaminant sources:

BLM_0036186

Table 3.  Susceptibility of Water Source(s) to Dispersed Contaminant Sources.

| Contaminant Source Type | Individual Susceptibility Rating Summary (cumulative count for all water sources) | | | | |
|---|---|---|---|---|---|
| | Low | Mod. Low | Moderate | Mod. High | High |
| LAND USE / LAND COVER TYPES: | | | | | |
| Commercial/Industrial/Transportation | 0 | 2 | 0 | 0 | 0 |
| High Intensity Residential | 0 | 2 | 0 | 0 | 0 |
| Low Intensity Residential | 0 | 2 | 0 | 0 | 0 |
| Urban Recreational Grasses | 0 | 2 | 0 | 0 | 0 |
| Quarries / Strip Mines / Gravel Pits | 0 | 1 | 0 | 0 | 0 |
| Row Crops | 0 | 2 | 0 | 0 | 0 |
| Fallow | 0 | 2 | 0 | 0 | 0 |
| Small Grains | 0 | 2 | 0 | 0 | 0 |
| Pasture / Hay | 0 | 2 | 0 | 0 | 0 |
| Orchards / Vineyards / Other | 0 | 0 | 0 | 0 | 0 |
| Deciduous Forest | 0 | 2 | 0 | 0 | 0 |
| Evergreen Forest | 0 | 0 | 2 | 0 | 0 |
| Mixed Forest | 0 | 2 | 0 | 0 | 0 |
| OTHER TYPES: | | | | | |
| Septic Systems | 0 | 2 | 0 | 0 | 0 |
| Oil / Gas Wells | 0 | 2 | 0 | 0 | 0 |
| Road Miles | 0 | 2 | 0 | 0 | 0 |
| | | | | | |
| TOTAL: | 0 | 27 | 2 | 0 | 0 |

Figure 6 presents the statewide rating distribution plot of the individual susceptibility to various types of dispersed contaminant sources for all surface water sources and ground water sources under the direct influence of surface water that were analyzed.  The rating distribution plot presents the numerical scoring ranges associated with a given rating category, and the number of dispersed contaminant sources throughout the state that received a specific qualitative rating.  By comparing the total count results in Table 3 to Figure 6, one can see how the individual susceptibility results of the water source(s) in Table 3 compared to the combined individual susceptibility results of the other surface water sources and ground water sources under the direct influence of surface water throughout the state.

BLM_0036187

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

Figure 6.    Statewide Rating Distribution Plot of Individual Susceptibility to Dispersed Contaminant Sources.



> Table 4 presents the cumulative results of the physical setting vulnerability ratings of the water source(s). A vulnerable physical setting generally means the water source(s) will be more susceptible to potential contamination. Water sources with physical setting vulnerability ratings of Moderately High or High generally are expected to have higher levels of potential susceptibility to contamination. As shown in Table 4, 0 active water source(s) was/were determined to have a Moderately High or High physical setting vulnerability.

Table 4.  Physical Setting Vulnerability Ratings for Water Sources.

| Number of Water Sources | Physical Setting Vulnerability Rating |
|---|---|
| 0 | Low |
| 2 | Moderately Low |
| 0 | Moderate |
| 0 | Moderately High |
| 0 | High |

BLM_0036188

Figure 7 presents the statewide physical setting vulnerability rating distribution plot for all surface water sources and ground water sources under the direct influence of surface water that were analyzed. The rating distribution plot presents the numerical scoring ranges associated with a given rating category, and the number of surface water sources and ground water sources under the direct influence of surface water throughout the state that received a specific qualitative rating. By comparing the results in Table 4 to Figure 7, one can see how the physical setting vulnerability of the water source(s) in Table 4 compared to the physical setting vulnerability of the other surface water sources and ground water sources under the direct influence of surface water throughout the state.

Figure 7. Statewide Physical Setting Vulnerability Rating Distribution Plot.



The physical setting vulnerability remains important even where no or very few potential contaminant sources (discrete and/or dispersed) have been identified within the source water assessment area. In this case, if the physical setting vulnerability for a water source is estimated to be Moderately High or High, it could cause an increased susceptibility to contamination in the future if certain discrete and/or dispersed contaminant sources were located within the source water assessment area. This potential impact ultimately will depend on the degree of contaminant threat posed by the specific potential contaminant sources. Public water systems are strongly encouraged to consider this in their source water protection planning efforts, and to be vigilant to the introduction of potential contaminant sources within highly vulnerable physical settings. Such information may be useful to local land use planning agencies making land use and zoning decisions related to the siting of these future potential contaminant sources.

BLM_0036189

GREELEY, TOWN OF
PWSID: CO0162321

Surface Water Sources

## Additional Considerations

The source water assessment provides a screening-level evaluation of the likelihood that a potential contamination problem could occur rather than an indication that a potential contamination problem has or will occur. This evaluation is comparable to what a doctor might use to screen a patient for a particular medical condition. The results of this assessment reflect the best efforts of the Colorado Department of Public Health and Environment and its contractors to simplify several complex physical, chemical and operational processes, and to assemble quality data sets for use in the assessment. Future improvements to the source water assessment results are envisioned as additional data become available. The Colorado Department of Public Health and Environment is confident that this assessment provides useful information to communities concerning the contaminant sources to which their water supply is potentially most susceptible. Public water systems also can use this information to evaluate the need for improvement to current water treatment capabilities, so as to be better prepared for future contamination threats.

