Birds observed during the four-season point count survey include lark sparrows, dusky flycatchers, cliff swallow, western meadowlarks, mourning dove, western scrub-jay, rubythroated hummingbird, loggerhead shrike, dark-eyed junco, European starling, and American crow. The second survey for the additional 80-acres also identified: Broad-tailed Hummingbird (*Selasphorus platycercus*), Common Raven *(Corvus corax)*, Loggerhead Shrike (*Lanius ludovicianus*), Mountain Bluebird (*Sialia currucoides*), and Rock Wren (*Salpinctes obsoletus*). The above-listed birds are typical for the habitat and ecosystem found on the site.

Reptiles observed during the four season surveys included Eastern fence lizard, five-lined skink, and greater short horned lizard. These reptiles are typical for the habitat and ecosystem found on the site.

Insects and spiders observed during the four season surveys included red harvester ant, praying mantis, and Argiope spider. These insects and the spider are typical for the habitat and ecosystem on the site.

## Endangered Species

The purpose of the Endangered Species Act of 1973 (ESA) is to conserve "the ecosystems upon which endangered and threatened species depend" and to conserve and recover listed species. Under the law, species may be listed as either "endangered," "threatened," or a "candidate" species. Endangered means a species is in danger of extinction throughout all or a significant portion of its range. Threatened means a species is likely to become endangered within the foreseeable future. Candidate means a species is likely to decline in numbers due to habitat loss and that additional data are needed to warrant listing as an endangered or threatened species. All species of plants and animals, except pest insects, are eligible for listing as endangered or threatened. In addition to the Federal list, Colorado has its own list. Both lists are found in the Wildlife Survey (Table 15).

BLM_0036833

**Table 15: Species Likely to Be Found at the Site**

| Status* | Common Name | Scientific Name | Occurrence |
|---|---|---|---|
| **SPECIES LISTED IN MONTROSE COUNTY, COLORADO** | | | |
| **Birds** | | | |
| ST | Western burrowing owl | *Athene cunicularia* | Likely to occur, not observed on the Site |
| ST | Bald eagle | *Haliaeetus leucocephalus* | Likely to occur, not observed on the Site |
| SC | Ferruginous hawk | *Buteo regalis* | Likely to occur, not observed on the Site |
| SC | Gunnison sage-grouse | *Centrocercus minimus* | Likely to occur, not observed on the Site |
| SC | Western snowy plover | *Charadrius alexandrinus* | Likely to occur, not observed on the Site |
| SC | American peregrine falcon | *Falco perigrinus anatum* | Likely to occur, not observed on the Site |
| **Mammals** | | | |
| SC | Townsend's big-eared bat | *Corynorhinus townsendii pallescens* | Likely to occur, not observed on the Site |
| SC | Botta's pocket gopher | *Thomomys bottae rubidus* | Likely to occur, not observed on the Site |
| SC | Northern pocket gopher | *Thomomys talpoides macrotis* | Likely to occur, not observed on the Site |
| **Reptiles** | | | |
| SC | Midget faded rattlesnake | *Crotalus virdis concolor* | Likely to occur, not observed on the Site |
| SC | Longnose leopard lizard | *Gambelia wislizenii* | Likely to occur, not observed on the Site |

*Status Codes:
ST = State Threatened
SC = State Special Concern (not a statuary category)
SE = State Endangered

No federally threatened, endangered, or candidate species were observed during the surveys conducted in 2007 and 2008. In addition, no state species of concern were observed on the site. A bald eagle was observed flying along the portion of the highway that bisects the northern portion of the site.

Four habitats of interest to the CDOW were located and identified on the site that are of importance to the areas wildlife resources:
- Severe winter range for deer and elk;
- Potentially suitable habitat for the Gunnison Sage Grouse;
- Potentially suitable habitat for the Western Burrowing Owl;
- Potentially suitable habitat for the Gunnison's Prairie Dog.

EFR has proposed offsets for these potential impacts, which are discussed later.

## Aquatic Species/ Wetlands

Nine ephemeral drainages on-site have been described as discontinuous; however, the ephemeral drainage crossing the northwest portion of the site appears to have connections to East Paradox Creek (Kleinfelder, 2008c). No aquatic species or habitats occur within the site.

No U.S. Army Corps of Engineers jurisdictional wetlands were observed within the site. Only one non-jurisdictional wetland feature, a retention pond located on the site historically used to water cattle, exhibited hydrologic criteria necessary for classification

[EIA — 56]

BLM_0036834

as a wetland. Vegetation present at the retention pond sample plots did not meet the standards to be considered wetland vegetation.

Several species of native non-game fish are possible within East Paradox Creek if flows are sufficient to provide habitat, and downstream in the Dolores River. Speckled dace (*Rhinichthys osculus*) likely inhabit riffles and gravel substrates, longnose suckers (*Catostomus catostomus*) inhabit pools and riffles, and mottled sculpins (*Cottus bairdii*) are associated with cobbles and rubble bottoms of cool clear streams (Woodling, 1985). Native flannelmouth suckers and roundtail chubs may be present but are more typical inhabitants of larger streams, including the Dolores River. Flannelmouth suckers and roundtail chubs are BLM-sensitive species and Colorado species of concern. Other species including fathead minnows (*Pimephales promelas*) and white suckers (*Catostomus commersoni*) may also be present. They are native to Colorado, but were originally restricted to east slope streams. Over time, they and many other fish species have been introduced to the upper Colorado River Basin.

Investigations were conducted into the Potential Impacts to Dolores River and Potential Effects to Pikeminnow. Those studies show that the project will not reduce runoff to East Paradox Creek and the Dolores River and that any depletion of ground water inflow or benefit to water quality from the project's operation will be delayed, given an estimated travel time of more than 300 years for ground water from the project site to reach the Dolores River.

With respect to the pikeminnow, the extremely low probabilities associated with occurrence of extreme low flows during the life of the project, based on the past 40 years of stream flow data, and the simultaneous occurrence of Colorado pikeminnow, the likelihood of which is unknown, leads to a conclusion that project-related effects on the endangered species are discountable (i.e., extremely unlikely to occur) and insignificant (never reaching the point where take occurs) because extreme low flows in the Dolores River do not appear to persist for more than a few days. This assessment does not take into consideration the potential for pikeminnow to relocate to deeper water, if available, in case of extreme low flow events.

## Federally Listed, Candidate and BLM Sensitive Species

**Canada Lynx.** Lynx have dispersed from the San Juan Mountains into the Uncompahgre National Forest in central Montrose County. A few lynx have been located in San Miguel County, south of the site and in San Juan County, Utah to the west of the site. Compilations of lynx locations between 1999 and 2008, following reintroduction to southern Colorado, indicated most used Engelmann spruce/subalpine fir forest cover types throughout the year, including mixtures of conifers with aspen. Lynx also utilized riparian cover types, primarily from July through December. Lynx were mostly found at elevations averaging above 10,000 feet. The site is not suitable habitat for lynx and a resident population of lynx in the project vicinity is highly unlikely.

**Black-Footed Ferret.** Black-footed ferrets are closely associated with prairie dogs, particularly black-tailed prairie dogs and to a lesser extent, white-tailed prairie dogs and

BLM_0036835

Gunnison's prairie dogs. No critical habitat has been designated for black-footed ferrets. Black-footed ferrets are highly unlikely to occur in the site and vicinity.

**Owls.** There is no critical habitat for Mexican spotted owls near the site, and they are highly unlikely to occur at the site or in the vicinity. Western burrowing owls are classified as threatened in Colorado. No burrowing owls or sign of owls were seen in any of the burrows, but they may have been present on the adjacent 80-acre parcel in 2008.

**Gunnison Sage-grouse** . The Gunnison Sage-grouse was named a separate species in 2000, and subsequently determined to be "important" under the ESA. In September 2010, the USFWS determined that there was sufficient scientific and commercial data to propose threatened or endangered status for the species, but it is of a lower priority than other species for listing under the Act (*Montrose Daily Press*, 2010).

Studies have identified seven highly fragmented populations scattered in eight different counties in Colorado. The San Miguel Basin population consists of six distinct occupied subpopulations, and there are two additional areas of potential habitat where the species was thought to occur historically, but there have been no recent documented sightings. One of these potential habitat areas is the portion of the Paradox Valley east of the Dolores River (Colorado Division of Wildlife, 2009). Former habitat west of the Dolores River has been lost to agriculture and development (Colorado Division of Wildlife, DOW, 2010).

**Colorado Hookless Cactus.** Colorado hookless cactus is a federally listed threatened plant (U.S. Fish and Wildlife Service, 1979) that occurs on river benches, valley slopes, and rolling hills in Delta, Garfield, Mesa, and Montrose counties. No critical habitat has been designated for the species. The Colorado hookless cactus is highly unlikely to occur at the site and vicinity.

**Bats.** Four of the six species of bats considered sensitive or of special concern could occur at the site. There are currently no roosting sites or colonies on the site.

**Gophers.** Botta's pocket gopher is a medium-sized rodent and Northern pocket gophers are found in many different habitat types. Although there is suitable habitat at the site for both species, neither was observed during surveys conducted in 2007 and 2008.

**Fish**. Four species of Colorado River Basin fish (the bonytail chub, Colorado pikeminnow, humpback chub, and razorback sucker) are listed as endangered and critical habitat has been designated, although none has been designated in Montrose County for any of the four species.

## Proposed Mill Facilities

The proposed mill facilities are described throughout the application. A summary of the facilities and equipment are found in the [Facility Operating Plan](#).

[EIA — 58]

The Piñon Ridge mill facility includes an administration building, a 17-acre mill, tailing ponds totaling approximately 90 acres, a 40-acre evaporation pond (expansion capacity to 80 acres), an approximately six-acre ore storage pad, and access roads. The mill is designed to process ore produced from mines on the Colorado Plateau located within a reasonable truck-haul distance. The mill will initially process 500 tons of ore per day and is designed for future expansion capable of accommodating a production capacity of 1,000 tons per day ("tpd"). The surrounding property consists of rangeland, uranium mines, and undeveloped land. The uranium mines include an open pit operation immediately southeast of the property and underground mines along the top of the mesa south of the property. EFR does not own or operate these mines, which are currently inactive. The closest residences to the property are located 1.8 miles southwest, 3.2 miles northwest, and 3.1 miles southeast of the property boundary. More specifically, these residences are located 2.3 miles west-southwest, 3.4 miles northwest, and 3.5 miles southeast of the mill license boundary, which is positioned within the property boundary.

EFR categorizes the milling and process components into the following 10 areas (Figure 43):

- Area 100 – Ore Handling and Grinding
- Area 200 – Leaching
- Area 300 – CCD Thickeners and Tailings Disposal
- Area 400 – Uranium Solvent Extraction (SX)
- Area 500 – Uranium Precipitation
- Area 600 – Vanadium Oxidation and Solvent Extraction (SX)
- Area 700 – Vanadium Precipitation
- Area 800 – Reagents
- Area 900 – Utilities and Buildings
- Area 1000 – General Plant

BLM_0036837



**Figure 43: Major Mill Facilities (source: Facility Operating Plan).**

The department reviewed drawings and plans provided in the application. Originals can be found in the application and on the web site. They include the Basic Engineering Report Selected Drawings - General Arrangements, Basic Engineering Report Selected Drawings - Process Flows, Roadway Pavement Design Recommendations, Site Drainage Analysis and Design Report, Ore Stockpile Pad Design Report, Tailings Cell Design, and Evaporation Pond Design.

Locations of the updated designs are in the individual sections below. Revised foundation design for all mill buildings is found in the Response #2 to RFI #1. Special emphasis has been placed on building and facility design to mitigate the chances for leaks to the environment. An assessment of volume for secondary containment was provided. Information on air pollution control equipment is presented in the Air Emission Control Data report.

[EIA — 60]

BLM_0036838

A simplified flow chart of the mill facilities is shown in Figure 44.



**Figure 44: Facility Process Flow Diagram (source: Facility Operating Plan)**

## Area 100 – Ore Handling and Grinding

The ore pad (Figure 45) is designed to encompass approximately six acres. Approximately one acre of the ore pad will be lined with concrete and the remaining five acres will be lined with a geosynthetic clay liner (GCL) covered with a protective layer of compacted native soils and roadbase materials. The concrete pad will be located next to the feed hopper and conveyor, where equipment loading and unloading activity is greatest. The five-acre lined pad will be in a horseshoe-shaped configuration encircling the feed hopper and concrete pad. A front-end loader will feed the dumped ore into the ore hopper. The hopper will be enclosed within a three-sided structure to minimize fugitive dust emissions. The department had numerous comments on the geotechnical aspects of the pad; these were answered in the response to comments.

[EIA — 61]

BLM_0036839



**Figure 45: Area 100 (source: Facility Operations Plan)**

Haul trucks entering the site will be weighed at an on-site truck scale before moving to the ore pad facility. After being weighed, trucks would move onto an elevated earthen platform (located on the east end of the ore pad) and dump their loads over a retaining wall onto the five-acre ore pad without entering the ore pad area. Trucks dumping onto the pad from the dumping platform will not require washing prior to leaving the site provided they pass the required radiation screening. Under certain situations and after being weighed, trucks delivering ore may enter directly onto the concrete ore pad or five-acre ore pad to dump their loads. Upon leaving the pad, these trucks will be washed at the onsite truck wash facility and screened for radiation prior to leaving the site.

The unloading and handling of ore will utilize dust suppression methods. A built-in, winterized dust mitigation system will be built into the unloading area to mitigate dusts.

The ore will be dumped into a feed hopper and delivered by belt conveyor to a semiautogenous grinding (SAG) mill located in the main mill building (grinding and leaching building). In the SAG mill, the ore will be combined with water and tumbled with steel balls. The grinding and leaching building and the pulp storage and pre-leach pad will have concrete floors and concrete stem walls or curbs around their perimeters, which will provide secondary containment.

Abrasion-resistant HDPE pipe will be used for process lines, while steel pipe will be used for water and compressed air lines. The tanks and sumps will be equipped with high- and low-level gauges, and alarms that alert the control room and mill operators in the event of upset conditions.

[EIA — 62]

BLM_0036840

The proposed SAG mill is an advancement over earlier mills that used cone crushers or other crushing methods that released significant amounts of dust. The SAG mill will be completely enclosed and will not emit dust from an outdoor stack. This is a reduction in potential radioparticulates to the environment.

Before an ore truck or other piece of equipment would leave the ore pad area, its tires and chassis will be cleaned at the truck wash facility. The truck wash will be a partially enclosed and fully automated touch-less system consisting of a platform constructed of heavy-duty angle iron with high pressure water sprays mounted both below and on the sides. The high-pressure sprays will remove dirt or mud tracked off the ore pad area, and will require between one and two minutes to wash a truck.

## Area 200 – Leaching, Pre-leaching, and Thickening

The resulting slurry from the SAG mill will be distributed to one of two large, steel pulp storage tanks located outside in the area west of the grinding and leaching building. The pulp storage and pre-leach Area facilities will be located on a concrete pad enclosed within a 4.5-foot tall concrete containment wall. This wall will provide containment equal to the volume of the largest tank on the pad plus 10 percent.

The slurry will be pumped from the storage tanks to two rubber-lined, steel pre-leach tanks where the pulp will react with sulfuric acid reducing the pulp density to approximately 25-percent solids. The pulp will then report to a rubber-lined, steel thickener tank. A thickener is a device that separates the solid material in the process stream from the liquid portion by creating a very gradual upward current of solution that is too slow to carry the solid material up with it.

The overflow from the thickener will be clarified, filtered, and sent to a feed tank for use in the uranium recovery circuit. These processing units will be located outside, next to the pulp storage tanks on the same concrete pad.

The partially dewatered underflow from the thickener will be pumped to the leaching circuit.

The pre-leach tanks will be completely enclosed. When the feed pulp is mixed with the low-pH solution from the counter current decantation (CCD) circuit, acidic fumes will be generated. These fumes, as well as the fumes from the leach tanks, will be vented to the wet Venturi scrubber located in the northeast corner of the grinding and leaching building.

**Leaching.** The leach circuit, located on the north end of the grinding and leaching building, will consist of eight rubber-lined steel tanks with agitators. Five leach tanks will be required to process 500 tpd. They will be 21-foot diameter by 24-foot high rubber-lined, steel tanks, each with a nominal capacity of 60,000 gallons. The leach tank area will be enclosed within a concrete curb and/or wall along the perimeter of the building and between the tanks and the SAG mill area.

BLM_0036841



**Figure 46: Area 200 (source: Facility Operations Plan)**

The tanks will be arranged in a cascading and staggered configuration so that individual tanks can be bypassed if necessary. The tanks will be arranged in a stair-step fashion so that the pulp gravity flows from one tank to the next. In the leaching circuit, the pulp pumped from the pre-leach thickener tank will be heated with steam and then leached with sulfuric acid to dissolve the uranium and vanadium minerals. Sodium chlorate will also be added as an oxidant, as necessary.

After leaving the last leach tank, the pulp will flow by gravity to the CCD circuit. The leach tanks will be completely enclosed. When reagents and heat are added to the solution, acidic fumes will be generated. These fumes, as well as the fumes from the pre-leach tanks, will be vented to the wet Venturi scrubber located in the northeast corner of the Grinding and Leach Building.

BLM_0036842

## Area 300 – CCD Thickeners and Tailings Disposal

The leached pulp will be pumped to a series of 40-foot diameter CCD thickeners, where liquids and solids will be separated (Figure 47). The CCD thickener tanks will be located outside, on the north side of the grinding and leaching building, and the CCD thickener building will run between the two rows of tanks. The CCD circuit will consist of a series of thickeners in which the pulp (i.e., underflow) will go in one direction, while the uranium/vanadium-bearing solution (i.e., overflow) will go in the opposite direction. As the pulp is pumped from one thickener to the next, it will gradually be depleted of its uranium and vanadium. By the time the pulp leaves the last thickener, it will essentially be barren waste that is disposed of in the tailings cells.



**Figure 47: Area 300 (source: Facility Operations Plan)**

The pregnant solution will be pumped to the pre-leach tanks and subsequently to the uranium recovery feed tank. The underflow from the last CCD thickener, a portion of the vanadium raffinate stream, and the intermittent backwash stream from the vanadium polishing filters will flow into the tailings sump. The tailings will then be pumped to the

[EIA — 65]

BLM_0036843

operating tailings cell for disposal. The tailings sump area will be located outside and immediately northwest of the CCD thickeners on an extension of the CCD concrete pad.

The tailings cells and evaporation cells are described in detail elsewhere.

## Area 400 – Uranium Solvent Extraction (SX)

A solvent extraction (SX) process will be used to concentrate and recover the uranium from the pregnant solution (Figure 48). In the SX process, the pregnant solution will be filtered and the uranium separated and purified using a kerosene-based solvent. The result will be a relatively pure, but weak, uranium solution, which will be washed with sulfuric acid and water to remove impurities. Following washing, the uranium will be stripped from the solvent using a sodium carbonate solution. The uranium SX circuit will be located in the solvent extraction building.



**Figure 48: Area 400 Solvent Extraction Circuits source: Facility Operations Plan)**

[EIA — 66]

BLM_0036844

## Area 500 – Uranium Precipitation

The circuit will consist of the uranium precipitation tanks, dewatering thickeners, and drying and packaging systems (Figure 49).



**Figure 49: Area 500 – Uranium Precipitation**

The loaded (pregnant) solution will then be pumped from the clarifier overflow pipe to the polishing filters, which will remove fine-grained particles that could potentially contaminate the extraction system (i.e., cause emulsification within the mixer-settler tanks). After filtering, the solution will flow into the uranium SX feed tank, while the solids removed by the filters will be pumped to the tailings cell.

Within the precipitation and packaging building, the uranium will be continuously precipitated from the stripping fluid by adding hydrogen peroxide to the solution, which precipitates a bright yellow powder referred to as yellowcake. The powder will then be

BLM_0036845

partially dewatered, washed, filtered, and dried in a vacuum dryer. The filter press will remove additional water from the yellowcake using a high-pressure filtering system.

Finally, the dried yellowcake will be packed, weighed, and sealed in 55-gallon, steel drums for shipment. The wet yellowcake containing 35 percent moisture by weight will be transferred from the decant tank into the yellowcake vacuum dryer, which is a zero-emission dryer where the cake will be indirectly heated to evaporate the contained moisture. The dried cake will then be transferred to 55-gallon drums via a rotary valve and an enclosed packaging system. This is a major change from legacy mills that used calciners (i.e. furnaces) rather than vacuum drying and extraction. There will be no yellowcake stack to the environment; rather there will be a dryer vent inside the building.

At an ore processing rate of 500 tpd, an average ore grade of 0.23 percent $U_3O_8$, and a 96 percent recovery rate, approximately 2,200 pounds of yellowcake (or two and one-half drums) will be produced per day. A rotary valve and transfer hood will be incorporated into the yellowcake dryer. The transfer hood will lower directly to the top of an open drum.

The uranium precipitation tanks and adjacent uranium thickener will be enclosed within a concrete curbed area designed to contain the contents of the largest tank (i.e., the thickener) plus 10 percent. The uranium thickener will be a 32-foot diameter by 12-foot high rubber-lined steel tank with a sloped bottom. The uranium thickener will have a capacity of approximately 100,000 gallons and, because of its relatively large size, can be used to store yellowcake slurry over a number of consecutive operating shifts.

## Area 600 – Vanadium Oxidation and Solvent Extraction (SX)

The raffinate solution that remains after the uranium minerals have been recovered will be prepared for vanadium recovery by oxidizing the vanadium ion species in solution with the addition of sodium chlorate, and reducing the acid concentration slightly by the addition of ammonia. In a similar fashion to the uranium recovery process discussed above, the vanadium circuit will use an SX process to recover vanadium. The barren raffinate from the vanadium circuit will be pumped to the CCD circuit for use in transporting the tailings to the tailings cell or to the evaporation pond for disposal. The vanadium SX circuit will be located in the solvent extraction building (Figure 50).

[EIA — 68]



**Figure 50: Area 600 Vanadium SX (source: Facility Operations Plan)**

Given the flammable nature of the organics present in the stripping process, the solvent extraction building will be equipped with smoke and heat detectors, which activate a suppression system. Fire extinguishers will be present at key locations throughout the building.

## Area 700 – Vanadium Precipitation

The vanadium will be precipitated by adding ammonium sulfate to the stripping fluid within the precipitation and packaging building (Figure 51). The precipitate will then be dewatered, dried, and removed of ammonium in a kiln. The $V_2O_5$ discharging from the kiln will be melted in a furnace and solidified into a black-flake product, which will be packed, weighed, and sealed in 55-gallon, steel drums for shipment. All tanks in the vanadium precipitation circuit will be enclosed at the top. Tanks No. 1 through No. 5 will be vented to a packed-bed wet scrubber to remove the ammonia fumes and cool the air prior to venting. This system, which will be located on the first floor near the center of

BLM_0036847

the building, will provide 99 percent removal efficiency for particle sizes down to five microns.



**Figure 51: Area 700 Vanadium Precipitation (source: Facility Operations Plan)**

The vanadium dryer will consist of a U-shaped steel trough with a screw-type shaft that advances the cake through the dryer. A 30-foot-long by 30-inch diameter rotary kiln will be constructed of stainless steel. The cake will be fed in at one end of the kiln and will gradually move to the other end as the kiln rotates. The granular vanadium oxide will be conveyed from the rotary kiln to the 5-foot diameter by 10-foot-long fusion furnace. The furnace will discharge to a casting water wheel where the vanadium oxide melt will be solidified into a fused black-flake product.

Two sets of scrubbers will be located in the precipitation and packaging building. The first scrubber will be a packed bed wet scrubber and the second will be a wet Venturi scrubber. The gas emissions from the steam dryer and rotary kiln along with the vacuum flow from the belt filter will all be directed to the packed bed wet scrubber. The

[EIA — 70]

BLM_0036848

emissions from the dryer will first be vented through a baghouse before entering the scrubber.

At an ore processing rate of 500 tpd, an average ore grade of 0.92 percent $V_2O_5$, and an 80 percent recovery rate, approximately 7,300 pounds of $V_2O_5$ (or 13 drums) will be produced per day. The drums of $V_2O_5$ will be shipped via truck to a plant that produces ferro-vanadium products. Two of the larger plants include the Stratcor plant in Hot Springs, Ark. and the Bear Metallurgical plant in Butler, Penn.

## Area 800 – Reagents

Area 800 facilities will consist of the chemical reagent handling and storage systems. During operations, varieties of reagents will be used in the uranium and vanadium recovery processes. The reagents will be stored on-site in prepackaged totes, barrels, and bulk bags within weatherproof buildings and/or in closed bulk storage tanks. The containers will be chemically and physically compatible with the media stored and will meet applicable local, state and federal storage regulations, including secondary containment. They are shown on Figure 52 and listed in Table 16.



**Figure 52: Area 800, Reagent Storage and Handling
(source: Facility Operations Plan)**

BLM_0036849

**Table 16: Primary Reagents**

| Primary Reagents | | |
| --- | --- | --- |
| **Tank Storage** | **Organic Storage** | **Other Storage** |
| Sulfuric Acid | Kerosene | Sodium Hydroxide |
| Ammonia | Amine | Flocculent Polymer |
| Ammonia Sulfate | Isodecanol | Diatomaceous Earth |
| Sodium Chlorate | | |
| Sodium Carbonate | | |
| Hydrogen Peroxide | | |

With the exception of ammonia, reagents will be offloaded at the reagent unloading area, located on the south side of the mill. Ammonia will be offloaded directly from a tanker truck into the on-site storage vessel located west of the solvent extraction building. Both the reagent unloading area and the ammonia storage tank will be located outside of the restricted area (i.e., mill license boundary) so that delivery trucks are not exposed to mill process areas.

Bulk shipments of reagents received in liquid form (e.g., sulfuric acid, sodium chlorate, hydrogen peroxide, and kerosene) and in dry form (e.g., ammonia sulfate and sodium carbonate) will be offloaded from tanker trucks at the reagent unloading area via hose connections, and pumped/blown into mixing and/or storage tanks located within various areas of the mill. Reagents delivered in prepackaged totes, barrels and bulk bags will be offloaded at the reagent storage area and subsequently moved to the warehouse for storage or directly to the area of the mill where they will be used.

## Area 900 – Utilities and Buildings

Area 900 facilities will consist of the utility and building systems, which will include electric power, propane heating, fuel storage, water supply, septic, buildings and parking systems (Figure 53).

BLM_0036850



**Figure 53: Area 900, Utilities (source: Facility Operations Plan)**

[EIA — 73]

## Area 1000 – General Plant

Area 1000 facilities will consist of the general plant and ancillary facilities and systems, which will include access, security, warehouse, shop and laboratory facilities, and environmental monitoring and emergency response systems (Figure 54).



**Figure 54: Area 1000 General Plant (source: Facility Operations Plan**)

## Facility Layout and Restricted Area (Licensed) Area Boundary

The property covers approximately 880 acres in the southeastern portion of Paradox Valley. The restricted area will be about 300 acres (Figure 55).

[EIA — 74]

BLM_0036852



**Figure 55: Restricted Area**

The mill layout is designed to limit the access to the restricted area by administrative and support services. All secondary buildings will be located outside of the mill license boundary area. These include an administration building, change house and laboratory building, warehouse, truck shop, and guardhouse. The administration building, located east of the main access road at the north end of the project site, will house office facilities for both milling and mining personnel and will include a garage for the onsite ambulance. The change house and laboratory building, warehouse, and truck shop will be located next to the primary process facilities at the mill. Gravel parking areas will be located at the administration building and secondary mill buildings.

[EIA — 75]

BLM_0036853

The mill facility will be located toward the back of the property (when looking from the road). The tailings cell(s) and evaporation cells will be closer to the road. The low-profile tailings cells will be approximately 30 feet above grade at their highest point. The evaporation cells will have bird netting and will be visible from the road. The highest mill building will be about 96 feet above grade.

# Mill Health and Safety

The applicants, Energy Fuels Resources, Inc. (EFR) have established a structured, tiered Health and Safety (H&S) program as part of their application for a radioactive materials license using a top-down approach that stresses the importance of all personnel at all levels being responsible for safety. The H&S Plan outlines the requirements and responsibilities of each layer of management in establishing a safe work environment for mill workers, contractors, and visitors to the mill site. The overall occupational safety program is implemented through a series of health and safety procedures as part of the H&S plan, which address the following "key" areas:

- Hazard Communication Program;
- Administrative Procedures;
- General Health and Safety Procedures;
- Radiological Health and Safety Procedures;
- Environmental Procedures; and
- Security Procedures.

The Colorado Department of Public Health and Environment has reviewed and provided comments on the H&S Plan.

Radiological and non-radiological safety is administered through a series of operational procedures found in the H&S Plan. These procedures guide management, workers, contractors, and visitors in the fundamental aspects and requirements associated with safety at the mill. Radiological safety is regulated by the requirements of the Colorado Rules and Regulations Pertaining to Radiation Control at 6 CCR 1007-1 (the regulations), parts 1, 3, 4, and 18, and the facility-specific radioactive materials license. Additionally, the applicants' procedures and related documents submitted as part of the application process are tied to the license through license conditions that mandate the licensee adhere to their procedures. Once a license is issued, compliance with the requirements is verified through routine inspection processes. Failure of a licensee to follow the legally binding requirements may result in issuance of violations by the department and where warranted, escalated enforcement actions, which can carry administrative or other monetary penalties.

Due to the inherent dangers associated with a heavy industry such as milling, non-radiological, industrial hazards often outweigh the risks and subsequent impacts presented solely from radiological hazards. Non-radiological safety at mill sites is governed by federal Mine Safety and Health Administration (MSHA) requirements and other state and federal workplace requirements. Although not the primary focus of the

[EIA — 76]

review for licensed activities, non-radiological safety procedures were reviewed as part of the application process for general consistency and integration with the radiological safety procedures. A complex radiation safety program such as that found at a conventional uranium mill requires a fully integrated safety program. Following review and comment by the department, the H&S Plan and associated procedures were revised to address some inconsistencies and ensure better integration.

## Radiological Safety

Members of the public are protected from direct contact with radiological materials on the mill site through physical means such as fences, and other access-control measures. Visitors to the site are required to be under escort by mill employees to ensure their overall safety. This approach is consistent with the regulatory requirements and is common practice at other licensed facilities.

Workers at the mill site are occupational radiation workers and are limited to the annual dose limits specified in Part 4 of the regulations. Worker exposure is controlled and limited through proper implementation of a well-defined radiological safety program.

From an occupational radiation safety perspective, conventional uranium mills generally present lower external radiation hazards than many other radioactive materials licensees. Although some external radiation hazards exist at a mill, more significant occupational radiological exposures associated with milling activities and operations typically arise from internal exposures due to accidents, or from system, equipment, or personnel failures. Thus, the mechanisms put in place to prevent and monitor internal exposures (or potential exposures) are paramount to ensuring radiological safety. Although radiation exposure and personnel contact with radioactive materials and contaminated systems cannot be fully avoided in the operation of a mill, the implementation of a radiological safety program helps minimize the potential radiological exposures to workers.

A properly designed and implemented program for occupational radiological safety is expected to carry out two primary functions: (1) to prevent or reduce the potential for exposure before it occurs; and (2) to measure, monitor, and help mitigate dose through implementation of "retrospective" programs. The preventive aspects of a radiation safety program are implemented through elements that involve:
- personnel training;
- operational procedures;
- establishment of an As Low As Reasonably Achievable (ALARA) program;
- use and implementation of radiation work permits;
- use of Personal Protective Equipment (PPE), such as respiratory protection;
- performance of job safety analyses for unique or complex work activities; and
- routine radiological surveys and monitoring of work areas.

The retrospective side of a radiological safety program involves:
- procedures that establish action levels;
- personal and area air monitoring;

[EIA — 77]

BLM_0036855

- routine and special bioassay measurements; and
- external dose monitoring (dosimetry).

While the radiological safety program for the EFR mill addressed the above elements, it was discovered during the application review process that many of the health and safety procedures were not well integrated with one another. While a smaller, simpler facility using radioactive materials may function with less integrated procedures, a conventional uranium mill mandates a greater degree of consistency and integration due to the complexity of the program. The applicant was informed of the procedural integration issues and submitted revised health and safety related procedures as part of the application review process. The revised documents are deemed acceptable for licensing purposes.

The EFR mill Health and Safety Plan and its underlying procedures as described in the application and subsequent documents follows standard protocols and processes for ensuring radiological safety for workers, contractors, and visitors to the site. The plan, procedures and subsequent documents also address the preventive and retrospective program needs. The EFR radiation safety program is consistent with federal guidance and addresses the requirements of the regulations, and is deemed acceptable for licensing purposes. Due to the complexity of operations at the site, it is expected that some aspects of the operational radiation safety program will require adjustment and modification and will be phased in as part of start up operations following construction of the facility. Any license issued will contain license conditions restricting possession of radioactive material until certain milestones or requirements are achieved. For example, procurement, calibration, and availability of radiological survey instruments for performing site surveys are not necessary since with a new facility, there would be no immediate physical location in which to use them. Unlike most other applicants whose start-up time is shorter and simpler, licensing of a conventional uranium mill requires a phased implementation approach.

## Impact Analysis

A significant number of documents have been generated evaluating various potential impacts from the proposed mill. The EFR application, including the Environmental Report and other studies, has been a primary resource for evaluating impacts from the mill. In addition, information provided by other state agencies, external organizations, and numerous individuals have been used to supplement and supplant the EFR information. In general terms, EFR information was found to be accurate and appropriate for the analysis, and most of that analysis is not repeated in this section. The reader is referred to the EFR documents for an understanding of the project and its basic impacts. Additional discussion of the impacts and significant issues raised in the review by department staff, other agencies, local government, or the public is presented below.

[EIA — 78]

BLM_0036856

# Environmental Effects of Site Preparation and Mill Construction

Potential impacts from mill site construction and operation are discussed throughout Section 4 of the ER. Excerpts are presented here for brevity.

## Land Use

Land use impacts during construction would include traffic-related impacts to nearby residents and recreationists and rangeland impacts. Traffic associated with construction could impact nearby landowners who use SH 90 to access their property. During the Dolores River's floating season, which typically extends between April 30 and June 15, floaters who take out at the Bedrock launch site potentially could encounter additional traffic on SH 90. Bicyclists along SH 141 also could encounter increased truck traffic. The site would be removed from use as seasonal rangeland, which would result in the loss of approximately 90 to 124 AUMs. To the extent that hunting has been allowed on the site in the past, construction would remove 880 acres for use by game and bird hunters.

## Transportation

Traffic associated with construction would include heavy vehicles delivering materials and equipment to the site and light vehicles transporting workers to the site. Approximately 2,250 truckloads of materials and equipment would be delivered during the first two quarters of construction (Golder, 2009b). Deliveries would include gravel and concrete from the local community and fencing, building steel and siding, culverts, piping, electrical, and grounding materials from regional sources. Another 4,350 truckloads of equipment and materials would be delivered between the third and seventh quarters of construction. These deliveries would include gravel, fencing supplies, concrete, and petroleum products from the local area, and structural steel, plate work, and building, liner, and piping materials from all areas of the continental United States (Golder, 2009b).

Peak traffic would occur in the fourth quarter of construction. During construction, daily (one-way) trips to and from the site would range from a low of 12 trips during the seventh quarter to a high of 234 trips during the fourth quarter. All road segments affected by the proposed action are classified as rural arterial or rural collector roads by the respective Colorado and Utah Departments of Transportation. During construction, the most heavily used public road segments would be SH 90 between the site and Vancorum, and SH 141 between Vancorum and Naturita. Most construction-related traffic would be associated with the workforce.

Average daily traffic on SH 90 between Vancorum and the site would increase by 39.6 percent during the fourth quarter of construction. Average daily traffic on SH 141 between Vancorum and Naturita would increase by 29.7 percent. The greatest increases in truck traffic would occur along SH 90, between the site and Vancorum, and on a two-mile segment of SH 141 north of Vancorum. Truck traffic would increase by 36.6 percent

BLM_0036857

along this segment of SH 90, and by 34.8 percent on this segment of SH 141 during the fourth quarter of construction.

EFR has obtained a site access permit from the CDOT that provides for safe site access and egress (Colorado Department of Transportation, 2008). Consistent with the terms of the access permit, EFR would widen SH 90 over a length of 2,175 feet at the site access intersection by constructing a left-turn deceleration lane for westbound traffic on SH 90, and a 10-foot-wide shoulder on the south (eastbound) side of SH 90, east of the site access road (Colorado Department of Transportation, 2008).

EFR would encourage its workers to carpool to reduce project-related traffic. To reduce project-related traffic during construction, EFR would encourage its contractors to provide busses or vans at central collection points in nearby towns to transport construction workers to and from the site.

Dust suppression measures would include magnesium chloride or equivalent treatments and water sprays on gravel roads on the site.

## Soil/Geology

Geology-related potential impacts could occur during construction, operation, or closure. Potential impacts could result from geologic hazards such as slope instability, flooding and headward erosion, karst or dissolution features, faulting, seismicity, liquefaction, collapsible soils, and volcanism.

Part 18, Appendix A, Criterion 1 of the Radiation Regulations relates to site selection, and favors minimal potential for erosion and disturbance in the long-term. Criterion 3 favors placement below grade, or "reasonably equivalent isolation of tailings from natural erosional forces."

The site was selected to minimize impacts from geologic hazards. Tailings cells would be mostly below grade, minimizing the height of disturbance and allowing for construction of very gradual, erosion-resistant embankment slopes during closure in compliance with Criterion 6 of Appendix A.

No saturated soils were observed, either perched or at the base of the alluvium. The uppermost materials contain some poorly packed, collapsible soils, which would require removal prior to laying foundations. Local soils, including the surficial collapsible material, could be moisture conditioned (wet to optimum moisture) and re-laid and compacted to achieve a competent base for spread foundations. The site alluvium would therefore be a suitable foundation, provided that some loose soils were removed or replaced and re-compacted and deep foundations installed under critical plant areas. These requirements have been incorporated as license conditions.

There would be no insurmountable soil stability problems in terms of bearing competence or destabilization by natural events. Appropriate foundation design would preclude any

[EIA — 80]

BLM_0036858

subsidence due to soil instability or probable seismic disturbance. The alluvium is well-drained and has limited plasticity.

Faults parallel the valley side, formed by the collapse of the former anticlinal dome. Trenching over known faults in the valley floor indicated no displacement of Quaternary soils. Falls and slides pose no plausible risk to the mill.

The hazards of seismicity include potential damage to the mill due to ground acceleration and destabilization of the subsurface beneath the plant. The historic seismicity of the area is low, and associated with distant faults or with the Paradox Valley Unit (PVU) brine injection, which has been scaled back, with concomitant decrease in quake intensity.

The probability of natural earthquake occurrence and magnitude was assessed. The design earthquake (the magnitude the plant would be designed to resist with a factor of safety) has magnitude 4.8 at a distance of 10 miles from the site, and causes a ground acceleration of 0.161 g (16 percent of the acceleration of gravity, or five ft/s$^2$). All facilities, including the plant, offices, foundations, containments, storm water structures, and roadways are designed in accordance with Montrose County building codes. The county currently relies on the Uniform Building Code (UBC) but is transitioning to the International Building Code (IBC), which includes a more comprehensive analysis of earthquakes. Under the IBC, the facility would be designed based on the design earthquake with a suitable safety factor. The final design would then be checked for stability using the acceleration of gravity associated with the maximum credible earthquake (MCE). The MCE has a probability of occurrence of two percent in 50 years, corresponding to a return period of 2,475 years.

Potential impacts to soil resources within the site would be associated with development activities from the construction, operation, and closure of the mill. Construction activities would include site clearing and grading activities required to install the project components which include the mill, administration building, ore stockpile pad, tailing cells, evaporation ponds, and surface water control features, as well as disturbance associated with general site grading requirements, roads, soil stockpiles, and other minor ancillary facilities.

In construction, the site would be disturbed and modified, surficial soils stripped and stockpiled, subsoils excavated and/or compacted, foundations (deep and shallow) installed for the plant, and an access road constructed.

The site access road and surface water control structures would be the first items constructed at the site so that complete runoff and sedimentation controls would be in place prior to facility construction. During the construction of the site access road and surface water control structures, temporary erosion and sediment control measures would be installed. These include the use of silt fences and straw bale filters where appropriate, water sprays to control dust, and stabilization of disturbed areas and embankments as soon as is practicable. While the facility is being constructed, permanent surface water

[EIA — 81]

BLM_0036859

controls would be in place, and mobilized sediment would be contained to the extent practicable.

Impacts to soils from construction would occur from the loss of soil production associated with the long-term disturbance and occupation of the area by the mill. Although topsoil salvaging would occur during clearing and grading, soil productivity could diminish through the loss of topsoil, or from the mixing of topsoil with less productive subsoils. Soil productivity could be degraded by soil compaction and damage or loss of soil structure from the movement of heavy construction equipment, soil mixing or displacement during grading, and site development activities. The long-term storage of topsoil in stockpiles could decrease soil quality by the loss in organic matter or biological activity. Soil disturbance from clearing and grading could increase the potential for soil loss and sedimentation from wind and water erosion. This may occur because increased soil exposure would occur from the loss of vegetation cover, loss of biological or physical soil crusts, and from physical disturbance. Soils disturbance could increase the potential for noxious weed infestation which typically decreases soil productivity.

Approximately 415 acres of soils would be disturbed by site development activities. Although the soils that would be affected are not considered prime farmland because they have not been irrigated or farmed, the majority of the soils that would be affected have chemical and physical characteristics that rate them as suitable topsoil and reclamation materials.

Topsoil would be stripped to depths of six to 12 inches and stockpiled for later use during reclamation and closure. Topsoil salvaging would occur in a manner to minimize contamination with other soil horizons, and to ensure topsoil removal does not result in erosion or excessive sedimentation. Further, topsoil stockpiles would not be disturbed and would be protected from wind and water erosion, compaction, and contamination. Topsoil stockpiles would be graded to prevent erosion and an effective cover of non-noxious, quick-growing, annual and perennial plants would be established to stabilize the stockpiles and to ensure long-term viability of the topsoil. The topsoil stockpiles would be seeded and mulched during the first appropriate growing season after topsoil stripping and stockpiling. Diversion channels would be constructed around each pile to minimize storm water run-on.

During topsoil salvaging efforts, EFR would ensure that a qualified representative would observe these operations to verify and confirm suitable topsoil salvaging depths are being utilized to prevent potential loss of this resource.

None of soils that would be affected by development activities have a high wind or water erosion hazard. Although a large area of disturbance would occur during clearing and grading, the mill has been designed to occupy or disturb the minimum area necessary for construction and operations. The area is generally flat, which minimizes the potential for slope wash erosion. Prior to clearing and grading, the site would be surveyed and staked to minimize disturbance to surrounding areas outside of the construction footprint.

[EIA — 82]

BLM_0036860

The native overburden soils may be used as engineered fill anywhere on the site provided they are processed and moisture conditioned.

## Water

The potential for erosion would be minimized by diverting un-impacted or undisturbed surface water drainage around the mill through designed diversion berms and channels that are directed into natural drainage channels east and west of the site. Diverting runoff around the facilities would minimize potential sedimentation by minimizing runoff volumes over disturbed areas of the site.

Surface water control structures would be constructed at the start of construction activities, so that full erosion and sedimentation control would be in place before most surface disturbance would occur. During construction there is the potential for damage to partially constructed runoff control structures. Best-management-practices (BMPs) temporary erosion and surface water control measures would be used during construction of the site access road and permanent surface water control structures. Disturbed soils and constructed berms would be stabilized as soon as is practicable, using DOT liner and riprap on storm water diversionary dikes, grouted riprap in runoff diversion channels, and vegetation on low to moderate slopes.

A detailed *Construction Stormwater Management Plan* is required prior to site construction. Implementation of the storm water management plans would minimize the potential for erosion and sediment-laden runoff. During construction, grading of the site would be managed to control runoff, erosion, and sediment transport by utilizing a variety of sediment control measures including hay bales, silt fences, and temporary detention basins. The purpose of these controls would be to minimize the amount of sediment runoff from the property boundary to levels that approximate conditions prior to initiating construction.

During construction of the storm water control structures, there is the potential of storm water eroding disturbed areas and contributing sediments to East Paradox Creek. EFR would implement temporary sediment control measures, such as erosion control matting, silt fences, straw bale wattles, and swales outlined in the BMPs to control erosion during construction, and temporarily halt construction that would create muddy and rutted conditions until the soil dries out sufficiently to support the appropriate equipment. Disturbed areas outside of the facility footprint would be vegetated as soon as is practical. BMP control measures would continue to be used in those areas until soils are fully stabilized.

Water supply wells would be installed prior to any other construction and water would be available from the wells as required through the life of project. Impacts to the bedrock aquifer (dewatering) may therefore begin during construction. Spills of equipment fuel could occur and enter the subsurface. Once installed, storm water control structures would intercept water that would otherwise have infiltrated or run off.

BLM_0036861

Water for dust suppression would be a small and intermittent demand compared to plant use and is not expected to make measurable impacts to the water table. On-site fuel tanks would be in secondary containment and BMPs would be in effect to prevent or mitigate any spills or leaks.

## Vegetation

Construction would directly impact vegetation, primarily by removal. Direct impact within the mill license boundary is expected to be long-term (for the life of the project). Although the entire mill license boundary would not be void of vegetation, the entire area is being considered for direct impact (307.8 acres). The majority of the development within the mill license boundary would affect big sagebrush shrublands, removing approximately 236.5 acres. Approximately 71.3 acres of mixed grasslands would be affected. No piñon-juniper would be removed; therefore no direct impact to this dominant vegetation type is expected. Long-term disturbance (for the life of the project) outside the mill license boundary would be approximately 46.1 acres and would include 8.8 acres of big sagebrush habitat and 37.3 acres of mixed grassland habitat. Disturbance that would be revegetated during the life of the project (soil stockpile and pipelines) would be approximately 60.7 acres and would include 2.3 acres of big sagebrush and 58.4 acres of mixed grasslands.

The amounts of impacted big sagebrush and mixed grasslands are minor compared to the extent of each vegetation type within the region surrounding the site. For example, there are 70,396 acres dominated by big sagebrush vegetation and 29,119 acres of grass/forb rangeland (corresponding to mixed grasslands) that have been identified within the San Miguel Basin Gunnison Sage-Grouse Conservation Area (Gunnison Sage-Grouse Rangewide Steering Committee, 2005), within which the site is located. Consequently, the proposed action would impact 0.4 percent of sagebrush and 0.6 percent of grasslands in this portion of the San Miguel Basin Gunnison Sage-Grouse Conservation Area.

Because noxious weeds are often able to establish in cleared areas following surface disturbance, primarily along roads and areas of development, construction of the proposed action could increase the presence of these weed species and/or introduce them into areas that are not currently infested with non-native species through increased vehicle traffic, equipment placement and operation, foot traffic, and other surface-disturbing activities associated with the project. Establishment of noxious weeds could alter the native plant communities, which may out-compete more desirable native plant species and be less palatable than native vegetation, indirectly impacting wildlife. EFR will implement a weed control program.

## Threatened and Endangered Species

The reader is directed to Section 4 of the ER for a detailed discussion of impacts to wildlife. Only a brief summary is presented here.

Construction of the mill would generate noise. The closest construction area to piñon-juniper habitat where noise would be generated is the subsoil stockpile (480 feet away). Noise produced by some construction equipment (jackhammers, mounted impact

[EIA — 84]

BLM_0036862

hammer, graders) could generate noise ≥70 dBA which would be sufficient to disturb northern spotted owls. In most of the piñon-juniper habitat, noise would range between 57 dBA (threshold causing alert behavior in northern spotted owls) and 70 dBA during construction. Based on responses to noise by northern spotted owls, Mexican spotted owls, if they were present in the piñon-juniper woodlands, could be affected by noise produced during construction. However, their presence within the site is highly unlikely and adverse effects to Mexican spotted owls due to construction noise would be minimal and discountable.

Soil disturbance during construction of the mill site could provide habitat suitable for colonization by prairie dogs during or following construction. If they did colonize the site, they could be susceptible to direct mortality by construction equipment.

Construction of the mill would impact 247.6 acres of big sagebrush, which would reduce the amount of available sagebrush within Paradox Valley. Construction could potentially interfere with attempted movements by Gunnison Sage-grouse between occupied habitat in Dry Creek Basin (where there is oil and gas development) and potentially suitable habitat in the East Paradox Valley. Consequently, the mill could potentially affect efforts to re-establish Gunnison Sage-grouse populations in East Paradox Valley. Recent decisions by the DOI do not impact this site.

Night lighting would likely occur during construction and could act as a barrier to bat movements, bat activity in the immediate vicinity, or have an opposite effect by attracting nocturnal insects to mercury vapor lamps. Loss of foraging habitat can adversely affect bats (Adams, 2003) and potential use by foraging bats of the retention pond on the southern end of the site may be limited by noise and other disturbances associated with construction. Construction of the proposed action would impact 247.6 acres of big sagebrush and 167.0 acres of mixed grasslands that provide feeding habitats for these species.

Removal of foraging habitat or alteration in vegetation cover and vegetation composition from introduced, invasive species may negatively affect the pocket gophers, if present. Increased traffic resulting from with construction of the mill would increase the potential for vehicular collisions with wildlife and potential mortality for bald eagles scavenging along roadsides.

Although western burrowing owls are relatively tolerant of passive human disturbance, such as increased traffic or construction noise, the owls could be indirectly impacted during their breeding season from noise and vibration associated with construction and increased human presence, habitat loss including destruction or degradation of foraging habitat adjacent to occupied or potentially occupied burrows, and decrease in prey species. Such disturbance may displace individuals to surrounding habitat, possibly resulting in overcrowding and increased competition for food resources and nesting sites. Colorado Partners in Flight (2000a) recommend a disturbance buffer of 100 to 300 meters (328 to 984 feet) to minimize disturbance to nesting or foraging western burrowing owls, especially during the breeding season (Feb. 1 through Aug. 31);

[EIA — 85]

BLM_0036863

therefore, any activity or project component within 300 meters may indirectly impact this species.

Increased traffic due to mill construction could potentially contribute to mortality of mule deer, elk, and possibly pronghorn. Mule deer mortality could potentially increase on several routes during construction including 1) SH 90, east and west of the site in Colorado where it passes through a resident population of mule deer, severe winter ranges and/or winter concentration areas, 2) on SH 141 in San Miguel County and Montrose County where the highway passes through mule deer winter range, severe winter range, and winter concentration range, and 3) on SH 46 in Utah, which connects U.S. Highway 191 to SH 90 while passing through mule deer crucial range.

The site is entirely within elk overall range, elk winter range, elk severe winter range, and an elk winter concentration area. In addition, routes to be used during construction would pass through resident elk populations, elk winter ranges, severe winter ranges, and winter concentration ranges in Colorado, and elk crucial ranges in Utah. Based on similar assumptions to those discussed for mule deer, elk vehicle-related mortality would most likely increase during construction 1) on SH 90, east and west of the Piñon Ridge Mill in Colorado where it passes through a resident population of elk, as well as through elk severe winter range, 2) on SH 141 in Montrose County where the highway coincides with elk winter range and severe winter range, and 3) on SH 46 in Utah, which connects U.S. Highway 191 to SH 90 while passing through elk crucial winter range.

U.S. Highway 191 in San Juan County, Utah and SH 141 in San Miguel County, Colorado also pass through pronghorn crucial yearlong range and winter range, respectively. However, given the existing (2008) traffic levels and relatively few project-related trips per day through those ranges, increased pronghorn mortality due to traffic associated with construction of the proposed action is expected to be minimal.

Construction of the mill would take nearly two years to complete and would possibly coincide with two consecutive winters. Mule deer and elk wintering on or in the vicinity of the site would potentially be displaced by construction activity. Mule deer, elk, and pronghorn mortalities occur when they attempt to jump fences and their legs become ensnared between the top two fence wires (Harrington and Conover, 2006). Additional mortality can also occur if the property boundary fence would cause mule deer and elk to cross SH 90 more often than they would in its absence. Increased crossing rates are assumed to increase animals' risk of collision with vehicles. Increased mortality could potentially occur for fawns that are unable to cross fences (usually woven wire fence) and die next to the fence. Ninety percent of ungulate carcasses found adjacent to fences were fawns lying in a curled position, probably after being separated from their mothers.

Most indirect effects to mule deer and other wildlife are associated with degradation and/or alterations to habitats (habitat loss). The proposed action could potentially impact mule deer and elk by reducing the amount of habitat available and/or causing diminished use of habitats adjacent to human activities. Increased presence of humans in wildlife habitats induced by the action also contributes to indirect (sometimes called "secondary")

[EIA — 86]

BLM_0036864

impact. Examples typically include increased recreation demand (including off-highway vehicle use), increased habitat conversion, habitat degradation by human encroachment, and increased illegal harvest.

No mule deer winter concentration areas would be directly affected by the project. The project would affect the non-concentration portion of the winter range so that, if mule deer became distributed on winter concentration areas (where densities are at least 200 percent greater than the surrounding winter range) during average five out of 10 winters, then habitat on the non-concentration area affected by the proposed action would have supported 14 mule deer. However, the direct loss of severe winter range due to construction of the proposed action would have otherwise supported 48 mule deer on the site during the worst two out of 10 winters. The effects of construction, however, could alter mule deer and elk distributions on winter ranges some distance away from the property boundary.

## Birds

Some migratory birds, especially raptors, are susceptible to electrocution on power lines, which can occur whenever a bird touches a conductor while perched on a grounded crossarm, or touches two phase conductors or a conductor and ground wire simultaneously while in flight. Bird species susceptible to electrocution use power lines and power poles as hunting and resting perches and/or nesting structures, and have wingspans large enough to connect two sources of electricity. Species found within the site that may be affected by electrocution belong to the following orders: Falconiformes (eagles, hawks, kites, falcons, and osprey), Strigiformes (owls), and Passeriformes (perching birds). Electrocution of some species may increase temporally during juvenile dispersal, as observed for owls and eagles.

Modifications to existing transmission lines or that have been incorporated into new transmission lines have been effective at reducing the number of casualties resulting from electrocution. Because the site does not have a lot of perching sites there is potential for the new power line to be used as perch sites frequented by hunting raptors. However, potential for electrocution of raptors should be minimized from new transmission line designs, including spacing of conductors and adequate insulation.

## Air

Emissions during construction would be limited to those associated with land-clearing and construction equipment and would include particulate matter emissions in the form of fugitive dust and combustion emissions associated with fuel-burning equipment. Because the land development for the proposed action is expected to continue longer than six months and would cover an area greater than 25 acres, EFR would be required to prepare an APEN form for land development. EFR would also be required to follow measures described in the Fugitive Dust Control Plan included in the APEN to minimize fugitive dust.

[EIA — 87]

## Noise

During mill construction, it is estimated that an average of 65 trucks per day would arrive at the site, with the highest vehicle estimates occurring during the second and third quarter of 2011. Most construction-related traffic (90 percent) is expected to arrive from the east on SH 90 and would consist mostly of light vehicles transporting workers to the site.

Construction-related traffic would increase daily traffic on SH 90 east of the site by nearly 40 percent above the 2008 average annual daily traffic volume. Less of an increase in construction traffic (only 4.5 percent) is expected on SH 90, arriving from west of the site.

All project-related construction traffic, when added to the 2008 daily volume on SH 90 (530 vehicles per day) would produce the estimated noise levels 50 feet away from the highway. Expected increase in vehicular traffic during construction would generate the highest noise levels because of traffic volume on SH 90 arriving from Vancorum, east of the site. However, the distance for construction traffic noise from the highway to attenuate to background levels of 40 dBA is estimated to increase by only about 300 feet (soft site reduction) or by 2,440 feet (hard site reduction), a very conservative estimate. There are five known residences and one structure within 5.5 miles of the site. The loudest construction noises would be associated with clearing and grading, materials handling, and stationary equipment would attenuate to background noise at each of the five residences.

## Cultural Resources

The greatest potential for an unanticipated discovery of cultural resources would likely occur during construction when most surface-disturbing activities would occur. However, cultural resource sites in the area tend to be located near or on the mesas with NRHP-eligible sites found in the central portion of the valley where construction activities would be concentrated. EFR would follow measures in their *Unanticipated Discovery Plan* if cultural resources are encountered as described in Operational Monitoring Plan (Visus and Energy Fuels, 2009b).

## Visual Impacts

Visual impacts during construction would be temporary and would include the presence of large vehicles and construction equipment and materials necessary to construct the mill. The stripping of vegetation over a large area and the creation of the soil stockpiles on the west end of the site would also present a temporary visual impact until such time that the soil stockpiles are revegetated and the facilities are constructed.

[EIA — 88]

# Environmental Effects of Operations

## Land Use

Land use impacts during operations would be comparable to impacts during construction. Nearby residents and recreationists would encounter increased traffic, especially ore-hauling trucks, along SH 90 and SH 141. During the anticipated 40-year operational life of the mill, the entire 880-acre site would be unavailable for use as hunting land or seasonal rangeland. The latter would result in the ongoing loss of 90 to 124 AUMs. Because existing mines within the region are capable of supplying the mill with feedstock ore throughout its operational life, no changes in land use are expected to be associated with the mining of feedstock ore for the mill, except that it would allow some of the mines currently on standby to resume production.

## Transportation

During operations, trucks transporting ore to the site would comprise a substantial portion of operational traffic. According to the *Mine Operations Plan* (Energy Fuels, 2009d), daily ore deliveries would include between 12 and 18 trucks traveling from mines in Colorado and between eight and 12 trucks traveling from mines in Utah.

The U.S. Department of Transportation (USDOT) is the primary regulatory authority for uranium ore haulage. All ore shipments would be conducted in accordance with USDOT hazardous materials shipping regulations and requirements (49 CFR Parts 171, 172, 173, 177, 178, and 179). Additionally, ore shipments would be tarped to reduce the potential for accidental spillage or fugitive dust during transportation (SENES Consultants - SENES, 2009a). The Ore Transportation Plan (Appendix B of the Mine Operations Plan) describes EFR's procedures and methods for shipping uranium ore from a mine site to an off-site mill (Energy Fuels, 2009d). The ore trucks would, in most cases, be dedicated to hauling ore from a specific mine or mines to the mill. Prior to being released for unrestricted use, the trucks would be thoroughly washed and screened to verify that they meet regulatory standards for radiation levels.

Additional heavy-vehicle truck traffic during operations would include water trucks, tankers, and semi-trailers delivering chemical reagents and fuel. Chemical reagents, diesel fuel, and propane used to process ores would be delivered to the site by licensed haulers in approved USDOT containers. Reagents would be transported to the site in tankers or prepackaged totes, barrels, and bulk bags. The bulk materials are typically transported by closed tanker trucks. Bulk material transported in open trucks would be covered with tarps to reduce dusting and falling debris during transportation (SENES, 2009a). Light-vehicle traffic would include miscellaneous delivery trucks (e.g,. UPS and FedEx), straight-day and shift workers, and visitors. With the exception of some shift worker traffic, most of this traffic would occur during daylight hours.

Additional traffic associated with operations would include product shipments from the mill. Approximately 50 truckloads of vanadium and 15 truckloads of yellowcake would be shipped from the mill annually (Visus, 2009). This corresponds to one truckload

[EIA — 89]

BLM_0036867

shipment of vanadium per week and one yellowcake truckload shipment every three weeks.

During operations, daily trips to and from the site would be relatively constant, consisting primarily of ore, material and water deliveries, and worker traffic. As with the construction phase, the most heavily used public road segments would be SH 90 between the site and Vancorum and SH 141 between Vancorum and Naturita. Trucks delivering ore to the site would represent a substantial increase in truck traffic along many road segments, including all of SH 90 and SH141 between Naturita and Gateway.
Based on anticipated ore haul routes and worker commuting patterns, the intersections that would be most affected by traffic associated with the mill would be the site access road/SH 90 intersection and the SH 90/SH 141 intersection.

EFR will construct a left-turn deceleration lane for westbound traffic on SH 90 so that traffic can access the site safely. A 10-foot wide shoulder will also be constructed on the south (eastbound) side of SH 90, east of the site access road. The entire length of highway widening would be 2,175 feet. Additional warning signs may be placed along the highway on either side of the site access road to warn on-coming vehicles of truck traffic entering the highway

No significant dust or fume emissions are expected during routine shipment of chemical reagents and other hazardous materials. Therefore, no significant non-radiological risks and/or health related impacts to the driver or members of the public are expected from the routine transportation of these materials.

Similarly, no significant dust emissions are expected during the routine transport of ore, which accounts for the majority of material shipments associated with the mill. The ore would be covered with tarps to reduce dusting and falling debris during transportation. The ore being shipped from mines contains a substantial amount of moisture and has a lower percentage of fines than ore that has been crushed. Minor spillage of ore from trucks in transit would add little additional radioactivity to the mineralized natural environment of the Colorado Plateau.

## Geology/Soils

Impacts of a geologic nature that might occur during operations include seismic activity, settlement and erosion. Impacts of seismicity might include damage to the plant and structures, and destabilization of foundation subgrade. All components would be designed to withstand the MCE, determined from historic seismicity records and assessment of the energetic capability of capable faults within 100 miles of the site During operations, surface disturbances outside of the mill and ancillary facilities would have been stabilized with vegetation and other methods. Potential impacts during construction might consist of seismic disturbance, erosion of surface water control structures, or settling caused by incompetent foundation materials.

BLM_0036868

There is little potential of seismicity disrupting or compromising operations through soil (geotechnical) destabilization. Trenched soils show no evidence of dislocations since at least the Pleistocene (from 75,000 to 125,000 years ago) (Kleinfelder, 2009e). The mill, including tailings cells, would be designed to meet IBC requirements for earthquake protection. Because of the absence of saturated material in the alluvium beneath the site, the factor of safety against any seismic liquefaction in the alluvium under the MCE event is generally greater than 10, even if saturation is conservatively assumed.

Failure of a tailings embankment because of an earthquake would be unlikely because the site is in a zone of low to moderate seismicity based on the number of sizable earthquakes that have occurred in the historical and more recent record. The three tailings cells were designed in accordance with the IBC based on a magnitude 4.8 earthquake occurring at a distance of approximately 10 miles from the site. Minimum static and pseudo-static factors of safety ranged from 2.0 to 4.9 and 1.7 to 2.7, respectively, during the life of the cells, with the highest factors of safety occurring during the post-closure period. Faults beneath the site are "non-capable" (analogous to a volcano being extinct) according to the Colorado Geological Survey (Kleinfelder, 2009e) and are believed to not have moved since the Pleistocene at the most recent (from 75,000 to 125,000 years ago). No evidence of soil displacements was found in several site trenches overlying bedrock faults, except for one shallow dislocation between five and seven feet depth, without any extension at depth in the trench or geophysical investigations (Kleinfelder, 2009e). The investigation results indicate that the site meets the requirements of Criterion 4E of Appendix A of 6 CCR 1007-1 Part 18 (Colorado Department of Public Health and Environment, 2001), because there are no capable faults as defined in section III(g) of Appendix A of 10 CFR Part 100 that could cause a MCE larger than that which the tailings cells could be expected to withstand.

## Surface Water

The mill, ore pad, tailings cells, and evaporation ponds have been designed as zero-discharge facilities where there would be no off-site storm water discharge. Precipitation and storm water runoff that contacts these areas would be contained on-site in lined ponds or cells and recycled for use in the mill and/or evaporated. Storm water runoff from the administration facility and other structures not within the footprint of the zero-discharge area (e.g., monitoring stations, water supply well field, secondary roads, soil stockpiles) would be controlled using best management practices (BMPs) for storm water and erosion control. These measures include surface water diversion channels, energy dissipating structures, slope projection and sediment catchment basins.

Potential hydrological impacts during the 40 years of anticipated operations could include flooding of the facility and spreading of contamination, erosion or breaching of storm water control channels, and reduction of flow to the Dolores River due to precipitation captured in the zero-discharge area of the site.

Critical elements of the storm water control structures have been designed to manage the 1,000-year, 24-hour storm event. They include:

BLM_0036869

- Storm water ponds with capacity to hold the 100-year storm runoff from the mill, with overflow to evaporation ponds which can readily hold the difference between 100- and 1,000-year events. Tailings cells would always have sufficient freeboard to contain direct precipitation of the 1,000-year storm event.
- Diversionary dikes at the south end of the facility and channels, suitably armored against erosion, to carry runoff from Davis Mesa around the mill to natural drainages.
- Elevated ore pad and mill with perimeter berms and channels to prevent run-on. Tailings cells and evaporation ponds would also be protected by berms and/or embankments from run-on.

The process fluid remaining after uranium and vanadium have been extracted (raffinate solution) would be directed to evaporation ponds. Evaporation ponds would have sufficient capacity to contain the raffinate solution, accumulated precipitated salts, and the direct precipitation and storm water pond overflow from the 1,000-year, 24-hour storm event.

During operations, water in storm water ponds may be used in the mill to both maintain storm water capture capacity and to reduce water supply requirements. The storm water control structures would contain runoff resulting from precipitation up to the 1,000-year, 24-hour storm event.

## Ground Water

The principal potential impact to ground water during operations would be depletion of the bedrock aquifer by the supply wells. Such depletion could possibly impact other ground water users, lowering the water levels in their wells, or drying up springs. Other potential impacts to ground water include leaks and spills affecting water quality. Capture of incident precipitation by the storm water control structures would continue to intercept water that would either have infiltrated the alluvium or run off to the Dolores River.

There are other ground water wells and springs in the southeast Paradox Valley, which are completed in or flow from the same valley margin Triassic aquifer. Those wells and springs located northwest of the site may experience some drawdown due to ground water withdrawals at the site, if the drawdown is highly elliptical. However, those wells to the northwest should also continue to get most of their recharge from the valley side. Impacts are therefore possible, though not quantifiable until ground water withdrawals begin at the site.

There would be a very low probably of impacting the ground water quality from leaks or releases during operations because:

- The multiple liner systems below waste disposal facilities and the secondary containment measures in the mill are designed to minimize the potential for a release to the environment. Spill response measures and monitoring of soils and ground water are designed to limit the impact of a spill or release should it occur.

[EIA — 92]

BLM_0036870

- Ground water is absent below most of the tailings cells (i.e., Tailing Cells B and C) and all of the evaporation ponds. Where water is present below the mill and Tailings Cell A, it is of poor quality, limited in extent, and more than 450 feet deep. Low permeable formations between the surface and the ground water would also prevent seepage from reaching the ground water.

## Vegetation

Indirect impact to vegetation may occur during mill operations if the proposed action displaces native and domestic herbivores, causing excessive browsing and/or grazing on vegetation resources that would otherwise not occur. Indirect impact to native vegetation could also occur if invasive, non-native species become established in disturbed areas and result in infestations that may limit or prohibit growth of native and/or desirable species. Weed seeds or cuttings of some species could be transported naturally (wind and water) or accidentally (vehicles or other equipment) to the disturbed areas. Also, weed seeds may be present in the native soil materials and the removal of vegetative cover and soil disturbance may promote weed establishment at the expense of the native species. Soil disturbance and potential weed distribution due to surface disturbance, increased vehicle traffic, equipment placement and operation, foot traffic, and other activities associated with the proposed action may promote the spread of invasive plants and noxious weeds. Surface disturbance at the soil stockpiles that would be revegetated within one growing season of construction would be less likely to be infested by weeds than if left as exposed soil for longer periods.

The potential for invasive, non-native species to become established, as described above and during construction, will continue during operation. Introduction of additional noxious and invasive weed species may occur as a result of ore trucks entering the site from mines outside the county or state, including species not currently located at or within the vicinity of the site. EFR will implement a weed control program.

## Threatened and Endangered Species

Maximum noise at the property boundary during operations has been estimated at 60 dBA. Within the closest piñon-juniper habitat to the mill (approximately 750 feet away), the maximum noise level is estimated at 64 dBA, less than the expected level sufficient to disturb Mexican spotted owls but loud enough to possibly cause alert behaviors if owls were present.

During operations, Gunnison's prairie dogs could possibly pass through the chain-link fence and/or burrow beneath. Depths of Gunnison's prairie dog burrows range from 33 inches to more than six and one-half feet (Pizzimenti and Hoffmann, 1973) and burrow diameters may be as small as 3.6 inches (Verdolin et al., 2008). Most common mesh sizes for chain-link fence are two inches or more (2.25 and 2.375 inches). Gunnison's prairie dogs could suffer direct mortality or injury if they access the evaporation ponds or

[EIA — 93]

BLM_0036871

tailings cells. The raffinate solution and tailings solution is potentially acutely and chronically toxic to wildlife because of low pH and elevated metal concentrations.

The proposed action could potentially hinder re-establishment of Gunnison Sage-grouse populations in East Paradox Valley during operations. In general, sage-grouse are sensitive to disturbance from roads and noise during breeding. Females avoid nesting and utilizing brood-rearing habitats in areas with high levels of human presence related to oil and gas industrial activities. The traffic and noise associated with operations and traffic on SH 90 could similarly affect Gunnison Sage-grouse if they do occupy habitats in the Paradox Valley.

Night lighting would be present during operations, and could act as a barrier to bat movements such as described during construction. Loss of foraging habitat can adversely affect bats. Potential use by foraging bats of the retention pond on the southern end of the site may be limited by noise and other disturbances associated with operations. The proposed action would impact 247.6 acres of big sagebrush and 167.0 acres of mixed grasslands that provide feeding habitats for these species.

Revegetation of disturbed sites with grasses may attract Botta's pocket gophers. Potential impacts to pocket gophers would be similar to those described above for Gunnison's prairie dog if they were to enter the evaporation ponds and tailings cells.

Increased traffic during operations would increase the potential for vehicular collisions with wildlife and potential mortality for bald eagles scavenging along roadsides. Project components within 300 meters of potential burrowing owl nesting sites (i.e., abandoned Gunnison's prairie dog burrows) include the barbed wire perimeter fencing, spoil storage sites, access roads, and pipelines to water wells. The barbed wire fence could provide additional elevated perches near potential nest burrows in grassland areas used for foraging, potentially benefiting the western burrowing owl. However, the spoil storage sites would be approximately 30 feet high, altering the existing, relatively flat and open landscape. It is possible that burrowing owls would permanently vacate the abandoned prairie dog burrows along the western portion of the site adjacent to the spoil storage sites, although the amount of disturbance that burrowing owls will tolerate before nest desertion is unknown.

One threat identified for the western burrowing owl includes collisions with moving vehicles and barbed wire fence because this species flies low to the ground (U.S. Fish and Wildlife Service, 2003b). It is possible that an increase in traffic associated with the proposed action and erection of barbed wire fence along the perimeter of the site may increase owl mortality.

[EIA — 94]

BLM_0036872

## Terrestrial Wildlife

Increased traffic could potentially increase mule deer mortality on several routes. Similarly, vehicle-related elk mortality would most likely increase during operation of the mill. Increased pronghorn mortality due to traffic associated with operations is expected to be minimal. As described for project effects during construction, mule deer and elk wintering in the vicinity of the site could suffer direct mortality due to additional fencing proposed along the perimeter of the property boundary.

Most indirect effects to mule deer and other wildlife are associated with degradation and/or alterations to habitats (habitat loss). The proposed action would impact mule deer and elk by reducing the amount of habitat available and/or causing diminished use of habitats adjacent to human activities, as described above under construction. There would be long-term similar losses of habitats supporting elk on winter range, severe winter range and winter concentration areas. Because densities of elk on winter ranges are less than mule deer densities, numbers of elk supported by lost habitat are less than effects to mule deer.

Due to increased traffic, mule deer are likely to disperse away from the location as described above for construction. Similar dispersion of wintering elk away from the site during operations is also expected and could result in lower winter habitat functionality as a result.

Small game birds and mammals are not expected to be affected by compounds present in the evaporation pond or the tailings cells. Construction of an eight-foot chain-link fence topped with three-strand barbed wire surrounding each facility is expected to be a completely effective deterrent to small game mammals (assumed to be lagomorphs and carnivores). Bird netting would be placed on a support system elevating it over the evaporation pond. The netting would completely seal off access to the pond.

During the operative life of the tailings cell, the tailings solution from the tailings slurry would collect on the surface and be recovered and pumped back to the mill for reuse by a floating pump barge. At most, the tailings solution could encompass an area of approximately 30 acres. The tailings solution can be acutely and chronically toxic to wildlife because of its low pH and elevated metal concentrations.

To discourage bird use of the fluctuating levels of tailings solution that collects within the tailings cells, EFR has proposed to place bird balls on top of the ponded portion of the cells. Bird balls float on top of exposed water and prevent birds from landing on the water by creating a physical barrier and disguising the surface of the water within the tailings cells. USFWS (2009f) has identified the use of bird balls as a potential solution to excluding wildlife and preventing mortality at various industrial wastewater impoundments including cyanide ponds, coal-fired power plant evaporation ponds, and acidic water impoundments.

[EIA — 95]

BLM_0036873

Use of bird balls is generally accepted as an effective means of excluding small game birds (e.g., mourning doves) from the pond water within the tailings cells. Mill personnel would inspect the tailings cells daily and identify and record any wildlife mortalities, and where possible, implement measures to reduce or eliminate future occurrences.

## Air

Emissions from the mill would be considered either non-fugitive emissions or fugitive emissions. Fugitive emissions are emissions from facilities or activities that could not reasonably pass through a stack, chimney, vent, or other equivalent opening. In determining if a facility is a "major source" or "minor source," only non-fugitive emissions would be considered for comparison against the thresholds for facilities that are not considered a "Categorical Source" by the EPA (of which the mill is not). Potential emissions from the mill do not exceed the thresholds for a major source permit and therefore, EFR is seeking a minor source permit from the APCD. Based on the estimated emissions, the Prevention of Significant Deterioration (PSD) thresholds would also not be exceeded.

In conversations between EFR and APCD, $PM_{10}$ is the only emission that is anticipated to be a concern and therefore, EFR conducted baseline monitoring for $PM_{10}$ to get a background concentrations at the site as reported in the Meteorology, Air Quality, and Climatology Report (Kleinfelder, 2009i). Impact modeling was conducted to demonstrate that $PM_{10}$ emissions added to this background measurement would not cause an exceedance of either the National Ambient Air Quality Standards or the Colorado Ambient Air Quality Standards and is reported in the Air Dispersion Modeling Report

**Noise.** All project-related operations traffic, when added to the 2008 daily volume on SH 90 (530 vehicles per day) would produce the estimated noise levels 50 feet away from the highway. Distances estimated for traffic noise on SH 90 to attenuate to background levels (assumed to be 40 dBA) under soft site or hard site conditions are also included in the table below.

### Table 17: Estimated Noise Generated by Project-Related Traffic on SH 90 during Operation

| Approach Direction on SH 90 | Daily Traffic on SH 90 Due to Operation | | Total Volume (added to 2008 baseline) | Estimated Hourly Traffic Volume | Estimated Noise (dBA) Level at 50 feet [1] | Distance (feet) to Attenuate to Assumed Ambient Noise Level of 40 dBA | |
|---|---|---|---|---|---|---|---|
| | Trucks | Light Vehicles | | | | Soft Site Reduction At 4.5 dB per double of distance | Hard Site Reduction At 3 dB per double of distance |
| East | 58 | 70 | 658 | 65.8 | 61.5 | 1,470 | 7,670 |
| West | 38 | 10 | 578 | 57.8 | 61.0 | 1,340 | 6,400 |
| [1] Derived from the progressive relationship between traffic volume and associated noise provided in WSDOT's (2008) Table 7-3, hourly traffic volumes, traveling at 65 miles per hour. | | | | | | | |

Ore unloading and loading activities would be the primary source of noise generated during operations. In particular, the backup alarms from the front-end loaders and highway trucks are expected to generate the loudest noises at the mill. Warning horns are expected to attenuate to background levels 2,660 feet away (soft-site reduction) or 7,184

[EIA — 96]

BLM_0036874

feet away (hard-site reduction). Soft-site conditions surrounding the site are more realistic due to vegetative ground cover. Other operations, which generate high noise levels, would be located within enclosed buildings (e.g., the SAG mill). For comparison, the estimated maximum noise level occurring at the property boundary was modeled using conservative assumptions and determined to be 60 dBA. This level is well below the most restrictive maximum permissible noise level of 75 dBA established by Montrose County for gravel mining operations located within 1,320 feet of an existing residence or an existing platted subdivision. The estimated maximum noise level at the property boundary occurs at the south end of the site, approximately 800 feet south of the mill if the attenuation rate of 6 dB per doubling of distance is assumed (hard-site reduction) or about 460 feet if the attenuation rate of 7.5 dB per doubling of distance is applied (soft-site reduction).

## Cultural Resources

There is little potential for disturbance of known cultural sites or unanticipated discovery during operations because surface disturbance should be minimal during this period and would have to be cleared with the radiation safety officer (RSO) prior to startup (Visus and Energy Fuels, 2009b). Most of the projected surface disturbance that would occur during operations would be for the construction of Tailings Cells B and C. If surface disturbing activities encounter cultural resources during operations, EFR would follow its *Unanticipated Discovery Plan* (Operational Monitoring Plan – Visus and Energy Fuels, 2009b).

## Visual Resources

Visual resource impacts from the site would be most prominent when the evaporation ponds are completed to full 80-acre capacity sometime near the later portion of its 40-year production life. Operation of the mill, and the initial series of evaporation ponds and tailings cells, would be noticeable in the middleground viewsheds for observers traveling on SH 90. The evaporation ponds and the administration building would be approximately 675 feet from the road at their closest point. An approximately 9,000 square-foot administration building and associated parking area would be a similar distance from SH 90 and would be clearly visible to observers using the road.

The ponds and eventual three tailings cells (covering 30 acres each) would have low-profile containment embankments, with the majority of their storage capacity located below the existing ground level. The embankments, protective six-foot-high fencing, and bird netting over the evaporation ponds may be noticeable to observers.

The mill and associated ore pad would be approximately three-quarters of a mile south of SH 90 and would sit about 100 feet higher in elevation than SH 90. The mill buildings would have varying heights up to 85 feet and would be visible in the middle-background from SH 90 but are not expected to dominate the view of the casual observer.

[EIA — 97]

To a large extent, the existing open pit mine overburden pile, vegetation alterations, waste rock dumps, mine buildings, and access roads present in the landscape around the site currently draw the attention of observers on SH 90. The site would be an obvious addition to the human developments in the area, but it would not dominate the landscape.

**Emergency Plan**

As an element of the Health & Safety Plan, the applicant has established a site emergency plan outlining potential hazards resulting from site activities or from naturally occurring hazards to which the mill and personnel may be exposed. The plan and its associated risk analysis evaluate the consequences of the postulated accident scenarios for onsite and offsite receptors and establish certain response actions. At the request of the department, the applicant made modifications to their emergency plan, associated risk assessment, and radiological health procedures to incorporate or address comments and to better integrate the documents. The revised emergency plan provided by the applicant is consistent with the NRC guidance and Part 3 of the regulations.

## Design Features to Mitigate Releases

Mill buildings and equipment have many features associated with a containment structure, and procedures are designed to institute rigorous inspection, maintenance, and repair plans on critical path systems such as secondary containment and liners. Equally important is personnel training.

The building foundations are designed to minimize movement due to total settlement and differential settlement, which prevents releases as structures settle over time, and minimizing settlement will minimize the stress on pipes and tanks. All concrete slabs, secondary containment, and sumps will be constructed with continuous, welded-construction waterstop at all expansion, construction, and other joints. Concrete slabs have been designed to facilitate lateral movement, but constrain vertical movement with requisite joints to eliminate cracking. Acid-resistant concrete will be used in lieu of epoxy-based coatings.

All process, fuel, chemical, and process waste pipelines will have secondary containment in the form of buildings, containment piping, or lined areas and leak detection. Buried lines will have appropriate cathodic protection. Secondary containment is used for chemical and fuel tanks, process areas, and various pipelines.

Run-off from the two ore pads, facility footprint, and ore dumping platform is collected in two storm water ponds, which will keep contaminated runoff from exiting the site. Both ponds will be double-lined with leak detection/collection systems.

The raffinate has low concentrations of heavy metals, so there will only be minor accumulations in the tailings and evaporation ponds. The tailings cells that hold process waste and evaporation ponds are double-lined with a leak detection/collection system.

BLM_0036876

The bulk reagents unloading area will have a divider to prevent inadvertent mixing of hydrogen peroxide or sodium chlorate oxidizers with organics such as diesel fuel or kerosene during unloading operations when spills might occur. The bulk reagent storage tanks will be equipped with level-indicating instruments warning the operator that the tank is approaching maximum fill height to prevent releases during filling operations.

Table 18 summarizes some mill design features used to mitigate potential impacts from the mill.

BLM_0036877

## Table 18: Mitigation of Impacts

| Impacts to | Mitigation |
|---|---|
| Land use | <ul><li>All building and parking facility designs at the site will conform to Montrose County development standards and will be submitted to the Montrose County Building Department for approval prior to construction.</li><li>Upon closure, all areas of the site except the Restricted Tailings Cell Area will be returned to rangeland.</li><li>Upon closure, EFR will cap the tailings cells with an engineered soil cover and fence the entire restricted tailings cell area pursuant to relevant EPA/NRC/state surface stabilization requirements and guidance. EFR will provide the DOE or the state of Colorado with the funds necessary to conduct long-term surveillance and monitoring of the restricted tailings cell area and funds for maintenance of fencing for 200 to 1,000 years.</li></ul> |
| Transportation | <ul><li>EFR has obtained a site access permit from the CDOT that provides for safe site access and egress (CDOT, 2008). Consistent with the terms of the access permit, EFR will widen SH 90 over a length of 2,175 feet at the site Access intersection by constructing a left-turn deceleration lane for westbound traffic on SH 90, and a 10-foot wide shoulder on the south (eastbound) side of SH 90, east of the site access road (CDOT, 2008).</li><li>EFR will encourage its workers to carpool to reduce project-related traffic.</li><li>To reduce project-related traffic during construction, EFR will encourage its contractors to provide busses or vans at central collection points in nearby towns to transport construction workers to and from the site.</li><li>Dust suppression measures will include magnesium chloride or equivalent treatments and water sprays on gravel roads on the site.</li><li>All ore shipments will be transported in dedicated ore haulage trucks, and will be conducted in accordance with USDOT hazardous materials shipping regulations and requirements.</li><li>EFR will verify that the trucking contractors transporting ore, chemical reagents, and fuel to the mill and yellowcake and vanadium oxide from the mill have emergency response plans in place to respond to highway accidents and cargo spills. Guidelines for evaluating the effectiveness of ore transportation carriers' emergency response plans are provided in Appendix B to the Mine Operations Plan (Energy Fuels 2009d).</li><li>Ore shipments will be tarped to reduce the potential for accidental spillage or fugitive dust during transportation.</li><li>Chemicals reagents, diesel fuel, and propane used to process ores will be delivered to the site by licensed haulers in USDOT-</li></ul> |

BLM_0036878

| Impacts to | Mitigation |
| --- | --- |
|  | approved containers. |
|  | • EFR's emergency response teams will be available to assist with radiological screening, surveying, and clean-up at off-site accident locations and will provide verification sampling of cleanup actions. |
| Geology and soils | • The site was selected in part for its isolation from geologic hazards such as slope instabilities, significant seismicity, and erosion potential. Extensive geotechnical and geophysical studies (Kleinfelder, 2009e) showed no subsurface cavities (karst) or insurmountable soil stability issues. The research and investigations showed that the risk of geologic hazards is low.
• All facilities (mill, tailings cells, evaporation ponds, and ancillary facilities) will be designed to withstand the MCE's ground acceleration in accordance with IBC requirements.
• In areas where collapsible soils have been identified at the surface within the mill footprint, soils will be removed and a competent compacted soil base would be created.
• Engineering control of surface water runoff including diversion, soil stabilization, riprap, etc. as described in the Stormwater Management Plan (Golder, 2009a) will be incorporated into the design of the mill.
• Timing of construction and removal of surface water control structures (first built, last dismantled) will maintain erosion and sediment control during construction, operations, and closure.
• BMPs for erosion control, as outlined in the Stormwater Management Plan (Golder, 2009a), will be implemented during construction of the access road and surface water structures.
• Post-closure monitoring and maintenance of the reclaimed facilities will be conducted to verify long-term stability prior to transfer of the reclaimed tailings cells to the state of Colorado or the DOE for long-term surveillance and monitoring. |
| Surface water and ground water | • The mill is designed to be a zero-discharge site. This means no industrial wastewater will leave the milling and waste disposal areas of the site. Septic adsorption fields will treat the only water released to the environment.
• Storm water containment structures will be constructed to contain direct precipitation on the zero-discharge area of 240 acres including the mill, ore pad, tailings cells, and evaporation ponds to prevent any runoff, sediment transport or solute migration from the facility. Storm water control structures will be completed prior to facility construction so as to minimize erosion and impacts to drainages during construction. The storm water structures will be removed only after facility decommissioning.
• Permanent diversionary dikes at the south end of the site will |

BLM_0036879

| Impacts to | Mitigation |
|---|---|
| | prevent run-on during the life of the mill, and divert runoff from the closed tailings cells. Diversion channels will carry intercepted runoff to existing drainages. |
| | • The mill and its storm water control structures are designed to withstand and fully contain the 1,000-year, 24-hour storm event. |
| | • Regular inspections and maintenance of storm water structures, as required in the *Stormwater Management Plan*, would keep the storm water management system operating as designed. |
| | • The *Material Containment Plan* and the *SPCC Plan* detail extensive structural (physical containment) and non-structural (institutional practices, training, reporting) measures to prevent spills of chemicals, reagents or products. Quarterly storm water inspections, semi-annual facility inspections, and standard operating procedures in the *Facility Operating Plan* for each process area also are independently protective of the environment and water quality in particular. |
| | • Aquifer depletion by water supply wells will be closely monitored at startup and during the project's life to project long-term performance and develop a water supply strategy that is protective of the resource and other ground water users. |
| | • The ground water monitoring program will include off-site wells and springs, to detect and manage any aquifer depletion impacts. The on-site and vicinity ground water monitoring program will detect contamination of ground water by the mill. |
| | • The surface water monitoring program will allow for evaluating water quality of the site's runoff over time and provide early detection of potential surface water impacts. |
| | • Tailings cells and evaporation ponds will be constructed with leak collection and recovery systems between the primary and secondary liners. An engineered cover, constructed at closure, will limit percolation into the dewatered tailings and provide long-term erosion protection. |
| | • Operation of the LCRS in the tailings cells and evaporation ponds will result in little to no hydraulic head on the secondary and tertiary liners; therefore, the driving force behind any seepage from these facilities will be minimal. |
| Wetland features | • EFR will locate project components and access roads away from the non-jurisdictional retention pond. |
| | • The mill (the area within the mill license boundary) is designed as a "zero discharge" facility, so that all runoff will be contained on-site in lined ponds and cells and recycled for use in the mill. No contaminated water will enter natural drainages or ground water systems. |
| | • Tailings cells and evaporation pond will be equipped with multiple liners and leak collection and recovery systems to |

[EIA — 102]

| Impacts to | Mitigation |
|------------|-----------|
|  | provide containment of 11e.(2) byproduct material during operations. During closure, the tailings would be dewatered and the mill, ore pad, and evaporation ponds would be removed and placed in the final tailings cell. The tailings cells will be capped with an engineered cover that is designed to provide containment of 11e.(2) byproduct material for 200 years, and, to the extent practicable, 1,000 years with no active maintenance or controls to minimize the potential for the 11e.(2) byproduct material to impact ground water<br>• EFR will follow measures in its SPCC and Material Containment Plan, which include methods to contain spills and prevent oils/chemicals from reaching waters of the U.S. |
| Vegetation resources | • EFR will develop and implement a weed control plan to minimize potential impacts and expansion of noxious weeds (Colorado Division of Wildlife, 2008).<br>• During construction, EFR will retain and stockpile topsoil (six to 12 inches) and vegetative matter to use during interim and final reclamation of the site as described in the *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c). Topsoil stockpiles will be seeded and mulched using certified weed-free seed mix and mulch during the first appropriate growing season after topsoil stripping and stockpiling to minimize infestation of invasive and noxious weeds and stabilization during the life of the project.<br>• During construction, sediment control measures will be utilized, including weed-free hay bales, silt fences, and temporary detention basins as described in the *Stormwater Management Plan* (Golder, 2009a).<br>• Dust suppression will be used on roads (magnesium chloride, water), ore pads, tailings cells, and evaporation ponds to eliminate fugitive dust from negatively affecting native vegetation within the site.<br>• EFR will implement the measures included in the *Tailings Cell Closure Design Report* (Kleinfelder, 2009c) the *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c), the *Mill Decommissioning Plan* (Kleinfelder, 2009b), and the *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h), which describe methods for recontouring, topsoil redistribution, soil preparation, fertilization, and revegetation, including a recommended seed mixture, mulching, seeding methods, and timing.<br>• EFR will exclude livestock from revegetated and rehabilitated areas to promote complete revegetation. Exclusion will continue until the vegetation in the reclaimed area is established and self- |

[EIA — 103]

BLM_0036881

| Impacts to | Mitigation |
|---|---|
| | sustaining.<br>• EFR will include revegetation status in the reports required by the department. |
| Noxious weeds | • EFR will develop and implement a Weed Control Plan to minimize potential impacts and expansion of noxious weeds (Colorado Division of Wildlife, 2008).<br>• Weed-free sedimentation barriers will be used.<br>• The soil stockpile will be revegetated during the first growing season to minimize infestation of invasive and noxious weeds.<br>• Revegetation will occur during the first growing season following closure.<br>• EFR will conduct weed control monitoring and implement weed control measures, as necessary, on a biannual basis (spring and fall) to limit the occurrence of noxious weeds on the property. The program will start prior to construction and continue until the site is successfully reclaimed. Records will be kept of the weed surveys and herbicide applications. |
| General wildlife | • Employees will receive environmental awareness training during project orientation. EFR will provide information about: native wildlife including ESA-listed species, BLM sensitive species and state of Colorado special status species, and terrestrial wildlife within the site and vicinity, sensitivity to various kinds of impacts; consequences of poaching; and information about federal and state wildlife laws.<br>• Recreational hunting will not be allowed on site. EFR would encourage its employees and contractors to report any incidents of poaching immediately to the CDOW, such as through the program "Operation Game Thief." EFR would place "No Hunting" signs on the property boundary.<br>• EFR would erect a six-foot chain-link fence topped with three strands of angled barbed wire around the tailings cells and evaporation ponds to eliminate entry of larger terrestrial wildlife. A fine mesh wire fence or hardware cloth apron extending two feet below the ground surface will be buried around the outside perimeter of the chain-link fence to minimize or eliminate burrowing animals from entering tailings cells and evaporation ponds. Fine mesh fencing extending to three feet above ground around the inside perimeter of the chain-link fence would be placed to prevent smaller, ground-dwelling wildlife (i.e., pocket gophers and other rodents, lizards, and snakes) from entering tailings cells and evaporation ponds. EFR would inspect the fence daily, and repair, as necessary.<br>• Bird netting will be placed over the evaporation pond to eliminate birds and other wildlife species from entering potentially toxic raffinate solution. Netting would be securely |

[EIA — 104]

BLM_0036882

| Impacts to | Mitigation |
|---|---|
| | fastened to the pond-top perimeter to seal off access to the ponds at ground level.<br>• Bird balls will be used in the ponded portion of tailings cells to disguise the tailings solution and prevent birds from landing on the tailings solution. |
| Threatened, endangered, and candidate wildlife species | • EFR may cooperate in ongoing efforts to reopen sagebrush habitats/remove piñon-juniper woodlands on Monogram Mesa to mitigate for impacts to Gunnison Sage-grouse by the proposed action. The off-site mitigation could create usable habitat further south and east of the site and close the gap between occupied habitat in Dry Creek Basin and potentially suitable habitat in East Paradox Valley.<br>• EFR will follow measures in its SPCC Plan (Energy Fuels, 2009b) and Material Containment Plan (Energy Fuels, 2009c), which include methods to contain spills and prevent oils/chemicals from reaching waters of the U.S.<br>• EFR will obtain approximately 415 acres of habitat similar to the mill site in the East Paradox valley floor on private lands prior to construction. The mitigation site would be fenced to exclude domestic livestock and livestock grazing would be prohibited as would public access and development. The goal is to increase the carrying capacity of similar, adjacent habitats so that displaced wildlife can remain in the general area. EFR will propose improvements to increase the quality of the habitat, such as restoration of shrubs, increasing desirable understory species, and reducing the widespread weed problems found in the area. |
| BLM Sensitive Wildlife Species and State of Colorado Wildlife Species of Special Concern | • To minimize attracting bats and disrupting bat feeding behaviors, EFR will utilize monochromatic orange sodium lamps that do not attract insects or bats, except in those locations where health, safety, or security considerations require additional lighting. Night lighting would be the direct cut-off variety that points down and minimizes lateral light glare.<br>• EFR will conduct burrowing owl surveys prior to construction and soil storage site use. If this species is present, EFR will maintain a 328- to 984-foot (100- to 300-meter) disturbance buffer around nest burrows to prevent possible disturbance to adjacent burrows and foraging habitat (Colorado Partners in Flight, 2000a). EFR will avoid affecting occupied burrows until vacated. If destruction of potential burrows is unavoidable, EFR would consider creating artificial burrows away from impacted areas (Marks and Ball, 1983).<br>• EFR will minimize fugitive dust on adjacent burrowing owl foraging habitat from access roads and milling operations through application of magnesium chloride and/or water on the roads and pads. |

[EIA — 105]

BLM_0036883

| Impacts to | Mitigation |
|---|---|
| Terrestrial wildlife | • Risks of collisions of project-related vehicles with big game and other terrestrial wildlife would be reduced but not eliminated with the majority of ore, reagent, and fuel deliveries scheduled during daylight hours.<br>• EFR would erect barbed wire perimeter fencing around the property boundary to permit big game passage to the extent possible. The fence would be no taller than 42 inches with at least 12-inch spacing between the top two wires to minimize big game entanglement with the fence. The bottom wire would be at least 16 to 18 inches off the ground to allow passage of young deer and elk. If domestic cows with calves are present in adjacent pastures and calf penetration is an issue, fencing could be designed so that the bottom wire could be lowered although bottom wires 16 inches off the ground would hold livestock. EFR will visually inspect and maintain the fence, as needed, so that wires are taut to minimize entanglement.<br>• Vegetation removal will occur prior to May 15 or after July 15 to avoid taking of migratory bird species, nests, or eggs (U.S. Bureau of Land Management, 2007).<br>• EFR will require that contractors install raptor-safe transmission lines and they would be inspected to determine if raptor perch deterrents are warranted.<br>• EFR will use bear-resistant containers and collect refuse frequently to minimize potential for conflicts with bears at the site.<br>• The site will be revegetated with species palatable for livestock and wildlife. Weeds would be controlled to maintain native vegetation.<br>• EFR will obtain approximately 415 acres of habitat similar to the mill site in the East Paradox valley floor on private lands prior to construction. The mitigation site would be fenced to exclude domestic livestock and livestock grazing would be prohibited as would public access and development. The goal is to increase the carrying capacity of similar, adjacent habitats so that displaced wildlife can remain in the general area. EFR will propose improvements to increase the quality of the habitat, such as restoration of shrubs, increasing desirable understory species, and reducing the widespread weed problems found in the area. |
| Air quality | • EFR will enforce low speed limits on roads within the mill to reduce particulate matter emissions.<br>• The unpaved main haul road will be treated with magnesium chloride with the first application typically in the spring and two to three additional treatments through the summer, as necessary. Supplemental watering of the road to control fugitive particulate matter emissions may occur during dry and windy periods. |

[EIA — 106]

BLM_0036884

| Impacts to | Mitigation |
|---|---|
| | • Motion-sensing water sprays will be located at the dumping platform dump points for emission control. Both the ore stockpiles and the ore pad travel routes will be sprayed with either water or a raffinate solution from the mill.<br>• Emissions at the feed hopper building area will be controlled through the use of drive-through curtains over the open side of the building as well as water sprays located at the grizzly screen. Further, air from the grizzly screen, coarse feed hopper, and apron feeder area will be vented to a dust collecting baghouse and then through a stack to the atmosphere.<br>• The vibratory feeder area and discharge end of the SAG mill will be connected to a dust scrubber with a control efficiency of 99 percent.<br>• The pre-leach and leach tanks will be enclosed and vented to a Venturi scrubber that will provide 99 percent control for sulfuric acid emissions.<br>• During the hotter months, the beaches of the tailings cells and evaporation ponds will be sprayed with tailings water or raffinate to control particulate emissions.<br>• Tanks in the vanadium precipitation and packaging area will be vented to a packed-bed wet scrubber to remove the ammonia fumes, providing 99 percent removal efficiency for particulate emissions.<br>• The diatomaceous earth and ammonium sulfate systems will be equipped with dust filters for emission control.<br>• Ammonia will be stored in a pressure vessel designed to prevent vapor from escaping.<br>• Low-$NO_x$ burners will be used on the boilers for emission control.<br>• The uranium and vanadium SX tanks will be covered to reduce volatile organic compound (VOC) emissions from the process by approximately 90 percent during normal operation and by approximately 75 percent overall considering the tanks may be occasionally opened.<br>• Solvent extraction solution will be collected during an upset condition and the organic solution will be recovered from emulsified and entrained mixtures reducing the amount of kerosene added to the system by 279 tons per year.<br>• Pressure leaf filters will be used to reduce the amount of kerosene added to the organic makeup solution by 25 tons or more per year.<br>• EFR will prepare and implement a Fugitive Dust Control Plan to minimize impacts from fugitive dust during construction and closure. |

[EIA — 107]

BLM_0036885

| Impacts to | Mitigation |
|---|---|
| Cultural resources | <ul><li>All four sites located in the 80-acre well field will be avoided by ground disturbance, where feasible, regardless of eligibility status.</li><li>Where outstanding, Energy Fuels' cultural resources consultant will continue and complete Native American consultation.</li><li>If newly discovered cultural resources are identified during project implementation, work in that area will stop and the SHPO will be notified immediately (36 CFR §800.13) according to Energy Fuels' Unanticipated Discovery Plan (Operational Monitoring Plan – Visus and Energy Fuels, 2009b).</li><li>Strict adherence to the confidentiality of information on the description and location of archeological resources (43 CFR 7.18).</li><li>EFR will inform all persons associated with construction and maintenance of the proposed action that they will be subject to prosecution for knowingly disturbing historic or archaeological sites, or for collecting artifacts.</li></ul> |
| Visual/scenic resources | <ul><li>All aboveground facilities will be painted to blend with the surrounding landscape with an appropriate color selected from the BLM Standard Environmental Colors chart or a similar color reference.</li><li>Outdoor lighting will be down-directed, with fixtures having a 90degree cutoff, to eliminate glare and minimize upward light scattering.</li><li>An efficient lighting scheme will be designed to provide the minimum amount of lighting required for safety and security.</li><li>Fences will be coated or painted with non-reflective surfacing, or an appropriate color that blends with the surroundings.</li><li>EFR will minimize disturbance and control erosion by avoiding steep slopes and by minimizing the amount of construction and ground clearing needed for roads, staging areas, and crane pads.</li><li>To the extent practicable, facility construction and placement will utilize natural features in the landscape to screen operations from observers.</li><li>All disturbed areas will be re-contoured and revegetated to blend with the natural topography as soon as possible after disturbance, where practicable.</li><li>Dust abatement measures will be practiced on the gravel roads and parking lots as needed.</li></ul> |

# Exposure Impacts

## Radiological Exposure Pathways

[EIA — 108]

BLM_0036886

Exposure to radiation is generally thought of in two forms – external and internal. There are numerous pathways through which radioactivity can come in contact with receptors. An exposure to radiation can lead to a dose (but not always). The radioactivity must travel through an environmental medium to reach receptors. These are discussed in a trilogy of reports in the application, all of which have been revised based on requests for additional information submitted by the department. The revised reports are:

- Revised Exposure Pathways Report,
- Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill, and
- Risk Assessment Report.

The Exposure Pathways Report describes the potential releases of radioactive and non-radioactive materials from normal mill operations and activities and the consequent potential for exposing plants, animals, and humans to radionuclides of concern. Further discussion of the effects of exposure to radioactive and non-radioactive emissions described in this report is provided in the risk assessment (SENES 2010), which also discusses the potential exposures and risks arising from malfunctions and accidents.

Pathway analysis is a mature environmental impact assessment technique, which has been used for many years to assess the release, transport and fate of radionuclides and other contaminants of potential concern (COPC) through environmental media to receptors of interest (human and/or other biota). The pathways analysis links the source of the COPC with the local mechanisms of environmental transport (action of wind, water, etc.) through receiving and exposure media (air, soil, vegetation, surface and ground water, etc.) and identifies the exposure mechanisms and receptors of interest. The results can then be used as input for risk and/or dose assessment.

Figure 56 below shows a simplified schematic illustrating pathways of exposure for biota.

[EIA — 109]



**Figure 56: Simplified Schematic Illustrating Exposure Pathways for Biota
(source: Revised Exposure Pathways Report)**

The general operation of the proposed mill includes the processes provided in Table 19.
The potential for release of contaminants from each process is also provided in the table.

[EIA — 110]

BLM_0036888

**Table 19: Mill Processes and Potential Releases**

| The Process | The Process Component | Contaminants of Potential Concern |
|---|---|---|
| Transportation | Transport of ore to the mill | Dust (including heavy metals), radionuclides including radon |
| | Transport of reagents to the mill | Reagents |
| | Transport of yellowcake from the mill to out-of-state processing plants | Uranium and other radionuclides including radon |
| | Transport of vanadium concentrate from the mill to out-of-state processing plants | Heavy metals |
| On-site storage and handling of ore, reagents, and fuels | On-site storage and handling of ore | Dust (including heavy metals), radionuclides including radon |
| | On-site storage and handling of reagents and fuels | Acids, caustics, petrochemicals |
| Mineral processing operation including process components in the following areas: | Ore Handling and Grinding | Dust (including heavy metals) and radionuclides (including radon) |
| | Leaching and CCD Thickeners | radon |
| | Uranium Solvent Extraction (SX) | Radon, Organics |
| | Uranium Precipitation, Drying, and Packaging | Uranium dust and radionuclides |
| | Vanadium Oxidation and Solvent Extraction (SX) | Organics |
| | Vanadium Precipitation, Drying, and Packaging | Vanadium dust |
| | Waste Disposal Facilities including Tailings Cells and Evaporation Ponds | Dust, radon |

Source: Revised Risk Assessment Report

A discussion of the uranium decay series is presented in the report. Isotopes of concern at the site are:

- Uranium-238 ($^{238}$U) is the most common isotope of uranium and represents 99.3 percent by mass of natural uranium (and along with its daughter product, uranium- 234 ($^{234}$U), about 98 percent of the radioactivity of the uranium present in uranium ores). Of the 15 radionuclides presented in the $^{238}$U series, the dominant contributors to dose are $^{238}$U, $^{234}$U, $^{230}$Th, $^{226}$Ra,$^{210}$Po, $^{210}$Pb and $^{222}$Rn (and its short-lived decay products).

- Uranium isotopes ($^{238}$U, $^{234}$U and $^{235}$U), $^{226}$Ra, $^{230}$Th, $^{210}$Po, and $^{210}$Pb will be present in ore dust that may be generated through ore transfer operations such as truck travel on the ore pad, dumping ore from trucks onto the pad, picking up ore

[EIA — 111]

BLM_0036889

and dumping it into the grizzly, and subsequent crushing and grinding. Ore dust is also generated from wind erosion of the ore pile. The size of the dust particles generated by the various mill activities can be an important factor in determining dose. The MILDOS-AREA code considers the effects of particle size on its calculation of dose.

- Polonium-210, although with a relatively short half life, can exist in the ecosystem since it is a decay product of $^{210}$Pb (and in turn, of $^{222}$Rn) and is potentially important radiologically in the ingestion pathway. However, for this site, ingestion pathways (consumption of meat, milk, and vegetation) contribute only a very small percentage of the dose.

- Uranium-238 series radionuclides are present in equilibrium with the $^{238}$U parent in the ore. Thus, in dust originating from ores, all $^{238}$U series radionuclides must be considered. In the mill, once the uranium has been separated from the bulk of the ore, the uranium isotopes are the primary isotopes of concern. The final product, yellowcake, consists mainly of uranium oxides and their hydrates (e.g., $UO_4$, $UO_3$ with $H_2O$).

Milling activities are closely monitored and potential dust sources carefully controlled through a combination of isolation and dust control at the source. Air exhausted from the mill process areas is directed through high efficiency dust collectors. The mill stacks release only very limited quantities of radionuclides due to the use of highly efficient effluent control systems in the mill. These stacks are considered minor pathway sources. Emissions from these stacks are quantified in the Air Permit Application.

Essentially all of the $^{230}$Th, $^{226}$Ra, $^{210}$Po, and $^{210}$Pb and limited amounts (on the order of four percent) of $^{238}$U, $^{234}$U will be present in the tailings placed in the tailings cells. Application of tailings solution or raffinate on the tailings beaches will minimize dust generation, but some tailings solids may dry out on the beaches and become airborne. Radon will be produced from the beaches and, to some degree, from tailings solutions. The dust and radon are considered pathway sources for exposure to humans and animals. Liquids containing these sources will be prevented from entering pathways to plants, animals, and/or humans by the lining system under the tailings.

At the mill site radon is released from the ore storage pad, from processing the ore in the mill and from the mill tailings in the tailings cells. The radon that is released into the air from those sources is dispersed by local winds and air currents.

During the milling process, the concentration of radionuclides including $^{226}$Ra is enhanced in the acidic leached solution. After selective extraction of uranium and vanadium, the leached radionuclides remain in the raffinate and the tailings. Therefore, evaporation ponds and tailings are potential sources of $^{222}$Rn.

Sources of non-radioactive constituents are also evaluated; they are listed in Table 20.

[EIA — 112]

BLM_0036890

**Table 20: Non-radioactive Sources and Potential Emissions**

| Source | Emission |
|---|---|
| Ore storage and crushing/grinding | Ore dust including heavy metals |
| Leaching tanks vent | Sulfuric acid mist, sulfur dioxide |
| Solvent extraction vent | Organic Solvent (kerosene/Isodecanol) |
| Yellowcake precipitation | Ammonia |
| Yellowcake centrifuge or filter and dryer | Ammonia |
| Laboratory hood | Miscellaneous vapors |
| Tailings pile | Tailings dust including heavy metals |
| Burning of fuel oil | $SO_2$, $NO_2$ |

Source: Revised Risk Assessment Report

The source of heavy metals at the site is uranium ore. Ore from numerous mines in the area were evaluated for metals and shown in Table 21

**Table 21: Metals Concentrations in Area Ores**

| Metal | Unit | Whirlwind Mine-1 | Whirlwind Mine-2 | Whirlwind Mine-3 | Slick Rock Mine | Paradox Valley Mine | Packrat Mine | Energy Queen Mine | Mean Value |
|---|---|---|---|---|---|---|---|---|---|
| Arsenic | mg/kg-dry | 221 | 387 | 387 | 9.6 | 12.9 | 112 | 43.2 | 168 |
| Cadmium | mg/kg-dry | ND | 2.2 | 0.6 | 2.0 | 3.8 | 1.0 | 3.5 | 2.2 |
| Copper | mg/kg-dry | 4.0 | 10.1 | 12.7 | 15.6 | 30.9 | 14.4 | 29.2 | 16.7 |
| Lead | mg/kg-dry | 852 | 117 | 1470 | 43.1 | 23.6 | 32.2 | 181 | 388 |
| Molybdenum | mg/kg-dry | 1.2 | 39.6 | 40.0 | 21.8 | 45.1 | 1.7 | 71.3 | 31.5 |
| Selenium | mg/kg-dry | 282 | 28.7 | 410 | 64.2 | 97.9 | 120 | 57.4 | 151 |
| Uranium | mg/kg-dry | 474 | 4000 | 5100 | 1160 | 984 | 883 | 12100 | 3529 |
| Vanadium | mg/kg-dry | 8020 | 3940 | 14500 | 5980 | 3920 | 14500 | 9150 | 8573 |
| Zinc | mg/kg-dry | 36.3 | 355 | 59.5 | 45.0 | 58.0 | 69.6 | 240 | 123 |

Source: Revised Risk Assessment Report

During the milling process, the concentration of these heavy metals is enhanced in the acidic leach solution, raffinate, and tailings solution.

Based on a comparison of the concentrations of 21 elements in raffinate process water to ecological screening levels, neutralization of the acidic raffinate process waters before discharge to surface impoundments would not reduce the metal concentrations in the solution to non-toxic levels for wildlife. The dissolved concentrations of boron, cadmium, copper, manganese, selenium, and uranium concentrations exceed ecological screening levels even at neutral pH while several other metals (barium, nickel, and zinc) were

[EIA — 113]

BLM_0036891

elevated above screening levels at the pH level of 7.5 in one of the two samples tested. The selenium concentrations observed in the raffinate are of most concern given its toxicity to waterfowl and elevated concentrations compared to the screening level. Details can be found in the Ecological Screening of Raffinate Process Water report.

Overall, non-radiological COPC considered for this study are:

- heavy metals and particulate matter from erosion of ore stockpiles, and dry tailings;
- heavy metals and particulate matter from transportation and handling of ore and yellowcake;
- heavy metals and particulate matter from ore grinding, uranium/vanadium recovery and drying processes;
- acid mists and fumes from the leach and CCD circuits;
- organic vapors from SX circuits;
- heavy metals in surface runoff and evaporation ponds, tailings impoundments, and beach sands; and
- acid solutions in evaporation ponds and tailings impoundments.

**Conceptual Site Model.** The environmental fate of radionuclides released from a source is determined through a combination of processes. The released radionuclides are transported through the air or water and subsequently distributed into other environmental media via processes such as deposition to soil or transfer to plants and animals. Radionuclides distributed in the environment can then result in exposure from external radiation (direct exposure, immersion and groundshine) or from the intake of radioactivity in air, water or food. Similarly, plants and animals can be exposed.

The Conceptual Site Model (CSM) is the primary tool that is used to conduct the exposure pathways analysis and risk assessment. The CSM links the source of COPC with their environmental fate and transport mechanisms, receiving and exposure media, exposure mechanism, and the receptors. It is shown graphically in the following figures for human receptors and non-human receptors.

[EIA — 114]

BLM_0036892



**Figure 57: Conceptual Site Model for Human Exposure**
**(source: Revised Exposure Pathways Report)**

[EIA — 115]

BLM_0036893



**Figure 58:Conceptual Site Model for Biota other than Humans**
**(source: Revised Exposure Pathways Report)**

Airborne Pathways. The following processes have a potential for generating sources of airborne radioactivity to humans and flora and fauna:

- transportation of ore to the mill;
- transportation of yellowcake from the mill to out-of-state processing plants;
- on-site storage and use of ore;
- ore handling and grinding;
- leaching;
- uranium recovery including solvent extraction (SX), precipitation, drying, and packaging; and
- waste disposal facilities including tailings cells and evaporation ponds.

Radionuclides released into the atmosphere from the Piñon Ridge Mill, as particulates or as radon gas, are dispersed by the local winds. Although the predominant wind direction shifts diurnally between east and west, dispersion occurs in all directions. These are discussed in detail in the Revised Exposure Pathways Report Each of these sources have been evaluated and input into the MILDOSE_AREA model. The results are discussed below.

Waterborne Pathways. The mill is located in a semi-arid environment with an absence of lakes, running streams or tributaries near the site. The dry washes that cross the site from

[EIA — 116]

south to north will occasionally contain running water for a short period of time after a significant rain event. Engineering controls, such as diversion channels, will be used to direct runoff away from the facility limiting the potential for this water to come in direct contact with the mill infrastructure. Runoff from the mill itself will be collected and contained on site in the storm water ponds, which will be monitored and maintained by mill personnel. At the Piñon Ridge Mill, there will be no releases of water arising from normal operations. Accidental releases are discussed later in the Risk Assessment Report.

Because of the lack of inhabitants near the mill and the lack of waterborne sources of radioactivity, potential contamination to humans from the surface water pathway is negligible.

Evaporation ponds are not a source of drinking water for human receptors, and bird netting and fencing are expected to exclude livestock and wildlife including birds from the ponds. The bird netting may be difficult to maintain, particularly in the winter months. The department will be monitoring the performance of the bird netting (and bird balls on the tailings cells) for effectiveness.

*De Minimis.* *De minimis* is a Latin expression meaning "about minimal things," normally in *de minimis non curat lex* ("The law does not concern itself with trifles"). In risk assessment, it refers to a level of risk too small to be of concern. Some refer to this as a "virtually safe" level. EFR chose to use this term. For purposes of this pathway analysis, *de minimis* pathways are those that are considered too small to be of consequence or with a probability of occurrence that is so low as to be "incredible." For the Piñon Ridge Uranium Mill, the *de minimis* pathways for radiological contaminants of potential concern result from incomplete pathways or those pathways that contribute less than five percent to the overall dose. A pathway is considered "incomplete" if the contaminant cannot reach the receptor of interest due to absence of the source (no release), and/or the absence of a mechanism of transport (e.g., surface or ground water) and/or absence of a media of exposure (soil, vegetation, biota in food chain to humans, etc.).

The *de minimis* pathways include:

- Yellowcake drying and packaging area. Legacy uranium mills used calciners, or furnaces, to dry yellowcake. The calciner exhaust went out the yellowcake stack, a major particulate source. The vacuum dryer eliminates this emission point.
- Soil. Dust suppression techniques built into the mill and standard procedures for dust control should mitigate soil as a pathway that will contribute to dose. Despite EFR's classification of soil as *de minimis*, the department will be monitoring soil concentrations and any transport away from the site. The dose from soil is discussed in the Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill report.
- Meat, vegetation, and milk. Cattle are grazed seasonally near the mill on some lands in Paradox Valley. Vegetables and milk are not produced in the immediate area of the mill; however, for completeness of the radiological assessment of effluents from the mill, vegetable and meat pathways were included in the

BLM_0036895

computer model MILDOS-AREA. Consumption of wild game is another pathway of radionuclides to humans. This pathway depends on the uptake of radionuclides by wild game (i.e., from soils to plants to animals) and on the subsequent harvesting and consumption by humans. This pathway is discussed in more detail in the report.

- Water runoff and ground water. Under normal conditions, consumption of locally occurring water is not anticipated by humans in the mill area because of the scarcity of perennial surface waters in the area. Animals may drink rainwater when available, but that activity is limited at the site because of the lack of available water collection areas and low rainfall, and should not be a significant pathway of radionuclides to animals. Bird balls will cover the water surfaces in the tailings cells and bird netting will cover the evaporation pond area. These measures will block access by waterfowl and birds that might attempt to drink from the tailing cells or evaporation ponds. Accidental releases are discussed later in the Risk Assessment Report.

- Sprinklers. Sprinklers (or misters) often are used to assist in the evaporation of tailings liquid from the evaporation pond. Winds can carry the spray beyond the edges of the evaporation pond. An analysis of the radon emissions from the evaporation ponds indicated that the emissions from the sprinkler system are extremely insignificant compared to the estimated total emissions from the ponds (approximately six orders of magnitude smaller) (SENES 2010a). This pathway is considered *de minimis*.

- Wildlife and livestock pathways. Limited airborne releases and subsequent deposition to the soil results in soil and offsite surface water concentrations that are likely to be within background levels. In addition, the access to tailings impoundments and evaporation ponds is limited due to the bird netting, bird balls and the presence of an eight-foot high chain-link fence around these facilities. Therefore, pathways to wildlife and livestock are considered to be de minimis.

- Pathways for future land use. Although future residential development near the mills is theoretically possible, it is anticipated that future land use "at the fence line" is likely to be limited to non-residential, industrial/commercial exposure scenarios.

## Radiological Impacts on Humans

Inhalation is the main pathway of radionuclides from the Piñon Ridge mill to people residing in the vicinity of the mill. Radon progeny, $^{230}$Th and $^{226}$Ra, in inhaled dust particles from the tailings impoundments and the milling operations, produce the greatest radiation dose to people in the environment. MILDOS-AREA modeling has been used to assess the magnitude of that impact in units of millirem per year (mrem/yr) to the general public within an 80-km radius of the mill. Details of the modeling effort are presented in Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill.

The model estimated a maximum Total Effective Dose Equivalent (TEDE) for an off-site receptor of 8.21 mrem/yr (including radon) compared to the regulatory maximum limit of 25 mrem/yr (40 CFR 190) excluding radon and 100 mrem/yr (Colorado 6 CCR-1007-1, Part 4) including radon. However, this estimate was not based on the presence of an

[EIA — 118]

existing residence, but rather a theoretical residence located at the property boundary. The estimated maximum TEDE for an actual off-site receptor (i.e., the nearest downwind resident) was estimated to be 0.50 mrem/yr. Natural background in the area results in an estimated TEDE of approximately 400 mrem/yr.

The maximum doses at the property line are shown in Table 22.

**Table 22: Maximum Calculated Doses at the Property Line**

| Location | TEDE | Effective (excluding radon) | Bone (excluding radon) | Lung (excluding radon) |
|---|---|---|---|---|
| Location with maximum dose | 8.21 (Fence 14) | 3.35 (Fence 13) | 17.4 (Fence 13) | 19.8 (Fence 13) |

The maximum doses at the nearest residence are shown in Table 23.

**Table 23: Maximum Calculated Doses at the Nearest Residence**

| Receptor | TEDE | Effective (excluding radon) | Bone (excluding radon) | Lung (excluding radon) |
|---|---|---|---|---|
| Infant | 5.04E-01 | 1.03E-01 | - | 7.98E-01 |
| Child | 4.73E-01 | 4.95E-02 | 1.28E-01 | 3.84E-01 |
| Teen | 4.62E-01 | 2.70E-02 | 1.61E-01 | 2.01E-01 |
| Adult | 4.61E-01 | 2.29E-02 | 1.78E-01 | 1.68E-01 |

*Infant doses do not include bone doses as the pathway is home grown vegetables, which are not typically consumed by infants

The reader is referred to the Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill report for detailed discussion of public dose.

## Summary of Occupational Dose

The pathways that result in radiological impact to mill employees and visitors are exposure to gamma rays from radionuclides in the mill and exposures from the inhalation of yellowcake dust, ore and tailings dust, and radon progeny. The ongoing radiological impact of mill operations to the mill employees and visitors will be assessed by the mill radiation safety officer and staff.

Doses are determined from mill area air samples, breathing zone air samples, uranium in urine bioassay samples, and by direct measurement of radiation in the mill. Procedures for collecting those samples and making the measurements are presented in the Piñon Ridge Mill Health and Safety Plan (Energy Fuels, 2009).

Radiation doses to workers must be limited to 5,000 mrem/yr per the department by regulations, but EFR's goal is to limit exposure for employees to 100 mrem/yr or less. Radiation doses will be evaluated regularly, including on a daily basis for some

[EIA — 119]

operations. Employee dose reports from the RSO will be sent to employees and the department. Additionally, copies will be sent to mill management and to the Safety Committee to determine if the doses are as low as reasonably achievable (ALARA).

The radiation safety program for Piñon Ridge is based largely on that of the Cotter mill in Cañon City. That program has been evaluated and refined by Cotter and the department with excellent results over the last decade. Doses to workers at Cotter have come down by about 50 percent since the late 1990s due to program improvements. Doses to workers at Cotter now are less than 500 mrem/yr, with many employees below 100 mrem/yr.

## Chemical Impacts on Humans

The impact of chemicals used (e.g., reagents) and heavy metals released from the site are discussed in the Risk Assessment Report and the Revised Exposure Pathways Report. Hazardous chemicals are used at the mill facilities, the amount and variation of such chemical usage is small compared to large chemical facilities and many other industrial plants. The reagents are stored on site in pre-packaged totes, barrels, and bulk bags within weatherproof buildings and/or in closed bulk storage tanks. Additional information about the specific chemicals used, and their Material Safety Data Sheets are provided in the Material Containment Plan.

In addition to the reagents, the heavy metals contained in the uranium ore could potentially have impact on the humans and the environment. Various processes and associated release mechanisms have a potential for generating airborne particulate matter and heavy metals (including V, As, Pb, Mo, Cd, Se, Cu, U and Zn) that could impact humans and flora and fauna.

Examples of milling activities that generate emissions are shown in Table 24, below.

[EIA — 120]

BLM_0036898

**Table 24: Examples of Milling Activities that Generate Emissions**

| Pollutant | Mill Activity |
|---|---|
| Particulate Matter, $PM_{10}$, $PM_{2.5}$ | Travel on main and secondary roads, ore handling and grinding, wind erosion of ore stockpiles, wind erosion of tailing cell and evaporation pond beaches, product precipitation and packaging, boilers, and emergency engines |
| Carbon monoxide | Boilers and emergency engines |
| Nitrogen oxides | Boilers and emergency engines |
| Sulfur oxides | Boilers and emergency engines |
| Volatile organic compounds | Evaporation of tailing cell and evaporation pond solution, solvent extraction process, gasoline storage, boilers, and emergency engines |
| Hazardous air pollutants | Ore handling and grinding, wind erosion of ore stockpiles, wind erosion of tailing cell beaches, leach process, product precipitation and packaging, boilers, and emergency engines |
| Ammonia | Vanadium precipitation process |
| Sulfuric Acid | Leach process and evaporation of tailing cell and evaporation pond solution |

The mill facilities with potential for release of dust or toxic fumes (e.g., SAG mill, leach tanks, precipitation tanks, vanadium kiln and furnace) are equipped with baghouses or wet scrubbers to minimize emissions of dust or fumes to the atmosphere. The uranium dryer and its off gas system is zero-emission equipment.

It is expected that dust emissions from ore handling and grinding and resuspension and erosion of particulate matter from soil, ore stockpiles, and dry tailings will be the major sources of exposure to heavy metals. Metals in the emissions from the ore and byproduct material processes were estimated based on the modeled $PM_{10}$ emissions for a 1,000 tpd mill in the Air Dispersion Modeling Report (Kleinfelder 2010b) as well as the metal concentrations in the ore and tailings.

The potential emissions from the 1,000 tpd mill are shown in Table 25 below.

BLM_0036899

**Table 25: Potential Emissions from a 1,000 tpd Mill**

| Pollutant | Uncontrolled Non-Fugitive Emissions (tpy) | Controlled Fugitive Emissions (tpy) | Controlled Non-Fugitive Emissions (tpy) | Total Controlled Emissions (tpy) |
|---|---|---|---|---|
| Particulate matter | 51.01 | 177.26 | 1.24 | 178.50 |
| PM$_{10}$ | 47.46 | 66.06 | 1.20 | 67.26 |
| PM$_{2.5}$ | 45.45 | 7.77 | 1.18 | 8.95 |
| Nitrogen oxides | 17.67 | 0.00 | 6.33 | 6.33 |
| Sulfur dioxide | 1.84 | 0.00 | 1.84 | 1.84 |
| Carbon monoxide | 11.67 | 0.00 | 11.67 | 11.67 |
| VOCs | 37.30 | 162.01 | 37.30 | 199.31 |
| Single HAP | 0.37 | 0.03 | 0.20 | 0.23 |
| Total HAPs | 0.59 | 0.03 | 0.20 | 0.23 |
| Ammonia | 5.41 | 0.00 | 5.15 | 5.15 |
| Sulfuric Acid | 7.76 | 14.21 | 7.76 | 21.96 |

(Note that the Piñon Ridge Mill is only being authorized for 500 tpd; therefore the emissions are expected to be half of what is modeled here.)

The point of maximum impact for the 24-hour averaging period was located at the receptor on SH 90 that was adjacent to the main haul road for the proposed facility. The ore and byproduct material were determined to be 30 percent and 8 percent of the total PM$_{10}$ emissions, respectively. The balance of the PM$_{10}$ emissions is from roads (61 percent) and combustion processes (one percent). The impact levels diminish quickly from the maximum of 104 µg/m$^3$ to values below 60 µg/m$^3$ just outside the proposed facility site fence line and to below 26 µg/m$^3$ more than one km from the proposed facility site fence line.

The point of maximum impact for annual averaging was located on the proposed facility site fence line on the northern border. Emissions generated from travel on the unpaved main haul road and the unpaved secondary roads were the largest contributor to the impact. The impact levels diminish quickly from the maximum of 24 µg/m$^3$ to values below 15 µg/m$^3$ just outside the proposed facility site fence line and to below 5 µg/m$^3$ more than one km from the proposed facility site fence line.

Therefore, impacts to air quality in the area of the proposed facility would be less than levels deemed to be protective of human health and the environment and would not degrade the existing air quality. Further, many conservative assumptions were used in the modeling analysis, such as modeling worst-case operating hours and assuming more acreage exposed to wind erosion for the evaporating ponds than would most likely occur; thus, the actual impacts would likely be less than those modeled.

It is worth repeating that the conservative model results for 1,000 tpd mill would be half of the values for the 500 TPD mill being proposed, more than 60 percent of the emissions are from driving on gravel roads, and the impacts that do exist diminish quickly within one km of the proposed facility site fence line.

[EIA — 122]

BLM_0036900

Based on the total $PM_{10}$ emissions and concentrations of various metals in ore and byproduct material, the amount of metals emitted from the mill per year (at the point of emission, i.e., on site) are shown in Table 26.

### Table 26: Total Metals Emissions
### PM10=67.26 ton/yr

|  | Ore (30%) (lb/yr) | Tailings (8%) (lb/yr) | Total (lb/yr) |
|---|---|---|---|
| Arsenic | 6.78 | 1.80 | 8.58 |
| Cadmium | 0.09 | 0.02 | 0.11 |
| Copper | 0.68 | 0.18 | 0.85 |
| Lead | 15.71 | 4.17 | 19.88 |
| Molybdenum | 1.28 | 0.34 | 1.61 |
| Selenium | 6.13 | 1.63 | 7.75 |
| Uranium | 142.8 | 1.52 | 144.30 |
| Vanadium | 346.6 | 13.81 | 360.45 |
| Zinc | 4.99 | 1.32 | 6.31 |

The following tables show the annual estimated average metal concentrations in the atmosphere at the property line (maximum location) and at the nearest residence in Paradox Valley based on the modeled $PM_{10}$ concentrations and concentrations of various metals in ore and byproduct material. These concentrations are in micrograms per cubic meter ($\mu g/m^3$) and represent the incremental concentrations above background levels.

### Table 27: Maximum Annual Concentrations at the Property Line
### PM10=$\mu g/m^3$

|  | Ore (30%) ($\mu g/m^3$) | Tailings (8%) ($\mu g/m^3$) | Total ($\mu g/m^3$) |
|---|---|---|---|
| Arsenic | 1.20E-03 | 3.18E-04 | 1.52E-03 |
| Cadmium | 1.56E-05 | 4.15E-06 | 1.98E-05 |
| Copper | 1.20E-04 | 3.17E-05 | 1.51E-04 |
| Lead | 2.78E-03 | 7.38E-04 | 3.52E-03 |
| Molybdenum | 2.26E-04 | 5.99E-05 | 2.86E-04 |
| Selenium | 1.08E-03 | 2.88E-04 | 1.37E-03 |
| Uranium | 2.53E-02 | 2.68E-04 | 2.55E-02 |
| Vanadium | 6.13E-02 | 2.44E-03 | 6.38E-02 |
| Zinc | 8.83E-04 | 2.34E-04 | 1.12E-03 |

[EIA — 123]

**Table 28: Annual Concentrations at the Nearest Residence**
**PM10=1.7μg/m$^3$**

| Metal | Ore (30%) (μg/m$^3$) | Tailings (8%) (μg/m$^3$) | Total (μg/m$^3$) |
|---|---|---|---|
| Arsenic | 8.56E-05 | 2.27E-05 | 1.08E-04 |
| Cadmium | 1.12E-06 | 2.96E-07 | 1.41E-06 |
| Copper | 8.54E-06 | 2.27E-06 | 1.08E-05 |
| Lead | 1.99E-04 | 5.27E-05 | 2.51E-04 |
| Molybdenum | 1.61E-05 | 4.28E-06 | 2.04E-05 |
| Selenium | 7.74E-05 | 2.06E-05 | 9.80E-05 |
| Uranium | 1.80E-03 | 1.92E-05 | 1.82E-03 |
| Vanadium | 4.38E-03 | 1.74E-04 | 4.56E-03 |
| Zinc | 6.30E-05 | 1.67E-05 | 7.98E-05 |

For comparison purposes, exposure limits from various agencies are presented here.

**Table 29: Air Quality Guidelines**

| COPC | NAAQS[1] | California[2] | Texas[3] |
|---|---|---|---|
| Arsenic | | 0.015 μg/m$^3$ Chronic REL[6] | 0.1 μg/m$^3$ short-term[4] 0.01 μg/m$^3$ long-term[5] |
| Cadmium | | 0.02 μg/m$^3$ Chronic REL | 0.1 μg/m$^3$ short-term 0.01 μg/m$^3$ long-term |
| Copper | | | 10 μg/m$^3$ short-term 1 μg/m$^3$ long-term |
| Lead | 0.15 μg/m$^3$ 3-months 1.5 ug/m$^3$ quarterly | 1.5 μg/m$^3$ 30-day | NAAQS |
| Molybdenum | | | 30 PM μg/m$^3$ short-term 3 μg/m$^3$ long-term |
| Selenium | | 20 μg/m$^3$ Chronic REL | 2 μg/m$^3$ short-term 0.2 μg/m$^3$ long-term |
| Uranium | | | Soluble: 0.5 μg/m$^3$ short-term 0.05 ug/m$^3$ long-term Insoluble: 2 μg/m$^3$ short-term 0.2 μg/m$^3$ long-term |
| Vanadium | | | 0.5 μg/m$^3$ short-term 0.05 μg/m$^3$ long-term |
| Zinc | | | 20 PM μg/m$^3$ short-term 2 μg/m$^3$ long-term |
| Kerosene | | | 1000 μg/m$^3$ short-term 100 μg/m$^3$ long-term |

1 - http://www.epa.gov/air/criteria.html
2 - http://www.arb.ca.gov/research/aaqs/caaqs/caaqs.htm
3 - http://www.tceq.state.tx.us/assets/public/implementation/tox/esl/list/june2010.pdf
4 - in Particulate Matter
5 - generally 1-hour
6 - generally annual
7 - Recommended Exposure Limit

[EIA — 124]

**Process Chemicals.** The following processes have a potential for generating sources of airborne acid mists and fumes and organic vapors that could impact humans and flora and fauna:

- Acid mists and fumes emissions from the leach and CCD circuits;
- Organic vapor emissions from SX circuits.

The process vessels in the leach, CCD, and SX circuits are closed to minimize the emissions of the acid mists and fumes and organic vapors. However, off-site receptors may also be exposed to very low concentrations of organic vapors emitted from the SX circuits and evaporation ponds.

The organic reagents used in the uranium and vanadium SX circuits include kerosene ("$C_{14}H_{30}$"), amine ("Alamine 336 ($R_3N$)") and isodecanol ("Exxal 13($C_{10}H_{22}O$)"). The organic mixture is nominally 96 percent kerosene, three percent isodecanol, and one percent alamine. For a 1,000 tpd processing rate, it is estimated that 36.4 tons/year (1.06 g/s) of VOCs are emitted from the SX system and 162 tons/year (4.7 g/s) of VOCs are emitted from the tailings and evaporation facilities. Those values for the 500 tpd mill under consideration would be reduced accordingly.

The average concentrations of organic vapor (mostly kerosene) at the nearest residence and at the site boundary were 3.4 $\mu g/m^3$ and 48.8 $\mu g/m^3$, respectively. These are very conservative estimates since it is assumed that all kerosene in the tailings slurry and raffinate solutions evaporates to the atmosphere.

**Occupational Hazards.** EFR claims that the modern state-of-the-art design of the Piñon Ridge Mill (monitoring; containment and control of hazardous materials, dust and fume emissions; HVAC systems; process control; etc.) combined with the implementation of the Health and Safety plan, extensive training program, availability of personal protection equipment, and compliance with federal (e.g., MSHA, EPA) and Colorado (CDPHE) regulations will ensure that occupational health and safety limits are not exceeded and that a safe workplace is maintained at all times. The department will monitor the industrial hygiene program at the mill to verify that workers are safe.

In addition to the workplace safety measures, uranium exposure of workers will also be monitored using a uranium-in-urine bioassay program, which monitors the levels of uranium in the human body. Uranium will be monitored in the mill using breathing-zone air samples that sample uranium in the air while workers conduct tasks potentially generating uranium dusts.

Area air samplers also will be used to monitor uranium concentrations in specific work areas of the mill. In addition to uranium, concentrations of other heavy metals, ammonia, sodium hydroxide, and sulfuric acid will be controlled to comply with the Mine Safety and Health Administration (MSHA) regulations and the Threshold Limit Values (TLVs) recommended by the American Conference of Governmental Industrial Hygienists (ACGIH). Control of acid and caustics is important because these chemicals are corrosive

[EIA — 125]

BLM_0036903

and can cause burns upon contact with skin (which happened at Cotter in 2005, leading to the cessation of operations).

Based on the occupational health and safety measures and other control measures in place at the mill, it is expected that the worker exposure to elevated levels of non-radiological COPC is unlikely. In addition, the exposure to acid fumes and organic solvent vapors will also be reduced by process control measures (i.e., closed systems equipped with scrubbers or baghouses) implemented in the acid storage areas and the leach, CCD, and SX circuits. Therefore, no significant non-radiological risks and/or health related impacts to workers are expected from the routine operation of the mill. As discussed above, accidents do happen, and those risks are evaluated in the Risk Assessment Report.

## Effects of Sanitary and Other Waste Discharges

The Water and Wastewater Plan in Vol. 13 of the application discussed management of sanitary and other liquid waste discharges. Mill wastewater is created from three sources in the mill. The first is the barren process water that remains after the uranium and vanadium have been recovered from the process solution. The second is the gray water that comes from the sinks, showers, and laboratory drains. The third is the water from the commodes and urinals that is handled in the sanitary septic system.

Once the supply water is utilized in the milling process, it is termed process water. The process water is utilized in all areas of the plant and is recycled wherever practicable. After uranium and vanadium have been recovered from the process stream in the solvent extraction (SX) building, the barren solution (i.e., raffinate) is pumped to the tailings box, where it is used to dilute the tailings as described above. Excess raffinate, which contains high salt levels, is pumped to the evaporation pond, where the water is allowed to evaporate and the salts precipitate out in the bottom of the lined ponds.

A large portion of the tailings water is recovered. A floating barge-mounted pump on top of the cell's water pool pumps process water back to the return water tank in the mill for reuse. There is also a drainage layer above the tailings liner system that collects water that percolates through the tailings, which is then pumped back to the water pool on top. A portion of the wastewater remains entrained within the tailings solids.

During processing, a small amount of the process water evaporates from open storage tanks in the system or is exhausted from air pollution control scrubbers on process tanks. The makeup water that is added in the milling process represents about 40 percent of the total process flows (i.e., 130 gpm makeup water of 318 gpm process flows).

The gray water is used water from the showers, sinks, and laboratory. It should be noted that 100 percent of the gray water is recycled into the process water system through the process water tank. The source water for the gray water is the potable water system.

The sanitary septic system handles waste from the urinals and commodes in the mill. The 3,475 square-foot septic system was designed to handle 3,885 gallons per day. The water

BLM_0036904

from the potable water system flows to the bathrooms and then from the urinals and commodes into the septic system.

The administration building has a potable water supply that feeds through the building. All building drains, water coolers, commodes and urinals drain to the sanitary septic system. The 544 square-foot system was designed to dispose of 608 gallons per day. The design and tests for the septic systems is described in Appendix C of the Water and Wastewater Plan.



**Figure 59: Schematic of Water and Wastewater**

BLM_0036905





**Figure 60: Location of Septic Systems**

## Radiological Impacts on Ecological Receptors

Radiological impacts on plant and animal receptors result from pathways such as the uptake and physical contact of plants with tailings and/or ore, inhalation of ore dust and tailings dust, and the consumption of vegetation by animals. Inhalation of radionuclides by animals near the mill site may occur, but the magnitude of these exposures is expected to be minimal due to the movement of animals in and out of the area. The radiation doses to animals can be approximated by the radiation doses to humans as calculated by MILDOS, e.g., <10 mrem/yr.

The liquids that will be contained in the evaporation ponds and tailings cells have attracted birds, including ducks and geese, at some mill sites. The liquids will have a low

[EIA — 128]

pH and elevated concentrations of radionuclides, and birds may attempt to drink from or land on the ponds. To prevent this from occurring, bird balls will be placed over the tailings water pool and bird netting will be installed over the evaporation ponds. Bird balls are floating plastic balls placed on the surface of the tailings liquid. In addition, the evaporation ponds will be covered with netting to prevent access, and a chain link fence will be installed around the perimeter of the tailings cells and evaporation ponds to prevent access to the area by terrestrial wildlife.

The maximum gamma exposure rate in the vicinity of a typical uranium mill tailing site is only a few mrem/yr. That rate is very low and will not impact plants significantly. For example, the DOE has concluded that for a facility in compliance with the dose limits for humans, the total doses to plants and animals should be well below the recommended dose limit for animals of 0.1 rad/day and the higher limit of 1 rad/day for plants (U.S. Department of Energy, 2002). Additionally, it is generally considered that when radiological doses to humans are small, doses to animals are similarly small (Whicker and Schultz, 1982).

## Non-Radiological Impacts on Humans

Toxicology is the study of the adverse effects of chemicals on living organisms. Of all the radioactive materials in the uranium-238 and uranium-235 decay chains, uranium is singled out in the state of Colorado radiation control regulations as important to regulate based on chemical toxicity (chemotoxic impact on renal system, i.e., kidneys). Uranium is a heavy metal that can concentrate in the bones of mill workers. At the Piñon Ridge Uranium Mill, uranium will be monitored using a uranium-in-urine bioassay program that monitors uranium levels in the human body.

In addition to uranium, concentrations of other heavy metals, ammonia, sodium hydroxide, and sulfuric acid will be controlled to comply with MSHA regulations and the TLVs recommended by the ACGIH.

Dust emissions from ore handling and grinding and resuspension and erosion of particulate matter originating from soil, ore stockpiles, and dry tailings likely will be the major sources of exposure to heavy metals. However, these emissions are expected to be quite low. Dust emission controls such as water spraying, baghouses, and scrubbers will reduce the offsite receptors exposure to dust. In addition, the exposure to acid fumes and organic solvent vapors also will be reduced by process control measures implemented in the acid storage areas and the leach, CCD, and SX circuits. The Risk Assessment Report (SENES 2010) evaluates the potential impact to off-site receptors for metal concentrations in the air.

## Radiological Impacts on Biota Other Than Humans

Radiological impacts on wildlife and plants are discussed primarily in the Risk Assessment Report as well as the Revised Exposure Pathways Report. Radiological impacts on plant and animal receptors result from pathways such as the uptake and physical contact of plants with tailings and/or ore, inhalation of ore dust and tailings dust, and the consumption of vegetation by animals. Inhalation of radionuclides by animals

BLM_0036907

near the mill site may occur, but the magnitude of these exposures is expected to be minimal due to the movement of animals in and out of the area.

The radioactive materials handled at a uranium mill have relatively low specific activities (amount of radioactivity per unit mass, e.g., μCi/g). The low specific activities require the release of exceedingly large quantities of material to be of concern. Driving forces (energy sources — initiating events for accidents) for such releases are generally lacking or extremely unlikely in the milling operation.

The greatest hazard to wildlife is from the liquids that will be contained in the evaporation ponds and tailings cells. The liquids that will be contained in the evaporation ponds and tailings cells have attracted birds, including ducks and geese, at some mill sites. The liquids will have a low pH and elevated concentrations of radionuclides and birds may attempt to drink from or land on the ponds. Because of their elevated metal and radionuclide concentrations, the tailings and raffinate solution can be acutely and chronically toxic to wildlife; especially birds and bats that may attempt to drink from or land on the ponds. Therefore, the waste management facilities (tailings cells and evaporation ponds) represent the primary potential sources of exposure pathways to wildlife.

A screening exposure pathway assessment was conducted to estimate the radiation dose to a bird (mallard duck) landing on the tailing cells. This assessment was based on wildlife having unlimited access to the tailings impoundments and evaporation ponds. The major exposure pathways considered was drinking the water and direct gamma exposure to the duck. A chemical analysis for the tailing solution from a conventional uranium mill, conducted in April 2003 (Energy Laboratories Inc., 2003) was used for the dose estimation. The calculations show that the total dose from $^{226}$Ra, $^{210}$Pb, $^{230}$Th, and $^{232}$Th could be as high as 1,400 milliGrays per day (mGy/d), which exceeds the benchmark of 5 mGy/d (Garisto 2005) for birds (See Appendix A1 of the Risk Assessment for details of calculations).

The ponds will be fenced. The evaporation ponds will have bird netting and the tailings cells will use bird balls for the ponded portions of the cells. Due to the fairly steep sides to the cells, exposed beaches should be minimized. Mill staff will inspect the cells daily and will take mitigative measures to chase birds away from exposed beaches if necessary. The restricted area fencing is sufficient to prevent mammals from accessing the beach sands; however, birds could land on the salt-encrusted beach sands. The beach sands are acidic and constantly being deposited during operations and would not be expected to support vegetation or a large number of insects; but there is the potential for direct exposure. Generally, metals are much more soluble in acidic conditions and any tailings solution coming in contact with birds is likely to have dissolved metal cations as well as radionuclides. Birds could be exposed by directly drinking this solution or by preening wetted and encrusted feathers.

The maximum gamma exposure rate in the vicinity of a typical uranium mill tailing site is only a few mrem/yr. That rate is very low (a fraction of natural background) and will

BLM_0036908

not impact plants or animals. Additionally, it is generally considered that when radiological doses to humans are small, doses to animals are similarly small (Whicker and Schultz 1982).

Limited airborne releases and subsequent deposition to the soil results in soil and offsite surface water concentrations that are likely to be within background levels. This is validated by the very low deposition onto soil as suggested by the very low doses from the worst-case MILDOS Area analyses in the Regional Dust Report, as well as the limited area of deposition as shown in the Air Dispersion Modeling Report. Inhalation of radionuclides by animals near the mill may occur, but the magnitude of these exposures is expected to be minimal due to the movement of animals in and out of the area, thus reducing the exposure time.

Part of the environmental monitoring program for the site is to monitor radionuclide uptake in flora and fauna. Baseline concentrations in cattle and rabbits are described in the Baseline Survey of Radionuclides in Animal Tissue report.

## Non-Radiological Impacts on Biota other than Humans

The Piñon Ridge Uranium Mill is designed as a zero-discharge mill in terms of surface and ground water. Process solution is routed from the mill to lined tailings cells and lined evaporation ponds for evaporation. No liquids are released from those structures to runoff channels near or on the property. Without perennial surface water in the area, bioaccumulation of uranium, thorium, radium, and lead and other heavy metals cannot occur in the runoff channels.

The waste management facilities (tailings cells and evaporation ponds) represent the potential sources of exposure pathways to the wildlife. Because of their low pH and elevated metal concentrations, the tailings and raffinate solutions can be acutely and chronically toxic to wildlife; especially birds and bats that may attempt to drink from or land on the ponds.

Aquatic organisms that may be present within the tailings cells and evaporation ponds can take up uranium, thorium, radium, or lead but those organisms will remain in those structures. At the end of the mill life those organisms will be buried under a tailings cover and will not be available to transfer these elements to human or animals as a part of the food chain.

Surface water channels near the mill will contain water after local rains but not for a long enough period of time for aquatic organism to live in the channels and take up uranium, thorium, radium, or lead from dust generated from mill operations.

## Summary

The following tables summarize the pathways and exposure potential from the Piñon Ridge Mill. The department concurs in general with the analysis. Empirical sampling and continued monitoring and modeling will be used to verify the accuracy of the estimates.

BLM_0036909

## Table 30: Summary of Radiological Pathways

| Source | Pathways | Receptors | Comments | De minimis |
|---|---|---|---|---|
| Surface runoff from tailings and ore pads including acid drainage, and radioactive waste storage areas | Release of uranium and other radionuclides to soil | Ecological receptors | Storm water and surface runoff management reduces access to the ecological receptors, incomplete pathway | Yes |
| | Release of uranium and other radionuclides to surface water | Ecological and human receptors | No permanent surface water. Control measures for evaporation ponds to limit the access of ecological receptors, no source of surface water as drinking water, incomplete pathway | Yes |
| | Leach of uranium and other radionuclides to groundwater | Human receptors | Proper linings and mentoring wells are planned, incomplete pathway | Yes |
| | Release of uranium and other radionuclides to soil and subsequent resuspension | Ecological and human receptors | Storm water and surface runoff management and dust control measures are in place | Yes |
| Tailings impoundments and beach sands | Soil contamination with uranium and other radionuclides | Ecological receptors | Fence around the tailings impoundments limits the access to the terrestrial receptors. No significant source of food for birds | Yes |
| Process line leaks | Release of uranium and other radionuclides to soil | Human receptors including the workers | Scheduled maintenance, secondary containment, spill control measures and personal protection equipment minimize the exposure to public and workers | Yes |
| | Release of radon to air | Human receptors including the workers | Scheduled maintenance, secondary containment, spill control measures and personal protection equipment minimize the exposure to public and workers | Yes |
| | Release of uranium and other radionuclides to groundwater | Human receptors | Scheduled maintenance, secondary containment spill control measures, and great depth to groundwater make it an incomplete pathway | Yes |
| Radon releases from tailings, ore pads, evaporation ponds, milling process | Release of radon to air | Human receptors including the workers | Radiological doses to public were estimated via the MILDOS computer code and determined to be much less than regulatory limits (Little 2010) | No |

| Source | Pathways | Receptors | Comments | De minimis |
|---|---|---|---|---|
| Radon emissions from sprinklers | Release to air | Human receptors including the workers | Insignificant release amount | Yes |
| Yellowcake storage | Release of uranium and other radionuclides to soil | Human receptors including the workers | Spill control measures minimize the exposure to public and workers | Yes |
| | Radon emission to air | Human receptors including the workers | Negligible as radium-226, the parent of radon has been separated from uranium (send to tailings) | Yes |
| Particulate emissions from U/V recovery and drying, off gas systems, | Release of uranium and other radionuclides and radon to air | Ecological and human receptors | Dust control measures including filters and scrubbers. Incomplete pathway for yellowcake dryer (zero emissions) | Yes |
| Particulate emissions from ore grinding | Release of uranium and other radionuclides and radon to air | Ecological and human receptors | Dust control measures including filters, and scrubbers. | Yes |
| Particulate emissions from exposed dry tailings and ore stockpiles (wind erosion) | Release of uranium and other radionuclides and radon to air | Ecological and human receptors | Dust control measures including water spraying | No |
| | Release of uranium and other radionuclides to air, subsequent deposition, transfer to food source (through food chain | Ecological and human receptors | Dust control measures including water spray | Yes |
| | Release of uranium and other radionuclides to air and subsequent deposition to surface water | Ecological and human receptors | Dust control measures including water spray | Yes |
| Offsite transportation accidents | Release of uranium and other radionuclides and radon to air | Ecological and human receptors | Spill response plan in-place, short-term exposure | No |
| | Release of uranium and other radionuclides to soil or surface water | Ecological receptors | Spill response plan in place, sort-term exposure | Yes |

[EIA — 132]

**Table 31: Summary of Non-radiological Pathways**

| Source | Pathways | Receptors | Comments | De minimis |
|---|---|---|---|---|
| Surface runoff from tailings and ore pads including acid drainage, and radioactive waste storage areas | Release of heavy metals to soil | Ecological receptors | Storm water and surface runoff management reduces access to the ecological receptors, incomplete pathway | Yes |
| | Release of heavy metals to surface water | Ecological and human receptors | No permanent surface water. Control measures for evaporation ponds to limit the access of ecological receptors, no source of surface water as drinking water, incomplete pathway | Yes |
| | Leach of heavy metals to groundwater | Human receptors | Proper linings and mentoring wells are planned, incomplete pathway | Yes |
| | Release of heavy metals to soil and subsequent resuspension | Ecological and human receptors | Storm water and surface runoff management and dust control measures are in place | Yes |
| Tailings impoundments and beach sands | Soil contamination with heavy metals | Ecological receptors | Fence around the tailings impoundments limits the access to the terrestrial receptors. No significant source of food for birds | Yes |
| Process line leaks | Release of heavy metals, acids, caustics, and organic solvents to soil | Human receptors including the workers | Scheduled maintenance, secondary containment, spill control measures and personal protection equipment minimize the exposure to public and workers | Yes |
| | Release of organic solvent vapor and acid fume to air | Human receptors including the workers | Scheduled maintenance, spill control measures and personal protection equipment minimize the exposure to public and workers | Yes |
| | Release of heavy metals, acids, caustics, and organic solvents to groundwater | Human receptors | Scheduled maintenance, secondary containment spill control measures, and great depth to groundwater make it an incomplete pathway | Yes |
| Acid mists and fumes from CCD and leach circuits and organics from SX circuit | Release of organic solvent vapor and acid fumes to air | Human Receptors | Enclosed process vessels and emission control measures at the mill | Yes |

| Source | Pathways | Receptors | Comments | De minimis |
|---|---|---|---|---|
| Particulate emissions from U/V recovery and drying off gas systems, | Release to air | Ecological and human receptors | Dust control measures including filters and scrubbers. Incomplete pathway for dryer (zero emissions) | Yes |
| Particulate emissions from ore grinding off gas systems, | Release to air | Ecological and human receptors | Dust control measures including filters and scrubbers. Incomplete pathway for dryer (zero emissions) | Yes |
| Particulate emissions from exposed dry tailings and ore stockpiles, (wind erosion) | Release of heavy metals to air | Ecological and human receptors | Dust control measures including water spraying | No |
| | Release of heavy metals to air, subsequent deposition, transfer to food source (through food chain) | Ecological and human receptors | Dust control measures including water spraying | Yes |
| | Release of heavy metals to air and subsequent deposition to surface water | Ecological and human receptors | Dust control measures including water spraying, lack of permanent surface water bodies around the site | Yes |
| Offsite transportation accidents | Release of heavy metals to air | Ecological and human receptors | Spill response plan in-place, short-term exposure | No |
| | Release of heavy metals to soil or surface water | Ecological receptors | Spill response plan in place , sort-term exposure | Yes |

# Effects of Accidents

A keystone of the mill license approval is to prevent releases or accidents from occurring and mitigate their impact when they do occur. Mill design, as discussed above, incorporates features and considerations directed to preventing contamination of workers

BLM_0036911

or the environment. The above sections also address the mechanisms for prevention during construction, operation and decommissioning and provide insight to the potential impact of chemical and radiological exposures, should they occur.

EFR has established a structured, tiered Health and Safety (H&S) program as part of its application for a radioactive materials license using a top-down approach that stresses the importance of all personnel at all levels being responsible for safety. The H&S Plan outlines the requirements and responsibilities of each layer of management in establishing a safe work environment for mill workers, contractors, and visitors to the mill site.

Design features and operating protocols minimize the possibility of spills or other accidents and include physical and procedural steps for mitigation when accidents or releases do occur. As noted in the above sections, releases from the mill can be managed to minimize impact.

The radioactive materials handled at a uranium mill have relatively low specific activities (amount of radioactivity per unit mass, e.g., $\mu Ci/g$). The low specific activities require the release of exceedingly large quantities of material to be of concern. Driving forces (energy sources — initiating events for accidents) for such releases are generally lacking or extremely unlikely in the milling operation.

It has also been recommended (Stratus, December 15, 2010) that over the period of operation, EFR and the department continue to evaluate mill operations and features as experience is gained, and institute changes and improvements as appropriate. This process is compatible with the ongoing monitoring, inspection, and evaluation of operations and incidents that will occur throughout operations.

No significant dust or fume emissions are expected during routine shipment of chemical reagents and other hazardous materials. Therefore, no significant non-radiological risks and/or health-related impacts to the driver or members of the public are expected from the routine transportation of these materials.

Similarly, no significant dust emissions are expected during the routine transport of ore, which accounts for the majority of material shipments associated with the mill. The ore would be covered with tarps to reduce dusting and falling debris during transportation. The ore being shipped from mines contains a substantial amount of moisture and has a lower percentage of fines than ore that has been crushed. Minor ore spillage from trucks in transit would add little additional radioactivity to the mineralized natural environment of the Colorado Plateau. Transportation issues are discussed in greater detail below, but accidents involving trucks carrying ore, yellowcake, or chemicals could result in spills of those materials. The roadways in the region are consistently narrow and winding with limited shoulders, and in some reaches, parallel rivers or streams.

The trucking companies transporting ore, chemical reagents and fuel to the mill and yellowcake and vanadium oxide from the mill to other processing facilities are required

[EIA — 134]

BLM_0036912

under USDOT regulations to have an emergency response plan in place for responding to accidents and cargo spills. As part of its contracting program, EFR will verify that these plans are in place. In addition, carriers of low-level radioactive shipments ( i.e., ore, yellowcake, etc.) may incorporate the EFR emergency response teams into their emergency management planning for incidents occurring within a reasonable distance from the mill. The extent to which mill personnel will travel to respond to an incident will be included in the contract with the carrier. Generally the shipping company has either an in-house emergency response team or has hired a contractor to deal with these types of shipments.

Local and regional response capability exists; however, response times and specific capabilities are limited. The presence of a large safety-trained workforce at the mill and mines will significantly improve the response capability of the local resources. The EFR response teams will have expertise in radiation control and will have the necessary specialized monitoring equipment that is generally not available to law enforcement agencies, fire departments, and other first responders. In addition, requirements for truck drivers specify medical exams, successful testing, and records checks, and a hazardous materials endorsement specifies a detailed background check and additional training.

Heavy-vehicle truck traffic during operations would include water trucks, tankers, and semi-trailers delivering chemical reagents and fuel. Chemical reagents, diesel fuel, and propane used to process ores would be delivered to the site by licensed haulers in approved USDOT containers. Reagents would be transported to the site in tankers or prepackaged totes, barrels, and bulk bags. The bulk materials are typically transported by closed tanker trucks. Bulk material transported in open trucks would be covered with tarps to reduce dusting and falling debris during transportation. Most of this traffic would occur during daylight hours. Bulk shipments of reagents in liquid form include sulfuric acid, sodium chlorate, hydrogen peroxide, and kerosene, and in dry form include ammonia sulfate and sodium carbonate. sodium hydroxide ("NaOH") is delivered in 275-gallon totes. (Facility Operations Plan)

Large quantities of ammonia are used as fertilizer in agricultural operations and numerous shipments are transported on U.S. highways every day without incident. Truck shipments of anhydrous ammonia to the mill could result in a significant environmental impact if involved in a severe accident (SENES, 2009a). Anhydrous ammonia is delivered by tanker as a compressed liquid. If released, liquid ammonia reacts violently with water and a vapor cloud is produced.

The number of shipments of anhydrous ammonia to the mill is expected to be approximately three times the number of yellowcake shipments from the mill. However, ammonia is expected to be shipped from a supplier closer to the mill, therefore the Risk Assessment estimates that the frequency of a rollover and crush of an ammonia truck that could result in a catastrophic release of ammonia would be much smaller than that of a yellowcake truck. In the event of a minor release of ammonia, impacts to members of the public are expected to be small. However, the driver could be exposed to elevated ammonia concentrations before he could be evacuated from the scene of the accident. If a

[EIA — 135]

large amount of ammonia were released in a populated area, members of the public and the driver could be exposed to high ammonia concentrations. In the event of a traffic accident resulting in an ammonia spill, USDOT and/or CDOT hazmat teams would respond to the accident and would initiate appropriate evacuation and corrective actions.

Under most circumstances, a spill of liquid or solid materials onto land would be easily contained, which will allow more complete recovery of spilled material by the emergency response team. As a result of the low probability and the small consequences, the risk of this scenario of yellowcake and ore transportation accidents on members of the public would be small. Even if the contents of an ore container were washed into a river, the effect on metal and radionuclide concentrations in the surface water would dissipate quickly. However, short-term effects within the areas affected by the spill would be expected.

The U.S. Department of Energy (2007) considered a transportation accident in which uranium ore was dumped into a surface water source. DOE concluded that it is unlikely that any adverse impacts to biota would occur because of the relatively low toxicity and low concentrations of the potentially hazardous constituents of uranium ore. If the ore were spilled into a shallow surface-water source, it would be removed before water quality could be adversely affected. Most ore would be in large enough sizes (e.g., cobbles) that it would be recovered easily from the water source. The finer particles would be dispersed by stream flow and would not create a radiological hazard to aquatic life. The primary impact to water quality from a spill would be a short-term increase in turbidity and total suspended solids.

An assessment of impact of release of radioactive materials due to a tornado was reported by NRC (U.S. Nuclear Regulatory Commission, 1980). Based on a conservative assumption that the tornado lifts about 11,400 kg (25,100 lb) of yellowcake, the maximum exposure occurs at a distance of approximately four km (2.5 miles) from the mill, the 50-year dose commitment to the lungs of an individual was estimated to be 8.3 x $10^{-7}$ rem (0.00083 mrem). For individuals at the fence line 500 m (1,600 ft) the 50-year dose commitments were estimated to be 2.2 x $10^{-7}$ rem (0.00022 mrem). Between 1950 and 1995, there have been 1,160 tornados in Colorado with various strengths (26 tornados per year) and the vast majority of tornadoes occur in eastern Colorado. With low frequency of occurrence and low impact, the risk of a tornado striking the mill and impacting a member of the general public is judged to be low.

# Employment

EFR estimated that construction of ancillary site facilities during the first two quarters of construction would require between 25 and 45 workers. Mill construction would begin in the first quarter of 2011 and continue through the end of the year, requiring between 125 and 200 workers. Upon opening in the first quarter of 2012, the mill would employ 85 workers for a 24/7 operation.

BLM_0036914

EFR anticipates that the operational workforce would include some construction workers, such as electricians, instrumentation workers, boiler makers, and mechanics, who would transition to permanent maintenance positions. EFR expects that approximately 80 percent of the operational workforce would comprise workers already residing in the local area. In addition to the direct employment, the proposed mill is estimated by EFR to generate indirect employment of approximately 228 workers by stimulating regional mining activities and transporting ore to the mill. Most of these jobs would be in Montrose, Mesa, and San Juan (Utah) counties with mines that supply ore to the mill.

The Montrose Economic Development Corporation (2010) has estimated that in addition to the 85 direct jobs, the mill would create an additional 105 jobs (indirect) locally. They also estimate that the mill would create 538 direct jobs in mining and another 664 indirect jobs associated with the mining jobs.

The Montrose County Socioeconomic Impact Study (2010) estimated direct milling and mining employment at 313 jobs, indirect employment at 212 jobs and induced employment at 124 jobs for total employment created by the mill at 649 jobs. Induced jobs are created by the spending power of the direct and indirect jobs.

The Colorado Office of Economic Development and International Trade (2010) estimated that the 85 direct jobs during operation of the mill would create an additional 230 indirect and induced jobs. Power Consulting prepared a report for the SMA and estimated that the mill would generate a total of 116 jobs (Power, 2010).

## Table 32: Mill Operation Employment Estimates

| Source | Direct Jobs | Indirect Jobs | Induced Jobs | Total Jobs |
|---|---|---|---|---|
| Energy Fuels | 85 | 228 | | 313 |
| Montrose EDC | 85 + 538** = 623 | 105 + 664 = 769* | | 1392 |
| Montrose County | 85 + 228** = 313 | 212 | 124 | 649 |
| Colorado OEDIT | 85 | 230* | | 315 |
| Power Consulting | 85 | 31* | | 116 |

*Includes indirect and induced
**mine-related direct employment

As shown in Table 32, estimates for the employment impact vary widely. In general, it seems that most estimates assume a local impact from employment that includes direct employment at the mill, indirect employment for mining and provision of goods and services and transportation related to the mill, and induced employment related to spending power generated by direct and indirect employment. EFR has estimated that roughly 80 percent of mill employees would be from local residents and that 20 percent would either relocate to the area or commute. The two main mines expected to provide ore to the mill are located near Gateway, Colo. and LaSal, Utah. Thus the mining-associated direct employment would occur at those locations, and indirect employment

BLM_0036915

would relate to those locations, as well. Indirect impacts could be felt in a wider service area depending on where goods and services for those locations are available.

# Land Use, Housing, and Infrastructure

Montrose County already has approved zoning changes for the site from agricultural to special use, specifically for the uranium mill. There is limited privately owned land in the eastern portion of the Paradox Valley, and lack of water limits the development of properties there. In addition, EFR has committed to restrict development of approximately 415 acres of private land in this area as habitat mitigation for wildlife (Energy Fuels, "Habitat Mitigation Plan," November 13, 2010).

The added workforce is expected to come largely from local residents, but the increase in jobs from direct and indirect effects will undoubtedly increase the demand for housing. Currently, housing in the mill-area communities reflects a vacancy rate between 15 and 20 percent; however, the age and condition of some units may limit their use. Water supply limitations would restrict growth in the Paradox Valley, but growth in the Nucla/Naturita area would occur. Given the current experience with Nucla/Naturita residents commuting to jobs elsewhere, and the high unemployment levels in this part of the county and surrounding counties, it is likely that workers from communities farther away will be willing to commute to the site. This may be particularly true during construction and decommissioning, when jobs will be of a finite duration.

The availability of housing in the Gateway area also is limited and many employees of the Gateway Resort commute from Grand Junction. Housing is dominated by newer, relatively expensive homes, and the vacancy rate is half that of the Nucla/Naturita area. The creation of direct and indirect jobs at the Whirlwind Mine will increase local demand for housing and likely increase commuter traffic from Mesa County and eastern Montrose County.

LaSal's housing situation is similar to that in the Nucla/Naturita/Paradox area, with a 20 percent vacancy rate and older homes. The unemployment rate is lower at approximately 10 percent, possibly due to the greater access to jobs in Moab. The creation of direct and indirect jobs at the Energy Queen Mine will increase local demand for housing.

Questions have been raised about the potential negative impact of the mill on land values. One property owner provided information that an offer on his property five miles northwest of Paradox was withdrawn due to concerns about the perceived impact of the mill (Schneider, 2010). Several organic gardeners in the west end of the Paradox Valley have expressed concern that the presence of the mill would undermine their "organic" designation and the ability to sell their produce. Technical analyses described elsewhere in this report demonstrate that the mill would not have a direct impact on these properties. Perception of impact is difficult to assess; however, both Cañon City, Colo., and Moab, Utah, now host both uranium mills and organic farms, or have in the past. The Uravan Mineral Belt stretching across southwestern Colorado has relatively high background levels of uranium in soils and, as discussed in the EFR application, is dotted with historic

[EIA — 138]

BLM_0036916

uranium mines. If there is a negative association between the perceived presence of uranium and organic farming, the mill in the eastern Paradox Valley with its proposed environmental controls is unlikely to be a major factor.

One impact of growth in the Nucla/Naturita/Paradox area is that some surveys for property lines in the West End are off by as much as 30 feet, so new developments and redevelopment of older properties should consider updated surveys. In addition, building codes in the West End may be out of date, which could hinder construction of new buildings and building restoration or refurbishment (Montrose County, White, February 2010).

The current infrastructure was largely established during previous periods of relative affluence, thus some existing infrastructure has been designed for greater-than-current uses. For these systems, adequate capacity may depend on maintenance upgrades or refurbishment to expand service. Services that fall into this category include water supply and wastewater systems for Nucla and Naturita, local roads, and schools. Current levels of service that meet requirements during mill operation levels include medical and emergency services, law enforcement, and housing. Infrastructure and services dependent on taxes may suffer a period of inadequacy because tax revenue and distribution will lag the increase in use and demand for services. This situation will likely be worsened during the construction period.

Increases in local employment and demand for services will result in greater tax revenues. Locally, sales taxes generate the largest portion of revenues for Nucla and Naturita, and may provide a more timely revenue stream than other deferred sources of income. Property taxes are also important locally as well as within the county, and increases in employment and housing demand will likely increase the assessed value of properties across the area, resulting in higher taxes on property owners and more tax revenue to local governments. Severance taxes, a portion of which are distributed to local governments, would increase for mining properties as mining resumes; however, the two primary mines expected to produce ore for the mill initially are located in Mesa County and San Juan County, Utah. Thus severance tax increases would not necessarily be reflected in an increase in local government funding.

One concern regarding increases in tax revenues relates to the variable nature of the resource extraction economy. Dependence on one component of the economy can lead to significant swings in prosperity that impact both public and private components of the community. Specifically, prosperous periods may lead to lower specific taxes due to distribution of costs, broader sources of income, etc. Concern exists that during an economic downturn, the broader tax base may disappear, and raising taxes at that point may be problematic. Thus an economic downturn not only impacts the economy in general, but may have an amplifying negative impact on tax revenues.

BLM_0036917

# Recreation and Tourism

In other parts of western Colorado, recreation, tourism, and second homes are an important part of the local economies. These components are not significant contributors in the West End of Montrose County. The proposed mill could negatively impact these potential components of the economy through competition for limited services, perceived or real environmental or health impacts, or direct conflict with resource use.

The proposed mill would increase the availability of local services, and over time may result in greater government expenditures locally for roads, medical services, and other amenities. Concurrently, property taxes could increase with the demand for housing, which may increase home costs. These factors could improve the desirability of the area for second or retirement homes. In this case the pre-existence of the uranium mill would be an inherent factor in the area's attractiveness, rather than an imposed condition on existing home owners.

The increased availability of local services as a result of the mill may provide an impetus for expansion of the area as a tourism or recreation destination. Currently, the lack of services facilitates the drive-by aspect of the Paradox Valley and the surrounding area. The most identifiable recreation resource in the valley is the rafting take-out area near Bedrock; however, except for the limited amenities of the Bedrock Store, no services are available to capture recreationist dollars. In a similar vein, it is thought that Highway 90 serves as a corridor for tourist traffic between Moab and Telluride, Ouray, or other points east. The lack of services throughout the area limits the destination attractiveness for tourists. For example, along Highways 141 and 90, there are only convenience stores/gas stations in Gateway, Naturita, and La Sal, Utah. There is a bed and breakfast in Paradox, and motels in Gateway, Naturita, and in towns to the south and east.

Mining and milling has been alleged to have a negative impact on tourism and local development, but data supporting this assertion has not been found. Areas with tourism as a major part of the economy have existed with uranium and other mineral mines and mills for years. For example, in Telluride, extensive tourism-related development exists adjacent to the Idarado tailings impoundment, and the California Gulch Superfund site in Leadville has mine waste piles located throughout the community, as does the Central City/Blackhawk Superfund site. In Moab, the Atlas mill operated on the edge of town, and contaminated soils and tailings are stored in a repository on the major highway into town on the bank of the Colorado River. Each of these communities relies on tourism as a major component of the local economy.

In Cañon City, the Cotter uranium mill caused significant ground water contamination during the 1960s and 1970s, but operated through 2005. Tourism and retirement homes continue to be a major part of the local economy, and numerous new housing developments have encroached on the areas surrounding the mill in the last 15 years. A review by the EPA in 2007 and 2009 determined that the remediation measures undertaken were protective of human health and the environment, and a recent draft public health assessment conducted by the U.S. Agency for Toxic Substances and Disease Registry concluded that no health effects or risks were discernable from the site.

[EIA — 140]

BLM_0036918

# Community and Social Impacts

The proposed uranium mill and the associated employment and local revenue will provide direct and indirect benefits and impacts. The influx of construction workers will likely overwhelm some aspects of local resources, and introduce a transient population into the area. Recent experience with major construction projects has shown that companies are concerned about impacts on local communities and consider employee behavior in hiring and management practices. Thus, companies are taking more responsibility for employee behavior (Montrose County Sheriff's Office, July 2010).

The increase in local employment and attendant economic improvements likely will stabilize the community to some extent, although the influx of new people and businesses will be disruptive to many established community members and business owners. While direct and indirect employment will be most apparent, induced effects of these increases may encourage the development of new businesses or endeavors. These effects could include larger resources for recreational or social organizations to draw upon, and more local people staying local during the day, which could improve family situations, local business use, and school attendance.

In the same vein, however, if the employment decreases or becomes volatile, the impacts on the community would be negative. Businesses that anticipated continued prosperity could be endangered and individuals that gave up jobs elsewhere may be unable to return to them. This circumstance could undo progress made during better times. Dealing with this possibility is part of the community responsibility to plan and implement change appropriately, as well as the responsibility of EFR to communicate their activity status to their workers and the community in a timely manner.

# Transportation

The site is located on Highway 90, and all traffic to and from the site will utilize Highway 90 west or east of the site. Traffic will include trucks with construction materials, ore, process chemicals, and drinking water, and personal vehicles carrying employees. Truck traffic carrying ore will originate near Gateway and approach the site on Highway 141 and Highway 90 from the east, and near La Sal, Utah and approach the site on Highway 90 from the west. Other truck traffic will originate locally in the Naturita vicinity, and regionally from Interstate 70 via Highway 141 to the east or via Highway 191 and Utah Highway 46 to the west, and possibly from the south or east via Highway 145 and 141. Most truck traffic will occur during daylight hours.

Personal vehicles will most likely originate locally, although in this region, individuals are accustomed to driving long distances routinely, as illustrated in Table 33. Public comments have indicated that individuals from Nucla, Naturita, and the Paradox Valley regularly commute to jobs as far away as Telluride, Montrose, and Grand Junction.

BLM_0036919

## Table 33: Estimated Distances from the Project Site

| Location (Colorado unless noted) | Direct Distance [2] (miles) | Paved Road Distance [1] (miles) | Estimated Travel Time [1] (hours:minutes) |
|---|---|---|---|
| Montrose | 51 | 100 | 2:10 |
| Ridgeway | 55 | 74 | 1:36 |
| Telluride | 57 | 68 | 1:33 |
| Ophir | 58 | 73 | 1:46 |
| Placerville | 42 | 52 | 1:10 |
| Monticello, UT | 41 | 75 | 1:22 |
| Dove Creek | 35 | 78 | 1:32 |
| Slick Rock | 17 | 55 | 1:04 |
| Norwood | 27 | 35 | 0:44 |
| Redvale | 20 | 25 | 0:31 |
| Naturita | 11 | 15 | 0:18 |
| Nucla | 12 | 19 | 0:25 |
| Bedrock | 7 | 7 | 0:07 |
| Paradox | 13 | 13 | 0:14 |
| La Sal, UT | 26 | 34 | 0:41 |
| Moab, UT | 51 | 65 | 1:15 |
| Gateway | 31 | 61 | 1:15 |
| Grand Junction | 57 | 114 | 2:22 |

[1] Estimated using Mapquest.com
[2] Estimated using Google Maps Distance Measurement Tool

Traffic-related issues include congestion at key intersections, accidents resulting in spills, and accidents causing damage or injury. In addition, weather impacts on mill access may have consequences.

EFR has estimated traffic loading into and out of the site during construction, operation, and decommissioning. According to CDOT, traffic in the region is sparse and even the estimated increased traffic associated with the mill does not represent a large amount of traffic. Based on the estimated traffic, EFR is required by CDOT regulation to enhance Highway 90 at the entrance to the mill, including a westbound deceleration left-turn lane and widened shoulder to accommodate eastbound right-turn accelerating vehicles. In addition, EFR evaluated the intersection of Highways 90 and 141, and CDOT is concerned that left-turn lanes are already desirable at that intersection; however, the estimated increased traffic at that point does not justify additional traffic-control features at this time (Colorado Department of Transportation, July 1, 2010 ).

Another potential issue is the use of County Road Y-11 between Bedrock and Uravan. This gravel road parallels the Dolores River north from Bedrock through a narrow, winding canyon until the junction with the San Miguel River, which it follows upstream to Uravan. This road currently experiences traffic problems due to the unimproved and sinuous nature of the road. This circumstance would likely worsen with the presence of

[EIA — 142]

BLM_0036920

the mill, as it represents a shorter drive than the Highway 141-90 route from the north (Montrose County Public Works, February 17, 2010). The condition of the road would limit its attractiveness to truck traffic, and would likely limit travel speeds for other vehicles.

Accidents involving trucks carrying ore, yellowcake, or chemicals could result in spills of those materials, and EFR will require contractors hauling materials to the mill to have emergency response plans in place in the event of incidents. The roadways in the region are consistently narrow and winding with limited shoulders. Two specific stretches of concern are Highway 90 west of the mill (Paradox Hill) and Highway 141 between Uravan and Gateway, each of which is on a primary access route to the mill. In addition, the area between Uravan and Gateway is served poorly or not at all by cell phone or radio coverage. Spills must be addressed by the hauler, with technical support from mill staff, as discussed in the Emergency Response Plan.

Both the Montrose Sheriff and Colorado Highway Patrol have response authority and limited capability. The state hazmat team can be mobilized out of Mesa County, Cortez, or Monarch, but response times are one and one-half hours at a minimum. The Nucla/Naturita Fire Protection District and Paradox Volunteer Fire Department also provide limited emergency response capability. It is anticipated that the presence of a large safety-trained workforce at the proposed mill would significantly improve the response capability of the local resources. Mill staff will provide support to response actions related to mill traffic and, as available, to the local area.

Requirements for truck drivers have improved from historic uranium milling periods. Drivers are required to obtain a commercial driver's license, which specifies medical exams, successful testing, and records checks. In addition, a hazardous materials endorsement is required to transport hazardous materials and specifies a detailed background check and additional training. Commercial drivers must obtain a hazmat endorsement to transport both uranium ore and yellowcake shipments (CFR 49, Vol. 2, Chapter 383.93).

Most accidents in the area are single-vehicle accidents (Colorado State Patrol, June 9, 2010; Montrose Sheriff, July 14, 2010). These accidents include vehicle-animal collisions or near-collisions resulting in accidents due to avoidance maneuvers. Over a recent four-year period, 10 wildlife/vehicle accidents occurred on a section of Highway 90 near the proposed mill, and 24 wildlife/vehicle accidents occurred on Highway 141 north of Vancorum. The greater number along Highway 141 likely reflects higher traffic and worse road conditions, such as steep slopes and limited shoulders. In addition, parts of Highway 90 in the Paradox Valley are open range with cattle grazing adjacent to the roadway. It is estimated that approximately two vehicle/cow accidents occur in any given year (Colorado State Patrol, July 1, 2010).

Worker-related traffic will be significant during shift changes. Historically, construction-worker-related traffic has caused a significant increase in incidents; however, more recent experience has shown that construction companies are more responsible and more

[EIA — 143]

BLM_0036921

selective about employees, resulting in far fewer worker traffic problems. In addition, recent experience has shown that the use of a predominantly local (non-transient) workforce with ties to the local community results in fewer problems, as well (Montrose Sheriff, July 14, 2010).

Beginning in 2008, CDOT instituted a policy that limited the amount of snow removal on highways with low traffic volumes. Both Highway 141 and 90 fall into this category, and during the winter will not have snow removal between 7 p.m. and 5 a.m. (Colorado Department of Transportation, July 1, 2010). The bulk of the workforce works during the day shift, and truck traffic is concentrated during daylight hours. The nighttime road conditions will likely limit access to and from the site on occasion.

# Specific Issues and Concerns

Questions have arisen through public processes and the license application review process. This section summarizes and addresses concerns expressed during public processes and the license application review process.

## Cumulative Impacts

**Concern.** Assessment of the uranium mill does not adequately evaluate the regional and cumulative effects of the uranium industry on the Uravan Mineral Belt.

**Response.** There is no single agency responsible for determining impacts of uranium development on a regional level. The department's Radiation Program licenses only the uranium milling process. Air emissions from mines and mills are controlled by the Air Pollution Control Division regulations, and liquid discharges are regulated by the Water Quality Control Division regulations. Active mines are regulated primarily by the Colorado Department of Natural Resources, Division of Reclamation, Mining and Safety. The Environmental Protection Agency regulates radon emissions from active tailing impoundments at mills and from uranium mines.

As described in the EFR application, this area has historically had significant numbers of uranium mines and mills, dating back to the beginning of the 1900s. Many of the communities in the area exist due to the uranium industry, as evidenced by place names, such as Nucla, Uravan, and Vancorum. (Similarly, many community histories are tied to the gold and silver districts further south, such as Telluride, Placerville, Ophir, and Silverton.)

**Concern.** Construction impacts will be similar to those of oil and natural gas development.

**Response.** Major impacts of oil and gas development occur during initial development of the wells, construction of gathering pipelines, and management facilities. During this period, traffic is concentrated on gravel and unimproved roads, activities occur continuously until completed, and many facilities are remote from any communities, requiring significant travel for workers and equipment. For a single well or drilling pad,

[EIA — 144]

BLM_0036922

the activity is of a finite duration, and once operational, traffic and attendance at the site is intermittent. Impacts are more complicated when an entire region or well field is in development, such that activities shift only a limited distance as work progresses.

In contrast, the EFR mill construction is anticipated to last approximately two years, with operations subsequently utilizing a smaller, more stable local workforce. Mining will likely occur at various locations, but will continue for extended periods, allowing some stability in workforce and impacts for each location.

**Concern.** Other regional development should be considered in the mill application.

**Response.** Highway 90 between Nucla and Montrose could be converted to an all-weather, all-season road, and the Gateway Canyons Resort or development of other resort properties could be expanded. The Montrose County Commissioners have considered a project to upgrade Highway 90 between Nucla and Montrose to provide more direct access between the east and west portions of the county and to allow greater access to the Uncompahgre Plateau for recreation, timber harvest, and pine beetle-killed tree management (Montrose County, March 2010). This plan would increase the connectivity between the populated and unpopulated parts of the county, and distribute jobs and access to goods and services more evenly. The Gateway Canyons Resort has considered a major expansion to include a large golf course surrounded by high-end resort facilities and residences (*Grand Junction Free Press*, 2010). This development would have major local impacts due to construction activities, as well as longer term impacts associated with increased population, access to services, tax base, and employment.

## Dust Control/Windblown Contamination

**Concern.** The uranium milling process, and associated handling requirements, can generate dust containing radioactivity. Dust particles can be deposited on ground surfaces and can be re-suspended and re-deposited over time, which can pose both an occupational and environmental hazard.

**Response.** Various dust-suppression mechanisms have been designed to minimize the spread of these particulates, including use of water, surfactants, gravel, and clean soils. EFR has generated various plans and commitments describing dust-suppression activities at the mill, and required dust-control measures limit dust and radiation releases at the boundary to levels protective of human health.

Dust storms are observed fairly often in the western U.S. when periods of hot, dry, windy weather coincide with disturbances to surface and soil conditions. Windblown dust is of interest because of concerns with soil erosion, driving safety affected by poor visibility, $PM_{10}$ air quality, and potentially reduced snow cover and water runoff in the mountains during late spring and summer because of dust deposition causing more rapid melting in early spring. Dust storms and subsequent dust deposition have been reported frequently in the mountains of the Colorado River Basin. Dust produced in the western deserts has been attributed to contributing to early snow melt and reduced runoff (Belnap et al, 2010). Neff and his colleagues (2008) reported that dust fall in the San Juan Mountains

[EIA — 145]

BLM_0036923

was five times heavier than any time in the previous 5,000 years. Regional dust storms are natural events that do not count against the $PM_{10}$ standard if the state documents the occurrence and the EPA concurs on our analysis. Telluride had a $PM_{10}$ 24-hour maximum of 354 $\mu g/m^3$ from one of these storms.

Community members in the Telluride and Ophir area have repeatedly made allegations that the proposed facility will impact air quality and perhaps even pollute drinking water sources as a result of these storms scouring radioactive dust from the site and depositing them in the Telluride watershed, based almost exclusively on studies on impacts from coal fired power plants.

The Regional Dust Report addresses the impact on a regional scale of particulate emissions from Piñon Ridge Mill. The regional dust analysis was completed in response to the department request that EFR evaluate the effect of uncontrolled dust emissions from the tailings cells on regional concentrations and in particular on concentrations and deposition rates in the Telluride area.

The scientific literature includes hundreds of papers on dust storms in the western U.S. Most of these papers deal with the meteorological and surface conditions that are associated with regional scale dust storms. For example, Painter et al (2007) performed isotopic analyses of soils collected on the Colorado Plateau and compared the results to dust deposited in the San Juan Mountains. Painter and his colleagues also performed back trajectory wind modeling to identify dust source regions. The isotropic and trajectory analyses and other research led the Painter team to conclude that most of the dust deposited in the San Juan Mountains originated on the Colorado Plateau in northwestern New Mexico and northeastern Arizona over an area of hundreds of thousands of square km ($km^2$).

In order to respond to the questions posed by the department regarding regional dust, an analysis was conducted of the regional impact of particle deposition from the Piñon Ridge Mill during short-term high wind events. To address the scenario with the hypothetical maximum dust release from the facility, the analysis was based on the period when one of the tailings cells would be at full capacity and dewatered prior to closure. The analysis was done using AERMOD, with the Breeze interface.

During normal operations, ore storage piles and tailings cells will be subject to dust suppression and mitigation practices such as application of water or raffinate to maintain higher moisture, reducing the particulate emissions due to wind erosion. The cells will be approximately 70 feet deep and mostly below surface grade. Each tailings cell will also typically have a water pool covering 20 to 80 percent of its surface. However, before final closure of a tailings cell, the cell would be dewatered prior to placement of the final cap. This dewatering procedure would leave a maximum of one tailings cell at full capacity (approximately 30 acres) without a water cover. The exposed surface would still be sprayed with water or treated with a chemical dust suppressant during this time; however, a dry condition is assumed for worst-case dust modeling purposes.

BLM_0036924

Because wind erosion does not depend on operational schedules, the emissions were calculated over 24 hours per day, 365 days per year. The emissions were calculated assuming no control efficiency (no dust mitigation measures) to determine maximum dust emissions under a worst-case scenario. This assumes the surface of the tailings cell is continuously disturbed and does not crust over to form a barrier that would limit scouring of particles from the wind. In fact, tailings have so much salt in them that they do form crusts, so this is a very conservative assumption.

The analysis addressed emissions of $PM_{10}$. Total suspended particulates (TSP) were not considered because a large fraction of the larger particles would be deposited near the proposed facility and because the Telluride area was formerly recognized as a nonattainment area for $PM_{10}$ prior to 2000 (significantly impacted by wood stoves). The $PM_{10}$ air quality levels modeled from the proposed Piñon Ridge Mill were then compared to $PM_{10}$ background concentrations in the region to elucidate the addition of $PM_{10}$ generated by the proposed facility. The analysis included evaluation of the impacts of the proposed facility's $PM_{10}$ emissions at receptors 25 to 100 km from the proposed facility in the Colorado Rockies where ambient monitoring data are available. Also, $PM_{10}$ emissions from the proposed Piñon Ridge Mill were compared to $PM_{10}$ emissions estimated during regional dust storms. Emissions from the proposed Piñon Ridge Mill in this analysis are consistent with emissions that were calculated in the recent Air Pollution Emission Notice for Permit to Construct, and the Air Dispersion Modeling Report, except that one of the tailings cells was considered to be dewatered and without dust mitigation in order to represent a hypothetical worst case scenario.

The facility is being licensed for only 500 tpd production. However, some of the equipment sizing and air permitting were performed to 1,000 tpd production in case EFR decides to increase the production of the mill over time (which would require a major amendment to the license and another environmental review). Using the 1,000 tpd emission rates adds more conservatism to the modeling effort. The total $PM_{10}$ emissions for the 1,000 tpd facility are 401.29 lbs/day or 71.53 tpy including the dewatered tailings cell. It is worth noting that the majority of the controlled $PM_{10}$ emissions originate from road use within the property, which has natural background levels of radiation.

Several field studies have also been performed to characterize emissions of particulate matter during dust storms. Although no studies were identified that estimated emissions during dust storms over the Colorado Plateau, results from field campaigns performed by scientists at the Great Basin Unified Air Pollution Control District in California around the dry lake bed at Owens Lake (e.g., Ono et al, 2003) and by the U.S. Department of Agriculture and university researchers on the Columbia Plateau, Wash. (e.g., Kjelgaard et al, 2004) provide useful data to better understand and characterize $PM_{10}$ emissions during periods of windblown dust.

Other studies addressed dust and emissions in the Mojave Desert, on the Great Plains in the central United States, and the Chihuahuan Desert that straddles the Mexico/New Mexico border. To show the relative difference within an expected order of magnitude between the dust emissions generated by the proposed facility and its small geographic

[EIA — 147]

BLM_0036925

footprint versus a typical dust storm in the western United States, which occurs on a regional scale of tens of thousands of square kilometers, e.g., the southern half of the Colorado Plateau, the $PM_{10}$ emissions estimated for dust storms were compared to emissions from the Piñon Ridge Mill shown in Table 34.

**Table 34: Estimated Regional PM10 Emissions from Dust Storms**

| Location | Daily or per Event Emissions (tons) | Annual Emissions (tons) | Source |
|---|---|---|---|
| Piñon Ridge Mill | 0.016 | 71.53 | Appendix A – Emission Calculations |
| Owens Lake | 7,200 | 79,200 | Ono and Weaver (2003) |
| Columbia Plateau | 21,600 | ----- | Kjelgaard et al (2004) |
| Great Plains (1932-39) | ----- | 400 million | Cook et al (2008) |

Note: Daily or per event emissions for the Piñon Ridge Mill are for dewatered tailings cell wind erosion only. Annual emissions from the Piñon Ridge Mill are total facility emissions.

The AERMOD air dispersion model calculated concentrations of $PM_{10}$ at the five receptor locations. The 24-hour average modeled concentrations for both the total facility and the dewatered tailings cell are presented below. These results represent the air quality impact on the day with the worst-case meteorological and operating conditions for dispersion. The modeled $PM_{10}$ air quality impact in Telluride from the proposed Piñon Ridge Mill of 0.032 $\mu g/m^3$ is very small compared to the existing background concentration of 19 $\mu g/m^3$ annually.

**Table 35: 24-Hour Average PM10 AERMOD Air Dispersion Model Results**

| Receptor Location | Dewatered Tailings Cell Modeled Concentration ($\mu g/m^3$) | Total Facility Modeled Concentration ($\mu g/m^3$) |
|---|---|---|
| Telluride (91 km from proposed facility) | 0.0012 | 0.032 |
| 25 km SE from proposed facility | 0.0085 | 0.14 |
| 50 km SE from proposed facility | 0.0031 | 0.069 |
| 75 km SE from proposed facility | 0.0011[1] | 0.042 |
| 100 km SE from proposed facility | 0.00062 | 0.028 |

Note: (1) The modeled concentration at the 75 km receptor is less than at the 91 km receptor for the dewatered tailings cell due to terrain effects in the air dispersion model.

[EIA — 148]

The one-hour average modeled concentrations were also calculated to determine air quality impacts from the worst-case hour of meteorology data. The one-hour average $PM_{10}$ air quality impact at the Telluride receptor is 0.018 μg/m$^3$ from the dewatered tailings cell alone and 0.76 μg/m$^3$ from the proposed facility in total with the tailings cell. Even if this worst-case meteorological condition were to persist for an entire day, the resulting concentration would again be very small compared to the background concentration at Telluride, which is 19 μg/m$^3$ annually. The modeled 24-hour concentration of 0.032 μg/m$^3$ would produce dry-particle deposition of approximately 14 μg/m$^2$ (14 millionths of a gram) per day, based on a dry-deposition velocity of 0.5 cm/sec. A $PM_{10}$ concentration of this magnitude persisting for a year would produce an annual estimated deposition of about 0.005 grams of dust per square meter — less than one grain of sand per square meter.

Based on these results, the $PM_{10}$ emissions from the proposed facility are insignificant compared to $PM_{10}$ emissions estimated during regional dust storms. For example, 24-hour emissions from the proposed facility are 401 lbs/day compared to estimated order of magnitude dust storm emissions of 7,200 tons/day. Similarly, annual emissions are 71.5 tpy from the proposed facility versus an annual aggregated value of 79,000 tpy from dust storms. The difference in scale is due to the fact that the Piñon Ridge Mill's dust emissions are produced by a proposed facility with a very small geographic footprint compared to the large scale (hundreds of square kilometers) source of the regional emissions during a dust storm.

Because the $PM_{10}$ air dispersion modeling does not include an analysis of radiation impacts, EFR requested that additional modeling be included in the analysis to quantify potential radiation impacts. Dr. Craig Little completed two analyses using the MILDOS-AREA model.

Like the $PM_{10}$ analysis, a worst-case scenario was assumed in which a 30-acre tailings cell was left uncovered with no dust emission controls. Impacts were evaluated at nearby towns ranging from Bedrock to Telluride.

Maximizing assumptions were made for the calculation. A 30-acre tailings cell with no dust control measures was modeled similar to the AERMOD analysis. Based on the average uranium content in the ore of 0.23 percent, radionuclide concentrations in the tailings cell were set at 647 picoCuries per gram (pCi/g) for the progeny of Uranium-238 ($^{238}$U), including Thorium-230 ($^{230}$Th), Radium-226 ($^{226}$Ra), and Lead-210 ($^{210}$Pb) (Two Lines, Inc, 2010).

Concentrations of $^{238}$U were set at 25.8 pCi/g, which is consistent with a 96-percent uranium milling efficiency. A second analysis was also completed that included the ore stockpiles as well as the 30-acre tailings cell without dust control measures.

Under the maximizing conditions noted above in the model, the activity per square meter from the proposed facility's dewatered tailings cell that could be deposited annually on each of the locations modeled is shown in Table 36 below. The activity per square meter

BLM_0036927

from the proposed facility's ore stockpiles and dewatered tailings cell that could be deposited annually on each of the locations modeled is shown in Table 37.

**Table 36: Activity from Tailings Piles**

| Location | Ground Concentrations (pCi/m$^2$) | | | |
|----------|--------|--------|--------|--------|
|          | U-238 | Th-230 | Ra-226 | Pb-210 |
| Bedrock  | 1.49  | 37.2   | 37.2   | 37.2   |
| Naturita | 0.254 | 6.33   | 6.33   | 6.33   |
| Norwood  | 0.038 | 0.955  | 0.954  | 0.954  |
| Moab     | 0.004 | 0.100  | 0.100  | 0.100  |
| Montrose | 0.009 | 0.225  | 0.225  | 0.225  |
| Telluride| 0.010 | 0.259  | 0.259  | 0.259  |

**Table 37: Activity from Ore Piles and Dewatered Tailings Cell**

| Location | Ground Concentrations (pCi/m$^2$) | | | |
|----------|--------|--------|--------|--------|
|          | U-238 | Th-230 | Ra-226 | Pb-210 |
| Bedrock  | 11.3  | 55.3   | 55.3   | 55.3   |
| Naturita | 1.81  | 9.26   | 9.26   | 9.26   |
| Norwood  | 0.140 | 1.26   | 1.26   | 1.26   |
| Moab     | 0.017 | 0.134  | 0.134  | 0.134  |
| Montrose | 0.033 | 0.297  | 0.297  | 0.297  |
| Telluride| 0.036 | 0.341  | 0.341  | 0.341  |

It is important to note the magnitude of the concentrations presented in these tables. For example, $^{226}$Ra has a generally agreed-upon background of 1 - 2 pCi/g soil. Assuming that soil has a bulk density of 1.2 grams per cubic centimeter (g/cm$^3$), then a square meter of soil with a 15-centimeter depth contains approximately 180,000 grams (approximately 400 pounds) of soil. At background concentrations of one to two pCi/g, this means there are approximately 180,000 – 360,000 pCi of $^{226}$Ra in each square meter of soil at each location *without* the influence of the Piñon Ridge Mill. The location with the highest modeled annual deposition, would have its $^{226}$Ra concentration in the top 15 cm (six inches) of soil increased from a low background value of 180,000 pCi/m$^2$ to 180,055 pCi/m$^2$, an increase of only three ten-thousandths from the annual deposition modeled. For more distant locations such as Telluride, the contribution from the Piñon Ridge Mill would add only about two one-millionths (1.9x10-6 pCi/m$^2$) to the existing $^{226}$Ra background. A picocurie is to a curie as one penny ($0.01) is to 10 billion dollars ($10,000,000,000).

BLM_0036928

<u>APCD Review.</u> The Air Pollution Control Division is responsible for monitoring air conditions across the state. It regulates air quality from pristine areas such as Rocky Mountain National Park and Mesa Verde, to less-pristine areas such as the Front Range. They are expert at evaluating pollution levels and their impacts. APCD's review of the Piñon Ridge proposal and its impacts on Telluride as alleged by stakeholders is presented in Reddy (2010) and is attached. Highlights are presented here.

The APCD prepared NOAA HYSPLIT (Draxler and Rolph, 2010, and Rolph, 2010) back trajectory model runs for 21 "dust on snow" days identified by Landry and Neff (2010). These significant dust deposition events occurred between the fall of 2008 and spring of 2010. The back trajectories show where air parcels originate during each of 12 hours preceding each hour of the day for the dust-on-snow days. Figure 61 presents a composite of these back trajectories for Telluride. The grid cells are color-coded by the number of back trajectory points occurring in each cell. This plot shows that most of the dust deposition events are associated with southwesterly flow from extreme southwestern Colorado, northeastern Arizona, and northwestern New Mexico. Only a small fraction of event-days are associated with flow from the Piñon Ridge area towards Telluride.

Figures 62 through 64 contain wind roses for the proposed Piñon Ridge facility, Cortez, and Durango, respectively, for wind or gust speeds just below the thresholds identified by the APCD for blowing dust conditions. Values just below the thresholds were selected in order to provide a conservative estimate for dust storm conditions. These plots further demonstrate that dust storm conditions are predominantly associated with flows from the southwest.

[EIA — 151]

BLM_0036929



**Figure 61: Back Trajectories**

[EIA — 152]

BLM_0036930



**Figure 62: Piñon Ridge wind rose showing the number of hours with gust speeds of 39 miles per hour or higher at 10-meters height by wind direction for July 2008 through June 2010.**

[EIA — 153]

BLM_0036931



**Figure 63: Cortez wind rose showing the number of hours with wind speeds of 25 mile per hour or higher by wind direction for 2005 and 2006.**

[EIA — 154]

BLM_0036932



**Figure 64: Durango wind rose showing the number of hours with wind speeds of 25 mile per hour or higher by wind direction for 2005 and 2006**

Controls of potential dust sources at the Piñon Ridge EFR facility will create soil moisture fractions that are not conducive to dust emission even under high wind conditions.

Finally, extensive work by the U.S. Army Corps of Engineers (2007) and aerial radiological surveys associated with this work (Hendricks, 2001) have identified 15 square miles of abandoned uranium mining areas on the Navajo Nation in northeastern Arizona and southern Utah. The abandoned and or un-reclaimed uranium-mining lands are located in the portions of the Four Corners region most likely to be source areas for blowing dust. These mines have been abandoned for several decades. These areas are also upwind of the Telluride area during most dust storms. While the extent of potential impacts from transport of radionuclides from the abandoned uranium mines into southwestern Colorado is not known, it is worth pointing out that (in 2006) no public water systems in any of the southwestern Colorado counties had radionuclides above the Maximum Concentration Limits (Colorado Department of Public Health and Environment Hazardous Materials and Waste Management Division and Water Quality Control Division, 2007, see also: http://www.durangogov.org/forms/City%20of%20Durango%202010%20CCR.pdf and: http://www.telluride-co.gov/Modules/ShowDocument.aspx?documentid=1912 ). This provides some perspective on the role of dust storms in radionuclide transport in the area.

[EIA — 155]

BLM_0036933

The large expanse of un-reclaimed sources upwind of Telluride will dwarf the impacts from a relatively small and highly controlled facility that will not normally be upwind of Telluride during a dust storm.

<u>Summary.</u> The application, ER and subsequent reports adequately address meteorology and climate relative to the project and are acceptable. Dust storms are a very real and persistent problem. They transport large volumes of particulate matter from the desert southwest and deposit in the high country. The increased dust levels exacerbate snow melt. It has since been demonstrated by numerous parties that the proposed Piñon Ridge facility will not negatively impact air, soil or water quality in the Telluride basin, nor will it add to natural radioactivity levels already present in the soil. The wind direction of these dust storms is not from Piñon Ridge, but rather from the south and southwest. Dilution and dispersion of particulates precludes any significant (if any) amount of deposition from this site that far away.

The Piñon Ridge facility has been designed from the ground up to mitigate dust losses that were prevalent at these mills 50 years ago. All ore and tailings are subject to dust-suppression systems and programs. The tailings are kept below grade and kept wet to prevent them from becoming airborne. Even when modeling under extreme conditions, the facility source terms are so small compared to the thousands of source terms that have existed for decades and not shown to impact the environment near Telluride.

The impacts and geographic extent of dust emissions from the proposed facility are virtually negligible compared to the massive emissions produced during a regional dust storm.

## Alternate Feed

**Concern.** EFR would accept materials for direct disposal and alternate feed for processing.

**Response.** EFR does *not* want to process alternate feed wastes from industry. The company has not asked for that authorization, and therefore is precluded from processing alternate feed without additional approval. Additionally, the special use permit from Montrose County limits the mill to processing only native ore. However, it is the position of the department that the filter cake material that EFR owns at its mines is source material, does not contain listed hazardous waste, and is not a sham recycling effort to avoid strict, joint and several liability under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, commonly known as Superfund).

"Byproduct Material Type II" means the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content… (10 CFR 40.4, CCR 1007-18). This definition was crafted carefully when the Atomic Energy Act was amended with the UMTRA legislation. NRC did not want to capture mills that may have had a uranium side-stream, such as copper mills. Therefore the term "primarily for its source material content" was crafted.

[EIA — 156]

BLM_0036934

Over time, it became apparent that some wastes from outside the uranium mine and milling arena had potential for uranium recovery due to their high uranium content (e.g., radium tailings, Formerly Utilized Sites Remedial Action Project, or "FUSRAP" tailings that were physically, chemically, and radiologically similar to uranium mill tailings). It would make sense to recover uranium from these materials. However, those materials are not "ore" and therefore could not be processed at a uranium mill without special approval.

It also became apparent to others (e.g., mill owners who were in a huge economic slump) that by processing the waste at a uranium mill, whatever classification the waste had prior to being run through the uranium mill became moot, as the discharge was designated 11e.(2) (or Type II) byproduct material. The liability for the waste would then transfer from the generator to the taxpayer (in the long term, because DOE takes custody of the sites in perpetuity, and the material would be indistinguishable from and comingled with the other tailings). The mill owners could charge large sums to take the waste and run it through the mill. The generator would save money over disposal at hazardous waste sites, and the cradle-to-grave liability would shift to others.

NRC issued final guidance in 2000 in RIS-00-023:
"1. Determination of whether the feed material is ore.
For the tailings and wastes from the proposed processing to qualify as 11e.(2) byproduct material, the feed material must qualify as "ore." In determining whether the feed material is ore, the following definition of ore will be used:
Ore is a natural or native matter that may be mined and treated for the extraction of any of its constituents or any other matter from which source material is extracted in a licensed uranium or thorium mill.

2. Determination of whether the feed material contains hazardous waste.
If the proposed feed material contains hazardous waste, listed under subpart D Sections 261.30-33 of 40 CFR (or comparable Resource Conservation and Recovery Act (RCRA) authorized state regulations), it would be subject to the U.S. Environmental Protection Agency (EPA) or state regulation under RCRA. If the licensee can show that the proposed feed material does not contain a listed hazardous waste, this issue is resolved.

Feed material exhibiting only a characteristic of hazardous waste (ignitable, corrosive, reactive, toxic) would not be regulated as hazardous waste and could therefore be approved for recycling and extraction of source material. However, this does not apply to residues from water treatment, so determination that such residues are not subject to regulation under RCRA will depend on their not containing any characteristic hazardous waste. Staff may consult with EPA (or the state) before making a determination of whether the feed material contains hazardous waste.

If the feed material contains hazardous waste, the licensee can process it only if it obtains EPA (or the state) approval and provides the necessary documentation to that

[EIA — 157]

BLM_0036935

effect. Additionally, for feed material containing hazardous waste, the staff will review documentation from the licensee that provides a commitment from the U.S. Department of Energy or the state to take title to the tailings impoundment after closure.

3. Determination of whether the ore is being processed primarily for its source-material content.
For the tailings and waste from the proposed processing to qualify as 11e.(2) byproduct material, the ore must be processed primarily for its source-material content. If the only product produced in the processing of the alternate feed is uranium product, this determination is satisfied. If, in addition to uranium product, another material is also produced in the processing of the ore, the licensee must provide documentation showing that the uranium product is the primary product produced.

If it can be determined, using the aforementioned guidance, that the proposed feed material meets the definition of ore, that it will not introduce a hazardous waste not otherwise exempted, or if it has been approved by the EPA (or the state) and the long-term custodian, and that the primary purpose of its processing is for its source-material content, the request can be approved."

In 2006, the department denied an application to bring alternate feed material from the Sequoyah Fuels Facility in Gore, Okla. to Cotter. The material had copious amounts of uranium in it; however it also had high levels of fluorine, which is extremely toxic when it comes in contact with acid — like at a uranium mill (hydrogen sulfide gas is deadly). The material was neither physically, chemically, nor radiologically similar to uranium ore or mill tailings.

EFR has not proposed to accept alternate feed; however, EFR would want to recover uranium that is source material from its mines that is in liquid form instead of solid form. EFR did not ask for specific authorization to accept its mine water-treatment residuals in the application; it was discussed in Section 3 of the Material Containment Plan, and as such, is a request to accept the material. However, because EFR did not provide any information on how it will transport, store, and introduce the material into the mill circuit, we will not authorize it at this time. Concurrently, if acceptance of that material is desired, EFR would need to modify the Montrose County special use permit. Should EFR get the changes to the county permit, and submit a material acceptance report with all necessary information, including public comment, then the department would consider an amendment to the license for the authorization.

An additional alternate feed material that has been discussed in the public is water treatment plant residuals from municipalities that are required to remove uranium from their water sources to meet the regulations for drinking water. EFR has not requested authorization for this material; however, the technical attributes of the material make reprocessing at a uranium mill desirable. In addition, if reprocessing is not an option,

[EIA — 158]

disposal of this material can be very expensive and many small public water systems do not have the necessary resources.

Another issue that has been raised is the direct disposal of off-site waste in a uranium mill tailings impoundment. Direct disposal was proposed for the Cotter mill in 2002 for out-of-state material nearly identical to the mill tailings already in the impoundment, and would have provided significant revenue to Cotter. In the department evaluation of this proposal, it was determined that the shift of the mill from uranium processing to waste disposal was perceived by the local community as extremely negative, and evidence was provided that it would negatively impact future growth and development of the community. The benefit of this activity was solely to Cotter and the negative impact was solely to the local community. The department denied the proposal in 2005. Any direct disposal proposals would be subject to significant regulatory and public scrutiny.

## Boom and Bust Cycles

**Concern.** Historically, the economic viability of resource extraction industries has suffered significant variability over time. Multiple factors influence this variability including resource availability, local, national and international markets, weather, politics, and others. The uranium mining and milling industry has been in a slowdown since the early 1980s as a result of numerous converging factors. The uranium market expressed by the spot price continues to show wide fluctuation in recent years.

**Response.** These swings in economic viability are similar to those experienced in other industries, such as agriculture, tourism, manufacturing, construction, finance and housing, among others. A boom or bust is determined by the rapidity of the change in the viability, as opposed to the gradual economic cycles experienced by every sector of the economy. The bulk of uranium sales are conducted on long-term private contracts and are not necessarily subject to the spot price volatility.

While the country experienced major downturns in uranium mining and milling, one of the two operating uranium mills' experience may be informative. The Cotter Cañon City mill employment is shown in Table 38.

### Table 38: Cotter Cañon City Mill Employment

| Time period | Estimated Average Employment | Comment |
| --- | --- | --- |
| 1950s - 1960s | 80 - 100 | |
| Early 1970s | 100 - 120 | |
| Late 1970s | 150 - 200 | Alkaline mill expansion and catalyst plant construction; national recession[1] (1975) |
| 1980 - 1981 | 90 - 100 | National recession[1] (1980) |
| 1981 - | 75 | National recession[1] (1983) |

[EIA — 159]

BLM_0036937

| Time period | Estimated Average Employment | Comment |
|---|---|---|
| 1986 | | |
| 1987 - 1990 | 30 | |
| 1990 - 1995 | 25 | National recession[1](1991) |
| 1996 | 40 | |
| 1997 | 45 | |
| 1998 | 50 | |
| 1999 | 80 | |
| 2000 | 80 | |
| 2001 | 120 | Mill conversion; National recession[1] |
| 2002 | 55 | |
| 2003 | 30 | |
| 2004 | 55 | |
| 2005 | 101 | Mill refurbishment |
| 2006 | 65 | |
| 2007 | 32 | |
| 2008 | 31 | National recession |
| 2009 | 31 | National recession |

[1]Headwaters Economics, December 2, 2008
Source: Cotter, June 29, 2010

The data shows that the mill employment estimated at 120 for full operations beginning in 2000 was never consistently achieved. However, in spite of the fluctuating uranium economy, employment at the mill remained from about a quarter to a third of the full employment level during lulls. Furthermore, employment at the mill actually increased during several periods of national recession (1975, 1980, and 2001), reinforcing the need for communities to establish a diverse economy. It should be noted that during periods of low or no production, the auxiliary industries affiliated with the mill would not likely be required at the same level. These off-site industries would include mining, transportation, and the provision of various goods and services.

If the same model were applied to the Piñon Ridge Mill, the lowest employment at the mill during "bust" periods would be roughly 21 employees, with limited amounts of goods and services or mining and transportation employment. The reduction in employment and loss of income to affiliated industries would have a negative impact on those individuals and businesses impacted. Laid-off individuals may not be able to obtain their previous employment, most of which occurred outside the local area, or other jobs. Local businesses may not be able to effectively transition back to lower service levels. However, during this period, the level of local employment and infusion of income into the local community due to the Piñon Ridge mill would still be greater than that existing without the mill. In addition, Paradox Valley residents have indicated that they are interested in developing a diverse economic base that is not totally dependent on mining and milling.

[EIA — 160]

BLM_0036938

## Process Water Availability

**Concern.** Availability of water in this area is limited.

**Response.** The department requires that at a minimum amount of water be available for dust control, and the minimum estimate of 64 gallons per minute is adequate for dust control. The estimate for Piñon Ridge Mill water usage during operations is 141 gallons per minute (gpm) process water and three gpm potable water. Potable water is to be hauled from Naturita and stored on-site. The estimate for the sustainable long-term pumping rate for on-site wells is 135 gpm to 64 gpm depending on the geometry of the aquifer. If additional water is required for the mill, EFR has a long-term water access agreement with the town of Naturita for more water.

## Wildlife Impacts

**Concern.** The mill would have a negative impact on wildlife, primarily through the disruption of habitat critical to Gunnison Sage-grouse, elk and deer, the use of the tailings and evaporation impoundments by wildlife, and the depletion of the Dolores River.

**Response.** EFR negotiated a Habitat Improvement Plan, dated November 2010, that addresses habitat loss related to the mill. The mitigation goal is to increase the carrying capacity of similar, adjacent habitats so that displaced wildlife can remain in the general area. EFR is committed to obtaining a suitable site and improving habitat on that site in consultation with CDOW. The site will consist of approximately 415 acres of private land of similar habitat in the east Paradox Valley floor between the Dolores River and Dry Creek.

Gunnison Sage-Grouse. The Gunnison Sage-grouse was named a separate species in 2000, and subsequently determined to be "important" under the Endangered Species Act (ESA). In September 2010, the USFWS determined that there was sufficient scientific and commercial data to propose threatened or endangered status for the species, but it is of a lower priority than other species for listing under the Act (*Montrose Daily Press*, 2010).

Studies have identified seven highly fragmented populations scattered in eight different counties in Colorado. The San Miguel Basin population consists of six distinct occupied subpopulations, and there are two additional areas of potential habitat where the species was thought to occur historically, but there have been no recently documented sightings. One of these potential habitat areas is the portion of the Paradox Valley east of the Dolores River (Colorado Division of Wildlife, 2009). Former habitat west of the Dolores River has been lost to agriculture and development (Colorado Division of Wildlife, 2010).

Various groups have worked with the CDOW and other agencies to develop the San Miguel Basin Gunnison Sage-grouse Conservation Plan. This plan evaluated grouse populations, habitat, linkages among populations, and conservation measures to promote

[EIA — 161]

BLM_0036939

the species and mitigate impacts of resource extraction and land development. The majority of occupied and potential habitat is located on federal- or state-owned land.

Studies of the grouse indicated their presence in the Paradox Valley in a 1942 survey, but no populations were identified in the Paradox Valley during surveys conducted in 1945 and 1961. The plan also identified important linkage zones where the grouse may move from an occupied area to currently unoccupied potential habitat. The Paradox Valley was not within a linkage zone, nor was it connected to other current or potential habitat. Gunnison Sage-grouse were not found on or near the proposed mill property during studies conducted by EFR contractors.

The proposed Piñon Ridge Mill sits within the potential habitat identified in the Paradox Valley. Implementation of the San Miguel Basin conservation plan is voluntary for private landowners, and CDOW has signed a Candidate Conservation Agreement with Assurances with the USFWS that can incorporate Certificates of Inclusion for specific landowners. No private landowners in the Paradox Valley have signed Certificates of Inclusion thus far.

EFR has negotiated mitigation measures with the CDOW regarding potential impacts to the possible future grouse population. Given the current absence of grouse populations, and the relatively small disturbed footprint of the proposed mill compared to the remainder of the potential habitat in the Paradox Valley, the impact on the Gunnison Sage-grouse population from this project would be minimal.

Elk Winter Concentration Area. The mill site is located in an area that provides winter range and severe winter range for elk and mule deer, and provides an elk winter concentration area. The Habitat Mitigation Plan approved by CDOW is designed to increase the carrying capacity of similar adjacent habitats so that displaced wildlife can remain in the general area. To this end, EFR will obtain control over a suitable similar-sized property in the area through either purchase or a long-term lease, and improve the habitat on that property, in consultation with CDOW, to roughly double the carrying capacity of the property.

Impoundment Protection. The liquids that will be contained in the evaporation ponds and tailings cells have attracted birds, including ducks and geese, at some mill sites. Because of their elevated metal and radionuclide concentrations, the tailings and raffinate solution can be acutely and chronically toxic to wildlife; especially birds and bats that may attempt to drink from or land on the ponds. Therefore, the waste management facilities (tailings cells and evaporation ponds) represent the primary potential sources of exposure pathways to wildlife.

Measures will be implemented to minimize the access of wildlife and livestock to the tailings cells and evaporation ponds. These measures include:
- An eight-foot high chain-link fence topped by three strands of barbed wire installed around the entire perimeter of the tailings cells and evaporation ponds.

[EIA — 162]

BLM_0036940

The fence will be inspected daily and repaired, as necessary, to prevent access to the area by wildlife.

- A fine mesh wire fence or hardware cloth apron extending two feet below the ground surface buried around the outside perimeter of the chain-link fence to minimize or eliminate burrowing animals from entering tailings cells and evaporation ponds. Fine mesh fencing extending to three feet above ground around the inside perimeter of the chain-link fence placed to prevent smaller, ground-dwelling wildlife (i.e., pocket gophers and other rodents, lizards, and snakes) from entering tailings cells and evaporation ponds.
- Bird balls placed on top of the ponded portion of the tailings area to deter birds from landing on the water. The hollow balls are made of plastic and float on top of the water, concealing the water surface and creating a physical barrier.
- Woven bird netting installed over and along the sides of the evaporation ponds on wooden support poles elevating it over the evaporation pond. The netting would completely seal off access to the pond because nets would be fastened at the base to wood furring strips. The bird netting is designed with two-inch openings to prevent access by waterfowl and small game birds (e.g., mourning doves).
- Mill personnel will inspect the tailings cells on a daily basis. They will inspect the fence daily and make repairs as necessary, identify and record any wildlife mortalities, and, where possible, implement measures to reduce or eliminate future occurrences.

The noise and movements associated with mill activity may also deter wildlife encroachment on the impoundments. If monitoring indicates this is not the case, hazing of birds and other animals in combination with the construction of an alternate water source (e.g., pond) away from the mill may be effective.

Dolores River Water Depletion. Ground water moving off of the Piñon Ridge site now flows towards the Dolores River. The ground water pumping program for process water at the mill has an upper estimate of sustainable flow of 135 gallons per minute. The stream flow report for the Dolores River at Bedrock has low volume at about 50 cubic feet per second (CFS) and a high volume of 4,000 CFS. This is equivalent to a range of 22,442 gallons per minute to 1.8 million gallons per minute. Even at low water, the ground water used by the mill represents a loss of 0.6 percent or 0.31 cfs at most.

Currently, it is not clear that water from the Piñon Ridge site actually reaches the Dolores River. The BOR desalinization project pumps 230 gpm of salt water (A. Nicholas, 2010) from the valley before it reaches the river. After treatment, approximately half that amount is discharged into the Dolores River and the salt-laden brine is injected into the deep well.

## Tailings and Evaporation Impoundment Liner Systems

**Concern.** The integrity of the liner system beneath the tailings cells and its ability to contain liquids is suspect.

BLM_0036941

**Response.** Information on projects that were designed and constructed many years, often decades, ago, where specific quality control and quality assurance requirements were lacking or nonexistent have shown liner leakage. The impoundment leaks through liners were determined to be torn, to contain holes, to be installed incorrectly, or to have been exposed to long periods of solar (UV) radiation. These concerns may have been valid historically, but state-of-the-practice for liner design, installation, and quality control has been significantly improved since that time. For example, after installation but prior to operation, the primary liner will have an electric leak-detection survey to determine whether imperfections as small as a pinhole exist. This technology did not exist when liners were installed at older facilities. In addition, some common-sense measures such as prohibiting vehicle traffic over the installed geomembrane were not a standard practice in the past. It has been shown that heavy vehicle traffic caused about 75 percent of liner tears historically. Other improvements to the industry have also been made with respect to materials and formulation, seaming and installation, and quality control.

## Catastrophic Emergency Conditions and Response

**Concern.** Low-probability incidents could create catastrophic impacts. These incidents include spills at the mill and leakage from the impoundments, wildfires, and releases of materials or dust from the mill being dispersed by high wind events.

Spills and Leakage. One of the principal considerations in deciding the suitability of a particular site for the placement of a long-term disposal facility is how the native materials react with the materials being disposed. Even in the best designed impoundment or disposal cell there may be leakage or there may be operational spills.

Two types of impoundments would exist at the proposed mill. Tailings impoundments will receive slurried tailings and evaporation ponds will receive processing liquids. For both impoundment types, design and construction will focus on minimizing the potential for leakage or liner failure. Tailings impoundments will be operated such that tailings solids will accumulate and the water is pumped back to the mill for reuse. When enough solids have accumulated in the impoundment, a new one will be put into service and the old impoundment will be dewatered and closed. It is expected that each of the three tailings impoundments will be operated for around 10 years. The design of closure is such that liquids are removed and the tailings cell sealed to prevent inflow or infiltration, which makes safe, long-term disposal possible. The evaporation ponds will hold liquids only during operation and once emptied and closed, will not require long-term care.

It is also prudent to examine the fate of potential leakage before it gets to ground water.

Unsaturated Zone – At the proposed Piñon Ridge site there are soils covering the Chinle Formation and Moenkopi Formation. Ground water is found at the boundaries between these formations and the Hermosa Formation. Ground water is not found where the soil covers only the Hermosa Formation. Ground water is not found at the soil interface with either the Chinle Formation of the Moenkopi formation. The soil area without ground water is the unsaturated or vadose zone.

BLM_0036942

There are three possible adsorptive media available for solutions moving through the unsaturated zone: organics, iron and manganese oxides, and clays (smectites) (U.S. Environmental Protection Agency, 1999).

- The organic soil carbon is a sink for organics.
- The clays are a sink for cations due to the negative surface charge.
- The iron and manganese oxides are sinks for anionic species like uranium and molybdenum because of their positive surface charge.

There are exceptions, overlaps, and changes due to pH and solution content, but this represents the basic adsorptive behavior in soil (Deutsch, 1997).

Eastern Paradox Valley soils contain little carbon to act as a uranium sink. The clays' ability to absorb uranium is limited because the high carbonate content of these soils (U.S. Environmental Protection Agency, 1999) and the preponderance of negative net charge on clay surfaces. The iron and manganese oxides can act as a sink for some of the uranium moving through it, but the high carbonate content of the soil will inhibit adsorption. (Hsi and Langmuir, 1985, and Waite, et al, 1994). However, if the solution is acidic, and has time to act on the iron oxides, the iron oxides will adsorb the uranium species because the acid will change the surface charge to positive. Primarily, the soil will act to chemically neutralize acidic solutions and physically disperse solutions with capillary forces. Plus, there is some potential for physical adsorption of uranium.

Radium-containing waters will be greatly affected by the site soil. Acidic waters with dissolved radium will be pH neutralized by the soil carbonate. Radium carbonate and sulfate are essentially insoluble (CRC, 1975) and will precipitate onto soil particles. The other daughter products of uranium such as bismuth, thorium, lead, and polonium are essentially insoluble in oxidizing and pH-neutral waters.

Uranium-containing waters moving through the Chinle and Moenkopi formations will be subject to a strong adsorption by the high iron oxide/hydroxide content of these formations. EPA (1999) gives values in the range of 100 to 1,000,000 for the Kd or partition coefficient in the pH range of four to 10. Kd is the ratio of how a material, like dissolved uranium, will partition to a solid surface, like iron oxyhydroxides, rather than remaining in solution. The variable carbonate content of these formations will also allow the clay to act as adsorptive media for cations in some zones. The adsorption thermodynamics of uranyl on iron oxide surfaces are discussed in Sanpawanitchakit (2001). Dragun (1988) gives a pH value of 8.5 for when the goethite (iron oxyhydroxide) surface charge is neutral. So long as the pH is less than 8.5, it will act to adsorb the uranyl ion.

The other anionic metal species such as chromium, molybdenum, and vanadium will behave very much like uranium in solution. They are mobile when they are

[EIA — 165]

BLM_0036943

oxidized and immobile when they are reduced. Their negative surface charge means they will sorb to iron oxyhydroxides. Arsenic may be present in some ores.

The soil found at this site has a high reactivity with acids as noted in the drilling logs. Because this mill will process ores using an acid solution, the soils will tend to neutralize the acid content of any spill or release. This process will inhibit ability of a solution to carry some dissolved metals and enhance partitioning to the solid phase, as well as reducing the corrosive hazard of the solution.

When considering the physical action of soil on released water, it is probably easiest to think of the soil being momentarily saturated by the release. It will retain the field capacity of the soil and the rest of the water will continue down until the liquid is all suspended in the soil or the water is impeded by low permeability. Capillary action will "wick" the water away laterally. Because no damp or wet zones were found in the soil drilling program, it is appropriate to assume air movement through the soil contributes to the evaporation of any water in the soil. Any dissolved or suspended solids in the released water will be retained in the soil and will not reach the ground water.

Saturated Zone – There are two saturated zones associated with the main part of the proposed Piñon Ridge site: the Chinle/Moenkopi contact and the Hermosa contact. The Chinle Formation is the principal water-bearing formation and extends beneath the proposed mill and tailings cell locations; however, the Chinle is not water-bearing beneath the tailing cell locations. The Wingate Sandstone is not water bearing at the site.

The Hermosa contact water found in monitoring wells MW-6 and MW-8B show reducing conditions with free Mg, Fe, and sulfide species. The oxidation-reduction potential (ORP) is approximately -200 mV in MW-8B and there is dissolved uranium (VI). MW-6 has an ORP less than -300 mV and has no dissolved uranium (VI).

The Chinle/Moenkopi contact water is oxidizing and capable of carrying dissolved uranyl complexes. No studies have been performed on the Chinle water to determine if uranium is at equilibrium. It is assumed that any uranium-contaminated waters reaching this aquifer will raise the uranium concentration. The same is assumed for the other metallic anion species. The very low oxidation-reduction potential of the Moenkopi/Hermosa contact waters indicates that they are not in direct contact with significant surface waters.


Wildfire Protection. The Montrose County Master Plan 2010, Appendix F (4) indicates that the proposed mill site is located in an area designated as a "moderate" to "substantial" wildfire hazard area. EFR has included measures to mitigate the impact of a wildfire on the mill, and to mitigate the possibility of a fire on the site becoming a wildfire. Few areas within the restricted area will be vegetated to the extent that a fire at

BLM_0036944

the mill would spread, and the roadway surrounding the restricted area would also serve as a fire break to fire movement in or out of the restricted area.

For the purposes of the emergency response plan, wildfires are defined as fires outside of the restricted area. Fires within or entering the restricted area will be treated as a fire/explosion under the plan. Wildfires will be detected by visual observation by mill personnel. Most wildfires are expected to affect outdoor operations only. Responses include internal and external communication, evacuation as necessary, and appropriate fire fighting and control response.

Off-site wildfires will be controlled primarily by the local fire department and/or BLM. In this context, wildfires only include fires that are outside of the restricted area, and there is very little likelihood of chemical or radiological exposure associated with a wildfire outside this boundary. Mill emergency response personnel may provide off-site assistance for wildfires upon request, as long as the capacity to control the fire if it reaches the license boundary is not compromised. The first priority of mill emergency response personnel will be to protect the mill facilities on the mill property.

A number of local emergency planning organizations and other emergency response organizations were consulted and provided input during the preparation of the emergency response plan, including the Nucla/Naturita and Paradox fire departments, Montrose County Sheriff's Office, Basin Clinic, St. Mary's Hospital, Montrose Memorial Hospital, BLM, Montrose LEPC, Colorado State Patrol, Utah Highway Patrol, Colorado DOT, Utah DOT, and the Colorado Department of Public Health and Environment. The local emergency planning organizations will be asked to review the plan and provide input prior to start-up of mill construction and operations.

High Wind Events. Studies directed at wind dispersion of dust from the mill, noted above, have concluded that distribution of contaminants from the mill under regional dust storms does not present a risk to nearby or distant receptors. Mitigation measures implemented at the mill will serve to minimize releases from the site during both normal and high wind events.

An assessment of impact of release of radioactive materials due to a tornado was reported by NRC (U.S. Nuclear Regulatory Commission,1980). Based on a conservative assumption that the tornado lifts about 11,400 kg (25,100 lbs) of yellowcake, the maximum exposure occurs at a distance of approximately four km (2.5 miles) from the mill, the 50-year dose commitment to the lungs of an individual was estimated to be $8.3 \times 10^{-7}$ rem (0.00083 mrem). For individuals at the fence line 500 m (1,600 ft) the 50-year dose commitments were estimated to be $2.2 \times 10^{-7}$ rem (0.00022 mrem). Between 1950 and 1995, there have been 1,160 tornados in Colorado with various strengths (26 tornados per year) and the vast majority of tornadoes occur in eastern Colorado. With low frequency of occurrence and low impact, the risk of a tornado striking the mill and impacting a member of the general public is judged to be low.

[EIA — 167]

BLM_0036945

## Taxpayer Funds Spent on Uranium Mill Cleanup

**Concern.** Historic uranium mills required significant amounts of public funds for remediation and closure.

**Response.** Uranium mills operating in the United States from the 1940s through the early 1970s produced uranium concentrate for the federal government, primarily for the nuclear weapons program. The federal government has accepted responsibility for cleanup of sites that were under contract to them, under the Uranium Mill Tailings Remedial Action Project (UMTRA) Title I. Clean up costs are shared with the states in a 90-percent federal, 10-percent state fund share, with a total cost for 24 sites estimated at $1,476,340,000. For the seven mill sites in Colorado, an estimated $720 million to $850 million has been spent by the federal government and $72 million to $85 million has been spent by the state (Scheppers, March 30, 2010; DOE, USEIA, Uranium Mill Sites, September 2010).

Additionally, in Grand Junction, where local governments, businesses, and individuals removed mill tailings from an abandoned mill site for construction projects, the total cleanup cost was $22.7 million, of which the federal government paid 75 percent ($17.025 million) and the state paid 25 percent ($5.675 million) (Colorado Department of Public Health and Environment, Daniel Scheppers, e-mail message to Steve Tarlton, March 26, 2010). Additional cost summaries show that the DOE spent approximately $250 million on the Grand Junction vicinity properties (U.S. Department of Energy, 1999).

Uranium mills operated after 1978 were licensed by the NRC or an Agreement State and were required to maintain financial assurance to cover the commercial operation portion of the final decommissioning and cleanup. These sites were designated UMTRA Title II sites and cost for decommissioning related to operations performed under contract to the federal government are reimbursed to the company under Title X of the Energy Policy Act of 1992. Reimbursement is based on the amount of tailings produced and disposed related to operations prior to 1970 (U.S. Department of Energy, March 2010). Title X estimates of total cleanup costs for UMTRA Title II sites is approximately $1,765 million, with federal government costs of approximately $821 million and private sector costs greater than $944 million.

In addition to decommissioning costs, two Colorado operations were also required to pay for historic natural resource damages. At the UMETCO Uravan site, $852,360 is being used to remediate mine wastes associated with more than 400 mines within the San Miguel and Dolores River watersheds. At the Cotter Cañon City site, Cotter has funded more than $2 million for community and environmental improvement projects.

Projected closure costs for new uranium mills will be scrutinized during license application review and annually thereafter, and financial assurance will be adjusted as necessary to cover the estimated costs. Average decommissioning costs for conventional uranium mills are estimated at $14.1 million, including $7.7 million for tailings reclamation (DOE, USEAI, Decommissioning, September 29, 2010). The intent of the

[EIA — 168]

BLM_0036946

financial assurance process is to minimize or eliminate the possibility that public funds would be required for decommissioning of the mill. Currently in Colorado, one mill has an active license, and the financial assurance amount for that facility has been recently adjusted to $30.7 million. The company operating the facility has responsibility for completing any required cleanup, or will forfeit the financial assurance amount.

New and existing mills are required to transfer their final material repositories to the federal or state government at closure; however, states generally have chosen not to take the properties. The companies maintain a long-term care fund that will be transferred to DOE at closure to pay for long term surveillance and maintenance of the repositories.

## Financial Status of Energy Fuels

**Concern.** EFR does not have resources to complete the mill project.

**Response.** EFR is required to establish financial assurance as described above, in order to receive a license. In addition, construction implementation of all environmental protections and development of operating controls must be in place in order for EFR to proceed from construction to receipt of ore and begin processing. There are no other specific demonstrations of financial status required for approval.

If a license is issued to Energy Fuels, that license cannot be transferred to another entity without the department's review and approval, as noted in the regulations, section 3.15.2:

> "No license issued or granted under this part and no right to possess or utilize radioactive material granted by any license issued pursuant to this part shall be transferred, assigned, or in any manner disposed of, either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person unless the department shall, after securing full information, find that the transfer is in accordance with the provisions of the Act, now or hereafter in effect, and to all valid rules, regulations, and orders of the department, and shall give its consent in writing."

## Environmental Justice

**Concern.** Siting the facility in the Paradox Valley violates environmental justice requirements.

**Response.** As defined by the U.S. EPA,

> "Environmental Justice is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, culture, education, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. Fair Treatment means that no group of people, including racial, ethnic, or socioeconomic groups, should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal environmental programs and policies. Meaningful Involvement means that: (1) potentially affected community residents have an appropriate opportunity to participate in decisions about a proposed activity that will affect their environment

[EIA — 169]

BLM_0036947

and/or health; (2) the public's contribution can influence the regulatory agency's decision; (3) the concerns of all participants involved will be considered in the decision-making process; and (4) the decision-makers seek out and facilitate the involvement of those potentially affected."

The Paradox Valley does not appear to have a significant population of an ethnic or racial minority; however, poverty levels are relatively high, as is true throughout most of rural Colorado. Even though this EPA policy is not required under a state process, the approach used by the department for reaching a decision on the proposed EFR mill satisfies the policy process requirements.

## Radiation Dangers

**Concern.** Any amount of radiation is harmful to humans and the environment.

**Response.** The earth's environment is radioactive. Radiation is what sustains life on Earth, and is probably responsible for the evolution of life on the planet. Like anything else, radiation is harmful in the wrong amount; however, determining that amount is difficult.

Research has been done to evaluate the impact of radiation on individual cells and cellular structure, and radiation has been conclusively shown to cause damage. However, since cellular damage and creation is constantly occurring in all organisms from various causes, it is more difficult to demonstrate impact to the organism. A significant amount of the data related to radiation impacts on humans comes from studies of the Hiroshima and Nagasaki bombing, radium dial painters, unprotected underground uranium miners and, more recently, Chernobyl and radiation workers. Most of the long-term data relates to high levels of exposure, complicating extrapolation to lower exposure levels. In all cases, determining the exposure amount is complicated, and along with modifying factors such as smoking, adds uncertainty to the analysis.

A National Academy of Sciences committee is chartered to study the effects (risks) of low-level ionizing radiation. Results of these studies are presented in Biological Effects of Ionizing Radiation (BEIR) VII, Health Risks from Exposure to Low Levels of Ionizing Radiation (National Academy of Sciences, 2005). BEIR VII evaluated the current knowledge and research on radiation exposure, and concluded,
> "At doses less than 40 times the average yearly background exposure (100 mSv), statistical limitations make it difficult to evaluate cancer risk in humans."

The value 100 mSv (milliSieverts) is equal to 10 Rem.

This information can be placed in context, below:
- 10 Rem (10,000 mrem): Cancer occurrence from lifetime exposure estimated at one in 100
- Less than 10 Rem (10,000 mrem): Cannot evaluate cancer risk
- 5 Rem (5,000 mrem): Worker exposure standard
- 300 mrem/yr; Average U.S. background exposure

[EIA — 170]

BLM_0036948

- 350-650 mrem/yr: Colorado background exposure
- 100 mrem/yr: Public exposure standard
- 25 mrem/yr: Public exposure standard (one source)
- 30-250 mrem/yr: Typical Cotter mill worker exposures
- 5-20 mrem/yr: Typical maximum Cotter mill public exposures (calculated)

In addition to the numerical standards, the department applies an As Low As Reasonably Achievable (ALARA) approach, which drives potential exposures even lower. As noted in the above sections, none of the EFR exposure projections exceed the 100 mrem standard.

Furthermore, natural and man-made radiation are ubiquitous in the environment. Natural rock and soils derived from those rocks contain varying amounts of natural radioactivity. Where that natural radioactivity is concentrated, mining of the materials may be profitable, such as in the Uravan Mineral Belt. Even without mining, natural processes, including wind and water erosion and freeze/thaw cycles break down the rock structure and spread the material through the environment. Throughout Colorado, water supplies are reported with high natural radioactivity, and radon testing of homes throughout the state confirms the widespread presence of natural radioactivity in soils.

Man-made radiation exists throughout the planet from both the atomic weapons used on Japan and the atmospheric testing of nuclear weapons that occurred from 1943 through the 1980s. Levels of this radiation are extremely low, but detectable, and are often reported and misinterpreted in the media for specific areas.

## Evaluation of Impacts

The impacts of each alternative have been evaluated in the application, and in supplemental documents, including two reports prepared by the Fremont County Commissioners. The department's summary evaluation of impacts is presented in Table 39 below.

### Table 39: Summary of Impact Analysis

| Category | Issue | Significance | Impact |
|---|---|---|---|
| Alternatives | Action or no action | If not approved, neither benefits nor costs would accrue. | The environmental analysis concludes that the project has a positive net benefit. |
| | Site location | Site selection crosses all impact categories. | The Piñon Ridge site was chosen based on regulatory issues, site conditions, access, and proximity to occupied properties. |
| | Tech-nology | Mill technology and configuration is key to meeting | The technology selected provides the highest recovery rate of uranium and vanadium at the lowest price per |

BLM_0036949

| Category | Issue | Significance | Impact |
|---|---|---|---|
| | | regulatory requirements and optimizing processing. | pound recovered. Mill configuration was selected for processing efficiency, ability to control materials and exposures, regulatory requirements and costs. |
| Facility Layout | Visual, lighting | The scenic and rural nature of the project area could be disturbed. | The ponds and tailings cells would have low-profile containment embankments with the majority of their storage capacity located below the existing ground level. All disturbed areas would be re-contoured and re-vegetated to blend with the natural topography. Lighting would be directed downward to minimize glare and scattering. |
| | Land use | Surrounding land use is for grazing or vacant land. | Montrose County has approved a special use permit for the site to allow milling. The mill construction or operation would have no impact on the current uses of nearby lands. Habitat mitigation will remove some private land from grazing or development. Final closure of the site will permanently remove approximately 100 acres from future grazing or development use. |
| Chemical and Radioactivity Containment | Exposure controls/ Dose | Workers, members of the public and biological receptors. | Material management procedures and facility processes are designed to minimize exposure. Monitoring will be conducted in the facility, at the boundary and off-site. |
| | Spill controls/ Response | Uncontrolled releases present different exposure scenarios. | Response plans and mechanisms are in place to respond to spills or releases. Hydrologic conditions would limit the extent of spills, and meteorological conditions would limit the extent of releases. |
| | Impound-ments | Intrusion by human or biological receptors. | Fencing and site security will minimize the potential for human intrusion. Fencing, bird netting, and bird balls will minimize the potential for animal intrusion. |
| Water Use | Avail-ability | Limited water is available at the site. | Water supplies have been located that can supply the mill process requirements, and potable water will |

[EIA — 172]

BLM_0036950

| Category | Issue | Significance | Impact |
|---|---|---|---|
| | | | be trucked from Naturita. If required, additional water can be trucked from Naturita. |
| | Depletion of Dolores River water | The Dolores River provides habitat for several threatened or endangered species. | Ground water used at the mill accounts for less than one percent of the low flow in the river. In addition, the BOR desalinization project likely captures ground water from this formation prior to reaching the Dolores River. |
| Access and security | Restricted area | Intentional or unintentional contact with materials or operations. | The site is remote and fenced; access to the restricted area is restricted physically and through other controls, including site inspection and surveillance. |
| | Boundary/ Off-site monitor-ing | Intentional or unintentional contact with materials or operations. | The site is remote and fenced; Gate house controls access; routine surveillance of boundary and surrounding areas. |
| Environ-mental | Site selection/ Land use | Development of the site has inherent impacts on the site ecology. | The site was selected to avoid sensitive physical and environmental limitations. The mitigation plan approved by DOW addresses issues associated with the potential Gunnison Sage-grouse habitat and elk overwintering. |
| | Transport-ation accidents | Releases could occur along roadways and threaten population or the environment. | Trucker training and requirements will minimize accidents. Response capability will be improved locally and support can be provided by the mill. Solid and liquid materials spilled to the ground can be retrieved by responders; Solid materials released to waterways may be retrieved, but liquid materials released to waterways will be dispersed. |
| | Hydrology | Activities could interfere with local ground water and surface water. | There is no permanent surface water on the site. The subsurface water comes primarily from waters moving off Davis Mesa to the south, which then flows northwest along the Hermosa Formation to the Dolores River. |
| | Dust controls | Fugitive dust or emissions from the | Controls will limit emissions at the site boundary to within regulatory |

[EIA — 173]

BLM_0036951

| Category | Issue | Significance | Impact |
|---|---|---|---|
| | | facility could impact offsite areas. | requirements and be protective. Extreme wind events would dilute site emissions significantly, and primary high wind events flow from southwest to northeast, away from populated areas. |
| | Wildlife | The activities at the site could disturb sensitive species | The mitigation plan approved by DOW addresses issues associated with the potential Gunnison Sage-grouse habitat and elk overwintering. |
| Social and Economic | Employ-ment | The mill would create up to 200 jobs during the construction phase and an estimated 85 employees during operation. | EFR estimates that approximately 80 percent of the operations jobs would be filled locally and a lesser percentage during construction. Jobs are scarce in southwest Colorado with unemployment rates above the state average. The mill would generate an additional 228 to 770 indirect and induced jobs associated with services to the mill, including transportation, mining and materials and equipment, as well as services to the increased numbers of employees and families. |
| | Transport-ation | A significant increase in car and truck traffic is expected to and from the site | EFR will upgrade Highway 90 at the entrance to the mill. The traffic increase does not require additional roadway changes; however, the increased traffic will create an increased need and additional funding for road maintenance. |
| | Housing/ Land use | The increase in employment will drive the need for local housing. | The Nucla/Naturita/Paradox area has relatively high vacancy rates for housing; however, age of available housing may limit its suitability. Water supply limitations probably prevent the addition of housing in the Paradox Valley, but housing growth should be possible in Nucla and Naturita, and in other area communities for commuters. Indirect job increases associated with the uranium mines near LaSal, Utah and Gateway, Colo. will likely cause a need for additional housing in those communities, as well. |

[EIA — 174]

BLM_0036952

| Category | Issue | Significance | Impact |
|---|---|---|---|
| | | | |
| | Infrastruc-ture | Adequacy of basic infrastructure to handle the increases in population. | Nucla and Naturita have adequate water supply and sanitary services, local roads and schools for the anticipated growth. Medical and emergency services and law enforcement may be stretched during construction, and relief through increased tax revenues will be delayed by several years. |
| | Commun-ity and social context | Increases in population will change demands for community services and change social structure | The influx of construction workers will likely overwhelm some local resources and introduce a transient population into the area. The increase in local employment and attendant economic improvements will likely stabilize the community, although the influx of new people and businesses will be disruptive to many established community members and business owners. Induced effects may encourage the development of new businesses or endeavors and could include larger resources for recreational or social organizations and more local people staying local during the day. If the employment decreases or becomes volatile, the impacts on the community would be negative. |

[EIA — 175]

BLM_0036953

| Category | Issue | Significance | Impact |
|---|---|---|---|
| | Recreation /Tourism | The presence of a uranium mill may have a negative perception or stigma. | In the West End of Montrose County, recreation, tourism, and second homes are not significant contributors to the local economy. The proposed mill could potentially compete with other parts of the economy for limited services, present perceived or real environmental or health impacts, or cause direct conflict with resource use. However, the increased availability of local services may cause expansion of the area as a tourism or recreation destination. Areas with tourism as a major part of the economy have existed with uranium and other mineral mines and mills, including Moab, Telluride, and Cañon City. |
| | | The presence of a uranium mill may have a negative perception or stigma. | In the West End of Montrose County, recreation, tourism, and second homes are not significant contributors to the local economy. The proposed mill could potentially compete with other parts of the economy for limited services, present perceived or real environmental or health impacts, or cause direct conflict with resource use. However, the increased availability of local services may cause expansion of the area as a tourism or recreation destination. Areas with tourism as a major part of the economy have existed with uranium and other mineral mines and mills, including Moab, Telluride, and Cañon City. |

## Costs and Benefits

EFR conducted an evaluation of financial costs and benefits of the project in the Environmental Report, and the department does not take issue with that analysis. However, a significant part of the impact of the proposed mill is in unquantifiable terms and not subject to financial accounting. The department's analysis of benefits and costs is more qualitative and presented below in Table 40.

[EIA — 176]

BLM_0036954

**Table 40: Benefits and Costs of the Piñon Ridge Uranium Mill**

| Impact | Accrued to |
|---|---|
| **Benefits** | |
| The uranium oxide (yellowcake) generated by this mill would be used primarily in the production of electricity by nuclear power plants, and as such would contribute a small amount to the international trade balance as a domestic fuel source. | U.S. economy |
| The uranium oxide (yellowcake) generated by this mill would be used primarily in the production of electricity by nuclear power plants, and may spark a resurgence in uranium mining and milling in the Uravan Mineral Belt, contributing to environmental and social impacts in the region. | Local and regional workers, local and regional businesses, local and regional governments |
| Construction of the mill would generate up to 200 jobs and operations would generate 85 jobs. | Local and regional workers |
| Construction of the mill would generate a large number (estimated at 326) indirect and induced jobs to support construction. | Local and regional workers, local and regional businesses |
| Operation of the mill would generate a large number of direct (estimated at 228 to 536) and indirect and induced (estimated at 228 to 664) jobs in mining and transportation. | Local and regional workers, local and regional businesses in Montrose, Mesa, and San Juan (Utah) counties |
| Unemployment in the West End would be reduced significantly due to direct, indirect, and induced employment, achieving greater individual and family financial stability | Local and regional workers and families |
| Increased employment with benefits provides greater spending power, increasing the viability (and profitability) of local businesses. | Local and regional workers and families, local and regional businesses |
| Increased employment with benefits provides greater medical insurance coverage for individuals and families. The percentage of patients with medical insurance will increase, improving the viability (and profitability) of medical service providers. | Local and regional workers and families, local and regional medical service providers |
| Increased local employment will increase the pool of capable individuals able to support volunteer emergency services and community activities. | Local communities, families, emergency service providers, and service organizations |
| Construction and operation of the mill would generate jobs, creating demand for local housing, and increasing housing prices, costs of local services, and a likely increase in commuter traffic into the Paradox Valley. | Local property owners, developers and local businesses |
| Increased refurbishment and development of housing and businesses will require greater adherence to established or new | Local governments, property owners |

[EIA — 177]

| Impact | Accrued to |
|---|---|
| building codes in the local communities and likely redefinition of legal property boundaries in the Paradox Valley. | |
| Transportation infrastructure would experience increased traffic which would, after some delay, increase maintenance and repair funds for local roadways. In addition, impact funds may be more available for some local traffic issues. | Montrose County, local communities |
| The sale of ore and processed uranium would generate more than $2 billion in estimated gross sales. | EFR and some additional mining companies |
| Economic activity associated with the mill would generate a significant amount of county, local government, school, and water conservancy district taxes. | Montrose County, local governments, school, and water conservancy districts |
| Property taxes could increase with the demand for housing, which may increase home costs. These factors could improve the desirability of the area for second or retirement homes. | Property owners, developers, local governments |
| The increased availability of local services as a result of the mill may provide an impetus for expansion of the area as a tourism or recreation destination. | Local businesses, local governments |
| The economic viability of resource extraction industries can be significantly variable over time, based on resource availability, local, national, and international markets, weather, politics, and other factors. However, base employment in uranium milling in the recent past has been relatively unaffected by national recessions. | Workers, local governments, local businesses |
| Potential loss of wildlife habitat due to the construction of the mill is being addressed through a wildlife mitigation plan that proposes to offset impacted property by establishing additional protected habitat on nearby property. Because the amount of private property is very limited in the eastern Paradox Valley, long-term protection of this additional private property reduces the amount of property available for subsequent development and habitat loss. | Recreational users, wildlife officials |
| | |
| **Costs** | |
| The uranium oxide (yellowcake) generated by this mill would be used primarily in the production of electricity by nuclear power plants, and may spark a resurgence in uranium mining and milling in the Uravan Mineral Belt, contributing to environmental and social impacts in the region. | Local and regional workers, local and regional businesses, local and regional governments |
| Construction of the mill would generate up to 200 jobs, creating a temporary peak in demand for local housing and housing prices, local services, and a likely increase in commuter traffic into the Paradox Valley. | Local residents, commuting employees, and transient visitors to the area |

[EIA — 178]

BLM_0036956

| Impact | Accrued to |
|---|---|
| Operation of the mill would generate an estimated 85 direct jobs and numerous indirect and induced jobs locally, which would create a demand for local housing, increasing housing prices and potentially limiting the availability of housing for transient visitors to the area. | Local residents and transient visitors to the area |
| Increased housing and services demand would increase property values locally, leading to higher property taxes. | Local property owners, renters |
| Increased employment and mill construction and operations will increase traffic, leading to higher road maintenance costs, and potentially an increase in traffic accidents. | Montrose County, local governments, local residents and commuters |
| EFR and associated mining companies have to invest significant capital and operating costs to be able to implement the mill and associated mining. | EFR and some additional mining companies |
| Economic activity associated with the mill would generate a significant amount of county, local government, school, and water conservancy district taxes. If tax rates were reduced based on the greater income, a reduction in mill activity could result in lower tax revenue and possibly the inability to raise tax rates back to the original level. | Montrose County, local governments, school and water conservancy districts |
| Given the variable nature of the resource extraction economy, dependence on this one component of the economy can lead to significant swings in prosperity that impact both public and private components of the community. Businesses that anticipated continued prosperity could be endangered and individuals that gave up jobs elsewhere may be unable to return to them. | Local and regional workers and residents, local and regional businesses, local governments, EFR, and other mining companies |
| Truck traffic associated with the mill would travel largely on routes with narrow roadways, dangerous curves, and limited emergency response access, such as Highway 141 north of Vancorum and Highway 90 at Paradox Hill. | Truck drivers, emergency responders, and other travelers on these roadways |
| CDOT limits the amount of snow removal on highways with low traffic volumes including both highways 141 and 90, and during the winter will not have snow removal between 7 p.m. and 5 a.m. The nighttime road conditions will likely limit access to and from the site on occasion. | Workers, EFR, and other mining companies |
| Potential loss of wildlife habitat due to the construction of the mill is being addressed through a wildlife mitigation plan that proposes to offset impacted property by establishing additional protected habitat on nearby property. Because the amount of private property is very limited in the eastern Paradox Valley, long-term protection of this additional private property reduces the amount of property available for subsequent development and habitat loss. | Developers, property owners, ranchers seeking grazing areas, local governments |

[EIA — 179]

BLM_0036957

From the above analysis, it appears that both benefits and costs are spread across the communities, local governments, and companies involved. Benefits and costs do not appear to be unfairly distributed to any specific sector, but benefits and costs both accrue to all segments of the larger community. Thus, this project does not benefit one aspect of the community at the expense of another.

The failure of the project economically is a risk that is borne primarily by Energy Fuels Resources Corporation, and the potential benefits of the project appear to outweigh the costs across all segments of the larger community.

[EIA — 180]

BLM_0036958

# References

(Please note: Some of the references cited in the text appear in the EFR application and are not listed here.)

25 CRS 11. *Radiation Control Act* [25 CRS 11-101]

25 CRS 15. *Colorado Hazardous Waste Act* [25 CRS 151

30 CRS 20. *Colorado Solid Waste Disposal and Facilities Act* [30 CRS 20, Pt.1]

33 USC 1251. *Federal Water Pollution Control Act.* (33 U.S.C. 1251 et seq.). Public Law 107–303. November 27, 2002.

40 USC 121. *Atomic Energy Act* [40 USC 121] as amended.

42 USC 15801. *Energy Policy Act of 2005.* Public Law 109-58.

42 USC 6901-6992k. Resource Conservation and Recovery Act (RCRA).

42 USC 9601-9675. *Comprehensive Environmental Response, Compensation, and Liability Act of 1980* (CERCLA). 1980

5 CCR 1002-31. *Basic Standards and Methodologies for Protection of Surface Water* [5CCR 1002-31]. Denver, Colorado: Water Quality Control Commission. Colorado Department of Public Health and Environment. August.

5 CCR 1002-41. *The Basic Standards for Groundwater.* Regulation #41. Denver, Colorado: Water Quality Control Commission. Colorado Department of Public Health and Environment. March

5 CCR 1003-1. *Colorado Primary Drinking Water Regulations* [5 CCR 1003-1]. Denver, Colorado: Water Quality Control Commission. Colorado Department of Public Health and Environment. March

6 CCR 1007. *Colorado Rules and Regulations Pertaining to Radiation Control* [6 CCR-1007] Denver, Colorado: Colorado Department of Public Health and Environment.

6 CCR 1007-2. *Regulations Pertaining To Solid Waste Disposal Sites and Facilities.* 6 CCR 1007-2. Denver, Colorado: Colorado Department of Public Health and Environment. April

6 CCR 1007-3. *Hazardous Waste Commission Regulations* [6CCR 1007-3] Denver, Colorado: Colorado Department of Public Health and Environment. August

6 CCR 1007-3. *Hazardous Waste Commission Regulations* [6CCR 1007-3] Denver, Colorado. Colorado Department of Public Health and Environment. August

Adamson, A.W. 1990. *Physical Chemistry of Surfaces (Fifth Edition).* New York: John Wiley & Sons.

[R — 1]

BLM_0036959

Adkins, Anthony R. February 17, 2010. Letter

Albright, W.H., Benson, C.H., and Waugh, W.J. 2010 *Water Balance Covers for Waste Containment: Principles and Practice*. Reston, Virginia: ASCE Press.

American Concrete Institute. 2006. *ASTM Standards in ACI 301 and 318, ACI 301-05 Specifications for Structural Concrete and ACI 318-05 Building Code Requirements for Structural Concrete*, Publication SP-71 (05). Farmington Hills, Michigan: American Concrete Institute. Authorized reprint from the *Annual Book of ASTM Standards*, Copyright © ASTM International, West Conshohocken, Pennsylvania.

American Concrete Institute. 2008. *ACI Manual of Concrete Practice 2008, Parts 1–6*. Farmington Hills, Michigan: American Concrete Institute.

Benson, C.H. 2006. "Introduction to Water Balance Covers." Presented at Alternative Covers for Landfills, Waste Repositories, and Mine Waste Workshop, Denver, Colorado, November.

Benson, C.H. 2008. "Alternative Covers: Theory, Design, and Practice." Workshop sponsored by U.S. EPA Region 7 HQ, Kansas City, Kansas, November.

Benson, C.H., Albright, W.H., Roesler, A.C., and Abichou, T. 2002. "Evaluation of Final Cover Performance: Field Data from the Alternative Cover Assessment Program (ACAP)." Presented at Waste Management 2002 Conference, Tucson, Arizona, February 24-28.

Bonaparte, R., Daniel, D.E., and Koerner, R.M. 2002. *Assessment and Recommendations for Improving the Performance of Waste Containment Systems*. U.S. Environmental Protection Agency, EPA/600/R-02/099.

Cater, F.W. 1955. *Geology of the Davis Mesa Quadrangle, Colorado*. Washington, D.C.: U.S. Geological Survey Map GQ-71.

Center for Business and Economic Forecasting, Inc. 2001. *Tourism Jobs Gain Ground In Colorado, 1999 Estimates of State & County Tourism Jobs*. April 27.

Center for Business and Economic Forecasting, Inc. 2001. *Tourism Jobs In Colorado, Estimates of a Critical Part of the State & County Economies*. March 15.

Citizens Against Resource Destruction. Brochure containing "Colorado Medical Society Resolution Opposing Uranium Mining in Colorado."

Colorado Department of Health. 1966. Colorado Radiation Regulation #2.

Colorado Department of Local Affairs, State Demography Office. 2009. *Regional Socio-Economic Profile, Region 10 – Delta, Gunnison, Hinsdale, Montrose, Ouray & San Miguel Counties*. Updated October.

Colorado Department of Natural Resources Division of Wildlife, Jim Garner, e-mail message to Steve Tarlton, March 19, 2010

BLM_0036960

Colorado Department of Natural Resources Division of Wildlife. 2006. "Candidate Conservation Agreement with Assurances for Gunnison Sage-grouse between the Colorado Division of Wildlife and the U.S. Fish and Wildlife Service." July 15.

Colorado Department of Natural Resources, Division of Wildlife. 2009. *San Miguel Basin Gunnison Sage-grouse Conservation Plan.* December 10.

Colorado Department of Public Health and Environment, Air Pollution Control Division, Technical Services Program, memorandum from Nancy Chick and Doris Jung to Edgar Ethington. "Response to Public Comment on Energy Fuels' Project," May 6, 2010.

Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division, Bob Peterson, e-mail message to Steve Tarlton, February 6, 2010.

Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division, Dan Scheppers, e-mail message to Steve Tarlton, March 26, 2010.

Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division, Dan Scheppers, e-mail message to Steve Tarlton, March 30, 2010.

Colorado Department of Public Health and Environment, Water Quality Control Division, Jocelyn Mullen, e-mail message to Steve Tarlton, March 17, 2010.

Colorado Department of Public Health and Environment, Water Quality Control Division, Ron Falco, e-mail message to Steve Tarlton with attachments, February 26, 2010.

Colorado Department of Transportation, James B. Horn, e-mail message to Steve Tarlton, July 1, 2010.

Colorado Division of Wildlife, Proposed Piñon Ridge Mill Facility, Renzo DelPiccolo, letter, November 19, 2010.

Colorado Geological Survey. 2010. "Colorado Late Cenozoic Fault, Fold and Earthquake Database. Accessed Spring 2010. http://geosurvey.state.co.us/loadmap.htm.

Colorado Office of Economic Development and International Trade, letter, January 26, 2010.

Colorado State Patrol, Capt. Clark Bates, interview, June 9, 2010.

Colorado State Patrol, Ron Prater, e-mail message to Steve Tarlton, June 3, 2010.

Corey, A.T. 1994. *Mechanics of Immiscible Fluids in Porous Media*, Highlands Ranch, Colorado: Water Resources Publications.

Cotter Cañon City Mill, John Hamrick, e-mail, June 29, 2010.

Daniel, D.E. and Koerner, R.M. 2007. *Waste Containment Facilities, Guidance for Construction Quality Assurance and Construction Quality Control of Liner and Cover Systems Second Edition.* Reston, Virginia: ASCE Press.

[R — 3]

BLM_0036961

Daniel, D.E. and Koerner, R.M. 2007. *Waste Containment Facilities, Guidance for Construction Quality Assurance and Construction Quality Control of Liner and Cover Systems, 2nd Edition.* Reston, Virginia: ASCE Press.

Deutsch, W.J. 1997 *Groundwater Geochemistry: Fundamentals and applications to contamination.* Boca Raton, Florida: Lewis Publishers.

Domenico, P.A., and Schwartz, F.W. 1990. *Physical and Chemical Hydrogeology.* New York: John Wiley & Sons.

Dragun, James. 1988. *Soil Chemistry of Hazardous Materials.* Silver Spring, Maryland: Hazardous Materials Control Research Institute.

Elless, M.P., and Lee, S.Y. 1998. "Uranium solubility of carbonate-rich uranium-contaminates soils," *Water, Air, and Soil Pollution* 107: 147-162, Netherlands: Kluwer Academic Publishers.

Energy Fuels Resources Corporation, Frank Filas, letter to Patty Schrader Gelatt, May 14, 2010.

Energy Fuels Resources Corporation, License Application Documents. November 18, 2009. *Piñon Ridge Project Environmental Report* by Edge Environmental. November 2009.
Volume 1
Radioactive Materials License Application. November 6, 2009.
A1, "Basic Engineering Report Selected Drawings - General Arrangements," and "Basic Engineering Report Selected Drawings - Process Flows."
A2 "Geotechnical Design Recommendations." Kleinfelder. October 31, 2008.
A3 "Roadway Pavement Design Recommendations," Kleinfelder. October 30, 2008.
A4 "Site Drainage Analysis and Design Report." Kleinfelder. February 13, 2009.
Volume 2
A5 "Ore Stockpile Pad Design Report." Golder Associates. October 2008.
A6 "Tailings Cell Design." Golder Associates. October 2008.
A7 "Evaporation Pond Design." Golder Associates. 2008.
A8 "Technical Specifications, Revision A." Golder Associates. September 2008.
Volume 3
B1 "Construction Plan." Golder Associates. October 2009.
B2 "Facility Operating Plan." Visus Consulting Group. November 3, 2009.
B3 "Mine Operations Plan." August 2009.
C1 "Socioeconomics Baseline and Impact Analysis Report." The Louis Berger Group. November 5, 2009.
D1 "Soil Survey, Rev 0." Kleinfelder. January 29, 2009.
D2 "Vegetation Survey, Rev. 1." Kleinfelder. February 9, 2009.
D3 "Wildlife Survey," Rev. 1." Kleinfelder. February 12, 2009.
D4 "Biological Survey." WestWater Engineering. August 2009.
D5 "Ecological Screening of Raffinate Process Water." Kleinfelder. November 4, 2008.
Volume 4
E1 "Geologic Report." Kleinfelder. June 9, 2009.

BLM_0036962

E2 "Phase 2 Geotechnical Field and Laboratory Test Program." Golder Associates. September 2008.

Volume 5

F1 "Hydrogeologic Report, Rev. 1," Golder Associates. October 2009.

F2 "Phase 3 Long Term Pumping Test Data Report." Golder Associates. September 2008.

F3 "Water Supply Evaluation." Golder Associates. November 2008

F4 "Groundwater Monitoring Summary Report." Golder Associates. October 2009.

Volume 6

G1 "Baseline Surface Hydrology Modeling, Rev. 1." Kleinfelder. September 14, 2009.

G2 "2008 – 2009 Surface Water Monitoring Summary Report." Golder Associates. October 2009.

Volume 7

H1 "Meteorology, Air Quality and Climatology Report, Rev. 1. Kleinfelder. October 9, 2009.

Volume 8

H2 "Second Quarter 2009 Data Report for Ambient Air Monitoring. August 19, 2009.

H3 "Work Plan for Ambient Air Monitoring." Kleinfelder. July 18, 2008.

Volume 9

I1 "Baseline Radiological Investigation Report, Rev. 1." Kleinfelder. October 5, 2009.

Volume 10

I2 "Baseline Survey of Radionuclides in Animal Tissue." F. Ward Whicker, Department of Environmental & Radiological Health Sciences, Colorado State University. August 27, 2008.

Volume 11

J1 "Mill Health and Safety Plan." October 2009.

J2 "Estimates of Radiation Doses to Members of the Public." Two Lines, Inc. November 2009.

J3 "Radiological Exposure Pathways Report, Rev. 1." Noel Savignac, Ph. D., Kleinfelder West. November 11, 2009.

J4 "Risk Assessment Report." SENES Consultants Limited. November 2009.

Volume 12

J5 "Emergency Response Plan." October 2009.

J6 "Operational Monitoring Plan." Visus Consulting Group, Inc. November 11, 2009.

J7 "Material Containment Plan." October 2009.

J8 "Spill Prevention, Control and Countermeasure Plan (SPCC)." September 2009.

Volume 13

K1 "Mill Decommissioning Plan." Kleinfelder. October 16, 2009.

K2 "Tailings Cell Closure Design Report." Kleinfelder. February 13, 2009.

K3 "Specifications for Closure and Reclamation of Mill Facilities, Rev. A." Golder Associates. October 2009.

K4 "Decommissioning and Reclamation Cost Estimate." October 2009.

L1 "Water Rights and Well Permits."

L2 "Water and Wastewater Plan." October 2009.

L3 "Wetland and Jurisdictional Determination." Kleinfelder West, Inc. June 5, 2008.

L4 "Stormwater Management Plan." Golder Associates. October 2009.

[R — 5]

Volume 14
L5 "Colorado Department of Transportation Permanent Access Permit and Traffic Study." November 16, 2008.
"Colorado Department of Transportation Temporary Access Permit."
L6 "Colorado Department of Transportation Access Design Submittal."
L7 "Special Use Permit Application." Visus Consulting Group, Inc. April 14, 2009 and "Special Use Permit." Montrose County Commissioners. September 30, 2009.
L8 "Air Pollutant Emission Notice, Rev. A." Kleinfelder. July 21, 2009.
Volume 15
"Confidentiality Rationale." November 30, 2009.

Fetter, C.W. 1988. *Applied Hydrology (2nd Ed)*. New York: Macmillan Publishing Company.

Freeze, R.A., and Cherry, J.A. 1979. *Groundwater*, Englewood Cliffs, New Jersey: Prentice-Hall, Inc.

Garner, E. 2010. "Colorado Demographic Trends," Presentation by Elizabeth Garner, State Demographer, Colorado Department of Local Affairs. January.

Goldsmith, W., Silva, M., and Fischenich, C. 2001. *Determining Optimal Degree of Soil Compaction for Balancing Mechanical Stability and Plant Growth Capacity, ERDC TN-EMRRP-SR-26*. Vicksburg, Mississippi: U.S. Army Engineer Research and Development Center.

Goodwin, Bruce. 1982. "Calculated uranium solubility in groundwater: Implications for nuclear fuel waste disposal." *Canadian Journal of Chemistry* 60: 1759-1766.

Grand Junction Free Press. 2010. "Preparing for Change, Preservation, As World Comes to Gateway." November 5, printed November 11,

Great Outdoors America. 2009, Report of the Outdoor Resources Review Group. July.

Gupta, Chiranjib Kumar, and Singh, Harvinderpal. 2003. *Uranium Resource Processing: Secondary Resources*. Berlin: Springer-Verlag.

Headwaters Economics. 2008. *Colorado Socioeconomic Profile*. December 2.

Headwaters Economics. 2008. *Fossil Fuel Extraction as a County Economic Development Strategy*. September.

Headwaters Economics. 2008. *Impacts of Energy Development in Colorado*. November.

Headwaters Economics. 2008. *U.S. Energy Needs and the Role of Western Public Lands*. September.

Hem, J.D., 1985. *Study and Interpretation of the Chemical Characteristics of Natural Water (Third Edition)*, U. S. Geological Survey Water-Supply Paper 2254. Washington, D.C.: U.S. Government Printing Office.

[R — 6]

BLM_0036964

Hoffman, Markella Danielle. 2010. "Mio-Pliocene erosional exhumation of the central Colorado Plateau, eastern Utah: New insights from apatite (uranium/thorium)/helium thermochronometry. MS Thesis, University of Kansas.

Hsi and Langmuir. 1985. "Adsorption of uranyl onto ferric oxyhydroxides: Application of the surface complex site-binding model." *Geochemica et Cosmochemica Acta.* 49: 1931-1941.

International Concrete Repair Institute (ICRI). January 1997. *Technical Guideline No. 03732 Selecting and Specifying Concrete Surface Preparation for Sealers, Coatings, and Polymer Overlays.* Des Plaines, Illinois: International Concrete Repair Institute.

Interstate Technology & Regulatory Council. 2003. *Technical and Regulatory Guidance for Design, Installation, and Monitoring of Alternative Final Landfill Covers.* Prepared by ITRC Alternative Landfill Technologies Team.

Keller, G.V., and Frischknecht, F.C. 1966. *Electrical methods in geophysical prospecting.* New York: Pergamon Press.

Khire, M.V., Benson, C.H., and Bosscher, P.J., 2000. "Capillary Barriers: Design Variables and Water Balance." *Journal of Geotechnical and Geoenvironmental Engineering*, August.

Kleinfelder. 2009. *Soil survey for the Environmental Report in Support of the Application for License for Source Material Milling, Piñon Ridge Uranium Mill, Montrose County, Colorado: Technical Report prepared for Energy Fuels Resources Corporation.* Rev 0, January 20, 2009.

Knowles, Craig. 2002. "Status of the White-tailed and Gunnison's Prairie Dog. Accessed January 30, 2009." http://bsi.montana.edu.prairiemap/files/Gunnisonprairiedogreport.pdf. Page 6.

Kosmatka, Steven H., Kerkhoff, Beatrix, and Panarese, William C. 2002. *Design and Control of Concrete Mixtures – 14th Edition, Engineering Bulletin 101.* Skokie, Illinois: Portland Cement Association.

Lamond, Joseph F., and Pielert, James H., editors. 2006. *Significance of Tests and Properties of Concrete & Concrete-Making Materials-STP 169D.* Bridgeport, New Jersey: ASTM International

Landry, Chris. 2009. Center for Snow & Avalanche Studies. Announcement and newsletter text for the dust-on-snow talk at the June 4, 2009 meeting. May 4.

Lawrence, Corey R., T.H. Painter, C.C. Landry, and J.C. Neff. 2010. "Contemporary Geochemical Composition and Flux of Aeolian Dust to the San Juan Mountains, Colorado, United States." Journal of Geophysical Research. Vol. 115, G03007. July 16.

Liu, L. and Neretnieks, I. 1999. "Sensitivity analysis of Uranium solubility under strongly oxidizing conditions." *Materials Research Society Symposium Proceedings* 556: 1001-1008.

BLM_0036965

Lohman, S.W. 1979. *Ground-Water Hydraulics*, Geological Survey Professional Paper 708. Washington, D.C.: U.S. Government Printing Office.

Maest, Ann, Ph.D. 2009. "Questions for the Piñon Ridge Mill Hearing in Nucla, Colorado." Powerpoint presentation, August 13.

Martinez, Sofia. 2009. "Environmental Justice, the Green Economy, and the Politics of Diversity." *Voices from the Earth.* Winter. www.sric.org/voices/2009/v10n3/voices_10_3_EJ_green_jobs.pdf.

Mindess, Sidney, Young, Francis J., and Darwin, David. 2003. *Concrete, Second Edition.* Upper Saddle River, New Jersey: Prentice Hall.

Mogren, E.W. 2002 *Warm Sands Uranium Mill Tailings Policy in the Atomic West.* Albuquerque, New Mexico: University of New Mexico Press.

Montrose County Board of County Commissioners, letter, April 19, 2010.

Montrose County Health and Human Services, Richard Thompson, interview, June 8, 2010.

Montrose County Planning and Development, Steven White, Director, interview, June 8, 2010.

Montrose County Public Works, Brian Wilson, Director, interview, February 17, 2010.

Montrose County Sheriff, Sgt. William McClellan, interview, July 14, 2010.

Montrose County, Dave White, Commissioner, interview, February 17, 2010.

Montrose County. 2010. *Montrose County Socioeconomic Impact Study.* Economic & Planning Systems, Inc. March 31.

Montrose County. 2010. *Review of Piñon Ridge Project Environmental Report.* Pinnock Allen & Holt, March 11.

Montrose County. Montrose County Master Plan 2010. www.co.montrose.co.us/index.aspx?nid=308. Printed May 4, 2010.

*Montrose Daily Press.* 2008. "Radon Gas Gamma Ray Risks, Uranium & Health." November 9.

*Montrose Daily Press.* 2010. "No Protections For Gunnison-sage Grouse." September 27.

Montrose Economic Development Corporation. 2010. Economic Impact of Jobs Created. Piñon Ridge State Hearing, January 21.

Montrose Economic Development Corporation. 2010. *Resolution #2010-4 In Support of the Uranium Mill in the West End of Montrose County.* October 19.

National Academy of Sciences. 2005. *BEIR VII: Health Risks from Exposure to Low Levels of Ionizing Radiation.* Washington, D.C.: National Academies Press.

[R — 8]

BLM_0036966

Neff, J.C., A.P. Ballantyne, G.L. Farmer, N.M. Mahowald, J.L. Conroy, C.C. Landry, J.T. Overpeck, T.H. Painter, C.R. Lawrence, and R.L. Reynolds. 2008. "Increasing Aeolian Dust Deposition in the Western United States Linked to Human Activity." *Nature Geoscience*. Vol. 1. March.

Nicholas, Andrew. 2010. Personal communication.

Nucla-Naturita Area Chamber of Commerce. *2009 Consumer Survey*. 2009

Pasternak, J. 2010. *Yellow Dirt An American Story of a Poisoned Land and a People Betrayed*. New York: Free Press.

Pierce, K.L. 2003. "Pleistocene glaciations of the Rocky Mountains," *Developments in Quaternary Science*. Volume 1. Amsterdam: Elsevier, B.V.

Post '71 Uranium Workers Committee. 2009. *A Survey of Former Uranium Workers*. August.

Power Consulting. 2010. *A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado*. Prepared for Sheep Mountain Alliance. December.

Reynolds, T.D., and Fraley, L. 1989. "Root Profiles of Some Native and Exotic Plant Species in Southeastern Idaho." *Environmental and Experimental Botany*, Vol. 29, No. 2: 241-248.

Ringholz, R.C. 2002. *Uranium Frenzy Saga of the Nuclear West*. Logan, Utah: Utah State University Press.

Sanders, D.R. and Lommler, J.C. 1995. "Engineering Solutions to the Long-Term Stabilization and Isolation of Uranium Mill Tailings in the United States." Proceedings from International Conference on Radiation Protection and Radioactive Waste Management in the Mining and Minerals Industry, South Africa, February 20.

Sanpawanitchakit, Charoen. 2001. "The application of surface complexation modeling to the adsorption of uranium (VI) on natural composite materials." Ph.D. thesis. Colorado School of Mines.

Schneider, Frank & Mabel, comment card submitted July 13, 2010.

Sheep Mountain Alliance/Paradox Valley Sustainability Association., Hilary White and Julie Schneider, letter, December 15, 2009.

Sonoran Institute. 2009. *Uranium Mining, Tourism and Outdoor Recreation in Gateway, Colorado*. July.

Southwest Research and Information Center. 2009. "Is There a Need for New Uranium Mines in the U.S.?" *Voices from the Earth* Spring. http://www.sric.org/voices/2009/v10n1/Need%20for%20New%20U%20Mines.pdf.

[R — 9]

BLM_0036967

Sperling's Best Places to Live in Colorado. 2010. "Nucla, Naturita and Paradox." Accessed May 21, November 2 and November 8. www.bestplaces.net.

Stormont, J.C. 2007. *Evaluation of Capillary Barrier Design for Rocky Mountain Arsenal Covers*. Prepared in support of *the Integrated Cover System Design Project, Revised 100% Design Package*, October 23.

Stratus Consulting, "Revised comments on Energy Fuels' proposed Piñon Ridge Uranium Mill," memorandum, December 15, 2010.

Stratus Consulting. 2010. Jamie Holmes. "Review of Piñon Ridge Mill Proposal." Powerpoint presentation, June 9.

Telford, W.M., Geldart, L.P., and Sheriff, R.E. 1990. *Applied Geophysics, Second Edition*, New York: Cambridge University Press.

Telluride Foundation. 2010. "West End Community Resources." Printed June 2. www.telluridefoundation.org.

The Society for Protective Coatings (SSPC) and National Society of Corrosion Engineers, NACE International. 2003. *SSPC-SP 13/NACE No. 6 Surface Preparation of Concrete, Joint Surface Preparation Standard*.

U.S. Agency for Toxic Substances and Disease Registry. 2010. *Draft Public Health Assessment for Lincoln Park/Cotter Uranium Mill*. September 9.

U.S. Census Bureau. 2010. "LED OnTheMap Origin-Destination Database." Accessed October 7 and November 1. https://dola.colorado.gov/demog_webapps/eba_parameters.jsf.

U.S. Department of Energy. 1999. *Uranium Mill Tailings Remedial Action Surface Project, 1979-1999 End of Project Report*. U.S. Department of Energy Restoration Division: Albuquerque, N.M. May. Prepared by Jacobs Engineering Group, Inc.

U.S. Department of Energy, U.S. Energy Information Administration. 2010. "Uranium Mill Sites Under the UMTRA Project, Background." Printed September 29. www.eia.doe.gov/cneaf/nuclear/page/umtra/background.html.

U.S. Department of Energy, U.S. Energy Information Administration. 2010. "Decommissioning of U.S. Uranium Production Facilities Executive Summary." Printed September 29. www.eia.doe.gov/cneaf/nuclear/decom/decom_sum.html.

U.S. Department of Energy. 1989. *UMTRA Project Technical Approach Document, Revision II*. UMTRA-DOE/AL 050425.0002.

U.S. Department of Energy. 2010. *Fiscal Year 2009 & 2010 Status Report Reimbursements to Licensees of Active Uranium and Thorium Processing Facilities*. March.

BLM_0036968

U.S. Department of Interior, Bureau of Reclamation. 1987. *Design of Small Dams, Third Edition.* Washington, D.C.: U.S. Government Printing Office.

U.S. Environmental Protection Agency. 1989. Technical Guidance Document. *Final Covers on Hazardous Waste Landfills and Surface Impoundments.* EPA/530-SW-89-047.

U.S. Environmental Protection Agency. 1993. *Technical Guidance Document. Quality Assurance and Quality Control for Waste Containment Facilities.* EPA/600/R-93/182.

U.S. Environmental Protection Agency. 1999. *Understanding variation in partition coefficient, $K_d$, Values Volumes 1 and 2.* Office of Air and Radiation. EPA402-R-99-004A.

U.S. Environmental Protection Agency. 2003. "Evapotranspiration Landfill Cover Systems Fact Sheet." EPA 542-F-03-015.

U.S. Environmental Protection Agency. 2007. *First Five-year Review Report for the Lincoln Park Superfund Site Operable Unit 2.* September.

U.S. Environmental Protection Agency. 2009. *January 2009 Update, Five-year Review Report for the Lincoln Park Superfund Site Operable Unit 2.* January.

U.S. Geological Survey. 2010. National Earthquake Information Center Data Base. Accessed Spring 2010. http://earthquake.usgs.gov/earthquakes.eqarchives/epic/epic_circ.php.

U.S. Nuclear Regulatory Commission. 1998. – See page DA-54

U.S. Nuclear Regulatory Commission. 2002. *Design of Erosion Protection for Long-Term Stabilization, Final Report.* NUREG-1623.

U.S. Nuclear Regulatory Commission. 2003. *Standard Review Plan for the Review of a Reclamation Plan for Mill Tailings Sites Under Title II of the Uranium Mill Tailings Radiation Control Act of 1978.* NUREG-1620, Rev. 1.

U.S. Nuclear Regulatory Commission. 2008. *Design, Construction, and Inspection of Embankment Retention Systems at Uranium Recovery Facilities.* Regulatory Guide 3.11, Revision 3.

U.S. Nuclear Regulatory Commission. 2009. *Nuclear Regulatory Legislation, 110th Congress, 2d Session.* NUREG-0980, Vol. 1, No. 8. May. www.nrc.gov/reading-rm/doc-collections/nuregs/staff/sr0980/v1/sr0980v1.pdf#pagemode=bookmarks&page=5.

U.S. Nuclear Regulatory Commission. NUREG-1556, Vol. 4. NRC: Consolidated Guidance About Materials Licenses (NUREG-1556)

Wait, J.R. 1982. *Geo-Electromagnetism.* New York: Pergamon Press.

BLM_0036969

Waite, T.D., Davis, J.A., Payen, T.E., Waychunas, G.A., and Xu, N. 1994. "Uranium (VI) adsorption to ferrihydrite: Application of a surface complexation model." *Geochemica et Cosmochemica Acta*. 58: 5465-5438.

Washington Radiation Program, Dorothy Stoffel, personal communication with Philip Egidi, Colorado Department of Public Health and Environment, July 28, 2010.

West End Public School District, RE-2, letter, September 1, 2009.

Williams, Mark W. and Dave Manthorne, Institute of Arctic and Alpine Research and Department of Geography, University of Colorado, Boulder. 2001. "Class I Areas at Risk: Event-Based Nitrogen Deposition to a High-Elevation, Western Site." *The Scientific World*. October.

Williams, Mark W. and Kim S. Raby, Institute of Arctic and Alpine Research and Department of Geography, University of Colorado, Boulder. 2010. *AIRMoN Data Analysis, Summers 2000 – 2002, Telluride, Colorado, Draft Report*. March 23.

Williams, Mark, Professor of Geography and Fellow, INSTAAR, University of Colorado-Boulder, interview, August 18, 2010.

Williams, Mark, Professor of Geography and Fellow, INSTAAR, University of Colorado-Boulder, Powerpoint presentation in Ophir, June 10, 2010.

Williams, Mark, Professor of Geography and Fellow, INSTAAR, University of Colorado-Boulder. 2010. *Recommendations to San Miguel County in Response to The Proposed Piñon Ridge Uranium Mill*. July 21.

Wills, R.A. 1979. *Mineral Processing Technology: An Introduction to the Practical Aspects of Ore Treatment and Mineral Recovery*. International Series on Material Science and Technology Volume 29. New York: Pergamon Press.

Youd, T.L., Idriss, I.M., Andrus, R.D., Arango, G., Castro, J.T., Christian, R.D., Dobry, W.D., Liam Finn, W.D., Harder Jr., L.F., Hynes, M.E, Ishahara, K., Koester, J.P., Liao, S.S.C., Marcusin III, W.F., Martin, G.R., Mitchell, J.K., Moriwaki, M.S., Power, M.S., Robertson, P.K., Seed, R.B., and Stokoe II, K.H., 2001, "Liquefaction Resistance of Soils: Summary Report from the 1996 NCEER and 1998 NCEER/NSF Workshops on Evaluation of Liquefaction Resistance of Soils." *Journal of Geotechnical and Geoenvironmental Engineering*. Vol. 127, No. 10, ASCE.

Zoellner, T. 2009. *Uranium, War, Energy, and the Rock that Shaped the World*. New York:Viking

[R — 12]

BLM_0036970

Appendix A

[Appendix A]

BLM_0036971

# Appendix A: Colorado Radiation Control Act, Uranium Recovery Requirements

| | |
|---|---|
| (b) (I) No facility shall dispose of or receive for storage incident to disposal or processing at the facility classified material unless such facility has received a license, a five-year license renewal, or license amendment pertaining to the facility's receipt of classified material, in accordance with sections 24-4-104 and 24-4-105, C.R.S., for such receipt, storage, processing, or disposal of classified material and such license, license renewal, or license amendment approves that type of classified material. | The application meets the requirements of the RCA and the cited sections of the APA. |
| (II) Nothing in this paragraph (b) shall apply to a contract for the storage, processing, or disposal of less than the sum of one hundred ten tons of classified material per source or to a contract for a bench-scale or a pilot-scale testing project or a contract for less than a de minimis amount of classified material as determined by the department for storage, processing, or disposal. | May be applicable for processing of mine cake owned by Energy Fuels. |
| (III) License amendments for the receipt of classified material at a facility are subject to subsections (2) and (3) of this section except when the material is from an approved source and such amendment would not result in a change in ownership, design, or operation of the facility. License amendments not subject to subsections (2) and (3) of this section are subject to subsection (4) of this section. | Amendment not required for ore from local mines; an application would be required for any other matter. |
| (b) In addition to the requirements of paragraph (a) of this subsection (2), each proposed license, five-year license renewal, or license amendment pertaining to the facility's receipt of classified material shall include a written application to the department and information relevant to the pending application, including: | The application satisfies this requirement. |
| (I) Transcripts of two public meetings hosted and presided over by a person selected upon agreement by the department, the board of county commissioners of the county where the facility is located, and the applicant. One or both of the meetings shall be a hearing conducted to comply with section 24-4-104 or 24-4-105, C.R.S. The reasonable, necessary, and documented expense of the meetings or hearing shall be paid by the facility. Such meetings shall not be held until the department determines that the application is substantially complete. The facility shall provide the public with: | These transcripts are available for review on the Department web site. |
| (A) Pursuant to part 1 of article 70 of title 24, C.R.S., at least two weeks' written notice before the first meeting and an additional two weeks' written notice before the second meeting; | This was done. |
| (B) At both meetings, summaries of the facility's license to receive, store, process, or dispose of classified material and the nature of the classified material, and an opportunity to be heard; and | This was done. |
| (C) Access to make copies of a transcript of the meetings, and shall provide an electronic copy to the department in a manner that allows | This was done. The transcripts are |

[Appendix A — 1]

BLM_0036972

| | |
|---|---|
| posting on the department's web site within ten days after receipt from the transcription service; | available on the Department's web site. |
| (II) An environmental assessment as defined in paragraph (c) of this subsection (2); | The ER submitted by EFR satisfies this requirement. |
| *(III) A response, if any, to the environmental assessment written by the board of county commissioners of the county in which the classified material is proposed to be received for storage, processing, or disposal at a facility and provided to the facility within ninety days after the first public meeting. Upon request of and documentation of the expenditure by such board, the applicant shall provide the board with up to fifty thousand dollars, which shall be available to the board for the reasonable and necessary expenses during the pendency of the application to assist the board in responding to the application, including to pay for an independent environmental analysis by a disinterested party with appropriate environmental expertise to assist the board in preparing its response. The board's response may consider whether the approval of the license, five-year license renewal, or license amendment pertaining to the facility's receipt or disposal of the classified material will present any substantial adverse impact upon the safety or maintenance of transportation infrastructure or transportation facilities within the county.* | This was received by the Department and considered during the review process. It is located on the Department's web site. |
| (c) As used in paragraph (b) of this subsection (2), "environmental assessment" means a report and assessment submitted to the department by a facility upon and in connection with application for a license, a five-year renewal, or license amendment pertaining to the facility's receipt of classified material, proposing to receive classified material for storage, processing, or disposal at a facility that addresses the impacts of the receipt for storage, processing, or disposal of such material. The environmental assessment shall contain all information deemed necessary by the department, and shall include, at a minimum: | The ER submitted by EFR and the subsequent deliverables based on technical review satisfies this requirement. |
| (I) The identification of the types of classified material to be received, stored, processed, or disposed of; | Native ores primarily, with filter cake from mine water processing. |
| (II) A representative presentation of the physical, chemical, and radiological properties of the type of classified material to be received, stored, processed, or disposed of; | Provided in the application. |
| (III) An evaluation of the short-term and long-range environmental impacts of such receipt, storage, processing, or disposal; | Provided in the application. |
| (IV) An assessment of the radiological and nonradiological impacts to the public health from the application; | Provided in the application. |
| (V) Any facility-related impact on any waterway and ground water from the application; | Provided in the application. |
| (VI) An analysis of the environmental, economic, social, technical, and | Provided in the |

[Appendix A — 2]

BLM_0036973

| | |
|---|---|
| other benefits of the proposed application against environmental costs and social effects while considering available alternatives; | application. |
| (VII) A list of all material violations of local, state, or federal law at the facility since the submittal date of the previous license application or license renewal application; | Not applicable |
| (VIII) For an application for a license or license amendment pertaining to the facility's receipt of classified material for storage, processing, or disposal at the facility, a demonstration that: | Provided in the application. |
| (A) There are no outstanding material violations of any state or federal statutes, compliance orders, or court orders applicable to the facility, and any releases giving rise to any such violation have been remediated; | Not applicable |
| (B) The operator, after a good faith review of the facility and its operations, is not aware of any current license violation at the facility; | Not applicable |
| (C) There are no current releases to the air, ground, surface water, or groundwater that exceed permitted limits; and | Not applicable |
| (D) No conditions exist at the facility that would prevent the department of energy's receipt of title to the facility pursuant to the federal "Atomic Energy Act of 1954", 42 U.S.C. sec. 2113; | Not applicable |
| (IX) A list of all necessary permits and any changes to local land use ordinances that are needed to construct or operate the facility; and | Provided in the application. |
| (3) (a) Upon receipt of an application or notice as provided in subsection (2) of this section, the department of public health and environment shall notify the public and forward a copy of the application or notice to the governor and the general assembly, as appropriate. | This was done. |
| (c) (I) In deciding whether to approve a license, five-year license renewal, or license amendment pertaining to the facility's receipt of classified material, the department shall consider the transcripts of the public meetings held pursuant to subparagraph (I) of paragraph (b) of subsection (2) of this section, the facility's license, any environmental assessment or analysis performed pursuant to this section, the facility's compliance with financial assurance requirements of section 25-11-110, and the board of county commissioners' response to the environmental assessment prepared pursuant to subparagraph (III) of paragraph (b) of subsection (2) of this section. The department shall deny or approve the application as a whole. | This was done. The application, as amended is approved as a whole, with additional conditions. |
| (II) The department may order reasonable mitigation measures to address any substantial adverse impacts to public health or the environment or transportation infrastructure or transportation facilities within the county attributable solely to approval of the license, five-year renewal, or license amendment pertaining to the facility's receipt of classified material. | Mitigation is required as part of the license. See the EIA. |
| (III) The applicant shall demonstrate that if the license, five-year renewal, or license amendment pertaining to the facility's receipt of classified material is approved, then the receipt, storage, processing, and disposal of classified material shall: | Provided in the application. |
| (A) Be conducted such that the exposures to workers and the public are within the dose limits of part 4 of the department's rules pertaining to | Provided in the application. |

[Appendix A — 3]

BLM_0036974

| | |
|---|---|
| radiation control for workers and the public; | |
| (B) Not cause releases to the air, ground, or surface or ground water that exceed permitted limits; and | Provided in the application. |
| (C) Not prevent transfer of the facility to the United States in accordance with 42 U.S.C. sec. 2113 upon completion of decontamination, decommissioning, and reclamation of the facility. | Provided in the application. |
| (V) (A) The department shall publish a determination as to whether an application submitted pursuant to paragraph (b) of subsection (2) of this section is substantially complete within forty-five days after receipt of the application. | This was done. |
| (B) The first public meeting or hearing required by subparagraph (I) of paragraph (b) of subsection (2) of this section shall be convened within forty-five days after publication of its determination that the application is substantially complete. The second such public meeting or hearing shall be convened within thirty days after the first public meeting. | This was done. |
| (C) The department shall approve, approve with conditions, or deny the application submitted under paragraph (b) of subsection (2) of this section within three hundred sixty days after the second public meeting; except that, for an applicant that has completed the second public meeting on or before June 8, 2010, the department shall act upon the application within the time frame prescribed by this sub-subparagraph (C) as it existed as of the date of the application. | The application is approved with conditions. |
| (B) The material acceptance report that demonstrates that the classified material does not contain hazardous waste characteristics not found in uranium ore; | Not applicable to ore. May be required for filter cake. |
| (C) A detailed plan for transport, acceptance, storage, handling, processing, and disposal of the material; | May be required for filter cake. |
| (D) A demonstration that the material contains technically and economically recoverable uranium, without taking into account its value as disposal material; | This was done. |
| (E) The existing location of the classified material; | This was done. |
| (F) The history of the classified material; | This was done. |
| (G) A written statement by the applicant describing any pre-existing regulatory classification of the classified waste in the state of origin that describes all steps taken by the applicant to identify such classification; | May be required for filter cake. |
| (H) A written statement from the United States department of energy or successor agency that the receipt, storage, processing, or disposal of the classified material at the facility will not adversely affect the department of energy's receipt of title to the facility pursuant to the federal "Atomic Energy Act of 1954 ", 42 U.S.C. sec. 2113; | May be required for filter cake. |
| (I) Documentation showing any necessary approvals of the United States environmental protection agency; and | Pending for the NESHAPS |
| (J) An environmental assessment as defined in paragraph (c) of subsection (2) of this section, which may incorporate by reference relevant information contained in an environmental assessment previously submitted for the facility. | This was done. |

[Appendix A — 4]

| | |
|---|---|
| (II) For classified material that would otherwise be subject to the "Low-level Radioactive Waste Act", part 22 of article 60 of title 24, C.R.S., the facility's notice shall also include written documentation that the rocky mountain low-level radioactive waste board has been notified that the classified material is being considered for disposal in the subject facility. | Not applicable for ore.  May be required for filter cake. |
| (b) Within thirty days after the department's receipt of notice pursuant to subparagraph (I) of paragraph (a) of this subsection (4), the department shall determine whether the notice is complete. | This was done. |
| (c) Once the department determines that the notice is complete, the department shall publish the notice on its web site and provide a sixty-day public comment period for the receipt of written comments concerning the notice. A public hearing may be held, at the department's discretion, at the operator's expense. | This was done. |
| (d) Within thirty days after the close of the written public comment period provided by paragraph (c) of this subsection (4), the department shall approve, approve with conditions, or deny the receipt, storage, processing, or disposal as described in the notice based on whether the material proposed for receipt, storage, processing, or disposal at the facility complies with the facility's license and meets the standards established pursuant to subparagraph (III) of paragraph (c) of subsection (3) of this section. | |

[Appendix A — 5]

BLM_0036976

Appendix B

[Appendix B]

BLM_0036977

# Appendix B: Regulatory Guides and NUREG Documents Germane to the Energy Fuels Application

Regulatory Guides Germane to the Energy Fuels Application

| Regulatory Guide (RG) Number | Regulatory Guide Name | Applicability | Comment |
|---|---|---|---|
| Draft DG-3024 | Standard Format and Content of License Applications for Conventional Uranium Mills, May 2008 | Provides the basis for application content. It provides an outline for the form and content of the application. It is very helpful in understanding the scope of the application. | Used as a template for application by EF. EF has provided a cross-walk that is very helpful in negotiating the application. |
| Draft DG-3039 | Standard Format And Content For Emergency Plans For Fuel Cycle And Materials Facilities, 2010 | Used as guidance in evaluating the emergency plan in the application. | Based on the revised guidance and comments from the Department in FRI #3, EF revised the emergency plan and resubmitted it. The revised plan meets the requirements and is acceptable. |

[Appendix B — 1]

BLM_0036978

| RG 3.8 | Preparation of Environmental Reports for Uranium Mills, 1982 | Provides additional information on what should be in the ER. This is important since and EIS is not required, this report details what quantitative data are expected. | Since NUREG-1748 provides more recent and more detailed input, EF used it as well as RG 3.8 in scoping and conducting the ER. |
| --- | --- | --- | --- |
| RG 3.11 | Design, Construction, And Inspection Of Embankment Retention Systems At Uranium Recovery Facilities, 2008 | This RG is a result of past practices where mill tailings were used to construct tailings dams (some of which failed). None of the embankments at EF will be of this type. | The embankments at Piñon Ridge are highly engineered and do not have the inherent weakness of earlier tailings dams. Used as a basis for QA/QC testing. Daily inspections are still required of the tailings systems, including the piping used to transfer tailings from the mill to the impoundments. |
| RG 3.51 | Calculational Models For Estimating Radiation Doses To Man From Airborne Radioactive Materials Resulting From Uranium Milling Operations, 1982 | Used to verify parameters in the MILDOSE-AREA model. | These formulas are incorporated into MILDOSE-AREA, which is used to calculate dose to the public. See Vol. 11, Radiation Doses to the Public |

BLM_0036979

| RG 3.56 | General Guidance For Designing, Testing, Operating, And Maintaining Emission Control Devices At Uranium Mills, 1986 | The earlier generation of uranium mills had numerous point source emissions that contributed to public dose. Many of those emission points have been removed at Piñon Ridge. Remaining points have bag houses or scrubbers. | Basic requirements for testing of bag houses and scrubbers is included. Technology has advanced since this RG was published. Current standards of care are used at Piñon Ridge for emissions control devices. See APCD APENS permit for additional information. |
| RG 3.59 | Methods For Estimating Radioactive And<br><br>Toxic Airborne Source Terms For Uranium Milling Operations, 1987 | Used for setting some of the parameters in MILDOSE-AREA. | Reductions in source term for ore piles since dust suppression is used. See Vol. 11, Radiation Doses to the Public |
| RG 3.63 | Onsite Meteorological Measurement Program For Uranium Recovery Facilities- Data Acquisition And Reporting, 1988 | Used for scoping, siting, and instrument selection for met towers. | NRC has updated guidance in RG 1.23 and EPA also has more current guidance, both of which were used at Piñon Ridge in addition to RG 3.63. EF meets or exceeds the requirements and has two fully-instrumented met towers at the site. |

[Appendix B — 3]

BLM_0036980

| | | | |
|---|---|---|---|
| RG 3.64 | Calculation of Radon Flux Attenuation by Earthen Uranium Mill Tailings Covers, 1989 | This is the basis for the RADON model used in calculating radon flux through the caps. | The model is now online.  This RG provides the technical basis for use. EF application meets or exceeds this guidance. |
| RG 3.65 | Standard Format and Content of Decommissioning Plans for Materials Licensees, 2008 | Not specific to uranium recovery, but provides guidance of format and content.  Takes the reader to the NUREG-1757 series. | Used in part to develop the draft plan in the application.  See Vol. 13, Decommissioning Plan. |
| RG 3.66 | Standard Format and Content of Financial Assurance Mechanisms, 2008 | Describes what types of financial instruments are acceptable to NRC for surety. | Colorado has its own restrictions on instruments in Part 3.9.6 of the Regulations. |
| DG-4018 | Constraint on Releases of Airborne Radioactive Materials to the Environment for Licensees other than Power Reactors, 2010 | Provides methodology for showing compliance to dose constraint in Part 4.5.4. Updates old RG 4.20. | This constraint is also demonstrated through MILDOSE-AREA. See Vol. 11, Radiation Doses to the Public |

[Appendix B — 4]

BLM_0036981

| RG 4.14 | Radiological Effluent and Environmental Monitoring at Uranium Mills, 1980 | Basic guidance for air, water and soil monitoring at uranium recovery sites. | EF has exceeded the basic requirements in this guide in the application for baseline measurements. Operational measurements will also meet or exceed this guidance. |
|---|---|---|---|
| RG 4.15 | Quality Assurance For Radiological Monitoring Programs (Inception Through Normal Operations To License Termination) - Effluent Streams And The Environment, 2006 | Discusses QA/QC approaches and references the MARLAP.  Good overview and reference list. | EF has extensive QA/QC programs planned for the mill.  Their program will meet these requirements on data quality. |
| RG 4.21 | Minimization of Contamination and Radioactive Waste Generation:  Life-Cycle Planning, 2008 | Provides a major shift in NRC guidance from past uranium operations where the subsurface was not characterized until near closure, which resulted in inadequate surety at many locations.  See SECY-03-069 for more discussion. | Used in the design of the mill to mitigate leaks and monitor for chronic releases.  This is a major advance over old uranium mills; facility designed with secondary containment and monitors.  See Vol. 12, Operational Monitoring Plan and Material Containment Plan, as update by the RFIs. |

BLM_0036982

| DG-8035 | Administrative Practices In Radiation Surveys And Monitoring, 2010 | Gives very basic guidance on minimum requirements for administration of a radiation management program. | EF has adopted a comprehensive survey and monitoring program (based on Cotter Cañon City mill procedures) as part of the H&S procedures.  It is acceptable to the Department. |
| --- | --- | --- | --- |
| RG 8.7 | Instructions for Recording and Reporting Occupational Radiation Exposure Data, 2005 | Discusses what measurements and forms to use. Basic requirements. | Reflected in H&S Procedures. |
| RG 8.9 | Acceptable Concepts, Models, Equations, and Assumptions for a Bioassay Program, 1993 | Bioassay is a qualitative process.  This document provides basic assumptions that can be used as part of a bioassay program. | Used to compile the EF Bioassay procedure, which is based on Cotter Cañon City mill procedures. |

[Appendix B — 6]

BLM_0036983

| RG 8.10 | Operating Philosophy for Maintaining Occupational Radiation Exposures as Low as Is Reasonably Achievable, 1977 | This RG predates the regulatory requirement for ALARA. Provides basic administrative requirements. | These requirements are fulfilled by the Admin procedures and the ALARA Program. Doses at uranium recovery facilities have come down considerably since the adoption of the ALARA concept. EF has an administrative dose limit of 100 mrem/y that they will strive to meet that is a fraction of the regulatory requirements. |
| --- | --- | --- | --- |
| RG 8.11 | Applications of Bioassay for Uranium, 1974 | Provides examples of how to calculate exposure and dose through bioassay. | Background document used to design the bioassay programs at UR facilities. |
| RG 8.13 | Instruction Concerning Prenatal Radiation Exposure, 1999 | Declared pregnant workers are subject to increased monitoring and lower dose during pregnancy. | EF procedures adopt this protocol. Reflected in H&S Procedures. |
| RG 8.15 | Acceptable Programs for Respiratory Protection, 1999 | Outlines basic requirements for a respiratory protection program, along with NUREG-1400. | EF procedures follow this protocol. Reflected in H&S Procedures. |

[Appendix B — 7]

BLM_0036984

| RG 8.22 | Bioassay at Uranium Mills, 1988 | Provides specific information relative to uranium bioassay at mills. | EF procedures follow this protocol. Reflected in H&S Procedures. |
|---|---|---|---|
| RG 8.25 | Air Sampling in the Workplace, 1992 | Provides minimum requirements for general air samples as well as breathing zone samplers. | EF procedures follow this protocol. Reflected in H&S Procedures. |
| RG 8.29 | Instruction Concerning Risks from Occupational Radiation Exposure, 1999 | Provides basic guidance for a training program for radiation workers. | EF procedures follow this protocol. Reflected in H&S Procedures. |
| RG 8.30 | Health Physics Surveys in Uranium Recovery Facilities, 2002 | Provides basic requirements for radiation surveys at uranium recovery facilities. Scheduled to be updated in 2011. | EF procedures follow this protocol. Reflected in H&S Procedures. Note that EF goes beyond this guidance in tracking solubility of uranium. |
| RG 8.31 | Information Relevant to Ensuring that Occupational Radiation Exposures at Uranium Recovery Facilities Will Be as Low as Is Reasonably Achievable, 2002 | Used in putting together the ALARA program. Goes beyond general requirements in RG 8.10. Focus on airborne and whole body exposure. | EF procedures follow this protocol. Reflected in H&S Procedures. |

[Appendix B — 8]

| RG 8.36 | Radiation Dose to the Embryo/Fetus, 1992 | Declared pregnant workers are subject to increased monitoring and lower dose during pregnancy. | EF procedures follow this protocol. Reflected in H&S Procedures. |
| RG 8.37 | ALARA Levels For Effluents From Materials Facilities, 1993 | Basic guidance for liquid and gaseous effluents. Incorporates ALARA requirements. | EF procedures follow this protocol. Reflected in H&S Procedures. Also see Vol. 12<br><br>Operational Monitoring Program |

NUREG Documents Germane to the Energy Fuels Application

| NUREG Number | NUREG Name | Applicability | Comment |
| --- | --- | --- | --- |
| NUREG-0706 | Final Generic Environmental Impact Statement on Uranium Milling, 1980 | Provided the technical basis for 10 CFR 40 regulations. | Portions of this NUREG are no longer relevant. |
| NUREG-0859 | Compliance Determination Procedures for Environmental Radiation Protection Standards for Uranium Recovery Facilities, 40 CFR 190 | Provided early guidance on how to meet compliance with the Part 190 standards. Predictive modeling used for new applications and references RG 3.51 | Not available electronically anymore.<br><br>MILDOS-AREA used to show compliance with Part 190 limits.<br><br>See Vol. 11, Estimates of Radiation Doses to Members of the Public |

[Appendix B — 9]

BLM_0036986

| NUREG-1400 | Air Sampling in the Workplace | Technical basis for locating samplers and choosing types of samplers. | Used as a technical basis for SOPs. |
|---|---|---|---|
| NUREG-1507 | Minimum Detectable Concentrations With Typical Survey Instruments for Various Field Contaminants and Field Conditions | Provides data and formulas for estimating and quantifying instrument and source efficiencies and conversion formulas. | Used as a technical basis for the SOPs. |
| NUREG-1757 | Consolidated Decommissioning Guidance | Used as a basis for designing the reclamation plan. Also has guidance on financial assurance instruments. | Three Volumes. Used for review of the reclamation plan. |
| NUREG-1748 | Environmental Review Guidance for Licensing Actions Associated with NMSS Programs | While not directly applicable at EF, it provides more detail than RG 3.8. | EF has provided a cross-walk list that is very helpful in finding the various components in the application. |
| NUREG-1736 | Consolidated Guidance: 10 CFR Part 20 - Standards for Protection Against Radiation | Basic and generic information on license application requirements. | Used as part of technical review, e.g., qualification of authorized users. |
| NUREG-1620 | Standard Review Plan for the Review of a Reclamation Plan for Mill Tailings Sites Under Title II of the Uranium Mill Tailings Radiation | Very important document relating to technical review of the liner and cap system. | Used extensively by CDPHE staff in its review. |

[Appendix B — 10]

BLM_0036987

|  | Control Act of 1978 |  |  |
|---|---|---|---|
| NUREG-1576 | Multi-Agency Radiological Laboratory Analytical Protocols Manual | Provides guidance on selecting laboratories and analytical methods. | Considered in the application; will be used going forward. |
| NUREG-1575 | Multi-Agency Radiation Survey and Site Investigation Manual (MARSSIM) | Provides guidance on gathering information and conducting radiation surveys for cleanup and release at closure. | Will be used in the final reclamation plans at closure (as amended over time).  Also includes a link to the MARSAME manual. |
| NUREG-1501 | Background as a Residual Radioactivity Criterion for Decommissioning: Appendix A to the Draft Generic Environmental Impact Statement in Support of Rulemaking on Radiological Criteria for Decommissioning of NRC-Licensed Nuclear Facilities | Provides a good primer on background radioactivity in the environment. | Used as background information during the application review of the baseline radiation assessment in Vol. 9. |
| NUREG/CR-0041 | Manual of Respiratory Protection Against Radioactive Material, 2001 | Technical basis for choosing types of respiratory protection. | Used as a technical basis for SOPs. |
| NUREG/CR-1610 | Alternative Conceptual Models for Assessing Food- | Provides background on pathway parameters | Background information only. |

[Appendix B — 11]

BLM_0036988

| | Chain Pathways in Biosphere Models | used in modeling. | |
|---|---|---|---|
| NUREG/CR-3332 | Radiological Assessment | Provides basis and description of radiological assessment of the environment and receptors. Industry standard document. | Used in evaluating the Estimating Radiation Doses to Members of the Public from the Piñon Ridge Mill, Radiological Pathways Report and Risk Assessment in Vol. 11 as amended by responses to the RFIs. |
| NUREG/CR-4088 | Methods for Estimating Radioactive and Toxic Source Terms for Uranium Milling Operations | Provides historical and background information in support of RG 3.51 and MILDOSE. Somewhat outdated by newer technologies. Also note that EF has no crushers or calciners. | Used in the review of the MILDOSE modeling in Vol. 11 Estimating Radiation Doses to Members of the Public from the Piñon Ridge Mill |
| NUREG/CR-6705 | Historical Case Assessment of Uranium Plume Attenuation | This series of NUREGs presents recent findings of research and was used as background in the review to verify that assumptions in the models are reasonable. | Used as background in the review of the modeling. Since there is no credible groundwater pathway and surface water is not released from the site, they are mostly informational. |
| NUREG/CR-6820 | Application of Surface | | |

[Appendix B — 12]

BLM_0036989

|  | Complexation Modeling to Describe Uranium (VI) Adsorption and Retardation at the Uranium Mill Tailings Site at Naturita, Colorado |  |  |
|---|---|---|---|
| NUREG/CR-6821 | Solubility and Leaching of Radionuclides in Site Decommissioning Management Plan (SDMP) Soil and Ponded Wastes |  |  |
| NUREG/CR-6898 | A Combined Analytical Study to Characterize Uranium Soil and Sediment Contamination: The Case of the Naturita UMTRA Site and the Role of Grain Coatings |  |  |
| NUREG/CR-6911 | Tests of Uranium (VI) Adsorption Models in a Field Setting |  |  |
| NUREG/CR-6941 | Soil-to-Plant Concentration Ratios for Assessing Food Chain Pathways in Biosphere Models |  |  |

[Appendix B — 13]

BLM_0036990

# Appendix C

[Appendix C]

BLM_0036991

# Appendix C: Radiation Regulations Germane to the Application

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| 1.9.1 | The Department may, by rule, regulation, or order, impose upon any licensee or registrant such requirements in addition to those established in these regulations, as it deems appropriate or necessary to minimize danger to public health and safety or property. | N/A | License conditions address site-specific requirements. |
| 1.10.4 | Submittal of false information shall be sufficient basis for rejecting or revoking any Department license, registration, certification or other acceptance, approval or permit. | N/A | All submittals appear to be based on good faith efforts and due diligence. |
| 3.8.2 | The Department may at any time after the filing of the original application, and before the expiration of the license, require further statements in order to enable the Department to determine whether the application should be granted or denied or whether a license should be modified or revoked. | Numerous | Four additional requests for information were made. They are posted on the Department web site. |
| 3.8.7.1 | An application for a license, or to amend or renew an existing | Environmental Report | Timely filed and the ER has been provided. |

[Appendix C — 1]

BLM_0036992

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | license, for (1) source material milling… shall be filed with the Department at least nine (9) months prior to the anticipated commencement of construction of the plant or facility in which the activity will be conducted and shall be accompanied by the environmental report required by 3.8.8, unless an exemption from the requirement of furnishing such a report has been obtained from the Department. | | |
| 3.8.7.2 | No construction shall be commenced until the license has been issued. | N/A (see 3.8.7.3 for further clarification) | NRC is reviewing this provision, no radioactive materials can be brought on site until the license has been issued (and the bond is in place). |
| 3.8.8.1 | In the case of an application for a license, or to amend or renew an existing license, for (1) source material milling… the applicant shall submit all information required under these regulations and such other material as the Department may deem necessary. | Application and response to requests for additional information. | They are posted on the Department web site. |
| | (1) Such information shall include the environmental report and other information required by 3.8.8.2 to be | Environmental Report and response to requests for additional information. | They are posted on the Department web site. |

[Appendix C — 2]

BLM_0036993

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | submitted to assist the Department in the evaluation of the short-term and long-range environmental impact of the project and activity so that the Department may weigh environmental, economic, technical, and other benefits against environmental costs, while considering available alternatives. | | |
| 3.8.8.2 | An environmental report shall be required of the applicant and shall contain all information deemed necessary by the Department as authorized by the Act. | Environmental Report | Can be viewed on the Department's web site. |
| | (1) Upon receipt of the environmental report or any amendment thereto, and of any other documents required, the Department shall determine the necessity to transmit and, if appropriate, shall transmit the same for review and comment to Federal, State, and local agencies having expertise in and jurisdiction over the proposed project and activity. | Environmental Report | CDPHE reached out to CDOW, CDOT, DOLA, CHP for comment. There is no federal nexus. |
| | (2) Written comments and reports of reviewing agencies shall be considered by the Department in its | N/A | Comments were considered and incorporated into the final EA. |

[Appendix C — 3]

BLM_0036994

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | decision-making review process on the license application request. | | |
| | (4) The Department shall consider applicable regulations of Federal, State, and local regulatory agencies and permit requirements thereof. | N/A | No federal nexus, however the most conservative criteria are used when there is a conflict. |
| 3.9 | General Requirements for the Issuance of Specific Licenses. A license application will be approved if the Department determines that: | | |
| 3.9.1 | The applicant is qualified by reason of training and experience to use the material in question for the purpose requested in accordance with these regulations in such a manner as to minimize danger to public health and safety or property; | Vol. 1 Revised Main application | Licensee has numerous staff with experience in uranium recovery. |
| 3.9.2 | The applicant's proposed equipment, facilities, and procedures are adequate to minimize danger to public health and safety or property; | Vol. 1 Revised Main application Vol. 11 Radiological Health and Safety Procedures. Revisions to SOPS | Facility design is state of the practice, design minimizes effluents, procedures partially based on update to Cotter Cañon City mill procedures. |
| 3.9.3 | The issuance of the license will not be inimical to the health and safety of the public; | This report. | The Department review of the application and additional information leads us to the conclusion that issuance will not be inimical to the health and safety of the public. |

[Appendix C — 4]

BLM_0036995

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| 3.9.5 | The applicant has established Department-approved financial assurance warranties in accordance with the following requirements. | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| 3.9.5.1 | A signed executed original copy of each warranty required by this part shall be furnished to and approved by the Department prior to the issuance of a new license, or any amendment or renewal of an existing license. | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| 3.9.5.2 | The Department may require any licensee to furnish a decommissioning warranty in a dollar amount determined by the agency as necessary to protect public health and safety, to ensure corrective action during operation, to ensure decontamination and decommissioning of a facility and disposal of radioactive materials in the event of abandonment, default or inability of the licensee to meet the requirements of the Act, these regulations, or the license. | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| 3.9.5.3 | The following specific licensees are required to furnish decommissioning warranties: | | |

[Appendix C — 5]

BLM_0036996

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | (6) Source material milling licensees; | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| 3.9.5.5 | The amount of funds to be provided by such decommissioning warranties shall be based on Department-approved cost estimates and shall: | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| | (1) Include the disposal of radioactive materials; | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| | (2) Include decontamination and decommissioning of buildings, facilities and the site to levels which would allow unrestricted use of these areas upon decommissioning; | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| | (3) Include the reclamation of tailings and/or waste disposal areas in accordance with technical criteria delineated in Parts 3, 4 and/or 18, as appropriate; | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| | (4) Take into account total costs that would be incurred if an independent contractor were hired to dispose of radioactive materials and perform decontamination, decommissioning, and reclamation work, including: | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| | (a) The cost of removal | Vol. 13 | Licensee commits to |

[Appendix C — 6]

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | and/or disposal of radioactive material, or a radioactivity-inducing machine, which is or would be generated, stored, processed or otherwise present at the facility or site; and | Decommissioning and Reclamation Cost Estimate | surety, and must be in place prior to construction. |
| | (b) The probable extent of contamination through the possession or use of radioactive material, at or adjacent to the facility or site, and the probable cost of removal of such contamination; and | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| | (5) Include reasonable administrative costs, including indirect costs, incurred by the Department in conducting or overseeing the decontamination, decommissioning, and disposal activities, and to cover the Department's reasonable attorney costs that may be incurred in successfully revoking, foreclosing, or realizing the decommissioning warranties established by the licensee in accordance with Part 3. | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| 3.9.5.10 | In addition to the decommissioning warranty required by 3.9.5.2, the Department | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |

[Appendix C — 7]

BLM_0036998

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | may require any licensee to provide a long-term care warranty if the licensed facility will remain a disposal site for radioactive materials subsequent to the termination of the license, or the license will be terminated using criteria in 4.61.3 or 4.61.4. | | |
| | (1) Except as provided in 3.9.5.10(2), the following specific licensees are required to provide long-term care warranties: | | Additional detail in the regulations pertaining to surety. |
| | (c) Source material milling licensees; | | |
| 3.9.6 | Decommissioning Funding Plan Required. | Vol. 13 Decommissioning and Reclamation Cost Estimate | Licensee commits to surety, and must be in place prior to construction. |
| 3.9.7 | In the case of an application for a license for (1) source material milling... the Department has concluded that the action called for is the issuance of the proposed license with any appropriate conditions to protect environmental values. Such determination shall be made before commencement of construction of the plant or facility in which the activity will be conducted and based on information filed and | This document | See license. |

[Appendix C — 8]

BLM_0036999

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | evaluation made pursuant to 3.8.8. | | |
| 3.9.8 | Commencement of construction prior to the issuance of a license, or of an amendment or renewal thereof, or of an exemption under the requirements of 3.8.7, may be grounds for denial of such license, amendment or renewal; | N/A | No construction until license and surety are in place. |
| 3.10 | Additional Requirements for Issuance of Specific Licenses for Use Of Unsealed Radioactive Material. In addition to the requirements set forth in 3.9, applicants for licenses authorizing the possession and use of unsealed radioactive materials shall include in the application a description of the facility and procedures for operation which | Vol. 1 design. Vol. 12.  Ops Plan | Adequate |
| 3.10.1 | Minimize to the extent practicable, contamination of the facility and environment; | Vol. 1 design Vol. 12, Material Containment Plan, SPCC Plan | Secondary containment and double-lined piping throughout. |
| 3.10.2 | Facilitate eventual decommissioning; and | Vol. 1 design | |
| 3.10.3 | Minimize, to the extent practicable, the generation of radioactive waste. | Vol. 1 design | Raffinate treatment and recycling |
| 3.14 | Upon a determination that an application meets the requirements | License | License |

[Appendix C — 9]

BLM_0037000

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | of the Act and the regulations of the Department, the Department will issue a specific license authorizing the proposed activity in such form and containing such conditions and limitations as it deems appropriate or necessary. | | |
| 3.14.2 | The Department may incorporate in any license at the time of issuance, or thereafter by appropriate rule, regulation, or order, such additional requirements and conditions with respect to the licensee's receipt, possession, use, and transfer of radioactive material subject to this part, as it deems appropriate or necessary in order to: | N/A | License |
| 3.14.2.1 | Minimize danger to public health and safety or property; | N/A | License |
| 3.14.2.2 | Require such reports and the keeping of such records, and to provide for such inspections of activities under the license as may be appropriate or necessary; and | N/A | License |
| 3.14.2.3 | Prevent loss or theft of material subject to this part. | N/A | License |
| 3.16.4 | Decommissioning Plan. | Vol. 13 | Living document that |

[Appendix C — 10]

BLM_0037001

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | | Decommissioning Plan. Decommissioning cost estimate. | will be updated over time based on conditions and changes in regulatory requirements. |
| 3.16.4.1 | A licensee must submit a decommissioning plan: if the licensee intends to terminate the license using radiological criteria specified in 4.61.3 or 4.61.4 (the exemption of 4.61.1.1 applies); if required otherwise by these regulations; if required by license condition; or if the procedures and activities necessary to carry out decommissioning of the site or separate building or outdoor area have not been previously approved by the Department and these procedures could increase potential health and safety impacts to workers or to the public, such as in any of the following cases: | Vol. 13 Decommissioning Plan | Cleanup standards are in Part 18, but Decommissioning Plan still required per Part 18. |
| | (1) Procedures would involve techniques not applied routinely during cleanup or maintenance operations; | | Not anticipated |
| | (2) Workers would be entering areas not normally occupied where surface contamination and radiation levels are | | Confined spaces, etc. |

[Appendix C — 11]

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | significantly higher than routinely encountered during operation; | | |
| | (3) Procedures could result in significantly greater airborne concentrations of radioactive materials than are present during operation; or | | Dust suppression will be used throughout. |
| | (4) Procedures could result in significantly greater releases of radioactive material to the environment than those associated with operation. | | Not anticipated. |
| 3.16.4.2 | Procedures such as those listed in 3.16.4.1 of this section with potential health and safety impacts may not be carried out prior to Department approval of the decommissioning plan. | | H&S/ALARA evaluations  integral part of plan review. |
| 3.16.4.3 | The decommissioning plan for the site or separate building or outdoor area must include: | | |
| | (1) A description of the conditions of the site, separate buildings, and/or outdoor areas sufficient to evaluate the acceptability of the plan; | Vol. 13. Decommissioning Plan. | Makes conservative assumptions since the site not yet built. |
| | (2) A description of planned decommissioning activities and a schedule | Vol. 13. Decommissioning and Reclamation Cost Estimate | Cost estimate well documented. |

[Appendix C — 12]

BLM_0037003

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | for completion; | | |
| | (3) A description of methods used to ensure protection of workers and the environment against radiation hazards during decommissioning; | Vol. 13. Decommissioning Plan. | Commits to safe and ALARA practices. |
| | (4) A description of the planned final radiation survey; | Vol. 13. Decommissioning Plan. | This is lacking, there is a general description, but not much on detail. |
| | (5) A current detailed cost estimate for decommissioning, comparison of that estimate with present funds set aside for decommissioning, and a plan for assuring the availability of adequate funds for completion of decommissioning; and | Vol. 13. Decommissioning and Reclamation Cost Estimate | Cost estimate well documented, application is lacking on decommissioning funding plan. |
| | (6) A description of the intended final condition of the site, separate buildings, and/or outdoor areas upon completion of decommissioning activities. | Decommissioning Plan. | Commits to restoration in plan |
| 3.16.4.4 | For decommissioning plans calling for completion of decommissioning later than 24 months after plan approval, the plan shall include a justification for the decommissioning schedule which addresses the following: | Vol. 13. Decommissioning and Reclamation Cost Estimate | Gantt chart shows more than 2 years due to settlement time. |
| | (1) Whether it is | Vol. 13. | Will depend on |

[Appendix C — 13]

BLM_0037004

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | technically feasible to complete decommissioning within a 24-month period; | Decommissioning and Reclamation Cost Estimate | dewatering/settlement of tailings cells. |
| | (5) Other site-specific factors which the Department may consider appropriate on a case-by-case basis, such as the regulatory requirements of other government agencies, lawsuits, ground-water treatment activities, monitored natural groundwater restoration, actions that could result in more environmental harm than deferred cleanup, and other factors beyond the control of the licensee. | Vol. 13. Decommissioning and Reclamation Cost Estimate | Department reserves this right. |
| 3.16.5.2 | Information considered important to decommissioning includes: | | |
| | (1) Records of spills or other unusual occurrences involving the spread of contamination in and around the facility, equipment, or site. These records may be limited to instances when contamination remains after any cleanup procedures or when there is reasonable likelihood that contaminants may have spread to inaccessible areas as in the case of possible seepage into | Vol. 12. Operational Monitoring Plan Vol. 13 SPCC | Records will be reviewed at least annually upon inspection. |

[Appendix C — 14]

BLM_0037005

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
|  | porous materials such as concrete. These records must include any known information on identification of involved nuclides, quantities, forms and concentrations. |  |  |
|  | (2) As-built drawings and modifications of structures and equipment in restricted areas where radioactive materials are used and/or stored, and of locations of possible inaccessible contamination such as buried pipes which may be subject to contamination. If required drawings are referenced, each relevant document needs to be indexed individually. If drawings are not available, the licensee shall substitute appropriate records of available information concerning these areas and locations. | Vol. 1 Basic Engineering Report Vol. 2. Ore Stockpile Pad Design. Vol. 3 Facility Operations Plan | Also will be in Department GIS data system |
| 3.17 | Renewal of Licenses. |  |  |
| 3.17.2 | In any case in which a licensee, not less than 30 days prior to expiration of his existing license, has filed an application in proper form for renewal or for a new license authorizing the same activities, such existing | N/A | Describes "timely renewal," which is often the case for uranium recovery license renewals. |

[Appendix C — 15]

BLM_0037006

| Citation | Requirement | Locations in application | Comment |
|----------|-------------|--------------------------|---------|
|  | license shall not expire until final action by the Department. |  |  |
| 3.18 | Amendment of Licenses at Request of Licensee. Applications for amendment of a license shall be filed in accordance with 3.8 and shall specify the respects in which the licensee desires the license to be amended and the grounds for such amendment. | N/A | Process |
| 3.23 | Modification and Revocation of Licenses. |  |  |
| 3.23.1 | The terms and conditions of all licenses shall be subject to amendment, revision, or modification or the license may be suspended or revoked by reason of amendments to the Act, or by reason of rules, regulations, and orders issued by the Department. | N/A | The Department has flexibility to react to new information or as a result of an incident. |
| 3.23.2 | Any license may be revoked, suspended, or modified, in whole or in part, for any material false statement in the application or any statement of fact required under provisions of the Act, or because of conditions revealed by such application or statement of fact or any report, record, or inspection or | N/A | All submittals appear truthful and due diligence appears to have been applied. |

[Appendix C — 16]

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | other means which would warrant the Department to refuse to grant a license on an original application, or for violation of, or failure to observe any of the terms and conditions of the Act, or of the license, or of any rule, regulation, or order of the Department. | | |
| 3.23.3 | Except in cases of willfulness or those in which the public health, interest or safety requires otherwise, no license shall be modified, suspended, or revoked unless, prior to the institution of proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee in writing and the licensee shall have been accorded an opportunity to demonstrate or achieve compliance with all lawful requirements. | N/A | Process |
| | | | |
| 4.5 | Radiation Protection Programs. | | |
| 4.5.1 | Each licensee or registrant shall develop, document, and implement a radiation protection program sufficient to ensure compliance with the provisions of Part 4. See | Vol. 11 Mill Health and Safety Plan Vol. 12 Operational Monitoring Plan | Living documents that will be updated over time. |

[Appendix C — 17]

BLM_0037008

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | 4.41 for recordkeeping requirements relating to these programs. | | |
| 4.5.2 | The licensee or registrant shall use, to the extent practical, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as is reasonably achievable (ALARA). | Vol. 11 Mill Health and Safety Plan Vol. 12 Operational Monitoring Plan | |
| 4.5.3 | The licensee or registrant shall, at intervals not to exceed 12 months, review the radiation protection program content and implementation. | Vol. 11 Mill Health and Safety Plan | This is a routine inspection item, the ALARA committee activities address this requirement. |
| 4.5.4 | To implement the ALARA requirements of 4.5.2 and notwithstanding the requirements in 4.14 of this part, a constraint on air emissions of radioactive material to the environment, excluding radon-222 and its decay products, shall be established by licensees, such that the individual member of the public likely to receive the highest dose will not be expected to receive a total effective dose equivalent in excess of 0.1 milliSievert (10 | Vol. 11 Mill Health and Safety Plan Vol. 11 Estimates of Radiation Doses Vol. 12. Operational Monitoring Plan Vol. 12. Material Containment Plan | Dust control is imperative to meet this standard; tailings will have to be kept moist to avoid excursions. |

[Appendix C — 18]

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | mrem) per year from these emissions. If a licensee subject to this requirement exceeds this dose constraint, the licensee shall report such event as provided in 4.53.2 and promptly take appropriate corrective action to ensure against recurrence. | | |
| 4.6.1 | Occupational Dose Limits for Adults. The licensee or registrant shall control the occupational dose to individual adults, except for planned special exposures pursuant to 4.11, to the following dose limits: | Vol. 11 Mill Health and Safety Plan | ALARA Program results in doses a fraction of annual limits. |
| 4.6.1.1 | An annual limit, which is the more limiting of: | | |
| | (1) The total effective dose equivalent being equal to 0.05 Sv (5 rem); or | Vol. 11 Mill Health and Safety Plan | |
| | (2) The sum of the deep dose equivalent and the committed dose equivalent to any individual organ or tissue other than the lens of the eye being equal to 0.5 Sv (50 rem). | Vol. 11 Mill Health and Safety Plan | |
| 4.6.4 | Derived air concentration (DAC) and annual limit on intake (ALI) values are presented in Table 4B1 of Appendix 4B and may be used to | Vol. 11 Mill Health and Safety Plan | EFR has petitioned to use DCFs from ICRP 68, which is approved. |

[Appendix C — 19]

BLM_0037010

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | determine the individual's dose and to demonstrate compliance with the occupational dose limits. See 4.46. | | |
| 4.6.5 | Notwithstanding the annual dose limits, the licensee shall limit the soluble uranium intake by an individual to 10 milligrams in a week in consideration of chemical toxicity. See footnote 3 of Appendix 4B. | Vol. 11 Mill Health and Safety Plan | Bioassay program used to monitor this parameter. |
| 4.7.1 | If the licensee or registrant is required to monitor pursuant to both 4.18.1 and 4.18.2, the licensee or registrant shall demonstrate compliance with the dose limits by summing external and internal doses… The licensee or registrant may demonstrate compliance with the requirements for summation of external and internal doses pursuant to 4.7.2, 4.7.3 and 4.7.4. | Vol. 11 Mill Health and Safety Plan | Dose limits are total effective dose equivalent (TEDE) so internal and external must be monitored. |
| 4.9.1 | For purposes of assessing dose used to determine compliance with occupational dose equivalent limits, the licensee or registrant shall, when required pursuant to 4.18, take suitable and timely measurements of: | Vol. 11 Mill Health and Safety Plan | Licensee has a program that requires all pertinent measurements to be made. |
| 4.9.1.1 | Concentrations of | Vol. 11 | Standard Operating |

[Appendix C — 20]

BLM_0037011

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | radioactive materials in air in work areas; or | Mill Health and Safety Plan | Procedures (SOPs) for general air and BZ samplers |
| 4.9.1.2 | Quantities of radionuclides in the body; or | Vol. 11 Mill Health and Safety Plan | SOP for whole body program |
| 4.9.1.3 | Quantities of radionuclides excreted from the body; or | Vol. 11 Mill Health and Safety Plan | SOP for bioassay program |
| 4.9.1.4 | Combinations of 4.9.1.1, 4.9.1.2 and 4.9.1.3. | Vol. 11 Mill Health and Safety Plan | Dose is calculated based primarily on direct gamma and inhalation and ingestion. |
| 4.9.2 | Unless respiratory protective equipment is used, as provided in 4.24, or the assessment of intake is based on bioassays, the licensee or registrant shall assume that an individual inhales radioactive material at the airborne concentration in which the individual is present. | Vol. 11 Mill Health and Safety Plan | Dose calculation procedure. |
| 4.9.3 | When specific information on the physical and biochemical properties of the radionuclides taken into the body or the behavior of the material in an individual is known, the licensee or registrant may: | In process. Vol.3 Ecological Screening of Raffinate Material Vol.1 License Application | This is common for uranium recovery projects where there is a known combination(s) of uranium series isotopes. |
| 4.9.3.1 | Use that information to calculate the committed effective dose equivalent, and, if used, the licensee or registrant shall document that information in the individual's record; and | Not specifically requested in application. | This is usually reserved for an incident or non-normal intake. |

[Appendix C — 21]

BLM_0037012

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| 4.9.3.2 | Upon prior approval of the Department, adjust the DAC or ALI values to reflect the actual physical and chemical characteristics of airborne radioactive material, for example, aerosol size distribution or density; and | Vol. 11 Mill Health and Safety Plan | The applicant petitioned the Department in their response to RFI 2 that they would like to calculate a site-specific DAC. |
| 4.9.3.3 | Separately assess the contribution of fractional intakes of Class D, W, or Y compounds of a given radionuclide to the committed effective dose equivalent. | Vol. 11 Mill Health and Safety Plan | The procedures call for this even though the NRC guidance has not been updated yet. |
| 4.13.1 | The licensee or registrant shall ensure that the dose equivalent to an embryo/fetus during the entire pregnancy, due to the occupational exposure of a declared pregnant woman, does not exceed 5 mSv (0.5 rem). See 4.46 for recordkeeping requirements. | Vol. 11 Mill Health and Safety Plan | Standard |
| 4.14 | Dose Limits for Individual Members of the Public. | | |
| 4.14.1 | Each licensee or registrant shall conduct operations so that: | | |
| 4.14.1.1 | The total effective dose equivalent to individual members of the public from the licensed or registered operation does not exceed 1 milliSievert (0.1 rem) in a year, | | |

[Appendix C — 22]

BLM_0037013

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | exclusive of the dose contributions from background radiation, from any medical administration the individual has received, from exposure to individuals administered radioactive material and released in accordance with 7.26, from voluntary participation in medical research programs, and from the dose contribution from the licensee's or registrant's disposal of radioactive material into sanitary sewerage in accordance with 4.35, and | | |
| 4.14.4 | In addition to the requirements of Part 4, a licensee or registrant subject to the provisions of the U.S. Environmental Protection Agency's generally applicable environmental radiation standards in 40 CFR 190 (July 1, 2004) shall comply with those standards. | Vol. 12 Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill. | These are the organ doses that are also required by Appendix A of Part 18. |
| 4.15.1 | The licensee or registrant shall make or cause to be made surveys of radiation levels in unrestricted areas and radioactive materials in effluents released to unrestricted areas to demonstrate compliance with the | Vol. 11 Mill Health and Safety Plan Vol.12 Operational Monitoring Plan | Air, water and soil samples collected on a regular basis. |

[Appendix C — 23]

BLM_0037014

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | dose limits for individual members of the public in 4.14. | | |
| 4.17.1 | Each licensee or registrant shall make, or cause to be made, surveys that: | | |
| 4.17.1.1 | Are necessary for the licensee or registrant to comply with Part 4; and | Vol. 11 Mill Health and Safety Plan Vol.12 Operational Monitoring Plan | Surveys and measurements on an ongoing and routine basis. |
| 4.17.1.2 | Are necessary under the circumstances to evaluate: | | |
| | (1) The magnitude and extent of radiation levels; and (2) Concentrations or quantities of radioactive material; and (3) The potential radiological hazards. | Vol. 11 Mill Health and Safety Plan Vol.12 Operational Monitoring Plan | This includes environmental sampling of biota, etc. |
| 4.17.2 | The licensee or registrant shall ensure that instruments and equipment used for quantitative radiation measurements, for example, dose rate and effluent monitoring, are calibrated at intervals not to exceed 12 months for the radiation measured unless otherwise noted in these regulations. | Vol. 1. License Application Vol. 12 Operational Monitoring Program | |
| 4.22 | The licensee shall use, to the extent practical, process or other engineering controls, such as containment, | Vol. 11 Mill Health and Safety Plan Vol. 12 Operational | Bag houses and scrubbers used to limit effluents. |

[Appendix C — 24]

BLM_0037015

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
|  | decontamination or ventilation, to control the concentrations of radioactive material in air. | Monitoring Program |  |
| 10.3.1 | All individuals who in the course of employment are likely to receive in a year an occupational dose (see also 10.3.2) in excess of 1 milliSievert (100 mrem) shall be: | Vol. 11 Mill Health and Safety Plan | These requirements are all elements of the training program. |
| 10.3.1.1 | Kept informed of the storage, transfer, or use of sources of radiation; | Vol. 11 Mill Health and Safety Plan |  |
| 10.3.1.2 | Instructed in the health protection problems associated with exposure to radiation and/or radioactive material to the individual and potential offspring, in precautions or procedures to minimize exposure, and in the purposes and functions of protective devices employed; | Vol. 11 Mill Health and Safety Plan |  |
| 10.3.1.3 | Instructed in, and required to observe, to the extent within the worker's control, the applicable provisions of these regulations and licenses for the protection of personnel from exposures to radiation or radioactive material; | Vol. 11 Mill Health and Safety Plan |  |
| 10.3.1.4 | Instructed of their responsibility to report promptly to the licensee or registrant any | Vol. 11 Mill Health and Safety Plan |  |

[Appendix C — 25]

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| | condition which may constitute, lead to, or cause a violation of the Act, these regulations, and licenses or registrations, or unnecessary exposure to radiation and/or radioactive material; | | |
| 10.3.1.5 | Instructed in the appropriate response to warnings made in the event of any unusual occurrence or malfunction that may involve exposure to radiation and/or radioactive material; and | Vol. 11 Mill Health and Safety Plan | |
| 10.3.1.6 | Advised as to the radiation exposure reports which workers shall be furnished pursuant to 10.4. | Vol. 11 Mill Health and Safety Plan | |
| 10.5.1 | Each licensee or registrant shall afford to the Department at all reasonable times opportunity to inspect materials, machines, activities, facilities, premises, and records pursuant to these regulations. | Not in application | Policy – this allows for the Department to make unannounced inspections. |
| 17.5.1 | Each licensee who transports licensed material outside the site of usage, as specified in the Department license, or where transport is on public highways, or who delivers licensed material to a carrier for transport, shall: | Vol. 11 Mill Health and Safety Plan | |

[Appendix C — 26]

BLM_0037017

| Citation | Requirement | Locations in application | Comment |
|---|---|---|---|
| 17.5.1.1 | Comply with the applicable requirements, appropriate to the mode of transport, of the regulations of the DOT, particularly the regulations of the DOT in the following areas: | Vol. 11 Mill Health and Safety Plan | This section mostly pertains to shipping of yellowcake from the mill.  The mines are responsible for shipping the ore to the mill. |
| | (1) Packaging - 49 CFR Part 173: Subparts A and B and I. (2) Marking and labeling - 49 CFR Part 172: Subpart D, §§ 172.400 through 172.407, §§ 172.436 through 172.441, and Subpart E. (3) Placarding - 49 CFR Part 172: Subpart F, especially §§ 172.500 through 172.519, 172.556, and Appendices B and C. (4) Accident reporting - 49 CFR Part 171: §§ 171.15 and 171.16. (5) Shipping papers and emergency information - 49 CFR Part 172: Subparts C and G. (6) Hazardous material employee training - 49 CFR Part 172: Subpart H. (7) Security plans - 49 CFR Part 172: Subpart I. (8) Hazardous material shipper/carrier registration - 49 CFR Part 107: Subpart G. | | |
| 18.3 | Special Requirements for Issuance of Specific | The Application plus the additional | The Department has determined that the |

[Appendix C — 27]

BLM_0037018