(3.7)  LB VOC / GAL COATING LESS WATER  x  1 GAL VOC x 100 / 7.36 LB VOC = (50) V0L% VOC

100 - (50) V0L% VOC = (50) V0L% SOLIDS

(3.7) LB VOC / GAL COATING LESS H2O  x  100 GAL COATING / (50) GAL SOLIDS   = (7.4) LB VOC / GAL SOLIDS

See "A Guideline For Surface Coating Calculations" EPA - 340/1-86-0l6 for additional examples.

The following table lists equivalent mass VOC/volume solids emission limits for various coating operations.

Equivalency Data for Surface Coating Processes

(VOC Density = 7.36 lb/gal)

| Industrial Finishing Categories | Lb VOC per Gallon Coating less water | Lb VOC per Gallon of Solids | Kg VOC per Liter of Solids |
|---|---|---|---|
| Can Industry | | | |
| Sheet Basecoat (Exterior and Interior) and over-varnish; two-piece can exterior (base-coat and over-varnish) | 2.8 | 4.5 | 0.55 |
| Two- and three-piece can interior body spray, two-piece can exterior end spray or roll coat | 4.2 | 9.8 | 1.19 |
| Three-piece can side-seam spray | 5.5 | 21.7 | 2.61 |
| End sealing compound | 3.7 | 7.4 | 0.88 |
| Any additional coats | 4.2 | 9.8 | 1.19 |
| Coil Coating | | | |
| Any coat | 2.6 | 4.0 | 0.48 |
| Fabric Coating | | | |
| Fabric coating line | 2.9 | 4.8 | 0.58 |
| Vinyl coating line | 3.8 | 7.9 | 0.93 |
| Paper Coating | | | |
| Coating line | 2.9 | 4.8 | 0.58 |

| Automotive and Light-Duty Truck Assembly Plant | | | |
|---|---|---|---|
| Primer (electrodeposition) application, flashoff area and oven | 1.9 | 2.6 | 0.31 |
| Topcoat application, flashoff area and oven | 2.8 | 4.5 | 0.55 |
| Final repair application, flashoff area and oven | 4.8 | 13.8 | 1.67 |
| Metal Furniture | | | |
| Coating line | 3.0 | 5.1 | 0.61 |
| Magnet Wire | | | |
| Wire coating operation | 1.7 | 2.2 | 0.26 |
| Large Appliances | | | |
| Prime, single, or topcoat application area, flashoff area and oven | 2.8 | 4.5 | 0.55 |
| Miscellaneous Metal Parts and Products | | | |
| Air-dried items | 3.5 | 6.7 | 0.80 |
| Clear-coated items | 4.3 | 10.3 | 1.25 |
| Extreme performance coatings | 3.5 | 6.7 | 0.80 |
| Other coatings and systems | 3.0 | 5.1 | 0.61 |
| Plastic Film Coating | | | |
| Plastic film coating line | 2.9 | 4.8 | 0.58 |

**Jim Zapert**

| | |
|---|---|
| **From:** | Susan Connell <susan@carterlakeconsulting.com> |
| **Sent:** | Tuesday, November 20, 2012 1:37 PM |
| **To:** | 'Jim Zapert' |
| **Subject:** | FW: Southwest Colorado Monitored Data Request |
| **Attachments:** | BLM UFO Management plan request.zip |

**From:** Malone, Emmett [mailto:emmett.malone@state.co.us]
**Sent:** Wednesday, October 10, 2012 10:25 AM
**To:** susan@carterlakeconsulting.com
**Cc:** Machovec', 'CHUCK; Chick, Nancy D.; doris.jung@state.co.us
**Subject:** Re: Southwest Colorado Monitored Data Request

Hello,

I have attached a zip fill that contains the annual wind roses for the the private sites West Elk Mine, Energy Fuels, and Olathe along with National Weather Services sites Telluride and Montrose. These wind roses are from a tool use in the meteorological determination process for AERMOD modeling. The wind rose for Olathe is a PDF from an old report. Nancy does not believe she has an electronic copy of this data. The zip file also contains the processed data for West Elk Mine, Energy Fuels, and Montrose. The Division does not have processed data for Telluride. The last time this data was looked at there were completeness issues with it.

The Energy Fuels site was previous called Naturita and the Naturita name is used for the wind roses. This site has 30 m and 10 m towers. The processed meteorological data for this site has been processed to create a profile. If this data is used in AERMOD modeling it should only be used for the portion of the valley that is west of the low point of the valley with high terrain to the west. The file naming convention used with the wind roses includes the years of data included in the wind rose. For example Montrose 23456.bmp means the years 2002, 2003, 2004, 2005, and 2006 were used to create the wind rose.

Note that if modeling was needed for many locations within the UFO boundaries a meteorological data set from outside of the UFO area would be used as it would be more representative than one of the data sets provide above. If you have any questions please contact me.

Emmett Malone
Air Quality Meteorologist
Modeling, Meteorology, and Emissions Inventory Unit
Technical Services Program
Air Pollution Control Division
Colorado Department of Public Health and Environment
APCD-TS-B1
4300 Cherry Creek Drive South
Denver, CO 80246-1530
303-692-3136| Emmett.Malone@state.co.us

BLM_0037284

On Tue, Oct 9, 2012 at 1:49 PM, Chick, Nancy <nancy.chick@state.co.us> wrote:


---------- Forwarded message ----------
From: **Susan Connell** <susan@carterlakeconsulting.com>
Date: Tue, Oct 9, 2012 at 12:58 PM
Subject: Southwest Colorado Monitored Data Request
To: "Chick, Nancy D." <Nancy.Chick@dphe.state.co.us>
Cc: Jim Zapert <jim@carterlakeconsulting.com>

Ms. Chick,


Our firm is preparing an air quality section for the BLM Uncompahgre Field Office (UFO) Resource Management Plan document.  The boundary of the UFO is shown in the attached map.


We are requesting CDPHE's recommendation for representative criteria pollutant background concentrations for this area.  Concentrations of all available criteria pollutants are requested, and will be used in characterize regional air quality in tabular and narrative format.


We would also be interested in obtaining any publically-available processed surface meteorological data sets within the UFO.  These data would be used to generate wind roses and characterize meteorological conditions in the region.


Thank you very much for your assistance.  Please feel free to contact me anytime.


Susan Connell




**Susan Connell**

**Carter Lake Consulting LLC**

**Wyoming – Western NE**

**(308) 764-2550**

**(308) 764-2363 fax**

BLM_0037285

susan@carterlakeconsulting.com

www.carterlakeconsulting.com

CONFIDENTIALITY NOTICE: This message is confidential and may be privileged. If you believe that this email has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

3

BLM_0037286

| | DMM | | DDD | | UTM Zone |
|---|---|---|---|---|---|
| | Lat | Lon | | | Northing |
| North Site 10m Tower | 38° 15.854 | 108° 46.120 | 38.26423 | 108.76867 | 4237487.24 |
| East Site 30m Tower | 38° 14.745 | 108° 45.661 | 38.24575 | 108.76102 | 4235452.56 |

| West Elk Mine | | | DDD | | UTM Zone 13 |
|---|---|---|---|---|---|
| | | | 37.9561 | -107.9164 | 243768.123 |

| 12 (NAD 83) |
|---|
| Easting |
| 695211.425 |
| 695930.424 |

| NAD83 |
|---|
| 4204957.116 |



BLM_0037289



BLM_0037290



BLM_0037291



LEGEND



< 6 KNOTS

≥ 6 KNOTS

FIGURE 2

WIND FREQUENCY DISTRIBUTION

OLATHE, COLORADO
OCTOBER 22,1987-OCTOBER 21,1988

AIR SCIENCES INC.

BLM_0037292



BLM_0037293



BLM_0037294

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Air Quality Control Commission

### AIR QUALITY STANDARDS, DESIGNATIONS AND EMISSION BUDGETS

### 5 CCR 1001-14

I.      **Ambient Air Quality Standards**

I.A.    National Ambient Air Quality Standards

For National Ambient Air Quality Standards and associated ambient air monitoring reference methods, see Title 40, CFR Part 50.

I.B.    Colorado Ambient Air Quality Standards (State Only)

I.B.1.    Sulfur Dioxide (SO2)[1]

The actual concentration of sulfur dioxide at any given receptor site (no greater than five meters above ground level) in the State of Colorado shall not exceed a three-hour maximum of 700 micrograms per cubic meter (ug/m3) (or 0.267 parts per million by volume (ppmv) at one atmosphere and 25 degrees Celsius more than once in any twelve-month period.

The analytical methods to be employed for the determination of ambient air concentrations of sulfur dioxide shall be any reference method identified in title 40 CFR, Part 50, Appendix A. Alternative methods may be used listed as a "reference" or "equivalent" method by the U.S. Environmental Protection Agency in accordance with Title 40 CFR, Part 53. Concentrations shall be reported as micrograms per cubic meter or parts per million referred to a temperature of 25 degrees Celsius and a pressure of one atmosphere (1013 millibars).

[1]Sulfur Dioxide: Revised: 3/10/83; Effective 4/30/83.  Revised 2/18/10; Effective 3/30/10.

II.     **Reserved**

III.    **Classification of Nonattainment and Attainment/Maintenance Areas in Colorado[*]**

| Carbon Monoxide | | |
|---|---|---|
| Area | Classification | Boundary |
| Denver Metro Area | Attainment/Maintenance (effective 1/14/02) | See attached legal description and map. |
| Colorado Springs | Attainment/Maintenance (effective 10/25/99) | Urban Transportation Planning Study Area as defined in 1989. See attached map. |
| Fort Collins | Attainment/Maintenance | Fort Collins Urban Growth Area boundary as adopted |

| Carbon Monoxide | | |
|---|---|---|
| Area | Classification | Boundary |
| | (effective 9/22/03) | by the city of Fort Collins and the Larimer County Commissioners and in effect as of July 30, 1991. See attached map. |
| Greeley Area | Attainment/Maintenance (effective 5/10/99) | Urban Boundaries defined in the North Front Range Regional Transportation Plan, May 1990. See attached map. |
| Longmont | Attainment/Maintenance (effective 11/23/99) | Begin at Highway 52 and Boulder/Weld county line and go west to 95th Street/Hooker Road to the intersection of Plateau Road, then west on Plateau Road to the intersection of N. 75th Street, then north to the Boulder/Larimer County line, then east along the Boulder/Larimer County line to the Boulder/Weld county line, then south along the Boulder/Weld County line to Highway 52, plus the portion of the City of Longmont east of the Boulder/Weld County line in Weld County. See attached map. |

**Description of Boundaries for Denver Metropolitan Carbon Monoxide Attainment/Maintenance Area**

The Boundaries for the Denver metropolitan attainment/maintenance area for carbon monoxide (CO) are described as follows:

Starting at Colorado Highway 52 where it intersects the eastern boundary of Boulder County;

Follow Highway 52 where it intersects Colorado Highway 119;

Follow northern boundary of Boulder city limits west to the 6000-ft. elevation line;

Follow the 6000-ft. elevation line south through Boulder and Jefferson counties to US 6 in Jefferson County;

Follow US 6 west to the Jefferson County-Clear Creek County line;

BLM_0037296

Follow the Jefferson County western boundary south to the southern boundary of Range 72 West, Township 6 South, Section 24;

Follow the southern section line east to the eastern boundary of Range 71 West, Township 6 South, Section 24;

Follow the eastern section line north to South Turkey Creek;

Follow South Turkey Creek northeast to Deer Creek Canyon Road;

Follow Deer Creek Canyon Road to the eastern boundary of Range 69 West, Township 6 South, Section 5;

Follow the Pike National Forest boundary southeast through Douglas County to the Douglas County - El Paso County line;

Follow the southern boundary of Douglas County east to the Elbert County line;

Follow the eastern boundary of Douglas County north to the Arapahoe county line;

Follow the southern boundary of Arapahoe County east to Kiowa Creek;

Follow Kiowa Creek northeast through Arapahoe county and Adams counties to the Adams County - Weld County line;

Follow the northern boundary of Adams County west to the Boulder County line;

Follow the eastern boundary of Boulder County north to Highway 52.

Descriptions and Maps

## III.A.    Denver Attainment/Maintenance Area for Carbon Monoxide

III.A. Denver Attainment/Maintenance Area for Carbon Monoxide

BLM_0037297



*Map Generated September 1999 by CDPHE/APCD/Technical Services Program*

### III.B.    Colorado Springs Attainment/Maintenance Area for Carbon Monoxide

III.B. Colorado Springs Attainment/Maintenance Area for Carbon Monoxide

BLM_0037298



**Legend**

- Attainment/Maintenance Area
- County Boundary

Map Created by the APCD Technical Services Program
Colorado Department of Public Health and Environment

**III.C.     Fort Collins Attainment/Maintenance Area for Carbon Monoxide**

BLM_0037299

III.C. Fort Collins Attainment/Maintenance Area for Carbon Monoxide



Map created by the APCD Technical Services Program,
Colorado Department of Public Health and Environment

**III.D.    Greeley Attainment/Maintenance Area for Carbon Monoxide**

BLM_0037300

III.D. Greeley Attainment/Maintenance Area for Carbon Monoxide



### Legend

☐ Attainment / Maintenance Area

Map created by the APCD Technical Services Program,
Colorado Department of Public Health and Environment

**III.E.    Longmont Attainment/Maintenance Area For Carbon Monoxide**

III.E. Longmont Attainment/Maintenance Area For Carbon Monoxide



Map created by the APCD Technical Services Program.
Colorado Department of Public Health and Environment

| PM10 | | |
|---|---|---|
| Area | Classification | Boundary |
| Denver Metro (effective 10/16/02) | Attainment/Maintenance * | All of Denver, Jefferson, and Douglas Counties; Boulder County (excluding Rocky Mountain National Park) and the Automobile Inspection and Readjustment Program portions of Adams and Arapahoe Counties.  See attached map. |
| Steamboat Springs (effective 11/24/04) | Attainment/Maintenance | Steamboat Springs Area Airshed as adopted by the Routt County Commissioners May 28, 1991. See attached map. |
| Pagosa Springs (effective 8/14/01) | Attainment/Maintenance | See attached map. |
| Telluride/Mt. Village/San Miguel County (effective 8/14/01) | Attainment/Maintenance | See attached map. |
| Aspen/Pitkin County (effective 7/14/03) | Attainment/Maintenance | See attached map. |
| Cañon City/Fremont County (effective 7/31/00) | Attainment/ Maintenance | See attached map. |
| Lamar (effective 11/25/05) | Attainment/Maintenance | Lamar City Limits as of July 30, 1991. See attached map. |
| Ozone | | |
| Denver 1-Hour Ozone Attainment/Maintenance Area (effective 10/11/01) | Attainment/Maintenance | The Counties of Jefferson and Douglas, the Cities and Counties of Denver and Broomfield, Boulder County (excluding Rocky Mountain National Park), Adams County west of Kiowa Creek, and Arapahoe County west of Kiowa Creek. See attached map. |
| Denver Metro Area/North Front Range 8-Hour Ozone Nonattainment Area (effective 11/20/07) | Nonattainment | The Counties of Adams, Arapahoe, Boulder (includes part of Rocky Mountain National Park), Douglas, and Jefferson; the Cities and Counties of Denver and Broomfield; and the following portions of the Counties of Larimer and Weld: For Larimer County (includes part of Rocky Mountain National Park), that portion of the county that lies south of a line described as follows:  Beginning at a point on Larimer County's eastern boundary and Weld County's western boundary intersected by 40 degrees, 42 minutes, and 47.1 seconds north latitude, proceed west to |

| | | a point defined by the intersection of 40 degrees, 42 minutes, 47.1 seconds north latitude and 105 degrees, 29 minutes, and 40.0 seconds west longitude, thence proceed south on 105 degrees, 29 minutes, 40.0 seconds west longitude to the intersection with 40 degrees, 33 minutes and 17.4 seconds north latitude, thence proceed west on 40 degrees, 33 minutes, 17.4 seconds north latitude until this line intersects Larimer County's western boundary and Grand County's eastern boundary. |
| | | For Weld County, that portion of the county that lies south of a line described as follows: Beginning at a point on Weld County's eastern boundary and Logan County's western boundary intersected by 40 degrees, 42 minutes, 47.1 seconds north latitude, proceed west on 40 degrees, 42 minutes, 47.1 seconds north latitude until this line intersects Weld County's western boundary and Larimer County's eastern boundary. |
| | | See attached map. |

*The classification of the Denver Metro Area as an attainment/maintenance area shall not affect Air Quality Control Commission Regulations Number 1, 5 CCR 1001-3, Section VIII; or Number 3, 5 CCR 1001-5, Part B, Section IV.D.2(d)(i) or (ii).  Such provisions shall apply in the Denver Metro Area in the same manner as they would apply if the Denver Metro Area were nonattainment area for PM10.

**III.F.**   **Denver PM10 and 1-Hour Ozone Attainment/Maintenance Area**

III.F. Denver PM10 and 1-Hour Ozone Attainment/Maintenance Area

BLM_0037304

**Map of the Denver Metropolitan 1-Hour Ozone
Attainment/Maintenance Area and Monitoring Sites**



**III.G.    Steamboat Springs Attainment/Maintenance Area for PM10**

BLM_0037305

III.G. Steamboat Springs Attainment/Maintenance Area for PM10



Map created by the APCD Technical Services Program.
Colorado Department of Public Health and Environment

**III.H.    Pagosa Springs Attainment/Maintenance Area for PM10**

III.H. Pagosa Springs Attainment/Maintenance Area for PM10



**Legend**

Attainment/Maintenance Area

Map created by the APCD Technical Services Program.
Colorado Department of Public Health and Environment

**III.I.     Telluride/Mt. Village/San Miguel County Attainment/Maintenance Area for PM10**

BLM_0037307

III.I. Telluride/Mt. Village/San Miguel County Attainment/Maintenance Area for PM10



**Legend**

Attainment/Maintenance Area

County Boundary

Map created by the APCD Technical Services Program,
Colorado Department of Public Health and Environment

**III.J.    Aspen/Pitkin County Attainment/Maintenance Area for PM10**

BLM_0037308

III.J. Aspen/Pitkin County Attainment/Maintenance Area for PM10

BLM_0037309



Legend

Attainment/ Maintenance Area

Map created by the APCD Technical Services Program.
Colorado Department of Public Health and Environment

BLM_0037310

### III.K.    Cañon City/Fremont County Attainment/Maintenance Area for PM10

III.K. Cañon City/Fremont County Attainment/Maintenance Area for PM10



Legend

Attainment / Maintenance Area

Map created by the APCD Technical Services Program.
Colorado Department of Public Health and Environment

### III.L. Lamar Attainment/Maintenance Area for PM10

III.L. Lamar Attainment/Maintenance Area for PM10



**Legend**

Attainment/Maintenance Area

Map created by the APCD Technical Services Program.
Colorado Department of Public Health and Environment

BLM_0037312

### III.M.    Denver Metro Area/North Front Range 8-Hour Ozone Nonattainment Area

III.M. Denver Metro Area/North Front Range 8-Hour Ozone Nonattainment Area



Denver-Boulder-Greeley-Fort Collins, Colorado
Eight-Hour Ozone Nonattainment Area Boundary



May 2004

BLM_0037313

## IV.     Visibility Standard

To be added to the Colorado Air Quality Control Commission document "Ambient Air Standards for Metropolitan Denver Air Quality Control Region, State Air Pollution Control Areas and the State of Colorado."

<u>Visibility Standard for the AIR Program Area</u>

Level: The Visibility Standard for the AIR program area is an atmospheric extinction of.076/km[1], equivalent to a standard visual range of 32 miles[2]

Averaging Time: The Averaging time is four hours. All four hours must be contiguous. No four-hour average in violation of the standard can have hours in common with any other four-hour period in violation of the standard.[3]

Applicability: The visibility standard is applicable in the AIR program area.[4] The visibility standard applies during an eight-hour period from 8:00 a.m. (0800) to 4:00 p.m. (1600) each day Mountain Local Time. The visibility standard applies only during hours when the hourly average relative humidity is less than 70 percent.[5]

[1]Extinction is a measure of the ability of the atmosphere to attenuate light. It is traditionally expressed in light attenuation per kilometer. It is measured directly with a long-path transmissometer or by other equivalent methods as determined by the Air Pollution Control Division.

[2]Extinction (Bext) can be converted to standard visual range (SVR) in miles as follows:

$$SVR \text{ (Miles)} = (3.912/(Bext + .01 \text{ km}))^*.06214$$

where Bray is the Rayleigh scattering coefficient (.0099/km) for Denver's altitude and the visual range is standardized to a Rayleigh scattering coefficient of.01/km or an altitude of 1.55km. The formula assumes a contrast threshold of two percent.

[3]There are five possible contiguous four-hour periods from 0800 to 1600 each day (0800 to 1200, 0900 to 1300, 1000 to 1500, and 1200 to 1600). Only the periods from 0800 to 1200 and from 1200 to 1600 do not have overlapping hours. Therefore, a maximum of two standard violations are possible each day that have no overlapping hours or hours in common.

[4]The AIR program area is defined in C.R.S. 42-4-307 (8).

[5]Any hour with a relative humidity of 70 percent or over would not be included in the four-hour running averages.

* Visibility:  Adopted: 12/21/89  Effective:  1/1/95

## V.     Emission Budgets for Attainment/Maintenance Areas in the State of Colorado

## V.A.     Budgets

V.A.1.   The following Motor Vehicle Emission Budgets shall be utilized to assess the conformity of Transportation Plans, TIPs, and where appropriate, Projects, for the applicable periods and geographic areas indicated:

| <u>Denver Attainment/Maintenance Area (Modeling Domain)</u> | <u>PM10</u>: 2015 through 2021: 54 tons/day; 2022 and beyond: 55 tons/day.<br><br><u>Nitrogen Oxides:</u> 2015 through 2021: 70 tons/day; 2022 and beyond: 56 tons/day<br><br>Trading provisions:  Trading of PM10 for NOx, or NOx for PM10 to adjust emission budgets for purposes of demonstrating transportation conformity shall be allowed using the emission trading formula as follows: |
|---|---|

| | |
|---|---|
| | For trades necessary to increase a primary PM10 budget, 15.0 tons/day of NOx will be taken from the NOx budget to increase the primary PM10 budget by 1.0 tons/day, a ration of 15 to 1. |
| | For trades necessary to increase a NOx budget, 1.0 tons/day of primary PM10 will be taken from the primary PM10 budget to increase the NOx budget by 12.0 tons/day, a ratio of 1 to 12. |
| | Implementation of trading provisions:  In the event the MPO cannot demonstrate consistency with the specific PM10 and NOx mobile source emission budgets, the trading provisions may be utilized only after the MPO has considered all reasonably available local control measures to meet the budgets.  The MPO must demonstrate the need for trading through the usual consultation procedures for state implementation plan development delineated in Section IV (F) of AQCC Regulation Number 10, Criteria for Analysis of Conformity. |
| | If trading is utilized, the MPO shall include the following information in the transportation conformity determination: |
| | (1)      The budget for primary PM10 and NOx for each required year of the conformity determination, before trading is employed; (2) The portion of the original budget to be used to supplement a wanting budget, for each required year for the conformity determination; (3) The increased budget that results from trading, along with relevant calculations, and (4) the resulting primary PM10 and NOx budgets for each required year of the conformity demonstration. |
| | The MPO shall then compare projected emissions to the adjusted PM10 and NOx motor vehicle emission budgets to demonstrate conformity. |
| Denver Attainment Maintenance Area | Ozone Precursors (attainment/maintenance area boundary) NOx 2002 and beyond 134 tpsd VOC 2002 and beyond 119 tpsd (tpsd = tons per summer day) Carbon Monoxide (attainment/maintenance area boundary) 2013 through 2020: 1625 tons/day; 2021 and beyond: 1600 tons/day. |
| Denver Metro Area/North Front Range 8-Hour Ozone Nonattainment Area | Regional Emissions Budgets NOx:  122.9 tons/day VOCs:  109.2 tons/day |

BLM_0037315

|  | Southern Sub-Regional Emissions Budgets NOx: 102.4 tons/day VOCs: 89.7 tons/day Northern Sub-Regional Emissions Budgets NOx: 20.5 tons/day VOCs: 19.5 tons/day |
|---|---|
| Aspen Attainment/Maintenance Area | PM10 2023 and Beyond: 1,146 lbs./day |
| Cañon City | PM10 2020 and Beyond: 1,613 lbs./day |
| Lamar (Modeling Area) | PM10 2025 and Beyond: 764 lbs./day |
| Pagosa Springs (Modeling Area) | PM10 2021 and Beyond: 946 lbs./day |
| Steamboat Springs (Modeling Area) | PM10 2015 through 2023: 21,773 lbs./day PM10 2024 and Beyond: 1,103.2 lbs./day |
| Telluride (Modeling Area) | PM10 2021 and Beyond: 1,008 lbs./day |
| Longmont Attainment/Maintenance Area | Carbon Monoxide 2010 through 2014: 43 tons/day 2015-2019: 43 tons/day 2020 and Beyond: 43 tons/day |
| Colorado Springs Attainment/Maintenance Area | Carbon Monoxide 2010 and Beyond: 531 tons/day |
| Ft. Collins Attainment/Maintenance Area | Carbon Monoxide 2005 through 2009: 99 tons/day 2010 through 2014: 98 tons/day 2015 and Beyond: 94 tons/day |
| Greeley Area Attainment/Maintenance Area | Carbon Monoxide 2005 through 2009: 63 tons/day 2010 through 2014: 62 tons/day 2015 and Beyond: 60 tons/day |

V.A.2.   Geographic Coverage

Unless otherwise specified, the geographic coverage of each of the area Motor Vehicle Emissions Budgets shall be the nonattainment or attainment maintenance area as defined in the respective state implementation plans.

V.A.3.   The Motor Vehicle Emissions Budget for PM10 applies to total primary PM10 emissions, including emissions from tailpipe exhaust, unpaved roads (except for the Denver PM10 nonattainment

BLM_0037316

area), re-entrained road dust and street sand. It does not include precursor or secondary emissions, which, where appropriate, are covered under separate budgets.

V.A.4.   Effective Dates

V.A.4.a. Denver Carbon Monoxide

The 1,520 tons per day (2013 and beyond) carbon monoxide emission budget established in Section V.A.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118. Until such time as the 1,520 tons per day budget takes effect pursuant to this section and 40 CFR Section 93.118, the carbon monoxide emission budgets for the Denver CO attainment/maintenance area shall be 800 tons per day (2002 and beyond).

V.A.4.b. Colorado Springs Carbon Monoxide

The 531 tons per day carbon monoxide emission budget established in Section V.A.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118. Until such time as the 531 tons per day budget takes effect pursuant to this section and 40 CFR Section 93.118, the carbon monoxide emission budget for the Colorado Springs CO attainment/maintenance area shall be 270 tons per day (2001 and beyond).

V.A.4.c. Reserved

V.A.4.d. Reserved

V.A.4.e. Aspen PM10

The 16,244 pounds-per-day PM10 emission budget established in Section V.A.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118. Until such time as the 16,244 pounds-per-day budget takes effect pursuant to this section and 40 CFR Section 93.118, the PM10 emission budget for the Aspen PM10 Nonattainment Area shall be 13,974 pounds-per-day.

V.A.4.f.  Pagosa Springs PM10

The 946 pounds-per-day PM10 emission budget established in Section V.A.1. shall take effect as a matter of state law when budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118.  Until such time as the 946 pounds-per-day budget takes effect pursuant to this section and 40 CFR Section 93.118, the PM10 emission budget for the Pagosa Springs PM10 attainment/maintenance area shall be 7,486 pounds-per-day.

V.A.4.g. Cañon City PM10

The 1,1613 pounds-per-day PM10 emission budget established in Section V.A.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118.  Until such time as the 1,613 pounds-per-day budget takes effect pursuant to this section and 40 CFR section 93.118, the PM10 emission budget for the Cañon City PM10 attainment/maintenance area shall be 7,439 pounds-per-day.

V.A.4.h. Lamar PM10

The 764 pounds-per-day PM10 emission budget established in Section V.A.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118. Until such time as the 764 pounds-per-day budget takes effect pursuant to this section and 40 CFR Section 93.118, the PM10 emission budget for the Lamar PM10 Nonattainment Area shall be 7,534 pounds-per-day.

### V.A.4.i. Steamboat Springs PM10

The 21,773 pounds-per-day PM10 emission budget established in Section V.A.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118. Until such time as the 21,773 pounds-per-day budget takes effect pursuant to this section and 40 CFR Section 93.118, the PM10 emission budget for the Steamboat Springs PM10 Nonattainment Area shall be 20,682 pounds-per-day.

### V.A.4.j. Telluride PM10

The 1,108 pounds-per-day PM10 emission budget established in Section V.a.1. shall take effect as a matter of state law when such budget takes effect as a matter of federal law pursuant to 40 CFR Section 93.118.  Until such time as the 1,108 pounds-per-day budget takes effect pursuant to this section and 40 CFR Section 93.118, the PM10 emission budget for the Telluride PM10 Attainment Area shall be 10,001 pounds-per-day (2012 and beyond).

## V.B.    Reserved

## V.C.    Additional Requirements for the Denver PM10 Attainment/Maintenance Area

### V.C.I.   Geographic Coverage

The geographic coverage for the Denver PM10 Motor Vehicle Emissions Budget is the modeling domain contained in the most recent revision to the Denver PM10 state implementation plan and technical support documentation, which are available for inspection at the offices of the AQCC located at 4300 Cherry Creek Drive South, Denver, Colorado.

### V.C.2.   Regional Emissions Analysis

The emissions budgets set out in this section shall be used for regional emissions analyses required for conformity determinations.

## V.D.    Additional Requirements for the Denver CO Attainment/Maintenance Area

### V.D.I.   Geographic Coverage

The geographic coverage for the Denver CO Motor Vehicle Emissions Budget is the Denver CO attainment/maintenance area as defined in the section of this Ambient Air Standards regulation entitled "Description of Boundaries for Denver CO Attainment/Maintenance Area."

## VI.    Carbon Monoxide Standard within the Eisenhower Tunnel* (State Only)

Pursuant to the authority of Section 25-7-106 (1), (b) and (c) and of 25-7-107 (1), (a), and (b) of Colorado Revised Statutes 1973, the Colorado Air Pollution Control Commission designated and confines of any traveled portions of the roadways within the Eisenhower Tunnel as a control area in which the adoption and maintenance of an ambient air standard is deemed necessary with particular identification of "carbon monoxide" as the pollutant hereby made subject to the following standard to maintain an acceptable

BLM_0037318

human carboxyhemoglobin level: the ambient air within the Eisenhower Tunnel shall be maintained so that the levels of carbon monoxide shall not excee a 15 minute average of 100 parts per million volume (115 milligrams per cubic meter at 760 Torr and 25 degrees Celsius) concentration.

