# *Delta Comprehensive Plan 1997*

| Public Facilities and Services | |
|---|---|
| **Section One: Criminal Justice/Code Enforcement** | **Status** C=completed, I=incomplete, P=in progress |
| *Goals* | |
| Ensure that the rights and property of all citizens are protected by adequate laws, efficient law enforcement agencies, and by a general climate in which respect for the law and those enforcing it can flourish. | P |
| Create a proactive stance on crime prevention with citizen involvement | P |
| *Guidelines* | |
| Promote a judicial system which allows for prosecution of more crimes in municipal court | C |
| Provide improved access to the system for citizens of the City by reevaluating scheduling | CI |
| Encourage programs which have the potential for deterring crime | P |
| Seek constant upgrading of the quality of police services to achieve a high degree of training, proficiency of performance, humane attitudes, and courteous conduct | P |
| Cooperate with the Delta County Sheriff's Office to clarify jurisdictional issues | PCI |
| *Actions* | |
| Continue to work to eliminate obsolete laws and simplify existing ones | CIP |
| Encourage consolidation of local law enforcement facilities whenever such consolidations are feasible, economically viable, and of obvious efficiency | P |
| Educate the citizens to accept that crime is a community issue and encourage citizen participation throughout the entire spectrum of the criminal justice system | P |
| Continue to support community service programs such as D.A.R.E., reserve officer programs, safety and neighborhood watch programs.  Provide non-official public contact/service in the community | P |

BLM_0037674

| Public Facilities and Services | |
|---|---|
| **Section Two: Utilities** | **Status** C=completed, I=incomplete, P=in progress |
| ***Goals*** | |
| Continue to provide utilities in adequate amounts, reliability, economically, and in environmentally acceptable manner | P |
| ***Guidelines*** | |
| Facilitate resource management in all utility resources | CP |
| Improve efforts for coordination and integration of utilities throughout utility planning | P |
| Adapt the services and programs of each utility to the needs of the businesses and residents of the City | CP |
| Utilize progressive management techniques and business practices to plan for, operate, and maintain the City utility system | P |
| Maintain systems and plants to serve all consumers of City services | P |
| Promote the reuse of products and by-products of utility resources | P |
| Coordinate long-range planning between emergency service providers and utilities | P |
| Coordinate the City's three mile plan policies with those of the County | P |
| ***Actions*** | |
| Complete a capital improvements program for all utility infrastructure | P |
| Study incentives for alternative systems of supply and management for conservation purposes | P |
| Keep current the agreements in place for service of utilities in the Delta service area | P |
| Enforce the requirement that new developments complete utility plans | P |
| Encourage utilities to attend the Delta County utility coordination meetings | PI |

BLM_0037675

| Public Facilities and Services | Status C=completed, I=incomplete, P=in progress |
|---|---|
| Encourage utilities to respond to requests for plat review during the development process | P |
| Coordinate and renegotiate, if deemed necessary, service area agreements with annexation policies and actions. | P |
| **Section Three: Emergency Services** (fire, emergency and disaster preparedness and emergency medical services) | |
| *Goals* | |
| Ensure rapid, efficient, and economical emergency services within the community | P |
| *Guidelines* | |
| Play an active role in the Delta County Emergency Planning Committee and the Regional Emergency Planning Committee | P |
| *Actions* | |
| Strive for reduction in response time to all areas of the City | P |
| Coordinate and upgrade disaster prevention and hazardous materials response in the area through participation in the development of a county-wide comprehensive management preparedness plan | P |
| Coordinate emergency management training and exercising of emergency management plans with Delta County Emergency preparedness Department | P |
| Continue to update City addressing systems and ensure changes and new additions are brought to the attention of the E 911 Public service Answering point (PSAP) | P |
| Plan for growth of services as the City grows and expands | P |
| Review subdivision specifications in new developments with emergency service providers | P |
| Perform quarterly checks of the emergency broadcast override on the Cablevision channel | C |
| **Section Four: Fiscal responsibility** | |
| *Goals* | |
| Promote fiscal accountability and responsibility in the provision of municipal facilities & services | P |

9-8

BLM_0037676

| Public Facilities and Services | Status C=completed, I=incomplete, P=in progress |
|---|---|
| **Guidelines** | |
| Require that new development pay a reasonable share of the cost of the expanded services | P (pay their own way) |
| Establish priorities for programs with favorable cost/benefit ratios.  Allow for other programs or services which are desired by the community and which citizens are willing to support | P |
| Provide comprehensive and objective financial data to facilitate fair and equitable decisions | CP |
| **Actions** | |
| Determine those public faculties or services for which development fees can reasonably be assessed | P (impact fee study) |
| Establish a basis for determining the incremental costs associated with new development for each service. | P |
| Increase fees for services as the cost of those services increases | P |
| Coordinate utility check-offs within each development to encourage the use of single trenches for utility placement | P |
| **Section Six: Education** | |
| **Goals** | |
| Education should provide all students of all ages with as many options in life as possible | CIP |
| **Guidelines** | |
| Integrate school access into the City's transportation plan | CIP |
| **Actions** | |
| Investigate impacts of new development on schools and create an impact fee system which reflects those impacts | I |
| **Section Seven: Solid Waste** | |
| **Goals** | |
| Strive to create a solid waste system which include all components of an environmentally sound and efficient process of source reduction, recycling and reuse in cooperation with Delta County | P (efforts underway re countywide pgm) |
| **Guidelines** | |
| Advocate recycling to decrease trash volumes and recycle reusable materials | I (Evaluate cost of pickup/recycle) |

BLM_0037677

| Public Facilities and Services | Status C=completed, I=incomplete, P=in progress |
|---|---|
| *Actions* | |
| Coordinate with the County to increase the efficiency of trash hauling | PI |
| Encourage City-sponsored composting project at the wastewater treatment plant through education | PI |
| Educate the community on source reduction | I |
| Encourage purchase of recycled products | I |
| Develop recycling center | I |

BLM_0037678

*Chapter 10*

# *Agriculture and Open Space*

## *Agriculture and Quality of Life*

Agriculture is an important part of Delta's history, community character and quality of life. Figure 10 – 1 shows parcels in agricultural land use, including prime agricultural parcels, according to the U.S. Department of Agriculture's database. It may be important to distinguish between prime and non-prime agricultural parcels when designating areas for potential future growth. Given the preferences of the Delta community, it may be appropriate to avoid residential subdivisions or any other non-agricultural development on these prime parcels.

The Steering committee acknowledges the history and value of agriculture in Delta County. As the economics surrounding agriculture continue to change, the committee recognizes that the small farm parcels currently within the city of Delta may not remain as viable farmland. Although these parcels may be developed, the general agricultural atmosphere that still exists will continue at some new levels in areas within the county. It will be difficult to limit the development of ag lands within the City as the demand for that land for higher value use may eliminate all ag lands in the City by the year 2030.

The Black Canyon Land Trust (BCLT) has protected just over 32,000 acres in Montrose, Delta, Ouray and Gunnison counties. (See Figure 10-2). They also worked with the Northern San Juan Initiative to conserve parcels of property in San Miguel County that are contiguous with BCLT- conserved properties.

The BCLT (http://www.blackcanyonlandtrust.org/index.htm) projects include ranches, farms, river corridors and valuable view sheds. The largest conservation parcel the group has contracted with is 3,700 acres in Delta County and all the properties they have worked with have varied size and use. Federal and state tax deductions are allowed for donation of conservation easements.

## *The Agricultural Economy*

Although agriculture provides much of the pastoral quality of the landscape, agriculture represents a very small part of Delta County's economy.

According to the U.S. Department of Agriculture 2002 Census of Agriculture (latest information available), there were 1,063 farms in Delta County and the average farm size was 247 acres. The fairly large average size is skewed by the small number of very large farms. The size distribution by size category indicates that about two-thirds of the farms are less than 50 acres, which is typical for farms in the Delta area. Forage land (alfalfa, hay) occupies approximately 24,775 acres, followed by 2,887 in corn for grain and 1,404 acres of corn for silage. Livestock also continues to be a

BLM_0037679

strong element in Delta County's agricultural economy. Sweet corn production has increased with the advent of "Olathe Sweet Corn."

---

# 2002 Census of Agriculture
# County Profile
## Delta, Colorado

**Number of farms**
1,063 farms in 2002, 1,100 farms in 1997, down 3 percent.

**Land in farms**
262,443 acres in 2002, 265,593 acres in 1997, down 1 percent.

**Average size of farm**
247 acres in 2002, 241 acres in 1997, up 2 percent.

**Market Value of Production**
$39,077,000 in 2002, $38,312,000 in 1997, up 2 percent.
Crop sales accounted for $14,413,000 of the total value in 2002.
Livestock sales accounted for $24,664,000 of the total value in 2002.

**Market Value of Production, average per farm**
$36,761 in 2002, $34,829 in 1997, up 6 percent.

**Government Payments**
$847,000 in 2002, $392,000 in 1997, up 116 percent.

**Government Payments, average per farm receiving payments**
$5,803 in 2002, $4,606 in 1997, up 26 percent.

Source: USDA NASS

---

## *Public Opinion About Agriculture*

### Community Survey

See comments in Steering Committee Recommendations in the Appendix.

### Comments from Public Workshop

See comments in Steering Committee Recommendations in the Appendix.

10-2

BLM_0037680

# Desired Future Condition, Policies and Action Items

## Desired Future Condition

Recognizing that agriculture is important to Delta's heritage, economy, agro-tourism and rural character, agriculture is preserved and enhanced through creative ways to maintain working farms.

## Policies and Action Items

*Policy 1* – Encourage the long-range protection of agriculture in and near Delta. Action items to implement this policy include:

1. Continue and expand opportunities for community farmers markets.

2. Create incentives to encourage U-Pick agriculture, particularly on small "hobby farm" parcels.

3. Coordinate with farmers and the Land Trust to encourage farmers to voluntarily place conservation easements on agricultural land.

4. Continue to support agri-business in Delta (e.g. egg farm, grain elevators, etc.)

BLM_0037681

# *Delta Comprehensive Plan 1997*

| Section Three: Open Space Preservation | Status<br>C=completed, I=incomplete, P=in progress) |
|---|---|
| *Goals* | |
| Conserve open space or vacant land in around the City which will contribute to the preservation of our rural character, enhance the livability of our community, and provide recreational opportunism for our residents and visitors | P |
| *Guidelines* | |
| Encourage the use of tax incentives, gifts, federal and state recreation and conservation funds, easements, and innovative agreements with landowners (transfer of development rights), and other possibilities to implement the City's open space and master plan | P |
| *Actions* | |
| Develop an open space master plan which creates a process for evaluating potential open space parcels, identifying and prioritizing acquisitions, and developing a financing plan to obtain desirable open space | C |
| Investigate the creation of a readily available and expandable open space fund which can be used to take advantage of immediate and unexpected opportunities to buy land | C |
| Collaborate with land preservation agencies and organizations to receive financial and technical assistance for open space projects (an example would be the Trust for Public Land) | ICP |
| Investigate the application of impact fees for open space preservation | C |

10-4

BLM_0037682

## Figure 10-1



BLM_0037683



**Figure 10-2**                              **Source: Black Canyon Land Trust**

BLM_0037684

# *Chapter 11*

# *Implementation*

This Comprehensive Plan is designed to guide future growth and development of the City of Delta. **The plan is an advisory document only and does not have the force of law.** While the policies contained within the plan can serve as a basis for reviewing future development projects, such policies are more effectively implemented by incorporating them into law (an ordinance, for example).

The plan contains numerous action items designed to achieve stated policies. In the preceding chapters, the action items are organized by subject.

Upon adoption of this Plan by the City Council, it is recommended that the Council select those items of highest priority within the plan and make specific annual Work Plans with responsibilities assigned to Staff. The following are Steering Committee recommendations for consideration by the Council.

## TABLE 11 - 1
## ACTION ITEMS PRIORITIES AND SCHEDULE

| Action Item Priorities | Comments | Information/ Resources |
|---|---|---|
| 1. Adopt the Comprehensive Plan | The Delta Planning and Zoning Commission should recommend approval of the plan to the City Council. The Delta City Charter requires consideration of adoption of the plan by the City Council after receiving a favorable recommendation from the Planning Commission. | Colorado State Statutes/Delta City Charter |
| 2. Revise the Land Use Code to implement various sections of the Comprehensive Plan. Specific items to be addressed include: a. Update design standards for new commercial development on U.S. 50 and Highway 92. | | |

BLM_0037685

| **Action Item Priorities** | **Comments** | **Information/ Resources** |
|---|---|---|
| 3. Modify the Land Use Code to allow mixed use developments in appropriate locations (see policies and action items for Chapter 3) | Delta's zoning code currently allows mixed use (commercial/residential) in its business zones, but additional standards could be added to ensure that the commercial uses are compatible with the residential uses. | |
| 4. Continue to develop intergovernmental agreements with Delta County to ensure that Delta County honors the land use districts and densities specified in unincorporated areas within the three mile plan area when reviewing and approving development proposals. | The City and County of Delta already have the Highway 92 overlay district and will work together on additional overlay districts. | Relevant intergovernmental agreements. |
| 5. Conduct a general government facilities study. | | Department of Local Affairs (DOLA) |
| 6. Conduct a detailed engineering study to determine the best alternative to expand or relocate the sewage treatment plant. | | Colorado Department of Health (CDH) |
| 7. Develop a comprehensive drainage and stormwater management plan. | | CDH, DOLA |
| 8. Develop a parks recreation and trails master plan to include a plan to recommend improvements to the Bill Heddles Recreation Center | | DOLA, Go Colorado (GOCO) |
| 9. Prepare a detailed downtown development plan, including design alternatives for parking after the truck route is constructed and a downtown plaza. | A plaza is an important design element for a revitalized downtown center. | DOLA |

11-2

BLM_0037686

| | | |
|---|---|---|
| 10. Work with tourist related groups, including state and federal agencies to:<br>a. Continue to encourage tourist information centers at Fort Uncompahgre and on Main Street.<br>b. Create additional festivals/events to attract tourists to Delta, including events/festivals at Confluence Park.<br>c. Continue and expand opportunities for community farmers markets.<br>d. Create incentives to encourage U-Pick agriculture, particularly on small "hobby farm" parcels.<br>e. Publicize and promote boating on the Uncompagre and Gunnison Rivers | See discussion of Enterprise Zones and various tax incentives in Chapter 5. | Delta Chamber of Commerce, DOLA, U.S. Economic Development Administration |
| 11. Coordinate with CDOT and / or Delta County to accomplish the following:<br>a. Make appropriate road and other improvements needed to serve future growth areas.<br>b. Beautify U.S. 50 and SH 92 to make them more welcoming.<br>c. Install better signs with a map of major roads advertising Delta at U.S. 50 and SH 92.<br>d. Install gates across rail crossings near Delta that presently do not have gates. | . | |

11-3

BLM_0037687

| | | |
|---|---|---|
| 12. Coordinate with Region 10 to develop a bus loop route in Delta connecting downtown and the three other major commercial areas and the outlying communities; and coordinate with the Union Pacific to develop a rail commuter/tourist train from Delta to Grand Junction and Montrose.<br><br>(http://www.region10.net/senior/providers.cfm#Transportation) | | CDOT, Delta County |
| 13. Work with outdoor recreation groups to develop trails and facilities for outdoor sports such as mountain biking, Off Road Vehicles, hiking, horseback riding. | Delta can become a hub for outdoor sports. | U. S. Forest Service; U.S. Bureau of Land Management; Colorado Plateau Mountain Bike Association, Colorado Mountain Club, Colorado Off Road Vehicle Association |

BLM_0037688

# City of Montrose

# COMPREHENSIVE PLAN

Adopted March 6, 2008

*Page 3-1 and Map 3-1 were updated on March 20, 2012 per City Council Resolution 2012-9*


BLM_0037689

BLM_0037690



2.1



BLM_0037691

10.1

8.1



BLM_0037692



BLM_0037693



BLM_0037694





BLM_0037695







BLM_0037696



The foundation of the Comprehensive Plan was built with

BLM_0037697



Employment

Industrial / Employment

Minor Mixed-use Centers

Future Arterial

Future Major Center
(Hwy 50 East)

North Gateway
(existing)

River Greenway

Airport

Downtown - Comprised of:
➢ Mixed Density High
➢ Downtown Mixed-Use
➢ Downtown Infill and Rede-
   velopment

East
Gatew

Employ

Neighborho
Centers

Future Arter

Mixed
Density
Medium
(typical)

Trails connecti
parks, centers a
neighborhoods

Riverbottom Park
(community/regional)

South Townsend Commercial
Center

Regional Parks
(general
locations)

South Gateway



MONTROSE

BLM_0037698

BLM_0037699











BLM_0037701



During the course of the Comprehensive Plan update process, eight guiding principles emerged, which broadly represent the



BLM_0037702



BLM_0037703

# Land Use 3

## 3.1   FUTURE LAND USE MAP

The Future Land Use Map of the Comprehensive Plan is a visual reference for public agencies or private individuals seeking information about land use objectives of the City. The Future Land Use Map encompasses areas within the City as well as areas that could annex into the City in the future. It represents the growth pattern for our future that reflects our vision and values.

## 3.2   LAND USE DESIGNATION SUMMARY

The following table shows proposed land uses on the Comprehensive Plan Future Land Use Map.

*Table 3.1:* *General comparisons between the Land Use Plan Map designations.*

| LAND USE PLAN DESIGNATION/PURPOSE | |
|---|---|
| **RESIDENTIAL LAND USES** | **DENSITY (DU/ACRE)** |
| *RESIDENTIAL MIXED DENSITY LOW:* *This low-density residential land use is intended to preserve the traditional building pattern of the existing residential development in Montrose and will continue to be a predominant density in the City. In addition to single-family homes, this district allows small amounts of attached residential dwelling units (such as duplexes and even small groups of townhomes).* | *Min.: 1 du/per 3 acres*<br>*Max: 6 du/acre*<br>*Avg: 4 du/acre* |
| *RESIDENTIAL MIXED DENSITY MEDIUM:* *The majority of the mixed-density medium residential land uses are designated in areas that are not yet developed. This district provides for a variety of residential types, mixed within a neighborhood, including single-family homes, townhomes, duplexes and triplexes.* | *Min.: 6 du/ac*<br>*Max:10 du/ac*<br>*Avg: 8 du/ac* |
| *DOWNTOWN MIXED DENSITY HIGH:* *This high-density residential land use is primarily intended for attached buildings on individual lots (such as townhomes), as well as multi-family structures such as apartments and condominiums. Accessory dwelling units (apartments over garage) are encouraged. This use is especially appropriate in the Downtown and immediately surrounding core area, as well as adjacent to major and minor business centers.* | *Min: 8 du/ac*<br>*Max: 16 du/ac*<br>*Avg: 12 du/ac* |



*Note: This page was updated per Council Resolution 2012-9, adopted March 20, 2012.*

BLM_0037704



BLM_0037705





Note: This page has been updated per City Council Resolution 2012-9, Adopted March 20, 2012

BLM_0037706



BLM_0037707



To ensure that we reach our goals, we need to plan ahead on how best to get there.  A long range vision allows us to guide



1. Amend the IGA and 201 boundaries to be consistent with the expanded Comprehensive Plan UGB area.
2. Upon adoption of the Comprehensive Plan, it is important that relevant portions of the City's land use ordinances be updated or expanded to conform to the Comprehensive Plan.
3. Make a biannual "State of the Comprehensive Plan," presentation to Council and Planning Commission.

MONTROSE

BLM_0037708



BLM_0037709



BLM_0037710



Policy 3.3:



MONTROSE

1. *Do a detailed analysis of possible incentives, and their relative merits, to attract retail and commercial development to infill locations in Montrose (such as in the core area, which may have disproportionately high public infrastructure costs).*
2. *Evaluate the feasibility (cost vs. benefit) of an outdoor amphitheater in Cerise Park.*
3. *Create zoning and building code provisions for the Downtown that allow and encourage: mixed-use, urban residential types and shared parking.*
4. *Expand the number and quality of community events that bring residents together, and visitors to the city.*





BLM_0037712











BLM_0037714











BLM_0037716



1. *Establish a consistent methodology to determine City costs incurred when providing services to new annexations.*

2. *Adopt an annexation fee system that reflects the true cost of the development on City infrastructure and providing services. Include public maintenance costs (if any) for non-contiguous developments. Evaluate the potential to apply the existing COPS fee system to the Growth Areas concept to encourage development within Growth Area 1 (the City boundaries) and to make sure that annexations in Growth Areas 2 and 3 do not place a disproportionate financial burden on City service costs.*



MONTROSE

BLM_0037717

3. *Consider amending the Intergovernmental Agreement with Montrose County to extend the Urban Growth/201 Boundary to the extent of the Comprehensive Plan Urban Growth Boundary. Include annexation and development policies consistent with the Comprehensive Plan.*

4. *Pursue with the County a simple, effective staff level review procedure to coordinate City/County review within the Urban Growth Boundary. Formalize the process through the City/County Intergovernmental Agreement (IGA).*



Montrose had been experiencing a rapid growth rate over



*Figure 6.2: Future Growth Projections*





BLM_0037718



BLM_0037719







BLM_0037720



| | Growth Area 1 |
| | Growth Area 2 |
| | Growth Area 3 |
| | 201 Boundary (2008) |
| | Urban Growth Boundary |
| | City Limits (2008) |
| —— | Roads |
| ------ | Airport |
| —— | Uncompahgre River |



MONTROSE



BLM_0037722





BLM_0037723



BLM_0037724



BLM_0037725

**D**







1. Revise zoning and subdivision regulations to allow for Centers as detailed in the Comprehensive Plan (for example, to allow mixed use commercial). Allow land uses that will have a positive impact on Downtown development and redevelopment. Include permitting, shared parking credit, public/private partnerships for parking, increased building heights, and allowing accessory dwelling units.

2. Develop incentives for developing Centers and for infill development such as density bonuses, infrastructure upgrades, streamlined processes or fee reductions.

3. To demonstrate how Centers can be integrated into the community, develop detailed, voluntary guidelines for appropriate Center design.

4. To help streamline the review process, prepare and adopt basic guidelines for development and redevelopment in the core area of the City where design compatibility is important to preserving overall character.

MONTROSE

BLM_0037726



sketch by tom



BLM_0037727





BLM_0037728



















BLM_0037730



BLM_0037731



BLM_0037732



1. Remove zoning barriers that discourage new residential construction methods that can lower housing costs, such as mixing house types within a zoning category and using modular (factory-built) construction.

2. Revise existing zoning ordinances or create an overlay zone, to encourage in the core area of the City:
   ❏ Residential uses in the Downtown (e.g. above stores and offices),
   ❏ Infill of vacant and underutilized parcels, and
   ❏ Accessory Dwelling Units (ADU's, "mother-in-law" units over garages) to provide financial incentives to maintain and upgrade residential properties around the Downtown.

3. Set up an "early warning" system to track indicators of housing affordability, and housing conditions, in the community. Report to the City Council and Planning Commission annually or when there is greater than 5% change in indicators.

4. Support and work with the Montrose County Housing Authority to increase the amount of affordable housing in Montrose. Potential City strategies might include:
   ❏ Create an Incentive Zone,
   ❏ Affordable Housing Trust and Land Bank,
   ❏ Federal and State tax credits,
   ❏ Workforce Housing Partnership, and
   ❏ Regulatory Incentives (e.g. fee waivers, density bonuses, streamlined review process, etc.).

5. Encourage quality design of higher density housing by creating simple voluntary design guidelines and training staff to encourage quality design.





MONTROSE

BLM_0037733















BLM_0037735



BLM_0037736







BLM_0037737



Montrose is located in a high country environment. BLM and National Forest Public lands surround the community on three







BLM_0037739

## Open Space / River Corridor Greenway

1. *Conduct a detailed environmental assessment (including all existing information) of the Uncompahgre River corridor. Objectives include identifying: current floodplains (taking into account upstream dams), jurisdictional wetlands, riparian wildlife habitats, vegetation that is important to flood protection, scenic qualities, etc.).*

2. *Develop a Master Plan for the Uncompahgre River corridor.*

3. *Through a public process, create a River Corridor Overlay Zone to guide river preservation efforts. The Overlay Zone should address:*
   - ❑ *the siting of buildings (should not face the river with service yards, etc.),*
   - ❑ *minimizing impact on riparian vegetation (preserve mature trees and riparian vegetation),*
   - ❑ *maintaining a quality natural environment,*
   - ❑ *preserving an attractive setting for river users,*
   - ❑ *continuation of the trails and park system, and*
   - ❑ *including other public amenities (a nature center, river access points, fishing access, a kayak park, etc.).*

   *In the absence of more definitive data, consider using the "hydric soils" map designation or a 100 foot buffer from the river's edge as a preliminary corridor boundary.*

4. *Initiate, and/or support activities to clean up the river. Consider an annual clean-up day, Boy/Girl Scout projects, an "adopt-a-river" program, and student projects.*

5. *Work with Montrose County to establish an intergovernmental agreement to set consistent development standards for the river corridor outside of the City.*

6. *When existing industrial areas along the River redevelop for other uses, consider applying the River Corridor Overlay zone.*

7. *Research and develop a presentation to property owners outlining the fiscal and tax advantages of various forms of land conservation techniques, such as: donating conservation easements, below-market sales, bonus density clustering, transfer of development rights, etc.*

8. *Do a detailed evaluation of the potential to use a transfer-of-development-rights (TDR) to preserve land (including corridors) in Montrose. If feasible, create TDR provisions in the zoning and/or subdivision regulations.*

### Gateways:

1. *Commission a landscape plan to upgrade the North gateway, including:*
   - ❑ *Increasing the density of planting and design of a gateway monument.*
   - ❑ *Work with landowners on the east side of the roadway to create a complementary landscape.*

2. *Create gateways along Highways 550 South and 50 East by either acquiring land, or establishing an overlay zone that encourages (with incentives) generous setbacks.*

### Stormwater Drainage

1. *Work with Montrose County to develop consistent stormwater standards.*

2. *With the cooperation of Montrose County develop a Storm Drainage Master Plan for the City and adjoining drainages in the County. Include capital improvement priorities and policies for new development.*

## Parks

1. *Develop a detailed Parks Master Plan that includes a strategy to acquire and construct an integrated system of city-wide parks, trails and open spaces. In the plan:*
   - ❑ *Develop minimum size requirements and construction standards for parks constructed by developers.*
   - ❑ *Develop guidelines and maintenance standards for mini parks.*
   - ❑ *Establish a 10-year capital improvements plan for Community and Neighborhood Parks, coordinated with growth projections and impact fees. Update the 10-year CIP annually.*

2. *Biannually update the analysis of the actual cost of development for Neighborhood Parks and recommend to the City Council an appropriate, equitable dedication/money-in-lieu requirement.*

3. *Work with the School District to formalize the joint development, and maintenance, of combined parks and schools to reduce the cost of both schools and*



MONTROSE

*parks. Establish a clearly defined joint use agreement to make school-park relationships efficient and cost-effective. The agreement should address acquisition, development, maintenance, liability, security, and priorities for use and programming.*

**Trails**

1. *Approach the BLM regarding potential acquisitions for Community and Regional parks (under the federal Recreation & Public Purposes criteria). Request that potential public land transfers be identified in any future BLM Urban Interface Plan.*

2. *Work with the MRD and County to develop specific funding mechanisms to acquire property for Community and Regional parks.*

3. *Acquire land and construct at least one additional Community park in the next five years, preferably in the southeast or northeast portions of the City.*

4. *Begin long-range planning for a Regional Park.*











BLM_0037743



BLM_0037744



GATEWAYS



Entry Monument

✱ PRIMARY



MONTROSE

BLM_0037745



BLM_0037746





BLM_0037747

|  |  |
|--|--|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

|  |  |
|--|--|
|  |  |

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

BLM_0037748

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |







BLM_0037750





BLM_0037751





BLM_0037752



BLM_0037753



BLM_0037754



BLM_0037755



BLM_0037756



BLM_0037757



BLM_0037758



BLM_0037759



BLM_0037760







BLM_0037761

_____
_____

1. *Establish a plan and schedule for the financing, design and construction of missing links in the City's arterial road system and new transportation routes.*
2. *Develop a comprehensive sidewalk master plan that:*
   - *Provides "safe routes to school",*
   - *Identifies all missing sidewalk links,*
   - *Identifies the potential for adjacent development or redevelopment to complete the missing connections,*
   - *Estimates the cost of implementing the missing sidewalks to provide a continuous pedestrian connection along at least one side of each roadway,*
   - *Identifies funding sources to implement sidewalk connections that will not be provided by development projects,*
   - *Prioritizes the missing sidewalks, and*
   - *Programs their implementation over time.*
3. *Develop and continually revise a plan for public transportation including identification of corridors for future mass transit.*
4. *Update subdivision design standards to require adjacent developments to have interconnected streets.*





BLM_0037763







BLM_0037764



NOTES:

1. IN URBAN AREAS WITH BUILDINGS AT R.O.W. LINE, SIDEWALKS MAY BE 16'-0", ATTACHED TO CURB, WITH TREES IN TREE GRATES.
2. IN NON-URBAN AREAS, SIDEWALK ON ONE SIDE TO BE 10'-0" TO BECOME A "SHARED USE PATH". PLANTING STRIP SHOULD BE 6'-0" WIDE MINIMUM.
3. R.O.W. WIDTH SHALL BE WIDENED TO 134'-0" WITHIN 500'-0" OF AN ARTERIAL CROSS-STREET TO ALLOW FOR A DOUBLE LEFT TURN LANE.
4. NO ON-STREET PARKING
5. MEDIAN WILL ALLOW FOR SINGLE OR DOUBLE TURN LANE
6. RIGHT TURN LANES PROVIDED AS NEEDED
7. MINIMUM RAISED MEDIAN WIDTH OF 4'-0" ADJACENT TO LEFT TURN LANE



NOTES:

1. SIDEWALK ON ONE SIDE MAY BE WIDENED TO 10'-0" WIDE TO BECOME A "SHARED USE PATH".
2. R.O.W. WIDTH SHALL BE WIDENED TO 134'-0" WITHIN 500'-0" OF AN ARTERIAL CROSS-STREET TO ALLOW FOR A DOUBLE LEFT TURN LANE.
3. NO ON-STREET PARKING
4. MEDIAN WILL ALLOW FOR SINGLE LEFT TURN LANE OR TWO-WAY LEFT TURN LANE
5. RIGHT TURN LANES MAY BE ADDED AS NEEDED (NARROW PLANTING STRIP)
6. 8'-0" WIDE PAVED SHOULDER SUITABLE FOR BICYCLING IS REQUIRED
7. RURAL MAJOR ARTERIAL MAY BE CONVERTED TO AN URBAN MAJOR ARTERIAL SECTION OVER TIME



MONTROSE



NOTES:
1. IN NON-URBAN AREAS, SIDEWALK ON ONE SIDE TO BE 10'-0" TO BECOME A "SHARED USE PATH". PLANTING STRIP WOULD BE 5'-0" WIDE.
2. IN URBAN AREAS WITH BUILDINGS AT THE R.O.W. LINE, SIDEWALKS MAY BE WIDENED TO 15'-0", ATTACHED TO THE CURB, WITH TREES IN TREE GRATES.
3. R.O.W. WIDTH SHALL BE WIDENED TO 124'-0" WITHIN 500'-0" OF AN ARTERIAL CROSS-STREET TO ALLOW FOR A DOUBLE LEFT TURN LANE.
4. MEDIAN WILL ALLOW FOR SINGLE LEFT TURN LANE OR TWO-WAY LEFT TURN LANE
5. MEDIAN MAY BE RAISED IF APPROPRIATE FOR ACCESS CONTROL OR STREETSCAPE



NOTES:

1. IN NON-URBAN AREAS, SIDEWALK MAY BE WIDENED TO 10'-0" TO BECOME A "SHARED USE PATH". PLANTING STRIP WOULD BE AT LEAST 6'-0" WIDE. SIDEWALK/PATH MAY MEANDER TO PROPERTY LINE.
2. IN URBAN AREAS WITH BUILDINGS AT THE R.O.W. LINE, SIDEWALKS MAY BE WIDENED TO 16'-0", ATTACHED TO THE CURB, WITH TREES IN TREE GRATES.
3. R.O.W. WIDTH SHALL BE WIDENED TO 124'-0" WITHIN 500'-0" OF AN ARTERIAL CROSS-STREET TO ALLOW FOR A DOUBLE LEFT TURN LANE.
4. MEDIAN WILL ALLOW FOR SINGLE LEFT TURN LANE OR TWO-WAY LEFT TURN LANE
5. MEDIAN MAY BE RAISED IF APPROPRIATE FOR ACCESS CONTROL OR STREETSCAPE



MONTROSE



NOTES:

1.  SIDEWALK TO BE 8'-0" WIDE SEPARATED FROM STREET BY PLANTING STRIP AT LEAST 12'-0" WIDE.  SIDEWALK MAY MEANDER TO PROPERTY LINE.
2.  IN NON-URBAN AREAS, SIDEWALK TO BECOME A "SHARED-USE PATH".  PLANTING STRIP WOULD BE AT LEAST 12'-0" WIDE.  SIDEWALK /PATH MAY MEANDER TO PROPERTY LINE.
3.  R.O.W. WIDTH SHALL BE WIDENED TO 124'-0" WITHIN 500'-0" OF AN ARTERIAL CROSS-STREET TO ALLOW FOR A DOUBLE LEFT TURN LANE.
4.  NO ON-STREET PARKING
5.  LEFT TURN LANE MAY BE ADDED IF NEEDED BY NARROWING PLANTING STRIPS
6.  RURAL MAJOR ARTERIAL MAY BE CONVERTED TO URBAN MINOR ARTERIAL SECTION OVER TIME
7.  8'-0" WIDE PAVED SHOULDER IS TO BE SUITABLE FOR BICYCLING



NOTES:

1.  SIDEWALK TO BE 6'-0" SEPARATED FROM STREET BY 6'-0" PLANTING STRIP
2.  SIDEWALK MAY BE WIDENED TO 12'-0" IN URBAN AREAS WHERE BUILDINGS FRONT ON THE R.O.W. LINE.  TREES WOULD BE IN TREE GRATES.
3.  DRIVE ZONE TO BE TWO-LANE UNDIVIDED
4.  CURB AND GUTTER REQUIRED
5.  ON-STREET PARKING LANES AND STRIPED BIKE LANES REQUIRED



MONTROSE

BLM_0037767



NOTES:
1. TWO-LANE SECTION
2. PARKING ALLOWED ON BOTH SIDES
3. BICYCLISTS TRAVEL IN VEHICLE LANE

*Figure 10.8:*



NOTES:
1. TWO-LANE SECTION
2. PARKING ALLOWED ON BOTH SIDES
3. BICYCLISTS TRAVEL IN VEHICLE LANE



MONTROSE



14'-0" MIN. R.O.W. OR TRACT

2'-0" MIN.     10'-0"     2'-0" MIN.

6:1 MAX.     2% MAX.     6:1 MAX.

H

SLOPE

4" CLASS 6 AGGREGATE

SIZE FOR 25 YEAR STORM

4" MIN. CONCRETE PAVEMENT

6" CLASS 6 AGGREGATE BASE COURSE COMPACT TO 95% AASHTO T-180

COMPACT TOP 6" OF SUBGRADE TO 90% AASHTO T-180

NOTES:
1. 10'-0" BETWEEN CONTRACTION JOINTS REQUIRED. 100' BETWEEN EXPANSION JOINTS REQUIRED.
2. APPLY BROOM FINISH PERPENDICULAR TO PATH.
3. TWO FOOT MIN. RECOVERY AREAS EACH SIDE OF PATH WILL BE KEPT CLEAR OF OBSTACLES.
4. OFF STREET PATHS SHALL BE DESIGNED IN ACCORDANCE WITH THE AASHTO "GUIDE FOR THE DEVELOPMENT OF BICYCLE FACILITIES" LATEST EDITION.



20'-0" R.O.W. (TYP)

VARIES     16'-0" RESIDENTIAL     VARIES
18'-0" COMMERCIAL

1"/FT. MAX.     1/4"/FT. MAX.

6", CLASS 6 AGGREGATE BASE COURSE COMPACT TO 90% AASHTO T-180

LONGITUDINAL CONSTRUCTION JOINT

PORTLAND CEMENT CONCRETE (PCC) PAVEMENT. THICKNESS PER AASHTO DESIGN PROCEDURES (6" MIN.)

SUBGRADE PREPARATION PER ENGINEERS SPECIFICATIONS.

NOTES:
1. SAW CUT LONGITUDINAL CONTRACTION JOINTS SPACED AT 1/3 PAVEMENT WIDTH.
2. SAW CUT TRANSVERSE CONTRACTION JOINTS AT 10'-0" SPACING.
3. SEE STANDARD CONCRETE DETAILS FOR EXPANSION JOINT SPACING.
4. ALL EXPANSION AND CONTRACTION JOINTS SHALL BE SEALED.
5. PCC PAVEMENT SHALL BE DESIGNED IN ACCORDANCE WITH THE AASHTO GUIDE FOR DESIGN OF PAVEMENT STRUCTURES.



MONTROSE

Sidewalks are a critical component of the multi-modal



BLM_0037770



BLM_0037771



BLM_0037772



BLM_0037773



BLM_0037774



BLM_0037775



BLM_0037776



BLM_0037777



BLM_0037778







BLM_0037779

1. Identify and preserve necessary rights-of-way and utility easements that will be needed to support future growth.
2. Establish drainage standards for new development throughout the drainage basins.
3. The City is conducting a public building needs analysis at the time of the update to the Comprehensive Plan. When completed, general locations for the public buildings should be determined (in conjunction with desired "Centers" where possible) and the Comprehensive Plan updated accordingly.
4. Require that annual Capital Improvements budget requests include: "How does this item help implement the Comprehensive Plan?"
5. Work with the School District to refine policies and procedures regarding locating and acquiring school sites consistent with the land use in the Comprehensive Plan.
6. Regularly update the requirement of impact fees for school sites to match current market conditions.
7. Adapt Crime Prevention Through Environmental Design (CPTED) principles to Montrose.
8. Develop a phased plan for enforcement of existing property maintenance ordinances and nuisance abatement.





BLM_0037780



BLM_0037781






BLM_0037782



BLM_0037783





BLM_0037784

|  |  |
| --- | --- |
|  |  |
|  |  |





BLM_0037786



BLM_0037787



BLM_0037788



BLM_0037789



BLM_0037790



BLM_0037791







*Figure A1.2: Montrose Area Populations Growth 1950 -2006*







MONTROSE

BLM_0037793







BLM_0037794



















BLM_0037796





BLM_0037797



BLM_0037798







BLM_0037799











BLM_0037800













BLM_0037802













BLM_0037804





BLM_0037805







BLM_0037806



BLM_0037807







|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |







BLM_0037810





BLM_0037811

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



BLM_0037812











BLM_0037814



BLM_0037815





BLM_0037816

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |







BLM_0037818



BLM_0037819



BLM_0037820



BLM_0037821



BLM_0037822



BLM_0037823

BLM_0037824



BLM_0037825

BLM_0037826



BLM_0037827



BLM_0037828





Exhibit A
Page 1

| AccessID | Milepost | Type | Side | ExistingAccess | ProposedAccess | Description |
|---|---|---|---|---|---|---|
| 1 | 124.820 | Existing | LT | Unsignalized Full Movement | Signalized full movement with auxillary lane improvements | Racine Road |
| 2 | 124.820 | Existing | RT | Unsignalized Full Movement | Signalized full movement with auxillary lane improvements | Racine Road |
| 3 | 125.124 | Existing | RT | Unsignalized Full Movement | RIRO | Field Access- Driveway |
| 4 | 125.187 | Existing | LT | Unsignalized Full Movement | RIRO | Field Access- Frontage/Cemetery |
| 5 | 125.235 | Existing | RT | Unsignalized Full Movement | RIRO | Antique Shops |
| 6 | 125.427 | Proposed | LT | | Signalized Full Movement | |
| 7 | 125.427 | Proposed | RT | | Signalized Full Movement | |
| 8 | 125.515 | Existing | RT | Unsignalized Full Movement | Close Access | Driveway |
| 9 | 125.678 | Existing | RT | Unsignalized Full Movement | RIRO | Field Access- Private Dr. |
| 10 | 125.682 | Existing | LT | Unsignalized Full Movement | Close Access | Field Access- Driveway |
| 11 | 125.694 | Existing | RT | Unsignalized Full Movement | Close Access | Conoco |
| 12 | 125.724 | Existing | RT | Unsignalized Full Movement | Close Access | Private Drive- Driveway |
| 13 | 125.774 | Proposed | LT | | Signalized Full Movement | |
| 14 | 125.774 | Proposed | RT | | Signalized Full Movement | |
| 15 | 125.786 | Existing | RT | Unsignalized Full Movement | Close Access | Private Drive |
| 16 | 125.848 | Existing | RT | Unsignalized Full Movement | RIRO | Private Drive |
| 17 | 125.856 | Existing | LT | Unsignalized Full Movement | Close Access | Chipeta Drive- At such time as the Chipeta Road alignment is relocated, reasonable access for all properties along the existing Chipeta Road will be granted. Alternate route(s) shall meet AASHTO standards in order to accommodate all types of vehicles that commonly use this road and its access points. |
| 18 | 126.023 | Existing | LT | Unsignalized Full Movement | Close Access | Field Access |
| 19 | 126.039 | Existing | RT | Unsignalized Full Movement | Close Access | Field Access |
| 20 | 126.148 | Existing | RT | Unsignalized Full Movement | Close Access | Field Access |
| 21 | 126.202 | Existing | LT | Unsignalized Full Movement | Close Access | Field Access |
| 22 | 126.213 | Existing | LT | Unsignalized Full Movement | Signalized full movement with auxillary lane improvements | Wolverine Drive |
| 23 | 126.213 | Existing | RT | Unsignalized Full Movement | Signalized full movement with auxillary lane improvements | Otter Road |
| 24 | 126.321 | Existing | RT | Unsignalized Full Movement | Close Access | Field Access |
| 25 | 126.369 | Existing | RT | Unsignalized Full Movement | Close Access | Field Access |
| 26 | 126.620 | Existing | LT | Signalized Full Movement | | Rio Grande |
| 27 | 126.620 | Existing | RT | Signalized Full Movement | | Williams Dr. |
| 28 | 126.724 | Existing | LT | Unsignalized Full Movement | Close Access | Field Access |
| 29 | 126.828 | Existing | LT | Signalized Full Movement | | Hawk Parkway |
| 30 | 126.828 | Existing | RT | Signalized Full Movement | | Walmart Drive |
| 31 | 126.928 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Shed Business |
| 32 | 126.943 | Existing | RT | Unsignalized Full Movement | Close Access | Camelot Garden |
| 33 | 126.971 | Existing | LT | Signalized Full Movement | | Ogden Road |
| 34 | 126.971 | Existing | RT | Signalized Full Movement | | Ogden Road |
| 35 | 127.081 | Existing | LT | Unsignalized Full Movement | RIRO | Private Drive |
| 36 | 127.215 | Existing | LT | Signalized Full Movement | | Odelle Road |

BLM_0037830

Exhibit A
Page 2

| AccessID | Milepost | Type | Side | ExistingAccess | ProposedAccess | Description |
|---|---|---|---|---|---|---|
| 37 | 127.215 | Existing | RT | Signalized Full Movement | | Odelle Road |
| 38 | 127.307 | Existing | RT | Unsignalized Full Movement | RIRO | Venture Way |
| 39 | 127.343 | Existing | LT | Unsignalized Full Movement | RIRO | Private Drive |
| 40 | 127.378 | Existing | LT | Unsignalized Full Movement | RIRO | Private Drive |
| 41 | 127.410 | Existing | LT | Unsignalized Full Movement | 3/4 Movement | Anderson Road |
| 42 | 127.488 | Existing | LT | Unsignalized Full Movement | RIRO | Private Drive- BLM & NFS |
| 43 | 127.488 | Existing | RT | Unsignalized Full Movement | RIRO | Woodgate Drive |
| 44 | 127.524 | Existing | RT | Unsignalized Full Movement | Close Access | Bank |
| 45 | 127.593 | Existing | LT | Signalized Full Movement | | Oak Grove Road |
| 46 | 127.593 | Existing | RT | Signalized Full Movement | | Oak Grove Road |
| 47 | 127.615 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Bray Realty |
| 48 | 127.630 | Existing | RT | Unsignalized Full Movement | RIRO | Private Drive- Walgreens & Payless |
| 49 | 127.643 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Wendy's |
| 50 | 127.650 | Proposed | LT | | RIRO- Combine #49 and #51 | Private DOW & Wendy's |
| 51 | 127.655 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- DOW |
| 52 | 127.655 | Existing | RT | Unsignalized Full Movement | Close South Access/RIRO North Access | Private Drive- Strip Mall |
| 53 | 127.686 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- DOW |
| 54 | 127.695 | Proposed | LT | | RIRO- Combine #53 and #55 | Private DOW & Vet Clinic |
| 55 | 127.702 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Vet Clinic |
| 56 | 127.702 | Existing | RT | Unsignalized Full Movement | RIRO | Private Drive- Gas Station |
| 57 | 127.715 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Vet Clinic |
| 58 | 127.741 | Existing | RT | Unsignalized Full Movement | RIRO | Private Drive- Office Depot |
| 59 | 127.796 | Proposed | LT | | 3/4 Movement | New Stover Alignment |
| 60 | 127.796 | Existing | RT | Unsignalized Full Movement | 3/4 Movement | Encanto Place |
| 61 | 127.833 | Existing | LT | Unsignalized Full Movement | Close Access | Stover Avenue |
| 62 | 127.846 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive |
| 63 | 127.857 | Existing | LT | Unsignalized Full Movement | RIRO | Private Drive |
| 64 | 127.861 | Existing | RT | Unsignalized Full Movement | RIRO | Church Street |
| 65 | 127.888 | Existing | LT | Unsignalized Full Movement | RIRO | Private Drive- Taco Bell |
| 66 | 127.899 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Vacant Lot |
| 67 | 127.899 | Existing | RT | Unsignalized Full Movement | RIRO | Private Drive- Church |
| 68 | 127.920 | Proposed | LT | | RIRO- combine #69 and vacant lot | Private Drive |
| 69 | 127.922 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive- Offices |
| 70 | 127.922 | Existing | RT | Unsignalized Full Movement | RIRO | Private Drive- Coldwell Banker |
| 71 | 127.941 | Proposed | LT | | RIRO- combine #69 and #73 | Private Drive |
| 72 | 127.945 | Existing | RT | Unsignalized Full Movement | Close Access | Private Drive- Field Access |
| 73 | 127.961 | Existing | LT | Unsignalized Full Movement | Close Access | Private Drive |
| 74 | 127.961 | Existing | RT | Unsignalized Full Movement | Close Access | Private Drive- Field Access |
| 75 | 127.990 | Existing | LT | Unsignalized Full Movement | RIRO | Montrose Drive |
| 76 | 127.990 | Existing | RT | Unsignalized Full Movement | RIRO | Montrose Drive |
| 77 | 128.045 | Existing | RT | Unsignalized Full Movement | Close Access | Alley |
| 78 | 128.050 | Proposed | RT | | RIRO- combine #77 and #79 | Private Drive |
| 79 | 128.054 | Existing | RT | Unsignalized Full Movement | Close Access | Private Drive- Gas Station |
| 80 | 128.063 | Existing | LT | Unsignalized Full Movement | RIRO | Poplar Drive |

BLM_0037831

Exhibit A

Page 3

| AccessID | Milepost | Type | Side | ExistingAccess | ProposedAccess | Description |
|---|---|---|---|---|---|---|
| 81 | 128.089 | Existing | LT | RIO | RIO | Private Drive |
| 82 | 128.092 | Existing | RT | Signalized Full Movement | | Niagara Rd. |

BLM_0037832



**Legend for Mapbook**

Index For Mapbook

Access to be Closed

Existing

Proposed

Right In Only

Right In- Right Out

3/4 Movement

Existing Access

Potential Road Connectors-approximate location

New Cul de sac

New Access

**Medians**

Borrow Ditch

Raised Median

Streets

Parcel

Map 1
Map 2
Map 3
Map 4
Map 5
Map 6
Map 7
Map 8
Map 9

Index for
Mapbook

Exhibit A
Page 4

0   750 1,500      3,000       4,500       6,000
Feet



# South Townsend Access Plan

0  100 200   400   600   800
Feet

Exhibit A
Page 5





# South Townsend Access Plan

0   100 200   400   600   800
Feet

Exhibit A
Page 6





Map 3

# South Townsend Access Plan

0   100 200     400     600     800
━━━━━━━━━━━━━━━━━━━Feet

Exhibit A
Page 7



BLM_0037836



Map 4

**South Townsend Access Plan**

0   100 200   400   600   800
Feet

Exhibit A
Page 8



BLM_0037837



Map 5

# South Townsend Access Plan

0   100 200    400    600    800
Feet

Exhibit A
Page 9





**South Townsend Access Plan**

0   100 200    400    600    800
━━━━━━━━━━━━━━━━ Feet

Exhibit A
Page 10

BLM_0037839



**South Townsend Access Plan**

0   100 200    400     600     800
■■■■■■■■■■■■■■■■Feet

Exhibit A
Page 11



BLM_0037840



Map 8

## South Townsend Access Plan

0   100 200    400    600    800
Feet

Exhibit A
Page 12

BLM_0037841



Map 9

## South Townsend Access Plan

0   100 200    400    600    800
Feet

Exhibit A
Page 13

BLM_0037842





BLM_0037843



BLM_0037844



BLM_0037845

INTERGOVERNMENTAL AGREEMENT
BY AND AMONG THE CITY OF MONTROSE,
MONTROSE COUNTY,
AND
THE STATE OF COLORADO
BY AND THROUGH THE DEPARTMENT OF TRANSPORTATION

# UNITED STATES HIGHWAY 50
## ACCESS CONTROL PLAN, MP 91.878 – MP 93.558

**THIS AGREEMENT** is entered into effective as of the __12__ day of _August_ 2010, by and among the City of Montrose and Montrose County (hereafter referred to collectively as the "City and County"), and the State of Colorado, Department of Transportation (hereafter referred to as the "Department"), all of the parties being referred to collectively herein as the "Agencies" or solely as an "Agency".

## WITNESSETH:

**WHEREAS**, the Agencies are authorized by the provisions of Article XIV, Section 18(2)(a), Colorado Constitution, and Sections 29-1-201, et. seq., C.R.S., to enter into contracts with each other for the performance of functions which they are authorized by law to perform on their own; and

**WHEREAS,** each Agency is authorized by Section 43-2-147(1)(a), C.R.S., to regulate access to public highways within its jurisdiction; and

**WHEREAS,** the coordinated regulation of vehicular access to public highways is necessary to maintain the efficient and smooth flow of traffic, to reduce the potential for traffic accidents, to protect the functional level and optimize the traffic capacity, to provide an efficient spacing of traffic signals, and to protect the public health, safety and welfare; and

**WHEREAS,** the Agencies desire to provide for the coordinated regulation of vehicular access for the section of United States Highway 50 between local government street North Grand Avenue (MP 91.878) to local government street San Juan Avenue (MP 93.558). (hereafter referred to as the "Segment"), which is within the jurisdiction of the Agencies; and

**WHEREAS,** the Agencies are authorized pursuant to Section 2.12 of the 2002 State Highway Access Code, 2 C.C.R. 601-1 (the "Access Code") to achieve such objective by written agreement among themselves adopting and implementing a comprehensive and mutually acceptable highway access control plan for the Segment for the purposes above recited; and

**WHEREAS,** the development of this Access Control Plan adheres to the requirements of the Access Code, Section 2.12; and

**NOW THEREFORE,** for and in consideration of the mutual promises and undertakings herein contained, the Agencies agree as follows:

1. This Agreement and the conclusions made in accordance with the Agreement shall constitute an approved Access Control Plan for the Segment, within the meaning of Section 2.12 of the Access Code.

2. The Agencies shall regulate access to the Segment in compliance with the Highway Access Law, Section 43-2-147, C.R.S. (the "Access Law"), the Access Code, and this Agreement including Exhibit A ("Appendix A. United States Highway 50 Access Control Plan") – which exhibit by this reference is hereby incorporated into this document as though fully set forth herein. Vehicular access to the Segment shall be permitted only when such access is in compliance with the Access Law, the Access Code and this Agreement, including Exhibit A.

3. Accesses which were in existence and fully complied with the Access Law prior to the effective date of this Agreement may continue in existence until such time as a change in the access is required by the Access Law, the Access Code or this Agreement or in the course of highway construction. When closure, modification, or relocation of access is required, the Agency(ies) having jurisdiction shall utilize appropriate legal process to affect such action.

4. Actions taken by any Agency with regard to transportation planning and traffic operations within the areas described in Exhibit A to this Agreement shall be in conformity with this Agreement. As per Code Section 2.12 (3), design waivers may be approved if agreed upon by all of the participating Agencies. Each Agency shall conduct an independent review and all participating Agencies must concur on the design waiver in order for its approval.

5. Lots or parcels of real property created after the effective date of this Agreement that adjoin the Segment shall not be provided with direct access to the Segment unless the location, use and design thereof conform to the provisions of this Agreement.

6. This Agreement is based upon and is intended to be consistent with the Access Law and the Access Code as now or hereafter constituted. An amendment to either the Access Law or the Access Code which becomes effective after the effective date of this Agreement and which conflicts irreconcilably with an express provision of this Agreement may be grounds for revision of this Agreement. Conflicts shall be submitted to the agencies for their revision and revision of this Agreement.

7. This Agreement does not create any current financial obligation for any Agency. Any future financial obligation of any Agency shall be subject to the execution of an appropriate encumbrance document, where required. Agencies involved in or affected by any particular or site-specific undertaking provided for herein will cooperate with each other to agree upon a fair and equitable allocation of the costs associated therewith, but, notwithstanding any provision of this Agreement, no Agency shall be required to expend its public funds for such undertaking without the express prior approval of its governing body or director as applicable. All financial obligations of the Agencies hereunder shall be contingent upon sufficient funds therefore being appropriated, budgeted, and otherwise made available.

8. Should any one or more sections or provisions of this Agreement be determined by a court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair or invalidate the remaining provisions of this Agreement, the intention being that the various provisions hereof are severable.

9. This Agreement supersedes and controls all prior written and oral agreements and representations of the Agencies concerning regulating vehicular access to the Segment. No additional or different oral representation, promises or agreement shall be binding on any Agency. This agreement may be amended or terminated only in writing executed by the Agencies with express authorization from their respective governing bodies or legally designated officials. To the extent the Access Control Plan, attached as Exhibit A to this Agreement, is modified by a change, closure, relocation, consolidation or addition of an access, the Agencies may amend the attached Exhibit A so long as the amendment to the Access Control Plan is executed in writing and amended in accord with the Access Law and Access Code. The Access Control Plan Amendment Process has been included in Exhibit B.

10. By signing this Agreement, the Agencies acknowledge and represent to one another that all procedures necessary to validly contract and execute this Agreement have been performed, and that the persons signing for each Agency have been duly authorized by such Agency to do so.

11. No portion of this Agreement shall be deemed to constitute a waiver of any immunities the parties or their officers or employees may possess, nor shall any portion of this Agreement be deemed to have created a duty of care which did not previously exist with respect to any person not a party to this Agreement.

12. It is expressly understood and agreed that the enforcement of the terms and conditions of this Agreement, and all rights of action relating to such enforcement, shall be strictly reserved to the undersigned parties and nothing in this Agreement shall give or allow any claim or right of action whatsoever by any other person not included in this Agreement. It is the express intention of the undersigned parties that any entity other than the undersigned parties receiving services or benefits under this Agreement shall be an incidental beneficiary only.

13. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one original Agreement. Facsimile signature shall be as effective as an original signature.

IN WITNESS WHEREOF, the Agencies have executed this Agreement effective as of the day and year first above written.

**City of Montrose, Colorado**                    ATTEST:

_____          _____
City Manager, City of Montrose                   City Clerk

APPROVED AS TO FORM:

_sr. Asst._ _____          _____


**Montrose County, Colorado**                     ATTEST:

_____          _____
Chair, Montrose County

APPROVED AS TO FORM:

_____
County Attorney                                   7/6/10

**State of Colorado**
**Department of Transportation**

_____          _____
Chief Engineer                                   Chief Clerk

CONCUR:

_____
Regional Transportation Director

BLM_0037849

"EXHIBIT – A"
ACCESS CONTROL PLAN
United States Highway 50 between local government streets North Grand Avenue (MP
91.878) to local government street San Juan Avenue (MP 93.558).
_____ (date)

City of Montrose, and Montrose County, and the State of Colorado Department of
Transportation

**I.    PURPOSE**
The purpose of this Access Control Plan (ACP) is to provide the Agencies with a comprehensive
roadway access control plan for the pertinent segment of United States Highway 50 between
local government street North Grand Avenue (MP 91.878) to local government street San Juan
Avenue (MP 93.558).

**II.   AUTHORITY**
The development of this Access Control Plan was completed pursuant to the requirements of the
Access Code, Section 2.12, and adopted by the foregoing Agreement.

**III.  RESPONSIBILITIES**
It is the responsibility of each of the Agencies to this Agreement to ensure that vehicular access
to the Segment shall only be in conformance with this Agreement. The cost of access
improvements, closures and modifications shall be determined pursuant to section 43-2-
147(6)(b) C.R.S., the Agreement, and this Access Control Plan. All access construction shall be
consistent with the design criteria and specifications of the Access Code.

**IV.   EXISTING AND FUTURE ACCESS**
  A.  The attached table provides a listing of each existing and future access point in the
      Segment. For each access point the following information is provided: location,
      description of the current access status, and the proposed configuration or condition for
      change (Access Plan). All access points are defined by the approximate Department mile
      point (in thousandths of a mile) along United States Highway 550. All access points are
      located at the approximate centerline of the access.

  B.  All highway design and construction will be based on the assumption that the Segment
      will have a sufficient cross section to accommodate all travel lanes and sufficient right-
      of-way to accommodate longitudinal installation of utilities.

**V.    ACCESS MODIFICATION**
Any proposed access modification including but not limited to an addition in access must be in
compliance with this Agreement and the current Access Code design standards unless the
Agency having jurisdiction approves a design waiver under the waiver subsection of the Code.
Any access described in this section, which requires changes or closure as part of this Agreement
or if significant public safety concerns develop, including but not limited to, when traffic
operations have deteriorated, a documented accident history pattern has occurred, or when

BLM_0037850

consistent complaints are received, may be closed, relocated, or consolidated, turning movements may be restricted, or the access may be brought into conformance with this Access Control Plan, when a formal written request documenting reasons for the change is presented by the Agency having jurisdiction, with Department concurrence, or in the opinion of the Department, any of the following conditions occur:

a. The access is determined to be detrimental to the public's health, safety and welfare;
b. The access has developed an accident history that in the opinion of the Agency having jurisdiction or Department is correctable by restricting the access;
c. The access restrictions are necessitated by a change in road or traffic conditions;
d. There is an approved (by the Agency having jurisdiction) change in the use of the property that would result in a change in the type of access operation; or
e. A highway reconstruction project provides the opportunity to make highway and access improvements in support of this Access Control Plan.
f. The existing development does not allow for the proposed street and road network.

Access construction shall be consistent with the design and specifications of the current State Highway Access Code.

"EXHIBIT – B"
## ACCESS CONTROL PLAN AMENDMENT PROCESS
**United States Highway 50 between local government street North Grand Avenue (MP 91.878) to local government street San Juan Avenue (MP 93.558).**

_____ (date)

### City of Montrose, and Montrose County and the State of Colorado Department of Transportation

1.      Any request for amendment of the Access Control Plan must be submitted to the Colorado Department of Transportation, the City of Montrose staff, and Montrose County staff. The amendment request shall include:

- Description of changes requested of the Access Control Plan; and
- Justification for Amendment; and
- Traffic Impact Study or analysis, as required by the State Highway Access Code. Any party to the Access Control Plan may request this supporting documentation.

2.      The Department shall review the submittal for completeness and for consistency with the access objectives, principles, and strategies described in the United States Highway 50 Access Control Plan report for this corridor and the State Highway Access Code.

3.      Once all participating agencies (CDOT, County, and the City) approve the request for the amendment, the amendment and all accompanying documentation shall be submitted if necessary to Transportation Commission for final review and approval.

**RESOLUTION NO. 2009-10**

**A RESOLUTION OF THE CITY OF MONTROSE, COLORADO, ADOPTING THE SAN JUAN BYPASS ACCESS MAP AND TABLE.**

**WHEREAS,** the City is seeking to transfer Highway 50 designation from Main Street to the San Juan Bypass and to grant ownership of the San Juan Bypass to the Colorado Department of Transportation (CDOT) in exchange for ownership of the existing Highway 50 route (Main Street), and

**WHEREAS,** CDOT has indicated that they would like a map and table to be adopted by the City Council which will govern access to the Bypass, and

**WHEREAS,** the 2001 North San Juan Avenue Corridor Plan listed "Develop access control criteria for NSJ. Permit no new direct access to NSJ." as an implementation action item and the attached San Juan Bypass Map and Table will address this recommendation, and

**WHEREAS,** the City, following notice, have held public hearings on adopting the Access Map and Table for the San Juan Bypass in order to properly manage access to the roadway, ensure safety, protect roadway efficiency, and to facilitate the transfer of state highway designation from Main Street to the Bypass, and

**WHEREAS,** the City Council believes that the adoption and implementation of the Access Map and Table will promote the public health, safety or welfare, and

**NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF MONTROSE, COLORADO, as follows:**

SECTION 1:

The City of Montrose, Colorado, hereby formally acknowledges the San Juan Bypass Access Map and Table as the guiding document for managing access to the Bypass.

SECTION 2:

The City Council authorizes the City Manager and City staff to work with CDOT to create an Intergovernmental Agreement to establish the San Juan Bypass Access Map and Table as the formal governing documents for the roadway once state highway designation is transferred.

ADOPTED this 7th day of May 2009.

CITY OF MONTROSE                                     ATTEST:

Jose Abeyta, Mayor                                   Teri Colvin, City Clerk

**San Juan Bypass Access Management Table (Final Version: March 8, 2010)**

| # | Name | Side | Type | Current | Action | Final |
|---|------|------|------|---------|--------|-------|
| 1 | City/Jutten Property Shared Access | North | Public/Private | Full Movement with appropriate auxiliary lanes | Change to RI-RO when Access #5 is signalized. | RI-RO (raised median) |
| 2 | N. Cascade Avenue | South | Public | RI-RO (raised median) | None | RI-RO (raised median) |
| 3 | Ray Moore Tire and Petroleum | South | Private | RI-RO (raised median) | Close upon redevelopment (Access from Weldon Road) | Closed |
| 4 | S. 64.50 Road | South | Public | RI-RO (raised median) | Close when Access #5 is signalized. | Closed (if possible, provide connection from S. 64.50 Road to Park Avenue) |
| 5 & 6 | Park Ave/N. 64.50 Road | Both | Public | Full Movement | Signalization (when warranted) | Signalized, Full Movement with Protected Left Turns |
| 7 | Two Creeks Development | South | Future Public Road Dedication | Full Movement | Create ¾ Movement access when a connection to a local street is established and Access #5 becomes signalized | ¾ Movement Intersection |
| 8 | UVWUA Ditch Maintenance Easement | South | Restricted | RI-RO Authorized Access Only | 1. Install gate and signage 2. Close when internal access is provided | 1. Gated, RI-RO for authorized vehicles in the near-term 2. Closed in the long-term |
| 9 | Buster Way | North | Future Public Road Dedication | Full Movement | Auxiliary lanes stripped as condition of subdivision or site development approval 2. Monitor for operational or safety hazards | Full Movement with appropriate auxiliary lanes (unless safety or operational hazards develop) |
| 10 | S & J SAX LLC Access | North | Private | Full Movement | Close | Closed |
| 11 | Docs Court | North | Future Public Road Dedication | Full Movement | 1. Auxiliary lanes stripped as condition of subdivision or site development approval 2. Monitor for operational or safety hazards | Full Movement with appropriate auxiliary lanes (unless safety or operational hazards develop) |
| 12 | Montrose County Fairgrounds & N. 7th Street | South | Public | Full Movement with appropriate auxiliary lanes | None | Full Movement with appropriate auxiliary lanes |
| 13 | 65.30 Road | North | Public | Full Movement, 3-Way Intersection with appropriate auxiliary lanes | Signalization (when warranted) | Signalized, Full Movement 3-Way Intersection with Protected Left Turns |
| 14 | Cordova Driveway (227 N San Juan Ave) | Southwest | Private | RI-RO (striped median) | Close upon redevelopment (Access from alley) | Closed |
| 15 | Cordova Driveway (229 N San Juan Ave) | Southeast | Private | RI-RO (striped median) | Close upon redevelopment (Access from alley) | Closed |
| 16 | Serra Driveway (217 N San Juan Avenue) | Southwest | Private | RI-RO (striped median) | Install raised medians (No other access possible) | RI-RO (raised median) |
| 17 | Pekus Driveway (1301 N 2nd Street) | Northeast | Private | RI-RO (striped median) | Close upon redevelopment (Access from N. 2nd Street) | Closed |
| 18 | Seacat Driveway | Southwest | Private | RI-RO (striped median) | Close upon redevelopment (Access from N. 2nd Street) | Closed |
| 19 & 20 | N. 2nd Street | Both | Public | Full Movement with no auxiliary lanes | Install raised median with appropriate auxiliary lanes | Full Movement with appropriate auxiliary lanes |
| 21 | Ramsey Driveway (130 N San Juan Avenue) | Northeast | Private | RI-RO (Striped median) | Close upon redevelopment and install raised medians (Access from N. 2nd Street) | Closed |
| 22 | Stephens Driveway (126 N San Juan Avenue) | Northeast | Private | RI-RO (Striped median) | Close upon redevelopment and install raised medians (access from alley) | Closed |
| 23 & 24 | N 1 ½ Street Alley | Both | Public | RI-RO (Striped median) | Install raised medians | RI-RO (raised median) |
| 25 & 26 | N 1st Street | Both | Public | Full Movement with stripped auxiliary lanes | Install raised medians | Full Movement with appropriate auxiliary lanes |
| 27 | Parrish Oil (20 N San Juan Avenue) | Northeast | Private | RI-RO (Striped median) | Close upon redevelopment (Access from N 1st Street or shared driveway to the south) | Closed |
| 28 | Grimsley Garage Access (1244 N. 1st Street) | Southwest | Private | RI-RO (Striped median) | Close upon redevelopment (Access from N 1st Street) | Closed |
| 29 & 30 | N ½ Street Alley/Gas Station Access | Both | Public/Private | RI-RO (Striped median) | Install raised medians | RI-RO (raised median) |

BLM_0037854



San Juan Bypass Access Goals

Goals
The goals of the access map and table are:
• Provide **a comprehensive approach** to managing access along the Bypass
• **Improve and maintain safety** along the Bypass for City residents and the traveling public
• Provide **convenient and efficient through travel** traffic on the Bypass
• **Meet local and state priorities**, comply with CDOT's standards for access management, and **facilitate the transfer** of Highway 50 designation to the Bypass
• **Provide safe and effective access** to all properties adjacent to the Bypass

BLM_0037855



# OURAY COMMUNITY PLAN
# 2004

BLM_0037856

BLM_0037857

**The Ouray Community Plan was updated under the direction of:**

Mayor Pam Larson

Ouray City Council

Melanie Kline

Marc Hitchcox

Jack Schoenebaum

Robert Stoufer

Adopted by the City of Ouray Planning Commission on

March 9, 2004

Adopted by the Ouray City Council on

March 15, 2004

**Originally produced by**

A. James Viets

Associate, American Institute of Architects

American Planning Association

1993

**Updated by**

Ouray Planning Commission

Rich Spaulding

Pat Davarn

Bud Zanett

Heidi Albritton

Mike Fedel

Marc Hitchcox

Ouray City Administrator

Michael Penny

Community Development Director

David Vince

BLM_0037858

BLM_0037859

# TABLE OF CONTENTS

**A Vision Statement for Ouray** ........................................................................... 1

    An Overview of the Plan .................................................................................. 2

    The Planning Process ...................................................................................... 2

    A Comprehensive Approach ........................................................................... 3

    Adoption and Revision ................................................................................... 3

    How to Use the Plan ....................................................................................... 4

**Environment** ........................................................................................................ 5

**Population and Culture** ..................................................................................... 10

    Education, Culture and Recreation ............................................................... 10

    Housing ......................................................................................................... 11

    Historic Resources ........................................................................................ 13

**Economy** ............................................................................................................ 15

**Land Use** ............................................................................................................ 18

    Growth and Development .............................................................................. 20

    Residential Neighborhoods ........................................................................... 21

    Commercial and Industrial Uses ................................................................... 21

**Community Services and Facilities** ................................................................. 23

    Government .................................................................................................... 23

    Infrastructure ................................................................................................. 24

    Parks and Trails ............................................................................................. 28

    City Hall/Community Center and School ...................................................... 30

    Public Safety ................................................................................................. 31

    Utilities .......................................................................................................... 32

**References, Resources** ....................................................................................... 36

**Community Profile** ............................................................................................ 40

BLM_0037860

**Ouray Community Plan, 2004**

ii

BLM_0037861

# A VISION STATEMENT FOR OURAY

Ouray is a family-oriented city with a strong sense of community and pride in its history. It enjoys a high quality environment, natural beauty and resources, historic character, social diversity and active community involvement. Its residents want to ensure that these unique attributes not be jeopardized, and that development and growth occur in a manner that protects and preserves Ouray's assets.

Ouray's residents recognize the need for a balanced and diverse economy. They want to maintain the current qualities that make Ouray a desirable place to live, work, play, and raise a family, while enhancing its public facilities and services.

The citizens of Ouray wish to provide for orderly and managed growth with respect for the capacity and quality of the natural environment, to improve and expand community functions and services, and to protect and enhance the historic character and the quality of life in Ouray.



**Ouray combines small town character with a mountain setting.**

BLM_0037862

# AN OVERVIEW OF THE PLAN

The Ouray Community Plan is a comprehensive, long-range guide for the future development of Ouray. The plan provides a basic framework of goals, objectives and policies to guide public and private investments. It will help elected officials and private entities make decisions that are consistent with the community's goals for the future. The plan will help preserve the character of the community, and it will provide some certainty or predictability for those who live, work, visit or invest in Ouray.

## The Planning Process

The planning process for the original plan began in early 1992 with the collection of data about existing conditions in Ouray. In June, questionnaires were distributed and two town meetings were held to document residents' needs, concerns and aspirations for the future. The data was analyzed, opportunities and constraints were identified, and a first draft of goals, objectives, policies and actions was developed.

During the winter of 1992-93, three town meetings were held to discuss the proposed goals and policies. Community volunteers led discussion groups and recorded comments at the town meetings, and later helped edit the proposed plan. A public hearing was held in July 1993 for comment on the proposed plan. Following the hearing, the plan was revised and a final draft was prepared. The last phase of the process was implementation of recommended actions, which occurred after adoption of the plan by the City.

In 1995, major revisions to the City's land use regulations were adopted with the passage of the Ouray Land Use Code. These new regulations were promulgated in an effort to implement recommendations made in the Community Plan.

Nearly ten years after the 1993 Plan was adopted, the process of updating it began. Evaluating the need for an update was prioritized in the City Council's Work Plan for 2003 and the Ouray Planning Commission was given the lead role in this process. The project was first formally discussed at Planning Commission's April meeting. This was the first of eleven consecutive public meetings at which the update was discussed during 2003 and early 2004. Notices of all meetings were published and the *Ouray County Plaindealer* gave extensive and prominent news coverage to the update process.

To facilitate the process, review of the 1993 Plan occurred one section at a time, with a different Planning Commission Member taking the lead for each section. Review of the final section was completed in December and a final draft of the update presented at the Planning Commission's February 2004 meeting.

Early on in the update process, the consensus of Commission members was that the original plan was fundamentally sound, but certain statistics and data required updating. Also, recommendations that had been implemented since the plan's adoption needed to be documented. Aside from these additions, the updated plan embodies most if not all of the values expressed in the original plan, which demonstrates remarkable consistency in community values over the past 10 years.

BLM_0037863

## A Comprehensive Approach

The plan is comprehensive; it provides for a coordinated approach to problem solving by looking at environment, economics, population, culture, land use and community services and facilities simultaneously.

## Adoption and Revision

The plan should be adopted by the Planning Commission by resolution, and it should be continuously used by the Planning Commission and City Council to carry out the stated goals of the community. The plan is advisory only, and adoption does not commit the City to any specific program or legislation. Community priorities will, as always, be determined by the willingness and ability to pay for facilities and services.

Goals are enduring and seldom change over time, but policies should be updated every five years or sooner, if necessary. Amendments to the plan must consider community-wide goals and objectives and should be accomplished with broad public participation.



**The strong sense of community is one of the things that attracts new residents to Ouray. Photo provided by the *Ouray Plaindealer*.**

BLM_0037864

## How to Use the Plan

The plan should be used to update zoning and subdivision regulations and performance standards. The Planning Commission should use it to evaluate individual development proposals for conformance with community goals. Elected officials and City staff should use the plan to guide sound public investments in community services and facilities. The plan should be used to assist other jurisdictions in the vicinity in understanding Ouray's goals, and to promote cooperation among local governments. The plan should be made available to private developers, landowners and residents to help voluntarily guide proposals in a way that will bring Ouray closer to its goals for the future.

Planning is a continuing process. The Ouray Community Plan should be consulted frequently in decision-making, and it should be made widely available to promote public knowledge of and support for the goals of the community. It should be reviewed every five years to determine whether an update is necessary and used continuously to promote sound planning for the future of Ouray.



**The historic ambience of Ouray's Main Street district and neighborhoods appeals to tourists and other visitors.**

BLM_0037865

# ENVIRONMENT

**Ouray is uniquely situated in a mountain setting, which features dramatic views, clean air and water, proximity and easy access to public lands, geothermal springs, and abundant wildlife. These amenities have been major factors in making Ouray a desirable place to live. Ouray lies within the narrow valley of the Uncompahgre River with undeveloped mountainsides and cliffs rising abruptly on the east and west sides of town.**

**Within the City limits, higher lands on the town's eastern and western edges were platted for development as part of the original townsite. The steep terrain creates a potential for natural hazards that include floods, rockfalls and debris flows. Soils in town are generally alluvial deposits from rivers and streams, except east of 6th Street where unconsolidated glacial drift forms the hillside. Natural vegetation and native forests of scrub oak, spruce and fir grow undisturbed down the hillsides, gradually giving way to the human landscape of the town. Most of the lands immediately outside the city limits and surrounding Ouray are privately owned mining claims or publicly owned lands managed by the U.S. Forest Service.**

## Analysis

Important issues and concerns stated by residents during the public comment period for the 1993 plan included protection of overall environmental and visual quality, protection of air and water quality, noise and dust control, protection of geothermal water resources, and protection of back country public lands and trails. Protection of the natural setting and open spaces that surround Ouray is very important to residents. Many residents expressed concern that environmental quality may be affected by future increases in population, development, industry and traffic.



**Ouray's spectacular natural setting is an important component of its appeal for local residents and visitors.**

BLM_0037866

## Air Quality

Air quality is most affected by dust from unpaved roads during dry periods and by sanding operations on Main Street during winter months. Magnesium chloride is applied to unpaved streets during the summer months to control dust.

According to the EPA and C-DOT, magnesium chloride has no adverse environmental or health effects and is acceptable for use in dust abatement. Fine dust, designated PM-10 (particulate matter less than 10 microns in diameter), from unpaved streets, winter road sanding and wood burning, has been shown to aggravate or provoke respiratory illnesses. A National Ambient Air Quality Standard has been established by the EPA for allowable levels of PM-10, but Ouray's air has never been sampled.

Tests conducted by the State Department of Health in towns similar to Ouray have shown that unpaved roads and sanding operations generate 90% of the harmful particulates in the air. Fireplaces, open burning, wood and coal burning stoves, restaurant exhausts and vehicle emissions account for the remainder of the harmful particulates. During the Plan update period, public comment continued to indicate that dust control and protection of air quality should be a high priority.

Radon, a radioactive gas produced by the natural decay of uranium and other elements in the soil, has been detected in some buildings in Ouray. Exposure to an elevated level of radon for a long time has been shown to increase the risk of developing lung cancer.

Ouray has limited performance standards to regulate impacts from industries in the C-2 zone. Zoning Ordinance 7-2-F.6 permits industrial or manufacturing operations "…from which no excessive volume of sound or vibrations is generated, or from which no dust, smoke, fumes, gas, noxious odors or other atmospheric effluent is disseminated."

## Water Quality

Domestic water is supplied from Weehawken Spring. The City also owns additional surface water rights in both Weehawken and Oak Creeks. The recharge zone for the aquifer is not identified but appears to be at higher elevations in undeveloped lands. There is no immediate threat to water quality, but potential threats might include mining operations or other development activities in the recharge zone. Regular testing has shown Ouray's water to be free of microbiological and inorganic contaminates. Additional information on Ouray's water system can be found in the Community Services and Facilities section of the Community Plan.

The Uncompahgre River water quality has been reduced by the effects of earlier mining operations in the Red Mountain district; sedimentation, high acidity, dissolved metals and reduction of aquatic life are current problems. Remedial actions undertaken in 1993 on Idarado Mine properties involved stabilizing and revegetating mine tailings, rerouting water courses around mine dumps and in some cases sealing off old portals. These activities have begun to improve river water quality.

The natural geothermal water system consists of hot water moving continuously through aquifers in limestone and in the alluvial river valley. The recharge area is not known but may be in limestone outcroppings at higher elevations in the mountains east of Ouray. According to Colorado Geological Survey report 90-3, the quantity and temperature of

BLM_0037867

the water in the system should remain in equilibrium as long as hot water is not removed faster than it is recharged.

Flooding

Ouray periodically experiences damaging floods. Most of the town is built on the debris fans of Portland, Cascade and Oak Creeks, and on the alluvial flood plain of the Uncompahgre River. Floods in Portland, Cascade, Oak, Skyrocket and Bridalveil Creeks typically occur as debris-flows, in which loose soil, rocks and organic debris flow with water in a dense slurry. Debris-flows occur during periods of heavy rain, usually in July or August, and in the past have come at intervals of 10 to 25 years. As a flood protection measure, the flows of Portland and Cascade Creeks have been channeled through concrete flumes within the city.

Flooding of the Uncompahgre River is a result of rapid melting of the mountain snow pack, sometimes augmented by rainfall, in May, June or early July. In 1985, a Flood Insurance Study was prepared by the Federal Emergency Management Agency (FEMA) to help local planners promote sound flood plain management and to establish base flood elevations and Flood Hazard Areas for insurance purposes. In 1995, an effort began to reevaluate floodplains of Portland and Cascade Creeks taking into account the reconstruction of the flumes nine years earlier. The study was initiated by FEMA in cooperation with the City and State Water Conservation Board. Though the study has yet to be finalized, it is hoped that the area encompassed by these floodplains will be reduced as a result of this effort.

In 1998, revisions to the Uncompahgre River floodplain in the northern reaches of Ouray were approved by FEMA as part of the City's river restoration project. This effort reduced the size of the floodplain in the project area by one-half. Development in any designated Flood Hazard Area must conform to the City's existing flood plain regulations.

Wildlife

Deer and bear come into town throughout the year and deer are seen daily in the winter. During the comment period, public opinion about visiting wildlife was varied; some residents recommended management of the deer herd while others commented on the value and beauty of regularly seeing wildlife in town. Wildlife management is a function of the Colorado Division of Wildlife.

## Goal

Identify, conserve and protect the environmental qualities that make Ouray a special place.

## Objectives

1. Minimize adverse environmental impacts, which can result from growth and development.
2. Actively plan for conservation and protection of unique natural resources.
3. Encourage land uses that are consistent with conservation of environmental quality and efficient use of natural resources.

BLM_0037868

4.  Encourage practices that lead to the protection of the health of Ouray's citizens.

5.  Prevent development of private and public property located in the recharge area of the Weehawken Spring aquifer.

## Policies

1.  Provide leadership to achieve cooperative planning with Ouray County, the U.S. Forest Service and other public and private entities for environmental quality and other mutual planning goals.

2.  Continue to utilize public open space as a means of preserving and protecting the natural setting around Ouray.  This may include the acquisition of private property for public open space.

3.  Maintain or improve Ouray's air quality and water quality.

4.  Support efforts to improve water quality in the Uncompahgre River and the visual quality of the riverway.

5.  Monitor development and use of geothermal water sources to prevent depletion of aquifer.

6.  Ensure that proposed developments, including excavation and fill projects, respond to the soil, drainage, flood plain, erosion and surface geologic characteristics of the development site by proper engineering and construction.

7.  Regulate development to maintain or enhance the environmental quality of Ouray.

8.  Promote energy conservation, increase energy efficiency and use of renewable sources such as solar, wind, hydropower and geothermal.

9.  **Prevent development of visually sensitive private properties through acquisition for open space.**

## Recommended Actions

1.  Establish a cooperative planning agreement with the U.S. Forest Service.

2.  Maintain and expand the existing system of parks and public open spaces.

3.  Consider more effective methods of dust control.

4.  Make information available for Ouray residents regarding methods of reducing radon  in buildings.

5.  Identify wetlands and natural hazard areas such as floodways, floodplains, and debris-flow channels. Define performance standards to guide development in these areas.

6.  Pursue land exchanges with the U.S. Forest Service that achieve mutual environmental goals.

7.  Develop land use regulations that address the goals, objectives, and policies outlined in the Ouray Community Plan, including visual quality.

8.  Pursue rehabilitation of the Skyrocket Dam structure.

9.  Participate with Ouray County in efforts to improve Uncompahgre River Water Quality.

10.  Require bear-proof trash containers throughout the City.

11.  Review design of flume crossings at Highway 550.

BLM_0037869

**Accomplishments since 1993**

1.   Establishment of an "Intergovernmental Agreement" with Ouray County to guide decision-making on issues of mutual concern.
2.   Expanded the existing system of parks and public open spaces.
3.   Discontinued use of fly ash in road sanding.
4.   Established a No Smoking policy for all City buildings and vehicles.
5.   Continued monitoring flows of existing geothermal water resources.
6.   Defined engineering requirements for steep or unstable slopes.
7.   Required permits for excavation and fill.
8.   Developed requirements for revegetation of road cuts and areas of excavation and fill.

BLM_0037870

# POPULATION AND CULTURE

According to the 1990 Census, Ouray had a permanent year-round population of about 650 persons. The 2000 Census figures show Ouray's permanent population to be 813. During the summer the population grows to more than 1000 as part-time residents return. Ouray has an unusually high civic spirit with volunteerism providing a solid base of support for many civic and cultural activities. There is much pride in the community, and in its long history of mining, its Victorian architecture, and its traditions. Ouray's small size and unique cultural heritage are conducive to residents interacting, getting to know and taking care of each other.

## Analysis

Residents continue to value retaining Ouray's small town, family-oriented character. Cooperation, caring, friendliness and tolerance for others are very important to this community. Residents said support for organizations and events, for volunteerism and involvement, and for the school and churches are important. Residents recommended further development of cultural activities, the arts and music.

Ouray is undergoing changes. The decline of mining, the growth of the tourism industry, the growth of Ridgway's economic base, investment in second homes by non-residents, an influx of new residents and a growing transient population are affecting the community. Residents do not want to see changes erode Ouray's small town character and essential attributes. The residents want to retain Ouray's unique qualities and special identity. Ouray should accommodate growth in a way that maintains community strengths.

## Education, Culture and Recreation

Social and cultural events can help create a common spirit, which binds residents together. Educational and recreational programs can enrich the quality of life for all ages. Ouray's school, with preschool through 12th grade and about 200 students, is highly rated for its academic achievements.

## Goals

1. Provide and maintain facilities in Ouray for comprehensive education from preschool through 12th grade and beyond.
2. Expand opportunities for education, the arts, cultural activities and recreation in Ouray.

BLM_0037871

## Policies

1. Support civic and cultural events by continuing to make city-owned facilities available at affordable rates.
2. Continue to facilitate, sponsor and support cultural and recreational events.
3. Support creation of a countywide recreation district.
4. Encourage awareness, education and integration of minority populations within the community.

## Recommended Actions

1. Encourage advanced education courses or a technical/vocational school in Ouray.
2. Improve community information sharing; install bulletin boards or information kiosks.
3. Sponsor City and County recreation and cultural programs.

# Housing

When the 1993 Plan was prepared, Ouray had approximately 500 housing units. Around 400 of the housing units were single family residences, 350 were houses and 50 were mobile homes. The remaining 100 units were apartments, condominiums and residences within commercial buildings.

City records for 2003 show that Ouray has about 592 housing units. Single family residences account for 453 of these, with 401 being houses and 52 mobile homes. Apartments and multi-family dwellings account for the remaining 139 units.

According to the 1990 Census, of the 480 housing units documented in that year, 290 were occupied and 190 were vacant. Of the 290 households, 211 were owner occupied and 79 were renter occupied.  One hundred seventy nine (179) of the 290 households were families, while 100 of the households consisted of only one person. Twenty-one percent (21%) of Ouray's residents were over 59 years of age.

Figures from the 2000 Census show 374 occupied units (64.2%) and 209 vacant units (35.8%). Of the occupied units, 260 (69.5%) are occupied by owners and 114 (30.5%) by renters. Families make up 60.4% or 226 of all households identified by the 2000 Census. Average family size is 2.76 persons. Non-family households account for 148 or 39.6% of the total and householders living alone account for 128 of these. The average household size is 2.15. 17.7% of Ouray's population is 62 years and over.

During the update process, residents continued to express concern about affordable family housing, employee housing and housing for seniors. As in the 1993 plan, residents are concerned about the inadequate supply of rental housing and the high cost of purchasing a home.

**Ouray Community Plan, 2004**                                                                    **11**

BLM_0037872



**As in many mountain towns, affordable housing is an ongoing concern in Ouray.**

A continued increase in economic activity since the original plan was adopted, has created more jobs and the need for more employee housing; at the same time, no new low income housing has been added to the market. Much of the construction activity is occurring as infill of vacant lots, new high-end development in the North section of town, and redevelopment of existing properties in the older sections of town. Considerable new housing development is occurring in the North Ouray C-2 Industrial zone. Also in North Ouray, an annexation that would increase the area of the city by six acres has been approved. There is expected to be an increase in the number of annexation requests over the next 5-10 years. The cost of existing homes and vacant land continues to increase because of the accelerated demand for vacation homes, investment property and homes for new residents.

## Goal
Encourage the supply of safe year-round low and moderate income housing in Ouray.

## Objective
Provide housing opportunities for a stable and diverse population.

## Policy
1. Evaluate Ouray's need for low and moderate income housing in conjunction with Ouray County housing needs.

## Recommended Actions
1. Form a housing study group to explore needs, opportunities and constraints and make recommendations regarding low to moderate income housing, employee housing and senior housing.
2. Develop policies to encourage affordable housing development through the use of incentives.

**Ouray Community Plan, 2004**                                                    **12**

BLM_0037873

## Historic Resources

The City of Ouray was nominated as a National Historic District on the National Register of Historic Places in 1983, and is listed as resource number 50R585. In the Historic Resources Survey prepared in 1981 in support of Ouray's nomination as a National Historic District, Sullenberger and Baker wrote:

> Ouray is a fine example of late 19[th] century architecture and a physical reminder of mining history in the San Juans. Its unique and magnificent setting, well preserved buildings, and relative lack of inharmonious modern intrusions make it a significant historical district. Furthermore, this significance is based on Ouray's historical and architectural integrity dating from the period 1886 to 1910. These years encompass the height of Ouray's importance as a supply center for nearby mining regions and they also saw the architectural maturing of the town from a rude frame-dominated camp to a brick and stone, prosperous city. In this framework, Ouray is important as an example of the process of urbanization on the mining frontier in the last decade of the 19[th] century (Smith 1967). Along with Silverton and Telluride, Ouray was the principal town in the San Juan mining district, ranked as the third largest producing mining district in Colorado between 1893-1915 and the first on the western slope. (Sullenberger and Baker, *A Historic Resources Survey of Ouray County, Colorado*: pg 100, Ms. Centuries Research, Inc., Montrose, Colorado, 1981)

Residents rate historic charm as one of Ouray's most desirable features. During the update process, concern was raised about the type of architecture being built throughout town and the need for design guidelines. Residents also said historic restorations and preservation of historic buildings should be encouraged and an historic preservation ordinance to protect historic buildings was suggested.



**The Ouray National Register Historic District is regarded as both a cultural and an economic resource.**

BLM_0037874

## Goal
Preserve Ouray's historic resources.

## Objectives
1.  Protect the economic and cultural value of Ouray's historic resources.
2.  Protect Ouray's designation as a National Historic District.
3.  Keep community history and cultural heritage alive.
4.  Encourage the continued use and preservation of historic buildings.

## Policies
1.  Recognize historic resources as irreplaceable community, economic and cultural resources.
2.  Recognize that Ouray's designation as a National Historic District is a valuable economic and cultural resource, and that this designation can be removed by loss of contributing structures and new incompatible structures. Encourage preservation of contributing historic properties (buildings used to help obtain the designation).
3.  Encourage new buildings, which are compatible with Ouray's historic character.
4.  Encourage listing of individual buildings on the National Register of Historic Places.
5.  Recognize some historic mine structures as valuable resources, support efforts to conserve or protect them.
6.  Promote the economic and cultural benefits of restoration of historic buildings.
7.  Prevent adverse impacts of new or remodeled buildings, which may be much larger than Ouray's currently existing buildings, by developing guidelines for mass, scale, materials and design.

## Recommended Actions
1.  Create voluntary guidelines to assist owners in the rehabilitation and maintenance of historic buildings and to help achieve compatibility in new building design.
2.  Assist owners with the application process for state and federal tax credits, grants for rehabilitation and listing on the National Register of Historic Places.
3.  Investigate the value of an historic preservation ordinance, hold informational meetings, obtain citizen input, decide whether to promote conservation of historic buildings with voluntary guidelines or with ordinance.
4.  Update the inventory of historic buildings every five years.
5.  Publicize results of the updated survey of historic properties to promote public understanding of historic design and values- solicit comments.

## Accomplishments Since 1993
1.  Informational bulletin board installed at the Hot Springs Pool and Visitor Center.
2.  Policy of prohibiting short-term rentals in the R-1 zone has been continued.
3.  A study group was formed to explore on a countywide basis needs, opportunities and constraints regarding housing. The value of an historic preservation ordinance was investigated by holding public meetings to obtain citizen input on whether an ordinance or voluntary guidelines were preferred.
4.  Initiated Architectural Inventory of Ouray National Register Historic District.

BLM_0037875

# ECONOMY

**Ouray began as a mining boom town in 1876. The boom faded in the early part of the 20th century and population declined, but mining continued as the most important economic activity through the 1960s. In the 1950s, summer tourism began to play an important role in the town economy and it now comprises the major component of Ouray's economic base.**

**According to the 1990 Census, major employers in Ouray were 1) self-employed workers including sole proprietorships, 2) government and 3) the school district. The largest industries were construction, retailing, lodging and restaurants. In 1990 there were 26 persons employed in mining in Ouray County. According to Region 10, there were 13 in 2003.**

In contrast, the 2000 Census reveals that 48% of Ouray's workforce is employed in service, sales or office occupations, while management or professional occupations account for 35% and construction 13% respectively, of all local jobs. The largest industries by percentage are as follows: education, health and social services, 16%; construction, 13%; professional, scientific and administration, 12%; retail trade, 10%; and finance, rental, real estate, 10%.

Most commercial activity occurs during the primary tourist season between June 1 and October 1. In 1990, Ouray's sales tax receipts showed that about 70% of sales occur during that four-month period. July and August were the peak months of tourism, followed by September and June. As of 2003, 56% of all retail sales occur during the primary tourist season, which indicates that efforts to develop a more year-round economy are having an impact. Even so, many of Ouray's businesses, including motels, restaurants, Jeep rentals, gift shops and campgrounds, still serve the tourist industry and remain open during the summer season only. Nevertheless, indications are that the winter economy is improving due to public and private promotional efforts and winter facilities such as the Ouray Ice Park and the Ouray Hot Springs Pool.

## Analysis

During the 1993 public comment period for the original plan, many residents expressed concern about the growth of the tourism industry and feared that the friendliness, caring and cooperation that are a part of life in Ouray might be undermined by commercialism. Public comment during the 2003 update of the plan indicates that residents have not seen this fear realized. Moderate economic growth continues to be supported, but not necessarily in the tourism industry. Most residents want to see economic growth that will provide greater diversity and a more stable, year-round balance to the economy, reducing the dependence on tourism.

In both 1993 and 2003, residents expressed a desire to have more opportunities for middle-income jobs and more employment opportunities for young families. Encouraging businesses that rely on telecommunications and computers is a popular idea. Efforts to

**Ouray Community Plan, 2004**                                                    **15**

BLM_0037876

increase winter visitors in recent years may help provide a more even balance to economic activity. Despite these efforts, economic diversification remains a challenge.

Tourism now influences most aspects of Ouray's economy and well-being; it creates both advantages and disadvantages for the town and provides the base and strength for much of the economy. Maintaining the health of the tourism industry is important to Ouray's stability. During the current summer tourism season, between 1,200 and 1,600 overnight visitors stay in Ouray's vacation houses, lodging facilities and campgrounds every night. Ouray's population, and the corresponding economic activity and demand on public facilities and services, varies between the winter low of 813 permanent residents and summer daily peaks of as many as 3,000 residents, overnight visitors and day visitors.

This has resulted in a seasonal pattern with summer months characterized by full employment and inadequate housing, followed by winter months with decreased employment opportunities, yet still an inadequate amount of affordable employee housing. The lack of housing causes difficulties for employees as well as businesses, which sometimes must operate understaffed. Many employees commute from towns as far away as Delta. There has also been an increasing reliance on foreign-born transient workers.

## Goal

Develop and maintain a strong and diversified economy that is consistent with the Ouray Community Plan.

## Objectives

1. Develop a more diversified year-round economy.
2. Maintain and improve the health of the tourism and recreation industry.
3. Promote more year-round visitation while protecting the quality of the visitor experience.
4. Continue to recognize the goals, objectives and policies of the Ouray Community Plan in contracts with the Ouray Chamber Resort Association and other business development groups.

## Policies

1. Promote economic diversification by supporting existing businesses, encouraging the expansion of professions and businesses that do not have a negative impact on the quality of the area.
2. Support efforts to promote year-round visitation.
3. Foster business development in accordance with Ouray's long-term goals as expressed in the Community Plan.
4. Actively plan for and manage demands on facilities and services created by increased business and residential activity.
5. Maintain City facilities and services to a high standard to make diversified private sector investment attractive.

BLM_0037877

## Recommended Actions

1. Ensure that action to promote economic diversification and year-round marketing is undertaken by public and private entities, both by contract and by volunteer efforts as currently accomplished by contract with the Ouray Chamber Resort Association through distributions of the Lodging Occupation Tax and other public funds.

2. Ensure that visitor services are provided including information, parking, public restrooms, signage and public communication to enhance the visitor experience and to mitigate impacts on the community.

3. Support efforts to improve leading edge technology as it relates to businesses that rely on telecommunications and computer access.

4. Actively promote arts and crafts, performing arts, small conventions and heritage tourism accomplished in cooperation with the Ouray Chamber Resort Association, Ouray County Historical Society and others.



**Ouray's Fourth of July Celebration is one of many events that entertains local residents and attracts visitors to the city. Photo provided by the *Ouray Plaindealer*.**

BLM_0037878

# LAND USE

The land use pattern in Ouray reflects a concentrated, built-up central business district surrounded by Victorian-era residential neighborhoods. New residential developments have been built primarily on the outer edges of town, while new condos, townhouses and motels have been built in some older neighborhoods close to the town center. More recently residential development has expanded to the north in the annexed corridor along Highway 550 and the Uncompahgre River.  Both at the time of the original plan and in 2003, there is no concentrated industrial activity in Ouray.

Ouray established zoning regulations in 1972. Six zoning districts were created:

- P-1 Parks, Developed
- P-2 Parks, Conservation
- R-1 Residential
- R-2 Residential, High Density
- C-1 Commercial
- C-2 Commercial - Industrial

Definitions, standards and permitted uses for each zone are found in Section 7 of the Ouray Land Use Code.

## Analysis

Historically, residents have strongly supported maintaining the existing boundaries of the zoning districts; zoning districts have remained unchanged since their inception. Within the original town limits (from the municipal pool south), the zones were created to reflect existing land use patterns.

North Ouray (from the municipal pool north to Rotary Park) was designated C-1 and C-2. Most of this area was undeveloped when the zoning ordinance was created. Therefore, the C-2 designation for industrial uses in North Ouray did not reflect existing use; it was created to provide an opportunity for industrial growth. Lot coverage and minimum lot size requirements for the C-2 zone still reflect the low-density industrial uses that were anticipated, even though much of the recent development has been residential. Public comments during meetings in 2003 for input on the Plan update indicated concern over the apparent trend of converting C-2 land to residential uses.

During the public comment period for the 1993 plan, there was a lot of concern regarding how the North Ouray corridor will develop. Original suggestions for this area included maintaining public open space (Forest Service land or City-owned land) and access to it, creating pedestrian paths along the highway and river, landscaping around new development, and promoting mixed-use development to accommodate growth in housing, businesses and industry. The Uncompahgre River flows through the zone; some of the

BLM_0037879

land is affected by federal, state and local regulations governing floodways, flood plains and wetlands.

Soon after adoption of the 1993 plan, the City sponsored a planning effort aimed at lands in the North Ouray corridor. A Vision Statement was adopted that emphasized the importance of a comprehensive approach to the river and its associated floodplain. Implementation involved a major undertaking that has resulted in many of the policies and action items recommended in 1993 being accomplished. As of 2003, the Ouray Uncompahgre River Restoration Project has restored the river channel and led to a renewal of the entire North Ouray corridor.

Concern was also expressed in 1993 for the strip of C-2 zoning that runs along the river through town from the Third Avenue bridge to the municipal pool. This area was originally an industrial zone that included the railroad right-of-way, the power plant and other businesses. Most of the industrial uses have been discontinued and the primary use of the land now is residential, lodging and camping. Several commercial businesses and the power plant still remain in the zone. In 1993, some residents suggested rezoning land in this area to R-1, R-2 or P-1 to reflect desired future uses. As of 2003, rezoning has not occurred, but neither has any industrial development.

During the comment period for the 1993 plan there was support for keeping businesses from expanding into R-1 (the current regulations seem to be acceptable). Some residents were concerned that more large motels in R-2 would adversely affect the current pattern of mixed use (houses, condos, bed and breakfasts and motels now blend together in R-2) – concerns included the creation of large paved areas required for motel parking lots, drainage problems caused by large parking lots, lack of landscaping and height of buildings.

Density and over development were areas of concern during the public comment period in both 1993 and 2003. Residents commented on the need to keep development in balance with the City's ability to provide community services and facilities. In 1993 residents stated that taxpayers should not have to pay for additional capital improvements required by new development. Since then policies and regulations have been adopted that require development to pay its own way. During development of the original plan, some residents thought two houses should not be allowed on one lot, and some said new subdivided lots are too small. There were many comments in both 1993 and 2003 stating that open space should be protected and that greenbelts, future parks, and landscaping are important to reduce the effect of increased density. Some residents said, in 1993 and 2003, that street and parking lot lighting and signs should be compatible with Ouray's character and natural setting.

Public comments in 2003 expressed the need to evaluate development trends in light of their effect on structures in Ouray's National Historic District. The possibility of establishing sub-districts or overlay zones within the boundaries of the historic district was discussed. There was also significant discussion about the need for design guidelines or standards aimed at guiding development so that the integrity of the City's historic resources is protected.

BLM_0037880

## Goal

1. Plan for growth and redevelopment that maintains the high quality, small town character of Ouray, preserves and enhances the scenic beauty, natural resources, environmental quality and cultural assets that make Ouray a desirable place to live.

## Objectives

1. Ensure that the City Code is structured to maintain the diversity and vitality of Ouray for residential, cultural and commercial/services.
2. Ensure that zoning and development requirements address adverse impacts resulting from conflicting land uses.
3. Reduce negative fiscal impacts on the City and its residents by new development.
4. Reduce environmental impacts and hazards created by new development.

# Growth and Development

## Policies

1. Cooperate with Ouray County and the Forest Service regarding sound planning for the area surrounding the City to accomplish mutual planning goals.
2. Require new development to pay its share of costs associated with its present and future demands on the community.
3. Create performance standards for new development.

## Recommended Actions

1. Complete a density build-out analysis for the City to determine future capital improvement requirements for increased City services and facilities. Identify where there is a shortage in the capacity of public utilities and city facilities. Establish a process to regularly review and update the analysis.
2. Ensure that, as growth and development occurs, open space and access to it is maintained.
3. Plan for future parks and open space as needed.
4. Clarify subdivision regulations, which pertain to condominiums.
5. Consider revisions to the existing land use regulations to accomplish the goals, objectives and policies stated in the Community Plan.
6. Establish a cooperative planning agreement with the U.S. Forest Service.

BLM_0037881

# Residential Neighborhoods

## Policy

1.  Preserve the existing housing stock to ensure quality residential areas.

## Recommended Action

1.  Develop regulations to create affordable housing opportunities.

# Commercial and Industrial Uses

## Policies

1.  Encourage infill of vacant lots along Main Street and adjacent C-1 zoned properties.
2.  Support efforts to create more pedestrian facilities and other facilities for outdoor use including benches, plazas, walkways and public restrooms
3.  Continue to promote sign standards, which allow effective business identification while preserving Ouray's natural setting and traditional small-town character.

## Recommended Actions

1.  Evaluate the impacts of restricting residential uses in the C-2 zone.
2.  Evaluate the impacts of restricting residential uses on the first floor, in the C-1 zone on Main Street between 4th Avenue and 9th Avenue.

## Accomplishments Since 1993

1.  Development is tied to the ability of the City to provide new services and facilities
2   Requirements were adopted to ensure that new development pays its share of improvement costs necessitated by the development.
3   Utility corridors are planned, designed or implemented to avoid conflict with existing and future uses and to protect scenic and cultural resources.
4.  Regulations for development in areas of known hazards are being enforced.
5.  With landowners' participation, a comprehensive development plan for North Ouray (from the municipal pool to Rotary Park) was created that provides for maintenance of open space, adequate community services and facilities, parking and landscaping, pedestrian opportunities, improved safety on Highway 550 and other factors necessary to enhance the community while allowing for growth and development in this area.
6.  New development now must include adequate provisions for pedestrians and landscaping elements.
7.  A plan and associated policies for annexation have been adopted.
8.  Regulations to allow Planned Unit Developments (PUDs) in any zone have been adopted.
9.  The definition of building height has been revised to take into account the overall height of the structure and its relation to the slope of the building site.

BLM_0037882

10. A cooperative planning agreement with the County has been established.

11. Resolution of parking needs and traffic flow has been made a high priority.

12 Underground utilities to new developments are now required.

13. Performance standards to address impacts of new development have been established.

14. Adverse impacts on residential housing caused by motel development in R-2 have been mitigated.

15. Landscaping and lot coverage regulations for new commercial lodging in R-2 have been established to help maintain a balance between residential and commercial buildings.

16. Lot coverage regulation for paved parking surfaces have been created.

17. Density in the C-2 zone has been managed by establishing minimum lot sizes and revised lot coverage limits.

18. Lot coverage limits, parking requirements and minimum lot size for C-2 have been redefined to meet minimum standards for similar uses in other zones.

19. Guidelines for expansion of new residential, commercial and industrial uses in North Ouray have been established by a comprehensive development plan created by current landowners, residents and municipal staff.

**Ouray Community Plan, 2004**                                                    **22**

BLM_0037883

# COMMUNITY SERVICES AND FACILITIES

**Ouray government provides citizens with necessary services and quality of life through several arenas, including:**

- **Government**
- **Infrastructure**
- **Parks and Trails**
- **City Hall/Community Center and School**
- **Public Safety**
- **Utilities**

## Government

Ouray was incorporated in 1876. Ouray is a statutory city; it has not adopted a home rule charter. Ouray may govern its own affairs within certain limits, but authority to exercise powers is derived from State statutes. The City Council is comprised of five elected officials – two representatives are elected from each precinct and the Mayor is elected at large. Precinct One is located east of Main Street; Precinct Two is west of Main Street. There are four administrative departments, General Government, Public Works, Public Safety, and Parks.

### Analysis

While much of Ouray's appeal for residents and visitors alike stems from its picturesque San Juan Mountain setting, this same asset can be a liability when it comes to providing municipal services. Terrain and climate of the mountains pose challenges in the delivery of utility services that municipalities in the "flatlands" do not have to face. Conversely, Ouray's small town character and sense of community fosters volunteerism, which facilitates the delivery of emergency services in particular. While not as refined or extensive as in urban areas, in most cases Ouray is fortunate to have an array of services that is more than adequate.

Facilities in Ouray compare favorably or exceed those found in other communities. The park system in particular is exceptional by any comparison. The  community center, City Hall, public schools and library are also first rate for a community of this size.

Services and facilities provided by the City include potable and wastewater treatment, streets, sidewalks, drainage and flood control, parks, open space, community center, law enforcement, and fire protection. Other services and facilities such as electrical power, communications, library and business/community promotion are provided by a variety of private sector or non-profit entities.

Revenue to pay the cost of services provided by the City comes from a variety of sources including utility service charges and investment fees, park admissions, sales, property and

BLM_0037884

other taxes, as well as various other license and permit fees. In recent years grant funds have played an increasing role in City finances, but these revenues are typically used for capital improvements rather than the delivery of services.

# Infrastructure

## Water

Normal precipitation, is adequate to satisfy Ouray's current water requirements with some reserve capacity The City owns water rights at Weehawken Spring, Weehawken Creek and Oak Creek. All of the water currently used by Ouray, over one million gallons per day during summer months, comes from Weehawken Spring. The capacity of the spring, during periods of normal precipitation, is adequate to satisfy Ouray's current water requirements with some reserve capacity. Regular tests required by the Colorado Department of Health have shown Ouray's water to be free of microbiological and inorganic contaminates.

Under an agreement made in 1996, the City agreed to sell excess untreated Weehawken Spring water to BIOTA Pure, L.L.C. for bottling purposes. The agreement allows the City unlimited use of Weehawken Spring water, but after these needs are met BIOTA Pure is entitled to bottle the next 100,000,000 gallons per year, provided that during the months of November, December, January, February and March, all but 50,000 gallons bottled per day of BIOTA's use are subordinate to use by the Ouray Ice Park's needs as determined by the City.

### Analysis

Ouray's water is disinfected with chlorine gas. Filtration is currently not required, however, the State may require a filtration plant in the future, a large capital expense. Major expenditures were incurred in 1993 to improve the spring source to comply with State requirements

Water is stored in a 500,000-gallon tank. Through a Water System Distribution Master Plan completed in November of 2003, the need to increase storage capacity, replace substandard mains, improve chlorination and system reliability, was evaluated. Much of the distribution system that delivers water throughout the city utilizes old steel pipes in poor condition. Ouray's varied elevations create pressure problems in some sectors of town. Pressure regulating valves have been installed but the problem is not entirely corrected and the valves require frequent adjustment and maintenance. The improvements identified in the Water System Distribution Master Plan will cost nearly $2 million. In November of 2002 voters authorized borrowing up to half of that amount and it is hoped that the balance can be provided by future grants and City capital reserves.

During the public comment periods for the plan in 1993 and 2003, residents said the water system should be carefully managed to protect the supply, quality and distribution. Some residents said new developments should pay for the increased burden on services such as water and sewer. In recent years water investment fees have been increased to help fund future capital improvements. The higher fees will be paid by all new developments and the funds collected are reserved for use in capital improvements projects.

**Ouray Community Plan, 2004**                                                                                    **24**

## Wastewater Treatment

In July 1992 the city initiated construction of a new wastewater treatment plant which combined aerated lagoons with constructed wetlands. The new plant provided an increase in capacity while offering the benefits of constructed wetlands. It was to be visually pleasing, a sanctuary for small animals and waterfowl, emit less odor and discharge cleaner water into the Uncompahgre River than a conventional plant. When completed it was the largest constructed wetlands wastewater treatment plant in the State of Colorado, and the largest plant of its kind anywhere in the U.S. at this altitude.

### Analysis

Many of the older sewer lines are jointed clay tile pipes that allow infiltration from groundwater sources into the system. Infiltrated water passes through the treatment plant and adds to the burden of treatment. Parts of the system have been replaced with newer concrete or PVC pipe and current policy is to replace at least 2,000 lineal feet of substandard pipe each year.

Currently, the treatment plant can process up to 363,000 gallons of effluent per day, which is about 38% more than the average flows during the summer season when flows are the highest. Improvements aimed at reducing odors were installed in 2002 and 2003 and other measures are being evaluated. Plans are being made to divert backwash water from the hot springs pool filtration system, now processed by the plant, to an auxiliary treatment structure buried in the pool parking lot. Estimates show that this could significantly increase capacity at the wastewater plant. In recent years, sewer investment fees have been increased to help fund future capital improvements.. The higher fees will be paid by all new developments and the funds collected are reserved for use in capital improvements projects.

During the public comment periods in 1993 and 2003, residents said the system for wastewater collection and treatment should be carefully managed to prevent problems with effluents and to ensure adequate treatment capacity.

## Streets and Drainage

Until recently, all of Ouray's streets, except Main Street were unpaved. In recent years, however, paving has occurred on lower Third and Seventh and upper Fifth Avenues The City's Public Works Department is responsible for maintenance that includes grading, drainage and snow removal. Dust control on gravel streets is achieved by at least one application of magnesium chloride during the summer.  Ouray's Main Street is U.S. Highway 550. All aspects of Main Street, including parking, signage, auto and pedestrian traffic control are regulated by the Colorado Department of Transportation.



**The Portland and Cascade Creek Flumes are important components in Ouray's drainage system.**

BLM_0037886

Components of Ouray's drainage system include Portland and Cascade Creek Flumes, the new Fourth Street interceptor system, concrete valley pans, drop inlets, miscellaneous culverts and the streets themselves.

**Analysis**

During the public comment period for the 1993 plan, some residents said better maintenance of streets and flumes is a concern. They wished to see a reduction in bumps and ruts, better dust control for the streets and protection from "flumalanches" in Cascade Flume. In 1993, the City initiated action to prevent flumalanches in Cascade Flume. Some residents said better general clean up of streets, alleys and flumes is important and that random fill and dumping along street rights-of-way should be prevented. Some residents supported paving some of the busier streets in Ouray to improve dust control and drainage. A more complete analysis of dust in Ouray appears in the Environment section of the Community Plan.

Thanks to voter authorization, proceeds from a bond originally used to finance construction of the Portland Flume, were approved for use to pay for street paving. This revenue could pay for the paving of approximately one block per year, but since these same funds must also pay for flume maintenance, the City Council must prioritize between these two important areas of infrastructure.

In 1993 some residents expressed concern that local community needs and pedestrian safety may not be adequately reflected in Colorado Department of Transportation policy, which places a high priority on moving vehicles efficiently and quickly along Highway 550, Ouray's Main Street. In response to these concerns, traffic lanes on Main Street were delineated to provide a center lane for freight unloading, one lane north and south and left turn lanes at each avenue intersection. Markings at all pedestrian crossings have also been made more distinct.

## Bridges

Ouray's bridges include vehicular bridges over the Uncompahgre River and Portland and Cascade Flumes, and pedestrian bridges over the river and flumes.

**Analysis**

Bridges over the Uncompahgre River have been replaced to comply with Colorado Department of Transportation standards. The Third Avenue bridge was replaced in 1989, the Box Canyon exit and entry bridges were replaced in 1990 and 1992 respectively and the Seventh Avenue bridge was replaced in 1992. Eighty percent (80%) of the cost of bridge replacement was paid by State grants. Due to deterioration of the wood structures, bridges over Portland and Cascade Creek flumes have gradually been reinforced with steel girders or heavier wood stringers. This increases their capacity to accommodate heavier loads from fire and garbage trucks.



**Ouray's five creeks contribute to the town's character and their bridges are an important element of infrastructure.**

BLM_0037887

## Pedestrians

The sidewalks of Ouray are owned by the City. Residents are required, by city code, to repair, replace and maintain sidewalks, including snow removal, adjacent to private property. Sidewalks were originally provided in the older neighborhoods and the commercial district of Ouray, but have not been built in many newer areas of development. The Master Plan for parks and trails addresses future pedestrian circulation citywide and the City's sidewalk master plan provides an assessment of sidewalks in all parts of town.

### Analysis

During the public comment period for the 1993 plan residents said increased pedestrian opportunities and safety are important to Ouray. Some said pedestrian safety should be improved along Highway 550 and at flume bridges. A pedestrian mall in the 300 block of Sixth Avenue (around City Hall) was suggested.

Modified traffic lanes on Highway 550 have reduced speeds and increased pedestrian safety as has upgraded pedestrian bridges over the flumes. A master plan for pedestrian enhancements in the 300 block of Sixth Avenue is now in process, overseen by the Beautification Committee.

Access to hiking trails and the Amphitheater road has been improved thanks to cooperative efforts between the City and the Ouray County Trails Group. Public transportation between Ouray and Montrose was suggested as was a shuttle bus from the pool parking area to Main Street.

During the comment period for the original plan, some residents said a park or walkway along the Uncompahgre River should be considered. In 1989 design of a trail system along the river from Ouray to Delta was completed by the Department of Landscape Architecture at the University of Colorado at Denver. An organization, Uncompahgre RiverWay, Inc. was formed to help implement the plan.

Following adoption of the 1993 plan, the City, affected land owners and federal agencies embarked on a planning effort that ultimately led to the restoration of a one mile section of the river in the northern limits of the City. This project was completed in 2002 and features a pedestrian walkway  on both sides of the river throughout the project area. This trail forms the southernmost section of the Uncompahgre RiverWay project.

BLM_0037888

# Parks and Trails

Ouray has seven parks and multiple trailheads that provide a wide variety of recreational activities for residents and visitors. Maintenance and capital improvements for the City's parks system are paid for by the Parks Fund, which operates as a government enterprise. The Parks Fund is supported mainly by revenues generated at the Ouray Hot Springs Pool and Box Canyon Park. Trailheads within the City provide access to an extensive network of hiking trails on adjacent public lands.



**Ouray's plentiful parks and abundant hiking trails provide outdoor recreation for visitors and local residents alike. Shown here, the Ouray Women's Club Park.**

**Analysis**

The comprehensive plan for park facilities, trails and recreation programs that some residents said was needed during the comment period for the original plan was completed in 1998. A description of the major components addressed by the 1998 plan follows.

Hot Springs Park and Pool

Ouray's Hot Springs Park includes the Hot Springs Pool, bathhouse and fitness center, a playground, outdoor basketball and tennis courts, baseball/soccer field, walking/jogging track, gazebo, picnic tables, barbecue grills and public restrooms. The Hot Springs Pool is Ouray's most popular attraction and is listed on the National Register of Historic Places. It annually generates significant revenue while providing employment for as many as 40 full and part-time employees. Natural geothermal water from several sources is mixed with cooler water from the City's domestic water system to supply the pool. A filtration system to improve pool water quality and achieve compliance with state and federal standards began operating in 1996.

The Colorado Geological Survey has studied the sources of Ouray's geothermal water and concluded that the aquifer probably does not contain a large quantity of water, but "as long as hot water is not removed from the system faster than it is being recharged, the quantity and temperature of the water in the system should remain in equilibrium." The CGS report indicates there is adequate hot water for the pool without affecting other springs. Because the available quantity of hot water is unknown but assumed to be

BLM_0037889

limited, further development, if any, of geothermal water sources will be carefully monitored.

Box Canon Park

Box Canon Park is accessible to the public year-round but is staffed, with charged admission, only during the months of May through October. During these months it offers picnicking, interpretive learning, sightseeing, with short hikes to the famous Box Canyon Falls and an overlook. A small admission fee and low expenses have allowed the park to consistently operate at a profit, not including repayment of debt for recent capital improvements.

Since 1999 several major capital projects have been completed at the park including a new visitor center furnished with interpretive exhibits, bridge and stairway to the falls, high bridge stairway, high bridge decking and stringers and catwalk to the falls. The new visitor center now makes it possible for the park to be staffed on a year-round basis and this has been attempted on a trial basis during the Christmas/New Years holidays and during the annual Ice Festival in January. There is also an opportunity for expansion of nature trails and picnic areas onto the adjacent Whippoorwill Lode acquired by the City in 1989.

Ouray Ice Park

Ancient glaciers and the Uncompahgre River have carved a dramatic canyon through solid rock at the south edge of town adjacent to and within Box Canon Park. The Uncompahgre Gorge, as it's called, is an impressive natural phenomenon in any season, but during the winter months it is indeed spectacular and a perfect venue for Ouray's newest sport, ice climbing.

Land in the gorge is held by a combination of public and private owners that together lease their property to Ouray County, which in turn oversees operation of the Ouray Ice Park through a non-profit organization, the Ouray Ice Park Inc. During winter months, employees of the Ice Park use overflow from the City's water tank and freezing temperatures to transform sheer walls of the gorge into solid towers of ice. The Ouray Ice Park is the only facility of its kind in the Western Hemisphere, attracts thousands of climbers annually and has benefited the local winter economy greatly. With the assistance of the Trust for Public lands, the City, U.S. Forest Service and other landowners are cooperating in an effort to consolidate ownership of properties in the Ice Park. Consolidated ownership will greatly simplify Ice Park operations and clarify insurance and liability issues.

Lee's Ski Slope

Lee's Ski Slope is a youth downhill ski hill on the south side of Ouray. A rope tow, currently in service on weekends and on weekdays after school, provides conveyance to the hilltop. An operator is present while the tow is in use, but there is no charge for use of the lift. The City supports its operation from park revenues. The base apparatus was completely rebuilt by the City in 2001.

Rotary Park, Cascade Falls Park and Woman's Club Minipark.

Visitors use Rotary Park, fronting Highway 550 on the north side of town, primarily as a picnic area and rest stop. Cascade Falls Park, at the east end of Eighth Avenue, is an undeveloped park with a parking area and access, by a primitive trail, to the base of

**Ouray Community Plan, 2004**                                                    **29**

BLM_0037890

Cascade Falls. The Woman's Club Mini-park, corner of Fourth Avenue and Fifth Street, has playground equipment for small children and picnicking.

Conservation Parklands

City-owned land on the hillsides east and south of town is currently zoned P-2, which requires land to be left in its natural state except for parking and sanitary facilities. During the public comment period for both the original and 2003 plan update, residents said hillsides should remain undeveloped and existing open space should be maintained and protected. Maintaining the P-2 designation for this land will help protect Ouray's natural setting.

Uncompahgre Park

In response to consensus voiced during development of the original plan, an effort began in 1993 to articulate community values regarding the future of lands in the northern reaches of the City. The effort created a Vision Statement for the North Ouray Corridor, which called for complete renewal of the area beginning with restoration of a one-mile section of the Uncompahgre River. Construction began in the fall of 1996 and was completed in the fall of 2002. The project created an 18-acre riparian corridor on either side of the river that will be owned and maintained in perpetuity by the City. Previous to this, private ownership prevented public access to the river. The riparian corridor has been developed as a park and features a continuous walkway linked by pedestrian bridges across the river and is furnished with amenities such as picnic tables, exercise equipment, interpretive panels, public parking and a restroom.

# City Hall/Community Center and School

## City Hall and Community Center

The original City Hall, including the Walsh Library on the second floor, was built in 1900. It was damaged by fire in 1950 and rebuilt with a modern façade. In 1983, the adjoining Community Center building was constructed and a connection made to the space formerly occupied by the Walsh Library on the second floor. In 1988, a civic effort was initiated to replace the 1950's front with a reproduction of the historic design. The building Thanks to funding provided by gifts and donations, the project was completed at that time. The City Hall now houses the City administrative offices, library and police department.



Ouray's City Hall, reconstructed in 1988 is listed in the National Register.

BLM_0037891

The Community Center houses the Emergency Services Center on the ground floor, including the fire department, and emergency medical services. The three Community Center meeting rooms have capacities of approximately 30, 150, and 300 persons, as well as facilities for food preparation. The rooms are currently rented for meetings, conferences and civic events.

## Library

The public library, located in City Hall, is supported by a mill levy on property taxes, donations and funds raised by Friends of the Library. The library owns approximately 16,000 volumes.

## School

The Ouray School is funded to provide for kindergarten through 12th grade. Two hundred sixty four (264) students were enrolled for the 2003-04 school year. The school regularly achieves higher than average academic standards. The campus consists of two buildings; the main building was built in 1937 and the secondary building with a gym, shop and cafeteria was built in the 1960's. Several capital projects have upgraded facilities since then, most recently a new library, classrooms and gym improvements completed in 1997.

The school is fiscally independent from the city. Funding for operations is derived from the State and from local sources. The local portion of the funding is raised by a mill levy from property taxes. Funding for facility improvements is raised through bond issues that are repaid by property taxes. All property taxes and mill levies are administered by the County Treasurer.

# Public Safety

## Emergency Medical Services

Emergency medical services for the community, including two ambulances and 10 to 15 EMT's, are directed by Ouray County, but headquartered in the City's Emergency Services Center. Mountain Rescue, with approximately 50 volunteer members, is directed by the Ouray County Sheriff's Office. The 911 emergency phone service became available in 1992 and is managed by a county-wide Emergency Management Board.

### Analysis

During the1993 and 2003 public comment periods for plan development, residents commented on the importance of maintaining quality emergency services and encouraging continuing volunteerism.

## Police and Fire Departments

The Police Department is located in City Hall and employs four full-time officers, including the chief. The Volunteer Fire Department, housed on the ground floor of the Community Center, has about 28 volunteers and four vehicles including a 1983 750-gallon pump truck, a 2000 model pumper/ladder truck, a quick-response 200-gallon truck and a 2003 model tender for firefighting in remote areas that lack developed water systems.

BLM_0037892

# Utilities

## Power

Ouray's power needs are served by the San Miguel Power Association, which has a franchise agreement with the City. As an REA co-op, any profits realized are to be returned to its customers. Overhead transmission lines that feed Ouray from the north have recently been upgraded in conjunction with construction of a new substation located at the City's northern limits on north Oak Street. Over time, this new substation will replace the old original facility located on the river at the south end of town. This will also allow the overhead transmission lines between the old and new substations to be abandoned.

## Telephone and Internet Service

Quest provides telephone service to Ouray. Internet service is provided by a local company, Ouraynet.

## Natural Gas

Natural gas is not currently available in Ouray, but a gas provider has recently secured permission from the City and Ouray County to construct pipelines that will serve both entities

## Community Service and Facilities Goals

1. Provide efficient and high quality community services and facilities to the residents and visitors of Ouray.
2. Manage growth in a manner that balances land development with the ability of the City to provide necessary public services, facilities and capital improvements.

## Community Service and Facilities Objectives

1. Ensure economy and efficiency in operations and capital improvements projects.
2. Maintain a balance between growth and development and the capacity of services and facilities.

## Policies

### Government Administration

1. Achieve more effective and comprehensive planning.
2. Promote economy and efficiency in all expenditures, seek grants for funding whenever possible.

### Infrastructure

Water and Sewer

1. Maintain the quality of Ouray's water.
2. Continue to use water and sewer investment fees to raise revenue to pay for capital improvements.
3. Monitor the capacity of the water and sewer systems with respect to new demands created by growth and plan for needed system improvements.

BLM_0037893

Streets

1. Make safety, paving, dust control and maintenance high priorities.
2. Encourage landscaping and other streetscape improvements.
3. Urge the State to improve avalanche safety and enforce hazardous materials regulations on Highway 550.

Pedestrians

1. Recognize the importance of pedestrian opportunities and safety in all planning and development.

**Parks and Trails**

1. Maintain and expand Ouray's current parks program including developed parks for recreation and undeveloped parks for public open space.

**Public Safety**

1. Work cooperatively with the county to support emergency medical services and encourage volunteerism.

**Utilities**

1. Support efforts to improve the quality of utility services and facilities in Ouray.

## Recommended Actions

**Government Administration**

1. Develop a Capital Improvements Program, that identifies long-range needs and financial implications.
2. As needs arise, create citizen groups to study and propose solutions to problems. Encourage citizen participation in study groups.
3. Create a policy or plan for public properties.
4. Update the existing City Forestry Plan prepared by the State Forest Service.

**Infrastructure**

Water and Sewer

1. Implement the recommendations made by the Water Distribution System Master Plan.
2. Replace at least 2,000 linear of substandard sewer line per year.
3. Address odor problems at the wastewater treatment plant.

Streets and Drainage

1. Establish standards and specifications for streets and their paving.
2. Clean up weeds and debris in flumes, landscape the perimeter of the Cascade catchment basin.
3. Complete implementation of the drainage plan.
4. Require landscaping and replanting along streets in coordination with the Forestry Plan.
5. Support efforts to improve safety on Highway 550 through Ouray.
6. Investigate alternatives to achieve more effective dust control.
7. Use voter authorized revenues from the Portland Flume tax to pave streets.

Pedestrians

1. Create a comprehensive plan for construction and maintenance of sidewalks and other pedestrianways, including snow removal.

BLM_0037894

2. Establish standards for sidewalks on grade (including allowable slope, railings and steps).
3. Complete the Uncompahgre Riverway through Ouray.

**Parks and Trails**

1. Implement elements from Parks Development Plan.
2. Expand the P-2 Parks-Conservation designation for undeveloped land on the hillsides around Ouray.
3. Address issues of need, location and cost for new restrooms.

**Utilities**

1. Establish standards for street lighting; consider decorative lighting and additional lighting for safety in some areas. Promote street lighting standards that will preserve Ouray's natural setting and traditional small town character.

## Accomplishments Since 1993

Infrastructure

1   The need for future improvements and expansion of water storage has been analyzed.
2   Long-range plans for water improvements have been created and record drawings maintained.
3   Progress has been made to bring water and sewer systems into compliance with state and federal regulations.
4   Flumalanche prevention devices have been installed on the Cascade Creek Flume.
5   Better communication between the City, County and State for maintenance of Highway 550 has been achieved.
6   The pros and cons of paving some of the busier streets to improve dust control and drainage have been considered.
7   Railings and steps on footbridges over flumes comply with the Uniform Building Code.
8   Pedestrian safety and sidewalks in the comprehensive plan for North Ouray have been planned for.
9   The City has provided for persons with disabilities by requiring compliance with the Americans with Disabilities Act.

Parks and Trails

1   Access, signage and parking for hiking trails have been planned.
2   The City and landowners have created a comprehensive Parks Development Plan including facilities planning, parking and circulation planning, landscaping and budgeting, with public participation in the planning process.
3   Major improvements have been made at Lee's Ski Slope.
4   Major capital improvements at Box Canyon Park, including a new visitor center.
5   Creation/expansion of Ouray Ice Park.
6   Creation of 18-acre riparian corridor and completion of one-mile section of Uncompahgre RiverWay.

**Ouray Community Plan, 2004**                                                    **34**

BLM_0037895

7   Numerous improvement to trails made by Ouray County Trails Group.

Utilities

1   The City has worked with utility companies to identify alternatives and establish corridors for future service needs.

2   The City has supported efforts to improve power and phone service and to bring natural gas to Ouray.

3   Underground utilities to new developments is now required by City regulations.



**New visitors' center in Box Canyon Park.**

**Ouray Community Plan, 2004**                                                              **35**

# References, Resources

## References

Please refer to 1990 *Ouray Community Plan.*

## Resources

Bureau of Land Management
2505 S. Townsend Ave.
Montrose, CO. 81401

1-970-240-5300
www.co.blm.gov

Colorado Department of Local Affairs
C/O Ken Charles
Ft. Lewis College, 1000 Rim Drive
Durango, CO. 81301

970-247-7311
charles_k@fortlewis.edu

Colorado Center for Community Development
C/O Jon Schler
222 S. Sixth Street, Room 409
Grand Junction, CO 81501

970-248-7310
schler@earthlink.net

Colorado Office of Community Services
C/O Ken Francis
Ft. Lewis College, 1000 Rim Drive
Durango, CO. 81301

970-247-7310

Colorado Geological Survey
705 State Centennial Building
1313 Sherman Street
Denver, CO. 80202

303-866-2611

Colorado Department of Public Health
and Environment
Grand Junction Regional Office
222 S. Sixth Street, Room 232
Grand Junction, CO. 81501-2768

970-248-7198
http://www.cdphe.state.co.us

Colorado Division of Wildlife
2300 South Townsend Ave.
Montrose, CO. 81401

970-252-6000

Colorado Division of Water Resources
1871 E. Main Street
Montrose, CO. 81401

970-249-6622
www.water.state.co.us

Colorado Department of Transportation
Region Five Engineering
3803 N. Main Street
Durango, CO. 81301

970-385-1400

**Ouray Community Plan, 2004**

36

Colorado Climate Center           970-491-8545
Department of Atmospheric Science    ccc.atmos.colostate.edu
1371 General Delivery
Colorado State University
Fort Collins, CO. 80523-1371

Colorado Municipal League        303-866-3682
1300 Broadway                www.cml.org
Denver, CO. 80203

Colorado Historical Society        303-866-3682
1300 Broadway                www.coloradohistory.org
Denver, CO.80203

Colorado Preservation, Inc         303-893-4260
1900 Wazee Street, Suite 360      www.coloradopreservation.org
Denver, CO. 80202

National Trust for Historic Preservation   303-623-1504
Mountains/Plains Regional Office      www.nationaltrust.net
535 16th Street, Suite 750
Denver, CO. 80202

Region 10, League for Economic Assistance
and Planning                   970-249-2436
301 North Cascade           info@region10.net
Montrose, CO. 81401

U.S. Army Corps of Engineers, Regulatory Office   1-970-243-1199
400 Rood Ave., Room 142
Grand Junction, CO. 81501

U.S. Environmental Protection Agency, Region 8    1-303-312-6312
999 18th Street, Suite 300           www.epa.gov
Denver, CO. 80202

U.S. Forest Service                1-970-240-5300
2505 S. Townsend Ave.          www.fs.fed.us.gov
Montrose, CO. 81401

BLM_0037898

### *Geological History of Ouray*

By Pam Larson, Geological Engineer

The geology within Ouray city limits consists of three major rock types, one major fault structure, and three types of unconsolidated debris. These features affect the slope angle and stability of this area.

The three main rock types are quartzite, limestone and sandstone. The oldest rock is Precambrian quartzite and is located south of the Ouray fault (see Geologic Map on the next page). This rock is a white to gray, massive bedded, hard, dense, relatively pure quartzite. This rock is very stable and forms cliffs along the Uncompahgre River to the south.

The limestone is of Mississippian age (305 to 350 million years old) and is located just north of the Ouray fault. It consists of massive beds of dark brown-gray coarsely crystalline limestone. This rock forms the moderate slope on the south of Ouray and is also stable. Several geothermal springs are associated with this formation. Limestone can be slowly dissolved by water and re-deposited as travertine. Many of the springs are associated with such travertine, the most predominate deposit being located northeast of the intersection of 5th Street and 5th Avenue. This form of travertine can be porous to compact and is highly varied in stability.

The sandstone is of Pennsylvanian/Permian age (225 to 305 million years old) and forms the cliffs around town. These formations consist of red, massive beds of sandstone interbedded with shales and siltstones. The alternating beds of sandstones and shale form the benched appearance of the cliffs. The slope resulting angle is nearly vertical. Boulders within the talus deposits are from these cliffs.

The major structural feature of the area is the near east-west fault in the southern portion of the city. This is a major fault along which no movement has occurred in recent times. Box Canyon Falls is along this fault where the hard, dense quartzite was thrust up along the softer sandstones and limestones.

The areas of town where rocks do not outcrop are covered with three types of unconsolidated debris. The debris is stream channel alluvium, talus deposits or glacial drift. Allubium covers a major portion of the city. As seen on the map, alluvium deposits are found along the Uncompahgre River, Bridal Veil Creek, Skyrocket Creek, Cascade Creek, Portland Creek, Oak Creek and Canyon Creek. The deposits of Cascade Creek and Portland Creek have spread alluvial material throughout Ouray. These water courses are presently contained in flumes. The slope angle along the alluvium deposits is higher nearer the cliffs, is less within the city proper and is nearly flat in the Uncompahgre River bed.

Talus slopes occur at the base of the sandstone cliffs. These slopes consist of varied sized rocks up to large boulders. The slope angle of the talus is higher than in other unconsolidated debris areas as can be seen on the topographic map of the city.

The third type of debris is glacial drift. This is unconsolidated debris left from glacial erosion. The area to the east of Ouray up to the Amphitheater is such a deposit. This glacial drift consists of material highly varied in size. The slope angle of the glacial drift is much like the slopes of the alluvium deposits below the cliffs.

**Ouray Community Plan, 2004**                                                    **38**

BLM_0037899



GEOLOGIC MAP OF THE CITY OF OURAY

*Prepared by Pam Larson, Geological Engineer*

BLM_0037900

# COMMUNITY PROFILE

## *History of Ouray*

By Barbara L. Muntyan, Director, Ouray County Museum

Ouray was incorporated in 1876, the year of Colorado's statehood and the nation's centennial celebration. Originally called "Uncompahgre City" by its first residents, the name was changed upon incorporation to honor the chief of the Ute Indians in this area.

Two prospectors, Gus Begole and Jack Echols, are reported to have been the first whites in Ouray's valley. Having come up from the Silverton area, they discovered a rich outcrop of close-spaced parallel veins of ore and later named their find "The Mineral Farm" because initially the ore could simply be dug out of the ground like potatoes. Thus started the first mining rush to Ouray.

By the end of 1876, Ouray already boasted 400 inhabitants, over 200 dwellings, four stores, a sawmill, two blacksmith shops, two hotels, a post office, and a school house with almost fifty students.

This last statistic is revealing, for – unlike many bonanza mining camps occupied by single men and loose women – this one started out with numerous families who were here for the duration. Structures were built with more permanence in mind and wide parallel streets were laid out. The presence of women and children was obvious – the schoolhouse, churches, a library (started by the Ouray Woman's Club) and the Wright Opera House (which was the scene of many social events and concerts) were among the early buildings.

Of course, there was the inevitable "red light" district, along Second Street at the north end of town. No matter how many families came early to Ouray, there were still many single men far away from home and friends, cooped up for weeks at a time in the high mountains, working their little mines. They liked to come to town, get a bath, have a few drinks, play some poker and find a woman to help forget their loneliness. The Gold Belt Theater, the Roma Café, the Chinese laundry (which dispensed opium along with washing single men's shirts) and numerous cribs all bespoke the rougher side of Ouray's existence. The town had periodic "clean-up" campaigns, but with marginal success.

A newspaper (the *Ouray Herald*) and a waterworks were established in 1877. Telephone lines were run in 1878 to connect Ouray, Lake City, Mineral Point and Silverton. The first bank, The Miners and Merchants Bank, was also established the same year. The first church was established in 1879 as well as a volunteer fire department. Civilization was here to stay.

Mining, of course, was the reason for Ouray's existence and by 1879 there were three small smelters in town to refine the ore coming out of the mines in the surrounding hills. The Bachelor Mine, the Calliope, the American Nettie, the Virginius and numerous smaller mines were all established during Ouray's first years and employed hundreds of miners. Gold producing mines such as the Camp Bird continued to operate profitably even after the earlier silver mines closed following the repeal of the Sherman Silver Purchase Act in 1893. Many of the men lived at the mines during the workweek and

BLM_0037901

more so in winter, since transportation was difficult, but their families lived in town. Several little satellite communities sprang up nearer to the big mines: Sneffels, Ash and Portland. But Ouray remained the commercial and social hub of the Uncompahgre drainage.

The Meeker Massacre in 1879 resulted in the forcible removal of most Ute Indians to a reservation in Utah two years later. This sad event was a blessing for the whites in the San Juans, and guaranteed Ouray's success as a permanent mining and supply community. The construction of fine brick structures began in earnest during the 1880's with the Beaumont Hotel, St. Joseph's Hospital, the County Courthouse, and others.

The census of 1890 indicated 2,000 people living in Ouray. Electricity had come to Ouray five years earlier. The railroad followed shortly thereafter. By the end of the century, nearly all of Ouray's major public and commercial buildings were completed.

It is important to note that Ouray was fortunate in never having a major fire destroy a large section of town. The majority of these buildings are still standing, and many are still used for their original purposes. There were, of course, several major flash floods over the years, which filled Main Street and the lower part of town with mud and rocks. The last two floods occurred in 1980 and 1981 – each time townspeople dug out the ooze, repaired fences, repainted buildings and went on about their business.

For more than 100 years Ouray remained primarily a town committed to servicing the surrounding mines, but even in the early years Ouray was also a tourist destination. There are numerous memoirs written in the period from the 1880's to the first World War which describe a visit to the "Switzerland of America" and the picturesque valley with its little "Gem of the Rockies" nestled within. Both nicknames were in common usage even then.

As mining activity has declined in the San Juans in recent years the emphasis on the tourist business has increased. Motels began to be built in town in the 1950's. Numerous social and cultural events, including art and photography shows, chamber music concerts and culinary events, have been planned by local residents to attract tourists.

Many visitors now come to Ouray merely to savor an intact little Victorian town, to visit the old mines, and to jeep or hike through the mind-boggling scenery of the surrounding hills. Ouray's essential character and flavor represent a step back into history, a time when life was more simple, values of honesty and hard work were more admired, and success was just around the corner for almost anyone willing to give it a try.

The character of Ouray, and the living reality of its past, can be lost or changed through a spurt in growth, through destruction of large numbers of the old structures, through modernization of other structures, or through rampant new building in a non-compatible style of architecture. The further we come from our Victorian past, the more significant it becomes that Ouray has survived as unchanged as it is. This essential historic character of Ouray was and is a community asset not to be underestimated.

BLM_0037902

# *Calendar of Events*

**January**
   Moonlight Ski and Soak
   Ouray Ice Climbing Festival

**February**
   Valentine's Dinner, Elks Lodge
   Mardi Gras, Elks Lodge

**March**
   St. Patty's Day Celebration, Elks Lodge

**April**
   Easter Eggstravaganza
   Stitch & Soak

**May**
   Booksellers Rendezvous
   Taste of Ouray
   Memorial Weekend Celebration with Classic Car Show

**June**
   Kids Days at Hot Springs Pool
   Evenings of History by Ouray County Historical Society (throughout summer)

**July**
   Old Fashioned Fourth of July, Elks BBQ
   Hardrock 100 Endurance Race
   Friends of the Ouray Library Book Sale
   Annual Women's Club Rummage Sale

**August**
   Alpine Artists Holiday
   High Graders Holiday
   Jeep Jamboree
   Mount Sneffels 1/2 Marathon

**September**
   Labor Day Weekend County Fair and Rodeo
   Annual Imogene Pass Run

**October**
   Octoberfest Celebration

**November**
   Nordic Council Fund-raiser Dinner

**December**
   Yule Weekend
   Old Fashioned Christmas Days
   Ouray Holiday Home & Hotel Tour



**Gut busters Band playing at Fourth of July celebration.
Photo provided by *Ouray Plaindealer***

BLM_0037903

## *Organizations in Ouray*

American Association of Retired Persons (AARP)
Animal Humane Society
Boy Scouts
Benevolent and Protective Order of Elks (BPOE)
Curmudgeon Club of Ouray
Embroiderers Guild of America (EGA)
Friends of the Ouray Library
Girl Scouts
Lions Club
Masonic Lodge, Ouray Lodge #37
Meals on Wheels
Mt. Hayden Rebekah Lodge #54
Mt. Sneffels Education Association
Order of the Eastern Star/OES
Ouray Athletic Booster Club
Ouray Chamber Resort Association
Ouray County Arts Association
Ouray County Council on Aging
Ouray County Historical Society
Ouray County Nordic Council
Ouray Performing Arts Guild
Ouray Trails Group
Polar Bears – Water Aerobics
Red Mountain Project
Screaming Eels Swim Club
SPIRIT
Woman's Club of Ouray
WISE–Women in Support of Education

BLM_0037904



**Ouray Community Plan, 2004**

44

BLM_0037905

# AN EXAMINATION OF FIRE EFFECTS ON PREHISTORIC PERIOD CULTURAL RESOURCES IN NEVADA

Prepared For

Nevada State Office
Bureau of Land Management
1340 Financial Boulevard
Reno, Nevada 89520

Prepared by

Vickie Clay, Michael P. Drews, Eric Ingbar, and Charles Zeier

MACTEC Engineering and Consulting
1572 East College Parkway, Suite 162
Carson City, Nevada 89706

Gnomon, Inc.
1601 Fairview Drive, Suite F
Carson City, Nevada 89701

Prepared in accordance with provisions of Order FAQ 030047
As issued under GSA Contract GS10F0157K

March 2004

BLM_0037906

# Table of Contents

BLM_0037907

# 1. INTRODUCTION

Agency officials and land managers have expressed an increased interest in the effects of fire on cultural resources.  The interrelation of fire and cultural resource management has become more pronounced as the occurrence and intensity of unusually large wildfires has increased, especially in National Parks and Monuments dedicated to preserving such resources (e.g., Bandelier, Mesa Verde, and Yellowstone). These management concerns have also affected large public land management agencies such as the BLM and USFS.

Fire effects on cultural resources have become a prominent topic of professional papers, articles, bibliographic compilations, and publications (Deal 2001, 2002; Fawcett 2003; Halford 2001; Jones and Ryan, in press; Loyd et al. 2002; Rude and Jones 2001). Some studies are materials science studies, asking "if one burns a particular artifact or material at a particular temperature and for a specific duration what happens?"  Both laboratory (usually involving controlled furnace tests) and field studies (during prescribed burns) have addressed this kind of question.

A second focus of fire effects studies has been the immediate effect of fire on archaeological sites, including their depositional and structural contexts. Most often, such studies focus on the period immediately after a fire. Studied effects include physical alteration of material (changes in color, texture, luster, structure, archaeomagnetic signature) or its disintegration (crackling, crazing, and potlidding, fracturing into smaller and smaller fragments, melting). Chemical alterations also have been studied with regard to obsidian hydration rinds, obsidian sourcing, chemical weathering, and calcined bone.  Fewer studies have looked at post-fire depositional and structural context alterations.

The emphasis of the present study is focused more on fire's effects to those essential qualities that make some cultural resources eligible for listing on the National Register of Historic Places. Deal (2001), Jackson (2001), and others have pointed out that the destruction and alteration of artifacts, features, and even structures or buildings are only the proximate effect of fire and heat.  In some cases, fire may destroy elements that make a cultural resource significant. In other cases, those

BLM_0037908

attributes may not be affected. When viewed in this light, the dimension of measurement of fire effect becomes the intellectual, legal, or administrative elements that make a cultural resource important and whether or not those elements would be affected by fire.

Focusing on effects to site eligibility is important for several reasons. First, if it can be determined that fire does affect elements that routinely make a class of resources eligible, then it may be possible to single them out for special treatment in action planning processes. Conversely, if it can be determined that fire does <u>not</u> effect elements that routinely make a class of resources eligible, then it may be possible to reduce or eliminate constraints on fire management practices in those site areas. Also, threat assessments could be mapped for planning and response situations if resource types are predictable geographically (such as flammable ethnohistoric features in old growth pinyon-juniper woodlands). Finally, it may be possible to address whether fire-related changes are ameliorated with the passage of time. Are fire-effected, eligibility-related elements impacted only over the short term, or are those impacts irreversible?

## *1.1 Overview of Project*

The theme of the present study is to develop a concise selection and recording strategy that assesses the effect of fire on previously recorded prehistoric cultural resources in northeast Nevada.  The study isolated key eligibility related elements that could be affected by fire and that would be discernable using standard archaeological field recording methods. From a wide range of elements, four were selected for detailed review. The second phase of this study will be a program of field research at previously recorded prehistoric sites with different, known, fire histories (based on BLM fire regime mapping).  The goal of the study is to test specific hypotheses regarding the effects of fire on eligibility related site elements, and the ability to discern those effects over time.

This study will, we hope, be the start of a more extensive, long-term, collection of observations. The field protocol developed for this study is intended to be straightforward. Consistent, widespread, use of a protocol of this type for several years throughout the western states could provide excellent data on which to base definitive statements about fire effects on cultural resources.

BLM_0037909

BLM_0037910

# 2. RESEARCH DESIGN

A fairly extensive body of published and "gray" literature exists on the interrelationship between cultural resources and fire. Much of that literature was written by agency personnel and archaeological researchers over the past four decades, as cultural resource management became part of stewardship actions implemented by land-managing agencies coping with fire in the West. Review of this literature suggests that there is a gap with regard to the relationship of fire effects to the broad question of National Register eligibility.  Rather, studies have focused on the physics and effects of fire on individual artifact types such as flaked stone (e.g., chert, obsidian, and quartz), ground stone (e.g., limestone, sandstone, and granite), historic artifacts (e.g., plastics, glass, metal), perishables, and flammable structures and features, among many others.  These studies provide excellent baseline data for use in the present study.

The research design for this project creates a systematic framework for the observation of fire effects on those elements typically considered when determining the eligibility of prehistoric archaeological sites under National Register Criterion D. More specifically, the study focuses on the effects of fire on eligibility-related elements at the general category of prehistoric archaeological site commonly referred to as "lithic scatters and features." Such sites comprise over 75 percent of known cultural resources in Nevada, and in most other western states as well. The study does not address elements associated with other National Register criteria (A, B, and C).  This is because so few prehistoric sites in the West have been evaluated based, in part or in whole, on these criteria. Also, historic period archaeological sites are not considered in detail.

## 2.1 Study Hypotheses

To focus the study, several explicit hypotheses have been defined. The hypotheses are stated below, accompanied by a brief discussion.

BLM_0037911

## 2.1.1 Hypothesis One: It is possible to discern the effects of fire at prehistoric archaeological sites.

The concept of "known fire history" deserves discussion. For this study, known fire history means that the past 10 to 20 years of a site's exposure to fire is documented. In principle, there are four possible combinations of "exposure to fire" and "evidence of exposure to fire." Those combinations are shown in the table below.

**Table 1. Hypothesis One Structure and Expectations**

| | Evidence of Exposure | |
|---|---|---|
| **Exposed to Fire** | **Yes** | **No** |
| **Yes** | ** | |
| **No** | | ** |

Cells in the table with asterisks are the "expected" combinations. Although it would be ideal to know if sites were ever exposed to fire (see Livingston et al. 2003), in practice (and in this study), we will rely on available BLM fire records as controls on exposure. Most prehistoric sites are hundreds to thousands of years old. It is only reasonable to assume that most sites in the study area (northeast Nevada) have been exposed to fire at some time in the past. As a result, it will be important to look for archaeological evidence of exposure even in places where we are not able to discern evidence of fire itself.

Evidence of exposure will be collected through the examination of previously recorded sites. Site examination will include the visual review of archaeological materials and features, and the collection of artifact for selected analysis (obsidian sourcing and hydration). Examination of sites will seek to answer the following questions:

➢ Is there direct or indirect evidence of exposure to fire?
➢ Have artifacts been altered by exposure to heat?
➢ Has fire altered microphysical or chemical characteristics of selected artifact classes (obsidian)?

BLM_0037912

Because the questions require expert judgment, field examinations will be performed by two highly experienced individuals with experience in archaeology and geo-archaeology. The field team will not be provided information on the fire history status of the sites chosen for evaluation. Sites will be chosen for evaluation by a team of archaeologists and fire specialists through study of maps, records, and fire histories.

Fire, fire suppression and management, and fire prevention encompass a wide variety of natural occurrences and human actions that can directly affect cultural resources. Six categories of fire-related natural and human processes are identified. Each category contains a subset of occurrences or actions.

> ➢ Direct Heat Exposure – varying heat intensity;
> ➢ Fire Suppression – mechanical construction of fire lines and roads, hand construction of fire lines, fire camps and staging areas, water and chemical retardant drop areas;
> ➢ Post-fire Reclamation – air seeding, drill seeding, mulched seeding, hand planting, erosion control features;
> ➢ Accelerated Natural Effects – wind erosion, water erosion, deposition, and weathering;
> ➢ Effects of People – increased access, unauthorized artifact collection, vandalism;
> ➢ Fuel Management Practices – controlled or prescribed burns, chipping or muching of forest products, green strip planting, woodland thinning or removal, herbicide application, and hand clearing.

The present study will focus primarily on effects of direct heat exposure, either from wildfire or by planned burning. To the extent possible, we will also make observations regarding accelerated natural effects.

Cultural resources alteration by heat exposure has been studied by fire and cultural resource specialists for some time. Siefkin (2002) indicates temperature and duration of exposure are the most important factors. Logically, one can consider the combination of temperature and time (duration) as *heat intensity*. Heat intensity may be determined through careful post-fire examinations of artifacts and soil characteristics, and the depth of charring in live and dead fuels.

Heat intensity has been assessed in many ways, but most researchers and fire managers seem content to use three qualitative intensity levels of high, medium, and low. In this study we rely upon

BLM_0037913

proxy definitions that use sagebrush and other woody shrubs as our frame of reference for measuring heat intensity.

> *High Intensity* exposure will be reported if most sagebrush was burned off flush with ground level, with some visible soil color alteration around the trunk and root zone, and few unburned patches are present;
> *Medium Intensity* exposure will be reported if most sagebrush is burned to within several inches of the ground surface, no ground color alteration is visible, and a moderate amount of unburned patches are present throughout the burned area; and
> *Low Intensity* exposure will be reported if most of the brush remains with burned branches and scorched leaves; brush may or may not be alive.

It should be noted that these characteristics are most observable immediately after the fire, and that one's ability to perceive evidence of heat intensity diminishes with time.

The three levels of heat intensity have implications for both temperature and duration of the effects of heat to artifacts and features.  The higher the intensity, presumably the higher the effect, however, many plot studies have shown that all exposure may have an effect. For example, Benson (2002) discusses what she presumed would be low intensity exposure in a prescribed burn in sagebrush that had a marked effect on obsidian hydration and newly manufactured chert flakes.

## 2.1.2 Hypothesis Two: The effects of fire on archaeological sites are long lasting.

It is important to recognize that fire only affects that portion of a site that is on or near the surface at the time of the fire. If site deposits are thin or limited to the surface, then evidence of exposure to fire (especially on artifacts) should remain through time. If site deposits are present that were not affected, and if turbation or some other mechanism subsequently results in the mixing of burned and unburned materials, then surface evidence of exposure to fire may diminish with time. This hypothesis has implications to fire's effects on site eligibility and on the advisability of fire management prescriptions.

We intend to examine the question of whether prehistoric sites in our project area (northeast Nevada) recover from the effects of fire over a relatively short time span (the span of readily

BLM_0037914

available fire regime data). Variables to be examined are "age of the burn" and "evidence of exposure to fire." Possible combinations are shown in the table below.

**Table 2. Hypothesis Two Structure and Expectations**

|  | Evidence of Exposure to Fire | |
|---|---|---|
| Age of the Burn | Yes | No |
| Within 1 Year | ** | |
| 2 to 5 Years | ** | |
| 6 to 10 Years | ** | |
| 11 to 15 Years | ** | |
| 16 to 20 Years | ** | |

Cells in the table with asterisks are the "expected" combinations. As noted, the age of the burn will be determined based on existing BLM fire data. Evidence of exposure to fire will be assessed as discussed under Hypothesis One.

The ability to determine whether a site has been "burned over" may diminish through time. For instance, if one walks across a site immediately after a fire, one may see exploded artifacts, exposed features, the potential for surface erosion, and so forth. Five years later, the same site may appear quite stable and in good condition because the obvious effects of fire have been masked by vegetation, upward migration of "undamaged" artifacts, and so on. Ultimately, one may not even know that a site has been exposed to a fire. The lingering question is, however, are impacts to eligibility related elements still evident after evidence of the fire itself has been removed?

## 2.1.3 Hypothesis Three: The effects of fire diminish elements that make a prehistoric site National Register eligible.

Cultural resources management places a heavy emphasis on segregating sites based on their eligibility to the National Register of Historic Places. The question central to Hypothesis Three is whether fire affects those characteristics that make a particular site National Register eligible. In principle, there are four possible combinations of "exposure to fire" and "changes eligibility."

BLM_0037915

Those combinations are shown in the table below. Cells in the table with asterisks are the "expected" combinations.

**Table 3. Hypothesis Three Structure and Expectations**

| | Changes Eligibility | |
|---|---|---|
| **Exposed to Fire** | **Yes** | **No** |
| **Yes** | ** | |
| **No** | | ** |

Eligibility determinations are based on site specific elements and the relationship of those site elements to an established historic context. Where possible, we rely on the Nevada State Comprehensive Preservation Plan (Lyneis 1982, White et al.1989) as our historic context. Necessarily, we consider State Plan elements in a more "evidential" way than the State Plan itself presents, because the field study cannot observe State Plan *themes*, only *data elements* relevant to such themes. Themes identified in the State Plan that relate directly to prehistoric archaeological sites include settlement, subsistence, chronology, technology, paleo-environment, trade and exchange, beliefs and ideology, and demography. These prehistoric research themes have remained essentially the same for some time.

Regardless of how one approaches any given theme, the archaeologist must discern whether a site contains elements that speak to one or more themes. Given that the present study is interested in effects to qualities that make a site eligible under Criterion D, our interest is in the presence of data elements that can inform on some aspect of prehistory. Data elements central to the determination of site eligibility under Criterion D have been categorized variously. For purposes of the present study, the following elements are recognized:

> ➤ Activity areas: items, deposits, and/or surfaces that provide inferences about specific, relevant past activities.
> ➤ Chronological indicators: items or deposits that can place the site or individual components in time.
> ➤ Structural indicators: spatial relationships among items, deposits, and/or surfaces that can be reconstructed (i.e., site structure) and that provide information on specific, relevant past

BLM_0037916

activities.
- ➢ Economic indicators: floral, pollen, faunal, or other botanical and zoological data relevant to understanding past subsistence practices.
- ➢ Source indicators: items whose potential source area(s) can be identified and are relevant to understanding past trade or exchange, mobility, and/or settlement patterns.
- ➢ Human remains: evidence of a preserved burial or cremation relevant to understanding beliefs, ideology, or demography.
- ➢ Belief indicators: items or deposits that can provide inferences about past beliefs.
- ➢ Paleo-environmental indicators: items or deposits or surfaces (natural or cultural) that allow for the paleo-environmental reconstruction of the site, locality, or region.
- ➢ Flammable items: containing flammable wooden resources.

The relationship between themes and data elements is shown in the following table. This type of matrix is often used to evaluate the significance of prehistoric resources with regard to Criterion D.

### Table 4.  Prehistoric Research Themes and Data Elements

| Theme | Activity | Chronology | Structure | Economic | Source | Human Remains | Beliefs | Paleo-environment | Flammable |
|---|---|---|---|---|---|---|---|---|---|
| **Data Element** | | | | | | | | | |
| Settlement | X | X | X | X | X | | | **X** | **X** |
| Subsistence | X | X | X | X | | | | **X** | **X** |
| Paleo-environment | | X | | **X** | | | | X | |
| Trade/Exchange | **X** | X | | | X | | | | |
| Beliefs/Ideology | **X** | X | X | | | | X | | |
| Technology | X | X | | | | | | | **X** |
| Chronology | X | X | X | | | | | | **X** |
| Demography | X | X | X | | | **X** | X | | |

X indicates that site information is necessary to contribute to a research theme.
**X** indicates that site information is desirable but not always necessary to contribute to a research theme.

Note: A depositional context or primary physical context is assumed for all value-bearing elements.

The current study places an emphasis on the re-assessment of site eligibility based on surface indications. As a result, four of the nine data elements are likely to be measurable in the field. These are activity areas, chronology, structure, and flammability. The first three of those data elements correspond well with guidelines provided in the State Protocol Agreement between Nevada BLM

BLM_0037917

and SHPO (1999: Appendix G). The protocol places an emphasis on three physical contexts (depositional, temporal, and structural) when determining eligibility. To some degree, all three data elements must be present if a site is to address most themes.

ACTIVITY INDICATORS.  Sites supporting items, deposits, and/or surfaces can provide inferences about relevant past activities.  Many sites contain discernable activity indicators such as material or task specific stone tool assemblages, stone tool production debris, hearth or cooking feature traces such as fire-cracked rock or charcoal stains, and their distribution across the site.  On some sites, these tools, features, and inferred activity areas are spatially discrete. Sites that inform on many research themes (settlement, subsistence, paleo-environment, trade/exchange, ideology, technology, chronology, and demography) most often contain substantial data regarding inferred activities. Single component base and field camps rich in artifacts (ground and flaked stone tools, debitage) and discernable features (hearths, wickiups, rock rings, storage facilities) are considered prime locations for assessing fire effects on activity data elements.

Recording how fire affects activity indicators and surface features is crucial to determining whether this element has been altered measurably.  The effects of fire on each previously recorded activity area, concentration, locus, or feature will be reviewed.  A tri-partite system of observation will be employed:

> - no visible effects;
> - limited visible effects (< 50% of the assemblage shows changes, somewhat diminishing its analytical potential); and,
> - strong visible effects (> 50% of the assemblage is altered, substantially diminishing its analytic potential ).

The following questions will be considered when determining the effect of fire on a site's activity areas.

> - Are tools and flakes still present and recognizable as to type, heat-treatment, or have they been cracked, crazed, potlidded, exploded, vitrified, or weathered into unidentifiable fragments?
> - Are surface features still identifiable or are they no longer discernable?
> - Has fire-cracked rock changed in size and number?

BLM_0037918

- Has ground stone been noticeably altered by cracking, breaking, exfoliation, disintegration, or charring?
- Has erosion or deposition disturbed evidence of inferred activities?
- Is new information regarding activity areas or features present, through increased site visibility or erosional activity?

The ultimate question is, has fire compromised or destroyed activity areas causing a sufficient loss of integrity such that the site is no longer significant with regard to Criterion D.

CHRONOLOGICAL INDICATORS. This data element is represented at sites that contain datable items, assemblages, or stratigraphic deposits (including charcoal, volcanic ashes). Most research themes are predicated on the knowledge of the time period or range of periods during which a site was occupied. Common temporal indicators include specific projectile point types (Thomas 1981), ceramic types, obsidian hydration rinds, charcoal for radiocarbon dating, trees with non-complacent tree rings for dendrochronology, and, more rarely, archaeomagnetic or other chemical or geomagnetic dating techniques. Most site types recommended eligible under Criterion D contain chronologically diagnostic artifacts or assemblages.

This study proposes to look at effects on chronological indicators in several ways. One will be to collect, source by XRF (if it is not possible to ascribe visibly), and hydrate a sample of diagnostic obsidian tools and debitage collected from revisited sites. As obsidian appears to be highly sensitive to ground fires (Loyd et al. 2002), we will target sites with pre-fire hydration values. Sampling and analysis of obsidian can yield evidence of fire intensity, fire history, and assessments of whether chronological indicators have been adversely affected by fire. Other chronologically diagnostic tool types (projectile points, crescents, ceramics) will be assessed (but not collected) for specific fire damage. A list of temporally diagnostic items will be maintained at each site, with condition recorded, and a collection record will be used when obsidian tools and debitage are collected. We do not propose to collect artifacts other than time-diagnostic obsidian artifacts and obsidian pieces suitable for hydration (whether morphologically time diagnostic or not). The following questions will be addressed at each revisited site.

- Are previously recorded chronological indicators present and in recognizable condition?
- Have existing chronological indicators changed, and in what way(s)?

BLM_0037919

> ➢ Are new chronological indicators present, and what are the possible reasons for this?
> ➢ Has the obsidian hydration rind been altered, such that all bands are diffuse or non-existent?

Assessing whether fire actions have or have not altered a site's chronological information potential will be the ultimate goal. The extent of these alterations, if visible or related to obsidian, will also be assessed.

SPATIAL PATTERNING OR SITE STRUCTURE. Effects to site structure will be manifested in physical removal, damage, destruction, movement, selective movement, or burial of site elements (usually activity areas or features) originally mapped and used to recommend significance with regard to site patterning. Effects on the spatial inter-relationship between activity indicators will be assessed. Original site maps will be used in an attempt to relocate and assess relationships. Major geomorphic processes and/or events such as dune movement, rilling, headward erosion of arroyos, sheet wash, and flood deposits will be described for the entire site and for each area where task specific activities are represented. Basic areas of inquiry will include.

> ➢ Has the site structure or spatial patterning of tools or deposits changed?
> ➢ How is change evident, and does this change effect site integrity?
> ➢ Has the site environment changed catastrophically?
> ➢ Is there an increase in site structure or site elements related to fire actions?

The location of original features (preferably GPS based) will be compared with revisited GPS locations. Additionally, the site size as noted originally and during the revisit will be compared to assess fundamental change(s) in overall size and site layout.

FLAMMABLE RESOURCES. Flammable prehistoric and ethnohistoric resources such as pinyon gathering poles and hooks, wickiups, drive lines, surrounds, traps, wooden stump mortars, and pinyon caches offer specific at-risk resource types that are usually significant under Criterion D. Measuring effects to these types of features is warranted during this study. Depth of charring (also a way to indicate fire intensity and duration) on pinyon and juniper elements and complete destruction by burning will be noted for these types of resources. However, these resources are quite rare: we will likely revisit them with BLM staff in a targeted fashion.

BLM_0037920

Assumptions regarding the effects of fire on the four key data elements are provided in the table below. For each intersection of element and effect, a qualitative scale of low (L), medium (M), and high (H) is provided. These represent assumptions about the effect of fire to the particular data element. Each cell can be thought of as an independent hypothesis, though in practice the cells are not likely to be independent of each other.

**Table 5.  Predicted Fire Effects to Key Data Elements**

| Effects of Direct Heat Exposure | Key Data Elements | | | |
| --- | --- | --- | --- | --- |
| | Activity Areas | Chronology | Structure | Flammability |
| High intensity | L-H | L-H | L | H |
| Medium intensity | L-M | L-M | L | H |
| Low intensity | L | L | L | H |

Heat exposure and fuel levels have a variable effect on essential data elements.  Generally, high intensity burns are expected to have the greatest effects to:

> ➢ certain artifacts and their inferential potential;
> ➢ chronological indicators such as obsidian;
> ➢ site structure by adding false (root burn) features, new features, or by increasing site size; and
> ➢ to flammable features and structures such as drive lines, traps, bow stave trees, wickiups, lean-tos, among others.

Medium intensity fires have slightly less and possibly more variable effects on these same data elements, while low intensity fires (presumably including prescribed burns) are suggested to have the least effect. In all cases, flammable resources are at risk, and in most cases are considered highly valuable data elements.

## 2.2 Site Selection Process

To obtain a sufficient sample, we will select a sample of sites using the current NVCRIS site

BLM_0037921

distributions, fire polygons obtained from the BLM Nevada State Office, and assistance from the staff of the Elko and Ely Field Offices. In general, our goal is to select about 100 sites for consideration and then to revisit about 45 to 50 of those sites. Selection criteria include a polythetic set consisting of:

> - Use BLM NVSO fire polygons that show fires within the past 20 years (current maps show fire polygons from 1981 through 2002);
> - Overlay large area cultural resource inventories on these fire polygons;
> - Select inventoried ground within the spectrum of known-age fires;
> - Select sites in and near inventoried, burned, areas;
> - Sites will be mapped (electronically) and examined for clusters. Clusters are convenient because they save travel time, thus increasing the number of sites it is feasible to record.
> - The highest ranked sites will be screened for site record adequacy, to further winnow the possible target sites.
> - Examine records and select sites considered eligible under Criterion D, and sites with multiple kinds of archaeological evidence (features, time-diagnostic artifacts, etc.);
> - Some criterion D eligible sites located outside burn areas should be selected as control units (the field crew will not be told that these sites are outside of known burn areas);
> - Consult with agency staff on the list of prospective sites;
> - Add to the list of high priority sites based on recommendations by agency staff;
> - Gather records for the target sites;
> - The field team will familiarize themselves with the target sites (but not their fire histories) and create a fieldwork agenda.

Prehistoric property types in the Great Basin may be described using Binford's (1980, 1983) classification for observed hunter-gatherer site types. Locations, field camps, and base camps are the three major site types, which can be described quantitatively by looking at the number of tool types, thus inferring the number of activities and the complexity of the site assemblage (Delacorte 1990, Leach 1992). In this study, emphasis will be placed on selecting a sample of base camps or field camps (more likely to be data element rich) that are medium to small size sites. The preferred site size would be about 5 acres (2.7 hectares). A perfectly circular five acre site would have a radius of about 100 m – large enough to be diverse, but small enough to address easily. Sites larger than 5 acres are often so large and complex that they could not be addressed effectively.

A key element to this selection strategy is reviewing the preliminary list with agency staff in the Ely and Elko Field Offices. The field staff will have a good sense of "interesting" sites to visit, and burn areas where fire effects can best be seen. Once the preliminary list has been updated based on its

BLM_0037922

review by field office staff, it will be reduced to a final list containing approximately 100 sites. This number is more than we can revisit, but it provides a large number of "alternates" in case access to some sites is impossible, sites cannot be re-located, or sites turn out to be inappropriately recorded.

Once selected, sites will be targeted for revisits by the field team. Targeting must also consider the feasibility of traveling to the site, finding it, and making field observations in a timely fashion. Sites that are remote or that are difficult to access will be passed over in favor of other sites, all other things being equal.

We had initially considered selecting sites with known fire exposure histories. This would have included sites exposed to high, moderate, and low fire intensities. Our intent is to keep this information from the field team, creating something of a blind test situation. However, specific fire intensity data is lacking for sites themselves – only general fire intensity is available for particular burn areas. So, there was no way to be precise about degree of heat exposure. Also, micro-topography, vegetation cover, thickness of duff, climate, and other factors create variation in heat intensity across a site. So, characterizing a site as having been exposed to a single heat intensity is probably not appropriate.

The field teams will not be given site fire histories prior to the site visit. We have, however, dropped a strict double-blind methodology. The field crews will invoke the prescribed field protocols. Later, in the office, we will examine whether data element impairment is associated with overall fire regime.

In the long run, assuming that the results of this study are interesting and useful, we recommend the creation of a double-blind methodology and a control study. A control study methodology could be deployed in prescribed burn situations. Sites would be recorded prior to the burn, heat sensing monitors would be installed, the burn would take place, the intensity of the fire would be "measured," and the archaeology would be observed for changes. A series of such studies using the same methodology but in many different settings across the West would be extraordinarily useful. A double-blind method could then be used to test the results of such a study, examining the question of whether one can tell if a site has been exposed to fire and fire management, and whether

or not this alters site significance.

## 2.3 Field Protocol

Researchers have proposed that fire intensity (heat and length of heat exposure) are the main correlates of damage to archaeological materials themselves. In this study, we examine how damage to archaeological materials and contexts impairs the values that make a site significant. To do this, we will revisit sites that were already recorded but have since been subjected to fire. As a control, we will also revisit nearby sites that have not been subjected to fire.

Field methods will follow a consistent routine at each site chosen. This protocol is outlined in flow chart form below (Figure 1). At each site, the field team will assess whether they have sufficient information to meaningfully review the targeted key data elements. If they do not, then the site will be abandoned for the purposes of this study. Because the study contrasts prior recording to current observations, the first field task after locating the site will be to evaluate the validity of such a comparison. If the prior record does not allow study questions to be addressed, then no valid contrast can be made. If a site is adequately recorded, then the field team will relocate features and other attributes of the site, decide upon a representative location and direction for a 100 m sample transect, and create an observation plan that will estimate the range of variation and dominant effects of fire and fire management.

At each site included in the study, the team will place a 100 m transect. Observations will be made every 5 m along the 100 m line. The observation points will encompass approximately a 1 m radius around the appropriate meter and record whether fire effects are evident, and if so, in what way or ways. Figure 2 shows an observation recording sheet. The 100 m transect samples (21 per transect) create comparable information across all visited sites.

BLM_0037924

Mactec-Gnomon Fire and Fire Management Effects Study, Site Revisit Procedure



Figure 1. Fieldwork process.

BLM_0037925

Features, concentrations, and other site attributes are also of interest. These will be relocated from the field maps and assessed. As Figure 1 shows, sites with many features of the same type will not have each feature revisited and recorded – a representative selection will be made by the field team. The same observations noted at transect points will be made at features, and activity areas.

Because obsidian hydration is such an important technique for dating sites, and it is known to be affected by heat exposure, the team will collect samples of obsidian when encountered. We are especially interested in collecting obsidian from sites that burned after obsidian artifacts were already collected. Apparently, several sites in the Elko District will be useful for this (W. Fawcett, personal communication). All collected artifacts will be listed in a log, and their location will be recorded with resource grade GPS.

At each observation point, an analysis sheet will be completed. Artifacts will be collected for obsidian hydration as appropriate. Observation points and collected artifacts will be recorded with resource grade GPS measurements, with each measurement keyed to the observation records (or individual artifact). The location of all observation points will be taken with resource grade GPS units. Other recording that will be done at the site will be to take representative photographs, assess whether the site needs to be re-recorded, and determine whether the NRHP status ascribed to it might be inappropriate.

A general site summary will be made in addition to each observation point. Figure 3 shows the site summary sheet. We are especially interested in the data element summary at the bottom of the recording form, where the field team will assess whether data elements once recorded at the site have changed in some way. These will become part of the analytical process, a brief glimpse of which can be seen in Table 6.

Revisited sites will not be fully rerecord. However, we will note whether the site records need to be completely redone, updated, or a new map made. The study records will be attached to the site records already in electronic form in NVCRIS, and hard copies will be sent to the appropriate repository to append to the paper file.

BLM_0037926

Table 6.  Example Assessment of Pre and Post-visit Presence of Key Data Elements

| | Key Data Elements Pre-visit (P), Re-visit (R) | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Activity Area | | Chronology | | Structure | | Flammable | |
| Theme | P | R | P | R | P | R | P | R |
| Settlement | X | **X** | X | | | X | **X** | X | |
| Subsistence | | **X** | | | | **X** | | |
| Paleo-environment | | | | | | | | |
| Trade/Exchange | X | | | X | | | | |
| Beliefs/Ideology | | | | | | | | |
| Technology | X | **X** | X | **X** | X | **X** | | |
| Chronology | X | | X | | | | | |
| Demography | | | | | | | X | |

X indicates information originally recorded and documented on IMACS and in report.
**X** indicates information now present, or if blank, not present.

## 2.4 Limitations of the Current Study

There are several important limitations to this study. First, the field study concentrates on prehistoric archaeological sites and materials. These are the majority of archaeological sites known in the Great Basin and they are the sites most frequently evaluated with respect to Criterion D of the National Register.

Second, some data elements will not be studied systematically. We propose to study only those that can be assessed based on the surface archaeology. Other data elements could only be evaluated through detailed excavation. A second reason for eliminating some data elements is that we will have no baseline on which to base a comparison. For instance, a site might have contained floral remains prior to a fire, but because the site was never excavated we have no knowledge of its presence or its relationship to site eligibility. We think it wiser to focus on the few, key data elements that are most often cited in arguments about the National Register eligibility of surface archaeological sites.

BLM_0037927

This leads to a third limitation; the prior record of each visited site. We will rely on prior recordings to tell us about data elements present at each site. Sometimes these records are spotty or poor; in other records, no good consideration of the data elements can be found, although the record may be exemplary otherwise. Evidence of burning and impairment of data elements will necessarily be informed conjecture. The best records for study would be those that have already been through the formal National Register nomination process at the state and federal level; these sites are likely to have had the most thorough field investigation.

BLM_0037928

# REFERENCES

Benson, Arlene
1999    *Effects of Fire on Obsidian Hydration Rind Thickness.* Paper presented at the Annual Meeting of Society for California Archaeology, Sacramento, California.

Binford, Louis R.
 1980   Willow Smoke and Dogs' Tails: Hunter-Gatherer Settlement Systems and Archaeological Site Formation. *American Antiquity* 45(1):4-20.
 1983   *In Pursuit of the Past: Decoding the Archaeological Record.* London: Thames and Hudson.

Deal, Krista
2001    Field Guide for Recording Fire Intensity and Fire Severity and Fire Effects on Prehistoric Sites in the North-Central Sierras. In *Appendix D, Archaeological Investigations at 13 Sites within the Cleveland Fire, Pacific Ranger District, Eldorado National Forest.* Eldorado National Forest, Placerville, California.
2002    *Fire Effects to Lithic Artifacts.* Cultural Resources Protection and Fire Planning Meeting. Tucson, Arizona.

Delacorte, Michael G.
 1990   *The Prehistory of Deep Springs Valley, Eastern California: Adaptive Variation in the Western Great Basin.* Unpublished Ph.D. dissertation, Department of Anthropology, University of California, Davis.

Clay, Vickie L.
 2000   *The Archaeology of Locations: Data Recovery at CrNV-22-6218 and CrNV-22-6243 North Peak Battle Mountain, Humboldt County, Nevada.*

Eisenberg, Anne
2003    Mapping Technology Speeds Help to Fire-Scarred Land. Originally published in *The New York Times,* 7 August. New York, New York.
        < http://www.nytimes.com/2003/08/07/technology/circuits/07next.html>

Fawcett, William B.
2003    *Impacts of Fires and Fire Treatments upon Environments and Cultural Resources in the American West: A Bibliography.* Bureau of Land Management, Elko, Nevada

Haecker, Charles
2001    *Effects on Fire on Historic Structures and Historic Artifacts.* Cultural Resources and Protection and Fire Management Planning. Sponsored by the Stephen T. Mather Training Center, Harper's Ferry, West Virginia. Held at the Columbia Cascades Support Office, Seattle, Washington.

Halford, Kirk

BLM_0037929

2001    *Fire Effects on Cultural Resources: A Bibliographic Survey of Specific and Related Literature.*  Bureau of Land Management, Bishop, California

Jackson, Robert J.
2001    *Introducing the Matrix Tool.*  National Park Service: Cultural Resources and Fire Management Planning Meeting.

Jones, Anne Trinkle and Kevin C. Ryan
nd      *Wildland Fire in Ecosystems: Effects of Fire on Cultural Resources and Archaeology.* General Technical Report 42, Volume 3.  USDA Forest Service, Rocky Mountain Range and Experiment Station, Fort Collins, Colorado.  In press.

Kelly, Roger E. and Jim Mayberry
1980    Trial by Fire: Effects of NPS Burn Programs upon Archaeological Resources.  In *Proceedings of the Second Conference on Scientific Research in the National Parks* 1:603-610.  Special Addresses Anthropology Report No. NPS/ST-80/02-1.  National Park Service, Washington D.C.

Leach, Melinda
1992    Chapter 24.  Site Function and Residentiality.  In *Archaeological Investigations at Tosawihi, A Great Basin Quarry, Part I: The Periphery*, edited by R. G. Elston and C. Raven, pp. 713-738.  BLM Elko Field Office, Elko, Nevada.

Linderman, Carole A. and Eric O. Bergland
1991    *The Effect of Fire on Obsidian Artifacts: 1989 Regional Forester's Challenge Grant Study.* USDA Forest Service, Pacific Northwest Region, Willamette National Forest, McKenzie Ranger District, McKenzie Bridge, Oregon.

Livingston, Stephanie
2003    *Development of a Methodology for Building Long-term Fire History in Great Basin Valley Landscapes.*  Proposal to the BLM Nevada State Office, Reno.

Loyd, Janine M., Thomas M. Origer, David A. Fredrickson (editors)
2002    *The Effects of Fire and Heat on Obsidian.*  Bureau of Land Management, Sacramento, California.

Lyneis, Margaret M.
1982    *An Archaeological Element for the Nevada Historical Preservation Plan 1982.*  Prepared for Nevada Division of Historic Preservation and Archaeology Project 230-0580.  University of Nevada, Las Vegas.

McCabe, Allen
2003    *Documentation of Site CrNV-21-7640, Tin Canyon Fire Rehabilitation Project, Washoe County, Nevada.* Bureau of Land Management Report CR2-1501(P).

Miller, Richard F. and Robin J. Tausch

BLM_0037930

2001    The Role of Fire in Juniper and Pinyon Woodlands: A Descriptive Analysis.  In *K.E.M.* *Galley* and T.P. Wilson, editors.  Proceedings of Invasive Species Workshop: the Role of Fire in the Control and Spread of Invasive Species.  Fire Conference 2000: the First National Congress on Fire Ecology, Prevention, and Management, Miscellaneous Publication No. 11, Tall Timbers Research Station, Tallahassee, Florida

Pidanick, Bill
1982    *Prescribed Fire/Cultural Artifacts – Investigating the Effects.*  Pacific/Southwest Log. October 4-5.  USDA Forest Service, Pacific Northwest Region, San Francisco.

Rude, Trisha and Anne Trinkle Jones
2001    *Bibliography of Fire Effects on Cultural Resources.*  National Park Service, Western Archaeological and Conservation Center, Tucson, Arizona.

Ryan, Kevin C.
2001a *Evaluating Fire Effects on Cultural Resources.*  Paper presented at Cultural Resources Protection and Fire Management Planning training course, Western Archaeological and Conservation Center, Tucson, Arizona.  Sponsored by the Stephen T. Mather Training Center, Harper's Ferry, West Virginia.
2001b *Effects of Retardant on Historic Sites.*  <kryan@fs.fed.us>  Personal communication.

Ryan, Kevin C. and Nonan V. Noste
1983    *Evaluating Prescribed Fires.*  Paper presented at the Wilderness Fire Symposium, Missoula, Montana.

Scott, Linda J.
1990    Appendix C: Pollen Analysis of Three Sites in the La Mesa Study Area.  In *The 1977 La Mesa Fire Study: An Investigation of Fire and Fire Suppression Impact on Cultural Resources in Bandelier National Monument,* edited by D. Traylor, L. Hubbel, N. Wood, and B. Fiedler, pp. 153-164.  Southwest Cultural Resources Center Professional Papers No. 28, National Park Service, Division of Anthropology, Branch of Cultural Resources Management, Santa Fe, New Mexico.

Siefkin, Nelson
2002    Manual Fuel Load Reduction as a Means of Reducing the Effects of Fire on Obsidian Hydration: Examples from Lassen Volcanic National Park and Lava Beds National Monument.  In *The Effects of Fire and Heat on Obsidian*, edited by Janine M. Loyd, pp. 153-158.  Bureau of Land Management, Sacramento, California

Tamez, S.
1978    *Effects of the La Mesa Fire on Bandelier's Cultural Resources – Draft.*  National Park Service, Bandelier National Monument.  Bandelier National Monument, New Mexico.

Thomas, David H.
1981    How to Classify the Projectile Points from Monitor Valley, Nevada.  In *Journal of California and Great Basin Anthropology* 3(1):7-43.

BLM_0037931

Traylor, Diane, Lyndi Hubbell, Nancy Wood, and Barbara Fiedler
1983    The La Mesa Fire: Impact on Cultural Resources at Bandelier National Monument. *CRM Bulletin* 6(4):5-7.  Western Archaeological and Conservation Center, Tucson, Arizona.

Vermont SHPO
2001    *The Vermont State Historic Preservation Office's Guidelines for Conducting Archaeology in Vermont* - Draft.  The Vermont Division for Historic Preservation, Montpelier, Vermont.

Wessel, R. L.
1985    Assessment of the Impacts to Three Archaeological Sites in the Saugus Ranger District, Angeles National Forest.  USDA Forest Service, Cultural Resource Section, Angeles National Forest, Arcadia, California.

Wettsaed, J. R.
1988    *Forest Fires and Archaeology on the Ashland District, Custer National Forest, Montana.* Paper presented at the 46th Annual Plains Anthropological Conference, Witchita, Kansas.

White, William G., Ronald M. James, and Richard Bernstein
1989    *Nevada Comprehensive Preservation Plan.*  The Division of Historic Preservation and Archaeology, Department of Conservation and Natural Resources.  The Historical Society, Department of Museums and History.  USDI, National Park Service.

Zeanah, David W.
1993    *Archaeological Investigation of a James Creek Phase Projectile Point Repair Site in the Little Boulder Basin, Nevada.*  Report on file, P-III Associates, Salt Lake City, Utah.

**Figure 2.  Fire Effects Assessment Study – Field Observation Record**
**Attached as separate file "recordingsheetnewest"**

**Figure 3.  Fire Effects Assessment Study – Site Summary Record**
**Attached as separate file "recordingsiteesheetnewest"**

BLM_0037932

### *Sclerocactus glaucus*
Author: (J.A. Purpus ex K. Schum.) L. Benson

**Colorado hookless cactus**

Cactaceae (cactus family)



Close up of *Sclerocactus glaucus* by Gina Glenne





Close up of *Sclerocactus glaucus* by Lori Brummer



Close up of *Sclerocactus glaucus* by Gina Glenne

### Ranks and Status

**Global rank:** G2G3
**State rank:** S2S3
**Federal protection status:** USFWS Threatened
**State protection status:** None

### Description and Phenology

**General description:** A squat, globular, spiny succulent. Each mature stem is 3-12 cm tall, 4-9 cm wide; the largest observed was 24 cm tall x 14 cm wide (DeYoung 2010). However, during the driest part of the year the stem may shrink to below ground-level. Central spines are straight (hookless). The plants are inconspicuous except when in flower (April-May), when showy, fragrant, pink to magenta flowers appear at the top of the stem.

Please see 1997 profile

BLM_0037933

**Look Alikes:** Distinguished from *Sclerocactus parviflorus* by the absence of a strongly hooked central spine (Weber and Wittmann 2012).

**Phenology:** Plants are readily visible when flowering, usually late April and early May. After flowering, their dull greyish green color makes them difficult to see. During extended dry periods the stems may shrink to below ground level. Fall rains may cause them to swell up again and become easier to see (Spackman et al. 1997).

## Habitat

Populations occur primarily on alluvial benches along the Colorado and Gunnison Rivers and their tributaries. *Sclerocactus glaucus* generally occurs on gravelly, or rocky surfaces on river terrace deposits and lower mesa slopes. Exposures vary, but *S. glaucus* is more abundant on south-facing slopes. Soils are usually coarse,




Habitat of Sclerocactus glaucus by Peggy Lyon

Habitat of *Sclerocactus glaucus* by Peggy Lyon

gravelly river alluvium above the river flood plains usually consisting of Mancos shale with volcanic cobbles and pebbles on the surface. Elevations range from 1200-2000 m. Associated vegetation is typically desert scrub dominated by shadscale (*Atriplex confertifolia*), galleta (*Hilaria jamesii*), black-sage (*Artemisia nova*), and Indian rice grass (*Stipa hymenoides*). Other important species include two similar spherical or cylindrical cactus species, strawberry hedgehog cactus (*Echinocereus triglochidiatus* var. *melanacanthus*) and Simpson's pincushion cactus (*Pediocactus simpsonii*). Other important species in the plant community include the prickly pear cactus (*Opuntia polyacantha*), winterfat (*Krascheninnikovia lanata*), yucca (*Yucca harrimaniae*), snakeweed (*Gutierrezia sarothrae*), low rabbitbrush (*Chrysothamnus viscidiflorus*), sand dropseed (*Sporobolus cryptandrus*), and Salina wildrye (*Elymus salinus*) (USFWS 1990, Scheck 1994). Fire is not typically characteristic of *S. glaucus* habitat, but areas with large infestations of cheatgrass (*Bromus tectorum*) may build up sufficient fuel to carry fire into *S. glaucus* populations.

Exposed, gravel-covered, clay hills, saltbush or sagebrush flats, or pinyon-juniper woodlands; 1400-2000 m (Flora of North America Editorial Committee 2003).

**Elevation Range:** 4,646 - 7,126 feet (1,416 - 2,172 meters)

## Distribution

**Colorado endemic:** Yes

**Global range:** Known from Delta, Garfield, Mesa, and Montrose counties in Colorado. Estimated range is 3307 square kilometers (1277 square miles), with the northern population covering 505 square kilometers, and the southern population 2802 square kilometers. Values calculated in GIS by the Colorado Natural Heritage Program in 2017 following NatureServe methodology.

BLM_0037934

Distribution of *Sclerocactus glaucus* in Colorado.

## Threats and Management Issues

Habitat destruction or modification by development of energy extraction, water storage projects, transportation, and residental facilities constitutes the greatest threat to *S. glaucus*. This threat is wide-ranging, increasing, and less amenable to mitigation than are the threats of illegal collecting or disturbance by agricultural or recreational activities. The scope and severity of this threat are inferred from numbers of plants known to be impacted by projects such as the TransColorado gas transmission pipeline and Colorado Highway 50 widening, as well as anecdotal observations from field personnel familiar with the species. Cheatgrass (*Anisantha tectorum*) invasion is also causing considerable degradation of *S. glaucus* habitat in some areas.



Summary results of an analysis of the status of *Sclerocactus glaucus* based on several ranking factors. This species was concluded to be "weakly conserved". From Rondeau et al. 2011.

## References

Ackerfield, J. 2012. The Flora of Colorado. Colorado State University Herbarium. 433 pp.

Benson, L. 1982. The Cacti of the United States and Canada. Stanford University Press, Stanford, California. 1044 pp.

Dawson, C. 2009. Personal communication with Colorado Natural Heritage Program staff regarding BLM rare plant monitoring in Colorado.

Denver Botanic Gardens. 2008. Demographic monitoring of Sclerocactus glaucus, an Endemic Species of western Colorado. Population Monitoring 2007-2008. Technical Report to Bureau of Land Management, U.S. Department of Interior.

Ecology Consultants, Inc. 1978. An illustrated guide to the proposed threatened and endangered plant species in Colorado. U.S. Fish and Wildlife Service, Lakewood, CO. 114 pp.

Elliott, B. A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

Ferguson, J. 2003. Personal communication with CNHP staff.

Flora of North America Editorial Committee. 2003. Flora of North America North of Mexico. Vol. 4, Magnoliophyta: Caryophyllidae, part 1. Oxford University Press, New York. 559 pp.

Franklin, B. 2003. Personal communication with Colorado Natural Heritage Program.

Heil, K.D., and J.M. Porter. 1994. Sclerocactus (Cactaceae): A revision. Haseltonia 2:20-46.

Hochstatter, F. 1997. The genus Sclerocactus (Cactaceae) - Part 4. Cact. Succ. J. Gr. Brit. 15: 74-81.

Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.

BLM_0037935

Lambeth, Ron. 2003. Personal communication with Colorado Natural Heritage program staff.

Lyon, P. 2003. Personal communication with Colorado Natural Heritage Program.

Mayo, E. 2009. USFWS communication with Colorado Natural Heritage Program staff.

Neale, J.R. and M. DePrenger-Levin. 2010. Demographic monitoring of Sclerocactus glaucus,an endemic species of western Colorado. Population Monitoring 2007-2010Technical Report to Bureau of Land Management, U.S. Department of Interior. Prepared by Denver Botanic Gardens.

Neely, B., S. Panjabi, E. Lane, P. Lewis, C. Dawson, A. Kratz, B. Kurzel, T. Hogan, J. Handwerk, S. Krishnan, J. Neale, and N. Ripley. 2009. Colorado Rare Plant Conservation Strategy, Developed by the Colorado Rare Plant conservation Initiative. The Nature Conservancy, Boulder, Colorado, 117 pp.

O'Kane, S. L. 1988. Colorado's Rare Flora. Great Basin Naturalist. 48(4):434-484.

O'Kane, S.L. 1988. Colorado's rare flora. Great Basin Naturalist 48(4): 434-484.

Peterson, J.S. 1982 Plant species of special concern. Unpublished manuscript.

Peterson, S.J. 1982. Threatened and endangered plants of Colorado. U.S. Fish and Wildlife Service, Denver, CO. 35 pp.

Porter, J. M., M. S. Kinney, and K. D. Heil. 2000. Relationships between Sclerocactus and Toumeya (Cactaceae) based on chloroplast trnL-trnF sequences. Haseltonia 7: 8-23.

Robertson, E. 2009. Center for Native Ecosystems personal communication with Colorado Natural Heritage Program staff.

Rocky Mountain Society of Botanical Artists. 2009. RARE Imperiled Plants of Colorado, a traveling art exhibition. Exhibition catalogue developed by the Denver Botanic Gardens and Steamboat Art Museum.

Scheck, C. 1994. Special Status Plants Handbook Glenwood Springs Resource Area. Unpublished report prepared for the Bureau of Land Management, Glenwood Springs, CO.

Scheck, C. 1994. Special Status Plants Handbook Glenwood Springs Resource Area. Unpublished report prepared for the Bureau of Land Management, Glenwood Springs, CO.

Schneider, A. 2013. Wildflowers, Ferns, and Trees of the Four Corners Regions of Colorado, New Mexico, Arizona, and Utah. Accessed on-line at http://www.swcoloradowildflowers.com.

Smithsonian Institution. 1980. Draft abstracts on rare plants. Unpublished. Perhaps 100 individual abstracts.

Spackman, S., B. Jennings, J. Coles, C. Dawson, M. Minton, A. Kratz, and C. Spurrier. 1997. Colorado rare plant field guide. Prepared for Bureau of Land Management, U.S. Forest Service and U.S. Fish and Wildlife Service by Colorado Natural Heritage Program.

U.S. Fish and Wildlife Service (USFWS). 2007. Endangered and Threatened Wildlife and Plants; 12-month Finding on a Petition To List Sclerocactus brevispinus (Pariette cactus) as an Endangered or Threatened Species; Taxonomic Change From Sclerocactus glaucus to Sclerocactus brevispinus, S. glaucus, and S. wetlandicus. Federal Register 72(180): 53211-53222.

U.S. Fish and Wildlife Service (USFWS). 2009. Endangered and Threatened Wildlife and Plants; Taxonomic Change of Sclerocactus Glaucus to Three Separate Species. Federal Register 74(177): 47112-47117.

U.S. Fish and Wildlife Service. 1990. Recovery Plan for Sclerocactus glaucus.

USDA, NRCS. 2013. The PLANTS Database. National Plant Data Team, Greensboro, NC 27401-4901 USA.

Weber, W. A. and R. C. Wittmann. 2012. Colorado Flora, Western Slope, A Field Guide to the Vascular Plants, Fourth Edition. Boulder, Colorado. 532 pp.

# Last Updated

2014-11-24



### *Eriogonum pelinophilum*
### Author: Reveal

**Clay-loving wild buckwheat**

**Polygonaceae (buckwheat family)**

Close up of *Eriogonum pelinophilum* by Lori Brummer





Close up of *Eriogonum pelinophilum* by Lori Brummer

Close up of *Eriogonum pelinophilum* by Alicia Langton

## Ranks and Status

**Global rank:** G2
**State rank:** S2
**Federal protection status:** USFWS Endangered
**State protection status:** None

## Description and Phenology

**General description:** Low rounded heavily branched pulvinate subshrubs 5-10 cm high and 8-15 cm across; lower stems light brown, woody, bark exfoliating in long loose strips or wide plates; leafless, upper branches herbaceous, slender, floccose to glabrous; leaves solitary, scattered along entire length of herbaceous stems, except for the last 5-10 mm, somewhat closely placed and congested to widely spaced, leaf blades oblanceolate, 5-12 mm long, 1-1.5 mm wide, densely white-tomentose below, midveins totally obscured by the tomentum, subglabrous to glabrous and green above, margins entire, revolute and completely enclosing the lower surface, apices and bases acute, leaves persistent, petioles 1 mm long, light yellowish-brown to tan and thinly pubescent when young, becoming glabrous; flowering stems slender, 5-10 mm long, floccose to glabrous; inflorescence cymose, +/- compact and congested, 1-2 cm long and wide, trichotomous, rays 2-5 mm long, floccose to glabrous without, thinly



*Eriogonum pelinophilum* by Vicky MacWilliam. Please also see 1997 profile.

tormentose within, connate at base; peduncles, when present, 1-1.5 mm long, floccose to glabrous, erect; involucres solitary, narrowly turbinate, 3-3.5 mm long, 1-1.5 mm wide, floccose to glabrous without, glabrous within, 5 acute lobes 0.3-0.4 mm long, bractlets oblanceolate, 1.8-2.5 mm long, minutely fringed with capitate gland-shaped cells, pedicels 2.5-4.5 mm long, glabrous; flowers white with reddish-brown midribs and brownish-red bases, 3-3.5 mm long, glabrous within and without except for microscopic glands along the midribs within, tepals similar; achenes 3-3.5 mm long (Peterson 1982).

**Look Alikes:** *Eriogonum contortum* has yellow flowers and occurs further north (Mesa and Garfield Cos.). *Eriogonum clavellatum* is taller (1-2 dm), has larger involucres (4-4.5 mm long), and is only known from Montezuma Co. (Spackman et al. 1997).

**Phenology:** Flowering occurs from mid June to late July, and fruiting in August.

## Habitat

*Eriogonum pelinophilum* is found in substrates derived from the Mancos Formation shales. The entire area is typified by rolling adobe (clay) hills and flats. Generally, the plants are found in a sharply defined soil microhabitat with shadscale (*Atriplex confertifolia*), on mid to lower slopes of the hills. The soil types are part of the Billings Series, known for its fine texture and weak and unstable structure. These soils are calcareous throughout and in some places have visible accumulations of calcium carbonate or calcium sulfate (Cline et al. 1967). Steeper barren slopes (badlands) are above, with flatlands



Habitat of *Eriogonum pelinophilum* by Lori Brummer



Habitat of *Eriogonum pelinophilum* by Alicia Langton

below dominated by mat saltbush (*A. corrugata*) (Cline et al. 1967, U.S. Fish and Wildlife Service 1988). The change from the lower slope soils to the flatland soils is characterized by a jump in soil sulfate level (from &lt;100 ppm to 1650 ppm) and sodium level (Potter et. al. 1985). Clay soils have a high water holding capacity, but this moisture is not readily available to plants (Barbour et. al. 1980, cit. in O'Kane 1985). Rainfall in the *E. pelinophilum* habitat averages 7-10 inches annually, further contributing to the low moisture availability (Colorado Climate Center 1984). *Eriogonum pelinophilum* generally prefers swales and bottoms where useable moisture is more available (O'Kane 1985). Because of the low moisture availability, communities in which *E. pelinophilum* occur are characterized by low species diversity, low productivity and minimal canopy cover. *Eriogonum pelinophilum* is codominant with other xerophytic shrubs or subshrubs such as shadscale, the rare *Penstemon retrorsus*, Castle Valley clover (*Atriplex cuneata*), mat saltbush, black sagebrush (*Artemesia nova*) and *Xylorhiza venusta* (Neely 1985, O'Kane 1985). The communities are apparently stable, climax associations, judging from the lack of invading species capable of dominating the sites. Field observations indicate that the species is most abundant where biological soil crust cover is not extensive (Ferguson 2007).

**Elevation Range:** 5,220 - 6,378 feet (1,591 - 1,944 meters)

## Distribution

**Colorado endemic:** Yes

**Global range:** Known from Delta and Montrose counties, Colorado. Estimated range is 420 square kilometers, calculated in 2008 by the Colorado Natural Heritage Program in GIS by drawing a minimum convex polygon around the known occurrences. Imprecisely reported occurrences are not included.



Distribution of *Eriogonum pelinophilum* in Colorado.

## Threats and Management Issues

Fragmentation of *Eriogonum pelinophilum* habitat into small units of possibly nonviable population size is the greatest threat at this time (U.S. Fish and Wildlife Service 1988). Habitats are being destroyed by rapid encroachment of irrigated agricultural land and residential development. Known occurrences are reported to be extirpated or have undergone recent degradation due to residential development (Reveal 2003). Subsequent impacts such as road building and off-road vehicle use are also significant threats. A large portion of the critical habitat type is on public land and is not in danger of being developed. However, due to the close proximity of human development, many of these sites suffer from right-of-way access, off-road vehicle use and overgrazing. These activities not only endanger known populations, but also damage or destroy potential habitat recovery areas. Other threats include gas and oil exploration, pipelines and new irrigation canals, which often skirt the bases of the adobe hills, potentially interfering with *E. pelinophilum* habitats (Neeley 1985, O'Kane 1985, U.S. Fish and Wildlife Service 1988).



Summary results of an analysis of the status of *Eriogonum pelinophilum* based on several ranking factors. This species was concluded to be "under conserved". From Rondeau et al. 2011.

## References

Ackerfield, J. 2012. The Flora of Colorado. Colorado State University Herbarium. 433 pp.

Barbour, M.G., J.H. Burke, and W.D. Pitts. 1980. Terrestrial Plant Ecology. Benjamin/Cummings Pub. Co., Inc. Menlo Park, CA.

Bowlin, W.R.,V.J. Tepedino, and T.L. Griswold. 1993. The reproductive biology of Eriogonum pelinophilum (Polygonaceae). Pages 296-302 in R. Sivinski and K. Lightfoot, editors. Southwestern rare and endangered plants. New Mexico Energy, Minerals and Natural Resources Department, Forestry and Resources Conservation Division, Miscellaneous Publication Number 2.

Bureau of Land Management (BLM). 1988. Uncompahgre Basin Proposed Resource Management Plan and Final Environmental Impact Statement. Department of the Interior, Colorado State Office, Montrose District. 195pp.

Bureau of Land Management (BLM). 1989. Uncompahgre Basin Resource Management Plan and Record of Decision. U.S. Department of the Interior, Colorado State Office, Montrose District. 56pp.

Bureau of Land Management. 2003. Environmental Assessment Record for Eriogonum pelinophilum.

Carpenter, A. and T. Schultz. 1994. Population Dynamics, Growth and Reproduction of the Clay-loving Wild Buckwheat (Eriogonum pelinophilum) at Wacker Ranch in Montrose County, Colorado.

Cline, A.J., Spears, F. Mehaffey, E. Kubin, R. Franklin and C. Pachek. 1967. Soil Survey of the Delta-Montrose Area, Colorado. U.S. Department of Agriculture - Soil Conservation Service. U.S. Government Printing Office, Washington, D.C. 73pp.

Coles, J. 2003. Personal communication with Colorado Natural Heritage Program.

Colorado Climate Center. 1984. Colorado Average Annual Precipitation 1951-1980. Colorado State University, Ft. Collins.

Colorado Native Plant Society. 1989. Rare plants of Colorado. Rocky Mountain Nature Association, Colorado Native Plant Society, Estes Park, Colorado. 73 pp.

Colorado Natural Areas Program (CNAP). Life History Characterisitics and Habitat Requirements for ERIOGONUM PELINOPHILUM and Protection of Known Populations; 3 reports: i) Program Narrative, Undated ii) Performance Report 1987 iii) Performance Report 1988. All unpublished.

Elliott, B. A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

Ferguson, J. 2003. Personal communication with CNHP staff.

Ferguson, J. 2007. Summer 2007 Clay-Loving Wild Buckwheat (Eriogonum pelinophilum) Field Surveys, Including an Assessment of the Potential Effects of Livestock Grazing on this Species within the Colona LHA.

Flora of North America Editorial Committee. 2005. Flora of North America North of Mexico. Vol. 5. Magnoliophyta: Caryophyllidae: Caryophyllales, Polygonales, and Plumbaginales. Oxford Univ. Press, New York. vii + 656 pp.

Graham, S. 1984 July 18. Delta plant declared endangered. Rocky Mountain News.

Kartesz, J. T. 1999. Comments regarding taxa 1-187 [of list supplied by TNC]. Unpublished, Biota of North America Program, North Carolina Botanical Garden, Chapel Hill, N.C., Nov. 25, 1999.

Kartesz, J.T. 1994. A synonymized checklist of the vascular flora of the United States, Canada, and Greenland. 2nd edition. 2 vols. Timber Press, Portland, OR.

Kartesz, J.T. 1999. A synonymized checklist and atlas with biological attributes for the vascular flora of the United States, Canada, and Greenland. First edition. In: Kartesz, J.T., and C.A. Meacham. Synthesis of the North American Flora, Version 1.0. North Carolina Botanical Garden, Chapel Hill, N.C.

Lyon, P. 2003. Personal communication with Colorado Natural Heritage Program.

Lyon, P. 2008. Monitoring of Eriogonum pelinophilum at the Wacker Ranch, Montrose, Colorado.

Mueller-Dumbois, D. and H. Ellenberg. 1974. Aims and Methods of Vegetation Ecology. Wiley and Sons, Inc.

NatureServe. Unpublished. Concept reference for taxa for which no reference which describes the circumscription has been recorded; to be used as a placeholder until such a citation is identified.

Neely, B., S. Panjabi, E. Lane, P. Lewis, C. Dawson, A. Kratz, B. Kurzel, T. Hogan, J. Handwerk, S. Krishnan, J. Neale, and N. Ripley. 2009. Colorado Rare Plant Conservation Strategy, Developed by the Colorado Rare Plant conservation Initiative. The Nature Conservancy, Boulder, Colorado, 117 pp.

Neely, E.E. 1985. Site Conservation Summary for Wacker's Ranch. Unpublished report for the Nature Conservancy, Boulder, Colorado.

O'Kane, S. L., Jr. 1985. Endangered Species Information System, Species Biology Workbook for ERIOGONUM PELINOPHILUM. U.S. Fish and Wildlife Service.

O'Kane, S.L. 1988. Colorado's rare flora. Great Basin Naturalist 48(4): 434-484.

Potter, L. D., R. C. Reynolds, and E. T. Louderbough. 1985. Mancos shale and plant community relationships: Analysis of shale, soil, and vegetation transects. Journal of Arid Environments 9:147-165.

Potter, L.D., R.C. Reynolds Jr., and E.T. Louderbaugh. 1985. Mancos Shale and plant community relationships: field observations. Journal of Arid Environments. 9:137-145.

Reveal, J. 2003. Personal communiction with Colorado Natural Heritage Program.

BLM_0037940

Reveal, J.L. 1973. A new subfruticose Eriogonum (Polygonaceae) from western Colorado. Great Basin Naturalist 33:120-2.

Reveal, J.L. 2006. On the Status of Eriogonum pelinophilum Reveal (Polygonaceae Juss.: subf. Eriogonoideae Arn.)

Reveal, James L. 1973. A new subfruticose Eriogonum (Polygonaceae) from western Colorado. Great Basin Naturalist. 33:120-2.

Rocky Mountain Society of Botanical Artists. 2009. RARE Imperiled Plants of Colorado, a traveling art exhibition. Exhibition catalogue developed by the Denver Botanic Gardens and Steamboat Art Museum.

Spackman, S., B. Jennings, J. Coles, C. Dawson, M. Minton, A. Kratz, and C. Spurrier. 1997. Colorado rare plant field guide. Prepared for Bureau of Land Management, U.S. Forest Service and U.S. Fish and Wildlife Service by Colorado Natural Heritage Program.

Spinks, J. 1991. Clay loving wild buckwheat recovery plan. Unpublished report prepared for the US Fish and Wildlife Service.

U.S. Fish and Wildlife Service (USFWS). 1988. Clay-loving Wild-buckwheat Recovery Plan. U.S. Fish and Wildlife Service, Denver, Colorado.

U.S. Fish and Wildlife Service. 1984. Final rule to determine Eriogonum pelinophilum to be an endangered species. Federal Register 49(136): 28562-28565.

USDA, NRCS. 2013. The PLANTS Database. National Plant Data Team, Greensboro, NC 27401-4901 USA.

Weber, W. A. and R. C. Wittmann. 2012. Colorado Flora, Western Slope, A Field Guide to the Vascular Plants, Fourth Edition. Boulder, Colorado. 532 pp.

Weber, W.A. 1987. Colorado flora: Western slope. Colorado Associated University Press. Boulder. 530 pp.

West, R. 2003. Personal commuication with CNHP staff.

## Last Updated

2014-11-20

- Colorado.gov

**Colorado** The Official State Web Portal
Get Help Search    SEARCH

C O L O R A D O
DEPARTMENT OF
AGRICULTURE

- About Us
- I'm a Producer
- I'm a Consumer
- Learn about Ag
- Divisions
- Newsroom
- Contact Us
- Site Map

- Home
- I'm a Producer
- Industry Information
- Colorado Beef Exports

- Best Management Practices
- FAQ
- Forms & Downloads
- Industry Assistance
- Industry Information
  - Agricultural Industries
  - Brands
  - Calendar
  - **Colorado Beef Exports**
  - Conservation
  - Food
  - Governor's Forum on Colorado Agriculture
  - In The News
  - Inside Ag Newsletter
  - Livestock
  - Missing or Stolen Livestock
  - National Ag Statistics Service-Colorado Office
  - Plant Related
  - South Platte Task Force
  - Weights & Measures
- Inspections
- Laboratory Services
- Laws
- Online Services
- Rules & Regulations
- Related Links
- Contact Us

COLORADO
DEPARTMENT OF
AGRICULTURE
Text

Colorado Beef Exports

**Colorado's Growth in Beef Exports Continue to Outpace Total U.S. Exports**

BLM_0037942

Exports of beef from Colorado surged 55 percent in 2008 to $497 million.  Colorado's top three markets represented over 91 percent of total exports
and in each market Colorado is the number one or two supplier.  Exports of beef from Colorado increased at a rate 33 percent faster than total U.S.
beef exports, which topped $3 billion in 2008.

**Total Exports of Beef from Colorado**
Value in US$ Millions



**US Beef Exports By State**
Value in US$ Millions



**Exports of Colorado Beef by Country**
Value in US$ millions



Exports of beef from Colorado are comprised of fresh beef (chilled, not frozen), frozen beef and beef variety meats.  Fresh beef exports from
Colorado represented 81 percent of beef exports, frozen beef represented 14 percent and variety meats represented 5 percent of the state's beef
exports.

Exports of beef to Mexico grew by over 37 percent in 2008 to $206 million and Mexico continued in 2008 as the top export market for Colorado
beef.  Colorado's beef industry supplied over 21 percent of all beef exports from the U.S. to Mexico and was second only to Texas as a beef supplier
to Mexico.

Canada remained Colorado's second largest export market for beef, growing 36 percent in 2008 to $171 million.  Colorado ranks first among all
states as a supplier of beef to Canada, supplying 28 percent of all beef imported from the U.S. by Canada.

Japan's imports of beef from Colorado grew 122 percent to $76 million with the partial opening of its market to U.S. and Colorado beef.  Colorado
ranked second among all states as a supplier of beef to Japan and accounted for 20 percent of total U.S. beef exports to Japan in 2008.  Colorado's
beef industry looks forward to the full opening of the Japan market which should allow Japan's imports to return to and exceed pre-2003 levels.

Korea was Colorado's fourth largest beef export market.  With the reopening of the Korean market to Colorado and U.S. beef in mid-2008, exports
of beef from Colorado grew from $2.1 million to $30.4 million.  Colorado ranked as the top supplier among all states of fresh beef exports to Korea
in 2008, supplying over 43 percent of the fresh beef exports from the U.S. to Korea.

BLM_0037943

### Looking Forward

Colorado's beef exports are now 33 percent higher than in 2003 when almost all major markets closed to imports of U.S. beef.  Colorado's beef industry looks forward to continued growth of exports to Korea and is optimistic about the potential for a full reopening of the Japanese market. China also holds significant potential but has yet to agree to internationally accepted protocols that would allow for a resumption of beef imports from the U.S.

February 2009
Further information contact:
Tim Larsen, CDA Senior International Marketing Specialist
tim.larsen@ag.state.co.us

Colorado Department of Agriculture · 700 Kipling Street · Suite 4000 · Lakewood, CO 80215-8000 ·
Divisions · Staff Directory · Site Map · Privacy & Security Policy

BLM_0037944

# STATE OF COLORADO



# 2010

# FORTIETH ANNUAL REPORT

## TO THE
## GOVERNOR AND THE GENERAL ASSEMBLY

Department of Local Affairs

Division of Property Taxation

BLM_0037945

BLM_0037946



John W. Hickenlooper, Governor

**Department of Local Affairs**
Reeves Brown, Executive Director

**Division of Property Taxation**
JoAnn Groff, Property Tax Administrator

April 30, 2011

The Honorable John Hickenlooper
   Governor of Colorado
     and
The General Assembly of the
   State of Colorado
200 E. Colfax Avenue
Denver, CO  80203

Governor Hickenlooper and Members of the General Assembly:

    We are submitting the Fortieth Annual Report in compliance with 39-2-119, C.R.S.  In addition to providing listings of assessed values in the counties and property tax revenues of the local taxing jurisdictions, the report contains statistical and summary information.

Respectfully submitted,

JoAnn Groff

JAG:jr

---



BLM_0037947

BLM_0037948

# REQUEST FOR ADDITIONAL COPIES OF 2010 ANNUAL REPORT

State of Colorado                                Date _____
Division of Property Taxation                    Department of Local Affairs
1313 Sherman St., #419                               (303) 866-2371
Denver, CO  80203

One copy of the 2010 Annual Report is provided free to your company or organization.
Each additional copy is $10.00.  Make checks payable to State of Colorado, Department of
Local Affairs.

Name _____

Company/Organization _____

Address _____

City _____ State _____ Zip _____ Phone No._____

2009 Annual Report _____ No. Copies _____ $10 each $ _____
                                                                    Amount Enclosed
Previous years reports: (NOTE:  Some reports are no longer available)

_____  _____  _____
Year                           No. of Copies     1 Free $10 each additional

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## NOTICE

To receive a copy of the 2011 State of Colorado Property Tax Annual Report detach and
return the request card below.  **No 2011 report will be forwarded without this request on
file.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Division of Property Taxation                    Date_____
1313 Sherman St., #419
Denver, Co  80203

## REQUEST FOR DPT FORTY-FIRST ANNUAL REPORT (2011)

The Annual Report is available on compact disk (CD) or in printed format.  In addition, it
can be found on our web site at:  www.dola.state.co.us/propertytax/index.htm.

Please choose:  Paper Copy _____ or CD _____

Please send the 2011 Annual Report to the Governor and the General Assembly to:
Name _____ Organization _____

Address _____ Phone_____

City _____State _____ Zip Code _____

BLM_0037949

**Place
Postage
Here**

**Division of Property Taxation
1313 Sherman St., #419
Denver, CO  80203**

BLM_0037950

# TABLE OF CONTENTS

**SECTION I**                                                              **PAGE**
   **STATE AND COUNTY ADMINISTRATION**
      State Agencies                                               3
      County Assessors                                             4

**SECTION II**
   **ADMINISTRATION**
      COLORADO PROPERTY TAXES
         Overview                                                 7
         State Board of Equalization                              7
            Membership                                           7
            Duties and Responsibilities                          7
            2010 Enforcement and Repayment Actions               8
            2009 Enforcement and Repayment Actions               8
            2008 Enforcement and Repayment Actions               8
            2007 Enforcement and Repayment Actions               8
            2006 Enforcement and Repayment Actions               9
         Division of Property Taxation                            9
         2010 Value Information                                   10
         Residential Assessment Rate                              18
         Shift of Assessed Values and Tax Burden                  18
         Protests, Appeals & Abatements                           21
         Abatements, Refunds and Cancellations of Taxes Reported
            by Treasurers for 2010, 2009 and 2008                24
         Senior Citizen Exemption                                 25
         Disabled Veteran Exemption                               25
         Possessory Interest                                      25
      2010 PROPERTY TAX LEGISLATION
         Senate Bills                                             26
         House Bills                                              28

**SECTION III**
   **ASSESSED VALUATION ABSTRACT DATA**
      Abstract for Years 1873 through 2010                         36
      Abstract Data by Class of Property                          38
      Abstract Data for Type of Property                          39

**SECTION IV**
   **REVENUE DERIVED FROM PROPERTY TAX**
      By Years 1950 through 2010                                  42
      Revenue Analysis for 2010                                   43
      Distribution of Revenue                                     44

BLM_0037951

## SECTION V
### PUBLIC UTILITIES ASSESSED BY STATE

Assessed Valuation Comparison by County 2009 to 2010    46
Assessed Valuation Comparison by Company 2009 to 2010    48
Summary of Utility Valuations 2010    62

## SECTION VI
### TAXABLE REAL AND PERSONAL PROPERTY ASSESSED BY COUNTIES

Vacant Land    69
Residential    83
Commercial    103
Industrial    125
Agricultural    136
Natural Resources    153
Producing Mines    162
Oil and Gas    165
State Assessed    174
County Valuation by Classes 2010 to 2009    176
School Districts Assessed Valuation by Class by County    180
Total School District Assessed Valuation by Class    188
Cities and Towns Assessed Valuation by County    194
Cities and Towns Assessed Valuation by Class    203

## SECTION VII
### EXEMPT REAL AND PERSONAL PROPERTY BY CLASS AND COUNTY

Exempt Property by Type    207
Exempt Property by Subclass    236

## SECTION VIII
### SUMMARIES OF ASSESSMENTS FOR ALL PROPERTIES

Summary of Taxable & Exempt Property Valuations 2010    242
Summary of Taxable & Exempt Property Valuations 2009    244

## SECTION IX
### LOCAL GOVERNMENT CORPORATIONS

Active Colorado Municipalities    248
In-Active Colorado Municipalities    252
Local Improvement and Service Districts    253
Colorado Local Governments    292

## SECTION X
### CERTIFICATION OF LEVIES AND REVENUES BY COUNTY

| | | | | | |
|---|---|---|---|---|---|
| Adams | 296 | Fremont | 498 | Morgan | 644 |
| Alamosa | 320 | Garfield | 504 | Otero | 650 |
| Arapahoe | 324 | Gilpin | 512 | Ouray | 654 |
| Archuleta | 354 | Grand | 516 | Park | 658 |
| Baca | 358 | Gunnison | 524 | Phillips | 664 |
| Bent | 364 | Hinsdale | 530 | Pitkin | 668 |
| Boulder | 368 | Huerfano | 534 | Prowers | 676 |
| Broomfield | 380 | Jackson | 538 | Pueblo | 682 |
| Chaffee | 388 | Jefferson | 542 | Rio Blanco | 688 |
| Cheyenne | 392 | Kiowa | 560 | Rio Grande | 694 |
| Clear Creek | 396 | Kit Carson | 564 | Routt | 698 |
| Conejos | 400 | Lake | 570 | Saguache | 706 |
| Costilla | 404 | La Plata | 574 | San Juan | 710 |
| Crowley | 408 | Larimer | 580 | San Miguel | 714 |
| Custer | 412 | Las Animas | 598 | Sedgwick | 720 |
| Delta | 416 | Lincoln | 602 | Summit | 724 |
| Denver | 422 | Logan | 608 | Teller | 730 |
| Dolores | 432 | Mesa | 614 | Washington | 736 |
| Douglas | 436 | Mineral | 624 | Weld | 742 |
| Eagle | 456 | Moffat | 628 | Yuma | 768 |
| Elbert | 468 | Montezuma | 632 | | |
| El Paso | 476 | Montrose | 638 | | |

## SECTION XI
### REVENUE AND LEVY

| | |
|---|---|
| Revenue for All Purposes | 774 |
| Total Revenue and Average Mill Levy by County | 778 |
| Total Valuation of School Districts | 780 |
| Total Valuation of Municipalities | 784 |
| Petition for Abatement and Refund | 792 |

## SECTION XII
### REVENUES BY TAXING CLASSIFICATION

| | |
|---|---|
| 2010 Property Tax Revenues by Taxing Classification | 794 |
| 2010 Percent Property Tax Revenues by Taxing Classification | 796 |
| 2010 County Property Tax Revenues by Type of Expenditure | 798 |
| 2010 Percent County Property Tax Revenues by Type of Expenditure | 800 |
| 2010 County Property Tax Mill Levies by Type of Expenditures | 802 |
| 2010 Special District Property Tax Revenues by Type of District by County | 804 |
| 2010 Percent Special District Property Tax Revenues by Type of District by County | 806 |

BLM_0037954

# Section I

# State and County Administration

BLM_0037955

2

BLM_0037956

# STATE AND COUNTY ADMINISTRATION

# STATE AGENCIES

# PROPERTY TAX YEAR 2010

# DEPARTMENT OF LOCAL AFFAIRS

**Executive Director**
**Susan E. Kirkpatrick**

## DIVISION OF PROPERTY TAXATION

**JoAnn Groff**
**Property Tax Administrator**

## ADVISORY COMMITTEE TO THE
## PROPERTY TAX ADMINISTRATOR

**Damon Barry, Chairman**
**Christopher M. Woodruff**
**Naomi Keys**
**Virginia Patton**
**Doralyn Genova**

## STATE BOARD OF EQUALIZATION

**Charles Brown, Chairman, Appointee of Governor**
**Sandra M. Adams, Vice Chairman, Appointee of Governor**
**Craig R. Welling, Designee of Governor Ritter**
**Wally Grant, Designee of the President of the Senate, Brandon Shaffer**
**Rep. Joel Judd, Designee of the Speaker of the House, Terrence Carroll**

BLM_0037957

## COUNTY ASSESSORS

| Cty No | County | County Seat | Assessor |
|--------|--------|-------------|----------|
| 1 | Adams | Brighton 80601 | Gilbert Reyes |
| 2 | Alamosa | Alamosa 81101 | Sandra Hostetter |
| 3 | Arapahoe | Littleton 80166 | Corbin Sakdol |
| 4 | Archuleta | Pagosa Springs 81147 | Keren Prior |
| 5 | Baca | Springfield 81073 | Gayla Thompson |
| 6 | Bent | Las Animas 81054 | Guy Wagner |
| 7 | Boulder | Boulder 80306 | Jerry Roberts |
| 80 | Broomfield | Broomfield 80020 | John Storb |
| 8 | Chaffee | Salida 81201 | Brenda J. Mosby |
| 9 | Cheyenne | Cheyenne Wells 80810 | Ambie Cullens |
| 10 | Clear Creek | Georgetown 80444 | Diane Settle |
| 11 | Conejos | Conejos 81129 | Naomi Keys |
| 12 | Costilla | San Luis 81152 | R. Thomas Aragon |
| 13 | Crowley | Ordway 81063 | Warren H. Davis |
| 14 | Custer | Westcliffe 81252 | J. D. Henrich |
| 15 | Delta | Delta 81416 | Debbie Griffith |
| 16 | Denver | Denver 80202 | Paul Jacobs |
| 17 | Dolores | Dove Creek 81324 | Berna Ernst |
| 18 | Douglas | Castle Rock 80104 | Teri Cox |
| 19 | Eagle | Eagle 81631 | Mark Chapin |
| 20 | Elbert | Kiowa 80117 | P. J. Trostel |
| 21 | El Paso | Colorado springs 80903 | Mark Lowderman |
| 22 | Fremont | Canon City 81212 | Stacey Seifert |
| 23 | Garfield | Glenwood Springs 81601 | John Gorman |
| 24 | Gilpin | Central City 80427 | Anne Schafer |
| 25 | Grand | Hot Sulphur Springs 80451 | Tom Weydert |
| 26 | Gunnison | Gunnison 81230 | Kristy McFarland |
| 27 | Hinsdale | Lake City 81235 | Amy B. Wilcox |
| 28 | Huerfano | Walsenburg 81089 | Louise Sandoval |
| 29 | Jackson | Walden 80480 | Kerry Moran |
| 30 | Jefferson | Golden 80491 | Jim Everson |
| 31 | Kiowa | Eads 81036 | Penny D. Baker |
| 32 | Kit Carson | Burlington 80807 | Abbey Mullis |
| 33 | Lake | Leadville 80461 | Howard Tritz |
| 34 | La Plata | Durango 81301 | Craig Larson |
| 35 | Larimer | Fort Collins 80522 | Steve Miller |
| 36 | Las Animas | Trinidad 81082 | Dan Espinoza |
| 37 | Lincoln | Hugo 80821 | Jeremiah Higgins |
| 38 | Logan | Sterling 80751 | Peggy Michaels |
| 39 | Mesa | Grand Junction 81501 | Barbara Brewer |
| 40 | Mineral | Creede 81130 | Wendy Leggitt |
| 41 | Moffat | Craig 81625 | Suzanne Brinks |
| 42 | Montezuma | Cortez 81321 | Mark Vanderpool |
| 43 | Montrose | Montrose 81401 | Bradley Hughes |
| 44 | Morgan | Fort Morgan 80701 | Robert L. Wooldridge |
| 45 | Otero | La Junta 81050 | Ken Hood |
| 46 | Ouray | Ouray 81427 | Susie Mayfield |
| 47 | Park | Fairplay 80440 | Dave Wissel |
| 48 | Phillips | Holyoke 80734 | Douglas Kamery |
| 49 | Pitkin | Aspen 81611 | Tom Isaac |
| 50 | Prowers | Lamar 81052 | Andy Wyatt |
| 51 | Pueblo | Pueblo 81003 | Frank Beltran |
| 52 | Rio Blanco | Meeker 81641 | Renae T. Neilson |
| 53 | Rio Grande | Del Norte 81132 | T. Joe Dominguez |
| 54 | Routt | Steamboat Springs 80477 | Gary Peterson |
| 55 | Saguache | Saguache 81149 | Jacqueline Stephens |
| 56 | San Juan | Silverton 81433 | Judith K. Zimmerman |
| 57 | San Miguel | Telluride 81435 | Peggy Kanter |
| 58 | Sedgwick | Julesburg 80737 | Robert Johnson |
| 59 | Summit | Breckenridge 80424 | Beverly Breakstone |
| 60 | Teller | Cripple Creek 80813 | Tom King |
| 61 | Washington | Akron 80720 | Larry Griese |
| 62 | Weld | Greeley 80631 | Chris Woodruff |
| 63 | Yuma | Wray 80758 | Cindy Taylor |

BLM_0037958

# Section II

# Administration

BLM_0037959

BLM_0037960

# COLORADO PROPERTY TAX

## OVERVIEW

In Colorado, the authority for property taxation is both constitutional and statutory. Article X of the Colorado Constitution provides that all property is taxable unless declared exempt by the Constitution, and that the actual value of taxable property shall be determined under the general laws to secure just and equalized valuations. The specific statutes pertaining to property taxation are found in articles 1 through 14 of title 39 of the Colorado Revised Statutes.

Under the general laws of Colorado, county assessors are required to value all taxable property within their county boundaries. The State Board of Equalization (state board) has supervision over the administration of all laws concerning the valuation and assessment of taxable property and the levying of property taxes. The Division of Property Taxation (Division), under direction of the Property Tax Administrator (Administrator), coordinates the implementation of property tax law throughout Colorado's sixty-four counties.

The Colorado property tax system provides revenue exclusively for local government services. The largest share of property tax revenue (49.9 percent) goes to support the state's public schools. County governments claim the next largest share (24.9 percent), followed by special districts (18.8 percent), municipal governments (5.2 percent), and junior colleges (1.2 percent).

Revenue derived from 2010 property taxes (payable 2011) will decrease statewide for both counties and junior colleges, while it will increase slightly for school districts, municipalities, and special districts. The decrease for counties and junior colleges was caused by a 47 percent drop in the value of oil and gas property, which is mostly located in unincorporated areas.

**Table 1** lists the percentage change in property tax revenue between taxes payable in 2010 and taxes payable in 2011.

TABLE 1

| REVENUE CHANGE BY ENTITY TYPE | |
|---|---|
| Tax Years 2009-2010 | |
| **Taxing Entity** | **% Change** |
| School District K-12 | 0.7% |
| Junior Colleges | -14.7% |
| Counties | -2.4% |
| Municipalities | 1.1% |
| Special Districts | 0.6% |
| **Combined Change** | **-0.3%** |

## STATE BOARD OF EQUALIZATION

The State Board of Equalization consists of the Governor, the President of the Senate, the Speaker of the House of Representatives, or their designees, and two members appointed by the Governor with consent of the Senate. Each appointed member must be a qualified appraiser, a former assessor, or a person who has knowledge and experience in property taxation. The 2010 State Board of Equalization saw a changing of the guard with Lyle Kyle's retirement. Lyle Kyle, appointee of the Governor, started serving on the board in 1986 and served as Chairman of the Board from 1993 until his retirement. Charles Brown, formerly Vice-Chairman and appointee of the Governor was selected to be the new Chairman at the October 5, 2010, meeting. The remaining state board members for 2010 were Craig R. Welling, designee of Governor Bill Ritter, Jr.; Wally Grant, designee of Brandon Shaffer, President of the Senate; Representative Joel Judd, designee of Terrance D. Carroll, Speaker of the House of Representatives; and Sandra M. Adams, appointee of Governor Bill Ritter, Jr.

## Duties and Responsibilities

The state board supervises the administration of property tax laws and the equalization of the values of classes and subclasses of taxable property. Duties of the state board are found primarily in article X, sections 3 and 15 of the Colorado Constitution and title 39, articles 1 and 9 of the Colorado Revised Statutes.

BLM_0037961

Among its duties, the state board reviews the findings and conclusions of the annual study contractor and orders reappraisals in counties found not in compliance. The annual study was initiated by a 1982 amendment to the Colorado Constitution to ensure that all assessors value property at the same level of value using standardized procedures and statistical measurements. The study is conducted by an independent auditing firm contracted by the Director of Research, Colorado Legislative Council, § 39-1-104(16), C.R.S. The study and the resulting orders of reappraisal are the primary means of achieving statewide equalization.

The importance of the state board's equalization function is due in part to the relationship that exists between assessed values and state aid to schools. Generally, if the property in a school district is under-assessed, it is likely that the district will receive more state revenue than it is entitled. When the results of a reappraisal order indicate that the affected school district(s) received too much state revenue, the state board will order the county (not the school district) to pay back the excess funding. During the 1980s and early 1990s, this occasionally required the repayment of substantial revenue to the state. In more recent years however, significant improvements in the quality of county assessments have resulted in far fewer reappraisal orders and smaller repayments of excess state aid to schools.

The state board also reviews county Abstracts of Assessment, decisions of county boards of equalization (county boards) and the policies and recommendations of the Property Tax Administrator.

## STATE BOARD ENFORCEMENT

The following is a brief history of recent enforcement actions by the State Board of Equalization.

## 2010 Enforcement and Repayment

On October 5, 2010, the state board met to review the findings and conclusions of Wildrose Appraisal, Incorporated, annual study contractor for Legislative Council. Based on the findings, the state board issued a second order to Montezuma County to reappraise oil and gas personal property utilizing the methodology prescribed in the

Basic Equipment Lists (BELs) and valuation grids published by the Division of Property Taxation in the Assessor's Reference Library, Volume 5. The board also met in executive session to discuss the pending District Court case resulting from a similar order that the board had issued to Montezuma County in 2009.

**NOTE:** The 2010 order was also appealed to the District Court. The District Court issued an order holding the 2010 appeal in abeyance until the decision of the 2009 case has been delivered.

## 2009 Enforcement and Repayment

On October 27, 2009, the state board met to review the findings and conclusions of Wildrose Appraisal, Incorporated, annual study contractor for Legislative Council. Based on the findings, the state board issued a reappraisal order for oil and gas personal property in Montezuma County.

**NOTE:** This order was appealed to the District Court.

The board also reviewed the status of its 2005 recommendation that Jackson County implement a five-year cycle for physical inspections of rural outbuildings. The Jackson County Assessor indicated that she had completed the physical inspections of all rural outbuildings in Jackson County.

## 2008 Enforcement and Repayment

On October 8, 2008, the state board met to review the findings and conclusions of Rocky Mountain Valuation Specialists, Inc., annual study contractor for Legislative Council. Based on these findings, the state board issued no orders of reappraisal.

The board also reviewed the status of its 2005 recommendation for Jackson County. The 2005 recommendation asked Jackson County to implement a five-year cycle for physical inspections of rural outbuildings. The Jackson County Assessor indicated that she only had four physical inspections left to complete the project.

## 2007 Enforcement and Repayment

On October 10, 2007, the state board met to review the findings and conclusions of Rocky Mountain Valuation Specialists, Inc., annual

BLM_0037962

study contractor for Legislative Council. Based on these findings, the state board issued no orders of reappraisal. It did, however, review the status of a prior reappraisal order issued to Costilla County.

On October 11, 2006, the state board determined that the order it had issued in 2005 for the reappraisal of single-family residential property had been successfully completed, and it ordered Costilla County to pay back the excess state aid to schools and supervision costs during 2007. At the October 2007 state board hearing, Division staff testified that the county had paid back the entire $968.09 of excess state aid to schools, with interest, and the Costilla County Deputy Assessor documented the repayment of all but $307 of the supervision costs. In accordance with the "Bledsoe Plan" described below, the supervision costs were repaid through investments in training and equipment within the Costilla County Assessor's Office, and the remaining $307 was slated to be spent on additional training.

The board reviewed the progress of its 2005 recommendations to both Rio Grande and Jackson Counties. The state board's 2005 recommendation to Rio Grande County asked that the county determine the productive capability of agricultural land by implementing the National Resource Conservation Service (NRCS) soil survey by 2007 for tax year 2008. Staff of the Division and Rocky Mountain Valuation Specialists, Inc., reported that Rio Grande County had completed the soil survey.

The state board also reviewed Jackson County's progress toward implementing a five-year cycle for physical inspections of rural outbuildings. The Jackson County Assessor indicated that as of October 10, 2007, 45 percent of the inspections had been completed.

## 2006 Enforcement and Repayment

On October 11, 2006, the state board met to review the findings and conclusions of Rocky Mountain Valuation Specialists, Inc., annual study contractor for Legislative Council. Based on these findings, the board issued no orders of reappraisal. It did, however, review the results of the reappraisal order given to Costilla County in 2005 for all single-family residential properties in the county.

The board determined that the reappraisal was successfully completed, and ordered the county to make the following payback and reimbursement.

| County | Supervision Reimbursement | State Aid To Schools Payback |
|--------|---------------------------|------------------------------|
| Costilla | $17,964.97 | $968.09* |

*   + interest on state aid payback based on the rate set by the Colorado Banking Commissioner, which can be reduced by three percent under the authority of the state board.

The board approved Costilla County's request to repay the excess state equalization payments to schools by the end of 2007. In addition, the state board approved a three percentage point reduction to the interest rate, resulting in a rate of six percent.

The board also approved the county's request to employ the "Bledsoe Plan" for the repayment of the cost of supervision. Under the Bledsoe Plan, a county is allowed to pay back the supervision costs by adding the money to the assessor's budget, thereby enhancing the operational effectiveness of the assessor's office.

## DIVISION OF PROPERTY TAXATION

Under the general laws of Colorado, the Property Tax Administrator (Administrator) heads the Division of Property Taxation. The Administrator is appointed by the State Board of Equalization to serve a five-year term, and until a successor is appointed and qualified.

A primary responsibility of the Division is to administer the implementation of property tax law throughout the 64 counties so that valuations are fair, uniform, and defensible, thereby ensuring that each property class contributes only its fair share of the total property tax revenue. In other words, the Division's goal is equalization of valuation and proper distribution of property taxes throughout the state.

The Division is comprised of four sections: Administrative Resources, Appraisal Standards, Exempt Properties, and State Assessed Properties.

BLM_0037963

## Administrative Resources

Administrative Resources prepares and publishes administrative manuals, procedures and instructions. It conducts schools and seminars regarding the administrative functions of the assessors' offices. It conducts field studies and provides statewide assistance in tax increment financing, manufactured housing, title conveyance, mapping, abstracting valuations, certification of values to taxing entities, and workforce analysis studies. The section also investigates taxpayer or taxing entity complaints. It is responsible for various studies and reports such as the residential assessment rate study and the Property Tax Administrator's <u>Annual Report to the Governor and the General Assembly</u>. It also coordinates with agencies having an interest in property taxation. In addition, the field staff works closely with assessors in all areas of property taxation.

## Appraisal Standards

Appraisal Standards prepares and publishes appraisal manuals, procedures and instructions. It holds schools and seminars regarding all areas of appraisal. It conducts field studies and provides statewide assistance in agricultural land classification, natural resources and personal property valuation, as well as assistance in the valuation of residential, commercial and industrial properties. The section assists in reappraisal efforts, reviews internal appraisal forms used by assessors, and investigates and responds to taxpayer complaints.

## Exempt Properties

The Exemptions Section is responsible for determining qualification for exemption from property taxation for properties that are owned and used for religious, charitable and private school purposes. Exempt property owners are required to file annual reports with the Division to continue exemption. The section provides assistance to counties and taxpayers with inquiries about exempt properties, conducts hearings on denied exemption applications and revocations of exemption, and defends appeals of such denials and revocations.

## State Assessed Properties

The State Assessed Section values all public utilities, rail transportation companies, and airlines doing business in Colorado. The company valuations are then apportioned to the counties for collection of local property tax. The section conducts research projects in connection with state assessed companies; assists counties and taxpayers with inquiries on the assessment of public utilities, rail transportation companies, and airlines; hears protests of the assigned values and defends appeals of such valuations.

## 2010 VALUE INFORMATION

Taxable real property classified as residential, commercial, industrial, agricultural, and vacant land, is subject to revaluation by county assessors every two years. For this property, the 2010 tax year was a non-reappraisal year, and for most properties, the actual values remained the same as they had been for tax year 2009.

Taxable property not subject to the biennial reassessment cycle is valued every year. This includes all property classified as state assessed; land and leaseholds classified as oil and gas, natural resources, and producing mines; and all subclasses of personal property.

For 2010, Colorado assessed values decreased by $5.1 billion, representing a 5.3 percent reduction from the prior year. The decrease was attributable to a 47.3 percent decline to the value of the oil and gas class caused by lower commodity prices.

BLM_0037964

Table **2** displays the changes to the total value of each property class.

TABLE 2

| VALUE CHANGES BY CLASS | | |
|---|---|---|
| Class | 2009-2010 Change | Class as % of Total |
| Vacant Land | -4.2% | 6.4% |
| Residential | 1.0% | 46.1% |
| Commercial | -0.8% | 29.3% |
| Industrial | 8.0% | 3.8% |
| Agricultural | 1.0% | 1.0% |
| Natural Resources | -5.1% | 0.4% |
| Producing Mines | 4.5% | 0.6% |
| Oil and Gas | -47.3% | 6.7% |
| State Assessed | 5.2% | 5.6% |
| **Net Total** | **-5.3%** | **100.0%** |

## Residential, Commercial, Industrial, and Vacant Land

The Colorado Constitution and statutes specify that real property classified as commercial, industrial and vacant land is valued by county assessors through consideration of the market, cost and income approaches to value. Residential property is valued solely by the market approach. For tax years 2009 and 2010, the actual values established for these properties represent their market value as of June 30, 2008.

Although 2010 was a non-reappraisal year, the values of some parcels were subject to change as a result of an appeal or abatement petition, the discovery of omitted property, or the occurrence of an "unusual condition." Colorado statute identifies a limited set of unusual conditions that necessitate a revaluation of the property during a non-reappraisal year. Examples include new construction, destroyed property, and changes to the property's use. The new values also reflect an appraisal date of June 30, 2008.

A portion of the commercial and industrial classes is comprised of personal property, which is subject to revaluation every year. Personal property accounts for 12.9 percent of the value of the commercial class and 49.9 percent of the value of the industrial class. The 8.0 percent increase to the total value of the industrial class is largely attributable to new personal property located at natural gas plants in Rio Blanco County.

Table 3 provides a by-county comparison of 2010 to 2009 values for the residential, commercial, and vacant land classes.

BLM_0037965

TABLE 3

| COUNTY | RESIDENTIAL CLASS | | | COMMERCIAL CLASS | | | VACANT LAND CLASS | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2009 | Change | 2010 | 2009 | Change | 2010 | 2009 | Change |
| Adams | 2,015,295,810 | 2,005,689,060 | 0.5% | 1,680,969,270 | 1,676,166,460 | 0.3% | 156,155,870 | 169,451,270 | -7.8% |
| Alamosa | 49,791,969 | 49,620,684 | 0.3% | 48,777,829 | 49,679,043 | -1.8% | 14,142,305 | 14,131,497 | 0.1% |
| Arapahoe | 3,988,026,170 | 3,955,280,450 | 0.8% | 3,346,834,380 | 3,356,710,690 | -0.3% | 236,088,290 | 256,650,870 | -8.0% |
| Archuleta | 190,620,740 | 185,556,060 | 2.7% | 55,862,090 | 55,573,680 | 0.5% | 139,357,470 | 140,435,830 | -0.8% |
| Baca | 6,184,864 | 6,119,320 | 1.1% | 5,273,108 | 5,318,745 | -0.9% | 313,988 | 306,559 | 2.4% |
| Bent | 7,780,068 | 7,783,383 | 0.0% | 19,149,797 | 20,131,371 | -4.9% | 426,439 | 429,259 | -0.7% |
| Boulder | 3,172,955,440 | 3,151,178,140 | 0.7% | 1,764,909,840 | 1,789,084,720 | -1.4% | 179,187,870 | 174,286,800 | 2.8% |
| Broomfield | 432,519,415 | 424,535,458 | 1.9% | 461,645,210 | 452,716,760 | 2.0% | 45,696,390 | 51,769,290 | -11.7% |
| Chaffee | 183,857,510 | 180,033,600 | 2.1% | 94,301,280 | 92,027,400 | 2.5% | 82,069,820 | 81,947,860 | 0.1% |
| Cheyenne | 3,468,771 | 3,400,816 | 2.0% | 3,517,409 | 3,332,495 | 5.5% | 221,099 | 225,209 | -1.8% |
| Clear Creek | 106,803,850 | 106,688,860 | 0.1% | 27,908,320 | 28,028,040 | -0.4% | 25,848,320 | 26,585,410 | -2.8% |
| Conejos | 26,882,628 | 26,304,148 | 2.2% | 4,498,032 | 4,731,297 | -4.9% | 9,296,355 | 9,414,931 | -1.3% |
| Costilla | 12,785,002 | 8,576,080 | 49.1% | 3,586,107 | 3,488,280 | 2.8% | 100,252,157 | 103,380,870 | -3.0% |
| Crowley | 5,890,071 | 5,896,339 | -0.1% | 20,218,509 | 20,201,753 | 0.1% | 305,957 | 313,248 | -2.3% |
| Custer | 53,536,500 | 52,342,270 | 2.3% | 7,615,600 | 8,080,830 | -5.8% | 24,508,740 | 24,716,500 | -0.8% |
| Delta | 174,448,480 | 172,684,260 | 1.0% | 67,435,070 | 68,063,080 | -0.9% | 32,522,100 | 33,209,000 | -2.1% |
| Denver | 4,574,934,180 | 4,546,921,570 | 0.6% | 6,104,234,510 | 6,153,135,030 | -0.8% | 219,158,050 | 238,222,210 | -8.0% |
| Dolores | 12,569,645 | 11,992,746 | 4.8% | 3,520,326 | 3,669,289 | -4.1% | 8,108,003 | 7,910,262 | 2.5% |
| Douglas | 2,833,355,670 | 2,802,092,260 | 1.1% | 1,466,126,830 | 1,468,078,660 | -0.1% | 328,783,960 | 338,494,900 | -2.9% |
| Eagle | 2,470,983,640 | 2,430,226,340 | 1.7% | 756,283,660 | 766,533,050 | -1.3% | 323,514,540 | 340,734,250 | -5.1% |
| El Paso | 3,727,014,550 | 3,695,866,590 | 0.8% | 2,190,288,680 | 2,203,595,620 | -0.6% | 378,608,170 | 408,458,840 | -7.3% |
| Elbert | 186,861,770 | 185,072,074 | 1.0% | 25,626,860 | 23,113,160 | 10.9% | 25,586,180 | 26,587,709 | -3.8% |
| Fremont | 200,886,660 | 198,549,420 | 1.2% | 80,425,310 | 80,556,890 | -0.2% | 49,630,020 | 50,614,970 | -1.9% |
| Garfield | 655,603,940 | 633,504,570 | 3.5% | 387,893,450 | 391,563,830 | -0.9% | 214,785,450 | 232,354,710 | -7.6% |
| Gilpin | 59,662,120 | 58,889,650 | 1.3% | 255,678,370 | 258,487,560 | -1.1% | 50,192,760 | 50,882,670 | -1.4% |
| Grand | 440,566,570 | 432,577,610 | 1.8% | 109,122,970 | 109,640,330 | -0.5% | 193,089,390 | 189,818,750 | 1.7% |
| Gunnison | 369,274,540 | 362,891,150 | 1.8% | 118,971,620 | 121,012,160 | -1.7% | 236,789,260 | 240,695,010 | -1.6% |
| Hinsdale | 30,479,600 | 29,972,520 | 1.7% | 7,918,090 | 7,904,060 | 0.2% | 21,028,160 | 21,954,370 | -4.2% |
| Huerfano | 37,154,055 | 36,111,307 | 2.9% | 21,542,784 | 20,065,298 | 7.4% | 19,030,637 | 19,749,379 | -3.6% |
| Jackson | 9,204,136 | 8,835,373 | 4.2% | 3,905,701 | 3,668,351 | 6.5% | 1,908,781 | 2,009,980 | -5.0% |
| Jefferson | 4,272,079,190 | 4,260,319,360 | 0.3% | 2,305,637,810 | 2,355,434,360 | -2.1% | 223,016,960 | 236,064,300 | -5.5% |
| Kiowa | 2,021,420 | 1,972,390 | 2.5% | 1,096,100 | 1,036,430 | 5.8% | 71,490 | 70,850 | 0.9% |
| Kit Carson | 20,892,443 | 20,911,097 | -0.1% | 35,806,336 | 35,844,649 | -0.1% | 901,256 | 905,354 | -0.5% |
| La Plata | 635,029,760 | 627,852,580 | 1.1% | 400,978,090 | 403,422,710 | -0.6% | 219,828,680 | 218,847,090 | 0.4% |
| Lake | 52,007,765 | 51,136,438 | 1.7% | 10,748,519 | 11,424,625 | -5.9% | 22,430,145 | 22,902,071 | -2.1% |
| Larimer | 2,221,433,310 | 2,204,408,320 | 0.8% | 1,317,134,220 | 1,336,388,540 | -1.4% | 285,159,470 | 308,321,990 | -7.5% |
| Las Animas | 56,915,090 | 56,460,960 | 0.8% | 37,775,460 | 37,052,210 | 2.0% | 20,504,930 | 21,234,270 | -3.4% |
| Lincoln | 11,944,300 | 11,787,328 | 1.3% | 14,046,567 | 14,723,160 | -4.6% | 1,536,950 | 1,563,800 | -1.7% |
| Logan | 59,135,430 | 58,816,000 | 0.5% | 41,308,780 | 42,353,640 | -2.5% | 2,727,670 | 2,775,880 | -1.7% |
| Mesa | 1,057,374,460 | 1,046,195,930 | 1.1% | 635,702,630 | 641,173,550 | -0.9% | 168,746,450 | 176,471,170 | -4.4% |
| Mineral | 16,489,530 | 15,974,390 | 3.2% | 6,048,940 | 6,315,640 | -4.2% | 8,295,150 | 8,078,330 | 2.7% |
| Moffat | 64,914,940 | 64,381,320 | 0.8% | 44,943,750 | 42,694,210 | 5.3% | 11,799,760 | 12,876,200 | -8.4% |
| Montezuma | 137,677,250 | 135,419,390 | 1.7% | 66,942,140 | 68,312,000 | -2.0% | 29,492,700 | 32,266,070 | -8.6% |
| Montrose | 263,052,510 | 259,953,240 | 1.2% | 177,699,750 | 178,598,510 | -0.5% | 71,089,940 | 74,270,940 | -4.3% |
| Morgan | 94,448,290 | 93,678,390 | 0.8% | 60,660,860 | 61,527,830 | -1.4% | 5,882,220 | 6,088,510 | -3.4% |
| Otero | 43,605,990 | 43,498,999 | 0.2% | 27,233,688 | 26,441,999 | 3.0% | 1,532,363 | 1,545,261 | -0.8% |
| Ouray | 92,212,500 | 89,660,520 | 2.8% | 33,497,890 | 33,563,570 | -0.2% | 72,169,750 | 74,180,560 | -2.7% |
| Park | 236,802,860 | 234,222,430 | 1.1% | 30,329,722 | 29,397,456 | 3.2% | 174,205,530 | 178,202,810 | -2.2% |
| Phillips | 14,461,060 | 14,303,310 | 1.1% | 11,539,280 | 11,624,230 | -0.7% | 321,930 | 339,480 | -5.2% |
| Pitkin | 2,578,516,740 | 2,550,405,870 | 1.1% | 668,528,380 | 680,069,030 | -1.7% | 399,516,200 | 406,076,730 | -1.6% |
| Prowers | 24,404,070 | 24,304,670 | 0.4% | 25,159,030 | 25,669,700 | -2.0% | 906,500 | 923,530 | -1.8% |
| Pueblo | 631,402,294 | 626,005,600 | 0.9% | 302,221,434 | 297,574,400 | 1.6% | 75,071,130 | 75,741,160 | -0.9% |
| Rio Blanco | 43,389,230 | 42,319,610 | 2.5% | 28,967,040 | 30,847,210 | -6.1% | 7,110,610 | 17,808,180 | -60.1% |
| Rio Grande | 65,653,148 | 64,464,000 | 1.8% | 43,478,539 | 43,905,650 | -1.0% | 40,770,972 | 41,468,190 | -1.7% |
| Routt | 759,436,989 | 732,016,880 | 3.7% | 294,350,125 | 297,637,390 | -1.1% | 238,318,815 | 251,066,630 | -5.1% |
| Saguache | 18,034,680 | 18,181,330 | -0.8% | 5,696,620 | 5,646,670 | 0.9% | 19,195,950 | 19,483,280 | -1.5% |
| San Juan | 14,790,910 | 14,761,670 | 0.2% | 10,560,920 | 10,794,000 | -2.2% | 19,153,610 | 20,738,610 | -7.6% |
| San Miguel | 537,203,510 | 522,459,540 | 2.8% | 125,536,060 | 150,066,900 | -16.3% | 245,391,020 | 253,580,560 | -3.2% |
| Sedgwick | 5,380,610 | 5,346,800 | 0.6% | 3,506,700 | 3,067,220 | 14.3% | 82,380 | 71,130 | 15.8% |
| Summit | 1,258,530,777 | 1,252,239,785 | 0.5% | 368,556,692 | 375,296,389 | -1.8% | 267,985,056 | 281,511,276 | -4.8% |
| Teller | 195,433,260 | 193,291,060 | 1.1% | 107,293,700 | 111,076,920 | -3.4% | 83,303,150 | 84,991,250 | -2.0% |
| Washington | 10,777,809 | 10,647,753 | 1.2% | 3,922,075 | 3,920,514 | 0.0% | 220,760 | 240,424 | -8.2% |
| Weld | 1,161,744,960 | 1,147,452,920 | 1.2% | 716,330,330 | 711,373,330 | 0.7% | 107,728,910 | 114,753,370 | -6.1% |
| Yuma | 28,231,110 | 27,896,690 | 1.2% | 25,164,230 | 25,562,140 | -1.6% | 1,000,460 | 954,100 | 4.9% |
| Total | 42,724,826,559 | 42,297,938,878 | 1.0% | 27,132,443,419 | 27,354,184,714 | -0.8% | 5,942,074,798 | 6,202,155,769 | -4.2% |

12

BLM_0037966

## Oil and Gas

There were approximately 41,000, active natural gas and oil wells in Colorado as of the close of 2009. Over half of the wells are concentrated in Weld and Garfield Counties. Nearly 85 percent of the total number of wells are located in six counties: Weld, Garfield, Yuma, La Plata, Las Animas and Rio Blanco. The taxable value of real property associated with oil and gas wells is calculated as a percentage of the revenue obtained for the product at the wellhead during the prior year. This makes oil and gas among the most volatile of property classes because the market prices of natural gas and crude oil can change considerably from year to year.

In 2009, the commodity prices were approximately 52 percent lower for natural gas and 40 percent lower for oil than they had been in 2008. The 47.3 percent reduction to the total value of the oil and gas class was a direct result of the drop in prices. (See Tables 4 and 5 below). The decline was by far the largest reduction in the assessed value of oil and gas in recent memory, and it occurred after a series of years in which oil and gas had grown to become the third largest class of taxable property. Because the Constitutional Taxpayer Bill of Rights (TABOR) prohibits a mill levy increase without voter approval, the volatile nature of oil and gas values can contribute to a "ratchet down" effect on property tax revenue.

Table 4 displays a recent history of statewide values for oil and gas, and table 5 provides a more detailed understanding of the assessed values for each of the oil and gas counties.

TABLE 4

| 2010 OIL AND GAS CLASS | | | |
|---|---|---|---|
| Year | (Billions) Value | Change from Prior Year | % of Total Taxable |
| 2001 | $2.65 | 78.5% | 4.5% |
| 2002 | $2.80 | 5.6% | 4.6% |
| 2003 | $2.20 | -21.4% | 3.6% |
| 2004 | $3.91 | 77.6% | 6.0% |
| 2005 | $5.06 | 29.4% | 7.2% |
| 2006 | $7.33 | 45.0% | 9.8% |
| 2007 | $7.22 | -1.4% | 8.5% |
| 2008 | $7.68 | 6.3% | 8.8% |
| 2009 | $11.86 | 54.5% | 12.1% |
| 2010 | $6.25 | -47.3% | 6.7% |

BLM_0037967

TABLE 5

| County Rank | County | Oil and Gas Value 2010 | Total Taxable Value 2010 | Oil & Gas as % of Total Value | Oil & Gas % Change 2009-2010 | Total Value % Change 2009-2010 |
|---|---|---|---|---|---|---|
| | | **2010 OIL & GAS - COUNTY RANK** | | | | |
| 1 | Garfield | 1,932,805,840 | 3,297,809,630 | 58.6% | -50.2% | -37.1% |
| 2 | Weld | 1,601,870,660 | 4,625,444,510 | 34.6% | -44.1% | -20.0% |
| 3 | La Plata | 937,311,060 | 2,338,224,720 | 40.1% | -53.7% | -31.5% |
| 4 | Rio Blanco | 568,248,780 | 1,130,673,390 | 50.3% | -30.8% | -3.2% |
| 5 | Montezuma | 241,485,350 | 543,642,970 | 44.4% | -22.2% | -10.8% |
| 6 | Las Animas | 240,199,400 | 451,419,190 | 53.2% | -62.4% | -46.6% |
| 7 | Mesa | 193,143,470 | 2,316,357,860 | 8.3% | -31.9% | -3.4% |
| 8 | Yuma | 100,733,490 | 272,473,200 | 37.0% | -59.9% | -35.2% |
| 9 | Cheyenne | 84,595,473 | 126,621,336 | 66.8% | -39.8% | -30.1% |
| 10 | Moffat | 80,000,830 | 473,376,830 | 16.9% | -43.9% | -7.4% |
| 11 | Dolores | 36,096,749 | 78,127,371 | 46.2% | -39.6% | -21.6% |
| 12 | Adams | 32,004,830 | 4,601,619,680 | 0.7% | -50.7% | 0.1% |
| 13 | Washington | 28,079,460 | 110,885,598 | 25.3% | -48.4% | -14.0% |
| 14 | San Miguel | 26,180,490 | 965,915,150 | 2.7% | -69.4% | -7.3% |
| 15 | Boulder | 22,456,220 | 5,808,261,190 | 0.4% | -51.7% | -0.5% |
| 16 | Archuleta | 20,354,060 | 424,772,749 | 4.8% | -10.3% | 0.2% |
| 17 | Huerfano | 14,808,475 | 124,534,692 | 11.9% | -41.6% | -5.8% |
| 18 | Lincoln | 13,060,793 | 82,944,053 | 15.7% | 33.0% | 6.1% |
| 19 | Logan | 10,384,840 | 254,985,410 | 4.1% | -29.2% | -6.3% |
| 20 | Kiowa | 8,645,270 | 32,417,940 | 26.7% | -46.4% | -17.3% |
| 21 | Broomfield | 6,052,730 | 1,087,415,155 | 0.6% | -16.2% | 0.3% |
| 22 | Jackson | 5,659,015 | 35,397,603 | 16.0% | -37.2% | -9.9% |
| 23 | Baca | 5,645,699 | 71,484,003 | 7.9% | -50.9% | -6.2% |
| 24 | Larimer | 5,488,503 | 4,238,819,303 | 0.1% | -41.4% | -0.7% |
| 25 | Gunnison | 4,672,580 | 840,863,260 | 0.6% | -28.5% | -0.8% |
| 26 | Morgan | 4,645,540 | 413,605,060 | 1.1% | -52.4% | 1.7% |
| 27 | Arapahoe | 4,584,900 | 7,963,447,430 | 0.1% | -32.8% | 0.0% |
| 28 | Fremont | 4,243,620 | 452,553,980 | 0.9% | 106.5% | -0.4% |
| 29 | Phillips | 3,651,090 | 52,398,490 | 7.0% | -62.6% | -10.2% |
| 30 | Routt | 3,104,378 | 1,468,564,329 | 0.2% | -45.0% | 0.4% |
| 31 | Prowers | 2,977,470 | 122,010,980 | 2.4% | -46.3% | -2.6% |
| 32 | Elbert | 2,332,460 | 276,654,740 | 0.8% | -43.8% | 1.1% |
| 33 | Delta | 1,599,940 | 355,260,450 | 0.5% | 166.1% | 0.7% |
| 34 | Kit Carson | 1,363,986 | 131,202,236 | 1.0% | -48.1% | 8.8% |
| 35 | Bent | 865,280 | 72,463,983 | 1.2% | -63.5% | -1.6% |
| 36 | Sedgwick | 98,000 | 54,679,932 | 0.2% | -71.9% | -6.1% |
| 37 | Denver | 26,940 | 11,985,812,970 | 0.0% | -99.3% | -0.3% |
| 38 | Jefferson | 5,650 | 7,356,437,890 | 0.0% | 0.0% | -0.7% |

BLM_0037968

## Agricultural Property

The value established for agricultural land is based on the earning or productive capacity of the land regardless of the property's market value or its highest and best use. As a result, the actual values of agricultural property are often much lower than their market values, and they tend to be stable from year to year.

## Other Production Classes

As with oil and gas, most of the value of real property classified as natural resources and producing mines is calculated as a percentage of the money obtained from selling the product. The natural resources class includes properties that produce coal, sand, and gravel, and it also includes non-producing mining claims and severed mineral interests. Sixty three counties have natural resource property, but the class comprises only 0.4 percent of the state's total assessed value.

Although similar in total value, the great majority of the producing mines value is associated with only two mines located in three counties. The Henderson mine, located on the Continental Divide in the counties of Clear Creek and Grand, is the world's largest primary producer of molybdenum. The mine and the mill are connected by the world's longest conveyor of its kind; a fifteen–mile elevated belt that passes underneath the Continental Divide through an old train tunnel and then above ground to the mill. Since 1976, the Henderson Mine has produced more than 160 million tons of ore and 770 million pounds of molybdenum.

Teller County is the location of most of Colorado's gold production. The county's primary mine, the Cresson Mine, is located between the towns of Victor and Cripple Creek.

The value of mining operations in Colorado is sensitive to changes in commodity prices, owners' business choices and decisions rendered on property tax appeals. According to the United States Geological Survey's website, the average price of gold for 2010 was $1,200 per ounce, up from the $950 per ounce price listed the prior year.

## State Assessed Property

Unlike most other classes, property classified as state assessed is valued annually by the Division of Property Taxation using unitary valuation procedures. The state assessed property class is comprised of real and personal property owned by public utilities, airlines and railroads. By far the largest portion of this value is attributable to personal property. The State Assessed Section of the Division values each company and allocates a portion of the value to Colorado. That value is then apportioned to the appropriate counties based on the location of the company's operating property or business activity. The county assessor then distributes the value to the appropriate locations throughout the county.

State assessed values were up 5.1 percent in 2010. New pipeline infrastructure, non-renewable power generation, and increases to railroad values were the largest contributors to the increase. Gains to those sectors were partially offset by declines in the airline and private carline industries.

## Personal Property in 2010

In 2010, personal property accounted for 12.7 percent of Colorado's property tax base, but that percentage varied substantially from county to county. Approximately 39.4 percent of personal property is classified as state assessed while the remainder is valued at the local level. In 2010, 89.0 percent of the state assessed property value was for personal property. All taxable personal property is assessed at 29 percent of its actual value.

Under the Colorado Constitution and statutes, certain categories of business personal property are exempt from taxation, including equipment used for agricultural purposes, inventory, and supplies held for consumption.

Prior to January 1, 2009, business personal property under common ownership with a total actual value of no more than $2,500 per county was also exempt. However, with the passage of HB 08-1225, the amount of actual value subject to the exemption is increasing according to the following schedule:

BLM_0037969

— Four thousand dollars ($4,000) for property tax years 2009 and 2010.

— Five thousand five hundred dollars ($5,500) for property tax years 2011 and 2012.

— Seven thousand dollars ($7,000) for property tax years 2013 and 2014.

In addition, a provision found in the constitution allows any taxing entity to "enact cumulative uniform exemptions and credits to reduce or end business personal property taxes," § 20(8)(b), art. X, COLO. CONST.

**Table 6** lists the state assessed, locally assessed and total taxable personal property by county and the percentage of taxable value consisting of personal property.

BLM_0037970

TABLE 6

## DISTRIBUTION OF PERSONAL PROPERTY IN 2010

| County | State Assd. Personal | % of Total | Locally Assd Personal | % of Total | Total Personal | % of Total | Total Real | Total Assd. Value |
|---|---|---|---|---|---|---|---|---|
| Adams | 348,657,630 | 7.58% | 557,028,650 | 12.11% | 905,686,280 | 19.68% | 3,695,933,400 | 4,601,619,680 |
| Alamosa | 12,618,484 | 8.83% | 8,014,843 | 5.61% | 20,633,327 | 14.43% | 122,345,252 | 142,978,579 |
| Arapahoe | 310,722,530 | 3.90% | 447,292,860 | 5.62% | 758,015,390 | 9.52% | 7,205,432,040 | 7,963,447,430 |
| Archuleta | 9,356,920 | 2.20% | 7,708,670 | 1.81% | 17,065,590 | 4.02% | 407,707,159 | 424,772,749 |
| Baca | 33,044,036 | 46.23% | 2,999,021 | 4.20% | 36,043,057 | 50.42% | 35,440,946 | 71,484,003 |
| Bent | 21,540,774 | 29.73% | 1,171,986 | 1.62% | 22,712,760 | 31.34% | 49,751,223 | 72,463,983 |
| Boulder | 150,778,178 | 2.60% | 384,696,680 | 6.62% | 535,474,858 | 9.22% | 5,272,786,332 | 5,808,261,190 |
| Broomfield | 40,050,000 | 3.68% | 110,386,130 | 10.15% | 150,436,130 | 13.83% | 936,979,025 | 1,087,415,155 |
| Chaffee | 15,714,120 | 3.97% | 9,192,260 | 2.32% | 24,906,380 | 6.29% | 370,936,740 | 395,843,120 |
| Cheyenne | 15,368,505 | 12.14% | 11,113,927 | 8.78% | 26,482,432 | 20.91% | 100,138,904 | 126,621,336 |
| Clear Creek | 11,713,900 | 2.16% | 73,663,590 | 13.60% | 85,377,490 | 15.76% | 456,439,890 | 541,817,380 |
| Conejos | 3,917,343 | 7.18% | 860,220 | 1.58% | 4,777,563 | 8.75% | 49,798,837 | 54,576,400 |
| Costilla | 6,243,269 | 4.78% | 682,686 | 0.52% | 6,925,955 | 5.30% | 123,763,513 | 130,689,468 |
| Crowley | 4,098,558 | 11.70% | 673,525 | 1.92% | 4,772,083 | 13.63% | 30,251,377 | 35,023,460 |
| Custer | 3,789,190 | 3.94% | 489,340 | 0.51% | 4,278,530 | 4.44% | 91,980,670 | 96,259,200 |
| Delta | 26,339,210 | 7.41% | 27,725,730 | 7.80% | 54,064,940 | 15.22% | 301,195,510 | 355,260,450 |
| Denver | 668,619,360 | 5.58% | 734,227,230 | 6.13% | 1,402,846,590 | 11.70% | 10,582,966,380 | 11,985,812,970 |
| Dolores | 12,939,285 | 16.56% | 11,904,369 | 15.24% | 24,843,654 | 31.80% | 53,283,717 | 78,127,371 |
| Douglas | 140,055,080 | 2.85% | 255,031,820 | 5.18% | 395,086,900 | 8.03% | 4,525,048,800 | 4,920,135,700 |
| Eagle | 55,675,210 | 1.53% | 92,785,110 | 2.55% | 148,460,320 | 4.09% | 3,483,177,130 | 3,631,637,450 |
| El Paso | 267,712,480 | 3.92% | 385,249,300 | 5.64% | 652,961,780 | 9.55% | 6,183,444,780 | 6,836,406,560 |
| Elbert | 18,046,025 | 6.52% | 4,415,860 | 1.60% | 22,461,885 | 8.12% | 254,192,855 | 276,654,740 |
| Fremont | 28,064,740 | 6.20% | 72,804,430 | 16.09% | 100,869,170 | 22.29% | 351,684,810 | 452,553,980 |
| Garfield | 72,296,190 | 2.19% | 638,003,520 | 19.35% | 710,299,710 | 21.54% | 2,587,509,920 | 3,297,809,630 |
| Gilpin | 6,630,648 | 1.73% | 31,474,200 | 8.19% | 38,104,848 | 9.92% | 346,182,092 | 384,286,940 |
| Grand | 29,462,280 | 2.99% | 58,771,840 | 5.96% | 88,234,120 | 8.95% | 897,138,260 | 985,372,380 |
| Gunnison | 11,258,280 | 1.34% | 63,679,300 | 7.57% | 74,937,580 | 8.91% | 765,925,680 | 840,863,260 |
| Hinsdale | 688,790 | 1.12% | 298,500 | 0.48% | 987,290 | 1.60% | 60,568,040 | 61,555,330 |
| Huerfano | 20,838,040 | 16.73% | 7,102,474 | 5.70% | 27,940,514 | 22.44% | 96,594,178 | 124,534,692 |
| Jackson | 2,074,970 | 5.86% | 2,345,769 | 6.63% | 4,420,739 | 12.49% | 30,976,864 | 35,397,803 |
| Jefferson | 258,628,270 | 3.52% | 454,747,130 | 6.18% | 713,375,400 | 9.70% | 6,643,062,490 | 7,356,437,890 |
| Kiowa | 3,919,850 | 12.09% | 1,125,650 | 3.47% | 5,045,500 | 15.56% | 27,372,440 | 32,417,940 |
| Kit Carson | 31,649,948 | 24.12% | 4,759,684 | 3.63% | 36,409,632 | 27.75% | 94,792,604 | 131,202,236 |
| La Plata | 66,218,760 | 2.83% | 315,464,300 | 13.49% | 381,683,060 | 16.32% | 1,956,541,660 | 2,338,224,720 |
| Lake | 10,325,111 | 9.54% | 3,400,557 | 3.14% | 13,725,668 | 12.68% | 94,490,605 | 108,216,273 |
| Larimer | 93,623,030 | 2.21% | 307,238,302 | 7.25% | 400,861,332 | 9.46% | 3,837,957,971 | 4,238,819,303 |
| Las Animas | 67,389,790 | 14.93% | 102,294,040 | 22.66% | 169,683,830 | 37.59% | 281,735,360 | 451,419,190 |
| Lincoln | 22,094,065 | 26.64% | 2,748,338 | 3.31% | 24,842,403 | 29.95% | 58,101,650 | 82,944,053 |
| Logan | 86,648,300 | 33.98% | 19,258,900 | 7.55% | 105,907,200 | 41.53% | 149,078,210 | 254,985,410 |
| Mesa | 104,358,990 | 4.51% | 243,495,890 | 10.51% | 347,854,880 | 15.02% | 1,968,502,980 | 2,316,357,860 |
| Mineral | 1,127,510 | 3.36% | 1,715,180 | 5.12% | 2,842,690 | 8.48% | 30,677,370 | 33,520,060 |
| Moffat | 173,197,490 | 36.59% | 69,052,570 | 14.59% | 242,250,060 | 51.17% | 231,126,770 | 473,376,830 |
| Montezuma | 39,165,250 | 7.20% | 54,425,010 | 10.01% | 93,590,260 | 17.22% | 450,052,710 | 543,642,970 |
| Montrose | 51,097,649 | 8.21% | 29,846,660 | 4.80% | 80,944,309 | 13.01% | 541,447,261 | 622,391,570 |
| Morgan | 142,895,320 | 34.55% | 44,445,580 | 10.75% | 187,340,900 | 45.29% | 226,264,160 | 413,605,060 |
| Otero | 26,139,381 | 21.05% | 7,953,729 | 6.40% | 34,093,110 | 27.45% | 90,112,547 | 124,205,657 |
| Ouray | 5,483,918 | 2.60% | 2,310,350 | 1.10% | 7,794,268 | 3.70% | 203,005,312 | 210,799,580 |
| Park | 15,456,930 | 3.29% | 2,622,629 | 0.56% | 18,079,559 | 3.85% | 451,666,981 | 469,746,540 |
| Phillips | 3,158,360 | 6.03% | 4,152,780 | 7.93% | 7,311,140 | 13.95% | 45,087,350 | 52,398,490 |
| Pitkin | 23,248,760 | 0.63% | 53,973,040 | 1.46% | 77,221,800 | 2.09% | 3,609,603,600 | 3,686,825,400 |
| Prowers | 34,286,736 | 28.10% | 7,060,500 | 5.79% | 41,347,236 | 33.89% | 80,663,744 | 122,010,980 |
| Pueblo | 145,075,470 | 10.35% | 174,302,869 | 12.44% | 319,378,339 | 22.80% | 1,081,700,561 | 1,401,078,900 |
| Rio Blanco | 105,464,110 | 9.33% | 620,613,120 | 54.89% | 726,077,230 | 64.22% | 404,596,160 | 1,130,673,390 |
| Rio Grande | 9,157,239 | 5.06% | 5,950,133 | 3.29% | 15,107,372 | 8.35% | 165,857,751 | 180,965,123 |
| Routt | 77,143,613 | 5.25% | 64,236,990 | 4.37% | 141,380,603 | 9.63% | 1,327,183,726 | 1,468,564,329 |
| Saguache | 5,078,640 | 8.19% | 842,610 | 1.36% | 5,921,250 | 9.55% | 56,052,390 | 61,973,640 |
| San Juan | 2,045,714 | 3.55% | 724,170 | 1.26% | 2,769,884 | 4.81% | 54,832,156 | 57,602,040 |
| San Miguel | 12,875,860 | 1.33% | 24,743,260 | 2.56% | 37,619,120 | 3.89% | 928,296,030 | 965,915,150 |
| Sedgwick | 31,093,316 | 56.86% | 1,035,093 | 1.89% | 32,128,409 | 58.76% | 22,551,523 | 54,679,932 |
| Summit | 27,687,882 | 1.43% | 66,607,483 | 3.44% | 94,295,365 | 4.86% | 1,844,459,894 | 1,938,755,259 |
| Teller | 12,815,260 | 2.58% | 42,292,760 | 8.52% | 55,108,020 | 11.10% | 441,311,530 | 496,419,550 |
| Washington | 36,157,503 | 32.61% | 3,983,461 | 3.59% | 40,140,964 | 36.20% | 70,744,634 | 110,885,598 |
| Weld | 526,500,100 | 11.38% | 368,445,020 | 7.97% | 894,945,120 | 19.35% | 3,730,499,390 | 4,625,444,510 |
| Yuma | 46,693,760 | 17.14% | 35,045,630 | 12.86% | 81,739,390 | 30.00% | 190,733,810 | 272,473,200 |
| TOTALS | 4,646,215,910 | 5.01% | 7,142,707,258 | 7.71% | 11,788,923,168 | 12.72% | 80,859,737,654 | 92,648,660,822 |

17

## RESIDENTIAL ASSESSMENT RATE

In 1982, the electorate passed sweeping changes to the portion of the Colorado Constitution that governs the property tax system. One of these changes was the enactment of a provision known as the "Gallagher Amendment," found in § 3(1)(b), art. X, COLO. CONST.

The purpose of the Gallagher Amendment is to stabilize residential real property's share of the statewide property tax base. From 1958 to 1982, the percentage of total assessed value consisting of residential property increased from 29 to 44 percent. This occurred primarily because market value increases to residential property greatly outpaced market value increases to non-residential property.

To counter this trend, the Gallagher Amendment requires a review and potential adjustment of the residential assessment rate each time there is a year of general reassessment. This adjustment is meant to ensure that the rate of change to the state's total assessed value of residential property remains essentially the same as it is for non-residential property. The current residential assessment rate is 7.96 percent of assessed value. In contrast, the assessment rate for most classes of non-residential property is fixed at 29 percent. A history of changes to the residential assessment rate is shown in **Table 7**.

TABLE 7

| RESIDENTIAL ASSESSMENT RATE ||
| --- | --- |
| **Years** | **Rate** |
| Prior to 1983 | 30% |
| 1983-1986 | 21% |
| 1987 | 18% |
| 1988 | 16% |
| 1989-1990 | 15% |
| 1991-1992 | 14.34% |
| 1993-1994 | 12.86% |
| 1995-1996 | 10.36% |
| 1997-1998 | 9.74% |
| 1999-2000 | 9.74%* |
| 2001-2002 | 9.15% |
| 2003-2004 | 7.96% |
| 2005-2006 | 7.96%* |
| 2007-2008 | 7.96%* |
| 2009-2010 | 7.96%* |

During years of general reassessment (odd numbered years), § 39-1-104.2(5)(c), C.R.S., requires the Property Tax Administrator to complete a documented study that is used by the General Assembly to enact a new residential assessment rate into law. The 2009 preliminary and final residential assessment rate study reports are accessible on the Division's web site at www.dola.colorado.gov/dpt/publications/index.htm.

* The studies conducted in 1999, 2005, 2007, and 2009, resulted in a determination that the residential assessment rate should be adjusted above the rate that had been enacted for the previous two-year cycle. However, § 20(4)(a), art. X, COLO. CONST. (TABOR), prohibits the General Assembly from increasing an assessment rate without statewide voter approval. For these years, the General Assembly chose to reenact the rate that was effective during the prior two years.

## Assessment Rate and Tax Burden

**Table 8** calculates the savings to residential taxpayers from the inception of the Gallagher Amendment through 2009. It does so by comparing the taxes paid by residential property owners to an estimate of the taxes they would have paid had the Gallagher Amendment not been enacted. The estimated savings to residential property owners is $17,519,533,277. The table begins with 1987, because the residential assessment rate remained at 21 percent until 1987. The contents of each column in the table are described below.

1   Tax year

2   Hypothetical residential assessment rate of 21 percent

3   Enacted residential assessment rate for each tax year

4   Savings to residential taxpayers

BLM_0037972

TABLE 8

| PROPERTY TAX BURDEN SHIFT DUE TO GALLAGHER AMENDMENT | | | |
|---|---|---|---|
| Tax Year | Res. Rate w/o Gallagher | Actual Res. Rate | Savings to Res Taxpayers |
| 1987 | 21% | 18.00% | $79,064,785 |
| 1988 | 21% | 16.00% | $147,836,269 |
| 1989 | 21% | 15.00% | $187,262,167 |
| 1990 | 21% | 15.00% | $188,963,583 |
| 1991 | 21% | 14.34% | $222,648,266 |
| 1992 | 21% | 14.34% | $228,704,050 |
| 1993 | 21% | 12.86% | $294,643,464 |
| 1994 | 21% | 12.86% | $305,366,542 |
| 1995 | 21% | 10.36% | $460,958,707 |
| 1996 | 21% | 10.36% | $480,301,188 |
| 1997 | 21% | 9.74% | $568,826,762 |
| 1998 | 21% | 9.74% | $598,265,545 |
| 1999 | 21% | 9.74% | $653,172,356 |
| 2000 | 21% | 9.74% | $688,841,354 |
| 2001 | 21% | 9.15% | $823,345,112 |
| 2002 | 21% | 9.15% | $873,143,882 |
| 2003 | 21% | 7.96% | $1,053,722,569 |
| 2004 | 21% | 7.96% | $1,113,935,541 |
| 2005 | 21% | 7.96% | $1,190,706,817 |
| 2006 | 21% | 7.96% | $1,269,270,060 |
| 2007 | 21% | 7.96% | $1,436,467,739 |
| 2008 | 21% | 7.96% | $1,474,388,587 |
| 2009 | 21% | 7.96% | $1,603,527,584 |
| 2010 | 21% | 7.96% | $1,576,170,350 |
| | | | $17,519,533,277 |

**Table 9** illustrates the effect of Gallagher on the statewide assessed value of residential property since 1983. As the table shows, the percentage of actual value attributable to residential property has increased dramatically since Gallagher's inception, from 53.2 percent in 1983 to 77.0 percent today. At the same time, the adjustment of the residential assessment rate caused the percentage of total assessed value consisting of residential property to remain essentially stable.

BLM_0037973

## TABLE 9

| ASSESSED VALUES | | | | DISTRIBUTION OF VALUE | | | |
|---|---|---|---|---|---|---|---|
| Year | Total | Residential | Non-Residential | Year | Total | Residential | Non-Residential |
| 1983 | $17,185,698,000 | $7,424,951,000 | $9,760,747,000 | 1983 | 100.00% | 43.20% | 56.80% |
| 1984 | $17,905,089,000 | $7,921,865,470 | $9,983,223,530 | 1984 | 100.00% | 44.24% | 55.76% |
| 1985 | $18,730,104,000 | $8,327,520,240 | $10,402,583,760 | 1985 | 100.00% | 44.46% | 55.54% |
| 1986 | $19,216,096,000 | $8,646,958,180 | $10,569,137,820 | 1986 | 100.00% | 45.00% | 55.00% |
| 1987 | $33,261,142,000 | $16,082,850,600 | $17,178,291,400 | 1987 | 100.00% | 48.35% | 51.65% |
| 1988 | $31,660,568,730 | $14,565,865,580 | $17,094,703,150 | 1988 | 100.00% | 46.01% | 53.99% |
| 1989 | $29,131,941,640 | $13,247,498,311 | $15,884,443,329 | 1989 | 100.00% | 45.47% | 54.53% |
| 1990 | $29,082,011,770 | $13,393,681,560 | $15,688,330,210 | 1990 | 100.00% | 46.05% | 53.95% |
| 1991 | $28,285,335,860 | $12,886,606,790 | $15,398,729,070 | 1991 | 100.00% | 45.56% | 54.44% |
| 1992 | $28,490,629,640 | $13,256,627,100 | $15,234,002,540 | 1992 | 100.00% | 46.53% | 53.47% |
| 1993 | $28,820,035,320 | $13,373,489,410 | $15,446,545,910 | 1993 | 100.00% | 46.40% | 53.60% |
| 1994 | $29,831,046,660 | $13,970,427,000 | $15,860,619,660 | 1994 | 100.00% | 46.83% | 53.17% |
| 1995 | $32,469,922,680 | $15,155,131,610 | $17,314,791,070 | 1995 | 100.00% | 46.67% | 53.33% |
| 1996 | $33,606,775,890 | $15,788,272,000 | $17,818,503,890 | 1996 | 100.00% | 46.98% | 53.02% |
| 1997 | $38,538,664,720 | $17,673,602,020 | $20,863,062,700 | 1997 | 100.00% | 45.86% | 54.14% |
| 1998 | $40,165,596,490 | $18,452,519,220 | $21,713,077,270 | 1998 | 100.00% | 45.94% | 54.06% |
| 1999 | $46,711,921,473 | $21,633,354,370 | $25,078,567,103 | 1999 | 100.00% | 46.31% | 53.69% |
| 2000 | $48,757,383,218 | $22,729,547,584 | $26,027,835,634 | 2000 | 100.00% | 46.62% | 53.38% |
| 2001 | $58,812,663,875 | $27,699,298,175 | $31,113,365,700 | 2001 | 100.00% | 47.10% | 52.90% |
| 2002 | $60,564,946,027 | $28,888,969,314 | $31,675,976,713 | 2002 | 100.00% | 47.70% | 52.30% |
| 2003 | $61,949,204,975 | $29,523,577,562 | $32,425,627,413 | 2003 | 100.00% | 47.66% | 52.34% |
| 2004 | $64,630,921,990 | $30,470,840,993 | $34,160,080,997 | 2004 | 100.00% | 47.15% | 52.85% |
| 2005 | $70,625,603,899 | $33,110,601,388 | $37,515,002,511 | 2005 | 100.00% | 46.88% | 53.12% |
| 2006 | $74,549,449,375 | $34,350,208,817 | $40,199,240,558 | 2006 | 100.00% | 46.08% | 53.92% |
| 2007 | $85,147,187,463 | $39,331,276,064 | $45,815,911,399 | 2007 | 100.00% | 46.19% | 53.81% |
| 2008 | $87,550,006,576 | $40,409,568,301 | $47,140,438,275 | 2008 | 100.00% | 46.16% | 53.84% |
| 2009 | $97,784,900,451 | $42,297,938,878 | $55,486,961,573 | 2009 | 100.00% | 43.26% | 56.74% |
| 2010 | $92,648,660,822 | $42,724,826,559 | $49,923,834,263 | 2010 | 100.00% | 46.11% | 53.89% |

### COLORADO ACTUAL VALUES

| ACTUAL VALUES | | | | DISTRIBUTION OF VALUE | | | |
|---|---|---|---|---|---|---|---|
| Year | Total | Residential | Non-Residential | Year | Total | Residential | Non-Residential |
| 1983 | $66,459,485,820 | $35,356,909,524 | $31,102,576,296 | 1983 | 100.00% | 53.20% | 46.80% |
| 1984 | $69,718,797,755 | $37,723,168,905 | $31,995,628,850 | 1984 | 100.00% | 54.11% | 45.89% |
| 1985 | $72,958,307,383 | $39,654,858,286 | $33,303,449,078 | 1985 | 100.00% | 54.35% | 45.65% |
| 1986 | $75,118,950,953 | $41,175,991,333 | $33,942,959,620 | 1986 | 100.00% | 54.81% | 45.19% |
| 1987 | $146,891,450,388 | $89,349,170,000 | $57,542,280,388 | 1987 | 100.00% | 60.83% | 39.17% |
| 1988 | $148,225,023,177 | $91,036,659,875 | $57,188,363,302 | 1988 | 100.00% | 61.42% | 38.58% |
| 1989 | $141,342,075,160 | $88,316,655,407 | $53,025,419,753 | 1989 | 100.00% | 62.48% | 37.52% |
| 1990 | $141,421,555,163 | $89,291,210,400 | $52,130,344,763 | 1990 | 100.00% | 63.14% | 36.86% |
| 1991 | $140,967,103,411 | $89,864,761,437 | $51,102,341,974 | 1991 | 100.00% | 63.75% | 36.25% |
| 1992 | $142,906,267,259 | $92,445,098,326 | $50,461,168,932 | 1992 | 100.00% | 64.69% | 35.31% |
| 1993 | $155,096,689,828 | $103,992,919,207 | $51,103,770,621 | 1993 | 100.00% | 67.05% | 32.95% |
| 1994 | $160,946,706,538 | $108,634,735,614 | $52,311,970,923 | 1994 | 100.00% | 67.50% | 32.50% |
| 1995 | $203,663,083,533 | $146,285,054,151 | $57,378,029,382 | 1995 | 100.00% | 71.83% | 28.17% |
| 1996 | $211,793,556,887 | $152,396,447,876 | $59,397,109,011 | 1996 | 100.00% | 71.96% | 28.04% |
| 1997 | $250,804,220,896 | $181,453,819,507 | $69,350,401,389 | 1997 | 100.00% | 72.35% | 27.65% |
| 1998 | $261,128,074,968 | $189,450,916,016 | $71,677,158,951 | 1998 | 100.00% | 72.55% | 27.45% |
| 1999 | $306,002,830,219 | $222,108,361,088 | $83,894,469,131 | 1999 | 100.00% | 72.58% | 27.42% |
| 2000 | $320,312,771,175 | $233,362,911,540 | $86,949,859,635 | 2000 | 100.00% | 72.85% | 27.15% |
| 2001 | $404,716,127,139 | $302,724,570,219 | $101,991,556,920 | 2001 | 100.00% | 74.80% | 25.20% |
| 2002 | $419,294,563,373 | $315,726,440,590 | $103,568,122,783 | 2002 | 100.00% | 75.30% | 24.70% |
| 2003 | $478,546,478,821 | $370,899,215,603 | $107,647,263,218 | 2003 | 100.00% | 77.51% | 22.49% |
| 2004 | $492,572,877,562 | $382,799,509,962 | $109,773,367,599 | 2004 | 100.00% | 77.71% | 22.29% |
| 2005 | $534,826,428,655 | $415,962,328,995 | $118,864,099,660 | 2005 | 100.00% | 77.78% | 22.22% |
| 2006 | $554,757,341,157 | $431,535,286,646 | $123,222,054,512 | 2006 | 100.00% | 77.79% | 22.21% |
| 2007 | $636,895,128,388 | $494,111,508,342 | $142,783,620,046 | 2007 | 100.00% | 77.58% | 22.42% |
| 2008 | $654,555,841,028 | $507,657,893,229 | $146,897,947,799 | 2008 | 100.00% | 77.56% | 22.44% |
| 2009 | $698,329,685,726 | $531,381,141,683 | $166,948,544,043 | 2009 | 100.00% | 76.09% | 23.91% |
| 2010 | $697,131,096,490 | $536,744,052,249 | $160,387,044,241 | 2010 | 100.00% | 76.99% | 23.01% |

BLM_0037974

## PROTESTS, APPEALS, AND ABATEMENTS

### Protests and Appeals

Colorado statutes mandate a process that allows taxpayers the opportunity to challenge the actual value established for their property. The process begins with the taxpayer's protest to the assessor. Upon receiving a protest, the assessor reviews the issues raised, and either adjusts or maintains the actual value for the property. Taxpayers who disagree with the assessor's decision can appeal to the county board of equalization. Taxpayers who disagree with the county board's decision have three choices for further appeal. They can appeal to the State Board of Assessment Appeals (BAA), district court, or binding arbitration. Decisions of the BAA and district court can be appealed to the Colorado Court of Appeals and ultimately to the Colorado Supreme Court. Decisions of an arbitrator are final.

Taxpayers can protest and appeal in both reappraisal (odd numbered years) and intervening years (even numbered years). However, the number of protests and appeals are typically higher during years of reappraisal.

The number of protests and appeals vary greatly from county to county. In 2009, Denver County received the greatest number of protests with 15,016 while Kiowa County received three. For many counties, the protest process places a significant strain on the resources of the assessor's office.

**Table 10** lists the protests and county board appeals for each county during the last three reappraisal years, organized according to the county officer pay categories established in § 30-2-102, C.R.S. For the purpose of this table, the Cities and Counties of Denver and Broomfield are placed in category one.

**Table 11** provides a statistical summary of protests and appeals.

### Abatements

An abatement of tax is a cancellation or reduction in the amount of tax owed by the taxpayer. Abatements may be granted after the tax roll has been printed for an "erroneous valuation for assessment, irregularity in levying, clerical error, or overvaluation," § 39-10-114(1)(a)(I)(A), C.R.S. Abatement petitions may be approved only if they are filed within two years after January 1 of the year following the year in which the taxes were levied. Because abatement petitions are filed on taxes already levied, the abated or refunded taxes constitute lost revenue to the affected local governments. However, § 39-10-114(1)(a)(I)(B), C.R.S., and case law, allow local governments to recover abated taxes through an increase in mill levies. **Table 12** displays the taxes abated during 2008, 2009, and 2010.

BLM_0037975

TABLE 10

| County | Protests to Assessor | | | Protests to Assessor (PER EMPLOYEE) | | | Appeals to CBOE | | |
|---|---|---|---|---|---|---|---|---|---|
| **PROTESTS AND APPEALS** | | | | | | | | | |
| **Category 1** | 2005 | 2007 | 2009 | 2005 | 2007 | 2009 | 2005 | 2007 | 2009 |
| Adams | 8,404 | 6,242 | 6,519 | 195 | 145 | 152 | 1,488 | 964 | 2,308 |
| Arapahoe | 5,119 | 9,679 | 9,594 | 71 | 138 | 145 | 1,337 | 2,758 | 4,283 |
| Boulder | 6,741 | 9,682 | 10,722 | 145 | 206 | 241 | 648 | 230 | 1,383 |
| Broomfield | 939 | 1,084 | 1,154 | 104 | 120 | 144 | 111 | 178 | 354 |
| Denver | 5,784 | 12,292 | 15,016 | 70 | 154 | 218 | 1,807 | 2,456 | 4,197 |
| Douglas | 6,360 | 8,608 | 9,182 | 127 | 172 | 200 | 2,512 | 2,508 | 4,268 |
| El Paso | 7,000 | 5,999 | 9,956 | 113 | 105 | 195 | 1,440 | 851 | 1,366 |
| Jefferson | 8,285 | 12,974 | 10,539 | 145 | 228 | 199 | 1,557 | 1,741 | 2,429 |
| Larimer | 14,783 | 11,685 | 13,533 | 279 | 225 | 271 | 2,035 | 1,161 | 3,276 |
| Pueblo | 733 | 1,272 | 925 | 23 | 42 | 30 | 3 | 10 | 14 |
| Weld | 4,626 | 4,340 | 5,165 | 119 | 122 | 161 | 468 | 396 | 866 |
| **Category 2** | | | | | | | | | |
| Eagle | 2,550 | 5,869 | 8,103 | 116 | 293 | 386 | 495 | 1,548 | 2,555 |
| Fremont | 1,221 | 1,636 | 1,369 | 94 | 126 | 124 | 17 | 145 | 108 |
| Garfield | 1,166 | 981 | 2,753 | 69 | 59 | 125 | 339 | 345 | 423 |
| La Plata | 1,466 | 2,772 | 1,132 | 75 | 135 | 60 | 57 | 60 | 63 |
| Mesa | 2,658 | 3,235 | 4,319 | 95 | 112 | 144 | 164 | 213 | 599 |
| Pitkin | 963 | 2,118 | 4,628 | 96 | 223 | 441 | 181 | 387 | 1,873 |
| Summit | 3,283 | 3,365 | 6,873 | 173 | 173 | 362 | 300 | 374 | 825 |
| **Category 3** | | | | | | | | | |
| Alamosa | 151 | 248 | 237 | 19 | 31 | 30 | 7 | 9 | 7 |
| Archuleta | 1,303 | 2,207 | 3,181 | 118 | 276 | 277 | 32 | 500 | 435 |
| Chaffee | 1,177 | 1,011 | 1,638 | 131 | 112 | 182 | 164 | 101 | 218 |
| Clear Creek | 779 | 732 | 747 | 139 | 146 | 149 | 12 | 41 | 51 |
| Delta | 609 | 780 | 1,106 | 57 | 59 | 88 | 14 | 32 | 98 |
| Gilpin | 378 | 696 | 352 | 63 | 99 | 50 | 10 | 47 | 25 |
| Grand | 1,047 | 2,431 | 2,065 | 95 | 221 | 188 | 91 | 321 | 246 |
| Gunnison | 943 | 2,200 | 2,251 | 86 | 220 | 225 | 64 | 182 | 279 |
| Las Animas | 403 | 445 | 840 | 40 | 45 | 76 | 4 | 23 | 9 |
| Logan | 231 | 255 | 201 | 26 | 28 | 22 | 13 | 20 | 10 |
| Moffat | 289 | 454 | 497 | 48 | 76 | 83 | 6 | 13 | 40 |
| Montrose | 645 | 928 | 733 | 61 | 81 | 64 | 97 | 186 | 197 |
| Morgan | 504 | 466 | 158 | 46 | 42 | 14 | 29 | 9 | 6 |
| Otero | 103 | 107 | 102 | 13 | 13 | 16 | 6 | 1 | 3 |
| Park | 2,324 | 2,270 | 2,244 | 186 | 197 | 204 | 348 | 172 | 375 |
| Rio Blanco | 77 | 263 | 302 | 13 | 44 | 43 | 0 | 145 | 110 |
| Routt | 837 | 1,533 | 2,706 | 73 | 153 | 271 | 150 | 352 | 465 |
| San Miguel | 761 | 657 | 1,127 | 109 | 73 | 125 | 134 | 68 | 288 |
| Teller | 917 | 1,942 | 1,257 | 61 | 129 | 79 | 110 | 323 | 235 |
| **Category 4** | | | | | | | | | |
| Custer | 98 | 173 | 284 | 20 | 35 | 57 | 1 | 0 | 1 |
| Elbert | 612 | 236 | 659 | 47 | 18 | 60 | 175 | 15 | 35 |
| Huerfano | 127 | 186 | 317 | 21 | 27 | 45 | 2 | 4 | 22 |
| Kit Carson | 194 | 271 | 102 | 49 | 90 | 26 | 5 | 1 | 3 |
| Lake | 246 | 476 | 387 | 41 | 95 | 77 | 7 | 16 | 35 |
| Montezuma | 486 | 622 | 1,225 | 54 | 69 | 144 | 71 | 83 | 43 |
| Ouray | 413 | 463 | 250 | 103 | 116 | 63 | 21 | 55 | 34 |
| Prowers | 350 | 150 | 50 | 70 | 30 | 10 | 0 | 0 | 0 |
| Rio Grande | 332 | 1,086 | 652 | 83 | 136 | 82 | 4 | 25 | 202 |
| Washington | 90 | 15 | 20 | 18 | 3 | 3 | 1 | 0 | 0 |
| Yuma | 256 | 148 | 949 | 51 | 27 | 173 | 1 | 0 | 0 |
| **Category 5** | | | | | | | | | |
| Baca | 5 | 20 | 4 | 1 | 6 | 1 | 0 | 0 | 0 |
| Bent | 134 | 126 | 116 | 34 | 32 | 26 | 2 | 0 | 2 |
| Cheyenne | 60 | 128 | 52 | 20 | 51 | 21 | 3 | 0 | 0 |
| Conejos | 137 | 113 | 256 | 137 | 25 | 57 | 0 | 0 | 26 |
| Costilla | 54 | 765 | 2,159 | 11 | 153 | 432 | 5 | 194 | 730 |
| Crowley | 11 | 5 | 12 | 11 | 5 | 12 | 0 | 1 | 3 |
| Hinsdale | 81 | 319 | 489 | 41 | 80 | 245 | 6 | 1 | 40 |
| Lincoln | 24 | 15 | 25 | 5 | 3 | 5 | 0 | 0 | 2 |
| Phillips | 37 | 13 | 60 | 12 | 4 | 20 | 0 | 0 | 0 |
| Saguache | 43 | 133 | 131 | 9 | 27 | 33 | 0 | 1 | 0 |
| San Juan | 56 | 59 | 43 | 56 | 59 | 29 | 2 | 10 | 3 |
| **Category 6** | | | | | | | | | |
| Dolores | 112 | 199 | 89 | 37 | 66 | 30 | 0 | 1 | 0 |
| Jackson | 1 | 2 | 6 | 1 | 2 | 3 | 1 | 2 | 0 |
| Kiowa | 0 | 0 | 3 | 0 | 0 | 2 | 0 | 0 | 0 |
| Mineral | 6 | 35 | 20 | 4 | 18 | 11 | 0 | 1 | 3 |
| Sedgwick | 14 | 18 | 15 | 7 | 6 | 5 | 14 | 0 | 0 |

BLM_0037976

TABLE 11

## PROTESTS AND APPEALS

| Assessors | 2005 | 2007 | 2009 |
|---|---|---|---|
| Total Parcels | 2,268,488 | 2,342,391 | 2,511,308 |
| Parcels/Schedules Protested | 99,538 | 129,234 | 151,601 |
| Protests as a Percent of Total Parcels | 4.4% | 5.5% | 6.0% |
| Percent Change from Prior Reappraisal | -21.5% | 29.8% | 17.3% |
| **County Boards of Equalization (CBOE)** | | | |
| Parcels/Schedules Appealed to CBOE | 19,065 | 19,280 | 35,471 |
| Percent of CBOE Appeals to Protests | 19.2% | 14.9% | 23.4% |
| **Additional Assessor Costs** | | | |
| Dollars of Overtime Paid | $93,226 | $113,288 | $221,428 |
| Hours of Compensation Time Granted | 2,825 | 3,317 | 7,396 |
| **Parcels Protested Per Assessor's Employee** | | | |
| Average Number Protested Per Employee | 109 | 94 | 116 |
| Maximum Number Protested Per Employee | 279 | 293 | 441 |
| Minimum Number Protested Per Employee | 0 | 0 | 1 |
| **Parcels Protested Per Employee – Frequency Distribution** | | | |
| 0 – 50 | 28 | 24 | 24 |
| 51 – 100 | 19 | 13 | 12 |
| 101 – 200 | 16 | 19 | 16 |
| 201 – 300 | 1 | 8 | 8 |
| 301 – 400 | 0 | 0 | 2 |
| 401 – 500 | 0 | 0 | 2 |
| Counties Reporting | 64 | 64 | 64 |

Parcel count derived from county Abstracts of Assessment.  Includes condominium units.
Overtime/comp time figures not available from all counties.

BLM_0037977

TABLE 12

| County | 2010 Abatement Amounts | 2010 Abatement Counts | 2010 Average Abated | 2009 Abatement Amounts | 2009 Abatement Counts | 2009 Average Abated | 2008 Abatement Amounts | 2008 Abatement Counts | 2008 Average Abated |
|---|---|---|---|---|---|---|---|---|---|
| Adams | $3,410,872 | 1,656 | $2,060 | $2,174,806 | 1,603 | $1,357 | $1,500,009 | 1,133 | $1,324 |
| Alamosa | $242,513 | 44 | $5,512 | $30,530 | 50 | $611 | $7,926 | 38 | $209 |
| Arapahoe | $18,502,905 | 1,804 | $10,257 | $7,766,984 | 1,306 | $5,947 | $9,076,676 | 1,153 | $7,872 |
| Archuleta | $151,059 | 166 | $910 | $56,116 | 46 | $1,220 | $101,887 | 97 | $1,050 |
| Baca | $1,107 | 38 | $29 | $13,419 | 38 | $353 | $10,617 | 41 | $259 |
| Bent | $3,525 | 15 | $235 | $2,363 | 33 | $72 | $7,607 | 119 | $64 |
| Boulder | $1,765,105 | 798 | $2,212 | $1,496,375 | 1,163 | $1,287 | $1,557,669 | 697 | $2,235 |
| Broomfield | $1,050,717 | 352 | $2,985 | $2,298,613 | 843 | $2,985 | $1,809,958 | 237 | $7,637 |
| Chaffee | $52,998 | 69 | $768 | $32,632 | 63 | $518 | $35,440 | 74 | $479 |
| Cheyenne | $7,692 | 13 | $592 | $5,608 | 14 | $401 | $559 | 13 | $43 |
| Clear Creek | $144,645 | 131 | $1,104 | $123,406 | 173 | $713 | $65,408 | 257 | $255 |
| Conejos | $9,258 | 43 | $215 | $17,780 | 63 | $282 | $26,151 | 108 | $242 |
| Costilla | $219,789 | 547 | $402 | $22,800 | 83 | $275 | $91,212 | 57 | $1,600 |
| Crowley | $113,476 | 3 | $37,825 | $44 | 1 | $44 | $505 | 3 | $168 |
| Custer | $3,392 | 6 | $565 | $6,702 | 17 | $394 | $5,070 | 16 | $317 |
| Delta | $94,248 | 137 | $688 | $34,456 | 244 | $141 | $76,841 | 96 | $800 |
| Denver | $15,502,687 | 2,946 | $5,262 | $11,596,449 | 2,073 | $5,594 | $9,903,961 | 1,937 | $5,113 |
| Dolores | $8,298 | 12 | $692 | $4,184 | 10 | $418 | $11,263 | 23 | $490 |
| Douglas | $4,748,599 | 1,331 | $3,568 | $3,533,946 | 1,021 | $3,461 | $6,063,080 | 898 | $6,752 |
| Eagle | $3,527,624 | 852 | $4,140 | $2,488,018 | 525 | $4,739 | $3,648,808 | 949 | $3,845 |
| Elbert | $200,333 | 250 | $801 | $145,701 | 123 | $1,185 | $307,941 | 102 | $3,019 |
| El Paso | $5,797,762 | 2,166 | $2,677 | $4,270,915 | 2,419 | $1,766 | $4,614,242 | 3,493 | $1,321 |
| Fremont | $302,095 | 72 | $4,196 | $241,342 | 261 | $925 | $125,300 | 319 | $393 |
| Garfield | $2,257,481 | 327 | $6,904 | $221,959 | 169 | $1,313 | $447,335 | 317 | $1,411 |
| Gilpin | $76,482 | 34 | $2,249 | $252,948 | 50 | $5,059 | $22,963 | 49 | $469 |
| Grand | $122,574 | 81 | $1,513 | $119,829 | 139 | $862 | $97,872 | 165 | $593 |
| Gunnison | $83,963 | 93 | $903 | $100,450 | 109 | $922 | $78,804 | 71 | $1,110 |
| Hinsdale | $16,600 | 100 | $166 | $13,425 | 9 | $1,492 | $8,478 | 18 | $471 |
| Huerfano | $93,251 | 130 | $717 | $476,917 | 571 | $835 | $280,061 | 48 | $5,835 |
| Jackson | $0 | 0 | $0 | $5,836 | 2 | $2,918 | $1,197 | 7 | $171 |
| Jefferson | $7,497,561 | 2,347 | $3,195 | $7,244,322 | 1,982 | $3,655 | $6,595,429 | 1,867 | $3,533 |
| Kiowa | $768 | 10 | $77 | $25,880 | 3 | $8,627 | $1,991 | 6 | $332 |
| Kit Carson | $98,347 | 44 | $2,235 | $312,380 | 94 | $3,323 | $57,979 | 263 | $220 |
| Lake | $66,797 | 287 | $233 | $71,063 | 22 | $3,230 | $19,071 | 93 | $205 |
| La Plata | $502,663 | 301 | $1,670 | $1,739,272 | 359 | $4,845 | $885,635 | 551 | $1,607 |
| Larimer | $3,598,680 | 2,079 | $1,731 | $1,413,709 | 1,387 | $1,019 | $1,209,725 | 1,542 | $785 |
| Las Animas | $65,339 | 52 | $1,257 | $6,665 | 25 | $267 | $10,716 | 36 | $298 |
| Lincoln | $1,503 | 10 | $150 | $18,251 | 29 | $629 | $30,429 | 19 | $1,602 |
| Logan | $454,111 | 55 | $8,257 | $88,907 | 33 | $2,694 | $10,034 | 29 | $346 |
| Mesa | $685,620 | 333 | $2,059 | $719,143 | 228 | $3,154 | $184,150 | 281 | $655 |
| Mineral | $85 | 1 | $85 | $15 | 1 | $15 | $696 | 4 | $174 |
| Moffat | $66,333 | 194 | $342 | $36,464 | 125 | $292 | $218,173 | 510 | $428 |
| Montezuma | $722,066 | 543 | $1,330 | $269,507 | 161 | $1,674 | $219,728 | 334 | $658 |
| Montrose | $98,155 | 95 | $1,033 | $152,405 | 125 | $1,219 | $65,673 | 78 | $842 |
| Morgan | $16,509 | 19 | $869 | $51,146 | 20 | $2,557 | $10,662 | 23 | $464 |
| Otero | $36,414 | 11 | $3,310 | $8,976 | 23 | $390 | $10,839 | 21 | $516 |
| Ouray | $15,601 | 99 | $158 | $15,882 | 19 | $836 | $185,148 | 66 | $2,805 |
| Park | $108,280 | 314 | $345 | $60,361 | 560 | $108 | $84,878 | 355 | $239 |
| Phillips | $4,076 | 21 | $194 | $4,574 | 12 | $381 | $357 | 4 | $89 |
| Pitkin | $1,202,813 | 396 | $3,037 | $485,027 | 123 | $3,943 | $240,001 | 98 | $2,449 |
| Prowers | $13,582 | 246 | $55 | $11,873 | 43 | $276 | $686 | 17 | $40 |
| Pueblo | $3,998,304 | 210 | $19,040 | $968,974 | 201 | $4,821 | $233,114 | 276 | $845 |
| Rio Blanco | $93,737 | 118 | $794 | $99,614 | 56 | $1,779 | $127,267 | 60 | $2,121 |
| Rio Grande | $10,703 | 45 | $238 | $16,258 | 57 | $285 | $134,194 | 57 | $2,354 |
| Routt | $346,856 | 197 | $1,761 | $313,430 | 187 | $1,676 | $321,807 | 373 | $863 |
| Saguache | $136,748 | 43 | $3,180 | $2,178 | 13 | $168 | $10,302 | 40 | $258 |
| San Juan | $64,529 | 17 | $3,796 | $361 | 2 | $181 | $1,936 | 3 | $645 |
| San Miguel | $348,881 | 97 | $3,597 | $72,418 | 39 | $1,857 | $112,586 | 198 | $569 |
| Sedgwick | $1,984 | 15 | $132 | $7,713 | 21 | $367 | $1,969 | 5 | $394 |
| Summit | $267,976 | 357 | $751 | $406,847 | 380 | $1,071 | $465,628 | 233 | $1,998 |
| Teller | $33,267 | 51 | $652 | $104,531 | 64 | $1,633 | $84,483 | 63 | $1,341 |
| Washington | $1,645 | 10 | $165 | $1,230 | 19 | $65 | $697 | 13 | $54 |
| Weld | $3,668,144 | 1,361 | $2,695 | $815,284 | 627 | $1,300 | $1,215,689 | 1,068 | $1,138 |
| Yuma | $53,911 | 44 | $1,225 | $27,478 | 72 | $382 | $13,954 | 56 | $249 |
| **Totals:** | **$82,793,038** | **24,238** | **$3,416** | **$53,126,692** | **20,333** | **$2,613** | **$52,750,526** | **21,177** | **$2,491** |

BLM_0037978

## SENIOR CITIZEN AND DISABLED VETERAN EXEMPTION

In 2000, voters enacted Section 3.5, Article X of the Colorado Constitution, creating a property tax exemption for qualifying senior citizens and their surviving spouses. Voters expanded the program in 2006 to include qualifying disabled veterans. For both groups, the exemptions as enacted reduce the taxable actual value of a residential property by 50 percent, up to a maximum reduction of $100,000. The reduction in property tax revenue is backfilled by the State of Colorado.

The constitution grants the Colorado General Assembly the authority to increase or decrease the amount of the senior and disabled veteran exemptions. For tax year 2009, the General Assembly enacted legislation to reduce the amount of the senior exemption to 50 percent of $0, effectively suspending the senior exemption benefit. In 2010, the suspension was extended to property tax years 2010 and 2011, through the passage of Senate Bill 10-190.The suspension, which did not affect the disabled veteran exemption, saved the state approximately $91.7 million in 2010.

To qualify for the senior exemption, a senior must be at least 65 years old on January 1 and must have owned and occupied the property for at least 10 consecutive years as his or her primary residence. To qualify for the disabled veteran exemption, a veteran must be 100 percent permanently disabled through a service connected disability and must have owned and occupied the property since January 1.

Applications for the senior citizen exemption are filed with the county assessor no later than July 15, and applications for the disabled veteran exemption are filed with the Colorado Division of Veterans Affairs, Department of Military and Veterans Affairs (DMVA), no later than July 1. If approved by the DMVA, the veteran's application is forwarded to the county assessor for further processing and approval. Once approved, the senior citizen or disabled veteran exemption remains in effect from year to year until a change in ownership or occupancy triggers its removal. Each year, the assessor is required to mail a notice to all residential property owners explaining the exemption programs.

No later than October 10, the assessor is required to send the Division of Property Taxation an electronic list of the exemptions granted, including the names and social security numbers of each person occupying the property. The Division uses the data to identify individuals who were granted an exemption on more than one property, and denies the exemptions on each property. In 2010, the Division denied exemptions on 21 properties owned by 12 applicants. In 2010, 167,714 properties were approved for the senior citizen exemption, and 3,012 received the disabled veteran exemption.

The senior and disabled veteran exemption programs do not result in a loss of revenue to local governments. Instead, the state reimburses the local governments for the tax revenue exempted. No later than April 1, county treasurers send the State Treasurer an itemized list of the exemptions granted and taxes exempted. No later than April 15, the State Treasurer reimburses the local governments for the lost revenue. In April 2011, the State Treasurer reimbursed local governments $1,578,459 for disabled veteran exemptions granted for tax year 2010.

## POSSESSORY INTERESTS

In 2001 the Colorado Supreme Court ruled that certain possessory interests are subject to ad valorem taxation in Colorado. A possessory interest is defined as a private property interest in government-owned property or the right to the occupancy and use of any benefit in government-owned property that has been granted under lease, permit, license, concession, contract or other agreement. The use of the property must be in connection with a business conducted for profit.

Taxable possessory interests may include but are not limited to:

1. Private concessionaires utilizing government owned land, improvements, or personal property unless operating pursuant to a management contract.

2. Government land and improvements used in the operation of a farm or ranch.

3. Government land, improvements, and/or personal property used in the operation of ski or recreational areas.

BLM_0037979

4. Land underlying privately owned cabins or other residential property located on government land that is rented commercially.

5. Recreational use of lakes, reservoirs, and rivers in a revenue-generating capacity.

6. Land, improvements, and personal property at a tax-exempt airport.

7. Other government property leased to private parties. However, the property <u>may</u> be otherwise exempt pursuant to Colorado Revised Statutes.

## 2010 PROPERTY TAX LEGISLATION

### Senate Bills

### SB 10-019
**Property taxation - small or low impact hydroelectric facilities - valuation for purpose of property taxation.**

This bill adds "small or low impact hydroelectric energy facility" to the definition of "public utility" found in § 39-4-101(3)(b), C.R.S. It states that, for the purpose of property taxation, these facilities shall be valued solely by the income approach in the same manner in which wind energy and solar energy facilities are valued.

A small or low impact hydroelectric facility is a new facility, or an improvement to an existing facility that increases its capacity by at least 25%, that has been placed in service on or after January 1, 2010, and meets the following criteria:

The facility has a nameplate rating of 10 megawatts or less.

Or, the facility has a nameplate rating of more than 10 megawatts, and it conforms to the following conditions:

— It includes measures to prevent fish mortality in on-stream reservoirs and natural waterways;

— It does not cause any violation of state water quality standards when operated;

— If it is an addition to water infrastructure that existed prior to January 1, 2010, it does not change the quantity or timing of diversions or releases for purposes of peak power generation; and if it is an addition to water infrastructure constructed on or after January 1, 2010,

its primary purpose is not the sole production of electricity.

Signed by Governor Ritter: June 8, 2010
Effective Date: Upon signature

### SB 10-046
**Concerning the boundaries of Forest Improvement Districts.**

This bill amends § 32-18-103(1), C.R.S., in several places to allow for the creation of a forest improvement district with boundaries that comprise less than the full territory of the counties and/or municipalities in which it is located. Changes were also made to allow the boundaries of a forest improvement district to include non-contiguous tracts of property. Prior to this bill, the boundaries of a forest improvement district could only include the entire territory of the counties and/or municipalities located within the district.

Signed by Governor Ritter: March 10, 2010
Effective Date: Upon signature

### SB 10-100
**Concerning greater financing flexibility for local districts organized for purposes related to energy.**

In 2008, House Bill 1350 expanded Colorado cities' and counties' existing authority to create local improvement districts (LIDs) by permitting them to create a local improvement district specifically for clean energy improvements. SB 10-100 expands upon the 2008 changes to allow multiple counties, even non-contiguous counties, to form a single improvement district and to except new energy LIDs from a variety of requirements that are otherwise applicable to local improvement districts.

The bill also expands the definition of renewable energy improvements for LIDs to include improvements located at a "qualified community location," and it defines "qualified community location" to include "community solar gardens" created pursuant to HB 10-1342.

The bill amends §§ 30-20-602, 603, 609, 616, 619, 627 (county local improvement districts) and §§ 31-25-501 and 503 (municipal special improvement districts) of the Colorado Revised Statutes.

Signed by Governor Ritter: May 5, 2010
Effective Date: Upon signature

BLM_0037980

## SB 10-138

**Concerning the award of expenses in a proceeding to appeal the valuation of property for property tax purposes.**

This bill was the direct result of a Board of Assessment Appeals (BAA) case which was appealed to the Court of Appeals and then heard by the Supreme Court. It removed language from § 39-8-109(1), C.R.S., which had indicated that the successful party in a BAA or District Court proceeding could recover its costs from the losing party and replaced it with language stating that the appellant and the county shall each be responsible for their respective costs.

Signed by Governor Ritter: April 21, 2010
Effective Date: August 11, 2010

## SB 10-177

**Concerning the promotion of clean energy technologies.**

This bill adds "biomass energy facility" to the definition of "public utility" found in § 39-4-101(3)(b), C.R.S. It states that for the purpose of property taxation, a biomass energy facility shall be valued solely by the income approach in the same manner in which wind energy and solar energy facilities are valued.

The bill also amends § 39-1-102(1.1), C.R.S., to state that, effective July 1, 2013, "agriculture" shall include "silviculture." "Silviculture" is defined as the branch of forestry that is concerned with the cultivation of trees. The bill provides that "implements of husbandry," as defined in § 42-1-102(44), C.R.S., shall include personal property valued by the county assessor as silvicultural. "Implements of husbandry" means every vehicle that is designated, adapted, or used for agricultural purposes and includes equipment used solely for the application of fertilizer.

Signed by Governor Ritter: June 9, 2010
Effective Date: August 11, 2010 for tax years 2011 forward

## SB 10-190

**Concerning the suspension of the property tax exemption for qualifying seniors for specified property tax years, and making an appropriation therefore.**

This bill amends § 39-3-203(1), C.R.S., to suspend the property tax exemption for qualifying seniors for the 2010 and 2011 tax years (payable in 2011 and 2012). The bill also reduces the general fund appropriation to the Department of the Treasury for the senior exemption by $91,729,198.

Although the funding has been suspended, assessors will continue to notify residential property owners of the existence of the exemption, process applications, and submit exemption data to the Division. The disabled veteran exemption is not affected by this bill.

Signed by Governor Ritter: May 27, 2010
Effective Date: July 1, 2010

## SB10-212

**Concerning the repeal of mechanisms to refund excess state revenue.**

This bill repeals several mechanisms that had been enacted as a means to refund money collected in excess of the state spending limit imposed by section 20, article X of the Colorado Constitution (TABOR).

One of the repealed mechanisms was the business personal property tax rebate found in § 39-22-124, C.R.S. The repealed statute had provided a refund of a portion of the property taxes paid on personal property by establishing a credit against state income taxes. The refund was only issued during years in which the State Controller certified that state revenues exceeded the fiscal limitations imposed by TABOR by $170,000,000 or more.

Since 2006 however, Referendum C (passed in November of 2005) allowed the state to retain excess revenue and use it for other designated purposes.

Signed by Governor Ritter: June 10, 2010
Effective Date: July 1, 2010

## SJR 10-002

**Concerning a request for a comprehensive tax study.**

This resolution is a request for a comprehensive tax study to be conducted by the University of Denver and funded by the

BLM_0037981

private sector. The study will consider, but not be limited to, the following questions:

— A nonpartisan review of tax policy of the state and local governments in Colorado;

— Whether changes in tax policy or tax laws would aid in the equitable distribution of state and local tax burdens among Colorado taxpayers;

— The relationship of state and local taxes to the long-term economic growth and prosperity of the state, its communities, and its citizens;

— The burdens on individuals and businesses resulting from taxes imposed by the state and by local governments and how these burdens have changed over time;

— The changing burdens on the state and local governments in financing the provision of public services to the residents of Colorado;

— Recommendations concerning the optimum combination of broad-based state and local taxes to adequately finance future needs for government services and equitably distribute the burdens on taxpayers;

— Future trends that might create financial impacts on the state and local governments within the next ten years and evaluation of the ability of the tax base of the state and local governments to respond to those trends;

— The rate, bases, credits, and exemptions of each state and local tax;

— The potential revenue and expenditure limitations for state and local governments.

The General Assembly asked that the report be provided to the First Regular Session of the Sixty-eighth General Assembly in January 2011.

## House Bills

### HB 10-1007
**Concerning an adjustment of fees charged by a county clerk and recorder for filing a document with the county.**

This bill amends § 30-1-103, C.R.S., to change the standard recording fees collected by the county clerk and recorder.

It increases the recording fee for the first page of a multi-page document from five to ten dollars while the fee for each additional page remains five dollars. The increase does not apply to any filing received by the clerk and recorder when acting as the authorized agent of the Department of Revenue pursuant to § 38-29-128, C.R.S., and § 42-6-121, C.R.S.

For documents that require multiple entries in the grantor or grantee index, the bill eliminates a five dollar fee that had been required for each additional entry.

**NOTE**: Each document recorded will still include the $1.00 surcharge; for example, a two page deed will cost $16.00.

Signed by Governor Ritter: April 5, 2010
Effective Date: July 1, 2010

### HB 10-1046
**Concerning the recorded date of receipt of property tax payments by a county treasurer's office when the payment has no United States Postal Service postmark.**

This bill was introduced to assist the county treasurers with receipt of property tax payments that do not have a United States Postal Service postmark.

It amends § 39-10-104.5 (8), C.R.S., to remove the language "Postage meter postmarks must be accompanied by a United States Postal Service postmark if not received on or before the due date." The bill added provisions to instruct the county treasurer as follows:

— If the payment was actually received no later than five days after the due date, the payment is recorded as if it was received on the due date.

— If the payment was actually received six or more days after the due date, the payment is recorded as received on the actual date.

Signed by Governor Ritter: March 5, 2010
Effective Date: Upon Signature

BLM_0037982

## HB 10-1062

**Concerning the ability to allow a county to purchase crime insurance coverage in lieu of surety bonds.**

This bill amends § 30-10-110 (1), C.R.S., and adds a new sub-section (2), to allow counties the option of purchasing crime insurance coverage in lieu of a surety bond to protect against potential malfeasance of county officers named in § 39-10-101, C.R.S., or any of their employees.

It amends various sections of title 30, article 10 of the Colorado Revised Statutes to make them consistent with the requirements of § 39-10-110(2), C.R.S., for county commissioners, clerks and recorders, sheriffs, coroners, treasurers, assessors, and surveyors.

It amends § 30-10-111, C.R.S., clarifying the oath of office for appointed deputies of county officers.

The bill also amends §§ 30-10-101(1)(a) and 102(1), C.R.S., to remove obsolete references to clerks of district and county courts as county officers. Such court clerks are employees of the judicial branch.

Signed by Governor Ritter: April 21, 2010
Effective Date August 11, 2010

## HB 10-1107

**Concerning limitations on the inclusion of agricultural lands within urban renewal areas.**

This bill modifies §§ 31-25-102, 103, and 107, C.R.S., to prohibit the inclusion of agricultural land within an urban renewal area unless the exceptions listed below are satisfied. The bill does not pertain to agricultural land made part of an urban renewal area prior to June 1, 2010. Agricultural land is defined by the bill to include land that has been classified by the assessor as agricultural land at any time during the five years prior to its inclusion into an urban renewal area, § 31-25-103(8.5), C.R.S.

**Exceptions** - Under the bill, a municipality may only include agricultural land into a new or existing urban renewal area if the land meets one or more of the following conditions, § 31-25-107(1)(c)(II), C.R.S.:

— The land is a brownfield site. As defined in § 31-25-103(3.1), C.R.S., "'brownfield site' means real property, the development expansion, redevelopment, or reuse of which will be complicated by the presence of a substantial amount of one or more hazardous substances, pollutants, or contaminants, as designated by the United States Environmental Protection Agency (EPA);"

— At least one-half of the urban renewal area consists of parcels containing "urban level development" that constitute a slum or blighted area, and at least two-thirds of the perimeter of the urban renewal area boarders "urban level development." As defined in § 31-25-103(7.5), C.R.S., "'urban level development' means an area in which there is a predominance of either permanent structures or above-ground or at-grade infrastructure;"

— The land is an enclave within the municipality, and the entire perimeter of the enclave boarders "urban level development;" or,

— Each public body that levies a property tax on the agricultural land agrees to its inclusion into the urban renewal area.

In addition, agricultural land cannot be incorporated into an urban renewal area prior to June 1, 2020, unless each of the following conditions found in § 31-25-107(1)(c)(III), C.R.S., is also satisfied:

— The agricultural land is contiguous to the urban renewal area, and the urban renewal area existed on June 1, 2010;

— Since June 1, 2010, the current owner has owned both the agricultural land and other land located within the urban renewal area that is contiguous to the agricultural land; and

— Both the agricultural land, and the owner's other land, are to be developed solely to create long-term jobs related to manufacturing.

**Assessor Enforcement** - Within 30 days after receiving notice that an urban renewal plan authorizing the use of sales or property tax TIF has been adopted or substantially modified, the assessor may notify the municipality if he or she believes that agricultural land has been improperly included within the urban renewal area. If the assessor does so, the municipality may file an action in district court to establish its right to include the area in conformance with the exceptions listed above. If the assessor fails

BLM_0037983

to do so, the inclusion of the agricultural land becomes incontestable, § 39-25-107(13), C.R.S..

The bill clarifies that a municipality is required to notify the assessor whenever an urban renewal plan authorizing the use of tax increment financing has been substantially modified, § 31-25-107(10)(a), C.R.S. It also states that urban renewal plans approved or substantially modified must include the legal description of any agricultural land added to the urban renewal area, § 31-25-107(1)(d), C.R.S.

**Calculation of Base Value** – When agricultural land is appropriately included in an urban renewal area, the bill directs the assessor to determine the market value of the agricultural land and include that value in the base value of the TIF area. The purpose of this provision is to ensure that the URA does not receive a windfall of tax increment revenue when the land is later reclassified to a different class of taxable property. This does not affect the classification or valuation for assessment of the agricultural land.

**Other provisions** - The bill directs the assessor to administer tax increment financing for urban renewal areas in accordance with the manuals, appraisal procedures, and instructions of the Property Tax Administrator, § 31-25-107(9)(h), C.R.S.

Language allowing the municipality or authority to enter into an intergovernmental agreement with the county to allocate responsibility for the cost of additional county infrastructure was modified to allow intergovernmental agreements with any political subdivision in the urban renewal area, §31-25-107(11), C.R.S. Language was also added allowing such an agreement to include a waiver of notice requirements and enforcement rights.

The bill exempts a city and county from the requirement that an urban renewal impact report be submitted to the county commissioners. § 31-25-107(3.5)(c), C.R.S.

Signed by Governor Ritter: April 14, 2010
Effective Date: June 1, 2010

## HB 10-1117
**Concerning Abatement and Refund of Taxes and Electronic Transmission of Notices of Valuation and Tax Statements.**

This bill amends § 39-1-113, C.R.S., to allow the board of county commissioners (BOCC)

to authorize the assessor to settle by written mutual agreement any petition for abatement or refund in an amount of $10,000 (previously $1,000) or less per tract, parcel, or lot of land or per schedule of personal property. The bill further provides that abatement petitions approved by the BOCC that are greater than $10,000 (formerly $1,000) in taxes, per schedule, per year, must be submitted to the Property Tax Administrator for review.

The bill adds a new subsection (1.7) to § 39-5-121, C.R.S., allowing a taxpayer to request to receive Notices of Valuation (NOVs) electronically by submitting an electronic (e-mail) address to the assessor. The assessor may then send all future NOVs to the taxpayer's e-mail address. If the taxpayer subsequently requests to receive future NOVs by mail, the assessor must comply with the request. Failure of a taxpayer to receive the electronic NOV shall not preclude the collection of taxes due.

The bill amends § 39-10-103 C.R.S., allowing a taxpayer to request to receive tax statements electronically by submitting an electronic (e-mail) address to the treasurer. The treasurer may then send all future tax statements to the taxpayer's e-mail address. If the taxpayer subsequently requests to receive future tax statements by mail, the treasurer must comply with the request. Failure of a taxpayer to receive the electronic tax statement shall not preclude the collection of taxes due.

The bill adds the "electronic statement" language to § 39-10-104.5(3)(a), C.R.S., which outlines tax payment dates and accrual of delinquent interest.

It is the Division's position that changes to the abatement threshold ($1,000 to $10,000), as outlined in this bill, are effective beginning January 1, 2011. Therefore, abatement petitions filed with the county after January 1, 2011, and that are approved by the BOCC, need additional review and approval by the Property Tax Administrator only when the approved refund or abatement amount is greater than $10,000 in taxes, per parcel, per year.

Signed by Governor Ritter: May 5, 2010
Effective Date: August 11, 2010

BLM_0037984

## HB 10-1197

**Concerning a decrease in the maximum amount of a state income tax credit that may be claimed for the donation of a conservation easement in gross, and making an appropriation therefor.**

The primary purpose of this bill is to decrease the maximum state income tax credit available for placing land in a conservation easement. However, the bill also makes the following changes to property tax law.

It amends the definition of agricultural land in § 39-1-102(1.6)(a)(III), C.R.S., by adding the word "nonagricultural" in front of the word residential as follows:

"'Agricultural land' under this subparagraph (III) does not include any portion of such land that is actually used for nonagricultural commercial or NONAGRICULTURAL residential purposes."

It also amends § 39-1-103(5)(a), C.R.S., with the addition of the following language:

"Nothing in this subsection (5) shall be construed to require or permit the reclassification of agricultural land or improvements, including residential property, due solely to subjecting the land to a perpetual conservation easement."

Under these changes, when a parcel of land that is subject to a perpetual conservation easement qualifies for agricultural classification pursuant to § 39-1-102(1.6)(a)(III), C.R.S., the agricultural classification and valuation shall extend to the portion of the parcel that constitutes a residential footprint, unless that portion is used for nonagricultural residential purposes.

Signed by Governor Ritter:  June 7, 2010
Effective Date: Upon Signature

## HB 10-1267

**Concerning the property tax treatment of an independently owned residential solar electric generation facility.**

This bill amends §§ 39-1-102(6) and 39-3-102(1), C.R.S., to expand the household furnishings (not productive of income) exemption to include any independently owned residential solar electric generation facility that:

— Is located on residential real property

— Is owned by a person other than the owner of the residential real property

— Is installed on the customer's side of the meter

— Is used to produce electricity from solar energy primarily for use in the residential improvement(s)

— Has a production capacity of no more than 100 kilowatts.

An independently owned residential solar electric generation facility is not considered to be used for the production of income unless the facility produces income for the owner of the residential real property on which the facility is located. Rebates, offsets, credits, and reimbursements made available by a utility do not constitute the production of income under this statute.

Signed by Governor Ritter:  June 11, 2010
Effective Date: August 11, 2010, for tax years 2011 forward

## HB 10-1293

**Concerning the creation of a task force to study property tax assessment issues related to the use of land for agricultural purposes.**

This bill adds § 39-1-122, C.R.S., to create an interim task force directed to study the property tax assessment and classification of land used for agricultural and other purposes. The task force is instructed as follows:

— To study, make recommendations, and report findings on all matters relating to property tax assessment and classification in connection with land used for both agricultural and residential purposes, including, without limitation, the current system for classification of agricultural and residential property in Colorado, the fiscal, land use, and other impacts of the state's current classification system, and ideas for improving the current classification system.

— To meet in public at least four times, with the first meeting occurring no later than August 2, 2010.

— To solicit and accept reports and public testimony from sources that may include the National Conference of State Legislatures, representatives from state and local governments, property owners,

BLM_0037985

nonprofit organizations, and appropriate trade groups.

— To submit a written report of its findings and recommendations to the Local Government and Agriculture Committees of the Senate and House of Representatives by October 15, 2010.

— This section is repealed, effective July 1, 2012.

**NOTE:** The nine members of the Task Force consisted of: Colorado Property Tax Administrator, JoAnn Groff; four agricultural industry representatives: Alan Foutz (Farm Bureau), Tim Canterbury (Colorado Cattlemen's Association), Kent Peppler (Farm Bureau) and Gene Pielan (greenhouse business owner); two Colorado county commissioners, Hap Channell (Gunnison) and Frank Weddig (Arapahoe); and two Colorado county assessors, Brad Hughes (Montrose) and Ken Hood (Otero).

Signed by Governor Ritter:  June 7, 2010
Effective Date:  Task Force recommendation due October 15, 2010

## HB 10-1328
**Concerning the "New Energy Jobs Creation Act of 2010", and, in connection therewith, creating the Colorado New Energy Improvement District.**

This bill adds article 20 to title 32 of the Colorado Revised Statutes to create the Colorado New Energy Improvement District. The district was created to administer and finance a New Energy Improvement Program for on-site energy efficiency and renewable energy improvements.

The district is not an agency of state government, or of any local government, but is an independent public body corporate governed by an appointed board of directors. To operate in a county, the district needs authorization from the board of county commissioners.

The district's boundaries include residential properties that are accepted to the district upon application by the owner.  Applicants consent to the levying of a special assessment, and they may receive direct payments or reimbursements for energy improvements.

The energy improvements will be financed by bonds issued by the district that are paid by the special assessments.  A special assessment constitutes a lien against the property and shall have priority over all other liens, except property taxes, and shall be coequal with other special assessments.

The district shall deliver the assessment roll for collection to the treasurer of each county in which the district has assessed eligible real property.

The bill also amends § 31-25-1102, C.R.S., to include this district in the definition of "taxing authority."

Signed by Governor Ritter: June 11, 2010
Effective Date: Upon Signature

## HB 10-1342
**Concerning measures to encourage additional investment in solar energy generation facilities, and, in connection therewith, authorizing the creation of community solar gardens.**

This bill amends § 40-2-127, C.R.S., to direct the Public Utilities Commission (PUC) to adopt rules under which standard rebates may apply to solar generation facilities called "community solar gardens".

Its purpose is to provide Colorado residents and businesses, including renters, low-income customers, and agricultural producers, with the ability to own a portable and transferable interest in a solar generation facility.  Community Solar Gardens are defined as solar electric generation facilities:

— With a nameplate rating of two megawatts or less;

— That are located in or near a community served by a qualifying retail utility;

— Where the beneficial use of the facility belongs to the subscribers;

— Where the owner may be the retail utility or a different for-profit or non-profit entity;

— That are deemed to be located on the site of the customer facilities;

— And where each subscription has at least one kW and each facility has at least 10 subscribers;

BLM_0037986

The Division is monitoring the rule-making proceedings of the PUC. Language changes for the Assessors' Reference Library, Volume 5, will be proposed once the process has been completed.

Signed by Governor Ritter:  June 5
Effective Date:  Upon signature for tax years 2011 forward

## HB 10-1362
## Concerning the inactive status of a special district.

This bill authorizes certain non-functioning special districts to enter into an inactive status, thereby removing themselves from reporting and accountability requirements found in title 32 of the Colorado Revised Statutes.

The bill amends § 32-1-103, C.R.S., with the addition of a new subsection 9.3 that defines an inactive special district as a special district that:

— Is in a predevelopment stage.

— Has no residents other than those that lived within the district boundaries prior to the formation of the district.

— Has no business or commercial ventures or facilities within its boundaries.

— Has not issued any general obligation or revenue debt and does not have any financial obligations outstanding or contracts in effect that require performance by the district.

— Has not imposed a mill levy for tax collection in that fiscal year.

— Anticipates no receipt of revenue or has no planned expenditures, except for statutory compliance.

— Has initially filed a notice of inactive status pursuant to § 32-1-104 (3), C.R.S.

— And each year thereafter has filed a notice of continuing inactive status pursuant to § 32-1-104 (4), C.R.S.

The bill adds new subsections to § 32-1-104 C.R.S., to specify the rules by which a special district may enter into or leave an inactive status and to specify the provisions from which an inactive special district is exempted.

The Division recommends that assessors continue to certify values to districts that have placed themselves on an inactive status.

Signed by Governor Ritter: June 7, 2010
Effective Date: August 11, 2010

## HB 10-1365
## Electric utilities - conversion of coal-fired generation - natural gas or other low-emitting resources - cost recovery - appropriation.

This bill adds part 2 to article 3.2, title 40 of the Colorado Revised Statutes, to require that all rate-regulated utilities with coal-fired generating units submit an emissions reduction plan to the PUC covering the lesser of 900 megawatts or 50% of the utility's coal-fired units in Colorado. The plans must give primary consideration to replacing or repowering coal-fired generators with natural gas and must consider other low-emitting resources.

The PUC is to approve, deny, or modify the plans by December 15, 2010. The utilities' actions in complying with the plans are presumed to be prudent, and their costs are recoverable in rates.

NOTE: Replacing coal fired generation with natural gas or other low-emitting plants may leave some existing coal fired facilities stranded without Power Purchase Agreements. This could result in significant drops in taxable value to those counties when production of energy ceases.

Signed by Governor Ritter: April 19, 2010
Effective Date: Upon signature

## HB-10-1369
## Concerning the financing of public schools and making an appropriation therefore.

This bill amends §§ 22-54-103, 104, 106, 107, and 108 (The Public School Finance Act of 1994); 22-41-102; and 36-1-116 of the Colorado Revised Statutes, to modify funding for K-12 public schools.

For FY 2010-11 and FY 2011-12, the bill decreases the state's share of Total Program funding for school districts and institute charter schools by an amount determined by the Colorado Department of Education (CDE) and Legislative Council Staff. The bill specifies that the maximum reduction cannot exceed an amount that would reduce Total Program funding below $5,438,295,823 in FY 2010-11 and FY 2011-12. This would be $260 million below the original appropriation for FY 2009-10 and represents a reduction of

BLM_0037987

$365.4 million, or 6.35 percent, compared to the requirements of current law.

These reductions will be accomplished through the creation of district-level budget stabilization factors. The bill directs the CDE to determine the size of these budget stabilization factors and to apportion this reduction across school districts. Specifically, the CDE is directed to:

— Calculate a budget stabilization factor for the applicable budget year by dividing the total reduction by the sum of Total Program funding for all districts;

— Calculate the reduction for each district by multiplying the district's Total Program funding under current law by the district's budget stabilization factor; and

— Reduce each district's state share of Total Program funding by the calculated reduction or the district's state share, whichever is less.

In districts that have enacted a mill levy override, the override revenue will be calculated based on the district's Total Program funding before the calculated budget stabilization reduction has been applied.

Districts that do not receive enough state aid to implement a 6.35 percent funding reduction lose whatever state aid they do receive. In addition, such districts will be required to use their Total Program mill levy to buy down the state support they receive for categorical programs.

Finally, the bill specifies that, beginning in FY 2010-11, district pupil counts will not include pupils who were enrolled in charter schools converted to institute charter schools after July 1, 2010.

Signed by Governor Ritter: May 21, 2010
Effective Date: Upon signature

## HB 10-1386
### Concerning the amounts of filing fees charged by the property tax administrator for purposes of exemption of property from general taxation, and making an appropriation therefor.

This bill amends various provisions of § 39-2-117, C.R.S., to adjust the fees paid by those seeking or maintaining an exemption from the Property Tax Administrator for property owned and used for religious, charitable, or private school purposes.

Subparagraph (1)(a)(I) was amended to increase the application fee from $150 to $175. Subparagraphs (3)(a)(I) and (3)(a)(III) were amended to increase the fee for filing an annual report on or before April 15 from $53 to $75 and the fee for filing an annual report after April 15, but prior to the final deadline, from $150 to $250.

Subparagraphs (3)(a)(I) and (3)(a)(III) were amended to allow the Property Tax Administrator to waive all or part of the late filing fee for "good cause shown." Subsection (7) was amended to direct the PTA to adopt a rule to specify what constitutes "good cause shown."

The bill also makes adjustments to the 2010 long bill due to the anticipated increase in revenue from the changes in fees.

Signed by Governor Ritter: May 27, 2010
Effective Date: July 1, 2010

## HB 10-1431
### Property tax - valuation of renewable energy facilities.

This bill amends § 39-4-102, C.R.S., to specify a change in the valuation methodology for renewable energy facilities.

When valuing a renewable energy facility that begins generating energy before January 1, 2012, the Property Tax Administrator shall include only the cost of all property required to generate and deliver renewable energy to the interconnection meter that does not exceed the cost of property required to generate nonrenewable energy.

When valuing a renewable energy facility that begins generating energy on or after January 1, 2012, the administrator shall include only the cost of all property required to generate and deliver renewable energy to the interconnection meter that does not exceed the cost of property required to generate and deliver nonrenewable energy to the interconnection meter.

Signed by Governor Ritter: June 7, 2010
Effective Date: August 11, 2010, for tax years 2013 forward

BLM_0037988

# Section III

# Assessed Valuation Abstract Data

BLM_0037989

## ASSESSED VALUATION ABSTRACT DATA
## FOR YEARS 1873 THROUGH 2010

| YEAR | ASSESSED VALUATION | YEAR | ASSESSED VALUATION | YEAR | ASSESSED VALUATION |
|---|---|---|---|---|---|
| 1873... | $35,582,438 | 1896... | $206,598,561 | 1919... | $1,495,213,659 |
| 1874... | $44,393,806 | 1897... | $199,324,941 | 1920... | $1,590,267,667 |
| 1875... | $44,690,933 | 1898... | $192,243,080 | 1921... | $1,578,256,499 |
| 1876... | $44,130,204 | 1899... | $203,486,692 | 1922... | $1,548,617,879 |
| 1877... | $43,453,946 | 1900... | $216,776,356 | 1923... | $1,543,589,603 |
| 1878... | $43,072,648 | 1901... | $465,874,288 | 1924... | $1,540,500,479 |
| 1879... | $58,315,389 | 1902... | $354,002,501 | 1925... | $1,540,732,487 |
| 1880... | $73,698,746 | 1903... | $333,156,320 | 1926... | $1,546,830,046 |
| 1881... | $96,135,305 | 1904... | $342,170,703 | 1927... | $1,565,290,666 |
| 1882... | $104,440,683 | 1905... | $349,242,363 | 1928... | $1,577,560,380 |
| 1883... | $110,759,756 | 1906... | $356,244,547 | 1929... | $1,586,919,769 |
| 1884... | $115,675,014 | 1907... | $367,343,319 | 1930... | $1,586,462,903 |
| 1885... | $115,420,193 | 1908... | $375,284,970 | 1931... | $1,438,448,065 |
| 1886... | $124,269,710 | 1909... | $400,803,888 | 1932... | $1,280,563,890 |
| 1887... | $131,323,634 | 1910... | $414,885,770 | 1933... | $1,099,603,890 |
| 1888... | $168,812,246 | 1911... | $413,835,450 | 1934... | $1,099,332,563 |
| 1889... | $193,254,127 | 1912... | $422,722,713 | 1935... | $1,088,350,535 |
| 1890... | $220,544,064 | 1913... | $1,306,536,692 | 1936... | $1,105,517,854 |
| 1891... | $231,405,296 | 1914... | $1,309,559,205 | 1936... | $1,111,561,006 |
| 1892... | $236,884,449 | 1915... | $1,249,199,210 | 1938... | $1,102,040,724 |
| 1893... | $238,722,417 | 1916... | $1,211,694,278 | 1939... | $1,114,278,215 |
| 1894... | $208,905,279 | 1917... | $1,305,286,409 | 1940... | $1,112,976,403 |
| 1895... | $202,584,334 | 1918... | $1,422,113,275 | 1941... | $1,126,781,372 |

BLM_0037990

## ASSESSED VALUATION ABSTRACT DATA
## FOR YEARS 1873 THROUGH 2010

| YEAR | ASSESSED VALUATION | YEAR | ASSESSED VALUATION | YEAR | ASSESSED VALUATION |
|---|---|---|---|---|---|
| 1942... | $1,161,901,207 | 1965... | $4,087,548,975 | 1988... | $31,660,569,000 |
| 1943... | $1,193,836,023 | 1966... | $4,235,827,147 | 1989... | $29,132,506,180 |
| 1944... | $1,212,134,905 | 1967... | $4,432,601,753 | 1990... | $29,037,603,790 |
| 1945... | $1,219,234,042 | 1968... | $4,661,229,864 | 1991... | $28,285,335,860 |
| 1946... | $1,260,270,716 | 1969... | $4,908,914,976 | 1992... | $28,490,629,640 |
| 1947... | $1,342,108,659 | 1970... | $5,158,677,660 | 1993... | $28,890,934,470 |
| 1948... | $1,466,547,471 | 1971... | $5,464,256,510 | 1994... | $29,831,046,660 |
| 1949... | $1,592,007,699 | 1972... | $5,984,840,720 | 1995... | $32,470,109,440 |
| 1950... | $1,644,623,238 | 1973... | $6,687,980,620 | 1996... | $33,595,086,130 |
| 1951... | $1,733,575,141 | 1974... | $7,490,101,970 | 1997... | $38,536,664,770 |
| 1952... | $2,470,607,866 | 1975... | $8,435,941,210 | 1998... | $40,167,970,063 |
| 1953... | $2,567,275,641 | 1976... | $10,058,847,560 | 1999... | $46,711,921,473 |
| 1954... | $2,698,816,248 | 1977... | $10,689,629,240 | 2000... | $48,757,383,218 |
| 1955... | $2,870,738,672 | 1978... | $11,586,277,020 | 2001... | $58,812,663,875 |
| 1956... | $3,069,112,462 | 1979... | $12,460,543,070 | 2002... | $60,564,946,027 |
| 1957... | $3,150,835,369 | 1980... | $13,717,838,260 | 2003... | $61,949,204,975 |
| 1958... | $3,282,086,098 | 1981... | $14,777,063,510 | 2004... | $64,630,921,990 |
| 1959... | $3,422,957,409 | 1982... | $15,730,457,235 | 2005... | $70,625,603,899 |
| 1960... | $3,582,088,705 | 1983... | $17,185,697,873 | 2006... | $74,549,449,375 |
| 1961... | $3,699,659,623 | 1984... | $17,905,089,540 | 2007... | $85,147,187,463 |
| 1962... | $3,810,384,618 | 1985... | $18,730,103,171 | 2008... | $87,550,006,576 |
| 1963... | $3,924,735,526 | 1986... | $19,215,721,948 | 2009... | $97,784,900,451 |
| 1964... | $3,989,801,312 | 1987... | $33,261,144,000 | 2010... | $92,648,660,822 |

BLM_0037991

# ABSTRACT BY CLASS OF PROPERTY
## (In Dollars)

| CLASS OF PROPERTY | 2009 Assessed Valuation | 2009 Percent of Total | 2010 Assessed Valuation | 2010 Percent of Total |
|---|---|---|---|---|
| Vacant | $6,202,155,769 | 5.36% | $5,942,074,798 | 5.35% |
| Residential | $42,297,938,878 | 36.56% | $42,724,826,559 | 38.47% |
| Commercial | $27,354,184,714 | 23.65% | $27,132,443,419 | 24.43% |
| Industrial | $3,268,774,175 | 2.83% | $3,529,734,298 | 3.18% |
| Agricultural | $874,548,984 | 0.76% | $883,380,213 | 0.80% |
| Natural Resources | $431,952,540 | 0.37% | $409,858,623 | 0.37% |
| Producing Mines | $532,160,826 | 0.46% | $556,282,045 | 0.50% |
| Oil and Gas | $11,858,552,261 | 10.25% | $6,249,483,321 | 5.63% |
| **TOTAL ASSESSED BY COUNTY ASSESSOR** | **$92,820,268,147** | **80.24%** | **$87,428,083,276** | **78.73%** |
| State Assessed | $4,964,632,304 | 4.29% | $5,220,577,546 | 4.70% |
| **TOTAL TAXABLE PROPERTY** | **$97,784,900,451** | **84.53%** | **$92,648,660,822** | **83.43%** |
| Exempt | $17,897,727,469 | 15.47% | $18,397,953,348 | 16.57% |
| **TOTAL ASSESSED VALUATION** | **$115,682,627,920** | **100.00%** | **$111,046,614,170** | **100.00%** |

BLM_0037992

# ABSTRACT DATA BY TYPE OF PROPERTY

## 2010

| Type/Class | Land Dollars | Land Percent | Improvements Dollars | Improvements Percent | Personal Property Dollars | Personal Property Percent | Total Dollars | Total Percent |
|---|---|---|---|---|---|---|---|---|
| Vacant | $5,925,394,180 | 5.34% | $16,680,618 | 0.02% | $0 | 0.00% | $5,942,074,798 | 5.35% |
| Residential | $11,536,504,393 | 10.39% | $31,188,322,166 | 28.09% | $0 | 0.00% | $42,724,826,559 | 38.47% |
| Commercial | $7,185,239,150 | 6.47% | $16,442,614,702 | 14.81% | $3,504,589,567 | 3.16% | $27,132,443,419 | 24.43% |
| Industrial | $442,846,876 | 0.40% | $1,326,694,900 | 1.19% | $1,760,192,522 | 1.59% | $3,529,734,298 | 3.18% |
| Agricultural | $544,620,316 | 0.49% | $329,917,558 | 0.30% | $8,842,339 | 0.01% | $883,380,213 | 0.80% |
| Natural Resources | $192,173,225 | 0.17% | $22,952,634 | 0.02% | $194,732,764 | 0.18% | $409,858,623 | 0.37% |
| Producing Mines | $430,396,370 | 0.39% | $28,308,334 | 0.03% | $97,577,341 | 0.09% | $556,282,045 | 0.50% |
| Oil and Gas | $4,665,430,866 | 4.20% | $7,279,730 | 0.01% | $1,576,772,725 | 1.42% | $6,249,483,321 | 5.63% |
| **TOTAL ASSESSED BY COUNTY ASSESSORS** | **$30,922,605,376** | **27.85%** | **$49,362,770,642** | **44.45%** | **$7,142,707,258** | **6.43%** | **$87,428,083,276** | **78.73%** |
| State Assessed* | $574,361,636 | 0.52% | $0 | 0.00% | $4,646,215,910 | 4.18% | $5,220,577,546 | 4.70% |
| **TOTAL TAXABLE PROPERTY** | **$31,496,967,012** | **28.37%** | **$49,362,770,642** | **44.45%** | **$11,788,923,168** | **10.61%** | **$92,648,660,822** | **83.43%** |
| Exempt Properties | $9,364,474,779 | 8.43% | $9,033,478,569 | 8.13% | $0 | 0.00% | $18,397,953,348 | 16.57% |
| **TOTAL OF ABSTRACT** | **$40,861,441,791** | **36.80%** | **$58,396,249,211** | **52.58%** | **$11,788,923,168** | **10.61%** | **$111,046,614,170** | **100.00%** |

*It is not possible to break out land value.  All value is shown as improvements

BLM_0037993

BLM_0037994