This report represents the public version of the source water assessment that the Colorado Department of Public Health and Environment is required to make available under the Safe Drinking Water Act. The public version differs from the public water system version in that more detailed supporting information (e.g., input data and maps) was provided to each public water system as part of their report. Some of this supporting information is viewed by the Colorado Department of Public Health and Environment and many public water systems as security sensitive. Under the Colorado Open Records Act, certain information can be withheld from public disclosure if the information can be characterized either as "details of security arrangements or investigations" [section 27-72-204(3)(a)(XVII) C.R.S] or as information whose disclosure "would do substantial injury to the public interest" [section 24-72-204(6)(a) C.R.S.]. The Colorado Department of Public Health and Environment has determined that the following security sensitive information meets one or both of the preceding characterization criteria and will be withheld from public disclosure:

- Location information about the public water system's intakes/wells, treatment facilities, and diversion/conveyance structures, as well as location information about potential sources of contamination. Location information would include location coordinates, physical addresses and maps showing the locations of the intakes/wells, treatment facilities, diversion/conveyance structures, and potential sources of contamination;
- Hazardous chemical quantities, type, processes, and/or likelihood of release;
- Well/intake depths; and
- Structural integrity information concerning the drinking water intakes/wells.

Public water systems also will be given the opportunity to provide the Colorado Department of Public Health and Environment with rationale for excluding additional supporting information from public disclosure once they have received and reviewed their source water assessment report. Their rationale must meet one or both of the preceding characterization criteria established under the Colorado Open Records Act to be acceptable.

BLM_0036190

Consumers are encouraged to contact **_GREELEY, TOWN OF_** at **_970-336-4095_** if you are:

- interested in knowing more about the supporting information provided to the public water system; or
- interested in what source water protection measures the water system may be developing.

If you have questions concerning the results presented in the public version of the source water assessment, the methodologies used in the source water assessment, or the SWAP program in general, please contact the Colorado Department of Public Health and Environment at (303) 692-3592.

---

**DISCLAIMER**

**This Source Water Assessment utilized information from a variety of public and other sources, and as such, no warranty of merchantability or of fitness for a particular purpose, expressed or implied, shall apply and the Colorado Department of Public Health and Environment specifically disclaims the making of such warranties.  In no event shall the Colorado Department of Public Health and Environment be liable to anyone for special, incidental, consequential or exemplary damages.**

BLM_0036191

# SOURCE WATER ASSESSMENT METHODOLOGY

**for**
**Surface Water Sources**
**and**
**Ground Water Sources Under the**
**Direct Influence of Surface Water**

**November 2004**



**Prepared For:**
Colorado Department of Public Health and Environment
Water Quality Control Division
Source Water Assessment and Protection Program
4300 Cherry Creek Drive South
Denver, Colorado 80246-1530
(303) 692-3500

**Prepared By:**
EnecoTech Inc.
1580 Lincoln Street, Suite 1000
Denver, Colorado 80203-1512
(303) 861-2200

BLM_0036192

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

SWAP PROGRAM BACKGROUND ............................................................................ 1

OVERVIEW OF THE WATER CYCLE, WATER SOURCES AND PUBLIC WATER
SYSTEMS ......................................................................................................................... 2

THE WATER CYCLE ............................................................................................................ 2

SOURCES OF DRINKING WATER ........................................................................................ 3

PUBLIC WATER SYSTEMS ................................................................................................. 3

SOURCE WATER ASSESSMENT ELEMENTS ....................................................... 4

DELINEATION OF SOURCE WATER ASSESSMENT AREAS ............................................... 5

INVENTORY OF POTENTIAL CONTAMINANT SOURCES .................................................. 6

    Discrete Contaminant Sources ............................................................................... 7

    Dispersed Contaminant Sources ............................................................................ 7

    Public Water System Feedback on the Contaminant Inventory Results ............... 9

SUSCEPTIBILITY ANALYSIS ............................................................................................. 9

    Physical Setting Vulnerability .............................................................................. 10

    Contaminant Source Threat .................................................................................. 11

        *Migration Potential* ...................................................................................... 12

        *Contaminant Hazard* ..................................................................................... 13

        *Potential Volume* .......................................................................................... 13

        *Likelihood of Release* ................................................................................... 13

    Methodology for Estimating Potential Susceptibility ........................................... 14

    Deriving Scores for Independent Variables .......................................................... 15

    Deriving Scores for Dependent Variables ............................................................ 16

        *Physical Setting Vulnerability Score* ........................................................... 17

        *Contaminant Source Threat Scores* .............................................................. 18

        *Individual Susceptibility Scores for Water Source* ...................................... 20

        *Total Susceptibility Score for Water Source* ................................................ 20

REPORTING THE SOURCE WATER ASSESSMENT RESULTS ........................................... 24

SOURCE WATER PROTECTION PHASE ............................................................. 25

BLM_0036193

## INTRODUCTION

The purpose of this document is to present an overview of the assessment methodology used by the Colorado Source Water Assessment and Protection (SWAP) Program. This methodology was used to evaluate all public drinking water systems in Colorado that have surface water sources or ground water sources that are under the direct influence of surface water. Topics addressed in this document include: 1) background information on the SWAP Program; 2) an overview of the water cycle, water sources and public water systems; 3) a discussion of the source water assessment elements, methodologies and reporting requirements; and 4) local responsibility for the protection phase. A similar document presenting an overview of the assessment methodology that was used to evaluate all public drinking water systems in Colorado that have ground water sources is also available for review.