\* Carbon Monoxide/Eisenhower Tunnel: Adopted: 9/5/75 Effective: 12/17/75

**Method of Testing:**

1.   For the purpose of this regulation, primary determinations of CO shall be made by use of instrumentation based on non-dispersive infrared spectrophotometry (NDIR), as specified in <u>Federal Register, 36</u> (84), 8194-8195 (30 April, 1971), Appendix C. Other methods equivalent, in accuracy, precision, and freedom from interferences may be used if approved in advance by the Air Pollution Control Division.

2.   Routine monitoring of CO may be performed by instruments based on other principles, provided that such instruments are demonstrated to yield results equivalent to measurements by NDIR. methods, within the limits of accuracy and precision approved in advance by the Air Pollution Control Division.

3.   Instruments used for primary determinations and routine monitoring shall be maintained to at least the minimum standards recommended by their manufacturers. Calibrations shall be made at the location of use according to the procedures set out in "Guidelines for Development of a Quality Assurance Program: Reference Method for the "Continuous Measurement of Carbon Monoxide in the Atmosphere", EPA-R4-028A, June 1973, pp. 8-20.

4.   Records of maintenance and calibrations of all instruments shall be kept in a current, timely manner. The sources and identifications of gas mixtures used in calibrations shall be entered in records of calibration. These records of calibration and summaries of operating CO levels shall be made available within 30 days after the end of the calendar quarter to the Air Pollution Control Division for review.

**VII.   Rationale**

**VII.A.   Rationale for the Promulgation of Ambient Air Quality Standards for Sulfur Dioxide**

The Commission's review of the large volume of scientific data presented at the hearings led to several conclusions relevant to the establishment of appropriate ambient air quality standards for the State of Colorado.

Sulfur dioxide is a colorless, irritating gas with a taste threshold on the order of 600 to 800 micrograms per cubic meter and an odor threshold approximately twice that value. It is converted in the atmosphere (at a presently undetermined rate) into particulate sulfuric acid droplets, and solid metallic sulfates. The hazards to human health of such sulfates are presently under extensive investigation by EPA and a broad section of the scientific community. This Commission has not considered the question of health impacts of particulate surfaces in its adoption of ambient air standards for Colorado except to note that the information available is often conflicting and confusing. The same remarks are applicable to the effect of particulate sulfates on visibility. The Commission is very much aware that many have questioned the validity of EPA primary and secondary sulfur dioxide standards to protect humans, and animals, and vegetation with regard to (a) long term exposure to low concentrations of sulfur dioxide, (b) effects of altitude on atmospheric conversion of sulfur dioxide and attendant sulfate hazards, and (c) synergistic action of sulfur dioxide with other pollutants on vegetation.

The concerns of this Commission with regard to such considerations has led to the adoption of ambient air standards more restrictive than the EPA primary and secondary standards because: (1) the Commission is charged under the Colorado Air Pollution Control Act of 1970 with the

BLM_0037319

achievement of the maximum practical degree of air purity throughout the State, (2) the evidence presented before this Commission and the evaluation conducted by the Commission and its staff raises serious unanswered questions about the possible effect of long term exposure of certain low levels of sulfur dioxide on vegetation and on the agricultural industry in our State, (3) the Commission desired to ensure that the policy of this State with regard to maximization of air purity and the Federal Prevention of Significant Deterioration policies, under which Colorado desires to seek delegation of authority, will be realized with regard to existing air quality in Colorado for sulfur dioxide which is generally very good.

Under the Prevention of Significant Deterioration doctrine, EPA has adopted sulfur dioxide ambient air quality standards in three classes. Class I preserves the pristine quality of pristine air. Class II permits moderate deterioration, and Class III sets an absolute limit at the Federal secondary standard (that ambient air standard designed to protect human welfare). The evidence received by this Commission was overwhelming in its support of the preservation of pristine conditions in National Parks, National Monuments, Wilderness and Primitive Areas, and the Gunnison Gorge Recreation area. It is logical to apply the EPA Prevention of Significant Deterioration Class I standards to these regions, to protect the air quality for intrusion by external sources, and no submission by any industrial representative in these public hearings opposed the use of the Federal Class I standards for the areas noted above.

The Commission has discovered no adequate rationale for adoption of the (EPA) PSD Class III standard for sulfur dioxide. This Commission questions the need for authorization of such concentrations of sulfur dioxide in the State of Colorado. Existing conditions in Colorado do not appear to even approach the Class in levels, and no proposal for development, as described by industrial representatives at the hearings, would be at all restricted by a standard more stringent than the Federal Class II standard. Therefore, Federal PSD Class II standards have been adopted as the Colorado Category III standards: proposed development of sulfur dioxide sources as presented to the Commission by a variety of industrial representatives, can proceed with much less impact than the Federal Class II for sulfur dioxide would allow. The Commission has thereby maintained consistency with Federal PSD requirements and feels that the State will be in a position in the near future to request delegation of authority from the Environmental Protection Agency for enforcement of PSD requirements.

The Colorado Category I standards for sulfur dioxide effective December 18, 1975 are very stringent ones, and because the bulk of the state is now designated as a Colorado Category I, certain proposed industrial development, as presented before this Commission and including energy conversion, might thereby be restricted. One proposed solution to this problem was redesignation to the Federal (PSD) Class II for the entire state. This concentration of sulfur dioxide. As noted above, the Commission simply does not feel that such extreme degradation in existing air quality for sulfur dioxide throughout the entire state is necessary. It is not necessary, according to evidence presented to the Commission, to go to the Colorado Category II standards set forth under the 1975 regulation to permit projected new industrial development. The Commission has therefore adopted a standard, which are essentially at the halfway mark between PSD Class I and PSD Class II. This standard does allow for all the proposed development of sulfur dioxide sources described in hearings before this Commission and is an acceptable one to the Commission because it will not prohibit development, with careful siting considerations, yet avoids the necessity for redesignation involving substantial deterioration of existing air quality for sulfur dioxide. It should be noted that, at the PSD Class II levels, many Colorado citizens might actually be physically affected by the unpleasant and irritating taste of sulfur dioxide in the ambient air.

All of the above-described ambient standards to be established by this Commission for sulfur dioxide, are incremental standards. However, the Commission also feels strongly that an absolute standard, and "under lid," should be placed on sulfur dioxide levels as well. It is the absolute concentration, rather than the increment, which affects human health, welfare, and the "quality of life" which our Colorado Air Pollution Control Act so clearly seeks to protect. In order to assure

compliance with the policy of this state, this Commission has adopted a three-hour average concentration of sulfur dioxide, of 700 micrograms per cubic meter, as an absolute standard not to be exceeded more than once per year. This absolute standard is again related to that level of sulfur dioxide in the ambient air, which may cause obvious physical irritation for certain Colorado citizens. This Commission intends to protect those citizens and all other residents of our State from impairment of their general welfare, convenience, and enjoyment of the beauty of life, which Colorado has to offer.

Ambient air quality standards will play an important role in the permitting process, and since that process involves the application of predictive modeling all incremental standards should be considered significant only to one significant figure.

As noted above, Colorado Category I for sulfur dioxide has been designated for certain areas based on the evidence received at public hearing. The Commission has also provided for designation of any National Parks, Monuments, Wilderness or Primitive Areas or Wild and Scenic River Corridors, which may be established in Colorado in the future. Such designation will be made after Commission evaluation of the comments of members of the public at hearing.

The Commission, on the basis of broad support from industry and the general public, decided not to permit redesignation of the Category I areas. The Commission found that sufficient documentation should accompany a redesignation request to show that the request is serious, well thought out in its various implications, and has some public support. On the basis of considerable testimony, it also developed a set of criteria by which the redesignation request will be judged. The Commission thus concluded that all of these elements in the redesignation process must be met before the designation is granted.

**VII.B.    Rationale and Justification for Revision to the Ambient Air Quality Standards for Sulfur Dioxide Regarding the Method of Testing and Reporting (Section C)**

This action brings the State of Colorado regulations into conformity with the Federal regulations for (a) the methods for measurements of ambient concentrations of sulfur dioxide and (b) the manner in which these concentrations are reported:

This question as to whether these concentrations should be expressed in (a) micrograms per actual cubic meter or (b) micrograms per standard cubic meter (at 25 degrees Celsius and one atmosphere) is not resolved. If the hazard is related to the ratio of sulfur dioxide to oxygen the standard cubic meter concentration is preferable. If the concentrations are expressed in micrograms per standard cubic meter, the equivalent expression in parts per million is independent of altitude and temperature; this is not true if the concentrations are given in micrograms per actual cubic meter. The deciding issue in the decision was conformity with Federal Standards.

**VII.C.    Rationale and Justification for the Repeal and Readoption of Ambient Air Quality Standards for Total Suspended Particulates***

This action brings the State of Colorado Ambient Air Quality Standards for Total Suspended Particulates into conformity with the existing Federal Ambient Air Quality Standards for Total Suspended Particulates, and are the same standards, which are required to be met by 1982 by the Clean Air Act (1977 Amendments) and the Colorado State Implementation Plan.

Ambient Air Quality Standards play an important role in determining various aspects of the State air pollution permitting process and thus the adoption of State Ambient Air Quality Standards for Total Suspended Particulates identical to the Federal standards subjects applicants for an emission permit to only one standard, rather than different State and Federal Standard

The deciding issues in the decision were conformity with Federal standards and great public understanding.

\* Rationale/TSP – Repeal and Readoption:  Adopted 4/12/79

## VIII.    Statements of Basis, Specific Statutory Authority and Purpose

## VIII.A.   Emission Budgets for Nonattainment Areas in the State of Colorado

Adopted: February 16,1995

Section 176(c) of the Federal Clean Air Act Amendments of 1990 requires that transportation plans and programs adopted by a metropolitan planning organization conform to the appropriate state implementation plan. Pursuant to EPA regulations implementing Section 176(c), mobile source emissions resulting from such plans and programs ultimately must be demonstrated, to be consistent with the motor vehicle emissions budget set forth in the applicable SIP. Without a clearly indicated otherwise, the SIP's highway and transit mobile source inventory serves as the motor vehicle emissions budget. However, where a SIP quantifies a "safety margin" by which emissions from all sources are less than would be consistent with attainment throughout the region, the State may submit a SIP revision which assigns some or all of this safety margin to the motor vehicle emissions budget for purposes of conformity determinations.

*ADOPTION OF MOBILE SOURCE EMISSIONS BUDGETS FOR THE DENVER NONATTAINMENT AREA*

A.      PM10

The Denver PM10 SIP, which originally was submitted prior to EPA's adoption of the conformity regulations in November 1993, does not have mobile source emissions budgets explicitly labeled. The Denver PM10 SIP adopted by the Air Quality Control Commission on October 20,1994 notes the intent to establish specific mobile source emissions budgets for both primary PM10 emissions and emissions of PM10 precursors. The Regional Air Quality Council proposed and the Air Quality Control Commission adopted a regional PM10 emissions budget that allocates some of the "safety margin" in regional emissions to the mobile source emissions budget for purposes of conformity.

1.      Establishing the Primary PM10 Budget

The attainment demonstration for the Denver PM10 SIP indicates that modeled concentrations approaching the federal PM10 health and welfare standard are limited to a very small portion of the Denver region centered along the 1-25 corridor generally between Broadway and 1-70. The remainder of the region is well below the federal standard. Thus, while the mobile source inventory in the central Denver area is at the Maximum consistent with meeting the health and welfare standards, on a regional basis there is a "safety margin" by which emissions from all sources in the region are less than the total emissions that would be consistent with attainment of the PM10 health and welfare standard.

In order to determine how much of the regional emissions "safety margin" to assign to the mobile source emissions budget, the RAQC used DRCOG's transportation network as defined by the 2015 Interim Regional Transportation Plan and projections of vehicle miles traveled ("VMT") as the basis for the analysis in order to determine how much of the anticipated mobile source emission growth can be accommodated in the revision while still maintaining the federal PM10 health and welfare standard. The emissions from the 2015 network and its resulting VMT were estimated for each modeling grid based on the primary PM10 emissions factors for tailpipe exhaust, re-entrained road dust and street sand used in the PM10 SIP. The resulting gridded emissions from the network were then modeled using the same dispersion model used for the

PM10 SIP. The analysis then identified any areas where the increased emissions resulted in predicted concentrations greater than the federal standard of 150/ugm3. Emissions in these areas were then reduced sufficiently so that no values above the federal standard were predicted. The sum of the total emissions in the geographic area modeled, taking in to account emission reductions needed to assure that PM10 health and welfare standards were met, was then established as the PM10 mobile source emissions budget set forth in the Ambient Air Standards rule. That budget applies as a ceiling on emissions for each identified year.

The AQCC is aware that EPA is under court order to reconsider the PM10 national ambient air quality standard, and that EPA is actively considering revision of the particle size indicator and mass concentration of current standard. The AQCC considers this an interim budget that will be replaced by a 44-ton budget in 1998. This will give the AQCC an opportunity to develop and review a long range, comprehensive air quality management plan that will set the air quality goals and agenda for the Denver region over the next 20 years. The AQCC anticipates that the mobile source emissions budget in the long range, comprehensive air quality plan will not exceed 44 tons per day. The notice for the hearing on the long range, comprehensive air quality plan will also include a notice for rule making on the mobile source emissions budget.

2.      Development of Control Measures

The PM10 SIP includes all control measures necessary to achieve the emissions budget levels for 1995 through 1997 and to ensure that localized violations of the national ambient air quality standard for PM10 will not develop prior to December 31,1997. However, as the SIP does not extend beyond 1997, it does not include the control measures that may be necessary to achieve later budgeted levels. Additional control measures to reduce mobile source emissions in the years beyond 1997 must become enforceable as set forth in the Ambient Air Standards rule before an MPO may rely on any such reductions in assessing conformity of a future plan or program with the mobile source emissions budgets. This will ensure that no local violations of the national standard will result beyond 1997.

B.      *PM10 Precursors*

The Motor Vehicle Emissions Budget for PM10 applies to total primary PM10 emissions and does not include precursor or secondary emissions. A separate Motor Vehicle Emissions Budget for emissions of nitrogen oxides as a precursor to PM10 is established by this Regulation. Available information indicates that SO2 emissions from mobile sources are an insignificant contributor to secondary particulate formation in the Denver area. Therefore, a Motor Vehicle Emissions Budget for SO2 is not established.

C.      *Carbon Monoxide*

The RAQC recommended and the AQCC adopted as the Motor Vehicle Emissions Budget for 1995 through 1999 the Denver Nonattainment Area Carbon Monoxide ("CO") SIP's estimation of regional mobile source emissions that will result after implementation of the base programs and measures set forth in Chapter V of the SIP. These measures include 2.7% oxygenated gasoline, the first year of the Enhanced Inspection and Maintenance Program, and the base transportation system network that is in place or will be completed by 1995. For purposes of determining conformity, the budget of 1125 tons per day will remain in effect until the attainment budget takes effect in 2000.

The RAQC recommended establishing the CO mobile source emissions budget for the year 2000 and beyond at 825 tons per day, the level of emissions necessary to demonstrate attainment of the federal CO standard. The AQCC chose to adopt a budget of 808 tons per day when the Denver CO SIP was adopted on June 16, 1994. As part of this Regulation, the RAQC and DRCOG recommended adoption of the originally recommended CO Mobile Vehicle Emissions Budget of 825 tons per day.

BLM_0037323

D.   *Specific Statutory Authority*

The specific statutory authority for this rule is set out at § 25-7-105(1)(a), C.R.S.

**VIII.B.   Ozone Redesignation and the Adoption of the Mobile Source Emissions Budgets for Ozone Precursors: VOC and NO$_X$ Adopted: March 21, 1996**

The Denver metropolitan area was designated as nonattainment area by the EPA in 1978 for violations of the Ozone National Ambient Air Quality Standard (NAAQS). Pursuant to 185A of the 1990 amendments to the federal Clean Air Act (CAA), the Denver Metro Area was classified as a transitional nonattainment area. The Denver metropolitan area has demonstrated through quality-assured, monitored data from 1993 through 1995 that it has attained the ozone NAAQS. The Regional Air Quality Council has compiled the documentation required by Section 107(d)(3)(E) of the CAA to request redesignation to attainment status.

Included in the requirement for redesignation is a fully approved Maintenance Plan that meets Section 175A of the CAA. Upon approval by the EPA, the Maintenance Plan will become an element of the Colorado State Implementation Plan. The maintenance demonstration was based on future inventories that assumed the continuance of existing VOC controls in the Denver metro area. Such controls include the continued application of Regulation Number 7 to the Denver area.

Federal law does not require the redesignation of the Denver nonattainment area. However, such redesignation is required by state law. Section 25-7-107(2.5). The changes to the Ambient Air Quality Standard regulation are consistent with continued maintenance of the ozone standard and are not otherwise more stringent than the relevant federal requirements.

**Classification of the Denver metropolitan area**

Upon redesignation by the EPA, the classification of the Denver metro area will change from "transitional" to "attainment" for the ozone NAAQS. The Regional Air Quality Council recommended and the Commission adopted a change in classification for the Denver Metro area to attainment maintenance reflecting this change in status. In addition the boundaries of the attainment maintenance are redefined and a map depicting the boundaries is noted. The boundaries and map are the same as the present Denver metro nonattainment area.

The specific statutory authority to redesignate the area is set out in §§25-7-105(1)(a)(I) and (2), -106(1)(a); -107(1) and (2.5); and 25-7-301.

**Adoption of mobile source emissions budgets**

Section 176(c) of the CAA requires that transportation plans and programs adopted by a metropolitan planning organization conform to the appropriate state implementation plan. Pursuant to EPA regulations implementing Section 176(c), mobile source emissions resulting from such plans and programs ultimately mus2 be consistent with the motor vehicle emissions budget set forth in the applicable SIP.

Without clearly indicated intent otherwise, the SIP's highway and transit mobile source inventory serves as the motor vehicle emissions budget. However, where a SIP quantifies a "safety margin" by which emissions from all sources are less than would be consistent with attainment throughout the region, the state may submit a SIP revision which assigns some or all of this safety margin to the motor vehicle emissions budget for the purposed of conformity determinations.

The most recent revisions to the Denver Ozone SIP were submitted in 1989 and 1990, which was prior to EPA's adoption of the conformity regulations in November 1993, and those revisions did not include explicitly labeled mobile source emissions budgets. The Denver Ozone Maintenance Plan adopted March 21, 1996 notes the intent to establish specific mobile source emissions budgets for the two ozone

precursor gases, volatile organic compounds (VOC) and nitrogen oxides ($NO_x$). The Regional Air Quality Council proposed, and the Commission adopted regional VOC and $NO_x$ emissions budgets as provide in the rule. Such budgets allocate the "safety margin" in regional emissions to the mobile source emissions budget for purposes of conformity.

The specific statutory authority to establish such budgets is set out in §25-7-105(1)(a)(l).

**Establishing ozone precursor budgets**

The attainment demonstration is based on monitored data, which demonstrates attainment of the NAAQS during the three-year period, 1993-95. The attainment inventory is the baseline VOC and $NO_x$ inventory calculated for the 1993 year. The maintenance demonstration for the Denver Ozone Maintenance Plan is based on the future projected VOC and $NO_x$ maintenance year (2010) inventory being less than or equal to the respective, VOC or $NO_x$ attainment year (1993) inventory. The projected 2010 inventories take into account projected growth, existing state and local control strategies and additional federal measures and standards mandated by the Clean Air Act Amendments of 1990.

The total 2010 inventory for either precursor does not exceed the total 1993 inventory, therefore demonstrating maintenance of the NAAQS through the year 2010. Then inventory provides a "margin of safety", since the 2010 VOC inventory is about 33 tons per day less than the 1993 attainment inventory and the 2010 $NO_x$ inventory is about 14 tons per day less than the 1993 attainment inventory.

The emissions budget applies as a ceiling on emission in the year for which it is defined and for all subsequent years until another milestone year for which a different budget is defined.

**Adopted ozone precursor budgets**

The Regional Air Quality Council recommended that the Commission adopt mobile source emission budgets for ozone precursors, VOC and $NO_x$ to include the available safety margin in 1993 and in 2010 and beyond.

The adopted mobile source emissions budget is 124 tons per day for VOC in 1993 and 2010 and beyond. For $NO_x$ the budget is 139 tons per day for 1993, and 135 tons per day is adopted for 2010 and beyond.

**Findings required pursuant to § 25-7-110.8**

The Commission determines that:

1.  The emission inventory and the maintenance demonstration that support the redesignation request are based on reasonably available, validated and sound scientific methodologies. Such inventory and maintenance demonstration were prepared by the Regional Air Quality Council and have been reviewed by the Division. Any validated and sound scientific methodologies and information made available by interested parties has been considered.

2.  The rule is administrative in nature in that it redesignates the area as an attainment maintenance area, and will not result in any further reduction in air pollution beyond those reductions that are currently being achieved.

3.  The alternative chosen by the Commission is the most cost-effective, provides the regulated community flexibility, and achieves the necessary reduction in air pollution.

4.  The alternative chosen by the Commission will maximize the air quality benefits in the most cost-effective manner.

BLM_0037325

**VIII.C. Redesignation of the Greeley Carbon Monoxide Nonattainment Area to Attainment/Maintenance September 19,1996**

This Statement of Basis, Specific Statutory Authority and Purpose complies with the requirements of the Administrative Procedures Act, Section 24-4-103, C.R.S., and the Colorado Air Pollution Prevention and Control Act, Section 25-7-110.5, C.R.S.

**Basis**

Greeley carbon monoxide (CO) nonattainment area has not exceeded the National Ambient Air Quality Standards for CO since 1988. Therefore, the area is eligible for redesignation to attainment status under Section 107 of the federal Clean Air Act. The State of Colorado is formally requesting redesignation, and the adopted redesignation request and maintenance plan for the area will become part of the State Implementation Plan (SIP) upon approval by the U.S.    Environmental Protection Agency. The *Ambient Air Quality Standards for the State of Colorado* regulation must be revised to reflect the requested redesignation.

**Authority**

Specific authorities for revising the Ambient Air Quality Standards rule to reclassify the area to attainment are contained in the Colorado Air Pollution Prevention and Control Act, Sections 25-7-105 (1) and (2), 25-7-106(1)(a), and 25-7-107(1), (2.5), and (4). Additional authorities are contained in Sections 25-7-302 regarding SIP contents and 25-7-109 (2)(c) regarding the authority to regulate CO.

**Purpose**

The revisions to the Ambient Air Quality Standards regulation will implement the redesignation of the Greeley CO nonattainment area to attainment. The rule revisions become effective upon EPA's approval of the redesignation request and the accompanying maintenance plan. The purpose of this delay in the effective date of this rule revision is to comply with the requirement of 175 A(c) that all applicable nonattainment area requirements shall remain in place pending EPA approval. The changes to the Ambient Air Quality Standards regulation are as follows:

1.     Revise the classification of the area to "Attainment/Maintenance"; and

2.     Update the map of the area with a more legible version (the boundaries of the area remain unchanged).

The overall effect of these rule changes will be to relax some of the applicable requirements for stationary source permitting and for transportation planning. These amendments to the rules are not specifically intended to reduce air pollution and, therefore, the findings of Section 25-7-110.8(1) C.R.S. are inapplicable.

**Federal Requirements**

Redesignation to an attainment area is authorized but not strictly required by the federal Act. However, expeditious action to redesignate the area as an attainment area is required by Section 25-7-107(2.5) C.R.S. In order to be meaningful, such a redesignation must be submitted to the EPA as a SIP revision. The rule amendments are not otherwise more stringent than the requirements of the federal Act.

**VIII.D.   Steamboat Springs PM10 State Implementation Plan Element October 17, 1996**

This Statement of Basis, Specific Statutory Authority, and Purpose complies with the requirements of the Administrative Procedures Act, Section 24-4-103 C.R.S. and the Colorado Air Pollution Prevention and Control Act, Section 25-7-110.5, C.R.S.

BLM_0037326

**Basis**

Section 172 of the federal Clean Air Act requires that control measures and contingency measures be adopted as part of nonattainment area state implementation plans. The Colorado Attorney General's Office has determined that any emission control measure for a nonattainment area must be adopted as a State regulation in order for the measure to be enforceable by the State of Colorado.

The Steamboat Springs area is designated as nonattainment for fine particulate matter (PM10). In the Steamboat Springs State Implementation Plan (SIP) Element (September 1995), the State of Colorado committed to adopt additional control measures that allow the area to demonstrate continued maintenance of the PM10 National Ambient Air Quality Standards (NAAQS), and contingency measures that could be implemented in the future if the area fails to attain the PM10 NAAQS by the required date. The *State Implementation Plan-Specific Regulations for Nonattainment Areas* has been revised to include these measures. Also, the *Ambient Air Quality Standards for the State of Colorado* regulation has been revised to reflect the correct name of the nonattainment area and to include emission budgets that are utilized in transportation planning efforts.

**Authority**

General authority for revising the *Ambient Air Quality Standards...* to change the name of the nonattainment area and to adopt the emission budgets is contained in the Colorado Air Pollution Prevention and Control Act, Section 25-7-105 (1). General and specific authorities for revising the *SIP-Specific Regulations...* to adopt the emission control measures and the contingency measures are contained in Sections 25-7-105 (1), 25-7-106(1)(c), and 25-7-109(1) and (2).

**Purpose**

Administrative changes to the *Ambient Air Quality Standards...* regulation are as follows:

1.  Revise the name of the nonattainment area from "Routt County" to "Steamboat Springs", making the regulation consistent with the Steamboat Springs PM10 SIP Element; and

2.  Establish PM10 mobile source emission budgets for Steamboat Springs modeling area for the periods "1999-2001" and "2002 and Beyond" for use in making transportation conformity determinations.

Paved road dust is a primary source of PM10 emissions in the Steamboat Springs nonattainment area. Revisions to the *SIP-Specific Regulations...* to control paved road dust are as follows:

1.  The previously adopted "one percent" specification for fine materials contained in street sand is changed to "two percent". This change was originally requested by the City of Steamboat Springs in order to provide the City with the maximum flexibility for providing safe streets during winter driving conditions. This revision will increase PM10 emissions, but the increase is more than offset by the street sweeping activities described below.

2.  In order to show continued attainment and maintenance of the PM10 National Ambient Air Quality Standards (NAAQS), the City of Steamboat Springs must increase the frequency of street sweeping on Lincoln Avenue. Sweeping must occur at least once each day following each street sanding deployment (weather and road conditions permitting) until the City has swept Lincoln Avenue at least four times, instead of once after each sanding deployment as previously required. The City requested this increase in sweeping frequency in order to compensate for increased emissions that resulted from changing the street sand specification, and to provide emission reductions necessary to demonstrate continued maintenance with the PM10 NAAQS.

BLM_0037367

3.　Within two months following a determination that the Steamboat Springs nonattainment area has failed to attain the PM10 NAAQS or show reasonable further progress, the City must sweep additional sections of Lincoln Avenue and all other City streets within a defined area of central Steamboat Springs within four days following each street sanding deployment (weather and road conditions permitting). This sweeping constitutes the federally required contingency measures for the Steamboat Springs nonattainment area.

**Findings**

The Air Quality Control Commission makes the following findings pursuant to C.R.S. Section 25-7-110.8(1).

First, the rule revisions are based on reasonably available, validated, reviewed and sound scientific methodologies. The emission inventories that establish the emission budgets, and the monitoring, inventories, and dispersion modeling that indicate the need for control measures and their effectiveness in reducing PM10 emissions, were developed/performed in accordance with published guidance from EPA. Monitoring activities in Steamboat Springs are conducted in compliance with the EPA regulations of 40 CFR Part 58. Emission inventories were developed in accordance with EPA guidance found in "AP-42", the "SIP Development Guideline Document", and the "Control of Open Fugitive Dust" document. Dispersion modeling using the "WYND valley" model was performed in accordance with EPA's "Supplement B to the Guideline on Air Quality Models".

Second, the street sweeping revisions to the *SIP-Specific Regulations...* shall result in a demonstrable reduction in air pollution due to the removal of street sand and background paved road dust from the streets. The amount of reductions relied upon in the SIP Element's attainment demonstration are supported by the EPA guidance documents cited above. The emission budgets in the *Ambient Air Quality Standards...* regulation will result in PM10 emission reductions in the area by limiting growth from the mobile sources sector to 2002 levels (for the purposes of "transportation conformity" determinations - federal transportation conformity regulations of 40 CFR Subpart T). As a result, federally funded or approved projects will have to offset any additional growth in mobile source emissions.

Third, street sweeping is cost-effective in this case because the City is already conducting some of the sweeping in this rule. Other alternatives, such as alternative deicers and sand reduction plans, were not considered viable because of concerns about public safety during winter driving conditions. The potentially lower cost alternative of one percent fines was not adopted because the City of Steamboat Springs preferred this control measure.

Therefore, it is assumed that the street sweeping controls and the emission budget are the most cost effective alternative, and the rule revisions maximize air quality benefits in the most cost effective manner.

**Federal Requirements**

The adoption of control measures, contingency measures, and emission budgets are required by federal regulations, and the federal regulations allow the State flexibility in determining what the measures and budgets should be. These measures and budgets will be submitted to the EPA as a SIP revision. The rule amendments are not otherwise more stringent than the requirements of the federal Act.

**VIII.E.　Redesignating Cañon City/Fremont County PM10 Nonattainment Area to Attainment and Establishing a New Emissions Budget for the area for 1997 through 2015. Adopted October 17, 1996**

**Background**

This statement of Basis, Specific Statutory Authority and Purpose complies with the requirements of the Administrative Procedures Act, C.R.S. 1973, Section 24-4-103(4) for adopted or modified regulations.

Because the Cañon City/Fremont County nonattainment area qualifies for redesignation to attainment/maintenance status, continuation of "nonattainment" status would keep in effect unnecessarily burdensome requirements for the area's the public and private sectors. Rule changes corresponding to redesignation are not more stringent than federal requirements.

**Basis**

The Cañon City/Fremont County PM10 Nonattainment area has never violated the National Ambient Air Quality Standards for PM10, and has not had an exceedance in eight years (since May of 1988). Therefore the area is eligible for redesignation to attainment status under Section 107 of the federal Clean Air Act as amended. Colorado is formally requesting redesignation and proposing a maintenance plan for the area, which will become that area's portion of the State Implementation Plan (SIP) upon USEPA approval. The *Ambient Air Standards for the State of Colorado* rule must be revised to reflect the SIP changes.