## SWAP PROGRAM BACKGROUND

SWAP came into existence in 1996 as a result of Congress reauthorizing and amending the Safe Drinking Water Act. The 1996 amendments required each state to develop a source water assessment and protection program. The Water Quality Control Division, an agency of the Colorado Department of Public Health and Environment, assumed the responsibility of developing Colorado's SWAP program.

The SWAP program is designed to take a "preventive" approach to protecting public water systems from contamination. It is a two-phased process as presented below:



BLM_0036194

The **Assessment Phase** involves understanding where each public water system's source water comes from, what contaminant sources potentially threaten the water source(s), and how susceptible each water source is to potential contamination. Since many water systems obtain their water from multiple sources, the susceptibility of a public water system is analyzed by examining the susceptibility of each of its water sources. The susceptibility of an individual water source is analyzed by examining the properties of its physical setting and potential contaminant source threats. The results of the susceptibility analysis calculations are used to report an estimate of how susceptible each water source is to potential contamination.

The **Protection Phase** is a voluntary, ongoing process in which the public water system and local community employ preventive measures to protect the water supply from the potential sources of contamination to which it may be most vulnerable.

This phase can be used to take action to avoid unnecessary treatment or replacement costs associated with contamination of the water supply. Source water protection begins when local decision-makers use the source water assessment results and other pertinent information to develop and implement management and response strategies to protect the water sources from potential contamination.

## OVERVIEW OF THE WATER CYCLE, WATER SOURCES AND PUBLIC WATER SYSTEMS

This section presents an overview of the water cycle, and the types of drinking water sources and the public water systems involved in the statewide source water assessment.

### THE WATER CYCLE

The adjacent figure of the water cycle (or hydrologic cycle) depicts the migration pathways that a drop of water may take. Surface water and ground water are closely related. In some areas, surface water infiltrates (discharges) into the ground and therefore influences ground water. In other areas, ground water discharges to streams and lakes and therefore influences surface water. "Understanding the interaction of ground water and surface water is essential to water managers and water scientists.



Management of one component of the hydrologic system, such as a stream or an aquifer, commonly is only partly effective ...," (USGS Circular 1139). Contaminants can enter the water cycle through many pathways – stormwater runoff, infiltration, atmospheric deposition, discharges from man-made activities and others.

BLM_0036195

## SOURCES OF DRINKING WATER

A public water system may use one or more source water types for drinking water.   These source water types include:

- **Surface water source** - any "untreated" water source that is diverted directly from a stream, river, lake, pond or similar surface water body.
- **Ground water source** - any "untreated" water source that is diverted directly from an underground source of water (i.e., an aquifer).
- **Ground water source under the direct influence of surface water** - any "untreated," shallow ground water source that testing has shown to be in hydrologic connection to a nearby surface water body.

A public water system also may have purchased water sources.  A purchased water source includes any "treated" water that is purchased from another public water system.

This document presents the source water assessment methodology only for 1) surface water sources and/or 2) ground water sources under the direct influence of surface water.  A separate document presents an assessment methodology for ground water sources.

## PUBLIC WATER SYSTEMS

There are three different categories of public water systems.  The SWAP program evaluated the following types of public water systems:



Conceptual Public Water System

1) **Community systems** which primarily serve the homes of year-round residential customers (such as city water systems);
2) **Non-Transient, Non-Community systems** which serve a relatively stable group of non-residential customers (such as schools and factories with their own water systems); and
3) **Transient, Non-Community systems** which serve a changing population group (such as campgrounds, rest areas and truck stops with their own water systems).

The SWAP program evaluates the underlined water component of the public water system, *before water enters the transmission, treatment, and distribution part of the system*.  **The source water assessment is NOT a reflection of the quality of the water being provided to drinking water consumers.**  The accompanying figure shows the major components of a public water system. *The source water area is the primary concern of the SWAP program, and is depicted in the upper left portion of the figure above (upstream of the source intake).*

BLM_0036196

## SOURCE WATER ASSESSMENT ELEMENTS

This section presents details of the source water assessment process that was conducted by the Water Quality Control Division and its subcontractors between 2000 and 2004. A source water assessment consists of the following elements:

1) **Delineation** of source water assessment areas for each water source;
2) **Inventory** of potential sources of contamination within the source water assessment areas;
3) **Susceptibility Analysis** of each water source to the potential contaminant sources; and
4) **Reporting** the assessment results to the public.

These elements are discussed in more detail below.



BLM_0036197