**Authority**

General authority for the *Ambient Air Standards* rule is contained in the Colorado Air Pollution Prevention and Control Act. Sections 25-7-105 (1) and (2). Specific authority is found at Sections 25-7-107 (2.5), regarding expeditious redesignation; and 25-7-302, regarding SIP contents. Commission action in promulgating these revisions is taken pursuant to Sections 25-7-105(1)(a), regarding establishment of emissions budgets; 25-7-106 (1)(a), regarding redesignations; 25-7-109(2)(b), regarding the authority to regulate particulate matter.

**Federal Requirements**

Redesignation to an attainment area is authorized but not strictly required by the federal act. However, expeditious action to redesignate the area as an attainment area is required by State statute (25-7-107(2.5)). In order to be meaningful such redesignation must be submitted to EPA as a SIP revision, and, in fact, Section 25-7-107(4) compels that it be submitted to EPA. Federal law requires the establishment of a motor vehicle emissions budget in the SIP, either explicitly by identifying such an emissions budget or implicitly in the maintenance demonstration. The emissions budget required by Federal law must be consistent with the maintenance of the NAAQS. This rule explicitly establishes such an emissions budget as a regulation as required by 24-4-103(1), C. R.S. The motor vehicle emissions budget established in the rule is consistent with continued maintenance of the NAAQS and therefore complies with, and does not exceed, this federal requirement.

**Purpose**

Expeditious action to redesignate to attainment status is taken pursuant to 27-7-107(2.5), C.R.S.

The proposed revisions to the *Ambient Air Standards for the State of Colorado* would implement changes to be made to the State Implementation Plan via redesignation to attainment for PM10 and adoption and approval of the maintenance plan for the Cañon City/Fremont County area. The rule revisions would relax certain requirements for the area. The purpose of an increased mobile source emissions budget is to provide greater flexibility in making transportation conformity findings, and to maintain a reasonable margin for accommodation of uncertainty and future growth. NOTE: Excepting the increase in the area's mobile source emissions budget, the rule revisions would take effect only upon published USEPA approval of redesignation and of the maintenance plan. The changes to the *Ambient Air Standards* would be as follows:

1. Page 12: Changing the Cañon City/Fremont County classification from "Moderate" (nonattainment area) to: "Attainment/Maintenance" for the PM10 NAAQS. This change does not take effect until request/plan is approved by USEPA.

2.    Map page 19: Changing the Cañon City/Fremont County area map from "nonattainment" to "attainment/maintenance" for PM10. This change does not take effect until request/plan is approved by USEPA.

3.    Page 23: Motor Vehicle Emission Budget for the area would increase from 5,130 lbs./day to 7,439 lbs./day for 1997 and beyond.

**Overall Effect**

The overall effect of these rule changes will be to relax the applicable regulations. These amendments to the rules are not specifically intended to reduce air pollution and, therefore, the findings in 25-7-110.8(1) are inapplicable.

**VIII.F.   Longmont Nonattainment Area Redesignation as an attainment area for carbon monoxide (CO) Adopted: December 18,1997**

**Federal Requirements**

42 USC § 7407 (d)(3) provides that the State may request redesignation to attainment status for areas of the State that qualify for such redesignation based on air quality data, planning and control considerations. In order for the EPA to approve of such a redesignation request, § 42 USC §§ 7407(d)(3)(E) and 7505a require the State to submit a maintenance plan that includes enforceable control measures, will provide for maintenance of the standard for ten years following the approval of the redesignation request, and that complies with the requirements of 42 USC § 7410.

EPA policy implementing federal law on maintenance plans gives the State a choice between two options. Under the first option, the State may develop a simplified maintenance plan based on a comparison of base-year and future-year emissions inventories. Such a maintenance plan is acceptable if the future-year emissions are less than the emissions in the base-year. However, this option is available only if the maintenance plan includes all of the control measures that were included in the attainment SIP for the area. Under the second option, the State may eliminate control measures from the maintenance plan, provided that the maintenance plan demonstrates maintenance of the NAAQS without such control measures. Such a maintenance demonstration must be supported by dispersion analysis or some other form of air quality modeling.

The rule change adopted by the Commission is based on a maintenance plan with a design value of 5.5 parts per million (ppm). This design value is well below the NAAQS of 9.0 ppm, and suggests that the State may be able to eliminate some control measures from the maintenance plan. However, the State has not performed the level of air quality modeling adequate to justify removal of control measures from the maintenance plan. Therefore, the State cannot use the second option at this time. The rule change is supported by a maintenance plan that is based on the first option. Such a maintenance plan must include all of the control measures that were included in the attainment SIP in order to comply with federal requirements. Furthermore, the State may not eliminate the oxygenated fuels program from the Longmont maintenance area because Longmont is part of the Denver consolidated metropolitan statistical area. 42 USC 7512a(b)(3). Therefore, the rule adopted by the Commission does not differ or exceed federal requirements.

**Statutory Authority**

Specific statutory authority for the redesignation of the Longmont area as an attainment area is provided in § 25-7-107(1).

**Findings pursuant to § 25-7-110.8**

The rule change adopted by the Commission on October 16,1997 does not include the adoption of any additional control measures intended to reduce air pollution. The Commission's action merely changes the status of the Longmont nonattainment area, and assigns the safety margin to mobile sources. This rule change provides flexibility for the community by establishing a Basis for redesignation of the area as an attainment area, and by allocating the safety margin to the mobile source sector for purposes of transportation conformity determinations. In the meantime, the Commission has initiated a process for evaluating whether control measures such as the Automobile Inspection and Readjustment Program are still necessary to maintain the NAAQS for CO in Longmont and other communities in Colorado, In this way the rule change provides greater flexibility in the near term while the Commission continues to evaluate its options for reducing air pollution and maintaining the NAAQS in the most cost-effective manner.

The Commission has also considered the factors described in § 25-7-109(1)(b) in adopting these revisions.

**VIII.G.   Colorado Springs Nonattainment Area Redesignation as an attainment area for carbon monoxide (CO), and to establish an emissions budget that allocates a portion of the safety margin to the mobile source sector Adopted: January 15,1998**

**Federal Requirements**

42 USC §7407(d)(3) provides that the State may request redesignation to attainment status for areas of the State that qualify for such redesignation based on air quality data, planning and control considerations. In order for the EPA to approve of such a redesignation request, § 42 USC §§7407(d)(3)((E) and 7505a require the State to submit a maintenance plan that includes enforceable control measures, will provide for maintenance of the standard for ten years following the approval of the redesignation request, and that complies with the requirements of 42 USC §7410.

EPA policy implementing federal law on maintenance plans generally gives the State a choice between two options. Under the first option, the State may develop a simplified maintenance plan based on a comparison of base-year and future-year emissions inventories. Such a maintenance plan is acceptable if the future-year emissions are less than the emissions in the base-year. As a general rule, this option is available only if the maintenance plan includes all of the control measures that were included in the attainment SIP for the area.

However, pursuant to a memo the EPA sent the Division on October 10,1997, the State was able to eliminate the Clean Air Campaign and RIDEFINDERS from the Colorado Springs carbon monoxide maintenance SIP by supplementing the emission inventory comparison with additional modeling. EPA concurred that these two SIP elements (RIDEFINDERS and the Clean Air Campaign) may be deleted in accordance with its maintenance SIP policy. Under the second option, the State may eliminate control measures from the maintenance plan, provided that the maintenance plan demonstrates maintenance of the NAAQS without such control measures. Such a maintenance demonstration must be supported by adequate air quality modeling or analysis.

There is reason to believe that the state may be able to eliminate either the oxygenated fuels program or the motor vehicle inspection and maintenance program, and still demonstrate maintenance of the NAAQS for carbon monoxide for the Colorado Springs area. However, the State has not performed the air quality modeling necessary to justify removal such control measures. Therefore, the State cannot use the second option at this time. The rule change is supported by a maintenance plan that is based on the first option. Such a maintenance plan must include all of the control measures that were included in the attainment SIP in order to comply with federal requirements. EPA has concurred with the Division's and the Pikes Peak Area Council of Governments' inventory and supplemental modeling was adequate to support the removal of the RIDEFINDERS and Clean Air Campaigns from the Colorado Springs carbon monoxide maintenance SIP because these control strategies will not impact maintenance of the NAAQS.

**Statutory Authority**

Specific statutory authority for the redesignation of the Colorado Springs area as an attainment area is provided in §25-7-107(1).

**Findings pursuant to §25-7-110.8**

The rule change adopted by the Commission on January 15,1998 does not include the adoption of any additional control measures intended to reduce air pollution. The Commission's action merely changes the status of the Colorado Springs nonattainment area, and allocates a portion of the safety margin in the year 2010 to the mobile source sector.

The redesignation of the area was based on reasonably available, validated, reviewed and sound scientific methodologies, which are described in the maintenance plan narrative and the Final Emission Inventories for the Colorado Springs, Colorado, Carbon Monoxide Nonattainment Area Redesignation Plan. Such documents have been available for public review in draft form for several months, and have been revised in response to comments and review. Final documents were available thirty days prior to the hearing.

The redesignation of the Colorado Springs area as an attainment area is the most cost-effective alternative. Such redesignation provides the regulated community with flexibility, yet maintains the National Ambient Air Quality Standard (NAAQS) for carbon monoxide.

**Contested issues**

The maintenance plan associated with the rule change does not include two control measures (RIDEFINDERS and the Clean Air Campaign) that were previously included in the State Implementation Plan (SIP). Several parties to the hearing objected to the removal of these measures from the SIP. The Commission voted to remove the RIDEFINDERS and the Clean Air Campaign from the mandatory sections of the SIP in deference to the request of the Pikes Peak Area Council of Governments, the lead air quality-planning agency for the Colorado Springs area, pursuant to CRS §25-7-105(1)(a)(II). These measures are not necessary to maintain the NAAQS and are not otherwise federally required. Therefore, pursuant to §25-7-105.1, these measures should not be included in the maintenance plan. Furthermore, these control measures were not implemented by rule. Accordingly no rule change is necessary to remove such measures from the SIP.

As indicated above, the Commission chose to redesignate the area by comparing the base-year and future-year inventories, and the Division did not perform air quality modeling adequate to justify the removal of the oxygenated fuels program from the SIP. Several parties urged the removal of the oxygenated fuels program from the plan. However, such revision of the plan would have delayed the redesignation of the area pending further air quality analysis, and would have required substantial revisions to the maintenance plan. The Colorado Springs area would remain a nonattainment area in the meantime. The Commission has initiated a process for evaluating whether control measures such as the oxygenated furls program and the Automobile Inspection and Readjustment (I/M) Program are still necessary to maintain the NAAQS for CO in the Colorado Springs area and other communities in Colorado. For these reasons, the Commission has decided to approve of the maintenance plan and to redesignate the area, but also agrees that the evaluation of the need for the control measures should be expedited. PPACG has proposed that the Air Pollution Control Division expedite analyses of whether oxygenated fuels program is necessary to demonstrate maintenance of the carbon monoxide NAAQS in the Colorado Springs area. This evaluation is consistent with the Division's ongoing consideration of future carbon monoxide control strategies for Colorado's Front Range, and PPACG suggests that an expedited Colorado Springs evaluation could provide valuable information and experience for other areas eligible for redesignation to attainment status. This evaluation shall include both 1990 and 1993 base-years.

The APCD will report its progress to the PPACG and the Air Quality Control Commission in writing in March and June 1998, and will submit the results of said analyses to PPACG and other interested parties.

BLM_0037332

The PPACG has agreed to review the information, and will make an initial determination regarding whether oxygenated fuels are necessary to maintain the federal carbon monoxide NAAQS within 90 days of receipt of the technical analysis. If the oxygenated fuels program is not necessary to maintain the federal CO standards, PPACG has agreed to petition the Commission for revision of Regulation 13 and the Colorado Springs maintenance plan to reduce the oxygen content requirement or recategorize that program as a "contingency measure," as appropriate in light of the analyses. Similarly, the Division and other interested persons may petition for revisions to the I/M program, or removal of such program from the State Implementation Plan.

Based on this schedule, the Technical Secretary to the Commission has agreed to amend the Commission's long-term schedule and tentatively to set a hearing date as requested by the PPACG as early as practical.

Several parties also objected to the process used by Pikes Peak Area Council of Governments (PPACG) to develop the maintenance plan. The procedure used by the PPACG to develop the maintenance plan complied with the minimum requirements of the Intergovernmental Coordination and Public Involvement process ("the ICPI") contained in the 1982 Colorado Springs Element of the Carbon Monoxide State Implementation Plan (Including the 1993 and 1994 revisions) ("the Colorado Springs attainment SIP").

The primary complaint lodged by the parties is that the PPACG did not adequately consult with the Air Quality Technical Committee (AQTC). However, it appears that the staff of the PPACG consulted with the AQTC, and did so most recently on October 22,1997 and November 18,1997. In addition, members of the AQTC presented their complaints to the PPACG in September 1997. Pursuant to the Colorado Springs Attainment SIP, the PPACG is the lead agency for air quality planning and the AQTC is merely an advisory committee. The PPACG is not required to heed the advice of the AQTC. The consultation with AQTC complied with the minimum requirements of the ICPI.

The parties also complain that the maintenance plan had to be approved by the Urban Area Planning Council (UAPC), rather than the PPACG's Board of Directors. However, nothing in the Colorado Springs Attainment SIP implies that the PPACG Board of Directors does not have the authority to develop the maintenance plan. The Colorado Springs Attainment SIP identifies the PPACG as the lead air quality-planning agency, and identifies the UAPC as the Metropolitan Planning Agency for <u>transportation matters</u>, unless objected to by the PPACG. Colorado Springs Attainment SIP, Appendix A. The UAPC is advisory to the PPACG on all other matters, including air quality planning. <u>Id.</u>

Furthermore, according to Ken Prather of PPACG, the UAPC recommended approval of the maintenance plan and redesignation request.

The agreements and schedules set out in this Statement of Basis, Specific Statutory Authority, and Purpose shall not be included in the SIP, and this statement of basis, specific statutory authority and purpose shall not be construed to create enforceable requirements.

### VIII.H.   Total Suspended Particulate Matter Revocation Adopted: September 17,1998

The Commission revoked the Colorado ambient air quality standard for Total Suspended Particulate matter to conform Colorado's standards to the current National Ambient Air Quality Standards for Particulate Matter adopted by the U.S. Environmental Protection Agency.

### Federal Requirements

The State ambient standard for TSP is based on the National Ambient Air Quality Standard (NAAQS) for TSP that the Environmental Protection Agency ("EPA") repealed in 1987 in favor of the NAAQS for particulate matter less than ten microns in diameter (PM10). The NAAQS for PM10 is less stringent than the State ambient standard for TSP. The repeal of the TSP standard will ensure that Colorado's ambient air quality standards for particulate matter meet, but do not exceed, federal requirements.

The federal government no longer has an ambient air quality standard for particulate matter as TSP. Standards for the PM10 and PM2.5 size ranges have been adopted instead. EPA believes that PM10 and PM2.5, the smaller diameter particles, can travel deeper into the lungs than TSP, and has found that the NAAQS for PM10 and PM2.5 adequately protect public health. The federal Clean Air Act requires Colorado to adopt the new federal standards, which regulate particulate matter as PM10 and PM2.5. Retention of the state TSP standard would regulate particulate matter in all three-size ranges. The regulation of particulate matter in all three-size ranges is not necessary, and is not cost-effective.

The repeal of the ambient air quality standard for TSP shall be submitted to EPA as a SIP revision.

**Statutory Authority**

Section 25-7 108, C.R.S., authorizes the Commission to revoke the TSP ambient air quality standard. This section allows the Commission "to adopt, promulgate, amend, and modify such standards for the quality of ambient air as may be appropriate or necessary."

**Findings Pursuant to Colorado Revised Statutes 25-7-110.8**

This rule change does not include the adoption of any additional control measures intended to reduce air pollution. The Commission's action merely revokes an ambient air quality standard that is not federally required.

**VIII.I.    Denver metropolitan nonattainment area redesignation as an attainment area for carbon monoxide Adopted: January 10,2000**

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission change the air quality classification of the Denver area for carbon monoxide. The purpose of this rule change is to implement the direction in Section 25-7-107 (2.5), C.R.S. to take expeditious action to redesignate the area as attainment for carbon monoxide (CO).

The amendments also revise the mobile source emissions budget used to determine whether transportation plans and projects conform to the State Implementation Plan.

**Federal Requirements**

42 USC Section 7407(d)(3) provides that the State may request redesignation to attainment status for areas of the State that qualify for such redesignation based on air quality data, and planning and control considerations. In order for the EPA to approve of such a redesignation request, 42 USC Sections 7407(d)(3)(E) and 7505a require the State to submit a maintenance plan that will provide for maintenance of the standard for ten years following the approval of the redesignation request. The federal requirements for preparation, adoption and submittal of implementation plans, including the maintenance plan, are set out at 40 CFR, Part 51.

The maintenance plan adopted by the Commission includes an oxygenated fuels program and an Automobile Inspection and Readjustment Program as necessary to maintain the National Ambient Air Quality Standards (NAAQS) for carbon monoxide through the year 2013. The year 2013 is approximately ten years following the anticipated date of EPA approval of the maintenance plan.

The federal requirements for emissions budgets are set out at 42 USC Section 7506(c) and 40 CFR 93.124. The emissions budget establishes a test for determining whether transportation plans or projects may cause or contribute to a violation of the NAAQS. The emissions budget contained in the maintenance plan is based on the mobile source emission inventories supporting the maintenance demonstration.

BLM_0037334

The maintenance plan does not include any provisions that are not required by provisions of the federal act or that are otherwise more stringent than requirements of the federal act.

**Statutory Authority**

Specific statutory authority for the redesignation of the Denver area as an attainment area is provided in Section 25-7-107, C.R.S. (1999).

**Findings pursuant to § 25-7-110.8**

The mobile source emissions budget is the only control included in the amendments that will operate to reduce air pollution. The emissions budget establishes a cap on mobile source emissions and is administered though the transportation conformity regulations. Air Quality Control Commission Regulation Number 10, Part B; 40 CFR Part 93. The December 16, 1999 rule amendments reduced the mobile source emissions budget from 825 tons per day to 800 tons per day.

The revisions are based on the computer model currently approved by the EPA. The computer model used to develop the revised rule overstates the air quality benefits of some of the control programs in the SIP. The EPA is currently updating and improving the computer model but the revised computer model has not been approved by EPA and may not be used for federal regulatory purposes. In spite of the problems with the computer model used to develop this regulation, the regulation is based on the most reasonably available, validated, reviewed and sound scientific methodologies currently available under federal law. All methodologies and information made available by interested parties have been considered.

The alternative to the redesignation of the Denver area to an attainment area is to for the Denver area to remain a nonattainment area for carbon monoxide. Redesignation to attainment is the more cost-effective alternative. Redesignation provides the regulated community with more flexibility and achieves the reductions in air pollution necessary to maintain the NAAQS. There is no viable alternative to limiting mobile source emissions to 800 tons per day in the year 2013. Mobile source emissions can be effectively controlled using the measures described in the maintenance plan to keep mobile source emissions below the emissions budget. Thus, the revision to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost-effective manner.

**VIII.J.   Colorado Springs Adopted: February 17,2000**

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission revise the mobile source emissions budgets for the Colorado Springs area. The emissions budget is to determine whether transportation plans and projects conform to the State Implementation Plan.

**Federal Requirements**

The federal requirements for emissions budgets are set out at 42 USC 7506(c) and 40 CFR 93.124. The emissions budget establishes a test for determining whether transportation plans or projects may cause or contribute to a violation of the national ambient air quality standard (NAAQS). The emissions budget for Colorado Springs is based on the mobile source inventory for the year 1990. The previous emissions budget, which was adopted in January 1998, was based on the mobile source inventory for the year 1993. Some parties to the January 1998 hearing urged the Commission to adopt an emissions budget based on 1990, rather than 1993, mobile source emissions. The Commission did not have sufficient data or evidence at the January 1998 hearing to establish an emissions budget based on the 1990 base year. Therefore, the Commission adopted an emissions budget based on the 1993 base year and directed the Division to evaluate the request to establish an emissions budget based on 1990 mobile source emissions. Colorado Springs was in attainment of the national standard in both 1990 and 1993 but mobile source emissions were significantly higher in 1990 than in 1993. As authorized by federal regulations, this

BLM_0037335

revision establishes a higher emissions budget for mobile sources based on the 1990 mobile source inventory.

The regulatory revisions do not include any provisions that are not required by provisions of the federal act or that are otherwise more stringent than requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (1999).

**Findings pursuant to Section 25-7-110.8**

The emissions budget establishes a cap on mobile source emissions and will be administered though the transportation conformity regulations. Air Quality Control Commission Regulation Number 10, Part B; 40 CFR Part 93. The change increases the emissions budget, and thus increases the allowable emissions from mobile sources.

The carbon monoxide emissions budget is based on the computer model currently approved by the EPA. The computer model used to develop the revised rule overstates the air quality benefits of some of the control programs in the SIP. The EPA is currently updating and improving the computer model but the revised computer model has not been approved by EPA and may not be used for federal regulatory purposes, In spite of the problems with the computer model used to develop this regulation, the regulation is based on the most reasonably available, validated, reviewed and sound scientific methodologies currently available under federal law. All methodologies and information made available by interested parties have been considered.

The revisions to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost-effective manner.

**VIII.K.   Denver, Ozone Maintenance Plan Adopted: January 11,2001**

The amendments to the Ambient Air Quality Standards for the State of Colorado revise the mobile source emissions budgets for ozone precursors in the Denver metropolitan area. The emissions budgets are used to determine whether transportation plans and projects conform to the State Implementation Plan.

**Federal Requirements**

The federal requirements for emissions budgets are set out at 42 USC 7506(c) and 40 CFR 93.124. The emissions budget establishes a test for determining whether transportation plans or projects may cause or contribute to a violation of the national ambient air quality standard (NAAQS).

The maintenance plan must include emission budgets for ozone precursors, but the federal rules allow the State some discretion in setting the emissions budgets. The State may set an emission budget equal to the projected emissions from motor vehicles in the last year of the maintenance plan. Alternatively, the State may establish a higher emissions budget for mobile sources if the area could tolerate such higher emissions without exceeding the relevant NAAQS. 40 CFR 93.124. The Denver area can tolerate additional mobile source emissions of ozone precursors. The emissions budgets established in this rulemaking make this entire amount of additional emissions available to DRCOG and CDOT for conformity purposes. The rule revision is not more stringent than requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (1999).

BLM_0037336

**Findings pursuant to Section 25-7-110.8**

The emissions budgets are based on EPA-approved models and assumptions for estimating emissions from mobile sources. The Commission believes the EPA-approved model is inaccurate, but federal rules require the State to use such model to demonstrate the adequacy of the maintenance plan. Thus, the rule revision is based on the only scientific methodology authorized for use by federal law. All methodologies and information made available by interested parties have been considered.

The revisions to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost-effective manner.

**VIII.L.   Pagosa Springs and Telluride PM10 Adopted: March 16,2001**

The amendments to the "Ambient Air Quality Standards" for the State of Colorado Regulation adopted by the Commission change the air quality classifications of the Pagosa Springs area and the Telluride area for particulate matter. The purpose of this rule change is to implement the direction in Section 25-7-107 (2.5), C.R.S. (1999) to take expeditious action to redesignate the areas as attainment for particulate matter less than ten microns in diameter (PM10). The Commission also adopted simultaneous revisions to the "State Implementation Plan Specific Regulations for Nonattainment - Attainment/Maintenance Areas" to repeal obsolete control measures, contingency measures, and reporting requirements.

The amendments to the "Ambient Air Quality Standards" for the State of Colorado also revise the mobile source emissions budgets for the Pagosa Springs and Telluride areas. The emissions budgets are used to determine whether transportation plans and projects conform to the State Implementation Plan.

**Federal Requirements**

42 USC 7407(d)(3) provides that the State may request redesignation to attainment status for areas of the State that qualify for such redesignation based on air quality data, and planning and control considerations. In order for the EPA to approve such a redesignation request, 42 USC Sections 7407(d)(3)((E) and 7505a require the State to submit a maintenance plan that will provide for maintenance of the standard for ten years following the approval of the redesignation request. The federal requirements for preparation, adoption and submittal of implementation plans, including the maintenance plan, are set out at 40 CFR, Part 51. The maintenance plans adopted by the Commission will maintain the national standard for PM10 in Pagosa Springs and Telluride for the requisite ten-year period.

The federal requirements for emissions budgets are set out at 42 USC 7506(c) and 40 CFR 93.124. The emissions budget establishes a test for determining whether transportation plans or projects may cause or contribute to a violation of the national ambient air quality standard (NAAQS). The emissions budgets for Telluride and Pagosa Springs are based on the roll-forward analyses that support the maintenance demonstrations.

The regulatory revisions do not include any provisions that are not required by provisions of the federal act or that are otherwise more stringent than requirements of the federal act.

**Statutory Authority**

Specific statutory authority to redesignate areas to attainment is provided in Section 25-7-107, C.R.S. (1999). The authority to establish emissions budgets is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (1999).

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are the only control measures included in the amendments that will operate to reduce air pollution. The emissions budgets establish caps on mobile source emissions and

BLM_0037337

are administered though the transportation conformity regulations. Air Quality Control Commission Regulation Number 10, Part B; 40 CFR Part 93. For Pagosa Springs, the change increases the emissions budget, and thus increases the allowable emissions from mobile sources. The rule revisions decrease the allowable mobile source emissions of PM10 in Telluride.

The emissions budgets for PM10 for Pagosa Springs and Telluride are also based on EPA-approved models and assumptions for estimating PM10 emissions from mobile sources. The Commission believes the EPA-approved model is inaccurate, but federal rules require the State to use such model to demonstrate the adequacy of the maintenance plan. In spite of the problems with the computer model used to develop the regulation, the regulation is based on the most reasonably available, validated, reviewed and sound scientific methodologies currently available under federal law. All methodologies and information made available by interested parties have been considered.

The alternative to the redesignation of the Pagosa Springs and Telluride areas to attainment is for them to remain PM10 nonattainment areas. Redesignation to attainment is the more cost-effective alternative. Redesignation provides the regulated community with more flexibility and achieves the reductions in air pollution necessary to maintain the NAAQS. The revisions to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost-effective manner.

### VIII.M.   Denver Metropolitan Area, Redesignation to Attainment for PM10 Adopted: April 19,2001

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission change the air quality classification of the Denver metropolitan area for particulate matter. The purpose of this rule change is to implement the direction in Section 25-7-107 (2.5), C.R.S. (1999) to take expeditious action to redesignate the area as attainment for particulate matter less than ten microns in diameter (PM10). In conjunction with this redesignation, the Commission revised Regulation Number 16, "Street Sanding Emissions" to implement the control measures necessary to maintain the national standard for PM10 for at least ten years.

The change in the classification of the Denver area affects the regulatory requirements applicable to stationary sources. For most types of sources, the threshold for determining whether or not a source is a "major stationary source" for PM, NOx or S02 increases from 100 tons-per-year to 250 tons-per-year. Similarly, the requirements for new major stationary sources to use the lowest achievable emissions rate, and to obtain offsets, are relaxed. The rule change adopted by the Commission, however, maintains existing requirements in Regulation Number 3 for minor sources in the Denver area to use reasonably available control technology. The Commission intends, however, to review this requirement when it reviews Regulation Number 3.

The amendments to the "Ambient Air Quality Standards for the State of Colorado" also revise the PM10 mobile source emissions budget for the Denver metropolitan area. The emissions budget is used to determine whether transportation plans and projects conform to the State Implementation Plan.

### Federal Requirements

42 USC 7407(d)(3) provides that the State may request redesignation to attainment status for areas of the State that qualify for such redesignation based on air quality data, and planning and control considerations. In order for the EPA to approve such a redesignation request, 42 USC Sections 7407(d)(3)((E) and 7505a require the State to submit a maintenance plan that will provide for maintenance of the standard for ten years following the approval of the redesignation request. The federal requirements for preparation, adoption and submittal of implementation plans, including the maintenance plan, are set out at 40 CFR, Part 51. The maintenance plans adopted by the Commission will maintain the national standard for PM10 for the requisite ten-year period.

The federal requirements for emissions budgets are set out at 42 USC 7506(c) and 40 CFR 93.124. The emissions budget establishes a test for determining whether transportation plans or projects may cause

or contribute to a violation of the national ambient air quality standard (NAAQS). The emissions budget is based on the analysis that supports the maintenance demonstration.

The regulatory revisions do not include any provisions that are not required by provisions of the federal act or that are otherwise more stringent than requirements of the federal act.

**Statutory Authority**

Specific statutory authority to redesignate areas to attainment is provided in Section 25-7-107, C.R.S. (1999). The authority to establish emissions budgets is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (1999).

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are the only control measures included in the amendments to the Ambient Air Quality Standards rule that will operate to reduce air pollution. The reference to Regulation Number 3 added to the Ambient Air Quality Standards merely maintains the *status quo;* it does not establish any new requirement. The emissions budgets establish caps on mobile source emissions and are administered though the transportation conformity regulations. Air Quality Control Commission Regulation Number 10, Part B; 40 CFR Part 93. By capping mobile source emissions at a prescribed limit, the emission budget could result in a demonstrable reduction in air pollution.

The emissions budgets are based on EPA-approved models and assumptions for estimating PM10 emissions from mobile sources. The Commission believes the EPA-approved models are inaccurate, but federal rules require the State to use such models to demonstrate the adequacy of the maintenance plan. Thus, the emissions budgets are based on the only methodologies authorized for use by federal law. All methodologies and information made available by interested parties have been considered.

The alternative to redesignation is for the Denver area to remain a PM10 nonattainment area. Redesignation to attainment is the more cost-effective alternative. Redesignation provides the regulated community with more flexibility and achieves the reductions in air pollution necessary to maintain the NAAQS. The revisions to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost-effective manner.

**VIII.N.   Lamar and Steamboat Springs, Redesignation to Attainment for PM10 Adopted: November 15,2001**

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission change the air quality classifications of the Steamboat Springs and Lamar areas to attainment/maintenance for particulate matter, and revise the mobile source emissions budgets for these areas. The Commission adopted simultaneous revisions to the "State Implementation Plan-Specific Regulation for Nonattainment Areas" to repeal obsolete contingency measures.

**Federal Requirements**

The relevant federal requirements are described in detail in the statement of basis, specific statutory authority and purpose for Pagosa Springs and Telluride published in Section VIII.L. of the ambient air quality standards regulation. Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

Specific statutory authority to redesignate areas to attainment is provided in Section 25-7-107, C.R.S. (1999). The authority to establish emissions budgets is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (1999).

BLM_0037339

**Findings pursuant to Section 25-7-110.8**

The mobile source emission budget is the only control measures included in the amendments that will operate to reduce air pollution. The emissions budget is based on EPA-approved models and assumptions for estimating PM10 emissions from mobile sources. The Commission believes the EPA-approved model is inaccurate, but federal rules require the State to use such model to demonstrate the adequacy of the maintenance plan. All methodologies and information made available by interested parties have been considered.

The alternative to the redesignation of the areas to attainment is for these areas to remain PM10 nonattainment areas. Redesignation to attainment is the more cost-effective alternative. Redesignation provides the regulated community with more flexibility and achieves the reductions in air pollution necessary to maintain the NAAQS. The revisions to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost-effective manner.

**VIII.O.  Fort Collins Adopted: July 18,2002**

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission change the air quality classification of the Fort Collins area to attainment/maintenance for carbon monoxide and establish a mobile source emissions budget for the area. The Commission adopted simultaneous revisions to Regulation Number 11, Regulation Number 13 and the "State Implementation Plan-Specific Regulation for Nonattainment Areas."

The Commission also repealed Section V.B, "Requirement Regarding Enforceability." Section V.B established criteria for emission reduction credit in transportation conformity determinations. Federal regulations already establish such criteria. 40 CFR 93.122. Although Section V.B. was similar to the federal criteria set out at 40 CFR 93.122, Section V.B did not expressly authorize the option of taking credit for a control measure based on a SIP commitment to implement such a program. Thus, Section V.B appeared to deny transportation agencies an option that is available under the federal rules. The maintenance plan adopted by the Commission in conjunction with these changes to the Ambient Air Quality Standards regulations includes a commitment to implement an automobile testing program in the year 2026. Under the federal rules, such a commitment will allow the Colorado Department of Transportation to take emission reduction credit for the inspection program when it makes transportation conformity determinations that extend beyond 2026. The Commission repealed Section V.B so that the rules for taking credit during transportation conformity determinations are identical to the federal rules on the subject. Elsewhere, in Regulation Number 10, Part B, the Commission has already passed a state regulation requiring transportation agencies to comply with the federal rules when performing transportation conformity determinations. Therefore, Section V.B was confusing and unnecessary, and may have exceeded the minimum federal requirements. Finally, the Commission made several minor housekeeping changes and repealed obsolete provisions.

**Federal Requirements**

The federal requirements relevant to the redesignation and the emission budget are described in detail in the statement of basis, specific statutory authority and purpose for Pagosa Springs and Telluride published in Section VIII.L of the ambient air quality standards regulation. The federal regulation establishing criteria for taking credit in transportation conformity determinations is set out at 40 CFR 93.122. Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

**Specific statutory authority to redesignate areas to attainment is provided in Section 25-7-107, C.R.S. (1999). The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (1999).**

BLM_0037340

**Findings pursuant to Section 25-7-110.8**

The mobile source emission budget is the only control measures included in the amendments that will operate to reduce air pollution. The emissions budget is based on EPA's recently released MOBILE6. Federal rules require the State to use a model approved by EPA. The Commission believes that the MOBILE6 model is superior to the MOBILE5 model that was used to develop earlier SIPs. All methodologies and information's made available by interested parties have been considered.

The alternative to the redesignation of the areas to attainment is for the Fort Collins area to remain a nonattainment area for carbon monoxide. Redesignation to attainment is the more cost-effective alternative. Redesignation provides the regulated community with more flexibility and maintains the reductions in air pollution necessary to maintain the NAAQS. In particular, it allowed the Commission to repeal the oxygenated fuels program for the Fort Collins area, and to remove the automobile testing program from the SIP. The removal of the automobile testing program from the SIP gives the State the flexibility to amend or repeal the program later without the delay of the SIP amendment and approval process. For these reasons, the revisions to the ambient air quality standard will maximize the air quality benefits of the Commission's regulations in the most cost- effective manner.

**VIII.P.  Greeley**

Adopted: December 19,2002

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Greeley area. The Commission adopted simultaneous revisions to Regulation Number 13 so that this rule no longer applies in the Greeley area.

**Federal Requirements**

Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (2001).

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are based on EPA's MOBILE6 emissions model, as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. The rule allocates the margin of safety to mobile sources, thus providing the transportation community with maximum flexibility authorized by federal law. in adopting this rule, the Commission chose the most cost-effective alternative.

**VIII.Q   Denver Carbon Monoxide**

Adopted: June 19,2003

The carbon monoxide emissions budget for the Denver area has been revised to reflect a new computer model (mobile6) issued by EPA for use in estimating emissions from motor vehicles. Federal law requires transportation agencies to use such budgets to make transportation conformity determinations on transportation plans and programs. 40 CFR 93.118. Transportation agencies must use mobile6 for transportation conformity determinations that begin after January 2004.

**Federal Requirements**

The revision to the emission budget follows EPA policy established in *Policy Guidance On The Use of Mobile6 For Sip Development and Transportation Conformity* (U.S. EPA, Jan. 18,2002). The Commission's regulation does not allocate the entire safety margin to mobile sources, as authorized by federal regulations. Instead, the Commission reserved a portion of the safety margin in order to preserve a cushion for growth in other source categories. The reservation of a portion of the safety margin does not mean that the rule exceeds minimum federal requirements. Instead, the rule merely preserves a margin of safety for growth in other sources.

**Statutory Authority**

The Commission adopts this change under its general authority to promulgate and adopt a state implementation plan, as set out in Section 25-7-105(1)(a), C.R.S.

**Findings pursuant to Section 25-7-110.8. C.R.S.**

The purpose of this rule change is to make sure that transportation agencies will use mobile6-based emissions budgets when making mobile6-based transportation conformity determinations. The rule change is not intended to reduce air pollution. The requirements of 25-7-110.8 do not apply.

**VIII.R   Longmont and Colorado Springs Carbon Monoxide**

Adopted: December 18,2003

The carbon monoxide emission budgets for the Longmont and Colorado Springs areas have been revised to reflect a new computer model (mobile6) issued by EPA for use in estimating emissions from motor vehicles. Federal law requires transportation agencies to use such budgets to make transportation conformity determinations on transportation plans and programs. 40 CFR 93.118. Transportation agencies must use mobile6 for transportation conformity determinations that begin after January 2004.

**Federal Requirements**

The revisions to the emission budgets follow EPA policy established *in policy guidance on the use of mobile6 for sip development and transportation conformity* (u.s. EPA, Jan. 18,2002). The Commission's regulation allocates the entire safety margin to mobile sources, as authorized by federal regulations.

**Statutory Authority**

The Commission adopts this change under its general authority to promulgate and adopt a state implementation plan, as set out in Section 25-7-105(1)(a), C.R.S.

**Findings pursuant to Section 25-7-110.8. C.R.S.**

The purpose of this rule change is to make sure that transportation agencies will use mobile6-based emissions budgets when making mobile6-based transportation conformity determinations. The rule change is not intended to reduce air pollution. The requirements of 25-7-110.8 do not apply. Statutory authority

The Commission adopts this change under its general authority to promulgate and adopt a state implementation plan, as set out in Section 25-7-105(1)(a), C.R.S.

**Findings pursuant to Section 25-7-110.8, C.R.S.**

BLM_0037342

The purpose of this rule change is to make sure that transportation agencies will use mobile6-based emissions budgets when making mobile6-based transportation conformity determinations. The rule change is not intended to reduce air pollution. The requirements of 25-7-110.8 do not apply.

**VIII.S   Denver 8-Hour Ozone**

Adopted: March 11, 2004

The purpose of this rule change is to define the geographic scope of the Denver 8-hour Ozone Nonattainment Area for purposes of State Law and Commission regulations. This definition is not to be included in the state implementation plan.

The Commission adopted this definition in conjunction with the Ozone Action Plan and certain revisions to of Regulation Number 7 to reduce emissions of volatile organic compounds from oil and gas operations and from stationary and portable reciprocal internal combustion engines. Such control measures in Sections XVI, XVI, and XVII VI of Regulation Number 7 apply in the Denver 8-hour Ozone Nonattainment Area, as defined in the Ambient Air Quality Standards Regulation.

The U.S. EPA will also define the geographic scope of the Denver 8-hour Ozone Nonattainment Area. The Commission intends for its State definition of such area to be identical to the federal definition. The Commission would ordinarily incorporate the federal definition by reference but the Commission cannot do that in this case because EPA has not yet adopted a final rule defining the Denver 8-hour Ozone Nonattainment Area and will not do so until April 15, 2004 at the earliest. Section 24-4-103(12.5), C.R.S. prohibits the Commission from adopting a later edition of the federal rule. In the event the area defined by the federal rule is smaller than the area defined by this rule, the Commission will promptly revise this rule to conform to the federal rule.

The statutory authority to define the nonattainment area is set out in Sections 25-7-105(1)(a) and (1)(b); 25-7-106(1)(b)(viii), (1)(c) and (5); and 25-7-109(1)(a) and (2), C.R.S.

**VIII.T   Denver 8-Hour Ozone**

Adopted: December 16, 2004

The purpose of this rule change is to revise the geographic scope of the Denver 8-hour Ozone Nonattainment Area for purposes of State law and Commission regulations.

The revision to the boundaries for the Denver 8-hour ozone control area match the boundaries promulgated by the Environmental Protection Agency on April 15, 2004. The initial boundaries matched EPA's proposed boundaries for the area.

The revisions also include minor, nonsubstantive changes to simplify the language.

The statutory authority to define the nonattainment area is set out in Sections 25-7-105(1)(a) and (1)(b); 25-7-106(1)(b)(VIII), (1)(c) and (5); and 25-7-109(1)(a) and (2), C.R.S.

**VIII.U   Denver and Longmont Carbon Monoxide Carbon Monoxide, and Denver PM10**

Adopted: December 15, 2005

The Commission revised the emissions budgets for carbon monoxide and PM10 for Denver, as well as the carbon monoxide emissions budget for Longmont. The changes update the emissions budgets using the latest EPA computer models.

The Commission has assigned the safety margin for both carbon monoxide and particulate matter to the mobile source emissions budget, reserving a portion of the carbon monoxide safety margin in case of additional growth in other sectors beyond the growth anticipated in the maintenance demonstration. The rule also provides some flexibility to trade between the NOx and primary particulate budgets for purposes of transportation conformity determinations. The federal rules allow, but do not require, assignment of some or the entire safety margin to the transportation conformity budget. The reservation of a portion of the carbon monoxide safety margin allows for additional growth in other sectors, but does not make the sip more stringent than the federal requirements.

The authority to establish emissions budgets is included in the general authority to adopt a state implementation plan set out in Section 25-7-105(1), C.R.S.

The mobile source emissions budgets are based on EPA-approved computer models, as required by federal regulations. All methodologies and information made available by interested parties have been considered. The rule allocates most of the margin of safety to mobile sources, but maintains a reasonable margin for accommodation of uncertainty and future growth in other sectors. The allocation of most of the safety margin to mobile sources provides flexibility for the transportation community. In adopting this rule, the Commission chose the most cost-effective option.

## VIII.V   Cañon City PM10

Adopted:  November 20, 2008

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Cañon City area.

### Federal Requirements

Nothing in this rule change exceeds the minimum requirements of the federal act.

### Statutory Authority

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (2001).

### Findings pursuant to Section 25-7-110.8

The mobile source emissions budgets are based on EPA's MOBILE6 emissions model and EPA-approved methods for calculating fugitive dust emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

Further, these revisions include any typographical, grammatical and formatting errors throughout the regulation.

## VIII.W   Denver Metro Area/North Front Range 8-Hour Ozone Emissions Budgets

Adopted December 11, 2008

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Denver Metro Area/North Front Range 8-Hour Ozone area.

BLM_0037344

**Federal Requirements**

Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1) and in 25-7-107(1), C.R.S.

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are based on EPA's MOBILE6 emissions model and EPA-approved methods for calculating fugitive dust emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

**VIII.X    Pagosa Springs PM10**

Adopted November 19, 2009

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Pagosa Springs PM10 attainment area.

**Federal Requirements**

Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (2001).

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are based on EPA's MOBILE6 emissions model and EPA-approved methods for calculating fugitive dust emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

Further, these revisions will include any typographical, grammatical and formatting errors throughout the regulation.

**VIII.Y    Telluride PM10**

Adopted November 19, 2009

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Telluride PM10 attainment area.

**Federal Requirements**

BLM_0037345

Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (2001).

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are based on EPA's MOBILE6 emissions model and EPA-approved methods for calculating fugitive dust emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

Further, these revisions will include any typographical, grammatical and formatting errors throughout the regulation.

**VIII.Z.   Ambient Air Quality Standards Regulation Update**

Adopted March 18, 2010

The Commission intends to maintain and update its Ambient Air Quality Standards Regulation.

**Statutory Authority**

This Statement of Basis, Specific Statutory Authority and Purpose complies with the requirements of the Colorado Administrative Procedures Act, C.R.S. § 24-4-103, and the Colorado Air Pollution Prevention and Control Act, C.R.S. §§ 25-7-110, 110.5, and 110.8.  Specifically, C.R.S. § 25-7-108 authorizes the Commission to adopt standards for the quality of ambient air.   C.R.S. §§ 25-7-201 and 25-7-209 provide that increases in pollution concentrations above baseline concentration shall be the same as those provided for in the federal Clean Air Act.

**Basis**

Colorado's Ambient Air Quality Standards Regulation is outdated and unclear.

**Purpose**

The Commission intends to revise the Ambient Air Quality Standards Regulation by: 1) removing the ambient air quality standards in the Ambient Air Table in Section II.; 2)  removing the state-only PSD SO2 increments in Section I.B.; and 3) making administrative changes, including typographical, grammatical and formatting corrections, as necessary.

*Remove Section II. (Ambient Air Table)*

The Commission removes the Ambient Air Table in Section II., as it is unnecessary. The National Ambient Air Quality Standards (NAAQS) are set by EPA.  Citizens can get more current data from EPA.  The EPA maintains a readily available and accessible summary table of these NAAQS on the internet (see http://epa.gov/air/criteria.html), and the details of the NAAQS are codified in 40 C.F.R. Part 50, which is also readily available and accessible on the internet.  For these reasons, the Commission removes this Section II., and references where the information can be found.

*Remove Section I.B. (State-only PSD SO2 Increments)*

BLM_0037346

The Commission removes the state-only incremental ambient air standards for SO2, as they are artifacts from 1970's rulemakings that cannot be fully applied per current rules. The following table compares Colorado's SO2 increments to the federal SO2 increments.

| | Colorado SO2 Increments [1] | | | Federal SO2 Increments[2] | | |
|---|---|---|---|---|---|---|
| | Category I | Category II | Category III | Class I | Class II | Class III |
| Arithmetic Mean | 2 ug/m3 | 10 ug/m3 | 15 ug/m3 | 2 ug/m3 | 20 ug/m3 | 40 ug/m3 |
| 24-Hour Maximum | 5 ug/m3 | 50 ug/m3 | 100 ug/m3 | 5 ug/m3 | 91 ug/m3 | 182 ug/m3 |
| 3-Hour Maximum | 25 ug/m3 | 300 ug/m3 | 700 ug/m3 | 25 ug/m3 | 512 ug/m3 | 700 ug/m3 |

Note the distinction between Colorado's SO2 increment Category areas and the federal Class areas. When applicable, Colorado's Category I areas for SO2 were essentially the same as EPA's Class I area, except that Colorado's Category I areas included some additional national monuments and forest service primitive areas that would otherwise be considered as Class II areas. While these former Category I areas for SO2 were classified as Class II, they were given the protection of the Class I PSD increment for SO2 only. The remainder of the state was then considered Category II, and now considered a Class II area. There are no Category III or Class III areas previously or currently designated in Colorado.

These state-only SO2 increments no longer apply to any area in the state.  Early versions of the Ambient Air Quality Standards Regulation identify Category I, II and III areas in the state, in which these Colorado SO2 increments applied[3]. However in 1981, in preparation to adopt the federal Prevention of Significant Deterioration (PSD) rules, a Colorado Increment Task Force met and ultimately made recommendations on how to adopt the federal PSD Program in Colorado. Colorado's SO2 increments were part of these recommendations.  The Colorado Increment Task Force recommended the Commission review its authority to adopt more stringent increments than EPA[4].  Later in 1983, when the Commission adopted the federal PSD Program, industry identified similar concerns over authority to adopt more stringent increments than EPA[5].

1 See Ambient Air Quality Standards Regulation, Section I.B.

2 See the Clean Air Act, section 163(b), and/or Colorado's State Implementation Plan – Regulation Number 3, Part D, Section X.A.

3 See Ambient Air Quality Standards Regulation versions adopted September 4, 1975 and October 27, 1977.

4 See the December 17, 1981 "Increment Task Force Recommendations and Background Material," prepared for the AQCC, page 4.

5 See Exhibit M to the 1983 Rulemaking Hearing adopting the PSD program into Regulation Number 3, "Summary of Party Comments and Division Evaluation," page 101.

---

[1] See Ambient Air Quality Standards Regulation, Section I.B.

[2] See the Clean Air Act, Section 163(b), and/or Colorado's State Implementation Plan - Regulation 3, Part D, Section X.A.

[3] See Ambient Air Quality Standards Regulation versions adopted September 4, 1975 and October 27, 1977.

[4] See the December 17, 1981 "Increment Task Force Recommendations and Background Material," prepared for the AQCC, p. 4.

[5] See Exhibit M to the 1983 Rulemaking Hearing adopting the PSD program into Regulation 3, "Summary of Party Comments and Division Evaluation", p. 101

Review of the supporting rulemaking documents indicates that the Commission intentionally abandoned the use of Category I, II and III areas, largely adhering to the federal PSD Program's Class I, II and III areas instead. In 1983, when the Commission did adopt the federal PSD program, those classifications were more appropriately moved to Regulation Number 3. Today, area classifications are found in Regulation Number 3, Part D, Section VIII. This section only mentions Class I and II areas, and not any Category I, II or III. The current classifications are the same as those adopted in 1983. Based on the authority issues raised by Colorado Increment Task Force and industry, the omission of "categories" in the adopted Regulation Number 3 appears to be intentional.

In the absence of clearly defined geographic "Category" areas in rule, the Colorado "Category I, II and III" incremental standards that remain in the Ambient Air Quality Standards Regulation cannot be applied in practice. While this proposal removes the state-only SO2 incremental standards, this change does not undermine existing protection for Colorado Federal Class I and II areas, or for those additional Colorado national monuments and forest service primitive areas currently granted Class I protection in Regulation Number 3.

For these reasons, these state-only SO2 PSD increments should be removed from regulation.

*Reorganize, Clarify and Make Typographical, Grammatical, and Formatting Corrections*

The remaining proposed revisions to reorganize and rename the regulation, identify existing standards as state-only, identify missing CO and PM10 attainment/maintenance effective dates in tables, revise the 1-Hour Ozone Attainment/Maintenance Map title to clarify association with the 1-hour standard only, and make typographical, grammatical and formatting corrections, as necessary, are purely administrative in nature, and not believed to have any economic impact.

## Findings pursuant to C.R.S. §§ 110.5(5)(a) and 110.8

These revisions eliminate PSD SO2 increments that would be more stringent than federal increments if they had been fully implemented. Because there are no currently designated areas to which the more stringent standards would apply, these standards cannot be implemented. Therefore, these revisions do not exceed or differ from the federal act or rules.

These revisions align the increments in question with federal increments. The federal increments are based on reasonably available, validated, reviewed and sound scientific methodologies. These revisions are not intended to reduce air pollution and do not result in a demonstrable reduction in air pollution. Public health and the environment are sufficiently protected by the national increments. These revisions benefit the government, regulated community and the public by eliminating confusion caused by differences between state and federal requirements.

## VIII.AA.  Aspen PM10

Adopted:  December 16, 2010

The amendments to the "Ambient Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Aspen area.

## Federal Requirements

Nothing in this rule change exceeds the minimum requirements of the federal act.

## Statutory Authority

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (2001).

**Findings pursuant to Section 25-7-110.8**

The mobile source emissions budgets are based on EPA's MOVES2010 emissions model and EPA-approved methods for calculating fugitive dust emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

**VIII.BB.  Steamboat Springs**

Adopted:  December 15, 2011

**Basis and Purpose**

The purpose of this amendment is to update the PM10 emission budget for the Steamboat Springs area in connection with the adoption of the Revised PM10 Maintenance Plan for the Steamboat Springs Attainment/Maintenance Area.

**Specific Statutory Authority**

The Commission promulgates this regulatory change pursuant to its authority under Section 25-7-105(1)(a)(I), C.R.S. to adopt a comprehensive state implementation plan that meets the requirements of the federal Clean Air Act.

**Findings Pursuant to Section 25-7-110.8**

The mobile source emission budgets are based on EPA-approved methods for calculating PM10 emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emission budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

**VIII.CC  Lamar PM10**

Adopted:  December 20, 2012

The amendments to the "Air Quality Standards for the State of Colorado" Regulation adopted by the Commission establish mobile source emissions budgets for the Lamar area.

**Federal Requirements**

Nothing in this rule change exceeds the minimum requirements of the federal act.

**Statutory Authority**

The authority to establish emissions budgets and to establish criteria for transportation conformity determinations is included in the general authority to adopt a State Implementation Plan set out in Section 25-7-105(1), C.R.S. (2001).

**Findings pursuant to Section 25-7-110.8**

BLM_0037349

The mobile source emissions budgets are based on EPA's MOVES2010a emissions model and EPA-approved methods for calculating fugitive dust emissions as required by federal regulations. All methodologies and information made available by interested parties have been considered. The emissions budgets reduce the potential for air pollution by capping emissions from mobile sources. In adopting this rule, the Commission chose the most cost-effective alternative.

BLM_0037350

**Database Placeholder(file available in native format)**

**File Name:**              0_CDPHE2013_Environ APENS database request.mdb

Case No. 1:20-cv-02484-MSK Document 37-10 filed 04/27/21 USDC Colorado pg 71 of 154

Translate



| Home | Services & information | Boards & commissions | Divisions |

| Concerns & emergencies | Data | News |

# Air Quality Control Commission regulations

Back to air quality regulations

Air Quality Standards, Designation and Emission Budgets
(Adopted 12/20/12, effective 02/15/13)

Common Provisions Regulation
(Adopted 10/21/10, effective 12/15/10)

Procedural Rules
(Adopted 03/21/13, effective 05/15/13)

State Implementation Plan, Specific Regulation Numbers for Nonattainment-Attainment/Maintenance Areas (Local Elements)
(Adopted 11/20/08, effective 12/30/08)

Regulation Number 1
Emission Control for Particulate Matter, Smoke, Carbon Monoxide and Sulfur Oxides
(Adopted 06/21/07, effective 08/30/07)

Regulation Number 2
Odor Emission
(Adopted 05/16/13, effective 07/15/13)

BLM_0037352

## Regulation Number 3

Stationary Source Permitting and Air Pollutant Emission Notice Requirements

(Adopted 11/20/14, effective 01/14/15)

## Regulation Number 4

Concerning the Sale and Installation of Woodburning Appliances and the Use of Certain Woodburning Appliances During High Pollution Days

(Adopted 06/16/06, effective 08/30/06)

Regulation Number 5

Generic Emissions Trading and Banking

(Repealed 02/17/05, effective 03/30/05)

## Regulation Number 6

Standards of Performance for New Stationary Sources

(Adopted 08/21/14, effective 10/15/14)

## Regulation Number 7

Control of Ozone via Ozone Precursors and Control of Hydrocarbons via Oil and Gas Emissions (Emissions of Volatile Organic Compounds and Nitrogen Oxides)

(Adopted 02/23/14, effective 04/14/14)

## Regulation Number 8

Control of Hazardous Air Pollutants

(Adopted 08/21/14, effective 10/15/14)

## Regulation Number 9

Open Burning, Prescribed Fire, and Permitting

(Adopted 12/15/11, effective 01/30/12)

## Regulation Number 10

Criteria for Analysis of Transportation Conformity

(Adopted 12/15/11, effective 01/30/12)

## Regulation Number 11

Motor Vehicle Emissions Inspection Program

(Adopted 10/16/14, effective 11/30/14)

BLM_0037353

### Regulation Number 12
Reduction of Diesel Vehicle Emissions
(Adopted 08/15/13, effective 09/30/13)

Regulation Number 13
Reduction of Carbon Monoxide Emissions from Gasoline Powered Motor Vehicles through the
Use of Oxygenated Gasolines
(Repealed 08/20/09, effective 02/01/11)

Regulation Number 14
Reduction of Motor Vehicle Air Pollution from Alternative Fueled Vehicles
(Repealed 08/19/99, effective 10/30/99)

### Regulation Number 15
Control of Emission of Ozone-Depleting Compounds
(Adopted 09/18/08, effective 10/30/08)

### Regulation Number 16
Street Sanding Emissions
(Adopted 04/19/01, effective 06/30/01)

Regulation Number 17
Clean Fuel Fleet Program
(Repealed 08/15/02, effective 10/30/02)

### Regulation Number 18
Control of Emissions of Acid Deposition Precursors
(Adopted 10/18/12, effective 12/15/12)

### Regulation Number 19
The Control of Lead Hazards
(Adopted 12/20/07, effective 01/30/08)

BLM_0037354



About us   Careers   Contact us   News

© 2013 State of Colorado

BLM_0037355



# Assessment of Potential Public Health Effects from Oil and Gas Operations in Colorado

February 21, 2017

CDPHE

COLORADO
Department of Public
Health & Environment

colorado.gov/oghealth

# Oil and Gas Health Information and Response Program

**Tami McMullin, PhD**
Program Manager/ Toxicologist

**Allie Bamber, MS**
Health Professional/ Toxicologist

**James Flores, MS**
Environmental Health and Safety Advisor

**Daniel Vigil, MD, MPH**
Consulting Physician

**Mike Van Dyke, PhD, CIH**
Branch Chief, Environmental Epidemiology, Occupational Health and Toxicology

## CONTACT INFORMATION:
**Phone: (877) 462-2911**
**www.colorado.gov/oghealth**



BLM_0037357

# Table of Contents

| | |
|---|---|
| **Executive Summary** | **i-iv** |
| **Section 1: Screening Assessment of Potential Exposures and Health Effects** | **1-12** |
| Introduction | **2** |
| Process | **3-5** |
| Results | **6-9** |
| Strengths and Limitations | **10** |
| Conclusions | **11** |
| Recommendations | **11** |
| References | **12** |
| **Section 2: Systematic Review of Human Health Effects Literature** | **13-24** |
| Introduction | **14** |
| Process | **14-15** |
| Strength of evidence findings | **16-21** |
| Conclusions | **21** |
| Recommendations | **22** |
| References | **23-24** |
| **Glossary** | **25-27** |
| **Appendices** | **A1-A32** |
| Appendix 1A: Substance Identification | **A1-A2** |
| Appendix 1B: Exposure Assessment | **A3-A9** |
| Appendix 1C: Health Effects Assessment | **A10-A13** |
| Appendix 1D: Risk Characterization | **A14-A17** |
| Appendix 2A: Systematic Review Methodology | **A18-A21** |
| Appendix 2B: Summary of Human Health Effect Studies | **A22** |
| Appendix 2C: Individual Human Health Effect Study Evaluations | **A23-A32** |



COLORADO
Department of Public
Health & Environment

BLM_0037358

# Executive Summary

## Introduction

Over the last several years, multiple published papers have outlined the potential chemical and non-chemical hazards from oil and gas operations. In addition, studies specifically evaluating the relationship between living near oil and gas operations and the potential for certain adverse health effects have been widely publicized. This information led to heightened public and policy-maker concerns about whether or not harmful health effects occur in people living near oil and gas operations. In 2015, the Colorado Oil and Gas Task Force made several recommendations to the Colorado Department of Public Health and the Environment (CDPHE). Among them was a recommendation to review existing scientific literature and compile a summary of useful findings. That same year, CDPHE established the Oil and Gas Health Information and Response Program to respond to citizen health concerns and conduct evaluations of the exposure and health science related to oil and gas. An evaluation of the potential routes of exposures and types of public concerns reported to the program indicated that the greatest public health priority for evaluation was related to potential health effects from exposures to substances emitted into the air from oil and gas operations. Therefore, the scope of this report was to evaluate existing scientific data to answer the following question:

> Do substances emitted into the air from oil and gas operations result in exposures to Coloradans living near oil and gas operations at levels that may be harmful to their health?

Because each source of scientific information has strengths and weaknesses, an integrated approach used existing information from multiple sources. This report combines two evaluations of scientific information to assess the strength of evidence to answer the main question (Figure 1).

## Figure 1. Integration of scientific information to evaluate the potential for health effects in people living near oil and gas operations in Colorado





BLM_0037359

## Section 1: Screening Assessment of Potential Exposures and Health Effects

Sixty-two substances that are likely emitted, though not exclusively, from oil and gas operations were identified as priority substances for analysis. More than 10,000 air samples that measured these substances in regions of Colorado that have substantial oil and gas operations were combined.  These data were used to estimate potential air exposures to people living near oil and gas operations (defined as 500 feet or greater from an oil and gas site). These exposures were compared to standard short- and long-term health-based reference values (i.e. "safe" levels) related to cancer and non-cancer effects.

- The screening health risk assessment of these substances found:

    o   All measured air concentrations were below short- and long-term "safe" levels of exposure for non-cancer health effects, even for sensitive populations.

    o   The concentrations of a small number of substances (benzene, formaldehyde, acetaldehyde) in the air surrounding oil and gas operations were 4-5 times lower than standard short- and long-term health-based reference values for non-cancer effects.

    o   The concentrations of the other substances were 5-10,000 times lower than the standard short- and long-term health-based reference values for non-cancer effects.

    o   Cancer risks for all substances were within the "acceptable risk" range established by the U.S. EPA.

    o   Although well within the acceptable risk range for cancer and non-cancer effects, benzene, acetaldehyde and formaldehyde had the highest estimated risk levels and are high priority for continued monitoring.

    o   Overall, available air monitoring data suggest low risk of harmful health effects from combined exposure to all substances.

## Section 2: Systematic Review of Human Health Effect Studies

A standard systematic method was used to review all relevant studies that investigated health effects in communities near oil and gas operations. Using this method, the current level of scientific evidence was evaluated for whether or not living near oil and gas operations is related to harmful health effects.

- The review included twelve epidemiological studies with 27 different health effects and the following major conclusions were made:

    o   No substantial or moderate evidence for any health effects.

    o   Limited evidence for two health effects - self-reported skin symptoms and exacerbation of asthma. Limited evidence means modest scientific findings that support an association, but there are significant limitations.

    o   Mixed evidence for 11 health effects, including four different birth outcomes, hematological childhood cancers, hospitalizations for cancer, migraines, self-reported respiratory symptoms and musculoskeletal symptoms, and hospitalizations for neurological, hematological and immune diseases. Mixed evidence means there are



ii

BLM_0037360

findings that both support and oppose an association between the exposure and the outcome, with neither direction dominating.

o   A lack of evidence for three health effects, including respiratory hospitalizations and self-reported psychological symptoms and gastrointestinal symptoms. A lack of evidence means that the outcome has been researched without evidence of an association.

o   Insufficient evidence for 11 health effects, including three different birth defects, self-reported neurological symptoms, cardiovascular effects, overall childhood cancer incidence and hospitalizations for psychological, musculoskeletal and gastrointestinal symptoms. Insufficient evidence means that the outcome has not been adequately studied.

## Conclusions

- Based on currently available air monitoring data, the risk of harmful health effects is low for residents living near oil and gas operations.

- Studies of populations living near oil and gas operations provide limited evidence of the possibility for harmful health effects. This needs to be confirmed or disputed with higher quality studies.

- At this time, results from exposure and health effect studies do not indicate the need for immediate public health action, but rather indicate the need for more detailed exposure monitoring and systematic analyses of health effects of residents living near oil and gas operations.

## Recommendations

- Continued monitoring of exposures to people living near oil and gas including:

  o   Continued evaluation of ambient air levels of priority substances in areas with substantial oil and gas operations to assess the potential for community-wide health impacts.

  o   Collection of air samples in communities near oil and gas operations using our Colorado Air Mobile Monitoring Laboratory to better characterize short-term exposures for those living in close proximity to oil and gas operations.

- Continued evaluation of health risk using more comprehensive exposure data such as data from the Colorado State University studies that directly measured emissions of substances from oil and gas operations in Garfield County and the north Front Range and data collected by the Colorado Air Mobile Monitoring Laboratory.

- Continued monitoring of health effects in areas with substantial oil and gas operations including:

  o   High-quality epidemiological studies with improved characterization of exposures to directly assess the possibility of health effects in communities with substantial oil and gas operations.



    ○   Continued citizen reporting of health concerns to the CDPHE Oil and Gas Health Information and Response Program to monitor for trends in health effects that may be related to exposure.

BLM_0037362

# SECTION 1:

# Screening Assessment of Potential Exposures and Health Effects

BLM_0037363

## Introduction

The overall goal of this project was to evaluate the level of evidence from multiple sources of existing scientific information to answer the following question:

> **Do substances emitted into the air from oil and gas operations result in exposures to Coloradans living near oil and gas operations at levels that may be harmful to their health?**

The process of oil and gas extraction releases volatile substances (sometimes referred to as volatile organic chemicals or VOCs) into the air. Public health risks from these substances are largely determined by the type and amount of VOCs released into the air that could result in an exposure to someone living near these operations. A person's total exposure to VOCs in the air comes from many different sources at work, in homes, and outdoors. One challenge to evaluating potential public health risks solely from oil and gas operations is that there is a lack of easily accessible information in publicly available literature that directly identifies the types and amounts of substances that are emitted into the air during different phases of oil and gas extraction. There are, however, other sources of information, such as emission databases and air data collected across Colorado in areas of substantial oil and gas operations. These can be used to understand potential oil- and gas-related exposures. Additionally, there are extensive toxicological data on the health effects of VOCs that provide estimates of levels of human exposure that are unlikely to produce harmful non-cancer effects (i.e. "safe" levels) or added cancer risks. Together, these data provide information to estimate the potential for harmful health effects to occur in people who may be exposed to substances emitted into the air from oil and gas operations near their homes (i.e. human health risk assessment).

COLORADO
Department of Public
Health & Environment

BLM_0037364

## Process

This assessment was conducted using a screening-level human health risk assessment framework[1]. The following four questions framed the scope of each step in the assessment (Figure 1). Detailed methods and uncertainties for each step are provided in Appendix 1, A-D.

### Figure 1. Four questions of the screening health risk assessment



1. Substance identification: What substances could be released into the air from oil and gas operations?

   A variety of datasets were evaluated to identify the substances most likely to be released into the air from oil and gas operations in Colorado. Eleven sources of information were located relevant to identifying substances potentially emitted during any phase of oil and gas operations (Appendix 1A). The primary sources were studies that directly measured VOCs from oil and gas operations in Colorado and studies that collected air data in oil and gas areas and used models to estimate percent of oil and gas source contributions to overall measured samples. Ambient air data in areas with substantial oil and gas operations and minimal other industrial activities was used as a secondary source of information. The substances detected at least 50 percent of the time across all datasets were cross-checked with primary source data and any additional substances were added to the list. These were used in the subsequent steps of the assessment. Although substances detected at less than 50 percent may still be potentially emitted from oil and gas operations, the scope of this current assessment was limited to those substances most frequently detected.

COLORADO
Department of Public
Health & Environment

3

BLM_0037365

2. <u>Exposure assessment</u>: What are the levels of exposures to these substances?

Although exceptions may occur, the Colorado Oil and Gas Conservation Commission's established setback distance from residences is at 500 feet or greater from oil and gas operations[2]. Therefore, this exposure analysis only included air samples that were collected at 500 feet or greater from an oil and gas operation. A total of 13 different datasets across 33 locations were combined for the assessment (Appendix 1B). The data represent a range of concentrations across both the Denver-Julesburg and Piceance Basins over eight years (2008-2015) and include more than 10,000 individual air measurements (Appendix 1B, Table 1, Figure 1). The different values from these combined air data were used to represent two different potential exposure scenarios:

A) The maximum air concentration of a substance represents an estimate of an acute (short-term) exposure. An acute exposure is an intermittent, infrequent exposure that could occur for a few hours to a few days. This is what the air might be like from an unanticipated release of emissions during oil and gas activities.

B) The highest average air concentration for a substance across all datasets is used to represent an estimate of a chronic (long-term) exposure. A chronic exposure is a prolonged continuous exposure, generally over the lifetime of an individual. The air data likely indicates what the average outdoor air is like near residences over the life of a normal operating well or wells.

3. <u>Health effects assessment</u>: What are the "safe" levels of exposure for these substances?

A consistent, tiered approach was used to identify existing cancer risk estimate values and non-cancer health-based reference values from national and state sources for exposure scenarios A (short-term exposures) and B (long-term exposures) (Appendix 1C, Table 1). These values are generally based on the most sensitive, chemical-induced health effect considered to be relevant to humans. For non-cancer health effects, the health-based reference value is the exposure level below which health effects are not expected to occur, even for potentially sensitive people in the general population (also referred to as a "safe" level in this report). For cancer causing substances, there are no "safe" levels of exposure. Rather, inhalation unit risk (IUR) values are used to assess the incremental increase in cancer risks[3]. Details are provided in Appendix 1C.

4. <u>Risk Characterization</u>: Are the exposures to people living near oil and gas operations above or below "safe" levels?

Step 1: This step combines the results of the exposure assessment and the health effects assessment to estimate the level of health risk posed by oil and gas operations.

<u>Non-cancer</u>: The air concentrations of each substance (Step 2) were compared to health-based reference values (Step 3). Details are provided in Appendix 1D.

<u>Individual substances</u>: a hazard quotient (HQ) is determined for each individual substance. This ratio is a risk estimate that indicates the relationship between the exposure level of an individual substance compared to the health-based reference value (i.e. "safe" level). When the HQ is less than or equal to 1.0, harmful effects are not expected, even for sensitive populations. Exposures to substances at levels above a HQ of 1.0 will not necessarily cause harmful health effects and should be further evaluated. For example, a HQ of 2 indicates that the exposure level for a substance was two times higher than the "safe" level but does *not* mean there is a two times increased risk for that effect to occur.



BLM_0037366

It only means that the potential for harmful effects increases with exposures greater than the health-based reference value.

Combined substances: Evaluating the combined risks to human health from multiple substances is an important component to understanding the potential for health effects to occur from oil and gas emissions. A standard U.S. EPA screening level risk assessment approach was also used to screen for combined short and long term risk potential[4]. A Hazard Index (HI) was derived by summation of all the HQs. This total HI is a very conservative approximation of the total potential non-cancer risk estimate of all substances. The combined risks were also separated based on common (ie. neurological, respiratory). This is a more biologically appropriate method (Appendix 1D, Table 1).

Cancer: To estimate increased cancer risks, the exposure concentration of the substance in the air were multiplied by the inhalation unit risk (IUR) value of the substance (Appendix 1D). For example, a risk level of one in a million ($1x10^{-6}$) implies a likelihood that up to 1 out of one million equally exposed people would contract cancer if exposed continuously (i.e. 24 hours per day) to the specific concentration over a lifetime (i.e. 70 years). This would be in addition to those cancer cases that would normally occur in an unexposed population of one million people[3]. Combined cancer risks were also evaluated for all known cancer causing substances. This approach conservatively assumes that all the substances cause cancer in the body by the same mechanism and therefore, their combined effect is additive. Although this may not be biologically representative of the mechanisms for these substances, this method is consistent with standard U.S. EPA approaches for screening for combined risks.

The cancer and non-cancer health risk estimates are categorized, for individual substances or combined substances, as *elevated, acceptable, or negligible*. These categories were adapted from generally accepted categories used by U.S. EPA and other state agencies to assist in risk management decisions[5] (Table 1).

## Table 1. Screening health-risk levels for potential cancer and non-cancer health effects

| Screening Health Risk Level | Non-Cancer Risk (HQ/HI)[a] | Cancer Risk Estimate | |
|---|---|---|---|
| | > 1 | ≥ $1x10^{-4}$ | One in a hundred thousand |
| Acceptable[c] | 0.1 to 1 | $1x10^{-6}$ to $1x10^{-4}$ [b] | One in a million to one in a hundred thousand |
| Negligible | < 0.1 | < $1x10^{-6}$ | One in a million |

[a] HQ= Hazard Quotient; HI=Hazard Index
[b] U.S. EPA's target cancer risk range
[c] "Acceptable" risk levels indicate that harmful non-cancer health effects are not likely to occur below the estimated population threshold level.

BLM_0037367

## Results

- Sixty -two substances were selected as high priority to evaluate in the risk assessment (Table 2).

- More than 10,000 air measurements for all substances were combined.

- Long-term health-based guidelines for approximately 25 percent of the substances were found in the U.S. EPA IRIS database, approximately 50 percent were from Texas Commission on Environmental Quality (TCEQ) and only 5 percent were from other regulatory agencies. Information on similar substances was used to select health-based guidelines for four substances that did not have any published health-based guidelines (Appendix 1D, Table 2).

- For non-cancer health effects, all air concentrations of individual substances were below non-cancer health-based reference values and considered in the "safe" levels of exposure (Figure 2).

  o Benzene, formaldehyde, and acetaldehyde were approximately 4-5 times below standard health-based reference values.

  o Two substances, ethane and methane, do not produce any health effects except at extremely high exposures.

  o Although identified as a high priority substance, acrolein had no air monitoring data to compare with health-based reference values (Appendix 1B, Table 2).

  o All other 56 substances were 5-10,000 times below standard health-based reference values and considered in the negligible risk range.

- For non-cancer health effects of combined air concentrations (Figure 3):

  o For short-term exposures, all substances combined, regardless of the type of health effect, were within "safe" levels (HI = 0.7).

  o For long-term exposures, all substances combined, were slightly elevated above "safe" levels (HI = 1.4) However, this is a very minor finding considering the large number of substances evaluated.

  o Neurological (HI=1.3), upper and lower respiratory (HI=1.3) health effects are the main contributors to the elevated risk estimate, primarily due to the larger number of substances with the potential to cause these effects.

- All four cancer-causing substances (benzene, ethylbenzene, formaldehyde and acetaldehyde) were within acceptable risk range, even for combined exposures (Figure 4).

BLM_0037368

## Table 2. Substances selected for the health risk assessment

| Acetaldehyde | Dimethylcyclohexane(trans-13-) | Methane | Propane |
|---|---|---|---|
| Acetone | 2,3-Dimethylpentane | Methanol | n-Propylbenzene |
| Acrolein | 2,4-Dimethylpentane | Methylcyclohexane | Propylene |
| Benzene | Ethane | Methylcyclopentane | Styrene |
| n-Butane | Ethylbenzene | 2-Methylheptane | 1,2,3-Trimethylbenzene |
| 2-Butanone | Ethylcyclohexane | 3-Methylheptane | 1,2,4-Trimethylbenzene |
| 1-Butene | Ethylene | 2-Methylhexane | 1,3,5-Trimethylbenzene |
| Butene (cis-2-) | m-Ethyltoluene | 3-Methylhexane | 2,2,4-Trimethylpentane |
| Butene (trans-2-) | o-Ethyltoluene | 2-Methylpentane | 2,3,4-Trimethylpentane |
| Cyclohexane | p-Ethyltoluene | 3-Methylpentane | Toluene |
| Cyclopentane | Formaldehyde | n-Nonane | n-Undecane |
| n-Decane | n-Heptane | n-Octane | m-Xylene |
| p-Diethylbenzene | n-Hexane | n-Pentane | o-Xylene |
| m-Diethylbenzene | Isobutane | 1-Pentene | p-Xylene |
| Dimethylcyclohexane(cis-13-) | Isopentane | Pentene (cis-2-) | |
| Dimethylcyclohexane(trans-12-) | Isopropylbenzene | Pentene (trans-2-) | |

BLM_0037369

Section 1: Screening Assessment of Potential Exposure and Health Effects

## Figure 2. Short-term and long-term risk estimates (hazard quotients) for each substance for non-cancer effects





Assessment of Potential Public Health Effects from Oil and Gas Operations in Colorado : 2017



8

## Figure 3. Combined long-term risk estimates (hazard index) by each non-cancer health effect category



## Figure 4. Cancer risk estimates for each type of cancer



BLM_0037371

## Strengths & Limitations

This assessment had the following strengths:

- Multiple sources of reliable information were used to select the high priority substances evaluated in this assessment, resulting in a high level of confidence that the substances represent the majority of the substances emitted from oil and gas operations.

- The air concentration dataset was large including more than 10,000 individual air samples at 33 different locations across two different oil and gas basins.

- Multiple conservative assumptions were used to minimize underestimating any potential health risks:

  o The maximum air concentrations of all the averages and the overall maximum were used to compare against the short- and long-term health-based reference values.

  o A worst-case exposure scenario was used in which a person spends 100 percent of his or her time outdoors residing by the oil and gas operations. A more realistic exposure scenario that includes normal activity patterns, such as time indoors and time away from home, would result in lower exposure values.

  o The lowest of the available health-based reference values for the short-term assessment was used.

  o The combined risk from exposure to all substances combined was evaluated.

This assessment had the following limitations:

- To conduct a screening level assessment, air data collected in regions with substantial oil and gas operations as a substitute for a person's exposure was used. Although these are the best available data, they may not represent individual and community level exposures to people living near oil and gas operations.

- Average and maximum values across all studies are more likely to represent the high end of average long-term exposures, but there is less confidence that these values represent the short-term exposure scenario.

- The air data used represents a person's total outdoor air exposure to both oil and gas and non-oil and gas sources of emissions, such as emissions from vehicles, gas stations, industrial waste landfills or other industries.

- The standard health-based reference values do not account for substance interactions other than additivity. Although a conservative approach was used to assess the potential non-cancer health risks from combined exposures to all substances, this approach may not fully address potential interactions of substances.

COLORADO
Department of Public
Health & Environment

BLM_0037372

## Conclusions

- All measured air concentrations of were below short- and long-term "safe" levels of exposure for non-cancer health effects, even for sensitive populations.

- The concentrations of a small number of substances (benzene, formaldehyde, acetaldehyde) in the air surrounding oil and gas operations were 4-5 times lower than standard short- and long-term health-based reference levels for non-cancer effects.

- The concentrations of the other substances are 5-10,000 times lower than the standard short- and long-term health-based reference values for non-cancer effects.

- Cancer risks for all substances were within the "Acceptable Risk" range established by the U.S. EPA.

- Although well within the range considered "safe" for cancer and non-cancer effects, benzene, acetaldehyde and formaldehyde had the highest estimated risk levels and are high priority for continued monitoring.

- Overall, available air monitoring data suggest low risk of harmful health effects from combined exposure to all substances.

## Recommendations

- CDPHE will continue to collect data from citizens who report oil and gas health concerns in order to characterize the types and frequency of symptoms, map locations where symptoms are reported and determine response plans to address the concerns of the communities.

- CDPHE will continue to monitor regional air data in areas with substantial oil and gas operations and evaluate community-specific exposures using our Colorado Air Mobile Monitoring Laboratory that will enable collection of more frequent, real-time air samples over longer periods of time.

- CDPHE currently is supporting a comprehensive risk assessment that will address many of the limitations of this study. The assessment will use recently released data from Colorado State University on the direct emissions of VOC's during each phase of oil and gas extraction. The emission information will generate detailed, realistic exposure scenarios that will estimate potential health risks to people living at various distances from an oil and gas operation.

BLM_0037373

## References

1. U.S. Environmental Protection Agency. (2010). Preliminary Risk-Based Screening Approach for Air Toxics Monitoring Data Sets. Air, Pesticides and Toxics Management Division.

2. Colorado Oil and Gas Conservation Commission. 600 Series Safety Regulations.  Regulation 604.a(1). (Published Date: 3/16/2016).

3. U.S. Environmental Protection Agency. Integrated Risk Information System (IRIS). https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system

4. U.S. Environmental Protection Agency. (2003). Framework for Cumulative Risk Assessment. EPA document number EPA/630/P-02/001F.

5. U.S. Environmental Protection Agency  Superfund Regional Removal Management Levels https://www.epa.gov/risk

BLM_0037374

# SECTION 2:

# Systematic Review of

# Human Health Effect Studies

BLM_0037375

## Introduction

Over the last several years, multiple papers have outlined the potential chemical and non-chemical hazards from oil and gas operations[1-6]. Other studies have evaluated the relationship between living near oil and gas operations and the potential for certain adverse human health effects[9-20]. These studies contribute to the scientific evidence for identifying potential public health concerns that may need further investigation. This section systematically reviews the existing peer-reviewed epidemiology literature and determines the level of scientific evidence for the findings from these studies to answer our main question:

> **Do substances emitted into the air from oil and gas operations result in exposures to Coloradans living near oil and gas operations at levels that may be harmful to their health?**

## Systematic review process

We adapted the various established systematic review frameworks for environmental health assessments, such as GRADE and the Navigation Guide to ensure a standardized and rigorous review[7,8] (Figure 1).

**Figure 1. Steps in the review of the epidemiological literature**



Twelve studies met our criteria of *an observational human health epidemiologic study evaluating the potential health effects associated with living near oil and gas operations* and were included in this systematic review. The findings within each study were rated as either a low, medium or high quality of evidence based on the strengths and limitations of that study. Each of the findings were grouped into similar health-effect categories and the overall strength of evidence was assessed (Table 1). Details for each step are provided in Appendix 2A. Table 2 provides a summary of the evidence findings for each health effect. Individual study evaluation details, including relevant findings and strengths and limitations, are provided in Appendix 2B.

BLM_0037376

## Table 1. Strength of evidence statements and criteria

| Evidence Level | Definition |
|---|---|
| Substantial | Strong scientific findings that support an association between oil and gas exposure and the outcome, with no credible opposing scientific evidence. |
| Moderate | Strong scientific findings that support an association between oil and gas exposure and the outcome, but these findings have some limitations. |
| Limited | Modest scientific findings that support an association between oil and gas exposure and the outcome, but these findings have significant limitations. |
| Mixed | Both supporting and opposing scientific findings for an association between oil and gas exposure and the outcome, with neither direction dominating. |
| Failing to show an association | Body of research failing to show an association - indicates that the topic has been researched without evidence of an association; is further classified as a limited, moderate or substantial body of research failing to show an association. |
| Insufficient | The outcome has not been sufficiently studied. |

BLM_0037377

## Strength of evidence findings

**Table 2. Summary of overall strength of evidence for epidemiological studies by health effect**

| Health Effects Categories | Number of studies* | Health Effects | Evidence |
|---|---|---|---|
| Birth outcomes | 4 | Preterm birth[9,10,11,12] | *Mixed* |
| | | Low APGAR[10,11] | *Mixed* |
| | | Small for gestational age[10,11,12] | *Mixed* |
| | | Birth weight (LBW & mean)[9,10,11,12] | *Mixed* |
| Birth Defects | 1 | Congenital heart defects[9] | *Insufficient* |
| | | Oral Clefts[9] | *Insufficient* |
| | | Neural tube defects[9] | *Insufficient* |
| Respiratory (eye, nose and throat (ENT) and lung) | 6 | Multiple, self-reported symptoms[13,14,15] | *Mixed* |
| | | Hospitalizations[17,18] | *Failing to show an association* |
| | | Asthma exacerbations[16] | *Limited* |
| Neurological (migraines, dizziness) | 5 | Hospitalizations[17,18] | *Mixed* |
| | | Multiple, self-reported[14] | *Insufficient* |
| | | Migraine/severe headache[13,14,15] | *Mixed* |
| Cancer | 4 | Overall childhood cancer incidence[19] | *Insufficient* |
| | | Childhood Hematological (Blood) Cancers[19,20] | *Mixed* |
| | | Childhood CNS tumors[19] | *Insufficient* |
| | | Hospitalizations[17,18] | *Mixed* |
| Skin (irritation, rashes) | 2 | Multiple, self-reported[14,15] | *Limited* |
| Psychological (depression, sleep disturbances | 4 | Multiple, self-reported[13,14,15] | *Failing to show an association* |
| | | Hospitalizations[17] | *Insufficient* |
| Cardiovascular (heart) | 2 | Hospitalizations[17] | *Insufficient* |
| | | Multiple, self-reported[14] | *Insufficient* |
| Gastrointestinal (nausea, stomach pain) | 3 | Hospitalizations[17] | *Insufficient* |
| | | Multiple, self-reported[14,15] | *Failing to show an association* |
| Musculoskeletal (joint pain, muscle aches) | 2 | Hospitalizations[17] | *Insufficient* |
| | | Multiple, self-reported[15] | *Mixed* |
| Blood/Immune | 2 | Hospitalizations[17,18] | *Mixed* |

*\* A total of 12 studies were included with some studies evaluating multiple health effects*

BLM_0037378

## Reproductive and developmental effects

Oil and gas operations can emit volatile organic compounds (VOCs) and particulate matter into the air during the extraction process. Some VOCs can cause developmental effects in test animals following high levels of exposure – generally much higher than we have observed for individual VOCs at oil and gas operations. Additionally, systematic reviews of a broad set of data have demonstrated evidence of positive associations between maternal exposures to fine particulate matter in ambient outdoor air pollution in urban areas and adverse birth outcomes[21-23]. However, the ability of specific substances emitted directly from oil and gas operations to cause reproductive and developmental effects has not been proven at residential exposure levels. This review identified four low-quality epidemiological studies that evaluated the relationship between women that lived near oil and gas operations and the likelihood their offspring would have birth defects or other types of adverse effects at birth.

Birth outcomes

There is **MIXED** evidence for whether or not living near oil and gas operations during pregnancy is associated with adverse birth outcomes, such as preterm birth, changes in birth weight, low APGAR scores and small for gestational age, in the infant.

Four studies evaluated various birth outcomes in infants of mothers who lived near well operations[9-12]. These studies examined commonly used indicators of infant health status such as preterm birth, changes in birth weight, low APGAR scores, small for gestational age and birth weight (see glossary of terms for definitions). Overall, there were conflicting low- to medium-quality findings across the four studies.

Birth defects

There is **INSUFFICIENT** evidence to determine if living near oil and gas operations during pregnancy is associated with birth defects, such as oral clefts, heart defects and neural tube defects in the infant.

Evidence is limited to a single (1) study that evaluated the relationship between maternal residence proximity to O&G operations and the incidence of birth defects in their offspring[9].

BLM_0037379

## Upper (eye, nose and throat) and lower respiratory symptoms

There is **LIMITED** evidence that living near oil and gas operations is associated with exacerbation of existing asthma.

There is **MIXED** evidence for whether or not living near oil and gas operations is associated with self reported upper and lower respiratory symptoms.

There is a limited body of evidence **FAILING TO SHOW AN ASSOCIATION** between living near oil and gas operations and upper and lower respiratory hospitalizations.

Many different substances in the air can cause eye, nose and throat (ENT) irritation or respiratory effects in test animals and humans (see Section 1). Five low-quality and 1 medium- quality study evaluated the relationship between living near oil and gas operations and the occurrence of ENT irritation and respiratory health effects and found conflicting evidence based on the type of the specific health effect evaluated[13-18].

## Neurological symptoms

There is **MIXED** evidence for whether or not living near oil and gas operations is associated with migraines or an increased rate of hospitalizations for neurological symptoms.

There is **INSUFFICIENT** evidence to determine if living near oil and gas operations is associated with self reported neurological symptoms.

VOCs can produce neurological effects such as central nervous system damage, headaches, dizziness, visual disorders, loss of coordination, and memory impairment in test animals and humans[24] (see Section 1). Five studies evaluated the relationship between living near oil and gas operations and the occurrence of a variety of different measures for neurological health effects[13-15,17-18]. Overall, the low-quality studies lack clear positive findings for increased occurrence of neurological symptoms in people living in oil and gas areas.

BLM_0037380

## Cancer

> There is **INSUFFICIENT** evidence to determine if living near oil and gas operations is associated with increased incidence of overall childhood cancers.
>
> There is **MIXED** evidence to determine whether or not living near oil and gas operations is associated with increased incidence of childhood hematological cancers and rates of adult and child cancer hospitalizations.

Long-term exposure to certain substances that are likely emitted into the air from oil and gas operations, such as benzene, may increase the risk of developing certain types of cancer (see Section 1). However, the development of cancer is complex because many other non-environmental influences, such as genetics and lifestyle behaviors, can also contribute to cancer. Two epidemiological studies evaluated the incidence of childhood cancers in Pennsylvania counties or in rural Colorado[19-20]. Two community level studies examined hospitalization rates in an oil and gas areas compared to an area with no oil and gas[17-18]. Overall, these low quality studies have both supporting and opposing evidence that living near oil and gas operations may be positively associated with cancer.

## Dermal Symptoms

> There is **LIMITED** evidence that living near oil and gas operations is associated with self-reported dermal symptoms.

Two low-quality studies evaluated dermal outcomes such as rash, irritation, burning, itching, and hair loss in relation to oil and gas activities in Pennsylvania[14,15]. Skin related health effects, however, are unlikely to occur following inhalation exposures to oil and gas related substances in the air (Appendix 1C).

BLM_0037381

## Psychological Effects

There is a limited body of evidence **FAILING TO SHOW AN ASSOCIATION** that living near oil and gas operations is associated with self-reported psychological symptoms (sleep disturbances, fatigue, forgetfulness, anxiety, and depression).

There is **INSUFFICIENT** evidence to determine if living near oil and gas operations is associated with increased rates of psychological hospitalizations.

Measures of mental health, such as reported psychological symptoms, are not necessarily a result of direct exposure to substances emitted from oil and gas but could be indirectly associated with non-chemical environmental stressors such as noise, light or odors. For example, studies have shown associations between living in areas with increased noise and traffic, such as by airports, with increased psychological symptoms[25-28]. Four epidemiological studies evaluated a variety of indicators of psychological well-being, such as depression, anxiety, fatigue, sleep disturbances and forgetfulness specifically in populations living near oil and gas operations [13,14,15,17].

## Cardiovascular, Gastrointestinal, Musculoskeletal and Hematological (blood) and Immune Effects

There is **INSUFFICIENT** evidence to determine if living near oil and gas operations is associated with self-reported cardiovascular symptoms and cardiac and gastrointestinal hospitalizations.

There is a limited body of evidence **FAILING TO SHOW AN ASSOCIATION** between living near oil and gas operations and self-reported gastrointestinal symptoms.

There is **MIXED** epidemiologic evidence for whether or not living near oil and gas operations is associated with self-reported musculoskeletal or blood/immune symptoms.

BLM_0037382

Most of the substances that may be emitted from oil and gas are not known to cause gastrointestinal, cardiovascular or musculoskeletal effects (Appendix 1C). Benzene is the only substance identified in our screening risk assessment that is known to cause harmful blood disorders following repeated or prolonged exposures.  Four studies with low quality findings had both supporting and opposing evidence, depending on the health effect, for self-reported symptoms and rates of hospitalizations in people living near oil and gas operations[14,15,17,18].

## Conclusions

- A relatively small number of epidemiological studies (12) have been published that evaluate potential associations between oil and gas emissions and health outcomes.

- There is limited evidence that exacerbation of existing asthma and self-reported dermal symptoms are associated with exposure to substances emitted from oil and gas operations.

- There is a lack of evidence or, in some cases, conflicting evidence concerning the relationship between other health outcomes and oil and gas operations.

- The majority of findings from the studies were ranked as low quality, primarily due to limitations of the study designs that make it difficult to establish clear links between exposures to substances emitted directly from oil and gas and the outcomes evaluated.

- A person's total exposure may reflect multiple substances from both oil and gas and non-oil and gas sources from indoor and outdoor environments. For example, VOCs can be emitted from a variety of sources including oil and gas, other industrial operations, vehicle traffic and everyday consumer products such as nail polish, detergents, sealants, aerosol antiperspirants and deodorants.

- In addition, these epidemiological studies may also reflect the interactions of non-chemical stressors that may or may not be related to oil and gas operations that can contribute to adverse health outcomes in a population.

- Although these observational epidemiology studies alone are not sufficient to determine causality, they provide helpful information to direct further investigation into the public health implications of oil and gas activity near residential areas.

- Studies of populations living near oil and gas operations provide limited evidence of the possibility for harmful health effects. This needs to be confirmed or disputed with higher quality studies.

BLM_0037383

## Recommendations

- Epidemiological studies that include more controlled designs with direct measurements of exposure and determination of health effects are needed to confirm or dispute the associations published in the literature.

- Public health officials should continue to monitor health concerns in areas with substantial oil and gas operations through centralized data collection and analysis.

- Multi-state collaborations should be considered to collect consistent datasets from differing oil and gas basins across the United States in order to more comprehensively evaluate the potential for adverse health effects.

BLM_0037384

# References

1. Adgate JL, Goldstein BD, McKenzie, LM. Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development. Environ. Sci. Technol. 2014; 48(15): 8307-8320

2. Colborn T, Kwiatkowski C, Schultz K, Bachran M. Natural Gas Operations from a Public Health Perspective. Human and Ecological Risk Assessment: An International Journal. 2011; 17(5): 1039-1056.

3. Field RA, Soltis J, Murphy S. Air Quality Concerns of Unconventional Oil and Natural Gas Production. Environ. Sci.: Processes Impacts. 2014; 16: 954-969.

4. Terra Mentis Environmental Consulting. Fort Collins Memorandum 2A Technical Support Document City of Fort Collins. 2015.

5. Goldstein BD, Brooks BW, Cohen SD, Gates AE, Honeycutt ME, Morris JB, Orme-Zavaleta JO, Penning TM, Snawder J. The Role of Toxicological Science in Meeting the Challenges and Opportunities of Hydraulic Fracturing. Toxicological Sciences. 2014. 139(2): 271-283.

6. Werner AK, Vink S, Watt K, Jagals P. Environmental Health Impacts of Unconventional Natural Gas Development: A Review of the Current Strength of Evidence. Science of the Total Environment. 2015; 505: 1127-1141.

7. Grading of Recommendations, Assessment, Development and Evaluation (GRADE) Working Group. GRADE approach to evaluating the quality of evidence: a pathway. http://training.cochrane.org/path/grade-approach-evaluating-quality-evidence-pathway

8. Rooney AA, Boyles AL, Wolfe MS, Bucher JR, Thayer KA. Systematic Review and Evidence of Integration for Literature-based Environmental Health Science Assessments. Environ Health Perspect. 2014. 122:711-718.

9. McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado. Environ Health Perspect. 2014. 122(4):412-417.

10. Hill E. Shale Gas Development and Infant Health: Evidence from Pennsylvania. Unpublished. The Charles H. Dyson School of Applied Economics and Management, Cornell University, Ithaca, New York. 2013.

11. Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS, Unconventional Natural Gas Development and Birth Outcomes in Pennsylvania, USA. Epidemiology. 2016; 27(2): 163-172.

12. Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. Perinatal Outcomes and Unconventional Natural Gas Operations in Southwest Pennsylvania. PLOS ONE. 2015; doi:10.1371/journal.pone.0126425

13. Tustin AW, Hirsch AG, Rasmussen SG, Casey JA, Bandeen-Roche K, Schwartz BS. Associations between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania. Environ Health Perspect. 2016; doi: 10.1289/EHP281

14. Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MK, Reif JS, Weiss TR, Stowe MH. Proximity to Natural Gas Wells and Reported Health Status: Results of

BLM_0037385

a Household Survey in Washington County, Pennsylvania. Environmental Health Perspectives. 2015; 123(1): 21-26.

15. Steinzor N, Subra W, Sumi L. Investigating Links Between Shale Gas Development and Health Impacts Through a Community Survey Project in Pennsylvania. New Solutions. 2013; 23(1): 55-83.

16. Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. Association Between Unconventional Natural Gas Development in the Marcellus Shale and Asthma Exacerbations. JAMA Intern Med. 2016;doi:10.1001/jamainternmed.2016.2436

17. Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Frusti N, Penning TM, Roy J, Propert KJ, Panettieri RA. Unconventional Gas and Oil Drilling is Associated with Increased Hospital Utilization Rates. PLOS ONE. 2015; DOE:10.1371/journal.pone.0131093

18. Werner AK, Watt K, Cameron CM, Vink S, Page A, Jagals P. All-age Hospitalization Rates in Coal Seam Gas Areas in Queensland, Australia, 1995-2011. BMC Public Health. 2016; 16(125).

19. Fryzek J, Pastula S, Jiang X, Garabrant DH. Childhood cancer incidence in Pennsylvania counties in relation to living in counties with hydraulic fracturing sites. JOEM. 2013; 55(7): 796-801.

20. McKenzie LM, Allshouse WB, Byers TE, Bedrick EJ, Serdar B, Adgate JL. Childhood hematologic cancer and residential proximity to oil and gas development. PLoS ONE. 2017; 12(2): e0170423. doi:10.1371/journal.pone.0170423

21. Lamichhane DK, Leem JH, Lee JY, Kim HC. A Meta-Analysis of Exposure to Particulate Matter and Adverse Birth Outcomes. Environ. Health. Toxicol. 2015; doi: 10.5620/eht.e2015011.

22. Sapkota A., Chelikowsky AP, Nachman KE, Cohen AJ, Ritz B. Exposure to Particulate Matter and Adverse Birth Outcomes: A comprehensive review and meta-analysis. Air Qual Atmos Health. 2012; 5: 369. doi:10.1007/s11869-010-0106-3

23. Srám RJ, Binkova B, Dejmek J, Bobak M. Ambient Air Pollution and Pregnancy Outcomes: A Review of the Literature. Environ Health Perspect. 2005; 113(4):375-82.

24. National Institutes of Health. U.S. Department of Health and Human Services. Volatile Organic Compounts (VOCs). ToxTown. 2016. https://toxtown.nlm.nih.gov/text_version/chemicals.php?id=31

25. Morrell S1, Taylor R, Lyle D. A review of health effects of aircraft noise. Aust N Z J Public Health. 1997 Apr;21(2):221-36.

26. Stansfeld S1, Haines M, Brown B. Noise and health in the urban environment. Rev Environ Health. 2000 Jan-Jun;15(1-2):43-82.

27. Recio A, Linares C, Banegas JR, Díaz J. Road traffic noise effects on cardiovascular, respiratory, and metabolic health: An integrative model of biological mechanisms. Environ Res. 2016 Apr;146:359-70

28. Pedersen E. City dweller responses to multiple stressors intruding into their homes: noise, light, odour, and vibration. Int J Environ Res Public Health. 2015 Mar 18;12(3):3246-63.

BLM_0037386

## Glossary of terms and acronyms

**Acceptable risk** - the level of exposure to a substance or multiple substances that is unlikely to result in adverse health effects, even to the most sensitive populations.

**Ambient air** – Ambient air refers to the outdoor air surrounding a person through which pollutants can be carried. The ambient concentration of a substance is the concentration estimated in the outdoor environment.

**Asthma exacerbation** - Short- or long-term episode of worsening asthma symptoms including shortness of breath, wheezing, cough and chest tightness.

**Birth weight** - Weight of an infant at birth. Studies evaluating the average birth weight of many infants include premature infants, who usually weigh less. Therefore, some studies evaluate 'term birth weight,' which includes only infants who are not premature.

**Cancer risk** - The probability of contracting cancer over the course of a lifetime, assuming continuous exposure (assumed to be 70 years).

**Carcinogen** - A substance that can cause cancer.

**CDPHE** – Colorado Department of Public Health and Environment

**CHD** - Congenital Heart Defect: An abnormality in the structure of the heart at birth.

**CNS tumor** - Central nervous system (CNS) tumors are formed in the tissues of the brain or spinal cord.

**Elevated risk** - The level of exposure to a substance or multiple substances considered to be above a health-based guidance level. An elevated risk level does not necessarily mean that an adverse health effect is expected. Rather, it is a screening level that indicates further in-depth evaluation is warranted for substances that meet this level.

**Epidemiologic study** - The study and analysis of the patterns, causes, and effects of health and disease conditions in defined populations.

**Hazard Index (HI)** - The sum of hazard quotients for substances that affect the same target organ or organ system. When different substances can cause similar harmful health effects, it can be appropriate to combine hazard quotients for different substances.

**Hazard Quotient (HQ)** - A HQ indicates the relationship between the exposure level and the health-based guideline level. When the HQ is less than or equal to 1, harmful effects would not be expected, even for the most sensitive populations. When the hazard quotient is greater than 1, the potential for harmful effects should be examined more closely. For example, a HQ of 2 indicates that the exposure level for a substance was two times higher than the health-based guideline level and an HQ of 0.5 indicates the exposure level for a substance was two times lower than the health-based guideline level

---



BLM_0037387

**Health-Based Reference Level –** For non-cancer health effects, the health based reference value is the exposure level below which health effects are not expected to occur, even for potentially sensitive people in the general population (also referred to as a "safe" level in this report). These health based reference values are developed by federal or state regulatory agencies for use in comparison with exposure levels.

**Human health risk assessment** – the process to estimate the nature and probability of adverse health effects in humans who may be exposed to substances in the air they breathe or the water they drink, now or in the future.

**Inhalation** – Breathing. Substances can be inhaled into the nose or lungs and can then be taken into the blood to produce health effects.

**LBW -** Low birth weight: Infants who weigh less than 5 pounds (2500g) at birth.

**Leukemia -** A type of cancer affecting white blood cells

**Low APGAR score -** A newborn is given an APGAR test (appearance, pulse, grimace, activity, respiration) at birth by the delivery physician and scored 1-10. A low APGAR score is below 3.

**Negligible risk** – the level of exposure to a substance or multiple substances that is highly unlikely to result in adverse health effects, even to the most sensitive populations.

**Neoplasm -** An abnormal mass of tissue that results when cells divide more than they should or do not die when they should. Neoplasms may be benign (not cancer), or malignant (cancer). Also called tumor.

**Neoplasm -** An abnormal mass of tissue that results when cells divide more than they should or do not die when they should. Neoplasms may be benign (not cancer), or malignant (cancer). Also called tumor.

**NTD** – Neural tube defect. Birth defects of the brain, spine, or spinal cord.

**O&G -** Oil and gas. Refers to all phases of onshore oil and natural gas exploration and production.

**OGHIR** - Oil and Gas Health Information and Response Program at the Colorado Department of Public Health and Environment

**Oral Cleft -** A gap or split in upper lip or roof of mouth caused from incomplete development/fusion during pregnancy.

**Premature birth -** A birth that takes place before the baby is due (before 37 weeks of pregnancy).

**Read-across -** an approach that applies the toxicity information and the resulting health-based reference value from one substance to another substance that has similar chemical structure, physical-chemical properties and is anticipated to behave in a similar manner in the body to produce a health effect.



BLM_0037388

**Risk** – the likelihood that in a given situation, the conditions or exposure to a substance will be enough to cause an adverse consequence or effect.

**SGA -** Small for gestational age: babies who are smaller than normal for their gestational age (less than the 10th percentile of weights for their gestational age).

**Substance** – a manmade or naturally occurring chemical.

**Toxicity** – the ability of a substance to cause harmful health effects.

**US EPA** – United States Environmental Protection Agency

BLM_0037389

# Appendix 1A

## Substance identification

*What substances could be released into the air from oil and gas operations?*

## Methods

The following sources were used to identify the substances most likely to be released into the air from oil and gas operations in Colorado.  These substances were prioritized for evaluation in the risk assessment.

### Primary Sources

- Operator emissions inventories submitted to the Air Pollution Control Division (APCD), including gas and liquid analysis documents.

- Two emission characterization studies conducted in Colorado:

  - *Characterizing Air Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, Colorado*[1]

  - *North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study*[2]

- One source apportionment study conducted in Colorado:

  - *Source Signature of Volatile Organic Compounds from Oil and Natural Gas Operations in Northeastern Colorado*[3]

### Secondary Sources

- Colorado ambient air concentration measurements in regions of high oil and gas activity[4].

- Site-specific oil and gas air quality samples or studies in Colorado[5,6,7].

- Expert opinion from the CDPHE Air Pollution Control Division and the Colorado Oil and Gas Conservation Commission.

---

[1] Collett Jr., J. L., J. Ham, A. Hecobian, (2016) Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, Co., Available from: https://www.garfield-county.com/air-quality/documents/CSU-GarCo-Report-Final.pdf (Accessed: February 20, 2017).

[2] Collett Jr., J. L., J. Ham, A. Hecobian, (2016) North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study Report, Available from: http://www.colorado.gov/airquality/tech_doc_repository.aspx?action=open&file=CSU_NFR_Report_Final_20160908.pdf (Accessed: February 20, 2017).

[3] Gilman et al. (2013). Source Signature of Volatile Organic Compounds from Oil and Natural Gas Operations in Northeastern Colorado *Environ. Sci. Technol.* 47 (3), pp 1297–1305

[4] Garfield County Public Health Air Quality Management - Air Monitoring Reports (2008-2015)

[5] Olsson Associates, Inc. Air Quality Sampling Summary Report Production Scenario (2011)

[6] Swarthout RF et al. Volatile Organic Compounds during the NACHTT campaign at the Boulder Atmospheric Observatory: Influence of urban and natural gas sources (2013)

[7] CDPHE Air Emissions Case Study Related to Oil and Gas Development in Erie, Colorado (2012)

BLM_0037390

A subset of substances was identified as high priority for investigation in this assessment if they were either:

- o   Identified from a primary source.

- o   Greater than 50 percent detection frequency across the secondary data sources.

## Uncertainties

It is likely the substances identified do not reflect the full profile of substances emitted from oil and gas operations for these reasons:

- The studies, conducted by Colorado State University that quantified emission rates of 36 VOCs directly from each phase of oil and gas operations, are the only data that were located that identify specific VOCs emitted from oil and gas. These studies, however, did not quantify known constituents in oil and gas or reaction products, such as higher molecular weight volatile hydrocarbons, aldehydes, ketones and alcohols.

- Several additional substances detected in ambient air quality monitoring datasets were not included in this initial screening assessment. The scope of this assessment is limited to substances most frequently detected in air and therefore, of greatest concern for frequent exposures to people living near oil and gas operations.

- Many higher molecular weight hydrocarbons, including some polycyclic aromatic hydrocarbons (PAHs) that are known components of oil and/or natural gas were not analyzed in the majority of studies.

- Pollutants such as particulate matter and ozone were not within the scope of this assessment.

- Although ambient air datasets were selected from high oil and gas activity areas with minimal non-oil and gas activities, many other sources have the potential to emit the same substances as oil and gas operations.

BLM_0037391

# Appendix 1B

## Exposure assessment

***What are the levels of exposure to these substances?***

### Data Selection

A thorough search was conducted to locate data containing air concentrations of the substances detected in regions with substantial oil and gas operations in Colorado. Data that met the following criteria were used:

- Original data from a high-quality study or program with clear objectives and methods that identified the location of sampling and any other potential non-oil and gas sources in the area.

- Samples from a region of substantial oil and gas activity that would be representative of residential/community level exposures.

- Samples collected at a distance of 500 feet or greater from a specific oil-and-gas source to reflect general current setback distances established by Colorado Oil and Gas Conservation Commission (COGCC).

- Samples collected in a region that had minimal influence from other potential major sources of air pollution, including roads, industrial activities, or urban areas.

- Samples collected during or after 2008 in order to account for changes and improvements in operational practices and major technological advances including "green completion" technologies that reduce emissions.

### Exposure Scenarios

Two different values from these combined air data to represent two different potential exposure scenarios were used:

A) The maximum air concentration of a substance represents an estimate of an acute (short-term) exposure. An acute exposure is an intermittent, infrequent exposure that could occur for a few hours to a few days. This is what the air might be like from an unanticipated release of emissions during oil and gas activities.

B) The highest average air concentration for a substance across all datasets is used to represent an estimate of a chronic (long-term) exposure. A chronic exposure is a prolonged continuous exposure, generally over the lifetime of an individual. The air data likely indicates what the average outdoor air is like near residences over the life of a normal operating well or wells.

BLM_0037392

## Uncertainties

The highest average and the maximum values may not entirely be representative of short- or long-term emissions from oil and gas operations in Colorado due to the following data limitations:

- The data were highly variable across studies including year, location, duration and frequency of sample collection.

- The data could represent air concentrations from oil and gas and non-oil and gas sources and likely do not reflect concentrations of substances solely emitted from oil and gas.

- Ambient air concentrations from these studies were used as surrogates for quantifying potential exposure concentrations to people living near oil and gas operations. There are many assumptions that are made in using this approach:
  - Individual or community level exposures depend on several factors that may not be accounted for in ambient air such as:
    - Frequency and duration of the source emissions.
    - Length of time substance remains in the air (i.e., degradation rates or dispersion).
    - Meteorological conditions.
    - Proximity and geographical location of the resident in relationship to the source of emissions.
    - Length of time the person is in the area where the substance is present.
    - Individual traits (length of time spent indoors vs. outdoors, breathing rate).
    - Air concentrations in the breathing zone of an individual.

- The exposure assumptions are conservative. The daily activity patterns of a person are not accounted for in this assessment. This assessment assumes that a person spends 100 percent of their time outside in the location where samples were collected. This is likely to be a conservative assumption because indoor air concentrations of air pollutants are expected to be the same or lower than the outdoor concentrations (when the indoor concentrations are produced solely by inflow from outside air). Additionally, most people are not at their residences 24 hours a day.
  - The samples represent exposures that would occur at that level over the lifespan of a person (long-term) or would occur for a few hours to a few days (short-term) durations. These assumptions may over- or underestimate the actual concentrations because the data do not account for any short, temporal variations.

- Although acrolein was identified as a substance emitted from oil and gas operations, no air data was located.

- Although methane and ethane were identified as high priority substances, they generally do not produce any health effects except at extremely high exposures.

- The data from the two major oil and gas basins were combined because there were no notable differences in the types or concentrations of substances.


BLM_0037393

## Table 1. Air concentration datasets used in the screening-level health risk assessment

| Organization/ Author | County | Basin | Site Location(s)[1] | Site Description | Operation Type or Phase | Year(s) | Season | Total # Samples | Sample Duration | Collection Frequency |
|---|---|---|---|---|---|---|---|---|---|---|
| Gilman | Weld | Denver-Julesburg | Boulder Atmospheric Observatory | Agricultural region. > 15,000 active oil and gas wells within 100-km radius, 22 well pads within 0.8-km radius. Nearest pad - 300m (984 ft) | Production | 2011 | Winter | 544 | 5 minutes | Every 30 minutes for one month |
| Swarthout | Weld | Denver-Julesburg | Boulder Atmospheric Observatory | Agricultural region in area of substantial oil and gas developmen | NA | 2011 | Winter | 550 | 5 minutes | Every hour for one month |
| CDPHE | Weld | Denver-Julesburg | Platteville | Agricultural/residential region with multiple wells | NA | 2011-2015 | All | ~2750 | 3 hours | Daily on an annual basis |
| CDPHE | Weld | Denver-Julesburg | Erie | Residential neighborhood. 1650' from wellheads and supporting equipment and tanks | Completion | 2012 | Summer | 18 | 3 hours | One month: every three days (for 17 days) then every day (for 19 days) |
| CDPHE | Weld | Denver-Julesburg | Erie | Residential neighborhood. 850' from wellheads and supporting equipment and tanks | Completion | 2012 | Summer | 18 | 3 hours | One month: every three days (for 17 days) then every day (for 19 days) |
| Thompson | Weld | Denver-Julesburg | 7 sites in West Erie, East Erie & Longmont | Residential neighborhoods and rural farmland residences close to wells | Production | 2013 | Spring | 30 | 5 minutes-24 hours | Four months |
| FRAPPE[2] | Weld | Denver-Julesburg | 16 sites | Rural or residential area in oil and gas region >500 feet away from potential source and multiple wells within 1600 feet of each site | Methane enhancement and wellpads, oil tank, separators, midstream processing plant, pipelines, drilling, compressor, processing, produced water | 2014 | Summer | 18 | One minute | One day |
| Garfield County | Garfield | Piceance | Bell/Melton Ranch | Rural residence with "moderate oil and gas development and heavy natural | Production | 2008-2015 | All | ~3300 | 24 hours | Every 6 days on an annual basis |

[1] Each individual site is represented in Figure 1A.

[2] Data provided courtesy of Drs Pfister (CU Boulder), Flocke (CU Boulder) and Crawford (NASA). Data were collected as part of the Front Range Air Pollution and Photochemistry Experiment (FRAPPE), Date received: April, 2016. DOI:  10.5067  https://www-air.larc.nasa.gov/cgi-bin/ArcView/discover-aq.co-2014?C130=1

COLORADO
Department of Public
Health & Environment

A5

BLM_0037394

| | | | | gas production" | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Garfield County | Garfield | Piceance | Battlement Mesa | Rural community close to oil and gas | NA | 2010-2015 | All | ~3300 | 24 hours | Every 6 days on an annual basis |
| University of Colorado, Boulder[3] | Boulder | Denver-Julesburg | Dawson School | Collected to represent general ambient air in east Boulder with no specific distance from an oil and gas source | NA | | 2014 | Summer | 12 | 3 days | Every 6-10 days for 3 months |
| University of Colorado, Boulder | Boulder | Denver-Julesburg | Fire Station | Collected to represent general ambient air in east Boulder with no specific distance from an oil and gas source | NA | | 2014 | Summer | 12 | 3 days | Every 6-10 days for 3 months |
| University of Colorado, Boulder | Boulder | Denver-Julesburg | Stephen Day Park | Collected to represent general ambient air in east Boulder with no specific distance from an oil and gas source | NA | | 2014 | Summer | 12 | 3 days | Every 6-10 days for 3 months |
| University of Colorado, Boulder | Boulder | Denver-Julesburg | Church | Collected to represent general ambient air in east Boulder with no specific distance from an oil and gas source | NA | | 2014 | Summer | 12 | 3 days | Every 6-10 days for 3 months |

[3] Unpublished data courtesy of Dr. Detlev at CU Boulder, Institute of Arctic and Alpine Research (INSTAAR), Date received: Feb 14, 2017.

BLM_0037395

## Figure 1. Maps of sample collection sites

### A. Denver-Julesburg Basin



### B. Piceance Basin



BLM_0037396

Table 2. Range of average and maximum values of substances across all datasets. The maximum value of the averages was used to represent long-term exposures. The maximum value across all datasets was used to represent the short-term exposure.

| Substance | Range of Average Values (ppb) | | Maximum Value (ppb) |
|---|---|---|---|
| 1,2,3-Trimethylbenzene | 0.004 | 0.035 | 1.470 |
| 1,2,4-Trimethylbenzene | 0.018 | 0.190 | 2.900 |
| 1,3,5-Trimethylbenzene | 0.006 | 0.054 | 0.244 |
| 1-Butene | 0.013 | 0.912 | 5.920 |
| 1-Pentene | 0.008 | 0.680 | 1.465 |
| 2,2,4-Trimethylpentane | 0.008 | 0.711 | 3.381 |
| 2,3,4-Trimethylpentane | 0.008 | 0.053 | 0.384 |
| 2,3-Dimethylpentane | 0.031 | 0.315 | 1.256 |
| 2,4-Dimethylpentane | 0.024 | 0.352 | 1.344 |
| 2-Butanone | 0.213 | 33.100 | 290.000 |
| 2-Methylheptane | 0.034 | 0.260 | 2.100 |
| 2-Methylhexane | 0.212 | 5.000 | 29.400 |
| 2-Methylpentane | 0.360 | 7.462 | 28.903 |
| 3-Methylheptane | 0.024 | 0.179 | 1.180 |
| 3-Methylhexane | 0.098 | 0.905 | 3.957 |
| 3-Methylpentane | 0.245 | 3.986 | 15.179 |
| Acetaldehyde | 0.217 | 1.327 | 4.160 |
| Acetone | 0.622 | 2.999 | 6.702 |
| Acrolein | ND* | ND* | ND* |
| Benzene | 0.186 | 1.958 | 8.637 |
| Butene (cis-2-) | 0.008 | 0.232 | 1.520 |
| Butene (trans-2-) | 0.009 | 0.255 | 1.670 |
| Cyclohexane | 0.143 | 3.064 | 30.500 |
| Cyclopentane | 0.088 | 2.002 | 11.037 |
| Dimethylcyclohexane(cis-13-) | 0.027 | 0.027 | 0.100 |
| Dimethylcyclohexane(trans-12-) | 0.007 | 0.007 | 0.030 |
| Dimethylcyclohexane(trans-13-) | 0.004 | 0.004 | 0.010 |
| Ethane | 21.908 | 207.704 | 1061.752 |
| Ethylbenzene | 0.015 | 0.669 | 20.875 |
| Ethylcyclohexane | 0.014 | 0.014 | 0.050 |
| Ethylene | 0.434 | 11.249 | 75.000 |
| Formaldehyde | 0.511 | 2.227 | 8.310 |
| Isobutane | 2.100 | 32.933 | 172.100 |
| Isopentane | 0.016 | 30.220 | 139.157 |

BLM_0037397

| Substance | Range of Average Values (ppb) | Maximum Value (ppb) | Substance |
|---|---|---|---|
| Isopropylbenzene | 0.002 | 0.017 | 0.175 |
| m-Diethylbenzene | 0.004 | 0.047 | 0.238 |
| Methane | 1.870 | 3500.000 | 9127.500 |
| Methanol | 4.660 | 5.400 | 41.000 |
| Methylcyclohexane | 0.143 | 3.526 | 16.269 |
| Methylcyclopentane | 0.263 | 3.889 | 18.331 |
| m-Ethyltoluene | 0.010 | 0.087 | 2.155 |
| m-Xylene | 0.074 | 0.905 | 49.875 |
| n-Butane | 2.220 | 74.074 | 387.500 |
| n-Decane | 0.010 | 0.574 | 25.800 |
| n-Heptane | 0.150 | 3.360 | 15.798 |
| n-Hexane | 0.507 | 11.111 | 44.630 |
| n-Nonane | 0.019 | 5.828 | 14.868 |
| n-Octane | 0.052 | 0.895 | 3.732 |
| n-Pentane | 1.049 | 33.696 | 160.284 |
| n-Propylbenzene | 0.004 | 0.032 | 1.160 |
| n-Undecane | 0.013 | 0.767 | 39.800 |
| o-Ethyltoluene | 0.003 | 0.045 | 2.165 |
| o-Xylene | 0.023 | 0.212 | 16.500 |
| p-Diethylbenzene | 0.008 | 0.300 | 2.900 |
| Pentene (cis-2-) | 0.007 | 0.078 | 0.488 |
| Pentene (trans-2-) | 0.008 | 0.134 | 0.934 |
| p-Ethyltoluene | 0.005 | 0.056 | 2.225 |
| Propane | 5.210 | 151.686 | 723.333 |
| Propylene | 0.104 | 16.143 | 54.554 |
| p-Xylene | 0.074 | 0.905 | 49.875 |
| Styrene | 0.005 | 0.363 | 3.090 |
| Toluene | 0.190 | 5.489 | 21.000 |

*ND = no data

BLM_0037398

# Appendix 1C

*What are the health-based reference values ("safe" levels) for these substances of potential concern?*

## Health effects assessment

### Methods

A consistent approach was used to identify existing cancer risk estimate values and non-cancer health-based reference values from national and state sources for exposure scenarios A (short-term exposures) and B (long-term exposures) (Table 1). These values are generally based on the most sensitive, chemical-induced health effect considered to be relevant to humans. For non-cancer health effects, the health-based reference value is the exposure level below which health effects are not expected to occur, even for potentially sensitive people in the general population (also referred to as a "safe" level in this report). For cancer causing substances, there are no "safe" levels of exposure.

- <u>Short-Term Exposure Scenario:</u> Short-term health-based reference values can be highly variable across agencies because of multiple factors, including the duration of exposure and type of health effects specific to the agency goals for derivation of these values. The lowest acute values across all sources that were relevant to the exposure scenario of interest for this assessment conservatively used (Table 2).

- <u>Long-Term Exposure Scenario:</u> Chronic values are generally consistent across agencies and represent continuous (24 hour/day), lifetime (70 years) exposure and were selected using a tiered approach. For carcinogenic substances, all inhalation unit risk (IUR) values were chosen from US EPA or California EPA (Table 2).

### Table 1. Tiered approach for chronic, non-cancer health limit levels

| TIER | SOURCE | DESCRIPTION |
|------|--------|-------------|
| Tier I | U.S. Environmental Protection Agency | Acute Exposure Guideline Level (AEGL) Chronic: Reference Concentration (RfC) Cancer: Inhalation Unit Risk (IUR) |
| Tier II | Center for Disease Control - Agency For Toxic Substances and Disease Registry (ATSDR) | Acute & Chronic: Minimal Risk Level (MRL) |
| Tier III | U.S. Environmental Protection Agency | Subchronic & Chronic: Provisional Peer Reviewed Toxicity Value (PPRTV) |
| Tier IV | California EPA | Acute, Subacute and Chronic: Reference Exposure Level (REL) |
| Tier V | Texas Commission on Environmental Quality (TCEQ) | Short & Long-Term: Air Monitoring Comparison Value (AMCV) |
| Tier VI | European Chemicals Agency | Short & Long-Term: Derived No Effect |

BLM_0037399

Appendices

|  | (ECHA) | Level (DNEL) |
|---|---|---|
| Tier VII | Read-Across | Agency established or expert opinion surrogate values |

BLM_0037400

## Table 2. Acute and chronic health-based reference values for 62 substances of potential concern emitted from oil and gas operations

| CAS # | NAME | Acute (ppb) | Chronic (ppb) | CAS # | NAME | Acute (ppb) | Chronic (ppb) |
|---|---|---|---|---|---|---|---|
| 95-63-6 | 1,2,4-Trimethylbenzene | 3000[1] | 12[1] | 1678-91-7 | Ethylcyclohexane | 4000[7] | 400[7] |
| 526-73-8 | 1,2,3-Trimethylbenzene | 3000[1] | 12[1] | 620-14-4 | m-Ethyltoluene | 250[2] | 25[2] |
| 108-67-8 | 1,3,5-Trimethylbenzene | 3000[1] | 12[1] | 611-14-3 | o-Ethyltoluene | 250[2] | 25[2] |
| 78-93-3 | 2-Butanone | 20000[2] | 1,695[1] | 622-96-8 | p-Ethyltoluene | 250[2] | 25[2] |
| 565-59-3 | 2,3-Dimethylpentane | 8300[7] | 2200[7] | 100-41-4 | Formaldehyde | 40[3] | 8[3] |
| 108-08-7 | 2,4-Dimethylpentane | 8300[2] | 2200[2] | 75-28-5 | Isobutane | 33000[2] | 10000[2] |
| 591-76-4 | 2-Methylhexane | 8300[2] | 2200[2] | 78-78-4 | Isopentane | 8100[2] | 8000[2] |
| 592-27-8 | 2-Methylheptane | 4100[2] | 380[2] | 98-82-8 | Isopropylbenzene | 510[2] | 81[1] |
| 107-83-5 | 2-Methylpentane | 990[2] | 90[2] | 74-82-8 | Methane | NA | NA |
| 540-84-1 | 2,2,4-Trimethylpentane | 750[2] | 75[2] | 67-56-1 | Methanol | 270000[1] | 15262[1] |
| 565-75-3 | 2,3,4-Trimethylpentane | 750[2] | 75[2] | 108-87-2 | Methylcyclohexane | 4000[2] | 400[2] |
| 96-14-0 | 3-Methylpentane | 100[2] | 100[2] | 96-37-7 | Methylcyclopentane | 750[2] | 75[2] |
| 589-81-1 | 3-Methylheptane | 4100[2] | 380[2] | 106-97-8 | n-Butane | 92000[2] | 10000[2] |
| 589-34-4 | 3-Methylhexane | 8300[2] | 2200[2] | 124-18-5 | n-Decane | 1750[2] | 175[2] |
| 75-07-0 | Acetaldehyde | 250[2] | 5[1] | 142-82-5 | n-Heptane | 8300[2] | 2200[2] |
| 67-64-1 | Acetone | 26000[3] | 13000[3] | 110-54-3 | n-Hexane | 1700[2] | 198[1] |
| 107-02-8 | Acrolein | 3[3] | 0.01[1] | 111-84-2 | n-Nonane | 3000[2] | 38[5] |
| 71-43-2 | Benzene | 180[2] | 9.39[1] | 111-65-9 | n-Octane | 4100[2] | 75[2] |
| 106-98-9 | 1-Butene | 27000[2] | 2300[2] | 109-66-0 | n-Pentane | 68000[2] | 8000[2] |
| 590-19-1 | 2-Butene (cis) | 15000[2] | 700[2] | 103-65-1 | n-Propylbenzene | 510[2] | 203[5] |
| 624-64-6 | 2-Butene (trans) | 15000[2] | 700[2] | 1120-21-4 | n-Undecane | 550[2] | 55[2] |
| 110-82-7 | Cyclohexane | 1000[2] | 1743[1] | 108-38-3 | m-Xylene | 1700[3] | 23[1] |
| 287-92-3 | Cyclopentane | 5900[2] | 120[2] | 95-47-6 | o-Xylene | 1700[3] | 23[1] |
| 141-93-5 | 1,3-Diethylbenzene | 460[2] | 46[2] | 106-42-3 | p-Xylene | 1700[3] | 23[1] |
| 105-05-5 | 1,4-Diethylbenzene | 450[2] | 46[2] | 109-67-1 | 1-Pentene | 12000[2] | 560[2] |
| 638-04-0 | Dimethylcyclohexane (cis-13-) | 4000[7] | 400[7] | 627-20-3 | Pentene (cis-2-) | 12000[2] | 560[2] |
| 6876-23-9 | Dimethylcyclohexane(trans-12-) | 4000[7] | 400[7] | 646-04-8 | Pentene (trans-2-) | 12000[2] | 560[2] |
| 591-21-9 | Dimethylcyclohexane(trans-13-) | 4000[7] | 400[7] | 74-98-6 | Propane | 68000[2] | 8000[2] |
| 74-84-0 | Ethane | NA | NA | 115-07-1 | Propylene | NA | 1743[6] |
| 100-41-4 | Ethylbenzene | 20000[2] | 230[1] | 100-42-5 | Styrene | 200001 | 2351 |
| 74-85-1 | Ethylene | 500000[2] | 5300[2] | 108-88-3 | Toluene | 2000[3] | 1327[1] |

Sources: [1] EPA  [2] TCEQ  [3] ATSDR MRL  [4] ECHA  [5] EPA PPRTV  [6] CalEPA  [7] Read Across; N = not applicable - substance is a simple asphyxiant at extremely high exposures with no other toxicological effects.

## Uncertainties

- Uncertainties are inherent in the use of toxicity values, which can result in over- or under-estimation of risk. However, these values are generally derived in a way that is intentionally conservative; that is, risk estimates based on these values are more likely to overestimate risk. The general uncertainty for these values comes from a number of sources including uncertainties related to limited toxicity databases, use of animal studies to predict effects in humans, use of dose-response information from levels of exposure to predict adverse health effects at low levels of exposure, use of dose-response information from homogenous animal populations or healthy human populations to predict effects in a diverse general population with a wide range of sensitivities, and the use of models and upper-bound assumptions to estimate cancer risks.

- There is great variability in agency derived acute values mainly due to different exposure durations set by agencies (ie. 1 hour vs 14 day) and health effects used to derive the values. Although the most consistent exposure duration for selection of toxicity values was used, it was not always possible and therefore the most conservative value for the relevant duration of exposure was selected for this assessment.

- No health-based reference values for dimethylcyclohexane (3 isomers) and ethylcyclohexane and propylene were located. We used methylcyclohexane as surrogate for the four substances based on evidence for similar physical-chemical properties and degradation products that will likely result in similar health outcomes.

COLORADO
Department of Public
Health & Environment

BLM_0037402

# Appendix 1D

## Risk characterization

**Are the exposures to people living near oil and gas operations above or below health-based reference values ("safe" levels)?**

## Methods

### Non-Cancer

A screening-level estimate of non-cancer health risks were conducted by comparing the exposure concentration (EC) to the toxicity screening level (SL) – called a Hazard Quotient (HQ) ratio. The cumulative (combined) health risk estimates for substances can be calculated with a Hazard Index (HI). The HI is simply the sum of all HQs. The HI was determined for all substances combined and then segregated by substances that produce similar organ toxicity (Ie. neurological, respiratory) (Table 1). Details of systematic methodology used for selection of these substances into health effect categories available upon request.

$$HQ = \frac{EC}{SL}$$

$$HI = HQ_1 + HQ_2 + HQ_3...$$

HQ = Hazard Quotient
HI = Hazard Index
EC = Exposure Concentration (mean or maximum ambient air concentrations)
SL = Toxicity Screening Level (varies by agency)

Two different sets of hazard quotients were calculated to represent the two exposure scenarios:

- The maximum air concentration of a substance representing an intermittent, infrequent exposure that could occur for a few hours to a few days was compared to short-term (acute) toxicity values

- The highest average air concentration for a substance across all datasets represents a conservative estimate of long-term, continuous exposures was compared to long-term (chronic) toxicity values

### Cancer

To determine the magnitude of potential cancer risk, the exposure concentration of the substance in the air is multiplied by the inhalation unit risk (IUR) value of the substance. All IURs were taken from US EPA's established values.

$$\text{Cancer Risk Estimation} = [EC] \times IUR$$

[EC] = Exposure concentration (maximum average) measured in air
IUR = Inhalation Unit Risk Values

BLM_0037403

Appendices

Table 1. Categorization of priority substances by potential to produce health effects in animals and/or humans

| ENT | | Respiratory | | Neurological | |
|---|---|---|---|---|---|
| 1,2,3-Trimethylbenzene | Acrolein | 1,2,3-Trimethylbenzene | Acrolein | 1,2,3-Trimethylbenzene | Acrolein |
| 1,2,4-Trimethylbenzene | Benzene | 1,2,4-Trimethylbenzene | Benzene | 1,2,4-Trimethylbenzene | Benzene |
| 1,2-Dimethylcyclohexane (trans) | Cyclohexane | 1,2-Dimethylcyclohexane (trans) | Cyclohexane | 1,2-Dimethylcyclohexane (trans) | Cyclohexane |
| 1,3,5-Trimethylbenzene | Ethylbenzene | 1,3,5-Trimethylbenzene | Ethanol | 1,2-Dimethylcyclohexane (trans) | Ethanol |
| 1,3-Diethylbenzene | Ethylcyclohexane | 1,3-Dimethylcyclohexane (cis) | Ethylbenzene | 1,3,5-Trimethylbenzene | Ethylbenzene |
| 1,3-Dimethylcyclohexane (cis) | Formaldehyde | 1,3-Dimethylcyclohexane (trans) | Ethylcyclohexane | 1,3-Diethylbenzene | Ethylcyclohexane |
| 1,3-Dimethylcyclohexane (trans) | Isopropylbenzene | 1-Pentene | Formaldehyde | 1,3-Dimethylcyclohexane (cis) | Ethylene |
| 1,4-Diethylbenzene | Methanol | 2,2,4-Trimethylpentane | Isopropylbenzene | 1,3-Dimethylcyclohexane (cis) | Formaldehyde |
| 1-Butene | Methylcyclohexane | 2,3,4-Trimethylpentane | Methylcyclohexane | 1,3-Dimethylcyclohexane (trans) | Isobutane |
| 2,2,4-Trimethylpentane | Methylcyclopentane | 2,3-Dimethylpentane | Methylcyclopentane | 1,3-Dimethylcyclohexane (trans) | Isopropylbenzene |
| 2,3,4-Trimethylpentane | m-Ethyltoluene | 2,4-Dimethylpentane | m-Ethyltoluene | 1,4-Diethylbenzene | Methanol |
| 2,3-Dimethylpentane | m-Xylene | 2-Butanone | m-Xylene | 1-Pentene | Methylcyclohexane |
| 2,4-Dimethylpentane | n-Heptane | 2-Methylheptane | n-Heptane | 2,2,4-Trimethylpentane | Methylcyclopentane |
| 2-Butanone | n-Hexane | 2-Methylhexane | n-Hexane | 2,3,4-Trimethylpentane | m-Ethyltoluene |
| 2-Butene (cis) | n-Nonane | 2-Methylpentane | n-Octane | 2,3-Dimethylpentane | m-Xylene |
| 2-Butene (trans) | n-Octane | 2-Pentene (cis) | o-Ethyltoluene | 2,4-Dimethylpentane | n-Decane |
| 2-Methylheptane | o-Ethyltoluene | 2-Pentene (trans) | o-Xylene | 2-Butanone | n-Heptane |
| 2-Methylhexane | o-Xylene | 3-Methylheptane | p-Ethyltoluene | 2-Methylheptane | n-Hexane |
| 2-Methylpentane | p-Ethyltoluene | 3-Methylhexane | Propylbenzene | 2-Methylhexane | n-nonane |
| 3-Methylheptane | Propylbenzene | 3-Methylpentane | Propylene | 2-Methylpentane | n-Octane |
| 3-Methylhexane | p-Xylene | Acetaldehyde | p-Xylene | 2-Pentene (cis) | o-Ethyltoluene |
| 3-Methylpentane | Styrene | | Toluene | 2-Pentene (trans) | o-Xylene |
| Acetaldehyde | Toluene | | | 3-Methylheptane | p-Ethyltoluene |
| | Undecane | | | 3-Methylhexane | Propylbenzene |
| | | | | 3-Methylpentane | p-Xylene |
| | | | | Acetaldehyde | Toluene |
| | | | | Acetone | Undecane |
| | | | | Acetone | |



COLORADO
Department of Public Health & Environment

A15

BLM_0037404

Appendices

| Hematological | | Developmental | | Cardiovascular | |
|---|---|---|---|---|---|
| 1,2,3-Trimethylbenzene | Ethylene | 2-Butanone | Methanol | 1-Pentene | Cyclopentane |
| 1,2,4-Trimethylbenzene | Formaldehyde | Acetone | m-Xylene | 2-Methylheptane | Isobutane |
| 1,3,5-Trimethylbenzene | m-Xylene | Acrolein | n-Hexane | 2-Pentene (cis) | m-Xylene |
| 2-Butanone | o-Xylene | Benzene | o-Xylene | 2-Pentene (trans) | o-Xylene |
| Acetaldehyde | p-Xylene | Ethylbenzene | Propylbenzene | 3-Methylheptane | p-Xylene |
| Benzene | | Formaldehyde | p-Xylene | Acrolein | Toluene |
| | | | | Benzene | |

| Dermal | | Reproductive | | Immune | |
|---|---|---|---|---|---|
| 1,3-Diethylbenzene | Acetaldehyde | 2-Butanone | m-Xylene | Acetaldehyde | Ethylbenzene |
| 1,4-Diethylbenzene | Benzene | Acrolein | n-Hexane | Acrolein | Formaldehyde |
| **Gastrointestinal** | | Benzene | o-Xylene | Benzene | Toluene |
| Benzene | o-Xylene | Cyclohexane | p-Xylene | | |
| m-Xylene | p-Xylene | | | | |

| Cancer | | Renal | | Hepatic | |
|---|---|---|---|---|---|
| 1-Butene | Ethylbenzene | 1,2-Dimethylcyclohexane (trans) | Ethylcyclohexane | 1,2,3-Trimethylbenzene | Ethylene |
| 2-Butene (cis) | Formaldehyde | 1,3-Diethylbenzene | Isopropylbenzene | 1,2,4-Trimethylbenzene | Isopropylbenzene |
| 2-Butene (trans) | Methanol | 1,3-Dimethylcyclohexane (cis) | Methylcyclohexane | 1,2-Dimethylcyclohexane (trans) | Methanol |
| 2-Methylpentane | Methylcyclopentane | 1,3-Dimethylcyclohexane (trans) | Methylcyclopentane | 1,3,5-Trimethylbenzene | Methylcyclohexane |
| 3-Methylpentane | m-Xylene | 1,4-Diethylbenzene | m-Ethyltoluene | 1,3-Diethylbenzene | Methylcyclopentane |
| Acetaldehyde | n-hexane | 2,2,4-Trimethylpentane | m-Xylene | 1,3-Dimethylcyclohexane (cis) | m-Ethyltoluene |
| Acrolein | o-Xylene | 2,3,4-Trimethylpentane | n-Hexane | 1,3-Dimethylcyclohexane (trans) | m-Xylene |
| Benzene | p-Xylene | 2-Butanone | n-Nonane | 1,4-Diethylbenzene | o-Ethyltoluene |
| Ethanol | Undecane | 2-Methylpentane | n-Octane | 2-Butanone | o-Xylene |
| | | 3-Methylpentane | o-Ethyltoluene | Acetaldehyde | p-Ethyltoluene |
| | | Acetaldehyde | o-Xylene | Cyclohexane | Propylbenzene |
| | | Acetone | p-Ethyltoluene | Ethanol | p-Xylene |
| | | Acrolein | Propylbenzene | Ethylbenzene | Toluene |
| | | Ethylbenzene | p-Xylene | Ethylcyclohexane | |
| | | | Toluene | | |


BLM_0037405

## Uncertainties

- In accordance with the U.S. EPA guidance, both carcinogenic and non-carcinogenic risks for multiple contaminants are assumed to be additive. This assumption is associated with several limitations, and could result in under- or over-estimation of risk.  For example, the assumption of additivity of risk does not account for synergistic or antagonistic chemical interactions.

COLORADO
Department of Public
Health & Environment

BLM_0037406

# Appendix 2A

## Systematic Review Methodology

### Literature search

A  thorough search was conducted with the objective of *identifying observational human health studies evaluating the potential health effects associated with living near oil and gas operations.* PubMed was the primary research database used to obtain articles. Review articles and risk assessments were screened for references to identify any additional original sources of data.

The following PubMed search term was used to identify relevant records: (("**Oil and Gas Industry**"[Mesh] OR "**Natural Gas**"[Mesh]) AND (**epidemiolog\* or symptom\***)) OR ((oil OR natural gas) AND (**epidemiolog\* OR health OR symptom\***) AND (**unconventional OR drilling OR shale OR coal OR production OR development**) NOT ("**Occupational Health**"[Mesh] OR "**Animal Experimentation**"[Mesh]) AND ("**2016/01/01**"[Date - Publication] : "3000"[Date - Publication]))

### Figure 1. Systematic literature search process



Studies were excluded if one or more of the following criteria were met:

- Exposure to oil and gas chemicals was not measured in, or estimated for, the study subjects.

- Failed to quantify associations between exposures and a specific outcome (i.e., did not measure odds ratio values, relative risk).

- Did not include original data or observations (i.e., literature review, health impact or risk assessment).

COLORADO
Department of Public
Health & Environment

BLM_0037407

- Did not define oil and gas operations to include all or any processes associated with the development and production of shale or coal-seam gas resources using conventional and unconventional methods (including hydraulic fracturing).

- Not representative of the United States regulatory and operational environment.

- Study population not representative of the general population in the United States.

## Quality assessment

Each health outcome in a study was rated as high, medium, or low quality based on a modified GRADE system[11]. The GRADE system is a well-established framework for conducting a transparent and objective assessment of the quality of the literature as part of a systematic literature review. The findings were rated by individual health outcomes; therefore, it was possible for a single study to have multiple findings of differing quality. Observational studies and their findings start as "low" quality and are upgraded according to the strengths and limitations of the study. The body of evidence is downgraded or upgraded according to strengths and limitations in the broad areas of study design, study quality, consistency of findings and directness of effect.

The primary considerations for strengths and limitations in the above areas include:
- Population
    - Methods of selecting exposed and control groups.
    - Relevance of study population to the population of interest.

- Exposure characterization
    - Method for defining exposure.
    - Method for measuring exposure (self-report or other method).
    - Adequacy of exposure group size.

- Health outcome
    - Relevance of outcome studied to outcomes of interest.
    - Method for measurement of outcome (validated tools, etc.).
    - Adequacy of outcome group sizes.
    - Full vs. selective outcome reporting.
    - Effect size and width of confidence intervals.
    - Temporal and dose-response effect.

- Confounders
    - Adequate control for confounders (ie. smoking, education level, etc.).

---

[11] Balshem H et al. GRADE guidelines: 3. Rating the quality of evidence. J Clin Epidemiol. 2011: 64(4):401-6

BLM_0037408

Study quality was defined as the following:

**High-quality:** We are confident the true effect is close to that of the estimate of the effect outlined in the study. High quality findings originate from well-designed and well-controlled studies with few limitations. In the context of observational epidemiology studies, high quality does not necessary imply causation. High quality implies that an observed association persists between an exposure and effect in an appropriately-sized study population after adjusting for appropriate confounders.

**Medium- quality:** We are moderately confident of the effect estimate outlined in the study. The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different. Moderate-quality findings originate from studies that may be well-designed, but have significant limitations that affect the interpretation of the results. In the context of observational epidemiology studies, moderate quality implies the finding of an observed association with an interpretation that may be limited by a small study population or insufficient adjustment for important confounders.

**Low-quality:** Our confidence in the effect estimate outlined in the study is limited. The true effect may be substantially different from the estimate of the effect. Low quality findings originate from studies with significant methodological limitations that affect the interpretation of the results. In the context of observational epidemiology studies, low quality implies the finding of an observed association with an interpretation that is significantly restricted by major study limitations.

**Health outcome categories and level-of-evidence conclusions**

For each health outcome, relevant findings from individual studies were grouped and evaluated to derive level-of-evidence statements based on the following criteria:

**Substantial** evidence refers to either:

A. Robust scientific findings that support the outcome with no credible opposing scientific evidence. This was defined as any of the following:

- At least one high-quality positive finding, plus supporting findings at least one of which is medium-quality, with no opposing findings (must include studies of at least two cohorts).

- At least three medium-quality positive findings from studies of at least two cohorts, with no opposing findings.

- Many high- and medium-quality positive findings from studies of at least two cohorts that heavily outweigh opposing findings.

B. A robust body of scientific literature that has examined the outcome and failed to demonstrate a positive finding. This was defined as any of the following:

- At least one high-quality study lacking a positive finding, plus at least one medium- quality supporting study, and no opposing findings (must include studies of at least two cohorts).

- At least three medium-quality studies lacking a positive finding from studies of at least two cohorts, and no opposing findings.

- Many high- and medium-quality studies lacking a positive finding that heavily outweigh opposing findings.



BLM_0037409

**Moderate** evidence refers to:
A. Strong scientific findings that support the outcome, but these findings have some limitations. This was defined as any of the following:

- A single high-quality positive finding, with no opposing findings.

- At least one medium quality positive finding, plus supporting findings with no opposing findings; supporting findings can include animal studies.

- Many medium- and low-quality positive findings from studies of at least two cohorts that heavily outweigh opposing findings.

B. A strong body of scientific literature that has examined the outcome and failed to demonstrate a positive finding. This was defined as any of the following:

- A single high-quality study lacking a positive finding, and no opposing findings

- At least one medium-quality study lacking a positive finding, plus supporting findings, and no opposing findings.

- Many medium and low-quality studies lacking positive findings from studies of at least two cohorts that heavily outweigh opposing findings.

**Limited** evidence refers to:
A. Modest scientific findings that support the outcome, but these findings have significant limitations. This was defined as any of the following:

- A single medium-quality positive finding.

- Two or more low-quality positive findings from studies of at least two cohorts.

- Many low-quality positive findings from studies of at least two cohorts that outweigh opposing findings.

B. Modest scientific findings that have examined the outcome and failed to demonstrate a positive finding. This was defined as any of the following:

- A single medium-quality study lacking a positive finding.

- Two or more low-quality studies lacking positive findings from studies of at least two cohorts.

- One low-quality study lacking a positive finding supported by animal studies.

- Many low-quality studies lacking positive findings from studies of at least two cohorts that outweigh opposing findings.

**Mixed** evidence refers to:
Both supporting and opposing scientific findings for the outcome with neither direction dominating. This was defined as the following:
- Mixed findings, with neither direction dominating.

**Insufficient** evidence refers to:
The outcome has not been sufficiently studied. This was defined as any of the following:
- A single low-quality positive finding or less.

- We found no studies examining the outcome or relevant parameters.



BLM_0037410

# Appendix 2B

## Summary of Human Health Effect Studies

| Author | Year | Title | Publication | State | Study Type | Population | Health Outcome | Quality Rating |
|--------|------|-------|-------------|-------|------------|------------|----------------|----------------|
| McKenzie[9] | 2014 | Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado | Environmental Health Perspectives | Colorado | Retrospective cohort | Mothers living within various densities of a well site | Birth defects | Low |
| Hill[10] | 2013 | Unconventional Natural Gas Development and Infant Health: Evidence from Pennsylvania | Unpublished | Pennsylvania | Cross-sectional | Mothers living near a completed gas sites versus a future gas site | Birth outcomes | Low |
| Casey[11] | 2016 | Unconventional Natural Gas Development and Birth Outcomes in Pennsylvania, USA | Epidemiology | Pennsylvania | Retrospective cohort | Mothers living within various proximities of a gas development site | Birth outcomes | Medium |
| Stacy[12] | 2015 | Perinatal Outcomes and Unconventional Natural Gas Operations in Southwest Pennsylvania | PLOS ONE | Pennsylvania | Retrospective cohort | Mothers living within various densities of a well site | Birth outcomes | Low |
| Tustin[13] | 2016 | Associations between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania | Environmental Health Perspectives | Pennsylvania | Cross-sectional | Survey of residents in Pennsylvania | Upper respiratory and neurological | Low |
| Rabinowitz[14] | 2015 | Proximity to Natural Gas Wells and Reported Health Status: Results of a Household Survey in Washington County, Pennsylvania | Environmental Health Perspectives | Pennsylvania | Cross-sectional | Survey of residents in Pennsylvania | Self reported symptoms | Low |
| Steinzor[15] | 2013 | Investigating Links Between Shale Gas Development and Health Impacts Through a Community Survey Project in Pennsylvania | New Solutions | Pennsylvania | Cross-sectional | Survey of residents in Pennsylvania | Self reported symptoms | Low |
| Rasmussen[16] | 2016 | Association Between Unconventional Natural Gas Development in the Marcellus Shale and Asthma Exacerbations | JAMA Intern. Med. | Pennsylvania | Nested case-control | Asthma patients living within various metrics of oil and gas operation | Respiratory | Medium |
| Jemielita[17] | 2015 | Unconventional Gas and Oil Drilling is Associated with Increased Hospital Utilization Rates | PLOS ONE | Pennsylvania | Ecological | Patients in relation to active oil/gas wells | Hospitalization Rates | Low |
| Werner[18] | 2016 | All-age hospitalization rates in coal seam gas areas in Queensland, Australia, 1995-2011 | BMC Public Health | Australia | Ecological | Coal seam gas population in Australia | Hospitalization Rates | Low |
| Fryzek[19] | 2013 | Childhood Cancer Incidence in Pennsylvania Counties in Relation to Living in Counties with Hydraulic Fracturing Sites | Journal of Environmental Medicine | Pennsylvania | Ecological | Children with cancer before and after oil/gas drilling | Childhood cancer | Low |
| McKenzie[20] | 2017 | Childhood Hematologic Cancer and Residential Proximity to Oil and Gas Development. | PLOS ONE | Colorado | Case-control | Children living within various densities of oil and gas | Childhood cancer | Low |



COLORADO
Department of Public
Health & Environment

# Appendix 2C

## Individual study evaluations

| Health Effects Categories | Total number of studies | Health Effects | Number of studies per quality rating | | | | | | Evidence |
|---|---|---|---|---|---|---|---|---|---|
| | | | No Association | | | Positive Association | | | |
| | | | Low | Med | High | Low | Med | High | |
| Birth defects | 1 | Congenital heart defects[9] | | | | 1 | | | *Insufficient* |
| | | Oral clefts[9] | 1 | | | | | | *Insufficient* |
| | | Neural tube defects[9] | | | | 1 | | | *Insufficient* |
| Birth outcomes | 4 | Preterm birth[9,10,11,12] | 3 | | | | 1 | | *Mixed* |
| | | Low APGAR[10,11] | | 1 | | 1 | | | *Mixed* |
| | | Small for gestational age[10,11,12] | | 1 | | 2 | | | *Mixed* |
| | | Birth weight[9,10,11,12] | 1 | 1 | | 2 | | | *Mixed* |
| Eye, Nose & Throat and Respiratory | 6 | Multiple, self-reported symptoms[13,14,15] | 3 | | | 2 | | | *Mixed* |
| | | Hospitalizations[17,18] | 2 | | | | | | *Failing to show an association* |
| | | Asthma exacerbation[16] | | | | | 1 | | *Limited* |
| Skin (irritation, rashes) | 2 | Multiple,self-reported[14,15] | | | | 2 | | | *Limited* |
| Neurological (migraines, dizziness) | 5 | Hospitalization rates[17,18] | 1 | | | 1 | | | *Mixed* |
| | | Multiple, self-reported[14] | 1 | | | | | | *Insufficient* |
| | | Migraine/severe headache[13,14,15] | 2 | | | 1 | | | *Mixed* |
| Cancer | 4 | Overall childhood cancer incidence[19] | 1 | | | | | | *Insufficient* |
| | | Childhood Hematological Cancers[19,20] | 2 | | | 1 | | | *Mixed* |
| | | Childhood CNS tumors[19] | | | | 1 | | | *Insufficient* |
| | | Hospitalization[17,18] | 1 | | | 1 | | | *Mixed* |
| Psychological (depression, sleep disturbances | 4 | Multiple, self-reported[13,14,15] | 3 | | | | | | *Failing to show an association* |
| | | Hospitalization[17] | 1 | | | | | | *Insufficient* |
| Cardiovascular (heart) | 2 | Hospitalization rates[17] | | | | 1 | | | *Insufficient* |
| | | Multiple, self-reported[14] | 1 | | | | | | *Insufficient* |
| Gastrointestinal nausea, stomach pain) | 3 | Hospitalization rates[17] | 1 | | | | | | *Insufficient* |
| | | Multiple, self-reported[14,15] | 2 | | | | | | *Failing to show an association* |
| Musculoskeletal (joint pain, muscle aches) | 2 | Hospitalization rates[17] | 1 | | | | | | *Insufficient* |
| | | Multiple, self-reported[15] | | | | 1 | | | *Mixed* |
| Blood | 2 | Hospitalization rates[17,18] | 1 | | | 1 | | | *Mixed* |

COLORADO
Department of Public
Health & Environment

BLM_0037412

Appendices

---

**REFERENCE NUMBER: 9**

McKenzie L *et al.*
**Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado.**

Quality: *Low-quality evidence based on the strengths and limitations*

**Findings:**
- ✓ Positive association with **congenital heart defects** and **neural tube defects**.
- ✓ No associations with oral clefts, preterm birth, or reduced fetal growth.

| Strengths: | Limitations: |
|---|---|
| • Exposure and outcome data obtained from valid sources<br>• Exposure metric was weighted by well distance for every well within 10 miles of maternal residence and included 4 exposure groups<br>• CHD, oral cleft, birth weight, preterm birth outcomes adjusted for maternal and infant covariates: maternal age, ethnicity, smoking, alcohol use, education, elevation, infant parity, sex and gestational age | • Exposure metric did not account for phases and production levels<br>• Assumes mother lived at same residence through entire pregnancy<br>• Focused only on Caucasian births<br>• Does not consider stillbirths<br>• Indirect exposure measurement<br>• Incorrect methodology for assessing cancer clusters<br>• Did not adjust for other environmental covariates<br>• Preterm birth continuous variable would have been better than dichotomous<br>• Mean difference in birth weight of 24g may not be clinically significant<br>• NTD adjustment does not include main covariates |

---

**REFERENCE NUMBER: 10**

Hill E.
**Shale Gas Development and Infant Health: Evidence from Pennsylvania (working paper).**

Quality: *Low-quality evidence based on the strengths and limitations*

**Findings:**
- ✓ Positive associations with **lower birth weights**, APGAR scores and **small for gestational age**
- ✓ No associations with premature birth outcome

| Strengths: | Limitations: |
|---|---|
| • Exposure and outcome data obtained from valid sources<br>• Study population is large and representative of a general population<br>• Adjusted for main confounders: Race, education, mothers age, smoking, WIC, insurance, marital status, gender | • Incomplete vital statistic records are not considered<br>• Measures of exposure are lacking and does not quantify multiple wells, well density, well activity, or phases of production<br>• Indirect exposure measurement<br>• Methodology overly complicated |

---

BLM_0037413

| REFERENCE NUMBER: 11 |
|---|
| **Casey, J.A.** *et al.*<br>**Unconventional Natural Gas Development and Birth Outcomes in Pennsylvania, USA.** |
| Quality: *Medium-quality evidence based on the strengths and limitations* |
| **Findings:**<br>✓  Positive association with **preterm birth.**<br>✓  No associations with APGAR score, small for gestational age birth, or term birth weight. |

| Strengths: | Limitations: |
|---|---|
| • Study population is large and representative of a general population<br>• Exposure and outcome data obtained from valid sources<br>• Measure of exposure is cumulative estimate using inverse distance squared method including distance, duration, phases and production volume<br>• Adjusted for clinical, demographic and environmental confounders: neonate sex, gestational age, season and year of birth, maternal age, race/ethnicity, PCP status, smoking status during pregnancy, pre-pregnancy body mass index, parity, antibiotic orders during pregnancy, receipt of medical assistance (socioeconomics), distance to major road, community socioeconomic deprivation, residential greenness<br>• Dose-response evident for preterm birth | • Assumes 2013 addresses were the same as during pregnancy<br>• Dichotomous measure of preterm birth, without clear information on the actual number of weeks or days difference between groups<br>• Significant findings for preterm birth were not seen in unadjusted analysis, only after adjustment<br>• Indirect exposure measurement |

BLM_0037414

**REFERENCE NUMBER: 12**

Stacy SL *et al.*
**Perinatal Outcomes and Unconventional Natural Gas Operations in Southwest Pennsylvania.**

Quality: *Low-quality evidence based on the strengths and limitations*

Findings:
- ✓ Positive association with **decreased birth weight** and **small for gestational age**
- ✓ No association with premature birth

| Strengths: | Limitations: |
|---|---|
| • Exposure and outcome data obtained from valid sources | • Population included only three counties (18% of total wells) |
| • Only singleton births, with complete records | • Incomplete exposure metrics did not account for phases, durations, production amounts |
| • Population was limited to births with at least one well within 10 miles to eliminate possible unidentified confounders | • No adjustment done for exposure covariates |
| • Inverse distance weighted approach to quantify exposure | • No control group in premature birth analysis |
| • Each exposure group had over 3,000 subjects | • Indirect exposure measurement |
| • Adjusted for main confounders: gender, mother's age, mother's education, pre-pregnancy weight, race, WIC, prenatal care, gestational diabetes, cigarette smoking during pregnancy, parity. | • Birth weight higher in second and third quartiles than referent group, and only lower in fourth quartile |
| • Birth weight evaluated as a continuous variable | |
| • Apparent dose response for small for gestational age | |

BLM_0037415

| REFERENCE NUMBER: 13 |
|---|

**Tustin AW *et al*.**
**Associations between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania.**

**Quality:** Low--quality evidence based on the strengths and limitations

**Findings:**
✓   No associations with **CRS**, **fatigue** and **migraine** when evaluated individually.

| Strengths: | Limitations: |
|---|---|
| • Study population is large and representative of a general population<br>• Exposure data obtained from valid source<br>• Exposure metrics estimate distance, number of wells, duration of phases, depth and volume of gas produced (surrogate for chemical volumes and truck traffic)<br>• Adjusted for main confounders: sex, race/ethnicity, age, medical assistance, smoking status, BMI, CSD<br>• Measurements of migraine and CRS defined outcome<br>• Low likelihood of bias demonstrated by comparison of responders vs. non responders | • Self reported health outcomes<br>• Individual outcomes were non-significant making the importance of the findings for two or more outcomes unclear<br>• Prorated fatigue analysis methods may magnify response bias<br>• Low response rate (33%)<br>• Significant findings confidence intervals were close to null<br>• For 6 of the 7 outcomes, the third quartile has lower odds ratios than reference group (lack of dose response)<br>• Indirect exposure measurement |

| REFERENCE NUMBER: 14 |
|---|

**Rabinowitz PM *et al*.**
**Proximity to Natural Gas Wells and Reported Health Status: Results of a Household Survey in Washington County, Pennsylvania.**

**Quality:** *Low quality evidence based on the strengths and limitations*

**Findings:**
✓   Positive associations with **self reported skin conditions** and **upper respiratory symptoms**
✓   No associations seen with lower respiratory, cardiac, gastrointestinal, or neurologic self reported symptoms

| Strengths: | Limitations: |
|---|---|
| • Hypothesis-generating survey study with random selection<br>• Study population is large<br>• Adjusts for main confounders: age, sex, smokers in household, presence of animals, education level, work type, awareness of environmental risk<br>• Exposure data obtained from valid source | • Measure of exposure does not include phases of operation or well density<br>• Indirect exposure measurement<br>• Measures self-reported symptoms with unblended exposure |

COLORADO
Department of Public
Health & Environment

BLM_0037416

Appendices

| REFERENCE NUMBER: 15 |
| --- |

Steinzor N *et al*.
**Investigating Links Between Shale Gas Development and Health Impacts Through a Community Survey Project in Pennsylvania.**

Quality: *Low-quality evidence based on the strengths and limitations*

**Findings:**
- ✓ Positive associations with **self reported upper and lower respiratory, dermal, musculoskeletal, neurological and psychological self-reported symptoms** (throat irritation, sinus problems, nasal irritation, eye burning, severe headache, skin rashes, loss of sense of smell, persistent cough, frequent nose bleeds, swollen painful joints)
- ✓ No associations seen with lower respiratory, neurological, gastrointestinal, musculoskeletal, psychological self-reported symptoms (joint pain, shortness of breath, sleep disorders, forgetfulness, feeling weak and tired, increased fatigue, lumbar pain, muscle aches, diarrhea)

| Strengths: | Limitations: |
| --- | --- |
| • Hypothesis generating health symptom survey | • Population is not generalizable to a broader population |
| | • Exposure does not include control group |
| | • Self reported measures of exposure and outcomes |
| | • Unclear methodology |
| | • No standardization or metrics of symptoms |
| | • No confounding variables used in analysis |

COLORADO
Department of Public
Health & Environment

BLM_0037417

| REFERENCE NUMBER: 16 |
|---|

Rasmussen SG *et al*.
**Associations Between Unconventional Natural Gas Development in the Marcellus Shale and Asthma Exacerbations.**

Quality: *Medium quality evidence based on the strengths and limitations*

**Findings:**
✓ Positive associations with **asthma exacerbations**

| Strengths: | Limitations: |
|---|---|
| • Nested case-control study<br>• Study population is large and representative of a general population<br>• Exposure and outcome data obtained from valid sources<br>• Measure of exposure is comprehensive and includes estimated activity metrics for 4 different phases using density/proximity (inverse distance squared method), well characteristics, and dates/durations of phases, total depth and volume metrics (surrogates for truck traffic and fugitive emissions/ compressor engine activity)<br>• Adjusted for time-varying covariates (age, season, smoking status, overweight/obesity status, medical assistance, type-2 diabetes) and non-time-varying covariates (sex, race/ethnicity) | • Only patients most recent address were used<br>• Only events that occurred at Geisinger facilities are represented<br>• Indirect exposure measurement |

BLM_0037418

| REFERENCE NUMBER: 17 |
| --- |

**Jemielita T *et al.***
**Unconventional Gas and Oil Drilling is Associated with Increased Hospital Utilization Rates.**

Quality: *Low-quality evidence based on the strengths and limitations*

**Findings:**
- ✓ Positive associations with **cardiology** and **neurology** inpatient hospitalization rates.
- ✓ No associations with oncology, dermatology and urology.

| Strengths: | Limitations: |
| --- | --- |
| • Study population is large, distributed and representative of a typical population by zip code<br>• Exposure and outcome data obtained from valid sources<br>• Exposure metric included well density<br>• A dose response is evident for cardiology inpatient prevalence | • Ecological study at ZIP code level<br>• Neurology outcome only significantly associated with wells per $km^2$ and not wells per zip code<br>• Measures of exposures are lacking<br>• Well density (number of wells per km2) is at a ZIP code level and may not accurately reflect individual exposure<br>• No specific confounders were evaluated (relied on poisson regression to correct for possible confounders)<br>• Health outcomes were only at a broad category level and specific health effects in the various medical categories were not identified |

| REFERENCE NUMBER: 18 |
| --- |

**Werner AK *et al.*. All-age hospitalization rates in coal seam gas areas in Queensland, Australia, 1995-2011.**

Quality: *Low quality evidence based on the strengths and limitations*

**Findings:**
- ✓ Positive associations with **neoplasms** and **blood/immune** hospitalization rates
- ✓ No associations seen with nervous system and eye hospitalization rates

| Strengths: | Limitations: |
| --- | --- |
| • Study population is large, distributed and representative of three areas of Queensland, Australia<br>• Outcome data obtained from valid sources<br>• Adjusted for age, sex, proportion indigenous, proportion Australian-born, proportion employed full-time, proportion white collar, median household income, mean household size | • Ecological study<br>• Measures of exposure is limited to area with/without coal seam gas<br>• Confidence intervals are close to null with no adjustment for multiple comparisons<br>• Associations are seen only when compared to rural reference population<br>• Neoplasm hospitalizations can include either cancerous or non-cancerous effects and cannot conclusively be linked to a cancer outcome |

COLORADO
Department of Public
Health & Environment

BLM_0037419

| REFERENCE NUMBER: 19 |
| --- |
| Fryzek J, *et al*.<br>**Childhood cancer incidence in Pennsylvania counties in relation to living in counties with hydraulic fracturing sites.** |
| Quality: *Low quality evidence based on the strengths and limitations* |
| **Findings:**<br>✓ Positive association **CNS tumor** incidences.<br>✓ No association with all childhood cancers and childhood leukemia. |

| Strengths: | Limitations: |
| --- | --- |
| • Study population is large and representative of a general population at a county level<br>• Exposure and outcome data obtained from valid sources<br>• Adjusted for age, sex and race | • Ecological study at a county level<br>• CNS tumors significant finding is only seen in counties with the fewest number of wells<br>• Subjects are divided relative to first well drilled per county (before or after drilling)<br>• Despite an estimated CNS tumor SIR of 1.13, the 95% confidence interval is close to null (1.02)<br>• Does not consider exposure covariates<br>• Indirect exposure measurement |

BLM_0037420

| REFERENCE NUMBER: 20 |
| --- |
| McKenzie LM, *et al*.<br>**Childhood Hematologic Cancer and Residential Proximity to Oil and Gas Development.** |
| Quality: *Low quality evidence based on the strengths and limitations* |

**Findings:**
- ✓ Positive association **childhood acute lymphocytic leukemia**.
- ✓ No association with non-Hodgkin's lymphoma.

| Strengths: | Limitations: |
| --- | --- |
| • Exposure and outcome data obtained from valid sources<br>• Exposure metric used inverse distance weighted method and included a latency period<br>• Adjusted for main confounders: age, race, gender, elevation , socio-economic status, year of diagnosis | • Indirect exposure measurement for cases and controls<br>• Limited number of cases (ALL n=15)<br>• Did not account for resident mobility or full address history during exposure time period<br>• Reported analysis did not include an adjustment for maternal smoking and specific results that did include smoking were not provided<br>• High percentage excluded (27%) due to missing address or lat/long<br>• Despite an estimated ALL odds ratio of 4.3, the 95% confidence interval is close to null (1.1)<br>• Age 20-24 introduces different measures of exposure in grouped analysis<br>• Did not evaluate overall hematological cancers including acute myeloid leukemia, which is more closely associated with the chemicals of concern as specified in this study |

BLM_0037421



# Clean water: GIS maps

Back to clean water

## Water Quality Control Division (WQCD) GIS data

- 2018 spatial representation of stream segmentation (Zip file with ArcGIS geodatabase)
- Map of stream water quality standards (ArcGIS online map)
- Map of outstanding waters (ArcGIS online map)
- 2018 inventory of outstanding waters (Zip file with ArcGIS shapefiles)
- Explanation of stream segment 8 character description.
- Regulation 42 classified areas (ArcGIS shapefile)
- Regulation 71 to 74 phosphorus control (ArcGIS geodatabase)

# Get an account for eRAMS access

Start eRAMS work by creating an account on the eRAMS website.

## Watershed Rapid Assessment Program (WRAP) - Interactive map

This tool is used to extract, organize, and analyze data and information.
Organized by watershed HUC codes:

- HUC12.
- HUC10.
- HUC8.

You can view:

- Geospatial characteristics.
- Water quantity.
- Water quality.

## CLEAN Nutrient Dashboard Tools -  Interactive map

For watershed managers to review possibilities for implementing nutrient requirements from Regulation 85 - Nutrients Management Control Regulation. (Low flow, Reg. 85,

BLM_0037422

storet, stream segments, fish tissue).

# Found an error?

If you you've found an error in the data of the water quality standards, please contact us with these details:

- GEOID of the segment.
- Cycle year of the segment.
- WBID of the segment.
- Potential correction.

All corrections will be reflected on the next integrated report cycle.

BLM_0037423

# Colorado
# Greenhouse Gas Inventory and
# Reference Case Projections 1990-2020

## Center for Climate Strategies
## Spring 2007

Principal Authors: Randy Strait, Steve Roe, Alison Bailie, Holly Lindquist, Alison Jamison



BLM_0037424

# Disclaimer

The Center for Climate Strategies (CCS) prepared this report for the Colorado Department of Public Health and Environment (CDPHE) through an effort of the Western Regional Air Partnership (WRAP). This report presents a preliminary draft greenhouse gas (GHG) emissions inventory and forecast from 1990 to 2020 for Colorado. This report provides an initial comprehensive understanding of Colorado's current and possible future GHG emissions. The information presented provides the State with a starting point for revising the initial estimates as improvements to data sources and assumptions are identified. Note that the CDPHE has been supporting development of GHG inventories and forecasts and some of the CDPHE's information has been included in this report. The CDPHE will be continuing to improve the GHG inventory and forecast for Colorado. Please contact Mr. Jim DiLeo of the CDPHE to obtain the latest information on Colorado's GHG emissions inventory and forecast.

Note that this report is being reviewed by the Climate Action Panel of the Colorado Climate Project as a part of an effort to develop recommendations for mitigating GHG emissions in Colorado. This review will likely result in revisions to data sources and assumption for some sectors as a result of the technical expertise of members participating in the Climate Action Panel. Improvements to this preliminary inventory and forecast resulting from the work of the Climate Action Panel will be made available to the public through the Rocky Mountain Climate Organization's website at http://www.coloradoclimate.org/.

BLM_0037425

# Executive Summary

The Center for Climate Strategies (CCS) prepared this report for the Colorado Department of Public Health and Environment (CDPHE) through an effort of the Western Regional Air Partnership (WRAP). The report contains an inventory and forecast of the State's greenhouse gas (GHG) emissions from 1990 to 2020 to provide an initial comprehensive understanding of Colorado's current and possible future GHG emissions. The information presented provides the State with a starting point for revising the initial estimates as improvements to data sources and assumptions are identified.

Colorado's anthropogenic GHG emissions and anthropogenic/natural sinks (carbon storage) were estimated for the period from 1990 to 2020. Historical GHG emission estimates (1990 through 2005) were developed using a set of generally accepted principles and guidelines for State GHG emissions estimates (both historical and forecasted), with adjustments by CCS as needed to provide Colorado-specific data and inputs when it was possible to do so. The initial reference case projections (2006-2020) are based on a compilation of various existing projections of electricity generation, fuel use, and other GHG-emitting activities, along with a set of transparent assumptions.

Table ES-1 provides a summary of historical (1990 to 2005) and reference case projection (2010 and 2020) GHG emissions for Colorado. Activities in Colorado accounted for approximately 118 million metric tons (MMt) of *gross*[1] carbon dioxide equivalent ($CO_2e$) emissions in 2005, an amount equal to 1.7% of total US gross GHG emissions. Colorado's gross GHG emissions are rising faster than those of the nation as a whole (gross emissions exclude carbon sinks, such as forests). Colorado's gross GHG emissions increased 35% from 1990 to 2005, while national emissions rose by only 16% during this period.

Figure ES-1 illustrates the State's emissions per capita and per unit of economic output. Colorado's per capita emission rate is slightly more than the national average of 25 $MtCO_2e$/yr. Between 1990 and 2004, per capita emissions in Colorado and national per capita emissions have changed relatively little. Economic growth exceeded emissions growth in Colorado throughout the 1990-2004 period. From 1990 to 2004, emissions per unit of gross product dropped by 40% nationally, and by 53% in Colorado.[2]

The principle sources of Colorado's GHG emissions are electricity use (which exclude electricity exports to other states) and transportation, accounting for about 37% and 23% of Colorado's gross GHG emissions, respectively. The next largest contributor to emissions is the residential, commercial, and industrial (RCI) fuel use sector, accounting for 18% of the total State emissions.

As illustrated in Figure ES-2 and shown numerically in Table ES-1, under the reference case projections, Colorado's gross GHG emissions continue to grow, and are projected to climb to

---

[1] Excluding GHG emissions removed due to forestry and other land uses and excluding GHG emissions associated with exported electricity.
[2] Based on gross domestic product by state (millions of current dollars), available from the US Bureau of Economic Analysis, http://www.bea.gov/regional/gsp/. The national emissions used for these comparisons are based on 2004 emissions, http://www.epa.gov/climatechange/emissions/usinventoryreport.html.

BLM_0037426

157 MMtCO$_2$e by 2020, reaching 81% above 1990 levels. As shown in Figure ES-3, demand for electricity is projected to be the largest contributor to future emissions growth, followed by emissions associated with transportation, RCI fossil fuel use, and fossil fuel production in the State.

Some data gaps exist in this analysis, particularly for the reference case projections. Key tasks include review and revision of key emissions drivers (such as electricity, fossil fuel production, and transportation fuel use growth rates) that will be major determinants of Colorado's future GHG emissions. Appendices A through H provide the detailed methods, data sources, and assumptions for each GHG sector. We welcome comments and suggestions on this preliminary analysis and report.

Emissions of aerosols, particularly "black carbon" (BC) from fossil fuel combustion, could have significant climate impacts through their effects on radiative forcing. Estimates of these aerosol emissions on a CO$_2$e basis were developed for Colorado based on 2002 and 2018 data from the WRAP. The results were a total of 6.75 MMtCO$_2$e, which is the mid-point of a range of estimated emissions (4.3 – 9.2 MMtCO$_2$e) in 2002. Based on an assessment of the primary contributors, it is estimated that BC emissions will decrease substantially by 2018 after new engine and fuel standards take effect in the onroad and nonroad diesel engine sectors (decrease of about 4.0 MMtCO$_2$e). Details of this analysis are presented in Appendix I to this report. These estimates are not incorporated into the totals shown in Table ES-1 because a global warming potential for BC has not yet been assigned by the Intergovernmental Panel on Climate Change (IPCC). By including BC emission estimates in the inventory, however, additional opportunities for reducing climate impacts can be identified as the scientific knowledge related to BC emissions improves.

BLM_0037427

Colorado GHG Inventory and Reference Case Projection
CCS, Spring 2007

### Table ES-1.  Colorado Historical and Reference Case GHG Emissions, by Sector[a]

| (Million Metric Tons CO₂e) | 1990 | 2000 | 2005 | 2010 | 2020 | Explanatory Notes for Projections |
|---|---|---|---|---|---|---|
| **Energy** | **75.4** | **96.0** | **102.2** | **114.8** | **135.9** | |
| Electricity Production | 31.6 | 38.7 | 39.8 | 45.3 | 54.0 | |
| Coal | 30.9 | 35.1 | 34.9 | 40.0 | 47.6 | See electric sector assumptions |
| Natural Gas | 0.7 | 3.5 | 4.9 | 5.2 | 6.3 | in appendix |
| Oil | 0.02 | 0.08 | 0.02 | 0.02 | 0.02 | |
| Net Imported Electricity | 1.0 | 2.2 | 3.1 | 3.0 | 3.0 | |
| **Electricity Consumption Based** | **32.7** | **40.9** | **42.9** | **48.2** | **57.0** | |
| **Residential/Commercial/ Industrial (RCI) Fuel Use** | **16.3** | **20.2** | **21.2** | **24.2** | **30.4** | |
| Coal | 1.6 | 1.0 | 1.2 | 1.3 | 1.5 | Based on US DOE regional projections |
| Natural Gas | 11.8 | 15.4 | 16.5 | 18.8 | 23.7 | Based on US DOE regional projections |
| Oil | 2.8 | 3.7 | 3.5 | 4.1 | 5.2 | Based on US DOE regional projections |
| Wood (CH₄ and N₂O) | 0.06 | 0.07 | 0.04 | 0.05 | 0.05 | Based on US DOE regional projections |
| **Transportation** | **19.0** | **25.5** | **28.0** | **30.6** | **36.2** | |
| Motor Gasoline | 13.3 | 17.4 | 18.1 | 19.2 | 22.1 | Based on US DOE regional projections |
| Diesel | 2.9 | 4.8 | 6.5 | 7.7 | 9.8 | Based on US DOE regional projections |
| Natural Gas, LPG, other | 0.19 | 0.22 | 0.22 | 0.28 | 0.39 | Based on US DOE regional projections |
| Jet Fuel and Aviation Gasoline | 2.5 | 3.1 | 3.2 | 3.4 | 3.9 | Based on US DOE regional projections |
| **Fossil Fuel Industry** | **7.5** | **9.3** | **10.1** | **11.8** | **12.3** | |
| Natural Gas Industry | 3.1 | 4.8 | 5.0 | 6.5 | 7.3 | Increase based on current trend to 2009, then US DOE to 2020 |
| Oil Industry | 0.22 | 0.15 | 0.16 | 0.18 | 0.20 | Increase based on current trend to 2009, then US DOE to 2020 |
| Coal Mining (Methane) | 4.2 | 4.3 | 4.9 | 5.1 | 4.8 | Assumes no change after 2003 |
| **Industrial Processes** | **0.8** | **2.1** | **2.9** | **3.8** | **5.9** | |
| Cement Manufacture (CO₂) | 0.32 | 0.56 | 0.52 | 0.55 | 0.62 | Based on State's Nonmetallic Minerals employment projections (2004-2014) |
| Lime Manufacture (CO₂) | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | Ditto |
| Limestone & Dolomite Use (CO₂) | 0.00 | 0.03 | 0.04 | 0.04 | 0.04 | Ditto |
| Soda Ash (CO₂) | 0.04 | 0.04 | 0.04 | 0.04 | 0.05 | Based on 2004 and 2009 projections for US production |
| ODS Substitutes (HFC, PFC, and SF₆) | 0.004 | 1.2 | 2.1 | 3.0 | 5.1 | Based on national projections (US State Dept.) |
| Semiconductor Manufacturing (HFC, PFC, and SF₆) | 0.05 | 0.14 | 0.08 | 0.06 | 0.03 | Based on national projections (US EPA) |
| Electric Power T & D (SF₆) | 0.35 | 0.20 | 0.19 | 0.14 | 0.08 | Based on national projections (US EPA) |
| **Waste Management** | **2.0** | **3.2** | **3.7** | **4.5** | **6.6** | |
| Solid Waste Management | 1.6 | 2.6 | 3.2 | 3.8 | 5.7 | Projections primarily based on population |
| Wastewater Management | 0.4 | 0.6 | 0.6 | 0.7 | 0.8 | Projections based on population |
| **Agriculture (Ag)** | **8.7** | **9.6** | **8.9** | **8.9** | **9.1** | |
| Enteric Fermentation | 3.0 | 3.2 | 3.2 | 3.2 | 3.2 | Projections held constant at 2003 levels except for dairy cattle (see Appendix F) |
| Manure Management | 0.8 | 1.2 | 1.2 | 1.2 | 1.3 | Ditto |
| Ag. Soils and Residue Burning | 4.9 | 5.2 | 4.5 | 4.5 | 4.5 | Projections held constant at 2005 levels |
| **Total Gross Emissions** | **86.9** | **110.9** | **117.7** | **132.0** | **157.4** | |
| *increase relative to 1990* | | 27% | 35% | 52% | 81% | |
| **Forestry and Land Use** | **-24.7** | **-24.7** | **-24.7** | **-24.7** | **-24.7** | Historical and projected emissions held constant at 2004 levels. |
| **Agricultural Soils** | **-2.0** | **-2.0** | **-2.0** | **-2.0** | **-2.0** | Historical and projected emissions held constant at 1997 levels. |
| **Net Emissions (including sinks)** | **60.2** | **84.2** | **91.0** | **105.3** | **130.7** | |

[a] Totals may not equal exact sum of subtotals shown in this table due to independent rounding.

Colorado Department of Public Health and Environment

v

Center for Climate Strategies
www.climatestrategies.us

Colorado GHG Inventory and Reference Case Projection
CCS, Spring 2007

**Figure ES-1.  Historical Colorado and US GHG Emissions, Per Capita and Per Unit Gross Product**



**Figure ES-2.  Colorado Gross GHG Emissions by Sector, 1990-2020: Historical and Projected**



\* RCI – direct fuel use in residential, commercial, and industrial sectors. ODS – ozone depleting substance.

**Figure ES-3. Sector Contributions to Emissions Growth in Colorado, 1990-2020:
Reference Case Projections (MMtCO$_2$e Basis)**



RCI – direct fuel use in residential, commercial, and industrial sectors. ODS – ozone depleting substance. HFCs – hydrofluorocarbons.

BLM_0037430

Colorado GHG Inventory and Reference Case Projection
CCS, Spring 2007

# Table of Contents

Executive Summary ..................................................................................................................... iii

Acronyms and Key Terms ........................................................................................................... ix

Acknowledgements...................................................................................................................... xii

Summary of Preliminary Findings............................................................................................... 1

    Introduction............................................................................................................................... 1

Colorado Greenhouse Gas Emissions: Sources and Trends ........................................................ 2

    Historical Emissions ................................................................................................................ 4

        Overview ............................................................................................................................. 4

        A Closer Look at the Two Major Sources: Electricity and Transportation .......................... 5

    Reference Case Projections...................................................................................................... 6

    Key Uncertainties and Next Steps .......................................................................................... 8

    Approach.................................................................................................................................. 9

        General Methodology ......................................................................................................... 9

        General Principles and Guidelines...................................................................................... 9

Appendix A. Electricity Use and Supply .................................................................................... A-1

Appendix B. Residential, Commercial, and Industrial (RCI) Fuel Combustion ...................... B-1

Appendix C. Transportation Energy Use.................................................................................... C-1

Appendix D. Industrial Processes ............................................................................................... D-1

Appendix E. Fossil Fuel Industries ............................................................................................ E-1

Appendix F. Agriculture ............................................................................................................. F-1

Appendix G. Waste Management ................................................................................................ G-1

Appendix H. Forestry .................................................................................................................. H-1

Appendix I. Inventory and Forecast for Black Carbon................................................................ I-1

Appendix J. Greenhouse Gases and Global Warming Potential Values: Excerpts from the
    *Inventory of U.S. Greenhouse Emissions and Sinks: 1990-2000*......................... J-1

BLM_0037431

Colorado GHG Inventory and Reference Case Projection
CCS, Spring 2007

# Acronyms and Key Terms

AEO – Annual Energy Outlook, EIA

Ag – Agriculture

bbls – Barrels

BC – Black Carbon*

Bcf – Billion cubic feet

BLM – United States Bureau of Land Management

BOD – Biochemical Oxygen Demand

BTU – British thermal unit

C – Carbon*

$CaCO_3$ – Calcium Carbonate

CBM – Coal Bed Methane

CCS – Center for Climate Strategies

CDOT – Colorado Department of Transportation

CDPHE – Colorado Department of Public Health and Environment

CFCs – Chlorofluorocarbons*

$CH_4$ – Methane*

CO – Carbon monoxide*

$CO_2$ – Carbon Dioxide*

$CO_2e$ – Carbon Dioxide equivalent*

CRP – Federal Conservation Reserve Program

DRCOG – Denver Regional Council of Governments

EC – Elemental Carbon*

eGRID – US EPA's Emissions & Generation Resource Integrated Database

EGU – Electricity Generating Unit

EIA – US DOE Energy Information Administration

EIIP – Emissions Inventory Improvement Program

Eq. – Equivalent

FIA – Forest Inventory and Analysis

Gg – Gigagram

GHG – Greenhouse Gases*

GWh – Gigawatt-hour

BLM_0037432

GWP – Global Warming Potential*

HFCs – Hydrofluorocarbons*

IPCC – Intergovernmental Panel on Climate Change*

kWh – Kilowatt-hour

LF – Landfill

LFGTE – Landfill Gas Collection System and Landfill-Gas-to-Energy

LMOP – Landfill Methane Outreach Program

LNG – Liquefied Natural Gas

LPG – Liquefied Petroleum Gas

Mt – Metric ton (equivalent to 1.102 short tons)

MMt – Million Metric tons

MPO – Metropolitan Planning Organization

MSW – Municipal Solid Waste

MW – Megawatt

MWh – Megawatt-hour

N – Nitrogen*

$N_2O$ – Nitrous Oxide*

$NO_2$ – Nitrogen Dioxide*

$NO_x$ – Nitrogen Oxides*

NAICS – North American Industry Classification System

NASS – National Agricultural Statistics Service

NFRTAQPC – North Front Range Transportation and Air Quality Planning Council

NMVOCs – Nonmethane Volatile Organic Compounds*

$O_3$ – Ozone*

ODS – Ozone-Depleting Substances*

OM – Organic Matter*

PADD – Petroleum Administration for Defense Districts

PFCs – Perfluorocarbons*

PM – Particulate Matter*

PPACG – Pikes Peak Area Council of Governments

ppb – parts per billion

ppm – parts per million

BLM_0037433

ppt – parts per trillion

PV – Photovoltaic

RCI – Residential, Commercial, and Industrial

RES – Renewable Energy Standard

RPA – Resources Planning Act Assessment

RPS – Renewable Portfolio Standard

SAR – Second Assessment Report*

SED – State Energy Data

$SF_6$ – Sulfur Hexafluoride*

SGIT – State Greenhouse Gas Inventory Tool

Sinks – Removals of carbon from the atmosphere, with the carbon stored in forests, soils, landfills, wood structures, or other biomass-related products.

TAR – Third Assessment Report*

T&D – Transmission and Distribution

Tg – Teragram

TWh – Terawatt-hours

UNFCCC – United Nations Framework Convention on Climate Change

US EPA – United States Environmental Protection Agency

US DOE – United States Department of Energy

USDA – United States Department of Agriculture

USFS – United States Forest Service

USGS – United States Geological Survey

VMT – Vehicle-Miles Traveled

WAPA – Western Area Power Administration

WECC – Western Electricity Coordinating Council

$W/m^2$ – Watts per Square Meter

WMO – World Meteorological Organization*

WRAP – Western Regional Air Partnership

WW – Wastewater

* – See Appendix J for more information.

BLM_0037434

# Acknowledgements

We appreciate all of the time and assistance provided by numerous contacts throughout Colorado, as well as in neighboring States, and at federal agencies. Thanks go to in particular the many staff at several Colorado State Agencies for their inputs, and in particular to Jill Cooper, Jim DiLeo, and the peer review staff of the Colorado Department of Public Health and Environment (CDPHE) who provided key guidance for this analytical effort.

The authors would also like to express their appreciation to Katie Bickel, Michael Lazarus, Lewison Lem, Katie Pasko, and David Von Hippel of the Center for Climate Strategies (CCS) who provided valuable review comments during development of this report. Thanks also to Michael Gillenwater for directing preparation of Appendix J.

BLM_0037435